———————————————————————

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

———————————————————————

Case No. 25-2086

**STANDING TREES, INC.,**

Plaintiff - Appellant,

v.

**US FOREST SERVICE; DEREK IBARGUEN**, in the official capacity as Supervisor of the White Mountain National Forest**; BROOKE BROWN**, in the official capacity as District Ranger for the Pemigewasset Ranger District**; JOSHUA SJOSTROM**, in the official capacity as District Ranger for the Androscoggin Ranger District**,**

Defendants - Appellees.

———————————————————————

On Appeal from the United States District Court for the District of New Hampshire
Judge Joseph Laplante, Case No. 1:24-cv-138-JL-TSM

———————————————————————

## PLAINTIFF-APPELLANT'S REPLY BRIEF

———————————————————————

Christophe Courchesne, Associate Professor and Director
Rachel Westrate, Fellow
ENVIRONMENTAL ADVOCACY CLINIC
Vermont Law and Graduate School
P.O. Box 96, 164 Chelsea St.
South Royalton, VT 05068
(802) 831-1630
ccourchesne@vermontlaw.edu
*Counsel for Plaintiff-Appellant Standing Trees, Inc.*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...................................................................... iii

INTRODUCTION ..................................................................................1

ARGUMENT ........................................................................................2

    I.      The Service's Flawed Forest Health Analyses Violated NFMA and NEPA. ........................................................................................2

          A.      The Service's Substantive Defenses Are Without Merit.............3

          B.      Standing Trees Preserved Its NFMA Arguments......................10

    II.     With an Inadequate Environmental Review, the Service Violated Plan Provisions Protecting Scenic Resources, Wild and Scenic Rivers, and Endangered Species...............................................11

    III.    The Service's Environmental Assessments Violated NEPA. ..............15

          A.      The Service's Consideration of Alternatives Violated Its Own Regulations and NEPA....................................................16

          B.      The Service's Water Quality Analysis Lacks Any Site-Specific Baselines. ....................................................................21

          C.      The Service Failed to Consider Cumulative Impacts, Including Carbon Emissions....................................................22

    IV.    The Service's Errors Undermined the FONSIs, Were Not Harmless, and Warrant Vacatur of the Project Approvals...................25

CONCLUSION....................................................................................27

CERTIFICATE OF COMPLIANCE .......................................................29

CERTIFICATE OF SERVICE ...............................................................30

ii

# TABLE OF AUTHORITIES

## Cases

*All. for the Wild Rockies v. Forest Serv.*,
 907 F.3d 1105 (9th Cir. 2018)........................................................ 3, 8, 9, 12

*All. for the Wild Rockies v. Mulholland*,
 No. CV 25-5-M-KLD, 2026 WL 892385 (D. Mont. Mar. 31, 2026), *appeal docketed*, No. 26-3563 (9th Cir. Jun. 2, 2026) ...................................... 16, 23

*Bark v. Forest Serv.*,
 958 F.3d 865 (9th Cir. 2020)................................................................22

*Bob Marshall Alliance v. Hodel*,
 852 F.2d 1223 (9th Cir. 1988) ..........................................................18

*Bowen v. Georgetown Univ. Hosp.*,
 488 U.S. 204 (1988).............................................................................6

*Cascadia Wildlands v. Adcock*,
 No. 6:22-CV-00767-AA, 2026 WL 800702 (D. Or. Mar. 23, 2026).............16

*Cascadia Wildlands v. Bureau of Land Mgmt.*,
 No. 6:24-CV-01641-MTK, 2026 WL 1346855 (D. Or. May 14, 2026)..........3

*Ctr. for Biological Diversity v. FERC*,
 67 F.4th 1176 (D.C. Cir. 2023) ........................................................20

*Ctr. for Biological Diversity v. Forest Serv.*,
 687 F. Supp. 3d 1053 (D. Mont. 2023), *aff'd in part, rev'd in part on other grounds, and remanded* 2025 WL 586358
 (9th Cir. Feb. 24, 2025)......................................................................24

*Diné Citizens Against Ruining Our Env't v. Haaland*,
 59 F.4th 1016 (10th Cir. 2023)...........................................................25

*Dubois v. USDA*,
 102 F.3d 1273 (1st Cir. 1996) ........................................................ 2, 17, 19

*Envtl. Prot. Info. Ctr. v. Forest Serv.*,
 234 F. App'x 440 (9th Cir. 2007)......................................................18

*Friends of the Inyo v. Forest Serv.*,
 103 F.4th 543 (9th Cir. 2024)............................................................26

*Great Basin Res. Watch v. Bureau of Land Mgmt.*,
 844 F.3d 1095 (9th Cir. 2016)............................................................21

*Holsum de Puerto Rico, Inc. v. ITW Food Equip. Grp. LLC,*
    116 F.4th 59 (1st Cir. 2024) ......................................................................11

*In re Fin. Oversight and Mgmt. Bd. for P.R.,*
    37 F.4th 746 (1st Cir. 2022) .......................................................................9

*Kleppe v. Sierra Club,*
    427 U.S. 390 (1976).................................................................................23

*Lands Council v. Powell,*
    395 F.3d 1019 (9th Cir. 2005)..................................................................26

*Lorenzo v. SEC,*
    587 U.S. 71 (2019)...................................................................................10

*McDonnell Douglas Corp. v. Dep't of the Air Force,*
    375 F.3d 1182 (D.C. Cir. 2004) .................................................................4

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)................................................................................4, 9

*N. Plains Res. Council v. Surface Transp. Bd.,*
    668 F.3d 1067 (9th Cir. 2011)...............................................................5, 14

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.,*
    606 F.3d 1058 (9th Cir. 2010)...................................................................6

*Native Ecosystems Council v. Forest Serv.,*
    418 F.3d 953 (9th Cir. 2005)................................................................3, 11

*Native Ecosystems Council v. Lannom,*
    598 F. Supp. 3d 957 (D. Mont. 2022), *amended* 2022 WL 2309011
    (D. Mont. Apr. 25, 2022) ...........................................................................9

*Neighbors of Cuddy Mountain v. Forest Serv.,*
    137 F.3d 1372 (9th Cir. 1998)...............................................................8, 22

*NLRB v. Beverly Enters.-Mass.,*
    174 F.3d 13 (1st Cir. 1999) ........................................................................6

*Ocean Advocates v. Army Corps of Eng'rs,*
    402 F.3d 846 (9th Cir. 2005)....................................................................19

*Or. Natural Desert Ass'n v. Bureau of Land Mgmt.,*
    625 F.3d 1092 (9th Cir. 2010)..................................................................20

*Or. Natural Desert Ass'n v. Jewell,* 840 F.3d 562
    (9th Cir. 2016)........................................................................ 6, 14, 21, 27

*Pub. Employees for Envtl. Resp. v. Fish & Wildlife Serv.*,
177 F. Supp. 3d 146 (D.D.C. 2016) ................................................................19

*Seattle Audubon Soc'y v. Espy*,
998 F.2d 699 (9th Cir. 1993) ..........................................................................25

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947)..........................................................................................9

*Seven County Infrastructure Coal. v. Eagle County*,
605 U.S. 168 (2025)............................................................... 2, 15, 16, 23

*Sierra Club v. Wagner*,
555 F.3d 21 (1st Cir. 2009) ............................................... 10, 25, 26

*The Humane Soc. of U.S. v. Dep't of Com.*,
432 F. Supp. 2d 4  (D.D.C. 2006) ..................................................................13

*United States v. Coal. for Buzzards Bay*,
644 F.3d 26 (1st Cir. 2011) ............................................................................17

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019) .....................................................................27

*W. Watersheds Project v. Bernhardt*,
392 F. Supp. 3d 1225 (D. Or. 2019) ................................................................4

## Statutes

16 U.S.C. § 1604(f)(5)(A)...............................................................................15

42 U.S.C. § 4332(H) ......................................................................................17

5 U.S.C. § 706(2) ..........................................................................................27

## Regulations

36 C.F.R. § 220.7(b)(2) (2008) .....................................................................18

40 C.F.R. § 1508.27(b)(7) .............................................................................13

## Other Authorities

88 Fed. Reg. 1196 (Jan. 9, 2023) ..................................................................24

**INTRODUCTION**

"Deference" does not license agencies to do less than the bare minimum that federal law requires. This is especially true where an agency flouts its charge under the governing statute to make balanced choices among many options and to deliberate on those choices through a meaningful public process built on current, relevant, and decipherable information. When a federal agency action departs from reasoned explanation and decision-making by failing to show how the agency is meeting its statutory mandates and by sidestepping requirements of its own governing regulations and policies, that action is unlawful and warrants vacatur under the Administrative Procedure Act (APA).

That is the case here. Before the Court are Appellant Standing Trees' challenges to the U.S. Forest Service's (Service) unreasoned approvals of two substantial logging projects now underway in the White Mountain National Forest (Forest)—the Peabody West and Tarleton Integrated Resource Projects. As explained in Standing Trees' opening brief (Appellant's-Br.), these Projects violate the National Forest Management Act (NFMA), the National Environmental Policy Act (NEPA), and the APA.

The Service's defenses of its unlawful actions in its answering brief (Appellees'-Br.) variously mischaracterize Standing Trees' arguments before the agency and the District Court, present reasoning that is nowhere evident in the

1

administrative record, and repeatedly retreat to the supposed trump card of deference under *Seven County Infrastructure Coal. v. Eagle County*, 605 U.S. 168 (2025) (*Seven County*). The Court should reject the Service's evasions, reverse the district court, and order vacatur of the Service's approvals of the Projects.

## ARGUMENT

**I.    The Service's Flawed Forest Health Analyses Violated NFMA and NEPA.**

As the Service acknowledges, the Projects must comply with the Forest Plan (Plan) to comply with NFMA, and the Service must provide satisfactory explanations for the Projects' adherence to Plan requirements under the APA.  *See* Appellees'-Br. 4, 18, 19; *Dubois v. USDA*, 102 F.3d 1273, 1284–86 (1st Cir. 1996) (agencies must "articulate[] a rational connection between the facts found and the choice made" such that "the decision makes sense" (citations and quotations omitted)). The Service did not do so here. The EAs do not offer a reasoned explanation sufficient to show that the Service was doing what it now says it is doing, Appellees'-Br. 22, 27: avoiding logging in old growth forest and stands with old forest habitat. In fact, the Tarleton EA does not even mention the issue. JA0885 (Peabody EA); JA1488 (Tarleton objection response as to old growth); JA0862 (Peabody response to EA comments, as to stands with old forest habitat); *see also, e.g.*, *Cascadia Wildlands v. Bureau of Land Mgmt.*, No. 6:24-CV-01641-MTK,

2

2026 WL 1346855, at \*11 (D. Or. May 14, 2026) (agency failed to support assertions of compliance with required protection of old growth forests). These actions violate NFMA and also NEPA. *See All. for the Wild Rockies v. Forest Serv.*, 907 F.3d 1105, 1116–17 (9th Cir. 2018); *Native Ecosystems Council v. Forest Serv.*, 418 F.3d 953, 965 (9th Cir. 2005).

A.    The Service's Substantive Defenses Are Without Merit.

The Plan forbids logging in "old growth forest" and "stands containing old forest habitat." Appellant's-Br. 16–18, the Plan's Rare and Unique Features Standard S-3 states that "[t]imber harvest is prohibited in old growth forest," JA0694, and the Plan also states "no harvest will occur in stands identified to provide old forest habitat," JA0733, a habitat category in one of the Plan's wildlife objectives, JA0679, which the Service says these Projects will help achieve. JA1487–1488. The Service defends the Projects' compliance with these provisions with two principal arguments, neither with merit.

**1.** The Service relies on the conclusory assertions in the record that the Projects do not include logging in old growth forest or old forest habitat, Appellees'-Br. 22, 27, which are not supported by the Service's record citations. The Service cites its responses to comments and objections and Habitat Management Unit Rationale documents, but none identify old growth forest or old forest habitat conditions or locations in the management units, nor do they purport

3

to do so. JA0876; JA0885; JA1673–1685; JA1488; JA1382–1394. In essence, to show compliance with the keystone Forest Plan standard that protects exceedingly rare old growth forest, the Service cites its own assurances that its Projects do not affect that resource—without any supporting analysis showing where those resources are situated in relation to Project activities. *See McDonnell Douglas Corp. v. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004) (courts should "not defer to the agency's conclusory or unsupported suppositions") (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *W. Watersheds Project v. Bernhardt*, 392 F. Supp. 3d 1225, 1251 (D. Or. 2019) (no deference to "conclusory opinion that is unsupported by meaningful analysis").

Then the Service string-cites a pile of field surveys and tables in the record. Appellees'-Br. 29–30.[1] But the Service's citations do not add up. For example, at Peabody, the Service cites its own objection response, JA0990–0991, which in turn

---

[1] For Peabody, the Service cites JA1060–1097, which are surveys for "stands of interest" in only two "compartments," and JA1167–1170, a supposed list of "stands selected for harvest" with several stands in another compartment but also several stands flagged as "old" and "old growth." For Tarleton, the Service cites JA1603–1616, showing field notes from harvest units in stands with years-of-origin dating to the 1800s and early 1900s; JA1458–1468, spreadsheets with data for many more stands in the management unit that do not differentiate between mature and old forest habitat (or age-class); and JA1212–1221, isolated stand age data without reference to habitat.

cites a tracking spreadsheet that dates to 2019 and lacks any analysis of old growth forest or old forest habitat conditions. In fact, in that response, the Service acknowledged Standing Trees' objection and directed itself to address the confusion in the record about the Project's impacts on old forest habitat. *Id.*[2] There is no evidence in the record that it did so. And at Tarleton, there is nothing in the Service's citations to explain why using raw stand "year-of-origin" data is sufficient to rule out old growth forest, let alone old forest habitat. Indeed, some of Tarleton's targeted stands date to the 19th century and early 1900s, indicating the likely presence of old forest habitat. These documents lack any compilation or maps of stand data and conditions that justify the Service's assurances of no-impact and compliance with the Plan. Standing Trees has repeatedly asked the Service to provide this information, but the Service has never done so. JA0816–0817; JA1003–1005; JA1359–1361; JA1506, 1539.[3]

---

[2] JA0991 ("Statements that old-forest habitat will not be harvested in the Peabody West project may be inconsistent with the HMU rationale document … Instruction: Address the potential inconsistency between Forest Plan Appendix D and the HMU rationale document regarding 'old' forest, as defined by age, and 'old-forest habitat' as defined by structural attributes").

[3] The Service and the District Court fault Standing Trees for its unrewarded efforts to secure the underlying stand data during the public processes for both Projects, Appellees'-Br. 32; Add.-34, ignoring that Standing Trees sought and never actually obtained meaningful *public* disclosure of comprehensible stand-age information, which is the Service's core NEPA obligation. *See N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2011) (NEPA aims "to guarantee relevant information is available to the public").

The Service's self-serving characterization in briefing of its own garbled administrative record, which the District Court wrongly accepted, cannot substitute for true record support. *Or. Natural Desert Ass'n v. Jewell*, 840 F.3d 562, 571 (9th Cir. 2016) (finding agency analysis arbitrary and capricious when lacking "reasonable assessment" supporting agency assurances); *see also NLRB v. Beverly Enters.-Mass.*, 174 F.3d 13, 24 (1st Cir. 1999) (APA requires courts to "undertake 'a thorough, probing, in-depth review' and a 'searching and careful' inquiry into the [administrative] record" (citation omitted)); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212-13 (1988) (no deference for "agency's convenient litigating position").[4]

The Service also celebrates the supposed steps it says it took to avoid logging in old growth forest. When probed, these fall apart. To support its conclusion that it avoided logging in old growth forest at Tarleton, the Service can only point to raw data in a spreadsheet, requiring the public to "put the pieces together." *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1073 (9th Cir. 2010) (record requiring public to "put [] pieces together" insufficient under NEPA). For Peabody, the Service relies on a single email

---

[4] And, arbitrarily, the Service appears to employ one methodology for assessing forest conditions in one project (in part), but no discernable methodology for the other, *without ever explaining why*. *See* Appellant's-Br. 19 (noting use of Late Successional Index for analyzing forest conditions for some stands at Peabody, but not at Tarleton).

summarizing its steps, without any connection or reference to any underlying data or analysis that would support either assertion. Appellees'-Br. 29 (citing JA0802–0804). This is not reasoned decision-making under the APA.

As to old forest habitat, the Service has no answer to its lack of record support for its assertions. There is no direct evidence in the record that the Service looked for old forest habitat or excluded it from treatment units, and the Service does not cite anything to show otherwise. Appellees'-Br. 27 (citing conclusory statements in EA and Service response to comments for Peabody, JA0862, JA0876, and nothing for Tarleton).[5] In response to Standing Trees' illustrative example of how the Service has failed to ensure that stands along the West Branch of the Peabody River at Peabody do not contain old forest habitat, the Service falls back on the same spreadsheet that it presented to the District Court, which lacks any supporting evidence that the Service looked for or excluded old forest habitat. JA1169–1170. Yet, Standing Trees showed that the timber harvest unit boundaries

---

[5] In fact, the Service's objection response for Peabody directly admits that the Project will affect hundreds of acres of "old forest age class" areas, indicating that a deeper analysis of those areas would be crucial to rule out the presence of old forest habitat. JA0991 ("Eight proposed units with a total acreage of 524 acres overlap with stands that exceed the year of origin definitions for mature forests in the HMU rationale document."). Below, the Service (JA0270) cited to the District Court its objection response for Tarleton as support for the Project's lack of harvest in stands with old forest habitat, JA1488; the citation does not even include a conclusory assertion to that effect.

depicted in the EA encompass certain stands containing old growth forest and old forest habitat, based on maps in the record that were not published for public review. *See* Appellant's-Br. 24–25. In the end, the Service cannot comply with the Plan prohibition of logging in stands with old forest habitat because the Service provides no evidence that it looked for old forest habitat in either Project. Such a complete lack of reasoned explanation violates NMFA and the APA. *See All. for the Wild Rockies*, 907 F.3d at 1116–17 (Service's disregard of forest plan-defined "old forest" in environmental review contrary to NFMA); *Neighbors of Cuddy Mountain v. Forest Serv.*, 137 F.3d 1372, 1377–78 (9th Cir. 1998) (Service's lack of information about old growth forest within species home-range violated NFMA).

**2.** Without direct record evidence for its assertions that the Projects do not affect stands with old forest habitat, the Service advances an argument for the first time that the Plan "properly understood" does not actually prohibit logging in stands with old forest habitat, as the plain language of the Plan provides, because the prohibition appears in the Plan's definition of old forest habitat. Appellees'-Br. 22–26. Yet, in its most recent statement in the record, the Service acknowledged that the Plan *does* prohibit logging in these areas. *See* JA0991 (Peabody objection response stating that "Forest Plan *direction* for old forest habitat management" is that "'No harvest will occur in stands identified to provide old forest habitat' (see

8

Forest Plan glossary, p. 21 for definition)" (emphasis added)). The Court cannot consider the Service's counsel's new *post hoc* interpretation of the Plan, which counsel also did not raise in the District Court. *In re Fin. Oversight and Mgmt. Bd. for P.R.*, 37 F.4th 746, 761 (1st Cir. 2022) ("agency must stand by the reasons it provided at the time of its decision and cannot rely on post-hoc rationalizations developed and presented during litigation" (citation omitted)); *State Farm*, 463 U.S. at 43 (citing *SEC v. Chenery Corp.,* 332 U.S. 194, 196 (1947)) (review cannot consider rationale that "the agency itself has not given"). *See also All. for the Wild Rockies*, 907 F.3d at 1116–17 (rejecting Service's use of new, less inclusive "old forest habitat" definition in lieu of "old forest" definition in forest plan).

Moreover, the Service's new interpretation is wrong. The Plan unambiguously requires the Service to assess the presence of "old forest habitat." JA0679. And the Plan's "old forest habitat" logging prohibition is clear, found within a highly-substantive set of definitions also addressing "old growth forest." JA0733. The Plan's definitions must be given binding effect for the Plan's standards, guidelines, and objectives to make sense. The Service now seeks to change the rules and rewrite these Plan provisions to effectively delete the plain language. *See Native Ecosystems Council v. Lannom*, 598 F. Supp. 3d 957, 975 (D. Mont. 2022), *amended* 2022 WL 2309011 (D. Mont. Apr. 25, 2022) (enforcing "plain language" of forest plan).

9

Substantively, the Plan prohibits logging in old-growth forest and in stands with old forest habitat. Contrary to the Service's strained reading, that there is a Plan standard prohibiting logging in old growth forest does not preclude the Plan's inclusion of a broader prohibition to protect important habitat conditions that are nearing the definition of old growth forest. *Cf. Lorenzo v. SEC*, 587 U.S. 71, 80 (2019) ("no warrant for narrowing alternative provisions ... adopted with the purpose of affording added safeguards" (citations omitted)). The Court should not countenance this interpretive end-run around the Plan's clear language. As with the prohibition of logging in old growth forest, the Service failed to show compliance with the Plan's prohibition of logging in stands with old forest habitat, in violation of NFMA and the APA. Given the importance of logging's environmental impacts on the Forest, these failures also violated NEPA's "hard look" requirement. *See* Appellant's-Br. 16–17.

B.    <u>Standing Trees Preserved Its NFMA Arguments.</u>

The Service is wrong that Standing Trees forfeited its NFMA argument here by "fail[ing] to develop it below." Appellees'-Br. 21. This is not a case where the appellant crafted a wholly "new legal theory" on appeal, as in *Sierra Club v. Wagner*, 555 F.3d 21, 26 (1st Cir. 2009). To the contrary, Standing Trees presented its argument that the Service violated NFMA by failing to demonstrate compliance with the Plan's forest health provisions in its complaint, JA0033, 0049, and

10

summary judgment briefing, JA0217–0220, 0225, 0312–0314, 0323, and at length at oral argument, *e.g.*, JA0383–0390. Although ordered differently here, Standing Trees' arguments below—as part of *both* its NEPA and NFMA arguments—squarely focused on the failure of the Service's analysis to address the compliance of the Projects with the Plan's forest health provisions, which the district court did consider, Appellant's-Br. Add.-31–34. That is the same argument before this Court. *See Holsum de Puerto Rico, Inc. v. ITW Food Equip. Grp. LLC*, 116 F.4th 59, 66 (1st Cir. 2024) (no waiver where "district court addressed the argument"). Indeed, it is telling that the Service's responses to Standing Trees' NFMA arguments repeatedly cite the District Court. Appellees'-Br. 28–29. There was no forfeiture.[6]

## II. With an Inadequate Environmental Review, the Service Violated Plan Provisions Protecting Scenic Resources, Wild and Scenic Rivers, and Endangered Species.

Similarly, the Service ignored the Forest Plan's requirements for scenic analysis, protecting waterways eligible for designation as Wild and Scenic Rivers, and preserving endangered species habitat, *see* Appellant's-Br. 28–32, and failed to take the "hard look" at impacts to these resources that NEPA requires, *id.* at 50–53.

---

[6] The Court's *de novo* standard of review forecloses the Service's cursory suggestion (Appellees'-Br. 20 n.4) that Standing Trees waived its arguments for scrutiny of the Service's interpretations of the Plan. *See* Appellant's Br. 30, citing *Native Ecosystems Council*, 418 F.3d at 962 ("[a]n agency's position that is contrary to the clear language of a Forest Plan is not entitled to deference"). Moreover, as discussed above, given the Service's shifting interpretations of the Plan's requirements, it is not clear to what the Court would defer.

***Scenery.*** As to the scenery violations identified at Peabody, a project that sits in the shadow of the iconic northern Presidential Range and the Appalachian Trail, the Service justifies deviating from the Plan's guidelines limiting the size of visible forest openings with a single conclusory assertion: to the Service, logging every last harvest unit in the Project "take[s] precedence" over scenic impacts that violate the Plan's scenic guidelines. Appellees'-Br. 33–35; JA0987–0988. Why? Because it says so. In theory, the Service could say the same thing about any aspect of any logging project, nullifying the Plan's scenic guidelines and obligation to justify deviations. *See All. for the Wild Rockies*, 907 F.3d at 1114 ("agency's explanation [for deviation] is, in effect, no explanation at all").

With regard to violations of the Plan's guideline directing openings appear as "natural disturbances" and be "well-distributed," the Service cites only to the simulation photos in the record with counsel's unsupported opinion that the openings appear natural and consistent with large natural disturbances. Appellees'-Br. 34–35. To justify the deviations from the guideline, the Service then contends that it had no other options that would achieve the *overall* Project objectives. *Id.* at 34. Not so. The Service admits it reduced scenic impacts through other changes to treatments during development of the Project, Appellees'-Br. 33, but does not explain why it could not do so here. The Project's deviations from the Plan guidelines thus are not reasoned or reasonably explained, as NFMA requires. Thus,

12

the Service has not met its obligations to show Plan compliance with regard to scenic protection.

***Wild and Scenic Rivers***. Likewise, the Service has no credible explanation for how the Peabody's planned even-aged treatments (i.e., clearcuts) comply with the Plan's standard requiring that the Service maintain the eligibility of adjacent waterways for potential Wild and Scenic designation. JA0713. Indeed, the Service effectively concedes that the Project will violate the Plan standard when it admits that the Project will harm the river segments' eligibility for Congressional designation, for an unspecified duration and to an unspecified extent. Appellant's-Br. 37. Indeed, the Service's argument—that logging will only temporarily impair the resource values of the eligible rivers, JA0907–08—would mean that no logging could ever violate the Plan's standard. *Cf. The Humane Soc. of U.S. v. Dep't of Com.*, 432 F. Supp. 2d 4, 21 (D.D.C. 2006) ("[s]ignificance cannot be avoided by terming an action temporary" (quoting 40 C.F.R. § 1508.27(b)(7)). As with scenery, it appears the Service has given itself a blank check to violate the Plan requirements, in violation of NFMA, based on a conclusory analysis of impacts that also violated NEPA.

***Northern Long-Eared Bat.*** The Plan requires the Service to contribute to the conservation of endangered species, JA0667, and "investigate[]" "all project *sites*" "for the presence of [threatened and endangered] species and/or habitat,"

13

JA0694 (emphasis added). And in the case of the northern long-eared bat, the U.S. Fish and Wildlife Service counsels in favor of site-specific surveys before undertaking logging projects. JA0644. Yet the Service did not look for bat presence or habitat in either Project area, instead citing biological "evaluations" without site-specific analysis and referencing historic site visits to only one of the Project areas, Tarleton, by a state agency in 2019. Appellees'-Br. 38. This omission also violated NEPA's "hard look" requirement because it meant that the Service had nothing like adequate baselines for assessing potential impacts of the Projects on bats. *N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2011) (agency violated NEPA by not conducting surveys for sage grouse and other wildlife because "[t]he problem …. is that the [agency] did not collect this data in the first place, and was therefore unable to consider it during the [NEPA] process").

The Service then contorts the "investigate" requirement of the Plan, arguing that the Plan's adjacent mandate for plant surveys absolves it of obligations to conduct investigations of *all* "sites" for endangered wildlife. Appellees'-Br. 39. This illogical interpretation belies both the Plan's purposes and NFMA's design— site-specific investigations were required to inform the location and components of the Service's proposed activities. *Or. Natural Desert Ass'n*, 840 F.3d at 569

14

(agency had "duty to assess, in some reasonable way, the actual baseline conditions at the [] site").

To defend itself under NFMA and NEPA, the Service also contends that it "conservatively" assumed the bat was present. Appellees'-Br. 38, 55. But the Service did not alter the Projects in any way to accommodate bat presence. It actually authorized harvest activities at Peabody during the bat's active season, in areas where the bat was presumed to be present. JA0599–0602, 0914–0915. As to the bat, the Service violated the Plan's requirements and failed to support its decision with reasoned decision-making in violation of NFMA, NEPA, and the APA.

## III.    The Service's Environmental Assessments Violated NEPA.

A thorough, legally-compliant NEPA review is especially important for Projects like these, which are tiered to a two-decades-old Forest-wide EIS, which now exceeds NFMA's planning horizon, 16 U.S.C. § 1604(f)(5)(A), and which postponed site-specific analysis of environmental impacts for future NEPA processes. Instead, the Service's arguments for affirmance seek to strip meaning and transparency from its NEPA review process. The Service's defense of its NEPA review heavily depends on its reading of the Supreme Court's recent decision in *Seven County* to mean that NEPA's "hard look" requirement no longer applies to

15

EAs. But *Seven County* did not address an EA at all and left NEPA's "hard look" requirement intact.[7]

This case is also distinguishable from *Seven County* in two ways. First, here, unlike in *Seven County,* the Service failed to include analysis of reasonable alternatives to the Projects in the EAs, including reasonable alternatives proposed by Standing Trees. Second, the Service's cursory assessment of the Projects' impacts on water quality and of the Projects' cumulative impacts did not satisfy NEPA's "hard look" requirement, an unchanged statutory imperative. *See, e.g.*, *All. for the Wild Rockies v. Mulholland*, No. CV 25-5-M-KLD, 2026 WL 892385, at *3 (D. Mont. Mar. 31, 2026), *appeal docketed*, No. 26-3563 (9th Cir. Jun. 2, 2026).

A.    The Service's Consideration of Alternatives Violated Its Own Regulations and NEPA.

Through both Projects' environmental reviews, and despite repeated pleas by Standing Trees and other commenters, the Service steadfastly refused to heed NEPA's requirement for agencies to "study, develop, *and describe* appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C.

---

[7] Contrary to the Service's oblique argument, Appellees'-Br. 40–41, an environmental assessment was not before the Supreme Court in *Seven County*. *See, e.g.*, *Cascadia Wildlands v. Adcock*, No. 6:22-CV-00767-AA, 2026 WL 800702, at *4 (D. Or. Mar. 23, 2026) ("no indication that *Seven County* removed the requirement for an agency to provide a convincing statement of reasons to support its no-significant-impact finding").

§ 4332(H) (emphasis added). Because analysis of alternatives is "the heart" of NEPA review, *see Dubois*, 102 F.3d at 1286 (citations omitted), the Service's approach to that analysis for these two Projects violated NEPA. The deference afforded under *Seven County* for agency choices—to define, scope, and pick among reasonable alternatives, 605 U.S. at 181–82, has no purchase when the agency, as here, does not publicly "describe" alternatives. 42 U.S.C. § 4332(H).

This Court should accept neither the Service's cramped and meaningless understanding of what NEPA requires nor its erroneous reading of its regulations. What the Service did here was the antithesis of what NEPA requires—designing and iterating on virtually all Project components outside public view without full vetting of alternative courses of action. Appellant's-Br. 40–42. This left the public process with little effect other than to rubber-stamp the agency's choices. *See United States v. Coal. for Buzzards Bay*, 644 F.3d 26, 38 (1st Cir. 2011) ("NEPA framework is designed in part to stimulate public participation"); *Dubois*, 102 F.3d at 1290–91.

The Service concedes that, under NEPA, it was obligated to consider reasonable alternatives to the Projects. Appellees'-Br. 18, 41–42, 46. However, irrationally and without a reasoned basis in the record, it says there are in fact *no* reasonable alternatives warranting detailed analysis, despite its independent obligation to develop them. *Dubois*, 102 F.3d at 1291 ("NEPA requires the agency

17

to try on its own to develop alternatives that will 'mitigate the adverse environmental consequences'" of proposal, and "agency must *on its own initiative* study all alternatives that appear reasonable and appropriate..." (citation omitted)); *Envtl. Prot. Info. Ctr. v. Forest Serv.*, 234 F. App'x 440, 443–44 (9th Cir. 2007) (requiring Service to develop action alternatives for logging project). This stance is wholly inconsistent with its pre-EA planning behavior, Appellant's-Br. 40–42, rendering its decision not to develop any alternatives arbitrary and capricious.

Instead, the Service says that its barebones paragraphs in the EAs, the "Consequences of No Action," presenting only downsides and none of the many benefits, functionally constitutes an alternative that sanctifies its NEPA analysis. Appellees'-Br. 43–45; JA0902, JA1298. Because there are unresolved conflicts in resource use, skeletally presenting no "action alternatives" is an unlawful approach under the plain language of the Service's regulations. *See* 36 C.F.R. § 220.7(b)(2) (2008) (EA shall describe "alternative(s) *that meet the need for action*" (emphasis added)). Neither is it the "[i]nformed and meaningful" no-action alternative that NEPA requires, *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988), especially in light of its utter dereliction of the Service's obligation to weigh the real ecological benefits of no-action, which Standing Trees, among others, presented. *See* Appellant's-Br. 44–45.

18

And the Court should reject the Service's half-hearted attempt to distinguish *Dubois* here—the case is still binding law and, although focused on an EIS, one of the few in this Circuit to address the Forest Service's NEPA obligations and NEPA's alternatives analysis requirement in that context. It also is apt where, as here, the agency did not engage in reasoned rejections of commenters' alternatives. *Dubois*, 102 F.3d at 1288–89. In this regard, the Service has no response to Standing Trees' argument, Appellant's-Br. 38–40, that its rejection of Standing Trees' alternatives was unreasonably premised on the fatally circular rationale that they would not achieve the specific goals of the Projects. Indeed, a reasonable alternative need only advance the purpose and need for the Projects, i.e., "advancing" Plan "goals, objectives, and desired conditions for vegetation, wildlife, and other resources." JA0882, JA1295.

Contrary to the Service's argument and the nonbinding case the Service cites, a challenged EA merits careful scrutiny—an EA/FONSI with fundamental flaws, as here, forecloses the deeper NEPA review and public engagement associated with an EIS that would provide more analysis that could merit judicial deference. *Pub. Employees for Envtl. Resp. v. Fish & Wildlife Serv.*, 177 F. Supp. 3d 146, 156 (D.D.C. 2016) (courts "have not hesitated to apply the same general standards [applicable to alternatives analysis in EISs] to their evaluation of EAs"); *Ocean Advocates v. Army Corps of Eng'rs*, 402 F.3d 846, 864 (9th Cir. 2005)

19

(agency needs "'convincing statement of reasons' that explain why the project will impact the environment no more than insignificantly") (citation omitted)).

The Service's approach here effectively reads the alternative analysis requirement out of its regulations. Indeed, the Service defeats the core purpose of the alternatives analysis, which is to "present the environmental impacts of the proposal and the alternatives in *comparative form*, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1182–83 (D.C. Cir. 2023) (emphasis added) (citation omitted). This goal is especially important under NFMA and its multiple-use planning framework. *See Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1109 (9th Cir. 2010) ("statutory objectives underlying the agency's action work significantly to define its analytic obligations," so "considerations made relevant by the substantive statute driving the proposed action must be addressed in NEPA analysis"). Ultimately, the Service's failure to describe any alternatives to the Projects fatally undermines the reasonableness of the NEPA reviews and thus the Service's ultimate FONSIs and decisions to undertake the Projects. The Court should reject the Service's ploys to tear out the "heart" of the NEPA analysis in this way.

20

B.    <u>The Service's Water Quality Analysis Lacks Any Site-Specific Baselines.</u>

The Service's defense of its water quality analysis relies on a series of excuses for its failure to establish site-specific water quality baselines for either Project and a request for deference. Appellees'-Br. 52–54. Neither should persuade the Court.

The Service's water quality analysis rests on a basal removal methodology developed as part of its prior analysis of the Albany South project in the Forest—a crude, threshold-based approach that purports to be a significance measure for water quality impacts. *Id.* at 53. On its merits, this measure is abjectly underinclusive of the potential impacts of the Projects on water resources, both within the Project areas and beyond. *See, e.g.*, JA1021–1023 (Standing Trees Peabody objection); JA1525–1530 (Standing Trees Tarleton objection). And remarkably, at Peabody, the Service concedes the Project's logging will exceed the supposedly-protective threshold in *twelve* watersheds. Appellees'-Br. 54. Despite these exceedances, and disregarding the outstanding water resources in the Project areas, the Service undertook no new analysis, sampling, or other site-specific effort to characterize water quality for either Project. *See* Appellant's-Br. 49.

This conclusory, superficial analysis is barely a look, let alone a "hard look." *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016); *Or. Natural Desert Ass'n*, 840 F.3d at 570 ("extrapolation must be based on

21

accurate information and defensible reasoning"). Without baseline water quality data, a reasoned explanation for the applicability of the Albany South methodology to the Projects, or a plausible rationale for the lack of effects from pervasively exceeding its own threshold, it is impossible for the Service to reach the no-significant-impact conclusions reflected in the EAs.

C.    The Service Failed to Consider Cumulative Impacts, Including Carbon Emissions.

In another instance of conclusory hand-waving, the Service insists its analysis addressed the cumulative impacts of the Projects on the Forest. Appellees'-Br. 56-57. What it means by this is that it asserted in the EAs that, for each resource, there would be no cumulative environmental impacts from the Projects. JA0902–0906 (Peabody); JA1309–1313 (Tarleton). These conclusions are disconnected from any reasonable account of past, present, and reasonably foreseeable actions within the vicinity of the Project areas, the surrounding areas, or the Forest as a whole, or their environmental impacts. *See Bark v. Forest Serv.*, 958 F.3d 865, 872 (9th Cir. 2020) ("cumulative impact analyses [are] insufficient when they discuss[] only the direct effects of the project at issue on a small area and merely contemplate[] other projects but ha[ve] no quantified assessment of their combined impacts") (cleaned up)); *Neighbors of Cuddy Mountain v. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998) (NEPA requires analysis of cumulative effects of reasonably foreseeable timber projects in project vicinity, such as "extent

22

to which the proposed sales would cumulatively impact and reduce old growth habitat").

Pivoting from this deficient analysis, the Service relies on a misreading of *Seven County*, which it seems to claim has ended NEPA's requirement for cumulative impacts analysis encompassing geographically distinct projects. Appellees'-Br. 57. *Seven County* does no such thing. *Seven County*'s limitation on the requirement to consider indirect impacts from projects outside an agency's control or jurisdiction has nothing to do with an agency's obligation to consider together the indirect impacts of *the agency's own projects*, such as those past, present, and reasonably foreseeable projects within the Forest, at the very least. 605 U.S. at 186; *see also Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976). Courts regularly enforce an agency's responsibility to consider the cumulative impacts of its own projects, including after *Seven County*. *See, e.g.*, *All. for the Wild Rockies v. Mulholland*, 2026 WL 892385, at *21 (Service "required to include reasonably foreseeable actions in its effects analysis" and "substantial deference [Service] owed does not alter that conclusion").

Likewise, the Service has not undertaken any effort to understand the Projects' specific carbon impacts, including their net greenhouse gas emissions. Befitting its overall approach to these Projects, the Service generated Project-specific documents entitled "carbon assessments" that do not contain any estimate

23

of the Projects' impacts on carbon emissions or the likely emissions from their timber sales, other than to say they will be "negligible" in comparison with global and domestic emissions. JA1098–1103, 1563–1569.[8] This dismissiveness also contravened the federal government's well-supported contemporaneous direction to agencies (direction the Service ignored here). 88 Fed. Reg. 1196, 1201 (Jan. 9, 2023) (prior federal guidance rejecting comparison to global or domestic emissions as "not a useful basis for deciding whether or to what extent to consider climate change effects under NEPA"). This is not a "hard look." *Ctr. for Biological Diversity v. Forest Serv.*, 687 F. Supp. 3d 1053, 1073 (D. Mont. 2023), *aff'd in part, rev'd in part on other grounds, and remanded* 2025 WL 586358 (9th Cir. Feb. 24, 2025) (Service does not engage in "hard look" by "merely discussing carbon impacts and concluding that they will be minor").[9] And, as Standing Trees has

---

[8] At Tarleton, the Service apparently could not even be bothered to double-check its use of cut-and-paste in replicating a document used for another logging project elsewhere in the Forest. JA1564 ("Wanosha IRP makes an extremely small contribution to overall emissions").

[9] In blessing the Service's approach here, the District Court arbitrarily dismissed this persuasive decision from the Ninth Circuit rejecting another deficient Service analysis, based on an illogical mathematical comparison without technical basis, of the relative project scale. *See Ctr. for Biological Diversity,* 687 F. Supp. 3d at 1076 ("[L]ogging causes immediate carbon losses, while re-sequestration happens slowly over time, time that the planet may not have"). To the contrary, the decision takes seriously the Service's obligations to undertake site-specific analysis of carbon impacts—a particularly acute need here given not only the urgency of climate change but the two decades since the underlying Plan, which in its 207 pages, does not mention "climate change" once, let alone assess the climate-change

24

repeatedly pointed out, the Service's approach is arbitrarily at odds with the state of science.[10] "The impact of [greenhouse gas emissions] on climate change is precisely the kind of [cumulative] impacts analysis that NEPA requires agencies to conduct," *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1035 (10th Cir. 2023) (citation omitted), and the Service did not do so here.

**IV.    The Service's Errors Undermined the FONSIs, Were Not Harmless, and Warrant Vacatur of the Project Approvals.**

The deficiencies of the Service's environmental review and its failures to engage in reasoned decision-making, extensively argued throughout Standing Trees' briefing, give the FONSIs no rational foundation. Appellant's-Br. 57-59. The Service's defense of its FONSIs rests on general statements from *Sierra Club v. Wagner*, 555 F.3d 21 (1st Cir. 2009), the last occasion this Court considered challenges to logging projects in the Forest. *Wagner*, however, receives only modest play in the Service's brief and the District Court decision, and that is

---

impacts of the management choices opening the Project areas to logging. *See* JA0653 *et seq.* (full Plan in record at AR3405–3611).

[10] Standing Trees presented extensive scientific information, at every turn, that mature and old forests like the ones in the Project areas are more important to carbon storage and emissions than the Service's cursory analyses say and that projects with hundreds of acres of intensive logging warrant detailed evaluation in the context of the Service's many other pending logging projects. *E.g.*, JA1005–1010, JA1521–1526. The Service never did such a cumulative analysis and rested on its unchanged pre-proposal assessments, underscoring the arbitrariness of its analysis. *Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 704 (9th Cir. 1993) ("It would not further NEPA's aims for environmental protection to allow the Forest Service to ignore reputable scientific criticisms that have surfaced….").

because it is distinguishable: this Court there was considering much more extensive EAs for smaller projects, which were prepared very shortly in time after the Plan's EIS process and finalization. And the plaintiffs' objections to the EAs in *Wagner* centered on an inapt dispute about the applicable regulatory standard and were otherwise, in the Court's reading, "disagree[ment]" with the Service's conclusions. 555 F.3d at 30. Here, across the resource issues in this appeal—forest health, scenery, endangered bats, alternatives, water quality, cumulative impacts, and carbon effects—the issue before the Court is not Standing Trees' substantive disagreement with the FONSIs, but rather the Service's own failures of reasoning: its derelictions of required analysis, its conclusory assertions, and its threadbare explanations for its choices.

None of the errors are harmless. Under NEPA, errors are not harmless if "they prevented a proper, thorough, and public evaluation of the environmental impact of [a] Project." *Friends of the Inyo v. Forest Serv.*, 103 F.4th 543, 557 (9th Cir. 2024) (quoting *Lands Council v. Powell*, 395 F.3d 1019, 1037 n.25 (9th Cir. 2005)). And here, that was precisely the effect of the Service's unlawful and arbitrary decision-making. A legally compliant review would put on the table meaningful changes to these Projects and provide greater public disclosure of their impacts, and the Service's assertion that fixing the errors here would not change the outcome is no more than speculation. *Friends of the Inyo*, 103 F.4th at 557

26

("conclusions about the environmental impact of [an] under-evaluated project are speculation"); *see also Or. Natural Desert Ass'n*, 840 F.3d at 570–71 (presence of mitigation measures "are not a panacea for inadequate data collection and analysis" and "do not address the concerns relevant to the prejudice analysis: the error's effect on informed decisionmaking and public participation, and on the outcome of the decision").

Under the circumstances, with the seriousness of the errors catalogued in Standing Trees' briefs, and without any argument from the government the public interest requires otherwise, the Court should order vacatur of the challenged approvals. *See, e.g.*, *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("ordinary practice is to vacate unlawful agency action" (citing 5 U.S.C. § 706(2))).

## CONCLUSION

Standing Trees respectfully asks the Court to reverse the District Court and vacate the Service's decision to authorize the Projects.

27

Respectfully submitted,

/s/ Christophe Courchesne

Christophe Courchesne, Associate Professor
and Director
Rachel Westrate, Fellow
ENVIRONMENTAL ADVOCACY CLINIC
Vermont Law and Graduate School
P.O. Box 96
164 Chelsea St.
South Royalton, VT 05068
(802) 831-1630
ccourchesne@vermontlaw.edu

*Counsel for Plaintiff-Appellant Standing
Trees, Inc.*

28

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), the undersigned herby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because:

Exclusive of the portions exempted by Fed. R. App. P. 32(f), the brief contains 6,497 words.

The brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Time New Roman font as provided by Fed. R. App. P. 32(a)(5)-(6).

Dated: June 12, 2026

_/s/ Christophe Courchesne_
Christophe Courchesne

_Counsel for Plaintiff-Appellant_
_Standing Trees, Inc._

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: June 12, 2026                 */s/ Christophe Courchesne*

                          Christophe Courchesne

                          *Counsel for Plaintiff-Appellant*
                          *Standing Trees, Inc.*