**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

Case No. 25-2086

**STANDING TREES, INC.,**
Plaintiff - Appellant,

v.

**US FOREST SERVICE; DEREK IBARGUEN**, in the official capacity as Supervisor of the White Mountain National Forest**; BROOKE BROWN**, in the official capacity as District Ranger for the Pemigewasset Ranger District**;** **JOSHUA SJOSTROM**, in the official capacity as District Ranger for the Androscoggin Ranger District**,**
Defendants - Appellees.

On Appeal from the United States District Court for the District of New Hampshire
Judge Joseph Laplante, Case No. 1:24-cv-138-JL-TSM

**JOINT DEFERRED APPENDIX**

## TABLE OF CONTENTS FOR JOINT APPENDIX OF RECORD EXCERPTS

***Standing Trees, Inc. v. US Forest Service, et al.*, No. 25-2086**

VOLUME I

| **Documents from District Court Record** | **ECF No.** | **JA Page** |
|---|---|---|
| District Court Docket Report | | 0001–0008 |
| Complaint | 1 | 0009–0061 |
| Joint Case Management Plan | 8 | 0062–0071 |
| Notice of Lodging of Administrative Record | 9 | 0072–0073 |
| Declaration of Stacy Lemieux | 9-1 | 0074–0076 |
| Notice of Lodging Additional Administrative Record Documents | 13 | 0077–0078 |
| Declaration of Stacy Lemieux | 13-1 | 0079–0081 |
| Administrative Record Index | 13-2 | 0082–0185 |
| Standing Trees' Motion for Summary Judgment | 14 | 0186–0188 |
| Memorandum in Support of Standing Trees' Motion for Summary Judgment | 14-1 | 0189–0229 |
| Declaration of Zack Porter on Behalf of Standing Trees | 14-2 | 0230–0239 |
| Declaration of Elaine Faletra | 14-4 | 0240–0243 |
| Declaration of Peter Faletra | 14-5 | 0244–0247 |
| Declaration of Eric Jones | 14-6 | 0248–0250 |
| Declaration of Robert Wipfler | 14-11 | 0251–0255 |
| Declaration of Peter Ascher | 14-12 | 0256–0259 |
| Defendants' Memorandum in Support of Cross-Motion for Summary Judgment and Response in Opposition to Plaintiff's Motion For Summary Judgment | 16-1 | 0260–0299 |
| Plaintiff's Reply in Support of Motion For Summary Judgment and Opposition to Defendants' Cross-Motion | 27 | 0300–0325 |
| Exhibit A to Plaintiff's Reply in Support of Motion For Summary Judgment and Opposition to Defendants' Cross-Motion | 27-1 | 0326–0328 |
| Defendants' Reply in Support of Cross-Motion for Summary Judgment | 31 | 0329–0352 |
| Transcript of Recorded Oral Argument on Motions for Summary Judgment | 33 | 0353–0438 |
| Judgment | 38 | 0439 |
| Notice of Appeal | 39 | 0440–0441 |

**TABLE OF CONTENTS FOR JOINT APPENDIX OF RECORD EXCERPTS**

***Standing Trees, Inc. v. US Forest Service, et al.*, No. 25-2086**

VOLUME II

| **Documents from Administrative Record** (authored by U.S. Forest Service unless otherwise specified) | **AR Page** | **JA Page** |
|---|---|---|
| U.S. Fish and Wildlife Service, Endangered and Threatened Wildlife and Plants; Endangered Species Status for Northern Long-Eared Bat, 87 Fed. Reg. 73,488 (Nov. 30, 2022) | 704–720 | 0442–0458 |
| Landscape Aesthetics, A Handbook for Scenery Management (December 1995) (cover page and Appendix H) | 893, 1044–1101 | 0459–0517 |
| Biological Assessment for Ongoing Project Activities with Determinations of No Effect or May Affect, Not Likely To Adversely Affect for the Northern Long-Eared Bat on The Green Mountain National Forest and White Mountain National Forest (Mar. 2, 2015) (excerpts) | 1515, 1556–1557 | 0518–0520 |
| Albany South Integrated Resource Project, Final Environmental Assessment (Dec. 2017) (excerpts) | 2191, 2204, 2229–2256, 2291–2292; 2320; 2330–2353, 2489 | 0521–0578 |
| U.S. First and Wildlife Service, Programmatic Biological Opinion on Final 4(d) Rule for the Northern Long-eared Bat and Activities Excepted from Take Prohibitions (Jan. 5, 2016) (excerpt) | 2828–2833 | 0579–0584 |
| U.S. Fish and Wildlife Service, Species Status Assessment report for the Northern Long-eared bat (Aug. 2022) (excerpts) | 3103, 3128–3129 | 0585–0587 |
| U.S. Fish and Wildlife Service, Cover Letter and Biological Opinion, Effects to the Northern Long-Eared Bat from Planned and Ongoing Activities Being Implemented in the Eastern and Southern Regions of the U.S. Forest Service (March 31, 2023) | 3302–3358 | 0588–0644 |
| Final Environmental Impact Statement for the Land and Resource Management Plan, White Mountain National Forest (2005) (cover page and online pages) | 3404; [2-27; 3-79; 3-85; 3-107 to 3-109; B-18] | 0645–0652 |
| White Mountain National Forest Land and Resource Management Plan (Sept. 2005) (excerpts) | 3405; 3408–3479; 3516; 3523; 3562; 3574; 3578; 3586; 3592; 3595; 3602; 3604–3605 | 0653–0736 |

| | | |
|---|---|---|
| Record of Decision, Final Environmental Impact Statement for the Land and Resource Management Plan, White Mountain National Forest (Sept. 13, 2005) | 3612–3661 | 0737–0786 |
| Newsletter, Peabody West Integrated Resource Project (Dec. 2019) (excerpts) | 4085; 4087; 4089 | 0787–0789 |
| Peabody West Scoping Comment Consideration Spreadsheet (undated) (excerpt) | 4097 | 0790 |
| Peabody West Integrated Resource Project, Scoping Summary Report (Jul. 2021) | 4120–4122 | 0791–0793 |
| Email, Discussion of Hermit Lake Proposal (Oct. 29, 2019) | 4406–4408 | 0794–0796 |
| Email, Peabody Prescription Changes (Stands 88, 89 and 90) (Feb. 8, 2022) | 4509–4510 | 0797–0798 |
| Meeting notes, Peabody West Scenery Management Review (Feb. 15, 2022) | 4511 | 0799 |
| Email, Peabody Prescription Changes (Apr. 21, 2022) | 4513–4514 | 0800–0801 |
| Email, Peabody Transmittal Letter Assignments (Jun. 26, 2023) | 4527–4529 | 0802–0804 |
| Ruffed Grouse Society & American Woodcock Society, Peabody West Draft EA Comment Letter (Aug. 25, 2022) | 4672–4674 | 0805–0807 |
| Standing Trees, Peabody West Draft EA Comment (Sept. 6, 2022) | 4679–4717 | 0808–0486 |
| Peabody West Integrated Resource Project, Draft Environmental Assessment and Preliminary Finding of No Significant Impact (Aug. 4, 2022) (excerpts) | 4802–4808; 4810 | 0847–0854 |
| Peabody West Response to Comments by Author (undated) | 4841–4863 | 0855–0877 |

## TABLE OF CONTENTS FOR JOINT APPENDIX OF RECORD EXCERPTS

***Standing Trees, Inc. v. US Forest Service, et al.,* No. 25-2086**

VOLUME III

| | | |
|---|---|---|
| Decision Notice, Peabody West Integrated Resource Project (Feb. 7, 2024) | 4867–4869 | 0878–0880 |
| Peabody West Integrated Resource Project, Environmental Assessment and Finding of No Significant Impact (Apr. 27, 2023) | 4876–4912 | 0881–0917 |
| Gunn et al., Late-successional and old-growth forest carbon temporal dynamics in the Northern Forest (Northeastern USA), FOREST ECOLOGY MGMT. (2013) | 5140–5146 | 0918–0924 |
| Law et al., Creating Strategic Reserves to Protect Forest Carbon and Reduce Biodiversity Losses in the United States, LAND (2022) | 5288–5302 | 0925–0939 |
| Leverett et al., Older eastern white pine trees and stands sequester carbon for many decades and maximize cumulative carbon (2021) (excerpts) | 5343–5356 | 0940–0953 |
| Forest Carbon Assessment for the White Mountain National Forest (Mar. 19, 2019) | 5678–5703 | 0954–0979 |
| Letter to Standing Trees, Peabody West Integrated Resource Project Objection Response (Oct. 18, 2023) | 6106–6123 | 0980–0997 |
| Standing Trees, Objection to Peabody West Integrated Resource Project (Jun. 12, 2023) | 6124–6185 | 0998–1059 |
| Peabody West Botany Field Work Summary (2021) | 6264–6301 | 1060–1097 |
| Project-level carbon assessment for the Peabody West Integrated Resource Project (Nov. 1, 2021) | 6322–6327 | 1098–1103 |
| Albany South Integrated Resource Project Water Resources Report (2017) (excerpt) | 6369–6389 | 1104–1124 |
| Peabody West Basal Area Watershed Analysis (undated) | 6441–6442 | 1125–1126 |
| Peabody West Recreation Effects Analysis (Sept. 20, 2022) | 6462–6463 | 1127–1128 |
| Peabody West Wilderness and Roadless Areas Effects Analysis (May 18, 2022) | 6473–6474 | 1129–1130 |
| Peabody West Integrated Resource Project Scenery Management Effects Analysis (Jun. 17, 2022 and Dec. 19, 2023) | 6498–6522 | 1131–1155 |
| Peabody West Integrated Resource Project Soils Specialist Report (Nov. 2021) | 6633–6643 | 1156–1166 |
| Black and White Photo of Peabody Plot Locations | 7425 | 1167 |
| Peabody Features Base-line Data (undated) | 7672 | 1168 |
| Peabody Stand Table (May 1, 2020) | 7834–7835 | 1169–1170 |
| Topographic Map 1 of Peabody Plot Locations (undated) | 8939 | 1171 |

| | | |
|---|---|---|
| Peabody Habitat Management Unit Conditions (undated) (excerpt) | 9212 | 1172 |
| Peabody West Integrated Resource Project: Biological Evaluation and Wildlife Reports (Jul. 29, 2022 and Apr. 20, 2023) | 9238–9259; 9264–9265 | 1173–1196 |
| Peabody West Acres of treatment within Wild and Scenic River Buffer (2021) | 9349–9351 | 1197–1199 |
| Tarleton Scoping Comment Consideration Spreadsheet (undated) | 9463–9469 | 1200–1206 |
| Newsletter, Tarleton Integrated Resource Project (Dec. 2020) (excerpts) | 9471; 9473; 9475 | 1207–1209 |
| Email Bat Data from Tarleton (Jul. 16, 2019). | 9492 | 1210 |
| Email to Rob Wipfler (Apr. 14, 2023) | 9885 | 1211 |
| Tarleton HMU Stand Year of Origin (Mar. 28, 2019) | 9969–78 | 1212–1221 |
| Lake Tarleton Project (map) (Jan. 2020) | 10227 | 1222 |
| Tarleton – Long Form PDF Response to Comments (on 2nd Draft Environmental Assessment) (undated) | 10536–10571 | 1223–1258 |
| Standing Trees, Comment Submission (May 11, 2022) | 11785–11786 | 1259–1260 |
| Tarleton Integrated Resource Project, Draft Environmental Assessment and Preliminary Finding of No Significant Impact (Apr. 2022) (excerpts) | 11810; 11815 | 1261–1262 |
| Tarleton (1st Draft Environmental Assessment) Comment Consideration Spreadsheet (undated) | 11876–11897 | 1263–1284 |

**TABLE OF CONTENTS FOR JOINT APPENDIX OF RECORD EXCERPTS**

***Standing Trees, Inc. v. US Forest Service, et al.*, No. 25-2086**

VOLUME IV

| | | |
|---|---|---|
| Decision Notice, Tarleton Integrated Resource Project (Nov. 13, 2023) | 11929–11934 | 1285–1290 |
| Tarleton Integrated Resource Project, Final Environmental Assessment and Finding of No Significant Impact (Nov. 2023) | 11968–12001 | 1291–1324 |
| Tarleton Timber Harvest Unit Treatment Map (undated) | 12060 | 1325 |
| Standing Trees, Tarleton Draft EA Comment (May 11, 2022) | 12079–12134 | 1326–1381 |
| Lake Tarleton Integrated Resource Project, Rationale for Habitat Objectives in the Lake Tarleton Habitat Management Unit (Dec. 2020) | 12344–12356 | 1382–1394 |
| N.H. Department of Environmental Services, Volunteer Lake Assessment Program, Individual Lake Reports: Lake Katherine, Piermont, Data Summary (2021) | 12475–12476 | 1395–1396 |
| Email from N.H. Department of Environmental Services, Lake Katherine Water Quality (Aug. 18, 2022) | 12477–12480 | 1397–1400 |
| New Hampshire Northern Long-Eared Bat Survey (2019) | 12481–12502 | 1401–1422 |
| Species Abstract, Northern Long-Eared Bat (2019) (excerpt) | 12632–12635 | 1423–1426 |
| Terrestrial Habitat Management Reference Document (2019) | 12653–12667 | 1427–1441 |
| WMNF Ecological Approach (Nov. 2002 full version and excerpts from version revised Feb. 2019) | 12668, 12677–12678; 12701–12713 | 1442–1457 |
| Lake Tarleton Habitat Management Unit Conditions Spreadsheets (undated) | 12874–12884 | 1458–1468 |
| Letter to Objectors, Tarleton Integrated Resource Project (Sept. 27, 2023) | 12900–12927 | 1469–1496 |
| Standing Trees and Lake Tarleton Coalition, Objection to Tarleton Integrated Resource Project (May 1, 2023) | 13065–13130 | 1497–1562 |
| Project-level carbon assessment for the White Mountain National Forest: Tarleton Integrated Resource Project (undated, filename dated Feb. 19, 2021) | 13259–13265 | 1563–1569 |
| Tarleton Cumulative Actions (undated) | 13735 | 1570 |
| Tarleton Basal Area Watershed Analysis (undated) | 13750 | 1571 |
| Recreation Specialist Report for Tarleton (undated) | 13793–13798 | 1572–1577 |
| Scenery Management Report for Tarleton (undated) | 13826–13850 | 1578–1602 |
| Tarleton Field Notes (2017–2021) | 13898–13911 | 1603–1616 |

| | | |
|---|---|---|
| Tarleton Master Treatment Table (Oct. 8, 2020) | 13912 | 1617 |
| Tarleton Integrated Resource Project Biological Evaluation (Sept. 2023) | 13915–13961 | 1618–1664 |
| Tarleton Habitat Management Unit Conditions (undated) (excerpt) | 13977 | 1665 |
| Tarleton Integrated Resource Project Wildlife and Wildlife Habitat Assessment (Sept. 2020) (excerpt) | 14047; 14060–14061 | 1666–1668 |
| Tarleton Second 30 Day Comment Period Concern Responses (undated) (excerpt) | 17577 | 1669 |
| White Mountain National Forest Land and Resource Management Plan, Appendix D (Sept. 2005) | 17851–17852 | 1670–1671 |
| Rationale for Habitat Objectives in the Peabody West Habitat Management Unit (Jul. 6, 2022) | 17906–17918 | 1672–1685 |

# U.S. District Court
# District of New Hampshire (Concord)
# CIVIL DOCKET FOR CASE #: 1:24-cv-00138-JL-TSM

Standing Trees, Inc. v. US Forest Service et al
Assigned to: Judge Joseph N. Laplante
Referred to: US Magistrate Judge Talesha L. Saint-Marc
Case in other court: First Circuit Court of Appeals, #25-02086
Cause: 05:551 Administrative Procedure Act

Date Filed: 05/16/2024
Date Terminated: 09/23/2025
Jury Demand: None
Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Standing Trees, Inc.** represented by **Christophe G. Courchesne**
Vermont Law and Graduate School
164 Chelsea Street
PO Box 96
South Royalton, VT 05068
802-831-1627
Email: ccourchesne@vermontlaw.edu
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**US Forest Service** represented by **John Tustin**
United States Department of Justice
Environment and Natural Resources Division
PO Box 7611
Washington, DC 20044-7611
202-598-3543
Fax: 202-305-0275
Email: john.tustin@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**White Mountain National Forest, Forest Supervisor**
*agent of*
Derek Ibarguen
represented by **John Tustin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Pemigewasset Ranger District, District Ranger**
*other*
Brooke Brown
represented by **John Tustin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Androscoggin Ranger District, District Ranger**<br>*other*<br>Joshua Sjostrom | represented by | **John Tustin**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **Society for the Protection of New Hampshire Forests** | represented by | **Amy Manzelli**<br>BCM Environmental & Land Law, PLLC<br>3 Maple St<br>Concord, NH 03301-4202<br>603-225-2585<br>Email: manzelli@nhlandlaw.com<br>*TERMINATED: 12/02/2024*<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Jeremy David Eggleton**<br>Orr & Reno PA<br>PO Box 3550<br>45 S Main St<br>Concord, NH 03302<br>603 223-9122<br>Email: jeggleton@orr-reno.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Timothy John Kopczynski**<br>BCM Environmental Land Law PLLC<br>3 Maple St<br>Concord, NH 03301<br>603-225-2585<br>Email: kopczynski@nhlandlaw.com<br>*TERMINATED: 12/02/2024*<br>*ATTORNEY TO BE NOTICED* |

V.

**Interested Party**

| | | |
|---|---|---|
| **State of New Hampshire** | represented by | **Christopher G Aslin(NHAG)**<br>NH Attorney General's Office (Environmental)<br>33 Capitol St<br>Concord, NH 03301<br>603-271-3679<br>Fax: 603-271-2110<br>Email: christopher.g.aslin@doj.nh.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|

| | | |
|---|---|---|
| 05/16/2024 | 1 | NEW CASE/ COMPLAINT Filing fee $ 405, receipt number ANHDC-2511634 filed by Standing Trees, Inc.. (Attachments: # 1 Exhibit Tarleton Decision Notice (Ex. 1), # 2 Exhibit Peabody West Decision Notice (Ex. 2), # 3 Civil Cover Sheet, # 4 Summons - Waiver)(Courchesne, Christophe) (Entered: 05/16/2024) |
| 05/16/2024 | 2 | Disclosure Statement by Standing Trees, Inc. disclosing no parent company, no publicly traded company, and no merger agreement. (Courchesne, Christophe) (Entered: 05/16/2024) |
| 05/16/2024 | | Case assigned to US Magistrate Judge Talesha L. Saint-Marc. The case designation is: 1:24-cv-138-TSM. Please show this number with the judge designation on all future pleadings. (ed) (Entered: 05/17/2024) |
| 05/16/2024 | 3 | NOTICE of Assignment to U.S. Magistrate Judge and Consent Form sent to plaintiff for service on all parties. MJ Consent Form Due 7/5/2024.(ed) (Entered: 05/17/2024) |
| 05/17/2024 | | NOTICE. This case has been designated for Electronic Case Filing. All further submissions shall be filed in compliance with the Administrative Procedures for Electronic Case Filing. Pro se litigants are not required to file electronically and may continue to file documents in paper format. Persons filing electronically are strongly encouraged to complete the interactive training modules available on the courts website. To access these modules, click HERE. (ed) (Entered: 05/17/2024) |
| 05/17/2024 | 4 | Summonses issued electronically as to Androscoggin Ranger District, District Ranger, Pemigewasset Ranger District, District Ranger, US Forest Service, White Mountain National Forest, Forest Supervisor. **NOTICE: Counsel shall print and serve the summonses and all attachments in accordance with Fed. R. Civ. P. 4. NOTICE of Assignment to Magistrate Judge attached.** (Attachments: # 1 Assignment to Magistrate, # 2 Notice ECF)(ed) (Entered: 05/17/2024) |
| 06/26/2024 | 5 | NOTICE of Attorney Appearance by John Tustin on behalf of Androscoggin Ranger District, District Ranger, Pemigewasset Ranger District, District Ranger, US Forest Service, White Mountain National Forest, Forest Supervisor Attorney John Tustin added to party Androscoggin Ranger District, District Ranger(pty:dft), Attorney John Tustin added to party Pemigewasset Ranger District, District Ranger(pty:dft), Attorney John Tustin added to party US Forest Service(pty:dft), Attorney John Tustin added to party White Mountain National Forest, Forest Supervisor(pty:dft).(Tustin, John) (Entered: 06/26/2024) |
| 07/01/2024 | 6 | NO CONSENT to Jurisdiction by U.S. Magistrate Judge. Because not all parties to the case consent to the assignment of a United States Magistrate Judge for all purposes including trial, pursuant to Fed. R. Civ. P. 73, 28 U.S.C. sec. 636(c), and Local Rule 73.1(b)(2), the case will be assigned to a United States District Judge. Clerk Daniel J. Lynch. (Courchesne, Christophe) (Entered: 07/01/2024) |
| 07/01/2024 | | Case reassigned to Judge Joseph N. Laplante and US Magistrate Judge Talesha L. Saint-Marc. Reason for Reassignment: No Consent to Jurisdiction by U.S. Magistrate Judge. The new case designation is: 1:24-cv-138-JL-TSM. Please show this number with the correct judge designation on all further pleadings. (bd) (Entered: 07/01/2024) |
| 07/23/2024 | 7 | ANSWER to 1 Complaint - New Case, filed by Androscoggin Ranger District, District Ranger, Pemigewasset Ranger District, District Ranger, US Forest Service, White Mountain National Forest, Forest Supervisor.(Tustin, John) (Entered: 07/23/2024) |
| 07/24/2024 | | **NOTICE OF PRETRIAL CONFERENCE.** Pretrial Conference via video-conference set for 8/19/2024 at 11:00 AM before Judge Joseph N. Laplante. Follow up on Discovery Plan 8/12/2024. **The preliminary pretrial conference will not be canceled and at least one counsel for each party will be required to attend. While not mandatory, the court prefers that the Joint Discovery Plan filed in accordance with Fed. R. Civ. P. 26(f)** |

| | | |
|---|---|---|
| | | **specify a summary judgment deadline which falls after the close of discovery, but at least 120 days before trial.** Please note pursuant to Title 28 USC 636(c) and Local Rule 73.1, the parties may consent to have the case reassigned to the Magistrate Judge, but are free to withhold consent without adverse consequences.(jb) (Entered: 07/24/2024) |
| 07/29/2024 | 8 | Proposed Discovery Plan *(Joint Case Management Plan)* filed by Androscoggin Ranger District, District Ranger, Pemigewasset Ranger District, District Ranger, US Forest Service, White Mountain National Forest, Forest Supervisor. (Attachments: # 1 Proposed Order)(Tustin, John) (Entered: 07/29/2024) |
| 07/30/2024 | 9 | NOTICE of Lodging Administrative Record by Androscoggin Ranger District, District Ranger, Pemigewasset Ranger District, District Ranger, US Forest Service, White Mountain National Forest, Forest Supervisor. **Certain exhibit(s) maintained conventionally in Clerk's Office. (Attorney filers must submit conventional materials to the court within 72 hours.)**(Attachments: # 1 Exhibit 1 - Declaration of Stacy Lemieux, # 2 Exhibit 2 - Administrative Record Index)(Tustin, John) Modified on 8/6/2024 to add exhibits maintained text: (jb). (Entered: 07/30/2024) |
| 07/30/2024 | | **ENDORSED ORDER reviewing 8 Proposed Discovery Plan. *Text of Order: Reviewed.* So Ordered by Judge Joseph N. Laplante.(jb)** (Entered: 07/30/2024) |
| 08/01/2024 | 10 | Return of Service Executed as to All Defendants by Standing Trees, Inc.. Served/Mailed on 6/20/2024. Answer Follow Up on 7/11/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Courchesne, Christophe) (Entered: 08/01/2024) |
| 08/15/2024 | 11 | **PROCEDURAL ORDER re Preliminary Pretrial Conference via video-conference scheduled for Monday, August 19, 2024 at 11:00 am before Judge Joseph N. Laplante. So Ordered by Judge Joseph N. Laplante.(jb)** (Entered: 08/15/2024) |
| 08/19/2024 | | Minute Entry for proceedings held before Judge Joseph N. Laplante. PRETRIAL CONFERENCE held via video-conference on 8/19/2024. Order to issue. (Pltfs Atty: Christophe G. Courchesne) (Defts Atty: John Tustin)(Total Hearing Time: 24 minutes) (jb) (Entered: 08/19/2024) |
| 08/22/2024 | 12 | **ORDER approving 8 Proposed Discovery Plan *(Joint Case Management Plan)*. So Ordered by Judge Joseph N. Laplante. Plaintiff's Summary Judgment Motion due by 10/3/2024. Defendant's Cross-Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment due 10/31/2024. Plaintiff's Combined Response and Reply Brief to Defendant's Motion for Summary Judgment due 11/21/2024. Defendant's Reply due 12/12/2024. (Attachments: # 1 Scheduling Order) (jb)** (Entered: 08/22/2024) |
| 08/30/2024 | 13 | NOTICE of Lodging Additional Administrative Record Documents **Certain exhibit(s) maintained conventionally in Clerk's Office. (Attorney filers must submit conventional materials to the court within 72 hours**) by Androscoggin Ranger District, District Ranger, Pemigewasset Ranger District, District Ranger, US Forest Service, White Mountain National Forest, Forest Supervisor. (Attachments: # 1 Exhibit 1 - Declaration of Stacy Lemieux, # 2 Exhibit 2 - Administrative Record Index)(Tustin, John) Modified on 9/4/2024 to add exhibits maintained conventionally text: (jb). (Entered: 08/30/2024) |
| 10/03/2024 | 14 | MOTION for Summary Judgment filed by Standing Trees, Inc.. **HEARING REQUESTED.**Follow up on Objection on 11/4/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Memorandum of Law, # 2 Exhibit (Affidavit) A - Declaration of Zack Porter, # 3 Exhibit (Affidavit) B - Declaration of Gerald Curran, # 4 Exhibit (Affidavit) C - Declaration of Elaine Faletra, # 5 Exhibit (Affidavit) D - Declaration of Peter Faletra, # 6 Exhibit (Affidavit) E - Declaration of Eric Jones, # 7 Exhibit (Affidavit) F - Declaration of |

| | | |
|---|---|---|
| | | Rebecca Lovejoy, # 8 Exhibit (Affidavit) G - Declaration of Jamie Sayen, # 9 Exhibit (Affidavit) H - Declaration of Nataliya Sundina, # 10 Exhibit (Affidavit) I - Declaration of Michael Wipfler, # 11 Exhibit (Affidavit) J - Declaration of Robert Wipfler, # 12 Exhibit (Affidavit) K - Declaration of Peter Ascher, # 13 Exhibit (Affidavit) L - Declaration of Robin Sadek Ascher)(Courchesne, Christophe) (Entered: 10/03/2024) |
| 10/31/2024 | 15 | NOTICE of Lodging Corrected Administrative Record Documents by US Forest Service, White Mountain National Forest, Forest Supervisor, Pemigewasset Ranger District, District Ranger, Androscoggin Ranger District, District Ranger. (Attachments: # 1 Exhibit 1 - Declaration of Stacy Lemieux, # 2 Exhibit 2 - Forest Plan appendices, # 3 Exhibit 3 - corrected document)(Tustin, John) (Entered: 10/31/2024) |
| 10/31/2024 | 16 | Cross MOTION for Summary Judgment *and Response in Opposition to Plaintiff's Motion for Summary Judgment* filed by US Forest Service, White Mountain National Forest, Forest Supervisor, Pemigewasset Ranger District, District Ranger, Androscoggin Ranger District, District Ranger. **HEARING REQUESTED.**Follow up on Objection on 12/2/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Memorandum of Law)(Tustin, John) (Entered: 10/31/2024) |
| 11/07/2024 | 17 | NOTICE of Attorney Appearance by Timothy John Kopczynski on behalf of Society for the Protection of New Hampshire Forests Attorney Timothy John Kopczynski added to party Society for the Protection of New Hampshire Forests(pty:am).(Kopczynski, Timothy) (Entered: 11/07/2024) |
| 11/07/2024 | 18 | NOTICE of Attorney Appearance by Amy Manzelli on behalf of Society for the Protection of New Hampshire Forests Attorney Amy Manzelli added to party Society for the Protection of New Hampshire Forests(pty:am).(Manzelli, Amy) (Entered: 11/07/2024) |
| 11/07/2024 | 19 | MOTION to Extend Time to File Amicus Brief filed by Society for the Protection of New Hampshire Forests.Follow up on Objection on 11/21/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Manzelli, Amy) (Entered: 11/07/2024) |
| 11/07/2024 | 20 | NOTICE of Attorney Appearance by Christopher G Aslin(NHAG) on behalf of State of New Hampshire Attorney Christopher G Aslin(NHAG) added to party State of New Hampshire(pty:ip).(Aslin(NHAG), Christopher) (Entered: 11/07/2024) |
| 11/07/2024 | 21 | MOTION for Leave to File Memorandum as Amicus Curiae in Response to the Parties' Cross-Motions for Summary Judgment filed by State of New Hampshire.Follow up on Objection on 11/21/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Aslin(NHAG), Christopher) (Entered: 11/07/2024) |
| 11/07/2024 | 22 | MEMORANDUM in Opposition re 14 MOTION for Summary Judgment filed by State of New Hampshire. Follow up on Reply on 11/14/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Aslin(NHAG), Christopher) (Entered: 11/07/2024) |
| 11/07/2024 | | **ENDORSED ORDER granting 19 MOTION to Extend Time to File Amicus Brief. *Text of Order: Granted.* So Ordered by Judge Joseph N. Laplante. Amicus Brief due 11/14/2024.(jb)** (Entered: 11/07/2024) |
| 11/08/2024 | | **ENDORSED ORDER granting 21 MOTION for Leave to File Memorandum as Amicus Curiae in Response to the Parties' Cross-Motions for Summary Judgment. *Text of Order: Granted.* So Ordered by Judge Joseph N. Laplante.(jb)** (Entered: 11/08/2024) |

| | | |
|---|---|---|
| 11/14/2024 | 23 | NOTICE of Attorney Appearance by Jeremy David Eggleton on behalf of Society for the Protection of New Hampshire Forests Attorney Jeremy David Eggleton added to party Society for the Protection of New Hampshire Forests(pty:am).(Eggleton, Jeremy) (Entered: 11/14/2024) |
| 11/14/2024 | 24 | MOTION for Leave to File Amicus Brief *with Declaration & Exhibits 1-9* filed by Society for the Protection of New Hampshire Forests.Follow up on Objection on 11/29/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Eggleton, Jeremy) (Entered: 11/14/2024) |
| 11/14/2024 | 25 | BRIEF/MEMORANDUM *AMICUS CURIAE BRIEF IN SUPPORT OF DEFENDANTS* by Society for the Protection of New Hampshire Forests (Attachments: # 1 Exhibit (Affidavit) Declaration of Matthew Leahy, # 2 Exhibit Ex. 1 - Thompson Hepp Letter 2-19-98, # 3 Exhibit Ex. 2 - FAQ Sheet Tarleton Project, # 4 Exhibit Ex. 3 - Forest Society Tarleton Comment 5-6-22, # 5 Exhibit Ex. 4 - TOA Tarleton Comment 11-1-21, # 6 Exhibit Ex. 5 - TOA Peabody Comment 5-11-22, # 7 Exhibit Ex. 6 - TOA Peabody Comment 8-25-22, # 8 Exhibit Ex. 7 - Ruffed Grouse Soc Peabody Comment 8-25-22, # 9 Exhibit Ex. 8 - AMC Peabody Comment 1-10-20, # 10 Exhibit Ex. 9 - AMC Peabody Comment 9-2-22) (Eggleton, Jeremy) (Entered: 11/14/2024) |
| 11/14/2024 | 26 | MOTION to Clarify 12 Order on Discovery Plan,, *regarding Amicus Brief page limit* filed by Society for the Protection of New Hampshire Forests.Follow up on Objection on 11/29/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Eggleton, Jeremy) (Entered: 11/14/2024) |
| 11/21/2024 | 27 | REPLY to Objection to Motion re 14 MOTION for Summary Judgment , 16 Cross MOTION for Summary Judgment *and Response in Opposition to Plaintiff's Motion for Summary Judgment* filed by Standing Trees, Inc.. Surreply due by 11/26/2024. (Attachments: # 1 Exhibit Maps from AR (Ex. A))(Courchesne, Christophe) (Entered: 11/21/2024) |
| 12/02/2024 | 28 | Assented to MOTION for Amy Manzelli, Timothy Kopczynski to Withdraw as Attorney filed by Society for the Protection of New Hampshire Forests.(Manzelli, Amy) (Entered: 12/02/2024) |
| 12/02/2024 | 29 | NOTICE of Attorney Withdrawal by Amy Manzelli on behalf of Society for the Protection of New Hampshire Forests(Manzelli, Amy) (Entered: 12/02/2024) |
| 12/02/2024 | 30 | NOTICE of Attorney Withdrawal by Timothy John Kopczynski on behalf of Society for the Protection of New Hampshire Forests(Kopczynski, Timothy) (Entered: 12/02/2024) |
| 12/03/2024 | | **ENDORSED ORDER granting 28 Motion for Amy Manzelli, Timothy Kopczynski to Withdraw as Attorney. *Text of Order: Granted.* So Ordered by Judge Joseph N. Laplante.(jb)** Modified on 12/3/2024 to change text to granting. (jb). (Entered: 12/03/2024) |
| 12/12/2024 | 31 | REPLY to Objection to Motion re 16 Cross MOTION for Summary Judgment *and Response in Opposition to Plaintiff's Motion for Summary Judgment* filed by US Forest Service, White Mountain National Forest, Forest Supervisor, Pemigewasset Ranger District, District Ranger, Androscoggin Ranger District, District Ranger. Surreply due by 12/17/2024. (Tustin, John) (Entered: 12/12/2024) |
| 12/12/2024 | 32 | NOTICE of Lodging Corrected Administrative Record Index by US Forest Service, White Mountain National Forest, Forest Supervisor, Pemigewasset Ranger District, District Ranger, Androscoggin Ranger District, District Ranger. (Attachments: # 1 Exhibit 1 - Declaration of Stacy Lemieux, # 2 Exhibit 2 - Administrative Record Index (corrected)) (Tustin, John) (Entered: 12/12/2024) |

| | | |
|---|---|---|
| 12/17/2024 | | NOTICE of Hearing re: 14 MOTION for Summary Judgment, 16 Cross MOTION for Summary Judgment and Response in Opposition to Plaintiff's Motion for Summary Judgment. Oral Argument set for 2/27/2025 02:00 PM before Judge Joseph N. Laplante. (jwb) (Entered: 12/17/2024) |
| 12/18/2024 | | RESCHEDULING NOTICE of Hearing re: 14 MOTION for Summary Judgment, 16 Cross MOTION for Summary Judgment *and Response in Opposition to Plaintiff's Motion for Summary Judgment*. Oral Argument set for 3/11/2025 10:00 AM before Judge Joseph N. Laplante.(jwb) (Entered: 12/18/2024) |
| 12/19/2024 | | **ENDORSED ORDER granting 24 Motion for Leave to File Amicus Brief with Declaration & Exhibits 1-9. *Text of Order: Granted.* So Ordered by Judge Joseph N. Laplante.(jwb)** (Entered: 12/19/2024) |
| 12/19/2024 | | **ENDORSED ORDER granting 26 Motion to Clarify 12 Order on Discovery Plan, regarding Amicus Brief page limit. *Text of Order: Granted. The filings are accepted. Page limits do not include exhibits.* So Ordered by Judge Joseph N. Laplante.(jwb)** (Entered: 12/19/2024) |
| 03/11/2025 | | Minute Entry for proceedings held before Judge Joseph N. Laplante. ORAL ARGUMENT held on 3/11/2025 re: 14 MOTION for Summary Judgment, 16 Cross MOTION for Summary Judgment and Response in Opposition to Plaintiff's Motion for Summary Judgment. Order to issue. (Court Reporter: FTR) (Pltfs Atty: Christophe G. Courchesne) (Defts Atty: John Tustin) (Amicus: Jeremy David Eggleton, Christopher G. Aslin)(Total Hearing Time: 2 hours) (jwb) (Entered: 03/11/2025) |
| 04/21/2025 | 33 | TRANSCRIPT of Proceedings for RECORDED ORAL ARGUMENT ON MOTIONS FOR SUMMARY JUDGMENT held on March 11, 2025. Court Reporter: Liza Dubois, Telephone # 603-225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 5/12/2025. Redacted Transcript Follow Up 5/22/2025. Release of Transcript Restriction set for 7/21/2025.(jwb) (Entered: 04/21/2025) |
| 05/28/2025 | 34 | NOTICE of CEQ's withdrawal of 2023 Interim Guidance on Consideration of Greenhouse Gas Emissions and Climate Change by Androscoggin Ranger District, District Ranger, Pemigewasset Ranger District, District Ranger, US Forest Service, White Mountain National Forest, Forest Supervisor.(Tustin, John) (Entered: 05/28/2025) |
| 05/29/2025 | | **ENDORSED ORDER 34 Notice. *Text of Order: Reviewed.* So Ordered by Judge Joseph N. Laplante.(jwb)** (Entered: 05/29/2025) |
| 06/10/2025 | 35 | NOTICE of Supplemental Authority by Androscoggin Ranger District, District Ranger, Pemigewasset Ranger District, District Ranger, US Forest Service, White Mountain National Forest, Forest Supervisor. (Attachments: # 1 Exhibit 1 - Slip Opinion for Seven County Infrastructure Coalition v. Eagle County)(Tustin, John) (Entered: 06/10/2025) |
| 06/11/2025 | 36 | RESPONSE re 34 Notice (Other), 35 Notice (Other), filed by Standing Trees, Inc.. (Courchesne, Christophe) (Entered: 06/11/2025) |

| | | |
|---|---|---|
| 06/12/2025 | | **ENDORSED ORDER RE 36 Response, 35 Notice of Supplemental Authority.** ***Text of Order: Reviewed.*** **So Ordered by Judge Joseph N. Laplante.(jwb)** (Entered: 06/12/2025) |
| 08/20/2025 | 37 | **///MEMORANDUM ORDER denying 14 Motion for Summary Judgment; granting 16 Motion for Summary Judgment.** ***The court grants summary judgment in favor of the defendants.*** **So Ordered by Judge Joseph N. Laplante.(jwb)** (Entered: 08/20/2025) |
| 09/23/2025 | 38 | **JUDGMENT is hereby entered in accordance with 37 Memorandum Order on Motion for Summary Judgment. Signed by Tracy A. Uhrin, Clerk of Court.** ***(Case Closed)*** **(jwb)** (Entered: 09/23/2025) |
| 11/06/2025 | 39 | NOTICE OF APPEAL as to 38 Judgment by Standing Trees, Inc..( Filing fee $ 605, receipt number ANHDC-2701289.) [NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the Forms & Notices section of the First Circuit website at www.ca1.uscourts.gov, MUST be completed and submitted to the U.S. Court of Appeals for the First Circuit.]<br><br>**NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf** (Courchesne, Christophe) (Entered: 11/06/2025) |
| 11/06/2025 | 40 | Appeal Cover Sheet as to 39 Notice of Appeal filed by Standing Trees, Inc. (jwb) (Entered: 11/06/2025) |
| 11/06/2025 | 41 | Clerk's Certificate transmitting Record on Appeal to US Court of Appeals, documents numbered 37-41, re 39 Notice of Appeal. A copy of the Notice of Appeal provided electronically to all parties this date.(jwb) (Entered: 11/06/2025) |
| 11/06/2025 | | Appellate Case Number: First Circuit Court of Appeals #25-2086 re 39 Notice of Appeal filed by Standing Trees, Inc. (jwb) (Entered: 11/07/2025) |

---

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/11/2026 18:11:13 | | | |
| **PACER Login:** | ccourchesne | **Client Code:** | EAC |
| **Description:** | Docket Report | **Search Criteria:** | 1:24-cv-00138-JL-TSM |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| STANDING TREES, INC.<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES FOREST SERVICE; DEREK IBARGUEN, in his official capacity as Supervisor of the White Mountain National Forest; BROOKE BROWN, in her official capacity as the District Ranger for the Pemigewasset Ranger District; JOSHUA SJOSTROM, in his official capacity as the District Ranger for the Androscoggin Ranger District<br><br>*Defendants*. | Case No.:<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. Plaintiff Standing Trees challenges the U.S. Forest Service's (Service) Tarleton Integrated Resource Project and Peabody West Integrated Resource Project, which collectively authorize nearly 3,000 acres of commercial logging and nearly a dozen miles of road construction in the White Mountain National Forest without the required environmental review.

2. Both projects target publicly owned forests traversed by the Appalachian Trail and enjoyed by thousands of visitors each year. The Tarleton project targets mature forests encircling Lake Tarleton, one of the largest, cleanest, and least developed lakes in the region. The forests surrounding Lake Tarleton were added to the White Mountain National Forest by citizen initiative in the late 1990s to stop the threat of future logging and development, including the

very activities proposed by the Tarleton project. Similarly, the Peabody West project targets mature and roadless forests in the iconic Presidential Range, home of the Great Gulf Wilderness and Great Gulf Inventoried Roadless Area. Stately white pines, massive hemlocks, and mature hardwoods have taken decades to grow in the two project areas. Like old friends, they are irreplaceable components of the White Mountain National Forest.

3. To approve the two projects, the Forest Service bypassed the required environmental review. The National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, requires review of "the environmental impacts of the proposed action and alternatives[.]" 40 C.F.R. § 1508.9; *see also* 36 C.F.R. § 220.7(b)(2); 42 U.S.C. § 4332(2)(H). The point of reviewing impacts in this comparative form is to define them sharply and provide a clear basis for choice among the actions available to the Forest Service. Here, the Service refused to review *any* alternatives and thus failed to compare the impacts of its projects alongside alternatives with less or no logging of mature trees. This violates NEPA.

4. The Forest Service likewise failed to follow NEPA's command to take a "hard look" at each project's environmental impacts, especially the impacts on climate, water quality, endangered species, and scenic and other resources. Nor did the Forest Service take the requisite hard look at the cumulative impacts of the two projects together, much less in combination with other projects in the White Mountain National Forest.

5. Regarding climate impacts, the Forest Service approved both projects without quantifying the greenhouse gas (GHG) emissions that would result from logging nearly 3,000 acres of maturing forest or disclosing the resulting adverse environmental impacts. Instead, the Service concluded that project-specific emissions were too small to matter in comparison to global emissions and that the projects would yield net benefits for climate change and climate

resilience. But these conclusions are arbitrary, given the evidence before the Service establishing that project-specific emissions are quantifiable and instructive for evaluating climate impacts, and that preserving maturing forests leads to a net climate benefit.

6. Regarding forest health and water quality impacts, Standing Trees underscored—but the Forest Service disregarded—years' worth of science and executive guidance identifying that preserving maturing forests leads to benefits, especially in inventoried roadless areas.

7. Regarding endangered species impacts, the Forest Service arbitrarily relied on not knowing locations of the northern long-eared bat's roosts and hibernacula to claim that the projects "may affect, [but are] not likely to adversely affect" the bat.

8. Regarding scenic and recreational impacts, the Forest Service arbitrarily disregarded logging's negative impacts on visitors in the project areas.

9. The Forest Service made no effort to consider the climate, forest health, water quality, species, scenic, or recreational impacts of these projects together, much less combined with other projects the Forest Service is conducting in the White Mountain National Forest.

10. The Forest Service cannot claim to know whether each proposed project—individually or cumulatively—would have significant environmental impacts. Thus, the Service cannot proceed until it fully discloses these impacts in environmental reviews that comply with NEPA's requirements and ultimate purpose: to protect and promote environmental quality. *See Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1285–87 (1st Cir. 1996).

11. The Forest Service also violated the National Forest Management Act (NFMA), 16 U.S.C. §§ 1600 *et seq.*, which requires the projects to comply with the 2005 White Mountain National Forest Plan (Forest Plan). The projects do not. They violate Forest Plan directives that protect endangered species' habitat, water quality, and forest scenic integrity.

12. Because the Forest Service's authorizations of the Tarleton and Peabody West projects violate federal law, this Court should declare them unlawful, vacate the final decisions, and enjoin the authorized logging and road construction.

## JURISDICTION

13. This Court has jurisdiction over this case under 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1346 (United States as defendant), as well as 5 U.S.C. §§ 701–06 (Administrative Procedure Act's judicial review provisions).

14. The Court may order relief under 28 U.S.C. §§ 2201 (declaratory judgment), 2202 (further relief), and 2412 (costs and fees), as well as 5 U.S.C. § 706 (vacatur).

15. Venue is proper in this Court under 28 U.S.C. § 1391 because the lands at issue are in Grafton County and Coos County, New Hampshire, and because a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district.

## PARTIES

### Plaintiff

16. Plaintiff Standing Trees is a grassroots membership organization. Its mission is to protect and restore New England's forests, with a focus on public lands in New Hampshire and Vermont. Consistent with its mission, Standing Trees advocates just and equitable policies and practices for managing public lands and thereby achieving clean water, clean air, forest health, public health, and unfragmented habitat in the region.

17. Over the past three years, Standing Trees has participated in available public processes for the Tarleton and Peabody West projects, including filing comments on the Forest Service's draft environmental assessments (EAs) for each project and filing objections to the

proposed decision for each project. Thus, Standing Trees has exhausted its administrative remedies to challenge these projects.

18. Likewise, Standing Trees has participated in available public processes for similar, contemporaneous projects in the White Mountain National Forest (National Forest) because each suffers from similar, legally deficient environmental review.

19. Standing Trees brings this case on behalf of itself and its members, including those who live near and regularly visit the Tarleton and Peabody West project areas.

20. In both project areas, Standing Trees members recreate year-round: hiking, skiing, camping, backpacking, swimming, fishing, and observing wildlife. The members plan to continue visiting these areas for the foreseeable future. However, as detailed below, the projects' adverse environmental impacts threaten their ability to do so.

21. Similarly, Standing Trees members have related nature-based business interests, such as the youth outdoors camp, Kingswood Camp, that would be directly harmed by the Tarleton project's adverse environmental impacts.

22. Debris and runoff from commercial logging will harm the water quality of waters in both project areas. Upon reaching these waters, logging debris and runoff increases the risk of algal blooms, which may degrade water quality to the point where it is no longer safe to recreate in or on these waters.

23. Logging mature trees will harm the health of the forests and the scenic beauty in both project areas. Standing Trees members have specifically chosen to recreate or manage businesses in these areas—some for many decades—because of the areas' healthy forests and scenic beauty, including the iconic views from Lake Tarleton and along the Great Gulf and

Appalachian Trails. These members' recreational and business interests are certain to be impacted by the proposed logging.

24. Moreover, the impacts will disturb, displace, or otherwise harm wildlife, thereby limiting the wildlife-viewing opportunities for Standing Trees members in the project areas.

25. Defendants' failure to fully disclose these impacts harms Standing Trees members by denying their right to meaningfully participate in the decision-making process.

26. The interests of Standing Trees have been, and are being, adversely and irreparably injured by Defendants' failure to comply with federal law, and these injuries will continue until and unless the relief requested in this Complaint is granted.

27. These injuries are actual, concrete injuries that are traceable to Defendants' decision to authorize the activities described in the decision notices for the projects.

28. These injuries would be redressed by the requested relief.

**Defendants**

29. Defendant U.S. Forest Service is a federal agency within the Department of Agriculture. The Service, which manages the National Forest, issued decision notices on November 13, 2023, and February 7, 2024, that authorized the Tarleton and Peabody West projects, respectively. Those decision notices are attached to this Complaint as Exhibits 1 and 2.

30. Defendant Derek Ibarguen is the Forest Supervisor for the National Forest, responsible for issuing the objection response letters for the Tarleton and Peabody West projects on September 27, 2023, and October 18, 2023, respectively. Defendant Ibarguen is sued in their official capacity.

31. Defendant Brooke Brown is the District Ranger for the Pemigewasset Ranger District and the official who signed the Tarleton project Decision Notice on November 13, 2023. Defendant Brown is sued in their official capacity.

32. Defendant Joshua Sjostrom is the District Ranger for the Androscoggin Ranger District and the official who signed the Peabody West project Decision Notice on February 7, 2024. Defendant Sjostrom is sued in their official capacity.

## LEGAL BACKGROUND

### Administrative Procedure Act (APA)

33. This case is brought under the Administrative Procedure Act (APA). 5 U.S.C. §§ 551–59, 701–06.

34. The APA allows associations like Standing Trees to challenge federal agency actions in the federal courts. *Id.* §§ 702, 704. The APA declares that a court "shall . . . hold unlawful and set aside agency action[s] . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

35. As relevant here, an agency decision is arbitrary and capricious if the agency "entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

36. The APA provides for relief for claims brought under the National Environmental Policy Act and the National Forest Management Act.

**National Environmental Policy Act (NEPA)**

37. Congress enacted NEPA to promote government efforts that "will prevent or eliminate damage to the environment[.]" 42 U.S.C. § 4321. Federal agencies must review and publicly disclose the environmental impacts of their proposed actions. 40 C.F.R. § 1508.9(b).

38. The Council on Environmental Quality (CEQ) promulgated implementing regulations. *Id.* §§ 1500–1508. The regulations' stated purpose is "to tell federal agencies what they must do to comply with the procedures and achieve the goals of [NEPA]," to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken," and, "[u]ltimately," to achieve "better decisions" and "excellent action." 40 C.F.R. § 1500.1(a)–(c).[1]

39. The Forest Service promulgated its own NEPA regulations. 36 C.F.R. Part 220. The Service is bound by these regulations in addition to CEQ regulations.

40. NEPA requires federal agencies to prepare an environmental impact statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Agencies must supplement an EIS where "new information . . . show[s] that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered[.]" *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989) (quoting 42 U.S.C. § 4332(2)(C)).

---

[1] CEQ amended the regulations in 2020. The amendments "apply to any NEPA process begun after September 14, 2020. An agency may apply the regulations in this subchapter to ongoing activities and environmental documents begun before September 14, 2020." 40 C.F.R. § 1506.13 (2020). Here, the amendments do not apply because the Service initiated both the Tarleton and Peabody West projects in 2019 and because the Forest Service consistently relied on CEQ's original regulations throughout its environmental review. *See* Tarleton Final EA and FONSI at 4; Peabody West Final EA and FONSI at 3. The original regulations apply here.

41. If the need for an EIS is unclear, the agency must prepare an environmental assessment (EA) to determine whether the action may have significant impacts and thus require EIS preparation. 40 C.F.R. § 1508.9. If the agency determines the action will not have a significant impact, it issues a finding of no significant impact (FONSI). *Id.* § 1508.13.

42. The agency must take a "hard look" at an action's impacts regardless of which environmental review process the agency conducts. *Kleppe v. Sierra Club*, 427 U.S. 390, 409 n. 21 (1976).

43. As part of that review, NEPA requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources[.]" 42 U.S.C. § 4332(2)(E); *see also* 40 C.F.R. § 1501.2(c) (same).

44. Agencies also must "quantify GHG emissions, compare GHG emission quantities across alternative scenarios, . . . and place emissions in relevant context[.]" National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change, 88 Fed. Reg. 1196, 1201 (Jan. 9, 2023). This requires agencies to use the "best available science and data[.]" *Id.*

45. Significance is determined by the action's context and intensity. 40 C.F.R. § 1508.27. Context refers to the action's setting. *Id.* § 1508.27(a). Intensity refers to the action's impact, which is informed by ten factors. *Id.* § 1508.27(b). As relevant here, those factors include the project's beneficial and adverse impacts; the unique characteristics of the project areas; the degree to which the actions will have environmental impacts that are likely to be highly controversial; whether the actions are cumulatively significant alongside other actions; and the

degree to which the actions may adversely affect an endangered species. *Id.* §§ 1508.27(b)(1), (3), (4), (7), (9).

46. To determine an action's context and intensity, agencies must first set a baseline that "succinctly describe[s] the environment of the area(s) to be affected or created by the alternatives under consideration." *Id.* § 1502.15. "The concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process." CEQ, Considering Cumulative Effects Under the National Environmental Policy Act, at 41 (Jan. 1997). Without establishing baselines, the Service cannot determine the significance of an action's environmental impacts and, consequently, cannot comply with NEPA.

47. Furthermore, an agency's EA must identify the direct, indirect, and cumulative impacts of an action, including its ecological, aesthetic, economic, social, and health effects. *See* 40 C.F.R. §§ 1508.7 (defining cumulative impact), 1508.8 (defining environmental effects), and 1508.9(b) (requiring EAs to disclose the "environmental impacts of proposed action and alternatives"). Direct impacts are those impacts that are "caused by the action and occur at the same time and place." *Id*. § 1508.8(a). Indirect impacts are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id*. § 1508.8(b). Cumulative impacts are "the impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions[.]" *Id*. § 1508.7. They can result from "individually minor but collectively significant actions taking place over a period of time." *Id*.

**National Forest Management Act (NFMA)**

48. NFMA governs the Forest Service's management of the national forests and prescribes the process for management activities.

49. First, the Forest Service must develop, maintain, and revise a land and resource management plan for each national forest. 16 U.S.C. § 1604; 36 C.F.R. § 219.2(b). These plans guide management activities forest wide, setting standards and guidelines, management goals and objectives, and monitoring and evaluation requirements.

50. Second, the Forest Service must ensure that its site-specific management activities are "consistent" with the broader Forest Plans. 16 U.S.C. § 1604(i). Site-specific projects like those at issue here must adhere to applicable plan standards and guidelines.

## FACTUAL BACKGROUND

### I. THE WHITE MOUNTAIN NATIONAL FOREST

51. The Tarleton and Peabody West projects are among at least nine logging projects that have been or are proposed to be implemented in the National Forest within the span of a decade. To date, the Forest Service has not acknowledged the cumulative impacts of these projects in its environmental reviews.

**TABLE 1**[2]

| PROJECT NAME | RANGER DISTRICT | DECISION DATE | ACRES TO BE LOGGED |
|---|---|---|---|
| Bowen Brook Integrated Resource Management | Pemigewasset | 05/20/16 | 2101 |
| Deer Ridge Integrated Resource Project (IRP) | Androscoggin | 08/01/16 | 993.25 |
| Wanosha IRP | Pemigewasset | 06/27/20 | 2405 |
| Cold River IRP | Saco | 11/17/20 | 189 |
| Tarleton IRP | Pemigewasset | 11/13/23 | 880 |
| Peabody West IRP | Androscoggin | 02/07/24 | 2220 |
| Hales Location Wildfire Resiliency Project | Saco | 04/01/24 (estimated) | 913 |
| Sandwich Vegetation Management Project | Saco | 05/01/24 (estimated) | 135 |
| Lost River IRP | Pemigewasset | 04/01/25 (estimated) | 1674 |

[2] These figures may underrepresent the true acres logged because they may not include logging designated as "pre-commercial" logging by the Forest Service.

## II. TARLETON PROJECT

52. The Forest Service asserted that the Tarleton project "is needed to help meet the goals and objectives for wildlife and vegetation described in the Forest Plan and to increase forest health, vitality, and resiliency within the project area, including the effects of climate change, and insect and disease outbreaks." U.S. Forest Serv., Tarleton Project Final Environmental Assessment and Finding of No Significant Impact at 6 (Nov. 2023) (Tarleton Final EA).[3] Such broad objectives can be achieved in myriad ways. Yet the Service arbitrarily reviewed only its initial proposal.

53. On April 12, 2022, the Forest Service issued its draft EA and FONSI for the Tarleton project, on which Standing Trees submitted a timely comment. On March 16, 2023, the Forest Service released its final EA and FONSI and draft decision notice, to which Standing Trees timely objected. On September 27, 2023, the Forest Service rejected all objections.

### A. Project Area

54. The Tarleton project centers on Lake Tarleton, a clear, cold, and quiet mountain lake in Grafton County, New Hampshire. Long cherished for its wild beauty, the lake is near the westernmost edge of the White Mountain National Forest. Loons call through the mist, and the alpine tundra-topped Mount Moosilauke looms in the distance. The project area includes Kingswood Camp; Lakes Katherine and Armington; well-used camping grounds; spectacular hiking trails; unique and sensitive wildlife species; and stands of forest that are aging toward old-growth conditions. Nearly 200 species of songbirds call from the trees' branches, and bald eagles

---

[3] The Forest Service's environmental documents for the Tarleton project are available on the Service's website at https://www.fs.usda.gov/project/?project=56394. The Tarleton Final EA and FONSI is viewable on the Service's website at https://usfs-public.app.box.com/v/PinyonPublic/file/1361269062428.

and other raptors fly about the canopies.

*Lake Tarleton with Mt. Moosilauke in the distance.*
*Photo courtesy of Standing Trees.*

55. In the late 1990s, a planned resort inspired a grassroots effort to "permanently" protect Lake Tarleton from development. With the support of congressional leaders from New Hampshire and the federal government, the public gained ownership of the land around the lake, which then became part of the National Forest. The Lake Tarleton Coalition, some members of which are also Standing Trees members, continues the grassroots effort to uphold this conservation victory. Together, Standing Trees and the Lake Tarleton Coalition have earnestly engaged the Forest Service to consider alternatives to the proposed project on several occasions.

**B. "Alternatives" Analysis**

56. Throughout its review of the Tarleton project, the Forest Service failed to discuss or otherwise consider alternatives to the proposed project.

57. In its comment on the Tarleton draft EA, Standing Trees proposed one alternative that would have fewer and less significant impacts on numerous environmental resources than

the project as proposed. Standing Trees stressed that the Forest Service must consider alternatives that would authorize less logging as well as the crucial no-action alternative, which would authorize no logging.

58. In its objection to the project, Standing Trees reiterated its proposed alternative and the evidence in the record of the significant environmental impacts overlooked by the Forest Service.

59. Standing Trees' proposed alternative would increase wildlife habitat diversity and improve forest health through small-scale habitat restoration and the redesignation of land around Lake Tarleton as a "Scenic Area" under the Forest Plan. But the Forest Service dismissed this alternative for purportedly not meeting the project's purpose and being beyond the project's scope. U.S. Forest Serv., Tarleton Objection Response at 5 (Sept. 2023) (Tarleton Objection Response).[4]

60. The final EA did not consider any alternatives. It contained a short section entitled "Consequences of No Action," which stated—without citing any support or further explanation or analyzing the potential benefits—that "taking no action would not meet the need to advance forest plan goals or wildlife habitat diversity objectives in the Tarleton [Habitat Management Unit]." Tarleton Final EA at 8.

**C. <u>Project Impacts</u>**

61. In total, the Tarleton project would commercially log nearly 700 acres of forest, including mature forest, and reconstruct one and a half miles of road. The project will require years' worth of intrusion by workers and vehicles engaged in logging and roadwork.

---

[4] The Tarleton Project Objection Response is viewable on the Service's website at https://usfs-public.app.box.com/v/PinyonPublic/file/1325681761761.

62. Logging is proposed to take place within 300 feet of Lake Tarleton and within 500 feet of the Appalachian Trail. Logging would make it impossible for views along the Appalachian Trail to meet the Forest Plan's "high" Scenic Integrity Objective for up to 15 years.

63. Without establishing adequate baselines or considering cumulative impacts, the Forest Service cannot claim to know whether the project's impacts will be significant. Specifically, the Service's assessment of climate change, water quality, endangered species, and scenic and other resources failed to capture the full significance of the project's environmental impacts for the reasons described below.

*1. Climate and Carbon Storage*

64. Regarding climate impacts, the final EA stated that "in the near-term, [the project] might contribute an extremely small quantity of [GHG] emissions relative to national and global emissions[,] . . . [and] any carbon initially emitted from the proposed action [will] have a temporary influence on atmospheric [GHG] concentrations, because carbon will be removed from the atmosphere over time as the forest regrows." Tarleton Final EA at 20. The Service also asserted that the projects would somehow yield a "long-term net benefit in terms of resiliency to climate change and GHG emission[s]." Tarleton Objection Response at 7. But the Service reached these conclusions without using the best available science, attempting to quantify the GHG emissions likely to result from their major decisions, or considering the cumulative effects of the project when assessed alongside similar, contemporaneous projects, *see* Table 1, *supra*.

65. In its comment and objection, Standing Trees provided scientific evidence that (1) timber harvesting accounts for 86% of annual forest carbon loss in the northeastern U.S.; (2) the rate of carbon sequestration increases as trees age, with carbon storage maximized in unlogged stands; and (3) among land uses generally, timber harvesting has the greatest relative

impact on aboveground carbon storage regionally. The Service did not explain its decision to dismiss this science. Even if the Service dismissed the provided literature as not being the best, the Service did not provide a reasoned basis for dismissing it.

66. Rather, the Forest Service dismissed this evidence for being general in nature, rather than site-specific, but the Service abandoned that rationale in other contexts, e.g., by relying on non-site-specific water quality data within the same document. Additionally, the Service claimed to "document[] consideration of the scientific papers brought forward by the public," but the response omits any consideration of the scientific evidence submitted by Standing Trees. Tarleton Objection Response at 3.

67. Moreover, the Forest Service itself recognized the importance of protecting and restoring mature and old-growth forests for biodiversity, carbon storage, and climate resiliency. *See* U.S. Forest Serv., Climate Adaptation Plan at 13 (July 2022) (Climate Adaptation Plan). But the Service's conclusion here—that the goals of the Forest Plan can only be satisfied by the Tarleton project as proposed—was inconsistent with this internal management direction.

68. The Forest Service also failed to acknowledge Executive Order 14072, which requires the Service to "retain and enhance carbon storage[.]" Strengthening the Nation's Forests, Communities, and Local Economies, 87 Fed. Reg. 24851, 24852 (Apr. 27, 2022).

69. Furthermore, the Forest Service did not measure both project-specific and cumulative GHG emissions from other reasonably foreseeable actions, including the Service's own logging projects in the National Forest. *See* Table 1, *supra*.

70. In sum, the Forest Service (1) did not use the best available science; (2) made the qualitative assertion that the project will have *de minimis* climate impacts without any quantitative, project-specific science to support it; (3) disregarded the Service's own science as

well as applicable executive direction; and (4) did not undertake the necessary cumulative impacts analysis.

*2. Water Quality*

71. Regarding water quality impacts, the final EA concluded that "[n]o measurable adverse effects to water quality or quantity are expected due to project implementation." Tarleton Final EA at 21.

72. The Forest Service did not identify a baseline for water quality, without which there is simply no way to determine the significance of the project's environmental impacts. Rather, as Standing Trees raised in its objection, the Service relied on an assessment of water quality impacts over 50 miles away at the Albany South project site, concluding that the Albany South impacts analysis should be "broadly applicable" to the Tarleton project. *Id*. at 21.

73. Although the Forest Service stated that herbicides may be used in this project, *see id*. at 18, the Service did not discuss the impacts of such herbicide application on water quality in the project area.

74. The Forest Service also did not mention the impacts to water quality that might stem from the proposed construction of a boat launch on Lake Katherine in the final EA—namely, the heightened risk of introducing invasive species from other waterbodies—an important omission given Lake Katherine's particularly high water quality.

75. In sum, the Forest Service (1) did not establish a baseline for water quality in the project area; (2) used mismatched science for site-specific analysis; (3) omitted any consideration of the impacts of herbicide treatment in the project area; and (4) did not consider the impacts of the proposed boat launch on Lake Katherine.

*3. Northern Long-Eared Bat*

76. The northern long-eared bat is classified as endangered under the Endangered Species Act. *See* Endangered and Threatened Wildlife and Plants; Endangered Species Status for Northern Long-Eared Bat, 87 Fed. Reg. 73488 (Nov. 30, 2022).

77. The northern long-eared bat depends on mature and old forests for roosting and foraging—preferably large-diameter trees with exfoliating bark, cavities, or crevices for roosting. The bats favor unfragmented habitat for foraging.

78. This project occurs within the northern long-eared bat's habitat, and according to data published in 2004, specimens have been captured in the project area. *See* U.S. Forest Serv., Tarleton Project Biological Evaluation at 9 (Sept. 2023) (Tarleton Biological Evaluation).[5]

79. The Forest Service "assumed" the bat's presence in the project area. *Id*. At the same time, however, without conducting any new surveys the Service claimed that there were "no known hibernacula or maternity roosts within the [project] area." *Id*. The Service relied on not knowing of any hibernacula or roosts in the project area to conclude that the project would not have direct effects on the bat. *Id*. This departs from the Forest Plan, which requires the Forest Service "contribute to conservation and recovery of [endangered] species and their habitats." Forest Plan at 1-8.

80. Together with recently approved and anticipated projects in the National Forest—including the Peabody West project—the Forest Service plans to eliminate or degrade several thousand acres of northern long-eared bat habitat. *See* Table 1, *supra*.

---

[5] The Tarleton Project Biological Evaluation is viewable on the Service's website at https://usfs-public.app.box.com/v/PinyonPublic/file/1361273126290.

81. But the Forest Service limited the scope of the project's cumulative impacts review to the Tarleton Habitat Management Unit and did not take similar, nearby projects into account. *See* Tarleton Biological Evaluation at 7.

*4. Scenic Resources*

82. Regarding scenic resource impacts, the Forest Service concluded that "[s]ome visual impacts from the proposal can be expected, however these impacts would be most apparently [sic] immediately following timber harvest and would fade and blend over time as the forest regenerates." Tarleton Final EA at 21.

83. The project would involve logging on Appalachian National Scenic Trail lands (MA 8.3) and General Forest Management lands (MA 2.1).[6]

84. As relevant here, the Forest Plan provides the following Scenery Management Standards and Guidelines:

- Standard S-1 for MA 8.3: "The [Appalachian Trail] is a Concern Level 1 Travelway, and middlegound and background areas on National Forest lands seen from the [Appalachian Trail] must be managed for scenery in accordance with Scenic Integrity Objectives[.]" Forest Plan at 3-52.
- Standard S-2 for MA 8.3: "All management activities will meet a Scenic Integrity Objective of High or Very High." *Id*.
- Guideline G-1 for MA 2.1: "[N]o more than 9 percent" of the area within landscapes viewed from the Appalachian Trail, among other significant viewpoints, should be subject to even-aged logging over a single 30-year period. *Id*. at 3-6. "Total area affected

[6] Management Areas (MA) are the group of land areas allocated to similar management goals. Forest Plan Glossary at 17.

during any one entry period with new [‘even-aged’ logging] should not exceed 4 percent of the acreage.” *Id*.

85. But the Forest Service failed to establish a baseline of previously logged acres, without which there is simply no way to determine the significance of the project’s environmental impacts.

86. For example, the Tarleton Scenery Specialist Report stated that “substantial harvesting happened from the mid 1980’s through the mid 1990’s throughout the Lake Tarleton viewshed.” U.S. Forest Serv., Tarleton Scenery Specialist Report at 7 (Nov. 2023).[7] But the Service did not have specific information about “what type of harvest occurred and when it occurred.” *Id.* In other words, the Service has not disclosed the extent of the impacts near the beginning of that 30-year range. This information is necessary to evaluate whether the project would exceed the 9 percent harvest threshold in the applicable Forest Plan guidelines.

87. Finally, Standing Trees objected to the Forest Service’s failure to select a viewpoint within Lake Tarleton. In its response to Standing Trees, the Service stated, “[v]iewpoints within the boundary of Lake Tarleton itself were not selected . . . because they would not be fixed points that could be precisely revisited for scenery monitoring over time.” Tarleton Objection Response at 27. It is beyond dispute that geographic coordinates can be used to do just that.

88. In sum, the Forest Service (1) did not disclose the extent of logging during the early and mid-1990s, which is necessary to determine whether the Service’s actions would exceed the 30-year harvest threshold in the Forest Plan for viewpoints visible from the

[7] The Tarleton Project Scenery Specialist Report is viewable on the Service’s website at https://usfs-public.app.box.com/v/PinyonPublic/file/1361272101061.

Appalachian Trail; and (2) failed to articulate a credible rationale for not selecting a viewpoint within Lake Tarleton.

*5. Other Resource Impacts*

89. Regarding recreational impacts, the Forest Service stated—while acknowledging the proposed logging's "confict[ing]" nature with MA 8.3 land use standards—that "potential noise impacts to hikers along the Appalachian Trail . . . would be minimized" due to a 500-foot buffer to the Appalachian Trail and through limiting logging to the winter. U.S. Forest Serv., Tarleton Recreation Specialist Report at 6; Tarleton Final EA at 21. The Service also claimed—with no analysis in the record—that "[p]otential noise impacts to winter recreation users . . . would be reduced from the lake with the 300 foot no-cut buffer." *Id.*

90. Regarding soil health, the Forest Service likewise claimed that following "best management practices" alongside "design features related to this project" will ensure that only "non-detrimental" soil erosion, compaction, and nutrient cycling will occur in the project area. Tarleton Final EA at 22. But the Service made this claim without defining or substantiating how soil impacts would be "non-detrimental." Nor did the Service disclose cumulative impacts of soil erosion, compaction, and nutrient cycling across similar, contemporaneous projects.

91. Regarding vegetation health, the Forest Service claimed that project goals include "increas[ing] age-class diversity" and "promot[ing] wildlife habitat objectives." Tarleton Final EA at 6. But the record does not contain any data on stand ages or early-successional habitat in either the project area or the National Forest in a format conducive to independent review. Thus, the Service did not—and cannot—show how the project advances its purported goals. Moreover, the Service did not acknowledge Executive Order 14072, which requires agencies to "conserve . . . mature and old-growth forests on Federal lands[.]" Strengthening the Nation's Forests,

Communities, and Local Economies, 87 Fed. Reg. 24851, 24851 (Apr. 27, 2022). The Order also directs the Service to manage the National Forest to "retain and enhance carbon storage[,] conserve biodiversity . . . enhance climate resilience, . . . [and] provide outdoor recreational opportunities[.]" *Id.* at 24852.

*6. Cumulative Impacts*

92. The Forest Service's cumulative impacts review consisted merely of the conclusion that "[t]he incremental impacts of this project when overlapped in time and space with other projects with similar impacts would be minor or less[,]" and that "[t]herefore, there would be no significant cumulative impacts as a result of implementing this project." Tarleton Final EA at 25.

93. As noted, the Forest Service took a *de minimis* approach to GHG emissions, which truncated its review of climate impacts. The Service asserted that the project—alone, without regard to similar, contemporaneous logging projects in the very same National Forest—would "contribute an extremely small quantity of [GHG] emissions relative to national and global emissions[.]" *Id.* at 20.

94. Similarly, the Forest Service truncated its review of all environmental impacts: The Service acknowledged that the project would "occur over an area totaling less than about one percent of the total acreage within the [National Forest] . . . over a 5- to 10-year period." Tarleton Final EA at 24. But other past, present, and reasonably foreseeable future projects in the National Forest are glaringly absent from the Service's review of cumulative impacts.

95. Thus, the Forest Service did not—and could not—determine whether project impacts—together with the impacts from recent, ongoing, or reasonably foreseeable future projects in the National Forest—are cumulatively significant. Specifically, the Service failed to

consider the environmental impacts resulting from the Bowen Brook Integrated Resource Project, Deer Ridge Integrated Resource Project, Wanosha Integrated Resource Project, Cold River Integrated Resource Project, Peabody West Integrated Resource Project, Hales Location Wildfire Resiliency Project, Sandwich Vegetation Management Project, and Lost River Integrated Resource Project. *See* Table 1, *supra*.

96. For the foregoing reasons, the Forest Service failed to take a hard look at the Tarleton project's environmental impacts.

### D. Project Final EA and FONSI

97. In its final EA and FONSI, the Forest Service failed to demonstrate that the project would not significantly affect the environment. This includes demonstrating whether the project would affect the environment to a significant extent that the Service has not already considered.

98. The Forest Plan is a "strategic, programmatic document that does not make project-level decisions," and it envisions that the Service will make any necessary evaluations at the outset of project planning. Forest Plan at v.

99. Here, the Forest Service did not make the necessary evaluations at the outset (or any other point) of planning the Tarleton project. Notably, this omission includes new information that was not available to the Service when it developed the Forest Plan. For example, the Forest Service disregarded its own recent research on the role of forests in climate adaptation. *See generally* Climate Adaptation Plan. Also, the northern long-eared bat was recently added to the federal endangered species list. The Service did not have the opportunity to consider such information in its decades-old Forest Plan. Nor did it consider the information here.

100. Furthermore, in reviewing the significance of the project, the Forest Service summarily concluded that "the effects of the proposed action are limited in context[,]" declaring that the project would "occur over an area totaling less than about one percent of the total acreage within the [National Forest] . . . over a 5- to 10-year period." Tarleton Final EA at 24. Although that statement identified the scope of the project area, it failed to properly identify the geographic context for the Service's analysis, which would have been necessary to make an initial significance determination. *See* 40 C.F.R. § 1508.27(a).

101. The Forest Service also failed to consider how the Tarleton project's "impacts that may be both beneficial and adverse" contribute to the project's significance. *Id.* § 1508.27(b)(1). The Service claims that the final EA "describes both the potential beneficial and adverse impacts of the Proposed Action in terms of context and intensity," Tarleton Final EA at 25, but that document contains no discussion of the well-studied risks posed by logging, which include the spread of invasive species, increased erosion, decreased water quality, soil compaction, and diminished capacity for carbon storage and sequestration.

102. Additionally, the Forest Service failed to acknowledge that the "unique characteristics" of the Tarleton project area merited further analysis as part of an EIS. 40 C.F.R. § 1508.27(b)(3). Most notably, Lake Tarleton is the largest lake in the National Forest, but the Service asserts that the project area is "not unique" and that "similar areas can be found on several parts of the [National] Forest." Tarleton Final EA at 25.

103. Moreover, the Forest Service summarily dismissed substantial disputes as to the size, nature, and effects of the action on the environment that are "highly controversial." 40 C.F.R. § 1508.27(b)(4). The Service asserted that "[the project team] considered current scientific research, including that submitted by the public, . . . and found no controversy related

to the predicted effects." Tarleton Final EA at 25. There were substantial disputes concerning, *inter alia*, the proper management of early-successional habitat; the capacity of mature forests to capture and store carbon; best management practices for climate adaptation and resilience; and the extent of intact forests' benefits for water quality.

104. As noted, the Forest Service has failed to consider similar, contemporaneous projects. Therefore, the Service cannot claim to know whether the project will be "cumulatively significant[.]" 40 C.F.R. § 1508.27(b)(7).

105. Finally, as discussed above, the Forest Service relied on not knowing of any hibernacula or roosts in the project area to examine the "degree to which the action may adversely affect" the endangered northern long-eared bat and its habitat as part of the Service's final EA for the project. *Id.* § 1508.27(b)(9).

**E. Project Compliance with the Forest Plan**

106. The Tarleton project is inconsistent with the Forest Plan.

107. As noted in Section II(C)(4), the Forest Service failed to quantify a baseline on which the Service might rationally base a conclusion that no more than 9% of the viewed landscape for a given Concern Level 1 Travelway viewpoint has been subject to regeneration-age logging in the past 30 years. This violates MA 2.1 Guideline G-1. *See* Forest Plan at 3-52.

108. Regarding logging in old-growth forest or old-forest habitat, the Forest Service failed to publicly disclose information about the age of forest stands in the Tarleton project area, despite the Forest Plan's prohibitions on logging in old-growth forest or old-forest habitat.[8]

---

[8] *See* Forest Plan Glossary at 21 (including in the definition of "Old Forest Habitat" that "[n]o harvest will occur in stands identified to provide old forest habitat"); *see also* Forest Plan at 2-13 ("Timber harvest is prohibited in old-growth forest.").

Without such information, the public could not have either ensured (1) that project would actually avoid harvest in old-growth forest or in stands that provide old-forest habitat; or (2) that the project is necessary to meet the Forest Plan's age-class goals.

109. The fact that the science on which the Forest Service relied is so outdated also conflicts with the Service's own Planning Rule, which requires plans to be "responsive[] to changing conditions[.]" 36 C.F.R. § 219.1(b)(14) (1982); *see also* 36 C.F.R. § 219.5(a) (requiring forest management that would allow the Service to "adapt to changing conditions, including climate change, and improve management *based on new information and monitoring*") (emphasis added). Here, not only has the Service failed to respond to new information regarding climate change and the northern long-eared bat in the National Forest since 2005, but it also refused to consider new information provided by Standing Trees.

110. Furthermore, despite Standing Trees having offered numerous peer-reviewed scientific studies that were published more recently than the science on which the Forest Service relies, the Service failed to consider such science. The studies on which the Service relied objectively do not constitute the "latest" scientific knowledge. This departs from the Forest Plan, which requires the Service to manage the forest using "the latest scientific knowledge" Forest Plan at 1-3.

111. The Forest Service stated that the project "may affect, but is unlikely to adversely affect" the northern long-eared bat. Tarleton Final EA at 19. But the Service failed to include any measures that are designed to contribute to the recovery of the bat. Nor did the Service propose any species-specific actions to provide the ecological conditions necessary for the bat's recovery.

112. In sum, the final EA failed to (1) establish the baseline necessary to determine whether the project will comply with scenic guidelines; (2) publicly demonstrate that the Service

will not harvest timber in old-growth forests or stands with old-forest habitat; (3) consider new information; and (4) contribute to conservation and recovery of the northern long-eared bat.

### F. Project Final Decision

113. On November 13, 2023, the Forest Service authorized the Tarleton project after issuing its final EA and FONSI concluding that the project would not have a significant impact on the environment. As discussed above, this conclusion is arbitrary and capricious, and was made over Standing Trees' timely objection.

114. Because the Forest Service may implement the project at any time, harm to Plaintiff's members' interests in protecting the Tarleton project area is imminent.

## III. PEABODY WEST PROJECT

115. The Forest Service asserted that "[t]he project is needed to provide a sustainable yield of high-quality timber products and to improve wildlife habitat diversity within the Peabody West [Habitat Management Unit], thereby helping to achieve the desired future conditions for wildlife and vegetation described in Chapter 1 of the Forest Plan." U.S. Forest Serv., Peabody West Project Final Environmental Assessment and Finding of No Significant Impact at 6 (Apr. 2023) (Peabody West Final EA).[9] Such broad objectives can be achieved in myriad ways. Yet—just as it did with respect to the Tarleton project—the Service arbitrarily reviewed only the initial proposal for the Peabody West project.

116. On August 4, 2022, the Forest Service issued its draft EA and FONSI for the Peabody West project, on which Standing Trees submitted a timely comment. On April 27, 2023,

[9] The Forest Service's environmental documents for the Peabody West project are available on the Service's website at https://www.fs.usda.gov/project/?project=55659. The Peabody West Final EA and FONSI is viewable on the Service's website at https://usfs-public.app.box.com/v/PinyonPublic/file/1200238908343.

the Forest Service released its final EA and FONSI and draft decision notice, to which Standing Trees timely objected. On October 18, 2023, the Forest Service rejected Standing Trees' objection.

**A. Project Area**

117. The Peabody West project area, near Gorham, New Hampshire, is in the Presidential Range, north of the Great Gulf Wilderness and Mount Washington. The Appalachian Trail traverses the project area, which has long been cherished for its stunning mountain peaks, stands of mature hardwood forests, and awe-inspiring mountain hiking trails.

*Peabody West project area*
*Source: Peabody West Final EA (Forest Service photo by Jeff Williams)*

**B. "Alternatives" Analysis**

118. Throughout its review of the Peabody West project, the Forest Service failed to discuss or otherwise consider alternatives to the proposed project.

119. In its comment on the Peabody West draft EA, Standing Trees proposed one alternative that would have fewer and less significant impacts on numerous environmental resources than the proposed project. Standing Trees stressed that the Forest Service must consider alternatives that would authorize less logging as well as the crucial no-action alternative, which would authorize no logging.

120. In its objection to the project, Standing Trees reiterated its proposed alternative and the evidence in the record of the significant environmental impacts overlooked by the Forest Service.

121. The Forest Service dismissed Standing Trees' proposed alternative for failing to meet the project's purported purpose and need. U.S. Forest Serv., Peabody West Objection Response at 2 (Oct. 2023).[10]

122. The final EA did not consider any alternatives. It contained a short section entitled "Consequences of No Action," which stated— without citing any support or further explanation or analyzing the potential benefits—that "taking no action would not meet the need to advance forest plan goals or wildlife habitat diversity objectives in the Peabody West [Habitat Management Unit]." Peabody West Final EA at 21.

## C. Project Impacts

123. In total, the Peabody West project would commercially log nearly 2,200 acres within primarily mature forest and construct or reconstruct nearly 10 miles of road. Over 600 acres of logging are proposed to take place in the Great Gulf Inventoried Roadless Area. Without establishing adequate baselines or considering cumulative impacts, the Forest Service cannot

---

[10] The Peabody West Project Objection Response is viewable on the Service's website at https://usfs-public.app.box.com/v/PinyonPublic/file/1338855440652.

claim to know whether the project's impacts will be significant. Specifically, the Service's assessment of climate change, water quality, endangered species, and scenic and other resources failed to capture the full significance of environmental impacts for the reasons described below.

*1. Climate and Carbon Storage*

124. Much like the Forest Service's Tarleton project review, the Peabody West final EA stated that "in the short-term, [the project] might contribute an extremely small quantity of [GHG] emissions relative to national and global emissions[,] . . . [and] carbon would be removed from the atmosphere over time as the forest regrows. Therefore, effects . . . would be negligible." Peabody West Final EA at 24. But these speculative conclusions do not meet NEPA's "hard look" standard, which requires that federal agencies use the best available science, attempt to quantify the GHG emissions likely to result from their major decisions, and consider the cumulative effects of the project when assessed alongside similar, contemporaneous projects.

125. In its comment and objection, Standing Trees provided scientific evidence that (1) timber harvesting accounts for 86% of annual forest carbon loss in the northeastern U.S.; (2) the rate of carbon sequestration increases as trees age, with carbon storage maximized in unlogged stands; and (3) among land uses generally, timber harvesting has the greatest relative impact on aboveground carbon storage regionally. The Forest Service did not explain its decision to dismiss this science. Even if the Service dismissed the provided literature as not being the best, the Service did not provide a reasoned basis for dismissing it.

126. Rather, the Forest Service dismissed this evidence for being general in nature, rather than site-specific, but the Service abandoned that rationale in other contexts, e.g., by relying on non-site-specific water quality data within the same document. *See* Peabody West Final EA at 24.

127. Moreover, the Forest Service itself recognized the importance of protecting and restoring mature and old-growth forests for biodiversity, carbon storage, and climate resiliency. Climate Adaptation Plan at 13. But the Service's conclusion here—that the goals of the Forest Plan can only be satisfied by the Peabody West project as proposed—was inconsistent with this internal management direction.

128. The Final EA also failed to acknowledge Executive Order 14072, which requires the Forest Service to "retain and enhance carbon storage[.]" Strengthening the Nation's Forests, Communities, and Local Economies, 87 Fed. Reg. 24851, 24852 (Apr. 27, 2022).

129. Furthermore, the Forest Service must measure both project-specific GHG emissions and cumulative emissions from other reasonably foreseeable actions, including the Service's own logging projects. But the Service did not.

130. In sum, the Forest Service (1) did not use the best available science; (2) made the qualitative assertion that the project will have *de minimis* climate impacts without any quantitative, project-specific science to support it; (3) disregarded the Service's own science as well as applicable executive direction; and (4) did not undertake the necessary cumulative impacts analysis.

*2. Water Quality*

131. Regarding water quality impacts, the Forest Service claimed that there is "a high confidence of no measurable effect on water quality resulting from timber harvest" when the

basal area removed in a watershed containing a perennial stream does not exceed 20 percent. Peabody West Final EA at 24.[11]

132. Here, the project would exceed that threshold with respect to 12 distinct watersheds, which "rang[e] in size from 9 acres to 698 acres." *Id.*

133. The Forest Service purported that, because 7 of the 12 do not provide perennial fish habitat, "*there are no concerns about changes in water quality in these seven watersheds*." *Id.* (emphasis added). This declaration is inconsistent with the Forest Plan's direction, which applies regardless of the presence of fish.[12]

134. After eliminating 7 of the watersheds from genuine consideration because they supposedly do not contain perennial fish habitat, the Forest Service conceded that, of the 5 remaining, the highest percent basal area removed is 27%. *Id.*

135. Furthermore, echoing verbatim the Tarleton project EA, the Service inexplicably relied on non-site-specific analysis.

136. Thus, the Forest Service never established a baseline for the actual project area's water quality.

---

[11] "Basal area" refers to "the area of the cross section of a tree at 4-1/2 feet above the ground. Generally expressed as total basal area per acre." Forest Plan Glossary at 5. Basal area is commonly measured to assess the density and productivity of a forest stand.

[12] *See generally* 2005 White Mountain National Forest Plan (making no mention of the value of perennial water streams where fish are present); *see also id*. at 1-17 to 1-18 (listing "Water Resources" goals as "water quality is maintained or improved to protect existing and designated instream water uses such as aquatic life," and "[w]atersheds will continue to provide high quality water for public water supplies, recreational activities, aquatic biota such as fish, and other purposes").

137. In sum, the Forest Service (1) relied on reasoning that contradicts the Forest Plan to justify the Service's project; (2) used mismatched science to dismiss site-specific impacts; and (3) failed to establish the necessary baseline for water quality in the project area.

*3. Northern Long-Eared Bat*

138. As discussed in Section II(C)(3), northern long-eared bats have been documented throughout the National Forest.

139. The Forest Service "assumed" the bat was present for project review. Peabody West Integrated Resource Project Biological Evaluation and Wildlife Report at 7 (Apr. 2023) (Peabody West Biological Evaluation).[13]

140. At the same time, however, the Forest Service claimed that there were "no known hibernacula or maternity roosts within the [project] area." *Id.* The Service, without conducting any new surveys, relied on not knowing of any hibernacula or roost trees existing in the project area to conclude that direct effects on the bat would be limited to logging during summer and fall and tree removal related to bike-trail construction. *Id*. This departs from the Forest Plan, which requires the Forest Service "contribute to conservation and recovery of [endangered] species and their habitats." Forest Plan at 1-8.

141. The Forest Service admitted—without further analysis or explanation—that there is a "risk of impacting maternity colonies with the degree of tree removal proposed." Peabody West Biological Evaluation at 7.

[13] The Peabody West Project Biological Evaluation is viewable on the Service's website at https://usfs-public.app.box.com/v/PinyonPublic/file/1200243326958.

142. Together with recently approved and anticipated projects in the National Forest—including the Tarleton project—the Forest Service plans to eliminate or degrade several thousand acres of northern long-eared bat habitat. *See* Table 1, *supra*.

143. Just as it did with the Tarleton project, the Forest Service limited the Peabody West project's cumulative impacts review to the Peabody West Habitat Management Unit, without taking similar, nearby projects into account. *See* Peabody West Biological Evaluation at 6–7.

*4. Scenic Resources*

144. Regarding scenic resource impacts, the final EA concluded the project's scenic impacts "exceed the Forest Plan" for three large "even-aged" logging cuts, ranging in size from a 9-acre patch cut to a 26-acre clearcut. Peabody West Final EA at 22.

145. The final EA stated that "three relatively large even-aged treatment units" exist in the project area: "a 26-acre clearcut . . . a 9-acre patch cut . . . and the expansion of an existing permanent wildlife opening to about 19 acres." Peabody West Final EA at 22.[14] These opening sizes vastly exceed the recommendations under Forest Plan guidelines, which limit "observed size[s]" to 4-5 acres for "high" scenic integrity areas and 10 acres for "moderate" scenic integrity areas. Forest Plan at 3-6 to 3-8.

[14] These lands are designated MA 2.1 and are subject to Forest Plan Guideline G-3. *See* Forest Plan at 3-7.

146. Rather than analyzing alternatives with less logging that would nonetheless adhere to the Forest Plan, the final EA bypassed that necessary analysis and failed to disclose scenic impacts by instead relying on a future determination.[15]

147. The Forest Service attempted to justify its guideline departures by asserting that "the larger acreage is intended to better meet project-level objectives for the Peabody West [Habitat Management Unit], and to move the forest toward desired conditions consistent with the Forest Plan." Peabody West Final EA at 22. The Service relied on two presumptions: first, that project-level goals can outweigh forest-wide management direction, and second, that failing to comply with Forest Plan management direction is permissible so long as the Service intends for such violations to move the forest *generally* toward Forest Plan desired conditions. These presumptions are inconsistent with the Forest Plan.

148. In sum, the Forest Service failed to evaluate or credibly justify the project's significant proposed departure from Forest Plan guidelines regarding the maximum size of created openings.

*5. Other Resource Impacts*

149. Regarding recreational impacts, the Forest Service stated that "[o]verall, effects from closures or other restrictions on recreation activities would be minimal, localized, and would not persist past project implementation." U.S. Forest Serv., Peabody West Recreation Specialist Report at 2 (Sept. 2022).[16] But the Service plans to conduct logging and roadwork

---

[15] *See* Peabody West Final EA at 15 (stating that the "Forest Landscape Architect [will] review final layouts . . . to ensure that openings are well-distributed in the landscape to the maximum extent practical").

[16] The Peabody West Project Recreation Specialist Report is viewable on the Service's website at https://usfs-public.app.box.com/v/PinyonPublic/file/1200238994549.

during the winter as well as the summer and fall, the busiest seasons for hikers, campers, and other recreationists. Although the Service limited logging in units 67 and 78–80 to winter, it arbitrarily authorized summer and fall logging in or near units 65 and 68–74, which, like units 67 and 78–80, are adjacent to or overlap hiking trails. Peabody West Final EA at 14, 19.

150. Regarding cultural resource impacts, the Forest Service summarily dismissed the impacts to both the water quality and eligibility for federal wild and scenic designation of the two eligible river segments in the project area, the Peabody River and the West Branch of the Peabody River, and failed to properly justify its deviation from the Forest Plan. The Service stated that "[a]bout 14 total acres are proposed for even-aged silvicultural treatment within 0.25 mile[s] . . . of the two eligible rivers." Peabody West Final EA at 26–27. Within these acres, the nearest logging units are as close as 0.1 miles to either river. *Id*. at 27. Despite "even-aged" logging taking place so close to rivers, the Service arbitrarily concluded that its project will only affect the rivers' eligibility for designation in the "short-term." *Id.*

151. Regarding vegetation health impacts, the Forest Service claimed that the purpose of the project is to "advance Forest Plan goals, objectives, and desired conditions for vegetation, wildlife, and other resources in the Peabody West Habitat Management Unit[.]" Peabody West Final EA at 1. But the Service did not disclose any data on stand ages or early-successional habitat in either the project area or the National Forest. Thus, the Service did not—and cannot—show how the project advances its purported goals. Moreover, the Service did not acknowledge Executive Order 14072, which requires agencies to "conserve . . . mature and old-growth forests on Federal lands[.]" Strengthening the Nation's Forests, Communities, and Local Economies, 87 Fed. Reg. 24851, 24851 (Apr. 27, 2022). The Order also directs the Service to manage the

National Forest to "retain and enhance carbon storage[,] conserve biodiversity . . . enhance climate resilience, . . . [and] provide outdoor recreational opportunities[.]" *Id.* at 24852.

152. Regarding impacts on inventoried roadless areas (IRAs), the Forest Service concluded that the project would have "limited, short term effects on the Great Gulf IRA and would therefore not impact future eligibility for the Great Gulf IRA as potential wilderness." U.S. Forest Serv., Peabody West Roadless Effects Summary at 2 (May 2022).[17] At face value, this assessment still failed to account for the project's impacts on the remaining three "suitability" components of the Chapter 70 wilderness-evaluation process: (1) the future evaluation of wilderness characteristics; (2) analysis; and (3) recommendation. *See* U.S. Forest Serv., FSH 1909.12 – Land Management Planning Handbook Chapter 70 – Wilderness at 4–5.

153. Although the Forest Service has indeed already assessed the Great Gulf IRA—and even if it did "reach[] definitive conclusions"—the Service irrationally concluded that, more than 20 years later, "the Peabody West project's analysis need not consider the Great Gulf IRA's suitability and potential for wilderness recommendation and designation by Congress[.]" Peabody West Objection Response at 15. Additionally, the Service admitted that it did not address impacts to many of such areas' unique characteristics, including their "high quality or undisturbed soil, water, and air." *Id*. at 16.

*6. Cumulative Impacts*

154. The final EA concluded that "[t]he incremental impacts of this project when overlapped in time and space with other actions with similar impacts would not result in significant cumulative impacts." Peabody West Final EA at 30.

---

[17] The Peabody West Project Roadless Effects Summary is viewable on the Service's website at https://usfs-public.app.box.com/v/PinyonPublic/file/992714716427.

155. As noted, the Forest Service took a *de minimis* approach to GHG emissions, which truncated its review of climate impacts. The Service asserted that the project—alone, without regard to similar, contemporaneous logging projects in the very same National Forest—would "contribute an extremely small quantity of [GHG] emissions relative to national and global emissions[.]" *Id*. at 24.

156. Similarly, the Forest Service truncated its review of all environmental impacts: The Service acknowledged that the project would "[include] about 3,000 acres . . . of lands administered by the WMNF[, and would] occur over several years." *Id*. at 28. But other past, present, and reasonably foreseeable future projects in the National Forest are glaringly absent from the Service's review of cumulative impacts.

157. Thus, the Forest Service did not—and could not—determine whether project impacts—together with the impacts from recent, ongoing, or reasonably foreseeable future projects in the National Forest—are cumulatively significant. *See* Table 1, *supra*.

158. For the foregoing reasons, the Forest Service failed to take a hard look at the Peabody West project's environmental impacts.

### D. <u>Project Final EA and FONSI</u>

159. In its final EA and FONSI, the Forest Service failed to demonstrate that the project would not significantly affect the environment. This includes demonstrating whether the project would affect the environment to a significant extent that the Service has not already considered.

160. The Forest Plan is a "strategic, programmatic document that does not make project-level decisions," and it envisions that the Service will make any necessary evaluations at the outset of project planning. Forest Plan at v.

161. Here, the Forest Service did not make the necessary evaluations at the outset (or any other point) of planning the Peabody West project. Notably, this omission includes new information that was not available to the Service when it developed the Forest Plan. For example, the Forest Service disregarded its own recent research on the role of forests in climate adaptation. *See generally* Climate Adaptation Plan. Also, the northern long-eared bat was recently added to the federal endangered species list. The Service did not have the opportunity to consider such information in its decades-old Forest Plan. Nor did it consider the information here.

162. Furthermore, in reviewing the significance of the project, the Forest Service stated that "[t]he proposed project includes about 3,000 acres of the more than 800,000 acres of land administered by the WMNF." Peabody West Final EA at 28. Although this implies that the Service used the project area as the "context" for determining the project's significance in one respect, the Service then stated that "the potential environmental effects would be site-specific, localized to the project area, and would not be measurable at a regional or larger scale," implying that the project area cannot be used as the project's "context" in other respects. *Id*. The Service failed to properly identify the geographic context for the Service's analysis, which would have been necessary to make an initial significance determination. *See* 40 C.F.R. § 1508.27(a).

163. The Forest Service failed to consider how the Peabody West project's "impacts that may be both beneficial and adverse" contribute to the project's significance. *Id.* § 1508.27(b)(1). The Service claimed that the final EA "considers both the potential beneficial and adverse impacts of the proposed action in terms of context and intensity," Peabody West Final EA at 29, but that EA contains no discussion of the well-studied risks posed by logging,

which include the spread of invasive species, increased erosion, decreased water quality, soil compaction, and diminished capacity for carbon storage and sequestration.

164. Additionally, the Forest Service failed to acknowledge that the "unique characteristics" of the Peabody West project area merited further analysis to determine the project's significance. 40 C.F.R. § 1508.27(b)(3). Most notably, the Forest Service did not account for the unique characteristics of the Great Gulf Wilderness, the Great Gulf IRA, the Appalachian Trail corridor, eligible wild and scenic rivers, or potential northern long-eared bat habitat in the project area. Dismissing these unique characteristics, the Service asserted that the project area is "not unique[.]" Peabody West Final EA at 29.

165. Moreover, the Forest Service summarily dismissed substantial disputes as to the size, nature, and effects of the action on the human environment that are "highly controversial." 40 C.F.R. § 1508.27(b)(4). The Service asserted that "[the project team] considered current scientific research, including that submitted by the public, . . . and found no scientific controversy related to the predicted effects." Peabody West Final EA at 29. To the contrary, there were substantial disputes concerning, *inter alia*, the proper management of early-successional habitat; the capacity of mature forests to capture and store carbon; best management practices for climate adaptation and resilience; and the extent of intact forests' benefits for water quality.

166. As noted, the Forest Service has failed to consider similar, contemporaneous projects. Therefore, the Service cannot claim to know whether the project will be "cumulatively significant[.]" 40 C.F.R. § 1508.27(b)(7).

167. As discussed above, the Forest Service relied on not knowing of the existence of bat hibernacula or roosts to examine the "degree to which the action may adversely affect" the endangered northern long-eared bat and its habitat. *Id.* § 1508.27(9).

### E. Project Compliance with the Forest Plan

168. The Peabody West project is also inconsistent with the Forest Plan.

169. As noted in Section III(C)(4), the Forest Service failed to either adhere to Forest Plan direction concerning scenic resources or justify departing from such guidelines.

170. Forest-wide Standard S-1 for Wild and Scenic Rivers directs the Forest Service to "[m]anage eligible rivers to maintain their classification and eligibility until Congress designates the segments or decides not to designate them[.]" Forest Plan at 2-32. The final EA did not acknowledge this standard, much less rationally justify deviating from it. Instead, the Forest Service summarily concluded—without providing any analysis—that the project's impacts will be "limited" and "short term." Peabody West Final EA at 27.

171. Regarding logging in old-growth forest or old-forest habitat, the Forest Service failed to disclose information on the age of forest stands in the Peabody West project area, despite the Forest Plan's prohibitions on logging in old-growth forest or old-forest habitat. Without such information, the public could not have either ensured (1) that project would actually avoid harvest in old-growth forest or in stands that provide old-forest habitat; or (2) that the project is necessary to meet the Plan's age-class goals.

172. The fact that the science on which the Forest Service relied is so outdated also conflicts with the Service's own Planning Rule, which requires plans to be "responsive[] to changing conditions[.]" 36 C.F.R. § 219.1(b)(14) (1982); *see also* 36 C.F.R. § 219.5(a) (requiring forest management that would allow the Service to "adapt to changing conditions, including climate change, and improve management *based on new information and monitoring.*") (emphasis added). Here, not only has the Service failed to respond to new information regarding

climate change and the northern long-eared bat in the National Forest since 2005, but it also refused to consider new information provided by Standing Trees.

173. Furthermore, despite Standing Trees having offered numerous peer-reviewed scientific studies that were published more recently than the science on which the Forest Service relies, the Service failed to consider such science. The studies the Service relied objectively do not constitute the "latest" scientific knowledge. This departs from the Forest Plan, which requires the Service to manage the forest using "the latest scientific knowledge" Forest Plan at 1-3.

174. Contrary to the Forest Plan, the Forest Service failed to include any measures that are designed to contribute to the recovery of the northern long-eared bat. Nor did the Service provide any species-specific plan components to provide the ecological conditions necessary for the bat's recovery.

175. In sum, the final EA (1) failed to rationally justify its departure from the Forest Plan's scenic integrity objectives; (2) summarily dismissed the project's impacts on the eligibility of rivers in the project area for federal wild and scenic designation; (3) failed to publicly demonstrate that the Service will not harvest timber in old-growth forests or stands with old-forest habitat; (4) failed to consider new information; and (5) failed to contribute to conservation and recovery of the northern long-eared bat.

### F. <u>Project Final Decision</u>

176. On February 7, 2024, the Forest Service authorized the Peabody West project after issuing its final EA and FONSI concluding that the project would not have a significant impact on the environment. As discussed above, this conclusion is arbitrary and capricious, and was made over Standing Trees' timely objection.

177. Because the Forest Service may implement the project at any time, harm to Plaintiff's members' interests in protecting the Peabody West project area is imminent.

## CLAIMS FOR RELIEF

### Claim 1: Failure to Consider Appropriate Alternatives Under NEPA and the APA

178. Standing Trees incorporates the above allegations by reference.

179. The Forest Service violated NEPA by failing to adequately consider appropriate alternatives during the preparation of the final EAs for the Tarleton and Peabody West projects. These decisions are arbitrary, capricious, an abuse of discretion, and not in accordance with law in violation of the APA.

180. The alternatives analysis—the "heart" of environmental reviews under NEPA—commands agencies to consider "appropriate" alternatives when preparing an EA. 40 C.F.R. §§ 1501.2(c), 1508.9(b); *see also* 42 U.S.C. § 4332(2)(E).

**A) Tarleton Project**

181. The Tarleton project is a major federal action that requires compliance with NEPA and its implementing regulations. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500–1508.

182. The Forest Service's authorization of the Tarleton project was a final agency action for purposes of APA review. 5 U.S.C. § 704.

183. In its comment on the EA for and its objection to the Tarleton project, Standing Trees proposed an alternative that would have reduced the size and scope of impacts to environmental resources. The Service dismissed the alternative for purportedly failing to achieve the project's purpose and need. Tarleton Objection Response at 5.

184. The final EA does not consider any alternatives. It contains a short section entitled "Consequences of No Action," which states—without analyzing potential benefits—that "taking

no action would not meet the need to advance forest plan goals or wildlife habitat diversity objectives in the Tarleton [Habitat Management Unit].” Tarleton Final EA at 8.

185. By failing to consider appropriate alternatives in preparing its EA or justify its consistent failure to genuinely explore alternatives and making a finding of no significant impact for the Tarleton project, the Forest Service violated NEPA.

186. This failure to consider alternatives also violates the APA because it is arbitrary, capricious, an abuse of discretion, and not in accordance with law.

**B) Peabody West Project**

187. The Peabody West project is a major federal action that requires compliance with NEPA and its implementing regulations. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500–1508.

188. The Forest Service’s approval of the Peabody West project was a final agency action for purposes of APA review. 5 U.S.C. § 704.

189. In its comment on the EA for and its objection to the Peabody West project, Standing Trees proposed an alternative to the existing proposal. The Service dismissed the alternative for purportedly failing to achieve the project’s purpose and need and concluded that the Service satisfied any obligations to discuss alternatives by “describ[ing] the consequences of taking no action[.]” Peabody West Objection Response at 2.

190. The final EA does not consider any alternatives. It contains a short section entitled “Consequences of No Action,” which states—without analyzing potential benefits—that “taking no action would not meet the need to advance Forest Plan goals or the wildlife habitat diversity objectives in the Peabody West [Habitat Management Unit].” Peabody West Final EA at 21.

191. By failing to consider appropriate alternatives in preparing its EA or justify its consistent failure to genuinely explore alternatives and making a finding of no significant impact for the Peabody West project, the Forest Service violated NEPA.

192. This failure to consider alternatives also violates the APA because it is arbitrary, capricious, an abuse of discretion, and not in accordance with law.

**Claim 2: Failure to Take a Hard Look Under NEPA and the APA**

193. Standing Trees incorporates the above allegations by reference.

194. NEPA and its implementing regulations require the Forest Service to take a "hard look" at the environmental impacts of a project and its alternatives, including their direct, indirect, and cumulative impacts, when preparing an EA. 40 C.F.R. § 1508.9(b). Establishing baselines is critical to any NEPA review because without them, there is no way to determine the extent of the project's environmental impacts and, consequently, no way to comply with NEPA.

195. Regarding GHG emissions, the Forest Service must also use appropriate tools and methodologies and the best available science to "quantity GHG emissions, compare GHG emissions quantities across alternative scenarios, . . . and place emissions in [the] relevant context[.]" National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change, 88 Fed. Reg. 1196, 1201 (Jan. 9, 2023). Additionally, "a statement that emissions from a proposed Federal action . . . represent only a small fraction of global or domestic emissions" does not satisfy NEPA because such a statement "is not a useful basis" for considering climate change impacts. *Id.*

196. The Forest Service's Tarleton and Peabody West project reviews violate NEPA because they fail adequately to consider the direct, indirect, and cumulative environmental impacts of each project.

197. These failures to take a "hard look" also violate the APA because they are arbitrary, capricious, an abuse of discretion, and not in accordance with law.

**A) Tarleton Project**

198. The Forest Service violated NEPA by failing to take the required "hard look" at the Tarleton project's environmental impacts, including impacts to the climate; water quality; the northern long-eared bat; scenic, recreational, and soil resources; and mature forest stands.

199. Regarding water quality, the northern long-eared bat, and scenic resources, the Forest Service violated NEPA by relying on inapplicable or incomplete data. Establishing baselines is necessary to determine that the physical realities of the project area justify an agency's decision. By not identifying baselines, the Service fails to satisfy NEPA's requirement that agencies demonstrate a rational connection between the facts they find and the choices they make.

200. The Forest Service also violated NEPA by failing properly to consider the direct, indirect, and cumulative environmental impacts from similar, contemporaneous projects in the same region, including the Peabody West project.

201. These failures to take a "hard look" also violate the APA because they are arbitrary, capricious, an abuse of discretion, and not in accordance with law.

**B) Peabody West Project**

202. The Forest Service failed to take the required "hard look" at the Peabody West project's environmental impacts, including impacts to the climate; water quality; the northern long-eared bat; scenic, recreational, and cultural resources; mature forest stands; and wilderness and inventoried roadless areas.

203. Regarding water quality, the northern long-eared bat, and scenic resources, the Forest Service violated NEPA by relying on inapplicable or incomplete data. Establishing baselines is necessary to determine that the physical realities of the project area justify an agency's decision. By not identifying baselines, the Service fails to satisfy NEPA's requirement that agencies demonstrate a rational connection between the facts they find and the choices they make.

204. The Forest Service also violated NEPA by failing properly to consider the direct, indirect, and cumulative environmental impacts from similar, contemporaneous projects in the same region, including the Tarleton project.

205. These failures to take a "hard look" also violate the APA because they are arbitrary, capricious, an abuse of discretion, and not in accordance with law.

**Claim 3: Unlawful Finding of No Significant Impacts**

206. Standing Trees incorporates the above allegations by reference.

207. NEPA requires the Forest Service to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Agencies must prepare supplements to such statements where "new information . . . show[s] that the remaining action will affect the quality of the human environment . . . *to a significant extent not already considered*[.]" *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 374 (1989) (emphasis added).

208. New information has arisen with respect to, *inter alia*, climate change, endangered species, and vegetation health, and this information highlights significant project-related environmental impacts that the Forest Service has not already considered. Thus, the Forest Service cannot rely on its Forest Plan EIS to make a FONSI with respect to these projects.

209. In determining whether a project is significant, the Forest Service must consider both the context and intensity of the action. 40 C.F.R. § 1508.27.

210. Consideration of an action's "context" requires the deciding agency to analyze the action's significance to "society as a whole[], the affected region, the affected interests, and the locality." *Id.* § 1508.27(a). Both short- and long-term effects must be considered. *Id.* Assessing the significance of cumulative impacts—which, by definition, are comprised of constituent parts that may be individually insignificant—is impossible without identifying the geographic context, e.g., the National Forest or New England, within which such impacts are to be assessed.

211. To determine the "intensity" of an action, the agency must evaluate the severity of the action's impact using certain factors enumerated in the regulations, as discussed below. *Id*. § 1508.27(b).

212. The Forest Service's FONSIs for the Tarleton and Peabody West projects violate NEPA and the APA because the Service did not appropriately analyze the projects' context or intensity.

**A) Tarleton Project**

213. The Forest Service did not properly identify the Tarleton project's geographic context, stating simply that it would "occur over an area totaling less than about one percent of the total acreage within the [National Forest] . . . over a 5- to 10-year period." Tarleton Final EA at 24.

214. As discussed in Section II(D) *supra*, the Forest Service was obligated to evaluate "impacts that may be both beneficial and adverse," 40 C.F.R. § 1508.27(b)(1); the project's impacts on the "unique characteristics" of the Tarleton project area, namely Lake Tarleton itself, *id*. § 1508.27(b)(3); the extent to which the effects are rendered "highly controversial" by the

substantially disputed science in the record, *id*. § 1508.27(b)(4); the extent to which the Tarleton project contributes to significant impacts when considered alongside "other actions with individually insignificant but cumulatively significant impacts," *id*. § 1508.27(b)(7); and the "degree to which the action may adversely affect" the endangered northern long-eared bat and its habitat, *id*. § 1508.27(9). But the Service failed to do so.

215. The Forest Service's FONSI for the Tarleton project was arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of NEPA and the APA, because the Service neither properly identified the geographic context nor considered relevant intensity factors.

**B) Peabody West Project**

216. As with the Tarleton project, the Forest Service did not properly identify the Peabody West project's geographic context. In its FONSI, the Service stated that the project "includes about 3,000 acres of the more than 800,000 acres of lands administered by the [National Forest]," Peabody West Final EA at 28, implying that the Service used the project area as the "context" to assess the project's intensity. Simultaneously, however, the Service acknowledged that the project's "potential environmental effects . . . would not be measurable at a regional or larger scale," *id*., implying that the context the Service used to assess the intensity of *these* effects was different than the context used to assess *other* effects.

217. As discussed in Section III(D) *supra*, the Forest Service was obligated to evaluate "impacts that may be both beneficial and adverse," 40 C.F.R. § 1508.27(b)(1); the project's impacts on the "unique characteristics" of the Peabody West project area, namely the Great Gulf Wilderness, Great Gulf IRA, and rivers eligible for wild and scenic designation, *id*. § 1508.27(b)(3); the extent to which the effects are rendered "highly controversial" by the

substantial scientific dispute in the record, *id*. § 1508.27(b)(4); the extent to which the Peabody West project contributes to significant impacts when considered alongside "other actions with individually insignificant but cumulatively significant impacts," *id*. § 1508.27(b)(7); and the "degree to which the action may adversely affect" the endangered northern long-eared bat and its habitat, *id*. § 1508.27(9). As with the Tarleton project review, the Service failed to do so.

218. The Forest Service's FONSI for the Peabody West project was arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of NEPA and the APA, because the Service neither properly identified the geographic context nor considered relevant intensity factors.

**Claim 4: Failure to Comply with the Forest Plan and NFMA**

219. Standing Trees incorporates the above allegations by reference.

220. NFMA requires the Forest Service to ensure that its site-specific actions comply with the requirements of the Forest Plan. *See* 16 U.S.C. § 1604(i). The Forest Plan includes management direction for scenic integrity and water quality, as well as restrictions on timber harvest. It also requires the Service to manage the forest using "the latest scientific knowledge[.]" Forest Plan at 1-3. The Plan also requires the Service to "contribute to conservation and recovery of species and their habitats." *Id*. at 1-8.

221. To be consistent with the Forest Plan, an EA must describe how the action: (1) either contributes to the maintenance or attainment of one or more goals, desired conditions, or objectives or at least does not foreclose the opportunity to do so over the long term; (2) complies with applicable standards; (3) either complies with applicable guidelines or is designed in a way that is as effective in achieving the purpose of the applicable guidelines; and (4) occurs in an area

deemed suitable for that type of action or for which the plan is silent with respect to the area's suitability for that type of action. 36 C.F.R. § 219.15(d).

222. When a project is inconsistent with an applicable Forest Plan component, the Service must do one of four things: (1) modify the action so as to make it consistent with the Plan; (2) terminate the action; (3) amend the Forest Plan so that the action becomes consistent with the Plan; or (4) enact a limited Plan amendment contemporaneously with the action's approval so that the action will be consistent with the Plan as amended. *Id*. § 219.15(c).

223. The Forest Service's deviations from the Forest Plan, discussed below, violate NFMA and the APA.

**A) Tarleton Project**

224. As noted, the Tarleton project is inconsistent with the Forest Plan because the Forest Service fails to ensure compliance with the Plan's standards and guidelines for scenic integrity objectives, fails to disclose stand-age information, dismisses the latest scientific knowledge, and fails to contribute to the conservation and recovery of endangered species.

225. These failures violate NFMA's requirement that the Forest Service ensure that every element of the Tarleton project complies with the Forest Plan by either contributing to the maintenance or attainment of one or more goals, desired conditions, or objectives or at least not foreclosing the opportunity to do so over the long term; by complying with all applicable standards; by complying with or justifying the departure from applicable guidelines; and by occurring in a suitable area.

226. The Forest Service's authorization of the Tarleton project was arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of NFMA and the APA, because the Service improperly deviated from the Forest Plan.

**B) Peabody West Project**

227. The Peabody West project is inconsistent with the Forest Plan because the Forest Service fails to ensure compliance with the Forest Plan's standards and guidelines for wild and scenic rivers and scenic integrity objectives, fails to disclose information on stand ages, dismisses the latest scientific knowledge, and fails to contribute to the conservation and recovery of endangered species.

228. These failures violate NFMA's requirement that the Forest Service ensure that every element of the Peabody West project complies with the Forest Plan by either contributing to the maintenance or attainment of one or more goals, desired conditions, or objectives or at least not foreclosing the opportunity to do so over the long term; by complying with all applicable standards; by complying with or justifying the departure from applicable guidelines; and by occurring in a suitable area.

229. The Forest Service's authorization of the Peabody West project was arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of NFMA and the APA, because the Service improperly deviated from the Forest Plan.

## PRAYER FOR RELIEF

WHEREFORE, Standing Trees respectfully requests that the Court:

A. DECLARE that Defendants violated the National Environmental Policy Act, National Forest Management Act, and Administrative Procedure Act in the respects set forth above when issuing the 2023 Decision Notices for both (1) the Tarleton Integrated Resource Project and (2) the Peabody West Integrated Resource Project;

B. VACATE and set aside the Decision Notices for the Tarleton project and the Peabody West project as unlawful agency actions under the Administrative Procedure Act;

C. ENJOIN Defendants from proceeding with the Tarleton and Peabody West projects until they have complied with the National Environmental Policy Act, National Forest Management Act, and Administrative Procedure Act;

D. AWARD Standing Trees its reasonable costs, litigation expenses, expert fees, and attorney fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

E. GRANT such further relief as the Court deems just and equitable.

Respectfully submitted, this the 16th day of May, 2024.

STANDING TREES, INC.

By its attorneys:

/s/ Christophe Courchesne
Christophe Courchesne
NH Bar No. 20431
Assistant Professor and Director
Environmental Advocacy Clinic
Vermont Law and Graduate School
164 Chelsea Street, PO Box 96
South Royalton, VT 05068
(802) 831-1630
(802) 831-1631 (fax)
ccourchesne@vermontlaw.edu

/s/ Diana Csank
Diana Csank*
Assistant Professor
Environmental Advocacy Clinic
Vermont Law and Graduate School
164 Chelsea Street, PO Box 96
South Royalton, VT 05068
(802) 831-1630
(802) 831-1631 (fax)
dcsank@vermontlaw.edu
**Admitted in New York; pro hac vice motion forthcoming*

*Environmental Advocacy Clinic student attorneys Hannah Weisgerber, Logan Keen, Ashton Danneels, Katlyn Schafer, and Angela Galik contributed to this Complaint.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| STANDING TREES, INC.<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES FOREST SERVICE, *et al.*,<br><br>Defendants. | Case No. 1:24-cv-00138-JL-TSM |

## JOINT CASE MANAGEMENT PLAN

Pursuant to of Rule 16(b) of the Federal Rules of Civil Procedure and the Court's July 24, 2024 Notice of Pretrial Conference, counsel for the parties have conferred and submit the following case management plan and proposed scheduling order.

**DATE/PLACE OF MEETING:** Telephone and email correspondence were completed by July 26, 2024.

**COUNSEL REPRESENTING:**

Christophe Courchesne, counsel for Plaintiff Standing Trees.

John P. Tustin, counsel for Defendant United States Forest Service; Derek Ibarguen, in his official capacity as Supervisor of the Mountain National Forest; Brooke Brown, in her official capacity as the District Ranger for the Pemigewasset Ranger District; and Joshua Sjostrom, in his official capacity as the District Ranger for the Androscoggin Ranger District.

## CASE SUMMARY

This case is brought under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706. DN 1, ¶ 33. Plaintiff challenges the Forest Service's authorization of two projects on the White Mountain National Forest: the Tarleton Integrated Resource Project (Tarleton) and the

Peabody West Integrated Resource Project (Peabody West). *Id.* ¶ 1. The Forest Service issued separate decision notices authorizing the Tarleton and Peabody West projects on November 13, 2023, and February 7, 2024, respectively. *Id.* ¶ 29.

**THEORY OF LIABILITY**: Plaintiff alleges the challenged actions violate the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4331-4370m, the National Forest Management Act (NFMA), 16 U.S.C. § 1604, and the APA. *Id.* ¶¶ 178-218 (Claims 1, 2, and 3) (NEPA and APA), ¶¶ 219-229 (Claim 4) (NFMA and APA).

**THEORY OF DEFENSE**: Defendants deny that the Tarleton Project and Peabody West Project decisions are arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law.

**DAMAGES**: Plaintiff seeks declaratory and injunctive relief and an award of costs, expenses, and fees. DN 1 at 52-53. Defendants reserve the right to seek court costs, including costs for producing the Administrative Records.

**DEMAND**: The parties will discuss possible informal resolution throughout the pendency of the matter.

**OFFER**: The parties will discuss possible informal resolution throughout the pendency of the matter.

**JURISDICTIONAL QUESTIONS**: Plaintiff alleges the Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1346 (federal question and United States as defendant), 5 U.S.C. §§ 701-706 (Administrative Procedure Act), and 28 U.S.C. §§ 2201, 2202 (Declaratory Judgment Act). ECF No. 1 ¶¶ 13-14. Defendants may raise in their summary judgment motion certain jurisdictional and other threshold non-merits challenges, including lack of subject matter jurisdiction, failure to exhaust administrative remedies, statute of limitations, and waiver.

**QUESTIONS OF LAW**: This is an action for review of agency actions brought under the APA. The questions of law for the Court are whether the challenged agency decisions are arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law.

**TYPE OF TRIAL**: This case is brought under the APA. The parties agree that a trial is not warranted or appropriate.

**SCHEDULE**[1]

**TRACK ASSIGNMENT**: The parties agree that a trial is not warranted or appropriate because this case is brought under the APA. To the extent that the trial calendar is implicated, the parties request that this case be assigned to the administrative track under LR 40.1(a)(1).

**TRIAL DATE**: The parties agree that a trial is not warranted or appropriate because this case is brought under the APA. The parties expect that the matter will be ripe for the Court's resolution upon the completion of summary judgment briefing in December 2024, and after oral argument if the Court determines that argument is appropriate. Should the Court desire oral argument on the parties' cross-motions for summary judgment, counsel for the parties are available December 16-20, 2024, and in January or February 2025 **except** January 2-17. The parties can propose additional dates beyond February 2025 if that timeframe is better for the Court's calendar.

**AMENDMENT OF PLEADINGS**: Defendants responded to the Complaint on July 23, 2024. DN 7. Plaintiff agrees that any amendment to the Complaint as a matter of course under Fed. R. Civ. P. 15(a)(1) is due by **August 13, 2024**. The parties agree that Defendants' Response to

[1] This case is brought under the APA and should proceed under the administrative track described in LR 40.1(a)(1). The parties agree that the following topics in Civil Form 2 do not apply: "Schedule" (Disclosure of Claims against Unnamed Parties, Third Party Actions, Dates of Disclosure of Experts and Experts' Written Supplementations, Completion of Discovery, Challenges to Expert Testimony); "Discovery" (all topics); and "Other Items" (Trial Estimate, Witnesses and Exhibits, Preliminary Pretrial Conference).

Plaintiff's Complaint (DN 7) should be deemed the responsive pleading to any amended complaint, if one is filed.

**JOINDER OF ADDITIONAL PARTIES**: The Parties do not anticipate adding any other parties. Counsel for three outside entities have contacted counsel for Defendants about participating in this matter as amicus: Christopher G. Aslin, representing the New Hampshire Fish and Game Department and the New Hampshire Department of Natural and Cultural Resources, and David B. Van Slyke, representing the New Hampshire Timberland Owners Association. The parties have included a deadline for amicus briefs in the summary judgment schedule. The known prospective amicus parties agree to move for leave to participate as amicus, to file their proposed amicus briefs by the proposed deadline, and to follow the identified page limits for amicus briefs.

**MOTIONS TO DISMISS**: None. Defendants may raise in their summary judgment motion certain jurisdictional and other threshold non-merits challenges, including lack of subject matter jurisdiction, failure to exhaust administrative remedies, statute of limitations, and waiver.

**ADMINISTRATIVE RECORDS**: The parties agree that the Court's review of Plaintiff's claims is based on the Administrative Records for the challenged agency decisions. The parties propose the following schedule for reviewing, lodging, and resolving the contents of the Administrative Records prior to merits briefing:

1. Defendants will send an electronic copy of the Administrative Records to counsel for the Plaintiff and lodge the Administrative Records with the Court by **July 30, 2024**. The Administrative Records currently contain approximately 15,000 pages. The electronic version of the Administrative Records will have a hyperlinked index and is searchable to the extent practical. If printed, the Administrative Records would fill between six and

eight standard bankers boxes and would not be searchable. Defendants hereby seek leave to provide the Administrative Records on electronic media only (e.g., thumb drive), rather than filing the Administrative Records on ECF and/or providing a paper copy to the Court. Plaintiff does not oppose Defendants' request to lodge the Administrative Records in electronic format.

2. In the event there are any issues with the Administrative Records, the parties agree to confer and attempt to resolve the issues without judicial intervention. Plaintiff agrees to raise informally in writing to Defendants' counsel any materials that it asserts are necessary to supplement, complete, or otherwise challenge the contents of the Administrative Records by **August 22, 2024**.
3. The parties agree that any motion to supplement, complete, or otherwise challenge the contents of the Administrative Records is due **September 5, 2024**, and that any such motion shall be based only on the issues that Plaintiff raised informally with Defendant as set forth in the preceding paragraph.
4. The parties agree that the filing of a motion to complete, supplement, or otherwise challenge the contents of the Administrative Records **will suspend** the summary judgment briefing set forth below. The parties agree to file a joint status report with proposed briefing dates for summary judgment briefing within **fourteen days** of the Court's order resolving challenges to the contents of the Administrative Records.

**MOTIONS FOR SUMMARY JUDGMENT**: Subject to the Court's approval, the parties agree to the following proposed schedule to brief all claims on cross-motions for summary judgment:

1. If there are no motions regarding the Administrative Records, Plaintiff's opening summary judgment brief and declarations on standing are due **October 3, 2024**.

2. Defendants' combined cross-motion and response is due **October 31, 2024**.
3. Amicus briefs (if any) are due **November 7, 2024**.
4. Plaintiff's combined response and reply brief is due **November 21, 2024**.
5. Defendants' reply is due **December 12, 2024**.
6. In addition to the proposed schedule, the parties reserve the right to file additional motions not contemplated by this schedule and in accordance with the Local Rules of this Court.

## OTHER ITEMS

**SETTLEMENT POSSIBILITIES**: The parties agree that settlement is unlikely, though will discuss possible informal resolution throughout the pendency of the matter.

**JOINT STATEMENT RE: MEDIATION**: The parties met and conferred and state that they do not plan to pursue mediation. Insofar as the Court requires a joint statement regarding mediation, the parties will submit a joint statement by a deadline set within the Court's discretion.

**OTHER MATTERS**:

1. **Page limits**: The parties request that the Court modestly increase the number of pages allowed under LR 7.1(a)(3) from 25 to 35 pages for their opening briefs and from 10 to 20 pages for their closing briefs. Plaintiff's opening summary judgment brief and Defendants' combined cross-motion and response brief would be 35 pages each. Plaintiff's combined response and reply brief and Defendants' reply brief would be 20 pages each. This arrangement provides each party with 55 total pages for their summary judgment arguments. The parties and prospective amici agree that amicus briefs, if any, shall be limited to 10 pages each.

2. **Project operations**: The Forest Service plans to advertise a timber sale for Peabody West in late August 2024. Timber harvest operations on units located in the center and west of the Peabody West project area could begin this winter (*i.e.*, mid-December 2024) at the earliest. Road reconstruction on existing Forest Service roads in the Peabody West area could begin earlier, possibly in early fall 2024. The Forest Service also plans to offer a timber sale for Tarleton in the spring of 2025. The earliest timber harvest operations on Tarleton could begin is December 2025. Tarleton also authorizes construction of a boat launch and aquatic habitat restoration work. That work will occur this summer and fall (*i.e.*, June 2024 – November 2024).
3. **August 19, 2024 Pretrial Conference**: As noted above in footnote 1, this case is brought under the APA and neither discovery nor a pretrial conference apply. The parties agree upon the contents of this Joint Case Management Plan and believe the Court may enter the attached proposed order. Counsel for the parties will participate in the conference scheduled for August 19 unless the Court orders otherwise or vacates the scheduled conference.

The parties are not aware of any other matters that require the Court's attention. A proposed order accompanies this joint case management plan.

Dated: July 29, 2024

*For Plaintiff*

<u>*/s/ Christophe Courchesne (with permission)*</u>
CHRISTOPHE COURCHESNE
NH Bar No. 20431
Associate Professor and Director

Environmental Advocacy Clinic

Vermont Law and Graduate School
164 Chelsea Street, PO Box 96
South Royalton, VT 05068
Phone: (802) 831-1630
Fax: (802) 831-1631
ccourchesne@vermontlaw.edu

*For Defendants*

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

*/s/ John P. Tustin*
JOHN P. TUSTIN
TX Bar No. 24056458
Senior Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 305-3022
Fax: (202) 305-0275
john.tustin@usdoj.gov

JANE E. YOUNG
United States Attorney

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| STANDING TREES, INC.<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES FOREST SERVICE, *et al.*,<br><br>Defendants. | Case No. 1:24-cv-00138-JL-TSM |

**[PROPOSED] SCHEDULING ORDER**

The Court has considered the parties' joint case management plan and enters the following Scheduling Order:

1. This action for review of agency actions on administrative records is assigned to the administrative track under LR 40.1(a)(1).

2. Any amendment to the Complaint as a matter of course under Fed. R. Civ. P. 15(a)(1) is due by **August 13, 2024**. Defendants' Response to Plaintiff's Complaint (DN 7) is deemed the responsive pleading to any amended complaint.

3. The Administrative Records shall be lodged by **July 30, 2024**. Defendants' request to lodge the Administrative Records in electronic format only is **GRANTED**.

4. Plaintiff's deadline to raise informally in writing to Defendants' counsel any materials that it asserts are necessary to supplement, complete, or otherwise challenge the contents of the Administrative Records is **August 22, 2024**.

5. Any motion to supplement, complete, or otherwise challenge the contents of the Administrative Records is due **September 5, 2024**. Any such motion shall be based only

on the issues that Plaintiff raised informally with Defendants as set forth in the preceding paragraph.

6. The filing of a motion to complete, supplement, or otherwise challenge the contents of the Administrative Records **will suspend** the summary judgment briefing set forth below. The parties shall file a joint status report with proposed briefing dates for summary judgment briefing within **fourteen days** of the Court's order resolving challenges (if any) to the contents of the Administrative Records.

7. If there are no motions regarding the Administrative Records, Plaintiff's opening summary judgment brief and declarations on standing are due **October 3, 2024**. Plaintiff's opening brief is limited to **35 pages**.

8. Defendants' combined cross-motion and response is due **October 31, 2024**. Defendants' opening brief is limited to **35 pages**.

9. Amicus briefs (if any) are due **November 7, 2024**. Amicus briefs are limited to **10 pages**.

10. Plaintiff's combined response and reply brief is due **November 21, 2024**. Plaintiff's second brief is limited to **20 pages**.

11. Defendants' reply is due **December 12, 2024**. Defendants' second brief is limited to **20 pages**.

12. Oral argument on the parties' cross-motions for summary judgment is scheduled for ____________ .

**SO ORDERED**.

______________________________
The Honorable Joseph N. Laplante
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| STANDING TREES, INC.,<br>Plaintiff,<br>v.<br>UNITED STATES FOREST SERVICE, *et al.*,<br>Defendants. | Case No. 1:24-cv-00138-JL-TSM |

**DEFENDANTS' NOTICE OF LODGING ADMINISTRATIVE RECORD**

Defendants notice the lodging of the Administrative Record for the Tarleton Integrated Resource Project and the Peabody West Integrated Resource Project, which are the subjects of this litigation.

The Forest Service's Administrative Record consists of documents bearing Bates numbers PBWTAR_0001 through PBWTAR_14233. The declaration of Stacy Lemieux certifies the Forest Service's Administrative Record and is attached to this notice as Exhibit 1. A copy of the index of the Forest Service's Administrative Record is attached to this notice as Exhibit 2.

Two thumb drives each containing a set of the Administrative Record are being provided to the Clerk's office via overnight delivery to the Chambers of the Honorable Joseph N. Laplante. Counsel for Plaintiff received a link to an electronic copy of the Administrative Record that can be downloaded from a Forest Service Pinyon/Box folder.

Respectfully submitted,

Dated: July 30, 2024. TODD KIM

Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

*/s/ John P. Tustin*
Texas Bar No. 24056458
Senior Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 305-3022
Fax: (202) 305-0275
john.tustin@usdoj.gov

JANE E. YOUNG
United States Attorney

# Exhibit 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| STANDING TREES, INC.<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES FOREST SERVICE, *et al.*,<br><br>Defendants. | Case No. 1:24-cv-00138-JL-TSM |

**DECLARATION OF STACY LEMIEUX**

I, Stacy Lemieux, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am employed by the United States Department of Agriculture, United States Forest Service as the Natural Resources Staff Officer for the White Mountain National Forest. I have been employed in that position since January 2017. I have 33 years of service with the Forest Service, previously serving as a Wildlife Biologist in multiple locations, including on the White Mountain National Forest's Forest Plan revision core team, and most recently as the Forest Planner on the White Mountain National Forest. My current responsibilities include supervising seven Forest-level program managers (forestry, silviculture, wildlife, soils, hydrology, planning, and GIS), coordinating the Forest's approach to mature and old growth forest, leading the Forest's budget team, and being a member of the Forest's leadership team. I also assisted with compiling, organizing, and assembling the pertinent documents for the Tarleton Integrated Resource Project and the Peabody West Integrated Resource Project, which comprise the administrative record for the above-captioned lawsuit.

2. The Forest Service's Administrative Record for the Tarleton Integrated Resource Project and the Peabody West Integrated Resource Project consists of documents Bates

numbered PBWTAR_0001 through PBWTAR_14233. The documents are in pdf format and are searchable to the extent practical. The documents are hyperlinked to an index on an Excel spreadsheet. A copy of the index is attached to this declaration.

3. The Administrative Record will be provided to the Court via overnight delivery and is contained on a single flash drive labeled "Standing Trees v. USFS, 24-cv-00138-JL-TSM." The Administrative Record will be provided to counsel for Plaintiff via an electronic link to Pinyon/Box folders where the record can be downloaded.

4. I certify to the best of my knowledge that the documents identified in the index are the materials that have been considered, either directly or indirectly, for the associated agency actions in the above-captioned case.

5. I further certify to the best of my knowledge that the documents identified on the index are true and correct copies of the documents that comprise the Administrative Record for the Tarleton Integrated Resource Project and the Peabody West Integrated Resource Project.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on: July 30, 2024

STACY LEMIEUX
Digitally signed by STACY LEMIEUX
Date: 2024.07.30 13:00:46 -04'00'

Stacy Lemieux
United States Forest Service

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| STANDING TREES, INC.,<br>Plaintiff,<br>v.<br>UNITED STATES FOREST SERVICE, *et al.*,<br>Defendants. | Case No. 1:24-cv-00138-JL-TSM |

**DEFENDANTS' NOTICE OF LODGING**
**ADDITIONAL ADMINISTRATIVE RECORD DOCUMENTS**

Defendants notice the lodging of additional documents for the Administrative Record in this case.

The additional documents are Bates numbered PBWTAR_14234 through PBWTAR_17838. The declaration of Stacy Lemieux certifies the additional documents for the Forest Service's Administrative Record and is attached to this notice as Exhibit 1. A copy of the index of the additional documents for the Forest Service's Administrative Record is attached to this notice as Exhibit 2.

Two thumb drives each containing a set of the Administrative Record are being provided to the Clerk's office via overnight delivery to the Chambers of the Honorable Joseph N. Laplante. Counsel for Plaintiff received a link to an electronic copy of the Administrative Record that can be downloaded from a Forest Service Pinyon/Box folder.

Respectfully submitted,

Dated: August 30, 2024.

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

*/s/ John P. Tustin*
Texas Bar No. 24056458
Senior Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 305-3022
Fax: (202) 305-0275
john.tustin@usdoj.gov

JANE E. YOUNG
United States Attorney

# Exhibit 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| STANDING TREES, INC.<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES FOREST SERVICE, *et al.*,<br><br>Defendants. | Case No. 1:24-cv-00138-JL-TSM |

**DECLARATION OF STACY LEMIEUX**

I, Stacy Lemieux, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am employed by the United States Department of Agriculture, United States Forest Service as the Natural Resources Staff Officer for the White Mountain National Forest. I previously submitted a declaration certifying the Administrative Record for the Tarleton Integrated Resource Project and the Peabody West Integrated Resource Project, which are the subject of this litigation. DN 9-1.

2. The Forest Service inadvertently omitted 33 documents from the Forest Service's Administrative Record. Those documents are Bates numbered PBWTAR_14234 through PBWTAR_17838. The documents are in pdf format and are searchable to the extent practical. The documents have been included in the updated Administrative Record Index on an Excel spreadsheet. A copy of the updated Administrative Record Index is attached to this declaration.

3. I certify to the best of my knowledge that the documents identified in the updated Administrative Record Index are the materials that been considered, either directly or indirectly, for the associated agency actions in the above-captioned case.

4. I further certify to the best of my knowledge that the documents identified on the index are true and correct copies of the documents that comprise the Administrative Record for the Tarleton Integrated Resource Project and the Peabody West Integrated Resource Project.

5. The additional documents are included in the updated Administrative Record that will be provided to the Court via overnight delivery. The updated Administrative Record is contained on a single flash drive labeled "Standing Trees v. USFS, 24-cv-00138-JL-TSM." The updated Administrative Record have been provided to counsel for Plaintiff via an electronic link to Pinyon/Box folders where the record can be downloaded.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: August 29, 2024

STACY LEMIEUX

Digitally signed by STACY LEMIEUX
Date: 2024.08.30 06:43:56 -04'00'

Stacy Lemieux
United States Forest Service

# Exhibit 2

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00001 | PBWTAR_0001 | | Flow chart of steps in first part of basal area removal calculation |
| PBWTAR_00002 | PBWTAR_0002 | | Flow chart of steps in second part of basal area removal calculation |
| PBWTAR_00003 | PBWTAR_0003 | USFS | FSH 2309.18 Trails Management handbook, Chapter 20 - Trail Development |
| PBWTAR_00004 | PBWTAR_0018 | USA | Federal Register notice of Executive Order 14008, Tackling the Climate Crisis at home and abroad |
| PBWTAR_00005 | PBWTAR_0031 | USFWS | Federal Register Notice proposing the listing of the tri-colored bat |
| PBWTAR_00006 | PBWTAR_0069 | USFS | Climate Change Tools and Approaches for Land Managers. Workbook to help address climate change in vegetation management |
| PBWTAR_00007 | PBWTAR_0239 | Ohio | The tolerant confiers: Eastern hemlock and red spruce, their ecology and management |
| PBWTAR_00008 | PBWTAR_0285 | USFS | Assessment of the influence of disturbance, management activities, and environmental factors on carbon stocks of U.S. |
| PBWTAR_00009 | PBWTAR_0416 | USDOI | Biological Opinion: Effects to the Northern Long-Eared Bat from Planned and Ongoing Activities Being Implemented in the Eastern and Southern Regions of the U.S. Forest Service |
| PBWTAR_00010 | PBWTAR_0473 | CEQ | CEQ National Environmental Policy Act guidance on consideration of greenhouse gas emission and climate change |
| PBWTAR_00011 | PBWTAR_0490 | USFS | EQ National Environmental Policy Act guidance on consideration of greenhouse gas emission and climate change |
| PBWTAR_00012 | PBWTAR_0495 | USDA | 2004 Woodland bat survey in the White Mountain National Forest |
| PBWTAR_00013 | PBWTAR_0540 | USDOI | Memo to Assistant Secretaries and Bureau Directors from Deputy Solicitor Standardizing guidance on compiling a decision file and administrative record |
| PBWTAR_00014 | PBWTAR_0558 | USFS | Environmental analysis & decision making (EADM) - Climate change FAQ |
| PBWTAR_00015 | PBWTAR_0562 | USEPA | EPA Cumulative Effects Guidance |
| PBWTAR_00016 | PBWTAR_0584 | | Document prepared by the Forest explaining the NEPA process to the general public |
| PBWTAR_00017 | PBWTAR_0586 | USA | Federal plain language guidelines |
| PBWTAR_00018 | PBWTAR_0704 | USFWS | Federal Register notice of Final Rule reclassifying the northern long-eared bat as an Endangered species |
| PBWTAR_00019 | PBWTAR_0721 | USFS | Document discussing six key risks to the Forest Service Mission and a plan to mitigate thise risks |
| PBWTAR_00020 | PBWTAR_0809 | USFS | FSH 2309.18 Trails Management handbook, Chapter 20 - Trail Development |
| PBWTAR_00021 | PBWTAR_0857 | USFS | Forest Supplement to FSH 2309.18 - Trails Management handbook, Chapter 20 - Trail development |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00022 | PBWTAR_0863 | USFS | FSM 2500 - Watershed and air management, Chapter 2550 - Soil management |
| PBWTAR_00023 | PBWTAR_0883 | USFS | R9 Regional Supplement to FSM 2500 - Watershed and air management, Chapter 2550 - Soil management |
| PBWTAR_00024 | PBWTAR_0889 | USFS | Landscape Aesthetics, A handbook for scenery management |
| PBWTAR_00025 | PBWTAR_1135 | Leak | Silvicultural Guide for Northern Hardwoods in the Northeast |
| PBWTAR_00026 | PBWTAR_1187 | | Excerpt of standards and guidelined from the WMNF Forest Plan |
| PBWTAR_00027 | PBWTAR_1191 | New Hampshire | Manual of best management practices (BMPs) for agriculture in New Hampshire |
| PBWTAR_00028 | PBWTAR_1255 | Rounds | Vernal pool detection user guide |
| PBWTAR_00029 | PBWTAR_1269 | Stafford | Silvicultural Guide for paper birch in the northeast |
| PBWTAR_00030 | PBWTAR_1301 | Sandeno | Programmatic Biological Assessment, Northern Long-eared Bat for land and resource management plans of the Forest Service Eastern Region |
| PBWTAR_00031 | PBWTAR_1515 | Sease | Biological Assessment for ongoing project activities with determinations of no effect or may affect, not likely to adversely affect for the northern long-eared bat on the Green Mountain National Forest and White Mountain National Forest |
| PBWTAR_00032 | PBWTAR_1635 | USFS | Section 508 Quick Reference Guide, Creating accessible documents using Microsoft Word 2010 |
| PBWTAR_00033 | PBWTAR_1677 | Shugart | Forests & global climate change, Potential impacts on U.S. forest resources |
| PBWTAR_00034 | PBWTAR_1741 | USA | The Wilderness Act |
| PBWTAR_00035 | PBWTAR_1750 | New Hampshire | Good Forestry in the Granite State: Recommended voluntary forest management practices for New Hampshire |
| PBWTAR_00036 | PBWTAR_1977 | USFS | Cover letter to U.S. Fish and Wildlife Service requesting re-initiation of formal consultation related to the northern long-eared bat for ongoing projects in the USFS Eastern and Southern Regions |
| PBWTAR_00037 | PBWTAR_1988 | USFS | Re-initiation of Consultation Project List for northern long-eared bat for 2022 |
| PBWTAR_00038 | PBWTAR_1989 | USFS | Forest Service strategic framework for responding to climate change |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00039 | PBWTAR_1993 | USFS | Letter from Forest Supervisor to District Ranger and Staff officers clarifying the intent of two Forest Plan trail management objectives |
| PBWTAR_00040 | PBWTAR_2014 | USFS | National best management practices for water quality management on National Forest System lands. Volume 1: National core BMP technical guide |
| PBWTAR_00041 | PBWTAR_2191 | USFS | Albany South Integrated Resource Project Final Environmental Assessment |
| PBWTAR_00042 | PBWTAR_2509 | USFS | Background on the 2005 White Mountain National Forest Land and Resource Management Plan Inventoried Roadless Areas |
| PBWTAR_00043 | PBWTAR_2512 | USFS | Biennial Monitoring and evalluation report for fiscal years 2018-2019 |
| PBWTAR_00044 | PBWTAR_2789 | USFS | ROS Primer and Field Guide. Guide for applying the Recreation Opportunity Spectrum on National Forest System lands |
| PBWTAR_00045 | PBWTAR_2805 | USFWS | Federal Register notice of final 4(d) rule for northern long-eared bat |
| PBWTAR_00046 | PBWTAR_2828 | USFWS | Programmatic Biological Opinion on Final 4(d) rule for the northern long-eared bat and activities excepted from take provisions |
| PBWTAR_00047 | PBWTAR_2937 | USFWS | Special Status Assessment Report for Tri-Colored Bat |
| PBWTAR_00048 | PBWTAR_3103 | USFWS | Species Status Assessment report for the Northern long-eared bat |
| PBWTAR_00049 | PBWTAR_3272 | USFWS | Federal Register notice of Final Rule reclassifying the northern long-eared bat as an Endangered species |
| PBWTAR_00050 | PBWTAR_3289 | USFWS | Federal Register notice of Proposed Rule to list the tricolored bat as an Endangered species |
| PBWTAR_00051 | PBWTAR_3302 | USFWS | Biological Opinion: Effects to the Northern Long-Eared Bat from Planned and Ongoing Activities Being Implemented in the Eastern and Southern Regions of the U.S. Forest Service |
| PBWTAR_00052 | PBWTAR_3359 | USFWS | Re-initiation of Consultation Project List for northern long-eared bat after reclassification to Endangered status |
| PBWTAR_00053 | PBWTAR_3404 | WMNF | Final Environmental Impact Statement for the Land and Resource Management Plan |
| PBWTAR_00054 | PBWTAR_3405 | WMNF | White Mountain National Forest Land and Resource Management Plan (Forest Plan) |
| PBWTAR_00055 | PBWTAR_3612 | WMNF | Record of Decision for the Land and Resource Management Plan |
| PBWTAR_00056 | PBWTAR_3662 | WMNF | White Mountain National Forest Forest-wide Travel Analysis Report |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00057 | PBWTAR_3797 | WMNF | 2018 Biennial monitoring and evaluation report for fiscal years 2015, 2016, and 2017 |
| PBWTAR_00058 | PBWTAR_3971 | USFS | FSH 2309.13 Recreation Site Handbook, Chapter 50 - Forest Service operation and maintenance of development recreation sites |
| PBWTAR_00059 | PBWTAR_4027 | USFS | Effects of clearcutting, patch cutting, and low-density shelterwoods on breeding birds and tree regeneration in New Hampshire northern hardwoods |
| PBWTAR_00060 | PBWTAR_4047 | GovDelivery | Performance report of scoping bulletin delivery to subscribers generated by GovDelivery |
| PBWTAR_00061 | PBWTAR_4048 | GovDelivery | Copy of email bulletin to subscribers informing of comment period |
| PBWTAR_00062 | PBWTAR_4050 | Berlin Sun | Ad in the Berlin Sun soliciting public comment |
| PBWTAR_00063 | PBWTAR_4052 | Presidential Range Riders Snowmobile Club of Gorham - Brian Ruel scoping | Presidential Range Riders Snowmobile Club of Gorham scoping comment letter |
| PBWTAR_00064 | PBWTAR_4054 | The Friends of Tuckerman Ravine - Jake Risch scoping comment letter | The Friends of Tuckerman Ravine scoping comment letter |
| PBWTAR_00065 | PBWTAR_4055 | Appalachian Mountain Club addendum to prior scoping comment letter | Appalachian Mountain Club addendum to prior scoping comment letter |
| PBWTAR_00066 | PBWTAR_4056 | GovDelivery | Performance report of scoping bulletin delivery to subscribers generated by GovDelivery |
| PBWTAR_00067 | PBWTAR_4060 | GovDelivery | Copy of email bulletin to subscribers informing of comment period |
| PBWTAR_00068 | PBWTAR_4062 | Dockins | Log of public comments received during 30-day comment period |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00069 | PBWTAR_4064 | Dockins | Log of public comments received during 30-day comment period |
| PBWTAR_00070 | PBWTAR_4065 | Dockins | Log of public comments received during 30-day comment period |
| PBWTAR_00071 | PBWTAR_4066 | WMNF | Plan of Hermit Lake Shelter Complex |
| PBWTAR_00072 | PBWTAR_4067 | WMNF | Updated mailing list for scoping |
| PBWTAR_00073 | PBWTAR_4082 | WMNF | Mailing list for Comment Period 1 |
| PBWTAR_00074 | PBWTAR_4083 | WMNF | Mailing list for Comment Period 2 |
| PBWTAR_00075 | PBWTAR_4084 | WMNF | Mailing list report generated by CARA |
| PBWTAR_00076 | PBWTAR_4085 | WMNF | Scoping newsletter |
| PBWTAR_00077 | PBWTAR_4092 | WMNF | Scoping comments and their corresponding responses |
| PBWTAR_00078 | PBWTAR_4120 | WMNF | Scoping summary report |
| PBWTAR_00079 | PBWTAR_4123 | WMNF | Updated scoping newsletter |
| PBWTAR_00080 | PBWTAR_4148 | Amato, Fernando | Fernando Amato scoping comment letter |
| PBWTAR_00081 | PBWTAR_4149 | Arduser | Scoping comment letter |
| PBWTAR_00082 | PBWTAR_4150 | Artley, Dick | Dick Artley scoping comment letter attachment - road construction impacts on downstream ecosystems |
| PBWTAR_00083 | PBWTAR_4178 | Artley, Dick | Dick Artley scoping comment letter attachment - cutting practice concerns w/photos |
| PBWTAR_00084 | PBWTAR_4181 | Artley, Dick | Dick Artley scoping comment letter attachment - timber harvest impacts on downstream natural resources |
| PBWTAR_00085 | PBWTAR_4224 | Artley, Dick | Dick Artley scoping comment letter attachment - post-harvest conditions concerns w/photos |
| PBWTAR_00086 | PBWTAR_4230 | Artley, Dick | Dick Artley scoping comment letter attachment - public opinion on logging polls |
| PBWTAR_00087 | PBWTAR_4244 | Artley, Dick | Dick Artley Scoping comment letter |
| PBWTAR_00088 | PBWTAR_4258 | Benchimol, Peter | Peter Benchimol scoping comment letter |
| PBWTAR_00089 | PBWTAR_4259 | Carter, Matthew | Matthew Carter scoping comment letter |
| PBWTAR_00090 | PBWTAR_4260 | Chisena, Daniel | Daniel Chisena scoping comment letter |
| PBWTAR_00091 | PBWTAR_4261 | Cole, Swenson | Swenson Cole scoping comment letter |
| PBWTAR_00092 | PBWTAR_4262 | Backler, David | David Backler scoping comment letter |
| PBWTAR_00093 | PBWTAR_4263 | Decourcey, Nancy | Nancy Decourcey scoping comment letter |
| PBWTAR_00094 | PBWTAR_4264 | Delardi, Derek | Derek Delardi scoping comment letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00095 | PBWTAR_4265 | Duniho, Kevin | Kevin Duniho scoping comment letter |
| PBWTAR_00096 | PBWTAR_4266 | Englert, Peter | Peter Englert scoping comment letter |
| PBWTAR_00097 | PBWTAR_4267 | Evankow, Abby | Abby Evankow scoping comment letter |
| PBWTAR_00098 | PBWTAR_4268 | Flynn, Jonathan | Jonathan Flynn scoping comment letter |
| PBWTAR_00099 | PBWTAR_4269 | State of New Hampshire, Department of Natural and Cultural Resources | Chris Gamache scoping comment letter - formal input on behalf of State of New Hampshire Bureau of Trails |
| PBWTAR_00100 | PBWTAR_4270 | Garland, Larry | Larry Garland scoping comment letter attachment - questions/comments on project newsletter distributed Dec 2019 |
| PBWTAR_00101 | PBWTAR_4272 | Garland, Larry | Larry Garland scoping comment letter |
| PBWTAR_00102 | PBWTAR_4273 | Hamilton, Lars | Lars Hamilton scoping comment letter |
| PBWTAR_00103 | PBWTAR_4274 | Hanrahan, Tira | Tira Hanrahan scoping comment letter |
| PBWTAR_00104 | PBWTAR_4275 | Hesslein Jr., Richard A | Richard A. Hesslein Jr. scoping comment letter |
| PBWTAR_00105 | PBWTAR_4276 | Hill, Douglas | Douglas Hill scoping comment letter |
| PBWTAR_00106 | PBWTAR_4277 | Hoch, Jason | Jason Hoch scoping comment letter - photo of four-sided Hermit Lake shelter #8 |
| PBWTAR_00107 | PBWTAR_4278 | Hoch, Jason | Jason Hoch scoping comment letter - photo of skiier at four-sided Hermit Lake shelter |
| PBWTAR_00108 | PBWTAR_4279 | Hoch, Jason | Jason Hoch scoping comment letter - photo of the inside of four-sidered Hermit Lake shelter |
| PBWTAR_00109 | PBWTAR_4280 | Hoch, Jason | Jason Hoch scoping comment letter |
| PBWTAR_00110 | PBWTAR_4281 | Hwang, Frank | Frank Hwang scoping comment letter |
| PBWTAR_00111 | PBWTAR_4282 | Jacobs, Adam | Adam Jacobs scoping comment letter attachment - photo of winter hiker ascending North Gully of Huntington Ravine |
| PBWTAR_00112 | PBWTAR_4283 | Jacobs, Adam | Adam Jacobs scoping comment letter |
| PBWTAR_00113 | PBWTAR_4284 | Jenkinson, Rick | Rick Jenkinson scoping comment letter |
| PBWTAR_00114 | PBWTAR_4285 | Jones, Dave | Dave Jones scoping comment letter |
| PBWTAR_00115 | PBWTAR_4286 | Kane, Michael | Michael Kane scoping comment letter |
| PBWTAR_00116 | PBWTAR_4287 | Kaszas-Hoch, Julia | Julia Kaszas-Hoch scoping comment letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00117 | PBWTAR_4288 | Keat, Moriah | Moriah Keat scoping comment letter |
| PBWTAR_00118 | PBWTAR_4289 | Keller, Ryan | Ryan Keller scoping comment letter |
| PBWTAR_00119 | PBWTAR_4290 | Lang, Catherine | Catherine Lang scoping comment letter |
| PBWTAR_00120 | PBWTAR_4291 | Lawson McCreedy, Jesse | Jesse Lawson McCreedy scoping comment letter |
| PBWTAR_00121 | PBWTAR_4292 | Leaf, Cody | Cody Leaf scoping comment letter |
| PBWTAR_00122 | PBWTAR_4293 | LePage, Mark | Scoping comment letter |
| PBWTAR_00123 | PBWTAR_4294 | Miatke, Baxter | Baxter Miatke scoping comment letter |
| PBWTAR_00124 | PBWTAR_4295 | Peltzer, Parker | Parker Peltzer scoping comment letter |
| PBWTAR_00125 | PBWTAR_4296 | Publicover, David | David Publicover scoping comment letter |
| PBWTAR_00126 | PBWTAR_4298 | Rajala, Reuben | Rajala Reuben scoping comment letter |
| PBWTAR_00127 | PBWTAR_4302 | Granite Backcountry Alliance - Ray, Tyler | Granite Backcountry Alliance - Tyler Ray scoping comment letter attachment - request for GBA to design, implement, and maintain the proposed Pine Mountain glade |
| PBWTAR_00128 | PBWTAR_4304 | Granite Backcountry Alliance - Ray, Tyler | Granite Backcountry Alliance - Tyler Ray scoping comment letter |
| PBWTAR_00129 | PBWTAR_4306 | Granite Backcountry Alliance - Ray, Tyler | Granite Backcountry Alliance - Tyler Ray scoping comment letter |
| PBWTAR_00130 | PBWTAR_4308 | Granite Backcountry Alliance - Ray, Tyler | Granite Backcountry Alliance - Tyler Ray scoping comment attachment - proposal of additional glade zones in addition to the Pine Mountain glade |
| PBWTAR_00131 | PBWTAR_4311 | Granite Backcountry Alliance - Ray, Tyler | Granite Backcountry Alliance - Tyler Ray scoping comment attachment - map of proposed additional glade sites |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00132 | PBWTAR_4312 | Renson, Mark | Mark Renson scoping comment letter |
| PBWTAR_00133 | PBWTAR_4313 | The Friends of Tuckerman Ravine - Risch, Jake | The Friends of Tuckerman Ravine - Jake Risch scoping comment letter |
| PBWTAR_00134 | PBWTAR_4315 | The Friends of Tuckerman Ravine - Risch, Jake | The Friends of Tuckerman Ravine - Jake Risch scoping comment letter |
| PBWTAR_00135 | PBWTAR_4317 | Root, Gregory | Gregory Root scoping comment letter |
| PBWTAR_00136 | PBWTAR_4318 | Rousseau, Nicolas | Nicolas Rousseau scoping comment letter |
| PBWTAR_00137 | PBWTAR_4319 | Presidential Range Riders Snowmobile Club of Gorham - Ruel, Brian | Presidential Range Riders Snowmobile Club of Gorham - Brian Ruel scoping comment letter |
| PBWTAR_00138 | PBWTAR_4320 | Sadr, Pat | Pat Sadr scoping comment letter |
| PBWTAR_00139 | PBWTAR_4321 | Strauten, Robert | Robert Strauten scoping comment letter |
| PBWTAR_00140 | PBWTAR_4322 | Tener, Kinley | Kinley Tener scoping comment letter |
| PBWTAR_00141 | PBWTAR_4323 | Town of Gorham, New Hampshire - | Town of Gorham, New Hampshire - Denise Vallee scoping comment letter attachment - letter of support |
| PBWTAR_00142 | PBWTAR_4324 | Town of Gorham, New Hampshire - | Town of Gorham, New Hampshire - Denise Vallee scoping comment letter attachment - letter of support |
| PBWTAR_00143 | PBWTAR_4325 | Mt. Washington Auto Road, Great Glen Trails - Wemyss, | Mt. Washington Auto Road, Great Glen Trails - Howie Wemyss scoping comment letter |
| PBWTAR_00144 | PBWTAR_4326 | Winters, Frank | Frank Winters scoping comment letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00145 | PBWTAR_4327 | Winters, Luke | Luke Winters scoping comment letter |
| PBWTAR_00146 | PBWTAR_4328 | White Mountain National Forest | Peabody West Project Area Map |
| PBWTAR_00147 | PBWTAR_4329 | Barnhart, Jennifer | "A couple things" - Email string between District Ranger Jennifer Barnhart and Paul Cunha (of AMC) regarding public involvement opportunities specifically regarding the Hermit Lake proposal |
| PBWTAR_00148 | PBWTAR_4336 | Ray, Tyler | "Peabody West Project - NEPA coordinator" - Email from Tyler Ray (Granite Backcountry Alliance) to Johnida Dockens (FS) proposing a stakeholder discussion on the public comments received for the Peabody West project |
| PBWTAR_00149 | PBWTAR_4337 | Peters, Nathan | "Peabody West Proposed Glade" - Email from Nathan Peters (FS) to Jason Hunter (Coos Cycling Club) evaluating proposed Gorham to Dolly Copp mountainbiking trail and proposed glade near Pine Mountain, with reply from Hunter |
| PBWTAR_00150 | PBWTAR_4340 | Lutz, Michelle | "[Gorham NH] Request for Information..." - Email string replying to Dockens, Johnida (FS) message via the Gorham, NH Town Clerk's online contact form requesting information on past and proposed notices of intent to cut on non-federal land in Gorham |
| PBWTAR_00151 | PBWTAR_4341 | Macrae-Hawkins, Jeremiah | "Peabody West Proposed Glade" - Reply from Jeremiah Macrae-Hawkins (Granite Backcountry Alliance) to aforementioned email from Nathan Peters (FS) evaluating proposed Gorham to Dolly Copp mountainbiking trail and proposed glade near Pine Mountain |
| PBWTAR_00152 | PBWTAR_4343 | White Mountain National Forest | "Peabody West Partner Meeting" - Notes on partner meeting between Nathan Peters (FS), Jason Hunter (Coos Cycling Club), and Jeremiah Macrae-Hawkins (Granite Backcountry Alliance) to discuss recent field visits, possible layouts for the proposed Pine Mountain Glade, trails and access |
| PBWTAR_00153 | PBWTAR_4345 | Peters, Nathan | "Meeting with Coos Cycling Club (CCC) - 11/12/2020" - Meeting notes on Peabody West proposed bike trails and zones |
| PBWTAR_00154 | PBWTAR_4347 | Sjostrom, Joshua | "Voicemail from Friday" - Email between District Ranger Joshua Sjostrom and Edith Tucker (reporter for the Berlin Sun) in reply to voicemail from Tucker requesting statement |
| PBWTAR_00155 | PBWTAR_4349 | Tucker, Edith | "Assessment of WMNF tract expected in 2022" - Article printed in the Berlin Sun on Peabody West IRP |
| PBWTAR_00156 | PBWTAR_4351 | White Mountain National Forest | "Granite Backcountry Alliance - General Meeting" - Meeting notes on the proposed Pine Mountain glade |
| PBWTAR_00157 | PBWTAR_4352 | Sherman, Jeremy | "Keep the Backcountry Backcountry" - Email from Jeremy Sherman (of Keep the Backcountry the Backcountry) against development of backcountry, followed by internal discussion email string |
| PBWTAR_00158 | PBWTAR_4356 | LePage, Mark | "Peabody West Integrated Resource Project" - Email from Mark LePage requesting information on the status of Hermit Lake lean-to's, with reply from Joshua Sjostrom |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00159 | PBWTAR_4358 | Ibarguen, Derek | Letter from Forest Supervisor Derek Ibarguen to Howie Wemyss (Great Glen Trails), in reply to a letter from Wemyss on multi-use trail and modified proposed action therein |
| PBWTAR_00160 | PBWTAR_4360 | Sherman, Jeremy | "Pine Mountain Glade Call" - Email from Jeremy Sherman to District Ranger Joshua Sjostrom requesting status update on backcountry ski component of Peabody IRP |
| PBWTAR_00161 | PBWTAR_4363 | Waldron, Todd | "Peabody West IRP and USFS Region 9 Funding Opportunities - Ruffed Grouse Society" - Email from Todd Waldron inquiring about partnership opportunities to support silviculture for Peabody IRP |
| PBWTAR_00162 | PBWTAR_4366 | Garland, Larry | "Peabody West Integrated Resource Project" - Email from Larry Garland to District Ranger Joshua Sjostrom about proposed bike trail to Hayes Copp ski trail network |
| PBWTAR_00163 | PBWTAR_4368 | Sherman, Jeremy | "Pine Mountain Glade Call" - Continuation of aforementioned email string from Jeremy Sherman to District Ranger Joshua Sjostrom on Peabody IRP backcountry ski development, here requesting information on partnering |
| PBWTAR_00164 | PBWTAR_4374 | Sjostrom, Joshua | "Glades" - Email from District Ranger Joshua Sjostrom to Jeremy Sherman to schedule call on proposed Pine Mountain glade |
| PBWTAR_00165 | PBWTAR_4376 | Sjostrom, Joshua | "ATC Consultation Meeting 8/8/2023" - Email from District Ranger Joshua Sjostrom to Scott Hall (FS) informing of a meeting with the Appalachian Trail Conservancy (ATC) and their interest in the Peabody West IRP |
| PBWTAR_00166 | PBWTAR_4377 | Metheny, Hawk | "An Exciting Shelburne Conservation Opportunity" - Email from Hawk Metheny (ATC) to Nathan Peters (FS) and District Ranger Joshua Sjostrom informing of a large Society for the Protection of New Hampshire Forests conservation project in Shelburne, NH along the Appalachian Trail corridor |
| PBWTAR_00167 | PBWTAR_4381 | White Mountain National Forest | "Telephone Conversation Log" - Public comment call log notes |
| PBWTAR_00168 | PBWTAR_4383 | White Mountain National Forest | Map - Conceptual stands within Peabody West Habitat Management Unit (HMU) |
| PBWTAR_00169 | PBWTAR_4384 | White Mountain National Forest | Peabody West Interdisiplinary Team (IDT) Kick-off Agenda and Notes |
| PBWTAR_00170 | PBWTAR_4387 | White Mountain National Forest | Peabody West Interdisiplinary Team (IDT) Agenda and Notes |
| PBWTAR_00171 | PBWTAR_4389 | Dockins, [illegible] | E-mail - Proposed Activities |
| PBWTAR_00172 | PBWTAR_4391 | Pellerin, Travis and Barnhart, Jennifer | E-mail - Trail Management Memo |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00173 | PBWTAR_4393 | Bartlett, Olivia | E-mail - Acreage in Management Area 2.1 in Peabody West HMU |
| PBWTAR_00174 | PBWTAR_4395 | Dockins, Johnida and | Email - Road reconstruction and construction mileage |
| PBWTAR_00175 | PBWTAR_4398 | Young, Craig | E-mail - Libby and Sons gravel pit deed |
| PBWTAR_00176 | PBWTAR_4400 | Williams, Jeffrey | E-mail - Libby and Sons gravel pit rights |
| PBWTAR_00177 | PBWTAR_4403 | Pellerin, Travis and Jordan, Sarah | E-mail - Conceptual designs for Hermit Lake Shelter |
| PBWTAR_00178 | PBWTAR_4406 | Barnhart, Jennifer | E-mail Hermit Lake Shelter Meeting on 10/30 |
| PBWTAR_00179 | PBWTAR_4409 | Janowiak, Maria | E-mail - Climate Change Agenda for IDT |
| PBWTAR_00180 | PBWTAR_4414 | Johnston, Anna | E-mail - Modify boundary of Unit 153 so outside Wilderness boundary |
| PBWTAR_00181 | PBWTAR_4419 | Dockin, Johnida and Johnston, Anna | E-mail - Peabody IDT notes with GIS updates |
| PBWTAR_00182 | PBWTAR_4421 | Pellerin, Travis and Dockins, Johnida | E-mail - Updates on Hermit Lake project proposal regarding structure improvements and construction. |
| PBWTAR_00183 | PBWTAR_4423 | Carus, Frank and Dockins, | Updated scoping contact list for Hermit Lake project |
| PBWTAR_00184 | PBWTAR_4426 | White Mountain National Forest | Peabody West Project Initation Letter signed by Jennifer Barnhart |
| PBWTAR_00185 | PBWTAR_4431 | O'Neill, William | Peabody West Recreation and Wildlife field review notes |
| PBWTAR_00186 | PBWTAR_4433 | White Mountain National Forest | Map - Peabody IDT field trip with designated visitiation sites |
| PBWTAR_00187 | PBWTAR_4434 | White Mountain National Forest | Field visit to Great Gulf Trail by Recreation staff and Hydrologist to discuss projects adjacent to Peabody River |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00188 | PBWTAR_4436 | Gamache, Christopher and Peters, Nathan | E-mail - Updates provided to the NH Bureau of Trails regarding snowmobile relocation project |
| PBWTAR_00189 | PBWTAR_4438 | White Mountain National Forest | Map - Proposed Bear Springs Snowmobile Trail  Relocation and Decommission. |
| PBWTAR_00190 | PBWTAR_4439 | Peters, Nathan | Field notes of proposed glade and skin tracks on north slope of Pine Mountain |
| PBWTAR_00191 | PBWTAR_4442 | Peters, Nathan | Field  review of recreation projects (3rd Hole and Bear Spring Road) with Recreation Specialist and Wildlife Biologist. |
| PBWTAR_00192 | PBWTAR_4443 | Peters, Nathan | Field review of glade location adjacent to Horton Center with Recreation Specialist and Forester |
| PBWTAR_00193 | PBWTAR_4445 | Peters, Nathan | Field review of recreation projects with Soil Scientist, Hydrologist, Road Engineer and Recreation Staff. |
| PBWTAR_00194 | PBWTAR_4449 | Peters, Nathan and Barnhart, Jennifer | E-mail - Potential bridge construction across Peabody River to access Great Glen Trail system. |
| PBWTAR_00195 | PBWTAR_4451 | Nugent, Johanna | E-mail - Clarification of the classification of NH State bridge across Barnes Brook on Pinkham B Road. |
| PBWTAR_00196 | PBWTAR_4452 | Wigler, Gail | IDT Field Review of Culhane Brook Road |
| PBWTAR_00197 | PBWTAR_4458 | White Mountain National Forest | Agenda for field review of Culhane Brook Road improvements and impacts to recreation, wildlife, hydrology, soils and fisheries. |
| PBWTAR_00198 | PBWTAR_4459 | White Mountain National Forest | Summary of field visit to Horton Center Road, ski glade, permananent wildife opening and Culhane Brook broad and bridge. |
| PBWTAR_00199 | PBWTAR_4461 | Lemieux, Stacy and Wigler, Gail | E-mail - Documentation for assigning Land Suitability Class (LSC) codes to several stands in Peabody West project area. |
| PBWTAR_00200 | PBWTAR_4463 | Dockins, Johnida and | E-mail - Edits to the wording of the mountain bike trail proposal |
| PBWTAR_00201 | PBWTAR_4465 | Frasier, Olivia | E- mail - Management Area (MA) acre calculations |
| PBWTAR_00202 | PBWTAR_4466 | Nugent, Johanna | E-mail - Thinning treatment at District office to improve building visibility. |
| PBWTAR_00203 | PBWTAR_4469 | Frasier, Olivia | E-mail - Mileage of proposed construction and reconstruction of  hiking and snowmobile and trails and skin tracks. |
| PBWTAR_00204 | PBWTAR_4470 | Pellerin, Travis and Wigler, Gail | E-mail - Maintenance level of road in Barnes Field developed recreation site. |
| PBWTAR_00205 | PBWTAR_4472 | Dockins, Johnida | E-mail - Path name to review updated Peabody West Scoping document. |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00206 | PBWTAR_4473 | Nugent, Johanna | E-mail - Change wording from "construction" to "reconstruction" for five roads in the scoping document . |
| PBWTAR_00207 | PBWTAR_4474 | Sjsostrom, Joshua | E-mail - Decision to not propose whole tree harvesting for Peabody West project. |
| PBWTAR_00208 | PBWTAR_4475 | Pellerin, Travis and Dockins, Johnida | E-mail - Recreation Opportunity Spectrum (ROS) classes in the project area |
| PBWTAR_00209 | PBWTAR_4477 | White Mountain National Forest | Field Trip with foresters and recreational staff to evaluate stands (LSC 810) around Barnes Field for harvest opportunites. |
| PBWTAR_00210 | PBWTAR_4479 | Sjsostrom, Joshua | E-mail- Summary of field trip in regard to LSC, prescriptions and old growth |
| PBWTAR_00211 | PBWTAR_4482 | Barnhart, Jennifer | E-mail - Hermit Lake shelter closure |
| PBWTAR_00212 | PBWTAR_4496 | Carus, Frank and Dockins, | E-mail - Hermit Lake shelter designs |
| PBWTAR_00213 | PBWTAR_4501 | Carus, Frank and Dockins, | E-mail - Hermit Lake facilities not covered/covered under the Special Use Permit. |
| PBWTAR_00214 | PBWTAR_4503 | White Mountain National Forest | Hermit Lake Complex discussion with staff representing Special Uses, Heritage, NEPA and Recreation. |
| PBWTAR_00215 | PBWTAR_4504 | White Mountain National Forest | IDT notes in regard to Season of Harvest and Floodplain concerns |
| PBWTAR_00216 | PBWTAR_4505 | Nugent, Johanna and Pellerin, Travis | Question - Is timber or recreation responsible for paying for culverts on the Bear Springs Road? |
| PBWTAR_00217 | PBWTAR_4508 | White Mountain National Forest | Removal of Hermit Lake Shelter proposal from scoping document |
| PBWTAR_00218 | PBWTAR_4509 | Wigler, Gail | E-mail - Prescription changes to three proposed stands based on scenery analysis. |
| PBWTAR_00219 | PBWTAR_4511 | White Mountain National Forest | IDT Scenery Management Review and Follow-Up |
| PBWTAR_00220 | PBWTAR_4512 | Johnston, Anna | E-mail - Acre calculation of proposed glade and harvest units and feet of bike and skintrails |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00221 | PBWTAR_4513 | Wigler, Gail | Field Review with District Ranger and Silviculturist of five stands resulting in modification of prescriptions to group selection |
| PBWTAR_00222 | PBWTAR_4515 | Hansen, Michelle | E-mail - Informing Dsitrict Ranger there is a new requisition for publishing the Peabody EA/FONSI legal notice for signature. |
| PBWTAR_00223 | PBWTAR_4520 | Peters, Nathan | E-mail - GIS acreage of a thirty foot buffer around five ski routes |
| PBWTAR_00224 | PBWTAR_4521 | O'Neill, William | E-mail - References for Biological Evaluation and Biological Opinion for Northern Long Eared Bat (NLEB) |
| PBWTAR_00225 | PBWTAR_4522 | O'Neill, William | E-mail - References for Biological Evaluation and Biological Opinion for Tri-colored bats |
| PBWTAR_00226 | PBWTAR_4524 | Sjsostrom, Joshua | E-mail- Funding opportunities from Ruffed Grouse and American Woodcock Societies for vegetation management projects providing habitat for these species. |
| PBWTAR_00227 | PBWTAR_4527 | Sperduto, Daniel | E-mail - Botany work contributing to transmittal letter in regard to old growth documentation. |
| PBWTAR_00228 | PBWTAR_4530 | White Mountain National Forest | Hermit Lake Special Use Permit - Appendix A Annual Operating Plan |
| PBWTAR_00229 | PBWTAR_4537 | White Mountain National Forest | Hermit Lake Special Use Permit - Appendix B Annual Granger Thye Fee Offset Agreement |
| PBWTAR_00230 | PBWTAR_4539 | White Mountain National Forest | Hermit Lake Special Use Permit - Appendix B Annual Granger Thye (GT) Fee Claim Certification |
| PBWTAR_00231 | PBWTAR_4541 | White Mountain National Forest | Hermit Lake Special Use Permit - Appendix C Annual Maintenance and Reconditioning Responsibilities |
| PBWTAR_00232 | PBWTAR_4544 | White Mountain National Forest | Hermit Lake Special Use Permit - Appendix D Site Maps |
| PBWTAR_00233 | PBWTAR_4545 | White Mountain National Forest | Hermit Lake Special Use Permit - Appendix E Inventory of Government Furnished Property |
| PBWTAR_00234 | PBWTAR_4551 | White Mountain National Forest | Hermit Lake Special Use Permit - Appendix F Operation of Federally Owned Drinking Water Systems |
| PBWTAR_00235 | PBWTAR_4561 | White Mountain National Forest | Draft Map of 2020 Field Visit |
| PBWTAR_00236 | PBWTAR_4562 | White Mountain National Forest | Draft Map of 2020 Field Visit |
| PBWTAR_00237 | PBWTAR_4563 | White Mountain National Forest | Forest Adaptations Strategies and Approaches |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00238 | PBWTAR_4564 | White Mountain National Forest | GIS File Structure for Peabody EA |
| PBWTAR_00239 | PBWTAR_4566 | Fraser, Olivia | E-mail - Management Area (MA) Calculated Acreage |
| PBWTAR_00240 | PBWTAR_4567 | Peters, Nathan | List and dates of field visits by Nate Peters |
| PBWTAR_00241 | PBWTAR_4568 | White Mountain National Forest | Climate Change Adaptation Strategies and Approaches for Outdoor Recreation |
| PBWTAR_00242 | PBWTAR_4569 | White Mountain National Forest | Hermit Lake Special Use Permit - Special Use Permit for Campground and Related GT Concessions |
| PBWTAR_00243 | PBWTAR_4585 | White Mountain National Forest | Schedule of Proposed Action |
| PBWTAR_00244 | PBWTAR_4589 | Berlin Daily Sun | 30-day Comment Period Legal Ad proof in Berlin Daily Sun - published 8/4/2022 |
| PBWTAR_00245 | PBWTAR_4590 | NH Union Leader | 30-day Comment Period Legal Ad proof in NH Union Leader - published 8/4/2022 |
| PBWTAR_00246 | PBWTAR_4591 | NH Union Leader | 30-day Comment Period tear sheet in NH Union Leader - published 8/4/2023 |
| PBWTAR_00247 | PBWTAR_4592 | White Mountain National Forest | Public Meeting Slide Presentation on Peabody West project |
| PBWTAR_00248 | PBWTAR_4616 | White Mountain National Forest | Public Meeting attendance report |
| PBWTAR_00249 | PBWTAR_4617 | White Mountain National Forest | Peabody West Public Meeting Question and Answer Sheet |
| PBWTAR_00250 | PBWTAR_4619 | Brothers, Jamie | Quote from Berlin Sun on cost of publishing legal ad |
| PBWTAR_00251 | PBWTAR_4621 | White Mountain National Forest | Email - Release of Draft EA/FONSI to subscribers of the Peabody West project. |
| PBWTAR_00252 | PBWTAR_4623 | Hall, Scott | Request for tear sheet from Berlin Daily Sun for published Draft EA/FONSI |
| PBWTAR_00253 | PBWTAR_4625 | Gonzales, Rosa | Email- Electronic tear sheet of legal ad for Draft EA/FONSI in the NH Union Leader sent to Scott Hall |
| PBWTAR_00254 | PBWTAR_4626 | White Mountain National Forest | Electronic delivery of the release of Environmental Assessment and FONSI to subscribers of the Peabody West project |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00255 | PBWTAR_4627 | Keep the Backcountry Backcountry | Brochure for Keep the Backcountry Backcountry |
| PBWTAR_00256 | PBWTAR_4632 | White Mountain National Forest | Peabody West CARA Index of Comments - Name and organization of commenter and attachments |
| PBWTAR_00257 | PBWTAR_4633 | White Mountain National Forest | CARA mailing list report for the delivery of Draft EA/FONSI |
| PBWTAR_00258 | PBWTAR_4635 | Anonymous | Draft EA Comment Letter |
| PBWTAR_00259 | PBWTAR_4636 | Anonymous | Draft EA Comment Letter |
| PBWTAR_00260 | PBWTAR_4637 | Artley, Dick | Draft EA Comment Letter |
| PBWTAR_00261 | PBWTAR_4666 | Delardi, Derek | Draft EA Comment Letter |
| PBWTAR_00262 | PBWTAR_4667 | Evankow, Abby | Draft EA Comment Letter |
| PBWTAR_00263 | PBWTAR_4668 | Carland, Larry | Draft EA Comment Letter |
| PBWTAR_00264 | PBWTAR_4669 | Marsh, Adam | Draft EA Comment Letter |
| PBWTAR_00265 | PBWTAR_4670 | Standing Trees - Porter, Zack | Draft EA Comment Letter |
| PBWTAR_00266 | PBWTAR_4671 | Standing Trees - Porter, Zack | Draft EA Comment Letter |
| PBWTAR_00267 | PBWTAR_4672 | Ruffed Grouse Society & American Woodcock Society - Waldron, Todd | Draft EA Comment Letter |
| PBWTAR_00268 | PBWTAR_4675 | Robey, Frank | Draft EA Comment Letter |
| PBWTAR_00269 | PBWTAR_4676 | Rousseau, Nicolas | Draft EA Comment Letter |
| PBWTAR_00270 | PBWTAR_4677 | Keep the Backcountry Backcountry - Sherman, | Draft EA Comment Letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00271 | PBWTAR_4678 | Keep the Backcountry Backcountry - Sherman, | Draft EA Comment Letter |
| PBWTAR_00272 | PBWTAR_4679 | Standing Trees - Porter, Zack | Draft EA Comment Letter |
| PBWTAR_00273 | PBWTAR_4718 | Stock, Jasen | Draft EA Comment Letter |
| PBWTAR_00274 | PBWTAR_4719 | Appalachian Mountain Club - Thayer, Chris | Draft EA Comment Letter |
| PBWTAR_00275 | PBWTAR_4721 | Ruffed Grouse Society & American Woodcock Society - Waldron, Todd | Draft EA Comment Letter |
| PBWTAR_00276 | PBWTAR_4724 | White Mountain National Forest | Report of all comments/concerns and corresponding FS responses |
| PBWTAR_00277 | PBWTAR_4782 | White Mountain National Forest | Table of proposed actions and alternatives for the Hermit Lake Complex of shelters during project development |
| PBWTAR_00278 | PBWTAR_4783 | Dockin, Johnida | Requisition for Legal Ads in the Berlin Daily Sun and NH Union Leader |
| PBWTAR_00279 | PBWTAR_4784 | White Mountain National Forest | Literature submitted by the public for consideration |
| PBWTAR_00280 | PBWTAR_4796 | White Mountain National Forest | CARA index of commenter's name, literature submitted and author and date documents were uploaded into CARA. |
| PBWTAR_00281 | PBWTAR_4798 | White Mountain National Forest | Hard copy mailing list of 30-day Draft EA |
| PBWTAR_00282 | PBWTAR_4802 | White Mountain National Forest | Peabody West IRP Draft Environmental Assessment and Preliminary Finding of No Significant Impact |
| PBWTAR_00283 | PBWTAR_4837 | White Mountain National Forest | Peabody West IRP Public Comment Period Draft EA Newsletter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00284 | PBWTAR_4839 | White Mountain National Forest | Peabody West IRP Public Comment Period Draft EA Newsletter mailing labels |
| PBWTAR_00285 | PBWTAR_4840 | White Mountain National Forest | Peabody West 30 day Notice of Delivery Report |
| PBWTAR_00286 | PBWTAR_4841 | White Mountain National Forest | Peabody West Response to Comments by Author |
| PBWTAR_00287 | PBWTAR_4864 | | Peabody West IRP Draft Decision Notice |
| PBWTAR_00288 | PBWTAR_4867 | White Mountain National Forest | Peabody West Decision Notice |
| PBWTAR_00289 | PBWTAR_4870 | White Mountain National Forest | Peabody West Cover Letter |
| PBWTAR_00290 | PBWTAR_4871 | White Mountain National Forest | Mailing list for hardcopies of the Peabody West Decision Notice |
| PBWTAR_00291 | PBWTAR_4872 | White Mountain National Forest | Legal Notice of the EA and Draft Decision Notice |
| PBWTAR_00292 | PBWTAR_4873 | Berlin Daily Sun | Legal Notice of the EA and Draft Decision Notice tear sheet published in the Berlin Daily Sun |
| PBWTAR_00293 | PBWTAR_4874 | NH Union Leader | Legal Notice of the EA and Draft Decision Notice tear sheet published in the NH Union Leader |
| PBWTAR_00294 | PBWTAR_4875 | NH Union Leader | Legal Notice of the EA and Draft Decision Notice for publishing in the NH Union Leader |
| PBWTAR_00295 | PBWTAR_4876 | White Mountain National Forest | Peabody Eest Environmental Assessment and Finding of No Significant Impacts (FONSI) |
| PBWTAR_00296 | PBWTAR_4913 | Dockins, Johnida | Electronic delivery of the release of Environmental Assessment and FONSI to subscribers of the Peabody West project |
| PBWTAR_00297 | PBWTAR_4914 | White Mountain National Forest | Response to Standing Trees Comment Letter |
| PBWTAR_00298 | PBWTAR_4916 | White Mountain National Forest | Peabody West Supporting Documentation |
| PBWTAR_00299 | PBWTAR_4917 | Janowiak, Maria | "Climate Change and Considerations on the Peabody IRP" - Discussion on climate change for the Peabody IRP prepared by the Northern Institute of Applied Climate Science, FS Northern Research Station |
| PBWTAR_00300 | PBWTAR_4921 | Askins, Robert | The Critical Importance of Large Expanses of Continuous Forest for Bird Conservation |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00301 | PBWTAR_4928 | Brown, M., et al. | Timber harvest as the predominant disturbance regime in northeastern U.S. forests: effects of harvest intensification |
| PBWTAR_00302 | PBWTAR_4947 | Canham, C., et al. | Regional variation in forest harvest regimes in the northeastern United States |
| PBWTAR_00303 | PBWTAR_4956 | Ceballos, G., et al. | Vertebrates on the brink as indicators of biological annihilation and the sixth mass extinction |
| PBWTAR_00304 | PBWTAR_4963 | Rosa, Lindsay and Jacob Malcom | Document prepared by the Defenders of Wildlife providing guidance for decision makers. |
| PBWTAR_00305 | PBWTAR_4989 | Dietz, M., et al. | The importance of U.S. national forest roadless areas for vulnerable wildlife species |
| PBWTAR_00306 | PBWTAR_5001 | Di Marco, M., et al. | Wilderness areas halve the extinction risk of terrestrial biodiversity |
| PBWTAR_00307 | PBWTAR_5018 | Dinerstein, E., et al. | A "Global Safety Net" to reverse biodiversity loss and stabilize Earth's climate |
| PBWTAR_00308 | PBWTAR_5032 | Dinerstein, E., et al. | A Global Deal for Nature: Guiding principles, milestones, and targets |
| PBWTAR_00309 | PBWTAR_5050 | Ducey, M., et al. | Late-Successional and Old-Growth Forests in the Northeastern United States: Structures, Dynamics, and Prospects for Restoration |
| PBWTAR_00310 | PBWTAR_5082 | Duveneck, M., & Thompson, J. | Social and biophysical determinants of future forest conditions in New England: Effects of a modern land-use regime |
| PBWTAR_00311 | PBWTAR_5097 | Erb, K., et al. | Unexpectedly large impact of forest management and grazing on global vegetation biomass |
| PBWTAR_00312 | PBWTAR_5125 | Evans, B., & Mortelliti, A. | Effects of forest disturbance, snow depth, and intraguild dynamics on American marten and fisher occupancy in Maine, USA |
| PBWTAR_00313 | PBWTAR_5140 | Gunn, J., et al. | Late-successional and old-growth forest carbon temporal dynamics in the Northern Forest (Northeastern USA) |
| PBWTAR_00314 | PBWTAR_5147 | Harris, N., et al. | Attribution of net carbon change by disturbance type across forest lands of the conterminous United States |
| PBWTAR_00315 | PBWTAR_5168 | | Summary of findings for policy makers |
| PBWTAR_00316 | PBWTAR_5205 | Jung, M., et al. | Areas of global importance for terrestrial biodiversity, carbon, and water |
| PBWTAR_00317 | PBWTAR_5248 | Keeton, W., et al. | Late-Successional Biomass Development in Northern Hardwood-Conifer Forests of the Northeastern United States |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00318 | PBWTAR_5265 | Keith, H., et al. | Re-evaluation of forest biomass carbon stocks and lessons from the world's most carbon-dense forests |
| PBWTAR_00319 | PBWTAR_5272 | Law, B., et al. | Changes in carbon storage and fluxes in chronosequence of ponderosa pine |
| PBWTAR_00320 | PBWTAR_5288 | Law, B., et al. | Creating Strategic Reserves to Protect Forest Carbon and Reduce Biodiversity Losses in the United States |
| PBWTAR_00321 | PBWTAR_5303 | Lorimer, C., & White, A. | Scale and frequency of natural disturbances in the northeastern US: implications for early successional forest habitats and regional age distributions |
| PBWTAR_00322 | PBWTAR_5327 | Lu, X., et al. | A Contemporary Carbon Balance for the Northeast Region of the United States |
| PBWTAR_00323 | PBWTAR_5336 | Luyssaert, S., et al. | Old-growth forests as global carbon sinks |
| PBWTAR_00324 | PBWTAR_5340 | Masino, S., et al. | Older eastern white pine trees and stands sequester carbon for many decades and maximize cumulative carbon |
| PBWTAR_00325 | PBWTAR_5366 | Miller, K., et al. | National parks in the eastern United States harbor important older forest structure compared with matrix forests |
| PBWTAR_00326 | PBWTAR_5386 | Miller, K., et al. | Eastern national parks protect greater tree species diversity than unprotected matrix forests |
| PBWTAR_00327 | PBWTAR_5397 | Moomaw, W., et al. | Intact Forests in the United States: Proforestation Mitigates Climate Change and Serves the Greatest Good |
| PBWTAR_00328 | PBWTAR_5407 | Nowacki, G., & Abrams, M. | The Demise of Fire and "Mesophication" of Forests in the Eastern United States |
| PBWTAR_00329 | PBWTAR_5423 | Stephenson, N., et al. | Rate of tree carbon accumulation increases continuously with tree size |
| PBWTAR_00330 | PBWTAR_5436 | Talty, M., et al. | Conservation value of national forest roadless areas |
| PBWTAR_00331 | PBWTAR_5450 | Thom, D., et al. | The climate sensitivity of carbon, timber, and species richness covaries with forest age in boreal-temperate North America |
| PBWTAR_00332 | PBWTAR_5463 | Underwood, K., & Brynn, D. | Enhancing Flood Resiliency of Vermont State Lands |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00333 | PBWTAR_5515 | Zaino, R., et al. (Vermont Fish and Wildlife Department); Thompson, K. (Vermont Department of Forests, Parks and Recreation) | Vermont Conservation Design, Part 2: Natural Communities and Habitats Technical Report |
| PBWTAR_00334 | PBWTAR_5587 | Keeton, W., et al. | Ecology and Recovery of Eastern Old-Growth Forests: Forest-Stream Interactions in Eastern Old Growth Forests |
| PBWTAR_00335 | PBWTAR_5607 | Watson, J., et al. | The exceptional value of intact forest ecosystems |
| PBWTAR_00336 | PBWTAR_5620 | USDA Forest Service | Forest Adaptation Resources: Climate Change Tools and Approaches for Land Managers, 2nd edition, Appendix 4. Adaptation Workbook: Short Version |
| PBWTAR_00337 | PBWTAR_5627 | White Mountain National Forest | "Selected Climate Change Publications by Resource Area" - Climate change literature relevant to different programs ie Botany |
| PBWTAR_00338 | PBWTAR_5629 | Nothern Insitute of Applied Climate Science (NIACS) | Climate Impacts New England and Nothern NY in Climate Adaptation Workbook |
| PBWTAR_00339 | PBWTAR_5637 | DeGraaf, R., & Yamasaki, M. | New England Wildlife: Habitat, Natural History, and Distribution |
| PBWTAR_00340 | PBWTAR_5650 | Demaria, E., et al. | Regional climate change projections of streamflow characteristics in the Northeast and Midwest U.S. |
| PBWTAR_00341 | PBWTAR_5665 | Domke, G., et al. | Toward inventory-based estimates of soil organic carbon in forests of the United States |
| PBWTAR_00342 | PBWTAR_5678 | Dugan, A., & McKinley, D. | Forest Carbon Assessment for the White Mountain National Forest |
| PBWTAR_00343 | PBWTAR_5704 | Foster, J., & D'Amato, A. | Montane forest ecotones moved downslope in northeastern USA in spite of warming between 1984 and 2011 |
| PBWTAR_00344 | PBWTAR_5715 | Helms, John A. | The Dictionary of Forestry |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00345 | PBWTAR_5717 | High, C., et al. | A Socio-Economic Assessment to Provide a Context for the White Mountain National Forest Plan Revision |
| PBWTAR_00346 | PBWTAR_5833 | | Summary for policymakers in Climate Change 2021: The Physical Science Basis. Contribution of Working Group I to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change |
| PBWTAR_00347 | PBWTAR_5865 | Lacroix, E., et al. | Evidence for Losses From Strongly Bound SOM Pools After Clear Cutting in a Northern Hardwood Forest |
| PBWTAR_00348 | PBWTAR_5871 | Leak, William B. | Seventy Years of Understory Development by Elevation Class in a New Hampshire Mixed Forest: Management Implications |
| PBWTAR_00349 | PBWTAR_5874 | Lynch, C., et al. | Recent and Projected Annual Cycles of Temperature and Precipitation in the Northeast United States from CMIP5 |
| PBWTAR_00350 | PBWTAR_5893 | McKinley, D., et al. | A synthesis of current knowledge on forests and carbon storage in the United States |
| PBWTAR_00351 | PBWTAR_5916 | White Mountain National Forest | "Forest-wide Invasive Plant Control Project - SIR" - Letter from Deputy Forest Supervisor Clare Mendelsohn to extend project decision through 2022 |
| PBWTAR_00352 | PBWTAR_5918 | Millen, Wayne | Estimated Climate Change Effects on New England Forests: Literature Review and Summary |
| PBWTAR_00353 | PBWTAR_5921 | Town of Gorham, New | Trail easment deed from Town of Gorham to USA |
| PBWTAR_00354 | PBWTAR_5928 | Oswald, W., et al. | Conservation implications of limited Native American impacts in pre-contact New England |
| PBWTAR_00355 | PBWTAR_5934 | Smallidge, P., & Nyland, R. | Woodland Guidelines for the Control and Management of American Beech |
| PBWTAR_00356 | PBWTAR_5940 | State of New Hampshire | Best Management Practices for Erosion Control During Trail Maintenance and Contruction |
| PBWTAR_00357 | PBWTAR_5983 | White Mountain National Forest | Stony Brook Trailhead right-of-way deed for parking lot easement in Gorham, NH |
| PBWTAR_00358 | PBWTAR_5985 | White Mountain National Forest | Stony Brook Trailhead right-of-way plat for parking lot easement in Gorham, NH |
| PBWTAR_00359 | PBWTAR_5986 | Sullivan, J.T. et al. | Spatial Distribution of Acid-sensitive and Acid-impacted Streams in Relation to Watershed Features in the Southern Appalachian Mountains |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00360 | PBWTAR_6001 | UNH Cooperative Extension, & NH Division of Forests and | New Hampshire Best Management Practices for Erosion Control on Timber Harvesting Operations |
| PBWTAR_00361 | PBWTAR_6096 | USGS | Document describing codes for GAP analysis |
| PBWTAR_00362 | PBWTAR_6101 | Weeks-Miller, Margaret | Current Status of Beech Bark Disease in New England and New York |
| PBWTAR_00363 | PBWTAR_6104 | Porter, Zack | "Attached: Peabody Response Letter" - Email from Jessica Marunowski to Zack Porter Executive Director of Standing Trees sharing objection response letter dated October 18, 2023 |
| PBWTAR_00364 | PBWTAR_6106 | White Mountain National Forest | "Peabody West Project Objection Response Letter" - Letter from Forest Supervisor Derek Ibarguen to Zack Port Executive Director of Standing Trees responding to objection letter dated June 12, 2023 |
| PBWTAR_00365 | PBWTAR_6124 | Standing Trees | "Objection Pursuant to 36 C.F.R. § 218.8 to Peabody West Integrated Resource Project #55659, Androscoggin Ranger district, White Mountain National Forest" - Public comment period letter of objection from Zack Porter Executive Director of Standing Trees |
| PBWTAR_00366 | PBWTAR_6186 | | Table depicting the milestone NEPA Dates for both the Peabody and Tarleton Project |
| PBWTAR_00367 | PBWTAR_6187 | White Mountain National Forest | Peabody West NNIS Risk Assessment |
| PBWTAR_00368 | PBWTAR_6196 | White Mountain National Forest | Peabody West Forest Cover |
| PBWTAR_00369 | PBWTAR_6220 | White Mountain National Forest | Peabody West Field Data for vegetation and trees |
| PBWTAR_00370 | PBWTAR_6264 | White Mountain National Forest | White Mountain National Forest |
| PBWTAR_00371 | PBWTAR_6302 | White Mountain National Forest | Power Point Presentation - Peabody IRMP Climate Change Discussion |
| PBWTAR_00372 | PBWTAR_6318 | White Mountain National Forest | Climate Change and Considerations to Peabody IRP |
| PBWTAR_00373 | PBWTAR_6322 | White Mountain National Forest | Project-level Carbon Assessment of Peabody West IRP |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00374 | PBWTAR_6328 | White Mountain National Forest | Forest Adaption Strategies and Approaches |
| PBWTAR_00375 | PBWTAR_6329 | White Mountain National Forest | Carbon Assessment for the Nantahala-Pisgah NF |
| PBWTAR_00376 | PBWTAR_6352 | White Mountain National Forest | Nantahala-Pisgah Carbon Forest Plan Ch 3 - Carbon |
| PBWTAR_00377 | PBWTAR_6366 | White Mountain National Forest | Climate Change Adaptions Strategies and Approaches for Outdoor Recreation |
| PBWTAR_00378 | PBWTAR_6367 | State Heritage Program Office | Letter from the SHPO concurring with a finding "no historic properties affected" |
| PBWTAR_00379 | PBWTAR_6369 | Gryczkowski, Landon | Albany South IRP Water Resource Report |
| PBWTAR_00380 | PBWTAR_6438 | Gryczkowski, Landon | Email- Peabody West Watershed Analysis Boundary |
| PBWTAR_00381 | PBWTAR_6440 | White Mountain National Forest | Peabody Watershed Map- Area of Minimal Flood Hazard |
| PBWTAR_00382 | PBWTAR_6441 | White Mountain National Forest | Peabody west Basal Area Watershed Analysis |
| PBWTAR_00383 | PBWTAR_6443 | White Mountain National Forest | Photo-Field Stream Classification |
| PBWTAR_00384 | PBWTAR_6444 | Wagner, Thomas | E-mail- Letter to Granite Backcountry Alliance |
| PBWTAR_00385 | PBWTAR_6445 | White Mountain National Forest | Developed Recreation Closure Order |
| PBWTAR_00386 | PBWTAR_6447 | White Mountain National Forest | Peabody West Recreation Map |
| PBWTAR_00387 | PBWTAR_6448 | Leberman, Marianne | Email- Hermit Lake Persons at One Time (PAOT) Capacity |
| PBWTAR_00388 | PBWTAR_6450 | White Mountain National Forest | Map- Proposed bike trails and glades |
| PBWTAR_00389 | PBWTAR_6451 | White Mountain National Forest | Map- Skin trails and glades |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00390 | PBWTAR_6452 | White Mountain National Forest | Map- Proposed bike trails and glades |
| PBWTAR_00391 | PBWTAR_6453 | White Mountain National Forest | Peabody West Design Features |
| PBWTAR_00392 | PBWTAR_6454 | Pellerin, Travis | E-mail - Bike Trail Ranking |
| PBWTAR_00393 | PBWTAR_6455 | White Mountain National Forest | Proposed Mountain Bike Recreation Opportunities and Alternatives |
| PBWTAR_00394 | PBWTAR_6457 | White Mountain National Forest | Proposed Recreation Opportunities and Alternatives |
| PBWTAR_00395 | PBWTAR_6460 | White Mountain National Forest | Map - Proposed Recreational Opportunities and Alternatives |
| PBWTAR_00396 | PBWTAR_6461 | White Mountain National Forest | Map - Recreation Trails with the Peabody West Project Area |
| PBWTAR_00397 | PBWTAR_6462 | Pellerin, Travis | Peabody West Recreation Specialist Report |
| PBWTAR_00398 | PBWTAR_6465 | White Mountain National Forest | Inventoried Roadless Brackground |
| PBWTAR_00399 | PBWTAR_6468 | White Mountain National Forest | Peabody West Roadless Inventory Acre Calculation Table |
| PBWTAR_00400 | PBWTAR_6473 | White Mountain National Forest | Peabody West Roadless Effects Summary |
| PBWTAR_00401 | PBWTAR_6476 | White Mountain National Forest | Modeled view of proposed units from Howker Ridge Viewpoint 1 |
| PBWTAR_00402 | PBWTAR_6477 | White Mountain National Forest | Modeled view of proposed units from Howker Ridge Viewpoint 2 |
| PBWTAR_00403 | PBWTAR_6478 | White Mountain National Forest | Isometric View Image- Proposed Units from Carter Viewpoint |
| PBWTAR_00404 | PBWTAR_6479 | White Mountain National Forest | Isometric View Image- Proposed Units from Howker Viewpoint |
| PBWTAR_00405 | PBWTAR_6480 | White Mountain National Forest | Isometric View Image- Proposed Units from Moriah Viewpoint |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00406 | PBWTAR_6481 | White Mountain National Forest | Isometric View Image- Proposed Units from Osgood Viewpoint |
| PBWTAR_00407 | PBWTAR_6482 | White Mountain National Forest | Modeled view of proposed units from Mt. Carter Viewpoint 1 |
| PBWTAR_00408 | PBWTAR_6483 | White Mountain National Forest | Modeled view of proposed units from Mt. Carter Viewpoint 2 |
| PBWTAR_00409 | PBWTAR_6484 | White Mountain National Forest | Modeled view of proposed units from Mt. Madision Viewpoint 1 |
| PBWTAR_00410 | PBWTAR_6485 | White Mountain National Forest | Modeled view of proposed units from Mt. Madision Viewpoint 2 |
| PBWTAR_00411 | PBWTAR_6486 | White Mountain National Forest | Modeled view of proposed units from Mount Moriah Viewpoint |
| PBWTAR_00412 | PBWTAR_6487 | White Mountain National Forest | Modeled view of proposed units from Mount Surprise Viewpoint |
| PBWTAR_00413 | PBWTAR_6488 | White Mountain National Forest | Modeled view of proposed units from Osgood Ridge Trail Viewpoint 1 |
| PBWTAR_00414 | PBWTAR_6489 | White Mountain National Forest | Modeled view of proposed units from Osgood Ridge Trail Viewpoint 2 |
| PBWTAR_00415 | PBWTAR_6490 | White Mountain National Forest | Map - Proposed Units |
| PBWTAR_00416 | PBWTAR_6491 | White Mountain National Forest | Modeled view of proposed units from Pine Mountain Viewpoint 1 |
| PBWTAR_00417 | PBWTAR_6492 | White Mountain National Forest | Modeled view of proposed units from Pine Mountain Viewpoint 2 |
| PBWTAR_00418 | PBWTAR_6493 | White Mountain National Forest | Modeled view of proposed units from Pine Mountain Viewpoint 3 |
| PBWTAR_00419 | PBWTAR_6494 | White Mountain National Forest | Modeled view of proposed units from the south of Mt. Carter Viewpoint |
| PBWTAR_00420 | PBWTAR_6495 | White Mountain National Forest | Map of Peabody West Viewpoints |
| PBWTAR_00421 | PBWTAR_6496 | White Mountain National Forest | Map of Peabody West Viewpoints |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00422 | PBWTAR_6497 | White Mountain National Forest | Estimated Visitation Levels at Preliminary Scenery Viewpoints |
| PBWTAR_00423 | PBWTAR_6498 | Allen, Kenneth | Peabody West Scenery Management Effects Analysis |
| PBWTAR_00424 | PBWTAR_6507 | Allen, Kenneth | Peabody West Scenery Management Effects Analysis |
| PBWTAR_00425 | PBWTAR_6523 | White Mountain National Forest | EJScreen American Community Survey(ACS) Report 2015-2019 |
| PBWTAR_00426 | PBWTAR_6526 | White Mountain National Forest | Demographics of Coos County, NH |
| PBWTAR_00427 | PBWTAR_6572 | White Mountain National Forest | Demographics of Gorham, NH |
| PBWTAR_00428 | PBWTAR_6618 | White Mountain National Forest | EJScreen |
| PBWTAR_00429 | PBWTAR_6621 | High et al. | 2004 A Socioeconomic Assessment to Provide a Context for the White Mountain National Forest Plan Revision |
| PBWTAR_00430 | PBWTAR_6624 | Colter, Robert | Soils Background information for how effects are determined for soil productivity |
| PBWTAR_00431 | PBWTAR_6632 | Colter, Robert | Peabody West Soil Assessment |
| PBWTAR_00432 | PBWTAR_6633 | Colter, Robert | Peabody West Soil Assessment |
| PBWTAR_00433 | PBWTAR_6644 | White Mountain National Forest | Map - Culhane Brook Road |
| PBWTAR_00434 | PBWTAR_6645 | White Mountain National Forest | Comprehensive stand report 092202000330017_r19 |
| PBWTAR_00435 | PBWTAR_7276 | White Mountain National Forest | Comprehensive stand report 092202000330020_r19 |
| PBWTAR_00436 | PBWTAR_7304 | White Mountain National Forest | Comprehensive stand report 092202000330035_r19 |
| PBWTAR_00437 | PBWTAR_7308 | White Mountain National Forest | Comprehensive stand report 092202000330036_r19 |
| PBWTAR_00438 | PBWTAR_7311 | White Mountain National Forest | Comprehensive stand report 092202000330041_r19 |
| PBWTAR_00439 | PBWTAR_7316 | White Mountain National Forest | Comprehensive stand report 092202000330042_r19 |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00440 | PBWTAR_7320 | White Mountain National Forest | Comprehensive stand report 092202000330051_r19 |
| PBWTAR_00441 | PBWTAR_7326 | White Mountain National Forest | Comprehensive stand report 092202000330058_r19 |
| PBWTAR_00442 | PBWTAR_7330 | White Mountain National Forest | Comprehensive stand report 092202000330059_r19 |
| PBWTAR_00443 | PBWTAR_7334 | White Mountain National Forest | Comprehensive stand report 092202000330061_r19 |
| PBWTAR_00444 | PBWTAR_7339 | White Mountain National Forest | Comprehensive stand report 092202000330067_r19 |
| PBWTAR_00445 | PBWTAR_7343 | White Mountain National Forest | Comprehensive stand report 092202000330068_r19 |
| PBWTAR_00446 | PBWTAR_7348 | White Mountain National Forest | Comprehensive stand report 092202000330070_r19 |
| PBWTAR_00447 | PBWTAR_7352 | White Mountain National Forest | Comprehensive stand report 092202000330072_r19 |
| PBWTAR_00448 | PBWTAR_7356 | White Mountain National Forest | Comprehensive stand report 092202000330073_r19 |
| PBWTAR_00449 | PBWTAR_7359 | White Mountain National Forest | Comprehensive stand 092202000330075_r19 |
| PBWTAR_00450 | PBWTAR_7363 | White Mountain National Forest | Comprehensive stand report 092202000330077_r19 |
| PBWTAR_00451 | PBWTAR_7367 | White Mountain National Forest | Comprehensive stand report 092202000330078_r19 |
| PBWTAR_00452 | PBWTAR_7371 | White Mountain National Forest | Comprehensive stand report 092202000330079_r19 |
| PBWTAR_00453 | PBWTAR_7375 | White Mountain National Forest | Comrehensive stand report 092202000330089_r19 |
| PBWTAR_00454 | PBWTAR_7379 | White Mountain National Forest | Comrehensive stand report 092202000340002_r19 |
| PBWTAR_00455 | PBWTAR_7384 | White Mountain National Forest | Comprehensive stand report 092202000340003_r19 |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00456 | PBWTAR_7388 | White Mountain National Forest | Comprehensive stand report 092202000340006_r19 |
| PBWTAR_00457 | PBWTAR_7394 | White Mountain National Forest | Comprehensive stand report 092202000340041_r19 |
| PBWTAR_00458 | PBWTAR_7398 | White Mountain National Forest | Comprehensive stand report 092202000340052_r19 |
| PBWTAR_00459 | PBWTAR_7402 | White Mountain National Forest | Comprehensive stand report 092202000330061_r19 |
| PBWTAR_00460 | PBWTAR_7409 | White Mountain National Forest | Comprehensive stand report 092202000340062_r19 |
| PBWTAR_00461 | PBWTAR_7412 | White Mountain National Forest | Final Volume Report Peabody - Rudy Marrufo |
| PBWTAR_00462 | PBWTAR_7416 | White Mountain National Forest | Peabody IDT Recreation Field Visit |
| PBWTAR_00463 | PBWTAR_7419 | White Mountain National Forest | GIS Map of Bear Mast Area |
| PBWTAR_00464 | PBWTAR_7420 | White Mountain National Forest | Black and White Photos of Peabody Plot Locations |
| PBWTAR_00465 | PBWTAR_7421 | White Mountain National Forest | Black and White Photos of Peabody Plot Locations |
| PBWTAR_00466 | PBWTAR_7422 | White Mountain National Forest | Black and White Photos of Peabody Plot Locations |
| PBWTAR_00467 | PBWTAR_7423 | White Mountain National Forest | Black and White Photos of Peabody Plot Locations |
| PBWTAR_00468 | PBWTAR_7424 | White Mountain National Forest | Black and White Photos of Peabody Plot Locations |
| PBWTAR_00469 | PBWTAR_7425 | White Mountain National Forest | Black and White Photos of Peabody Plot Locations |
| PBWTAR_00470 | PBWTAR_7426 | White Mountain National Forest | Black and White Photos of Peabody Plot Locations |
| PBWTAR_00471 | PBWTAR_7427 | White Mountain National Forest | Photo of Peabody River Crossing in March |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00472 | PBWTAR_7428 | White Mountain National Forest | Ecological Land Type (ELT) Interpretation Table |
| PBWTAR_00473 | PBWTAR_7429 | White Mountain National Forest | Photo - Digging soil pits to confirm Ecological Land Type (ELT) |
| PBWTAR_00474 | PBWTAR_7430 | Allen, Ken | E-mail- Design Features for Peabody Project |
| PBWTAR_00475 | PBWTAR_7432 | White Mountain National Forest | Photo - Gravel Pit on Bear Springs Road |
| PBWTAR_00476 | PBWTAR_7433 | White Mountain National Forest | Hardwood and Softwood Ecological Land Types |
| PBWTAR_00477 | PBWTAR_7435 | White Mountain National Forest | Photo of View from Imp Lookout |
| PBWTAR_00478 | PBWTAR_7436 | White Mountain National Forest | NED Stand Reports Total Volume |
| PBWTAR_00479 | PBWTAR_7529 | White Mountain National Forest | Photo - Peabody River from Unit 61 |
| PBWTAR_00480 | PBWTAR_7530 | White Mountain National Forest | Peabody Sale Volume Estimate for Gate 1 Analysis |
| PBWTAR_00481 | PBWTAR_7545 | White Mountain National Forest | 2007 Stand Exams Report 16 |
| PBWTAR_00482 | PBWTAR_7671 | White Mountain National Forest | Peabody Stand Exam Procedure |
| PBWTAR_00483 | PBWTAR_7672 | White Mountain National Forest | GIS Features in Peabody Project Area |
| PBWTAR_00484 | PBWTAR_7673 | White Mountain National Forest | 2007 Stand Exams Report 17 |
| PBWTAR_00485 | PBWTAR_7810 | White Mountain National Forest | Peabody Stand Exam Table |
| PBWTAR_00486 | PBWTAR_7812 | White Mountain National Forest | Peabody Stand Exam Table |
| PBWTAR_00487 | PBWTAR_7814 | White Mountain National Forest | Peabody Stand Exam Table - Jeff Williams |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00488 | PBWTAR_7819 | White Mountain National Forest | Peabody Stand Exam Table - Rudy Marrufo |
| PBWTAR_00489 | PBWTAR_7824 | White Mountain National Forest | Peabody Stand Exam Pie Charts - Jeff Williams |
| PBWTAR_00490 | PBWTAR_7834 | White Mountain National Forest | Peabody Stand Table |
| PBWTAR_00491 | PBWTAR_7836 | White Mountain National Forest | Final Stand Assessment Forms |
| PBWTAR_00492 | PBWTAR_7905 | White Mountain National Forest | Aspen and Paper Birch stands in Peabody West Project |
| PBWTAR_00493 | PBWTAR_7912 | White Mountain National Forest | Map of past timber sales in Peabody Project Area |
| PBWTAR_00494 | PBWTAR_7913 | White Mountain National Forest | Proposed Land Suitablity Class (LSC) Changes |
| PBWTAR_00495 | PBWTAR_7916 | White Mountain National Forest | Compartment 37 Prescription Map |
| PBWTAR_00496 | PBWTAR_7917 | White Mountain National Forest | Report 16 for all stands in Project Area |
| PBWTAR_00497 | PBWTAR_8338 | White Mountain National Forest | Report 17 for all stands in Project Area |
| PBWTAR_00498 | PBWTAR_8925 | White Mountain National Forest | 2007 Peabody Stand Exams Report 22 |
| PBWTAR_00499 | PBWTAR_8930 | White Mountain National Forest | Photo of Ski Hut at Great Glen Trails |
| PBWTAR_00500 | PBWTAR_8931 | White Mountain National Forest | Photo of Ski Hut at Great Glen Trails |
| PBWTAR_00501 | PBWTAR_8932 | White Mountain National Forest | Peabody Stands with Volumes and Acres |
| PBWTAR_00502 | PBWTAR_8934 | White Mountain National Forest | Peabody Stand Exam Data Sheets |
| PBWTAR_00503 | PBWTAR_8939 | White Mountain National Forest | Topographic Map 1 of Peabody Plot Locations |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00504 | PBWTAR_8940 | White Mountain National Forest | Topographic Map 2 of Peabody Plot Locations |
| PBWTAR_00505 | PBWTAR_8941 | White Mountain National Forest | Topographic Map 3 of Peabody Plot Locations |
| PBWTAR_00506 | PBWTAR_8942 | White Mountain National Forest | Topographic Map 4 of Peabody Plot Locations |
| PBWTAR_00507 | PBWTAR_8943 | White Mountain National Forest | Topographic Map 5 of Peabody Plot Locations |
| PBWTAR_00508 | PBWTAR_8944 | White Mountain National Forest | Photo - View of Unit 61 |
| PBWTAR_00509 | PBWTAR_8945 | White Mountain National Forest | Photo - View of Unit 61 |
| PBWTAR_00510 | PBWTAR_8946 | White Mountain National Forest | Photo - View of Unit 67 |
| PBWTAR_00511 | PBWTAR_8947 | White Mountain National Forest | Photo - View of Unit 73 |
| PBWTAR_00512 | PBWTAR_8948 | White Mountain National Forest | Photo - View from Imp Lookout into Project Area |
| PBWTAR_00513 | PBWTAR_8949 | White Mountain National Forest | Photo - View from Wildcat Mountain into Project Area |
| PBWTAR_00514 | PBWTAR_8950 | White Mountain National Forest | Map of Northern Goshawk Nest in Peabody West Project Area |
| PBWTAR_00515 | PBWTAR_8951 | US Fish & Wildlife Service | Fish and Wildlife Service IPaC Resource List |
| PBWTAR_00516 | PBWTAR_8962 | US Fish & Wildlife Service | Consultation with Fish and Wildlife on Official Species List |
| PBWTAR_00517 | PBWTAR_8968 | White Mountain National Forest | Field Visit with Recreation reviewing trails in the Project Area |
| PBWTAR_00518 | PBWTAR_8970 | White Mountain National Forest | Letter from New Hamsphire Fish and Game acknowledging field visit to review trails near bear mast areas. |
| PBWTAR_00519 | PBWTAR_8972 | US Fish & Wildlife Service | Fish and Wildlife Service Updated Species List |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00520 | PBWTAR_8977 | White Mountain National Forest | Northern Long Eared Bat Consultation and 4(d) Rule Consistency |
| PBWTAR_00521 | PBWTAR_8983 | O'Neill, William | Email to FWS regarding NLEB and change of project scope |
| PBWTAR_00522 | PBWTAR_8985 | US Fish & Wildlife Service | Peabody West Habitat Management Unit Conditions |
| PBWTAR_00523 | PBWTAR_9118 | US Fish & Wildlife Service | Moat Mountain Trail System Project EA |
| PBWTAR_00524 | PBWTAR_9188 | White Mountain National Forest | Wildlife Map- Peabody West Management Areas |
| PBWTAR_00525 | PBWTAR_9189 | White Mountain National Forest | Map of Peabody West Proposed Harvest Units |
| PBWTAR_00526 | PBWTAR_9190 | White Mountain National Forest | Regional Forester Sensitive Species Efects |
| PBWTAR_00527 | PBWTAR_9203 | White Mountain National Forest | Peabody West Habitat Management Unit Conditions |
| PBWTAR_00528 | PBWTAR_9219 | White Mountain National Forest | Peabody West Biological Evaluation and Wildlife Report |
| PBWTAR_00529 | PBWTAR_9238 | White Mountain National Forest | Peabody West Biological Evaluation and Wildlife Report |
| PBWTAR_00530 | PBWTAR_9259 | White Mountain National Forest | Peabody West Biological Evaluation and Wildlife Report |
| PBWTAR_00531 | PBWTAR_9278 | White Mountain National Forest | Rationale for Habitat Objectives in the Peabody HMU |
| PBWTAR_00532 | PBWTAR_9291 | White Mountain National Forest | Region 9 List of projectsinvolving tree cutting and effects to NLEB. |
| PBWTAR_00533 | PBWTAR_9338 | White Mountain National Forest | Region 9 Migratory Bird Treaty Act |
| PBWTAR_00534 | PBWTAR_9340 | White Mountain National Forest | 2023 Summary of Biological Opinions for NLEB for Region 9 |
| PBWTAR_00535 | PBWTAR_9346 | White Mountain National Forest | Nesting Activity for Northern Goshawks for the Forest |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00536 | PBWTAR_9349 | White Mountain National Forest | Acres of treatment within Wild and Scenic River Buffer |
| PBWTAR_00537 | PBWTAR_9352 | Dockens, Johnida | Email exchange betwee Johnida Dockens and Mary D'Onofirio about placing a legal ad in Gorham and Berlin area newspapers re Open House |
| PBWTAR_00538 | PBWTAR_9354 | Davenza, Thomas | Email exchage between Thomas Davenza (Instructor, Stonehilll College)and Johnida Dockens re info on WMNF projects for his class |
| PBWTAR_00539 | PBWTAR_9358 | White Mountain National Forest | Open House Ad - Berlin Sun |
| PBWTAR_00540 | PBWTAR_9359 | jPublic (Barbara Sachau) | email comment on proposed project |
| PBWTAR_00541 | PBWTAR_9360 | Appalachian Mountain Club (AMC) | Open House comments - AMC |
| PBWTAR_00542 | PBWTAR_9361 | White Mountain National Forest | Open House Comment forms |
| PBWTAR_00543 | PBWTAR_9367 | White Mountain National Forest | Open House Comments Tracking |
| PBWTAR_00544 | PBWTAR_9368 | White Mountain National Forest | Open House sign-in sheet |
| PBWTAR_00545 | PBWTAR_9370 | Appalachian Mountain Club (AMC) | AMC Initial Hermit Lake Proposal |
| PBWTAR_00546 | PBWTAR_9374 | White Mountain National Forest | Draft Peabody West Alternatives map |
| PBWTAR_00547 | PBWTAR_9375 | White Mountain National Forest | Public Meeting Map with Post-it note comments from the public |
| PBWTAR_00548 | PBWTAR_9376 | White Mountain National Forest | Public Meeting Map with Post-it note comments from the public |
| PBWTAR_00549 | PBWTAR_9377 | White Mountain National Forest | Public Meeting Map with Post-it note comments from the public |
| PBWTAR_00550 | PBWTAR_9378 | White Mountain National Forest | Public Meeting Map with Post-it note comments from the public |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00551 | PBWTAR_9379 | White Mountain National Forest | Final Peabody West Conceptual Planning HMU Poster |
| PBWTAR_00552 | PBWTAR_9380 | White Mountain National Forest | Final Peabody West Concept Planning Recreation Poster |
| PBWTAR_00553 | PBWTAR_9381 | Town of Gorham, New | Tax Assessment Map - abutters |
| PBWTAR_00554 | PBWTAR_9389 | White Mountain National Forest | Hermit Lakes Proposal Graphic |
| PBWTAR_00555 | PBWTAR_9390 | White Mountain National Forest | Hermit Lakes Shelter Chart Final - table - Summary of WMNF Shelters by district |
| PBWTAR_00556 | PBWTAR_9391 | White Mountain National Forest | Hermit Lakes site map (hand drawn) |
| PBWTAR_00557 | PBWTAR_9392 | White Mountain National Forest | Peabody Conceptual Open House Informational posters |
| PBWTAR_00558 | PBWTAR_9394 | White Mountain National Forest | Peabody Proposed Rec Opportunities Overview |
| PBWTAR_00559 | PBWTAR_9397 | White Mountain National Forest | Draft Peabody West Rec Planning |
| PBWTAR_00560 | PBWTAR_9398 | White Mountain National Forest | Peabody Conceptural Open House Posters |
| PBWTAR_00561 | PBWTAR_9402 | White Mountain National Forest | Public Meeting Map with Post-it note comments from the public |
| PBWTAR_00562 | PBWTAR_9403 | White Mountain National Forest | Public Meeting Map with Post-it note comments from the public |
| PBWTAR_00563 | PBWTAR_9404 | White Mountain National Forest | Public Meeting Map with Post-it note comments from the public |
| PBWTAR_00564 | PBWTAR_9405 | White Mountain National Forest | Public Meeting Map with Post-it note comments from the public |
| PBWTAR_00565 | PBWTAR_9406 | White Mountain National Forest | Peabody West Conceptual Open House Flyer |
| PBWTAR_00566 | PBWTAR_9407 | Town of Gorham, New | Peabody West Mailing List Subscription Instructions and FAQs |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00567 | PBWTAR_9413 | White Mountain National Forest | Peabody West Conceptual Open House Public Notice |
| PBWTAR_00568 | PBWTAR_9414 | | |
| PBWTAR_00569 | PBWTAR_9415 | GovDelivery | |
| PBWTAR_00570 | PBWTAR_9417 | GovDelivery | |
| PBWTAR_00571 | PBWTAR_9418 | Settel | Settel_Scoping Comment |
| PBWTAR_00572 | PBWTAR_9422 | Hillman | |
| PBWTAR_00573 | PBWTAR_9423 | Ryan | Ryan_Scoping Comment |
| PBWTAR_00574 | PBWTAR_9424 | ATC | ATC_Scoping Comment |
| PBWTAR_00575 | PBWTAR_9426 | Acharya | Acharya_Scoping Comment |
| PBWTAR_00576 | PBWTAR_9427 | Acharya | Acharya_Scoping Comment |
| PBWTAR_00577 | PBWTAR_9428 | Ascher | Ascher_Scoping Comment |
| PBWTAR_00578 | PBWTAR_9429 | Dennison | Dennison_Scoping Comment |
| PBWTAR_00579 | PBWTAR_9430 | Dennison | Dennison_Scoping Comment |
| PBWTAR_00580 | PBWTAR_9431 | DiPietro | DiPietro_Scoping Comment |
| PBWTAR_00581 | PBWTAR_9432 | Donelon | Donelon_Scoping Comment |
| PBWTAR_00582 | PBWTAR_9433 | Horning | Horning_Scoping Comment |
| PBWTAR_00583 | PBWTAR_9434 | Metheny | Metheny_Scoping Comment |
| PBWTAR_00584 | PBWTAR_9435 | Metheny | Metheny_Scoping Comment |
| PBWTAR_00585 | PBWTAR_9437 | Nicol | Nicol_Scoping Comment |
| PBWTAR_00586 | PBWTAR_9438 | Ryan | Ryan_Scoping Comment |
| PBWTAR_00587 | PBWTAR_9439 | Ryan | Ryan_Scoping Comment |
| PBWTAR_00588 | PBWTAR_9440 | Ryan | Ryan_Scoping Comment |
| PBWTAR_00589 | PBWTAR_9441 | Settel | Settel_Scoping Comment |
| PBWTAR_00590 | PBWTAR_9443 | Teschner | Teschner_Scoping Comment |
| PBWTAR_00591 | PBWTAR_9444 | Tompkins, Joyce | Tompkins, Joyce_ scoping comment letter |
| PBWTAR_00592 | PBWTAR_9446 | Tompkins, Joyce | Tompkins, Joyce_scoping comment letter attachment |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00593 | PBWTAR_9449 | Uline, Nancy | Nancy Uline scoping comment letter |
| PBWTAR_00594 | PBWTAR_9450 | Wellington, Roger | Roger Wellington scoping comment letter |
| PBWTAR_00595 | PBWTAR_9451 | Wipfler, Alice | Alice Wipfler scoping comment letter |
| PBWTAR_00596 | PBWTAR_9452 | Wipfler, Michael | Michael Wipfler scoping comment letter |
| PBWTAR_00597 | PBWTAR_9453 | Wipfler, Rob | Rob Wipfler scoping comment letter |
| PBWTAR_00598 | PBWTAR_9454 | Wipfler, Rob | Rob Wipfler scoping comment letter attachment |
| PBWTAR_00599 | PBWTAR_9455 | Wipfler, Rob | Rob Wipfler scoping comment letter attachment bullet points |
| PBWTAR_00600 | PBWTAR_9456 | Wright, Theresa | Theresa Wright scoping comment letter |
| PBWTAR_00601 | PBWTAR_9457 | White Mountain National Forest | Full Mailing List for the Tarleton IRP during the scoping period |
| PBWTAR_00602 | PBWTAR_9463 | White Mountain National Forest | Spreadsheet of all Tarleton project scoping comments and how they were considered by the responsible official |
| PBWTAR_00603 | PBWTAR_9470 | White Mountain National Forest | Mailings labels for the project hardcopy mailing list |
| PBWTAR_00604 | PBWTAR_9471 | White Mountain National Forest | Newsletter advertising the scoping period for the Tarleton IRP and providing initial project information |
| PBWTAR_00605 | PBWTAR_9478 | White Mountain National Forest | Standalone map of the project area from the scoping newsletter |
| PBWTAR_00606 | PBWTAR_9479 | Journal Opinion | Newspaper article: updating the public on the Lake Tarleton Trust for Public Lands (TPL) |
| PBWTAR_00607 | PBWTAR_9481 | Journal Opinion | Newspaper article: Trust for Public Lands Airs Plans Lake Tarleton |
| PBWTAR_00608 | PBWTAR_9482 | Journal Opinion | Newspaper article: updating the status of Lake Tarleton TPL |
| PBWTAR_00609 | PBWTAR_9483 | Journal Opinion | Newspaper article: Lake Armington News |
| PBWTAR_00610 | PBWTAR_9484 | Journal Opinion | Newspaper article: regarding two management areas around Lake Tarleton |
| PBWTAR_00611 | PBWTAR_9485 | Journal Opinion | Newspaper article: notice to burn and removed non native plant species around Lake Tarleton |
| PBWTAR_00612 | PBWTAR_9486 | Andrea LaMoreaux | Email from Andrea LaMoreaux (of NH Lakes) to Brett Hillman - Project Ideas in the Tarleton project area |
| PBWTAR_00613 | PBWTAR_9487 | Prout, Leighlan | Bat Survey Data |
| PBWTAR_00614 | PBWTAR_9489 | Houghton, Sandra | Tarleton Bat Survey Report |
| PBWTAR_00615 | PBWTAR_9490 | Hillman, Brett | Project Information to NH Fish and Game |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00616 | PBWTAR_9492 | Uline, Betsy | Tarleton Integrated Resource Project 56394 |
| PBWTAR_00617 | PBWTAR_9493 | Albro, Austin | Charleston Road Warren NH |
| PBWTAR_00618 | PBWTAR_9494 | Hall, Scott | Lake Tarleton Project RAD Response |
| PBWTAR_00619 | PBWTAR_9495 | Robey, Frank | Request to be added to the Email list for the Lake Tarleton IRP EA |
| PBWTAR_00620 | PBWTAR_9497 | Hall, Scott | Piermont Charleston Road Status Check-in |
| PBWTAR_00621 | PBWTAR_9498 | Settel, Kenneth | Tarleton Early Project Development Public Meeting Open House |
| PBWTAR_00622 | PBWTAR_9499 | Giles, Thomas | Response to Tarleton Early Project Development Public Meeting Open House |
| PBWTAR_00623 | PBWTAR_9500 | George, Eric and Farina, | WMNF Proposing Project near NE Powerline Corridor |
| PBWTAR_00624 | PBWTAR_9501 | George, Eric and Farina, | Picture of the Powerline During Site Visit to the Proposed Project new NE Powerline Corridor |
| PBWTAR_00625 | PBWTAR_9560 | George, Eric and Farina, | Picture of the Powerline During Site Visit to the Proposed Project new NE Powerline Corridor |
| PBWTAR_00626 | PBWTAR_9565 | George, Eric and Farina, | Picture of the Powerline During Site Visit to the Proposed Project new NE Powerline Corridor |
| PBWTAR_00627 | PBWTAR_9573 | George, Eric and Farina, | Tarleton IRP Powerline Field Visit; Clarification of Two Items |
| PBWTAR_00628 | PBWTAR_9574 | Park, Michelle | Tarleton IRP Powerline Field Visit; Permit Application Process |
| PBWTAR_00629 | PBWTAR_9575 | Hall, Scott | Tarleton Powerline Corridor Meeting Notes |
| PBWTAR_00630 | PBWTAR_9576 | Hall, Scott and Pierce, Sandi | Piermont Board of Selectmen Meeting Times |
| PBWTAR_00631 | PBWTAR_9579 | Hall, Scott and Albro, Austin | Warren Board of Selectmen Meeting Times |
| PBWTAR_00632 | PBWTAR_9582 | Hillman, Brett | NHFG Field Trip Coordination |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00633 | PBWTAR_9583 | Hall, Scott and Faletra, Elaine | Tarleton Project Herbicide Use |
| PBWTAR_00634 | PBWTAR_9586 | Hall, Scott and Faletra, Elaine | Tarleton Project Objection Information |
| PBWTAR_00635 | PBWTAR_9588 | Hall, Scott | Request for Ganey's Postal Address |
| PBWTAR_00636 | PBWTAR_9594 | Hall, Scott and Faletra, Elaine | Tarleton Project Comment vs. Objection Period |
| PBWTAR_00637 | PBWTAR_9595 | Ascher, Robin | Tarleton Project Historical Information |
| PBWTAR_00638 | PBWTAR_9596 | Reder, Jake | Tarleton Project Pushback |
| PBWTAR_00639 | PBWTAR_9597 | NHTOA | NH Timber Owners Association Support for Tarleton Project |
| PBWTAR_00640 | PBWTAR_9602 | Hall, Scott and Belyea, Phillip | Tarleton Project Lot Line Question |
| PBWTAR_00641 | PBWTAR_9604 | Weyburne, Emily | Tarleton Project Opposition |
| PBWTAR_00642 | PBWTAR_9607 | Balanger, Ben | Staffer for Senator Maggie Hassan for Tarleton Meeting |
| PBWTAR_00643 | PBWTAR_9609 | Miller, Heath | Save Lake Tarleton |
| PBWTAR_00644 | PBWTAR_9611 | Hall, Scott | Tarleton Project Lake Tarleton Association (LTA) Invitaion Meeting Notes DRAFT |
| PBWTAR_00645 | PBWTAR_9613 | Martin, Christian | NH Audubon Concern for Eagle Breeding |
| PBWTAR_00646 | PBWTAR_9615 | Martin, Christian | NH Audubon Concern for Eagle Breeding continued |
| PBWTAR_00647 | PBWTAR_9617 | Reder, Jake and Brown, Brooke | Response to Jake Reder's Comments on the Tarleton Project Outside of the Comments Period |
| PBWTAR_00648 | PBWTAR_9620 | Faletra, Peter | Request to Re-open Comments Period on the Tarleton Project |
| PBWTAR_00649 | PBWTAR_9624 | Wipfler, Rob and Mike | Tarleton Project Site Visit; Kingswood Camp |
| PBWTAR_00650 | PBWTAR_9629 | Baranoski, David and Alana | Request to Re-open Comments Period on the Tarleton Project |
| PBWTAR_00651 | PBWTAR_9635 | Hamllin, Joeanna | Lake Tarleton Project Opposition |
| PBWTAR_00652 | PBWTAR_9636 | DiPietro, Mike | Lake Tarleton Comments; Ensuring the Comments were Received |
| PBWTAR_00653 | PBWTAR_9640 | Potter, Claire | Tarleton Project; Valley News Reporter Inquiry for Interview with District Ranger |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00654 | PBWTAR_9642 | Faletra, Elaine | Tarleton Project Request to Re-Open Public Information and Engagement Process |
| PBWTAR_00655 | PBWTAR_9643 | Potter, Claire | Tarleton Project; Valley News Reporter Request for Response to Follow-up Questions |
| PBWTAR_00656 | PBWTAR_9646 | Brown, Brooke and Faletra, Elaine | Request by Lake Tarleton Coalition Steering Committee to Pause Tarleton Project |
| PBWTAR_00657 | PBWTAR_9648 | Reder, Jake | Response to Re-opening the Public Engagement Process WRT the Tarleton Project |
| PBWTAR_00658 | PBWTAR_9649 | Wiplfer, Rob | |
| PBWTAR_00659 | PBWTAR_9657 | Porter, Zack | Response to Re-opening the Public Engagement Process WRT the Tarleton Project |
| PBWTAR_00660 | PBWTAR_9659 | Miller, Ted | Opposition to the Lake Tarleton Project |
| PBWTAR_00661 | PBWTAR_9660 | Martin, Christian | NH Audubon Agreeable to 100 ft no-cut Buffer Eagle Design |
| PBWTAR_00662 | PBWTAR_9663 | Wipfler, Rob and Mike | Tarleton IRP Logging History |
| PBWTAR_00663 | PBWTAR_9665 | Balanger, Ben | Staffer for Senator Maggie Hassan Requesting Update on Tarleton Project |
| PBWTAR_00664 | PBWTAR_9666 | Spoerl, Robert and Nelson, Erik | Permission Granted by NH State Parks to Use Kiosk at Lake Tarleton to Post Project Information |
| PBWTAR_00665 | PBWTAR_9668 | Pastoriza, Kris | Comment about Tarleton Project Carbon Data |
| PBWTAR_00666 | PBWTAR_9670 | Janowiak, Maria | Response to Comment about Tarleton Project Carbon Data |
| PBWTAR_00667 | PBWTAR_9672 | Leahy, Matt | Society for the Protection of NH Forests Timber Records |
| PBWTAR_00668 | PBWTAR_9674 | Pierce, Sandi | Peirmont Town Office to find out Level of Activity on the Cape Moonshine Road |
| PBWTAR_00669 | PBWTAR_9675 | Wellington, Roger | Tarleton Project Positive Feedback |
| PBWTAR_00670 | PBWTAR_9678 | Pastoriza, Kris | Continued Comments regarding the Tarleton Project Carbon Data |
| PBWTAR_00671 | PBWTAR_9682 | Ascher, Tobey | Meeting with WMNF Staff to Discuss Tarleton Project |
| PBWTAR_00672 | PBWTAR_9684 | Hall, Scott | Availability of the Tarleton EA for the Town of Piermont |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00673 | PBWTAR_9686 | Hall, Scott | Availability of the Tarleton EA for the Town of Warren |
| PBWTAR_00674 | PBWTAR_9693 | Pastoriza, Kris | Request for Revised EA on the Tarleton Project |
| PBWTAR_00675 | PBWTAR_9697 | Giles, Thomas | Request for Digital Copy of the DRAFT Tarleton EA and FONSI |
| PBWTAR_00676 | PBWTAR_9698 | Wagner, Thomas | Request for Status of Additional Comments Period for Tarleton Project |
| PBWTAR_00677 | PBWTAR_9699 | Porter, Zack | Request for Forest Plan EIS Alternatives and Maps |
| PBWTAR_00678 | PBWTAR_9701 | Faletra, Elaine | Question Regarding Second Comment Period for Lake Tarleton Project |
| PBWTAR_00679 | PBWTAR_9702 | Ascher, Tobey and Brown, Brooke | Phone Conversation from Tobey Regarding Concerns about the Tarleton Project |
| PBWTAR_00680 | PBWTAR_9703 | Potter, Claire | Valley News follow-up questions for WMNF Regarding Lake Tarleton Project |
| PBWTAR_00681 | PBWTAR_9707 | Henderson, Chuck | Staffer for Senator Shaheen asks Questions about the Tarleton Project |
| PBWTAR_00682 | PBWTAR_9708 | Olsen, Jessica | Positive Support for the Tarleton Project |
| PBWTAR_00683 | PBWTAR_9710 | Henderson, Chuck | Staffer for Senator Shaheen asks Follow-up Questions about the Tarleton Project |
| PBWTAR_00684 | PBWTAR_9713 | Gelbart, Adam | Opposition to the Lake Tarleton Project |
| PBWTAR_00685 | PBWTAR_9715 | Clough, Ian | Opposition to the Lake Tarleton Project |
| PBWTAR_00686 | PBWTAR_9716 | Fowler, Joanna Montoya | Opposition to the Lake Tarleton Project |
| PBWTAR_00687 | PBWTAR_9718 | Cantwell, Shelly | Opposition to the Lake Tarleton Project |
| PBWTAR_00688 | PBWTAR_9719 | Holbrook, Henry | Opposition to the Lake Tarleton Project |
| PBWTAR_00689 | PBWTAR_9720 | Hall, Scott | Society for the Protection of NH Forests Field Visit to Tarleton Project |
| PBWTAR_00690 | PBWTAR_9721 | Calvo-Sotelo, Ricardo | Opposition to the Lake Tarleton Project |
| PBWTAR_00691 | PBWTAR_9722 | Noyes, Dan | Opposition to Clear-cutting of the Lake Tarleton Project |
| PBWTAR_00692 | PBWTAR_9723 | Corless, Theresa | Response to E. Faletra's Request for FOIA of Lake Tarleton Project Information |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00693 | PBWTAR_9724 | Corless, Theresa | Follow-up Response to E. Faletra Regarding Comments Received on Lake Tarleton Project |
| PBWTAR_00694 | PBWTAR_9725 | Jones, Eric and Hall, Scott | Questions and Answers in Approach to NEPA Decisions by WMNF |
| PBWTAR_00695 | PBWTAR_9726 | Brown, Brooke and Settel, Kenneth | Meeting with Residence of Lake Armington Association |
| PBWTAR_00696 | PBWTAR_9727 | Brown, Brooke | Lake Tarleton Coalition (LTC) Meeting Summary |
| PBWTAR_00697 | PBWTAR_9730 | Wipfler, Rob | Thank you to the WMNF for Meeting with Camp Kingswood and the LTC |
| PBWTAR_00698 | PBWTAR_9732 | Brown, Brooke and Settel, Kenneth | Lake Armington Association Meeting with Pemigewasset District Ranger and Staff |
| PBWTAR_00699 | PBWTAR_9734 | Hunt, Suzanne | Opposition to the Lake Tarleton Project |
| PBWTAR_00700 | PBWTAR_9735 | Brown, Brooke | Transcript of Meeting Between Lake Armington Association Meeting and Pemigewasset District Ranger and Staff |
| PBWTAR_00701 | PBWTAR_9737 | Brown, Brooke and Settel, Kenneth | Thank You from the Lake Armington Association for the Meeting with Pemigewasset District Ranger and Staff |
| PBWTAR_00702 | PBWTAR_9741 | Stock, Jasen and Brown, Brooke | Clarifying Points in an Opinion Piece Written in the Concord Monitor Newspaper |
| PBWTAR_00703 | PBWTAR_9743 | Twomey, Ryan | Invitation to the Appalachain Trail Conservancy to Join WMNF to Confirm Foreground Visuals WRT Tarleton Project |
| PBWTAR_00704 | PBWTAR_9782 | Wipfler, Mike | Checking-in On the Lake Tarleton IRP |
| PBWTAR_00705 | PBWTAR_9789 | Henderson, Chuck | Checking-in On the Lake Tarleton IRP |
| PBWTAR_00706 | PBWTAR_9791 | Twomey, Ryan | Follow-up to the Appalachain Trail Conservancy with regard to Foreground Visuals of Tarleton Project |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00707 | PBWTAR_9794 | NH Congressional Delegates | Lake Tarleton Congressional Letter |
| PBWTAR_00708 | PBWTAR_9796 | Henderson, Chuck | Lake Tarleton Congressional Letter |
| PBWTAR_00709 | PBWTAR_9798 | Brown, Brooke and Wipfler Rob and Mike | Invitation to a Meeting with the Pemigewasset District Ranger and Staff |
| PBWTAR_00710 | PBWTAR_9803 | Brown, Brooke and Wipfler Rob and Mike | Follow-up on Invitation to a Meeting with the Pemigewasset District Ranger and Staff |
| PBWTAR_00711 | PBWTAR_9804 | Hackley, Patrick | Support Letter from NH Dept of Natural and Cultural Resource, Division of Forests and Lands |
| PBWTAR_00712 | PBWTAR_9806 | Nelson, Mark | Standing Trees Board Chairman's article The Root |
| PBWTAR_00713 | PBWTAR_9807 | Fillion, Robert | Editor of Haverhill Heritage Books with a History of Lake Tarleton Area |
| PBWTAR_00714 | PBWTAR_9812 | Brown, Brooke | Link to Valley News article |
| PBWTAR_00715 | PBWTAR_9813 | Hall, Scott and Bald, Mike | Request for Tarleton IRP EA and Decision Notice |
| PBWTAR_00716 | PBWTAR_9818 | Hall, Scott and Bald, Mike | Request for Tarleton IRP EA and Decision Notice and Follow-up |
| PBWTAR_00717 | PBWTAR_9864 | Mainville, Colleen | Link to Concord Monitor Newspaper Article about Lake Tarleton |
| PBWTAR_00718 | PBWTAR_9865 | Brown, Brooke and Wipfler Rob and Mike | Folow-up email from Phone Conversation on 3/27/23 |
| PBWTAR_00719 | PBWTAR_9867 | Paradales, Isabella | Question regarding the End of the Objection Period for the Lake Tarleton IRP |
| PBWTAR_00720 | PBWTAR_9869 | Pastoriza, Kris | Submitted a Correction to his Carbon Assessment of the Lake Tarleton IRP |
| PBWTAR_00721 | PBWTAR_9875 | Guetti, Bart | Questions about the Tarleton IRP Objection Period and Mountain Lions in NH |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00722 | PBWTAR_9878 | Corless, Theresa | Response to the Wipfler's regarding their FOIA Request |
| PBWTAR_00723 | PBWTAR_9881 | Guetti, Bart | Questions about the Tarleton IRP Objection Period and Mountain Lions in NH |
| PBWTAR_00724 | PBWTAR_9883 | Brown, Brooke and Wipfler Rob | Query to Mr. Wipfler to Aid in Understanding His Question |
| PBWTAR_00725 | PBWTAR_9885 | Faletra, Elaine and Corless, Theresa | Follow-up Questions and Answers to the Oliverian Project |
| PBWTAR_00726 | PBWTAR_9886 | Faletra, Elaine and Hall, Scott | Lake Tarleton Apple Tree Questions |
| PBWTAR_00727 | PBWTAR_9888 | Porter, Zack and Corless, Theresa | Follow-up Questions and Answers to the Tarleton IRP |
| PBWTAR_00728 | PBWTAR_9892 | Vermont Business Magazine | A Staff Writer for the Vermont Business Magazine Weighs in on Lake Tarleon IRP |
| PBWTAR_00729 | PBWTAR_9897 | Porter, Zack and Ibarguen, Derek | Objection to the Tarleton IRP |
| PBWTAR_00730 | PBWTAR_9898 | Brown, Brooke | Email from District Ranger to Patricia Brown with Informaton on Tarleton IRP |
| PBWTAR_00731 | PBWTAR_9904 | Twomey, Ryan | Checking-in with Dartmouth (DOC) regarding the EA for the Lake Tarleton IRP |
| PBWTAR_00732 | PBWTAR_9906 | Brown, Brooke and Guetti, Bart | Reqeust for Update on the Lake Tarleton IRP |
| PBWTAR_00733 | PBWTAR_9909 | DiPietro, Mike | Request for Meeting Minutes of the Revewiing Official's Resolution Meeting for Tarleton IRP |
| PBWTAR_00734 | PBWTAR_9910 | Galik, Angela | Request for Update and Timelines on Tarleton and Peabody IRPs |
| PBWTAR_00735 | PBWTAR_9911 | Barbour, Jordan | Newspaper Article from the White River Valley Herald Regarding Lake Tarleton IRP |
| PBWTAR_00736 | PBWTAR_9913 | USDA, Forest Service | Media Advisory for Lake Tarleton IRP |
| PBWTAR_00737 | PBWTAR_9915 | Sunday Monitor | Newspaper article: Lake (Tarleton) has Escaped the Grasp of Developers |
| PBWTAR_00738 | PBWTAR_9918 | State of NH | Approval to expand the WMNF to include Lakes Tarleton, Armington, Katherine and Constance |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00739 | PBWTAR_9919 | Lake Tarleton Land Management Corporation | Partial Release of Tarleton Shores II |
| PBWTAR_00740 | PBWTAR_9926 | Lake Tarleton Land Management Corporation | Partial Release of Tarleton Shores II |
| PBWTAR_00741 | PBWTAR_9933 | USDA, Forest Service | Tarleton IRP EA and DRAFT Decision Notice Available |
| PBWTAR_00742 | PBWTAR_9935 | Caldwell, Thomas | IndepthNH.org Article on Tarleton IRP |
| PBWTAR_00743 | PBWTAR_9939 | Piermont Board of Selectmen | Response to Inquiry of Charleston Road by Piermont Board of Selectmen |
| PBWTAR_00744 | PBWTAR_9940 | Brown, Brooke | Inquiry to the Town of Peirmont on the Status of Charleston Road |
| PBWTAR_00745 | PBWTAR_9941 | Brown, Brooke | Inquiry to the town of Warren on the Status of Charleston Road |
| PBWTAR_00746 | PBWTAR_9942 | Albro, Austin | Response to Inquiry of Charleston Road by Town of Warren Town Administrator |
| PBWTAR_00747 | PBWTAR_9944 | Lake Tarleton Land Management Corporation | Deed Lake Tarleton to TPL Lots 6 8 10 11 |
| PBWTAR_00748 | PBWTAR_9946 | Lake Tarleton Land Management Corporation | Deed Lake Tarleton to TPL. |
| PBWTAR_00749 | PBWTAR_9955 | Corless, Theresa | FOIA 2002-FSR9-00723-F Response Part Two to E. Faletra |
| PBWTAR_00750 | PBWTAR_9956 | Corless, Theresa | FOIA Response # 2022-FSR9-00723-F Initial Response to E. Faletra |
| PBWTAR_00751 | PBWTAR_9957 | NH Timberland Owner's Association | NH Timberland Owners Association Information |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00752 | PBWTAR_9963 | Ibarguen, Derek | Formal Response Letter to E. Faletra's FOIA Inquiry |
| PBWTAR_00753 | PBWTAR_9965 | Lake Tarleton Land Management Corporation | GCRD Plan #7512, Map only |
| PBWTAR_00754 | PBWTAR_9966 | White Mountain National Forest | Subscribers of the Tarleton Integrated Resource Project (738 recipients) |
| PBWTAR_00755 | PBWTAR_9967 | Lake Tarleton Coalition | Article Sent to the Valley News Newspaper to Protect Lake Tarleton |
| PBWTAR_00756 | PBWTAR_9969 | White Mountain National Forest | Lake Tarleton HMU Stand YOO |
| PBWTAR_00757 | PBWTAR_9979 | Trust for Public Lands NH | Transfer of Deed from the Trust to Lake Tarleton State Park |
| PBWTAR_00758 | PBWTAR_9993 | White Mountain National Forest | Powerpoint Explaining the Purpose and Process of Tarleton IRP |
| PBWTAR_00759 | PBWTAR_10012 | Anonymous | A Flyer in Opposition to the Tarleton IRP |
| PBWTAR_00760 | PBWTAR_10014 | White Mountain National Forest | Meeting Attendance Report, Pemigewasset Ranger District with Lake Armington Assoc. |
| PBWTAR_00761 | PBWTAR_10015 | Multiple Newspaper Clippings | Newspaper Article and Clippings from Multiple Sources regarding Tarleton IRP |
| PBWTAR_00762 | PBWTAR_10029 | Gregg, Judd | News Release from the Office of NH Senator Judd Gregg Regarding Lake Tarleton |
| PBWTAR_00763 | PBWTAR_10030 | White Mountain National Forest | Press Release from the USDA, Forest Service Regarding Lake Tarleton |
| PBWTAR_00764 | PBWTAR_10031 | NH Dept of Natural and Cultural Resources | Support Letter from NH Dept of Natural and Cultural Resource, Division of Forests and Lands for the Tarleton IRP |
| PBWTAR_00765 | PBWTAR_10033 | indepthNH.org | Link to Op-Ed in Support of the Lake Tarleton Coalition |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00766 | PBWTAR_10034 | Faletra, Peter | Request to Re-open the Comment Period for the Tarleton IRP |
| PBWTAR_00767 | PBWTAR_10035 | White Mountain National Forest | Tarleton EA Facts Sheet |
| PBWTAR_00768 | PBWTAR_10037 | NH Dep't of Resources & Economic Development | Reference Map of Area and Access to Tarleton IRP |
| PBWTAR_00769 | PBWTAR_10038 | Lake Tarleton Land Management Corporation | Tarleton Shores II HOA By-laws and Covenants |
| PBWTAR_00770 | PBWTAR_10074 | White Mountain National Forest | Tarleton Decision Notice Talking Points |
| PBWTAR_00771 | PBWTAR_10075 | Rodat, Warren | Historical Information on Lake Tarleton by a Publication known as the Outlook |
| PBWTAR_00772 | PBWTAR_10076 | Holden Engineering and Surveying | Map and Sub-division Plan of Tarleton Shores II |
| PBWTAR_00773 | PBWTAR_10077 | Alpine Land Surveying Co. | Map and lot Line Adjustments on Lake Tarleton |
| PBWTAR_00774 | PBWTAR_10078 | Alpine Land Surveying Co. | Map and Lot Line Adjustments on Lake Tarleton |
| PBWTAR_00775 | PBWTAR_10079 | White Mountain National Forest | Map Indicating Skid Trails Along the Powerline Corridor of the Tarleton IRP |
| PBWTAR_00776 | PBWTAR_10080 | Warren-NH.com | Link on Warren's Town Page to the WMNF Lake Tarleton IRP |
| PBWTAR_00777 | PBWTAR_10081 | Lake Tarleton Land Management Corporation | Tract 1067 Deed for land on Lake Tarleton |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00778 | PBWTAR_10091 | lake Tarleton Land Management Corporation | Tract 1067A Deed for land on Lake Tarleton |
| PBWTAR_00779 | PBWTAR_10106 | The Trust for Public Lands | Tract 1067B Deed for land on Lake Tarleton |
| PBWTAR_00780 | PBWTAR_10119 | Potter, Claire | Staff Writer for the Valley News Article on the Tarleton IRP |
| PBWTAR_00781 | PBWTAR_10125 | Ibarguen, Derek | Response to R. Wipfler's FOIA Request |
| PBWTAR_00782 | PBWTAR_10126 | Young, Craig | Email - To District staff clarifying status of the Charleston Road |
| PBWTAR_00783 | PBWTAR_10128 | Farina, Benjamin | Email - Potential field dates with resource specialist |
| PBWTAR_00784 | PBWTAR_10129 | Everett, Genevieve and Hillman, Brett | E-mail - Heritage concerns with stumping an Orchard expansion |
| PBWTAR_00785 | PBWTAR_10131 | Prout, Leighlan and Hillman, Brett | Maximum size of Permanaent Wildlife Openings (PWOs) |
| PBWTAR_00786 | PBWTAR_10133 | Frasier, Olivia | Email to Hall and Farina with acreage computations for differing Management Aeas (MA) and wtaer bodies within the Tarlton IRP. |
| PBWTAR_00787 | PBWTAR_10140 | Jordan, Sarah | State Historic Preservation Office (SHPO) Concurence on Tarleton IRP project |
| PBWTAR_00788 | PBWTAR_10142 | Farina, Benjamin and | Email - Aquisition of Sentinel Mountain Tract |
| PBWTAR_00789 | PBWTAR_10143 | Farina, Benjamin and | Email - Field Meeting with National Grid Transmission representative to review powerline corridor in the Tarleton project area |
| PBWTAR_00790 | PBWTAR_10147 | Sperduto, Daniel | Email - With State of NH to request signs for NF lakes to preventspread of milfoil. |
| PBWTAR_00791 | PBWTAR_10152 | Sperduto, Daniel and Hillman, Brett | Email - Possible purchase of power washers to prevent spread of aquatic NNIS species. |
| PBWTAR_00792 | PBWTAR_10155 | Everett, Genevieve | Email- Potential cemetary in Sentinel Forest |
| PBWTAR_00793 | PBWTAR_10156 | Brown, Brooke | Email - Summarizing conversation with Kevin Peterson and his request for additional public outreach. |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00794 | PBWTAR_10158 | Hillman, Brett | Email - Design Features for Bald Eagle Habitat |
| PBWTAR_00795 | PBWTAR_10160 | Currier, Morgan and Ibarguen, Derek | E-mail Phone call from Toby Ascher asking to speak to District Ranger in regard to Tarleton prokect |
| PBWTAR_00796 | PBWTAR_10162 | Pemberton, Franklin | Email - Article about Tarleton Project by Kris Pastoriza in the R9 Morning News Roundup |
| PBWTAR_00797 | PBWTAR_10166 | Brown, Brooke | Email - Summary of Brook Bown's (District Ranger) phone conversation with Toby Ascher |
| PBWTAR_00798 | PBWTAR_10167 | Currier, Morgan | Email - Michelle Davis is requesting a conversation with Brooke Brown in regard to Tarleton project. |
| PBWTAR_00799 | PBWTAR_10169 | Gryczkowski, Landon and Demarais, Kenneth | Email- Standard and guidelines for water quality and Forestry responses to newspaper reporter |
| PBWTAR_00800 | PBWTAR_10172 | Demarais, Kenneth | Email- Forestry responses to newspaper reporter |
| PBWTAR_00801 | PBWTAR_10174 | Detzel, James | Email - Lake Tarleton Aquisition and Shedule B Exemption from Coverage |
| PBWTAR_00802 | PBWTAR_10176 | Demarais, Kenneth and Hall, Scott | Email - Response to Socio-economic impacts comment |
| PBWTAR_00803 | PBWTAR_10178 | Hall, Scott and Sebestyen, Stephen | Email- Reference literature on Mercury transport in forests in response to public comment |
| PBWTAR_00804 | PBWTAR_10184 | Hall, Scott and Sebestyen, Stephen | Email- Reference literature on Mercury transport in forests in response to public comment |
| PBWTAR_00805 | PBWTAR_10190 | Hall, Scott and Twomey, Ryan | Email- Question whether snowmobiles have legal use on powerline corridor |
| PBWTAR_00806 | PBWTAR_10193 | Campbell, John | Email - Mercury has not been measured on harvest experiments nor is long-term monitoring expected at Hubbard Brook. |
| PBWTAR_00807 | PBWTAR_10198 | Hall, Scott | Email - Follow up responses to public comments on mercury levels in the watershed and algae blooms |
| PBWTAR_00808 | PBWTAR_10201 | Neely, John | Email- Fire models predict low fire spread |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00809 | PBWTAR_10203 | Corless, Theresa | Email- Timeline of RO Objection and informing ID team of objection period |
| PBWTAR_00810 | PBWTAR_10205 | Tilton, Kevin | Email - Covenant and Restrictions for Shoreline lots |
| PBWTAR_00811 | PBWTAR_10206 | Hall, Scott and VanGorden, | Email - Response to potentially how many apples trees that may be harvested in the Apple Orchard |
| PBWTAR_00812 | PBWTAR_10207 | Farina, Benjamin | Email - Concerns with how to minimize illegal useage of skid trails after harvest is completed |
| PBWTAR_00813 | PBWTAR_10210 | White Mountain National Forest | Specialist NEPA checklist and signature |
| PBWTAR_00814 | PBWTAR_10211 | New Hampshire | State Land Record and Deed for Lake Tarleton State Park Tract, 1999. |
| PBWTAR_00815 | PBWTAR_10225 | Brown, Brooke | Email - Summary of Brooke Brown's phone conversation with Rob Wipfer in regard to scope of harvesting and recreational and funding opprtunities. |
| PBWTAR_00816 | PBWTAR_10227 | White Mountain National Forest | Map of proposed project area |
| PBWTAR_00817 | PBWTAR_10228 | Browne, Brooke | Tarleton Project Intiation Letter - signed by Brooke Brown |
| PBWTAR_00818 | PBWTAR_10233 | Chapin, Beth | Email from Beth Chapin to Scott Hall and Amy Callahan - Coordinating payment and publishing date for the Valley News Ad notifying the public of the available Final EA/FONSI and Draft Decision Notice |
| PBWTAR_00819 | PBWTAR_10234 | GovDelivery | |
| PBWTAR_00820 | PBWTAR_10235 | GovDelivery | |
| PBWTAR_00821 | PBWTAR_10245 | White Mountain National Forest | Question and answers from the audience during the Pemi district virtual presentation |
| PBWTAR_00822 | PBWTAR_10246 | Pastoriza, Kris | Kris Pastoriza email to Brooke Brown - emailed comment attached as a pdf |
| PBWTAR_00823 | PBWTAR_10247 | Blood, Stuart | Stuart Blood email to Brooke Brown - emailed comment |
| PBWTAR_00824 | PBWTAR_10251 | Pastoriza, Kris | Kris Pastoriza email to Brooke Brown - emailed comment attached as a pdf |
| PBWTAR_00825 | PBWTAR_10255 | Pastoriza, Kris | Kris Pastoriza email to Brooke Brown - emailed comment attached as a pdf |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00826 | PBWTAR_10276 | Lipton, Cheryl | Cheryl Lipton email to Brooke Brown - emailed comment |
| PBWTAR_00827 | PBWTAR_10278 | Shen, Lilian | Lilian Shen email to Brooke Brown - emailed comment |
| PBWTAR_00828 | PBWTAR_10279 | DiPietro, Mike | Mike DiPietro email to Brooke Brown - emailed comment |
| PBWTAR_00829 | PBWTAR_10280 | Pastoriza, Kris | Kris Pastoriza email to Brooke Brown - emailed comment attached as a pdf |
| PBWTAR_00830 | PBWTAR_10281 | Heyart, Mark | |
| PBWTAR_00831 | PBWTAR_10283 | Sully, Sarah | |
| PBWTAR_00832 | PBWTAR_10284 | Miller, Heather | |
| PBWTAR_00833 | PBWTAR_10285 | Metz, Jessica | |
| PBWTAR_00834 | PBWTAR_10288 | Ascher, Peter | |
| PBWTAR_00835 | PBWTAR_10290 | Lang, Sara | |
| PBWTAR_00836 | PBWTAR_10294 | Sully, Sarah | |
| PBWTAR_00837 | PBWTAR_10295 | Pogacar, Ted | |
| PBWTAR_00838 | PBWTAR_10296 | Ascher, Robin | |
| PBWTAR_00839 | PBWTAR_10297 | Pastoriza, Kris | Kris Pastoriza email to Brooke Brown - emailed comment attached as a pdf |
| PBWTAR_00840 | PBWTAR_10300 | Pastoriza, Kris | Kris Pastoriza email to Brooke Brown - emailed comment attached as a pdf |
| PBWTAR_00841 | PBWTAR_10301 | Hatch, Debbie | Debbie Hatch email to Brooke Brown - emailed comment |
| PBWTAR_00842 | PBWTAR_10303 | King, Wayne | Wayne King email to Brooke Brown - emailed comment |
| PBWTAR_00843 | PBWTAR_10305 | Bligh, Joanna | Joanna Bligh email to Brooke Brown - emailed comment |
| PBWTAR_00844 | PBWTAR_10306 | Reder, Jake | Jake Reder email to Brooke Brown - emailed comment |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00845 | PBWTAR_10307 | Hassey, Kathleen | Kathleen Hassey email to Brooke Brown - emailed comment |
| PBWTAR_00846 | PBWTAR_10310 | Settel, Kenneth | Kenneth Settel email to Brooke Brown - emailed comment |
| PBWTAR_00847 | PBWTAR_10311 | Miller, Lynne | Lynne Miller email to Brooke Brown - emailed comment |
| PBWTAR_00848 | PBWTAR_10312 | Bald, Mike | Mike Bald email to Brooke Brown - emailed comment attached as a pdf |
| PBWTAR_00849 | PBWTAR_10313 | Guyre, Paul | Paul Guyre email to Brooke Brown - emailed comment |
| PBWTAR_00850 | PBWTAR_10320 | Andrews, Richard | Richard Andrews email to Brooke Brown - emailed comment |
| PBWTAR_00851 | PBWTAR_10322 | Wagner, Tom | Tom Wagner comment letter addressed to Brooke Brown |
| PBWTAR_00852 | PBWTAR_10327 | Ruhan, Jon | Jon Ruhan email to Scott Hall - passing on over the phone comment from Charles Foote |
| PBWTAR_00853 | PBWTAR_10329 | Faletra, Elaine | Elaine Faletra email to Scott Hall - email with all comment attachments as pdfs |
| PBWTAR_00854 | PBWTAR_10332 | Gardner, Geoffrey | Geoffrey Gardner email to Brooke Brown - emailed comment |
| PBWTAR_00855 | PBWTAR_10333 | Trebitz, Heinz | Heinz Trebitz email to Brooke Brown - emailed comment |
| PBWTAR_00856 | PBWTAR_10335 | Stock, Jasen | Jasen Stock email to Brooke Brown - emailed comment attached as a pdf |
| PBWTAR_00857 | PBWTAR_10336 | Stevens, Matt | Matt Stevens email to Scott Hall - emailed comment attached as a pdf |
| PBWTAR_00858 | PBWTAR_10338 | Wagner, Tom | Tom Wagner email to Scott Hall - emailed comment attached as a pdf |
| PBWTAR_00859 | PBWTAR_10341 | Porter, Zack | Zack Porter email to Brooke Brown - emailed comment attached as a pdf |
| PBWTAR_00860 | PBWTAR_10342 | Peterson, Kevin | Kevin Peterson email to Derek Ibarguen - emailed copy of comment letter |
| PBWTAR_00861 | PBWTAR_10343 | GovDelivery | Courtesy copy of the GovDelivery bulletin sent to the electronic project mailing list notifying them of the Tarleton Decision Notice availability |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00862 | PBWTAR_10346 | Gonzales, Rebecca | Cover letter for the hardcopy mailing list accompanying a personal copy of the Draft EA/FONSI |
| PBWTAR_00863 | PBWTAR_10348 | White Mountain National Forest | Pemi District virtual presentation powerpoint on the Tarleton Draft EA |
| PBWTAR_00864 | PBWTAR_10349 | White Mountain National Forest | Information sheet provided to the public for notice of the virtual information session on the Draft EA/FONSI and 30-day comment period |
| PBWTAR_00865 | PBWTAR_10350 | White Mountain National Forest | Legal Notice published in the New Hampshire Union Leader notifying the public of the Draft EA availability and the start of the 30-day comment period |
| PBWTAR_00866 | PBWTAR_10351 | White Mountain National Forest | Information packet on the Tarleton IRP Draft EA/FONSI provided to the Piermont BoS to provide to Piermont residents |
| PBWTAR_00867 | PBWTAR_10354 | White Mountain National Forest | Information packet on the Tarleton IRP Draft EA/FONSI provided to the Warren BoS to provide to Warren residents |
| PBWTAR_00868 | PBWTAR_10356 | White Mountain National Forest | Tarleton IRP Draft EA 30-Day Comment Periods Consideration Summary Report |
| PBWTAR_00869 | PBWTAR_10357 | Brown, Andrew | Article submitted by Elaine Faletra in support of her 30-day comment letter |
| PBWTAR_00870 | PBWTAR_10365 | GovDelivery | Bulletin Report from GovDelivery on the Tarleton IRP Updated Draft EA/FONSI email blast |
| PBWTAR_00871 | PBWTAR_10367 | GovDelivery | Bulletin Report from GovDelivery on the Tarleton IRP Updated Draft EA/FONSI email blast |
| PBWTAR_00872 | PBWTAR_10370 | Callieri, Cristiana | Article submitted by Elaine Faletra in support of her 30-day comment letter |
| PBWTAR_00873 | PBWTAR_10378 | Chaudhary, Abhishek | Article submitted by Elaine Faletra in support of her 30-day comment letter |
| PBWTAR_00874 | PBWTAR_10388 | GovDelivery | Courtesy copy of the GovDelivery bulletin sent to the electronic project mailing list notifying them of the Tarleton IRP Final EA/FONSI and Draft Decision Notice availability |
| PBWTAR_00875 | PBWTAR_10390 | UDSA Forest Service | emNEPA support email notice that CARA was down during active 30-day comment period |
| PBWTAR_00876 | PBWTAR_10392 | Myers, Lisy | Lisy Myers comment via Facebook on the Tarleton IRP |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00877 | PBWTAR_10393 | GovDelivery | Bulletin Report from GovDelivery on the Tarleton IRP Virtual Public Meeting held by the Pemi Ranger District email blast |
| PBWTAR_00878 | PBWTAR_10395 | GovDelivery | Bulletin Report from GovDelivery on the Tarleton IRP Draft EA/FONSI email blast |
| PBWTAR_00879 | PBWTAR_10398 | GovDelivery | Bulletin sent from GovDelivery on the Tarleton IRP Virtual Public Meeting held by the Pemi Ranger District |
| PBWTAR_00880 | PBWTAR_10399 | GovDelivery | Bulletin sent from GovDelivery on the Tarleton IRP Draft EA/FONSI |
| PBWTAR_00881 | PBWTAR_10400 | Gustafsson, Lena | Article submitted by Elaine Faletra in support of her 30-day comment letter |
| PBWTAR_00882 | PBWTAR_10413 | White Mountain National Forest | Labels for the hardcopy mailing letters in support of the 2nd 30-day comment period |
| PBWTAR_00883 | PBWTAR_10414 | Mueller, Helga | Helga Mueller comment letter addressed to USFS |
| PBWTAR_00884 | PBWTAR_10415 | Metheny, Hawk | Hawk Metheny from ATC comment letter addressed to Brooke Brown |
| PBWTAR_00885 | PBWTAR_10417 | Ives, Anthony | Article submitted by Elaine Faletra in support of her 30-day comment letter |
| PBWTAR_00886 | PBWTAR_10422 | Stock, Jasen | Jasen Stock from NHTOA comment letter addressed to Brooke Brown |
| PBWTAR_00887 | PBWTAR_10424 | Karp, Daniel | Article submitted by Elaine Faletra in support of her 30-day comment letter |
| PBWTAR_00888 | PBWTAR_10432 | Pastoriza, Kris | Kris Pastoriza comment pdf sent via email |
| PBWTAR_00889 | PBWTAR_10453 | Pastoriza, Kris | Kris Pastoriza comment pdf sent via email |
| PBWTAR_00890 | PBWTAR_10474 | Pastoriza, Kris | Kris Pastoriza comment pdf sent via email |
| PBWTAR_00891 | PBWTAR_10490 | Pastoriza, Kris | Kris Pastoriza comment pdf sent via email |
| PBWTAR_00892 | PBWTAR_10502 | Pastoriza, Kris | Kris Pastoriza comment pdf sent via email |
| PBWTAR_00893 | PBWTAR_10509 | Pastoriza, Kris | Kris Pastoriza comment pdf sent via email |
| PBWTAR_00894 | PBWTAR_10530 | Peterson, Kevin | Kevin Peterson comment letter addressed to Brooke Brown |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00895 | PBWTAR_10532 | Davis, Michelle | Michelle Davis of NH Lakes 30-day comment letter addressed to Scott Hall |
| PBWTAR_00896 | PBWTAR_10534 | White Mountain National Forest | Spreadsheet with alternative actions provided to Brooke Brown to decide which action to analyze for the sentinel mountain units |
| PBWTAR_00897 | PBWTAR_10536 | White Mountain National Forest | Excel Spreadsheet holding record of the content of all long form pdf submitted comments from the 2nd 30 day comment period on the Draft EA |
| PBWTAR_00898 | PBWTAR_10572 | Lutz, James | Article submitted by Elaine Faletra in support of her 30-day comment letter |
| PBWTAR_00899 | PBWTAR_10588 | Bald, Mike | Mike Bald comment letter addressed to Brooke Brown |
| PBWTAR_00900 | PBWTAR_10592 | Mildrexler, David | Article submitted by Elaine Faletra in support of her 30-day comment letter |
| PBWTAR_00901 | PBWTAR_10607 | Anonymous | Photo submitted with a public comment |
| PBWTAR_00902 | PBWTAR_10608 | Sully, Sarah | Photo submitted with a public comment |
| PBWTAR_00903 | PBWTAR_10609 | Newbury, David | Newbury, David_Comment period letter |
| PBWTAR_00904 | PBWTAR_10610 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_00905 | PBWTAR_10611 | Anonymous | Anonymous_Photo submitted with a public comment |
| PBWTAR_00906 | PBWTAR_10612 | Anonymous | Anonymous_Photo submitted with a public comment |
| PBWTAR_00907 | PBWTAR_10613 | Van Heerden, Abbot | Van Heerden, Abbot_Comment period letter |
| PBWTAR_00908 | PBWTAR_10614 | Anon, Abby | Anon, Abby_Comment period letter |
| PBWTAR_00909 | PBWTAR_10615 | Braverman, Adam | Braverman, Adam_Comment letter 30-day comment period |
| PBWTAR_00910 | PBWTAR_10616 | Burnett, Adam | Burnett, Adam_Comment period letter |
| PBWTAR_00911 | PBWTAR_10617 | Schrier, Adam | Schrier, Adam_Comment period letter |
| PBWTAR_00912 | PBWTAR_10618 | Adrian, Gail | Adrian, Gail_Comment period letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00913 | PBWTAR_10619 | Smyth, Aidan | Smyth, Aidan_Comment period letter |
| PBWTAR_00914 | PBWTAR_10620 | Lewis, Aiyana | Lewis, Aiyana_Comment period letter |
| PBWTAR_00915 | PBWTAR_10621 | Muheim, AJ | Muheim, AJ_Comment period letter |
| PBWTAR_00916 | PBWTAR_10622 | Ring, Alaina | Ring, Alaina_Comment period letter |
| PBWTAR_00917 | PBWTAR_10623 | Baker, Alan | Baker, Alan_Comment period letter |
| PBWTAR_00918 | PBWTAR_10624 | Carr, Alanna | Carr, Alanna_Comment period letter |
| PBWTAR_00919 | PBWTAR_10625 | Zambrana, Aldana | Zambrana, Aldana_Comment period letter |
| PBWTAR_00920 | PBWTAR_10626 | Filannino, Alessandra | Filannino, Alessandra_Comment period letter |
| PBWTAR_00921 | PBWTAR_10627 | Evangelist, Alex | Evangelist, Alex_Comment period letter |
| PBWTAR_00922 | PBWTAR_10628 | George, Alex | George, Alex_Comment period letter |
| PBWTAR_00923 | PBWTAR_10629 | Goulden, Alex | Goulden, Alex_Comment period letter |
| PBWTAR_00924 | PBWTAR_10630 | Medlicott, Alex | Medlicott, Alex_Comment period letter |
| PBWTAR_00925 | PBWTAR_10631 | Hess, Alexander | Hess, Alexander_Comment period letter |
| PBWTAR_00926 | PBWTAR_10632 | Taylor, Alexandra | Taylor, Alexandra_Comment period letter |
| PBWTAR_00927 | PBWTAR_10633 | Dejarnett, Ali | Dejarnett, Ali_Comment period letter |
| PBWTAR_00928 | PBWTAR_10634 | Wipfler, Alice | Wipfler, Alice_Comment period letter |
| PBWTAR_00929 | PBWTAR_10635 | Brown, Alyssa | Brown, Alyssa_Comment period letter |
| PBWTAR_00930 | PBWTAR_10636 | Levy, Allison | Levy, Allison_Comment period letter |
| PBWTAR_00931 | PBWTAR_10637 | Tanner, Allison | Tanner, Allison_Comment period letter |
| PBWTAR_00932 | PBWTAR_10638 | Brown, Alyssa | Brown, Alyssa_Comment period letter |
| PBWTAR_00933 | PBWTAR_10639 | Slabik, Amanda | Slabik, Amanda_Comment period letter |
| PBWTAR_00934 | PBWTAR_10640 | Teppo, Amanda | Teppo, Amanda_Comment period letter |
| PBWTAR_00935 | PBWTAR_10641 | Carabase, Amy | Carabase, Amy_Comment period letter |
| PBWTAR_00936 | PBWTAR_10642 | Harff, Amy | Harff, Amy_Comment period letter |
| PBWTAR_00937 | PBWTAR_10643 | Schrier Miller, Andrea | Schrier Miller, Andrea_Comment period letter |
| PBWTAR_00938 | PBWTAR_10644 | Kline, Andrew | Kline, Andrew_Comment period letter |
| PBWTAR_00939 | PBWTAR_10645 | Robinson, Andrew | Robinson, Andrew_Comment period letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00940 | PBWTAR_10646 | Craven, Andy | Craven, Andy_Comment period letter |
| PBWTAR_00941 | PBWTAR_10647 | Oswald, Angela | Oswald, Angela_Comment period letter |
| PBWTAR_00942 | PBWTAR_10648 | Hartzel, Angie | Hartzel, Angie_Comment period letter |
| PBWTAR_00943 | PBWTAR_10649 | Campbell, Anna | Campbell, Anna_Comment period letter |
| PBWTAR_00944 | PBWTAR_10650 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_00945 | PBWTAR_10651 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_00946 | PBWTAR_10652 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_00947 | PBWTAR_10653 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_00948 | PBWTAR_10654 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_00949 | PBWTAR_10657 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_00950 | PBWTAR_10658 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_00951 | PBWTAR_10659 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_00952 | PBWTAR_10660 | Anonymous | Anonymous_Comment peroid letter |
| PBWTAR_00953 | PBWTAR_10661 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_00954 | PBWTAR_10662 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_00955 | PBWTAR_10663 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_00956 | PBWTAR_10664 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_00957 | PBWTAR_10665 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_00958 | PBWTAR_10666 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_00959 | PBWTAR_10667 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_00960 | PBWTAR_10668 | Patti, Anthony | Patti, Anthony_Comment period letter |
| PBWTAR_00961 | PBWTAR_10669 | Rudy, Ariel | Rudy, Ariel_Comment period letter |
| PBWTAR_00962 | PBWTAR_10670 | Ascher, Peter & Robin | Ascher, Peter & Robin_Comment period letter |
| PBWTAR_00963 | PBWTAR_10671 | Ascher, Peter & Robin | Ascher, Peter & Robin_Comment period letter attached to CARA comment |
| PBWTAR_00964 | PBWTAR_10673 | Doyle, Audrey | Doyle, Audrey_Comment period letter |
| PBWTAR_00965 | PBWTAR_10674 | Sabiston, Audrey | Sabiston, Audrey_Comment period letter |
| PBWTAR_00966 | PBWTAR_10675 | Lawrence, Ava | Lawrence, Ava_Comment period letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00967 | PBWTAR_10676 | BAcharya, Baibhav | BAcharya, Baibhav_Comment period letter |
| PBWTAR_00968 | PBWTAR_10677 | DeFelice, Barbara | DeFelice, Barbara_Comment period letter |
| PBWTAR_00969 | PBWTAR_10678 | Delaney, Barbara | Delaney, Barbara_Comment period letter |
| PBWTAR_00970 | PBWTAR_10679 | McGowan, Barbara | McGowan, Barbara_Comment period letter |
| PBWTAR_00971 | PBWTAR_10680 | Perez, Beatriz | Perez, Beatriz_Comment period letter |
| PBWTAR_00972 | PBWTAR_10681 | Anonymous | Anonymous_Multiple lake photos and Call to designate lands as a Scenic Area |
| PBWTAR_00973 | PBWTAR_10686 | Soloway, Belle | Soloway, Belle_Comment period letter |
| PBWTAR_00974 | PBWTAR_10687 | Beach, Ben | Beach, Ben_Comment period letter |
| PBWTAR_00975 | PBWTAR_10688 | Schwartz, Ben | Schwartz, Ben_Comment period letter |
| PBWTAR_00976 | PBWTAR_10689 | Nielsen, Bjarne | Nielsen, Bjarne_Comment period letter |
| PBWTAR_00977 | PBWTAR_10690 | Bordeau, Karen | Bordeau, Karen_Comment period letter |
| PBWTAR_00978 | PBWTAR_10691 | Marsh, Bradley | Marsh, Bradley_Comment period letter |
| PBWTAR_00979 | PBWTAR_10692 | Schut, Bragi | Schut, Bragi_Comment period letter |
| PBWTAR_00980 | PBWTAR_10693 | Shoulders, Breanna | Shoulders, Breanna_Comment period letter |
| PBWTAR_00981 | PBWTAR_10694 | McMullen, Brenden | McMullen, Brenden_Comment period letter |
| PBWTAR_00982 | PBWTAR_10695 | Delgado, Bret | Delgado, Bret_Comment period letter |
| PBWTAR_00983 | PBWTAR_10696 | McCarthy, Brian | McCarthy, Brian_Comment period letter |
| PBWTAR_00984 | PBWTAR_10697 | Monroe, Briana | Monroe, Briana_Comment period letter |
| PBWTAR_00985 | PBWTAR_10698 | Jonsson, Brooke | Jonsson, Brooke_Comment period letter |
| PBWTAR_00986 | PBWTAR_10699 | Stepanuik, Bryce | Stepanuik, Bryce_Comment period letter |
| PBWTAR_00987 | PBWTAR_10700 | Baker, Cailey | Baker, Cailey_Comment period letter |
| PBWTAR_00988 | PBWTAR_10701 | weaver, Campbell | weaver, Campbell_Comment period letter |
| PBWTAR_00989 | PBWTAR_10702 | Schulman, Carly | Schulman, Carly_Comment period letter |
| PBWTAR_00990 | PBWTAR_10703 | Aaron, Caronline | Aaron, Caronline_Comment period letter |
| PBWTAR_00991 | PBWTAR_10704 | Schrader, Carrie | Schrader, Carrie_Comment period letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_00992 | PBWTAR_10705 | Easton, Catherine | Easton, Catherine_Comment period letter |
| PBWTAR_00993 | PBWTAR_10706 | Newbury, Catherine | Newbury, Catherine_Comment period letter |
| PBWTAR_00994 | PBWTAR_10707 | Joly, Cathy | Joly, Cathy_Comment period letter |
| PBWTAR_00995 | PBWTAR_10708 | Lennov, Cece | Lennov, Cece_Comment period letter |
| PBWTAR_00996 | PBWTAR_10709 | Sanborn, Cedric | Sanborn, Cedric_Comment period letter |
| PBWTAR_00997 | PBWTAR_10710 | Cain, Charles | Cain, Charles_Comment period letter |
| PBWTAR_00998 | PBWTAR_10711 | Calley, Charles | Calley, Charles_Comment period letter |
| PBWTAR_00999 | PBWTAR_10712 | Kelly, Charles | Kelly, Charles_Comment period letter |
| PBWTAR_01000 | PBWTAR_10713 | Klassen, Charles | Klassen, Charles_Comment period letter |
| PBWTAR_01001 | PBWTAR_10714 | Grant, Charley | Grant, Charley_Comment period letter |
| PBWTAR_01002 | PBWTAR_10715 | Clark, Charlie | Clark, Charlie_Comment period letter |
| PBWTAR_01003 | PBWTAR_10716 | Ford, Charlie | Ford, Charlie_Comment period letter |
| PBWTAR_01004 | PBWTAR_10717 | Ippolito, Charlie | Ippolito, Charlie_Comment period letter |
| PBWTAR_01005 | PBWTAR_10718 | McCarthy, Charlie | McCarthy, Charlie_Comment period letter |
| PBWTAR_01006 | PBWTAR_10719 | Reynolds, Charlotte | Reynolds, Charlotte_Comment period letter |
| PBWTAR_01007 | PBWTAR_10720 | Wood, Charmion | Wood, Charmion_Comment period letter |
| PBWTAR_01008 | PBWTAR_10721 | Palmer, Chelsea | Palmer, Chelsea_Comment period letter |
| PBWTAR_01009 | PBWTAR_10722 | Lipton, Cheryl | Lipton, Cheryl_Comment period letter |
| PBWTAR_01010 | PBWTAR_10724 | Marceau, Cheryl | Marceau, Cheryl_Comment period letter |
| PBWTAR_01011 | PBWTAR_10725 | Lech, Christian | Lech, Christian_Comment period letter |
| PBWTAR_01012 | PBWTAR_10726 | Pichardo, Christian | Pichardo, Christian_Comment period letter |
| PBWTAR_01013 | PBWTAR_10729 | Davis, Christopher | Davis, Christopher_Comment period letter |
| PBWTAR_01014 | PBWTAR_10730 | Keeffe, Christopher | Keeffe, Christopher_Comment period letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01015 | PBWTAR_10731 | Mumford, Christopher | Mumford, Christopher_Comment period letter |
| PBWTAR_01016 | PBWTAR_10732 | Renaud, Chrys | Renaud, Chrys_Comment period letter |
| PBWTAR_01017 | PBWTAR_10733 | Sibley, Clare | Sibley, Clare_Comment period letter |
| PBWTAR_01018 | PBWTAR_10734 | Rios Escobar, Coco | Rios Escobar, Coco_Comment period letter |
| PBWTAR_01019 | PBWTAR_10735 | Coffey, Gail | Coffey, Gail_Comment period letter |
| PBWTAR_01020 | PBWTAR_10736 | Czubaruk, Colin | Czubaruk, Colin_Comment period letter |
| PBWTAR_01021 | PBWTAR_10737 | Duncan, Colin | Duncan, Colin_Comment period letter |
| PBWTAR_01022 | PBWTAR_10738 | ODonnell, Colin | ODonnell, Colin_Comment period letter |
| PBWTAR_01023 | PBWTAR_10739 | Randzio, Guyre, Ascher | Randzio, Guyre, Ascher_Comment period letter |
| PBWTAR_01024 | PBWTAR_10794 | Sadek, Constance | Sadek, Constance_Comment period letter |
| PBWTAR_01025 | PBWTAR_10795 | Cooley, John | Cooley, John_Comment period letter |
| PBWTAR_01026 | PBWTAR_10796 | Schmidt, Corey | Schmidt, Corey_Comment period letter |
| PBWTAR_01027 | PBWTAR_10797 | Schmidt, Corey | Schmidt, Corey_Comment period letter |
| PBWTAR_01028 | PBWTAR_10798 | Schmidt, Corey | Schmidt, Corey_Comment period letter |
| PBWTAR_01029 | PBWTAR_10799 | Wipfler, Cristin | Wipfler, Cristin_Comment period letter |
| PBWTAR_01030 | PBWTAR_10800 | Pilling, Dan | Pilling, Dan_Comment period letter |
| PBWTAR_01031 | PBWTAR_10801 | Forester, Daniel | Forester, Daniel_Comment period letter |
| PBWTAR_01032 | PBWTAR_10802 | Surgnier, Danielle | Surgnier, Danielle_Comment period letter |
| PBWTAR_01033 | PBWTAR_10803 | Strauss, Danny | Strauss, Danny_Comment period letter |
| PBWTAR_01034 | PBWTAR_10804 | Ascher, David | Ascher, David_Comment period letter |
| PBWTAR_01035 | PBWTAR_10806 | Baranoski, David | Baranoski, David_Comment period letter |
| PBWTAR_01036 | PBWTAR_10807 | Glueck, David | Glueck, David_Comment period letter |
| PBWTAR_01037 | PBWTAR_10808 | Govatski, David | Govatski, David_Comment period letter |
| PBWTAR_01038 | PBWTAR_10809 | Heilbron, David | Heilbron, David_Comment period letter |
| PBWTAR_01039 | PBWTAR_10810 | Murray, David | Murray, David_Comment period letter |
| PBWTAR_01040 | PBWTAR_10811 | Newbury, David | Newbury, David_Comment period letter |
| PBWTAR_01041 | PBWTAR_10812 | Person, David | Person, David_Comment period letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01042 | PBWTAR_10813 | Soady, David | Soady, David_Comment period letter |
| PBWTAR_01043 | PBWTAR_10814 | Davis, Michelle | Davis, Michelle_Comment period letter |
| PBWTAR_01044 | PBWTAR_10815 | NH Lakes | NH Lakes_Comment period letter submitted as attachment to letter from Michelle Davis, representing NH Lakes |
| PBWTAR_01045 | PBWTAR_10817 | Dawsey, Dawn | Dawsey, Dawn_Comment period letter |
| PBWTAR_01046 | PBWTAR_10818 | Hatch, Debbie | Hatch, Debbie_Comment period letter |
| PBWTAR_01047 | PBWTAR_10819 | Todd, Debby | Todd, Debby_Comment period letter |
| PBWTAR_01048 | PBWTAR_10820 | Minchin, Deborah | Minchin, Deborah_Comment period letter |
| PBWTAR_01049 | PBWTAR_10821 | Dionne, Denis | Dionne, Denis_Comment period letter |
| PBWTAR_01050 | PBWTAR_10822 | Bloodsaw, Denise | Bloodsaw, Denise_Comment period letter |
| PBWTAR_01051 | PBWTAR_10823 | Guilfoyle, Devin | Guilfoyle, Devin_Comment period letter |
| PBWTAR_01052 | PBWTAR_10824 | DiPietro, Mike | DiPietro, Mike_Comment period letter |
| PBWTAR_01053 | PBWTAR_10825 | Dolsky, Ken | Dolsky, Ken_Comment period letter |
| PBWTAR_01054 | PBWTAR_10826 | Protomastro, Dominick | Protomastro, Dominick_Comment period letter |
| PBWTAR_01055 | PBWTAR_10827 | Wicks, Donald | Wicks, Donald_Comment period letter |
| PBWTAR_01056 | PBWTAR_10828 | Kelleher, Donna | Kelleher, Donna_Comment period letter |
| PBWTAR_01057 | PBWTAR_10829 | Briggs, Doris | Briggs, Doris_Comment period letter |
| PBWTAR_01058 | PBWTAR_10830 | Jeffress, Dorothy | Jeffress, Dorothy_Comment period letter |
| PBWTAR_01059 | PBWTAR_10831 | Anderson, Dottie | Anderson, Dottie_Comment period letter |
| PBWTAR_01060 | PBWTAR_10832 | Clarke, Douglas | Clarke, Douglas_Comment period letter |
| PBWTAR_01061 | PBWTAR_10833 | Mandelkern, Jeremy | Mandelkern, Jeremy_Comment period letter |
| PBWTAR_01062 | PBWTAR_10834 | Bradley, Dylan | Bradley, Dylan_Comment period letter |
| PBWTAR_01063 | PBWTAR_10835 | Roman, Dylan | Roman, Dylan_Comment period letter |
| PBWTAR_01064 | PBWTAR_10836 | Zamrana, Dylan | Zamrana, Dylan_Comment period letter |
| PBWTAR_01065 | PBWTAR_10837 | Eastburn, Catherine | Eastburn, Catherine_Comment period letter |
| PBWTAR_01066 | PBWTAR_10838 | Lumadue, Ed | Lumadue, Ed_Comment period letter |
| PBWTAR_01067 | PBWTAR_10839 | Miller, Eddie | Miller, Eddie_Comment period letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01068 | PBWTAR_10840 | Faletra, Elaine | Faletra, Elaine_Comment period letter |
| PBWTAR_01069 | PBWTAR_10843 | Vogt, Eleanor | Vogt, Eleanor_Comment period letter |
| PBWTAR_01070 | PBWTAR_10844 | Fording, Elias | Fording, Elias_Comment period letter |
| PBWTAR_01071 | PBWTAR_10845 | Caplan, Elise | Caplan, Elise_Comment period letter |
| PBWTAR_01072 | PBWTAR_10846 | Gillilan, Eliza | Gillilan, Eliza_Comment period letter |
| PBWTAR_01073 | PBWTAR_10847 | Haddon, Eliza | Haddon, Eliza_Comment period letter |
| PBWTAR_01074 | PBWTAR_10848 | Anon, Elizabeth | Anon, Elizabeth_Comment period letter |
| PBWTAR_01075 | PBWTAR_10849 | Barry, Elizabeth | Barry, Elizabeth_Comment period letter |
| PBWTAR_01076 | PBWTAR_10850 | Kamb, Elizabeth | Kamb, Elizabeth_Comment period letter |
| PBWTAR_01077 | PBWTAR_10851 | Marino, Elizabeth | Marino, Elizabeth_Comment period letter |
| PBWTAR_01078 | PBWTAR_10852 | Meyer, Elizabeth | Meyer, Elizabeth_Comment period letter |
| PBWTAR_01079 | PBWTAR_10853 | Shippen, Elizabeth | Shippen, Elizabeth_Comment period letter |
| PBWTAR_01080 | PBWTAR_10854 | Nez, Ely | Nez, Ely_Comment period letter |
| PBWTAR_01081 | PBWTAR_10855 | McCambley, Elysee | McCambley, Elysee_Comment period letter |
| PBWTAR_01082 | PBWTAR_10856 | Cowan, Emma | Cowan, Emma_Comment period letter |
| PBWTAR_01083 | PBWTAR_10857 | Cowan, Emma | Cowan, Emma_Comment period letter |
| PBWTAR_01084 | PBWTAR_10858 | Heffner, Emma | Heffner, Emma_Comment period letter |
| PBWTAR_01085 | PBWTAR_10859 | Fulton, West | Fulton, West_Forestry Impacts on Water Quality article |
| PBWTAR_01086 | PBWTAR_10878 | Fennekohl, Eric | Fennekohl, Eric_Comment period letter |
| PBWTAR_01087 | PBWTAR_10879 | Jones, Eric | Jones, Eric_Comment period letter |
| PBWTAR_01088 | PBWTAR_10880 | Knaus, Eric | Knaus, Eric_Comment period letter |
| PBWTAR_01089 | PBWTAR_10881 | Cullmann, Erica | Cullmann, Erica_Comment period letter |
| PBWTAR_01090 | PBWTAR_10882 | Thompson, Erica | Thompson, Erica_Comment period letter |
| PBWTAR_01091 | PBWTAR_10883 | Cheng, Ericka | Cheng, Ericka_Comment period letter |
| PBWTAR_01092 | PBWTAR_10884 | Hodson, Erin | Hodson, Erin_Comment period letter |
| PBWTAR_01093 | PBWTAR_10885 | Bonanno, Eva Marie | Bonanno, Eva Marie_Comment period letter |
| PBWTAR_01094 | PBWTAR_10886 | Drummond, Eva | Drummond, Eva_Comment period letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01095 | PBWTAR_10887 | Alves, Evan | Alves, Evan_Comment period letter |
| PBWTAR_01096 | PBWTAR_10888 | Devillers, Eve | Devillers, Eve_Comment period letter |
| PBWTAR_01097 | PBWTAR_10889 | Faletra, Elaine | Faletra, Elaine_Comment period letter |
| PBWTAR_01098 | PBWTAR_10890 | Faletra, Peter | Faletra, Peter_Comment period letter |
| PBWTAR_01099 | PBWTAR_10891 | Feudi, Melissa | Feudi, Melissa_Comment period letter |
| PBWTAR_01100 | PBWTAR_10892 | Marable, Finn | Marable, Finn_Comment period letter |
| PBWTAR_01101 | PBWTAR_10893 | Kyne, Fiona | Kyne, Fiona_Comment period letter |
| PBWTAR_01102 | PBWTAR_10894 | Foote, Charles | Foote, Charles_Comment period letter |
| PBWTAR_01103 | PBWTAR_10895 | Society for the Protection of New Hampshire Forests | Society for the Protection of New Hampshire Forests_Comment period letter |
| PBWTAR_01104 | PBWTAR_10899 | SNS Nordic Forest Research | SNS Nordic Forest Research_Article on Forestry and Fungi |
| PBWTAR_01105 | PBWTAR_10901 | Woodard, Frances | Woodard, Frances_Comment period letter |
| PBWTAR_01106 | PBWTAR_10902 | Robey, Frank | Robey, Frank_Comment period letter |
| PBWTAR_01107 | PBWTAR_10904 | Robey, Frank | Robey, Frank_Comment period letter |
| PBWTAR_01108 | PBWTAR_10905 | Anonymous | Anonymous_Diagram |
| PBWTAR_01109 | PBWTAR_10906 | Yablonski, Gabby | Yablonski, Gabby_Comment period letter |
| PBWTAR_01110 | PBWTAR_10907 | Almendras, Gabriel | Almendras, Gabriel_Comment period letter |
| PBWTAR_01111 | PBWTAR_10908 | Sanchez-Ramirez, Gabriela | Sanchez-Ramirez, Gabriela_Comment period letter |
| PBWTAR_01112 | PBWTAR_10909 | Coffey, Gail | Coffey, Gail_Comment period letter |
| PBWTAR_01113 | PBWTAR_11136 | Coffey, Gail | Coffey, Gail_Comment period letter Attachment- UNHGoodForestry2010FINAL.pdf |
| PBWTAR_01114 | PBWTAR_11142 | Ganey, Karen | Ganey, Karen_Comment period letter |
| PBWTAR_01115 | PBWTAR_11143 | Brown, Garrett | Brown, Garrett_Comment period letter |
| PBWTAR_01116 | PBWTAR_11144 | Sopko, Garrett | Sopko, Garrett_Comment period letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01117 | PBWTAR_11145 | Wetterhahn, Genevieve | Wetterhahn, Genevieve_Comment period letter |
| PBWTAR_01118 | PBWTAR_11146 | Gardner, Geoffrey | Gardner, Geoffrey_Comment period letter |
| PBWTAR_01119 | PBWTAR_11148 | Gardner, Geoffrey | Gardner, Geoffrey_Comment period letter |
| PBWTAR_01120 | PBWTAR_11150 | Lewis, George | Lewis, George_Comment period letter |
| PBWTAR_01121 | PBWTAR_11151 | Grzywacz, Georgia | Grzywacz, Georgia_Comment period letter |
| PBWTAR_01122 | PBWTAR_11152 | Beck, Gerald | Beck, Gerald_Comment period letter |
| PBWTAR_01123 | PBWTAR_11153 | Gomez Hernandez, Gerardo | Gomez Hernandez, Gerardo_Comment period letter |
| PBWTAR_01124 | PBWTAR_11154 | Scherpbier, Gerben | Scherpbier, Gerben_Comment period letter |
| PBWTAR_01125 | PBWTAR_11155 | Rappa, Gianna | Rappa, Gianna_Comment period letter |
| PBWTAR_01126 | PBWTAR_11156 | Acharya, Govinda | Acharya, Govinda_Comment period letter |
| PBWTAR_01127 | PBWTAR_11157 | Pardee, Grant | Pardee, Grant_Comment period letter |
| PBWTAR_01128 | PBWTAR_11158 | Hadley, Detrick | Hadley, Detrick_Comment period letter |
| PBWTAR_01129 | PBWTAR_11159 | Smith, Hartel | Smith, Hartel_Comment period letter |
| PBWTAR_01130 | PBWTAR_11160 | Habte, Hasset | Habte, Hasset_Comment period letter |
| PBWTAR_01131 | PBWTAR_11161 | Geist, Hattie | Geist, Hattie_Comment period letter |
| PBWTAR_01132 | PBWTAR_11162 | Metheny, Hawk | Metheny, Hawk_Comment period letter |
| PBWTAR_01133 | PBWTAR_11164 | Hughes, Heather | Hughes, Heather_Comment period letter |
| PBWTAR_01134 | PBWTAR_11165 | Miller, Heather | Miller, Heather_Comment period letter |
| PBWTAR_01135 | PBWTAR_11166 | Wittman, Heather | Wittman, Heather_Comment period letter |
| PBWTAR_01136 | PBWTAR_11167 | Trebitz, Heinz | Trebitz, Heinz_Comment period letter |
| PBWTAR_01137 | PBWTAR_11168 | Jarnagin, Helen | Jarnagin, Helen_Comment period letter |
| PBWTAR_01138 | PBWTAR_11169 | Hackett, Henry | Hackett, Henry_Comment period letter |
| PBWTAR_01139 | PBWTAR_11170 | Kapp, Henry | Kapp, Henry_Comment period letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01140 | PBWTAR_11171 | Anoymous | Anoymous_Comment period letter |
| PBWTAR_01141 | PBWTAR_11172 | Hopkins, Stacy | Hopkins, Stacy_Comment period letter |
| PBWTAR_01142 | PBWTAR_11173 | Timpson, Hunter | Timpson, Hunter_Comment period letter |
| PBWTAR_01143 | PBWTAR_11174 | Hutslar, Jan | Hutslar, Jan_Comment period letter |
| PBWTAR_01144 | PBWTAR_11175 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_01145 | PBWTAR_11176 | Bruce, Ian | Bruce, Ian_Comment period letter |
| PBWTAR_01146 | PBWTAR_11177 | Engler, Ian | Engler, Ian_Comment period letter |
| PBWTAR_01147 | PBWTAR_11178 | Engler, Ian | Engler, Ian_Comment period letter |
| PBWTAR_01148 | PBWTAR_11179 | McInerney, Ian | McInerney, Ian_Comment period letter |
| PBWTAR_01149 | PBWTAR_11180 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_01150 | PBWTAR_11181 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_01151 | PBWTAR_11182 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_01152 | PBWTAR_11183 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_01153 | PBWTAR_11184 | Buchanan, Iris | Buchanan, Iris_Comment period letter |
| PBWTAR_01154 | PBWTAR_11185 | Donovan, Jack | Donovan, Jack_Comment period letter |
| PBWTAR_01155 | PBWTAR_11186 | Feely, Jack | Feely, Jack_Comment period letter |
| PBWTAR_01156 | PBWTAR_11187 | Kenney, Jack | Kenney, Jack_Comment period letter |
| PBWTAR_01157 | PBWTAR_11188 | Reppucci, Jack | Reppucci, Jack_Comment period letter |
| PBWTAR_01158 | PBWTAR_11189 | Dalton, Jacob | Dalton, Jacob_Comment period letter |
| PBWTAR_01159 | PBWTAR_11190 | Eichmann, Jacob | Eichmann, Jacob_Comment period letter |
| PBWTAR_01160 | PBWTAR_11191 | Gordob, Jacob | Gordob, Jacob_Comment period letter |
| PBWTAR_01161 | PBWTAR_11192 | Schwartz, Jacob | Schwartz, Jacob_Comment period letter |
| PBWTAR_01162 | PBWTAR_11193 | Baker, Jacqui | Baker, Jacqui_Comment period letter |
| PBWTAR_01163 | PBWTAR_11194 | Uram, Jaden | Uram, Jaden_Comment period letter |
| PBWTAR_01164 | PBWTAR_11195 | Ivory, Jai | Ivory, Jai_Comment period letter |
| PBWTAR_01165 | PBWTAR_11196 | Reder, Jake | Reder, Jake_Comment period letter |
| PBWTAR_01166 | PBWTAR_11199 | Krausman, Jane | Krausman, Jane_Comment period letter |
| PBWTAR_01167 | PBWTAR_11200 | Bill, Janet | Bill, Janet_Comment period letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01168 | PBWTAR_11201 | Bill, Janet | Bill, Janet_Comment period letter |
| PBWTAR_01169 | PBWTAR_11202 | Bill, Janet | Bill, Janet_Comment period letter |
| PBWTAR_01170 | PBWTAR_11203 | Broder, Janis | Broder, Janis_Comment period letter |
| PBWTAR_01171 | PBWTAR_11204 | Appuzzo, Jared | Appuzzo, Jared_Comment period letter |
| PBWTAR_01172 | PBWTAR_11205 | Braveman, Jared | Braveman, Jared_Comment period letter |
| PBWTAR_01173 | PBWTAR_11206 | Cooper, Jared | Cooper, Jared_Comment period letter |
| PBWTAR_01174 | PBWTAR_11207 | Martin, Jarred | Martin, Jarred_Comment period letter |
| PBWTAR_01175 | PBWTAR_11208 | Peskie, Jasara | Peskie, Jasara_Comment period letter |
| PBWTAR_01176 | PBWTAR_11209 | Stock, Jasen | Stock, Jasen_Comment period letter |
| PBWTAR_01177 | PBWTAR_11210 | Curcio, Jasmin | Curcio, Jasmin_Comment period letter |
| PBWTAR_01178 | PBWTAR_11211 | Mund, Jason | Mund, Jason_Comment period letter |
| PBWTAR_01179 | PBWTAR_11212 | Spillers, Jason | Spillers, Jason_Comment period letter |
| PBWTAR_01180 | PBWTAR_11213 | Gaajardo, [illegible] | Gaajardo, Javiera_Comment period letter |
| PBWTAR_01181 | PBWTAR_11214 | Sneider, Jeff | Sneider, Jeff_Comment period letter |
| PBWTAR_01182 | PBWTAR_11215 | Warshaw, Jeff | Warshaw, Jeff_Comment period letter |
| PBWTAR_01183 | PBWTAR_11216 | Cohen, Jeffrey | Cohen, Jeffrey_Comment period letter |
| PBWTAR_01184 | PBWTAR_11217 | Morris, Jen | Morris, Jen_Comment period letter |
| PBWTAR_01185 | PBWTAR_11218 | Jenkins, Pam | Jenkins, Pam_Comment period letter |
| PBWTAR_01186 | PBWTAR_11219 | Crytzer, Jennifer | Crytzer, Jennifer_Comment period letter |
| PBWTAR_01187 | PBWTAR_11220 | Duarte, Jennifer | Duarte, Jennifer_Comment period letter |
| PBWTAR_01188 | PBWTAR_11221 | Ho, Jennifer | Ho, Jennifer_Comment period letter |
| PBWTAR_01189 | PBWTAR_11222 | Hochschild, Jennifer | Hochschild, Jennifer_Comment period letter |
| PBWTAR_01190 | PBWTAR_11223 | Morowitz, [illegible] | Morowitz, Jeremy_Comment period letter |
| PBWTAR_01191 | PBWTAR_11224 | Libassi, Jesse | Libassi, Jesse_Comment period letter |
| PBWTAR_01192 | PBWTAR_11225 | Greenlow, Jessica | Greenlow, Jessica_Comment period letter |
| PBWTAR_01193 | PBWTAR_11226 | Metz. Jessica | Metz. Jessica_Comment period letter |
| PBWTAR_01194 | PBWTAR_11227 | M, Jo | M, Jo_Comment period letter |
| PBWTAR_01195 | PBWTAR_11228 | Bligh, Joanna | Bligh, Joanna_Comment period letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01196 | PBWTAR_11229 | Murphy, Joanna | Murphy, Joanna_Comment period letter |
| PBWTAR_01197 | PBWTAR_11230 | Bello, John | Bello, John_Comment period letter |
| PBWTAR_01198 | PBWTAR_11231 | Fannon, John | Fannon, John_Comment period letter |
| PBWTAR_01199 | PBWTAR_11232 | Kavanaugh, John | Kavanaugh, John_Comment period letter |
| PBWTAR_01200 | PBWTAR_11233 | Nelepovitz, John | Nelepovitz, John_Comment period letter |
| PBWTAR_01201 | PBWTAR_11234 | Abbey, Jonathon | Abbey, Jonathon_Comment period letter |
| PBWTAR_01202 | PBWTAR_11235 | Fischer, Jonathon | Fischer, Jonathon_Comment period letter |
| PBWTAR_01203 | PBWTAR_11236 | Jones, Eric | Jones, Eric_Comment period letter |
| PBWTAR_01204 | PBWTAR_11237 | Jones, Eric | Jones, Eric_Comment period letter |
| PBWTAR_01205 | PBWTAR_11238 | Jones, Eric | Jones, Eric_Comment period letter |
| PBWTAR_01206 | PBWTAR_11239 | Mayers, Jordan | Mayers, Jordan_Comment period letter |
| PBWTAR_01207 | PBWTAR_11240 | Narducci, Jordan | Narducci, Jordan_Comment period letter |
| PBWTAR_01208 | PBWTAR_11241 | Pare, Joshua | Pare, Joshua_Comment period letter |
| PBWTAR_01209 | PBWTAR_11242 | Tomkins, Joyce | Tomkins, Joyce_Comment period letter |
| PBWTAR_01210 | PBWTAR_11243 | Lona, Juana | Lona, Juana_Comment period letter |
| PBWTAR_01211 | PBWTAR_11244 | Brown, Julia | Brown, Julia_Comment period letter |
| PBWTAR_01212 | PBWTAR_11245 | Berman, Julie | Berman, Julie_Comment period letter |
| PBWTAR_01213 | PBWTAR_11246 | D'Angelo, Julie | D'Angelo, Julie_Comment period letter |
| PBWTAR_01214 | PBWTAR_11247 | Kahn, Juliette | Kahn, Juliette_Comment period letter |
| PBWTAR_01215 | PBWTAR_11248 | Austin, Justin | Austin, Justin_Comment period letter |
| PBWTAR_01216 | PBWTAR_11249 | Renaud, Justin | Renaud, Justin_Comment period letter |
| PBWTAR_01217 | PBWTAR_11250 | Roman, Justin | Roman, Justin_Comment period letter |
| PBWTAR_01218 | PBWTAR_11251 | D, K | D, K_Comment period letter |
| PBWTAR_01219 | PBWTAR_11252 | Turanski, Kai | Turanski, Kai_Comment period letter |
| PBWTAR_01220 | PBWTAR_11255 | Harris, Karen | Harris, Karen_Comment period letter |
| PBWTAR_01221 | PBWTAR_11256 | Meyers, Kasey | Meyers, Kasey_Comment period letter |
| PBWTAR_01222 | PBWTAR_11257 | Randzio, Kassia | Randzio, Kassia_Comment period letter |
| PBWTAR_01223 | PBWTAR_11258 | Angus, Kate | Angus, Kate_Comment period letter |
| PBWTAR_01224 | PBWTAR_11259 | Hassey, Kate | Hassey, Kate_Comment period letter |
| PBWTAR_01225 | PBWTAR_11260 | Yurenka, Katrina | Yurenka, Katrina_Comment period letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01226 | PBWTAR_11261 | Arford-Horne, Kelly | Arford-Horne, Kelly_Comment period letter |
| PBWTAR_01227 | PBWTAR_11263 | Kavanaugh, Kelly | Kavanaugh, Kelly_Comment period letter |
| PBWTAR_01228 | PBWTAR_11264 | Nicholson, Kelsey | Nicholson, Kelsey_Comment period letter |
| PBWTAR_01229 | PBWTAR_11265 | Sipple, Kelsey | Sipple, Kelsey_Comment period letter |
| PBWTAR_01230 | PBWTAR_11266 | Settle, Kenneth | Settle, Kenneth_Comment period letter |
| PBWTAR_01231 | PBWTAR_11268 | Borden, Kevin | Borden, Kevin_Comment period letter |
| PBWTAR_01232 | PBWTAR_11269 | Kennedy, Kevin | Kennedy, Kevin_Comment period letter |
| PBWTAR_01233 | PBWTAR_11270 | Peterson, Kevin | Peterson, Kevin_Comment period letter |
| PBWTAR_01234 | PBWTAR_11271 | Peterson, Kevin | Peterson, Kevin_Comment period letter |
| PBWTAR_01235 | PBWTAR_11273 | Woolley, Kevin | Woolley, Kevin_Comment period letter |
| PBWTAR_01236 | PBWTAR_11274 | Wegner, Kilian | Wegner, Kilian_Comment period letter |
| PBWTAR_01237 | PBWTAR_11275 | Ilg, Kimberly | Ilg, Kimberly_Comment period letter |
| PBWTAR_01238 | PBWTAR_11276 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_01239 | PBWTAR_11282 | Gehl, Kirsten | Gehl, Kirsten_Comment period letter |
| PBWTAR_01240 | PBWTAR_11283 | Pastoriza, Kris | Pastoriza, Kris_Comment period letter |
| PBWTAR_01241 | PBWTAR_11295 | Pastoriza, Kris | Pastoriza, Kris_Comment period letter |
| PBWTAR_01242 | PBWTAR_11302 | Pastoriza, Kris | Pastoriza, Kris_Comment period letter |
| PBWTAR_01243 | PBWTAR_11318 | Pastoriza, Kris | Pastoriza, Kris_Comment period letter |
| PBWTAR_01244 | PBWTAR_11339 | Pastoriza, Kris | Pastoriza, Kris_Comment period letter |
| PBWTAR_01245 | PBWTAR_11360 | Pastoriza, Kris | Pastoriza, Kris_Comment period letter |
| PBWTAR_01246 | PBWTAR_11361 | Pastoriza, Kris | Pastoriza, Kris_Comment period letter |
| PBWTAR_01247 | PBWTAR_11365 | Ascher, Kristin | Ascher, Kristin_Comment period letter |
| PBWTAR_01248 | PBWTAR_11366 | John, Kristin | John, Kristin_Comment period letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01249 | PBWTAR_11367 | Pastoriza, Kristina | Pastoriza, Kristina_Comment period letter |
| PBWTAR_01250 | PBWTAR_11368 | Pastoriza, Kristina | Pastoriza, Kristina_Comment period letter |
| PBWTAR_01251 | PBWTAR_11371 | Pastoriza, Kristina | Pastoriza, Kristina_Comment period letter |
| PBWTAR_01252 | PBWTAR_11372 | Pastoriza, Kristina | Pastoriza, Kristina_Comment period letter |
| PBWTAR_01253 | PBWTAR_11373 | Pastoriza, Kristina | Pastoriza, Kristina_Comment period letter |
| PBWTAR_01254 | PBWTAR_11374 | Horne, Rob | Horne, Rob_Comment period letter |
| PBWTAR_01255 | PBWTAR_11375 | Peterson, Kevin | Peterson, Kevin_Comment period letter |
| PBWTAR_01256 | PBWTAR_11377 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_01257 | PBWTAR_11378 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_01258 | PBWTAR_11399 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_01259 | PBWTAR_11401 | Trust for Public Land | Trust for Public Land_Comment period letter |
| PBWTAR_01260 | PBWTAR_11403 | Klaus, Michael | Klaus, Michael_Comment period letter |
| PBWTAR_01261 | PBWTAR_11404 | Lather, Bruce | Lather, Bruce_Comment period letter |
| PBWTAR_01262 | PBWTAR_11405 | Born, Laura | Born, Laura_Comment period letter |
| PBWTAR_01263 | PBWTAR_11406 | Evans, Laura | Evans, Laura_Comment period letter |
| PBWTAR_01264 | PBWTAR_11407 | Torres, Laura | Torres, Laura_Comment period letter |
| PBWTAR_01265 | PBWTAR_11408 | Gulbicki, Lauren | Gulbicki, Lauren_Comment period letter |
| PBWTAR_01266 | PBWTAR_11409 | Krzyzewski, Lauren | Krzyzewski, Lauren_Comment period letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01267 | PBWTAR_11410 | Calvo-Sotelo, Leopoldo | Calvo-Sotelo, Leopoldo_Comment period letter |
| PBWTAR_01268 | PBWTAR_11411 | Owen, Liam | Owen, Liam_Comment period letter |
| PBWTAR_01269 | PBWTAR_11412 | Shen, Lilian | Shen, Lilian_Comment period letter |
| PBWTAR_01270 | PBWTAR_11413 | Sullivan, Lillian | Sullivan, Lillian_Comment period letter |
| PBWTAR_01271 | PBWTAR_11414 | Sadek, Lily | Sadek, Lily_Comment period letter |
| PBWTAR_01272 | PBWTAR_11415 | Dionne, Linda | Dionne, Linda_Comment period letter |
| PBWTAR_01273 | PBWTAR_11416 | Graham, Linda | Graham, Linda_Comment period letter |
| PBWTAR_01274 | PBWTAR_11417 | Kline, Linda | Kline, Linda_Comment period letter |
| PBWTAR_01275 | PBWTAR_11419 | Smith, Lindsey | Smith, Lindsey_Comment period letter |
| PBWTAR_01276 | PBWTAR_11420 | C, Meg | C, Meg_Comment period letter |
| PBWTAR_01277 | PBWTAR_11421 | Cath. | Cath._Comment period letter |
| PBWTAR_01278 | PBWTAR_11422 | Kelly | Kelly_Comment period letter |
| PBWTAR_01279 | PBWTAR_11423 | Melendez | Melendez_Comment period letter |
| PBWTAR_01280 | PBWTAR_11424 | | _Comment period letter |
| PBWTAR_01281 | PBWTAR_11425 | | _Comment period letter |
| PBWTAR_01282 | PBWTAR_11426 | | _Comment period letter |
| PBWTAR_01283 | PBWTAR_11427 | Haralson | Haralson_Comment period letter |
| PBWTAR_01284 | PBWTAR_11428 | Slevin | Slevin_Comment period letter |
| PBWTAR_01285 | PBWTAR_11429 | Ashley | Ashley_Comment period letter |
| PBWTAR_01286 | PBWTAR_11430 | Burr | Burr_Comment period letter |
| PBWTAR_01287 | PBWTAR_11431 | Ramirez | Ramirez_Comment period letter |
| PBWTAR_01288 | PBWTAR_11432 | Harris | Harris_Comment period letter |
| PBWTAR_01289 | PBWTAR_11433 | Miller | Miller_Comment period letter |
| PBWTAR_01290 | PBWTAR_11434 | Voss | Voss_Comment period letter |
| PBWTAR_01291 | PBWTAR_11435 | Wilson | Wilson_Comment period letter |
| PBWTAR_01292 | PBWTAR_11436 | MacKenzie | MacKenzie_Comment period letter |
| PBWTAR_01293 | PBWTAR_11437 | Rebecca | Rebecca_Comment period letter |
| PBWTAR_01294 | PBWTAR_11519 | lytton | lytton_Comment period letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01295 | PBWTAR_11520 | McCarthy | McCarthy_Comment period letter |
| PBWTAR_01296 | PBWTAR_11521 | Page | Page_Comment period letter |
| PBWTAR_01297 | PBWTAR_11522 | Dennison | Dennison_Comment period letter |
| PBWTAR_01298 | PBWTAR_11523 | Pisera | Pisera_Comment period letter |
| PBWTAR_01299 | PBWTAR_11524 | Heyert | Heyert_Comment period letter |
| PBWTAR_01300 | PBWTAR_11525 | Francisco | Francisco_Comment period letter |
| PBWTAR_01301 | PBWTAR_11526 | Guevara | Guevara_Comment period letter |
| PBWTAR_01302 | PBWTAR_11527 | Durand | Durand_Comment period letter |
| PBWTAR_01303 | PBWTAR_11528 | Gustafson | Gustafson_Comment period letter |
| PBWTAR_01304 | PBWTAR_11529 | Leahy | Leahy_Comment period letter |
| PBWTAR_01305 | PBWTAR_11531 | LoBosco | LoBosco_Comment period letter |
| PBWTAR_01306 | PBWTAR_11532 | Taylor | Taylor_Comment period letter |
| PBWTAR_01307 | PBWTAR_11533 | Muheim | Muheim_Comment period letter |
| PBWTAR_01308 | PBWTAR_11534 | Sobieski | Sobieski_Comment period letter |
| PBWTAR_01309 | PBWTAR_11535 | McLaughlin | McLaughlin_Comment period letter |
| PBWTAR_01310 | PBWTAR_11536 | C | C_Comment period letter |
| PBWTAR_01311 | PBWTAR_11537 | ONiel, Meka | ONiel, Meka_Comment period letter |
| PBWTAR_01312 | PBWTAR_11538 | Meyers, Lisy | Meyers, Lisy_Comment period letter |
| PBWTAR_01313 | PBWTAR_11539 | Fontan Chavez, Michaela | Fontan Chavez, Michaela_Comment period letter |
| PBWTAR_01314 | PBWTAR_11540 | Bald, Michael | Bald, Michael_Comment period letter |
| PBWTAR_01315 | PBWTAR_11542 | Cubello, Michael | Cubello, Michael_Comment period letter |
| PBWTAR_01316 | PBWTAR_11543 | Farr, Michael | Farr, Michael_Comment period letter |
| PBWTAR_01317 | PBWTAR_11544 | Fischetti, Michael | Fischetti, Michael_Comment period letter |
| PBWTAR_01318 | PBWTAR_11545 | Hummel, Michael | Hummel, Michael_Comment period letter |
| PBWTAR_01319 | PBWTAR_11546 | Klaus, Michael | Klaus, Michael_Comment period letter |
| PBWTAR_01320 | PBWTAR_11547 | Minchin, Michael | Minchin, Michael_Comment period letter |
| PBWTAR_01321 | PBWTAR_11548 | Minchin, Michael | Minchin, Michael_Comment period letter |
| PBWTAR_01322 | PBWTAR_11549 | Rosenberg, Michael | Rosenberg, Michael_Comment period letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01323 | PBWTAR_11550 | Wipfler, Michael | Wipfler, Michael_Comment period letter |
| PBWTAR_01324 | PBWTAR_11554 | Wipfler, Michael | Wipfler, Michael_Comment period letter |
| PBWTAR_01325 | PBWTAR_11556 | Zizzo, Michael | Zizzo, Michael_Comment period letter |
| PBWTAR_01326 | PBWTAR_11557 | Logue, Michaelyn | Logue, Michaelyn_Comment period letter |
| PBWTAR_01327 | PBWTAR_11558 | Avery, Michele | Avery, Michele_Comment period letter |
| PBWTAR_01328 | PBWTAR_11559 | Beadle, Michele | Beadle, Michele_Comment period letter |
| PBWTAR_01329 | PBWTAR_11560 | Lorraine, Michele | Lorraine, Michele_Comment period letter |
| PBWTAR_01330 | PBWTAR_11561 | Massa, Michelle | Massa, Michelle_Comment period letter |
| PBWTAR_01331 | PBWTAR_11562 | Tran, Mikayla | Tran, Mikayla_Comment period letter |
| PBWTAR_01332 | PBWTAR_11563 | Dipietro, Mike | Dipietro, Mike_Comment period letter |
| PBWTAR_01333 | PBWTAR_11564 | Ferster, Mike | Ferster, Mike_Comment period letter |
| PBWTAR_01334 | PBWTAR_11565 | Gustafson, Mike | Gustafson, Mike_Comment period letter |
| PBWTAR_01335 | PBWTAR_11566 | Rosenberg, Mike | Rosenberg, Mike_Comment period letter |
| PBWTAR_01336 | PBWTAR_11567 | Miller, Joann | Miller, Joann_Comment period letter |
| PBWTAR_01337 | PBWTAR_11568 | Strauss, Miriam | Strauss, Miriam_Comment period letter |
| PBWTAR_01338 | PBWTAR_11569 | Gladstone, Mitchell | Gladstone, Mitchell_Comment period letter |
| PBWTAR_01339 | PBWTAR_11570 | Mangum, Molly | Mangum, Molly_Comment period letter |
| PBWTAR_01340 | PBWTAR_11571 | McMasters, Molly | McMasters, Molly_Comment period letter |
| PBWTAR_01341 | PBWTAR_11572 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_01342 | PBWTAR_11573 | Gold, Morris | Gold, Morris_Comment period letter |
| PBWTAR_01343 | PBWTAR_11574 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_01344 | PBWTAR_11575 | Mueller, Helga | Mueller, Helga_Comment period letter |
| PBWTAR_01345 | PBWTAR_11576 | Mueller, Helga | Mueller, Helga_Comment period letter |
| PBWTAR_01346 | PBWTAR_11577 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_01347 | PBWTAR_11578 | Le, My-Lan | Le, My-Lan_Comment period letter |
| PBWTAR_01348 | PBWTAR_11579 | Roldan, Nadia | Roldan, Nadia_Comment period letter |
| PBWTAR_01349 | PBWTAR_11580 | Zambrana, Naira | Zambrana, Naira_Comment period letter |
| PBWTAR_01350 | PBWTAR_11581 | Steadman, Nakia | Steadman, Nakia_Comment period letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01351 | PBWTAR_11582 | Holme Elsberg, Natalie | Holme Elsberg, Natalie_Comment period letter |
| PBWTAR_01352 | PBWTAR_11583 | Pontikes, Natalie | Pontikes, Natalie_Comment period letter |
| PBWTAR_01353 | PBWTAR_11584 | Misak, Natan | Misak, Natan_Comment period letter |
| PBWTAR_01354 | PBWTAR_11586 | Marvelle, Nathan | Marvelle, Nathan_Comment period letter |
| PBWTAR_01355 | PBWTAR_11587 | Burn, Nathaniel | Burn, Nathaniel_Comment period letter |
| PBWTAR_01356 | PBWTAR_11588 | Miller, Neil | Miller, Neil_Comment period letter |
| PBWTAR_01357 | PBWTAR_11589 | Kulick, Nelle | Kulick, Nelle_Comment period letter |
| PBWTAR_01358 | PBWTAR_11590 | Creedon-Carey, Niamh | Creedon-Carey, Niamh_Comment period letter |
| PBWTAR_01359 | PBWTAR_11591 | Filannino, Nicholas | Filannino, Nicholas_Comment period letter |
| PBWTAR_01360 | PBWTAR_11592 | Hall, Nicholas | Hall, Nicholas_Comment period letter |
| PBWTAR_01361 | PBWTAR_11593 | Sprague, Nicholas | Sprague, Nicholas_Comment period letter |
| PBWTAR_01362 | PBWTAR_11594 | Gotham, Nicholle | Gotham, Nicholle_Comment period letter |
| PBWTAR_01363 | PBWTAR_11595 | Gehrenbeck-Shim, Nick | Gehrenbeck-Shim, Nick_Comment period letter |
| PBWTAR_01364 | PBWTAR_11596 | Heck, Nick | Heck, Nick_Comment period letter |
| PBWTAR_01365 | PBWTAR_11597 | Halsted, Nicolas | Halsted, Nicolas_Comment period letter |
| PBWTAR_01366 | PBWTAR_11598 | Filannino, Nicole | Filannino, Nicole_Comment period letter |
| PBWTAR_01367 | PBWTAR_11599 | D'Annunzio, Nikki | D'Annunzio, Nikki_Comment period letter |
| PBWTAR_01368 | PBWTAR_11600 | Collette, Norm | Collette, Norm_Comment period letter |
| PBWTAR_01369 | PBWTAR_11601 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_01370 | PBWTAR_11602 | Anonymous | Anonymous_Comment period letter |
| PBWTAR_01371 | PBWTAR_11604 | Satola, Oliver | Satola, Oliver_Comment period letter |
| PBWTAR_01372 | PBWTAR_11605 | LoChiatto, Olivia | LoChiatto, Olivia_Comment period letter |
| PBWTAR_01373 | PBWTAR_11606 | C, Onyx | C, Onyx_Comment period letter |
| PBWTAR_01374 | PBWTAR_11607 | Jackson, Owen | Jackson, Owen_Comment period letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01375 | PBWTAR_11608 | Lutz, Owen | Lutz, Owen_Comment period letter |
| PBWTAR_01376 | PBWTAR_11609 | Freilich, Pam | Freilich, Pam_Comment period letter |
| PBWTAR_01377 | PBWTAR_11610 | Gaw, Pam | Gaw, Pam_Comment period letter |
| PBWTAR_01378 | PBWTAR_11611 | Sullivan, Pam | Sullivan, Pam_Comment period letter |
| PBWTAR_01379 | PBWTAR_11612 | Unger, Pamela | Unger, Pamela_Comment period letter |
| PBWTAR_01380 | PBWTAR_11613 | Meadows, Patty | Meadows, Patty_Comment period letter |
| PBWTAR_01381 | PBWTAR_11614 | Cirillo, Paul | Cirillo, Paul_Comment period letter |
| PBWTAR_01382 | PBWTAR_11615 | Esparza, Paul | Esparza, Paul_Comment period letter |
| PBWTAR_01383 | PBWTAR_11616 | Gustafson, Paul | Gustafson, Paul_Comment period letter |
| PBWTAR_01384 | PBWTAR_11617 | Guyre, Paul | Guyre, Paul_Comment period letter |
| PBWTAR_01385 | PBWTAR_11618 | Reif, Paul | Reif, Paul_Comment period letter |
| PBWTAR_01386 | PBWTAR_11619 | Leins, Penelope | Leins, Penelope_Penelope Leins Comment Period Letter |
| PBWTAR_01387 | PBWTAR_11620 | Koburger, Penny | Koburger, Penny_Penny Koburger Comment Period Letter |
| PBWTAR_01388 | PBWTAR_11621 | Anon, Peter | Anon, Peter_Peter Anon Comment Period Letter |
| PBWTAR_01389 | PBWTAR_11622 | Ascher, Peter | Ascher, Peter_Peter Ascher Comment Period Letter |
| PBWTAR_01390 | PBWTAR_11623 | Baldassare, Peter | Baldassare, Peter_Peter Baldassare Comment Period Letter |
| PBWTAR_01391 | PBWTAR_11624 | Brennan, Peter | Brennan, Peter_Peter Brennan Comment Period Letter |
| PBWTAR_01392 | PBWTAR_11625 | Cain, Peter | Cain, Peter_Peter Cain Comment Period Letter |
| PBWTAR_01393 | PBWTAR_11626 | Eckhardt, Peter | Eckhardt, Peter_Peter Eckhardt Comment Period Letter |
| PBWTAR_01394 | PBWTAR_11627 | Faletra, Peter | Faletra, Peter_Peter Faletra Comment Period Letter |
| PBWTAR_01395 | PBWTAR_11636 | Gawne, Peter | Gawne, Peter_Peter Gawne Comment Period Letter |
| PBWTAR_01396 | PBWTAR_11637 | Jons, Peter | Jons, Peter_Peter Jons Comment Period Letter |
| PBWTAR_01397 | PBWTAR_11640 | Mandeau, Peter | Mandeau, Peter_Peter Mandeau Comment Period Letter |
| PBWTAR_01398 | PBWTAR_11641 | Mandeau, Peter | Mandeau, Peter_Peter Mandeau Comment Period Letter |
| PBWTAR_01399 | PBWTAR_11642 | Nist-Ferrare, Phoenyx | Nist-Ferrare, Phoenyx_Phoenyx Nist-Ferrare Comment Period Letter |
| PBWTAR_01400 | PBWTAR_11643 | Sidhu, Poonam | Sidhu, Poonam_Poonam Sidhu Comment Period Letter |
| PBWTAR_01401 | PBWTAR_11644 | Puleo, Cheryl | Puleo, Cheryl_Cheryl Puleo Comment Period Letter |
| PBWTAR_01402 | PBWTAR_11645 | Puleo, Cheryl | Puleo, Cheryl_Cheryl Puleo Comment Period Letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01403 | PBWTAR_11646 | Anonymous | Anonymous_Serene Lake Scene with Mountains and a Rainbow in the Background |
| PBWTAR_01404 | PBWTAR_11647 | Ilg, Ray | Ilg, Ray_Comment Period Letter |
| PBWTAR_01405 | PBWTAR_11648 | McGaughey, Ray | McGaughey, Ray_Comment Period Letter |
| PBWTAR_01406 | PBWTAR_11649 | Lovejoy, Rebecca | Lovejoy, Rebecca_Comment Period Letter |
| PBWTAR_01407 | PBWTAR_11651 | Neuroth, Rebecca | Neuroth, Rebecca_Comment Period Letter |
| PBWTAR_01408 | PBWTAR_11652 | Sadek, Rebecca | Sadek, Rebecca_Comment Period Letter |
| PBWTAR_01409 | PBWTAR_11653 | Sommers, Rebecca | Sommers, Rebecca_Comment Period Letter |
| PBWTAR_01410 | PBWTAR_11654 | Andrews, Richard | Andrews, Richard_Comment Period Letter |
| PBWTAR_01411 | PBWTAR_11655 | Biddle, Richard | Biddle, Richard_Comment Period Letter |
| PBWTAR_01412 | PBWTAR_11656 | Rachman, Richard | Rachman, Richard_Comment Period Letter |
| PBWTAR_01413 | PBWTAR_11657 | Wipfler, Rob and Mike | Wipfler, Rob and Mike_Comment Period Letter |
| PBWTAR_01414 | PBWTAR_11664 | Horne, Rob | Horne, Rob_Comment Period Letter |
| PBWTAR_01415 | PBWTAR_11665 | Wipfler, Rob | Wipfler, Rob_Comment Period Letter |
| PBWTAR_01416 | PBWTAR_11668 | Wipfler, Rob | Wipfler, Rob_Comment Period Letter |
| PBWTAR_01417 | PBWTAR_11669 | Wipfler, Rob | Wipfler, Rob_Comment Period Letter |
| PBWTAR_01418 | PBWTAR_11670 | Donahue, Robert | Donahue, Robert_Comment Period Letter |
| PBWTAR_01419 | PBWTAR_11671 | Smith, Robert | Smith, Robert_Comment Period Letter |
| PBWTAR_01420 | PBWTAR_11672 | Wipfler, Robert | Wipfler, Robert_Comment Period Letter |
| PBWTAR_01421 | PBWTAR_11673 | Wipfler, Robert | Wipfler, Robert_Comment Period Letter |
| PBWTAR_01422 | PBWTAR_11674 | Wipfler, Robert | Wipfler, Robert_Comment Period Letter |
| PBWTAR_01423 | PBWTAR_11675 | Wipfler, Robert | Wipfler, Robert_Comment Period Letter |
| PBWTAR_01424 | PBWTAR_11676 | Wipfler, Robert | Wipfler, Robert_Comment Period Letter |
| PBWTAR_01425 | PBWTAR_11677 | Kaplow, Roberta | Kaplow, Roberta_Comment Period Letter |
| PBWTAR_01426 | PBWTAR_11678 | Robey, Frank | Robey, Frank_Comment Period Letter |
| PBWTAR_01427 | PBWTAR_11679 | Ascher, Robin | Ascher, Robin_Comment Period Letter |
| PBWTAR_01428 | PBWTAR_11681 | Creedon-Carey, Roisin | Creedon-Carey, Roisin_Comment Period Letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01429 | PBWTAR_11682 | McWilliams, Ronan | McWilliams, Ronan_Comment Period Letter |
| PBWTAR_01430 | PBWTAR_11683 | Denman, Rory | Denman, Rory_Comment Period Letter |
| PBWTAR_01431 | PBWTAR_11684 | Kilmer, Rosa | Kilmer, Rosa_Comment Period Letter |
| PBWTAR_01432 | PBWTAR_11685 | Sacco, Rosie | Sacco, Rosie_Comment Period Letter |
| PBWTAR_01433 | PBWTAR_11686 | Day, Russell | Day, Russell_Comment Period Letter |
| PBWTAR_01434 | PBWTAR_11687 | Gagarin, Russell | Gagarin, Russell_Comment Period Letter |
| PBWTAR_01435 | PBWTAR_11688 | Stein, Russell | Stein, Russell_Comment Period Letter |
| PBWTAR_01436 | PBWTAR_11689 | Schlosser, Ryan | Schlosser, Ryan_Comment Period Letter |
| PBWTAR_01437 | PBWTAR_11690 | Cain, Sam | Cain, Sam _Comment Period Letter |
| PBWTAR_01438 | PBWTAR_11691 | Nichols, Sam | Nichols, Sam_Comment Period Letter |
| PBWTAR_01439 | PBWTAR_11692 | Warshaw, Sammy | Warshaw, Sammy_Comment Period Letter |
| PBWTAR_01440 | PBWTAR_11693 | Cain, Samuel | Cain, Samuel_Comment Period Letter |
| PBWTAR_01441 | PBWTAR_11694 | Sadek, Sanford | Sadek, Sanford_Comment Period Letter |
| PBWTAR_01442 | PBWTAR_11695 | Godoy, Santiago | Godoy, Santiago_Comment Period Letter |
| PBWTAR_01443 | PBWTAR_11696 | Acharya, Sara | Acharya, Sara_Comment Period Letter |
| PBWTAR_01444 | PBWTAR_11698 | Acharya, Sara | Acharya, Sara_Comment Period Letter |
| PBWTAR_01445 | PBWTAR_11699 | Acharya, Sara | Acharya, Sara_Comment Period Letter |
| PBWTAR_01446 | PBWTAR_11700 | Lang, Sara | Lang, Sara_Comment Period Letter |
| PBWTAR_01447 | PBWTAR_11701 | Stillwell, Sarah | Stillwell, Sarah_Comment Period Letter |
| PBWTAR_01448 | PBWTAR_11702 | Damron-Brown, Sarah | Damron-Brown, Sarah_Comment Period Letter |
| PBWTAR_01449 | PBWTAR_11703 | Ganzman, Sarah | Ganzman, Sarah_Comment Period Letter |
| PBWTAR_01450 | PBWTAR_11704 | Potter, Sarah | Potter, Sarah_Comment Period Letter |
| PBWTAR_01451 | PBWTAR_11705 | Sully, Sarah | Sully, Sarah_Comment Period Letter |
| PBWTAR_01452 | PBWTAR_11706 | Science of The Total Environment | Science of The Total Environment_Glyphosate Decreases Mycorrhizal Colonization and Affects Pland-soil Feedback |
| PBWTAR_01453 | PBWTAR_11707 | Neff, Scott | Neff, Scott_Comment Period Letter |
| PBWTAR_01454 | PBWTAR_11708 | Sandler, Scott | Sandler, Scott_Comment Period Letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01455 | PBWTAR_11709 | Shupe, Scott | Shupe, Scott_Comment Period Letter |
| PBWTAR_01456 | PBWTAR_11710 | O'Brien, Seamus | O'Brien, Seamus_Comment Period Letter |
| PBWTAR_01457 | PBWTAR_11711 | Austin, Sean | Austin, Sean_Comment Period Letter |
| PBWTAR_01458 | PBWTAR_11712 | Bredbenner, Sean | Bredbenner, Sean_Comment Period Letter |
| PBWTAR_01459 | PBWTAR_11713 | Thorn, Serena | Thorn, Serena_Comment Period Letter |
| PBWTAR_01460 | PBWTAR_11714 | Crandall, Seth | Crandall, Seth_Comment Period Letter |
| PBWTAR_01461 | PBWTAR_11715 | Pyne, Shannon | Pyne, Shannon_Comment Period Letter |
| PBWTAR_01462 | PBWTAR_11716 | Sheehan, Margaret | Sheehan, Margaret_Comment Period Letter |
| PBWTAR_01463 | PBWTAR_11717 | Semmes, Shelby | Semmes, Shelby_Comment Period Letter |
| PBWTAR_01464 | PBWTAR_11718 | McKee, Shelley | McKee, Shelley_Comment Period Letter |
| PBWTAR_01465 | PBWTAR_11719 | Davidman, Skyler | Davidman, Skyler_Comment Period Letter |
| PBWTAR_01466 | PBWTAR_11720 | Smith, Douglas | Smith, Douglas_Comment Period Letter |
| PBWTAR_01467 | PBWTAR_11721 | Smolker, Rachel | Smolker, Rachel_Comment Period Letter |
| PBWTAR_01468 | PBWTAR_11722 | Solaun, Silvia | Solaun, Silvia_Comment Period Letter |
| PBWTAR_01469 | PBWTAR_11723 | Kai, Sora | Kai, Sora_Comment Period Letter |
| PBWTAR_01470 | PBWTAR_11724 | Weiss, Spencer | Weiss, Spencer_Comment Period Letter |
| PBWTAR_01471 | PBWTAR_11725 | Anonymous | Anonymous_Serene Cloud free Lake Scene with Mountains in the Background |
| PBWTAR_01472 | PBWTAR_11726 | Cannariato, Stephanie | Cannariato, Stephanie_Comment Period Letter |
| PBWTAR_01473 | PBWTAR_11727 | Powell, Stephanie | Powell, Stephanie_Comment Period Letter |
| PBWTAR_01474 | PBWTAR_11728 | Loutrel, Stephen and Elizabeth | Loutrel, Stephen and Elizabeth_Comment Period Letter |
| PBWTAR_01475 | PBWTAR_11729 | Alden, Stephen | Alden, Stephen_Comment Period Letter |
| PBWTAR_01476 | PBWTAR_11731 | Bortz, Stephen | Bortz, Stephen_Comment Period Letter |
| PBWTAR_01477 | PBWTAR_11732 | John, Steven | John, Steven_Comment Period Letter |
| PBWTAR_01478 | PBWTAR_11733 | Blood, Stuart | Blood, Stuart_Comment Period Letter |
| PBWTAR_01479 | PBWTAR_11734 | Fournier, Suzanne | Fournier, Suzanne_Comment Period Letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01480 | PBWTAR_11735 | Paquin, Suzanne | Paquin, Suzanne_Comment Period Letter |
| PBWTAR_01481 | PBWTAR_11736 | Bloom, Tara | Bloom, Tara_Comment Period Letter |
| PBWTAR_01482 | PBWTAR_11737 | Steele, Taylor | Steele, Taylor_Comment Period Letter |
| PBWTAR_01483 | PBWTAR_11738 | Dunlap, Ted | Dunlap, Ted_Comment Period Letter |
| PBWTAR_01484 | PBWTAR_11739 | Pogacar, Ted | Pogacar, Ted_Comment Period Letter |
| PBWTAR_01485 | PBWTAR_11740 | Unkles, Ted | Unkles, Ted_Comment Period Letter |
| PBWTAR_01486 | PBWTAR_11741 | Martin, Terry | Martin, Terry_Comment Period Letter |
| PBWTAR_01487 | PBWTAR_11742 | Teschner, Douglass | Teschner, Douglass_Comment Period Letter |
| PBWTAR_01488 | PBWTAR_11743 | B. Tessa | B. Tessa_Comment Period Letter |
| PBWTAR_01489 | PBWTAR_11744 | Casey, Thomas | Casey, Thomas_Comment Period Letter |
| PBWTAR_01490 | PBWTAR_11745 | Savage, Thomas | Savage, Thomas_Comment Period Letter |
| PBWTAR_01491 | PBWTAR_11746 | Amstutz, Tobias | Amstutz, Tobias_Comment Period Letter |
| PBWTAR_01492 | PBWTAR_11747 | Ascher, Toby | Ascher, Toby_Comment Period Letter |
| PBWTAR_01493 | PBWTAR_11748 | Sabiston, Todd | Sabiston, Todd_Comment Period Letter |
| PBWTAR_01494 | PBWTAR_11749 | Hale, Tom | Hale, Tom_Comment Period Letter |
| PBWTAR_01495 | PBWTAR_11750 | Savage, Tom | Savage, Tom_Comment Period Letter |
| PBWTAR_01496 | PBWTAR_11751 | Wagner, Tom | Wagner, Tom_Comment Period Letter |
| PBWTAR_01497 | PBWTAR_11753 | Wessels, Tom | Wessels, Tom_Comment Period Letter |
| PBWTAR_01498 | PBWTAR_11754 | Whitehead, Tom | Whitehead, Tom_Comment Period Letter |
| PBWTAR_01499 | PBWTAR_11755 | Tompkins, Joyce | Tompkins, Joyce_Comment Period Letter |
| PBWTAR_01500 | PBWTAR_11756 | Oyenarte, Tony | Oyenarte, Tony_Comment Period Letter |
| PBWTAR_01501 | PBWTAR_11757 | West, Travis | West, Travis_Comment Period Letter |
| PBWTAR_01502 | PBWTAR_11758 | Gorman, Tyler | Gorman, Tyler_Comment Period Letter |
| PBWTAR_01503 | PBWTAR_11759 | Alden, Stephen | Alden, Stephen_Comment Period Letter with Pictures of Cultural Areas, Cellar hole, Stone Walls and Old Orchard |
| PBWTAR_01504 | PBWTAR_11766 | Rojas, Valeria | Rojas, Valeria_Comment Period Letter |
| PBWTAR_01505 | PBWTAR_11767 | Guyre, Veronica | Guyre, Veronica_Comment Period Letter |
| PBWTAR_01506 | PBWTAR_11768 | Norton, Victoria | Norton, Victoria_Comment Period Letter |
| PBWTAR_01507 | PBWTAR_11769 | Urquidi, Victoria | Urquidi, Victoria_Comment Period Letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01508 | PBWTAR_11770 | Ginalski, Walt | Ginalski, Walt_Comment Period Letter |
| PBWTAR_01509 | PBWTAR_11771 | King, Wayne | King, Wayne_Comment Period Letter |
| PBWTAR_01510 | PBWTAR_11772 | Cahill, Wendy | Cahill, Wendy_Comment Period Letter |
| PBWTAR_01511 | PBWTAR_11773 | Roman, Wesley | Roman, Wesley_Comment Period Letter |
| PBWTAR_01512 | PBWTAR_11774 | P, Will | P, Will_Comment Period Letter |
| PBWTAR_01513 | PBWTAR_11775 | Farrar, William | Farrar, William_Comment Period Letter |
| PBWTAR_01514 | PBWTAR_11776 | Rose, William | Rose, William_Comment Period Letter |
| PBWTAR_01515 | PBWTAR_11777 | Williamson, Kevin | Williamson, Kevin_Comment Period Letter |
| PBWTAR_01516 | PBWTAR_11778 | Williamson, Kevin | Williamson, Kevin_Attachment, picture of Lund Cemetary |
| PBWTAR_01517 | PBWTAR_11779 | Olmsted, Wyeth | Olmsted, Wyeth_Comment Period Letter |
| PBWTAR_01518 | PBWTAR_11780 | David, Zachary | David, Zachary_Comment Period Letter |
| PBWTAR_01519 | PBWTAR_11781 | Huber, Zachary | Huber, Zachary_Comment Period Letter |
| PBWTAR_01520 | PBWTAR_11782 | Jackson, Zachary | Jackson, Zachary_Comment Period Letter |
| PBWTAR_01521 | PBWTAR_11783 | Jeffrey, Zachary | Jeffrey, Zachary_Comment Period Letter |
| PBWTAR_01522 | PBWTAR_11784 | Sadek, Zachary | Sadek, Zachary_Comment Period Letter |
| PBWTAR_01523 | PBWTAR_11785 | Porter, Zack | Porter, Zack_Comment Period Letter |
| PBWTAR_01524 | PBWTAR_11787 | Reinl, Kaitlin | Article submitted by Elaine Faletra in support of her 30-day comment letter |
| PBWTAR_01525 | PBWTAR_11801 | Foote, Charles | Document from the public advising District Ranger Brown of the presence of monuments and cemetaries |
| PBWTAR_01526 | PBWTAR_11803 | Puleo, Cheryl | Cheryl Puleo of the Greenhouse Restaurant 30-day comment letter addressed to USFS |
| PBWTAR_01527 | PBWTAR_11804 | Ascher, Peter and Robin | Peter and Robin Ascher 30-day comment letter addressed to Brooke Brown |
| PBWTAR_01528 | PBWTAR_11806 | Bordeau, Karen | Karen Bordeau of NHFG 30-day comment letter addressed to Brooke Brown |
| PBWTAR_01529 | PBWTAR_11808 | White Mountain National Forest | Cover letter sent alongside a personal copy of the Tarleton IRP Updated Draft EA/FONSI to the project hardcopy mailing list |
| PBWTAR_01530 | PBWTAR_11809 | White Mountain National Forest | Requisition for the Valley News advertisement on the Tarleton IRP Updated Draft EA/FONSI availability |
| PBWTAR_01531 | PBWTAR_11810 | White Mountain National Forest | Tarleton IRP Draft EA/FONSI updated and published in conjunction with the second comment period |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01532 | PBWTAR_11842 | White Mountain National Forest | Information sheet provided to the public for notice of the Updated Draft EA/FONSI and 2nd 30-day comment period |
| PBWTAR_01533 | PBWTAR_11843 | White Mountain National Forest | Advertisement sent to Velley News to publish for public notification of the Updated Draft EA/FONSI availability |
| PBWTAR_01534 | PBWTAR_11844 | Hall, Scott | Email from Scott Hall to Piermont town admin notifying them on the Draft EA/FONSI availability |
| PBWTAR_01535 | PBWTAR_11845 | Hall, Scott | Email from Scott Hall to Warren town admin notifying them on the Draft EA/FONSI availability |
| PBWTAR_01536 | PBWTAR_11846 | White Mountain National Forest | Requisition for the Union Leader Legal Notice on the Tarleton IRP Draft EA/FONSI |
| PBWTAR_01537 | PBWTAR_11847 | White Mountain National Forest | Tarleton IRP Draft EA/FONSI published in conjunction with the first comment period |
| PBWTAR_01538 | PBWTAR_11876 | White Mountain National Forest | Spreadsheet recording all comments and the WMNF consideration for the 1st 30-day comment period on the Draft EA |
| PBWTAR_01539 | PBWTAR_11898 | White Mountain National Forest | Summary Report on the public comments and the WMNF consideration on the Draft EA/FONSI |
| PBWTAR_01540 | PBWTAR_11900 | White Mountain National Forest | Legal Notice for the Tarleton IRP DraftEA/FONSI |
| PBWTAR_01541 | PBWTAR_11901 | White Mountain National Forest | Mailing List report exported from the CARA program Tarleton project page |
| PBWTAR_01542 | PBWTAR_11922 | Brown, Brooke | Tarleton IRP Draft Decision Notice |
| PBWTAR_01543 | PBWTAR_11928 | White Mountain National Forest | Cover letter sent alongside a personal copy of the Tarleton IRP Decision Notice to the project hardcopy mailing list |
| PBWTAR_01544 | PBWTAR_11929 | Brown, Brooke | Tarleton IRP Decision Notice |
| PBWTAR_01545 | PBWTAR_11935 | White Mountain National Forest | Tarleton IRP Final EA/FONSI made available to the public to begin the objection period |
| PBWTAR_01546 | PBWTAR_11968 | White Mountain National Forest | Tarleton Final EA/FONSI modified from the administrative review instruction and recommendations and published alongside the Final DN |
| PBWTAR_01547 | PBWTAR_12002 | Valley News | Ad Proof for the Valley News |
| PBWTAR_01548 | PBWTAR_12003 | White Mountain National Forest | Legal Notice for the Tarleton IRP Final EA/FONSI and Draft Decision Notice |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01549 | PBWTAR_12004 | White Mountain National Forest | Legal Notice published in the New Hampshire Union Leader notifying the public of the Final EA/FONSI and Draft Decision Notice availability |
| PBWTAR_01550 | PBWTAR_12005 | White Mountain National Forest | Tear sheet from the New Hampshire Union Leader advertising the Final EA/FONSI and Draft Decision Notice Legal Notice |
| PBWTAR_01551 | PBWTAR_12006 | White Mountain National Forest | GovDelivery Subscriber List for the Tarleton IRP Objection period |
| PBWTAR_01552 | PBWTAR_12027 | White Mountain National Forest | GovDelivery subscriber list exported from GovDelivery |
| PBWTAR_01553 | PBWTAR_12036 | White Mountain National Forest | Question and Answer report from the Pemi District presentation on the Tarleton Draft EA/FONSI and the accompanying 30-day comment period |
| PBWTAR_01554 | PBWTAR_12038 | White Mountain National Forest | Electronic and hardcopy mailing list for the Tarleton IRP |
| PBWTAR_01555 | PBWTAR_12044 | White Mountain National Forest | Mailing Labels for the hardcopy mailing letters distributing copies of the Final EA/FONSI to the harcopy mailing list |
| PBWTAR_01556 | PBWTAR_12045 | White Mountain National Forest | Mailing List for the Tarleton IRP Objection Period |
| PBWTAR_01557 | PBWTAR_12051 | White Mountain National Forest | Map of the overall Tarleton IRP project area, published in the Final EA |
| PBWTAR_01558 | PBWTAR_12052 | White Mountain National Forest | Map of the 300-foot no cut buffer along the Lake Tarleton shoreline, published in the Final EA |
| PBWTAR_01559 | PBWTAR_12053 | White Mountain National Forest | Travel management map |
| PBWTAR_01560 | PBWTAR_12054 | White Mountain National Forest | Map of the timber harvest treatment units |
| PBWTAR_01561 | PBWTAR_12055 | White Mountain National Forest | Map of the 300-foot no cut buffer along the Lake Tarleton shoreline, published in the Final EA |
| PBWTAR_01562 | PBWTAR_12056 | White Mountain National Forest | Map of the timber harvest treatment units, published in the Final EA |
| PBWTAR_01563 | PBWTAR_12057 | White Mountain National Forest | Map of the timber harvest treatment units with Lake Armington included |
| PBWTAR_01564 | PBWTAR_12058 | White Mountain National Forest | Map of Lake Tarleton with 100-foot no cut buffer in proximity to the timber harvest units closest to the lake |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01565 | PBWTAR_12059 | White Mountain National Forest | Map of the timber harvest treatment units with contour lines added |
| PBWTAR_01566 | PBWTAR_12060 | White Mountain National Forest | Map of the timber harvest treatment units with labels |
| PBWTAR_01567 | PBWTAR_12061 | White Mountain National Forest | Map of the Tarleton IRP scenery viewpoints, published in the Final EA |
| PBWTAR_01568 | PBWTAR_12062 | Valley News | News Article from the Valley News reporting the Tarleton IRP Decision Notice |
| PBWTAR_01569 | PBWTAR_12064 | White Mountain National Forest | Full attendance list of the Pemi ranger district virtual public presentation on the Draft EA/FONSI |
| PBWTAR_01570 | PBWTAR_12065 | Valley News | Ad proof provided by the Valley News in preparation for payment and publication |
| PBWTAR_01571 | PBWTAR_12066 | Valley News | Ad page provided by the Valley News after publication |
| PBWTAR_01572 | PBWTAR_12067 | Zhang, Xiao | Article submitted by Elaine Faletra in support of her 30-day comment letter |
| PBWTAR_01573 | PBWTAR_12079 | Porter, Zack | Zack Porter from Standing Trees comment letter addressed to Brooke Brown |
| PBWTAR_01574 | PBWTAR_12135 | USDA, Forest Service | Mittersill-Sential Mountain Land Exchange |
| PBWTAR_01575 | PBWTAR_12188 | | 2019 Special Report on Paddlesports and Safety; summary of paddlesport data |
| PBWTAR_01576 | PBWTAR_12213 | Binkley, Dan and Valentine, David | Fifty Year Biogeochemical Effects of Green Ash White Pine and Norway Spruce In Replicated Experiment |
| PBWTAR_01577 | PBWTAR_12226 | Chandler et al. | Do Mature Forest Birds Prefer Early Successional Habitat during the Post Fledging Period |
| PBWTAR_01578 | PBWTAR_12235 | Collado et al. | Divergent Above and Below Ground Responses of Fungal Functional Groups to Forest Thinning |
| PBWTAR_01579 | PBWTAR_12246 | Costello et al. | Songbird Response to Group selection Harvests and Clearcuts in a NH Northern Hardwood Forest |
| PBWTAR_01580 | PBWTAR_12260 | Czarnecka, Magdalena | Coarse Woody Debris In Temperate Li |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01581 | PBWTAR_12273 | DeGraaf et al. | Technical Guide to Forest Wildlife Management |
| PBWTAR_01582 | PBWTAR_12276 | DeGraaf, Richard and Yamasaki, | Options for Managing Early-Successional Forest and Shrubland Bird Habitats in the Northeastern United States |
| PBWTAR_01583 | PBWTAR_12289 | Demaria et al. | Streamflow |
| PBWTAR_01584 | PBWTAR_12304 | Domke et al. | SOC Estimates |
| PBWTAR_01585 | PBWTAR_12317 | Foster, Jane and D'Amato, | Global Change Biology |
| PBWTAR_01586 | PBWTAR_12328 | Harding et al | Guidelines for Managing Canada Warbler Habitat |
| PBWTAR_01587 | PBWTAR_12344 | Hillman, Brett | Rational for Habitat Objectives in the Lake Tarleton Habitat Management Unit |
| PBWTAR_01588 | PBWTAR_12358 | Hornbeck et al. | Water Yeild NE USA |
| PBWTAR_01589 | PBWTAR_12371 | Karraker, Nancy and Gibbs, James | Amphibian Production in Forested Landscaped in Relation to Wetland Hydroperiod |
| PBWTAR_01590 | PBWTAR_12381 | King et al. | Three Decades of Avian Research on the Bartlett Experimental Forest New Hampshire USA |
| PBWTAR_01591 | PBWTAR_12390 | Kline, Linda and Settel, Kenneth | Notable Bird Observations |
| PBWTAR_01592 | PBWTAR_12396 | Kline, Linda and Settel, Kenneth | Osprey Information |
| PBWTAR_01593 | PBWTAR_12401 | Lazaruk et al. | Effects of Partial Cutting on the Ectomycorrhizae of Picea Glauca Forests in Northwestern Alberta |
| PBWTAR_01594 | PBWTAR_12414 | Leski et al. | Both Forest Reserves and Managed Forests Help Maintain Ectomycorrhizal Fungal Diversity |
| PBWTAR_01595 | PBWTAR_12427 | Lorimer, Craig and Frelich, Lee | Natural Disturbance Regimes in Old-Growth Northern Hardwoods |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01596 | PBWTAR_12433 | Lynch et al. | Northeast Temerature Precipitations |
| PBWTAR_01597 | PBWTAR_12452 | Mclinley et al. | Forest Carbon Storage |
| PBWTAR_01598 | PBWTAR_12475 | NH Dep't of Environmental Services | Lake Katherine VLAP Report |
| PBWTAR_01599 | PBWTAR_12477 | NH Dep't of Environmental Services | Information on Lake Katherine Water Quality |
| PBWTAR_01600 | PBWTAR_12481 | Biodiversity Research Institute | NH NLEB Survey |
| PBWTAR_01601 | PBWTAR_12503 | Prout, Leighlan | Lack of Regen Harvesting |
| PBWTAR_01602 | PBWTAR_12504 | Prout, Mark | Ameletus Mayflies at S. Branch Gale River |
| PBWTAR_01603 | PBWTAR_12506 | Cooley, John | Loon Issues on Lakes Tarleton, Katherine, Armington, and Constance |
| PBWTAR_01604 | PBWTAR_12509 | Seymour, Robert | Red Spruce Balsam Fir Forest of Maine Evolution of Silvicultural Practice in Response to Stand Development Patterns and Disturbances |
| PBWTAR_01605 | PBWTAR_12537 | Ruddell et al. | The Role for Sustainably Managed Forests in Climate Change Mitigation |
| PBWTAR_01606 | PBWTAR_12543 | Settel, Kenneth | Notabel Bird Observations |
| PBWTAR_01607 | PBWTAR_12547 | Silvis et al. | Effects of Hierarchical Roost Removal on NLEB Maternity Colonies |
| PBWTAR_01608 | PBWTAR_12564 | Smallidge, Peter | Woodland Guidelines for the Control and Management of American Beech |
| PBWTAR_01609 | PBWTAR_12570 | Smallidge, Peter | What is Tree Vigor and Why Does it Matter |
| PBWTAR_01610 | PBWTAR_12578 | Stephenson et al. | Rate of Tree Carbon Accumulation Increases |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01611 | PBWTAR_12590 | USDA Forest Service | Draft Northern long-eared bat species abstract |
| PBWTAR_01612 | PBWTAR_12632 | USDA Forest Service | Northern long-eared bat species abstract |
| PBWTAR_01613 | PBWTAR_12653 | USDA Forest Service | Terr Habitat Mgmt Ref Doc (revised) |
| PBWTAR_01614 | PBWTAR_12668 | USDA Forest Service | Ecological Approach Doc (revised) |
| PBWTAR_01615 | PBWTAR_12681 | USDA Forest Service | Tricolored Bat Species Abstract |
| PBWTAR_01616 | PBWTAR_12701 | USDA Forest Service | WMNF Ecological Approach |
| PBWTAR_01617 | PBWTAR_12714 | USDA Forest Service | Little Brown Bat species Abstract |
| PBWTAR_01618 | PBWTAR_12732 | USDA Forest Service | Eastern Small-footed Bat Species Abstract |
| PBWTAR_01619 | PBWTAR_12754 | USDA Forest Service | American Peregrine Falcon Species Abstract |
| PBWTAR_01620 | PBWTAR_12769 | USDA Forest Service | Common Loon Species Abstract |
| PBWTAR_01621 | PBWTAR_12787 | USDA Forest Service | Osprey Species Abstract |
| PBWTAR_01622 | PBWTAR_12800 | USDA Forest Service | Little brown bat species abstract |
| PBWTAR_01623 | PBWTAR_12814 | USDA Forest Service | Ameletus Browni Species Abstract |
| PBWTAR_01624 | PBWTAR_12824 | USDA Forest Service | Ameletus Tertius Species Abstact |
| PBWTAR_01625 | PBWTAR_12836 | USDA Forest Service | Monarch Butterfly Species Abstract |
| PBWTAR_01626 | PBWTAR_12850 | USDA Forest Service | Yellow-banded Bumblebee Species Abstract |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01627 | PBWTAR_12864 | USDA Forest Service | Incurvate Emeral Species Abstract |
| PBWTAR_01628 | PBWTAR_12874 | USDA Forest Service | Lake Tarleton HMU Conditions |
| PBWTAR_01629 | PBWTAR_12885 | USDA Forest Service | Tarleton IRP Vernal Pool Data |
| PBWTAR_01630 | PBWTAR_12889 | Pastoriza, Kris | E-mail - Hybrid meeting would have allowed both kinds of access |
| PBWTAR_01631 | PBWTAR_12890 | Pastoriza, Kris | E-mail - Sending ojection and references to Forest Service |
| PBWTAR_01632 | PBWTAR_12891 | Porter, Zack and Ibarguen, Derek | E-mail - Porter requesting objection meeting with Forest Supervisor |
| PBWTAR_01633 | PBWTAR_12894 | Corless, Theresa | E-mail -Dismissing Mr. Guetti's objection due to lack of standing |
| PBWTAR_01634 | PBWTAR_12895 | Corless, Theresa | E-mail -Dismissing Ms. Rizzo's objection due to lack of standing |
| PBWTAR_01635 | PBWTAR_12896 | Marunowski, Jessica and Porter Zack | E-mail - To Porter with Tarleton IRP objection letter and response attached |
| PBWTAR_01636 | PBWTAR_12898 | Marunowski, Jessica | E-mail - To Porter informing objectors of minor clarifications due to an inquery. |
| PBWTAR_01637 | PBWTAR_12900 | Ibarguen, Derek | E-mail - Objection Response Letter sent to objectors |
| PBWTAR_01638 | PBWTAR_12928 | White Mountain National Forest | Comment Analayis and Response Application (CARA) spreadsheet of objectors and reference materials |
| PBWTAR_01639 | PBWTAR_12929 | Carey et al. | Reference: Occurance and toxicity of the cynobacterium Gloeotrichia echinulata in low-nutrient lakes in the northeastern US. |
| PBWTAR_01640 | PBWTAR_12944 | Mildrexler et al. | Reference: Large Trees dominate Carbon Storage (broken link) |
| PBWTAR_01641 | PBWTAR_12959 | Durall et al. | effects of Clearcutting on the fruiting bodies formed by ectomycorrhizal fungi. |
| PBWTAR_01642 | PBWTAR_12974 | White Mountain National Forest | June 28, 2023 recording of public meeting |
| PBWTAR_01643 | PBWTAR_12977 | Gustafson et al. | Reference: Retention Forestry to Maiantain Multifunctional Forests: A World Perspective |
| PBWTAR_01644 | PBWTAR_12990 | Ives et al. | Reference: Stability and Diversity of Ecosystems |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01645 | PBWTAR_12995 | Kellett et al. | Reference: Forest-clearing to create early successional habitat:Questionable benefits, significant costs |
| PBWTAR_01646 | PBWTAR_13025 | King et al. | Review of Kellett et al. research paper |
| PBWTAR_01647 | PBWTAR_13034 | Pastoriza, Kris | Written testimony from Kris Pastorizo presented to WMNF Team meeting on 6/28/2023 |
| PBWTAR_01648 | PBWTAR_13035 | Anon, Allona | Anon, Allona_Objection letter |
| PBWTAR_01649 | PBWTAR_13036 | Bald, Michael | Bald, Michael_Objection letter |
| PBWTAR_01650 | PBWTAR_13037 | Nelepovitz, John | Nelepovitz, John_Objection letter |
| PBWTAR_01651 | PBWTAR_13038 | Kline, Linda | Kline, Linda _Objection letter |
| PBWTAR_01652 | PBWTAR_13040 | Ascher, Robin and Peter | Ascher, Robin and Peter_Objection letter |
| PBWTAR_01653 | PBWTAR_13042 | Ascher, Toby | Ascher, Toby_Objection letter |
| PBWTAR_01654 | PBWTAR_13046 | Donelon, Tim | Donelon, Tim_Objection letter |
| PBWTAR_01655 | PBWTAR_13050 | Porter et al. | Porter et al._Objection letter |
| PBWTAR_01656 | PBWTAR_13051 | Porter, Zack | Porter, Zack_Objection letter |
| PBWTAR_01657 | PBWTAR_13052 | Appalachian Trail | Appalachian Trail Conservancy_Objection letter |
| PBWTAR_01658 | PBWTAR_13053 | Stevens, Mathew | Stevens, Mathew_Objection letter |
| PBWTAR_01659 | PBWTAR_13054 | Faletra, Peter and Elaine | Faletra, Peter and Elaine_Objection letter |
| PBWTAR_01660 | PBWTAR_13055 | Faletra, Peter | Faletra, Peter_Objection letter |
| PBWTAR_01661 | PBWTAR_13057 | Faletra, Elaine | Faletra, Elaine_Objection letter |
| PBWTAR_01662 | PBWTAR_13058 | Faletra, Elaine | Faletra, Elaine_Objection letter |
| PBWTAR_01663 | PBWTAR_13060 | Faletra, Elaine | Faletra, Elaine_Objection letter |
| PBWTAR_01664 | PBWTAR_13062 | Turanski, Kai | Turanski, Kai_Objection letter |
| PBWTAR_01665 | PBWTAR_13064 | Hochschild, Jennifer | Hochschild, Jennifer_Objection letter |
| PBWTAR_01666 | PBWTAR_13065 | Mandeau, Peter | Mandeau, Peter_Objection letter |
| PBWTAR_01667 | PBWTAR_13131 | Pastoriza, Kris | Pastoriza, Kris_Objection letter |
| PBWTAR_01668 | PBWTAR_13132 | Pastoriza, Kris | Pastoriza, Kris_Objection letter |
| PBWTAR_01669 | PBWTAR_13133 | Pastoriza, Kris | Pastoriza, Kris_Objection letter |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01670 | PBWTAR_13134 | George, Alex | George, Alex_Objection letter |
| PBWTAR_01671 | PBWTAR_13145 | Marvelle, Nathan | Marvelle, Nathan_Objection letter |
| PBWTAR_01672 | PBWTAR_13146 | Guetti, Bart | Guetti, Bart_Objection letter |
| PBWTAR_01673 | PBWTAR_13151 | Guetti, Bart | Guetti, Bart_Objection letter |
| PBWTAR_01674 | PBWTAR_13152 | Rizzo, Jullian | Rizzo, Jullian_Objection letter |
| PBWTAR_01675 | PBWTAR_13153 | Popkins | Reference: Forest Fight December Issue - Tree dieback from climate change |
| PBWTAR_01676 | PBWTAR_13160 | Corless, Theresa | E-mail - To Porter Invitation to Tarleton Objection Resolution Meeting with Forest Supervisor |
| PBWTAR_01677 | PBWTAR_13163 | Corless, Theresa | E-mail - Response to Porter's questions in regard to Tarleton Objection Resolution meeting |
| PBWTAR_01678 | PBWTAR_13171 | Corless, Theresa | E-mail - To Pastoriza explaining rationale for a TEAMs Objection Resolution meeting |
| PBWTAR_01679 | PBWTAR_13173 | Corless, Theresa | E-mail - Mailing list for objection response letters |
| PBWTAR_01680 | PBWTAR_13175 | Simard et al. | Reference: Net transfer of carbon between ectomycorrhizal tree species in the field |
| PBWTAR_01681 | PBWTAR_13179 | Swanson et al. | Reference: Chapter 9 Land-Water Interactions: The Riparian Zone |
| PBWTAR_01682 | PBWTAR_13204 | Corless, Theresa | E-mail - Tarlteon IRP Objection Resolution Meeting Invitiation |
| PBWTAR_01683 | PBWTAR_13205 | White Mountain National Forest | Tarleton IRP Resolution Meeting Agenda for 6/28/2023 |
| PBWTAR_01684 | PBWTAR_13206 | Ibarguen, Derek | Letter from Forest Supervisor to Mr. Guetti setting aside objection to Tarleton IRP |
| PBWTAR_01685 | PBWTAR_13207 | Ibarguen, Derek | Letter from Forest Supervisor to Ms. Rizzo setting aside objection to Tarleton IRP |
| PBWTAR_01686 | PBWTAR_13208 | | Table depicting the milestone NEPA Dates for both the Peabody and Tarleton Project |
| PBWTAR_01687 | PBWTAR_13209 | White Mountain National Forest | Supplemental Information Report for Forest-wide wildlife opening maintenance, scenic vista maintenance and hazardous fuels reduction |
| PBWTAR_01688 | PBWTAR_13211 | White Mountain National Forest | Non-native invasive species risk assessment for the Tarleton project |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01689 | PBWTAR_13221 | White Mountain National Forest | Non-native invasive species risk assessment for the Tarleton project |
| PBWTAR_01690 | PBWTAR_13231 | Mendelsohn, Clare | Supplemental Information Report for Forest-wide invasive plant control |
| PBWTAR_01691 | PBWTAR_13233 | Dugan, Janowiak and McKinley | Forest carbon assessment for the White Mountain National Forest |
| PBWTAR_01692 | PBWTAR_13259 | | TarletonCarbonFinal021921 |
| PBWTAR_01693 | PBWTAR_13266 | State of New Hampshire | PA7_IntentToCut_Piermont_Warren |
| PBWTAR_01694 | PBWTAR_13539 | State of New Hampshire | PA8_ReportsOfCut_Piermont_Warren |
| PBWTAR_01695 | PBWTAR_13735 | White Mountain National Forest | Spreadsheet of all private and USFS projects on the Pemi. |
| PBWTAR_01696 | PBWTAR_13736 | White Mountain National Forest | Photos of Historic Concrete pads and view of the old buildings they used to hold |
| PBWTAR_01697 | PBWTAR_13741 | Everett, Genevieve | Email from Genevieve Everett to Brooke Brown - Information on WMNF Archeologists field visit with local abutters. |
| PBWTAR_01698 | PBWTAR_13742 | Everett, Genevieve | Tarleton Heritage sites in relation to proposed road work locations - CUI |
| PBWTAR_01699 | PBWTAR_13743 | Alden, Stephen | Email from Genevieve Everett to Scott Hall - Information on a conversation with a local abutter regarding potential heritage site in the Sentinal Mountain area |
| PBWTAR_01700 | PBWTAR_13748 | NH Division of Historical Resources | SHPO Concurrence for the Tarleton IRP |
| PBWTAR_01701 | PBWTAR_13750 | White Mountain National Forest | Spreadsheet comparing watersheds vs. basal area removal in the project area |
| PBWTAR_01702 | PBWTAR_13751 | White Mountain National Forest | Document that proposed action is in compliance with the Clean Water Act |
| PBWTAR_01703 | PBWTAR_13752 | White Mountain National Forest | Photo of proposed boat launch area at Lake Katherine |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01704 | PBWTAR_13753 | White Mountain National Forest | Photo of proposed boat launch area at Lake Katherine |
| PBWTAR_01705 | PBWTAR_13754 | White Mountain National Forest | Photo of proposed boat launch area at Lake Katherine |
| PBWTAR_01706 | PBWTAR_13755 | White Mountain National Forest | Photo of proposed boat launch area at Lake Katherine |
| PBWTAR_01707 | PBWTAR_13756 | White Mountain National Forest | Photo of proposed boat launch area at Lake Katherine |
| PBWTAR_01708 | PBWTAR_13757 | White Mountain National Forest | Photo of user created brook crossing |
| PBWTAR_01709 | PBWTAR_13758 | White Mountain National Forest | Spreadsheet documenting numbers of AT hikers per month and year |
| PBWTAR_01710 | PBWTAR_13762 | White Mountain National Forest | Spreadsheet documenting proximity of potential harvest unit to closet point on the AT |
| PBWTAR_01711 | PBWTAR_13769 | White Mountain National Forest | Photo of Charleston Road in project area |
| PBWTAR_01712 | PBWTAR_13770 | White Mountain National Forest | Photo of Charleston Road in project area |
| PBWTAR_01713 | PBWTAR_13771 | White Mountain National Forest | Photo of user created crossing on Charleston Road in project area |
| PBWTAR_01714 | PBWTAR_13772 | White Mountain National Forest | Photo of powerline adjacent to project units |
| PBWTAR_01715 | PBWTAR_13773 | White Mountain National Forest | Photo of powerline adjacent to project units |
| PBWTAR_01716 | PBWTAR_13774 | White Mountain National Forest | Photo of powerline within project area |
| PBWTAR_01717 | PBWTAR_13775 | White Mountain National Forest | Photo of turtle |
| PBWTAR_01718 | PBWTAR_13776 | White Mountain National Forest | Photo of beaver activity near Charleston Road in project area |
| PBWTAR_01719 | PBWTAR_13777 | White Mountain National Forest | Brief document of scoping comments related to recreation |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01720 | PBWTAR_13778 | Seixas, F. et al | Research showing the noise levels observed during harvest operations |
| PBWTAR_01721 | PBWTAR_13792 | White Mountain National Forest | Historical photo of the Lake Tarelton club house |
| PBWTAR_01722 | PBWTAR_13793 | White Mountain National Forest | Recreation specialist report for the Tarleton EA |
| PBWTAR_01723 | PBWTAR_13800 | White Mountain National Forest | Video of foreground after injunction |
| PBWTAR_01724 | PBWTAR_13801 | White Mountain National Forest | Video of foreground between Mt Mist and injunction |
| PBWTAR_01725 | PBWTAR_13802 | White Mountain National Forest | Documentation of field visit at Appalachian TrailWebster slide |
| PBWTAR_01726 | PBWTAR_13803 | White Mountain National Forest | Photo of Appalachian Trail foreground near trailhead |
| PBWTAR_01727 | PBWTAR_13804 | White Mountain National Forest | Photo of Appalachian Trailforeground near trailhead |
| PBWTAR_01728 | PBWTAR_13805 | White Mountain National Forest | Photo of Appalachian Trail foreground near trailhead |
| PBWTAR_01729 | PBWTAR_13806 | White Mountain National Forest | Photo of Appalachian Trail foreground near trailhead |
| PBWTAR_01730 | PBWTAR_13807 | White Mountain National Forest | Tables showing cumulative harvest unit acres visible from an individual view point in the Tarleton project area |
| PBWTAR_01731 | PBWTAR_13810 | White Mountain National Forest | Photo on Mt. Mist summit |
| PBWTAR_01732 | PBWTAR_13811 | White Mountain National Forest | Photo of Norway Spruce plantation near Ore Hill tent site |
| PBWTAR_01733 | PBWTAR_13812 | White Mountain National Forest | Photo of Norway Spruce plantation below the Appalachian Trail |
| PBWTAR_01734 | PBWTAR_13813 | White Mountain National Forest | Photo of Norway Spruce plantation below the Appalachian Trail |
| PBWTAR_01735 | PBWTAR_13814 | White Mountain National Forest | Photo of Norway Spruce plantation below the Appalachian Trail |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01736 | PBWTAR_13815 | White Mountain National Forest | Photo of Norway Spruce plantaion below Appalachian Trailshowing squirrel habitat |
| PBWTAR_01737 | PBWTAR_13816 | White Mountain National Forest | Photo of Norway Spruce plantation belot Appalachian Trail showing gap in the stone wall |
| PBWTAR_01738 | PBWTAR_13817 | White Mountain National Forest | Photo of Norway Spruce plantation on the Appalachian Trail |
| PBWTAR_01739 | PBWTAR_13818 | White Mountain National Forest | Photo of Norway Spruce plantation on the Appalachian Trail |
| PBWTAR_01740 | PBWTAR_13819 | White Mountain National Forest | Photo of Norway Spruce plantation on the Appalachian Trail |
| PBWTAR_01741 | PBWTAR_13820 | White Mountain National Forest | Photo of Norway Spruce plantation on Appalachian Trailedge |
| PBWTAR_01742 | PBWTAR_13821 | White Mountain National Forest | Photo of Norway Spruce plantation on Appalachian Trailedge |
| PBWTAR_01743 | PBWTAR_13822 | White Mountain National Forest | Photo of Norway Spruce plantation |
| PBWTAR_01744 | PBWTAR_13823 | White Mountain National Forest | Photo of Norway Spruce plantation on the Appalachian Trail near private land |
| PBWTAR_01745 | PBWTAR_13824 | White Mountain National Forest | Photo of Norway Spruce plantation near Ore Hill tent site |
| PBWTAR_01746 | PBWTAR_13825 | White Mountain National Forest | Document describing process followed for the scenery analysis |
| PBWTAR_01747 | PBWTAR_13826 | White Mountain National Forest | Document describing scenery specialists review and summary of the Tarleton project area |
| PBWTAR_01748 | PBWTAR_13851 | White Mountain National Forest | Photo of powerline from Webster |
| PBWTAR_01749 | PBWTAR_13852 | White Mountain National Forest | Documentation of scenery impact to the Sentinel Mountain SIO decision |
| PBWTAR_01750 | PBWTAR_13853 | White Mountain National Forest | Photo of Lake Tarleton |
| PBWTAR_01751 | PBWTAR_13854 | White Mountain National Forest | Photo of Lake Tarleton |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01752 | PBWTAR_13855 | White Mountain National Forest | Photo of Lake Tarleton |
| PBWTAR_01753 | PBWTAR_13856 | White Mountain National Forest | Photo of Webster Slide Foreground |
| PBWTAR_01754 | PBWTAR_13857 | White Mountain National Forest | Photo of Webster Slide Spur Opening |
| PBWTAR_01755 | PBWTAR_13858 | White Mountain National Forest | Photo of Webster Slide Spur Opening |
| PBWTAR_01756 | PBWTAR_13859 | White Mountain National Forest | Socioeconomic report for the Tarleton project |
| PBWTAR_01757 | PBWTAR_13861 | Colter, Robert | Document identifying soil background information and how the effects were determined for soil productivity in the Tarleton project area |
| PBWTAR_01758 | PBWTAR_13870 | Colter, Robert | Soil assessment for the Tarleton project area |
| PBWTAR_01759 | PBWTAR_13871 | Colter, Robert | Soil specialist report for the Tarleton project area |
| PBWTAR_01760 | PBWTAR_13884 | White Mountain National Forest | Document describing field visit with forester and engineer discussing haul road and access of the project area |
| PBWTAR_01761 | PBWTAR_13895 | White Mountain National Forest | Map showing access into project area identifing area of concern and landings. |
| PBWTAR_01762 | PBWTAR_13896 | White Mountain National Forest | Excel Spreadsheet to identify National Forest Management Act requirements for vegetation management |
| PBWTAR_01763 | PBWTAR_13898 | Farina, Benjamin | Field notes from District Silviculturist of stand and site conditions. |
| PBWTAR_01764 | PBWTAR_13912 | White Mountain National Forest | Excel spreadsheet that identifies all NEPA units in the project area and lists their compartment, forest type, gross acrea, estimated treatment acres and recommended harvest prescription |
| PBWTAR_01765 | PBWTAR_13913 | White Mountain National Forest | Excel spreadsheet documenting comparment, stand and any changes in actions in the project area. |
| PBWTAR_01766 | PBWTAR_13915 | Hillman, Brett | Biological Evaluation for the Tarleton Integrated Resource Project |
| PBWTAR_01767 | PBWTAR_13962 | White Mountain National Forest | Document showing calculations need for equal wood density on buffered side of lake. |
| PBWTAR_01768 | PBWTAR_13963 | White Mountain National Forest | Documentation of butternut tree species along Charlestown road. |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01769 | PBWTAR_13964 | USFS, US Fish and Wildlife Service | Addendum continuing the agreement between both agencies and the Migratory Brid Treaty Act. |
| PBWTAR_01770 | PBWTAR_13965 | White Mountain National Forest | Field notes and documentation of stand and compartments within the project area. |
| PBWTAR_01771 | PBWTAR_13977 | White Mountain National Forest | Printout of compartment and stand analysis in Tarleton |
| PBWTAR_01772 | PBWTAR_13988 | White Mountain National Forest | Printout of compartment and stand analysis in Tarleton |
| PBWTAR_01773 | PBWTAR_13995 | White Mountain National Forest | Picture of butternet tree species along Charlestown road. |
| PBWTAR_01774 | PBWTAR_13996 | White Mountain National Forest | Picture of crew measuring distance from butternut tree species to edge of existing road bed. |
| PBWTAR_01775 | PBWTAR_13997 | White Mountain National Forest | Picture of number of downed tree and limbes greater thatn 5" in diameter at the shorline along Lake Katherine. |
| PBWTAR_01776 | PBWTAR_13998 | US Fish and Wildlife & USFS | Agreement between to two agencies to promote and enforce the Migratory Bird Act. |
| PBWTAR_01777 | PBWTAR_14011 | White Mountain National Forest | Documentation of field visit between WMNF biologists and NH Fish and Game. |
| PBWTAR_01778 | PBWTAR_14012 | Hillman, Brett | Species determination table for endangered species project review (New England Field Office template) |
| PBWTAR_01779 | PBWTAR_14015 | US Fish and Wildlife Service | Document highlighting conservation measures the Forest Service must comply with for NLEB |
| PBWTAR_01780 | PBWTAR_14021 | US Fish and Wildlife Service | Letter providing list of threatened and endangered species that may occur in the Tarleton Integrated Resource Project area or may be affected by the project |
| PBWTAR_01781 | PBWTAR_14027 | US Fish and Wildlife Service | Letter providing list of threatened and endangered species that may occur in the Tarleton Integrated Resource Project area or may be affected by the project |
| PBWTAR_01782 | PBWTAR_14035 | US Fish and Wildlife Service | Verification letter for the Tarleton Integrated Resource Project under the January 5, 2016, Programmatic Biological Opinion on Final 4(d) Rule for the Northern Long-eared Bat and Activities Excepted from Take Prohibitions |
| PBWTAR_01783 | PBWTAR_14042 | White Mountain National Forest | Spreadsheet identfiing results of bat surveys in the project area |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01784 | PBWTAR_14043 | White Mountain National Forest | Scoping document used to describe wildlife activies in project area |
| PBWTAR_01785 | PBWTAR_14046 | White Mountain National Forest | Document tracking implimentation of design features identified in the EA |
| PBWTAR_01786 | PBWTAR_14047 | Hillman, Brett | Wildlife and wildlife habitat assessment |
| PBWTAR_01787 | PBWTAR_14068 | White Mountain National Forest | Spreadsheet used to track all resource effects within the Tarleton project area |
| PBWTAR_01788 | PBWTAR_14071 | White Mountain National Forest | All handwritten comments from the Tarleton Open House |
| PBWTAR_01789 | PBWTAR_14079 | White Mountain National Forest | Public Sign In sheet for the Tarleton Open House |
| PBWTAR_01790 | PBWTAR_14082 | Daley, Travis | Email from Travis Daley to Scott Hall - Tarleton Dam Owner, Introduction email |
| PBWTAR_01791 | PBWTAR_14083 | Sackheim, Kelly | Email from Kelly Sackheim to Scott Hall and the Lake Tarleton Association - Sharing information the Pemi District presented at the August Piermont BoS Meeting |
| PBWTAR_01792 | PBWTAR_14086 | Settel, Kenneth | Email from Kenneth Settel to Kelly Sackheim - getting clarification on the proposed Tarleton project |
| PBWTAR_01793 | PBWTAR_14089 | Marvin, Bernie | Email from Bernie Marvin to Scott Hall - Introductory email |
| PBWTAR_01794 | PBWTAR_14090 | Uline, Betsy | Email from Betsy Uline to Scott Hall - Requesting project information and a copy of the open house flyer |
| PBWTAR_01795 | PBWTAR_14092 | Settel, Kenneth | Email from Kenneth Settel to Scott Hall - Expressing interest in the project and informing of areas that could use some attention |
| PBWTAR_01796 | PBWTAR_14098 | Wipfler, Rob | Email from Rob Wipfler to Kelly Sackheim - asking for more information on the Pemi District's Piermont BoS presentation |
| PBWTAR_01797 | PBWTAR_14100 | Uline, Betsy | Email from Betsy Uline to Scott Hall - Requesting information on the Pemi District presentation to the Warren BoS |
| PBWTAR_01798 | PBWTAR_14103 | Brown, Brooke | Email from Brooke Brown to Scott Hall - Instruction to add Rob and Lynn Dennison to project mailing list |
| PBWTAR_01799 | PBWTAR_14104 | Brown, Brooke | Email from Brooke Brown to Scott Hall - Instruction to add Joe Kennon to project mailing list |
| PBWTAR_01800 | PBWTAR_14105 | Settel, Kenneth | Email from Kenneth Settel to Scott Hall - Sharing information on the current conditions of the recreation around Lake Tarleton and some of its history |
| PBWTAR_01801 | PBWTAR_14110 | Settel, Kenneth | Email from Kenneth Settel to Scott Hall - Sharing a map of the old trail system around Lake Tarleton |
| PBWTAR_01802 | PBWTAR_14112 | Hall, Scott | Meeting Notes taken by Scott Hall during the Pemi District presentation to the Warren BoS |
| PBWTAR_01803 | PBWTAR_14113 | Hall, Scott | Agenda for the Pemi DLT on what to go over during the presentation to the Warren BoS |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01804 | PBWTAR_14114 | Dickmann, Deb | Email from Deb Dickmann to Scott Hall - Request to be added to the mailing list and for the Forest Service to provide opportunities for affordable summer camp programs |
| PBWTAR_01805 | PBWTAR_14115 | Settel, Kenneth | Email from Kenneth Settel to Scott Hall - Request to improve access for the Tarleton trail network |
| PBWTAR_01806 | PBWTAR_14129 | White Mountain National Forest | IDT Field Visit - Photo of potential cellar hole |
| PBWTAR_01807 | PBWTAR_14130 | White Mountain National Forest | IDT Field Visit - Photo of potential cellar hole |
| PBWTAR_01808 | PBWTAR_14131 | White Mountain National Forest | IDT Field Visit - Photo of wooden culvert |
| PBWTAR_01809 | PBWTAR_14132 | White Mountain National Forest | IDT Field Visit - Photo of wooden culvert |
| PBWTAR_01810 | PBWTAR_14133 | White Mountain National Forest | IDT Field Visit - Photo of wooden culvert |
| PBWTAR_01811 | PBWTAR_14134 | White Mountain National Forest | IDT Field Visit - Photo of wooden culvert |
| PBWTAR_01812 | PBWTAR_14135 | White Mountain National Forest | IDT Field Visit - Photo of potential cellar hole |
| PBWTAR_01813 | PBWTAR_14136 | White Mountain National Forest | IDT Field Visit - Photo of potential cellar hole |
| PBWTAR_01814 | PBWTAR_14137 | White Mountain National Forest | IDT Field Visit - Photo of potential cellar hole |
| PBWTAR_01815 | PBWTAR_14138 | White Mountain National Forest | IDT Field Visit - Photo of apple orchard |
| PBWTAR_01816 | PBWTAR_14139 | White Mountain National Forest | IDT Field Visit - Photo of apple orchard |
| PBWTAR_01817 | PBWTAR_14140 | White Mountain National Forest | IDT Field Visit - Photo of project engineer in apple orchard |
| PBWTAR_01818 | PBWTAR_14141 | White Mountain National Forest | IDT Field Visit - Photo of shelter |
| PBWTAR_01819 | PBWTAR_14142 | White Mountain National Forest | IDT Field Visit - Photo of project Wildlife Biologist outside cabin |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01820 | PBWTAR_14143 | White Mountain National Forest | IDT Field Visit - Photo of cabin exterior |
| PBWTAR_01821 | PBWTAR_14144 | White Mountain National Forest | IDT Field Visit - Photo of cabin interior trash |
| PBWTAR_01822 | PBWTAR_14145 | White Mountain National Forest | IDT Field Visit - Photo of cabin interior graffiti |
| PBWTAR_01823 | PBWTAR_14146 | White Mountain National Forest | IDT Field Visit - Photo of project Wildlife Biologist inside cabin |
| PBWTAR_01824 | PBWTAR_14147 | White Mountain National Forest | IDT Field Visit - Photo of cabin interior |
| PBWTAR_01825 | PBWTAR_14148 | White Mountain National Forest | IDT Field Visit - Photo of Outhouse |
| PBWTAR_01826 | PBWTAR_14149 | White Mountain National Forest | IDT Field Visit - Photo of abandoned appliance |
| PBWTAR_01827 | PBWTAR_14150 | White Mountain National Forest | IDT Field Visit - Photo of buried culvert |
| PBWTAR_01828 | PBWTAR_14151 | White Mountain National Forest | IDT Field Visit - Photo of buried culvert |
| PBWTAR_01829 | PBWTAR_14152 | White Mountain National Forest | IDT Field Visit - Photo of buried culvert |
| PBWTAR_01830 | PBWTAR_14153 | White Mountain National Forest | IDT Field Visit - Photo of beaver pond |
| PBWTAR_01831 | PBWTAR_14154 | White Mountain National Forest | IDT Field Visit - Photo of beaver pond |
| PBWTAR_01832 | PBWTAR_14155 | White Mountain National Forest | IDT Field Visit - Photo of beaver pond |
| PBWTAR_01833 | PBWTAR_14156 | White Mountain National Forest | IDT Field Visit - Photo of beaver pond |
| PBWTAR_01834 | PBWTAR_14157 | White Mountain National Forest | IDT Field Visit - Photo of beaver dam |
| PBWTAR_01835 | PBWTAR_14158 | White Mountain National Forest | IDT Field Visit - Photo of damaged culvert |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01836 | PBWTAR_14159 | White Mountain National Forest | IDT Field Visit - Photo of beaver pond |
| PBWTAR_01837 | PBWTAR_14160 | White Mountain National Forest | IDT Field Visit - Photo of beaver activity evidence |
| PBWTAR_01838 | PBWTAR_14161 | White Mountain National Forest | IDT Field Visit - Photo of beaver activity evidence |
| PBWTAR_01839 | PBWTAR_14162 | White Mountain National Forest | IDT Field Visit - Photo of beaver activity evidence |
| PBWTAR_01840 | PBWTAR_14163 | White Mountain National Forest | IDT Field Visit - Photo of resource damage at Lake Katherine Boat Launch |
| PBWTAR_01841 | PBWTAR_14164 | White Mountain National Forest | IDT Field Visit - Photo of potential cellar hole |
| PBWTAR_01842 | PBWTAR_14165 | White Mountain National Forest | IDT Field Visit - Photo of potential cellar hole |
| PBWTAR_01843 | PBWTAR_14166 | White Mountain National Forest | IDT Field Visit - Photo of potential cellar hole |
| PBWTAR_01844 | PBWTAR_14167 | White Mountain National Forest | IDT Field Visit - Photo of rock wall |
| PBWTAR_01845 | PBWTAR_14168 | White Mountain National Forest | IDT Field Visit - Photo of artifacts |
| PBWTAR_01846 | PBWTAR_14169 | White Mountain National Forest | IDT Field Visit - Photo of artifacts |
| PBWTAR_01847 | PBWTAR_14170 | White Mountain National Forest | IDT Field Visit - Photo of artifacts |
| PBWTAR_01848 | PBWTAR_14171 | White Mountain National Forest | IDT Field Visit - Photo of project archeologist Jon Ruhan around artifacts |
| PBWTAR_01849 | PBWTAR_14172 | White Mountain National Forest | Notes from the October 2019 IDT field visit to the project area |
| PBWTAR_01850 | PBWTAR_14174 | White Mountain National Forest | Spreadsheet with all comments from the open house consolidated |
| PBWTAR_01851 | PBWTAR_14175 | Eastman, Stacy | Email from Stacy Eastman to Scott Hall - Sharing thoughts on Charleston Road hunting activities |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01852 | PBWTAR_14176 | Settel, Kenneth | |
| PBWTAR_01853 | PBWTAR_14180 | White Mountain National Forest | Posters used at the NEPA station for the Tarleton public open house |
| PBWTAR_01854 | PBWTAR_14182 | White Mountain National Forest | Preliminary map of the project area with access roads |
| PBWTAR_01855 | PBWTAR_14183 | Town of Piermont | Tax Map Section R04 for the town of Piermont |
| PBWTAR_01856 | PBWTAR_14184 | Town of Piermont | Tax Map Section R05 for the town of Piermont |
| PBWTAR_01857 | PBWTAR_14185 | Town of Piermont | Tax Map Section R06 for the town of Piermont |
| PBWTAR_01858 | PBWTAR_14186 | Town of Piermont | Tax Map Section R07 for the town of Piermont |
| PBWTAR_01859 | PBWTAR_14187 | Town of Piermont | Tax Map Section R14 for the town of Piermont |
| PBWTAR_01860 | PBWTAR_14188 | Town of Piermont | Tax Map Section R15 for the town of Piermont |
| PBWTAR_01861 | PBWTAR_14189 | Town of Piermont | Tax Map Section R16 for the town of Piermont |
| PBWTAR_01862 | PBWTAR_14190 | Town of Piermont | Tax Map Index for the town of Piermont |
| PBWTAR_01863 | PBWTAR_14191 | White Mountain National Forest | Poster showing the different steps in the NEPA process |
| PBWTAR_01864 | PBWTAR_14192 | White Mountain National Forest | Flyer used to advertise the public open house held in November 2019 in Warren |
| PBWTAR_01865 | PBWTAR_14193 | White Mountain National Forest | Flyer used to spread awareness of the upcoming open house, when and where was TBD |
| PBWTAR_01866 | PBWTAR_14194 | White Mountain National Forest | |
| PBWTAR_01867 | PBWTAR_14196 | White Mountain National Forest | Poster showing the management areas the project area is made up of |
| PBWTAR_01868 | PBWTAR_14197 | White Mountain National Forest | |
| PBWTAR_01869 | PBWTAR_14202 | White Mountain National Forest | Spreadsheet with all prescoping comments consolidated |
| PBWTAR_01870 | PBWTAR_14206 | White Mountain National Forest | Poster showing existing recreation features in the area |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01871 | PBWTAR_14207 | White Mountain National Forest | Recreation Poster used at the public open house marked by members of the public |
| PBWTAR_01872 | PBWTAR_14208 | White Mountain National Forest | Recreation Poster used at the public open house marked by members of the public - CUI |
| PBWTAR_01873 | PBWTAR_14209 | White Mountain National Forest | |
| PBWTAR_01874 | PBWTAR_14216 | White Mountain National Forest | Poster used at the public open house showing known wildlife habitat features in the area |
| PBWTAR_01875 | PBWTAR_14217 | USDA, Forest Service | Poster used at the public open house showing examples of different timber treatments |
| PBWTAR_01876 | PBWTAR_14218 | Town of Warren | Tax Map Section 202 for the town of Warren |
| PBWTAR_01877 | PBWTAR_14219 | Town of Warren | Tax Map Section 203 for the town of Warren |
| PBWTAR_01878 | PBWTAR_14220 | Town of Warren | Tax Map Section 208 for the town of Warren |
| PBWTAR_01879 | PBWTAR_14221 | Town of Warren | Tax Map Section 209 for the town of Warren |
| PBWTAR_01880 | PBWTAR_14222 | Town of Warren | Tax Map Section 210 for the town of Warren |
| PBWTAR_01881 | PBWTAR_14223 | Town of Warren | Tax Map Section 211 for the town of Warren |
| PBWTAR_01882 | PBWTAR_14224 | Town of Warren | Tax Map Section 222 for the town of Warren |
| PBWTAR_01883 | PBWTAR_14225 | Town of Warren | Tax Map Section 223 for the town of Warren |
| PBWTAR_01884 | PBWTAR_14226 | Town of Warren | Tax Map Section 224 for the town of Warren |
| PBWTAR_01885 | PBWTAR_14227 | Town of Warren | Tax Map Section 225 for the town of Warren |
| PBWTAR_01886 | PBWTAR_14228 | Town of Warren | Tax Map Section 235 for the town of Warren |
| PBWTAR_01887 | PBWTAR_14229 | Town of Warren | Tax Map Section 236 for the town of Warren |
| PBWTAR_01888 | PBWTAR_14230 | Town of Warren | Tax Map Section 237 for the town of Warren |
| PBWTAR_01889 | PBWTAR_14231 | Town of Warren | Tax Map Section 238 for the town of Warren |
| PBWTAR_01890 | PBWTAR_14232 | Town of Wentworth | Tax Map Section 01 for the town of Wentworth |
| PBWTAR_01891 | PBWTAR_14233 | Town of Warren | Tax Map Index for the town of Warren |
| PBWTAR_01892 | PBWTAR_14234 | | Letter from Chris French, Forest Service Deputy Chief, to Regional Foresters (Apr. 18, 2023) |
| PBWTAR_01893 | PBWTAR_14236 | | WMNF U.S. Forest Service Logging Projects Map |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01894 | PBWTAR_14237 | | U.S. Fish and Wildlife Serv., Northern Long-Eared Bat: State-Specific Information Sources, https://www.fws.gov/sites/default/files/ documents/Roost%20Tree%20and%20Hibernacula%20-%20State-Specific%20Data%20Links_2.pdf |
| PBWTAR_01895 | PBWTAR_14240 | | N.H. Division of Forests and Lands, NHB DataCheck Tool, https://www4.des.state.nh.us/NHB-DataCheck |
| PBWTAR_01896 | PBWTAR_14242 | | Mature and Old-Growth Forests: Definition, Identification, and Initial Inventory on Lands Managed by the Forest Service and Bureau of Land Management 1 (Apr. 2023), https://www.fs.usda.gov/sites/default/files/mature-and-old-growth- forests-tech.pdf |
| PBWTAR_01897 | PBWTAR_14310 | | Letter from Chris French, Forest Service Deputy Chief, re: Advance Notice of Proposed Rulemaking (Apr. 21, 2023) |
| PBWTAR_01898 | PBWTAR_14317 | | Standing Analysis and Implementation Plan – Northern Long-Eared Bat Assisted Determination Key, Version 1.1, USFWS (April 2023), https://www.fws.gov/sites/default/files/documents/Standing%20Analysis%20Version%201.1%20April%202023.pdf |
| PBWTAR_01899 | PBWTAR_14353 | | DellaSala et al., Mature and Old-Growth Forest Contributions to Large-Scale Conservation Targets in the Conterminous USA, 5 FRONTIERS IN FORESTS AND GLOB. CHANGE 1 (2022) |
| PBWTAR_01900 | PBWTAR_14373 | | Forest Service Climate Adaptation Plan 1, 13 (July 2022), https://www.usda.gov/sites/default/ files/documents/4_NRE_FS_ClimateAdaptationPlan_2022.pdf |
| PBWTAR_01901 | PBWTAR_14461 | | CLIMATE CHANGE 2022: IMPACTS, ADAPTATION AND VULNERABILITY – WORKING GROUP II CONTRIBUTION TO THE SIXTH ASSESSMENT REPORT OF THE INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE (Pörtner et al., eds., 2022), available at https://report.ipcc.ch/ar6/wg2/IPCC_AR6_WGII_FullReport.pdf |
| PBWTAR_01902 | PBWTAR_17531 | | Thorn et al., The Living Dead: Acknowledging Life After Tree Death to Stop Forest Degradation, 18 FRONTIERS IN ECOL. AND THE ENV'T 505 (2020) |
| PBWTAR_01903 | PBWTAR_17539 | | Faison et al., Adaptation and Mitigation Capacity of Wildland Forests in the Northeastern United States, 544 FOREST ECOLOGY & MGMT. (forthcoming Sept. 15, 2023) |
| PBWTAR_01904 | PBWTAR_17552 | | Faison et al., The Importance of Natural Forest Stewardship in Adaptation Planning in the United States, 5 CONSERVATION SCIENCE AND PRACTICE (Apr. 24, 2023), available at https://conbio.onlinelibrary.wiley.com/doi/10.1111/csp2.12935 |
| PBWTAR_01905 | PBWTAR_17562 | | Letter from The Lake Tarleton Coalition to Brooke M. Brown, Pemigewasset District Ranger (July 20, 2022) |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01906 | PBWTAR_17564 | | Lake Tarleton and WMNF Petition -With List of Signers (Feb. 8, 2022) |
| PBWTAR_01907 | PBWTAR_17565 | | Water Quality Assessment and TMDLs, N.H. DEP'T. ENV'T. SERVS. https://www.des.nh.gov/water/rivers-and-lakes/water-quality-assessment (last visited Apr. 23, 2023) |
| PBWTAR_01908 | PBWTAR_17618 | | New Hampshire's 2020-2022 303(d) List. U.S. EPA, https://www.epa.gov/system/files/documents/2022-03/2020-2022-nh-303d-list.pdf (last updated Mar. 1, 2023). |
| PBWTAR_01909 | PBWTAR_17655 | | Photo: Canoeing on Lake Tarleton (Zack Porter) |
| PBWTAR_01910 | PBWTAR_17656 | | Photo: Lake Tarleton parking area in wintertime (Elaine Felatra) |
| PBWTAR_01911 | PBWTAR_17673 | | Photo: Recreation activities on Lake Tarleton in wintertime (Elaine Felatra) |
| PBWTAR_01912 | PBWTAR_17676 | | Photo: Sunset from Piermont Mountain with Lake Tarleton in foreground (Rob/Mike Wipfler) |
| PBWTAR_01913 | PBWTAR_17705 | | Letter from Chris French, USFS Deputy Chief, to Regional Foresters (Apr. 18, 2023). |
| PBWTAR_01914 | PBWTAR_17706 | | WMNF U.S. Forest Service Logging Projects Map |
| PBWTAR_01915 | PBWTAR_17707 | | Northern Long-Eared Bat: State-Specific Information Sources, USFWS, https://www.fws.gov/sites/default/files/documents/Roost%20Tree%20and%20H ibernacula%20-%20State-Specific%20Data%20Links_2.pdf |
| PBWTAR_01916 | PBWTAR_17708 | | NHB DataCheck Tool, NH Division of Forests and Lands, https://www4.des.state.nh.us/NHB-DataCheck (last modified Feb. 28, 2022) |
| PBWTAR_01917 | PBWTAR_17709 | | Trust for Public Land, Residents Celebrate Protection of Lake Tarleton (NH) (Aug. 23, 2000) https://www.tpl.org/media-room/residents-celebrate-protection- lake-tarleton-nh#:~:text=Warren%2C%20New%20Hampshire%3A%20Today%20U.S.,Warren%2C%20Piermont%2C%20and%20Benton. |
| PBWTAR_01918 | PBWTAR_17711 | | Mature and Old-Growth Forests: Definition, Identification, and Initial Inventory on Lands Managed by the Forest Service and Bureau of LAND MANAGEMENT, U.S. DEP'T OF AGRIC. 1 (Apr. 2023) |
| PBWTAR_01919 | PBWTAR_17712 | | Letter from Chris French, USFS Deputy Chief, re: Advance Notice of Proposed Rulemaking (Apr. 21, 2023) |

| File Number | Bates Begin | Author | Description |
|---|---|---|---|
| PBWTAR_01920 | PBWTAR_17715 | | Standing Analysis and Implementation Plan – Northern Long-Eared Bat Assisted Determination Key, Version 1.1, USFWS (April 2023) |
| PBWTAR_01921 | PBWTAR_17717 | | E-mail from Suzanne Gifford, USFS Ecologist and Wildlife Biologist, to Zack Porter (April 10, 2023, 1:37 PM) |
| PBWTAR_01922 | PBWTAR_17719 | | Standing Trees, Categorization of Lake Tarleton Comments (July 2022) |
| PBWTAR_01923 | PBWTAR_17787 | | Tarleton Second 30-Day Comment Period Concern Responses, U.S. FOREST SERVICE (Sept. 5, 2022) |
| PBWTAR_01924 | PBWTAR_17803 | | Santa Fe Mountains Landscape Resiliency Project: Draft Environmental Assessment Public Comment Period Content Analysis and Response, U.S. FOREST SERVICE 1 (2021) https://drive.google.com/file/d/1z6lid22zC8WZvVzkpUtNANVsnuh- 0wKm/view |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| STANDING TREES, INC.<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES FOREST SERVICE, et al.,<br><br>*Defendants*. | Case No.: 1:24-cv-00138-JL-TSM<br><br>**STANDING TREES' MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Court's Order after Preliminary Pretrial Conference and Scheduling Order of August 22, 2024, Plaintiff Standing Trees, by and through undersigned counsel, moves this Court to enter summary judgment on all claims asserted in Standing Trees' Complaint in this action.

In support of this motion, Standing Trees refers the Court to the attached memorandum in support of its motion, the administrative record, and the record of this litigation. As detailed in the memorandum, Standing Trees is entitled to summary judgment because Defendants U.S. Forest Service (Service) and Service officials violated the National Environmental Policy Act (NEPA), the National Forest Management Act (NFMA), and the Administrative Procedure Act (APA) by authorizing two forest management projects in the White Mountain National Forest, namely, the Tarleton Integrated Resource Project and the Peabody West Integrated Resource Project (Projects). Specifically:

1. Standing Trees is entitled to summary judgment on Claim 1 of its Complaint because the Service violated NEPA by failing to adequately consider appropriate alternatives during the preparation of the final environmental assessments for the Projects. These actions are

arbitrary, capricious, an abuse of discretion, and not in accordance with law in violation of the APA.

2. Standing Trees is entitled to summary judgment on Claim 2 of its Complaint because the Service violated NEPA by failing to take a hard look at the environmental impacts of the Projects. These actions are arbitrary, capricious, an abuse of discretion, and not in accordance with law in violation of the APA.

3. Standing Trees is entitled to summary judgment on Claim 3 of its Complaint because the Service violated NEPA by concluding that the Projects would have no significant environmental impacts without first adequately considering all required factors. These actions are arbitrary, capricious, an abuse of discretion, and not in accordance with law in violation of the APA.

4. Standing Trees is entitled to summary judgment on Claim 4 of its Complaint because the Service violated NFMA by failing to conform the Projects to the requirements of the Service's Forest Plan for the White Mountain National Forest. These actions are arbitrary, capricious, an abuse of discretion, and not in accordance with law in violation of the APA.

5. Pursuant to Local Rule 7.1(a)(2), attached are the following supporting documents, all of which are incorporated by reference:

a. Memorandum in Support of Standing Trees' Motion for Summary Judgment and its references to the Service's administrative record; and

b. Exhibits to said Memorandum, including the Declarations of Zack Porter on behalf of Standing Trees (Exhibit A), Gerald Curran (Exhibit B), Elaine Faletra (Exhibit C), Peter Faletra (Exhibit D), Eric Jones (Exhibit E), Rebecca Lovejoy (Exhibit F), Jamie Sayen (Exhibit G), Nataliya Sundina (Exhibit H), Michael

Wipfler (Exhibit I), Robert Wipfler (Exhibit J), Peter Ascher (Exhibit K), and Robin Ascher (Exhibit L).

6. Pursuant to Local Rule 7.1(d), Standing Trees respectfully requests oral argument on this motion and the Service's anticipated cross-motion following the close of briefing in accord with the schedule set forth in the parties' joint case management submission of July 29, 2024.

WHEREFORE, Standing Trees respectfully requests that this Court grant Standing Trees' motion for summary judgment, vacate the Service's decisions regarding the Projects, and such further relief as the Court deems just and reasonable.

Respectfully submitted, this the 3rd day of October, 2024.

STANDING TREES, INC.

By its counsel:

/s/ Christophe Courchesne
Christophe Courchesne
NH Bar No. 20431
Associate Professor and Director
Environmental Advocacy Clinic
Vermont Law and Graduate School
164 Chelsea Street, PO Box 96
South Royalton, VT 05068
(802) 831-1630
(802) 831-1631 (fax)
ccourchesne@vermontlaw.edu

**CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2024, I served the foregoing document electronically through ECF upon all counsel of record.

/s/ Christophe Courchesne
Christophe Courchesne

*Counsel for Standing Trees*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| STANDING TREES, INC.<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES FOREST SERVICE, et al.,<br><br>*Defendants*. | Case No.: 1:24-cv-00138-JL-TSM |

# MEMORANDUM IN SUPPORT OF STANDING TREES' MOTION FOR SUMMARY JUDGMENT

Christophe Courchesne
NH Bar No. 20431
Assistant Professor and Director
Environmental Advocacy Clinic
Vermont Law and Graduate School
164 Chelsea Street, PO Box 96
South Royalton, VT 05068
(802) 831-1630
(802) 831-1631 (fax)
ccourchesne@vermontlaw.edu

*Counsel for Standing Trees, Inc.*

## TABLE OF CONTENTS

TABLE OF CONTENTS ........ ii
TABLE OF AUTHORITIES ........ iv
GLOSSARY ........ viii
INTRODUCTION ........ 1
STATEMENT OF FACTS ........ 2

TARLETON PROJECT ........ 2
PEABODY WEST PROJECT ........ 5

JURISDICTION ........ 6
STANDING ........ 6
STANDARD OF REVIEW ........ 9
ARGUMENT ........ 10

I. The Forest Service violated NEPA and the APA because it did not analyze alternatives ........ 10

A. The Service failed to analyze alternatives to log less or otherwise reduce the Projects' negative environmental impacts ........ 10

B. The Service failed to analyze an alternative not to log, that is, a genuine no action alternative ........ 12

II. The Forest Service violated NEPA and the APA because it failed to take a hard look at the Projects' environmental impacts and unlawfully found no significant impact ........ 14

A. The Service failed to look hard at the Projects' direct and indirect impacts ........ 16

1. Water quality ........ 16

2. Northern long-eared bat ........ 18

3. Scenery & recreation ........ 18

4. Forest health ........ 21

B. The Service failed to take a hard at the Projects' cumulative impacts ........ 25

C. The Service violated NEPA and the APA by issuing an unlawful finding of no significant impact ........ 28

III. The Forest Service violated NFMA and the APA because the Projects violate the Forest Plan ........ 29

A. The Service failed to make the Peabody West project consistent with Forest Plan scenic standards ........ 30

B. The Service failed to make the Peabody West project consistent with the Forest Plan wild and scenic river designation standard ........ 30

C. The Service violated NFMA because it did not contribute to the conservation and recovery of endangered species ........ 31

CONCLUSION ........ 32

# TABLE OF AUTHORITIES

## CASES

### United States Supreme Court Cases

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87 (1983) .............................. 9, 14

*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ............................................... 9

*Flint Ridge Dev. Co. v. Scenic Rivers Ass'n,* 426 U.S. 776 (1976) ............................................... 15

*Horne v. Flores,* 557 U.S. 433 (2009) ......................................................................................... 6

*Hunt v. Washington State Apple Advert. Comm'n.*, 432 U.S. 333 (1977) .................................. 6, 8

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976) ................................................................................ 14

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ........................................................ 6

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ....................... 9

*Thomas Jefferson University v. Shalala*, 512 U.S. 504 (1994) ..................................................... 30

### Circuit Court Cases

*Alaska Wilderness Recreation and Tourism Ass'n v. Morrison*, 67 F.3d 723 (9th Cir. 1995) ........ 13

*Bob Marshall All. v. Hodel*, 852 F.2d 1223 (9th Cir. 1988) ....................................... 11, 12, 13, 14

*Calvert Cliff's Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109 (D.C. Cir. 1971) ........................................................................................................................... 13

*Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n*, 59 F.3d 284 (1st Cir. 1995) .... 9

*City of New York v. U.S. Dep't of Transp.*, 715 F.2d 732 (2d Cir. 1983) ................................ 11, 12

*Conservation L. Found. v. Gen. Serv. Admin.*, 707 F.2d 626 (1st Cir. 1983) ................................ 14

*Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020) ..................................... 13

*Ctr. for Biological Diversity v. EPA*, 56 F.4th 55 (D.C. Cir. 2022) ............................................... 7

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172 (9th Cir. 2008) ............................................................................................................................... 27

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166 (10th Cir. 2023) ............ 12

*Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024 (10th Cir. 2001) .......................................... 13

*Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016 (10th Cir. 2023)................27

*Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273 (1st Cir. 1996)................................9, 10, 13, 14, 15

*Friends of Southeast's Future*, 153 F.3d 1059 (9th Cir. 1998).....................................................30

*Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068 (1st Cir. 1980) ..........................................15

*Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095 (9th Cir. 2016) .......................21

*Klamath-Siskiyou Wildlands Center v. Bureau of Land Mgmt.*, 387 F.3d 989 (9th Cir. 2004)......25

*Melone v. Coit*, 100 F.4th 21 (1st Cir. 2024) ....................................................................................9

*N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2011).............................21

*Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1 (1st Cir. 2024) ..........................................................................................................................18

*Nat. Res. Def. Council, Inc. v. Callaway*, 524 F.2d 79 (2d Cir. 1975) ..........................................11

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058 (9th Cir. 2010) 20, 23

*Native Ecosystems Council v. United States Forest Serv.*, 418 F.3d 953 (9th Cir. 2005) .............30

*New Hampshire Motor Transp. Ass'n v. Rowe*, 448 F.3d 66 (1st Cir. 2006) .................................9

*Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108 (9th Cir. 2004) ............................25

*Sierra Club v. Marsh*, 976 F.2d 763 (1st Cir. 1996)..................................................................9, 10

*Sierra Club v. Martin*, 168 F.3d 1 (11th Cir. 1999).........................................................................32

*Silva v. Lynn*, 482 F.2d 1282 (1st Cir. 1973) ...............................................................................15, 23

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032 (D.C. Cir. 2021) .........32

**District Court Cases**

*Appalachian Mountain Club v. Brinegar*, 394 F. Supp. 105 (D.N.H. 1975) ..........................15, 21

*Cape Hatteras Access Pres. All. v. U.S. Dep't. of Interior*, 344 F. Supp. 2d 108 (D.D.C. 2004)..14, 15

*Cascade Forest Conservancy v. Heppler*, No. 3:19-CV-00424-HZ, 2021 WL 641614 (D. Or. Feb. 15, 2021) ..........................................................................................................................21

*Conservation L. Found. v. U.S. Army Corps of Eng'rs*, 457 F. Supp. 3d 33 (D.N.H. 2019) ..........................................................................................................9, 12, 13, 14, 16, 20, 25

*Ctr. for Biological Diversity v. U.S. Forest Serv.*, 687 F. Supp. 3d 1053 (D. Mont. 2023) ..........27

*Env't Def. Fund v. Corps of Eng'rs*, 348 F. Supp. 916 (W.D. Miss. 1972) ..................................23

*Kettle Range Conservation Grp. v. U.S. Forest Serv.*, No. 2:21-CV-00161-SAB, 2023 WL 4112930 (E.D. Wa. June 21, 2023) ..........................................................................18, 28

*N.W. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 470 F. Supp. 2d 30 (D.N.H. 2007)..................14

*Northwest Bypass Grp. v. U.S. Army Corps of Eng'rs*, 552 F. Supp. 2d 97 (D.N.H. 2008) ...26, 28

*WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D.D.C. 2019).......................................26, 27

**STATUTORY AND REGULATORY AUTHORITIES**

5 U.S.C § 701 ........................................................................................................6

5 U.S.C § 702 ........................................................................................................6

5 U.S.C § 703 ........................................................................................................6

5 U.S.C § 704 ........................................................................................................6

5 U.S.C § 705 ........................................................................................................6

5 U.S.C § 706 ....................................................................................................6, 9

16 U.S.C. § 1271 ..................................................................................................31

16 U.S.C. § 1273(b) ..............................................................................................31

16 U.S.C. § 1604(i) ...............................................................................................29

28 U.S.C. § 1331 ....................................................................................................6

28 U.S.C. § 1346 ....................................................................................................6

28 U.S.C. § 2201 ....................................................................................................6

28 U.S.C. § 2202 ....................................................................................................6

28 U.S.C. § 2412 ....................................................................................................6

36 C.F.R. § 219.15(b).............................................................................................29

36 C.F.R. § 219.26 (1978).......................................................................................32

36 C.F.R. § 220.7(b)(2) ..........................................................................................10

40 C.F.R. § 1508.7 .................................................................................................25

40 C.F.R. § 1508.9 ....................10, 14

40 C.F.R. § 1502.21 ....................15, 22

40 C.F.R. § 1508.27(a)....................26

42 U.S.C. § 4332(C)(iii) ....................12

42 U.S.C. § 4332(2)(H)....................10, 11

**OTHER AUTHORITIES**

36 Fed. Reg. 7724 (1971) ....................11

2005 White Mountain National Forest, Appendix H Third and Fourth Order Streams WMNF Plan ....................31

Council on Env't Quality, *Considering Cumulative Effects Under the National Environmental Policy Act* (Jan. 1997) ....................13

FOREST SERV., TELEPHONE GAP INTEGRATED RESOURCE PROJECT HABITAT MANAGEMENT UNIT ANALYSIS AND RATIONALE FOR HABITAT OBJECTIVES (July 2024) ....................23

Letter from Chris French, Forest Serv. Deputy Chief, to Reg'l Foresters (Dec. 18, 2023)....................24

Strengthening the Nation's Forests, Communities, and Local Economies, 87 Fed. Reg. 24851 (Apr. 22, 2022)....................24

U.S. Forest Serv., FSH 1909.12 – Land Management Planning Handbook Chapter 70 – Wilderness....................20

## GLOSSARY

| | |
|---|---|
| Administrative Procedure Act | APA |
| Council for Environmental Quality | CEQ |
| Forest Service | Service |
| Greenhouse Gas | GHG |
| Inventoried Roadless Area | IRA |
| National Environmental Policy Act | NEPA |
| National Forest Management Act | NFMA |
| White Mountain National Forest | National Forest |
| White Mountain National Forest Plan | Forest Plan |

## INTRODUCTION

Plaintiff Standing Trees challenges the U.S. Forest Service's (Service) approvals of the Tarleton and Peabody West projects (Projects) in the White Mountain National Forest (National Forest).

Together, the Projects authorize nearly 3,000 acres of logging, twelve miles of related road construction and reconstruction, and intrusion into inventoried roadless areas and potential old forest habitat. For decades to come, the Projects will utterly transform wild, ecologically important, and iconic areas of the National Forest. Yet as explained below, the Service's environmental reviews of these Projects fail to meet fundamental requirements of the National Environmental Policy Act (NEPA), and the Projects violate the National Forest Management Act (NFMA) by contravening the Service's management plan for the National Forest (Forest Plan). NEPA required the Service to consider alternatives to the Projects, including a true no-action alternative and the reasonable and less-harmful alternatives Standing Trees itself repeatedly presented to the Service. The Service wholly failed to do so. The Service's analyses also fail to take the required "hard look" at the environmental impacts of the Projects on numerous resources in the project areas, or at the Projects' cumulative impacts considered with other projects in the National Forest. These failures fatally undermine the validity of the Service's conclusions that the massive amounts of logging and related activities authorized by the Projects would have no significant environmental impacts. And in violation of NFMA, the Service failed to design the Projects consistently with important Forest Plan requirements that protect natural resources.

For these reasons, Standing Trees respectfully moves this Court for summary judgment on all claims and requests that this Court vacate the Service's decisions to approve the Projects.

## STATEMENT OF FACTS

Per Local Rule 56.1, material facts as to which there is no genuine issue to be tried are incorporated here, as follows:

Standing Trees submitted timely comments on and formal objections to the Projects. AR 12079 (Standing Trees Tarleton project comment); 13065 (Standing Trees Tarleton project objection); 4679 (Standing Trees Peabody West project comment); and 6124 (Standing Trees Peabody West project objection); *see also* Compl., ¶¶ 53, 116. The Service rejected the comments and objections, and declined to make material changes to the Projects. AR 12907; 6107. Then, upon finalizing environmental assessments and finding "no significant impact," the Service authorized the Projects on November 13, 2023, and February 7, 2024. AR 11934; 4869.

### TARLETON PROJECT

*Project and alternatives.* In the late 1990s, members of Congress and the local community worked together to "permanently" conserve the land encircling Lake Tarleton, a stunning mountain lake long cherished for its wild beauty in Grafton County, New Hampshire. AR 12079; 13065. Now the Service claims the Tarleton project "is needed to help meet the goals and objectives for wildlife and vegetation described in the Forest Plan and to increase forest health, vitality, and resiliency within the project area, including the effects of climate change, and insect and disease outbreaks." AR 11973. Specifically, the Service proposes to log over about "690 acres." AR 11976. Logging will occur only 300 feet from Lake Tarleton, AR 11984, and 500 feet from the Appalachian Trail. AR 11988.

The Service did not identify a single alternative to meet the Tarleton project's broad objectives, arguing that "no specific number of alternatives is required or prescribed[.]" AR 12904. Standing Trees proposed an alternative with less logging, AR 13082, which the Service

dismissed for failing to achieve the purpose and need of the project. AR 12904. As for taking no action and not logging, the Service claims that "would not meet the need to advance Forest Plan goals or wildlife habitat diversity objectives in the Tarleton [Habitat Management Unit]." AR 11975. However, the Forest Service has the authority to review and implement alternatives to log less or not at all or otherwise reduce the Project's negative environmental impacts.

*Resource impacts.* Standing Trees' timely comments and objections identified information gaps and inaccuracies in the Service's environmental review, as follows:

Regarding water quality, rather than assessing the Tarleton project area, the Service relied on the Albany South project site assessment, which is over 50 miles away from the Tarleton project site. AR 11987–88. In doing so, the Service failed to acknowledge and explain the Project's impacts to Lake Tarleton's superb water quality. *See* AR 13094; *see also* Decl. of Peter Ascher, ¶ 9.

Regarding endangered species, a 2004 study confirmed the presence of the endangered northern long-eared bat in the project area. AR 13923. The Service "assume[s]" the bat continues to be present. AR 13923. Mature and old forests in the project area are where the bat typically roosts and forages. AR 3128–29. Yet no surveys of the bat's presence have been conducted since a two-night excursion by the New Hampshire Fish and Game Department in 2019. AR 13923; *see also* AR 9224. That is, the Service does not know of any roosts or hibernacula in the project area—and therefore does not anticipate any direct impacts from the project to the bats—without undertaking any effort to look for them. AR 13923.

Regarding scenic resources, the Service did not analyze a viewpoint from Lake Tarleton, claiming that it could not use a boat to navigate to a set of GPS coordinates on the surface of the lake. AR 12926.

Regarding recreational resources, the Service claims that "potential noise impacts to hikers along the Appalachian Trail . . . would be minimized" with a 500-foot buffer and by limiting the logging to winter. AR 11988. The Service similarly claims that noise impacts to winter recreationists will be limited with a 300-foot buffer around Lake Tarleton. AR 11988. But Standing Trees members report hearing logging activity from more than a mile away at another logging site. *See* Exhibit A, Decl. of Peter Faletra, ¶ 13.

Regarding forest health, the Service did not provide data on stand ages during the public comment and objection periods. Compl., ¶ 91.[1] The data are crucial to verify the logging's impacts on forest health.

Regarding climate change, the Service did not measure the direct, indirect, and cumulative greenhouse gas (GHG) emissions arising from the Tarleton project in combination with the Peabody West project and other recent, ongoing, or reasonably foreseeable actions, including the Service's other logging projects in the National Forest. Compl., ¶ 69; AR 11987. Furthermore, the Service did not acknowledge or respond to the relevant scientific literature submitted by Standing Trees—in contrast to the Service's explicit analysis of other scientific literature before it. *Compare* AR 10547–71 *with* AR 10536–46. Crucially, the submitted but unacknowledged literature presents the latest scientific findings concerning the carbon capture and storage functions of mature and old forests—and corresponding updates to properly measure

[1] The Service publishes discernible stand age data in its environmental reviews for other projects. For example, the Service published stand age information in the Green Mountain National Forest. *See* Forest Serv., *Telephone Gap Integrated Resource Project Habitat Management Unit Analysis and Rationale for Habitat Objectives*, 8 (July 2024), https://www.fs.usda.gov/project/?project=60192 (Project Documents/02Scoping/Supporting Information).

the climate impacts of preserving versus logging these forests. AR 13065 (Standing Trees Tarleton project objection); 6124 (Standing Trees Peabody West project objection).

*Cumulative impacts.* The Service did not analyze cumulative impacts on resources across recent, ongoing, or reasonably foreseeable projects in the National Forest. AR 11992; 4906. The Service did not identify the relevant projects for such analysis. The Service merely asserted that "there would be no significant cumulative impacts as a result of implementing this project," without producing written, comparative analysis of relevant projects or their impacts. AR 11992.

PEABODY WEST PROJECT

*Project and alternatives.* Located just north of the Great Gulf Wilderness and traversed by the Appalachian Trail, the Peabody West project area has been long cherished for its stunning mountain peaks, stands of mature and old forest, and awe-inspiring hiking and skiing trails. AR 6124. Now the Service claims the project "is needed to provide a sustainable yield of high-quality timber products and to improve wildlife habitat diversity . . . thereby helping to achieve the desired future conditions for wildlife and vegetation described in" the Forest Plan. AR 4877. Specifically, the Service proposes to log about 2,220 acres, AR 4867, including about 600 acres of land within the Great Gulf Inventoried Roadless Area (IRA), AR 4896. The Appalachian Trail descends from the Great Gulf Wilderness—the Appalachian Trail, Mount Madison, and Carter Mountain overlook the units proposed for clearcuts and other logging. AR 4896, 6500. The Service also proposes nearly twelve miles of road construction or reconstruction. AR 4911. At least six logging "units" contain stands that meet the definition for the "old forest" age class, identified old growth habitat, or exemplary natural communities. AR 6282–86; 7834.

For the Peabody West project, the Service's approach to alternatives, water quality, endangered species, scenic and recreational resources, forest health, climate change, and

cumulative impacts is virtually identical to its approach described above for the Tarleton project: neither environmental review engages in any comparison of choices indisputably available to the agency to log less or not at all or otherwise reduce these Projects' negative environmental impacts. AR 4876. The Service admits the Peabody West project violates its Forest Plan scenic standards. AR 4898. "Timber harvest operations could begin this winter (*i.e.*, mid-December 2024) at the earliest. Road reconstruction . . . could begin earlier, possibly in early fall 2024." Docket No. 8 at 7, ¶ 2. Standing Trees filed this action on May 16, 2024.

**JURISDICTION**

This case challenges a final agency action that is reviewable under the Administrative Procedure Act (APA). 5 U.S.C §§ 701–706. This Court has jurisdiction over the action under 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1346 (United States as defendant). The Court may order relief under 28 U.S.C. §§ 2201 (declaratory judgment), 2202 (further relief), and 2412 (costs and fees), as well as 5 U.S.C. § 706 (vacatur).

**STANDING**

On behalf of itself and its members, Standing Trees has standing to bring this lawsuit. Generally, standing requires an injury that is (i) "concrete, particularized, and actual or imminent; [(ii)] fairly traceable to the challenged action; and [(iii)] redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010) (quoting *Horne v. Flores,* 557 U.S. 433, 445 (2009)). A membership-based organization like Standing Trees must also show: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation in the lawsuit of each of the individual members." *Hunt v. Washington State Apple Advert. Comm'n.*, 432 U.S. 333, 343 (1977). As

shown below and through the attached declarations of Standing Trees and several Standing Trees members affected by the projects, Standing Trees meets these requirements. *See Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 67 (D.C. Cir. 2022) (finding declarations acceptable to demonstrate satisfaction of standing requirements).

Standing Trees is a grassroots organization committed to safeguarding New England's forests, with a focus on public lands in New Hampshire and Vermont. Decl. of Zack Porter, ¶ 6. Standing Trees advocates fair policies and practices to ensure clean water, clean air, forest health, public health, and unfragmented habitat in the region. *Id*. The organization is representing its members, who engage in outdoor activities and have nature-based business interests, such as the youth outdoors camp, Kingswood Camp, that would be directly impacted by the Projects' negative environmental impacts.[2]

The logging and road construction proposed in the Projects will harm Standing Trees members' interests in the project areas. Specifically, the logging and roads will harm water quality, increasing the risk of algal blooms that make the water unsafe for recreation and unfit for aesthetic enjoyment.[3] The logging and roads will thus harm the recreational, aesthetic, and business interests of Standing Trees members.[4] The logging and roads will also harm the wildlife

---

[2] *See generally* Decls. of Zack Porter (on behalf of Standing Trees) (Exhibit A); Gerald Curran (Exhibit B); Elaine Faletra (Exhibit C); Peter Faletra (Exhibit D); Eric Jones (Exhibit E); Rebecca Lovejoy (Exhibit F); Jamie Sayen (Exhibit G); Nataliya Sundina (Exhibit H); Michael Wipfler (Exhibit I); Robert Wipfler (Exhibit J); Peter Ascher (Exhibit K); and Robin Sadek Ascher (Exhibit L).

[3] *See generally* Decl. of Zack Porter; *see also* Decls. of Peter Ascher, ¶¶ 7–11; Gerald Curran, ¶ 9; Elaine Faletra, ¶¶ 5–7, 14; Peter Faletra, ¶¶ 8–11; Eric Jones ¶ 7; Rebecca Lovejoy ¶ 8; Robin Sadek Ascher ¶¶ 9–12; Michael Wipfler, ¶ 17; and Robert Wipfler ¶¶ 7–9, 18.

[4] *See generally* Decls. of Zack Porter; Peter Ascher; Gerald Curran; Elaine Faletra; Peter Faletra; Eric Jones; Rebecca Lovejoy; Robin Sadek Ascher; Jamie Sayen; Nataliya Sundina; Michael Wipfler; and Robert Wipfler.

in the area, reducing the opportunities for wildlife viewing.[5] The logging and roads will also harm mature and old trees, literally cutting holes in the beautiful views in both areas.[6]

Standing Trees members have been coming to these areas for many years to enjoy healthy forests and scenic beauty, including the famous views from Lake Tarleton and along the Great Gulf and Appalachian Trails.[7] By not analyzing any alternatives or sufficiently disclosing the environmental consequences of the Projects, the Service has blocked Standing Trees members from meaningfully participating in its decision-making process.[8] Standing Trees members' interests have been harmed by the Service's actions and will continue to be unless or until the Service complies with the law.[9]

Standing Trees has organizational standing because protecting National Forest lands from environmental harms is germane to its organizational purpose, and Standing Trees represents the interests of its members, which individually would have standing to challenge the Service's actions, as discussed above. This lawsuit does not require their individual participation to assert claims against the Service or secure relief. *New Hampshire Motor Transp. Ass'n v. Rowe*, 448 F.3d 66, 71–72 (1st Cir. 2006) (citing *Hunt*, 432 U.S. at 343).

---

[5] Decls. of Zack Porter, ¶¶ 5, 9, 14–15, 19; Elaine Faletra, ¶¶ 6–8, 13, 16; Peter Faletra, ¶ 12; Eric Jones, ¶ 5; Rebecca Lovejoy, ¶ 7; Jamie Sayen, ¶ 9; Nataliya Sundina, ¶ 8; Michael Wipfler, ¶¶ 8, 17; and Robert Wipfler, ¶¶ 7, 10.

[6] *See generally* Decls. of Zack Porter; Peter Ascher; Gerald Curran; Elaine Faletra; Peter Faletra; Eric Jones; Rebecca Lovejoy; Robin Sadek Ascher; Jamie Sayen; Nataliya Sundina; Michael Wipfler; and Robert Wipfler.

[7] *See generally* Decls. of Zack Porter; Peter Ascher; Gerald Curran; Elaine Faletra; Peter Faletra; Eric Jones; Rebecca Lovejoy; Robin Sadek Ascher; Jamie Sayen; Nataliya Sundina; Michael Wipfler; Robert Wipfler; *see also* Decls. of Gerald Curran, ¶ 7; Jamie Sayen, ¶¶ 7–8; and Nataliya Sundina, ¶ 4.

[8] Decls. of Gerald Curran, ¶ 10; Elaine Faletra, ¶ 4; Peter Faletra, ¶ 4; and Rebecca Lovejoy, ¶ 4.

[9] *See generally* Decls. of Zack Porter; Peter Ascher; Gerald Curran; Elaine Faletra; Peter Faletra; Eric Jones; Rebecca Lovejoy; Robin Sadek Ascher; Jamie Sayen; Nataliya Sundina; Michael Wipfler; and Robert Wipfler.

## STANDARD OF REVIEW

In cases like this challenging agency compliance with the APA, NEPA, and NFMA, "[t]he court must undertake a thorough, probing, [in depth] review, and a searching and careful inquiry into the record." *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1285 (1st Cir. 1996) (citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971)). Although deferential, this review "is not a rubber stamp." *Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n*, 59 F.3d 284, 290 (1st Cir. 1995). Specifically, upon finding agency action "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," a court must "hold [the action] unlawful and set [it] aside." 5 U.S.C. § 706(2)(A).

An agency decision will violate the APA to the extent the agency "entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). In applying the arbitrary and capricious standard, the court must determine whether the Service "articulated a rational connection between the facts found and the choice made," *Conservation L. Found. v. U.S. Army Corps of Eng'rs*, 457 F. Supp. 3d 33, 56 (D.N.H. 2019) (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983)), and whether the agency's decision and underlying analysis are "too unreasonable for the law to permit it to stand." *Conservation L. Found.*, 457 F. Supp. 3d at 56 (citing *Sierra Club v. Marsh*, 976 F.2d 763, 769 (1st Cir. 1996)); *see also Dubois*, 102 F.3d at 1288 (applying a "rule of reason" to determine whether agency's environmental review was adequate).

## ARGUMENT

The Service violated NEPA, NFMA, and the APA when it authorized the Projects. First, the Service failed to analyze alternatives. Second, the Service failed to take a hard look at the Projects' environmental impacts. Third, the Service failed to make the Projects consistent with the requirements of the Forest Plan. The Service's authorizations of the Projects are therefore unlawful and must be set aside.

### I. The Forest Service violated NEPA and the APA because it did not analyze alternatives.

Environmental review under NEPA must include "the environmental impacts of the proposed action and alternatives[.]" 42 U.S.C. § 4332(2)(H); 40 C.F.R. § 1508.9;[10] *see also* 36 C.F.R. § 220.7(b)(2). The point of reviewing impacts in this comparative form is to define them sharply and provide a clear basis for choice among the actions available to the agency. Here, the Forest Service failed to analyze *any* alternatives and thus failed to compare the impacts of its Projects alongside alternatives to log less or no mature trees or to otherwise reduce the Project's negative environmental impacts. As discussed further below, this violates NEPA and the APA.

#### A. The Service failed to analyze alternatives to log less or otherwise reduce the Projects' negative environmental impacts.

NEPA requires an alternatives analysis when an agency's proposal "involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(H). This requirement is fundamental and applies to environmental assessments like those under review.

[10] Council on Environmental Quality (CEQ) amended the regulations in 2020. The amendments "apply to any NEPA process begun after September 14, 2020. An agency may apply the regulations in this subchapter to ongoing activities and environmental documents begun before September 14, 2020." 40 C.F.R. § 1506.13 (2020). Here, the amendments do not apply because the Service initiated both the Tarleton and Peabody West projects in 2019 and because the Service consistently relied on CEQ's original regulations throughout its environmental review. *See* AR 11971; AR 4879.

*See Nat. Res. Def. Council, Inc. v. Callaway*, 524 F.2d 79, 92–93 (2d Cir. 1975) ("[T]he development and discussion of a wide range of alternatives to *any* proposed federal action is so important that it is *independent of* and *of wider scope than* the duty to file the EIS[.]") (emphasis added); *see also* 36 Fed. Reg. 7724 (1971) (providing CEQ guidance that agencies should consider "alternative actions that will minimize adverse impact" "as early as possible" in the NEPA process).

Here, there are unresolved conflicts concerning the present and future alternative uses of the Tarleton and Peabody West project areas. *See Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1229 (9th Cir. 1988) (unresolved conflicts where conflicts arise between agency's and other "present and future uses" of project area resources). And as discussed above, the project areas contain truly magnificent resources. Lake Tarleton and the surrounding area include unique "use[s]" and "resources" that will be affected by the Tarleton project, including air, water, forest land, scenery, recreation, and wildlife habitat in which Standing Trees and its members have abiding interests. *See, e.g.*, Decl. of Peter Faletra, ¶¶ 8–11. Similarly, the Peabody West project area implicates the same "use[s]" of many of the same "resources." *See also City of New York v. U.S. Dep't of Transp.*, 715 F.2d 732, 742 (2d Cir. 1983) (finding the requirement to consider alternatives applies to environmental assessments). Because the authorization of the Projects "opens the door to potentially harmful . . . activity," which would impact the use of available resources in the project area, the Service is required to consider alternatives beyond merely the proposed action. *Hodel*, 852 F.2d at 1229. Although it is true that a "less extensive search for alternatives is required" in an environmental assessment compared to an environmental impact statement, *some* analysis is nonetheless still required. *Conservation L. Found.*, 457 F. Supp. 3d at 57.

In response, however, the Service refused to analyze *any* alternatives, arguing that it need not look at any particular number of them. AR 12904; 6107. But that argument is beside the point: the law requires agency review of a "range of alternatives." 42 U.S.C. § 4332(C)(iii). The Service did not and cannot cite any record evidence that alternatives with less logging could not achieve the Projects' objectives. Furthermore, the objectives are broad. Faced with similarly broad objectives elsewhere, the Service itself has reviewed a range of alternatives. *See* AR 2229-2256 (Albany South project alternatives analysis); *see also City of New York,* 715 F.2d 732, at 743 ("The scope of alternatives to be considered is a function of how narrowly or broadly one views the objective of an agency's proposed action."). Consequently, here, the Service's refusal to look at *any* alternatives, including Standing Trees' proposed alternative to log less, rests on nothing more than an unsupported opinion that such alternatives would not meet the project objectives. The Service did not and cannot cite any support for the opinion, because it never performed the requisite assessment of the environmental impacts of logging less, or otherwise reducing the Projects' environmental impacts. Such arbitrary decision-making cannot stand.

**B. The Service failed to analyze an alternative not to log, that is, a genuine no action alternative.**

An agency's environmental review must identify the status quo—known as the "baseline" or "no action" alternative. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166, 1185–86 (10th Cir. 2023). Specifically, the agency must describe existing conditions—both positive and negative—in sufficient detail to allow for meaningful comparison of the environmental impacts of alternative actions, including the agency's proposal. *See* Council on Env't Quality, *Considering Cumulative Effects Under the National Environmental Policy Act*, 41 (Jan. 1997) ("The concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."); *see also Alaska*

*Wilderness Recreation and Tourism Ass'n v. Morrison*, 67 F.3d 723, 730 (9th Cir. 1995) (finding the no action alternative "serves as the benchmark by which effects of all action alternatives are measured"); *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1040 (10th Cir. 2001) (finding the purpose of the no action alternative is to "compare the potential impacts of the proposed major federal action to the known impacts of maintaining the status quo"); *Calvert Cliff's Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971) ("Th[e] requirement [to consider alternatives] . . . seeks to ensure that each agency decision maker has before him and takes into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance."). A genuine no action alternative will be "[i]nformed and meaningful." *Hodel*, 852 F.2d at 1228. For example, agencies must use the same methodologies to compare the proposed and no action alternatives so they can make an "informed and meaningful choice" that coherently accounts for future conditions. *Cf. Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 735 (9th Cir. 2020) (rejecting environmental impact statement because no action alternative failed to consider impact of foreign oil consumption).

Here, the Service's refusal to investigate baseline conditions, that is, a genuine no action alternative without logging, is "too unreasonable for the law to permit it to stand." *Conservation L. Found.*, 457 F. Supp. 3d at 56; *see also Dubois*, 102 F.3d at 1289 ("The agency . . . must legitimately assess the relative merits of reasonable alternatives before making its decision."). Rather than perform the requisite investigation, including of the potential benefits, the Service speculates that "taking no action would not meet the need to advance forest plan goals or wildlife habitat diversity objectives in the" Tarleton and Peabody West Habitat Management Units. AR 11975; 4897. The Service does not and cannot cite any support because there simply is none in

the record. Unsupported speculation, however, does not satisfy NEPA's requirement to investigate the baseline in an "informed and meaningful" way, *Hodel*, 852 F.2d at 1228, and to "legitimately assess" the Projects' "negative environmental impacts[.]" *Dubois*, 102 F.3d at 1289–91.

Accordingly, the Service's failure to analyze alternatives, including the basic, baseline, no-action alternative was arbitrary and capricious, in violation of NEPA and the APA.

## II. The Forest Service violated NEPA and the APA because it failed to take a hard look at the Projects' environmental impacts and unlawfully found no significant impact.

NEPA and its implementing regulations require the Service to take a "hard look" at the environmental impacts of the Projects, including direct, indirect, and cumulative impacts and to make those impacts available for public review. *N.W. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 470 F. Supp. 2d 30, 59 (D.N.H. 2007) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 409 n. 21 (1976)); 40 C.F.R. § 1508.9(b). To take a hard look, an agency must articulate a rational connection between the facts found and decision made. *Conservation L. Found.*, 457 F. Supp. 3d at 56 (citing *Baltimore Gas and Elec. Co.*, 462 U.S. at 105). Further, the agency must conduct a site-specific analysis of its proposed action. *Conservation L. Found. v. Gen. Serv. Admin.*, 707 F.2d 626, 630–31 (1st Cir. 1983). "NEPA's strong language 'is neither accidental nor hyperbolic,' but 'is a deliberate command that the duty NEPA imposes upon the agencies to consider environmental factors not be shunted aside in the bureaucratic shuffle.'" *Cape Hatteras Access Pres. All. v. U.S. Dep't. of Interior*, 344 F. Supp. 2d 108, 134 (D.D.C. 2004) (quoting *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n,* 426 U.S. 776, 787 (1976)).

Likewise, all NEPA reviews must make the agency's information on environmental impacts available for public comment. This public comment provision is meant not only to inform the public, but also to further inform and thereby assist the agency's decision-making.

*Dubois*, 102 F.3d at 1286–87; *see also Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068, 1073 (1st Cir. 1980) ("NEPA seeks to achieve substantive environmental improvement by requiring full disclosure of the basis for agency action."); *Silva v. Lynn*, 482 F.2d 1282, 1284 (1st Cir. 1973) ("[NEPA] serves as an environmental full disclosure law, providing information which Congress thought the public should have concerning the particular environmental costs involved in a project."). Failure to transparently and accessibly share data upon which a final decision is made deprives the public of the opportunity to "test, assess, and evaluate the data and make an informed judgment as to the validity of the conclusions drawn therefrom," *Appalachian Mountain Club v. Brinegar*, 394 F. Supp. 105, 122 (D.N.H. 1975), and fatally undermines an agency's findings. *Dubois*, 102. F.3d at 1287; *see also* 40 C.F.R. § 1502.21. To this end, agencies must not incorporate by reference unless the referenced material is "reasonably available for inspection by potentially interested persons within the time allowed for comment." 40 C.F.R. § 1502.21.

As applied here, the Service failed to take a hard look at the environmental impacts of the Projects in three critical respects: First, the Service failed to investigate and disclose site-specific conditions relevant to the Projects' impacts on water quality, the northern long-eared bat, and scenic and recreational resources. Second, the Service failed to disclose stand age information, which precluded the public from understanding whether the Service had sufficiently investigated the forest health conditions that are central to the Projects' purpose. Third, as a consequence of its just described failures, the Service had to resort to incomplete, inaccurate, or illogical descriptions of the Projects' impacts in its environmental assessments. Perhaps most glaringly, the Service ended its assessments by claiming that the Projects' incremental impacts would be "minor or less," as compared to unidentified "other projects with similar impacts," and that

"therefore, there would be no significant cumulative impacts as a result of implementing [each] project." AR 11992; 4906. Such bald claims do not fulfill NEPA and the APA's mandates of well-informed, reasoned decision-making. Nor do they support the Service's findings of no significant impact upon which it authorized the Projects.

### A. The Service failed to take a hard look at the projects' direct and indirect impacts.

#### *1. Water quality*

The Service failed to take a hard look at the Projects' water quality impacts because it did not actually look at the water quality within the impacted areas; rather, it made generic assertions based on its prior assessment of another distant site (the Albany South project). By contrast, in *Conservation Law Foundation v. U.S. Army Corps of Engineers*, this Court upheld a NEPA review that turned on water quality, noting that the agency had "[t]horoughly discussed the expected environmental impact *in* [*the project area*]." 457 F. Supp. 3d at 62 (emphasis added). The Court further noted that the agency surveyed the local ecosystem and discussed how its proposal would affect that ecosystem. *Id*.

Applying *Conservation Law Foundation* to this case, the Service would have had to investigate the ecosystems within its chosen areas for the Projects, and to have discussed how the Projects would affect these ecosystems. 457 F. Supp. 3d 33. But the Service did not. Standing Trees commented and objected that the Service cannot substitute the requisite site-specific assessment with inferences from the assessment of distant ecosystems at the Albany project site—fifty miles away from the Tarleton site, and eighteen miles away from the Peabody West site. AR 11987–88; 4900. The Service nonetheless insisted on this arbitrary approach. It never identified or explained how the ecosystem or water quality information from the distant Albany

site could be comparable for assessing the Projects. Nor did it identify or explain any practical reason for not conducting site-specific assessments for the Projects. AR 11987–88; 4900.

To be sure, there are site-specific issues that required the Service to look hard at the Projects' sites themselves. For example, Lake Tarleton is indisputably one of the largest, cleanest, and least developed lakes in the region. AR 12082. The increased runoff from logging into Lake Tarleton is a site-specific issue that the Service could not actually assess by reference to the Albany project site, which does not contain a comparably large, clean, undeveloped lake. AR 11995 (Tarleton Project area and overview of proposed activities) *compare with* AR 2204 (Albany South Integrated Resource Project vicinity map). Clearly, the Service failed to take the requisite hard look. Similarly, it failed the APA's rule of reason when it subsequently claimed that the logging proposed in the Tarleton project would have "no measurable effect" on water resources.

The same is true for the Service's cursory review of the Peabody West project site, which spans numerous watersheds, including the Peabody River and its West Branch, both of which are eligible for federal wild and scenic designation. The Service claims that there will be "no measurable effect" to water resources when logging is limited to a certain volume of trees within in a watershed. However, the Service proposes to exceed this limit in twelve distinct watersheds but then does not bother to measure or otherwise explain the resulting measurable effects. AR 4900. Instead, the Service arbitrarily dismissed from further discussion several impacted watersheds for supposedly lacking fish habitat. *Id*. For the remainder, the Service simply did not elaborate meaningfully on the impacts of its plan to log in excess of the no measurable effects limit. *Id*.

*2. Northern long-eared bat*

The Service failed to take a hard look at impacts to the northern long-eared bat because it did not conduct a survey for either project; instead, it made illogical assertions that the bats, though "assumed" present, would not be harmed. AR 9224. Specifically, the Service's review of this issue relied heavily upon the U.S. Fish and Wildlife Service's Biological Opinion. AR 3302–3358. The latter purports to assess 2,927 projects across twenty-eight national forests in only fifty-five pages—it contains no analysis specific to either project. AR 3302. Reliance can be arbitrary and capricious when an agency blindly adopts the biological opinion of a consulting agency without performing its own investigation. *Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1, 12 (1st Cir. 2024).

Here, the Service's decision not to look for bats at either site was arbitrary. The most recent bat survey conducted in the National Forest was a two-night forest-wide bat survey from 2019. AR 13923; 9244. Without any further investigation at the sites, the Service asserts no known hibernacula or roosts exist there. *Id*. The Service assumes the bat's presence, and then concludes that, even if bats exist in the project area, impacts would be "[m]inimal." AR 4901. The Service's conclusion rests on an illogical justification. The Service violated NEPA because it cannot provide a reasoned conclusion from the data available. *See Kettle Range Conservation Grp. v. U.S. Forest Serv.*, No. 2:21-CV-00161-SAB, 2023 WL 4112930, at *10 (E.D. Wa. June 21, 2023) (finding the Forest Service violated NEPA where it failed to consider site-specific effects of the project on endangered species, including endangered bat species).

*3. Scenery & recreation*

The Service failed to take a hard look at the Projects' scenic and recreational impacts because it excluded from its review publicly-identified resources of outstanding scenic and

recreational value. The relevant discussion in the environmental assessments is brief and perfunctory: for example, for Peabody West, the Service limits itself to one paragraph in the "Recreational Effects Report," and baldly claims impacts will "be minimal, localized, and would not persist past project implementation." AR 6463.

Regarding scenic impacts, the Service fails to take a hard look at scenic impacts in the project areas. The Service failed to take a hard look at the Tarleton project because it failed to account for scenic impacts on Lake Tarleton itself. Lake Tarleton is the largest lake within the National Forest, and countless recreationists swim, canoe, ski, and more on the lake throughout the summer.[11] Despite the Lake's recreational importance, the Service asserted it was unable to select a scenic viewpoint on the surface of Lake Tarleton because it was not a fixed point. AR 12926. This is patently false: the Service possesses accurate GPS systems and could use a boat to navigate to a set of geographic coordinates on the surface of the lake. Furthermore, and as discussed in detail below, the Service failed to reconcile its requisite hard look with its decision to violate the Forest Plan. *See infra* Section III. A.

On the Peabody West project, the Service failed to disclose the project's relation to the Appalachian Trail. The Trail is about a mile from the edge of the nearest logging unit, making a large "U" around the project area. It is adjacent to the eastern, southern, and western edges of the project area. Logging units would be visible for miles from virtually every scenic vista along the trail looking out onto the Peabody West area. Despite these impacts, the Service fails to discuss any impact to the Appalachian Trail whatsoever. AR 6498–6506. The only reference to the Trail is by its initials in the name of one of the scenic viewpoints, "Osgood-AT." AR 6505. The Trail is not labeled on any scenic viewpoint map. *Id*. Its virtual exclusion from any discussion illustrates

---

[11] *See, e.g.*, Decls. of Elaine Faletra ¶¶ 6, 14; Eric Jones, ¶ 7; and Robert Wipfler ¶ 9.

the lack of attention the Service paid to the project's scenic impacts on the Trail. The Service's cursory analysis does not satisfy NEPA's requirement to take a hard look.

Furthermore, the Peabody West project area abounds with recreational opportunities, including the Great Gulf Trail and Great Gulf IRA. The project will log in stands near and overlapping the Great Gulf Trail, a renowned scenic hiking route in the area. But there is no map that overlays the logging units with labeled recreational resources, let alone a "forthright acknowledgment of the negative [] impacts." AR 4892–96; *Conservation L. Found.*, 457 F. Supp. 3d. at 62. The Service is also proposing to log nearly 600 acres in the Great Gulf IRA, but there is similarly no map that overlays the logging units with the resource. The public is left to scroll back and forth between maps in the environmental assessments to piece together where logging will occur, and whether logging overlaps with cherished trails and forest. *See Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1073 (9th Cir. 2010) (finding that requiring the public to "put the pieces together" to understand an environmental resource issue does not satisfy NEPA's public disclosure requirement). Moreover, regarding the Great Gulf IRA, the Service cursorily dismisses the Peabody West project's impacts on the region without any proper analysis. *See* U.S. Forest Serv., FSH 1909.12 – Land Management Planning Handbook Chapter 70 – Wilderness at 4–5 (requiring consideration of: (1) the future evaluation of wilderness characteristics; (2) analysis; and (3) recommendation).

Finally, these failures demonstrate the Service did not set baselines for recreational impacts in the Peabody West project area. The Service's baseline consists of a cursory listing of some recreational resources in a single paragraph—it references the parking lot for the Great Gulf Trailhead, but not impacts to the trail itself. AR 4878. There is no elaboration or detail about the trails or the Great Gulf IRA, for which there will be clear recreational impacts. Without

setting a baseline—at least some assessment of the existing conditions of the trails and their offerings—there is no way to assess the impacts to those resources and no way for the Service to comply with NEPA. *See e.g.*, *N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1083–87 (9th Cir. 2011); *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016) ("Establishing appropriate baseline conditions is critical to any NEPA analysis."); *Cascade Forest Conservancy v. Heppler*, No. 3:19-CV-00424-HZ, 2021 WL 641614, at *17–20 (D. Or. Feb. 15, 2021).

*4. Forest Health*

The Service failed to take a hard look at forest health because it did not disclose information to the public that was central to assessing impacts to forest health. For the Peabody West project, the Service offered a post hoc rationalization. It also did not explain how stands the Service has identified as containing old forest or old growth habitat were removed from the project and provided no reason for why the Service should not follow government-wide and internal guidance regarding old forest and old growth habitat.

First, the Service failed to take a hard look at the Projects' impacts on forest health and, for Peabody West project, tried to rationalize this failure post-hoc. Proper timber management is inextricably linked with forest health. AR 13104–08; 6129–36. The Service did not disclose stand survey information during the public comment period, snatching the public's "vital" opportunity to comment on the propriety of the Service's timber management. *See Appalachian Mountain Club*, 394 F. Supp. At 121; *see also* AR 11785 (Standing Trees Tarleton comment); AR 13074, 13107 (Standing Trees requesting stand age data in its objection); AR 4687–88 (same in its Peabody West comment); AR 6129–31 (same in its Peabody West objection). This stand survey information is central to analyzing impacts to forest health and determining whether a

project is needed because it details the distribution of forest types and age classes present in the project areas. In other words, environmental impacts of logging cannot be assessed without knowledge of what trees will be cut and where. Any reliance on these undisclosed surveys is improper because "[n]o material may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment." 40 C.F.R. § 1502.21.

Second, the Peabody West project offers a particularly illustrative example of the Service's failure to disclose stand survey information. For example, the Service references several withheld documents in support of its assertion that it is not logging in old growth or old forest habitat. AR 6115–16. At least one of these documents—the botanist's e-mail regarding the presence of old forest characteristics in multiple stands targeted in the Peabody West project area—did not exist at the time the decision was authorized. AR at 4527–29 (dating botanist's email two months after the Peabody West project was authorized).

The Service's assertions in its environmental assessment and objection response that it is not logging in "old forest" and "old growth habitat," AR 4880; 6116–17, are unsupported by the stand surveys, AR 7834; 6282–86. Indeed, the withheld survey data indicate that such habitat is present in at least six stands. AR 6282–86. Similarly, stand exam information from the Tarleton project indicates stands of old forest age class. AR 13899–911. Both projects fail to identify the presence of old forest habitat despite indications of its presence. AR 12353; 9287 (showing Table 4 in both reports omit any information on old forest). This is precisely the type of factual discrepancy the public disclosure and comment requirements are designed to timely identify and resolve.

The Service's patchwork of stand surveys and spreadsheets, which lack any connective tissue to link them, fails to foster NEPA's requisite informed decision-making and public participation. *See Nat'l Parks & Conservation Ass'n*, 606 F.3d at 1073–74. Many of the documents cited appear to be raw outputs of data: they define no terms and contain no analysis, rendering them unfit for public review. *See Silva,* 482 F.2d at 1285 ("To that end, [environmental reports] 'must be written in language that is understandable to nontechnical minds and yet contain enough scientific reasoning to alert specialists to particular problems within the field of their expertise.'") (quoting *Env't Def. Fund v. Corps of Eng'rs*, 348 F. Supp. 916, 933 (W.D. Miss. 1972); *see also* Decl. of Zack Porter, ¶ 16. The Service is capable of providing this information to the public during the comment period in an accessible and transparent manner.[12] The Service's failure to provide stand survey data to the public in an accessible manner and explain a rational connection between its surveys and the decision to approve the Projects indicates the Service did not take a hard look at forest health.

Furthermore, underpinning the Service's arbitrary authorization of the Projects are the Service's claims that it is free to ignore government-wide direction, internal management advice concerning old forests, and scientific literature submitted by Standing Trees. The Service neglected to recognize Executive Order 14072, which mandates that the Service "retain and enhance carbon storage." Strengthening the Nation's Forests, Communities, and Local Economies, 87 Fed. Reg. 24851, 24852 (Apr. 22, 2022). The Service also internally

[12] The Forest Service has demonstrated its ability to produce stand age information in the Green Mountain National Forest. *See* FOREST SERV., TELEPHONE GAP INTEGRATED RESOURCE PROJECT HABITAT MANAGEMENT UNIT ANALYSIS AND RATIONALE FOR HABITAT OBJECTIVES, 8 (July 2024).

acknowledged the importance of protecting and revitalizing mature and old-growth forests for biodiversity, carbon storage, and climate resilience, yet refused to recognize this guidance in authorizing these Projects. AR 0733. Furthermore, the Service did not explain why Peabody West is not subject to internal Forest Service guidance requiring "any projects proposing vegetation management activities that will occur where old growth forest conditions . . . exist . . . be submitted to the National Forest System Deputy Chief for review and approval."[13] Finally, the Service also fails to acknowledge or discuss the scientific literature submitted by Standing Trees. The Service claimed to "document[] consideration of the scientific papers brought forward by the public," but failed to consider any of the scientific literature provided by Standing Trees for the Tarleton project.[14] AR 12902; *compare* AR 10547–71 *with* AR 10536–46. The Service failed to articulate a rational basis for refusing to consider Standing Trees' scientific literature.

The Service failed to take a hard look at the Projects' impacts on forest health, tried to subsequently provide post hoc rationalization for this failure, and disregarded national and internal guidance, management direction, and publicly submitted, peer-reviewed literature.

---

[13] Https://www.fs.usda.gov/sites/default/files/ReviewOfProposedProjectsWithManagementOfOldGrowthForestConditions-NFSDC.pdf.

[14] "In its comment and objection, Standing Trees provided scientific evidence that (1) timber harvesting accounts for 86% of annual forest carbon loss in the northeastern U.S.; (2) the rate of carbon sequestration increases as trees age, with carbon storage maximized in unlogged stands; and (3) among land uses generally, timber harvesting has the greatest relative impact on aboveground carbon storage regionally. The Service did not explain its decision to dismiss this science. Even if the Service dismissed the provided literature as not being the best, the Service did not provide a reasoned basis for dismissing it." Compl., ¶¶ 65, 125.

**B. The Service failed to take a hard look at the Projects' cumulative impacts.**

The Service's failure to look hard at cumulative impacts spans many resources and is especially glaring with respect to climate impacts. As noted above and discussed further below, the Service did not acknowledge the cumulative climate impacts of the Projects together or in combination with other projects the Service itself has authorized or proposed in the National Forest. Furthermore, the Service failed to quantify the Projects' GHG emissions and thus never verified or explained how these emissions translate into cumulative impacts. Instead, the Service opined arbitrarily that the Projects would lead to net benefits and improved climate resiliency without any quantitative analytical support. AR 11954; 4900.

Cumulative impacts are those impacts that result from an action when added "to other past, present, and reasonably foreseeable future actions," and which arise from "individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. A cumulative impacts analysis must contain "quantified or detailed information," not just "general statements about possible effects and some risk." *Conservation L. Found.*, 457 F. Supp. at 58 (quoting *Klamath-Siskiyou Wildlands Center v. Bureau of Land Mgmt.*, 387 F.3d 989, 994 (9th Cir. 2004)); *see also Klamath-Siskiyou Wildlands Center.*, 387 F.3d at 993–94 (9th Cir. 2004) ("The analysis 'must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects.'") (quoting *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108, 1128 (9th Cir. 2004)).

Here, the Service never acknowledged or explained why it did not disclose the cumulative climate impacts of its own projects to log the National Forest,[15] going so far as to not

[15] Other projects that similarly propose logging or road construction include, but are not limited to: Bowen Brook Integrated Resource Project, Deer Ridge Integrated Resource Project, Wanosha

mention Peabody West in the Tarleton environmental assessment, and vice versa. AR 11992; 4906.[16] Regardless, these projects are reasonably foreseeable and thus belong in the agency's cumulative impacts analysis. *Northwest Bypass Grp. v. U.S. Army Corps of Eng'rs*, 552 F. Supp. 2d 97, 126 (D.N.H. 2008) (internal citations omitted) (agency " must evaluate the reasonably foreseeable significant effects of the proposed action.")

Further, the Service purported to find that the Projects' incremental impacts would be "minor or less," as compared to "other projects with similar impacts," and that "therefore, there would be no significant cumulative impacts as a result of implementing [each] project." AR 11992; *see also* 4906 ("The incremental impacts of this project when overlapped in time and space with other actions with similar impacts would not result in significant cumulative impacts."). But as noted above, whatever projects the Service considered, it never identified them. Nor did the Service document or further explain whatever comparative analysis it referenced. Thus, when the Service stated both Projects would result in no "significant cumulative impacts," it could not and did not cite any support in the record. AR 11992; 4906. This is an insufficient analysis of cumulative impacts.

Moreover, the Service failed to quantify the Projects' GHG emissions or, as discussed further below, sufficiently explain how these emissions translate into cumulative impacts. Courts widely agree that because climate emissions do not remain confined to a specific project area, it is important to analyze and discuss their impacts cumulatively. *See generally WildEarth*

---

Integrated Resource Project, Cold River Integrated Resource Project, Hales Location Wildfire Resiliency Project, Sandwich Vegetation Management Project, and Lost River Integrated Resource Project.

[16] Cumulative impacts analysis requires the agency to identify the relevant geographic context. 40 C.F.R. § 1508.27(a). Standing Trees maintains that the Service's choice to limit its review of forest health and endangered bats impacts to viewsheds and watersheds as opposed to the National Forest is arbitrary and capricious. AR 11986; 4897.

*Guardians v. Zinke*, 368 F. Supp. 3d 41, 76 (D.D.C. 2019) ("BLM's failure to quantify GHG emissions rendered the environmental assessments' cumulative impact analyses inadequate."); *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1216 (9th Cir. 2008) (finding the environmental assessment inadequate because it failed to consider the cumulative impacts of GHG on the environment); *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1044 (10th Cir. 2023) (finding BLM's environmental assessment inadequate for failing to consider the cumulative impacts of GHG emissions). Applying the case law, not to mention on point CEQ guidance, the Service needed to quantify the emissions from each Project.[17] But it did not.

Rather, the Service merely speculates that the Projects' emissions will be "small." AR 11988; 4900. But courts reject analysis that stops at identifying the obvious, that the climate crisis is a global problem, and that any singular project's contribution to it is necessarily small. *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 687 F. Supp. 3d 1053, 1075 (D. Mont. 2023). Notably, in a similar case concerning the climate impacts of a Forest Service proposal, the court found "logging causes immediate carbon losses, while re-sequestration happens slowly over time, time that the planet may not have." *Id*. at 1076. Further, the court found the environmental assessment in that case did not "sufficiently provide scientific evidence indicating why [the benefit of new-growth carbon] would offset the carbon loss leading to an overall 'minor' impact on the environment." *Id*. The environmental assessments here suffer from the very same defect:

[17] The CEQ issued guidance to assist agencies in quantifying GHG emissions. AR 0473–89, 0475 (recommending that "agencies quantify a proposed action's projected GHG emissions or reductions for the expected lifetime of the action, considering available data and GHG quantification tools that are suitable for the proposed action"). The Service must provide a reasoned basis for refusing to follow the CEQ guidance. *But see* AR 12906; 6116 (claiming that the "level of estimate" conducted in the environmental assessment was "consistent with the []standard approach at the time of analysis.").

in them, the Service claims new growth would offset any possible emissions from logging, without sufficient explanation or scientific evidence. AR 11987; 13260–61; 4900; 6322–23. Moreover, the Service failed to acknowledge and explain the relevant scientific literature submitted by Standing Trees. AR 13050 (Standing Trees Tarleton project objection); 6124 (Standing Trees Peabody West project objection). All of the above-described failures render the Service's look at cumulative impacts too unreasonable to stand.

**C. The Service violated NEPA and the APA by issuing an unlawful finding of no significant impact.**

The Service failures, detailed above, to analyze alternatives or look hard at environmental impacts resulted in its issuance of unlawful findings of no significant impact. Stated another way, the Service's findings are unlawful because they were not predicated on any alternatives analysis, but rather on cursory looks at environmental impacts, in violation of NEPA and the APA. *See, e.g.*, *Kettle Range Conservation Grp.*, 2023 WL 4112930, at *12 ("The lack of quantified or detailed information about the Sanpoil Project's impacts in this respect creates substantial questions about whether the action will have a cumulatively significant environmental impact.").

Here, the Service's findings of no significant impact are inadequate under the applicable standard of review, which requires the Service to accurately identify the pertinent environmental impacts, take a hard look at those impacts, and, if a finding of no significant impact is made, the agency must be able to convincingly support this conclusion. *See Northwest Bypass Grp.*, 552 F. Supp. 2d at 134 (further requiring sufficient mitigation of any significant impacts to support a finding of no significant impact). The final environmental assessments and findings of no significant impact failed to show that the Projects' impacts would not significantly affect the environment and failed to take a hard look at the Projects' impacts. *Supra* Section II. A–B.

## III. The Forest Service violated NFMA and the APA because the Projects violate the Forest Plan.

Forest Service projects must be consistent with applicable forest plans. The Projects here are not. As made clear above, the Service's failure to disclose stand data belies its claim that it is abiding by the Forest Plan's prohibition on logging old growth or within old forest habitat. Furthermore, due to the Service's failure to consider scientific literature submitted by Standing Trees, the Service failed to account for the latest scientific knowledge, in violation of the Forest Plan. AR 3416 (requiring use of "latest scientific knowledge"). These failures render its NEPA analysis deficient and also demonstrate a failure to comply with NFMA. Moreover, the Service violated the Forest Plan in the following ways: first, the Forest Service deviated from the scenic standards in the Forest Plan. Second, the Service disregarded the Forest Plan's requirements regarding wild and scenic rivers. Third, and finally, the Service has failed to locate or develop conservation strategies for the northern long-eared bat in the project area.

NFMA requires that site-specific projects be "consistent" with the applicable forest plan. 16 U.S.C. § 1604(i); *see also* 36 C.F.R. § 219.15(b). A project is consistent with the forest plan when it (1) contributes to the maintenance or attainment of one or more goals, desired conditions, or objectives, or does not foreclose the opportunity to do so; (2) *complies with applicable standards*; (3) *complies with applicable guidelines*; and (4) occurs in an area that is "suitable" for that project. *Id*. at § 219.15(d) (emphasis added). The Forest Service may resolve an inconsistency between a project and the Forest Plan in several ways: by modifying either the project or the plan to make either consistent with the other, or by rejecting the project. *Id*.

The Forest Plan sets standards and guidelines for site-specific projects. These include standards on scenic integrity and water quality and restrictions on logging. The Forest Plan also requires the Service to "contribute to conservation and recovery of species and their habitats."

AR 3421. Importantly, "an agency's position that is contrary to the clear language of a Forest Plan is not entitled to deference." *Native Ecosystems Council v. United States Forest Serv.*, 418 F.3d 953, 962 (9th Cir. 2005) (citing *Friends of Southeast's Future*, 153 F.3d 1059, 1069 (9th Cir. 1998)); *see also Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994) (finding that no deference is due to an agency interpretation that contradicts regulation's plain language).

**A. The Service failed to make the Peabody West project consistent with Forest Plan scenic standards.**

The Forest Plan requires observed sizes of clearcut acreage to be limited to 4–5 acres for "high" scenic integrity areas and ten acres for "moderate" scenic integrity areas. AR 3477, 3479. Here, the Service will clearcut twenty-six acres in Unit 19, nine acres in Unit 20, and nineteen acres in the wildlife opening. AR 4898. The Service suggests that its design element—"the Forest Landscape Architect shall review final layouts in units 19 and 20 to ensure that openings are well-distributed in the landscape to the maximum extend practical"—takes care of the Forest Plan violation. AR 4891. But this is not possible. In Unit 19, the Landscape Architect cannot "distribute" the *clearcut* acreage across the unit. Additionally, the Forest Service omits any mention of mitigation measures in the nineteen-acre clearcut proposed to expand the wildlife opening. *Id*. Overall, the Service's position is contrary to the stated intentions of the Forest Plan.

**B. The Service failed to make the Peabody West project consistent with the Forest Plan wild and scenic river designation standard.**

The Forest Plan requires the Service to "[m]anage eligible rivers to maintain their classification and eligibility until Congress designates the segments or decides not to designate them[.]" AR 3467. And the Service establishes a goal to "protect the wild, scenic, and recreational values of eligible rivers to maintain their potential for Wild and Scenic River designation." AR 3431. A river is eligible for protection if it is free-flowing and possesses at least

one of the outstanding remarkable values set forth in the statute. *See* 16 U.S.C. §§ 1271, 1273(b). The Service is required to include a buffer of 575 feet for fourth and larger order streams. AR 3460.

Here, the Service's proposed logging includes clearcutting on nearly fourteen acres of land within a quarter mile of both the Peabody River and the West Branch of the Peabody River, the two eligible river segments in the project area. AR 9349. These river segments are fourth order streams. *See* 2005 White Mountain National Forest, Appendix H Third and Fourth Order Streams WMNF Plan, H-3. More than that, over 350 acres of logging treatment will occur within a quarter mile of the Peabody River, and nearly eighty-five acres will occur within a quarter mile of the West Branch of the Peabody River. AR 9349. Despite the substantial amount of intrusion and logging that will take place near these eligible rivers, the Service finds that "[g]iven the scope and location of proposed project activities, the proposed action would have limited, short-term effects on potential outstandingly remarkable values but would not result in an irreversible or irretrievable change in the condition of the river corridor or its potential for designation in the future." AR 4903. Overall, the Service's position is without evidentiary basis and is contrary to the plain provisions of the Forest Plan, in violation of NFMA.

### C. The Service violated NFMA because it did not contribute to the conservation and recovery of endangered species.

Under the Forest Plan, the Service must investigate all project sites for the presence of threatened, endangered, or sensitive species prior to beginning any authorized ground-disturbing activity at the site. AR 3448. Surveys must be completed for all new ground-disturbing projects unless biologists determine threatened, endangered, or sensitive species occurrence is unlikely (e.g., no habitat exists). *Id.* The regulations state that "forest planning shall provide for the diversity of plant and animal communities . . . consistent with the overall multiple use objectives

of the planning area . . .[, and] [i]nventories shall include quantitative data making possible the evaluation of diversity in terms of its prior and present condition." *Sierra Club v. Martin*, 168 F.3d 1, 5 (11th Cir. 1999) (citing 36 C.F.R. § 219.26 (1978)).

In *Sierra Club v. Martin*, the court recognized that both NFMA and the Forest Plan required the Service to conduct surveys of endangered, threatened, or sensitive species in the project areas. 168 F.3d at 4–5. Similarly, here, the Forest Plan requires the Service to investigate project sites for the northern long-eared bat. But the Service has not made any effort to inventory the occurrence of northern long-eared bats in the project area. AR 13923; 9224 (recognizing the last attempt to locate northern long-eared bats was in 2019). Rather, the Service is assuming the bat's presence and then concluding that—even if they encounter several bats—impacts would be minimal. This conclusion does not follow from the Service's presumption of bat presence, let alone justify the Service's decision not to undertake site-specific investigations of the species.

Notably, the Service's approach to the northern long-eared bat's conservation and recovery is emblematic of the agency's broader "see no evil, hear no evil" approach to many of the Projects' environmental impacts. Under NEPA, NFMA, and the APA, this deficient level of environmental analysis cannot stand.

## CONCLUSION

For the foregoing reasons, the Court should grant this motion for summary judgment and vacate the agency decisions to authorize the Projects. *See*, *e.g.*, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021).

Respectfully submitted, this the 3rd day of October, 2024.

STANDING TREES, INC.

By its attorney:

/s/ Christophe Courchesne
Christophe Courchesne
NH Bar No. 20431
Assistant Professor and Director
Environmental Advocacy Clinic
Vermont Law and Graduate School
164 Chelsea Street, PO Box 96
South Royalton, VT 05068
(802) 831-1630
(802) 831-1631 (fax)
ccourchesne@vermontlaw.edu

*Environmental Advocacy Clinic student attorneys Hannah Weisgerber, Joe Anderson, and Willow Hogan, and assistant professor Diana Csank contributed to this brief.*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2024, I served the foregoing document electronically through ECF upon all counsel of record.

/s/ Christophe Courchesne
Christophe Courchesne
*Counsel for Standing Trees, Inc.*

# Exhibit A

**DECLARATION OF ZACK PORTER ON BEHALF OF STANDING TREES**

1. I, Zack Porter, am over the age of 18, and I am competent to testify to all facts contained in this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am providing this declaration in support of Plaintiff Standing Trees.

3. Standing Trees is a grassroots membership organization with more than 3,000 members and supporters in the New England region and beyond.

4. I co-founded Standing Trees and have served as executive director since 2021.

5. I have dedicated my career to protecting public lands and waters. I have degrees in Geography and Wilderness Studies from the University of Montana, where I studied forest ecology, natural resource conflict resolution, and public land policy, planning, and management. I began my professional career in 2004 with the US Forest Service, where I worked for three seasons as a Forestry Technician/Wilderness Ranger on two National Forests. From 2008 to 2018, I served in a variety of capacities with the Montana Wilderness Association, including as a board member, NexGen Wilderness Leaders Program Director, and Western Montana Field Director, positions in which I leveraged my expertise in public land policy and management and community organizing to influence Congressional legislation and decision-making by the US Forest Service. During my time at Montana Wilderness Association, I participated in conservation collaboratives including the Blackfoot-Clearwater Stewardship Project and the Southwestern Crown Collaborative, a part of the congressionally-created Collaborative Forest Landscape Restoration Program. While serving in these collaboratives, I worked closely with the Forest Service to protect imperiled wildlands and wildlife, support the regional wood products industry, and guide National Forest timber harvests and landscape restoration activities

to ecologically appropriate locations for the benefit of fish and wildlife habitat, and to reduce community vulnerability to wildfire. The Forest Service recognized my commitment and partnership with a Regional Forester's Award and a Wilderness Legacy Award. Additionally, I was selected to serve as a panelist for Forest Service Chief Tom Tidwell's five-year performance review of Forest Service Region One. After moving back to New England in 2018, I worked for Northeast Wilderness Trust, a regional land trust, and Conservation Law Foundation, a regional public interest and environmental law non-profit, before co-founding Standing Trees in 2020 and becoming its first Executive Director in 2021.

6. The purpose of Standing Trees is to protect and restore New England's native ecosystems and safeguard the interests of its supporters and members. Standing Trees works to protect and restore forests on New England's public lands, with a focus on New Hampshire and Vermont. Consistent with its purpose, Standing Trees advocates just and equitable policies and practices for managing public lands, thereby promoting clean water, clean air, forest health, public health, and unfragmented habitat in the region. This includes monitoring the development of forest management plans and timber sales to ensure the lawful and scientifically-supported management of public lands.

7. Standing Trees and its members rely on the open government provisions of the National Environmental Policy Act (NEPA). In particular, public disclosure of pending environmental reviews under NEPA enables Standing Trees to learn about proposed federal actions in New England that impact water quality, air quality, forest health, public health, and intact habitat in the region. Standing Trees actively participates in these environmental reviews by submitting comments and objections on project documents and attending public meetings—all to ensure that information on environmental impacts is publicly disclosed, that state and

federal agencies rely on the best available science, and that agency decision-making is lawful and in the public interest. The comments and objections that Standing Trees submits usually contain proposed alternatives to plans that will reduce negative impacts to the environment and protect and restore high-functioning ecosystems. Therefore, to develop well-informed and site-specific alternatives, Standing Trees relies on detailed information provided in project documentation.

8. Standing Trees has been involved with the Tarleton Integrated Resource Project (Tarleton project) since attending a presentation about the project by White Mountain National Forest staff at Kingswood Camp on Lake Tarleton on November 3, 2021. Standing Trees submitted its first comment on the project's draft environmental assessment in May, 2022. AR 10739-10793. Numerous current Standing Trees members submitted comments and objections in their individual capacities, as well.

9. Members of Standing Trees live adjacent to or near the Tarleton project site and fear the Tarleton project will negatively impact their community as well as the wildlife, plant life, water, and other resources within the project area. Similarly, these members reasonably expect that the Tarleton project will impact their businesses, property values, and recreational, aesthetic, and spiritual interests in the land and water in or adjacent to the project area.

10. As Standing Trees' Executive Director I have investigated the impacts of proposed timber harvests in the Tarleton project area: I hiked along the historic Charleston Road on May 22, 2023; I paddled Lake Tarleton on April 23, 2022 to experience its serenity, exceptional water quality, and healthy population of loons and warblers; and I climbed Piermont Mountain with the co-owner of Kingswood Camp on May 25, 2023 to assess impacts to scenery. Since November 2021, I have visited with impacted business owners, local residents, and

concerned citizens on multiple occasions, many of whom were involved in the campaign to purchase and transfer the land surrounding Lake Tarleton to the White Mountain National Forest. These individuals, including Standing Trees members, feel betrayed by the Forest Service for breaking promises to their community and violating expectations set by the 2005 WMNF Forest Plan.

11. According to the October 17, 2001 edition of the Bradford Journal Opinion, "Under the motto 'Less is More,' the [Lake Tarleton conservation] plan as presented by [Trust for Public Land representative Rodger] Krussman 'will protect and conserve the "wilderness" quality of the Lake Tarleton area,' stressing low impact recreational activities." AR 9481. At a meeting of the Lake Armington Association that was also reported on by the Bradford Journal Opinion, "guest speaker . . . John Serfass, district ranger of the US Forest Service . . . addressed the concerns of Armington residents regarding logging activities that have taken place on Piermont Mountain overlooking the lake . . . He assured the members of the association that the Forest Service has no plans to harvest timber from land it owns in the Lakes Tarleton and Armington area." AR 9483. In the 2005 Forest Plan final environmental impact statement, the Forest Service declared that "public participation will be an important part of the process we use for making site-specific management decisions" at Lake Tarleton, specifically. *See* 2005 WMNF Forest Plan EIS, Appendix A-Public Involvement at A-235. AR 3626, 6180, 13077. Nevertheless, I believe the Forest Service failed to ensure that public participation was an "important part of the process" for the Tarleton project. *Id*.

12. On May 1, 2023, Standing Trees submitted a detailed objection to the Tarleton project, highlighting, among other things, the importance of preserving interior, mature forest to protect clean water, sequester and store carbon, and provide healthy, unfragmented forest habitat,

including for endangered species. AR 13065-130.This objection, submitted together with the Lake Tarleton Coalition by Vermont Law and Graduate School's Environmental Advocacy Clinic, detailed the numerous NEPA violations that the Forest Service committed in releasing a finding of no significant impact. Additionally, the objection detailed the Forest Service's violation of the National Forest Management Act (NFMA). *Id*.

13. Similarly, Standing Trees has actively participated in the public process for the Peabody West Integrated Resource Project (Peabody West project) since the summer of 2022, submitting its first comment on the Peabody West project's draft environmental assessment on September 6, 2022. AR 4679-4717.

14. Members of Standing Trees who recreate in and around the project area fear that the Peabody West project will irrevocably impact the wildlife, plant life, and water resources within the project area. These members reasonably expect that the Peabody West project will preclude their ability to recreate in and around the project area. These members also reasonably expect that their aesthetic and spiritual enjoyment of this unique landscape at the foot of the Presidential Range will be harmed by the noisy and destructive qualities of logging.

15. Standing Trees submitted a detailed objection to the Peabody West project, highlighting, among other things, the importance of preserving mature forests to maximize the benefits of carbon sequestration and storage, preventing impacts to water quality, protecting important habitat for endangered species and other fish and wildlife, avoiding impacts to the Great Gulf Wilderness and adjoining Inventoried Roadless Area (IRA), and refraining from causing disruption or degradation of recreational resources in the Presidential Range, where the Peabody West project is proposed to take place. This objection, submitted by the Vermont Law and Graduate School's Environmental Advocacy Clinic, detailed the numerous NEPA violations

that the Forest Service committed in releasing a finding of no significant impact. Additionally, the objection detailed the Forest Service's violation of NFMA.

16. Standing Trees is concerned that the Forest Service's misleading use of language regarding different styles of silviculture impedes meaningful public participation and understanding of the Forest Service's plans, which harms Standing Trees' and its members ability to engage in the NEPA process. For example, several different styles of silviculture other than what the Service denotes as "clear-cuts" involve the extensive removal of trees in single cut.

17. As Standing Trees' Executive Director, I visited Unit 72 in the Peabody West project on September 29, 2024 after learning from the Administrative Record that Unit 72 has an estimated stand year of origin of 1860, AR 7834, and contains late successional forest with no evidence of past harvests. AR 6285-89. Neither of the Habitat Management Unit Rationale documents, AR 12344; 9278, acknowledge the presence of forests in the "old" age class, as it is defined by the 2005 WMNF Forest Plan Appendix D, Age Class Definitions by Habitat Type. Consequently, I was surprised to learn in their respective Administrative Records that multiple stands or units in both project areas meet or exceed the threshold for the "old forest" age class. A careful inspection of Peabody West project Unit 72 revealed what appeared to be old forest habitat, and possibly old-growth forest. Timber harvest is prohibited in old forest habitat, *see* 2005 WMNF Forest Plan: Abbreviations, Acronyms, and Glossary at 21; AR 3595, and in old-growth forest, *see* 2005 WMNF Forest Plan Chapter 2, Forest-Wide Management Direction at 2-13; AR 3415-3426. However, thirty-four acres of Unit 72 are proposed for "single tree selection and group selection," AR 4910, including cuts up to two acres in size. AR 4884. Other harvest units that meet or exceed the threshold for the "old forest" age class are proposed for timber harvest in both projects.

18. Standing Trees is also concerned about logging's impacts on the Great Gulf IRA, cultural resources, and water quality, particularly near the Peabody River. Standing Trees is troubled that the Forest Service overlooked the potential effects on the future wilderness evaluation of the Great Gulf IRA, and on the eligibility for federal wild and scenic designation of the two eligible river segments within the project area.

19. The authorization of the Tarleton and Peabody West projects will cause harm to Standing Trees' interests in protecting the climate, water quality, endangered and otherwise sensitive species, scenic integrity in the White Mountain National Forest, and recreational and other resources.

20. Many of Standing Trees' members and supporters regularly visit the White Mountain National Forest, including the Tarleton and Peabody West project areas, where they enjoy hiking, wildlife watching, boating, swimming, and other activities that will be harmed by the Forest Service's approved management actions. Some of Standing Trees' members and supporters live or operate businesses within or adjacent to the project areas and, as mentioned, will be harmed by the projects.

21. Standing Trees asserts that the Forest Service's decision to approve these two projects violate NEPA and NFMA. Specifically, Standing Trees and its members are concerned that the Forest Service failed to consider any alternatives, take a requisite "hard look" at impacts to a range of resources, calculate cumulative impacts, or comply with the 2005 White Mountain National Forest Plan (Forest Plan). Moreover, Standing Trees asserts the Service's finding of no significant impact is arbitrary without proper treatment of the failures mentioned above.

22. Standing Trees and its members have been harmed by the Forest Service's decisions to approve these two projects because the Forest Service did not consider alternatives,

take the requisite “hard look” at impacts to a range of resources, calculate cumulative impacts, or comply with the Forest Plan to make a lawful finding of no significant impact.

23. Additionally, Standing Trees and its members are being harmed because the Forest Service has not provided Standing Trees nor its members the necessary information to make fully informed decisions and engage in informed advocacy efforts.

24. Standing Trees relies on the public involvement aspect of the NEPA process to engage in administrative decisions and to influence decisions that would affect it and its members.

25. Standing Trees is actively involved in the NEPA process for several additional Forest Service projects being proposed in Vermont and New Hampshire. Standing Trees plans to continue its involvement in these projects, many of which demonstrate a replication by the Forest Service of the same legal violations at issue in the Tarleton and Peabody West projects.

26. Standing Trees and its members, therefore, will suffer concrete and particularized injuries that are imminent now that the Tarleton and Peabody West projects have been authorized.

27. The injury to Standing Trees and its members would be redressed by an order from this Court vacating the final Decision Notices and enjoining the defendants from proceeding with the projects until the Forest Service has complied with the National Environmental Policy Act, National Forest Management Act, and Administrative Procedure Act.

28. I swear, under penalty of perjury, that the foregoing is true and correct.

Executed on this 3rd of October, 2024:

Zack Porter

Executive Director, Standing Trees

# Exhibit C

# DECLARATION OF ELAINE FALETRA

1. I, Elaine Faletra, am competent to testify to all the facts contained in this declaration.
2. I live in Warren, New Hampshire, approximately six miles from Lake Tarleton. I have lived here since 1984 and currently have no plans to move. I plan to continue recreating at Lake Tarleton.
3. I am a member of Standing Trees, and I signed onto the Standing Trees' objection to the Tarleton Project in April 2023.
4. I became aware of the Tarleton Project only a few days before the close of the first public comment period in August 2021. My neighbor texted me a picture of the announcement, which had been posted in a local newspaper, the Vermont Journal Opinion. We had to scramble to submit a comment.
5. I usually visit the lake with my husband, Peter Faletra, and our friends. We visit this lake for its aesthetics, accessibility, and size. Unlike other lakes, Tarleton's perimeter is undisturbed forest, which I find incredibly beautiful. And because Tarleton is the largest lake in the White Mountain National Forest, there is plenty to explore and enjoy on each visit, for several hours at a time.
6. I visit the lake year-round. During all seasons, I hike around the lake and birdwatch. In the quietness of wintertime, I snowshoe and watch as eagles swoop down to take fish left by those who use the lake for ice-fishing. In the summertime, my husband, friends, and I canoe, kayak, and swim on the lake. I like to walk on both ends of the lake; I especially like to walk to the northern part of the lake, near so-called treatment units 7 and 9, where I sit on a lovely granite outcrop. I have witnessed common loons, monarch butterflies, ospreys (which are one of my favorite birds), grebes, bumblebees, Canada warblers, and the occasional peregrine falcon.

7. I am also a member of the Loon Preservation Committee, an association that is dedicated to restoring and maintaining a healthy population of loons throughout New Hampshire. I have tagged loons on Lake Tarleton before.

8. One night, I witnessed numerous bats while I was out on the lake. As we shone the light over the lake to locate the loon nests for tagging, innumerable bats flew overhead—I was astounded by their numbers.

9. The natural environment, including the pristine lake and the beautiful, forested hills, against the backdrop of Mt. Moosilauke, make Lake Tarleton incredibly special to me. It is where I go to experience wilderness.

10. I believe the Tarleton Project's logging will irrevocably harm the lake and surrounding forest.

11. The area's aesthetics will be harmed by the project exposing the high-tension lines in the mountains, which have previously been covered by trees—another quality that is unique to the Lake Tarleton area, compared to other lakes in New Hampshire.

12. My peace and quiet will be disturbed, not only at the lake, but also when I am home with my husband, because we live so close to the project area. I am sure we will hear the noise from the logging trucks and chippers. You can generally hear them from five miles away; we live a couple miles downhill from a fish hatchery where logging occurs, and we can hear the logging from there.

13. My ability to observe wildlife will also be disturbed. The logging—which is scheduled to extend over *at least* the next five years—is bound to disturb resident wintering birds and mammals, such as owls, eagles, ruffed grouse, fox, and bobcats. I am also afraid many birds will be displaced when they migrate back to New Hampshire in the spring.

14. I am likewise concerned that the project will interfere with my ability to canoe, kayak, and swim. Tarleton's exceptional water quality, free of any industrial human impacts, has made it one of my favorite places to go boating. However, the project proposes spraying herbicides to stop the spread of invasive species that is bound to occur once logging begins. Based on what I have read, this herbicide, along with eroded soil dislodged by the heavy machinery involved in logging, threatens to pollute the lake. I am concerned that this could lead to a high concentration of cyanobacteria, which is known to cause incredibly destructive algae blooms. I am concerned that I will no longer be able to canoe, kayak, and swim on the lake due to such water pollution from the project.

15. In the late 1990s, the Forest Service represented to me and others that it would preserve the land around Lake Tarleton. I feel betrayed that the Forest Service has not followed through with its promise.

16. Over the decades that I have visited Lake Tarleton, I have grown incredibly fond of this place. I cherish its scenic quality, the presence of diverse wildlife, and all the recreation I have done here with friends and family. But the Tarleton Project threatens to permanently alter this place and undercut my ability to enjoy it.

17. I swear, under penalty of perjury, that the foregoing is true and correct.

Executed on [Month Day, Year].

April 24, 2024

[Full Name]

Elaine Faletra

[Signature]

Elaine Faletra

# Exhibit D

**DECLARATION OF PETER FALETRA**

1. I, Peter Faletra, am competent to testify to all the facts contained in this declaration.
2. I live in Warren, New Hampshire, approximately six miles from Lake Tarleton. I have lived there since 1984 and currently have no plans to move. I plan to continue recreating at Lake Tarleton.
3. I am a member of Standing Trees, and I signed onto the Standing Trees' objection to the Tarleton Project in April 2023.
4. I became aware of the Tarleton Project only a few days before the close of the first public comment period in August 2021. My neighbor texted my wife a picture of the announcement, which had been posted in a local newspaper, the Vermont Journal Opinion. We had to scramble to submit a comment.
5. I visit Lake Tarleton year-round for its aesthetics, accessibility, and size. Unlike other lakes, Tarleton's perimeter is undisturbed forest, which I find incredibly beautiful. I can access the lake easily because the surrounding forest is public land. And because Tarleton is the largest lake in the White Mountain National Forest, there is plenty to explore and enjoy on each visit, for several hours at a time.
6. I usually visit with my wife, Elaine Faletra, and our friends. We hike year-round. In the winter, my wife and I accompany friends who use the lake for ice-fishing. In the summer, we canoe and kayak on the lake, enjoying the location's tranquility and charm.
7. The project area, including so-called treatment units 7 and 9, are right by the trails we hike. I am concerned that the proposed logging will ruin the aesthetics and the tranquility of our hiking experience on those trails. Frankly, the trails will become useless to me because I do not want to encounter logging and roadbuilding while hiking. Similarly,

because I do not want to camp near logging debris and slash, the campgrounds along the trails will be ruined for me, too.

8. Lake Tarleton's pristine water quality is another reason I spend so much time recreating on and by the lake. It is not easy to find similarly clean lakes in New Hampshire. As I will explain in more detail, based on my review of the project record, I am concerned that the logging throughout the project—especially in so-called treatment units 6, 7, 9, and 28—could cause cyanobacteria to bloom in the lake.

9. I learned about the causes and effects of cyanobacteria when I recently performed literature research on cyanobacteria. I am concerned that the research that the Forest Service relies on—scientific data from 30-40 years ago—does not accurately reflect the new developments in cyanobacteria research. I am concerned that Forest Service employees are making decisions based on inadequate understanding of the risks associated with logging.

10. Because treatment units 6 and 9 contain a huge fen, I am especially concerned that logging in those areas could harm the fen and, subsequently, the lake's water quality. This fen is a part of the watershed in this area. If you disturb a watershed that feeds into a pristine lake, you will increase the risk of runoff contaminating the lake.

11. I like to land my canoe or my kayak along the inlets of the lake. I am concerned that the project will cause cyanobacteria to bloom in the inlets on the lake. In addition to impacting the lake's water quality, this will also impact my ability to recreate on the lake.

12. I have witnessed common loons, many bats, monarch butterflies, osprey, an occasional peregrine falcon, and bumblebees at Lake Tarleton. I value the wilderness quality of Lake

Tarleton. I am concerned that the proposed logging will make the area unhabitable to these species, displace them, and ruin my opportunity to witness them going forward.

13. I am familiar with other logging operations that take place a few miles away from me, at a fish hatchery. The logging project there is incredibly loud; I can hear the chippers running from about five miles away. I am concerned that I will be able to hear the noise pollution from the Tarleton Project, including the noise from the logging trucks hauling their loads up and downhill. The project is expected to be implemented over the span of five years. I am concerned that the noise pollution will cause long-term discomfort for my wife and I because the project will create noise pollution for as many years as it is being implemented. Then, I will have to live with the detritus and slash, damage that will be both long-term and, potentially, permanent.

14. Last, but certainly not least, the Forest Service is pursuing this project after promising in the early 2000s to protect this land, after the momentous effort made by the local community state legislators to purchase the land with a goal of achieving permanent preservation. I want the Forest Service to keep their promise.

15. I swear, under penalty of perjury, that the foregoing is true and correct.

Executed on [Month Day, Year].

April 25, 2024

[Full Name]

Peter Faletra

[Signature]

[signature]

# Exhibit E

# DECLARATION OF ERIC JONES

1. I, Eric Jones, am competent to testify to all the facts contained in this declaration.
2. I live about 3 miles from Lake Tarleton, on land that I have owned for 25 years. I have no plans to move. I plan to continue recreating at Lake Tarleton.
3. I am a member of Standing Trees, and I signed onto the Standing Trees' objection to the Tarleton Project in April 2023.
4. I became aware of the Tarleton Project when the Forest Service sent me a notice about it in the fall of 2019.
5. I am a frequent hiker in the project area. I have seen loons, monarch butterflies, bald eagles, and osprey there. I enjoy observing these species when I hike and am concerned about the negative impacts that the project will have on their habitat, potentially displacing the species and interfering with my ability to continue to observe them while hiking.
6. As I have hiked elsewhere, I have seen the "blots" on the land created by other logging projects. But Lake Tarleton has an untouched tree line, free from any logging. I am concerned that if the logging project proceeds as proposed, Lake Tarleton's unique and undisturbed quality will be lost. I am concerned I will no longer enjoy the same aesthetic value that currently exists.
7. I frequently canoe to the island in Lake Tarleton with my family, and my family uses the beaches of the lake regularly, at least once a month well into the fall. I am concerned that the water quality will be impacted by the logging project and will disrupt my and my family's use of the lake and its beaches.

8. I also own a land trust that abuts the northern boundary of the Tarleton Project area. I purchased this land to conserve and protect the area's heavily forested, wild, and unique scenic values.

9. If the project moves forward as proposed, I believe that the impacts from removing mature trees and similar logging will alter the ecosystem of my land trust and destroy the heavily forested nature that makes the area unique. The connectivity of the forest, which allows for the ecosystem to function as it is supposed to, will be fractured, and destroyed. I will not be able to enjoy the natural environment as before.

10. The Forest Service is directly responsible for the injuries to my aesthetic and recreational enjoyment of this land that I will experience if this project is allowed to continue.

11. I swear, under penalty of perjury, that the foregoing is true and correct.

Executed on [04/22/2024] Earth Day

Eric Jones

[Eric Jones]

[Signature]

Eric Jones

# Exhibit J

**DECLARATION OF ROBERT WIPFLER**

1. I, Robert Wipfler, am competent to testify to all the facts contained in this declaration.
2. The Kingswood Camp has been in my family since 1985—nearly 40 years.
3. I am a co-owner of the Kingswood Camp, located at 949 New Hampshire Route 25C, Piermont, New Hampshire 03779. My brother, Michael Wipfler, is my fellow co-owner. I have been a full-time director at the camp for 12 years in addition to living and working at the camp since I was a child.
4. I currently reside in Lyme, New Hampshire, which is a brief, 20-mile drive to the camp. Currently, I have no plans to move from the Lyme-Piermont area.
5. I am a member of Standing Trees, and I signed onto the Standing Trees' objection to the Tarleton Project in April 2023.
6. I became aware of the Tarleton Project in 2019, shortly before I attended the project's first scoping meeting, in Warren, New Hampshire. I also coordinated and hosted an informational meeting at Kingswood Camp, where I invited the Forest Service to present on the project on November 3, 2021. I submitted two comments during May 2022. I also tuned in to view the Objection Meeting that occurred in June 2023.
7. I regularly use Lake Tarleton and the surrounding forest for swimming, boating, fishing, and hiking. I often see common loons, mayflies, monarch butterflies, ospreys, peregrine falcons, and yellow-banded bumblebees in the area. I have occasionally observed bats in the forest.
8. Similarly, thousands of youths have come to camp here—approximately 250 to 270 each summer—for the area's unique recreational and aesthetic values. As I will explain, the pristine environment is perfect for campers to explore a wide variety of outdoor activities, wildlife observation, and tree and plant identification.

9. Campers use Lake Tarleton daily to swim, waterski, windsurf, sail, snorkel, and fish. Each camper spends at least one hour per day in or on the water, and they often spend longer. It is safe to say the heart of the camp experience is the lake and its pristine water quality. But the experience would be ruined by algae blooms and other pollution associated with the industrial logging proposed by the project.

10. Campers also hike, observe wildlife, and otherwise recreate in the forest and on the trails within the project's so-called treatment units 7, 9, 29-31, and 34-36. The proposed logging in these areas may impair campers' ability to observe wildlife and otherwise enjoy the aesthetic value of the surroundings. Moreover, unit 7 is right by campsites, so we risk losing those sites to the pollution (light, noise, etc.) from the Tarleton Project.

11. The project's so-called treatment units 7, 9, 29-31, and 34-36 cover exceptional trails. Known as the Tarleton Club Trails, they hold remarkable historical value because they are over 100 years old. They lead to Lake Constance, Freddy's Pond, the Manning Plaque (Memorial) on Aloha Hill, and the Lund Cemetery. In fact, they circumscribe the entire lake. Logging near or on these trails could render them impassable, or worse, destroy them altogether.

12. Additionally, so-called treatment units 7, 9, 29-31, and 34-36 overlap with a hike that campers take along Charleston Road. Should these units be logged as proposed, the soil and forest health are bound to be harmed, including flora and fauna long enjoyed by campers on their hikes.

13. Kingswood Camp extends beyond the summer. For example, in the fall we host children from Boston for a wilderness retreat and serve as a wedding venue. Like the summer campers, the children from Boston and the wedding parties come for the area's recreational and aesthetic values. Couples who rent the venue for weddings emphasize how much they

care for the forest's scenic integrity, especially the uninterrupted tree line. Couples are married right on the shore of the lake.

14. I have also worked hard to ensure that Kingswood Camp provides a sense of community not only to the campers and other patrons, but also to the staff, which consists of as many as 80 people between the months of June and August. This community is particularly important to me because we share an immense appreciation for this water and this land.
15. Kingswood Camp is the second largest taxpayer in Piermont, New Hampshire. The camp averages a gross revenue of $2 million per year. The gross revenue we generate from weddings averages $100,000 per year. The camp and its wedding services attract many people from out of the area who patronize Piermont businesses including restaurants, grocery stores, pharmacies, hotels, and Airbnbs.
16. I am concerned that the project will prevent my personal enjoyment of Lake Tarleton, the surrounding forest, and the camp community, all of which contribute to my mental, social, and spiritual well-being. And all this stems from this being a place without industrial human activity, such as the logging proposed in the project.
17. I am concerned that the project will disturb camp activities and lessen the aesthetic and recreational value to campers, our other patrons, and the camp community.
18. I am particularly concerned that the project will impair the lake's water quality, precluding the water-based activities that are the heart of the camp experience.
19. I am concerned that the Tarleton Project will jeopardize my business's viability. The project clearly could harm the aesthetic and recreational values of Lake Tarleton and the surrounding forest. In turn, Kingswood Camp's annual attendance may drop substantially, jeopardizing the camp's future and my livelihood.

20. I am concerned that the logging proposed by the project will negatively impact the business that Kingswood Camp brings in from booking weddings. If the view of the forest around Lake Tarleton is despoiled, or if the water quality is negatively impacted, or if the peaceful tranquility of unperturbed natural environment is polluted with the noise of buzzsaws and heavy machinery, prospective newlyweds may choose to take their business elsewhere when they otherwise would have chosen Kingswood Camp as the venue for their wedding.

21. The project could negatively impact my business, driving down camp attendance, school field trips, and wedding events. Moreover, the project could jeopardize the community that I've built at Kingswood Camp. Most significantly, this project could weaken or totally destroy the physical, emotional, mental, and spiritual connections that I and so many others have cultivated with this uniquely pristine and deeply cherished natural environment.

22. I swear, under penalty of perjury, that the foregoing is true and correct.

Executed on [Month Day, Year].

March 28, 2024

[Full Name]

Robert Daniels Wipfler

[Signature]

Robert D. Wipfler

# Exhibit K

# DECLARATION OF PETER ASCHER

1. I, Peter Anthony Ascher, am competent to testify to all the facts contained in this declaration.

2. Since 2006, I have lived in Piermont, New Hampshire, on a five-acre lot overlooking the northwest end of Lake Tarleton.

3. I am a member of Standing Trees, and I signed onto the Standing Trees objection to the Tarleton Project in April 2023.

4. My wife, Robin Sadek Ascher, and I purchased our property to live and raise our children here. We have expended significant resources on renovations and other improvements.

5. From our home, which sits atop a hill, we can see Lake Tarleton and much of the gently sloping land surrounding it. I am concerned about the project's aesthetic impacts, especially several proposed "treatment" units that will be clearly visible from our home.

6. In 1992, my three sons began attending the Kingswood Camp every summer, and we plan for future generations of our family to continue attending the camp. I am concerned, however, that project-related activities will interfere, forcing the camp to close temporarily if not permanently.

7. My wife and I swim in and boat on the lake for most of the year. We enjoy hiking on many nearby trails. We host family reunions and other events to share these beloved activities with family and friends. But I would no longer feel comfortable living here or inviting others if the proposed logging proceeds to pollute our pristine environment. I am especially concerned that the project will introduce invasive weeds, like those found in

many surrounding waterbodies, including Lakes Morey, Fairlee, Winnipesaukee, and Squam.

8. I serve as the volunteer treasurer for the New Hampshire Lakes Association's Lake Host program for Tarleton. This program broadly aims to protect the ecology and recreational opportunities on waterbodies by preventing the spread of invasive plant and animal species from one waterbody to the next. So far, we have successfully prevented the spread of such invasives to Tarleton.

9. As part of this program, I regularly take water-quality samples from Tarleton, so I have first-hand knowledge of the high quality of this lake.

10. I am concerned that the Forest Service's approach to the probable weed infestation from the project is to spray herbicide. The false choice—between spreading invasive species or spraying herbicide, both of which would be largely unprecedented in Tarleton—does not seem acceptable to me. I am concerned that either option will degrade water quality and, by extension, will diminish my family's ability to safely recreate without adverse health consequences.

11. Similarly, I am concerned that the Forest Service has not adequately considered the potential negative impacts from the project's recreation-related additions. Tarleton's current water quality has been protected by low recreational use relative to other regional waterbodies. I am concerned that increased recreational use—anticipated due to the project's design—will increase the risk of introducing and spreading invasive species to the lake. Although I would generally welcome an increase in visitor traffic to the lake

if the Forest Service had first considered the potential risks of such an increase and explored methods for effectively mitigating such risks, the fact that the Forest Service has so quickly dismissed the community's concerns is troubling to me.

12. In 2001, the Forest Service represented to me and others that it would preserve the land around Lake Tarleton. I feel betrayed because the Forest Service has not made good on this promise.

13. Because my wife and I continue to love this area and have raised our family here, we intend to remain living here as full-time residents for the foreseeable future. The Tarleton Project, however, has undermined our reasonable expectations and threatens what we thought would remain an idyllic, protected place.

14. I swear, under penalty of perjury, that the foregoing is true and correct.

Executed on [Month Day, Year].

APRIL 22, 2024
______________

[Full Name]

PETER ASCHER
______________

[Signature]

______________

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| STANDING TREES, INC.,<br>Plaintiff,<br>v.<br>UNITED STATES FOREST SERVICE, *et al.*,<br>Defendants. | Case No. 1:24-cv-00138-JL-TSM |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I. INTRODUCTION ..... 1

II. LEGAL BACKGROUND ..... 2

A. National Environmental Policy Act ..... 2

B. National Forest Management Act ..... 3

III. STANDARD OF REVIEW ..... 4

IV. FACTUAL BACKGROUND ..... 5

V. ARGUMENT ..... 8

A. The Projects' alternatives analyses are not arbitrary and capricious ..... 8

1. Analyzing the proposed action with a comparative no action baseline satisfies NEPA ..... 9

2. Plaintiff's suggested alternatives do not meet the Projects' purpose and need ..... 10

3. Forest Service regulations do not require a stand-alone no action alternative ..... 13

B. The Forest Service conducted a reasonably thorough evaluation of the Projects' environmental effects ..... 14

1. The Forest Service reasonably evaluated direct and indirect effects ..... 15

a. The Forest Service analyzed impacts to water quality with its percent basal area removal methodology ..... 15

b. The Forest Service prepared Project-specific biological evaluations to examine impacts to the northern long-eared bat ..... 18

c. The Forest Service analyzed impacts to scenery and recreation ..... 19

d. The Forest Service analyzed impacts to forest health ..... 22

2. The Projects reasonably evaluate cumulative impacts to climate ..... 26

C. The FONSIs are not arbitrary and capricious ..... 30

D. The Projects comply with the Forest Plan ..... 32

VI. CONCLUSION ........................................ 35

# I. INTRODUCTION

The White Mountain National Forest (Forest) spans nearly 800,000 acres of public land in New Hampshire and Maine. While the Forest is ecologically diverse, it is not pristine. Like many eastern forests, the Forest has – for centuries – been used for timber production and conversion to agriculture. Some lakes on the Forest are impaired with mercury contamination, acidity, or both. The Forest's recreational offerings are among the best in the United States and are enjoyed by millions of visitors each year. To balance these diverse and sometimes competing interests, the Forest is statutorily obligated to administer lands for outdoor recreation, timber, watershed, and wildlife and fish purposes. The goal of this multiple-use mandate is to sustain healthy, diverse, and productive ecosystems for present and future generations.

Parts of the Forest are not meeting these goals. The trees do not represent a diverse mix of species, age classes, or both, and are not meeting what the Forest determined is necessary for a healthy, diverse, and productive Forest. To address the divergence between current and desired conditions, the Forest Service authorized two projects: the Peabody West Integrated Resource Project (Peabody) and the Tarleton Integrated Resource Project (Tarleton).

In compliance with the National Environmental Policy Act (NEPA), the Forest Service analyzed the Projects' environmental effects in two Environmental Assessments (EAs). The EAs allowed for extensive public participation and demonstrate the Projects' compliance with the Forest Plan, as required by the National Forest Management Act (NFMA). Based on the EAs, the Forest Service issued two Findings of No Significant Impact (FONSIs) that document the Forest's determination that the Projects do not have significant environmental effects and thus do not require the preparation of Environmental Impact Statements (EISs). The Projects authorize several actions, including commercial and non-commercial vegetation treatments, wildlife

habitat improvements, and recreational enhancements. The Projects fulfill the Forest Service's multiple-use mandate and will create a more diverse, healthier, and more sustainable Forest.

Plaintiff seeks to impede these important Projects through claims brought under NEPA and NFMA. None of Plaintiff's claims have merit. All are reviewed under the Administrative Procedure Act's (APA) deferential standard of review and the rule of reason. The demand for endless analysis and needless detail does not meet Plaintiff's burden to show the Projects are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The EAs, FONSIs, and supporting documents in the Administrative Record show that the Forest Service reasonably explained its decisions and that the Projects comply with the Forest Plan. The Court should grant summary judgment to the Forest Service on all claims.

## II. LEGAL BACKGROUND

### A. National Environmental Policy Act

"NEPA does not mandate any specific outcome; it only requires agencies to conduct environmental studies." *Historic Bridge Found. v. Buttigieg*, 22 F.4th 275, 280 (1st Cir. 2022); 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500-1508.[1] An EIS is required only when a proposed action will "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C). An agency may prepare an EA to determine whether an EIS is required. 40 C.F.R. § 1501.4(b), (c). "An EA is meant to be less detailed than an EIS." *Safeguarding the Historic Hanscom Area's Irreplaceable Res., Inc. v. FAA*, 651 F.3d 202, 217 (1st Cir. 2011). If an EA

[1] The Council on Environmental Quality (CEQ) issues regulations implementing NEPA. First promulgated in 1978, CEQ revised its regulations in 2020 and again in 2024. *See* 85 Fed. Reg. 43,304 (July 16, 2020) and 89 Fed. Reg. 35,442 (May 1, 2024). The Forest Service applied CEQ's 1978 regulations because they were in effect at the time the Forest Service analyzed and authorized the Projects. AR04879, 11931. Unless otherwise noted, all citations to the CEQ regulations in this brief are to the 1978 regulations.

"finds a significant impact, a full EIS must be prepared; if not the agency makes a [FONSI], which exhausts its obligation under NEPA." *Sierra Club v. Wagner*, 555 F.3d 21, 24 (1st Cir. 2009). "[O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to [e]nsure that the agency has considered the environmental consequences." *Sierra Club v. Marsh*, 872 F.2d 497, 502 (1st Cir. 1989).

## B. National Forest Management Act

Congress enacted NFMA in 1976 and directed the Forest Service to develop "one integrated plan" for each unit of the National Forest System, and to ensure that such plans "provide for multiple use and sustained yield" of forest resources. 16 U.S.C. § 1604(e), (f). Pursuant to that direction, the Forest Service established a system of staged decision-making. At the first stage, the Forest Service develops a Land Management Plan (forest plan). 16 U.S.C. § 1604(a); *Sierra Club*, 555 F.3d at 23. A forest plan establishes planning goals and objectives for management of national forest resources. 16 U.S.C. § 1604 (g)(1)-(g)(3). While forest plans establish management goals and broad standards and guidelines, they do not authorize any on-the-ground action. *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 729-30 (1998). At the second stage, the Forest Service proposes, analyzes, and approves project-level decisions, such as timber harvests or recreational enhancements. *See id.* "All projects within a forest must comply with the overall plan for that forest." *Sierra Club*, 555 F.3d at 23 (citing 16 U.S.C. § 1604(i)); *Sierra Club v. Wagner*, 581 F. Supp. 2d 246, 251 (D.N.H. 2008), *aff'd,* 555 F.3d 21 ("The Forest Plan is, then, somewhat analogous to a city's zoning ordinance.").

In reviewing a NFMA challenge under the APA's deferential standard of review, courts "give the Forest Service ample latitude in ensuring the consistency of its actions with Forest Plans...." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020); *Lamb*

*v. Thompson*, 265 F.3d 1038, 1047 (10th Cir. 2001). A court may "conclude that the Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan." *Lands Council v. McNair*, 537 F.3d 981, 994 (9th Cir. 2008), *overruled on other grounds by Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 n.10 (9th Cir. 2009).

## III. STANDARD OF REVIEW

Neither NEPA nor NFMA provide a private right of action, so courts review the Forest Service's approval of a final agency action under the APA. *Utah Envt'l Cong. v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006). The Court's review is limited to the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 742 (1985); *Lovgren v. Locke*, 701 F.3d 5, 20 (1st Cir. 2012). Under the APA, a court may not set aside a decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024). "Under this standard, we are required to determine whether the agency's decision is supported by a rational basis, and if so, we must affirm." *River Street Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009); *Assoc. Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997) ("Because the APA standard affords great deference to agency decisionmaking and because [agency] action is presumed valid, judicial review, even at the summary judgment stage, is narrow.").[2]

[2] Plaintiff filed twelve declarations with its opening brief. DN 41-2 through DN 41-13. While Defendants do not object to the declarations to establish standing, they may not be considered in evaluating the merits of Plaintiff's claims. *See* Pl.'s Mem. 3, 4, 11, 19, 23 (citing declarations outside of its arguments on standing (at *id.* 6)). Plaintiff also refers to an extra-record website (at *id.* 24, n.13). This website may not be considered for the merits of Plaintiff's claims, either. *Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the

This case is brought under the APA and has been assigned to this district's Administrative Track, L.R. 40.1(a)(1). Complaint ¶ 33, DN 1 ("Compl."); DN 12-1, ¶1. Consequently, "material facts" cannot be admitted or opposed as they might in other civil actions with discovery and possible trial. *See* L.R. 56.1; *Atieh v. Riordan*, 727 F.3d 73, 76 (1st Cir. 2013) ("APA review…involves neither discovery nor trial."). The following factual background provides an overview of the two Projects challenged in this action.

## IV. FACTUAL BACKGROUND

The White Mountain National Forest (Forest) encompasses nearly 800,000 acres in northern New Hampshire and western Maine. AR3621.[3] The Forest was established under the Weeks Act of 1911, which authorized the Secretary of Agriculture to purchase cut-over and denuded land for the National Forest System "necessary to the regulation of the flow of navigable streams or for the production of timber." 16 U.S.C. § 515. As the first region to be widely settled in the United States, eastern forests have had a long history of intensive harvesting and conversion of forests to agriculture. AR13259. The first land purchased for the Forest was in 1914 near Benton, New Hampshire. AR3621. More recently, the lands comprising the Tarleton Project area were transferred to federal ownership in the late 1990s and early 2000s. AR11930.

The Forest is the largest public land area in New England. AR3624. The Forest offers a wide range of high-quality recreational opportunities and provides ecological services and wildlife habitat. AR3622. The Forest also continues to provide timber and other forest products, primarily for local and regional markets. AR3622. These diverse and sometimes competing

---

administrative record already in existence, not some new record made initially in the reviewing court."); *Lovgren*, 701 F.3d at 20 ("Our review is limited to the administrative record….").

[3] Record documents are identified with the prefix "AR" followed by a five-digit Bates number. Defendants lodged the Administrative Record on July 30, 2024 (DN 9) and additional documents on August 30, 2024 (DN 13), and corrected documents on October 31, 2024 (DN 15).

interests are managed according to the Forest Service's multiple-use mandate, which requires the Forest to be "administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528. The 2005 Land and Resource Management Plan (Forest Plan) guides decisions to implement the Forest's multiple-use mandate and helps meet the Forest Service's mission "to sustain the health, diversity, and productivity of the nation's forests and grasslands to meet the needs of present and future generations." AR3616. The Forest Plan was developed under NFMA, the Forest Service's 1982 Planning Rule, and NEPA. AR3620.

Portions of the Forest currently are not meeting the Forest Plan's desired conditions. Relevant here are Peabody and Tarleton, two of the Forest's fifty-nine Habitat Management Units (HMUs).[4] Analyses of the two HMUs show that neither meets habitat composition and age class objectives. AR4877, 11973; *see* AR12350-53, 17907-14. For example, both Project areas lack young (regeneration-age) forest habitat, softwood species like spruce and fir, and open forest conditions more favorable to shade intolerant tree species – all of which would be more prominent but for historical disturbances like intensive logging. AR4877-78, 11973.

To move the Forest landscape towards desired conditions, the Forest proposed the Peabody Project in March 2019 and the Tarleton Project in October 2019. AR4868, 11931. Over four years and as required by NEPA, the Forest Service conducted a robust and open public process to develop and analyze the Project proposals. The Forest Service held open houses, solicited comments and objections from the public, conducted field and site visits, used Forest Service experts to analyze environmental effects, and revised and modified proposed activities.

[4] The Forest Plan defines "HMU" as a "block Forest land in which habitat composition and age class objectives will be established to help ensure that habitats are well distributed across the Forest and provide a framework for analyzing project impacts to wildlife habitat at a local scale. Blocks vary in size from about 6,000-49,000 acres and contain a variety of habitat types and land in a mix of Management Areas." AR3586.

AR4120-22, 4868, 11931-11934. The Forest Service analyzed the Projects' environmental effects in EAs, which culminated in FONSIs that documented why neither Project has significant effects within the meaning of NEPA and thus do not require EISs. AR4876-912 (April 2023 Peabody final EA and FONSI), 11968-12001 (November 2023 Tarleton final EA and FONSI).

Peabody is in the Androscoggin Ranger District along State Highway 16, a few miles south of Randolph and Gorham. AR4892 (Figure 1). The Project authorizes activities in a 3,000-acre Project area in the 15,500-acre Peabody HMU. AR4877. Activities include commercial and non-commercial vegetation treatments, expansion of a wildlife opening, road construction and reconstruction, and recreational improvements for mountain biking, skiing, and swimming. AR4867, 4881, 4892-95 (Figures 1-4).[5] All proposed silvicultural treatments would occur on Management Area (MA) 2.1 lands (General Forest Management), whose purpose includes providing high-quality sawtimber and other timber products on a sustained yield basis and providing a balanced mix of habitats for wildlife species. AR3474. No treatments are proposed in old forest or old growth habitats in the Project area. AR4880.

Tarleton is in the Pemigewasset Ranger District east of State Highway 25 around Lake Katherine and Lake Tarleton near the communities of Warren and Glencliff. AR11995 (Figure 1). Prior to the Forest's acquisition of the Project area in the late 1990s, the area was heavily harvested by private timber companies and contained tracts managed by the state. AR11973-74. The Project authorizes vegetation management, wildlife, and recreation activities on a 755-acre Project area in the 5,375-acre Tarleton HMU. AR11971, 11995-98 (Figures 1-4); *see* AR11976 (Table 1) (vegetation treatments), 11977-82 (defining treatments). All proposed silvicultural

---

[5] Modern timber management includes a variety of treatments that serve different purposes. The Peabody EA identifies the objective, prescription type, and acreage for the vegetation treatments. AR4881 (Table 1); *see* 4882-85 (defining treatments).

treatments would occur on either MA 2.1 lands or MA 8.3 (Appalachian National Scenic Trail) lands, the latter whose purpose is to manage the segment of the Trail in the Forest and provide for the conservation and enjoyment on the Trail and recreation opportunities. AR3516. None of the stands in the Project area are old forest or old growth habitat. AR12919. No proposed units within MA 8.3 are within the foreground (500 feet) of the Appalachian Trail, and thus meet Forest Plan scenic requirements for the Trail. AR11988-89; *see* AR3523.

The Forest Service District Rangers signed separate Decision Notices in November 2023 and February 2024 authorizing Tarleton and Peabody, respectively, to proceed. AR4867-69, 11929-34. Habitat restoration work unrelated to timber harvest began this summer in Tarleton. *See* DN 8 at 7, ¶ 2 (July 2024 Joint Case Management Plan). The Forest Service has awarded a timber sale contract for Peabody, but has not yet advertised or awarded a contract for the associated road work. The earliest timber operations could begin in a portion of Peabody is mid-December 2024, depending on contract timelines and conditions. *Id.* The earliest timber operations could begin in Tarleton is December 2025. DN 8 at 7. While not everyone supports the Projects, *see* Compl., the Projects enjoy strong support from the local community, state and local governments, and a wide array of interest groups. *See, e.g.*, AR4325 (Town of Gorham); 4719, 13132 (Appalachian Mountain Club); 10031-10032 (New Hampshire Department of Natural and Cultural Resources); 10806-07 (New Hampshire Department of Fish and Game).

## V. ARGUMENT

### A. The Projects' alternatives analyses are not arbitrary and capricious.

Claim One alleges the Forest Service violated NEPA because the Projects did not consider alternatives. Pl.'s Mem. in Supp. of Mot. for Summ. J. 10-14, DN 14-1 (Pl.'s Mem.) ; Compl., ¶¶ 178-192. Plaintiff is wrong. The Forest Service's detailed evaluation of the proposed

action and inclusion of no action as a comparative baseline satisfies NEPA's requirement to consider a reasonable range of alternatives.

1. <u>Analyzing the proposed action with a comparative no action baseline satisfies NEPA.</u>

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action." 42 U.S.C. § 4332(2)(E). For alternatives eliminated from detailed study, the agency need only "briefly discuss the reasons." 40 C.F.R. § 1502.14(a). "It is well-settled that under NEPA the range of alternatives that must be discussed is a matter within an agency's discretion." *Friends of Animals v. Romero*, 948 F.3d 579, 591 (2d Cir. 2020). "[A]n agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." *Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 470 F. Supp. 2d 30, 62 (D.N.H. 2007) (citation and quotation omitted). An agency need not consider alternatives which are "infeasible, ineffective, or inconsistent with the basic policy objectives" for the management of the area. *Lovgren*, 701 F.3d at 37. "[T]he process of studying alternatives is not endless." *Seacoast Anti-Pollution League v. Nuclear Reg. Com'n*, 598 F.2d 1221, 1230 (1st Cir. 1979).

The Forest Service's NEPA regulations for EAs provide that "[n]o specific number of alternatives is required or prescribed." 36 C.F.R. § 220.7(b)(2). In an EA, the Forest Service may "document consideration of a no-action alternative through the effects analysis by contrasting the impacts of the proposed action and any alternative(s) with the current condition and expected future condition if the proposed action were not implemented." 36 C.F.R. § 220.7(b)(2)(ii).

"In order to determine whether an alternative advances the project's purpose and need, an agency must consider the nature and scope of the proposed action." *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1065 (9th Cir. 2023). Here, the primary purpose of the two Projects is to implement the management direction of the Forest Plan by advancing forest plan goals,

objectives, and desired conditions for vegetation, wildlife, and other resources. AR4877, 11972. Analyses of the current habitat conditions show that neither the Peabody nor the Tarleton HMUs are meeting Forest Plan MA 2.1 habitat composition or age class objectives. AR4877, 11973; *see* AR3433-34 (Forest Plan objectives for MA 2.1).

To implement the Projects' goals, the Forest Service analyzed in detail the proposed action (AR4880-88, 11976-83) and included in the effects analysis a no action alternative to contrast the effects of the proposed action (AR4897, 11975). Neither NEPA's implementing regulations nor the Forest Service's NEPA regulations require the agency to examine a specific number of alternatives. 40 C.F.R. § 1502.14; 36 C.F.R. § 220.7(b)(2). The consideration of a proposed action with a no action baseline – and no other alternatives – satisfies NEPA. 36 C.F.R. § 220.7(b)(2); *Earth Island Inst.*, 87 F.4th at 1065 ("We have repeatedly held that an agency satisfies NEPA when it considers only two alternatives – action and no action."); *Utah Env't Cong. v. Bosworth*, 439 F.3d 1184, 1195 (10th Cir. 2006) ("[T]he Forest Service examined a reasonable range of alternatives and did not act arbitrarily when it considered only the no-action alternative and the modified proposed action.").

2. Plaintiff's suggested alternatives do not meet the Projects' purpose and need.

Plaintiff does not challenge the reasonableness of the Projects' purpose and need statements. Instead, Plaintiff claims the Forest Service "failed to analyze alternatives to log less or otherwise reduce the Project's negative environmental effects." Pl.'s Mem. 10. The Forest Service considered Plaintiff's "Alternative 3" to Tarleton, a recreation and habitat-focused alternative that would prohibit timber harvest. AR10553 (comment #27). The Forest Service explained that Plaintiff's Alternative 3 was not reasonable because it did not meet the Project's purpose and need to address habitat composition and age class objectives for MA 2.1, which can

be adjusted only through timber harvest. AR12904 (identifying response to comment #27); AR12353-55, 17911-13 (HMU Rationales). In Peabody, Plaintiff suggested an alternative that also prohibited timber harvest in MA 2.1 and included some habitat enhancements, such as introducing beavers or girdling trees. AR4845 (line #22 of spreadsheet, at the top of page). The Forest Service explained, "this alternative functionally represents a partial implementation of the full Proposed Action and would not meet the need as well as the full Proposed Action." *Id.*; AR6107 (objection response for line #22). Contrary to Plaintiff's claim, Pl.'s Mem. 12, the Forest Service did not "refuse" to look at other alternatives.[6] The Forest Service provided a brief explanation why Plaintiff's alternatives did not meet the Projects' purpose and need. 40 C.F.R. § 1502.14(a). "[F]urther explanation was not required." *Lovgren*, 701 F.3d at 37.

Plaintiff does not meet its burden to show the Forest Service's range of alternatives is arbitrary and capricious. No regulation requires a specific number – or even any – alternatives; NEPA only requires an agency to examine "reasonable" alternatives (40 C.F.R. §§ 1502.14(a), 1508.9(b)), and Forest Service regulations expressly state that "[n]o specific number of alternatives is required or prescribed." 36 C.F.R. § 220.7(b)(2). The Forest Service considered Plaintiff's proposed alternatives and explained why they did not meet the Projects' purposes and need. The Forest Service was well within its discretion to consider only the proposed action with the effects of no action as a comparative baseline. *Friends of Animals*, 948 F.3d at 591.

---

[6] The Forest Service was receptive to constructive public comments and modified the proposed actions where possible. For example, in response to feedback about dispersed recreation in Tarleton, the Forest Service increased the no-cut buffer along Lake Tarleton from 100 to 300 feet. AR11971. The Forest Service modified Peabody to remove all activities from the Hermit Lake Complex, which contains facilities for year-round mountaineering. AR4806. The Forest Service also reduced forestry activities from the initial proposals by 49% for Peabody (4,500 to 2,220 acres) and by 21.5% for Tarleton (880 to 690 acres). AR4087, 9473.

Plaintiff's cited authority does not show that the Forest Service' range of alternatives is arbitrary and capricious. Plaintiff selectively quotes NEPA for language about a "range of alternatives," but omits the key modifiers of "appropriate" and "reasonable." Pl.'s Mem. 10 and 12 (citing 42 U.S.C. § 4332(H) and 42 U.S.C. § 4332(C)(iii)).[7] Plaintiff's selective quoting of the statute also ignores NEPA's implementing regulations, which emphasize that alternatives must be reasonable. 40 C.F.R. §§ 1502.14(a), 1508.9(b). Two of Plaintiff's cases involve the range of alternatives in an EIS, not an EA. Pl.'s Mem. 12-13 (citing *Bob Marshall All. v. Hodel*, 852 F.2d 1223 (9th Cir. 1988) and *Nat. Res. Def. Council, Inc. v. Callaway*, 524 F.2d 79 (2d Cir. 1975)). But, "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." *Nw. Bypass Grp.*, 470 F. Supp. 2d at 62. For the two cases that concerned EAs, the courts upheld the range of alternatives. Pl.'s Mem. 12-13 (citing *City of New York v. U.S. Dep't of Transp.*, 715 F.2d 732 (2d Cir. 1983) and *Conservation Law Found. v. U.S. Army Corps of Eng'rs*, 457 F. Supp. 3d 33, 57 (D.N.H. 2019).

That the Forest Service included additional alternatives in a different forest health project's analysis does not show that *these* analyses are arbitrary and capricious, either. Pl.'s Mem. 12 (citing AR2229-56, the Albany South Project). In its comments on Peabody, Plaintiff cited the Albany South Project to argue the Forest Service should have considered an alternative that eliminated timber harvesting in a portion Project area. AR4845. The Forest responded, "this alternative functionally represents a partial implementation of the full Proposed Action and would not meet the need as well as the full Proposed Action." *Id.* The Forest Service provided a

[7] *See* 42 U.S.C. § 4332(H) (agencies must "study, develop, and describe *appropriate* alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources") and 42 U.S.C. § 4332(C)(iii) (requiring "a *reasonable* range of alternatives to the proposed agency action").

rational explanation for why Albany South was not a useful comparison and why partial implementation was not a reasonable alternative in Peabody. 40 C.F.R. § 1502.14(a). That is all NEPA requires. Additionally, a different District Ranger authorized the Albany South Project than these two Projects. *Compare* AR2191 *with* AR4869, 11934. That different Forest Service officials have different management approaches does not show their decisions to analyze a different range of alternatives for these Projects is arbitrary and capricious.

3. Forest Service regulations do not require a stand-alone no action alternative.

Plaintiff also argues the Forest Service failed to analyze "a genuine no action alternative." Pl.'s Mem. 12. The Forest Service's NEPA regulations explicitly allow an EA to "document consideration of a no-action alternative through the effects analysis by contrasting the impacts of the proposed action and any alternative(s) with the current condition and expected future condition if the proposed action were not implemented." 36 C.F.R. § 220.7(b)(2)(ii). The plain language of this regulation – which Plaintiff does not address – disposes of its claim that the Forest Service had to consider a stand-alone no action alternative.[8]

In the final rule implementing this regulation, the Forest Service explained "[t]here is no specific CEQ requirement to include a no-action alternative in an EA and the language follows CEQ's EA guidance…." NEPA Procedures, 73 Fed. Reg. 43084-01, 43,092 (July 24, 2008). The Forest Service further explained, "[b]y contrasting the impacts of the proposal and alternatives with the current condition and expected future condition of the environment, the effects of a no-action alternative are considered." *Id.* at 43,093. Here, the Forest Service, in its best judgment, exercised this option to best serve the need of the Projects' analyses. *See id.*; *see also* AR6107

[8] None of Plaintiff's cases about a no-action alternative address 36 C.F.R. § 220.7(b)(2)(ii). *See* Pl.'s Mem. 12-14. While the regulation has been in effect since 2008, this claim appears to be an issue of first impression.

(objection response #1), 12904 (objection response #6), 10551 (response to comment #23). The consequences of no action in the EAs adequately describe the existing conditions of the Project areas and provide useful baselines from which to compare the effects of the proposed actions. AR4897, 11975; *see* AR11973-74, 17906-18 (describing existing conditions in the HMUs). A stand-alone no action alternative was not required. 36 C.F.R. § 220.7(b)(2)(ii).

In sum, the procedure the Forest Service used to examine the effects of the proposed actions with a no action comparative baseline satisfies NEPA and is not arbitrary and capricious. As the First Circuit held in *Seacoast Anti-pollution League*, "*Vermont Yankee* makes it clear that the NEPA requirement of studying alternatives may not be turned into a game to be played by persons who for whatever reasons and with whatever depth of conviction are chiefly interested in scuttling a particular project." 598 F.2d at 1230-31 (citing *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978)). While Plaintiff may want the Forest Service to consider additional alternatives, there is no requirement to do so and Plaintiff did not meet its burden to present a reasonable, but unexamined alternative. The Court should grant judgment for Defendants on Claim One.

**B. <u>The Forest Service conducted a reasonably thorough evaluation of the Projects' environmental effects.</u>**

Claim Two alleges the Forest Service did not take a "hard look" at the Projects' direct, indirect, and cumulative impacts. Pl.'s Mem. 14-28; Compl., ¶¶ 192-205. Plaintiff alleges the Forest Service did not adequately examine effects to water quality, the northern long eared bat, scenery and recreation, forest health, and climate. Plaintiff's litany of complaints merely fly-speck the environmental analyses and do not show that the decisions are arbitrary and capricious.

NEPA requires agencies to evaluate the "reasonably foreseeable environmental effects of the proposed agency action." 42 U.S.C. § 4332(C)(i)). In doing so, an agency must consider the

direct, indirect, and cumulative impacts of the proposed action. 40 C.F.R. §§ 1502.16, 1508.7, 1508.8. The court's only role is the ensure "the agency has taken a 'hard look' at environmental consequences; it cannot interject itself within the area of discretion of the executive as to the choice of the action to be taken." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976). Courts apply a "rule of reason" and "should not 'fly speck' an [environmental analysis] and hold it insufficient based on inconsequential or technical deficiencies." *Dubois v. Dep't of Agric.*, 102 F.3d 1273, 1287 (1st Cir. 1996). "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *United States v. Buzzards Bay*, 644 F.3d 26, 31 (1st Cir. 2011).

1. <u>The Forest Service reasonably evaluated direct and indirect effects.</u>

a. <u>The Forest Service analyzed impacts to water quality with its percent basal area removal methodology.</u>

The measure the Forest uses to assess the impacts of timber harvesting on water quality is the percent basal area removed in a watershed that contains a perennial stream. AR4900, 11987; *see* AR1-2 (flow charts showing steps of basal area calculation). Basal area is the cross-section of a tree at breast height (4.5 feet above ground), and is common way to measure the density of a stand. AR3578. When basal area removed in a watershed does not exceed 20%, there is high confidence of no measurable effect on water quality resulting from timber harvest. AR4900, 11988. The Forest Service explained its water quality methodology in the 2022 Albany South EA, which both Projects incorporate by reference. AR4900, 11987-88; *see* AR2331-49 (Albany South EA), AR6369-437 (Albany South Water Resources Report).

Of the fifty-seven watersheds in the Peabody Project area, the Forest Service determined basal area removal will exceed 20% in twelve watersheds. AR4900; AR6441-42 (57 watersheds,

with 12 highlighted in yellow). Of these twelve watersheds, seven do not provide perennial fish habitat, so the Forest found no concerns with changes in water quality. AR4900. The remaining five watersheds probably contain fish habitat, and the highest basal area removed is 27.3%. AR4900. In these five watersheds, changes of concern are a decrease in pH or an increase in aluminum. AR4900. But due to the dominant bedrock in the five watersheds (Two-mica granite), the effect on stream pH is expected to be minor and of short duration (one to three years). AR4900. And even at the 27% basal removal level, aluminum leaching is not expected to reach toxic thresholds. AR4900. Of the twelve watersheds in the Tarleton Project area, percent basal removal area ranges from 0.5% to 15.5%. AR13750. Three watersheds in the area (Lake Tarleton, Lake Katherine, Eastman Brook) are impaired with mercury contamination, acidity, or both. AR11987. Because removal does not exceed 20% in any watershed, no measurable adverse effects to water quality are expected from the Project. AR11988, 13750. Nor are any measurable increases in acidity or mercury expected. AR11987.

Both Projects comply with the Clean Water Act. AR4901, 11987. Both Projects also include design features to reduce potential negative effects from activities, such as implementing national and state best management practices, limiting ground-disturbing activities to appropriate seasons, and minimizing stream crossings where possible. AR4889, 11984. The Forest Service also approved a 300-foot buffer for activities around Lake Tarleton, four times greater than the 75-foot buffer suggested under best management practices. AR12912.

Plaintiff alleges the water quality analysis is deficient "because it did not actually look at the water quality within the impacted areas; rather, it made generic assertions based on its prior assessment of another distant site." Pl.'s Mem. 16. Plaintiff misinterprets the water quality analysis. The Project EAs did not rely on Albany South to replace the water quality analysis.

Rather, the EAs incorporated by reference the Albany South EA for more information about the percent basal removal methodology. AR4900, 11987-88; *see also* AR12910 (objection response explaining that "[t]he analysis protocols used for the Albany South project were used again for the Tarleton project because studies in the White Mountains indicate the validity of this method."). The Forest Service then used the percent basal removal methodology to conduct Project-specific assessments of impacts to water quality in the watersheds. AR4900, 11987-88.

Plaintiff also misinterprets this Court's prior holding in *Conservation Law Foundation*. In that case, the Court found that the effects analysis of a dredging project was not arbitrary and capricious because the Corps surveyed the aquatic ecosystem and discussed the specific impacts the proposed dredging activities will have on local species. *Conservation Law Found.*, 457 F. Supp. 3d at 62. The Court did not hold that on-the-ground surveys are required for an adequate water quality effects analysis. Moreover, the Army Corps and Forest Service are analyzing different ecosystems using their own methodology. Percent basal removal is how the Forest Service assesses impacts to water quality on the Forest.

Plaintiff may prefer sampling or some other undefined "site-specific assessment," but the Forest Service is entitled to rely on its own methodology when evaluating environmental effects. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); *Advocs. for Transp. Alts., Inc. v. U.S. Army Corps of Eng'rs*, 453 F. Supp. 2d 289, 304 (D. Mass. 2006) ("[T]he Court grants substantial deference to the agency's choices regarding methodology and technical analyses" (citing *Town of Norfolk v. U.S. Army Corps of Eng'rs*, 968 F.2d 1438, 1446 (1st Cir. 1992))).

b. The Forest Service prepared Project-specific biological evaluations to examine impacts to the northern long-eared bat.

At the request of the Forest Service, the U.S. Fish and Wildlife Service (FWS) reinitiated consultation and completed a programmatic biological opinion under the Endangered Species Act for the effects to the northern long-eared bat (*Myotis septentrionalis*) from planned and ongoing activities in the Eastern and Southern Regions of the Forest Service. AR3302-58.[9] FWS concurred with the Forest Service's determination that the Projects may affect but were not likely to adversely affect the bat. AR3302-03 (FWS letter); *see* 3398 (Peabody, #55659), 3399 (Tarleton, #56394). The Forest Service also evaluated effects on the bat through Project-specific biological evaluations (BEs). AR9238-58, 13915-61. The BEs took a conservative approach and assumed that bats were present even though no bats were captured during the most recent two-night survey conducted in 2019. AR9243-44, 13923. The Forest Service determined that the Projects may affect but are not likely to adversely affect the bat. AR9244, 13925.

Plaintiff's criticisms of the analyses on the bat have no merit. Pl.'s Mem. 18. The First Circuit holds that agency reliance on a biological opinion to document impacts to wildlife violates NEPA "if (1) the biological opinion is defective, or (2) the agency blindly relies on the biological opinion without conducting its own independent analysis." *Nantucket Res. Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1, 21 (1st Cir. 2024). Neither applies here. Plaintiff has identified no defects in the programmatic biological opinion, and the Forest Service conducted its own analysis of effects to the bat in the Project-specific BEs. AR9238-58, 13915-61. Plaintiff does not acknowledge the Projects' BEs at all. The Forest Service's EAs, BEs, and consultations with FWS satisfy the Forest Service's obligations to analyze effects to

[9] In November 2022, FWS reclassified the bat from threatened to endangered. AR3302. The reinitiated programmatic consultation addresses the change in the bat's listing.

Federally listed species and their critical habitat. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 650 (9th Cir. 2014) ("Congress specifically contemplated that an agency could comply with NEPA while discharging its duties under Section 7 of the ESA." (citing 16 U.S.C. § 1536(c)(1))).

As for surveys, the Forest Service relied on surveys conducted in 2019 that did not find any bats. Plaintiff does not claim that these surveys are unreliable, and even if "some of the data is 'old' does not mean that the data is unreliable." *Friends of Rapid River v. Probert*, 427 F. Supp. 3d 1239, 1258 (D. Idaho 2019), *aff'd,* 816 F. App'x 59 (9th Cir. 2020). More importantly, rather than conducting new surveys, the Forest Service assumed that bats were present – a far more conservative approach than looking for bats that may not be found. The Court must defer to the Forest Service's reasonable methodology that evaluated effects to bats by assuming their presence. *Town of Winthrop v. FAA*, 535 F.3d 1, 13 (1st Cir. 2008).

c. <u>The Forest Service analyzed impacts to scenery and recreation.</u>

The Forest Service conducted a reasonably thorough analysis of the Projects' effects on scenery and recreation. The Forest Service prepared scenery and recreation specialist reports for each Project and summarized the findings in the EAs. AR4887-88, 4897-98, 6462-64, 6498-506 (Peabody); AR11983, 11988-89, 13793-80, 13826-50 (Tarleton). The Forest Service identified four viewpoints in Peabody and nine viewpoints in Tarleton that best represented a Project area's viewshed. AR4898, AR4896 (map) (Peabody); AR11988, 11999 (map) (Tarleton). Using these viewpoints, the Forest Service modeled and adjusted the design of some of the timber units (*i.e.*, reducing size or changing prescriptions) to minimize visual impacts and to ensure Forest Plan compliance. AR4898, 11988-99. The EAs explain how the Projects contribute to providing quality and sustainable recreation experiences for visitors. AR4878-79, 4887-88, 11974-75,

11983, 11988. Both Projects include design features to reduce impacts to recreation, including an expanded 300-foot no-cut buffer for units next to Lake Tarleton. AR4890 (REC-1 through REC-5), 119894 (REC-1). The Forest Service also identified the location and prescription of timber units near recreation opportunities. AR4892-95 (Figures 1, 3, 4), 11995-97 (Figures 1, 2, 3).

Plaintiff complains that Tarleton's nine viewpoints were inadequate because the Forest Service should have included a floating viewpoint on Lake Tarleton itself. Pl.'s Mem. 19. As the Forest explained in its objection response, neither the Forest Service's Landscape Aesthetic Handbook (AR889-1134) nor the Forest Plan (AR3477-79) provide specific guidance for how to select viewpoints. AR12925 (#33). Forest Service specialists therefore used their knowledge of the Project area, mapping tools, and site visits to select the most representative viewpoints and then assess the Project's impacts on those viewpoints. *See* AR13826-50. This methodology is reasonable, well-informed, and entitled to deference. *Marsh*, 490 U.S. at 378. The Forest Service also explained that floating viewpoints had practical problems because they were not fixed and could not be precisely revisited for monitoring over time. AR12926. An agency decision can be found arbitrary and capricious if the agency "*entirely* failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (emphasis added). That is not the case here because the record shows the Forest Service considered, in tremendous detail, the Projects' effects on scenery.

Plaintiff also complains that the Forest Service did not inform the public about the location of Peabody's timber harvest units in relation to Great Gulf Trail and Great Gulf Inventoried Roadless Area. Specifically, Plaintiff complains the Forest Service did not prepare "overlay maps" obligating Plaintiff to "piece together where logging will occur." Pl.'s Mem. 20. This claim has no merit. The Forest Service provided several maps that show the location and

type of vegetation management in relation to recreational resources. AR4892-95 (Figures 1, 3, 4). The maps include roads, towns, streams and rivers, bike and ski trails, campsites, and other pertinent information that inform the public where Project activities will occur. *Id.* Figure 3 also *labels* the Great Gulf Trail in the lower lefthand corner. AR4894. The EA also incorporated the Peabody HMU Rationale by reference, and that analysis contains a map that shows the proposed units in relation to the Great Gulf Wilderness. AR17908. The Forest Service satisfied its procedural duties to reasonably inform the public of where Project activities will occur. 40 C.F.R. § 1500.1. Plaintiff's demand for overlay maps fly-specks the EA and would not contribute to a better-informed decision. *Dubois*, 102 F.3d at 1287.[10]

Finally, Plaintiff complains about scenic effects to the Appalachian Trail and recreational impacts baselines in Peabody. The Court's review of these two claims is barred by the doctrine of administrative exhaustion. The Forest Service's pre-decisional administrative review process requires that "[i]ssues raised in objections must be based on previously submitted specific written comments…the burden is on the objector to demonstrate compliance with this requirement…." 36 C.F.R. § 218.8(c). Objections not based on previously submitted written comments must be set aside. *Id.* § 218.10(a)(3). The reviewing officer rejected both claims, informing Plaintiff that its objections were not based on issues raised during scoping or any other designated opportunity for public comment. AR6113 (issues ## 8, 9). Plaintiff's failure to properly raise these claims during the Forest Service's mandatory objection process deprived the agency of the opportunity to consider the issues during the administrative process and thus bars

[10] With no elaboration, Plaintiff complains the Forest Service did not adequately assess impacts to the Great Gulf Inventoried Resource Area. Pl.'s Mem. 20. But the Forest Service completed a Wilderness and Roadless Areas Effects Analysis that explicitly addresses impacts to the Great Gulf Inventoried Roadless Area. AR6473-74; *see also* AR6120-21 (objection response #19).

judicial review. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004); *Massachusetts v. United States*, 522 F.3d 115, 132 (1st Cir. 2008); *Earth Island Inst.*, 87 F.4th at 1064.

Even if the Court were to consider these claims, two circuits have already dismissed such narrow-interested fly-specking. The First Circuit has already rejected claims that visual scarring – including from clearcutting – is significant within the meaning of NEPA. *Sierra Club*, 555 F.3d at 29. The Ninth Circuit holds that "NEPA does not require the Forest Service to cater to the preferred interests or preferences of one user group." *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1460 (9th Cir. 1996). While Plaintiff may be dissatisfied with the Forest Service's analysis of impacts to recreation, other local recreation groups support the Projects. *See, e.g.*, AR4719, 13132 (Appalachian Mountain Club); AR4304-05 (Granite Backcountry Alliance); AR4313 (Friends of Tuckerman Ravine); AR4672-74 (Ruffed Grouse Society).

d. The Forest Service analyzed impacts to forest health.

The EAs and supporting documents analyze the Projects' impacts on forest health. Each Project seeks to improve wildlife habitat diversity within the respective HMU. AR4877-78, 11973-74. The EAs summarize and incorporate by reference the "Rationale for Habitat Objectives" for the respective HMU (HMU Rationale). AR4877-78 (citing 17906-18), 11973-74 (citing 12344-57). The Forest Service determined existing HMU conditions through field stand examinations, data analysis and modeling, and site visits. AR12350, 17910; *see* AR9203-18, 13977, 13988 (HMU conditions); AR7836, 13898-911 (field notes). As found in the HMU Rationales and summarized in the EAs, neither HMU currently meets MA 2.1 habitat composition and age class objectives. AR4877, 11973; *see* AR12350-53, 17907-14. The EAs explain in detail how the proposed activities address the discrepancy between current conditions and desired Forest Plan goals and objectives in each of the HMUs. AR4880-85, 11976-82.

Plaintiff does not dispute the Forest Service's conclusions that neither HMU is meeting Forest Plan objectives for MA 2.1, nor that the proposed activities will move the HMUs toward desired conditions. Pl.'s Mem. 21-24. Instead, Plaintiff makes a confusing argument about the availability and accessibility of the raw stand surveys themselves.

Plaintiff first claims that the Forest Service "did not disclose the stand survey information during the public comment period…." Pl.'s Mem. 21. However, both the *draft and final* EAs clearly identified the HMU Rationales, and those Rationales identify stand surveys as one of the sources the Forest used to assess forest health. AR4877-78, 11973-74, 12350, 17910; *see* AR4803-04 (August 2022 Peabody draft EA), 11815 (April 2022 Tarleton draft EA). The draft EAs, final EAs, and material incorporated by reference inform the public how the Forest Service analyzed forest health. 40 C.F.R. § 1501.21; *Jones v. Nat'l Marine Fisheries Serv.*, 741 F.3d 989, 998 (9th Cir. 2013) ("[A]n agency may incorporate data underlying an EA by reference."); *Friends of the Clearwater v. Petrick*, 588 F. Supp. 3d 1071, 1097 (D. Idaho 2022) ("The Forest Service was not impeding agency or public review because the documents were available for inspection."). *Appalachian Mountain Club v. Brinegar* does not apply. Pl.'s Mem. 21 (citing 394 F. Supp. 105, 121 (D.N.H. 1975)). There, the court found the failure to include traffic data in a draft EA violated the Federal Highway Administration's own regulations. There is no corresponding Forest Service regulation requiring the agency to disclose stand survey data.[11]

Plaintiff then claims the stand surveys are too confusing, "rendering them unfit for public review." Pl.'s Mem. 23. As required by NEPA's implementing regulations, the EAs are written

[11] Further, anyone who wanted to see the stand surveys during the administrative process could have requested them. In fact, Plaintiff made such a request – one year after the Forest Service released the draft EA for Tarleton. The Forest Service responded within two weeks. AR12901; *see* AR9885 (FOIA response dated April 14, 2023). That Plaintiff waited more than a year to request data it now claims was "vital" to public review is not the fault of the Forest Service.

in plain language that can be readily understood. 40 C.F.R. § 1502.8. This regulation only applies to an environmental analysis – such as an EIS or EA – not to all documents supporting an agency's decision. *Id.* (EISs); *see Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 996 (9th Cir. 2004) (applying 40 C.F.R. § 1502.8 to EAs). The stand surveys necessarily are intended for specialists to interpret, including members of public who claim to have the requisite expertise. *See* Decl. of Zack Porter ¶¶ 5, 6, DN 14-2 (claiming academic and professional training in public lands management and forestry). As for Plaintiff's claim that the information is a "patchwork of stand surveys and spreadsheets," Pl.'s Mem. 23, the EAs and HMU Rationales contain clear prose and easy to understand graphics that explain why neither HMU is meeting Forest Plan objectives and goals. AR4877-78, 11973-74, 12344-57, 17906-18.

Plaintiff also questions the Forest Service's determination that no vegetation management will occur in old forest or old growth habitat. Pl.'s Mem. 22. Plaintiff does not identify any stands it thinks both have these attributes and authorized timber harvest, nor explain how any limited harvest within such a stand would necessarily impact old growth. Plaintiff thus fails to show that the Forest Service's stand data is arbitrary and capricious. *Friends of Rapid River*, 427 F. Supp. 3d at 1258-59 (rejecting NEPA challenge because "Plaintiffs have not cited any information, authority, or studies illustrating that the Forest Service's stand exam information (old or new) is erroneous or unreliable."). Rather than identifying particular stands, Plaintiff refers to the Forest Service's objection response and an email from a botanist. These documents show that while a few units were initially included for treatments, they were *dropped* once old-growth characteristics were confirmed. AR4527, 6116.[12] The Court should reject Plaintiff's

[12] Contrary to Plaintiff's assertion, the botanist's email is not a post hoc rationalization because the Forest Service itself identified the misclassified stands and the explanation is part of the Administrative Record. *Sierra Club*, 555 F.3d at 27.

allegation of timber harvest in old forest or old growth habitat both because of Plaintiff's "cryptic and obscure" references to unidentified stands and because of the Forest Service's demonstrated "willingness to receive evidence on the matters." *Vt. Yankee*, 435 U.S. at 554.

Plaintiff claims the Forest Service ignored Executive Order 14072, which requires the agency to inventory old growth and mature forest habitat and then develop policies to institutionalize climate-smart management and conservation strategies. Pl.'s Mem. 23-24; *see* Executive Order 14072, 87 Fed. Reg. 24851, 24852 (Sections 2(b) and 2(c)). The Forest Service did not "ignore" the Executive Order; it explained that although the initial inventory has been released, no strategies have been developed and that Order does not promulgate a specific policy. AR12905; *see* 6116 (stating the Order does not apply at the project scale).

Finally, Plaintiff claims the Forest Service ignored scientific literature it submitted. Pl.'s Mem. 24. This argument fails for two reasons. First, NEPA's requirement to address "responsible opposing view[s]" applies to EISs, not EAs. 40 C.F.R. § 1502.10(b); *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1020 (9th Cir. 2012); *see Vt. Yankee*, 435 U.S. at 549 (a court should not "impose upon the agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good."). Second, Plaintiff identifies no literature it believes should have been consulted, instead citing three vague propositions about timber harvest and carbon storage from its own Complaint. Pl.'s Mem. 24, n.14 (citing Compl. ¶¶ 65, 125). The Forest Service considered and addressed each of these propositions. AR4846-47, 4851, 10270-71; *see also* AR6115, 12906-07. Plaintiff's argument amounts to a complaint that the Forest Service did not specifically identify and respond to three pieces of literature buried in Plaintiff's voluminous submissions. But the Forest Service did not have to do so.

2. The Projects reasonably evaluate cumulative impacts to climate.

"[P]roper consideration of the cumulative impacts of a project requires some quantified or detailed information, not just general statements about possible effects and some risk." *Conservation Law. Found.*, 457 F. Supp. 3d at 58 (citation omitted). But "quantified data in a cumulative effects analysis is not a per se requirement." *Ctr. for Comm. Action & Env't Just. v. FAA*, 18 F.4th 592, 605 (9th Cir. 2021). The Forest Service's NEPA regulations for cumulative effects do not require the agency "to catalogue or exhaustively list and analyze all individual past actions." 36 C.F.R. § 220.4(f). The touchstones of NEPA is that impacts need only "be discussed in proportion to their significance" and that EAs are "concise public documents" that "briefly provide sufficient evidence…." 40 C.F.R. §§ 1502.2(b), 1508.9(a), (b).

In 2019, the Forest Service completed a Forest-wide carbon assessment. AR5678-703. The assessment quantifies the amount of carbon stored in the Forest and how disturbances, management, and environmental factors have influenced carbon storage over time. *Id.* The Forest Service also completed Project-level carbon assessments. AR6322-27, 13259-65. The Project-level assessments incorporate by reference the Forest-wide quantitative assessment and place the extremely small contribution each Project has into context with Forest carbon storage and global climate change. The Project-level assessments note that the 2,220 acres of vegetation management on Peabody Project and 690 acres of vegetation management on Tarleton affect no more than 0.5% and 0.1% of the 800,000-acre Forest, respectively. AR13260. The Projects' effects focus on aboveground carbon stocks stored in live woody vegetation, which comprise about 35% of the total ecosystem carbon stocks of the Forest. AR6322, 13260. In the context of global climate change, the Projects' contributions to global greenhouse gases are negligible. AR6323, 13260. Additionally, any carbon initially emitted is temporary, both because a healthier

and more resilient forest will regrow and because the harvested wood transfers to the product sector, where it may be stored for decades. AR6324, 13262. The EAs summarize and incorporate by reference the analyses in the Forest-wide and Project-level assessments. AR4900, 11987.

Plaintiff claims the Forest Service's cumulative impacts analysis is deficient for two reasons. First, it claims the Forest Service had to "disclose the cumulative climate impacts of its own projects…." Pl.'s Mem. 25; *see id.* n.15 (naming seven projects). An agency may "characterize the cumulative effects of past actions in the aggregate without enumerating every past project that has affected an area." *Ctr. for Env't Law & Pol'y v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1007 (9th Cir. 2011); *see* 36 C.F.R. § 220.4(g) (cataloging past actions is not required). The Forest-wide carbon report aggregates past projects, noting that timber harvesting from 1990 to 2011 was the primary disturbance influencing carbon stocks. AR5689. The record also identifies the date and type of past timber harvest in the Peabody Project area. AR7912. The Tarleton Project area was heavily harvested before the Forest Service acquired it in the late 1990s and early 2000s. AR11973-74. There have been no sales since.

Second, Plaintiff claims the climate analysis is deficient because it did not quantify the Projects' effects on climate change. Pl.'s Mem. 26-28. "Qualitative analyses are acceptable in an [environmental document] where an agency explains why objective data cannot be provided." *League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1076 (9th Cir. 2012) (cleaned up). The Project-level assessments explain why the extremely small amount of emissions cannot be reasonably quantified. AR6324, 13262.

None of Plaintiff's cases support their argument that the Forest Service must quantify the greenhouse gases for these two forest management projects with negligible emissions. *WildEarth Guardians v. Zinke* concerned the issuance of 473 oil and gas leases on more than 460,000 acres

of federal land in three western states. 368 F. Supp. 3d 41, 55 (D.D.C. 2019). *Center for Biological Diversity v. National Highway Traffic Safety Administration* challenged a nationally applicable final rule for fuel economy standards for light trucks. 538 F.3d 1172, 1191 (9th Cir. 2008). *Diné Citizens Against Ruining Our Environment v. Haaland* concerned 370 applications to drill for oil and gas in northern New Mexico. 59 F.4th 1016, 1044 (10th Cir. 2023).

In the context of forest management projects, which involve the renewable and carbon-storing resource of timber, most courts have not required the Forest Service to quantify a project's effects on climate change. For example, the Ninth Circuit previously upheld an EA for a project that authorized timber harvest "to reduce likely fire intensity" that did not discuss climate change. *Hapner v. Tidwell*, 621 F.3d 1239, 1242, 1245 (9th Cir. 2010). In doing so, the court correctly noted that potential "[i]mpacts shall be discussed in proportion to their significance." *Id.* at 1245 (quoting 40 C.F.R. § 1502.2(b). At least two district courts have upheld the Forest Service's qualitative analysis of a forest management project's climate impacts. *Swomley v. Schroyer*, 484 F. Supp. 3d 970, 975-77 (D. Colo. 2020) *aff'd*, No. 20-1335, 2021 WL 4810161 (10th Cir. Oct. 15, 2021); *League of Wilderness Defs. v. Connaughton*, No. 3:12-cv-2271-HZ, 2014 WL 6977611, at *26-27 (D. Or. Dec. 9, 2014).

Plaintiff cites *Center for Biological Diversity v. United States Forest Service* (*Black Ram*) to support a different conclusion, but that case is readily distinguishable. Pl.'s Mem. 27 (citing 687 F. Supp. 3d 1053, 1075 (D. Mont. 2023)). *Black Ram* improperly disregarded binding precedent from *Hapner* and failed to defer to Forest Service expertise about the potential impacts of a forest resiliency project. *Marsh*, 490 U.S. at 378. This failure is reflected in the court's facile framing of the issue: "logging causes immediate carbon losses, while re-sequestration happens slowly over time, time that the planet may not have." *Black Ram*, 687 F. Supp. 3d at 1076. The

*Black Ram* court ignored that harvested timber continues to store carbon when converted to wood products, and ignored that the remaining and new trees that grow in the healthier forest will sequester more carbon than if left untreated. AR6324, 13262.

Plaintiff also claims "on point CEQ guidance" requires quantification of emissions. Pl.'s Mem. 27 and n.17. It does not. In January 2023, CEQ promulgated interim guidance to help agencies analyze greenhouse gas and climate change effects for proposed actions. AR473. The interim guidance applies to "new proposed actions," AR489, and so does not apply to either of the Projects' NEPA processes that were well underway. *See* AR4085, 9741. For on-going NEPA processes, agencies are to exercise their judgment when considering whether to apply the guidance. AR489. Though not required, both Projects explain how their analyses comply. AR6116, 12905-06. Notably, the interim guidance provides that "actions with only small GHG emissions may be able to rely on less detailed emissions estimates." AR479. When an agency cannot provide a reasonable range of emissions, "the agency should provide a qualitative analysis and its rationale for determining that a quantitative analysis is not possible." *Id.* The Project-specific analyses explain that in the near-term, the Projects might contribute an extremely small quantity of emissions relative to national and global emissions. AR6324, 13262. Additionally, any negligible increase would be balanced and possibly eliminated because the remaining and new trees will have higher rates of growth and carbon storage. AR6324, 13261.

While quantification of climate impacts may be useful for certain projects (such as energy facilities or oil and gas development), it is not required here. *Ctr. for Env't Law*, 655 F.3d at 1007. The Forest Service's qualitative assessment of the Projects' negligible effects on global climate change satisfies NEPA's requirement discuss impacts in proportion to their significance. 40 C.F.R. § 1502.2(b); *Hapner*, 621 F.3d at 1245; *Swomley*, 484 F. Supp. 3d at 976.

In sum, none of Plaintiff's challenges to the Projects analysis of direct, indirect, or cumulative effects have any merit. The Forest Service conducted a reasonable analysis of effects in proportion to their significance. 40 C.F.R. § 1502.2(b); *Balt. Gas & Elec. v. Nat. Res. Defense Council*, 462 U.S. 87, 97 (1983) ("[A]n agency must consider only every *significant* aspect of a proposed action"). Plaintiff's demand for irrelevant detail merely fly-specks the EAs and would not contribute to an informed decision. *Dubois*, 102 F.3d at 1287. As the Ninth Circuit recently held, "[i]t is always possible to quibble with an agency's explanation; a motivated litigant will be able to identify parts of any agency explanation that could have been more precise or thorough. But the arbitrary and capricious standard does not demand perfection." *Earth Island Institute v. Muldoon*, 82 F.4th 624, 637 (9th Cir. 2023). That Plaintiff disagrees with the Forest Service's analysis "is not a basis for deeming it invalid. The NEPA ensures that an informed decision is made, not that the decision is satisfactory to all those affected by it." *Lovgren*, 701 F.3d at 38.

## C. <u>The FONSIs are not arbitrary and capricious.</u>

Claim Three alleges the Projects' FONSIs are unlawful. Pl.'s Mem. 28; Compl., ¶¶ 206-218. Plaintiff's barely articulated argument does not meet its burden to show that the Forest Service's conclusions on the Projects' lack of significant effects is arbitrary and capricious.

A FONSI "briefly present[s] the reasons why an action…will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared." 40 C.F.R. § 1508.13. Agencies consider both context and intensity to determine whether an action may "significantly affect" the environment. 40 C.F.R. §1508.27; *No East-West Hwy. Comm., Inc. v. Chandler*, 767 F.2d 21, 25 (1st Cir. 1985). "Context simply delimits the scope of the agency's action, including the interests affected." *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014). Intensity refers to the "severity of impact," and the

regulations identify ten factors that agencies should consider. 40 C.F.R. §1508.27(b)(1)-(10). To prevail on a claim that the decision not to prepare an EIS is arbitrary and capricious, "plaintiffs must do more than simply identify potential shortcomings in the projects themselves or their environmental assessments/decision notices." *Sierra Club*, 581 F. Supp. 2d at 268.

The FONSIs identify the context of the proposed actions and address each of the ten intensity factors. AR4904-06 (Peabody), 11991-93 (Tarleton). The objection response provided additional explanation for why the Projects do not have significant effects. AR6107-08, 12902-03. The FONSIs thus satisfy NEPA because they briefly explain why the Projects do not have significant environmental effects and why EISs are not required. 40 C.F.R. §§ 1508.13, 1508.27.

Though Plaintiff's Complaint alleges deficiencies in the Projects' context analysis and five of the ten intensity factors, their opening brief does not provide any legal argument to support their claim. *Compare* Compl. ¶¶ 213, 216 (alleging failure to identify context), ¶¶ 214, 217 (alleging failure to consider intensity factors 1, 3, 4, 7, 9) *with* Pl.'s Mem. 28. Instead, Plaintiff summarily claims the Forest Service's "failures, detailed above…resulted in unlawful [FONSIs]." Pl.'s Mem. 28; *see also id*. at 26, n.16 (disagreeing with the context for forest health and bat impacts). The Court should find that Plaintiff waived Claim Three because "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990); *In re Jackson*, 988 F.3d 583, 590 (1st Cir. 2021) ("The mere mention of a challenge suffices only to waive it."). Even if the Court finds that Plaintiff preserved Claim Three, its catch-all argument falls far short of Plaintiff's burden to show that the FONSI's consideration of context or any of the ten intensity factors are arbitrary and capricious. *Sierra Club*, 581 F. Supp. 2d at 268. Further, as discussed above, the EAs that a hard look at the

Projects' environmental effects and fully support the Forest Service's conclusions that the Project will not have any significant environmental effects within the meaning of NEPA.

**D. <u>The Projects comply with the Forest Plan</u>.**

Claim Four alleges the Projects do not comply with the Forest Plan and violate NFMA. Pl.'s Mem. 29-32; Compl, ¶¶ 219-229. Plaintiff alleges Peabody violates Forest Plan standards for scenery and eligible Wild and Scenic Rivers and that neither Project contributes to the conservation and recovery of the northern long-eared bat.[13] The Forest Service's EAs and supporting documentation show that the Projects comply with all Forest Plan standards. *See, e.g.*, 4906, 11993 (FONSIs documenting compliance with Forest Plan).

Plaintiff first alleges the Peabody Project violates Forest Plan "scenic standards" for Units 19, 20 and the wildlife opening. Pl.'s Mem. 30. Peabody is located entirely within MA 2.1 (General Forest Management). Contrary to Plaintiff's claim, there are no scenic *standards* for MA 2.1, but there are seven *guidelines*. AR3477-79. This distinction matters, because a "standard" must be followed and can only be changed through a Forest Plan amendment. AR3438. A "guideline," on the other hand, also must be followed, "but permits operational flexibility to respond to variations in conditions." *Id.* If a guideline is not followed, "the rationale for doing so must be documented in a project-level analysis and signed decision." AR3438.

Relevant here is Guideline 3, which generally limits visible openings to 3-4 acres in "high" scenic integrity areas in MA 2.1. AR3477. The Forest Service acknowledged that three of the units have relatively large even-aged treatments and would exceed Guideline 3 for MA 2.1. AR4898 (26 acres in Unit 19, 9 acres in Unit 20, and 19 acres in the wildlife opening); AR6521,

---

[13] Plaintiff also alleges that its NEPA arguments about stand data and scientific literature also show NFMA violations. Pl.'s Mem. 29. These barely articulated arguments are waived. *Zannino*, 895 F.2d at 17; *In re Jackson*, 988 F.3d at 590.

4892 (classifying Units 19, 20, and the wildlife opening as areas of "high" scenic integrity). But the EA explained that the larger openings in these units will better meet Project-level objectives for the area and help move the Forest towards desired conditions consistent with the Forest Plan. AR4898. Additionally, to minimize visual impacts from this modification, the Forest Service incorporated a design element to distribute the openings in units 19 and 20. AR4898; *see* AR4891 (SCM-1). Consistent with Forest Plan requirements, the Forest Service explained the rationale for modifying MA 2.1 Guideline 3 for these three units and documented the modification in the Peabody Decision Notice. AR4867. Under the APA's deferential standard of review, the Court should defer to the Forest Service's established procedure – followed here – to modify Guideline 3. *Or. Nat. Desert Ass'n*, 957 F.3d at 1035. Plaintiff cites no authority that prevents the Forest Service from modifying Forest Plan guidelines as it did here.

Plaintiff also alleges that Peabody does not comply with Forest Plan standards for the Peabody River and West Branch of the Peabody River, which are eligible for designation as Wild and Scenic Rivers. Pl.'s Mem. 30-31. Plaintiff failed to exhaust its administrative remedies for this claim because it did not raise this issue during scoping or any other designated opportunity for public comment. 36 C.F.R. §§ 218.10(a)(3), 218.8(c); AR6119 (objection response #16). Plaintiff cannot raise this claim for the first time in litigation. *Public Citizen*, 541 U.S. at 764; *Massachusetts*, 522 F.3d at 132. Even if the Court could reach the merits of this claim, the Forest Service analyzed impacts to the two eligible rivers and determined that Project activities would not result in irreversible or irretrievable changes that could affect potential designation. AR4902-03 and AR4903 (Table 7).

Finally, Plaintiff alleges the Projects do not contribute to the conservation and recovery of endangered species, and specifically the northern long-eared bat. Pl.'s Mem. 31-32. Forest

Plan Rare and Unique Features Standard 1 requires, "all project sites must be investigated for the presence of TES [Threated, Endangered, Sensitive] species and/or habitat prior to beginning any authorized ground-disturbing activity at the site. TES *plant* surveys must be completed for all new ground-disturbing projects, unless biologists/botanists determine TES species occurrence is unlikely." AR3448 (emphasis added). The Forest Service complied with Standard 1 because it investigated both Project areas for the presence of the bat, through Project-specific BEs that assumed bats were present and through reinitiated programmatic consultation with FWS. *See supra*, Part V.B.1.b. The Court should defer to the Forest Service's reasonable interpretation of the investigation required by Standard 1. *Or. Nat. Desert Ass'n.*, 957 F.3d at 1035.

Plaintiff believes an investigation must include surveys. Standard 1's requirement to conduct surveys applies to *plants* – the key term omitted from Plaintiff's paraphrase. Pl.'s Mem. 31 (citing AR3448). This omission is fatal to Plaintiff's claim. Surveys are not required for bats.

*Sierra Club v. Martin* does not apply, either. Pl.'s Mem. 31-32 (citing 168 F.3d 1 (11th Cir. 1999)). In *Sierra Club*, the Eleventh Circuit found that seven timber sales on Georgia's Chattahoochee National Forest violated NFMA because "the Forest Service did not obtain, and therefore did not consider, population inventory and population trend data…*as required by the Forest Plan* and the Forest Service's own regulations." 168 F.3d at 3 (emphasis added). This Forest Plan has no requirement to conduct a population inventory for the bat. AR3448. Additionally, 36 C.F.R. § 219.26 (1982), the regulation relied on in *Sierra Club* and cited by Plaintiff here applies only to population monitoring for management indicator species, which are selected representative species used to estimate effects of the forest plan on forest ecosystems. *Sierra Club*, 168 F.3d at 5 n.7. The northern-long eared bat is not one of the Forest's management indicator species, AR17899-90, so this regulation does not apply.

In sum, Plaintiff has not met its burden to show that the Projects do not comply with Forest Plan standards. While Plaintiff may disagree, the Forest Service's interpretation of its own Forest Plan is entitled to deference. *Or. Nat. Desert Ass'n*, 957 F.3d at 1035. The Court should grant summary judgment for the Forest Service on Claim Four.[14]

## VI. CONCLUSION

Plaintiff has not met its burden to show that the Peabody or Tarleton Projects are arbitrary and capricious. The Projects satisfy the Forest Service's multiple-use mandate and will create a more diverse, healthier, and more sustainable Forest for present and future generations. The Court should grant summary judgment for Defendants on all claims and deny Plaintiff's motion for summary judgment in its entirety.[15]

Respectfully submitted,

Dated: October 31, 2024.

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

---

[14] Plaintiff pleaded, but did not argue, claims about impacts to soil resources (Compl. ¶ 198); cultural resources, wilderness, and inventoried roadless areas on Peabody (*id.* ¶ 202); new information that would require a supplemental NEPA analysis (*id.* ¶¶ 207-08); and consistency with Forest Plan requirements for using the latest scientific information (*id.* ¶¶ 220, 224, 227). These claims are waived. *Sullivan v. Neiman Marcus Grp., Inc.*, 358 F.3d 110, 114 n.1 (1st Cir. 2004) (issues not raised in an opening brief on appeal are waived).

[15] In passing, and with no analysis, Plaintiff asks the Court to vacate the Projects' decisions. Pl.'s Mem. 32. The Forest Service satisfied its statutory obligations under NEPA and NFMA. If the Court concludes otherwise, it should permit the Parties to brief remedy. A court has wide discretion to fashion an appropriate remedy. *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 541-42 (1987). Whether to vacate agency decisions "rests in the sound discretion of the reviewing court; and it depends *inter alia* on the severity of the errors, the likelihood that they can be mended without altering the order, and on the balance of equities and public interest considerations." *Cent. Maine Power Co. v. FERC*, 252 F.3d 34, 49 (1st Cir. 2001). Unless or until a specific violation is established, it will not be clear what a reasonable remedy might be.

*/s/ John P. Tustin*
Texas Bar No. 24056458
Senior Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 305-3022
Fax: (202) 305-0275
john.tustin@usdoj.gov

JANE E. YOUNG
United States Attorney

**TABLE OF ACRONYMS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| CEQ | Council on Environmental Quality |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FONSI | Finding of No Significant Impact |
| FWS | Fish & Wildlife Service |
| HMU | Habitat Management Unit |
| NFMA | National Forest Management Act |
| NEPA | National Environmental Policy Act |
| TES | Threatened, Endangered, Sensitive |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| STANDING TREES, INC.<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES FOREST SERVICE, et al.,<br><br>*Defendants*. | Case No.: 1:24-cv-00138-JL-TSM |

**PLANTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION**

Christophe Courchesne
NH Bar No. 20431
Associate Professor and Director
Environmental Advocacy Clinic
Vermont Law and Graduate School
164 Chelsea Street, PO Box 96
South Royalton, VT 05068
(802) 831-1630
(802) 831-1631 (fax)
ccourchesne@vermontlaw.edu

*Counsel for Standing Trees, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... iii

GLOSSARY ..... v

INTRODUCTION ..... 1

ARGUMENT ..... 1

I. The Service Failed to Consider Alternatives as NEPA Requires. ..... 1

A. The Service failed to consider "appropriate" alternatives. ..... 2

B. Standing Trees' alternatives are reasonable. ..... 4

C. The Service failed to conduct a full no-action analysis. ..... 6

II. The Service Did Not Lawfully Evaluate The Projects' Environmental Effects. ..... 7

A. The Service failed to assess the Projects' direct and indirect impacts. ..... 7

1. The Service failed to take a hard look at forest health and improperly incorporated key forest health information by reference. ..... 8

2. The Service failed to explain its cursory water quality analysis. ..... 10

3. The Service failed to take a hard look at the Projects' impacts to the northern long-eared bat. ..... 12

4. The Service failed to adequately assess and inform the public of the Projects' scenic and recreational impacts. ..... 13

B. The Service failed to analyze climate or cumulative impacts. ..... 15

C. The Service violated NEPA and the APA by issuing an unlawful finding of no significant impact. ..... 18

III. The Projects Violate the Forest Plan. ..... 18

CONCLUSION ..... 20

# TABLE OF AUTHORITIES

## CASES

### United States Supreme Court Cases

*Baltimore Gas and Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87 (1983) ................................20

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004)..........................................................15, 20

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976) .........................................................................17

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989)...........................................................7

*Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ..........................19

### Circuit Court Cases

*Bark v. U.S. Forest Serv.*, 958 F.3d 865 (9th Cir. 2020)...................................................17

*Brown v. Nucor Corp.*, 785 F.3d 895 (4th Cir. 2015)..........................................................19

*City of New York v. U.S. Dep't of Transp.*, 715 F.2d 732 (2d Cir. 1993) ....................................2, 3

*Ctr. for Env't L. & Pol'y v. U.S. Bureau of Reclamation*, 655 F.3d 1000 (9th Cir. 2011).............17

*Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016 (10th Cir. 2023) .................16

*Dubois v. Dept. of Agriculture*, 102 F.3d 1273 (1st Cir. 1996) .............................................3, 6, 20

*Earth Island Institute v. U.S. Forest Service*, 87 F.4th 1054 (9th Cir. 2023) ..................................7

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850 (9th Cir. 2022)..........3, 10, 12, 18

*Friends of Clearwater v. Dombeck*, 222 F.3d 552 (9th Cir. 2000)..........................................15, 20

*Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095 (9th Cir. 2016) .......................11

*Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062 (9th Cir. 2002) ............................................15

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989 (9th Cir. 2004)...........16

*Lovgren v. Locke*, 701 F.3d 5 (1st Cir. 2012) ........................................................................6

*Nantucket Res. Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1 (1st Cir. 2024) ..........................................................................................................................13

*U.S. v. Zannino*, 895 F.2d 1 (1st Cir. 1990)...........................................................................19

*Utah Environmental Congress v. Bosworth*, 439 F.3d 1184 (10th Cir. 2006).................................7

*WildEarth Guardians v. Mont. Snowmobile Ass'n.*, 790 F.3d 920 (9th Cir. 2015) ......................8, 9

**District Court Cases**

*Conservation L. Found. v. U.S. Army Corps of Eng'rs*, 457 F. Supp. 3d 33 (D.N.H. 2019) ..........2, 3, 6, 11, 12

*Ctr. for Biological Diversity v. U.S. Forest Serv. (Black Ram)*, 687 F. Supp. 3d 1053 (D. Mont. 2023) ..........16

*Friends of Clearwater v. Petrick*, 588 F. Supp. 3d 1071 (D. Idaho 2022)..........8

*Gifford Pinchot Task Force v. Perez*, 2014 WL 3019165 (D. Or. 2014)..........10, 11

*Kettle Range Conservation Grp. v. U.S. Forest Serv.*, 2023 WL 4112930 (E.D. Wa. 2023) .........18

*Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 552 F. Supp. 2d 97 (D.N.H. 2008) ..........18

*Sierra Club v. Wagner*, 581 F. Supp. 2d 2464, *aff'd* 555 F.3d 21 (D.N.H. 2008)..........4

**STATUTORY AND REGULATORY AUTHORITIES**

42 U.S.C. § 4332(H) ..........2

36 C.F.R. § 220.7(b)(2) ..........2

40 C.F.R. § 1502.8 ..........13

40 C.F.R. § 1508.13 ..........18

40 C.F.R. § 1508.7 ..........15

40 C.F.R. § 1502.21 ..........9

40 C.F.R. § 1507.2(d) ..........2

40 C.F.R. § 1508.9(b) ..........2

**OTHER AUTHORITIES**

88 Fed. Reg. 1196, 1201 (Jan. 9, 2023) ..........15, 17

## GLOSSARY

| | |
|---|---|
| Administrative Procedure Act | APA |
| Appalachian Trail | AT |
| Biological Opinion | BiOp |
| Council on Environmental Quality | CEQ |
| Forest Service | Service |
| Greenhouse Gas | GHG |
| Habitat Management Unit | HMU |
| Inventoried Roadless Area | IRA |
| National Environmental Policy Act | NEPA |
| National Forest Management Act | NFMA |
| Tarleton and Peabody Projects | Projects |
| United States Fish and Wildlife Service | USFWS |
| White Mountain National Forest | Forest |
| White Mountain National Plan | Forest Plan |

## INTRODUCTION

Plaintiff Standing Trees challenges the U.S. Forest Service's (Service) approvals of the Tarleton and Peabody projects (Projects) in the White Mountain National Forest (Forest). This case is about ensuring the Service complies with the National Environmental Policy Act (NEPA), the National Forest Management Act (NFMA), and the Administrative Procedure Act (APA). Together, the Projects authorize nearly 3,000 acres of logging, twelve miles of road construction and reconstruction, and intrusion into inventoried roadless areas (IRA) and stands that contain old forest habitat—all without the requisite environmental review in violation of applicable law.

In defense of this flawed and cursory review, the Service resorts to mischaracterizing Standing Trees' positions and alternatives, overstating the transparency and rigor of the Service's process, and asserting—based on a self-serving misreading of the relevant regulations and case law—that the Service adequately fulfilled its legal obligations. But the Service's "see no evil, hear no evil" approach here cannot stand. First, the Service failed to consider alternatives, including a true no action alternative, as required by NEPA and the Service's regulations. Second, the Service failed to take the required "hard look" at the Projects' environmental impacts on numerous resources, undermining its finding that neither has significant impacts. Third, the Service authorized the Projects despite noncompliance with the Forest Plan and NFMA.

For these reasons, the Court should grant Standing Trees' motion for summary judgment and deny the Service's cross-motion for summary judgment.[1]

## ARGUMENT

### I. The Service Failed to Consider Alternatives as NEPA Requires.

As discussed in Standing Trees' opening brief, the Service's threadbare approach to

---

[1] The Service did not question Standing Trees' standing, the basis for which is set forth in its opening brief. *See* Pl.'s Mem. 6-8 (establishing associational standing for both Projects).

analyzing alternatives to the Projects failed to comply with NEPA. For the reasons that follow, the Service's efforts to excuse this fatal flaw in the Projects' NEPA analysis are without merit.

**A. The Service failed to consider "appropriate" alternatives.**

Agencies must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(H). "This requirement . . . extends to all such proposals, not just . . . impact statements." 40 C.F.R. § 1507.2(d), § 1508.9(b). The Service's regulations fully support this requirement, too. *See* 36 C.F.R. § 220.7(b)(2).

The Service points out that its regulations state that "[n]o specific number of alternatives is required or prescribed," Def. Mem. 10, but the regulations further elaborate. Specifically, § 220.7(b)(2)(i) states that "the EA need only analyze the proposed action and proceed without consideration of additional alternatives" in the event that "there are no unresolved conflicts concerning alternative uses of available resources[.]" But here, the Service never addressed the "unresolved conflicts" over Project area resources, including forest land, water, wildlife habitat, scenery, and recreation, that the Projects will affect. *See* Pl.'s Mem. 11.

As the Service points out, courts found agency alternatives analyses to be acceptable in *City of New York v. U.S. Dep't of Transp.*, 715 F.2d 732, 743–44 (2d Cir. 1993), and *Conservation Law. Found. v. U.S. Army Corps of Eng'rs*, 457 F. Supp. 3d 33, 57 (D.N.H. 2019). Def. Mem. 12. These examples prove Standing Trees' point. In *City of New York*, the court explained that an alternatives analysis is guided by "how narrowly or broadly one views the objective of an agency's proposed action," deciding that the agency appropriately considered nine alternatives in its EA that each would secure highway transportation of radioactive materials. 715 F.2d at 743. Similarly, in *Conservation Law Foundation*, this Court affirmed the agency's alternative analysis that considered five alternatives because it supplied "reasonable,

common-sense explanations for rejecting alternatives." 457 F. Supp. 3d at 57. The Service analyzed no actual alternatives here.

The Service contends that only its proposed actions could satisfy the Projects' purpose and need. But it cannot be the case that the only reasonable or appropriate alternative is the proposed action. The best evidence for the Service's error is in the Service's own actions to modify the Projects during the review process: it increased the buffer around Lake Tarleton for logging units in the Tarleton project and claims to have dropped segments of stands that contain old growth forest in the Peabody project. AR 11971, 6116. *See also* AR 4406–08, 4509–10, 4511, 4513–14 (project modifications for Peabody). These actions underscore that—of course—in Projects proposing to log thousands of acres, there are many alternatives to achieving the Projects' objectives, and NEPA required the Service to consider a range of such alternatives and their relative benefits and impacts in the public environmental assessment documents—not through unilateral, singular decisions made outside public view. The Service's failures to describe and evaluate any reasonable alternatives to its proposed actions are enough to render its EAs inadequate. *See Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 877 (9th Cir. 2022) (holding agency's alternatives analysis did not satisfy NEPA's requirement to "give full and meaningful consideration to all viable alternatives in [the agency's] environmental assessment"); *cf. Dubois v. Dept. of Agriculture*, 102 F.3d 1273, 1287 (1st Cir. 1996) (viable but unexamined alternative rendered NEPA review inadequate).

Where, as here, substantial logging will change the face of the Forest for decades to come, with thousands of acres of environmental impacts, "an EA must still reflect consideration of some range of alternatives[.]" *Conservation L. Found.*, 457 F. Supp. 3d at 57 (citation omitted); *see also City of New York*, 715 F.2d at 742–43 (finding that reviewing courts have

insisted that the agency consider such alternatives to the proposed action as may partially or completely meet the proposal's goal). In fact, the Service has not cited a single case affirming its methodology here: analyzing no alternatives and providing only a one-sided discussion of the "consequences of no action." *See* Def. Mem. 13 n. 8, 14. As mentioned in Standing Trees' opening brief, Pl.'s Mem. 12, the absence of alternatives analysis here is an anomaly, *see also* AR 2229–51 (Albany South EA analyzing six distinct alternatives); *Sierra Club v. Wagner*, 581 F. Supp. 2d 246, 253–54 (D.N.H. 2008), *aff'd* 555 F.3d 21 (1st Cir. 2009) (reviewing Than and Batchelder projects, which considered four distinct alternatives each), and violated NEPA.

**B. Standing Trees' alternatives are reasonable.**

The Service's failure to consider alternatives was especially egregious because, as explained in Standing Trees' principal brief, Standing Trees presented and repeatedly sought analysis of reasonable alternatives to each Project. Pl.'s Mem. 12. Far from being unreasonable, as the Service now contends, Def. Mem. 10–13, Standing Trees' alternatives would have advanced the Projects' broad objectives and warranted detailed consideration under NEPA.

In its brief, the Service insists on mischaracterizing and dismissing these alternatives as opposing all logging and failing to address Forest Plan requirements. Def. Mem. 10; AR 4845.[2] The Service's goals for both Projects are to advance Forest Plan "goals, objectives, and desired conditions for vegetation, wildlife, and other resources[.]" AR 11972; 4877. And Standing Trees recognized the importance of these Projects' multiple uses; indeed, Standing Trees' alternatives *do not* prohibit all timber harvest but instead propose a different, less extensive set of silvicultural treatments. For example, for the Peabody project, Standing Trees proposed to meet

[2] Amici likewise mischaracterize Standing Trees' alternatives as failing to "achieve the multiple goals and objectives set out in the Forest Plan," or as "no action approach[es.]" Forest Society's Mem. 5-6; State of New Hampshire's Mem. 5.

Forest Plan objectives for wildlife habitat diversity by creating "*complex* early successional habitat rather than simplified regeneration-age forest through even-aged management." AR 4685–86. This alternative would also increase watercourses and wetlands buffers and avoid mature and old growth forest, restoring wildlife habitat for those species that are in desperate need of mature and old forest habitat that is rare across the region—chief among them, the northern long-eared bat. *See* AR 4685–86, 6160; AR 6178; AR 3128 (identifying mature forest as "an important habitat type for foraging [northern long-eared bats]"). Finally, this alternative proposed to avoid IRA impacts and protect IRA areas by guiding logging away from Forest Plan IRAs, encouraging an analysis of how logging would affect site-specific and broadly applicable roadless area values, or a future site-specific evaluation for Wilderness designation in a Forest Plan revision. AR 4685–86, 6160.[3] In accordance with the Service's broad statements of purpose and need, this alternative considers paths to moving the Forest toward Forest Plan goals.

Similarly, for the Tarleton project, Standing Trees' Alternative 3 also seeks to promote wildlife habitat for endangered species that rely on mature forests. AR 13085–86. It also supports fish habitat and restoration of historic apple orchards and former tree plantations. AR 13082. Here again, the Service mischaracterizes Alternative 3 as a prohibition on timber harvest. Def. Mem. at 10. But Alternative 3 only proposes to "omit[] the *unnecessary* harvest and treatment activities included in the current proposed action." AR 13082 (emphasis added).

In support of its alternatives, Standing Trees submitted extensive scientific data demonstrating that protecting mature forest, well on its way to developing old-growth forest characteristics, would advance the Forest Plan goals by promoting resilience to environmental

[3] The Service claims to have considered roadless area impacts through an attachment to the EA, Def. Mem. 21 n. 10; that attachment contains no real analysis, let alone careful consideration of the Peabody project's impacts on potential roadless area designations in the future.

and climate risks. AR 13105 (citing studies that describe that older forests can better withstand climate change stresses, particularly regarding timber growth rate and species richness). These studies, the Service arbitrarily decided, did not warrant acknowledgment. AR 10547–71 (omitting Standing Trees' submitted literature from "submitted literature" column). Under these circumstances, the Service's rejections of Standing Trees' alternatives were arbitrary and capricious, underscoring the Service's legal error in refusing to undertake any serious alternatives analysis for these Projects. *Contrast Conservation L. Found.*, 457 F. Supp. 3d at 57 (requiring "reasonable, common sense" reasons for rejecting alternatives).

**C. The Service failed to conduct a full no-action analysis.**

The Service purports to have made a detailed evaluation of a no-action alternative as a comparative baseline. Def. Mem. 13. This is false. Contrary to NEPA, the Service failed to genuinely consider a true no-action alternative—that is, the Service made no mention of the positive impacts of no action. Indeed, the Service "must legitimately assess the relative merits of reasonable alternatives before making its decision" to proceed with the proposed actions. *Dubois*, 102 F.3d at 1289; *see also Lovgren v. Locke*, 701 F.3d 5, 36 (1st Cir. 2012) (requiring "information sufficient to permit a reasoned choice" among alternatives as to their environmental consequences). The Service failed to do so here when it omitted the environmental benefits of no action, including carbon storage and sequestration, enhanced water quality, and unfragmented habitat for certain endangered and threatened species. *Cf. Dubois*, 102 F.3d at 1286–87 ("It is absolutely essential . . . that the decisionmaker be provided with a detailed and careful analysis of the relative environmental merits *and* demerits of the proposed action and possible alternatives" (emphasis added)).

The Service seeks to justify its conclusory and incomplete discussions of the "Consequences of No Action" with reference to unpersuasive authorities that do not apply. In

*Earth Island Institute v. U.S. Forest Service*, the agency proposed a forest management project in an area "greatly at risk of high-intensity fires." 87 F.4th 1054, 1060 (9th Cir. 2023). The purported danger of failing to take action to address wildfire harms—threatening serious and immediate concerns like loss of life and property and ecological devastation—is undeniably different in kind from the potential consequences of deferring or limiting logging in these Projects, which present neither public safety nor other imminent risks. Likewise, *Utah Environmental Congress v. Bosworth*—involving management to purportedly mitigate a spruce beetle infestation in a much smaller area—does not bear on the adequacy of the Service's actions in these very different circumstances of the long-term implementation of the Forest Plan within management units of thousands of acres. 439 F.3d 1184, 1187 (10th Cir. 2006).

In sum, the Service's single-minded consideration of only the Projects themselves and the supposed adverse consequences of no action violates NEPA's alternative analysis requirements.

## II. The Service Did Not Lawfully Evaluate The Projects' Environmental Effects.

As more fully discussed in Standing Trees' opening brief, the Project EAs also fail to meet NEPA's requirements in their consideration of the Projects' important and substantial environmental impacts on a range of resources. *See* Pl.'s Mem. 14–28. As explained below, these errors are fundamental flaws in reasoning, analytical rigor, and transparency, and are not merely "fly-specking" and a lack of "endless" and "needless" detail, Def. Mem. 2, 14; again, the Service's points in defense of its environmental reviews ring hollow.

### A. The Service failed to assess the Projects' direct and indirect impacts.

The Service failed to take its requisite "hard look" at the environmental impacts of the Projects. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989). The Service stifled public review by withholding key forest health information, conducted illogical non-site-specific water quality analyses, disregarded commonsense measures to protect endangered species, and failed

to adequately inform the public of the scenic and recreational impacts flowing from the Projects. Altogether, these errors render the analyses deficient under NEPA's "hard look" standard.

**1. The Service failed to take a hard look at forest health and improperly incorporated key forest health information by reference.**

The Service did not take a hard look at forest health because its analysis is deficient, and it withheld crucial information from the public. The Service asserts that the EAs incorporate the stand ages by reference from the HMU Rationale documents, which themselves reference stand surveys. Def. Mem. 23; *see also* AR 6117. But the Service improperly incorporated these and other documents that were not publicly available during comment periods. *See* AR 6116. After a confusing and opaque process, these withheld documents suggest ongoing risk that the Projects will destroy old forest age class and stands with old forest habitat, in violation of the Forest Plan and contrary to the Service's own EAs. AR 6117; Def. Mem. 22. And for the Peabody project, the Service relied on a post hoc rationalization to fill in gaps in its analysis. AR 6116.

Data and documents incorporated by reference must be "reasonably available for inspection by potentially interested persons within the time allowed for comment." 40 C.F.R. § 1502.21. The procedures describe what it means to comply with NEPA, even if "there is no corresponding [Service] regulation requiring the agency to disclose stand survey data." Def. Mem. 23; *see Friends of Clearwater v. Petrick*, 588 F. Supp. 3d 1071, 1097 (D. Idaho 2022) (incorporated documents must be available for public review during designated comment period).[4] "To fulfill NEPA's public disclosure requirements, the [Service] must provide to the public the underlying environmental data from which the [Service] develops its opinions and arrives at its decisions." *WildEarth Guardians v. Mont. Snowmobile Ass'n.*, 790 F.3d 920, 925

[4] The Service cites *Friends of Clearwater* for its assertion that it properly incorporated stand age data and surveys by reference. Def. Mem. 23. But there, the Service made the information available for inspection *during the comment period*. *See* 588 F. Supp. 3d at 1097. Not so here.

its objection response, the Service relies on an email that is a post hoc rationalization, and a spreadsheet tracking stand changes that it did not include in the administrative record. AR 6116. But the Service's denial of the email's timing, Def. Mem. 24 n. 12, is wrong, as it is dated June 26, 2023, two months after the Service authorized the Peabody project. AR 4527–29. Moreover, the email is a recitation from memory and provides no analysis. *Id.* The Service's opaque and confusing forest health analysis frustrated the public's participation in the NEPA review process. *See Env't Def. Ctr.*, 36 F.4th at 872 (finding that agency may not rely on "incorrect assumptions or data" in arriving at its conclusion of no significant impacts).[7] Despite twice correcting the administrative record to remedy omissions, the Service's assertion that the Peabody project does not target old growth and entire stands that contain old forest habitat remains unsupported.

**2. The Service failed to explain its cursory water quality analysis.**

The Service failed to take a hard look at the Projects' impacts on water quality. Pl.'s Mem. 16–17. The Service wrongly claims that it used the Albany South EA solely for its "methodology." Def. Mem. 15. Rather, the Service relied on the Albany South EA more broadly to reach conclusions on the Projects' impacts. AR 11954 ("Because of the similar types of activities included in the Tarleton project, the potential impacts to riparian and aquatic resources and water quality discussed in the Albany South EA would be broadly applicable to the current proposal"); AR 4900 (same for Peabody). This approach utterly failed to establish a site-specific baseline for the Service's water quality analysis, flunking NEPA's "hard look" requirement. *See Gifford Pinchot Task Force v. Perez*, 2014 WL 3019165, at *33 (D. Or. 2014) ("Without baseline data, the impact to groundwater remains uncertain because there is no information as to the current conditions of the actual Project area. As a result, there is no way to determine what effect

[7] Standing Trees' Executive Director never implied that he possessed specialized expertise to identify old forest habitat, as the Service misleadingly implies. Def. Mem. 24.

the action will have on the environment and thus, no way to comply with NEPA") (citations and quotations omitted).

In fact, the Albany South EA provides a site-specific water quality analysis with reference to important factors such as water temperature, various local species, stream connectivity, both direct and indirect cumulative effects on basal area, site-specific mapping, a scientifically supported discussion of effect indicators, and a comprehensive outline of existing conditions. AR 2330–53. Arbitrarily relying on the Albany South EA analysis without any site-specific information, the Projects' EAs fall markedly short of this standard. With the Albany South approach included as no more than a short cut, the EAs merely reference general standards for harvest levels based on basal area and the anticipated harvest percentages. AR 11954, 4900.

And the Service found that, even using its Albany South short cut, the Peabody project would exceed basal area impacts in numerous watersheds. AR 4900. Instead of addressing these impacts, the Service dismissed seven watersheds simply because they do not contain "perennial fish habitat." *Id*. This reasoning was arbitrary and unsubstantiated in either the Peabody or Albany South EAs. AR 4900, 2330–53; *see also Great Basin Res. Watch v. Bureau of Land Mgmt*., 844 F.3d 1095, 1103 (9th Cir. 2016) (finding that a "baseline estimate must be based on accurate information and defensible reasoning"). Likewise, without evidentiary support, the Service dismissed impacts to the five watersheds with fish habitat as "minor" with "[n]o measurable adverse effects." AR 11954, 4900.

The Service also improperly frames this Court's decision in *Conservation Law Foundation*. Def. Mem. 17 (discussing 457 F. Supp. 3d at 62–63). There, the agency surveyed the local ecosystem and "[t]horoughly discussed the expected environmental impact" in the project area. 457 F. Supp. 3d at 62. The agency also "provided a forthright acknowledgement of

the negative environmental impacts of the [project] on wildlife *in the affected area*." *Id*. (emphasis added). Not here. The Service took only a cursory look at the Peabody project's basal areas, soil, and bedrock analyses to determine there would be no water quality impact. AR 11954, 4900. The Service's water quality analyses violated NEPA's "hard look" requirement.

### 3. The Service failed to take a hard look at the Projects' impacts to the northern long-eared bat.

The Service improperly relied on the United States Fish and Wildlife Service's (USFWS) Biological Opinion (BiOp) because it did not conduct a thorough investigation of its own. Pl.'s Mem. 18. The Service's approach at Peabody is the height of arbitrariness: the Service took the "conservative" approach of assuming the bat's presence, acknowledging the Projects could result in direct and indirect harms, but then included no design element to protect the bat. *Id*.[8]

For the Peabody project, the Service assumed the northern long-eared bat is present, but did not adopt any measures outlined in its 2015 biological assessment or the 2023 USFWS BiOp to minimize the chance of taking pregnant females and pups, including avoiding active seasons. AR 1566, 3357–58. While assuming the bats are present, the Project relies on not knowing of any maternity roosts to feign compliance with USFWS's prohibition on harvest within 150 feet of known occupied roost trees during the pupping season. AR 3309. In fact, the Service notes in its biological evaluation that timber harvest during the bat's active season can cause direct harms. AR 9244. Despite assuming the presence of the bat, the Service provided no explanation for why it did not conduct surveys or radio telemetry to discover maternity roosts in the area, or avoid direct impacts by limiting logging to only the hibernation season. *See* AR 3358 (USFWS BiOp recommending such surveys); *see* AR 13920 (limiting logging in Tarleton project); *Env't Def. Ctr.*, 36 F.4th at 872 (an agency may not rely on "incorrect assumptions or data" in arriving at its

[8] In its brief, Standing Trees did address the Project biological evaluations. Pl.'s Mem. 18, 29, 32.

conclusion of no significant impacts). Similarly, for the Tarleton project, the Service assumed the bats' presence and took steps to avoid direct harm to the bat, but did not address indirect harms. AR 14061. Despite the Service's "conservative" approach in assuming that bats were present, the Service did not take any steps recommended by USFWS to identify roost trees for Tarleton. AR 3358. And the Service admits that removing roost trees when the bats are not present would cause indirect harm because bats frequently reuse their roost trees. AR 13923.

For these reasons, the Service acted arbitrarily in relying on the BiOp because the Service assumed the presence of the bats, but then proposed virtually no conditions to protect the bats. The Projects relied on the illogical assumption that bats are present but will not be harmed. This contradictory approach is exactly the blind reliance the First Circuit has said should be rejected. *Contrast Nantucket Res. Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1, 21 (1st Cir. 2024) (affirming given agency's own thorough independent analysis).

**4. The Service failed to adequately assess and inform the public of the Projects' scenic and recreational impacts.**

The Service also failed to analyze and inform the public about impacts to some of the Forest's most iconic trails. For Peabody, the cutting units that overlap with stands containing old forest habitat, *supra* at 9, also contain the Great Gulf. The Service does not discuss this impact whatsoever despite its claim that it provided several maps that show the relationship between logging and recreational resources. Def. Mem. 20–21. The Service must draft its documents "in plain language and may use appropriate graphics so that decisionmakers and the public can readily understand them." 40 C.F.R. § 1502.8. Here, the Service omitted information entirely, including stand ages and both Forest Plan and Roadless Area Conservation Rule IRAs, or spread the information across multiple maps that use different scales. AR 4892–4896 (Figures 1–5). The map depicting the cutting units omits the labels of recreational resources. AR 4895. To make

sense of the maps, the public must flip back and forth between pages to compare maps of varying scale with missing labels. The information provided does not comprehensibly disclose the scope of logging and resources impacted; the Service even failed to include a zoomed in map for the entire northern half of the Project's cutting units. *See* AR 4895. The Service asserts this claim is "fly specking." Def. Mem. 21. It is not. The Service violated NEPA because its EA does not make scenic and recreational impacts understandable to the public.

Furthermore, the Service failed to engage in any discussion of the specific impacts to the Great Gulf Trail. Considering the dramatic change a single tree and group selection silvicultural treatment would have, especially on this iconic trail that traverses old age class forest, old forest habitat, and old growth, this omission illustrates the Service's failure to take a hard look at the impacts logging would have on recreational resources.

For Tarleton, the Service continues to claim that it could not return to GPS coordinates on the Lake; it never considered using its modeling software to study projected impacts for such a viewpoint. Def. Mem. 20. This omission fails to address how scenic impacts would affect local businesses like Kingswood Camp that rely on Lake Tarleton's stunning scenic beauty.[9]

The Service now claims Standing Trees' arguments regarding scenic impacts and recreational baselines at Peabody are barred by the doctrine of administrative exhaustion. Def. Mem. 21. But the Service is wrong. Standing Trees raised these in its comments. AR 4694 (noting lack of recreational baseline data); AR 4692–93 (noting the Service did not adequately address scenic impacts); Pl.'s. Mem. 19. And regardless, where an agency has independent knowledge of the issues, "there is no need for a commentator to point them out specifically in

[9] The Service acknowledged the Project would displace recreationists from the area, but did not study the impacts on businesses that rely on the intact natural area. AR 11989; Pl.'s Mem. 7–8.

order to preserve its ability to challenge a proposed action." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 765 (2004); *Friends of Clearwater v. Dombeck*, 222 F.3d 552, 559 (9th Cir. 2000) (finding Service to be "aware" of problem where information was generated by Service itself). Here, the Service had independent knowledge of impacts to the Appalachian Trail (AT) because three of its four scenic viewpoints are on the AT. AR 4896. But the Service only referenced the AT a single time in its entire analysis, in the name of the "Osgood-AT" viewpoint. *Id*. It did not make clear that viewpoints are located on the AT. AR 6498. For these reasons, the Service did not take a hard look at the Projects' scenic and recreational impacts.

**B. The Service failed to analyze climate or cumulative impacts.**

Despite seven recent, ongoing, and reasonably foreseeable projects that have come or are coming before the Service within the span of ten years, the Service refused to consider the cumulative effects of these projects alongside Tarleton and Peabody, including their greenhouse gas (GHG) emission impacts. Pl.'s Mem. 15–16, 25 n. 15, Def. Mem. 27. *Kern v. U.S. Bureau of Land Mgmt*., 284 F.3d 1062, 1077 (9th Cir. 2002) (finding NEPA requires an agency to analyze the "impact of reasonably foreseeable timber sales" and future actions). The Service attempts to subvert its requirement to consider cumulative impacts by portraying the Projects' "contributions to global greenhouse gases" as "negligible." Def. Mem. 26. But the Service is required to consider "past, present, and reasonably foreseeable future actions[.]" 40 C.F.R. § 1508.7. These include "individually minor but collectively significant actions taking place over a period of time." *Id*. CEQ guidance clarifies that "NEPA requires more than a statement that emissions from a proposed Federal action or its alternatives represent only a small fraction of global or domestic emissions." 88 Fed. Reg. 1196, 1201 (Jan. 9, 2023).

The Service's excuses for failing to analyze the Projects' GHG emissions are unavailing. For one, the Service suggests that analyzing climate impacts would not be "useful" in this case.

Def. Mem. 29. But NEPA is not optional, especially given the dangers and importance of climate change as an issue within NEPA's scope. *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1035 (10th Cir. 2023) (citation omitted) ("The impact of [GHG] emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct").

Furthermore, the Service claims that "[a]ny initial carbon emitted is temporary." Def. Mem. 26. But it can take hundreds of years to recover the same level of carbon storage in the interim, and there will be significant forgone carbon sequestration. *Ctr. for Biological Diversity v. U.S. Forest Serv. (Black Ram)*, 687 F. Supp. 3d 1053, 1076 (D. Mont. 2023) ("Ultimately, [GHG] reduction must happen quickly and removing carbon from forests in the form of logging, even if the trees are going to grow back, will take decades to centuries to re-sequester") (quotations omitted). The Service's failure to analyze old forest age class, *supra*, Section II(A)(1), showcases a blatant disregard for the Forest's carbon sequestration benefits. The Service dismisses *Black Ram*, a highly persuasive recent decision out of the District Court for the District of Montana, Def. Mem. 28, which found the Service's treatment of the issue in that case lacking and unequivocally affirmed that global research confirms climate warming is an urgent threat to the planet. 687 F. Supp. at 1076 ("[L]ogging causes immediate carbon losses, while re-sequestration happens slowly over time, time that the planet may not have"). The Service next misinterprets a series of cases that do not in fact support the Service's position. It is well established that a proper cumulative impact analysis requires detailed, quantified information rather than general statements about potential effects and risks, such as the Service has provided here. *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt*., 387 F.3d 989, 993-94 (9th Cir. 2004).

The Supreme Court and other courts' decisions have made clear that an adequate NEPA

analysis must comprehensively evaluate a project's potential impacts, particularly in relation to other ongoing or reasonably foreseeable projects. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976) ("[W]hen several proposals . . . that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together"); *see also Bark v. U.S. Forest Serv.*, 958 F.3d 865, 872 (9th Cir. 2020) ("We have held that cumulative impact analyses [are] insufficient when they discuss[] only the direct effects of the project at issue on a small area or merely contemplates other projects but had no quantified assessment of their combined impacts") (cleaned up)). The Service must go beyond general statements and provide a thorough, detailed evaluation of all relevant environmental impacts, particularly those arising from recent, ongoing, and reasonably foreseeable projects. *Ctr. for Env't L. & Pol'y v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1007 (9th Cir. 2011) ("[G]eneral statements about possible effects and some risk" insufficient "absent a justification regarding why more definitive information could not be provided") (citation omitted). The Service claims it can sufficiently perform a cumulative climate analysis without enumerating *every* past project. Def. Mem. 27. But the Service did not consider *any* of the cumulative impacts of recent, ongoing, and reasonably foreseeable projects. Pl.'s Mem. at 25.

Finally, the Service arbitrarily bypasses two critical pieces of guidance. First, the Service claims the CEQ climate guidance does not apply, despite the guidance urging agencies to use it for ongoing projects, even projects with a small amount of GHG emissions. Def. Mem. 29; *see also* 88 Fed. Reg. 1196, 1212 (Jan. 9, 2023). Second, the Service substantively ignores its own Climate Adaptation Plan, which highlights the importance of wilderness, roadless areas, and mature and old-growth forests for climate stability and biodiversity. AR 0733. The Service claimed climate risks were outside the Projects' scope and that its actions were "consistent" with

the Forest Plan but offered no further explanation. AR 12905, 6116. The Service's climate and cumulative impacts analyses do not fulfill NEPA's "hard look" requirement.

### C. The Service violated NEPA and the APA by issuing an unlawful finding of no significant impact.

The Service's unlawful findings of no significant impact stem from its failure to analyze alternatives and properly assess environmental impacts. *See, e.g.*, *Kettle Range Conservation Grp. v. U.S. Forest Serv.*, 2023 WL 4112930, at *12 (E.D. Wa. 2023) ("lack of quantified or detailed information about the Sanpoil Project's impacts in this respect creates substantial questions about whether the action will have a cumulatively significant environmental impact"). The agency must be able to support this conclusion with sufficient evidence and analysis. 40 C.F.R. § 1508.13; *see Env't Def. Ctr.*, 36 F.4th at 872; *Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 552 F. Supp. 2d 97, 134 (D.N.H. 2008) (agency must "sufficiently" mitigate any significant impacts to support finding of no significant impact). The Service's findings of no significant impact are insufficient *because* it failed to consider alternatives or take a hard look at the Projects' forest health, water quality, bats, scenic and recreational effects, and cumulative impacts. *Supra* Section II(A). Standing Trees is *not* insisting on an EIS, but rather seeking to ensure that the Service complies with bedrock NEPA principles.

## III. The Projects Violate the Forest Plan.

The Service violated NFMA and the APA because it authorized Projects that do not comply with the Forest Plan. Specifically, the Projects stray from Forest Plan requirements because the Service failed to (1) remove stands identified to provide old forest habitat from harvest units, (2) justify deviating from scenic guidelines, (3) support its finding that eligible wild and scenic rivers would not be jeopardized in the future, and (4) include any conditions to contribute to the conservation and recovery of the northern long-eared bat.

First, the Service's failure to disclose stand age data*, supra* Section II(A)(1), made it impossible for the public to know whether these Projects were compliant with the Forest Plan, including that the Service was not proposing harvest in old growth or stands with old forest habitat. The Service improperly asserts that Standing Trees waived this argument. Def. Mem. at 32 n. 13. Rather than present the stand data argument "in the most skeletal way," Standing Trees fully fleshed it out in the context of NEPA. *U.S. v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990); *see also Brown v. Nucor Corp.*, 785 F.3d 895, 918 (4th Cir. 2015) (finding no waiver occurred because plaintiff's arguments covered both issues); Pl.'s Mem. 21–24. As stated in Standing Trees' opening brief, the same facts and argumentation support the NFMA claim because these Projects are inconsistent with the Forest Plan, which prohibits any such logging. AR 3448, 3595.

Second, the Service's conclusory reasoning does not justify violating the Forest Plan's scenic guidelines for the Peabody project. AR 3410; *see also* Def. Mem. at 33.[10] The Service maintains that "the larger acreage is intended to better meet project-level objectives" and move the Forest toward the Forest Plan's desired conditions. AR 4898. But the Service offers no explanation for why one of the desired conditions of the Forest Plan, scenic integrity, must yield to another here. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency must "articulate a satisfactory explanation for its action").[11]

Third, the Service violated the Forest Plan wild and scenic rivers standard by summarily dismissing impacts to two river segments in the Peabody project area. AR 4902–03, 3467. The Service claims that the issue was not administratively exhausted. Def. Mem. at 33. But Standing Trees raised in its comments that the Service should avoid "potential detrimental impacts to

---

[10] Standing Trees' opening brief contained an error in an argument heading, Pl.'s Mem. 30; *cf.* Def. Mem. 32; the argument addressed the Service's violation of a scenic "guideline." AR 3477.
[11] Furthermore, the design element fails to genuinely address this violation. *See* Pl.'s Mem. at 30.

water quality due to runoff, sedimentation, and potential herbicide contamination; [and] loss or damage to historic and cultural resources located within the proposed action area[.]" AR 4684. Furthermore, the Service had independent knowledge of this issue. *Pub. Citizen*, 541 U.S. at 765; *Friends of the Clearwater*, 222 F.3d at 559. Here, the Service was on notice that its Projects would alter the rivers' eligibility but nonetheless violated by the Forest Plan by choosing to clearcut fourteen acres just a quarter mile away. *See* AR 4902–03.

Finally, the Service's assumption of the bat's presence does not satisfy its Forest Plan obligations. Def. Mem. at 34. As discussed in connection with the Service's failure to take a hard look at impacts to the bat under NEPA, *supra* Section II(A)(3), this assumption helps the Service shirk its requirement to consider relevant data and articulate a "rational connection between the *facts found* and the choices made[.]" *Dubois*, 102 F.3d at 1284 (quoting *Baltimore Gas and Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983)). Here also, the Service's failure to conduct a survey demonstrates its failure to investigate the Project sites, evidenced by the BiOp's very own "conservation recommendations." AR 0471–72.

In these respects, the Service violated the Forest Plan and NFMA.

## CONCLUSION

For the foregoing reasons, Standing Trees respectfully requests this Court grant its motion for summary judgment, deny the Service's cross-motion for summary judgment, and vacate the agency decisions to authorize the Projects.[12]

---

[12] The Service suggests vacatur may not be an appropriate remedy, but "[a]s a general matter, an agency action that violates the APA must be set aside." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021). *See also id.* (discretion to vacate depending on seriousness of deficiencies and disruptive consequences of vacatur). Until the Service complies with legal mandates, the Court should vacate the orders authorizing the Projects. *See* Pl.'s Mem. 6–8 (detailing harm to Standing Trees' members from Projects).

Respectfully submitted, this the 21st day of November, 2024.

STANDING TREES, INC.

By its attorney:

/s/ Christophe Courchesne
Christophe Courchesne
NH Bar No. 20431
Associate Professor and Director
Environmental Advocacy Clinic
Vermont Law and Graduate School
164 Chelsea Street, PO Box 96
South Royalton, VT 05068
(802) 831-1630
(802) 831-1631 (fax)
ccourchesne@vermontlaw.edu

*Environmental Advocacy Clinic student attorneys Hannah Weisgerber, Joe Anderson, and Willow Hogan contributed to this brief.*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 21, 2024, I served the foregoing document electronically through ECF upon all counsel of record.

/s/ Christophe Courchesne
Christophe Courchesne
*Counsel for Standing Trees, Inc.*

# Exhibit A

Peabody W Comp 34 Stand 71-North
Min Tree Age
182
271
199
166
133
182
101
Peabody River
147
189
140
299
161
West Branch
Peabody River
N
Tree cores (min age)
Peabody_Stands_2020_0714
Hike
Cross Country Ski
520 260 0 520 Feet

Peabody W Comp 34 Stand 71, 72, 75
Min Tree Age
94
184
175
West Branch
Peabody River
138
N
Hike
Cross Country Ski
Tree cores (min age)
Peabody_Stands_2020_0714
Peabody_Proposed_Units_2021_0505
900 450 0 900 Feet

USDA

# Peabody West Integrated Resource Project

94
89
88
79
78
Peabody River
67
HAYES COPP
X-C SKI TRAIL
80
DOLLY COPP
CAMPGROUND
68
16
64
65
73
71
70
69
72
74
Date: 8/3/2022
USDA
Forest Service
U.S. DEPARTMENT OF AGRICULTURE
Peabody West
Vegetation Management Map
Project Proposals
Shelterwood Prepcut
Improvement Cut
Group Selection
Single Tree Selection
Single Tree Selection and Groups
Thinning
Patchcut
Map Legend
Road
Hiking Trail
Cross Country Ski Trail
River
National Forest Land
N
W
E
S
0
¼
½ Miles

**Figure 4. Detail showing location of timber units subject to design elements REC-4 and REC-5 relative to adjacent recreation opportunities.**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| STANDING TREES, INC.,<br>Plaintiff,<br>v.<br>UNITED STATES FOREST SERVICE, *et al.*,<br>Defendants. | Case No. 1:24-cv-00138-JL-TSM |

**DEFENDANTS' REPLY IN SUPPORT OF**
**CROSS-MOTION FOR SUMMARY JUDGMENT [DN 16]**

# TABLE OF CONTENTS

I. INTRODUCTION .......... 1

II. ARGUMENT .......... 2

A. The alternatives analyses satisfy NEPA .......... 2

1. Forest Service regulation 36 C.F.R. § 220.7(b)(2)(ii) allows the agency to document consideration of the no-action alternative in the effects analysis .......... 2

2. Plaintiff's suggested alternatives do not meet the Projects' purpose and need .......... 4

B. The Forest Service evaluated the Projects' environmental effects and satisfied NEPA's rule of reason .......... 6

1. The Forest Service reasonably evaluated direct and indirect effects .......... 7

a. The Project-specific water quality analyses apply established methodology .......... 7

b. The Project-specific biological evaluations examine impacts to the northern long-eared bat .......... 8

c. The EAs and specialist reports analyzed impacts to scenery and recreation .......... 10

d. The Forest Service analyzed impacts to forest health and disclosed its reliance on stand data .......... 12

2. The Projects reasonably evaluate cumulative impacts to climate .......... 15

C. The Projects comply with the Forest Plan and satisfy NFMA .......... 17

III. CONCLUSION .......... 20

# I. INTRODUCTION

In compliance with the National Environmental Policy Act (NEPA), the Forest Service prepared robust Environmental Assessments (EAs) to consider and disclose the environmental effects of the Peabody West Integrated Resource Project (Peabody) and the Tarleton Integrated Resource Project (Tarleton). Over more than four years, the Forest Service provided ample opportunities for public participation and comment, including field trips, site visits, open houses, receipt and consideration of written comments and objections, and meetings with interested stakeholders. The EAs support the Forest Service's Findings of No Significant Impact (FONSIs) and document how the two Projects comply with the Forest Plan, as required by the National Forest Management Act (NFMA). The Projects include several actions, including commercial and non-commercial vegetation treatments, wildlife habitat improvements, and recreational enhancements. In addition to many individual members of the public, the Projects are strongly supported by the State of New Hampshire and diverse interest groups. DN 22 (State of New Hampshire's amicus brief), DN 25 (organizational and individual's amicus brief).

Plaintiff seeks to impede these important Projects through claims brought under NEPA and NFMA. As explained in Defendants' opening brief and this reply, none of Plaintiff's claims have merit. Applying the Administrative Procedure Act's (APA) deferential standard of review and the rule of reason, the Court should find that Plaintiff has not met its burden to show the Projects are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The EAs, FONSIs, and supporting documents in the Administrative Record demonstrate that the Forest Service reasonably explained its decisions and that the Projects comply with the Forest Plan. The Court should grant summary judgment to the Forest Service on all claims.

## II. ARGUMENT

### A. The alternatives analyses satisfy NEPA.

For both Projects, the Forest Service analyzed in detail the proposed action and included in the effects analysis a no action alternative to contrast the effects of the proposed action. The Forest Service provided a brief explanation for why Plaintiff's proposed alternatives did not meet the Projects' purpose and need. The alternatives analyses satisfy NEPA's requirement for EAs to consider a reasonable range of alternatives. Defs.' Mem. in Supp. of Cross-Mot. for Summ. J. 8-14, DN 16-1 (Defs.' Mem.). Plaintiff fails to meet its burden to show that the alternatives analyses are arbitrary and capricious because Plaintiff does not address the relevant regulation and does not show that its proposed alternatives satisfy the Projects' purpose and need. *See* Pl.'s Reply in Supp. for Summ. J. and Opp'n to Defs.' Cross-Mot. 1-7, DN 27 (Pl.'s Resp.).

1. Forest Service regulation 36 C.F.R. § 220.7(b)(2)(ii) allows the agency to document consideration of the no-action alternative in the effects analysis.

The Forest Service's NEPA regulations say, "[t]he EA shall briefly describe the proposed action and alternative(s) that meet the need for action. No specific number of alternatives is required or prescribed." 36 C.F.R. § 220.7(b)(2) (2024). In an EA, the Forest Service may "document consideration of a no-action alternative through the effects analysis by contrasting the impacts of the proposed action and any alternative(s) with the current condition and expected future condition if the proposed action were not implemented." 36 C.F.R. § 220.7(b)(2)(ii). Here, the Forest Service relied on subsection (b)(2)(ii) to document consideration of the no-action alternative. Defs.' Mem. 9-10, 13-14 (discussing 36 C.F.R. § 220.7(b)(2)(ii) and NEPA Procedures, 73 Fed. Reg. 43084-01, 43,092 (July 24, 2008)); AR4897, 11975.

Plaintiff claims, citing 36 C.F.R. § 220.7(b)(2)(i), that the Forest Service can only proceed without consideration of additional alternatives when there are no unresolved conflicts.

Pl.'s Resp. 2. But subsection (b)(2)(i) does not apply because the Forest Service documented consideration of a no-action alternative through the effects analysis as expressly allowed by subsection (b)(2)(ii). Defs.' Mem. 9-10, 13-14. Plaintiff does not address subsection (b)(2)(ii) at all, and thus waived any argument that the Forest Service's analyses of the proposed actions with a comparative no action baseline is arbitrary and capricious. *Furtado v. Oberg*, 949 F.3d 56, 59 (1st Cir. 2020) ("Our caselaw also makes clear that we may treat a party's failure on appeal to respond to a properly raised argument for summary judgment as waiver.").

Plaintiff faults Defendants because "the Service has not cited a single case affirming" its use of subsection (b)(2)(ii). Pl.'s Resp. 4. But as noted in Defendants' brief, this claim appears to be an issue of first impression. Defs.' Mem. 13 at n.8. The lack of case law in support of Defendants' decision to rely on 36 C.F.R. § 220.7(b)(2)(ii) to document the no-action alternative does not meet Plaintiff's burden under the APA to show that such a decision or reliance is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with applicable law." 5 U.S.C. § 706(2)(A); *Sierra Club v. Wagner*, 581 F. Supp. 2d 246, 254-55 (D.N.H. 2008) ("[T]he sole question presented [in an APA case] is legal in nature: whether plaintiffs have carried their burden of proof…."). The Forest Service relied on an established regulation to document consideration of a no-action alternative, and explained this exercise of discretion in the EAs and response to comments and objections. Defs.' Mem. 10 (citing AR4897, 11975) (EAs); *id.* 13-14 (citing AR6107 (objection response #1), 12904 (objection response #6), 10551 (response to comment #23)). Relying on subsection (b)(2)(ii) was not arbitrary and capricious.

Plaintiff's attempt to factually distinguish this case and two circuit court cases lacks merit. Pl.' Resp. 6-7 (citing *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054 (9th Cir. 2023) and *Utah Env't Cong. v. Bosworth*, 439 F.3d 1184 (10th Cir. 2006)). Both cases provide

persuasive authority that a Forest Service's EA satisfies NEPA when it considers only two alternatives – action and no action. *Earth Island Inst.*, 87 F.4th at 1065; *Utah Env't Cong.*, 439 F.3d at 1195. Both cases are also consistent with binding precedent that "the process of studying alternatives is not endless." *Seacoast Anti-Pollution League v. Nuclear Reg. Com'n*, 598 F.2d 1221, 1230 (1st Cir. 1979); *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978) ("Common sense also teaches us that the 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man.").

2. <u>Plaintiff's suggested alternatives do not meet the Projects' purpose and need.</u>

NEPA only requires an agency to examine "reasonable" alternatives (40 C.F.R. §§ 1502.14(a), 1508.9(b)). An agency need not consider alternatives which are "infeasible, ineffective, or inconsistent with the basic policy objectives" for the management of the area. *Lovgren v. Locke*, 701 F.3d 20, 37 (1st Cir. 2012). While Plaintiff suggested other alternatives, the Forest Service briefly explained that none met the Projects' goals for vegetation, wildlife, and other resources and thus were not reasonable. Defs.' Mem. 9-12; *see also* AR4845, 6107, 10553. The brief explanations satisfy NEPA; the Forest Service was not required to respond to Plaintiff's alternatives in detail. 40 C.F.R. § 1502.14(a); *Lovgren*, 701 F.3d at 37.

Plaintiff claims the Forest Service mischaracterizes its alternatives as "opposing all logging" and that it "propose[d] a different, less extensive set of silvicultural treatments." Pl.'s Resp. 4. But Plaintiff's comments show that it does in fact oppose timber harvest, and – despite their voluminous nature – the comments do not provide any detail for what kind or amount of timber harvest Plaintiff would find acceptable. AR4683 (stating, "[t]he sheer number of different silviculture prescriptions for the proposed action demonstrates that even if logging is needed –

which Standing Trees asserts it is not – there is a wide variability in how the logging can achieve desired conditions."); AR13082 (asking the Service to "omit[] the unnecessary harvest and treatment activities included in the current proposed action."). Plaintiff's comments objecting to timber harvest and vaguely asking the Forest Service to do something else does not meet its burden to identify a reasonable, unexamined alternative. *Vt. Yankee*, 435 U.S. at 553-54 ("[A]dministrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters 'forcefully presented.'"); *Seacoast Anti-Pollution League*, 598 F.2d at 1230-31.

Even if Plaintiff had provided any detail for what it considers "unnecessary" timber harvest, it still has not shown how a pared-down alternative with less timber harvest satisfies the Projects' need to address age class objectives for Forest Plan Management Area (MA) 2.1 lands (General Forest Management).[1] The Forest Plan identifies the desired percentage of age class (regeneration, young, mature) by habitat type (Northern hardwood, Mixedwood, Spruce-Fir, Aspen-Birch) on lands suitable for timber harvest in MA 2.1. AR3434. The Forest Plan explicitly notes that "[t]he regeneration age class can be created immediately through even-aged harvest, making this a short-term objective that should be met during the first decade of implementation." *Id.* Additionally, age class composition can only be adjusted through timber harvest. Defs.' Mem. 10-11 (citing AR12904, 12353-55, 17911-13). Plaintiff's response discusses only wildlife habitat, and does not explain how its vague alternative would meet the age class objectives

---

[1] "Age class" is "[a] distinct aggregation of trees originating from a single natural disturbance or regeneration cutting." AR3577.

required in MA 2.1. Pl.'s Resp. 4-6; *see* AR3434 (Table 1-04, Age Class Objectives for MA 2.1). Nor does Plaintiff acknowledge the fact that wildlife diversity depends on healthy and varied habitat conditions – including areas with regeneration age class timber stands. AR3434; *see also* AR4029, 12276 (studies on regeneration harvest and wildlife in the northeast).

Plaintiff complains that the Forest Service did not respond to its "extensive scientific data" it claims advance Forest Plan goals by promoting resilience to environmental and climate risks. Pl.'s Resp. 4-5 (citing AR13105). Even if Plaintiff articulated how its dozens of studies support its preferred alternative (they do not, *see* AR13105), forest resilience is only part of the Projects' purpose and need and does not address the need to adjust age class. Additionally, the Forest Service need not provide a "point-by-point response" to all issues raised in an objection, 36 C.F.R. § 218.11(b)(1), and NEPA's requirement to address "responsible opposing view[s]" applies to environmental impact statements (EISs), not EAs. 40 C.F.R. § 1502.10(b); *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1020 (9th Cir. 2012).

The Forest Service satisfied its procedural requirement to consider a reasonable range of alternatives. It was not required to consider either a stand-alone, no-action alternative or Plaintiff's alternatives in greater detail. Under the APA's narrow standard of review, the Court should grant summary judgment for Defendants on Claim One. *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009).

**B. <u>The Forest Service evaluated the Projects' environmental effects and satisfied NEPA's rule of reason.</u>**

The EAs and supporting documents examined the Projects' effects to water quality, the northern long eared bat, scenery and recreation, forest health, and climate. The Forest Service provided a reasonably thorough analysis and informed the public of the basis for its decisions. Defs.' Mem. 14-30. Plaintiff's myriad complaints baselessly attack the Forest Service's

methodology and fly-speck the environmental analyses, but do not show that the decisions are arbitrary and capricious. *See* Pl.'s Resp. 7-18.

1. <u>The Forest Service reasonably evaluated direct and indirect effects.</u>

a. <u>The Project-specific water quality analyses apply established methodology.</u>

The Forest Service conducted Project-specific analyses of impacts to water quality. Defs.' Mem. 15-17; *see also* AR4900, 11987-88 (water quality analyses in the EAs). These analyses applied the Forest's percent basal removal methodology developed in the Albany South EA that both Projects incorporate by reference. AR4900, 11987-88; *see* AR2331-49 (Albany South EA), AR6369-437 (Albany South Water Resources Report); *see also* AR1-2 (flow charts showing steps of basal area calculation). The Project-specific analyses support the determination that there will be no measurable adverse effects to water quality. AR4900, 11988, 13750.

Plaintiff suggests the Forest Service took an impermissible "short cut" by relying on the methodology developed in the Albany South EA. *Id.* 10-11. Incorporation by reference is not an impermissible "short cut"; it is expressly allowed by NEPA's implementing regulations. 40 C.F.R. § 1502.21; *Jones v. Nat'l Marine Fisheries Serv.*, 741 F.3d 989, 998 (9th Cir. 2013). The Albany South Water Resources Report and EA analyzed the effects of timber harvest on water quality and quantity, and found that percent basal area removal is the key indicator for whether a project has adverse effects on water quality. AR2331, 6382. The Albany South Water Resources Report also explains in detail the importance of riparian buffers (such as those planned for the Projects) and the role the region's dominant soil type has on mitigating impacts to water quality. AR6385-88. The two Projects challenged here examined the percent basal area removed by authorized timber harvest, applied the methodology, and reasonably determined there would be no measurable adverse effects. AR4900, 11988, 13750.

While Plaintiff may want more information about species, water temperature, stream connectivity, and a host of other items, the percent basal area removal methodology is not arbitrary and capricious. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); *Advocs. for Transp. Alts., Inc. v. U.S. Army Corps of Eng'rs*, 453 F. Supp. 2d 289, 304 (D. Mass. 2006) ("[T]he Court grants substantial deference to the agency's choices regarding methodology and technical analyses" (citing *Town of Norfolk v. U.S. Army Corps of Eng'rs*, 968 F.2d 1438, 1446 (1st Cir. 1992))).

b. The Project-specific biological evaluations examine impacts to the northern long-eared bat.

The Project-specific biological evaluations (BEs), EAs, and consultation with the Fish and Wildlife Service (FWS) satisfy the Forest Service's obligations to analyze effects to northern long-eared bat. Defs.' Mem. 18-19; *Nantucket Res. Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1, 21 (1st Cir. 2024); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 650 (9th Cir. 2014).

Plaintiff responds that the Forest Service "did not conduct a thorough investigation of its own." Pl.'s Resp. 12. But it did, in the Project-specific BEs prepared by the Forest Service. AR9238-58 (Peabody BE), 13915-61 (Tarlton BE). If Plaintiff's argument is that the BEs are not "thorough enough" because the BEs assume the presence of the bat, that argument is merely a disagreement with methodology and does not establish a NEPA violation. *Marsh*, 490 U.S. at 378; *Town of Winthrop v. FAA*, 535 F.3d 1, 13 (1st Cir. 2008) ("[a]gencies are entitled to select their own methodology as long as that methodology is reasonable. The reviewing court must

give deference to that decision.") (citation omitted). And, of course, assuming bats are present is a far more conservative approach than surveying for bats that may not be found.

Plaintiff then complains that the BEs are arbitrary because they contain no measures to protect bats. Even if true (it's not), this substantive complaint fails to establish a NEPA violation. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs."); *Historic Bridge Found. v. Buttigieg*, 22 F.4th 275, 280 (1st Cir. 2022) ("NEPA does not mandate any specific outcome; it only requires agencies to conduct environmental studies.").

Plaintiff's statement that there are no measures to protect bats is not true because both Projects apply Forest Plan standards and guidelines for wildlife (including wildlife reserve trees) and regional bat conservation measures. AR9244 (Peabody BE), 13923 (Tarleton BE); *see* AR3309 (conservation measures from FWS's Biological Opinion), 3470-71 (Forest Plan, Wildlife Reserve Trees S-1, S-2 and G-1 through G-4). The wildlife reserve tree standards and guidelines ensure that abundant roost trees remain within treated stands. Plaintiff's complaint about a *de minimis* loss of roosting habitat overlooks the fact that even if any individual roost trees are removed, ample roosting habitat remains after treatment in both the Project areas and across the Forest. AR9243, 13923-24. Plaintiff also ignores the fact that the treatments *improve* foraging habitat because bats forage over open areas and along physical land features. AR9244, 13924. Given the protective measures, ample roosting habitat, and improved foraging habitat, the Court should reject Plaintiff's challenge based on complaints about the bat. *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1259 (10th Cir. 2019) ("In light of those conservation measures and the low likelihood of [lynx analysis units] having insufficient denning habitat to

begin with, the Service did not need to quantify denning habitat to conclude that the Project will not adversely affect lynx."); *WildWest Inst. v. Bull*, 547 F.3d 1162, 1176 (9th Cir. 2008) (rejecting NEPA challenge because there "would likely be a negligible reduction, if a reduction at all, in habitat suitability" and "treatments may actually improve or create foraging habitat.").

c. The EAs and specialist reports analyzed impacts to scenery and recreation.

The Forest Service prepared scenery and recreation specialist reports for each Project and summarized the findings in the EAs. Defs.' Mem. 19-22; *see* AR4887-88, 4897-98, 6462-64, 6498-506 (Peabody); AR11983, 11988-89, 13793-80, 13826-50 (Tarleton). These analyses, informed by the Forest Service's viewpoint modeling methodology and design features that reduce impacts, satisfy the agency's duty to analyze impacts and make an informed decision.

Plaintiff largely retreats from its main argument about viewpoints, and merely restates – with no legal support – its disagreement with the Forest Service's decision not to include a floating viewpoint on Lake Tarleton. The Forest Service's methodology and selection of viewpoints is reasonable, well-informed, and entitled to deference. *Marsh*, 490 U.S. at 378.

Plaintiff repeats its complaints about the format of information for effects to the Great Gulf Trail. Pl.'s Resp. 13-14. The Forest Service disclosed relevant information and is not required to present information in a particular way or in Plaintiff's preferred format. Defs.' Mem. 20-21 (citing AR4892-95, 17908); *Citizens for Clean Air & Clean Water in Brazoria Cty. v. U.S. Dep't of Transp.*, 98 F.4th 178, 192 (5th Cir. 2024) ("[B]ecause Petitioners here fail to show how the agency's formatting decisions affect the substance of the decision reached, any challenge to the [environmental analysis's] format is meritless.") (cleaned up); *Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1112 (9th Cir. 2015) ("Agencies…have discretion in deciding how to organize and present information in environmental assessments.") (cleaned up).

Plaintiff's complaints about the effects of Peabody's vegetation treatments on Appalachian Trail scenery and recreational baselines are barred by the doctrine of administrative exhaustion. Defs.' Mem. 21-22 (citing 36 C.F.R. §§ 218.8(c), 218.10(a)(3); AR6113 (objection response ## 8, 9)). Plaintiff cites three pages of its comments on the Peabody draft EA. Pl.'s Resp. 14 (citing 4692-94). But these comments (1) do not mention the Appalachian Trail and (2) are about the Projects' recreational improvements, not the effects of timber harvest on recreation. *See* AR4691-93 (Plaintiff's comment on scenery), 4693-94 (commenting that "recreation proposals are unsupported" by the Forest Plan). Nowhere does Plaintiff raise the claims it now pursues in litigation. The claims are thus barred. *Ark Initiative v. U.S. Forest Serv.*, 660 F.3d 1256, 1261 (10th Cir. 2011) ("Parties must exhaust available administrative remedies before the Forest Service prior to bringing their grievances to federal court. The claim must have been presented in sufficient detail to allow the agency to rectify the alleged violation.") (cleaned up).

Plaintiff argues the Court should excuse its failure to exhaust because the Forest Service had independent knowledge of the issues. Pl.'s Mem. 14-15. Plaintiff's cases do not support this argument. First, neither case addresses the Forest Service's administrative exhaustion requirements promulgated in 2013. *Friends of the Clearwater v. Dombeck* has nothing to do with exhaustion; it is a case about whether an agency must supplement a NEPA analysis when new information arises after a decision. 222 F.3d 552, 559 (9th Cir. 2000). And *Department of Transportation v. Public Citizen* addresses the general duty to raise issues in the public comment process; it does not address the obligation to comply with a regulatorily required administrative exhaustion process. 541 U.S. 752, 765 (2004). Second, even if *Public Citizen* applied to administrative exhaustion, its exception for flaws that may be "so obvious" that a commenter need not point them out to preserve a challenge does not help Plaintiff here. *See Public Citizen*,

541 U.S. at 765. Plaintiff's complaints about scenic impacts to the Appalachian Trail and recreation baselines are a quarrel over the degree to which the agency addressed those impacts, not a failure to address the impacts entirely. *League of Wilderness Defs.-Blue Mountains Biodiversity Proj. v. Bosworth*, 383 F. Supp. 2d 1285, 1296-97 (D. Or. 2005) (rejecting "so obvious" exception by reasoning that "[w]hen the argument is one of degree, rather than an outright failure to address, the plaintiff must raise that argument during the comment period or be precluded from litigating it at a later date").

Plaintiff failed to meet its burden to show that its objections about the Appalachian Trail and recreation are based on previously submitted public written comments, and thus failed to show that it satisfied regulatory requirements for administrative exhaustion. 36 C.F.R. §§ 218.8(c), 218.10(a)(3); *Earth Island Inst.*, 87 F.4th at 1064; *Massachusetts v. United States*, 522 F.3d 115, 132 (1st Cir. 2008).

d. <u>The Forest Service analyzed impacts to forest health and disclosed its reliance on stand data.</u>

The EAs and supporting documents analyze the Projects' impacts on forest health. Defs.' Mem. 22-25; *see* AR4877-85, 12344-57, 11973-82, 17906-18. The Forest Service disclosed the information it relied on and made that information available to the public.

Plaintiff continues to claim that the Projects "will destroy old forest age class and stands with old forest habitat." Pl.'s Resp. 8. Defendants challenged this unfounded assertion, noting "Plaintiff does not identify any stands it thinks both have these attributes and authorized timber harvest, nor explain how any limited harvest within such a stand would necessarily impact old growth." Defs.' Mem. 24. Plaintiff responds that old growth or old forest habitat "stands 71, 72, and 75 are within the boundaries of cutting units 72 and 74" in Peabody. Pl.'s Resp. 9 (citing AR6289 and 4895). But Plaintiff misinterprets both the Botany Survey Summary and list of units

where treatments are authorized. The Botany Survey Summary cites both "Compartment" and "Stand" identifiers. Compartment 34 contains Stands 71, 72 and 75. AR6289. The stand table for Peabody assigns a sequential "Stand Identification" number to identify which compartments and stands from the Botany Survey Summary have authorized timber harvest. AR7834-35. The "Stand ID" column in the stand table does not correspond to the compartment and stand identifier from the Botany Survey Summary. The Peabody stand table does not list Compartment 34 Stands 71, 72 or 75, so these stands are not identified for treatment:

| | | |
|---|---|---|
| 70 | 00034 | 3 |
| 71 | 00034 | 41 |
| 72 | 00034 | 4 |
| 73 | 00034 | 20 |
| 74 | 00034 | 6 |
| 75 | 00035 | 23 |

AR7835 (excerpt from Peabody stand table, showing that the Stand Identification number (left column) does not correspond to the compartment and stand identifiers from the Botany Survey Summary (center and right columns)); *see id*. (for full list). Had Plaintiff raised this concern with the Forest Service earlier (and outside of litigation), the Forest Service could have cleared up Plaintiff's apparent confusion.

Plaintiff claims the botanist's email is a "post-hoc rationalization" because "it is dated June 26, 2023, two months after the Service authorized the Peabody project." Pl.'s Resp. 10 (citing email at AR4527-29). Plaintiff mistakenly believes the April 27, 2023 Peabody EA (AR4876-912) authorized the Project. It did not. The EA analyzes and discloses the environmental effects of a proposed action. 36 C.F.R. § 220.7(b)(3). The February 7, 2024 Decision Notice (AR4867-69) documents the decision to proceed with an action and is the final agency action subject to judicial review under the APA. *Id*. § 220.7(c); 5 U.S.C. § 551(13)

(defining "agency action"); *see Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (identifying prongs for final agency action); *All. for the Wild Rockies v. Gassmann*, CV-21-105-M-DLC-KLD, 2022 WL 20287353, at *11 (D. Mont. Sept. 30, 2022) (stating the "Project Decision Notice constitutes final agency action for purposes of the APA."). The June 2023 email pre-dates the February 2024 Decision Notice and is not post-hoc or post-decisional.

In addition, Plaintiff argues that the Peabody objection response "admits eight cutting units overlap with 524 acres of old forest." Pl.'s Resp. 9. This argument is meritless because it confuses the analysis in the Habitat Management Unit (HMU) Rationale, under which "mature" and "old" age classes are categorized together for purposes of evaluating habitat conditions and objectives, with the Forest Plan's definition of old forest habitat and old growth forest. *Compare* AR12654-12655 (HMU reference document) *with* AR3595 (Forest Plan definition). The Forest Plan uses qualitative definitions that account for forest structure, not just age. AR3595. Under the Forest Plan's definitions, no old growth or old forest habitat will be harvested.

Despite ample opportunity to do so, Plaintiff still identifies no specific old growth or old forest stands that are authorized for treatment, while the Forest Service's environmental documents establish the opposite. AR6116, 4880. Plaintiff has not met its burden to support its assertions that the Forest Service is harvesting timber in old forest or old growth habitat. *Friends of Rapid River v. Probert*, 427 F. Supp. 3d 1239, 1258-59 (D. Idaho 2019) (rejecting NEPA challenge because "Plaintiffs have not cited any information, authority, or studies illustrating that the Forest Service's stand exam information (old or new) is erroneous or unreliable.").

Plaintiff also continues to peddle its argument that the Forest Service withheld information about stand data from the public. This assertion is false and frivolous. Both the draft and final EAs clearly identified the HMU Rationales, and those Rationales identify stand surveys

as one of the sources the Forest used to assess forest health. Defs.' Mem. 23 (citing AR4803-04, 4877-78, 11815, 11973-74, 12350, 17910). The Forest Service satisfied its NEPA obligations to inform the public how the agency analyzed forest health. 40 C.F.R. § 1501.21; *Jones*, 741 F.3d at 998; *Friends of the Clearwater v. Petrick*, 588 F. Supp. 3d 1071, 1097 (D. Idaho 2022) ("The Forest Service was not impeding agency or public review because the documents were available for inspection."). Anyone who was interested in more detailed information about stand data was informed of the data during the comment period and could have requested it from the Forest Service. That Plaintiff did not ask for the information during the comment period – but instead waited a year to submit a FOIA request – is not the Forest Service's fault and does not meet Plaintiff's burden to show the stand data information was unavailable to the public.

2. The Projects reasonably evaluate cumulative impacts to climate.

The Forest Service reasonably analyzed the Projects' negligible effect on greenhouse gas emissions. Defs.' Mem. 26-27 (citing AR5678-703 (Forest-wide carbon assessment); 6322-27, 13259-65 (Project-level carbon assessments); 4900, 11987 (EAs). In the context of global climate change, these analyses satisfy NEPA's requirement to discuss impacts from forest management projects "in proportion to their significance." 40 C.F.R. § 1502.2(b); *Hapner v. Tidwell*, 621 F.3d 1239, 1242, 1245 (9th Cir. 2010); *Swomley v. Schroyer*, 484 F. Supp. 3d 970, 975-77 (D. Colo. 2020) *aff'd*, No. 20-1335, 2021 WL 4810161 (10th Cir. Oct. 15, 2021).

Plaintiff fails to show that the Forest Service's analyses are arbitrary and capricious. First, it fails to acknowledge the quantitative Forest-wide and qualitative Project-level carbon assessments that the EAs incorporate by reference. *See* Pl.'s Resp. 15-18. The Forest-wide and Project-level assessments disclose potential impacts and provide a detailed and reasoned basis to support the Forest Service's finding that the Projects' impacts on greenhouse gas emissions and

global climate change are negligible. AR6323, 13260. Importantly, the Project-level assessments found that after treatment, the remaining and new trees that grow in the healthier forest will sequester more carbon than if left untreated. AR6324, 13262.

Plaintiff also fails to acknowledge the principal of aggregation, under which an agency may "characterize the cumulative effects of past actions in the aggregate without enumerating every past project that has affected an area." *Ctr. for Env't Law & Pol'y v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1007 (9th Cir. 2011); *see* 36 C.F.R. § 220.4(g) (cataloging past actions is not required). The Forest-wide and Project-level carbon assessments aggregate the effects of past projects, so Plaintiff's allegation that the Forest Service refused to consider the cumulative effects of other projects is baseless. Defs.' Mem. 27 (discussing aggregation).

Plaintiff wrongly claims that the Forest Service must quantify greenhouse gas emissions. "[Q]uantified data in a cumulative effects analysis is not a per se requirement." *Ctr. for Comm. Action & Env't Just. v. FAA*, 18 F.4th 592, 605 (9th Cir. 2021). Plaintiff continues to rely on a single case from the District of Montana and does not respond to Defendants' case law showing that the Montana case contradicts binding precedent and is an outlier among cases addressing the carbon analysis in other forest management projects. Defs. Mem. 28 (citing *Hapner*, 621 F.3d at 1242, 1245; *Swomley*, 484 F. Supp. 3d at 975-77; *League of Wilderness Defs. v. Connaughton*, No. 3:12-cv-2271-HZ, 2014 WL 6977611, at *26-27 (D. Or. Dec. 9, 2014)).

Finally, Plaintiff claims the Forest Service "arbitrarily bypasses two critical pieces of guidance." Pl.'s Resp. 17. The first is the 2023 Council on Environmental Quality (CEQ) interim guidance, but the Forest Service was not required to apply the interim guidance because the NEPA process for the Projects was already underway. Defs.' Mem. 29; *see* AR489, 4085, 9741. The second is the Forest Service's July 2022 Climate Adaption Plan, which Plaintiff mentions

for the first time in its reply and should not be considered by the Court. *Sullivan v. Neiman Marcus Grp., Inc.*, 358 F.3d 110, 114 n.1 (1st Cir. 2004) (issues not raised in an opening brief on appeal are waived). Even if the Court were to consider this new argument, it fails to show the Projects' analysis of climate impacts is arbitrary and capricious. The passage cited by Plaintiff addresses old-growth and mature forests (AR733), but no treatments are proposed in old forest or old growth habitats on either of the Projects. AR4880, 12919; *see* Part II.B.1.d, *supra*.

In sum, none of Plaintiff's challenges to the Projects' analysis of direct, indirect, or cumulative effects have any merit. The Forest Service conducted a reasonable analysis of effects in proportion to their significance. 40 C.F.R. § 1502.2(b); *Balt. Gas & Elec. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983). That Plaintiff disagrees with the Forest Service's analysis on any of these issues "is not a basis for deeming it invalid. The NEPA ensures that an informed decision is made, not that the decision is satisfactory to all those affected by it." *Lovgren*, 701 F.3d at 38. The Court should grant summary judgment for Defendants on Claim Two.

### C. <u>The Projects comply with the Forest Plan and satisfy NFMA.</u>

The Forest Service's EAs and supporting documentation show that the Projects comply with the Forest Plan and thus comply with NFMA. Defs.' Mem. 32-35. Plaintiff's NFMA claims are either barred by the doctrines of waiver and administrative exhaustion or fail to meet Plaintiff's burden to show the Forest Service's decisions are arbitrary and capricious.

*First*, Plaintiff waived its NFMA arguments about stand data and scientific literature. Defs.' Mem. 32 n.13. Plaintiff responds that it "fully fleshed [the argument] out in the context of NEPA" and asserts "the same facts and argumentation support the NFMA claim…." Pl.'s Resp. 19. But the statutes are distinct; NEPA is procedural whereas NFMA is substantive. *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998) ("NEPA, unlike the NFMA, simply

guarantees a particular procedure, not a particular result.”).[2] Plaintiff's passing reference to prior procedural NEPA arguments does not meet its burden to show that the Forest Service's substantive decisions about Forest Plan compliance violate NFMA. *Lands Council v. McNair*, 537 F.3d 981, 994 (9th Cir. 2008) (en banc) (“[T]he Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan.”), *overruling on other grounds recognized by City of Los Angeles v. FAA*, 63 F.4th 835, 824 (9th Cir. 2023). Even if the Court were to reach the merits of this claim, there is no NFMA violation because there is no timber harvest in old forest or old growth habitat in either of the Projects. AR4880, 12919; *see* Part II.B.1.d, *supra*.

*Second*, the Forest Service provided a rational explanation for modifying MA 2.1 Guideline 3, which generally limits visible openings to three to four acres in “high” scenic integrity areas. Defs.' Mem. 32-33. Plaintiff provides no support for its new argument that scenic integrity standards are somehow paramount to other Forest and Project-level objectives, such as moving towards desired conditions for vegetation, wildlife, and other resources.[3] Additionally, the Forest Service has a statutory mandate to “provide for multiple use and sustained yield” of forest resources. 16 U.S.C. § 1604(e). While Plaintiff may be dissatisfied with the Forest Service's reason to modify Guideline 3, it is not arbitrary and capricious and is entitled to deference. *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020)

---

[2] At least one district court has been reversed for conflating NEPA and NFMA claims. *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1070 (9th Cir. 2002) (“Because the [NEPA and NFMA] counts are based on different statutes and seek to enforce different duties of the Forest Service, the district court abused its discretion in striking the counts as redundant.”).

[3] Plaintiff does not respond to Defendants' argument that design elements distribute temporary openings in units 19 and 20 across the landscape. Defs.' Resp. 33 (citing AR4891 (SCM-1).

(courts "give the Forest Service ample latitude in ensuring the consistency of its actions with Forest Plans....").

*Third*, Plaintiff failed to exhaust its administrative remedies for its claim about the Projects' compliance with Forest Plan standards for two rivers eligible for designation as Wild and Scenic Rivers because it did not raise this issue in scoping or any other designated opportunity for public comment. Defs.' Mem. 33 (citing 36 C.F.R. §§ 218.8(c), 218.10(a)(3). In response, Plaintiff selects a phrase from one of its comments about a no action alternative. Pl.'s Mem. 19-20 (citing AR4684). Not only does the selected phrase fail to mention the key term "wild and scenic river," it says nothing about compliance with the Forest Plan and is about NEPA, not NFMA. Plaintiff bears the burden to demonstrate compliance with the Forest Service's regulations for administrative exhaustion. 36 C.F.R. § 218.8(c). It failed.

Plaintiff then asserts the claim is not exhausted because the Forest Service had independent knowledge of the issue. Pl.'s Mem. 20. As noted in Part II.B.1.c *supra*, the same cases Plaintiff cites here about a "so obvious" exception do not apply. Additionally, the Forest Service did not ignore Forest Plan standards for eligible Wild and Scenic Rivers. The Forest Service analyzed impacts to the two eligible rivers and determined that Project activities would not result in irreversible or irretrievable changes that could affect potential designation. AR4902-03 and AR4903 (Table 7).

*Fourth*, Plaintiff continues to claim that "assumption of the bat's presence does not satisfy its Forest Plan obligations." Pl.'s Resp. 20. But Plaintiff cites no Forest Plan "obligations" that support its view, and doubles down on its erroneous interpretation that the Forest Service must conduct bat surveys. *Id.* The Forest Plan requirement to conduct surveys only applies to certain *plant* species. Defs.' Mem. 33-34; AR3448 (citing Rare and Unique Features Standard 1).

Bats are not plants, so the survey requirement does not apply. The Court should defer to the Forest Service's reasonable interpretation of the investigation required by Standard 1. *Or. Nat. Desert Ass'n.*, 957 F.3d at 1035.

The Projects comply with all Forest Plan requirements, including those raised in this lawsuit. The Court should grant summary judgment for Defendants on Claim Four.[4]

## III. CONCLUSION

Plaintiff has not met its burden to show that the Peabody or Tarleton Projects are arbitrary and capricious. The Projects satisfy the Forest Service's multiple-use mandate and will create a more diverse, healthier, and more sustainable Forest for present and future generations. The Court should grant summary judgment for Defendants on all claims and deny Plaintiff's motion for summary judgment in its entirety.[5]

Respectfully submitted,

Dated: December 12, 2024.

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

*/s/ John P. Tustin*

[4] Plaintiff waived its challenge to the FONSIs because it provided no legal argument in its opening brief in support of Claim Three. Defs.' Mem. 30-32. Plaintiff's single paragraph catch-all response both fails to show it preserved the claim and fails to show the Forest Service's consideration of the context and ten intensity factors was arbitrary and capricious. Pl.'s Resp. 18. The Court should grant judgment for Defendants on Claim Three.

[5] Plaintiff's response continues to ask the Court to vacate the Projects' decisions, but still provides no analysis and cites no binding precedent. Pl.'s Resp. 20 n.12. In the First Circuit, whether to vacate agency decisions "rests in the sound discretion of the reviewing court; and it depends *inter alia* on the severity of the errors, the likelihood that they can be mended without altering the order, and on the balance of equities and public interest considerations." *Cent. Maine Power Co. v. FERC*, 252 F.3d 34, 49 (1st Cir. 2001). Unless or until a specific violation is established, it will not be clear what a reasonable remedy might be.

Texas Bar No. 24056458
Senior Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 305-3022
Fax: (202) 305-0275
john.tustin@usdoj.gov

JANE E. YOUNG
United States Attorney

**TABLE OF ACRONYMS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| CEQ | Council on Environmental Quality |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FONSI | Finding of No Significant Impact |
| FWS | Fish & Wildlife Service |
| HMU | Habitat Management Unit |
| NFMA | National Forest Management Act |
| NEPA | National Environmental Policy Act |
| TES | Threatened, Endangered, Sensitive |

P R O C E E D I N G S

THE CLERK: This Court is in session and has for consideration oral argument on motions for summary judgment in civil matter 24-cv-138-JL-TSM, Standing Trees, Incorporated vs. the U.S. Forest Service, et al.

THE COURT: All right. We're here on -- you know, it's a motion for summary judgment, but it's actually just a case that's tried on -- or that's -- you know, that's litigated on the administrative record. So I think of it more as just a -- you know, this is not the trial, of course, but it's oral argument on the merits of the case. And I'm not crazy about the term summary judgment for something like this because it's not a shortcut, but we all understand each other.

So why don't counsel identify themselves for the record and then we'll just get started. We'll start with Standing Trees' counsel.

MR. COURCHESNE: Your Honor, good morning. Christophe Courchesne, counsel for Standing Trees.

THE COURT: Yup. So you're the --

MR. COURCHESNE: And, actually, I -- thank you for -- thank you for asking me. I appreciate the Court's indulgence that we have our student clinicians from the Environmental Advocacy Clinic at Vermont Law and Graduate School who have assisted with this case over the last year and a half.

So I would like, if they would like to introduce themselves, it's up to you.

THE COURT: Sure. Yeah, welcome.

MR. COURCHESNE: Terrific.

MR. ANDERSON: Joseph Anderson. I'm a 2L at Vermont Law.

THE COURT: Welcome.

MS. WEISGERBER: Hannah Weisgerber, a 3L at Vermont Law.

THE COURT: Happy to have you.

You two in the back?

MS. DANNEELS: Ashton Danneels, also a 3L at Vermont Law.

MR. BEHIMER: Ben Behimer, 2L at Vermont Law.

THE COURT: Great.

MR. TUSTIN: Good morning, your Honor, John Tustin on behalf of the United States.

THE COURT: All right. Counsel in the back?

MR. EGGLETON: Jeremy Eggleton, your Honor, with the law firm of Orr & Reno, on behalf of the private amici, your Honor, and I'm joined by Matt Leahy of the Forest Society.

MR. ASLIN: Good morning, your Honor. Chris Aslin from the Attorney General's Office on behalf of the state of New Hampshire.

THE COURT: Thank you.

All right. Let's proceed. I have a paper copy of what looks like a slide presentation here.

MR. COURCHESNE: Yes. With your Honor's permission, I'd like to present some tables from the record --

THE COURT: Sure.

MR. COURCHESNE: -- to guide my discussion a bit since it's a -- it's a dense record with a lot of visuals, so I thought it would be helpful.

THE COURT: Not a problem.

MR. COURCHESNE: So, your Honor, it's been about a decade since I've been before you.

THE COURT: Yeah.

MR. COURCHESNE: I was at Conservation Law Foundation, then I was a stint at the Mass AG's office in Boston for a number of years. I'm now the director of the Environmental Advocacy Clinic at Vermont Law and Graduate School.

THE COURT: Excellent.

MR. COURCHESNE: And I work with law students and they're really an integral part of the case team in our cases and the way we do them. And so in this case, you know, the students have been -- took the lead in writing the briefs, working with our client, Standing Trees, and under my supervision. And they've worked on the administrative objections, the complaint, the summary judgment papers. So --

THE COURT: So you've been working the case since it's been before the agency, even before -- before it got to court.

MR. COURCHESNE: Before it got to court, exactly. The students worked on the administrative objections phase of the process. The client worked on the comments on the environmental assessments --

THE COURT: Right.

MR. COURCHESNE: -- previous to that. So it's been a -- a terrific experience.

THE COURT: Law school's a lot better than when I went to law school.

MR. COURCHESNE: They've done so much hard work on this case, your Honor. It's really --

THE COURT: Yeah, it's amazing. I've got a daughter in law school and she's in court all the time, like all the time. So, I don't know, it just -- I think I was born a few decades too early.

So, anyway, let's keep going.

MR. COURCHESNE: Yes. And so this case, your Honor, is about the Forest Service approval of two large logging projects in the White Mountains. While there are other components of these projects that aren't at issue here, at their core, these are two huge logging projects with some logging roads as well, and thousands of acres of logging, many

miles of roadwork, and this will have major impacts on the National Forest.

I want to show you quickly a couple of the overview maps from these projects that are in the record.

So here are the two -- two maps for these two projects. It shows there, you know, this is -- can you see the -- oh, I'm sorry.

THE COURT: I can see them on the -- sure.

MR. COURCHESNE: Okay. Terrific.

These are substantial -- all these -- all these blocks that you see are treatment areas that some logging is proposed in both these areas. This will, you know, have significant impacts on the treasured resources of these areas and the people who enjoy these areas, including Standing Trees members.

So these are sort of -- this is the overview of the projects that are in the environmental assessments.

The next -- this is sort of the overview of where they are in context in the White Mountains. One's in the northeast corner and one's on the west side. But you can see there's a -- a variety of other logging projects that are proposed and that's part of our argument later, but I wanted to show you them in context.

THE COURT: Yup.

MR. COURCHESNE: So -- this is Lake Tarleton and

I've also -- I also wanted to include a quote from the record about Lake Tarleton which reflects that -- I think the views of Standing Trees members about this area from Senator Judd Gregg who said that "Many of us here today in 2000 worked hard for a number of years to reach the point where we are at today where we can proudly say this pristine New Hampshire wilderness has been saved."

So this was about Lake Tarleton, that beautiful lake, and the resources that it -- that are there.

It's really -- it's also true and it's also why it's so controversial, this quote, I think, because the Standing Trees members in the record, including I think we've got the Faletras at Exhibit C of my papers, the Aschers at Exhibits E and L of our papers, represent that they were told that this area would be preserved as a result of being acquired by the Forest Service. And so that's a big driver for some of our members' feelings about these project -- this project at Tarleton.

THE COURT: Wait. What's a big driver?

MR. COURCHESNE: That they feel that that area was promised to them to be --

THE COURT: Oh.

MR. COURCHESNE: -- preserved in a wilderness state as a certain quote suggests was the understanding of --

THE COURT: So not just less logging, but no

logging, bottom line.

MR. COURCHESNE: Bottom line, certainly not anything like the proposal that's on the table today to do really significant logging all around the lake.

So this is Peabody West, which is, you know, one of the iconic areas of the Presidentials, right in the shadow of the Presidentials. This is in summer from the Imp lookout, which is sort of on the east side of Route 16, and then this is the winter view of the area from Wildcat. These are both sort of Appalachian Trail views of the area. So that's just the context, your Honor.

So I'm going to leave the -- I'll leave that picture up for now.

For reasons I'll explain, the Forest Service's approval of both projects violated NEPA and NFMA, the National Forest Management Act, and we're asking the Court under the APA to set aside these project approvals and to send the Forest Service back to the drawing board based on those errors.

So we think these reviews are among the most threadbare we've ever seen. They're extremely -- extremely conclusory. And you look at the other agency reviews that the Forest Service has done that are actually in this administrative record because they were included by reference or they were included in the record like at Albany South, which is really firmly at issue when we're talking about water

quality, or the mount -- the mount -- the Moat Mountain Trail project which is close to my heart because that's right behind a place that I stay in the White Mountains when I'm there.

There's really no comparison with those two environmental assessments that were done and the two that you have in front of you in terms of care, rigor, and reasoning, and the analysis here in these two projects is very, very one-sided. It was often cursory and, really, the key issue is in some spots it just doesn't make sense, your Honor. That's really the standard. It was a -- kind of a brochure for what the Forest Service was doing. If you -- if you read through these assessments, it was not an assessment. So even with the deferential standard of review, we think that these assessments flunk.

So I want to emphasize we're here because of what the service did wrong here, not as -- not about vindicating our policy preferences that -- you know, for forest management. We have good faith disagreements with lots of different parties, Standing Trees does, about the way these forests should be managed. That's not really at issue. That's not really before the Court. We're talking about, really, you know, the -- in fact, you know, to that point, Standing Trees proposed alternatives in both projects that would have entailed some logging and the Forest Service rejected them.

So I will get -- I'll get to that point about our

alternatives, because it's important. It's a subsidiary point to what -- our overall alternative point.

I'd like to talk quickly about standing, if I could, your Honor, because it's an important factor in these cases, and then proceed to the merits and emphasize sort of the key problems with the Forest Service's actions.

So let's start with standing. The Forest Service did not contest our standing and we appreciate that it's a threshold question for the Court, however, and so we wanted to mention it and talk about it briefly.

Standing Trees' members live, work, recreate, enjoy the forest and the wildlife in these precise areas in the vicinity of both projects. And at Lake Tarleton, Standing Trees members also run one of the area's signature summer camps and event venues. It's a multimillion-dollar operation, a major employer in the area, and its only -- the area it enjoys and uses as part of its camp will be affected by this project.

In terms of standing, logging in the place and manner the Forest Service has proposed will change the Forest Service's -- the forest's appearance, its ecological health, and recreational opportunities. And these are -- these are things that the Standing Trees members currently enjoy. It's reflected in our standing declarations that we attached to our original --

THE COURT: Sure. But there's no challenge to

standing here, so ...

MR. COURCHESNE: There's -- no. And I'll just briefly sort of say I -- I think we satisfied the -- we satisfied the test. We've got injury in these particular areas. That's traceable to these approvals of these projects and it would be redressable with a decision setting aside these approvals under the APA.

THE COURT: I don't disagree, and I don't think the defendant -- I don't think the Forest Service does either.

MR. COURCHESNE: So turning to the merits then, your Honor, I wanted to take a step back to the way this is supposed to work.

The -- the Forest Service -- the Forest Service is supposed to develop this very broad plan for the forest. You see it throughout the papers talked about as the forest plan. And during the plan period, the forest management needs to follow the plan. That's the command of NFMA.

The plan, in essence, is the bible for the -- for these projects and for forest management. It governs -- you know, it has a lot of language that governs the forest and establishes zones for forest management.

So one of the biggest issues that the plan leaves open is what to do in these general management areas, these MA2.1 areas, that are not restricted as other areas are. So because there's a lot of options in those areas, each forest

management plan has to go through a NEPA review and it needs to do a great deal of site-specific work to determine what -- what the impacts are, what -- and we think what the alternatives to the proposal are. And the forest plan doesn't purport to do that even though it's a very long document and it has an EIS attached to it.

So it's all the more -- you know, it's all the more important here, your Honor, to be looking at that -- these issues very closely because the Forest Service is -- the forest plan is now 20 years old. That's five years past NFMA's 15-year, you know, really requirement for forest plans. That's their life span. And we're five years past that now.

THE COURT: Have the operations started yet under these two projects? Like is there actual logging going on?

MR. COURCHESNE: Well, I'd like to ask the counsel for the government on that.

THE COURT: What do you think?

MR. COURCHESNE: We have not noticed in Lake Tarleton, which at Lake Tarleton I believe the representation was December of this year that logging will be -- will be starting.

At Peabody West, there were some preparations and a timber sale that has occurred, but we'd defer to the Forest Service in terms of --

THE COURT: Mr. Tustin, what's the status?

MR. TUSTIN: It's operational on Peabody, yes. I was out there yesterday. And as we noticed in our status -- as we noticed in our report in July that we told the Court and plaintiffs that operations would begin in December. Operations should be halting in the next couple weeks, but they are operational at Peabody.

Tarleton has been delayed about a year so that there will be -- there is an anticipated sale for Tarleton in the spring of '26 with operations to begin in December '26.

THE COURT: So operations means -- this is more just curiosity at this point, but operations means what, like --

MR. TUSTIN: Timber harvest.

THE COURT: -- trees being cut?

MR. TUSTIN: Timber harvest, yes.

THE COURT: Okay. Go ahead, Counsel.

MR. COURCHESNE: So to make that sort of point that we really are trying to get the really strong site-specific review of these projects and that's what we -- what NEPA requires and it's all the more important, given the age of the forest plan.

So there are three big problems that we wanted to highlight with you on the merits. The first one -- the first one's alternatives and it's actually an interesting legal issue to start with.

THE COURT: It's actually a what issue to start

with?

MR. COURCHESNE: It's a really interesting legal issue to start with. It's not an issue, we believe at the outset, of arbitrary and capricious review. It's an issue of what the regulations and the statute require.

And so the obligation to consider alternatives comes straight from NEPA and that's why we wanted to show you this slide, showing you where it comes from.

And this is -- you know, to not consider alternatives in the way that the final EAs did in this project is legal error. And so we have the statute requires it, the Forest Service regulations require it, and the case law requires it.

So it's also worth noting that the Forest Service approach here is a real outlier. As our papers show, cases before the Court that have considered environmental assessment like the *Army Corps* case, Great Bay case that you heard in 2019, and all the other Forest Service projects in New Hampshire that are in the record and that we've -- we've seen routinely consider actual alternatives, the main point of dispute with the service appears to be their understanding of their own obligations.

The Forest Service says that its consequences of no action passages in the EAs are enough. What they did in those discussions is say essentially doing nothing would be a

problem and --

THE COURT: Right.

MR. COURCHESNE: Because it would not meet the need for the project. And that's deeply conclusory. It also -- we think that NEPA and the regulations require more, whether you credit the fact that they -- this was an alternative analysis or not.

So here's the purpose section for the --

THE COURT: Well, you -- but you -- you -- they claim that, you know, that -- they claim that no unresolved conflicts have been brought forward and you said that's an egregious misstatement. What's egregious about it? What's the misstatement?

MR. COURCHESNE: Well, there were absolutely unresolved conflicts about the uses of the property, of these areas. The public raised those concerns and even in the -- even in the bodies of the EAs, even if there were no -- even if there were no public comments suggesting that the Forest Service should have done something differently, we have sort of a conflict of scenery guidelines and the Forest Service's age class management goals at Peabody West.

And we have -- you know, there are -- that's just one example of how the Forest Service is taking some guidelines and saying, well, this value is more important than the other. That's a -- that's an unresolved conflict under the statute.

And so that creates that problem under the statute and generates this alternatives analysis requirement.

The regulations that the Forest Service has promulgated in this space purport to answer what the Forest Service is supposed to do and it includes this discussion of unresolved conflict.

Actually, I think that the Forest Service, which, you know, will make its points here, but their contention is not that they don't have to do an alternatives analysis; their contention is that they relied on the second half of the regulation, which is this here. They relied on the second prong that says they can document an alternative using this consequences of no action approach that they did.

THE COURT: Yeah.

MR. COURCHESNE: So they don't make an argument as to this issue of unresolved conflicts.

So they're really -- they're really focused on the idea that B22 blesses what they did and we just don't -- we just don't agree with that, if you look at the regulation.

So the -- you know, the focus of these are on planning and public disclosure. The leading sentence of this regulation says that the EA shall briefly describe the proposed action and alternatives that meet the need for action.

The key point is that the alternatives that they analyze, if they need to analyze them, need to meet the project

need and that they -- they didn't do that here. They say that the consequences of no action are that it won't meet the project needs. So a no action alternative could not possibly satisfy the service's obligations to consider alternatives here. And we think the case law interpreting NEPA here and around the country are in accord that some alternatives analysis is required.

So the question that is presented by the service's argument is does this second prong bless, as they contend, what they did in these two projects. And, interestingly, the reason I said it was interesting is that in all the litigation over Forest Service projects over the years, it doesn't appear this has come up. And I think that's telling, your Honor, that it hasn't come up. There's been a lot of Forest Service projects and a lot of environmental assessments, especially in the west, and this issue has not yet come up even though these regulations are more than a decade old.

I think the -- the Forest Service cites the preamble to these regulations to try to get some better sense of what it means. So we looked at the preamble and the preamble has a pretty telling reference. It says that typically most Forest Service proposals will have alternatives. It says that, you know, when there's consensus about the action, you don't need to do an alternatives analysis. Otherwise, you need to develop alternatives that meet the project needs.

So that's why we talk about action alternatives and that you -- we think the regs require at least one of them and if you don't, then you don't satisfy that first sentence of the regs.

So that's our legal -- that's our legal argument, but we also think that even if you don't credit that argument, you can move to the question of whether it was arbitrary and capricious in context here. And I think that, you know, our -- our position is that this decision to not engage in action alternatives analysis was arbitrary and capricious for two reasons.

One is that in the consequences of no actions sections of these EAs, they say nothing about the benefits of no action to water quality, wildlife, carbon, of allowing the national processes to unfold across the landscape, either in whole or in part, and no mention of the benefits of less intensive options at all. No mention of the benefits to, say, the Kingswood Camp on Lake Tarleton, for example, if this project didn't go forward as proposed. That's fatally inadequate under the requirement that's stated in *Dubois*, the case from the First Circuit in 1996 that says you have to consider the merits and demerits from an environmental perspective under NEPA.

And that consequences of no action section was not robust. It's a paragraph. It is, as I said, a brochure for

the project and why it's needed. It's not an -- it's not an analysis.

So that's the -- that's one reason. You know, I think, secondly, such a choice, given the record, is also, you know, arbitrary and capricious. There were a rich -- there were -- there were a rich array of alternatives proposed, including by Standing Trees. Both projects -- so there's a contention now there aren't any alternatives to the proposed actions. Well, the Forest Service was doing its own alternatives analysis outside the NEPA process and shrinking these projects over the course of their review without making them alternatives.

And they also made other changes to the recreation proposals. They decided to exclude some areas from logging over the course of the environmental assessment process and they're very proud of that in their statements about how they reduced the logging areas.

THE COURT: Yeah.

MR. COURCHESNE: That's proof positive that there were alternatives. It's really -- it's really -- there were alternatives to what they proposed.

So that's just a commonsense rule of reason point that we would make, that there are absolutely more protective alternatives that were evident from the record and not considered.

Our alternatives would have had less -- less impact on the forest for both projects. The Forest Service in considering alternatives -- our alternatives said, no, thanks, essentially, in that they said they don't meet the project needs. But, importantly, they did not document that in the EAs themselves.

So we think that's a -- that's a big reason why it was arbitrary here to not consider alternatives.

I'll move on to the next -- unless the Court has questions about alternatives, I'd like to move on to hard look.

THE COURT: Hard look?

MR. COURCHESNE: Yeah.

THE COURT: All right.

MR. COURCHESNE: So as we think about the hard look question, it's again guided by that rule of reason and the Forest Service's fundamental obligation to engage in nonarbitrary decisions.

THE COURT: You know, I'm debating in my mind whether we should do these one at a time.

MR. COURCHESNE: Yeah.

THE COURT: You know, hear from counsel regarding alternatives and then move to hard look, go back and forth so it's not sort of like this mountain we've got to climb each time. You know what I mean?

MR. COURCHESNE: Yes. And that would be fine with

us, your Honor.

THE COURT: Okay. Thank you.

So alternative analysis.

MR. TUSTIN: Yes, sir.

Could you please take this down, the visual?

MR. COURCHESNE: Yes, I will.

MR. TUSTIN: Good morning, your Honor. John Tustin on behalf of the Forest Service.

I'd like to acknowledge several members of the district and the supervisor's office that came out today. So they are very interested in this Court's proceedings and what we're discussing here today.

THE COURT: Understood.

MR. TUSTIN: Before I discuss alternatives, I'd just like to give a brief overview, if you don't mind.

THE COURT: Of course.

MR. TUSTIN: So, your Honor, this case concerns two integrated resource projects, and that integrated word is quite important for this forest because it -- it shows how the forest is fulfilling its mandate under the National Forest Management Act to provide for multiple use and sustained yield of forest resources, which includes wildlife, timber, recreation.

And this forest here, the White Mountain National Forest, it's a Weeks Act forest, which means -- the Weeks Act was passed in 1911 for eastern forests to acquire disturbed

lands to -- primarily for water quality, but also now for other purposes under the National Forest Management Act and the Multiple-Use and Sustained-Yield Act.

The forests in the areas really show New Hampshire's agricultural past. The mature forests in the project are from farmland that are cut more than a hundred years ago, and what has regrown are just different species, composition, and different age classes than what is desired in the forest plan and, importantly, what the Forest Service needs to do to provide not only for current generations, but for future generations who will depend on this forest for its multiple uses. And these projects here are designed to sustain a healthy, diverse, and productive ecosystem.

Plaintiffs raised two legal claims under the National Environmental Policy Act, NEPA, or the -- and the National Forest Management Act, or NFMA. We'll talk about them in turn, but since we're talking about NEPA, I just really want to emphasize that NEPA is a procedural statute. It does not have any -- it does not mandate a specific outcome. So long as the agency conducts analyses, the Court should defer to the Forest Service's reasoned and informed decision. And, here, the environmental assessment shows the Forest Service really did take a hard look and assess the project's impacts and provided for ample public comment.

These projects began in 2019, they'd been in

development for five years before they were authorized, and as I mentioned about 20 minutes ago, they are operational now. So there are people out there removing the timber, restoring the ecosystem, improving the wildlife habitat.

Turning to alternatives, we've talked about the two points here. The first issue is whether or not there is an action or no action alternative and also how the Forest Service examines their proposed alternatives. The range of alternatives is within the agency's discretion and the Forest Service regulations expressly provide that no specific number of alternatives is required or prescribed.

This is just a --

THE COURT: Yeah.

MR. TUSTIN: -- 36 CFR 220.7.

THE COURT: Yup.

MR. TUSTIN: All right. So this is what we're -- this is what is guiding the Forest Service -- Forest Service alternatives here.

And as we note in our brief, the Forest Service analyzed in detail a proposed action, that's at 4880 to 88 in one of them, and 1197 -- 11976 to 83 in Tarleton. They also included the effects analysis as a comparative known -- as a comparative baseline.

Now, what these -- the first point is whether or not the Forest Service had to consider multiple alternatives or an

explicit no action alternative. We cited cases that say you do not have to do that and there's binding -- there's precedent from the First -- from the Ninth Circuit and Tenth Circuit that say as long as there is an action and a no action alternative, the Court -- that satisfies it. You don't have to have multiple action alternatives because, as the First Circuit held in *Seacoast*, it's really endless. You can always think of ways to have a different range, a different spectrum, to decide things.

But NEPA, especially for environmental assessments, it's not to make paperwork. That's not the purpose of the statute. It's just to provide an informed basis for the Forest Service to make a decision.

Now, the issue here is whether or not the Forest Service is allowed to include the no action alternative in the baseline as opposed to an expressly analyzed no action alternative that analyzes everything. And the regulations are quite clear the Forest Service may.

Now, as we noted in our brief, this is an issue of first impression, so we agree with plaintiffs that this is an interesting issue for the Court. But just because we can't find an example in case law does not mean the Forest Service's decision to rely on that is arbitrary and capricious.

So I'd just like to walk through the regulation to just respond to plaintiff's points here.

THE COURT: Yeah.

MR. TUSTIN: So we've talked about the opening portion of the part B -- part A that just says that you have to describe the alternatives analysis here and that no specific number is -- is required or prescribed.

Plaintiff spent a lot of time discussing part 1 about unresolved conflicts, but, your Honor, this doesn't have ands or ors or semicolons after each one of these subparts, so each one stands alone. Part 1 for the unresolved conflicts, that is not an issue here. This is when there is no -- no action analysis at all. If you're doing something to administrate a site or -- not a categorical exclusion, but there may be some situations in which there's no possible way to have a -- an alternative.

That does not apply here and as the plaintiffs discussed in their responsive brief, focusing solely on 2, subpart 1. But as we noted in our brief, we are relying on 2, subpart 2, which plaintiffs really did not respond to at all in their papers in the briefs. So the argument you heard today from Mr. -- from the plaintiff's counsel is new argument that was not addressed in the papers. And because they didn't do that, one way for the Court to find in favor of the Forest Service is waiver. They did not address our express argument in reliance on 2, subpart 2.

But, more importantly, the plain language say that

you don't have to do a no action alternative. You can look at the effects analysis just by -- in the baseline. And that is what the Forest Service did here. In the baseline, they relied on that at 480 -- 48897 in Peabody and 1197 in Tarleton.

And the regulations are quite clear that that is sufficient, that satisfies the regulation, and under the arbitrary and capricious standard, that is not arbitrary and capricious.

THE COURT: Looking at the EA for Tarleton, though --

MR. TUSTIN: Yes.

THE COURT: -- it says, in addition to increasing forest, tree, and wildlife habitat diversity, that without management action, no improvements to shoreline or aquatic habitat at Lake Katherine would occur, resulting in a higher -- here's the thing -- higher water temperature, less cover for aquatic animals, and stormwater, right, that would run off into the lake before it could be adequately filtered.

And the -- you know, that -- that makes sense to me just reading it, but you're -- there's no citation to anything, nothing, to support any of that. What am I to make of that?

MR. TUSTIN: Well, I think that what you should make of that is that that is setting forth the baseline position, the baseline condition. And those other supports which are incorporated by reference, all the water specialists' reports,

the other wildlife reports, those are available in the record and those are discussed in greater detail when they're analyzed in the action.

But what the Forest Service has done here is it's given the baseline. And it says that if we don't do anything, this age class composition is going to continue to worsen. The wildlife habitat is not going to provide for the needs. We're not going to provide timber and wood products for the economy and for local workers. That if you do nothing -- I mean, that might be fine for some people, but that's certainly inconsistent with what the forest -- what the forest plan requires for a sustainable ecosystem and wood products for not just now but for future generations.

And in some -- in most environmental assessments, the no action alternative would have been discussed to go through each of the resources and say, if we do nothing, this happens. But that really is not necessary because the Forest Service regulations say that. And also in the Federal Register that we cited in our -- in our brief, 73 Federal Register 43084, that's sort of -- they give a little more flavor about how the -- that by having the no action in the baseline, the Forest Service issued a final regulation that says you do not have to have a separate no action alternative.

THE COURT: Go ahead.

MR. TUSTIN: All right. So turning to the other --

the other alternatives argument is whether or not there are reasonable alternatives the Forest Service did not consider, and we maintain the answer is no.

In our brief we discussed how the alternatives is based on the purpose and need of the project. The Forest Service provided a purpose and need. That is uncontested. So there is no dispute that the forest -- there is no dispute in this case that the purpose and need is impermissibly narrow.

And so what plaintiffs needed to do or, actually, what the Forest Service did here is that they -- it looked at the no action alternative in the baseline and their proposed action alternative. Under NEPA and under -- under case law, that satisfies the Forest Service's burden.

If plaintiffs believed there was a reasonable action alternative that the Forest Service did not consider, it is their obligation to prevent -- to provide that to the Forest Service for consideration and they did not do that here. They -- they did provide alternatives, but the Forest -- the Forest Service, consistent with its regulations, it briefly discussed those and explained why it did not satisfy the purpose and need.

And, for example, in Tarleton, they said that they had a -- plaintiffs had a recreation and habitat-focused alternative, but the Forest Service explained at -- at 10553 that just focusing on recreation and habitat does not meet the

purpose and need to adjust the age class composition, which is just the age of stands -- the age of stands of trees in the area.

They also -- plaintiffs also had an alternative for Peabody that prohibited timber harvest and the Forest Service explained this does not implement the purpose and need.

And I think the central issue here, if we're looking at plaintiff's alternatives, I would direct the Court to *Vermont Yankee* from the Supreme Court and *Seacoast Antipollution League* from the First Circuit that you can't have a vague alternative. They can't just say don't do unnecessary timber harvests. What does unnecessary timber harvests mean?

Plaintiffs bear the burden under *Vermont Yankee* and *Seacoast* to provide specific alternatives. They can't have cryptic and obscure references in the administrative proceedings and then sue in court to have that decision invalidated. And they simply have not done that here. They did not promote -- they did not provide a concrete alternative that the Forest Service could analyze and consider to explain why. And alternatives, it's not endless. *Seacoast* says that you can't just make this into a game to have more alternatives that you can look at.

So, here, for the alternatives, the Forest Service, just to sum up, no action is not required. They did that in the baseline as expressly allowed by the regulation and the

Forest Service also considered and responded to plaintiff's alternatives that did not meet the purpose and need.

THE COURT: Understood. All right.

Standing Trees counsel, hard look. I guess you might want to respond to something you just heard.

MR. COURCHESNE: Yeah, I'd like to say just a couple things.

THE COURT: Take a couple minutes on that if you want.

MR. COURCHESNE: The -- the first point is, I think, that the -- if you look at our papers, I don't think there's a -- I don't think there's an argument that we waived this argument that the no action alternative was insufficient. It's replete in our papers and I wanted to mention that.

I do think that the broader point, that first sentence of this regulation that's on the screen, from our perspective, is -- it really does answer the question. It says that meet the need for action. And that is -- that's -- that's very clear. It reflects the Forest Service's practice in many other projects where they do develop projects that meet the need for action and we think that's required here.

The -- sort of the all-or-nothing approach the Forest Service is taking to this review and in counsel's comments that our -- our alternatives were not reasonable belies the fact that our alternatives did include logging, as I

why they're going forward.

So we think that's a really important issue the Forest Service needs to take a hard look at. And certainly the project documents talk in general about the lack of certain age classes in the forests as a problem, but it's stated in sort of raw acres and percentages in a few tables and I'll show you a couple of those in a second.

And it's extremely confusing. There was very little way for the -- for the public to understand exactly what the Forest Service was trying to do here in terms of meeting its need, stated need. Until we got the full records for these projects, we didn't have the information on the age or the habitat types of individual stands within the project areas. We cried foul at this at every opportunity and asked for those to be disclosed as part of the project documentation.

The Forest Service blames us, by the way, for not FOIAing these documents out of the gate. It's not that they would have been that helpful given what we received in our FOIA responses, but this isn't really about us. It's about the integrity of the project documentation and the reasoning of the EAs and it's about the public as a whole, not just us.

So let me illustrate just how hard it is to make sense of what the Forest Service is doing here and -- and why we think the Forest Service is just wrong in their papers on their assurances about its impacts on stands with old forest

habitat and old growth -- and old growth forests.

So the forest plan, it's confusing but it lays out these age classes for forest habitat that are based on the year and it also lays out a strict rule that no harvest will occur in stands identified to provide old forest habitat. So that's not, you know, old forest habitat itself. It's stands that -- where that occurs. And stands has a meaning under the forest plan and I don't think the service disagrees with the way that that is depicted in all the maps.

So old growth is a -- is a rarer thing. You know, that's about 200 -- more than 200 years old and harvest there is also prohibited by the forest plan. But the key -- the key provision of the forest plan that we're concerned about is that -- is this big one, no harvest will occur in stands identified to provide old forest habitat.

So these are -- this is what's in the EAs for these projects. Actually, you know, they're in the habitat management unit rationale documents that are attached.

And so what we see here is that these are the -- this is what the Forest Service keeps saying, but it isn't clear. It doesn't say anything about old forest in these documents, doesn't say anything about old forest age class, and so we're really left to -- to figure out what's going on. It -- it lumps in mature forest and old forest.

And this is a problem for both projects, not just

Peabody West, where we'll spend a little time in a moment. It's a problem for both projects because it's about what the Forest Service disclosed about its analysis on forest health.

THE COURT: Yeah.

MR. COURCHESNE: So there's no map anywhere that shows these age classes. We asked. They said there wasn't any. This is a -- this really undermines their analysis. So we're sort of left to go with what the Forest Service did map out and provided.

So I'll highlight Peabody West, which is the focus of some back-and-forth in the briefs, so I want to go over that for a moment.

We can zoom in on the logging units in the southern part of the project. This is the -- this is a map from the EA showing the logging units and it, you know, shows a zoom-in on the southern part of the project in particular. And it -- you know, we need to -- this is really, just to put a -- this in context, this is a truly beautiful area. This is right along the Great Gulf Trail and the gateway to the Great Gulf Wilderness. It's right in the northeast shadow of the Presidentials that's depicted in those pictures. It's a -- it's a -- it's a -- the entry to wilderness. So that's the context for this particular area.

We're going to add in another layer of numbers from the record, which are the stands themselves, and, you know, we

see -- we see that this is a map that we had to, you know, dig through. These are not the same numbers as the logging units. Logging units cross stand boundaries, so these stand boundaries are sort of in the record on this map. And we had to -- we had to -- we actually had to dive really deep within the administrative record to find this map, but here they are.

So what -- what kind of forest is this? It's the same area that was depicted on the project map. The service told us in our -- in its response to our objection that we should look at the botany survey document. That was not -- that was -- that's just in the administrative record. It wasn't part of the package of documents that the public saw.

THE COURT: Yeah.

MR. COURCHESNE: It -- so we did, and here's what we found. It really -- and there's some references here to the administrative record pages where this -- where these appear, where these excerpts from the botany survey appear. What we see is that stand 71, stand -- you know, this is -- this is a depiction of stand 71 and this -- and this is what it's described as, late succession of old growth, exemplary natural community. That's what the Forest Service says these stands are and that they have these really remarkable, exceptional characteristics, some very old, really large trees, providing exceptional, very rare habitat conditions.

So we're sort of look -- we're sort of looking at

this -- this is -- the only little nuance in this -- we've looked at this very carefully. We think that that -- if you look at the stand map and you look at this map from the botany survey, we think 72 in the botany survey should actually be stand 73.

But so we're looking at these maps, we're trying to compare them, and what we see is this. This is our comparison of them. This just -- this is the zoom-in. And what we see is that in these areas, unit 74 is in stand 71; unit 74 is in stand 73; unit 72 is in stand 73; and unit 72 is in stand 75. All of those stands have old forest habitat. That violates the forest plan's prohibition of harvest in stands with old forest habitat.

So that's our detective work, your Honor. That's what we tried to do with the -- with the maps in the record. We see this -- and it's sort of -- you can sort of see the -- in particular how there's that west branch of the Peabody River and there's an area which is kind of carved out north of the river. That appears to be something they call a botany reserve in some of the documents, but the problem is that the stand extends beyond that botany reserve into the cutting units.

So the stand is effect -- you know, may -- it's unclear whether the cutting units actually hit the old forest habitat and I think the Forest Service says that a couple times, like we're not cutting in any old forest habitat. Well,

they can't cut in stands with old forest habitat. It's a really key difference that the forest plan makes. And that makes sense because a stand is -- is an area that they've mapped as having a sort of a consistency and you want to avoid that if you're trying to protect an important resource.

THE COURT: Your point is it's not -- it's not really a defense to say we are -- we're within the stand but we're avoiding the old forest.

MR. COURCHESNE: Correct, under the forest plan as it's drafted.

So, you know, what the Forest Service admits is that in -- you know, in their objection response, they do say that, you know, they're cutting in a lot of old forest age class. They -- they don't, you know, in stands with old forest age class. They don't deny that. But this is what they -- I think they're wrong about. The Forest Service is saying they're not violating the forest plan.

They gave you in their reply something that was just a spreadsheet of units and we couldn't really make heads or tails of it in terms of whether -- where the Forest Service was operating. We're looking at this map. It says they're cutting there. It's in those stands. So that's -- we think the situation is kind of unacceptable and doesn't make a lot of sense and it suggests is pretty clear forest plan violation.

So we think that this doesn't constitute reasoned

decision-making under NEPA and advise -- it flunks that obligation to take a hard look at this resource. And we see some forest plan violations in Peabody West as proposed. So that's -- that's actually not just a NEPA violation. It's also a NFMA violation that we allege in our complaint.

So, if you'd like, I can move on to other -- other topics. This was a bit of a deep dive, but we felt it was really important, your Honor, to -- to sort of try to make sense of these competing claims about what was being harvested.

THE COURT: Understood. You -- say whatever you want to say about the hard look --

MR. COURCHESNE: Yeah.

THE COURT: -- hard look impacts.

MR. COURCHESNE: So the other -- the other points on hard look, we don't think that the Forest Service's review of cumulative impacts of these projects was adequate, so that's the next topic, and these are thousands of acres of logging. These projects -- there are projects underway that I showed you at the very beginning that are authorizing many -- many more acres of logging.

In -- in these projects, they didn't even consider the other one -- you know, they didn't even consider both projects in the same document. So they didn't even acknowledge that these other projects were taking place in these environmental assessments and I think that's a real problem

when you have parallel projects, all those projects on that map that are going forward at the same time, and the cumulative impacts analysis doesn't address that.

The -- the -- you know -- in particular, you know, this is a -- this is a single national forest with a -- it's pretty tight relative to other national forests. So it -- it seems -- it seems unreasoned to look at each of these projects without acknowledging the others and that that flunks the sort of standard for cumulative impacts analysis under NEPA.

We also think that -- we wanted to mention the greenhouse gas emissions review of these projects.

THE COURT: Why doesn't it work the other way?

MR. COURCHESNE: Huh?

THE COURT: Why doesn't the tightness actually work the other way? Right? I mean, if -- you know, in -- in -- if an area in the White Mountain National Forest is probably like a small speck on a larger national forest somewhere else, maybe it's -- it's exactly why you shouldn't focus on cumulative impacts.

Do you follow what I'm saying? Because you're going to be within -- you know, you're going to be within what would basically amount to a single area in a larger forest. Do you follow me?

MR. COURCHESNE: I do. I do.

I think that the reason that we take this position

is that the cumulative impacts on some resources are -- you know, the projects affect them in common.

So for -- greenhouse gas emissions is, of course, the biggest one. It doesn't -- it doesn't -- these are happening at the same time and they do have cumulative impacts. They're all happening and so we think that that's an omission that's a problem.

But the other one that I wanted to point out, which is really redolent in the record with the Albany South EA, which is sort of the water quality issue --

THE COURT: Yes.

MR. COURCHESNE: -- that we can talk about, but they did it and -- they did a cumulative impacts analysis that covered 64,000 acres for the water quality analysis for that project --

THE COURT: Yeah.

MR. COURCHESNE: -- which expands well beyond that project area, certainly -- maybe not the entire forest, but certainly a large area.

And what the Forest Service has said here without any analysis is that there just aren't any cumulative impacts and we don't think that's enough, under -- especially under the standards in the cases we've cited that go back to *Kleppe vs. Sierra Club* in the late '70s of the Supreme Court. We're like, this is a really important obligation under NEPA, EA, EIS, what

have you.

And I think that the -- you found in the *Army Corps* case that the cumulative impacts analysis that the Army Corps did in that case was adequate.

THE COURT: Was that the jet plow case?

MR. COURCHESNE: Yes.

THE COURT: All right.

MR. COURCHESNE: And we don't think that this analysis, if you compare those, it even comes close to meeting that standard.

So as to greenhouse gas emissions, we just wanted to say that, you know, we've made -- we've cited cases in our papers about how the service is obligated to do more than it did here, which is essentially just say it's a really small project and it won't have a big impact and it's minimal in the context of global emissions. We think that reasoning is invalid and has been rejected by a number of courts.

And just to point out that Black Ram case, which is *Center for Biological Diversity vs. Forest Service* from Montana, the Forest Service disagreed in its papers with the analysis in that case which was pretty squarely on point and rejected the type of service -- type of analysis of greenhouse gas emissions that was in place here.

And it -- I just wanted to point out that there was a decision in that case on appeal, that the Forest Service made

replete with site-specific analysis, and it includes pages and pages of it, looking at streams and watersheds in that area, again, that larger cumulative impact zone as well, and it just doesn't compare with the analytical rigor here for these projects. There's not a -- you know, not only in that case were there five action alternatives and a no action alternative in that -- in that -- even analyzed solely for water quality in that water quality analysis, you'll see that there are specific provisions about small tributaries, brooks, very specific features in the Albany South area. And the Forest Service's approach here was to say that's -- we're just incorporating that by reference, that's fine, that's what we're going to apply here, without looking at all those brooks and tributaries and all those issues in the two projects.

And that's really problematic from the perspective of we've got a very different set of resources in those three projects. We've got a wild and scenic river in Peabody West and we've got Lake Tarleton, this sort of magical, large lake in the western part of the White Mountains, and that's just very different than Albany South.

And it's very interesting, the -- the point that you raised earlier about sort of the consequences of no action, of not doing the recreational upgrades at Lake Katherine and some of the work around Lake Katherine, they talked a lot about the impacts that are being avoided by their work on that project,

but there is not a commensurate, you know, attention to the actual water quality impacts of the logging in the -- in these areas.

It feels even more arbitrary when you look at the fact that in the Peabody West project, the service is proposing to log well in excess of that Albany South threshold. And they have a brief explanation of it, but we don't think it passes analytical muster. It just doesn't make sense that you wouldn't -- you -- you're going well beyond this all-important literature value of 20 percent basal removal, and then you don't actually look at the things that are going to be affected by that over 20 percent removal.

So that's the water quality issue. We think that was arbitrary.

Moving on to the bat, the northern long-eared bat.

THE COURT: Yup.

MR. COURCHESNE: The service hasn't even looked for the bat on the ground and it relies on this one two-night excursion in 2019. There was a visit to Lake Tarleton for two nights, but the Peabody West doesn't appear to be included in that.

It points to the biological evaluations that the service did about impacts to the bat. You -- I think if you look at the few pages that they cite in the biological evaluation, you'll see kind of what we mean and why we're

concerned. This is actually a forest plan issue, too, because we think that they have an obligation under the forest plan to investigate the presence of the species and to promote the conservation and recovery of the bat.

Just relying on this 2019 excursion and then approaching the bat in the way that they did, this is -- this does not constitute, you know, reasonable investigation under the forest plan; it doesn't constitute a hard look under NEPA.

And I think there's a telling point here. Between the two projects, the service's analysis was inconsistent. So at Tarleton, there's no summer harvesting proposed. And one of the reasons for that in the -- in the EA is that, well, we'll avoid impacts to the bat, which is off hibernating, you know, and which is -- which is off hibernating in the winter and is in the trees in the summer. And -- but they didn't make that choice at Peabody West and they didn't explain why. They just said it was fine. So I think that's a -- that's an example of where they're not meeting the rigorous standard, the standard of rigor that the -- that NEPA requires.

We also make some points about recreational impacts and roadless area impacts and we think these are also examples of arbitrary decision-making. Really, in terms of the recreational impacts, what we -- I'm trying to make sure that I'm -- I'm not going too far over my allowance of time here.

But it really made it --

THE COURT: We'll take what time you folks need today. Don't worry.

MR. COURCHESNE: So the -- the -- on this issue, the specialist recreational reports are fully conclusory and, in fact, if you look at Peabody West versus Tarleton, you'll see a difference. There's really not a good way to figure out what the impacts on these trails in the White Mountains are. They're -- we don't know what the ages of the impacted stands are, as we talked about in forest health, and so as you're traveling along these trails, there's only a few viewpoints selected and the scenery impacts to those viewpoints are actually beyond what the forest plan allows in their guidelines.

And so we don't think that was adequately explained, you know, what are the impacts to, for example, the Appalachian Trail, what are the impacts to the Great Gulf Trail, what are the impacts to those trails around Lake Tarleton. We just don't see that in these recreational reports.

We did raise these issues sufficiently at the commenting stage. We talked about how there was not sufficient recreational baselines and that's really -- that's really -- that really says it. And so it was wrong for the supervisor to reject our objection on this in the administrative process.

There's no -- there's no dispute that we raised roadless areas. The Forest Service's response on roadless

areas is just we shouldn't worry about it. And -- which is belied by their approach in other projects where they actually create alternatives that avoid roadless -- inventory roadless areas, just to actually do that analysis and see whether they can meet their project needs without encroaching into those. Those are important because they are eventually something that Congress can consider designating as wilderness. And if you do a massive logging project in those areas, the Forest Service says, well, you know, in a decade or so it'll be back and we'll have those roadless characteristics again. And I just don't think that's -- that doesn't make a lot of sense. These roadless areas are apprised for their wilderness characteristics and doing the intensive logging that's required there really does impair those -- impair those characteristics.

And so our point on that really is that they've admitted there'll be hundreds of acres of impacts in those -- in those inventoried roadless areas and we really think that they -- they say in terms of roadless effects doesn't -- you know, doesn't hit protected roadless areas, so there's no problem, and we think that they needed to do more analysis there.

Finally, I think it's really important to recognize in closing on NEPA that the forest plan and its EIS didn't do this analysis for any of these projects and it did not specifically authorize these projects. And as I said earlier,

you know, the plan is 20 years old, reflecting decades-old science on things like greenhouse gas emissions and very little consideration of issues like climate change and carbon.

And so we think that, to kind of close out the NEPA point, we've raised all these issues with the NEPA analysis and our assertion is that that makes the EAs invalid and it also makes the FONSIs, the findings of no significant impact, analysis, those -- those FONSIs invalid.

We've made arguments on endangered species, unique areas, cumulative impacts, for all the factors that are at issue in the FONSI analysis, and those go directly to the validity of the FONSI.

So our point is that we just did not rotely go through the FONSI regs, instead relying on our other objections to the EAs. So that's our -- that's our point on the findings of no significant impact.

So that's the -- that's the conclusion of our NEPA discussion and happy to answer the Court's questions and then we can go to the final point, which is the NFMA violations, which is much briefer.

If you'd like us to do that now, I can. If it's -- it's pretty brief.

THE COURT: No, I'll hear from counsel.

MR. COURCHESNE: Okay. Thank you, your Honor.

THE COURT: Hard look and impact.

these projects are necessary to move these habitat management units towards the desired condition that will provide for current and future generations. And the environmental assessments explain how these proposed treatments will address the discrepancy between the existing and the desired conditions.

The argument here is really about the availability and accessibility of the raw standard surveys. So the availability of the habitat management unit rationales were clearly identified in the environmental assessments and available to anyone who wanted them. And in the habitat management unit rationales, they identified stand surveys as one source of information that the Forest Service looked at to determine whether or not the -- the conditions were what were desired. And the underlying data was incorporated by reference and is available. That is expressly allowed by NEPA's regulations. Anyone could have requested this information. The assessments were available online, the habitat management units were expressly identified, and if someone wanted to take a deeper dive into that data, they could have asked for it. But plaintiffs didn't. They waited until the year after the assessments were out and submitted a FOIA request. So it was available to anyone who asked it.

There is no question that this data is unreliable. For the accessibility portion, this data is confusing and

that's why -- let me show you what it looks like here. This is in the record at -- and we -- we've provided excerpts in our brief. Okay. It's this -- it's kind of a mess of a table.

So, you know, I had to zoom in to see it, but, again, these are intended to be for the record. Right? So this table is a mess, but you can look at it when you want to and use it in your review and the -- sorry. The record citation is 7420 -- no.

7835, that is the stand table. And that stand table is -- is really for people who have an in-depth knowledge to identify what is here, but it -- if the public wanted it, they could have asked for it. And I think that's really fundamental here as to where plaintiff's confusion lied.

Now -- lies.

Now, in their brief or in their presentation, they provided this excerpt here where they have gone through and identified what they think the stand is, what -- where they think the stands are. This is from 7425 in the record. But these arrows are not in the record documents, so it is plaintiffs who added the record document. The record document looks like this with no arrows.

So 7425 is a document in the record here and plaintiffs are applying their interpretation of the stand data today in their presentation is not the record and really is not proper for the Court to review. And as we discussed in our

reply brief, this really is a misunderstanding that could have been cleared up outside of litigation.

So on page 13 of our reply, this is the excerpt the plaintiff cited to here.

THE COURT: Uh-huh.

MR. TUSTIN: So what they are doing, it's actually quite a simple explanation that has caused a lot of confusion here that is -- should have been cleared up prior to litigation.

They are saying that the stand data information from the stand surveys is the same thing as the stand ID number from the stand data information. It is not. The harvested units for the computation is 34, and 34 shows that 72, 71, 75, are not identified for timber harvest. They have different numbers. The numbers are different.

Now, while they both say one is stand ID and one is stand, that is confusing, but it's not -- plaintiffs are just wrong at this point. They have not identified any stands in old growth habitat that are identified for timber harvest, as we explain in detail on page 13 of our reply brief, and that was the exhibits that I was showing that -- zooming in to show where their confusion lies.

The second point of confusion that really permeates this case is this commingling of mature forest habitat, old forest habitat, and old forest growth. The forest plan has

specific definitions for these at 3592 in the record.

So there are different definitions for mature forest habitat, which are essentially older trees that are -- you know, depending on the species, they can be 40 to 80 years old or older, but old growth has more of them and old growth forest habitat, which is the most critical here, it's not just old trees. It has complex structures, trees that have fallen down, you know, multiple generational stands within -- multiple successional stages within the stand. And when I was out there yesterday near Gorham, we walked through all three of these.

Now, I had the benefit of having forest service experts with me, but I think even the untrained eye can see the difference between just because you have an old tree somewhere does not mean that it's an old forest habitat or old growth habitat. And the Forest Service is not harvesting any trees in old growth habitat.

We have repeatedly asked the plaintiffs to identify stands that have -- that they believe are both being harvested and have an impact on old growth forest habitat, and they have not been able to do that and they have not done that here.

All right. So turning to their second point, which was cumulative effects, the touchstone of NEPA -- did your Honor have any questions on stand data? I know there's a lot of moving around, but before I proceed to other --

THE COURT: No, not on stand data.

MR. TUSTIN: For cumulative effects, the touchstone is that they really only need to be discussed in proportion to their significance. Here, for their -- both the past project and for the carbon assessments, the complaint about the past projects is that they did not look at the specific projects individually. That is not required. NEPA clearly allows for aggregation. That's 30 CFR 220.4(g) or Center for Environmental Law and Policy for the Ninth Circuit. They don't have to list all their projects to look at what is happening in the baseline and what is happening in the aggregate.

The Forest Service here, for carbon, they did two levels of analysis. They did a forest-wide carbon assessment from 2019 that has a quantitative assessment of carbon in the forest. It explains how disturbances and management influence the storage and it explains that wood products store carbon.

Then the Forest Service also completed project-level carbon assessments that places the scale of these projects in context, which is the touchstone of NEPA, to look at it in proportion to the significance here.

For Peabody, it's less than half a percent of the acreage of the forest, that's any kind of timber harvest, and in Tarleton it's less than .1 percent. And even the -- these timber harvests here, the aboveground disturbances, the aboveground tree removal, is just 35 percent of the total ecosystem carbon stocks of the forest. So you're really

and we have provided the Court with other cases to cite and rely upon if it's so inclined.

All right. Turning to the third argument, which was water quality, again, the Forest Service only needs to analyze things that impact their significance and in relation to other areas.

The Forest Service here looked at the impacts to water quality by looking at the basal methodology. So the -- the basal -- the tree -- the basal stand area, if you're at a tree four and a half feet up, you look at the breast height, that provides the stand data and then it's a substitute for the stand density. You know, the more basal area you have, the more trees you have in an area. And the Forest Service knows through its own methodology that is explained in detail in the Albany South that if you remove less than 20 percent of the basal area in an area -- basal stand area in a project area, you're very likely -- unlikely to have any significant impacts on water quality.

And, here, it did -- it looked at both. It looked at both the Tarleton area and in Peabody. Peabody is at four-nine a hundred and sixty-four forty-one 6441; Tarleton is in the 13750.

So it applied its established methodology to determine whether or not there are impacts to the water.

And I would like to note that, you know, while Lake

Tarleton might be perceived as pristine to some people, it is impaired by mercury and acidity. So it is not a pristine water body.

THE COURT: Mercury what?

MR. TUSTIN: Mercury and acidity.

THE COURT: Oh, acidity.

MR. TUSTIN: Acidic, yeah.

So Lake Tarleton is an impaired watershed, but the Forest Service still looked at the impacts of removing trees. And in Tarleton, none -- none of the projects removed more than 20 percentage of the acreage.

THE COURT: Well, the -- the point in the EA about some of the watersheds not providing perennial fish --

MR. TUSTIN: Yeah.

THE COURT: -- right? So there's no concerns about water quality. Is that -- is that all the water quality's tied to, perennial fish habitat?

MR. TUSTIN: No. So there -- there are two issues here.

So for -- for the basal methodology, you're looking at impacts on perennial streams. So Peabody does not have any in excess of 20 -- I'm sorry. Tarleton does not have any in excess of 20 percent. But Peabody has 12 watersheds that exceed -- 12 stands that exceed 20 percent in those watersheds.

But, here, what they did, because the water needs to

be year-round, they can exclude perennial -- they can exclude non-perennial -- they -- they can exclude perennial streams because those are not year-round.

So here it needs to have a year-round impact for the water quality and seven of the 12 are not year-round, so they don't need to be -- they say that -- they said there's no impact based on the Forest Service's established methodology.

THE COURT: Seven out of the 12 are not what?

MR. TUSTIN: Are -- seven do not have perennial fish habitat.

THE COURT: Right.

MR. TUSTIN: So 12 exceed 20 percent.

THE COURT: Okay.

MR. TUSTIN: Seven of those do not have perennial fish habitat; five of them do. And the -- and those five that do exceed 20 percent and have perennial fish habitat, they range from 23 to 27 percent. And the Forest Service explained that the changes of concern are pH in bedrock, so this doesn't have the -- it -- the impacts are not expected to reach the threshold.

But, critically, this discussion of impacts, this is not a NEPA violation. If the Forest Service identifies and discloses what the impacts are, that is the procedural information that is satisfied. There is no forest plan violation here. Plaintiffs are not alleging a Clean Water Act

violation.

So NEPA is procedural. You do not have to select the environmentally preferred alternative. So long as the Forest Service considers and discloses, which it did here, it can take an action -- an action that some people may perceive to have a deleterious effect on the environment.

So the Forest Service looked to water quality. While it may have an impact on 12 watersheds, it explained its reasoning, it explained what those impacts are. That is not a NEPA violation, to say that you don't like the impacts that are coming from here.

The third point of --

THE COURT: I thought the third was the bats.

MR. TUSTIN: The bats, yes. Okay. Actually, three was water quality, yes, so --

THE COURT: Go ahead, yeah.

MR. TUSTIN: That's fine. I'll make sure I touch all of these.

So turning to the bats, the -- there's binding precedent in the First Circuit that we would direct the Court's attention to, *Nantucket Residents*, 100 F.4th at 21. Here it explains that if the biological opinion is defective or if the agency blindly relies on the biological opinion, then there's a -- then there's a violation. But that's -- it's not cured. There is a biological opinion. There are no complaints about

it. The Forest Service is not blindly relying on it. It did a project-specific biological evaluation for each of the projects at 9238 and 13915. So the Forest Service -- under this First Circuit precedent, there's no NEPA violation because it did its own work.

The complaint here is the Forest Service didn't do surveys. It doesn't have to. It -- because it assumed the facts were present. And this is a far more conservative approach --

THE COURT: Yeah.

MR. TUSTIN: -- than taking surveys that may not find bats which was in 2019.

THE COURT: That's what I thought, but I wanted to make sure I was right about that. Yeah.

MR. TUSTIN: Yeah.

THE COURT: It seems like it -- it gives the benefit of the doubt.

MR. TUSTIN: It does.

THE COURT: Yeah.

MR. TUSTIN: Because had they relied just -- had they -- you know, cited the 2019 surveys; they said, we didn't find any bats. Had they just relied on the 2019 surveys, they could have said, we didn't -- we didn't find any bats, we don't need to have any protective measures. But they did not do that. They said, we have these surveys, we didn't find

anything, but we're going to assume they're here.

So they found that there are multiple protective measures that are included. It is not correct that the project does not contain those, but even if it didn't, that is not a NEPA violation because the Forest Service considered and disclosed impacts to bats.

And I would like to point out that we mention in our reply, you know, that these -- plaintiffs are very focused on roosting habitat, which are these standing trees or these old snags, they're called, that provide places for bats to sleep and have nests, but that's not the only portion of bat habitat.

The roosting habitat -- there's ample roosting habitat in these trees to remain. And -- but there is also the foraging habitat component that this project does help with. It -- as we've cited studies that bats, you know, they fly around when they're looking for insects. So they want to fly along edges, they want to fly along structures. And this project improves foraging habitat for the bats. So it maintains adequate and ample roosting habitat and it improves the foraging habitat for the bats.

I believe the final point was scenery and recreation.

THE COURT: Yup.

MR. TUSTIN: Just to touch on a point, a couple things here.

We explained in detail why the viewpoints for Tarleton is a methodology question. I don't believe there are any questions about that. But I do want to rebut plaintiff's claim that they adequately preserved their arguments for the Appalachian Trail and the recreational baseline. These two comments are barred by administrative exhaustion. The Forest Service has a very clear regulation at 36 CFR 218.8(c) that requires issues raised in objections to be raised in previous submitted written comments.

We asked plaintiffs -- you know, plaintiffs bear the burden here, what -- how are they tying their comments from their scoping and from the EA to their objections and they didn't. They're -- we identify in our reply, at 11, their comments don't mention the Appalachian Trail at all. They complain about recreation, not the impact of timber harvest on recreation.

So if you're complaining about inadequate recreation, that is what they did in their comments, but they didn't complain about the impacts of timber harvest on recreation, which is what they want to do here.

So that is barred by the Forest Service regulation, but even if the Court were to consider it, visual scarring is not significant in the meaning of NEPA. That's the First Circuit in *Sierra Club*, and the Ninth Circuit has the helpful case, *Bicycle Trails*, that says you don't have to cater

to the recreation interests of one group.

I believe I've touched on everything for hard look unless the Court has any questions.

THE COURT: You touched on the things I had questions about.

MR. TUSTIN: Okay. Thank you.

THE COURT: Okay. All right. Why don't we -- we're not using a court reporter today. We're just recording the proceeding. Usually at 90 minutes I take a little bit of a break for the court reporter, but we don't have to do that today. Let's just keep going.

MR. COURCHESNE: So, thank you, your Honor.

Just a quick point about this -- this slide which we presented and the other slide that was a little bit earlier in our presentation that is straight from the -- straight from the record.

We just put the numbers, showed the numbers, the blue numbers that are the stand values.

THE COURT: Yeah, I was --

MR. COURCHESNE: Okay.

THE COURT: Yeah.

MR. COURCHESNE: So to talk a little bit, I had just a couple very quick responses to the -- to the hard look statements that counsel made.

The -- one is that there is a -- there was a

statement that -- you know, that the carbon impact analyses were adequate and that they would be beneficial. And one thing that the -- is an example of how this is not a detailed analytical report is that we actually have no idea what the forest products are going to be for these -- for these projects. They very well could be firewood that is burnt. But there's no analysis of what that might do for the carbon analysis. Some of these projects do use -- do become firewood and that certainly would create a lot more carbon emissions than the Forest Service is assuming from their assumption that, well, the forest will -- forests will grow back. Those would be immediately burned and lost.

And so I just wanted to make that point. There's really no analytical assurance in the record for a lot of the assertions in the carbon report and that's a big part of our problem and a big part of the Black Ram reasoning as well is that you need defensible emissions estimates which are doable now, the Forest Service does them, and they could have done them for this project in combination with these other projects that are proposed. We think that's the standard now. It may not have been the standard in 2005. We think that's the standard now for reasoned decision-making under NEPA.

So --

THE COURT: What's the authority for the proposition, though, that it's the standard now, just that

they're possible? I mean --

MR. COURCHESNE: No. I'd say that the combination of the Black Ram case and the other cases we've cited in our brief essentially establish that you need to quantify these emissions. And that's true in EAs or in EISs. That was really squarely an issue in the Black Ram case. It's also something that the Council on Environmental Quality issued guidance in 2023 which we urged the Forest Service to take into account, and the Forest Service's response was we don't need to, which is really their response to a lot of our concerns along the way. And at some point they can do that and at some point that becomes arbitrary and so we're alleging that crosses the line in these areas.

I'd just say on the bat issue that it's really that inconsistency is really -- they do assume the bat presence, but that doesn't actually seem to result in any change in any of the decision-making. They assume it's a -- they assume it's around, but because they don't know where the roost trees may be or where the roost -- roost tree habitat might most likely be, they don't really have any data or information upon which to make their ultimate decision that there is an unlikely effect on the bat. That's our -- that's our point -- point there. It's -- they're acting, actually, inconsistency -- inconsistently with that assumption when they basically say that roost trees in -- in Peabody aren't as important as in

Tarleton, for example, where they're banning harvesting during the summer. So that inconsistency strikes us as -- as -- arbitrary.

THE COURT: Right.

MR. COURCHESNE: -- in measures of protection.

So let me move on to the forest plan violations which we've alleged.

THE COURT: Yup.

MR. COURCHESNE: So I think that the first one we've talked a lot about, so I won't belabor it. It's the forest health -- it's the forest health violation of the old forest habitat requirement that they can't harvest in stands with old forest habitat.

And I'm still confused by counsel's presentation on this point. We identified the stands that are in the record where the botanist's survey says they're going to harvest. Those stands have old growth habitat and old forest habitat and are a stand -- and the stands that that habitat is in are targeted for harvest based on the actual project map. It was -- I don't know what that spreadsheet means. It's not explained anywhere. If that is what we would have gotten -- that's what we got, you know, in Tarleton, it's just indecipherable in terms of what they're actually doing where. And we asked that question, you know, repeatedly.

THE COURT: Yeah. You're talking past each other on

this.

MR. COURCHESNE: Yes.

THE COURT: And it's going to be up to me to see if I can figure it out.

MR. COURCHESNE: So the -- we allege that's a forest plan violation and we also allege that that lumping together of the mature and old forest habitat so they can't -- or I should say that old forest age class and mature age class on those habitat management unit documents, that that doesn't allow them to make a decision under the -- under NFMA that they're complying with the forest plan for these projects.

So the -- we certainly have alleged, you know, at Peabody West, we'll talk a little bit about the forest plan violations that are related to the scenic integrity requirements.

The scenic integrity requirements of the forest plan limit clear-cutting, especially in areas of very high scenic value, and the project violates this limitation by authorizing a number of significant clear-cuts. It admits as much. I think there's no dispute on it. But they say that the forest -- the forest goals -- the forest plan goals take precedence over this scenic violation of the guideline.

THE COURT: Uh-huh.

MR. COURCHESNE: We think that this is a -- this is a project-specific goal that they've developed. The forest

plan sets out age class goals for the whole forest and the forest service has interpreted that we need to have a certain amount of age class, regeneration of age class, in this management area. And the Forest Service has interpreted that as to each habitat management unit and as to each project, and that's why there's -- HMU rationale documents exist. The goal that they have for these projects, in fact, at Peabody West, is twice the overall forest plan goal for regeneration habitat.

So we think they're essentially arbitrarily preferencing those goals that they've developed for this particular project over the scenic guideline of the forest plan and we think that they did so in an arbitrary fashion as a result. They -- they only just said, as they have in a number of case law, that wouldn't -- that doesn't meet our need. And in light of that clear violation of the guideline, we don't think they explain that in any type of way that would justify that forest plan guideline violation.

As I mentioned, you know, I think that the service's approach to the northern long-eared bat and their conservation obligations, we think they were required to conduct an investigation. That's what the forest plan says. The biological evaluations in these two projects do not constitute investigations of the locations of the bat, where the habitat is, and what would need to be protected. So we think that's a forest plan violation.

And I'll just mention briefly the final issue that we identified, which was the subject of some back-and-forth in the briefing, was the eligible wild and scenic rivers standard.

And the project proposes many hundreds of acres of logging within a quarter-mile of two eligible rivers and more than a dozen acres of clear-cuts in that area as close to a tenth of a mile from the river. The service then says that there will be only limited short-term effects and does not explain why. It just does not make sense. It certainly did not explain how these impacts to these rivers comply with the forest plan.

Now, the forest -- the service, as it said in a couple of these instances, says that our comments that we filed on the draft EAs didn't preserve this issue. And what we would say in response to that is kind of twofold. One is we think that we did raise these issues in our comments on the draft EA at a much earlier stage of the process and then we --

THE COURT: Yeah.

MR. COURCHESNE: -- developed and refined those problems that we identified in the objections, which are much more complicated and are, you know, 50 to 60 single-spaced pages of detailed legal objections that our -- that our clinic worked on.

We think that the Forest Service was definitely on notice of these problems as they are passages of these

environmental assessments. And we've cited some cases for the proposition that this -- this is sufficient for administrative exhaustion and that the Forest Service was aware of this issue, these issues, as well.

So we don't take as cramped a view of our obligations very early in the process. That's probably understandable. Forest Service wants to hold us to this really, really challenging standard to present all of our potential legal issues with these approvals, you know, in the 30-day comment period on a draft EA. And we raised a lot of different issues, including these issues of scenic integrity, of recreation, and we think we did so adequately.

Again, we raise -- we raised issues of compliance with the forest plan, water quality habitat impacts, the dangers of clear-cutting and the impacts to wilderness values.

So we think that the Forest Service in all these cases under the forest plan was obligated to consider these effects and impacts in more detail. These were not mysterious issues to the Forest Service.

Because I'll just -- I think I can close out my remarks just with a brief -- brief couple sentences about remedy.

THE COURT: Yup.

MR. COURCHESNE: We believe it's simple under the case law. Because the Forest Service broke the law here in the

ways that we've identified, the EAs and the FONSIs should be vacated and the matters remanded to the agencies to correct the errors, to take some other course of action. The service -- you know, or to take some other course of action. They could actually, and I think this is important. They could go back and do the analysis in a way that met the NEPA standards we've identified. And if they had done the analysis --

THE COURT: It would be a different outcome, you said.

MR. COURCHESNE: Well, it could be, or to a different outcome. It's not -- it's not inherent in our claim that they come to a different outcome.

THE COURT: Okay. That's my question.

MR. COURCHESNE: It's really -- it's really important. We think that the analysis is really -- the analysis is important and it -- it -- if it justifies their actions, it could be legally valid.

Now, we contend that if they did the analysis, you know, in the way that we've defined, then it would be likely that they would come to another outcome, but we can't actually assert with certitude that the analysis will come out any particular way. Now, we think there's enough of a -- of a risk that they haven't considered these issues carefully enough and that once they -- once they will, the outcome will be different.

So the issue on remedy is that this is the default remedy in cases like this. If there's an unlawful approval, vacatur is the -- is the remedy. And I will say, your Honor, if there are questions about remedy and we get there, we would be, you know, I think, more than willing to provide further information on why vacatur is the right reason, but we believe we've done so adequately in our papers so far.

THE COURT: Understood.

MR. COURCHESNE: All right, your Honor. Thank you very much.

THE COURT: Not at all.

MR. TUSTIN: Thank you, your Honor. I'll be brief.

Before I turn to the National Forest Management arguments, I just want to respond very briefly to an argument made during their response about the 2023 guidance from the Council on Environmental Quality. Two points here, we address this in our briefing, that it only applies to new actions -- new proposed actions and because these projects were underway that did not apply.

But perhaps more relevant is that it was rescinded on January 20th of 2025 in executive order 14154, so that guidance is to longer in effect. And while it was in effect at the time of the projects, it did not apply because it only applied to proposed actions and now that guidance is gone.

On the National Forest Management Act claim, here

there are substantive requirements. The National Forest Management Act is for forest planning, the forest plan is the zoning ordinance, and the project-specific actions must comply with that zoning ordinance at the second stage here. And the Forest Service satisfies those requirements.

I'll begin with the stand data. Very briefly, you know, in our brief, we don't think that plaintiff can raise a me too argument based on their NEPA arguments because the National Forest Management Act has substantive requirements that are different from those analyzed under the National Environmental Policy Act and under *Zannino*, barely articulated arguments in their brief are waived.

Second, turning to the scenery component, the plaintiff's argument here discussed forest plan requirements, but the forest plan is quite specific. They're not called requirements. There are standards and there are guidelines. You know, they have very different things that must satisfy -- a standard must be satisfied and there are several, 43477. There are no scenic standards for management area 2.1. That's at 3477 to 79 in the forest plan.

What there are, there are guidelines. There's seven guidelines for scenery for this management area but these guidelines allow for operational flexibility. It's what the Forest Service should attain and they are supposed to attain them, but they -- in a project they can explain why they're not

being followed so long as there's documentation. It does not require a forest plan amendment.

What the Forest Service did here is for these three areas in Peabody, these units that will exceed the acreage allowed for openings, it explained that we think -- that the Forest Service thinks that requirements for providing for healthy forests, for stand -- healthy stands and for wildlife is more important than the standard and they have, therefore, given a rational explanation for why they have decided to exceed the guideline and that satisfies the forest plan and forest plan standards.

Now, there is no support for plaintiff's argument here that scenery somehow is predominant or should take precedence over here. One, you know, the Forest Service is multiple use, which I alluded to in my opening remarks, and has to provide for a variety of impacts. But if you really want to dig down on it, scenery is not one of the five enumerated things listed in 16 U.S.C. 1604. Wildlife and recreation and timber harvests are three of those and scenery is not among those.

So the Forest Service balanced its requirements under the forest plan. Here, for these three units, it determined these guidelines should be exceeded and they gave a rational explanation for that.

The bats, the Forest Service did conduct the

investigation required by the forest plan. It looked at the biological evaluations, looked at the BiOp, looked at the biological opinion, it looked at the 2019 surveys. That satisfies the requirement of the investigation. But in plaintiff's brief they really doubled down on surveys, but bats are not plants. The survey requirement only applies to plants. The case they cite discusses management indicator species, which is not a bat in this forest. So the Forest Service satisfied its substantive obligations to investigate for the bat.

THE COURT: What case is that you're referring to?

MR. TUSTIN: So in their brief they cited to *Sierra Club v. Martin* in the Eleventh Circuit.

THE COURT: Yeah.

MR. TUSTIN: Okay. And they say this supports their argument that you have to do a bat survey. That's not right. Because *Sierra Club*, it -- that forest plan required you to do an investigation into species for inventory data and surveys. The White Mountain National Forest plan does not.

And, also, the regulation at issue in *Sierra Club* from the Eleventh Circuit was 36 CFR 219.26, which applies to what are called management indicator species, which the Forest Service uses to -- almost as a proxy for forest health. But the bat is not a management indicator species. And that's at 78 -- 17899 to 90.

So if the bat were a management indicator species, there could have been an argument that this regulation applied, but that isn't even a brief -- this cases they rely heavily on does not apply. Bats are not plants. Surveys are not required.

Turning to --

THE COURT: Let me ask you this question.

MR. TUSTIN: Yes.

THE COURT: This is about -- there's a lot of environmental experts in this room right now, you know, at counsel table and watching.

One of the things I'm -- I never quite -- this is not apropos of this decision. It's more in general. Right?

You read the different federal cases regarding not just like under Endangered Species Act or things that implicate species like this and this one happens to be about the long-eared bat. But, I mean, it -- I'm always struck, you know, that they'll -- the cases about the snail darter or the spotted owl or whatever it is. But how is this species identified that becomes important in the project? Like why this case -- of all the species that must live, right, near these two bodies of water, why the long-eared bat? How does that become -- how does that present itself --

MR. TUSTIN: Well, that's what plaintiff --

THE COURT: -- if anybody knows?

MR. TUSTIN: That's what the plaintiff's focused on. There are thousands --

THE COURT: Yeah, I know. I'm asking -- I'm sort of asking you why.

MR. COURCHESNE: Well, your Honor, I can just say that the endangered species are --

THE COURT: Is it --

MR. COURCHESNE: -- are relatively limited number of species that are affected by timber harvest and so this particular species was an issue -- was an issue early in the project development as it was threatened and then it became increasingly endangered and --

THE COURT: I see.

MR. COURCHESNE: -- it was listed as endangered under the standards of Fish and Wildlife Service.

And so that's really where it took on a heightened importance in this case.

It's also -- the other issue is that the Fish and Wildlife Service did basically an eastern forest-wide biological opinion --

THE COURT: Yeah.

MR. COURCHESNE: -- for this bat and the impacts of --

THE COURT: Ah.

MR. COURCHESNE: -- projects.

THE COURT: So there's data out there.

MR. COURCHESNE: There is. There is data out there. And the -- the opinion analyzes all of these questions and it comes to the conclusion that basically 3- or 4,000 Forest Service projects can go forward. That's -- there is a -- there is a whole probable other case that other parties might make to challenge that biological opinion or its sufficiency under the Endangered Species Act --

THE COURT: That's not your mission there.

MR. COURCHESNE: No. Our point is that this is just -- this is important, the Forest Service acknowledges that it's important, and they did not do a good enough job here.

THE COURT: I get it.

MR. COURCHESNE: Yeah.

THE COURT: Go ahead, Counsel.

MR. TUSTIN: There is -- there is no ESA claim here. So they could have brought an ESA claim. They did not.

THE COURT: Understood.

MR. TUSTIN: It's about --

THE COURT: That was just my question.

MR. TUSTIN: Yeah. That's a good question.

But there is no ESA claim, but it's the procedure of how the Forest Service analyzed the impacts of bats. And it did. And you even see it in the project record that when the bat was up-listed from threatened to endangered, the Forest

Service paused to complete the biological opinion for the eastern and the southern forests. And then also it did the evaluations and got concurrence from the Fish and Wildlife Service. So it stopped what it was doing and took a pause and looked at the impacts to the project. And that satisfies NEPA.

So turning to the rivers issue, there are two segments, the Peabody and west branch of the Peabody, that are eligible for designation as wild and scenic rivers. As with the ESA claim, there is no claim under the Wild & Scenic Rivers Act. They could have brought a claim about alleged impairments or preventing from designation in the future, but they did not perceive a substantive claim under that act.

What is at issue here is whether the Forest Service took a reasoned look at the project's impacts on these two segments that are eligible for designation. They did not -- they -- our first argument that -- in their briefing, in their administrative comments, where plaintiff was represented by counsel, they never raised this issue in any public comment period. The comment period they talk about is about the no action alternative and does not even mention the Wild & Scenic River Act or forest plan requirements. You can't have an extremely vague argument and try to sandwich in a litigation claim. That is precluded under the Forest Service's waiver and exhaustion regulations.

So they didn't do it. They were represented by

counsel. They can't just simply raise something new now and they couldn't even if they were *pro se*.

But more importantly, on the merits it also fails because the Forest Service analyzed the impacts at 4902 to 03 that this project would not have irreversible and irretrievable changes that could affect the potential designation by Congress and the future of these two segments of the river.

I'll touch very briefly on remedy unless the Court has any questions about the National Forest Management Act.

THE COURT: What are you going to touch briefly on?

MR. TUSTIN: Remedy.

THE COURT: Yup.

MR. TUSTIN: And I know that we have counsel from our intervenors, the amicus parties, that also --

THE COURT: I think I wanted to get back to wild and scenic rivers for a minute.

MR. TUSTIN: Sure.

THE COURT: I had a note in my -- looking at the administrative record, 4903, it -- it says that project activities would not result in irreversible or irretrievable changes, but there doesn't seem to be a -- what's the basis for that assertion?

MR. TUSTIN: Right. So the basis of -- so this is getting into the context of the Wild & Scenic River Act. So --

THE COURT: Yeah.

MR. TUSTIN: -- what -- there are -- these rivers are eligible -- only Congress can designate a river as wild and scenic. But what the forest has done and what the Wild & Scenic River Act does -- requires is for there -- for potential rivers that might be designated in the future, you can't -- you have to preserve their possibility for future designation --

THE COURT: Okay.

MR. TUSTIN: -- by Congress.

And so to do that you need to look at whether or not there are irreversible and irretrievable impacts to free-flowing conditions or to what the Wild & Scenic River Act calls outstandingly remarkable values.

THE COURT: And are irretrievable and irreversible, are those defined terms under the act or the regs, or like --

MR. TUSTIN: I believe those are in the Wild & Scenic River Act, but I -- I don't have a citation for you.

THE COURT: In the act, but, like, are they defined?

MR. TUSTIN: I don't -- I don't have an answer to that question.

THE COURT: Okay.

MR. TUSTIN: But the case law certainly -- like, I mean, if you look back at the history of the Wild & Scenic River Act, it -- originally it was started, I think, in the early '70s or late '60s to prevent -- to -- in response to dams; like dam construction in the American west and elsewhere

were impeding the flow of rivers. So Congress stepped in to say you can't just build a dam -- for certain rivers, you can't just build a dam and stop the flow.

But it wasn't just about the free-flowing conditions. It was also about what they called outstandingly remarkable values or ORVs. And these could be habitat scenery, recreation, whatever a river is designated.

THE COURT: Yup.

MR. TUSTIN: And that is what they want to preserve the possibility for future designation in the Wild & Scenic River Act.

THE COURT: So where does the position come from then that -- that these two projects would not result in irreversible or irretrievable changes?

MR. TUSTIN: That would be in the scenery reports. The environmental assessment references the scenery report there, that -- that is our statement to the -- to the environmental assessment here at 4902, but the Court also looks at the record for water quality impacts, which is another quality here for the Peabody and Peabody West that -- that it is sufficient here, the analysis on the potential impacts.

THE COURT: All right.

MR. TUSTIN: And, again, this was waived because it was never raised in their comments.

If the Court finds a violation -- we don't think you

should, we believe the Forest Service did a robust analysis that satisfies NEPA and NFMA -- we would ask for additional briefing. *Century Power* from the First Circuit says you have to balance the equities. So if there is a violation, we believe the Court should balance the equities, which I think provides a nice segue to the amicus who I know want to talk about their clients' interests here.

So unless the Court has any more questions for me, I'm happy to rest.

THE COURT: Understood.

MR. TUSTIN: Thank you.

THE COURT: I'll give you the last word if you want it. If you're good, you're good. I just don't want to cut you off.

MR. COURCHESNE: I appreciate it. It would be helpful, your Honor, since the amicus parties are speaking, if I could have the last word after that. Is that the Bar rule?

THE COURT: I wasn't planning on hearing from the amicus parties.

MR. COURCHESNE: Okay.

THE COURT: But if you're dying to speak to me, I'll listen to you --

MR. COURCHESNE: I didn't mean to --

THE COURT: -- but it wasn't part -- it wasn't part of my plan, to be honest.

MR. COURCHESNE: Okay.

THE COURT: But that doesn't mean I won't.

MR. EGGLETON: No, your Honor. I mean, if you don't want to hear from us --

THE COURT: It's not that I don't want to hear from you. It's just that I hadn't planned on it because it's generally not what I do. But I read your materials carefully and if there are things you want to react to or talk to me about, you know, Mr. Eggleton, you're always welcome here.

MR. EGGLETON: I don't think I need to say anything, your Honor. We definitely make our case in the brief.

The only -- I guess the only thing I would say, your Honor, is that the array of amici that I represent in this case is very broad. It includes conservation organizations, recreation organizations, advocacy organizations, wildlife organizations, and they all don't see eye to eye on every issue, as you might imagine.

THE COURT: Of course.

MR. EGGLETON: And in this case, we're all in agreement and in support of the Forest Service decision.

And the only other point I would make is that this was an exhaustive record. There's more than 18,000 documents in it. And the notion that somehow the ball was hidden in this process I think is not correct.

Thank you.

THE COURT: Understood. Okay. Did the law students in the room notice that, though? Lawyers do that all the time: I have nothing to say, except I'm going to say this.

But Mr. Eggleton's, you know, a well-respected practitioner here and he doesn't overdo it and I appreciate that.

All right, look. I think I'm good on these -- thank you for the presentations. We've been studying this hard at a very busy time and I ought to have a -- I ought to have a decision out here for you in relatively short order.

I -- I'll -- I'm going to -- just to give you a preview, I -- so far, I have not been overall persuaded of Standing Trees' position, but you've given me a couple things to think about today and a couple things to look at more closely, and I'm going to do that.

All right. All right then. Thank you, counsel. We're adjourned.

THE CLERK: All rise.

(Proceedings concluded at 12:00 p.m.)

C E R T I F I C A T E

I, Liza W. Dubois, do hereby certify that the foregoing transcript is true and accurate to the best of my ability and belief.

Submitted: 4/21/25

*/s/ Liza W. Dubois*
LIZA W. DUBOIS, RMR, CRR

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Standing Trees, Inc.

v. Case No. 24-cv-138-JL-TSM

US Forest Service, et al.

# JUDGMENT

In accordance with the Memorandum Order by Judge Joseph N. Laplante dated August 20, 2025, judgment is hereby entered.

The prevailing party may recover costs consistent with Fed. R. Civ. P. 54(d) and 28 U.S.C. § 1920.

By the Court:

Tracy A. Uhrin
Clerk of Court

Date: September 23, 2025

cc: Counsel of Record

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

STANDING TREES, INC.,

*Plaintiff*,

v.

UNITED STATES FOREST SERVICE, et al.,

*Defendants*.

Case No.: 1:24-cv-00138-JL-TSM

## NOTICE OF APPEAL

Pursuant to Federal Rules of Appellate Procedure 3(a)(1) and 4(a)(1)(B), notice is hereby given that Standing Trees, Inc., Plaintiff in the above-captioned matter, hereby appeals to the United States Court of Appeals for the First Circuit from the judgment of the United States District Court for the District of New Hampshire entered in this action on September 23, 2025 (Doc. No. 38).

Dated: November 6, 2025

Respectfully submitted,

/s/ Christophe Courchesne
Christophe Courchesne
NH Bar No. 20431
Associate Professor and Director
Environmental Advocacy Clinic
Vermont Law and Graduate School
164 Chelsea Street, PO Box 96
South Royalton, VT 05068
(802) 831-1630
(802) 831-1631 (fax)
ccourchesne@vermontlaw.edu

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 6, 2025, I served the foregoing document electronically through ECF upon all counsel of record.

/s/ Christophe Courchesne
Christophe Courchesne
*Counsel for Standing Trees, Inc.*

[FR Doc. 2022–25946 Filed 11–29–22; 8:45 a.m.]

BILLING CODE 6560–50–P

**DEPARTMENT OF THE INTERIOR**

**Fish and Wildlife Service**

**50 CFR Part 17**

**[Docket No. FWS–R3–ES–2021–0140; FF09E21000 FXES1111090FEDR 234]**

**RIN 1018–BG14**

# Endangered and Threatened Wildlife and Plants; Endangered Species Status for Northern Long-Eared Bat

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (Service), reclassify the northern long-eared bat (*Myotis septentrionalis*), a bat species found in all or portions of 37 U.S. States, the District of Columbia, and much of Canada, as an endangered species under the Endangered Species Act of 1973, as amended (Act). Our review of the best available scientific and commercial information indicates that the northern long-eared bat meets the Act's definition of an endangered species. Because we are reclassifying the northern long-eared bat from a threatened to an endangered species, we are amending this species' listing on the List of Endangered and Threatened Wildlife to reflect its endangered species status and removing its species-specific rule issued under section 4(d) of the Act.

**DATES:** This rule is effective January 30, 2023.

**ADDRESSES:** This final rule is available on the internet at *https://www.regulations.gov*. Comments and materials we received, as well as supporting documentation we used in preparing this rule, are available for public inspection at *https://www.regulations.gov* at Docket No. FWS–R3–ES–2021–0140.

**FOR FURTHER INFORMATION CONTACT:** Shauna Marquardt, Field Supervisor, U.S. Fish and Wildlife Service, Minnesota Wisconsin Ecological Services Field Office, 4101 American Boulevard East, Bloomington, MN 55425; telephone 952–252–0092. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:**

## Executive Summary

*Why we need to publish a rule.* Under the Act, a species warrants listing if it meets the definition of an endangered species (in danger of extinction throughout all or a significant portion of its range) or a threatened species (likely to become endangered within the foreseeable future throughout all or a significant portion of its range). If we determine that a species warrants listing, we must list the species promptly and designate the species' critical habitat to the maximum extent prudent and determinable. In 2015, we listed the northern long-eared bat as a threatened species under the Act, but we have since determined that the northern long-eared bat meets the Act's definition of an endangered species; therefore, we are reclassifying the species as an endangered species. We published a not-prudent determination for critical habitat for the northern long-eared bat on April 27, 2016 (81 FR 24707). Listing a species as an endangered or threatened species can be completed only by issuing a rule through the Administrative Procedure Act rulemaking process (5 U.S.C. 551 *et seq.*).

*What this document does.* This rule reclassifies the northern long-eared bat (*Myotis septentrionalis*) from a threatened species to an endangered species under the Endangered Species Act (Act). It also removes the northern long-eared bat's species-specific rule issued under section 4(d) of the Act, because such rules apply only to species listed as threatened species under the Act.

*The basis for our action.* Under the Act, we may determine that a species is an endangered or threatened species because of any of five factors: (A) The present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence. We have determined that the foremost stressor impacting the northern long-eared bat is white nose syndrome (WNS; Factor C).

## Previous Federal Actions

Please refer to the proposed rule to reclassify the northern long-eared bat as an endangered species (87 FR 16442; March 23, 2022) for a detailed description of previous Federal actions concerning this species.

## Peer Review

A species status assessment (SSA) team prepared an SSA report for the northern long-eared bat. The SSA team was composed of Service biologists, in consultation with other species experts. The SSA report represents a compilation of the best scientific and commercial data available concerning the status of the species, including the impacts of past, present, and future factors (both negative and beneficial) affecting the species.

In accordance with our joint policy on peer review published in the **Federal Register** on July 1, 1994 (59 FR 34270), and our August 22, 2016, memorandum updating and clarifying the role of peer review of listing actions under the Act, we solicited independent scientific review of the information contained in the SSA report. As discussed in the proposed rule, we sent the SSA report to five independent peer reviewers and received three responses. The peer reviews can be found at *https://regulations.gov* Docket No. FWS–R3–ES–2021–0140. In preparing the proposed rule, we incorporated the results of these reviews, as appropriate, into the SSA report, which was the foundation for the proposed rule and this final rule.

## Summary of Changes From the Proposed Rule

To comply with the January 4, 2012, Office of Management and Budget (OMB) memo title, *Clarifying Regulatory Requirements: Executive Summaries* and the Department of the Interior's Departmental Handbook on Preparing **Federal Register** Documents, we added an executive summary to this rule.

During the public comment period, we received comments from several public commenters and one State commenter expressing concerns that the Service was not able to identify actions that would not likely result in a violation of section 9 of the Act (16 U.S.C. 1531 *et seq.*). After evaluating all the information we received during the public comment period and other available information, we created a list of actions that are not likely to result in a violation of section 9 of the Act, if these activities are carried out in accordance with existing regulations and permit requirements. The provided list is not comprehensive and does not absolve any individual or organization from legal liability if a northern long-eared bat is taken. Although we have determined take is unlikely, any take resulting from the actions listed below

for the species. We explain more fully our process below.

Northern long-eared bat percent species composition is very small to start (0.2 percent). As such, declines in percent species composition will necessarily be small. As a result, the difference in the total amount of take (killed bats) pre- and post-WNS will be small; however, this does not mean the take will be insignificant. Furthermore, northern long-eared bat data are very limited and thus erratic. For example, northern long-eared bat post-WNS percent species composition varies from 0.2 percent pre-WNS to 0.09 percent during the invasion stage and increases to 0.4 percent in the epidemic stage (where we would expect to see the highest decline in percent species composition to 0 percent in the establishment stage). However, we would expect percent species composition to decline over the invasion, epidemic, and establishment stages. Given the limited pre- and post-WNS data sample sizes and subsequent inconclusive results and the small number of bats killed overall, the most efficient and defensible approach was to consolidate the pre- and post-WNS data (*i.e.,* assume no change in percent species composition) for the northern long-eared bat (rather than further derive pre- and post-WNS values from even smaller sample sizes). Given the above, the data were too limited to calculate a pre- and post-WNS percent species composition value. Instead, we used all data to calculate a single percent species composition value.

*(6) Comment:* A few commenters stated that they believe the Service relied on an insufficient peer review that is contrary to agency policy. The commenters contended that the Service had only the northern long-eared bat SSA report peer reviewed but should have had the other bat SSA reports peer reviewed as well. Some commenters also expressed concern that the analysis presented in the northern long-eared bat report was not publicly available or peer reviewed; therefore, the Service did not rely on the best available data.

*Our Response:* The Service's peer review policy states that we will solicit review of, and comment on, such listing and recovery actions from three or more objective and independent reviewers with expertise relevant to the scientific questions. In general, we will attempt to solicit from the reviewer whether: (1) We have assembled and considered the best available scientific and commercial information relevant to our decision; (2) our analysis of this information is correct and properly applied to our decisions; and (3) our scientific conclusions are reasonable in light of the information.

To the commenter's point, we solicited peer review from five (more than the required three) independent peer reviewers for the northern long-eared bat SSA report as per the requirement of the guidance. We evaluated three bat species concurrently using the same analytical approach; however, we developed individual reports for each species, and each report was peer reviewed by a separate set of peer reviewers.

Additionally, the supplementary analytical reports mentioned by the commenter that were not publicly available at the time of peer review have become publicly available since the time that the proposed rule published (87 FR 16442; March 23, 2022). The analyses used in support of the northern long-eared bat SSA report have also been independently peer reviewed since that time (though not required by our peer review policy). The reports were published by the U.S. Geological Survey and followed their Fundamental Science Practices for peer review. This process included receiving peer review from two independent peer reviewers for each chapter of the reports. Accordingly, we have exceeded the requirements of the Service's peer review guidelines and policies.

*Public Comments Related to the Reclassification of the Northern Long-Eared Bat*

*(7) Comment:* Some commenters believe there has been no significant status change since the northern long-eared bat was listed as threatened in 2015 and that maintaining the threatened status is more appropriate.

*Our Response:* The status of the northern long-eared bat has changed since we listed the species as a threatened species under the Act (see 80 FR 17974; April 2, 2015), and it now meets the Act's definition of an endangered species. The primary threat affecting northern long-eared bats continues to be WNS, and the disease has spread significantly since 2015, at which time it was present in approximately 60 percent of the species' range and in 25 of the 37 States in the U.S. range of the species. As WNS spreads, its impact on northern long-eared bats is severe. WNS caused estimated population declines of 97–100 percent across 79 percent of northern long-eared bat's range and WNS is now likely present in every State within the U.S. range of the northern long-eared bat (Cheng et al. 2021, entire; Service 2022, pg. 34; see figure 1, below). WNS is likely to affect bats across 100 percent of the northern long-eared bat's range by the end of the decade. As a result, we are finalizing the listing for the northern long-eared bat as an endangered species.

BILLING CODE 4333–15–P

White-nose Syndrome Spread within the Northern Long-eared Bat's (*Myotis septentrionalis*) Range
Across the United States and Canada
Map Elements
Northern long-eared bat Range
State/Province Boundary
International Border
WNS Status
Pre-2015: Evidence of Pd or WNS
2015 - 2022: Evidence of Pd or WNS
Data Sources: NLEB range (adapted from IUCN); Political Boundaries (USGS); Basemap (ESRI);
WNS Spread (https://www.whitenosesyndrome.org/; date accessed: Nov. 10, 2022)
0 500 1,000 2,000 Kilometers
0 350 700 1,400 Miles
N

BILLING CODE 4333–15–C

Figure 1. Counties/districts with evidence of WNS or the WNS-causing fungus (*Pd*) as of 2015 (hashed polygons) and 2022 (solid black polygons), respectively, throughout the range of the northern long-eared bat (grey polygon). WNS spread data were obtained from *http://www.whitenosesyndrome.org* (accessed October 27, 2022).

*(8) Comment:* Several commenters encouraged the Service to conduct a more extensive literature review and incorporate more threats to individual bats into the northern long-eared bat SSA report. They provided citations for relevant literature not included in the report.

*Our Response:* We have reviewed the literature provided by commenters and incorporated this information into the SSA report, where appropriate. The purpose of an SSA is to present the best available scientific information regarding a species' status that focuses on the likelihood that the species will sustain populations into the future. The SSA is not designed to conduct an exhaustive literature review on all aspects of the species' life history. As a result, we did not incorporate all information in the SSA regarding individual actions that may result in the harm or loss of a single bat; instead, we focused on science that elucidates what is happening to the species at the population and species level to inform our determination regarding the danger of extinction for the species.

*(9) Comment:* Several commenters stated that hibernacula survey data are too unreliable to determine the species' status because northern long-eared bats are often overlooked in winter surveys due to their cryptic nature, and that instead, the Service should base its listing decision on summer survey data. Further, some commenters stated that this means that the Service was not basing its decision on the best available data.

*Our Response:* Northern long-eared bats are often difficult to observe during winter hibernacula surveys due to their tendency to roost deep in cracks and crevices within hibernacula. Despite the difficulties in observing or counting northern long-eared bats, hibernacula survey counts are regularly relied on since they are consistently available over time. Winter counts are conducted in mid- to late winter when bats are expected to be predominantly inactive and occupying known locations. Surveying known locations regularly allows for accurate observation of trend data over time. Across the eastern half of North America, where many bat species aggregate (including the northern long-eared bat) during hibernation, counts of bats during hibernation provide the best available data for estimating changes in abundance related to the invasion and progression of WNS (Frick et al., 2010, 2015; Turner et al., 2011; Langwig et al., 2012; Thogmartin et al., 2012 as cited in Cheng et al. 2021, pp. 1588–1589) For these reasons, we conclude that hibernacula surveys are considered the best available data for cave-dwelling bats. However, the SSA made use of several forms of ''summer data'' in acoustic call (mobile and stationary) and mist-net data in our analysis (Service 2022, entire). Together, these data represent the best scientific and commercial data available to us.

*(10) Comment:* The North Dakota Game and Fish Department requested that the Service consider a recently finalized report (Gillam 2021, entire) that recommends the range of the northern long-eared bat in North Dakota be modified to only include the badlands habitats of extreme western North Dakota. The final report also states that the most appropriate categorization of this species is rare in western North Dakota and absent in the remainder of the State. The North Dakota Department of Agriculture (NDDA), the North Dakota Public Service Commission (NDPSC) and several North Dakota commenters also echoed these comments. The NDDA and NDPSC indicate that scattered woodlands comprise less than 1.8 percent of the total lands in North Dakota, while the remaining 98.2 percent of the State is non-wooded lands and does not contain any suitable or potentially suitable habitat for the northern long-eared bat.

*Our Response:* We thank the commenters for providing the recently completed Gillam (2021, entire) report. Although the report provides recent bat data, we determined that the limited number of survey sites does not provide sufficient information for us to assess Statewide occupancy for the northern long-eared bat. The methods used in the report are not designed to determine presence/probable absence for individual species, such as northern long-eared bat. It is unclear if the acoustic detectors used in the survey were deployed in areas with potential suitable habitat for northern long-eared bat and if specific habitat requirements for northern long-eared were considered in the selection of individual mist-net sites. Mist-net locations were selected only in the western part of the State, as the author stated that eastern North Dakota is a very difficult area to capture bats due to a lack of known roosts and the predominance of agriculture, which is primarily open and lacks natural flyways in which bats can be effectively captured using mist nets.

However, Haugen et al. (2009, p. 16) considered forests to be more abundant in eastern North Dakota than in the western half of the State, as conditions become less favorable to the west. The report's author states that ''given issues with distinguishing the calls of this species from other *Myotis* species'' in the State, these results ''support the finding that this species is rare to absent'' in North Dakota. However, it is also possible that there were northern long-eared bat calls that were missed by the acoustic identification software, as a high number of high-frequency calls that could possibly have been northern long-eared bats were recorded at several locations. Further, it is unclear if the qualitative analysis was conducted on those calls classified as northern long-eared bat calls or high frequency. To conclusively determine presence/probable absence of the northern long-eared bat, we recommend use of the rangewide Indiana bat and northern long-eared bat survey guidelines (*https://www.fws.gov/library/collections/range-wide-indiana-bat-and-northern-long-eared-bat-survey-guidelines*). Overall, we do not find that this single study provides conclusive evidence of absence of the northern long-eared bat in the eastern portion of North Dakota or Statewide.

We also reviewed the North Dakota Forest Service Forest Action Plan presented by NDDA and NDPSC. Northern long-eared bats predominantly are found in forest habitat (outside of hibernation), but when foraging they have also been observed in other habitat, such as over small forest clearings and water and along roads (van Zyll de Jong 1985, p. 94). In areas where forested habitat is scattered, such as North Dakota, remaining patches of habitat are increasingly important for the species where it is still present. We are currently developing a comprehensive current range map for the northern long-eared bat, which will incorporate the best available information on habitat feature requirements for the species. This map will be subject to revision over time as the quality of our scientific information improves.

*(11) Comment:* The Kansas Department of Wildlife and Parks (KDWP) commented that since the northern long-eared bat's range is known to occur in only a small portion of the State, the KDWP requests that Kansas be exempt from the endangered species status and maintain the species' threatened status with the current 4(d) rule remaining in effect throughout the State.

*Our Response:* The Service has found that the northern long-eared bat meets the Act's definition of an endangered species, rather than a threatened species, throughout all of its range. Therefore, it is not possible for a portion of the species' range to maintain threatened species status with the current 4(d) rule remaining in effect.

*(12) Comment:* Several commenters requested that the Service identify activities for which take is not reasonably certain to occur. Several State commenters (Massachusetts

Division of Fisheries and Wildlife and Iowa Department of Natural Resources) requested guidance on how activities, such as habitat management, habitat restoration, and forest management, can continue in a streamlined manner. These commenters all expressed their desire for regulatory predictability and the need for the Service to provide a list of activities that are likely to result in a violation of Section 9 of the Act and a list of activities that are not likely to result in a violation of section 9 in the Act (which the commenters referred to as ''no-take guidance'').

*Our Response:* We recognize the need expressed from commenters to provide regulatory predictability by identifying those activities for which take is not reasonably certain to occur. Due to the northern long-eared bat's extensive range with a variety of habitat conditions, we are unable to provide a comprehensive list of activities that would not be considered to result in a violation of section 9 of the Act. However, we have added a condensed list of activities that are not likely to result in a violation of section 9 of the Act, if these activities are carried out in accordance with existing regulations and permit requirements (see Available Conservation Measures, below).

Further, we continue to develop tools to allow projects compatible with the species' conservation to move forward. We are developing streamlining tools and guidance to help project proponents identify what types of activities may result in ''take'' under the Act. When available, these resources will be accessible on the Service's northern long-eared bat website (*https://www.fws.gov/species/northern-long-eared-bat-myotis-septentrionalis*). One tool in development intended to streamline consultation is the rangewide northern long-eared bat determination key (DKey). The DKey will address many project scenarios in which adverse effects to the species would be unlikely. The DKey will help streamline section 7 consultations for Federal agencies and their designated non-Federal representatives and will help proponents of non-Federal actions determine whether their action may cause incidental take of the northern long-eared bat.

*(13) Comment:* Many commenters requested the Service pursue programmatic section 7 consultations under the Act and cited as an example the Federal Highway Administration (FHWA), Federal Railroad Administration, and Federal Transit Administration's section 7 rangewide consultation for Indiana bat and northern long-eared bat.

*Our Response:* We are fortunate to have experience in developing streamlined consultations under the Act and compliance processes for this and other listed bat species. The Service will look to build on those example programmatic consultations and to work proactively with other Federal agencies to develop other similar streamlined consultations to ensure efficiency in compliance with the requirements in the Act.

*(14) Comment:* Commenters encouraged the Service to develop regional or industry-wide habitat conservation plans (HCPs) with associated incidental take permits (ITPs) or general conservation plans (GCPs) to avoid potential delays to projects. Commenters also encouraged the Service to accept financial contributions toward research into preventing and reversing the effects of white-nose syndrome as a valid option for compensatory mitigation in HCPs.

*Our Response:* We recommend applying for an ITP when incidental take is reasonably certain to occur. For some non-Federal activities, there may not be reasonable certainty of take for northern long-eared bats. The decision to pursue a permit rests with the applicant based on their environmental risk assessment. The Service continues to develop tools and templates to streamline regulatory processes (see our response to *(12) Comment,* above). The Service has developed a short-term HCP template for wind facility impacts to northern long-eared bats and Indiana bats. State or regional forestry HCPs have been issued or are in development for Missouri, Pennsylvania, Minnesota, Michigan, and Wisconsin. A regional GCP is in development for projects in the Northeast Region. We will continue to work with industry in developing effective mitigation measures for the northern long-eared bat.

The latest information on these tools is available on our northern long-eared bat website: *https://www.fws.gov/species/northern-long-eared-bat-myotis-septentrionalis.*

*(15) Comment:* Commenters expressed concerns over the Service's rangewide Indiana bat and northern long-eared bat survey guidelines and recommended that the Service separate survey guidelines for the Indiana bat and northern long-eared bat. Also, commenters recommended that the Service consider identifying ''block clearance'' zones (area that is free of value to northern long-eared bats) within the species' range.

*Our Response:* The team that developed the rangewide Indiana bat and northern long-eared bat survey guidelines (guidelines) considered the best available information in developing survey recommendations for both the northern long-eared bat and Indiana bat. The Service's white paper (Niver et al. 2014, entire) and 2018 addendum (Niver et al. 2018, entire) outline the methods used to determine the minimum Indiana bat level of effort (LOE). Our 2022 addendum (Armstrong et al. 2022, entire) provides the rationale for the northern long-eared bat minimum LOE for acoustic and mist-net surveys (previously we deferred to LOE used for the Indiana bat). The guidelines take into consideration the differences between the two species' ranges and habitat requirements, and they provide separate recommendations for each species for survey level of effort and survey equipment placement. See *https://www.fws.gov/library/collections/range-wide-indiana-bat-and-northern-long-eared-bat-survey-guidelines* for more information. We may consider identifying ''block clearance'' zones as suggested. We may identify areas where take is unlikely to occur as areas with extensive surveys that demonstrate the absence of northern long-eared bat and in areas with no suitable habitat (see definition in SSA report (Service 2022, Chapter 2) and guidelines); however, the northern long-eared bat is a highly mobile species, which presents challenges to confirming absence from large ''blocks'' of suitable habitat.

*(16) Comment:* One commenter stated that the Service did not rely on the best available data in the SSA by not fully considering the impact of WNS in each portion of the species' range, particularly in the mid- to southern Atlantic Coast where the species may remain viable. Also, this and other commenters state that the SSA did not fully consider the benefit of positive actions, such as habitat management, in the analysis of threats to the species.

*Our Response:* The SSA assessed the current and future impacts to the species from WNS, not only rangewide but separately for each representation unit (*i.e.,* areas of unique adaptive diversity) throughout the range. Five representation units were identified in the SSA: Eastern Hardwoods, Southeast, Midwest, Subarctic, and East Coast. All current and future hibernacula abundances and probability of persistence either have already declined or are projected to decline precipitously throughout all representation units, including the East Coast unit, which includes the mid- to southern Atlantic Coast portion of the species' range.

As for considering all positive actions in the assessment of influences on the species, we considered all relevant

potential influences on the species (positive and negative), and we included in our analysis only those that were ecologically significant at the population level or species level and for which we had adequate qualitative or quantitative information (WNS, wind energy mortality, effects from climate change, habitat loss, and conservation efforts).

*(17) Comment:* Several commenters sought clarification to ensure that specific activities or projects will not constitute harassment or harm or both of potential (summer) roosting northern long-eared bats.

*Our Response:* For information on impacts to northern long-eared bats from specific activities or projects, we recommend contacting your respective field office(s) where the activity or project will occur for further guidance (see *https://www.fws.gov/our-facilities?program=%5B%22Ecological%20Services%22%5D*).

*(18) Comment:* One commenter recommended that the final rule state that any threats or stresses to cave-dwelling bats from the operation of offshore wind energy have not been documented.

*Our Response:* For offshore wind development, assessment of potential impacts to bats is complicated due to a broader lack of data on bat use of offshore environments. North American bats have been observed offshore along the Atlantic coast, mainly within the extent of the continental shelf, although there are also several observations of bats found farther offshore. Most observations are of migratory species (*e.g.,* hoary bat (*Aeorestes cinereus*), eastern red bat (*Lasiurus borealis*), silver-haired bat (*Lasionycteris noctivagans*)), with records of *Myotis* species, tricolored bats, and big brown bats being relatively rare. It is possible that individual northern long-eared bats may be killed by wind turbines offshore. However, at this time, data are lacking to project the potential for substantive impacts of offshore wind development on populations of northern long-eared bats.

*(19) Comment:* One commenter stated they were opposed to listing the bat as an endangered species because of the restrictions that will be placed on farmers and ranchers. They were concerned that the listing would affect a significant amount of land and practices that are otherwise beneficial to animal and plant species. The commenter expressed that listing the northern long-eared bat would create hardship for food producers when they did not cause the issue (*i.e.,* white nose syndrome).

*Our Response:* We appreciate the commenters' concerns. The Act does not allow us to consider these impacts from a listing, when making a determination that a species meets the definition of a threatened or endangered species. When a species is listed as endangered, the species receives protections that are outlined in section 9 of the Act. These protections include a prohibition of take of the listed species. Take means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct. Ranching and farming activities are not prohibited under section 9 of the Act, unless they result in take of the northern long-eared bat.

We understand there may be concern about the effect of listing the northern long-eared bat as an endangered species under the Act. We encourage any landowners with a listed species present on their property and who think they carry out activities that may negatively impact that listed species to work with the Service. We can help those landowners determine whether a habitat conservation plan (HCP) or safe harbor agreement (SHA) may be appropriate for their needs. These plans or agreements provide for the conservation of the listed species while providing the landowner with a permit for incidental take of the species during the course of otherwise lawful activities.

*(20) Comment:* Several commenters stated that they believed the definition of ''take'' had been amended and the Service should explain that the revised ''take'' definition recognizes that actual death or injury of a protected animal is necessary for a violation of section 9 of the Act. To support their argument, commenters point to the definition of harm in our regulations (see 50 CFR 17.3), which states that ''harm'' means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.

*Our Response:* The Act defines ''take'' as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect or to attempt to engage in any such conduct (16 U.S.C. 1532(19)). The Act's definition of ''take'' has been supplemented by the Service with regulatory definitions of the terms ''harm'' and ''harass,'' and these terms have been redefined several times. As the commenters stated, ''harm'' means an act which actually kills or injures wildlife. Such an act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavior patterns, including breeding, feeding, or sheltering (see 50 CFR 17.3). ''Harass'' is defined in our regulations (see 50 CFR 17.3) as an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering. Therefore ''take'' is broader than just ''harm'' and includes other actions besides those that result in death or injury of a northern long-eared bat.

*(21) Comment:* Several commenters stated that the Service should state that forest management activities that comply with the existing 4(d) rule are not likely to cause take.

*Our Response:* When this final rule goes into effect (see **DATES**, above), the species-specific rule issued under section 4(d) of the Act (''4(d) rule'') that was associated with the northern long-eared bat's threatened species status will be null and void and will be removed from the Code of Federal Regulations. The 4(d) rule for the northern long-eared bat did not prohibit take that may occur during certain tree removal activities in certain locations, provided the activities complied with the conservation measures in the 4(d) rule. Although the 4(d) rule did not prohibit this take, the Service did not determine that take is not likely to occur during such activities. Many of the actions excepted by the 4(d) rule may actually cause take, so we are unable to do what the commenter requested. For example, it is possible that tree removal activities could result in take if an unknown but occupied roost tree is cut down while northern long-eared bats are present. If any private entity is concerned that they may be engaging in an activity that will result in take of a northern long-eared bat, they should coordinate with their respective Service field office.

*(22) Comment:* Several commenters argued that the proposed reclassification rule did not satisfy the ''best scientific and commercial data available'' and a commenter provided alternative results to parts of our analysis using a different dataset.

*Our Response:* We find that we did comply with this standard. We collected data and information during a multi-month data collection period and throughout the SSA process. The Service considered and incorporated all data relevant to our analysis. The

Service coordinated with Federal agencies, Tribal nations, 47 States, academia, and many nongovernmental organizations during the SSA process. No information that we received was overlooked. The Service used multiple data sets (*e.g.,* hibernacula count, mist-net captures, mobile and stationary acoustic data) in its modeling effort and the report was reviewed by independent peer reviewers and many experts selected from across the range of the species. No one data stream was prioritized or weighted more heavily than another. We also conducted a qualitative analysis of the threats considered in the SSA. All data submitted to the Service (multiple analyses and data streams) provided the scientific bedrock for this decision. Although one commenter provided alternative results to our analysis, the commenter did not provide us the underlying data they used; therefore, we could not fully evaluate their analysis. Therefore, we considered the best scientific and commercial data available when determining that the northern long-eared bat meets the definition of an endangered species.

*(22) Comment:* One commenter was concerned with the effect of the listing on wildlife control officers, private citizens, or both with regard to actions that may be classified as ''take'' when conducting bat removal or exclusion activities in buildings or other artificial structures. Specifically, the commenter mentioned concern about the cost, feasibility, or both of identifying whether bats being considered for exclusion were northern long-eared bats, whether exclusions can occur if northern long-eared bats are present, and whether northern long-eared bats can be submitted for disease testing in accordance with State/local Department of Health guidelines.

*Our Response:* The reclassification of the northern long-eared bat to an endangered species will not prevent citizens from removing bats from dwellings or other structures, but additional coordination with the Service may be needed. The Act's implementing regulations include a take exception for the defense of human life (see 50 CFR 17.21(c)(2)). The regulations require that any person taking, including killing, endangered wildlife in the defense of human life under this exception must report that take as set forth at 50 CFR 17.21(c)(4). It is important to note that Federal regulations do not supersede State or local laws that are more restrictive than those mentioned here. Please consult your local Service field office (*https://www.fws.gov/our-facilities?program=%5B%22Ecological%20Services%22%5D*) or State wildlife conservation agency with any questions or concerns.

When the presence of a bat or bat colony is not imminently endangering human safety, we recommend contacting the local Service field office for assistance. We encourage the bat removal to be conducted safely and humanely by a trained professional, such as a wildlife or pest exclusion company or a State-certified bat rehabilitator. Additionally, we recommend the White-nose Syndrome Response Team's acceptable management practices (AMPs) for nuisance wildlife control operators (available at *https://www.whitenosesyndrome.org/mmedia-education/acceptable-management-practices-for-bat-control-activities-in-structures-a-guide-for-nuisance-wildlife-control-operators*). The AMPs were developed in concert with wildlife control operators, State and Federal agencies, private conservation organizations, and the Centers for Disease Control. The AMPs are recommended for use with all structure-dwelling bat species, regardless of their conservation status. Again, these recommendations do not supersede or replace any existing, valid State or local government laws regarding the handling of bats in homes and artificial structures.

*(23) Comment:* Several commenters pointed out several potential stressors (for example, hibernacula collapse and vandalism, pesticide use, disease (other than WNS), and road related mortalities) to the northern long-eared bat that were not analyzed in the SSA.

*Our Response:* We considered all relevant population- and species-level potential stressors to the species (positive and negative) and only those for which we had substantial qualitative or quantitative information (WNS, wind energy mortality, effects from climate change, and habitat loss) were included our analysis. We did not include every known source of mortality to individuals of the species.

*(24) Comment:* Some commenters requested that the Service delay the effective date of the final rule to allow more time for coordination and preparations for the effect of reclassifying the northern long-eared bat and removing its species-specific 4(d) rule.

*Our Response:* We have set an effective date of 60 days after this rule publishes so that the Service can finalize consultation tools for the northern long-eared bat (*e.g.,* a determination key and an interim consultation framework). A delay in effective date will have little to no effect on the northern long-eared bat because it will still be protected under the previous final listing rule. Additionally, the species will be hibernating throughout most of its range during this time and we anticipate few projects occurring between this final rule publication and the bat's active season in 2023.

*(25) Comment:* One commenter requested that emergency work (*e.g.,* hazard tree removal, storm restoration), that was allowed under the 4(d) rule, should continue to be allowed.

*Our Response:* A 4(d) rule is a tool provided by the Act to allow for flexibility in the Act's implementation and to tailor prohibitions to those that make the most sense for protecting and managing at-risk species. This rule, which may be applied only to species listed as threatened, directs the Service to issue regulations deemed ''necessary and advisable to provide for the conservation of threatened species.'' The Act does not allow application of 4(d) rules for species listed as endangered; thus, the 4(d) rule will be nullified.

However, Section 7 regulations recognize that a Federal action agency's response to an emergency may require expedited consultation and such provisions are provided at 50 CFR 402.05.

We recommend coordinating with your respective Service field office (see *https://www.fws.gov/our-facilities?program=%5B%22Ecological%20Services%22%5D*) as soon as practicable after the emergency is under control.

## I. Final Listing Determination

### Background

A thorough review of the taxonomy, life history, and ecology of the northern long-eared bat is presented in the SSA report (Service 2022, entire).

The northern long-eared bat is a wide-ranging bat species found in 37 States (Alabama, Arkansas, Connecticut, Delaware, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Vermont, Virginia, West Virginia, Wisconsin, and Wyoming), the District of Columbia, and 8 Canadian provinces. The species typically

overwinters in caves or mines and spends the remainder of the year in forested habitats. As its name suggests, the northern long-eared bat is distinguished by its long ears, particularly as compared to other bats in its genus, *Myotis.* The bat is medium to dark brown on its back, with dark brown ears and wings, and tawny to pale-brown fur on its ventral side. Its weight ranges from approximately 5 to 8 grams (0.2 to 0.3 ounces). Female northern long-eared bats produce a maximum of one pup per year; therefore, loss of one pup results in missing one year of recruitment for a female.

The individual, population-level, and species-level needs of the northern long-eared bat are summarized below in tables 1 through 3. For additional information, please see the SSA report (Service 2022, chapter 2).

TABLE 1—THE ECOLOGICAL REQUISITES FOR SURVIVAL AND REPRODUCTIVE SUCCESS OF NORTHERN-LONG-EARED BAT INDIVIDUALS

| LIFE STAGE | SEASON | | | |
|---|---|---|---|---|
| | Spring | Summer | Fall | Winter |
| Pups (non-flying juveniles). | | Roosting habitat with suitable conditions for lactating females and for pups to stay warm and protected from predators while adults are foraging. | | |
| Juveniles | | Other maternity colony members (colony dynamics, thermoregulation), and suitable roosting and foraging habitat near abundant food and water resources. | Suitable roosting and foraging habitat near abundant food and water resources. | Habitat with suitable conditions for prolonged bouts of torpor and shortened periods of arousal. |
| All adults | Suitable roosting and foraging habitat near abundant food and water resources, and habitat connectivity and open-air space for safe migration between winter and summer habitats. | Summer roosts and foraging habitat near abundant food and water resources. | Suitable roosting and foraging habitat near abundant food and water resources, cave and/or mine entrances or other similar locations (for example, culvert, tunnel) for conspecifics to swarm and mate, and habitat connectivity and open-air space for safe migration between winter and summer habitats. | Habitat with suitable conditions for prolonged bouts of torpor and shortened periods of arousal. |
| Reproductive females. | | Other maternity colony members (colony dynamics), a network of suitable roosts (i.e., multiple summer roosts in close proximity) near conspecifics, and foraging habitat near abundant food and water resources. | | |

TABLE 2—POPULATION-LEVEL REQUISITES FOR A HEALTHY NORTHERN LONG-EARED BAT POPULATION

| Parameter | Requirements |
|---|---|
| Population growth rate, $\lambda$ | At a minimum, $\lambda$ must be $\geq 1$ for a population to remain stable over time. |
| Population size, N | Sufficiently large N to allow for essential colony dynamics and to be adequately resilient to environmental fluctuations. |
| Winter roosting habitat | Safe and stable winter roosting sites with suitable microclimates. |
| Migration habitat | Safe space to migrate between spring/fall habitat and winter roost sites. |
| Spring and fall roosting, foraging, and commuting (i.e., traveling between habitat types) habitat. | A matrix of habitat of sufficient quality and quantity to support bats as they exit hibernation (lowest body condition) or as they enter hibernation (need to put on body fat). |
| Summer roosting, foraging, and commuting habitat | A matrix of habitat of sufficient quality and quantity to support maternity colonies. |

TABLE 3—SPECIES-LEVEL ECOLOGY: REQUISITES FOR LONG-TERM VIABILITY

[Ability to maintain self-sustaining populations over a biologically meaningful timeframe]

| 3 Rs | Requisites for long-term viability | Description |
| --- | --- | --- |
| Resiliency (populations able to withstand stochastic events). | Healthy populations across a diversity of environmental conditions. | Self-sustaining populations are demographically, genetically, and physiologically robust, and have enough suitable habitat. |
| Redundancy (number and distribution of populations to withstand catastrophic events). | Multiple and sufficient distribution of populations within areas of unique variation (representation units). | Sufficient number and distribution of populations to guard against population losses. |
| Representation (genetic and ecological diversity to maintain adaptive potential). | Maintain adaptive diversity of the species | Populations maintained across a range of behavioral, physiological, ecological, and environmental diversity. |
| | Maintain evolutionary processes | Maintain evolutionary drivers—gene flow, natural selection—to mimic historical patterns. |

**Regulatory and Analytical Framework**

*Regulatory Framework*

Section 4 of the Act (16 U.S.C. 1533) and the implementing regulations in title 50 of the Code of Federal Regulations set forth the procedures for determining whether a species is an endangered species or a threatened species, issuing protective regulations for threatened species, and designating critical habitat for threatened and endangered species. In 2019, jointly with the National Marine Fisheries Service, the Service issued final rules that revised the regulations in 50 CFR parts 17 and 424 regarding how we add, remove, and reclassify threatened and endangered species and the criteria for designating listed species' critical habitat (84 FR 45020 and 84 FR 44752; August 27, 2019). At the same time, the Service also issued final regulations that, for species listed as threatened species after September 26, 2019, eliminated the Service's general protective regulations automatically applying to threatened species the prohibitions that section 9 of the Act applies to endangered species (collectively, the 2019 regulations).

As with the proposed rule, we are applying the 2019 regulations for this final rule because the 2019 regulations are the governing law just as they were when we completed the proposed rule. Although there was a period in the interim—between July 5, 2022, and September 21, 2022—when the 2019 regulations became vacated and the pre-2019 regulations therefore governed, the 2019 regulations are now in effect and govern listing and critical habitat decisions (*see Center for Biological Diversity* v. *Haaland,* No. 4:19–cv–05206–JST, Doc. 168 (N.D. Cal. July 5, 2022) (CBD v. Haaland) (vacating the 2019 regulations and thereby reinstating the pre-2019 regulations)); *In re: Cattlemen's Ass'n,* No. 22–70194 (9th Cir. Sept. 21, 2022) (staying the district court's order vacating the 2019 regulations until the district court resolved a pending motion to amend the order); *Center for Biological Diversity* v. *Haaland,* No. 4:19–cv–5206–JST, Doc. Nos. 197, 198 (N.D. Cal. Nov. 16, 2022) (granting plaintiffs' motion to amend July 5, 2022 order and granting government's motion for remand without vacatur).

The Act defines an ''endangered species'' as a species that is in danger of extinction throughout all or a significant portion of its range, and a ''threatened species'' as a species that is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range. The Act requires that we determine whether any species is an endangered species or a threatened species because of any of the following factors:

(A) The present or threatened destruction, modification, or curtailment of its habitat or range;

(B) Overutilization for commercial, recreational, scientific, or educational purposes;

(C) Disease or predation;

(D) The inadequacy of existing regulatory mechanisms; or

(E) Other natural or manmade factors affecting its continued existence.

These factors represent broad categories of natural or human-caused actions or conditions that could have an effect on a species' continued existence. In evaluating these actions and conditions, we look for those that may have a negative effect on individuals of the species, as well as other actions or conditions that may ameliorate any negative effects or may have positive effects.

We use the term ''threat'' to refer in general to actions or conditions that are known to or are reasonably likely to negatively affect individuals of a species. The term ''threat'' includes actions or conditions that have a direct impact on individuals (direct impacts), as well as those that affect individuals through alteration of their habitat or required resources (stressors). The term ''threat'' may encompass—either together or separately—the source of the action or condition or the action or condition itself.

However, the mere identification of any threat(s) does not necessarily mean that the species meets the statutory definition of an ''endangered species'' or a ''threatened species.'' In determining whether a species meets either definition, we must evaluate all identified threats by considering the expected response by the species, and the effects of the threats—in light of those actions and conditions that will ameliorate the threats—on an individual, population, and species level. We evaluate each threat and its expected effects on the species, then analyze the cumulative effect of all of the threats on the species as a whole. We also consider the cumulative effect of the threats in light of those actions and conditions that will have positive effects on the species, such as any existing regulatory mechanisms or conservation efforts. The Secretary determines whether the species meets the definition of an ''endangered species'' or a ''threatened species'' only after conducting this cumulative analysis and describing the expected effect on the species now and in the foreseeable future.

The Act does not define the term ''foreseeable future,'' which appears in the statutory definition of ''threatened species.'' Our implementing regulations at 50 CFR 424.11(d) set forth a framework for evaluating the foreseeable future on a case-by-case basis. The term ''foreseeable future'' extends only so far into the future as the Services can reasonably determine that both the future threats and the species' responses to those threats are likely. In other words, the foreseeable future is the period of time in which we can make

reliable predictions. ''Reliable'' does not mean ''certain''; it means sufficient to provide a reasonable degree of confidence in the prediction. Thus, a prediction is reliable if it is reasonable to depend on it when making decisions.

It is not always possible or necessary to define the foreseeable future as a particular number of years. Analysis of the foreseeable future uses the best scientific and commercial data available and should consider the timeframes applicable to the relevant threats and to the species' likely responses to those threats in view of its life-history characteristics. Data that are typically relevant to assessing the species' biological response include species-specific factors such as lifespan, reproductive rates or productivity, certain behaviors, and other demographic factors.

*Analytical Framework*

The SSA report documents the results of our comprehensive biological review of the best scientific and commercial data regarding the status of the species, including an assessment of the potential threats to the species. The SSA report does not represent our decision on whether the species should be listed as an endangered or threatened species under the Act. However, it does provide the scientific basis that informs our regulatory decisions, which involve the further application of standards within the Act and its implementing regulations and policies.

To assess the northern long-eared bat's viability, we used the three conservation biology principles of resiliency, redundancy, and representation (Shaffer and Stein 2000, pp. 306–310). Briefly, resiliency is the ability of the species to withstand environmental and demographic stochasticity (for example, wet or dry, warm or cold years), redundancy is the ability of the species to withstand catastrophic events (for example, droughts, large pollution events), and representation is the ability of the species to adapt to both near-term and long-term changes in its physical and biological environment (for example, climate conditions, pathogens). In general, species viability will increase with increases in resiliency, redundancy, and representation (Smith et al. 2018, p. 306). Using these principles, we identified the species' ecological requirements for survival and reproduction at the individual, population, and species levels, and described the beneficial and risk factors influencing the species' viability.

The SSA process can be categorized into three sequential stages. During the first stage, we evaluated the individual species' life-history needs. The next stage involved an assessment of the historical and current condition of the species' demographics and habitat characteristics, including an explanation of how the species arrived at its current condition. The final stage of the SSA involved making predictions about the species' responses to positive and negative environmental and anthropogenic influences. Throughout all of these stages, we used the best available information to characterize viability as the ability of a species to sustain populations in the wild over time. We use this information to inform our regulatory decision.

The following is a summary of the key results and conclusions from the SSA report; the full SSA report can be found under Docket No. FWS–R3–ES–2021–0140 at *https://www.regulations.gov* and at *https://www.fws.gov/species/northern-long-eared-bat-myotis-septentrionalis.*

**Summary of Biological Status and Threats**

In this discussion, we review the biological condition of the species and its resources, and the threats that influence the species' current and future condition, in order to assess the species' overall viability and the risks to that viability. For a full description, see the SSA report (Service 2022, entire).

Although there are other stressors affecting the northern long-eared bat, the primary factor influencing its viability is white-nose syndrome (WNS), a disease of bats caused by a fungal pathogen. Some of the other factors that influence the northern long-eared bat's viability (although to a far lesser extent than the influence of WNS) include wind energy mortality, effects from climate change, and habitat loss. These stressors and their effects to the northern long-eared bat are summarized below:

- WNS has been the foremost stressor on the northern long-eared bat for more than a decade. The fungus that causes the disease, *Pd,* invades the skin of bats. Infection leads to increases in the frequency and duration of arousals during hibernation and eventual depletion of fat reserves needed to survive winter and results in mortality. Since its discovery in New York in 2006, *Pd* has been confirmed (or presumed) in 43 States and 8 Canadian provinces. There is no known mitigation or treatment strategy to slow the spread of *Pd* or to treat WNS in bats. WNS has caused estimated northern long-eared bat population declines of 97–100 percent across 79 percent of the species' range.
- Wind energy-related mortality of the northern long-eared bat is a stressor at local and regional levels. In 2020, northern long-eared bats were at risk from wind mortality in approximately 49 percent of their range, based on the areas where wind turbines were in place and operating (using known northern long-eared bat occurrences, average migration distance, and the spatial distribution of wind turbines) (Service 2022, p. iv). Most bat mortality at wind energy projects is caused by direct collisions with moving turbine blades.
- Climate change variables, such as changes in temperature and precipitation, may influence the northern long-eared bat's resource needs, such as suitable roosting habitat for all seasons, foraging habitat, and prey availability. Although a changing climate may provide some benefit to the northern long-eared bat, overall negative impacts are anticipated, especially at local levels.
- Habitat loss (including, but not limited to, forest conversion or hibernacula disturbance or destruction) may include loss of suitable roosting or foraging habitat, resulting in longer flights between suitable roosting and foraging habitats due to habitat fragmentation, fragmentation of maternity colony networks, and direct injury or mortality. Loss or modification of winter roosts (*i.e.,* making hibernaculum no longer suitable) can result in impacts to individuals or at the population level. However, habitat loss alone is not considered to be a key stressor at the species level, and habitat does not appear to be limiting.

We note that, by using the SSA framework to guide our analysis of the scientific information documented in the SSA report, we have not only analyzed individual effects on the species, but we have also analyzed their potential cumulative effects. We incorporate the cumulative effects into our SSA analysis when we characterize the current and future condition of the species. To assess the current and future condition of the species, we undertake an iterative analysis that encompasses and incorporates the threats individually and then accumulates and evaluates the effects of all the factors that may be influencing the species, including threats and conservation efforts. Because the SSA framework considers not just the presence of the factors, but to what degree they collectively influence risk to the entire species, our assessment integrates the cumulative effects of the factors and

replaces a standalone cumulative effects analysis.

Current Condition

In evaluating current conditions of the northern long-eared bat, we used the best available data. Winter hibernacula counts provide the most consistent, long-term, reliable trend data and provide the most direct measure of WNS impacts. We also used summer data in evaluating population trends, although the availability and quality of summer data varies temporally and spatially.

Available evidence, including both winter and summer data, indicates northern long-eared bat abundance has and will continue to decline substantially under current demographic and stressor conditions, primarily driven by the effects of WNS. As part of our assessment of the current condition of northern long-eared bat's representation, we identified and delineated the variation across the northern long-eared bat's range into geographical representation units (RPUs) using the following proxies: variation in biological traits, genetic diversity, peripheral populations, habitat niche diversity, and steep environmental gradients.

Winter abundance (from known hibernacula) has declined rangewide (49 percent) and declined across all but one RPU (declines range from no decline to 90 percent). The number of extant winter colonies also declined rangewide (by 81 percent) and across all RPUs (40–88 percent). There has also been a noticeable shift towards smaller colony sizes, with a 96–100 percent decline in the number of large hibernacula (≥100 individuals) across the RPUs (see figure 2, below). Continued declines are anticipated, with projections indicating rangewide abundance declining by 95 percent and the spatial extent declining by 75 percent from historical conditions (under current threat conditions), by 2030 (Service 2022, Chapter 5). Declines continue to be driven by the catastrophic effects of WNS.

Number of colonies in each abundance category under current conditions
Number of hibernacula
800
700
600
500
400
300
200
100
0
2000
2010
2020
2030
2040
2050
2060
Extinct
Count 2-9
Count 10-99
Count 100-499
Count 500-999
Count 1000-9999
Count 10000-99999

Figure 2. The number of hibernacula in each colony abundance category under current conditions.

Declining trends in abundance and extent of occurrence are also evident across much of the northern long-eared bat's summer range. Rangewide occupancy has declined by 80 percent from 2010–2019. Data collected from mobile acoustic transects found a 79 percent decline in rangewide relative abundance from 2009–2019, and summer mist-net captures declined by 43–77 percent (across RPUs) compared to pre-WNS capture rates.

As discussed above, multiple data types and analyses indicate downward trends in northern long-eared bat population abundance and distribution over the last 14 years, and the best available information indicates that this downward trend will continue. Northern long-eared bat abundance (winter and summer), number of occupied hibernacula, spatial extent, and summer habitat occupancy across the range and within all RPUs are decreasing. Since the occurrence of WNS, northern long-eared bat abundance has steeply declined, leaving populations with small numbers of individuals. At these low population sizes, colonies are vulnerable to extirpation from stochastic events and the deleterious effects of reduced population sizes, such as limiting natural selection processes and decreased genetic diversity. Furthermore, small populations generally cannot rescue one another from such a depressed state because of the northern long-eared bat's low reproduction output (one pup per year) and its high philopatry (tending to return to a particular area). These inherent life-history traits limit the ability of populations to recover from low abundances. Consequently, effects of small population sizes exacerbate the effects of current and future declines due to continued exposure to WNS, mortality from wind turbines, and impacts associated with habitat loss and climate change.

Therefore, the northern long-eared bat's resiliency is greatly compromised in its current condition. Because the northern long-eared bat's abundance and spatial extent have so dramatically declined, it has also become more vulnerable to catastrophic events. In other words, its redundancy has also declined dramatically. The steep and

continued declines in abundance have likely led to reductions in genetic diversity, and thereby reduced the northern long-eared bat's adaptive capacity, and a decline in the species' overall representation. Moreover, at its current low abundance, loss of genetic diversity will likely accelerate. Consequently, limited natural selection processes and decreased genetic diversity will further lessen the species' ability to adapt to novel changes and exacerbate declines due to continued exposure to WNS, mortality from wind turbines, and impacts associated with habitat loss and climate change. Thus, even without further WNS spread and additional wind energy development (northern long-eared bat's current condition), its viability is likely to continue to rapidly decline over the next 10 years.

Future Condition

As part of the SSA, we also developed two future condition scenarios to capture the range of uncertainties regarding future threats and the projected responses by the northern long-eared bat. Our scenarios included a plausible highest impact scenario and a plausible lowest impact scenario for each primary threat. Because we determined that the current condition of the northern long-eared bat is consistent with an endangered species (see Determination of Northern Long-eared Bat's Status, below), we are not presenting the results of the future scenarios in this rule. Please refer to the SSA report (Service 2022, entire) for the full analysis of future scenarios.

*Conservation Efforts and Regulatory Mechanisms*

Below is a brief description of conservation measures and regulatory mechanisms currently in place. Please see the SSA report for a more detailed description (Service 2022, appendix 4).

Multiple national and international efforts are underway to try to reduce the impacts of WNS. Despite these efforts, there are no proven measures to reduce the severity of impacts of WNS. More than 100 State and Federal agencies, Tribes, organizations, and institutions are engaged in this collaborative work to combat WNS and conserve affected bats. Partners from all 37 States in the northern long-eared bat's range, Canada, and Mexico are engaged in collaborations to conduct disease surveillance, population monitoring, and management actions in preparation for or response to WNS.

To reduce bat fatalities, some wind facilities ''feather'' turbine blades (*i.e.,* pitch turbine blades parallel with the prevailing wind direction to slow rotation speeds) at low wind speeds at times when bats are more likely to be present. The wind speed at which the turbine blades begin to generate electricity is known as the ''cut-in speed,'' and this can be set at the manufacturer's recommended speed or at a higher threshold, typically referred to as curtailment. The effectiveness of feathering below various cut-in speeds differs among sites and years (Arnett et al. 2013, entire; Berthinussen et al. 2021, pp. 94–106); nonetheless, most studies have shown all-bat (based on dead bats detected from all bat species) fatality reductions of greater than 50 percent associated with raising cut-in speeds by 1.0–3.0 meters per second (m/s) above the manufacturer's cut-in speed (Arnett et al. 2013, entire; USFWS unpublished data). The effectiveness of curtailment at reducing fatality rates specifically for the northern long-eared bat has not been documented.

All States have active forestry programs with a variety of goals and objectives. Several States have established habitat protection buffers around known Indiana bat hibernacula that will also serve to benefit other bat species by maintaining sufficient quality and quantity of swarming habitat. Some States conduct some of their forest management activities in the winter within known listed bat home ranges as a measure that would protect maternity colonies and non-volant (non-flying) pups during summer months. Depending on the type and timing of activities, forest management can be beneficial to bat species (for example, maintaining or increasing suitable roosting and foraging habitat). Forest management that results in heterogeneous (including forest type, age, and structural characteristics) habitat may benefit tree-roosting bat species such as northern long-eared bat (Silvis et al. 2016, p. 37). Silvicultural practices can meet both male and female northern long-eared bats' roosting requirements by maintaining large-diameter snags in early stages of decay, while allowing for regeneration of forests (Lacki and Schwierjohann 2001, p. 487).

Many State and Federal agencies, conservation organizations, and land trusts have installed bat-friendly gates to protect important hibernation sites. All known hibernacula within national grasslands and forestlands of the Rocky Mountain Region of the U.S. Forest Service (USFS) are closed during the winter hibernation period, primarily due to the threat of WNS, although this will reduce disturbance to bats in general inhabiting these hibernacula (USFS 2013, unpaginated). Because of concern over the importance of bat roosts, including hibernacula, the American Society of Mammologists developed guidelines for protection of roosts, many of which have been adopted by government agencies and special interest groups (Sheffield et al. 1992, p. 707). Also, regulations, such as the Federal Cave Resources Protection Act (16 U.S.C. 4301 *et seq.*), protect caves on Federal lands by limiting access to some caves, thereby reducing disturbance. Finally, many Indiana bat hibernacula have been gated, and some have been permanently protected via acquisition or easement, which provides benefits to other bats that also use the sites, including the northern long-eared bat.

The northern long-eared bat is listed as endangered under Canada's Species at Risk Act (COSEWIC 2013, entire). In addition, the northern long-eared bat receives varying degrees of protection through State laws, which designate the species as endangered in 9 States (Arkansas, Connecticut, Delaware, Indiana, Maine, Massachusetts, Missouri, New Hampshire, and Vermont); as threatened in 10 States (Georgia, Illinois, Louisiana, Maryland, New York, Ohio, Pennsylvania, Tennessee, Virginia, and Wisconsin); and as a species of special concern in 10 States (Alabama, Iowa, Michigan, Minnesota, Mississippi, Oklahoma, South Carolina, South Dakota, West Virginia, and Wyoming).

**Determination of Northern Long-Eared Bat's Status**

Section 4 of the Act (16 U.S.C. 1533) and its implementing regulations (50 CFR part 424) set forth the procedures for determining whether a species meets the definition of an endangered species or a threatened species. The Act defines an ''endangered species'' as a species in danger of extinction throughout all or a significant portion of its range, and a ''threatened species'' as a species likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range. The Act requires that we determine whether a species meets the definition of endangered species or threatened species because of any of the following factors: (A) The present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence.

*Status Throughout All of Its Range*

WNS has been the foremost stressor on the northern long-eared bat for more than a decade and continues to be currently. The fungus that causes the disease, *Pd,* invades the skin of bats and leads to infection that increases the frequency and duration of arousals during hibernation that eventually deplete the fat reserves needed to survive winter, resulting in mortality. There is no known mitigation or treatment strategy to slow the spread of *Pd* or to treat WNS in bats. WNS has caused estimated northern long-eared bat population declines of 97–100 percent across 79 percent of the species' range (Factor C). Winter abundance (from known hibernacula) has declined rangewide (49 percent) and declined across all but one RPU (declines range from 0 to 90 percent), and the number of extant winter colonies also declined rangewide (81 percent) and across all RPUs (40–88 percent). There has also been a noticeable shift towards smaller colony sizes, with a 96–100 percent decline in the number of large hibernacula (≥100 individuals). Rangewide summer occupancy has declined by 80 percent from 2010–2019. Summer data collected from mobile acoustic transects found a 79 percent decline in rangewide relative abundance from 2009–2019, and summer mist-net captures declined by 43–77 percent (across RPUs) compared to pre-WNS capture rates. We created projections for the species using its current condition and the current rates of mortality from WNS effects and wind energy. Rangewide abundance is projected to decline by 95 percent and the spatial extent is projected to decline by 75 percent from historical conditions by 2030.

As a result of these steep population declines, the northern long-eared bat's resiliency is greatly compromised in its current condition. Because the northern long-eared bat's abundance and spatial extent substantially declined, its redundancy has decreased such that northern long-eared bats are more vulnerable to catastrophic events. The northern long-eared bat's representation has also been reduced, as the steep and continued declines in abundance have likely led to reductions in genetic diversity, and thereby reduced the northern long-eared bat's adaptive capacity. Further, the projected widespread reduction in the distribution of occupied hibernacula under current conditions will lead to losses in the diversity of environments and climatic conditions occupied, which will impede natural selection and further limit the northern long-eared bat's ability to adapt to changing environmental conditions. Moreover, at its current low abundance, loss of genetic diversity via genetic drift will likely accelerate. Consequently, limiting natural selection process and decreasing genetic diversity will further lessen the northern long-eared bat's ability to adapt to novel changes (currently ongoing as well as future changes) and exacerbate declines due to continued exposure to WNS and other stressors. Thus, even without further *Pd* spread and additional pressure from other stressors, the northern long-eared bat's viability has declined substantially and is expected to continue to rapidly decline over the near term.

Current population trends and status indicate this species is currently in danger of extinction. The species continues to experience the catastrophic effects of WNS and the compounding effect of other stressors from which extinction is now a plausible outcome under the current conditions. Therefore, the species meets the Act's definition of an endangered species rather than that of a threatened species. Thus, after assessing the best available information, we determine that the northern long-eared bat is in danger of extinction throughout all of its range.

*Status Throughout a Significant Portion of Its Range*

Under the Act and our implementing regulations, a species may warrant listing if it is in danger of extinction or likely to become so in the foreseeable future throughout all or a significant portion of its range. We have determined that the northern long-eared bat is in danger of extinction throughout all of its range and accordingly did not undertake an analysis of any significant portions of its range. Because the northern long-eared bat warrants listing as endangered throughout all of its range, our determination does not conflict with the decision in *Center for Biological Diversity* v. *Everson,* 435 F. Supp. 3d 69 (D.D.C. 2020), which vacated the provision of the Final Policy on Interpretation of the Phrase "Significant Portion of Its Range" in the Endangered Species Act's Definitions of "Endangered Species" and "Threatened Species" (Final Policy) (79 FR 37578, July 1, 2014) providing that if the Services determine that a species is threatened throughout all of its range, the Services will not analyze whether the species is endangered in a significant portion of its range.

*Determination of Status*

Our review of the best available scientific and commercial information indicates that the northern long-eared bat meets the definition of an endangered species. Therefore, we are reclassifying the northern long-eared bat as an endangered species in accordance with sections 3(6) and 4(a)(1) of the Act.

**Available Conservation Measures**

Conservation measures provided to species listed as endangered or threatened species under the Act include recognition as a listed species, planning and implementation of recovery actions, requirements for Federal protection, and prohibitions against certain practices. Recognition through listing results in public awareness, and conservation by Federal, State, Tribal, and local agencies, private organizations, and individuals. The Act encourages cooperation with the States and other countries and calls for recovery actions to be carried out for listed species. The protection required by Federal agencies and the prohibitions against certain activities are discussed, in part, below.

The primary purpose of the Act is the conservation of endangered and threatened species and the ecosystems upon which they depend. The ultimate goal of such conservation efforts is the recovery of these listed species, so that they no longer need the protective measures of the Act. Section 4(f) of the Act calls for the Service to develop and implement recovery plans for the conservation of endangered and threatened species. The goal of this process is to restore listed species to a point where they are secure, self-sustaining, and functioning components of their ecosystems.

Recovery planning consists of preparing draft and final recovery plans, beginning with the development of a recovery outline and making it available to the public within 30 days of a final listing determination. The recovery outline guides the immediate implementation of urgent recovery actions and describes the process to be used to develop a recovery plan. Revisions of the plan may be done to address continuing or new threats to the species, as new substantive information becomes available. The recovery plan also identifies recovery criteria for review of when a species may be ready for reclassification from endangered to threatened ("downlisting") or removal from protected status ("delisting"), and methods for monitoring recovery progress. Recovery plans also establish a framework for agencies to coordinate

their recovery efforts and provide estimates of the cost of implementing recovery tasks. Recovery teams (composed of species experts, Federal and State agencies, nongovernmental organizations, and stakeholders) are often established to develop recovery plans. When completed, the recovery outline, draft recovery plan, and the final recovery plan will be available on our website (*https://www.fws.gov/species/northern-long-eared-bat-myotis-septentrionalis*), or from our Minnesota Wisconsin Ecological Services Field Office (see **FOR FURTHER INFORMATION CONTACT**).

Implementation of recovery actions generally requires the participation of a broad range of partners, including other Federal agencies, States, Tribes, nongovernmental organizations, businesses, and private landowners. Examples of recovery actions include habitat restoration (*e.g.,* restoration of native vegetation), research, captive propagation and reintroduction, and outreach and education. The recovery of many listed species cannot be accomplished solely on Federal lands because their range may occur primarily or solely on non-Federal lands. To achieve recovery of these species requires cooperative conservation efforts on private, State, and Tribal lands.

Funding for recovery actions is available from a variety of sources, including Federal budgets, State programs, and cost-share grants for non-Federal landowners, the academic community, and nongovernmental organizations. In addition, pursuant to section 6 of the Act, the States of Alabama, Arkansas, Connecticut, Delaware, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Vermont, Virginia, West Virginia, Wisconsin, and Wyoming will continue to be eligible for Federal funds to implement management actions that promote the protection or recovery of the northern long-eared bat. Information on our grant programs that are available to aid species recovery can be found at: *https://www.fws.gov/service/financial-assistance.*

Please let us know if you are interested in participating in recovery efforts for the northern long-eared bat. Additionally, we invite you to submit any new information on this species whenever it becomes available and any information you may have for recovery planning purposes (see **FOR FURTHER INFORMATION CONTACT**).

Section 7(a) of the Act requires Federal agencies to evaluate their actions with respect to any species that is listed as an endangered or threatened species. Regulations implementing this interagency cooperation provision of the Act are codified at 50 CFR part 402. Section 7(a)(2) of the Act requires Federal agencies to ensure that activities they authorize, fund, or carry out are not likely to jeopardize the continued existence of any endangered or threatened species. If a Federal action may affect a listed species, the responsible Federal agency must enter into consultation with us.

Federal agency actions within the species' habitat that may require consultation include, but are not limited to, management and any other landscape-altering activities on Federal lands administered by the U.S. Fish and Wildlife Service, U.S. Forest Service, Bureau of Land Management, National Park Service, and other Federal agencies; issuance of section 404 Clean Water Act (33 U.S.C. 1251 *et seq.*) permits by the U.S. Army Corps of Engineers; and construction and maintenance of roads or highways by the Federal Highway Administration.

The Act and its implementing regulations set forth a series of general prohibitions and exceptions that apply to endangered wildlife. The prohibitions of section 9(a)(1) of the Act, codified at 50 CFR 17.21, make it illegal for any person subject to the jurisdiction of the United States to take (which includes harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect; or to attempt any of these) endangered wildlife within the United States or on the high seas. In addition, it is unlawful to import; export; deliver, receive, carry, transport, or ship in interstate or foreign commerce in the course of commercial activity; or sell or offer for sale in interstate or foreign commerce any species listed as an endangered species. It is also illegal to possess, sell, deliver, carry, transport, or ship any such wildlife that has been taken illegally. Certain exceptions apply to employees of the Service, the National Marine Fisheries Service, other Federal land management agencies, and State conservation agencies.

We may issue permits to carry out otherwise prohibited activities involving endangered wildlife under certain circumstances. Regulations governing permits are codified at 50 CFR 17.22. With regard to endangered wildlife, a permit may be issued for the following purposes: for scientific purposes, to enhance the propagation or survival of the species, and for incidental take in connection with otherwise lawful activities. There are also certain statutory exemptions from the prohibitions, which are found in sections 9 and 10 of the Act.

It is our policy, as published in the **Federal Register** on July 1, 1994 (59 FR 34272), to identify to the maximum extent practicable at the time a species is listed, those activities that will or will not constitute a violation of section 9 of the Act. The intent of this policy is to increase public awareness of the effect of a final listing on proposed and ongoing activities within the range of a listed species. Based on the best available information, the following actions are unlikely to result in a violation of section 9, if these activities are carried out in accordance with existing regulations and permit requirements; this list is not comprehensive:

(1) Minimal tree removal and vegetation management activities that occur any time of the year outside of suitable forested/wooded habitat and more than 5 miles from known or potential hibernacula. We define suitable forested/wooded habitat as containing potential roosts (*i.e.,* live trees or snags greater or equal to 3 inches in diameter at breast height that have exfoliating bark, cracks, crevices, or cavities), as well as forested linear features such as wooded fencerows, riparian forests, and other wooded corridors. Individual trees may be suitable habitat when they exhibit characteristics of potential roost trees and are within 1,000 feet (305 meters) of other forested/wooded habitat (USFWS 2022, pp.16–17). We broadly define hibernacula as caves (or associated sinkholes, fissures, or other karst features), mines, rocky outcroppings, or tunnels.

(2) Insignificant amounts of suitable forested/wooded habitat removal provided it occurs during the hibernation period and the modification of habitat does not significantly impair an essential behavior pattern such that it is likely to result in the actual killing or injury of northern long-eared bats after hibernation.

(3) Tree removal that occurs at any time of year in highly developed urban areas (*e.g.,* street trees, downtown areas; USFWS 2022, p. 17).

(4) Herbicide application activities that adhere to the product label, occur outside of suitable forested/wooded habitat, and are more than 5 miles from known or potential hibernacula.

(5) Prescribed fire activities that are restricted to the inactive (hibernation) season, provided they are more than 0.5

miles from a known hibernacula and do not result in changes to suitable forested/wooded habitat to the extent that the habitat becomes unsuitable for the northern long-eared bat.

(6) Activities that may disturb northern long-eared bat hibernation locations, provided they are restricted to the active (non-hibernation) season and could not result in permanent changes to suitable or potential hibernacula.

(7) Activities that may result in modification or removal of human structures provided: (a) the structure does not provide roosting habitat for northern long-eared bats, or (b) the results of a structure assessment indicate no signs of bats.

(8) Wind turbine operations at facilities following a Service-approved avoidance strategy (such as curtailment, deterrents, or other technology) documented in a letter specific to the facility from the appropriate Ecological Services field office.

(9) All activities (except wind turbine operation) in areas where a negative presence/probable absence survey result was obtained using the most recent version of the rangewide northern long-eared bat survey guidance and with Service approval of the proposed survey methods and results.

(10) Livestock grazing and routine ranch maintenance.

(11) Residential and commercial building construction, exterior improvements or additions, renovation, and demolition in urban areas.

(12) Mowing of existing (non-suitable forested/woodland habitat) rights-of-way.

(13) Maintenance, repair, and replacement activities conducted completely within existing, maintained utility rights-of-way provided there is no tree removal or tree trimming.

(14) Maintenance and repair activities conducted completely within existing road or rail surface that do not involve tree removal, tree trimming, or blasting or other percussive activities.

Based on the best available information, the following activities may potentially result in a violation of section 9 of the Act if they are not authorized in accordance with applicable law; this list is not comprehensive:

(1) Unauthorized collecting, handling, possessing, selling, delivering, carrying, or transporting of the species, including import or export across State lines and international boundaries, except for properly documented antique specimens of this taxon at least 100 years old, as defined by section 10(h)(1) of the Act.

(2) Incidental take of the species without authorization pursuant to section 7 or section 10(a)(1)(B) of the Act.

(3) Disturbance or destruction (or otherwise making a hibernaculum no longer suitable) of known hibernacula due to commercial or recreational activities during known periods of hibernation.

(4) Unauthorized destruction or modification of suitable forested habitat (including unauthorized grading, leveling, burning, herbicide spraying, or other destruction or modification of habitat) in ways that kill or injure individuals by significantly impairing the species' essential breeding, foraging, sheltering, commuting, or other essential life functions.

(5) Unauthorized removal or destruction of trees and other natural and manmade structures being used as roosts by the northern long-eared bat that results in take of the species.

(6) Unauthorized release of biological control agents that attack any life stage of this taxon.

(7) Unauthorized removal or exclusion from buildings or artificial structures being used as roost sites by the species, resulting in take of the species.

(8) Unauthorized building and operation of wind energy facilities within areas used by the species, which results in take of the species.

(9) Unauthorized discharge of chemicals, fill, or other materials into sinkholes, which may lead to contamination of known northern long-eared bat hibernacula.

Questions regarding whether specific activities would constitute a violation of section 9 of the Act should be directed to the Minnesota Wisconsin Ecological Services Field Office (see **FOR FURTHER INFORMATION CONTACT**).

## Required Determinations

*Government-to-Government Relationship With Tribes*

In accordance with the President's memorandum of April 29, 1994 (Government-to-Government Relations with Native American Tribal Governments; 59 FR 22951), Executive Order 13175 (Consultation and Coordination with Indian Tribal Governments), and the Department of the Interior's manual at 512 DM 2, we readily acknowledge our responsibility to communicate meaningfully with recognized Federal Tribes on a government-to-government basis. In accordance with Secretarial Order 3206 of June 5, 1997 (American Indian Tribal Rights, Federal-Tribal Trust Responsibilities, and the Endangered Species Act), we readily acknowledge our responsibilities to work directly with Tribes in developing programs for healthy ecosystems, to acknowledge that Tribal lands are not subject to the same controls as Federal public lands, to remain sensitive to Indian culture, and to make information available to Tribes. We solicited information, provided updates, and invited participation in the SSA process in emails sent to Tribes, nationally, in April 2020 and November 2020. We will continue to work with Tribal entities during the recovery planning for the northern long-eared bat.

## References Cited

A complete list of references cited in this rulemaking is available on the internet at *https://www.regulations.gov* and upon request from the Minnesota Wisconsin Ecological Services Field Office (see **FOR FURTHER INFORMATION CONTACT**).

## Authors

The primary authors of this final rule are the staff members of the Fish and Wildlife Service's Species Assessment Team and the Minnesota Wisconsin Ecological Services Field Office.

## List of Subjects in 50 CFR Part 17

Endangered and threatened species, Exports, Imports, Plants, Reporting and recordkeeping requirements, Transportation, Wildlife.

## Regulation Promulgation

Accordingly, we amend part 17, subchapter B of chapter I, title 50 of the Code of Federal Regulations, as set forth below:

## PART 17—ENDANGERED AND THREATENED WILDLIFE AND PLANTS

■ 1. The authority citation for part 17 continues to read as follows:

**Authority:** 16 U.S.C. 1361–1407; 1531–1544; and 4201–4245, unless otherwise noted.

■ 2. In § 17.11, in paragraph (h) amend the table ''List of Endangered and Threatened Wildlife'' by revising the entry for ''Bat, northern long-eared'' under MAMMALS to read as follows:

### § 17.11 Endangered and threatened wildlife.

* * * * *

(h) * * *

| Common name | Scientific name | Where listed | Status | Listing citations and applicable rules |
|---|---|---|---|---|
| MAMMALS | | | | |
| * * * * * * * | | | | |
| Bat, northern long-eared | *Myotis septentrionalis* | Wherever found | E | 80 FR 17974, 4/2/2015; 87 FR [Insert **Federal Register** page where the document begins], 11/30/22. |
| * * * * * * * | | | | |

**§ 17.40 [Amended]**

■ 3. Amend § 17.40 by removing and reserving paragraph (o).

**Stephen Guertin,**

*Acting Director, U.S. Fish and Wildlife Service.*

[FR Doc. 2022–25998 Filed 11–29–22; 8:45 am]

BILLING CODE 4333–15–P

## DEPARTMENT OF COMMERCE

## National Oceanic and Atmospheric Administration

## 50 CFR Part 635

**[Docket No. 220523–0119; RTID 0648–XC483]**

## Atlantic Highly Migratory Species; Atlantic Bluefin Tuna Fisheries; General Category December Quota Transfer

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Temporary rule; quota transfer.

**SUMMARY:** NMFS is transferring a total of 57.5 metric tons (mt) of Atlantic bluefin tuna (BFT) quota from both the Reserve category and the Harpoon category to the General category for the remainder of the 2022 fishing year. With this transfer, the adjusted General category December subquota, Reserve category quota, and Harpoon category quota will be 50.1 mt, 6 mt, and 76.4 mt respectively. This action accounts for the accrued overharvest from previous 2022 General category time period subquotas, and will further opportunities for General category fishermen to participate in the December General category fishery, based on consideration of the regulatory determination criteria regarding inseason adjustments. This action would affect Atlantic Tunas General category (commercial) permitted vessels and Highly Migratory Species (HMS) Charter/Headboat permitted vessels with a commercial sale endorsement when fishing commercially for BFT.

**DATES:** Effective December 1, 2022, through December 31, 2022.

**FOR FURTHER INFORMATION CONTACT:** Becky Curtis, *becky.curtis@noaa.gov,* 301–427–8503, Larry Redd, Jr., *larry.redd@noaa.gov,* 301–427–8503, or Nicholas Velseboer, *nicholas.velseboer@noaa.gov,* 978–281–9260.

**SUPPLEMENTARY INFORMATION:** Atlantic HMS fisheries, including BFT fisheries, are managed under the authority of the Atlantic Tunas Convention Act (ATCA; 16 U.S.C. 971 *et seq.*) and the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act; 16 U.S.C. 1801 *et seq.*). The 2006 Consolidated Atlantic HMS Fishery Management Plan (FMP) and its amendments are implemented by regulations at 50 CFR part 635. Section 635.27 divides the U.S. BFT quota recommended by the International Commission for the Conservation of Atlantic Tunas (ICCAT) and as implemented by the United States among the various domestic fishing categories, per the allocations established in the 2006 Consolidated Atlantic HMS FMP and its amendments. NMFS is required under the Magnuson-Stevens Act to provide U.S. fishing vessels with a reasonable opportunity to harvest quotas under relevant international fishery agreements such as the ICCAT Convention, which is implemented domestically pursuant to ATCA.

The baseline General, Reserve, and Harpoon category quotas are 587.9 mt, 29.5 mt, and 48.7 mt respectively. The General category baseline quota is further suballocated to different time periods. Relevant to this action, the baseline subquota for the December time period is 30.6 mt. On December 23, 2021 (86 FR 72857), NMFS transferred 19.5 mt of BFT quota from the December 2022 subquota time period to the January through March 2022 subquota time period, resulting in an adjusted subquota of 9.4 mt for the December 2022 time period. This adjusted subquota was subsequently adjusted to 11.1 mt via a final rulemaking that adjusted the overall quota (87 FR 33049, June 1, 2022).

To date for 2022, NMFS has published several actions that adjusted the Reserve and Harpoon category quotas, including the allowable carryover of underharvest from 2021 to 2022 (87 FR 5737, February 2, 2022; 87 FR 33049, June 1, 2022; 87 FR 43447, July 21, 2022; 87 FR 54910, September 8, 2022; 87 FR 60938, October 7, 2022). The current adjusted Reserve and Harpoon category quotas are 61.2 mt and 78.7 mt, respectively. Per § 635.27(a)(5), the Harpoon category fishery closed for the year on September 5, 2022 (87 FR 54912, September 9, 2022). At that time, 2.3 mt of the Harpoon category quota remained unharvested.

### Quota Transfer Calculations

Under § 635.27(a)(9), NMFS has the authority to transfer quota among fishing categories or subcategories after considering the determination criteria provided under § 635.27(a)(8). This section focuses on the various calculations involved in transferring quotas; the consideration of the determination criteria can be found below after this section.

To date, preliminary landings data indicate that the General category landed 836.8 mt through November 30, 2022. This amount exceeds the cumulative adjusted quota available through November 30 (818.3 mt) by 18.5 mt (836.8 mt − 818.3 mt = 18.5 mt).

As stated above, the adjusted Reserve category quota is 61.2 mt. The quota in the Reserve category is held in reserve for inseason or annual adjustments and research. Under § 635.24(a)(7), NMFS may allocate any portion of the Reserve category quota for inseason or annual adjustments to any fishing category quota. Transferring 55.2 mt from the Reserve category would account for the 18.5 mt accrued overharvest from the prior time periods. This transfer would result in 36.7 mt being available for the General category December subquota time period (55.2 mt − 18.5 mt = 36.7 mt). Transferring 55.2 mt out of the Reserve category would leave 6 mt in the Reserve category (61.2 mt − 55.2 mt = 6 mt), which could be used to account

**United States Department of Agriculture**

Forest Service

Agriculture Handbook Number 701

# Landscape Aesthetics

## A Handbook for Scenery Management

**Abstract**

High quality scenery, especially scenery with natural-appearing landscapes, enhances people's lives and benefits society. The Scenery Management System presents a vocabulary for managing scenery and a systematic approach for determining the relative value and importance of scenery in a national forest. This handbook was written for national forest resource managers, landscape architects, and others interested in landscape aesthetics and scenery. Both students and the general public, our "constituents," will benefit from the straightforward approach of the system to a complex art and science. Ecosystems provides the environmental context for this scenery management system. The system is to be used in the context of ecosystem management to inventory and analyze scenery in a national forest, to assist in establishment of overall resource goals and objectives, to monitor the scenic resource, and to ensure high-quality scenery for future generations.

December 1995

This handbook supercedes AH-462,
National Forest Landscape Management,
Volume 2, Chapter 1,
The Visual Management System
Issued April 1974

An original draft was prepared under contract by
Lee Roger Anderson, ASLA, CA License # 1586
Environmental Consulting, Planning, and Design
P.O. Box 1191
Mt. Shasta, CA 96067
Contract #53-04H1-1-4040

# Appendix H
# Examples of Scenic Integrity Levels

**This chapter contains photographs and narrative descriptions of the six scenic integrity levels. As explained in Chapter 2, scenic integrity is a continuum that is subdivided into six levels, from very high to very low. By no means does a single photograph of a landscape provide a complete picture of the scenic effects of a management activity. Therefore, each discussion of the scenic integrity level achieved in the photograph refers only to perceptions gained in the context of that view.**

Note to reader: The terms that are used to describe the following examples are from the original Visual Management System. The cross-walk below will assist in making the transition from the old terms to the new terms.

| SMS | VMS |
|---|---|
| Very High | Preservation |
| High | Retention |
| Moderate | Partial Retention |
| Low | Modification |
| Very Low | Maximum Modification |

JA-0460
PBWTAR_1044

## Preservation

**Wilderness**

This heavily traveled trail in the Daniel Boone National Forest creates enough contrast to be noticed, but, when viewed from beyond immediate foreground distances, would not be evident in this natural-appearing landscape. This is an excellent example of the **preservation** scenic condition level.

**Wilderness**

This bridge of native materials and simple design, located in the Three Sisters Wilderness in Oregon, is an appropriate example of low impact recreation development for **preservation**. When the new pole railings weather to a natural grey color, the structure will blend in better than it does in this scene.

## Preservation

**Wilderness**

This camping area meets the **preservation** scenic condition level. The evaluation of this site is based upon the path clearing and sign only. There are no controls over the colors of backpacks and tents, although they blend with fall colors at this time of year. It is necessary that a camping area be visible in immediate foreground, but at middleground and background distances, any sign of human occupancy must fade out of view in the natural landscape character.

**Special Interest Area**

Brice Creek, a coastal stream in the "black water area" of the Croatan National Forest in North Carolina, is an excellent example of management for **preservation** scenic condition level in an area of special interest.

**Passive Relay Electronic Site**
This is an outstanding example of siting and camouflage painting of a huge rectangular structure. The paint colors and pattern mimic those of the natural landscape character. The location takes advantage of visual absorption capability and avoids any potential for skyline silhouetting of the structure. The passive relay is on Carson Pass Highway, a State scenic highway in California, passing through the Eldorado National Forest. This structure retains the natural character and condition of the landscape. It is not evident unless attention is directed to it. Even though this is a telephoto view, the scene meets **retention**.

**Electronic Site**
This series of four photographs, taken in the Coronado National Forest in Arizona, illustrates details of reducing visual impact of large structures through techniques of paint color and pattern. The slim-line tower design keeps it imperceptible at distance zones from far-middleground to background views. As is true for many structures that must be located on ridgetops and are subsequently silhouetted, the site does not achieve **retention** in the foreground, but, from distant-middleground and background, where it is primarily viewed, it remains virtually unnoticed.

**Boat-in Campground**
This boat-in campground in the Ottawa National Forest meets **retention**. The evaluation of the scenic condition level of this site is based solely on the path clearing and sign. There are no regulations governing the colors of boats or canoes. It is necessary that the sign be visible in foreground views, but at middleground and background distances the trailhead and sign fade out of view in the existing landscape character. Given the colors of the simple vertical lines of tree trunks, the sign color might have been selected to blend more with the backdrop, yet be clearly visible.

**Avalanche Control "Jet Roofs"**
Because of their function, "jet roofs" utilized for highway avalanche control must often be seen as silhouetted structures against the skyline. At Carson Pass in the Eldorado National Forest, they are viewed in middleground near the focal point of the scene. The "filtered screen" of structures repeats the line of the mountain ridgeline. From this distance, the "jet roofs" are on the low end of **retention**. Selection of colors from gray-tan to gray instead of the rust color may have reduced the contrast and raised the "jet roofs" to a solid **retention**.

## Retention

**Stream Improvement**

This log across a stream in the Green Mountain National Forest helps create improved conditions for watershed and fisheries. The log has been sensitively placed and appears to be natural. Although it may have caused a tiny waterfall to form, thus deviating from the natural landscape character, a fallen log in a forest stream is a common occurrence. This scene meets **retention**.

**Fish Structures**

The boulders placed in this stream in the Huron-Manistee National Forest are of such natural sizes and shapes that it is difficult to know for certain if they were placed there by humans. The boulders provide both cover and stream flow rate diversity for aquatic life while maintaining or enhancing the natural scenic beauty of the stream. The uneven distribution, uneven depths, and variable sizes of boulders create an outstanding example of **retention** with structural elements added to the landscape.

## Retention

**Fish Structures**

Placement of fish structures in the Huron-Manistee National Forest may achieve the objectives of fisheries management, but the structures barely meet a high scenic integrity level. If there were some larger boulders in this natural-appearing landscape character, their use as "anchors" for the "islands and peninsulas" of small rock piles would have improved the naturalness.

**Wildlife Pond**

This pond in the Mark Twain National Forest appears to be natural. Close inspection reveals its human-caused origins. The site has outstanding vegetative recovery. The duration of visual impact is expected to be a few months because of the abundance of water and fertile soil. Although this wildlife pond may not have been common to the natural-appearing landscape character, the subtle departure to meet other resource objectives is probably not evident, nor disagreeable, to most people.

## Retention

**Wildlife Pond**

A reclaimed clay pit in the Thunder Basin National Grassland near Upton, Wyoming, is now a bass fishery. The landform shaping and revegetation blend beautifully with the landscape. This pond in the Western plains may not repeat characteristic waterforms, but it probably enhances landscape attractiveness. Such departures from the natural landscape character would not normally be viewed as negative by the public. This wildlife pond meets **retention**.

**Range Management**

Grazing land in the Mark Twain National Forest is managed in a manner that is natural appearing. The patterns of grasses, wild flowers, shrubs, and trees make this scene difficult to distinguish from a natural landscape. It meets **retention**.

## Retention

**Fuelbreak/Timber Harvest**

This foreground view shows a forest fuelbreak in the Klamath National Forest. The vegetative recovery by grasses, combined with the presence of low stump heights and the absence of debris, makes it difficult to discern whether this is a human-altered roadside. Maintenance of individual trees, together with variations in lower-limb pruning, improves the natural appearance. The project achieves **retention**.

**Fuelbreak**

This fuelbreak in a forested site is located in the Wenatchee National Forest. It meets the low end of **retention**. It could have been raised to a solid **retention** if the stumps had been somewhat lower (flush-cut), better screened by grasses and groundcovers, or manually covered with duff and needles. The diversity of groundcover, most importantly the inclusion of leave-trees of varying sizes in the opening, improved the natural appearance of the project.

## Retention

**Timber Harvest**
This timber harvest, combining overstory removal/shelterwood/group selection, on a foreground ridge in the Klamath National Forest, was helicopter logged. The only possible evidence of any activity on this ridge—the uneven tree height on the middle section—would probably not be noticed by anyone but forest managers and woods-workers. The mixed species and patterns of this forest landscape do not draw attention to such subtle differences. It meets **retention**.

**Timber Management**
This roadside scene of a managed timber stand in the Chequamegon National Forest would be considered a natural landscape by most people driving along the highway. However, closer inspection reveals some remaining brush piles and piled cordwood further back in the newly opened stand. When the brush is removed or scattered, and the cordwood is hauled off, this site will meet the upper end of **retention**. This opening in an otherwise dense forest may vary from the natural-appearing landscape character, but it would likely be a positive change associated with a selected landscape character goal.

## Retention

**Reforestation**

This area in the Wayne-Hoosier National Forest has been planted with yellow poplars in the immediate foreground and with white pine behind. It has the appearance of an abandoned field that will one day be a forest again. The plantings are not evident in the scene. It barely meets **retention** and could be considered to fall between **retention** and **partial retention**. However, it is probably looked upon as a positive deviation from the natural-appearing landscape character.

**Cable Logging**

A view from U.S. Highway 219 of a uniform textured ridge of timber on the Monongahela National Forest reveals no tell-tale linear vertical pattern of the cable logging that has taken place. This is an excellent example of **retention**, because cable logging in a continuous, even-textured forest ordinarily makes it difficult to achieve **retention**.

## Retention

**Timber Management**

This roadside view into a timber stand in the White Mountain National Forest provides a natural-appearing scene to most people. Forest managers and woods-workers would be able to distinguish this as a managed forest with trees removed. The dense vegetation in the immediate foreground helps to screen off views into the forest that might reveal stumps. It easily meets **retention**.

**Timber Harvest**

A timber harvest, located in the middleground in the Sequoia National Forest, repeats some of the lighter patterns created by rock outcrops. Since this timber harvest lies on a ridge top and has excellently feathered edges, the open forest appears natural. It is an outstanding example of **retention**, because it borrows so heavily from form, line, color, and texture of the natural landscape character that it appears to be a natural occurrence.

## Retention

**Timber Harvest**

This timber harvest in the Lolo National Forest in Montana is evidenced only by a slight discoloration in some areas. Most people would interpret the timber harvest as an area of subtle soil color changes. As seen from above, the site benefits from considerable vegetative pattern and several natural, barren soil patterns on the left. The major concern of scenery and recreation managers was to meet **retention** from a trail below. **Retention** is met because the harvest is not evident from the trail.

**Seed Tree Cut**

This seed tree cut was carried out in the Mark Twain National Forest. There is subtle evidence of a reduction in tree crown density on the left near the ridgetop. The photograph was taken from off the roadway so that the reduction in tree crown density is distinguishable. In some sidelighting conditions, the break in the tree-canopy texture may be more pronounced. From this viewpoint, the cut meets the lower end of **retention**.

## Retention

**Road**

The North River Road in the Cherokee National Forest lies lightly on the land. Even when viewed as foreground, the natural-appearing edge effect, reduced cut and fill slopes, and fall colors tend to soften the visual impact of the road. Ordinarily, a long road tangent has a strong negative visual effect. This road blends with the landscape and meets **retention**.

**Trail**

This trail in the Huron-Manistee National Forest in Michigan lies lightly on the land and creates minimal visual impact. Although there is no functional reason to align the trail in a more curvilinear nature, to do so could further improve the scenic condition by making the trail invisible in middleground. The trail meets **retention**.

## Retention

**Trail**

This trail in the Klamath National Forest creates only enough contrast to be noticed. Beyond immediate foreground distances, it would not be evident in this natural landscape character. The rocky trail repeats the appearance of the naturally occurring rocky slope with its scattered groundcover of low shrubs. The sawn log, however, detracts from the natural appearance. The trail itself represents an excellent example of achieving **retention**.

## Retention

**Winter Sports Site**
These two early summer views of Mt. Bachelor Ski Area, located in the Deschutes National Forest in Oregon, exemplify excellent planning, design, and construction of a major ski facility in a landscape with good visual absorption capability. Summer offers the highest visual contrasts, yet the ski area easily meets **retention**. Above is a normal view from Century Drive, a National Forest Scenic Byway, and below left is a telephoto view from the same observer position. Numerous ski runs, chairlifts, maintenance roads, and a day lodge are visible from the highway, yet they remain virtually unnoticed unless pointed out. The computer graphic below, by revealing areas of low visual magnitude, enabled the planning team to decide where the new Pine Marten day lodge would be constructed. Existing ski area facilities are located in the red, orange, and yellow zones that indicate areas of highest visual magnitude.

## Retention

**Winter Sports Site**

With the Three Sisters Wilderness in the background, the Pine Marten Lodge and top terminal of a detachable-quad chairlift at Mt. Bachelor Ski Area are very evident when seen from ski runs above timberline. The ski facilities are located on a barren, rocky topographic bench at timberline. Because of careful landscape architectural design and material selection, the form, line, color, and texture of the lodge borrow from the natural landscape. The lodge and chairlift terminal are quite evident to skiers and are their expected image, yet the structures blend very well and remain virtually unnoticed when seen from Century Drive National Scenic Byway. (See photo on opposite page.) This is an excellent example of recreation structures in the landscape meeting **retention**.

**Underburn**

This immediate foreground view in the Croatan National Forest in North Carolina shows an area of longleaf pine trees that has been recently underburned. The area has revegetated sufficiently to meet **retention**. Before revegetation, it probably met **partial retention** for one growing season.

## Partial Retention

**Powerline**

It appears that an attempt was made to reduce contrasts of cross-arms for this powerline viewed as foreground in the White River National Forest. The contrast of poles with the lighter backdrop, however, causes the structure to be quite evident. The strong verticals of the conifers naturally dictated that horizontal forms should be minimized. This powerline barely achieves the **partial retention** scenic condition level from this distance, although it may achieve a higher level when viewed from middleground. Use of gray green poles in this particular section of powerline could have possibly moved this project to the high end of **partial retention** from foreground distances.

**Powerline**

Another section of this powerline achieves the high end of **partial retention** due to the dark-colored poles against a dark backdrop. If it would have been technically feasible to eliminate the short crossarms, the visual evidence of the powerline would have been further reduced. Flat, low reflectivity colors against dark forest vegetation greatly aid the achievement of **partial retention**.

## Partial Retention

**Created Openings**

The created openings in this middleground landscape are evident but do not visually dominate. They are in scale and shaped like natural openings. This scene meets **partial retention.**

**Microwave Repeater Station**

A microwave installation in the Sequoia National Forest is located on 9,900-foot Sherman Peak. Fortunately, the natural landscape character has a dominant pattern of rock and vegetation. The structures, located on the silhouetted ridgeline in a rocky component of the landscape, have colors that emulate those of the rock. All structures are in scale with those of the natural landscape and generally repeat the horizontality of the rockforms. The station is evident—not enough to be a focal point—and it meets **partial retention**. Use of some camouflaging techniques, such as those illustrated in the passive relay in the **retention** series, could have further blended the structures on the left. Use of a light gray-blue paint on the elevated dish may have been another desirable alternative.

## Partial Retention

### Overstory Removal

This overstory removal is located along a major highway in the Bitterroot National Forest in Montana. The road and landing at the back of the unit are not evident; however, the activity slash and debris is evident but not visually dominant. This harvest activity meets **partial retention.**

### Stream Improvement

A low log dam in the Green Mountain National Forest in Vermont was constructed to improve the stream for aquatic life and watershed purposes. At this distance it is quite visible. Once the decision is made to use log construction, there is little to borrow from the natural-appearing landscape character. The zig-zag form of the logs reduces the impact of a straight line, but in itself creates another unnatural form. The dam achieves a scenic condition level between low **partial retention** and high **modification**. It could have blended better if it were less symmetrical and if the logs had been overlapped rather than butted, thus more closely resembling natural windfall logs in a stream. If the dam had been built with rocks, the dam may have met **retention**.

## Partial Retention

**Stream Improvement**

Log-cover structures, located on the shore of the Paint River in the Ottawa National Forest, provide cover and flow diversity. They borrow from naturally occurring characteristics of down trees in the stream. Although this scene is natural appearing, the uniformity of the nearest structure on the right strongly hints of human intervention. The scene meets **partial retention**. Introducing greater variation in log size, leaving branches on the logs, and creating less uniformity in spacing of the downstream "stringers" might have led to the achievement of **retention**.

**Wildlife Habitat Improvement**

A wildlife brush-crushing project in the Klamath National Forest helped create the conversion to a more usable vegetation condition. There are indications of color contrasts in the slope and some rather sharp contrasts of color on the upper edges of the project at mid-slope. This project meets the lower end of **partial retention**. Reduction in the sharper contrasts on the upper edge of the treated area through feathering of brush might have raised its rating to a solid **partial retention**. Because of these sharp upper edges, the project draws attention to artificial, rather than natural, focal points.

## Partial Retention

**Fuelbreak and Road**

A fuelbreak was developed in the Los Padres National Forest. The fuelbreak borrowed from the tendency of the existing landscape character to be more barren on ridgetops having shallow soils. The islands and peninsulas of shrubs allowed to remain in the fuelbreak were key to the reduction of visual contrasts. The road lies lightly on the landscape and is only intermittently visible from this viewpoint. The scene is an outstanding example of **partial retention**, perhaps at the upper end. A bit more feathering of the near ridge could have further improved the quality of the scene.

**Fuelbreak and Road**

Another fuelbreak, also in the Los Padres National Forest, shows immediate foreground and middleground detail. Again, individual and groups of small trees and shrubs have been retained within the fuelbreak to create a more natural-appearing condition that detracts little or nothing from the effectiveness of the fuelbreak. From this viewpoint, the road is barely discernible in the middle of the photograph through the fuelbreak. The fuelbreak seems to "belong" and clearly meets **partial retention**.

## Partial Retention

**Created Opening**

A created opening viewed as middleground in the White Mountain National Forest creates shadow patterns on the far edge of the opening. That line of shadow, however, emulates the undulating ridgelines above. The lighter color of the regenerating timber attracts considerable attention, but has textural contrast. This project now achieves the lower end of **partial retention**. If there were an opportunity to soften the shadow pattern by selective thinning at the far edge, it is likely that the resulting feathering would have raised this to a solid **partial retention**.

**Created Openings and Structure**

Another example in the White Mountain National Forest also creates heavy shadow patterns on the far edge. Only the middle of the three vegetative alterations allows a view of the lighter color and smoother texture of the regeneration unit. The patterns formed by these created openings borrow from the upper ridge line and intermediate low ridge. The structure in back of the beach is aided by its linear form and park walls. The reflectivity of the roof creates a color and texture contrast. The scene barely meets **partial retention**. If the lower created openings were separated into two or three units to break up the linearity, and if the roof of the structure were darker, it would have better met **partial retention**.

## Partial Retention

**Timber Harvest**

This two-stage timber harvest in the Pisgah National Forest in North Carolina was carefully designed and implemented to borrow from all the elements found in the natural-appearing landscape. The irregular shape, heavily feathered edges, and carefully selected leave-trees of varying sizes create a natural appearance. Because the timber harvest is a noticeable human activity to forest visitors, it meets the definition of **partial retention**. However, in 1-to-2 growing seasons, the area will "green-up" and probably meet **retention**.

**Roadside Opening**

Situated in the Allegheny National Forest, a roadside opening, which probably provides some visual and spacial relief along a tunnel effect roadway, has been created. It has recovered with grasses and other low vegetation, but some lopped branches are indicative of a recent project. Possibly, the limbless tree trunk was retained to provide interest and character, but it stands out strongly from the multi-storied edge. This project barely meets **partial retention**.

## Partial Retention

**Created Opening**

These two views of the same scene in the Allegheny National Forest demonstrate the effect of seasons upon achievement of scenic condition levels. The primary scenic factor is the heavy shadow created by the rear edge of the created openings in both summer and winter. As might be expected, the problem is greater in the summer "leaf-on" period when there is less light filtering through the forest. The front edge of the created openings borrows line from the natural-appearing landscape character and blends beautifully in both seasons. The rear shadowed edge borrows from the ridgeline above, but creates a rather heavy contrast. The winter scene is a good example of **partial retention**, but the summer scene barely achieves it. The best means of reducing the contrast of these created openings may have been to thin and feather the rear edge. Incidentally, these scenes also provide a vivid comparison of the effect of seasonal variations on the vegetative screening on the structure in the middle foreground. What meets **retention** in summer would barely meet **modification** in winter.

## Partial Retention

**Shelterwood Timber Harvest**

This foreground view in the Sequoia National Forest resulted from a shelterwood cut. The only evidence of the activity are some stumps and the heavier tree density in the rear. The road near the back is barely distinguishable. Retaining several small fir trees amongst the large red-barked character trees undoubtedly improved the scenic attractiveness of the site. The sensitive cutting and cleanup of this project cause it to meet the high end of **partial retention**.

## Partial Retention

**Shelterwood Timber Harvest**

This middleground view of a project in the Klamath National Forest reveals an area harvested by the shelterwood method. It borrowed from the natural opening on the ridgetop. Its design might have borrowed from the natural light-green opening on the right, but it would have been difficult to emulate the greens of wetter sites. Slight evidence on the left and top of the shelterwood of a skid trail or some other linear disturbance is not sufficient to cause the activity to dominate the scene, but without the surrounding natural openings, it could have become dominant. It barely meets **partial retention**. More feathering of the edges on the two sides and retaining clumps of trees would have created an even higher level of scenic condition.

**Shelterwood Timber Harvest**

This shelterwood harvest in the Klamath National Forest was carried out by helicopter; thus, roads would not have a potential impact. There were few shapes and patterns from which to borrow in the natural landscape character. However, the excellent transition of the edges into the surrounding forest makes this a good example of **partial retention**.

## Partial Retention

**Timber Harvest**

This is another Sequoia National Forest foreground view where the timber harvest activity appears to have removed all of the larger trees. A linear pattern at mid-slope and at the bottom of the scene would seem to indicate the existence of roadways. Logging debris and fresh stump faces are fairly evident. This project falls into the lower end of **partial retention.** Cleanup of logging debris and a growing season to heal the groundcover could raise it to the upper end of **partial retention**.

**Partial Removal Timber Harvest**

In this foreground view in the Willamette National Forest, a partial removal cut was made to harvest timber. It is virtually impossible to distinguish a landscape alteration, except for some exposure of the ridgetop landform. This scene meets the high end of **partial retention**. Lighter cutting on the ridgetop could have raised the achieved scenic condition level to **retention**.

## Partial Retention

### Partial Removal Timber Harvest

This foreground view in the same forest illustrates a "clump and randomly spaced" timber removal project. The primary evidence of the activity is the high limbless condition of the larger trees. To most people, it would appear that this forest differs only slightly from the adjacent forest. Conversely, forest managers would immediately see the area as a heavy partial removal cut. Cleanup has been thorough, and the majority of the scene has a natural ground appearance of outstanding quality. Slight evidence of logging debris appears in the upper right. **Partial retention** has been solidly met.

### Underburn

The immediate foreground in this photograph, taken in the Deschutes National Forest, shows a forest area that was lightly underburned to improve its visibility and to reduce fuel loading. The color contrast created by the leaf and needle die-off clearly makes it evident that something has happened here. Given some time, the scorched leaves and needles will fall off and significantly reduce color contrasts. At the time of the photograph, the low end of **partial retention** was met.

## Partial Retention

**Road**

This is a middleground view of a road in the Fremont National Forest. The road, rather than the fire scar, is being evaluated in this scene, although both appear to barely meet **partial retention**. The road may have been a solid **partial retention** prior to the fire, which removed some of the vegetative screening. The soil color contrast of the road is a key factor in increasing its visibility. It also appears evident that the lower part of the hill has either burned or has been vegetatively altered in the past, as it lacks the characteristics of the natural cover.

**Road**

This foreground/middleground summer scene in the Allegheny National Forest is bisected by a road. Summer is probably a more critical season than winter for color and texture contrasts. The slight notch in the treeline silhouetted against the sky, together with the shadow pattern in the right one-third of the scene, creates the only visual evidence of the road. Therefore, it meets **partial retention**.

## Partial Retention

**Road**

This foreground/middleground scene in the Crooked River Valley of the Ochoco National Forest is traversed by a highway. The alignment of the highway and the relationship of its structure to the clearing width mimic the river and its adjacent meadows. The color contrast of the highway is moderate. The highway is evident, but does not form a focal point in this powerful landscape, which has its own strong focal points of the river amidst the meadows, the distinctive silhouetted rockforms on the left, and the convergence of lines in front of the more distant mountain ridge. The dark soil colors in the cut banks on the left greatly enhance the scene. This is an outstanding example of **partial retention**.

**Trail and Road**

A trail is shown crossing a slope in this national forest in Montana. The trail has little opportunity to borrow from the natural landscape character from this vantage point, but it undulates similarly to the ridgetops, and its dominance is broken up by its intermittent visibility. The road at the bottom of the hill is also intermittently visible. Once again, a powerful landscape draws focus to other points, such as the knob-ridge in the center right, the distant mountain ranges, and the distinctive spire-like trees on the open ridge. The trail and road meet **partial retention**..

## Partial Retention

**Trail**

A middleground view in the Russian Wilderness of the Klamath National Forest reveals a section of the Pacific Crest Trail on the upper slopes of steep mountains. The trail crosses through drifts of conifers, rocky areas, and brushfields. The greatest visual problems are the soil color contrasts that create an unnatural line in the evenly textured, dark-green brushfields. On the right half of the photograph, the trail is undetectable except for two or three short segments. Where it passes through the rocky areas on the left, it is barely distinguishable. The trail forms a linear pattern that is too smooth to borrow from any part of the natural landscape character other than possibly the background mountain silhouette. Achieving **retention** would have required a longer trail that switched back up the rocky areas, entered conifer stands, then followed more of the rocky areas. The only other way to reduce contrasts in the brushfields would have been to clear brush in patterns, borrowing from the shapes and textures of the rocky areas. This is **not** permissible in wilderness. The trail meets **partial retention** from this viewpoint.

**Trail Bridge**

A trail bridge connects two promontories on a lake in the White Mountain National Forest. The powerful landscape draws some attention away from the light bridge structure. The structure carries out the horizontal line of the two peninsulas jutting into the lake. It is evident, but does not detract from the scene. It meets **partial retention**.

## Partial Retention

### Structure

In this scene at Coghill Lake in the Chugach National Forest, a trailhead structure stands out in the immediate foreground. This "stairs trailhead," common in Alaska but not elsewhere in the Forest Service, gives access to people from the shore up a steep, rocky bank. The major visual contrasts are the vertical lines and uniformity of the steps. Time might possibly reduce the color contrast as the wood turns gray. At this distance, the trailhead structure meets **partial retention**. From middleground distances, it is likely to be undetectable and would meet **retention**.

### Structure

Another immediate foreground view of a scene in Alaska's Prince William Sound reveals a cabin located just onshore. The shape of the A-frame cabin reflects the shape of the conifers, and its dark color borrows from the shadows. Only the yellow sign and the people in brightly colored clothing draw attention to the site. The cabin structure meets **partial retention**. It might have been simpler to tuck the cabin behind the trees, consequently raising the structure from **partial retention** to **retention**.

## Partial Retention

**Winter Sports Site**

This middleground view in the Eldorado National Forest reveals a major ski area development. The cabin at the right meadow-treeline edge is on private land, while the ski area lies beyond on the right of the mountain backdrop. The primary evidence of the development from this view is the vegetative clearing for the chairlift in mid-photo and a ski run down the forested slope on the right. The ski run design borrows from natural openings in the existing landscape character. The line created by chairlift clearing was too narrow to emulate the existing landscape character. This is an example of **partial retention**. Additional clearing of trees to create a more natural opening for the chairlift could have further improved the scenic condition of the landscape, but could have created unfavorable conditions, such as excessive winds, for people riding the lift.

**Winter Sports Site**

This is the same ski area viewed with a telephoto lens in the summer a few years later. The resort configuration ties in with the tree patterns, but the roofs create less than desirable reflectivity. The new runs and slope stabilization material colors do not completely blend into the natural landscape character. The reflections off the chairlift are distracting. Yet without a telephoto, the site continues to meet **partial retention**—although at the lower end. Reduction in reflectivity of the structures and feathering the sharp even edge of the new ski run (as seen mid-photo) would help greatly.

## Partial Retention

**Ski Area Structure**

This is an immediate foreground view of a ski patrol hut in the Eldorado National Forest. The hut was built of on-site stone, tied into a natural light to dark gray volcanic rock formation at the crest of the mountain. It successfully borrowed color, texture, and scale from the existing landscape character. The form suffers more than necessary from the human tendency to build with cubes and rectangles. The hut meets **partial retention** despite the small but sharp contrast of the light-gray square corner on the left backed by the dark rock backdrop. A more natural shaping on the left side and a more uneven roof line on top, together with the use of some dark rock in that corner of the structure, might have helped blend it into this unique site. Furthermore, it may have been possible to develop a more natural window shape that did not exhibit the use of traditional window hardware. This hut might have been an excellent example of **retention** if a bit more creativity had been applied in its design and construction.

**Electronics Site**

An electronics installation in the Los Padres National Forest is silhouetted against the sky. It is clearly dominant and forms a focal point in foreground views. These structures are of an appropriate scale to repeat the sizes of rock outcrops and are painted in flat tones common to this existing landscape character. Vegetative screening of the lower structures would have been desirable. The scene meets **modification**.

**Gas Exploration**

An immediate foreground scene in the Monongahela National Forest illustrates the results of gas exploration. The linear scar has been reshaped and seeded. Some rocks protrude to break up the contrast. Neither vegetative debris cleanup nor scattering is sufficient to move this foreground view beyond the **modification** scenic condition level.

**Microwave Installation**
A middleground view in the Great Plains of the Nebraska National Grassland shows the difficulty of blending structures into a natural-appearing landscape character that lacks diversity. The steel lattice tower helps reduce visibility, but necessary bulky hardware on the tower top creates a definite focal point. Even the use of light gray-blue, flat paint may not be adequate to reduce the contrasts. The focalization on this tower is greatly increased due to its placement on the lonely knob of wooded landscape in a sea of flat land. The installation meets **modification**.

**Stream Improvement**
This pleasant setting—an immediate foreground view of a stream improvement structure—is located in the Monongahela National Forest. The evenness and uninterrupted exposure of the log dam is enough to lower this scene barely into the upper end of **modification**. Several large borders in front to break up the exposure of the waterfall over the log would have raised the scene to **partial retention**. Additional use of rocks might have moved it up to **retention**.

**Fuelbreak and Road**

This ridgetop fuelbreak in the Los Padres National Forest borrows forms that resemble natural patterns in this chaparral landscape. Only the sharp edges of grass and brush bring an unnatural element to this scene. The road in the middleground at the right is also dominant, primarily because of the horizontal line it introduces. Both the fuelbreak and road meet **modification**.

**Created Opening**

Continuous forest texture, seen in this middleground view in the Pisgah National Forest, makes it difficult to introduce any clearings that do not attract attention. The shape of the opening follows a slight side ridge and borrows diagonal lines from that form. The freshness of the broadcast burn and lack of any regrowth creates high contrast in color and texture. The shadow line stands out on the far edges. The road through the center of the clearing is evident but not a focal point. This project meets the low end of **modification** at the time of this photograph. It would be expected to move up to the high end of **modification** by the end of one growing season. Feathering of the sharp edges could have further reduced their visual contrasts.

## Modification

**Final Harvest**

A foreground view in the Allegheny National Forest reveals a timber harvest area following the last stage of tree removal. Edges are strong in contrast, but logging debris, although visible, is not dominant in this scene. This scene meets the low end of **modification**. Reduction in edge contrast is necessary to bring this landscape up to the middle or high end of **modification**.

**Created Opening**

This foreground view of another created opening in the Pisgah National Forest demonstrates high degrees of varying contrasts between the near and far edges of the opening. The near edge blends exceedingly well and appears to be feathered. Typically, the far edges are more critical because of their sharp edges, color and texture contrasts, and prominent shadows. This forest opening repeats the line of the ridge upon which it lies, but is so close that it introduces a heavy linear component. The opening forms a focal point that dominates the scene. It meets **modification**.

## Modification

**Roadside Timber Harvest**

This immediate foreground view in the Allegheny National Forest in Pennsylvania illustrates an opening created by a timber harvest at the roadside. The maintenance of a screen of young trees helps to mute the contrasts. No sharp edges are visible, except for the logging residue at the extreme left. From this viewpoint, the project meets the upper end of **modification**.

**Created Openings and Shelterwood Harvests**

This scene in the Northern Region illustrates the effects of several timber harvest openings. The shapes of the openings resemble natural forms in this existing landscape character. One exception is the lowest opening at the middle right, which has far too straight an upper edge. The patterns of the openings relate well to each other, yet they dominate the landscape. With the one exception stated, this is an excellent example of **modification** for multiple timber harvests.

## Modification

**Created Openings**

This middleground view in the Jefferson National Forest in Virginia illustrates the effects of well-designed and skillfully implemented created openings in an extremely sensitive scenic area. The shapes of these openings borrow from the natural ridgelines. Feathering the far edges could have reduced the linear effect of the shadows. This is an excellent example of the high end of **modification**.

**Green-Tree Retention**

A middleground view in the Mt. Hood National Forest includes this "green-tree retention" timber harvest on the left side of the photograph. The landscape character has some subtle vegetative patterns, including the natural opening on the right. The shape of the introduced opening borrows somewhat from those patterns. The size and color contrast are strong enough to cause the opening to be dominant, drawing attention. This scene meets the high end of **modification**. If a few more full-crowned trees had remained in the harvest area, it would have met **partial retention**.

## Modification

**Created Opening**

This detailed immediate foreground view in the Willamette National Forest exposes a recently broadcast burned regeneration harvest unit. Color contrasts of the burn are strong. The opening meets foreground **modification**. Upon greening-up of the burn, it may stand out even more until the regeneration reaches a sufficient height for effective screening.

**Seed Tree Cut**

This Klamath National Forest scene provides a detailed foreground look into a seed tree timber harvest unit. Soil color contrast is high on this recently logged site. Saving seed trees and scattered young trees in the opening helps greatly to soften the visual impact. Logging residue is subordinate to the remainder of the activity, as specified for foreground **modification**.

## Modification

**Small Created Opening**

A small created opening is located mid-slope on a small ridge in the Fremont National Forest. This foreground view indicates that the logging residue is subordinate to the remainder of the activity as it should be. The soil color contrast is quite high at completion of logging. This created opening meets **modification**.

**Created Opening**

This created opening, seen in the foreground near the skyline in the Fremont National Forest, shows some soil color contrast. It is located at a point that creates focal attention near a small rounded ridgetop. The road on the upper side of the created opening and the logging residue are subordinate to the remainder of the activity. Cable-line scars remain but are not dominant. Islands of small trees are retained in the opening between cable-line corridors. It meets **modification**.

## Modification

**Timber Thinning**

In the Malheur National Forest, a thinning project in the foreground has altered the landscape. Logging residue is heavy and the reflectivity of the slash remains dominant. Once the slash is removed, the project should easily meet **modification**. Retaining a few untreated islands of various sized tree clumps may have allowed it to move up into **partial retention**, following cleanup activities.

**Created Openings**

A mountainside in the Gifford Pinchot National Forest was altered by a series of created openings after insect infestation. This is a difficult landscape; it is steep and has an even texture of tall conifers. The picturesque ranch competes for attention. There are a few natural rock outcrops at the top right that have color and texture characteristics similar to the exposed soils in the created openings. The created openings borrowed from the natural openings, but perhaps the larger one is out of scale. The harvest included some helicopter logging, which reduced the impact of linear road clearings in this sensitive landscape. This is an example of **modification**.

## Modification

**Created Opening**

In the Malheur National Forest, a middleground created opening emulates natural patterns of the natural landscape character behind it. Its linear form resembles that of the partial opening at the upper right but its apparent size is dominant. Soil color differs little from exposed grasslands in the scene. It easily achieves **modification**. It could have easily met **partial retention** if a few islands and peninsulas of trees had been left in the created opening to resemble the middleground patterns.

**Created Opening**

In Alaska, a middleground created opening is partially screened by foreground vegetation along the shoreline. Its shape and color are similar to the natural opening on the mountaintop to the left. The shadow pattern on the far side of the created opening produces considerable contrast with the lighter green interior, but that linear pattern undulates with the natural ridgelines. The opening meets the upper end of **modification**.

## Modification

**Created Opening**

Another created opening in Alaska is shaped to a form that could be taken as "natural" in this landscape. Its degree of contrast forms a focal point, but borrows somewhat from the smaller natural openings above. The edge treatment is very well handled and is aided by the presence of dark vegetation intrusions. This is a good example of **modification**.

**Created Opening**

A created opening in Alaska generally demonstrates an appropriate scale and mimics the shape of the landform upon which it sits. The site has revegetated sufficiently to reduce color contrasts to a minimum, although texture contrast remains. The far edge shadow pattern creates the most dominant contrast but fades out on the right, where a shelterwood harvest has occurred. This project now meets the upper end of **modification**.

## Modification

**Road**

The Moffet Road in the Roosevelt National Forest gracefully winds up the valley. Its alignment borrows from the landforms. Its color contrast creates its dominance. Soil color contrasts at this season are minimal. The cutbank at the upper curve blends exceedingly well, as do the cut and fill slopes on the mountainside above. The strong patterns of the natural landscape character do much to help reduce the dominance of the road. The valley highway is an excellent example of **modification**. The railroad grade across the right middleground slope is at the upper end of **partial retention**.

**Road**

A scenic road in the Pisgah National Forest traverses a landform having smoothly textured vegetative cover. The light color of the roadway sharply contrasts with the existing landscape character. Shadow patterns of cut slopes create additional attention to the road, yet the scale of the road is such that it meets **modification**. A darkened road surface might move this roadway up to the low end of **partial retention**.

## Modification

**Road**

A road passing through the Coronado National Forest follows rather than fights the contours of the landform. The light color of the road surface sharply conflicts with the grassland cover. Soil color contrast is moderately low. From this viewpoint, the road meets **modification**. A darker colored road surface might have allowed this scene to reach the low end of **partial retention**.

**Roads and Recreation Development**

This foreground view looks down on a recreation site in the Coronado National Forest. The typical desert vegetation is not sufficient to screen the roads, trails, and structures. The light colors of the loop road and trails are dominant. The color of the structure is not of high contrast, but it could have blended in quite well through a better color choice. From this viewpoint, the entire development meets **modification**.

## Modification

**Road**

Moffet Road at Devil Slide in Colorado cuts across a scenically sensitive landform that has only limited, low vegetation. The straight line of the road borrows little from the natural landscape character. Fortunately, soil color contrast is low; otherwise, the cuts, fills, and slides caused by the road would be overwhelming. The road meets **modification**. With higher soil color contrasts, the scene would probably drop to **unacceptable alteration** scenic condition level.

**Trail**

This trail in the Pisgah National Forest traverses an evenly textured landform. The surface color of the trail creates an extreme contrast with surrounding vegetation. It meets **modification**. A darker trail surface could possibly move this up to the high end of **partial retention**.

## Modification

**Winter Sports Site**
Located in the lightly patterned portion of the natural landscape character, Beaver Creek Ski Area in Colorado is situated on the forested slopes above the valley floor. The barren ridge, on the left and upper right, offers only minimal opportunity to design clearings for chairlifts and ski runs that borrow from nature. The linear needs of ski facilities make it difficult to blend them into this natural landscape character. As the area revegetates, color contrasts of new construction activities will gradually decline but they will remain dominant. The ski area meets **modification**. Only massive feathering of vegetative clearings could raise this scene to **partial retention**.

**Winter Sports Site**
At the same ski area, winter heightens the color contrast between the snow and the dark conifers, reinforcing the conclusion that only massive feathering of the forested areas adjacent to chairlifts and ski runs could effectively improve the scenic condition. In winter, the ski hill development barely achieves **modification**.

## Modification

**Winter Sports Site**

A summer view of Copper Mountain Ski Area reveals similar problems, although variation in run widths has been helpful in reducing their dominance. Joining the runs to the natural mountain ridgetop openings may be another effective mitigation measure. There is an indication that shapes from natural landscape patterns were borrowed to use in the design of this ski area. The project is an excellent example of **modification**.

**Lodge Entry**

The entry to Keystone Lodge in Colorado illustrates how a structure can be designed to borrow form from the existing natural landscape character. The roof projecting above the tree-tops repeats the form of the mountain peak behind it. Unfortunately, the color selected for the roof contrasts with the yellow aspens in this autumn scene. The entry probably would have barely met **partial retention** when the aspen backdrop was light green. With proper paint color selection, this landscape scene could easily be rehabilitated to move it from **modification** to **partial retention**.

## Marginally Acceptable

### Powerline

This coastline of the Tongass National Forest in Alaska is paralleled by a major electric transmission line. The clearing width appears to be excessive. Although the clearing repeats the distinctive shoreline, it remains dominant in this natural landscape character of timbered slopes. The high contrast of the towers further emphasizes the clearing. It is rated **marginally acceptable**. In this situation, it may have been possible to minimize clearing limits and paint the towers a drab olive-green to bring the landscape up to **modification**.

### Electronic Site

This antenna on Mt. Pisgah in North Carolina is of such scale and color contrast that it forms an obvious focal point that is extremely evident at foreground and middleground distances. Federal Aviation Administration safety regulations provide no options to reduce color contrasts of such tall structures. When viewed as background, the colors become slightly muted and the scale of the antenna is not overwhelming in comparison to surrounding landforms and forest patterns. Although this tower is accepted as a necessary communications facility within this area, it barely achieves the **marginally acceptable** alteration scenic condition level. A less visually impacting structure may have been possible through the use of a slim-line central tower pole and multiple tension cable design or a shorter tower that did not require the alternating red-and-white paint pattern.

**JA-0511**

PBWTAR_1095

## Marginally Acceptable

**Mining Operation**

This foreground view of a mining operation in North Carolina represents a very high degree of visual impact caused by color and texture contrasts. It would be visible as a strong focal point from background as well. This is not so much a matter of scale or form as it is contrast. This landscape scene is **marginally acceptable**.

**Dam**

The Kinzua Dam in the Allegheny National Forest, viewed as middleground, forms a very definite dominance over the natural-appearing landscape character. It would be expected to do so in background as well. Although there are linear patterns on the far ridge and along the river, the sharp color contrast and straight edges of the dam stand out strongly. The linear pattern of the dam does not align with natural linear patterns, but forms a new diagonal line. From this viewpoint, the dam is rated **marginally acceptable**. Staining the structure a mottled, flat olive-drab color would greatly reduce its dominance.

## Marginally Acceptable

**Created Openings**

This scene in the Northern Region frames a view of created openings behind an island. The visual impact is heightened by the photo composition. The size of the multi-staged created openings would be dominant in the background. This scene is **marginally acceptable**. The road and rectangular created opening on the shoreline to the left is **unacceptable** because it borrows nothing from the existing landscape character.

**Created Openings**

A series of created openings in the Klamath National Forest is viewed in middleground. The upper opening takes on a form that seems to borrow from the existing landscape character but contains unnatural horizontal patterns. Scale and color of the openings cause them strongly dominate the scene. They would continue to do so from background distances. Because of the scattered trees and clumps of trees left in the openings, the openings rate at the high end of **marginally acceptable**. The arrow-shaped created opening, fined further by outlining road scars, does not borrow from the natural landscape character and is **unacceptable**.

## Marginally Acceptable

**Regeneration Harvests**

These created openings and shelterwood harvests, in the middleground in this Northern Region scene, borrow only slightly from the natural landscape character. The scale of the harvests and their proximity to one another create a major dominance. They are barely **marginally acceptable**.

**Created Openings**

This series of three created openings in the Klamath National Forest is located high on a mountain ridge viewed as middleground. The shapes of these created openings borrow somewhat from the natural landscape character; however, their linear arrangement on the mountainside, combined with the linear road pattern on the right, creates an unnatural appearance. They are **marginally acceptable**.

## Marginally Acceptable

**Created Openings**

The size and shape of these created openings in the Northern Region clearly dominate the scene. Although the shapes of the created openings are not rectangular, their long straight edges and narrow strips of leave-trees make them stand out as dominant features from background distances. These created openings are rated at the lower end of **marginally acceptable**.

**Created Openings**

A series of created openings in the Klamath National Forest borrow somewhat from the natural landscape character, but their similarity in size and shape causes them to dominate the natural landscape character. They would be dominant in background views as well. This set of created openings is at the upper end of **marginally acceptable**.

## Marginally Acceptable

**Created Opening**
Although viewed in a foreground situation, this large created opening, located in the Eastern Region in an evenly textured landscape, causes it to be rated **marginally acceptable**. Saving the lone twin birch did not adequately improve the scenic condition above that level. Evidently there was an opportunity to save many more birch trees and to feature their positive scenic effects.

**Created Opening**
A created opening on South Mitkof Island in Alaska's Tongass National Forest has borrowed heavily from existing landform shapes, yet the extent of this alteration places it in the upper end of **marginally acceptable**. Color and texture contrasts would be dominant even at background distances.

## Marginally Acceptable

**Created Openings and Roads**

These large created openings in the Tongass National Forest attempt to borrow from the natural landscape character. However, the uniformity of the cover on the upper slope creates strong contrasts. The created openings and roads will continue to dominate in background distances because of these contrasts. It is at the low end of **marginally acceptable**.

**Winter Sport Site**

Copper Mountain Ski Area, when viewed from this foreground view, creates strongly dominating alterations to this landscape. The sharply defined edges and the uniform widths of some of the ski runs reinforce this dominance. Only a massive edge-feathering project could move this up from **marginally acceptable** to **modification**. The ski runs at the far left and right meet **partial retention** in this scene.

# BIOLOGICAL ASSESSMENT

## FOR ONGOING PROJECT ACTIVITIES WITH DETERMINATIONS OF NO EFFECT OR MAY AFFECT, NOT LIKELY TO ADVERSELY AFFECT

## FOR THE NORTHERN LONG-EARED BAT

## ON THE

## GREEN MOUNTAIN NATIONAL FOREST AND WHITE MOUNTAIN NATIONAL FOREST

**Prepared by:**

**JOHN SEASE**
Wildlife Biologist
USDA Forest Service
Green Mountain National Forest
Manchester Ranger District
2538 Depot Street
Manchester Center, VT 05255

**LEIGHLAN PROUT**
Wildlife Program Leader
USDA Forest Service
White Mountain National Forest Service
71 White Mountain Drive
Campton, NH 03223

**Date:** March 2, 2015

| | | | | | |
|---|---|---|---|---|---|
| W116A | ME | Miles Brook wood addition | ~700 trees along 2.5 miles | Aug-Nov 2015 | Project occurs after Aug. 1 |
| W71P | NH | Basin stewardship wood addition | 12 trees | June-Oct. 2015-2017 | |
| W72S | NH | Meserve Brook wood addition | 22 trees | June-Sept. 2015-2017 | |

Conservation measures

The GMNF Land and Resource Management Plan (Forest Plan) includes the following pertinent standards and guidelines:

Soil, Water, and Riparian Area Protection and Restoration

*S-2 -- A protective strip of predominantly undisturbed soil (having plant and/or organic matter cover) shall separate soil-disturbing activities from all water sources (streams, lakes, ponds, wetlands, and vernal or seasonal pools).*

*G-1 -- To maintain bank stability and provide for long-term recruitment of large woody debris (LWD) to streams and ponds, tree cutting and/or harvesting should not occur within 25 feet of a perennial stream or high water mark of a pond. Maintain a minimum basal area of 50 square feet per acre including the retention of large diameter trees within 25 feet of the bank of intermittent streams. Exceptions to these guidelines include: tree removal for public safety; prescriptions to benefit hydrological and/or ecological function of associated stream, pond, or riparian area; and tree removal needed to construct and maintain existing roads, bridges, and other infrastructure. Trees cut or moved in this zone should be used to benefit riparian and aquatic habitat.*

*G-9 -- In the 25 to 50 foot distance zones of all streams, consider leaving large diameter trees (12 inches or greater), especially conifers to enhance achievement of riparian vegetation composition goals.*

*G-10 -- Within 100 feet of wetlands and seasonal pools, activities should be limited to those that protect, manage, and improve the condition of these resources. Acceptable activities should be approved on a case-by-case basis.*

*G-13 An average canopy closure of at least 70 percent should be maintained over a stream's length to ensure that stream temperatures are appropriate for native fish species. Permanent upland openings may be maintained and established to the water's edge in accordance with FSM 2526.03.2 and .5. Trees cut or moved in this zone should be used to benefit riparian and aquatic habitats when possible.*

*The WMNF Forest Plan (pp. 2-24 to 2-25) includes the following pertinent guidelines:*

Riparian and Aquatic Habitats

*G-1 -- Tree cutting and harvest should not occur within 25 feet of the bank of mapped perennial streams, the high water mark of a pond, or a identified natural vernal pool, unless prescribed to benefit hydrological or ecological function of the associated stream, pond, or riparian area. Exceptions to this include tree removals needed to clear a designated stream crossing, maintaining an existing road or previously cleared skid road that cannot be relocated, or protecting human safety or infrastructure. Trees (greater than 4 inch DBH) cut or moved in this zone should be placed in a fashion that benefits riparian functions or aquatic habitats when possible.*

*G-2 -- Uneven-aged silvicultural practices should be used within the Riparian Management Zone (RMZ) along all perennial streams, lakes, ponds, and vernal pools. Cuts should be should be designed to maintain a relatively continuous forest canopy for the protection and maintenance of water quality, dead wood recruitment, hydrologic function, wildlife habitat, and scenic values. Regeneration group cuts should be limited to less than one acre in size. Exceptions may apply in areas deemed important for maintaining beaver colonies. In the absence of on-the-ground riparian mapping, width of RMZs should be defined as in Table 2-01.*

*Table 2-01 Width of RMZ for Specific Aquatic Features*

| *Aquatic Feature* | *Width of RMZ* (feet)* |
|---|---|
| *1st and 2nd order streams* | *75′* |
| *3rd order streams* | *275′* |
| *4th and larger order streams* | *575′* |
| *Lakes, ponds, and vernal pools* | *75′* |

**These widths may vary on the ground and may be modified at the project level if a hydrologist or biologist maps the actual riparian zone.*

Rationale for Determination
Conservation measures assure that most riparian areas do not have much tree cutting so outside of these projects, habitat is mature and provides abundant suitable roosting habitat. Some implementation could occur during the summer maternity season, but all of these projects are extremely small in scope compared to the overall availability of potential roost trees in riparian habitats and adjacent stands. Trees being cut are visually examined for defect prior to cutting, since the most sound trees will last the longest once felled. The likelihood of a NLEB occurring in a tree being cut in one of these projects is considered discountable.

**10. Parking Lot Construction**
Three projects involve removal of trees to create a more open area. This is similar to the Campsite Construction or Reconstruction activity, just at a slightly larger scale.

| Project # | State | Project | Extent of Activity | Season of Implementation | Comments |
|---|---|---|---|---|---|
| W18A | NH | Glen Ellis parking lot relocation | 500 trees | Aug-Nov 2015-2017 | Same size parking lot being moved adjacent to current location. Trees cut after Aug. 1 |
| W98P | NH | The Eddy parking area reconstruction (includes replacement of 5 culverts) | 15 trees | Summer/Fall 2015 | |
| W65S | NH | Champney Trailhead parking lot relocation | 2 acres | Spring/Fall 2016-2017 | |

Conservation measures
Trees for the Glen Ellis parking lot will be cut after August 1, which will avoid any impacts to pregnant or non-volant young.

White Mountain National Forest

United States Department of Agriculture

Forest Service

# Albany South Integrated Resource Project

## Oxford County, Maine

# Final Environmental Assessment

## Prepared by the Androscoggin Ranger District

## December 2017

For Information Contact:
Jennifer Barnhart, District Ranger
Androscoggin Ranger District
300 Glen Road
Gorham, NH 03581
Email: jenniferjbarnhart@fs.fed.us
Phone: 603-466-2713 ext 1210
Fax: 603-466-2856

http://www.fs.usda.gov/projects/whitemountain/landmanagement/projects

Vicinity Map
Proposed Albany South Project
White Mountain National Forest
Androscoggin Ranger District
Lovell, Stoneham, Albany and Mason Townships
Oxford County, Maine
ME
NH
White Mountain National Forest
Bethel
Mason Township
Albany Township
Stoneham
New Hampshire
Maine
Lovell
Stow
Kezar Lake
2
5
35
113
LEGEND
State Road
Local Road
State Line
Town Line
Brook or River
Lake or Pond
White Mountain N.F.
Project Area
N
Miles
0
2
4

Figure 1. Albany South Integrated Resource Project vicinity map

# Chapter 2. Proposed Action and Alternatives

## Introduction

This section describes the alternatives considered for the Albany South Integrated Resource Project. It includes alternatives studied in detail and those alternatives considered but not studied in detail.

The Modified Proposed Action (Alternative 2) was developed to meet the purpose and need for action in the Albany South project area as described in Chapter 1. Alternatives 3, 4, and 5 were developed to address the issues identified by the public by eliminating action in the 2005 Forest Plan inventoried roadless area (Alternative 3), and by varying the use of log trucks on the Hut Road (alternatives 4 and 5). In addition to these action alternatives, a No Action Alternative is included in this analysis to provide a baseline from which to compare the environmental effects of the action alternatives (2, 3, 4, 5, and 6).

Alternative 6 was developed and analyzed in detail to address concerns raised during the comment period on the draft EA. Members of the public expressed concerns regarding possible negative impacts of new road construction on National Forest System lands. They stated that logging road construction causes significant ecological harm and asks us to analyze an action alternative in detail that does not construct any new roads (temporary or system). They also stated that without exception, road construction and reconstruction are activities that cause damage to some important natural resources in the forest. New road construction is particularly detrimental to aquatic and wildlife resources.

Alternative 6 eliminates all new road construction. No temporary roads would be constructed. The level of timber harvest would be slightly reduced from similar alternatives.

Another important change from the draft EA to the final EA that the Forest Service decided to undertake is the decommissioning of the full length of FR 3347, and that no further construction or reconstruction would occur on FR 3347. This applies to all alternatives and adds 0.4 miles to the decommissioned totals; this will be reflected in the appropriate tables.

Other changes made to this final EA, from the draft EA, include some minor clarification to the purpose and need to better express our concern for resources and associated activities such as watershed restoration, correction to a number of spelling and grammatical errors, and some added language for clarification purposes when necessary.

# Alternatives Studied in Detail

## Proposed Activities

This section describes what each activity would entail. The proposed extent (miles, acres, number) and locations for each alternative are listed later in this chapter under each alternative heading.

Appendices A, B, C, D, and E provide additional information for the action alternatives:

- Appendix A: Alternative Maps – these maps display the locations of all proposed activities by alternative.
- Appendix B: Project Design Features – these are actions on the ground that will reduce or eliminate potential negative effects resulting from the proposed activities. For example, if timber harvest is implemented, project design features would include stream buffers and other design features known to reduce or eliminate effects to water quality. Project design features are assigned where they would be effective on the ground; they are site-specific. Design features are based on Forest Plan standards and guidelines, Maine best management practices, relevant science, and professional expertise gained from monitoring the effects of past actions. Conclusions regarding the duration and intensity of environmental consequences described in Chapter 3 take into account the implementation of project design features. Also note that some design features have been added and/or modified based on changes from the draft EA to the final EA.
- Appendix C: Unit Details and Treatment Objectives – this is a list of the individual units as proposed by alternative for timber harvest with acres, forest type, treatment objective, harvest method, and season of operation.
- Appendix D: Roads and Transportation System Details – this is a list of road work and transportation system adjustments as proposed by alternative.
- Appendix E: Changes From the Scoped Action – this is a description of the more substantive changes made to the proposed action since the public scoping period in July and August 2012.

### *Timber Harvest*

The terms “timber harvest,” “harvest method,” and “silvicultural prescription” are used interchangeably in this analysis as descriptions of the kind of timber harvest to be conducted in each proposed unit. These include clearcuts, patch cuts, seed tree cuts, shelterwood seed cuts, group selection, single-tree selection, improvement cuts, and release treatments as described in Chapter 1 (Purpose and Need for Action) and in Chapter 3 (Vegetation). These silvicultural prescriptions would be used to meet the project’s wildlife habitat and forest management objectives. Prescriptions vary widely in the number, size, species, and pattern of trees removed.

Timber harvest generally requires a combination of mechanical harvesting (using feller bunchers, harvesters, forwarders) and conventional logging systems (using chainsaws and cable skidders) to cut trees and move them to the landing. Tree tops and limbs would remain on site. Existing landings and skid trails would be used where possible, reconstructed to minimum standards (vegetation and stumps removed and surface graded) necessary for equipment use. New landings would be up to one-half acre in size and may include up to 500 feet of temporary road access. New landings and skid trails would be located prior to operations in order to limit the area affected by harvest operations. They would be built for the site-specific forest and ground conditions. Locations, construction, reconstruction, and decommissioning would adhere to Forest Plan standards and guidelines and best management practices developed to protect resources as prescribed in the project design features (Appendix B). The logs would be hauled to the mill using either tractor trailer or triaxle log trucks.

### Release Treatments

Release treatments would remove non-commercial vegetation and species that may interfere with the establishment of desirable tree species such as white pine, hemlock, aspen, red oak, and other softwood and northern hardwood species. A portion of the dense mid-story (mostly beech and red maple saplings) would be removed from harvested areas to provide “free to grow” conditions for regeneration-age and young oak, sugar maple, white pine and softwoods. These treatments would occur from May to November in harvest units after the commercial harvesting operations have been completed. One or more release treatments per stand may be needed to achieve desired conditions. Release treatments would be conducted by crews using brush saws and chainsaws. The removed trees would be cut into pieces and left on site.

### Operating Seasons

Operating seasons are defined by season and ground conditions and are assigned to timber harvest activities in treatment units and to road use. Forest roads are built to a standard suitable for use during their assigned season.

Winter operations are conducted during frozen ground conditions to protect soil and water resources.

Summer harvest is proposed as follows:

- Operations on bare ground are required to create a seedbed necessary to establish regeneration of particular tree species;
- There is low potential for bark damage to residual trees, such as clearcuts, patch cuts, and seed tree cuts
- The soil types can support equipment without adverse effects.
- Summer harvest is proposed as an option only in the most easterly part of the project near Route 5.

Operations would be allowed when site conditions are considered normal for the season: winter harvest would require weather suitable for freezing skid trails and

landings or frozen ground; summer would require unsaturated soil conditions. Operations may also be limited to protect nesting wildlife or other resource concerns. Harvesting operations would be overseen by the Forest Service timber sale administrator who has the authority to cease operations at any time to protect resources.

### Prescribed Fire

Site-specific burn plans would be developed after a final decision on this project is issued. Use of prescribed fire would adhere to the parameters of the burn plans developed for each area to be burned. Burn plans are based on the site conditions including topography, access, size, vegetation, and existing woody debris. They identify the weather and ground conditions, people, equipment, and notification required for safe and effective burning. Resource protection measures and specific actions for containing and controlling the fire are also in the burn plans.

Burning would occur by hand ignition in the spring or fall depending on conditions in each unit. The desired outcomes for prescribed fire would be to have an average overall duff layer of one to three inches and average understory light levels above 35 percent (U.S. Forest Service, 2004). These effects would promote pine and oak regeneration.

Pre- and post-burn forest conditions would be monitored and coordinated with silviculture and botany specialists. Monitoring would include an assessment of fuel conditions (particularly leaf litter), tree mortality, and understory species composition. Burning would be timed to take advantage of years with good pine cone and acorn crops to maximize the sources for regeneration. An adaptive management approach is planned to allow additional treatments in the burn units if the desired outcomes for duff and light are not accomplished with the initial treatment.

Residual understory tree species and fuel conditions (particularly leaf litter) in two red oak timber harvest units (53 and 55) would be evaluated after logging operations are completed to determine the need for prescribed fire to prepare a seed bed for oak regeneration.

Minimum impact suppression techniques would be used to prepare fire control lines. The types of control lines used in prescribed fire units would depend on the specific topography, vegetation, as well as the time of year and weather conditions. Existing trails, ridgelines, areas of thinner vegetation, and hose-lays would be used as control lines where possible. Other fire control line methods would be used as needed:

- Blackline is an area or a line in which existing fuels have been burned away using prescribed fire. Blackline is created with a low-intensity, slow-burning backing fire.
- Hand line is constructed using hand tools to scrape vegetation down to mineral soil. The width would vary by fuels and location, but minimum impact techniques would be used and the lines will generally be no wider than 24 inches. Chainsaws may be used to remove small trees, brush, and low hanging branches in the immediate vicinity of the control line.

### *Access and Roads Proposals*

Treatment units would be reached via state, county, town, and Forest Service roads. Prescribed fire units may also be reached on foot or all-terrain vehicles.

Specific miles and locations of roads proposals are listed below in the alternative descriptions. The actions are defined as follows:

- **Maintenance:** This includes road surfaces and shoulders, parking and side areas, structures, and any traffic-control devices necessary for safe use. Activities would include all or some of the following depending on the site-specific road conditions: surface blading, ditch cleaning and reshaping, aggregate placement, installation of drain dips and cross drains for surface erosion control, minor culvert cleaning or installation, roadside brushing, dust abatement, mulching and seeding disturbed areas. Roadside brushing would trim lower overhanging vegetation but higher tree limbs would be left to maintain a forested canopy setting.
- **Reconstruction:** Activities would include all or some of the following depending on the site-specific road conditions: realignment, curve widening, clearing and grubbing, excavation work to accommodate safe use of product haul and equipment transport vehicles, establishing road template, adding greater amounts of road surface materials, major drainage structure installation, and general maintenance activities as described above. Vegetation would be removed or trimmed in proposed road rights-of-way to accommodate construction equipment. Most work would be conducted during the driest weather conditions under the guidance of the Forest Service to minimize potential impacts to resources and roads.
- **New Construction:** All new roads would be built to standards for winter travel only. Road construction would adhere to the design specifications developed by engineers to include appropriate drainage, surfacing, clearing, grade, and turning radius to allow for safe use by vehicles needed for timber harvest and haul. Most work would be conducted during the drier weather conditions under the guidance of the Forest Service to minimize potential impacts to resources and roads.
- **Road Decommissioning:** This action involves allowing natural revegetation to continue and using the following activities as needed to accelerate restoration and mitigate watershed impacts:  remove culverts, install drainage dips or water bars, rip and seed road surfaces, and re-contour road surfaces. Decommissioning is proposed for system roads and old non-system roads existing on the ground that are not needed for future access. Some roads to be decommissioned are revegetated or in the process of revegetating and stable and would require no work on the ground.
- **Road Additions to the National Forest Transportation System:** Roads constructed for this project and some segments of existing unauthorized routes would be added to the forest's inventory of system roads. These roads will be needed in the future and would be managed as "maintenance level 1" – meaning that they would be closed to motor vehicles (except snowmobiles if adopted as part of the ITS 82 trail system) and allowed to revegetate except when opened intermittently for future management activities or

JA-0527
PBWTAR_2233

administrative needs. Maintenance level 1 roads would have appropriate drainage features and receive basic maintenance to minimize harm to adjacent resources and to ensure the road will be usable in the future.

### Watershed Restoration

Undersized or otherwise ineffective culverts would be removed or replaced. Stream crossings would meet best management practices to protect water resources.

About 1,800 feet of old roads or skid trails would be rehabilitated where the natural hydrology has been altered due to channelized flow in entrenched corridors in the Beaver Brook, Virginia Lake and Keewaydin Lake tributary 1 watersheds. Water flow would be dispersed onto vegetated ground through placement of water bars or large woody material across the corridor at specified intervals. This action would promote infiltration of water into the soil instead of the artificial concentration of overland flow in these areas. Where natural stream channels cross these corridors, channel function would improve by disconnecting these channels from the road or trail bed. These activities would selectively cut and leave in place approximately 75 trees scattered across the project area.

Watershed restoration activities would require use of excavators and other equipment typically used in road construction. Streams and soils would be protected using project design features described in Appendix B.

### Recreation Improvements

**Campsite Decommissioning:** Activities would include all or some of the following, depending on site-specific conditions:  aerating soil in the barren core of each site, transplanting tree saplings, partially submerging rocks in tenting areas, and naturalizing the sites. Barren core areas would be seeded with a native plant mix approved by the WMNF botanist. Signs would notify visitors of the efforts made to help these sites recover and their other options for camping in the area.

**Forest Closure Order, Trailhead Relocation, and Forest Protection Area:** The temporary Forest Closure Order that prohibits overnight camping at the beach area at Virginia Lake would be replaced with a permanent Forest Closure Order to prohibit overnight camping at that site.

The closed Great Brook campsites would be protected by formally relocating the Great Brook Trail trailhead from the lower gate on the Hut Road (close to the cemetery and WMNF boundary) to the bridge/gate area north of its current location on FR 4. This would be consistent with current use by hikers and with many trail guides that depict the upper gate as the trailhead. Formally relocating the trailhead will also put in place a Forest Protection Area that prohibits camping and fires within one-quarter mile of a trailhead unless in a campsite designated by the Forest Service, and by doing so the campsites proposed for closure along Great Brook will be protected from further impacts.

**Primitive Campsite Construction:** Vegetation would be removed to create a primitive access path and spots for tents. Mineral soil may be added to the tent

pads as necessary to create a well-drained surface that encourages visitor use in appropriate areas. Rocks may be partially submerged in the ground to define fire pits of an acceptable size.

**Snowmobile Trail Decommissioning:** Trail segments would be stabilized and allowed to naturally rehabilitate over time. Any trail-related infrastructure such as bridges, culverts or signs would be removed and some drainage features such as waterbars installed to better protect soil and water resources. Intersections between the old and new trail alignments would be blocked and obscured to dissuade future use. Logs, brush, and rocks would be placed in the former corridor to naturalize the site and prevent passage. Bare soil on decommissioned segments immediately adjacent to these intersections would be seeded with a native plant mix approved by the WMNF botanist.

**Snowmobile Trail Relocation:** The majority of relocation would occur onto new or improved system roads. A section of the Stoneham State Trail in the vicinity of Lombard Pond would be relocated to coincide with FR 2018E, 2018, 2018C, and 320A in Alternatives 2, 4, and 5.

Construction of FR 2018E would not occur in Alternative 3. To complete the trail relocation through this section, about 800 feet of the trail would be constructed on a skid trail used to harvest unit 100. The trail alignment would be similar to that proposed for FR 2018E in other alternatives. This trail segment would meet minimum standards for trail use with stumping, grading, and drainage installed as needed.

For Alternative 6, the relocation of the section of the Stoneham State Trail in the vicinity of Lombard Pond would be not relocated.

To facilitate timber hauling or skidding, along with snowmobile traffic, the existing crossing/bridge over Lombard Brook would be modified depending upon the alternative. See the descriptions below for each alternative.

See Appendix B for project design features regarding timber hauling, including restrictions on weekend and holiday hauling, as well as design features for dual use and timing where harvest equipment or hauling would occur on trails.

### *Hazardous Fuels Reduction*

Hazardous fuels reduction would entail removing dead and down woody material greater than four inches diameter breast height and reducing ladder fuels (low branches and small trees that can carry a fire from the forest floor to the forest canopy) within 300 feet of structures on private land adjacent to the project area. Woody material would be pulled back out of the hazardous fuel zone. Treatments would occur on sites where the adjacent private landowner is participating in the Maine Forest Service Firewise program to reduce flammability and create defensible space around homes in the event of a wildfire. The Forest Service would coordinate with landowners in areas identified for treatment.

### *Project Duration*

All project activities would be implemented periodically over the course of about 10 years, except prescribed fire which could occur 2-3 times over 15 years if needed. During the 10-year period, timber harvest (including the connected road and landing work) would likely occur over 5 years, and the remaining activities would occur seasonally as funding and staffing allows.

## Alternative 1: No Action

None of the proposed actions would occur under this alternative. The effects of taking no action are analyzed in detail in each of the resource reports and summarized in Chapter 3. The No Action Alternative does not preclude on-going activities and future proposals in the project area.

By taking no action, the following proposed activities would not occur, and the need for action and resource management goals associated with the activities would not be accomplished.

- Vegetation treatments: No mechanical treatments for timber harvesting, (logging), release treatments, or prescribed fire (and connected fire control line construction) would occur.
- Road work and transportation system adjustments: No road improvements proposed as part of this project would occur. On-going routine road maintenance planned as part of the forest roads management program would continue. No road additions or decommissioning would occur.
- Watershed restoration: No culvert removal or replacement would occur. No road and trail bed restoration would occur.
- Recreation improvements: No snowmobile trails would be relocated or decommissioned. No changes to dispersed camping would be made. On-going routine maintenance of trails and other recreation facilities would continue.
- Hazardous fuels reduction: No removal of dead and downed woody material or ladder fuels on National Forest System lands near structures on private land would occur.
- Project design features: No project design features would be implemented for this project, however Forest Plan standards and guidelines, best management practices, and other law, regulation, and policy required for national forest management would continue to be implemented for ongoing activities in the project area.

## Alternative 2: Modified Proposed Action

The 2013 scoped proposed action was developed to meet the need for action identified by comparing the existing the site-specific conditions in the project area and the desired future conditions outlined in the Forest Plan, as discussed in Chapter 1.

Alternative 2 was developed by modifying the scoped proposed action as the analysis progressed. Modifications occurred iteratively to incorporate new information, reduce potential impacts, and to address public concerns. See Appendix E for a summary of the revisions made to the scoped proposed action.

### *Vegetation Treatments*

As noted in Chapter 1, the overall objectives for vegetation treatments are to promote diverse habitats and enhance forest health and resiliency while providing wood products to local economies. Table 2 summarizes the proposed treatments designed to meet these objectives. See Appendix C - Unit Details and Treatment Objectives, for specific information about individual units, including unit number, forest type, treatment objective, release treatment, harvest method, acres, and operating season.

Alternative 2 would include:

- Trees of merchantable size and quality would be removed from using commercial timber sales totaling an estimated 7.5 million board feet of sawtimber and pulpwood.
- Timber harvest would be done on 1,298 acres from 2,365 unit acres.
- A total of 34 log landings would be used: 18 existing landings would be re-used, and 16 would be constructed.
- Release treatments (non-commercial) would be implemented on up to 577 acres of the treatment units.
- All but 142 acres would be winter harvest. Units 117, 118, 119, 120, 121, 122, 123, 124, and 125 could include summer harvest.
- Prescribed fire would be used on Albany and Cecil Mountains to mimic the positive effects of natural fire. Light-intensity fire would be used over several years as needed to create the light and ground conditions needed to perpetuate oak/pine communities.
- In addition to areas treated by fire only, prescribed fire would be used in small areas of red oak on Cecil Mountain after mechanical timber harvest if post-harvest tree species composition and fuel conditions (particularly leaf litter) warrant additional treatment to promote regeneration.
- The majority of timber harvested from the eastern side of the project area would be hauled to FR 320 and out of the project area to the northeast, past Round Pond. Virginia Lake Road, Beaver Brook Road, the Hut Road and FR 88 would also be used for accessing harvest units and trucking timber.

Table 2. Acres and forest types proposed for timber harvest and prescribed fire, Alternative 2

| Harvest Method | Forest Type | Acres |
|---|---|---|
| Clearcut with Reserves | aspen<br>northern hardwood<br>northern hardwood/red oak | 212 |
| Patch Cut | mixedwood<br>northern hardwood | 42 |
| Seed-tree Seed Cuts with Reserves | red oak | 94 |
| Shelterwood Seed Cut | mixedwood<br>northern hardwood<br>red oak/white pine<br>white pine/eastern hemlock | 99 |
| Commercial Thinning | northern hardwood | 138 |
| Group Selection | eastern hemlock<br>mixedwood<br>northern hardwood<br>northern hardwood/eastern hemlock<br>northern hardwood/red oak<br>red oak<br>red oak/white pine<br>red pine/red oak | 188 acres would be cut from 1,255 unit acres |
| Single Tree Selection | mixedwood<br>northern hardwood<br>northern hardwood/eastern hemlock<br>northern hardwood/red oak<br>red oak<br>red oak/white pine<br>white pine/eastern hemlock | 493 |
| Improvement Cut | northern hardwood<br>white pine/eastern hemlock | 32 |
| Total Timber Harvest | | 1,298 acres would be cut from 2,365 unit acres. |
| Prescribed fire on Cecil Mountain | oak/pine woodland | 24 |
| Prescribed fire on Albany Mountain | red pine woodland | 140 |
| Prescribed fire after timber harvest in units 53 and 55 | red oak | 48 |
| Total Prescribed Fire | | 212 |

### *Road Work and Transportation System Adjustments*

Road work proposed in this alternative includes the maintenance, reconstruction, and new construction necessary to implement the vegetation treatments noted above. In addition, the network of forest roads in the project area would be adjusted by adding new and existing but unclassified road segments to the national forest transportation system, and decommissioning some segments and removing them from the system. Table 3 displays the miles of road work and adjustments proposed in Alternative 2.

Unless a road use agreement is formed with the abutting landowner to allow use of FR 722, a new road segment would be constructed on National Forest System lands in the vicinity of the Beaver Brook Road (FR 722) to allow for current, continued, and projected management and use of the national forest. This road segment would be FR 3346A and approximately 850 feet long.

Table 3. Miles of road work and transportation system adjustments, Alternative 2

| Road Proposal | Miles | Comments |
|---|---|---|
| Maintenance and Reconstruction | 9.3 | 0.9 miles summer use<br>8.4 winter use |
| New Road Construction | 1.3 * | All winter use |
| Road Decommissioning | 4.7 ** | 1.7 miles of existing non-system routes<br>3.0 miles of system roads |
| Roads Added to the National Forest Transportation System | 3.0 | 1.7 miles of existing non-system routes<br>1.3 miles of new construction<br>Add as Maintenance Level 1 |

* This includes the 850-foot FR 3346A which would be constructed only if needed as described above.
** This includes 800 feet of FR 3347 proposed for rehabilitation under the watershed restoration proposals, as well as decommissioning the full length of FR 3347.

### Watershed Restoration

Table 4 displays the actions proposed to restore and improve watershed conditions under Alternative 2.

### Recreation and Snowmobile Trail Improvements

Primitive campsites closest to Great Brook would be closed and rehabilitated. To accommodate continued overnight use, 3 primitive campsites would be constructed on the east side of FR 4 north of the trail to the swimming hole and south of the bridge/gate. Two of the sites would be designed with a capacity of 8 people at one time while the third would be designed for a capacity of 12 people at one time. The total area rehabilitated would be approximately 7,800 square feet. The total area covered by the new campsites would be approximately 5,000 square feet.

The beach area on the south end of Virginia Lake Beach would be closed to overnight use and the existing camping impacts would be rehabilitated. Day use would continue. Motorized access via FR 308A would be closed and beach access would be by foot.

Permanent forest orders to prohibit overnight camping at the closed sites along Great Brook and at Virginia Lake would be issued.

Table 4. Watershed restoration objectives and activities proposed under Alternative 2

| Watershed Restoration Action | Location | Objectives/Comments |
|---|---|---|
| Remove 4 culverts | FR 308A -- Virginia Lake Spur A | Remove after vegetation treatment operations are complete. Stream channels would be reconnected where necessary, and road elevations would be designed to preserve wetland hydrology adjacent to one crossing. |
| Remove 3 culverts | Non-system road segments off FR 4 along Great Book, mapped as FR 3324 and FR 2009 | Culvert removal would restore more natural flow patterns to floodplain and wetland areas. Restore the channels immediately adjacent to the culverts as necessary. |
| Replace 4 culverts | FR 722 -- Beaver Brook Road | Replacement culverts would be appropriately sized for the stream. Minor changes in road elevation or alignment near the crossings may also be necessary. |
| Replace 1 culvert | Private section of Beaver Brook Road | Would be replaced in collaboration with the adjacent landowner if a mutually acceptable solution is found. |
| Rehabilitate 1,800 feet of old roads and skid trails* | Add water bars to 400 feet of FR 308B | Because of steep slopes and shallow soils, water dispersal is a particular challenge and an excavator would be needed to build and anchor larger and more frequent water bars than may be typically constructed. |
| | 800 feet of abandoned sections of a non-system road (mapped as FR 3347) and a connected skid trail. | Because of the moderate slopes and shallow gullies, rehabilitation would primarily involve felling trees across the road or trail at periodic intervals to divert water onto vegetated ground and allow sediment to settle. All sections of road and skid trail would be closed out with water bars and drainage dips as needed to prevent gully erosion. This work coincides with the decommissioning of road 3347. |
| | 300 feet of an old road bed on the west side of Virginia Lake | Rehabilitate to prevent erosion on steep slopes above Virginia Lake. Stabilize with water bars created by excavator or felling trees across the road bed. This road is not proposed for use in this project. |
| | 300 feet of an old road and skid trail north of Keewaydin Lake along FR 2018 | This old road and connecting skid trail, last used in the 1980s, is capturing flow from intermittent and ephemeral streams. Relocate and improve the stream crossing, surfacing, and water bars to prevent channelized flow and erosion in the trail. |

Portions of the Stoneham State Snowmobile Trail would be managed for dual use (project vehicles and snow machines using the road concurrently) during harvest operations under Alternative 2. However, timber hauling on any road which is part of the Stoneham State Snowmobile Trail (ITS82) would be restricted to weekdays only and would be prohibited on weekends and federally recognized holidays unless snowmobile trails are not in use due to low snow levels.

For Alternative 2, the existing trail bridge over Lombard Brook would be removed and a temporary truck bridge would be installed for timber haul and snowmobile use during harvest operations. Please note that this would also occur for Alternatives 4 and 5. Following the completion of harvest operations, the temporary bridge may be removed for use in another area. If this occurs, the Forest Service will work with the local snowmobile club and the State of Maine Bureau of Parks and Land Snowmobile Program to install a replacement trail

JA-0534

PBWTAR_2240

bridge. Until a replacement bridge is in place, the temporary bridge would remain during the snowmobile trail seasons.

There would be no action on the ground required to decommission the Old State Cutoff Snowmobile Trail because the trail hasn't been maintained or used regularly in recent years and is revegetating naturally. Minor work at the intersections to discourage use may be required.

Table 5 summarizes the activities proposed to address resource concerns and improve conditions related to dispersed camping and snowmobile trails.

Table 5. Campsite and snowmobile trail proposals, Alternative 2

| Recreation Improvement Action | Location | Comments |
|---|---|---|
| Decommission and rehabilitate 4 primitive campsites along Great Brook | West side of FR 4 | Close to overnight camping. One site between FR 2009 and Great Brook would be retained. |
| Construct 3 primitive campsites | East side of FR 4 | NA |
| Decommission and rehabilitate 1 primitive campsite on Virginia Lake | South end of the lake, beach and adjacent area. | Close to overnight camping. |
| Relocate a segment of the Stoneham State Snowmobile trail | Relocate to<br>• FR 2018E<br>• FR 2018<br>• FR 2018C<br>• FR 320A | This relocation would coincide with new and improved roads proposed in this project. |
| Decommission 0.98 miles of the Stoneham State Snowmobile Trail | The segment between FR 320 to FR 3326 that would be relocated as described above. | NA |
| Decommission 0.64 miles of the Old State Cutoff Snowmobile Trail | From FR 722 to junction with Old State Trail on FR 3329. | NA |

### *Hazardous Fuels Reduction*

Under alternatives 2, 3, 4, 5, and 6, hazardous fuels reduction would occur on national forest land near structures located on adjacent private land if the landowner is participating in the Maine Forest Service's Firewise program. There are approximately 19 sites that could be treated. Treated areas would be about one-half acre per site, with up to 10 acres treated in total.

## Alternative 3: No Activities in the Forest Plan Inventoried Roadless Area

As noted in Chapter 1, this alternative was developed to address concerns about potential negative impacts to the roadless character of the area identified during the Forest Plan revision roadless area inventory as the Caribou-Speckled Mountain 2 Forest Plan inventoried roadless area, or what will be referenced in

the remainder of this document as the Caribou-Speckled Mountain 2 inventoried area (Issue #1). Alternative 3 eliminates all activities proposed in the inventoried roadless area.

### Vegetation Treatments

Vegetation treatments would be conducted as described in Alternative 2, except for the following changes to eliminate activities in the inventoried roadless area:

- Approximately 626 acres of timber harvest would be dropped from the project. This would reduce the estimated timber volume by 2.9 MMBF down to a total of 4.6 MMBF. Acres of release treatments would drop by 131 acres, and 11 fewer landings would be required.
- Timber harvest would be done on 672 acres from 1,489 unit acres.
- No prescribed fire would occur on Albany Mountain.

The routes taken by log trucks would be adjusted as follows due to the changes in harvest units and associated road work in this alternative:

- Harvest units along road FR 722 would be trucked to the east and then south along roads FR 722, FR 3350, new construction 3321A, FR 3321, FR 308, and Birch Avenue.
- If a road use agreement is formed allowing the use of FR 722, harvest units may be trucked to the southwest along FR 722 and Hut Road.

Alternative 3 would include:

- Trees of merchantable size and quality would be removed from the units using commercial timber sales totaling about 4.6 million board feet of sawtimber and pulpwood.
- A total of 23 log landings would be used: 11 existing landings would be reused, and 12 would be constructed.
- Release treatments (non-commercial) would be implemented on up to 446 acres of the treatment units.
- All but 142 acres would be winter harvest. Units 117, 118, 119, 120, 121, 122, 123, 124, and 125 could include summer harvest.
- Prescribed fire would be used in the same manner as described in Alternative 2 but on Cecil Mountain and in Units 53 and 55 only. No prescribed fire would occur on Albany Mountain.

Table 6 summarizes the proposed timber harvest and prescribed fire outside of the inventoried roadless area.

JA-0536

PBWTAR_2242

Table 6. Acres and forest types proposed for timber harvest and prescribed fire, Alternative 3

| Harvest Method | Forest Type | Acres |
|---|---|---|
| Clearcut with Reserves | aspen<br>northern hardwood | 160 |
| Patch Cut | mixedwood<br>northern hardwood | 19 |
| Seed-tree Seed Cuts with Reserves | red oak | 94 |
| Shelterwood Seed Cut | mixedwood<br>northern hardwood<br>red oak/white pine | 70 |
| Commercial Thinning | northern hardwood | 138 |
| Group Selection | eastern hemlock<br>mixedwood<br>northern hardwood<br>northern hardwood/eastern hemlock<br>northern hardwood/red oak<br>red oak<br>red oak/white pine<br>red pine/red oak | 144 acres would be cut within 962 unit acres |
| Single Tree Selection | mixedwood<br>northern hardwood<br>northern hardwood/red oak<br>red oak/white pine<br>white pine/eastern hemlock | 46 |
| Improvement Cut | NA | 0 |
| Total Timber Harvest | | 672 acres cut out of 1,489 total acres |
| Prescribed fire on Cecil Mountain | oak/pine woodland | 24 |
| Prescribed fire after timber harvest in units 53 and 55 | red oak | 48 |
| Total Prescribed Fire | | 72 |

### *Road Work and Transportation System Adjustments*

Road work proposed in this alternative would be conducted as described in Alternative 2 except for the following:

- Road construction would be reduced by 0.5 miles (FRs 3346A, 3326A, and 2018E would not be constructed).
- Maintenance and reconstruction would be reduced by 2.4 miles (FRs 4, 3326, 3328, 3346, and part of 722, would not be reconstructed or maintained).
- Decommissioning would be reduced by 0.4 miles (FR 3324 would not be decommissioned; all of FR 3347 would be decommissioned).
- 0.5 miles would not be added to the national forest transportation system as compared to Alternative 2.

Table 7 displays the miles of road work and road inventory adjustments (decommissions and additions) proposed in Alternative 3.

Table 7. Miles of road work and transportation system adjustments, Alternative 3

| Road Proposal | Miles | Comments |
|---|---|---|
| Maintenance and Reconstruction | 6.9 | 0.9 miles summer use<br>6.0 miles winter use |
| New Road Construction | 0.8 | All winter use |
| Road Decommissioning | 4.3 * | 1.3 miles of existing non-system routes<br>3.0 miles of system roads |
| Roads Added to the National Forest Transportation System | 2.5 | 1.7 miles of existing non-system routes<br>0.8 miles of new construction<br>Add as Maintenance Level 1 |

* This includes 1,700 feet of old roads proposed for rehabilitation under the watershed restoration proposals.

### Watershed Restoration

Watershed restoration activities would be conducted as described in Alternative 2, except the two culverts on FR 3324 in the Great Brook watershed would not be removed because they are located in the inventoried roadless area. Under this alternative, five culverts would be removed and five would be replaced.

Table 8 displays the actions proposed to restore and improve watershed conditions under Alternative 3.

Table 8. Watershed restoration objectives and activities proposed under Alternative 3

| Watershed Restoration Action | Location | Objective/Comments |
|---|---|---|
| Remove 4 culverts | FR 308A -- Virginia Lake Spur A | Remove after vegetation treatment operations are complete. Stream channels would be reconnected where necessary, and road elevations would be designed to preserve wetland hydrology adjacent to one crossing. |
| Remove 1 culvert | Non-system spur off FR 4 in along Great Brook, mapped as FR 2009 | Culvert removal would restore more natural flow patterns to floodplain and wetland areas. Restore the channels immediately adjacent to the culverts as necessary. |
| Replace 4 culverts | FR 722 -- Beaver Brook Road | Replacement culverts would be appropriately sized for the stream. Minor changes in road elevation or alignment near the crossings may also be necessary. |
| Replace 1 culvert | Private section of Beaver Brook Road | Would be replaced in collaboration with the adjacent landowner if a mutually acceptable solution is found. |

| Watershed Restoration Action | Location | Objective/Comments |
|---|---|---|
| Rehabilitate 1800 feet of old roads and skid trails* | Add water bars to 400 feet of FR 308B | Because of steep slopes and shallow soils, water dispersal is a particular challenge and an excavator would be needed to build and anchor larger and more frequent water bars than may be typically constructed. |
| | 800 feet of abandoned sections of a non-system road (mapped as FR 3347) and a connected skid trail. | Because of the moderate slopes and shallow gullies, rehabilitation would primarily involve felling trees across the road or trail at periodic intervals to divert water onto vegetated ground and allow sediment to settle. All sections of road and skid trail would be closed out with water bars and drainage dips as needed to prevent gully erosion. This work coincides with the decommissioning of road 3347. |
| | 300 feet of an old road bed on the west side of Virginia Lake | Rehabilitate to prevent erosion on steep slopes above Virginia Lake. Stabilize with water bars created by excavator or felling trees across the road bed. This road is not proposed for use in this project. |
| | 300 feet of an old road and skid trail north of Keewaydin Lake along FR 2018 | This old road and connecting skid trail, last used in the1980s, is capturing flow from intermittent and ephemeral streams. Relocate and improve the stream crossing, surfacing, and water bars to prevent channelized flow and erosion in the trail. |

### *Recreation and Snowmobile Trail Improvements*

The recreation and snowmobile trail improvements would be conducted as described in Alternative 2, except for the following:

- No new primitive campsites sites would be designated across the Hut Road (FR 4) from Great Brook due to the inventoried roadless area.
- FR 2018E would not be built in this alternative which is part of the snowmobile trail relocation proposed in Alternative 2. Instead, Alternative 3 would develop a new snowmobile trail segment to connect FR 2018 in Unit 100 with the existing snowmobile trail on north end of Unit 100. This new trail segment would be located on skid trails used to log Unit 100. Stumping, grading, and drainage would be installed as needed. The total length of new connector trail would be 800 feet.
- The existing bridge at Lombard Brook would remain in its current location and not be affected.

Table 9. Campsite and snowmobile trail proposals, Alternative 3

| Recreation Improvement Action | Location | Comments |
|---|---|---|
| Decommission and rehabilitate 4 primitive campsites along Great Brook | West side of FR 4 | Close to overnight camping. One site between FR 2009 and Great Brook would be retained. |
| Decommission and rehabilitate 1 primitive campsite on Virginia Lake | South end of the lake – beach and adjacent area. | Close to overnight camping. |
| Relocate a segment of the Stoneham State Snowmobile trail | Relocate to<br>• FR 2018<br>• FR 2018C<br>• FR 320A | This relocation would partly coincide with new and improved roads proposed in this project. |
| Construct 800 feet of connector trail. | Connect FR 2018 in Unit 100 with the existing snowmobile trail on north end of Unit 100. | This connector would be located on skid trails used for timber harvest in Unit 100. |
| Decommission 0.86 miles of the Stoneham State Snowmobile Trail | The segment between FR 320 to FR 3326. | The trail would be relocated to system roads and the new connector trail as described above. |
| Decommission 0.64 miles of the Old State Cutoff Snowmobile Trail | From FR 722 to junction with Old State Trail on FR 3329. | NA |

### Hazardous Fuels Reduction

Hazardous fuels reduction would be conducted as described under Alternative 2.

## Alternative 4: No Hauling on the Hut Road

As noted in Chapter 1, this alternative was developed to address concerns about potential negative effects from log truck traffic on the Hut Road (Issue # 2).

### Vegetation Treatments

Vegetation treatments would be conducted as described in Alternative 2, except for the following changes required to eliminate timber haul on the Hut Road:

- Approximately 252 acres of timber harvest would be dropped from the project, reducing the timber volume by 0.8 MMBF for a total of 6.7 million board feet. Acres of release treatments would drop by 18 acres, and 8 fewer landings would be required.
- Timber harvest would be done on 1,046 acres from 2,113 unit acres.

The western-most units in the Great Brook drainage would be dropped. Harvest units along FR 722 and the west side of Beaver Brook would be trucked to the east and then south along roads FR 722, FR 3350, new construction 3321A, FR 3321, FR 308, and Birch Avenue.

Table 10. Acres and forest types proposed for timber harvest and prescribed fire, Alternative 4

| Harvest Method | Forest Type | Acres |
|---|---|---|
| Clearcut with Reserves | aspen<br>northern hardwood<br>northern hardwood/red oak | 212 |
| Patch Cut | mixedwood<br>northern hardwood | 27 |
| Seed-tree Seed Cuts with Reserves | red oak | 94 |
| Shelterwood Seed Cut | mixedwood<br>northern hardwood<br>red oak/white pine<br>white pine/eastern hemlock | 99 |
| Commercial Thinning | northern hardwood | 138 |
| Group Selection | eastern hemlock<br>mixedwood<br>northern hardwood<br>northern hardwood/eastern hemlock<br>northern hardwood/red oak<br>red oak<br>red oak/white pine<br>red pine/red oak | 188 acres cut within 1,255 unit acres |
| Single Tree Selection | mixedwood<br>northern hardwood<br>northern hardwood/eastern hemlock<br>red oak/white pine<br>white pine/eastern hemlock | 288 |
| Improvement Cut | NA | 0 |
| Total Timber Harvest | | 1,046 acres cut from 2,113 unit acres |
| Prescribed fire on Cecil Mountain | oak/pine woodland | 24 |
| Prescribed fire on Albany Mountain | red pine woodland | 140 |
| Prescribed fire after timber harvest in units 53 and 55 | red oak | 48 |
| Total Prescribed Fire | | 212 |

Alternative 4 would include:

- Trees of merchantable size and quality would be removed from the units using commercial timber sales totaling about 6.7 million board feet of sawtimber and pulpwood.
- A total of 26 log landings would be used: 14 existing landings would be re-used, and 12 would be constructed.
- Release treatments (non-commercial) would be implemented on up to 559 acres of the treatment units.
- All but 142 acres would be winter harvest. Units 117, 118, 119, 120, 121, 122, 123, 124, and 125 could include summer harvest.

JA-0541
PBWTAR_2247

- Prescribed fire would be used on Cecil and Albany Mountains and in Units 53 and 55 in the same manner as described in Alternative 2.

Table 10 summarizes the proposed vegetation treatments for Alternative 4.

### Road Work and Transportation System Adjustments

Road work proposed in this alternative would be conducted as described in Alternative 2 except for the following:

- Reconstruction and maintenance would be reduced by 1.8 miles (FRs 4, 3346, and part of 722 would not be reconstructed or maintained).
- Decommissioning would be reduced by 0.4 miles (FR 3324 would not be decommissioned; all of FR 3347 would be decommissioned).

Table 11 displays the miles of road work and adjustments proposed in Alternative 4.

Table 11. Miles of road work and transportation system adjustments, Alternative 4

| Road Proposal | Miles | Comments |
|---|---|---|
| Maintenance and Reconstruction | 7.5 | 0.9 miles summer use<br>6.6 miles winter use |
| New Road Construction | 1.3 * | all winter use |
| Road Decommissioning | 4.3 ** | 3.0 miles of existing non-system routes<br>1.3 miles of system roads |
| Roads Added to the National Forest Transportation System | 3.0 | 1.7 miles of existing non-system routes<br>1.3 miles of new construction<br>Add as Maintenance Level 1 |

* This includes the 850-foot FR 3346A which would be constructed only if needed as described above.
** This includes 800 feet of FR 3347 proposed for rehabilitation under the watershed restoration proposals, as well as decommissioning the full length of FR 3347.

### Watershed Restoration

Watershed restoration actions would be conducted as described in Alternative 2.

### Recreation and Snowmobile Trail Improvements

Recreation and snowmobile trail improvements would be conducted as described under Alternative 2. This would include the relocation of a section of the Stoneham State Trail in the vicinity of Lombard Pond, and the use of a temporary truck bridge proposed for the crossing at Lombard Brook.

### Hazardous Fuels Reduction

Hazardous fuels reduction would be conducted as described under Alternative 2.

## Alternative 5: No Hauling on the S-Turn Section of the Hut Road

This alternative retains all of the harvest units in Alternative 2 (Modified Proposed Action), but all timber trucked from the Hut Road would route to the Beaver Brook Road and out to Birch Ave via Virginia Lake Road.

### Vegetation Treatments

All treatment units (timber harvest and prescribed fire) proposed under Alternative 2 are proposed under this alternative as well. See table 2 under Alternative 2 for the acres and forest types proposed for timber harvest and prescribed fire under Alternative 2.

- Alternative 5 would include the same timber volume, number of landings, acres of release treatments, and season of harvest as described under Alternative 2.
- Timber harvest would also be done on 1,298 acres from 2,365 unit acres.

### Road Work and Transportation System Adjustments

Road work proposed in this alternative would be conducted as described in Alternative 2 except FR 3321A would be constructed, adding 0.2 miles of construction to the project.

Table 12 displays the miles of road work and adjustments proposed in Alternative 5.

Table 12. Miles of road work and transportation system adjustments, Alternative 5

| Road Proposal | Miles | Comments |
|---|---|---|
| Maintenance and Reconstruction | 9.3 | 0.9 miles summer use<br>8.4 miles winter use |
| New Road Construction | 1.5 * | all winter use |
| Road Decommissioning | 4.7 ** | 1.7 miles of existing non-system routes<br>3.0 miles of system roads |
| Roads Added to the National Forest Transportation System | 3.2 | 1.7 miles of existing non-system routes<br>1.5 miles of new construction<br>Add as Maintenance Level 1 |

* This includes the 850-foot FR 3346A which would be constructed only if needed as described above.
** This includes 800 feet of FR 3347 proposed for rehabilitation under the watershed restoration proposals, as well as decommissioning the full length of FR 3347.

### Watershed Restoration

Watershed restoration actions would be conducted as described in Alternative 2.

### Recreation and Snowmobile Trail Improvements

Recreation and snowmobile trail improvements would be conducted as described under Alternative 2. This would include the relocation of a section of the

Stoneham State Trail in the vicinity of Lombard Pond, and the use of a temporary truck bridge proposed for the crossing at Lombard Brook.

### *Hazardous Fuels Reduction*

Hazardous fuels reduction would be conducted as described under Alternative 2.

## Alternative 6: No New Roads

This alternative was developed in response to concerns raised during the comment period for the draft EA. It would eliminate all new road construction and use 0.1 miles more road reconstruction and extended skid trails to access activities in the project area.

This alternative is very similar to Alternative 2 (Modified Proposed Action) and Alternative 5 in regards to timber harvesting.

### *Vegetation Treatments*

Alternative 6 would drop approximately 23 acres of harvest, reducing the estimated timber volume by 200,000 thousand board feet for a total of 7.3 MMBF.

- Alternative 6 would include 3 less landings, 8 less acres of shelterwood seed cuts, 15 less acres of group selection cuts, and 14 less acres of release treatments than under Alternative 2.
- Alternative 6 would harvest 1,275 acres from 2,256 unit acres.
- Although 0.1 miles more road reconstruction and some skid trails would be extended to access harvest units, overall this alternative would require 0.2 less miles of skid roads than under Alternative 2.

### *Road Work and Transportation System Adjustments*

- New road construction at 3346A would be dropped. In place of the new construction, FR 722 would be reconstructed in this area, including a suitable crossing at Beaver Brook capable of providing resource protection. This reconstruction can only happen with a road-use agreement with the abutting landowner to the south (this landowner has indicated a willingness to work with the FS).
- New road construction at 722A would be dropped. In place of the new construction, FR 308B may be reconstructed, beginning at the junction with FR 722, to a landing northeast of a Forest Service property line corner. This reconstruction can only happen with a road-use agreement with the abutting landowner to the south (this landowner has indicated a willingness to work with the FS).
- New road construction at 3321A would be dropped. Nothing takes the place of this new construction. Harvest units to the north of this road would be accessed by FR 722. Harvest units to the south of this road would be accessed by FR 308.

- New road construction at 3326A, 2018E and 320A would be dropped. In place of the new construction, harvest units 90-98 would be accessed by extended skid trails from a landing at the end of 3327. Harvest units 100, 101, 105-114 would be accessed by extended skid trails from a landing at the west end of the reconstruction segment 320A.
- Reconstruction of FR 722 would be extended beyond the original ending to 3327 and include a bridge across Goodwin Brook.

Table 13 displays the miles of road work and adjustments proposed in Alternative 6.

Table 13. Miles of road work and transportation system adjustments, Alternative 6

| Road Proposal | Miles | Comments |
|---|---|---|
| Maintenance and Reconstruction | 9.4 | 0.9 miles summer use<br>8.5 miles winter use |
| New Road Construction | 0.0 | N/A |
| Road Decommissioning | 4.7 * | 1.7 miles of existing non-system routes<br>3.0 miles of system roads |
| Roads Added to the National Forest Transportation System | 1.5 | 1.5 miles of existing non-system routes<br>0 miles of new construction |

* This includes 800 feet of road 3347 proposed for rehabilitation under the watershed restoration proposals, as well as decommissioning the full length of FR 3347.

### Watershed Restoration

Watershed restoration actions would be conducted as described in Alternative 2.

### Recreation and Snowmobile Trail Improvements

Recreation and snowmobile trail improvements would be conducted as described under Alternative 2 except that the relocation of the Stoneham State Snowmobile Trail in the vicinity of Lombard Pond would not occur. For Alternative 6, the existing bridge at Lombard Brook would be overlaid with protective decking to facilitate skidding. No truck hauling would occur over the bridge under this alternative.

### Hazardous Fuels Reduction

Hazardous fuels reduction would be conducted as described under Alternative 2.

## Alternatives Considered But Eliminated from Detailed Study

Federal agencies are required by NEPA to evaluate reasonable alternatives and to briefly discuss the reasons for eliminating any alternatives that were not developed in detail (40 CFR 1502.14). Most suggested alternatives were not studied in detail because they would not effectively meet the project's purpose and need as described in Chapter 1. Also, many of the concerns expressed by the public are addressed by the no action alternative, design features incorporated in the action alternatives, and analysis of the effects related to the concerns as

disclosed in Chapter 3. Some components of the alternatives studied in detail could be selected in the Decision Notice without being studied as a separate alternative because they fall within the range of actions and effects disclosed.

The following alternatives were submitted for consideration during the 2013 public scoping period.

### 1. Eliminate all clearcutting.

**Rationale for elimination from detailed study**: Eliminating clearcutting would reduce the effectiveness of this project in meeting the purpose and need related to wildlife habitat objectives and forest management. Clearcutting would help create valuable early successional habitat as described in the Forest Plan and in the specific habitat management goals identified in the project area. It also is the most effective harvest method to regenerate shade-intolerant tree species such as aspen and birch, which is a forest type needed in the project area. See Chapter 1 for details on how clearcutting contributes to the purpose and need for this project. The current amount of proposed acres of clearcutting has been reduced from the original proposal reviewed by the public (see Appendix E). The analysis of alternatives studied in detail summarized in Chapter 3 includes the effects of taking no action (Alternative 1) which addresses the suggested alternative to eliminate clearcutting. Specific resource concerns that may be related to clearcutting such as effects to water quality or scenery were studied by the interdisciplinary team and are summarized in Chapter 3.

### 2 Retain public motorized access to the beach at the south end of Virginia Lake and add actions to address resource concerns.

Several commenters requested that the road to the beach be left open for public motor vehicle access because:

- Motorized access is valued by families with young children and grandchildren who would be challenged by the walk in. The beach must remain accessible to all ages and all levels of ability so that our future generations will develop a love and appreciation for nature. Closing the road will allow use only by experienced campers and hikers.
- Limiting access is unfair to local citizens who use the area the most and take pride in its care.
- There is no other nearby sandy beach for local residents to use.
- Trash will increase because people will not have vehicles close by and they won't carry it out.
- Rather than closing the road to vehicles, alleviate the current problems by adding Forest Service patrols, adopters, and a toilet.

**Rationale for elimination from detailed study**: Retaining open motorized public access on FR 308A would not meet the purpose and need to protect water resources such as Virginia Lake and streams in the vicinity of the road, and would violate the conservation easement that prohibits development within 1,700 feet of the lake. The road was constructed for access during timber salvage operations in the 1980s and was not built to standards necessary for long-term

JA-0546

PBWTAR_2252

public access. It is inventoried as a maintenance level 1 road, meaning that it should be opened only intermittently and for administrative use only.

The road was not physically closed after the 1980s salvage operations and resource damage is evident from continued motorized use. The Albany South project would fix the road to minimum standards for winter use by project vehicles, followed by closure and watershed restoration actions (culvert removal, reconnect stream channels where necessary). An open public motorized access road requires higher construction standards, including non-native surfacing, that would constitute development within 1,700 feet of the lake.

### 3 Do not harvest timber along Great Brook and in the Kezar Lake watershed.

Several commenters requested that all harvest along Great Brook and in the Kezar Lake watershed be dropped from the project to protect water quality. It was noted that while effects from the project may be short-term, water quality must be protected for ecosystem functions as well as human use, enjoyment, and contributions to tourism and the local economy. Specific concerns expressed are:

- Increased siltation from logging will cause further harm to the watershed which has not recovered from past logging, development, and dredging.
- Brook trout and salmon populations and spawning habitat in Great Brook, just now recovering from past dredging and logging, may be jeopardized if headwaters and tributaries are interfered with by roads, stream crossings, and loss of canopy protection.
- Lack of adequate buffers may increase sedimentation and water temperature and decrease pH. Recreation and the supply of clear cold water to Kezar Lake may be harmed.
- The benefits do not outweigh the risks.

**Rationale for elimination from detailed study**: The Forest Plan identified lands within the Kezar Lake watershed as suitable for forest management, including timber harvest. It also identifies standards and guidelines for implementing management activities that are designed to protect natural, cultural, and social resources. The project is designed to meet land management goals while protecting resources by applying those Forest Plan standards and guidelines and incorporating Maine best management practices, best current science, and professional expertise of the resource specialists conducting the analysis (see Appendix B).

Protecting water quality and associated aquatic habitat is a purpose and need for the project and would be accomplished through the watershed restoration proposals and with the application of site-specific project design features as described in appendix B. Eliminating timber harvest in areas where no significant or long-term effects to water-quality would be expected would arbitrarily and unnecessarily restrict the forest's ability to meet wildlife habitat and forest management goals in the project area. The environmental analysis discloses the predicted environmental effects to water quality in Great Brook and the Kezar Lake watershed (see Chapter 3).

### 4 Eliminate timber harvest and connected actions in the Great Brook watershed but increase harvest in other areas.

One commenter requested that all logging, skid trails, and roads proposed for the Great Brook watershed be shifted to areas outside of the watershed, and that any increased effects to viewsheds in the more heavily cut areas be accepted.

**Rationale for elimination from detailed study**: Please see the rationale for not eliminating timber harvest along Great Brook. The timber harvest currently proposed outside the Great Brook watershed already includes as much harvest as is appropriate given the need for action and requirement to protect all resources from unacceptable adverse effects, not just scenery. Increasing the harvest intensity in the rest of the project area would harm resources and could cause inconsistency and non-compliance with the Forest Plan and relevant laws, regulations, policies, science, and Maine's guidance for protecting resources in the project area.

### 5 Use larger buffers along streams.

Several commenters concerned about water quality and fisheries requested the project design be altered to adopt the stream buffer widths and riparian management practices recommended by Stantec, Trout Unlimited, the Best Management Practices Manual, and Shoreland Zoning guidance, and/or the Wilkerson et al. report.

**Rationale for elimination from detailed study**: Forest Plan standards and guidelines for riparian management, which includes appropriate buffer widths, were developed to protect water quality and aquatic and riparian habitats. In addition, the project includes implementation of Maine best management practices which were developed by loggers, foresters, and scientists from Maine and other states to protect water quality during and after timber harvesting. Finally, in accordance with Forest Service regulations for conducting this project-level environmental analysis, resource specialists considered the need to adjust buffer widths to protect resources based on the specific proposed actions and the conditions on the ground. As a result, buffers were widened in some areas as described in Appendix B. Forest Plan standards and guidelines, best management practices, and project design features are monitored for effectiveness and have been shown to adequately protect watersheds from risks posed by forest management activities.

In addition to adhering to Maine best management practices as mentioned by the commenters, the project design also follows Shoreland Zoning guidance, and recommendations provided during consultation about this project with the State of Maine Department of Inland Fisheries and Wildlife, and the Department of Conservation. Also, the recommendations noted by the commenters were taken into consideration and incorporated into the project as applicable when developing design features and predicting environmental effects to fisheries and water quality. See the relevant resource sections in Chapter 3 and the supporting documentation in the project record.

### 6 *Do not log old growth forest.*

Several commenters mentioned that old growth protection is required by the Forest Plan and therefore any impacts to old growth forest must be disclosed. One commenter requested an alternative that excludes logging of old growth forest.

**Rationale for elimination from detailed study**: None of the mature habitat in the Albany South HMU is old growth forest as defined in USDA Forest Service 2005a, Glossary, page 21, and no old growth is proposed for harvest.

### 7 *Create and maintain early successional habitat without harvesting mature timber.*

One commenter offered an alternative for creating and maintaining early successional habitat that would:

- Create 100 acres of permanent wildlife openings in the Albany HMU instead of regularly regenerating forest stands.
- Clearcut young forest to re-initiate early successional habitat in the same stands rather than log mature forests.
- Maintain early successional habitat along existing roads outside of inventoried roadless areas.

**Rationale for elimination from detailed study**: Timber harvest areas provide valuable components of early successional habitat not found in maintained permanent wildlife openings which would be lost with the suggested alternative. In addition, maintaining permanent wildlife openings or simply re-cutting young forest stands would be high-cost management actions with potential unacceptable environmental effects resulting from frequent entries.

### 8 *Close the Great Brook and Hut Road areas to all dispersed camping.*

Two commenters suggested closing the Great Brook and Hut Road areas to all camping. No specific concerns about dispersed camping are documented in their comments.

**Rationale for elimination from detailed study**: Dispersed camping is a desired recreation opportunity that is consistent with the goals and objectives of the Forest Plan. The area along the Hut Road has historically been used for dispersed camping and only the sites closest to Great Brook display unacceptable impacts to natural resources. Eliminating all dispersed camping along the Hut Road would arbitrarily prohibit a traditional and desired use of the area with no supporting rationale provided, or basis in science or policy. See the various alternative descriptions for what is proposed in regards to addressing undesirable effects of the existing dispersed camping along Great Brook.

JA-0549
PBWTAR_2255

### 9 Delay prescribed fire treatment on Albany Mountain by 20 years to evaluate the succeeding forest type and re-evaluate the need for action.

The State of Maine Natural Areas Program suggested that the red pine woodland on Albany Mountain does not appear to be succeeding out of its natural state at this time, and that prescribed fire may be more effective in perpetuating this community if it is implemented in the future. Delaying prescribed fire treatment on Albany Mountain would allow time to better understand the succession of forest types there and the need for action.

**Rationale for elimination from detailed study**: This suggestion to delay prescribed fire on Albany Mountain is incorporated in and studied as part of Alternative 3. The Responsible Official will decide whether to drop the proposed treatment on Albany Mountain from this project after considering the completed environmental analysis.

# Comparison of Alternatives Studied in Detail

## Summary of proposed Activities by Alternative

Table 14 summarizes the actions proposed in each alternative. See Chapter 3 for detailed descriptions of environmental effects for each alternative.

Table 14. Comparison of proposed activities by alternative

| Proposed Activity | Alt. 1 | Alt. 2 | Alt. 3 | Alt. 4 | Alt. 5 | Alt. 6 |
|---|---|---|---|---|---|---|
| Clearcut with reserves (acres) | 0 | 212 | 160 | 212 | 212 | 212 |
| Patch Cut (acres) | 0 | 42 | 19 | 27 | 42 | 42 |
| Seed-tree Seed Cut with Reserves (acres) | 0 | 94 | 94 | 94 | 94 | 94 |
| Shelterwood Seed Cut (acres) | 0 | 99 | 70 | 99 | 99 | 91 |
| Commercial Thinning (acres) | 0 | 138 | 138 | 138 | 138 | 138 |
| Group Selection (acres) | 0 | 188 acres cut within 1,255 unit acres | 144 of 962 | 188 of 1,255 | 188 of 1,255 | 173 of 1,254 |
| Single Tree Selection (acres) | 0 | 493 | 46 | 288 | 493 | 493 |
| Improvement Cut (acres) | 0 | 32 | 0 | 0 | 32 | 32 |
| Release Treatment (acres) | 0 | 577 | 446 | 559 | 577 | 563 |
| Total Timber Harvest (acres) | 0 | 1,298 acres cut within 2,365 unit acres | 672 of 1,489 | 1,046 of 2,113 | 1,298 of 2,365 | 1,275 of 2,256 |

JA-0550

PBWTAR_2256

## Effects Indicators and Measures

Table 30. Indicators used to measure effects to threatened, endangered, and sensitive species

| Resource Element | Resource Indicator | Measure | Source |
|---|---|---|---|
| Species and Individuals | Disturbance from project activities | Qualitative expectations based on activity and operating seasons. | ESA, 2670 Forest Service Manual |
| Habitat | Suitable and potential habitat | Acres of habitat change short and long term. | ESA, 2670 Forest Service Manual |

## Existing Conditions
## Federally-Listed Threatened Species

### *Northern Long-eared Bat*

Northern long-eared bats are found in the eastern United States and Canada out to British Columbia, south to Texas, and across the southern United States. They appear to prefer interior mature forests for summer roosting but are adaptable to various conditions. They may roost in tree cavities, under loose tree bark, in crevices, bridges, and buildings (USDA Forest Service 2014b). The majority of roost trees used by Northern long-eared bat on the WMNF are dead or live beech, sugar maple, red maple and yellow birch. The majority of trees in two maternity sites located on the WMNF are within 0.5 mile of a large wetland complex (Sasse 1995).

Northern long-eared bats hibernate in caves, mines, or rock crevices. They may begin hibernation as early as August and it may last for 8-9 months in northern latitudes. Bats leave their hibernacula sometime in March in the northern portions of the eastern United States (USDA Forest Service 2006b). There are no known hibernacula within or adjacent to the project area.

Foraging habitat generally consists of mature forest upland habitats, although water and riparian habitats (vernal pools, streams, etc.) are sometimes considered important. Several studies indicate an apparent preference for northern long-eared bats to forage under closed canopy conditions or very near the edge, with little activity occurring into the open fields and clearcuts.

Summer surveys conducted in the project area in 2014 identified all eight species of bats known to occur on the White Mountain National Forest (brown bat, northern long-eared bat, eastern small-footed myotis, silver-haired bat, Tri-colored Bat, big brown bat, red bat, and hoary bat). Eight northern long-eared bat calls (and two more probable northern long-eared bat calls) were verified at five of the 33 points surveyed. Habitat at the detection points included a small stream surrounded by beech, birch, and aspen, a forest road surrounded by mature northern hardwoods, a permanent wildlife opening surrounded by northern hardwoods and scattered pine, mature northern hardwoods, and a natural gap surrounded by red oak and beech. Northern long-eared bats were also detected at two locations just outside the project area.

Acoustic survey results indicate that a low number of northern long-eared bats are likely roosting and foraging during the non-hibernation season in the project area, and that the detected bats were likely travelling between a foraging and roost site. Bats will usually forage within one mile of a roost site (Sasse and Pekins 1996). Individual roost sites could occur across the landscape, with males known to be flexible in roost tree section and may choose smaller trees.

Maternity colonies are an important summer habitat feature and may encompass a complex of trees with a primary roost tree, used by several individuals with young over a period of years (Sease and Prout 2015a). Research and survey data indicate that maternity sites are likely located within one mile of large wetland complex. Using WMNF survey data, existing habitat conditions, and the best available science related to habitat requirements, seven potential northern long-eared bats maternity colony areas were identified in or within one mile of the project area. Although it is unlikely that all are occupied by northern long-eared bats, they were all evaluated in this analysis. Effects to foraging habitat and roosting habitat for males and non-reproductive females are not evaluated because these habitats are not limiting.

The primary limiting factor for bats, including northern long-eared bats, is white nose syndrome (USFWS 2013, USDA Forest Service 2014b) which has been detected in hibernacula in Maine and New Hampshire and has killed millions of bats in the eastern United States and Canada (Perry 2013). While there are no known hibernacula in the project area, white nose syndrome has been detected in known hibernacula approximately 25 miles from the project area.

### *Small Whorled Pogonia*

Small whorled pogonia occurs primarily in mid-successional stands of mixed deciduous or mixedwood forests, although some populations are in relatively young or mature forests. Most populations in New England occur at low elevations (less than 1,500 feet) on moderate slopes. Small-whorled pogonia generally occupies sites with sparse to moderate ground cover and a relatively open understory canopy. Many sites occur on soils with hardpans within a few feet of the surface.

There is one population of this species, consisting of three known, recently observed, sub-populations in a localized portion of the project area, as well as one nearby historic observation last observed more than 20 years ago. A large contiguous area adjacent to the historic and recently observed locations was searched extensively by individuals and teams directly familiar with the species. These areas contained intermittent patches of good potential habitat for small whorled pogonia. Due to the cryptic nature of the species, and its extremely low frequency in the landscape, it is always possible that plants remain undetected in surveyed areas. That said, the general surveys conducted across the entire project area, in combination with the intensive searches adjacent to known and historic areas of small whorled pogonia, indicate a very good and reasonable level of confidence about occupied and unoccupied areas. Most of the forest in the project area consists of either inappropriate natural community, forest type, or soil conditions for the species, or consists of more mature forest than the mid-

JA-0552

PBWTAR_2292

and proposed new landings would be removed. No adverse effects to forest health are expected from these activities under any action alternative.

### Forest Products

Although the amount varies, Alternatives 2 through 6 would each provide forest products to local markets and wood products manufacturers. The estimated volume of timber harvested is shown in table 32. In addition to this volume, the proposed treatments are designed to improve or maintain forest health and productivity and therefore ensure a sustained yield of forest products into the future. Revenue associated with the sale of the estimated volume is discussed in the Socioeconomics section in this chapter.

## *Cumulative Effects*

The analysis area for cumulative effects on timber resources encompasses national forest lands in the Albany North and South HMUs (21,785 acres) and adjacent private lands bounded by Route 5/35 to the east and Route 5 and West Stoneham Road to the south (8,328 acres). This area was chosen because it evaluates this project's contribution to the broader WMNF habitat objectives; it considers land newly acquired by the Forest Service that was recently harvested by the former landowner; and it considers activities on adjacent private lands. The analysis period for cumulative effects is ten years past and ten years into the future from planned harvests because even-aged stands are considered in the regeneration phase of growth after harvest for ten years, and the amount of regeneration age class is a measure of habitat and forest diversity.

Past, present, and reasonably foreseeable activities listed in Appendix F could contribute to cumulative effects when added to the direct and indirect effects of this Albany South project. For vegetation, only projects that include timber harvesting for the purposes of forest management were included in the analysis for cumulative effects to vegetation. Incidental tree removal that occurs when implementing non-forest management projects would have no measureable effect on forest health and productivity, or the availability of forest products to local markets, and therefore are not discussed further in this section.

The following data regarding timber harvests in the cumulative effects area was collected from national forest databases, roadside assessments, town office records, private land owners, and inspection of aerial photos taken every decade from the 1950s to the present. In addition, information was gathered through inquiries to the Maine Forest Service.

- In the past ten years in the cumulative effects area, 1,760 acres of intermediate harvest and 151 acres even-aged harvest occurred on national forest and the Maine Forest Service was notified of 1,630 acres of harvest on private lands. Harvest methods on private lands were similar to individual tree selection and commercial thinning as used on national forest land. All harvested land has remained forested up to this point in time.
- Of the 1,630 acres of private harvest initiated in the last decade, it is likely that some amount of harvesting is still taking place.

# Water Resources

The following discussion incorporates by reference the analysis and conclusions documented in the Albany South Integrated Resource Project Water Resources Report (Johnson and Gryczkowski 2017; updated 2015 report) located in the project record.

## Background

This analysis evaluates the potential environmental effects of the proposed activities on water resources in the project area and in the larger 12-digit hydrologic unit (HUC12) watersheds containing the project area. A map of streams and subwatersheds analyzed in this report is included in Appendix G – Water Resources Maps. The analysis also ensures consistency with the following Forest Plan's goals for water resources:

- Surface waters on the White Mountain National Forest are considered "outstanding resource waters," and water quality is maintained or improved to protect existing and designated instream water uses such as aquatic life (Forest Plan, pp. 1-17 and 1-18);
- The Forest Service will manage streams at proper functioning condition to dissipate stream energy associated with high water flows, thereby decreasing erosion, reducing flood damage, and improving water quality (Forest Plan, p. 1-18).

Public concerns about water quality, adequate riparian buffers, and mapped streams are also addressed in this analysis.

### *Stream Mapping*

Many wetlands and perennial, intermittent, and ephemeral streams in the project area were not mapped on existing USGS topographic maps or as part of the National Hydrography Dataset, and flow regimes were incorrect on some that were mapped. The Forest Hydrologist and other trained personnel walked the project area to update and correct maps with accurate stream and wetland locations and information, in particular in those areas that could be affected by the proposed activities. Perennial streams included in this analysis are shown on maps in Appendix G. Locations of other streams are in the project record.

Perennial streams were identified if stream flow persisted during the driest time of year, or, at other times, by secondary indicators such as presence of fish, upstream springs or seeps, vegetation type, and other indicators. Since intermittent and ephemeral streams can be difficult to distinguish without frequent observation, many ephemeral streams are likely mapped as intermittent streams. Upstream areas without defined, continuous channels or mineral soil or bedrock exposure were considered "ephemeral flow areas" in accordance with Maine best management practices (MFS 2004).

The flow regime and site-specific conditions define the minimum level of protection required to avoid long-term effects to water resources. If stream flow

JA-0554
PBWTAR_2330

regimes or channel locations are found to differ based on field observations by qualified personnel, stream reclassification and any appropriate protection measures would be applied during project implementation to protect water quality and comply with the Forest Plan, applicable laws, and State best management practices (see Appendix B - Design Features).

## Effects Indicators and Measures

Table 35 displays the indicators and measures used to determine the effects to water quantity and water quality, which are the relevant resource elements studied in this analysis.

Table 35. Resource indicators and measures for assessing effects to water resources

| Resource Element | Resource Indicator | Measure | Source |
|---|---|---|---|
| Water quantity | Stream flow does not substantially increase or decrease due to management activities | Basal area removed does not exceed 25 percent of a watershed | Hornbeck et al. 1993 |
| Water quantity | Concentration of surface runoff is minimized | Percent of watershed with mineral soil disturbance (comparative)*<br>best management practices for drainage are considered and incorporated into proposal (qualitative) | Aust and Blinn 2004<br>Stafford et al. 1996, Croke and Hairsine 2006, MFS 2004 |
| Water quantity and water quality | Change in runoff and peak flows; sediment and nutrient effects | Percentage of a watershed burned (comparative)* | Elliot and Vose 2005 |
| Water quantity and water quality | Channel capacity, shape and velocity; sediment and phosphorus inputs | Number of stream crossings<br>Capacity of stream crossings to withstand high flows | MFS 2012<br>2005 Forest Plan, Water Resources, Stream Crossings G-3 (p. 2-31) |
| Water quantity and water quality | Change in runoff and peak flows; sediment, nutrient, dissolved oxygen effects | Impervious cover does not exceed 10 percent of cumulative effects area watersheds | Center for Watershed Protection 2003;<br>Morse and Kahl 2003 |
| Water quality | Chemical changes (pH, aluminum, nitrate) are below thresholds harmful to aquatic life and human uses | Basal area removed does not exceed 20 percent of a watershed<br>No more than 15 percent of a watershed harvested with even age regeneration | Siemion et al. 2011; Wang et al. 2006; Baldigo et al. 2005; Lawrence and Driscoll, 1988<br>2005 Forest Plan Vegetation Guideline G-1 (p. 2-29) |
| Water quality | Sediment loads/ total phosphorus | Length/area of soil disturbance within 100 feet of stream or pond (comparative)* | 2005 Forest Plan Riparian and Aquatic Habitat Guidelines 5, 6 and 7, (p. 2-25) |
| Water quality | Water quality effects are limited to temporary, short-term changes | best management practices for sedimentation and/or spill prevention are incorporated into proposal where ground disturbance and/or chemical use occurs(qualitative) | MFS 2004; 2005 Forest Plan, Water Resources, Soil and Water Conservation S-2 |

*comparative indicators do not have a defined threshold based on literature, so analysis focuses on comparisons among alternatives, including the no action alternative, and outcomes of similar activities in other areas

JA-0555
PBWTAR_2331

## Existing Conditions

Watershed conditions related to the need for action are described in Chapter 1.

The project area is located in the following HUC12 watersheds:

- The Kezar Lake watershed drains into the Saco River just east of the New Hampshire state border in Maine.
- The Songo Pond-Crooked River watershed drains into Sebago Lake.

Perennial streams in the project area include Great Brook, Beaver Brook, Goodwin Brook, Hannah Brook, Bartlett Brook, Meadow Brook, Albany Brook, Willard Brook, and unnamed streams. The Crooked River is adjacent to and immediately downstream from the east side of the project area. Additional water bodies in the project area include Virginia Lake, Number 8 Pond, Lombard Pond, Kneeland Pond, Round Pond, and Crocker Pond; and unnamed wetlands, seeps, and vernal pools. Kezar Lake and Keewaydin Lake are major water bodies immediately downstream from the project area. Many unnamed perennial, intermittent, and ephemeral streams exist in the project area, some of which were newly mapped as part of this analysis.

Surface water intakes for two municipalities are downstream from the analysis area and there are no public water supply wells in the project area (MDEP 2014).

### Water Quantity and Watershed Condition

Increases in water quantity can affect the proper functioning of watersheds by concentrating or changing the direction of flow, intercepting surface or ground water, forming new channels, or increasing sedimentation. Water quantity in streams is directly related to annual precipitation rates but may be influenced by human alterations such as stream crossings (culverts, bridges, and fords) on roads and trails, and by changing vegetative conditions and evapotranspiration rates in the watershed. Some of the 24 stream crossings in the project area are undersized culverts as noted in Chapter 1. Virginia Lake has a dam on the outlet, as do Kezar Lake and Keewaydin Lake downstream from the project area.

The Kezar Lake and Songo Pond-Upper Crooked River subwatersheds are classified by the Forest Service as *Properly Functioning* (Class I). Sources of nonpoint source pollution occur on private land in the upper portion of the Crooked River watershed (Williams 2012). The Conservation Plan for the Kezar River, Kezar Lake, and Cold River watersheds identify a spectrum of threats to proper functioning including residential development, new and existing roads, invasive species, recreational vehicles and practices, point source pollution, sedimentation, poor forest harvest practices, and nutrient runoff.

### Water Quality

Basic water quality data and water samples collected since 2011 in and near the project area indicate low baseline pH and high total aluminum concentrations, which are typical across the WMNF (Hornbeck et al. 2001). This may be due to naturally low buffering capacity in the soil and bedrock of these watersheds, naturally occurring organic acids, and human-caused acid deposition effects.

JA-0556

PBWTAR_2332

Sampled streams averaged low turbidity (suspended sediment), with higher values during high flow periods. Based on observation of bed material, sedimentation is generally limited to the area near soil disturbances.

The Crooked River and its tributaries and minor tributaries to the Saco River in the project area have been assessed by the Maine Department of Environmental Protection as having water quality sufficient to support some designated uses. However, all freshwaters in Maine are affected by mercury from acid deposition and are impaired for fish consumption. Otherwise, these waters appear to meet state water quality standards to support aquatic life such as fish and macroinvertebrates (MDEP 2012). The State of Maine designates tributaries to the Saco River in the project area as Class A waters, Crooked River and its tributaries as Class AA waters, and waters on the White Mountain National Forest as outstanding natural resources. These designations require that water quality be maintained under state anti-degradation provisions (State of Maine 2009b).

Virginia Lake and wetlands greater than 10 acres in the towns of Stoneham and Lovell are protected under Maine Forest Service rules. These measures include preservation of shoreline integrity, shade retention within a 250 foot buffer, and standards for skid trails, landings, roads, and stream crossings. Water bodies with greater than 300-acre drainage are subject to similar standards under MFS rules, though the shade retention zone is 75 feet. A map of buffer zones associated with Maine Forest Service rules was generated by the State of Maine and is included in the project record.

Further information on water quantity and quality may be found in the water resources specialist report.

## Environmental Consequences

All effects conclusions incorporate the applicable project design features in Appendix B, which are part of Alternatives 2 through 6, also referred to as the action alternatives.

### *Analysis Area and Timeframe*

The analysis area for direct and indirect effects to water resources encompasses the Great Brook and Keewaydin Lake watersheds, and tributaries to Crooked River in the project area (Appendix G). This area was chosen because it includes all streams draining the project area. The analysis period for direct and indirect effects is 10 years in the past and 20 years in the future. Water quality and quantity effects from vegetation management and temporary disturbance would subside within 10 years of implementation (Hornbeck et al. 1993; Martin et al. 2000). Project implementation is expected to occur over approximately ten years.

### *Alternative 1- No Action*

#### Water Quantity

Current trends in water quantity in the project area would continue and be influenced by natural events, precipitation levels, and any management actions

not related to this project. Without the benefit of the proposed restoration actions and application of best management practices, hydrology in the project area would remain affected by channelized flow in roads, trails, and ditches. Wetland hydrology along some existing roads and trail segments would remain altered. The existing 24 stream crossings and their individual capacity to withstand high flows would remain the same. No culverts would be removed or replaced to improve hydrologic function of channels and wetlands. Stream reaches that are currently unstable due to undersized culverts would remain unstable and would likely lead to road washouts, which are already known to occur in some locations. Adverse effects to water would continue in disturbed areas. Road maintenance in the project area would continue and may disturb soil and affect water resources; however, use of best management practices would reduce or eliminate adverse effects.

#### Water Quality

Current trends in water quality would continue. Ongoing management activities would protect water quality and existing uses with Maine best management practices, Forest Plan Standards and Guidelines, and site-specific Soil and Water Conservation Practices.

Soil disturbance within 100 feet of streams and ponds would continue with road and trail maintenance, camping in riparian areas, and other areas impacted by past and present activity. Riparian camping along Great Brook, dispersed camping in wildlife openings, and camping on the shore of Virginia Lake could be an ongoing source of sediment, nutrients, and bacteria, and not in compliance with Forest Plan guidance and Maine best management practices, although the level of impact would likely remain within water quality standards. Effects on water quality from nutrient and bacteria levels from human uses in the project area would continue.

Water quality in short stream reaches near undersized stream crossings would continue to be affected by localized erosion and sedimentation.

#### Cumulative Effects-No Action

Since no other direct and indirect effects on water quantity and quality are anticipated under Alternative 1, no cumulative effect on water quantity and quality would occur in relation to these indicators.

### *Alternatives 2-6*

Table 36 displays the values for quantitative measures of environmental effects used in this analysis when evaluating direct and indirect effects to water resources. A summary of the analysis and results with conclusions about effects to water resources follows the table.

Table 36. Quantitative values for measures of direct and indirect effects to water resources, by alternative

| Measure | Alt. 2 | Alt. 3 | Alt. 4 | Alt. 5 | Alt. 6 |
|---|---|---|---|---|---|
| Highest percent of basal area removed in any watershed (percent) | 18 | 11 | 18 | 18 | 18 |
| Potential acres with mineral soil disturbance and percent of analysis area disturbed (acres/percent) | 144/0.89 | 98/0.61 | 126/0.78 | 145/0.90 | 139/0.86 |
| Highest percent of prescribed fire in any watershed | 17 | 3 | 17 | 17 | 17 |
| Number of permanent stream crossings in the project area | 21 | 21 | 21 | 21 | 18 |
| Number of temporary stream crossings (rehabilitated after project operations) in the project area | 46 | 19 | 39 | 46 | 44 |
| Acres of potential soil disturbance within 100 feet of waterbodies | 13.8 | 8.3 | 11.6 | 13.8 | 13.4 |

## *Direct and Indirect Effects*
## *Water Quantity*

### Timber Harvest

Changes in vegetation from timber harvesting, mechanical fuel reduction, and release treatments can alter evapotranspiration rates and stream flow. Research indicates that measurable increases in annual water yield may occur when basal area in the watershed is reduced by 25 percent or more in a 10-year period (Hornbeck et al. 1993). The greatest amount of basal area proposed for removal in any watershed is 18 percent under Alternatives 2, 4, 5, and 6 (in Beaver Brook Tributary 8), and 11 percent under Alternative 3 (in Lombard Brook and Albany Brook Tributary 9). These values are conservative estimates because additional basal area would be retained with implementation of design features to protect scenery.

Based on this analysis and best available science, any localized increase in water tables and headwater stream flow would be virtually undetectable in the main stem of first order or larger perennial streams. Increases would occur primarily during low flow periods and would dissipate within about 3 to 5 years due to vegetation regrowth (Hornbeck et al. 1993). Therefore, no detrimental direct or indirect effect on water quantity or channel function is expected from vegetation management under any action alternative. A map of subwatersheds used in analysis is in Appendix G and detailed calculations are in the project record.

### Prescribed Fire

The highest percentage of a watershed proposed for prescribed fire is 17 percent in Alternatives 2, 4, 5, and 6, (in the Meadow Brook Headwaters watershed) and 3 percent in Alternative 3 (in the Beaver Brook watershed). Prescribed fire is not proposed in all watersheds.

In contrast to wildfire, prescribed fire typically has minimal or no effect on hydrologic processes like canopy interception, infiltration, runoff, and

evapotranspiration because the canopy remains relatively undisturbed and much live vegetation remains in place (Baker 1988). Based on published studies of partially burned watersheds, any change in water quantity would be expected to be highly localized and abate in 1 to 2 years as vegetation regrows (Edwards and Troendle 2012). Potential effects include locally wetter conditions in the burn unit or small amounts of overland flow that are dispersed by vegetation or litter layers before reaching a water body. There would be little or no measurable effect on infiltration or overland flow because prescribed fire on the WMNF typically leaves much of the forest floor intact (USDA Forest Service 2010). Burning only part of a watershed further reduces the likelihood of hydrologic effects (Elliot and Vose 2005).

A small direct effect of prescribed burning on hydrology would be withdrawal of surface water for fire suppression. This would be limited, temporary, would not occur during drought or low flow, and would affect no more than 5 percent of mean annual flow under any alternative.

Additionally, all action alternatives propose mechanical means to reduce ladder fuels on National Forest lands that abut private properties that have structures within 300 feet of the White Mountain National Forest boundary. This would occur on less than 10 acres scattered throughout the project area, and would remove a negligible amount of live vegetation. Therefore, no effect on water quantity is expected.

Overall, there would be no detrimental effect on water quantity or channel function from prescribed fire or hazard fuels removal under any action alternative.

### Watershed Restoration

This work would occur in the Great Brook, Beaver Brook, and Virginia Lake watersheds. There would be a direct beneficial effect on water quantity in one tributary to Virginia Lake where the stream has been diverted into a ditch and the proposed culvert work would result in maintaining summer low flows and returning high flows to the original, stable channel.

Removal of existing culverts as proposed in the action alternatives would restore free-flowing, stable stream channels or wetland drainages. Existing alterations in channel shape, and in some cases, diversion of high flows down roads or ditches, would be remedied. This would bring sites closer to the free-flowing condition specified for Class AA waters in the Crooked River watershed. This beneficial effect would be slightly smaller under Alternative 3, in which two culverts in the inventoried roadless area along Great Brook would not be removed.

Replacing undersized culverts as proposed in all action alternatives would improve channel function by increasing the capacity of the crossing to accommodate high flows. Properly sized and constructed stream crossings allow channel-forming flows and flood flows to pass unimpeded and prevent years of scouring and changes in channel shape (University of New Hampshire 2009).

Rehabilitation of approximately 1,800 feet of legacy road or skid trail beds would occur in the Beaver Brook, Virginia Lake, and Keewaydin Lake Tributary 1

watersheds. Water bars or cut trees placed at specified intervals would disperse water onto vegetated ground and promote infiltration of water into the soil instead of the current artificial concentration of overland flow. Where natural stream channels cross these corridors, channel function would improve by disconnecting these channels from the road or trail bed. The reduction in basal area from use of cut trees would not be enough to exceed the 25 percent basal area removal threshold in any watershed.

Potential mineral soil disturbance is greatest under Alternatives 2 and 5, least under Alternative 3, and intermediate under Alternatives 4 and 6. This estimated potential disturbance is conservatively high, since road maintenance, watershed restoration and decommissioning activities would result in little soil disturbance over most of the area covered. All action alternatives would disturb 0.9 percent or less of the project analysis area. Because the need for action is to apply best management practices for drainages where they were not previously applied, any adverse effects would be minimal and offset by the beneficial effects resulting from the repair and improvements made to watershed function.

### Recreation and Snowmobile Trail Improvements

The proposed campsite closures at Virginia Lake and along Great Brook (Alternatives 2 through 6) and the construction of new sites on the east side of the Hut Road (Alternatives 2, 4, 5, and 6) would have minimal effect on water quantity since flows are not being withdrawn or diverted. Tree removal for campsite construction would not cause a watershed to exceed the 25 percent basal area removal threshold and soil disturbance (estimated to be about 0.1 acres) would be mitigated by best management practices and project design features. Channel function in Great Brook would improve as the former campsites revegetate and improve dissipation of flood flows and soil infiltration.

Decommissioning the Old State Cutoff Trail under Alternatives 2, 3, 4, 5, and 6 would retain all trees and disturb the minimum area of ground needed to remove crossing structures and install proper drainage features.

A section of the Stoneham State Snowmobile Trail just east and south of Lombard Pond currently travels through several poorly drained, wet, and muddy spots in the vicinity of Lombard Pond between Birch Avenue and the Keewaydin Spur Trail. With the FR 320A road construction proposed in this project, there is an opportunity to relocate this wet section of trail onto the proposed road system under Alternatives 2, 4, and 5. The relocation would place the snowmobile trail on higher, better drained, and more stable ground away from Lombard Pond, and thus, reduce impacts to water resources. Alternative 3 would also relocate this section of trail but would construct a new connector trail about 800 feet long where road construction is proposed in Alternatives 2, 4, and 5. The relocation of this section of the Stoneham State Snowmobile Trail would not occur under Alternative 6. Under any alternative where this trail is relocated, the former alignment will be decommissioned and vegetation allowed to regenerate in the former corridor.

The existing trail bridge over Lombard Brook is undersized and located on a bend, resulting in minor deposition and scour. This crossing would be improved

JA-0561
PBWTAR_2337

under Alternatives 2, 4, and 5 to meet Forest Plan standards and guidelines for stream crossings and would thus better accommodate expected flows. Under Alternatives 3 and 6, the existing bridge would be retained and upgraded when its condition warrants.

Overall, trail relocation and decommissioning activities would improve hydrology by reducing the number of stream crossings and the number of disturbed corridors that may intercept flow.

### Transportation

Depending on the alternative, transportation proposals include construction and use of new roads, landings, and skid trails; reconstruction and maintenance of existing roads; and decommissioning of existing roads and trails. The associated potential mineral soil disturbance, is greatest under Alternatives 2 and 5, least under Alternative 3, and intermediate under Alternatives 4 and 6. All action alternatives would disturb 0.9 percent or less of the 25 square mile analysis area. This includes activity in currently disturbed areas that would improve hydrologic function in the long term, and no detrimental effect on water quantity or channel function would be expected related to overall level of disturbance under any action alternative.

New road segments have been field reviewed to determine the potential for hydrologic impacts. No new road construction is proposed in Alternative 6. In the Beaver Brook watershed, two short connector roads (totaling about 0.3 miles) are proposed. The eastern section is proposed in all action alternatives except for Alternative 6, while the western segment with a crossing of Beaver Brook is only in Alternatives 2 and 5. In the Goodwin Brook watershed, less than 0.2 miles of road construction are proposed to connect existing road segments in Alternatives 3, 4 and 5. In the Meadow Brook/Keewaydin Lake watershed, approximately 1 mile of new road construction is proposed in Alternatives 2, 4, and 5; only 0.5 miles of this route would be constructed in Alternative 3.

These new road segments would tend to follow a combination of ridgelines and contours, have adequate drainage, avoid steep slopes and riparian areas except at crossings, and allow for adequate drainage. The use of some existing road bed and limitation to winter use also minimize potential hydrologic impacts. These measures would minimize adverse impacts to water quantity.

All new roads proposed in this project would be closed or converted to winter trails after use, drainage structures would be pulled or maintained, and road beds would revegetate by the end of the analysis period, recovering a degree of normal hydrologic function. Minor, localized changes in hydrology would be expected where cut and fill or ditch construction interrupts the direction of ephemeral flows for a short distance. This effect is small enough in extent and severity that it would not be expected to yield a measurable change in the flows of intermittent or perennial streams.

Research indicates that roads and some skid trails could affect water quantity if they change the direction of flow, intercept surface or ground water, or concentrate flow in ditches (Gucinski et al. 2001). Existing roads and skid trails

JA-0562
PBWTAR_2338

would be improved to meet standards before use so no effects to hydrology would occur. Alternatives 2, 5, and 6 would have the most acres of skid trails, at 75 to 76 acres, while Alternative 3 would have the least with 46 acres. Alternative 4 would use 67 acres for skid trails. Based on literature review and project monitoring, hydrologic effects due to skid trail construction, which accounts for most of the acreage disturbed, would be minimal and would dissipate within a few years as skid trails revegetate (Crook and Hairsine 2006; USDA Forest Service 2010).

Alternatives 2 and 5 would use 34 landings (16 new), Alternative 3 would use 23 landings (12 new), Alternative 4 would use 26 landings (12 new), Alternative 6 would use 31 landings in (13 new), each approximately 0.75 acres in size. Location, construction, and use of new and existing landings would adhere to project design features, best management practices, and Forest Plan guidance to protect water resources (Appendix B). Landings in the WMNF typically revegetate and normal hydrologic function returns within a few years after project closeout (see soil resources report; Donnelly et al. 1991; USDA Forest Service 2013). Because of the landing locations, reuse of previously disturbed areas, and temporary nature of disturbance, no direct or indirect effects on water quantity would occur under any alternative as a result of the proposed landings.

The number of permanent crossings would decrease from 24 to 21 under Alternatives 2, 3, 4, and 5, and to 18 under Alternative 6, as a result of removing some crossings that are currently in place. Replacements or permanent crossings would have equal or greater capacity to accommodate flood flows, in accordance with Forest Plan, Water Resources S-1 and G-3. As a result, there would be an overall increase in the ability of crossing locations to accommodate high flows.

The number of temporary crossings would be greatest under Alternatives 2 and 5, slightly less under Alternatives 4 and 6, and lowest under Alternative 3. A total of 46 would be used in Alternatives 2 and 5, 39 in Alternative 4, 19 in Alternative 3 and 44 in Alternative 6. Temporary crossings of perennial streams would be designed to accommodate flood flows with a 4 percent or greater chance of occurrence (the 25-year flow; see Forest Plan Water Resource, Stream Crossings G-5), but could temporarily restrict passage of the flood waters if a rare event occurs. Other temporary crossings would be implemented in accordance with applicable state best management practices. Monitoring of temporary crossing sites on recent WMNF timber sales has found close-out was consistent with best management practices and no permanent hydrologic alteration occurred (USDA Forest Service 2013; USDA Forest Service 2014a).

Road maintenance on existing roads would maintain or upgrade drainage features therefore no negative effect on hydrology would occur. Reconstruction may involve minor relocations and drainage improvements which would benefit hydrology by allowing more streams to flow freely in their original channels. Road decommissioning would have no effect or a slight positive effect on channel function as the areas revegetate.

JA-0563
PBWTAR_2339

## *Water Quality*

### Timber Harvest

Research, site-specific conditions, proposed buffers, and other design features indicate that adverse effects to water chemistry (water quality) would not occur if basal area removal in a watershed is restricted to 20 percent or less. Because the maximum removal in any watershed in any alternative would be 18 percent, no adverse effects to water chemistry would occur as a result of the proposed timber harvest. Beaver Brook Tributary 8, which has the highest removal at 18 percent, would be treated mostly with selective cutting which would reduce effects as compared to an equal amount of clearcutting. The proposed timber harvest is also consistent with Forest Plan Vegetation Guideline G-1 which limits even-age treatments in a watershed.

At smaller scales such as intermittent streams, changes in water chemistry such as an increase in nitrate or dissolved base cation concentrations could occur, but would be far below thresholds for negative effects and would abate within a few seasons as vegetation regrows (Brown and Binkley 1993, Clinton 2011, Martin et al. 2000). Additional basal area retention for scenery protection would reduce potential effects even further. Based on the best available science and the extent and type of the proposed timber harvest, no detrimental direct or indirect effect on water chemistry, and thus, water quality, would occur as a result of the proposed timber harvest.

Riparian buffers are effective in preventing sediment and associated pollutants from reaching streams as a result of timber harvest (Clinton 2011, Chase et al. 1995, Binkley and Brown 1993). Table 37 summarizes the minimum buffer widths and riparian harvest restrictions planned for streams, lakes, ponds, wetlands, seeps, and vernal pools in the project area. Relatively continuous canopy cover would be retained for at least 100 feet on either side of first and second order streams, and the forest floor would be protected from soil-disturbing activity for 50 feet or more, with this distance increasing with slope (2005 Forest Plan, Riparian and Aquatic Habitats, G-1, G-2, G-5 and G-6).

Site-specific protection for intermittent streams would follow Maine best management practices (MFS 2004) for minimizing soil disturbance and maintaining bank stability to prevent sedimentation. In addition to buffers, all streams would be protected by implementation of Forest Plan Guideline G-15 for Riparian and Aquatic Habitats (Forest Plan, page 2-26), which prohibits harvest of bank-stabilizing trees, as well as Maine best management practices and design features developed to address site-specific conditions. During project planning, wetlands, springs, ponds, and vernal pools have been identified for protection in accordance with design features, best management practices, and Forest Plan guidance. Ponds and vernal pools have a 100-foot riparian management zone, and water bodies greater than 10 acres receive additional protection under Maine shoreland standards.

See table 37 for a summary of site-specific riparian management, Appendix B for detailed design features to be implemented to protect water resources, and Appendix G for maps of water resources in the analysis area.

Table 37. Riparian management descriptions for water body types in the project area

| Stream reach | Stream order | Riparian harvest restrictions |
|---|---|---|
| Great Brook below the confluence of Willard Brook | 3 | **300 feet:** 25-foot no cut, plus 275-foot uneven-age management |
| Mapped perennial streams: Great Brook, Beaver Brook, Goodwin Brook, Hannah Brook, Bartlett Brook, Meadow Brook, Albany Brook, and Lombard Brook | 1 or 2 | **100 feet**: 25-foot no cut, plus 75-foot uneven-age management |
| Previously unmapped perennial streams with additional protection for high quality fish habitat: Beaver Brook Tributary 5, Beaver Brook Tributary 1, Beaver Brook Tributary 8, Great Brook Tributary 2, Great Brook Tributary 3, Meadow Brook Tributary 4, Meadow Brook Tributary 1 where specified in design features (EA Appendix B). | 1 | **100 feet**: 25-foot no cut, plus 75-foot uneven-age management |
| Other previously unmapped perennial streams | 1 | **75 feet**: uneven-age management only** |
| Intermittent streams in units 3, 32, 56, 69, 115, and 116 | 0 | **100 feet**: No even-age regeneration treatments shall occur within 100 feet of bank. |
| Other intermittent streams | 0 | **25 to 165 feet** filter area meeting Maine best management practices (MFS 2004); leave bank-stabilizing vegetation. |
| Virginia Lake, Number 8 Pond, Lombard Pond, Kneeland Pond | N/A | **100 feet:** 25-foot no cut, plus 75-foot uneven age management. Also follow state guidelines for habitat protection adjacent to vernal pools (EA appendix B). |
| Other ponds, lakes, identified natural vernal pools | N/A | **100 feet:** 25-foot no cut, plus 75-foot uneven age management. Also follow state guidelines for habitat protection adjacent to vernal pools (EA appendix B). |
| Other identified wetlands, springs, ephemeral flow areas | N/A | Comply with Forest Plan, Maine best management practices (MFS 2004), and Maine Standards for timber harvest in shoreland (MFS 2016) as applicable to protect hydrologic function water quality. |

The riparian management descriptions noted in table 37 are compatible with recommendations in the scientific literature for protection of water quality (Aust and Blinn 2004, Lee et al. 2004, Wilkerson et al. 2010). Soil disturbance within 100 feet of streams or ponds would be negligible due to the nature of proposed treatments and project design features (Appendix B). Forest monitoring indicates that sediment may move within units, but is unlikely to reach water bodies due to the forest floor, microtopography, and regenerating vegetation (Croke and Hairsine 2006, Stuart and Edwards 2006; USDA Forest Service 2010). A review of ten years of water monitoring data did not find sediment or turbidity concerns in WMNF watersheds with similar types of activity (USDA Forest Service 2010). Therefore, no detrimental direct or indirect effect to water quality from sedimentation is expected from timber management activities proposed in any action alternative.

The fuels reduction proposal to remove ladder fuels (limited live vegetation) and the proposed release treatments would not cause soil disturbance or changes in basal area or water chemistry; therefore no effects would occur to water quality.

### Prescribed Fire

The proposed low to moderate intensity prescribed fire on Albany and Cecil Mountains would not exceed 17 percent of the area of any watershed under any alternative. The burns would occur high in the watersheds on well-drained soils. About 1,400 feet of headwater streams occur in the planned burn area on Albany Mountain, and no streams occur in the Cecil Mountain burn area. No fire line would be constructed in riparian areas. Alternative 3 would have less prescribed fire use.

Research (Richter et al. 1982, Elliot, Vose 2005, Beche et al. 2005 ) and WMNF monitoring (USDA Forest Service 2010, USDA Forest Service 2011, USDA Forest Service 2012) indicate that prescribed fire that burns just part of a watershed, retains much of the forest floor, and includes riparian buffers would cause no detectable change in sediment or nutrients in streams. The burn units are designed with all of those parameters; therefore, no detrimental effect on water quality would be expected under any alternative.

### Watershed Restoration

Work would occur in and near stream channels with heavy equipment, and all actions would adhere to best management practices, state regulations, and Forest Service policies required to protect water quality (USDA Forest Service 2012, MDEP 2003). Approximately 1.2 acres would be disturbed in Alternatives 2, 4, 5, and 6 and 1.0 acres in Alternative 3. All alternatives would result in short-term increases in sedimentation and turbidity; however, measures such as working at low flows, temporarily diverting flow out of work areas, using sediment barriers, and establishing vegetation would minimize changes in turbidity and observable sedimentation (USDA Forest Service 2012) and keep these short-term effects below the Forest Plan standard (S-2) for Water Resources, Soil and Water Conservation Practices. Figure 11 illustrates an example of waterbarring in a decommissioned road segment.

Figure 11. Shows a water bar added to a decommissioned legacy road in 2012, within two weeks of completion

Restoration actions on old roads and trails would disturb soil at the site of waterbarring or other drainage work, with very low levels of sediment potentially reaching the stream during operations. Because these features would be designed to drain over undisturbed forest floor, the need for action to disperse flow onto vegetated ground would be met and direct or indirect adverse effects on water quality due to sediment would not occur. This work would improve consistency with Forest Plan guidance for soil and water resource protection and Maine best management practices.

The long-term objectives discussed in the need for action section in Chapter 1 would be met by all alternatives. The integrity of roads, trails, and stream channels would be restored and protected; current levels and sources of erosion and sedimentation would be reduced or eliminated; reduced potential for washouts would allow for continued access; and barriers to aquatic species would be eliminated.

### Recreation Improvements

As noted in the above section under water quantity, the proposed campsite closures at Virginia Lake and along Great Brook (Alternatives 2 through 6) and the construction of new sites on the east side of the Hut Road (Alternatives 2, 4, 5, and 6) would furthermore reduce human use and ongoing disturbance at existing sites within 100 feet of the water. There would be a small, beneficial effect on water quality by reducing the likelihood that nutrients, bacteria, fuel, or sediment generated by human uses would reach the water.

The activities connected with any relocation or decommissioning of the Stoneham State Snowmobile trail and associated bridge work or replacement, depending on the alternative, would result in very similar impacts to water quality as those disclosed for water quantity in the sub-sections above.

### Transportation

There is a low risk of changes in water chemistry from vehicle fluid leaks or use of vehicles near water resources. New roads and landings are excluded from riparian areas (except for stream crossings) and design features, best management practices, and Forest Plan standards and guidelines would be implemented to reduce or eliminate potential adverse effects during construction. Random sampling of 110 harvest areas in Maine found just one instance of chemical spillage (minor dripping) and no instances of chemicals reaching a water body (MFS 2012). The risk of direct or indirect effects on water chemistry from roads and landings proposals is minimal.

Most forestry-related sedimentation and increases in stream turbidity are associated with transportation systems (Martin and Hornbeck 1994) and are related to the area of disturbance (Gucinski et al. 2001). The area of disturbance within 100 feet of water bodies is a more relevant surrogate measure for sedimentation risk. Disturbance would be greatest under Alternatives 2 and 5, slightly less under Alternatives 4 and 6, and lowest under Alternative 3 (table 35). The action alternatives range from 2.54 to 6.5 acres of additional new disturbance relative to the no action alternative. The largest difference between alternatives is

JA-0567
PBWTAR_2343

primarily a result of less road maintenance and skid trail use in Alternatives 3 and 4.

New road construction, when occurring close to water bodies, represents a permanent disturbance for which water quality impacts must be carefully considered. Proposed new road construction would cause 0.24 acres of disturbance within 100 feet of water bodies in Alternatives 2 and 5, 0.12 acres in Alternative 4, and 0 acres in Alternatives 3 and 6. All of this area is on stream crossing approaches, indicating new road construction in riparian areas has been minimized.

Skid trails generally account for the greatest amount of potential soil disturbance, with 1 to 5 acres of disturbance within 100 feet of water bodies in this project. Skid trails would avoid stream or pond management zones except at stream crossings. Although not planned, if site conditions require skidding in a stream or pond management zone, Forest Service personnel would approve the location and assign additional sediment control measures to ensure compliance with the Forest Plan and Maine best management practices such as water bars, ditches with cross drainage, erosion barriers, properly-sized stream crossings, and slope limitations. These would prevent water from draining down skid trails and carrying sediment to streams.

Figure 12 depicts regrowth of vegetation on a skid trail one year after use.

Figure 12. A skid trail in a White Mountain National Forest timber harvest area, one year after use with application of best management practices

Approximately 175 feet of an existing skid trail may fall within 50 feet of an intermittent tributary to Virginia Lake because of ledge features upslope. This location has been approved for use based on its elevation above the brook, short length in the stream management zone, and ability to mitigate effects with best management practices. Skid roads and trails would revegetate within 2 to 3 years of use and have no more than a temporary impact. The anticipated skid trail system appears to meet and generally exceed Forest Plan guidance for skid trail location. Because of application of Forest Plan guidelines and State best

management practices, direct and indirect effects related to sedimentation due to skid trails would be negligible in all areas except stream crossings under all action alternatives. Skid trail monitoring in recent years has not found sediment from skid trails reaching streams, with the exception of stream crossings as discussed below (USDA Forest Service 2013).

Design features would exclude new landings within 100 feet of perennial streams or, if landings extend into this zone, additional measures would be implemented as needed to avoid sedimentation and meet Forest Plan guidelines (Forest Plan 2005, page 2-25). Maine best management practices would prevent landings from extending into specified filter areas or directing concentrated runoff into a water body. As illustrated in figure 13, White Mountain National Forest monitoring indicates that with careful site selection and application of best management practices, sedimentation was prevented and the sites revegetated within a few years (USDA Forest Service 2013, USDA Forest Service 2012, USDA Forest Service 2011, USDA Forest Service 2010). The most recent state evaluation of landings and haul roads on timber harvests in Maine supports this conclusion, with only one out of 110 sites having a landing or haul road in a filter area with measurable sedimentation (MFS 2012).

Figure 13. Landing in White Mountain National Forest timber harvest area, six years after use with application of best management practices

The transportation sub-section under the water quantity discussion above details the number of permanent and temporary stream crossings. Stream crossings on new road construction would disturb a total of up to one-quarter acre, depending on the alternative. No other new road segments are proposed within 100 feet of water bodies, in wetlands, or along ephemeral drainages that rapidly transport sediment. Winter use of the new road segments would further minimize soil disturbance and sedimentation. Sediment effects from these road segments are expected to be indistinguishable from background levels.

The transportation system proposed for use in Alternatives 2, 3, 4, and 5 involves 21 permanent and 9 to 11 temporary stream crossings on haul roads involved in the project. Alternative 6 proposes 18 permanent stream crossings and 11 temporary stream crossings. The number of permanent stream crossings would be less than the no action alternative due to changes in road use and proper close out. On skid trails, there would be 3 to 12 crossings on perennial streams and 7 to 23 crossings on intermittent streams. Within the proposed transportation system, stream crossings have higher potential than other road segments for effects on sedimentation (MFS 2009). Estimated increases in sedimentation rates for Alternatives 2 through 6 would be on the order of 0.2 to 0.3 kilogram/hectare for action alternatives and 0.1 kilogram/hectare for the no action alternative. This is an imperceptible difference relative to reported background sediment yields of 40 to 150 kilograms/hectare/year in New England (Martin et al. 2000), or the natural rates of 6 to 141 kilograms/hectare/year in uncut forested watersheds studied at Hubbard Brook Experimental Forest.

Though sediment yield from crossings is expected to be low, several factors would further minimize the occurrence of measurable sedimentation. More than half of the road crossings already have structures in place and would require little additional disturbance. This is particularly true in the Great Brook watershed. Also, the majority of crossings are on winter-use roads and skid trails. New or replacement crossing structures on perennial streams would be designed to pass bankfull flows, expected flood flows, sediment, and wood loads in accordance with Forest Plan Guidelines (p. 2-31). Temporary crossing structures would adhere to Forest Plan direction, Maine best management practices, and design features (Appendix B) to protect bank stability and minimize sedimentation. Following harvest, temporary crossing structures would be removed, with stream banks restored (graded and seeded) as necessary.

Since sedimentation risk increases with the number of crossings, Alternatives 2 and 5 would have the greatest risk, followed by Alternatives 6, 4 and 3, respectively. Given the additional design features in place, direct and indirect effects on sedimentation from all transportation activities would not exceed scattered instances of trace sediment input and rare cases of measurable sediment input on a temporary basis. An increase in short-term, localized sediment inputs may occur under any alternative, but activities such as road maintenance and reconstruction would decrease long-term sediment inputs. This would be in compliance with the Forest Plan, which allows effects of limited extent and duration that do not permanently degrade water quality if all appropriate measures have been taken to minimize effects. The difference among alternatives is negligible compared to background levels of sediment transport.

### Cumulative Effects

The analysis area for cumulative effects encompasses the Kezar Lake and Songo Pond- Upper Crooked River watersheds, totaling about 100 square miles. This area was chosen to adequately analyze the cumulative effects of activities in other parts of the Kezar Lake, Keewaydin Lake, and Crooked River watersheds along with the proposed activities, including portions of the Four Ponds project located just to the north of this project, and timber harvests on private lands to the

south of the project area. Effects of project activities would be masked by dilution further downstream. The analysis timeframe for cumulative effects is 10 years in the past and 20 years into the future, because water quality and quantity effects from vegetation management would be expected to subside in this period due to vegetation regrowth (Hornbeck et al. 1993; Martin et al. 2000). This project proposes changes to infrastructure that have a longer lifetime than 20 years, but trends should become apparent within ten years of implementation.

The analysis evaluated the past, present, and reasonably foreseeable activities listed in Appendix F that could contribute to cumulative effects when added to the direct and indirect effects of this Albany South project. Projects that have similar actions or effects include:

- Four Ponds Integrated Resource Management Project.
- Patte Mill Brook Road maintenance and reconstruction.
- Broken Bridge Pond dam repair.
- Great Brook Watershed Restoration.
- Ongoing road and trail maintenance, including relocations and bridge/culvert replacements.
- Permanent wildlife opening maintenance.
- Past timber harvest on private lands (452 acres).
- Planned timber harvest following the sale of private land parcels (1,345 acres) to include thinning, limited patch cuts, 2 miles of road construction, and 60 miles of skid trail use.
- Additional private timber harvest (712 acres) scattered throughout the analysis area.

Where specific timber harvest treatment information is not available, high estimates of intensity and disturbance were used to conduct a conservative analysis of cumulative effects. Where specific information about particular effects indicators is unknown (such as number of stream crossings, and area of soil disturbance near water), the alternatives are compared qualitatively based on projected changes in the analyses area.

### *Alternatives 2-6*

#### Water Quantity and Water Quality

**Timber Harvest**

The cumulative effects analysis for water resources evaluated basal area removal from past, present, and reasonably foreseeable future timber harvests listed above. To be conservative, harvest on private land assumed 100 percent basal area removal unless more specific information was obtained from the landowner.

Cumulatively, basal area removal (harvests) in the Kezar Lake watershed would range from 4.4 percent under Alternatives 2, 5, and 6 down to 3.7 percent under Alternative 3. Harvest in the Upper Crooked River watershed would be no more

JA-0571
PBWTAR_2347

than 5.5 percent under Alternatives 2, 4, 5 and 6, and 5.2 percent under Alternative 3, far below the 25 percent threshold level at which water quantity effects are expected. In addition, with just between 2.2 and 3.6 percent of the analysis area in regeneration (even-aged) harvest conditions, the Forest Plan threshold limiting regeneration harvests in first and second order watersheds to 15 percent over five years would be met. Given that timber harvest in the analysis area would be below thresholds for effects, even using conservative values, no detectable cumulative effect from basal area removal on water quantity would occur at the watershed scale.

No cumulative effects on water quality from sediment as a result of timber harvest and release treatments or mechanical fuel reduction would occur because implementation of Maine best management practices (applicable on private and National Forest System lands), Forest Plan Standards and Guidelines, and additional site-specific design features would minimize soil disturbance within 100 feet of water bodies. Research and monitoring indicates that harvest units are a very minor sediment source on managed forest lands.

**Prescribed Fire**

No cumulative effects on water quality or quantity related to prescribed fire are expected, since no detrimental direct or indirect effects are anticipated under any action alternative.

**Watershed Restoration**

No cumulative effects to water quantity would occur since no water withdrawal is planned for watershed restoration activities. Cumulative effects to channel function would be beneficial as a result of the additional restoration activities, road work, and trail relocations included in other projects in the analysis area. No detrimental cumulative effects on water chemistry are expected from these activities because Forest Plan guidance, Maine best management practices, and proper planning and usage would minimize chemical spills or releases near water (see previous discussion under direct and indirect effects above).

Any sediment inputs would be temporary, localized, and below water quality protection standards. Cumulative benefits would occur as banks are stabilized and erosion reduced from the projects in the analysis area. Sediment reductions may be evident at the first or second order watershed scale as discussed in the direct and indirect sections above, but are unlikely to be detectable at the larger watershed scale.

**Recreation Improvements and Transportation**

No detrimental cumulative effects on water quantity or quality would occur because these projects are designed to reduce existing effects to water resources, and protect against new effects. There would be small, beneficial effects on channel function and water quality and no effect on overall water quantity due to improved compliance with best management practices.

Impervious cover affects water quantity by increasing runoff and peak flows, and may also change water chemistry, particularly if the watershed exceeds 10 percent impervious cover (Center for Watershed Protection 2003, Morse and

Kahl 2003). Considering all projects and the existing condition, total impervious cover in the cumulative effects analysis area would average 2 percent, which is far below the 10 percent threshold. No cumulative effects on water quantity or quality are expected as a result of this indicator.

No adverse effects to water quality from sediment or turbidity would occur as a result of recreation or transportation projects. A high estimate of ground disturbance would average 2.5 percent of the cumulative effects area, which is a small increase over the existing 2.3 percent. While disturbance such as road maintenance, building construction or renovation, agriculture, timber harvest, and recreation in and near water would occur on private land, the small increase would not cause detrimental effects to water quality in the analysis area. Since disturbance within 100 feet of streams and water bodies in the project area would result in temporary, localized sediment input or reduced sediment input, such effects would not overlap sufficiently in time and space with other activities to have an adverse cumulative effect on downstream water bodies.

Sediment sources on both National Forest System lands and private lands are a known concern and are being addressed and mitigated by local organizations. Sediment and associated nutrient inputs have not reached detrimental levels in downstream water bodies, as evidenced by the low phosphorus levels and high clarity of Kezar Lake relative to other water bodies (FBEA 2012) as well as the Class AA status of the Crooked River. The potential for sedimentation is declining as protective measures required by the State and the Forest Plan are updated and made more effective than past measures in past forest management projects. Research and monitoring results translate to improved project designs including riparian buffers, location of roads, landings, and skid trails away from water, and appropriate operating seasons. These measures are consistent with the Kezar River, Kezar Lake and Cold River Conservation Plan strategies to “ensure that all timber harvesting within the watersheds be conducted according to Best Management Practices” and “guarantee that logging roads and skid trails are well-built and provide adequate drainage while minimizing erosion” (Ward and Duffy 2008).

The past, present, and reasonably foreseeable future actions are similar in scope and nature to other projects completed on similar watersheds in the White Mountain National Forest, and water quality monitoring has not identified detrimental effects related to sediment or associated nutrients in downstream lakes or rivers, including public water supplies, as discussed in monitoring reports (USDA Forest Service 2010; USDA Forest Service 2012; USDA Forest Service 2014a). The lack of sediment or nutrient impairments in waters draining the White Mountain National Forest is further evidence that recent management has not had a detrimental effect on these measures of water quality (MDEP 2012, NHDES 2012).

Though there are numerous stream crossings in the cumulative effects analysis area with unknown effects, the effects of this project are unlikely to overlap in time or space with effects of other crossings sufficiently to have a detrimental impact on water quality or quantity. Therefore, no effect or a beneficial effect on channel function and sediment would occur in the long term.

## Climate Change and Large-Scale Disturbance

### Alternative 1

See Appendix H for a summary of past and projected climate trends for the northeastern United States including the White Mountain region of New Hampshire and Maine through the year 2100. A summary of climate change trends related to water quality and quantity (Johnson and Cate 2014) is in the project record and incorporated by reference in the following discussion.

Climate trends over the past century include warming temperatures, fewer snow-cover days, and reduced snowpack that would indicate lower peak flow, a trend that is expected to continue (Campbell et al. 2011, Rustad et al. 2012). Data in this region since 1970 indicate a trend toward higher annual precipitation, and more frequent heavy rainfall events.

Climate change effects to water resources during the analysis timeframe would be small and subject to annual variability of climate patterns. Water quality could be affected by acidification during storm events, though acidity may be lower during snowmelt (Rustad et al. 2012). Without taking the proposed actions to correct undersized crossings and erosion, potential high flows from heavy rain events could impair channel function and increase streambank instability, risk of washouts, and sedimentation. Existing drainage features could be ineffective with high flows and cause streams to form on roads and trails. These effects would be unlikely to cause water quality impairment within the next twenty years, but would be part of a trend toward increasing sediment mobilization during more frequent, intense storms.

### Alternatives 2-6

Warming temperatures and fewer snow-cover days will shorten the period of suitable conditions for winter timber harvest and snowmobiling. Project operations would be adjusted as needed to occur only during suitable frozen or dry ground conditions, and the proposed changes to snowmobile trails would reduce erosion and sedimentation during marginal snow cover and high flow conditions.

The proposed activities would not measurably increase streamflow or runoff and are located and designed to minimize sedimentation from intense rain events. The short-term, localized sedimentation expected during project implementation would not increase due to the slightly higher frequency of intense rain events expected from climate change. While climate change may reduce snowpack and summer flows in the analysis area, the potential slight increases in water quantity resulting from the project's basal area removal, although not measurable, may offset any reduced flows caused by climate change during the analysis timeframe.

Overall, no detrimental cumulative effects from climate change on water resources are expected.

JA-0574
PBWTAR_2350

### Summary of Environmental Effects to Water Resources

Table 38 summarizes the effects to water resources based on the resource indicators. None of the proposed activities would exceed the thresholds where adverse effects may occur. Where thresholds are not identified, application of best management practices, compliance with applicable laws and regulations, and consistency with Forest Plan standards and guidelines ensure that all effects would be within acceptable and required limits for resource protection.

Generally, the effects to water resources under each alternative are directly related to the extent of the proposed activities. The risk of overall water quality and quantity impacts would be greatest under Alternative 2 and 5, followed by Alternative 6, 4 and 3. Since basal area removal is greatest under Alternatives 2 and 5, localized effects in some watersheds would be greater than for Alternative 3, 4 and 6. These may include temporarily wetter conditions and changes in water chemistry in small drainages that would not violate water quality standards. The locations, area, and light intensity of prescribed fire, and the design features in place, would prevent detrimental impacts on water quality or quantity from prescribed fire use.

Under all action alternatives, the watershed restoration work would lead to long-term improvements in channel function and reduced sedimentation over the existing condition. Alternatives 2, 5 and 6 would disturb the greatest amount of soil. All action alternatives, except Alternative 6 with 3 less, would have the same number of permanent stream crossings, and under all alternatives additional benefits and minimum effects to water quantity and quality would accrue from stream crossing replacements and application of best management practices for the approaches in the riparian areas.

The recreation improvement actions are intended in part to address existing conditions and concerns with effects to water resources from camping along water bodies and snowmobile travel in wet areas. The actions will therefore serve to protect water quality over time.

The amount of disturbed area, locations selected, and application of best management practices for work on roads, skid trails, and landings would prevent or minimize detrimental changes in water quantity or quality. Riparian area protections would also prevent sedimentation. Some localized, trace sediment may reach streams in association with ground- disturbing work, but this would be within allowable disturbance limits and would not permanently degrade water quality.

Table 38. Summary of effects on water quantity and water quality

| Resource Element | Resource Indicator | Measure | Effects on Resource Element |
|---|---|---|---|
| Water quantity | Stream flow does not substantially increase or decrease due to management activities | Basal area removed does not exceed 25 percent of a watershed | All action alternatives are below threshold; no more than temporary, localized effects. |
| Water quantity | Concentration of surface runoff is minimized | Percent of watershed with mineral soil disturbance (comparative)*<br>Best management practices for drainage are considered and incorporated into proposal (qualitative) | 0.6 percent to 0.9 percent of analysis area watersheds disturbed by action alternatives, compared to less than 0.1 percent in no action.<br>Best management practices are adequately considered in proposed project; no measurable detrimental effect to water quantity; beneficial effect of best management practices implementation for watershed restoration relative to no action. |
| Water quantity and water quality | Change in runoff and peak flows; sediment and nutrient effects | Percentage of a watershed burned (comparative)* | No more than 17 percent burned; much less (3 percent) in Alternative 3. Only temporary localized effects. |
| Water quantity and water quality | Channel capacity, shape and velocity; sediment and phosphorus inputs | Number of stream crossings<br>Capacity of stream crossings to withstand high flows | Permanent crossings decrease from 24 (no action) to 21 (alternatives 2, 3, 4, and 5) or 18 (alternative 6).<br>19 to 46 temporary crossings in action alternatives only; may have short term, localized effects.<br>Long-term beneficial effect due to fewer and larger permanent crossings. Minor, temporary effects possible during rare storm events (less than 4 percent chance). |
| Water quantity and water quality | Change in runoff and peak flows; sediment, nutrient, dissolved oxygen effects | Impervious cover does not exceed 10 percent of cumulative effects area watersheds | Cumulative effects indicator; does not exceed threshold. |
| Water quality | Chemical changes (pH, aluminum, nitrate) are below thresholds harmful to aquatic life and human uses | Basal area removed does not exceed 20 percent of a watershed<br>No more than 15 percent of a watershed harvested with even age regeneration | All action alternatives are below thresholds; no more than temporary, localized effects. |
| Water quality | Sediment loads and total phosphorus | Length and area of soil disturbance within 100 feet of stream or pond (comparative)* | 8 to 14 acres under action alternatives compared to 2 acres under no action. More than half of disturbance would reduce sedimentation in long term. Only temporary, localized effects not leading to water quality impairment. |
| Water quality | Water quality effects are limited to temporary, short-term changes | Best management practices for sedimentation and/or spill prevention are incorporated into proposal where ground disturbance and/or chemical use occurs (qualitative) | Adequately considered to prevent detrimental effects on water quality, based on prior studies and projects. |

* comparative indicators do not have a defined threshold based on literature, so analysis will focus on comparisons among alternatives, including the no action alternative, and outcomes of similar activities in other areas.

No effects to water resources would occur as a result of the fuels reduction activities (removing ladder fuels near the national forest boundary).

Examination of conditions and actions in the wider cumulative effects analysis area during the timeframe where effects would be evident, including timber harvest on private lands, indicate that no measurable cumulative effects to water resources would occur.

# Appendix F - Past, Present, and Reasonably Foreseeable Actions

Table 65 displays the past, present, and reasonably foreseeable future actions considered in the analysis of cumulative effects for this project. Forest Service projects were compiled from the White Mountain National Forest's Schedule of Proposed Actions and knowledge of additional project planning by local managers. Information about projects on private land was compiled through landowner contacts, Maine state data, and observation.

See individual resource sections in Chapter 3 for the predicted cumulative effects associated with these projects.

Use the Map ID number in the first column to locate individual projects on the map (figure 21) which follows this table.

Table 65. Past, present, and reasonably foreseeable future actions considered for cumulative effects

| Map ID | Activity | Acres | Date | Comments | Timeframe |
|---|---|---|---|---|---|
| 1 | timber harvest - private | 17 | 2011 | Private timber harvest on Hut Road. | past |
| 2 | timber harvest - private | 5 | 2011 | Private timber harvest on Hut Road. | past |
| 3 | timber harvest - private | 300 | 2014 | Private timber harvest on Enid Melrose Road. | past |
| 4 | timber harvest - private | 100 | 2012 | Private timber harvest on Enid Melrose Road. | past |
| 5 | timber harvest - private | 8 | 2014 | Private timber harvest on West Stoneham Road. | past |
| 6 | timber harvest - private | 35 | 2012 | Private timber harvest on West Stoneham Road. | past |
| 7 | timber harvest - private | 75 | 2012 | Private timber harvest on Maine State Route 5. | past |
| 8 | timber harvest - private | 45 | 2015 | Private timber harvest on Maine State Route 5. | present |
| 9 | timber harvest - private | 10 | 2010 | Private timber harvest, Albany Township | past |
| 10 | timber harvest - private | 70 | 2015 | Private timber harvest, Albany Township | present |
| 11 | timber harvest - private | 15 | 2015 | Private timber harvest, Albany Township | present |
| 12 | timber harvest - private | 2 | 2013 | Private timber harvest, Albany Township | past |
| 13 | timber harvest - private | 68 | 2015 | Private timber harvest, Albany Township | present |
| 14 | timber harvest - private | 14 | 2015 | Private timber harvest, Albany Township | present |
| 15 | timber harvest - private | 200 | 2006 | Private timber harvest, Albany Township | past |
| 16 | timber harvest - private | 200 | 2014 | Private timber harvest, Albany Township | past |
| 17 | timber harvest - FS | 298 | 2009 | Farwell Mtn. - includes 45 acres of even-aged management. | past |
| 18 | timber harvest - FS | 104 | 2011 | Tyler - includes 9 acres of even-aged mgt. | past |
| 19 | timber harvest - FS | 510 | 2014 | Kennison Ridge - includes 44 of even-aged mgt. | past |
| 20 | timber harvest - FS | 156 | 2014 | Edwards - includes 0 of even-aged mgt. | past |
| 21 | timber harvest - FS | 203 | 2014 | Millstone - includes 11 acres of even-aged mgt. | past |
| 22 | timber harvest - FS | 527 | 2014 | Orchard - includes 43 acres of even-aged mgt. | past |
| 23 | timber harvest - FS | 124 | ongoing | Brown's Ledge - includes 26 acres of even-aged mgt. | present |
| 24 | timber harvest - FS | 665 | ongoing | Four Ponds - includes 75 acres of even-aged mgt. | present |

JA-0578
PBWTAR_2489

# Programmatic Biological Opinion on Final 4(d) Rule for the Northern Long-Eared Bat and Activities Excepted from Take Prohibitions

U.S. Fish and Wildlife Service
Regions 2, 3, 4, 5, and 6

Prepared by:
U.S. Fish and Wildlife Service
Midwest Regional Office
Bloomington, Minnesota
January 5, 2016

Lynn Lewis
Lynn Lewis, Assistant Regional Director, R3

1/5/16
Date

## Table of Contents

EXECUTIVE SUMMARY ..... iii
BIOLOGICAL OPINION ..... 1

1 DESCRIPTION OF THE PROPOSED ACTION ..... 2

1.1 BACKGROUND ..... 2
1.2 U.S. FISH AND WILDLIFE SERVICE ACTION ..... 2
1.3 OTHER FEDERAL AGENCY ACTIONS ..... 4
1.4 ACTION AREA ..... 7
1.5 ACTIVITIES NOT EVALUATED IN THIS BIOLOGICAL OPINION ..... 8
1.6 TABLES AND FIGURES FOR DESCRIPTION OF THE ACTION ..... 9

2 STATUS OF THE SPECIES/CRITICAL HABITAT ..... 10

2.1 SPECIES BACKGROUND & HABITAT ..... 10
2.2 DISTRIBUTION AND RANGE ..... 13
2.3 STATUS AND THREATS ..... 14
2.4 POPULATION DYNAMICS ..... 17
2.5 ANALYSIS OF THE SPECIES/CRITICAL HABITAT LIKELY TO BE AFFECTED ..... 22
2.6 TABLES AND FIGURES FOR STATUS OF THE SPECIES ..... 24

3 ENVIRONMENTAL BASELINE ..... 31
4 EFFECTS OF THE ACTION ..... 31

4.1 EFFECTS ANALYSIS METHODOLOGY ..... 32
4.2 REMOVAL FROM HUMAN STRUCTURES ..... 33
4.3 TIMBER HARVEST ..... 35
4.4 PRESCRIBED FIRE ..... 43
4.5 FOREST CONVERSION ..... 48
4.6 WIND TURBINE OPERATION ..... 51
4.7 OTHER ACTIVITIES THAT MAY AFFECT THE NLEB ..... 57
4.8 CONSERVATION MEASURES IN THE 4(D) RULE ..... 64
4.9 SUMMARY OF IMPACTS OF INDIVIDUALS ..... 65
4.10 IMPACTS TO POPULATIONS ..... 66
4.11 INTERRELATED AND INTERDEPENDENT ACTIONS ..... 68
4.12 TABLES AND FIGURES FOR EFFECTS OF THE ACTION ..... 69

5 CUMULATIVE EFFECTS ..... 90
6 CONCLUSION ..... 90
7 REINITIATION NOTICE ..... 92

LITERATURE CITED ..... 93

# EXECUTIVE SUMMARY

This Endangered Species Act (Act) Biological Opinion (BO) addresses the effects to the northern long-eared bat (NLEB) resulting from the Service's finalization of a special rule under the authority of section 4(d) of the Act. It also evaluates activities that the Service proposes to prohibit and except from take prohibitions under the final 4(d) rule. In the request for intra-Service consultation, the Service proposes a framework for streamlined section 7 consultation for other federal actions that may affect the NLEB and are consistent with the provisions of the 4(d) rule. This is a programmatic intra-Service consultation, because it addresses multiple actions on a program basis conducted under the umbrella of the final 4(d) rule. The Service has not designated or proposed critical habitat for the NLEB; therefore, this BO does not address effects to critical habitat. Because we anticipate continued NLEB declines as white-nose syndrome (WNS) spreads, this BO will cover the next 7 years that the disease is minimally expected to spread and impact the NLEB throughout its entire range. The Service will reinitiate consultation by the end of 2022 or earlier if the standard reinitiation criteria are triggered.

The final rule addresses both purposeful take and incidental taking of the NLEB, with certain differences distinguished based on the occurrence of WNS as follows:

- The final 4(d) rule prohibits purposeful take of NLEBs throughout the species' range, except when (1) necessary to protect human health; (2) in instances of removal of NLEBs from human structures; or (3) the authorized capture and handling of NLEBs by individuals permitted to conduct these same activities for other bat species until May 3, 2016.
- The final 4(d) rule does not prohibit incidental take resulting from otherwise lawful activities in areas not yet affected by WNS (i.e., areas outside of the WNS zone).
- Within the WNS zone, the final 4(d) rule prohibits incidental take of NLEBs in their hibernacula, which may be caused by activities that disturb or disrupt hibernating individuals when they are present as well as the physical or other alteration of the hibernaculum's entrance or environment when bats are not present.
- Incidental take of NLEBs outside of hibernacula resulting from activities other than tree removal is not prohibited provided they do not result in the incidental take of NLEBs inside hibernacula.
- Incidental take resulting from tree removal is prohibited if it: (1) occurs within 0.25 miles (0.4 km) of known NLEB hibernacula; or (2) cuts or destroys known, occupied maternity roost trees or any other trees within a 150-foot (45-meter) radius around the known, occupied maternity tree during the pup season (June 1 to July 31).
- Removal of hazardous trees for the protection of human life and property is not prohibited.

Federal agencies can rely upon the finding of this BO to fulfill their project-specific section 7(a)(2) responsibilities if they utilize the optional framework as described. The framework requires prior notification of activities that may affect the NLEB, along with a determination that the action would not cause prohibited incidental take. Service concurrence with the action agency determination is not required, but the Service may advise the action agency whether additional information indicates project-level consultation for the NLEB is required. If the Service does not respond within 30 days, the action agency may consider its project responsibilities under section 7(a)(2) with respect to the NLEB fulfilled through this programmatic BO. Action agencies must also report if actions deviate from the determination, along with the surveys of any surveys.

The Action Area addressed in this BO includes the entire range of the NLEB within the United States, which includes all or portions of 37 States and the District of Columbia from Maine west to Montana, south to eastern Kansas, eastern Oklahoma, Arkansas, and east to South Carolina. Within the Action Area, the WNS zone currently includes all or most of the states within the species' range except North Dakota, Montana, South Dakota, and Wyoming.

*Status of the NLEB*

The disease WNS is the primary factor affecting the status of the NLEB, which has caused dramatic and rapid declines in abundance. Data support substantial declines in the Eastern range and portions of the Midwest range. We expect further declines as the disease continues to spread across the species' range. NLEBs continue to be distributed across much of the historical range, but there are many gaps where bats are no longer detected or captured, and in other areas, their occurrence is sparse given local declines and extirpations. Although significant NLEB population declines have only been documented due to the spread of WNS, other sources of mortality could further diminish the species' ability to persist as it experiences ongoing dramatic declines.

We estimate that the range-wide population of NLEBs is comprised of about 6.5 million adults. This population estimate was calculated for the purposes of assessing the potential relative impact of activities contemplated in this BO, and it has limitations and a substantial amount of uncertainty.

*Effects of the Action*

The NLEB is likely to be affected by many activities which are not prohibited in the final 4(d) rule. We address the general effects of different activities, which we categorized into 7 general groups: (1) capture and handling of NLEBs by individuals with section 10(a)(1)(A) permits for other listed bats or State permits until May 3, 2016; (2) removal from human structures; (3)

timber harvest; (4) prescribed fire; (5) forest conversion; (6) wind turbine operation; and (7) other activities that may affect the NLEB. The effects of category #1 are not addressed in this consultation.

Based on the available scientific literature, we identified various pathways by which environmental changes (stressors) caused by the Action may affect individual NLEB and the expected responses of individuals exposed to the stressors. General response categories include potentially increased fitness, reduced fitness, disturbance, and harm. We do not have enough information to quantify the effects of removal from human structures and the "other" category of activities that may affect the NLEB. For pathways associated with timber harvest, prescribed fire, and forest conversion, we estimate the number of NLEB individuals exposed by computing the expected overlap between the activities and NLEB-occupied habitats in each state. For wind turbine operation, we estimate the number of bats that could be killed using the current and projected amount of wind energy development and information on bat mortality rates.

Based on these estimations, we anticipate that up to 117,267 NLEB (1.2% of the total population) will be disturbed and 3,285 pups (0.1% of the total pup population) and 980 adults (less than 0.02% of the total adult population) will be harmed annually from timber harvest, prescribed fire, forest conversion, and wind turbine operation. We consider these numbers to be overestimates based on our methodology. Additional harm is anticipated for the unquantified effects from removal from human structures and "other" activities that may affect the NLEB; however, we do not expect the additional impacts to substantially change the total numbers estimated. In addition, we also expect that the numbers affected over time will be reduced as WNS continues to affect the range-wide population.

Although local populations could be affected by the implementation of the final 4(d) rule, most of the states have larger populations and more maternity colonies. In addition, less than 2.3% of NLEBs will be disturbed in all states, less than 1% of pups will be harmed in all states, and less than 1% of adults will be harmed in all states. Therefore, the vast majority of individuals and populations that survive WNS will be unaffected by these activities. Based on the relatively small numbers affected annually compared to the state population sizes, we conclude that adverse effects from timber harvest, prescribed fire, forest conversion, wind energy, and other activities will not lead to population-level declines in this species.

*Conclusion*

WNS is the primary factor affecting the status of the NLEB, which has caused dramatic and rapid declines in abundance, resulting in the local extirpation of the species in some areas. Our analysis of the effects of activities that may affect the NLEB, but do not cause prohibited take, indicates that the additional loss of individual NLEB resulting from these activities would not

exacerbate the effects of WNS at the scale of states within its range. Even if all anthropogenic activities that might adversely affect NLEB ceased, we do not believe that the resulting reduction in adverse effects would materially change the devastating impact WNS has had, and will continue to have, on NLEB at the local population level or at larger scales.

After reviewing the current status of the NLEB, environmental baseline, effects of the Action, and cumulative effects, it is the Service's biological opinion that the Action, as proposed, is not likely to jeopardize the continued existence of the NLEB.

This BO has evaluated major categories of actions that may affect the NLEB, but for which incidental take is not prohibited. Accordingly, there are no reasonable and prudent measures or terms and conditions that are necessary and appropriate for these actions. Federal agencies may rely on this BO to fulfill their project-specific section 7(a)(2) responsibilities under the framework specified in this BO. Prohibited incidental take requires either a separate consultation (federal actions) or an incidental take permit (non-federal actions).

# Species Status Assessment Report

# for the

# Northern long-eared bat

# (*Myotis septentrionalis*)

Version 1.2

Photo by: Jill Utrup, USFWS

August 2022
U.S. Fish and Wildlife Service
Great Lakes Region
Bloomington, MN

*Roosting behavior*–Maternity colonies, consisting of females and young, are generally small, numbering from about 30 (Whitaker and Mumford 2009, p. 212) to 60 individuals (Caceres and Barclay 2000, p. 3); however, larger colonies of up to 100 adult females have been observed (Whitaker and Mumford 2009, p. 212). Most studies have found that the number of individuals roosting together in a given roost typically decreases from pregnancy to post-lactation (Foster and Kurta 1999, p. 667; Lacki and Schwierjohann 2001, p. 485; Garroway and Broders 2007, p. 962; Perry and Thill 2007, p. 224; Johnson et al. 2012, p. 227). NLEBs exhibit fission-fusion behavior (Garroway and Broders 2007, p. 961), where members frequently coalesce to form a group (fusion), but composition of the group is in flux, with individuals frequently departing to be solitary or to form smaller groups (fission) before returning to the main spatially discrete unit or network (Barclay and Kurta 2007, p. 44). As part of this behavior, NLEBs switch tree roosts often (Sasse and Pekins 1996, p. 95), typically every 2 to 3 days (Foster and Kurta 1999, p. 665; Owen et al. 2002, p. 2; Carter and Feldhamer 2005, p. 261; Timpone et al. 2010, p. 119). Patriquin et al. (2016, p. 55) found that NLEB roost switching and use varies regionally in response to differences in ambient conditions (e.g., precipitation, temperature). Adult females give birth to a single pup (Barbour and Davis 1969, p. 104). Birthing within the colony tends to be synchronous, with the majority of births occurring around the same time (Krochmal and Sparks 2007, p. 654). Parturition (birth) may occur as early as late May or early June (Easterla 1968, p. 770; Caire et al. 1979, p. 406; Whitaker and Mumford 2009, p. 213) and may occur as late as mid-July (Whitaker and Mumford 2009, p. 213). Juvenile volancy (flight) often occurs by 21 days after birth (Kunz 1971, p. 480; Krochmal and Sparks 2007, p. 651) and has been documented as early as 18 days after birth (Krochmal and Sparks 2007, p. 651).

*Foraging (Spring, Summer, Fall)*

*Diet*–NLEBs are nocturnal foragers and use hawking (catching insects in flight) and gleaning (picking insects from surfaces) behaviors in conjunction with passive acoustic cues (Nagorsen and Brigham 1993, p. 88; Ratcliffe and Dawson 2003, p. 851). The NLEB has a diverse diet including moths, flies, leafhoppers, caddisflies, and beetles (Griffith and Gates 1985, p. 452; Nagorsen and Brigham 1993, p. 88; Brack and Whitaker 2001, p. 207), with diet composition differing geographically and seasonally (Brack and Whitaker 2001, p. 208). The most common insects found in the diets of NLEBs are lepidopterans (moths) and coleopterans (beetles) (Brack and Whitaker 2001, p. 207; Lee and McCracken 2004, pp. 595–596; Feldhamer et al. 2009, p. 45; Dodd et al. 2012, p. 1122), with arachnids also being a common prey item (Feldhamer et al. 2009, p. 45).

*Foraging behavior*–Most foraging occurs above the understory, 1 to 3 m (3 to 10 ft) above the ground, but under the canopy (Nagorsen and Brigham 1993, p. 88) on forested hillsides and ridges, rather than along riparian areas (LaVal et al. 1977, p. 594; Brack and Whitaker 2001, p. 207). This coincides with data indicating that mature forests are an important habitat type for foraging NLEBs (Caceres and Pybus 1997, p. 2; White et al. 2017, p. 8). Foraging also takes place over small forest clearings and water, and along roads (van Zyll de Jong 1985, p. 94). NLEB seem to prefer intact mixed-type forests with small gaps (i.e., forest trails, small roads, or forest-covered creeks) in forest with sparse or medium vegetation for forage and travel rather

than fragmented habitat or areas that have been clear cut (USFWS 2015, p. 17992). Foraging patterns indicate a peak activity period within 5 hours after sunset followed by a secondary peak within 8 hours after sunset (Kunz 1973, pp. 18–19). Brack and Whitaker (2001, p. 207) did not find significant differences in the overall diet of NLEBs between morning (3 a.m. to dawn) and evening (dusk to midnight) feedings; however there were some differences in the consumption of particular prey orders between morning and evening feedings. Additionally, no significant differences existed in dietary diversity values between age classes or sex groups (Brack and Whitaker 2001, p. 208).

*Staging (Spring)*

Spring staging for the NLEB is the time period between winter hibernation and spring migration to summer habitat (Whitaker and Hamilton 1998, p. 80). During this time, bats begin to gradually emerge from hibernation, exit the hibernacula to feed, but re-enter the same or alternative hibernacula to resume daily bouts of torpor (state of mental or physical inactivity) (Whitaker and Hamilton 1998, p. 80). The staging period for the NLEB is likely short in duration (Caire et al. 1979, p. 405; Whitaker and Hamilton 1998, p. 80). In Missouri, Caire et al. (1979, p. 405) found that NLEBs moved into the staging period in mid-March through early May. Sasse et al. (2014, p. 172) found pregnant NLEB using a mine in late April and May in Arkansas. In Michigan, Kurta et al. (1997, p. 478) determined that by early May, two-thirds of the *Myotis* species, including the NLEB, had dispersed to summer habitat. Variation in timing (onset and duration) of staging for Indiana bats (*Myotis sodalis*) was based on latitude and weather (USFWS 2007, pp. 39–40, 42); similarly, timing of staging for NLEBs is likely based on these same factors.

*Migration (Spring and Fall)*

While information is lacking, short regional migratory movements between seasonal habitats (summer roosts and winter hibernacula) of 56 kilometer (km) (35 mi) to 89 km (55 mi) have been documented (Griffin 1940b, pp. 235, 236; Caire et al. 1979, p. 404; Nagorsen and Brigham 1993 p. 88). The spring migration period typically runs from mid-March to mid-May (Easterla 1968, p. 770; Caire et al. 1979, p. 404; Whitaker and Mumford 2009, p. 207); fall migration typically occurs between mid-August and mid-October.

# United States Department of the Interior

FISH AND WILDLIFE SERVICE

5600 American Blvd West, Suite 990
Bloomington, Minnesota 55437-1458

IN REPLY REFER TO:

FWS/R3/ES-ARD

March 31, 2023

Ms. Gina Owens
Regional Forester, Eastern Region
U.S. Forest Service
626 East Wisconsin Avenue, Suite 800
Milwaukee, WI 53202

Dear Ms. Owens:

The U.S. Fish and Wildlife Service (Service) has received your request dated August 22, 2022, to reinitiate consultation on the continued implementation of planned and ongoing projects within the Eastern and Southern Regions of the USDA Forest Service.

Reinitiation was requested to address changes in the take prohibitions that apply to the northern long-eared bat (NLEB), as explained in the next two paragraphs. This batched reinitiation addresses the continued implementation of 2,927 planned and ongoing actions provided in your Biological Assessment, with subsequent revisions and clarifications. These actions were previously consulted on using the 2016 Programmatic Biological Opinion on Final 4(d) Rule for the Northern Long-Eared Bat and Activities Exempted From Take Prohibitions (PBO), but whose activities have not yet been completed.

The Service listed the NLEB as a threatened species on April 2, 2015 (80 FR 17974) and issued a species-specific 4(d) rule on January 14, 2016 (81 FR 1900). Under the 4(d) rule, incidental take of the NLEB was not prohibited (81 FR 1900, 50 CFR 17) except in certain situations described in the rule. Your request is in response to the reclassification of the NLEB as an endangered species on November 30, 2022 (87 FR 73488) that has resulted in a change to the take prohibitions that apply to the species, which become effective today, March 31, 2023.

The 2,927 actions proposed and previously addressed by the PBO specifically excluded any actions that would have resulted in prohibited incidental take under the 4(d) rule. With the promulgation of the new listing rule for the NLEB, however, the incidental take expected to occur because of these actions is now be prohibited. Therefore, in response to your request for reinitiation, the Service is providing an Incidental Take Statement (ITS) with terms and conditions to ensure that the incidental take of the NLEB that is likely to occur as a result of implementing 519 projects is exempted from section 9 prohibitions. This incidental take is exempted from section 9 prohibitions because it is not likely to jeopardize the continued existence of the NLEB and provided the Forest Service complies with the terms and conditions of the ITS.

Additionally, you have determined that 2,408 of the planned and ongoing actions are Not Likely to Adversely Affect NLEB. We concur with your determination. We are uncertain where the NLEB occurs on the landscape outside of known locations. Because of the steep declines in the species and vast amount of available and suitable forest habitat, the presence of suitable forest habitat alone is a far less reliable predictor of their presence. Based on the best available information, most suitable habitat is now expected to be unoccupied. Therefore, we conclude take is not reasonably certain to occur in undocumented habitat. In addition, the accompanying Biological Opinion analyzed the effects of implementing the maximum program of work for all Forests, not just the projects that occur in known locations. The analysis demonstrates adverse effects are extremely unlikely to occur in areas outside of known locations.

It is the Service's Opinion that the action, as proposed, is not likely to jeopardize the continued existence of the NLEB. The Service has not designated or proposed critical habitat for the NLEB; therefore, the FS does not require a Service opinion regarding the effects of this programmatic action to NLEB critical habitat. This concludes consultation on the identified list of projects that may affect NLEB, but whose activities have not yet been fully implemented.

Our analyses in the BO highlight the potential conservation importance of identifying NLEB maternity roosting areas on the Forests to inform project-level siting and scheduling decisions. Several of our conservation recommendations address this need.

The Service appreciates the outstanding cooperation of Forest Service staff throughout this consultation, in particular, Theresa Davidson, Peggy Luensmann, and Dennis Krusac. For further information, please contact Karen Herrington (Karen_Herrington@fws.gov) or Chris Mensing (Chris_Mensing@fws.gov).

**SIGNATURE PAGE**

KAREN HERRINGTON Digitally signed by KAREN HERRINGTON
Date: 2023.03.31 18:22:18 -05'00'

---

**Karen Herrington**

*Acting Assistant Regional Director for Ecological Services, Region 3*

# Biological Opinion

# Effects to the Northern Long-Eared Bat from Planned and Ongoing Activities Being Implemented in the Eastern and Southern Regions of the U.S. Forest Service

Prepared by:
U.S. Fish and Wildlife Service
Midwest Regional Office
Bloomington, Minnesota
March 31, 2023

## Contents

INTRODUCTION....................................................................................................4
DESCRIPTION OF THE PROPOSED ACTION....................................................................4
Forest Management.............................................................................................5
Prescribed Fire....................................................................................................5
Habitat Removal..................................................................................................5
Other Activities Caused by the Action....................................................................6
Conservation Measures ........................................................................................6
ACTION AREA....................................................................................................6
STATUS OF THE SPECIES/CRITICAL HABITAT ..........................................................8
Range and Distribution.........................................................................................8
Life History and Habitat Use ...............................................................................10
Population Status and Size ..................................................................................14
Threats.............................................................................................................19
Conservation Needs ............................................................................................19
ENVIRONMENTAL BASELINE...............................................................................21
Other Factors Affecting the Species in the Action Area:...........................................22
EFFECTS OF THE ACTION ...................................................................................23
Effects Analysis Methodology ...............................................................................23
    Effects of the Activity ......................................................................................24
    Quantifying Effects to Maternity Colonies ...........................................................28
    Population-level Effects ....................................................................................29
    Species Range-wide ..........................................................................................30
Effects of Forest Management ..............................................................................30
    Literature Review............................................................................................30
    Amount of Forest Management Proposed................................................................32
    Quantifying the Effects of Forest Management ........................................................32
Effects of Prescribed Fire.....................................................................................35
    Literature Review............................................................................................35
    Amount of Prescribed Fire Proposed ....................................................................38
    Quantifying Effects of Prescribed Fire...................................................................38
Effects of Habitat Removal....................................................................................41

Amount of Habitat Removal Proposed ........ 41
Quantifying Effects of Habitat Removal ........ 42
Disturbance/Noise ........ 44
Collision ........ 45
Summary of Impacts ........ 46
Impacts to individuals ........ 47
Impacts to populations ........ 47
CUMULATIVE EFFECTS ........ 48
CONCLUSION ........ 48
INCIDENTAL TAKE STATEMENT ........ 49
Amount or Extent of Take ........ 50
Effect of Take ........ 52
Reasonable and Prudent Measures ........ 52
Terms and Conditions ........ 52
REINITIATION NOTICE ........ 54
CONSERVATION RECOMMENDATIONS ........ 54
LITERATURE CITED ........ 55

## INTRODUCTION

This document transmits the U.S. Fish and Wildlife Service's (Service) Biological Opinion (BO) based on our review of the U.S. Forest Service's (FS) planned and ongoing activities being implemented in the Eastern and Southern Regions of the U.S. Forest Service (the Action) and their effects on the northern long-eared bat (*Myotis septentrionalis*; NLEB) in accordance with section 7(a)(2) of the Endangered Species Act (ESA) of 1973, as amended (16 U.S.C. 1531 et seq.). The FS has previously consulted with the Service on each of these planned and ongoing activities addressing effects to the northern long-eared bat and other listed species and designated critical habitats that occur on each Forest, as applicable.

The NLEB was proposed for federal listing as endangered on 2 October 2013. On 2 April 2015, the species was given a proposed listing of threatened with an interim 4(d) rule, which was finalized on 14 January 2016 (USFWS 2016). No critical habitat has been designated for the species. On November 30, 2022, the Service published a final rule reclassifying the NLEB as endangered under the ESA (87 FR 73488). The 4(d) rule was rendered obsolete on March 31, 2023, which was the effective date of the final rule (88 FR 4908, January 26, 2023), as 4(d) rules only apply to threatened species. The status change resulted in this reinitiation.

The FS prepared a Biological Assessment (BA) in support of its determination that the Action may adversely affect the NLEB and its request to reinitiate formal consultation as the status of the species has changed. The BA provided a description of activities that may affect the NLEB, including a list of ongoing and planned projects and the acres remaining to be implemented.

A complete administrative record and history of this consultation is on file at the Service's Midwest Regional Office, Ecological Services Program, Bloomington, Minnesota.

## DESCRIPTION OF THE PROPOSED ACTION

The FS Eastern and Southern Regions propose to continue implementation of 2,927 planned and ongoing actions that previously utilized the Service's 4(d) rule for NLEB to satisfy their ESA section 7(a)(2) responsibilities in respect to the NLEB. These projects range in type from vegetation management, recreation and roads management, and issuance of special use permits. Although the individual projects' actions address a wide-range of forest resource multiple use objectives and conservation needs, the scope of the BA was limited to a broad analysis of project-level actions that the FS has determined may adversely affect the NLEB. These actions are forest management utilizing tree cutting, prescribed fire, and non-timber clearing and permanent forest conversion.

Due to the number of planned and ongoing projects and the similarity of effects, the projects will be combined and collectively evaluated to determine the projects' effects on NLEB. Projects will be implemented in 1 to 15 years as noted in the BA and supporting information provided by the FS. Detailed descriptions of the planned and ongoing activities for specific projects subject to this consultation are available upon request.

### Forest Management

Forest management focuses on managing vegetation, restoring ecosystems, reducing hazards, and maintaining forest health. It is accomplished by applying different types of treatments such as thinning, harvesting, salvaging, planting, etc. Unlike habitat removal, forest management maintains, and typically retains, forest habitat on the landscape, and the impacts from forest management treatments are usually temporary.

Forest management includes a wide variety of practices from selected harvest of individual trees to clearcutting. Intermediate treatments (thinning) are designed to enhance growth, quality, vigor, and composition of the stand after establishment or regeneration and prior to final harvest. Regeneration treatments (e.g., clearcutting, seed tree harvest, shelterwood harvest) are applied to mature stands in order to establish a new age class of trees. It is conducted for a variety of purposes including, but not limited to, harvests (commercial and non-commercial) for forest products and for ecosystem restoration, endangered/threatened/sensitive species conservation, stand regeneration for forest health, wildlife habitat improvement, insect and disease control, and fuel reduction.

### Prescribed Fire

Prescribed fire is the controlled application of fire by experts under specified environmental conditions to attain resource management objectives. Prescribed fire also maintains forest habitat on the landscape. It is a management tool used in a variety of landscapes (e.g., grassland, brushland, forests). However, this BO limits the evaluation of prescribed fire occurring within potential northern long-eared bat habitat (i.e., forests, or the intersection of grassland and forested habitat).

Prescribed fire is typically classified as dormant season and growing season burning. The seasonality varies by latitude and elevation and by habitat objectives. Dormant season burning is primarily used to reduce the buildup of hazardous fuels and thereby reduce the likelihood of catastrophic wildfires or to achieve ecological stand objectives. Growing season burning is used for site preparation, control of undesirable species, and restoration and maintenance of fire-dependent plant communities and associated wildlife. Most growing season burning takes place in the spring and fall; dormant season burning typically occurs from the fall to spring.

### Habitat Removal

Habitat removal is the loss of forest to another land cover type (e.g., development, grassland, cropland, etc.). For the purposes of this BO, we define habitat removal as any activity that removes forested habitat that is suitable for the NLEB. This includes, but is not limited to, tree removal for commercial, residential, or recreational development, energy production and transmission (oil, gas, solar), mining, agriculture, transportation, and ecosystem management. Unlike forest management, habitat removal permanently removes forested habitat on the landscape, or in some cases, habitat is impacted for decades as in the case of mining.

### Other Activities Caused by the Action

Within a biological opinion, all consequences to species or critical habitat caused by the proposed Federal action are evaluated, including the consequences of other activities caused by the proposed action, that are reasonably certain to occur (see definition of "effects of the action" at 50 CFR §402.02). Additional regulations at 50 CFR §402.17(a) identify factors to consider when determining whether activities caused by the proposed action (but not part of the proposed action) are reasonably certain to occur.

In the request for consultation, the Forest Service did not describe, and the Service is not aware of, any additional activities caused by the actions that are not included in the previous description of the proposed actions. Therefore, this BO does not address further the topic of "other activities" caused by the actions.

### Conservation Measures

All individual projects must comply with the former 4(d) rule, and must include the following conservation measures:

1. The project will not disturb or disrupt hibernating NLEBs in a known hibernaculum during hibernation.
2. The project will not alter the entrance or interior environment of a known hibernaculum at any time of year.
3. The project will not remove any trees within 0.25 miles of a known NLEB hibernaculum at any time of the year. The 0.25-mile tree clearing buffer serves multiple purposes including protecting hibernating bats from disturbance, protecting the hibernaculum's microclimate (4d rule, pages 1909-1910), protecting roosting habitat around the hibernacula, and providing some roosting and foraging protection during spring staging and fall swarming.
4. The project will not cut or destroy known occupied maternity roost trees, or any other trees within a 150-foot radius from the maternity roost tree, from June 1 – July 31.

Note: winter roosts in areas where the species may be active year-round (see <u>Areas Where the NLEB is Active Year-Round</u>**,** below) were not subject to any restrictions under the former 4(d) rule; therefore, no conservation measures or restrictions apply to these areas.

## ACTION AREA

The action area is defined as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action" (50 CFR 402.02). The action area is not limited to the "footprint" of the project but rather encompasses the aerial extent of the biotic, chemical, and physical impacts to the environment resulting from the action.

The Action Area addressed in the BA and this BO includes all Eastern and Southern Region FS lands within the range of the NLEB including 28 national forests, one national tallgrass prairie, and the Fernow Experimental Forest (the Forests) (Table 1, Figure 1). This area contains 23,658,216 acres of National Forest System lands of which 22,542,298 acres are forested. The

Forests in these two regions have 142 congressionally designated wilderness areas for a total of 2,222,602 acres. None of the ongoing projects will be implemented in these wilderness areas. The total forest acres within National Forest System (NFS) units comprise a small component (approximately 8.1%) of the total acreage (277,972,347 acres) of potential NLEB habitat within of all states within these FS regions.

Table 1: Total acres and forested acres of each U.S Forest Service Unit in the Eastern and Southern Region (i.e. the Action Area) (adapted from FS BA).

| USDA Forest Service Unit (Region) | Total NFS Acres | Total NFS Forested Acres |
|---|---|---|
| Allegheny National Forest (9) | 516,843 | 475,496 |
| Chattahoochee-Oconee National Forest (8) | 867,592 | 863,250 |
| Chequamegon/Nicolet National Forest (9) | 1,523,709 | 1,318,863 |
| Cherokee National Forest (8) | 674,773 | 666,101 |
| Chippewa National Forest (9) | 671,951 | 589,690 |
| Croatan National Forest (8) | 161,142 | 155,228 |
| Daniel Boone National Forest (8) | 707,626 | 675,706 |
| Francis Marion National Forest (8) | 259,625 | 251,258 |
| George Washington and Jefferson National Forest (8) | 1,788,300 | 1,769,300 |
| Green Mountain/Finger Lakes National Forest (9) | 427,022 | 410,151 |
| Hiawatha National Forest (9) | 897,507 | 793,539 |
| Hoosier National Forest (9) | 203,499 | 195,969 |
| Huron-Manistee National Forest (9) | 978,859 | 915,757 |
| Kisatchie National Forest (8) | 608,484 | 599,059 |
| Land Between the Lakes NRA (8) | 171,280 | 160,501 |
| Mark Twain National Forest (9) | 1,505,329 | 1,398,068 |
| Midewin Tallgrass Prairie (9) | 18,225 | 1,755 |
| Monongahela National Forest (9) | 920,584 | 900,000 |
| National Forests in Alabama (8) | 669,015 | 658,463 |
| National Forests in Mississippi (8) | 1,172,531 | 1,153,705 |
| National Forests in North Carolina (8) (excluding Croatan) | 1,094,700 | 1,085,999 |
| Northern Research Station (Fernow Experimental Forest) (9) | 4,615 | 4,615 |
| Ottawa National Forest (9) | 996,533 | 905,000 |
| Ouachita National Forest (8) | 1,789,320 | 1,757,875 |
| Ozark – St. Francis National Forest (8) | 1,161,012 | 1,117,794 |
| Shawnee National Forest (9) | 286,254 | 252,900 |
| Sumter National Forest (8) | 362,850 | 355,648 |
| Superior National Forest (9) | 2,172,452 | 2,093,062 |
| Wayne National Forest (9) | 244,225 | 224,546 |
| White Mountain National Forest (9) | 802,359 | 793,000 |

Superior
Chippewa
Ottawa
Hiawatha
Chequamegon-Nicolet
White Mountain
Huron-Manistee
Green Mountain and Finger Lakes
Midewin
Allegheny
Wayne
Monongahela
Hoosier
Shawnee
Daniel Boone
Mark Twain
George Washington and Jefferson
Land Between the Lakes
Cherokee
NF in North Carolina
Ozark-St. Francis
Ouachita
Sumter
Croatan
Chattahoochee-Oconee
Francis Marion
NF in Mississippi
NF in Alabama
NF in Texas
Kisatchie
NLEB Range
NLEB Active Year-Round
NF in Florida
Esri, HERE, Garmin, FAO, NOAA, USGS, EPA, Esri, USGS

Figure 1: U.S Forest Service Units in the Eastern and Southern Region with NLEB Range

## STATUS OF THE SPECIES/CRITICAL HABITAT

This section presents the biological and ecological information relevant to formulating this BO. Appropriate information on the species' life history, its habitat and distribution, and other data on factors necessary to its survival are included to provide background for analysis in later sections. Portions of this information are also presented in listing documents (USFWS 2015), the 2016 Programmatic Biological Opinion on Final 4(d) Rule for the Northern Long-Eared Bat and Activities Exempted from Take Prohibitions (PBO) (USFWS 2016), the Species Status Assessment (SSA) for the Northern long-eared (version 1.1; USFWS 2022), and available literature.

### Range and Distribution

The NLEB ranges across much of the eastern and north central United States, and all Canadian provinces west to the southern Yukon Territory and eastern British Columbia (Figure 1)

(Nagorsen and Brigham 1993; Caceres and Pybus 1997; Environment Yukon 2011). In the United States, the species' range reaches from Maine west to Montana, south to eastern Kansas, eastern Oklahoma, Arkansas, and east to South Carolina (Whitaker and Hamilton 1998, p. 99; Caceres and Barclay 2000, p. 2; Simmons 2005, p. 516; Amelon and Burhans 2006, pp. 71–72). The species' range includes all or portions of the following 37 states and the District of Columbia (USFWS 2022, p. 15). Historically, the species has been most frequently observed in the northeastern United States and in Canadian Provinces, Quebec and Ontario, with sightings increasing during swarming and hibernation (Caceres and Barclay 2000).

Prior to 2006 (i.e., before white-nose syndrome was first documented), the NLEB was considered abundant and widespread throughout much of its range (despite having low winter detectability). The Service gathered information from a variety of sources (e.g., state agencies, federal agencies, tribes, and other organizations) and compiled a list of all known hibernacula and associated yearly winter counts (NABat 2021). Overall, the NLEB is known from 737 hibernacula, a maximum count of 38,181 individuals across >1.2 billion acres in 29 states and 3 Canadian provinces. Other States within the species' range have no known hibernacula (due to no suitable hibernacula present, lack of survey effort, or existence of unknown retreats). Among the five representation units (RPUs) identified in the NLEB SSA, the Eastern Hardwoods RPU historically encompassed approximately 90% of the total known hibernacula and 78% of the species' known winter abundance (Figure 2). The Southeast RPU contained 7% of the sites and 1% of total abundance, while the Subarctic RPU comprised 1% of the sites and 14% of the abundance. The Midwest and East Coast RPUs comprised 1% of the sites and 3% and 4% of the abundance, respectively (USFWS 2022, p. 28).

Representation Units
Southeast
Eastern Hardwoods
Subarctic
Midwest
East Coast

Figure 2. NLEB range organized into representation units (from USFWS 2022, p. 26).

**Life History and Habitat Use**

The species generalized annual life history is summarized for NLEB in Figure 3.

Important definitions for time periods for the NLEB include:

1. The active season is the range of time when NLEBs may be present outside of hibernacula and using trees for roosting.
2. The inactive season is the range of time when NLEBs are hibernating. This season does not apply to coastal areas of Virginia, North Carolina, South Carolina, and Louisiana where NLEBs are expected to be active year-round.
3. The maternity season is the range of time when NLEBs are concentrated in maternity colonies.
4. The pup season[1] is the range of time when females are close to giving birth (two weeks prior to birth) and have non-volant (i.e., unable to fly) young.

The time periods associated with these seasons vary depending on geographic location; however, we make some generalized time period assumptions in the Effects Analysis Section below.

July
Aug.
June
Sept.
May
Oct.
Apr.
Nov.
Mar.
Dec.
Feb.
Jan.
Summer Habitat
Summer / Winter Habitat
Summer / Winter Habitat
Winter Habitat
Post-Lactation
Lactation
Fall Migration & Swarm
Gestation & Spring Migration
Hibernation

Figure 3. Generalized annual life history diagram for NLEB (adapted from Silvis et al. 2016).

[1] The generic pup season used in the 4(d) rule only included the time of year when females care for non-volant young.

*Winter Hibernation*

NLEBs are thought to predominantly overwinter in hibernacula that include caves and abandoned mines. These hibernacula have relatively constant, cooler temperatures (0 to 9 degrees Celsius [°C] or 32 to 48 degrees Fahrenheit [°F]) (Raesly and Gates 1987, p. 18; Caceres and Pybus 1997, p. 2; Brack 2007, p. 744), with high humidity and no strong currents (Fitch and Shump 1979, p. 2; van Zyll de Jong 1985, p. 94; Raesly and Gates 1987, p. 118; Caceres and Pybus 1997, p. 2). NLEBs are typically found roosting singly or in small numbers in cave or mine walls or ceilings, often in small crevices or cracks, sometimes with only the nose and ears visible and thus are easily overlooked during surveys (Griffin 1940a, pp. 181–182; Barbour and Davis 1969, p. 77; Caire et al. 1979, p. 405; van Zyll de Jong 1985, p. 9; Caceres and Pybus 1997, p. 2; Whitaker and Mumford 2009, pp. 209–210).

NLEBs have also been observed overwintering in other types of habitat that have similar conditions (e.g., temperature, humidity levels, air flow) to cave or mine hibernacula. The species may use these alternate hibernacula in areas where caves or mines are not present (Griffin 1945, p. 22).

*Spring staging and fall swarming*

Spring staging for the NLEB is the time period between winter hibernation and spring migration to summer habitat (Whitaker and Hamilton 1998, p. 80). During this time, bats begin to gradually emerge from hibernation, exit the hibernacula to feed, but re-enter the same or alternative hibernacula to resume daily bouts of torpor (state of mental or physical inactivity) (Whitaker and Hamilton 1998, p. 80). NLEBs also roost in trees near hibernacula during spring staging, and Thalken et al. (2018) found that roost trees were situated within 2-km (1.2 mi) of hibernacula during spring staging and the early maternity season.

The swarming season occurs between the summer and winter seasons (Lowe 2012, p. 50) and the purpose of swarming behavior may include: introduction of juveniles to potential hibernacula, copulation, and stopping over sites on migratory pathways between summer and winter regions (Kurta et al. 1997, p. 479; Parsons et al. 2003, p. 64; Lowe 2012, p. 51; Randall and Broders 2014, pp. 109–110). NLEBs roost in hibernacula and also in trees during the swarming season, and Lowe (2012) found tree roosts were evenly distributed over distances within 7.3-km (4.5-mi) from hibernacula.

*Migration*

Typical of most bat species in the eastern United States, NLEBs migrate between winter hibernacula and summer roosting habitat. When female NLEBs emerge from hibernation, they migrate to maternity colonies. While information is lacking, short regional migratory movements between seasonal habitats (summer roosts and winter hibernacula) of 56 kilometer (km) (35 mi) to 89 km (55 mi) have been documented (Griffin 1940b, pp. 235, 236; Caire et al. 1979, p. 404; Nagorsen and Brigham 1993 p. 88). Depending on location within range, the spring migration period typically runs from mid-March to mid-May (Easterla 1968, p. 770; Caire et al. 1979, p.

404; Whitaker and Mumford 2009, p. 207); fall migration typically occurs between mid-August and mid-October (USFWS 2022, p. 19).

*Summer habitat use*

Suitable summer habitat for NLEB consists of a wide variety of forested/wooded habitats where they roost, forage, and travel and may also include some adjacent and interspersed non-forested habitats such as emergent wetlands and adjacent edges of agricultural fields, old fields and pastures. This includes forests and woodlots containing potential roosts, as well as linear features such as fencerows, riparian forests, and other wooded corridors. Most foraging occurs above the understory, 1 to 3 m (3 to 10 ft) above the ground, but under the canopy (Nagorsen and Brigham 1993, p. 88) on forested hillsides and ridges, rather than along riparian areas (LaVal et al. 1977, p. 594; Brack and Whitaker 2001, p. 207). NLEB seem to prefer intact mixed-type forests with small gaps (i.e., forest trails, small roads, or forest-covered creeks) in forest with sparse or medium vegetation for forage and travel rather than fragmented habitat or areas that have been clear cut (USFWS 2015, p. 17992; USFWS 2022, p. 18-19).

NLEBs typically roost singly or in maternity colonies underneath bark or more often in cavities or crevices of both live trees and snags (Sasse and Pekins 1996, p. 95; Foster and Kurta 1999, p. 662; Owen et al. 2002, p. 2; Carter and Feldhamer 2005, p. 262; Perry and Thill 2007, p. 222; Timpone et al. 2010, p. 119). Males' and non-reproductive females' summer roost sites may also include cooler locations, such as caves and mines (Barbour and Davis 1969, p. 77; Amelon and Burhans 2006, p. 72). NLEBs are flexible in tree species selection and while they may select for certain tree species regionally, likely are not dependent on certain species of trees for roosts throughout their range; rather, many tree species that form suitable cavities or retain bark will be used by the bats opportunistically (Foster and Kurta 1999, p. 668; Silvis et al. 2016, p. 12; Hyzy 2020, p. 62). To a lesser extent, NLEBs have also been observed roosting in colonies in human-made structures, such as in buildings, in barns, on utility poles, behind window shutters, in bridges, and in bat houses (Mumford and Cope 1964, p. 72; Barbour and Davis 1969, p. 77; Cope and Humphrey 1972, p. 9; Burke 1999, pp. 77–78; Sparks et al. 2004, p. 94; Amelon and Burhans 2006, p. 72; Whitaker and Mumford 2009, p. 209; Timpone et al. 2010, p. 119; Bohrman and Fecske 2013, pp. 37, 74; ; Feldhamer et al. 2003, p. 109; Sasse et al. 2014, p. 172; USFWS 2015, p. 17984; Dowling and O'Dell 2018, p. 376). It has been hypothesized that use of human-made structures may occur in areas with fewer suitable roost trees (Henderson and Broders 2008, p. 960; Dowling and O'Dell 2018, p. 376, (De La Cruz et al. 2018, p. 496).

Before white-nose syndrome (WNS), maternity colonies, consisting of females and young, were generally small, numbering from about 30 (Whitaker and Mumford 2009, p. 212) to 60 individuals (Caceres and Barclay 2000, p. 3); however, larger colonies of up to 100 adult females have been observed (Whitaker and Mumford 2009, p. 212). Maternity colonies are smaller after WNS declines. In Kentucky, recent exit counts for WNS-impacted northern long-eared bat maternity colonies averaged <4 bats per roost in Mammoth Cave National Park (Thalken et al. 2018) and <6 bats per roost in the Robinson Forest experimental forest reserve (Arant et al. 2022), with maximum counts of 40 and 24 individuals, respectively. The highest exit counts observed post-WNS in the Fernow Experimental Forest (FEF) in West Virginia were 5 in 2015

and 7 in 2016 (Kalen et al. 2022), in contrast to the maximum pre-WNS exit count of 48 reported for northern long-eared bat colonies in the FEF by Johnson et al. (2012).

Most studies have found that the number of individuals roosting together in a given roost typically decreases from pregnancy to post-lactation (Foster and Kurta 1999, p. 667; Lacki and Schwierjohann 2001, p. 485; Garroway and Broders 2007, p. 962; Perry and Thill 2007, p. 224; Johnson et al. 2012, p. 227). NLEBs switch tree roosts often (Sasse and Pekins 1996, p. 95), typically every 2 to 3 days (Foster and Kurta 1999, p. 665; Owen et al. 2002, p. 2; Carter and Feldhamer 2005, p. 261; Timpone et al. 2010, p. 119). Adult females give birth to a single pup (Barbour and Davis 1969, p. 104). Birthing within the colony tends to be synchronous, with the majority of births occurring around the same time (Krochmal and Sparks 2007, p. 654). Parturition (birth) may occur as early as late May or early June (Easterla 1968, p. 770; Caire et al. 1979, p. 406; Whitaker and Mumford 2009, p. 213) and may occur as late as mid-July (Whitaker and Mumford 2009, p. 213). Juvenile volancy (flight) often occurs by 21 days after birth (Kunz 1971, p. 480; Krochmal and Sparks 2007, p. 651) and has been documented as early as 18 days after birth (Krochmal and Sparks 2007, p. 651; USFWS 2022, p. 17-18).

Although many studies have calculated individual female northern long-eared bat home ranges, few studies have estimated the roosting area used by entire colonies. Henderson and Broders (2008) found that roosting areas for two northern long-eared bat colonies on Prince Edward Island ranged from 0.3 to 31.1 ha (0.7 to 77 acres). In 2008, Johnson et al. 2012 radio-tracked 32 female northern long-eared bats (including pregnant, lactating, and non-reproductive bats) to 64 roost trees in West Virginia. Using cluster analysis, the bats were assigned to 16 social groups, ranging in size from 1 to 5 individuals. Groups (including those of 1 individual) roosted in 1 to 11 roost trees, and roost areas ranged from 0.39 to 14.77 ha (0.96 to 36.50 acres). In 2009, they radio-tracked 38 females to 51 roost trees. The 38 bats were clustered into 11 social groups ranging in size from 1 to 12 individuals and roosted in 1 to 16 roost trees. Roost areas ranged from 5.24 to 35.33 ha (12.95 to 87.30 acres). Although the social groups characterized in the study were notably smaller than typical northern long-eared bat maternity colony estimates, Johnson et al. found that the roosting areas of many groups overlapped, with some being entirely enveloped by others. Finally, Silvis et al (2014) estimated core and whole roosting areas for three northern long-eared bat maternity colonies containing 8-15 bats in Kentucky. Core roosting areas were between 0.2 and 10.8 ha (0.5 to 26.7 acres), and whole roosting areas were between 1.3 and 59.5 ha (2.3 to 150 acres).

*Areas Where the NLEB is Active Year-Round*

There is evidence populations in southeast coastal areas and Louisiana are active year-round due to mild temperatures during the winter and the availability of insect prey (Caceres and Barclay 2000, Grider et al. 2016, p. 11; White et al. 2018, p. N4; Jordan 2020). This area includes the Southeast Coastal Plain from the James River in Virginia south to the border of Georgia and the species' entire range in Louisiana (Figure 1). Northern long-eared bats in these areas are actively roosting in trees year-round and only entering torpor (i.e., a state of lowered body temperature and metabolic activity) during extreme cold spells (Jordan 2020). Jordan (2020) also found that 94.6% of winter tree roosts were in wetland forest, and the remaining winter roosts were close

(<0.5 km) to wetland forest. They may also use bridges and culverts for winter roosts because maternity colonies have been documented using bridges and cluverts in Louisiana.

In the coastal plain of North Carolina, there are no known non-cavernicolous (cave-like) hibernacula (Grider et al. 2016; Jordan 2020). Some NLEBs here have been swabbed and confirmed negative for the fungus that causes the disease, *Pseudogymnoascus destructans* (Pd) and WNS (Jordan 2020). Because they are not dependent on caves or mines for hibernation, they may not be susceptible to WNS, and these populations may serve as refugium from WNS (Jordan 2020). This may be the case for all the areas where NLEBs are active year-round; however, Pd has been detected in Louisiana and in coastal Virginia.

**Population Status and Size**

*Species Population Status*

Prior to the onset of WNS (see below), the NLEB was abundant throughout much of the eastern United States and thus, was not a focus of detailed demographic studies. Although numbers varied temporally and spatially, abundance and occurrence on the landscape were considered stable prior to 2006 (Cheng et al. 2022, p. 204; Wiens et al. 2022, p. 233). USFWS estimated the U.S. population in 2016 to be 6,500,000 individuals (adults and juveniles; USFWS 2015b). However, catastrophic population declines have been continuing across the species' range since the emergence of WNS.

Available evidence from the SSA, including both winter and summer data, indicates NLEB abundance has and will continue to decline substantially over the next 10 years under current demographic conditions. Evidence of the past decline is demonstrated in available data in both winter and summer. For example, rangewide winter abundance has declined by 49% and the number of extant winter colonies (populations) by 81%. There has also been a noticeable shift towards smaller colony sizes, with a 96–100% decline in the number of large hibernacula (≥100 individuals). Although the declines are widespread, the magnitudes of the winter declines vary spatially. In the Eastern Hardwoods, the core of species' range, abundance declined by 56% and the number of sites by 88%. Abundance and the number of sites declined in the remaining 4 RPUs (87% and 82% - East Coast RPU, 90% and 44% - Midwest RPU, 24% and 70% - Southeast RPU, and 0% and 40% - Subarctic RPU, respectively). Across all RPUs, the potential of population growth is low; the probability of RPU growth rates ($\lambda$) ≥1 ranges from 0 to 11% (USFWS 2022, p. 53).

Declining trends in abundance and occurrence are also evident across much of NLEB's summer range. Based on derived rangewide summaries from Stratton and Irvine (2022, p. 102), rangewide occupancy has declined by 80% from 2010–2019 (Table A-3B4, Figure 5.7 in USFWS 2022). Although these declines attenuate westward, the probability of occupancy declined in all RPUs (Table A-3B4 in USFWS 2022). Similarly, Whitby et al. (2022, p. 160), using data collected from mobile acoustic transects, found a 79% decline in rangewide relative abundance from 2009–2019. Measurable declines were also found in the Midwest RU (91%) followed by the Eastern Hardwoods (85%), East Coast (71%), and Southeast (57%) RPUs. Data were not analyzed in the Subarctic RPU due to a lack of observations. Finally, Deeley and Ford

(2022, p. 18, 21–23) observed a significant decrease in mean capture rate post-WNS arrival. Estimates derived from their results indicted a 43–77% decline in summer mist net captures compared pre and post arrival of WNS (USFWS 2022, p. 54).

*Population Size*

As described in the SSA, winter colony counts produce the most direct, representative, and feasible method for estimating abundance of NLEB. These data represent a sound estimate of the site-specific winter abundances, relative abundances, and population trends. However, winter colony counts only represent minimum estimates of abundance because the NLEB is difficult to detect in hibernacula and not all hibernacula are known or accessible. Other hibernation sites across their range that may not lend themselves well to typical hibernacula surveys due to inaccessibility and lack of information on bat occurrence include structures like storm cellar entrances, dry wells, crawl spaces, and rock faces and bluffs (Lemen et al. 2016, Hurt 2017). In addition, hibernacula counts do not account for the populations that are active year-round.

Winter colony counts underestimate the total number of NLEBs that may be present on the landscape and thus susceptible to impacts from activities evaluated under this BO. Using winter colony counts size is therefore likely to underestimate the extent of impacts. In order to understand the extent of impacts the species could incur under this BO, we updated the estimated populations from the 2016 PBO and developed a maximum population size for each RPU in 2022. The 2016 PBO estimates were based on summer occupancy data and the amount of forested habitat.

There are limitations and uncertainty associated with the population estimates in the 2016 PBO. Like our purposes now, the estimates were calculated to assess the potential relative impact of activities contemplated in the 2016 PBO, not as a precise estimate of NLEB populations. Importantly, we acknowledged in the 2016 PBO these were likely overestimates for several reasons: 1) we assumed all forested habitat was suitable for NLEBs; 2) the surveys used to generate the occupancy data were often very sparse and not designed for this purpose; and 3) the estimates did not fully account for declines due to WNS because most data was at least one year old at the time and some occupancy rates were based on surveys conducted pre-WNS. Other experts have agreed the state populations were overestimated in the 2016 PBO, for example, bat experts in the states of Michigan, Minnesota, and Wisconsin (ICF 2023, Appendix C).

The same data limitations continue to apply today; however, because the 2016 PBO population estimates are likely overestimates, we consider them to be the best available data to quickly derive a maximum population estimate. As described in the SSA, a variety of methods have been developed and continue to be improved to fulfil this important information need, including winter and summer colony counts, mist-netting, acoustic monitoring, and mark-recapture studies. However, these efforts have been limited in scope or inconsistently applied across the species' range. We expect the true population census of the NLEB is the less than the maximum population estimates in this BO.

*2016 Population Estimates from PBO*

Below is a short summary of how the population estimates in the 2016 PBO were initially derived. For more information about the assumptions, limitations, and methods, refer to the 2016 PBO.

For purposes of the 2016 PBO, we estimated the population of NLEBs based on total forested acres in most states and the occupancy rate, as described in stepwise fashion below:

1. States included: We excluded states with less than 50% of their area within the species range because including the total forested acreage from states not fully within the species' range could greatly overestimate the population size. This eliminated Montana, Wyoming, Oklahoma, Louisiana, Alabama, Georgia, and South Carolina. We assumed the inclusion of the full states of Nebraska, Kansas, Mississippi, and North Carolina would compensate for any individuals not included in the excluded states.

2. Total forested acres for each state were determined using the U.S. Forest Service's 2015 State and Private Forestry Fact sheets (USFWS 2016 Section 2.4.2).

3. Occupancy rate was calculated using available summer survey results from recent years and calculated the proportion of sites occupied with NLEB from the total number of sites sampled. Where no data were available, we used the post-WNS survey data provided by the Forest Service within the respective state (USFWS 2016 Section 2.4.1).

4. Total occupied acres were determined by multiplying the number of forested acres (step 1) by the occupancy rate (step 2) in each state.

5. Colony-occupied acres were determined by multiplying the total occupied acres by the overlap between the adult male home range and maternity colony home range, and we assumed maternity colonies did not overlap. An overlap of 90.4% was assumed for adult male home range and maternity colony home range based on data from mist-net surveys in Kentucky (USFWS 2016 Section 2.4.4).

6. Number of colonies was determined by dividing the colony-occupied acres by the assumed home range size of 1,000 acres per colony (USFWS 2016 Section 2.1.1).

7. Total number of adult females were determined by multiplying the number of colonies by the number of females per colony. We assumed each maternity colony would be comprised of 30-60 adult females prior to the effects of WNS, and 20 adult females for states where bat populations were already impacted by WNS (USFWS 2016 Section 2.4.1), and

8. Total number of adults in a state were determined by adding the total number of adult females plus 1 adult male per female; we assumed an equal adult sex ratio.

We estimated the range-wide population of NLEBs in 2016 was comprised of 6,546,718 adults based on the calculations summarized above, and the assumption that the 30 states included in the analysis represented the range-wide population (USFWS 2016 Table 2.4).

*2023 Maximum Population Estimate*

To estimate the maximum current population, we updated the 2016 Population Estimates with the following information:

- Total acres of habitat for each state were determined using the Service's One Range model. The model used National Land Cover Dataset data to identify habitat based on forest layers, canopy cover, and forest patch size. Streams and rivers were incorporated into the model as these forested corridors often support movement between patches of forested habitat and provide important food and water resources (Gorman et al. 2022).

- Occupancy rate was updated for each state to reflect the percent change in populations based on the arrival of *Pd* in each state (Cheng et al. 2022), with the exception of North Carolina and Mississippi. Specifically, we used Cheng et al. 2022's reported percent change in winter colony counts by disease stage relative to predicted median count prior to arrival of *Pd* (with 95% credible interval): invasion -37% (-54, -10); epidemic -56% (-70, -37); established -73% (-85, -59); and endemic -94% (-100, -78). All states included in the population estimates from the 2016 PBO (USFWS 2016 Table 2.4) are now considered post-WNS (endemic) except for Kansas, Nebraska, North Dakota, and South Dakota. For North Carolina and Mississippi, we used an occupancy rate of 13% to account for areas where the species may be active year-round. Although we are uncertain whether populations in Mississippi are active year-round, we included this state due to the limitations of excluding states with less than 50% of their area within the species range.

- Average maternity colony size was updated to 13 adult females based on colony counts published in several studies and FWS data (Kalen et al. 2022; Arant et al. 2022, USFWS unpubl. data). We also assumed a colony size of 20 during the established phase of WNS (Nebraska, South Dakota) and 22 during the epidemic phase (Kansas, North Dakota) based on the decline rates in Cheng et al. 2022.

We estimate that the maximum current population of NLEBs is comprised of about 201,266 adults based on the calculations summarized above and the assumption that the 30 states included in the 2016 PBO represent the range-wide population (Table 2).

For comparison purposes, the biological opinion for the Lake States Habitat Conservation Plan (ICF 2022) estimates 5,428 NLEB in Michigan, 4,391 in Minnesota, and 1,056 in Wisconsin. These estimates were derived using little brown bat (*Myotis lucifugus)* to NLEB abundance ratios using summer capture rates provided by bat experts and available literature. The populations were then reduced by 98.5% based on the percent decline in hibernating NLEBs reported for Michigan (Kurta and Smith 2020), which is higher than the 94% decline used for these states in this BO. We estimate there are a maximum of 8,086 NLEB adults in Michigan, 11,232 in Minnesota, and 9,698 in Wisconsin.

Table 2. Estimated maximum current NLEB summer population estimates from for the 30 states included in the analysis. Note: West Virginia population estimates are not calculated using percent occupancy or occupied acres. The West Virginia Department of Natural Resources estimates that at least 449 maternity colonies exist in the state (Silvis, pers comm, 2023).

| State | Updated Forested Acres | Percent Occupancy | Occupied Acres | Maternity Colonies | Maternity Colony Size | Adult Females | Total Adults | Total Pups |
|---|---|---|---|---|---|---|---|---|
| Iowa | 2,028,770 | 2.5% | 50,760 | 46 | 13 | 598 | 1,196 | 598 |
| Illinois | 4,438,658 | 3.8% | 166,450 | 151 | 13 | 1,963 | 3,926 | 1,963 |
| Indiana | 4,763,934 | 2.3% | 107,189 | 97 | 13 | 1,261 | 2,522 | 1,261 |
| Michigan | 18,155,284 | 1.9% | 343,135 | 311 | 13 | 4,043 | 8,086 | 4,043 |
| Minnesota | 13,563,290 | 3.5% | 477,699 | 432 | 13 | 5,616 | 11,232 | 5,616 |
| Missouri | 14,353,492 | 1.6% | 225,637 | 205 | 13 | 2,665 | 5,330 | 2,665 |
| Ohio | 7,709,348 | 2.5% | 194,738 | 177 | 13 | 2,301 | 4,602 | 2,301 |
| Wisconsin | 15,281,072 | 2.7% | 411,672 | 373 | 13 | 4,849 | 9,698 | 4,849 |
| Connecticut | 1,873,585 | 0.6% | 10,567 | 10 | 13 | 130 | 260 | 130 |
| Delaware | 19,412 | 0.3% | 58 | 1 | 13 | 13 | 26 | 13 |
| Maine | 15,874,992 | 0.6% | 89,535 | 81 | 13 | 1,053 | 2,106 | 1,053 |
| Maryland | 2,032,174 | 0.3% | 6,097 | 6 | 13 | 78 | 156 | 78 |
| Massachusetts | 2,957,543 | 0.4% | 12,067 | 11 | 13 | 143 | 286 | 143 |
| New Hampshire | 4,540,517 | 0.6% | 26,698 | 25 | 13 | 325 | 650 | 325 |
| New Jersey | 1,881,274 | 1.9% | 36,120 | 33 | 13 | 429 | 858 | 429 |
| New York | 18,058,361 | 2.0% | 360,806 | 327 | 13 | 4,251 | 8,502 | 4,251 |
| Pennsylvania | 16,490,954 | 2.0% | 334,437 | 303 | 13 | 3,939 | 7,878 | 3,939 |
| Rhode Island | 351,455 | 0.6% | 1,982 | 2 | 13 | 26 | 52 | 26 |
| Vermont | 4,399,160 | 0.6% | 25,867 | 24 | 13 | 312 | 624 | 312 |
| Virginia | 14,325,047 | 2.9% | 415,140 | 376 | 13 | 4,888 | 9,776 | 4,888 |
| West Virginia | 11,913,113 | 3.2% | 383,126 | 449 | 13 | 5,837 | 11,674 | 5,837 |
| Arkansas | 16,333,451 | 3.9% | 639,945 | 579 | 13 | 7,527 | 15,054 | 7,527 |
| Kentucky | 12,850,213 | 2.4% | 313,802 | 284 | 13 | 3,692 | 7,384 | 3,692 |
| Mississippi | 11,644,940 | 13.0% | 1,513,842 | 1,369 | 13 | 17,797 | 35,594 | 17,797 |
| North Carolina | 12,938,367 | 13.0% | 1,681,988 | 1,522 | 13 | 19,786 | 39,572 | 19,786 |
| Tennessee | 13,634,358 | 2.5% | 336,223 | 305 | 13 | 3,965 | 7,930 | 3,965 |
| Kansas | 1,441,221 | 9.9% | 142,681 | 130 | 22 | 2,860 | 5,720 | 2,860 |
| Nebraska | 520,114 | 6.1% | 31,597 | 29 | 20 | 580 | 1,160 | 580 |
| North Dakota | 173,117 | 9.9% | 17,139 | 16 | 22 | 352 | 704 | 352 |
| South Dakota | 610,547 | 6.1% | 37,091 | 34 | 20 | 680 | 1,360 | 680 |
| **Total** | 245,157,764 | 3.4% | 8,394,086 | 7,708 | | 101,959 | 203,918 | 101,959 |

Table 3: Estimated range-wide maximum current NLEB summer population estimates.

| Representation Unit | Total Adult Population (Max) |
|---|---|
| Range-wide (USA) | 203,918 |
| Southeast RPU | 79,959 |
| East Coast RPU | 13,689 |
| Midwest RPU | 18,558 |
| Eastern Hardwoods RPU | 91,712 |

## Threats

Although there are countless stressors affecting NLEBs, the primary factor influencing the viability of the species is WNS, a disease of bats caused by a fungal pathogen. Other primary factors influencing the NLEB's viability include wind energy mortality, effects from climate change, and habitat loss.

WNS has been the foremost stressor on the NLEB for more than a decade. The fungus that causes the disease (Pd), invades the skin of bats, and infection leads to increases in the frequency and duration of arousals during hibernation and eventual depletion of fat reserves needed to survive winter, and often results in mortality. WNS has caused estimated NLEB population declines of 97–100% across 79% of the species' range. Wind energy-related mortality of NLEB is also proving to be a consequential stressor at local and regional levels, especially in combination with impacts from WNS. Most bat mortality at wind energy projects is caused by direct collisions with moving turbine blades. Wind energy mortality may occur over 49% of the NLEB range. Climate change variables, such as changes in temperature and precipitation, may influence NLEB resource needs, such as suitable roosting habitat for all seasons, foraging habitat, and prey availability. Although there may be some benefit to NLEB from a changing climate, overall negative impacts are anticipated, especially at local levels. Habitat loss may include loss of suitable roosting or foraging habitat, resulting in longer flights between suitable roosting and foraging habitats due to habitat fragmentation, fragmentation of maternity colony networks, and direct injury or mortality. Loss of or modification of winter roosts (i.e., making hibernaculum no longer suitable) can result in impacts to individuals or at the population level (USFWS 2022, p. iv).

## Conservation Needs

The SSA serves as a synthesis of the best available information on the biological status and thus is helpful in assessing the current and future conservation needs of the species. The needs of the NLEB include having a sufficient number and distribution of healthy populations to ensure NLEB can withstand annual variation in its environment (resiliency), catastrophes (redundancy), and novel or extraordinary changes in its environment (representation). Resiliency is best measured by the number, distribution, and health of populations across the species' range.

Redundancy can be measured through the duplication and distribution of resilient populations across the species' range relative to potential catastrophic events. Representation can be measured by the number and distribution of healthy populations across areas of unique adaptive diversity. For NLEB, five representation units (RPUs) were identified: Eastern Hardwoods, Southeast, Midwest, Subarctic, and East Coast (Figure 2). NLEB's requirements for resiliency, redundancy, and representation are summarized in Table 4.

Overall, for survival and reproduction at the individual level, the NLEB requires access to food and water resources when not hibernating, along with suitable habitat throughout its annual life cycle. During the spring, summer and fall seasons, NLEB requires suitable foraging, roosting, traveling (between summer and winter habitat) and swarming habitat with appropriate conditions for maternity colony members; during the winter, NLEB requires habitat with suitable conditions for prolonged bouts of torpor. For NLEB populations to be healthy, they require a population size and growth rate sufficient to withstand natural environmental fluctuations, habitat of sufficient quantity and quality to support all life stages, gene flow among populations, and a matrix of interconnected habitats that support spring migration, summer maternity colony formation, fall swarming, and winter hibernation (USFWS 2022).

Table 4. Species-level ecology: Requisites for long-term viability (ability to maintain self-sustaining populations over a biologically meaningful timeframe) (from USFWS 2022).

| **3 Rs** | **Requisites Long-Term Viability** | **Description** |
|---|---|---|
| Resiliency – (Populations able to withstand stochastic events) | Demographic, physically, and genetically healthy populations across a diversity of environmental conditions | Self-sustaining populations are demographically, genetically, and physiologically robust, have sufficient quantity of suitable habitat |
| Redundancy – (number & distribution of populations to withstand catastrophic events) | Multiple and sufficient distribution of populations within areas of unique variation, i.e., Representation units | Sufficient number and distribution to guard against population losses and losses in species adaptive diversity, i.e., reduce covariance among populations, spread out geographically but also ecologically |
| Representation – (genetic & ecological diversity to maintain adaptive potential) | Maintain adaptive diversity of the species; Maintain evolutionary processes | Populations maintained across breadth of behavioral, physiological, ecological, and environment Diversity; Maintain evolutionary drivers (e.g., gene flow, natural selection) to mimic historical patterns |

## ENVIRONMENTAL BASELINE

In accordance with 50 CFR 402.02, the environmental baseline refers to the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the proposed action. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. The consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline. The environmental baseline is a "snapshot" of the species' health in the Action Area at the time of the consultation and does not include the effects of the action under review.

The FS provided data on NLEB hibernacula, roosts, and mist net captures on NFS lands within the Action Area. Since 2015, NLEB are known to occur at 65 hibernacula, 265 roosts, and 206 mist net locations. The hibernacula data provided also included maximum population estimates/counts from two time periods: pre-2015 and 2015-2021. Prior to 2015, 219 hibernacula were known to contain NLEB, with a total maximum count of 9,938 individuals. Since then, NLEB have only been documented within 65 hibernacula with a maximum count of 4,999. These results are likely an overestimate, as the data provided the maximum count since 2015 and the NLEB population has continued to decrease.

The FS provided additional data for the Allegheny National Forest, Daniel Boone National Forest, Mark Twain National Forest, and the National Forests of North Carolina. These forests were chosen due to the availability of data and their distribution and representation of the diversity of ecological conditions across the Action Area.

Across 13 years of mist net surveys, the Allegheny National Forest captured over 5,300 bats. From 1998 to 2010, NLEB was the second most captured species (27.3% of all captures). After the onset of WNS in 2012, capture rates of NLEB during mist net surveys conducted with the specific objective to monitor the species declined to 7.3% of the total captures.

Hibernacula data from the Mark Twain National Forest has been collected since 1990. Prior to 2015, most caves recorded less than 5 NLEB, however 3 caves reported counts of 67, 104, and 245 NLEB. After 2015, only one of those three caves was occupied with just 4 NLEB detected. Similar declines were observed in mist net captures. Prior to 2015, NLEB was one of the most captured species, but no NLEB were captured or detected acoustically since 2016.

NLEB has been documented via hibernacula surveys on the Daniel Boone National Forest dating back to the 1960's. Prior to 2015, a total of 434 individuals were detected within 67 of 193 known and suspected hibernacula. Between 2015 and 2021, only 45 NLEB were detected in 17 of 77 surveys. Mist net captures have also declined from a total of 1,782 captures prior to 2015 and no individuals detected since.

A similar trend has been observed on the Nantahala and Pisgah National Forests (administered as part the National Forests of North Carolina). After the arrival of WNS in 2012, mist net capture rates declined from 21.4% to 3.6%. NLEB was not very abundant in hibernacula surveys, representing only 0.92% of bats prior to 2012. However, no NLEB have been detected since 2015.

Data provided from the FS documents comparable NLEB population declines to those seen throughout the species' range. Except for the Croatan NF and Francis Marion NF, WNS or Pd has either been detected or assumed to be present at all other Forests within the Action Area. The same assumptions and caveats presented in the "Population Status and Size" section above also apply to the Forests. Winter colony counts underestimate the total number of NLEBs that might be present and do not account for the populations active year-round. Additionally, NLEB is not restricted to a small home range, instead migrating between hibernacula and summer roosting areas. NLEB routinely travels across National Forest boundaries, especially as the species' foraging, roosting, traveling, and swarming habitat is assumed to be abundant. Therefore, it is not possible to develop more precise population estimates for NLEB on the Forests. Similarly, using statewide population estimates also limits the ability to account for the NLEBs seasonal movements. For those reasons, we will use the RPUs to establish the NLEBs baseline status in the Action Area and in further analysis.

**Other Factors Affecting the Species in the Action Area:**

The Service has issued BOs for several landscape level Incidental Take Permits under section 10(a)(1)(B) of the ESA that may occur near or adjacent to the Action Area. The Forestry Habitat Conservation Plan (HCP) for Bats on Pennsylvania State Game Lands, State Forests, and State Parks (December 17, 2020), HCP for the Missouri Department of Conservation (February 18, 2022), Aitkin-Carlton Counties (MN) HCP (August 12, 2022), and the Lake States (MI, MN, WI) Forest Management Bat HCP (January 25, 2023), were developed to address impacts to NLEB (among other bats) during routine forest management activities. The BOs collectively authorized taking 1,443,132 acres of suitable NLEB habitat on an annual basis between 25 and 50 years, depending on the permit length. The taking is estimated to result in killing 53 and harming 271 NLEB per year. These impacts, however, will be offset by mitigation measures required within the HCPs.

On March 23, 2023, the Service provided a BO to the Federal Highway Administration, Federal Railroad Administration, and Federal Transit Administration (Transportation Administrations) on their reinitiation of the February 5, 2018, Programmatic Biological Opinion for Transportation Projects in the Range of the Indiana bat and Northern Long-eared bat. The amended BO addresses impacts from 350 previous actions that have not yet been implemented as well as future project-specific actions to be implemented within the scope of the 2018 programmatic BO. In the amended BO, the Transportation Administrations are authorized to take 12,160 acres of suitable habitat and 10 bridges/culverts/structures per year.

## EFFECTS OF THE ACTION

This section addresses the direct and indirect effects of the Action on the NLEB. In accordance with 50 CFR 402.02, effects of the action are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action. (See 50 CFR § 402.17).

### Effects Analysis Methodology

Our effects analysis considers the following factors:

1. Proximity of the Action: This BO will only address impacts from projects where NLEBs are reasonably certain to occur. Outside of known locations, we are uncertain where the NLEB occurs on the landscape. Because of the steep declines in the species and vast amount of suitable forest habitat available, the presence of suitable forest habitat alone is a far less reliable predictor of their presence, and most suitable habitat is now expected to be unoccupied. For this consultation, we conclude take is not reasonably certain to occur in areas of suitable habitat where presence has not been documented. However, we do consider potential effects of projects to both known (i.e., occupied) and suitable but undocumented habitat.

2. Timing: Planned and ongoing projects may continue to be implemented over the next 15 years. Because bat densities in forests vary seasonally, the timing of activities greatly influences the potential risk to covered species. Activities will affect NLEBs during the spring staging, maternity, fall swarming, and migratory stages of their life cycles and may result in direct injury and/or mortality from roughly April through October. We do not expect any adverse effects to known hibernacula or known hibernating bats due to the conservation measures. Forest management and prescribed fire conducted outside known hibernacula may result in additional beneficial effects. It is possible that some adverse effects to undocumented hibernating NLEBs may occur from roughly November to March.

3. Duration: Activities covered in this BO will have both short- and long-term effects to NLEBs (see Exposure-Response Table 3 below).

4. Disturbance Frequency and Intensity: In general, intensity increases as activities impact more acres of suitable habitat or a greater number of individuals.

5. Disturbance Severity: Disturbance severity is related to the type of individuals or populations impacted. Severity is expected to be highest for impacts to maternity colonies because NLEBs are concentrated during the maternity season and especially sensitive during the pup season because NLEBs are birthing and caring for non-volant pups. We anticipate severity will be low for swarming/staging populations because these individuals are able to fly and escape impacts, individuals are more likely roosting singly

or in smaller groups during this time, and the 0.25 mile buffer around known hibernacula will reduce impacts. Severity could be high for undocumented hibernating bats; however, we expect it to be minimal for reasons described further below, and we do not anticipate direct effects to migratory NLEBs.

For each of the four categories of activities described above, we apply the following steps to analyze effects at the programmatic level:

Effects of the Activity

We review best available science and commercial information about how the activity may affect the NLEB. Based on the literature review, we identify the stressor(s) (i.e., alteration of the environment that can lead to results in a negative response) that may result from the proposed activity. For each stressor, we identify the circumstances for an individual bat's exposure to the stressor (overlap in time and space between the stressor and a NLEB). Given exposure, we identify the likely individual response(s). For this consultation, we group responses into one of three negative categories: (1) reduced fitness (e.g., reduced food resources, reduced suitable roosting sites); (2) disturbance (e.g., day-time disturbance in a maternity roosting area, causing bats to flee and increasing the likelihood of injury or predation); and (3) harm (e.g., harvesting a tree occupied by adults and flightless bat pups resulting in death or injury; predation resulting from disturbance). This analysis is captured in the Exposure-Response Table (Table 3). This table is intended to be read in concert with and support this effects analysis section. In addition, we describe the positive (i.e., beneficial, increased fitness) responses for activities, where relevant, within the text of each section.

Table 5. Exposure-response analysis for planned and ongoing activities submitted by the FS that may affect the NLEB.

| Activity | Stressor | Exposure (time) | Exposure (space) | Resource Affected | Individual Response | Interpretation |
|---|---|---|---|---|---|---|
| Forest Management, Habitat Removal | Removing occupied roost trees via the removal of maternity roosting habitat | Active season; direct effect | Maternity roosting areas; Swarming or Staging Habitat | Individuals (pups, juveniles, adults) | Harm; Injury, mortality | This can cause harm (death or injury) of pups, juveniles, and adults from predation resulting from fleeing roost trees during the day. Only a subset will be harmed |
| Forest Management, Habitat Removal | Removing occupied roost trees via the removal of maternity roosting habitat | Maternity season; direct effect | Maternity roosting areas | Individuals (pups, adults) | Harm; Injury, mortality | This can cause harm (death or injury) of pups and adults when the tree falls or from predation. Only a subset will be harmed |
| Forest Management, Habitat Removal | Removing occupied roost trees via the removal of swarming or staging habitat | Swarming or staging Season; direct effect | Swarming or Staging Habitat | Individuals (pups, juveniles) | Harm; Injury, mortality | This can cause harm (death or injury) of pups and adults when the tree falls or from predation if bats are in torpor. Only a subset will be harmed |
| Forest Management, Habitat Removal | Removing occupied roost trees in areas where NLEB are active year-round via the removal of roosting habitat in forested wetlands during the cold winter months | Winter Season; direct effect | Winter Roosting areas | Individuals (juveniles, adults) | Harm; Injury, mortality | If bats are in torpor (i.e., state of mental or physical inactivity), this can cause harm (death or injury) of adults and juveniles when the tree falls or from predation. Only a subset will be harmed |
| Habitat Removal | Removing unoccupied roost trees via the permanent removal of maternity roosting habitat | Winter; indirect effect | Maternity roosting areas | Trees | Harm via reduced reproductive fitness | Removal of roost trees where bat colonies have demonstrated repeated use could reduce fitness through additional energy expenditure while searching for a new roost site. This can cause harm through reduced fitness by fragmenting maternity colonies and significantly affecting behavioral patterns associated with breeding. |
| Forest Management, Habitat Removal, Prescribed Burning | Disturbance (noise, machinery exhaust, activity) associated with human activities or noise from munitions, detonations, and training vehicles, including aircraft | Active season, daytime; direct effect | Roosting areas (maternity and non-maternity) | Individuals (juveniles, adults) | Harm; Injury, mortality | This can cause harm (death or injury) of pups and adults from predation resulting from fleeing roost trees during the day. Only a subset will be harmed. In addition, studies indicate bats do not avoid active ranges or alter foraging behavior during night-time activities, and NLEBs are expected to become habituated to noise disturbance. |

PBWTAR_3328

JA-0614

Table 5 (cont.): Exposure-response analysis for planned and ongoing activities submitted by the FS that may affect the NLEB.

| Activity | Stressor | Exposure (time) | Exposure (space) | Resource Affected | Individual Response | Interpretation |
|---|---|---|---|---|---|---|
| Prescribed Burning | Heat and smoke | Active season; direct effect | Maternity roosting areas | Individuals; adults, pups, and volant juveniles | Harm; Injury, mortality | Fleeing the line of fire of a prescribed burn during daylight hours increases the likelihood of predation. A subset of individuals may be harmed by this activity |
| Prescribed Burning | Heat and smoke | Pup Season; direct effect | Maternity roosting areas | Individuals; adults and pups | Harm; Injury, mortality | Exposure to heat and smoke during fires can cause harm (death or injury) of pups and females caring for pups. |
| Prescribed Burning | Heat and smoke in areas where the NLEB is active year-round in forested wetlands during the cold winter months | Winter Season; direct effect | Winter Roosting areas | Individuals; adults and juveniles | Harm; Injury, mortality | If bats are in torpor (i.e., state of mental or physical inactivity), this can cause harm (death or injury) exposure to heat and smoke during fires can cause harm (death or injury) of adults and juveniles |
| Prescribed Burning | Heat and smoke | Non-volant season; direct effect | Maternity roosting areas | Individuals; non- volant juveniles | Harm; Injury, mortality | Response varies with fire intensity and roost height; a combination of high intensity burns and/or low roosts is likely to cause injury or mortality |
| Forest Management, Habitat Removal, Other | Altering the flow of air and water through hibernacula. | Winter (direct effect) and active season (indirect effect) | Near hibernacula | Individuals | Disturbance; Arousal from hibernation; reduced fitness | Response depends on proximity of tree removal to hibernacula entrances, airflow patterns, and local hydrology, roosting locations within hibernacula. |
| Forest Management | Removing unoccupied roost trees via the temporary removal of maternity roosting habitat | Winter; indirect effect | Maternity roosting areas | Trees | Disturbance through reduced fitness by temporarily impairing behavioral patterns associated with breeding, feeding, and sheltering | Removal of roost trees where bat colonies have demonstrated repeated use could reduce fitness through additional energy expenditure while searching for a new roost site. We do not expect harm because forest loss is not permanent and there are typically other maternity roosting areas available in forest management settings |

Table 5 (cont.): Exposure-response analysis for planned and ongoing activities submitted by the FS that may affect the NLEB.

| Activity | Stressor | Exposure (time) | Exposure (space) | Resource Affected | Individual Response | Interpretation |
|---|---|---|---|---|---|---|
| Forest Management, Habitat Removal | Removing trees that provide habitat used for foraging, swarming, or staging | Year-round; indirect effect | All occupied areas except hibernacula | Insect prey, forest cover that supports (shelters) bat activity | Disturbance through reduced fitness; temporary energy expenditure for relocating from traditional use areas to alternative habitat | Loss of forest habitat decreases opportunities for growth and successful reproduction. Depending on location and size of the harvest, forest cover removal in the summer home range may cause a shift in home range or relocation. Loss of habitat in staging/swarming areas near hibernacula may cause a similar shift in habitat use for larger numbers of individuals, due to their seasonal concentration in these areas, and may reduce fall mating success and/or reduced fitness in preparation for spring migration |
| Prescribed Burning | Heat and smoke | Winter; direct effect | Near hibernacula | Individuals | Arousal from hibernation; reduced fitness, injury, mortality; harm | Response depends on the proximity of fire to hibernacula entrances and airflow patterns. Sufficient smoke entering hibernacula may cause injury or mortality. We do not expect this to occur due to the conservation measures |
| Other | Collision through exposure to roadways, | Active Season | All occupied areas except hibernacula | Individuals: adults and juveniles | Harm; Injury, mortality | Construction of new roads within 1,000-ft of documented habitat. NLEBs colliding with vehicles can cause harm (death or injury) of adults and juveniles during the active season. |
| Other | Water Quality Alteration; sedimentation | Active season, indirect effect | All occupied areas except hibernacula | Insect prey | Disturbance; temporarily reduced fitness | This could affect fitness by temporarily disturbing behavioral patterns associated with feeding and sheltering. Temporary effects on water quality could occur during construction, which could reduce local insect populations. Standard construction BMPs (e.g., silt fencing) will minimize erosion and subsequent sedimentation, thus reducing potential impacts on aquatic ecosystems. |
| Other | Chemical contamination from use or spills in/around bat habitat | Active season, direct and indirect effect | All occupied areas except hibernacula | Individuals; insect prey | Disturbance; temporarily reduced fitness through sublethal exposure to toxins; reduction in prey availability | Bats may drink contaminated water or forage in affected areas with the potential to eat insects exposed to chemicals. |

PBWTAR_3330

JA-0616

Quantifying Effects to Maternity Colonies

As described above, NLEBs are concentrated in maternity colonies during the maternity season, and the severity of the effects is expected to be highest for impacts to maternity colonies. Although overall population densities are low in relation to available summer habitat, local densities may be high within maternity colony home ranges. As a result, even small-scale summer habitat impacts could result in death, injury, or disturbance to multiple individuals simultaneously. Thus, it is useful to understand the likelihood of such a situation occurring. For pathways associated with forest management, prescribed fire, and habitat removal, we conducted a simplified cell-based probability analysis. The goal of the analysis was to predict the chances of these activities occurring within an occupied maternity roosting area when maternity colonies are present. When conducting this analysis, we used the FS's Land and Resource Management Plans (Forest Plans) to determine the maximum amount of forest management, prescribed fire, and habitat removal that may be implemented on an annual basis. Forest Plans provide a framework for integrated resource management and guide project-level decision making. FS projects and activities must contribute to Forest Plan objectives and conform to the standards and guidelines. Using the Forest Plans' maximum program of work (MPOW) allows us to estimate the likelihood of impacts in relation to the highest amount of habitat management that may occur.

We first determined the probability of a single maternity colony area being occupied by calculating the following:

1. Total expected population of NLEBs impacted, including the total population size and the population size by RPU. We used the maximum population size (see Population Size, above) to understand the maximum extent of impacts. This is a conservative assumption because it increases the area over which colonies are distributed.

2. Total number of maternity colonies, calculated by dividing the total number of females (estimated population size divided by 2, assuming 1:1 sex ratio) by the assumed colony size (e.g., 13 individuals for colonies in states where WNS is endemic). The total number of maternity colonies is also the number of occupied maternity core area-sized cells in the probability analysis (Steps 3 and 4, below).

3. Maternity core area was assumed to be 150 acres based on the maximum core area reported by Silvis et al. (2014), which is larger than some estimates of maternity roosting areas, but within the range of maternity roosting areas reported. This is a conservative assumption because it increases the area over which colonies are distributed. The maternity core area is also the size of the 'core area-sized cells' in the probability analysis (step 4, below).

4. Total maternity core area-sized cells in available bat habitat, calculated by dividing the available bat habitat (determined using the One Range model) by the size of one maternity core area. This assumes maternity colonies are randomly distributed across suitable habitat within the range of the NLEB.

5. Probability of a single maternity core area-sized cell being occupied, calculated by dividing the number of maternity colonies by the total maternity core area-sized cells (150 acres) in available bat habitat

We then determined the probability of a maternity core area-sized cell being impacted by forest management, prescribed fire, or habitat removal by calculating the following:

6. Total maternity core area-sized cells in the impacted area, calculated by dividing the acres of habitat impacted by the size of 1 maternity core area. We input the maximum acres impacted annually using the cumulative MPOW for forest management practices, prescribed fire, and habitat removal, which is described for each category below.

7. Probability of impacting any given cell (proportion of cells harvested, etc.), calculated by dividing the total maternity core-sized cells in the impacted area by the total maternity core-sized cells in available bat habitat.

From there we calculated the probability of any given cell being impacted by forest management practices, prescribed fire, or habitat removal and the probability of maternity core areas being impacted:

- Probability of a single cell being both occupied and impacted. This is calculated by multiplying the probability of a single maternity core-sized cell being occupied by the probability of impacting any given cell.
- Probability of a single cell miss (not impacted, not occupied, or not impacted and not occupied) = 1 minus the probability of a single cell being both occupied and impacted
- Probability of all impacted cells in one year missing all maternity core areas = the probability of a single cell miss raised to the power of the total maternity core-sized cells in the treated area
- Percent chance of impacting a maternity colony. = 1 – probability of all impacted cells missing all maternity core areas multiplied by 100.

We also used these parameters to calculate the number of colonies that may be affected by these activities both range-wide and within each RPU by multiplying the probability of a single maternity core area-sized cell being occupied by the total maternity core area-sized cells in the impacted area. We then assumed that all of these maternity colonies and impacts would occur on Forest Service lands.

Population-level Effects

We evaluate the aggregated consequences of the effects to individuals/habitat on the fitness of the population(s) to which those individuals belong. Maternity colonies are the local population unit examined, and we also analyzed effects at the scale of the representation units (RPUs) from the SSA as analogous to recovery units or regional populations. This step closes with our

conclusions on the likely fate or ultimate response of the population(s) and is couched in terms of population fitness (i.e., persistence and reproductive potential, long and short-term).

Species Range-wide

This step determines whether the anticipated reductions in population fitness will reduce the likelihood of survival and recovery of the species by reducing its range-wide reproduction, numbers, or distribution (RND). If the Service and other action agencies have insured that the population-level risks do not noticeably, detectably, or perceivably reduce the likelihood of progressing towards or maintaining the RND needs, then the action is not likely to appreciably reduce the likelihood of both survival and recovery of the species.

**Effects of Forest Management**

Literature Review

*Beneficial Effects*

Active forest management can result in the creation, enhancement, and conservation of bat habitat over broad areas and time scales (Silvis et al. 2012). Forest management practices (harvest, thinning, etc.) can reduce clutter and create canopy openings in an otherwise densely forested setting, which may promote more rapid development of bat pups. In central Arkansas, Perry and Thill (2007) found female NLEB bat roosts were more often located in areas with partial harvesting than males, with more male roosts (42 percent) in un-harvested stands than female roosts (24 percent). They postulated that females roosted in relatively more open forest conditions because they may receive greater solar radiation, which may increase developmental rates of young or permit young bats a greater opportunity to conduct successful initial flights (Perry and Thill 2007). Cryan et al. (2001) found several reproductive and non-reproductive female NLEB roosts in recently harvested (less than 5 years) stands in the Black Hills of South Dakota where snags and small stems (dbh of 5 to 15 cm (2 to 6 inches)) were the only trees left standing. In this study, however, the largest colony (n=41) was found in a mature forest stand that had not been harvested in more than 50 years. Lacki and Schwierjohann (2001) stated that forest management practices could meet both male and female roosting requirements by maintaining large-diameter snags, while allowing for regeneration of forests.

Menzel et al. (2002) found NLEB roosting in intensively managed stands in West Virginia. At the same study site, Owen et al. (2002) concluded that NLEB roosted in areas with abundant snags, and that in intensively managed forests of the central Appalachians, roost availability was not a limiting factor. Perry and Thill (2007) tracked NLEB in central Arkansas and found roosts in eight different forest classes, of which 89 percent were in three classes of mixed pine-hardwood forest. The mixed pine-hardwood forest stands that supported most of the roosts were partially harvested or thinned, unharvested (50–99 years old), or harvested by group selection.

*Tree Felling*

The impacts from tree felling are expected to vary depending on location, time of year, and extent/intensity. If a bat is roosting in a tree that is felled, it may remain in the tree and be

crushed or flush and become more vulnerable to predation (e.g., by diurnal raptors). It is unlikely that all bats present in a stand during covered activities will be disturbed and flush, and not all disturbance will constitute harm.

While bats can flee during forest management practices, felling of occupied roosts has been shown to result in direct injury and death of Indiana bat (*Myotis sodalis*) adults and pups in three instances (Cope et al 1974; Bellwood 2002; J. Whitaker, Indiana State University, pers. comm. 2005). Indiana bats and NLEB are closely related and have similar behavior (i.e., forest-dwelling, forming maternity colonies, roosting in trees in the summer). These three instances did not occur during forest management operations, but available evidence indicates that both adults and pups can be killed when an occupied roost tree is felled.

Based on these reports, the risk of injury or death from being crushed when a tree is felled is most likely to impact non-volant pups. The risk is also greater to adults during cooler weather when bats periodically enter torpor and may be unable to arouse quickly enough to respond. The likelihood of potential roost trees containing larger numbers of covered species is greatest during pregnancy and lactation (April-July), with exit counts falling dramatically after this time. For example, two studies found little brown and northern long-eared bats' use of certain trees appears to be highest in spring, when females were pregnant, with colonies breaking into smaller groups before parturition (Foster and Kurta 1999, Sasse and Pekins 1996).

*Habitat Loss*

Silvis et al. (2014a) modeled the effects of roost-loss on NLEBs, and Silvis et al. (2015) actually removed known roosts during the winter to investigate the effects. Overall location and spatial size of colonies was similar pre- and post-treatment. Patterns of roost use before and after removal treatments also were similar. Roost height, diameter at breast height, percent canopy openness, and roost species composition were similar pre- and post-treatment. However, once removals exceeded 20–30% of documented roosts (ample similar roosts remained), a single maternity colony network started showing patterns of break-up. Sociality is believed to increase reproductive success (Silvis et al. 2014a), and smaller colonies could experience reduced reproductive success, providing less thermoregulatory benefits for adults in cool spring temperatures and/or for non-volant pups. Fitness benefits of colonial roosting include minimizing the physiological stress of lactation, creation of more favorable thermal conditions, and cooperative rearing of young (Olivera-Hyde et al. 2019).

Forest patch size and contiguity are factors that appear to influence habitat use by NLEB. Henderson et al. (2008) observed gender-based differences in mist-net capture rates of NLEB on Prince Edward Island related to forest patch size. The area of deciduous stands had a consistent positive relationship with the probability of presence of both males and females, but males were found more often in smaller stands than females. In southeastern Missouri, Yates and Muzika (2006) reported that NLEB showed a preference for contiguous tracts of forest over fragmented forest or open landscapes for foraging or traveling, and that different forest types interspersed on the landscape increased the likelihood of occupancy.

In West Virginia, Owen et al. (2003) radio-tracked nine female NLEB that spent their foraging and travelling time in the following habitat types (in descending order of use):

- 70–90-year-old stands without harvests in more than 10–15 years ("intact forest") (mean use 52.4 percent);
- 70–90-year-old stands with 30–40 percent of basal area removed in the past 10 years ("diameter-limit harvests") (mean use 42.9 percent);
- open areas (clearcuts and roads) (clear cut = all trees > 2.5 cm (1.0 inch) dbh removed) (mean use 4.6 percent); and
- clearcuts with approximately 4.5 $m^2$/ha (19.6 $ft^2$/acre) tree basal area remaining ("deferment harvests") (mean use 0.03 percent).

Habitat selection differed significantly relative to habitat availability, with diameter-limit harvests ranking as the strongest habitat preference, where percent use exceeded percent availability for 7 of the 9 bats.

In Alberta, Canada, NLEB avoided the center of clearcuts and foraged more in intact forest than expected (Patriquin and Barclay 2003). On Prince Edward Island, Canada, female NLEB preferred to forage in areas centered along creeks running through forests (Henderson and Broders 2008). A preference for riparian habitats was also reflected in the relative probability of acoustic detections of NLEB in riparian vs non-riparian areas in four eastern states and the District of Columbia (Gorman et al. 2022). In mature forests on the Sumter National Forest in northwestern South Carolina, 10 of the 11 stands in which NLEB were detected were mature stands (Loeb and O'Keefe 2006). Within those mature stands, NLEB were recorded more often at points with sparse or medium-density vegetation than at points with dense vegetation, suggesting that small openings within forest stands facilitate commuting and/or provide suitable foraging habitat. However, in southwestern North Carolina, Loeb and O'Keefe (2011) found that NLEB rarely used forest openings, but often used roads.

<u>Amount of Forest Management Proposed</u>

Under the FS's MPOW, the following acres of forest management may occur annually by RPU:

- Eastern Hardwoods RPU: 314,398 acres total (67.8%)
- Southeast RPU: 137,815 acres total (29.7%)
- East Coast RPU: 11,429 acres total (2.5%)

<u>Quantifying the Effects of Forest Management</u>

Forest management practices result in increased fitness (i.e., positive response) through the improvement of roosting, foraging, swarming/staging, and travel and migration habitat by reducing clutter, creating canopy, growing larger diameter trees, maintaining larger diameter snags, creating snags, allowing for regeneration, increasing heterogeneity, and removing non-native species. Forest management maintains forested habitat, and NLEBs use actively managed

forests. However, forest management practices also remove roost trees and harvest may reduce foraging, spring staging, fall swarming, or travel and migration habitat. Table 5 shows the pathways we identified for NLEB negative responses to forest management and the range of individual responses expected. Removing occupied trees is likely to kill or injure pups and adults. The disturbance (noise, exhaust from machinery, etc.) that accompanies harvest activities could result in harm or death because fleeing during daylight increases the likelihood of predation. The species' responses to these stressors depends on the type of harvest (e.g., thinning, salvage, even-aged management, clear cut, etc.) and its duration and timing (i.e., more likely to be beneficial when bats are not present).

Removing occupied roost trees can cause harm from death and injury when the tree falls or from predation that could occur when bats flee the roost. We expect this to occur when NLEBs are more concentrated during the maternity season (pups and adults) and the swarming/staging season (adults and juveniles). It is also possible during cold temperatures (<4.5ºC or 40ºF) in areas where NLEBs are active year-round when adults and juveniles experience bouts of torpor, which makes them less likely to escape. As described above, the vast majority of winter roosts occur within forested wetlands, so we do not anticipate effects outside of forested wetland habitat. We do not predict precise numbers of individuals affected, but the likelihood of harm and death is very low. The chance of felling an occupied roost tree is low because there are many trees on the landscape in most forest management settings, only a handful of which are maternity roost trees or roost trees used during swarming and staging or winter (in areas where they are active year-round). In addition, tree harvests in the eastern U.S. are almost always live trees, and dead trees (which are more likely to be roosts) are of little commercial value aside from salvage harvests or firewood. The likelihood of noise or exhaust resulting in fleeing is also low because it would have to occur in close proximity to an occupied roost tree. The chance of a fleeing bat being predated is low.

Although the likelihood of felling an occupied roost tree is low, the consequences can be severe. As described above, severity is expected to be low for swarming/staging populations because these individuals that are able to fly and escape impacts, individuals are more likely roosting singly or in smaller groups during this time, and the 0.25-mile buffer around known hibernacula will further reduce the likelihood of this occurring. The consequences for adult NLEBs in torpor in areas where the species is active year-round may be greater than for swarming/staging populations; however, the likelihood of it occurring is even lower because there are not many days with temperatures <4.5ºC, and available data indicate the NLEBs are roosting in forested wetlands in these areas (Jordan 2020), and these areas are not typically subjected to forest management treatments due to best management practices.

The likelihood and severity of effects is greatest for maternity colonies because NLEBs are pregnant and caring for non-volant pups. We used the simplified cell-based probability analysis to predict the chances of forest management practices occurring within an occupied maternity roosting area when NLEBs are present. We analyzed a reasonable worst-case scenario by using the FS's MPOW for forest management practices that may occur during the active season in any one year. Results indicate that the chance of impacting any given maternity colony is extremely

unlikely (<5%), and a maximum of 16 colonies could be affected over the range of the NLEB (Table 6).

Table 6. Maximum Impact of Forest Management Activities on Maternity Colonies

| FOREST MANAGEMENT | | | | | |
|---|---|---|---|---|---|
| Population | Maximum Treated (acres) | % of Modeled Habitat Affected | % Chance of Impacting Maternity Colony | # of Maternity Colonies Affected | % of Maternity Colonies Affected |
| Rangewide (USA) | 463,942 | 0.2% | 3.3% | 16 | 0.2% |
| Southeast RPU | 137,815 | 0.3% | 2.8% | 9 | 0.3% |
| East Coast RPU | 11,429 | 0.1% | 0.1% | 1 | 0.1% |
| Eastern Hardwoods RPU | 314,398 | 0.2% | 1.5% | 7 | 0.2% |

In addition to the pathways that result in direct effects, forest management practices could alter the flow of air and water through unknown hibernacula, which could also harm NLEBs. We expect the likelihood of this occurring will be low due to the FS's history of management and knowledge of local site conditions including the presence of caves, karst, or other hibernacula features. In addition, the hibernacula often selected by NLEB are "large, with large passages" (Raesly and Gates 1987) and may be less affected by relatively minor surficial micro-climatic changes that might result from forest management around unknown hibernacula. Further, bats rarely hibernate near the entrances of structures (Grieneisen 2011). Davis et al (1999) reported that partial clearcutting "appears not to affect winter temperatures deep in caves.". We anticipate very little, if any, impact based on the widely dispersed (i.e., not concentrated in a given area) nature of forest management activities and the nature of typical hibernacula.

We also do not quantify the potential reductions in fitness that may result as indirect effects from loss of habitat, and we do not expect the reductions in fitness to significantly impair essential behavioral patterns or result in harm. We anticipate that less than 0.2% (463,942 acres of 245,157,764 acres) of available habitat may be harvested in any one year. NLEB does not appear to be limited by habitat in most locations, as demonstrated by a great deal of plasticity within its environment (e.g., living in highly fragmented forest habitats to contiguous forest blocks from the southern United States to Canada's Yukon Territory) in the absence of WNS. In addition, habitat losses from forest management practices are temporary, and forest management occurs in areas with sufficient forested habitat on the landscape, which would allow for NLEBs to find alternate maternity roosting areas nearby. Therefore, reductions in fitness from habitat loss due to forest management are anticipated to uncommon and localized. Further, many forest management practices benefit NLEB habitat and may increase fitness of local NLEB populations.

*Effects of forest management in undocumented areas*

As described above, we conclude take is not reasonably certain to occur in areas of suitable habitat where presence has not been documented. Because the forest management practices are extremely unlikely (<5%) to impact an undocumented colony, the implementation of planned and ongoing activities is not likely to adversely affect NLEBs in areas outside of known locations. However, because the analysis indicates that 16 maternity colonies will be affected range-wide (which we assumed would occur on Forest Service lands in R8 and R9), it is

reasonable to conclude there will be some impacts to some individual NLEBs in areas where they have yet to be documented (i.e., specific areas where they are not reasonably certain to occur). Given the nature of forest management and overlap with suitable habitat, the best available science indicates that forest management practices are anticipated to have at least some negative impact on some individual NLEBs in unknown locations, as opposed to the assumption that forest management will have a large impact on all of the or most NLEBs. Forest management will also positively affect NLEBs in unknown locations. This relative quantification of impacts, even if somewhat qualitative, is essential to determining the magnitude of the importance of the impacts on the population and to the species. The low probability of forest management practices impacting a given colony, coupled with the low levels of harm and death anticipated shows that severe, localized effects to NLEBs in unknown locations are not likely.

*Effects of forest management in known occupied areas*

The FS is proposing to conduct forest management activities in areas where NLEBs are reasonably certain to occur and may be within a known colony area, known swarming or staging area, or known winter habitat in areas where the species is active year-round. Although the impacts to unknown populations are discountable across the range (3.3% chance of impacting a colony), the best available commercial and scientific information shows that conducting forest management practices in known areas is likely to adversely impacts individuals and populations.

As described above, the conservation measures prevent impacts to known hibernacula and known hibernating bats. The conservation measures also prevent impacts to known, occupied maternity roost trees during the pup season. However, we do expect impacts to some pups and adults during the maternity season, swarming/staging, and during cold temperatures in areas where bats are active year-round if NLEBs are in torpor and the activity occurs in a forested wetland. We anticipate that 16 maternity colonies may be impacted by forest management practices annually on Forest Service lands in R8 and R9. However, the low levels of harm and death anticipated provides evidence that severe, localized effects to northern long-eared bats in known locations are also unlikely. The low levels or harm and death predicted are further supported by other analyses of forest management on the NLEB. For example, the Service recently issued Incidental Take Permits for forest management activities in Michigan, Minnesota, and Wisconsin (ICF 2023). Harvest activities were expected to occur on over 500,000 acres per year, and less than 3 NLEBs were anticipated to be killed and 74 disturbed (a fraction of these would be harmed). In addition, forest management practices will benefit NLEB habitat.

**Effects of Prescribed Fire**

Literature Review

Perry (2012) provides a review of fire effects on bats in the eastern oak region of the U.S., and Carter et al. (2002) provides a similar review for bats in the southeastern and mid-Atlantic states. Forest-dwelling bats, including the wide-ranging NLEB, were presumably adapted to the fire-driven disturbance regime that preceded European settlement and to the habitat types that resulted from fire suppression in many parts of the eastern U.S. The impact of fire suppression

on populations of NLEBs is unclear, but it is apparent that fire may affect individual bats adversely through exposure to heat, smoke, and carbon monoxide, and positively through habitat modifications and resulting changes in their food base.

*Direct Effects – Summer Roosting*

Little is known about the direct effects of fire on cavity and bark roosting bats, such as the NLEB, and few studies have examined escape behaviors, direct mortality, or potential reductions in survival associated with fire. Dickinson et al. (2009) monitored two NLEBs (one male and one female) in roosts during a controlled summer burn. Within 10 minutes of ignition near their roosts, both bats flew to areas that were not burning. Among four bats they tracked before and after burning, all switched roosts during the fire, with no observed mortality. It was presumed that roosting sites (e.g. exfoliating bark, crevices) used by bats offer little protection from hot gases released by fire (Dickinson et al. 2009, p. 59; Guelta and Balbach 2005). By extrapolating from other species, carbon monoxide exposure would cause incapacitation at concentrations of >1000 PPM for 25 minutes or more (Dickinson et al. 2009, p. 59; Spietel 1996). Rodrigue et al. (2001) reported flushing a *Myotis* bat from an ignited snag during an April controlled burn in West Virginia.

Carter et al. (2002) suggested that the risk of direct injury and mortality to southeastern forest-dwelling bats resulting from summer prescribed fire is generally low. During warm temperatures, bats can arouse from short-term torpor quickly. Most adult bats are quick, flying at speeds > 30 km/hour (Patterson and Hardin 1969) and able to escape to unburned areas. NLEB use multiple roosts, switching roost trees often, and could likely use alternative roosts in unburned areas should fire destroy the current roost. Silvis et al. (2016) noted NLEBs aroused from torpor in late April during prescribed fires; however, the authors acknowledged how non-volant bats and adults with pups respond to fire is unknown. Non-volant pups are likely the most vulnerable to death and injury from prescribed fire.

At least some NLEBs roosting in burned areas may be harmed by carbon monoxide or heat. Dickinson et al. (2010) used a fire plume model, field measurements, and models of carbon monoxide and heat effects on mammals to explore the risk to the Indiana bat and other tree-roosting bats during prescribed fires in mixed-oak forests of southeastern Ohio and eastern Kentucky. Their research suggested that blood carboxyhemoglobin concentrations from CO exposure only approach critical levels just above flame heights in the most intense prescribed burns. However, if bats are in torpor during a fire and cannot arouse quickly enough to escape, thermal injury could occur up to the height of at which crown scorch occurs. Most prescribed fires for forest management are planned to avoid significant tree scorch.

*Direct and Indirect Effects – Winter Roosting*

Fires conducted during the winter could affect hibernating NLEBs if they generate gases that drift or are blown into hibernacula. Whether this occurs depends on local airflow characteristics and weather conditions (Carter et al. 2002; Perry 2011). Smoke from may not reach toxic levels in caves and mine, but introduced gases could arouse bats from hibernation, causing energy expenditure and reduced fitness (Dickinson et al. 2009). Caviness (2003) observed smoke

intrusion into hibernacula during winter burning in Missouri but did not observe any bat arousal. Fire could also alter vegetation surrounding the entrances to caves and mines, which could indirectly affect temperature and humidity regimes of hibernacula by modifying airflow (Carter et al. 2002, Richter et al. 1993).

*Indirect Effects – Roost Availability/Suitability*

Fire can affect availability of roosting sites (cavities, crevices, loose bark) by creating or consuming snags, which typically provide these features, or by creating these features in live trees. Although stand-replacing or other intense wildfires may create large areas of snags, the effects of multiple, low-intensity prescribed burns on snag density is less obvious, especially for forests consisting mostly of fire-adapted tree species. Low-intensity, ground-level fire may injure large hardwood trees, creating avenues for pathogens such as fungi to enter and eventually form hollow cavities in otherwise healthy trees (Smith and Sutherland 2006). Fire may scar the base of trees, promoting the growth of basal cavities or hollowing of the bole in hardwoods (Nelson et al. 1933, Van Lear and Harlow 2002). Repeated burning could potentially create forest stands with abundant hollow trees. Trees located near down logs, snags, or slash may be more susceptible to damage or death, and aggregations of these fuels can create clusters of damaged trees or snags (Brose and Van Lear 1999, Smith and Sutherland 2006).

Bats are known to take advantage of fire-killed snags to roost in burned areas. Boyles and Aubrey (2006) found that, after years of fire suppression, initial burning created abundant snags, which evening bats (*Nycticeius humeralis*) used extensively for roosting. Johnson et al. (2010) found that after burning, male Indiana bats roosted primarily in fire-killed maples. In the Daniel Boone National Forest, Lacki et al. (2009a) radio-tracked adult female NLEBs before and after prescribed fire, finding a greater percentage (74.3 percent) of roosts in burned habitats than in unburned habitats. NLEB behavior is consistent with being fire tolerant – that is, they frequently forage and roost in live trees and snags in early stages of decay in post-burn sites (Lacki et al. 2009a, p. 1172). NLEB post-burn roost selection was based on bole condition – they selected trees with higher number of cavities and a higher percentage of bark cover on the bole than random snags, likely due to a wider range of roosting options within a tree (Lacki et al. 2009a, p. 1172). Burning may create more suitable snags for roosting through exfoliation of bark (Johnson et al. 2009a), mimicking trees in the appropriate decay stage for roosting bats. The extent to which preferred roosts are limiting in forested habitats is unclear (Lacki et al. 2009a, p. 1172; Crampton and Barclay 1998, p. 1355; Kunz and Lumsden et al. 2003, p. 16). There is evidence, however, for competition for roost availability among syntopic (similar and closely related) species of tree-roosting bats (Lacki et al. 2009a, p. 1172; Boonman 2000, p. 385; Lumsden et al. 2002, p. 207).

In addition to creating snags and live trees with roost features, prescribed fire may enhance the suitability of trees as roosts by reducing adjacent forest clutter. Perry et al. (2007) found that five of six species, including NLEB, roosted disproportionally in stands that were thinned and burned 1-4 years prior but that still retained large overstory trees.

*Indirect Effects – Summer Foraging*

Adult insects are the predominant prey of NLEB. On the Daniel Boone National Forest, Lacki et al. (2009a) found that abundance of coleopterans (beetles), dipterans (flies), and all insects combined captured in black-light traps increased following prescribed fires. The mechanism of this increase is related to the insects' ability to use regrowth of ground vegetation stimulate by the burns (Swengel 2001, p. 1141). In NLEB fecal samples, lepidopterans (moths), coleopterans, and dipterans were the three most important groups of insect prey, with dipteran consumption increasing in the year after burning. NLEB appeared to track the observed changes in insect availability – home ranges were closer to burned habitats than to unburned habitats after fires, but home range size did not change.

<u>Amount of Prescribed Fire Proposed</u>

The information provided by the Forest Service indicated that 1.3 million acres of prescribed fire could occur during the active season under the MPOW. However, this is significantly higher than the MPOW analysis provided for two regional NLEB consultations in 2015 prior to issuance of the final 4(d) rule for the NLEB. Therefore, we worked with the Forest Service to evaluate the average annual amount of prescribed fire that was conducted during the active season over the past 10 years. This resulted in the following estimated acres of prescribed fire may occur annually by RPU:

- Eastern Hardwoods RPU: 61,685 acres total (35.8%)
- Southeast RPU: 98,530 acres total (51.4%)
- East Coast RPU: 12,225 acres total (7.1%)

We relied on the actual data from the past 10 years instead of the MPOW for prescribed fire so as not to greatly overestimate the effects.

<u>Quantifying Effects of Prescribed Fire</u>

Table 5 shows the pathways we identified for NLEB negative responses to prescribed fire and the range of individual responses expected. Prescribed fire also results in increased fitness (i.e., positive response) likely through the increases in roosting habitat quality and insect abundance. Prescribed fire creating snags, creates roost features in live trees, removes mid-story clutter, and stimulates growth of ground cover and insect populations. Exposure to prescribed burning can cause direct adverse responses (fleeing, injury, death). Stressors are caused by burning include heat and smoke during the actual movement of a fire through forested areas and fire-induced changes in vegetation structure and composition. Bat exposure to these direct and indirect stressors depends on timing of the burn and how bats may use the burned area, e.g., for roosting, foraging, spring staging, fall swarming, or hibernation in a cave/mine where the entrance is within or near the burned area.

Exposure to heat and smoke can cause harm from death or injury directly or from predation that could occur when NLEBs flee prescribed burns. We expect this to occur when NLEBs are more concentrated during the maternity season and the swarming/staging season, but we only

anticipate direct harm from heat and smoke during the pup season or during cold temperatures (<4.5ºC or 40ºF) in areas where NLEBs are active year-round. As described above, the vast majority of winter roosts occur within forested wetlands, so we do not anticipate effects outside of forested wetland habitat. We do not predict precise numbers of individuals affected, but the likelihood of harm and death is low. The chance of burning near an occupied roost tree is low because there are many trees on the landscape in most forest settings, only a handful of which are maternity roost trees or roost trees used during swarming and staging or winter (in areas where they are active year-round). The likelihood of heat, smoke, and disturbance resulting in fleeing or causing harm or death is low because it would have to occur in close proximity to an occupied roost tree. In addition, the chance of a fleeing bat being predated is low.

Although the likelihood of burning an occupied roost tree is low, the consequences can be severe. The consequences for NLEBs in torpor in areas where the species is active year-round may be high; however, the likelihood of it occurring is even lower because there are not many days with temperatures <4.5ºC, and available data indicate the NLEBs are roosting in forested wetlands in these areas (Jordan 2020), and these areas are not typically subjected to high intensity burns.

The likelihood and severity of effects is greatest for maternity colonies because NLEBs are pregnant and caring for non-volant pups. We used the simplified cell-based probability analysis to predict the chances of prescribed burns occurring within an occupied maternity roosting area when NLEBs are present. As described above, we analyzed a reasonable scenario by using the FS's average annual program over the last 10 years for prescribed fire practices that may during the active season in any one year. We assumed 172,440 acres of burning would occur during the active season. Results indicate that the chance of impacting any given maternity colony is extremely unlikely (<5%), and a maximum of 8 colonies could be affected over the range of the NLEB (Table 7).

The heat and smoke from burning could also harm hibernating bats if a hibernaculum is exposed to smoke. Although the conservation measures avoid impacts to known hibernaculum, prescribed burns may impact unknown hibernacula. We expect the likelihood of this occurring to be low due to the FS's history of management and knowledge of local site conditions including the presence of caves, karst, or other hibernacula features. In addition, prescribed fires may have little or no effects to NLEBs in unknown hibernacula. Caviness (2003), for example, reported that prescribed burns were found had no notable influence on bats hibernating in various caves in the Ozark National Forest. All bats present in caves at the beginning of the burn were still present and in "full hibernation" when the burn was completed, and bat numbers increased in the caves several days after the burn. There were minute changes in relative humidity and temperature during the burn and elevated short-term levels of some contaminants from smoke were noted.

Table 7. Maximum Impact of Prescribed Fire Activities on Maternity Colonies

| PRESCRIBED FIRE | | | | | |
|---|---|---|---|---|---|
| Population | Maximum Treated | % of Modeled | % Chance of Impacting | # of Maternity | % of Maternity |
| Rangewide (USA) | 172,440 | 0.1% | 0.5% | 8 | 0.1% |
| Southeast RPU | 98,530 | 0.2% | 1.6% | 6 | 0.2% |
| East Coast RPU | 12,225 | 0.1% | 0.1% | 1 | 0.1% |
| Eastern Hardwoods RPU | 61,685 | 0.0% | 0.1% | 1 | 0.0% |

*Effects of prescribed burning in undocumented areas*

As described above, we conclude take is not reasonably certain to occur in areas of suitable habitat where presence has not been documented. Because the prescribed fire is extremely unlikely (<5%) to impact an undocumented colony, the implementation of planned and ongoing activities is not likely to adversely affect NLEBs in areas outside of known locations. However, because the analysis indicates that 8 maternity colonies will be affected range-wide (which we assumed would occur on Forest Service lands in R8 and R9), it is reasonable to conclude that there will be some impacts to some individual NLEBs in areas where they have yet to be documented (e.g., specific areas where they are not reasonably certain to occur). It is also possible that some impacts could occur to NLEBs that may be hibernating in undocumented hibernacula. Given the nature of prescribed fire and overlap with suitable habitat, the best available science indicates that prescribed fire is anticipated to have at least some negative impact on some individual NLEBs in unknown locations, as opposed to the assumption that it will have a large impact on all of the or most NLEBs. Prescribed fire will also positively affect NLEBs in unknown locations. This relative quantification of impacts is essential to determining the magnitude of the importance of the impacts on the population and to the species. The low probability of prescribed fire impacting a given colony, coupled with the low levels of harm and death anticipated provides evidence that severe, localized effects to NLEBs in unknown locations are unlikely.

*Effects of prescribed burning in known occupied areas*

The FS is proposing to conduct prescribed fire in areas where NLEBs are reasonably certain to occur and may be within a known colony area, known swarming or staging area, or known winter habitat in areas where the species is active year-round. Although the impacts to unknown populations are discountable across the range (<5% chance of impacting a colony), controlled burning in areas of known colonies is likely to adversely impact individuals and populations.

As described above, the conservation measures prevent impacts to known hibernacula and known hibernating bats. The conservation measures also prevent impacts to known, occupied maternity roost trees during the pup season. However, we do expect impacts to some pups and adults during the maternity season, swarming/staging, and during cold temperatures in areas where bats are active year-round if NLEBs are in torpor and activities occur in forested wetlands. We anticipate that 8 maternity colonies may be impacted by prescribed burning. However, the low levels of harm and death anticipated provides evidence that severe, localized effects to northern long-eared bats in known locations are also unlikely. The low levels or harm and death predicted are further supported by other analyses of prescribed fire on the NLEB. For example,

the Service recently issued Incidental Take Permits for forest management activities in Michigan, Minnesota, and Wisconsin (ICF 2023). Prescribed fire was expected to occur on over 77,000 acres per year, and less than 1 NLEB was anticipated to be killed and <4 disturbed (a fraction of these would be harmed). In addition, prescribed fire will benefit NLEB habitat.

**Effects of Habitat Removal**

In the final listing rule for the NLEB, we note that habitat removal could result in the following impacts: (1) loss of suitable roosting or foraging habitat; (2) fragmentation of remaining forest patches, leading to longer flights between suitable roosting and foraging habitat; (3) removal of travel corridors fragmenting colonies/networks; and (4) direct injury or mortality from the removal of occupied roosts during active season clearing. Habitat removal could also alter the flow of air and water through unknown hibernacula and impact NLEBs. The literature review for forest management (above) describes the loss of suitable roosting or foraging habitat, direct injury or mortality from removal of occupied roost, and alteration of hibernacula, and all of these effects and studies apply to habitat removal as well. In addition, fragmentation of forests patches and travel corridors may result in longer flights to find alternative suitable habitat and result in colonial disruption.

NLEBs emerge from hibernation with their lowest annual fat reserves and return to their summer home ranges. Because NLEBs have summer home range fidelity (Foster and Kurta 1999; Patriquin et al. 2010; Broders et al. 2013), loss or alteration of forest habitat may put additional stress on females when returning to summer roost or foraging areas after hibernation. Females (often pregnant) have limited energy reserves available for use if forced to seek out new roosts or foraging areas. Hibernation and reproduction are the most energetically demanding periods for temperate-zone bats, including the NLEB (Broders et al. 2013). Bats may reduce metabolic costs of foraging by concentrating efforts in areas of known high prey profitability, a benefit that could result from the bat's local roosting and home range knowledge and site fidelity (Broders et al. 2013). Cool spring temperatures provide an additional energetic demand, as bats need to stay sufficiently warm or enter torpor. Entering torpor comes at a cost of delayed parturition; bats born earlier in the year have a greater chance of surviving their first winter and breeding in their first year of life (Frick et al. 2010). Delayed parturition may also be costly because young of the year and adult females would have less time to prepare for hibernation (Broders et al. 2013). Female NLEBs typically roost colonially, with their largest population counts occurring in the spring (Foster and Kurta 1999), presumably as one way to reduce thermal costs for individual bats (Foster and Kurta 1999). Therefore, similar to other temperate bats, NLEBs have multiple high metabolic demands (particularly in spring) and must have sufficient suitable roosting and foraging habitat available in relatively close proximity to allow for successful reproduction.

<u>Amount of Habitat Removal Proposed</u>

Under the FS's MPOW, the following acres of habitat removal may occur annually by RPU:

- Eastern Hardwoods RPU: 57,587 acres total (94.5%)
- Southeast RPU: 3,154 acres total (5.2%)

- East Coast RPU: 200 acres total (0.3%)

Quantifying Effects of Habitat Removal

Table 3 shows the pathways we identified for NLEB negative responses to habitat removal and the range of individual responses expected. Many of the pathways are similar to forest management; however, there are no beneficial effects anticipated from habitat removal. The primary alteration of the environment associated with habitat removal that is relevant to the NLEB is the removal of trees that provide roosts or serve as foraging, spring staging, or fall swarming habitat. Removing occupied trees is likely to kill or injure pups and adults. Fragmentation and loss of forest habitat decreases opportunities for growth and successful reproduction. Alteration of hibernacula can harm NLEBs. The disturbance (noise, exhaust from machinery, etc.) that accompanies habitat removal activities may result in harm or death because fleeing during daylight increases the likelihood of predation. A small subset of disturbed individuals may be harmed. The species' responses to these stressors depend on the timing, location, and extent of the removal. In areas with little forest or highly fragmented forests (e.g., western U.S. edge of the range, central Midwestern states, the impact of forest loss would be disproportionately greater than similar-sized losses in heavily forested areas (e.g., Appalachians and northern forests). Also, the impact of habitat loss within a NLEB's home range is expected to vary depending on the scope of removal.

Removing occupied roost trees can cause harm from death and injury when the tree falls or from predation that could occur when bats flee the roost. We expect this to occur when NLEBs are more concentrated during the maternity season and the swarming/staging season. It is also possible during cold temperatures (<4.5ºC or 40ºF) in areas where NLEBs are active year-round when they experience bouts of torpor, which makes them less likely to escape. As described above, the vast majority of winter roosts occur within forested wetlands, so we do not anticipate effects outside of forested wetland habitat. We do not predict precise numbers of individuals affected, but the likelihood of harm and death is low. The chance of felling an occupied roost tree is low because there are many trees on the landscape in most forested settings, only a handful of which are maternity roost trees or roost trees used during swarming and staging or winter (in areas where they are active year-round). The likelihood of disturbance (noise, exhaust, etc.) resulting in fleeing is also low because it would have to occur in close proximity to an occupied roost tree. The chance of a fleeing bat being predated is low.

Although the likelihood of felling an occupied roost tree is low, the consequences can be severe. As described above, severity is expected to be low for swarming/staging populations because these individuals are able to fly and escape impacts, individuals are more likely roosting singly or in smaller groups during this time, and the 0.25-mile buffer around known hibernacula will further reduce the likelihood of this occurring. The consequences for NLEBs in torpor in areas where the species is active year-round may be greater than for swarming/staging populations; however, the likelihood of it occurring is even lower because there are not many days with temperatures <4.5ºC, and available data indicate the NLEBs are roosting in forested wetlands in these areas (Jordan 2020), and these areas are not typically subjected to forest management treatments due to best management practices.

The likelihood and severity of effects is greatest for maternity colonies because NLEBs are pregnant and caring for non-volant pups. We used the simplified cell-based probability analysis to predict the chances of forest management practices occurring within an occupied maternity roosting area when NLEBs are present. We analyzed a reasonable worst-case scenario by using the FS's MPOW for habitat removal that may occur in any one year. Results indicate that the chance of impacting any given maternity colony is extremely unlikely (<5%), and a maximum of one colony could be affected over the range of the NLEB (Table 8).

Table 8. Maximum Impact of Habitat Removal Activities on Maternity Colonies

| HABITAT REMOVAL | | | | | |
|---|---|---|---|---|---|
| Population | Maximum Treated (acres) | % of Modeled Habitat Affected | % Chance of Impacting Maternity Colony | # of Maternity Colonies Affected | % of Maternity Colonies Affected |
| Rangewide (USA) | 60,983 | 0.0% | 0.1% | 1 | 0.0% |
| Southeast RPU | 3,154 | 0.0% | 0.0% | 0 | 0.0% |
| East Coast RPU | 200 | 0.0% | 0.0% | 0 | 0.0% |
| Eastern Hardwoods RPU | 57,587 | 0.0% | 0.1% | 1 | 0.0% |

In addition to these two pathways, habitat removal could alter the flow of air and water through unknown hibernacula, which could also harm NLEBs. We expect the likelihood of this occurring to be low due to the FS's history of management and knowledge of local site conditions including the presence of caves, karst, or other hibernacula features. In addition, the hibernacula often selected by NLEB are "large, with large passages" (Raesly and Gates 1987) and may be less affected by relatively minor surficial micro-climatic changes that might result from forest management around unknown hibernacula. Further, bats rarely hibernate near the entrances of structures (Grieneisen 2011). Davis et al (1999) reported that partial clearcutting "appears not to affect winter temperatures deep in caves." We anticipate very little, if any, impact based on the widely dispersed (i.e., not concentrated in a given area) nature of habitat removal and the nature of typical hibernacula.

Unlike forest management, we do anticipate adverse effects from the reduction in habitat, even if it occurs during the inactive season when NLEBs are not on the landscape. This results from reductions in fitness that may result as indirect effects from loss of habitat because habitat loss can result in fragmentation of maternity colonies. We anticipate that less than 0.02% (57,857 acres of 245,157,764 acres) of available habitat may be harvested in any one year.

*Effects of habitat removal in undocumented areas*

As described above, we conclude take is not reasonably certain to occur in areas of suitable habitat where presence has not been documented. Because the habitat removal is extremely unlikely (<5%) to impact an undocumented colony, the implementation of planned and ongoing activities is not likely to adversely affect NLEBs in areas outside of known locations. However, because the analysis indicates that only one maternity colony will be affected range-wide (which we assumed would occur on Forest Service lands in R8 and R9), it is reasonable to conclude that there may be some impacts to some individual NLEBs in areas where they have yet to be documented (e.g., specific areas where they are not reasonably certain to occur). It is also possible that some impacts could occur to NLEBs that may be hibernating in undocumented

hibernacula. Given the nature of habitat removal and overlap with suitable habitat, the best available science indicates that habitat removal is anticipated to have at least some negative impact on some individual NLEBs where data shows occurrence but where information that identifies species locations is absent. We do not conclude that it will have a large impact on all or most NLEBs. This relative qualitative assessment of impacts is essential to determining the magnitude of the importance of the impacts on the population and to the species. The low probability of habitat removal impacting a given colony, coupled with the low levels of harm and death anticipated provides evidence that severe, localized effects to NLEBs in unknown locations are unlikely. However, habitat removal is expected to be more impactful than forest management and prescribed fire because it does not benefit NLEB habitat.

*Effects of habitat removal in known occupied areas*

The FS is proposing to conduct habitat removal in areas where NLEBs are reasonably certain to occur and may be within a known colony area, known swarming or staging area, or known winter habitat in areas where the species is active year-round. Although the impacts to unknown populations are discountable across the range (<5% chance of impacting a colony), we conclude that the best available information shows that removing habitat in areas supporting known colonies is likely to adversely impact individuals and populations.

As described above, the conservation measures prevent impacts to known hibernacula, known hibernating bats. The conservation measures also prevent impacts to known, occupied maternity roost trees during the pup season. However, we do expect impacts to some pups and adults during the maternity season, swarming/staging, and during cold temperatures in areas where bats are active year-round if NLEBs are in torpor and activities occur in a forested wetland. We anticipate that one maternity colony may be impacted by habitat removal. The low levels of harm and death anticipated provides evidence that severe, localized effects to NLEBs in known locations are also unlikely except in the Eastern Hardwoods RPU where 1 colony may be affected. Habitat removal is expected to be more impactful than forest management and prescribed fire because it does not benefit NLEB habitat.

<u>Disturbance/Noise</u>

Noise, vibration, and general human disturbance are stressors that may disrupt normal feeding, sheltering, and breeding activities of the NLEB. Many activities may result in increased noise/vibration/disturbance that may result in effects to bats. Significant changes in noise levels in an area may result in temporary to permanent alteration of bat behaviors. The novelty of these noises and their relative volume levels will likely dictate the range of responses from individuals or colonies of bats. At low noise levels (or farther distances), bats initially may be startled, but they would likely habituate to the low background noise levels. At closer range and louder noise levels (particularly if accompanied by physical vibrations from heavy machinery and the crashing of falling trees) many bats would probably be startled to the point of fleeing from their day-time roosts and in a few cases may experience increased predation risk. For projects with noise levels greater than usually experienced by bats, and that continue for multiple days, the

bats roosting within or close to these areas are likely to shift their focal roosting areas further away or may temporarily abandon these roosting areas completely.

NLEBs may continue to roost and forage in areas with increased noise unless it is severe or intense or close to a roost. Gardner et al. (1991) had evidence that an NLEB conspecific, Indiana bat, continued to roost and forage in an area with active forest management (see the Forest Management Section above regarding other similar studies for NLEB). They suggested that noise and exhaust emissions from machinery could possibly disturb colonies of roosting bats, but such disturbances would have to be severe to cause roost abandonment.

Indiana bats have also been documented roosting within approximately 300 meters of a busy state route adjacent to Fort Drum Military Installation (Fort Drum) and immediately adjacent to housing areas and construction activities on Fort Drum (US Army 2014). Bats roosting or foraging in all the examples above may have become habituated to the noise/vibration and disturbance. Intense noise and vibration close to a roost tree, however, may cause NLEBs to abandon the roost. Callahan (1993) noted that the likely cause of the bats in his study area abandoning a primary roost tree was disturbance from a bulldozer clearing brush adjacent to the tree.

Noise/disturbance may disturb NLEBs – see Table 3 for the pathway identified for NLEB responses to noise/disturbance. Although some adverse effects to NLEBs may occur from noise or disturbance, we anticipate that relatively small numbers of bats will be impacted per year based on the widely dispersed nature of activities and occupancy rates that are typically less than 5%. In addition, the potential for noise disturbance to harm NLEBs is more probable when new sources of noise and disturbance occur within suitable habitat. We anticipate any new sources of noise within suitable habitat are likely to occur associated with forest management and habitat removal, which is addressed in the respective effects analysis above. Therefore, we do not anticipate any additional take due to noise or other disturbance beyond that estimated for forest management and habitat removal throughout the range.

<u>Collision</u>

Actions that facilitate vehicle traffic in areas where NLEBs are likely to fly at or below vehicle height pose a risk of collision for the species, especially where traffic volume is high and roads are near NLEB habitat. There is only sporadic evidence of NLEBs being killed by cars, but documenting roadkill is difficult due to short carcass persistence times (see next paragraph) and there are few studies focused on this topic in the U.S. Russell et al. (2009) assessed the level of mortality from road kills on a bat colony in Pennsylvania and collected 27 road-killed little brown bats and 1 Indiana bat and cited unpublished data from the Pennsylvania Game Commission documenting NLEB mortality. Curtis et al. (2014) indicates that a dead NLEB was found along a road in Kansas and was thought to have collided with a vehicle. Collision has been documented for other *Myotis* in Europe (Lesinski et al. 2011). Collision risk of bats varies depending on time of year, location of road in relation to roosting/foraging areas), species' flight characteristics of their flight, traffic volume, and whether young bats are dispersing (Lesinski 2007, Lesinski 2008, Russell et al. 2009, Bennett et al. 2011). Among European studies where

comparisons could be made, bat roadkill was higher at locations with greater traffic volume (Fensome and Mathews 2016, p. 319).

Loud and busy roads may repel NLEBs and function more as a barrier to movement than a collision risk. Many studies suggest that roads may serve as a barrier to bats (Bennett and Zurcher 2013, Bennett et al. 2013, Berthinussen and Altringham 2011, Wray et al. 2006), but roads with few vehicles (less than about 2,800 vehicles/day) and only two lanes had little effect on Indiana bat movement (Bennett et al. 2013, p. 988). Roads with this amount of traffic, however, may still cause roadkill if they are near NLEB habitat – bat roadkill has been detected on roads with as few as 1,100 vehicles per day, for example, in Europe (Vuk et al. 2015, p. 90). Traffic noise likely repels bats from at least some roads. During foraging, greater mouse-eared bats (*Myotis myotis*) avoid areas exposed to sources of "intense broadband noise", like vehicle traffic (Schaub et al. 2009, p. 3179). The repelling effect of noise lessens with distance – for example, two studies found no or insignificant effects of traffic noise when bats were more than 50-150 meters (m) from the noise source (Schaub et al. 2009, p. 3179, Bonsen et al. 2015, p. 355). In most cases, we expect there will be a decreased likelihood of bats crossing roads of increasing size (lanes).

Table 3 shows the pathway we identified for NLEB responses to the risk of collision and to a barrier effect of roads, and we anticipate that NLEBs may be killed from collisions with vehicles when roads are within approximately 1,000 feet of NLEB habitat when traffic is light enough to not simply function as an outright barrier. However, vehicle traffic resulting from continued implementation of timber harvest, prescribed fire, or habitat removal is nearly entirely restricted to daylight hours, minimizing the risk of collision. This low risk of collision, combined with the small number of bats and the distributed activity across the landscape, results in discountable effects.

**Summary of Impacts**

Forest management practices may remove roost trees and harvest may reduce foraging, staging/swarming, and migration habitat. Adults, juveniles, and non-volant pups may be injured or killed during tree felling. Additional harm may occur from a loss of habitat within core roosting areas. The likelihood and severity of effects is greatest for maternity colonies during the pup season when pups are non-volant. Forest management may have beneficial effects to NLEB by improving habitat conditions through reducing clutter, creating snags, and increasing heterogeneity. We estimate that 2,509,577.7 acres may be taken over the 15-year expected duration of project implementation.

Prescribed fire may injure or kill adults, juveniles, and non-volant pups due to exposure to heat and smoke. Additional harm may occur from a loss of habitat within core roost areas. The likelihood and severity of effects is greatest for maternity colonies during the pup season when pups are non-volant. Prescribed fire may have beneficial effects to NLEB by improving habitat conditions through creating snags, creating roost features in live trees, removing mid-story clutter, stimulating growth of ground cover, and increasing insect populations. We estimate that 3,346,697.1 acres may be taken over the 15-year expected duration of project implementation.

Permanent removal of roost habitat has similar effects as forest management. Tree felling may injure or kill adults, juveniles, and non-volant pups. NLEB may also be harmed by removing habitat in core roost areas. However, unlike forest management, there are no beneficial effects from permanently removing roost habitat. We estimate that 9,006.4 acres may be taken over the 15-year expected duration of project implementation.

Many of the proposed projects overlap in space and some of these activity areas may be entered more than once to reach the desired condition over the life of the project. Therefore, the spatial extent of these impacts would be smaller than the overall totals presented above.

We are uncertain where the NLEB occurs on the landscape outside of known locations. Because of the steep declines in the species and vast amount of available and suitable forest habitat, the presence of suitable forest habitat alone is a far less reliable predictor of their presence. Based on the best available information, most suitable habitat is now expected to be unoccupied. We analyzed the effects of implementing the maximum program of work for all Forests, not just the projects that occur in known locations. The analysis demonstrates adverse effects are extremely unlikely to occur in areas outside of known locations. Therefore, we conclude take is not reasonably certain to occur in undocumented habitat.

Impacts to individuals

Forest management, prescribed fire, and habitat removal activities are likely to result in injury and mortality of pups and adults through the removal of occupied roost trees. We expect impacts during the maternity season, especially the pup season, swarming/staging seasons, and during the winter in areas where NLEBs are active year-round if NLEBs are in torpor and the activity occurs in a forested wetland. Individual bats from 25 different maternity colonies are expected to be exposed to these activities, and of those, a small number are expected to be directly harmed. We do not anticipate the loss of any colonies, but we do anticipate one maternity colony could be fragmented by permanent maternity roosting habitat removal, which would cause a reduction in reproductive fitness. We also anticipate additional beneficial and adverse effects to NLEBs as a result of these activities, but none of these other adverse effects meet the definition of take. We expect the FS's implementation of ongoing and proposed projects will reduce the number of NLEBs and reduce reproductive success.

Impacts to populations

Because we expect impacts to individuals, we assess how the potential adverse effects to individuals affect the overall health and viability of NLEB populations. Therefore, we analyzed effects to RPUs to better understand whether these local effects could affect the species' resilience, redundancy, and representation. Our analysis predicts that there is a low likelihood that individual activities within these categories will intersect NLEBs and that few NLEBs will be affected within each RPU (Table 6, Table 7, and Table 8). Less than 3.3% of all maternity colonies will be affected in each RPU. Even if the impacts were severe enough to result in the loss of a maternity colony, the resilience, redundancy, and representation would not be significantly affected in any RPU.

Where the species has substantially declined as a result of WNS, the surviving members of the population may be resilient or resistant to WNS. These surviving populations are particularly important to the persistence of the populations. The individual effects analysis indicates that some additional impacts will occur as a result this action. We do not know at this time if the impacts from this action are additive to the effects of WNS; however, even if the potential mortality from these activities is additive to the impacts from WNS, our analysis suggests that the proportion of maternity colonies that will be affected in each RPU is small and would not significantly affect the species' likelihood of persisting in any these RPUs. Reproduction, numbers, and distribution (RND) changes at the RPU level are not likely. Based on the relatively small numbers affected annually compared to the RPU population sizes, we do not anticipate population-level effects to the NLEB. Based on this BO, we conclude that adverse effects from forest management, prescribed fire, and habitat removal, and other activities will not significantly affect the species' RND at the population-level.

WNS is the primary factor causing the declines of NLEBs. Our analysis of the effects of activities indicates that the additional loss of individual NLEB resulting from these activities would not exacerbate the effects of WNS at the scale of the RPUs within its range.

## CUMULATIVE EFFECTS

Cumulative effects are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation (50 CFR §402.02). Additional regulations at 50 CFR §402.17(a) identify factors to consider when determining whether activities are reasonably certain to occur. These factors include but are not limited to: existing plans for the activity; and any remaining economic, administrative, and legal requirements necessary for the activity to go forward.

The Service is not aware of any future State, tribal, local, or private actions that are reasonably certain to occur within the action area at this time; therefore, no cumulative effects are anticipated. Future Federal actions, unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the ESA. Because all lands within the action area are administered by the U.S. Forest Service, no cumulative effects are expected to occur.

## CONCLUSION

Section 7(a)(2) of the ESA requires that federal agencies ensure that any action they authorize, fund, or carry out is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of designated critical habitat. "Jeopardize the continued existence of" means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species (50 CFR 402.02).

The jeopardy analysis in this BO relies primarily on 2 components: (1) Status of the Species, which evaluates the NLEB range-wide condition, the factors responsible for that condition, and

its survival and recovery needs; and (2) Effects of the Action, which determines the impacts of the FS implementing their planned and ongoing actions. In accordance with policy and regulation, there are two other components that we are to rely upon to make a jeopardy determination: (3) the Environmental Baseline, which evaluates the status of the NLEB in the Action Area, the factors responsible for that condition, and the relationship of the action area to the survival and recovery of the NLEB; and (4) Cumulative Effects, which evaluates the effects of future, non-federal activities in the action area on the NLEB.

The Service adds the effects of the action and the cumulative effects to the status of the species and to the environmental baseline to determine if the proposed action is likely to appreciably reduce the likelihood of both the survival and recovery of a listed species in the wild by reducing the RND of that species. As described above, the environmental baseline for the BO is reflected by the status of the species. Therefore, we have enough information to now make a determination that the effects of the FS implementing their planned and ongoing projects are not likely to jeopardize the continued existence of the northern long-eared bat for the following reasons:

1. Adverse impacts all have a low likelihood of occurrence, and severe, localized effects are not expected.
2. Less than 3.3% of all maternity colonies will be affected in each RPU. Even if the impacts were severe enough to result in the loss of a maternity colony, the resilience, redundancy, and representation would not be significantly affected in any RPU.
3. While impacts could occur to individuals or populations, we do not consider these impacts to affect the survival or recovery of NLEBs in the RPUs or range-wide.
4. We acknowledge that our analysis of impacts may be an over-estimate of effects that are reasonably certain to occur. Projects may occur outside critical time periods when NLEB is not expected to be present on the landscape. Additionally, some NLEB will be able to avoid project activities without experiencing any adverse effects. As a result, we do not expect that take resulting from implementing ongoing and planned projects will exceed more than a small number of individual NLEB that may be present.
5. WNS is the primary factor causing the declines of NLEBs. Our analysis of the effects of activities that may occur over the next year indicates that the additional loss of individual NLEB resulting from these activities would not exacerbate the effects of WNS at the scale of the RPUs within its range.

## INCIDENTAL TAKE STATEMENT

Section 9 of the ESA and Federal regulation pursuant to section 4(d) of the ESA prohibit the take of endangered and threatened species, respectively, without special exemption. Harm is further defined by regulation. Under the terms of section 7(b)(4) and section 7(o)(2), taking that is incidental to and not intended as part of the agency action is not considered to be prohibited taking under the ESA provided that such taking is in compliance with the terms and conditions of this Incidental Take Statement (ITS).

The measures described below are non-discretionary and must be undertaken by the U.S. Forest Service, as applicable, for the exemption in section 7(o)(2) to apply. The U.S. Forest Service has a continuing duty to regulate the activity covered by this ITS. If the U.S. Forest Service fails to assume and implement the terms and conditions as part of the proposed action the protective coverage of section 7(o)(2) may lapse. To monitor the impact of incidental take, the U.S. Forest Service must document the progress of the action and its impact on the species as specified in the ITS. [50 CFR §402.14(i)(3)]

**Amount or Extent of Take**

This section specifies the amount or extent of take of the NLEB that the action is reasonably certain to cause. We anticipate that take is reasonably certain to occur resulting from tree removal and prescribed fire conducted during continued implementation of planned and ongoing actions

For impacts from tree removal and prescribed fire, the following ITS will use acres of habitat as a surrogate for quantifying the amount or extent of incidental take because determining the exact numerical limits on the amount of incidental take are not practical and cannot be feasibly used as a trigger for determining when reinitiation would be required. In this situation, acres of habitat impacted will serve as a reasonable and appropriate surrogate for quantifying and tracking incidental take of the NLEB because any activities within suitable habitat where NLEB exist are reasonably certain to directly and indirectly cause the anticipated incidental take of NLEBs within the bounds of the identified acres of habitat.

The ESA does not require use of precise, empirical scientific data to make decisions, but instead requires use of the best available scientific and commercial data to make determinations within specified statutory time frames. Therefore, when lacking empirical data, the Service must make science-based assumptions in its decision-making process. This is often the case when the Service must complete its effects analysis, jeopardy and adverse modification determinations, and ITS based on data that is incomplete, and lacks site-specific, empirical data.

For the NLEB, it is not practical to express the amount of anticipated take in terms of individuals because there is no density or abundance estimate for the portion of the action area where take is anticipated. As a result, predicting the precise number of individuals that will be taken is not possible. Additionally, it is not practical to monitor take-related impacts in terms of individual NLEBs for the following reasons: (1) the NLEB has a small body size, is drab in color, which makes encountering dead or injured individuals unlikely; (2) NLEBs occupy summer habitats (heavily forested) where they are difficult to locate (multiple roosts located within and outside of the action area); (3) NLEBs spend a substantial portion of their lifespan underground; (4) take may occur offsite (e.g., the bat dies outside of the action area); (5) starvation or failure to reproduce cannot be detected; and (6) losses may be masked by fluctuations in numbers associated with WNS.

Because the location, timing, and acreage of habitat impacts can be readily identified, measured, and monitored, this surrogate is the most reasonable means for detecting when take may be exceeded. While working outside of the evaluated parameters (e.g., work zones, seasonal or

timing restrictions, and specified acreages) it does not automatically mean that take has been exceeded, these events provide a clear trigger that requires the Action Agency to reinitiate consultation, during which the Service will determine whether incidental take has been exceeded since detection of individuals taken, as described above, is not practical.

Table 9: Anticipated take (using acres of suitable habitat as surrogate) of NLEB from the FS Planned and Ongoing Projects

| Forest** | Removal of Roosting Habitat (Active Season*) | Removal of Roosting Habitat (Pup Season) | Permanent Removal of Roosting Habitat (Inactive Season) | Prescribed Fire (Active Season*) | Prescribed Fire (Pup Season) |
|---|---|---|---|---|---|
| Allegheny | 37,069.4 | 20,769.3 | 40.4 | 46,533 | 0 |
| Chattahoochee-Oconee | 301,463.4 | 149,679.2 | 13.0 | 448,003.48 | 205,435.52 |
| Chequamegon-Nicolet | 153,703 | 72,571 | 7 | 26,076 | 12,795 |
| Cherokee | 29,248 | 18,031 | 0 | 134,395 | 13,611 |
| Chippewa | 26,624 | 13,138 | 0 | 2,312 | 1,030 |
| Daniel Boone | 13,112 | 2,165 | 42 | 123,897 | 0 |
| Fernow Experimental Forest | 20 | 0 | 0 | 398 | 0 |
| Francis Marion | 0 | 49,929 | 0 | 200,000 | 100,000 |
| George Washington and Jefferson | 18,145.9 | 13,357 | 74 | 592,385 | 94,430 |
| Green Mountain-Finger Lakes | 5,1951 | 6,875 | 173 | 51,270 | 1,470 |
| Hiawatha | 0 | 78,699 | 0 | 0 | 28,706 |
| Hoosier | 16,434 | 17,476 | 9 | 42,375 | 0 |
| Huron-Manistee | 135,012 | 86,373 | 8,535 | 1,932 | 1,942 |
| Kisatchie | 86,500 | 106,629 | 0 | 82,500 | 50,466 |
| Land Between the Lakes | 3,182 | 0 | 26 | 33,175 | 0 |
| Mark Twain | 25,958 | 10,676 | 0 | 0 | 0 |
| Monongahela | 17,488 | 25,094 | 0 | 59,451 | 0 |
| NF in Alabama | 27,032 | 31,394 | 5 | 205,000 | 98,500 |
| NF in North Carolina (excluding the Croatan NF) | 744 | 83,275 | 0 | 63,080 | 143,242 |
| Ottawa | 13,152 | 35,381 | 0 | 5,822 | 5,529 |
| Ouachita | 286,027 | 117,511 | 42 | 126,269 | 0 |
| Ozark-St. Francis | 56,276 | 25,298 | 0 | 169,585 | 31,780 |
| Shawnee | 4,033 | 2,549 | 0 | 0 | 0 |
| Sumter | 2,847 | 3,083 | 0 | 1,300 | 0 |
| Superior | 130,050 | 73,748 | 0 | 52,354 | 49,625.1 |
| Wayne | 18,500 | 11,165 | 40 | 37,460 | 0 |

| | | | | | |
|---|---|---|---|---|---|
| White Mountain | 0 | 140 | 0 | 1,560 | 1,000 |
| Total | 1,454,572.2 | 1,055,005.5 | 9006.4 | 2,507,132.48 | 839,564.62 |

*Active season acres do not include acres counted during the pup season.

**Although the Croatan NF, Midewin National Tallgrass Prairie, and National Forests in Mississippi are within the range of NLEB, no adverse effects to bats are expected on those units.

**Effect of Take**

In the accompanying BO, the Service determined that the level of anticipated take is not likely to jeopardize the continued existence of the NLEB.

**Reasonable and Prudent Measures**

The USFWS considers the following reasonable and prudent measure(s) (RPM) to be necessary and appropriate to minimize the incidental take of the NLEB.

RPM 1 – Conservation Measures

All conservation measures, as described in the Conservation Measures section of this BO, shall be fully implemented.

RPM 2 – Monitoring and Reporting Requirements

Report to the Service annually about the status of the Project activities until the Project and all terms and conditions have been implemented. Report any injured or dead NLEBs incidentally observed to the Service.

**Terms and Conditions**

The U.S Forest Service must comply with the terms and conditions of this statement, provided below, which include monitoring and reporting requirements. Any taking which is subject to this ITS that is in compliance with the following terms and conditions is not a prohibited taking under the ESA, and no other authorization or permit under the ESA is required.

Term & Condition 1.1 (RPM 1 – Conservation Measures)

The USFS shall require and include full implementation and adherence to the conservation measures provided in this BO and will include the conservation measures as a condition of any permit or contract developed for the Projects.

Term & Condition 1.2 (RPM 1 – Conservation Measures)

If any conservation measures cannot be implemented or require modification the USFS will contact the Service for further discussion before proceeding.

Term & Condition 1.3 (RPM 1 – Conservation Measures)

Additional conservation measures will be developed by March 31, 2024. After this date, the additional conservation measures will be implemented for project activities that may have an adverse effect to NLEB and that are not part of a

Forest Service contract in the contracting bid, award, or execution stages (including activities in the same contract stages that are part of a formal Forest Service agreement in which the partner is acting as an agent of the Forest Service). Contracts that are in the bid, award, or execution stages by March 31, 2024, will not be required to implement the additional conservation measures.

Term & Condition 2.1 (RPM 2 – Monitoring and Reporting Requirements)

The USFS will notify contractors and construction staff of the terms and conditions and reasonable and prudent measures from this biological opinion and ensure compliance with these provisions.

Term & Condition 2.2 (RPM 2 – Monitoring and Reporting Requirements)

The USFS will make all reasonable efforts to educate personnel to report any sick, injured, and/or dead bats (regardless of species) located in the project action area during construction, operations, maintenance, or monitoring activities as soon as possible but no more than 24 hours upon discovery to the local USFWS field office. When injured or dead bats are found, the USFS shall follow the steps outlined in condition 2.3 below.

Term & Condition 2.3 (RPM 2 – Monitoring and Reporting Requirements)

Injured listed species will be recovered and must be cared for by a licensed veterinarian or other qualified persons. The FS will notify the nearest FWS field office to recover injured individuals as soon as possible after discovery. Dead individuals must be preserved and provided to the FWS for further examination. Dead individuals will be collected by appropriate FS employees. Dead individuals shall be sealed in a resealable plastic bag and include the date and time when the animal was found, the location where it was found (GPS coordinates or other accepted location description), the name of the person who found it, and the name of the person collecting it. The specimen will then be frozen with the collection information in a secure location until instructions are received from the Service regarding the disposition of the dead specimen.

Term & Condition 2.4 (RPM 2 – Monitoring and Reporting Requirements)

To monitor the impacts of incidental take, the FS must report the progress of the action and its impact on the NLEB as specified below. Beginning in 2024, the FS will annually report the progress and impacts for each activity occurring the previous calendar year no later than May 1.

To report on the extent and nature of incidental take each year, the FS will provide the Service with the following information, or alternative information that the FS and the Service agree is appropriate:

- The completion status of the projects.

- The conservation measures that were applied.
- The acreage of project activities conducted by activity as listed in Table 9.
- The status and results of the RPMs and Terms and Conditions.
- Any listed species survey or habitat reports, or structure assessments, if applicable.

**REINITIATION NOTICE**

This concludes formal consultation on the U.S. Forest Service's continued implementation of planned and ongoing projects. As provided in 50 CFR 402.16, reinitiation of formal consultation is required where discretionary Federal agency involvement or control over the action has been retained (or is authorized by law) and if: 1) the amount or extent of incidental take is exceeded; 2) new information reveals effects of the action agency that may affect listed species or critical habitat in a manner or to an extent not considered in this opinion; 3) the action is subsequently modified in a manner that causes an effect to listed or critical habitat not considered in this opinion; or 4) a new species is listed or critical habitat designated that may be affected by the action. In instances where the amount or extent of incidental take is exceeded, any operations causing such take must cease pending reinitiation.

**CONSERVATION RECOMMENDATIONS**

Section 7(a) (1) of the ESA directs federal agencies to utilize their authorities to further the purposes of the ESA by carrying out conservation programs for the benefit of endangered and threatened species. Conservation recommendations are discretionary agency activities to minimize or avoid adverse effects of a proposed action on listed species or critical habitat, to help implement recovery plans, or to develop information. The FS has already been pro-active in participating in a number of efforts to contribute to the conservation of NLEB and other forest bat species. The Service strongly supports these efforts and encourages the FS to continue them in the future.

The Service has identified the following actions that, if undertaken or continued by the FS, would further the conservation and assist in the recovery of the NLEB. We recognize that limited resources and other agency priorities may affect the ability of the USFS to conduct these activities at any given time.

- Northern long-eared bats would benefit from minimizing activities with adverse effects during the period of summer occupancy. Bats cannot be directly injured or killed if they are not present when the activities are in progress. If an activity with potential adverse effects cannot avoid the summer occupancy period, consideration should be made for implementation outside of the important maternity periods when pregnant females are more susceptible to disturbance and when NLEB pups are born to the time the pups are flying. Once bats are capable of flight, their ability to flush and evade injury and mortality from certain USFS actions is enhanced. Adverse effects to NLEB would be minimized by following these timing restrictions.

- Continue to gather information and address information gaps related to NLEB distribution, life history, summer and winter habitat needs, and migration patterns, to better understand the bat's use of the Forests by:
    - Monitoring known roosts and hibernacula to confirm presence and population trends,
    - Conducting mist net and acoustic surveys to detect NLEB in previously unknown areas,
    - Conducting radio telemetry to discover unknown maternity roosts,
    - Participating in North American Bat Monitoring Program (NABat) efforts,
    - Investigating habitat characteristics of the forest in areas where post-WNS NLEB occurrences have been documented (e.g. forest type, cover, distance to water) and develop habitat suitability or occupancy models,
    - Investigating NLEB use of recently managed areas of different prescriptions to reduce the assumptions in how NLEB is impacted by forest management.
- Continue protecting hibernacula from unauthorized activity by installing and maintaining bat gates where appropriate.
- Continue to provide support to expand on scientific research and outreach efforts on NLEB and White Nose Syndrome. For example:
    - Collaborate with and support ongoing WNS research activities (on or off NFS lands),
    - Allow FS staff to participate and contribute to studies (on or off of USFS lands)
    - Provide funding for WNS research activities (on or off USFS lands),

In order to be kept informed of actions minimizing or avoiding adverse effects, or benefitting listed species or their habitats, the Service requests notification of the implementation of these conservation recommendations, or if any additional measures consistent with these recommendations are implemented

**LITERATURE CITED**

Literature cited throughout the BO is available upon request from the Midwest Regional Office, Ecological Services Program, Bloomington, Minnesota.

White Mountain National Forest

United States
Department of
Agriculture

Forest
Service

**Eastern**
**Region**

# Final Environmental Impact Statement

## for the Land and Resource Management Plan

**JA-0645**

PBWTAR_3404

*Table 2-06. Management Area Allocation for Alternative 2.*

| Management Area | Acres by MA* | MA as percent of total Forest acres |
|---|---|---|
| 2.1 General Forest Management | 358,200 | 45.0 |
| 5.1 Wilderness | 114,000 | 14.0 |
| 6.1 Semi-Primitive Recreation | 86,300 | 11.0 |
| 6.2 Semi-Primitive Non-Motorized Recreation | 105,600 | 13.0 |
| 6.3 Semi-Primitive Winter Motorized Recreation | 15,300 | 2.0 |
| 7.1 Alpine Ski Area permits | 3,700 | 0.5 |
| 8.1 Alpine Zone | 5,100 | 0.6 |
| 8.2 Experimental Forests | 13,400 | 2.0 |
| 8.3 Appalachian Trail | 39,000 | 5.0 |
| 8.4 Research Natural Areas* | 3,200 | 0.4 |
| 8.5 Scenic Areas | 15,200 | 2.0 |
| 8.6 Wild and Scenic Rivers | 900 | 0.1 |
| 9.1 Recommended Wilderness | 34,500 | 4.0 |
| 9.2 Alpine Ski Area Expansion | 2,200 | 0.2 |
| 9.3 Candidate Research Natural Areas | 2,100 | 0.2 |
| **Total** | **796,700** | **100.0** |

*1,500 acres of the Bowl RNA and its extension are also accounted for in MA 5.1, Wilderness acres.

## Vegetation Management

### *MA 2.1 Habitat Composition Objectives*

These objectives reflect land capability, with adjustments to maintain aspen-birch and wildlife opening habitats in the management area at existing levels. Forest composition changes naturally over time as the trees in the overstory die and other species grow up to take their place. Management can speed this conversion by removing trees of one type (e.g., hardwoods) and leaving trees of the desired type (e.g., spruce or fir) to continue growing. Even with management, habitat conversion takes time. Therefore, where the current condition does not match the objective, meeting these composition objectives may take decades or even centuries (Table 2-07).

## Natural Disturbance

Natural disturbance in the analysis area includes wind, insect and disease infestations, ice storms, and fire. All of these types of disturbance have an important role to play in local ecosystems when they occur naturally. All forms of disturbance influence local site conditions (e.g., dead wood abundance), making areas more or less suitable for a variety of plant and animal species. Large-scale disturbances can alter habitat development, changing the vegetative community on a site. For some species and communities (e.g., jack pine or pitch pine – scrub oak woodlands), disturbance is essential for their long-term persistence.

In the Northeast, small partial disturbances occur regularly, and large stand-replacing disturbances occur at much longer intervals (Lorimer and White, 2003). Wind is the most common natural disturbance type in all LTAs and habitats (Lee et al., 1993; Leak et al., 1994). It results in both stand-altering events (i.e., broken tops and small areas of blow-down) and stand-replacing events (all trees blown down in a large enough area to be recognized as a "stand" with a new regenerating forest). Insects and disease are discussed in the Timber Resources subsection. Fire disturbance is discussed in the Wildland Fire section.

Most disturbances of all types are very small in size, usually less than 0.2 acres (Lee et al., 1993). Hurricane events occur in New England approximately every 15 years. However, they are typically focused well south of the analysis area and do not usually regenerate large areas near the Forest. In the 1938 hurricane, for example, only 10 percent of the hardwood forest and 35 percent of the softwood forest at Bartlett Experimental Forest was damaged, and most of this was not stand-replacing (Leak et al., 1994). On rare occasions, hurricanes will blow down large areas of forest, but these are exceptions.

In general, disturbances are smallest in the hardwood portion of the Forest, and relatively larger in spruce-fir at both low and high elevations (Leak et al., 1994). Based on data for the Northeast, it is estimated that stand-replacing natural disturbance would place 3 to 6 percent of the spruce-fir landscape in seedling or sapling conditions (Lorimer and White, 2003). The size of openings from wind events is larger in high elevation spruce-fir forest than in the hardwood forest immediately down-slope, and may also be larger than in the low elevation spruce-fir (Lee et al., 1993).

Northern hardwood forest is considered a "gap-phase dynamic" community, meaning that most disturbances result in small openings in the forest canopy (gaps) that are re-invaded by early-successional species such as paper birch, yellow birch, or aspen. Northern hardwood forest is the least likely to endure large, catastrophic natural disturbances, with an estimated 1 to 3 percent in seedling or sapling stages at any one time as a result of natural disturbance (Lorimer and White, 2003).

Disturbance estimates apply equally to lands in the White Mountain National Forest, and across much of the analysis area.

JA-0647

*Table 3-12a. Forest-wide Summary of Current Age Class (acres/% of habitat) by Forest Habitat Type.*

| Habitat Type* | Regeneration | Young | Mature | Old |
|---|---|---|---|---|
| Northern Hardwood | 2,500 / <1 | 58,300 / 18 | 205,000 / 63 | 59,800 / 18 |
| Mixedwood | 525 / <1 | 10,400 / 7 | 99,800 / 67 | 38,000 / 25 |
| Spruce-Fir | 300 / <1 | 3,100 / 2 | 61,000 / 33 | 120,200 / 65 |
| Aspen-Birch | 425 / 1 | 4,700 / 7 | 4,300 / 6 | 61,800 / 87 |
| Oak-Pine | 30 / <1 | 700 / 8 | 3,400 / 39 | 4,600 / 53 |
| Hemlock | 25 / <1 | 450 / 4 | 9,000 / 78 | 2,100 / 18 |
| **Total Acres** | **3,805 / <1** | **77,650 / 10** | **382,500 / 51** | **286,500 / 38** |

* These habitat communities do not include most wetlands, water bodies, or recently acquired lands. Therefore the totals in this table do not match those in other tables.

*Table 3-12b. Forest-wide Summary of Current Age Class by Forest Habitat and MA Group (% of habitat).*

| Habitat | Total Acres | Regeneration Age | | Young | | Mature | | Old | |
|---|---|---|---|---|---|---|---|---|---|
| | | MAs 2.1, 7.1, 8.2, 9.2 | All Other MAs | MAs 2.1, 7.1, 8.2, 9.2 | All Other MAs | MAs 2.1, 7.1, 8.2, 9.2 | All Other MAs | MAs 2.1, 7.1, 8.2, 9.2 | All Other MAs |
| Northern Hardwood | 326,000 | 0.7 | <0.1 | 15 | 3.0 | 38 | 25 | 8 | 11 |
| Mixedwood | 150,000 | <0.1 | <0.1 | 6 | 1.0 | 38 | 29 | 8 | 18 |
| Spruce-Fir | 185,000 | 0.2 | <0.1 | 1 | 0.3 | 17 | 16 | 7 | 58 |
| Aspen-Birch | 71,000 | 0.6 | <0.1 | 6 | 0.4 | 5 | 1 | 13 | 74 |
| Oak-Pine | 9,000 | 0.4 | 0.0 | 7 | 0.4 | 32 | 7 | 32 | 21 |
| Hemlock | 11,000 | 0.2 | 0.0 | 4 | <0.1 | 71 | 5 | 11 | 8 |

* Numbers rounded to nearest whole except those less than 1 percent.

of old and mature forest before it is lost give way to maintenance of the regeneration and young age classes. Future decades also would see the mature age class settling within the objective range. This would benefit species that select regeneration and young forest and all species that use aspen-birch habitat (see MIS in Wildlife section). Since aspen-birch habitat in MA 2.1 is expected to be stable, there would be no increase in regeneration and young forest habitats over time.

Mature forest habitat of all types would continue to decline as more of the Forest advanced to the old age class. This decline would be slightly less than for Alternative 1 because more mixedwood forest likely would be managed through uneven-aged methods, keeping it in the mature age class. However the majority of the Forest would eventually be in the old age class.

Effects to forest age outside the WMNF would be similar to those described for Alternative 1. The cumulative effects for this alternative would differ slightly because northern hardwood and mixedwood forest regeneration age class objectives on the Forest are slightly lower than under Alternative 1. Implementation of this alternative would almost triple the amount of regeneration forest habitat in MA 2.1. Despite this increase, the Forest would likely remain at levels below the adjacent lands, even if clearcutting on surrounding lands decreases somewhat. This would allow for a more even distribution of species that prefer or depend on regeneration and young forest habitats across the landscape in the analysis area compared to the current condition, but a slightly less-even distribution than under Alternative 1. As with Alternative 1, mature and old forest conditions would continue to dominate the Forest landscape, providing a core area of habitat for species dependent on these conditions.

## Alternative 3

### Direct and Indirect Effects

This alternative proposes the smallest amount of even-aged regeneration harvest (Table 3-17). As a result, regeneration-age hardwood habitat would remain stable at current levels, and young habitat would decline, as current young forest advances to the mature age class. Therefore, this alternative would provide the least habitat for species that use or depend on regeneration and young deciduous forest (see MIS in Wildlife section). Despite high levels of uneven-aged management, compared to the other alternatives, mature hardwood habitat across the Forest would probably still decline in this alternative (Table 3-18a), because so much mature habitat would not be managed and would move into the old age class. This decline would be smaller than in all other alternatives, and this alternative would result in even more of the Forest's hardwood habitat being in mature and old age classes (Table 3-21).

Management of mixedwood forest, and therefore expected trends in age class abundance, would be the same as in Alternative 2 (Table 3-18a).

The proposed age class objectives for aspen-birch habitat are very similar to those for Alternative 1. Therefore, the management and time necessary to achieve these objectives, and age class trends, would be the same as for

*Table 3-21. MA 2.1 Age Class Objectives.*

| Habitat Types | Percent Regen | | Percent Young | | Percent Mature | | Percent Old | |
|---|---|---|---|---|---|---|---|---|
| | 2004[1] | Obj.[2] | 2004[1] | Obj.[2] | 2004[1] | Obj.[2] | 2004[1] | Obj.[2] |
| Northern Hardwood | 1 | 1 | 24 | 5-6 | 64 | 80-81 | 11 | 13 |
| Mixedwood | 1 | 1 | 12 | 3 | 73 | 77 | 14 | 19 |
| Spruce-Fir | 1 | 1-2 | 8 | 3-6 | 69 | 68-72 | 22 | 24 |
| Aspen-Birch | 3 | 12-15 | 31 | 36-45 | 20 | 17-29 | 46 | 23 |

[1] Current condition changes between alternatives because landbase allocated to MA 2.1 changes between alternatives.
[2] Obj. = Objective

Alternative 1 (Table 3-18a). Because less aspen-birch habitat is in MA 2.1 in this alternative, there would be fewer acres of regeneration and young aspen-birch habitat on the forest. Once the old aspen-birch declines substantially in 20 years or so, aspen-birch of all ages across the Forest will be limited to what is in MA 2.1.

Meeting age class objectives in MA 2.1 would result in an increase in the amount of regeneration-age aspen-birch habitat on the Forest, and a possible increase in softwood regeneration forest. Overall, this alternative would provide the smallest amount of regeneration forest habitat. Even-aged regeneration harvest would occur on less than one percent of the Forest. Natural disturbance regimes indicate that an additional one to six percent of the Forest would be in regeneration age forest habitat.

As would be true with all other alternatives, mature forest would decline in all habitats, except aspen-birch, due to even-aged regeneration harvest and advancement into the old age class. For all habitats except aspen-birch, natural aging of the Forest would mean an increase in the amount of old forest.

**Cumulative Effects**

The potential for changes in hardwood, mixedwood, and spruce-fir forest abundance to alter age class trends would be the same as for Alternative 2.

Long-term trends in age class abundance for aspen-birch would be the same as for Alternative 2 (Table 3-18b), because habitat composition and age class objectives would be essentially the same. Given the reduced land allocation to MA 2.1, there would be fewer acres of all aspen-birch age classes, but the age class distribution would be the same.

Mature mixedwood, softwood, and aspen-birch habitat would continue to decline as more of the Forest advanced to the old age class. These declines would be similar to those for Alternative 2. Mature hardwood forest would be stable (Table 3-18b), because more of this habitat would be managed through uneven-aged methods over the next 150 years, keeping it in the mature age class.

Effects to forest age outside the National Forest would be similar to those described for Alternative 1. The cumulative effects for this alternative would

differ slightly, because regeneration age class objectives in northern hardwood habitat are lower than under all other alternatives. Implementation of this alternative would increase the amount of regeneration forest habitat in MA 2.1 compared to current levels by about 40 percent, which would likely keep the Forest at levels within the natural disturbance regime and below the adjacent lands, even if clearcutting on surrounding lands decreases somewhat. As a result, the current relative distribution of habitats and species on the landscape would remain, with the Forest likely supporting only minimal populations of species that prefer or depend on regeneration and young forests. The Forest would provide a slightly larger concentration of habitat for species dependent on mature and old forest conditions, to balance potential changes off-Forest.

## Alternative 4

### Direct and Indirect Effects

Moving toward proposed age class objectives (Table 3-22) for hardwood habitat would quadruple the amount of regeneration forest, and increase the amount of young forest, in MA 2.1. This even-aged regeneration harvest benefits species that prefer or depend on regeneration and young deciduous forest habitat (see MIS in Wildlife section). The increase in regeneration-age hardwood habitat on the Forest would be similar to that in Alternative 1. Mature hardwood forest habitat would decline slightly on the Forest as some is regenerated and much of it moves into the old age class (Table 3-18a). Forest-wide, a majority of hardwood habitats would remain in the mature or old age classes.

*Table 3-22. MA 2.1 Age Class Objectives.*

| Habitat Types | Percent Regen | | Percent Young | | Percent Mature | | Percent Old | |
|---|---|---|---|---|---|---|---|---|
| | 2004[1] | Obj.[2] | 2004[1] | Obj.[2] | 2004[1] | Obj.[2] | 2004[1] | Obj.[2] |
| Northern Hardwood | 1 | 3-6 | 22 | 15-30 | 65 | 45-63 | 12 | 19 |
| Mixedwood | 1 | 1 | 12 | 5 | 73 | 72 | 14 | 22 |
| Spruce-Fir | 1 | 1-2 | 6 | 3-6 | 69 | 64-68 | 24 | 28 |
| Aspen-Birch | 3 | 12-15 | 25 | 36-45 | 18 | 8-20 | 54 | 32 |

[1] Current condition changes between alternatives because landbase allocated to MA 2.1 changes between alternatives.
[2] Obj. = Objective

Management of mixedwood forest, and, therefore, expected trends in age class abundance, would be the same as in Alternative 2 (Table 3-18a).

The proposed age class objectives for aspen-birch habitat are very similar to those for Alternative 1. Therefore, the management and time necessary to achieve these objectives, and age class trends, would be the same as for Alternative 1 (Table 3-18a). Forest-wide, old aspen-birch will decline substantially and in 20 years or so, aspen-birch of all ages will be limited to what is in MA 2.1.

Possible Attributes:

1. Sugar Maple – White Ash (SM-WA)
2. Beech-Red Maple (BE-RM)
3. Spruce-Balsam Fir (SP-BF)
4. Aspen-Paper Birch on SM-WA (ASSMWA)
5. Aspen-Paper Birch on BE-RM (ASBERM)
6. Aspen-Paper Birch on SP-BF (ASSPBF)

6. *Age Class:* does not change by alternative, based on stand boundaries and year of origin. Calculated from current year (2003) to year of origin.

   Possible Attributes: 2003 – year of origin in 20 year increments:

   1. 0-19
   2. 20-39
   3. 40-59
   4. 60-79
   5. 80-99
   6. 100-119
   7. 120+

7. *2000 Roadless Area Inventory:* does not change by alternative. This layer was developed from the 2000 Roadless Area Inventory. Providing this placeholder in the analysis unit formulation will provide a mechanism for future adjustments to the model as necessary.

   Possible Attributes:

   Y: Yes (in an inventoried roadless area)

   N: No (not in an inventoried roadless area)

8. *Acceptable Limits of Visual Change:* a layer developed to control the acres of openings (age class 0-9) within a viewshed. Since viewsheds are not spatially defined, the Forest used 12 digit Hydrological Unit Code (HUC) boundaries as a surrogate for viewsheds. By identifying which watershed (viewshed) the analysis unit is within, the amount of acreage in 0-9 age class could be constrained within the model.

9. *2004 Roadless Area Inventory:* a layer developed from the 2004 Roadless Area Inventory, which defined the inventory's boundaries. Providing this placeholder in the analysis unit formulation will provide a mechanism for future adjustments to the model as necessary.

After this process was complete, all like-type polygons that shared a common set of attribute labels, became one analysis unit. The sum of the acres from each of the polygons within an analysis unit became the acreage for that analysis unit.

White Mountain National Forest

United States
Department of
Agriculture

Forest
Service

**Eastern
Region**

# Land and Resource Management Plan

**JA-0653**

PBWTAR_3405

Quebec
Quebec
Montreal
201
NY
89
VT
NH
ME
Montpelier
Augusta
95
Portland
87
91
Concord
90
93
Albany
MA
Boston
Springfield
CT
Providence
Hartford
RI

# Preface

## Purpose of the Forest Plan

The White Mountain National Forest's Land and Resource Management Plan (Forest Plan) provides guidance for managing and protecting natural resources and our visitors' experiences on all Forest lands. Six programmatic decisions are made in the Forest Plan that will govern the landscape-scale management of the Forest. Project-level decisions are made within the established framework of the Plan.

1. Forest-wide multiple-use goals and objectives (36 CFR 219.11(b)).
2. Forest-wide management standards and guidelines (36 CFR 219.13-27).
3. Management area direction (36 CFR 219.11).
4. Lands suited for timber production (36 CFR 219.14), and establishment of an allowable sale quantity (36 CFR 219.16).
5. Monitoring and evaluation requirements (36 CFR 219.11(d)).
6. Recommendations to Congress (e.g., recommendations for Wilderness (36 CFR 219.17)).

## Management Direction

The Forest Plan provides guidance for managing resources and uses on the National Forest. All applicable laws, regulations, policies, and national and regional direction, as detailed in the Forest Service Manual and Forest Service Handbook, are part of Forest Plan management direction. This higher-level direction is only occasionally repeated in the Forest Plan.

In the Forest Plan, goals, objectives, and desired future conditions present a picture of what the Forest will look like, and what services, products, and experiences it will provide, in years to come. These are not absolute; rather they are a conceptual framework within which decisions can be made. Standards and guidelines provide more concrete direction for implementing projects and activities. Monitoring evaluates whether the goals and objectives are being met, and determines if additional or different management direction is necessary.

### *Chapter 1 — Goals and Objectives*

Goals are broad statements that describe the conditions the Forest Service will strive to achieve through implementation of the Forest Plan. They are generally timeless and not measurable, and their achievement is not required. Goals should be considered when planning projects and activities, and management should move the Forest toward these desired conditions.

Objectives are measurable accomplishments intended to move the Forest toward the desired conditions described in the goals. Objectives are generally achieved through site-level projects or activities.

Three Forest Plan goals were developed to provide overall guidance to Forest management. More specific Forest-wide goals and objectives are presented by resource, such as recreation or wildlife, in alphabetical order.

### *Chapter 2 — Forest-wide Management Direction*

Standards and guidelines are the specific, technical direction for managing resources. They provide another link in moving toward the desired conditions. Forest-wide standards and guidelines apply across all White Mountain National Forest lands and management activities, regardless of management area, unless more restrictive direction exists for a management area (see Chapter 3). They are presented by resource in the same alphabetical order used for goals and objectives.

A standard is a course of action that must be followed, or a level of attainment that must be reached, to achieve management goals and objectives. In general, standards limit project-related activities. Standards are preceded by the identifier S-# for each resource, and include words or phrases such as *must*, *is prohibited*, or *will* to indicate that adherence to the direction is mandatory. Deviations from standards must be analyzed and documented in a Forest Plan amendment.

A guideline also is a required course of action or level of attainment. It is intended to move the Forest toward desired conditions in a way that permits operational flexibility to respond to variations in conditions. Guidelines can be modified or not implemented if site-specific conditions warrant a deviation. This greater flexibility is indicated by the words *should* and *may*. The rationale for deviating from a guideline must be documented in a project-level analysis and signed decision. Guidelines are preceded by the identifier G-# for each resource.

In some cases, a standard or guideline will make a general prohibition, such as “Chainsaws are prohibited.” This may appear at odds with a more specific standard or guideline that says something like “Use of chainsaws may be allowed.” These standards and guidelines are not in conflict. The intent with the more specific direction is to identify exceptions to the general direction.

### *Chapter 3 — Management Area Direction*

The Selected Alternative in the Final Environmental Impact Statement (FEIS) allocates National Forest land among 15 management areas (MAs). The Forest Plan identifies a purpose, desired condition of the land, and standards and guidelines for each of these MAs. The purpose and desired condition for each MA describe the role of the MA in moving the Forest toward the Forest-wide goals. Management Area standards and guidelines are defined the same way as their Forest-wide counterparts, except that they apply only to land allocated to a specific MA. When conflicting direction is given in Forest-wide and MA standards and guidelines, the more restrictive direction applies. Standards and guidelines are presented by resource in the same alphabetical order used for Forest-wide direction. If there is no direction specific to an MA for a resource, there is a reminder that Forest-wide standards and guidelines still apply, which is true for all resources. When a given piece of land is allocated to more than one MA (e.g., Wilderness, Research Natural Area), all standards and guidelines for both MAs apply. If any standards or guidelines are in conflict, the more restrictive direction applies.

The Appalachian National Scenic Trail management area (MA 8.3), the Alpine Zone (MA 8.1), and Alpine Ski Areas (MA 7.1) will not overlap. Although the AT management area will not overlap the Wildcat Ski Area (MA 7.1), the recreation values of the Appalachian National Scenic Trail that runs along the upper boundary of the Wildcat Ski Area must be considered in management actions in the Wildcat Ski Area management area. Although the AT management area will not overlap the Pinkham Notch Scenic Area, the recreation values of the Appalachian National Scenic Trail that runs within the scenic area must be considered in management actions in the Pinkham Notch Scenic Area management area.

### *Chapter 4 — Monitoring and Evaluation*

Monitoring and evaluation are necessary to determine whether Forest Plan management direction is being met, if standards and guidelines are achieving the desired results, and whether the Forest Plan needs amending or revision. Chapter 4 provides a strategic plan that identifies the broad monitoring items and questions to be addressed. This monitoring plan can only be changed through a Forest Plan amendment. A separate Monitoring Guide, that accompanies the Forest Plan, details specific monitoring efforts and protocols.

## Relationship of the Forest Plan to Site-level Projects

The Forest Plan is a strategic, programmatic document that does not make project-level decisions. All Forest management, including project plans and decisions, outstanding and future contracts, agreements, and permits, must comply with the Forest Plan as soon after it is issued as practical.

Site-level project planning would start with evaluation of how the site can contribute to meeting the Forest-wide goals and objectives and the purpose and desired condition of the management area within which the project is proposed. Projects that would move the Forest toward those goals and desired conditions would be developed with Forest-wide and MA standards and guidelines included. The site-level project environmental analysis would tier to the Final Environmental Impact Statement (FEIS) for the Forest Plan. This means that a project's environmental analysis document would incorporate, by reference, the information in the FEIS without having to repeat it. Project-level analysis may indicate the need for site-specific mitigation in addition to Forest Plan standards and guidelines, and these additional measures would be detailed in the project-level analysis.

## Forest Plan Amendment and Revision

Most proposed activities will be consistent with Forest Plan direction. However, adjustments may be required when necessary management actions are determined to be inconsistent with the Plan or if an error in the Plan is identified. The goal is to keep the Plan up-to-date with new information and the changing needs of the Forest over time. Adjusting the Forest Plan requires an amendment, and the need to amend may result from:

- Changes in physical, biological, social, or economic conditions or information.
- Results of monitoring and evaluation.
- Determination by the Forest Supervisor that existing or proposed projects permits, contracts, etc. are appropriate and necessary, but not consistent with Forest Plan management direction.
- Identification of errors in the Forest Plan.

The Forest Supervisor is required to review conditions of the land at least every five years to determine if the Forest Plan needs to be revised. If conditions or monitoring indicate that changes are too substantial to be handled through an amendment, the Forest Plan may need to be revised before the required 10 to 15 year planning cycle.

**Note:**

The Forest Service uses the most current and complete data available. GIS data and product accuracy may vary. They may be: developed from sources of differing accuracy, accurate only at certain scales, based on modeling or interpretation, incomplete while being created or revised, etc. Using GIS products for purposes other than those for which they were created may yield inaccurate or misleading results. The Forest Service reserves the right to correct, update, modify, or replace GIS products without notification.

Note also that, generally, numbers used have been rounded, and this may yield some inconsistencies.

# Contents

Chapter 1 — Goals and Objectives
Chapter 2 — Forest-wide Management Direction
Chapter 3 — Management Area Direction
Chapter 4 — Monitoring and Evaluation
Glossary
Index
Appendix A — Summary Analysis of the Management Situation
Appendix B — Proposed and Probable Practices
Appendix C — Eligible Wild and Scenic Rivers
Appendix D — Age Class Definitions by Habitat Type
Appendix E — Wilderness Management Plan
Appendix F — Disposition of 1986 Management Indicator Species
Appendix G — Vegetation Interpretations by Forest Habitat Types
Appendix H — Third and Fourth Order Streams

White Mountain National Forest

# Chapter 1 Goals and Objectives

JA-0660

PBWTAR_3414

## Chapter Contents

Goals of the White Mountain National Forest .................................... 3
Forest Plan Goals .................................... 3
Accessibility .................................... 3
Air Quality .................................... 3
Alpine Ski Areas .................................... 4
Conservation Education .................................... 4
Geologic and Mineral Resources .................................... 5
Heritage Resources .................................... 6
Lands .................................... 6
Native American Relationships .................................... 7
Non-Native Invasive Species .................................... 7
Rare and Unique Features .................................... 8
Recreation .................................... 10
Riparian and Aquatic Habitats .................................... 15
Scenery Management .................................... 16
Soil Resources .................................... 16
Transportation System .................................... 16
Vegetation Management .................................... 17
Water Resources .................................... 17
Wild and Scenic Rivers .................................... 18
Wildland Fire .................................... 18
Wildlife .................................... 20
A Note on Wilderness .................................... 22

***Cover***

*Ice Climber (WMNF Photo by John Williams)*

# Goals of the White Mountain National Forest

The role of the White Mountain National Forest is expressed through goals that align with the legal context and social and ecological setting of the Forest.

## Forest Plan Goals

We will manage to sustain a healthy forest and use the latest scientific knowledge to restore the land and forest where needed. Rather than focus on individual species, we will manage for ecosystem viability within the context of New England.

The White Mountain National Forest will provide recreation and other opportunities, experiences, and benefits, some of which are not readily available elsewhere.

Management will recognize the Forest's support to local economies while realizing the importance to society of a natural appearing landscape distinct from the human altered environments otherwise dominant in the East.

## Accessibility

### *Goals*

The Forest will provide a variety of recreation opportunities for people with disabilities (without fundamentally altering the non-motorized policy), and will continue to improve accessibility to recreation sites and programs through specific capital investment proposals as sites are reconstructed or rehabilitated. Priority will be given to developed sites (camp and picnic grounds), but accessibility is also considered each time a trail or more remote site is maintained or reconstructed. The goal of the Forest is to provide as many recreational opportunities as possible, in as many varying degrees of difficulty as possible, that are barrier free.

Public use of ATVs (all-terrain vehicles, sometimes referred to as OHVs) on the Forest is prohibited except in the winter on snow cover. This restricted use applies equally to people with disabilities and to the general public. Individuals who use an assistive device for mobility purposes may use their device as long as it meets the definition of a wheelchair in the Glossary. Motorized wheelchairs are also allowed in Wilderness and in other areas signed as "Foot Travel Only."

Whenever possible, the Forest Service will continue to strive towards creating experiences that are a higher standard than the minimums required by law.

## Air Quality

### *Goals*

Forest ecosystems are not adversely affected by air pollution, and Forest management activities are conducted to protect or maintain air quality.

The White Mountain National Forest is involved with, and provides input to, local, regional, and national air quality groups where possible.

National Forest management activities, including permitted activities, are conducted in a manner that meets 1) National Ambient Air Quality Standards and 2) applicable provisions in the State Implementation Plan.

### *Objectives*

1. The White Mountain National Forest assesses major new sources of air pollution to determine if they would have an adverse affect on Air Quality Related Values (AQRVs) in Class I airsheds and advises the Regional Forester and appropriate air quality regulators.
2. The Interagency Monitoring of Protected Visual Environments (IMPROVE) or similar substitute technology site at Camp Dodge is maintained to monitor air quality in Class I airsheds.

## Alpine Ski Areas

### *Goals*

The White Mountain National Forest will maintain and provide quality alpine skiing and related opportunities on the Forest through partnerships with the private sector.

### *Objectives*

1. Loon Mountain, Waterville Valley, Attitash/Bear Peak, and Wildcat ski areas will continue to be operated by the private sector under special use permit authority, consistent with permit language and the Forest Plan.
2. The Forest retains the areas identified in the current Plan, as amended by the approved Loon Mountain Ski Resort Development and Expansion EIS, for potential ski area expansion (MA 9.2). This includes land adjacent to Loon Mountain, Attitash/Bear Peak, and Snows Mountain in Waterville Valley, as well as the former Mittersill Ski Area adjacent to Cannon Mountain Ski Area.
3. The Forest Service does not consider developing any new alpine ski areas.

## Conservation Education

### *Goals*

The White Mountain National Forest will continue to work internally and externally with partners and volunteers to connect people to the land by providing the public with the tools, experiences, training, and information they need to understand, appreciate, and enjoy their National Forest, and to participate effectively in sustaining natural and cultural resources.

The Forest Service will continue to interact with educators, researchers, partners, visitors, and urban audiences to learn and share information about the social, ecological, and economic factors that bind people to natural communities. Materials will correlate with state education standards and provide information that can be effectively incorporated into curricula and public programs.

The Conservation Education program will involve all Forest employees and incorporate national recreation and education programs that emphasize the dynamic nature of ecosystems, the role of humans in those systems, and the consequences of human actions.

### *Objectives*

1. Promote the Forest Service mission and program objectives through personal interactions and educational materials.
2. Incorporate all available technologies and methods into the Conservation Education program, including on-line information sharing, school and public presentations, publication in local and partner magazines, displays at local visitor centers, etc.
3. Establish citizen science projects to get local schools and residents active in learning about our natural and cultural resources.
4. Integrate relevant and recent information from Forest Service Research and State and Private Forestry programs into educational materials and trainings.
5. Meet annually with partners and educators to help identify ways to improve conservation education efforts and coordinate education and interpretation efforts across groups and agencies.

## Geologic and Mineral Resources

**General**

### *Goals*

The White Mountain National Forest will contribute toward satisfying demand for geologic and mineral resources through environmentally sound development.

### *Objectives*

1. The Forest Service will administer its geology and minerals program to provide resources for current and future generations commensurate with the need to sustain the long-term health and biological diversity of ecosystems.
2. The Forest Service will coordinate with other federal and state agencies having authority and expertise in mineral-related activities, and will collaborate with interested public, industry, and community representatives.

**Leasable (Commercial) Minerals**

### *Goals*

The Forest Service will manage the commercial mineral resources of the National Forest to ensure sustained ecosystems and maintain healthy watersheds.

### *Objectives*

1. Lands disturbed by mineral and energy activities, both past and present, will be reclaimed using the best scientific knowledge and principles, and returned to other productive uses.
2. Exploration, development, and production of mineral and energy resources will be conducted in an environmentally sensitive manner and will be integrated with the management of other resources using the principles of ecosystem management.

**Recreational Rock and Mineral Collecting**

### *Goals*

The Forest Service will contribute toward satisfying demand for hobby collecting of minerals through environmentally sound development on National Forest System Lands.

### *Objectives*

1. The Forest Service will administer and maintain recreational mineral collecting areas.
2. Sites no longer needed for rock and mineral activities will be stabilized.
3. The potential for a recreational mineral collecting site meeting Americans with Disabilities Act (ADA) standards will be assessed and, if feasible, constructed.

## Heritage Resources

### *Goals*

The White Mountain National Forest will identify, evaluate, preserve, protect, stabilize, interpret, and when necessary, mitigate for loss of heritage resources at a Forest-wide and project level. The Forest Service will develop the heritage program utilizing guidance provided in the USFS *National Heritage Strategy*.

### *Objectives*

1. The Forest Service will develop partnerships with local historical societies, colleges, and universities to accomplish program goals.

## Lands

### *Goals*

National Forest System lands will be accessible for public use.

National Forest System lands will be consolidated through acquisition and exchange to facilitate restoration, protection, enhancement of public benefits, and improved management effectiveness.

Special uses will be administered to provide a consistent, fair, and comprehensive application of regulations and policies to all users.

Any new or expired use of public lands will be examined to determine if the use is consistent with goals, objectives, and management area direction.

### *Objectives*

1. Determine annually any needs for right-of-way acquisition (roads and trails) or grants necessary to meet resource management objectives.
2. Complete an annual update of the *Forest Land Adjustment Plan* with any additions or changes showing funding sources, priorities, lands proposed for acquisition, exchanges or donations, and right-of-way needs.
3. Renew permits when appropriate in a timely manner.
4. Show continuous improvement with the percentage of permits managed to standard.
5. Develop and accomplish a land corner and property line maintenance program to ensure high visibility of property lines to prevent encroachments and the need for costly resurveys.
6. Mark property lines on newly acquired tracts within a two-year period after the date of acquisition, or sooner if funds are available.

## Native American Relationships

### *Goals*

The White Mountain National Forest will maintain a government-to-government relationship with Federally-recognized Native American tribes to honor the unique legal relationship the United States has with Indian tribal governments as set forth in the Constitution of the United States, statutes, Executive Orders, and court decisions.

## Non-Native Invasive Species

### *Goals*

The Forest will remain as free of non-native invasive species (NNIS) as reasonably possible. A weed-free user's ethic will be encouraged in all resource area programs with potential to spread NNIS. While some NNIS may occasionally be found on the Forest, occurrences will not be so widespread as to cause negative impacts to native communities. Prevention is the most economical and environmentally desirable method to minimize NNIS occurrence, and planning for all activities will consider NNIS prevention and mitigation of possible effects. The Forest Service will cooperate with adjacent landowners, towns, state agencies, and private organizations to prevent NNIS from being established on the Forest. Eradication efforts will be effective and cause minimal negative effects to other resources.

The Forest Service will emphasize prevention and eradication in Research Natural Areas, Scenic Areas, Alpine, Wilderness, and wetlands to protect unique, limited, or particularly threatened ecological communities. Prevention and eradication efforts will also emphasize roads, managed

upland openings, and other disturbed sites as potential routes of invasive species spread.

### *Objectives*

1. Prevent non-native invasive species (NNIS) not currently on the Forest from becoming established.
2. Eradicate new species infestations as quickly as possible. This may include, but is not limited to, physical/mechanical, biological, or chemical treatments.
3. For NNIS already occurring on the Forest:
   a. Prevent new infestations.
   b. Eradicate species that are known to be invasive and persistent throughout all or most of New England. These can spread into, and persist in, native communities and displace native species, thereby demonstrating a threat to the integrity of the natural ecosystem and communities. Prioritize scheduling of species whose dispersal mechanisms typically result in rapid spread of individuals over widespread areas (e.g., wind dispersed) or which are especially difficult to eradicate.
   c. Suppress species suspected or known to be invasive in limited areas of New England. These species will typically persist in the environment for long periods once established, and may become invasive under favorable conditions.
   d. Contain species about which some concern has been raised regarding their potential to become a management problem. These species have been shown to be invasive under special environmental conditions.

## Rare and Unique Features

**TES Species — General**

### *Goals*

The White Mountain National Forest will provide sufficient habitat and protection to preclude the need for species listing under the Federal Endangered Species Act due to National Forest habitat conditions or effects of activities.

For species currently listed under the Federal Endangered Species Act or designated Regional Forester's sensitive species, the Forest Service will contribute to conservation and recovery of species and their habitats.

### *Objectives*

1. Within five years of listing, develop conservation approaches for all sensitive species. Biological diversity will be conserved by maintaining viable reproducing populations for all native plant and animal species. For species where the Forest alone cannot support a viable population,

species persistence will be maintained, and the Forest Service will contribute to maintaining or improving viability where possible.

*Goals*

Outstanding natural communities will be conserved.

*Objectives*

1. Continue to develop a Forest-wide natural community inventory based on botanical, geologic and landscape considerations.

*Goals*

Alpine communities, including areas of alpine and subalpine habitat outside the Alpine Zone management area, will be conserved.

Maintain the successful recovery of dwarf cinquefoil (*Potentilla robbinsianna*).

**Bald Eagle**

*Goals*

Contribute to bald eagle recovery efforts.

**Gray Wolf**

*Goals*

Maintain habitat opportunities for wolf colonization on the Forest.

**Indiana Bat**

*Goals*

Maintain suitable conditions for roosting and foraging.

*Objectives*

1. Work with the US Fish and Wildlife Service and research partners to understand the role of the White Mountain National Forest in Indiana bat recovery.

**Small Whorled Pogonia**

*Goals*

Maintain or enhance habitat conditions around known occurrences, including consideration of vegetation management to increase light levels if needed.

**Canada Lynx**

*Goals*

In Lynx Analysis Units, provide suitable lynx habitat, with an emphasis on high quality foraging habitat in proximity to denning habitat, in sufficient amounts that neither is limiting to lynx.

Plan and manage activities and special uses to protect the integrity of lynx habitat.

Maintain the natural competitive advantage of lynx by providing a landscape with large, interconnected blocks of foraging habitat where snow-compacting activities are minimized.

Maintain sufficient habitat connectivity across forested landscapes and across highway rights-of-way to allow dispersal of lynx between Lynx Analysis Units and lynx population sources.

### *Objectives*

1. Concentrate recreational activities within existing developed areas rather than developing new recreational areas in lynx habitat.
2. Cooperate with state and other federal agencies to identify and prioritize highway crossing sites to reduce highway impacts.

**Dwarf Cinquefoil**

### *Goals*

Maintain the successful recovery of dwarf cinquefoil (*Potentilla robbinsiana*).

**Bicknell's Thrush**

### *Goals*

Maintain or enhance suitable breeding habitat for Bicknell's thrush.

### *Objectives*

1. During the planning period, determine if human activity levels result in reduced breeding success.

## Recreation

### *Goals*

The White Mountain National Forest will provide a range of quality recreation activities and opportunities.

### *Objectives*

1. Manage the Forest recreation program consistent with the Recreation Opportunity Spectrum (ROS) framework. (See Map 1-01)
2. Maintain existing ROS objectives and do not increase the number of inconsistencies.
3. Develop approaches to outline limits of acceptable change to maintain or improve the quality of the recreation opportunity.

### *Goals*

The Forest Service will implement recreation management approaches to provide Forest recreation managers a more complete framework within which to consider management actions. Their purpose is to minimize increased development levels in the backcountry and to protect and manage both high and low use areas and facilities. The overall effect of these approaches will be to guide, and seek public support for, agency actions in response to changing or increasing use.

*Map 1-01. Recreation Opportunity Spectrum (ROS) Class Allocations on the White Mountain National Forest.*

White Mountain National Forest
Recreation Opportunity Spectrum
ROS Classes
none
Urban
Rural
Roaded Natural
Semi-Primitive Motorized
Semi-Primitive Non-Motorized
Primitive
N

PBWTAR_3425

**JA-0671**

### *Objectives*

1. The Forest Service will emphasize concentrating use at specific sites or locations rather than dispersing use within the area or to other areas.
2. Forest management actions will not disperse use from high to low use areas.
3. Current development levels in the backcountry will be maintained or lowered where appropriate.
4. Current low use areas and facilities will be managed to meet visitor needs and resource requirements through education and management controls, where necessary.
5. High use areas and facilities will be managed for high use to meet visitor needs, while ensuring that they can be sustained over the long term. Appropriate mitigation will be provided to manage the effects of high use. Use will not be allowed to increase indefinitely in high use areas.
6. The Forest Service and partner organizations will collaborate to provide recreational opportunities, conservation education, and visitor information programs.

**Developed Recreation**

### *Goals*

Developed recreation will provide a variety of quality campground, day use, and other roadside recreation opportunities where the natural forest setting is an important part of the visitor's experience, while ensuring the balanced protection of social and natural resources.

### *Objectives*

1. Campgrounds and picnic areas will have lower site densities than private facilities, with ample screening between sites and more immediate access to other Forest recreational activities.

### *Goals*

The Forest Service will provide a range of opportunities from large, more developed campgrounds and day use areas to smaller, less developed campgrounds and day use areas. These sites will generally relate to the variety of locations, design, and construction standards offered by road systems throughout the Forest.

### *Objectives*

1. Allow for a net increase of up to 32 new campground sites.

**Winter Motorized Dispersed Recreation**

### *Goals*

The Forest Service will provide for snowmobile use on designated trails in certain areas. The importance of the natural setting will be emphasized.

### *Objectives*

1. Allow for a net increase of up to 20 miles of new snowmobile trails.

### *Goals*

The White Mountain National Forest will maintain its role as part of the statewide and regional snowmobile trail network.

### *Objectives*

1. The winter motorized trail system will be managed cooperatively with the states of New Hampshire and Maine.

**Non-Motorized Dispersed Recreation**

### *Goals*

The Forest Service will provide a range of dispersed recreation experiences that most visitors will perceive as rustic, wild, and undeveloped. Inconsistencies with ROS objectives will be minimized. Management actions will emphasize protecting unmodified, undeveloped areas and maintaining a low development level at backcountry facilities in order to ensure the continued opportunity for this experience. Personal responsibility, risk, and challenge will be recognized as an integral part of the backcountry experience.

### *Objectives*

1. Allow for a net increase of up to 25 miles of new non-motorized trails, not including trails at ski areas operating under a Special Use Permit.
2. Conduct site-specific reviews of travel corridors for inclusion into the trail system. These reviews will be guided by the recreation management approaches listed on page 2-17. Following appropriate analysis, corridors will be designated part of the Forest Trail System or closed to mountain bike use. Travel corridors designated as part of the forest Trail System are not considered in the 25 mile non-motorized trail constraint.
3. Allow for a net increase in the capacity of shelters, cabins, or tent platforms by up to 40 people at one time.

**Rock and Ice Climbing**

### *Goals*

The White Mountain National Forest has both traditional and sport climbing areas. The Forest Service will recognize the value of both types of climbing areas and will continue to provide a range of climbing opportunities while protecting natural and cultural resources. It will emphasize traditional climbing over sport climbing.

### *Objectives*

1. The Forest Service will work closely with the climbing community to locate new and developing rock climbing areas in order to address

emerging issues in a cooperative manner, track new areas, and prevent route development that will affect Threatened, Endangered, and Sensitive (TES) species.

**Special Uses — Recreation Specific**

*Goals*

The Forest Service will work with the private sector through Special Use permits to provide recreation opportunities (areas, facilities, services, and events) that the Forest Service alone is not able to offer, and that are consistent with the Desired Future Condition.

**Wildlife Related Recreation**

*Goals*

The White Mountain National Forest will provide hunting, fishing, and trapping opportunities consistent with federal and state law.

## Riparian and Aquatic Habitats

**Riparian**

*Goals*

Protect, restore, or improve riparian area conditions to benefit riparian dependent resources and values.

Manage riparian areas to provide for coldwater, coolwater, and warmwater aquatic communities within the ecological capability of the landscape.

**Fisheries**

*Goals*

Restore and improve self-sustaining populations of indigenous fish and other aquatic species and their habitats.

Provide a range of recreational fishing opportunities (stocked put-and-take fisheries to non-stocked wild fisheries) in a manner that will protect self-sustaining populations of indigenous fish species.

Minimize the spread of non-indigenous stocked fish species or other aquatic invasive species through cooperative management and environmental education.

*Objectives*

Increase Atlantic salmon populations in streams through stocking and spawning activities, in cooperation with both the Merrimack River Anadromous Fish Restoration Program and the Connecticut River Atlantic Salmon Commission, as identified in either current or updated strategic plans for both river basins.

Restore or improve 5-10 miles of in-stream habitat per year over the planning period with emphasis on 6th level watersheds best suited for managing self-sustaining wild brook trout populations and their associated coldwater aquatic communities.

Maintain existing impoundment structures constructed for fish and wildlife management every 1-5 years to insure their long term structural integrity and prevent downstream resource damage. Decommission structures when funds are not available for proper long-term maintenance.

## Scenery Management

### *Goals*

The White Mountain National Forest will conduct all management activities to be consistent with assigned Scenic Integrity Objectives, realizing the importance to local communities and Forest users of a natural-appearing landscape, distinct from the human-made environments dominant in the East.

## Soil Resources

### *Goals*

The Forest Service will work closely with the Natural Resource Conservation Service and research entities to protect the long-term sustainability of the soil resource with an emphasis on maintaining appropriate soil nutrients.

### *Objectives*

1. Further establish and document a network of permanent soil quality monitoring sites to measure long-term change in soil base saturation.
2. Cooperate in further development of a till source model, land use history evaluation, and soil inventory specifically to support large-scale analysis of factors affecting soil quality.
3. Cooperate in re-measurement of long-term Forest plots at Bartlett Experimental Forest.

### *Goals*

The Forest Service will ensure soils are stabilized around management activities.

### *Objectives*

1. Implement measures to minimize off-site movement of soil on Forest projects.

## Transportation System

### *Goals*

The Forest Roads Program will provide a safe, efficient, and seamless transportation and parking network that allows for current, continued, and projected management, use, and enjoyment of the Forest with a variety of

challenge levels. The Forest Service will continue to maintain and update the Forest road inventory and index as management decisions are made, and through monitoring and field verification. The Forest Service will also continue to look for and analyze alternative transportation opportunities to deal with projected increases in traffic and parking volumes. The White Mountain National Forest will work cooperatively with state, town, and county officials.

### *Objectives*

1. Construct only those roads necessary to meet the management objectives of the Forest Plan.
2. Decommission all classified and unclassified roads not necessary to meet the management objectives of the Forest Plan as funding is available.
3. Maintain the classified road network to meet the requirements of the Highway Transportation Safety Act with available funding.
4. Explore opportunities for alternative transportation methods and clean fuels that would reduce resource impacts.

## Vegetation Management

### *Goals*

The White Mountain National Forest will manage vegetation using an ecological approach to provide both healthy ecosystems and a sustainable yield of high quality forest products, with special emphasis on sawtimber and veneer.

### *Objectives*

1. Manage for commercial products using well-integrated prescriptions that protect biotic and abiotic resources and are compatible with the high level of recreational use on the Forest.

### *Goals*

The Forest timber harvest program will function as an outdoor classroom, permitting visitors to see the benefits of sound stewardship implemented through well-executed, integrated resource management.

The Forest Service will ensure that products harvested on National Forest lands are fully accounted for, and that fair value is received for all products sold.

The Forest Service will use timber harvesting as a tool to attain wildlife habitat and other resource objectives.

## Water Resources

### *Goals*

Surface waters on the White Mountain National Forest are considered “outstanding resource waters,” and water quality is maintained or improved

to protect existing and designated instream water uses such as aquatic life.

The Forest Service will use watershed assessments to help guide planning and management activities.

The Forest Service will manage streams at proper functioning condition (PFC) to dissipate stream energy associated with high water flows, thereby decreasing erosion, reducing flood damage, and improving water quality.

Watersheds will continue to provide high quality water for public water supplies, recreational activities, aquatic biota such as fish, and other purposes.

The Forest Service will work cooperatively with communities within public water supplies to maintain high quality drinking water. Management activities may occur in these watersheds consistent with management area objectives.

### *Objectives*

1. Improve watershed and soil condition on at least 25 acres per year.

## Wild and Scenic Rivers

### *Goals*

The Forest Service will protect the wild, scenic, and recreational values of eligible rivers to maintain their potential for Wild and Scenic River designation.

Wildcat River will be cooperatively managed through the Comprehensive River Management Plan to maintain its scenic and recreation nature.

## Wildland Fire

### *Goals*

Firefighter and public safety will be the first priority in every fire management activity. Other priorities are 1) protecting human communities and community infrastructure, 2) other property and improvements, and 3) natural and cultural resources, based on the values to be protected and the costs of protection. Once people have been committed to an incident, these human resources become the highest value to be protected.

Cooperative wildland fire-related activities will be developed and maintained with other groups and agencies in the New England/New York area. Other Federal and state agencies, volunteer fire departments, and non-governmental organizations will be included as appropriate. Prescribed fire and natural ignitions will be used as tools to enhance ecosystem resiliency and to maintain desired fuel levels. Fire will play its natural role in the ecosystem, but will be actively suppressed where necessary to protect life, investments, and resources. Effects of wildland fire will be acceptable, and fire will occur within historical fire regimes appropriate to the vegetation type.

The Forest Service will use the full spectrum of fire management actions — from prompt suppression of unwanted fires to managing naturally-ignited fires — to realize and accomplish specific resource management objectives. The vast majority of wildland fires on the Forest will continue to receive a suppression-oriented response. Preparedness capabilities will meet the needs for appropriate management responses, included those needed for the wildland/urban interface areas in and around the Forest.

The Forest Service will use fire as a tool to meet management objectives, including but not limited to:

- Reducing hazardous fuel loading.
- Creating, maintaining, or improving wildlife habitat.
- Preparing sites for restoration of species (e.g., oak, pine, birch and aspen).
- Creating, maintaining, or improving plant community composition by influencing the scale and pattern of vegetation across the landscape, including changing successional patterns.
- Managing insect and disease.
- Enhancing blueberry production.
- Creating or maintaining scenic vistas.

Prescribed fire may be used in the management areas shown in Table 1-01.

The Forest Service will maintain fuels in proportion to the levels of hazards, risks, and values to be protected, and to address resource management objectives both outside and within the Wildland Urban Interface.

*Table 1-01. Management Areas Where Prescribed Fire May Be Used.*

| MA | Description | MA | Description |
|---|---|---|---|
| 2.1 | General Forest Management | 7.1 | Alpine Ski Area |
| 6.1 | Semi-Primitive Recreation (to maintain the viability of fire-adapted communities such as pine, oak, and mixed oak-pine types) | 8.2 | Experimental Forests |
| 6.2 | Semi-Primitive Non-Motorized Recreation (to maintain the viability of fire-adapted communities such as pine, oak, and mixed oak-pine types) | 9.2 | Alpine Ski Area Expansion |
| 6.3 | Semi-Primitive Winter-Motorized Recreation (to maintain the viability of fire-adapted communities such as pine, oak, and mixed oak-pine types) | | |

The goal of wildland fire use (WFU) implementation will be to allow lightning-ignited fires to function as a natural ecosystem process within a maximum allowable area within the management areas indicated in Table 1-02.

*Table 1-02. Management Areas Allowing Wildland Fire Use.*

| MA | Description | MA | Description |
|---|---|---|---|
| 5.1 | Wilderness | 8.3 | Appalachian Trail (only when adjacent MA allows WFU) |
| 6.1 | Semi-Primitive Recreation | 8.4 | Research Natural Areas |
| 6.2 | Semi-Primitive Non-Motorized Recreation | 9.1 | Recommended Wilderness |
| 6.3 | Semi-Primitive Winter-Motorized Recreation | 9.3 | Candidate Research Natural Areas |
| 8.1 | Alpine Zone | | |

Lightning-ignited fires will be managed within these areas as wildland fire use, under conditions and criteria that constitute low risk to firefighter and public safety.

### *Objectives*

1. Use prescribed fire and mechanical methods to treat approximately 80-300 acres annually to meet a wide range of Forest objectives.
2. Within the next 10-year period, manage an estimated 4 to 8 lightning-ignited fires under wildland fire use.

## Wildlife

**Habitat Management**

### *Goals*

The White Mountain National Forest will use sustainable ecosystem management practices to provide a diversity of habitats across the Forest, including various forest types, age classes, and non-forested habitats.

### *Objectives*

1. Manage forest composition for the broad habitat types of northern hardwood, mixed hardwood-softwood, and spruce-fir forest, consistent with ecological land type capability.
2. Maintain less common habitat types, such as aspen-birch and oak-pine, where ecologically feasible and desirable to provide for native and desired non-native wildlife and plant species.
3. Maintain high quality mature forest and old forest habitats on a majority of the Forest.
4. Provide regeneration age forest and open habitats to sustain biological diversity and support species that prefer those habitats.

**MA 2.1 Habitat Composition Objectives**

These objectives reflect land capability, with adjustments to maintain aspen-birch and wildlife opening habitats in the management area at existing levels. Forest composition changes naturally over time as the trees in the overstory die and other species grow up to take their place. Management can speed

can speed this conversion by removing trees of one type (e.g., hardwoods) and leaving trees of the desired type (e.g., spruce or fir) to continue growing. Even with management, habitat conversion takes time. Therefore, where the current condition does not match the objective, meeting these composition objectives may take decades or even centuries (Table 1-03).

**Table 1-03. Habitat Composition Objectives.**

| Habitat Type | Current Composition (% of MA 2.1) | Composition Objective (% of MA 2.1) |
|---|---|---|
| Northern Hardwood | 54 | 45 |
| Mixedwood | 21 | 11 |
| Spruce-Fir | 12 | 32 |
| Aspen-Birch | 5 | 5 |
| Wildlife Opening | <1 | 1 |
| Other* | 7 | 6 |

*Hemlock Forest, oak-pine forest, wetlands, and non-vegetated habitats.

### MA 2.1 Age Class Objectives

Age class objectives are proposed primarily to provide a variety of habitat conditions for wildlife. Management Indicator Species have been identified to represent both vegetative composition objectives and the age class objectives presented in Table 1-04 (see also Chapter 3, Wildlife section).

**Table 1-04. Age Class Objectives.**

| Habitat Type | % in Regen Age Class | % in Young Age Class | % in Mature Age Class | Land Unsuitable for Harvest (%) |
|---|---|---|---|---|
| Northern Hardwood | 3-4 | 15-20 | 61-67 | 15 |
| Mixedwood | 1 | 5 | 73 | 21 |
| Spruce-Fir | 1-2 | 3-6 | 66-70 | 26 |
| Aspen-Birch | 12-15 | 36-45 | 18-30 | 22 |

The regeneration age class can be created immediately through even-aged harvest, making this a short-term objective that should be met during the first decade of implementation. The young age class objective results when regeneration habitat ages. The mature age class includes a majority of the land in this MA. It is a result of even- or uneven-aged management. After even-aged regeneration harvest, it takes 40 to 70 years for mature forest to develop, so this is a long-term objective, particularly in some habitats. Land unsuitable for harvest is not available for timber harvest, so should continue aging for the long-term.

## *Goals*

The Forest Service will maintain the health and integrity of all habitats by protecting and enhancing within-habitat features and processes, such as snags and downed logs, minor tree species, vegetative layers, and nutrient cycling.

The Forest Service will protect sensitive habitats, such as wetlands, den and nest sites for key species, and rare communities.

**Recreation-Wildlife**

*Goals*

The Forest Service will gain an improved understanding of how recreation use may affect wildlife populations and will manage recreation use and wildlife habitat to minimize negative impacts on wildlife.

The Forest Service will recognize that visitor safety and the well-being of wildlife are both important components of National Forest management. Recreation sites will be managed to allow for wildlife viewing, where appropriate, while minimizing the potential for human-wildlife conflicts.

## A Note on Wilderness

Wilderness is a management area and its goals and objectives are described under "Purpose" and "Desired Condition of the Land" in the introduction to MA 5.1 (Wilderness) in Chapter 3.

*Lookout towers on Mt. Carrigain, ca. 1926. Original wood platform built by NH Timberland Owners Association in 1910. Seated at left is Col. William Greeley, third Chief of the US Forest Service (1920-1928), on a visit to the WMNF. At right is a Mr. Kneipp. Mssrs. Reed, Davis, and Belas sit at the base of a replacement tower. (WMNF photo; historical information from I.W. Baird and C. Haartz,* A Field Guide to New Hampshire Firetowers*)*

**JA-0681**

PBWTAR_3435

White Mountain National Forest

# Chapter 2 Forest-Wide Management Direction

JA-0682

# Chapter Contents

Standards and Guidelines ..... 3
- All Resources and Management Areas ..... 3
- Accessibility ..... 3
- Air Quality ..... 4
- Conservation Education ..... 4
- Geologic and Mineral Resources ..... 4
- Heritage Resources ..... 6
- Lands ..... 8
- Native American Relationships ..... 11
- Non-native Invasive Species ..... 11
- Rare and Unique Features ..... 13
- Recreation ..... 17
- Riparian and Aquatic Habitats ..... 24
- Scenery Management ..... 26
- Transportation System ..... 27
- Vegetation Management ..... 29
- Water Resources ..... 30
- Wild and Scenic Rivers ..... 32
- Wildland Fire ..... 32
- Wildlife ..... 33

***Cover***

*Smarts Brook Falls (WMNF Photo by John Williams)*

# Standards and Guidelines

Standards and guidelines are the specific, technical direction for managing resources. A *standard* is a course of action that must be followed, or a level of attainment that must be reached, to achieve management goals and objectives, and can only be changed through an amendment to the Plan. A *guideline* also is a required course of action or level of attainment, but permits operational flexibility to respond to variations in conditions. Guidelines can be modified or not implemented, but the rationale for doing so must be documented in a project-level analysis and signed decision.

## All Resources and Management Areas

**General**

S-1 The White Mountain National Forest must follow all applicable laws, executive orders, regulations, rules, and direction established in the Forest Service Manual.

S-2 To protect forest resources when hazardous materials are present, mitigations will be put in place at the appropriate level, depending on the amount and type of material.

S-3 Motorized administrative use will be allowed consistent with WMNF/ state agreements.

G-1 Motorized administrative use should be consistent with the management area direction. There are fewer restrictions on emergency motorized administrative use than for project-related administrative motorized use.

G-2 To make sure goals of the various agencies are considered in any management decisions, the Forest Service should work cooperatively with the states of New Hampshire and Maine to manage adjacent National Forest and State lands.

**Closures**

G-1 Forest Supervisor's Orders or other means may be used to restrict or close activities, uses, or areas in order to prevent, mitigate, or correct existing or potential resource impacts, trail development, health and safety issues, user conflicts, or other management concerns.

**Firewood**

S-1 A commercial permit is required for cutting live trees or vegetation.

S-2 Where campfires are allowed, firewood collection must be limited to dead and down wood.

G-1 Firewood permits should be issued for dead and down wood only.

## Accessibility

*Accessibility standards and guidelines apply to all management areas.*

S-1 All Forest programs, publications, facilities, and outdoor recreation areas including trails, must meet all federal and Forest Service

accessibility guidelines (and any future revisions and policies) regarding accessibility requirements.

S-2 The Forest Service will provide opportunities in which all people can participate in the most independent and integrated way possible that does not fundamentally alter the program, and is in accordance with the Forest Land and Resource Management Plan.

S-3 Wheelchairs are allowed on all of our Forest Service roads and trails, and wilderness areas. The signs that state "Foot Traffic Welcome" also apply to devices that meet the definition of a wheelchair.

G-1 The Forest Service should maintain transition plans identifying areas that do not meet current guidelines, and identify steps that may be taken to improve the facility during scheduled maintenance or restoration activities.

## Air Quality

*Also see Chapter 3 for required management area-specific direction.*

G-1 Air Quality Related Values (AQRVs), such as aquatic biota, vegetation, and water quality should be protected to the extent possible from adverse impacts related to air quality within the White Mountain National Forest.

## Conservation Education

G-1 Signage, other educational tools, and Forest Supervisor's Orders may be used to inform and educate visitors about occurrences of threatened, endangered, and sensitive species, heritage resources, and other management concerns.

G-2 Management actions should emphasize education over law enforcement.

G-3 Education messages should emphasize programs such as "hikeSafe" and "Leave No Trace" to foster personal responsibility for safety and to promote low-impact backcountry travel, day-use activities, and commercial operations.

G-4 Public education efforts emphasizing the Forest Service mission and management, natural resource protection, safety, and personal responsibility should be encouraged.

## Geologic and Mineral Resources

*Also see Chapter 3 for required management area-specific direction.*

**Leasable (Commercial) Minerals**

S-1 Surface disturbance for mineral resources is prohibited in public water supply watersheds, developed recreation and administrative sites, and where there are natural features such as open water, streams, riparian areas, floodplains, wetlands, and sensitive soil types.

S-2 Reclamation provisions and environmental protection measures of operating plans and surface use plans of operation must be adequate to reclaim the site.

S-3 Reasons for closing an area to surface-disturbing mineral exploration must be documented.

S-4 All practical means of minimizing resource impacts including best available technology must be used when surface disturbance is allowed.

G-1 Where prospecting and exploration activities are allowed, the existing access infrastructure should be used.

G-2 Surface disturbance related to the development of federal minerals should not occur within the seen area of National Forest System trails or roads.

**Mineral Materials (Common Variety)**

S-1 Except for administrative use, there must be no new surface disturbance activity for the development of common variety minerals in:

a. Public water supply watersheds.

b. The visual foreground of roads and National Forest System trails.

S-2 Sites must be stabilized between periods of use.

S-3 Sites must be stabilized and, if needed, revegetated when closed.

G-1 Except for administrative use, there should be no new development of common variety minerals sites.

**Recreational Rock and Mineral Collecting**

S-1 The collection of mineral specimens for personal use is allowed without a permit, as long as there is no surface disturbance, except within officially designated fee collecting areas, closure areas, and other restricted areas.

S-2 Collection of recreational minerals on, in, or near cultural/historic features is prohibited unless specifically allowed through designation.

S-3 Recreational mineral activities for personal use that involve limited surface disturbance are allowed through a permit, provided that the activities comply with Forest standards and guidelines.

S-4 When surface-disturbing collection activities are allowed through a permit, the following are required:

a. Only hand tools are permitted. The use of power, mechanized equipment, or explosives for recreational collecting of geologic resources, including gold recovery activities, is prohibited. This includes sluice boxes, rocker boxes, and dredges.

b. Maximum excavation at any one site must not exceed one cubic yard. Only one site may be disturbed at a time.

c. Excavated holes must not be dug deeper than three feet as measured from the bottom of the hole to a projected horizontal line drawn between the bases of trees or plants adjoining the hole. In areas where the entire site is already disturbed and the original ground level is heavily altered, an estimated projection will be made of the earth's surface for the purposes of monitoring or enforcement.

d. Prior to leaving the site, disturbed areas must be restored to as near original condition as possible.

e. No surface disturbance is allowed within developed recreation areas immediately adjacent to roads, trails, other facilities, streambanks, or in other areas where such activity may adversely affect other resources or activities.

f. Gold panning for recreational purposes may be allowed within active stream channels, provided due care is taken to protect water quality and aquatic habitat. Small trowels or similar digging tools for scooping sediment into the pan are allowed.

g. Where streams are disturbed for recreational mineral collecting such as gold panning, turbidity levels must not exceed water quality standards needed to maintain "outstanding resource waters" as defined by the water quality regulations of New Hampshire and Maine.

h. No surface disturbance is allowed on or near cultural/historic features.

i. Digging under trees or severing roots greater than ½ inch in diameter is not permitted.

j. Surface disturbance that creates or contributes to a safety hazard is not allowed.

k. Surface disturbance is not permitted on, in, or adjacent to existing safety hazards.

S-5 Recreational mineral collecting activities at fee permit sites shall adhere to guidelines specific to that area as described on the fee permit. Small drills may be allowed when specifically authorized at designated fee permit sites.

S-6 Sites may be restricted by closure or permit where there are safety or resource concerns.

G-1 A permit system may be used to manage recreational collecting activities.

## Heritage Resources

*Also see Chapter 3 for required management area-specific direction.*

S-1 Management of heritage resources must be coordinated with State Historic Preservation Offices (SHPOs), appropriate Tribal Historic Preservation Offices (THPOs), and Federally recognized Indian Tribes and their representatives. Any mitigation plans must include the above

consultation, with the addition of The Advisory Council on Historic Preservation (ACHP) when projects might affect resources eligible for the National Register of Historic Places. Consulting parties may include local governments or other interested parties.

S-2 Any proposed Federal or Federally assisted undertaking must, prior to the approval of the expenditure of any Federal funds or issuance of any license, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register of Historic Places (Section 106, National Historic Preservation Act of 1966, as amended).

All proposed undertakings must consider the effect on any National Register listed, eligible, or un-evaluated heritage resource within the Area of Potential Effect (APE) prior to project implementation. The Forest Service must manage properties found to be eligible for National Register listing, or which remain un-evaluated, as if they were listed on the National Register of Historic Places.

S-3 Contracts, leases, or permits must include appropriate clause(s) requiring protection of heritage resources.

S-4 The nature and location of heritage resource sites must not be disclosed without line officer approval (36 CFR 296.18).

S-5 Discoveries of human remains and associated objects must remain in place and protected if encountered. They must be reported immediately to USFS Law Enforcement Officers (LEOs), who will contact Forest Heritage Resource Specialists if appropriate. Work in the area of the discovery must cease until LEO and, if applicable, Heritage evaluation is completed.

S-6 Vandalism, destruction, or unauthorized removal of Heritage resources must receive appropriate investigation under the Archaeological Resources Protection Act or 36 CFR 261 (Prohibitions).

S-7 Non-Forest Service archaeological research initiatives must be authorized and/or permitted by the Forest Service prior to implementation.

G-1 Heritage resources should be evaluated to determine their eligibility for listing in the National Register of Historic Places. Priority should be placed on situations where resources are most at risk or management options are limited. Examples include lands to be exchanged out of Federal management, lands with shallow soils where heritage resources are especially vulnerable to disturbance, and within project areas where sites may be impacted.

G-2 The Forest Service should curate its heritage resource collections and associated records in accordance with Federal standards (36 CFR 79), and through consultation with SHPO, ACHP, and other interested parties.

G-3 The White Mountain National Forest's *Heritage Resource Survey Strategy* should be followed in developing heritage surveys.

G-4 Heritage inventories and resulting data should meet current national guidance and professional standards and should be maintained in the Forest Service's corporate database and mapping systems.

## Lands

*Also see Chapter 3 for required management area-specific direction.*

**Land Status/Adjustments/Acquisition**

S-1 To ensure protection of state, county, town, private, and other federal agency rights and interests, a land ownership review using land status records must be performed during early project planning stages, prior to implementation of management activities.

S-2 Acquisition of land by the United States must comply with New Hampshire and Maine state and local statutes concerning the consent to acquire lands.

S-3 Lands on which only a partial interest is acquired must be managed as directed by the easement, or as agreed to in the specific acquisition documentation.

S-4 The following procedure must be used in assigning management area prescriptions for newly-acquired National Forest System (NFS) lands:

1. The tract should have the same management area classification as the surrounding National Forest land (if it has similar attributes); or
2. If the land has attributes that are unique or different than the surrounding land, the acquired tract will be evaluated by an integrated team to decide its management area designation.

G-1 The following should be used to evaluate and track land adjustment activities. The *Forest Land Adjustment Plan* should be updated annually to reflect:

a. Acquisition, exchange, or interests in lands which have been directed by Executive or Congressional action.

b. Acquisition, exchange, or conveyance of lands needed to reduce expenses of both the Forest Service and the public in administration and utilization, including the consolidation of split estates.

c. Acquisition, exchange, or interests in lands which

1) will provide a significant recreational experience or opportunity;
2) improve riparian ecosystems on water frontage such as lakes and major streams;
3) provide critical habitat lands needed for the protection of federally-listed endangered, threatened, or sensitive fish, wildlife, or plant species;
4) provide for the protection of significant historical or cultural resources when management may be enhanced by public ownership; and
5) protect or enhance watersheds, and wetlands.

**JA-0689**

PBWTAR_3443

d. Acquisition, exchange, or interests in lands needed to implement other scheduled management actions such as a campground expansion, road construction, or trail construction or reconstruction.

e. Acquisition, exchange, or interests in lands needed to enhance or protect facilities or programs surrounding National Forest System lands.

f. Acquisition, exchange, or interests in lands that will consolidate existing National Forest System lands, eliminate the need for right-of-way acquisition, provide access to existing NFS lands, or meet the goals and objectives of the management area surrounding the proposed acquisition or exchange.

g. Land conveyances or exchange of lands no longer needed or suitable to meet the goals and objectives of a management area, and serve a greater public need in state, county, town, or other federal agency ownership.

G-2 Access should be acquired, exchanged, or granted with other federal agencies, states, counties, towns, and private interests to assure management objectives are met for all ownerships.

**Survey/Landline/Title Claims**

S-1 Boundaries shall be surveyed, marked, and posted prior to implementing land-disturbing activities adjacent to Wilderness or private land.

S-2 A professional, licensed surveyor shall supervise Forest Service personnel or administer the necessary contracts to locate and mark property boundaries.

G-1 Care should be taken to avoid damaging or destroying evidence of town boundaries when planning and executing management activities near these boundaries.

**Land Use Authorizations (Special Uses)**

*Also see the Recreation section for standards and guidelines pertaining specifically to recreation special uses.*

S-1 Special uses must be managed to best serve the public interest, in accordance with the following:

a. Private uses of National Forest System land must not be authorized when such uses can be reasonably accommodated on other lands.

b. Special use requests must be reviewed for their compatibility with Forest-wide and management area direction, as well as consideration of environmental values, economic feasibility, and determination of social and economic benefits.

c. Upon renewal or transfer of a permit, or as soon as practical, existing uses that are not compatible with the Forest Plan must be brought into compliance.

d. New landfill disposal sites or storage, or disposal of radioactive, or other hazardous substances are prohibited. Existing landfill disposal sites must be phased out and closed.

e. Permits must not be authorized that create an exclusive or perpetual right of use or occupancy that would in effect grant title to federal land to an authorization holder, or would create the appearance of granting such a right. Examples of such uses include, but are not limited to, cemeteries, monuments, memorials, or major capital improvements by municipal entities.

S-2 Special use proposals that may affect heritage resources (e.g., ground disturbance or potential for discovery and displacement or removal of artifacts) must include an archeological/paleontological clause.

S-3 To reduce the proliferation of separate rights-of-way, new transportation, utility, and communication use proposals shall be accommodated within existing corridors to the maximum extent feasible. Mitigation measures shall be determined by project level planning.

S-4 Military training activities shall be authorized only after the Department of Defense has determined and substantiated that lands under its jurisdiction are either unsuitable or unavailable in accordance with the Master Agreement between the Department of Defense and the Department of Agriculture that governs the use of National Forest lands for these purposes. When local supplemental agreements with military agencies exist, consult such agreements for additional direction. Activities must be in conformance with management area objectives.

S-5 All research permits shall include a requirement that the Forest Service receive a copy of the final report or analysis.

S-6 Contracts, leases, or permits must include appropriate clause(s) requiring invasive species control plans to minimize spread to other areas.

G-1 Special use applications may be denied if the authorizing officer determines that:

a. The proposed use would not be in the public interest.

b. The proposed use would otherwise be inconsistent with applicable federal, state, and local laws, regulations, and special orders that apply to the National Forests.

c. The proposed use may endanger public health or safety.

d. The proposed use conflicts or interferes with administrative use by the Forest Service, other authorized existing uses, or uses of adjacent non-federal lands.

e. The applicant does not or cannot demonstrate technical or financial capability.

G-2 Applicants may conduct environmental analysis and supporting activities (e.g., cultural resource surveys, biological evaluations) and submit them to the responsible official for consideration in Forest Service decisions to the extent allowed by law, regulation, and policy.

G-3 Research permits are generally authorized, but may be denied, or limited in structure to meet specific management area objectives, e.g., only non-manipulative research in Research Natural Areas, or requiring non-motorized, non-mechanized access and temporary sample area identification in Wilderness.

G-4 Electrical utility lines of 33 kilovolts or less, communication lines, or pipelines should be installed by burying unless one or more of the following applies:

a. Visual quality objectives of the area can be met using an overhead line.

b. Burial is not feasible due to geological hazards or unfavorable geologic conditions.

c. Greater long-term site disturbance would result.

d. It is not technically feasible.

## Native American Relationships

*Also see Chapter 3 for required management area-specific direction.*

S-1 Recognized tribes must be consulted early in the planning process regarding proposed management activities that may affect the tribes in order to identify and address tribal interests.

G-1 Environmental documents should disclose potential effects on cultural resources, traditional uses, and tribal areas of special interest that include tribal cultural values, properties, uses, and species of special concern.

## Non-native Invasive Species

*The following direction generally applies to all Forest lands. However, see standards and guidelines in Management Areas 5.1, 8.4, 9.1, and 9.3 for exceptions.*

S-1 Non-native invasive species must not knowingly be brought onto the Forest for any project, landscaping, or other purpose.

S-2 Forest projects or approvals must consider weed prevention measures to minimize the chances of new infestations occurring because of project activities. The intent is not to prohibit all ground disturbances or to require exhaustive mitigation measures for minor activities, but to take action where possible to minimize opportunities for invasive species to become established.

S-3 In revegetation or rehabilitation efforts, native or non-persistent (annual, biannual, or sterile) species must be used.

S-4 Gravel and fill must come from weed-free sources. The Forest Service will be available to work with owners of local gravel sources to identify

weed-free borrow material in their pits. The entire pit or fill area need not be identified as weed-free; material may be used that is not likely to contain invasive plants or seeds. If gravel or fill cannot be identified as weed-free, project monitoring must be conducted for three years following implementation to assure no new infestations occur. If infestations are found, eradication must occur within a suitable timeframe to prevent further spread.

S-5 When sources of certified weed-free mulch and seed are available locally at reasonable cost, they must be used on erosion control projects requiring mulch and seed.

S-6 Heavy equipment must be visibly free of seeds or plant material prior to entering the Forest for project work. In order to minimize the spread of existing invasive plants, heavy equipment must be cleaned to be visibly free of seeds or plant material when moving between project units if invasive plants exist in areas being vacated, or if units have not been surveyed for invasive plants. The Forest Service will work to educate heavy equipment operators regarding these standards prior to project implementation.

S-7 Non-native invasive plants or their parts removed during eradication efforts must be disposed of in a manner that prevents new infestations elsewhere.

G-1 Areas under existing permits should have on-site non-native invasive species control plans in place to minimize spread to other areas.

**Recreation**

G-1 Outfitter/guides should be encouraged to have pack animals that are free of non-native invasive species when entering the Forest. The animals' feed should be weed-free while on the Forest

G-2 The use of weed-free feed for animals used for pleasure riding on the Forest should be encouraged.

G-3 Boaters and other recreationists should be encouraged to check equipment to prevent infestations in lakes and ponds.

**Transportation System**

G-1 Roadside clearing widths should be minimized (without compromising safety standards) to retain shade for invasive plant suppression.

G-2 If non-native invasive plants are present, roadside maintenance operations should be scheduled to minimize spread into new areas (e.g., prior to seed set).

**Wildland Fire**

S-1 The risk of non-native invasive species establishment following fire suppression and prescribed fire efforts must be evaluated, and mitigation measures implemented if needed.

## Rare and Unique Features

*Also see Chapter 3 for required management area-specific direction.*

S-1 All project sites must be investigated for the presence of TES species and/or habitat prior to beginning any authorized ground-disturbing activity at the site. TES plant surveys must be completed for all new ground-disturbing projects, unless biologists/botanists determine TES species occurrence is unlikely (e.g., no habitat exists).

S-2 Unless conservation approaches have already been developed for a species, individual site prescriptions must be developed for each identified TES plant species occurrence to provide specific habitat conservation actions for those plant species. Individual site prescriptions must similarly be developed for all fixed TES wildlife habitat features (e.g., den sites, nest sites, or other features necessary for the reproductive success of the animal). Until conservation approaches or specific site prescriptions are developed, new management actions that would negatively alter habitat conditions necessary to support the species must not be allowed within 100 feet of the plant(s) or within one quarter mile of the wildlife habitat feature(s).

S-3 Timber harvest is prohibited in old growth forest.

G-1 Outstanding natural communities should be conserved.

G-2 TES habitat that is important to species conservation should be retained in public ownership unless an exchange results in a net gain or acquisition of higher quality habitat.

G-3 Use restrictions and other mitigative measures may be implemented to protect or improve habitat for threatened, endangered, or sensitive species. See individual management areas for additional direction.

G-4 When feasible, standards and guidelines for the Alpine Zone MA (8.1) also should apply to alpine and subalpine communities outside MA 8.1.

**Bald Eagle**

G-1 Winter roost habitat should be protected along major rivers and water bodies with known eagle activity.

**Gray Wolf**

G-1 If wolves become reestablished on or near the Forest, suitable early successional habitat should be provided, especially for deer and moose.

G-2 Known winter deeryards should be protected and deeryard conditions should be improved where possible.

**Indiana Bat**

S-1 Standards for *wildlife reserve trees* in the Wildlife resource section apply.

G-1 Guidelines for *wildlife reserve trees* in the Wildlife resource section apply.

**Small Whorled Pogonia**

S-1 Known small whorled pogonia colonies must be protected from human disturbances that may be detrimental to the colony.

S-2 Evaluate projects with ground-disturbing activities to determine the potential for small whorled pogonia habitat to occur within the influence of the project area.

G-1 Known small whorled pogonia colonies should be evaluated to determine the potential for natural colonization of surrounding habitat that becomes functionally suitable over time. Actions may be taken that would benefit existing colonies or encourage additional colonization, e.g., removing trees to reduce canopy cover allowing more sunlight to reach the forest floor.

**Canada Lynx**

S-1 Standards and guidelines for lynx apply only to lynx habitat within a Lynx Analysis Unit (LAU).

S-2 LAUs shall not be adjusted without agreement between the U.S. Forest Service and the U.S. Fish and Wildlife Service.

S-3 Unless a broad-scale assessment of landscape patterns that compares historical and current ecological processes and vegetation patterns is developed, disturbance must be limited in the following manner:

a. If more than 30 percent of lynx habitat within a LAU is currently in unsuitable condition, no further reduction of suitable conditions shall occur because of vegetation management activities by federal agencies unless the activity is proposed specifically to improve future snowshoe hare habitat.

b. Vegetation management projects in lynx habitat should promote increases in suitable snowshoe hare habitat and retain/enhance habitat conditions for important alternate prey (particularly red squirrel) where possible. Overstory harvest treatments that retain or enhance existing softwood understories are allowed provided denning habitat within the LAU does not fall below 10 percent.

S-4 Prior to any action that may affect lynx, lynx habitat within affected LAUs must be mapped, including potential foraging and denning habitat. Mapping should also include identification of topographic features that may be important for lynx movement (e.g. major ridge systems, prominent saddles, riparian corridors).

S-5 Within an LAU, denning habitat in patches generally larger than five acres, comprising at least 10 percent of lynx habitat must be maintained. Where less than 10 percent denning habitat is currently present within an LAU, management actions that would delay development of denning habitat structure must be deferred. Projects may still move forward if other lynx habitat areas within the LAU can be identified that will not be treated (e.g., RNAs) and which will subsequently move into denning conditions at some future time.

S-6 On-the-ground management actions must not change more than 15 percent of lynx habitat within an LAU to an unsuitable condition within a 10-year period.

S-7 Existing and potential diurnal security habitat around highly disturbed recreation developments (e.g., ski areas) must be maintained.

G-1 In lynx habitat, no net increase in groomed or designated over-the-snow routes and snowmobile play areas by LAU is allowed unless:

a. The designation serves to consolidate unregulated use and improves lynx habitat.

b. Existing snowmobile trails must be temporarily rerouted to avoid conflicts around active timber sales.

c. Preexisting trails or corridors on private land come into National Forest ownership.

Groomed or designated over-the-snow routes include the following: designated winter route, groomed winter route, and authorized winter route/use area. Groomed or designated over-the-snow routes are generally compacted during the winter season, but do not include plowed roads or roads/trails accessing private land. Winter logging and alpine ski areas are not subject to this guideline. Nordic ski areas should have a "concentrated trail area" delineated by a Forest Service biologist within which existing trails are so networked that a competitive advantage for lynx does not likely exist. These "concentrated trail areas" are not subject to this guideline.

G-2 For trails constructed primarily for summer use but which may also be used in winter (e.g., hiking trails), new construction should result in no net increase in trail mileage in lynx habitat by LAU. Designating or grooming these routes for winter use should include closures of other similar routes in lynx habitat so no net increase in routes occurs by LAU.

a. Exceptions to this guideline may be considered when an increase in over-the-snow routes would not increase the potential for competitors to gain access to an area, e.g., constructing a snowmobile trail that closely parallels an existing winter road. Exceptions may also be allowed in areas where snow depth or snow condition is insufficient to limit competing predators in winter, and consistent presence by competing predators off-trail is documented. Exceptions must be recommended by a Forest Service wildlife biologist.

G-3 Following disturbances such as blow down, fire, or insects/pathogens resulting in mortality that could contribute to lynx denning habitat, salvage harvest should not occur when the affected area is smaller than five acres. Exceptions to this include:

a. Areas such as developed recreation sites or other areas of high human concentration; and

b. LAUs where denning habitat has been mapped and field-validated (not simply modeled or estimated) and comprises more than 10% of lynx habitat within a LAU. In these cases, salvage harvest may occur, if at least the minimum amount of denning habitat is maintained in a well-distributed pattern.

c. Already active timber sales where removal of blowdown trees is necessary to ensure access, reduce safety hazards, or otherwise meet the project objectives.

G-4 In lynx habitat, pre-commercial thinning may be allowed only when stands no longer provide snowshoe hare habitat (e.g., self-pruning processes have eliminated snowshoe hare cover and forage availability during winter conditions with average snowpack). However, timber stand improvement may be used in softwoods or mixed wood stands to enhance or maintain softwood regeneration. This practice would be acceptable in stands that have suitable stem density (greater than or equal to 7,000 stems per acre in softwoods or mixed woods) for snowshoe hare cover if that stem density is retained across most of the stand.

G-5 Key linkage areas must be maintained to allow lynx movement. Native plant communities and patterns, and habitat for potential lynx prey, should be maintained or enhanced within identified key lynx linkage areas where feasible. Habitat connectivity (e.g. along large riparian zones and across major ridges, and prominent saddles) should be retained across the landscape to support lynx movement. Creation of permanent linear routes (e.g., roads, fuel breaks, trails) that could facilitate increased over-the-snow access by competitors should not be built on ridges and saddles or in riparian zones. Clearcuts should be placed near softwood cover where possible.

G-6 Snow compaction off designated trails and roads should be minimized when authorizing and monitoring special uses in lynx habitat.

G-7 New temporary roads constructed in lynx habitat should be closed to public use. The ability to implement effective closures should be provided in the initial road designs. Upon project completion these roads should be reclaimed or obliterated if not needed for other forest management objectives.

G-8 Dirt and gravel roads (particularly those that could become highways) traversing lynx habitat should not be paved or otherwise upgraded (e.g., straightening of curves, widening of roadway) in a manner that is likely to lead to significant increases in traffic volumes, traffic speeds, or would contribute to development or increases in human activity in lynx habitat, unless road safety hazards exist.

**Bicknell's Thrush**

S-1 Projects must not result in a net decrease of suitable Bicknell's thrush habitat.

**JA-0697**

PBWTAR_3451

## Recreation

*Also see Chapter 3 for required management area-specific direction.*

**General**

*Recreation Management Approaches*

S-1 Use will be focused on trails or at backcountry facilities in the backcountry. Use will be focused on roads or developed sites in the frontcountry.

S-2 Current development levels in the backcountry will be maintained or lowered where appropriate.

S-3 Current low use areas and facilities will be managed to meet visitor needs and resource requirements through education and management controls, where necessary.

G-1 Current high use areas and facilities should be managed for high use to meet visitor needs. Appropriate mitigation should be provided to manage the effects of high use to ensure that they can be sustained over the long term. Use should not be allowed to increase indefinitely in high use areas.

G-2 The Forest Service should collaborate with partner organizations to provide recreational opportunities, conservation education, and visitor information programs.

### *Developed Recreation*

**General**

S-1 In order to maintain a range of developed recreation opportunities, any construction, reconstruction, or rehabilitation projects must be evaluated in terms of their effects on both the individual sites and on Forest-wide development levels.

S-2 The Forest Service must determine the appropriate development levels for campgrounds, day use areas, and trailheads. To determine development levels, the Forest recreation management approaches, current and future public needs and use levels, and the role of the public sector in providing these opportunities must be considered.

S-3 The Forest Service capital investment process must be guided by desired development levels.

S-4 Capital investment construction or expansion to increase capacity must not be authorized unless it clearly provides for public need, addresses resource impacts and health and safety standards, and meets developed recreation goals.

S-5 New campgrounds will not be constructed.

G-1 The Forest Service should create architectural design standards for facilities and signs, consistent with the Built Environment Image Guide (USDA Forest Service, FS-710, September 2001), to maintain a consistent architectural character.

G-2 Existing campgrounds and day use areas may be improved or expanded.

**Driving for Pleasure**

G-1 Forest System roads are open to street-licensed registered motor vehicles except where closed. Open/closed roads may vary from year to year and season to season.

**Roadside Camping**

G-1 Roadside camping is allowed along open Forest System roads unless closed to that use by Forest Supervisor's Order.

G-2 The development level of roadside camping opportunities may vary, but Forest-wide the emphasis will be on lower levels of development.

G-3 Roadside camping should include a range of opportunities from random roadside openings to specifically designated sites.

**Trailheads**

G-1 Trailheads and trailhead parking lots serve as primary access to the trail system and backcountry sites. The Forest Service should determine the appropriate levels of development (e.g., paved or gravel, size, toilets provided/not provided) based on the objectives of the backcountry areas and the facilities served by the trails.

G-2 Trailhead parking lots should not be constructed, improved, or expanded solely to accommodate increased recreation use.

### *Motorized Dispersed Recreation (Motorized Trails)*

**Winter Motorized Trails**

S-1 Motorized trail use and maintenance must be coordinated with the states of New Hampshire and Maine and must be consistent with state laws. All motor vehicles using Forest trails must be state registered.

S-2 The White Mountain National Forest will remain closed unless designated open to snowmobile and all terrain vehicle (ATV) use.

S-3 Motorized use is permitted on designated motorized trails only. Off-trail cross-country use is prohibited.

G-1 Trails may be closed if conditions warrant.

G-2 Special use permits for new competitive events should be prohibited.

G-3 New Hampshire corridor trails and Maine ITS (Interconnected Trail System) trails should provide uninterrupted use. Corridor/ITS routes should be relocated, alternate locations determined, or dual use considered before management actions such as timber harvesting require temporary trail closure.

G-4 New Hampshire non-corridor (primary and local trails) and Maine non-ITS trails may be closed or interrupted due to Forest operations.

G-5 Snowmobile trails should be managed and maintained consistent with the respective state and White Mountain National Forest agreements for snowmobile trail operation and maintenance.

G-6 New or relocated snowmobile trails should not be located on frozen waterbodies.

**Summer Motorized Trails**

S-1 Summer motorized trail use is prohibited.

### *Non-Motorized Dispersed Recreation*

**General**

S-1 Concentrating use will be emphasized over dispersing use.

G-1 To protect low- and moderate-use locations, management actions (e.g., authorization of special use permits, information and education efforts) should not disperse recreation use from high- to low-use areas.

G-2 Use should be managed to prevent negative impacts to natural and cultural resources, and to the recreation experience.

**Education**

G-1 Consistent with ROS objectives, education and information delivery:

1. Should be concentrated primarily at visitor centers, classrooms, and other off-Forest locations, or at trailhead and developed facilities when delivery can be effectively accomplished at those locations.
2. To a lesser degree, may be conducted at backcountry locations when effective delivery cannot be accomplished at developed or frontcountry locations.

G-2 Posted public safety messages and signs (other than directional trail signs) should be located primarily at trailheads and visitor centers. They may be used at backcountry locations in unusual or unique circumstances.

G-3 Education messages should emphasize programs such as “hikeSafe” and “Leave No Trace” to foster personal responsibility for safety and to promote low impact in backcountry locations.

G-4 Education messages should emphasize the objectives of the Forest recreation management approaches to ensure Forest visitors understand the impacts of specific use related issues and to ensure that recreationists are going to the appropriate area for the opportunities they seek.

**Trails**

S-1 The Forest Trail System consists of the trails identified in the White Mountain National Forest trails database.

S-2 Trailhead and interior identification and directional signs must conform to standards identified in FSH 2309.18 and EM 7100-15.

G-1 Existing trails should be removed from the Forest Trail System and closed if continued use causes unacceptable impacts that cannot be mitigated, or if the trail does not meet overall objectives for the trail system.

G-2 Trails should be maintained to standards described in FSH 2309.18, consistent with the ROS objectives of each management area.

G-3 Incidental trails should be evaluated for potential removal or inclusion in the Forest trail system.

G-4 No additional trails should be constructed or authorized unless clearly needed to: provide public access to the existing system, address resource impacts, resolve public safety issues, meet recreation management or accessibility goals, or best meet the recreation management approaches. New trails should be evaluated and prioritized consistent with supplemental direction in FSH 2309.18.

**Overnight Facilities**

S-1 Overnight facilities (huts, shelters, tent platforms, and their related support structures such as toilets) and dispersed campsites must be managed as components of an overall system of backcountry opportunities.

S-2 Existing overnight facilities must be managed to minimize inconsistencies with desired ROS class objectives.

G-1 Forest Protection Areas (areas where restrictions such as limits on camping, use of wood or charcoal fires, and limits on party size are applied) should be established around all overnight facilities to prevent uncontrolled increases in use and size.

G-2 Forest users should bear a share of management costs for overnight facilities and dispersed sites through continued use of volunteer programs, payment for services, recreation passes, and cooperative agreements.

G-3 Overnight facilities may be provided to concentrate use. They should be designed and managed to absorb recreation impacts and prevent site deterioration, and to be consistent with ROS objectives.

**Appalachian Mountain Club Huts**

S-1 Huts must be managed consistent with the Appalachian Mountain Club Special Use Permit mitigation requirements.

S-2 The construction of additional huts is prohibited.

S-3 Expanding hut capacity is prohibited.

S-4 Except for health, safety, and resource impact concerns, expanding existing huts in physical structure is prohibited.

G-1 Potable public water systems may be provided.

**Shelters/Cabins/Tent Platforms**

S-1 If not clearly needed to protect natural resources, maintain a desired recreation use opportunity or pattern, or conform to the Forest recreation management approaches, shelters, cabins, and tent platforms must be removed.

S-2 Shelters, cabins, and tent platforms that are retained must be maintained. Native materials should be emphasized for maintenance and repair activities. Non-native material may be used if native material is

is unavailable or impractical. Materials should be replaced in-kind. Any material used should be durable and blend closely with the natural surroundings.

S-3 Reconstruction of shelters, cabins, and tent platforms determined eligible for the National Register of Historic Places must conform to required standards in *Standards for Upkeep and Rehabilitation of Historic Buildings.*

G-1 Shelters, cabins, and tent platforms that currently control and mitigate recreation impacts that are unlikely to be successfully mitigated through other appropriate strategies should be retained.

G-2 Human waste disposal facilities should be provided consistent with appropriate backcountry waste management technology.

G-3 Where fires are allowed, they should be confined to designated fire rings.

G-4 Additional shelters, cabins, and tent platforms should not be constructed unless unacceptable resource or social conditions exist that cannot be otherwise mitigated. New shelters, cabins, or tent platforms must be consistent with the Forest recreation management approaches.

G-5 New shelter and tent platform sites should be located 100 feet or more from any main trail, water body, or riparian area, and should not be located within two miles of an existing road open to motor vehicles.

G-6 Reconstruction and relocation of cabins, shelters, and tent platforms may include expansion of facilities, but should allow only the minimum expansion needed to better manage existing recreation use of the site and the surrounding area.

**Dispersed Campsites**

S-1 Dispersed campsites causing unacceptable impacts that cannot be reasonably mitigated must be removed.

G-1 Dispersed campsites may be designated with limited signing, as needed, to better manage recreation use.

G-2 Human waste disposal facilities and water systems should not be provided at dispersed campsites.

G-3 Consistent with management area direction, dispersed campsites may be allowed or relocated to manage existing recreation use.

**Cross-Country Skiing**

G-1 Forest Service-maintained cross-country ski trails should provide a lower level of development and services than cross-country areas under special use permit.

**Mountain Biking**

S-1 Except for designated Wilderness and the Appalachian Trail corridor, which are closed, Forest development trails will be open unless closed to mountain bike use.

S-2 Mountain biking is allowed on travel corridors unless closed to that use.

S-3 Cross-country mountain bike travel outside the open system of Forest trails and open travel corridors is prohibited.

G-1 Existing travel corridors should be reviewed systematically, with public involvement, with the goal of establishing a designated Forest trail system.

**Rock and Ice Climbing**

S-1 The White Mountain National Forest is open unless designated closed to rock, ice, and mixed climbing.

S-2 Except in Wilderness (see MA 5.1) where it is prohibited, storing (caching) equipment, including fixed ropes is permitted for no more than 14 days.

S-3 Chipping to create foot and hand holds, gluing to stabilize features, and attaching permanent artificial handholds is prohibited.

S-4 Route cleaning is prohibited where federally-listed threatened, endangered, and sensitive species occur.

S-5 To protect natural features, the use of mechanical or motorized devices, explosives, or chemicals for cleaning or developing climbing routes is prohibited. Hand drills and power drills are permitted for the installation of bolt protection, except in Wilderness where power drills are prohibited.

G-1 Specific areas should be closed or limitations placed on use, including group size, if recreational climbing creates unacceptable social or natural resource impacts. This may result in temporary or permanent closures or limits on number of outfitter/guide permits authorized.

G-2 To minimize social and environmental impacts, climbing party size should be limited to 12 persons, except in Wilderness, where group size is limited to 10.

G-3 Removing, altering, or manipulating vegetation, soils, or other natural features at the cliff edge, talus slope, or cliff base should be avoided.

G-4 Climbing or new route development may be restricted to protect federally listed threatened, endangered, and sensitive species.

G-5 Climbing should be restricted where there is potential to impact heritage resources.

G-6 When issues are no longer effectively addressed by application of standards and guidelines, climbing plans for specific areas should be developed to minimize environmental and social impacts.

G-7 Removable traditional protection should be used. Fixed protection may be considered when the use of removable protection is impossible, impractical, or causes increased or ongoing unacceptable resource impact. If installation of fixed protection for a new route, or the replacement of fixed protection on an existing route, is required, the following guidelines should be used:

a. 3/8" expansion bolts with hangers (or other acceptable industry standard that has the same or less impact) should be used. Ring hangers should be used for rappel stations. Webbing should not be used on new bolt anchors.

b. Replacement bolts should use the existing holes when possible.

c. Natural-colored webbing should be used on tree anchors.

d. All bolt hangers should be painted to blend with the color of the cliff face.

e. Hand drills, battery powered rock drills (except in Wilderness), hammers, crowbars, and wrenches are recognized as standard tools for fixed anchor installation and maintenance.

G-8 Reasonable cleaning of a route is allowed (except per S-4). Hand tools such as wire brushes, hand brooms, and toothbrushes are recognized as standard tools.

*Rock and Ice Climbing Special Use Permits*

S-1 To minimize social and environmental impacts from commercial group use, rock and ice climbing outfitter/guide group size must be limited to 12 persons. In Wilderness, the group size limit is 10 persons.

G-1 Rock and ice climbing recreation events permits should limit group size to 12 persons.

G-2 Numbers of permits per cliff for outfitter/guide and recreation events may be limited to protect natural resources or the recreation experience.

## *Special Uses — Recreation Specific*

S-1 Special uses apply to all kinds of commercial use on the Forest and must be managed to best serve the public interest, in accordance with FSM 2700. Standards and guidelines pertaining to any type of special use are stated in "Land Use Authorizations (Special Uses)" in the Lands section of this chapter. These must be followed, in addition to the recreation-specific requirements, below.

S-2 Outfitters/guides must submit operating plans and itineraries as part of their annual permit process.

S-3 Permits for recreation events and services with off-trail use are prohibited with the following exceptions: 1) water-based activities, 2) activities in the alpine zone on two or more feet of snow, 3) established climbing routes (as restricted by Rock and Ice Climbing standards and guidelines), 4) existing sporting dog field trial permits in the Kilkenny area, and 5) hunting.

S-4 Recreation special uses must not be dispersed from high-use to low-use areas, as identified in the current *Trail Use Inventory*.

S-5 Recreation Special Uses must be managed to protect the characteristics of low-use areas as identified by current trail use levels.

G-1 Recreation Special Use proposals should be denied if not consistent with the Forest recreation management approaches.

JA-0704

PBWTAR_3458

G-2 Recreation Special Use proposals may be denied when applications are not received in a timely manner.

G-3 If monitoring and analysis determines that recreation Special Use capacity (either social or resource) is being reached, an allocation study should be considered to determine need for user day limits. If applicable, results of the allocation study will be used to set and implement user day limits.

G-4 Group size may be limited when necessary to provide for safety and resource protection, or to minimize the impact large groups have on others.

G-5 In general, Special Use Permits for cross-country ski areas should provide more developed opportunities, including highly groomed trails and patrols, than Forest trails.

### *Wildlife Related Recreation*

S-1 The White Mountain National Forest is open unless designated closed to hunting, fishing, and trapping.

## Riparian and Aquatic Habitats

*Also see Chapter 3 for required management area-specific direction.*

S-1 All appropriate state and federal permits must be acquired prior to implementing management activities within wetlands, floodplains, streams, or ponds.

S-2 Projects requiring the use of heavy machinery within the wetted area of a stream or pond must have hazardous material spill kits on site.

S-3 Crossing of perennial streams with motorized vehicles for recreational and commercial purposes must be done at designated locations.

S-4 Acceptable stream flow must be maintained during construction on all fish bearing streams.

G-1 Tree cutting and harvest should not occur within 25 feet of the bank of mapped perennial streams, the high water mark of a pond, or a identified natural vernal pool, unless prescribed to benefit hydrological or ecological function of the associated stream, pond, or riparian area. Exceptions to this include tree removals needed to clear a designated stream crossing, maintaining an existing road or previously cleared skid road that cannot be relocated, or protecting human safety or infrastructure. Trees (greater than 4 inch DBH) cut or moved in this zone should be placed in a fashion that benefits riparian functions or aquatic habitats when possible.

G-2 Uneven-aged silvicultural practices should be used within the Riparian Management Zone (RMZ) along all perennial streams, lakes, ponds, and vernal pools. Cuts should be designed to maintain a relatively continuous forest canopy for the protection and maintenance of water quality, dead wood recruitment, hydrologic function, wildlife habitat, and scenic values. Regeneration group cuts should be limited to less than one acre in size. Exceptions may apply in areas deemed important

important for maintaining beaver colonies. In the absence of on-the-ground riparian mapping, width of RMZs should be defined as in Table 2-01.

*Table 2-01. Width of RMZ for Specific Aquatic Features*

| Aquatic Feature | Width of RMZ* (feet) |
|---|---|
| 1st and 2nd order streams | 75’ |
| 3rd order streams | 275’ |
| 4th and larger order streams | 575’ |
| Lakes, ponds, and vernal pools | 75’ |

* These widths may vary on the ground and may be modified at the project level if a hydrologist or biologist maps the actual riparian zone.

G-3 Treatments of riparian vegetation to enhance beaver forage should occur only in riparian types 30 or 35. If areas are not typed, treatments should occur on streams with less than 2 percent gradient, bankfull channel widths less than 25 feet, and valley widths greater than 150 feet.

G-4 Treetops and slash from commercial timber harvesting operations should not remain in any perennial stream, pond, lake, wetland, or vernal pool.

G-5 New skid roads, classified roads, trails, and walk-in campsites should not be located within the stream or pond management zone, which is a minimum of 50 feet in width. The width of the zone increases 20 feet in width with each increase of 10 percent in side slope. If any of the above need to be located within the zone, additional measures to minimize sedimentation should be taken.

G-6 New timber log landings, developed campsites, and permanent facilities should not be located within 100 feet of a perennial stream or the high water mark of a pond. If they need to be located within 100 feet, additional measures to prevent direct runoff into surface waters and to minimize sedimentation should be taken.

G-7 Existing roads, facilities, campsites, or trails within 100 feet of perennial streams or ponds should be considered for relocation as part of normal project planning, except when doing so would result in greater overall impact to the land or water resource.

G-8 Known springs should be protected from human impact.

G-9 Specific protection measures will be prescribed on a site-by-site basis for intermittent and ephemeral streams. These streams should not be permanently filled or relocated because of skidding operations. Sites where temporary water diversions or channel fill is necessary will be functionally restored after project completion.

G-10 Naturally occurring downed wood should not be removed from streams, floodplains, wetlands, ponds, or vernal pools unless needed

to protect culverts, bridge crossings, existing infrastructure, or human safety.

G-11 Naturally occurring vernal pools identified during project planning should not be altered as a result of skidding or construction activities.

G-12 Management activities should avoid soil rutting that could lead to amphibian migration barriers between uplands and vernal pools.

G-13 Restoration or enhancement of streams should occur where aquatic habitats are considered to be below their ecological potential.

G-14 Stream restoration efforts or habitat enhancement projects prescribed to increase habitat diversity (pool habitat, fish cover, nutrient and sediment storage, etc.) should harmonize with the surrounding visual setting and be consistent with ecological conditions and floodplain characteristics. The use of native materials (boulders, trees) should be emphasized.

G-15 Trees that directly provide structure to the streambanks and channels of intermittent streams should be retained.

G-16 Permitted construction activities in streams identified as having a fisheries value should not occur during the egg incubation period of October through April in areas where potential sedimentation would be detrimental to egg survival.

## Scenery Management

*Also see Chapter 3 for required management area-specific direction.*

S-1 Scenic Integrity Objectives provide an indication of the alteration or disturbance allowed in the viewed landscape. They are defined in terms of Very High, High, Moderate, and Low. Scenic Integrity Objectives are assigned based on Scenic Classes and Management Areas. Scenic Integrity Objective assignments for the Forest are shown in Table 2-02a and Table 2-02b.

S-2 Scenic Integrity Objectives will be met by

a. Applying the technical principles and guidelines outlined in the *National Forest Landscape Management Handbook* series, specifically for timber, roads, utilities, recreation and ski areas (See FSM 2380.61 – Current Publications).

b. Following examples of Scenic Integrity Objectives found in Appendix H of *Landscape Aesthetics – A Handbook for Scenery Management.*

c. Following current and/or future guidelines developed specifically for the White Mountain National Forest to achieve Scenic Integrity Objectives within individual management areas.

G-1 All management activities should meet or exceed Scenic Integrity Objectives established for the Forest through the Scenery Management System (SMS) outlined in *Agriculture Handbook 701, Landscape Aesthetics – A Handbook for Scenery Management.*

*Table 2-02a. Management Areas with Multiple Scenic Integrity Objectives.*

| Scenic Class | Management Area | | |
|---|---|---|---|
| | 2.1 | 8.2 | 6.1, 6.2, 6.3 |
| 1 | High | High | High |
| 2 | Moderate | Moderate | High |
| 3 | Moderate | Low | Moderate |
| 4 | Moderate | Low | Moderate |
| 5 | Low | Low | Moderate |
| 6 | Low | Low | Moderate |
| 7 | Low | Low | Moderate |

*Table 2-02b. Management Areas with a Single Scenic Integrity Objective.*

| Management Area | Scenic Integrity Objective |
|---|---|
| 5.1 | Very High |
| 7.1 | Low |
| 8.1 | High |
| 8.3 | High – Very High |
| 8.4 | High |
| 8.5 | See specific Scenic Area |
| 8.6 | High |
| 9.1 | Very High |
| 9.2 | Low |
| 9.3 | High |
| 9.5 | High |

## Transportation System

*Also see Chapter 3 for required management area-specific direction.*

**Road Location, Design, and Construction**

S-1 Roads and related facilities (e.g. parking lots, trailheads) must be located, designed, and constructed to the appropriate standard necessary to meet management objectives for the area served.

S-2 Road and related facility standards shall be determined by the needs of all resources, including consideration of safety, costs of transportation, and effects upon lands and resources.

S-3 Road location must consider soil erosion and slope stability risks.

S-4 Temporary erosion control devices must be installed and maintained until disturbed ground has been stabilized.

S-5 Roads subject to the Highway Safety Act, that do not meet two-lane standards, must 1) be increased to a full two lanes or 2) reduced to a single lane with intervisible turnouts when they are reconstructed.

G-1 New through roads should not be constructed.

G-2 Roads and related facilities should be located outside of riparian areas, wetlands, deer wintering areas and vernal pools.

G-3 Road construction on the small breakland Ecological Land Types (ELTs) should be avoided.

G-4 Where abutments are required for resource protection, permanent abutments should be considered on temporary bridges that will be utilized on classified roads scheduled for future recurrent use.

G-5 Excess materials generated during construction activities should be removed from construction sites and properly disposed of.

G-6 Appropriate control and management of storm water runoff should be considered in parking lot design.

G-7 When roads subject to the Highway Safety Act, along with their related facilities, are reconstructed, they should be brought into compliance with the Highway Safety Act standards.

**Road Management**

S-1 Roads are open to non-motorized uses unless specifically closed.

S-2 Temporary roads must be decommissioned upon completion of the activity for which they were authorized.

S-3 Private landowners and other government agencies shall be required to obtain an access permit from the Forest Service to construct a new road which connects onto an existing National Forest System road to ensure public safety and resource protection.

G-1 New roads constructed for resource management purposes should be open to public highway vehicle traffic when the following guidelines are met, otherwise they should be closed to public highway vehicle use:

a. The road provides access to ongoing multi-resource activities;

b. Specific public benefit(s) and time are identified in the road management objectives (RMO);

c. The road adequately supports the expected use, and no significant public safety or resource hazards exist; or

d. The road meets recreation management goals and objectives.

G-2 Seasonal road restrictions should be considered when:

a. Use would cause unacceptable damage to roadbed or soil and water resources;

b. Use causes unacceptable wildlife conflict or habitat degradation;

c. Use results in unsafe conditions;

d. A seasonal public or administration need is served;

e. The area accessed has seasonal need for protection or non-use; or

f. It is necessary to resolve conflicts between users.

G-3 Administrative use of closed or restricted roads should not occur when such use would cause damage to roads or resources.

G-4 Roads may be open to winter motorized, non-highway vehicle use (e.g., snowmobiles) when they are part of an official trail system designed, maintained, and signed for that use.

G-5 Objective maintenance Level I (intermittent stored service) roads should have temporary drainage structures removed, be stabilized, and have entrances blocked during the period they are closed to vehicles.

G-6 Existing roads should be considered for decommissioning

a. When there is no longer any need for the road.

b. When alternative routes may be available.

c. To protect natural and cultural resources or to meet other resource needs.

### Road Maintenance

S-1 Commercial users must be responsible for all winter and summer maintenance associated with their activities.

S-2 Roads and related facilities maintained for winter use must be designed and maintained to protect investment, resources, and to ensure public safety.

G-1 National Forest System roads and related facilities will not normally be maintained (i.e. plowed) for winter highway vehicle use by the public unless specifically designated to support winter use.

## Vegetation Management

*Also see Chapter 3 for required management area-specific direction.*

S-1 The maximum size of temporary openings created by even-aged management is limited to 30 acres.

S-2 Whole tree removal is limited to soils with sufficient nutrient concentration and nutrient replenishment capacity to support the new or residual stand of vegetation, maintain soil productivity, and meet other resource objectives.

S-3 All tops and limbs from harvested trees must be scattered and left on-site when harvesting on outwash sands or soils shallow to ledge.

S-4 State of Maine and State of New Hampshire *Best Management Practices* must be met or exceeded.

G-1 No more than 15 percent of the area of watersheds of first and second order perennial streams should be treated with even-age regeneration methods in a five year period.

G-2 Timber management prescriptions adjacent to trail corridors should be modified to protect trail- and recreation-related values (e.g., uncut

JA-0710

PBWTAR_3464

zones, slash disposal, trail relocation, and/or use of uneven-aged management).

G-3 Timber stand improvement prescriptions may be implemented to influence stand composition and development in order to attain desired vegetative conditions. Practices should be consistent with currently approved silvicultural guides.

G-4 New even-aged regeneration harvest should not be made adjacent to previous regeneration areas until the average height of the first harvest area is at least 15 feet, unless the combined acreage of the regeneration areas is less than 30 acres.

G-5 Where exposure of mineral soil is expected, skid roads should generally be located on grades of less than 20 percent, with only short steeper pitches.

G-6 When even-aged regeneration harvests are separated by a forested stand, that stand should be at least 10 acres in size.

G-7 Harvesting in hardwood stands adjoining deer wintering areas should occur during the winter when needed to provide browse.

G-8 Logging slash within 50 feet of a maintenance level 3 road, a trail, or private property should be treated or removed. Slash may be treated or removed at a greater distances when necessary to protect resource values.

G-9 Wood residues from harvest activities should be made available for firewood permittees when consistent with management area objectives.

## Water Resources

*Also see Chapter 3 for required management area-specific direction.*

### *Soil and Water Conservation Practices*

S-1 Soil and Water Conservation Practices (FSH 2509.22) must be developed and documented for activities that could affect water and soil resources.

S-2 Water quality must be maintained and protected, except that some discharges may be allowed if they are of limited extent and duration and result in no more than temporary and short term changes in water quality. Such activities shall not permanently degrade water quality or result at any time in water quality lower than that necessary to protect the existing and designated uses. Such temporary and short term degradation is only allowed when all practical and appropriate Soil and Water Conservation Practices are used to reduce impacts to water quality.

S-3 Effective, proven methods (e.g., silt fencing) to reduce concentrated runoff and erosion from construction activities must be used.

S-4 Where used, sediment traps must be maintained until disturbed sites and/or cut and fill slopes are stabilized.

S-5 Permanent stream crossings must be designed to pass the bankfull discharge unimpeded.

S-6 Fords must not be used on perennial streams, except on a temporary basis during construction, unless approved for administrative use at designated locations with appropriate mitigations.

G-1 New or reconstructed features (e.g., ditches and water bars) intended to capture runoff water should be designed to drain into areas suitable for trapping sediment and not directly into streams, wetlands, and vernal pools.

G-2 To minimize turbidity where construction activity occurs in intermittent or perennial watercourses, such activity should be isolated from the streamflow or carried out during low flow periods.

G-3 Cross drainage on roads and skid trails should use the spacing in the appropriate state Best Management Practices.

### *Stream Crossings*

G-1 Stream crossings of watercourses and riparian strips should be located as close to perpendicular, and as straight, as is compatible with the topography on either side.

G-2 Permanent stream crossings should cross at stream segments with Riparian Types 12, 15, and 17.

G-3 All permanent new, redesigned, or reconstructed stream crossings and other instream structures must be designed and constructed to pass bank full flows, withstand expected flood flows, provide for the passage of sediment, bedload, and woody material, and allow free movement of resident aquatic life.

G-4 *(Deleted per administrative correction dated 1 July 2009.)*

G-5 Temporary stream crossings on perennial streams should be designed to withstand at least a 25-year flood and pass bankfull flows.

G-6 *(Deleted per administrative correction dated 1 July 2009.)*

G-7 *(Deleted per administrative correction dated 1 July 2009.)*

G-8 Stream crossings should be installed using techniques to keep streambeds and banks intact.

### *Floodplains and Wetlands*

S-1 New facilities or structures within the 100-year floodplain must be designed to protect public safety and preserve the beneficial values of floodplains.

G-1 New campgrounds and facilities should be located outside the 100-year floodplain and wetlands.

G-2 Ensure, as much as possible, that natural drainage patterns are not altered by management activities that negatively impact wetlands.

G-3 When implementing ground disturbing activities adjacent to or in wetlands and floodplains, all practical mitigations should be used.

G-4 Fragmentation of floodplains and wetlands should be avoided when planning corridors (e.g., for power lines, roads, or trails).

G-5 Wetlands should be managed across the Forest for "no net loss."

#### *Water Uses*

S-1 Projects that withdraw water from surface water features or groundwater must ensure that water is maintained at levels that will protect management uses and Forest resources, including aquatic species, their habitats, and water quality.

S-2 A site-specific assessment and/or consultation with appropriate agencies must be done to determine instream flow requirements and/or water withdrawal limits.

S-3 Existing and designated instream water uses, and the level of water quality necessary to protect those uses, must be maintained or improved and protected.

S-4 State Best Management Practices (BMPs) for well drilling and groundwater protection must be met or exceeded.

S-5 All well drilling operations must have the site contained during and after well installation until the site stabilizes. This could include such measures as a containment pit, adding a temporary well cap, installing hay bales and silt fencing, and pumping overflow off-site or to a poly-lined dumpster when necessary.

S-6 All wells must be constructed outside of wetlands and surface waters.

S-7 Well drilling materials and by-products must be contained and prevented from moving into wetlands and surface waters.

### Wild and Scenic Rivers

*Also see Chapter 3 for required management area-specific direction.*

S-1 Manage eligible rivers to maintain their classification and eligibility until Congress designates the segments or decides not to designate them (see Appendix C).

### Wildland Fire

*Also see Chapter 3 for required management area-specific direction.*

S-1 Wildland fire use (WFU) implementation criteria must be described in the *Fire Management Plan* before fire is managed under WFU. Wildland fires that do not meet the established criteria will be managed using the full range of suppression options available to confine, contain, and control the fire.

S-2 All ignitions must receive an appropriate management response (suppression or wildland fire use) according to the *Fire Management Plan*.

G-1 Fire planning should be integrated into all resource management plans to ensure treatment objectives utilize fire in an appropriate manner from both ecological and resource protection standpoints.

G-2 Fire suppression and prescribed fire impacts should be minimized by implementing Minimum Impact Suppression Tactics as described in the *Interagency Standards for Fire and fire Aviation Operations*.

G-3 Existing standing dead, and dead-and-down, woody material should be retained and not damaged during fuel reduction activities unless they are considered a safety hazard. This applies especially to large (greater than or equal to eighteen inches DBH) hollow or rotten logs and rotten stumps.

G-4 Best available smoke management practices should be used to assure that prescribed fire will not result in adverse effects on public health and safety, or visibility in Class I airsheds.

## Wildlife

*Also see Chapter 3 for required management area-specific direction.*

**Wildlife Habitat Management**

S-1 Habitat management objectives must be developed for an individual Habitat Management Unit (HMU) prior to implementation of vegetative management in that HMU. These objectives must be based on land capability, current condition in the HMU, and landscape needs to meet management area objectives.

S-2 The Forest Service shall not introduce non-indigenous species except as biological controls for invasive species.

S-3 Known active raptor nest areas must be protected. Extent of the protection should be based on proposed management activities, human activities existing before nest establishment, species, topography, vegetative cover, and other factors. A no-disturbance buffer of at least 66 feet is required around nest sites from nest-site selection to fledging (generally March through July); exceptions may occur for some management activities when animals are adapted to human activity. At many sites, conditions will result in the need for a larger buffer to provide adequate protection.

G-1 Habitat should be managed according to guidance provided in the Forest's *Terrestrial Habitat Management* reference document.

G-2 Oak-pine and hemlock habitats should be retained on the landscape, but not all existing stands need to be maintained.

G-3 Maintain or enhance tree species diversity within stands, except when a stand is converted to aspen-birch, which reduces tree species diversity in the stand but provides a key habitat on the landscape. This includes retaining components of yellow birch and other minor species, and

retaining at least a few softwoods in hardwood stands and a few hardwoods in softwood stands where possible.

G-4 Even-aged regeneration harvest in spruce-fir and mixedwood habitats should occur only where softwood regeneration would be expected based on ecological land type or other conditions. Exceptions include when trying to create or maintain aspen-birch habitat, or when salvage harvesting after a large-scale disturbance.

G-5 Patches of regeneration forest habitat less than five acres in size should be created only in close proximity to other patches of regeneration habitat; grouping makes small habitat patches suitable for a number of species associated with regeneration forest habitat. Larger patches may be grouped or spread out within an HMU, depending on project objectives, forest type distribution, accessibility, and other resource concerns.

G-6 Group selection harvest should be emphasized in deer wintering areas (deeryards). Other management methods that would retain dense cover while providing pockets of browse can also be used if group selection is not appropriate.

G-7 Roads, trails, and new facilities should be located outside of deer wintering areas.

G-8 Gated roads may be opened seasonally to allow access to hunting or fishing areas, if resource concerns permit and if consistent with Forest Plan direction.

G-9 Multi-year surveys of air space used by birds and bats should be conducted prior to permitting wind tower applications.

G-10 When structures that exceed the height of the adjacent canopy (e.g., cell towers) are proposed, mitigation measures to deter collisions by birds, bats, and other wildlife species should be implemented.

G-11 Protection of sensitive habitats, such as wetlands, and den and nest sites for key species, should be considered for protection at the project-level.

### Nuisance Wildlife

S-1 All dumpsters, garbage cans, and recycling bins at developed recreation sites must be wildlife-resistant.

S-2 At developed and backcountry sites with known problems, actions must be taken to alleviate the wildlife-human conflict. If these measures do not work, trapping or other measures may be used to remove the problem animal in coordination with state agencies. A process for addressing conflicts and recommended preventative measures are documented in the *White Mountain National Forest Protocol to Avoid Wildlife-Human Conflicts*.

G-1 Preventative measures and education should be used to minimize wildlife-human conflicts.

G-2 To the degree feasible, campers, hikers, and day-use visitors should be advised when there is a known nuisance wildlife problem in developed or backcountry areas near where they are recreating.

G-3 Information about proper food storage should be available to campers and recreationists at recreation sites.

G-4 When education and deterrents do not eliminate wildlife-human conflicts, or when necessary to maintain public safety, dispersed or developed recreation sites may be closed by Forest Supervisor's Order.

**Wildlife Openings**

S-1 The value of wildlife trees, snags, and down logs must be considered during development of burn plans for wildlife openings.

G-1 Alternate uses of wildlife openings should be limited, and should be designed and timed to reduce impacts to the habitat value of the opening.

a. When a wildlife opening is used for other purposes, such as a helicopter site, it must be restored to the condition it was in prior to that use.

b. Special uses and events are not allowed in a wildlife opening if they alter the habitat value of the opening.

c. Camping in wildlife openings should be discouraged.

**Wildlife Reserve Trees**

S-1 When harvest reduces the basal area of a stand below thirty square feet per acre, uncut patches totaling five percent of the harvested area must be retained, with each at least one quarter acre in size.

S-2 When timber harvest will leave basal area above thirty square feet per acre, at least six cavity and/or snag trees per acre must be retained. These leave trees should include at least one wildlife tree and three trees exceeding twelve inches DBH per acre when feasible. In areas lacking such cavity trees and snags, trees of the largest available diameters with defects likely to lead to cavity formation should be retained.

G-1 Uncut patches retained under S-1 should be located to encompass as many wildlife trees, snags greater than or equal to nine inches DBH, other trees with cavities or broken tops, and bear-clawed beech as possible. A wildlife tree or snag greater than eighteen inch DBH may be used as a nucleus. In areas lacking suitable cavity trees and snags, trees of the largest available diameters with defects likely to lead to cavity formation should be retained.

G-2 When possible, uncut patches retained under S-1 and leave trees retained under S-2 should be placed within three hundred feet of open wetlands, ponds, riparian areas, or wildlife openings greater than five acres in size.

G-3 Existing standing dead, and dead-and-down woody material, should be retained and not damaged during Forest management activities unless they are considered a safety hazard or the area is being permanently removed from a forest condition (for example, parking lot construction). This applies especially to large (greater than or equal to eighteen inches DBH) hollow or rotten logs and rotten stumps,

G-4 Cull material from harvested trees, especially hollow logs, should be left in the woods.

*Forestry pioneers studying five-year-old slash on the northwest slope of Mt. Carrigain, 1919, in what is now the Pemigewasset Wilderness. From left: Henry S. Graves, then Chief of the U.S. Forest Service; J.J. Fritz, WMNF Forest Supervisor, 1918-1923; Franklin Reed, District Forester; Philip W. Ayres, SPNHF Forester; Allen Chamberlain of the Boston Transcript, SPNHF officer; and District Ranger C.B. Shiffer. (WMNF photo)*

41821-A

**JA-0717**

PBWTAR_3471

White Mountain National Forest

# Chapter 3
# Management Area Direction

JA-0718

PBWTAR_3472

## Chapter Contents

MA 2.1 — General Forest Management .............................................. 3
MA 5.1 — Wilderness ..................................................................... 9
MA 6.1 — Semi-Primitive Recreation ............................................... 19
MA 6.2 — Semi-Primitive Non-Motorized Recreation .................... 23
MA 6.3 — Semi-Primitive Winter Motorized Recreation ................ 27
MA 7.1 — Alpine Ski Areas ............................................................... 31
MA 8.1 — Alpine Zone ...................................................................... 35
MA 8.2 — Experimental Forests ........................................................ 41
MA 8.3 — Appalachian National Scenic Trail .................................. 45
MA 8.4 — Research Natural Areas .................................................... 55
MA 8.5 — Scenic Areas ...................................................................... 61
MA 8.6 — Wildcat Wild and Scenic River ......................................... 69
MA 9.1 — Recommended Wilderness .............................................. 75
MA 9.2 — Alpine Ski Area Expansion .............................................. 79
MA 9.3 — Candidate Research Natural Areas ................................. 83

***Cover***

*Titus Brook Wildlife Opening (WMNF Photo by John Williams)*

# MA 2.1 — General Forest Management

## Purpose

1. Provide high quality sawtimber and other timber products on a sustained yield basis.
2. Provide a balanced mix of habitats for wildlife species.
3. Provide opportunities for a full mix of recreation opportunities, from low-use hiking trails to highly developed campgrounds, and ROS objectives, varying from urban to semi-primitive motorized in different locations and sometimes varying by season or presence of management activities.
4. Manage high-use or highly developed recreation areas to acceptable social and ecological standards; manage to retain some low-use and less developed areas.

## Desired Condition of the Land

The Forest will be a mix of deciduous and coniferous forest stands of various types. The stands will vary in size, shape, height, and tree species. Both even-aged and uneven-aged harvest techniques will be used. As a result, two different conditions will occur among the stands: some stands will consist of trees of about the same age and size; the remaining stands will consist of a mix of tree sizes and ages ranging from seedlings to very large, mature trees.

Silvicultural practices will be used to meet timber, ecological, visual, and recreation objectives. Most stands will provide high quality sawtimber. Suitable habitat will be provided for a variety of wildlife and plant species. TES species and Outstanding Natural Communities will be conserved. Habitat at the landscape level will include a sustainable mix of young and mature forest. Permanent and temporary openings will occur across the landscape in shapes and sizes that are consistent with scenic objectives in an area. All communities that would naturally be present will be managed so that they are maintained or enhanced.

Along major road corridors, large diameter trees of different species with a variety of bark and foliage characteristics will predominate. Numerous views of broad, changing landscapes will be provided along roads and trails. Views, ecological processes, and management practices will be interpreted at stationary vista sites.

Recreation opportunities will be diverse, including activities such as hiking, mountain biking, driving for pleasure, snowmobiling, hunting and fishing, roadside camping, and developed camping. Some roads and trails will receive limited use, while others will be heavily used at certain times. Campground development levels will vary among sites, with some offering limited facilities and others providing more amenities. The location of various types and levels of recreation development will be determined by the Recreation Opportunity Spectrum (ROS) objective assigned to specific areas as well as by public demand and feasibility. ROS objectives will include

rural, roaded natural, semi-primitive motorized. Within these ROS objectives, there will be substantial non-motorized recreation opportunities.

Noticeable human activity in these areas will differ from very evident to absent.

Permanent and temporary roads will provide access to meet land management objectives. Major road corridors will be open for public use. Other roads will be open occasionally to provide for activities such as firewood gathering or hunting access. Most roads will be closed to public vehicular traffic. Selected areas may have snowmobile trails.

*Log skidding then and now: horses drag logs at Waterville Valley ca. 1938; at right, a modern skidder at the Clear Brook timber sale. (WMNF photos by Bluford W. Muir, Forrest Seavey)*

## Standards and Guidelines

*See Chapter 2, Forest-wide standards and guidelines, for additional required direction in each program area.*

### General

G-1 Emergency and project-related motorized administrative use may be allowed. Project-related motorized administrative use should consider potential impacts to social conditions and ecological resources in the area.

### Accessibility

*Forest-wide standards and guidelines apply.*

### Air Quality

*Forest-wide standards and guidelines apply.*

### Geologic and Mineral

*Forest-wide standards and guidelines apply.*

### Heritage

*Forest-wide standards and guidelines apply.*

### Lands

**Special Uses**

S-1 Designated communication sites are prohibited.

G-1 New communication use permits may be authorized on a case-by-case basis if they are attached to existing facilities and consistent with visual quality standards, Recreation Opportunity Spectrum requirements, and management area objectives.

G-2 Wind towers may be considered.

### Native American Relations

*Forest-wide standards and guidelines apply.*

### Non-Native Invasive Species

*Forest-wide standards and guidelines apply.*

### Rare and Unique Features

G-1 Vegetative manipulation may be implemented to protect or improve habitat for threatened, endangered, or sensitive species.

### Recreation

G-1 Recreation management activities will match the ROS Class objectives

provided in this management area. Recreation management activities themselves should not drive the ROS Class from a less developed to a more developed Class. For example, a paved trail should not be constructed in an area with a semi-primitive motorized objective. ROS objectives in this management area include:

a. Areas adjacent to, and within one half mile of, Interstate, state, town, and National Forest System roads open to public vehicular use should have recreation management activities consistent with urban, rural, or roaded natural ROS objectives. The specific ROS objective depends on the individual road classification and related development on National Forest or adjacent private lands.

b. Areas adjacent and within one half-mile of National Forest System roads closed to public vehicular use should have recreation management activities consistent with the roaded natural ROS objective. During the winter months, some of these roads become part of the snowmobile trail system.

c. Areas generally beyond one half-mile of roads open to public vehicular use should have recreation management activities consistent with the semi-primitive motorized ROS objective. During timber harvesting, some areas may temporarily appear roaded natural due to the presence of people, equipment, and reconstructed roads. But when timber activities are not present and during summer months when there is no motorized recreation, much of this management area will appear as SPNM.

**Riparian/Aquatic**

*Forest-wide standards and guidelines apply.*

**Scenery Management**

G-1 In evaluating cumulative effects for viewed landscapes from established concern level 1, open, higher elevation viewpoints affording expansive or large scale views, no more than 9 percent of the acreage within the view should be treated with regeneration vegetation management activities within a 30 year period. Total area affected during any one entry period with new regeneration treatment should not exceed 4 percent of the acreage. Assessment may need to be made from multiple viewpoints (that view a common land base). The assessment will apply to each view separately.

G-2 VisualFX or similar computer graphics/simulation software should be used to design and evaluate visibility of proposed regeneration cuts, especially when viewed from higher elevation or superior viewpoints.

G-3 For areas with a "High" Scenic Integrity Objective, created openings should be minimally evident from trail, road, or use area vantage points. Maximum observed size should not exceed 4-5 acres. If openings occur, they should appear as natural occurrences and be well-distributed in the viewed landscape.

*The General Forest Management area (MA 2.1) offers a broad range of recreational activities. Dogsledding (WMNF photo by Terry Miller); Bowhunting (WMNF photo by Forrest Seavey); Canoeing on Long Pond (WMNF photo by Kathie Fife); Backpacking on the Zealand Trail (WMNF photo by Forrest Seavey); RV and tent camping at Hancock Campground (WMNF photos by Forrest Seavey)*

G-4 For areas with a "Moderate" Scenic Integrity Objective, and viewed from superior viewpoints, clearcuts and other noticeable openings should be informal in distribution and designed to be in scale with the observed landscape.

G-5 Observed opening acreages will vary under different situations and in relationship to the viewing position. As a starting point, observed acreages of approximately 10 acres normally achieve a Moderate Scenic Integrity Objective.

G-6 In general, larger-sized openings relate better to existing landscape character when placed at lower elevations (Valley Bottom Land Type Association).

G-7 For projects where group cutting is the preferred prescription, and views from a superior viewpoint are a concern, groups should be laid out in an informal distribution pattern and varied in size.

### Transportation System

*Forest-wide standards and guidelines apply.*

### Vegetation Management

G-1 Harvest restrictions, such as time of day, day of the week, or season, should be considered in high-use recreation areas or other sensitive areas, such as private residences, on a case-by-case basis.

G-2 The use of chemicals for Timber Stand Improvement (TSI) or site preparation may be allowed as per label specifications and in accordance with appropriate Forest Service handbook and manual direction. Proper mitigation procedures for resource protection will be utilized.

G-3 When artificial regeneration is prescribed it should be initiated within two years of the harvest cut. Site preparation for planting may include manual, prescribed fire, chemical, or mechanical methods.

G-4 Selection cuts should be made on a 15- to 20-year entry interval, depending on individual site conditions.

### Water Resources

*Forest-wide standards and guidelines apply.*

### Wild and Scenic Rivers

*Forest-wide standards and guidelines apply.*

### Wildland Fire

S-1 Wildland fire use (WFU) is prohibited.

G-1 Prescribed fire may be used.

### Wildlife

*Forest-wide standards and guidelines apply.*

# MA 8.3 — Appalachian National Scenic Trail

## Introduction

The Appalachian National Scenic Trail (AT) includes all trails designated by the National Trails System Act, as amended (P.L. 90-543), that occur on federal lands managed by the White Mountain National Forest. The AT includes spur trails to shelters, overnight-use sites, viewpoints, and water sources. Within the Proclamation Boundary, the Appalachian National Scenic Trail management area is the land designated as 0.5 miles either side of the trail. Outside the Proclamation Boundary, the Appalachian National Scenic Trail management area includes all the lands acquired by the National Park Service for the AT in the state of New Hampshire and administratively transferred to the USDA Forest Service under a Memorandum of Agreement. They are managed as part of the White Mountain National Forest "... for the protection and enhancement of the Appalachian Trail and also in accordance with this agreement." They are "... subject to the National Trails System Act and laws, rules and regulations pertaining to the National Forest System." These NPS-acquired lands are commonly referred to as either "corridor lands" or "transfer lands."

The Appalachian National Scenic Trail is administered by the Secretary of Interior in consultation with the Secretary of Agriculture, and managed as a partnership between the National Park Service AT Park Office, USDA Forest Service, local Appalachian Trail Clubs, and the Appalachian Trail Conservancy (ATC, formerly named the Appalachian Trail Conference).

## Purpose

1. Manage the segment of the Appalachian National Scenic Trail on Federal lands that traverses the state of New Hampshire and the White Mountain National Forest.
2. Provide for the conservation and enjoyment of the nationally significant scenic, historic, natural, and cultural qualities of the land through which the trail passes.
3. Provide opportunities for high quality outdoor recreation experiences, including a sense of remoteness and solitude.
4. Recognize and strengthen the level of partnership, cooperation and volunteer efforts integral to AT management.

## Desired Condition of the Land

The AT will be accessible only by foot and other non-motorized, pedestrian means, such as skis or snowshoes. Roads and motorized trails are not present except at designated crossings. Limited recreation facilities such as huts, cabins, shelters, and tent platforms may be present but will complement the desired recreation opportunities. Development levels and levels of use will vary by location, but the management area will emphasize a remote backcountry recreation experience in a predominantly natural or natural-appearing landscape.

G-2 Recreation Special Use permits on the AT should be denied when social or resource conditions warrant (for example, if crowding or overuse negatively affects natural resources or a specific experience objective).

G-3 If monitoring and analysis of social and resource conditions determines that recreation special use capacity along the AT has been reached, a process should be developed to assign user days.

G-4 Group size may be limited when necessary to provide for safety and resource protection or to minimize the impact large groups have on others.

### Riparian/Aquatic

G-1 Artificial habitat structures should not be used. If used, they must be created from materials that blend with the site and do not detract from the natural landscape.

### Scenery Management

S-1 The AT is a Concern Level 1 Travelway, and middleground and background areas on National Forest lands seen from the AT must be managed for scenery in accordance with Scenic Integrity Objectives identified through the Scenery Management System.

S-2 All management activities will meet a Scenic Integrity Objective of High or Very High.

### Transportation System

G-1 To maintain a discrete trail experience, trailhead parking facilities should be located where the Appalachian Trail can be accessed by a short spur trail rather than locations where the trail footpath crosses a road.

G-2 New roads should not be allowed within this management area. New roads may be allowed if they are the only feasible and prudent alternative, and after impacts have been mitigated to the extent practical.

G-3 Where the AT follows Forest Service system roads, road maintenance may be done as needed on drainage structures, closure devices, and the roadbed. Grass may be allowed to grow in local roads (maintenance levels I or II).

G-4 Roads crossings should be at right angles wherever possible.

### Vegetation Management

S-1 On all National Park Service (NPS) acquired corridor lands, commercial timber management and salvage operations are prohibited.

S-2 Commercial timber management is prohibited where the AT management area is adjacent to any MA other than MA 2.1.

## Introduction

The White Mountain National Forest's Forest Plan identifies management direction in terms of desired conditions, goals and objectives, standards and guidelines, and management area direction. Monitoring and evaluation are separate, sequential activities required by the National Forest Management Act (NFMA) to determine how well this management direction is being met, and to provide a basis for the periodic evaluation of the Forest Plan. Together, they constitute a quality control process.

*Monitoring* is the systematic collection of information which reflects changes in actions, conditions, and relationships over time and space, relative to a predetermined standard or expectation.

*Evaluation* is the interpretation or judging of the information collected during the monitoring phase. Evaluation results are used to answer the monitoring questions, determine the need to revise or amend management plans, or determine how they are implemented. They form a basis for adaptively managing National Forests.

Forest monitoring and evaluation have a number of purposes, including:

- Keeping the Plan current.
- Ensuring compliance with specific standards, laws, and regulatory requirements.
- Examining the implications of administrative decisions.
- Tracking public concerns about the Forest Plan.
- Assessing the state of systems.
- Ultimately, assessing the effectiveness of Forest management in moving toward management goals and desired conditions.

The revised Forest Plan recognizes three basic categories of monitoring and evaluation: *implementation*, *effectiveness*, and *validation* (Table 4-01). Forest

*Table 4-01. Monitoring Categories.*

| Monitoring Category | Purpose |
|---|---|
| **Implementation** | Is the overall direction in the revised Forest Plan being implemented? This includes goals, objectives, desired conditions, standards, guidelines, and management area direction. Or, "Did we do what we said we were going to do?" |
| **Effectiveness** | Are the standards and guidelines working? It also includes an evaluation of whether there are significant changes in productivity of the land. Or "Did it work?" |
| **Validation** | Are the assumptions and predicted effects used to formulate the revised Forest Plan accurate? Or "Were we right in our initial understanding of the situation, did we look at the right things?" |

White Mountain National Forest

# Abbreviations, Acronyms, and Glossary

**Architectural Barriers Act (ABA):** The 1968 legislation that requires all facilities constructed, rented, leased or purchased by a Federal agency to be accessible. The UFAS (Uniform Federal Accessibility Standards) covers construction standards for Federal and Federally-assisted facilities. The Forest Service has directed that the agency and its federally-assisted programs, in all new construction or retrofit, to adhere to either UFAS or the Americans with Disabilities Act Accessibility Guidelines (ADAAG), whichever is the higher standard. Reform of both the facility accessibility standards under the ABA and the ADA is underway and will ultimately combine both guidelines under one rule.

**Aspen-birch habitat:** Forest habitat in which the canopy is comprised almost entirely of aspen species or paper birch. For implementation purposes, this habitat includes forest types 91-95 in our database, but stand conditions, not typing in CDS should be relied on to define habitat.

**ATV Racers:** ATV riders participating in competitive events, long distances, challenge courses, and sprints. In general they do not use trails and the riding challenge is more important than the natural setting.

**Backcountry:** The natural and near-primitive forest setting of areas, accessible by trail or off-trail travel.

**Backcountry Facility:** A relatively small, distinctly defined location in the backcountry where concentrated public use occurs and facilities are provided. These include huts, cabins, shelters, or tent platform sites. Backcountry facilities generally have no motorized access, except if located along a snowmobile trail, or where motorized administrative use is allowed. Backcountry facilities are not considered developed recreation areas. See also huts, cabins, shelters, and tent platform sites.

**Basal Area:** The area of the cross section of a tree at 4-1/2 feet above the ground. Generally expressed as total basal area per acre.

**Base Cation:** A positively charged ion, such as Ca++, that occurs soil exchange sites or in soil solution.

**Base Sale Schedule:** A timber sale schedule formulated on the basis that the quantity of timber planned for sale and harvest for any future decade is equal to or greater than the planned sale and harvest for the preceding decade; and this planned sale and harvest for any decade is not greater than the Long Term Sustained Yield Capacity.

**Batholith:** A large mass of coarse grained igneous rock that has cooled from magma underground with an exposed surface of at least 40 square miles.

**Bed Load:** The sediment that generally remains in contact with the stream by sliding, rolling, or saltation (hopping) on the stream bottom.

**Benchmark:** A set of estimates used to establish standards to compare alternatives considered in detail. Benchmark alternatives include the minimum level, maximum resource levels, and maximum present net value levels.

**Bicknell's Thrush Suitable Habitat:** Dense softwood stands generally above 2,800 feet elevation. Habitat models based on elevation and latitude, such as those developed by the Vermont Institute of Natural Science, should be used to fine-tune

**Group Selection:** The uneven-aged-cutting method that describes the silvicultural system in which trees are removed periodically in small groups, resulting in openings that do not exceed an acre or two in size. This leads to the formation of an uneven-aged stand, in the form of a mosaic of age class groups in the same stand. It may be applied in combination with single-tree selection.

**Guide/Guiding (Special Uses):** Providing services or assistance (such as supervision, protection, education, training, packing, touring, subsistence, interpretation, or other assistance to individuals or groups in their pursuit of a natural resource based outdoor activity) for pecuniary remuneration (monetary reward) or other gain. The term "guide" includes the permit holder's employees, agents, and instructors (WO Amendment 2709.11-95-11, 41.53c).

**Guidelines:** A required course of action or level of attainment. It is intended to move the Forest toward desired conditions in a way that permits operational flexibility to respond to variations in conditions. Guidelines can be modified or not implemented if site-specific conditions warrant a deviation. The rationale for deviating from a guideline must be documented in a project-level analysis and signed decision.

**Habitat Connectivity (Lynx):** Vegetative cover in sufficient quantity and arrangement to allow for the movement of lynx. Lynx tend to use ridges, saddles, and riparian corridors to move between larger areas of suitable habitat.

**Habitat Management Unit (HMU):** A block of Forest land in which habitat composition and age class objectives will be established to help ensure that habitats are well-distributed across the Forest and provide a framework for analyzing project impacts to wildlife habitat at a local scale. Blocks vary in size from about 6,000-49,000 acres, and contain a variety of habitat types and land in a mix of Management Areas.

**Heritage Property:** Any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in the National Register of Historic Places. The term includes artifacts, records, and remains that are related to and located within such properties.

**Highway:** A road that is at least 2 lanes wide, paved with asphalt or concrete. Average daily traffic may exceed 5,000 vehicles and speeds are 45 MPH or greater.

**"hikeSafe":** A joint initiative between the White Mountain National Forest and NH Fish and Game Department to promote responsible and safe hiking practices. hikeSafe uses the Hiker Responsibility Code to encourage hikers to take personal responsibility and be prepared for their hike. A long-term goal of hikeSafe is to reduce the need for search and rescue services.

**Hut (Appalachian Mountain Club):** A type of backcountry facility (see photo)

*AMC's Greenleaf Hut near Franconia Ridge. (WMNF Photo)*

JA-0731

PBWTAR_3586

**Mature Forest Habitat:** Stands in which the overstory is in the mature age class. Mature forest habitat is typically made up of trees that are eight inches or more in diameter. Mortality is just beginning in these stands, resulting in a few scattered canopy gaps and a small number of snags and cavities in the overstory. Most snags and down logs are small in diameter and within the intermediate or understory layers. Depending on site conditions, thinning and uneven-aged harvest methods can be used in this habitat without negatively impacting habitat quality. Some uneven-aged harvest may enhance vegetative and structural diversity.

**MBF (Thousand Board Feet):** A measure of one thousand board feet of wood fiber volume either in log form or after conversion into lumber.

**MCF (Thousand Cubic Feet):** A measure of one thousand cubic feet of wood volume.

**Mean Annual Increment of Growth (MAI):** the total increase in girth, diameter, basal area, height or volume of individual trees or a stand up to a given age, divided by that given age.

**Mineral Weathering:** The slow release of elements from mineral soil, pebbles, stones and boulders over time that contribute to forest soil nutrition.

**Minimum Flow Requirements:** The lowest discharge permissible in a river or stream, after withdrawals, below which no removal of water is allowed.

**Minimum Tool Concept:** A two-step decision making process used to determine the least intrusive method of accomplishing a proposed action in Wilderness. The first decision determines if the proposed action is needed and necessary in Wilderness. If it is considered necessary, the second step leads to selection of the management action (or method) which will have the least amount of biophysical and experiential impact on Wilderness. Cost and convenience are not deciding factors in determining the minimum requirement.

**Mixed Climbing (Climbing):** A combination of ice and rock climbing. A typical mixed route requires the climber to use crampons and ice axes on rock edges and flakes to climb up to or past a section of ice.

**Mixedwood Forest Habitat:** Also referred to as hardwood-softwood forest habitat. Forest habitat in which the canopy is comprised of a mix of northern hardwoods and hemlock, pine, spruce, or fir. Typically this is a northern hardwood stand with at least 25% made up of softwood species. For implementation purposes, this habitat is usually typed as forest type 87 in the CDS database, but stand conditions, not typing in CDS should be relied on to define habitat.

**MMBF (Million Board Feet):** A measure of one million board feet of wood fiber volume either in log form or after conversion into lumber.

**Mobility Device:** See Wheelchair.

**Mobilize:** An ion dissolved into water is transported with the water thereby entering ground and surface waters.

**Montane Circumneutral Cliff Community:** An outstanding natural community in which seepage from the cliff face has a pH of 6.5 or greater, and plants include calciphile lichens, bryophytes, and plants, such as *Dryopteris fragrans* and *Woodsia glabella*.

**Nuisance Wildlife:** An individual animal whose regular visits to a recreation area involve theft of food, destruction of property, or aggressive behavior toward people.

**Oak-Pine Forest Habitat:** Forest habitat in which the canopy is comprised primarily of oak or pine species. For implementation purposes, this habitat includes forest types 2-3, and 41-55 in our database, but stand conditions, not typing in CDS should be relied on to define habitat.

**Objectives:** Are measurable accomplishments intended to move the Forest towards the desired conditions described in the goals. Objectives are generally achieved through site-level projects or activities. However they are not the same as "targets," which are dependent on budgets and their accompanying direction.

**Off Highway Recreational Vehicle (OHRV):** OHRVs are any motorized vehicles used for pleasure or recreational purposes on any unimproved terrain. OHRVs may run on tires, belts, cleats, tracks, skis or cushions of air. All conventional motorized vehicles, when used for off-highway recreational purposes, are considered an OHRV. Any motor-driven wheeled vehicle on which there is a saddle or seat for the operator or passenger, or both, and which is designed or adapted for travel over surfaces other than maintained roads, whether on bare ground or covered by ice or snow. OHRVs include ATVs, snowmobiles, 4X4 off-highway vehicles, and dirt/trail bikes. See also All Terrain Vehicle, Snowmobile, 4X4 Off Highway Vehicle, and Dirt/Trail Bike.

**Off-Trail Use Objective:** The stated intent of a hiking trip is to avoid the use of trails, as in bushwhacking or orienteering.

**Old Forest Habitat:** Desired habitat conditions start with those for mature forest and can include greater size, decadence, structural complexity, etc. No harvest will occur in stands identified to provide old forest habitat.

**Old Growth Enriched Upland Forest Community:** A forest 200+ years old with abundant sugar maple and two or more of the following site indicator species: blue cohosh, ostrich fern, maidenhair fern, sweet cicily, Dutchman's breeches, baneberry, foamflower, hepatica, wood nettle, round-leaved violet, jack-in-the-pulpit, zig-zag goldenrod, ginseng, or alternate leaved dogwood. These may occur in areas of calcium-rich mineral soil or at the base of steep slopes or ledges, where organic material may accumulate and contribute to enrichment.

**Old Growth Forest:** Uneven-aged (three or more age classes) forest with an abundance of trees at least 200 years old, multiple canopy layers, large diameter snags and down logs, and a forest floor exhibiting pit-and-mound topography. There should be little or no evidence of past timber harvest or agriculture. Northern hardwood old growth consists primarily of sugar maple and American beech; softwood old growth is largely made up of spruce and hemlock. Stands need to be at least 10 acres in size to be identified as old growth. Anything smaller is a patch of old trees within a younger stand, not a habitat type in its own right.

**The Optimal Location Review (OLR):** The defined, cooperative process for systematically and objectively determining the best location for the Appalachian National Scenic Trail. The process is described in detail in Appendix I of the A.T. Local Management Planning Guide.

**Scenery Management System, Concern Levels:** A measure of the degree of public importance placed on landscapes viewed from travel corridors and use areas. They are identified as Levels 1, 2, and 3, with 1 being the highest level.

**Scenery Management System, Distance Zone:** Landscape areas denoted by specified distances from the observer. Used as a frame of reference in which to discuss landscape attributes or the scenic effect of human activities in a landscape. Distance Zones are defined as:

**Foreground:** Detailed landscape generally found from the observer to ½ mile away;

**Middleground:** The zone between the foreground and the background in a landscape. The area located from ½ mile to 4 miles from the observer;

**Background:** The distant part of a landscape. The landscape area located from 4 miles to infinity from the viewer.

**Scenery Management System, Landscape Character:** An overall visual and cultural impression of landscape attributes (physical, biological, and cultural) that make each landscape identifiable or unique.

**Scenery Management System, Scenic Attractiveness:** The scenic importance of a landscape based on human perceptions of the intrinsic beauty of landform, water characteristics, vegetation pattern, and cultural land use. Scenic attractiveness classifications are: Class A – Distinctive; Class B – Typical; Class C – Indistinctive;

**Scenery Management System Scenic Classes:** Measures of the relative importance, or value, of discrete landscape areas having similar characteristics of scenic attractiveness, user concern, and distance zone viewed in.

**Scenery Management System, Scenic Integrity Objective:** Measure of the degree to which a landscape is visually perceived to be intact and whole; an indication of the degree of deviation from the character valued by users for its aesthetic appeal. The Scenery Management System identifies the following levels of scenic integrity.

**Very High (Unaltered)** Refers to landscapes where the valued landscape character "is intact" with only minute if any deviations. The existing landscape character is expressed at the highest possible level.

**High (Appears Unaltered)** Refers to landscapes where the valued landscape character "appears intact." Deviations may be present but must repeat the form, line, color, texture, and pattern common to the landscape character so completely and at such scale that they are not evident.

**Moderate (Slightly Altered)** Refers to landscapes where the valued landscape character "appears slightly altered." Noticeable deviations must remain visually subordinate to the landscape character being viewed.

**Low (Moderately Altered)** Refers to landscapes where the valued landscape character "appears moderately altered." Deviations begin to dominate the valued landscape character being viewed but they borrow valued attributes such as size, shape, edge effect and pattern of natural openings, vegetation type changes or architectural styles from outside the landscape being viewed.

**Silviculture:** The art and science of controlling forest establishment, composition, structure, and growth.

**Single Tree Selection Cutting:** An uneven-aged cutting method where individual trees are selected and cut in a stand while maintaining a prescribed number of trees in each diameter class.

**Sinkholes:** Described as a “collapse” associated with fresh water dissolving evaporite minerals.

**Slash:** Debris left after logging, pruning, thinning, or brush cutting, and large accumulation of debris after wind or fire. It includes logs, branches, bark, and stumps.

**Slump:** A landslide characterized by a shearing and rotary movement of a generally independent mass of rock or earth along a curved slip surface (concave upward) and about an axis parallel to the slope from which it descends.

**Snow Compaction (Lynx):** In reference to lynx, snow compaction refers to conditions where snow is compacted generally throughout the winter or for long periods of time, as opposed to occasional use that compacts the snow for a period of a few days until the next snowfall occurs. Conditions where snow compaction is sufficient to allow competing carnivores to gain access to an area otherwise unavailable because of deep, fluffy snow, is considered a potential negative impact to lynx.

**Snowmobile:** Any vehicle propelled by mechanical power that is designed to travel over ice or snow supported in part by skis, belts or cleats. Also called a snowmachine. See Off Highway Recreational Vehicle.

**Special Use Permit:** A type of special use authorization that provides permission, without conveying an interest in land, to occupy and use national forest land or facilities for specific purposes, and that is both revocable and terminable. A permit is not transferable. There are different classes, categories, and designations of special use permits.

**Sport Climbing:** A climbing discipline involving ascents of routes established with fixed protection, usually bolts and hangers. Designed to provide an increased level of safety and the opportunity to focus on gymnastic difficulty with lower risk of injury.

**Spring:** A location where groundwater flows out of bedrock or surficial material onto the land or into a surface water feature such as a stream or pond.

**Spruce-Fir Forest Habitat:** Forest habitat in which the canopy is comprised almost entirely of balsam fir or red spruce. For implementation purposes, this habitat includes forest types 11-19 in our database, but stand conditions, not typing in CDS should be relied on to define habitat.

**Stand:** A community of naturally or artificially established trees of any age sufficiently uniform in composition constitution, age, spatial arrangement, or condition to be distinguishable from adjacent communities, thereby forming a silvicultural or management entity.

**Standards:** A course of action that must be followed, or a level of attainment that must be reached, to achieve management goals and objectives. In general standards limit project-related activities. Deviations from standards must be analyzed and documented in a Forest Plan amendment.

**Strip Cut:** An even-aged cutting method. It describes the linear configuration of clear cut areas. The regeneration of the stand may be accomplished in two or more stages.

**Suitability:** The appropriateness of applying certain resource management practices to a particular area of land, as determined by an analysis of the economic and environmental consequences and the alternative uses foregone. A unit of land may be suitable for a variety of individual or combined management practices.

**Suitable Forest Land:** Land that is to be managed for timber production on a regulated basis.

**Surface Disturbance:** Removing, digging in, excavating, disturbing, injuring, destroying, or in any way damaging any natural or cultural resources.

**Sustained-Yield:** The achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the National Forest System without impairment of the productivity of the land.

**Talus Slope:** Areas of coarse rock debris, accumulated at the base of cliffs, with vegetation ranging from closed-canopy forest to open barrens, depending on talus size, degree of soil development, and level of disturbance. Talus slope/woodlands can be distinguished from those on stable substrates by herb shrub and vine species characteristic of woodland openings, rocky areas or disturbed habitats, such as gooseberry, currants, climbing buckwheat, poison ivy and rock polypody.

**Tent Platform (Site):** A type of backcountry facility (see photo)

*Tent Platform at Ethan Pond, 1979 (WMNF Photo)*

**Tentatively Suitable Forest Land:** Forest land that is producing or is capable of producing crops of industrial wood and (a) has not been withdrawn by Congress, the Secretary, or the Chief; (b) existing technology and knowledge are available to ensure timber production without irreversible damage to soils, productivity, or watershed conditions; (c) existing technology and knowledge, as reflected in current research and experience, provide reasonable assurance that adequate restocking can be attained within 5 years after final harvest; (d) adequate information is available to project responses to timber management activities, and (e) has not undergone analysis to determine if other resource objectives would preclude timber harvesting and thus make the land area unsuitable.

**TES Species:** Plant or animal species that are designated as threatened or endangered by the U.S. Fish and Wildlife Service or that are designated as sensitive by the Regional Forester.

White Mountain National Forest

USDA

United States
Department of
Agriculture

Forest
Service

**Eastern
Region**

R9-WM-FEIS-ROD

September 2005

# Record of Decision

## Final Environmental Impact Statement

### To accompany the Land and Resource Management Plan

**JA-0737**

PBWTAR_3612

**This document is available in large print.**
**Contact the**
**White Mountain National Forest**
**Supervisor's Office**
**1-603-528-8721**
**TTY 1-603-528-8722**

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and where applicable, sex, marital status, familial status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or part of an individual's income is derived from any public assistance program. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD). To file a complaint of discrimination, write to USDA, Director, Office of Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410, or call (800) 795-3272 (voice) or (202) 720-6382 (TDD). USDA is an equal opportunity provider and employer.

White Mountain National Forest

United States
Department of
Agriculture

Forest
Service

**Eastern
Region**

R9-WM-FEIS-ROD

September 2005

# Record of Decision

## Final Environmental Impact Statement

### To accompany the Land and Resource Management Plan

| | |
|---|---|
| **Responsible Agency** | USDA Forest Service |
| **Responsible Official** | Randy Moore, Regional Forester<br>310 W. Wisconsin Avenue<br>Suite 580<br>Milwaukee, WI 53203<br>414-297-3600 |
| **Forest Supervisor** | Thomas G. Wagner<br>White Mountain National Forest<br>719 Main Street<br>Laconia, NH 03246<br>603 528-8774 |
| **For further information contact** | Barbara Levesque, Forest Planner<br>White Mountain National Forest<br>719 Main Street<br>Laconia, NH 03246<br>603-528-8743 |
| **White Mountain National Forest** | Carroll County, New Hampshire<br>Coos County, New Hampshire<br>Grafton County, New Hampshire<br>Oxford County, Maine |

# Preface

This document, titled the Record of Decision, describes my decision to select Alternative 2, modified in the Final Environmental Impact Statement, as the revised Land and Resource Management Plan for the White Mountain National Forest. The Record of Decision has two purposes: first, it is a legal document detailing a formal decision from a government agency; and second, and equally important, it explains the rationale and logic I used in arriving at my decision.

In accordance with the planning regulations under which this plan revision was prepared, I am the responsible official for this decision. I do not take this responsibility lightly, and have relied heavily on many people and the information they provided to ensure the Forest Service is making the best possible decision for this important piece of public land.

Public involvement and respectful discourse has been the hallmark of this planning effort since the Notice of Intent was published March 9, 2000. It has been my observation that this is how business is conducted in New Hampshire and Maine, and I'm proud that Forest Service employees have recognized the need for citizen involvement through every step of the process.

The staff of the White Mountain National Forest worked closely with individuals, local and state government, other federal agencies, tribal governments, and many interested organizations to develop the draft environmental impact statement and proposed plan that were released about one year ago. We received more then 6,100 responses, and these were very useful in our effort to further clarify and improve the Revised Plan. I am pleased that my decision is based on solid relationships that have evolved through this planning process, and I am confident that our future cooperation will ensure sustainable conditions for use and enjoyment of the White Mountain National Forest.

Creating this revised Forest Plan has not been an easy task. Developing a plan that is supported by most members of the public is even more difficult. The complexity involved with managing almost 800,000 acres of public land for a multitude of benefits and values can be challenging. There are many Federal laws, executive orders and policies that govern National Forest management. The American people, for whom these forests are managed, often have divergent views and values when it comes to what they want the White Mountain National Forest to provide, and how it should be managed.

The revised Forest Plan helps to meet the mission of the Forest Service, which is "To sustain the health, diversity, and productivity of the nation's forests and grasslands to meet the needs of present and future generations." The revised Forest Plan evolved from the work of a dedicated interdisciplinary team of Forest Service employees who fully considered the best available science in their analysis of the capability of the Forest to provide various benefits and the environmental effects likely to occur as the plan is implemented. However, science does not always provide

definitive answers to complex resource management questions, nor can any one field of science provide all of the answers. Science can, however, offer insight into the effects of management decisions and actions. In other words, good science can clear the fog, and help us reach a better decision.

I want to take this opportunity to sincerely thank all those who worked closely with Forest Service staff throughout the planning process. You helped us identify issues, identify the need for change, develop alternatives, and you contributed substantive and helpful comments on the draft documents. Your continued interest and participation will be even more important as we implement, monitor, and update the Forest Plan in the years to come.

We are very aware that the Forest does not exist in isolation, that it is part of larger state and regional landscapes, and our management actions affect surrounding communities and ecosystems. This is all the more reason we value the breadth of input we have received.

My thanks go out to the leaders in the communities within and around the Forest, to the many interest groups who advocate for the various multiple uses this Forest provides, and to the Forest Service employees who spent long hours and brought essential expertise to the revision process. My appreciation also extends to the Native American Indian Tribes in Maine, to the state and federal agencies who provided valuable input, and to the thousands of individuals who cared enough to attend meetings, read documents, and provide comments.

We now have a Revised Plan that will guide the management of your White Mountain National Forest for the next 10 to 15 years. But what does that really mean? The Revised Plan focuses on outcomes, recognizing that what we leave on the landscape is vitally important. At the same time, it recognizes how important forest management is to people and their social and economic well-being. The outputs and uses of the Forest that result from achieving the desired conditions and objectives will continue to provide jobs, products, and recreational uses for the American people. These lands can help maintain a quality of life, both for the people who live and work near the Forest and those interested in visiting this American treasure. Together, I believe we have crafted a revised Forest Plan with a strong foundation for ecological, social, and economic sustainability over the long-term.

Finally, where do we go from here and how do we get there? Our work is not finished; in fact it is just beginning. This Revised Plan is more than just a collection of words and ideas written on paper. We must transfer the ideas to the ground to make the desired conditions become real. The White Mountain National Forest is part of a vast and complex social, ecologic, and economic ecosystem in the Northeast. It should not and cannot be managed without consideration and assistance from the various land managers, governments, and agencies that are part of the landscape, or the many people interested in these lands.

The challenge that remains before all of us is to work together to implement the Revised Plan. I fully understand this can sometimes be difficult to achieve. At the same time, I am confident that cooperation will unite us, because I believe we share the common bond that these lands remain

productive, ecologically healthy, and beautiful for both the current and future generations.

I thank you again for your support, participation, and patience throughout this process. I invite your continued partnership in helping implement the revised Forest Plan and in keeping it fresh and relevant.

*Randy Moore*

Regional Forester

Eastern Region, USDA Forest Service

# Contents

Preface ........ 3
Introduction ........ 7
Public Involvement ........ 11
Need for Change Addressed in Plan Revision (Issues) ........ 14
Alternatives ........ 16
Decision and Rationale ........ 22
Changes between Draft and Final EIS and the Draft and Final Revised Plan ........ 33
Consistency with the Plans of Others ........ 36
Consistency with Other National Policies, Laws, and Authorities 38
Implementation, Monitoring, Evaluation ........ 44
Administrative Appeal of My Decision ........ 47
Contacts ........ 48

# Introduction

The Land and Resource Management Plan (Forest Plan) for the White Mountain National Forest provides the principal framework for preserving and protecting the resources of the Forest, while at the same time making those resources available to the public for a variety of uses and experiences.

A Forest Plan was originally developed in 1986 and, as required by the National Forest Management Act (NFMA), has now been revised. As provided in the 2005 planning rule (36 CFR 219.14), this plan revision has been completed using the planning procedures of the 1982 planning rule. In accordance with NFMA, the National Environmental Policy Act (NEPA), and the 1982 Planning Rule, a range of management alternatives has been developed. Each alternative provides a different approach for meeting the need for change considered early in the planning process, and for addressing issues that were identified by the public and Forest Service personnel through scoping and comment. The Final Environmental Impact Statement (FEIS) documents the potential environmental effects of several alternatives that were considered in detail. This intensive study provided me, as the deciding officer, with the information necessary to select the alternative which provides the greatest net public benefit. The alternative selected is the basis for the revised Land and Resource Management Plan, which is a companion document to this Record of Decision (ROD) and to the FEIS.

The FEIS addresses:

1. The Purpose and Need for Change — why the Forest Plan is being revised and what issues need to be considered in the revision process.
2. The Alternatives — a range of reasonable approaches for meeting the purpose and need and addressing the issues.
3. The Affected Environment — the physical, biological, and social settings within the Forest and its surrounding area.
4. The Environmental Effects — the effects of each alternative on the Forest's resources, as well as the surrounding social and economic environments, in the long- and short-term and cumulatively.

The Forest Plan states the goals and objectives to achieve desired conditions, and establishes standards and guidelines to govern management activities — both Forest-wide and in each of the Forest's management areas. A monitoring and evaluation strategy is included in the Plan, which will help determine how well management direction is being met. Monitoring provides a basis for the periodic evaluation and amending of the Forest Plan.

This Revised Plan replaces all previous resource management plans for the White Mountain National Forest. The Revised Plan may be amended or revised to respond to new information or management technologies, Congressional land designations, and changing needs and opportunities. Any action taken to amend or revise the Plan will include further public involvement.

Management practices will be implemented and outputs will be produced as the Forest Service strives to meet the desired conditions called for in the Revised Plan. The Revised Plan is implemented through site-specific projects, and annual budgets determine which and how many projects are planned and implemented during any given year.

The Revised Plan and accompanying Final Environmental Impact Statement are programmatic in nature, providing a long-range strategy for the Forest. Site-specific environmental analysis will occur for each project needed to implement this strategy. Any resulting project documents will be tiered to the Final Environmental Impact Statement for the Revised Plan, pursuant to 40 CFR 1508.28.

## Decisions Made in the Forest Plan

Six programmatic decisions are made in the Forest Plan that will govern the landscape-scale management of the Forest. Project-level decisions are made within the framework established in the Plan.

1. Forest-wide multiple-use goals and objectives (36 CFR 219.11(b)).
2. Forest-wide management standards and guidelines (36 CFR 219.13-27).
3. Management area direction (36 CFR 219.11).
4. Lands suited for timber production (36 CFR 219.14), and establishment of an allowable sale quantity (36 CFR 219.16).
5. Monitoring and evaluation requirements (36 CFR 219.11(d)).
6. Recommendations to Congress (e.g., recommendations for Wilderness) (36 CFR 219.17)).

## The Forest

The White Mountain National Forest encompasses approximately 796,700 acres in northern New Hampshire (including Coos, Carroll, and Grafton Counties) and western Maine (Oxford County). It was established under the provisions of the Weeks Law of 1911, which authorized the Secretary of Agriculture to purchase cut-over and denuded land for the National Forest System. This far-thinking law was responsible for most of the Eastern National Forests. The first land purchase for the White Mountain National Forest was in the town of Benton, New Hampshire, in 1914.

Characterized by rugged mountain peaks and the largest alpine zone in the East, the Forest has forty-eight summits of 4,000 feet and higher, including Mount Washington, the highest peak in the Northeast. A variety of species — softwoods and northern hardwoods, rare and unique plants, fish, birds, and other animals — can be found, and are part of the attraction for visitors. The dramatic landscape, so close to major metropolitan areas (Boston, Massachusetts, is only 130 miles to the south; New York City only a half-day drive; and Montreal, Quebec, less than one day's drive), has made the White Mountains a destination for people seeking a variety of recreation experiences for close to two centuries.

The USDA Forest Service administers the White Mountain National Forest, aided by partners, other agencies, individuals, and concessionaires. There are three ranger districts: the Androscoggin in the northeast, the Saco in the southeast, and the Ammonoosuc/Pemigewasset district covering the western side of the Forest. The Forest Headquarters is currently located in Laconia, New Hampshire.

## A Vision of the Future

The landscape of the White Mountain National Forest is unique in New England. It provides opportunities that are not available on private or other public lands. The Forest's resources are managed to ensure that their social and economic values to the region will benefit both present and future generations.

The ecological processes necessary to maintain the Forest's biological diversity are provided across the landscape. Populations of native and desired non-native species of plants and animals thrive and offer opportunities for viewing, hunting, and fishing. Habitat management activities maintain and enhance habitat for rare species and other species valued by Forest users, and support recovery of threatened and endangered species. The Forest continues to provide some of the most natural appearing and scenic mountainous settings in New England.

The National Forest is enjoyed for a wide range of high quality recreation opportunities, mountain and forest scenery, and an extensive trail network. The management emphasis is on non-motorized and dispersed activities, such as hiking, mountain biking, and backpacking, especially in primitive and semi-primitive settings. The Forest provides opportunities for activities that can only be pursued in mountainous terrain, such as rock and ice climbing and alpine skiing. The Forest also provides opportunities for many other recreation activities, such as camping in developed and dispersed areas, driving for pleasure, winter motorized trail riding, swimming, fishing, hunting, hobby mineral collecting, and natural and cultural resource interpretation.

The Wilderness areas of the White Mountain National Forest provide opportunities for primitive and unconfined recreation as populations around the Forest grow. In addition, Wilderness provides significant ecological values — filtering air pollution, sequestering carbon, providing unbroken wildlife habitat, and protecting watersheds. These lands are managed to allow natural processes to predominate, and to minimize the impacts of human intrusion. Wilderness on the White Mountain National Forest provides unique educational opportunities not found in other places. Our interpretive programs and materials allow visitors become more familiar with natural processes, recognize the evolving role of humans in affecting landscape change, and see how those same processes occur around their homes.

The Forest continues to provide high quality hardwood and softwood sawtimber, as well as other forest products, primarily for local and regional markets. Sustainable forestry activities occur on about 47 percent of the Forest

in a manner that is compatible with other resource and recreation objectives. During any one year, harvesting operations will be active on a very small part of the Forest, generally on no more than one percent of the overall landbase.

Water quality standards are met and long-term productivity of the Forest is sustained. Water resources support a variety of uses, while watersheds maintain their natural hydrologic function. Watersheds are managed in cooperation with local, state, and federal agencies so that high quality water supplies can be provided to local communities while sustaining aquatic ecosystems.

Transportation networks and facilities are provided to support the goals and objectives of the Forest Plan. Road networks are managed to provide safe travel, while ensuring that environmental impacts from roads are mitigated where possible.

Stewardship of the National Forest continues to be a collaborative effort between local communities, Forest users, private sector entities, nonprofit partners, and other government agencies. Many programs, facilities, and services that contribute to local and regional economies and the quality of life are developed and implemented through partnerships, volunteer programs, cooperative agreements, and donations. Educational and interpretive programs deliver messages about natural and cultural history, land conservation, and multiple use issues to local communities and Forest users. Educational institutions, government agencies, and other entities assist in determining research activities on the Forest.

An ongoing monitoring and evaluation program is in place, focused on reviewing progress toward implementing the Forest Plan goals and objectives. Monitoring efforts identify effects to date and how they match what was anticipated, new information, and the need to change the Plan through amendments.

# Public Involvement

As the largest public land area in New England, the White Mountain National Forest plays an important and unique role in people's hearts and minds. It is one of the most popular forests in the country, with upwards of 6 million visitors annually. The Forest is the recreational draw for outdoor enthusiasts with myriad interests. It is a place of refuge from the hectic pace of life on the eastern seaboard, and the backyard business to outfitter guides, tourism services, and the wood products industry. The Forest is within a day's drive of 70 million people and is home to 58 towns in New Hampshire and Maine. The Forest Plan Revision Public Involvement Plan was prepared with this diverse audience in mind.

Creating a way to involve the stakeholders of the White Mountain National Forest was essential in producing a revised Forest Plan that will be supported and understood by the public, resource professionals, and employees. Support for the Plan can only be gained if there is a widely held belief that people's concerns have been heard and addressed, where possible, in the planning process. To this end, efforts were focused on involving people in a way that fostered ownership in the Plan and its implementation.

Since 1997, the employees of the White Mountain National Forest have sought comments and provided opportunities for individuals, interest groups, tribal governments, and local, state and federal government agencies to become involved in the Plan revision. This public involvement made it possible for people to learn about resource management and the Forest Plan revision process, and to engage in open dialogue. The New England culture of relying on local collaboration to achieve solutions has guided the Forest Plan revision process.

## Public Participation Opportunities

### *Pre-Revision Outreach - Identifying Needed Changes for the Forest Plan*

In the January, 1997, outreach meetings were held in Gorham and Concord, New Hampshire, and Boston, Massachusetts. The public was asked what aspects of the current Forest Plan should be changed. Over 3,000 comments were received, ranging from broad to narrow, simple to complex, and technical to non-technical in nature. These were grouped into 31 topics of concern, and briefing papers were developed for each topic. The briefing papers summarized current Plan direction, monitoring information, any new information, and public or internal concerns. During the remainder of 1997, the public reviewed each of the briefing papers through a series of three all-day public planning meetings. The Forest then aggregated the 31 topics into 23, and used these to build a Need for Change document, which formed the basis for the formal proposal to revise the Forest Plan, the Notice of Intent (NOI).

The Notice of Intent for the White Mountain National Forest Plan Revision was published in the Federal Register on March 9, 2000, and initiated an official comment period that ended on May 23, 2000. We received 3,425 responses on the NOI, with 14,615 comments. This interest demonstrated

the profound value of public land in New England. With 55 percent of the commenters from Massachusetts, 18 percent from New Hampshire, 10 percent from New York and New Jersey, 5 percent from Connecticut and Rhode Island, 3 percent from Maine and Vermont, 2 percent from Pennsylvania, and 1 percent from Maryland, the White Mountain National Forest is truly a northeastern regional resource.

In the Fall of 1999, Local Planning Groups (LPGs) were established in four geographic areas. Meetings were held monthly at these locations over a two year period. At each meeting, LPG attendees and members of the interdisciplinary plan revision team would discuss, in depth, the 23 topics of concern. In late 2000 and early 2001, the Forest Service developed working papers to address each of the 23 topics of concern. These papers summarized public comment received during the NOI comment period. They also provided management options for how the Forest could deal with the topic during Forest Plan revision. As working papers were drafted, they were shared with federal and state agencies and LPGs. The Forest Service revised the working papers, after adding management options based on discussions at these meetings. Meetings were also held with Native American tribes, local governments, and private organizations and individuals.

### *Post-NOI Collaboration*

From November 2001 through 2002, collaboration continued as the 23 topics of concern were screened to see if they were relevant to Forest Plan-level strategic decisions as opposed to concerns about how the existing Plan had been implemented. This review focused on whether a concern was based on a change in resource conditions or on public demands. The result was that the 23 topics of concern became six need for change issues.

In May 2002, eight public meetings were held at locations throughout New England to present the six issues and receive comment. Through public comment, the six preliminary issues were narrowed or combined into three issues or concern areas to help guide the formation of alternatives.

Forest Plan revision final resource issues and Forest Plan goals were presented to the public on June 22, 2002, at a meeting at Plymouth State University, Plymouth, NH. Approximately 100 people attended the meeting, where Forest resource specialists explained the issues and responded to questions from the audience.

Planning Team members presented and discussed conceptual alternatives at meetings throughout the month of November, 2002, in Littleton, NH; Gorham, NH; Chelmsford, MA; Plymouth, NH; and Bartlett, NH. Based on these meetings and previous public comments, four proposed alternatives for the Revised Plan were presented to an audience of several hundred at a public meeting in Plymouth, NH, on March 29, 2003. In addition to discussion and comment at that meeting, an ensuing comment period drew some 3,700 further responses. The public response indicated that the four proposed alternatives were acceptable for analysis.

Personal contacts were also made with a variety of individuals and organizations to explain the planning process and receive their input. The

Forest Supervisor routinely provided updates and briefings throughout the process with the Congressional delegation, State legislators, town and local officials, and other members of the public. Officials from 49 towns in New Hampshire and 9 towns in Maine received periodic updates and information throughout the process.

Though there are no recognized tribes or tribal lands in New Hampshire, nor tribal lands within the immediate vicinity of the National Forest in Maine, Forest officials provided updates and briefings throughout the process to the four federally recognized tribes in the state of Maine and visited with the Tribal Chairmen or Governors during the process.

In the spring of 2004, plan revision team members completed the Draft Environmental Impact Statement and proposed Forest Plan for the White Mountain National Forest. Throughout April and May of 2004, meetings were held in Littleton, Bartlett, Plymouth, and Gorham, NH, and Chelmsford, MA, to provide an update about the upcoming publication of the draft EIS and proposed Forest Plan, and to help the public understand how to read, use, and comment on the DEIS.

### *Review and Comment on DEIS and Proposed Plan*

A 3-month public comment period began September 17, 2004, upon publication of the notice in the Federal Register that the Draft Environmental Impact Statement and Proposed Plan were available for review and comment.

A "Reviewer's Guide" was provided along with the two documents to help readers to navigate through the documents and understand how to provide substantive comments. The documents were mailed to approximately 900 individuals, groups, agencies, and governments. They were also available at local libraries and through the Internet. One public meeting was held in central New Hampshire that coincided with the release of the draft documents. This was followed by six open houses at which the public could meet with members of the planning team and District Rangers to ask questions and gather information to assist them in preparing their response to the documents. An open house on the draft documents was also hosted by the Appalachian Mountain Club in Boston during the comment period.

### *Response to Comment and Preparation of Revised Forest Plan and FEIS*

Over the 3-month comment period, 6,160 letters, cards, emails, and faxes were received, comprising some 18,500 separate comments. These were read, coded, entered into a database, and summarized into Public Concern Statements. A detailed description of the public involvement process and Public Concern Statements is included in Appendix A of the FEIS.

# Need for Change Addressed in Plan Revision (Issues)

## Management Emphasis Through Land Allocation

The 1986 White Mountain National Forest Plan emphasized non-motorized dispersed recreation experiences on approximately 54 percent of the Forest. Management of these acres provided for older forest conditions and large blocks of naturally evolving landscapes. Included within this management emphasis were 114,000 acres (14 percent of the Forest) of Congressionally-designated Wilderness. The remaining 46 percent of the National Forest was managed for more developed recreation, within a roaded landscape with active timber and wildlife management activities.

This Plan revision addressed whether changes in management emphasis are needed to meet the ecological, social, and economic demands expected of the Forest over the next 10 to 15 years. This issue also looked at whether additional areas should be recommended to Congress for Wilderness designation.

## Timber Management and Wildlife Habitat

Sustainable forestry on the White Mountain National Forest accomplishes many goals. It provides a source of high quality wood products, modifies wildlife habitat, maintains a healthy forest by removing trees damaged by insects and disease, benefits the regional economy, and demonstrates science-based forest management.

The plan revision process looked at how much timber should be harvested from the Forest, where harvest may occur, and the type of harvest treatment to be used. This issue also addressed the role of the White Mountain National Forest in providing young forest wildlife habitat within the larger landscape.

There are varying opinions on the value of and need for active habitat manipulation to ensure an adequate presence of wildlife species that benefit from early successional habitat. Species such as moose, deer, ruffed grouse, and some songbirds rely on young forest habitats to meet some of their life cycle needs. Our wildlife management cooperators and researchers emphasized in their comments the need to maintain or create these habitats in key areas through the use of clearcutting and other even-age harvest treatments. Other wildlife advocates believe the Forest should be managed primarily as a refuge, with naturally evolving forest, because of habitat changes that are occurring on other ownerships within the landscape.

## Recreation Management

The 1986 Forest Plan provided a broad array of recreation opportunities with an emphasis on non-motorized dispersed recreation. Millions of people visit the White Mountain National Forest each year, using facilities such as trails, shelters, roads, fishing and boat access sites, overlooks, restrooms, campgrounds, and ski areas. Recreation and tourism are very important to the local and regional economy.

Demand for many types of recreational activities and experiences has grown during the past 20 years, due to marketing and improvements in equipment. In addition to expanded use within traditional recreation activities, the Forest is being asked to accommodate a broader array of recreation experiences, including summer motorized trail vehicles and new recreational events.

Plan revision addressed concerns about how increased use may affect ecological conditions and recreational experiences. It looked closely at how changing activities and increasing use can be managed to prevent unacceptable ecological impacts and ensure high quality recreation opportunities. The 1986 Forest Plan provided little long-term guidance or management direction for addressing new uses, or existing activities such as rock and ice climbing, outfitter and guide operations, mountain biking, and group events. There was a need to have these uses addressed in the Revised Plan.

# Alternatives

The interdisciplinary team developed four preliminary alternatives in response to the issues and need for change. While all four alternatives provide a range of multiple uses, goods, and services, each addressed the issues in a different way.

The preliminary alternatives were presented at a public workshop in March of 2003. Many of the comments received during and after the workshop were incorporated, and the four alternatives were brought forward for detailed analysis in the Environmental Impact Statement. Each alternative considered in detail is a management approach that could have become the revised Forest Plan. The alternatives that were considered in detail share goals and policies that all National Forests are directed to follow. They differ in the emphasis given to addressing particular issues.

One of the interdisciplinary team's most important tasks in revising the Plan was to develop a reasonable range of alternatives. Based on resource information, public comment, and experience gained under the 1986 Plan, the team crafted what I believe to be an excellent representation of alternative means to meet the purpose and need for this programmatic document. To the extent practicable, we have solicited and reviewed alternatives submitted by the public and documented that analysis in the Administrative Record. At root, the range of alternatives is driven by what is best for the land and the people that use it. Existing resource conditions and the role of the Forest (as embodied in the purpose and need statement) are the heart of the development of the alternatives. Development of a programmatic multiple use resource plan involves compromise and balancing of a host of biological, physical, and social factors. The range of alternatives reflects the trade-offs associated with this task.

## Alternatives Eliminated from Detailed Study

### *No Timber Harvest*

Public comment about timber management on the White Mountain National Forest concentrated around the legitimacy of timber harvesting on public land, the amount of timber that should be harvested, where on the landscape timber should be harvested, the harvest methods that should be used, and the intensity of timber management. Some members of the public proposed options to the current timber management program that would end timber harvest completely on the Forest. These options, as submitted, were eliminated from detailed consideration for several reasons.

Sustainable supplies of timber products is one of the original purposes for establishing the National Forests, as described in the Organic Administration Act and Weeks Law. Timber on the White Mountain National Forest has been actively managed for almost 90 years. The Forest is now at the point where long-term investments, such as thinning and stand improvement cuts aimed at growing high quality sawtimber, will be more fully realized with continued management. The Forest has a history of providing a sustainable supply of timber. As stated in its Ten Year Monitoring Summary, published

in 1996, the Forest supplied 80 million board feet of sawtimber and 2.5 million cubic feet of pulpwood to wood producing industries during the first ten years of implementing the 1986 Forest Plan. Overall benefits of the program, including market and non-market values, exceed costs. Monitoring also indicates that timber harvesting has proven to be the most effective method of providing vegetative diversity, and is closely tied with achieving wildlife habitat composition objectives. Another factor is the role that public land management agencies play in demonstrating how timber can be produced in a sustainable and ecologically sensitive manner. As stated in the Notice of Intent, a sustainable timber harvest program for the White Mountain National Forest is part of the purpose and need for the Plan revision.

### *All Inventoried Roadless Areas Recommended as Wilderness*

An alternative was proposed that all 27 inventoried roadless areas on the Forest (403,144 acres) be recommended for Wilderness designation. This was considered and eliminated from detailed analysis.

To be considered for Wilderness recommendation, a roadless area must be evaluated against three criteria: availability, capability, and need. The 27 roadless areas identified in the Forest's roadless inventory were put through this evaluation but, for various reasons, not all areas met the recommendation criteria (see Appendix C of the Forest Plan).

New Wilderness recommendations reflect public interest over the last fifteen years. Public input ranged from not increasing Wilderness above current levels to recommending substantially more designated Wilderness. However, public comments have also indicated a desire for a mix of uses on the Forest, such as winter motorized trail use, developed campgrounds, mountain biking, and timber harvest, to name a few. The proposal to recommend all 27 inventoried roadless areas for Wilderness designation would not meet this balance of products, services, and experiences that the public has requested, nor the Desired Future Condition of the Forest. Under this proposal, approximately 48 percent of the total Forest land base would be placed in MA 9.1, a holding area allocation. When added to the 114,000 acres of existing Wilderness, 63 percent of the Forest land base would be allocated to management areas that limit recreation opportunities, close existing roads, and prohibit new timber harvest and road construction. Winter motorized recreation use and mountain biking would be constrained, forcing use onto private and other, non-federal, public lands.

### *Roadless Areas Not Recommended for Wilderness in Any Alternative or in Their Entirety*

Though all 27 inventoried roadless areas meet minimum Wilderness evaluation criteria, some roadless areas were not considered for Wilderness study in any alternative. Some of these areas have nonconforming uses that diminish Wilderness values. Others currently have little or no public support as proposed Wilderness areas. New Wilderness recommendations reflect public interest over the last fifteen years, as well as how specific areas address the overall Desired Future Condition for the White Mountain National Forest.

In recommending roadless areas for Wilderness designation, portions of some roadless areas were considered for designation rather than the entire inventoried roadless area. Some inventoried roadless areas contain, or are in close proximity to, mountain bike trails, snowmobile trails, and scenic highways or other developed areas. In addition, parts of inventoried roadless areas have been actively managed for wood products. These diminish Wilderness characteristics, so boundaries for Recommended Wilderness were proposed where they would lessen human-created impacts to the overall Wilderness.

## Alternatives Considered in Detail

### *Alternative 2 — Selected Alternative*

The Selected Alternative is Alternative 2 in the FEIS. Alternative 2 was modified between the Draft and Final EIS in response to public comments and to improve the accuracy of information. Alternative 2 provides a programmatic framework for future Forest management activities and projects. This framework includes Forest-wide management direction and specific direction for 15 separate management areas.

Dispersed recreation experiences within unroaded landscapes will be emphasized on approximately 53 percent of the Forest, with the remaining 47 percent of the Forest emphasizing more developed recreation in roaded landscapes with active habitat and timber management activities. This alternative includes a recommendation to Congress an additional 34,500 acres of Wilderness — a new Wilderness in the Wild River drainage and several additions to the existing Sandwich Range Wilderness.

Alternative 2 provides for an active vegetation management program while maintaining scenic quality and minimizing conflicts with other important Forest uses. This alternative provides for a sustainable level of timber products from the Forest (allowable sale quantity of 24 million board feet), with an average harvest intensity of 3,430 acres treated per year. This harvest level is consistent with what has been occurring on the Forest over the last 15 years. It provides for a small increase of early successional habitat creation through even-aged timber harvest (940 acres per year) compared to what was accomplished over the last 15 years, but will maintain species viability and manage within the range of natural variation. This level of harvest will meet all scenic integrity objectives of the revised Forest Plan.

The selected alternative includes an overall goal of preventing increased development levels in the backcountry. The monitoring program will evaluate impacts and user experiences in both high and low use areas. Standards and guidelines have been included to assure that recreation use in all areas is sustainable. Expansion of the Forest's recreation infrastructure will be limited.

Recreation use will continue to be focused on trails and facilities, and the Forest Service will strive to maintain current development levels in the backcountry. Low use areas and facilities will be managed to meet visitor needs and resource requirements through education and management controls where necessary. High use areas and facilities will be managed for

high use to meet visitor needs, while ensuring they can be sustained over the long term.

The Forest trail system will not be open to all terrain vehicles (ATV) except on designated trails in the winter. The Forest open road system will continue to be open for ATV use where that use is legal under state law.

Alternative 2, the Selected Alternative for the Revised Plan, recognizes the influence of National Forest lands and programs on local and regional economies and communities, and strives to provide a mix of benefits that can be delivered on a consistent and reliable basis over the long term. It has the highest net present value of the four alternatives.

### *Alternative 1 — No Action — Continue Management Approach of the 1986 Forest Plan*

Alternative 1 provides guidance for the next ten years that would generally be the same as the direction in the amended 1986 Forest Plan. Resource management activities on the Forest would be implemented through overall Forest-wide direction and specific direction provided for in 13 management areas. Dispersed recreation experiences within unroaded landscapes would be emphasized on approximately 54 percent of the Forest, with the remaining 46 percent of the Forest emphasizing more developed recreation in roaded landscapes with active habitat and timber management activities. The increased demand for Wilderness would not be met, as there are no recommendations for new or expanded Wilderness areas in this alternative.

The vegetation management program in this alternative would have an average annual allowable sale quantity of 35 million board feet per year, with 1,700 acres of early successional habitat created yearly. Harvest at this ASQ level would likely result in difficulty meeting scenic integrity objectives in some areas of the Forest. The average marketability of sales would be lower than for the Selected Alternative, due to the commercially marginal stands that would be offered for harvest. However, the sale marketability of Alternative 1 would be higher than Alternatives 3 and 4, due to generally higher volumes per acre harvested and greater amounts of sawtimber.

In this alternative, there are no desired conditions to guide recreation management. The Forest Service would respond on a case-by-case basis to important resource or social interaction concerns when they become apparent or cause a significant public concern. However, continuing in this direction would make it difficult to manage the Forest's recreation opportunities as an interrelated system, and may not adequately address increases in use. This alternative would have the second highest increase in infrastructure and facility capacity.

Summer off-highway vehicle use would be permitted on a trial basis within the General Forest Management area in up to two areas. Proposals submitted by the public would be evaluated on a case-by-case basis, with use limited to ATVs and two wheeled motorbikes. Up to 60 miles of summer motorized trail would be considered for designation. The Forest trail system would be open to ATVs on designated trails in the winter. The Forest open road system would continue to be open for ATV use where legal under state law.

### *Alternative 3*

Alternative 3 reflects the greatest shift in land allocation of all four alternatives. Dispersed recreation experiences within unroaded landscapes would be emphasized on approximately 59 percent of the Forest. The remaining 41 percent of the land base would emphasize more developed recreation in roaded landscapes, with active habitat and timber management activities occurring as well. This alternative proposes the largest recommendation for Congressionally-designated Wilderness of all the alternatives. Three new Wilderness areas and expansion of two existing Wilderness areas would add approximately 96,900 acres to the current Wilderness allocation. Lands allocated to the General Forest Management area would decrease by 15,500 acres, due to the Wilderness recommendations.

This alternative has the least potential of all the alternatives to provide timber products and early successional habitat. The harvest intensity is the lowest of all the alternatives at approximately 3,350 acres annually, with an average ASQ of 18 million board feet per year and 480 acres of early successional habitat created yearly. The reduced annual output indicates a more widespread distribution of harvest activity, which would be favorable to maintaining a natural-appearing forest.

Recreation management in this alternative is similar to the Selected Alternative, by establishing an overall goal of preventing increased development levels in the backcountry. However, increases in infrastructure and facilities are slightly reduced from the Selected Alternative levels. The Forest trail system would not be open to all terrain vehicles (ATVs) except on designated trails in the winter. The Forest open road system would continue to be open for ATV use where legal under state law.

From a market price standpoint, Alternative 3 has the lowest program costs and the smallest timber revenues, due to having the smallest timber program of all the alternatives. From an assigned value standpoint, it has the highest level of hiking in Wilderness when compared to the other alternatives. The low program costs are offset by the low timber revenues, which outweigh the gains in net present value from the high levels in backcountry use, resulting in the lowest net present value of all the alternatives.

### *Alternative 4*

This alternative emphasizes dispersed recreation experiences within unroaded landscapes on approximately 52 percent of the Forest. These management areas provide for older forest conditions and large blocks of non-manipulated landscapes that are valued for both their ecological and social character. The remaining 48 percent of the Forest includes management that emphasizes more developed recreation, in roaded landscapes with active habitat and timber management activities. These management areas provide early successional habitat important for some wildlife species. Approximately 18,100 acres in the Wild River area would be recommended for Congressional designation as a Wilderness.

Alternative 4 provides for an average annual ASQ of 30 million board feet and roughly 1,120 acres of early successional habitat per year. Harvest would occur over approximately 4,470 acres annually, the most acres harvested of all the alternatives. Visual quality objectives would be met. To sustain this level of harvest, marginal stands of timber would be treated and low value sawtimber could cause sales to be less marketable than in Alternatives 2 and 1.

The recreation management approach would be similar to that in Alternatives 2 and 3. However, Alternative 4 has the highest objective for increases in campgrounds, snowmobile trails, non-motorized trails, and backcountry facility capacity. Up to 100 miles of non-motorized trail could be added to the designated Forest trail system over the next 10 to 15 years. This alternative also provides for an increase in backcountry facility capacity of up to 65 people at one time. Some current low use areas may receive additional backcountry facility capacity or more trails, bringing them into a higher use category. Summer off-highway vehicle use could be permitted on up to 30 miles of trail designated in either the Moat Mountain or Landaff area subject to further site-specific analysis.The Forest trail system would be open to ATVs on designated trails in the winter. The Forest open road system would continue to be open for ATV use where legal under state law.

## Decision and Rationale

I began my decision making process by looking closely at how well the 1986 Forest Plan, was "caring for the land and serving people." While we did not complete all of the goals in that plan, I believe it did do a relatively good job of responding to the ecological, social, and economic concerns and needs we faced over the last twenty years. In revising the 1986 Forest Plan, we built on this experience in trying to select the best overall course of action for the future.

I recognize that over the last twenty years there have been many changes in our country and the world that ultimately could have an effect on the White Mountain National Forest and all of the nation's forest lands. Looking specifically at the New England landscape, I have reviewed some of the work that has been done by others to get a better understanding of the changes that are occurring in the Northeast and the Northern Forest. The recent "Northern Forest Lands Council Tenth Anniversary Forum Report," sponsored by the North East State Foresters, highlights the significant changes that are occurring across the region. This report reaffirms "the regional and national stature of the Northern Forest as a vast region that has been impacted by economic, cultural and social change. Past concerns about pattern of land ownership in relation to traditional uses have been coupled with an increased recognition of how the working landscape and conservation goals affect local communities and economies." The report, and other recent publications and forums by different organizations and agencies, has helped shape my decision on the Selected Alternative

Changes in our understanding of ecological systems and the potential management needs to address new concerns also require us to look beyond our borders to ensure we are making the best possible decisions for the future. Issues such as the spread of invasive species, air quality, acid deposition, forest fragmentation, wildlife viability, and increasing recreational demand require increased emphasis in this Plan, as well as a good understanding of how Forest Service management actions contribute to or complement what is happening on other lands within our sphere of influence.

I also fully understand that there are many, and sometimes conflicting, demands and expectations for this public land called the White Mountain National Forest. In some cases, in order to meet long-term sustainable goals, not all these demands and expectations can be met from a finite resource base. Sometimes one person's values and desires cannot be met without having an effect on another person's values and desires. However, in my decision I have looked for an alternative that best meets the demands and expectations, ensures the long-term sustainability of the National Forest, and responds to the laws and policies under which the Forest Service must work.

I have selected Alternative 2, with some modifications, as the Revised Plan for the White Mountain National Forest. I chose Alternative 2 because, in my judgment, it maximizes the net benefit to the public by:

- Maintaining or enhancing biological diversity and the long-term health of the Forest;
- Contributing to the economic and social needs of people, cultures, and communities;
- Providing sustainable and predictable levels of products and services;
- Providing the best mix of benefits to address the needs for change identified in the Final Environmental Impact Statement;
- Recognizing the relationship of the White Mountain National Forest to other public and private lands in the area of influence;
- Emphasizing adaptive management over the long term; and
- Providing consistent direction at the Forest level to assist managers in making site-specific project decisions at a local level in the context of broader ecological and landscape level considerations.

My decision also considered how the Revised Plan responds to public comments, internal management concerns, and national direction and policy. My decision incorporates by reference the management direction in the Revised Plan, the analysis of effects disclosed in the Final Environmental Impact Statement, and the planning Administrative Record in its entirety. This decision applies only to National Forest System land on the White Mountain National Forest. It does not apply to any other federal, tribal, state, county, municipal, or private lands; although in making my decision, I considered the effects on those lands.

In a broad context, Alternative 2 with some modifications recognizes that in many ways the 1986 Forest Plan was responding well to the overall needs of the Forest from an ecological, social, economic standpoint. Many parts of the new Plan do not make radical departures in our overall management approach. They do, however, recognize new information, better scientific understanding, and the overall changes that have occurred over the last twenty years. I have looked at the issues described in the Final Environmental Impact Statement and selected Alternative 2 with the understanding that it outlines the following approaches relative to the three issue areas.

### *Management Area Allocation*

Alternative 2 (the revised Forest Plan) will emphasize dispersed recreation experiences within unroaded landscapes on approximately 53 percent of the Forest. These management areas will provide older forest conditions and large blocks of non-manipulated landscapes that are valued for both their ecological and social character. The remaining 47 percent of the Forest includes management emphasis that provides for timber management activities, road systems for public access, developed recreation areas, non-motorized trails, Nordic and downhill ski areas, snowmobiling, and a host of other activities. These management areas will provide young forest habitat that is important to some wildlife species. All of the management areas will provide the opportunity for people to hunt and fish on the Forest consistent with State laws.

The Revised Plan also provides for the establishment of two new management areas: Management Area 8.3 — Appalachian National Scenic Trail and Management Area 8.1 — Alpine Zone. It combines Management Areas 2.1 and 3.1 from the 1986 Plan into one Management Area 2.1 — General Forest Management, which better reflects how these areas will be managed over the next fifteen years. The Revised Plan will also add an additional 3,190 acres to the Bartlett Experimental Forest to assist in our ability to conduct broader scale research activities. Management Area 2.1A and Management Area 9.4, which were considered holding areas in the 1986 Forest Plan, were deleted from this plan, and these acres were added to other management areas to better reflect how these areas will be managed over the next 15 years.

Also, with the Revised Plan I am recommending to Congress that an additional 34,500 acres on the White Mountain National Forest be considered for inclusion in the National Wilderness Preservation System. This alternative proposes the designation of a new Wilderness in the Wild River drainage, as well as additions to the existing Sandwich Range Wilderness. If these areas are designated by Congress, approximately 18 percent of the Forest would be managed for its wilderness values.

The following table outlines the proposed allocation by management area.

| Management Area | Allocation (Acres) |
|---|---|
| 2.1: General Forest Management | 358,000 |
| 5.1: Wilderness | 114,000 |
| 6.1: Semi-Primitive Recreation | 86,300 |
| 6.2: Semi-Primitive Non-Motorized Recreation | 105,600 |
| 6.3: Semi-Primitive Winter Motorized Recreation | 15,300 |
| 7.1: Alpine Ski Areas | 3,700 |
| 8.1: Alpine Zone | 5,100 |
| 8.2: Experimental Forests | 13,400 |
| 8.3: Appalachian National Scenic Trail | 39,000 |
| 8.4: Research Natural Areas | 3,200 |
| 8.5: Scenic Areas | 15,200 |
| 8.6: Wildcat Wild and Scenic River | 900 |
| 9.1: Recommended Wilderness | 34,500 |
| 9.2: Alpine Ski Area Expansion | 2,200 |
| 9.3: Candidate Research Natural Areas | 2,100 |

The four alternatives considered in the Final Environmental Impact Statement provided a range of possible management area emphasis and allocation that I considered. The majority of the comments on this issue

revolved around whether lands should be in management areas that restrict the use of roads and are managed more for a dispersed recreational experience, with less overall development, or are available for timber and wildlife management with additional roading as needed.

People tended to focus on key areas that they thought should remain in, or be taken out of, the landbase classified as "suitable for timber production." I have chosen to leave the overall allocation of lands through management areas similar to the way the Forest has been managed over the last 15 years. This mix of resource management approaches and land use values seems to have worked well in most cases, and has provided a very balanced program overall. While I could have chosen Alternative 3 and moved more of the Forest into roadless character, I did not think this was needed to provide a Plan that was responsive to all the ecological, social, and economic demands placed on the Forest. Some people suggested increasing the intensity of the forestry activities on the Forest but reduce the acres available for treatment as a way of maintaining overall commodity outputs. I believe this approach would have proven impossible to implement while meeting all the other resource expectations. I believe an approach of managing 53 percent of the Forest in a non-motorized dispersed recreation condition will provide ecological benefits and experiences people expect from the White Mountain National Forest, while at the same time allowing diverse uses such as downhill skiing, roaded access, developed campgrounds, and forestry activity on much of the remainder of Forest.

I have reviewed the Roadless Inventory completed by the White Mountain National Forest staff to ensure that the inventory and evaluation process we used is consistent with national and regional guidelines. The focus of this inventory and evaluation was to identify lands that meet the criteria for inclusion in the Forest's roadless inventory, and to evaluate these areas to determine if any areas should be recommended to Congress for Wilderness.

Some groups and individuals, in their comments on the Draft EIS, disagreed with the process that we used to inventory and evaluate roadless areas. I believe the process we followed is sound, and did result in an accurate inventory and a thorough evaluation of each inventoried roadless area. There were also questions about our determination of which roads were considered "improved" for the purpose of the roadless area inventory. The Forest Supervisor had an additional field review conducted to respond to stated concerns. This review resulted in an additional 19,617 acres being included within the roadless inventory and evaluation. I have looked again at the inventory and the evaluation of roadless areas (Appendix C), and believe that my recommendations for Wilderness designation do not need to change based on this additional information.

The Wilderness Act of 1964 and the subsequent Eastern Wilderness legislation have demonstrated the will of the people to have some land set aside that could be managed in an untrammeled state. With increasing development in the East, and the desire of people to reconnect with a place in its true wild state, it is reasonable for me to recommend additional lands be considered by Congress for Wilderness designation. The additions to the Sandwich Range Wilderness and the proposed new Wild River

Wilderness would provide unique opportunities for solitude and preserve ecological, geological, and other features of scientific, educational, scenic, and historical value. While there would be some trade-offs and effects on other outputs and experiences, I believe the long-term benefits outweigh the trade-offs in the case of the two areas recommended. I considered recommending other areas discussed in the EIS for Wilderness, but believe Wilderness designation in those areas would significantly disrupt the balance of expected experiences, outputs, and services provided on the Forest. The proposed addition of 34,500 acres to the Wilderness Preservation System would result in approximately 18 percent of the Forest being managed as Wilderness.

The Wild and Scenic Rivers Act (WSRA) of 1968, as amended, protects rivers' free flowing condition, water quality, and outstanding remarkable values for the "benefit and enjoyment of present and future generations." In October of 1988, Congress passed legislation designating segments of the Wildcat River and its tributaries as part of the National Wild and Scenic Rivers System. Management Area 8.6 of the Revised Plan includes direction for managing the National Forest Service lands within the Wildcat River corridor, and is based on the Wildcat River Comprehensive River Management Plan, 2005. The direction is in conformance with Section 3(d)(1) of the WSRA. The Forest Service is also responsible for the evaluation of water resources under Section 7(a) of the WSRA on all ownerships for designated rivers.

### *Management of Vegetation*

The White Mountain National Forest was born out of primarily heavily cut-over lands, through the efforts of concerned citizens who lived in the area or visited the White Mountains from the growing metropolitan areas. It has been, truly, a remarkable success story over the last 90 years, and a testament to the healing power of nature, the diligence of a land management agency, and unwavering support of individuals and organizations. The Environmental Impact Statement for the White Mountain National Forest Land and Resource Management Plan considered alternative ways to manage the vegetation over the next 15 years.

Alternative 2, the Selected Alternative, calls for active forest management using sustainable forestry practices on about 47 percent of the Forest. In most cases, the remainder of the Forest will continue to age and will go through successional changes that will be influenced by wind, fire, and insect and disease outbreaks. In the suitable landbase where timber will be harvested, it will be accomplished according to the standards and guidelines within the Forest Plan and consistent with state Best Management Practices. Vegetation management will move the Forest toward wildlife habitat objectives for vegetative age class and species composition. These objectives consider the importance of providing a diversity of wildlife habitat for native game and non-game species on the Forest.

In any one year, it is anticipated that the Forest Service, through timber sale contractors, would be treating approximately 3,400 acres of the Forest, which accounts for less than one percent of the overall Forest land base. These

treatments are expected to provide an average annual allowable sale quantity of 24 million board feet of wood products in the form of sawtimber and pulpwood. The Forest Service will continue silvicultural treatments that favor the production of high quality sawtimber.

The White Mountain National Forest has a long history of using timber harvest to accomplish resource objectives and provide wood products to the public. These efforts have been coordinated and administered by field staff in order to address potential resource impacts and minimize effects on the recreational use of the Forest. I would like to discuss four specific areas that provide my rationale with respect to this issue for the selection of Alternative 2. They include: 1) the ability to accomplish wildlife habitat objectives; 2) the ability to provide wood products; 3) the effects on land productivity and ecological processes; and 4) the role of the Forest in furthering our understanding of sustainable forestry practices.

### Wildlife Habitat Objectives

The Forest Service has analyzed our overall role within the landscape in maintaining wildlife habitat and populations. Indications are that natural disturbances, such as wind, hurricanes, and insect and disease outbreaks, have typically maintained a portion of the Forest ecosystem in a young forest seedling/sapling condition (early successional). These habitats are important to a host of wildlife species, from some bird species to larger species such as moose. Our wildlife management cooperators and researchers have emphasized in their comments the need for creating these habitats using clearcutting and other even-age harvest treatments. Some other wildlife advocates think the Forest should be managed primarily as a refuge of undisturbed forest, because of habitat changes that are occurring other places on the landscape.

I have reviewed the FEIS, available scientific information, and public comments, and I firmly believe that the White Mountain National Forest can and should provide both early successional and mature, undisturbed forest habitat components. The targeted treatments within MA 2.1, and the large portion of the Forest that is allocated to management areas that don't feature active habitat manipulation, combine well to address the Forest's important role within the larger landscape.

I believe managing a portion of the Forest using sustainable forestry practices is needed to provide many benefits that the public expects from the Forest, including maintaining the aspen-birch component on the Forest, assisting state wildlife agencies in meeting wildlife population goals, reducing the buildup of heavy fuel situations near communities adjacent to or within the Forest, and responding to invasive species outbreaks that may threaten the overall health of the forest ecosystem. We have also balanced the amount of even-aged and uneven-aged harvest to ensure vegetation and wildlife management goals can be met while still meeting our recreation and visual quality objectives.

### Wood Products — Allowable Sale Quantity

One of the decisions I am required to make with this Revised Plan is to identify the allowable sale quantity (ASQ) for the Forest. The ASQ is defined as the quantity of timber that may be sold from the area of suitable land covered by the Forest Plan, for a time period specified by the Plan, while meeting the requirements of multiple use management and resource protection.

I have reviewed the FEIS, the models used to project varying harvest intensities, and public comment on this issue. I have also discussed with my staff of resource specialists, and with researchers, the experience they have gained in managing our forestry program over the last 20 years. I have listened closely to those people who are familiar with on-the-ground conditions and issues. All of this information tells me that an allowable sale quantity of 24 million board feet per year is a reasonable ceiling for the program over the next 10 to 15 years.

If we were to manage the Forest solely for its wood products, timber yield models tell us that the outputs could probably double the ASQ for Alternative 2. However, this is public forest land that is managed for a multitude of benefits and uses, and as such it requires significantly more flexibility, coordination, and compromise if we hope to meet the desired conditions and goals for all resources as outlined in the Revised Plan.

Some commenters suggested that the yearly production of timber products should be higher later in the planning period, based on land acquisitions and the productivity of the suitable timber base. From my review, I don't believe we could sustain these higher production levels later in the planning period, but we will continue to monitor our objectives and outputs over the life of the Plan, and if our projections are drastically off-base we could adjust the ASQ level through a revision or amendment to the Plan.

Some commenters questioned the reliability of the FIBER and SPECTRUM models used in estimating the allowable sale quantity. We have responded to these concerns in detail in Appendix A — Response to Comments. I believe the models used provided an adequate picture of the overall potential for the Forest to produce outputs, and along with many other factors they helped me ascertain the best mix of resource outputs. The models also provided the necessary assurance that the Forest will be managed for a sustainable, non-declining flow of wood products over the long term.

### Effects on Land Productivity and Ecological Processes

I have reviewed the environmental effects section of the FEIS to ensure that the program we have outlined meets the requirements of the National Forest Management Act. While all activities on the National Forest typically involve some kind of trade-offs, I believe the analysis demonstrates that the benefits of actively managing for wildlife habitat and wood production on part of the Forest outweigh any trade-offs associated with these activities.

Some commenters specifically were concerned that timber harvest could compound the existing soil and water quality impacts experienced on the Forest due to acid deposition. I asked my staff to provide additional information in the Final Environmental Impact Statement that would assist me in understanding the concerns related to this important issue. I also asked that they discuss the issue with Forest Service and other researchers to ensure we have a full understanding of the best available scientific information on this subject. While the effects of acid deposition are a concern throughout the world for both health and ecological reasons, I do not believe the body of available scientific information supports the theory that continuing timber harvest in New Hampshire and Maine will have a significant effect on overall soil productivity or water quality in Forest streams. Lands that are designated in the Revised Plan as "suitable for timber production" can be harvested, under the standards and guidelines required by the Plan, in a way that will maintain the long-term soil productivity of the land and water quality of Forest streams. Proposed timber harvest projects also undergo site-specific environmental analysis to ensure that land productivity and ecological processes are not compromised. The White Mountain National Forest is committed to continuing to work with Forest personnel, researchers, and partner groups to monitor the effects from acid deposition to ensure this issue continues to be addressed in forest management actions as necessary.

The revised Forest Plan also includes standards and guidelines to ensure that Forest managers are effectively responding to the threat of invasive species on the overall vegetation and aquatic ecosystems of the Forest.

## Demonstrating Sustainable Forestry

The White Mountain National Forest is in a unique position to demonstrate and further the understanding of sustainable forestry practices for both public and private landowners. The historical creation of this Forest was the product of concerns about unsustainable cutting practices that were occurring at the turn of the 20th century. Since that time, the science of forestry has helped guide decisions on the treatment of specific areas that were made to provide long-term investments in the land. National Forest employees have a rich tradition of working with Forest Service researchers and other institutions of higher learning to better understand the complicated relationships and workings of ecosystems in the Northeast. In addition, there are two designated experimental forests within the White Mountain National Forest that continue to conduct long-term research on water quality, watershed processes, acid deposition, silviculture, wildlife relationships, carbon sequestration, and other related topics. The Forest Service has long-term relationships with many conservation organizations that support the use of forest resources from public lands and actively work to further public understanding. Finally, the Forest hosts as many as 6 million people annually, who all rely on wood products in their lives and will benefit from a better scientific understanding of the effects of forestry on the nation's forests and the global environment.

### *Recreation Management*

Recreation use in the White Mountains predates the creation of the National Forest, and clearly played a role in its establishment. Since the early 1900s, use levels have steadily increased, and there have been many changes in the kinds of use over time. As we implement the revised Forest Plan, we will continue to work with Forest stakeholders to better understand the effects of recreation on the land and the experiences people expect when they visit the Forest. In some cases, providing desired experiences or reducing the environmental effects of recreation use may call for some levels of restrictions — on certain uses or in specific locations — to ensure that the Forest continues to be one of the unique places in the overall National Forest System.

The White Mountain National Forest has many developed recreation facilities, including campgrounds, cabins, interpretative sites, trails, and backcountry facilities. The Revised Plan calls for limited expansion of these in order to maintain the overall recreational experience. Commenters on the Draft Environmental Impact Statement generally supported this approach, but provided feedback on specific sites or locations. We expect that in some cases where demand outpaces the capability of existing facilities, the needed additional facilities will be provided on private or other public lands.

In many cases, commenters encouraged the Forest Service to maintain the existing situation on the Forest, especially within backcountry areas. Goals, objectives, standards, guidelines, and monitoring efforts within the revised Forest Plan are focused on providing for recreation use of the Forest while ensuring this use is sustainable over the long term. Included within this approach is additional direction for conservation education, concentration versus dispersal of use, maintenance of the existing recreation opportunity spectrum classes, and additional monitoring of overall effects from recreation use.

The revised Forest Plan has additional guidance on how we will better meet our management responsibilities within designated Wilderness. This includes specific Wilderness management direction (Appendix E of the Forest Plan) that outlines various zones within the existing designated White Mountain National Forest Wildernesses, and sets specific indicators and standards that will be measured to meet the overall goals of the Wilderness Act. Successful implementation of this approach will require knowledgeable Wilderness visitors and, in some cases, management actions to ensure an "enduring resource of wilderness" called for in the Wilderness Act.

I have decided to modify the approach outlined in the Proposed Plan for the management of existing travelways for mountain bike use. The Forest's designated trail system will be opened to mountain bikes unless closed for a specific resource, safety, or conflicting use concern. However, mountain bike use will not be allowed on the Appalachian Trail, cross-country, or within designated Wilderness. Use of old, non-system roads or travelways will be allowed unless specifically closed, pending a Forest-wide review of the overall mountain bike trail system. The Plan's goal is for the Forest to

have a mountain bike system that will provide opportunities for this use without causing undue impact on the environment or conflicts with other trail uses.

In the last two years, the Chief of the Forest Service has talked about the importance of managing all terrain vehicle (ATV) use on the National Forests. I have worked throughout the Eastern Region to ensure that we carefully manage ATV use consistent with national policy. Based on local conditions and their overall recreational niche, some National Forests within the Region provide ATV trail opportunities while other Forests do not.

In the case of the White Mountain National Forest, early in the public scoping process ATV riders asked that we consider developing some motorized summer trails, and the Forest Service considered providing these in Alternatives 1 and 4. I reviewed the possible effects of introducing this new use to some areas of the Forest, and have reviewed the comments that we received on this topic. This subject received more comments than any other portion of the Draft EIS, with the majority of the comments favoring the approach outlined in the proposed plan. The Selected Alternative does not provide for the creation of a summer motorized trail system, but continues to allow all terrain vehicles on designated snowmobile trails during the winter, and on open Forest roads where they meet state motor vehicle standards.

My rationale for selecting this alternative is the recognition that the White Mountain National Forest is a unique place within New England. I am not convinced at this time that summer ATV use should be added to all the other recreation uses occurring on this land. The Forest has historically featured a non-motorized trail system that attracts residents and visitors to the Forest for the unique experience it provides in a heavily populated area of the country. The existing levels of use on the Forest would make it difficult to add this new use without experiencing significant user conflicts. I believe summer motorized trail use is an appropriate use of National Forest land, and I have approved this use in other areas of the Eastern Region. But in this case, I believe this situation calls for the approach outlined in Alternative 2. I have asked the Forest Supervisor to monitor efforts to accommodate ATV use on nearby private and public land to ensure we have a good understanding of the benefits and effects of this use for future forest planning efforts.

In addition to the recreation management approaches described above, the revised Forest Plan provides direction and guidance on other activities, such as: rock and ice climbing, recreation special use permits, hobby mineral collecting, facility accessibility, ski area management, snowmobile use, trails, and other recreation activities on the White Mountain National Forest.

### *Other Management Actions Considered In My Decision*

Alternative 2 in the Final EIS contains many other suggested management actions, in response to public input, that are not tied to the three issues discussed above. They include provisions for the management of wildland fire use, designation of communication sites, additional emphasis on

conservation education, provisions guiding consideration of wind power sites, and the recommendation for an additional Research Natural Area at Shingle Pond. These actions, along with additional information in the revised Forest Plan, will help the Forest Service meet its management responsibilities over the next fifteen years.

# Changes between Draft and Final EIS and the Draft and Final Revised Plan

As stated earlier in this Record of Decision, we received well-prepared and constructive comments on the DEIS and Proposed Plan. We considered both public and internal comments in preparing the Final EIS and revised Plan.

Changes made for the final documents range from minor editing for improved clarity to changes in management direction, desired conditions, objectives, and standards and guidelines. Some changes resulted from data corrections, new survey information, and field verification. The summary below describes the most substantial changes made between the Draft and Final Environmental Impact Statements and the proposed and revised Plan.

### *Changes to Mountain Biking Management Direction*

We received comments about the proposed changes in mountain bike policy from various Forest stakeholders and members of the mountain bike community. Direction in the proposed Forest Plan had stated that Forest development trails would be open to mountain bike use unless signed closed, travel corridors would be closed to bike use unless signed open, and cross-country travel would be prohibited. While there was general public support for prohibiting cross-country travel, many commenters were concerned that there was not enough information at this point to restrict the use of travel corridors without further site-specific analysis.

I have decided to maintain the prohibition of cross country travel outlined in the proposed Forest Plan. In addition, Wilderness Areas, the Appalachian Trail, and any other specific Area Closure implemented through a Forest Supervisor Order will also remain closed to mountain bike use. However, all other Forest development trails and travel corridors will remain open to mountain bike use, unless signed closed. The intent is that, as the Forest Plan is implemented, eventually all trails and some additional travelways will be part of a designated non-motorized trail system on the Forest. The Forest Service will work with mountain bike organizations and other concerned stakeholders to determine, through site-specific analysis, which travel corridors will be managed and maintained as part of the designated Forest trail system.

### *Inventoried Roadless Process*

Concerns were raised that the DEIS lacked an explanation of the roadless inventory process, that documentation of the process was insufficient, and that the inventory criteria had been inconsistently applied across the Forest. Based on these comments, additional information about the inventory process is included in the FEIS (Appendix C). Additional documentation that further outlines each step of the process is also included in the Administrative Record.

The Forest Service also invested additional resources to further review some of the specific areas of concern expressed in letters on approximately 34,000 acres of the Forest. A thorough review of decisions made on specific

boundary locations of various inventoried roadless areas was conducted, based on public comment. This review resulted in approximately 13,000 acres being added to four of the existing inventoried roadless areas, consistent with our original roadless area criteria. Forest employees also completed further field verification of improved roads near existing inventoried areas which could have a potential effect on the size of the overall inventory areas for the Forest. This review demonstrated that most roads were correctly mapped in the original inventory, but that a few roads no longer meet the improved road criteria. These have been dropped from our improved road GIS map layer. This field verification resulted in the addition of one inventoried roadless area, in the Sawyer River area, which is approximately 6,718 acres in size.

The changes between draft and final have resulted in a total of 403,144 acres of inventoried roadless areas in 27 different areas of the Forest. I have considered the additions to the original inventory, and have evaluated them relative to our overall management area allocation and proposals for Recommended Wilderness. I believe the Selected Alternative strikes a good balance in assigning these inventoried lands to various management allocations for the next fifteen years.

### *Wilderness Boundaries*

The Selected Alternative in the Final Environmental Impact Statement recommends the same two areas for Wilderness consideration as the Draft EIS. Within the Sandwich Range Recommended Wilderness, however, we are making minor boundary changes in two areas to improve overall boundary management, avoid areas of active timber management, and incorporate some additional wilderness attributes. These two areas are along the southeastern and southwestern boundary of the Recommended Wilderness, in the Algonquin Trail and Ferncroft areas. This change will add an additional 900 acres to Management Area 9.1 (Recommended Wilderness). The additional acres were identified as part of the MA 2.1 (General Forest Management) area in the proposed Forest Plan. This minor change to the overall allocation has been considered in our analysis in the Final Environmental Impact Statement, and will not affect the expected overall outputs from the General Forest Management area or overall environmental effects from Alternative 2. The Alternative 2 map in the FEIS and revised Forest Plan are updated with these boundary changes.

### *Changes to the Application of Prescribed Fire*

Proposed standards in the proposed Forest Plan stated that prescribed fire was prohibited in MA 7.1 (Alpine Ski Areas) and MA 9.2 (Ski Area Expansion). Commenters suggested that prescribed fire should be used in these as an alternate slope management tool for vegetation control at alpine ski areas. An example would be to use fire on slopes that are too steep for wheeled or tracked equipment, and that do not pose an unacceptable risk to ski lifts or other improvements.

In reviewing these standards, I agree that the use of prescribed fire to manage vegetation in alpine ski areas is an appropriate management tool to be considered, and the revised Forest Plan reflects this decision.

### *Acid Deposition, Soil Productivity, and Water Quality Analysis*

Some commenters raised concerns about the adequacy of our acid deposition, soil productivity, and land suitability analysis relative to timber harvest. The analysis area for soil productivity and management of outstanding resource waters was also questioned. In the FEIS, we have redefined our analysis area for soils and expanded our discussion and analysis of these soil and water concerns. Additional information provided by commenters was reviewed and discussed with subject matter experts to determine if any adjustments in the timber management approach were necessary. I have considered this additional information, along with the outlined standards and guidelines and monitoring approach, and do not see a need to change our initial determination of which lands are classified as suitable for timber production.

### *Additions to Species Viability Evaluation (SVE) List*

Based on 2004 survey data and further peer review, six species (Brown's ameletid mayfly, third ameletid mayfly, *Arctostaphylos alpina*, *Carex exilis*, *Corallorhiza odontorhiza*, and *Epilobium anagallidifolium*) was added to the SVE list since the release of the DEIS. The potential for each alternative to impact these species is addressed in the Rare and Unique Features section and Appendix F of the FEIS.

### *Management Area 9.5 — Newly Acquired Lands*

The DEIS stated that newly acquired lands would be placed in a holding status (MA 9.5) pending an analysis to determine the land's management area prescription. Internal review indicated that allocating a management area to new lands at the time of acquisition would be more expedient than placing them in a holding area. As stated in the revised Plan, a new land acquisition will be allocated to the same management area as the surrounding National Forest land if it has similar attributes. If the land attributes are unique, or are different from the surrounding land, the acquired tract will be evaluated by an interdisciplinary team to decide its management area prescription. This meets the intent of MA 9.5 to allocate management area designations to new land acquisitions.

# Consistency with the Plans of Others

It is important that the management direction within the Revised Plan for the White Mountain National Forest be coordinated with the plans of other governments and agencies within the landscape. The following is not a complete list of local and regional plans considered in the forest planning process, but it does highlight some key plans that will be used during Forest Plan implementation.

## New Hampshire Comprehensive Wildlife Conservation Plan

Forest employees participated in broad policy discussions and detailed assessments of habitat conditions and potential threats to wildlife species during development of New Hampshire's Comprehensive Wildlife Conservation Plan (CWCP). The Forest Service worked with the New Hampshire Department of Fish and Game to ensure that both the CWCP and revised White Mountain Forest Plan presented consistent information concerning habitats on the Forest and threats that may impact those habitats. Strategies identified in the revised Forest Plan to address threats and conserve habitats should be consistent with approaches proposed in the CWCP.

## Northern Forest Lands Council

White Mountain National Forest employees have participated in the work sponsored by the State Foresters on the recent 10th Anniversary Forum of the Northern Forest Lands Council. This Report was recently endorsed by the governors of Maine, New Hampshire, Vermont, and New York. The four key recommendations of the forum report were considered in the revised Forest Plan in relation to the White Mountain National Forest's role in sustaining important social, economic, and environmental values from the Northern Forest Region.

## Forest Resources Plan and Best Management Practices

The Forest Service worked with the State of New Hampshire in developing the current New Hampshire Forest Resources Plan, and serves on a Forest Advisory board that advises the State Forester in implementing that plan. The Revised Plan for the White Mountain National Forest complements the ecologic approach taken by the State of New Hampshire, and is consistent with the vision identified in the state plan. The standards and guidelines within the Forest Plan are also consistent with the Best Management Practices Guidelines for the states of Maine and New Hampshire.

## Maine Comprehensive Land Use Plan

The Maine Land Use Regulation Commission (LURC) serves as the planning and zoning authority for the state's plantations and unorganized areas. Portions of the White Mountain National Forest are located within three unorganized townships in Maine. The Commission's Comprehensive Land Use Plan includes policies that provide alternatives to traditional regulatory

approaches where the state has a permitting role on National Forest land. The revised Forest Plan will undergo a review by the Land Use Regulation Commission to ascertain if the Plan can meet regulatory permitting requirements during its implementation. This approach was used in Maine over the last fifteen years under the 1986 Forest Plan, and has protected important resource values while providing an efficient regulatory process between two levels of government.

## Appalachian Trail Conservancy (ATC) Comprehensive Plan for the Protection, Management, Development, and Use of the Appalachian National Scenic Trail

Throughout the revision process, Forest Service and Appalachian Trail Conservancy employees met to discuss necessary coordination issues and the standards and guidelines for the management of the Appalachian Trail. I find the revised White Mountain Forest Plan to be consistent with the Comprehensive Plan for the Protection, Management, Development, and Use of the Appalachian National Scenic Trail.

# Consistency with Other National Policies, Laws, and Authorities

The Forest Service manages the White Mountain National Forest in conformance with many laws, regulations, executive orders, and policies. The list provided here does not include all governing statutes that apply to the Forest Plan revision, but it highlights the primary ones guiding the preparation of this plan revision. In all cases, the Revised Plan is consistent with national law, policy, and direction.

## National Environmental Policy Act (NEPA)

The Forest has compiled and considered an enormous amount of information relevant to the effects of each alternative analyzed in the Final Environmental Impact Statement. I believe that the best available and relevant scientific information has been considered. The public has been involved throughout the plan revision process in a manner that is far beyond the minimum requirements of NEPA. I find that the environmental analysis and public involvement process comply with the requirements set forth by the Council on Environmental Quality for implementing NEPA (40 CFR 1500-1508). These requirements include 1) considering a broad range of reasonable alternatives; 2) disclosing cumulative effects; 3) using best scientific information; 4) consideration of long-term and short-term effects; and 5) disclosure of unavoidable adverse effects.

The decision here does not directly authorize any new activities or projects, but rather activities and projects will be subject to additional site-specific environmental analysis that will tier to the Final Environmental Impact Statement and follow applicable environmental analysis, public involvement, and administrative appeal procedures.

The Revised Plan has adopted all practicable means to avoid or minimize environmental harm. These means include providing ecological conditions needed to support biological diversity, and standards and guidelines to mitigate adverse environmental effects that may result from implementing various management practices. The Revised Plan includes monitoring requirements and an adaptive management approach to assure needed adjustments are made over time.

### *Environmentally Preferable Alternative*

Regulations implementing NEPA also require the specification of "…the alternative or alternatives which were considered to be environmentally preferable." (40 CFR 1505.2(b)) I have reviewed the National Environmental Policy Act to determine the criteria for identifying the environmentally preferable alternative. All six criteria in NEPA (section 101(b)) were considered.

Based on review of the NEPA criteria for identifying the environmentally preferable alternative, I believe the Selected Alternative, Alternative 2, is environmentally preferable. This alternative best addresses the protection

and stewardship aspects of the criteria, while at the same time addressing those criteria which speak toward providing a balance between population and resource uses and attaining the widest range of beneficial uses of the environment without degradation. This alternative places top priority on conservation and recovery of threatened and endangered species.

## National Forest Management Act

When the White Mountain National Forest Plan revision effort began with the publication in the Federal Register of a Notice of Intent to prepare an Environmental Impact Statement for the Revised Plan, the Agency's 1982 planning regulations were in effect. On November 9, 2000, new planning rules were adopted. However, the 2000 planning rule allowed ongoing revisions to be completed under the 1982 rule if the revision had begun before the 2000 rule was issued. Subsequently, on January 5, 2005 a new planning rule was promulgated which replaced the 2000 rule. However, the transition provisions of the 2005 planning rule (36 CFR 219.14(e)) also allowed ongoing revisions to be completed under the rule that was in effect before November 9, 2000. Since the White Mountain National Forest had already released their Draft EIS and proposed Forest Plan before the new rule was released, I have decided they should proceed to completion of their Plan revision using the procedures of the 1982 planning rule.

The NFMA planning regulations specify a number of requirements that guide Forest Service planning. The Revised Plan complies with each of these management requirements, as explained in this Record of Decision, the accompanying Final Environmental Impact Statement and Appendices, and the planning Administrative Record.

The 1982 NFMA regulations require fish and wildlife habitat to be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area (36 CFR 219.19). A key part of Forest Plan revision was the evaluation of 242 species for viability concern.

Using an ecological or "coarse filter" approach, broad land categories containing wildlife habitat were identified. The magnitude of change in the abundance and quality of wildlife habitats likely to occur under the revised Forest Plan in the next decade is relatively small. Some changes in the quality and quantity of wildlife habitat will occur through natural succession and disturbances. These changes are not anticipated to create any viability concerns. The Forest also used a species, or "fine filter," analysis to assure that standards and guidelines were in place to provide for the needs of species identified as threatened, endangered, or sensitive. Programmatic Forest Plan direction was developed for use in future project decision-making to conserve habitat and avoid adverse effects of future management actions. The analysis presented in the FEIS indicates that there is a high likelihood of continued representation of all species and important wildlife habitats on the Forest under all alternatives.

Management Indicator Species (MIS) were chosen that, we believe, will respond to forest management activities and assist in predicting the effects of implementing the Forest Plan over time. The choice of MIS was based

upon experience as we implemented the 1986 Forest Plan and the best available scientific information. Monitoring and management experience has shown that some species that were selected as MIS in the previous plan were not good indicators. This was because they were habitat generalists, so were not very responsive to changes in management; they occurred on only a small portion of the Forest so were of limited use in indicating overall effects; or they were difficult to find , so that regular monitoring was either impossible or unreliable.

MIS are just one part of the overall monitoring effort. Species that are not designated as MIS may still be monitored. Recognizing the discretion provided by the 1982 NFMA regulations (36 CFR 219.19(a)(1)), the Forest carefully selected MIS that will meet the intent of the NFMA regulation, but not impose an unattainable or unnecessarily burdensome monitoring requirement on the Forest.

NFMA requires that forest plans identify the proportion of harvest methods that are proposed or probable for implementation. The Forest analyzed possible harvest methods, and the revised Forest Plan includes a forecast of the methods that are likely to be chosen as the plan is implemented. The revised Forest Plan does not mandate any particular harvest method to be applied for any specific project. The choice of when, where, and how to harvest timber is appropriately reserved as a future, site-specific decision.

The 1982 Planning Rule requires identification of the alternative that maximizes the present net value (PNV) and how the Selected Alternative compares to this alternative. According to the economic analysis displayed in the Final Environmental Impact Statement, Alternative 2 maximizes PNV due to the mix of products and services provided and the treatments and management actions prescribed.

## Endangered Species Act

The Endangered Species Act creates an affirmative obligation "…that all Federal departments and agencies shall seek to conserve endangered and threatened (and proposed) species" of fish, wildlife, and plants. This obligation is further clarified in the national Interagency Memorandum of Agreement (dated August 30, 2000) which states our shared mission to "…enhance conservation of imperiled species while delivering appropriate goods and services provided by the lands and resources."

The revised Forest Plan was developed with our responsibilities concerning conservation of listed species (section 7(a)(1) foremost in mind. Based upon consultation with the US Fish and Wildlife Service, I have determined that the Revised Plan is in compliance with the Endangered Species Act.

## Forest and Rangeland Renewable Resources Planning Act (RPA) and Forest Service Strategic Plan, 2004-2008

The procedures of the 1982 planning rule (36 CFR 219.12(f) (6)) require that at least one alternative be developed that responds to and incorporates the Resources Planning Act Program's tentative resource objectives for each National Forest, as displayed in Regional Guides. There is no longer a

**JA-0778**

PBWTAR_3653

Regional Guide for the Eastern Region; this was withdrawn on November 27, 2001, as required by the 2000 planning rule (36 CFR 219.35(e)). The Forest Service Strategic Plan 2004-2008, in lieu of a Resource Planning Act Program, was completed in accordance with the Government Performance Results Act and the Interior and Related Agencies Appropriations Act. While Forest Plans should be consistent with the broad guidance provided in the Strategic Plan and should consider the information provided by the Resource Planning Act Assessment along with other available and relevant science, neither the Strategic Plan nor the Assessment contain recommended outputs to incorporate in specific Forest Plans. I find the Revised Plan to be in compliance with the Forest Service Strategic Plan, and to contribute toward its goals, which are:

### *Reduce the risk from catastrophic wildland fire*

Fire, both prescribed and wildland, will be used as a tool to enhance ecosystem resiliency and to maintain desired fuel levels. Fire will play its natural role where appropriate and desirable, but will be actively suppressed where necessary to protect life, investments, and resources. Effects of wildland fire will be acceptable, and fire will operate within historical fire regimes appropriate to the vegetation type. Firefighter and public safety will be the first priority in every fire management activity.

### *Reduce the impacts from invasive species*

The Forest will remain as free of non-native invasive species as reasonably possible. A weed-free user's ethic will be encouraged in all resource area programs with potential to spread invasive species. While some invasive species may occasionally be found on the Forest, occurrences will not be so widespread as to cause negative impacts to native communities. The Forest Plan contains specific standards and guidelines to minimize impacts from invasive species.

### *Provide outdoor recreation opportunities*

Forest recreation management will provide a range of developed and dispersed recreation opportunities, protect low use developed and dispersed areas, emphasize concentrated dispersed use within high use corridors and destinations, and manage developed facilities to concentrate use within acceptable impacts and limits. The Forest Plan contains specific standards and guidelines to provide for recreation use while sustaining ecological processes and functions.

### *Help meet energy resource needs*

The Revised Plan provides direction that allows for energy development within the capabilities and sensitivities of specific landscapes across the Forest. The Forest will protect, improve, or mitigate energy development impacts on watersheds, riparian and aquatic habitats, visual integrity, and threatened, endangered, and sensitive species habitats.

### *Improve watershed condition*

Forest watersheds, streams, water dependent resources, and designated uses will be protected and restored by implementing practices designed to maintain or improve conditions. Streams will be managed at proper functioning condition to dissipate stream energy associated with high water flows, thereby decreasing erosion, reducing flood damage, and improving water quality. Watersheds will continue to provide high quality water for public water supplies, recreational activities, aquatic biota such as fish, and other purposes.

### *Mission related work that supports Forest Service Goals*

The revised Forest Plan was developed consistent with the overall laws and policies that guide the management of National Forests. It provides for human uses of the environment as well as sustaining ecological processes for future generations. It also includes standards and guidelines to protect, improve, or mitigate impacts to watersheds, riparian and aquatic habitats, visual integrity, and threatened, endangered, and sensitive species habitats. Monitoring and evaluation are incorporated to ensure an adaptive management approach that is consistent with land capability, scientific understanding, and expected outputs.

## Healthy Forest Restoration Act

In 2003, the Healthy Forest Restoration Act was signed into law. While the White Mountain National Forest is not dominated by fire-dependent ecosystems, I find the revised Plan is consistent with the Healthy Forest Restoration Act in that it provides for the protection of old growth when conducting covered projects, provides for public involvement in assessing and conducting hazardous fuels reduction projects, and prioritizes areas for hazardous fuels reduction based on condition class and fire regime. The Forest Plan also allows for appropriate responses to insect and disease concerns based on its overall land allocation process. The Revised Plan also emphasizes protection and enhancement of riparian areas and watershed health as directed under the Healthy Forest Restoration Act.

## Environmental Justice (Executive Order 12898)

Executive Order 12898 (59 Federal Register 7629, 1994) directs federal agencies to identify and address, as appropriate, any disproportionately high and adverse human health or environmental effects on minority populations and low-income populations. I have determined, from the analysis disclosed in the Final Environmental Impact Statement, that the Revised Plan is in compliance with Executive Order 12898.

## National Historic Preservation Act

The Revised Plan is a programmatic action and does not authorize any site-specific ground-disturbing activity. Projects undertaken in response to direction of the Revised Plan will fully comply with the laws and regulations that ensure protection of cultural resources. The Revised Plan contains

direction for cultural resource management, including direction to integrate cultural resource management with other resource management activities.

Several other laws apply to the preservation of cultural resources on federal land. Since the Revised Plan does not authorize ground-disturbing activities, consultation with the New Hampshire and Maine State Historic Preservation Offices (SHPOs) under the NHPA is not required. Tribal consultation has taken place during the development of this Revised Plan.

It is my determination that the Revised Plan complies with the National Historic Preservation Act and other statutes that pertain to the protection of cultural resources.

## Government-to-Government Relations with Native American Tribal Government, 1994

These policies support the Forest Service actions in establishing mutual and beneficial partnerships with American Indians and Alaska Natives and honoring treaty obligations. The Revised Plan is consistent with Forest Service policy in Forest Service Manual section 1563.

## Data Quality Act

The Data Quality Act and its federal guidelines concern the quality of information used in the work of federal agencies. The revised Forest Plan and its accompanying EIS were developed by an interdisciplinary team of agency scientists and resource specialists using the best available scientific information. Data quality was a paramount concern, as the objectivity and quality of scientific data is key to development of a realistic resource plan. The interdisciplinary team was aware of USDA information guidelines and devoted considerable effort towards ensuring that the information used in Plan development was credible and appropriate for the context. Scientific information was solicited from other federal agencies, state resource agencies, and other recognized experts and scientists. Although the USDA Data Quality Act guidelines are not intended to be legally binding regulations, they wee carefully considered during development of the revised Forest Plan and EIS.

## Other Laws, Policy and Regulations

I also find that the Final Environmental Impact Statement and the Revised Plan are consistent with the following body of policy and regulation: the National Energy Policy Act (Executive Order 13212 of May 18, 2001), The National Energy Policy Act of 2005, the Transportation Rule and Policy, the Clean Air Act, the Clean Water Act, the Migratory Bird Treaty Act, the Energy Requirement and Conservation Potential, Executive Order 13112 on Invasive Species, Secretary of Agriculture's Memorandum #1827 on Prime Farmland, Rangeland and Forestland, Executive Order 1099 on the Protection of Wetlands and Floodplains, and the existing body of national direction for managing National Forests.

# Implementation, Monitoring, Evaluation

## Implementation Begins in 30 Days

The Revised Plan becomes effective 30 calendar days after the Notice of Availability of the Record of Decision and Final Environmental Impact Statement is published in the Federal Register (36 CFR 219.10 (c)(1)). Implementation of the Revised Plan will be accomplished and tracked through the management direction detailed in Chapters 2 and 3 of the Revised Plan. The desired conditions and objectives in Chapters 2 and 3 will be used to help design the Forest's annual program of work and budget requests.

## Transition from 1986 Plan to Revised Plan

Revised Plan direction will apply to all projects that have decisions made on or after the effective date of this Record of Decision. Because this was a revision of the 1986 White Mountain Forest Plan, many aspects and much management direction from the 1986 Plan are carried forward relatively unchanged into the Revised Plan. Therefore, many existing projects and ongoing actions that were consistent with the 1986 Plan will continue to be so with the Revised Plan.

Many management actions decided prior to issuance of the Record of Decision are routine and ongoing. Those decisions are generally allowed to continue unchanged because the projected effects of the actions are part of the baseline analysis considered in the Final Environmental Impact Statement and Biological Assessments for the revision.

The National Forest Management Act requires that "permits, contracts and other instruments for use and occupancy" of National Forest System lands be "consistent" with the Forest Plan (16 U.S.C. 1640(i)). In the context of a Revised Plan, the National Forest Management Act specifically conditions this requirement in three ways:

- These documents must be revised only "when necessary";
- These documents must be revised as "soon as practicable";
- Any revisions are "subject to valid existing rights."

I have decided not to modify any existing timber sale contracts solely due to the Revised Plan. These contracts will be executed according to their terms, and these effects and conditions were considered in the Final Environmental Impact Statement. Existing timber contracts, in most cases, will be completed within three years. The decision is left to the Forest Supervisor to determine whether to modify decisions authorizing timber sales not currently under contract.

Other use and occupancy agreements are substantially longer than timber contracts, and will be reviewed to determine whether or when the Forest Supervisor should exercise discretion to bring them into compliance with the Revised Plan. Recent project decisions that have not yet been

implemented will be reviewed and adjusted by the decision maker, if necessary, to meet the direction found in the Revised Plan.

The decision maker has the discretion, on a case-by-case basis, to modify preexisting authorizations to bring them into compliance with the Revised Plan standards and guidelines. I find that the statutory criteria of "as soon as practicable" and excepting "valid existing rights" useful in exercising that discretion.

## Key Considerations in Plan Implementation

The Revised Plan provides broad, strategic, landscape-level direction for managing the White Mountain National Forest. Working toward the desired conditions and achieving the objectives in the Revised Plan will be accomplished through site-specific project decisions, using the appropriate analyses and processes to meet the requirements of the National Environmental Policy Act and other laws and regulations. The Revised Plan itself makes no project-level decisions

The Final Environmental Impact Statement for the Revised Plan considered and evaluated the total management program that likely would be necessary to implement the objectives of the Revised Plan. It also dealt with those issues and concerns relevant at a larger landscape or Forest-wide level. Therefore, in essence, the Final Environmental Impact Statement is a large cumulative effects document because it analyzes the total of activities that may be expected in the first decade (and longer term), and discloses the Forest-wide effects of those activities considered in total.

By tiering to the Final Environmental Impact Statement for this Plan revision, we will make use of this Forest-wide analysis to streamline our environmental analyses for project-level decisions. We will not revisit landscape or Forest-wide scale issues and effects, because those effects have already been considered and disclosed in the Final Environmental Impact Statement. This has applicability to a wide range of findings that are appropriately done at the Forest-wide level. Analysis and findings related to species viability and threatened species should be greatly simplified when projects are within the parameters of the Revised Plan and Final EIS. Project-level analysis will not revisit Plan decisions, but rather will determine which management techniques (if any) and mitigations (beyond those in the Revised Plan) are best suited to the site being analyzed.

## Future Changes to the Plan

### *Monitoring and Evaluation*

Monitoring is designed to answer questions regarding implementation of the revised Forest Plan. Monitoring and evaluation will focus on decisions made in this Record of Decision.

Evaluation reports will display how Forest Plan decisions have been implemented, how effective the implementation has proved to be in accomplishing desired outcomes, and what we learned along the way. This

will allow a check and review of the validity of the assumptions upon which this decision is based.

The Monitoring Framework in Chapter 4 ties well with the strategic nature of Forest Plans, with increasing specificity as the Plan is stepped down to specific projects. More specific monitoring methods, protocols, and analytical procedures will be included in a monitoring and evaluation implementation guide, as needed.

### *Amending the Forest Plan*

The revision of this Forest Plan is shaped by a central idea: how we manage the Forest should adapt to changes in how we understand the ecological, social, and economic environments. In the Forest Service, we call this adaptive management. The Revised Plan is well structured for adaptive management to occur, because it does a good job of describing the desired conditions toward which we will strive as we implement the Plan. In fact, those desired conditions are the very basis for the projects we will accomplish during the life of the Plan.

In making the decision on the Revised Plan, I am also deciding that this Plan will be adaptive and subject to change as we monitor, learn, and gain new information. I hope that you choose to be partners with us in our monitoring, learning, and adapting. The revision of the White Mountain National Forest Plan has taken many years, and has incorporated much that has been learned since the 1986 Plan and even as the Revised Plan was being developed. However, as I have said before, this Plan can still be improved as we learn more about complex ecosystem functions and processes. Neither is it cast in stone to be unquestioningly adhered to for the next 10-15 years. We will track progress toward reaching the desired conditions identified in the Plan, and modify or reformulate management actions in response to that progress. If a particular management strategy, technique, or practice is applied, its results will be monitored to see if the desired effect is occurring, and if not, a modified or new strategy will be developed and implemented. That new strategy will also be subject to monitoring, evaluation, and, if needed, change.

Changes to the Plan will generally take the form of plan amendments or corrections, and will follow the appropriate procedures as specified in National Forest Management Act and its regulations.

# Administrative Appeal of My Decision

This decision is subject to appeal pursuant to the provisions of 36 CFR 217.3. A written notice of appeal must be filed with the Chief of the Forest Service within 90 days of the date that legal notice of this decision appears in the Milwaukee Journal Sentinel. Appeals must be sent to:

**Regular Mail**
USDA Forest Service Ecosystem Management Coordination
1400 Independence Ave., SW
Mailstop Code 1104
Washington DC, 20250-1104

**Express Mail**
USDA Forest Service
Ecosystem Management Coordination
201 14th Street, SW, 3rd Floor, Central Wing
Washington DC 20024
Phone: (202) 205-0895

A copy of the appeal must simultaneously be sent to the deciding officer:

Regional Forester of the Eastern Region
USDA Forest Service
Eastern Region
626 East Wisconsin Avenue
Milwaukee, WI 53202

Any notice of appeal must be fully consistent with 36 CFR 217.9 and include at a minimum:

- A statement that the document is a Notice of Appeal filed pursuant to 36 CFR Part 217.
- The name, address, and telephone number of the appellant.
- Identification of the decision to which the objection is being made.
- Identification of the document in which the decision is contained, by title and subject.
- Date of the decision, and name and title of the deciding officer.
- Identification of the specific portion of the decision to which objection is made.
- The reason for the appeal, including issues of fact, law, regulation, or policy.
- Identification of the specific change(s) in the decision that the appellant seeks.

## Contacts

More information on this decision, the revised White Mountain National Forest Land and Resource Management Plan, and the White Mountain National Forest Final Environmental Impact Statement can be obtained by contacting:

| | | | | |
|---|---|---|---|---|
| Thomas G. Wagner | or | Barbara Levesque | or | Alexis Jackson |
| Forest Supervisor | | Forest Planner | | Public Affairs Officer |
| (603) 528-8774 | | (603) 528-8743 | | (603) 528-8724 |

719 Main Street
Laconia, NH 03264

Electronic copies of the Final Environmental Impact Statement, the Executive Summary, the Revised Plan, and the Record of Decision can be obtained at: www.fs.fed.us/r9/white

**9/13/05**

**Randy Moore, Regional Forester** **Date**

UNITED STATES DEPARTMENT OF AGRICULTURE

# Peabody West Integrated Resource Project

White Mountain National Forest, Androscoggin Ranger District
December 2019

## GREETINGS!

This newsletter is a new format I am trying out to share information about projects. It is intended to give a brief overview of why we are developing this project, what actions we propose, and what results we would like to see on the ground. Your comments about the project are welcome during this initial scoping period. There will be another opportunity to provide comments in the future, once we have completed our analysis on the proposed action and any alternatives.

Figure 1. Project Location Map

Vicinity Map
Project Location
Vermont
White Mountain National Forest
Maine
New Hampshire

### Where is this project?

The Peabody West Integrated Resource Project, or Peabody West Project, is on National Forest System lands in the Androscoggin Ranger District of the White Mountain National Forest (WMNF). The project is in Gorham, Greens Grant, Martins Location, Randolph, and Sargents in Coos County, New Hampshire (Figure 1).

### Why are we proposing this project?

The primary focus of the Peabody West Project is to implement the management direction in the 2005 WMNF Land and Resource Management Plan (Forest Plan) by comparing the existing conditions in the project area with the desired conditions established in the Forest Plan. The purpose and need for action, and the proposed project activities, are described in this document. Additional project information is available on the project website: https://www.fs.usda.gov/project/?project=55659.

Please send me your thoughts or concerns about this project. I also welcome comments about this newsletter format.

*- Jennifer Barnhart, Androscoggin District Ranger*

quality recreation opportunities consistent with the Forest Plan and Recreation Opportunity Spectrum assigned to lands within the project area. In addition, in 2015 the WMNF completed a Forest-wide Transportation Analysis Process that included long-term recommendations for administration of the Forest transportation system. This project is needed to complete a site-specific transportation analysis to review and implement or modify the 2015 recommendations within the project area.

## PROJECT-LEVEL OBJECTIVES

- Provide sustainably managed forest products to benefit local economies and communities
- Meet project-level wildlife habitat objectives:
  - In the long-term, increase spruce-fir habitat
  - Increase age-class diversity and foster the regeneration of stands
  - Maintain or increase aspen-birch habitat
  - Maintain current levels of hemlock within stands
  - Gradually convert stands situated on non-compatible Ecological Lands Types to forest types consistent with land capability
  - Expand existing Hayes Copp 45 and Spring Brook permanent wildlife openings
- Complete a site-specific assessment of the transportation system for public and administrative access
- Improve recreational opportunities and visitor access and address resource and safety concerns

## PROPOSED PROJECT ACTIVITIES

The WMNF proposes to conduct the following activities to address the need for management in the project area. Applicable Forest Plan Standards and Guidelines and National Core and New Hampshire Best Management Practices (BMPs) would be implemented under the proposed action. Project-specific measures to avoid, minimize, or mitigate known or potential adverse effects from the proposed project activities would be developed during the environmental analysis process. As the project progresses, resource specialists will gather additional information, including public input, to further refine the project's objectives and more fully develop the proposed action. The proposed project is expected to be implemented starting in 2022. The proposed project activities are described below.

### Vegetation and Wildlife Habitat Management

The WMNF proposes to conduct commercial and non-commercial silvicultural treatments within about 4,500 acres of forested stands in the project area. All proposed timber harvest activities are on MA 2.1 lands in the Peabody HMU. Each stand has site-specific objectives to improve habitat conditions and the vigor, health and diversity of forest vegetation. Additional field reconnaissance would be conducted prior to finalizing the stand acres and boundaries and modifications would be made to account for specific ground conditions (e.g., wet areas, steep or rocky slopes, and forest type changes). In addition, the stand acres may be modified to meet visual and water quality objectives, to account for the incorporation of reserve patches of uncut trees in final-harvest stands, and to include protective buffers around features such as vernal pools, cultural resources, nest trees, and riparian zones.

A range of silvicultural treatments (Table 2) would be used to provide commercial wood products; create openings of various sizes in the forest to allow regeneration of trees and other vegetation and increase wildlife habitat diversity; provide additional growing space to enhance crown and bole development; and encourage the establishment of shade-intolerant species in the understory. The proposed action would include specific silvicultural strategies tied to objectives such as retaining the existing disease free mast producing trees for wildlife, implementing silvicultural treatments that discourage beech regeneration, and removing beech saplings during treatment to reduce their dominance in the new stand. For more information on general forest management, visit the WMNF Story Map at http://tinyurl.com/WMNF12345.

Table 2. Proposed silvicultural treatments with approximate acres.

| Silvicultural Treatment | Harvest Method[1] | Estimated Acres[2] |
|---|---|---|
| **Even-Aged Regeneration** | Clearcut with Reserves | 460 |
| | Commercial Thinning | 30 |
| | Patch Clearcut | 220 |
| | Overstory Removal | 360 |
| | Seed Tree | 330 |
| | Shelterwood | 35 |
| **Uneven-Aged Regeneration** | Group Selection | 20 |
| | Single Tree Selection | 550 |
| | Single Tree Selection/Group Selection Combined | 2,480 |
| **Wildlife Opening Expansions** | Patch Clearcut | 15 |
| | Total Acres | 4,500 |

1 Descriptions of harvest methods can be found in the Forest Plan Glossary.

2 Estimated treatment acres include reserve patches of uncut trees, as well as protective buffers for vernal pools, streams and riparian zones, cultural resources, nest trees, and other sensitive resources as needed.

## Pine Mountain Glade Skiing

The WMNF proposes to construct a backcountry glade skiing area on Pine Mountain. Granite Backcountry Alliance maintains a glade known as Bill Hill on land adjacent to the Forest that is owned by the Gorham Land Company. The WMNF proposes designating about 360 acres of National Forest System land uphill from the existing glade as a backcountry ski zone. Within this zone, gladed skiing terrain would be developed in up to five braided lines (Figure 3). The glade would be built and maintained to the same standards as the South Baldface and Maple Villa glades on the WMNF.

Figure 3. Diagram of sample gladed skiing terrain layout

## Hermit Lake Complex

The WMNF proposes to decommission three of the historic USFS design 12-Man Adirondack Shelters to address safety concerns and one of the historic USFS design 8-Man Adirondack Shelters to address water quality concerns. One of the 12-Man Adirondack Shelters would be rehabilitated to preserve the historic design and address safety concerns. Up to three wooden or mineral tent platforms would be constructed near the existing tent platforms. A Mahoosuc-style or other shelter designed for heavy snow loads would be constructed of native materials to offset some of the reduction in capacity resulting from shelter decommissioning and to provide a shelter for winter use. A four-bay and up to 2 two-bay composting toilet systems would be constructed and the existing water tower and toilets (summer, winter, vault, barrel) would be decommissioned. The Hermit Lake complex, most of which was constructed in the 1960s, would be evaluated for historic significance and the Forest would seek public input on potential mitigation measures for any adverse effect to historic properties in consultation with the State Historic Preservation Office.

## Third Hole Access Improvements

The WMNF proposes to improve accessibility to the Third Hole swimming location by creating a trail to Third Hole which meets Forest Service accessibility standards. Incidental (i.e., social) trails accessing the Third Hole location would be decommissioned and restored.

| Commenter | CommentText | ResponseText |
|---|---|---|
| Amato, Fernando | Unless these shelters pose a danger or are beyond repair I urge you to keep or repair them for backcountry skiers or hikers to use. Having shelter options can really be beneficial and ease some of the travel for many of us especially in the more challenging weather conditions. Thanks for all you do and I hope these remain in place. | The shelters proposed to be removed are not designed for the snow loads found at higher elevations in the White Mountains. Over the modifications have been made to keep some of these structures from collapsing under the weight of heavy winter snows. Shelter 6 has couple of years now and has been heavily modified with bracing that is still inadequate to alleviate concerns of collapse. Leaving these s not resolve the structural issues. The need to close the shelters results in perpetual reductions in overnight capacity.<br><br>Alternative 1 was considered early in the project process. Alternative 1 would have constructed up to two 4 sided, enclosed cabins to he capacity resulting from other proposed activities at Hermit Lake. In addition, the construction of tent platforms would address the incre tent platforms during the summer months. However, following further evaluation, the responsible official has decided to dismiss an alte cabins from further evaluation. Because the Hermit Lake Complex is an eligible historic district, and because the project needs could be (e.g., reconstructing the existing shelters), the alternative to construct cabins is being dismissed to minimize unnecessary impacts to hist Removing this alternative from consideration at this time does not preclude the Forest Service from proposing a simi ar project in the fu |
| Arduser, Bill | Do not get rid of the Hermit lake shelters. Those are very important and useful winter shelters for backcountry skiers. | The shelters proposed to be removed are not designed for the snow loads found at higher elevations in the White Mountains. Over the modifications have been made to keep some of these structures from collapsing under the weight of heavy winter snows. Shelter 6 has couple of years now and has been heavily modified with bracing that is still inadequate to alleviate concerns of collapse. Leaving these s not resolve the structural issues. The need to close the shelters results in perpetual reductions in overnight capacity.<br><br>Alternative 1 was considered early in the project process. Alternative 1 would have constructed up to two 4 sided, enclosed cabins to he capacity resulting from other proposed activities at Hermit Lake. In addition, the construction of tent platforms would address the incre tent platforms during the summer months. However, following further evaluation, the responsible official has decided to dismiss an alte cabins from further evaluation. Because the Hermit Lake Complex is an eligible historic district, and because the project needs could be (e.g., reconstructing the existing shelters), the alternative to construct cabins is being dismissed to minimize unnecessary impacts to hist Removing this alternative from consideration at this time does not preclude the Forest Service from proposing a simi ar project in the fu |
| Benchimol, Peter | These shelters are a critical part of my annual pilgrimage to Tuckerman ravine for early season ice climbing and mountaineering. Typically, a group of 4-5 of us will drive up from New York the weekend before thanksgiving and climb in this alpine playground before it fills with snow. They provide a service to many other like minded alpinists and skiers in the winter months. Traditional three sided shelters lack the adequate protection provided by the sliding doors. Please do not remove these | The shelters proposed to be removed are not designed for the snow loads found at higher elevations in the White Mountains. Over the modifications have been made to keep some of these structures from collapsing under the weight of heavy winter snows. Shelter 6 has couple of years now and has been heavily modified with bracing that is still inadequate to alleviate concerns of collapse. Leaving these s not resolve the structural issues. The need to close the shelters results in perpetual reductions in overnight capacity.<br><br>Alternative 1 was considered early in the project process. Alternative 1 would have constructed up to two 4 sided, enclosed cabins to he capacity resulting from other proposed activities at Hermit Lake. In addition, the construction of tent platforms would address the incre tent platforms during the summer months. However, following further evaluation, the responsible official has decided to dismiss an alte cabins from further evaluation. Because the Hermit Lake Complex is an eligible historic district, and because the project needs could be (e.g., reconstructing the existing shelters), the alternative to construct cabins is being dismissed to minimize unnecessary impacts to hist Removing this alternative from consideration at this time does not preclude the Forest Service from proposing a simi ar project in the fu |
| Carter, Matthew | Please do not remove the shelters. It is my favorite spot to camp with friends and family before ice climbing and skiing. If it's removed I will likely have no reason to visit NH to camp, shop and provide tax revenue. | The shelters proposed to be removed are not designed for the snow loads found at higher elevations in the White Mountains. Over the modifications have been made to keep some of these structures from collapsing under the weight of heavy winter snows. Shelter 6 has couple of years now and has been heavily modified with bracing that is still inadequate to alleviate concerns of collapse. Leaving these s not resolve the structural issues. The need to close the shelters results in perpetual reductions in overnight capacity.<br><br>Alternative 1 was considered early in the project process. Alternative 1 would have constructed up to two 4 sided, enclosed cabins to he capacity resulting from other proposed activities at Hermit Lake. In addition, the construction of tent platforms would address the incre tent platforms during the summer months. However, following further evaluation, the responsible official has decided to dismiss an alte cabins from further evaluation. Because the Hermit Lake Complex is an eligible historic district, and because the project needs could be (e.g., reconstructing the existing shelters), the alternative to construct cabins is being dismissed to minimize unnecessary impacts to hist Removing this alternative from consideration at this time does not preclude the Forest Service from proposing a similar project in the fu |
| Chisena, Daniel | Please do not remove the sliding doors on the Hermit Lake lean-tos. These have been a life saver on some winter camp outs in the shelters blocking high winds. | The shelters proposed to be removed are not designed for the snow loads found at higher elevations in the White Mountains. Over the modifications have been made to keep some of these structures from collapsing under the weight of heavy winter snows. Shelter 6 has couple of years now and has been heavily modified with bracing that is still inadequate to alleviate concerns of collapse. Leaving these s not resolve the structural issues. The need to close the shelters results in perpetual reductions in overnight capacity.<br><br>Alternative 1 was considered early in the project process. Alternative 1 would have constructed up to two 4 sided, enclosed cabins to he capacity resulting from other proposed activities at Hermit Lake. In addition, the construction of tent platforms would address the incre tent platforms during the summer months. However, following further evaluation, the responsible official has decided to dismiss an alte cabins from further evaluation. Because the Hermit Lake Complex is an eligible historic district, and because the project needs could be (e.g., reconstructing the existing shelters), the alternative to construct cabins is being dismissed to minimize unnecessary impacts to hist Removing this alternative from consideration at this time does not preclude the Forest Service from proposing a similar project in the fu |
| Cole, Swenson | I am excited to see the mountain bike trail build in the Peabody West project. I am hoping this project could connect up with the trail system at Great Glen Trails and eventually up to AMC. This could create great opportunities to connect all of that history back to Gorham. People could ride (not drive) from Gorham and grab lunch in the Notch and ride back- it would be a special experience. The same could happen in the winter- ski from Gorham all the way to GGT or AMC. It would be even better if it could be (at least one trail) groomed in the winter. It would open up how many people could access this great area. Thank you. | Based on additional internal review by the interdisciplinary project team and the responsible official, the scope of the proposed mounta revised, as per the scoping document released March 26, 2021. The current proposal would include a trail starting at the north end of th Pine Mountain and connecting to the Hayes Copp ski network. A multi-use trail to the Great Glen area is outside the scope of the curren addition, largely due to issues with Forest Plan compliance, groomed winter use is not being considered for the mountain bike trail at th |
| David, Backler | I am writing in support of the Peabody West project. As a resident of Gorham, I am in support of the concept of "A Trail for Everyone" and this project goes toward this idea. The expansion of Mountain Biking and Backcountry skiing are positive aspects of our community. I am hopeful that this project can be seen through. | Commenters express general support for the project or agreement with stated need. No further response required. |

# Peabody West Integrated Resource Project Scoping Summary Report

July 2021

## Summary of Public Involvement to Date

This document provides a summary of the public involvement process and comments received during the scoping period for the proposed Peabody West Integrated Resource Project (Peabody West Project). In March 2019, the White Mountain National Forest (WMNF) announced the conceptual Peabody West Project. The conceptual project was published on the Forest Service's schedule of proposed actions (SOPA) in April 2019 and a proposal development open house was held on April 9, 2019. On December 6, 2019, the WMNF initiated a scoping comment period for the Peabody West Project. A notice of the availability of the scoping newsletter and request for comments was sent to over 450 parties and published in the Berlin Sun. This scoping comment period closed on January 10, 2020. An additional scoping comment period with an updated project proposal began on March 26, 2021, and closed April 28, 2021. Notice of this additional scoping comment period with an updated project proposal was sent to over 650 parties.

The Forest received 53 unique comment letters in total from interested parties during the two scoping comment periods. All comment letters were reviewed by the project team and are saved in the project record.

## Next Steps

Comments are used to help the project team refine the proposed action, evaluate potential alternatives, identify relevant issues for analysis, develop project design elements or other minimization measures, and refine the environmental analysis. Table 1 provides a representative summary of the range of comments received, organized by general resource area or topic.

The project team is currently completing resource analyses and developing the draft environmental assessment for the Peabody West Project. Another opportunity for public engagement will occur during the 30-day public comment period for the draft environmental assessment which is planned for early 2022.

# Summary of Comments Received

**Table 1. Summary of comments received, organized by general resource area or topic. Original comment letters are filed in the project record.**

| Resource/Topic | Summary of Comments[1] |
|---|---|
| Forest Plan Inventoried Roadless Areas | • The Forest should limit vegetation management in Forest Plan inventoried roadless areas to those areas accessible from the existing road system. |
| Bike Trails | • The proposed new mountain bike trails should include a corridor between Great Glen Trails, Dolly Copp, and the Town of Gorham.<br>• Trails should be designed for accessibility, and wide enough to accommodate groomers for non-motorized winter use and two-way pedestrian use.<br>• The proposed new mountain bike trails should be groomed for winter non-motorized use.<br>• The proposed bike trail should not use a portion of the existing snowmobile trail but should include a separate one-mile segment in that area. |
| Hermit Lake Complex | • The shelters proposed for decommissioning at the Hermit Lake Complex should be retained and repaired or replaced in-kind.<br>• The layout for the Hermit Lake Complex should minimize the potential for social trails and environmental impact, while maintaining adequate capacity for year-round demand.<br>• The proposed project should include construction of at least one four-walled heated cabin at Hermit Lake Complex to meet user needs.<br>• Shelter 8 should be retained and rehabilitated to the extent practicable because it provides a unique recreational and cultural (historic) experience. |
| Recreation (General) | • The proposed project should include additional parking areas to support recreation infrastructure.<br>• The Bear Springs snowmobile trail should not be closed during winter timber harvest operations. |
| Transportation System | • The Forest Service should examine an alternative that does not include new road construction. |
| Vegetation Management | • The proposed project should not conduct timber harvesting.<br>• The proposed project should not include clearcuts because of potential scenery impacts. |
| General Comments or Statements of Support/Opposition | • Statements of opinion generally in favor of or opposing the proposed project or its components without substantive rationale.<br>• Questions or statements regarding clarification of project components, locations, and acres.<br>• Questions regarding definitions of Forest Service terms.<br>• Other requests for clarifications or editorial corrections. |
| Issues Already Addressed or Required by Other Law, Regulation, or Policy | • The WMNF should evaluate impacts to wildlife and other resources resulting from the proposed recreation management activities.<br>• The Hermit Lake Complex should be evaluated for impacts to historic properties. |

JA-0792

[1] Summary provides a broad overview of the range of comments received and is not intended to represent specific, individual comments.

| Resource/Topic | Summary of Comments[1] |
| --- | --- |
| Beyond the Scope of the Current Proposal | • The Graham Trail should be recognized and maintained as a winter-only trail.<br>• The proposed project should include management of backcountry ski glades outside of the proposed Pine Mountain Glade area.<br>• The proposed project should include additional scenic pullouts.<br>• The Bear Springs snowmobile trail should not be relocated around the Spring Brook permanent wildlife opening.[2]<br>• The Spring Brook permanent wildlife opening should be reconfigured so that it no longer overlaps the Bear Springs snowmobile trail rather than relocating the trail.[2] |
| Not relevant to the decision to be made | • Requests for additional coordination with local user groups regarding trails management or other activities.<br>• Questions or comments regarding program budgets.<br>• Questions or comments regarding the status of other projects or infrastructure.<br>• Questions or comments regarding law enforcement and emergency response activities.<br>• General comments regarding document format or technology used for public involvement. |

JA-0793

[2] The proposed Bear Springs snowmobile trail relocation around the Spring Brook permanent wildlife opening was removed from the current proposal following the initial scoping period.

| | |
|---|---|
| **From:** | Barnhart, Jennifer J -FS |
| **To:** | Benna, Tiffany T -FS; Jordan, Sarah C -FS; Burnett, Jennifer -FS; Pellerin, Travis J -FS; Carus, Franklin S -FS; Dockens, Johnida - FS; FS-WMNF FLT Conference Call Line/Conference Line/R9 WHITEMTN; Leberman, Marianne -FS; FS-WMNF Skookumchuck Conference Room-FHQ/R9 WHITEMTN; Mckenny, Heather - FS |
| **Cc:** | Taliaferro, Diane -FS |
| **Subject:** | REMINDER: Discussion of Hermit Lake Proposal - Wed. Oct. 30th 9:30am - 11am |
| **Date:** | Tuesday, October 29, 2019 5:11:25 PM |
| **Attachments:** | hand drawn site map.jpg<br>Hermit Lake complex landscape drawing 20170621-1151.pdf<br>Hermit Lakes proposal V3.docx<br>image001.png<br>image002.png<br>image003.png<br>image004.png<br>RE Hermit Lake conceptual plans.msg |

Good Afternoon,

Friendly reminder that tomorrow (Wed. Oct. 30th), we have our meeting related to discussing the attached USFS proposal for Hermit Lake in relation to resource protection issues and safety/health issues. This is being considered as potentially being part of the Peabody IRP.

*A reminder that AMC has a special use permit to operate the Hermit Lake Complex, which is a permit that is signed at the Forest Supervisor level.

VTC - Tecumseh Conference Room & FLT Conference Line 1-888-844-9904 Access: 9175894#

The objective of the meeting is to allow for all perspectives to be heard related to the proposal so a decision can be made for the Hermit Lake proposal to go forward or not in the Peabody IRP Scoping (expected to go out in November). Jen will be following up with Diane after the meeting and will provide an overview of the proposal and input received in the meeting.

- Meeting Objectives & Agenda (Jen Barnhart)
- Overview of the Proposal (Frank Carus)
- Questions/comments on the proposal (All)
- Next steps

Please review the attached proposal prepared by Frank related to the purpose and need for action to protect resources and safety concerns in that area. I have attached Sarah's input prior to this proposal in relation to cultural heritage aspects of the Hermit Lake complex.

Jen

**Jen Barnhart**
**District Ranger**
**Forest Service**
**White Mountain National Forest,**
**Androscoggin Ranger District**

**p: 603-466-2713 ext. 1210**
**f: 603-466-2856**
**[jennifer.barnhart@usda.gov](mailto:jennifer.barnhart@usda.gov)**

300 Glen Rd.
Gorham, NH 03581-1399
[www.fs.fed.us](http://www.fs.fed.us)

**Caring for the land and serving people**

***Note New Email Address**

---

**From:** Carus, Franklin S -FS <franklin.s.carus@usda.gov>
**Sent:** Monday, October 21, 2019 6:53 AM
**To:** Barnhart, Jennifer J -FS <jennifer.barnhart@usda.gov>; Pellerin, Travis J -FS <travis.pellerin@usda.gov>
**Subject:** RE: Hermit Lake facilities

The complexity of any new layout or buildings seems best addressed in person with the landscape design map projected onto a white board where we can more easily visualize the pro's and con's of any proposed changes.

---

**From:** Barnhart, Jennifer J -FS
**Sent:** Wednesday, October 16, 2019 3:41 PM
**To:** Carus, Franklin S -FS <franklin.s.carus@usda.gov>; Pellerin, Travis J -FS <travis.pellerin@usda.gov>
**Subject:** RE: Hermit Lake facilities

Hi Frank,

Can you send me the final version for Hermit Lake proposal?

Jen

**Jen Barnhart**
**District Ranger**

**Forest Service**
**White Mountain National Forest,**
**Androscoggin Ranger District**

**p: 603-466-2713 ext. 1210**
**f: 603-466-2856**
**[jennifer.barnhart@usda.gov](mailto:jennifer.barnhart@usda.gov)**

300 Glen Rd.
Gorham, NH 03581-1399
[www.fs.fed.us](http://www.fs.fed.us)

**Caring for the land and serving people**

***Note New Email Address**

---

**From:** Carus, Franklin S -FS <franklin.s.carus@usda.gov>
**Sent:** Thursday, September 26, 2019 1:47 PM
**To:** Barnhart, Jennifer J -FS <jennifer.barnhart@usda.gov>; Pellerin, Travis J -FS <travis.pellerin@usda.gov>
**Subject:** Re: Hermit Lake facilities

I have revised these documents significantly and hope to have the improved version to you by COB tomorrow.

Frank Carus
Director, USFS Mount Washington Avalanche Center
300 Glen Road
Gorham, NH 03581
603-915-2838

---

**From:** Carus, Franklin S -FS
**Sent:** Tuesday, September 24, 2019 3:29:58 PM
**To:** Barnhart, Jennifer J -FS <jennifer.barnhart@usda.gov>; Pellerin, Travis J -FS <travis.pellerin@usda.gov>
**Subject:** Hermit Lake facilities

Please provide feedback or suggestions for improvement. There are a lot of moving pieces here. I will plan to print a landscape drawing to use at a meeting to help clarify the options.

**Franklin Carus, Lead Snow Ranger/Avalanche Specialist**
**Director, Mount Washington Avalanche Center**
**Forest Service**
**White Mountain National Forest,**
**Androscoggin Ranger District**
**p: 603-466-2713 x1215**
**work cell: 603-915-2838 c: 603-662-8684**
**franklin.s.carus@usda.gov**
300 Glen Road
Gorham, NH 03581
www.fs.fed.us
**Caring for the land and serving people**

58
59
61
90
89
88
94
79
78
67

**Gail Wigler**
**Forester**

**Forest Service**
**White Mountain National Forest, Androscoggin Ranger District**

**p: 603-466-2713 x1230**
**f: 603-466-2856**
**gail.wigler@usda.gov**

300 Glen Road
Gorham, NH 03581
www.fs.fed.us

**Caring for the land and serving people**

## Peabody West—Scenery Management Review | Feb 15, 2022

Attendees: Ken Allen, Johnida Dockens, Josh Sjostrom, Jason Lyle, Gail Wigler, Theresa Corless, Anna Johnston, Bill O'Neill

Follow-up discussion to resolve resource conflicts in key units:

- Unit 20 patch cut total 8.8 acres visible; unit 19 clearcut 25.8 acres, 22.9 acres are visible, mostly mostly aspen with objective of aspen regeneration.
    - Line officer decision to retain clearcuts to best meet vegetation and wildlife habitat management objectives
        - Aspen and birch regeneration occurs more quickly and robustly in larger openings vs patchcuts
    - Considered proposing a maximum of four 5-acre patchcuts in each unit to better meet objectives for regeneration habitat
        - Patchcuts would be less effective in aspen and birch regeneration and would not meet objectives for large openings in the HMU
- Need to assess Spring Brook permanent wildlife opening, which is currently about 9 acres and being expanded to about 24 acres (an addition of 15 acres)
    - Updated: expansion of up to 10 acres for total 19 acres; no other changes
- Three units are contiguous with each other and need to be adjusted for compliance (adjacent even-aged treatments). Changes made to unit prescriptions for compliance with forest plan:
    - Unit 88 total 4.9 acres overstory removal
        - Changed to 6-acre of shelterwood establishment cut
    - Unit 90 patchcut total acres 3.5
        - Changed to 3-acre improvement cut
    - Unit 89 overstory removal; 5.5 acres are visible but can be figured to avoid (proposed LSC change list)
        - Changed to 6-acre improvement cut

| | | |
|---|---|---|
| | Group Selection | 515 |
| | Single Tree Selection/Group Selection combined | 1250 |
| Wildlife Opening Expansion | Clearcut with Reserves | 10 |
| **Total** | | 2,610 |

6
7
93
21
9
10
11
20
22
19
87
23
24
28
17
25
26
27
29
36
16
33
35
37
38
30
43
44a
47
45

I created a new shapefile with these changes:

T:\FS\NFS\WhiteMountain\Project\Andro\PeabodyEA\GIS\Data\Silviculture\Peabody_Proposed_Units_2022_0421.shp

I felt we had time in the schedule to "get it right".

Thanks

**Gail Wigler**
**Forester**

**Forest Service**
**White Mountain National Forest, Androscoggin Ranger District**

**p: 603-466-2713 x1230**
**f: 603-466-2856**
**gail.wigler@usda.gov**

300 Glen Road
Gorham, NH 03581
www.fs.fed.us

**Caring for the land and serving people**

| | |
|---|---|
| **From:** | Sperduto, Daniel - FS, NH |
| **To:** | Corless, Theresa - FS, NH |
| **Cc:** | Hall, Scott - FS, NH; Wigler, Gail - FS, NH; Moran, Patrick - FS, CO |
| **Subject:** | RE: Peabody Transmittal letter assignments |
| **Date:** | Monday, June 26, 2023 11:52:04 AM |
| **Attachments:** | image001.png<br>image002.png<br>image003.png<br>image004.png |

---

Hi –

I am not tagged for mature forest/EO topic officially. But to an extent, the Botany survey work is relevant to the topic of "you didn't do anything to protect mature and OG/late successional forest".

If you look at the Botany project record, it reflects what the final project proposal does not explicitly identify: that certain ecologically significant areas were identified and excluded from the proposed timber sale stands, including protection of old growth (OG) and late successional (LS) forests (LS forests are probably a subset of "mature forest" category).

- We set out standardized plots in most stands in the project area (some were surveyed prior to 2014 so a few of these stands were surveyed but did not have plots done…very small minority of them)
- One of the many details we measured in these plots was large tree density (counting all 16" plus trees live/snag/or downed, the primary metric in the Manomet late successional index method published by Ducey-Whitman_Hagen et al.
- We returned to stands that exceeded the LS/OG threshold on this index (when the area appeared to be more than just a small high density area). We took many tree cores, quantified large live/snag/down metrics, collected other data on stand character and history, and delineated boundaries of OG/LS forests stands.
- We identified two legit OG areas per Forest Plan definition (near Barnes Field, on W Branch of Peabody), and one likely LS stand along Townline brook with some OG characteristics, less well quantified. These were all dropped per our recommendations, as part of our standard analysis and NEPA process, basically. There was also a stand up high along Pine Link trail, that was dropped early on in part due to access, but it also because it had LS/OG conditions. We also recommended a red spruce forest/swamp be reserved due to exemplary natural community status, near Bear Spring Brook. This area is mature with some LS/OG patches, but does not meet the FP definition of OG.
- Stands along the Peabody were dropped due to LSC status and other factors, including access and hydrologic/floodplain buffering.

I don't know how that gets reflected or not in the RTC, but wanted to highlight that to you in case it is relevant.

Dan

**Dan Sperduto** (he/him/his)
**Botanist**

**Forest Service**
**White Mountain National Forest**
**daniel.d.sperduto@usda.gov**
71 White Mountain Dr.
Campton, NH 03223
www.fs.fed.us
**Caring for the land and serving people**

---

**From:** Corless, Theresa - FS, NH <theresa.corless@usda.gov>
**Sent:** Wednesday, June 14, 2023 1:00 PM
**To:** Allen, Kenneth - FS, NH <kenneth.allen@usda.gov>; Gryczkowski, Landon - FS, NH <landon.gryczkowski@usda.gov>; Moran, Patrick - FS, CO <patrick.j.moran@usda.gov>; Hall, Scott - FS, NH <scott.hall@usda.gov>; Lyle, Jason - FS, NH <jason.s.lyle@usda.gov>; Wigler, Gail - FS, NH <gail.wigler@usda.gov>; Oneill, William - FS, NH <william.oneill@usda.gov>; Pellerin, Travis - FS, NH <travis.pellerin@usda.gov>; Peters, Nathan - FS, NH <nathan.peters@usda.gov>; Jordan, Sarah - FS, NH <sarah.jordan@usda.gov>
**Cc:** Neely, John - FS, NH <john.neely@usda.gov>; Sperduto, Daniel - FS, NH <daniel.d.sperduto@usda.gov>; Prout, Mark - FS, NH <mark.prout@usda.gov>; Sjostrom, Joshua - FS, NH <Joshua.Sjostrom@usda.gov>
**Subject:** Peabody Transmittal letter assignments
**Importance:** High

All,

We have the objection issues for Peabody a bit earlier than expected. This gives us a little more time. Our task is to complete the transmittal letter (or road map) that lists where the review team can find responsive information in the record. **This is due to me no later than Thursday June 22nd.** Attached please find:
1) a one-page overview of how to complete a transmittal letter. Please read this first even if you have done it before.
2) a table with a list of issues and the IDT member assignment (note: if more than one person is assigned to an issue, the first person listed is the lead and should coordinate with the others listed for additional citations.)
3) the transmittal letter form with the issues.
4) a sample completed transmittal letter.

If you haven't done this before or are rusty, I suggest you complete one issue and send it to me for

review to make sure you are on the right track. All completed transmittal letters should be sent to me.

Andro folks: I still plan to meet with you next Tuesday. But feel free to reach out before then with any questions.

John, Dan, and Mark, I believe you are off the hook for this one, unless someone reaches out to you.

Theresa

**Theresa Corless (she/her)**
**Forest Planner and Environmental Coordinator**
**Forest Service**
**White Mountain National Forest**
**p: 603-536-6135**
theresa.corless@usda.gov
71 White Mountain Drive
Campton, NH 03223
www.fs.fed.us

**Caring for the land and serving people**

Todd Waldron
Ruffed Grouse Society & American Woodcock Society
Northeast Forest Conservation Director

August 25, 2022

Johnida S. Dockens
NEPA Planner
White Mountain National Forest – Androscoggin Ranger District
300 Glen Road
Gorham, NH 03581-1399

**Re: White Mountain National Forest Androscoggin Ranger District Peabody West Integrated Resource Project**

**Atten: Johnida Dockens**

Thank you for allowing us to submit comments on the draft Environmental Assessment (EA) and Preliminary Finding of No Significant Impact for the Peabody West Integrated Resource Project.

RGS & AWS unites conservationists to improve wildlife habitat and forest health for ruffed grouse, American woodcock, and all forest wildlife. We promote forest stewardship for our forests, our wildlife, and our future. We envision landscapes of diverse, functioning forest ecosystems that provide homes for wildlife and opportunities for people to experience them. Ruffed grouse and American woodcock are bellwethers of forest condition; they can only persist in healthy, diverse forests. These same forests clean the air, filter water, and support local communities. Together with the American Woodcock Society (established in 2014), we work with landowners and government agencies to develop critical wildlife habitat utilizing scientific management practices.

Overall, RGS & AWS applauds the White Mountain National Forest's Androscoggin District team for your efforts to promote forest resiliency and improve habitat diversity and other co-benefits associated with healthy, diverse forest landscapes. We strongly support science-based vegetative management activities like those incorporated in the Peabody West Integrated Resource Project proposal and RGS & AWS is available as a conservation partner to help the Forest Service move these projects forward.

Numerous bird and wildlife species require forest habitat diversity and are declining. These species that are identified in New Hampshire's Wildlife Action Plan as Species of Greatest Conservation Need include Ruffed grouse, American woodcock, Golden-winged warbler, Spruce grouse and New England cottontail. New Hampshire's State Wildlife Action Plan's *Chapter 5 Conservation Actions* section identifies habitat management as one of several important tools to address this challenge. Recommended actions include incorporating young forest habitat conditions across landscapes (Section 1402) and promoting sustainable forestry (Section 1410) which when coupled with other outlined strategies promote resilient forest landscape conditions with a spectrum of forest ages and robust species composition diversity.

Our technical comments regarding the proposed vegetative management activities follow below:

The Peabody West Integrated Resource Plan's is aligned with the White Mountain National Forest Land and Resource Management Plan's (LRMP) Chapter 1, page 20, Objective 4, which is to "provide regeneration age forest and open habitats to sustain biological diversity and support species that prefer those habitats". These activities also are consistent with the allowable forest management activities within MA 2.1 lands which work toward multiple use management and diverse co-benefits, including wildlife habitat and sustainable forest products.

White Mountain National Forest's LRMP *Chapter 2 Table 1-04: Age Class Objectives* establishes MA 2.1 guidelines for age class diversity by forest type, which targets 3-4% of the WMNF in young forest age groups for Northern Hardwoods and 12-15% in young forest conditions for Aspen-Birch types. The Draft Environmental Assessment (EA) report's Page 1 Para 4 notes that "*An analysis of the current habitat conditions indicates that the Peabody West HMU is not meeting MA 2.1 habitat composition and age class objectives (forest plan, pp. 1-20 to 1-21; U.S. Department of Agriculture, Forest Service 2022). Most of the habitats in the project area are mature, with some younger stands interspersed. The general lack of open forest conditions tends to promote the development of shade-tolerant species and limit birch and aspen, which need abundant sunlight".*

Page 2 Para 1 continues and states *"No regeneration-age (0-9 years old) forest habitat occurs in the Peabody HMU except for three permanent wildlife openings which are managed to maintain valuable grassy and shrubby habitat. These existing conditions create a need for management action to move the landscape toward the desired future conditions consistent with forest plan direction. Wildlife habitat objectives for the Peabody West HMU include the following: • Increase spruce-fir habitat over the long-term • Increase age-class diversity and foster the regeneration of stands*

Page 4 Para 6 notes that "*A range of silvicultural treatments would be used to provide commercial wood products; create small and large openings in the forest to allow regeneration of trees and other vegetation and increase wildlife habitat diversity; provide additional growing space to enhance crown and bole development; and encourage the establishment of shade-intolerant species in the understory".*

Page 5 Table 1 establishes the proposed acreage totals of silvicultural treatment for management area 2.1 lands in the Peabody West habitat management unit which result in 10.6% even-aged silviculture (235 acres) and 89.4% uneven-aged silvicultural practices (1,985 acres).

Page 8 Para 6 explains that for the 1,250 acres that will be treated as uneven-aged single tree and group selection combined, "*Groups would be placed in areas where desirable advance regeneration could be released to enhance species composition and/or increase softwood habitat. The size of individual openings under this treatment would range from a single tree crown width up to about 2 acres".*

One of the driving factors for shifting to more uneven-aged management is explained on Page 21 Para 5: "*The proposal is consistent with forest plan guidelines in considering cumulative impacts for scenery management (forest plan, p. 3-6). No other even-aged treatment has occurred in the analysis area in the past 30 years, and no reasonably foreseeable silvicultural proposals are identified within the analysis area. Therefore, the proposed action would not contribute measurably to cumulative scenery impacts in the analysis area".*

RGS AWS
RUFFED GROUSE SOCIETY | AMERICAN WOODCOCK SOCIETY

60th ANNIVERSARY

Ruffed Grouse Society & American Woodcock Society supports science-based sustainable forestry, promotes diverse forest landscape mosaics, and applauds the positive impacts this diversity has on resilience, climate, people, forests, and wildlife. Given that MA 2.1 is not meeting its habitat objectives and there is tension between scenery impacts and vegetative practices like even-aged silviculture, we are available to work with the Forest Service team in the future to identify ways to mitigate these tensions and ensure forest habitat conditions aren't overly compromised by aesthetic considerations. Regarding the single-tree and group selection silviculture, we're also eager to discuss spatial layout options and clustering techniques for the group areas to maximize positive wildlife habitat benefits.

Ruffed Grouse Society and American Woodcock Society is a supporter of the Peabody West Integrated Resource Project. As a national and regional conservation partner with members and a chapter in the Granite State, we support the Forest Service's efforts to initiate this project and we look forward to working with the agency as a key partner and stakeholder.

On behalf of our members and supporters, we thank you for your careful consideration and action to support healthy forests, abundant wildlife, climate solutions and promoting a conservation ethic in New Hampshire. RGS & AWS would be happy to comment further or address questions on these considerations in your future deliberations.

Respectfully submitted,

*Todd H. Waldron*

Todd H. Waldron

Northeast Forest Conservation Director

Ruffed Grouse Society & American Woodcock Society

*For more information visit the RGS & AWS website at RuffedGrouseSociety.org. Follow us on Facebook and Instagram @RuffedGrouseSociety.*

*Protecting and restoring forests on New England's public lands*
*Montpelier, VT*

September 6, 2022

Joshua Sjostrom
District Ranger
USDA Forest Service
Androscoggin Ranger District
300 Glen Road
Gorham, NH 03581

**Re: Peabody West IRP Draft EA Comments from Standing Trees;** submitted electronically via https://cara.fs2c.usda.gov/Public//CommentInput?Project=55659.

Dear Mr. Sjostrom,

Standing Trees submits the following comments regarding the U.S. Forest Service's Draft Environmental Asessment and Finding of No Significant Impact ("DEA") for the Peabody West Integrated Resource Project ("Project" or "PWIRP") located in the White Mountain National Forest in the Androscoggin Ranger District.

Standing Trees is an incorporated nonprofit dedicated to advancing policy and legal solutions that protect and restore New England's native forests. Standing Trees seeks to hold state and federal agencies accountable for their actions that affect forests, and to ensure that land-managers and policymakers follow the latest climate and biodiversity science.

After reviewing the DEA, Standing Trees has concerns regarding the potential impacts of the Project on the character and composition of the White Mountain National Forest. As detailed below, in order to comply with the National Environmental Policy Act ("NEPA"), the National Forest Management Act ("NFMA"), Executive Order 14072, and the Endangered Species Act ("ESA"), an Environmental Impact Statement ("EIS") is required for the proposed project. The Forest Service erred when it completed only a draft Environmental Assessment ("DEA") for the

Project along with the EA's draft Finding of No Significant Impact ("FONSI"). The environmental harms of the Project are significant, or at the very least uncertain, because of the unique nature of the land involved, the intensity of potential impacts, the recent proposal by the U.S. Fish and Wildlife Service ("USFWS") to classify the Northern Long-eared Bat as endangered under the ESA, President Biden's Executive Order to conserve mature and old-growth forests, and the 2022 DEA's failure to adequately analyze Project impacts in sufficient detail, among other things.

**The 2022 DEA is inadequate under NEPA and new analysis must be conducted**

"Federal agencies shall to the fullest extent possible… [u]se all practicable means, consistent with the requirements of [NEPA] and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment." 40 C.F.R. § 1500.2(f).

The overarching flaw for this "integrated resource project" is the Forest Service's failure to provide more than mere conclusory statements to support its finding of no significant impact. The analysis is sparse, and sometimes non-existent, for a number of impacted resources. As a result, it is nearly impossible for the public to meaningfully engage with agency's data and analysis presumably underlying the 2022 DEA.

**The Purpose and Need Statement must be properly defined**

To comply with NEPA, federal agencies must provide a statement explaining the purpose and need for the proposed action. *See* 40 CFR § 1501.5(c)(2) (2020); § 1502.13 (2020). It is important that this statement accurately reflects the proposed action's purpose and need because

this statement in turn informs the range of alternatives the agency will consider as part of its NEPA analysis. *See League of Wilderness Defs.-Blue Mountains Biodiversity Proj. v. U.S. Forest Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012). The Forest Service should take care to not define the purpose and need so narrowly as to eliminate reasonable alternatives from analysis. *City of Carmel–By–The–Sea v. U.S. Dep't of Transp.,* 123 F.3d 1142, 1155 (9th Cir. 1995); *see also Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664, 667 (7th Cir. 1997) (finding the range of alternatives the Corps considered to be inadequate because the agency too narrowly defined the project's purpose, emphasizing that the evaluation of alternatives is intended to be an evaluation of alternative means to accomplish the *general goal* of the action).

The DEA's stated Purpose and Need "is to advance forest plan goals, objectives, and desired conditions for vegetation, wildlife, and other resources in the Peabody West Habitat Management Unit (HMU)." *See* DEA at 1. These are very distinct objectives, but the Forest Service appears to believe that they can all only be met through various timber harvest prescriptions. Either the Purpose and Need has been drafted too narrowly, or the Forest Service has neglected to conduct a reasonable analysis of alternatives that could meet Forest Plan goals and objectives, and meet the intent of Executive Orders 14008 and 14072. The Forest Service should frame the purpose and need in such a manner that it allows the Forest Service to consider an adequate range of alternatives, as discussed in more detail below.

A properly crafted purpose and need statement would integrate purposes of the Forest Plan with current executive orders (for example, Executive Order 14072[1] and Executive Order

---

[1] *See* Strengthening the Nation's Forests, Communities, and Local Economies, Executive Order 14072, 87 Fed. Reg. 24,851 (April 22, 2022).

14008[2]) to identify the best management approaches. Instead, the DEA states the purpose of the proposed action is to implement the 17-year old Forest Plan. This inherently structures the DEA to presuppose that the Forest Plan could only be implemented by the proposed action and fails to explain the management context (i.e., is the management needed and is this the most appropriate management for the subject stands?) to demonstrate the need component of the purpose and need statement. In order to demonstrate the need for the action, the Forest Service must do more than simply state a preference for "high-quality timber products[,]" 2022 DEA at 1, but must actually connect stand conditions, best science, and desired future conditions to this supposed need. Without this, the DEA's purpose and need statement is inadequate to satisfy the NEPA requirements because it is too narrow and eliminates reasonable alternatives.

A more accurate purpose and need statement would promote and require exploration of other forest management prescriptions that could better implement the Forest Plan, better avoid significant impacts on scenic and cultural resources and mature forests, better support the full range of biodiversity in its natural abundance and distribution, and meet the intent of Executive Orders. A more accurate purpose and need statement would also promote detailed evaluations of current natural and cultural resources, which appear to be lacking thus far, which would, in turn, illuminate further reasonable alternatives for the Forest Service and the public to consider.

**The Forest Service must analyze an adequate range of alternatives**

NEPA mandates that an EA describe the environmental impacts of both the proposed action and alternatives to the proposed action. 40 C.F.R. § 1501.5(c)(2). NEPA similarly requires

---

[2] *See* Tackling the Climate Crisis at Home and Abroad, Executive Order 14008, 86 Fed. Reg. 7619 (February 2, 2021).

an alternatives analysis for Environmental Impact Statements ("EIS"). 40 C.F.R. § 1502.14. The alternatives analysis, in which an agency evaluates "reasonable alternatives," is the heart of the environmental assessment. 40 C.F.R. § 1502.14(a). An agency may consider *only* the proposed action when there are no "unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E); *see also* 36 C.F.R. § 220.7(b)(2)(i). Unresolved conflicts exist when the agency lacks a consensus about the proposed action based on input from interested parties. National Environmental Policy Act Procedures, 73 Fed. Reg. 43,084, 43,092 (July 24, 2008) (codified at 36 C.F.R. Part 220). Further, agencies "shall not commit resources prejudicing selection of alternatives before making a final decision." 40 CFR § 1502.2(f); § 1506.1.

CEQ regulations mandate that federal agencies shall "inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. It is also incumbent upon federal agencies to "[s]tudy, develop, and describe appropriate alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources." *Id*. § 1501.2(c); *see also* 42 U.S.C. § 4332(E). Given the many different facets of the proposed action and the current primary purpose articulated in the DEA — "to advance forest plan goals, objectives, and desired conditions for vegetation, wildlife, and other resources in the Peabody West Habitat Management Unit (HMU)" — it is inconceivable that there will be only one way to achieve that purpose. 2022 DEA at 1. This is especially true for the logging portions of the proposed action. The sheer number of different silviculture prescriptions for the proposed action demonstrates that even if logging is needed—which Standing Trees asserts it is not—there is a wide variability in how the logging can achieve desired conditions. This variability

necessarily implies several reasonable alternatives exist that the Forest Service should consider in an EIS.

With these considerations in mind, the Forest Service should include and analyze the following reasonable alternatives as part of its NEPA analysis.

**The Forest Service must consider a No Action Alternative.**

A "No Action Alternative" is the bare minimum alternative analysis an agency should undertake for an EA or EIS. 40 CFR § 1502.14(c). One of the most critical purposes of a No Action Alternative is to establish a baseline against which the proposed action can be measured. The Forest Service should consider a No Action Alternative to establish such a baseline for the proposed action. NEPA requires agencies to consider both the detriments and benefits of proposed projects, which would include considering the benefits of reasonable alternatives as well. There are numerous benefits of not moving ahead with the proposed action (i.e., taking No Action), including, but not limited to: climate benefits of retaining older, mature trees; habitat benefits for the Northern Long-eared Bat and other species that rely on mature, old, or interior forests or are sensitive to harvest impacts; avoiding potential detrimental impacts to water quality due to runoff, sedimentation, and potential herbicide contamination; avoiding loss or damage to historic and cultural resources located within the proposed action area; avoiding introduction of invasive species (which were noted to be essentially non-existent at the 6/23/22 public meeting); protecting values present in the Great Gulf Inventoried Roadless Area; and avoiding visual and noise impacts, among many others. A No Action alternative should also carefully detail how the full range of habitats required by native species can be facilitated within the project area by simply allowing natural processes and forest ageing to create habitat diversity and complexity.

As it stands, the DEA presents two paragraphs briefly outlining the "Consequences of No Action." DEA at 20. The title alone, which suggests that there will only be negative "consequences" from choosing "no action," suggests that the USFS has failed to perform a reasonable, impartial analysis. There is no assessment of any of the positive tradeoffs of leaving the forest as-is. Further, there is no scientific justification provided for claims that "no action" would result in lowered species diversity, ages, and structures. As evidenced in sections below, just the opposite is true: peer-reviewed science shows that older forests exhibit the greatest tree species and habitat diversity, the greatest structural complexity, and the greatest resilience to climate change.[3,4,5,6]

**Additional Alternatives**

In addition to a No Action Alternative, the WMNF should prepare additional alternatives that explore a reasonable range of options to meet the Purpose and Need while avoiding or minimizing harmful impacts. Additional alternatives should consider:

- Avoiding all roadless area impacts and protecting roadless area values by guiding logging away from Forest Plan Inventoried Roadless Areas that were allocated to Management Area 2.1 in the 2005 Forest Plan. Such an analysis should also consider how roadless area logging and road construction/reconstruction, regardless of whether a roadless area is managed according to the 2001 Roadless

---

[3] Thom et al., THE CLIMATE SENSITIVITY OF CARBON, TIMBER, AND SPECIES RICHNESS COVARIES WITH FOREST AGE IN BOREAL-TEMPERATE NORTH AMERICA (2019)
[4] Miller et al., EASTERN NATIONAL PARKS PROTECT GREATER TREE SPECIES DIVERSITY THAN UNPROTECTED MATRIX FORESTS (2018)
[5] Miller et al., NATIONAL PARKS IN THE EASTERN UNITED STATES HARBOR IMPORTANT OLDER FOREST STRUCTURE COMPARED WITH MATRIX FORESTS (2016)
[6] Gunn et al 2013. Late-successional and old-growth forest carbon temporal dynamics in the Northern Forest (Northeastern USA). Forest Ecology and Management.

Area Conservation Rule, may change the outcome of future Ch 70 wilderness inventories and evaluations and the potential for Congress to include these lands in the National Wilderness Preservation System, especially since the current forest plan has outlived its 15-year lifespan as dictated by the National Forest Management Act. The analysis should assess not only whether the landscape will still qualify for future Chapter 70 review, but also how the project would impact the WMNF's analysis of the IRA's suitability and potential for wilderness recommendation and designation by Congress;

- Achieve habitat management objectives for early young forest by creating *complex* early successional habitat rather than simplified regeneration-age forest through even-aged management. Such an analysis should evaluate the possibility of beaver reintroduction, girdling trees to create standing snags, "chop-and-drop" to increase woody debris and create canopy gaps, and more;
- Increasing the size of the buffer from watercourses and wetlands;
- Avoiding all mature and old forest as defined in WMNF Forest Plan Appendix D, Age Class Definitions by Habitat Type, and to comply with EO 14072 and to reduce risk of harm to Northern Long-eared Bat habitat.

**The DEA fails to provide supporting documentation to allow adequate and meaningful public participation.**

Public participation is a critical aspect of the NEPA process. *See* 40 C.F.R. § 1500.1(b) ("The purpose and function of NEPA is satisfied if Federal agencies have considered relevant environmental information, and the public has been informed regarding the decision-making

process."); 40 C.F.R. § 1506.6(a) ("Agencies shall . . . [m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures.").

Here, public involvement has been impeded by the unavailability of relevant supporting documents, the failure of the DEA to clearly identify other supporting documents, and the failure to include sufficient detail in the DEA to allow the public to engage the necessary substantive analysis underlying the agency's design of the Proposed action and its intended goals.

**The Forest Service makes several conclusions that are supported by documents that are not available to the public for review.**

Numerous references are made to other unspecified authorities to support conclusions advanced by the Forest Service in the 2022 DEA. For example, the DEA refers to "preliminary assessments of current stand conditions and characteristics," but these documents have not been made publicly available. DEA at 4.

The DEA suggests that "[m]ost of the habitats in the project area are mature, with some younger stands interspersed." DEA at 1. The Peabody West HMU Rationale document shows that 79% of the Project area is in the mature age class, across all forest types. PWIRP HMU Rationale at 9. However, the WMNF has not provided an age class map to help the public understand the amount and distribution of forest types and age classes. The DEA claims there is a "lack of open forest conditions," but does not suggest what conditions this is compared to. Lorimer and White 2003, the definitive paper on New England disturbance types, frequencies, and intensities, indicates that upland forests such as this one would have had only 1-3% of the landscape in early seral conditions.[7]

---

[7] Lorimer and White, SCALE AND FREQUENCY OF NATURAL DISTURBANCES IN THE NORTHEASTERN US: IMPLICATIONS FOR EARLY SUCCESSIONAL FOREST HABITATS AND REGIONAL AGE DISTRIBUTIONS (2003) (hereinafter "Lorimer and White (2003)").

In addition there has been no analysis of whether the WMNF is protecting "stands identified to provide old forest habitat," as required by the 2005 Forest Plan. WMNF Plan Abbreviations, Acronyms, and Glossary at 21. The WMNF Plan defines Old Forest Habitat as: "Desired habitat conditions start with those for mature forest and can include greater size, decadence, structural complexity, etc." WMNF Plan Abbreviations, Acronyms, and Glossary at 21 Certainly, these attributes could appear in stands that are otherwise classified as "mature" according to 2005 WMNF Forest Plan Appendix D, Age Class Definitions by Habitat Type. Nor is there any analysis showing that the Project does not violate the intent of Executive Order 14072, issued on Earth Day 2022, to conserve mature forests. Thus, the public cannot be certain that mature and old forests are being conserved and protected as required by law.

Similarly, the DEA states that transportation management actions were informed by the Forest-wide Transportation Analysis Process (TAP). The DEA notes:

> *"In 2015, the WMNF completed a Forest-wide transportation analysis process report for long-term administration of the WMNF's transportation system (U.S. Department of Agriculture, Forest Service 2015). The proposed project is needed to complete a site-specific transportation analysis to implement or modify the 2015 travel analysis process recommendations within the project area; to plan and manage for current and future public and Forest Service access to the project area; to meet forest plan standards for desired road operation maintenance levels (MLs); and to meet requirements of the Highway Safety Act..."* DEA at 2.

Standing Trees made inquiries to WMNF staff as to the availability of the analysis that went into the 2015 process, but all that is apparently available is the final map. Without detailed

information, it is impossible to assess why the final map looks the way that it does, and to understand the rationale for transportation-related decisions.

Finally, the DEA admits that "[s]ome system roads have travel analysis process recommendations that differ from the current proposal." DEA at 10. If this is so, additional analysis must show why these changes are necessary, and an amendment must be made to the Forest-wide TAP.

**Threatened and Endangered Species Issues**

On March 23, 2022, the U.S. Fish and Wildlife Service ("USFWS") announced a proposed rule to reclassify the northern long-eared bat from threatened to endangered and remove the bat's species-specific 4(d) rule. *Endangered Species Status for Northern Long-Eared Bat*, 87 Fed. Reg. 16,442 (March 23, 2022). The DEA does not address this significant event. The up-listing of the bat, if finalized, will remove its species-specific 4(d) Rule and make all take of the bat unlawful. 87 Fed. Reg. 16,442. While the Forest Service has analyzed impacts of logging on the bat in other projects, it is not clear whether such analysis has been done here. Additionally, in those projects the Forest Service found that at least some bats may be taken, especially under its cumulative impacts analysis, but the Forest Service has never evaluated the impacts of such take on the species in the absence of the 4(d) Rule. The proposed up-listing and removal of the 4(d) rule is thus new information that warrants additional analysis and an EIS, as discussed in more detail below.

The up-listing was, by definition, motivated by an increased likelihood that the Northern Long-eared Bat is in danger of extinction throughout all of its range. *See* 87 Fed. Reg. 16,449. The bat's abundance "has and will continue to decline substantially under current demographic

and stressor conditions;" extant winter colonies have declined range-wide by 81%; and range-wide abundance is projected to decline by 95% from historical conditions by 2030. *Id*. at 16,446. Further, there has been a 96–100% decline in the number of large hibernacula. *Id*. Such low population sizes "exacerbate the effects of current and future declines due to continued exposure to [white nose syndrome], mortality from wind turbines, and impacts associated with habitat loss and climate change." *Id*. at 16,447.

Northern Long-eared Bat habitat requirements are the opposite of the type of habitat that will be generated from the proposed action. According to the USFWS Species Status Assessment Report for the Northern Long-eared Bat[8] ("NLEB Report"), dated March 22, 2022, the bat depends on mature and old forests for roosting and foraging. Preferred roosting habitat is large diameter live or dead trees of a variety of species, with exfoliating bark, cavities, or crevices. Bats change roosts approximately every two days. Preferred foraging habitat is old forest with complex vertical structure on hillsides and ridges.

The WMNF, including the West Peabody IRP area, contains extensive mature forests that are beginning to acquire the characteristics of an old forest, likely providing some of the highest-quality Northern Long-eared Bat habitat in New England. Many of the silviculture treatment prescriptions involve the removal of mature trees. In combination with recently-approved projects (including Bowen Brook Integrated Resource Project, Deer Ridge Integrated Resource Project, Wanosha Integrated Resource Project, and others), and anticipated logging projects (including Sandwich Vegetation Management Project and Tarleton Integrated Resource Project), the WMNF is set to eliminate or degrade thousands of acres of Northern Long-eared Bat habitat

---

[8] Burkhart, J. et al. "Species Status Assessment Report for the Northern long-eared bat (Myotis septentrionalis)," U.S. Fish and Wildlife Service. (2022) Version 1.1.

across a large region. As discussed in further detail below, the Forest Service should evaluate the cumulative impact of these combined and geographically proximate projects.

What's more, logging is commonplace in private lands surrounding the WMNF and across the region, making mature and old forests a rare element in the New England landscape. Project analysis should assess age classes across the broader landscape to determine how WMNF lands can be best leveraged to restore natural disturbance regimes, native species, and their habitats.

In light of this new information that Northern Long-eared Bat populations have become so decimated that the species is now in danger of extinction throughout all of its range and has thus been proposed for up-listing to endangered status, the Forest Service must initiate formal consultation with USFWS. To the extent that such consultation is already ongoing, it must take this new information regarding the potential up-listing of the Northern Long-eared Bat into consideration. The failure to do so would not only be a violation of the ESA, but of NEPA, which holds an independent obligation that agencies continue to take a "hard look" at project impacts.

**The DEA does not adequately address scenery impacts or should require a Forest Plan amendment**

The WMNF Plan mandates that "all management activities should meet or exceed Scenic Integrity Objectives established for the Forest through the Scenery Management System ("SMS")[.]" WMNF Plan at 2-26.

The Scenery Management portion of the Forest Plan mandates that "[i]n evaluating cumulative effects for viewed landscapes from established concern level 1, open, higher elevation viewpoints affording expansive or large scale views, no more than 9 percent of the

acreage within the view should be treated with regeneration vegetation management activities within a 30 year period. Total area affected during any one entry period with new regeneration treatment should not exceed 4 percent of the acreage. Assessment may need to be made from multiple viewpoints (that view a common land base). The assessment will apply to each view separately." WMNF Plan at 3-6. Additionally, "VisualFX or similar computer graphics/simulation software should be used to design and evaluate visibility of proposed regeneration cuts, especially when viewed from higher elevation or superior viewpoints." *Id*. For areas with a "High" Scenic Integrity Objective, "most of the project area created openings should be minimally evident from trail, road, or use area vantage points. Maximum observed size should not exceed 4-5 acres. If openings occur, they should appear as natural occurrences and be well-distributed in the viewed landscape." *Id*.

The DEA acknowledges that the proposed timber harvest prescriptions are inconsistent with 2005 WMNF Forest Plan, but does not seek to remedy this deficiency through a Forest Plan amendment, as required by law. According to the DEA:

> "The proposed action includes three relatively large even-aged treatments: a 26-acre clearcut in unit 19, a 9-acre patch cut in unit 20, and the expansion of an existing permanent wildlife opening to about 19 acres. These proposals exceed the forest plan guideline G-3 for MA 2.1 land, which limits maximum observed opening size to 5 acres in areas with a high scenic integrity objective (forest plan, p. 3-6). Although each of these units would exceed this guideline, the larger acreage is intended to better meet project-level objectives for the Peabody West HMU, and to move the forest toward desired conditions consistent with the forest plan." DEA at 21.

In other words, the DEA admits that the project parameters exceed what is allowed by the 2005 Forest Plan. The DEA suggests that that the project-level goals should take precedence over the Forest Plan. If this were approved, it would constitute a violation of NFMA and must be corrected either by modifying the project or amending the Forest Plan.

**Recreation proposals are unsupported by the 2005 WMNF Forest Plan**

Without any supporting explanation or evidence, the DEA claims that new mountain bike trails and backcountry ski glades are "consistent" with the 2005 WMNF Forest Plan. DEA at 22. Even the Recreation Specialist Report admits that WMNF Forestwide Management Direction for Recreation, Guideline 4, states that:

> *"No additional trails should be constructed or authorized unless clearly needed to: provide public access to the existing system, address resource impacts, resolve public safety issues, meet recreation management or accessibility goals, or best meet the recreation management approaches. New trails should be evaluated and prioritized consistent with supplemental direction in FSH 2309.18"* PWIRP Recreation Effects Analysis at 1.

However, the DEA notes that opportunities for both mountain biking and backcountry skiing in gladed terrain (as opposed to natural terrain) already exist nearby on private land. DEA at 2, 3, 10, and 11. No reasons are offered for why there is a "clear [need]," as required by the Forest Plan, "to provide public access to the existing system, address resource impacts, resolve public safety issues, meet recreation management or accessibility goals, or best meet the recreation management approaches." PWIRP Recreation Effects Analysis at 1. Why should these

recreation opportunities be created on public lands, at public expense? The Forest Service must either modify the project proposal to eliminate these proposals, or it must amend the Forest Plan.

Although the DEA makes several references to recreational opportunities and management, the DEA makes no reference to the Recreation Opportunity Spectrum ("ROS"). The purpose of the ROS is to provide information on what the current status of recreational areas within National Forests are to allow the Forest Service to make informed decisions regarding how projects will impact the current settings of certain recreation areas and how to develop those areas to the desired settings. Additionally, the WMNF Plan requires that projects are developed in accordance with the ROS objectives and goals. For MA 2.1 Forest Management, recreational management "will match the ROS class objectives provided in this management area. Recreational management activities themselves should not derive the ROS Class from a less developed to a more developed class." WMNF Plan at 3-4 to 3-5. It is odd that the Forest Service would develop a DEA to make significant recreational modifications to the Forest without explaining which areas specific to the WPIRP DEA are not yet at the desired usage, in addition to failing to acknowledge what those areas within the DEA are currently qualified as.

Such baseline data is critical for the public to understand fully the potential recreational impacts of the proposed action. The Forest Service should provide more information explaining the current settings[9] of the recreational opportunities in the proposed action area and the positive and negative consequences the proposed action will have on those recreational opportunities.

**The DEA does not sufficiently address how the proposed action impacts Inventoried Roadless Areas.**

---

[9] Settings is a word used by the Forest Service to describe the status or designation of areas on the ROS.

The DEA acknowledges that 600 acres are proposed for logging within the 17,000-acre Great Gulf Inventoried Roadless Area. PWIRP Roadless Effects Summary at 1 and 2. Because the portion of the Great Gulf IRA proposed for logging was not inventoried prior to promulgation of the 2001 Roadless Area Conservation Rule, the WMNF claims that it had the discretion to allocate these lands to the General Forest Management (2.1) category in the 2005 Forest Plan revision. The Roadless Effects Summary suggests that the proposed logging will not disqualify the area from future consideration in a Chapter 70 Wilderness Inventory and Evaluation when the WMNF Forest Plan is revised. However, this merely addresses the *eligibility* of the lands for Chapter 70 review; it does not account for how logging will impact the landscape's suitability or potential for a wilderness recommendation or designation by Congress, nor how the proposed logging will degrade those values associated with roadless areas, including clean water, intact forest habitats, and more.[10,11]

**The Forest Service must comply with MA 2.1 standards and guidelines**

The proposed action must comply with all of the standards and guidelines contained in the WMNF for the MA 2.1 ("General Forest Management") designation. There are some standards and guidelines that Standing Trees would like to draw specific attention to, which may be particularly relevant to the proposed action. First, project-related motorized administrative use may be allowed but the Forest Service should "consider potential impacts to social conditions and ecological resources in the area," resulting from such motorized use. WMNF Plan at 3-5. Additionally, regarding general vegetation management, "[h]arvest restrictions, such as time of

---

[10] Dietz et al 2021. The importance of U.S. national forest roadless areas for vulnerable wildlife species. Global Ecology and Conservation.
[11] Talty et al 2021. Conservation value of national forest roadless areas. Conservation Science and Practice.

day, day of the week, or season, should be considered in high-use recreation areas or other sensitive areas, such as private residences, on a case-by-case basis." WMNF Plan at 3-8. Several of these guidelines are likely to be implicated due to the proposed action design; and therefore, must be considered and analyzed by the Forest Service as part of its NEPA evaluation.

**The Forest Service must comply with Forest-Wide Management Direction**

Standard S-3 in WMNF Plan Ch 2-Forest-Wide Management Direction states that "Timber harvest is prohibited in old growth forest." WMNF Plan 2-13. Further, Guideline G-1 states that "Outstanding natural communities should be conserved." *Id*. Old-growth is defined in the WMNF Plan as "Uneven-aged (three or more age classes) forest with an abundance of trees at least 200 years old, multiple canopy layers, large diameter snags and down logs, and a forest floor exhibiting pit-and-mound topography. There should be little or no evidence of past timber harvest or agriculture. Northern hardwood old growth consists primarily of sugar maple and American beech; softwood old growth is largely made up of spruce and hemlock. Stands need to be at least 10 acres in size to be identified as old growth. Anything smaller is a patch of old trees within a younger stand, not a habitat type in its own right." WMNF Plan Abbreviations, Acronyms, and Glossary at 21.

The WMNF Plan goes beyond protections for *existing* old-growth forest, however, clearly looking to how the WMNF can facilitate recovery of old-growth forest across a larger percentage of the forest in the future. The WMNF Plan defines old forest as beginning at 70 years of age in Aspen-birch habitat types, 90 years of age in Spruce-Fir, 120 years of age in Northern hardwoods, Mixed wood, Oak-Pine, and Hemlock. WMNF Plan Appendix D-2. The WMNF Plan defines Old Forest Habitat as: "Desired habitat conditions start with those for mature forest and can include greater size, decadence, structural complexity, etc. *No harvest will*

*occur in stands identified to provide old forest habitat"* (emphasis added). WMNF Plan Abbreviations, Acronyms, and Glossary at 21. The Environmental Assessment must analyze whether there are any portions of the project area that provide old forest habitat.

The WMNF Plan advises against even-aged management in Mature Forest Habitat, and yet the West Peabody IRP proposes extensive even-aged management in mature stands (79% of the project area is classified as Mature. PWIRP Habitat Rationale at 9. The 2005 WMNF Forest Plan defines Mature Forest as "Stands in which the overstory is in the mature age class. Mature forest habitat is typically made up of trees that are eight inches or more in diameter. Mortality is just beginning in these stands, resulting in a few scattered canopy gaps and a small number of snags and cavities in the overstory. Most snags and down logs are small in diameter and within the intermediate or understory layers. *Depending on site conditions, thinning and uneven-aged harvest methods can be used in this habitat without negatively impacting habitat quality.* Some uneven-aged harvest may enhance vegetative and structural diversity" (emphasis added). WMNF Plan Abbreviations, Acronyms, and Glossary at 18. The mature age class ranges from 40-89 years for Spruce-Fir habitat types, 60-119 years for Mixed wood and Northern hardwood, 40-69 years for Aspen-birch, and 70-119 years for Oak-Pine and Hemlock. WMNF Plan Appendix D-2. The Forest Plan is clearly implying that even-aged management in mature forest negatively impacts habitat quality. Despite this instruction to avoid even-aged management in mature forest habitat, the PWIRP DEA proposes extensive even-aged management. DEA at 5. Based on the Forest Plan, proposed management activities within the PWIRP will certainly degrade habitat quality.

**The DEA makes references to potential alterations in the proposed action without opportunity for public comment**

The DEA acknowledges several parts of the proposed action that are subject to change dependent upon several conditions. However, the Forest Service does not include an opportunity for the public to participate in the changes in the proposed action and does not explain when such changes would be implemented. The Forest Service in the DEA allows for "[f]inal locations of log landings [to] be *modified* during project layout subject to applicable forest plan standards and guidelines, best management practices, and other site specific requirements." DEA at 5 and 6 (emphasis added). Additionally, the DEA notes that "[s]ome system roads have travel analysis process recommendations that differ from the current proposal. The differences are the result of a project-level transportation analysis of long-term Forest Service plans and objectives in this area." DEA at 10.

In order to truly facilitate opportunities for public participation, the Forest Service must include more detail of these instances of deviation in order to allow for sufficient public comment on those deviations. Additionally, the Forest Service should narrow the opportunities to stray from a publicly reviewed proposed action deviation without further opportunity for public participation. If the Transportation Analysis Process (TAP) involved a signed record of decision, then any deviations from the TAP would require an amendment with NEPA review. As it stands, the TAP was unavailable for review on the WMNF website at the time that the DEA was posted, and to date the WMNF has only provided a TAP map with no supporting analysis.

**The aforementioned omissions impede public participation in violation of NEPA**

The public is not able to properly scrutinize agency decisions and analysis when relevant documentation is not made available or when available documents do not actually contain the analysis necessary to support the Forest Service's conclusory statements. The overall effect is to impede public participation, in violation of NEPA's clear mandate to "[m]ake diligent efforts to

involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. § 1506.6(a). In addition, the failure to provide clear analysis, or sometimes any analysis, violates NEPA's mandate that NEPA documents "shall be written in plain language . . . so that decisionmakers and the public can readily understand them." *Id.* § 1502.8. The public cannot understand what it is not told.

Without providing actual analysis, it is impossible to gauge the actual anticipated impact to proposed action-area resources, the significance of those impacts, and whether they may violate the Forest Plan standards and guidelines. "[T]he public should not be required to parse the agency's statements to determine how an area will be impacted[.]" *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 761 (9th Cir. 2014). Instances of this persistent defect are identified throughout these comments. Given the gaps in data available for public scrutiny, the Forest Service should reconsider its stance from the June 23, 2022 public meeting that it does not intend to provide another 30-day comment period on its draft EA. Reconsideration of that decision is also good public policy.

**The Forest Service's proposed action fails to meet current scientific standards and demands**

Despite the clear scientific evidence for increased amounts of old, wild forest, only 3% of New Hampshire (and a similar amount across New England) is managed to permanently protect or restore old forest conditions, with a primary emphasis on supporting native biodiversity, natural processes, and climate stabilization.[12]

[12] *See* Moomaw et al., INTACT FORESTS IN THE UNITED STATES: PROFORESTATION MITIGATES CLIMATE CHANGE AND SERVES THE GREATEST GOOD (2019) (hereinafter "Moomaw et al. (2019)").

New Hampshire was historically dominated by old forests, and it remained that way for millennia prior to European arrival.[13] Although the Abenaki people and other indigenous communities developed a sophisticated culture and cleared and managed some of the New England landscape with fire, recent science demonstrates that their impacts were highly concentrated, with the majority of historic New England forests primarily impacted by forces such as wind, ice, and beavers.[14] Much of New Hampshire's landscape evolved with relatively minor human influence over thousands of years since the last glaciation.

With these considerations in mind, the Forest Service should reconsider its stance in regard to the Age Class goals and implementation of Executive Order 14072.

**The Age Class goals do not match the latest scientific understanding of the ecology of New England forests, making the Forest Plan scientifically unsound**

Today, old forests – the forests that once dominated the region – are functionally absent from northern New England.[15] Elk, caribou, wolverine, wolves, cougars, and pine marten have been extirpated for more than a century. Salmon, once common in many rivers, have either been entirely eliminated or – where they are present – hang on primarily due to fish stocking and assisted migration. By any objective measure of ecosystem health, New Hampshire's ecosystems remain in the intensive care unit.

According to the definitive paper on disturbance frequency and intensity in New England, "the proportion of the presettlement landscape in seedling–sapling forest habitat (1–15

---

[13] Lorimer and White, SCALE AND FREQUENCY OF NATURAL DISTURBANCES IN THE NORTHEASTERN US: IMPLICATIONS FOR EARLY SUCCESSIONAL FOREST HABITATS AND REGIONAL AGE DISTRIBUTIONS (2003) (hereinafter "Lorimer and White (2003)").

[14] Oswald et al., CONSERVATION IMPLICATIONS OF LIMITED NATIVE AMERICAN IMPACTS IN PRE-CONTACT NEW ENGLAND (2020).

[15] Zaino et al., VERMONT CONSERVATION DESIGN – NATURAL COMMUNITY AND HABITAT TECHNICAL REPORT (2018) (hereinafter "Zaino et al. (2018)").

years old) ranged from 1 to 3% in northern hardwood forests (Fagus–Betula–Acer–Tsuga) of the interior uplands." "The current estimates of 9-25% [seedling-sapling habitat] for the northern New England states are probably several times higher than presettlement levels." Gap size in Hemlock-Northern Hardwood forests averaged less than .75 acres. Beech was the dominant species among Northern Hardwoods, comprising perhaps 30% of the forest. Stand replacing events occurred, on average, only every 1,000 to 7,500 years.[16]

A 2008 paper builds on these themes: "Although humans have a long history (about 12,000 years) on the North American continent, the magnitude of change wrought by European settlement has no parallel since the last glaciation... In New England, rates of landscape change have been far greater in the past 300 years than in the previous 1000 years as a result of forest cutting, agricultural conversion, urban development, altered fire regimes and herbivore populations, nonnative species introductions, and atmospheric pollution… There has been no return to presettlement conditions because of continuing low-level disturbance and perhaps insufficient recovery time."[17]

We can measure New Hampshire's progress towards forest ecosystem restoration against several large landscape conservation visions that have gained traction in the past fifteen years. In 2006, Wildlands and Woodlands, a program of Harvard Forest and Highstead Foundation, produced a widely supported vision for New England that included a goal for 10% of all regional forestlands to be conserved as wildlands. Fifteen years later, only 3% of New England is in wildlands, and relatively little progress has been made toward the 10% goal, despite excellent progress towards conserving forests for extraction of wood products.

---

[16] (Lorimer and White (2003)).
[17] Nowacki and Abrams, The Demise of Fire and "Mesophication" of Forests in the Eastern United States (2008)

More recently, based on the rapid decline of wildlife populations[18] and the rapid degradation of the climate,[19] scientists have suggested that much more aggressive measures must be taken to stave off climate and extinction catastrophe. The 2019 Global Deal for Nature (the inspiration for "30x30") calls for 30% of lands and waters to be permanently protected in GAP 1 and 2[20] protected areas[21] by 2030 to maintain and restore biodiversity, with an additional 20% percent conserved to stabilize the climate.[22] This vision was partially endorsed by the Biden Administration in Executive Order 14008, "Tackling the Climate Crisis at Home and Abroad."[23] To date, the Forest Service, including the White Mountain National Forest, has not revealed how it intends to implement EO 14008.

Large blocks of intact forest minimize harmful vectors for the spread of invasive species and allow natural disturbances to play out across a sufficiently large landscape to ensure that there is a mix of early and late successional habitats required by the full spectrum of New England's forest-dependent species. Although passive management is most often all that's required to restore old forest conditions,[24] it takes centuries to develop forest complexity, requiring permanent protection from timber harvest if restoration is to be successful.[25,26,27,28,29]

---

[18] Ceballos et al., VERTEBRATES ON THE BRINK AS INDICATES OF BIOLOGICAL ANNIHILATION AND THE SIXTH MASS EXTINCTION (2020)

[19] "Climate Change 2021: The Physical Science Basis" (Working Group I contribution to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change)

[20] The US Geological Survey maintains the nation's protected area database and has created a "GAP Status Code Assignment" to categorize types of conservation across all land ownerships, public and private.

[21] Dreiss and Malcom, GETTING TO 30X30: GUIDELINES FOR DECISION-MAKERS (2020)

[22] Dinerstein et al., A GLOBAL DEAL FOR NATURE: GUIDING PRINCIPLES, MILESTONES, AND TARGETS (2019)

[23] Executive Order 14008, "Tackling the Climate Crisis at Home and Abroad." (Jan 27, 2021)

[24] *See* (Zaino et al. (2018)).

[25] Watson et al., THE EXCEPTIONAL VALUE OF INTACT FOREST ECOSYSTEMS (2019)

[26] DiMarco et al., WILDERNESS AREAS HALVE THE EXTINCTION RISK OF TERRESTRIAL BIODIVERSITY (2019)

[27] (Dinerstein et al. (2020)).

[28] Miller et al., EASTERN NATIONAL PARKS PROTECT GREATER TREE SPECIES DIVERSITY THAN UNPROTECTED MATRIX FORESTS (2018)

[29] Miller et al., NATIONAL PARKS IN THE EASTERN UNITED STATES HARBOR IMPORTANT OLDER FOREST STRUCTURE COMPARED WITH MATRIX FORESTS (2016)

The DEA states that its vegetation management goals are focused on creating forest openings and regeneration-age forest. DEA at 1 and 2. The DEA suggests that "[a]n analysis of the current habitat conditions indicates that the the Peabody West HMU is not meeting MA 2.1 habitat composition and age class objectives" outlined in the 2005 Forest Plan. DEA at 1. However, the DEA fails to include any description of this purported analysis, and the WMNF has not produced an age-class map for the Peabody West IRP project area. Nor does the DEA contain an analysis of whether the age class objectives for regeneration and young age classes have already been met, forest-wide, in the 17 years since the signing of the Forest Plan. Indeed, the Forest Plan expects that regeneration age-class objectives will be met by year 10 of the Forest Plan. WMNF Plan at 1-21.

Taking the aforementioned science into account, the public is also left to wonder what science the White Mountain National Forest is grounding forest management decisions in. Which species does the West Peabody IRP stand to benefit most? Why does the WPIRP seem to favor game species, which already exist in abundance elsewhere in New Hampshire? Why are interior and mature forest species devalued in the proposed action area? Why does the DEA propose to reduce the beech population, despite the fact that it is a critical wildlife food source and that it was historically the dominant species on this site? By targeting beech, how can we identify strains that are resistant to beech bark disease? How should the public reconcile extensive areas of even-age management with the fact that such areas bear little resemblance to the natural disturbance regime of a Northern Hardwood forest?

**The Forest Service has failed to implement Executive Order 14072**

The DEA fails to explain how proposed logging will comply with the Forest Plan standards and prohibitions for mature and old forests, as well as President Biden's Executive

Order 14072, Strengthening the Nation's Forests, Communities, and Local Economies. The EO reads:

*"Sec. 2. Restoring and Conserving the Nation's Forests, Including Mature and Old-Growth Forests. My Administration will manage forests on Federal lands, which include many mature and old-growth forests, to promote their continued health and resilience; retain and enhance carbon storage; conserve biodiversity; mitigate the risk of wildfires; enhance climate resilience; enable subsistence and cultural uses; provide outdoor recreational opportunities; and promote sustainable local economic development."*[30]

The EO continues:

*"(b) The Secretary of the Interior, with respect to public lands managed by the Bureau of Land Management, and the Secretary of Agriculture, with respect to National Forest System lands, shall, within 1 year of the date of this order, define, identify, and complete an inventory of old-growth and mature forests on Federal lands, accounting for regional and ecological variations, as appropriate, and shall make such inventory publicly available.*

*(c) Following completion of the inventory, the Secretaries shall:*

*(i) coordinate conservation and wildfire risk reduction activities, including consideration of climate-smart stewardship of mature and old-growth forests, with other executive departments and agencies (agencies), States, Tribal Nations, and any private landowners who volunteer to participate;*

*(ii) analyze the threats to mature and old-growth forests on Federal lands, including from wildfires and climate change; and*

---

[30] *See* Strengthening the Nation's Forests, Communities, and Local Economies, Executive Order 14072, 87 Fed. Reg. 24,851 (April 22, 2022).

*(iii) develop policies, with robust opportunity for public comment, to institutionalize climate-smart management and conservation strategies that address threats to mature and old-growth forests on Federal lands."*[31]

The WMNF Plan gives the forest a distinct advantage in meeting its NFMA and EO obligations by already clearly defining mature, old, and old-growth forests. The WMNF has identified extensive mature forests in the West Peabody IRP project area, much of which it is planning to log in a clear violation of EO 14072. Until detailed analysis is completed and mature forests are conserved, the West Peabody IRP must not proceed.

The scientific underpinnings of EO 14072 are rooted in recent peer-reviewed studies that investigate climate change mitigation and the intersection of forest ecology and forest carbon. Climate change is driving and exacerbating a range of threats to New Hampshire, the New England region, and the globe. The 2009 New Hampshire Climate Action Plan notes that climate change is already "[i]ncreasing the frequency and severity of heavy, damaging precipitation events and the associated major economic impacts of cleanup, repair, and lost productivity and economic activity." In addition, climate change is "[i]ncreasing the frequency of short-term (i.e., one to three month) summer droughts from every two to three years to annually, resulting in increased water costs, and agricultural and forestry stress." Exhibit 19. Although perhaps not a primary driver of the spread of invasive species, ticks, and disease, climate change can amplify these threats.

The Intergovernmental Panel on Climate Change Report released in February 2022 found, "[s]afeguarding biodiversity and ecosystems is fundamental to climate resilient development … and to [climate] mitigation and adaptation." Exhibit 20. On November 12th,

---

[31] Ibid.

2021, the US joined 140 other nations in signing a commitment at the COP 26 UN Climate Change Conference in Glasgow, Scotland. The "Glasgow Leaders' Declaration on Forests and Land Use" promised to "to halt and reverse forest loss and *land degradation* by 2030" (emphasis added). Exhibit 21.

On the global scale, forest protection represents approximately *half or more* of the climate change mitigation needed to hold temperature rise to 1.5 degrees Celsius.[32] New Hampshire may be a relatively small state, but its temperate deciduous forests are among the planet's most effective carbon sinks. In the US, New England's in-situ carbon storage potential is second only to that of the Pacific Northwest, but carbon storage levels remain artificially low due to timber harvest frequency and intensity. Across the Northeast US and Upper Midwest, timber harvest accounts for 86% of annual forest carbon loss. In comparison only 9% of forest carbon in the same geographic area is lost annually from insect damage, and 3% from conversion to other land uses.[33] Other recent studies show that among land uses in New England, timber harvest is the leading cause of tree mortality[34] and has the greatest impact on aboveground carbon storage.[35]

**The exceptional values of mature and old-growth forests**

(a) Forest Carbon

There is a common misconception that young forests are better than old when it comes to removing carbon in the atmosphere. First of all, old forests store much more carbon than young

---

32 Erb et al., UNEXPECTEDLY LARGE IMPACT OF FOREST MANAGEMENT AND GRAZING ON GLOBAL VEGETATION BIOMASS (2018)

33 Harris et al., ATTRIBUTION OF NET CARBON CHANGE BY DISTURBANCE TYPE ACROSS FOREST LANDS OF THE COTERMINOUS UNITED STATES (2016)

34 Brown et al., TIMBER HARVEST AS THE PREDOMINANT DISTURBANCE REGIME IN NORTHEASTERN U.S. FORESTS: EFFECTS OF HARVEST INTENSIFICATION (2018)

35 Duveneck and Thompson, SOCIAL AND BIOPHYSICAL DETERMINATIONS OF FUTURE FOREST CONDITIONS IN NEW ENGLAND: EFFECTS OF A MODERN LAND-USE REGIME (2019) (hereinafter "Duveneck and Thompson (2019)").

forests, and they continue to accumulate carbon over time.[36,37,38] What's more, the rate of carbon sequestration also increases as trees age.[39] It can take up to 30 years after a regeneration cut for a young forest to become a carbon sink instead of a carbon source.[40]

Today, despite tree cover across the vast majority of the northern New-England landscape, the region's forests do not produce high levels of ecosystem services due to current management practices, including harvest frequency and intensity, and are still recovering from extensive clearing in the eighteenth and nineteenth centuries. A 2019 paper by Harvard Forest researchers found that:

> *"Among land uses, timber harvesting [has] a larger effect on [aboveground carbon] storage and changes in tree composition than did forest conversion to non-forest uses… Our results demonstrate a large difference between the landscape's potential to store carbon and the landscape's current trajectory."*[41]

Northeast secondary forests have the potential to increase biological carbon sequestration 2.3–4.2-fold.[42] A 2011 paper by UVM Professor Bill Keeton found that:

> *"…There is a significant potential to increase total carbon storage in the Northeast's northern hardwood-conifer forests. Young to mature secondary forests in the northeastern United States today have aboveground biomass (live and dead) levels of 107 Mg/ha on average (Turner et al. 1995, Birdsey and Lewis 2003). Thus, assuming a*

---

[36] Keith et al., RE-EVALUATION OF FOREST BIOMASS CARBON STOCKS AND LESSONS FROM THE WORLD'S MOST CARBON-DENSE FORESTS (2009).
[37] Luyssaert et al., OLD-GROWTH FORESTS AS GLOBAL CARBON SINKS (2008).
[38] Masino et al., OLDER EASTERN WHITE PINE TREES AND STANDS SEQUESTER CARBON FOR MANY DECADES AND MAXIMIZE CUMULATIVE CARBON (2021).
[39] Stephenson et al., RATE OF TREE CARBON ACCUMULATION INCREASES CONTINUOUSLY WITH TREE SIZE (2014).
[40] Law et al, CHANGES IN CARBON STORAGE AND FLUXES IN A CHRONOSEQUENCE OF PONDEROSA PINE (2003)
[41] Duveneck and Thompson (2019)
[42] Keeton et al., Late-successional Biomass Development in Northern Hardwood-Conifer Forests of the Northeastern United States (2011)

*maximum potential aboveground biomass range for old-growth of approximately 250–450 Mg/ha, a range consistent with upper thresholds in our data set and the lower threshold observed at Hubbard Brook, our results suggest a potential to increase in situ forest carbon storage by a factor of 2.3–4.2, depending on site-specific variability. This would sequester an additional 72–172 Mg/ha of carbon."*[43]

Forests in temperate zones such as in the Eastern U.S. have a particularly high untapped capacity for carbon storage and sequestration because of high growth and low decay rates, along with exceptionally long periods between stand replacing disturbance events, similar to the moist coastal forests of the Pacific Northwest. Further, because of recent recovery from an extensive history of timber harvesting and land conversion for agriculture in the 18th, 19th, and early 20th centuries, median forest age is about 75 years,[44] which is only about 25–35% of the lifespan of many of the common tree species in these forests.[45] Because of our remarkable forest ecosystems here in Northeastern North America, several global studies have highlighted the unique potential of our temperate deciduous forests to contribute on the global stage to climate stabilization and resilience.[46,47]

A 2013 study provides proof that protecting forests from logging is as close to a guarantee as there is for securing long-term carbon sequestration and storage. Strict protected areas prohibiting logging (i.e. GAP 1, IUCN Category 1, or equivalent classification) cover just 5% of the total land area of the mid-Atlantic and Northeast US (VA, PA, DE, NJ, NY, CT, RI,

---

[43] *Id.*
[44] Moomaw et al (2019). Intact Forests in the United States: Proforestation Mitigates Climate Change and Serves the Greatest Good.
[45] *Id.*
[46] Dinerstein et al., A GLOBAL SAFETY NET TO REVERSE BIODIVERSITY LOSS (2020).
[47] Jung et al., AREAS OF GLOBAL IMPORTANCE FOR TERRESTRIAL BIODIVERSITY, CARBON, AND WATER (2020).

MA, VT, NH, ME). However, these protected areas account for "30% of the carbon stored in all forests in the region."[48]

(b) Climate Resilience and Water Quality

Old forests are also the most resilient to changes in the climate, producing the highest outputs of ecosystem services like clean water, and reducing the impacts of droughts and floods. These ecosystem services protect downstream communities from flooding, purify drinking water at low cost, and maintain base flows and low temperatures in rivers during hot summers for the benefit of fish and wildlife.

In New England, frequent flooding and nutrient-driven water quality degradation are two of our most costly environmental crises, and both are compounded by climate change. Mature and old forests naturally mitigate against flooding and drought by slowing, sinking, and storing water that would otherwise rapidly flow into our streams, rivers, and lakes.[49] Scientists have also shown that old forests are exceptional at removing nutrients that drive harmful algae blooms, like phosphorus.[50]

After Tropical Storm Irene ravaged New England in 2011, Vermont's Department of Forests, Parks, and Recreation commissioned a report entitled "Enhancing Flood Resiliency of Vermont State Lands." According to the report:

> *"There may be a tendency to assume that lands in forest cover are resilient to the effects of flooding simply by virtue of their forested status. However, forest cover does not necessarily equate to forest health and forest flood resilience. Headwater forests of*

---

[48] Lu et al 2013 - A Contemporary Carbon Balance for the Northeast Region of the United States
[49] Underwood and Brynn, ENHANCING FLOOD RESILIENCY OF VERMONT STATE LANDS (2015)
[50] Warren et al., FOREST STREAM INTERACTIONS IN EASTERN OLD-GROWTH FORESTS (2018).

*Vermont include a legacy of human modifications that have left certain land areas with a heightened propensity to generate runoff, accelerate soil erosion, and sediment streams. These legacy impacts affect forest lands across the state... The quality of [today's] forests is not the same as the pre-Settlement old growth forests. The legacy of early landscape development and a history of channel and floodplain modifications continue to impact water and sediment routing from the land."*[51]

A 2019 study led by the University of Vermont looked into the climate resilience of older compared to younger forests. The research found that:

*"[Older forests] simultaneously support high levels of carbon storage, timber growth, and species richness. Older forests also exhibit low climate sensitivity…compared to younger forests… Strategies aimed at enhancing the representation of older forest conditions at landscape scales will help sustain [ecosystem services and biodiversity] in a changing world… Although our analysis suggests that old forests exhibit the highest combined [ecosystem services and biodiversity (ESB)] performance, less than 0.2% of the investigated sites are currently occupied by forests older than 200 years. This suggests a large potential to improve joint ESB outcomes in temperate and boreal forests of eastern North America by enhancing the representation of late-successional and older forest stand structures…"* [52]

Because of the overwhelming science in support of recovering America's old-growth forests, a recent peer-reviewed paper calls for the establishment of Strategic Carbon Reserves, with an emphasis on roadless, maturing forests. The paper finds that:

---

[51] Underwood and Brynn (2015)

[52] Thom et al., THE CLIMATE SENSITIVITY OF CARBON, TIMBER, AND SPECIES RICHNESS COVARIES WITH FOREST AGE IN BOREAL-TEMPERATE NORTH AMERICA (2019)

- *"Many of the current and proposed forest management actions in the United States are not consistent with climate goals... [P]reserving 30 to 50% of lands for their carbon, biodiversity and water is feasible, effective, and necessary for achieving them."*
- *"Instead of regularly harvesting on all of the 70% of US forest land designated as 'timberlands' by the US Forest Service, setting aside sufficient areas as Strategic Reserves would significantly increase the amount of carbon accumulated between now, 2050 and 2100, and reestablish greater ecosystem integrity, helping to slow climate change and restore biodiversity."*
- *"Preserving and protecting mature and old forests would not only increase carbon stocks and growing carbon accumulation, they would slow and potentially reverse accelerating species loss and ecosystem deterioration, and provide greater resilience to increasingly severe weather events such as intense precipitation and flooding."*[53]

(c) Biodiversity

Many of New England's native fish and wildlife species, including those that are often most imperiled, such as the Northern Long-eared Bat, pine marten, brook trout, Blackburnian and Cerulean Warblers, Scarlet Tanagers, and Wood Thrush, depend on large, unfragmented landscapes and structurally-complex old forests for suitable habitat.[54,55] Mature, unfragmented, interior forests are rare in New England overall, making the Green and White Mountain National Forests important concentrations of such habitat within New England. When this habitat is

---

[53] Law et al., CREATING STRATEGIC RESERVES TO PROTECT FOREST CARBON AND REDUCE BIODIVERSITY LOSSES IN THE UNITED STATES (2022)
[54] Zaino et al 2018
[55] "The Critical Importance of Large Expanses of Continuous Forest for Bird Conservation" (Askins 2015)

fragmented or degraded, such as through road construction and logging projects, these species experience increased threats from interactions with humans, predation, changes in microclimates, the spread of invasive species, and other fragmentation and edge effects.

Pine marten are on the State of Vermont Endangered Species List, and one of only two viable populations in the state is located within the Green Mountain National Forest. A 2022 study analyzing marten populations in Maine found that "even partial harvest activities can diminish the canopy cover, structural complexity and overall basal area [that marten] require[.]"[56] The same study found that "Marten…showed lower initial occupancy probability in areas of increasingly disturbed forest and had both higher extinction rates and lower colonization rates in these areas."[57]

Northern long-eared bats are federally listed as threatened and the US Fish and Wildlife Service has proposed to uplist the bat to endangered, with a decision due in the fall of 2023. The Northern long-eared bat depends on mature and old forests for roosting and foraging.[58] Its preferred roosting habitat is large-diameter live or dead trees of a variety of species, with exfoliating bark, cavities, or crevices. And its preferred foraging habitat is old forest with complex vertical structure on hillsides and ridges.[59]

**Logging is the greatest threat to mature and old forests in the WMNF and New England**

Due primarily to human-driven forest conversion (i.e. development, agriculture) and degradation (i.e. logging, fragmentation), mature and old-growth forests, once common in the

---

[56] Evans, B. E. and A. Mortelliti, "Effects of forest disturbance, snow depth, and intraguild dynamics on American marten and fisher occupancy in Maine, USA." Ecosphere (2022) Vol. 13, Iss. 4.
[57] *Id.*
[58] Burkhart, J. et al. "Species Status Assessment Report for the Northern long-eared bat (Myotis septentrionalis)," U.S. Fish and Wildlife Service. (2022) Version 1.1.
[59] *Id.*

forested regions of the US, are today underrepresented compared to historical levels. As explained previously, prior to European settlement, old-growth forests were the dominant land cover of northern New England, including the locations of the White and Green Mountain National Forests.

The recently-released USDA Forest Service Climate Adaptation Plan notes that mature and old-growth forests are "often viewed as ideal candidates for increased conservation efforts, and are frequently found within areas designated as wilderness or roadless or other management areas where timber harvest is precluded." The USDA Forest Service Climate Adaptation Plan is wise to highlight the inverse relationship between timber harvest levels and amounts of mature and old-growth forests. As implied by the USDA Forest Service Climate Adaptation Plan, there is no greater threat to the extent of mature and old-growth forests on federal public lands than logging.

Logging is the single greatest influence on the amount and extent of mature forests across the US, and is easily the most preventable threat to mature forests when compared to fire, insects, disease, and other disturbances. A 2013 study found that "Logging is a larger cause of adult tree mortality in northeastern U.S. forests than all other causes of mortality combined."[60] This finding was reinforced in another study from 2018: "[Logging] comprises more than half of all mortality (on a volume basis), making logging the predominant disturbance—natural or anthropogenic— affecting forest ecosystems in the region."[61]

This level of timber harvest has a significant impact on forest carbon – far greater than any other factor. Timber harvest drives 92% of annual forest carbon losses in the US South, 86%

---

[60] Canham et al 2013 - Regional variation in forest harvest regimes in the northeastern United States

[61] See Brown et al. 2018

in the North, and 66% in the West. For comparison, the second greatest impacts on forest carbon in each region are as follows: West: fire (15%); North: insect damage (9%); South: wind damage (5%).[62]

Forthcoming research led by Dr. Dominick DellaSala provides the first nationwide assessment of present levels of mature forests in the US. Today, mature and old-growth forests represent ~36% of all forest age classes across the nation, with the greatest amount in a single ownership (35%) located on federal lands. Of the mature forests on federal lands, 92% are managed by the US Forest Service, 9% by the Bureau of Land Management, and 3% by the National Park Service. These forests simultaneously support the highest concentrations of drinking water source areas, at-risk ecosystems, and aboveground living biomass. Despite their exceptional value, the vast majority of mature forests on federal lands (76%), storing approximately 10.64 Gt of $CO_2$, are unprotected from logging.[63]

Of the mature forests identified by Dr. Dellasala's study, old-growth represents a tiny fraction in each region of the United States outside of Alaska, demonstrating the need for policies that put a greater percentage of forests on a path to recover late successional forests. In the Eastern US, old-growth comprises just 1.6% of South-Central US forests, 1.1% of the Upper Midwest forests, .5% of Southeast US forests, and .4% of forests in the Northeast.[64]

As evidenced above, the Northeast US has lost a greater percentage of its old-growth forests than perhaps any other region of the US. Private lands across New England are managed

---

[62] Harris et al 2016. Attribution of net carbon change by disturbance type across forest lands of the conterminous United States. Carbon Balance and Management.

[63] Dellasala et al 2022 (forthcoming). Mature and Old-Growth Forest Contributions to Large-Scale Conservation Targets in the Conterminous USA. Frontiers in Science.

[64] Davis, M.B. (ed.). (1996). Eastern old-growth forests. Prospects for rediscovery and recovery. Island Press: Washington, D.C.

more intensively for timber harvest compared with federal public lands.[65] This is especially pronounced in the northern New England states of Maine, New Hampshire and Vermont, where the vast majority of forests are privately owned (~94% of Maine). Recent modeling suggests that logging, not forest conversion, will continue to be the greatest factor in regional aboveground forest carbon over at least the next 50 years.[66]

Although there is a large amount of maturing forest (80-100) across the landscape, future harvests will target these forests where they occur on private lands.[67] Despite widespread forest maturation, rates of timber harvest in New England are such that trends in regional amounts of late successional forest structure are static, and the amount of large diameter standing snags is declining.[68] "Even though forests of the Northeast are aging, changes in silviculture and forest policy are necessary to accelerate restoration of old-growth structure."[69] The White Mountain National Forest, containing a relatively high percentage of mature forests compared to private lands, is an especially important location to protect intact mature forests so that New England can recover regionally-significant amounts of late successional forest.

**The Forest Service should conduct additional analysis**

In addition, an Environmental Impact Statement should analyze and minimize:

- Water quality impacts, including from road construction/reconstruction and logging;

---

[65] Gunn et al 2013. Late-successional and old-growth forest carbon temporal dynamics in the Northern Forest (Northeastern USA). Forest Ecology and Management.
[66] Duveneck and Thompson 2019. Social and biophysical determinants of future forest conditions in New England: Effects of a modern land-use regime. Global Environmental Change.
[67] Ibid.
[68] Ducey et al 2013. Late-Successional and Old-Growth Forests in the Northeastern United States: Structure, Dynamics, and Prospects for Restoration.
[69] Ibid.

- Impacts to historic and cultural resources, including those of the Abenaki community;
- Soil quality impacts, including from road construction/reconstruction and logging.

**The Project, as proposed, is "significant" and requires an EIS**

NEPA requires that federal agencies prepare an Environmental Impact Statement ("EIS") for projects that are likely to have significant effects. 40 CFR § 1501.3(a)(3). In determining whether the effects of the proposed action are likely to be significant, agencies are to consider (1) both short- *and long-term effects*; (2) Both beneficial and *adverse effects*; (3) Effects on public health and safety, and (4) effects that would violate Federal, State, Tribal, or local law protecting the environment. *Id*. § 1501.3(b)(2) (emphasis added). In making the significance determination, agencies are also to consider connected actions. *Id*. § 1501.3(b). Moreover, "significance varies with the setting of the proposed action" and "in the case of a site-specific action, significance would usually depend only upon the effects in the local area." *Id*. § 1501.3(b)(1).

Standing Trees believes that an EA is not adequate for a project of this size, and requests that the Forest Service prepare an EIS. This is a multi-phase, multi-year project that is significantly affecting the environment, regardless of whether those effects are considered beneficial or detrimental. The proposed action is likely to have both short and long-term effects because of its expansive scope and size. Logging will harm the Northern Long-eared Bat as well as other species that depend on mature, interior forests. The proposed action will contribute to the loss of climate benefits of retaining mature and old stands, violating EO 14072. The proposed action will significantly impact the Great Gulf Roadless Area, its possibility for future wilderness designation, and its values for habitat, clean water, and recreation. Logging will cause

detrimental impacts to water quality due to runoff, sedimentation, and potential herbicide contamination. The proposed action may cause loss or damage to historic and cultural resources located within the proposed action area. Finally, the DEA may violate NFMA, NEPA, and the ESA, as described previously. For the above reasons, the size, scope, and significance of the Forest Service's proposed action indicates the need for the Forest Service to prepare an EIS instead of an EA.

**Conclusion**

NEPA requires that agencies fully evaluate and understand the potential environmental impacts of proposed actions before committing to a specific course of action. In order to fulfill this duty, Standing Trees asks that the Forest Service thoroughly analyze all concerns and recommendations raised above in an EIS. Standing Trees looks forward to the opportunity to review and comment upon the Forest Service's forthcoming NEPA analysis to ensure that this duty was faithfully performed.

Sincerely,

Zack Porter
Executive Director
Standing Trees
zporter@standingtrees.org
(802) 552-0160

United States Department of Agriculture

# Peabody West Integrated Resource Project

## Draft Environmental Assessment and Preliminary Finding of No Significant Impact

U.S. Department of Agriculture, Forest Service photo by Jeff Williams

Forest Service | White Mountain National Forest | 8/4/2022

**JA-0847**

PBWTAR_4802

# Purpose and Need for the Proposed Action

The White Mountain National Forest (WMNF) Land and Resource Management Plan (forest plan) guides management to "use an ecological approach to provide both healthy ecosystems and a sustainable yield of high quality forest products" (forest plan, p. 1-17) and to "use sustainable ecosystem management practices to provide a diversity of habitats across the WMNF, including various habitat types, age classes, and non-forested habitats" (forest plan, p. 1-20) (U.S. Department of Agriculture, Forest Service 2005). The forest plan allocates lands to a variety of management areas (MAs), each of which emphasizes goals, objectives, and desired conditions. Each MA also has associated standards and guidelines that set parameters on activities to ensure protection of the character and resources of the land. This EA is tiered to the 2005 WMNF Forest Plan Final Environmental Impact Statement (FEIS) (U.S. Department of Agriculture, Forest Service 2005). Both the forest plan and FEIS are incorporated by reference, as appropriate, and are available on the WMNF website.

The purpose of the Peabody West Integrated Resource Project (IRP) is to advance forest plan goals, objectives, and desired conditions for vegetation, wildlife, and other resources in the Peabody West Habitat Management Unit (HMU) (refer to Project Maps section[1]). The Peabody West HMU is about 15,500 acres. Project activities are proposed on a subset of about 3,000 acres within MA 2.1 lands—General Forest Management—and associated access roads, as described in the Proposed Action section. The purpose of this management area is to provide a sustained yield of high-quality timber products; provide a balanced mix of habitats for wildlife; provide a variety of recreation opportunities; and manage high-use or highly developed recreation areas to acceptable social and ecological standards while retaining some low-use and less developed areas (forest plan, p. 3-3). As described in the following sections, the proposed project would manage forest vegetation in the project area to diversify vegetation and wildlife habitat while providing a sustainable yield of high-quality timber products. The project would also implement management actions to address transportation system needs and improve recreational opportunities.

## Vegetation and Wildlife Habitat Management

This project is needed to provide a sustainable yield of high-quality timber products and to improve wildlife habitat diversity within the Peabody West HMU, thereby helping to achieve the desired future conditions for wildlife and vegetation described in Chapter 1 of the forest plan. The forest plan HMU framework guides management in the project area to ensure that diverse habitats are distributed across the WMNF where soils and other ecological site conditions are suitable (U.S. Department of Agriculture, Forest Service 2019, 2002).

An analysis of the current habitat conditions indicates that the Peabody West HMU is not meeting MA 2.1 habitat composition and age class objectives (forest plan, pp. 1-20 to 1-21; U.S. Department of Agriculture, Forest Service 2022). The Forest Service most recently conducted vegetation management in the Peabody West HMU in 2006, which consisted primarily of single-tree selection around the Dolly Copp Campground. The project area currently contains a mosaic of forest types and habitats typical throughout the WMNF including northern hardwood, mixedwood, spruce-fir, aspen-birch, and wildlife openings. Most of the habitats in the project area are mature, with some younger stands interspersed. The general lack of open forest conditions tends to promote the development of shade-tolerant species and limit birch and aspen, which need abundant sunlight.

---

[1] Maps in this document are intended to depict physical features as they generally appear on the ground and may not be used to determine title, ownership, legal boundaries/jurisdiction, including access restrictions that may be in place on either public or private land. The Forest Service reserves the right to correct, update, modify, or replace these products without notification. This map may not be suitable for navigational use. Please contact your local Forest Service office for more information.

No regeneration-age (0-9 years old) forest habitat occurs in the Peabody HMU except for three permanent wildlife openings which are managed to maintain valuable grassy and shrubby habitat. These existing conditions create a need for management action to move the landscape toward the desired future conditions consistent with forest plan direction.

Wildlife habitat objectives for the Peabody West HMU including the following:

- Increase spruce-fir habitat over the long-term
- Increase age-class diversity and foster the regeneration of stands
- Improve growing conditions for residual trees
- Maintain or increase aspen-birch habitat
- Maintain current levels of hemlock
- Gradually convert stands situated on non-compatible ecological land types to forest types consistent with land capability
- Maintain available permanent wildlife opening acreage and improve access to the openings for maintenance

The HMU rationale document includes more detailed information regarding existing and desired conditions for the Peabody West HMU (U.S. Department of Agriculture, Forest Service 2022).

## Transportation

In 2015, the WMNF completed a Forest-wide transportation analysis process report for long-term administration of the WMNF's transportation system (U.S. Department of Agriculture, Forest Service 2015). The proposed project is needed to complete a site-specific transportation analysis to implement or modify the 2015 travel analysis process recommendations within the project area; to plan and manage for current and future public and Forest Service access to the project area; to meet forest plan standards for desired road operation maintenance levels (MLs); and to meet requirements of the Highway Safety Act. Definitions of road operation MLs are provided in the forest plan (forest plan glossary, pp. 25-26).

## Recreation

The forest plan includes a goal of providing a range of quality recreation activities and opportunities (forest plan, p. 1-10). This project is needed to provide a sustainable range of quality recreation opportunities consistent with forest plan direction. In addition, the project is needed to improve accessibility at Third Hole swimming site, and to provide backcountry skiing and mountain biking opportunities and improve connectivity among those opportunities in the project area.

Existing recreation opportunities in the project area and nearby include three challenging hiking trails accessing the summit of Mount Madison, two moderate hiking trails accessing the summit of Pine Mountain, short trails at Triple Falls and the Androscoggin Ranger District office, three popular snowmobile routes, and the Hayes Copp Ski Trail. Numerous mountain bike trails exist on adjacent private lands north of the project area in the vicinity of Gorham, NH. The Dolly Copp and Barnes Field campgrounds are also located in the project area. Parking opportunities exist at Dolly Copp Campground, Great Gulf Wilderness Trailhead, and at several locations on public and private land within the town of Gorham.

### Mountain Biking Trails

Many routes in the WMNF were laid out and constructed according to design standards that never considered uses other than hiking. The combined effects of trail age, layout, design, use levels, and the naturally rugged terrain have resulted in a Forest-wide trail system that is steep and rocky and largely unsuitable for most mountain bike users. No managed opportunities for mountain biking exist on the Androscoggin Ranger District. Mountain biking opportunities in the project area are currently limited to trails maintained for hiking, National Forest System roads, and other travelways. Mountain bike trail networks exist or are proposed on adjacent private lands, such as the trail network on the north slope of Pine Mountain. The proposed project is needed to provide mountain biking opportunities on National Forest System lands in the project area.

### Third Hole Access

Currently, one trail provides access to the Third Hole site. The trail is about 300 feet in length, accessed from a private parking lot on State Route 16, and has been maintained in the past. However, additional maintenance is needed to address resource concerns and accessibility guidelines.

### Pine Mountain Glade

No backcountry skiing opportunities exist in the project area. One backcountry ski area, the Bill Hill glade, occurs on and is accessed via private land on the northeast slope of Pine Mountain. The proposed project would provide backcountry skiing opportunities on National Forest System lands in the project area.

### Androscoggin Ranger District Office Site

Currently, vegetation located in the State Route 16 right-of-way inhibits visibility of the Androscoggin Ranger District administrative site from the roadway. Management action is needed to improve line-of-sight, increase visibility, and facilitate visitation to the office by the public.

# Decision to be Made

The Androscoggin District Ranger, as the responsible official for the Forest Service, must determine whether the proposed action would have significant impacts on quality of the human environment, and therefore whether an environmental impact statement must be prepared.

## Council on Environmental Quality Regulations

This environmental analysis is conducted according to the Council on Environmental Quality's 1978 regulations for implementing the procedural provisions of the National Environmental Policy Act (40 CFR §§1500-1508, as amended). The CEQ issued revised regulations for implementing the procedural provisions of the National Environmental Policy Act, effective September 14, 2020. The revised regulations provide the responsible official the option of conducting an environmental analysis under the 1978 regulations if the process was initiated prior to September 14, 2020 (40 CFR §1506.13, 85 FR 137, p. 43373, July 16, 2020). The Peabody West Project was first published on the Forest Service's schedule of proposed actions in April 2019, and the first public scoping comment period was initiated in December 2019.

## Pre-decisional Administrative Review Process

The proposed project is an activity implementing a land management plan. It is not an activity authorized under the Healthy Forests Restoration Act of 2003, as amended (Pub. L. 108-148). Therefore, this activity is subject to pre-decisional administrative review consistent with the Consolidated Appropriations Act of 2012 (Pub. L. 112-74) as implemented by subparts A and B of 36 CFR Part 218.

## For More Information

We make every effort to create documents that are accessible to individuals of all abilities. However, limitations with our word processing programs may prevent some parts of this document from being readable by computer-assisted reading devices. If you need assistance with any part of this document, or for more information regarding this project, contact Johnida S. Dockens, NEPA Planner, at johnida.dockens@usda.gov or by phone at 207-323-5683.

# Proposed Action

The WMNF is proposing of variety of activities as described below and shown in the Project Maps section, to meet management objectives. Applicable forest plan standards and guidelines, National Core and State best management practices (New Hampshire Division of Lands and University of New Hampshire (UNH) Cooperative Extension 2016, U.S. Department of Agriculture, Forest Service 2012), and project-specific design elements would be implemented under the proposed action (refer to the

Design Elements section). In addition, the interdisciplinary team developed the proposal using the climate change tools and approaches described in Swanston et al. (2016).

The WMNF is proposing project activities on about 3,000 acres in MA 2.1, consistent with forest plan direction. Project implementation is expected to start in 2024.

## Changes Since Scoping

### Revised Mountain Biking Trails

Based on coordination with the Forest Service Wildlife Biologist and the New Hampshire Fish and Game Department, the District Ranger has decided to adjust the layout for the proposed mountain biking trail to avoid a large bear mast area. The revised layout would connect the bike trail to the existing Bear Springs Snowmobile Trail farther east than the original proposal, avoiding the mast area and eliminating about two miles of proposed new trail construction. The revised route would make greater use of and include improvements to the existing snowmobile trail to ensure that it is suitable for mountain bike use. Refer to the Mountain Biking Trails section below for the current scope.

### Removed Hermit Lake Complex

The WMNF originally proposed several management activities at the Hermit Lake Complex, including shelter replacements and other changes to infrastructure, as described in early scoping documents. Based on the need for additional proposal development, the District Ranger has decided to remove all activities at the Hermit Lake Complex from the current proposal. Removing these activities from the current proposal does not preclude the Forest Service from considering similar activities at the Hermit Lake Complex in the future, subject to separate environmental analysis and decision-making processes as required.

## Vegetation and Wildlife Habitat Management

From 2019 through 2021, the interdisciplinary team delineated forest stands in MA 2.1 lands and completed a preliminary assessment of current conditions including general stand type (hardwood and softwood) and tree heights using LiDAR and aerial photography. These data and mapped ecological land types were used to prioritize field assessments of current stand conditions and characteristics to inform the proposal development process. Following further preliminary internal review by the interdisciplinary team, refinements were made to proposed units, prescriptions, and season of harvest to avoid or minimize potential impacts to sensitive resources including floodplains, wildlife, and scenery.

The WMNF proposes to conduct commercial and non-commercial vegetation treatments on about 2,220 acres—within about 3,000 gross unit acres—of forest stands on National Forest System lands in the Peabody West HMU (Table 1; Figure 1). Proposed units, unit treatment acres, and seasons of harvest are provided in Appendix A. All proposed silvicultural treatments would occur on MA 2.1 lands. All stands proposed for timber harvesting have site-specific objectives and corresponding silvicultural prescriptions to meet the desired conditions for vegetation and/or wildlife habitat. Descriptions of proposed treatment types are summarized in the following section. The forest plan glossary also provides definitions of silvicultural treatments.

A range of silvicultural treatments would be used to provide commercial wood products; create small and large openings in the forest to allow regeneration of trees and other vegetation and increase wildlife habitat diversity; provide additional growing space to enhance crown and bole development; and encourage the establishment of shade-intolerant species in the understory. Other supporting project objectives include retaining existing disease-free, mast-producing trees for wildlife; discouraging beech regeneration; removing decadent, poor-quality trees to capture economic value; and removing beech saplings during treatment to reduce their dominance in the new stands.

Prior to implementation, field visits would occur to refine treatment unit boundaries and acres including modifications to address site-specific conditions (e.g., wet areas, steep or rocky slopes, and forest type changes). In addition, treatment acres may be reduced to meet visual and water quality objectives, to incorporate reserve patches of uncut trees, and to incorporate protective buffers around features such as

vernal pools, cultural resources, nest trees, and riparian zones. Typical harvesting equipment including chainsaws, skidders, feller-bunchers, and harvesters would be used to implement treatments.

Each unit proposed for vegetation management would be assigned an operating season based primarily on silvicultural and wildlife objectives, soil and other site conditions. However, other resource (e.g., botanical, cultural, and recreational) concerns also influence the selection of an operating season. Appendix A includes the list of proposed treatment units with applicable seasons of harvest. No vegetation management activities would occur during the spring or early summer due to anticipated wet conditions that could result in adverse impacts to soil, water, or vegetation.

**Table 1. Proposed silvicultural treatment acres for management area 2.1 lands in the Peabody West habitat management unit**

| Silvicultural Treatment or Objective | Prescription Type | Estimated Treatment Acres[1] |
|---|---|---|
| Even-aged Regeneration | Clearcut with Reserves | 30 |
| Even-aged Regeneration | Patch Cut | 70 |
| Even-aged Regeneration | Shelterwood Establishment Cut | 75 |
| Intermediate Treatment | Commercial Thin | 50 |
| Uneven-aged Regeneration | Improvement Cut | 310 |
| Uneven-aged Regeneration | Single Tree Selection | 310 |
| Uneven-aged Regeneration | Group Selection | 110 (OF 515 STAND ACRES) |
| Uneven-aged Regeneration | Single Tree Selection/Group Selection combined | 1,250 |
| Wildlife Opening Expansion | Clearcut with Reserves | 10 |
| **Total** | - | 2,220 |

[1] Acres are gross estimates, including reserve patches of uncut trees, as well as protective buffers for sensitive resources where cutting would not occur. Acres may not sum due to rounding.

A Forest Service Timber Sale Administrator monitors contract timber sale activities. Vegetation management activities would be implemented primarily through commercial timber harvest, providing an estimated 13 million board feet of forest products. Typically, vegetation management, including commercial timber harvests, would be conducted on smaller portions of the project area for weeks at a time during the appropriate seasons of harvest. For example, a forest stand subject to winter harvest would be managed when the ground has adequate snow cover and/or the soil is frozen. Depending on conditions, a stand or group of stands may be harvested in a single winter; however, variability in weather may result in extended periods of inactivity and the need for additional seasons to complete management activities.

In addition to commercial timber harvesting, non-commercial site preparation and release treatments would occur in units proposed for commercial treatments within three years following harvest. These and other proposed silvicultural treatments are described in the Silvicultural Treatments section.

About 25 existing log landings would be reconstructed and expanded, and about 13 new log landings would be constructed to support vegetation management activities. Log landings are typically 0.75 acre or smaller in size. Three access roads, each less than 500 feet in length, would be constructed or reconstructed to access log landings. Typically, log landings would be located near proposed hauling and access routes in relatively flat terrain. About 40 miles of skid trails would be constructed or reconstructed for timber harvest operations. Existing landings and skid trails would be used where possible and reconstructed to minimum standards (vegetation and stumps removed and surface graded) necessary for equipment use. Final locations of log landings and skid trails may be modified during implementation planning (i.e., layout), subject to applicable forest plan standards and guidelines, best management

practices, project-specific design elements and other site-specific requirements, and review by the interdisciplinary team prior to implementation.

## Silvicultural Treatments

This section provides a description of proposed silvicultural treatments. Refer to Figure 1 for a map of proposed treatments and Appendix A. Proposed Silvicultural Treatments for a list of proposed treatments and season of harvest by unit.

### *Even-Aged Management*

#### Clearcuts with Reserves

This type of treatment creates large openings (greater than 10 acres but no more than 30 acres) in the forest by removing all trees in a stand, except for trees located within reserve areas. Five percent of the acreage of each stand would remain uncut in reserve areas as directed by the forest plan. These large openings allow a high level of sunlight to reach the forest floor. All units proposed for clearcutting would result in an immediate change from mature to regeneration-age structure.

One outcome of clearcutting would be an increase in species diversity within units and across the project area. Compared to other silvicultural treatments, clearcutting would produce the greatest amount of early-successional habitat. Clearcutting would stimulate the germination of woody and herbaceous vegetation that have seeds with a relatively long period of dormancy. These include raspberries, blackberries, pin cherry, and various forbs and grasses. In response to clearcutting, the seeds of these plants would germinate due to the abundance of light and corresponding warming of the forest floor. Herbaceous cover would remain an important component of the new stand until the tree canopy begins to close. Clearcutting would likely result in the germination and establishment of fast-growing, shade-intolerant tree species such as pin cherry, paper birch, trembling aspen, and bigtooth aspen. Clearcutting would also promote asexual regeneration via root suckers and stump sprouts of hardwood species such as beech, bigtooth aspen, trembling aspen, and red maple.

#### Patch Cuts

Patch cuts differ from clearcuts primarily in opening size and the light environment created. All patch cuts would be between 2 and 10 acres to facilitate the regeneration and establishment of the same diversity of tree species expected from a clearcut. The reduced size of openings created by patch cuts could result in some minor differences in vegetative changes compared to clearcuts with reserves. The lack of reserve areas in patch cuts would influence the light environment through decreased shading of the treated area. Also, due to the lack of reserve areas, the age structure in a patch cut would be more simplified than a clearcut. Differences in species diversity would thus be negligible compared to the regeneration response in a clearcut.

Due to the inherently smaller opening sizes, resulting changes in microclimate conditions in neighboring stands would likely be reduced (assuming similar site, landform, topography, slope, aspect, elevation, and shape of unit) compared to those adjacent to a clearcut. Though growth rates of perimeter trees could increase as much as those adjacent to a clearcut, fewer trees would likely be affected due to the smaller size of the units. Similarly, fewer boundary trees would likely experience degradation in tree quality due to sun scald or branching from dormant buds. Because the probability of windthrow tends to increase as opening size increases, fewer trees would likely be affected by windthrow compared to those along a perimeter of a clearcut. The risk of incidental tree damage or mortality from wind would thus be less than a clearcut.

#### Shelterwood Harvest System

The shelterwood harvest system is used to regenerate an even-aged stand in which a new age class develops beneath the moderated microenvironment provided by the residual trees. The sequence of treatments can include three distinct types of cuttings: (1) an optional preparatory cut to enhance conditions for seed production, (2) an establishment cut to prepare the seed bed and to create a new age class, and (3) a removal cut to release established regeneration from competition with the overstory.

## Group Selection

Group selection units are typically 0.1 to 2 acres in size. The degree to which this treatment would facilitate regeneration of shade-intolerant, intermediate, or shade-tolerant tree species would depend, in part, on group size. Large groups would result in a comparatively greater amount of light than smaller groups. Accordingly, large groups would result in higher temperatures, greater amounts of evapotranspiration and reduced amounts of humidity at the forest floor than smaller groups. These conditions would facilitate the regeneration of a broad diversity of tree species particularly northern hardwoods characterized as intermediate or intolerant of shade such as white ash, yellow birch, and paper birch. Small groups would promote the regeneration of tree species characterized as intermediate and tolerant of shade such as maple species, hemlock, spruce, and fir. Some variation in regeneration responses would also be expected due to variation in seed periodicity, seed dispersal and other growth response characteristics.

Group selection areas are chosen to release advanced regeneration so saplings can grow from an understory to midstory crown position. In areas with no advanced regeneration, groups will establish young seedlings of shade-intolerant to mid-shade tolerant species within a few years following treatment. Trees around the perimeter of groups would expand their crowns and begin to occupy a portion of the groups within this five-year period. Over time, this treatment would lead to complex vertical and horizontal vegetative structure.

Although only about 20 percent of each unit would be treated, the targeted removal of poor-quality and low-vigor trees would likely result in an increase in tree quality and tree growth of residual trees while reducing the amount of mortality expected to occur in the absence of a treatment. Consequently, this treatment would also likely decrease each unit’s susceptibility to insects and disease.

## Single Tree Selection

Single-tree selection would create or foster the development of an uneven-aged structure by releasing advance reproduction and/or regenerating a diversity of northern hardwood and/or softwood trees. About one third of the trees would be cut and harvested from all merchantable size classes. Trees targeted for removal would include those exhibiting poor quality and low vigor. Residual stands would contain trees of variable sizes (i.e., heights and diameters). Over time, this treatment would lead to an increase in complexity of vertical vegetative structure. Trees and other plants would begin to occupy growing space created by the individual harvest of trees within five years following the treatment. The presence of shade intolerant tree species (e.g., paper birch and aspen) would decline in importance within each unit proposed for treatment. Though small gaps would be created, trees within residual stands would restrict and filter sunlight thereby favoring shade-tolerant plants such as spruce, hemlock, fir, beech, and sugar maple.

Vigorous trees of all size classes exhibiting good quality would be retained. Unlike group selection, single-tree selection would involve treatment throughout the entirety of each unit. This treatment would result in improving tree quality and growth of most residual trees while reducing the amount of mortality expected to occur in the absence of treatment. However, due to the greater density of residual trees, there would be less room for logging equipment to maneuver. Ultimately, this treatment would likely decrease each unit’s susceptibility to insects and disease because the potential adverse effect of residual tree damage would be minor compared to the increase in growth and quality of residual trees.

## Group and Single Tree Selection

The results of this treatment would be consistent with those outlined in the preceding subsections for group selection and single tree selection. A maximum of 20 percent of each unit is proposed for group selection under this combined treatment. Groups would be placed in areas where desirable advance regeneration could be released to enhance species composition and/or increase softwood habitat. The size of individual openings under this treatment would range from a single tree crown width up to about 2 acres.

| Author | Comment Text | Consideration Text |
| --- | --- | --- |
| Anon, Anon | Please no more GBA glades in the Gorham region until the parking and overuse problem is solved. More terrain combined with GBA's over use of social media in promoting is only going to crowd the limited glades in the northern region. There is no good parking option for the proposed glade. This will crowd the very limited parking angering locals and non glade users. Please build a new glade in a better suited area. | No parking area development or expansion is included in the proposed action. Recreation opportunities are intended to provide interconnection with existing trails and other facilities. Commenter does not suggest an alternate location for consideration.More broadly, the Forest Service recognizes the need to coordinate with neighboring communities regarding recreation access, much of which is outside the scope of the current proposal. Design feature REC-2 allows for line officer discretion regarding timing of implementation for recreation management activities for the Peabody West Project. |
| Artley, Dick | "Guidelines should provide the recommended technical and scientific of projects and activities to contribute to the achievement of desired conditions and objectives. They are the guidance that a project or activity would normally apply unless there is a reason for deviation. If deviation from plan guidelines is appropriate in specific circumstances, the rationale for deviation should be based on project or activity analysis and explained fully in the project decision document. However, deviation does not require an amendment to the plan." You tell the public you are not meeting one of your FP guidelines, yet you fail to provide rationale for deviation from plan guidelines based on project or activity analysis and explained fully in the project decision document. Request for changes to be made to the final NEPA document: tell the public you are not meeting one of your FP guidelines, yet you fail to provide rationale for deviation from plan guidelines based on project or activity analysis and explained fully in the project decision document. | The draft EA p. 21 provides rationale for exceeding guidelines for scenery management in MA 2.1 lands. In addition, the preliminary FONSI (p. 29) explains how exceeding these guidelines is consistent with operational flexibility provided in the forest plan. See also response to C/R #9 regarding scenery management considerations. No further response required. |
| Artley, Dick | 40 CFR §1502.10 Recommended format. The following standard format for environmental impact statements should be followed unless the agency determines that there is a compelling reason to do otherwise: (a) Cover sheet. (b) Summary. (c) Table of contents. (d) Purpose of and need for action. (e) Alternatives including proposed action (sections 102(2)(C)(iii) and 102(2)(E) of the Act). (f) Affected environment. (g) Environmental consequences (especially sections 102(2)(C)(i), (ii), (iv), and (v) of the Act). (h) List of preparers. (i) List of agencies, organizations, and persons to whom copies of the statement are sent. (j) Index. (k) Appendices (if any). NEPA does not give you the option to violate 40 CFR §1502.10 because you claim "concerns regarding several resources were addressed through project design, including design elements and the incorporation of forest plan standards and guidelines. | Commenter cites 40 CFR 1502.10 and 1502.16 which are relevant to environmental impact statements. Comment is not applicable to the current project. The proposed project is being analyzed via an environmental assessment and is consistent with content requirements for an EA (e.g., 40 CFR 1501.5).Commenter cites 40 CFR 1502.14(d) which is relevant to alternatives, and other sections regarding consideration of effects. The draft EA includes a discussion of the consequences of no action and an environmental impacts section. Commenter does not provide a suggested alternative to the proposed action, nor do they highlight a specific deficiency with the existing analysis. No further response required. |
| Artley, Dick | 40 CFR 1502.14(d) "In this section agencies shall: d) Include the alternative of no action." 40 CFR 1501.2(b), because you did not Identify environmental effects of project implementation on the resources you say were not analyzed in detail in adequate detail so they can be compared to economic and technical analyses. 40 CFR 1502.16 (b, d and h), because you did not divulge the: * (b) indirect effects and their significance of project Implementation on the resources you ignored (Sec. 1508.8). * (d) environmental effects of project Implementation on the resources you ignored.. * (h) means to mitigate adverse environmental impacts of project Implementation on the resources you ignored. | Commenter cites 40 CFR 1502.10 and 1502.16 which are relevant to environmental impact statements. Comment is not applicable to the current project. The proposed project is being analyzed via an environmental assessment and is consistent with content requirements for an EA (e.g., 40 CFR 1501.5).Commenter cites 40 CFR 1502.14(d) which is relevant to alternatives, and other sections regarding consideration of effects. The draft EA includes a discussion of the consequences of no action and an environmental impacts section. Commenter does not provide a suggested alternative to the proposed action, nor do they highlight a specific deficiency with the existing analysis. No further response required. |
| Artley, Dick | Every NEPA document must include a discussion of the following items. Your pre-decisional says nothing. (1) The environmental impacts of the proposed action and reasonable alternatives to the proposed action and the significance of those impacts. The comparison of the proposed action and reasonable alternatives shall be based on this discussion of the impacts. (2) Any adverse environmental effects that cannot be avoided should the proposal be implemented. (3) The relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity. (4) Any irreversible or irretrievable commitments of resources that would be involved in the proposal should it be implemented. (5) Possible conflicts between the proposed action and the objectives of Federal, regional, State, Tribal, and local land use plans, policies and controls for the area concerned. (6) Energy requirements and conservation potential of various alternatives and mitigation measures. (7) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures. (8) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures. (9) Means to mitigate adverse environmental impacts (if not fully covered under40 CFR § 1502.14(e). (10) Where applicable, economic and technical considerations, including the economic benefits of the proposed action. See: https://www.law.cornell.edu/cfr/text/40/1502.16 Request for changes to be made to the final NEPA document: Include discussions of these 10 items. | Commenter cites 40 CFR 1502.10 and 1502.16 which are relevant to environmental impact statements. Comment is not applicable to the current project. The proposed project is being analyzed via an environmental assessment and is consistent with content requirements for an EA (e.g., 40 CFR 1501.5).Commenter cites 40 CFR 1502.14(d) which is relevant to alternatives, and other sections regarding consideration of effects. The draft EA includes a discussion of the consequences of no action and an environmental impacts section. Commenter does not provide a suggested alternative to the proposed action, nor do they highlight a specific deficiency with the existing analysis. No further response required. |
| Artley, Dick | Failure to tell the public this chemical will not be applied to vegetation in your forest leaves the door open for you to apply glyphosate. This violates: 40 CFR 1501.2 (b)(2) because the Responsible Official did not "Identify environmental effects and values in adequate detail so the decision maker can appropriately consider such effects and values alongside economic and technical analyses." 40 CFR 1502.16(a) and (b) because the Responsible Official did not include the environmental impacts of the proposed action in Chapter 3 which would have caused any caring person to develop reasonable alternatives to the proposed action that would eliminate the possible harm to the public and wildlife. Apr. 21, 1997 Executive Order No. 13045 because the Responsible Official did not protect children from health and safety risks. Children are especially suseptable to glyphosate exposure risks because their neurological, immunological, digestive, and other bodily systems are still developing; 40 CFR §1508.27(b)(2) because the EA's intensity discussion will not discuss the degree to which the proposed action affects public health or safety. | The proposed action does not include herbicide application for NNIS. The revised EA will clarify the scope of NNIS treatment (none specific to this proposal). Any NNIS occurring in the project area would be handled under a separate analysis and decision, as indicated in the draft EA. No further response required. |
| Artley, Dick | I have included 4 Opposing Views Attachments with these comments. Please comply with the law by responding to each responsible opposing view quote contained in the Opposing Views Attachments. Request for changes to be made to the final NEPA document: Respond to all quotes that express opposing views contained in the Opposing Views Attachments. | Opposing views attachments submitted by the commenter primarily contain out-of-context quotes with no indication of cause-effect connection to the proposed project. Opposing views lack specificity, and several are derived from opinion pieces or popular articles. The interdisciplinary team has used appropriate best available science for this project.Opposing views #9 references herbicide use, which is not proposed as part of this project, and is therefore not relevant to this analysis. Opposing views #10 includes numerous quotes from a variety of press releases and popular articles referencing the use of best available science. Opposing views #10 does not, itself, contain scientific references relating to the project. No further response required.Opposing views #1 contains a variety of references, few of which are considered best available science (i.e., do not come from peer-reviewed or other reputable scientific sources). However, the commenter has not indicated the applicability of the excerpted references to the proposed project. No further response required. |

| | | |
|---|---|---|
| Artley, Dick | Request for changes to be made to the final NEPA document: Identify the Migratory Birds that exist in and near the project area that are protected under the Migratory Bird Treaty Act and discuss what you will require to assure these birds will be protected during burning and timber harvest operations. The Act makes no allowance to consciously harm these birds for any reason. Failure to do this will violate the Migratory Bird Treaty Act | Refer to the following document regarding compliance with MBTA: https://usfs.box.com/s/ve1h8u497g9lz4u0dlb09ldzygktc4lk. Note that the the M-Opinion does not change EO 13186, or its direction to federal agencies.Effects to wildlife are disclosed in the Forest Plan FEIS, starting on page 3-165. Migratory birds are specifically discussed on pp. 3-202 to 3-206. A detailed effects analysis of the 22 highest priority species, as determined by the U.S. Fish and Wildlife Service, is included within these pages. It was determined that concern for all other species that use the Forest during the breeding or winter season is not great or immediate enough to qualify any of them as potential viability concerns over the life of the Forest Plan.Implementation of the Migratory Bird Treaty Act (16 USC 703-712) on Federal lands was further clarified by Executive Order 13186 of January 2001 (66 FR 3853). The Forest Service entered into an Memorandum of Agreement (MOU) (FS Agreement # 08-MU-1113-2400-264) with the US Fish and Wildlife Service, which was extended until December 2017 to promote the conservation of migratory birds on National Forest System lands (see section D. 3. a-d, pages 6-7). Although the MOU has expired, the Forest Service still manages in accordance with the expired MOU that implements the Executive Order. The Proposed Action would abide by the direction contained in these documents to the extent practicable. No activities included in the Proposed Action would intentionally take migratory birds. Although some of the actions may incidentally result in impacts to migratory birds, this project would avoid measurable negative effects at the population level of migratory bird species. In compliance with the Forest Plan and to the extent practical, we have designed projects to minimize such incidental impacts, while still enabling implementation of the proposed activities. This project would therefore meet the direction contained in the Executive Order. |
| Artley, Dick | Request for changes to be made to the final NEPA document: Include a section that describes the required mitigation measures designed to reduce adverse effects resulting from timber sale activities that might or could be affected. | NEPA does not preclude or prevent environmental impacts from occurring. Rather, NEPA requires agencies to analyze and disclose those effects. Because the draft EA did not find potential significant impacts to resources, no mitigation has been proposed to date. The proposed project was designed, including specific design elements, to avoid or minimize impacts to sensitive resources and ensure compliance with applicable law, regulation, and policy. No further response required. |
| Artley, Dick | Request for final NEPA document modifications: Please assure Chapter 3 discloses the noise and dust effects to wildlife species according to the literature presented above. Chapter 3 should also disclose how noise and dust may adversely affect the recreation experience of human visitors to the forest. Indicate how you plan to mitigate this. Failure to do this will violate: 40 CFR 1508.3.because the omission of this information from Chapter 3 also violates 42 USC section 7641 and Title 42--The Public Health and Welfare, Chapter 65-- NOISE CONTROL, Sec. 4901. https://www.law.cornell.edu/cfr/text/40/1508.3 42 USC section 7641 because the Responsible Official did not contact the EPA Office of Noise Abatement and Control so they can determine: https://www.law.cornell.edu/uscode/text/42/7641 (A) effects at various levels; (B) projected growth of noise levels in urban areas through the year 2000; (C) the psychological and physiological effect on humans; (D) effects of sporadic extreme noise (such as jet noise near airports) as compared with constant noise; (E) effect on wildlife and property (including values); (F) effect of sonic booms on property (including values); and (G) such other matters as may be of interest in the public welfare. Title 42(3)--The Public Health and Welfare, Chapter 65-- NOISE CONTROL, Sec. 4901 because the Responsible Official did not take action to control of noise. https://uscodeweb1.house.gov/view.xhtml?path=/prelim@title42/chapter65&edition=prelim 42 USC section 7641 (c) because the Responsible Official did not "consult with the Administrator of the Environmental Protection Agency to determine possible means of abating such noise." https://www.law.cornell.edu/uscode/text/42/7641 | Potential impacts of noise and dust were not identified as key issues for the proposed action. 42 USC section 7641 is relevant to noise sources which are considered a "public nuisance." This project would not produce any new, permanent noise sources nor was it determined to produce nuisance noise sources. The project would use standard equipment and methods during implementation.Project is consistent with Clean Air Act as documented in the project record (refer to Effects Tracking spreadsheet at https://usfs.box.com/s/7u4ywmvx269s9ytn7yj65k2ayxtufg6f). Potential project impacts to recreation users and wildlife were considered, as appropriate, in the recreation specialist report and the biological evaluation. |
| Artley, Dick | What is Road Decommissioning? Road decommissioning is defined as: Activities that result in the stabilization and restoration of unneeded roads to a more natural state. (36 CFR 212.1, FSM 7705 Transportation System) The Forest Service Manual (7712.11-Exhibit 01) identifies five levels of treatments for road decommissioning which can achieve the intent of the definition. These include the following: 1. Block entrance 2. Revegetation and waterbarring 3. Remove fills and culverts 4. Establish drainageways and remove unstable road shoulders 5. Full obliteration recontouring and restoring natural slopes" https://www.fs.fed.us/eng/techdev/IM/road_decomission/road_overview.shtml Request for changes to be made to the final NEPA document: Include a road decommissioning effectiveness monitoring plan. Failure to do so will violate: FSH 190915 Chapter 54 because you fail to indicate in the pre-decisional EA that you will monitor the Road decommissioning effectiveness. | The proposed action includes a relatively short segment for decommissioning (EA, p. 10) and is intended to relocate a poorly sited road prism. This decommissioning is similar to other decommissioning activities conducted on the forest and does not require monitoring for effectiveness. FSH 1909.15 Chapter 54 describes monitoring considerations, if monitoring is included as a necessary component of an environmental impact statement or other project-level decision. Forest plan monitoring is outside the scope of the decision to be made for the Peabody West Project. |
| Artley, Dick | You prescribe sheltewood as a way to regenerate these forested areas. You fail to include information required by NFMA: Request for changes to be made to the final NEPA document: * provide data and text demonstrating that soil, slope, or other watershed conditions will not be irreversibly damaged by sheltewood silvicultural prescriptions. * provide data and text demonstrating that sheltewood silvicultural prescriptions are appropriate to meet the objectives and requirements of the relevant land management plan. Failure to do this will violate: NFMA Section 6 (E)(i) and (iii) because the Responsible Official is convinced NFMA has nothing to do with preparing a NEPA document. | A shelterwood system is a sequence of harvest treatments done in in multiple stages (preparatory, establishment and removal) which harvests most of the trees, leaving those needed to produce sufficient shade to produce a new age class in a moderated microenvironment (Helms, 1998). This project proposes three shelterwood establishment treatments on approximately 75 acres. Shelterwood establishment treatments will predominantly harvest trees in the intermediate and co-dominant crown classes, retaining high quality dominant seed trees. The goal is to prepare a seed bed by increase light reaching the forest floor and improve growing space needed to create a new age class of desired species in the understory while maintaining a mature overstory. Following silvicultural treatment, stands will remain classified as mature forest. Two of the stands are northern hardwoods with a large paper birch component; the goal of the shelterwood establishment harvest is to create open growing conditions in the understory with favorable light conditions to promote paper birch regeneration. The third stand is a dense spruce stand with established regeneration in the understory. The shelterwood prescription would remove a portion of the overstory to release existing regeneration and optimize growing conditions to promote additional spruce regeneration. This has the desired effect of perpetuating this forest type.All stands within the Project Area are located on lands classified as Suited for Timber Production which is defined as "Capable of being harvested within management standards and guidelines of the Forest Plan in accordance with 36 CFR 2.19.14." These stands were evaluated by the ID Team to ensure timber harvest would not cause irreversible damage. |

| | | |
|---|---|---|
| Artley, Dick | Your timber sale will either: 1) not accomplish the goals/needs in the P&N 2) will not completely accomplish the goals/needs in the P&N because more effective action which does not produce volume is rejected 3) might accomplish a P&N goal/need but would simultaneously harm the proper functioning of one or more of the other forest resources 40 CFR 1503.4 requires you to respond to public comments you receive in the pre-decisional EA in the final EA. Here are my comments: One of the needs for this project (P&N at page 3) is to"improve the resiliency of forested communities to environmental stressors by reducing conifer stand density." Why do you believe killing a tree with a chainsaw is better than trees dying from wildfire, insects, and diseases the way Nature intended? One of the needs for this project (P&N at page 3) is to "control non-native invasive species infestations." The herbicide and pesticide corporations have been sleeping with the USDA for many decades. The USFS says glyphosate is safe. The research conclusions on glyphosate safety are endless. They all say glyphosate causes blood cancer. One of the needs for this project (P&N at page 3) is to "construct new or temporary roads is needed to facilitate short-term access to treatment areas and facilitate forest product removal." No human activity on the forest pumps more sediment into streams having healthy aquatic habitat than roads. Clearly you care more about volume than aquatic health. One of the needs for this project (P&N at page 3) is to "increase resiliency to the effects of environmental stressors including drought, wildfire, insects, and diseases". These are all natural disturbance events that are often times beneficial. How do you know these are not? "Resiliency" is the new USFS buzzword used in the vast majority of P&N statements for timber sales nationwide. Approving copy and paste P&N statements is unprofessional. One of the needs for this project (P&N at page 4) is "reduce fuels so the WUI won't burn." Of course the real P&N is to use any method that might reduce the chance that homes will burn in the WUI should a wildfire start in the area. Reducing fuels is not a Purpose or Need. Its one of the many ways that might accomplish the real P&N. By limiting this to 1 action of the others available you increase the chances people might be burned to death and homes will be destroyed. Why do you not understand this simple fact? It must have been because you were so overcome by the need to generate volume you created a senseless P&N statement. Request for changes to be made to the final NEPA document: Assure it contains P&N statements specific to the sale area that describe how the sale will correct unique problems that cause resources in the forest to not function properly. This must include data showing why you believe the problem exists. Giving the public unsubstantiated P&N statements like you have done here is worse than unacceptable. If unique problems do not exist then drop the sale and get your wood elsewhere. | Commenter quotes purpose and need sections which do not exist in the environmental analysis for this project. The consequences of no action are discussed in the draft EA, p. 20. No further response required. |
| Delardi, Derek | I am in full support of the project, in specific the retaining of existing site structures and additions at Hermit lake. Updating or replacing the structures is important for a classic, unique outdoor experience replicated nowhere else in the world. The addition of a heat-able structure is very advisable and has my full support. | The Hermit Lake activities have been removed from the current proposal (draft EA, p. 4). No further response required. |
| Evankow, Abby | Please ensure that this plan protects all mature forests, aged 80 and above, from logging - so they can continue sequestering carbon and providing vital intact habitat. | 10-1 Management Area 2.1 lands, which is where this project is located, permits general forest management with the purpose of providing a high quality of sawtimber and other timber products on a sustained yield bases and provide a balanced mix of habitats for wildlife species through timber harvest. Approximately 95% of the project area will remain in mature habitat and the remaining 5% will be in early successional habitat which has great value to species that require this for all or a portion of their life cycle.17-5 The lack of open forest conditions stated in the DEA is based on the Peabody HMU analysis for Forest Service lands. Currently there is no early successional age class (0-10 years) in the Peabody HMU. The desired future conditions for the Peabody HMU are 3-4% of the landscape in northern hardwood regeneration, 1% in mixedwood regeneration, 1-2% in spruce-fir regeneration and 12-15% in aspen-paper birch. For this project we are proposing approximately 0.7% of the Peabody HMU (110 acres out of 15,495 acre) to be in early successional habitat which is below the amount stated in the comment. We do not produce age-class maps; age class and forest types are verified during stand exams and the Forest vegetation database is updated based on collected information.79% of the Project Area being in mature habitat the commenter references is not correct; this takes into account just the northern hardwood forest type and does not include mature acres of mixedwoods, spruce-fir and aspen-paper birch. Also, the 79% representing mature northern hardwood forest type is for the Peabody HMU, not the Project Area. The complete representation of mature habitat shown in Table 4: Age class composition by habitat type for Peabody West HMU is 79% of the total acres of northern hardwoods are mature, 95% of the total mixedwood acres are mature, 99% of the total acres of spruce-fir are mature and 97% of the aspen-paper birch acres are mature. Based on Table 4, approximately 90% of the acres within the Peabody HMU are mature when accounting for all forest types.17-12 The commenter is referencing the Appendix D Age Class definitions by Habitat Type (D-2) which documents the ages of which age class starts and ends by habitat type and is a reference to wildlife habitat not structure characteristics. The old age class objectives are based on the amount of MA 2.1 lands of each broad habitat type that are not suitable for timber harvest. They are determined from the acres of each habitat type in MA 2.1 with a land suitability class (LSC) code other than 500 or 699. The old age class is not specifically managed for, but displays the expected condition of the land since these lands will not be managed through timber harvest.Stands proposed for silvicultural treatment are all considered mature. While some old forest may occur in the Peabody HMU, these stands are not proposed for treatment. The Peabody HMU rationale document and project record include information on the existing and desired conditions for the HMU, including rationale for proposed objectives in MA 2.1 lands. In addition, the need for the project is to advance the goals of the forest plan, which encompass a range of resource and use objectives, including diversifying wildlife habitat in the HMU.All treatment units in the project area were inventoried and do not meet the Old Growth Forest criteria listed on page 21 of the Abbreviations, Acronyms, and Glossary section of the White Mountain National Forest Land and Resources Management Plan.The Forest Plan does not provide standards or guidelines advising against even-aged management in mature forest habitat. The commenter is referencing the definition of Mature Forest Habitat which states that "depending on site conditions, thinning or uneven-aged harvest methods can be used in this habitat without negatively impacting habitat quality".17-16 The Draft Environmental Assessment does not state any goals, rather it provides a rationale for the Purpose and Need for the Proposed Actions. The needs for the project are to provide a sustainable yield of high-quality timber |

| | | |
|---|---|---|
| Evankow, Abby | Please protect the Great Gulf Inventoried Roadless area, adjoining the Great Gulf Wilderness from logging. Public lands must be preserved for the great public good of sequestering carbon and providing vital intact habitat. There is more than enough private land to satisfy the wood market. | While regulations require that a range of alternatives be analyzed, there is no set number of alternatives required in order to reflect a reasonable range, nor is a No Action alternative required for an EA of this type. Agencies have discretion to determine appropriate alternatives based on the purpose of the proposal.The HMU document and the stated need for the project establish the existing conditions and the gap between the current and desired conditions as per the forest plan. In addition, the draft EA includes a Consequences of Taking No Action section to contrast the baseline conditions (also described in the HMU document) with effects of the Proposed Action. This approach used is at the discretion of the responsible official.The WMNF has considered alternatives which would eliminate timber harvesting in portions of the project area (e.g., forest plan IRAs) in a number of previous decisions where an EA was prepared (see Deer Ridge Integrated Resource Project EA, p. 36; Albany South Integrated Resource Project Final EA, pp. 41-46; North Chatham Integrated Resource Management Project EA, pp. 28-29). However, this alternative functionally represents a partial implementation of the full Proposed Action and would not meet the need as well as the full Proposed Action. The project record contains an analysis of potential impacts to both RACR and forest plan IRAs. Because the Proposed Action considers the broadest scope of potential impacts, the analysis in this EA and the project record provide the decision-maker with adequate information to decide whether or not to implement the Proposed Action, including deciding whether to exclude some or all IRAs.To reiterate, as described the Q&A Sheet, forest plan IRAs are not synonymous with roadless areas designated under the Roadless Area Conservation Rule (RACR) and are managed consistent with direction for the MA within which they occur. Refer to the background sheet on IRAs in the project record. As stated in the forest plan EIS:"One requirement in revising the Forest Plan is to consider lands on the Forest for Wilderness recommendation. This is done by first identifying areas that meet Wilderness criteria. The primary or sole purpose of this roadless area inventory is to identify those lands that could be considered for a Wilderness recommendation. Lands recommended for Wilderness are allocated to Management Area 9.4 while those not recommended are allocated to other management areas in response to issues. Issues related to other resource concerns are addressed elsewhere in the EA and project record." (p. 3-389,emphasis added)Finally, the commenter proposes a number of "alternatives" including the following: "Such an analysis should evaluate the possibility of beaver reintroduction, girdling trees to create standing snags, "chop-and-drop" to increase woody debris and create canopy gaps, and more; Increasing the size of the buffer from watercourses and wetlands; Avoiding all mature and old forest as defined in WMNF Forest Plan Appendix D, Age Class Definitions by Habitat Type, and to comply with EO 14072 and to reduce risk of harm to Northern Long-eared Bat habitat."While these suggestions may provide some benefits, they are not alternatives in terms of addressing unresolved resource conflicts, nor would they fully address the need for the project at the HMU scale. Some of these suggestions may present limited opportunities as management tools, while others (buffers for waterways) are already addressed via forest plan guidance and project design features (see WR-1). Issues regarding mature and old forest are addressed in C/R 45. |
| Garland, Larry | Reconstruction of FR 72 from Dolly Copp Rd to its southern terminus [a.k.a. Hayes Copp/Leavitts Link XC Ski Trails] should be done such that it is suitable and open to mountain biking during the non-snow seasons. Improving the ground condition of these trails will also require less snow cover for XC skiing and more gradual/even terrain for both ski and bike travel. | Mountain biking is allowed on all existing travelways on the National Forest. Improvements to the Hayes Copp cross-country ski system for design and use for mountain biking are not included in the current proposal; however, such improvements may be considered in the future if warranted. Improvements to FR 72 are currently limited to those necessary for project implementation and long-term administrative use.The proposed project is designed to minimize impacts to recreation users to the greatest extent possible. For example, design features REC-4 and REC-5 are intended to limit disturbance to Dolly Copp campground and other recreation opportunities in the project area. Forest Roads and other travelways used for hauling and skidding would be returned to operable condition when timber harvest activities are complete.The change in Maintenance Level of FR 72 from a 1 to a 2 would leave the road more suitable for mountain bike use, but would not be designed specifically for that activity. |
| Garland, Larry | These improvements are supported and warranted by the project's Recreation objectives [page 2], specifically "to provide a sustainable range of quality recreation opportunities consistent with forest plan direction" and "to provide backcountry skiing and mountain biking opportunities and improve connectivity among those opportunities in the project area." Further, these improvements are needed "to provide mountain biking opportunities on National Forest System lands in the project area" and more specifically to provide additional family-friendly opportunities for visitors of the Dolly-Copp Campground. | Commenter generally supports project objectives. No further response required. |
| Garland, Larry | To the extent that Leavitts link XC Ski Trail [labeled in Fig. 3 as 'Upper Hayes Copp XC'] is used for logging and skidding operations, this segment should also remain in a condition suitable and open to mountain biking as well as improving the XC Ski experience. | Mountain biking is allowed on all existing travelways on the National Forest. Improvements to the Hayes Copp cross-country ski system for design and use for mountain biking are not included in the current proposal; however, such improvements may be considered in the future if warranted. Improvements to FR 72 are currently limited to those necessary for project implementation and long-term administrative use.The proposed project is designed to minimize impacts to recreation users to the greatest extent possible. For example, design features REC-4 and REC-5 are intended to limit disturbance to Dolly Copp campground and other recreation opportunities in the project area. Forest Roads and other travelways used for hauling and skidding would be returned to operable condition when timber harvest activities are complete.The change in Maintenance Level of FR 72 from a 1 to a 2 would leave the road more suitable for mountain bike use, but would not be designed specifically for that activity. |
| Marsh, Adam | I am in full support of this initiative. With the reconstruction of the proposed road, this will help to promote non-motorized recreational activities in our region. This focus is paramount for economical development and growth by drawing people to visit the Town of Gorham. It is also a shift from motorized activities in and around our town, and allow people to enjoy the beauty of the White Mountains. Allowing for residents and visitors to recreate on the White Mountain National Forest property, and access services in town is a tremendous asset. My vision is to continue to promote this type of growth and create a miles long road into other towns. | Commenter expresses general support for project activities, including non-motorized recreation opportunities. Commenter further supports recreation development which may benefit neighboring communities.Commenter expresses interest in future development of longer roads accessing other towns, which is out of scope of the current proposal.No further response required. |

| | | |
|---|---|---|
| Porter, Zack | Additional Alternatives In addition to a No Action Alternative, the WMNF should prepare additional alternatives that explore a reasonable range of options to meet the Purpose and Need while avoiding or minimizing harmful impacts. Additional alternatives should consider: Avoiding all roadless area impacts and protecting roadless area values by guiding logging away from Forest Plan Inventoried Roadless Areas that were allocated to Management Area 2.1 in the 2005 Forest Plan. Such an analysis should also consider how roadless area logging and road construction/reconstruction, regardless of whether a roadless area is managed according to the 2001 Roadless Area Conservation Rule, may change the outcome of future Ch 70 wilderness inventories and evaluations and the potential for Congress to include these lands in the National Wilderness Preservation System, especially since the current forest plan has outlived its 15-year lifespan as dictated by the National Forest Management Act. The analysis should assess not only whether the landscape will still qualify for future Chapter 70 review, but also how the project would impact the WMNF's analysis of the IRA's suitability and potential for wilderness recommendation and designation by Congress; Achieve habitat management objectives for early young forest by creating complex early successional habitat rather than simplified regeneration-age forest through even-aged management. Such an analysis should evaluate the possibility of beaver reintroduction, girdling trees to create standing snags, "chop-and-drop" to increase woody debris and create canopy gaps, and more; Increasing the size of the buffer from watercourses and wetlands; Avoiding all mature and old forest as defined in WMNF Forest Plan Appendix D, Age Class Definitions by Habitat Type, and to comply with EO 14072 and to reduce risk of harm to Northern Long-eared Bat habitat. | While regulations require that a range of alternatives be analyzed, there is no set number of alternatives required in order to reflect a reasonable range, nor is a No Action alternative required for an EA of this type. Agencies have discretion to determine appropriate alternatives based on the purpose of the proposal.The HMU document and the stated need for the project establish the existing conditions and the gap between the current and desired conditions as per the forest plan. In addition, the draft EA includes a Consequences of Taking No Action section to contrast the baseline conditions (also described in the HMU document) with effects of the Proposed Action. This approach used is at the discretion of the responsible official.The WMNF has considered alternatives which would eliminate timber harvesting in portions of the project area (e.g., forest plan IRAs) in a number of previous decisions where an EA was prepared (see Deer Ridge Integrated Resource Project EA, p. 36; Albany South Integrated Resource Project Final EA, pp. 41-46; North Chatham Integrated Resource Management Project EA, pp. 28-29). However, this alternative functionally represents a partial implementation of the full Proposed Action and would not meet the need as well as the full Proposed Action. The project record contains an analysis of potential impacts to both RACR and forest plan IRAs. Because the Proposed Action considers the broadest scope of potential impacts, the analysis in this EA and the project record provide the decision-maker with adequate information to decide whether or not to implement the Proposed Action, including deciding whether to exclude some or all IRAs.To reiterate, as described the Q&A Sheet, forest plan IRAs are not synonymous with roadless areas designated under the Roadless Area Conservation Rule (RACR) and are managed consistent with direction for the MA within which they occur. Refer to the background sheet on IRAs in the project record. As stated in the forest plan EIS:"One requirement in revising the Forest Plan is to consider lands on the Forest for Wilderness recommendation. This is done by first identifying areas that meet Wilderness criteria. The primary or sole purpose of this roadless area inventory is to identify those lands that could be considered for a Wilderness recommendation. Lands recommended for Wilderness are allocated to Management Area 9.4 while those not recommended are allocated to other management areas in response to issues. Issues related to other resource concerns are addressed elsewhere in the EA and project record." (p. 3-389,emphasis added)Finally, the commenter proposes a number of "alternatives" including the following: "Such an analysis should evaluate the possibility of beaver reintroduction, girdling trees to create standing snags, "chop-and-drop" to increase woody debris and create canopy gaps, and more; Increasing the size of the buffer from watercourses and wetlands; Avoiding all mature and old forest as defined in WMNF Forest Plan Appendix D, Age Class Definitions by Habitat Type, and to comply with EO 14072 and to reduce risk of harm to Northern Long-eared Bat habitat."While these suggestions may provide some benefits, they are not alternatives in terms of addressing unresolved resource conflicts, nor would they fully address the need for the project at the HMU scale. Some of these suggestions may present limited opportunities as management tools, while others (buffers for waterways) are already addressed via forest plan guidance and project design features (see WR-1). Issues regarding mature and old forest are addressed in C/R 45. |
| Porter, Zack | Because of the size of attachments, I will send the remainder of my supporting footnotes in subsequent submissions. | Letters 14 and 15 include a number of attachments. To the extent that these references are included as literature cited in general comments or as background references, they are addressed under individual C/Rs. |
| Porter, Zack | Because of the size of the attachments, we are sending several submissions. | Letters 14 and 15 include a number of attachments. To the extent that these references are included as literature cited in general comments or as background references, they are addressed under individual C/Rs. |
| Porter, Zack | Biodiversity Many of New England's native fish and wildlife species, including those that are often most imperiled, such as the Northern Long-eared Bat, pine marten, brook trout, Blackburnian and Cerulean Warblers, Scarlet Tanagers, and Wood Thrush, depend on large, unfragmented landscapes and structurally-complex old forests for suitable habitat.[54],[55] Mature, unfragmented, interior forests are rare in New England overall, making the Green and White Mountain National Forests important concentrations of such habitat within New England. When this habitat is fragmented or degraded, such as through road construction and logging projects, these species experience increased threats from interactions with humans, predation, changes in microclimates, the spread of invasive species, and other fragmentation and edge effects. Pine marten are on the State of Vermont Endangered Species List, and one of only two viable populations in the state is located within the Green Mountain National Forest. A 2022 study analyzing marten populations in Maine found that "even partial harvest activities can diminish the canopy cover, structural complexity and overall basal area [that marten] require[.]"[56] The same study found that "Marten…showed lower initial occupancy probability in areas of increasingly disturbed forest and had both higher extinction rates and lower colonization rates in these areas."[57] Northern long-eared bats are federally listed as threatened and the US Fish and Wildlife Service has proposed to uplist the bat to endangered, with a decision due in the fall of 2023. The Northern long-eared bat depends on mature and old forests for roosting and foraging.[58] Its preferred roosting habitat is large-diameter live or dead trees of a variety of species, with exfoliating bark, cavities, or crevices. And its preferred foraging habitat is old forest with complex vertical structure on hillsides and ridges.[59] | No timber harvest is proposed in old growth forest. The proposed project is in compliance with applicable law, regulation, and policy, including forest plan direction and the Endangered Species Act.The White Mountain National Forest does not conduct timber harvesting over 2,500 feet and according to NH Fish and Game, American martens are typically found in spruce-fir habitats above 2,700 feet. Conifer cover is important during winter and course woody debris on the ground provides denning and nesting sites and refuge from predators (https://www.wildlife.state.nh.us/wildlife/profiles/american-marten.html). At higher elevations, deep snow, unique soil composition, inclement weather, and infrequent logging all contribute to the conifer cover and coarse woody debris that marten seek. Thus, ridgelines and areas of high elevation may be particularly important for marten in New Hampshire (NHFG 2016). Mixed deciduous and coniferous forests with a variety of horizontal and vertical structure.The Forest Service acknowledges the proposed timber harvests would have negative impacts on some species while benefitting others. Specifically, timber harvests would decrease the available habitat for species that depend on mature, interior forests for all or some of their life cycles. For example, there is likely to be less nesting habitat for ovenbirds after project implementation. On the other hand, species that require or prefer early successional forests, such as the chestnut-sided warbler, would benefit from the proposed harvests.The proposed action, by design, would change the wildlife species composition of the project area (refer to need for project, EA pp. 1-2 and HMU rationale). Forest plan standards and guidelines would minimize potential effects to wildlife (2-33 to 2-36), including rare and unique habitats and wildlife species (2-13 to 2-16). The silvicultural treatments are planned with interdisciplinary team input to ensure existing habitats would not be minimized to the point that any wildlife species would be lost. This includes common species as well those designated as threatened, endangered, or sensitive. The degree of forest management proposed would not disrupt migratory pathways. The commenters expressed concern over a number of individual species. All of these would continue to persist within the project area. Many, including the chestnut-sided warbler, Canada warbler, moose, deer, and bear, either depend on early-successional forests or are known to regularly use such habitats, including those created through timber harvests. |

| | | |
|---|---|---|
| Porter, Zack | Climate Resilience and Water Quality Old forests are also the most resilient to changes in the climate, producing the highest outputs of ecosystem services like clean water, and reducing the impacts of droughts and floods. These ecosystem services protect downstream communities from flooding, purify drinking water at low cost, and maintain base flows and low temperatures in rivers during hot summers for the benefit of fish and wildlife. In New England, frequent flooding and nutrient-driven water quality degradation are two of our most costly environmental crises, and both are compounded by climate change. Mature and old forests naturally mitigate against flooding and drought by slowing, sinking, and storing water that would otherwise rapidly flow into our streams, rivers, and lakes.[49] Scientists have also shown that old forests are exceptional at removing nutrients that drive harmful algae blooms, like phosphorus.[50] After Tropical Storm Irene ravaged New England in 2011, Vermont's Department of Forests, Parks, and Recreation commissioned a report entitled "Enhancing Flood Resiliency of Vermont State Lands." According to the report: "There may be a tendency to assume that lands in forest cover are resilient to the effects of flooding simply by virtue of their forested status. However, forest cover does not necessarily equate to forest health and forest flood resilience. Headwater forests of Vermont include a legacy of human modifications that have left certain land areas with a heightened propensity to generate runoff, accelerate soil erosion, and sediment streams. These legacy impacts affect forest lands across the state... The quality of [today's] forests is not the same as the pre-Settlement old growth forests. The legacy of early landscape development and a history of channel and floodplain modifications continue to impact water and sediment routing from the land."[51] A 2019 study led by the University of Vermont looked into the climate resilience of older compared to younger forests. The research found that: "[Older forests] simultaneously support high levels of carbon storage, timber growth, and species richness. Older forests also exhibit low climate sensitivity...compared to younger forests... Strategies aimed at enhancing the representation of older forest conditions at landscape scales will help sustain [ecosystem services and biodiversity] in a changing world... Although our analysis suggests that old forests exhibit the highest combined [ecosystem services and biodiversity (ESB)] performance, less than 0.2% of the investigated sites are currently occupied by forests older than 200 years. This suggests a large potential to improve joint ESB outcomes in temperate and boreal forests of eastern North America by enhancing the representation of late-successional and older forest stand structures..." [52] Because of the overwhelming science in support of recovering America's old-growth forests, a recent peer-reviewed paper calls for the establishment of Strategic Carbon Reserves, with an emphasis on roadless, maturing forests. The paper finds that: "Many of the current and proposed forest management actions in the United States are not consistent with climate goals... [P]reserving 30 to 50% of lands for their carbon, biodiversity and water is feasible, effective, and necessary for achieving them." "Instead of regularly harvesting on all of the 70% of US forest land designated as 'timberlands' by the US Forest Service, | Refer to C/R 45 for additional detail regarding habitat and forest composition in the project area and HMU (re: comment 17-24). No treatments are proposed in old forest or old growth habitats.The carbon assessment for the WMNF (white paper) addresses broad carbon and climate data relevant to forest management and eastern forests specifically. When considering carbon and climate change in the context of land management activities, it is necessary to consider the overall management objectives associated with a piece of land, the carbon stocks in different pools, and the flows of carbon between these pools. In other words, we consider the forest sector carbon cycle in its entirety and do not single out individual processes. The White Mountain National Forest is incorporating the concepts of resistance, resilience and transition in responding to the issue of climate change at the project level. The environmental impacts section of the EA includes an analysis of potential carbon and climate impacts resulting from the proposed action (draft EA, pp. 22-23). The proposed action would have short term carbon emissions, and also maintain the Forest as a net carbon sink in the long term, as addressed in the Forest Carbon Assessment for the White Mountain National Forest. Furthermore, the proposed project would transfer stored carbon in the harvested wood to the product sector, where it may be stored for up to several decades and substitute for more emission intensive materials or fuels. This proposed action is consistent with internationally recognized climate change adaptation and mitigation practices.The Forest has incorporated management actions that help to sustain and conserve ecosystems over the long term and ultimately stabilize the capacity of the forest to retain long-term carbon stocks. The conclusion that the project would increase resilience to climate change by increasing diversity of age class, forest type and within-stand diversity is paired with the conclusion that the project is designed to promote the Forest as a continuing carbon sink. This may involve short term reductions in carbon due to disturbance facilitated by the project (see WMNF Carbon Assessment, section 5.0) but such reductions due to disturbance have to be considered alongside the long-term management of the forest as a continuing carbon sink, with greater structural diversity, greater within-stand diversity of species, species composition that is better aligned with Forest Plan objectives, and continuing carbon uptake from young forests. |
| Porter, Zack | Given the gaps in data available for public scrutiny, the Forest Service should reconsider its stance from the June 23, 2022 public meeting that it does not intend to provide another 30-day comment period on its draft EA. Reconsideration of that decision is also good public policy. | Correction to commenter: 1500.1(b) states, "The regulations in this subchapter implement section 102(2) of NEPA. They provide direction to Federal agencies to determine what actions are subject to NEPA's procedural requirements and the level of NEPA review where applicable. The regulations in this subchapter are intended to ensure that relevant environmental information is identified and considered early in the process in order to ensure informed decision making by Federal agencies. The regulations in this subchapter are also intended to ensure that Federal agencies conduct environmental reviews in a coordinated, consistent, predictable and timely manner, and to reduce unnecessary burdens and delays. Finally, the regulations in this subchapter promote concurrent environmental reviews to ensure timely and efficient decision making." This section provides agency direction in establishing and carrying out their NEPA procedural requirements.Section 1505.6(a) referenced by the commenter is relevant to promulgating agency-level NEPA implementing regulations rather than project-level analysis.The public involvement process for the Peabody West Project is consistent with CEQ and agency NEPA implementing regulations, forest service handbook guidance, and 36 CFR 218 (pre-decisional administrative review). Public involvement for this project began in 2019 with a proposal development meeting. Early public involvement is summarized in the scoping summary report, provided to the public and available in the project record. The key document used to guide the actions proposed for this project is the 2005 Forest Plan, which is available to the public. A number of supporting documents (e.g., specialist reports, question-and-answer sheet, and white papers) were shared via the public website in support of the draft EA. Because a single issue was identified by the line officer for detailed analysis, the EA provides a concise analysis keying in on that issue (draft EA, pp. 20-21). While other resources and issues are not analyzed or discussed in detail in the EA, they have been considered by the IDT commensurate with their potential impacts (e.g., refer to issues and effects tracking spreadsheet in the project record).The 30-day comment period for the draft EA and preliminary FONSI fulfills the requirement for formal public commenting for this project under 36 CFR 218. A summary of the full public involvement process for this project to date will be included in the draft decision notice as required.An additional comment period for this project is not required by regulation but may be conducted at the discretion of the line officer. |

| | | |
|---|---|---|
| Porter, Zack | Logging is the greatest threat to mature and old forests in the WMNF and New England Due primarily to human-driven forest conversion (i.e. development, agriculture) and degradation (i.e. logging, fragmentation), mature and old-growth forests, once common in the forested regions of the US, are today underrepresented compared to historical levels. As explained previously, prior to European settlement, old-growth forests were the dominant land cover of northern New England, including the locations of the White and Green Mountain National Forests. The recently-released USDA Forest Service Climate Adaptation Plan notes that mature and old-growth forests are "often viewed as ideal candidates for increased conservation efforts, and are frequently found within areas designated as wilderness or roadless or other management areas where timber harvest is precluded." The USDA Forest Service Climate Adaptation Plan is wise to highlight the inverse relationship between timber harvest levels and amounts of mature and old-growth forests. As implied by the USDA Forest Service Climate Adaptation Plan, there is no greater threat to the extent of mature and old-growth forests on federal public lands than logging. Logging is the single greatest influence on the amount and extent of mature forests across the US, and is easily the most preventable threat to mature forests when compared to fire, insects, disease, and other disturbances. A 2013 study found that "Logging is a larger cause of adult tree mortality in northeastern U.S. forests than all other causes of mortality combined."[60] This finding was reinforced in another study from 2018: "[Logging] comprises more than half of all mortality (on a volume basis), making logging the predominant disturbance—natural or anthropogenic— affecting forest ecosystems in the region."[61] This level of timber harvest has a significant impact on forest carbon - far greater than any other factor. Timber harvest drives 92% of annual forest carbon losses in the US South, 86% in the North, and 66% in the West. For comparison, the second greatest impacts on forest carbon in each region are as follows: West: fire (15%); North: insect damage (9%); South: wind damage (5%).[62] Forthcoming research led by Dr. Dominick DellaSala provides the first nationwide assessment of present levels of mature forests in the US. Today, mature and old-growth forests represent ~36% of all forest age classes across the nation, with the greatest amount in a single ownership (35%) located on federal lands. Of the mature forests on federal lands, 92% are managed by the US Forest Service, 9% by the Bureau of Land Management, and 3% by the National Park Service. These forests simultaneously support the highest concentrations of drinking water source areas, at-risk ecosystems, and aboveground living biomass. Despite their exceptional value, the vast majority of mature forests on federal lands (76%), storing approximately 10.64 Gt of $CO_2$, are unprotected from logging.[63] Of the mature forests identified by Dr. Dellasala's study, old-growth represents a tiny fraction in each region of the United States outside of Alaska, demonstrating the need for policies that put a greater percentage of forests on a path to recover late successional forests. In the Eastern US, old-growth comprises just 1.6% of South-Central US forests, 1.1% of the Upper Midwest forests, .5% of Southeast US forests, and .4% of forests in the Northeast.[64] | Refer to C/R 45 for additional detail regarding habitat and forest composition in the project area and HMU (re: comment 17-24). No treatments are proposed in old forest or old growth habitats.The carbon assessment for the WMNF (white paper) addresses broad carbon and climate data relevant to forest management and eastern forests specifically. When considering carbon and climate change in the context of land management activities, it is necessary to consider the overall management objectives associated with a piece of land, the carbon stocks in different pools, and the flows of carbon between these pools. In other words, we consider the forest sector carbon cycle in its entirety and do not single out individual processes. The White Mountain National Forest is incorporating the concepts of resistance, resilience and transition in responding to the issue of climate change at the project level. The environmental impacts section of the EA includes an analysis of potential carbon and climate impacts resulting from the proposed action (draft EA, pp. 22-23). The proposed action would have short term carbon emissions, and also maintain the Forest as a net carbon sink in the long term, as addressed in the Forest Carbon Assessment for the White Mountain National Forest. Furthermore, the proposed project would transfer stored carbon in the harvested wood to the product sector, where it may be stored for up to several decades and substitute for more emission intensive materials or fuels. This proposed action is consistent with internationally recognized climate change adaptation and mitigation practices.The Forest has incorporated management actions that help to sustain and conserve ecosystems over the long term and ultimately stabilize the capacity of the forest to retain long-term carbon stocks. The conclusion that the project would increase resilience to climate change by increasing diversity of age class, forest type and within-stand diversity is paired with the conclusion that the project is designed to promote the Forest as a continuing carbon sink. This may involve short term reductions in carbon due to disturbance facilitated by the project (see WMNF Carbon Assessment, section 5.0) but such reductions due to disturbance have to be considered alongside the long-term management of the forest as a continuing carbon sink, with greater structural diversity, greater within-stand diversity of species, species composition that is better aligned with Forest Plan objectives, and continuing carbon uptake from young forests. |
| Porter, Zack | Recreation proposals are unsupported by the 2005 WMNF Forest Plan Without any supporting explanation or evidence, the DEA claims that new mountain bike trails and backcountry ski glades are "consistent" with the 2005 WMNF Forest Plan. DEA at 22. Even the Recreation Specialist Report admits that WMNF Forestwide Management Direction for Recreation, Guideline 4, states that: "No additional trails should be constructed or authorized unless clearly needed to: provide public access to the existing system, address resource impacts, resolve public safety issues, meet recreation management or accessibility goals, or best meet the recreation management approaches. New trails should be evaluated and prioritized consistent with supplemental direction in FSH 2309.18" PWIRP Recreation Effects Analysis at 1. However, the DEA notes that opportunities for both mountain biking and backcountry skiing in gladed terrain (as opposed to natural terrain) already exist nearby on private land. DEA at 2, 3, 10, and 11. No reasons are offered for why there is a "clear [need]," as required by the Forest Plan, "to provide public access to the existing system, address resource impacts, resolve public safety issues, meet recreation management or accessibility goals, or best meet the recreation management approaches." PWIRP Recreation Effects Analysis at 1. Why should these recreation opportunities be created on public lands, at public expense? The Forest Service must either modify the project proposal to eliminate these proposals, or it must amend the Forest Plan. Although the DEA makes several references to recreational opportunities and management, the DEA makes no reference to the Recreation Opportunity Spectrum ("ROS"). The purpose of the ROS is to provide information on what the current status of recreational areas within National Forests are to allow the Forest Service to make informed decisions regarding how projects will impact the current settings of certain recreation areas and how to develop those areas to the desired settings. Additionally, the WMNF Plan requires that projects are developed in accordance with the ROS objectives and goals. For MA 2.1 Forest Management, recreational management "will match the ROS class objectives provided in this management area. Recreational management activities themselves should not derive the ROS Class from a less developed to a more developed class." WMNF Plan at 3-4 to 3-5. It is odd that the Forest Service would develop a DEA to make significant recreational modifications to the Forest without explaining which areas specific to the WPIRP DEA are not yet at the desired usage, in addition to failing to acknowledge what those areas within the DEA are currently qualified as. Such baseline data is critical for the public to understand fully the potential recreational impacts of the proposed action. The Forest Service should provide more information explaining the current settings[9] of the recreational opportunities in the proposed action area and the positive and negative consequences the proposed action will have on those recreational opportunities. | Table 3 of the draft EA incorporates the recreation specialist report by reference (p. 22). The recreation specialist report includes a description of existing ROS, as defined in the forest plan glossary, and consistency with forestwide goals and guidelines G-4 (specialist report, p. 1). The recreation specialist report will be updated to provide additional clarifications regarding forest plan direction and consistency with the proposed project. |
| Porter, Zack | Similarly, the DEA states that transportation management actions were informed by the Forest-wide Transportation Analysis Process (TAP). The DEA notes: "In 2015, the WMNF completed a Forest-wide transportation analysis process report for long-term administration of the WMNF's transportation system (U.S. Department of Agriculture, Forest Service 2015). The proposed project is needed to complete a site-specific transportation analysis to implement or modify the 2015 travel analysis process recommendations within the project area; to plan and manage for current and future public and Forest Service access to the project area; to meet forest plan standards for desired road operation maintenance levels (MLs); and to meet requirements of the Highway Safety Act..." DEA at 2. Standing Trees made inquiries to WMNF staff as to the availability of the analysis that went into the 2015 process, but all that is apparently available is the final map. Without detailed information, it is impossible to assess why the final map looks the way that it does, and to understand the rationale for transportation-related decisions. Finally, the DEA admits that "[s]ome system roads have travel analysis process recommendations that differ from the current proposal." DEA at 10. If this is so, additional analysis must show why these changes are necessary, and an amendment must be made to the Forest-wide TAP. | The proposed action section for transportation describes the rationale for those proposed activities which deviate from recommendations found in the TAP (draft EA, p. 10). These activities are also included in Appendix B. Because the TAP provided recommendations and was not action-forcing, nor was it subject to NEPA analysis or a specific decision, the Peabody West Project analysis provides for consideration of potential impacts of transportation activities, including disclosure of those activities to the public. The TAP is not an analysis or decision document; therefore, an amendment to that document is not required No further response required. |

| | | |
|---|---|---|
| Porter, Zack | Standard S-3 in WMNF Plan Ch 2-Forest-Wide Management Direction states that "Timber harvest is prohibited in old growth forest." WMNF Plan 2-13. Further, Guideline G-1 states that "Outstanding natural communities should be conserved." Id. Old-growth is defined in the WMNF Plan as "Uneven-aged (three or more age classes) forest with an abundance of trees at least 200 years old, multiple canopy layers, large diameter snags and down logs, and a forest floor exhibiting pit-and-mound topography. There should be little or no evidence of past timber harvest or agriculture. Northern hardwood old growth consists primarily of sugar maple and American beech; softwood old growth is largely made up of spruce and hemlock. Stands need to be at least 10 acres in size to be identified as old growth. Anything smaller is a patch of old trees within a younger stand, not a habitat type in its own right." WMNF Plan Abbreviations, Acronyms, and Glossary at 21. The WMNF Plan goes beyond protections for existing old-growth forest, however, clearly looking to how the WMNF can facilitate recovery of old-growth forest across a larger percentage of the forest in the future. The WMNF Plan defines old forest as beginning at 70 years of age in Aspen-birch habitat types, 90 years of age in Spruce-Fir, 120 years of age in Northern hardwoods, Mixed wood, Oak-Pine, and Hemlock. WMNF Plan Appendix D-2. The WMNF Plan defines Old Forest Habitat as: "Desired habitat conditions start with those for mature forest and can include greater size, decadence, structural complexity, etc. No harvest will occur in stands identified to provide old forest habitat" (emphasis added). WMNF Plan Abbreviations, Acronyms, and Glossary at 21. The Environmental Assessment must analyze whether there are any portions of the project area that provide old forest habitat. The WMNF Plan advises against even-aged management in Mature Forest Habitat, and yet the West Peabody IRP proposes extensive even-aged management in mature stands (79% of the project area is classified as Mature. PWIRP Habitat Rationale at 9. The 2005 WMNF Forest Plan defines Mature Forest as "Stands in which the overstory is in the mature age class. Mature forest habitat is typically made up of trees that are eight inches or more in diameter. Mortality is just beginning in these stands, resulting in a few scattered canopy gaps and a small number of snags and cavities in the overstory. Most snags and down logs are small in diameter and within the intermediate or understory layers. Depending on site conditions, thinning and uneven-aged harvest methods can be used in this habitat without negatively impacting habitat quality. Some uneven-aged harvest may enhance vegetative and structural diversity" (emphasis added). WMNF Plan Abbreviations, Acronyms, and Glossary at 18. The mature age class ranges from 40-89 years for Spruce-Fir habitat types, 60-119 years for Mixed wood and Northern hardwood, 40-69 years for Aspen-birch, and 70-119 years for Oak-Pine and Hemlock. WMNF Plan Appendix D-2. The Forest Plan is clearly implying that even-aged management in mature forest negatively impacts habitat quality. Despite this instruction to avoid even-aged management in mature forest habitat, the PWIRP DEA proposes extensive even-aged management. DEA at 5. Based on the Forest Plan, proposed management activities within the PWIRP will certainly degrade habitat quality | 10-1 Management Area 2.1 lands, which is where this project is located, permits general forest management with the purpose of providing a high quality of sawtimber and other timber products on a sustained yield bases and provide a balanced mix of habitats for wildlife species through timber harvest. Approximately 95% of the project area will remain in mature habitat and the remaining 5% will be in early successional habitat which has great value to species that require this for all or a portion of their life cycle.17-5 The lack of open forest conditions stated in the DEA is based on the Peabody HMU analysis for Forest Service lands. Currently there is no early successional age class (0-10 years) in the Peabody HMU. The desired future conditions for the Peabody HMU are 3-4% of the landscape in northern hardwood regeneration, 1% in mixedwood regeneration, 1-2% in spruce-fir regeneration and 12-15% in aspen-paper birch. For this project we are proposing approximately 0.7% of the Peabody HMU (110 acres out of 15,495 acre) to be in early successional habitat which is below the amount stated in the comment. We do not produce age-class maps; age class and forest types are verified during stand exams and the Forest vegetation database is updated based on collected information.79% of the Project Area being in mature habitat the commenter references is not correct; this takes into account just the northern hardwood forest type and does not include mature acres of mixedwoods, spruce-fir and aspen-paper birch. Also, the 79% representing mature northern hardwood forest type is for the Peabody HMU, not the Project Area. The complete representation of mature habitat shown in Table 4: Age class composition by habitat type for Peabody West HMU is 79% of the total acres of northern hardwoods are mature, 95% of the total mixedwood acres are mature, 99% of the total acres of spruce-fir are mature and 97% of the aspen-paper b rch acres are mature. Based on Table 4, approximately 90% of the acres within the Peabody HMU are mature when accounting for all forest types.17-12 The commenter is referencing the Appendix D Age Class definitions by Habitat Type (D-2) which documents the ages of which age class starts and ends by habitat type and is a reference to wildlife habitat not structure characteristics. The old age class objectives are based on the amount of MA 2.1 lands of each broad habitat type that are not suitable for timber harvest. They are determined from the acres of each habitat type in MA 2.1 with a land suitability class (LSC) code other than 500 or 699. The old age class is not specifically managed for, but displays the expected condition of the land since these lands will not be managed through timber harvest.Stands proposed for silvicultural treatment are all considered mature. While some old forest may occur in the Peabody HMU, these stands are not proposed for treatment. The Peabody HMU rationale document and project record include information on the existing and desired conditions for the HMU, including rationale for proposed objectives in MA 2.1 lands. Stads proposed for harvest have been evaluated for structural charactereistics of old forest habitat and these features have been determined to be absent. In addition, the need for the project is to advance the goals of the forest plan, which encompass a range of resource and use objectives, including diversifying wildlife habitat in the HMU.All treatment units in the project area were inventoried and do not meet the Old Growth Forest criteria listed on page 21 of the Abbreviations, Acronyms, and Glossary section of the White Mountain National Forest Land and Resources Management Plan.The Forest Plan does not provide standards or guidelines advising against even-aged management in mature forest habitat. The commenter is referencing the definition of Mature Forest Habitat which states that "depending on site conditions, thinning or uneven-aged harvest methods can be used in this habitat without negatively impacting habitat quality" 17-16 The Draft Environmental Assessment does not state any goals, rather it |
| Porter, Zack | The aforementioned omissions impede public participation in violation of NEPA The public is not able to properly scrutinize agency decisions and analysis when relevant documentation is not made available or when available documents do not actually contain the analysis necessary to support the Forest Service's conclusory statements. The overall effect is to impede public participation, in violation of NEPA's clear mandate to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. § 1506.6(a). In addition, the failure to provide clear analysis, or sometimes any analysis, violates NEPA's mandate that NEPA documents "shall be written in plain language . . . so that decisionmakers and the public can readily understand them." Id. § 1502.8. The public cannot understand what it is not told. Without providing actual analysis, it is impossible to gauge the actual anticipated impact to proposed action-area resources, the significance of those impacts, and whether they may violate the Forest Plan standards and guidelines. "[T]he public should not be required to parse the agency's statements to determine how an area will be impacted[.]" League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton, 752 F.3d 755, 761 (9th Cir. 2014). | Correction to commenter: 1500.1(b) states, "The regulations in this subchapter implement section 102(2) of NEPA. They provide direction to Federal agencies to determine what actions are subject to NEPA's procedural requirements and the level of NEPA review where applicable. The regulations in this subchapter are intended to ensure that relevant environmental information is identified and considered early in the process in order to ensure informed decision making by Federal agencies. The regulations in this subchapter are also intended to ensure that Federal agencies conduct environmental reviews in a coordinated, consistent, predictable and timely manner, and to reduce unnecessary burdens and delays. Finally, the regulations in this subchapter promote concurrent environmental reviews to ensure timely and efficient decision making." This section provides agency direction in establishing and carrying out their NEPA procedural requirements.Section 1505.6(a) referenced by the commenter is relevant to promulgating agency-level NEPA implementing regulations rather than project-level analysis.The public involvement process for the Peabody West Project is consistent with CEQ and agency NEPA implementing regulations, forest service handbook guidance, and 36 CFR 218 (pre-decisional administrative review). Public involvement for this project began in 2019 with a proposal development meeting. Early public involvement is summarized in the scoping summary report, provided to the public and available in the project record. The key document used to guide the actions proposed for this project is the 2005 Forest Plan, which is available to the public. A number of supporting documents (e.g., specialist reports, question-and-answer sheet, and white papers) were shared via the public website in support of the draft EA. Because a single issue was identified by the line officer for detailed analysis, the EA provides a concise analysis keying in on that issue (draft EA, pp. 20-21). While other resources and issues are not analyzed or discussed in detail in the EA, they have been considered by the IDT commensurate with their potential impacts (e.g., refer to issues and effects tracking spreadsheet in the project record).The 30-day comment period for the draft EA and preliminary FONSI fulfills the requirement for formal public commenting for this project under 36 CFR 218. A summary of the full public involvement process for this project to date will be included in the draft decision notice as required.An additional comment period for this project is not required by regulation but may be conducted at the discretion of the line officer. |

| | | |
|---|---|---|
| Porter, Zack | The Age Class goals do not match the latest scientific understanding of the ecology of New England forests, making the Forest Plan scientifically unsound Today, old forests - the forests that once dominated the region - are functionally absent from northern New England.[15] Elk, caribou, wolverine, wolves, cougars, and pine marten have been extirpated for more than a century. Salmon, once common in many rivers, have either been entirely eliminated or - where they are present - hang on primarily due to fish stocking and assisted migration. By any objective measure of ecosystem health, New Hampshire's ecosystems remain in the intensive care unit. According to the definitive paper on disturbance frequency and intensity in New England, "the proportion of the presettlement landscape in seedling-sapling forest habitat (1-15 years old) ranged from 1 to 3% in northern hardwood forests (Fagus-Betula-Acer-Tsuga) of the interior uplands." "The current estimates of 9-25% [seedling-sapling habitat] for the northern New England states are probably several times higher than presettlement levels." Gap size in Hemlock-Northern Hardwood forests averaged less than .75 acres. Beech was the dominant species among Northern Hardwoods, comprising perhaps 30% of the forest. Stand replacing events occurred, on average, only every 1,000 to 7,500 years.[16] A 2008 paper builds on these themes: "Although humans have a long history (about 12,000 years) on the North American continent, the magnitude of change wrought by European settlement has no parallel since the last glaciation... In New England, rates of landscape change have been far greater in the past 300 years than in the previous 1000 years as a result of forest cutting, agricultural conversion, urban development, altered fire regimes and herbivore populations, nonnative species introductions, and atmospheric pollution... There has been no return to presettlement conditions because of continuing low-level disturbance and perhaps insufficient recovery time."[17] We can measure New Hampshire's progress towards forest ecosystem restoration against several large landscape conservation visions that have gained traction in the past fifteen years. In 2006, Wildlands and Woodlands, a program of Harvard Forest and Highstead Foundation, produced a widely supported vision for New England that included a goal for 10% of all regional forestlands to be conserved as wildlands. Fifteen years later, only 3% of New England is in wildlands, and relatively little progress has been made toward the 10% goal, despite excellent progress towards conserving forests for extraction of wood products. More recently, based on the rapid decline of wildlife populations[18] and the rapid degradation of the climate,[19] scientists have suggested that much more aggressive measures must be taken to stave off climate and extinction catastrophe. The 2019 Global Deal for Nature (the inspiration for "30x30") calls for 30% of lands and waters to be permanently protected in GAP 1 and 2[20] protected areas[21] by 2030 to maintain and restore biodiversity, with an additional 20% percent conserved to stabilize the climate.[22] This vision was partially endorsed by the Biden Administration in Executive Order 14008, "Tackling the Climate Crisis at Home and Abroad."[23] To date, the Forest Service, including the White Mountain National Forest, has not revealed how it intends to implement EO 14008. Large blocks of intact forest | 10-1 Management Area 2.1 lands, which is where this project is located, permits general forest management with the purpose of providing a high quality of sawtimber and other timber products on a sustained yield bases and provide a balanced mix of habitats for wildlife species through timber harvest. Approximately 95% of the project area will remain in mature habitat and the remaining 5% will be in early successional habitat which has great value to species that require this for all or a portion of their life cycle.17-5 The lack of open forest conditions stated in the DEA is based on the Peabody HMU analysis for Forest Service lands. Currently there is no early successional age class (0-10 years) in the Peabody HMU. The desired future conditions for the Peabody HMU are 3-4% of the landscape in northern hardwood regeneration, 1% in mixedwood regeneration, 1-2% in spruce-fir regeneration and 12-15% in aspen-paper birch. For this project we are proposing approximately 0.7% of the Peabody HMU (110 acres out of 15,495 acre) to be in early successional habitat which is below the amount stated in the comment. We do not produce age-class maps; age class and forest types are verified during stand exams and the Forest vegetation database is updated based on collected information.79% of the Project Area being in mature habitat the commenter references is not correct; this takes into account just the northern hardwood forest type and does not include mature acres of mixedwoods, spruce-fir and aspen-paper birch. Also, the 79% representing mature northern hardwood forest type is for the Peabody HMU, not the Project Area. The complete representation of mature habitat shown in Table 4: Age class composition by habitat type for Peabody West HMU is 79% of the total acres of northern hardwoods are mature, 95% of the total mixedwood acres are mature, 99% of the total acres of spruce-fir are mature and 97% of the aspen-paper b rch acres are mature. Based on Table 4, approximately 90% of the acres within the Peabody HMU are mature when accounting for all forest types.17-12 The commenter is referencing the Appendix D Age Class definitions by Habitat Type (D-2) which documents the ages of which age class starts and ends by habitat type and is a reference to wildlife habitat not structure characteristics. The old age class objectives are based on the amount of MA 2.1 lands of each broad habitat type that are not suitable for timber harvest. They are determined from the acres of each habitat type in MA 2.1 with a land suitability class (LSC) code other than 500 or 699. The old age class is not specifically managed for, but displays the expected condition of the land since these lands will not be managed through timber harvest.Stands proposed for silvicultural treatment are all considered mature. While some old forest may occur in the Peabody HMU, these stands are not proposed for treatment. The Peabody HMU rationale document and project record include information on the existing and desired conditions for the HMU, including rationale for proposed objectives in MA 2.1 lands. In addition, the need for the project is to advance the goals of the forest plan, which encompass a range of resource and use objectives, including diversifying wildlife habitat in the HMU.All treatment units in the project area were inventoried and do not meet the Old Growth Forest criteria listed on page 21 of the Abbreviations, Acronyms, and Glossary section of the White Mountain National Forest Land and Resources Management Plan.The Forest Plan does not provide standards or guidelines advising against even-aged management in mature forest habitat. The commenter is referencing the definition of Mature Forest Habitat which states that "depending on site conditions, thinning or uneven-aged harvest methods can be used in this habitat without negatively impacting habitat quality".17-16 The Draft Environmental Assessment does not state any goals, rather it provides a rationale for the Purpose and Need for the Proposed Actions. The needs for the project are to provide a sustainable yield of high-quality timber |
| Porter, Zack | The DEA does not adequately address scenery impacts or should require a Forest Plan amendment The WMNF Plan mandates that "all management activities should meet or exceed Scenic Integrity Objectives established for the Forest through the Scenery Management System ("SMS")[.]" WMNF Plan at 2-26. The Scenery Management portion of the Forest Plan mandates that "[i]n evaluating cumulative effects for viewed landscapes from established concern level 1, open, higher elevation viewpoints affording expansive or large scale views, no more than 9 percent of the acreage within the view should be treated with regeneration vegetation management activities within a 30 year period. Total area affected during any one entry period with new regeneration treatment should not exceed 4 percent of the acreage. Assessment may need to be made from multiple viewpoints (that view a common land base). The assessment will apply to each view separately." WMNF Plan at 3-6. Additionally, "VisualFX or similar computer graphics/simulation software should be used to design and evaluate visibility of proposed regeneration cuts, especially when viewed from higher elevation or superior viewpoints." Id. For areas with a "High" Scenic Integrity Objective, "most of the project area created openings should be minimally evident from trail, road, or use area vantage points. Maximum observed size should not exceed 4-5 acres. If openings occur, they should appear as natural occurrences and be well- distributed in the viewed landscape." Id. The DEA acknowledges that the proposed timber harvest prescriptions are inconsistent with 2005 WMNF Forest Plan, but does not seek to remedy this deficiency through a Forest Plan amendment, as required by law. According to the DEA: "The proposed action includes three relatively large even-aged treatments: a 26-acre clearcut in unit 19, a 9-acre patch cut in unit 20, and the expansion of an existing permanent wildlife opening to about 19 acres. These proposals exceed the forest plan guideline G-3 for MA 2.1 land, which limits maximum observed opening size to 5 acres in areas with a high scenic integrity objective (forest plan, p. 3-6). Although each of these units would exceed this guideline, the larger acreage is intended to better meet project-level objectives for the Peabody West HMU, and to move the forest toward desired conditions consistent with the forest plan." DEA at 21. In other words, the DEA admits that the project parameters exceed what is allowed by the 2005 Forest Plan. The DEA suggests that that the project-level goals should take precedence over the Forest Plan. If this were approved, it would constitute a violation of NFMA and must be corrected either by modifying the project or amending the Forest Plan. | The draft EA p. 21 provides rationale for exceeding guidelines for scenery management in MA 2.1 lands. In addition, the preliminary FONSI (p. 29) explains how exceeding these guidelines is consistent with operational flexibility provided in the forest plan. See also response to C/R #9 regarding scenery management considerations. No further response required. |

| | | |
|---|---|---|
| Porter, Zack | The DEA does not sufficiently address how the proposed action impacts Inventoried Roadless Areas. The DEA acknowledges that 600 acres are proposed for logging within the 17,000-acre Great Gulf Inventoried Roadless Area. PWIRP Roadless Effects Summary at 1 and 2. Because the portion of the Great Gulf IRA proposed for logging was not inventoried prior to promulgation of the 2001 Roadless Area Conservation Rule, the WMNF claims that it had the discretion to allocate these lands to the General Forest Management (2.1) category in the 2005 Forest Plan revision. The Roadless Effects Summary suggests that the proposed logging will not disqualify the area from future consideration in a Chapter 70 Wilderness Inventory and Evaluation when the WMNF Forest Plan is revised. However, this merely addresses the eligibility of the lands for Chapter 70 review; it does not account for how logging will impact the landscape's suitability or potential for a wilderness recommendation or designation by Congress, nor how the proposed logging will degrade those values associated with roadless areas, including clean water, intact forest habitats, and more.[10],[11] | While regulations require that a range of alternatives be analyzed, there is no set number of alternatives required in order to reflect a reasonable range, nor is a No Action alternative required for an EA of this type. Agencies have discretion to determine appropriate alternatives based on the purpose of the proposal.The HMU document and the stated need for the project establish the existing conditions and the gap between the current and desired conditions as per the forest plan. In addition, the draft EA includes a Consequences of Taking No Action section to contrast the baseline conditions (also described in the HMU document) with effects of the Proposed Action. This approach used is at the discretion of the responsible official.The WMNF has considered alternatives which would eliminate timber harvesting in portions of the project area (e.g., forest plan IRAs) in a number of previous decisions where an EA was prepared (see Deer Ridge Integrated Resource Project EA, p. 36; Albany South Integrated Resource Project Final EA, pp. 41-46; North Chatham Integrated Resource Management Project EA, pp. 28-29). However, this alternative functionally represents a partial implementation of the full Proposed Action and would not meet the need as well as the full Proposed Action. The project record contains an analysis of potential impacts to both RACR and forest plan IRAs. Because the Proposed Action considers the broadest scope of potential impacts, the analysis in this EA and the project record provide the decision-maker with adequate information to decide whether or not to implement the Proposed Action, including deciding whether to exclude some or all IRAs.To reiterate, as described the Q&A Sheet, forest plan IRAs are not synonymous with roadless areas designated under the Roadless Area Conservation Rule (RACR) and are managed consistent with direction for the MA within which they occur. Refer to the background sheet on IRAs in the project record. As stated in the forest plan EIS:"One requirement in revising the Forest Plan is to consider lands on the Forest for Wilderness recommendation. This is done by first identifying areas that meet Wilderness criteria. The primary or sole purpose of this roadless area inventory is to identify those lands that could be considered for a Wilderness recommendation. Lands recommended for Wilderness are allocated to Management Area 9.4 while those not recommended are allocated to other management areas in response to issues. Issues related to other resource concerns are addressed elsewhere in the EA and project record." (p. 3-389,emphasis added)Finally, the commenter proposes a number of "alternatives" including the following: "Such an analysis should evaluate the possibility of beaver reintroduction, girdling trees to create standing snags, "chop-and-drop" to increase woody debris and create canopy gaps, and more; Increasing the size of the buffer from watercourses and wetlands; Avoiding all mature and old forest as defined in WMNF Forest P an Appendix D, Age Class Definitions by Habitat Type, and to comply with EO 14072 and to reduce risk of harm to Northern Long-eared Bat habitat."While these suggestions may provide some benefits, they are not alternatives in terms of addressing unresolved resource conflicts, nor would they fully address the need for the project at the HMU scale. Some of these suggestions may present limited opportunities as management tools, while others (buffers for waterways) are already addressed via forest plan guidance and project design features (see WR-1). Issues regarding mature and old forest are addressed in C/R 45. |
| Porter, Zack | The DEA fails to provide supporting documentation to allow adequate and meaningful public participation. Public participation is a critical aspect of the NEPA process. See 40 C.F.R. § 1500.1(b) ("The purpose and function of NEPA is satisfied if Federal agencies have considered relevant environmental information, and the public has been informed regarding the decision-making process."); 40 C.F.R. § 1506.6(a) ("Agencies shall . . . [m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures."). Here, public involvement has been impeded by the unavailability of relevant supporting documents, the failure of the DEA to clearly identify other supporting documents, and the failure to include sufficient detail in the DEA to allow the public to engage the necessary substantive analysis underlying the agency's design of the Proposed action and its intended goals. | Correction to commenter: 1500.1(b) states, "The regulations in this subchapter implement section 102(2) of NEPA. They provide direction to Federal agencies to determine what actions are subject to NEPA's procedural requirements and the level of NEPA review where applicable. The regulations in this subchapter are intended to ensure that relevant environmental information is identified and considered early in the process in order to ensure informed decision making by Federal agencies. The regulations in this subchapter are also intended to ensure that Federal agencies conduct environmental reviews in a coordinated, consistent, predictable and timely manner, and to reduce unnecessary burdens and delays. Finally, the regulations in this subchapter promote concurrent environmental reviews to ensure timely and efficient decision making." This section provides agency direction in establishing and carrying out their NEPA procedural requirements.Section 1505.6(a) referenced by the commenter is relevant to promulgating agency-level NEPA implementing regulations rather than project-level analysis.The public involvement process for the Peabody West Project is consistent with CEQ and agency NEPA implementing regulations, forest service handbook guidance, and 36 CFR 218 (pre-decisional administrative review). Public involvement for this project began in 2019 with a proposal development meeting. Early public involvement is summarized in the scoping summary report, provided to the public and available in the project record. The key document used to guide the actions proposed for this project is the 2005 Forest Plan, which is available to the public. A number of supporting documents (e.g., specialist reports, question-and-answer sheet, and white papers) were shared via the public website in support of the draft EA. Because a single issue was identified by the line officer for detailed analysis, the EA provides a concise analysis keying in on that issue (draft EA, pp. 20-21). While other resources and issues are not analyzed or discussed in detail in the EA, they have been considered by the IDT commensurate with their potential impacts (e.g., refer to issues and effects tracking spreadsheet in the project record).The 30-day comment period for the draft EA and preliminary FONSI fulfills the requirement for formal public commenting for this project under 36 CFR 218. A summary of the full public involvement process for this project to date will be included in the draft decision notice as required.An additional comment period for this project is not required by regulation but may be conducted at the discretion of the line officer. |
| Porter, Zack | The DEA makes references to potential alterations in the proposed action without opportunity for public comment The DEA acknowledges several parts of the proposed action that are subject to change dependent upon several conditions. However, the Forest Service does not include an opportunity for the public to participate in the changes in the proposed action and does not explain when such changes would be implemented. The Forest Service in the DEA allows for "[f]inal locations of log landings [to] be modified during project layout subject to applicable forest plan standards and guidelines, best management practices, and other site specific requirements." DEA at 5 and 6 (emphasis added). Additionally, the DEA notes that "[s]ome system roads have travel analysis process recommendations that differ from the current proposal. The differences are the result of a project-level transportation analysis of long-term Forest Service plans and objectives in this area." DEA at 10. | As stated in the draft EA, log landing locations may be refined prior to implementation. Log landings are negotiated as part of the timber contracts implementing the project. As such, the draft EA defines sidebars and requirements for log landing locations without specifically limiting consideration of alternate locations. During project planning, potential log landings were identified based on past locations and access to proposed harvest area by foresters. Should log landing location be modified during implementation, they are subject to Forest Plan standards and guidelines, best management practices, design elements and interdisciplinary team review prior to implementation. |

| | | |
|---|---|---|
| Porter, Zack | The DEA states that its vegetation management goals are focused on creating forest openings and regeneration-age forest. DEA at 1 and 2. The DEA suggests that "[a]n analysis of the current habitat conditions indicates that the the Peabody West HMU is not meeting MA 2.1 habitat composition and age class objectives" outlined in the 2005 Forest Plan. DEA at 1. However, the DEA fails to include any description of this purported analysis, and the WMNF has not produced an age-class map for the Peabody West IRP project area. Nor does the DEA contain an analysis of whether the age class objectives for regeneration and young age classes have already been met, forest-wide, in the 17 years since the signing of the Forest Plan. Indeed, the Forest Plan expects that regeneration age-class objectives will be met by year 10 of the Forest Plan. WMNF Plan at 1-21. Taking the aforementioned science into account, the public is also left to wonder what science the White Mountain National Forest is grounding forest management decisions in. Which species does the West Peabody IRP stand to benefit most? Why does the WPIRP seem to favor game species, which already exist in abundance elsewhere in New Hampshire? Why are interior and mature forest species devalued in the proposed action area? Why does the DEA propose to reduce the beech population, despite the fact that it is a critical wildlife food source and that it was historically the dominant species on this site? By targeting beech, how can we identify strains that are resistant to beech bark disease? How should the public reconcile extensive areas of even-age management with the fact that such areas bear little resemblance to the natural disturbance regime of a Northern Hardwood forest? | 10-1 Management Area 2.1 lands, which is where this project is located, permits general forest management with the purpose of providing a high quality of sawtimber and other timber products on a sustained yield bases and provide a balanced mix of habitats for wildlife species through timber harvest. Approximately 95% of the project area will remain in mature habitat and the remaining 5% will be in early successional habitat which has great value to species that require this for all or a portion of their life cycle.17-5 The lack of open forest conditions stated in the DEA is based on the Peabody HMU analysis for Forest Service lands. Currently there is no early successional age class (0-10 years) in the Peabody HMU. The desired future conditions for the Peabody HMU are 3-4% of the landscape in northern hardwood regeneration, 1% in mixedwood regeneration, 1-2% in spruce-fir regeneration and 12-15% in aspen-paper birch. For this project we are proposing approximately 0.7% of the Peabody HMU (110 acres out of 15,495 acre) to be in early successional habitat which is below the amount stated in the comment. We do not produce age-class maps; age class and forest types are verified during stand exams and the Forest vegetation database is updated based on collected information.79% of the Project Area being in mature habitat the commenter references is not correct; this takes into account just the northern hardwood forest type and does not include mature acres of mixedwoods, spruce-fir and aspen-paper birch. Also, the 79% representing mature northern hardwood forest type is for the Peabody HMU, not the Project Area. The complete representation of mature habitat shown in Table 4: Age class composition by habitat type for Peabody West HMU is 79% of the total acres of northern hardwoods are mature, 95% of the total mixedwood acres are mature, 99% of the total acres of spruce-fir are mature and 97% of the aspen-paper birch acres are mature. Based on Table 4, approximately 90% of the acres within the Peabody HMU are mature when accounting for all forest types.17-12 The commenter is referencing the Appendix D Age Class definitions by Habitat Type (D-2) which documents the ages of which age class starts and ends by habitat type and is a reference to wildlife habitat not structure characteristics. The old age class objectives are based on the amount of MA 2.1 lands of each broad habitat type that are not suitable for timber harvest. They are determined from the acres of each habitat type in MA 2.1 with a land suitability class (LSC) code other than 500 or 699. The old age class is not specifically managed for, but displays the expected condition of the land since these lands will not be managed through timber harvest.Stands proposed for silvicultural treatment are all considered mature. While some old forest may occur in the Peabody HMU, these stands are not proposed for treatment. The Peabody HMU rationale document and project record include information on the existing and desired conditions for the HMU, including rationale for proposed objectives in MA 2.1 lands. In addition, the need for the project is to advance the goals of the forest plan, which encompass a range of resource and use objectives, including diversifying wildlife habitat in the HMU.All treatment units in the project area were inventoried and do not meet the Old Growth Forest criteria listed on page 21 of the Abbreviations, Acronyms, and Glossary section of the White Mountain National Forest Land and Resources Management Plan.The Forest Plan does not provide standards or guidelines advising against even-aged management in mature forest habitat. The commenter is referencing the definition of Mature Forest Habitat which states that "depending on site conditions, thinning or uneven-aged harvest methods can be used in this habitat without negatively impacting habitat quality".17-16 The Draft Environmental Assessment does not state any goals, rather it provides a rationale for the Purpose and Need for the Proposed Actions. The needs for the project are to provide a sustainable yield of high-quality timber |
| Porter, Zack | The exceptional values of mature and old-growth forests Forest Carbon There is a common misconception that young forests are better than old when it comes to removing carbon in the atmosphere. First of all, old forests store much more carbon than young forests, and they continue to accumulate carbon over time.[36],[37],[38] What's more, the rate of carbon sequestration also increases as trees age.[39] It can take up to 30 years after a regeneration cut for a young forest to become a carbon sink instead of a carbon source.[40] Today, despite tree cover across the vast majority of the northern New-England landscape, the region's forests do not produce high levels of ecosystem services due to current management practices, including harvest frequency and intensity, and are still recovering from extensive clearing in the eighteenth and nineteenth centuries. A 2019 paper by Harvard Forest researchers found that: "Among land uses, timber harvesting [has] a larger effect on [aboveground carbon] storage and changes in tree composition than did forest conversion to non-forest uses... Our results demonstrate a large difference between the landscape's potential to store carbon and the landscape's current trajectory."[41] Northeast secondary forests have the potential to increase biological carbon sequestration 2.3-4.2-fold.[42] A 2011 paper by UVM Professor Bill Keeton found that: "...There is a significant potential to increase total carbon storage in the Northeast's northern hardwood-conifer forests. Young to mature secondary forests in the northeastern United States today have aboveground biomass (live and dead) levels of 107 Mg/ha on average (Turner et al. 1995, Birdsey and Lewis 2003). Thus, assuming a maximum potential aboveground biomass range for old-growth of approximately 250-450 Mg/ha, a range consistent with upper thresholds in our data set and the lower threshold observed at Hubbard Brook, our results suggest a potential to increase in situ forest carbon storage by a factor of 2.3-4.2, depending on site-specific variability. This would sequester an additional 72-172 Mg/ha of carbon."[43] Forests in temperate zones such as in the Eastern U.S. have a particularly high untapped capacity for carbon storage and sequestration because of high growth and low decay rates, along with exceptionally long periods between stand replacing disturbance events, similar to the moist coastal forests of the Pacific Northwest. Further, because of recent recovery from an extensive history of timber harvesting and land conversion for agriculture in the 18th, 19th, and early 20th centuries, median forest age is about 75 years,[44] which is only about 25-35% of the lifespan of many of the common tree species in these forests.[45] Because of our remarkable forest ecosystems here in Northeastern North America, several global studies have highlighted the unique potential of our temperate deciduous forests to contribute on the global stage to climate stabilization and resilience.[46],[47] A 2013 study provides proof that protecting forests from logging is as close to a guarantee as there is for securing long-term carbon sequestration and storage. Strict protected areas prohibiting logging (i.e. GAP 1, IUCN Category 1, or equivalent classification) cover just 5% of the total land area of the mid-Atlantic and Northeast US (VA, PA, DE, NJ, NY, CT, RI, MA, VT, NH, ME). However, these protected areas account for "30% of the carbon stored in all forests in | Refer to C/R 45 for additional detail regarding habitat and forest composition in the project area and HMU (re: comment 17-24). No treatments are proposed in old forest or old growth habitats.The carbon assessment for the WMNF (white paper) addresses broad carbon and climate data relevant to forest management and eastern forests specifically. When considering carbon and climate change in the context of land management activities, it is necessary to consider the overall management objectives associated with a piece of land, the carbon stocks in different pools, and the flows of carbon between these pools. In other words, we consider the forest sector carbon cycle in its entirety and do not single out individual processes. The White Mountain National Forest is incorporating the concepts of resistance, resilience and transition in responding to the issue of climate change at the project level. The environmental impacts section of the EA includes an analysis of potential carbon and climate impacts resulting from the proposed action (draft EA, pp. 22-23). The proposed action would have short term carbon emissions, and also maintain the Forest as a net carbon sink in the long term, as addressed in the Forest Carbon Assessment for the White Mountain National Forest. Furthermore, the proposed project would transfer stored carbon in the harvested wood to the product sector, where it may be stored for up to several decades and substitute for more emission intensive materials or fuels. This proposed action is consistent with internationally recognized climate change adaptation and mitigation practices.The Forest has incorporated management actions that help to sustain and conserve ecosystems over the long term and ultimately stabilize the capacity of the forest to retain long-term carbon stocks. The conclusion that the project would increase resilience to climate change by increasing diversity of age class, forest type and within-stand diversity is paired with the conclusion that the project is designed to promote the Forest as a continuing carbon sink. This may involve short term reductions in carbon due to disturbance facilitated by the project (see WMNF Carbon Assessment, section 5.0) but such reductions due to disturbance have to be considered alongside the long-term management of the forest as a continuing carbon sink, with greater structural diversity, greater within-stand diversity of species, species composition that is better aligned with Forest Plan objectives, and continuing carbon uptake from young forests. |
| Porter, Zack | The Forest Service has failed to implement Executive Order 14072 The DEA fails to explain how proposed logging will comply with the Forest Plan standards and prohibitions for mature and old forests, as well as President Biden's Executive Order 14072, Strengthening the Nation's Forests, Communities, and Local Economies. | Currently, EO 14072 provides broad agency direction but is not prescriptive at the project level. Therefore, barring future direction relevant to this proposal, the EO is not applicable to this project. |

| | | |
|---|---|---|
| Porter, Zack | The Forest Service makes several conclusions that are supported by documents that are not available to the public for review. Numerous references are made to other unspecified authorities to support conclusions advanced by the Forest Service in the 2022 DEA. For example, the DEA refers to "preliminary assessments of current stand conditions and characteristics," but these documents have not been made publicly available. DEA at 4. The DEA suggests that "[m]ost of the habitats in the project area are mature, with some younger stands interspersed." DEA at 1. The Peabody West HMU Rationale document shows that 79% of the Project area is in the mature age class, across all forest types. PWIRP HMU Rationale at 9. However, the WMNF has not provided an age class map to help the public understand the amount and distribution of forest types and age classes. The DEA claims there is a "lack of open forest conditions," but does not suggest what conditions this is compared to. Lorimer and White 2003, the definitive paper on New England disturbance types, frequencies, and intensities, indicates that upland forests such as this one would have had only 1-3% of the landscape in early seral conditions.[7] In addition there has been no analysis of whether the WMNF is protecting "stands identified to provide old forest habitat," as required by the 2005 Forest Plan. WMNF Plan Abbreviations, Acronyms, and Glossary at 21. The WMNF Plan defines Old Forest Habitat as: "Desired habitat conditions start with those for mature forest and can include greater size, decadence, structural complexity, etc." WMNF Plan Abbreviations, Acronyms, and Glossary at 21 Certainly, these attributes could appear in stands that are otherwise classified as "mature" according to 2005 WMNF Forest Plan Appendix D, Age Class Definitions by Habitat Type. Nor is there any analysis showing that the Project does not violate the intent of Executive Order 14072, issued on Earth Day 2022, to conserve mature forests. Thus, the public cannot be certain that mature and old forests are being conserved and protected as required by law. | 10-1 Management Area 2.1 lands, which is where this project is located, permits general forest management with the purpose of providing a high quality of sawtimber and other timber products on a sustained yield bases and provide a balanced mix of habitats for wildlife species through timber harvest. Approximately 95% of the project area will remain in mature habitat and the remaining 5% will be in early successional habitat which has great value to species that require this for all or a portion of their life cycle.17-5 The lack of open forest conditions stated in the DEA is based on the Peabody HMU analysis for Forest Service lands. Currently there is no early successional age class (0-10 years) in the Peabody HMU. The desired future conditions for the Peabody HMU are 3-4% of the landscape in northern hardwood regeneration, 1% in mixedwood regeneration, 1-2% in spruce-fir regeneration and 12-15% in aspen-paper birch. For this project we are proposing approximately 0.7% of the Peabody HMU (110 acres out of 15,495 acre) to be in early successional habitat which is below the amount stated in the comment. We do not produce age-class maps; age class and forest types are verified during stand exams and the Forest vegetation database is updated based on collected information.79% of the Project Area being in mature habitat the commenter references is not correct; this takes into account just the northern hardwood forest type and does not include mature acres of mixedwoods, spruce-fir and aspen-paper birch. Also, the 79% representing mature northern hardwood forest type is for the Peabody HMU, not the Project Area. The complete representation of mature habitat shown in Table 4: Age class composition by habitat type for Peabody West HMU is 79% of the total acres of northern hardwoods are mature, 95% of the total mixedwood acres are mature, 99% of the total acres of spruce-fir are mature and 97% of the aspen-paper b rch acres are mature. Based on Table 4, approximately 90% of the acres within the Peabody HMU are mature when accounting for all forest types.17-12 The commenter is referencing the Appendix D Age Class definitions by Habitat Type (D-2) which documents the ages of which age class starts and ends by habitat type and is a reference to wildlife habitat not structure characteristics. The old age class objectives are based on the amount of MA 2.1 lands of each broad habitat type that are not suitable for timber harvest. They are determined from the acres of each habitat type in MA 2.1 with a land suitability class (LSC) code other than 500 or 699. The old age class is not specifically managed for, but displays the expected condition of the land since these lands will not be managed through timber harvest.Stands proposed for silvicultural treatment are all considered mature. While some old forest may occur in the Peabody HMU, these stands are not proposed for treatment. The Peabody HMU rationale document and project record include information on the existing and desired conditions for the HMU, including rationale for proposed objectives in MA 2.1 lands. In addition, the need for the project is to advance the goals of the forest plan, which encompass a range of resource and use objectives, including diversifying wildlife habitat in the HMU.All treatment units in the project area were inventoried and do not meet the Old Growth Forest criteria listed on page 21 of the Abbreviations, Acronyms, and Glossary section of the White Mountain National Forest Land and Resources Management Plan.The Forest Plan does not provide standards or guidelines advising against even-aged management in mature forest habitat. The commenter is referencing the definition of Mature Forest Habitat which states that "depending on site conditions, thinning or uneven-aged harvest methods can be used in this habitat without negatively impacting habitat quality".17-16 The Draft Environmental Assessment does not state any goals, rather it provides a rationale for the Purpose and Need for the Proposed Actions. The needs for the project are to provide a sustainable yield of high-quality timber |
| Porter, Zack | The Forest Service must analyze an adequate range of alternatives NEPA mandates that an EA describe the environmental impacts of both the proposed action and alternatives to the proposed action. 40 C.F.R. § 1501.5(c)(2). NEPA similarly requires an alternatives analysis for Environmental Impact Statements ("EIS"). 40 C.F.R. § 1502.14. The alternatives analysis, in which an agency evaluates "reasonable alternatives," is the heart of the environmental assessment. 40 C.F.R. § 1502.14(a). An agency may consider only the proposed action when there are no "unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E); see also 36 C.F.R. § 220.7(b)(2)(i). Unresolved conflicts exist when the agency lacks a consensus about the proposed action based on input from interested parties. National Environmental Policy Act Procedures, 73 Fed. Reg. 43,084, 43,092 (July 24, 2008) (codified at 36 C.F.R. Part 220). Further, agencies "shall not commit resources prejudicing selection of alternatives before making a final decision." 40 CFR § 1502.2(f); § 1506.1. CEQ regulations mandate that federal agencies shall "inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. It is also incumbent upon federal agencies to "[s]tudy, develop, and describe appropriate alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources." Id. § 1501.2(c); see also 42 U.S.C. § 4332(E). Given the many different facets of the proposed action and the current primary purpose articulated in the DEA — "to advance forest plan goals, objectives, and desired conditions for vegetation, wildlife, and other resources in the Peabody West Habitat Management Unit (HMU)" — it is inconceivable that there will be only one way to achieve that purpose. 2022 DEA at 1. This is especially true for the logging portions of the proposed action. The sheer number of different silviculture prescriptions for the proposed action demonstrates that even if logging is needed—which Standing Trees asserts it is not—there is a wide variability in how the logging can achieve desired conditions. This variability necessarily implies several reasonable alternatives exist that the Forest Service should consider in an EIS. With these considerations in mind, the Forest Service should include and analyze the following reasonable alternatives as part of its NEPA analysis. The Forest Service must consider a No Action Alternative. A "No Action Alternative" is the bare minimum alternative analysis an agency should undertake for an EA or EIS. 40 CFR § 1502.14(c). One of the most critical purposes of a No Action Alternative is to establish a baseline against which the proposed action can be measured. The Forest Service should consider a No Action Alternative to establish such a baseline for the proposed action. NEPA requires agencies to consider both the detriments and benefits of proposed projects, which would include considering the benefits of reasonable alternatives as well. There are numerous benefits of not moving ahead with the proposed action (i.e., taking No Action), including, but not limited to: climate benefits of retaining older, mature trees; habitat benefits for the Northern Long-eared Bat and other species that rely on mature, old, or interior forests or are sensitive to harvest | While regulations require that a range of alternatives be analyzed, there is no set number of alternatives required in order to reflect a reasonable range, nor is a No Action alternative required for an EA of this type. Agencies have discretion to determine appropriate alternatives based on the purpose of the proposal.The HMU document and the stated need for the project establish the existing conditions and the gap between the current and desired conditions as per the forest plan. In addition, the draft EA includes a Consequences of Taking No Action section to contrast the baseline conditions (also described in the HMU document) with effects of the Proposed Action. This approach used is at the discretion of the responsible official.The WMNF has considered alternatives which would eliminate timber harvesting in portions of the project area (e.g., forest plan IRAs) in a number of previous decisions where an EA was prepared (see Deer Ridge Integrated Resource Project EA, p. 36; Albany South Integrated Resource Project Final EA, pp. 41-46; North Chatham Integrated Resource Management Project EA, pp. 28-29). However, this alternative functionally represents a partial implementation of the full Proposed Action and would not meet the need as well as the full Proposed Action. The project record contains an analysis of potential impacts to both RACR and forest plan IRAs. Because the Proposed Action considers the broadest scope of potential impacts, the analysis in this EA and the project record provide the decision-maker with adequate information to decide whether or not to implement the Proposed Action, including deciding whether to exclude some or all IRAs.To reiterate, as described the Q&A Sheet, forest plan IRAs are not synonymous with roadless areas designated under the Roadless Area Conservation Rule (RACR) and are managed consistent with direction for the MA within which they occur. Refer to the background sheet on IRAs in the project record. As stated in the forest plan EIS:"One requirement in revising the Forest Plan is to consider lands on the Forest for Wilderness recommendation. This is done by first identifying areas that meet Wilderness criteria. The primary or sole purpose of this roadless area inventory is to identify those lands that could be considered for a Wilderness recommendation. Lands recommended for Wilderness are allocated to Management Area 9.4 while those not recommended are allocated to other management areas in response to issues. Issues related to other resource concerns are addressed elsewhere in the EA and project record." (p. 3-389,emphasis added)Finally, the commenter proposes a number of "alternatives" including the following: "Such an analysis should evaluate the possibility of beaver reintroduction, girdling trees to create standing snags, "chop-and-drop" to increase woody debris and create canopy gaps, and more; Increasing the size of the buffer from watercourses and wetlands; Avoiding all mature and old forest as defined in WMNF Forest Plan Appendix D, Age Class Definitions by Habitat Type, and to comply with EO 14072 and to reduce risk of harm to Northern Long-eared Bat habitat."While these suggestions may provide some benefits, they are not alternatives in terms of addressing unresolved resource conflicts, nor would they fully address the need for the project at the HMU scale. Some of these suggestions may present limited opportunities as management tools, while others (buffers for waterways) are already addressed via forest plan guidance and project design features (see WR-1). Issues regarding mature and old forest are addressed in C/R 45. |

| | | |
|---|---|---|
| Porter, Zack | The Forest Service should conduct additional analysis In addition, an Environmental Impact Statement should analyze and minimize: Water quality impacts, including from road construction/reconstruction and logging; Impacts to historic and cultural resources, including those of the Abenaki community; Soil quality impacts, including from road construction/reconstruction and logging. The Project, as proposed, is "significant" and requires an EIS NEPA requires that federal agencies prepare an Environmental Impact Statement ("EIS") for projects that are likely to have significant effects. 40 CFR § 1501.3(a)(3). In determining whether the effects of the proposed action are likely to be significant, agencies are to consider (1) both short- and long-term effects; (2) Both beneficial and adverse effects; (3) Effects on public health and safety, and (4) effects that would violate Federal, State, Tribal, or local law protecting the environment. Id. § 1501.3(b)(2) (emphasis added). In making the significance determination, agencies are also to consider connected actions. Id. § 1501.3(b). Moreover, "significance varies with the setting of the proposed action" and "in the case of a site-specific action, significance would usually depend only upon the effects in the local area." Id. § 1501.3(b)(1). Standing Trees believes that an EA is not adequate for a project of this size, and requests that the Forest Service prepare an EIS. This is a multi-phase, multi-year project that is significantly affecting the environment, regardless of whether those effects are considered beneficial or detrimental. The proposed action is likely to have both short and long-term effects because of its expansive scope and size. Logging will harm the Northern Long-eared Bat as well as other species that depend on mature, interior forests. The proposed action will contribute to the loss of climate benefits of retaining mature and old stands, violating EO 14072. The proposed action will significantly impact the Great Gulf Roadless Area, its possibility for future wilderness designation, and its values for habitat, clean water, and recreation. Logging will cause detrimental impacts to water quality due to runoff, sedimentation, and potential herbicide contamination. The proposed action may cause loss or damage to historic and cultural resources located within the proposed action area. Finally, the DEA may violate NFMA, NEPA, and the ESA, as described previously. For the above reasons, the size, scope, and significance of the Forest Service's proposed action indicates the need for the Forest Service to prepare an EIS instead of an EA. | Water quality and quantity concerns have been addressed in the EA (pp. 22-24) and project record. In addition, the list of Federally recognized tribes contacted during development and release of the draft environmental assessment are available in the project record, and the project is in compliance with the National Historic Preservation Act (EA, p. 26 and project record). Soil impacts are considered in the EA (p. 22) and project record as well.The Peabody West Project does not propose any actions which normally require preparation of an EIS (36 CFR § 220.5). Forest Service NEPA regulations direct the agency to prepare an Environmental Assessment (EA) for proposals that are not categorically excluded from documentation, and for which the need for an EIS has not been determined (36 CFR§ 220.7). An EIS must be prepared for major actions significantly affecting the human environment (42 U.S.C. 4332(C)). In determining whether actions are significant, Council on Environmental Quality (CEQ) regulations direct agencies to consider the potentially affected environment and the context and intensity, or degree, of the effects of the action (40 CFR 1501.3(b)). The proposed activities in the Peabody West Project are site-specific actions, and their potential effects have been analyzed and disclosed during the environmental analysis process. The responsible official, in issuing their draft decision, has the discretion to determine whether to prepare a Finding of No Significant Impact (FONSI) or to prepare an environmental impact statement. Based on the current analysis and project record, the responsible official has issued a preliminary FONSI. |
| Porter, Zack | The Forest Service's proposed action fails to meet current scientific standards and demands Despite the clear scientific evidence for increased amounts of old, wild forest, only 3% of New Hampshire (and a similar amount across New England) is managed to permanently protect or restore old forest conditions, with a primary emphasis on supporting native biodiversity, natural processes, and climate stabilization.[12] New Hampshire was historically dominated by old forests, and it remained that way for millennia prior to European arrival.[13] Although the Abenaki people and other indigenous communities developed a sophisticated culture and cleared and managed some of the New England landscape with fire, recent science demonstrates that their impacts were highly concentrated, with the majority of historic New England forests primarily impacted by forces such as wind, ice, and beavers.[14] Much of New Hampshire's landscape evolved with relatively minor human influence over thousands of years since the last glaciation. With these considerations in mind, the Forest Service should reconsider its stance in regard to the Age Class goals and implementation of Executive Order 14072. | Currently, EO 14072 provides broad agency direction but is not prescriptive at the project level. Therefore, barring future direction relevant to this proposal, the EO is not applicable to this project. The guiding document for the Peabody West Project is the 2005 forest plan; the proposal is consistent with forest plan direction and applicable law, regulation, and policy. See also response to C/R 45. |
| Porter, Zack | The proposed action must comply with all of the standards and guidelines contained in the WMNF for the MA 2.1 ("General Forest Management") designation. There are some standards and guidelines that Standing Trees would like to draw specific attention to, which may be particularly relevant to the proposed action. First, project-related motorized administrative use may be allowed but the Forest Service should "consider potential impacts to social conditions and ecological resources in the area," resulting from such motorized use. WMNF Plan at 3-5. Additionally, regarding general vegetation management, "[h]arvest restrictions, such as time of day, day of the week, or season, should be considered in high-use recreation areas or other sensitive areas, such as private residences, on a case-by-case basis." WMNF Plan at 3-8. Several of these guidelines are likely to be implicated due to the proposed action design; and therefore, must be considered and analyzed by the Forest Service as part of its NEPA evaluation. | Commenter does not indicate specific cause-effect issues or deficiencies with the proposed action or the analysis relative to forest plan direction. In addition, the proposed action contains several design features (e.g., REC- through REC-5) included with the intent of minimizing or avoiding potential impacts to recreation users (see Project Design Elements, draft EA, pp. 11-14). |
| Porter, Zack | The Purpose and Need Statement must be properly defined To comply with NEPA, federal agencies must provide a statement explaining the purpose and need for the proposed action. See 40 CFR § 1501.5(c)(2) (2020); § 1502.13 (2020). It is important that this statement accurately reflects the proposed action's purpose and need because this statement in turn informs the range of alternatives the agency will consider as part of its NEPA analysis. See League of Wilderness Defs.-Blue Mountains Biodiversity Proj. v. U.S. Forest Serv., 689 F.3d 1060, 1069 (9th Cir. 2012). The Forest Service should take care to not define the purpose and need so narrowly as to eliminate reasonable alternatives from analysis. City of Carmel-By-The-Sea v. U.S. Dep't of Transp., 123 F.3d 1142, 1155 (9th Cir. 1995); see also Simmons v. U.S. Army Corps of Engineers, 120 F.3d 664, 667 (7th Cir. 1997) (finding the range of alternatives the Corps considered to be inadequate because the agency too narrowly defined the project's purpose, emphasizing that the evaluation of alternatives is intended to be an evaluation of alternative means to accomplish the general goal of the action). The DEA's stated Purpose and Need "is to advance forest plan goals, objectives, and desired conditions for vegetation, wildlife, and other resources in the Peabody West Habitat Management Unit (HMU)." See DEA at 1. These are very distinct objectives, but the Forest Service appears to believe that they can all only be met through various timber harvest prescriptions. Either the Purpose and Need has been drafted too narrowly, or the Forest Service has neglected to conduct a reasonable analysis of alternatives that could meet Forest Plan goals and objectives, and meet the intent of Executive Orders 14008 and 14072. The Forest Service should frame the purpose and need in such a manner that it allows the Forest Service to consider an adequate range of alternatives, as discussed in more detail below. A properly crafted purpose and need statement would integrate purposes of the Forest Plan with current executive orders (for example, Executive Order 14072[1] and Executive Order 14008[2]) to identify the best management approaches. Instead, the DEA states the purpose of the proposed action is to implement the 17-year old Forest Plan. This inherently structures the DEA to presuppose that the Forest Plan could only be implemented by the proposed action and fails to explain the management context (i.e., is the management needed and is this the most appropriate management for the subject stands?) to demonstrate the need component of the purpose and need statement. In order to demonstrate the need for the action, the Forest Service must do more than simply state a preference for "high-quality timber products[,]" 2022 DEA at 1, but must actually connect stand conditions, best science, and desired future conditions to this supposed need. Without this, the DEA's purpose and need statement is inadequate to satisfy the NEPA requirements because it is too narrow and eliminates reasonable alternatives. A more accurate purpose and need statement would promote and require exploration of other forest management prescriptions that could better implement the Forest Plan, better avoid significant impacts on scenic and cultural resources and mature forests, better support the full range of biodiversity in its natural abundance and distribution, and meet the intent of Executive Orders. A more | The purpose and need for the Peabody West Project is defined by the difference between the existing habitat conditions and the desired habitat conditions. The desired habitat conditions are described for forest planning level in the current forest plan, and more site-specifically for the habitat within the Peabody West HMU rationale document. Additional information can be found in C/R 45. Agencies have discretion in crafting their proposed actions. For this project, the draft EA identifies which actions would be used to move the existing habitat conditions toward the desired conditions, including which vegetation prescriptions and other management activities would be applied and the methods that would be used, including a map series (pp. 3-19).As stated elsewhere, currently, EO 14072 provides broad agency direction but is not prescriptive at the project level. Therefore, barring future direction relevant to this proposal, the EO is not applicable to this project. |

| | | |
|---|---|---|
| Porter, Zack | Threatened and Endangered Species Issues On March 23, 2022, the U.S. Fish and Wildlife Service ("USFWS") announced a proposed rule to reclassify the northern long-eared bat from threatened to endangered and remove the bat's species-specific 4(d) rule. Endangered Species Status for Northern Long-Eared Bat, 87 Fed. Reg. 16,442 (March 23, 2022). The DEA does not address this significant event. The up-listing of the bat, if finalized, will remove its species-specific 4(d) Rule and make all take of the bat unlawful. 87 Fed. Reg. 16,442. While the Forest Service has analyzed impacts of logging on the bat in other projects, it is not clear whether such analysis has been done here. Additionally, in those projects the Forest Service found that at least some bats may be taken, especially under its cumulative impacts analysis, but the Forest Service has never evaluated the impacts of such take on the species in the absence of the 4(d) Rule. The proposed up-listing and removal of the 4(d) rule is thus new information that warrants additional analysis and an EIS, as discussed in more detail below. The up-listing was, by definition, motivated by an increased likelihood that the Northern Long-eared Bat is in danger of extinction throughout all of its range. See 87 Fed. Reg. 16,449. The bat's abundance "has and will continue to decline substantially under current demographic and stressor conditions;" extant winter colonies have declined range-wide by 81%; and range-wide abundance is projected to decline by 95% from historical conditions by 2030. Id. at 16,446. Further, there has been a 96-100% decline in the number of large hibernacula. Id. Such low population sizes "exacerbate the effects of current and future declines due to continued exposure to [white nose syndrome], mortality from wind turbines, and impacts associated with habitat loss and climate change." Id. at 16,447. Northern Long-eared Bat habitat requirements are the opposite of the type of habitat that will be generated from the proposed action. According to the USFWS Species Status Assessment Report for the Northern Long-eared Bat[8] ("NLEB Report"), dated March 22, 2022, the bat depends on mature and old forests for roosting and foraging. Preferred roosting habitat is large diameter live or dead trees of a variety of species, with exfoliating bark, cavities, or crevices. Bats change roosts approximately every two days. Preferred foraging habitat is old forest with complex vertical structure on hillsides and ridges. The WMNF, including the West Peabody IRP area, contains extensive mature forests that are beginning to acquire the characteristics of an old forest, likely providing some of the highest-quality Northern Long-eared Bat habitat in New England. Many of the silviculture treatment prescriptions involve the removal of mature trees. In combination with recently-approved projects (including Bowen Brook Integrated Resource Project, Deer Ridge Integrated Resource Project, Wanosha Integrated Resource Project, and others), and anticipated logging projects (including Sandwich Vegetation Management Project and Tarleton Integrated Resource Project), the WMNF is set to eliminate or degrade thousands of acres of Northern Long-eared Bat habitat across a large region. As discussed in further detail below, the Forest Service should evaluate the cumulative impact of these combined and geographically proximate projects. What's more, logging is commonplace in private lands surrounding the WMNF and across the | The biological evaluation for the Peabody West Project includes consideration of potential impacts to northern long-eared and other woodland bat species. Currently, the NLEB is listed as threatened under the 4(d) rule and the proposed project is consistent with the Endangered Species Act. Until such time as the listing for NLEB is finalized, re-initiation of consultation is not required. No further response required.The EA and BE have been updated to reflect the proposed listing status for tricolored bat. |
| Robey, Frank | As you continue logging and as rain/snow patterns continue changing even more than they have already you're not going to get the regrowth of trees like you have in the past. During periods of drought all those little seedlings are going to die rather than grow. | Comment is a broad or general statement or opinion. More broadly, climate and carbon assessments are considered in the draft EA and project record. No further response required. |
| Robey, Frank | FWS is proceeding with listing the Northern Long Eared bat as Endangered since they're basically going to be disappearing yet you're going to be killing them with this logging project. You need to do a cumulative effects analysis of ALL your logging projects and how many bats you already killed! https://www.fws.gov/press-release/2022-03/proposal-reclassify-northern-long-eared-bat-endangered "The Service's review found that white-nose syndrome is expected to affect 100% of the northern long-eared bat's U.S. range by 2025, spreading more quickly than anticipated across the continent. Data indicate white-nose syndrome has caused estimated declines of 97 to 100% of affected northern long-eared bat populations." | The biological evaluation for the Peabody West Project includes consideration of potential impacts to northern long-eared and other woodland bat species. Currently, the NLEB is listed as threatened under the 4(d) rule and the proposed project is consistent with the Endangered Species Act. Until such time as the listing for NLEB is finalized, re-initiation of consultation is not required. No further response required.The EA and BE have been updated to reflect the proposed listing status for tricolored bat. |
| Robey, Frank | How are the winter deer and moose going to be affected by the glades that you're looking to put in? How are Bicknell's thrush and other critters going to be affected by all the bike trails you're looking to put in? It's going to affect a LOT of critters! Are you going to prevent e-bikes from taking over these trails and killing all sorts of critter at 40 MPH? | Deer yards are typically located near riparian areas, south- and west-facing slopes, and in spruce-fir-hemlock habitats, all of which are ideal for providing protection from snow and wind. According to Maine Inland Fisheries and Wildlife (MEIFW), "A forest stand is a group of trees of same or similar species, age, height, or canopy closure. Stands dominated by cedar, spruce, fir, or hemlock are by far the best at intercepting snow, when they are over 35 feet tall and have canopy or crown closure over 50 percent. Snow depths under such stands can be 40 percent lower than under hardwood stands with similar characteristics. This is because their leaves (needles) intercept falling snow" (MEIFW 2010). Non-deciduous trees are essential to provide cover for deer because the evergreen needles keep the snow from reaching the ground and break the wind. Under the canopy of the dense limbs, nighttime temperatures are not as bitter, and winds are not as strong. The flat needle structure of hemlock trees is the best for retaining snow, followed by white cedar, balsam fir and spruce (NH Fish and Game Department 2010). Numerous field visits from Forest Service staff surveyed the proposed glade ski boundary, mapped in GIS, and flagged the best ski routes with general notes taken if wildlife sign was present (refer to notes in project record). There was no sign of browse or deer or moose droppings and the habitat composition of the 300-acre ski boundary area is primarily northern hardwood. Softwood sites including spruce, fir, and hemlock were avoided in the glade ski boundary area so none of the essential habitat criteria for deer wintering areas and moose wintering areas are present in the 300-acre boundary.Current Forest Service policy considers all electric bikes (e-bikes) motorized vehicles which are allowed only on routes open to motorized traffic on National Forest System lands. This project was not analyzed for e-bikes as they are not part of the proposed project and therefore only non-motorized bike trails were analyzed for this project.Bicknell's thrush are found in habitat characterized by high numbers of standing dead conifers with a dense understory of red spruce, black spruce, balsam fir, birch, and krummholz communities of high elevations greater than 2,500 feet. (NHFGD 2016). The backcountry ski routes and mountain bike trails are well below 2,500 feet and are not in Bicknell thrush habitat. |
| Robey, Frank | I saw no mention at all of the Emerald Ash borer or beech leaf disease or beech bark disease in your EA/FONSI. From what I'm reading these are going to have a profound effect on our Forests. How will you ensure that you're not getting below the minimum basal area, especially in the watershed when these trees will be dying quickly. Another reason not to do this logging. | Beech bark disease has been in New England for well over 70 years and the Forest has managed for it for many years. Beech trees do die (approximately 30% mortality of infected beech in New Hampshire) (Miller-Weeks), but others survive despite severe canker development. Emerald Ash borer is on the Forest, but currently there is no evidence of its presence in Coos County (University of New Hampshire, 2022). As for beech leaf disease, serious decline and mortality of infected beech can take 3-6 years depending on vigor of infested trees. Again, there is no evidence of its presence on the Forest and has only been detected in New Hampshire in 2022 (University of NH, 2022).A certified Silviculturist is responsible for writing silvicultural prescriptions dictating the basal area to be removed as well as acres to be harvested. Basal area retention is based on meeting Forest Plan standard and guidelines for visual quality, riparian and aquatic habitat, water resources, and promoting a diversity of tree species, forest types and age classes. Silvicultural prescriptions also promote healthy forests by retaining trees that are healthy and vigorous. Basal area removals focus on harvesting poor quality trees such as beech trees infected with BBD and being pro-active and harvesting mature ash trees that are most susceptible to future infestations of EAB. There is no minimum basal area requirement in the Forest Plan and the Forest Hydrologist analyzed the percent of basal area removed by treatment within 57 watersheds (EA, pg. 23). |
| Robey, Frank | The 66ft buffer around goshawk nests is way to narrow...Some of the trees that you'll be cutting outside that buffer are going to be taller than 66 feet and have the potential to take out the nests...that should be 300 feet or more. | The 66-foot buffer for raptor nests is consistent with the forest plan (S-3, p. 2-33) and design feature BIO-1 as described in the draft EA (p. 14). In addition, BIO-1 indicates a buffer of "at least" 66 feet; the wildlife biologist has discretion to adjust the buffer size appropriate to the location and activity. |

| | | |
|---|---|---|
| Robey, Frank | The only acceptable Option is Option 1. This project should end right here. The trees you want to kill are so much more important to the Earth than cutting them down and shipping them to China or Japan or wherever the highest bidder is. The carbon that they, as well as all the trees you've already killed with your logging program is all we have to try to lower the CO2 and save the world. You really need to get with the program and stop your logging. | Comment is a general position statement with no rationale or project-specific cause-effect issue. Commenter mentions carbon, which is considered in the EA and project record. No further response required. |
| Robey, Frank | You need to do a Cumulative Effects analysis of ALL your logging projects and the effect on the climate with all of those combined. | Cumulative effects were considered for each resource area at the appropriate temporal and geographic bounds as documented in the project record (Effects Tracking spreadsheet at https://usfs.box.com/s/7u4ywmvx269s9ytn7yj65k2ayxtufg6f, EA, and specialist reports as appropriate). Commenter does not indicate a project-specific concern with the existing analysis or findings. No further response required. |
| Robey, Frank | Your Scenery analysis doesn't meet your minimums so once again another reason to not do this project. | The draft EA p. 21 provides rationale for exceeding guidelines for scenery management in MA 2.1 lands. In addition, the preliminary FONSI (p. 29) explains how exceeding these guidelines is consistent with operational flexibility provided in the forest plan. See also response to C/R #9 regarding scenery management considerations. No further response required. |
| Rousseau, Nicolas | I'm in favor of the project and I push my luck to ask that a mountain biking trails be planned to link the Gorham Area to Pinkam Notch then south toward Jackson. Avalanche brook might be a good option. In other state, longer mountain bike ride are available and in time become a attraction. Single track could be a match for a future trails going south to Jackson. | Commenter suggests additional recreational trail development which is outside the scope of the current project. No further response required. |
| Rousseau, Nicolas | The proposed uses match with a big trend towards the "new" sports such as moutain biking and ski touring. Making available more areas will tend to limit the appereance of illicit trails and at the same time protect sensible area as well. | Comment expresses a general opinion or statement. No further response required. |
| Sherman, Jeremy | * 300 acres seems impossible to glade. Why is so large an area being designated for backcountry skiing? Is there a master/ further plan for this area? * The impact statement did not define what a "band" is, and the USFS staff on the call did not know the term. Can you update the impact statement to define what a band is? Is it an area of denser clearing? Does the 3" or less diameter requirement apply when making a "band?" | The scope of work for the backcountry ski glade is described in the draft EA: the entire 300-acre area would not be developed for skiing. Rather, up to 5 gladed lines would be developed within that zone. The updated EA will provide additional clarification on development of the Pine Hill glade. |
| Sherman, Jeremy | *How can the public review how Backyard Concept and GBA make money from these glades? I understand folks have to make money, but GBA and Backyard are now making money off natural backcountry areas like Baldface and Cooley Jericho. I am curious how much money is being made from these areas and if this is a conflict of interest? Is this financial information available to the public? What kind of agreement does USFS have with GBA and Backyard? How does this differ from what a for profit company, let's say a logging company, would require? *Could I sell memberships to Third Hole and other swim holes if I start a group that modifies and maps swim holes (not trying to be fresh, just had to ask due to them both being included in this EA)? * GBA has changed rather drastically from a non profit who's original goal was to prevent illegal trimming. Many glades, such as Crescent, bought into this ideology. GBA is now very focused on the economy and making money off these same glades. Those who bought into the original "prevent illegal trimming" philosophy and developed glades now feel what they signed up for is not what they received. Where does the USFS stand on the change from illegal trimming to the economy? Has the USFS been cognizant of the change in GBA's goals? Is the sole reason for Pine Mountain the economy? | Comment relates generally to partner roles during implementation and is outside the scope of the environmental analysis. The overall need for the project is addressed in the draft EA (pp. 1-3).The Forest Service retains authority over operation and management of recreation opportunities on National Forest System lands. The Forest Service would develop an implementation plan prior to any work starting on the ground. An agreement would be developed with any partners or contractors with a specific project scope of work included based on the implementation plan. The Forest Service would oversee any work carried out by a partner to ensure it meets the intent of the plan.No further response required. |
| Sherman, Jeremy | I noticed the description of the Pine Mountain Glade stated the area to be gladed has not been previously used for skiing. I appreciate this statement and I hope the USFS considers protecting natural backcountry zones that can and have been skied without development in the future, especially from being developed by groups like the GBA who, in return, make money off it. I spoke with a few locals from the Gorham area, and they confirmed this area has been poked around in, but is not a natural backcountry zone. Once again, thank you for including this information in the impact statement. | Commenter provides general information regarding current light use of Pine Hill glade area for backcountry skiing but that it is not a "natural backcountry zone." No further response required. |
| Sherman, Jeremy | Is the area to be gladed already a natural backcountry (bc) zone? Do folks already ski/ ride it? If so, can the area be kept natural for folks to continue using and have the new glades be relocated? USFS - consider protecting natural bc areas while encouraging modified bc in new zones. Protect terrain diversity and the natural bc experience, and avoid conflict and over-tourism. Both natural and modified bc are a good way to get outside and can help the economy (but very different experiences for the user). | The commenter's suggestion to not develop the backcountry ski glade is considered under the Consequences of No Action section of the draft EA (p. 20). The draft EA provides the responsible official with adequate information to determine whether to issue all, part, or none of the proposed action.In addition, as stated on p. 20 of the draft EA, taking no action would not advance one of the goals of the forest plan to provide a range of quality recreation opportunities (forest plan, p. 1-10).No further response required. |
| Stock, Jasen | Having said this, the NHTOA does have a concern over forest/habitat health and timber product production. The project area analysis currently shows no regeneration-age forest habitat. We believe the proposed project does not go far enough to correct this problem. The proposed treatment area's silvicultural treatment has 89 percent of the prescription area undergoing uneven-aged regeneration harvests (i.e. single tree selection, group selection) and 10.5 percent (240 acres) will be regeneration harvest. Putting this in the context of the entire Peabody West HMU, only 8 percent of the prescriptions directly address this issue. The Peabody West project reflects a forest-wide concern regarding diminishing age class diversity and timber product production. In the WMNF 2020 Monitoring Report, the Forest Service recognizes its failure to meet its harvest and age class objectives. The report states, "There are a number of reasons contributing to the Forest's shortfall in meeting Forest Plan harvest and age class objectives, including budget and staffing issues." Although we appreciate the budget and staffing issues every public, government, and private organization faces, it is unclear why such a large percentage of the acres of this project (acres where the Forest Service has already invested staff time and analysis resources) are not be managed to correct these shortfalls. | We understand the concern regarding the limited amount of desired early successional habitat. The desired conditions for early successional habitat within the Peabody Habitat Management Unit based on the HMU analysis is about 160-208 acres. For this project, about 110 acres of early successional habitat creation is proposed in the form of clearcuts, patchcuts and a permanent wildlife expansion, which represents about 5 percent of the total project area (refer to draft EA Table 1, p. 5; and Appendix A).There are several reasons why we did not reach the desired threshold for early successional habitat. The first is the location of this project area. It is located in a valley bottom surrounded by the Carter-Moriah and Presidential Mountain Ranges with very popular hiking trails leading up to Appalachian Trail. These trails look directly into the project area and present challenges in complying with the White Mountain National Forest Land Management Plan (forest plan) standards and guidelines for Scenery Management. A scenery management analysis, which included multiple modeling efforts, was performed during proposal development. Based on these modeling efforts and iterative discussions among the interdisciplinary team members and line officer, stand sizes and boundaries, and proposed prescriptions were adjusted for consistency with Forest Plan direction to minimize scenery impacts (draft EA, p. 20-21).A second reason why we did not meet the desired conditions for early successional habitat was a concern for water quality based on the percent of basal area removed within a watershed containing a perennial stream. The Project Area encompasses about 57 watersheds and drains quite a bit of water from the surrounding mountains. Our goal was to minimize the number of watersheds that exceed 20 percent basal area removal by adjusting harvest prescriptions and proposed stand sizes. The draft EA contains a discussion of potential water quality impacts (p. 23).All the prescriptions have the effect of providing additional growing space to residual trees as well as opening up the canopy (partially to fully) to allow for regeneration of shade tolerant, intermediate shade tolerant and shade intolerant species within the understory thus creating multi-age stands with a diversity of age and size classes. |
| Stock, Jasen | Moreover, we appreciate the work the Forest Service does managing and creating recreational opportunities but, this work should not come at the expense of forest/habitat health and timber products production. According to the Monitoring Report, staff and budget resources are already stretched. Therefore, creating new recreational opportunities (back country skiing, mountain biking) when resources are already stretched will further pull Forest Service resources and energy away from the fundamental task of managing the forest in accordance with the Plan's forest/habitat health and diversity goals and production of timber products. | Comment concerns staffing and operating budgets, which is outside the scope of the environmental analysis. The responsible official has the discretion, in their decision, to approve or disapprove proposed actions based on factors beyond environmental considerations. No further response required. |

| | | |
|---|---|---|
| Stock, Jasen | We are recommending the Forest Service re-evaluate their prescriptions on this project and seek to create a more diverse age class in this project and produce more forest products. | We understand the concern regarding the limited amount of desired early successional habitat. The desired conditions for early successional habitat within the Peabody Habitat Management Unit based on the HMU analysis is about 160-208 acres. For this project, about 110 acres of early successional habitat creation is proposed in the form of clearcuts, patchcuts and a permanent wildlife expansion, which represents about 5 percent of the total project area (refer to draft EA Table 1, p. 5; and Appendix A).There are several reasons why we did not reach the desired threshold for early successional habitat. The first is the location of this project area. It is located in a valley bottom surrounded by the Carter-Moriah and Presidential Mountain Ranges with very popular hiking trails leading up to Appalachian Trail. These trails look directly into the project area and present challenges in complying with the White Mountain National Forest Land Management Plan (forest plan) standards and guidelines for Scenery Management. A scenery management analysis, which included multiple modeling efforts, was performed during proposal development. Based on these modeling efforts and iterative discussions among the interdisciplinary team members and line officer, stand sizes and boundaries, and proposed prescriptions were adjusted for consistency with Forest Plan direction to minimize scenery impacts (draft EA, p. 20-21).A second reason why we did not meet the desired conditions for early successional habitat was a concern for water quality based on the percent of basal area removed within a watershed containing a perennial stream. The Project Area encompasses about 57 watersheds and drains quite a bit of water from the surrounding mountains. Our goal was to minimize the number of watersheds that exceed 20 percent basal area removal by adjusting harvest prescriptions and proposed stand sizes. The draft EA contains a discussion of potential water quality impacts (p. 23).All the prescriptions have the effect of providing additional growing space to residual trees as well as opening up the canopy (partially to fully) to allow for regeneration of shade tolerant, intermediate shade tolerant and shade intolerant species within the understory thus creating multi-age stands with a diversity of age and size classes. |
| Thayer, Chris | Hermit Lake Complex - we recognize that proposed improvements to Hermit Lake have been removed from this project EA to allow for additional engineering support to review potential design and scope. We appreciate that the activities at Hermit Lake remain a priority and look forward to cooperative planning and engagement as the Hermit Lake Special Use Permittee. As current operators of Hermit Lake, AMC can provide valuable insights on user trends, assessment of existing infrastructure, and improvements to infrastructure and experience that meet the current population of users. AMC looks forward to working with the White Mountain National Forest Androscoggin Ranger District in achieving shared goals and resulting investments. | The Hermit Lake activities have been removed from the current proposal (draft EA, p. 4). No further response required. |
| Thayer, Chris | Mountain Biking Trails - we recognize the value of enhancing mountain biking opportunities in the project as proposed. We would also encourage quality recreationopportunities to include multiple use trails that are graded and hardened to accommodate use by people of all abilities, not just hikers and mountain bikers that areathletically inclined. Improvements to Hayes-Copp and Leavitt's Link backcountry ski trails as year-round mountain biking and multiple-use trails is one incremental step toward such opportunities. The existing network of National Forest System Roads in the project area also present opportunities for a multiple use corridor that could be graded, hardened, sufficiently widen to accommodate groomers and two-way pedestrian use, and suitable for use by people of all abilities including families with children, seniors, and persons that require mobility aids. Specifically, (p. 9-10) "About 9 miles of existing and proposed National Forest SystemRoads (system roads) would be reconstructed, and about 3 miles of unauthorized road in the project area would be added to the Forest Service Road system...About 0.6 mile of new road are proposed for construction". Reference to Figure 3 identifies roads or portions of roads to be reconstructed including FR 72 (Culhane Brook), FR 263 (Libby South), FR 2318 (currently unauthorized), and FR 264 (Jacknife). These road reconstructions, constructions, and improvements should be made such that a nonmotorized multiuse trail is available that traverses the project area from the Dolly Camp Campground in the south, along FR 72 and FR 263, to the northern border of the project area (to be extended by others into the Town of Gorham). Such a multiuse trail in this vicinity has been proposed and discussed over the last two orthree decades. It not only would provide alternative recreational use for people visiting and staying at Dolly Copp Campground, but also day use by WMNF visitors looking for casual, family-friendly, close-to-nature experiences. Non-motorized multiple use and easy-access trails are not easily found and rarely present on the WMNF, and the USFS can "provide a sustainable range of quality recreation opportunities" through such investment. Connectivity to current and planned recreation paths to the north (Gorham and Randolph) - and conceivably a connection to the multiple use Presidential Range Rail Trail - cannot be realized if the USFS does not consider such amenities on WMNF lands. An extension southward to Great Glen Outdoor Center and the AMC Pinkham Notch Visitor Center as a distant goal is not possible without a corridor through this project area. Please consider plans for a non-motorized multiple use corridor from Dolly Copp Campground to Gorham using Forest System Roads that are being reconstructed as part of the Peabody West Integrated Resource Project. | Comment refers to additional improvements (e.g., hardening and other design improvements) to existing travelways in the project area. While such improvements have been discussed, and an early proposal to consider a through-trail to the Great Glen area was considered, these activities have been removed from the current proposal. Although these improvements may be considered by the Forest Service in the future, they are outside the scope of the current proposal. No further response required. |
| Waldron, Todd | Overall, RGS & AWS applauds the White Mountain National Forest's Androscoggin District team for your efforts to promote forest resiliency and improve habitat diversity and other co-benefits associated with healthy, diverse forest landscapes. We strongly support science-based vegetative management activities like those incorporated in the Peabody West Integrated Resource Project proposal and RGS & AWS is available as a conservation partner to help the Forest Service move these projects forward. | General statement of support for project. No further response required. |
| Waldron, Todd | Ruffed Grouse Society & American Woodcock Society supports science-based sustainable forestry, promotes diverse forest landscape mosaics, and applauds the positive impacts this diversity has on resilience, climate, people, forests, and wildlife. Given that MA 2.1 is not meeting its habitat objectives and there is tension between scenery impacts and vegetative practices like even-aged silviculture, we are available to work with the Forest Service team in the future to identify ways to mitigate these tensions and ensure forest habitat conditions aren't overly compromised by aesthetic considerations. Regarding the single-tree and group selection silviculture, we're also eager to discuss spatial layout options and clustering techniques for the group areas to maximize positive wildlife habitat benefits. Ruffed Grouse Society and American Woodcock Society is a supporter of the Peabody West Integrated Resource Project. As a national and regional conservation partner with members and a chapter in the Granite State, we support the Forest Service's efforts to initiate this project and we look forward to working with the agency as a key partner and stakeholder.<br>On behalf of our members and supporters, we thank you for your careful consideration and action to support healthy forests, abundant wildlife, climate solutions and promoting a conservation ethic in New Hampshire. RGS & AWS would be happy to comment further or address questions on these considerations in your future deliberations. | General statement of support for project. No further response required. |

| | | |
|---|---|---|
| XX, XX | More information on the connections Granite Backcountry Alliance has with associated businesses is needed before GBA is allowed to cut more glades on public lands. There is a wide variety of conflict of interests among Tyler Ray's thinly veiled non profit / business. No up to date tax info is available for GBA or associated businesses. These businesses are. Granite Backcountry Alliance, Back yard concepts, Front yard law, Ski Kind, Mt Washington backcountry ski festival and possibly more. Money is not directly made through fee's, however large amounts of money is being made by Mr. Ray off of public lands. Thank you for considering this and looking into these conflict of interests. | Commenter takes issue with business practices of an outside organization. Commenter does not indicate specific cause-effect issue related to the proposed action. No further response required. |

| Row Labels |
| --- |
| **1** |
| The commenter's suggestion to not develop the backcountry ski glade is considered under the Consequences of No Action section of the draft EA (p. 20). The draft EA provides the responsible official with adequate |
| **2** |
| The Hermit Lake activities have been removed from the current proposal (draft EA, p. 4). No further response |
| **3** |
| Commenter suggests additional recreational trail development which is outside the scope of the current |
| **4** |
| Comment expresses a general opinion or statement. No further response required. |
| **5** |
| Commenter expresses general support for project activities, including non-motorized recreation opportunities. Commenter further supports recreation development which may benefit neighboring communities.Commenter |
| **6** |
| Mountain biking is allowed on all existing travelways on the National Forest. Improvements to the Hayes Copp cross-country ski system for design and use for mountain biking are not included in the current proposal; however, such improvements may be considered in the future if warranted. Improvements to FR 72 are currently limited to those necessary for project implementation and long-term administrative use.The |
| **8** |
| Commenter generally supports project objectives. No further response required. |
| **9** |
| We understand the concern regarding the limited amount of desired early successional habitat. The desired conditions for early successional habitat within the Peabody Habitat Management Unit based on the HMU analysis is about 160-208 acres. For this project, about 110 acres of early successional habitat creation is proposed in the form of clearcuts, patchcuts and a permanent wildlife expansion, which represents about 5 percent of the total project area (refer to draft EA Table 1, p. 5; and Appendix A).There are several reasons why we did not reach the desired threshold for early successional habitat. The first is the location of this project area. It is located in a valley bottom surrounded by the Carter-Moriah and Presidential Mountain Ranges with very popular hiking trails leading up to Appalachian Trail. These trails look directly into the project area and present challenges in complying with the White Mountain National Forest Land Management Plan (forest plan) |
| **10** |
| General statement of support for project. No further response required. |
| **12** |
| Commenter provides general information regarding current light use of Pine Hill glade area for backcountry |
| **13** |
| The scope of work for the backcountry ski glade is described in the draft EA: the entire 300-acre area would not be developed for skiing. Rather, up to 5 gladed lines would be developed within that zone. The updated EA will |
| **14** |
| Comment relates generally to partner roles during implementation and is outside the scope of the environmental analysis. The overall need for the project is addressed in the draft EA (pp. 1-3).The Forest Service retains authority over operation and management of recreation opportunities on National Forest |
| **17** |
| Commenter takes issue with business practices of an outside organization. Commenter does not indicate |
| **18** |

No parking area development or expansion is included in the proposed action. Recreation opportunities are intended to provide interconnection with existing trails and other facilities. Commenter does not suggest an alternate location for consideration.More broadly, the Forest Service recognizes the need to coordinate with

**19**

The proposed action does not include herbicide application for NNIS. The revised EA will clarify the scope of NNIS treatment (none specific to this proposal). Any NNIS occurring in the project area would be handled under

**20**

Commenter quotes purpose and need sections which do not exist in the environmental analysis for this project.

**21**

The draft EA p. 21 provides rationale for exceeding guidelines for scenery management in MA 2.1 lands. In addition, the preliminary FONSI (p. 29) explains how exceeding these guidelines is consistent with operational

**22**

Commenter cites 40 CFR 1502.10 and 1502.16 which are relevant to environmental impact statements. Comment is not applicable to the current project. The proposed project is being analyzed via an environmental assessment and is consistent with content requirements for an EA (e.g., 40 CFR 1501.5).Commenter cites 40

**23**

Refer to the following document regarding compliance with MBTA: https://usfs.box.com/s/ve1h8u497g9lz4u0dlb09ldzygktc4lk. Note that the the M-Opinion does not change EO 13186, or its direction to federal agencies.Effects to wildlife are disclosed in the Forest Plan FEIS, starting on page 3-165. Migratory birds are specifically discussed on pp. 3-202 to 3-206. A detailed effects analysis of the 22 highest priority species, as determined by the U.S. Fish and Wildlife Service, is included within these pages. It was determined that concern for all other species that use the Forest during the breeding or winter season is not great or immediate enough to qualify any of them as potential viability concerns over the life of the Forest Plan.Implementation of the Migratory Bird Treaty Act (16 USC 703-712) on Federal lands was further clarified

**24**

NEPA does not preclude or prevent environmental impacts from occurring. Rather, NEPA requires agencies to analyze and disclose those effects. Because the draft EA did not find potential significant impacts to resources,

**26**

Opposing views attachments submitted by the commenter primarily contain out-of-context quotes with no indication of cause-effect connection to the proposed project. Opposing views lack specificity, and several are derived from opinion pieces or popular articles. The interdisciplinary team has used appropriate best available science for this project.Opposing views #9 references herbicide use, which is not proposed as part of this

**27**

Comment concerns staffing and operating budgets, which is outside the scope of the environmental analysis. The responsible official has the discretion, in their decision, to approve or disapprove proposed actions based

**28**

Potential impacts of noise and dust were not identified as key issues for the proposed action. 42 USC section 7641 is relevant to noise sources which are considered a "public nuisance." This project would not produce any new, permanent noise sources nor was it determined to produce nuisance noise sources. The project would

**30**

Comment refers to additional improvements (e.g., hardening and other design improvements) to existing travelways in the project area. While such improvements have been discussed, and an early proposal to

**31**

Comment is a general position statement with no rationale or project-specific cause-effect issue. Commenter

**32**

Cumulative effects were considered for each resource area at the appropriate temporal and geographic bounds as documented in the project record (Effects Tracking spreadsheet at

**33**

Beech bark disease has been in New England for well over 70 years and the Forest has managed for it for many years. Beech trees do die (approximately 30% mortality of infected beech in New Hampshire) (Miller-Weeks), but others survive despite severe canker development. Emerald Ash borer is on the Forest, but currently there is no evidence of its presence in Coos County (University of New Hampshire, 2022). As for beech leaf disease, serious decline and mortality of infected beech can take 3-6 years depending on vigor of infested trees. Again, there is no evidence of its presence on the Forest and has only been detected in New Hampshire in 2022

**34**

The biological evaluation for the Peabody West Project includes consideration of potential impacts to northern long-eared and other woodland bat species. Currently, the NLEB is listed as threatened under the 4(d) rule and

**35**

The 66-foot buffer for raptor nests is consistent with the forest plan (S-3, p. 2-33) and design feature BIO-1 as described in the draft EA (p. 14). In addition, BIO-1 indicates a buffer of "at least" 66 feet; the wildlife biologist

**36**

Deer yards are typically located near riparian areas, south- and west-facing slopes, and in spruce-fir-hemlock habitats, all of which are ideal for providing protection from snow and wind. According to Maine Inland Fisheries and Wildlife (MEIFW), "A forest stand is a group of trees of same or similar species, age, height, or canopy closure. Stands dominated by cedar, spruce, fir, or hemlock are by far the best at intercepting snow, when they are over 35 feet tall and have canopy or crown closure over 50 percent. Snow depths under such stands can be 40 percent lower than under hardwood stands with similar characteristics. This is because their leaves (needles) intercept falling snow" (MEIFW 2010). Non-deciduous trees are essential to provide cover for deer because the evergreen needles keep the snow from reaching the ground and break the wind. Under the canopy of the dense limbs, nighttime temperatures are not as bitter, and winds are not as strong. The flat

**37**

Letters 14 and 15 include a number of attachments. To the extent that these references are included as

**39**

Currently, EO 14072 provides broad agency direction but is not prescriptive at the project level. Therefore,

**40**

Water quality and quantity concerns have been addressed in the EA (pp. 22-24) and project record. In addition, the list of Federally recognized tribes contacted during development and release of the draft environmental assessment are available in the project record, and the project is in compliance with the National Historic Preservation Act (EA, p. 26 and project record). Soil impacts are considered in the EA (p. 22) and project record as well.The Peabody West Project does not propose any actions which normally require preparation of an EIS (36 CFR § 220.5). Forest Service NEPA regulations direct the agency to prepare an Environmental Assessment

**41**

with the purpose of providing a high quality of sawtimber and other timber products on a sustained yield bases and provide a balanced mix of habitats for wildlife species through timber harvest. Approximately 95% of the project area will remain in mature habitat and the remaining 5% will be in early successional habitat which has great value to species that require this for all or a portion of their life cycle.17-5 The lack of open forest conditions stated in the DEA is based on the Peabody HMU analysis for Forest Service lands. Currently there is no early successional age class (0-10 years) in the Peabody HMU. The desired future conditions for the Peabody HMU are 3-4% of the landscape in northern hardwood regeneration, 1% in mixedwood regeneration, 1-2% in spruce-fir regeneration and 12-15% in aspen-paper birch. For this project we are proposing approximately 0.7% of the Peabody HMU (110 acres out of 15,495 acre) to be in early successional habitat which is below the amount stated in the comment. We do not produce age-class maps; age class and forest types are verified during stand exams and the Forest vegetation database is updated based on collected information.79% of the Project Area being in mature habitat the commenter references is not correct; this takes into account just the northern hardwood forest type and does not include mature acres of mixedwoods, spruce-fir and aspen-paper birch. Also, the 79% representing mature northern hardwood forest type is for the Peabody HMU, not the Project Area. The complete representation of mature habitat shown in Table 4: Age class composition by habitat type for Peabody West HMU is 79% of the total acres of northern hardwoods are mature, 95% of the total mixedwood acres are mature, 99% of the total acres of spruce-fir are mature and 97% of the aspen-paper birch acres are mature. Based on Table 4, approximately 90% of the acres within the Peabody HMU are mature when accounting for all forest types.17-12 The commenter is referencing the Appendix D Age Class definitions by Habitat Type (D-2) which documents the ages of which age class starts and ends by habitat type and is a reference to wildlife habitat not structure characteristics. The old age class objectives are based on the amount of MA 2.1 lands of each broad habitat type that are not suitable for timber harvest. They are determined from the acres of each habitat type in MA 2.1 with a land suitability class (LSC) code other than 500 or 699. The old age class is not specifically managed for, but displays the expected condition of the land since these lands will not be managed through timber harvest.Stands proposed for silvicultural treatment are all considered mature. While some old forest may occur in the Peabody HMU, these stands are not proposed for treatment. The Peabody HMU rationale document and project record include information on the existing and desired

**46**

Currently, EO 14072 provides broad agency direction but is not prescriptive at the project level. Therefore, barring future direction relevant to this proposal, the EO is not applicable to this project. The guiding document

**47**

The purpose and need for the Peabody West Project is defined by the difference between the existing habitat conditions and the desired habitat conditions. The desired habitat conditions are described for forest planning level in the current forest plan, and more site-specifically for the habitat within the Peabody West HMU rationale document. Additional information can be found in C/R 45. Agencies have discretion in crafting their

**48**

The proposed action section for transportation describes the rationale for those proposed activities which deviate from recommendations found in the TAP (draft EA, p. 10). These activities are also included in Appendix B. Because the TAP provided recommendations and was not action-forcing, nor was it subject to

**49**

Comment is a broad or general statement or opinion. More broadly, climate and carbon assessments are

**50**

| | |
|---|---|
| | A shelterwood system is a sequence of harvest treatments done in in multiple stages (preparatory, establishment and removal) which harvests most of the trees, leaving those needed to produce sufficient shade to produce a new age class in a moderated microenvironment (Helms, 1998). This project proposes three shelterwood establishment treatments on approximately 75 acres. Shelterwood establishment treatments will predominantly harvest trees in the intermediate and co-dominant crown classes, retaining high quality dominant seed trees. The goal is to prepare a seed bed by increase light reaching the forest floor and improve growing space needed to create a new age class of desired species in the understory while maintaining a |
| **51** | |
| | As stated in the draft EA, log landing locations may be refined prior to implementation. Log landings are negotiated as part of the timber contracts implementing the project. As such, the draft EA defines sidebars and requirements for log landing locations without specifically limiting consideration of alternate locations. During |
| **52** | |
| | Refer to C/R 45 for additional detail regarding habitat and forest composition in the project area and HMU (re: comment 17-24). No treatments are proposed in old forest or old growth habitats.The carbon assessment for the WMNF (white paper) addresses broad carbon and climate data relevant to forest management and eastern forests specifically. When considering carbon and climate change in the context of land management activities, it is necessary to consider the overall management objectives associated with a piece of land, the carbon stocks in different pools, and the flows of carbon between these pools. In other words, we consider the forest sector carbon cycle in its entirety and do not single out individual processes. The White Mountain National Forest is incorporating the concepts of resistance, resilience and transition in responding to the issue of climate change at the project level. The environmental impacts section of the EA includes an analysis of potential carbon and climate impacts resulting from the proposed action (draft EA, pp. 22-23). The proposed action would have |
| **53** | |
| | No timber harvest is proposed in old growth forest. The proposed project is in compliance with applicable law, regulation, and policy, including forest plan direction and the Endangered Species Act.The White Mountain National Forest does not conduct timber harvesting over 2,500 feet and according to NH Fish and Game, American martens are typically found in spruce-fir habitats above 2,700 feet. Conifer cover is important during winter and course woody debris on the ground provides denning and nesting sites and refuge from predators (https://www.wildlife.state.nh.us/wildlife/profiles/american-marten.html). At higher elevations, deep snow, unique soil composition, inclement weather, and infrequent logging all contribute to the conifer cover and coarse woody debris that marten seek. Thus, ridgelines and areas of high elevation may be particularly important for marten in New Hampshire (NHFG 2016). Mixed deciduous and coniferous forests with a variety of horizontal and vertical structure.The Forest Service acknowledges the proposed timber harvests would have |
| **54** | |
| | The proposed action includes a relatively short segment for decommissioning (EA, p. 10) and is intended to relocate a poorly sited road prism. This decommissioning is similar to other decommissioning activities conducted on the forest and does not require monitoring for effectiveness. FSH 1909.15 Chapter 54 describes |
| **Grand Total** | |

# Decision Notice

Peabody West Integrated Resource Project

U.S. Department of Agriculture, Forest Service

White Mountain National Forest, Androscoggin Ranger District

Coos County, NH

The Decision Notice incorporates all previous information in the Peabody West Integrated Resource Project Environmental Assessment and Finding of No Significant Impact (EA/FONSI), as well as information included in the project record.

## Decision and Rationale

I have decided to approve the activities described in the "Purpose and Need" and "Proposed Action" sections of the project EA/FONSI, including modifications identified during environmental analysis and review of legal and regulatory compliance.

Under the proposed action, management actions will occur within approximately 3,000 acres of management area (MA) 2.1 (General Forest Management) lands. The purpose of this management area is to provide a sustained yield of high-quality timber products; provide a balanced mix of habitats for wildlife; provide a variety of recreation opportunities; and manage high-use or highly developed recreation areas to acceptable social and ecological standards while retaining some low-use and less developed areas.

The project will advance Forest Plan goals and objectives by providing high quality timber products, diversifying wildlife habitat, and addressing other recreation and transportation management needs. Refer to the EA/FONSI for a complete project description; the proposed action is summarized below.

- Conduct silvicultural treatment on about 2,220 acres of Management Area 2.1 lands within the Peabody West habitat management unit (HMU)
- Expand a permanent wildlife opening to about 19 total acres
- Construct about 0.6 mile of new road to replace a 0.8 mile decommissioned portion of Forest Road 263 (Libby South) and Forest Road 264 (Jacknife)
- Reconstruct about 9 miles of existing system and non-system roads
- Add about 3 miles of unauthorized roads to the forest road system
- Designate about 6 miles of mountain biking trail as part of the forest trail system, including constructing about 4 miles of new single- and double-track trail on National Forest System land
- Designate about 300 acres as a backcountry ski zone with up to 5 skiable downhill routes
- Grade and tread-harden trail access to the Third Hole swimming site
- Thin vegetation within a 3 acre area at the Androscoggin Ranger District office

Applicable Forest Plan standards and guidelines, national core and state best management practices, and project-specific design features identified by the interdisciplinary team will be implemented as part of the proposed action (EA, pp. 15-17). Acreage prescriptions for units 19 and 20 and a single wildlife opening exceed Forest Plan Guidelines G-3 for scenery management in MA 2.1 lands (Forest Plan p. 3-6). These units provide key opportunities to move the forest toward desired conditions for regeneration habitat as discussed in the Purpose and Need for the Proposed Action (EA, p.3) and in the HMU rationale document. Because the Forest Plan permits flexibility regarding guidelines (Forest Plan, p.2-3), this project is consistent with Forest Plan guidance and therefore a Forest Plan amendment is not required.

I have considered the best available science in making this decision. An interdisciplinary team fully evaluated and disclosed the environmental effects of the proposed project based on field study, resource inventory and survey, the best available science, and professional expertise. The project record demonstrates a thorough review of relevant scientific information and the consideration of opposing views. I considered the need for action and the issues identified during scoping and the public comment process in making my decision. I weighed the effects of the proposed action against taking no action. While taking no action would allow natural successional processes to continue, it would not advance the goals and objectives of the Forest Plan. Therefore, taking no action would not meet the need for the project. The proposed action will have minimal impact on the environment and will benefit multiple resources.

## Summary of Public Involvement

The EA (p. 31) describes the public involvement process including the list of agencies, organizations, and persons consulted regarding this project.

We first introduced the project to the public in March 2019. The conceptual project was published on the Forest Service's schedule of proposed actions (SOPA) in April 2019, and a proposal development open house was held with the public on April 9, 2019.

In December 2019, we initiated a scoping comment period for the Peabody West Project. A notice of the availability of the scoping newsletter and request for comments was sent to over 450 parties and published in the Berlin Sun. Based on public input gathered during this initial comment period, and additional interdisciplinary review, we modified the scope of the proposed project, primarily the recreation components. We then held an additional scoping comment period to present the updated proposal in March 2021. Notice of this additional scoping comment period was sent to over 650 parties. In August 2022, we initiated the formal 30-day comment period on the draft EA and preliminary FONSI for the project. A notice of the availability of the draft EA/FONSI was published in the New Hampshire Union Leader and the Berlin Sun. In addition, we sent notice of this comment period to over 560 parties. On August 16, 2022, we held a virtual public meeting to provide an overview of the project and assist the public with the comment process. The virtual public meeting included an open question-and-answer session with public.

Over the course of the analysis process, we received 68 unique comment letters, all of which have been reviewed by the interdisciplinary team and are saved in the project record. The interdisciplinary team and responsible official considered all comments received and used them to help refine and modify the proposed action, make factual corrections and updates, and adjust the analysis and supporting documentation for clarity.

## Findings Required by Other Laws and Regulations

This decision is consistent with the Biological Opinion issued on March 31, 2023, by the U. S. Fish and Wildlife Service for the management of northern long-eared bats. All reasonable and prudent measures and terms and conditions listed in the Biological Opinion will be adhered to during project implementation.

The Biological Evaluation determined that the proposed actions would not jeopardize the continued existence of tricolored bats, which were proposed for listing by the U. S. Fish and Wildlife Service on September 14, 2022. When the U. S. Fish and Wildlife Service finalizes the proposed rule to list the tricolored bat as endangered, the White Mountain National Forest will initiate consultation with the U. S. Fish and Wildlife Service on all project activities to comply with Section 7(a)(2) of the Endangered Species Act.

My decision complies with other law, regulation, and policy applicable to the proposal as documented in the EA (pp. 23-31) and finding of no significant impact.

## Implementation

Pursuant to regulations found at 36 CFR 218.12, the responsible official may not sign the decision notice until the reviewing officer has responded in writing to all pending objections. If no objections are received, the responsible official may sign the decision notice five (5) business days after expiration of the opportunity to object. Implementation may begin immediately after the decision notice is signed. Implementation of the project is expected to begin in fall 2024.

## Administrative Review and Objection Opportunities

This decision was subject to the pre-decisional objection process pursuant to 36 CFR 218, subparts A and B. Only individuals or organizations who submitted timely and specific written comments (section 218.2) about this project during designated opportunities for public comment are eligible to file an objection in accordance with section 218.5. Issues raised in objections must be based on previously submitted timely, specific written comments regarding the proposed project unless based on new information arising after designated comment opportunities (section 218.8(c)). The burden is on the objector to demonstrate compliance with this requirement. The objection must contain the minimum content requirements specified in section 218.8(d). Incorporation of documents by reference is permitted only as provided in section 218.8(b).

The opportunity to object ends 45 days following the date of publication of the legal notice in the newspaper of record, the New Hampshire Union Leader. Written objections must be postmarked during this time period and received within 5 business days after this time period. The publication date in the newspaper of record is the exclusive means for calculating the time to file an objection, and those wishing to object should not rely upon dates or timeframe information provided by any other source. The 45-day period is computed using calendar days, including Saturdays, Sundays, and federal holidays. When the period expires on a Saturday, Sunday, or federal holiday, the time is extended to the end of the next federal working day. The regulations prohibit extending the length of the comment period. It is the objector's responsibility to ensure timely filing of a written objection with the reviewing officer. All objections are available for public inspection during and after the objection process. Names and contact information submitted with objections will become part of the public record and may be released under the Freedom of Information Act. A legal notice was published in the Manchester Union Leader and the Berlin Sun on April 27, 2023. The objection filing period closed on June 12, 2023. One objection was received. The Reviewing Officer, WMNF Forest Supervisor Derek Ibarguen, issued an objection response letter on October 18, 2023. All instructions issued by the Reviewing Officer in his objection response letter have been addressed.

## Contact

For additional information concerning this decision, contact Joshua Sjostrom, District Ranger, by email at joshua.sjostrom@usda.gov or by phone at 603-446-2713 extension 1210.

Thank you for your interest in the management of the White Mountain National Forest.

JOSHUA SJOSTROM

Digitally signed by JOSHUA SJOSTROM
Date: 2024.02.07 15:19:17 -05'00'

Joshua Sjostrom

Androscoggin District Ranger

United States Department of Agriculture

# Peabody West Integrated Resource Project

## Environmental Assessment and Finding of No Significant Impact

U.S. Department of Agriculture, Forest Service photo by Jeff Williams

Forest Service White Mountain National Forest 4/27/2023

# Purpose and Need for the Proposed Action

The White Mountain National Forest (WMNF) Land and Resource Management Plan (Forest Plan) guides the forest to "use an ecological approach to provide both healthy ecosystems and a sustainable yield of high quality forest products" (Forest Plan, p. 1-17) and to "use sustainable ecosystem management practices to provide a diversity of habitats across the WMNF, including various habitat types, age classes, and non-forested habitats" (Forest Plan, p. 1-20) (U.S. Department of Agriculture, Forest Service 2005). The Forest Plan allocates lands to a variety of management areas (MAs), each of which emphasizes goals, objectives, and desired conditions. Each MA also has associated standards and guidelines that set parameters on activities to ensure protection of the character and resources of the land. This EA is tiered to the 2005 WMNF Forest Plan Final Environmental Impact Statement (FEIS) (U.S. Department of Agriculture, Forest Service 2005). Both the Forest Plan and FEIS are incorporated by reference, as appropriate, and are available on the WMNF website.

The purpose of the Peabody West Integrated Resource Project (IRP) is to advance Forest Plan goals, objectives, and desired conditions for vegetation, wildlife, and other resources in the Peabody West Habitat Management Unit (HMU) (refer to Project Maps section[1]). The Peabody West HMU is about 15,500 acres. Project activities are proposed on a subset of about 3,000 acres within MA 2.1 lands—General Forest Management—and associated access roads, as described in the Proposed Action section. The purpose of this management area is to provide a sustained yield of high-quality timber products; provide a balanced mix of habitats for wildlife; provide a variety of recreation opportunities; and manage high-use or highly developed recreation areas to acceptable social and ecological standards while retaining some low-use and less developed areas (Forest Plan, p. 3-3). As described in the following sections, the proposed project would manage forest vegetation in the project area to diversify vegetation and wildlife habitat while providing a sustainable yield of high-quality timber products. The project would also implement management actions to address transportation system needs and improve recreational opportunities.

## Vegetation and Wildlife Habitat Management

This project is needed to provide a sustainable yield of high-quality timber products and to improve wildlife habitat diversity within the Peabody West HMU, thereby helping to achieve the desired future conditions for wildlife and vegetation described in Chapter 1 of the Forest Plan. The Forest Plan HMU framework guides management in the project area to ensure that diverse habitats are distributed across the WMNF where soils and other ecological site conditions are suitable (U.S. Department of Agriculture, Forest Service 2019, 2002).

An analysis of the current habitat conditions indicates that the Peabody West HMU is not meeting MA 2.1 habitat composition and age class objectives (Forest Plan, pp. 1-20 to 1-21; U.S. Department of Agriculture, Forest Service 2022). The Forest Service most recently conducted vegetation management in the Peabody West HMU in 2006, which consisted primarily of single-tree selection around the Dolly Copp Campground. The project area currently contains a mosaic of forest types and habitats typical throughout the WMNF including northern hardwood, mixedwood, spruce-fir, aspen-birch, and wildlife openings. Most of the habitats in the project area are mature, with some younger stands interspersed.

---

[1] Maps in this document are intended to depict physical features as they generally appear on the ground and may not be used to determine title, ownership, legal boundaries/jurisdiction, including access restrictions that may be in place on either public or private land. The Forest Service reserves the right to correct, update, modify, or replace these products without notification. These maps may not be suitable for navigational use. Please contact your local Forest Service office for more information.

The general lack of open forest conditions tends to promote the development of shade-tolerant species and limit birch and aspen, which need abundant sunlight.

No regeneration-age (0-9 years old) forest habitat occurs in the Peabody West HMU except for three permanent wildlife openings which are managed to maintain valuable grassy and shrubby habitat. These existing conditions create a need for management action to move the landscape toward the desired future conditions consistent with Forest Plan direction.

Wildlife habitat objectives for the Peabody West HMU including the following:

- Increase spruce-fir habitat over the long-term
- Increase age-class diversity and foster the regeneration of stands
- Improve growing conditions for residual trees
- Maintain or increase aspen-birch habitat
- Maintain current levels of hemlock
- Gradually convert stands situated on non-compatible ecological land types to forest types consistent with land capability
- Maintain available permanent wildlife opening acreage and improve access to the openings for maintenance

The HMU rationale document includes more detailed information regarding existing and desired conditions for the Peabody West HMU (U.S. Department of Agriculture, Forest Service 2022).

## Transportation

In 2015, the WMNF completed a Forest-wide transportation analysis process report, which provided recommendations for long-term administration of the WMNF's transportation system (U.S. Department of Agriculture, Forest Service 2015). The proposed project is needed to complete a site-specific transportation analysis to implement or modify the 2015 travel analysis process recommendations within the project area; to plan and manage for current and future public and Forest Service access to the project area; to meet Forest Plan standards for desired road operation maintenance levels (MLs); and to meet requirements of the Highway Safety Act. Definitions of road operation MLs are provided in the Forest Plan (Forest Plan glossary, pp. 25-26).

## Recreation

The Forest Plan includes a goal of providing a range of quality recreation activities and opportunities (Forest Plan, p. 1-10). This project is needed to provide a sustainable range of quality recreation opportunities consistent with Forest Plan direction. In addition, the project is needed to improve accessibility at Third Hole swimming site, and to provide backcountry skiing and mountain biking opportunities and improve connectivity among those opportunities in the project area.

Existing recreation opportunities in the project area and nearby include three challenging hiking trails accessing the summit of Mount Madison, two moderate hiking trails accessing the summit of Pine Mountain, short trails at Triple Falls and the Androscoggin Ranger District office, three popular snowmobile routes, and the Hayes Copp Ski Trail. Numerous mountain bike trails exist on adjacent private lands north of the project area in the vicinity of Gorham, NH. The Dolly Copp and Barnes Field campgrounds are also located in the project area. Parking opportunities exist at Dolly Copp Campground, Great Gulf Wilderness Trailhead, and at several locations on public and private land within the town of Gorham.

### Mountain Biking Trails

Many routes in the WMNF were laid out and constructed according to design standards that never considered uses other than hiking. The combined effects of trail age, layout, design, use levels, and the naturally rugged terrain have resulted in a Forest-wide trail system that is steep and rocky and largely unsuitable for most mountain bike users. No managed opportunities for mountain biking exist on the Androscoggin Ranger District. Mountain biking opportunities in the project area are currently limited to

trails maintained for hiking, National Forest System roads, and other travelways. Mountain bike trail networks exist or are proposed on adjacent private lands, such as the trail network on the north slope of Pine Mountain. The proposed project is needed to provide mountain biking opportunities on National Forest System lands in the project area.

### Third Hole Access

Currently, one trail provides access to the Third Hole site. The trail is about 300 feet in length, accessed from a private parking lot on State Route 16, and has been maintained in the past. However, additional maintenance is needed to address resource concerns and accessibility guidelines.

### Pine Mountain Glade

No backcountry skiing opportunities exist in the project area. One backcountry ski area, the Bill Hill glade, occurs on and is accessed via private land on the northeast slope of Pine Mountain. The proposed project would provide backcountry skiing opportunities on National Forest System lands in the project area.

### Androscoggin Ranger District Office Site

Currently, vegetation located in the State Route 16 right-of-way inhibits visibility of the Androscoggin Ranger District administrative site from the roadway. Management action is needed to improve line-of-sight, increase visibility, and facilitate visitation to the office by the public.

# Decision to be Made

The Androscoggin District Ranger, as the responsible official for the Forest Service, must determine whether the proposed action would have significant impacts on quality of the human environment, and therefore whether an environmental impact statement must be prepared.

## Council on Environmental Quality Regulations

This environmental analysis is conducted according to the Council on Environmental Quality's (CEQ) 1978 regulations for implementing the procedural provisions of the National Environmental Policy Act (40 CFR §§1500-1508, as amended). The CEQ issued revised regulations for implementing the procedural provisions of the National Environmental Policy Act, effective September 14, 2020. The revised regulations provide the responsible official the option of conducting an environmental analysis under the 1978 regulations if the process was initiated prior to September 14, 2020 (40 CFR §1506.13, 85 FR 137, p. 43373, July 16, 2020). The Peabody West Project was first published on the Forest Service's schedule of proposed actions in April 2019, and the first public scoping comment period was initiated in December 2019.

## Pre-decisional Administrative Review Process

The proposed project is an activity implementing a land management plan. It is not an activity authorized under the Healthy Forests Restoration Act of 2003, as amended (Pub. L. 108-148). Therefore, this activity is subject to pre-decisional administrative review consistent with the Consolidated Appropriations Act of 2012 (Pub. L. 112-74) as implemented by subparts A and B of 36 CFR Part 218.

## For More Information

We make every effort to create documents that are accessible to all individuals. However, limitations with our word processing programs may prevent some parts of this document from being readable by computer-assisted reading devices. If you need assistance with any part of this document, or for more information regarding this project, contact Scott L. Hall, NEPA Planner, at scott.hall@usda.gov or by phone at 603-536-6226.

# Proposed Action

The WMNF is proposing of variety of activities, as described below and shown in the Project Maps section, to meet management objectives. Applicable Forest Plan standards and guidelines, National Core and State best management practices (New Hampshire Division of Lands and University of New Hampshire (UNH) Cooperative Extension 2016, U.S. Department of Agriculture, Forest Service 2012), and project-specific design elements would be implemented under the proposed action (refer to the Design Elements section). In addition, the interdisciplinary team developed the proposal using the climate change tools and approaches described in Swanston et al. (2016).

The WMNF is proposing project activities on about 3,000 acres in MA 2.1, consistent with Forest Plan direction. Project implementation is expected to start in 2024.

## Changes Since the Draft Environmental Assessment

Minor edits have been made to this document for clarity. Updates and clarifications have also been made to the following sections:

### Pine Mountain Glade

The proposed action description for the Pine Mountain Glade has been updated to include seasonal restrictions and acreage limits on vegetation removal within the 300-acre backcountry ski zone.

### Endangered Species Act

On September 14, 2022, the U.S. Fish and Wildlife Service proposed to list the tricolored bat as endangered under the Endangered Species Act (U.S. Fish and Wildlife Service 2022b). The tricolored bat is a Regional Forester sensitive species and was analyzed accordingly during the original project biological evaluation process. Updates have been made to the Endangered Species Act - Threatened, Endangered, Proposed and Candidate Species and Critical Habitat section and the project Biological Evaluation to reflect the proposed listing status.

On November 30, 2022, the U.S. Fish and Wildlife Service published a rule to reclassify the northern long-eared bat as endangered (U.S. Fish and Wildlife Service 2022) On August 22, 2022, the Eastern and Southern Regions of the Forest Service reinitiated consultation with the FWS and a Biological Opinion was provided on March 31, 2023. All reasonable and prudent measures and terms and conditions listed in the Biological Opinion will be adhered to during project implementation.

## Vegetation and Wildlife Habitat Management

From 2019 through 2021, the interdisciplinary team delineated forest stands in MA 2.1 lands and completed a preliminary assessment of current conditions including general stand type (hardwood and softwood) and tree heights using LiDAR and aerial photography. These data and mapped ecological land types were used to prioritize field assessments of current stand conditions and characteristics to inform the proposal development process. Following further internal review by the interdisciplinary team, refinements were made to proposed units, prescriptions, and season of harvest to avoid or minimize potential impacts to sensitive resources including floodplains, wildlife, and scenery.

The WMNF proposes to conduct commercial and non-commercial vegetation treatments on about 2,220 acres—within about 3,000 gross unit acres—of forest stands on National Forest System lands in the Peabody West HMU (Table 1; Figure 1). Proposed units, unit treatment acres, and seasons of harvest are provided in Appendix A. All proposed silvicultural treatments would occur on MA 2.1 lands. No treatments are proposed in old forest or old growth habitats; proposed treatments would occur in mature stands (refer to definitions for age classes in the HMU rationale document, p. 5). All stands proposed for timber harvesting have site-specific objectives and corresponding silvicultural prescriptions to achieve the desired conditions for vegetation and/or wildlife habitat. Descriptions of proposed treatment types are

summarized in the following section. The Forest Plan glossary also provides definitions of silvicultural treatments.

A range of silvicultural treatments would be used to provide commercial wood products; create small and large openings in the forest to allow regeneration of trees and other vegetation and increase wildlife habitat diversity; provide additional growing space to enhance crown and bole development; and encourage the establishment of shade-intolerant species in the understory. Other supporting project objectives include retaining existing disease-free, mast-producing trees for wildlife; discouraging beech regeneration; removing decadent, poor-quality trees to capture economic value; and removing beech saplings during treatment to reduce their dominance in the new stands.

Prior to implementation, field visits would occur to refine treatment unit boundaries and acres including modifications to address site-specific conditions (e.g., wet areas, steep or rocky slopes, and forest type changes). In addition, treatment acres may be reduced to meet visual and water quality objectives, to incorporate reserve patches of uncut trees, and to incorporate protective buffers around features such as vernal pools, cultural resources, nest trees, and riparian zones. Typical harvesting equipment including chainsaws, skidders, feller-bunchers, and harvesters would be used to implement treatments.

Each unit proposed for vegetation management would be assigned an operating season based primarily on silvicultural and wildlife objectives, soil, and other site conditions. However, other resource (e.g., botanical, cultural, and recreational) concerns also influence the selection of an operating season. Appendix A includes the list of proposed treatment units with applicable seasons of harvest. No vegetation management activities would occur during the spring or early summer due to anticipated wet conditions that could result in adverse impacts to soil, water, or vegetation.

**Table 1. Proposed silvicultural treatment acres for management area 2.1 lands in the Peabody West habitat management unit**

| Silvicultural Treatment or Objective | Prescription Type | Estimated Treatment Acres[1] |
|---|---|---|
| Even-aged Regeneration | Clearcut with Reserves | 30 |
| Even-aged Regeneration | Patch Cut | 70 |
| Even-aged Regeneration | Shelterwood Establishment Cut | 75 |
| Intermediate Treatment | Commercial Thin | 50 |
| Uneven-aged Regeneration | Improvement Cut | 310 |
| Uneven-aged Regeneration | Single Tree Selection | 310 |
| Uneven-aged Regeneration | Group Selection | 110 (OF 515 STAND ACRES) |
| Uneven-aged Regeneration | Single Tree Selection/Group Selection combined | 1,250 |
| Wildlife Opening Expansion | Clearcut with Reserves | 10 |
| **Total** | - | 2,220 |

[1] Acres are gross estimates, including reserve patches of uncut trees, as well as protective buffers for sensitive resources where cutting would not occur. Acres may not sum due to rounding.

A Forest Service Timber Sale Administrator monitors contract timber sale activities. Vegetation management activities would be implemented primarily through commercial timber harvest, providing an estimated 13 million board feet of forest products. Typically, vegetation management, including commercial timber harvests, would be conducted on smaller portions of the project area for weeks at a time during the appropriate seasons of harvest. For example, a forest stand subject to winter harvest would be managed when the ground has adequate snow cover and/or the soil is frozen. Depending on

conditions, a stand or group of stands may be harvested in a single winter; however, variability in weather may result in extended periods of inactivity and the need for additional seasons to complete management activities.

In addition to commercial timber harvesting, non-commercial site preparation and release treatments would occur in units proposed for commercial treatments within three years following harvest. These and other proposed silvicultural treatments are described in the Silvicultural Treatments section.

About 25 existing log landings would be reconstructed and expanded, and about 13 new log landings would be constructed to support vegetation management activities. Log landings are typically 0.75 acre or smaller in size. Three access routes, each less than 500 feet in length, would be constructed or reconstructed to access log landings. Typically, log landings would be located near proposed hauling and access routes in relatively flat terrain. About 40 miles of skid trails would be constructed or reconstructed for timber harvest operations. Existing landings and skid trails would be used where possible and reconstructed to minimum standards (vegetation and stumps removed and surface graded) necessary for equipment use. Final locations of log landings and skid trails may be modified during implementation planning (i.e., layout), subject to applicable Forest Plan standards and guidelines, best management practices, project-specific design elements and other site-specific requirements, and review by the interdisciplinary team prior to implementation.

## Silvicultural Treatments

This section provides a description of proposed silvicultural treatments. Refer to Figure 1 for a map of proposed treatments and Appendix A. Proposed Silvicultural Treatments for a list of proposed treatments and season of harvest by unit.

### *Even-Aged Management*

#### Clearcuts with Reserves

This type of treatment creates large openings (greater than 10 acres but no more than 30 acres) in the forest by removing all trees in a stand, except for trees located within reserve areas. Five percent of the acreage of each stand would remain uncut in reserve areas as directed by the Forest Plan. These large openings allow a high level of sunlight to reach the forest floor. All units proposed for clearcutting would result in an immediate change from mature to regeneration-age structure.

One outcome of clearcutting would be an increase in species diversity within units and across the project area. Compared to other silvicultural treatments, clearcutting would produce the greatest amount of early-successional habitat. Clearcutting would stimulate the germination of woody and herbaceous vegetation that have seeds with a relatively long period of dormancy. These include raspberries, blackberries, pin cherry, and various forbs and grasses. In response to clearcutting, the seeds of these plants would germinate due to the abundance of light and corresponding warming of the forest floor. Herbaceous cover would remain an important component of the new stand until the tree canopy begins to close. Clearcutting would likely result in the germination and establishment of fast-growing, shade-intolerant tree species such as pin cherry, paper birch, trembling aspen, and bigtooth aspen. Clearcutting would also promote asexual regeneration via root suckers and stump sprouts of hardwood species such as beech, bigtooth aspen, trembling aspen, and red maple.

#### Patch Cuts

Patch cuts differ from clearcuts primarily in opening size and the light environment created. All patch cuts would be between 2 and 10 acres to facilitate the regeneration and establishment of the same diversity of tree species expected from a clearcut. The reduced size of openings created by patch cuts could result in some minor differences in vegetative changes compared to clearcuts with reserves. The lack of reserve areas in patch cuts would influence the light environment through decreased shading of the treated area. Also, due to the lack of reserve areas, the age structure in a patch cut would be more simplified than a clearcut. Thus, differences in species diversity would be negligible compared to the regeneration response in a clearcut.

Due to the inherently smaller opening sizes, resulting changes in microclimate conditions in neighboring stands would likely be reduced (assuming similar site, landform, topography, slope, aspect, elevation, and shape of unit) compared to those adjacent to a clearcut. Though growth rates of perimeter trees could increase as much as those adjacent to a clearcut, fewer trees would likely be affected due to the smaller size of the units. Similarly, fewer boundary trees would likely experience degradation in tree quality due to sun scald or branching from dormant buds. Because the probability of windthrow tends to increase as opening size increases, fewer trees would likely be affected by windthrow compared to those along a perimeter of a clearcut. Thus, the risk of incidental tree damage or mortality from wind would be less than a clearcut.

## Shelterwood Harvest System

The shelterwood harvest system is used to regenerate an even-aged stand in which a new age class develops beneath the moderated microenvironment provided by the residual trees. The sequence of treatments can include three distinct types of cuttings: (1) an optional preparatory cut to enhance conditions for seed production, (2) an establishment cut to prepare the seed bed and to create a new age class, and (3) a removal cut to release established regeneration from competition with the overstory. Under the proposed action, treatments using this system are limited to shelterwood establishment cuts.

### *Shelterwood Establishment Cut*

The shelterwood establishment cut is used to open growing space in the canopy for establishment of regeneration to ensure uniformity. This cut would partially harvest stands, leaving a few trees per acre as a seed source for the most preferred species and provide some shade on the site. Generally, trees removed during this cut include the least desirable trees in a variety of crown classes including overtopped, intermediate, and occasionally co-dominant. This treatment would create a moderately open forest canopy that would allow light to reach the forest floor. For northern hardwoods, stump sprouts and root suckers would play a significant role in regeneration of aspen, beech, and red maple. This treatment would thereby foster a two-age structure until the overstory is removed or trees die from natural causes. Snow-free harvest would scarify the site to prepare a seed bed and reduce undesired vegetation for optimum regeneration success.

The felling and skidding of trees within units proposed for shelterwood treatments would likely result in a very limited amount of residual tree damage. The disturbance of leaf litter and exposure of mineral soil (incidental scarification) associated with logging operations would also provide favorable conditions for the establishment of seedlings.

The focus of trees targeted for retention would be mature, acceptable growing stock of sugar and red maple, yellow birch, paper birch, aspen, white pine, red spruce, and hemlock exhibiting good quality and health. Conversely, the trees targeted for removal would primarily be suppressed or poor-quality trees, resulting in an overall increase in tree quality. Additionally, the growth of residual trees would likely improve due to the increase in available light to stimulate crown development. The increase in tree growth and tree quality would also generally result in a greater resilience to insects and disease. Tree mortality resulting from natural causes thus would likely decrease in retained trees. In the majority of stands of this treatment type, the original treatment would be followed by an overstory removal within 8 to 10 years of initial treatment, as the understory reaches 5 to 7 feet in height, to further release the established understory.

### *Intermediate Treatment*

This treatment is designed to enhance growth, quality, vigor, and composition of stand after establishment and prior to final harvest.

## Commercial Thin

Commercial thinning would focus on reducing the number of trees in well-stocked, even-aged stands. A portion of the stands would be harvested to remove suppressed, defective, or declining trees. Generally, the poorer quality trees would be harvested, leaving a stand of well-spaced dominant to co-dominant

trees. Over time, residual tree growth (i.e., trees remaining after treatment) and ingrowth would return the stand to full stocking. The residual stand restricts sunlight so that the treatment would favor more shade tolerant plants and trees. Commercial thinning in stands would improve or maintain growth and make use of volume which may be lost due to overcrowded stands.

## *Uneven-Aged Management*

### Improvement Cut

Improvement cutting is a partial cut which removes inferior stems (e.g., defective, poor form, not favored species, poor growth, damage by insects, disease, or other agents) to favor the best-formed and healthiest trees of desirable species for the future. Improvement cutting would improve overall stand health, growth, quality, and value.

### Group Selection

Group selection units are typically 0.1 to 2 acres in size. The degree to which this treatment would facilitate regeneration of shade-intolerant, intermediate, or shade-tolerant tree species would depend, in part, on group size. Large groups would result in a comparatively greater amount of light than smaller groups. Accordingly, large groups would result in higher temperatures, greater amounts of evapotranspiration and reduced amounts of humidity at the forest floor than smaller groups. These conditions would facilitate the regeneration of a broad diversity of tree species particularly northern hardwoods characterized as intermediate or intolerant of shade such as white ash, yellow birch, and paper birch. Small groups would promote the regeneration of tree species characterized as intermediate and tolerant of shade such as maple species, hemlock, spruce, and fir. Some variation in regeneration responses would also be expected due to variation in seed periodicity, seed dispersal and other growth response characteristics.

Group selection areas are chosen to release advanced regeneration so saplings can grow from an understory to midstory crown position. In areas with no advanced regeneration, groups will establish young seedlings of shade-intolerant to mid-shade tolerant species within a few years following treatment. Trees around the perimeter of groups would expand their crowns and begin to occupy a portion of the groups within this five-year period. Over time, this treatment would lead to complex vertical and horizontal vegetative structure.

Although only about 20 percent of each unit would be treated, the targeted removal of poor-quality and low-vigor trees would likely result in an increase in tree quality and tree growth of residual trees while reducing the amount of mortality expected to occur in the absence of a treatment. Consequently, this treatment would also likely decrease each unit’s susceptibility to insects and disease.

### Single Tree Selection

Single-tree selection would create or foster the development of an uneven-aged structure by releasing advance reproduction and/or regenerating a diversity of northern hardwood and/or softwood trees. About one third of the trees would be cut and harvested from all merchantable size classes. Trees targeted for removal would include those exhibiting poor quality and low vigor. Residual stands would contain trees of variable sizes (i.e., heights and diameters). Over time, this treatment would lead to an increase in complexity of vertical vegetative structure. Trees and other plants would begin to occupy growing space created by the individual harvest of trees within five years following the treatment. The presence of shade intolerant tree species (e.g., paper birch and aspen) would decline in importance within each unit proposed for treatment. Though small gaps would be created, trees within residual stands would restrict and filter sunlight thereby favoring shade-tolerant plants such as spruce, hemlock, fir, beech, and sugar maple.

Vigorous trees of all size classes exhibiting good quality would be retained. Unlike group selection, single-tree selection would involve treatment throughout the entirety of each unit. This treatment would result in improving tree quality and growth of most residual trees while reducing the amount of mortality expected to occur in the absence of treatment. However, due to the greater density of residual trees, there would

be less room for logging equipment to maneuver. Ultimately, this treatment would likely decrease each unit's susceptibility to insects and disease because the potential adverse effect of residual tree damage would be minor compared to the increase in growth and quality of residual trees.

### Group and Single Tree Selection

The results of this treatment would be consistent with those outlined in the preceding subsections for group selection and single tree selection. A maximum of 20 percent of each unit is proposed for group selection under this combined treatment. Groups would be placed in areas where desirable advance regeneration could be released to enhance species composition and/or increase softwood habitat. The size of individual openings under this treatment would range from a single tree crown width up to about 2 acres.

### *Site Preparation and Release Treatments*

Site preparation treatments would include the non-commercial cutting and/or girdling of submerchantable trees (i.e., trees below a quality fit for market). Submerchantable trees include those less than 5 inches diameter at breast height. These treatments would be implemented with the use of heavy equipment (e.g., feller buncher) and/or a crew of workers using chainsaws, brushsaws, or handsaws. The timing of the treatment would occur during or following commercial timber harvest operations. Areas targeted for site preparation treatments include units proposed for clearcuts with reserves, patch cuts, and group selection. However, the need to implement site preparation treatments would depend on residual conditions in each unit following the completion of timber harvest activities. Specifically, site preparation treatments would occur in units containing an abundance of undesirable residual submerchantable trees. In clearcuts and patch cuts, the objectives of these treatments are to create even-aged structure and provide favorable growing conditions for the establishment of shade-intolerant trees. These treatments would occur within three growing seasons following the commercial timber harvest activities.

Release treatments would include the non-commercial cutting or girdling of submerchantable trees in units proposed for shelterwood seed cuts. These treatments would be implemented by a crew of workers using chainsaws, brushsaws, or handsaws. Individual trees targeted for release include desirable seedlings and saplings of aspen, paper birch, yellow birch, sugar maple, red maple, spruce, hemlock, and pine. Trees targeted for cutting or girdling would be those trees that compete with the crowns of trees targeted for release. At least three sides of the trees targeted for release would be freed from competition. No trees would be removed from the site for commercial use. The objective of these treatments is to provide adequate light and space for seedlings and saplings to grow free from competition.

The development of advance northern hardwood and softwood regeneration in many stands is currently impeded by midstories and/or understories of other trees, particularly beech. Mechanical control of beech has been found to be effective at promoting the development of desirable advanced regeneration (Smallidge and Nyland 2009). Release treatments would be conducted following the completion of commercial logging operations. Implementation of these treatments would depend on the residual conditions of each unit following the commercial logging operations. One or more release treatments per unit may be implemented, as necessary, to achieve desired conditions outlined in the silvicultural prescriptions.

### *Permanent Wildlife Openings*

Largely due to access issues, the Hayes Copp 45 and Hayes Copp 43 wildlife openings would no longer be maintained under the permanent wildlife opening program. The two Hayes Copp wildlife openings currently comprise about 8 total acres. To offset the acres lost by dropping these two openings, the Spring Brook permanent wildlife opening would be expanded by about 10 acres from its current 9 acres up to a total of about 19 acres (Figure 1).

The scope of work to expand the wildlife opening includes creating a mowed fire break around the perimeter to facilitate maintenance via prescribed fire, removing existing undesirable vegetation, treating non-native invasive species (if present), mowing, and stumping. After expansion, the wildlife opening would continue to be maintained under the permanent wildlife opening program.

## Transportation

Under the proposed action, the WMNF would reconstruct about 9 miles of existing and proposed National Forest system roads (system roads) and would add about 3 miles of unauthorized road in the project area to the Forest Service Road system. For clarity, the term “unauthorized” is applied to any road that exists on the ground but is not in the transportation database as a system road. The term does not imply that the roads were built illegally: some of these roads were built by the Forest Service but were not added to the system. Most of these unauthorized roads, however, existed on the landscape prior to the Forest Service acquiring the land, and when the land was acquired the Forest Service did not add these roads to the system.

The WMNF proposes to construct about 0.6 mile of new system road to replace a 0.8 mile section of road proposed for decommissioning (Figure 2). The WMNF proposes to decommission a 0.8 mile section of Libby South and Jacknife Roads (Forest Road [FR] 263 and FR 264) and remove it from the transportation database. Currently, this section of road, which serves as part of the Bear Springs Snowmobile Trail, is located on poorly drained soils with several spots that do not freeze in winter. A new road would be constructed to bypass this route, extending about 0.6 mile to connect FR 2318 and FR 264. The new bypass road would be situated on an existing skid road with well-drained soils and would replace the decommissioned segment of the Bear Springs Snowmobile Trail.

System roads would be constructed, maintained, or reconstructed to provide safe access to vegetation management areas and to meet current design standards. Upon completion of vegetation management, ML 1 roads would be closed to vehicles but may be open for non-motorized uses. Temporary culverts and bridges would be removed, water bars would be installed, and the entrance would be closed to vehicles. System roads proposed for reconstruction in recreation areas and system roads of ML 2 or higher would remain accessible for the public or administrative access depending on the long-term management objective of the road.

Reconstruction and maintenance activities are used to restore or regain the management objective of the road and improve or realign the roadway. Activities may include surface blading, ditch cleaning and reshaping, aggregate placement, installation or cleaning of drainage structures or features, roadside brushing, curve widening, clearing and grubbing, excavation and embankment work, and paving in campgrounds. Vegetation would be removed or trimmed in proposed road rights-of-way to accommodate construction equipment and commercial vehicles, and to improve line of sight where needed. Most work would be conducted during the driest weather conditions under the guidance of the Forest Service to minimize potential impacts to resources and roads.

Road decommissioning involves stabilizing and restoring an unneeded road to a more natural state and removing the road from the National Forest transportation system. Decommissioning activities may include installing drainage dips or water bars, removing culverts, scattering slash on roadbeds, and re-contouring road surfaces. In other cases, no groundwork is required where sufficient natural vegetation has already established. These roads are administratively decommissioned by removing them from the transportation system database.

Some system roads have travel analysis process recommendations that differ from the current proposal. The differences are the result of a project-level transportation analysis of long-term Forest Service plans and objectives in this area. Under the proposed action, the travel analysis process recommendation to change Barnes Field Road (FR 79) from an ML 5 to ML 4 would not be implemented. The current proposal is to retain Barnes Field Road as an ML 5 road for consistency with other similar campground roads.

Appendix B. Proposed Transportation Activities includes the list of system roads and proposed transportation management actions.

## Recreation

### Mountain Biking Trails

The WMNF proposes to designate about 6 miles of mountain biking trails as part of the Forest trail system to provide connection to trails on private land north of the project area and to the existing Hayes Copp Ski Trail network on National Forest System lands to the south (Figure 3). About 4 miles of new trail would be constructed. The proposed primary trail would comprise about 2 miles of single- and double-track trail designed for beginner to intermediate mountain biking skill levels. A 2 mile advanced, single-track loop trail would be constructed off the north end of the primary trail. In addition, a 2 mile segment of the existing Bear Springs snowmobile trail would provide connection between new mountain biking trail segments. Minor trail maintenance and hardening may occur on portions of the snowmobile trail to make it suitable for summer mountain bike use. The primary trail and loop trails would be brushed and limbed over about a 10-foot-wide corridor with a track width of about 5 feet. Mountain bike trails would not be groomed for winter use.

Trails designated under the proposed action would be managed for mountain biking as the designed use but would remain open for other authorized uses (e.g. hiking, cross country skiing). All trails on National Forest System lands would be managed, maintained, signed, and marked in accordance with Forest Plan standards and guidelines and Forest Service Handbook (FSH) 2309.18. Forest system trails receive recurring routine trail maintenance such as cleaning drainage structures, clearing blowdown, brushing, and maintaining signs and markers. All work would be completed using a combination of mechanical equipment, such as a mini excavator, and hand tools. Final trail layout would be subject to interdisciplinary team review and may be adjusted locally to avoid or minimize resource conflicts.

### Pine Mountain Glade

The WMNF proposes designating about 300 acres of National Forest System land as a backcountry ski zone at Pine Mountain (Figure 3). Within this zone, no more than 15 percent of the total zone area would be developed as gladed skiing terrain. Skiing terrain would be developed in up to 5 braided lines (i.e., skiable downhill routes) ending in a common glade. The Pine Mountain glade would be developed and maintained to the same standards as the South Baldface and Maple Villa glades on the WMNF. Users would access the glade from either the towns of Gorham or Randolph via existing parking and trail facilities on private lands. No new parking areas are included in the proposed action.

Under the proposed action, the WMNF would construct a 2.5 mile designated uphill access route (skintrack) on National Forest System lands. An additional skintrack extension about 1.3 miles in length would also be constructed on National Forest System lands to provide access to the Pine Mountain glade from Pine Mountain Trail. These skintracks would be maintained for non-motorized, over-the-snow winter use only.

**Photograph of a typical glade line through wooded terrain (U.S. Department of Agriculture, Forest Service photo by Nathan Peters).**

The WMNF shall prepare an implementation plan prior to development of gladed areas within the backcountry ski zone (see Table 2, Design Elements, REC-1). Project activities would include removing understory vegetation, primarily three inches and less in diameter, and limbing low-hanging branches on larger trees. Larger trees may be removed at the discretion of WMNF. Work would be done using hand tools, brush saws, and chain saws. All cut vegetation would remain on site. No traditional trail construction (e.g., tread clearance) is included in the scope of work for the Pine Mountain glade; project activities would be limited to above-ground vegetation management and signage to establish gladed skiing areas. All vegetation management activities for the glade would occur between October 1 and April 30 to avoid potential impacts to federally listed and sensitive bats and nesting birds.

### Third Hole Access

The WMNF proposes to improve accessibility to the Third Hole swimming site through trail grading and tread hardening using an existing 300-foot trail. The trail would be maintained in accordance with Forest Plan standards and guidelines and FSH 2309.18 and would be improved to meet Forest Service Trail Accessibility Guidelines.

### Androscoggin Ranger District Office

Vegetation would be thinned at the Androscoggin Ranger District administrative site. Thinning would occur within about a three-acre area located between the district office and State Route 16.

## Design Elements

The Forest Service and its contractors would implement applicable Forest Plan standards and guidelines, National Core and State best management practices (BMPs), standard operating procedures (SOPs), and project-specific minimization measures as part of the proposed action (Table 2). BMPs are those methods found to be the most effective and practical in meeting objectives (e.g., minimizing erosion). BMPs are not one-size-fits-all, can be an effective adaptive-management tool, and are therefore not listed here. SOPs are practices carried out regularly based on law, regulation, policy, and planning documents. SOPs describe workflow processes and roles and responsibilities for project implementation.

**Table 2. Design elements**

| Design Element Label | Design Element Description | Resource |
|---|---|---|
| SOP-1 | The WMNF shall establish and flag or otherwise designate a 50-foot boundary around each archaeological site located in project work zones to mark avoidance areas. No project activities shall take place within, and no equipment shall enter, designated avoidance areas. | Heritage |
| SOP-2 | Cultural sites not identified or relocated during survey may be present in project activity areas. If cultural features are encountered during project implementation, work in the area will stop and the Forest Archaeologist will be contacted. No work shall continue until directed by the Forest Archaeologist. | Heritage |
| SOP-4 | The WMNF and its contactors shall implement appropriate National Core and State BMPs to minimize soil loss and erosion and to protect water quality (New Hampshire Division of Lands and University of New Hampshire (UNH) Cooperative Extension 2016, U.S. Department of Agriculture, Forest Service 2012). | Water and Soils |
| SOP-5 | The WMNF and its contractors shall limit ground-disturbing activity (e.g., for parking area construction, road maintenance and reconstruction, trail relocation) to appropriate seasons and conditions to prevent excessive erosion and sedimentation. | Water and Soils |
| SOP-6 | Roads, landings, skid trails, and other travel corridors and trails shall be located such that the number of stream crossings is minimized to the extent practical. Crossings and approaches shall be stabilized and maintained throughout project implementation. | Water |
| SOP-7 | The National Hydrography Dataset (NHD), maintained by the U.S. Geological Survey, is the official water resources inventory for the Nation. The NHD will serve as the official water resources inventory for this project. While the NHD may be updated based on new information, the current version of the NHD at the time of the publication of this document will remain the version of record for the duration of this project. If streams or water bodies are discovered in the project area during project planning or implementation that are not included in the NHD or found to have a different flow regime (i.e., intermittent or perennial) than indicated by the NHD, appropriate Forest Plan standards and guidelines for Riparian and Aquatic Habitats, National Core and State BMPs, and other project design elements shall be implemented to provide the necessary resource protections. | Water |
| SOP-8 | Caution or closure signs shall be placed as needed along trails, trailheads, and roads affected by the proposed vegetation management activities to alert visitors to logging operations and ensure public safety. | Recreation |
| SOP-9 | To minimize damage to residual trees, skid trails shall be laid out and trees marked for removal to provide adequate working space for logging equipment. | Timber |
| SOP-10 | In group selection units where softwood regeneration is established, skid trails shall occur outside or adjacent to these groups to protect this regeneration where possible. | Timber |
| SOP-11 | The interdisciplinary team and line officer shall review any modified landing or skid trail locations prior to implementation to ensure consistency with this analysis and decision. | Timber |

| Design Element Label | Design Element Description | Resource |
|---|---|---|
| SOP-12 | District staff shall review the locations and status of non-native invasive species (NNIS) with the Forest Botanist prior to implementation. Prior to the start of ground-disturbing activities, an NNIS control plan shall be prepared and implemented consistent with the Forest-wide Invasive Plant Control Project EA to reduce or avoid the risk of spread of NNIS within the project area (U.S. Department of Agriculture, Forest Service 2007). | NNIS |
| SOP-13 | If any previously unknown or new occurrences of federally listed or Regional Forester sensitive species are found prior to or during project activities, work in the area shall stop immediately and the District Wildlife Biologist or Forest Botanist shall be notified. Work shall not proceed until applicable Forest Plan standards and guidelines or other appropriate measures have been implemented. | Wildlife and Botany |
| REC-1 | The WMNF shall prepare an implementation plan prior to the development of the Pine Mountain glade area. The WMNF shall be responsible for reviewing and approving any activities carried out during implementation and maintenance of the glade area.<br>Vegetation management activities associated with development of the glade shall occur between October 1 and April 30. | Recreation |
| REC-2 | The interdisciplinary team and line officer shall review final skintrack and mountain bike trail layout prior to implementation.<br>No trail or glade construction shall occur until connection points to trails on adjacent non-federal land have been confirmed and approved by the District Ranger. | Recreation |
| REC-3 | No timber hauling shall occur on weekends or federal holidays on FR 24 and Pinkham B Road during winter timber operations. | Recreation and Timber |
| REC-4 | All or portions of FR 72 and FR 263 shall be closed to the public during winter timber operations. Completion of timber harvest in units 64, 65, 67-74, and 78- 80 shall be prioritized to minimize impacts to winter recreation (Figure 4). | Recreation and Timber |
| REC-5 | To minimize impacts to recreation users, units 67, 78, 79, and 80 are limited to winter timber harvest (Figure 4). | Recreation and Timber |
| WR-1 | Consistent with guideline G-2 for Riparian and Aquatic Habitats (Forest Plan, pp. 2-24 and 2-25), the Forest Hydrologist shall map and verify on the ground timber harvest units adjacent to the Peabody River prior to final layout. | Water |
| BIO-1 | Consistent with standard S-3 for Wildlife (Forest Plan, p. 2-33), the Timber Sale Administrator shall coordinate with the District Wildlife Biologist to establish a buffer of at least 66 feet around known goshawk nests in timber units prior to implementation. No work shall occur during the nesting season in avoidance areas (generally March through July) unless otherwise authorized by the Wildlife Biologist.<br>If previously unknown raptor nests are discovered during project activities, the Wildlife Biologist shall be notified. Work shall not proceed until appropriate buffers have been established. | Wildlife |

| Design Element Label | Design Element Description | Resource |
|---|---|---|
| SCM-1 | Consistent with guideline G-3 for Scenery Management in MA 2.1 lands (Forest Plan, p. 3-6), the Forest Landscape Architect shall review final layouts in units 19 and 20 to ensure that openings are well-distributed in the landscape to the maximum extent practical. | Scenery |

## Project Maps

Gorham
Randolph
Peabody River
Pinkham B Dolly Copp Road
2
16
16
USDA
Peabody West Project Map
Project Proposals
Bike Trail
Uphill Ski Trail
Ski Glade
Shelterwood Prepcut
Improvement Cut
Group Selection
Single Tree Selection
Single Tree Selection and Groups
Thinning
Patchcut
Clearcut
Spring Brook Wildlife Opening
Map Legend
Road
River
National Forest Land
N
W
E
S
0
½
1 Miles
Date: 8/3/2022

**Figure 1. Overview of the project area, showing proposed vegetation management locations and silvicultural treatment types.**

Gorham
Randolph
Peabody River
Dolly Copp Road
2
16
2313
264
2282
24
2318
263
2319.1
2350
72
2320
N
S
W
E
USDA
Forest Service
U.S. DEPARTMENT OF AGRICULTURE
Peabody West Transportation Map
Project Proposals
Transportation Action
Construction
Decommission
Reconstruction
Map Legend
Road
River
National Forest Land
Date: 6/28/2022
0
½
1 Miles

**Figure 2. Proposed transportation management activities.**

Gorham
Randolph
Shelburne Snomo
Pine Mountain
Ledge
Carter-moriah
Pinkham B
Dolly Copp Rd
Townline Brook
Bear Springs
Howker Ridge
Peabody River
Pine Link
Stony Brook
Daniel Webster-scout
Imp
Osgood
Upper Hayes Copp Xc
Great Gulf Link
Great Gulf
Madison Gulf
Nineteen Mile Brook
USDA
Forest Service
U.S. DEPARTMENT OF AGRICULTURE
Peabody West Recreation Map
Project Proposals
Bike Trail
Uphill Ski Trail
Ski Glade
Spring Brook Wildlife Opening
Map Legend
Road
Hiking Trail
Snowmobile Trail
Cross Country Ski Trail
Anticipated Trail Design
River
National Forest Land
N
W
E
S
Date: 6/28/2022
0
½
1 Miles

**Figure 3. Proposed Pine Mountain glade, skintracks, and mountain bike trail locations. Anticipated and existing trails on private lands are shown for reference relative to the proposed federal activities.**

94
89
88
79
78
Peabody River
67
HAYES COPP
X-C SKI TRAIL
80
DOLLY COPP
CAMPGROUND
68
16
64
65
73
70
71
69
72
74
Date: 8/3/2022
USDA
Forest Service
U.S. DEPARTMENT OF AGRICULTURE
Peabody West
Vegetation Management Map
Project Proposals
Shelterwood Prepcut
Improvement Cut
Group Selection
Single Tree Selection
Single Tree Selection and Groups
Thinning
Patchcut
Map Legend
Road
Hiking Trail
Cross Country Ski Trail
River
National Forest Land
N
W
E
S
0
¼
½ Miles

**Figure 4. Detail showing location of timber units subject to design elements REC-4 and REC-5 relative to adjacent recreation opportunities.**

Randolph
Gorham
2
16
Pinkham B
Dolly Copp Rd
Howker Ridge
Osgood- AT
Mount Moriah
Carter Mountain
Peabody River
N
W
E
S
USDA
Forest Service
U.S. DEPARTMENT OF AGRICULTURE
Peabody West Viewpoint Map
Map Legend
Road
Hiking Trail
Snowmobile Trail
Viewpoint
River
Proposed Evenage Harvest Units
Proposed Harvest Units
National Forest Land
0
1
2 Miles
Date: 6/28/2022

**Figure 5. Scenery viewpoints selected for analysis showing locations of even-aged treatment units.**

## Consequences of No Action

Taking no action means the Forest Service would not implement the proposed action, although all other ongoing authorized activities would continue. The HMU rationale document provides an assessment of the existing conditions in the Peabody West HMU. In the absence of management action, current vegetative conditions and trends and natural successional processes would continue in the project area. Diversity of age and structure in the HMU would remain relatively limited, and a wildlife habitat objective of the Forest Plan would not be met as wildlife habitat diversity would continue to decline (U.S. Forest Service 2005). Overall, stand vigor in the proposed treatment units may decline over time due to increasing competition for sunlight, moisture, and nutrients among trees. Compared to the proposed action, taking no action would result in lower diversity of tree species, ages, and structures in the project area and the Peabody West HMU overall. Therefore, taking no action would not meet the need to advance Forest Plan goals or the wildlife habitat diversity objectives in the Peabody West HMU.

Taking no action also means the proposed recreation opportunities for the Pine Mountain glade, mountain bike trails, Third Hole swimming location, and thinning at the Androscoggin Ranger District office would not occur. Existing recreation opportunities would remain, and current recreation management and operation would continue in the project area. In addition, no transportation management activities would occur, and long-term travel management needs would not be addressed.

## Environmental Impacts

The following sections describe how the project was designed consistent with and complies with the relevant laws, regulations, policies, and the Forest Plan, which provide the basis for thresholds for significance. Consistency with relevant laws, regulations, policies, and Forest Plan standards ensures that the proposed action does not exceed thresholds for significance. The supporting analysis and rationale for consistency are provided in this section and are incorporated in the Finding of No Significant Impact (FONSI) section.

The interdisciplinary team considered direct and indirect effects of the proposal, and those cumulative actions that occur in the relevant spatial and temporal boundaries for their resource, as documented in the project record. These analysis boundaries vary by resource. For example, water quality considered effects on a watershed scale, while scenery considered effects on a viewshed scale.

Because concerns regarding several resources were addressed through project design, including design elements and the incorporation of Forest Plan standards and guidelines, the following issues were not analyzed in detail:

- Effects of project activities on vegetation, which are addressed in the Purpose and Need for the Proposed Action and Proposed Action sections of this document
- Effects associated with non-native invasive species, including treatment and control
- Effects associated with roads and access, traffic, and engineering
- Effects to fire potential, fuels, and air quality
- Socioeconomic effects including contributions to local and regional economies

The following issue has been brought forward for detailed analysis and is discussed in the following section: effects of vegetation management on scenery resources.

### Issues Considered for Detailed Analysis

#### Impacts of Vegetation Management Activities on Scenery

Based on preliminary internal review by the interdisciplinary team and the District Ranger, the potential impacts of even-aged timber harvest on scenery within the analysis area were identified as an issue

warranting detailed analysis. This section summarizes and incorporates information from the Scenery Specialist Report.

An initial scenery analysis was conducted to determine key viewpoints which would best represent viewsheds within the project area. Four final viewpoints were selected to assess potential impacts to scenery resulting from the proposed even-aged silvicultural treatments (Figure 5). These viewpoints were selected based on the improved vantage and potentially higher visitation by the public relative to other potential viewpoints, as well as their overall representation of the full project area.

Based on the scenery analysis using these four viewpoints, the design of the proposed action was modified to minimize impacts to scenery resources consistent with Forest Plan direction (Forest Plan, pp. 2-26 and 27, and pp. 3-6 to 3-8). For example, proposed treatments in several units were reduced in size or prescriptions were changed to minimize scenery impacts while continuing to address project objectives.

The proposed action includes three relatively large even-aged treatments: a 26-acre clearcut in unit 19, a 9-acre patch cut in unit 20, and the expansion of an existing permanent wildlife opening to about 19 acres. These proposals exceed the Forest Plan guideline G-3 for MA 2.1 land, which states maximum observed opening size should not exceed 5 acres in areas with a high scenic integrity objective (Forest Plan, p. 3-6). Although each of these units would exceed this guideline, the larger acreage is intended to better meet project-level objectives for the Peabody West HMU, and to move the forest toward desired conditions consistent with the Forest Plan.

Consistent with Forest Plan direction, and in meeting the intent of guideline G-3 for scenery management, a design element is included which would minimize visual impacts of the three larger even-aged units (see Design Elements SCM-1).

The proposal is consistent with Forest Plan guidelines in considering cumulative impacts for scenery management (Forest Plan, p. 3-6). No other even-aged treatment has occurred in the analysis area in the past 30 years, and no reasonably foreseeable silvicultural proposals are identified within the analysis area. Therefore, the proposed action would not contribute measurably to cumulative scenery impacts in the analysis area.

## National Forest Management Act (NFMA) - Land Management Plan Consistency

The pertinent specialists have reviewed the proposed action including design elements and provided supporting analysis and rationale for determinations in the project record. The following checklist provides specialist determinations regarding project consistency with applicable Forest Plan direction, standards, and guidelines. Resources which do not occur in the project area or for which no Forest Plan standards and guidelines are applicable to the proposal are listed as “N/A” and are not analyzed in further detail.

Table 3 summarizes additional rationale and conclusions, including key Forest Plan standards and guidelines, supporting plan consistency for specific resources.

**Accessibility**: Consistent

**Air Quality**: Consistent

**Geology and Minerals**: N/A

**Heritage**: Consistent

**Lands and Special Uses**: N/A

**Non-Native Invasive Species**: Consistent

**Rare and Unique Features**: Consistent

**Recreation**: Consistent

**Riparian and Aquatic Habitats**: Consistent

**Scenery**: Consistent

**Soils**: Consistent

**Transportation System**: Consistent

**Vegetation Management**: Consistent

**Water Resources**: Consistent

**Wildland Fire**: N/A

**Wildlife**: Consistent

**Table 3. Summary of analysis and findings supporting Forest Plan consistency for specific resources with rationale.**

| Potentially Affected Resource | Design Element and Unit of Measure | Analysis Metrics and Outcome by Alternative |
|---|---|---|
| Rare and Unique Features | Canada lynx standards and guidelines (Forest Plan, pp. 2-14 to 2-16) | Proposed vegetation management activities are consistent with Forest Plan direction for maintaining habitat. The project is designed to minimize net increase of trails in mapped lynx habitat. No new groomed winter trail use is proposed. |
| Recreation | Dispersed Non-Motorized Recreation standards and guidelines (Forest Plan, pp. 2-21 and 2-22)<br>Trails Management Handbook 2309.18 and supplement 2309.18-2010-1 | Proposed recreation activities are consistent with Forest Plan direction for recreation management. Refer to recreation specialist report for further analysis. |
| Riparian and Aquatic Habitats, and<br>Water Resources | • Potential fish-bearing HUC16 watersheds with basal area reductions greater than 20 percent<br>• Riparian and Aquatic Habitats guidelines G-1 and G-2 (Forest Plan, pp. 2-24 and 25)<br>• Vegetation Management guideline G-1 (Forest Plan, p. 2-29)<br>• Design element WR-1 | Proposed timber harvest units and associated prescriptions were refined through proposal development to maintain at least 80 percent basal area within most watersheds. Design feature WR-1 further reduces or avoids impacts to floodplains and water resources. See additional discussion below. |
| Soils | Soil quality standards for the Eastern Region (R9) (Forest Service Manual [FSM] 2550 and supplement R9 2550-2012-1) | Implementation of BMPs and Forest Plan standards and guidelines ensure impacts to soils are minimized and consistent with Forest Plan and FSM 2550 direction. Refer to the soil specialist report for further analysis. |
| Wildlife | • Wildlife standards and guidelines (Forest Plan, pp. 2-33 to 2-36)<br>• Design element BIO-1 | Proposed project activities are consistent with Forest Plan direction for wildlife resources. Design feature BIO-1 further ensures protection of known goshawk nests in the project area. |

## Effects of Vegetation Management on Climate Change and Carbon

The following summarizes the project-level carbon assessment (Colter 2021). The proposed action is consistent with internationally recognized climate change adaptation and mitigation practices and proposes specific actions to enhance compositional and structural diversity within the project area consistent with objectives of the Forest Plan. The proposed action would increase species and habitat diversity, which would improve the ability of the ecosystems within the project area to respond to change. The proposed silvicultural treatments would affect less than one percent of the total land acreage of the WMNF over a period of five to ten years. The proposed action would largely be limited to carbon stocks stored in aboveground live vegetation. Carbon stocks found in aboveground live vegetation comprise about 35 percent of the total ecosystem carbon stocks of the WMNF (Dugan, Janowiak and McKinley 2019). Ecosystem carbon stored in soils (approximately 39 percent in forests on the White Mountain National Forest) and other pools are not likely to be affected by the proposed action. Proposed project activities affect a relatively small amount of forest land and carbon and, in the short-term, might contribute an extremely small quantity of greenhouse gas emissions relative to national and global emissions. Project activities would not convert forest land to other non-forest uses, and carbon would be removed from the atmosphere over time as the forest regrows. Therefore, effects of the proposed activities on carbon, greenhouse gases, and climate overall would be negligible.

To the extent that climate change measurably contributes to cumulative effects on specific resources, those effects were considered by resource as appropriate.

## Effects of Vegetation Management on Riparian and Aquatic Resources and Water Quality

The measure used to assess the impacts of timber harvesting on water quality in the White Mountain National Forest is the percent basal area removed in a watershed that contains a perennial stream. Discussion on the general impacts of timber harvesting on water resources, including water quality and basal area thresholds, can be found in the Albany South EA (U.S. Department of Agriculture, Forest Service 2017, pp. 131-149). Because of the similar types of activities included in the Peabody West Project, and with the implementation of Forest Plan standards and guidelines and appropriate BMPs, the potential impacts to riparian and aquatic resources and water quality discussed in the Albany South EA would be broadly applicable to the current proposal.

When basal area removed in a watershed does not exceed 20 percent, there is high confidence of no measurable effect on water quality resulting from timber harvest. In the proposed action, percent basal area removed exceeds 20 percent in 12 watersheds, ranging in size from 9 acres to 698 acres. Of these 12 watersheds, seven do not provide perennial fish habitat, so there are no concerns about changes in water quality in these seven watersheds. Five watersheds in the project area are probable to contain fish habitat and exceed 20 percent basal area removal. Of these five watersheds, the highest basal area removed is 27.3 percent.

The potential changes in water quality resulting from the implementation of the proposed action that would be of concern to aquatic ecosystems are a decrease in pH or an increase in aluminum. Bedrock geology varies across the White Mountain National Forest, with varying acid sensitivity and aluminum leaching potential. The dominant bedrock unit in the five watersheds of potential concern is the Two-mica granite of Northern and Southeastern New Hampshire, which is moderately sensitive to acidity (Sullivan, et al. 2007). Since the 20 percent basal threshold is conservative, and given the geology present in these watersheds, the effect on stream pH from the proposed action is expected to be minor and short duration (one to three years) with little or no effect on the aquatic ecosystem in the analysis area. The bedrock units that are the most concern for aluminum leaching are the Jurassic granites. The Two-mica granite in the project area is from the late to early Devonian period. At the 27 percent basal area removal level, aluminum leaching is not expected to approach toxic thresholds.

## Other Law, Regulation, and Policy Consistency

**Other laws, regulations, or policies pertinent to this project include the following:**

### Clean Water Act

The proposed action is in compliance with the Clean Water Act. Project implementation shall not proceed until all required federal, state, and local permits have been obtained.

### Endangered Species Act - Threatened, Endangered, Proposed and Candidate Species and Critical Habitat

A Biological Evaluation (BE) was prepared for the proposed project and is incorporated here by reference. The BE includes effects evaluations for federally listed and proposed species and Regional Forester Sensitive Species (RFSS). The official list of threatened, endangered, and proposed species considered in the BE was generated through the U.S. Fish and Wildlife Service's Information, Planning, and Conservation System (IPaC). Findings for federally listed and proposed species are summarized in Table 4. The proposed project is in compliance with section 7 of the Endangered Species Act.

Minimal direct effects are anticipated, and indirect and cumulative effects may impact only a small number of individual bats and lead to subtle shifts in the locations of summer roosts. Initially the Proposed Project activities might affect northern long-eared bats; however, there were no effects beyond those previously disclosed in the U.S. Fish and Wildlife Service's programmatic biological opinion for the final 4(d) rule dated January 5, 2016 (U.S. Fish and Wildlife Service 2016). Therefore, the Proposed Action may affect, but is not likely to adversely affect the northern long-eared bat. Streamlined consultation with the United States Fish and Wildlife Service (USFWS) under Section 7 of the Endangered Species Act was completed in January 2022. However, on November 30, 2022, the FWS published a final rule to reclassify the northern long-eared bat as endangered under the Endangered Species Act which became effective on March 31, 2023 (U.S. Fish and Wildlife Service 2022). With the reclassification for NORTHERN LONG-EARED BAT as endangered, the 4(d) rule was removed. On August 22, 2022, the Eastern and Southern Regions of the Forest Service reinitiated consultation with the USFWS and a Biological Opinion was provided on March 31, 2023. The USFWS determined that the Proposed Actions for the Peabody West IRP may affect, but is not likely to adversely affect (NLAA) the northern long-eared bat (U.S. Fish and Wildlife Service 2023).

On September 14, 2022, the USFWS issued a proposed rule to list the tricolored bat as endangered (U.S. Fish and Wildlife Service 2021)(U.S. Fish and Wildlife Service 2022b). Effects from the proposed actions will not jeopardize the continued existence of tricolored bats. Conferencing with the USFWS on tricolored bats is not required. The proposed project activities on federally listed and proposed species are in compliance with the Endangered Species Act.

**Table 4. Federally listed and proposed species effect determinations**

| Species/Habitat | Status | Proposed or Designated Critical Habitat Present? | Determination | Brief Rationale |
|---|---|---|---|---|
| Canada lynx | Threatened | No | No effect | Project design is consistent with Forest Plan standards and guidelines for Canada lynx. |
| Northern long-eared bat | Endangered | No | May Affect, Not Likely to Adversely Affect | Project will not disturb or disrupt hibernating bats or remove any known occupied maternity roost trees. |
| Tricolored bat | Proposed Endangered | No | No jeopardy | Refer to project BE. |

## Sensitive Species (Forest Service Manual [FSM] 2670)

As disclosed in the BE, 9 Regional Forester sensitive animal species and 8 plant species were determined to potentially occur or are known to occur in the project area (Table 5). Of these, the BE determined that the project may impact individuals or habitat for 6 sensitive plant species and 4 sensitive animal species but is not likely to cause a trend toward federal listing or loss of viability. In addition, the BE determined that the project would have no measurable impacts on the remaining 7 species with potential to occur in the project area. Refer to the BE for the Peabody West Integrated Resource Project for species evaluations.

**Table 5. Sensitive species impact determinations for sensitive species with potential or known occurrences in the analysis area**

| Species | Determination |
|---|---|
| American ginseng | MIIH |
| Appalachian tiger beetle | NI |
| Auricled twayblade | NI |
| Bicknell's thrush | NI |
| Boreal bedstraw | MIIH |
| Brown's *Amaletus* mayfly | NI |
| Eastern small-footed bat | MIIH |
| Heart-leaved twayblade | MIIH |
| Lily-leaved twayblade | MIIH |
| Little brown bat | MIIH |
| Monarch butterfly | MIIH |
| Mountain sweet cicely | MIIH |
| Northern adder's tongue | MIIH |
| Osprey | NI |
| Pink pyrola | NI |
| Third *Amaletus* mayfly | NI |
| Yellow-banded bumblebee | MIIH |

**NI** – no impact; **MIIH**- may impact individuals or habitat, but will not likely contribute to a trend towards federal listing or loss of viability to the population or species

## Special Management Areas

### *Roadless Areas*

No project activities are proposed in designated wilderness or Roadless Area Conservation Rule (RACR) areas.

### *Eligible Wild and Scenic Rivers*

There are no designated wild and scenic rivers in the affected area. The project area includes portions of the Peabody River and the West Branch of the Peabody River which were determined eligible for designation under the Wild and Scenic River Act during the Forest Plan revision process (Table 6). Potential impacts to eligible wild and scenic rivers were evaluated according to the criteria in FSH 1909.12 Chapter 80. Forest Plan standards and guidelines for Riparian and Aquatic Habitats (Forest Plan, pp. 2-24-to 26), such as the application of Riparian Management Zones, and project design elements (e.g., WR-1) would be implemented for project activities occurring within floodplains and near the river corridor, as appropriate. About 14 total acres are proposed for even-aged silvicultural treatment

within 0.25 mile of mile of the two eligible rivers. Of these acres, the nearest even-aged treatment units are more than 0.10 mile from either river. Given the scope and location of proposed project activities, the proposed action would have limited, short-term effects on potential outstandingly remarkable values but would not result in an irreversible or irretrievable change in the condition of the river corridor or its potential for designation in the future.

**Table 6. Eligible Wild and Scenic Rivers in the project area**

| River Name | Miles of Eligible River within 0.25 mile of Proposed Treatment Units (of Total Eligible River Miles) | Eligible Classifications | Proposed Acres of Even-aged Treatment within 0.25 mile of River |
|---|---|---|---|
| Peabody River | 4.4 (of 11) | Recreational and Wild | 9.7 |
| West Branch Peabody River | 1.5 (of 5.3) | Scenic and Wild | 4.1 |

**Table 7. Special management area compliance determination summary**

| Management Area Type | Applicable Law/Regulation to Demonstrate Compliance With | Rationale for Compliance |
|---|---|---|
| Designated roadless areas | Roadless Area Conservation Rule | No designated RACR areas in project area. |
| Eligible Wild and Scenic Rivers | FSH 1909.18 Chapter 80 | Project activities would not result in irreversible or irretrievable changes affecting potential designation in the future. |

## National Historic Preservation Act – Section 106 Review

The pertinent specialist has reviewed the proposed action and made the following determination regarding Section 106 compliance:

No historic properties affected - 36 CFR 800.4(d)(1). Section 106 Review has been completed for the project area and no National Register eligible cultural sites were found.

### *Comments*

A cultural resource review was completed for this undertaking pursuant to 36 CFR 800 implementing section 106 of the National Historic Preservation Act. The review findings are summarized as above and documented in the project record.

## Relevant Executive Orders

The responsible official determined the proposal complies with the following Executive Orders, which were deemed relevant based on the nature of the proposal.

*EO 11988, Floodplain Management*: The proposed project is designed to avoid impacts to floodplains, including the implementation of BMPs, Forest Plan standards and guidelines, and relevant design elements.

*EO 12898, Environmental Justice*: The proposed project would not have any disproportionately high and adverse effects on minority or low-income populations, as documented in the project record.

*EO 13112, Invasive Species*: prevent the introduction of invasive species and provide for their control and to minimize the economic, ecological, and human health impacts that invasive species cause. A project-level non-native invasive species risk assessment was conducted for this project, and no non-native species treatments are included in the proposed action. Non-native invasive species are managed

across the WMNF in accordance with Forest Plan standards and guidelines and the Forest-wide Invasive Plant Control Project Environmental Assessment (U.S. Department of Agriculture, Forest Service 2007).

## Agencies, Organizations, and Persons Consulted

The responsible official contacted or consulted with those listed below during the preparation of the environmental assessment in compliance with requirements to involve the public, relevant agencies, organizations, and governments. The full list contacts and comments received are in the project record.

- Coos County
- New Hampshire Bureau of Trails
- New Hampshire Department of Environmental Services
- New Hampshire Fish and Game Department
- New Hampshire Division of Historical Resources, State Historic Preservation Office
- Town of Gorham
- Town of Randolph
- U.S. Fish and Wildlife Service

A scoping summary report was prepared following the two scoping comment periods for this project. The scoping summary report includes a description of the public involvement process to date, The scoping summary report is available on the project website.

A 30-day formal comment period for the draft environmental assessment (EA) and preliminary finding of no significant impact (FONSI) was initiated on August 4, 2022. A legal notice for the 30-day comment period was published in the New Hampshire Union Leader newspaper. A notice was also published in the Berlin Sun and sent to more than 560 interested parties. The Androscoggin Ranger District held a virtual public meeting in support of the 30-day comment period on August 16, 2022. The Forest Service received 15 unique comment letters during the 30-day comment period. All comments were reviewed by the interdisciplinary team and the responsible official and are included in the project record.

## Finding of No Significant Impact (FONSI)

The FONSI documents the reasons why an action, not otherwise excluded from documentation in an EA or environmental impact statement (EIS), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. The FONSI discussion considers all information included in this environmental assessment, as well as documentation in the project record. Pertinent specialists have reviewed the proposal and based on their input, the responsible official made the following determinations with regard to the potentially affected environment and degree of effects considered for a FONSI.

### Context

The proposed project includes about 3,000 acres of the more than 800,000 acres of lands administered by the WMNF. Implementation would occur over several years, with a small percentage of acres being treated in a given calendar year. Based on the proposed action and associated design elements, the potential environmental effects would be site-specific, localized to the project area, and would not be measurable at a regional or larger scale. The proposed action would be consistent with the management area direction and Forest Plan standards and guidelines specified for the project area.

## Intensity Factors

Intensity is a measure of the severity, extent, or quantity of effects, and is based on information from the effects analysis of this EA and the references in the project record. The effects of this project have been appropriately and thoroughly considered with an analysis that is responsive to concerns and issues raised by the public. The agency has taken a hard look at the environmental effects using relevant scientific information and knowledge of site-specific conditions gained from field visits. This finding of no significant impact is based on the context of the project and intensity of effects using the ten factors below:

1. **Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.**

   The EA considers both the potential beneficial and adverse impacts of the proposed action in terms of context and intensity. The analysis in the EA and the project record provides the rationale for a determination that there will be no significant effects resulting from the proposed project activities.

2. **The degree to which the proposed action affects public health or safety.**

   The Forest Service has implemented this type of project and similar proposed activities many times on National Forest System lands locally and in the region without substantial impacts to public health or safety. Project activities would be conducted using standard equipment and methods. Application of Forest Plan standards and guidelines, project-specific design elements, and BMPs further ensure that potential impacts to public health and safety are minimized or avoided. Based on these factors and experience with similar past projects, there are no circumstances or conditions that indicate that the proposed action would result in substantial or unusual risks to public health or safety.

3. **Unique characteristics of the geographic area such as the proximity to historical or cultural resources, parklands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.**

   The project area is not unique in its geographic setting, and there are no unique geographic areas such as parklands, prime farmlands, or ecologically critical areas near the project. Eligible wild and scenic rivers and floodplains occur in the project area. These areas are evaluated in the EA and project record and would not be measurably impacted by the project. See intensity factor 8 for more information related to historical or cultural resources.

4. **The degree to which the effects on the quality of the human environment are likely to be highly controversial.**

   The term "controversial" in this context refers to cases where substantial scientific dispute exists as to the size, nature, or effects of a major federal action on some human environmental factor, rather than to public opposition or social controversy regarding a proposed action or alternative. The interdisciplinary team for this project considered current scientific research, including that submitted by the public, to determine its applicability to the project and found no scientific controversy related to the predicted effects. Based on these factors, and the analysis provided in the EA and project record, the effects on the human environment are not likely to be highly controversial.

5. **The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.**

   Based on consideration of past projects, the proposed action is not new or unique to the WMNF. Similar actions have been implemented locally and elsewhere in the region for many years. The proposed project activities are consistent with the Forest Plan. The analysis shows that the effects are not uncertain and do not involve any unique or unknown risk that may result in significant impacts to the human environment.

6. **The degree to which the action may establish precedent for future actions with significant effects or represents a decision in principle about a future consideration.**

   The proposed project activities are well established on the WMNF and elsewhere in the region and nation. The proposed action would not establish precedent for future actions with significant effects because similar actions were considered in the Forest Plan and have occurred in the past. There is no unusual circumstance associated with the proposed management activities that would indicate that it is substantially different from past actions. Further, the scope of the decision to be made is limited to the actions proposed and analyzed in the EA.

7. **Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.**

   Potential impacts are disclosed in the Environmental Impacts section of this EA. The incremental impacts of this project when overlapped in time and space with other actions with similar impacts would not result in significant cumulative impacts.

8. **The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.**

   The proposed project would not affect historic properties eligible for listing in the National Register of Historic Places (refer to National Historic Preservation Act – Section 106 Review section). Proposed project activities are in compliance with the National Historic Preservation Act and other cultural resource laws and regulations.

9. **The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.**

   All federally listed species with potential to occur in the affected area were evaluated as part of the biological evaluation process (refer to Endangered Species Act - Threatened, Endangered, Proposed and Candidate Species and Critical Habitat section). Proposed project activities may affect northern long-eared bats; however, there are no effects beyond those previously disclosed in the U.S. Fish and Wildlife Service's programmatic biological opinion for the final 4(d) rule dated January 5, 2016 (U.S. Fish and Wildlife Service 2016). Forest Service reinitiated consultation with the USFWS and a Biological Opinion was provided on March 31, 2023. The USFWS determined that the Proposed Actions for the Peabody West IRP may affect, but is not likely to adversely affect (NLAA) the northern long-eared bat (U.S. Fish and Wildlife Service 2023). The biological evaluation determined that the Proposed Actions would not jeopardize the continued existence for tricolored bats. The proposed project activities are in compliance with the Endangered Species Act.

10. **Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.**

    The proposed project would not violate any federal, state, or local environmental laws or regulations, including Forest Plan requirements. Although acreage prescriptions for units 19 and 20 and a single wildlife opening exceed Forest Plan guideline G-3 for scenery management in MA 2.1 lands (refer to Issues Considered for Detailed Analysis), these units provide key opportunities to move the forest toward desired conditions for regeneration habitat as described in the Purpose and Need for the Proposed Action section and the HMU rationale document. Because the Forest Plan permits operational flexibility regarding guidelines (Forest Plan, p. 2-3), this project is consistent with Forest Plan guidance and therefore a Forest Plan amendment is not required.

## References

Colter, Robert. 2021. *Project-level carbon assessment for the White Mountain National Forest: Peabody West Integrated Resource Project.* Campton, NH: U.S. Department of Agriculture, Forest Service.

Dugan, Alex, Maria Janowiak, and Duncan McKinley. 2019. *Forest Carbon Assessment for the White Mountain National Forest.* Campton, NH: U.S. Department of Agriculture, Forest Service.

New Hampshire Division of Lands and University of New Hampshire (UNH) Cooperative Extension. 2016. *New Hampshire Best Management Practices for Erosion Control on Timber Harvesting Operations.* UNH Cooperative Extension. https://extension.unh.edu/sites/default/files/migrated_unmanaged_files/Resource000247_Rep266.pdf.

Smallidge, Peter J, and Ralph D Nyland. 2009. "Woodland guidelines for the control and management of American beech." Edited by Peter Smallidge. *Cornell University Cooperative Extension ForestConnect Fact Sheet* 6.

Sullivan, T. J., J. R. Webb, K. U. Snyder, A. T. Herlihy, and B. J. Cosby. 2007. "Spatial Distribution of Acid-sensitive and Acid-impacted." *Water, Air, and Soil Pollution* 182: 57-71. https://link.springer.com/article/10.1007/s11270-006-9320-x.

Swanston, Christopher W., Maria K. Janowiak, Leslie A. Brandt, Patricia R. Butler, Stephen D. Handler, P. Danielle Shannon, Abigail Derby Lewis, et al. 2016. *Forest Adaptation Resources: Climate Change Tools and Approaches for Land Managers.* 2nd. Forest Service, Northern Research Station, General Technical Report NRS-87-2.

U.S. Department of Agriculture, Forest Service. 2017. *Albany South Integrated Resource Project Final Environmental Assessment.* https://www.fs.usda.gov/project/?project=39614.

U.S. Department of Agriculture, Forest Service. 2002. "Ecological Approach." Campton, NH.

U.S. Department of Agriculture, Forest Service. 2008. "Forest Plan Trail Management Objectives (File Code 1920-2)." Campton, NH.

U.S. Department of Agriculture, Forest Service. 2018. *Inventoried Roadless Area Background.* Campton, NH: White Mountain National Forest.

U.S. Department of Agriculture, Forest Service. 2012. *National Best Management Practices for Water Quality Management on National Forest System Lands; Volume 1: National Core BMP Technical Guide.* FS-990a, U.S. Department of Agriculture, Forest Service. https://www.fs.usda.gov/sites/default/files/FS_National_Core_BMPs_April2012_sb.pdf.

U.S. Department of Agriculture, Forest Service. 2022. "Rationale for Habitat Objectives in the Peabody West Habitat Management Unit." Campton, NH.

U.S. Department of Agriculture, Forest Service. 2019. "Terrestrial Habitat Management Reference Document." Campton, NH.

U.S. Department of Agriculture, Forest Service. 2005. *White Mountain National Forest Final Environmental Impact Statement for the Land and Resource Management Plan.* Laconia, NH: White Mountain National Forest. https://www.fs.usda.gov/detail/whitemountain/landmanagement/planning/?cid=STELPRDB5199941.

U.S. Department of Agriculture, Forest Service. 2007. "White Mountain National Forest Forest-wide Invasive Plant Control Project." https://www.fs.usda.gov/project/?project=15742.

U.S. Department of Agriculture, Forest Service. 2015. "White Mountain National Forest Forest-wide Travel Analysis Report." Campton, NH.

U.S. Department of Agriculture, Forest Service. 2005. "White Mountain National Forest Land and Resource Management Plan." Campton, NH.

U.S. Fish and Wildlife Service. 2023. *Biological Opinion: Effects to the Northern Long-Eared Bat from Planned and Ongoing Activities Being Implemented in the Eastern and Southern Regions of the U.S. Forest Service.* U.S. Department of the Interior.

U.S. Fish and Wildlife Service. 2016. *Endangered and Threatened Wildlife and Plants; 4(d) Rule for the Northern Long-Eared Bat.* Federal Register. https://www.federalregister.gov/documents/2016/01/14/2016-00617/endangered-and-threatened-wildlife-and-plants-4d-rule-for-the-northern-long-eared-bat.

U.S. Fish and Wildlife Service. 2022. *Endangered and Threatened Wildlife and Plants; Endangered Species Status for Northern Long-Eared Bat.* Federal Register. https://www.federalregister.gov/documents/2022/11/30/2022-25998/endangered-and-threatened-wildlife-and-plants-endangered-species-status-for-northern-long-eared-bat.

U.S. Fish and Wildlife Service. 2022b. *Endangered and Threatened Wildlife and Plants; Endangered Species Status for Tricolored Bat.* Federal Register. https://www.federalregister.gov/documents/2022/09/14/2022-18852/endangered-and-threatened-wildlife-and-plants-endangered-species-status-for-tricolored-bat.

U.S. Fish and Wildlife Service. 2021. *Species Status Assessment (SSA) Report for the Tricolored Bat (Perimyotis subflavus).* United States Department of the Interior. https://ecos.fws.gov/ServCat/DownloadFile/221212.

# Appendix A. Proposed Silvicultural Treatments

**Table 8. Proposed treatment units with acres, treatment type, and season of harvest.**

| Unit Number | Estimated Acres | Silvicultural Treatment | Season of Harvest |
|---|---|---|---|
| 1 | 7 | Patch Cut | Summer/fall/winter |
| 6 | 16 | Single-tree selection | Summer/fall/winter |
| 7 | 183 | Improvement Cut | Summer/winter |
| 9 | 23 | Group Selection | Summer/fall/winter |
| 10 | 51 | Single-tree Selection | Summer/fall/winter |
| 11 | 17 | Single-tree Selection and Group Selection | Summer/winter |
| 12 | 71 | Single-tree Selection and Group Selection | Summer/winter |
| 13 | 25 | Single-tree Selection | Summer/fall/winter |
| 14 | 48 | Single-tree Selection and Group Selection | Summer/fall/winter |
| 15 | 79 | Single-tree Selection | Summer/fall/winter |
| 16 | 21 | Single-tree Selection | Summer/fall/winter |
| 17 | 208 | Single-tree Selection and Group Selection | Summer/fall/winter |
| 18 | 18 | Single-tree Selection and Group Selection | Summer/winter |
| 19 | 26 | Clearcut with Reserves | Summer/fall/winter |
| 20 | 9 | Patch Cut | Summer/winter |
| 21 | 6 | Improvement Cut | Summer/winter |
| 22 | 49 | Group Selection | Summer/fall/winter |
| 23 | 55 | Single-tree Selection and Group Selection | Summer/fall/winter |
| 24 | 14 | Single-tree Selection | Summer/fall/winter |
| 25 | 15 | Commercial Thin | Summer/fall/winter |
| 26 | 65 | Single-tree Selection and Group Selection | Summer/fall/winter |
| 27 | 50 | Single-tree Selection and Group Selection | Summer/fall/winter |
| 28 | 32 | Commercial Thin | Summer/fall/winter |
| 29 | 28 | Single-tree Selection | Summer/fall/winter |
| 30 | 70 | Single-tree Selection and Group Selection | Winter |
| 33 | 27 | Shelterwood Establishment Cut | Summer/fall/winter |
| 35 | 26 | Group Selection | Summer/fall/winter |
| 36 | 10 | Patchcut | Summer/fall/winter |
| 37 | 16 | Group Selection | Summer/fall/winter |
| 38 | 77 | Improvement Cut | Summer/fall/winter |
| 43 | 12 | Single-tree Selection | Summer/fall/winter |
| 44 | 5 | Patch Cut | Summer/fall/winter |
| 51 | 4 | Patch Cut | Summer/fall/winter |
| 45 | 33 | Single-tree Selection | Winter |
| 46 | 167 | Single-tree Selection and Group Selection | Winter |
| 47 | 29 | Single-tree Selection and Group Selection | Summer/fall/winter |
| 49 | 31 | Single-tree Selection and Group Selection | Summer/fall/winter |
| 50 | 16 | Single-tree Selection and Group Selection | Summer/fall/winter |
| 52 | 39 | Single-tree Selection and Group Selection | Summer/fall/winter |

| Unit Number | Estimated Acres | Silvicultural Treatment | Season of Harvest |
|---|---|---|---|
| 53 | 11 | Single-tree Selection | Summer/fall/winter |
| 55 | 23 | Single-tree Selection and Group Selection | Winter |
| 56 | 21 | Improvement Cut | Summer/fall/winter |
| 57 | 12 | Improvement Cut | Summer/fall/winter |
| 58 | 12 | Single-tree Selection and Group Selection | Summer/fall/winter |
| 59 | 24 | Single-tree Selection and Group Selection | Summer/fall/winter |
| 60 | 12 | Single-tree Selection and Group Selection | Winter |
| 61 | 60 | Single-tree Selection and Group Selection | Summer/fall/winter |
| 64 | 8 | Patch Cut | Winter |
| 65 | 7 | Patch Cut | Winter |
| 66 | 84 | Single-tree Selection and Group Selection | Summer/winter |
| 67 | 199 | Group Selection | Winter |
| 68 | 158 | Group Selection | Winter |
| 69 | 7 | Patch Cut | Winter |
| 70 | 5 | Patch Cut | Winter |
| 71 | 3 | Patch Cut | Winter |
| 73 | 5 | Patch Cut | Winter |
| 72 | 34 | Single-tree Selection and Group Selection | Winter |
| 74 | 54 | Single-tree Selection and Group Selection | Winter |
| 78 | 1 | Commercial Thin | Winter |
| 79 | 18 | Single-tree Selection and Group Selection | Winter |
| 80 | 9 | Single-tree Selection and Group Selection | Winter |
| 87 | 41 | Group Selection | Summer/fall/winter |
| 88 | 6 | Shelterwood Establishment Cut | Summer/fall/winter |
| 89 | 6 | Improvement Cut | Summer/fall/winter |
| 90 | 3 | Improvement Cut | Summer/fall/winter |
| 93 | 40 | Shelterwood Establishment Cut | Summer/fall/winter |
| 94 | 14 | Single-tree Selection | Fall/winter |

# Appendix B. Proposed Transportation Activities

**Table 9. Proposed transportation activities on National Forest System lands, or within easements held by Forest Service.**

| System Road Name | Road Number | Road Length (miles), FS[1] Jurisdiction | Road Length (miles), Non-FS Jurisdiction | Current Objective ML[2] | 2015 TAP[3] Recommendation | Proposed Forest Roads Database Action | Proposed Ground Action |
|---|---|---|---|---|---|---|---|
| Pine Mountain | 24 | 1.41 | 0.27 | 3 | Change ML | Change to ML 2 | Reconstruct 0.9 mile |
| Culhane Brook | 72 | 2.5 | | 1 | Change ML | Change to ML 2 | Reconstruct 2.5 miles |
| Barnes Field | 79 | 0.25 | | 5 | Change ML | No change to current ML (5) | None |
| Libby South | 263 | 2.56 | | 1 | Change ML | Change 0.40 mile to ML 2, Decommission last 0.71 miles | Reconstruct 1.85 miles |
| Jacknife | 264 | 1.22 | 0.51 | 1 | Keep | Decommission 0.38 mile | Reconstruct 0.84 mile |
| Unauthorized | 2261 | 0.14 | | None | Drop | Remove from database | None |
| Unauthorized | 2282 | 0.63 | | None | Keep | Add as ML 1 | Reconstruct 0.63 mile |
| Unauthorized | 2310 | 0.43 | | None | Keep | Add as ML 1 | None |
| Unauthorized | 2313 | 0.43 | | None | Keep | Add as ML 1 | Reconstruct 0.43 mile |
| Unauthorized | 2318 | 0.18 | | None | Keep | Add as ML 1 | Reconstruct 0.18 mile |
| New | 2318 ext | 0.61 | | None | NA | Add as ML 1 | Construct 0.61 mile |
| Unauthorized | 2319.1 | 0.83 | | None | Keep | Add as ML 1 | Reconstruct 0.83 mile |
| Unauthorized | 2319.2 | 0.10 | | None | Keep | Add as ML 1 | None |
| Unauthorized | 2320 | 0.22 | | None | Keep | Add as ML 1 | Reconstruct 0.22 mile |
| Unauthorized | 2349 | 0.18 | | None | Drop | Remove from database | None |
| Unauthorized | 2350 | 0.14 | | None | Keep | Add as ML 1 | Reconstruct 0.14 mile |

1 FS - Forest Service
2 ML - maintenance level
3 TAP – transportation analysis process

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

Forest Ecology and Management xxx (2013) xxx–xxx

Contents lists available at ScienceDirect

Forest Ecology and Management

journal homepage: www.elsevier.com/locate/foreco

# Late-successional and old-growth forest carbon temporal dynamics in the Northern Forest (Northeastern USA)

John S. Gunn [a,*], Mark J. Ducey [b], Andrew A. Whitman [a]

[a] Natural Capital Initiative, Manomet Center for Conservation Sciences, 14 Maine St., Suite 410, Brunswick, ME 04011, USA
[b] Department of Natural Resources and the Environment, University of New Hampshire, Durham, NH 03824, USA

ARTICLE INFO

*Article history:*
Received 6 June 2013
Received in revised form 28 August 2013
Accepted 15 October 2013
Available online xxxx

*Keywords:*
Forest carbon
Late-successional
Old-growth
Forest Vegetation Simulator

ABSTRACT

Comprehensive data on the capacity and rates of change for carbon pools in managed and unmanaged forests is essential for evaluating climate change mitigation options being considered by policy makers at regional and national levels. We currently lack real and long-term data on forest carbon dynamics covering a wide range of forest management practices and conditions. Because of this, selecting the best policies for conserving forest carbon must rely on forest growth and yield models such as US Forest Service (USFS) Forest Vegetation Simulator (FVS) to predict the future forest carbon impacts of management actions. FVS may underestimate the capacity of older stands to accumulate carbon because the model relies on USFS Forest Inventory and Analysis data that lack data from late-successional and old-growth (LSOG) stands. Improving these models will increase the likelihood of selecting policies that successfully use forests to reduce atmospheric carbon. From 1995 to 2002, Manomet Center for Conservation Sciences conducted research on 65 10 m by 50 m permanent plots to evaluate forest structure (standing live and dead trees, and down coarse woody material) in LSOG stands across northern Maine. We re-measured these plots in 2011 to assess long-term carbon sequestration trends in LSOG stands of common forest types in the Northern Forest region for above ground alive, standing dead, and coarse woody material carbon pools. Late-successional (LS) and Old-growth (OG) aboveground live carbon (C) stocks were very high relative to regional mean C stocks (2.0–2.5 times the mean), LS plots were accumulating aboveground live C at a positive rate (0.61 Mg $ha^{-1}$ $year^{-1}$), while C stocks on OG plots are declining (−0.54 Mg $ha^{-1}$ $year^{-1}$). This change is driven by the presence of beech bark fungus (*Nectria* sp.) that is leading to mortality in larger diameter American beech (*Fagus grandifolia*) trees. We also found that the Northeast Variant of the Forest Vegetation Simulator is not a reliable predictor of aboveground live carbon accumulation rates in Northeastern LS and OG stands. This work provides important baselines for understanding the role of older forests and forest management within climate change mitigation strategies in the northeastern US. Late-successional and old-growth forests can play an important role in mitigating climate change, but understanding and quantifying natural disturbance risk to forest carbon stocks is critical for successful implementation of mitigation strategies. Further, regional forest carbon models will need calibration to accurately predict carbon accumulation rates in older forests.

© 2013 Elsevier B.V. All rights reserved.

## 1. Introduction

Global forests have a crucial role for addressing climate change because they store substantial amounts of carbon and are a leading source of emissions due to deforestation (Keith et al., 2009; Yingchun et al., 2012). In the US, the forest products sector also plays a key role by sequestering the equivalent of 10% of domestic greenhouse gas (GHG) emissions (Birdsey et al., 2006; Woodbury et al., 2007). Emerging carbon markets and regional climate change policies now allow emitters of GHGs to offset their emissions through carbon sequestration projects. Forest-based offsets hold great potential in the carbon marketplace, but their role has been limited by quantification uncertainty and concerns over risk of carbon (C) loss caused by natural disturbances (Galik and Jackson, 2009; Hurteau et al., 2009). There has also been the perception that mature forests are destined to achieve a steady state with respect to net exchange with the atmosphere (Jarvis, 1989). Recent studies, however, suggest that old forests may continue to serve as net carbon sinks for longer than previously thought (Luyssaert et al., 2008; Keith et al., 2009; Keeton et al., 2011); hence, the assumption that old forests in the northeastern US (including both late-successional (LS) and old-growth stands (OG)) are net emitters of

* Corresponding author. Present Address: Spatial Informatics Group – Natural Assets Laboratory (SIG-NAL), 63 Marshall Pond Rd., Hebron, ME 04238, USA. Tel.: +1 207 212 7723.

*E-mail addresses:* jgunn@sig-nal.org (J.S. Gunn), mjducey@unh.edu (M.J. Ducey), awhitman@manomet.org (A.A. Whitman).

0378-1127/$ - see front matter © 2013 Elsevier B.V. All rights reserved.
http://dx.doi.org/10.1016/j.foreco.2013.10.023

JA-0918

PBWTAR_5140

C deserves reexamination. Unmanaged stands, and particularly late-successional and old-growth (LSOG) forests, may sequester an increasing amount of landscape C given the current age distribution of the northeastern U.S. forest.

Less than 1% of the northeastern forest is in an old-growth state (i.e., primary forest) (Davis, 1996) and long-term data on C stock changes over time within LSOG forests is lacking (Keeton et al., 2011). Our review of the stand establishment years (subtracting "stand age" from "measurement year") of the most recent measurement years (2008–2012) of US Forest Service (USFS) Forest Inventory and Analysis (FIA) data for New York and New England (USA) indicates that 0.4% (19 of 4921 plots) date from before 1862; with the oldest plot dating to an establishment around 1795. This small percentage of old forest plots represents a much smaller area than was present in the pre-settlement forest, and thus landscape C stocks are likely much lower now than 300 years ago. In Wisconsin (USA), the current forest C stocks in forests have only recovered to 49% of pre-settlement levels (Rhemtulla et al., 2009). The same conclusion would likely be made for the northeastern US forest, given an older, pre-settlement age-class distribution than current day (Lorimer, 1977; Keeton et al., 2011).

Forests younger than OG but beyond the typical rotation length of commercially managed forests of 50–100 years are often referred to as LS or "mature" forest (Frelich, 2002). LS forest stands represent a larger land area than OG in the northeastern US, but are still limited. In Maine, stand ages from 50–100 years are generally considered "economically mature" and stands over 100 years old are considered LS (Whitman and Hagan, 2007). However, Whitman and Hagan (2007) identified some stands over 80 years of age with LS structural characteristics. The fraction of FIA plots established between 80 and 150 years ago (i.e., representative of our study data) is 31% (1,534 of 4,921 plots). Of these plots, only 8% are greater than 100 years old, indicating that in the absence of harvest or stand-replacing disturbance a large number of plots will be entering a LS condition.

Comprehensive data on the storage capacity and rates of change of C in LSOG forests is essential for evaluating the full range of forest C mitigation and management options and as part of life cycle C accounting. Given the large forest area that may enter the LS class in the northeastern US, understanding the forest carbon dynamics within this age class becomes critical for forest management decision making. The work presented here builds on prior research in the region and provides a long-term (>15 years) evaluation of forest C stocks and rates of change using permanent sample plots in LS and OG stands in Maine (USA). These data are invaluable for assessing forest growth and yield models such as the USFS Forest Vegetation Simulator (FVS) to determine how well they predict the future forest C impacts of management actions. Most models like FVS may underestimate the capacity of older stands to accumulate carbon because data from old forest was lacking (Liu et al., 2011). Emerging forest carbon offset protocols also require field-based benchmarks to evaluate management trajectories. Our goals were to: (1) assess long-term carbon sequestration trends in LSOG stands of common forest types in the Northern Forest region of the northeastern USA; and (2) evaluate the ability of the USFS FVS model to predict carbon biomass accumulation in LSOG stands.

## 2. Material and methods

From 1995 to 2011, we measured and re-measured permanent plots to evaluate the impacts of harvest regimes on forest structure (standing live and dead trees, and down coarse woody material (DCWM)) on stands across Maine, including partially harvested, LS, and OG stands (Hagan and Grove, 1999; Gunn and Hagan, 2000). Re-measurement of these plots provided a unique opportunity to evaluate changes in carbon stocks to compare trends in carbon accumulation between LS and OG (LSOG) stands. LSOG plots were established in northern hardwood (hardwood) types and spruce-fir (softwood) types (Eyre, 1980). Northern hardwood plots were characterized by American beech (*Fagus grandifolia*), sugar maple (*Acer saccharum*), and yellow birch (*Betula alleghaniensis*). Spruce-fir plots were characterized by spruce (*Picea* spp., most *P. rubens*, with occasionally stems of *P. glauca*) and balsam fir (*Abies balsamea*).

OG plots were located in The Nature Conservancy's 2,000-ha Big Reed Forest Reserve, northern Piscataquis County, Maine (centered at 46°20′N and 69°5′W). Prior research by Fraver et al. (2009) on the Reserve determined there was no evidence of stand replacing disturbance on the plots they studied during the last 120–280 years (Fraver et al., 2009). LS plots were located in Kibby and Skinner Townships, northern Franklin County, Maine (centered at 45°25′N and 70°31′W) on private forestland with over 100 years of harvest history. Although these plots had evidence of prior logging, they were classified as LS stands because they lacked evidence of natural or human stand-replacing disturbances based on field observations (e.g., numerous tip-up mounds, fire scars, and even-aged distribution). Stand establishment for LS plots ranged from 80 to 150 years prior to the first measurement. Establishment dates are based on reviews of historical stand maps, logging records, and tree increment cores from the plots. Whitman and Hagan (2007) describe in greater detail the methods we used for distinguishing between LS and OG stands.

### 2.1. Aboveground forest carbon sampling

In 2011 we re-measured LS plots ($n = 23$) and OG plots ($n = 35$) at the two sites. The plots were permanently monumented and mapped by using GPS (±10 m) and recording nearby landmarks. OG plots were first measured in 1995. LS plots were first measured from 1998 to 2002. In 2011 we re-measured LS plots ($n = 23$) and OG plots ($n = 35$) at the two sites. The plots were permanently monumented and mapped by using GPS (±10 m) and recording nearby landmarks. OG plots were first measured in 1995. LS plots were first measured from 1998 to 2002. We established 10 m × 50 m plots in stands with large trees and a lack of obvious harvest disturbance evidence. The LS pots were established by choosing a starting point and a random cardinal direction for the orientation of the plot from the start point. We chose starting points that allowed the entirety of the plot to be >75 m from road and harvest block (existing and proposed) edges. Plots were large enough to encompass areas of closed canopy and natural tree fall gaps typical of LS and OG stands. Stand sizes in Kibby and Skinner Townships (for LS plots) were generally too small to allow for more than one plot per stand. OG plots were clustered in groups of six plots separated by at least 250 m. Six plot clusters were distributed throughout the 2000 ha forest reserve.

Except for diameters of down coarse woody material (DCWM), the original measurement methods were used in re-measurement (e.g., Gunn and Hagan, 2000): diameter of each live and dead trees (⩾8 cm DBH) was measured at breast height (DBH) and decay stage was assigned for the entire tree (Table 1); for each piece of DCWM (>10 cm mid-point diameter, >30 cm in length) length and mid-point diameter was measured and a decay stage and piece type (i.e., log, top, and whole tree) was assigned (Table 1). Initial DCWM diameters were measured using a linear tape measure held horizontally over the log. The re-measurements used calipers. The initial measurement method may overestimate mid-point diameter compared to the re-measurement method (see Section 3.2). Moreover, in 1995, the dimensions of the entire DCWM piece were recorded if any portion of it fell on the plot. Using the ordinary

**Table 1**
Qualitative decay class descriptions for standing trees and dead coarse woody material (adapted from Harmon et al., 1986).

| Decay class | Standing trees | Down coarse woody material (DCWM) |
|---|---|---|
| 1 | Live and healthy | Bark firmly attached, exposed wood has fresh color (not weathered), wood beneath bark is solid, small twigs and branches intact, log elevated on support points/branches |
| 2 | Live but in decline | Bark flaking and not firmly attached, bare wood has weathered appearance, kicking the log may knock off bark but wood is solid, small twigs mostly absent, larger branches mostly intact, log elevated but may sag slightly |
| 3 | Dead, bark intact, small twigs and branches intact, wood solid | Bark mostly absent, surface of bare wood will flake off or shred when kicked, log is firm, but some areas of the wood are soft when pressed with a foot, large branches mostly absent, log sagging considerably, much of it on the ground |
| 4 | Dead, bark flaking, small twigs absent, large branches intact, wood solid | Log no longer a solid and intact piece, log will crush or break into large pieces when kicked, log shape becoming oval or flattened, wood is very spongy when presses with a finger, powder wood may be present, nearly all of log on ground |
| 5 | Bark mostly absent, nearly all branches absent, wood still fairly solid | Log oval or flat, generally powder wood, log very soft, can be easily broken up using your fingers, entire log is on the ground |
| 6 | Wood becoming soft in places, very top of tree has separated from bole, some flaking of bole will result from kicking tree | Not applicable |
| 7 | Bole considerably decomposed, mid-portion of tree has collapsed, kicking bole may result in large chunks falling from bole, wood generally soft | Not applicable |
| 8 | Most of bole has collapsed, wood generally soft and powdery, wood can be easily crumbled by hand | Not applicable |

expansion factor of the reciprocal of plot area to scale biomass of each piece to a per hectare value would lead to biased estimates under the initial field protocol (Gove and Van Deusen, 2011). During re-measurement we measured both the full dimensions of each piece (e.g., the initial protocol) and the dimensions of the portion on the plot, but present the analysis using the full dimensions here for consistency. DCWM biomass volume per ha was then determined using new unbiased expansion factors described in detail in Appendix A.

### 2.2. Determining carbon stock change drivers

We compared aboveground C biomass stock changes between sampling periods by C pool type (Wilcoxon Rank Sum). We used coefficients from Jenkins et al. (2003) and Harmon et al. (2011) to convert species, volume, and decay class data to estimate C volume per ha (MgC $ha^{-1}$). Dead standing tree biomass estimates did not account for limb or top loss. We fit linear models to predict annual change in aboveground standing C storage using the following variables: stand age (LS vs. OG), stand type (softwood vs. hardwood), initial carbon stocks (total live C per ha), initial beech basal area, and mean DBH. We initially fit a full model containing simple effects of all variables listed, then used backward selection using the Akaike Information Criterion (AIC; Akaike, 1974; Burnham and Anderson, 2002) to select a final predictive model.

### 2.3. Forest carbon growth modeling

We used the USFS Forest Vegetation Simulator (FVS) to model carbon accumulation using the initial plot measurements to assess whether projected results from this model were consistent with our empirical results. FVS is the most widely accepted growth model within current forest carbon offset standards and relies on NE-TWIGS (Hilt and Teck, 1989) as the growth and yield model to derive carbon biomass estimates (Dixon, 2002). These growth and yield models are based on data collected by the USFS's Forest Inventory and Analysis (FIA) unit from the 1950s through the 1980s. FIA data for LS and OG forests in the northeastern US are scarce because LSOG forests are regionally scarce. Therefore, the forest growth models (i.e., FVS and NE-TWIGS) and remote sensing-derived maps (e.g., Zheng et al., 2008) currently used to guide decision-making regarding carbon stocks may underestimate the capacity of older stands to accumulate carbon because both depend on FIA data in which LSOG stands are scarce (Ingerson and Loya, 2008). Re-measured plot data allow rigorous model evaluation for LSOG stands. We used the Northeast Variant of the FVS growth and yield model to simulate growth from the initial measurement year to 2011. Because re-measurement periods were unequal between plots, and no other common divisor of re-measurement period existed, we used a one-year projection interval within the model. FVS includes extensive options for site-specific calibration. The need for calibration to obtain reliable projections has been widely documented both for conventional timber management purposes (Hamilton., 1994; Vandendriesche and Haugen, 2008; Ray et al., 2009) and for carbon estimation (MacLean et al., 2013). However, we lacked independent calibration data for LS and OG stands and so used the default parameter values for modeling. Modeled aboveground live tree carbon stocks (MgC $ha^{-1}$) and growth rates (MgC $ha^{-1}$ $year^{-1}$) were compared with values from the field measurements. All statistical analyses were conducted in R (R Core Team, 2012; Wessa, 2013).

## 3. Results and discussion

### 3.1. Carbon stock change trends: standing carbon

In 2011, both LS and OG mean aboveground live carbon stocks were 2.0–2.5 times greater than the mean stocks for forest types typical of the region (Table 2). Individual stands exceeded the mean carbon stocking by as much as 5.2 times. Mean LS aboveground live C stocks in 2011 had increased since the initial inventories (Table 2; $W = 21$, $p < 0.001$). However, mean 2011 OG aboveground live C stocks had declined (but the median increased) since the initial inventory in 1995 (Table 2; $W = 439$, $p = 0.04$). Mean annual change in LS aboveground live C was 0.61 MgC $ha^{-1}$ $year^{-1}$ (SD = 0.69, Table 2), while C was lost from aboveground live OG stocks at a mean annual rate of −0.54 MgC $ha^{-1}$ $year^{-1}$ (SD = 1.31, Table 2). The observed decrease in dead standing C stocks on both LS and OG plots was not statistically significant (LS $W = 119$, $p < 0.58$; OG $W = 439$, $p = 0.66$) and remained constant as an overall percentage of the total standing C volume on OG plots (Table 2). Dead standing carbon stocks in 2011 represented 10.22%

Please cite this article in press as: Gunn, J.S., et al. Late-successional and old-growth forest carbon temporal dynamics in the Northern Forest (Northeastern USA). Forest Ecol. Manage. (2013), http://dx.doi.org/10.1016/j.foreco.2013.10.0

JA-0920

PBWTAR_5142

**Table 2**
Summary data (mean and SD) of late successional (LS) and old growth (OG) measured plots for historical (OG 1995; LS 1998–2002) and re-measurement (LS and OG 2011) periods. Regional low and high mean carbon (C) stocks are presented for comparison with measured plots (Climate Action Reserve Forest Project Protocol Version 3.2, Assessment Area Data, Northeast Supersection, based on USFS Forest Inventory and Analysis data; February 2, 2010).

| Age class | Sample year (s) | Quadratic mean diameter (cm) (SD) | Mean trees $ha^{-1}$ (SD) | Mean aboveground live MgC $ha^{-1}$ (SD) | Mean aboveground dead standing MgC $ha^{-1}$ (SD) | Mean aboveground DWM MgC $ha^{-1}$ (SD) | Mean total aboveground MgC $ha^{-1}$ | Mean annual MgC $ha^{-1}$ AGL C stock change[a] | Low regional mean C stock (MgC $ha^{-1}$) | High Regional Mean C Stock (MgC $ha^{-1}$) |
|---|---|---|---|---|---|---|---|---|---|---|
| Old growth | 1995 | 22.47 (3.17) | 661.14 (164.78) | 111.25 (36.01) | 20.09 (17.61) | 16.69 (11.31) | 148.03 | – | 44.6 | 45.63 |
| Old growth | 2011 | 21.44 (3.33) | 596.00 (143.72) | 102.63 (34.49) | 18.71 (13.10) | 11.48 (4.70) | 132.82 | −0.54 | 44.6 | 45.63 |
| Late successional | 1998–2002 | 20.15 (4.56) | 922.61 (490.73) | 89.53 (29.91) | 14.44 (15.78) | 6.17 (3.34) | 110.14 | – | 44.6 | 45.63 |
| Late successional | 2011 | 21.73 (4.75) | 837.39 (486.56) | 96.79 (30.55) | 11.02 (7.32) | 5.05 (3.13) | 112.86 | 0.61 | 44.6 | 45.63 |

[a] AGL, aboveground live.

of total aboveground standing stocks in LS plots compared to 15.42% in OG.

Backward selection using AIC led to a final linear model that included only initial carbon stocks and initial American beech basal area as predictors:

$$\Delta C = 1.237 \quad 0.0008C_0 \quad 0.1249B$$

where $\Delta C$ is annual carbon accumulation (MgC $ha^{-1}$ $year^{-1}$), $C_0$ is initial carbon stock (MgC $ha^{-1}$), and $B$ is initial basal area of American beech ($m^2$ $ha^{-1}$). High plot-to-plot variability led to a rather low $R^2$ (0.368). Although model selection was information-theoretic, we note that the model would be highly significant if judged by frequentist standards ($p < 0.0001$ for the overall model, and both effects individually significant at $p = 0.01$). This model result indicates that starting American beech volume was an important predictor of lost C volume over time, corroborating that aboveground live tree carbon stock decline in OG is likely a result of a large portion of American beech trees in the region infected with the *Nectria* sp. fungus. Old growth aboveground live C volume of American beech declined on the study plots from 15% to 7% of total C volume. Statewide in Maine, live tree volume of American beech has declined 14% since 2003 (McCaskill et al., 2011). Beech bark disease (BBD), the result of sap feeding by an introduced beech scale insect (*Cryptococcus fagisuga*) that allows lethal fungal infections by *Neonectria ditissima* and *Neonectria faginata*, reached the Big Reed study area between 1935 and 1945 (Morin et al., 2007). An episode of high mortality in American beech occurred in northern Maine (including the Big Reed study area) from 2003 to 2006, likely the result of a combination of drought and BBD (Kasson and Livingston, 2012). Mortality within the OG plots was likely exacerbated by the presence of larger diameter trees that often experience greater decline and mortality from BBD (see Morin et al., 2007). We did not evaluate regeneration within the plots, but such an evaluation would be necessary to understand the long-term forest C response to this disturbance event. If American beech reclaims the space created by the mortality, then it is unlikely that forest stocks would recover to 1995 levels. The presence and relative abundance of sugar maple and other shade tolerant species within these plots will play a role in the future structure of these stands. The risk of C loss from a known disturbance agent like BBD emphasizes the importance of either planning for that possibility in forest carbon project development (e.g., contributing to C buffer pools or buying insurance) or managing to mitigate that risk (Galik and Jackson, 2009; Hurteau et al., 2009).

LSOG forest C stocks of the plots sampled in 2011 were greater than the regional mean for all stands types and ages (Table 2). Even with the recent C volume lost from the aboveground live pools, OG plots were 2.3 times greater than the regional mean for similar forest types. Our measured aboveground live C stocks are consistent with recent measurements by Hoover et al. (2012) of old-growth forest C stocks in northern hardwood stands in Maine. Hoover et al. (2012) reported mean stocks of 114 MgC $ha^{-1}$ ($n = 4$) compared to our mean of 102 MgC $ha^{-1}$. We measured dead standing stocks in OG plots that were more than two times the mean measured by Hoover et al. (2012). When the aboveground live and dead standing pools are considered together, total mean C was comparable to Hoover et al. (2012) at 121 MgC $ha^{-1}$. This shows that the carbon carrying capacity for these stands is quite high (and on par with other regional estimates) even with a recent disturbance. Keeton et al. (2011) report regional (Maine, New Hampshire, and New York) means for OG biomass volumes that were generally higher than our data and Hoover et al. (2012). Though Keeton et al. (2011) acknowledge the wide range of biomass volumes they observed across the region, particularly for OG plots in Maine ($n = 17$). However, our LS data are within the reported

Please cite this article in press as: Gunn, J.S., et al. Late-successional and old-growth forest carbon temporal dynamics in the Northern Forest (Northeastern USA). Forest Ecol. Manage. (2013), http://dx.doi.org/10.1016/j.foreco.2013.10.021

ARTICLE IN PRESS

(a)
45%
40%
35%
30%
25%
20%
15%
10%
5%
0%
% of Total DCWM C
1
2
3
4
5
Decay Class
LS_98_02
OG_1995
(b)
45%
40%
35%
30%
25%
20%
15%
10%
5%
0%
% of Total DCWM C
1
2
3
4
5
Decay Class
LS_2011
OG_2011

**Fig. 1.** Decay class distribution (% of total) for down coarse woody material (DCWM) carbon (C) volumes for (1b) historical LS (LS_98_02) plots measured between 1998 and 2002 and OG (OG_1995) plots measured in 1995; and (1b) re-measured LS (LS_2011) and OG (OG_2011) plots measured in 2011. See Table 1 for description of decay classes.

values for "mature" forests in Maine and more broadly within the region.

### *3.2. Carbon stock change trends: dead and down carbon*

Total DCWM C pools declined in OG plots from the initial measurements to 2011 ($W = 481$, $p = 0.005$) but did not significantly change on LS plots ($W = 193$, $p = 0.09$). DCWM C pools represented 9% of OG and 4% of LS aboveground total carbon volume in 2011 compared to 12% and 6% in the initial measurements (Table 2). Mean total DCWM C volume in OG plots was more than two times greater than the mean total volume LS plots within measurement periods (Table 2). However, methodological differences are likely responsible for some of the difference in DCWM C pools between measurement years. Initial measurements from 1995 to 2002 were made using diameter tape measures held over the width of a DCWM piece, whereas final measurements in 2011 were made using calipers. Ocular estimates made with a tape measure held over the DCWM piece are biased toward overestimating the piece diameter compared to a caliper (A. Whitman, pers. obs), which led to higher C volume estimates (Table 2). Additionally, earlier crews tended to identify more DCWM pieces than the 2011 field crew sampled, particularly on OG plots (e.g., 1520 pieces in 1995 vs. 1138 pieces in 2011). Hence, we have high confidence about within year comparisons and less confidence about between measurement comparisons.

The pattern of C distribution across decay stages differed between measurements and varied slightly between LS and OG. For both LS and OG, the initial measurements had a greater percentage of total C biomass in Decay Classes 4 and 5 than the re-measurements in 2011 (Fig. 1a and b), perhaps which may also be a result of the potential observer bias described above. For the initial measurements, the decay class distribution on LS plots was similar to OG plots, with the exception of Decay Class 1. Most of the C volume for both age classes was contained in Decay Class 3. In the re-measured plots from 2011, a greater percentage of LS DCWM C volume was in Decay Class 1 (24%) and a greater percentage OG DCWM C volume increased in Decay Class 2 and decreased in Decay Classes 4 and 5 (Fig. 1a and b).

Properly accounting for C stocks in the dead standing and DCWM pools should show how the dead above-ground C mitigates near-term loss of aboveground live C stocks, particularly when the disturbance does not involve combustion. However, the between-year methodological differences make it difficult to confidently evaluate whether accounting for DCWM C pools could demonstrate a mitigating effect for the above ground live pools. Since the BBD disturbance does not result in combustion, and there was no harvest salvage, most of the resulting mortality probably remains on the forest floor or has been incorporated into belowground C pools.

### *3.3. FVS model and old forest dynamics*

LS aboveground live C stocks increased since the initial measurements. The USFS FVS growth model was consistent with the increasing trend, but the modeled growth was poorly correlated with observed changes in carbon stocks for both LS and OG stands (LS stands, Spearman's $r = 0.05$, $p = 0.83$; OG stands, Spearman's $r = 0.16$, $p = 0.37$; Fig. 2). FVS generally over-predicted increases in carbon stocks for LS plots and greatly overestimated increases in carbon stocks for OG plots (Fig. 2). The somewhat better predictive output for LS stands was likely because only 3 of 23 LS plots had American beech present. Hence, the LS plots would not have been susceptible to the species-specific disturbance that led to mortality on the OG plots. Even so, the tendency for FVS to over predict carbon accumulation in LS plots was counter to our initial hypothesis, and to the results of MacLean et al. (2013) who found that uncalibrated FVS tended to under predict carbon accumulation for FIA plots across the northeastern United States. Local calibration of FVS is often necessary to achieve high accuracy estimates even in common forest types and age classes (e.g. Ray et al., 2009; MacLean et al., 2013), so it is unsurprising that predictions of carbon stocks of LSOG forest would be inaccurate without

LS
OG
Measured Mg C ha⁻¹ yr⁻¹
Modeled Mg C ha⁻¹ yr⁻¹
4
3
2
1
0
−1
−2
−3
−4

**Fig. 2.** Late-successional (LS) and old-growth (OG) measured aboveground live carbon accumulation rates (MgC ha$^{-1}$) plotted against modeled accumulation rates using the Northeast Variant of FVS.

Please cite this article in press as: Gunn, J.S., et al. Late-successional and old-growth forest carbon temporal dynamics in the Northern Forest (Northeastern USA). Forest Ecol. Manage. (2013), http://dx.doi.org/10.1016/j.foreco.2013.10.022

JA-0922

PBWTAR_5144

calibration. However, because of the relative rarity of the LS and OG development stages, there is a lack of calibration data available for LSOG forests. Enhancement of the projection ability of FVS may require targeted data collection on re-measured plots in such forests, especially if the age distribution of the northeastern forest shifts toward older stands on some ownerships and projection of stands into older age classes becomes necessary to model short- to mid-range business-as-usual scenarios for forest carbon offset projects.

Explicit incorporation of natural disturbance risk is essential for potential carbon losses to be appropriately accounted for in models. For example, if the *Nectria* spp. fungus remains common throughout the northeastern U.S., the capacity of Northern Hardwood LS and OG stands to sustain prolonged carbon gain could be reduced if American beech is abundant in a given stand. To accurately describe LSOG carbon dynamics, FVS would require modifications that include beech bark disease scenarios.

## 4. Conclusions

Our results show that the capacity for older forests to store C is more than two times the current average stocking. LS stands were continuing to accumulate aboveground C, though OG stands declined largely because of a widespread natural disturbance. Recent harvest trends (from 2003 to 2008) in Maine have reduced average stand diameters for maple/beech/birch forests (McCaskill et al., 2011), so LS and OG forest area is not likely to increase without additional incentives for private landowners to create such structure (Maine's forests are 96% privately-owned). Even though FIA plot data shows large number of plots in 80–100 year range, timber harvests will target those stands. Encouraging the development of LSOG forests will likely improve the climate change mitigation benefits of forests in the northeastern US (Seidl et al., 2012; Burrascano et al., 2013). Such a forest management strategy will be beneficial even when the full emissions implications of the full forest product sector are taken into account in a life cycle analysis (Gunn, Unpublished Data).

Increasing aboveground forest C stocks through the conservation of older forests also comes with risk that might not be detected by current modeling tools such as FVS, particularly in LSOG forests. Natural disturbance can lead to significant C loss, but is not necessarily catastrophic (Goetz et al., 2012). The risk of forest C loss is influenced by at least three factors: 1) the severity, duration, and frequency of natural disturbances, including fire, insect damage and severe weather; 2) the response of trees to increasing atmospheric $CO_2$ concentrations and changes in climatic conditions; and, 3) landowner behavior (Galik and Jackson, 2009). While landowner behavior can be addressed through legal mechanisms, greater understanding of C loss risk based on changing natural disturbance regimes in a warming climate (e.g., increased risk of ice storms, microbursts, and fire related to severe summer droughts) will support both carbon offset project development and policies that seek to use forests as part of a regional climate mitigation strategy.

Natural disturbance regimes and climate change could greatly enhance or reduce the carbon storage capacity of northeastern US forests (Groffman et al., 2012). Quantification of this risk for different forest types and age classes will be an important area of climate change mitigation research. Calibration and improvement of existing forest growth and yield models will help us better predict possible carbon storage trajectories. Continued monitoring of LSOG forests using permanent plots will provide vital data for model calibration and evaluation, and for detecting impacts of disease and climate change on existing and future potential carbon sinks.

## Acknowledgements

This project was supported by the Northeastern States Research Cooperative through funding made available by the USDA Forest Service. The conclusions and opinions in this paper are those of the authors and not of the NSRC, the Forest Service, or the USDA. Additional funding for the research came from the Davis Conservation Foundation, The Emily V. Wade Fund for Science, Fox Family Foundation, and Manomet Center for Conservation Sciences. We would like to thank the 2011 Field Crew (Jordan Bowmerman and Kathleen McKeever) and all the previous field crews (1995–2002). We thank the Maine Chapter of The Nature Conservancy for permission to conduct this work in the Big Reed Forest Reserve and Plum Creek for permission to work on their private land in Kibby and Skinner Townships of Maine, USA.

## Appendix A. DCWM volume calculations

As Gove and Van Deusen (2011) show, when DCWM attributes are measured for an entire log, and the log is included in a sample whenever any portion of the log is included in a fixed-area plot, estimates of the DCWM attributes are biased if the usual fixed plot estimators are used to expand the attributes of the sample to per hectare values. Gove and Van Deusen (2011) present an unbiased estimator appropriate to this protocol (their "sausage method") when the fixed-area plot is circular. Here, we develop an unbiased estimator that can be used when the fixed-area plot is any convex polygon (including a rectangle as used in the field work for this study).

Consider the situation in Fig. A1. A piece of DCWM of length $L_i$ (m) and orientation $\theta_i$ is tallied on a plot of area $a_{nominal}$ (ha). We assume only that the plot is of a convex shape, with its area and configuration fixed in advance, and with its center (or other unique point) located at random. Now, consider the shape, area, and orientation of the inclusion zone for this piece, defined as the region where the plot center can land and the piece will be included. This inclusion zone evidently has an area $a_i$ equal to $a_{nominal}$, plus the length of the piece multiplied by the projection of the plot onto an axis perpendicular to $\theta_i$:

$$\alpha_i = a_{nominal} + \frac{L_i proj(a \perp \theta_i)}{10,000}$$

where the factor of 10,000 converts m$^2$ to ha. Following logic similar to that employed in derivations for line intersect sampling, we either make the design-based assumption that the orientation of the plot is determined at random (Kaiser, 1983), or that the

(a)
$a_{nominal}$
$\theta_i$
$L_i$
(b)
$a_i$

Fig. A1. A piece of down coarse woody material intersected by a rectangular plot (a), and its corresponding inclusion zone (b).

pieces of DCWM are oriented at random (De Vries, 1973, 1986). Now, a powerful result in geometry states that the expectation over $\theta_i$ of the projection of the plot equals the circumference of the plot $c$ divided by $\pi$ (Kendall and Moran, 1963, p. 58). Therefore, we may calculate the expected value of the inclusion zone area for the DCWM piece as:

$$E[a_i] = a_{nominal} + \frac{cL_i}{10,000\pi}$$

and $1/E[a_i]$ provides an unbiased expansion factor for the piece, akin to the "unconditional" estimator of Kaiser (1983) for line intersect sampling. In the field protocol used in this study, which employed a $10 \times 50$ m plot, $a_{nominal}$ = 0.05 ha and $c$ = 120 m.

## References

Akaike, H., 1974. A new look at the statistical model identification. IEEE Trans. Autom. Control 19, 716–723.

Birdsey, R., Pregitzer, K., Lucier, A., 2006. Forest carbon management in the United States. J. Env. Qual. 35, 1461–1469.

Burnham, K.P., Anderson, D.R., 2002. Model Selection and Multimodel Inference: A Practical Information-Theoretic Approach, 2nd ed. Springer-Verlag, New York (NY).

Burrascano, S., Keeton, W.S., Sabatini, F.M., Blasi, C., 2013. Commonality and variability in the structural attributes of moist temperate old-growth forests: a global review. For. Ecol. Manage. 291, 458–479.

Davis, M.B., 1996. Eastern Old-growth Forests, Prospects for Rediscovery and Recovery. Island Press, Covelo (CA).

De Vries, P.G., 1973. A general theory on line intersect sampling with application to logging residue. Mededelingen Landbouwhogeschoole Wageningen 73, 1–23.

De Vries, P.G., 1986. Sampling Theory for Forest Inventory. Springer-Verlag, New York.

Dixon, G.E. 2002. Essential FVS: A user's guide to the Forest Vegetation Simulator. USDA-Forest Service, Forest Management Service Center, Fort Collins, CO.

Eyre, F.H., 1980. Forest Cover Types of the United States and Canada. Society of American Foresters, Washington (DC).

Fraver, S., White, A.S., Seymour, R.S., 2009. Natural disturbance in an old-growth landscape of northern Maine, USA. J. Ecol. 97, 289–298.

Frelich, L., 2002. Forest Dynamics and Disturbance Regimes: Studies from Temperate Evergreen-Deciduous Forests. Cambridge University Press, Cambridge, United Kingdom.

Galik, C.S., Jackson, R.B., 2009. Risks to forest carbon offset projects in a changing climate. For. Ecol. Manage. 257, 2209–2216.

Goetz, S.J., Bond-Lamberty, B., Law, B.E., Hicke, J.A., Huang, C., Houghton, R.A., McNulty, S., O'Halloran, T., Harmon, M., Meddens, A.J.H., Pfeifer, E.M., Mildrexler, D., Kasischke, E.S., 2012. Observations and assessment of forest carbon dynamics following disturbance in North America. J. Geophys. Res. 117, 1–17.

Gove, J.H., Van Deusen, P.C., 2011. On fixed-area plot sampling for downed coarse woody debris. Forestry 84, 109–117.

Groffman, P.M., Rustad, L., Templer, P.H., Campbell, J., Christenson, L.M., Lany, N.K., Socci, A.M., Vadeboncoeur, M.A., Schaberg, P., Wilson, G.F., Driscoll, C.T., Fahey, T.J., Fisk, M.C., Goodale, C.L., Green, M.B., Hamburg, S.P., Johnson, C.E., Mitchell, M.J., Morse, J.L., Pardo, L.H., Rodenhouse, N.L., 2012. Long-term integrated studies show complex and surprising effects of climate change in northern hardwood forests. BioSci. 62, 1056–1066.

Gunn, J.S., Hagan, J.M., 2000. Woodpecker abundance and tree use in uneven-aged managed, and unmanaged, forest in Northern Maine. For. Ecol. Manage. 126, 1–12.

Hagan, J.M., Grove, S.L., 1999. Coarse woody debris: humans and nature competing for trees. J. For. 97, 6–11.

Hamilton, D.A., Jr., 1994. Uses and abuses of multipliers in the stand prognosis model. In: General Technical Report No. INT-GTR-310, USDA Forest Service, Intermountain Research Station, Ogden, UT.

Harmon, M.E., Franklin, J.F., Swanson, F.J., Sollins, P., Gregory, S.V., Lattin, J.D., Anderson, N.H., Cline, S.P., Aumen, N.G., Sedell, J.R., Lienkaemper, G.W., Cromack Jr., K., Cummins, K.W., 1986. Ecology of coarse woody debris in temperate ecosystems. Adv. Ecol. Res. 15, 133–302.

Harmon, M.E., Woodall, C.W., Fasth, B., Sexton, J., Atkov, M., 2011. Differences between standing and downed dead tree wood density reduction factors: a comparison across decay classes and tree species. In: Research Paper No. NRS-15. USDA Forest Service, Northern Research Station, Newtown Square, PA.

Hilt, D.E., Teck, R.M., 1989. NE-TWIGS: An individual-tree growth and yield projection system for the northeastern United States. The Compiler. 7, 10–16.

Hoover, C.M., Leak, W.B., Keel, B.G., 2012. Benchmark carbon stocks from old-growth forests in northern New England, USA. For. Ecol. Manage. 266, 108–114.

Hurteau, M.D., Hungate, B.A., Koch, G.W., 2009. Accounting for risk in valuing forest carbon offsets. Carbon Balance Manage. 4, 1–5.

Ingerson, A., Loya, W., 2008. Measuring forest carbon: strengths and weaknesses of available tools. Science and Policy Brief. The Wilderness Society, Washington (DC).

Jarvis, P.G., 1989. Atmospheric carbon dioxide and forests. Phil. Trans. Roy. Soc. Biol. Sci. 324, 369–392.

Jenkins, J.C., Chojnacky, D.C., Heath, L.S., Birdsey, R.A., 2003. National-scale biomass estimators for United States tree species. For. Sci. 49, 12–35.

Kaiser, L., 1983. Unbiased estimation in line intersect sampling. Biometrics 39 (4), 965–976.

Kasson, M.T., Livingston, W.H., 2012. Relationships among beech bark disease, climate, radial growth response and mortality of American beech in northern Maine, USA. For. Path. 42, 199–212.

Keeton, W., Whitman, A., McGee, G.C., Goodale, C.L., 2011. Late-successional biomass development in northern hardwood-conifer forests of the northeastern United States. For. Sci. 57, 489–505.

Keith, H., Mackey, B.G., Lindenmayer, D.B., 2009. Re-evaluation of forest biomass carbon stocks and lessons from the world's most carbon-dense forests. Proc. Natl. Acad. Sci. USA 106, 11635–11640.

Kendall, M.G., Moran, P.A.P., 1963. Geometrical Probability. Griffin, London.

Liu, S., Bond-Lamberty, B., Hicke, J.A., Vargas, R., Zhao, S., Chen, J., Edburg, S.L., Hu, Y., Liu, J., McGuire, A.D., Xiao, J., Keane, R., Yuan, W., Tang, J., Luo, Y., Potter, C., Oeding, J., 2011. Simulating the impacts of disturbances on forest carbon cycling in North America: Processes, data, models, and challenges. J. Geophys. Res. 116, 1–22.

Lorimer, C.G., 1977. The presettlement forest and natural disturbance cycle of Northeastern Maine. Ecology 58, 139–148.

Luyssaert, S., Schulze, E., Börner, A., 2008. Old-growth forests as global carbon sinks. Nature 455, 213–215.

MacLean, R.G., Ducey, M.J., Hoover, C.M., 2013. A comparison of carbon stock estimates and growth projections for the northeastern United States. For. Sci.

McCaskill, G.L., McWilliams, W.H., Barnett, C.J., Butler, B.J., Hatfield, M.A., Kurtz, C.M., Morin, R.S., Moser, W.K., Perry, C.H., Woodall, C.W., 2011. Maine's forests 2008. (Resource Bulletin No. NRS- 48). USDA Forest Service, Northern Research Station, Newtown Square, PA.

Morin, R.S., Liebhold, A.M., Tobin, P.C., Gottschalk, K.W., Luzader, E., 2007. Spread of beech bark disease in the eastern United States and its relationship to regional forest composition. Can. J. For. Res. 37, 726–736.

R Core Team, 2012. R: A language and environment for statistical computing. R Foundation for Statistical Computing. R Foundation for Statistical Computing, Vienna, Austria, ISBN 3-900051-07-0.

Ray, D.G., Saunders, M.R., Seymour, R.S., 2009. Recent changes to the northeast variant of the forest vegetation simulator and some basic strategies for improving model outputs. Nor. J. Appl. For. 26, 31–34.

Rhemtulla, J.M., Mladenoff, D.J., Clayton, M.K., 2009. Historical forest baselines reveal potential for continued carbon sequestration. Proc. Nat. Acad. Sci. USA 106, 6082–6087.

Seidl, R., Spies, T.A., Rammer, W., Steel, E.A., Pabst, R.J., Olsen, K., 2012. Multi-scale drivers of spatial variation in old-growth forest carbon density disentangled with LiDAR and an Individual-based landscape model. Ecosystems 15, 1321–1335.

Vandendriesche, D., Haugen, L., 2008. Comparison of FVS projection of oak decline on the Mark Twain National Forest to actual growth and mortality as measured over three FIA inventory cycles. In: Havis, R.N., Crookston, N.L., comps. Third Forest Vegetation Simulator conference, 2007 February 13–15; Fort Collins, CO. Proceedings RMRS-P-54. Fort Collins, CO: US Department of Agriculture, Forest Service, Rocky Mountain Research Station: 68–80.

Wessa, P., 2013. Free Statistics Software, Office for Research Development and Education, version 1.1.23-r7. <http://www.wessa.net/>.

Whitman, A.A., Hagan, J.M., 2007. An index to identify late-successional forest in temperate and boreal zones. For. Ecol. Manage. 246, 144–154.

Woodbury, P.B., Smith, J.E., Heath, L.S., 2007. Carbon sequestration in the US forest sector from 1990 to 2010. For. Ecol. Manage. 241, 14–27.

Yingchun, L., Guirui, Y., Qiufeng, W., Yangjian, Z., 2012. Huge carbon sequestration potential in global forests. J. Res. Ecol. 3, 193–201.

Zheng, D., Heath, L.S., Ducey, M.J., 2008. Spatial distribution of forest aboveground biomass estimated from remote sensing and forest inventory data in New England, USA. J. Appl. Remote Sens. 2, 021502.

Please cite this article in press as: Gunn, J.S., et al. Late-successional and old-growth forest carbon temporal dynamics in the Northern Forest (Northeastern USA). Forest Ecol. Manage. (2013), http://dx.doi.org/10.1016/j.foreco.20

*land*

MDPI

*Perspective*

# Creating Strategic Reserves to Protect Forest Carbon and Reduce Biodiversity Losses in the United States

**Beverly E. Law [1,*], William R. Moomaw [2], Tara W. Hudiburg [3], William H. Schlesinger [4], John D. Sterman [5] and George M. Woodwell [6]**

1 Department of Forest Ecosystems and Society, Oregon State University, Corvallis, OR 97331, USA
2 The Fletcher School and Global Development and Environment Institute, Tufts University, Medford, MA 02155, USA; william.moomaw@tufts.edu
3 Department of Forest, Rangeland, and Fire Sciences, University of Idaho, Moscow, ID 83844, USA; thudiburg@uidaho.edu
4 Cary Institute of Ecosystems Studies, Millbrook, NY 12545, USA; schlesingerw@caryinstitute.org
5 MIT Sloan School of Management, Massachusetts Institute of Technology, Cambridge, MA 02139, USA; jsterman@mit.edu
6 Woodwell Climate Research Center, Falmouth, MA 02540, USA; gwoodwell@woodwellclimate.org
* Correspondence: bev.law@oregonstate.edu

**Abstract:** This paper provides a review and comparison of strategies to increase forest carbon, and reduce species losses for climate change mitigation and adaptation in the United States. It compares forest management strategies and actions that are taking place or being proposed to reduce wildfire risk and to increase carbon storage with recent research findings. International agreements state that safeguarding biodiversity and ecosystems is fundamental to climate resilience with respect to climate change impacts on them, and their roles in adaptation and mitigation. The recent Intergovernmental Panel on Climate Change report on impacts, mitigation, and adaptation found, and member countries agreed, that maintaining the resilience of biodiversity and ecosystem services at a global scale is "fundamental" for climate mitigation and adaptation, and requires "effective and equitable conservation of approximately 30 to 50% of Earth's land, freshwater and ocean areas, including current near-natural ecosystems." Our key message is that many of the current and proposed forest management actions in the United States are *not consistent* with climate goals, and that preserving 30 to 50% of lands for their carbon, biodiversity and water is feasible, effective, and necessary for achieving them.

**Keywords:** carbon dioxide; biodiversity; preservation targets; climate mitigation; climate adaptation; deforestation proforestation

check for updates

**Citation:** Law, B.E.; Moomaw, W.R.; Hudiburg, T.W.; Schlesinger, W.H.; Sterman, J.D.; Woodwell, G.M. Creating Strategic Reserves to Protect Forest Carbon and Reduce Biodiversity Losses in the United States. *Land* **2022**, *11*, 721. https://doi.org/10.3390/land11050721

Academic Editor: Edward Morgan

Received: 29 March 2022
Accepted: 10 May 2022
Published: 11 May 2022

**Publisher's Note:** MDPI stays neutral with regard to jurisdictional claims in published maps and institutional affiliations.

**Copyright:** © 2022 by the authors. Licensee MDPI, Basel, Switzerland. This article is an open access article distributed under the terms and conditions of the Creative Commons Attribution (CC BY) license (https://creativecommons.org/licenses/by/4.0/).

## 1. Introduction

The climate is changing rapidly at an accelerating rate in every region of the planet. Immediate and sustained actions are needed to reduce dangerous and amplifying warming feedbacks. To avoid catastrophic, irreversible release of heat trapping methane and carbon dioxide, it is essential that natural land and ocean sinks remove and store substantially more atmospheric carbon dioxide to halt Arctic warming that is increasing over 3 times faster than the planetary average [1,2]. The next 10 to 30 years are a critical window for climate action, when severe ecological disruption is expected to accelerate [2–4]. Analysis of country-based pledges to reduce emissions in the nationally determined contributions (NDCs) suggests that emissions reductions should increase by 80% above the combined NDCs to keep temperature increases below the proposed 2 °C limit [5], and even greater reductions are required to remain below 1.5 °C. It is worth noting that these limits are warmer than the current temperature increase of 1.1 °C, meaning that the consequences for all climate-related changes will be more severe if those limits are reached or breached.

Forests play an important role in storing carbon, along with oceans, wetlands, and peatlands. Forests account for 92% of all terrestrial biomass globally, storing approximately 400 gigatons carbon [6]. Despite regional negative effects of climate change on the net amount of carbon removed from the atmosphere annually by land ecosystems, their removal of carbon dioxide from the atmosphere has remained fairly constant over the last 60 years at about 31% of emissions, with forests contributing the most [7]. Forests can play an important role in capturing and storing immense amounts of carbon. Reducing emissions from energy systems, deforestation, forest degradation, and other sources while increasing accumulation of carbon by natural systems are the primary means by which we will control atmospheric carbon dioxide ($CO_2$).

Here we present the status of science on forest management to mitigate climate change, and protect water and biodiversity in the United States, as well as the importance of Strategic Reserves to accomplish national and international goals of reducing biodiversity losses, and increasing the forest carbon reservoirs using natural climate solutions.

As discussed in more detail below, functionally separating carbon, water, and biodiversity and considering them independently leads to actions that inadvertently reduce the values of each, and can increase carbon emissions. This is why the 2021 report by the Intergovernmental Science-Policy Platform on Biodiversity and Ecosystem Services and the Intergovernmental Panel on Climate Change (IPBES-IPCC) [8] stresses that climate change and biodiversity need to be examined together as parts of the same complex problem when developing climate mitigation and adaptation solutions [9,10].

The IPCC Assessment Report 6 confirms the findings of a growing body of research that maintaining ecosystem integrity and its biodiversity are essential to an effective response to a changing climate [1]. The Summary for Policy Makers, which is approved line by line by all IPCC member governments *including the United States*, summarizes current adaptation and mitigation climate science as follows:

"Summary for Policy Makers.D.4 Safeguarding biodiversity and ecosystems is fundamental to climate resilient development, in light of the threats climate change poses to them and their roles in adaptation and mitigation (very high confidence)."

"Summary for Policy Makers.D.4.1 Building the resilience of biodiversity and supporting ecosystem integrity can maintain benefits for people, including livelihoods, human health and well-being and the provision of food, fibre and water, as well as contributing to disaster risk reduction and climate change adaptation and mitigation." The formal definition of ecosystem integrity refers to the "ability of ecosystems to maintain key ecological processes, recover from disturbance, and adapt to new conditions."

Many current U.S. forest management practices that optimize resource extraction are inconsistent with this scientific consensus, are worsening both climate change and biodiversity loss, and decreasing multiple ecosystem services of U.S. forests. Strategies to mitigate and adapt to climate change have been proposed by scientists [8] and policymakers or those implemented by land managers and industries, and recent research has quantified their effectiveness and inadequacies. The strategies include:

- ○ Avoiding deforestation and forest degradation—keeping forests intact;
- ○ Reducing carbon loss by increasing harvest intervals and decreasing harvest intensity;
- ○ Carbon storage in long-lived forest products (e.g., in combination with shorter harvest intervals);
- ○ Burning trees for bioenergy;
- ○ Thinning to reduce fire risk or severity and thus carbon losses.

We provide a synthesis of literature on evaluation of these strategies, as well as the importance of protecting the many values of forests, including carbon accumulation, biodiversity, and water availability. We focus on two regions of the U.S., the Pacific Coast, and southeast regions, which account for about 45% of the total U.S. forests' living biomass and removals by harvest [11].

## 2. Strategies

### *2.1. Avoid Deforestation and Forest Degradation, and Decrease Harvest-Related Carbon Losses*

Primary forests are defined as forests composed of native species in which there are no clearly visible indications of human activities and ecological processes have not been significantly disturbed [12]. Multiple values are found at higher levels in intact forests of a given type, including habitat for endangered species, water security, and accumulated forest carbon stocks that keep carbon out of the atmosphere, and provide moderation of air and surface temperature through evapotranspiration [13,14]. Only 7% of the forest area in the U.S. is considered intact, with the exception of the nearly 68,000 $km^2$ Tongass National Forest in southeast Alaska, of which about 20,000 $km^2$ is defined as productive old-growth. Most of its 900 watersheds are near natural conditions, and its carbon-rich rainforests have similar carbon densities to the Pacific Northwest U.S. rainforests [15–17]. It is the largest intact temperate rainforest in the world, yet logging of old-growth continues while the USDA is in the process of restoring the roadless protections. The 2001 Roadless Rule prohibits road construction and timber harvesting on almost 30 million hectares of inventoried roadless areas (IRAs) on National Forest System lands, and is intended to provide protection for multiple uses.

Federal lands managed by the U.S. Forest Service (FS), the National Forest System (NFS), and the Bureau of Land Management (BLM) are managed under a multiple use—sustained yield model [18,19]. The statute directs the agencies to "balance multiple uses of their lands and ensure a sustained yield of those uses in perpetuity" [20]. The forest management plans describe where timber harvesting may occur as well as measures of sustainable harvest levels. The balance of these uses on federal lands has been an ongoing point of contention with the public [20].

Most timber harvesting occurs on private lands [11], however, there is increasing pressure to allow more timber cutting on federal lands. In the Pacific Northwest (PNW), removals declined on public lands after the peak in the late 1980s [11], partly due to implementation of the Northwest Forest Plan on public lands that aimed to protect endangered species in old-growth forests. The result was a strong increase in forest carbon accumulation on public lands over the next 17 years, while private lands remained near zero carbon accumulation, accounting for losses due to wildfire and harvesting [21].

Most forests in the U.S. have been harvested multiple times, and many managed forests are harvested well before reaching maturity. As of 2014, 51% of timber land in the south was less than 40 years old compared with 20% in the north and 22% in the west. In contrast, 56% of northern timber land was more than 60 years old, compared with 27% in the south and 69% in the west [11]. Since then, harvest ages have decreased in some cases because of changes in forest products (e.g., increasing production of cross-laminated timber, wood for bioenergy), thinning to reduce wildfire risk or severity, or removals after fire or beetle kill. Consequently, forest carbon densities are much lower than their potential, and could accumulate much more carbon and avoid carbon emissions associated with harvest [22].

Evaluation of strategies to mitigate climate change showed that forests can store more carbon if the harvest interval is lengthened on private lands and harvest is reduced on public lands in Oregon (Figure 1) [15]. A comparison of strategies showed that reducing harvest by half on public forests to allow them to continue to accumulate carbon (cumulative net ecosystem carbon balance, NECB) while increasing harvest rotation age from 40 years back to 80 years in forests with relatively low vulnerability to drought and fire under future climate conditions contribute the most to increasing forest carbon and reducing emissions. Far less effective are reforestation—just one-third as much carbon accumulation—and lastly, afforestation—just one-tenth as much carbon accumulation—that can compete with land usage for agriculture and urban development. This finding is supported by a recent National Academy report on "Negative Emissions" or atmospheric $CO_2$ removal options that finds the potential for afforestation and reforestation in limiting atmospheric $CO_2$ to be modest [23].

compete with land usage for agriculture and urban development. This finding is supported by a recent National Academy report on "Negative Emissions" or atmospheric $CO_2$ removal options that finds the potential for afforestation and reforestation in limiting atmospheric $CO_2$ to be modest [23].

Oregon
NECB (Tg C)
200
150
100
50
0
Afforestation
Reforestation
Reduce Harvest

**Figure 1.** Land-use strategies to mitigate climate change across Oregon. Values on *y*-axis are cumulative change in net ecosystem carbon balance (NECB) from 2015 to 2100. Reduced harvest is a combination of restricted harvest by half on federal lands, and increased harvest intervals to 80 years on private lands. Data are from observation-based modeling [15].

A global study of 48 forests of all types found that among "mature multi-aged forests" half the living aboveground carbon was in the largest diameter 1% of the trees [24]. A study of six National Forests in Oregon found that trees of 53 cm DBH or greater comprised just 3% of the total stems, but held 43% of the aboveground carbon [25]. The U.S. Forest Service decided to drop a restriction on harvesting large trees in this category (Federal Register Document 2021-00804; https://www.govinfo.gov/content/pkg/FR-2021-01-15/pdf/2021-00804.pdf, accessed 20 April 2022), an action at odds with climate and biodiversity goals. Contrary to common belief, older forests continue to accumulate large quantities of carbon in trees and forest soils. Globally, forests older than 200 years continue to accumulate carbon at a rate of 1.6 to 3.2 Mg C $ha^{-1}$ $yr^{-1}$ [26].

Thus, temperate forests with high carbon and lower vulnerability to mortality have substantial additional capacity for climate mitigation. On a global level, it is estimated that forests could hold twice as much carbon as they currently do if managed differently [27]. While planting trees is desirable, that will contribute relatively little to carbon accumulation out of the atmosphere by 2100 compared to reducing harvest (See Figure 1). For example, if the Bonn Challenge of restoring 350 Mha by 2030 is given to natural forests, they would store an additional 42 Pg C by 2100, whereas giving the same area to plantations would store only 1 Pg C [15,28].

The potential for additional carbon accumulation is also being degraded by current management practices [29]. It was estimated that the "current gross carbon sink in forests recovering from harvests and abandoned agriculture to be −4.4 GtC/y, globally" [30]. This is more than the current difference between anthropogenic emissions and land and ocean annual accumulation out of the atmosphere (3.4 GtC/y) [7].

Mature and old forests generally store more carbon in trees and soil than young forests, and continue to accumulate it over decades to centuries [15,16,25] making them the most effective forest-related climate mitigation strategy. For example, restricting harvest by half on federal forests and changing the harvest cycle to 80 years across Oregon would increase forest carbon stocks 118 Tg C by 2100 [15,16,25]. Converting mature and older forests to younger forests results in a significant loss of total carbon stores, even when wood products are considered [31,32]. For example, a comparison of carbon stored in an unharvested

most effective forest-related climate mitigation strategy. For example, restricting harvest by half on federal forests and changing the harvest cycle to 80 years across Oregon would increase forest carbon stocks 118 Tg C by 2100 [15,16,25]. Converting mature and older forests to younger forests results in a significant loss of total carbon stores, even when wood products are considered [31,32]. For example, a comparison of carbon stored in an unharvested versus harvested mature forest using the Forest-GHG life cycle assessment model to track harvested carbon from forest to landfill [31] shows that the unharvested forest has a much higher carbon density 120 years later, even when carbon in wood products is summed with the post-harvest carbon storage (Figure 2).

Tonnes of carbon stored in an unharvested forest versus a harvested forest with products
Harvested forest
Unharvested forest
Wood Products
Harvested + products
Mg C per hectare
0
50
100
150
200
250
300
2020
2040
2060
2080
2100
2120
2140
Year
C in the atmosphere
Even after 120 years, an unharvested forest stores 100 Mg more C than a harvested forest plus its products

**Figure 2.** A mature forest with a carbon density of 200 tons of carbon per hectare (green line) is harvested (blue line) in 2020. This results in an immediate reduction of live tree carbon stocks. Approximately half of the aboveground carbon is removed and taken to the mills (as wood) while the other half remains behind in slash piles (leaves, bark, branches, etc.) and in the dead belowground roots. The slash is burned on-site and the carbon is immediately emitted to the atmosphere. The roots decompose over the next few decades, emitting carbon to the atmosphere. The carbon taken to the mill as wood is processed into short- and long-term wood products (red line), that decay over years to centuries, eventually returning the carbon to the atmosphere.

Estimates comparing the carbon benefits of wood products to alternative materials have been found to overestimate the benefit by factors of between 2- and 100-fold by not counting the full life cycle carbon and the shorter durability of wood relative to alternative materials [33].

*2.2. Harvesting Forests for Bioenergy Production*

Utilizing wood biomass as a substitute for coal *increases* $CO_2$ emissions and *worsens* climate change for many decades or more [34]. Meeting U.S. national emissions reduction goals requires net emissions to drop by approximately 50% by 2030, reach net zero by 2050, and be net negative beyond 2100 [2,4].

Although wood and coal release comparable amounts of carbon dioxide per unit of primary energy [35], wood chips and pellets burn less efficiently. For example, a 500-megawatt power plant burning wood pellets emits an estimated 437,300 tons of $CO_2$-C annually, whereas the same plant burning coal would emit 392,000 tons/year [36]. The situation is worse if wood displaces other fossil fuels: wood releases about 25% more $CO_2$ per unit of primary energy than fuel oil, and about 75% more $CO_2$ than fossil (natural) gas [35]. Further, greenhouse gas emissions from the wood supply chain exceed those of the coal supply chain: Approximately 27% of harvested carbon equivalent is used to produce dry pellets [37], while coal processing adds just about 11% to emissions [38]. Therefore, the immediate impact of wood bioenergy is an increase in $CO_2$ emissions, creating a “carbon debt”, even when wood displaces coal, the most carbon intensive fossil fuel. The harvested forests can regrow, repaying the debt, but regrowth is uncertain and takes time.

*Regrowth takes time:* The time between the combustion of wood and the potential, *eventual* removal of that excess $CO_2$ by regrowth is known as the carbon debt payback time [39]. For forests in the eastern U.S., which supply much of the wood for pellet production and national and international export, carbon debt payback times range from many decades to a century or more, depending on forest age at harvest, species, and climate zone [38,40].

Carbon debt payback times are longer in the young forests prevalent in the U.S. because harvesting wood from growing forests also prevents the $CO_2$ removal that would have occurred had trees not been harvested and burned [41]. If a 40-year-old forest was harvested and burned, releasing its carbon immediately to the atmosphere, under ideal conditions, it would take another 40 years to remove the added carbon from the atmosphere and restore the initial carbon stocks in the regrown forest, known as "slow in, fast out" [42–44]. However, if not harvested, the same forests would have continued to accumulate significantly more carbon, thereby further reducing the amount in the atmosphere. Shorter rotation times between harvests for bioenergy leave the greatest amount of $CO_2$ in the atmosphere [40].

Forests of the southeastern and southcentral U.S. are the largest source of wood for commercial scale bioenergy, mostly for use in Europe. If allowed to continue growing (proforestation), they could remove significant additional atmospheric $CO_2$ and accumulate the additional carbon in trees and soils [22].

Note that wood bioenergy harvest worsens climate change even if the harvested forests are managed sustainably, because the average total stock of carbon on the land is lower than prior to harvest, and the carbon lost from the land is added to the atmosphere, worsening climate change [38,40]. Moreover, reforestation following harvest of a diverse bottomland hardwood forest that provided habitat for multiple animal species would, in most cases, be converted to a pine monoculture plantation.

*Eventual carbon neutrality* does not mean *climate neutrality*. The excess $CO_2$ from wood bioenergy worsens global warming immediately upon entering the atmosphere. The harms caused by that additional warming are not undone even if regrowth eventually removes all the excess $CO_2$. Global average surface temperatures will not immediately return to previous levels and may persist for a millennium or more [45]. The Greenland and Antarctic ice sheets melt faster, sea level rises higher, accelerated permafrost thaw releases more methane, wildfires become more likely, storms intensify more, and extinction is greater than if the forest had not been harvested and the wood had not been burned [45]. Recent simultaneous temperature spikes of tens of degrees Celsius in the Arctic and Antarctica demonstrate that unprecedented warming signals are already occurring, resulting in some changes, such as sea-level rise, that are irreversible for centuries to millennia [1]. Even eventual full forest recovery and carbon removal will not replace lost ice, lower sea level, undo climate disasters, or bring back communities lost to floods or wildfires.

### *2.3. Thinning to Reduce Fire Risk or Severity and Carbon Loss*

#### 2.3.1. Broad-Scale Thinning to Reduce Fire Severity Conflicts with Climate Goals

A reaction to the recent increase in the intensity and frequency of wildfires is to thin forests to reduce the quantity of combustible materials. However, the amount of carbon removed by thinning is much larger than the amount that might be saved from being burned in a fire, and far more area is harvested than would actually burn [42,46–49]. Most analyses of mid- to long-term thinning impacts on forest structure and carbon storage show there is a multi-decadal biomass carbon deficit following moderate to heavy thinning [50]. For example, thinning in a young ponderosa pine plantation showed that removal of 40% of the tree biomass would release about 60% of the carbon over the next 30 years [51]. Regional patchworks of intensive forest management have increased fire severity in adjacent forests [49]. Management actions can create more surface fuels. Broad-scale thinning (e.g., ecoregions, regions) to reduce fire risk or severity [52] results in more carbon emissions than fire, and creates a long-term carbon deficit that undermines climate goals.

**JA-0930**

PBWTAR_5293

As to the effectiveness and likelihood that thinning might have an impact on fire behavior, the area thinned at broad scales to reduce fuels has been found to have little relationship to area burned, which is mostly driven by wind, drought, and warming. A multi-year study of forest treatments such as thinning and prescribed fire across the western U.S. showed that about 1% of U.S. Forest Service treatments experience wildfire each year [53]. The potential effectiveness of treatments lasts only 10–20 years, diminishing annually [53]. Thus, the preemptive actions to reduce fire risk or severity across regions have been largely ineffective.

Effective risk reduction solutions need to be tailored to the specific conditions. In fire-prone dry forests, careful removal of fuel ladders such as saplings and leaving the large fire-resistant trees in the forest may be sufficient and would have lower carbon consequences than broad-scale thinning [54]. The goals of restoring ecosystem processes and/or reducing risk in fire-prone regions can be met by removing small trees and underburning to reduce surface fuels, not by removal of larger trees, which is sometimes done to offset the cost of the thinning. With continued warming and the need to adapt to wildfire, thinning may restore more frequent low-severity fire in some dry forests, but could jeopardize regeneration and trigger a regime change to non-forest ecosystems [53].

While moderate to high severity fire can kill trees, most of the carbon remains in the forest as dead wood that will take decades to centuries to decompose. Less than 10% of ecosystem carbon enters the atmosphere as carbon dioxide in PNW forest fires [21,46]. Recent field studies of combustion rates in California's large megafires show that carbon emissions were very low at the landscape-level (0.6 to 1.8%) because larger trees with low combustion rates were the majority of biomass, and high severity fire patches were less than half of the burn area [55,56]. These findings are consistent with field studies on Oregon's East Cascades wildfires and the large Biscuit Fire in southern Oregon [57,58].

To summarize, harvest-related emissions from thinning are much higher than potential reduction in fire emissions. In west coast states, overall harvest-related emissions were about 5 times fire emissions, and California's fire emissions were a few percent of its fossil fuel emissions [59]. In the conterminous 48 states, harvest-related emissions are 7.5 times those from all natural causes [60]. It is understandable that the public wants action to reduce wildfire threats, but false solutions that make the problem worse and increase global warming are counterproductive.

#### 2.3.2. Change Focus from Broadscale Thinning to the Home Ignition Zone

Over the past century, public agencies have been responsible for managing fire risk and protecting communities, however, their focus has been on suppression, fuel reduction, and prevention. Yet, of all the ignitions that crossed jurisdictional boundaries, more than 60% originated on private property and 28% in national forests [61]. These findings are in stark contrast to the common narrative that wildfires start on remote public land and then move into communities [62].

Hardening home structures in areas with high risk of wildfires such as the wildland-urban interface has been found to be the most effective means to reduce property damage from wildfires [63]. Many rural homes use propane tanks that explode from the intense heat. Safer energy options for homeowners would reduce the spread from house to house and the loss of the structures. Community safety experts and wildfire risk managers indicate that focus should be on addressing the home ignition zone by using fire-resistant designs, more intensive fuel reduction close to buildings, and preventing new developments in high fire-risk areas [64]. Incentives are misaligned because zoning and approval of building locations are functions of local governments, but responding to fires, and shouldering those costs, are the responsibility of state and federal agencies. Additionally, a large number of the most destructive fires have been ignited by poorly maintained powerlines [65]. Buried lines and better maintenance could reduce the frequency of wildfires.

2.3.3. Post-Fire Harvest versus Natural Regeneration

After fires, the remaining live and dead trees in the burn area and those on the periphery provide seed sources for natural regeneration [66]. Fires also provide ash which can act as a natural fertilizer, providing macro- and micronutrients for regrowth. Natural regeneration allows germination of genetic- and species-diverse seeds, and resprouting of shrubs that provide important habitat as forests recover. The diversity of early successional species also increases the resilience of the ecosystem to future disturbance, and accumulates additional carbon [67]. Natural and managed regeneration failures have occurred, particularly in dry regions [67–69], but here we are referring to the diversity of seed stock in natural regeneration compared to planting of less diverse seedling sources. Although there is enthusiasm about participating in reforestation, tree planting must be done carefully to ensure appropriate species selection for specific sites, whereas natural growth has more likelihood of re-establishing local biodiversity [67].

The complex early seral forest habitats that develop after high severity burns are important to a broad range of wildlife [70]. Post-fire harvest and felling of live and dead trees can harm soil integrity, hydrology, natural regeneration, slope stability, and wildlife habitat [71]. Large standing dead, live yet possibly dying, and downed trees help forests recover and provide habitat for more than 150 vertebrates in the PNW [72].

In burned watersheds, post-fire logging worsens conditions that have resulted from a century of human activity [73,74] and impedes the rate of recovery. In sum, post-fire treatments can cause a significant loss of ecosystem services [75].

## 3. Solutions

To mitigate climate change and avoid additional irreversible changes, we must reduce energy consumption through greater end-use efficiency gains and shift to carbon-free energy sources (e.g., solar and wind) [76], and simultaneously increase removal and accumulation of additional carbon from the atmosphere in forests, wetlands, and soils.

Global studies have identified areas for protection of intact forests that would stem biodiversity loss and prevent land conversion to other uses [77,78]. A recent study suggests assessment of ecosystem integrity represented by faunal intactness (no loss of species), habitat intactness, and functional intactness (no reduction in faunal densities below ecologically functional densities) [1]. However, global analyses can miss important local to regional ecological features that affect species and thus, the potential for protections. A global meta-analysis showed that most vulnerable bird species need large intact forests, although relatively small fragments can still have substantial biodiversity value if protected at the highest levels (IUCN categories I-VI) [79]. To address this issue, the International Union for Conservation of Nature (IUCN) developed a policy [80] for defining forests of conservation value:

"While primary forests of all extents have conservation value, areas of greater extent warrant particular attention where they persist, as they support more biodiversity, contain larger carbon stocks, provide more ecosystem services, encompass larger-scaled natural processes, and are more resilient to external stresses. The significance of large areas of primary forests has been highlighted by the global mapping of Intact Forest Landscapes (IFL) greater than 500 $km^2$ in extent. While suitable for many purposes, other thresholds may be more suitable at regional and national levels that reflect local ecological factors." (IUCN Policy Statement on Primary Forests, https://www.iucn.org/sites/dev/files/content/documents/iucn_pf-ifl_policy_2020_approved_version.pdf, accessed on 22 April 2020).

Much focus has been on protecting some notable primary forests [81] such as the Amazon, but that should not distract our attention from the need to retain significant intact forests within North America. There is more carbon stored in the world's temperate and boreal forests combined than in all remaining tropical forests [81]. There are ecosystems in many ecoregions that meet the conditions for protecting half of forestlands [82]. Bird populations are good indicators of ecosystem integrity. A net population decline of 2.9 billion birds in North America occurred between 1970 and 2017, of which forest- dependent

Much focus has been on protecting some notable primary forests [81] such as the Amazon, but that should not distract our attention from the need to retain significant intact forests within North America. There is more carbon stored in the world's temperate and boreal forests combined than in all remaining tropical forests [81]. There are ecosystems in many ecoregions that meet the conditions for protecting half of forestlands [82]. Bird populations are good indicators of ecosystem integrity. A net population decline of 2.9 billion birds in North America occurred between 1970 and 2017, of which forest- dependent species accounted for over one-third of the total, indicating a loss of insects and rapid recent degradation of forest ecosystem integrity [83,84].

Areas in the lower 48 states with high concentrations of imperiled forest- and non-forest species with small ranges in the west and east should be considered for protection (Figure 3) [85].

Range-size rarity for imperiled species
Low
High
Current protected areas

**Figure 3.** Summed range-size rarity of forest and non-forest species in the lower 48 states that are protected by the Endangered Species Act and/or considered to be in danger of extinction. Species include vertebrates (birds, mammals, amphibians, reptiles, freshwater fishes), freshwater invertebrates, pollinators, and vascular plants. High values (yellow) are areas where species with small ranges (and thus fewer places where they can be conserved) are likely to occur; the presence of multiple imperiled species contributes to higher scores. (Image produced by NatureServe; https://livingatlas.arcgis.com, accessed 21 April 2022).

Instead of regularly harvesting on all of the 70% of U.S. forest land designated as "timberlands" by the U.S. Forest Service, setting aside sufficient areas as Strategic Reserves would significantly increase the amount of carbon accumulated between now, 2050 and 2100, and reestablish greater ecosystem integrity, helping to slow climate change and restore biodiversity. The 2022 IPCC AR6 report stated that "Recent analyses, drawing on a range of lines of evidence, suggest that maintaining the resilience of biodiversity and ecosystem services at a global scale depends on effective and equitable conservation of approximately 30% to 50% of Earth's land, freshwater and ocean areas, including currently near-natural ecosystems (high confidence)." Continuing commercial timber harvest on a portion of the remaining public lands and tens of millions of hectares of private lands would continue to adequately supply a sustainable forestry sector.

Preserving and protecting mature and old forests would not only increase carbon stocks and growing carbon accumulation, they would slow and potentially reverse accelerating species loss and ecosystem deterioration, and provide greater resilience to increasingly severe weather events such as intense precipitation and flooding.

Domestic livestock grazing occurs on 85% of public lands in the western U.S. and is a significant source of greenhouse gas emissions (12.4 Tg $CO_2$ equivalents per year). Due to overgrazing, it was estimated to decrease aboveground biomass carbon by about 85% when converted from forests and woodlands to grass-dominated ecosystems [86]. Discontinuing or greatly reducing this practice would be an important climate mitigation strategy.

High carbon forests in the western U.S. are highly biodiverse ecosystems that store and provide water to millions of people and to major agricultural regions, and are more resilient to climate change [9]. The PNW and Alaska stand out as having the largest mature and old forests with immense carbon stores and high biodiversity that meet the IPCC criteria of meriting protection to remove significant additional carbon from the atmosphere. A majority of these areas are on public lands with the potential for permanent protection consistent with the highest international standards, and could be complemented with additional protections on private and indigenous lands [87]. These forests are critical for greater future carbon accumulation, and are an essential source of clean drinking water [9]. Forests dominate the drinking water supply in the U.S. that must be protected at the source [88,89]. For example, forests account for almost 60% of the most important areas for surface drinking water in the western U.S., yet only about 19% are protected at the highest levels. Other regions of the U.S. such as the southeast host some of the greatest biodiversity on the continent, and require protection for their forest carbon, biodiversity, and water.

Across the eleven western U.S. states, a framework was applied to prioritize protection of high carbon and biodiversity forest areas to meet the 30 × 30 and 50 × 50 preservation targets (Figure 4). Out of 92.5 Mha of forestland in the region, 14% is currently protected at the level equivalent to wilderness areas, IUCN classification Ia to II, and 5% is protected at IUCN classifications III to VI, which allows practices that degrade existing natural communities, such as road building and suppression of natural disturbances [90]. To achieve 30% protection of forest area by 2030, an additional 10 Mha would need to be protected at these levels. To meet the 50% target by 2050, an increase of 29 Mha is required. The analysis examined, removing from consideration, areas that are at high risk of mortality from wildfire or drought under future climate conditions (Figure 5) [91] to determine if there was sufficient qualifying area to protect. The prioritization used an ecoregion approach [82] to determine relative importance for protection of biodiversity and/or carbon within each ecoregion. Ecoregions are delineated based on similarity of a range of abiotic and biotic characteristics (topography, climate, soils, vegetation), e.g., EPA Level III [92]. Ecoregion-based conservation was evaluated in a range of habitats, and is recognized as a strong basis for the need to conserve about half of each region [82]. A similar framework could be applied in other regions, with additional data such as species endemism, if available.

*Land* **2022**, *11*, x FOR PEER REVIEW 11 of 16

High Vulnerability Forest Included
Forest Preservation Priority Areas
WA
MT
OR
ID
NV
UT
WY
CO
CA
AZ
NM
45°N
40°N
35°N
30°N
120°W
110°W
0 250 500 km
Forest extent
Preserved forest
Additional forest needed to reach:
30% preservation
50% preservation

**Figure 4.** Forestlands that are currently preserved, and additional areas identified as high priority for protection of biodiversity and forest carbon for climate mitigation across the western U.S. Adapted from [5].

**Figure 4.** Forestlands that are currently preserved, and additional areas identified as high priority for protection of biodiversity and forest carbon for climate mitigation across the western U.S. Adapted from [5].

Drought or Fire
WA
MT
Forest Vulnerability
high

JA-0934

PBWTAR_5297

120°W
110°W
Forest extent
Preserved forest
Additional forest needed to reach:
30% preservation
50% preservation

**Figure 4.** Forestlands that are currently preserved, and additional areas identified as higl for protection of biodiversity and forest carbon for climate mitigation across the wes Adapted from [5].

Drought or Fire
WA
MT
OR
ID
UT
WY
CO
NV
CA
AZ
NM
120°W
110°W
Forest vulnerability
high
medium - high
medium
medium - low
low
uncertain (fire only)
N
0
500
1,000
km

**Figure 5.** Vulnerability of forestlands to either drought or fire under future climate scenarios to year 2050. Adapted from [83].

The strategic reserves defined within each ecoregion would protect carbon, water, and biodiversity, and recognize the value of forested landscapes that are diverse in structure and function. Across the climate gradient from mesic to drier ecoregions, impacted by wildfire, but they are still important to protect their biod species to persist (e.g., in refugia), migrate, and reorganize with a changing climate. An example is the Klamath Mountains ecoregion in Oregon and California, which has high biodiversity partly because of its unique geology. It is one of the top four temperate coniferous forests in species richness globally. Its vulnerability to forest fires should not disqualify it from protecting the rich diversity of plant and animal species from human degradation [70].

## 4. Conclusions

Maintaining forest ecosystem integrity is "*fundamental*" *to resilient development and climate mitigation and adaptation*. Current extractive management practices on all forests designated as "timberlands" are inconsistent with slowing, and eventually achieve lower "atmospheric concentrations of greenhouse gases that will avoid dangerous anthropogenic interference with the climate system" [93]. Many of the existing forest management practices allegedly protect forests and homes from wildfire and are having severe adverse effects on forest ecosystem integrity and resilience, and are worsening climate change and diminishing biodiversity. Forest bioenergy adds significantly more $CO_2$ to the atmosphere than fossil fuels. Its use is based upon a mistaken assumption that it is necessary to shift to renewable energy than to reduce heat-trapping gas emissions such as carbon dioxide, rather than to reduce emissions from all sources including forest bioenergy for electricity.

Climate change mitigation and biodiversity protection is an essential component of forest management decision-making. To avoid dangerous anthropogenic interference with the climate system, provide water security, and stem biodiversity losses, permanent Strategic Climate and Biodiversity Reserves need to be established quickly, and their integrity monitored and maintained.

**Author Contributions:** Investigation, B.E.L., W.R.M., T.W.H., W.H.S., and J.D.S.; writing—original draft preparation, B.E.L., W.R.M., T.W.H., W.H.S., and J.D.S.; writing—review and editing, B.E.L., W.R.M., T.W.H., W.H.S., J.D.S., and G.M.W. All authors have read and agreed to the published version of the manuscript.

**Funding:** T.H. was funded by NSF DEB-1553049; B.L. was funded by OSU Agricultural Research Foundation; W.M. was funded by Rockefeller Brothers Fund.

**Data Availability Statement:** Not applicable.

**Conflicts of Interest:** The authors declare no conflict of interest.

## References

1. IPCC. Summary for Policymakers. In *Climate Change 2022: Impacts, Adaptation, and Vulnerability. Contribution of Working Group II to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change*; Pörtner, H.-O., Roberts, D.C., Poloczanska, E.S., Mintenbeck, K., Tignor, M., Alegría, A., Craig, M., Langsdorf, S., Löschke, S., Möller, V., et al., Eds.; Cambridge University Press: Cambridge, UK, 2022.
2. IPCC. Summar for Policymakers. In *Climate Change 2021: The Physical Science Basis. Contribution of Working Group I to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change*; Cambridge University Press: Cambridge, UK, 2021.
3. Trisos, C.H.; Merow, C.; Pigot, A.L. The projected timing of abrupt ecological disruption from climate change. *Nature* **2020**, *580*, 496–501. [CrossRef] [PubMed]
4. IPCC. Summary for Policymakers. In *Global Warming of 1.5 °C*; World Meteorological Organization: Geneva, Switzerland, 2018.
5. Liu, P.R.; Raftery, A.E. Country-based rate of emissions reductions should increase by 80% beyond nationally determined contributions to meet the 2 C target. *Commun. Earth Environ.* **2021**, *2*, 1–10. [CrossRef] [PubMed]
6. Pan, Y.; Birdsey, R.A.; Phillips, O.L.; Jackson, R.B. The structure, distribution, and biomass of the world's forests. *Annu. Rev. Ecol. Evol. Syst.* **2013**, *44*, 593–622. [CrossRef]
7. Friedlingstein, P.; Jones, M.W.; O'Sullivan, M.; Andrew, R.M.; Bakker, D.C.E.; Hauck, J.; Le Quéré, C.; Peters, G.P.; Peters, W.; Pongratz, J.; et al. Global Carbon Budget 2021. *Earth Syst. Sci. Data Discuss.* **2021**, *2021*, 1917–2005. [CrossRef]
8. Pandit, R.; Pörtner, H.-O.; Scholes, R.J.; Agard, J.; Archer, E.; Arneth, A.; Bai, X.; Barnes, D.; Burrows, M.; Chan, L. Scientific Outcome of the IPBES-IPCC Co-Sponsored Workshop on Biodiversity and Climate Change. 2021. Available online: https://zenodo.org/record/5101133#.YnqZFYfMLb0 (accessed on 20 April 2022).
9. Law, B.E.; Berner, L.T.; Buotte, P.C.; Mildrexler, D.J.; Ripple, W.J. Strategic Forest Reserves can protect biodiversity in the western United States and mitigate climate change. *Commun. Earth Environ.* **2021**, *2*, 254. [CrossRef]
10. Buotte, P.C.; Law, B.E.; Ripple, W.J.; Berner, L.T. Carbon sequestration and biodiversity co-benefits of preserving forests in the western United States. *Ecol. Appl.* **2020**, *30*, e02039. [CrossRef]
11. Oswalt, S.N.; Smith, W.B.; Miles, P.D.; Pugh, S.A. *Forest Resources of the United States, 2017: A Technical Document Supporting the Forest Service 2020 RPA Assessment*; Gen. Tech. Rep. WO-97; US Department of Agriculture, Forest Service, Washington Office: Washington, DC, USA, 2019; Volume 97.
12. FAO. *Global Forest Resources Assessment 2020–Key Findings*; FAO: Rome, Italy, 2020. [CrossRef]
13. Novick, K.A.; Katul, G.G. The Duality of Reforestation Impacts on Surface and Air Temperature. *J. Geophys. Res. Biogeosci.* **2020**, *125*, e2019JG005543. [CrossRef]
14. Lawrence, D.; Coe, M.; Walker, W.S.; Verchot, L.; Vandecar, K.L. The unseen effects of deforestation: Biophysical effects on climate. *Front. For. Glob. Change* **2022**, *5*, 756115. [CrossRef]
15. Law, B.E.; Hudiburg, T.W.; Berner, L.T.; Kent, J.J.; Buotte, P.C.; Harmon, M.E. Land use strategies to mitigate climate change in carbon dense temperate forests. *Proc. Natl. Acad. Sci. USA* **2018**, *115*, 3663–3668. [CrossRef]
16. Hudiburg, T.; Law, B.; Turner, D.P.; Campbell, J.; Donato, D.; Duane, M. Carbon dynamics of Oregon and Northern California forests and potential land-based carbon storage. *Ecol. Appl.* **2009**, *19*, 163–180. [CrossRef]
17. Vynne, C.; Dovichin, E.; Fresco, N.; Dawson, N.; Joshi, A.; Law, B.E.; Lertzman, K.; Rupp, S.; Schmiegelow, F.; Trammell, E.J. The importance of Alaska for climate stabilization, resilience, and biodiversity conservation. *Front. For. Glob. Change* **2021**, *121*. [CrossRef]
18. US Congress. Multiple Use-Sustained Yield Act. 1. PL 86-517; 74 Stat 1960, 215. Available online: https://www.fs.fed.us/emc/nfma/includes/musya60.pdf (accessed on 20 April 2022).
19. 94th US Congress. Federal Land Management and Policy ACT OF 1976. PL 94–579. Available online: https://www.govinfo.gov/content/pkg/STATUTE-90/pdf/STATUTE-90-Pg2743.pdf#page=1 (accessed on 20 April 2022).
20. Riddle, A.A. *Timber Harvesting on Federal Lands*; Congressional Research Service, R45688. Available online: https://crsreports.congress.gov/product/pdf/R/R45688 (accessed on 20 April 2022).
21. Law, B.E.; Waring, R.H. Carbon implications of current and future effects of drought, fire and management on Pacific Northwest forests. *For. Ecol. Manag.* **2015**, *355*, 4–14. [CrossRef]
22. Moomaw, W.R.; Masino, S.A.; Faison, E.K. Intact Forests in the United States: Proforestation Mitigates Climate Change and Serves the Greatest Good. *Front. For. Glob. Change* **2019**, *2*, 27. [CrossRef]
23. National Academies of Sciences, Engineering, and Medicine. Negative Emissions Technologies and Reliable Sequestration: A Research Agenda. 2018. Available online: https://nap.nationalacademies.org/read/25259/chapter/1 (accessed on 15 April 2022).
24. Lutz, J.A.; Furniss, T.J.; Johnson, D.J.; Davies, S.J.; Allen, D.; Alonso, A.; Anderson-Teixeira, K.J.; Andrade, A.; Baltzer, J.; Becker, K.M.L.; et al. Global importance of large-diameter trees. *Glob. Ecol. Biogeogr.* **2018**, *27*, 849–864. [CrossRef]

25. Mildrexler, D.J.; Berner, L.T.; Law, B.E.; Birdsey, R.A.; Moomaw, W.R. Large Trees Dominate Carbon Storage in Forests East of the Cascade Crest in the United States Pacific Northwest. *Front. For. Glob. Change* **2020**, *3*, 17. [CrossRef]
26. Luyssaert, S.; Schulze, E.D.; Borner, A.; Knohl, A.; Hessenmoller, D.; Law, B.E.; Ciais, P.; Grace, J. Old-growth forests as global carbon sinks. *Nature* **2008**, *455*, 213–215. [CrossRef]
27. Erb, K.-H.; Kastner, T.; Plutzar, C.; Bais, A.L.S.; Carvalhais, N.; Fetzel, T.; Gingrich, S.; Haberl, H.; Lauk, C.; Niedertscheider, M. Unexpectedly large impact of forest management and grazing on global vegetation biomass. *Nature* **2018**, *553*, 73–76. [CrossRef]
28. Lewis, S.L.; Wheeler, C.E.; Mitchard, E.T.; Koch, A. Regenerate natural forests to store carbon. *Nature* **2019**, *568*, 25–28. [CrossRef]
29. Watson, J.E.; Evans, T.; Venter, O.; Williams, B.; Tulloch, A.; Stewart, C.; Thompson, I.; Ray, J.C.; Murray, K.; Salazar, A. The exceptional value of intact forest ecosystems. *Nat. Ecol. Evol.* **2018**, *2*, 599–610. [CrossRef]
30. Houghton, R.A.; Nassikas, A.A. Negative emissions from stopping deforestation and forest degradation, globally. *Glob. Change Biol.* **2018**, *24*, 350–359. [CrossRef]
31. Hudiburg, T.W.; Law, B.E.; Moomaw, W.R.; Harmon, M.E.; Stenzel, J.E. Meeting GHG reduction targets requires accounting for all forest sector emissions. *Environ. Res. Lett.* **2019**, *14*, 095005. [CrossRef]
32. Harmon, M.E.; Marks, B. Effects of silvicultural practices on carbon stores in Douglas-fir western hemlock forests in the Pacific Northwest, USA: Results from a simulation model. *Can. J. For. Res.* **2002**, *32*, 863–877. [CrossRef]
33. Harmon, M.E. Have product substitution carbon benefits been overestimated? A sensitivity analysis of key assumptions. *Environ. Res. Lett.* **2019**, *14*, 065008.
34. Searchinger, T.D.; Beringer, T.; Holtsmark, B.; Kammen, D.M.; Lambin, E.F.; Lucht, W.; Raven, P.; van Ypersele, J.-P. Europe's renewable energy directive poised to harm global forests. *Nat. Commun.* **2018**, *9*, 3741. [CrossRef] [PubMed]
35. EPA. Emissions Factors for Greenhouse Gas Inventories. Available online: https://www.epa.gov/sites/default/files/2018-03/documents/emission-factors_mar_2018_0.pdf (accessed on 23 February 2022).
36. EPA. *Compilation of Air Pollutant Emission Factors, AP-42*; US Environemental Protection Agency: Washington, DC, USA, 1997.
37. Röder, M.; Whittaker, C.; Thornley, P. How certain are greenhouse gas reductions from bioenergy? Life cycle assessment and uncertainty analysis of wood pellet-to-electricity supply chains from forest residues. *Biomass Bioenerg.* **2015**, *79*, 50–63. [CrossRef]
38. Sterman, J.D.; Lori, S.; Juliette, N.R.-V. Does replacing coal with wood lower $CO_2$ emissions? Dynamic lifecycle analysis of wood bioenergy. *Environ. Res. Lett.* **2018**, *13*, 015007.
39. Mitchell, S.R.; Harmon, M.E.; O'Connell, K.E.B. Carbon debt and carbon sequestration parity in forest bioenergy production. *GCB Bioenergy* **2012**, *4*, 818–827. [CrossRef]
40. Sterman, J.D.; Siegel, L.; Rooney-Varga, J.N. Reply to comment on 'Does replacing coal with wood lower $CO_2$ emissions? Dynamic lifecycle analysis of wood bioenergy'. *Environ. Res. Lett.* **2018**, *13*, 128003. [CrossRef]
41. Obermeier, W.A.; Nabel, J.E.; Loughran, T.; Hartung, K.; Bastos, A.; Havermann, F.; Anthoni, P.; Arneth, A.; Goll, D.S.; Lienert, S. Modelled land use and land cover change emissions—A spatio-temporal comparison of different approaches. *Earth Syst. Dyn.* **2021**, *12*, 635–670. [CrossRef]
42. Hudiburg, T.W.; Law, B.E.; Wirth, C.; Luyssaert, S. Regional carbon dioxide implications of forest bioenergy production. *Nat. Clim. Change* **2011**, *1*, 419–423. [CrossRef]
43. Schlesinger, W.H. Are wood pellets a green fuel? *Science* **2018**, *359*, 1328–1329. [CrossRef] [PubMed]
44. Körner, C. Slow in, Rapid out–Carbon Flux Studies and Kyoto Targets. *Science* **2003**, *300*, 1242–1243. [CrossRef] [PubMed]
45. Solomon, S.; Plattner, G.-K.; Knutti, R.; Friedlingstein, P. Irreversible climate change due to carbon dioxide emissions. *Proc. Natl. Acad. Sci. USA* **2009**, *106*, 1704–1709. [CrossRef] [PubMed]
46. Campbell, J.L.; Harmon, M.E.; Mitchell, S.R. Can fuel-reduction treatments really increase forest carbon storage in the western US by reducing future fire emissions? *Front. Ecol. Environ.* **2012**, *10*, 83–90. [CrossRef]
47. Mitchell, S.R.; Harmon, M.E.; O'Connel, K.E.B. Forest fuel reduction alters fire severity and long-term carbon storage in three Pacific Northwest ecosystems. *Ecol. Appl.* **2009**, *19*, 643–655. [CrossRef]
48. Rhodes, J.J.; Baker, W.L. Fire probability, fuel treatment effectiveness and ecological tradeoffs in western US public forests. *Open For. Sci. J.* **2008**, *1*, 1–7.
49. Hudiburg, T.W.; Luyssaert, S.; Thornton, P.E.; Law, B.E. Interactive Effects of Environmental Change and Management Strategies on Regional Forest Carbon Emissions. *Environ. Sci. Technol.* **2013**, *47*, 13132–13140. [CrossRef]
50. Zhou, D.; Zhao, S.; Liu, S.; Oeding, J. A meta-analysis on the impacts of partial cutting on forest structure and carbon storage. *Biogeosciences* **2013**, *10*, 3691–3703. [CrossRef]
51. Stenzel, J.; Berardi, D.; Walsh, E.; Hudiburg, T. Restoration Thinning in a Drought-Prone Idaho Forest Creates a Persistent Carbon Deficit. *J. Geophys. Res. Biogeosciences* **2021**, *126*, e2020JG005815. [CrossRef]
52. Zald, H.S.; Dunn, C.J. Severe fire weather and intensive forest management increase fire severity in a multi-ownership landscape. *Ecol. Appl.* **2018**, *28*, 1068–1080. [CrossRef]
53. Schoennagel, T.; Balch, J.K.; Brenkert-Smith, H.; Dennison, P.E.; Harvey, B.J.; Krawchuk, M.A.; Mietkiewicz, N.; Morgan, P.; Moritz, M.A.; Rasker, R.; et al. Adapt to more wildfire in western North American forests as climate changes. *Proc. Natl. Acad. Sci. USA* **2017**, *114*, 4582–4590. [CrossRef] [PubMed]
54. Hurteau, M.D.; North, M.P.; Koch, G.W.; Hungate, B.A. Opinion: Managing for disturbance stabilizes forest carbon. *Proc. Natl. Acad. Sci. USA* **2019**, *116*, 10193–10195. [CrossRef] [PubMed]

55. Stenzel, J.E.; Bartowitz, K.J.; Hartman, M.D.; Lutz, J.A.; Kolden, C.A.; Smith, A.M.S.; Law, B.E.; Swanson, M.E.; Larson, A.J.; Parton, W.J.; et al. Fixing a snag in carbon emissions estimates from wildfires. *Glob. Change Biol.* **2019**, *25*, 3985–3994. [CrossRef] [PubMed]
56. Harmon, M.E.; Hanson, C.T.; DellaSala, D.A. Combustion of Aboveground Wood from Live Trees in Megafires, CA, USA. *Forests* **2022**, *13*, 391. [CrossRef]
57. Meigs, G.; Donato, D.; Campbell, J.; Martin, J.; Law, B. Forest fire impacts on carbon uptake, storage, and emission: The role of burn severity in the Eastern Cascades, Oregon. *Ecosystems* **2009**, *12*, 1246–1267. [CrossRef]
58. Campbell, J.; Donato, D.; Azuma, D.; Law, B. Pyrogenic carbon emission from a large wildfire in Oregon, United States. *J. Geophys. Res. Biogeosciences* **2007**, *112*, G04014. [CrossRef]
59. Bartowitz, K.J.; Walsh, E.S.; Stenzel, J.E.; Kolden, C.A.; Hudiburg, T.W. Forest carbon emission sources arenot equal: Putting fire, harvest, and fossil fuel emissions in context. *Front. For. Glob. Change* **2022**, *5*, 867112. [CrossRef]
60. Harris, N.L.; Hagen, S.C.; Saatchi, S.S.; Pearson, T.R.H.; Woodall, C.W.; Domke, G.M.; Braswell, B.H.; Walters, B.F.; Brown, S.; Salas, W.; et al. Attribution of net carbon change by disturbance type across forest lands of the conterminous United States. *Carbon Balance Manag.* **2016**, *11*, 24. [CrossRef]
61. Downing, W.M.; Dunn, C.J.; Thompson, M.P.; Caggiano, M.D.; Short, K.C. Human ignitions on private lands drive USFS cross-boundary wildfire transmission and community impacts in the western US. *Sci. Rep.* **2022**, *12*, 1–14. [CrossRef]
62. Ager, A.A.; Palaiologou, P.; Evers, C.R.; Day, M.A.; Ringo, C.; Short, K. Wildfire exposure to the wildland urban interface in the western US. *Appl. Geogr.* **2019**, *111*, 102059. [CrossRef]
63. Smith, A.M.; Kolden, C.A.; Paveglio, T.B.; Cochrane, M.A.; Bowman, D.M.; Moritz, M.A.; Kliskey, A.D.; Alessa, L.; Hudak, A.T.; Hoffman, C.M. The science of firescapes: Achieving fire-resilient communities. *Bioscience* **2016**, *66*, 130–146. [CrossRef] [PubMed]
64. Syphard, A.D.; Rustigian-Romsos, H.; Mann, M.; Conlisk, E.; Moritz, M.A.; Ackerly, D. The relative influence of climate and housing development on current and projected future fire patterns and structure loss across three California landscapes. *Glob. Environ. Change* **2019**, *56*, 41–55. [CrossRef]
65. Keeley, J.E.; Syphard, A.D. Twenty-first century California, USA, wildfires: Fuel-dominated vs. wind-dominated fires. *Fire Ecol.* **2019**, *15*, 24. [CrossRef]
66. Donato, D.C.; Fontaine, J.B.; Campbell, J.L.; Robinson, W.D.; Kauffman, J.B.; Law, B.E. Conifer regeneration in stand-replacement portions of a large mixed-severity wildfire in the Klamath–Siskiyou Mountains. *Can. J. For. Res.* **2009**, *39*, 823–838. [CrossRef]
67. Cook-Patton, S.C.; Leavitt, S.M.; Gibbs, D.; Harris, N.L.; Lister, K.; Anderson-Teixeira, K.J.; Briggs, R.D.; Chazdon, R.L.; Crowther, T.W.; Ellis, P.W.; et al. Mapping carbon accumulation potential from global natural forest regrowth. *Nature* **2020**, *585*, 545–550. [CrossRef]
68. Stevens-Rumann, C.S.; Kemp, K.B.; Higuera, P.E.; Harvey, B.J.; Rother, M.T.; Donato, D.C.; Morgan, P.; Veblen, T.T. Evidence for declining forest resilience to wildfires under climate change. *Ecol. Lett.* **2018**, *21*, 243–252. [CrossRef]
69. Davis, K.T.; Dobrowski, S.Z.; Higuera, P.E.; Holden, Z.A.; Veblen, T.T.; Rother, M.T.; Parks, S.A.; Sala, A.; Maneta, M.P. Wildfires and climate change push low-elevation forests across a critical climate threshold for tree regeneration. *Proc. Natl. Acad. Sci. USA* **2019**, *116*, 6193–6198. [CrossRef]
70. Fontaine, J.B.; Donato, D.C.; Robinson, W.D.; Law, B.E.; Kauffman, J.B. Bird communities following high-severity fire: Response to single and repeat fires in a mixed-evergreen forest, Oregon, USA. *For. Ecol. Manag.* **2009**, *257*, 1496–1504. [CrossRef]
71. Beschta, R.L.; Frissell, C.A.; Gresswell, R.; Hauer, R.; Karr, J.R.; Minshall, G.W.; Perry, D.A.; Rhodes, J.J. *Wildfire and Salvage Logging: Recommendations for Ecologically Sound Post-Fire Salvage Management And Other Post-Fire Treatments on Federal Lands in the West*; Oregon State University: Corvallis, OR, USA, 1995.
72. Rose, C.L.; Marcot, B.G.; Mellen, T.K.; Ohmann, J.L.; Waddell, K.L.; Lindley, D.L.; Schreiber, B. Decaying wood in Pacific Northwest forests: Concepts and tools for habitat management. In *Wildlife-Habitat Relationships in Oregon and Washington*; Oregon State University Press: Corvallis, OR, USA, 2001; pp. 580–623.
73. Thorn, S.; Bässler, C.; Brandl, R.; Burton, P.J.; Cahall, R.; Campbell, J.L.; Castro, J.; Choi, C.-Y.; Cobb, T.; Donato, D.C.; et al. Impacts of salvage logging on biodiversity: A meta-analysis. *J. Appl. Ecol.* **2018**, *55*, 279–289. [CrossRef]
74. Karr, J.R.; Rhodes, J.J.; Minshall, G.W.; Hauer, F.R.; Beschta, R.L.; Frissell, C.A.; Perry, D.A. The Effects of Postfire Salvage Logging on Aquatic Ecosystems in the American West. *BioScience* **2004**, *54*, 1029–1033. [CrossRef]
75. Beschta, R.L.; Rhodes, J.J.; Kauffman, J.B.; Gresswell, R.E.; Minshall, G.W.; Karr, J.R.; Perry, D.A.; Hauer, F.R.; Frissell, C.A. Postfire Management on Forested Public Lands of the Western United States. *Conserv. Biol.* **2004**, *18*, 957–967. [CrossRef]
76. Pehl, M.; Arvesen, A.; Humpenöder, F.; Popp, A.; Hertwich, E.G.; Luderer, G. Understanding future emissions from low-carbon power systems by integration of life-cycle assessment and integrated energy modelling. *Nat. Energy* **2017**, *2*, 939–945. [CrossRef]
77. Elsen, P.R.; Monahan, W.B.; Dougherty, E.R.; Merenlender, A.M. Keeping pace with climate change in global terrestrial protected areas. *Sci. Adv.* **2020**, *6*, eaay0814. [CrossRef] [PubMed]
78. Dinerstein, E.; Joshi, A.; Vynne, C.; Lee, A.; Pharand-Deschênes, F.; França, M.; Fernando, S.; Birch, T.; Burkart, K.; Asner, G. A "Global Safety Net" to reverse biodiversity loss and stabilize Earth's climate. *Sci. Adv.* **2020**, *6*, eabb2824. [CrossRef]
79. Timmers, R.; van Kuijk, M.; Verweij, P.A.; Ghazoul, J.; Hautier, Y.; Laurance, W.F.; Arriaga-Weiss, S.L.; Askins, R.A.; Battisti, C.; Berg, Å. Conservation of birds in fragmented landscapes requires protected areas. *Front. Ecol. Environ.* **2022**. [CrossRef]
80. IUCN. The IUCN Red List of Threatened Species. 2020. Available online: https://www.iucnredlist.org/ (accessed on 20 April 2022).

81. Mackey, B.; Kormos, C.F.; Keith, H.; Moomaw, W.R.; Houghton, R.A.; Mittermeier, R.A.; Hole, D.; Hugh, S. Understanding the importance of primary tropical forest protection as a mitigation strategy. *Mitig. Adapt. Strateg. Glob. Change* **2020**, *25*, 763–787. [CrossRef]
82. Dinerstein, E.; Olson, D.; Joshi, A.; Vynne, C.; Burgess, N.D.; Wikramanayake, E.; Hahn, N.; Palminteri, S.; Hedao, P.; Noss, R.; et al. An Ecoregion-Based Approach to Protecting Half the Terrestrial Realm. *BioScience* **2017**, *67*, 534–545. [CrossRef]
83. Rosenberg, K.V.; Dokter, A.M.; Blancher, P.J.; Sauer, J.R.; Smith, A.C.; Smith, P.A.; Stanton, J.C.; Panjabi, A.; Helft, L.; Parr, M. Decline of the North American avifauna. *Science* **2019**, *366*, 120–124. [CrossRef]
84. Wagner, D.L.; Grames, E.M.; Forister, M.L.; Berenbaum, M.R.; Stopak, D. Insect decline in the Anthropocene: Death by a thousand cuts. *Proc. Natl. Acad. Sci. USA* **2021**, *118*, e2023989118. [CrossRef]
85. Hamilton, H.; Smyth, R.L.; Young, B.E.; Howard, T.G.; Tracey, C.; Breyer, S.; Cameron, D.R.; Chazal, A.; Conley, A.K.; Frye, C.; et al. Increasing taxonomic diversity and spatial resolution clarifies opportunities for protecting US imperiled species. *Ecol. Appl.* **2022**, *32*, e2534. [CrossRef]
86. Kauffman, J.B.; Beschta, R.L.; Lacy, P.M.; Liverman, M. Livestock Use on Public Lands in the Western USA Exacerbates Climate Change: Implications for Climate Change Mitigation and Adaptation. *Environ. Manag.* **2022**, *69*, 1137–1152. [CrossRef] [PubMed]
87. Fa, J.E.; Watson, J.E.; Leiper, I.; Potapov, P.; Evans, T.D.; Burgess, N.D.; Molnár, Z.; Fernández-Llamazares, Á.; Duncan, T.; Wang, S. Importance of Indigenous Peoples' lands for the conservation of Intact Forest Landscapes. *Front. Ecol. Environ.* **2020**, *18*, 135–140. [CrossRef]
88. Liu, N.; Caldwell, P.V.; Dobbs, G.R.; Miniat, C.F.; Bolstad, P.V.; Nelson, S.A.; Sun, G. Forested lands dominate drinking water supply in the conterminous United States. *Environ. Res. Lett.* **2021**, *16*, 084008. [CrossRef]
89. USDA. Forests to Faucets 2.0 [Spatial Data Set]. 2019. Available online: https://usfs-public.app.box.com/v/Forests2Faucets (accessed on 5 April 2022).
90. USGS. Protected Areas Database of the United States (PAD-US) 2.1: U.S. Geological Survey Data Release. 2020. Available online: https://www.sciencebase.gov/catalog/item/5f186a2082cef313ed843257 (accessed on 30 March 2022).
91. Cook, B.; Mankin, J.; Marvel, K.; Williams, A.; Smerdon, J.; Anchukaitis, K. Twenty-first century drought projections in the CMIP6 forcing scenarios. *Earth's Future* **2020**, *8*, e2019EF001461. [CrossRef]
92. Omernik, J.M.; Griffith, G.E. Ecoregions of the conterminous United States: Evolution of a hierarchical spatial framework. *Environ. Manag.* **2014**, *54*, 1249–1266. [CrossRef]
93. UNFCCC. *MLA*, 7th ed.; United Nations Framework Convention on Climate Change; General Assembly: New York, NY, USA, 1992.

# Older eastern white pine trees and stands sequester carbon for many decades and maximize cumulative carbon

Robert T. Leverett[1], Susan A. Masino[2], William R. Moomaw[3,*]

[1]American Forests National Champion Tree Program, Washington, DC, USA; Native Tree Society (www.nativetreesociety.org); Friends of Mohawk Trail State Forest, Florence, MA, USA

[2]Trinity College, Hartford, CT; Harvard Forest (2018-2019), Petersham, MA, USA

[3]The Fletcher School and Global Development and Environment Institute, Tufts University, Medford, MA, USA; Woodwell Climate Research Center, Falmouth MA USA

**Correspondence:**
William R. Moomaw, Ph.D.
William.moomaw@tufts.edu

In review

## Abstract

Pre-settlement New England was heavily forested with trees exceeding 2 m in diameter. The forests have regrown since farm abandonment representing what is arguably the most successful regional reforestation on record and identified recently in the "Global Safety Net." Temperate "old-growth" forest and remnant stands demonstrate that native tree species can live several hundred years and continue to add to forest biomass and structural and ecological complexity. Forests globally are an essential natural climate solution that accumulate carbon and reduce annual increases in atmospheric $CO_2$ by approximately 30%. Some studies emphasize young, fast-growing trees and forests while others highlight carbon storage and accumulation in old trees and intact forests. We addressed this directly within New England with long-term, accurate field measurements and volume modeling of individual trees and two stands of eastern white pines (*Pinaceae*: *Pinus strobus*) and compared our results to models developed by the U.S. Forest Service. Within this sample and species, our major findings complement and clarify previous findings and are three-fold: 1) beyond 80 years, an intact eastern white pine forest can accumulate carbon above-ground in living trees at a high rate and double the carbon stored in this compartment in subsequent years; 2) large trees dominate above-ground carbon and can continue to accumulate carbon; 3) productive stands can continue to sequester high amounts of carbon in live trees for well over 150 years. Because the next decades are critical in addressing the climate crisis, and most New England forests are less than 100 years old, a major implication of this work is that maintaining and accumulating carbon in some existing forests – proforestation – is a powerful regional climate solution. Furthermore, older and old-growth trees and forests are rare, complex, highly dynamic and biodiverse: dedication of some forests to proforestation will produce large carbon-dense trees and also protect ecosystem integrity, special habitats, and native biodiversity long-term. In sum, strategic policies to grow and protect suitable existing forests in New England will optimize a proven, low cost, natural climate solution that also protects and restores biodiversity across the landscape.

**Keywords:** carbon accumulation, proforestation, chronosequence, tree volume measurements, old-growth forest, ecological integrity, ecological resilience

**Running title:** Carbon in eastern white pines and stands

## Introduction

A global priority for the climate has long been reducing ongoing emissions of heat-trapping greenhouse gases (GHGs) produced by burning carbon-based fuels. While this is essential, it is not sufficient for halting the rise in global temperatures. It is necessary to also simultaneously increase carbon dioxide ($CO_2$) removal (CDR) and keep carbon stored within natural systems. Clearing and harvesting forests, draining and developing wetlands, and degrading soils account for one-third of all the $CO_2$ added to the atmosphere by humans since the beginning of the industrial revolution (Simmons and Matthews, 2016). Together, these ongoing actions continue to add approximately 1.6 PgC/year (1 Pg equals 1 Gt or $10^{15}$ grams or 1 billion metric tonnes; Friedlingstein et al., 2020). Burning wood for heat and electricity adds additional $CO_2$, and current forest management practices limit the potential of this natural solution to accumulate carbon above and below ground and keep it out of the atmosphere (Sterman et al., 2018).

Two recent Intergovernmental Panel on Climate Change (IPCC) reports identify the urgent and unprecedented imperative to simultaneously and rapidly reduce Carbon Dioxide Emissions and achieve additional Carbon Dioxide Removal (CDR) from the atmosphere (IPCC, 2018; 2019). These reports identify forests as playing a major role in accumulating carbon out of the atmosphere. However, for CDR the focus is primarily on afforestation (planting new forests) and reforestation (regrowing forests) and ignores the more rapid climate mitigation and adaptation benefits of additional growth by existing forests, termed "proforestation" (Moomaw et al., 2019).

In review

Even achieving the goal of "zero net carbon" will only "probably" limit global average temperatures to 1.5°C (IPCC, 2018) above the pre-industrial global temperature and a significant increase above the current level (1.1°C). This additional temperature increase will result in greater disruption to the climate system and will accelerate ecological decline. To avoid ever-more serious consequences of a changed climate, the goal must be to become net carbon *negative* as soon as possible. Growing suitable existing forests is an effective and low cost means for reducing the atmospheric stock of carbon as others have noted (Fargione et al., 2018; Hudiburg et al., 2019; Moomaw et al., 2019; Mildrexler et al., 2020) and will be demonstrated by the findings reported in this paper. Natural regeneration of forests has recently been found to accumulate more carbon in the first 30 years than managed reforestation (Cook-Patton et al., 2020).

A second and perhaps even more urgent priority is the strong protection of intact biodiverse natural systems (Watson et al., 2018), as verified in the Global Assessment Report on Biodiversity and Ecosystem Services (Intergovernmental Science-Policy on Biodiversity and Ecosystem Services, 2019) and the recent "Global Deal for Nature"(Dinerstein et al., 2019). A global review with a dual focus on carbon and biodiversity identified regions that are part of a "Global Safety Net" (Dinerstein et al., 2020), and the safety net must be now be translated to local levels. This joint climate/biodiversity priority was also highlighted in the peer-reviewed declaration of a Climate Emergency signed by over 13,000 scientists in late 2019 and which highlighted proforestation as a global climate solution (Ripple et al., 2020).

There is scientific consensus that we can substantially close the gap between $CO_2$ emissions and removals by maximizing a range of nature-based solutions (Griscom et al., 2017; Fargione et al., 2018). Regarding biodiversity, the beneficial role of protected areas in supporting species abundance and diversity was confirmed in a global meta-analysis (Coetzee et al., 2014), and the benefit of protecting intact ecosystems was quantified by comparing the probability of extinction in the six major global regions. On average, "wilderness" reduces the rate of species' extinction by half due to higher

rates of species loss in unprotected areas (Di Marco et al., 2019); the quantified benefit of wilderness in preventing extinction is even higher in regions, including the Eastern United States. Biodiverse intact forests can simultaneously provide long-term protection to natural processes and biodiversity, reduce extinction, and provide pathways for migration while accumulating atmospheric carbon moderating local and global temperature increases (Friedlingstein et al., 2020). Taken together, it is practical and possible to act immediately to protect ecosystems and prevent extinction while we maintain increased CDR rates and store and accumulate additional carbon in forests and forest soils.

Forest conservation studies tend to focus on high-biodiversity tropical forests (Mitchard, 2018), yet temperate forests are also biodiverse (Hilmers et al., 2018), benefit human health and well-being in highly populated areas (Karjalainen et al., 2010), and provide many essential ecosystem services (United States Forest Service, 2021). They also have a large additional potential for CDR that has been underestimated by 32% (Cook-Patton et al., 2020). New England Acadian Forests are the only region in the lower 48 United States identified as part of the "Global Safety Net" as a Tier 1 climate stabilization area (Dinerstein et al., 2020). Current forest CDR in the United States reduces annual net nation-wide greenhouse gas emissions by 11.6% (United States Environmental Protection Agency, 2018), with the potential for much more (Keeton et al., 2011; Moomaw et al., 2019). Houghton and Nassikas (2018) estimate the current gross carbon sink in forests recovering from harvests and in abandoned agriculture to be -4.4 PgC/year (negative means removal) globally, consistent with the IPCC 1.5°C report that identified forests as key to increasing accumulation rates. This potential carbon sink from recovering forests is nearly as large as the gap between anthropogenic emissions and removal rates, 5.1 PgC/year (Friedlingstein et al., 2020).

In the context of resource production and forest management, some forest carbon is stored in lasting wood products and responsible forestry can provide a reliable wood supply from a semi-natural forest. However, multiple analyses have found that more carbon associated with timber harvests is lost to the atmosphere than is stored in the harvested wood products (Nunery and Keeton, 2010; Harris et al., 2016). For example, just 19% of the original carbon stock in Oregon forests in 1900 is in long lived wood products; approximately 16% is in landfills, and the remaining 65% is in the atmosphere as carbon dioxide (Hudiburg et al., 2019). Updated models indicate that the product substitution benefits of wood products are overestimated between 2 and 100-fold (Harmon, 2019) and any near-term carbon benefit relies on product subsitution (Hudiburg et al., 2019; Leturcq, 2020). Biogenic emissions from harvesting in the United States are estimated to be 640 MtC/year or 85% of total forestry emissions, exceeding the commercial and residential building sectors, and fossil fuel emissions from harvesting add an additional 17% $CO_2$ to the atmosphere above biogenic emissions (Harris et al., 2016).

Strategic planning for responsible resource production can both mitigate these emissions and ensure a protected network of intact natural areas. For example, the US Climate Alliance underestimates the importance of "net carbon accumulation" in forests (United States Climate Alliance, 2021). Forests do accumulate net carbon now, but carbon above and below ground is far below historic levels and far below its potential (Law et al., 2018; Hudiburg et al., 2019). A critical and explicit goal is to increase and optimize carbon accumulation by utilizing some forests for responsible resource production as needed and protecting other forests for climate protection, long-term full biodiversity, science, and human health and well-being.

At a global level, if deforestation were halted, and existing secondary forests allowed to continue growing, a network of these intact forests would protect the highest number of species from extinction (Di Marco et al., 2019; World Wildlife Federation, 2020) and it is estimated that they could sequester ~120 PgC in the 84 years between 2016 and 2100 (Houghton and Nassikas, 2018). This is equivalent to about 12 years of current global fossil fuel carbon emissions. These global numbers are conservative as outlined in recent analyses (Cook-Patton et al., 2020) and they do not factor in the enhanced

In review

regional CDR potential and high cumulative carbon that can be achieved with proforestation in such carbon-dense temperate forests of the Pacific Northwest (Law et al., 2018) and New England (Nunery and Keeton, 2010; Keeton et al., 2011; Moomaw et al., 2019; Dinerstein et al., 2020).

Because these global and regional projections can be difficult to translate locally, particularly over time, we focused on a detailed analysis of individual trees and stands in New England. Historically, between 80% and 90% of the New England landscape was heavily forested, and early chroniclers describe pre-settlement forests with many large, mature trees reaching 1 to 1.5 m in diameter (Whitney, 1996). Fast-growing riparian species like sycamores and cottonwoods could reach or exceed 2 m. Today, New England trees of this size are mostly found as isolated individuals in open areas, parks, and old estates. Old-growth forests (primary forests) and remnants are currently less than 0.2% of northern New England's landscape, and less than 0.03% in Southern New England. Ongoing attempts to document their value and identify their locations is underway (Davis, 1996; Kershner and Leverett, 2004; Ruddat, 2020). Secondary forests in New England consist mostly of smaller, relatively young trees (on average less than 100 years old). The U.S. Forest Service estimates that fewer than 7% of the nation's forests exceed 100 years in age.

Our goal in this study was to measure carbon directly in individual trees and in an "average" versus an older stand of eastern white pine (*Pinaceae: Pinus strobus*) in New England. Most forest carbon studies focus on large geographical areas, and utilize "net" carbo[illegible] dat[illegible] gathered from LIDAR (Light Detection And Ranging [illegible]nd satellite technology, as wel[illegible] as [illegible]tatistical modeli[illegible] Forest Service [illegible]ods. Upon examining [illegible]hese options we no[illegible] that [illegible] n e t [illegible] a [illegible] s [illegible] om different tools [illegible] models can lead to disparate [illegible]esults at the level of indi[illegible] s – and these errors can be [illegible]xt[illegible]pol[illegible]ed [illegible]o stands (Leverett e[illegible] al., 2020). Th[illegible] e [illegible] apitalized on the extensive tree-measuring [illegible] oc[illegible] id [illegible]xper[illegible]ence of the N[illegible]tive Tre[illegible] e [illegible] (NTS) to conduct highly accurate direct field [illegible] e [illegible] m [illegible] ts [illegible]nd measure vol[illegible] precisely in younger vs. older trees growing in stands (Native Tree Society [illegible]). We [illegible] measurements to evaluate volume-biomass models from multiple sources and developed a hybrid – termed FIA-COLE – to capitalize on the strengths of each model. We calculated the live above-ground carbon (in tonnes) in individual eastern white pines and individuals of other species in pine stands using conservative assumptions and direct measurements in pines up to 190 years old.

## 2. Materials and methods

This paper centers primarily on 1) individual eastern white pines (*Pinaceae*: *Pinus strobus*), 2) a representative older pine stand in Western Massachusetts, named the *Trees of Peace (TOP*: located in Mohawk Trail State Forest, Charlemont, MA), and 3) a nearby younger pine stand (~750 ft center to center from the *TOP*). Both stands regenerated naturally from pasture and they share abiotic conditions such as a similar elevation, soil type (Hinkley loamy), temperature and precipitation. The younger stand is slightly downslope, and neither shows evidence of major recent disturbance. In 1989 the *TOP* lost 6 trees in a storm. Currently the *TOP* has 76 pines covering 0.6 to 0.7 ha.

While not discussed in detail herein, we have also collected and analyzed data from NTS measurements in 38 other sites with white pines in the Eastern United States Since 1990, NTS has taken thousands of on-site direct measurements of individual trees in dozens of stands of eastern white pines (See examples Supplement 1). Measurements are published on the society's website (Native Tree Society, 2021) and comprehensive measurement protocols were adopted from those developed by NTS (Leverett et al., 2020) and incorporated into the American Forests Tree Measuring Guidelines Handbook (Leverett and Bertolette, 2014). A brief description of the measurement methods and models is provided in section 2.1, Supplement 2 and in Leverett et al. (Leverett et al., 2020). Here, in

In review

all cases, the best mathematical processes were applied, *e.g.* the sine instead of the tangent height method and the best statistical models.

In the pine stands, a point-centered plot was established with a radius of 35.89 m, covering 0.403 hectares (subsequently referred to as 0.4 ha), with the goal of evaluating a standard acre (radius: 117.75 ft), and thus relevant to forestry conventions in the U.S. Within the *TOP*, 44 mature white pine stems were tallied along with 20 hardwoods and eastern hemlocks greater than10 cm in diameter at breast height (DBH, 4' 5" of 1.37 m from the ground). The measured acre had 50 pines in July 1989 when six trees were lost in a wind event. The pines are ~160 years old; the hardwoods and hemlocks are estimated to be between 80 and 100 years old.

## 2.1 Height and diameter direct measurement methodology

We quantified the volume of the trunk and limbs of each tree from heights and diameters measured with laser-based hypsometers, monoculars with range-finding reticles, traditional diameter tapes, and calipers (described in detail in Leverett et al., 2020). Each instrument was calibrated and independently tested for accuracy over a wide range of distances and conditions (see Supplement 2 for an example). Absolute accuracies of the two main infrared lasers were verified as +/- 2.5 cm for distance, surpassing the manufacturer's stated accuracy of +/- 4.0 cm. The tilt sensors were accurate to +/- 0.1°, meeting the manufacturer's stated accuracy. The combination of these distance and angle error ranges, along with the most accurate trigonometric methods noted above (sine vs. tangent method), gave us height accuracies to within 10 to 15 cm on the most distant targets being measured and approximately half that on the closest targets. We distinguished the rated and/or tested accuracy of a particular sensor of an instrument (such as an infrared laser or tilt sensor) from the results of a measurement that utilized multiple sensors.

In review

Tree heights were measured directly for each pine with a visible top, using the sine method (Supplement 2) whenever possible rather than the traditional tangent method. Our preference for the sine method is supported by NTS, the US Forest Service (Bragg et al., 2011) and American Forests (Leverett and Bertolette, 2014). The more traditional tangent method often over/under-estimates heights by treating the sprig being measured (interpreted as the top), as if it were located vertically over the end of the baseline. The heights of 38 white pines in the *TOP* with visible tops were measured directly using the sine method.

## 2.2 Use of a form factor and FIA-COLE in determining pine volume

To compute trunk volume directly from the base to the absolute top of a tree, diameters at base and breast height were measured with conventional calibrated tapes according to the procedures established and published by NTS. Diameters aloft were measured with the combination of laser range-finders and high performance monoculars with range-finding reticles. A miniature surveying device, the LTI Trupoint 300, was also used. Its Class II, phase-based laser is rated at an accuracy of +/- 1.0 mm to clear targets and its tilt sensor is accurate to +/- 0.1 degrees. In the *TOP*, we computed the volume of each pine's trunk and limbs using diameter at breast height, full tree height, trunk form, and limb factors. (See Supplement 3 for a discussion on the development of the form factor and its importance in measuring volume, with comparisons to other methods of measurement).

Detailed measurements of 39 sample trees established an average form factor (see NTS measurements in Supplement 3, Table S3.2). The volume of each sample tree was determined by dividing the trunk into adjacent sections, with the length of each section guided by observed changes in trunk taper and/or visibility. Each section was modeled as the frustum of a regular geometric solid (neiloid, cone, paraboloid; see Supplement 3 and Leverett et al., 2020, for formulas). The form factor for each pine

was computed by adding its section volumes to obtain total trunk volume and then dividing the result by the product of the pine's height and breast-high cross-sectional area. This produced an average factor that would fit the pines growing in a stand. We applied the average form factor to all pines included in the *TOP* as one determination of trunk volume.

For comparison to our direct volume measurements, we applied a hybrid volume-biomass model to compute trunk volumes for pines in the *TOP*. This hybrid allowed us to make use of the extensive analysis of the US Forest Service Forest Inventory and Analysis (FIA) program and database (which determines volume and biomass through the use of allometric equations; United States Forest Service, 2020) as well as the Carbon On-Line Estimator (COLE; National Council for Air Stream Improvement, 2020). This hybrid was termed FIA-COLE. See Supplement 4 for a full explanation of the variables and equations for defining trunk volume. We finalized volumes for the pines in the *TOP* by averaging our direct measurements with those of FIA-COLE.

For the total volume of the above-ground portion of a pine, we derived a factor for limbs, branches, and twigs as a proportion of the trunk volume using the FIA-COLE model (Supplement 5). That model includes all the branching in what is defined as the "top" in a biomass calculation and the limb factor for large trees is typically an additional 15-16%. We ran the model for each of the individuals in the *TOP* and calculated the volume. This was converted to biomass (density) and then to carbon mass using a conservative  carbon mass fractional factor of 48%.

### 2.3 Analysis of individual pine trees and a representative stand

In review

In addition to the *TOP*, and older exemplary pines, we quantified above-ground carbon in younger trees and a representative stand. To determine an "average" pine at 50 years we defined two populations: (1) trees at 50 years that are still alive today, and (2) trees that were alive at 50 years but are missing today. This allowed us to compute an average trunk size for the missing trees and the associated carbon. We also measured white pines from young to older ages to estimate growth rates and volumes. The number of pines alive at 50 years but not alive today was determined from stand density data coming from both field counts and FIA (United States Forest Service, 2020).

We extensively studied an ~80-year-old stand of pines adjacent to the *TOP* (Supplement 6) growing on a terrace located just downslope from the *TOP* in an area fairly well protected from wind and with similar abiotic conditions and adequate soil depth. This age is more representative of the average stand of eastern white pine in New England (60-80 years; United States Forest Service, 2019). We also considered the range of pines of known ages from stands within the vicinity and elsewhere. Where we could, we examined ring growth and height patterns for individual pines during their early years on a variety of sites in different geographical locations. In some cases, we examined stumps and measured the average ring width. In other cases, we measured trees and counted limb whorls to get age estimates.

We measured the tallest pine in the *TOP* over a long time-span (referred to as Pine #58, its research tag number). Pine #58 has been measured carefully and regularly over a period of 28 years. In 1992 the tree was 47.24 m tall and 2.93 m in circumference. Since then, it has been climbed 4 times, tape-drop-measured, and volume-determined. Pine #58 continues to grow and has enabled us to quantify the changes in carbon accumulation in a dominant tree over decades. See Supplement 7 for a detailed measurement history of Pine #58.

Live tree above-ground volumes were converted to mass using standard wood density tables (United States Department of Agriculture, 2009). The air-dried density for white pine is 385.3 kg/m$^3$ (0.3853 tonnes/m$^3$). As noted above, we calculated the amount of carbon in each pine conservatively as 48% of total air-dried weight, whereby a cubic meter of white pine trunk or limbs holds 0.18494 tonnes of

carbon. (at least 50% is used more commonly; the percentage of carbon content in different species ranges from ~47% to 52+% and there is evidence that pine is at the upper range (Nicodemus and Williams, 2004). Note that the carbon in a cubic meter of wood varies depending on the species and is usually greater in hardwoods (United States Department of Agriculture, 2009).

## 3. Results

Our measurements indicate that individual eastern white pines can accumulate significant above-ground volume/carbon up to at least 190 years, that this volume/carbon accumulation in an individual tree can accelerate beyond 100 years, and that a stand of pines can double its above-ground live carbon between ~80 and 160 years.

### 3.1 Analysis of dominant individuals and averages for stand-grown pines

As Pine #58 is the tallest and the largest tree (volume) in the Trees of Peace (*TOP),* its performance over time was analyzed in great detail. It started growing as part of a more tightly packed stand, but presently has ample space. Its circumference at breast height is 3.30 m, its height is 53.71 m, and its crown spread is approximately 15.5 m. Over a period of 26 years, beginning in 1992, Pine #58 has grown in circumference at an average rate of 1.39 cm per year and grown in height 23.71 cm per year. For a chronosequence, we assumed that Pine #58 grew a lot when it was young – an average of up to 61 cm per year in its first 50 years. Its trunk and limb volume was 23.33 $m^3$ at the end of the 2018 growing season (Supplement 7).

In review

Figure 1 shows the increase in height, circumference and volume of Pine #58 within each 50-year interval up to 150 years and includes a photo of the tree. Its estimated age is ~160 years, and we used a chronosequence to determine previous epochs. For dominant pines in stands on good sites, ring widths for the first 50 years average ~0.6 cm and thus a 1.88 m circumference at 50 years. (Note that we measured one exceptional pine at 2.13 m in circumference.) Heights of stands at age 50 depend largely on site characteristics and expressed as site index (the average height of a stand at 50 years). The average index for white pine in Massachusetts is approximately 20 m (William Van Doren, Massachusetts Department of Conservation and Recreation, *pers. comm.*). For Pine #58 we calculated a much higher index to assume rapid early growth in the first 50 years. Based on these principles, the change in circumference and growth in height were greatest in the first 50 years, and decreased in the next two 50-year periods, confirming young pines "grow more rapidly" in terms of annual height and radial increases. However, volume growth, and thus carbon accumulation, continued to increase in the epochs studied here. This is primarily because volume increases linearly with height but increases as the square of the diameter (see Figure 1 and Supplement 8).

As noted, we assumed Pine #58 had optimal rapid growth in the first 50 years. Even so, our analysis supports the conclusion that the pine accumulated the majority of its current carbon *after age 50* and at an increased rate during subsequent epochs. Pine #58 now stores 4.33 tC above ground and continues to grow. For comparison, the carbon sequestered in the trunk of the highest volume 50-year-old pine that we encountered (2.13 m circumference, 34.75 m height, and 0.4346 form factor) is 1.16 tC. Therefore, even in the best-case scenario Pine #58 would have acquired only a quarter of its current carbon by age 50. Note that the same crown area occupied by multiple younger trees cannot achieve the carbon in this larger tree (Robert T. Leverett, *unpublished observations*).

Up to a point, the carbon advantage gained by the older trees accelerates with their increasing age and size, a finding that has been affirmed globally (Stephenson et al., 2014). Figure 2 documents the average volume in individual pines in the stands at ~80 and ~160 years as well as several additional large pines. MSF Pine #1, the largest pine in Monroe State Forest, western Massachusetts, has a trunk

volume of 35.9 m$^3$ at approximately 190 years (6.62 tC; Figure 2). Assuming its early years accumulated 1.16 tC at 50 years, which is the fastest growing 50-year old pine we measured in all sampled locations, the large pine added 5.46 tC between 50 and 190 years, or 1.95 tC per 50-year cycle after year 50. This is at least 1.68 times the rate of growth for the first 50 years. This compares to a 1.6 ratio for Pine #58. In both cases more than 75% of the carbon they sequestered occurred *after* their first 50 years even when assuming the most optimal growth observed during the first 50 years.

### 3.2 Stand measurements at ~80 and ~160 years

Detailed measurements were taken in comparable pine stands at ~80 and ~160 years *(TOP)*. As noted, the average tree in each stand is shown in Figure 2, and the distribution of tree sizes in the *TOP* is shown in Figure 3A. The largest pine in the *TOP* holds 4.33 tC and the smallest holds 0.53, an eight-fold difference. A comparison of the stand density and above ground carbon at ~80 vs. ~160 yr are shown in Figure 3B.

Complete data for 76 individual pines in the *TOP* (the 0.4 ha primary plot plus additional trees in the stand) is provided in Supplement 9. Similar data were collected from 0.4 ha of the ~80-year old stand (Supplement 6). This age is more representative of the average stand of eastern white pine in New England. Average values for both stands are summarized in Table 1. As shown in Figure 2, we found an average of 0.66 tC per tree compared to 1.95 tC per tree in the *TOP*, a near tripling of carbon in the average individual pine in the older stand. We found a robust size distribution among the pines in the older stand (Figure 3A), as well as a lower stand density (fewer stems), and a higher level of carbon in the *TOP* (Figure 3B). Pines predominated both plots, and non-pine species added ~10% to the total above ground carbon in the *TOP* (Figure 3B).

In review

We emphasize that all of our calculations are based on a conservative value for the carbon mass fractional factor in the pines (48%) and only include above ground live tree-based carbon – they do not include more labile sources of additional carbon in needles, leaves and understory plants, or the accumulation of carbon in downed woody debris in older stands. Our measurements also do not include the large store of underground carbon (the root system is typically estimated as an additional 15-20% of the above-ground tree volume, and total soil organic carbon can be an additional 50% or more (Birdsey and Heath, 1995). Therefore, the total carbon is considerably higher. Nevertheless, the live trees in the older stand hold twice the carbon of the younger stand: the above-ground tree-based carbon measured directly in the primary acre in the 80 year old stand is 46.9 tC and the 160-year-old stand is 94.4 tC, translating to 117.2 and 236.0 tC per hectare, respectively. Approximately 10% of the tree-based carbon in the older stand is non-pine whereas non-pine live tree carbon in the younger stand is negligible (Table 1).

## 4. Discussion

We found that above-ground carbon stored in individual eastern white pines (*Pinaceae: Pinus strobus*) and stands can continue to increase well beyond 150 years. A chronosequence coupled with decades of direct measurements of a dominant stand-grown individual pine in Massachusetts demonstrate that height and circumference increase rapidly during the first 50-year epoch with smaller increases in 50-year epochs thereafter. In contrast, volume (and therefore carbon) shows the smallest increment in the first 50 years and the biggest in the 50-yr epoch between 100 and 150 years. This superior carbon sequestration in older trees is consistent with recent reports of recent rapid sequestration of older oak trees in Massachusetts (Finzi et al., 2020) and the outsized forest accumulation in large trees (Stephenson et al., 2014; Mildrexler et al., 2020). Here, the largest pine measured in Massachusetts (by volume) achieved 6.62 tC at 190 years old, and we found very large pines at ages ranging up to 350 years at dozens of sites in the Eastern United States.

Using direct measurement of above-ground carbon in different-aged pine stands, we found that live tree carbon can continue to increase in a pine stand up to at least 160 years. We found twice as much above-ground live tree carbon in a measured research acre within the older vs. the younger stand. The live pines in the older stand also exhibited marked size diversity and the stand had a higher tree species diversity.

The representative stands in this analysis approximate the average pine forest age in New England (~80 years old) and a comparable stand approximately twice that age. To determine the biomass and above ground carbon in living trees as a function of tree size and age, we have used a combination of direct measurements and a hybrid FIA-COLE (Forest Inventory and Analysis - Carbon On-Line Estimator) volume and biomass model to quantify individual trees and stands of eastern white pine. We found that individual trees continue accumulating carbon well past 150 years, and more than 75% of the carbon in pines up to 190 years is gained after the first 50 years. Despite a lower stand density (fewer stems), total above-ground carbon is greatest in older stands and continues to increase past 150 years. The carbon per hectare quantified in these stands aligns with previous averages for the region and previous regional estimates that New England forests can accumulate between 2.3 and 4.2 times as much carbon as they now contain on productive sites (Keeton et al., 2011). The total carbon stored is much greater when below-ground carbon in roots, coarse woody debris, standing dead trees, smaller plants and soils are included (Birdsey and Heath, 1995; Nunery and Keeton, 2010; Tomasso and Leighton, 2014).

In review

Forest managers stress the high accumulation rates of younger forests as important in absorbing atmospheric $CO_2$. This is an important consideration for production forests as well as to help optimize between growing a wood resource and accumulating carbon. Younger individual trees do not sequester absolute amounts of carbon more rapidly than larger more mature trees, and we did not find evidence for a significant benefit for a young stand compared to an older stand. We note this is a limited sample, and we did not estimate rates of accumulation below 80 years (Table 1).

Multi-use forests provide a source of wood products and can support recreation but active management practices limit forest carbon accumulation long-term. At a range of scales, chronic intervention eliminates the ability for that forest to host the full biodiversity of some of our rarest species of plants, animals, insects, fungi, lichens, reptiles and amphibians found in older and continuously forested areas (McMullin and Wiersma, 2019; Moose et al., 2019) as well as climate-sensitive birds that may benefit from mature or old-growth forests (Betts et al., 2017). These older unmanaged forests also have fewer invasive species (Riitters et al., 2018).

The pine stands studied here grew from abandoned sheep pasture, and therefore were unlikely to have been severely disturbed prior to natural regeneration. Site history influences growth and net carbon accumulation, especially in the early years, since disturbed soil can continue to lose carbon for more than a decade (Birdsey and Heath, 1995; Hamburg et al., 2019). We recognize that at some point the above-ground carbon in living trees will no longer increase as the live trees in the stand eventually will reach a steady state of death and renewal. Pines easily reach 200 years and some live 400 years; today the *TOP* is less than halfway to that age and the younger stand is only ~25% of that lifespan. Previous work shows that pine stands continue to add above ground carbon beyond 200 years (Seymour, 2011; 2016), and even when above-ground live carbon reaches asymptote, total forest carbon continues to increase, even in some primary ("old-growth") forests (Mackey et al., 2015): after tree death or forest disturbance there is a new growth as well as transfer of live carbon to dead wood and woody debris, the litter layer, and into the soil. For example, 70 years after an old-growth (virgin) eastern hemlock (*Tsuga canadensis*) and eastern white pine stand blew down (the 1938 Hurricane in New England) that forest stored as much carbon as forests that were 250 years old (D'Amato et al., 2017).

There is no evidence of recent disturbance in either research plot herein. The older pine stand shows an increased prevalence and growth of trees of other species (including more carbon-dense hardwoods), and for multiple reasons it is unlikely it has reached maximal above-ground live carbon or total carbon. Rather, this forest appears to be transitioning into a phase where the structural diversity, species diversity and total carbon load will continue to rise. A goal for future research is a better understanding of tree and stand-level carbon accumulation and dynamics as well as many other ecological features in different forest types and in stands well beyond 150 years – a time when old-growth characteristics are starting to redevelop in eastern forests.

Public forests in New England are typically older than private forests (but still predominantly less than 100 years old), and provide the greatest possibility for future carbon-dense and biodiverse intact forests across the landscape. Native tree species can live for several hundred years (and in the case of eastern hemlock (*Tsuga canadensis*) and black gum (*Nyssa sylvatica*), up to and exceeding 500 years) (Whitney, 1996; Sperduto et al., 2000). Despite the shortage of old and old-growth forests (and their proven resilience to disturbance (D'Amato et al., 2017), and the increased prevalence of natural disturbances (e.g. insect outbreaks, windstorms) creating forest diversity and forest openings (Oswalt 2019), a major focus across public land has been to make forests younger. These programs assert that these habitats prevent a suite of species from declining, that they sequester carbon more rapidly, and that they are more resistant to disturbance than their older counterparts (Anwar, 2001). This approach downplays the rate of the natural development of niches for multiple species (Zlonis and Niemi, 2014) and the accumulation of biodiversity in temperate forests during natural forest succession (Hilmers et al., 2018). It also overlooks cumulative forest carbon (Moomaw et al., 2019) as well as the superior resilience of older forests to the stresses of climate change (Thom et al., 2019). Comparing details of age and location (tropical, temperate, boreal, etc.) are important, as is evaluating the term "young" – in some cases it is considered up to 140 years (Pugh et al., 2019).

Our findings are consistent with Stephenson et al. (2014) who found that absolute growth increases with tree size for most of 403 tropical and temperate tree species, and a study of 48 forest plots found that in older forests, regardless of geographical location, half of all above-ground biomass (and hence carbon), is stored in the largest 1% of trees as measured by diameter at breast height (Lutz et al., 2018). An increase in carbon density per hectare was found as the age of the stand increased in the Northeast U.S. (Keeton et al., 2011), and a recent study in China found that forests with older trees and greater species richness had twice the levels of carbon storage than did less diverse forests with younger trees (Liu et al., 2018). Earlier work demonstrated that intact old growth forests in the Pacific Northwest contained more than twice the amount of sequestered carbon as did those that were harvested on a fixed rotation basis (Harmon et al., 1990).

Globally, forests are capable of accumulating twice as much atmospheric carbon, and the current deficit is due to a combination of conversion and management (Erb et al., 2018). Continuing current management in the Northeast will result in a large difference between the potential for land-based carbon and the current trajectory (Duveneck and Thompson, 2019). Meanwhile, natural regeneration and reforestation is a superior climate solution compared to managed reforestation and tree planting (Cook-Patton et al., 2020), and proforestation – growing existing natural forests – complements and extends natural regeneration as an ongoing climate solution by leveraging the accumulation potential in forests that are already established (Moomaw et al., 2019). Proforestation recognizes implicitly that older forests and large trees are critical to a global strategy for carbon accumulation and biodiversity protection (Lindenmayer and Laurance, 2016). Rapidly moving large stocks of atmospheric carbon as $CO_2$ into forests and reducing emissions are both essential to limiting the increase in global temperatures, and protecting intact and connected habitat is essential in preventing extinction. These time-sensitive dual goals and the importance of traditional indigenous land use are explicitly recognized internationally in the Global Deal for Nature, the Global Safety Net, and the recent

In review

"Campaign for Nature" or "30 x 30" – i.e., protecting 30% of the planet's land and water by 2030 (Campaign for Nature, 2021), and in the ambitious coalition goal of "Nature Needs Half" (Nature Needs ).

An important additional implication of our study is that the estimated potential additional carbon dioxide ($CO_2$) removal (CDR) achieved by future growth of secondary forests as reported by Houghton and Nassikas (2018) is likely an underestimate because it does not account for high ongoing accumulation rates as trees age in regions with relatively young (compared to tree lifespan) forests like those of the Northeast United States. The global study of natural forest carbon accumulation by Cook-Patton et al. (2020) and the synthesis of quantified carbon and biodiversity by Moomaw et al. (2019) provide evidence for the power of natural forest processes throughout their growth and development. These reports and the current site-specific findings support the high regional contribution of carbon accumulation in the coming decades by Northeastern temperate forests and their designation as a Tier 1 climate stabilization region (Dinerstein et al., 2020).

While the IPCC clearly identified forests as essential for sequestering additional carbon for climate stability, it focused on production forests that are currently recovering from being harvested or on unforested areas where forests could be planted (afforestation). Bastin et al. (2019) proposes an afforestation project on 0.9 billion ha but acknowledges the relatively long time before large amounts of carbon would be sequestered. Global tree planting efforts are under way, but are presented too simplistically (Holl and Brancalion, 2020); for example, there is little data on how to plant an ecosystem, and tree planting efforts can suffer from numerous challenges, including high mortality (Cao et al., 2011). In contrast, growing existing forests is an established near-term strategy (Moomaw et al., 2019). Overall, afforestation and reforestation are valuable, but neither can keep as much carbon out of the atmosphere as proforestation in the next 50 years – the timeline when it is needed most to avoid irreversible consequences of a changed climate.

In review

Although this study focused exclusively on above-ground live tree carbon accumulation, we emphasize that additional carbon exists and accumulates above and below ground. Other ecosystem services of proforestation also accrue, and the essential goal of protecting a "Global Safety Net" of nature extends explicitly beyond greenhouse gas emissions and mitigating the climate crisis (Dinerstein et al., 2020). Nevertheless, an accurate carbon-centric model of "business as usual" vs. proforestation must include comprehensive real-world carbon fluxes. Removing carbon from the forest releases carbon into the atmosphere, and in some cases a portion of the carbon is stored in wood and/or wood is substituting for other materials. Recent work shows that near-term carbon benefits associated with wood products and substitution have been overestimated based on outdated assumptions or neglecting or underestimating future accumulation (Harmon, 2019; Leturcq, 2020). Efforts should be made on consumption and conservation to ensure we protect primary forests and additional secondary forests where possible: carbon storage in forests is low-risk, high-capacity and practical – therefore preferable to experimental bioenergy with carbon capture and storage (BECCS) suggested by the IPCC report (Anderson and Peters, 2016; IPCC, 2018). Finally, letting existing secondary forests grow creates a network of nature that can provide equity, access to natural heritage, scientific discovery, and cumulative health benefits for people. Protecting and growing a network of suitable existing forests as a carbon sink in New England is cost-effective (Tomasso and Leighton, 2014) and does not compete directly with agriculture and other demands for land use.

The direct measurements at the tree and stand level in this paper are consistent with parameterized and other studies at larger scale in verifying that larger trees (Stephenson et al., 2014; Lutz et al., 2018) and stands of larger trees accumulate the most carbon over time compared to smaller trees (Mildrexler et al., 2020). They support the proforestation strategy of growing existing forests to achieve their natural capacity to accumulate carbon and achieve their ecological potential (Moomaw et al., 2019) to redress

the balance of carbon lost to the atmosphere from global forests due to human activity (Hudiburg et al., 2019). The important implication of these findings is that the trees and the forests that we need most for carbon storage and CDR to help limit near-term climate change are the ones that are already established.

Currently, plantations and forests managed for forest products account for 71% of all forest area globally (IPCC, 2019), more than sufficient for resource production. Strategic decisions can enable some of these forests to be dedicated to climate protection and research, and the remaining 29% should be protected wherever possible. This would be a major step toward the goal of "30 x 30" – with additional climate stabilization areas are needed beyond that. Together 30 x 30 plus climate stabilization will move us toward long-term protection of "half-earth" (Wilson, 2016). High levels of carbon accumulation and biodiversity protection are integral to resiliency in a changing climate – including the resiliency achieved by protecting species networks and interactions, genetic diversity and the potential for specific adaptive epigenetic changes (Hanlon et al., 2019). These complexities are poorly understood – science and technology is evolving, and new techniques can discover new species (Schulz et al., 2018) – and any areas, even on public land, lack a detailed ecological inventory due to resource constraints or a focus on other priorities. Meanwhile, intensive biodiversity inventories have yielded many hundreds of new species – often small species such microbes, lichen, fungi, algae and insects; *i.e.* Smokies Species Tally (Discover Life in America, 2021) Much more research is needed, and essential ecological processes develop and diversify at timescales far beyond a human lifetime.

In review

In sum, the current findings ground-truth the capacity for a representative New England eastern white pine stand to at least double its above-ground live tree carbon in the coming decades, confirming previous chronosequencing of pine stands in the region (Seymour, 2011). We did not attempt to quantify or estimate the flux in other carbon compartments above or below ground. With a small fraction of New England (~3% overall, ~1% in Southern New England) prioritized for proforestation and natural processes, protection of a suitable network of land from unneeded intervention is urgent, and public land is the most logical place to start: funding to ensure evidence-based intervention and additional data collection will generate policies that protect the long-term public trust. At the same time, systems to support local wood use and reuse are equally needed to ensure the highest and best use of this resource, protect local expertise and jobs, and reduce emissions associated with the forest industry; in some states it is the largest source of emissions (Law et al., 2018). Comprehensive education, information and compensation programs should be established to provide private landowners a range of options based on numerous ecosystem services, including maximal carbon and biodiversity accumulation, with the goal of optimizing natural solutions that address the Climate Emergency immediately (Ripple et al., 2020). Failing to protect natural systems erodes the wealth and well-being that is essential to meet this unprecedented challenge and avoid "a ghastly future" (Bradshaw et al., 2021).

**Acknowledgments**

We acknowledge the critical technical assistance of Jared D. Lockwood in measuring pines in the *TOP*, the younger pine stand, and elsewhere as needed. We thank Ray Asselin for photographing pines for further analysis, and for ring and whorl counts to establish ages. We thank Monica Jakuc Leverett for invaluable assistance in editing and revising the original draft, thank Dr. David Ruskin for tireless efforts throughout the process, and thank Dr. Edward Faison for constructive suggestions. We also thank the reviewers for constructive comments. Supported by Trinity College (SAM), a Charles Bullard Fellowship in Forest Research (SAM), a Faculty Research Grant from the NASA Connecticut Space Grant Consortium (RTL, SAM) and the Rockefeller Brothers Fund (WRM).

**Author contributions statement**

RTL chose site locations and individual trees, established measurement methods and protocols, did the on-site tree measuring, and performed the subsequent analysis. SAM analyzed and organized the content and supplements and participated in drafting and finalizing the text. WRM framed the analysis in the context of other studies and the larger context of climate change, assisted with data analysis and presentation, and drafting and editing the text.

**Conflict of interest statement**

This work was not carried out in the presence of any personal, professional or financial relationships that could potentially be construed as a conflict of interest.

In review

**Table 1.** Summary of key measurements within a 160-year pine stand (*TOP*) and a comparable ~80 year old stand (2018 – 2019 values).

| | | |
|---|---|---|
| **Individual Values** | **~160 year old 0.4 hectare** | |
| | Circumference at breast height (avg) | **2.36 m** |
| | Diameter at breast height (avg) | **0.75 m** |
| | Height (avg) | **45.10 m** |
| | Tree Volume (trunk + limbs; avg) | **10.47 $m^3$** |
| | Above-ground carbon per tree (avg) | **1.95 tC** |
| | **~80 year old 0.4 hectare** | |
| | Circumference at breast height (avg) | **1.56 m** |
| | Diameter at breast height (avg) | **0.50 m** |
| | Height (avg) | **38.4 m** |
| | Tree volume (trunk + limbs; avg) | **3.58 $m^3$** |
| | Above-ground carbon per tree (avg) | **0.66 tC** |
| **Stand Values** | **Full Stand at ~160 years** | |
| | Number of pines | **76** |
| | Above-ground pine-based carbon | **146 84 tC** |
| | Above-gr und non-pine carbo | **14.90 tC** |
| | Total above-grou d tree carbon | **161.74 tC** |
| | **R search Acre ~160 years (0.4 hectare)** | |
| | Number of pines | **44** |
| | Above-ground pine-based carbon | **85.8 tC** |
| | Above-ground non-pine carbon | **8.6 tC** |
| | Total above-ground tree carbon | **94.4 tC** |
| | **Research Acre ~80 years (0.4 hectare)** | |
| | Number of pines | **71** |
| | Total above-ground pine-based carbon (*negligible non-pine carbon*) | **46.86 tC** |

In review

# Forest Carbon Assessment for the White Mountain National Forest

Alexa Dugan (adugan@fs.fed.us), Maria Janowiak (mjanowiak02@fs.fed.us), and Duncan McKinley (dcmckinley@fs.fed.us)

*March 15, 2019*

## 1.0 Introduction

Carbon uptake and storage are some of the many ecosystem services provided by forests and grasslands. Through the process of photosynthesis, growing plants remove carbon dioxide ($CO_2$) from the atmosphere and store it in forest biomass (plant stems, branches, foliage, roots) and much of this organic material is eventually stored in forest soils. This uptake and storage of carbon from the atmosphere helps modulate greenhouse gas (GHG) concentrations in the atmosphere. Estimates of net annual storage of carbon indicate that forests in the United States (U.S.) constitute an important carbon sink, removing more carbon from the atmosphere than they are emitting.[1] Forests in the U.S. remove the equivalent of about 13 percent of annual U.S. fossil fuel emissions or about 206 teragrams of carbon after accounting for natural emissions, such as wildfire and decomposition.[2, 3]

The Intergovernmental Panel on Climate Change (IPCC) has summarized the contributions of global human activity sectors to climate change in its Fifth Assessment Report.[4] From 2000 to 2009, forestry and other land uses contributed just 12 percent of human-caused global $CO_2$ emissions.[*] The forestry sector contribution to GHG emissions has declined over the last decade.[4-6] Globally, the largest source of GHG emissions in the forestry sector is deforestation,[1, 4, 7] defined as the removal of all trees to convert forested land to other land uses that either do not support trees or allow trees to regrow for an indefinite period.[8] However, the United States is experiencing a net increase in forestland in recent decades because of the reversion of agricultural lands back to forest and regrowth of cut forests,[9] a trend expected to continue for at least another decade.[10, 11]

Forests are dynamic systems that naturally undergo fluctuations in carbon storage and emissions as forests establish and grow, die with age or disturbances, and re-establish and regrow. Forests release $CO_2$ into the atmosphere when trees and other vegetation die, either through natural aging and competition processes or disturbance events (e.g., combustion from fires). This process transfers carbon from living carbon pools to dead pools, which also release carbon dioxide through decomposition or combustion (fires). Management activities include timber harvests, thinning, and fuel reduction treatments that remove carbon from the forest and transfer a portion to wood products. Carbon can then be stored in commodities (e.g., paper, lumber) for a variable duration ranging from days to years, or, in the case of some structural timber, from many decades to centuries. In the absence of commercial thinnings, harvests, and fuel reduction treatments, forests will thin naturally from mortality-inducing disturbances or aging, resulting in dead trees decaying and emitting carbon to the atmosphere.

[*] Fluxes from forestry and other land use (FOLU) activities are dominated by $CO_2$ emissions. Non-$CO_2$ greenhouse gas emissions from FOLU are small and mostly due to peat degradation releasing methane and were not included in this estimate.

Following natural disturbances or harvests, forests re-establish and regrow, resulting in the uptake and storage of carbon from the atmosphere. Over the long term, through one or more cycles of disturbance and regrowth (if the forest regenerates after the disturbance), net carbon flux (the balance from accumulation and loss) is often zero. This happens when regrowth of trees accumulates the same amount of carbon as was emitted as a result of disturbance or mortality.[12] Although disturbances, forest aging, and management are often the primary drivers of forest carbon dynamics in some ecosystems, environmental factors such as atmospheric $CO_2$ concentrations, climatic variability, and the availability of limiting forest nutrients, such as nitrogen, can also influence forest growth and carbon dynamics.[13, 14]

In this section, we provide an assessment of the amount of carbon stored on the White Mountain National Forest (baseline carbon stocks) and how disturbances, management, and environmental factors have influenced carbon storage overtime. This assessment primarily used two recent U.S. Forest Service reports: the Baseline Report[15] and Disturbance Report.[16] Both reports relied on Forest Inventory and Analysis (FIA) and several validated, data-driven modeling tools to provide nationally consistent evaluations of forest carbon trends across the National Forest System. The Baseline Report applies the Carbon Calculation Tool (CCT),[17] which summarizes available FIA data across multiple survey years to estimate forest carbon stocks and changes in stocks at the scale of the national forest from 1990 to 2013. The Baseline Report also provides information on carbon storage in harvested wood products (HWP) for each Forest Service region.

The Disturbance Report provides a national forest-scale evaluation of the influences of disturbances and management activities, using the Forest Carbon Management Framework (ForCaMF).[18-20] This report also contains estimates of the long-term relative effects of disturbance and non-disturbance factors on carbon stock change and accumulation, using the Integrated Terrestrial Ecosystem Carbon (InTEC) model.[21, 22] See Box 1 for descriptions of the carbon models used for these analyses.

## Box 1. Forest Carbon Models

**Carbon Calculation Tool (CCT)**

Estimates carbon stocks by summarizing data from two or more Forest Inventory and Analysis (FIA) survey years. Carbon stocks from 1990 to 2013 are estimated by linear interpolation between survey years and linear extrapolation since the most recent survey. CCT relies on allometric models to convert tree measurements to biomass and carbon.

**Forest Carbon Management Framework (ForCaMF)**

Integrates FIA data, Landsat-derived maps of disturbance type and severity, and an empirical forest dynamics model, the Forest Vegetation Simulator, to assess the relative impacts of disturbances (harvests, insects, fire, abiotic, disease). ForCaMF estimates how much more carbon (non-soil) would be on each national forest if disturbances from 1990 to 2011 had not occurred.

**Integrated Terrestrial Ecosystem Carbon (InTEC) model**

A process-based model that estimates relative effects of aging, disturbance, regrowth, and non-disturbance factors including climate, $CO_2$ fertilization, and nitrogen deposition on carbon stocks. InTEC integrates FIA data, Landsat-derived disturbance maps, as well as maps of maps of climate variables, nitrogen deposition, and $CO_2$ measurements to report carbon accumulation and stock changes from 1950 to 2011. Carbon stock and stock change estimates reported by InTEC are likely to differ from those reported by CCT because of the different data inputs and modeling processes.

The key findings from these reports are summarized here for the White Mountain National Forest (WMNF). Additional reports, including the most recent Resource Planning Act (RPA) assessment[10] and regional climate vulnerability assessments[23, 24] provide information on potential future conditions and are used to help infer future forest carbon dynamics. Collectively, these reports incorporate advances in data and analytical methods, representing the best available science to provide comprehensive assessments of National Forest System carbon trends.

### 1.1 Background

The WMNF, located in the Appalachian Mountains of New Hampshire and Maine, covers approximately 840,000 acres. (per recent FIA estimates).[†] Maple-beech-birch and spruce-fir forest types are the most abundant across the WMNF. The carbon legacy of WMNF and other national forests in the region is tied to the history of Euro-American settlement, land management, and disturbances. Exploration of the White Mountains by Europeans began in the mid-17th century. In the late 18th century, after the Revolutionary War, settlers cleared forests for mixed agriculture and grazing, establishing farming communities with schools, stores, and mills. Many of these farms, and sometimes entire communities, were abandoned in the mid to late 19th century, as farming technology changed and people moved west or to cities for better economic

[†] Estimate obtained using EVALIDator which queries the Forest Inventory & Analysis database.

opportunities. Large logging companies bought up the abandoned farmland and woodlots, constructing logging railroads and camps and stripping much of the timber from the mountains. The unregulated practices of these logging companies caused massive forest fires, and damaged watersheds vital to the industrial towns downstream, such as Manchester, NH, and Lowell, MA, which depended on water power to run their mills.

As the need for sustainable forest management became evident, the U.S. government began purchasing large areas of these overharvested and often submarginal lands in the eastern United States in the early and mid-20th century to be established as national forests.[25] In 1918, the WMNF was established as one of the first national forests in the eastern United States. This legacy of timber harvesting and early efforts to restore the forest is visible today, influencing forest age structures, tree composition, and carbon dynamics.[9]

# 2.0 Baseline Carbon Stocks and Flux

## 2.1 Forest Carbon Stocks and Stock Change

According to results of the Baseline Report,[14] carbon stocks in the WMNF increased from 57.9±8.0 teragrams of carbon (Tg C) in 1990 to 70.7±11.9 Tg C in 2013, a 22 percent increase in carbon stocks over this period (Fig. 1).[‡] Despite some uncertainty in annual carbon stock estimates, reflected by the 95 percent confidence intervals, there is a high degree of certainty that carbon stocks on the WMNF have been stable or increased from 1990 to 2013 (Fig. 1).

---

[‡] This report uses carbon mass, not $CO_2$ mass, because carbon is a standard unit and can easily be converted to any other unit. To convert carbon mass to $CO_2$ mass, multiply by 3.67 to account for the mass of the $O_2$.

1000 teragrams (Tg) =1 petagram (Pg)

1000 teragrams = 1 billion metric tonnes

1000 teragrams = 1 gigatonne

1 teragram = 1 million metric tonnes

1 teragram = 1 megatonne

1 megagram (Mg) = 1 metric tonne

1 metric tonne = 0.98 U.S. long ton

1 metric tonne per hectare = 0.4 U.S. long tons per acre

carbon (C) mass * 3.67 = carbon dioxide ($CO_2$) mass

100
80
60
40
20
0
Carbon Stocks (Tg)
1990
1992
1994
1996
1998
2000
2002
2004
2006
2008
2010
2012
Year

***Figure 1.*** *Estimated total forest carbon stocks for the baseline period of 1990-2013 for WMNF, bounded by 95 percent confidence intervals (green) (figure from Appendix A.I, USDA Forest Service 2015).*

About 35 percent of forest carbon stocks in the WMNF are stored in the aboveground portion of live trees, which includes all live woody vegetation at least one inch in diameter (Fig. 2). Soil carbon contained in organic material to a depth of one meter (excluding roots) is the second largest carbon pool, storing another 39 percent of the forest carbon stocks. Recently, new methods for measuring soil carbon have found that the amount of carbon stored in soils generally exceeds the estimates derived from using the methods of the CCT model by roughly 12 percent across forests in the United States.[26]

Aboveground live
Belowground live
Understory
Standing dead
Down dead
Forest floor
Soil
39%
35%
7%
1%
2%
2%
14%

***Figure 2.*** *Percentage of carbon stocks in each of the forest carbon pools for WMNF in 2013.*

The annual carbon stock change can be used to evaluate whether a forest is a carbon sink or source in a given year. Carbon stock change is typically reported from the perspective of the atmosphere. A negative value indicates a carbon sink: the forest is absorbing more carbon from the atmosphere (through growth) than it emits (via decomposition, removal, and combustion). A positive value indicates a source: the forest is emitting more carbon than it takes up.

Annual carbon stock changes in the WMNF ranged from -0.37 ± 1.28 Tg C per year (gain) to -0.90 ± 1.63 Tg C per year (gain) (Fig. 3). The uncertainty between annual estimates can make it difficult to determine whether the forest is a sink or a source in a specific year (i.e., uncertainty bounds overlap zero) (Fig. 3). However, the trend of increasing carbon stocks from 1990 to 2013 (Fig. 1) over the 23-year period suggests that the WMNF are a modest carbon sink.

Stock change (Tg/Year)
3
1
-1
-3
-5
-7
1990
1992
1994
1996
1998
2000
2002
2004
2006
2008
2010
2012
Year

***Figure 3.*** *Carbon stock change from 1990 to 2012 for WMNF, bounded by 95 percent confidence intervals (green). A positive value indicates a carbon source, and a negative value indicates a carbon sink (figure from Appendix A.II, USDA Forest Service 2015).*

The change in carbon stocks over time depends on several factors, including growth rates, natural ecosystem dynamics, and management activities. Changes in forested area may also affect whether forest carbon stocks are increasing or decreasing. The CCT estimates from the Baseline Report are based on FIA data, which may indicate changes in the total forested area from one year to the next.

According to the FIA data used to develop these baseline estimates, the forested area in WMNF has increased from 738,878 acres in 1990 to 868,848 acres in 2013, a net change of 129,970 acres, with some variations in estimates over this period.[§] When forestland area increases, total ecosystem carbon stocks typically also increase, indicating a carbon sink. The CCT model used inventory data from two different databases. This may have led to inaccurate estimates of changes in forested area, potentially altering the conclusion regarding whether or not forest carbon stocks are increasing or decreasing, and therefore, whether the National Forest is a carbon source or sink.[27]

Carbon density, which is an estimate of forest carbon stocks per unit area, can help separate the effects of changing forested area from the effects of growth and mortality on carbon stock trends. In the WMNF, carbon density increased from about 70 metric tonnes of carbon per acre in 1990 to 84 metric tonnes per acre in 2013 (Fig. 4). This increase in carbon density suggests that total carbon stocks may have indeed increased and are not just an artefact of changes in forested area.

§ Forested area used in the CCT model may differ from more recent FIA estimates, as well as from the forested areas used in the other modeling tools.

Carbon density, which is an estimate of forest carbon stocks per unit area, can help identify the effects of changing forested area. In the WMNF, carbon density increased from about 78.3 tonnes of carbon per acre in 1990 to 81.3 tonnes per acre in 2013 (Fig. 4). This increase in carbon density suggests that total carbon stocks may have indeed increased.

Carbon density (t/ac)
120
100
80
60
40
20
0
1990
1992
1994
1996
1998
2000
2002
2004
2006
2008
2010
2012
Year
Chippewa
Huron-Manistee
Mark Twain
Ottawa
Shawnee
Superior
Hiawatha
Hoosier
Chequamegon-Nicolet
Wayne
Midewin Tallgrass Prairie
Allegheny
Green Mountain
Monongahela
White Mountain

***Figure 4****. Estimated carbon stock density (metric tonnes C per acre) across National Forest units in the Eastern Region from 1990 to 2013.*

Carbon density is also useful for comparing trends among units or ownerships with different forest areas. Similar to WMNF, most national forests in the Eastern region have experienced increasing carbon densities from 1990 to 2013. Carbon density in the WMNF has been similar to the average for the 15 national forest units in the Eastern region. Differences in carbon density between units may be related to inherent differences in biophysical factors that influence growth and productivity, such as climatic conditions, elevation, and forest types. These differences may also be affected by disturbance and management regimes (see Section 3.0).

**2.2 Uncertainty associated with baseline forest carbon estimates**

All results reported in this assessment are estimates that are contingent on models, data inputs, assumptions, and uncertainties. Baseline estimates of total carbon stocks and carbon stock change include 95 percent confidence intervals derived using Monte Carlo simulations[**] and shown by the error bars (Figs. 1, 3). These confidence intervals indicate that 19 times out of 20, the carbon stock or stock change for any given year will fall within the green-highlighted zone. The uncertainties contained in the models, samples, and measurements can exceed 30 percent of the mean at the scale of a national forest, sometimes making it difficult to infer if or how carbon stocks are changing. However, despite relatively high annual error estimates for total carbon

[**] A Monte Carlo simulation performs an error analysis by building models of possible results by substituting a range of values – a probability distribution – for any factor that has inherent uncertainty (e.g., data inputs). It then calculates results over and over, each time using a different set of random values for the probability functions.

stocks in WMNF, indicated by the 95 percent confidence intervals, it can be inferred with a high degree of certainty that carbon stocks have been stable or potentially increased from 1990 to 2013.

The baseline estimates that rely on FIA data include uncertainty associated with sampling error (e.g., area estimates are based on a network of plots, not a census), measurement error (e.g., species identification, data entry errors), and model error (e.g., associated with volume, biomass, and carbon equations, interpolation between sampling designs). As mentioned in Section 2.1, one such model error has resulted from a change in FIA sampling design, which led to an apparent change in forested area. Change in forested area may reflect an actual change in land use due to reforestation or deforestation. However, given that the WMNF have experienced minimal changes in land use or adjustments to the boundaries of the national forests in recent years, the change in forested area incorporated in CCT is more likely a data artefact of altered inventory design and protocols.[28]

The inventory design changed from a periodic inventory, in which all plots were sampled in a single year to a standardized, national, annual inventory, in which a proportion of all plots is sampled every year. The older, periodic inventory was conducted differently across states and tended to focus on timberlands with high productivity. Any data gaps identified in the periodic surveys, which were conducted prior to the late 1990s, were filled by assigning average carbon densities calculated from the more complete, later inventories from the respective states.[27] The definition of what constitutes forested land also changed between the periodic and annual inventory in some states, which may also have contributed to apparent changes in forested area.

In addition, carbon stock estimates contain sampling error associated with the cycle in which inventory plots are measured. Forest Inventory and Analysis plots are resampled about every 5 years in the eastern United States, and a full cycle is completed when every plot is measured at least once. However, sampling is designed such that partial inventory cycles provide usable, unbiased samples annually but with higher errors. These baseline estimates may lack some temporal sensitivity, because plots are not resampled every year, and recent disturbances may not be incorporated in the estimates if the disturbed plots have not yet been sampled. For example, if a plot was measured in 2009 but was clear-cut in 2010, that harvest would not be detected in that plot until it was resampled in 2014. Therefore, effects of the harvest would show up in FIA/CCT estimates only gradually as affected plots are re-visited and the differences in carbon stocks are interpolated between survey years.[28] In the interim, re-growth and other disturbances may mute the responsiveness of CCT to disturbance effects on carbon stocks. Although CCT is linked to a designed sample that allows straightforward error analysis, it is best suited for detecting broader and long-term trends, rather than annual stock changes due to individual disturbance events.

In contrast, the Disturbance Report (Section 3.0) integrates high-resolution, remotely-sensed disturbance data to capture effects of each disturbance event the year it occurred. This report identifies mechanisms that alter carbon stocks and provides information on finer temporal scales. Consequently, discrepancies in results may occur between the Baseline Report and the Disturbance Report.[29]

**2.3 Carbon in Harvested Wood Products**
Although harvest transfers carbon out of the forest ecosystem, most of that carbon is not lost or emitted directly to the atmosphere. Rather, it can be stored in wood products for a variable duration depending on the commodity produced, as the harvested wood products (HWP) model illustrates (Fig. 5). Harvested wood can be used for products such as lumber, panels, and paper that account for a significant amount of off-site carbon storage. Estimates of the contribution of carbon stored in HWP are important for both national-level accounting and regional reporting.[30, 31] Wood products can also be substituted for other products, such as concrete and steel, that emit more GHGs in manufacturing, thus lowering net emissions and creating a "substitution effect."[32, 33] Harvested wood and residues may also be burned to produce heat or electrical energy, or converted to liquid transportation fuels and chemicals that would otherwise come from fossil fuels, also resulting in a substitution effect. Much of the harvested carbon that is initially transferred out of the forest can also be recovered with time as the affected area regrows.

The Baseline Report provides an assessment of carbon stored in the wood products sector for all national forests within each Forest Service region from 1912 to 2013. Carbon accounting for HWP was conducted by incorporating data on harvests on national forests documented in cut-and-sold reports within a production accounting system.[34, 35] This approach tracks the entire cycle of carbon, from harvest to timber products to primary wood products to disposal. Harvested wood products carbon pools include both products in use and products that have been discarded to solid waste disposal sites, such as landfills and dumps.

As more commodities are produced and remain in use, the amount of carbon stored in products increases. As more products are discarded, the carbon stored in solid waste disposal sites increases. Products in solid waste disposal sites may continue to store carbon for many decades. In national forests in the Eastern Region, harvest levels remained low until after the start of World War II in the late 1930s and early 1940s, when they began to increase, continuing to increase through the late 1970s.[6] This increase in harvests also caused an increase in carbon storage in HWP from national forests in the Eastern Region (Fig. 5).

HWP Carbon Stocks (Tg)
14
12
10
8
6
4
2
0
Products in use
Products in SWDS
1900 1910 1920 1930 1940 1950 1960 1970 1980 1990 2000 2010
Year

***Figure 5***. *Estimated cumulative total carbon stored in HWP sourced from national forests in the Eastern Region. Carbon in HWP includes products that are still in use and carbon stored at solid waste disposal sites (SWDS) (Loeffler et al. 2014).*

By 1973, HWP carbon stocks reached about 5 Tg C. Timber harvesting and subsequent carbon storage then declined in the mid to late 1970s, but later increased rapidly from the 1980s through the 1990s. Storage in products and landfills reached roughly 12 Tg C in 2001. However, because of a significant decline in harvesting in 2002 (to 1950s levels), carbon accumulation in the product sector has slowed, and carbon storage in products in use has declined slightly since 2002. In the Eastern Region, the contribution of national forest timber harvests to the HWP carbon pool exceeds the decay of retired products, causing a net increase in product-sector carbon stocks from 1912 to 2013. In 2012, the carbon stored in HWP was equivalent to roughly 1 percent of total forest carbon storage associated with national forests in the Eastern region.

### 2.4 Uncertainty associated with estimates of carbon in harvested wood products

As with the baseline estimates of ecosystem carbon storage, the analysis of carbon storage in HWP also contains uncertainties. Sources of error that influence the amount of uncertainty in the estimates include: adjustment of historic harvests to modern national forest boundaries; factors used to convert the volume harvested to biomass; the proportion of harvested wood used for different commodities (e.g., paper products, saw logs); product decay rates; and the lack of distinction between methane and $CO_2$ emissions from landfills. The approach also does not consider the substitution of wood products for emission-intensive materials or the substitution of bioenergy for fossil fuel energy. The collective effect of uncertainty was assessed using a Monte Carlo approach.[29] Results indicated a ±0.05 percent difference from the mean at the 90 percent confidence level for 2013, suggesting that uncertainty is relatively small at this regional scale.[36]

# 3.0 Factors Influencing Forest Carbon

## 3.1 Effects of Disturbance

The Disturbance Report builds on estimates in the Baseline Report by supplementing high-resolution, manually-verified, annual disturbance data from Landsat satellite imagery.[36] The Landsat imagery was used to detect land cover changes due to disturbances including fires, harvests, insects, and abiotic factors (e.g., wind, ice storms). The resulting Landsat-derived disturbance product indicates that timber harvest has been the dominant disturbance type detected on the WMNF from 1990 to 2011, in terms of the total percentage of forested area disturbed over the period (Fig. 6a). However, timber harvests affected a relatively small area of the forest during this time. In most years, timber harvests affected less than 0.3 percent of the total forested area of the WMNF in any single year from 1990 to 2011, and in total less than 2.5 percent (roughly 21,000 acres) of the approximately 850,000 acres of land on the WMNF. The percentage of the forest harvested annually has also decreased slightly over this 21-year period. Although harvests varied in proportion of trees removed (Fig. 6b), they generally removed less than 25 percent of canopy cover (magnitude).

Percentage of forest disturbed
1
0
Insects
Harvest
Fire
1991
1993
1995
1997
1999
2001
2003
2005
2007
2009
2011
Percentage of forest disturbed
1
0
4
3
2
1
1991
1993
1995
1997
1999
2001
2003
2005
2007
2009
2011

***Figure 6.*** *Percentage of forested area disturbed in WMNF, 1991-2011, by (a) disturbance type including fire, harvests, insects, and abiotic (wind), and (b) magnitude classes, characterized by percentage change in canopy cover (CC) and categorized from least to greatest: (1) 0-25% CC, (2) 26-50% CC, (3) 51-75% CC, and (4) 76-100% CC (Figure 1j, Appendix A, USDA Forest Service, in review). No fires, insects, or abiotic disturbances were detected during this period.*

The Forest Carbon Management Framework (ForCaMF) incorporates Landsat disturbance maps summarized in Figure 6, along with FIA data in the Forest Vegetation Simulator (FVS).[37] The FVS is used to develop regionally representative carbon accumulation functions for each combination of forest type, initial carbon density, and disturbance type and severity (including undisturbed).[20] The ForCaMF model then compares the undisturbed scenario with the carbon dynamics associated with the historical disturbances to estimate how much more carbon would be on each national forest if the disturbances and harvests during 1990-2011 had not occurred. ForCaMF simulates the effects of disturbance and management only on non-soil carbon stocks (i.e., vegetation, dead wood, forest floor). Like CCT, ForCaMF results supply 95 percent confidence intervals around estimates derived from a Monte Carlo approach.[19]

Timber harvesting on the WMNF was the primary disturbance influencing carbon stocks from 1990 to 2011 (Fig. 7). Harvesting accounted for nearly 100 percent of the total non-soil carbon lost from the forest due to disturbances, while losses from fire and insects were negligible.[15]

Lost Potential Storage (t C acre-1)
0.5
0
-0.5
-1
-1.5
All disturbances
Fire only
Harvest only
1990
1993
1996
1999
2002
2005
2008
2011
Year

***Figure** 7. Lost potential storage of carbon as a result of insect, harvest, and wind (abiotic) in WMNF, 1990–2011 (Figure 2n in Appendix A,* USDA Forest Service, in review*). The zero line represents a hypothetical undisturbed scenario.*

The ForCaMF model indicates that, by 2011, WMNF contained 0.41 metric tonnes per acre less non-soil carbon (i.e., vegetation and associated pools) due to harvests since 1990, as compared to a hypothetical undisturbed scenario (Fig. 7). As a result, non-soil carbon stocks in the WMNF would have been approximately 0.8 percent higher in 2011 if harvests had not occurred since 1990 (Fig. 8).

Across all national forests in the Eastern Region, harvest has been the most significant disturbance affecting carbon storage since 1990, causing non-soil forest ecosystem carbon stocks to be 1.6 percent lower by 2011 (Fig. 8). Considering all National Forests in the Eastern region, by 2011, abiotic factors (wind, ice storms) accounted for the loss of 0.2 percent of non-soil carbon stocks, fire 0.17 percent, and insects only 0.01 percent.

White Mountain
Monongahela
Green Mountain
Allegheny
Wayne
Chequamegon-...
Hoosier
Hiawatha
Superior
Shawnee
Ottawa
Mark Twain
Huron-Manistee
Chippewa
REGION 9
Abiotic (wind/ice)
Insects
Harvest
Fire
All disturbances
0.0%
0.5%
1.0%
1.5%
2.0%
2.5%
3.0%
3.5%
2011 Non-Soil Carbon Storage Reduction due to 1990-2011 Disturbances

***Figure 8.*** *The degree to which 2011 carbon storage on each National Forest in the Eastern region was reduced by disturbances from 1990 to 2011 relative to a hypothetical baseline with no disturbance. Results were derived through the ForCaMF system (Healey et al. 2014; Raymond et al. 2015) and include all non-soil ecosystem pools (i.e., vegetation). Wind disturbances include all abiotic effects, such as storm, ice damage, and flooding.*

The ForCaMF analysis was conducted over a relatively short time. After a forest is harvested, it will eventually regrow and recover the carbon removed from the ecosystem in the harvest. However, several decades may be needed to recover the carbon removed depending on the type of the harvest (e.g., clear-cut versus partial cut), as well as the conditions prior the harvest (e.g., forest type and amount of carbon). The time required for a forest to reach pre-disturbance stocking generally increases with both increased removal of biomass and the amount of pre-harvest aboveground live-tree carbon.[11] The ForCaMF model also does not track carbon stored in harvested wood after it leaves the forest ecosystem. In some cases, removing carbon from forests for human use can result in lower net contributions of GHGs to the atmosphere than if the forest was not managed, when accounting for the carbon stored in wood products, substitution effects, and forest regrowth.[12, 32, 38, 39] Therefore, the IPCC recognizes wood as a renewable resource that can provide a mitigation benefit to climate change.[8]

ForCaMF quantifies and compares the effects of different disturbance trends for each forest from 1990 to 2011, providing an estimate of how much more carbon the forest would have if observed fire, harvest, or insect trends had not occurred. This estimate helps to identify the biggest local influences on continued carbon storage and puts the recent effects of those influences into

perspective. However, factors such as stand age, drought, and climate may affect overall carbon change in ways that are independent of disturbance trends. The purpose of the InTEC work was to reconcile recent disturbance impacts with these other factors (Sections 3.2, 3.3).

### 3.2 Effects of Forest Aging

InTEC models the collective effects of forest disturbances and management, aging, mortality, and subsequent regrowth on carbon stocks from 1950 to 2010. The model uses inventory-derived maps of stand age, Landsat-derived disturbance maps (Fig. 6), and equations describing the relationship between net primary productivity (NPP) and stand age. Stand age serves as a proxy for past disturbances and management activities.[40] When a forested stand is disturbed by a severe, stand-replacing event, the age of the stand resets to zero and the forest begins to regrow. Thus, peaks of stand establishment can indicate stand-replacing disturbance events that promoted regeneration.

Stand-age distribution for the WMNF derived from 2011 forest inventory data indicates a pulse of stand establishment occurring 90 to 120 years before 2011 (1890–1920) (Fig. 9a). This period of elevated stand regeneration came after decades of intensive logging and large wildfires in the late 1800s and early 1900s.[41] Policies focusing on restoring forests after decades of overharvesting and conversion of forest to agriculture enabled these stands to establish, survive, and accumulate carbon. Similar age trends have been widely observed in eastern U.S. forests.[9]

(a)
Percentage of forest
0
2
4
6
8
10
12
14
16
18
Aspen/birch
Maple/Beech/Birch
Elm/ash/cottonwood
Oak/gum/cypress
Oak/hickory
Oak/pine
Spruce/fir
0-9
20-29
40-49
60-69
80-89
100-109
120-129
140-149
160-169
180-189
200-209
220-229
240-249
260-269
280-289
300+
Stand age (years)
(b)
NPP (t C ha-1 yr-1)
0
2
4
6
8
10
12
White/Red/Jack pine
Oak/pine
Oak/gum/cypress
Maple/Beech/Birch
Spruce/fir
Oak/hickory
Elm/ash/cottonwood
Aspen/birch
0
20
40
60
80
100
120
140
160
180
200
220
240
260
280
300
Stand age (years)

**Figure 9**. *Stand age distribution in 2011 (a) and net primary productivity (NPP)-stand age curves (b) for forest type groups in White Mountain National Forest (from Figures 1-2 in Appendix C.14, USDA Forest Service, in review).*

Stands regrow and recover at different rates depending on forest type and site conditions. Forests are generally most productive when they are young to middle age, then productivity peaks and declines or stabilizes as the forest canopy closes and as the stand experiences increased respiration and mortality of older trees.[42, 43] The relationship between forest productivity and stand age are quantified in NPP-age curves (Fig. 9b), derived in part from FIA data.[43] The predominantly spruce/fir and maple/beech/birch stands that established in the late 1800s to early 1900s would have been most productive when they were around 30–60 years old, indicating that stands in WMNF were growing at relatively high productivity from the 1920s through the mid-1900s.

InTEC model results show that WMNF was accumulating carbon steadily at the start of the analysis in the 1950s through the mid-1970s (Fig. 10) (positive slope) as a result of regrowth following disturbances and heightened productivity of the young to middle-aged forests. As stand establishment declined and more stands reached slower growth stages around the 1980s, the rate of carbon accumulation declined (negative slope). Aging forests, coupled with relatively low rates of new stand establishment, may cause the rate of carbon accumulation in the WMNF to decline in the future, a trend projected for many forests across the United States.[10, 11]

(4d)
Accumulated C (Tg)
20
10
0
-10
-20
All effects
Disturbance\aging
Climate
CO2
N deposition
1951
1961
1971
1981
1991
2001
2011
Year

***Figure 10.*** *Accumulated carbon in WMNF due to individual disturbance/aging, non-disturbance factors, and all factors combined for 1950–2011, excluding carbon accumulated pre-1950 (Figure 4d in Appendix C.4, USDA Forest Service, in review).*

Of all the factors modeled in InTEC, forest regrowth and aging following historical disturbances (early 1900s harvesting and land-use change), have collectively been responsible for the majority of carbon accumulation since 1950 in the WMNF (Fig. 10). However, the effects of disturbance and aging have declined relative to other factors in recent decades as forests have matured and non-disturbance factors have become more important.

### 3.3 Effects of Climate and Environment

The InTEC model also isolates the effects of climate (temperature and precipitation), atmospheric $CO_2$ concentrations, and nitrogen deposition on forest carbon stock change and accumulation. Annual precipitation and temperature conditions fluctuate considerably.[††] The modeled effects of variability in temperature and precipitation on carbon stocks has varied from year-to-year, but overall, climate since 1950 has had a small positive effect on carbon stocks in the WMNF relative to other factors (Fig. 10). Warmer temperatures can increase forest carbon emissions through enhanced soil microbial activity and higher respiration,[44, 45] but warming

[††] Figures 3a-3b, Appendix C4. USDA Forest Service. In review. Assessment of the Influence of Disturbance, Management Activities, and Environmental Factors on Carbon Stocks: Southern Region, Pp 104.

temperatures can also reduce soil moisture through increased evapotranspiration, causing lower forest growth.[46]

In addition to climate, the availability of $CO_2$ and nitrogen can alter forest growth rates and subsequent carbon uptake and accumulation.[13, 14] Increased fossil fuel combustion, expansion of agriculture, and urbanization have caused a significant increase in both $CO_2$ and nitrogen emissions. The InTEC model incorporated annual global estimates of atmospheric $CO_2$ concentrations[47] and national forest-scale observations of annual nitrogen deposition (National Atmospheric Deposition Program) to estimate the effects of $CO_2$ and nitrogen availability on carbon stocks.[21, 22]

According to the InTEC model, higher $CO_2$ has consistently had a positive effect on carbon stocks in WMNF, tracking an increase in atmospheric $CO_2$ concentrations worldwide (Fig. 10). However, a precise quantification of the magnitude of this $CO_2$ effect on terrestrial carbon storage is one of the more uncertain factors in ecosystem modeling.[48, 49] Although it has been suggested that elevated $CO_2$ increases productivity and aboveground biomass in young forests, it remains uncertain whether this effect is sustained as forests age.[50-53] Long-term studies examining the relationship between increased atmospheric $CO_2$ and soil nitrogen availability show that forests initially respond with higher productivity and growth, but the effect is greatly diminished or lost within 5 years in most forests.[54] There has been considerable debate regarding the effects of elevated $CO_2$ on forest growth and biomass accumulation, thus warranting additional study.[52, 54, 55]

Modeled estimates suggest that overall nitrogen deposition had a positive effect on carbon accumulation in the WMNF (Fig. 10). Like $CO_2$, the actual magnitude of this effect remains uncertain. Estimates from inventory data in the northeast and north-central United States confirm that nitrogen deposition has enhanced growth among most tree species, subsequently increasing forest carbon accumulation.[56] However, elevated nitrogen deposition can also decrease growth in some species for a variety of reasons, such as leaching of base cations in the soil, increased vulnerability to secondary stressors, and suppression by more competitive species.[57]**Error! Bookmark not defined.** Some regional studies have documented negative effects on forest productivity associated with chronically high levels of nitrogen deposition in the eastern United States.[57-59] Policies limiting nitrous oxide emissions may have led to a decline in nitrogen deposition since the 1990s.[60] The InTEC model simulated that rates of carbon accumulation associated with nitrogen deposition decreased as deposition rates declined. Overall, the InTEC model suggests that $CO_2$ and nitrogen fertilization partially offset the declines in carbon accumulation associated with historical disturbance, aging, and regrowth, and climate.

### 3.4 Uncertainty associated with disturbance effects and environmental factors

As with the baseline estimates, there is also uncertainty associated with estimates of the relative effects of disturbances, aging, and environmental factors on forest carbon trends. For example, omission, commission, and attribution errors may exist in the remotely-sensed disturbance maps used in the ForCaMF and InTEC models. However, these errors are not expected to be significant given that the maps were manually verified, rather than solely derived from automated methods. In addition to uncertainty in map products, ForCaMF results may also incorporate errors from the inventory data and the FVS-derived carbon accumulation functions.[20] To quantify uncertainties, the ForCaMF model employed a Monte Carlo-based approach[29] to

supply 95 percent confidence intervals around estimates.[19]

Uncertainty analyses such as the Monte Carlo approaches applied to the baseline estimates, HWP estimates, and ForCaMF results are not commonly conducted for spatially explicit, process-based models like InTEC because of significant computational requirements. However, process-based models are known to have considerable uncertainty, particularly in the parameter values used to represent complex ecosystem processes.[61] InTEC is highly calibrated to FIA data and remotely-sensed observations of disturbance and productivity, so uncertainties in these datasets are also propagated into the InTEC estimates. National-scale sensitivity analyses of InTEC inputs and assumptions[53] as well as calibration with observational datasets[22] suggest that model results produce a reasonable range of estimates of the total effect (e.g., Fig. 10, "All factors"). However, the relative partitioning of the effects of disturbance and non-disturbance factors as well as uncertainties at finer scales (e.g., national forest scale) are likely to be considerably higher.

Furthermore, results from the InTEC model may differ substantially from baseline estimates (CCT), given the application of different datasets, modeling approaches, and parameters.[22] The baseline estimates are almost entirely rooted in empirical forest inventory data, whereas the InTEC model involves additional data inputs and modeling complexity beyond simply summarizing ground data. Therefore, although InTEC also provides information on carbon stock change and accumulation, the baseline estimates derived from CCT (section 2.1) are the recommended estimates of carbon stocks and stock changes.

# 4.0 Future Carbon Conditions

### 4.1 Prospective Forest Aging Effects

The retrospective analyses presented in the previous sections can provide an important basis for understanding how various factors may influence carbon storage in the future. For instance, compared to other factors, the combination of historical disturbances, aging, and regrowth have had the largest effect on carbon trends the WMNF since 1950. The WMNF age structure shows that about 80 percent of the forested stands are middle-aged and older (greater than 80 years) and few stands are young (Fig. 9a). If the Forest continues on this aging trajectory, more stands will reach a slower growth stage in coming years and decades (Fig. 9b), potentially causing the rate carbon accumulation to decline and the Forest may eventually transition to a steady state in the future. However, although yield curves indicate that biomass carbon stocks may be approaching maximum levels (Fig. 9b), ecosystem carbon stocks can continue to increase for many decades as dead organic matter and soil carbon stocks continue to accumulate.[62] Furthermore, while past and present aging trends can inform future conditions, the applicability may be limited, because potential changes in management activities could affect future stand age and forest growth rates.[63, 64]

The RPA assessment provides regional projections of forest carbon trends across the United States.[10] These RPA estimates are based on a new approach that uses the annual FIA system developed in the early 2000s to estimate carbon stocks retrospectively to 1990 and forward to 2060.[65] The RPA assessment considers economic factors affecting potential land-use change and associated effects on rates of carbon accumulation or loss. For example, the RPA reference

scenario assumes forest area will continue to expand at current rates until 2022, when it will begin to decline as forests are increasingly converted to other uses. However, because these projections are conducted regionally, they include all forestland ownerships, including federal, tribal, state, and private lands. National forests tend to have higher carbon densities than private lands and may have land management objectives and practices that differ from those on other lands.

RPA North Region, Reference scenario
Net sequestration
Land use transfer
Total carbon stock change
Teragrams per year
100
50
0
-50
2005
2015
2025
2035
2045
2055
Year

***Figure 11.*** *Projections of forest carbon stock changes in the North Region (equivalent to the boundaries of Eastern Region, R9, but includes all land tenures) for the RPA reference scenario (Figure 8-8 in USDA Forest Service 2016). Actual net sequestration of forests is the total carbon stock change minus losses associated with land-use change. Solid green line: net sequestration; brown dashed line: land use transfer; blue-dashed line: total carbon stock change.*

For RPA's North Region (equivalent to Forest Service's Eastern Region boundary, but includes all land ownerships), projections indicate that the rate of carbon sequestration may start to decline in the 2020s, mostly due to the loss of forestland (land-use change), and to a lesser extent through forest aging and increased disturbances (Fig. 11). At the global and national scales, changes in land use—especially the conversion of forests to non-forest land (deforestation)—have a substantial effect on carbon stocks.[1, 7] Converting forest land to a non-forest use removes a large amount of carbon from the forest and inhibits future carbon sequestration. However, national forests tend to experience low rates of land-use change, and thus, forest land area is not expected to change substantially within the WMNF in the future. Therefore, on national forest lands, the projected carbon trends may closely resemble the "net sequestration" trend in Fig. 11, which isolates the effects of forest aging, disturbance, mortality, and growth from land-use transfers and indicates a small decline in the rate of net carbon sequestration through 2060.

**4.2 Prospective Climate and Environmental Effects**

The observational evidence described above and in previous sections highlights the role of natural forest development and succession as the major driver of historic and current forest carbon sequestration that is occurring at the WMNF and elsewhere in across the region. Several other modeling studies that have been conducted across the region simulate future changes in

forest growth, biomass, and carbon through the middle or end of the 21st century.[24, 66-69] Although these studies may include multiple ownerships and vary in the degree that they incorporate the potential for carbon changes from forest harvest and natural disturbances, they all include scenarios of climate change. From this robust collection of work, the collective evidence points to continued forest growth and recovery from past disturbances as the major driver of landscape-scale forest carbon gains for many decades into the future, in the absence of major disturbances from climate change or other causes.[24, 66, 70]

Climate change introduces additional uncertainty about how forests—and forest carbon sequestration and storage—may change in the future. Climate change causes many direct alterations of the local environment, such as changes in climate variables like temperature and precipitation, and it has indirect effects on a wide range of ecosystem processes.[71] Further, disturbance rates are projected to increase with climate change,[72] making it challenging to use past trends to project the effects of disturbance and aging on forest carbon dynamics.

A climate change vulnerability assessment of New England and northern New York [24], which encompasses the WMNF, describes projected changes in forest ecosystems through the end of the 21st century that could affect forest productivity and, ultimately, carbon sequestration and storage. Climate change is expected to cause temperatures to continue to rise in all seasons, increasing mean temperatures as well as the frequency of heat waves. Growing season length is expected to increase by several weeks under various climate scenarios, and a longer growing season may enhance forest growth and carbon sequestration, where water supply is adequate and temperatures do not exceed biological thresholds. [24, 73]

Elevated temperatures may increase soil respiration and reduce soil moisture through increased evapotranspiration, which would negatively affect growth rates and carbon accumulation.[44, 45] Modeled results of recent climate effects using the InTEC model indicate that years with elevated temperatures have generally had a negative effect on carbon uptake in the WMNF (Fig. 10).

Mean annual precipitation in New England and northern New York is projected to increase, although seasonal precipitation projections are less certain. Winter precipitation is projected to increase the most, though the amount of precipitation falling as snow is expected to decline as temperatures warm. More intense precipitation and extreme storm events are expected to continue increasing in this region. The potential for reduced soil moisture and drought is also predicted to increase, especially later in the growing season as increased temperatures drive evapotranspiration.[74-76] Although a longer growing season may increase annual biomass accumulation, droughts could offset these potential growth enhancements and increase the potential for other forest stressors. Drought-stressed trees may also be more susceptible to insects and pathogens[77], which can significant reduce carbon uptake.[78, 79]

Changes in climate are expected to drive many other changes in forests through the next century, including changes in forest establishment and composition.[24] Altered temperature, precipitation, and growing season may affect the ability of some species to germinate and regenerate.[50, 80-82] Some northern tree species are expected to be particularly vulnerable in the future as climate conditions drive declines or failures in species establishment or habitat suitability.[24, 81] Model

projections suggest that many northern conifer species, including balsam fir, red spruce, and black spruce, are the most vulnerable to climate change—particularly at lower elevations or more southerly locations and at the end of this century. The potential for future declines of northern species increase the risk of carbon losses in forest communities dominated by these species, particularly under scenarios of greater warming.[24, 66, 67] Further, climate-driven failures in species establishment further reduce the ability of forests to recover carbon lost after mortality-inducing events or harvests. Although future climate conditions also allow for other future-adapted species to increase, there is greater uncertainty about how well these species will be able to take advantage of new niches that may become available.[66, 81]

Lastly, $CO_2$ emissions are projected to increase through 2100 under even the most conservative emission scenarios.[4] Several studies point to the beneficial effects of carbon dioxide fertilization, particularly in deciduous forests. Several models, including the InTEC model (Figure 10), project greater increases in forest productivity when the $CO_2$ fertilization effect is included in modeling.[22, 67, 83, 84] Often, the models project that $CO_2$ fertilization has a greater effect on forest productivity than does climate change. However, the effect of increasing levels of atmospheric $CO_2$ on forest productivity is transient and can be limited by the availability nitrogen and other nutrients. Long-term studies examining the relationship between increased atmospheric $CO_2$ and soil nitrogen availability show that forests initially respond with higher productivity and growth, but the effect is greatly diminished or lost within 5 years in most forests.[52] There has been considerable debate regarding the effects of elevated $CO_2$ on forest growth and biomass accumulation.[48, 52, 54, 55] Further, productivity increases under elevated $CO_2$ could be offset by losses from climate-related stress or disturbance.

Given the complex interactions among forest ecosystem processes, disturbance regimes, climate, and nutrients, it is difficult to determine precisely how forests and carbon trends will respond to novel future conditions. Furthermore, the effects of future conditions on forest carbon dynamics may change over time. As climate change persists for several decades, critical thresholds may be exceeded, causing unanticipated responses to some variables like increasing temperature and $CO_2$ concentrations. The effects of changing conditions will almost certainly vary by species and forest type. Some factors may enhance forest growth and carbon uptake, whereas others may hinder the ability of forests to act as a carbon sink, potentially causing various influences to offset each other. Thus, it will be important for forest managers to continue to monitor forest responses to these changes and potentially alter management activities to better enable forests to better adapt to future conditions.

## 5.0 Summary

An assessment of forest carbon stocks and factors that influence carbon accumulation is critical for understanding how forests may respond to changing environmental and management conditions. The long-term capacity of forest ecosystems and wood products to sequester and store carbon depends in large part on their resilience and adaptive capacity, as well as how forests are managed to foster these attributes while providing ecosystem services.[12] Under a changing climate, forests are expected to be increasingly at risk to a variety of stressors, including moisture stress, forest insects, invasive species, and extreme weather events. [72, 77, 85]

From a carbon standpoint, forests in the WMNF are maintaining a carbon sink. Forest carbon stocks increased about 22 percent between 1990 and 2013, and negative impacts on carbon stocks caused by disturbances and environmental conditions have been modest and exceeded by forest growth. According to satellite imagery, timber harvesting has been the most prevalent disturbance detected on the Forest since 1990. However, harvests during this period have been relatively small, affecting on average roughly 0.1 percent of the WMNF forest area annually, and most harvests were characterized as low intensity (less than 25 percent reduction in canopy cover). Forest carbon losses associated with harvests have been small compared to the total amount of carbon stored in the Forest, resulting in a loss of about 0.8 percent of non-soil carbon from 1990 to 2011. However, these estimates represent an upper bound, because they do not account for continued storage of harvested carbon in wood products or the effect of substitution. Carbon storage in HWPs (in use and landfills) sourced from national forests increased since the early 1900s. However, recent declines in timber harvesting have slowed the rate of carbon accumulation in the product sector.

The biggest influence on current carbon dynamics on the WMNF is the legacy of intensive timber harvesting and land clearing for agriculture during the 19th century, followed by a period of forest recovery and more sustainable forest management beginning in the early to mid-20th century.[9] As a result, stands on the WMNF are now mostly middle to older aged (Fig. 4). Although older forests store more carbon and can continue to sequester significant amounts of carbon as they age, the rate of carbon uptake and sequestration generally decline as forests age. Projections from the RPA assessment also indicate a potential age-related decline in forest carbon stocks in the Eastern region (all land ownerships) beginning in the 2020s.

Climate and environmental factors, including elevated atmospheric $CO_2$ and nitrogen deposition, have also influenced carbon accumulation on the WMNF. Climate has had the least and most variable effect on forest carbon accumulation among all factors assessed. Recent warmer temperatures and precipitation variability may have stressed forests, causing climate to have a negative impact on carbon accumulation in the 2000s. Conversely, increased atmospheric $CO_2$ and nitrogen deposition may have enhanced growth rates and helped to counteract ecosystem carbon losses due to historical disturbances, aging, and climate.

The effects of future climate conditions are complex and remain uncertain. However, under changing climate and environmental conditions, forests of the WMNF may be increasingly vulnerable to a variety of stressors. These potentially negative effects might be balanced somewhat by the positive effects of longer growing season, elevated atmospheric $CO_2$ concentrations, and nitrogen deposition (where nitrogen deposition is not chronically elevated and damaging). However, it is difficult to judge how these factors and their interactions will affect future carbon dynamics on the WMNF.

Forested area on the WMNF will be maintained as forest in the foreseeable future, which will allow for a continuation of carbon uptake and storage over the long term. Across the broader region, land conversion for development on private ownerships is a concern[70] and this activity can cause carbon losses.[5] The WMNF will continue to have an important role in maintaining the carbon sink, regionally and nationally, for decades to come.

## References

1. Pan, Y.; Birdsey, R.A.; Fang, J.; Houghton, R.; Kauppi, P.E.; Kurz, W.A.; Phillips, O.L.; Shvidenko, A.; Lewis, S.L.; Canadell, J.G.; Ciais, P.; Jackson, R.B.; Pacala, S.W.; McGuire, A.D.; Piao, S.; Rautiainen, A.; Sitch, S.; Hayes, D. 2011. **A Large and Persistent Carbon Sink in the World's Forests.** Science. 333(6045): 988-993. doi: 10.1126/science.1201609.
2. US EPA. 2015. **Executive Summary.** Us Inventory of Greenhouse Gas Emissions and Sinks: 1990 – 2013. . Washington, DC: U.S. Environmental Protection Agency. p. 27.
3. Hayes, D.J.; Vargas, R.; Alin, S.R.; Conant, R.T.; Hutyra, L.R.; Jacobson, A.R.; Kurz, W.A.; Liu, S.; McGuire, A.D.; Poulter, B.; Woodall, C.W. 2018. **Chapter 2: The North American Carbon Budget.** In: Cavallaro, N.; Shrestha, G.; Birdsey; M. A. Mayes, R.; Najjar, R.G.; Reed, S.C.; Romero-Lankao, P.; Zhu, Z., eds. Second State of the Carbon Cycle Report (Soccr2): A Sustained Assessment Report. Washington, DC: U.S. Global Change Research Program. p. 71-108. doi: 10.7930/SOCCR2.2018.Ch2.
4. IPCC. 2014. **Climate Change 2014: Synthesis Report. Contribution of Working Groups I, Ii and Iii to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change.** In: Pachauri, R.K.; Meyer, L.A., eds. Geneva, Switzerland: Intergovernmental Panel on Climate Change. p. 151.
5. FAOSTAT. 2013. **Food and Agriculture Organization of the United Nations.** Statistical database.
6. Smith, P.; Bustamante, M.; Ahammad, H.; Clark, H.; Dong, H.; Elsiddig, E.A.; Haberl, H.; et al. 2014. **Agriculture, Forestry and Other Land Use (Afolu).** In: Edenhofer, O.; Pichs-Madruga, R.; Sokona, Y.; et al., eds. Climate Change 2014: Mitigation of Climate Change. Contribution of Working Group Iii to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change. Cambridge, United Kingdom and New York, NY, USA: Cambridge University Press. p. 121.
7. Houghton, R.A.; House, J.I.; Pongratz, J.; Van Der Werf, G.R.; Defries, R.S.; Hansen, M.C.; Le Quéré, C.; Ramankutty, N. 2012. **Carbon Emissions from Land Use and Land-Cover Change.** Biogeosciences. 9(12): 5125-5142. doi: 10.5194/bg-9-5125-2012.
8. IPCC. 2000. **Land Use, Land-Use Change and Forestry: A Special Report of the Intergovernmental Panel on Climate Change, Summary for Policy Makers.** Geneva, Switzerland: 20 p.
9. Birdsey, R.; Pregitzer, K.; Lucier, A. 2006. **Forest Carbon Management in the United States: 1600-2100.** Journal of Environmental Quality. 35(4): 1461-1469. doi: 10.2134/jeq2005.0162.
10. USDA Forest Service. 2016. **Future of America's Forests and Rangelands: Update to the 2010 Resources Planning Act Assessment.** Washington, DC. 250.
11. Wear, D.N.; Huggett, R.; Li, R.; Perryman, B.; Liu, S. 2013. **Forecasts of Forest Conditions in Regions of the United States under Future Scenarios: A Technical Document Supporting the Forest Service 2010 Rpa Assessment. .** General Technical Report SRS-170.: US Department of Agriculture Forest Service.
12. McKinley, D.C.; Ryan, M.G.; Birdsey, R.A.; Giardina, C.P.; Harmon, M.E.; Heath, L.S.; Houghton, R.A.; Jackson, R.B.; Morrison, J.F.; Murray, B.C.; Pataki, D.E.; Skog, K.E. 2011. **A Synthesis of Current Knowledge on Forests and Carbon Storage in the United States.** Ecological Applications. 21(6): 1902-1924. doi: 10.1890/10-0697.1.
13. Pan, Y.; Birdsey, R.; Hom, J.; McCullough, K. 2009. **Separating Effects of Changes in Atmospheric Composition, Climate and Land-Use on Carbon Sequestration of U.S. Mid-Atlantic Temperate Forests.** Forest Ecology and Management. 259(2): 151-164. doi: 10.1016/j.foreco.2009.09.049.
14. Caspersen, J.P.; Pacala, S.W.; Jenkins, J.C.; Hurtt, G.C.; Moorcroft, P.R.; Birdsey, R.A. 2000. **Contributions of Land-Use History to Carbon Accumulation in U.S. Forests.** Science. 290(5494): 1148-1151. doi: 10.1126/science.290.5494.1148.
15. USDA Forest Service. 2015. **Baseline Estimates of Carbon Stocks in Forests and Harvested Wood Products for National Forest System Units, Eastern Region.** 58 p.
16. USDA Forest Service. In review. **Assessment of the Influence of Disturbance, Management Activities, and Environmental Factors on Carbon Stocks, Eastern Region.**
17. Smith, J.E.; Heath, L.S.; Nichols, M.C. 2007. **Us Forest Carbon Calculation Tool: Forest-Land Carbon Stocks and Net Annual Stock Change. Revised. .** Gen. Tech. Rep. NRS-13. Newtown Square, PA: U.S. Department of Agriculture, Forest Service, Northern Research Station. 34 p. doi: https://doi.org/10.2737/NRS-GTR-13.
18. Healey, S.P.; Raymond, C.L.; Lockman, I.B.; Hernandez, A.J.; Garrard, C.; Huang, C. 2016. **Root Disease Can Rival Fire and Harvest in Reducing Forest Carbon Storage.** Ecosphere. 7(11). doi: 10.1002/ecs2.1569.
19. Healey, S.P.; Urbanski, S.P.; Patterson, P.L.; Garrard, C. 2014. **A Framework for Simulating Map Error in Ecosystem Models.** Remote Sensing of Environment. 150: 207-217. doi: 10.1016/j.rse.2014.04.028.
20. Raymond, C.L.; Healey, S.; Peduzzi, A.; Patterson, P. 2015. **Representative Regional Models of Post-Disturbance Forest Carbon Accumulation: Integrating Inventory Data and a Growth and Yield Model.** Forest Ecology and Management. 336: 21-34. doi: 10.1016/j.foreco.2014.09.038.

21. Chen, W.; Chen, J.; Cihlar, J. 2000. **An Integrated Terrestrial Ecosystem Carbon-Budget Model Based on Changes in Disturbance, Climate, and Atmospheric Chemistry.** Ecological Modelling. 135(1): 55-79. doi: 10.1016/s0304-3800(00)00371-9.
22. Zhang, F.; Chen, J.M.; Pan, Y.; Birdsey, R.A.; Shen, S.; Ju, W.; He, L. 2012. **Attributing Carbon Changes in Conterminous U.S. Forests to Disturbance and Non-Disturbance Factors from 1901 to 2010.** Journal of Geophysical Research: Biogeosciences. 117(2). doi: 10.1029/2011jg001930.
23. Dupigny-Giroux, L.A.; Mecray, E.L.; Lemcke-Stampone, M.D.; Hodgkins, G.A.; Lentz, E.E.; Mills, K.E.; Lane, E.D.; Miller, R.; Hollinger, D.Y.; Solecki, W.D.; Wellenius, G.A.; Sheffield, P.E.; MacDonald, A.B.; Caldwell, C. 2018. **Northeast.** In: Reidmiller, D.R.; Avery, C.W.; Easterling, D.R.; Kunkel, K.E.; Lewis, K.L.M.; Maycock, T.K.; Stewart, B.C., eds. Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume Ii. 18. Washington, DC, USA: US Global Change Research Program. p. 669-742. doi: 10.7930/NCA4.2018.CH18.
24. Janowiak, M.K.; D'Amato, A.W.; Swanston, C.; Iverson, L.; Thompson III, F.; Dijak, W.; Matthews, S.; Prasad, A.; Peters, M.; Fraser, J.S.; Brandt, L.; Butler, P.; Handler, S.; Shannon, P.D.; Burbank, D.; Campbell, J.; Cogbill, C.; Duveneck, M.; Emery, M.; Fisichelli, N.; Foster, J.; Hushaw, J.; Kenefic, L.; Mahaffey, A.; Morelli, T.L.; Reo, N.; Schaberg, P.; Simmons, K.R.; Weiskittel, A.; Wilmot, S.; Hollinger, D.; Lane, E.; Rustad, L.; Templer, P. 2018. **New England and New York Forest Ecosystem Vulnerability Assessment and Synthesis: A Report from the New England Climate Change Response Framework** Gen. Tech. Rep. NRS-173 Newtown Square, PA: U.S. Department of Agriculture, Forest Service, Northern Research Station. 234.
25. Shands, W. 1992. **The Lands Nobody Wanted: The Legacy of the Eastern National Forests. The Origins of the National Forests.**: Pinchot Institute for Conservation Studies.
26. Domke, G.; Perry, C.; Walters, B.; Nave, L.; Woodall, C.; Swanston, C. 2017. **Toward Inventory-Based Estimates of Soil Organic Carbon in Forests of the United States.** Ecological Applications.
27. Woodall, C.W.; Heath, L.S.; Domke, G.M.; Nichols, M.C. 2011. **Methods and Equations for Estimating Aboveground Volume, Biomass, and Carbon for Trees in the U.S. Forest Inventory, 2010.** Newtown Square, PA: U.S. Department of Agriculture, Forest Service, Northern Research Station. 30 p. doi: https://doi.org/10.2737/NRS-GTR-88.
28. Woodall, C.W.; Smith, J.E.; Nichols, M.C. 2013. **Data Sources and Estimation/Modeling Procedures for National Forest System Carbon Stocks and Stock Change Estimates Derived from the Us National Greenhouse Gas Inventory.** USDA Forest Service.
29. Dugan, A.J.; Birdsey, R.; Healey, S.P.; Pan, Y.; Zhang, F.; Mo, G.; Chen, J.; Woodall, C.W.; Hernandez, A.J.; McCullough, K. 2017. **Forest Sector Carbon Analyses Support Land Management Planning and Projects: Assessing the Influence of Anthropogenic and Natural Factors.** Climatic Change. 144(2): 207-220.
30. Skog, K.E. 2008. **Sequestration of Carbon in Harvested Wood Products for the United States.** Forest Products Journal. 58(6): 56-72.
31. Bergman, R.; Puettmann, M.; Taylor, A.; Skog, K.E. 2014. **The Carbon Impacts of Wood Products.** Forest Products Journal. 64(7-8): 220-231. doi: doi:10.13073/FPJ-D-14-00047.
32. Lippke, B.; Oneil, E.; Harrison, R.; Skog, K.; Gustavsson, L.; Sathre, R. 2011. **Life Cycle Impacts of Forest Management and Wood Utilization on Carbon Mitigation: Knowns and Unknowns.** Carbon Management. 2(3): 303-333. doi: 10.4155/cmt.11.24.
33. Gustavsson, L.; Madlener, R.; Hoen, H.F.; Jungmeier, G.; Karjalainen, T.; Klöhn, S.; Mahapatra, K.; Pohjola, J.; Solberg, B.; Spelter, H. 2006. **The Role of Wood Material for Greenhouse Gas Mitigation.** Mitigation and Adaptation Strategies for Global Change. 11(5-6): 1097-1127. doi: 10.1007/s11027-006-9035-8.
34. Smith, J.E.; Heath, L.S.; Skog, K.E.; Birdsey, R.A. 2006. **Methods for Calculating Forest Ecosystem and Harvested Carbon with Standard Estimates for Forest Types of the United States.** Gen. Tech. Rep. NE-343. . Newtown Square, PA: U.S. Department of Agriculture, Forest Service, Northeastern Research Station. 216.
35. Loeffler, D.; Anderson, N.; Stockmann, K.; Skog, K.; Healey, S.; Jones, J.G.; Morrison, J.; Young, J. 2014. Unpublished report. **Estimates of Carbon Stored in Harvested Wood Products from United States Forest Service Eastern Region.** Missoula, MT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station, Forestry Sciences Laboratory. 27 p.
36. Healey, S.P.; Cohen, W.B.; Yang, Z.; Kenneth Brewer, C.; Brooks, E.B.; Gorelick, N.; Hernandez, A.J.; Huang, C.; Joseph Hughes, M.; Kennedy, R.E.; Loveland, T.R.; Moisen, G.G.; Schroeder, T.A.; Stehman, S.V.; Vogelmann, J.E.; Woodcock, C.E.; Yang, L.; Zhu, Z. 2018. **Mapping Forest Change Using Stacked Generalization: An Ensemble Approach.** Remote Sensing of Environment. 204: 717-728. doi: 10.1016/j.rse.2017.09.029.
37. Crookston, N.L.; Dixon, G.E. 2005. **The Forest Vegetation Simulator: A Review of Its Structure, Content, and Applications.** Computers and Electronics in Agriculture. 49(1): 60-80. doi: 10.1016/j.compag.2005.02.003.
38. Skog, K.E.; McKinley, D.C.; Birdsey, R.A.; Hines, S.J.; Woodall, C.W.; Reinhardt, E.D.; Vose, J.M. 2014. **Managing Carbon.** In. Advances in Global Change Research. 151-182. doi: 10.1007/978-94-007-7515-2_7.

39. Dugan, A.J.; Birdsey, R.; Mascorro, V.S.; Magnan, M.; Smyth, C.E.; Olguin, M.; Kurz, W.A. 2018. **A Systems Approach to Assess Climate Change Mitigation Options in Landscapes of the United States Forest Sector.** Carbon Balance and Management. 13(1). doi: 10.1186/s13021-018-0100-x.
40. Pan, Y.; Chen, J.M.; Birdsey, R.; McCullough, K.; He, L.; Deng, F. 2011. **Age Structure and Disturbance Legacy of North American Forests.** Biogeosciences. 8(3): 715-732. doi: 10.5194/bg-8-715-2011.
41. Foster, D.R. 2006. **Forests in Time: The Environmental Consequences of 1,000 Years of Change in New England.** Yale University Press.
42. Pregitzer, K.S.; Euskirchen, E.S. 2004. **Carbon Cycling and Storage in World Forests: Biome Patterns Related to Forest Age.** Global change biology. 10(12): 2052-2077.
43. He, L.; Chen, J.M.; Pan, Y.; Birdsey, R.; Kattge, J. 2012. **Relationships between Net Primary Productivity and Forest Stand Age in U.S. Forests.** Global Biogeochemical Cycles. 26(3). doi: 10.1029/2010gb003942.
44. Ju, W.M.; Chen, J.M.; Harvey, D.; Wang, S. 2007. **Future Carbon Balance of China's Forests under Climate Change and Increasing Co2.** Journal of Environmental Management. 85(3): 538-562. doi: 10.1016/j.jenvman.2006.04.028.
45. Melillo, J.M.; Frey, S.D.; DeAngelis, K.M.; Werner, W.J.; Bernard, M.J.; Bowles, F.P.; Pold, G.; Knorr, M.A.; Grandy, A.S. 2017. **Long-Term Pattern and Magnitude of Soil Carbon Feedback to the Climate System in a Warming World.** Science. 358(6359): 101-105. doi: 10.1126/science.aan2874.
46. Xu, W.; Yuan, W.; Dong, W.; Xia, J.; Liu, D.; Chen, Y. 2013. **A Meta-Analysis of the Response of Soil Moisture to Experimental Warming.** Environmental Research Letters. 8(4). doi: 10.1088/1748-9326/8/4/044027.
47. Keeling, R.; Piper, S.; Bollenbacher, A.; Walker, S. 2009. **Atmospheric Co2 Records from Sites in the Sio Air Sampling Network, in Trends: A Compendium of Data on Global Change, Carbon Dioxide Information Analysis Center.** Carbon Dioxide Research Group Scripps Institution of Oceanography (SIO), University of California, La Jolla. California USA. URL: http://cdiac.ornl.gov/ftp/trends/co2/maunaloa.co2. Oak Ridge, TN: Oak Ridge Natl. Lab., U.S. Dep. of Energy.
48. Jones, A.G.; Scullion, J.; Ostle, N.; Levy, P.E.; Gwynn-Jones, D. 2014. **Completing the Face of Elevated Co2 Research.** Environment International. 73: 252-258. doi: 10.1016/j.envint.2014.07.021.
49. Zhang, F.; Chen, J.M.; Pan, Y.; Birdsey, R.A.; Shen, S.; Ju, W.; Dugan, A.J. 2015. **Impacts of Inadequate Historical Disturbance Data in the Early Twentieth Century on Modeling Recent Carbon Dynamics (1951-2010) in Conterminous U.S. Forests.** Journal of Geophysical Research: Biogeosciences. 120(3): 549-569. doi: 10.1002/2014jg002798.
50. Anderson-Teixeira, K.J.; Miller, A.D.; Mohan, J.E.; Hudiburg, T.W.; Duval, B.D.; DeLucia, E.H. 2013. **Altered Dynamics of Forest Recovery under a Changing Climate.** Global change biology. 19(7): 2001-2021. doi: 10.1111/gcb.12194.
51. DeLucia, E.H.; Hamilton, J.G.; Naidu, S.L.; Thomas, R.B.; Andrews, J.A.; Finzi, A.; Lavine, M.; Matamala, R.; Mohan, J.E.; Hendrey, G.R.; Schlesinger, W.H. 1999. **Net Primary Production of a Forest Ecosystem with Experimental Co2 Enrichment.** Science. 284(5417): 1177-1179. doi: 10.1126/science.284.5417.1177.
52. Norby, R.J.; Warren, J.M.; Iversen, C.M.; Medlyn, B.E.; McMurtrie, R.E. 2010. **Co2 Enhancement of Forest Productivity Constrained by Limited Nitrogen Availability.** Proceedings of the National Academy of Sciences. 107(45): 19368-19373.
53. Schimel, D.; Stephens, B.B.; Fisher, J.B. 2015. **Effect of Increasing Co2 on the Terrestrial Carbon Cycle.** Proceedings of the National Academy of Sciences of the United States of America. 112(2): 436-441. doi: 10.1073/pnas.1407302112.
54. Zhu, Z.; Piao, S.; Myneni, R.B.; Huang, M.; Zeng, Z.; Canadell, J.G.; Ciais, P.; Sitch, S.; Friedlingstein, P.; Arneth, A.; Cao, C.; Cheng, L.; Kato, E.; Koven, C.; Li, Y.; Lian, X.; Liu, Y.; Liu, R.; Mao, J.; Pan, Y.; Peng, S.; Peuelas, J.; Poulter, B.; Pugh, T.A.M.; Stocker, B.D.; Viovy, N.; Wang, X.; Wang, Y.; Xiao, Z.; Yang, H.; Zaehle, S.; Zeng, N. 2016. **Greening of the Earth and Its Drivers.** Nature Climate Change. 6(8): 791-795. doi: 10.1038/nclimate3004.
55. Körner, C.; Asshoff, R.; Bignucolo, O.; Hättenschwiler, S.; Keel, S.G.; Peláez-Riedl, S.; Pepin, S.; Siegwolf, R.T.W.; Zotz, G. 2005. **Ecology: Carbon Flux and Growth in Mature Deciduous Forest Trees Exposed to Elevated Co2.** Science. 309(5739): 1360-1362. doi: 10.1126/science.1113977.
56. Thomas, R.Q.; Canham, C.D.; Weathers, K.C.; Goodale, C.L. 2010. **Increased Tree Carbon Storage in Response to Nitrogen Deposition in the Us.** Nature Geoscience. 3(1): 13-17. doi: 10.1038/ngeo721.
57. Pardo, L.H.; Robin-Abbott, M.J.; Driscoll, C.T. 2011. **Assessment of Nitrogen Deposition Effects and Empirical Critical Loads of Nitrogen for Ecoregions of the United States.** Gen.
58. Aber, J.; McDowell, W.; Nadelhoffer, K.; Magill, A.; Berntson, G.; Kamakea, M.; McNulty, S.; Currie, W.; Rustad, L.; Fernandez, I. 1998. **Nitrogen Saturation in Temperate Forest Ecosystems.** BioScience. 921-934.
59. Boggs, J.L.; McNulty, S.G.; Gavazzi, M.J.; Myers, J.M. 2005. **Tree Growth, Foliar Chemistry, and Nitrogen Cycling across a Nitrogen Deposition Gradient in Southern Appalachian Deciduous Forests.** Canadian Journal of Forest Research. 35(8): 1901-1913. doi: 10.1139/x05-128.

60. Strock, K.E.; Nelson, S.J.; Kahl, J.S.; Saros, J.E.; McDowell, W.H. 2014. **Decadal Trends Reveal Recent Acceleration in the Rate of Recovery from Acidification in the Northeastern U.S.** Environmental science & technology. 48(9): 4681-4689. doi: 10.1021/es404772n.
61. Zaehle, S.; Sitch, S.; Smith, B.; Hatterman, F. 2005. **Effects of Parameter Uncertainties on the Modeling of Terrestrial Biosphere Dynamics.** Global Biogeochemical Cycles. 19(3): 1-16. doi: 10.1029/2004gb002395.
62. Luyssaert, S.; Schulze, E.D.; Börner, A.; Knohl, A.; Hessenmöller, D.; Law, B.E.; Ciais, P.; Grace, J. 2008. **Old-Growth Forests as Global Carbon Sinks.** Nature. 455(7210): 213-215. doi: 10.1038/nature07276.
63. Davis, S.C.; Hessl, A.E.; Scott, C.J.; Adams, M.B.; Thomas, R.B. 2009. **Forest Carbon Sequestration Changes in Response to Timber Harvest.** Forest Ecology and Management. 258(9): 2101-2109. doi: 10.1016/j.foreco.2009.08.009.
64. Keyser, T.L.; Zarnoch, S.J. 2012. **Thinning, Age, and Site Quality Influence Live Tree Carbon Stocks in Upland Hardwood Forests of the Southern Appalachians.** Forest Science. 58(5): 407-418. doi: 10.5849/forsci.11-030.
65. Woodall, C.W.; Coulston, J.W.; Domke, G.M.; Walters, B.F.; Wear, D.N.; Smith, J.E.; Andersen, H.-E.; Clough, B.J.; Cohen, W.B.; Griffith, D.M.; Hagen, S.C.; Hanou, I.S.; Nichols, M.C.; Perry, C.H.H.; Russell, M.B.; Westfall, J.; Wilson, B.T.T. 2015. **The U.S. Forest Carbon Accounting Framework: Stocks and Stock Change, 1990-2016.** Gen. Tech. Rep. NRS-154. Newtown Square, PA: U.S. Department of Agriculture, Forest Service, Northern Research Station. 49 p. doi: https://doi.org/10.2737/NRS-GTR-154.
66. Duveneck, M.J.; Thompson, J.R.; Gustafson, E.J.; Liang, Y.; de Bruijn, A.M.G. 2017. **Recovery Dynamics and Climate Change Effects to Future New England Forests.** Landscape Ecology. 32(7): 1385-1397. doi: 10.1007/s10980-016-0415-5.
67. Ollinger, S.; Goodale, C.; Hayhoe, K.; Jenkins, J. 2008. **Potential Effects of Climate Change and Rising Co2 on Ecosystem Processes in Northeastern U.S. Forests.** Mitigation and Adaptation Strategies for Global Change. 13(5): 467-485.
68. Tang, G.; Beckage, B.; Smith, B. 2014. **Potential Future Dynamics of Carbon Fluxes and Pools in New England Forests and Their Climatic Sensitivities: A Model-Based Study.** Global Biogeochemical Cycles. 28(3): 286-299. doi: 10.1002/2013gb004656.
69. Thompson, J.R.; Foster, D.R.; Scheller, R.; Kittredge, D. 2011. **The Influence of Land Use and Climate Change on Forest Biomass and Composition in Massachusetts, USA.** Ecological Applications. 21(7): 2425-2444. doi: 10.2307/41416668.
70. Shifley, S.R.; Moser, W.K. 2016. **Future Forests of the Northern United States.** Gen. Tech. Rep. NRS-151. Newtown Square, PA: U.S. Department of Agriculture, Forest Service, Northern Research Station. 77-106.
71. Vose, J.M.; Peterson, D.L.; Patel-Weynand, T. 2012. **Effects of Climatic Variability and Change on Forest Ecosystems: A Comprehensive Science Synthesis for the U.S. Forest Sector.** Portland, OR: U.S. Department of Agriculture, Forest Service, Pacific Northwest Research Station: 265 p.
72. Vose, J.M.; Peterson, D.L.; Domke, G.M.; Fettig, C.J.; Joyce, L.A.; Keane, R.E.; Luce, C.H.; Prestemon, J.P.; Band, L.E.; Clark, J.S.; Cooley, N.E.; D'Amato, A.; Halofsky, J.E. 2018. **Forests.** In: Reidmiller, D.R.; Avery, C.W.; Easterling, D.R.; Kunkel, K.E.; Lewis, K.L.M.; Maycock, T.K.; Stewart, B.C., eds. Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume Ii. 6. Washington, DC, USA: US Global Change Research Program. p. 232-267. doi: 10.7930/NCA4.2018.CH6.
73. McMahon, S.M.; Parker, G.G.; Miller, D.R. 2010. **Evidence for a Recent Increase in Forest Growth.** Proceedings of the National Academy of Sciences. 107(8): 3611-3615.
74. Campbell, J.L.; Rustad, L.E.; Boyer, E.W.; Christopher, S.F.; Driscoll, C.T.; Fernandez, I.J.; Groffman, P.M.; Houle, D.; Kiekbusch, J.; Magill, A.H.; Mitchell, M.J.; Ollinger, S.V. 2009. **Consequences of Climate Change for Biogeochemical Cycling in Forests of Northeastern North America.** Canadian Journal of Forest Research-Revue Canadienne De Recherche Forestiere. 39(2): 264-284. doi: 10.1139/x08-104.
75. Zhao, T.; Dai, A. 2016. **Uncertainties in Historical Changes and Future Projections of Drought. Part Ii: Model-Simulated Historical and Future Drought Changes.** Climatic Change. 1-14. doi: 10.1007/s10584-016-1742-x.
76. Berg, A.; Sheffield, J.; Milly, P.C.D. 2017. **Divergent Surface and Total Soil Moisture Projections under Global Warming.** Geophysical Research Letters. 44(1): 236-244. doi: 10.1002/2016gl071921.
77. Dukes, J.S.; Pontius, J.; Orwig, D.; Garnas, J.R.; Rodgers, V.L.; Brazee, N.; Cooke, B.; Theoharides, K.A.; Stange, E.E.; Harrington, R.; Ehrenfeld, J.; Gurevitch, J.; Lerdau, M.; Stinson, K.; Wick, R.; Ayres, M. 2009. **Responses of Insect Pests, Pathogens, and Invasive Plant Species to Climate Change in the Forests of Northeastern North America: What Can We Predict?** Canadian Journal of Forest Research. 39(2): 231-248.
78. D'Amato, A.W.; Bradford, J.B.; Fraver, S.; Palik, B.J. 2011. **Forest Management for Mitigation and Adaptation to Climate Change: Insights from Long-Term Silviculture Experiments.** Forest Ecology and Management. 262(5): 803-816. doi: http://dx.doi.org/10.1016/j.foreco.2011.05.014.
79. Kurz, W.A.; Dymond, C.C.; Stinson, G.; Rampley, G.J.; Neilson, E.T.; Carroll, A.L.; Ebata, T.; Safranyik, L. 2008. **Mountain Pine Beetle and Forest Carbon Feedback to Climate Change.** Nature. 452(7190): 987-990. doi: 10.1038/nature06777.

80. Walck, J.L.; Hidayati, S.N.; Dixon, K.W.; Thompson, K.; Poschlod, P. 2011. **Climate Change and Plant Regeneration from Seed.** Global Change Biology. 17(6): 2145-2161.
81. Iverson, L.R.; Thompson, F.R.; Matthews, S.; Peters, M.; Prasad, A.; Dijak, W.D.; Fraser, J.; Wang, W.J.; Hanberry, B.; He, H. 2017. **Multi-Model Comparison on the Effects of Climate Change on Tree Species in the Eastern Us: Results from an Enhanced Niche Model and Process-Based Ecosystem and Landscape Models.** Landscape Ecology. 32(7): 1327-1346.
82. Petrie, M.; Bradford, J.B.; Hubbard, R.; Lauenroth, W.; Andrews, C.; Schlaepfer, D. 2017. **Climate Change May Restrict Dryland Forest Regeneration in the 21st Century.** Ecology. 98(6): 1548-1559.
83. Aber, J.D.; Ollinger, S.V.; Fédérer, C.A.; Reich, P.B.; Goulden, M.L.; Kicklighter, D.W.; Melillo, J.; Lathrop, R. 1995. **Predicting the Effects of Climate Change on Water Yield and Forest Production in the Northeastern United States.**
84. Pan, Y.; Birdsey, R.; Hom, J.; McCullough, K. 2009. **Separating Effects of Changes in Atmospheric Composition, Climate and Land-Use on Carbon Sequestration of Us Mid-Atlantic Temperate Forests.** Forest Ecology and Management. 259(2): 151-164.
85. Allen, C.D.; Macalady, A.K.; Chenchouni, H.; Bachelet, D.; McDowell, N.; Vennetier, M.; Kitzberger, T.; Rigling, A.; Breshears, D.D.; Hogg, E.H.; Gonzalez, P.; Fensham, R.; Zhang, Z.; Castro, J.; Demidova, N.; Lim, J.H.; Allard, G.; Running, S.W.; Semerci, A.; Cobb, N. 2010. **A Global Overview of Drought and Heat-Induced Tree Mortality Reveals Emerging Climate Change Risks for Forests.** Forest Ecology and Management. 259(4): 660-684. doi: 10.1016/j.foreco.2009.09.001.

USDA United States Department of Agriculture | Forest Service | White Mountain National Forest | 71 White Mountain Drive
Campton, NH 03223
603-536-6100

**File Code:** 1570
**Date:** October 18, 2023

Zack Porter,
Executive Director of Standing Trees

Dear Zack Porter:

This letter is in response to the objection (# 23-09-22-021-A218) you filed on behalf of Standing Trees on the Peabody West Integrated Resource Project (Peabody West project) Environmental Assessment/Finding of No Significant Impact (EA/FONSI) and Draft Decision Notice (DDN). This project is located in the Androscoggin Ranger District of the White Mountain National Forest (WMNF). As the Reviewing Officer for the Peabody West project's objections, I have completed the review of your objection following the pre-decisional administrative review regulations provided by 36 CFR 218, Subparts A and B. The 45-day objection filing period for this project was initiated by the publication of a legal notice in the newspaper of record, the *Union Leader*, on April 27, 2023. The Responsible Official for this project is Josh Sjostrom, District Ranger. Your timely written objection was received on June 12, 2023.

The Peabody West project's proposed action was developed to meet desired conditions as provided by the WMNF's 2005 Land and Resource Management Plan (henceforth called the Forest Plan). Under the proposed action, management actions would occur within approximately 3,000 acres of management area (MA) 2.1 (General Forest Management) lands. The purpose of MA 2.1 is to provide a sustained yield of high-quality timber products; provide a balanced mix of habitats for wildlife; provide a variety of recreation opportunities; and manage high-use or highly developed recreation areas to acceptable social and ecological standards while retaining some low-use and less developed areas. The project will advance Forest Plan goals and objectives by providing high-quality timber products, diversifying wildlife habitat, and addressing other recreation and transportation management needs.

I have reviewed the project's supporting record including the Final EA/FONSI, DDN, and supporting documents relative to the issues raised in your objection. Some of the supporting project record documents were made available through Pinyon Public on the project website (https://www.fs.usda.gov/project/whitemountain/?project=55659). A team of natural resource professionals assisted me in this review. The body of this letter provides my written response to your objection as required by 36 CFR 218.11(b).

**Issue 1**

*The project's purpose and need lacks sufficient detail to allow for adequate analysis under NEPA including a range of alternatives.*

**Response:** Your objection claimed that the development of a more accurate purpose and need statement would promote and require exploration of other forest management prescriptions to better implement the Forest Plan.

My review found documentation in the Peabody West project record showing that the proposed action is consistent with the Forest Plan. The Final EA (p. 1) shows clear consistency with the Forest Plan by using language from the Forest Plan that requires projects to use sustainable ecosystem management practices to provide healthy ecosystems and a sustainable yield of high-quality forest products, as well as to provide for a diversity of habitats, including habitat types, age classes, and non-forested habitats.

The Final EA (pp. 1-2) references the detailed objectives from the Forest Plan and describes the current conditions and types of wildlife habitat required to meet the Peabody West Habitat Management Unit (HMU) objectives. The Final EA (p. 4) discusses internal review using LiDAR and aerial photography to define the current conditions and refine the "proposed units, prescriptions, and seasons of harvest to avoid or minimize potential impact to sensitive species, floodplains, wildlife and scenery." Additional review of silvicultural treatment options was discussed, such as large openings, for wildlife habitat diversity, additional growing space for enhanced crown and bole development, and to encourage the establishment of shade-intolerant species in the understory. After the interdisciplinary team conducted field visits, the treatment boundaries and acres were modified to address site-specific conditions, wet areas, steep or rocky slopes, and forest type changes (Final EA, p. 4).

By regulation 36 CFR 220.7(b)(2), no specific number of alternatives is required or prescribed for an EA. The Final EA describes the consequences of taking no action by comparing baseline conditions with the effects of the proposed action. This comparison is further supported by the response to comment #42 in the project record (PR): 30-day Response to Comments on the Draft EA document (henceforth called 30-day RTC). Also, as noted in PR: PeabodyWestScopingRTCPD1 (line 12), the Responsible Official was responsive to public comment by removing items from the proposed action. Further adjustments to the proposed action were summarized in the Draft EA (p. 20), Final EA (p. 21), PR: PeabodyWest_ScopingRTC_ScopingPd2Updated (lines 51 and 58), and PR: UnitChanges_Tracking spreadsheet (lines 26, 30, 31). Furthermore, the Draft EA (p. 4) highlighted changes to the project since initial scoping as evidence of continual review of the proposed actions, including, for example, the removal of actions to recreation infrastructure in the Hermit Lake Complex. Overall, these documents show that the proposed action evolved throughout project development in a way that minimized the value of creating a set of alternatives.

The Responsible Official addressed your objection's comment regarding the range of alternatives, specifically which project adjustments would counter the project's purpose and need, and which can be addressed through project design features in response to your comment during the comment period; see PR: PeabodyWest30dRTC workbook RTCbyAuthor spreadsheet (line 22).

In conclusion, the Peabody West project's purpose and need comply with the Forest Plan and with NEPA requirements.

**Issue 2**

*The FONSI is in violation of NEPA because of the uncertain or adverse impacts and the lack of consideration of context and intensity of effects.*

**Response:** The Final EA/FONSI documents project-specific analysis including context and intensity factors (pp. 28-30). Uncertain effects, a specific element of your objection, are also addressed (Final EA, p. 29). Similar past actions are referred to where relevant within the determination of several of the FONSI intensity factors. Your objection states that the Peabody West project's effects to numerous

resources are "significant"; however, my review of the project record found that its analysis supports a FONSI. The Responsible Official has discretion, based on the analysis and project record, to issue a FONSI.

**Issue 3**

*The Peabody West project ignores best available science in project development and in the analysis of effects.*

**Response:** Consideration of the best available scientific information is documented throughout the specialist reports where the analysis used, for example, information gathered through field stand exams (PR folder: 0411VegManagement); LiDAR (PR: Peabody West SHPO Package, p. 11); and basal area calculation using GIS (PR folder: 0404Hydrology; GIS-based HUC16 level basal area calculations). Additionally, the project was developed using a climate change adaptation workbook process (PR folder: 0402ClimateChg) using recent literature and scientific modeling tools as described in the WMNF Carbon Assessment (2019).

Numerous scientific papers and popular media articles were submitted by commenters, including the objector, though most were not specific or directly applicable to the project (per 36 CFR 218.2; specific written comments) as noted in 30-day RTC #26. For submitted scientific information that was determined to be accurate, reliable and relevant to the project, consideration is documented in the project record. Overall, literature included as footnote references in the comments was considered holistically in the comment and response statements in the Comment Analysis and Response Application (CARA) database and reported in PR: ConcernsResponsesAllCommentsReport_55659_2023-06-29. For instance, consideration of publications relevant to New England forest ecology and tree mortality were outlined in 30-day RTC #33, #45, and #52 and in the project record (PR: Peabody West HMU Rationale.pdf). The project's stated purposes of increasing within-stand diversity of species and moving the forest species composition and age classes closer to the Forest Plan objectives, as well as comment responses and cumulative effects discussions around forest ecology, are evidence of consideration of current scientific information.

The WMNF did not prepare a piece-by-piece review of scientific literature submitted by commenters and is not required to do so for literature submitted during the objection period (per 36 CFR 218.11 (b)(1)) though new literature is considered in the context of the objector's points when it is specifically related to the project. As noted in PR: PeabodyWestResponseStandingTreesSimplified.docx (p. 2), attachments to the comment letters were considered in the context of the statement in the body of the public comment.
In conclusion, my review found that the Final EA/FONSI and supporting documents in the project record demonstrate compliance with the Forest Plan and applicable laws, regulations, and policies by considering the best available scientific information.

**Issue 4**

*Public involvement in the Peabody West project was consistently thwarted by the unavailability of supporting documents, a lack of sufficient detail, and inadequate public engagement in project development.*

**Response:** For an EA, the Forest Service is required per 40 CFR 1501.5 (e) to "involve the public […] to the extent practicable [...]." The DDN (p. 2) provides a summary of public involvement, including a

pre-scoping open house, a formal scoping period, and a public comment period. During scoping, the project area map with the proposed actions provided the opportunity for the public to provide input on the proposal and to identify issues. Two bulletins informing the public of progress on project development were posted on Pinyon Public (PR: PeabodyWest_ScopingSummaryRpt.docx and PR: PeabodyWest_UpdatedScopingFinal.docx).

Supporting documents were available to the public on the Peabody West project website and its Pinyon Public folder, including the two Biological Evaluations, northern long-eared bat Biological Opinion re-initiation, WMNF Carbon Assessment (2019), specialist reports for Scenery, Soils, and Inventoried Roadless Areas, and the project-level Carbon Assessment. The Final EA (p. 24) refers to the Albany South EA, which is available on the Albany South Pinyon Public Folder at: https://www.fs.usda.gov/project/whitemountain/?project=39614. A detailed consideration of public comments is documented in the project record at PR: PeabodyWest30dRTC and PR: PeabodyWest30dRTC_Working. In addition, the project record contains documentation of email correspondences between the WMNF staff and the public on the Peabody West project in PR folder: 02OtherExtComms. Though these documents exist in the project record, they were not posted to Pinyon Public during the objection period.

In conclusion, my review found that the project record demonstrates compliance with regulations related to public engagement. An open house and formal scoping and comment periods afforded the public with opportunities to provide input on the project. Supporting documents were provided on Pinyon Public, but there are no requirements to make the entirety of the project record available for the public. The public could have requested additional documents that were not already made available on the project webpage.

**Issue 5**

*The Forest Service should have used project specific conditions to describe the impacted environment in its analysis of water quality impacts.*

**Response:** The Peabody West project does not include a project-specific hydrology/water specialist report documenting impacts to water quality. Instead, consideration of these effects was based broadly on the effects analysis from the Albany South EA (PR: USDA FS 2017 Albany South Final EA.pdf) and Albany South Water Resource Report (PR: 20171202AlbanySouthWaterRptFinalv2.pdf), suggesting that the analysis completed in the Albany South project was largely sufficient to make a decision in the Peabody West project area; however, no description of the sites' similarities or differences is explicitly documented in the Peabody West project record.

The Peabody West project will follow water quality best management practices (Final EA, p. 13) and Forest Plan Standard Operating Practices (SOP). Detailed analysis of watershed effects, in terms of basal area reductions and the extent of even-aged management, is documented in a spreadsheet (PR: PeabodyWestBAWatershedAnalysisTbl20220328.xlsx) and summarized in the Final EA (p. 24). According to an email dated October 6, 2021, the hydrologist on the Peabody West interdisciplinary team completed field review of timber harvest in units with proposed Land Suitability Class changes and has identified "no-harvest" zones in some of them and otherwise adjusted timber cutting unit boundaries to account for riparian zone buffers in others (PR: 20211006EmailLGryczkowski_LSCUnitsDesignFeatures.pdf). The project record does not otherwise include a stand-by-stand listing of where best management practices (BMPs) and other design features

would be applied, but this October 6, 2021, email suggests that such a GIS analysis exists and is located in the T-drive (Geographic Information Systems workspace for Forest Service employees).

In conclusion, the project record shows that the WMNF completed an assessment of watershed conditions and adjusted the proposed action according to these conditions. However, the project record has incomplete documentation of this analysis, especially in terms of how the Peabody West project area may be compared or contrasted to the Albany South project area.

**Instruction:** Explain the relevance of the Albany South project hydrology analysis to the Peabody West project analysis or provide an independent analysis of the Peabody Project.

**Issue 6**

*The Final EA does not explain or analyze the recreation and transportation needs driving the proposal.*

**Response:** My review found that the Final EA (pp. 2-3, 11-12) identifies the recreational needs driving the Peabody West project. The Recreation Specialist Report also references Forest Service Handbook (FSH) 2309.18, which provides additional context to justify the development of mountain biking and backcountry skiing trails, trail connections with surrounding communities, and trail accessibility improvements. The Forest Plan provides management direction specific to resolving transportation safety issues, improving trail accessibility, concentrating non-motorized dispersed recreational use, and, in MA 2.1 specifically, providing non-motorized recreation opportunities.

According to the Final EA, "the project is needed to […] provide backcountry skiing and mountain biking opportunities and improve connectivity among those opportunities in the project area" (p. 2). The Final EA further notes that "mountain bike trail networks exist or are proposed on adjacent private lands" (p. 3). A few pages later, the Final EA discusses in greater detail the proposed connections to those systems and how the proposed backcountry skiing zone would connect to existing parking and trail facilities on adjacent private lands, as well as to the Pine Mountain Trail (p. 11).

FSH 2309.18-2010-1, 21.21 WMNF Trails Management Handbook Supplement (hereafter Trails Management Handbook Supplement) (p. 4), as referenced by the Recreation Specialist Report (p. 1), provides a weighted rating method for the prioritization of trail proposals based on how well they meet defined emphasis areas including "connecting local communities to the National Forest," or "the degree to which [trails] provide access to NF lands for residents and visitors without the requirement to drive to a trailhead." As such, the connection of mountain biking and backcountry skiing trails to existing or proposed trail networks on adjacent private lands would not only be consistent with applicable management direction but would also be aligned with a defined trail prioritization emphasis area.

The Final EA (p. 2) provides rationale for why the Forest-wide mountain biking trail system is considered "largely unsuitable for most mountain bike users" and notes that "no managed opportunities for mountain biking exist on the Androscoggin Ranger District" (p. 2). Similarly, "no backcountry skiing opportunities exist [on National Forest System lands] in the project area" (Final EA, p. 3). The Trails Management Handbook Supplement at 21.1 (p. 3), as referenced by the Recreation Specialist Report (p. 1), specifies that neither "incorporation of existing incidental [mountain biking] trails and travel corridors in the Forest Trail System" nor "development of trails within permitted ski areas" would count against Forest Plan limitations (ref. G-4, p. 2-20). Thus, there would not be a management direction consistency issue associated with adding mountain biking or backcountry skiing trails. The

Trails Management Handbook Supplement at 21.21 (p. 4) further explains the weighted rating method for prioritization of trail proposals, including "scarcity of the opportunity," or "the degree to which [trails] provide a trail-based recreation activity that is appropriate for the terrain and the setting and is lacking on the Forest or surrounding area." As such, the development of mountain biking and backcountry skiing trails would be aligned with a defined trail prioritization emphasis area.

The Final EA states that "the project is needed to improve accessibility at Third Hole swimming site" (p. 2). The Trails Management Handbook Supplement at 21.21 (p. 4), as referenced by the Recreation Specialist Report (p. 1), provides a weighted rating method for the prioritization of trail proposals based on how well they meet defined emphasis areas including "universal access," or "the degree to which [trails] provide a more universally accessible trail opportunity." As such, the proposed accessibility improvements would be aligned with a defined trail prioritization emphasis area. Additionally, Forest-wide Accessibility Goals include providing recreation opportunities for people with disabilities and improving accessibility to recreation sites (Forest Plan, p. 1-3). The proposed trail accessibility improvements would clearly help meet these goals, even if not explicitly stated in the Final EA. Forest-wide Accessibility Goals also respond to a need for more accessible facilities that is evident in National Visitor Use Monitoring (NVUM) survey results for the WMNF, given that 12 percent of disabled visitors who were surveyed did not find Forest Service facilities to be accessible (PR: WMNF NVUM, FY 2020, p. 36).

As per Forest Plan Map 1-01 (p. 1-11) and the Recreation Specialist Report (p. 1), the proposed recreation activities would be located in Roaded Natural and Rural Recreation Opportunity Spectrum (ROS) classes. The desired conditions for those ROS classes in MA 2.1 include different levels of noticeable human activity (from moderate to readily evident) and "substantial non-motorized recreation opportunities" (Forest Plan, p. 3-3, 3-4; H-3, H-4). As such, the proposed action is not only consistent with applicable ROS-related management direction but would also help achieve desired conditions for MA 2.1.

The Final EA states that "vegetation located in the State Route 16 right-of-way inhibits visibility of the Androscoggin Ranger District administrative site from the roadway" and "management action is needed to improve line-of-sight [and] improve visibility" (p. 3). Forestwide Transportation System Goals include providing a safe transportation network (Forest Plan, p. 1-16). Improving roadway line-of-sight and visibility would clearly help meet this goal, even if the Final EA does not explicitly state it.

Finally, your objection claimed that the Final EA did not discuss the 2015 Transportation Analysis Report (PR: WMNF 2015 TravelAnalysisReport.pdf) in its rationale for the proposed transportation actions. The report was referenced in the Draft EA (p. 2) and Final EA (p. 2). The Final EA Appendix B (p. 35) provided sufficient detail on proposed transportation activities to understand what actions will be taken for the Peabody West project. However, the 2015 Transportation Analysis Report, which would provide additional context for the Peabody West project, was not made available to the public.

In conclusion, the Peabody West project identifies recreation needs that are well described and analyzed in the Final EA and in supporting documents in the project record. However, the public would have benefitted from access to the 2015 Transportation Analysis Report.

**Instruction:** Make the 2015 Transportation Analysis Report available to the public.

**<u>Issue 7</u>**

*The Final EA contains no analysis of the impact of logging on existing recreational resources within the project area.*

**Response:** The Final EA (pp. 13-14) lists multiple design elements that minimize the proposed action's effects to recreation, including the posting of caution or closure signs, the requirement for an implementation plan for the Pine Mountain glade area, additional review of skintrack and mountain bike trail layout prior to construction, timber-hauling limitations at specific times and locations, prioritization of harvest in certain units to reduce impacts to winter recreation, and a winter harvest requirement for other units to reduce impacts to summer recreation. The Final EA's inclusion of such design elements, especially given the unit specificity of some of them, is evidence that the analysis discloses the proposed action's impacts to recreation.

The Final EA (pp. 22-23) states that the proposed action is consistent with applicable recreation management direction, including the design elements noted above. The proposed action would adhere to Forest Plan direction including maintaining existing ROS objectives (Forest Plan, p. 1-10); timber management prescriptions adjacent to trail corridors that protect trail- and recreation-related values (Forest Plan, pp. 2-29 to 2-30); desired conditions including a range of noticeable human activity and silvicultural practices used to meet multiple resource objectives (Forest Plan, pp. 3-3 to 3-4); and harvest restrictions (time of day, day of the week, or season) in high-use or sensitive areas on a case-by-case basis (Forest Plan, p. 3-8). The proposed action's consistency with management direction, as stated in the Final EA, demonstrates that either the project activities would align with the setting and experience characterizations of the applicable ROS classes (refer to Forest Plan Appendix H) and desired conditions of MA 2.1 (Forest Plan, pp. 3-3 to 3-4); or, otherwise, the design elements listed in the Final EA (pp. 13-14) would help protect recreation-related values along trail corridors and in select high-use or sensitive areas (Forest Plan, pp. 2-29 to 2-30, 3-8).

As evidence of the recreation analysis performed, the Recreation Specialist Report states that "impacts to recreation resources are considered in the context of overall recreation experience, or project-related conflicts with recreation activities, in the local area" (p. 2), and it is reasonable to assume that logging would be considered a conflict with the recreation experience and recreation activities for the purposes of analysis. The Recreation Specialist Report also notes that the proposed action's impacts to recreation are anticipated to be "minor and short term in nature," as well as localized and not persisting past project implementation, including "noise, closures, or other disruptions in use associated with project construction or timber harvest activities," which are "not expected to have substantial cumulative impacts on recreation resources in the analysis area" (p. 2).

According to the Recreation Specialist Report, "the project area consists of Rural, Roaded Natural, Semi-Primitive Motorized, and Semi-Primitive Non-Motorized ROS classes" (p. 1). The Forest Plan (Appendix H) provides detailed descriptions of the setting and experience characterizations for each of these ROS classes, as well as a map of the ROS class allocations on the WMNF (Forest Plan, p. 1-11), to explain the current recreation settings in the project area. The current recreation opportunities in the project area are listed in the Recreation Specialist Report (p. 2) and include hiking, non-motorized and motorized winter recreation trails, campgrounds, trailheads, hunting, fishing, swimming, and other dispersed recreation opportunities.

In conclusion, the recreation-related impacts of vegetation management in the Peabody West project were sufficiently analyzed and disclosed.

**Issue 8**

*The Forest Service failed to consult with the National Park Service, Appalachian Mountain Club, and Dartmouth Outing Club on impacts of the project on the Appalachian Trail.*

**Response:** I am setting aside this objection point because you did not raise this issue during scoping or another designated opportunity for public comment (see 36 CFR § 218.10(a)(3)) and it is not based on information that arose after opportunities for public comment (see 36 CFR § 218.10(a)(4)).

**Issue 9**

*The Final EA's analysis of scenic resources is insufficient because it relies on four public land viewpoints, lacks discussion of impacts related to the AT, and fails to define the geographic scope of the cumulative impacts analysis.*

**Response:** I am setting aside this objection point because you did not raise this issue during scoping or another designated opportunity for public comment (see 36 CFR 218.10(a)(3)) and is not based on information that arose after opportunities for public comment (see 36 CFR 218.10(a)(4)).

**Issue 10**

*The project violates the National Forest Management Act (NFMA) because the opening sizes exceed Forest Plan guideline G-3 for scenic integrity objectives.*

**Response:** The Final EA discloses that the clearcut in unit 19, the patch cut in unit 20, and the expansion of the existing wildlife opening "exceed the Forest Plan guideline G-3 for MA 2.1 land [p. 3-6], which states maximum observed opening size should not exceed 5 acres in areas with a high scenic integrity objective" (p. 22). However, not following guideline G-3 in this instance does not constitute a NFMA violation, chiefly because guidelines are defined differently than standards, which must always be followed. As defined in the Forest Plan, "a guideline [as opposed to a standard] also is a required course of action or level of attainment but permits operational flexibility to respond to variations in conditions. Guidelines can be modified or not implemented, but the rationale for doing so must be documented in a project-level analysis and signed decision" (Forest Plan, p. 2-3).

My review found that the Final EA does provide this rationale for deviation from guideline G-3. The Final EA states that the clearcut in unit 19, the patch cut in unit 20, and the expansion of the existing wildlife opening "better meet project-level objectives for the Peabody West HMU, and to move the forest toward desired conditions consistent with the Forest Plan" (p. 22), even though they exceed the maximum observed opening size of 4-5 acres required by MA 2.1 scenery management guideline G-3 (Forest Plan, p. 3-6). The rationale for doing so is provided in the Peabody West HMU Rationale document, referenced in the Final EA (p. 2) and available on Pinyon Public, which provides extensive discussion of gaps between existing and desired future habitat conditions in the HMU. This discussion supports the Final EA's statement that "an analysis of the current habitat conditions indicates that the Peabody West HMU is not meeting MA 2.1 habitat composition and age class objectives" (p. 1). These documents make clear that it is not possible for the project area to be consistent with both MA 2.1 habitat management direction and MA 2.1 scenery management direction. Thus, the Responsible

Official is choosing for Forest Plan habitat objectives to take precedence over Forest Plan scenery objectives.

MA 2.1 scenery management guideline G-3 also states that "if openings occur, they should appear as natural occurrences and be well-distributed in the viewed landscape" (Forest Plan, p. 3-6). In response, design element SCM-1 was included in the Final EA (p. 15), specifying that the Forest Landscape Architect shall review final layouts in units 19 and 20 to ensure that openings are well distributed in the landscape to the maximum extent practical. The Forest Plan identifies Scenic Integrity Objectives as "indicators of the alteration or disturbance allowed in the viewed landscape" (S-1, p. 2-26). The Forest Plan further states that "Scenic Integrity Objectives will be met by a. Applying the technical principles and guidelines outlined in the National Forest Landscape Management Handbook series […]" and "b. Following examples of Scenic Integrity Objectives found in Appendix H of Landscape Aesthetics – A Handbook for Scenery Management" (S-2, p. 2-26).

In conclusion, excluding consistency with MA 2.1 Scenery Management guideline G-3 (Forest Plan, p. 3-6), the WMNF complied with all applicable laws, regulations, and policies in its evaluation and disclosure of potential scenery impacts associated with the project. The rationale for the deviation from the maximum visible acreage size specified by guideline G-3 is provided in the Final EA.

**Issue 11**
*Logging will harm the northern long-eared bat (NLEB) and other species that depend on mature, interior forests.*

**Response:** The Peabody West project's consultation history with the U.S. Fish & Wildlife Service is summarized in the 2023 Biological Evaluation (2023 BE, p. 3) and the EA/FONSI (p. 25). Two project-specific BEs were completed for the Peabody West project, the first in 2022 (before NLEB was listed as an endangered species) and the second in 2023 (PR: PeabodyWestBioEval20230420.docx) after the uplisting. At a broad scale, the Forest Service consulted with the U.S. Fish & Wildlife Service on the effects of land management activities across the Eastern and Southern Regions; the Peabody West project had a "May Affect, Not Likely to Adversely Affect" determination for NLEB (2023 BE) and received concurrence for that determination in the batched Biological Opinion (BO; see PR: R9 project list_NLEB PBO March 2023.xlsx Tab 0922 row 16).

The 2023 BE (p. 7) describes direct, indirect, and cumulative effects to NLEB. The project will follow Forest Plan standards and guidelines concerning rare habitat and reserve trees (pp. 13, 35-36), which were developed to minimize impacts to NLEB and other species dependent on mature, interior forests. Forest Plan standards and guidelines and bat conservation measures will be incorporated into the project (2023 BE, p. 7). No known hibernacula for NLEB or other bat species are in the project area (2023 BE, p. 7), so there can be no effects to bat hibernacula.
The 2023 BE documents analysis of effects to other sensitive species. It explains that most species' habitats will not be affected by proposed activities because they are not present in those locations, as evidence by negative survey results, or because the locations are not considered suitable for the species (2023 BE, pp. 14-15).

**Issue 12**
*The project violates the Endangered Species Act by failing to properly analyze the effects to NLEB and failing to protect the species.*

**Response:** The Peabody West project's consultation history with the U.S. Fish & Wildlife Service is summarized in the 2023 BE (p. 3) and the EA/FONSI (p. 25). Two project-specific BEs were completed for the Peabody West project, the first in 2022 (before NLEB was listed as an endangered species) and the second in 2023 after the uplisting on April 20, 2023 (PR: PeabodyWestBioEval20230420.docx). The 2023 BE (pp. 5-7) describes the status of the species and habitat suitability in the project area. The analysis assumes "presence" of the species in the project area and discloses direct, indirect, and cumulative effects to the species. The WMNF did consider NLEB as an endangered species for the cumulative effects portion of the Peabody West project (2023 BE, pp. 5-6). The 2023 BE (p. 7) further states that the species is not habitat-limited (either roost or foraging habitat). The 2023 BE estimated the level of logging activity of non-Forest Service lands in the project area in combination with project effects and concluded that there would be no adverse effect to the species.

The Eastern and Southern Regions of the Forest Service re-initiated consultation with the U.S. Fish & Wildlife Service when the NLEB was uplisted, who provided a BO on March 31, 2023, in which they determined that the Peabody West project may affect but is not likely to adversely affect NLEB. The Peabody West project was included in the BO (PR: R9 project list_NLEB PBO March 2023.xlsx; Tab 0922; row 16) and is thus compliant with the Endangered Species Act and satisfies Section 7 consultation requirements.

Uplisting was considered in the response to comments; however, during that time, NLEB had not been finalized as an endangered species (30-day RTC). The tri-colored bat was also considered as a proposed endangered species in the 2023 BE (p. 8). Presence is assumed for this species, but conferencing under ESA (Section 7) was not required.

The 2023 BE (pp. 7-8) states, "This effects analysis assumes that all Forest Plan Standards and Guidelines, in particular those applicable to wildlife reserve trees (White Mountain National Forest 2005 Chapter 2 pgs. 35-36), and the northern long-eared bat (NLEB) conservation measures developed by the Eastern Region of the USDA Forest Service (Sandeno 2015) would be followed." The 2023 BE (p. 10) also specifies NFMA and Forest Plan consistencies for wildlife, and these design elements related to wildlife are shown in the Final EA (p. 23).
In conclusion, the Peabody West project record provided sufficient analysis and clear rationale related to the objection issue and demonstrates that the WMNF complied with law, regulation, and policy relative to this issue.

**Issue 13**
*The project will contribute to the loss of climate benefits of retaining mature and old stands, in conflict with Executive Orders 14008 and 14072, Council on Environmental Quality guidance, and the Forest Service Climate Adaptation Plan.*

**Response:** The Final EA (pp. 6-9) describe the various types of silvicultural treatments and their purpose in achieving expected results on forest composition. It also summarizes a project-level carbon assessment, concluding that the proposed activities, "in the short term, might contribute an extremely small quantity of greenhouse gas emissions relative to national and global emissions" and that, in the longer term, those effects would be negligible due to forest regrowth (Final EA, p. 24).

In the project record, the four stands with identified old-growth characteristics (PR: Stand Proposal Changes Tracking spreadsheet; lines 10, 11, 12, and 26) are documented as dropped from silvicultural treatment proposals because of these attributes. One of these, Stand 77, was dropped following an interdisciplinary team field visit. The notes from the visit (PR: 20210609_PeabodyRecFieldVisit_.docx) describe a discussion between interdisciplinary team members who thought the stand had old-growth characteristics. This led to a referral to the Forest Botanist for reconsideration (and eventual deferral). A supporting email from the Forest Botanist (PR: 20230626DSperdutoPeabodyTransmittalLetterAssignments.pdf) further explained the process used for identifying and evaluating old-growth characteristics in mature stands, including survey methodology, definitions and thresholds, and determinations that led to recommendations and eventual modifications to the proposal.

In addition, the 30-day RTC #26 and #28 explain that no treatments are proposed in old-forest or old-growth habitat; refer to the Draft EA's analysis of carbon and climate impacts; and discuss longer-term carbon storage and sequestration. The 30-day RTC #31 clarifies forest types and age classes to address question about old-forest habitat. Both responses reference the Forest Plan definition of old-growth forest (Forest Plan glossary, p. 21).

Furthermore, 30-day RTC #40, #44, and #46 state plainly that Executive Order (EO) 14072 does not apply at the project scale. EO 14008 provides no instructions beyond the department level, thus is also beyond the scope of this project. The USDA Forest Service Climate Adaptation Plan (July 2022) "outlines key climate risks to the agency's operations and critical adaptation actions to reduce these risks […]." It does not, however, provide specific requirements related to planning or analysis and so is beyond the scope of the project.

The CEQ Guidance on Climate Change is interim guidance (Federal Register Doc. 2023–00158) providing recommendations about the consideration of the effects of greenhouse gas (GHG) emissions and climate change when evaluating proposed major Federal actions in accordance with NEPA. This guidance is intended to facilitate compliance with existing NEPA requirements, improving the efficiency and consistency of reviews of proposed Federal actions for agencies, decisionmakers, project proponents, and the public. The guidance recommends "that agencies quantify a proposed action's projected GHG emissions or reductions for the expected lifetime of the action, considering available data and GHG quantification tools that are suitable for the proposed action" (CEQ Guidance, p. 1198). GHG emissions were not quantified for this project but were described in the project-level analysis as "an extremely small quantity" (p. 24). This level of estimate is consistent with the standard approach at the time of analysis. As the Forest Service incorporates new tools and methods for quantifying GHG into its NEPA process, future projects may have more detailed GHG emission estimates; however, the CEQ guidance allows that "actions with only small GHG emissions may be able to rely on less detailed emissions estimates" (CEQ Guidance, p. 1202).

In conclusion, the EA/FONSI, DDN, and project record document consideration of old-growth and climate change impacts from the project.

**Issue 14**

*The Forest Service failed to provide detailed information on stand age and species composition.*

**Response:** Summaries of existing vegetation conditions across the Peabody West habitat management unit (HMU) are located in the project record. The data used to derive the HMU analysis (PR: 20190220_Peabody West HMU Conditions.xls) is stored in the project record and includes year of origin, age classes, and existing and potential vegetation types. The HMU rationale document (PR: PeabodyWestHMURationale.pdf) includes a section on methods that refers to the collection of stand examinations in 2018, the results of which are stored in the Forest Service's corporate vegetation inventory database (FSVeg).

Stand examinations collected quantitative information on overstory and regenerating trees and qualitative information including forest health and ecological land type (ELT). Qualitative data collected during the stand examinations is stored in the project record (PR: Peabody_StandExam_AssessmentForms_Final.pdf). The existing Botanical Survey Summary document (PR: PeabodyWest_BotSurveySummary2021) supports that the proposed action is consistent with the Forest Plan direction for old forest habitat management: "No harvest will occur in stands identified to provide old forest habitat" (see Forest Plan glossary, p. 21 for definition).

The project record includes documentation of additional context regarding the open forest conditions target, whether the WMNF has met the age class goals of the Forest Plan, and the absence of old-forest habitat within harvest areas (30-day RTC #45, #53), as well as inventories for qualitative measure of "old forest habitat" from "stands of interest" (PR: PeabodyWest_BotSurveySummary2021.docx).

Statements that old-forest habitat will not be harvested in the Peabody West project may be inconsistent with the HMU rationale document, which describes three age classes (p. 5), whereas the Forest Plan Appendix D includes four age classes, including "old." In the HMU rationale document, "mature" forest is defined as 60-119 years for northern hardwoods and mixedwood; 40-89 years for spruce-fir; and 40-69 years for aspen-birch. These age classes are consistent with the Forest Plan Appendix D. Within the Peabody West HMU on Land Suitability Code (LSC) 500 lands in MA 2.1, as of 2019 there were more than 1,660 acres of northern hardwood and mixedwood stands that exceed 119 years of age; 72 acres of spruce fir exceeding 89 years of age; and 42 acres of aspen birch exceeding 69 years of age. Eight proposed units with a total acreage of 524 acres overlap with stands that exceed the year of origin definitions for mature forests in the HMU rationale document. These would be classified as "old," not "mature," using the age classes in Forest Plan Appendix D. "Old-forest habitat," as defined by the Forest Plan glossary (p. 21), does not have an age class definition; rather, it uses qualitative adjectives around structural complexity.

**Instruction:** Address the potential inconsistency between Forest Plan Appendix D and the HMU rationale document regarding "old" forest, as defined by age, and "old-forest habitat" as defined by structural attributes.

**Issue 15**

*The Final EA fails to take a hard look at impacts to water quality due to runoff, sedimentation, and potential herbicide contamination.*

**Response:** The Final EA (p. 5) describes the identification of riparian protection buffers prior to project implementation (including timber sales) and further states that the "Forest Service and its contractors would implement applicable Forest Plan standards and guidelines, National Core and State best management practices (BMPs), SOPs and project-specific minimization measures as a part of the

proposed action" (p. 12). SOPs for minimizing impacts to water quality and perennial streams (SOP-4, SOP-5, SOP-6, SOP-7, WR-1) are described in the Final EA (p. 13) and referenced in 30-day RTC #40 and #41.

The Final EA (p. 24) summarizes the project's effects on water quality and cites the 2017 Albany South EA (PR: USDA FS 2017 Albany South Final EA.pdf) for its general description of the potential impacts that could be expected to riparian and aquatic resources and water quality from the actions in the Peabody West project, which are similar to those of the Albany South project. The 2017 Albany South Water Report (PR 20171202AlbanySouthWaterRptFinalv2.pdf, pp. 12-16) includes extensive discussion of potential impacts from timber harvest, including the basis for the discussion in the Peabody West EA. A discussion of the 15 percent even-age clearcut threshold as the basis for G-1 (Forest Plan, p. 2-29) basal area removals in perennial watersheds is included, as is a discussion regarding the threshold for "toxicity to fish" and the anticipated time period for measurable effects on the pH in these streams as 1 to 3 years. The 20 percent basal area removal threshold described in the Preliminary Effects Issues Tracking spreadsheet (PR: PeabodyWest_PrelimFxIssuesTracking.xlxs) and referenced by the objector is not a Forest Plan standard or guideline; rather, it is a threshold established in the Albany South Water Report with "confidence that no detrimental effect on water quality will occur" (p. 14) below that value. The BA Watershed Analysis Table (PR: PeabodyWestBAWatershedAnalysisTbl20220328.xlsx) summarizes the basal area reductions for each watershed.

The Preliminary Effects Issues Tracking spreadsheet describes direct effects of timber harvesting on the riparian and aquatic resource, including reducing forest canopy of streams and increasing water temperatures, as well as indirect effects such as reducing future inputs of downed wood and increasing sedimentation into streams. Indicators include loss of cold-water streams and loss of stream pool habitats. This effect was not identified for detailed analysis in the Final EA because, as stated in the Preliminary Effects Issues Tracking spreadsheet, "implementation of Forest Plan standards and guidelines, BMPs, and design features would minimize any direct and indirect effects to streams to *de minimis* levels" (row 10, column G). The spreadsheet documents that "no measurable water quality impacts" are anticipated and that the "project would not contribute cumulatively to impacts to this resource in the analysis area" (row 10, column H). Additionally, for hydrology, the spreadsheet notes that "Harvesting more than 20 percent of a watershed has the potential to measurably alter water quality" and that "Sedimentation may occur at road-stream crossings and/or skid trail-stream crossings" (row 5, column C).

Finally, the Final EA (p. 25) states that the project is in compliance with the Clean Water Act 303(d), though the impaired watersheds, if any, are not identified. This information may have bearing on judgments made in the Preliminary Effects Issues Tracking spreadsheet and the Final EA.

In conclusion, NEPA does not require encyclopedic reporting of baseline information in the EA. The Forest chose to incorporate the impact analysis from a previously analyzed project rather than repeat the same analysis. Supplemental, project-specific analysis are located in the project record.

**Instruction:** Add to the project record any relevant site-specific information on water quality effects related to Clean Water Act impairment.

**Issue 16**
*The project failed to evaluate the impacts of timber harvest treatments on the eligibility of West Branch of the Peabody River as a Wild and Scenic River.*

**Response:** I am setting aside this objection point because, you did not raise this issue during scoping or another designated opportunity for public comment (see 36 CFR § 218.10(a)(3)) and it is not based on an issue that arose after opportunities for public comment (see 36 CFR § 218.10(a)(4)).

**Issue 17**
*The Final EA fails to provide any analysis, discussion, and clarity surrounding impacts of the project on soil resources.*

**Response:** The Final EA (p. 23) notes that the project will include design elements consistent with soil quality standards and will implement best management practices and Forest Plan standards and guidelines to ensure soil impacts are minimized. The Final EA further references the Soils Specialist Report in the project record (PR: Colter2021PeabodySoilsSpecialistRpt.pdf) for further analysis, discussion, and clarification of effects from the no-action alternative and the proposed action. The project record also contains a project-specific soil assessment (PR: PeabodyIRPSoilAssessment_110121.docx ) describing field data collection and the potential effects to consider. Additional discussion of the condition and function of soils on the WMNF is documented in the Soils Background White Paper (PR: Colter2021SoilsBackgroundWhitePaper.pdf). Overall, impacts to soil resources were adequately discussed briefly in the Final EA and more thoroughly in the project record.

**Issue 18**
*The Forest Service failed to analyze the impacts of roads and skid trails on water quality and soil compaction.*

**Response:** Water quality and quantity concerns were addressed in the Final EA (pp. 24-25). The project includes design elements (Final EA, p. 13) to minimize impacts to water quality from roads and skid trails (SOP-4, SOP-5, SOP-6). The Final EA also includes a summary table of analysis and findings supporting Forest Plan consistency for specific resources including riparian and aquatic habitats and water resources (p. 23). The Final EA (p. 24) references the Albany South EA's discussion (pp. 131-149) of how timber harvest generally impacts water resources and water quality. These impacts are broadly applicable to the Peabody West project.
The Final EA (p. 23) includes this statement on the Analysis Metrics and Outcomes for the Soil Resource: "Implementation of BMPs and Forest Plan standards and guidelines ensure impacts to soils are minimized and consistent with Forest Plan and FSM 2550 direction." The Soils Specialist Report (PR: PeabodyIRPSoilsSpecialistRpt110121.docx) describes the anticipated effects to the soil resource from the proposed action, including road construction, skid trails, and harvesting (pp. 3-10). The report's conclusion documents the project's effects to soil productivity.

In conclusion, the project record provides sufficient analysis of the potential effects of roads and skid trails on water and soil resources.

**<u>Issue 19</u>**

*The Final EA fails to take a "hard look" at the impacts of the project on the Great Gulf Roadless Area, its possibility for future wilderness designation, the Peabody River (and its West Branch), and the values for habitat, clean water, and recreation.*

The Roadless Areas Effects Analysis (PR: PeabodyWestRoadlessEffectsSummary.pdf) states that "potential impacts to the Great Gulf IRA for this project were evaluated in the context of […] roadless and wilderness characteristics of the area as they relate to the future eligibility of that area as potential wilderness" (pp. 1-2). This document (p. 1) references an Inventoried Roadless Area (IRA) background document (PR: USDA FS 2018 Background 2005 WMNF Forest Plan IRAs.pdf) as a source of further information regarding Forest Plan IRAs. The IRA background document (p. 2), in turn, references Appendix C of the Forest Plan Final EIS (FEIS) for further information related to the inventory and evaluation of the Great Gulf IRA for wilderness capability, availability, and need. The IRA background document (pp. 2-3) also discusses IRAs identified after the 2001 Roadless Area Conservation Rule (RACR) was finalized, such as the Great Gulf IRA, which were either designated as wilderness under the 2006 New England Wilderness Act or were otherwise assigned to other Forest Plan management areas (MA), including MA 2.1 for those portions of the Great Gulf IRA that would be affected by the proposed action.

FEIS Appendix C provides detailed evaluation of the Great Gulf IRA's wilderness capability and availability for Wilderness designation and comes to the following conclusions (p. C-72) "designation of this area as Wilderness would be extremely controversial because of the popular and well-established non-conforming uses"; "the level of year-round recreation use, including both density and volume, within the Inventoried Roadless Area, severely compromises its Wilderness integrity and detracts from a Wilderness experience for most visitors"; and "the Inventoried Roadless Area's highest value is as an adjunct to the existing adjacent Wilderness. Designation of this Inventoried Roadless Area, with the noted boundary changes to exclude the AT corridor […] would not provide this connection." Thus, the Peabody West project's analysis need not consider the Great Gulf IRA's suitability and potential for Wilderness recommendation and designation by Congress, since such analysis has already occurred and reached definitive conclusions. Given its limited scope compared to the broader IRA analysis in FEIS Appendix C, the Peabody West project's proposed action would not result in any meaningful changes to those existing conclusions. Therefore, it is reasonable for the Roadless Area Effects Analysis to conclude that "the proposed action […] would therefore not impact future eligibility for the Great Gulf IRA as a potential wilderness" (p. 2).

The Roadless Areas Effects Analysis (p. 1) further states that "the project-level analysis also considers the potential for project activities to affect inventory criteria on lands in the forest plan inventory areas (forest plan IRAs)" and that "potential impacts to the Great Gulf IRA for this project were evaluated in the context of the designated management area." This aligns with the IRA background document's statement (p. 3) that "on lands that were included in the Forest Plan revision inventory but were not part of the RACR inventory [such as the Great Gulf IRA], management must be consistent with Forest Plan direction." Within this context, the proposed action would be consistent with recreation values described in MA 2.1's desired conditions (Forest Plan, pp. 3-3 to 3-4), including "permanent and temporary openings [occurring] across the landscape in shapes and sizes that are consistent with scenic objectives in an area"; "numerous views of broad, changing landscapes […] along roads and trails"; "substantial non-motorized recreation opportunities"; and "noticeable human activity [differering] from

very evident to absent." Because project activities would occur in Rural and Roaded Natural Recreation Opportunity Spectrum (ROS) classes, the proposed action would also be consistent with MA 2.1 recreation guideline G-1 (Forest Plan, pp. 3-5 to 3-6), which requires recreation management activities to match ROS class objectives, as outlined in the experience characterizations for Rural and Roaded Natural ROS classes found in Forest Plan Appendix H (pp. H-2 to H-3).

Although they do not directly apply to the Great Gulf IRA because it was identified as a Forest Plan IRA after the RACR was finalized in 2001, the RACR nonetheless provides general descriptions of the values and features that often characterize IRAs (p. 3245). These include "high quality or undisturbed soil, water, and air"; "sources of public drinking water"; "diversity of plant and animal communities"; "habitat for threatened, endangered, proposed candidate, and sensitive species and for those species dependent on large, undisturbed areas of land"; "Primitive, Semi-Primitive Non-Motorized, and Semi-Primitive Motorized classes of dispersed recreation"; "reference landscapes"; "natural appearing landscapes with high scenic quality"; "traditional cultural properties and sacred sites"; and "other locally identified unique characteristics." Of the identified IRA values, consideration of dispersed recreation opportunities, natural appearing landscapes, and locally identified unique characteristics are most applicable to recreation, while other IRA values are more applicable to other resource areas. In this context, the proposed action would benefit recreation-related IRA values by providing new and improved dispersed recreation opportunities. Regarding locally identified unique characteristics, the Great Gulf IRA is in close proximity to, but does not include unique landscape features or areas such as Pinkham Notch, Mount Washington, or the Great Gulf Wilderness. In fact, FEIS Appendix C states that "the lower elevations [where the proposed timber harvest activities would occur] are not unique and are much like adjacent low elevation stands of timber" (p. C-65).

Given the fact that "less than 4 percent (about 600 acres) of the total IRA acreage is proposed for timber harvest, of which less than 1 percent (about 80 acres) comprises even-aged treatment" (Roadless Areas Effects Analysis, p. 2), it is unlikely that the proposed action would substantially impact natural appearing scenery in comparison to the surrounding landscape, especially in light of Forest Plan FEIS Appendix C's detailed evaluation of the Great Gulf IRA's wilderness capability and availability for Wilderness designation. FEIS Appendix C makes the following assessments of the existing conditions of the IRA's recreation-related values (pp. C-65, C-67): "[there are] obvious impacts of long-term heavy recreation use"; "the high trail density significantly detracts from the natural appearance of the Inventoried Roadless Area"; "the AMC- and RMC-operated huts and facilities […] compromise the Wilderness character and adversely affect the natural appearance of the Inventoried Roadless Area"; "the Inventoried Roadless Area provides a limited opportunity for solitude"; and "the many off-site intrusions […] detract from a sense of solitude or isolation." Therefore, in consideration of the Great Gulf IRA's existing conditions, it is reasonable for the Roadless Areas Effects Analysis to conclude that "the proposed action would have limited, short term effects on the Great Gulf IRA" (p. 2) in terms of its impacts to recreation-related IRA values.

**Issue 20**

*The proposed action may cause loss or damage to historic and cultural resources located within the project area.*

**Response:** The Final EA states that no National Register-eligible sites are known in the project area (p. 27) and that the project would not affect listed or eligible sites (p. 30). The project record contains cultural resources (survey) reports (PR: Cultural Resource Reconnaissance Report NRM#:

R2019092202001) and documentation of the consultation with the New Hampshire State Historic Preservation Office (SHPO). SHPO concurred with the WMNF's "no historic properties affected" determination.

At the scoping phase, the Peabody West project included actions relating to heritage resources in the Hermit Lake Complex, but these activities were subsequently removed (see Draft EA, p. 4; 30-day RTC #2) because these actions may be evaluated under a separate environmental analysis as they have "independent utility".

The project record documents multiple archaeological surveys and site documentation efforts in the analysis area, all of which were completed to professional standards and demonstrate a reasonable and good faith effort to avoid, minimize, or mitigate impacts to cultural resources. Through project planning and design, treatment units have been altered, dropped, buffered, and constructed to avoid impacts to documented sites in the area. In this respect, the Section 106 process itself is deemed sufficient and justifiable to support the proposed action and decision. Both the National Historic Preservation Act (NHPA) and the Archaeological Resources Protection Act address confidentiality and informational integrity of historic properties and (by extension) unevaluated cultural resources, and it is within the discretion of the Agency to withhold information specifically regarding the location and integrity of sites and cultural resources, if there is reason to believe disclosure of information or data may lead to direct or indirect impacts to these sites and resources. The standard operating practices (SOP-1, SOP-2) at sites identified (or sites discovered during implementation of the project) were disclosed in the Final EA (p. 13). The Final EA and DDN provide appropriately limited information specific to heritage resources in the analysis area and how they will be protected or managed during project implementation.

In conclusion, the WMNF upheld its responsibilities to comply with NHPA Section 106, and a reasonable and good faith effort has been conducted to locate and conserve known resources.

**Objection Review Conclusion**

My review of your objection issues finds that the Peabody West Integrated Resource Project's EA/FONSI, DDN, and supporting documents in the project record comply with all applicable laws, regulations, and policies, and with the White Mountain's Forest Plan. The exceptions to my findings concern **Issues 5, 6, 14, and 15,** which are discussed earlier in this letter. I am instructing the Responsible Official to correct these concerns as follows:

- **Issue 5:** Explain the relevance of the Albany South project analysis to the Peabody West project analysis.
- **Issue 6:** Make the 2015 Transportation Analysis Report available to the public.
- **Issue 14:** Address the potential inconsistency between Forest Plan Appendix D and the HMU rationale document regarding "old" forest, as defined by age, and "old-forest habitat" as defined by structural attributes.
- **Issue 15:** Add to the project record any relevant site-specific information on the judgment of water quality effects related to Clean Water Act impairment.

The Responsible Official may not sign the final Decision Notice until these instructions have been addressed (36 CFR 218.12(b)). My review constitutes the final administrative determination of the

Department of Agriculture. No further review from any other Forest Service or Department of Agriculture official of my written response to your objection is available (36 CFR 218.11(b)(2)).

Sincerely,

X DEREK IBARGUEN

Digitally signed by DEREK IBARGUEN
Date: 2023.10.18 11:27:14 -04'00'

Derek J.S. Ibarguen,
Forest Supervisor/Reviewing Officer

cc: Joshua Sjostrom, Matthew St. Pierre, Theresa Corless, Scotty Hall

Environmental Advocacy Clinic
Vermont Law and Graduate School
PO Box 96, 164 Chelsea Street
South Royalton, VT 05068
802.831.1630 (p) | 802.831.1631 (f)

June 12, 2023

Derek Ibarguen, Reviewing Officer
Attn.: PAL-LSC Objections, Administrative Review Coord., Suite 700
USDA Forest Service, Eastern Region
626 East Wisconsin Avenue
Milwaukee, WI 53202

*Submitted via*: https://cara.fs2c.usda.gov/Public//CommentInput?Project=55659 and USPS certified mail

**Re: Objection Pursuant to 36 C.F.R. § 218.8 to Peabody West Integrated Resource Project #55659, Androscoggin Ranger District, White Mountain National Forest**

Dear Objection Reviewing Officer:

Standing Trees respectfully files this objection to the Peabody West Integrated Resource Project ("IRP") (the "Project") under the process identified in 36 C.F.R. § 218.8. Notice of availability of the Draft Decision Notice ("DDN"), Final Environmental Assessment ("Final EA"), and Finding of No Significant Impact ("FONSI") was published in the newspaper of record, the New Hampshire Union Leader, on April 27, 2023. This objection is timely as the deadline to submit objections is June 12, 2023. Standing Trees submits this objection via certified U.S. mail and electronically. The certified mail copy includes a thumb drive containing electronic copies of all the exhibits cited below. A list of those exhibits is included at the end of this objection.

## PROJECT

Pursuant to 36 C.F.R. § 218.8(d)(4), Standing Trees objects to the following project:

> *Project*: Peabody West Integrated Resource Project, Coos County, New Hampshire
>
> *Responsible Official and Forest/Ranger District:* Derek Ibarguen, White Mountain National Forest Supervisor and Androscoggin Ranger District, White Mountain National Forest

## ELIGIBILITY TO OBJECT

Standing Trees is a grassroots membership organization that works to protect and restore New England's forests, with a focus on state and federal public lands in New Hampshire and Vermont. Standing Trees works to ensure New England's public lands are managed using just and equitable policies and practices to support the region's residents and natural ecosystems. This includes managing public lands and waters to maximize carbon storage and protect clean water, clean air, public health, and intact habitat for the region's native biodiversity. Standing Trees has many members who regularly visit and recreate throughout the White Mountain National Forest ("WMNF"), including the area impacted by the Peabody West IRP. The Environmental Advocacy Clinic at Vermont Law and Graduate School submits this objection on behalf of Standing Trees.

Standing Trees filed a timely, specific, and substantive comment during the Draft Environmental Assessment ("Draft EA") comment period for the Project at issue on September 6, 2022. Under 36 C.F.R. § 218.8, Standing Trees has standing to file an Objection. All points and issues raised in this objection refer to issues raised in our September 6, 2022, comments on the Draft EA or are related to new information, pursuant to 36 C.F.R. § 218.8(c).

## LEAD OBJECTOR

Pursuant to 36 C.F.R. § 218.8(d)(3), the "Lead Objector" is:

Zack Porter
Executive Director, Standing Trees
PO Box 132
Montpelier, VT 05601
zporter@standingtrees.org
(802) 552-0160

## CONCISE STATEMENT OF OBJECTIONS

The Forest Service's founding motto implores the agency to *manage our public forests for the benefit of the greatest good for the greatest number for the longest time*. The public interest is best served by protecting the mature forests of the White Mountain National Forest. As proposed, the Peabody West IRP offends the purpose of the WMNF Forest Plan ("Forest Plan" or "Plan")[1] and threatens forest health, climate resilience, water quality, habitat for imperiled species, and the area's scenic beauty and recreational opportunities.

The Peabody West IRP is a multi-phase, multi-year project that will significantly affect the environment. The Project will likely have both short and long-term effects because of its

[1] White Mountain National Forest Land and Resource Management Plan (Sept. 2005), *available at* https://www.fs.usda.gov/detailfull/whitemountain/landmanagement/planning/?cid=STELPRDB5199941&width=full (hereinafter "WMNF Plan").

expansive scope and size. Logging will harm the now-endangered Northern Long-eared Bat ("NLEB") and other species that depend on mature, interior forests. The Project will contribute to the loss of climate benefits of retaining mature and old stands, violating Executive Order 14,072.[2] The Project will significantly impact the Great Gulf Roadless Area, its possibility for future wilderness designation, the Peabody River (and its West Branch), and this landscape's values for habitat, clean water, and recreation. Logging will cause detrimental impacts to water quality due to runoff, sedimentation, and potential herbicide contamination. The proposed action may cause loss or damage to historic and cultural resources located within the Project area.

Without meaningful justification and after sidestepping substantive and procedural requirements of federal law, the Forest Service has erroneously decided the Peabody West IRP is needed to implement the management direction in the Forest Plan and meet the Plan's goals, objectives, and desired conditions for vegetation, wildlife, and other resources. Yet the Forest Service failed to demonstrate compliance with the National Environmental Policy Act ("NEPA"), National Forest Management Act ("NFMA"), Clean Water Act ("CWA"), and Endangered Species Act ("ESA"), and the DDN,[3] Final EA,[4] and FONSI[5] violate specific provisions of NEPA, NFMA, ESA, Council on Environmental Quality ("CEQ") guidance, and recent executive orders. As a result, any final decision to proceed with the Project as currently proposed would violate the Administrative Procedure Act and its prohibition of agency decision-making that is arbitrary, capricious, or otherwise contrary to law.[6]

Standing Trees, therefore, objects to the Project, *inter alia*, on the ground that it requires an Environmental Impact Statement ("EIS") instead of an EA under NEPA and, if pursued, must be changed to avoid, minimize, or mitigate the full range of the Project's deleterious environmental impacts. Standing Trees also objects to the Project because it violates the ESA by failing to protect the endangered NLEB and other threatened and endangered species and because it is inconsistent with the Forest Plan in contravention of NFMA.

## SUMMARY OF PROJECT

The Peabody West IRP is a collection of management activities that the Forest Service has proposed to take place in approximately 3,000 acres of the Peabody West Habitat Management Unit ("HMU") of the WMNF. According to the Forest Service, it is intended to "advance Forest Plan goals and objectives by providing high quality timber products,

---

[2] *See infra* note 15.

[3] *Peabody West Integrated Resource Project: Draft Decision Notice* (April 27, 2023), https://usfs-public.app.box.com/v/PinyonPublic/file/1200237920268 (in Peabody West IRP project file at filename Peabody West Draft Decision Notice.pdf) (hereinafter "DDN").

[4] *Peabody West Integrated Resource Project: Final Environmental Assessment and Finding of No Significant Impact* 1 (April 27, 2023), https://usfs-public.app.box.com/v/PinyonPublic/file/1200238908343 (in Peabody West IRP project file at filename Peabody West Environmental Assessment and Finding of No Significant Impact.pdf) (hereinafter "Final EA").

[5] *Id.* at 28.

[6] 5 U.S.C. § 706.

diversifying wildlife habitat, and addressing other recreation and transportation management needs."[7] Specifically, the Project includes:

- Logging and other "silvicultural treatment" on about 2,220 acres of lands within the Peabody West HMU, as well as expanding a permanent wildlife opening to about 19 total acres and thinning vegetation within a 3-acre area at the Androscoggin Ranger District office;
- Road development, including:
  - constructing about 0.6 mile of new road to replace a 0.8-mile decommissioned portion of Forest Road 263 (Libby South) and Forest Road 264 (Jacknife);
  - reconstructing about 9 miles of existing system and non-system roads; and
  - adding about 3 miles of unauthorized roads to the forest road system;
- Recreational designations and development, including:
  - designating of about 6 miles of mountain biking trail as part of the forest trail system;
  - constructing about 4 miles of new single- and double-track trail on National Forest System land;
  - designating about 300 acres as a backcountry ski zone with up to 5 skiable downhill routes; and
  - grading and tread-hardening trail access to the Third Hole swimming site.[8]

The Forest Service developed this proposal beginning in 2019. On August 4, 2022, the Forest Service issued the Draft EA and FONSI for the Project. Standing Trees and other stakeholders filed comments during the public comment period on the Draft EA and FONSI that ended on September 6, 2022. The Forest Service issued the DDN, Final EA, and FONSI on April 27, 2023.

## DETAILED OBJECTIONS

The Peabody West IRP is a major federal action that is likely to significantly affect the quality of the human environment, warranting an EIS pursuant to 40 C.F.R. § 1502.3.[9] NEPA has "twin aims," imposing on "an agency the obligation to consider every significant aspect of the environmental impact of a proposed action . . . and ensures that the agency will inform the

---

[7] DDN at 1.

[8] *Id.*

[9] CEQ promulgates regulations to implement NEPA that are binding on all federal agencies. Those regulations are found at 40 C.F.R. §§ 1500–1508. CEQ amended its regulations effective September 14, 2020. *See* 40 C.F.R. § 1506.13 (2020) (effective date). This Project, however, was developed and analyzed under the prior (as amended) version of the CEQ regulations. *See* Final EA at 3. Because the 2020 regulations are not retroactive and the Service's NEPA analysis followed the 2019 version of the regulations, all references to these regulations throughout this Objection are to the 2019 version. *See Bair v. Cal. Dep't of Transp.*, 982 F.3d 569, 577 n.20 (9th Cir. 2020).

public that it has indeed considered environmental concerns in its decision making process."[10] Preparation of an EIS is required when an agency's action *may* have a significant effect on the environment.[11] As discussed below, the Final EA does not satisfy NEPA's requirements, and the Forest Service's decision to prepare only an EA when an EIS was required was erroneous and unlawful.[12] The Forest Service also has failed to ensure protection of endangered, threatened, and sensitive species, including the now-endangered NLEB, in contravention of the requirements of the ESA, Forest Plan, and NFMA. The Project also conflicts with the Forest Plan's requirements for scientific rigor, public participation, and other Plan standards and guidelines, in violation of NFMA.

***Requested Remedy: The Forest Service must complete an EIS for the Peabody West IRP to cure deficiencies in the Final EA, must undertake additional review of the Project's impacts on endangered, threatened, and sensitive species under the ESA, Forest Plan, and NFMA, and revise the Project in accord with the Forest Plan and the NFMA, as outlined in our prior comments and expanded upon below.***

## I. The Final EA Fails to Take a "Hard Look" at the Project's Many, Significant Environmental Impacts.

Under NEPA, the Forest Service must take a "hard look" at the environmental impacts of the planned action.[13] In the Final EA, like in the Draft EA, the Forest Service does not fully discuss relevant issues and fails to make meaningful statements regarding the Project's actual impacts.[14] Throughout the Final EA, the Forest Service failed to provide more than mere conclusory statements to support its findings. The discussion below highlights some of the continued inadequacies with the Final EA's analysis of project-area environmental resources.

---

[10] *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983).

[11] *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 444 F. Supp. 3d 832, 854 (S.D. Ohio 2020) (quoting *Mont. Wilderness Ass'n v. Fry*, 310 F. Supp 2d 1127, 1144 (D. Mont. 2004)).

[12] In June 2023, Congress amended NEPA in legislation regarding the federal debt ceiling, and the President signed those changes into law. Pub. L. 118-5. Standing Trees takes no position on the applicability of these amendments to the Forest Service's review of this Project but assumes for the limited purpose of this Objection that the amendments neither would affect the extent of Forest Service's obligations under CEQ regulations and applicable legal principles nor would they apply retroactively here.

[13] *Marsh v. Or. Natural Resources Council*, 490 U.S. 360, 374 (1989); *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 869 (9th Cir. 2020).

[14] *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004) ("A proper consideration of the cumulative impacts of a project requires 'some quantified or detailed information; ... [g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided'" (quoting *Ocean Advocs. v. U.S. Army Corps of Eng'rs.*, 361 F.3d 1108, 1127 (9th Cir. 2004)).).

### A. Vegetation and Forest Health

The Final EA's analysis of the Project's impacts on vegetation and forest health utterly fails to satisfy the requirements of NEPA. The Final EA does not support its conclusion that forest conditions in the Project area require timber management with detailed information regarding the age and species of stands that the Project seeks to alter. The Forest Service has wholly ignored the significant adverse environmental impacts of logging and the substantial scientific evidence that the proposed silvicultural prescriptions will threaten forest health, climate resilience, and wildlife habitat. In this regard, the Final EA also fails to explain how the Project's proposal to log more than 2,200 acres of the Peabody West HMU will comply with the policies of Forest Plan, Executive Order 14,072, and Executive Order 14,008, which support protecting mature forests like the Project area and disfavor the type of forest management proposed here.[15]

#### *1. Lack of Detailed Information on Stand Age and Species Composition*

As Standing Trees previously commented, a threshold problem with the Final EA is that it fails to take a hard look at stand ages and species composition within the Peabody West HMU—the purported rationale for the Project's logging proposals. The Forest Service suggests the Peabody West HMU is not meeting its "MA 2.1 Habitat Composition and Age Class Objectives" as outlined in the Forest Plan.[16]

From the Final EA and supporting documents, there is no way for the public to determine whether the Forest Service is correct. The Final EA refers to a "preliminary assessment of current conditions including general stand type (hardwood and softwood) and tree heights using LiDAR and aerial photography," but this assessment has not been made publicly available.[17] The Final EA suggests that "[m]ost of the habitats in the project area are mature, with some younger stands interspersed,"[18] and the Peabody West HMU Rationale document in the Project file says that 79% of the Project area is in the mature age class, across all forest types.[19] However, neither the Final EA nor its supporting documents include an age class map to help the public understand the amount and distribution of forest types and age classes. The public is unclear whether the Forest Service has complied with the requirements of the Forest Plan, including

[15] Exec. Order No. 14,072, 87 Fed. Reg. 24,851 (Apr. 22, 2022); Exec. Order No. 14,008, 86 Fed. Reg. 19 (Jan. 27, 2021).

[16] The Final EA claims there is a "lack of open forest conditions," but does not suggest what would constitute appropriate levels of such conditions. As discussed below, upland forests such as this one would have had only 1-3% of the landscape in early seral conditions. Lorimer and White, *Scale and Frequency of Natural Disturbances in the Northeastern US: Implications for Early Successional Forest Habitats and Regional Age Distributions* 185 FOREST AND ECOLOGY MANAGEMENT 41(2003), *available at* http://www.maforests.org/Lorimer%20and%20White%20-%20ES%20Habitat.pdf (Exhibit 14) (hereinafter "Lorimer and White").

[17] Final EA at 4.

[18] *Id*. at 1.

[19] Rationale for Habitat Objectives in the Peabody West Habitat Management Unit 9 (July 6, 2022) (hereinafter, "Habitat Rationale").

applicable Standard S-3 or Guideline G-1.[20] Nor does the Final EA contain an analysis of whether the age class objectives for regeneration and young age classes have already been met, forest-wide, in the 17 years since the signing of the Forest Plan. Indeed, the Forest Plan expects regeneration age-class objectives to be met by year 10 of the Forest Plan.[21]

The Forest Plan also states, "[n]o harvest will occur in stands identified to provide old forest habitat."[22] The Forest Plan defines Old Forest Habitat as: "Desired habitat conditions start with those for mature forest and can include greater size, decadence, structural complexity, etc."[23] Certainly, these attributes could appear in stands that are otherwise classified as "mature" according to the 2005 Forest Plan Appendix D, Age Class Definitions by Habitat Type. Yet there has been no analysis of whether the Project will protect such stands, as required by the Forest Plan—indeed, the Project targets mature forests.[24]

As raised in previous comments, the Forest Service's determination that the natural tendency of the majority of the forest is towards spruce/fir and that hardwoods, including beech, are unnaturally abundant is erroneous and factually baseless. Hardwoods were the dominant tree species in the WMNF prior to European settlement, and beech was the most dominant of the hardwoods. [25] The Forest Service's age class analysis is similarly erroneous. The Project analysis fails to account for regeneration and young-aged trees because it only accounts for these conditions at an artificial stand scale that would rarely, if ever, occur under natural conditions in the forest. As a result of this foundational error, the Peabody West IRP presupposes that the *only* way to achieve desired age class goals is to conduct logging activities. This determination biases the agency against other valid management approaches, constraining the development of alternatives.

The Forest Service suggests the Project will cultivate a healthy forest with improved biodiversity, yet provides no scientific evidence.[26] The Forest Service states that natural means would create less "[d]iversity of age and structure" and "wildlife habitat diversity would continue to decline,"[27] but provides no analysis of: (a) how much young forest habitat is already present on public lands or surrounding private lands; (b) how much would be created naturally with a no-action alternative; (c) how its proposed "young forest habitat" differs from what would occur naturally in the forest; and (d) "overall wildlife species diversity" would, in fact, differ

---

[20] Standard S-3 of the Forest Plan provides that "[t]imber harvest is prohibited in old growth forest." WMNF Plan at 2-13. Guideline G-1 of the Forest Plan provides that "[o]utstanding natural communities should be conserved." *Id.*

[21] WMNF Plan at 1-21.

[22] WMNF Plan Abbreviations, Acronyms, and Glossary at 21.

[23] *Id*.

[24] *Id.*

[25] Lorimer and White (Exhibit 14).

[26] DDN at 1.

[27] Final EA at 21.

between naturally and artificially-created early successional habitat. These gaps illustrate how, on its own terms, the Final EA fails to comply with NEPA's requirements of reasoned, transparent analysis.

### 2. *Failure to Address Current Scientific Understanding of Forest Health*

Indeed, a more far-reaching issue with the Final EA and its analysis of vegetation and forest conditions is that they are not informed by the latest scientific understanding of the ecology of New England forests, the benefits of protecting mature forests, and the negative environmental impacts of logging. The Final EA describes the Project's vegetation management goals as promoting tree regeneration, vegetation regeneration, and increases in wildlife habitat diversity.[28] As discussed below, the proposed harvests are neither preferable nor as necessary as the Final EA claims. The Forest Service also failed to disclose, discuss, and respond to the scientific evidence we raised in our comment.[29]

For example, we explained in our comment that old forests historically dominated New Hampshire, and it remained that way for millennia prior to European arrival.[30] Although the Abenaki people and other indigenous communities developed a sophisticated culture and cleared and managed some of the New England landscape with fire, recent science demonstrates that their impacts were highly concentrated, with the majority of historic New England forests primarily impacted by forces such as wind, ice, and beavers.[31] Much of New Hampshire's landscape evolved with relatively minor human influence over thousands of years since the last glaciation.

Today, old forests—the forests that once dominated the region—are functionally absent from northern New England.[32] The absence of old forests in New England has led to the elimination or decline of elk, caribou, wolverine, wolves, cougars, pine marten, and salmon.[33]

---

[28] Final EA at 5.

[29] Standing Trees Comments on Peabody West IRP Draft EA/FONSI at 22-24 (Sept. 6, 2022) (Exhibit 36) (hereinafter "Standing Trees Comments").

[30] Lorimer and White (Exhibit 14).

[31] Oswald et al., *Conservation implications of limited Native American impacts in pre-contact New England*, 3 NATURE SUSTAINABILITY 241, 243 (2020), *available at* https://rex.libraries.wsu.edu/esploro/fulltext/acceptedManuscript/Conservation-implications-of-limited-Native-American/99900586062001842?repId=12350928850001842&mId=13362786220001842&institution=01ALLIANCE_WSU (Exhibit 15).

[32] Zaino et al., Vt. Fish and Wildlife Dept., Vermont Conservation Design – Natural Community and Habitat Technical Report 15 (March 2018), *available at* https://vtfishandwildlife.com/sites/fishandwildlife/files/documents/Conserve/VT%20Conservation%20Landscape-level%20Design/Vermont%20Conservation%20Design--Natural-Community-and-Habitat-Technical-Report-March-2018.pdf (Exhibit 16) (hereinafter "Zaino et al. (2018)").

[33] Evans and Mortelliti, *Effects of Forest Disturbance, Snow Depth, and Intraguild Dynamics on American Marten and Fisher*, 13 ECOSPHERE 1 (Nov. 24, 2021) (Exhibit 17).

Large swaths of intact forest minimize harmful vectors for the spread of invasive species and ticks and allow for a mix of both early and late successional habitats as required by New England's forest-dependent species. Unlogged forests in New England exhibit the greatest structural complexity, tree species diversity,[34] and the greatest resilience to climate change.[35]

According to the definitive paper on disturbance frequency and intensity in New England, "the proportion of the presettlement landscape in seedling–sapling forest habitat (1–15 years old) ranged from 1 to 3% in northern hardwood forests (Fagus–Betula–Acer–Tsuga) of the interior uplands," and "[t]he current estimates of 9-25% [seedling-sapling habitat] for the northern New England states are probably several times higher than presettlement levels."[36] Gap size in Hemlock-Northern Hardwood forests averaged less than .75 acres. Beech was the dominant species among Northern Hardwoods, comprising perhaps 30% of the forest. Stand replacing events occurred, on average, only every 1,000 to 7,500 years.[37]

Due primarily to human-driven forest conversion (i.e., development, agriculture) and degradation (i.e., logging, fragmentation), mature and old-growth forests, once common in the forested regions of the U.S., are today underrepresented compared to historical levels. As explained previously, prior to European settlement, old-growth forests were the dominant land cover of northern New England, including in the WMNF.

Recent research led by Dr. Dominick DellaSala provided the first nationwide assessment of present levels of mature forests in the U.S.[38] Today, mature and old-growth forests represent ~36% of all forest age classes across the nation, with the greatest amount in a single ownership (35%) located on federal lands. Of the mature forests on federal lands, 92% are managed by the

---

[34] Miller et al., *Eastern National Parks Protect Greater Tree Species Diversity than Unprotected Matrix Forests*, 414 FOREST ECOLOGY & MGMT. 74 (April 15, 2018) (Exhibit 18) (hereinafter "Miller et al. (2018)").

[35] Thom et al., The Climate Sensitivity of Carbon, Timber, and Species Richness Covaries with Forest Age in Boreal-Temperate North America (2019) (Exhibit 19) (hereinafter "Thom et al.").

[36] Lorimer and White (Exhibit 14).

[37] *Id. See also* Nowacki and Abrams, *The Demise of Fire and "Mesophication" of Forests in the Eastern United States*, 58 BIOSCIENCE 123 (2008), *available at* https://www.nrs.fs.usda.gov/pubs/jrnl/2008/nrs_2008_nowacki_001.pdf (Exhibit 20) ("Although humans have a long history (about 12,000 years) on the North American continent, the magnitude of change wrought by European settlement has no parallel since the last glaciation... In New England, rates of landscape change have been far greater in the past 300 years than in the previous 1000 years as a result of forest cutting, agricultural conversion, urban development, altered fire regimes and herbivore populations, nonnative species introductions, and atmospheric pollution… There has been no return to presettlement conditions because of continuing low-level disturbance and perhaps insufficient recovery time.").

[38] DellaSala et al., *Mature and Old-Growth Forest Contributions to Large-Scale Conservation Targets in the Conterminous USA*, 5 FRONTIERS IN FORESTS AND GLOB. CHANGE 1, 1 (2022) (Exhibit 21).

Forest Service, 9% by the Bureau of Land Management, and 3% by the National Park Service.[39] These forests simultaneously support the highest concentrations of drinking water source areas, at-risk ecosystems, and aboveground living biomass. Despite their exceptional value, the vast majority of mature forests on federal lands (76%), storing approximately 10.64 gigatons of carbon dioxide, are unprotected from logging.[40]

Of the mature forests identified by Dr. DellaSala's study, old-growth represents a tiny fraction in each region of the United States outside of Alaska, demonstrating the need for policies that put a greater percentage of forests on a path to recover late successional forests. In the Eastern U.S., old-growth comprises just 1.6% of South-Central U.S. forests, 1.1% of the Upper Midwest forests, .5% of Southeast U.S. forests, and .4% of forests in the Northeast.[41]

Logging is the single greatest influence on the amount and extent of mature forests across the U.S. and is easily the most preventable threat to mature forests when compared to other disturbances. A 2013 study found that "[l]ogging is a larger cause of adult tree mortality in northeastern U.S. forests than all other causes of mortality combined."[42] This finding was reinforced in another study from 2018: "[Logging] comprises more than half of all mortality (on a volume basis), making logging the predominant disturbance—natural or anthropogenic—affecting forest ecosystems in the region."[43]

This level of timber harvest has a significant impact on forest carbon—far greater than any other factor. Timber harvest drives 92% of annual forest carbon losses in the U.S. South, 86% in the North, and 66% in the West. For comparison, the second greatest impacts on forest carbon in each region are as follows: West: fire (15%); North: insect damage (9%); South: wind damage (5%).[44]

As evidenced above, the Northeast has lost a greater percentage of its old-growth forests than perhaps any other region of the U.S. Private lands across New England are managed more

---

[39] *Id.*

[40] *Id.*

[41] EASTERN OLD-GROWTH FORESTS. PROSPECTS FOR REDISCOVERY AND RECOVERY 18-31 (Mary Byrd Davis ed., 2d ed. 1996).

[42] Charles D. Canham et al., *Regional Variation in Forest Harvest Regimes in the Northeastern United States*, 23 ECOLOGICAL APPLICATIONS, 515, 515 (2013), *available at* http://www.uvm.edu/giee/pubpdfs/Canham_2013_Ecological_Applications.pdf (Exhibit 22).

[43] Brown et al., *Timber Harvest as the Predominant Disturbance Regime in Northeastern U.S. Forests: Effects of Harvest Intensification*, 9 ECOSPHERE 1, 1 (2018) (Exhibit 23) (hereinafter Brown et al. (2018)).

[44] Harris et al., *Attribution of Net Carbon Change by Disturbance Type Across Forest Lands of the Conterminous United States*, 11 CARBON BALANCE AND MANAGEMENT 1, 12 (2016), *available at* https://doi.org/10.1186/s13021-016-0066-5 (Exhibit 24) (hereinafter "Harris et al.").

intensively for timber harvest compared with federal public lands.[45] This is especially pronounced in the northern New England states of Maine, New Hampshire, and Vermont, where the vast majority of forests are privately owned (~94% of Maine). Recent modeling suggests that logging, not forest conversion, will continue to be the greatest factor in regional aboveground forest carbon over at least the next 50 years.[46]

Although there is a large amount of maturing forest (80-100 years old) across the landscape, future harvests will target these forests where they occur on private lands.[47] Despite widespread forest maturation, rates of timber harvest in New England are such that trends in regional amounts of late successional forest structure are static, and the amount of large diameter standing snags is declining.[48] "Even though forests of the Northeast are aging, changes in silviculture and forest policy are necessary to accelerate restoration of old-growth structure."[49] The WMNF, containing a relatively high percentage of mature forests compared to private lands, is an especially important location to protect intact mature forests so that New England can recover regionally-significant amounts of late successional forest. Although passive management is most often all that is required to restore old forest conditions,[50] it takes centuries to develop forest complexity, requiring permanent protection from timber harvest if restoration is to be successful.[51]

---

[45] Gunn et al., *Late-Successional and Old-Growth Forest Carbon Temporal Dynamics in the Northern Forest* (*Northeastern USA*), FOREST ECOLOGY & MGMT. (2013), *available at* https://www.manomet.org/wp-content/uploads/old-files/2013%20Gunn%20et%20al%20%20LOSG%20Carbon%201-s2%200-S0378112713006907-main.pdf (Exhibit 45) (hereinafter "Gunn et al.").

[46] Duveneck and Thompson, *Social and Biophysical Determinants of Future Forest Conditions in New England: Effects of a Modern Land-Use Regime*, 55 GLOB. ENVIRONMENTAL CHANGE 115, 122, 124, 125 (March 2019) (Exhibit 25) (hereinafter "Duveneck and Thompson").

[47] *Id.*

[48] Ducey et al., *Late-Successional and Old-Growth Forests in the Northeastern United States: Structure, Dynamics, and Prospects for Restoration*, 4 FORESTS 1055, 1069 (2013), *available at* https://www.researchgate.net/publication/260516680_Late-Successional_and_Old-Growth_Forests_in_the_Northeastern_United_States_Structure_Dynamics_and_Prospects_for_Restoration (Exhibit 26).

[49] *Id*. at 1055, 1056.

[50] *See* Zaino et al. (2018) at 16 (Exhibit 16).

[51] Watson et al., *The Exceptional Value of Intact Forest Ecosystems*, NATURE ECOLOGY & EVOLUTION (2018), *available at* https://www.researchgate.net/profile/John-Robinson-18/publication/323399911_The_exceptional_value_of_intact_forest_ecosystems/links/5a9b0482aca2721e3f3018b2/The-exceptional-value-of-intact-forest-ecosystems.pdf (Exhibit 27). Di Marco et al., *Wilderness Areas Halve the Extinction Risk of Terrestrial Biodiversity*, 573 NATURE 582 (2019) (Exhibit 28); Dinerstein et al., *A Global Safety Net to Reverse Biodiversity Loss*, 6 SCI. ADVANCES 1 (Sept. 2020) (Exhibit 29) (hereinafter "Dinerstein et al."); Miller et al.

The recently-released Forest Service Climate Adaptation Plan notes that mature and old-growth forests are "often viewed as ideal candidates for increased conservation efforts, and are frequently found within areas designated as wilderness or roadless or other management areas where timber harvest is precluded."[52] The Forest Service Climate Adaptation Plan is wise to highlight the inverse relationship between timber harvest levels and amounts of mature and old-growth forests. As implied by the Forest Service Climate Adaptation Plan, there is no greater threat to the extent of mature and old-growth forests on federal public lands than logging.

Despite the clear scientific evidence for increasing amounts of old, wild forest, only 3% of New Hampshire (and a similar amount across New England) is managed to permanently protect or restore old forest conditions, with a primary emphasis on supporting native biodiversity, natural processes, and climate stabilization.[53] Since Standing Trees' comments on the Draft EA, additional science supporting permanent protection and restoration of old forests has been published, including a new study released in early 2023 questioning the major problems with forest management promoting early successional habitat.[54]

The Forest Service's proposal that providing non-shade conditions for some species of trees to thrive also is not in agreement with what we know of how large trees can transfer nutrients to smaller trees through fungal communities in the soil.[55] It is also at odds with how healthy forests mature and support the complex food web and balance in a natural undisturbed forest ecosystem.

The public is left to wonder whether this "need for management" is entirely based on commercial interests for a more profitable forest—as selective and clearcutting extirpate the largest, most profitable trees for timber.

For these reasons, the forest management practices embodied by this Project are increasingly contrary to scientific evidence, and the Final EA makes no effort to reckon with the

---

(2018) (Exhibit 18); Miller et al., *National Parks in the Eastern United States Harbor Important Older Forest Structure Compared with Matrix Forests*, 7 ECOSPHERE (2016), *available at* https://www.researchgate.net/profile/Aaron_Weed/publication/305484577_National_parks_in_the_eastern_United_States_harbor_important_older_forest_structure_compared_with_matrix_forests/links/57961bdd08aed51475e542a7/National-parks-in-the-eastern-United-States-harbor-important-older-forest-structure-compared-with-matrix-forests.pdf (Exhibit 30) (hereinafter "Miller et al. (2016)").

[52] Forest Service Climate Adaptation Plan 1, 13 (July 2022), https://www.usda.gov/sites/default/files/documents/4_NRE_FS_ClimateAdaptationPlan_2022.pdf (Exhibit 31).

[53] *See* Moomaw et al., *Intact Forests in the United States: Proforestation Mitigates Climate Change and Serves the Greatest Good*, 2 FRONTIERS IN FOREST AND GLOB. CHANGE 1, 3 (2019), *available at* https://www.frontiersin.org/articles/10.3389/ffgc.2019.00027/full (Exhibit 32).

[54] Kellett et al., *Forest-clearing to Create Early-successional Habitats: Questionable Benefits, Significant Costs*, 5 FRONTIERS FOR GLOB. CHANGE 1 (Jan. 9, 2023) (Exhibit 3).

[55] Simard et al., *Net Transfer of Carbon Between Ectomycorrhizal Tree Species in the Field*, 388 NATURE 579 (Aug. 7, 1997) (Exhibit 4).

growing body of science supporting greater protection of the Project area's mature forests. In conflict with NEPA, the Final EA fails to address and explain opposing viewpoints and contrary scientific information along with the agency's rationale for choosing one viewpoint over another.[56]

### *3. Failure to Address Recent Executive Orders on Forest Protection*

As discussed in our comment on the Draft EA, and above in this objection, there is clear scientific evidence that counsels in favor of protecting mature forests. Aggressive measures are necessary to stave off climate and extinction catastrophe.[57] This vision was endorsed by the Administration through Executive Orders 14,072 and 14,008. Like the Draft EA, the Final EA fails to explain how proposed logging will comply with either Executive Order. Like the Draft EA, the Final EA fails to explain how proposed logging will comply with either Executive Order.

Among other things, Executive Order 14,008 calls on the federal government to "protect America's natural treasures, increase reforestation, improve access to recreation, and increase resilience to wildfires and storms" and commits the Forest Service to measures to help "achieve the goal of conserving at least 30 percent of our lands and waters by 2030."[58]

Executive Order 14,072 provides that the Biden Administration "will manage forests on Federal lands, which include many mature and old-growth forests, to promote their continued health and resilience; retain and enhance carbon storage; conserve biodiversity; mitigate the risk of wildfires; enhance climate resilience; enable subsistence and cultural uses; provide outdoor recreational opportunities; and promote sustainable local economic development." To achieve this policy, the Administration, including the Forest Service, is directed to prepare an inventory of mature and old-growth forests, must analyze threats to mature and old-growth forests on Federal lands, and will implement policies to "institutionalize climate-smart management and conservation strategies that address threats to mature and old-growth forests on Federal lands."

On April 20, 2023, the Forest Service released a report titled "Mature and Old-Growth Forest: Definition, Identification, and Initial Inventory on Lands Managed by the Forest Service and Bureau of Land Management" as required under Executive Order 14,072.[59] Simultaneously, the Forest Service sent a letter to Regional Foresters stating that "[w]e will shortly issue

---

[56] 40 C.F.R. § 1502.9(c) (requiring agencies to disclose, discuss, and respond to "any responsible opposing view"). *See Bark*, 958 F.3d at 871 (9th Cir. 2020) (decision not to prepare EIS held arbitrary and capricious where Forest Service failed to "engage with the considerable contrary scientific and expert opinion" and "instead drew general conclusions").

[57] Ceballos et al., *Vertebrates on the Brink as Indicators of Biological Annihilation and the Sixth Mass Extinction*, 117 PNAS 13596 (June 2020) (Exhibit 33).

[58] *See* Exec. Order No. 14,008, §§ 214, 216.

[59] Mature and Old-Growth Forests: Definition, Identification, and Initial Inventory on Lands Managed by the Forest Service and Bureau of Land Management 1 (Apr. 2023), https://www.fs.usda.gov/sites/default/files/mature-and-old-growth-forests-tech.pdf (Exhibit 11).

guidance on using this information."[60] On April 21, 2023, the Forest Service published an Advance Notice of Proposed Rulemaking that seeks input on how the agency should "adapt current policies to protect, conserve, and manage the national forests and grasslands for climate resilience," including "concerns about…past and current management practices, including inappropriate vegetation management."[61]

The scientific underpinnings of this Executive Order are rooted in recent peer-reviewed studies that investigate climate change mitigation and the intersection of forest ecology and forest carbon. Climate change is driving and exacerbating a range of threats to New Hampshire, the New England region, and the globe. The Intergovernmental Panel on Climate Change Report released in February 2022 found, "[s]afeguarding biodiversity and ecosystems is fundamental to climate resilient development … and to [climate] mitigation and adaptation."[62] On November 12, 2021, the U.S. joined 140 other nations in signing a commitment at the COP 26 United Nations Climate Change Conference in Glasgow, Scotland. The "Glasgow Leaders' Declaration on Forests and Land Use" promised to "to halt and reverse forest loss and *land degradation* by 2030" (emphasis added).[63]

On the global scale, forest protection represents approximately *half or more* of the climate change mitigation needed to hold temperature rise to 1.5 degrees Celsius.[64] New Hampshire may be a relatively small state, but its temperate deciduous forests are among the planet's most effective carbon sinks. In the United States, New England's *in-situ* carbon storage potential is second only to that of the Pacific Northwest, but carbon storage levels remain artificially low due to timber harvest frequency and intensity.

The Final EA fails to acknowledge Executive Order 14,072 or incorporate the Forest Service's work to implement its directives. Indeed, the Final EA was released without any reference to the availability of the initial inventory and report, and prior to issuance of guidance to Regional Foresters and completion of proposed rulemaking, foreclosing the opportunity to

---

[60] Letter from Chris French, Forest Service Deputy Chief, to Regional Foresters (Apr. 18, 2023) (Exhibit 5).

[61] Letter from Chris French, Forest Service Deputy Chief, re: Advance Notice of Proposed Rulemaking (Apr. 21, 2023) (Exhibit 12).

[62] CLIMATE CHANGE 2022: IMPACTS, ADAPTATION AND VULNERABILITY – WORKING GROUP II CONTRIBUTION TO THE SIXTH ASSESSMENT REPORT OF THE INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE 32 (Pörtner et al., eds., 2022), *available at* https://report.ipcc.ch/ar6/wg2/IPCC_AR6_WGII_FullReport.pdf (Exhibit 34).

[63] Declaration on Forests and Land Use (Feb. 11, 2021), https://webarchive.nationalarchives.gov.uk/ukgwa/20230418175226/https:/ukcop26.org/glasgow-leaders-declaration-on-forests-and-land-use/.

[64] Erb et al., *Unexpectedly Large Impact of Forest Management and Grazing on Global Vegetation Biomass,* 553 NATURE 73 (2018), *available at* https://research.vu.nl/ws/files/118980188/Nature25138_Unexpectedly_large_impact_of_forest_management_and_grazing_on_global_vegetation_biomass.pdf (Exhibit 35) (hereinafter, "Erb et al.").

protect the very mature forest the Executive branch and the national leadership of the Forest Service are now setting out to protect. The public cannot assess this Project's compatibility with Executive Order 14,072. Given this guidance and the presence of mature forest in the Project area, proceeding with this project without further analysis would irretrievably commit limited resources against Administration policy.

The Forest Service has recognized that current scientific standards and the instruction of Executive Orders 14,072 and 14,008 require it to re-examine projects in the planning process. For example, the Forest Service recently withdrew the Flat Country Project in Oregon because the proposed project was inconsistent with Executive Orders 14,072 and 14,008.[65] Of concern was the project's purpose to regenerate younger age classes and the negative impacts the treatments would have on mature forest characteristics.[66]

The Forest Service should similarly withdraw or revise the Project and other Forest projects based on similar assumptions. This is particularly true because the Forest Plan gives the Forest Service a distinct advantage in meeting its obligations by already clearly defining mature, old, and old-growth forests. The Forest Service has identified extensive mature forests in the Peabody West IRP project area. Yet instead of protecting those mature forests, the Project proposes to engage in logging them. Until detailed analysis in the form of an EIS is completed to comply with Forest Plan and Executive Order requirements to conserve mature and old-growth forests, the Peabody West IRP cannot legally proceed under NEPA and NFMA.

### *4. Failure to Show Compliance with the Forest Plan*

The Final EA fails to show the Project's compliance with the Forest Plan—an essential component of analyzing the Project's impacts on vegetation and forest health in the context of the Forest Plan's standards and guidelines on these issues.

Standard S-3 of the Forest Plan's Forest-Wide Management Direction states that "Timber harvest is prohibited in old growth forest."[67] Further, Guideline G-1 states that "Outstanding

---

[65] *Flat Country Regional Review*, U.S. FOREST SERVICE, https://www.fs.usda.gov/detail/r6/landmanagement/planning/?cid=fseprd1080564 (last visited June 12, 2023).

[66] FLAT COUNTRY PROJECT REVIEW REPORT, U.S. FOREST SERVICE 1, 12 (Sept. 27, 2022), https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd1080562.pdf.

[67] WMNF Plan 2-13. Old-growth is defined in the Forest Plan as "Uneven-aged (three or more age classes) forest with an abundance of trees at least 200 years old, multiple canopy layers, large diameter snags and down logs, and a forest floor exhibiting pit-and-mound topography. There should be little or no evidence of past timber harvest or agriculture. Northern hardwood old growth consists primarily of sugar maple and American beech; softwood old growth is largely made up of spruce and hemlock. Stands need to be at least 10 acres in size to be identified as old growth. Anything smaller is a patch of old trees within a younger stand, not a habitat type in its own right." WMNF Plan Abbreviations, Acronyms, and Glossary at 21.

natural communities should be conserved."[68] The Forest Plan goes beyond protections for *existing* old-growth forest, however, clearly looking to how the Forest Service can facilitate recovery of old-growth forest across a larger percentage of the forest in the future. The Forest Plan defines old forest as beginning at 70 years of age in Aspen-birch habitat types, 90 years of age in Spruce-Fir, 120 years of age in Northern hardwoods, Mixed wood, Oak-Pine, and Hemlock.[69] The Forest Plan defines Old Forest Habitat as: "Desired habitat conditions start with those for mature forest and can include greater size, decadence, structural complexity, etc. *No harvest will occur in stands identified to provide old forest habitat"* (emphasis added).[70] From the Final EA, which denies that the Project affects any old forests, it is impossible to discern whether any portions of the Project area have the potential to provide old forest habitat and to conclude that the Project complies with the Forest Plan's protections for such habitat.

Moreover, in conflict with the Forest Plan's guidelines, the Peabody West IRP proposes extensive even-aged management in mature stands within the Project area, 79% of which is classified as Mature.[71] The Forest Plan's definition of mature forest suggests that uneven-aged harvest methods may be appropriate in mature forests in some circumstances but does not endorse any even-aged management: "*Depending on site conditions, thinning and uneven-aged harvest methods can be used in this habitat without negatively impacting habitat quality.* Some uneven-aged harvest may enhance vegetative and structural diversity" (emphasis added).[72] Despite this instruction to avoid even-aged management in mature forest habitat, the Project proposes extensive even-aged management. Notwithstanding numerous indications that even-aged management will have the most adverse environmental impacts of the Project's various silvicultural treatments, the Final EA never analyzes this conflict. Contrary to the Forest Plan, proposed management activities within the Project area will degrade habitat quality.

***Requested Remedy: The Forest Service should complete an EIS to fully analyze the Project's impacts to vegetation and forest health, developing an adequate range of alternatives and taking into account the analysis required under the WMNF Plan, Executive Order 14,072, and Executive Order 14,008.***

---

[68] WMNF Plan 2-13.

[69] WMNF Plan Appendix D-2.

[70] WMNF Plan Abbreviations, Acronyms, and Glossary at 21.

[71] Habitat Rationale at 9. The 2005 WMNF Forest Plan defines Mature Forest as "Stands in which the overstory is in the mature age class. Mature forest habitat is typically made up of trees that are eight inches or more in diameter. Mortality is just beginning in these stands, resulting in a few scattered canopy gaps and a small number of snags and cavities in the overstory. Most snags and down logs are small in diameter and within the intermediate or understory layers." WMNF Plan Abbreviations, Acronyms, and Glossary at 18. The mature age class ranges from 40-89 years for Spruce-Fir habitat types, 60-119 years for Mixed wood and Northern hardwood, 40-69 years for Aspen-birch, and 70-119 years for Oak-Pine and Hemlock. WMNF Plan Appendix D-2.

[72] WMNF Plan Abbreviations, Acronyms, and Glossary at 18.

### B. Endangered, Threatened, and Other Sensitive Species

The Final EA and supporting documentation provide virtually no Project-specific analysis of impacts to endangered, threatened, and sensitive species. The Final EA references the Peabody West IRP Biological Evaluation, which states that three federally listed or proposed species and seventeen Regional Forester Sensitive Species have potential to occur in the analysis area.[73] What information is provided suggests that the Project, in fact, will adversely affect listed species in violation of the ESA.

Based on the Biological Evaluation, the Final EA ultimately determined that the Proposed Action may affect, but is not likely to adversely affect, the endangered NLEB, that the Project would have no effect on the threatened Canada Lynx, and that the Project would not jeopardize the continued existence of the tricolored bat, which is proposed to be listed as endangered.

However, the Forest Service failed to provide Biological Assessments ("BA") for these species as part of the documentation for this Project. As further detailed below in this Objection, a project- and species-specific BA is required to "evaluate the potential effects of an action on listed and proposed species…[to] determine whether any such species or habitat are likely to be adversely affected by the action and is used in determining whether formal consultation or a conference [with the U.S. Fish and Wildlife Service ("USFWS")] is necessary."[74] Without more specific BAs, the public lacks important information related to Federally listed and proposed listed species that might be impacted in the Project area. This information is necessary for the public to make informed comments and objections, including regarding the Project's compliance with the ESA. As discussed in more detail in Section VII below, it appears, in particular, that the Forest Service's generic approach to protection of the now-endangered NLEB rather than a site- and Project-specific approach runs afoul of the ESA.

Furthermore, according to the Forest Plan:

> The White Mountain National Forest will provide sufficient habitat and protection to preclude the need for species listing under the Federal Endangered Species Act due to National Forest habitat conditions or effects of activities. For species currently listed under the Federal Endangered Species Act or designated Regional Forester's sensitive species, the Forest Service will contribute to conservation and recovery of species and their habitats.[75]

As previously raised in our comment on the Draft EA, NLEB habitat requirements are the opposite of the type of habitat that will be generated from the Project.[76] According to the

---

[73] Final EA at 25.

[74] 50 C.F.R. § 402.12.

[75] WMNF Plan 1-1, 1-8.

[76] Standing Trees Comments at 12 (Exhibit 36).

USFWS Species Status Assessment Report for the NLEB, dated March 22, 2022, the bat depends on mature and old forests for roosting and foraging.[77] Preferred roosting habitat is large diameter live or dead trees of a variety of species, with exfoliating bark, cavities, or crevices. Bats change roosts approximately every two days,[78] and females often return to the same maternity area over multiple years.[79] Additionally, "mature forests are an important habitat type for foraging NLEBs[,]" and "most foraging occurs . . . under the canopy . . . on forested hillsides and ridges."[80] Furthermore, NLEBs "seem to prefer intact mixed-type forests . . . for forage and travel rather than fragmented habitat or areas that have been clear cut."[81]

The WMNF, including the Project area, contains extensive mature forests that are beginning to acquire the characteristics of an old forest, likely providing some of the highest-quality NLEB habitat in New England. Yet many of the silviculture treatment prescriptions in this Project involve the removal of mature trees.[82]

In fact, the Biological Evaluation for the Project *concedes* potential negative effects on bats from the Project activities:

> Direct effects to NLEB include timber harvest activities during the summer and fall seasons from trees over 3 inches diameter at breast height, especially during the pupping season (June 1-July 31). Bike trail construction would directly impact NLEB if large trees need to be removed. . . Indirect effects include those that affect bats through alteration of habitat, such as timber harvest and bike trail construction, which would remove potential roost trees when bats are not present. While there would still be ample roost trees available within the HMU and the surrounding area after the proposed timber harvests have been conducted, bats may be impacted if existing maternity roost trees are removed. Site fidelity is common in NLEB and females often return to the same maternity area over multiple years (U.S. Forest Service, Eastern Region 2014). While research has shown that an NLEB maternity colony can persist with a 20 percent reduction of the roost trees

---

77 Species Status Assessment for the Northern long-eared bat (Myotis septentrionalis) Version 1.2, USFWS (Aug. 2022), https://www.fws.gov/media/species-status-assessment-report-northern-long-eared-bat (hereinafter "Species Status Assessment") (Exhibit 1).

78 *Id*. at 18.

79 *Peabody West Integrated Resource Project: Biological Evaluation*, U.S. FOREST SERVICE, 7 (Apr. 2023), https://usfs-public.app.box.com/v/PinyonPublic/file/1200243326958 (hereinafter "Biological Evaluation").

80 Species Status Assessment at 18 (Exhibit 1).

81 *Id*. at 18-19 (Exhibit 1).

82 For example, an estimated 30 acres will be clear-cuts with reserves, which "would result in an immediate change from mature to regeneration age structure." Final EA at 6.

> associated that colony, which would be consistent with the ephemeral nature of snags (Silvas, Ford and Britzke 2015), there is still a risk of impacting maternity colonies with the degree of tree removal proposed.[83]

Despite these conceded impacts and risks, the Forest Service has conducted no Project-specific analysis to characterize the risks to NLEB from Project activities fully, nor are there any site-specific mitigation measures incorporated into the Final EA or DDN.

In combination with recently approved projects and anticipated logging and tree-cutting projects (including the Wanosha Integrated Resource Project, Sandwich Vegetation Management Project, Lake Tarleton Integrated Resource Project, Lost River Integrated Resource Project, and others), WMNF is set to eliminate or degrade several thousand acres of NLEB habitat across a large region. As discussed in further detail below, the Forest Service failed to evaluate the cumulative impact of these combined and geographically proximate projects.

Failing to protect the NLEB is a violation of the ESA and NEPA, which provides an independent obligation that agencies continue to take a "hard look" at project impacts. Where "new circumstances or information" arise that are "relevant to environmental concerns and bear[] on the proposed action or its impacts," and "a major Federal action remains to occur," the agency must prepare supplemental NEPA documentation.[84] Additionally, one of the objectives listed in the Forest Plan states:

> Within five years of listing, [the Forest Service will] develop conservation approaches for all sensitive species. Biological diversity will be conserved by maintaining viable reproducing populations for all native plant and animal species. For species where the Forest alone cannot support a viable population, species persistence will be maintained, and the Forest Service will contribute to maintaining or improving viability where possible.[85]

To our knowledge, the Forest Service has not developed conservation approaches for all sensitive species within the WMNF that were listed five or more years ago. If it has, these approaches are not apparent in the Biological Evaluation. The Biological Evaluation provides generic information (some of which is controversial and conflicts with more accurate and recent scientific studies)[86] supporting the Forest Service's assertion that federally listed and sensitive

---

[83] Peabody West Integrated Resource Project: Biological Evaluation and Wildlife Report 7 (Apr. 20, 2023) (hereinafter "Biological Evaluation").

[84] 40 C.F.R. § 1502.9(d). *See Marsh v. Or. Natural Resources Council*, 490 U.S. 360, 374 (1989) (agency must at least take "hard look" at environmental impacts of planned action, even after proposal has received initial approval).

[85] WMNF Plan at 1-8.

[86] *See, e.g.*, Species Status Assessment at 18-19 (Exhibit 1) (describing NLEB preferred habitat, including foraging habitat).

species will not be impacted by the Project, but it fails to substantially address any conservation methods and recovery strategies for actually protecting these species.

Through the completion of an EIS, the Forest Service would have an opportunity to do an in-depth analysis of the Project's impacts on endangered, threatened, and sensitive species and to ensure their protection.

***Requested Remedy: The Forest Service should seek additional project-specific consultation from USFWS and complete an EIS to ensure adequate measures for species survival and protection.***

### C. Historic and Cultural Resources

In our comment on the Draft EA, we urged additional analysis of historic and cultural resources in an EIS, including resources of the Abenaki people. One of the goals listed in the WMNF Plan states that "[t]he White Mountain National Forest will identify, evaluate, preserve, protect, stabilize, interpret, and when necessary, mitigate for loss of heritage resources at a Forest-wide and project level."[87] The Final EA does not realize this goal, nor does it fulfill NEPA's required "hard look" at impacts to these resources.

In fact, the Final EA provides virtually no discussion of Project impacts on historic and cultural resources, apparently limiting its analysis to the presence of sites eligible for listing on the National Register of Historic Places—which is salient for compliance with the National Historic Preservation Act but insufficient for NEPA purposes—and concluding none exist.[88] The Final EA does not disclose whether there is any supporting documentation for this conclusion.

By completing an EIS, the Forest Service would have an opportunity to complete a full analysis of the historic and cultural resources within the Project area, ensure the protection of these resources, and properly provide this information to the public.

***Requested Remedy: The Forest Service should complete an EIS to further determine historic and cultural resources within the Project area and means for protecting these resources.***

### D. Climate Impacts and Resilience

While New Hampshire may be a relatively small state, its temperate deciduous forests are among the planet's most effective carbon sinks. The WMNF contains some of New England's oldest and most carbon-dense ecosystems. The insubstantial, one-paragraph climate change analysis in the Final EA fails to address the unique values of the WMNF and is inconsistent with Council on Environmental Quality ("CEQ") guidance, the Forest Service Climate Adaptation Plan, Executive Order 14,072, and Executive Order 14,008.

---

[87] WMNF Plan 1-6.

[88] Final EA at 27, 30.

By contrast, the Final EA, and the 3-page Project-Level Carbon Assessment it summarizes, cursorily claims that the Project will have negligible climate impacts and even incorrectly implies that prescribed treatments will enhance the WMNF's ability to withstand climate change. NEPA requires agencies to address and explain opposing viewpoints and contrary scientific information along with their rationale for choosing one viewpoint over another.[89] The Forest Service's analysis provides virtually no references to any material in opposition to its conclusions, despite voluminous references provided by Standing Trees on multiple occasions with reference to this Project and elsewhere.[90]

As discussed in Standing Trees' prior comments and above in this objection, New England's carbon storage levels remain artificially low due to timber harvest frequency and intensity. Timber harvest accounts for 86% of annual forest carbon loss across the Northeast U.S. The Forest Service incorrectly implies that the prescribed treatments will enhance the forest's ability to absorb carbon.[91] The Forest Service concludes carbon initially emitted from the proposed action would only have a *temporary influence* on emission concentrations because as the forest regrows, carbon is removed from the atmosphere.[92] This is based on a common misconception that young forests are better than old at removing carbon, and ignores strong scientific evidence that carbon storage and sequestration is maximized in un-logged stands in northern New England.[93] Old forests store more carbon than young forests, and they continue to accumulate carbon over time.[94] The rate of carbon sequestration actually increases as trees age.[95] As raised in our comment, recent studies show that among land uses in New England, timber harvest is the leading cause of tree mortality[96] and has the greatest impact on aboveground carbon storage.[97] Forests in New Hampshire are still recovering from extensive clearing in the

---

89 40 C.F.R. § 1502.9(b); *Bark*, 958 F.3d at 871.

90 *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 444 F. Supp. 3d at 858-59.

91 Harris et al. (Exhibit 24).

92 Final EA at 24.

93 Keeton et al., *Late-Successional Biomass Development in Northern Hardwood-Conifer Forests of the Northeastern United States* 57 FOREST SCIENCE (Jan. 18, 2011) (Exhibit 37).

94 Keith et al., *Re-evaluation of Forest Biomass Carbon Stocks and Lessons from the World's Most Carbon-Dense Forests*, 106 PNAS 11635 (July 14, 2009) (Exhibit 38); Luyssaert et al., *Old-growth Forests as Global Carbon Sinks*, 455 NATURE 213 (2008) (Exhibit 39); Leverett et al., *Older Eastern White Pine Trees and Stands Sequester Carbon for Many Decades and Maximize Cumulative Carbon*, 4 FRONTIERS FOR. GLOB. CHANGE 1 (May 2021) (Exhibit 40); Thom et al. (Exhibit 19).

95 Stephenson et al., *Rate of Tree Carbon Accumulation Increases Continuously with Tree Size,* 507 NATURE 90 (Jan. 2014) (Exhibit 41).

96 Brown et al. (2018) (Exhibit 23).

97 Duveneck and Thompson (Exhibit 25).

eighteenth and nineteenth centuries. Timber harvesting in New England has been found to have a larger effect on aboveground carbon storage than forest conversion to non-forest uses.[98]

On January 9, 2023, CEQ released Interim Guidance for agencies to "make use of immediately" when considering greenhouse gas emissions and climate change under NEPA. This guidance had yet to be released upon the submission of our comment on the Draft EA. Section VII of the CEQ guidance states, "agencies should consider applying this guidance to actions in the EIS or EA preparation stage if this would inform the consideration of alternatives or help address comments raised through the public comment process."[99] Our comments raised the issue of the Forest Service's failure to adequately consider climate change impacts. Yet, the CEQ guidance—now in effect and directly applicable to these concerns—is entirely absent from the climate change analysis section of the Final EA.

The CEQ guidance requires agencies to "quantify proposed actions' [Greenhouse Gas ("GHG")] emissions, place GHG emissions in appropriate context and disclose relevant GHG emissions and relevant climate impacts, and identify alternatives and mitigation measures to avoid or reduce GHG emissions."[100] Agency decisions should be based on the best available science and account for the urgency of the climate crisis.[101] The guidance clarifies "NEPA requires more than a statement that emissions from a proposed Federal action or its alternatives represent only a small fraction of global or domestic emissions."[102] Yet, the Peabody West IRP Final EA explicitly states: "[p]roposed project activities affect a relatively small amount of forest land and carbon and, in the short-term, might contribute an extremely small quantity of greenhouse gas emissions relative to national and global emissions," in blatant violation of CEQ guidance.[103] As CEQ has concluded, this approach "is not a useful basis for deciding whether or to what extent to consider climate change effects under NEPA." [104] In addition, no mitigation measures were considered. We cannot foresee all the ways in which the Forest Service fails to comply with the CEQ guidance because there was no attempt to abide by it.

Moreover, the Forest Service's approach to assessing climate impacts of the Peabody West IRP is not in compliance with Executive Orders 14,072 and 14,008. Both expressly direct the Forest Service to take much more extensive action than the insubstantial effort reflected in the Final EA. The Forest Service responded (in part) to Executive Order 14,008 with the publication of its Climate Change Adaptation Plan, which explicitly acknowledged that:

---

98 *Id.*

99 National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change, 88 Fed. Reg. 1,196 (Jan 9, 2023) (Exhibit 2).

100 *Id.*

101 *Id.*

102 *Id.* at 1201.

103 Final EA at 24.

104 88 Fed. Reg. at 1,202.

> [o]ld-growth and mature forests, and other forests with similar characteristics, are an ecologically and culturally important part of the National Forest System. They reside within a continuum of forest age classes and vegetation types that provides for a wide diversity of ecosystem values. Many forests with old-growth characteristics have a combination of higher carbon density and biodiversity that contributes to both carbon storage and climate resilience.[105]

Executive Order 14,072 aims to "enhance carbon storage" and the "climate resilience" of our mature and old-growth forests.[106] The Forest Service "Climate Adaptation Plan" recognized the importance of areas protected from logging as it relates to climate-informed stewardship of mature and old-growth forests on Federal lands.[107] The Forest Service itself identifies carbon uptake and storage as "a major goal for the Forest Service" in helping ecosystems adapt to a changing climate.[108] This vision was further supported by Executive Order 14,008, which aimed to "conserve and restore public lands. . . increase reforestation. . . and address the changing climate" through the adoption of climate-smart forestry practices. The climate change analysis for the Peabody West IRP fails to mention Executive Orders 14,072 or 14,008 or the Forest Service's own goals. Despite supposed policy alignment across the Executive branch, the Forest Service failed to ensure the Peabody West IRP is consistent with Executive Orders 14,072 and 14,008.

Furthermore, there is no such thing as an "extremely small quantity of greenhouse gas emissions" or effect on a "relatively small amount of forest land"[109] when on the global scale, forest protection represents approximately *half or more* of the climate change mitigation needed to hold temperature rise to 1.5 degrees Celsius.[110] The one-paragraph climate change analysis ignores our remarkable forest ecosystems here in Northeastern North America and the unique potential of our temperate deciduous forests to contribute on a global scale to climate stabilization and resilience. The WMNF is an insurance policy against a changing climate and increasing extinction rates. It is irresponsible not to consider the high untapped capacity for carbon storage and sequestration of Eastern U.S. forests. The Final EA does not once mention the remarkable and unique capacity of the WMNF to contribute to climate stabilization and

---

[105] Forest Service Climate Adaptation Plan 1, 13 (Exhibit 31).

[106] *Id.*

[107] *Id.*

[108] *Id.* at 42.

[109] Final EA at 20.

[110] Erb et al. (Exhibit 35).

resilience at a global scale.[111] Research published since the Final EA further supports the climate resilience value of mature forests in the Northeast, like those in the Peabody West HMU.[112]

On this issue of climate resilience, the Forest Service failed to acknowledge or consider the science that Standing Trees identified in our comment and in this objection. Federal courts have set aside NEPA analysis when an agency fails to respond to scientific analysis that calls into question the agency's assumptions or conclusions.[113] The Forest Service cherry-picked the science it wished to use and failed to respond in a meaningful way to comments regarding climate change impacts. Ultimately, the Forest Service failed to take a hard look at climate change under relevant authorities.

***Requested Remedy: The Forest Service should complete an EIS and additional analysis to address the unique climate resilience values of the WMNF and ensure compliance with relevant authorities including CEQ guidance, the Forest Service Climate Adaptation Plan, Executive Order 14,072, and Executive Order 14,008.***

### E. Water Quality Impacts

Notwithstanding the Final EA's discussion of the Clean Water Act ("CWA") and hydrology impacts in the Project area, and despite Standing Trees' request for further water quality impacts analysis, the Final EA still fails to take a hard look at impacts to water quality and the affected watersheds. In an EIS, the Forest Service should perform a thorough stratigraphic and hydrological analysis of the entire proposed treatment area and the adjoining forest area to fully grasp the Project's impacts on water quality, including the impacts of road construction/reconstruction as part of the Project and whether those impacts comply with the CWA.

From the Final EA, it is clear that this analysis is warranted, but that the Forest Service has not done it. As the Forest Service concedes, the Project runs afoul of Forest Plan guidelines

---

[111] Dinerstein et al. (Exhibit 29); Jung et al., *Areas of Global Importance for Conserving Terrestrial Biodiversity, Carbon and Water*, 5 NATURE ECOLOGY & EVOLUTION 1499 (2021) (Exhibit 47).

[112] Faison et al., *Adaptation and Mitigation Capacity of Wildland Forests in the Northeastern United States*, 544 FOREST ECOLOGY & MGMT. (forthcoming Sept. 15, 2023) (Exhibit 48); Faison et al., *The Importance of Natural Forest Stewardship in Adaptation Planning in the United States*, 5 CONSERVATION SCIENCE AND PRACTICE (Apr. 24, 2023), *available at* https://conbio.onlinelibrary.wiley.com/doi/10.1111/csp2.12935 (Exhibit 49).

[113] *See Bark*, 958 F.3d at 871; *High Country Conservation Advocs. v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174 (D. Colo. 2014) (concluding the Forest Service violated NEPA by failing to mention or respond to an expert report on climate impacts); *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1168 (9th Cir. 2003) (concluding that the Forest Service's failure to disclose and respond to evidence and opinions challenging scientific assumptions in an EIS violated NEPA); *Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 704 (9th Cir. 1993) (stating "[i]t would not further NEPA's aims for environmental protection to allow the Forest Service to ignore reputable scientific criticisms that have surfaced").

for water quality impacts, exceeding the standard for the percentage of basal areas removed in watersheds that contain a perennial stream. The Final EA reports these exceedances—in twelve watersheds affected by the Project, including five with perennial fish habitat—and then baselessly denies their significance without any supporting analysis.[114] Similarly, the Forest Service admits that the Project includes fourteen acres of even-aged silvicultural treatment within one quarter-mile of nearly six river-miles of the Peabody River and the West Branch of the Peabody River, which are eligible for designation as wild and scenic rivers under the Wild and Scenic River Act. Without any analysis whatsoever, the Forest Service then asserts that the impacts from these treatments would not be irreversible or irretrievable so as to interfere with potential designation.[115] NEPA requires more.

Pursuant to NEPA's "hard look" mandate, an agency must rely on adequate baseline data that enables the agency to carefully consider information about direct environmental impacts and may not rely on outdated data to do so.[116] Indeed, "establishing appropriate baseline conditions is critical to any NEPA analysis," because without establishing a baseline, "there is simply no way to determine what effect the [project] will have on the environment and, consequently, no way to comply with NEPA."[117] It is unclear if baseline data was even gathered for use in the Final EA's analysis because no analysis was presented. It is impossible for the public to evaluate or weigh in on the adequacy of the agency's analysis without a baseline and current data on the actual water quality of the waters in the Project area.

Additionally, the Final EA states that there will be field visits prior to project implementation "to refine treatment unit boundaries and acres including modifications to address on-site conditions[,]" including potentially "reduc[ing acres] to meet visual and water quality objectives, to incorporate reserve patches of uncut trees in final harvest stands, and to incorporate protective buffers around features such as vernal pools, cultural resources, nest trees, and riparian

---

[114] Final EA at 24. Further, the Forest Plan forest-wide guideline for vegetation management G-1 requires that "[n]o more than 15 percent of the area of watersheds of first and second order perennial streams should be treated with even-age regeneration methods in a five-year period." WMNF Plan 2-1, 2-29. The Final EA makes no mention of this standard, or whether the Project complies with it.

[115] Final EA at 26-27. The Forest Plan forest-wide guideline G-1 for Riparian and Aquatic Habitats states that "[t]ree cutting and harvest should not occur within 25 feet of the bank of mapped perennial streams[.]" WMNF Plan at 2-24. To our knowledge, no map of the project area was provided that shows both the location of perennial streams along with the harvest unit boundaries. The Final EA does not mention this guideline, nor does it make clear that these 25-foot buffers are integrated into the project design. Without this information, it is impossible to tell if this WMNF Plan guideline is being met, and further demonstrates the failure of the Forest Service to take a hard look at how the Project's timber harvesting activities might impact water quality.

[116] *N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1083–87 (9th Cir. 2011); *Cascade Forest Conservancy v. Heppler*, 2021 WL 641614, at *17-*20 (D. Or. Feb. 15, 2021).

[117] *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016).

zones."[118] For the resources mentioned, these on-site baseline conditions should be identified *prior* to completing the NEPA analysis. The Forest Service should have used that information to describe the impacted environment, provide analysis of *how* these resources may be impacted, and describe how the agency might propose to address those impacts. Further, it is especially important that the treatment unit boundaries be defined prior to any implementation because of the potential for boundaries to stray into protected riparian areas.

Furthermore, the Final EA relies on the Albany South EA to support its assertion that impacts of timber harvesting on water quality and the basal area thresholds within the Project area are expected to be negligible.[119] However, this reference illustrates the inadequacy of the Final EA. Nearly all the riparian and aquatic resources and water quality information contained in the Albany South EA is site-specific.[120] Although the document contains some broadly applicable indicators and measures for assessing effects to water resources, the Albany South EA dedicates the vast majority of its analysis to applying these standards to specific features within that project area. The Final EA here fails to conduct such an analysis, only mentioning general standards for the percent harvest levels at the basal area and the projected harvest percentages for the Peabody West IRP.[121] In addition, many of the sources cited in the Albany South EA are outdated, going back as far as 35 years.[122]

The lack of current site-specific data and sources to support the Forest Service's conclusory assessment of water quality impacts make it impossible for the public to make informed opinions about the Project and its potential implications on water quality. The Final EA fails to meet the NEPA "hard look" standard as it relates to hydrology and water quality in the project area.

***Requested Remedy: The Forest Service should complete an EIS and additional NEPA analysis to determine the impacts of the Project on hydrology and water quality.***

---

[118] Final EA at 5.

[119] Final EA at 24 (citing to Albany South Integrated Resource Project: Final Environmental Assessment 131-149 (Dec. 2017), https://www.fs.usda.gov/project/?project=39614 (hereinafter "Albany South EA").

[120] *See generally id*.

[121] Final EA at 23-24. The Albany South EA provides good context for what a proper analysis should look like as it relates to the hydrology and water quality impacts of a Forest Service project. The Albany South EA devotes 34 pages to sections on Water Resources and Riparian and Aquatic Habitat, each with subsections covering project-specific: existing conditions, effect indicators and measures, environmental consequences, various alternatives, direct and indirect effects to water quality, timber harvest impacts on water quality, fish habitat quality and productivity, cumulative effects, and climate change among others. Albany South EA at 130-164. By contrast, the Final EA here devotes a half-page to water quality impacts, and less than that to its analysis of wild and scenic river impacts. Final EA at 24, 26-27.

[122] Albany South EA at 131.

## F. Recreation

The Final EA also fails to undertake a "hard look" at recreational resources in two respects. First, as to the Project's recreational development within the WMNF, the Final EA does not explain or analyze the recreational "needs" driving the proposals. Even the Recreation Specialist Report admits that the Forest Plan's Forestwide Management Direction for Recreation, Guideline 4, states that:

> No additional trails should be constructed or authorized unless clearly needed to: provide public access to the existing system, address resource impacts, resolve public safety issues, meet recreation management or accessibility goals, or best meet the recreation management approaches. New trails should be evaluated and prioritized consistent with supplemental direction in FSH 2309.18.[123]

However, the Final EA notes that opportunities for both mountain biking and backcountry skiing in gladed terrain (as opposed to natural terrain) already exist nearby on private land.[124] No reasons are offered for why the Project serves a "clear [need]," as required by the Forest Plan, "to provide public access to the existing system, address resource impacts, resolve public safety issues, meet recreation management or accessibility goals, or best meet the recreation management approaches." And the Project's recreational proposals do have other resource impacts, including on vegetation, sensitive species, and other wildlife. [125] The cursory discussion of alignment of the proposals with the Recreation Opportunity Spectrum framework objections—in the Recreation Specialist Report, not the Final EA—does not cure the Final EA's lack of explanations. The Final EA, therefore, fails to analyze the relationship between the Project's recreational proposals and existing recreational opportunities and how the Project complies with Forest Plan direction.

Second, with respect to the logging elements of the Project, the Final EA contains no analysis of their impacts on existing recreational resources within the Project area. The Project area includes or abuts the well-used Dolly Copp Campground, numerous hiking trails within the WMNF and on nearby private land, including landmark trail connections to the Great Gulf Wilderness area immediately to the south; ski, snowmobile, and mountain biking trails running through the Project area; and the Appalachian Trail to the south and east—which appears to be obscured by the legend on the recreation map provided in the Final EA. The Final EA gives virtually no attention to the potential impacts of logging several thousand acres of mature forest

---

[123] Peabody West Recreation Effects Analysis 1 (Sept. 20, 2022) (hereinafter, "Recreation Specialist Report").

[124] Final EA at 2, 3, 11, and 18.

[125] Final EA at 11-12.

on these recreational activities, other than to note and then dismiss them as minor and temporary in the Recreation Specialist Report.[126]

Despite the close proximity of the iconic Appalachian Trail (or "AT"), there is little analysis of impacts to that resource and the multitude of hikers that use and enjoy it. Further, even though the Appalachian Trail is managed in conjunction with the National Park Service ("NPS"), there is no indication in the Final EA that the Forest Service consulted with NPS. Nor is there any indication that the Forest Service consulted with the Appalachian Mountain Club or the Dartmouth Outing Club. All of these groups are conspicuously absent from the list of "Agencies or Persons Consulted" in the Final EA.[127]

The Forest Service must provide adequate analysis of project impacts and cumulative impacts on recreation. This should be evaluated within the context of the local project planning area and at the forest level because surrounding recreation areas will be felt most acutely at the local level. In addition, the WMNF Plan itself requires that such "projects must be evaluated in terms of their effects on both the individual sites and on Forest-wide development levels."[128]

***Requested Remedy: The Forest Service should conduct an EIS to determine the impacts of the Project's recreational and non-recreational elements on recreational and natural resources in the area.***

### G. Scenic Resources

On its face, the Final EA's analysis of scenic resources is profoundly insufficient. The Final EA includes only a half-page of discussion addressing scenery within the Project area. The Scenery Specialist Report provides more detail but indicates that the analysis area for cumulative effects is the viewshed from just *four* public land viewpoints, and the timeframe is from 30 years in the past to 30 years in the future.[129] The Report further explains, "[t]his timeframe allows for all the harvested openings to fully restock, develop a full canopy of vegetation, and reach a height with enough spread and density to allow the shadow and textural differences to begin to blend with the adjacent surrounding."[130] The Report also indicates that depending on the viewpoint, project impacts can be seen for up to a distance of 10 miles by the "casual observer."[131] Logging projects that can be seen up to 10 miles away and take 30 years to "begin

---

[126] Recreation Specialist Report at 2 ("[R]ecreation impacts would be minor and short term in nature. Recreation resources (e.g., trails and campgrounds, dispersed recreation) within the project area would experience noise, closures, or other disruptions in use associated with project construction or timber harvest activities.").

[127] Final EA at 28.

[128] WMNF Plan at 2-17.

[129] Peabody West Integrated Resource Project Scenery Management Specialist Review and Summary (Jun. 17, 2022) (hereinafter "Scenery Specialist Report").

[130] *Id.*

[131] *Id.*

to blend" with their un-logged natural surroundings are clearly significant. All four of the viewpoints appear to be on the Appalachian Trail, the highly significant hiking trail discussed above.

The Project's long-lasting eyesores will negatively impact the surrounding community and also the through-hikers and other users of the AT. Indeed, the Final EA and Scenery Specialist Report strikingly omit virtually any detailed discussion of the impacts on the AT or of the Project's location in the shadow of some of the WMNF's most scenic and protected landscapes in the Great Gulf Wilderness, Pinkham Notch, and the Mount Washington area to the south. The level of analysis in the Final EA and the Scenery Specialist Report fall far short of a meaningful assessment of the Project's effects on this region's treasured scenic resources.

Moreover, the Final EA concludes that scenic impacts are acceptable despite conceded violations of Forest Plan guidelines. The WMNF Plan mandates that "all management activities should meet or exceed Scenic Integrity Objectives established for the Forest through the Scenery Management System ("SMS")[.]"[132] The Scenery Management portion of the Forest Plan mandates that:

> In evaluating cumulative effects for viewed landscapes from established concern level 1, open, higher elevation viewpoints affording expansive or large scale views, no more than 9 percent of the acreage within the view should be treated with regeneration vegetation management activities within a 30 year period. Total area affected during any one entry period with new regeneration treatment should not exceed 4 percent of the acreage. Assessment may need to be made from multiple viewpoints (that view a common land base). The assessment will apply to each view separately.[133]

For areas with a "High" Scenic Integrity Objective, "most of the project area created openings should be minimally evident from trail, road, or use area vantage points. Maximum observed size should not exceed 4-5 acres. If openings occur, they should appear as natural occurrences and be well- distributed in the viewed landscape."[134]

The Final EA concedes that the proposed timber harvest prescriptions are inconsistent with the Forest Plan. According to the Final EA:

> The proposed action includes three relatively large even-aged treatments: a 26-acre clearcut in unit 19, a 9-acre patch cut in unit 20, and the expansion of an existing permanent wildlife opening to about 19 acres. These proposals exceed the Forest Plan guideline G-3 for MA 2.1 land, which states maximum observed opening

[132] WMNF Plan at 2-26.

[133] WMNF Plan at 3-6.

[134] *Id*.

> size should not exceed 5 acres in areas with a high scenic integrity objective (Forest Plan, p. 3-6). Although each of these units would exceed this guideline, the larger acreage is intended to better meet project-level objectives for the Peabody West HMU, and to move the forest toward desired conditions consistent with the Forest Plan.
>
> Consistent with Forest Plan direction, and in meeting the intent of guideline G-3 for scenery management, a design element is included which would minimize visual impacts of the three larger even-aged units (see Design Elements SCM-1).

In other words, the Final EA admits that the project parameters exceed what is allowed by the Forest Plan, without providing a reasoned explanation under NEPA and in violation of NFMA.[135] Incoherently and contrary to NFMA, the Final EA suggests that that the project-level goals should take precedence over the Forest Plan, provided that certain design elements are included to mitigate scenic impacts in some unmeasured manner. There is no scenario in which these unlawful impacts to scenic resources can be considered "not significant" and should not have received much more detailed analysis and mitigation through an EIS.

Because the Forest Service failed to consider significant impacts to scenic values, it should correct its errors through completion of an EIS.

***Requested Remedy: The Forest Service should conduct an EIS to determine the true impacts that the Project will have on scenic resources in the area, including additional viewpoints from the Appalachian Trail.***

### H. Soils

The Final EA fails to provide any analysis, discussion, and clarity surrounding impacts on soil resources, let alone a "hard look" at the Project's effects. In Standing Trees' comment on the Draft EA, we urged additional analysis of impacts to Project area soils from road construction and logging. The Final EA provides no such analysis, instead referring to the Project's planned adherence to "[best management practices] and Forest Plan standards and guidelines" to "ensure impacts to soils are minimized," and a soil specialist report that does not appear in the project documentation at all[136]

---

[135] *See, e.g.*, *WildEarth Guardians v. Jeffries*, 370 F. Supp 3d 1208, 1233–34 (D. Or. 2019) (Inconsistency between the Forest Service's supplemental final environmental impact statement and its forest plan violated NFMA by failing to protect endangered species, despite the plan's "seasonal timing restrictions.").

[136] Final EA at 23. A "Soils Background White Paper" is included in the supporting documents for the Final EA, but it includes no Project-specific analysis, instead discussing soil-related conditions on a Forest-wide basis and offering guidance for conducting project-based analysis.

***Requested Remedy: The Forest Service should complete an EIS to determine detailed soil impacts that Project will have on the area.***

## I. Roadless Areas

The Final EA fails to take a "hard look" at the impacts of the Project's timber management activities on affected roadless areas. The Final EA disavows any impacts whatsoever on designated roadless areas. However, the Roadless Effects Summary acknowledges that 600 acres are proposed for logging within the 17,000-acre Great Gulf Inventoried Roadless Area, including 80 acres of even-aged management.[137]

Because the portion of the Great Gulf Inventoried Roadless Area proposed for logging was not inventoried prior to promulgation of the 2001 Roadless Area Conservation Rule, the WMNF claims that it had the discretion to allocate these lands to the General Forest Management (2.1) category in the 2005 Forest Plan. The Roadless Effects Summary suggests that the proposed logging will not disqualify the area from future consideration in a Chapter 70 Wilderness Inventory and Evaluation when the WMNF Forest Plan is revised. However, this merely addresses the *eligibility* of the lands for Chapter 70 review; it does not account for how logging will impact the landscape's suitability or potential for a wilderness recommendation or designation by Congress, nor how the proposed logging will degrade those values associated with roadless areas, including clean water, intact forest habitats, and more.[138]

Project activities threaten significant impacts to an area with outstanding natural resource value, and the Final EA fails to address them in violation of NEPA and in contravention of the Forest Service's own intent to address impacts to roadless characteristics in these areas.

***Requested Remedy: The Forest Service should complete an EIS to fully analyze the Project's impacts on inventoried roadless areas that are eligible for future designation as protected wilderness or roadless areas.***

## J. Wildlife

The Final EA fails to acknowledge the Project's impacts on wildlife and the important role that mature and old-growth forests play in this delicate ecosystem. The 2018 Vermont Conservation Design Natural Community and Habitat Technical Report is instructive for the state of New Hampshire and the White Mountain National Forest:

---

*See* Robert A. Colter, "Soils background information for how effects are determined for soil productivity" (Nov. 2021).

[137] Peabody West Wilderness and Roadless Areas Effects Analysis (May 18, 2022).

[138] Dietz et al., *The Importance of U.S. National Forest Roadless Areas for Vulnerable Wildlife Species*, 32 GLOB. ECOLOGY AND CONSERVATION 1, 1, 4 (Dec. 2021) (Exhibit 43); Talty et al., *Conservation Value of National Forest Roadless Areas*, 2 CONSERVATION SCI. AND PRAC. 1, 1, 11 (Nov. 2020) (Exhibit 44).

> The state's native flora and fauna that have been here prior to European settlement are adapted to this landscape of old, structurally complex forest punctuated by natural disturbance gaps and occasional natural openings such as wetlands or rock outcrops. The complex physical structure of old forests creates diverse habitats, many of which are absent or much less abundant in younger forests.[139]

What the White Mountain National Forest calls "old forests"—the forests that the Peabody West HMU's "mature forests" are poised to become—are northern New England's *natural forests*. As such, much of New Hampshire's community of life evolved over millennia within these remarkable original forests. A combination of overhunting and habitat loss following European settlement led to the disappearance of wide-ranging carnivores such as cougars, wolves, and wolverines. Elk and caribou met a similar fate. Some species we might take for granted today, such as bear, moose, beaver, and loons, were on the brink of extirpation only a short while ago. Lynx, NLEB, and pine marten currently teeter on the edge. Many of New Hampshire's imperiled bird species are adapted to interior forests and reliant upon complex forest structure for their survival, including standing snags and large living trees.

Indeed, the availability of dead and dying trees and downed wood is critical for the health of many species, from bats to pine marten to invertebrates.[140] Mature, unfragmented interior forests make ideal habitat for a variety of native and imperiled species. However, this type of forest is rare in New England overall. Thus, the WMNF is an important concentration of such habitat within New England. When this habitat is fragmented or degraded through activities such as logging, these species experience increased threats from interactions with humans, predation, changes in microclimates, the spread of invasive species and ticks, and other fragmentation and edge effects.

The Final EA utterly fails to reckon with this evidence, instead conclusorily asserting the Project will benefit wildlife diversity by promoting younger forests through logging. Yet one of the Wildlife Objectives listed in the WMNF Plan is to "[m]aintain high quality mature forest and old forest habitats on a majority of the Forest," as there is good reason for leaving mature forests intact.[141] Our native ecosystems preserve—and present the opportunity to restore—the greatest levels of wildlife and biodiversity. The Forest Service cannot ignore the vast amount of scientific data showing how mature and old-growth forests support a wide range of wildlife. The Final EA's discussion of wildlife is inadequate, and the completion of an EIS is necessary to determine the true impacts that the Project would have on wildlife in the area.

---

[139] Zaino et al. (Exhibit 16).

[140] Thorn et al., *The Living Dead: Acknowledging Life After Tree Death to Stop Forest Degradation*, 18 FRONTIERS IN ECOL. AND THE ENV'T 505 (2020) (Exhibit 42); Evans and Mortelliti, *Effects of Forest Disturbance, Snow Depth, and Intraguild Dynamics on American Marten and Fisher*, 13 ECOSPHERE 1 (Nov. 24, 2021) (Exhibit 17).

[141] WMNF Plan at 1-20.

***Requested Remedy: The Forest Service should the full range of the Project's impacts on wildlife taking into account the ecological resource values of mature and old forest habitat and complete an EIS to determine the best practices for protecting wildlife and habitat.***

### K. Impacts of Road Construction

Although "Transportation" and the need for a transportation analysis is included as one of the "needs" for the project, there is no analysis of transportation or the impacts of roads in the Environmental Impacts discussion.[142]

The Final EA did not analyze, or even mention, the potential for roads and skid trails to contribute to water quality issues through increased erosion and sedimentation, soil compaction resulting from the use of heavy machinery used to achieve the proposed road activities, and renewed fragmentation of wildlife habitat, among other things. For example, the new system road and extensive reconstruction of some system roads will, in combination, result in many miles of what are essentially new roads, likely in many locations where roads may have already been reclaimed by the forest. This is another example of a persistent theme of the Final EA of not identifying a baseline against which impacts can be measured. Because the existing condition of roads in the project area have not been described, it is impossible for the public to tell whether or not road reconstruction may result in significant impacts.

***Requested Remedy: The Forest Service should complete an EIS to determine the impacts of road reconstruction in the Project area.***

### L. Cumulative Impacts

The Forest Service not only fails to provide virtually any details in the Final EA's cumulative impacts analysis, but effectively denies that there will be any such impacts. When considered together, the combined resource impacts of relevant actions—past, present, and future—are both significant to the human environment and deeply troublesome.

The Forest Service is required by NEPA to consider the cumulative impacts of the Project.[143] Cumulative impacts are defined as "effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or persons undertakes such other actions. Cumulative effects can result from individually minor but collectively significant actions taking place over a period of time."[144] Cumulative effects analysis requires that the agency define and apply a consistent geographic scope in which to analyze cumulative

---

142 Final EA at 21.

143 40 C.F.R. § 1508.7.

144 40 C.F.R. § 1508.1(g)(3).

effects.[145] The geographic scope determines which nearby projects will be included in its analysis, and agencies "must provide support for its choice of analysis area[.]"[146]

The Final EA ignores other ongoing or upcoming Forest Service projects that involve logging and other tree-cutting in the WMNF, including the Wanosha Integrated Resource Project, Sandwich Vegetation Management Project, Lake Tarleton Integrated Resource Project, Lost River Integrated Resource Project, and Hales Location Wildfire Resiliency Project, among others.[147] All of these projects involve substantial logging, carbon emissions, and/or habitat alteration or destruction. It is unclear whether the Forest Service has assessed the cumulative impacts of these anticipated future logging operations, as that information is absent from the Final EA and project record. It is also unclear whether the Forest Service has accounted for the amount of early successional habitat located on private lands adjacent to the project area and throughout the WMNF region.

The Final EA failed to identify or explain the temporal and geographic scopes of its cumulative impacts analysis for a majority of the resources. Although it acknowledges that such analysis must address activities "overlap[ping] in space and time with effects of the proposed project[,]"[148] it does not actually define that "space" or analysis area. As noted, it vaguely states that "these analysis boundaries vary by resource" and are "documented in the project record."[149] In addition to its failure to define the geographic scope of the cumulative impacts analysis, the Final EA's cumulative impacts analysis contains no actual analysis at all and does not even state whether the Project is expected to contribute cumulatively to resource impacts within the analysis area. The Forest Service cannot just make a blanket statement about impacts without supporting it with an actual geographic scope and analysis or some level of detail. As-is, the public has no way of actually evaluating the cumulative impacts of the Project because the public is not given any detail to look into the matter themselves.

Finally, as discussed in other sections of this Objection, shortly after the Forest Service's issuing of the Final EA, the uplisting date of the NLEB went into effect pursuant to the ESA. The Forest Service was aware of the NLEB uplisting several months in advance, but the Final EA does not address it in its cumulative impacts section. However, the Forest Service did create a Biological Evaluation for the Project which includes a brief discussion of the NLEB. The Biological Evaluation indicates "the analysis area for cumulative effects for endangered, threatened, and [sensitive species] resulting from the activities included under the Proposed

---

[145] *League of Wilderness Defenders/Blue Mts. Biodiversity Project v. Connaughton*, 2014 WL 6977611, at *9-*11 (D. Or. Dec. 9, 2014).

[146] *Id*. at *9 (citing *Native Ecosystems Council v. Dombeck*, 304 F. 3d 886, 902 (9th Cir. 2002) and *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976)).

[147] *E.g., White Mountain National Forest: Projects*, https://www.fs.usda.gov/projects/whitemountain/landmanagement/projects; WMNF U.S. Forest Service Logging Projects Map (Exhibit 6).

[148] Final EA at 30.

[149] Final EA at 21. The only documents that provide a cumulative analysis in the project record are limited to the Biological Evaluation and Scenery Specialist Report.

Action encompasses National Forest System lands located within the Peabody West HMU" and "activities on private land adjacent to the HMU."[150] In other words, the cumulative impacts analysis for the NLEB and other TESP species only includes a relatively small area (although no map was provided showing the exact spatial scale of the effects analysis). When taken into consideration with all the other Forest Service projects within the WMNF[151] discussed above, the cumulative impact is significant. Because these projects may result in logging of mature trees that the bats use for roosting and foraging, the Forest Service must analyze the cumulative effects this Project will have on bat habitat, "when added to other past, present, and reasonably foreseeable future actions . . . ."[152]

To be certain, the cumulative effects of Forest Service projects on the NLEB will be substantial and consequential, not just within the WMNF but also throughout the bat's national habitat range. This is because USFWS has issued a batched (and botched) Biological Opinion, allowing 2,408 planned and ongoing Forest Service actions in the Eastern and Southern Regions to continue.[153] This action area contains 22,542,298 acres of forested National Forest System lands.[154] Due to the dire state of the NLEB, every individual bat and every activity contributing to the destruction of its habitat—including logging—are of utmost importance. Failure to protect this species is a violation of the ESA.

For all the reasons set forth above, the Forest Service significantly fails NEPA's hard look requirement of considering all cumulative impacts under NEPA's implementing regulations.

***Requested Remedy: The Forest Service should complete an EIS and additional NEPA analysis to ensure that all cumulative impacts of the Project are analyzed, addressed, and made clear to the public.***

## II. With Its Deficient Purpose and Need Statement, the Final EA Fails to Frame and Inform the NEPA Analysis.

NEPA directs the Forest Service to "specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action."[155] The

---

150 Biological Evaluation at 6.

151 *See* WMNF U.S. Forest Service Logging Projects Map (Exhibit 6).

152 40 C.F.R. § 1508.7.

153 Letter from Karen Herrington, Acting Assistant Regional Director for Ecological Services, Region 3 of USFWS, to Gina Owens, Regional Forester of Eastern Region, U.S. Forest Service (Mar. 31, 2023) (re Northern Long-eared Bat Biological Opinion) (in Peabody West IRP project file at filename Biological Opinion NLEB Reinitiation - Forest Service Region 8 and Region 9 Final.pdf) (hereinafter "BiOp") (Exhibit 46).

154 BiOp at 6.

155 40 C.F.R. § 1502.13.

statement must accurately reflect the proposed action's purpose and need because it will inform the range of alternatives the agency considers as part of its NEPA analysis.[156]

The Forest Service's purpose and need statement here fails to meet this standard. The Final EA states the purpose of the Peabody West IRP is "to advance Forest Plan goals, objectives, and desired conditions for vegetation, wildlife, and other resources in the Peabody West Habitat Management Unit (HMU)," and the Project is needed in particular to "manage forest vegetation in the project area to diversify vegetation and wildlife habitat while providing a sustainable yield of high-quality timber products," "address transportation system needs[,] and improve recreational opportunities."[157] As Standing Trees commented on the identical purpose and need statement in the Draft EA, the Final EA's purpose and need statement is uninformative and fails to contextualize the Project's purpose and need in a manner that promotes consideration of reasonable alternatives, including alternative forest management prescriptions.[158] Indeed, the statement is too vague to adequately connect the Project's purpose and need to stand conditions, best science, and desired future conditions in the Project area.

Moreover, the purpose and need statement fails to incorporate recent governing authorities that must inform it. A properly crafted purpose and need statement would integrate an accurate account of Forest Plan objectives and current Executive Orders.[159] The purpose and need statement for the Peabody West IRP fails on both accounts. Although the Final EA repeatedly cites the Forest Plan, the Plan is over 17 years old, conflicting with NFMA's intent that forest plans be updated on a regular basis to reflect updated science, management objectives, and community needs.[160] The Peabody West IRP further fails to reconcile the purpose and need statement with current Executive Orders 14,072 and 14,008, which aim to foster forest conservation, enhance forest resilience, and assess mature forests. The Final EA does not mention either Executive Order; as a result, the Final EA fails to incorporate their policies with the Plan's goals in the context of this Project.

As Standing Trees emphasized in its prior comments, a more accurate purpose and need statement would promote and require exploration of other forest management prescriptions that could better implement the Forest Plan, better avoid significant impacts on scenic and cultural resources and mature forests, better support the full range of biodiversity in its natural abundance and distribution, and meet the intent of the applicable Executive Orders.

---

[156] *See League of Wilderness Defenders/Blue Mtns. Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012).

[157] Final EA at 1. According to the Final EA, the Peabody West HMU's purpose is "to provide a sustained yield of high-quality timber products; provide a balanced mix of habitats for wildlife; provide a variety of recreation opportunities; and manage high-use or highly developed recreation areas to acceptable social and ecological standards while retaining some low-use and less developed areas." *Id.*

[158] Standing Trees Comments at 2-4 (Exhibit 36).

[159] Exec. Order Nos. 14,072, 14,008.

[160] 16 U.S.C. § 1604(f)(5).

In light of the failings identified above, the Final EA's purpose and need statement is unlawful under NEPA.

***Requested Remedy: The Forest Service should prepare an EIS with a more accurate purpose and need statement that promotes exploration of reasonable alternatives in compliance with the Forest Plan and Executive Orders 14,072 and 14,008. The Forest Service should update the Forest Plan as it is required to do under NFMA.***

## III. The Final EA Failed to Analyze Reasonable Alternatives Presented by Standing Trees.

In utter abdication of NEPA's insistence that agencies consider reasonable alternatives, the Forest Service failed to analyze such alternatives to the Project (other than in the Final EA's insufficient and cursory discussion of not taking the action, discussed *infra*). In its comments on the Draft EA, Standing Trees presented several reasonable alternatives that the Forest Service should have analyzed:

- Avoiding all roadless area impacts and protecting roadless area values by guiding logging away from Forest Plan Inventoried Roadless Areas that were allocated to Management Area 2.1 in the Forest Plan and any other roadless areas that would be affected by the Project,
- Creating *complex* early successional habitat rather than simplified regeneration-age forest through even-aged management, in order to achieve Forest Plan habitat management objectives for early successional forest, with evaluation of such strategies as the possibility of beaver reintroduction, girdling trees to create standing snags, "chop-and-drop" to increase woody debris and create canopy gaps, and more;
- Increasing the size of the buffer from watercourses and wetlands;
- Avoiding all mature and old forest as defined in Forest Plan Appendix D, Age Class Definitions by Habitat Type, in order to comply with Executive Order 14,072 and to reduce risk of harm to NLEB habitat.[161]

Instead, the Final EA does not consider any meaningful alternative to the Project whatsoever. CEQ regulations mandate that federal agencies "shall to the fullest extent possible . . . [u]se the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment."[162] It is also incumbent upon federal agencies to "[s]tudy, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves

---

[161] Standing Trees urged that such an alternative analysis would also consider how roadless area logging and road construction/reconstruction, regardless of whether a roadless area is managed according to the 2001 Roadless Area Conservation Rule, may affect the outcome of future Chapter 70 wilderness inventories and evaluations and also the potential for Congress to include these lands in the National Wilderness Preservation System. Standing Trees Comments at 7-8 (Exhibit 36).

[162] 40 C.F.R. § 1500.2(e) (emphasis added).

unresolved conflicts concerning alternative uses of available resources."[163] Furthermore, an agency may consider only the proposed action when there are no "unresolved conflicts concerning alternative uses of available resources."[164] Unresolved conflicts exist when the agency lacks a consensus about the proposed action based on input from interested parties.[165]

It is inconceivable that there was only one way to achieve the Forest Service's purpose in proposing this Project. This is especially true for the logging portions of the Project. The sheer number of different silviculture prescriptions for the proposed action demonstrates that even if logging is needed, there is a wide variability in how logging, if any is warranted at all, can achieve desired conditions. This variability necessarily implies additional reasonable alternatives exist that the Forest Service either did not identify, or, at a minimum, did not consider.

A recent case in federal district court in New Hampshire is instructive on this issue. In *Conservation Law Foundation v. U.S. Army Corps of Engineers*, 457 F. Supp. 3d 33 (D.N.H. 2019), a recent preliminary injunction opinion regarding the range of alternatives considered in an EA, the Court emphasized 40 C.F.R. § 1502.14, quoting from the regulation that agencies must:

> (a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.
>
> (b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.[166]

The Court went on to hold that the agency was likely to succeed on the merits because, unlike here, "the EA provided reasonable, common-sense explanations for rejecting alternatives." [167] In that case, the agency considered *five* alternatives, including a true no-action alternative.[168] The agency assessed the alternatives in quantitative terms, and for each alternative, the agency provided a rationale for why it was rejecting it in favor of the proposed action.[169]

By contrast, here, even after reviewing comments on the Project, the Forest Service did not analyze reasonable alternatives to the Project, much less provide any rationale, quantitative or otherwise, for why it rejected those presented by Standing Trees. To be sure, numerous

---

163 *Id*. § 1501.2(c); see also 42 U.S.C. § 4332(2)(E).

164 42 U.S.C. § 4332(E); see also 36 C.F.R. § 220.7(b)(2)(i).

165 National Environmental Policy Act Procedures, 73 Fed. Reg. 43,084, 43,092 (July 24, 2008) (codified at 36 C.F.R. Part 220).

166 457 F. Supp. 3d at 56.

167 *Id*.

168 *Id*. at 57.

169 *Id*. at 57–58.

reasonable alternatives exist—alternatives apparent to the agency and the public alike—and the Forest Service could have analyzed any of them, but it failed to do so. This choice violated NEPA.

Furthermore, in another recent and instructive case, the Court of Appeals for the Ninth Circuit held that the Bureau of Ocean Energy Management (BOEM) inadequately considered alternatives in its EA, thereby violating NEPA.[170] In *Environment Defense Center v. Bureau of Ocean Energy Management*, the court found that, although BOEM considered three alternatives, the alternatives were not sufficiently distinct.[171] Additionally, the court found the Final EA by BOEM needed to include "full and meaningful consideration [of] all viable alternatives 'in [the] environmental assessment,'" such as those proposed by commenters.[172] Here, the Forest Service failed to consider any alternatives beyond its conclusory assessment of the consequences of no action, let alone consider the viable alternatives proposed by commenters. And unlike the agency in *Environment Defense Center*, the Forest Service failed to consider *any* viable alternatives to silviculture treatment plans. This is a violation of NEPA.[173]

As stated elsewhere in this Objection, to the extent the Forest Service intends to move forward with the Project, it must complete an EIS. As part of that EIS, it must consider all reasonable alternatives, including a true No Action Alternative.

***Requested Remedy: The Forest Service should prepare an EIS with a full analysis of reasonable alternatives to the Project.***

## IV. The Final EA's Discussion of "No Action" Unlawfully Failed to Evaluate the No Action Alternative.

A "No Action Alternative" is the bare minimum alternative analysis an agency should undertake for an EA or EIS, and the Final EA does not adequately address this.[174] The Final EA fails to acknowledge, as Standing Trees previously commented, that not moving ahead with the proposed action (i.e., taking No Action), has major potential benefits including, but not limited to: climate benefits of retaining older, mature trees; habitat benefits for the Northern Long-eared Bat and other species that rely on mature, old, or interior forests or are sensitive to harvest impacts; avoiding potential detrimental impacts to water quality due to runoff, sedimentation, and potential herbicide contamination; avoiding loss of or damage to historic and cultural resources located within the proposed action area; avoiding introduction of invasive species (which were noted to be essentially non-existent at the June 23, 2022 public meeting regarding the Project); protecting values present in the Great Gulf Inventoried Roadless Area; and avoiding visual and noise impacts, among many others. Nor does the Final EA detail how the full range of

---

[170] *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 877 (9th Cir. 2022).

[171] *Id*. at 878.

[172] *Id*.

[173] 42 U.S.C. § 4332(C)(iii).

[174] 40 C.F.R. § 1502.14(c).

habitats required by native species can be facilitated within the project area by simply allowing natural processes and forest aging to create habitat diversity and complexity, including ecologically-appropriate amounts and patterns of early successional habitat.

Like the Draft EA, the Final EA presents two paragraphs briefly outlining the "Consequences of No Action."[175] These paragraphs do not reflect a true analysis of a No Action alternative, containing no assessment of any of the benefits of leaving the forest as-is. Further, there is no scientific justification provided for claims that "no action" would result in less diversity of tree species, ages, and structures. As discussed elsewhere in this Objection, just the opposite is true: peer-reviewed science shows that older forests exhibit the greatest tree species and habitat diversity, the greatest structural complexity, and the greatest resilience to climate change.[176] In failing to present a full analysis of a No Action Alternative that includes the environmental benefits, the Final EA violates NEPA.

***Requested Remedy: The Forest Service should prepare an EIS with a full analysis of a No Action Alternative to the Project.***

## V. The Project, as Proposed, Will Have "Significant" Impacts and Requires an Environmental Impact Statement.

As discussed in Standing Trees' prior comments on the Draft EA and elsewhere in the Objection, the Project, in myriad ways, threatens the outstanding natural resources of the affected area with a range of significant impacts. Yet, the Forest Service has concluded that the Project will have "no significant impact" and does not require an Environmental Impact Statement ("EIS") under NEPA.

Standing Trees objects to the Project on the ground that the Final EA's finding of no significant impact ("FONSI") is erroneous and violates NEPA. The FONSI is conclusory and unsupported by the facts, and the Project is and should be analyzed as a major federal action that will significantly impact the quality of the human environment. The Forest Service should conduct additional analysis in the form of an EIS.

### A. The FONSI Is Conclusory and Lacks Factual Support.

A FONSI must "present the reasons why an action . . . will not have a significant effect."[177] An agency FONSI will be held to the following standard: first, the agency must have accurately identified the relevant environmental concern; second, once the agency has identified the problem it must have taken a hard look at the problem in preparing the EA; and third, if a finding of no significant impact is made, the agency must be able to make a convincing case for

[175] Final EA at 21.

[176] Thom et al. (Exhibit 19); Miller et al. (2018) (Exhibit 18); Miller, et al. (2016) (Exhibit 30); Gunn et al. (Exhibit 45).

[177] 40 C.F.R. § 1508.13.

its finding.[178] As described in our comment on the Draft EA and expanded upon here, the Final EA fails to adequately describe the impacted environment and take a hard look at impacts to those resources. Despite this, the Forest Service has advanced a finding of no significant impact without providing convincing reasoning to support this finding.

The FONSI is grounded in the flawed analysis of the EA. The FONSI and the EA rely heavily on the purported lack of impact from past, similar projects to justify this project.[179] Yet the Forest Service provides no analysis regarding past WMNF projects and their alleged lack of impact.[180] Further, the Forest Service fails to provide up-to-date environmental information for itself, public officials, or residents, eschewing its statutory obligation.[181]

Here, the Forest Service fails to provide complete environmental information on at least two counts. First, the Forest Service does not have up-to-date environmental information regarding the presence of the NLEB in the proposed project area, including where NLEB hibernacula or roosts may exist. Although the New Hampshire Fish and Game Department attempted to catch NLEBs during a two-night excursion in July of 2019, this excursion produced no results.[182] Without complete data, the Forest Service cannot properly abide by NEPA.[183] Second, the Forest Service relies on the EIS compiled for the Forest Plan in 2005. This document is now many years out of date.[184] The Forest Service must compile a complete set of data before

---

[178] *Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 470 F. Supp. 2d 30, 61 (D.N.H. 2007).

[179] Final EA at 29-30.

[180] The closest the Final EA comes to discussing past activities is its conclusory reference to the Albany South EA's analysis of timber harvesting and its impacts on water quality, and even that reference does not describe the actual impacts from implementation of that previous project. Final EA at 24.

[181] 40 C.F.R. § 1500.1(b) ("NEPA procedures must insure that environmental information is available to public officials and citizens *before* decisions are made and *before* actions are taken" (emphasis added).); *see also Env't. Def. Ctr.*, 36 F.4th 850, 873 (agency cannot rely on inaccurate, incomplete data to "formulate an estimate for evaluating environmental impacts under NEPA").

[182] *Contrast Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1250 (9th Cir. 2005) (finding accurate data to determine species viability where the Forest Service had monitored goshawks in the Helena National Forest for more than eight years).

[183] *See also WildEarth Guardians*, 370 F. Supp. 3d at 1235 ("The problem is that, without data identifying the location of calving sites and wallows, the Forest Service cannot meet its obligation to protect those sites or minimize disturbance to [elk]."); *Sierra Club v. Martin*, 71 F. Supp 2d 1268, 1319 (N.D. Ga. 1996) (finding that, because there was no population data, quantitative data, or other adequate information, the Forest Service did not have sufficient facts or evidence regarding sensitive and endangered species to support its finding of no significant impact).

[184] 36 C.F.R. § 219.7(a).

it can effectively take the requisite hard look at the potential environmental effects of this proposed action.

The FONSI must "present[] the reasons why an action. . . will not have a significant effect[.]"[185] It is inadequate to state that because other actions did not have a significant impact, thus this Project will also have no significant impact. Similarly, it is inappropriate to issue a final EA without compiling and then considering a complete account of environmental information. The Final EA's failure to support its FONSI is alone sufficient to require additional or supplemental NEPA analysis in the form of an EIS.[186]

### B. The Final EA Fails to Adequately Define the Context or Discuss the Intensity of Project Impacts, Which Weigh in Favor of a Finding of Significance.

An EIS is required for all "major federal actions significantly affecting the quality of the human environment[.]"[187] Under NEPA, the analysis of significance "requires consideration of both context and intensity."[188] As raised in our comment on the Draft EA, the Forest Service's "analysis" of the context and intensity of impacts is cursory and incomplete. As proposed, the Peabody West IRP may cause significant degradation to some human environmental factor.[189] The Project's context and intensity of impacts overwhelmingly require a finding of significance and the preparation of an EIS.

#### *1. Context*

The Final EA's failure to appropriately identify, or—in some instances—failure to identify at all, the context within which to evaluate impacts of the proposed project is a critical failure. Without first establishing the proper context within which to conduct its analysis, it is impossible for the Forest Service to properly evaluate the intensity of project impacts. While a single housefire may be inconsequential on the scale of the city, the impacts on the affected home are devastating. Context is the key to determining the significance of an impact, and that is why context must be properly defined and supported for each resource being evaluated.

The CEQ's NEPA-implementing regulations provide that:

---

[185] 40 C.F.R. § 1508.13.

[186] *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 444 F. Supp. 3d at 859.

[187] 42 U.S.C. § 4332(2)(C).

[188] 40 C.F.R. § 1508.27.

[189] *See Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149-50 (9th Cir. 1998). *See also Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864-65 (9th Cir. 2005) ("To trigger this [EIS] requirement a plaintiff need not show that significant effects will in fact occur, but raising substantial questions whether a project may have a significant effect is sufficient" (internal quotations, citations, and alterations omitted).).

> [T]he significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend on the effects in the locale rather than in the world as a whole. Both short and long-term effects are relevant.[190]

Establishing the proper setting and scale ("context") within which to evaluate the impact of an action is critical, yet the FONSI's discussion of "context" does not establish the context for the analysis of resources impacted by the project at all.

The Context section of the FONSI does not indicate whether the project qualifies as a major federal action significantly affecting the quality of the human environment, nor does it provide discussion or detail about what the context for the Project is. The only analysis addressing the matter of context states the "proposed project includes about 3,000 acres of the more than 800,000 acres of lands administered by the WMNF," and the "potential environmental effects . . . would not be measurable at a regional or larger scale."[191] Other than this, the Forest Service fails to provide any actual analysis placing the impacts of the Project into context, never mentioning the outstanding natural resource values of the Project's location at the northern end of the Presidential Range—including the iconic Great Gulf Wilderness to the north of Mount Washington and to the immediate south of the Project area, the Appalachian Trail and other hiking trails in the vicinity, and the maturing forest ecosystem that will be affected by the Project directly.

The Forest Service's resort to simple numeric measurement of the size of the Project and the size of the WMNF improperly minimizes and obfuscates localized impacts from Project activities. The Forest Service is not allowed to sweep significant impacts under the rug by pointing to the vastness of the forest surrounding the Project.[192] This is equivalent to the Forest Service proposing to burn the house down and telling the family that impacts are minimal because the rest of the city is still there. With greater consideration of the context of this Project, the Forest Service would find that the Peabody West IRP is a major federal action significantly affecting the quality of the human environment.

---

[190] 40 C.F.R. § 1508.27(a).

[191] Final EA at 28.

[192] *See Pac. Coast Fed'n of Fisherman's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1035-37 (9th Cir. 2001) (agency cannot minimize impact of activity by adopting scale of analysis so broad that it trivializes site-level impact).

### 2. *Intensity*

Intensity refers to the "severity of impact."[193] NEPA provides a list of ten non-exclusive factors to consider when evaluating intensity.[194] Because the Forest Service failed to define the context of its analysis for most project-area resources, its analysis of intensity, which is intrinsically linked to the context within which it is evaluated, is also necessarily inadequate. The discussion provided for the majority of the ten consideration factors is cursory, often pointing to the supposed success of prior unnamed projects and referring to unspecified "analysis" in order to make findings that each factor weighs against a finding of significance. Each shortcoming is addressed individually below, as many of these considerations are implicated by the Peabody West IRP. The presence of even just "one of these factors may be sufficient to require an EIS in appropriate circumstances."[195] The following should be considered in evaluating intensity:

***(1) "Impacts that may be both beneficial and adverse. A significant effect may exist even if the federal agency believes that on balance the effect will be beneficial."***[196]

The Final EA does not describe potential adverse effects of the Project. For example, in the discussion of "Clearcuts with Reserves," there is no mention of known detrimental impacts of clear-cut logging, such as the potential to spread ticks and invasive plants, increased erosion, decreases in water quality, and soil compaction from logging activities.[197] *Only* perceived benefits are discussed.[198] The Final EA fails to acknowledge potential adverse impacts, and thus the Forest Service has not met its obligation to "consider... [i]mpacts that may be both beneficial and adverse."[199] This factor also weighs in favor of a finding of significance and the preparation of an EIS.

***(2) "The degree to which the proposed action affects public health or safety."***[200]

The Final EA states the Forest Service "implemented this type of project and similar activities . . . many times on National Forest System lands locally and in the region without substantial impacts to public health or safety."[201] Repeated reliance on the fact that similar projects have occurred in the past ignores the fact that each project location is unique and therefore requires its own analysis of potential impacts; in addition, no evidence has been presented to support the claim that there have not been "substantial impacts to public health or

---

193 40 C.F.R. § 1508.27(b).

194 40 C.F.R. § 1508.27(b)(1)-(10).

195 *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d at 865.

196 40 C.F.R. § 1508.27(b)(1).

197 Final EA at 6.

198 *Id*.

199 40 C.F.R. § 1508.27(b)(1).

200 40 C.F.R. § 1508.27(b)(2).

201 Final EA at 29.

safety" from past projects. It would undermine the entire purpose of NEPA to allow for general *types* of past actions to justify future actions. NEPA analysis is done on a project-specific basis. The Forest Service fails to describe the "potential impacts to public health and safety" or to ensure that these are minimized or avoided.[202] Valid public safety concerns were raised during public comment periods, and never addressed. This factor also weighs in favor of a finding of significance and the preparation of an EIS.

***(3) "Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas."***[203]

In the Final EA, the Forest Service makes a conclusory statement that the Project area is "not unique" and there are "no unique geographic areas."[204] We do not agree with this unsupported assertion, nor with the Forest Service's refusal to account for the Inventoried Roadless Areas, Great Gulf Wilderness, Appalachian Trail corridor, scenic location at the northern end of the Presidential Range, and ecologically critical areas within the Project area. In particular, the Project area is ecologically critical, especially in light of the NLEB's listing as an Endangered Species. NLEBs are known to occur in the Project area, and yet the Forest Service fails to recognize the importance of mature forest for the species. The intensity of potential impacts to this area is high when considering the characteristics of this area, as well as those raised in our comment on the Draft EA. The unique characteristics of the Project area weigh in favor of a finding of significance and the preparation of an EIS.

(4) ***"The degree to which the effects on the quality of the human environment are likely to be highly controversial."***[205]

For the purposes of this factor, "[a] substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI . . . casts serious doubt upon the reasonableness of an agency's conclusions."[206] The word "controversial" refers to situations where "substantial dispute exists as to [the] size, nature, or effect" of the major federal action.[207] The Forest Service ignores the high degree of scientific controversy over the Project's implementation and

---

[202] Id.

[203] 40 C.F.R. § 1508.27(b)(2).

[204] Final EA at 29.

[205] 40 C.F.R. § 1508.27(b)(4).

[206] *Nat'l Parks Conservation Ass'n v. Babbitt*, 241 F.3d 722, 736 (9th Cir. 2001).

[207] *Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 552 F. Supp. 2d 97, 136 (D.N.H. 2008) (alterations and citations omitted) (quoting *Advocs. For Transp. Alts. v. U.S. Army Corps of Eng'rs*, 453 F. Supp 2d 289, 304 (D. Mass. 2006)). *See also Town of Cave Creek v. FAA*, 325 F.3d 320, 331 (D.C. Cir. 2003) (quoting *North American Wild Sheep v. U.S. Department of Agriculture*, 681 F.2d 1172, 1182 (9th Cir. 1982)) (emphasis in original); *Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1229 (10th Cir. 2002) (same); *Town of Superior v. U.S. Fish and Wildlife Serv.*, 913 F. Supp. 2d 1087, 1120 (D. Colo. 2012) (same).

reasoning. Substantial scientific dispute clearly exists related to: management for early successional habitat, management to improve carbon storage and sequestration, management for climate adaptation and resilience, and protection of water quality. Elsewhere in this Objection, we elaborate on the importance of mature forests in climate change adaptation and mitigation. The Forest Service fails to respond to or consider recent studies that support the protection of mature forests. We also expand on the failure of the Forest Service to recognize and address the growing importance of mature forest conservation, in line with policy alignment across the Executive Branch as a result of Executive Orders 14,072 and 14,008. The Forest Service's determinations and reasoning in the Final EA are inconsistent with greater efforts to protect and conserve mature forests, rooted in scientific understanding ignored by the Forest Service. Substantial dispute exists as to the effect of the Peabody West IRP on the human environment, weighing in favor of a finding of significance and the preparation of an EIS.

***(5) "The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.***[208]

The Forest Service attempts to justify its decision based on the existence of past projects implemented in the Forest and the region.[209] Absent is any supporting information or authorities for the public to validate this claim. The possible effects on the human environment are highly uncertain *and* involve unique or unknown risks because the Project is predicated on "similar actions" implemented in the WMNF.[210] This reasoning ignores the heart of NEPA: *project*-specific analysis. The Forest Service denied the public due consideration of this specific Project's impacts, foreclosing the opportunity to assess unique or unknown risks. This flawed analysis weighs in favor of a finding of significance and the preparation of an EIS.

***(6) "The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration."***[211]

The Peabody West IRP will irretrievably harm the Peabody West HMU, with potential ramifications for the Roadless Area's consideration as Chapter 70 Wilderness Inventory and Evaluation, for Roadless Area protection, and further evaluation for other resource protection classifications in Forest Plan revisions. The Forest Service places too much weight on prior implementation of a *type* of activity, which says nothing about the impact of that activity on a specific location. Project-specific evaluation is critical because where and how activities occur in the landscape determines the nature of the impact. This is a dangerous precedent to establish for future actions and weighs in favor of a finding of significance and the preparation of an EIS.

***(7) "Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a***

---

[208] 40 C.F.R. § 1508.27(b)(5).

[209] Final EA at 29.

[210] Final EA at 30.

[211] 40 C.F.R. § 1508.27(b)(6).

***cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts."*** [212]

Above, we discuss the Final EA's lack of analysis regarding cumulative impacts. As previously explained, there are a number of potential cumulative impacts that the Final EA baselessly denies.[213] This factor also weighs in favor of a finding of significance and the preparation of an EIS.

***(8) "The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historic resources."***[214]

The Forest Service ignores the historic and cultural resources that deserve investigation within the project area. The potential loss of these resources counsels in favor of significance and the preparation of an EIS.

***(9) "The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973."***[215]

We expand below on the Final EA's complete lack of consideration for the endangered NLEB and its insufficient analysis of impacts to tricolored bats. The recent uplisting of the species and absence of transparency from both the Forest Service and USFWS weighs heavily in favor of a finding of significance, necessitating a full analysis of the impacts to the NLEB, tricolored bats, and other endangered and threatened species in an EIS.

***(10) "Whether the action threatens a violation of federal, state, or local law or requirements imposed for the protection of the environment."***[216]

As expanded upon at length in this Objection, the Forest Service failed to demonstrate compliance with a number of laws imposed for the protection of the environment: NEPA, NFMA, CWA, and the ESA. For example, the Final EA concedes inconsistency with the Forest Plan guidelines for scenery management[217] and thereby with NFMA. And below, we expand on the concern the Project will lead to violations of the ESA and the requirements imposed for the protection of the NLEB. The Project threatens the violation of numerous federal requirements, weighing in favor of a finding of significance and the preparation of an EIS.

---

[212] 40 C.F.R. § 1508.27(b)(7).

[213] Final EA at 30.

[214] 40 C.F.R. § 1508.27(b)(8).

[215] 40 C.F.R. § 1508.27(b)(9).

[216] 40 C.F.R. § 1508.27(b)(10).

[217] Final EA at 30.

***Requested Remedy: For all the reasons outlined above, the Forest Service should withdraw its FONSI and prepare an EIS to evaluate the significant impacts posed by this Project.***

## VI. The Public Involvement Process Was Burdened in Violation of NEPA.

Public participation is a critical aspect of the NEPA process.[218] However, public involvement in the Peabody West IRP has consistently been thwarted by the unavailability of supporting documents, a lack of sufficient detail, and inadequate public engagement in project development.

The public is unable to properly scrutinize agency decisions and analysis when relevant documentation is not made available or when available documents do not actually contain the analysis necessary to support conclusory statements. Agency conclusions in an EA "must be supported by some quantified or detailed information, and the underlying environmental data relied upon. . . must be made available to the public to allow for informed public comment on the project."[219] The Final EA contains "simple, conclusory statements" without carefully analyzing environmental impacts.[220] It is notably deficient in lacking analysis of public feedback on the Project.[221] Agencies must make genuine efforts to involve the public in their NEPA procedures.[222] The Forest Service fell short of this mark in the NEPA process for this Project to date.

To take one example, the Final EA states that transportation management actions were informed by the Forest-wide Transportation Analysis Process. The Final EA notes:

> In 2015, the WMNF completed a Forest-wide transportation analysis process report for long-term administration of the WMNF's transportation system (U.S. Department of Agriculture, Forest Service 2015). The proposed project is needed to complete a site-specific transportation analysis to implement or modify the 2015 travel analysis process recommendations within the project area; to plan and manage for current and future public and Forest Service access to the project area; to meet forest plan standards for desired road operation maintenance levels (MLs); and to meet requirements of the Highway Safety Act….[223]

---

[218] *See* 40 C.F.R. § 1500.1(b) ("The purpose and function of NEPA is satisfied if Federal agencies have considered relevant environmental information, and the public has been informed regarding the decision-making process."); 40 C.F.R. § 1506.6(a) ("Agencies shall . . . [m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures.").

[219] *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 444 F. Supp. 3d at 858-59.

[220] *Touret v. NASA*, 485 F. Supp. 2d 38, 45 (D.R.I. 2007).

[221] Id.

[222] 40 C.F.R. § 1506.6(a).

[223] Final EA at 2.

Neither the Final EA nor the other public project documentation provide the analysis that went into the 2015 process, making it impossible to understand the rationale for the Project's transportation-related proposals in their full context. This is especially true given that the Final EA admits that "[s]ome system roads have travel analysis process recommendations that differ from the current proposal."[224] This apparent conflict cannot be understood without transparency regarding the 2015 analysis, which the Forest Service failed to provide.

Another example of deficient public involvement concerns the Draft and Final EA's failure to explain the potential recreational and scenic impacts of the Project on the Appalachian Trail, the Great Gulf Wilderness, and other nearby scenic resources of major significance to the public. Because those impacts receive little attention in the Project documentation, few stakeholders and members of the public could meaningfully appreciate or comment on the Project proposals, depriving the Forest Service of the type of robust public participation on which NEPA is predicated.

Further complicating public involvement in this NEPA process is the Final EA's acknowledgement that numerous parts of the proposed action are subject to change dependent upon several conditions. However, the Forest Service does not include an opportunity for the public to participate in the changes in the proposed action and does not explain when such changes would be implemented. For example, the Forest Service in the Final EA allows for pre-implementation "field visits . . . to refine treatment unit boundaries and acres including modifications to address site-specific conditions (e.g., wet areas, steep or rocky slopes, and forest type changes)" and for "[f]inal locations of log landings [to] be modified during project layout subject to applicable forest plan standards and guidelines, best management practices, and other site specific requirements."[225]

Without providing actual analysis, it is impossible to gauge the actual anticipated impact to proposed action-area resources, the significance of those impacts, and whether they may violate the Forest Plan standards and guidelines. The public is not able to properly scrutinize agency decisions and analysis when relevant documentation is not made available or when available documents do not actually contain the analysis necessary to support the Forest Service's conclusory statements. In addition, the failure to provide clear analysis, or sometimes any analysis, violates NEPA's mandate that NEPA documents "shall be written in plain language . . . so that decisionmakers and the public can readily understand them." [226] The public cannot understand what it is not told. Instances of this persistent defect are identified throughout this objection.

The overall effect of the described inadequacies is the impediment of public participation, in violation of NEPA's clear mandate to "encourage and facilitate public involvement in decisions which affect the quality of the human environment" and to "[m]ake diligent efforts to

---

[224] *Id.* at 10.

[225] *Id.* at 5-6.

[226] 40 C.F.R. § 1502.8.

involve the public in preparing and implementing their NEPA procedures."[227] The Forest Service's decisions to impede public participation are in violation of NEPA's mandate, as the public should not have to "parse the agency's statements to determine" project impacts.[228]

***Requested Remedy: The Forest Service must adequately engage with the public and complete an EIS for the Peabody West IRP to cure the described inadequacies.***

## VII. The Analyses and Protections for the Endangered Northern Long-eared Bat Are Deficient.

In Standing Trees' comments on the Draft EA, we expressed substantial concern that the Forest Service had not adequately addressed the need for the Project to protect the Northern Long-eared Bat ("NLEB"), which was then listed as threatened and was proposed for listing as endangered under the ESA. While we acknowledge that the Forest Service reinitiated consultation with U.S. Fish and Wildlife Service ("USFWS") regarding the now finally-listed endangered NLEB, the Forest Service is still failing to meet its legal obligations under the ESA and other federal statutes, and Standing Trees objects to the Project on this ground.

### A. The Peabody West IRP Fails to Comply with the ESA.

Congress passed the ESA in 1973 for the purpose of conserving endangered and threatened species and the ecosystems upon which they rely.[229] According to the Supreme Court, the "plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost."[230] On November 30, 2022, USFWS published a final rule reclassifying the NLEB, uplisting the bat from threatened to endangered under the ESA.[231] Though initially set to become effective on January 30, 2023, in an unusual and unprecedented move, USFWS delayed the effective date of the uplisting until March 31, 2023.[232] The NLEB's endangered status is now in place, with part of its known habitat range within the Peabody West IRP area. Federal agencies, including the Forest Service, are required to be in compliance with the ESA as it relates to the endangered status of the NLEB.

Section 9 of the ESA broadly prohibits the "take" of any listed species.[233] "Take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to

---

[227] 40 C.F.R. § 1506.6(a).

[228] *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 761 (9th Cir. 2014).

[229] 16 U.S.C. § 1531(b).

[230] *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).

[231] Endangered and Threatened Wildlife and Plants; Endangered Species Status for Northern Long-Eared Bat, 87 Fed. Reg. 73,488-504 (Nov. 30, 2022) (Exhibit 7).

[232] Endangered and Threatened Wildlife and Plants; Endangered Species Status for Northern Long-Eared Bat; Delay of Effective Date, 88 Fed. Reg. 4,908-10 (Jan. 26, 2023) (Exhibit 8).

[233] 16 U.S.C. § 1538(a).

attempt to engage in any such conduct."[234] Section 7 of the ESA requires every federal agency to consult with the USFWS to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species."[235] To assist in the completion of this statutory requirement, the agency undertaking the action ("action agency") must complete a Biological Assessment ("BA").[236] The purpose of the BA is to "evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat."[237] USFWS reviews the BA, and if the agency determines that the proposed action may affect listed species or critical habitat, USFWS must formally consult with the action agency.[238] USFWS then produces a Biological Opinion ("BiOp") to determine whether the agency action is likely to jeopardize the continued existence of a listed species.[239] If the action is likely to jeopardize listed species, the BiOp must include reasonable and prudent alternatives to the action as proposed.[240]

The Forest Service is required to complete a BA evaluating the potential effects of the action (the Project) on listed species.[241] Accordingly, a species-specific BA should have been conducted for the NLEB (and the Tricolored bat). On May 1, 2023, Standing Trees received a copy of a potentially applicable BA for the NLEB in response to a FOIA request, although that BA is not included in the Project documents that have been provided to the public and it is not clear that the BA, while seemingly generically applicable to literally hundreds of Forest Service projects in the Eastern and Southern Regions of the Forest Service, constitutes the operative BA for the Peabody West IRP.

The Final EA reports that, following the 2022 reopening of consultation regarding the NLEB, the USFWS determined in a Biological Opinion that the Peabody West IRP may affect, but is not likely to adversely affect, the NLEB. The Final EA implies that this ends the analysis, with no further action necessary to protect the NLEB under the ESA.[242] Standing Trees disagrees.

First, contrary to Section 7 of the ESA, the Biological Opinion (and the apparent BA) for the NLEB makes no site- or Project-specific determination whatsoever, as the Final EA implies. The Biological Opinion provides a blanket assessment of nearly 3,000 Forest Service projects, of which the Peabody West IRP is only one: "[d]ue to the number of planned and ongoing projects

---

[234] *Id.* at § 1532(19).

[235] *Id.* at § 1536(a)(2).

[236] *Id.* at § 1536(c)(1).

[237] 50 C.F.R. § 402.12(a).

[238] *Id*. § 402.14(a).

[239] *Id.* at § 402.14(h).

[240] *Id.* at § 402.12(h)(2).

[241] 16 U.S.C. § 1536(c)(1).

[242] Final EA at 25.

and the similarity of effects, the projects will be combined and collectively evaluated to determine the projects' effects on NLEB."[243] The Biological Opinion goes on to estimate that the NLEB is apparently gravely endangered in the White Mountain National Forest, with as few as 25 maternity colonies and fewer than a thousand NLEB individuals in all of New Hampshire; to state that there are a litany of potential harms to NLEB and their habitat from projects like the Peabody West IRP; and to highlight the lack of reliable data on where NLEB colonies persist and the likelihood of impacts from Forest Service projects.[244] Incoherently, the Biological Opinion—with the same sweeping disregard as the Forest Service's own blanket analyses—authorizes projects like the Peabody West IRP, without any study, analysis, or concern for the potential for NLEBs to be harmed by the Project in its particular setting. In other words, based on available science, NLEBs are assumed to exist in the Project area, but nothing will change about the Project to protect them following their endangered listing, in blatant derogation of the purpose and procedures of the ESA.

Second, even using the Biological Opinion's own terms and methodology—and accompanying USFWS's NLEB tools—the Project fails to comply with those requirements. The Forest Service's Biological Evaluation indicates that the Forest Service used the USFWS Information for Planning and Conservation ("IPaC") website to determine which federally-listed species may occur within the action area.[245] However, neither the Final EA nor any other Project documentation discusses whether the Forest Service completed the Determination Key review process ("DKey") under IPaC to evaluate the effects of the project on the NLEB.

According to the Standing Analysis and Implementation Plan for the NLEB, "[t]ree removal could affect NLEBs by the loss and/or fragmentation of foraging and commuting habitat and the removal and loss of roost trees. Actions that implement the conservation measures for NLEBs will not result in a gap in forested habitat of greater than 1,000 feet or isolate habitat."[246] Additionally, "[t]ree removal projects proposed within the 3.0 miles of NLEB captures or detections, within 1.5 miles of known roosts, and within 5.0 miles of hibernacula will not be eligible for a predetermination of NLAA [Not Likely to Adversely Affect]."[247]

---

[243] BiOp at 4.

[244] BiOp at 18, 30-34, 34-35 ("it is reasonable to conclude there will be some impacts to some individual NLEBs in areas where they have yet to be documented (i.e., specific areas where they are not reasonably certain to occur). Given the nature of forest management and overlap with suitable habitat, the best available science indicates that forest management practices are anticipated to have at least some negative impact on some individual NLEBs in unknown locations, as opposed to the assumption that forest management will have a large impact on all of the or most NLEBs.").

[245] Biological Evaluation at 5.

[246] Standing Analysis and Implementation Plan – Northern Long-Eared Bat Assisted Determination Key, Version 1.1, USFWS (April 2023) at 19 (hereinafter "DKey"), https://www.fws.gov/sites/default/files/documents/Standing%20Analysis%20Version%201.1%20April%202023.pdf (Exhibit 13).

[247] DKey at 22 (Exhibit 13).

Attempting to apply this standard here illustrates how the Forest Service has not supported its assertion of compliance with the ESA. The Biological Evaluation indicates that "[t]here are no known hibernacula or roost trees within the action area, so there are no habitat features that would require a buffer from project activities."[248] Without any supporting data, studies, or evidence, this appears to be a conclusory statement of, in essence, see-no-evil, hear-no-evil, leaving the public wondering how the Forest Service came to this determination. It is unclear what field studies or actions—if any—the Forest Service actually undertook to reach this conclusion. The Forest Service must also consider roosts, hibernacula, or bat presence directly outside of the activity area that might fall within the USFWS DKey range requirements.

Even more directly, the Project's proposed clearcuts directly run afoul of USFWS standards. USFWS indicates that only tree clearing projects up to *10 acres* are eligible for a predetermined outcome of Not Likely to Adversely Affect the NLEB, a standard that does not appear to have informed the Final EA whatsoever.[249] Currently, the Biological Evaluation indicates the action may affect but is not likely to adversely affect the NLEB,[250] however, the Final EA asserts that clearcuts in the project area where all trees are removed in a stand will "create large openings (*greater than 10 acres but no more than 30 acres*)."[251] The Final EA estimates that a total of approximately 30 acres will undergo clearcut treatment in the Peabody West IRP area.[252] This proposed action clearly does not support a finding of Not Likely to Adversely Affect the NLEB as the Forest Service indicated in the Final EA and Biological Evaluation. The determination of Not Likely to Adversely Affect is inconsistent with the USFWS DKey requirements, and the Forest Service is required "to coordinate with the local USFWS Ecological Services Field Office and/or follow a supplemental consultation process."[253]

Third, USFWS also provides an NLEB State-Specific Information Sources document and advises government agencies to consult with the appropriate office to determine whether rare or listed species are located within a project area and may be affected by a proposed action.[254] The Forest Service should consult with the New Hampshire Division of Forests & Lands to ensure that the proposed activities do not overlap with the required distances from NLEB hibernacula, staging or swarming areas, recorded captures or acoustic detection locations, and roosts.[255] In fact, the Forest Service should consult with the New Hampshire Division of Forests and Lands

[248] Biological Evaluation at 8.

[249] DKey at 11, 22 (Exhibit 13).

[250] Biological Evaluation at 3, 7.

[251] Final EA at 6.

[252] Final EA at 5.

[253] DKey at 5. (Exhibit 13).

[254] *Northern Long-Eared Bat: State-Specific Information Sources*, https://www.fws.gov/sites/default/files/documents/Roost%20Tree%20and%20Hibernacula%20-%20State-Specific%20Data%20Links_2.pdf (last visited June 12, 2023) (Exhibit 9).

[255] N.H. Division of Forests and Lands, *NHB DataCheck Tool*, https://www4.des.state.nh.us/NHB-DataCheck (last modified Feb. 28, 2022) (Exhibit 10).

for *all* federally listed, proposed listed, and regional forester sensitive species within the project area. A consultation would provide additional species support assistance to the Forest Service and help ensure compliance with various statutes.

Finally, the Forest Service's own analysis—as deficient as it is—suggests harms to NLEBs from the Project, and the ESA does not countenance such a result. As indicated in Section 7 of the ESA, agencies may not engage in activity that results in the destruction or adverse modification of endangered and threatened species' habitat.[256] The 2023 Biological Evaluation for the Peabody West IRP indicates that the NLEB was documented throughout the WMNF, roosting and foraging habitat exists within the action area, and individuals were captured in the area prior to the onset of white-nose syndrome.[257] The Biological Evaluation mentions that the New Hampshire Fish and Game Department conducted an unsuccessful two-night capture effort in July 2019.[258] It does not appear that the Forest Service has attempted to conduct any additional surveys or capture efforts in the area for over three and a half years. For these reasons, information on the activity of NLEB in the Project area is not only scarce and inadequate, but also outdated. The Biological Evaluation concedes that, in the Peabody West IRP area, NLEB roosts may be removed during project activities and foraging habitat may also be impacted.[259] Therefore, the Project as-is would violate the ESA through destruction and adverse modification of endangered bat habitat.

Due to the recent and severe impacts on the species from threats such as white-nose syndrome, climate change, and habitat loss, the Forest Service should conduct additional studies to determine the current status of the NLEB in the project area before taking any action.[260]

**B. The Forest Service Fails to Meet NFMA Requirements.**

The Forest Service fails to meet its obligations under NFMA as they relate to the NLEB and other sensitive species. The Forest Service's NFMA implementing regulations outline forest plan ecosystem diversity and species protection requirements.[261] The regulations state:

> The plan must include plan components, including standards or guidelines, to maintain or restore the diversity of ecosystems and habitat types throughout the plan area. In doing so, the plan must include plan components to maintain or restore . . . [r]are aquatic and terrestrial plant and animal communities[.][262]

---

256 16 U.S.C. § 1536(a)(2).

257 Biological Evaluation at 7.

258 *Id.*

259 *Id*.

260 BiOp at 19.

261 36 C.F.R § 219.9.

262 36 C.F.R. § 219.9(a)(2).

Additional, species-specific NFMA plan components indicate that:

> The responsible official shall determine whether or not the plan components . . . provide the ecological conditions necessary to: contribute to the recovery[263] of federally listed threatened and endangered species, conserve proposed and candidate species, and maintain a viable population of each species of conservation concern within the plan area. If the responsible official determines that the plan components . . . are insufficient to provide such ecological conditions, then additional, species-specific plan components, including standards or guidelines, must be included in the plan to provide such ecological conditions in the plan area.[264]

The Forest Service's Biological Evaluation and the Project fail to meet these requirements for several reasons. First, the Biological Evaluation provides an incomplete project effects analysis on the species because it fails to include any discussion of how the Forest Service plans to maintain or restore the NLEB or other sensitive species in the project area.[265] The Forest Service admits to some negative short-term project effects on the NLEB, but then references conflicting scientific evidence to assert long-term benefits. For example, the Biological Evaluation suggests that some of the project activity outcomes (such as open habitat for foraging) may yield long-term benefits to the NLEB.[266] This suggestion is in direct conflict with other studies that describe preferred habitats for the NLEB.[267] Second, the Biological Evaluation fails to explain how the Project will contribute to the recovery of the NLEB to the point at which its listing as endangered is no longer necessary. Finally, the Biological Evaluation indicates the Project activities may indirectly impact the NLEB, but it does not include discussion of species-specific plan components to provide the required ecological conditions necessary for the bat's recovery. For these reasons, the Forest Service fails to meet its obligations under NFMA as they relate to the NLEB and other sensitive species.

---

[263] NFMA definition of "Recovery": "For the purposes of this subpart, and with respect to threatened or endangered species: The improvement in the status of a listed species to the point at which listing as federally endangered or threatened is no longer appropriate." *Id.* at § 219.19.

[264] *Id.* at § 219.9(b)(1).

[265] *See generally* Biological Evaluation at 6-10.

[266] *Id.* at 7.

[267] *See*, *e.g.*, Species Status Assessment at 18-19 (Exhibit 1) (explaining "most foraging occurs . . . under the canopy . . . on forested hillsides and ridges" which "coincides with data indicating that mature forests are an important habitat type for foraging NLEBs"). Furthermore, NLEBs "seem to prefer intact mixed-type forests . . . for forage and travel rather than fragmented habitat or areas that have been clear cut." *Id.*

***Requested Remedy: The Forest Service should complete additional site-specific analysis under the ESA and NFMA as well as NEPA to adequately address the impacts of the Project on the NLEB. This analysis should be done in an EIS, with additional Project-specific consultation with USFWS under the ESA.***

## VIII. The Project Violates the NFMA and the Forest Plan.

As previously discussed, NFMA requires the Forest Service to develop and implement a Forest Plan for each unit of the National Forest System.[268] Projects in each forest must be consistent with their relevant Forest Plan.[269] Reviewing courts must be able to reasonably ascertain the Forest Service's compliance with that Forest Plan.[270] Although Standing Trees believes that it is long past due for the WMNF to undertake a wholesale review and revision of its 2005 Forest Plan (NFMA requires plans to be revised at least every 15 years), the Project must still comply with, and yet fails to meet, the Plan's goals and objectives to comply with NFMA in the following respects. [271]

***Scientific knowledge and ecosystem viability***. The WMNF Plan requires the use of "the latest scientific knowledge to restore the land and forest where needed" and emphasizes a focus on "ecosystem viability within the context of New England."[272] NFMA constrains the Forest Service timber harvest in the National Forest System to situations where "cuts are consistent with the protection of soil and the regeneration of the timber resources."[273] As discussed in our comment on the Draft EA, and in this objection at great length, the Project fails to use the latest scientific knowledge to restore the land.

The Project ignores relevant scientific knowledge of healthy forests and their importance to building climate resilience. The proposed treatments are not appropriate methods to meet the objectives and requirements of the WMNF Plan, considering the best available science. NFMA empowers responsible officials to "document how the best available scientific information was used" and "explain the basis for that determination," as high quality scientific analysis and public scrutiny are essential to NEPA implementation. [274] The Peabody West IRP does not use the best available science based on its failure to analyze and incorporate the conclusions of numerous recent studies on forest ecology, biodiversity, forest carbon, water quality, and more.

[268] 16 U.S.C. §§ 1600–1614; 16 U.S.C. § 1604.

[269] *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1062 (9th Cir. 2002); *See also* 16 U.S.C. § 1604(i); *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 850 (9th Cir. 2013).

[270] *Native Ecosystems Council v. U.S. Forest Serv.,* 418 F.3d 953, 963 (9th Cir. 2005).

[271] 36 C.F.R. § 219.7(a).

[272] WMNF Plan at 1-3.

[273] 16 U.S.C. §§ 1604(g)(3)(E)(i), 1604(g)(3)(F)(v).

[274] 36 C.F.R § 219.3; 40 C.F.R. § 1500.1(b).

***Species protection***. The Forest Service also fails to consider the project within the greater context of New England and the importance of the Project area's habitat, which provides for species protection and interconnectivity. As discussed in more detail above, the Project fails to contribute to the "conservation and recovery" of the NLEB and its habitat, as required by the WMNF Plan.[275]

***Public participation***. In the Forest Plan, the Forest Service asserted that "[p]ublic participation will be an important part of the process we use for making site-specific management decisions."[276] With no evidence that public participation provided any meaningful direction to the Peabody West IRP, the Project reflects an abdication of this commitment.

***Violations of Forest Plan guidelines and standards***. As discussed in more detail elsewhere in Standing Trees' comments and this objection, the Project also violates a number of Forest Plan guidelines and standards, including its limitations on impacts to scenic resources and water quality.

***Requested Remedy*: *The Forest Service must ensure the Peabody West IRP fully complies with the WMNF Plan and revise the Project to reflect its requirements.***

## CONCLUSION

For the foregoing reasons, Standing Trees objects to the Peabody West IRP. To cure the manifest errors in the Final EA and FONSI, and given the significance of this Project, the Forest Service should prepare an EIS to adequately evaluate the significant impacts posed by the Peabody West IRP and develop revisions to the Project to ensure compliance with the ESA and NFMA. We look forward to hearing from you to discuss the issues raised in this Objection and specifically request a meeting with you pursuant to 36 C.F.R. § 218.11(a).

Respectfully submitted,

STANDING TREES

By its attorneys:

Christophe Courchesne
*Senior Attorney*
Environmental Advocacy Clinic
Vermont Law & Graduate School
PO Box 96, 164 Chelsea Street
South Royalton, VT 05068
(802) 831-1627 (direct)
(802) 831-1631 (fax)
ccourchesne@vermontlaw.edu

Amanda Reyes
Hannah Weisgerber
*Student Attorneys*

[275] WMNF at 1-8.

[276] WMNF Plan - Final EIS - Appendix A at A-235.

**Table of Exhibits**

| Number | Exhibit Title |
|---|---|
| 1 | Species Status Assessment for the Northern long-eared bat (Myotis septentrionalis) Version 1.2, USFWS (Aug. 2022), https://www.fws.gov/media/species-status-assessment-report-northern-long-eared-bat |
| 2 | National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change, 88 Fed. Reg. 1,196 (Jan 9, 2023) |
| 3 | Kellett et al., *Forest-clearing to Create Early-successional Habitats: Questionable Benefits, Significant Costs*, 5 FRONTIERS FOR GLOB. CHANGE 1 (Jan. 9, 2023) |
| 4 | Simard et al., *Net Transfer of Carbon Between Ectomycorrhizal Tree Species in the Field*, 388 NATURE 579 (Aug. 7, 1997) |
| 5 | Letter from Chris French, Forest Service Deputy Chief, to Regional Foresters (Apr. 18, 2023) |
| 6 | WMNF U.S. Forest Service Logging Projects Map |
| 7 | Endangered and Threatened Wildlife and Plants; Endangered Species Status for Northern Long-Eared Bat, 87 Fed. Reg. 73,488-504 (Nov. 30, 2022) |
| 8 | Endangered and Threatened Wildlife and Plants; Endangered Species Status for Northern Long-Eared Bat; Delay of Effective Date, 88 Fed. Reg. 4,908-10 (Jan. 26, 2023) |
| 9 | U.S. Fish and Wildlife Serv., *Northern Long-Eared Bat: State-Specific Information Sources*, https://www.fws.gov/sites/default/files/documents/Roost%20Tree%20and%20Hibernacula%20-%20State-Specific%20Data%20Links_2.pdf |
| 10 | N.H. Division of Forests and Lands, *NHB DataCheck Tool*, https://www4.des.state.nh.us/NHB-DataCheck |
| 11 | Mature and Old-Growth Forests: Definition, Identification, and Initial Inventory on Lands Managed by the Forest Service and Bureau of Land Management 1 (Apr. 2023), https://www.fs.usda.gov/sites/default/files/mature-and-old-growth-forests-tech.pdf |
| 12 | Letter from Chris French, Forest Service Deputy Chief, re: Advance Notice of Proposed Rulemaking (Apr. 21, 2023) |

| | |
|---|---|
| 13 | Standing Analysis and Implementation Plan – Northern Long-Eared Bat Assisted Determination Key, Version 1.1, USFWS (April 2023), https://www.fws.gov/sites/default/files/documents/Standing%20Analysis%20Version%201.1%20April%202023.pdf |
| 14 | Lorimer and White, *Scale and Frequency of Natural Disturbances in the Northeastern US: Implications for Early Successional Forest Habitats and Regional Age Distributions* 185 FOREST AND ECOLOGY MANAGEMENT 41(2003), *available at* http://www.maforests.org/Lorimer%20and%20White%20-%20ES%20Habitat.pdf |
| 15 | Oswald et al., *Conservation implications of limited Native American impacts in pre-contact New England*, 3 NATURE SUSTAINABILITY 24 (2020), *available at* https://rex.libraries.wsu.edu/esploro/fulltext/acceptedManuscript/ Conservation-implications-of-limited-Native-American/99900586062001842?repId=12350928850001842&mId=13362786220001842&institution=01ALLIANCE_WSU |
| 16 | Zaino et al., Vt. Fish and Wildlife Dept., Vermont Conservation Design – Natural Community and Habitat Technical Report 15 (March 2018), *available at* https://vtfishandwildlife.com/sites/fishandwildlife/files/documents/Conserve/VT%20Conservation%20Landscape-level%20Design/Vermont%20Conservation%20Design--Natural-Community-and-Habitat-Technical-Report-March-2018.pdf |
| 17 | Evans and Mortelliti, *Effects of Forest Disturbance, Snow Depth, and Intraguild Dynamics on American Marten and Fisher*, 13 ECOSPHERE 1 (Nov. 24, 2021) |
| 18 | Miller et al., *Eastern National Parks Protect Greater Tree Species Diversity than Unprotected Matrix Forests*, 414 FOREST ECOLOGY AND MGMT. 74 (April 15, 2018) |
| 19 | Thom et al., The Climate Sensitivity of Carbon, Timber, and Species Richness Covaries with Forest Age in Boreal-Temperate North America (2019) |
| 20 | Nowacki and Abrams, *The Demise of Fire and "Mesophication" of Forests in the Eastern United States*, 58 BIOSCIENCE 123 (2008), *available at* https://www.nrs.fs.usda.gov/ pubs/jrnl/2008/nrs_2008_nowacki_001.pdf |
| 21 | DellaSala et al., *Mature and Old-Growth Forest Contributions to Large-Scale Conservation Targets in the Conterminous USA*, 5 FRONTIERS IN FORESTS AND GLOB. CHANGE 1 (2022) |
| 22 | Charles D. Canham et al., *Regional Variation in Forest Harvest Regimes in the Northeastern United States*, 23 ECOLOGICAL APPLICATIONS, 515 (2013), |

| | |
|---|---|
| | *available at* http://www.uvm.edu/giee/pubpdfs/Canham_2013_Ecological_Applications.pdf |
| 23 | Brown et al., *Timber Harvest as the Predominant Disturbance Regime in Northeastern U.S. Forests: Effects of Harvest Intensification*, 9 ECOSPHERE 1, 1 (2018) |
| 24 | Harris et al., *Attribution of Net Carbon Change by Disturbance Type Across Forest Lands of the Conterminous United States*, 11 CARBON BALANCE AND MANAGEMENT 1 (2016), *available at* https://doi.org/10.1186/s13021-016-0066-5 |
| 25 | Duveneck and Thompson, *Social and Biophysical Determinants of Future Forest Conditions in New England: Effects of a Modern Land-Use Regime*, 55 GLOB. ENVIRONMENTAL CHANGE 115 (March 2019) |
| 26 | Ducey et al., *Late-Successional and Old-Growth Forests in the Northeastern United States: Structure, Dynamics, and Prospects for Restoration*, 4 FORESTS 1055 (2013), *available at* https://www.researchgate.net/publication/260516680_Late-Successional_and_Old-Growth_Forests_in_the_Northeastern_United_States_Structure_Dynamics_and_Prospects_for_Restoration |
| 27 | Watson et al., *The Exceptional Value of Intact Forest Ecosystems*, NATURE ECOLOGY & EVOLUTION (2018), *available at* https://www.researchgate.net/profile/John-Robinson-18/publication/323399911_The_exceptional_value_of_intact_forest_ecosystems/links/5a9b0482aca2721e3f3018b2/The-exceptional-value-of-intact-forest-ecosystems.pdf |
| 28 | Di Marco et al., *Wilderness Areas Halve the Extinction Risk of Terrestrial Biodiversity*, 573 NATURE 582 (2019) (Exhibit 28) |
| 29 | Dinerstein et al., *A Global Safety Net to Reverse Biodiversity Loss*, 6 SCI. ADVANCES 1 (Sept. 2020). |
| 30 | Miller et al., *National Parks in the Eastern United States Harbor Important Older Forest Structure Compared with Matrix Forests*, 7 ECOSPHERE (2016), *available at* https://www.researchgate.net/profile/Aaron_Weed/publication/305484577_National_parks_in_the_eastern_United_States_harbor_important_older_forest_structure_compared_with_matrix_forests/links/57961bdd08aed51475e542a7/National-parks-in-the-eastern-United-States-harbor-important-older-forest-structure-compared-with-matrix-forests.pdf |
| 31 | Forest Service Climate Adaptation Plan 1, 13 (July 2022), https://www.usda.gov/sites/default/files/documents/4_NRE_FS_ClimateAdaptationPlan_2022.pdf |

| | |
|---|---|
| 32 | Moomaw et al., *Intact Forests in the United States: Proforestation Mitigates Climate Change and Serves the Greatest Good*, 2 FRONTIERS IN FOREST AND GLOB. CHANGE 1, 3 (2019), *available at* https://www.frontiersin.org/articles/10.3389/ffgc.2019.00027/full |
| 33 | Ceballos et al., *Vertebrates on the Brink as Indicators of Biological Annihilation and the Sixth Mass Extinction*, 117 PNAS 13596 (June 2020) |
| 34 | CLIMATE CHANGE 2022: IMPACTS, ADAPTATION AND VULNERABILITY – WORKING GROUP II CONTRIBUTION TO THE SIXTH ASSESSMENT REPORT OF THE INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE (Pörtner et al., eds., 2022), *available at* https://report.ipcc.ch/ar6/wg2/IPCC_AR6_WGII_FullReport.pdf |
| 35 | Erb et al., *Unexpectedly Large Impact of Forest Management and Grazing on Global Vegetation Biomass,* 553 NATURE 73 (2018), *available at* https://research.vu.nl/ws/files/118980188/Nature25138_Unexpectedly_large_impact_of_forest_management_and_grazing_on_global_vegetation_biomass.pdf |
| 36 | Standing Trees Comments on Peabody West IRP Draft EA/FONSI (Sept. 6, 2022) |
| 37 | Keeton et al., *Late-Successional Biomass Development in Northern Hardwood-Conifer Forests of the Northeastern United States* 57 FOREST SCIENCE (Jan. 18, 2011) |
| 38 | Keith et al., *Re-evaluation of Forest Biomass Carbon Stocks and Lessons from the World's Most Carbon-Dense Forests*, 106 PNAS 11635 (July 14, 2009) |
| 39 | Luyssaert et al., *Old-growth Forests as Global Carbon Sinks*, 455 NATURE 213 (2008) |
| 40 | Leverett et al., *Older Eastern White Pine Trees and Stands Sequester Carbon for Many Decades and Maximize Cumulative Carbon*, 4 FRONTIERS FOR. GLOB. CHANGE 1 (May 2021) |
| 41 | Stephenson et al., *Rate of Tree Carbon Accumulation Increases Continuously with Tree Size,* 507 NATURE 90 (Jan. 2014) |
| 42 | Thorn et al., *The Living Dead: Acknowledging Life After Tree Death to Stop Forest Degradation*, 18 FRONTIERS IN ECOL. AND THE ENV'T 505 (2020) |
| 43 | Dietz et al., *The Importance of U.S. National Forest Roadless Areas for Vulnerable Wildlife Species*, 32 GLOB. ECOLOGY AND CONSERVATION 1 (Dec. 2021) |
| 44 | Talty et al., *Conservation Value of National Forest Roadless Areas*, 2 CONSERVATION SCI. AND PRAC. 1, 1, 11 (Nov. 2020) |

| | |
|---|---|
| 45 | Gunn et al., *Late-Successional and Old-Growth Forest Carbon Temporal Dynamics in the Northern Forest* (*Northeastern USA*), FOREST ECOLOGY & MGMT. (2013), *available at* https://www.manomet.org/wp-content/uploads/old-files/2013%20Gunn%20et%20 al%20%20LOSG%20Carbon%201-s2%200-S0378112713006907-main.pdf |
| 46 | Letter from Karen Herrington, Acting Assistant Regional Director for Ecological Services, Region 3 of USFWS, to Gina Owens, Regional Forester of Eastern Region, U.S. Forest Service (Mar. 31, 2023) (re Northern Long-eared Bat Biological Opinion) |
| 47 | Jung et al., *Areas of Global Importance for Conserving Terrestrial Biodiversity, Carbon and Water*, 5 NATURE ECOLOGY & EVOLUTION 1499 (2021) |
| 48 | Faison et al., *Adaptation and Mitigation Capacity of Wildland Forests in the Northeastern United States*, 544 FOREST ECOLOGY & MGMT. (forthcoming Sept. 15, 2023) |
| 49 | Faison et al., *The Importance of Natural Forest Stewardship in Adaptation Planning in the United States*, 5 CONSERVATION SCIENCE AND PRACTICE (Apr. 24, 2023), *available at* https://conbio.onlinelibrary.wiley.com/doi/10.1111/csp2.12935 |

# Peabody West IRP Botany Survey Summary

## Stands of Interest—Oct 2021

*Note: stand number correspond with the updated project stand #s

## Compartment 33

Surveyed Stands

### Comp 33_Stand 12: Sugar maple - beech - yellow birch forest

| **Compartment:** 33 | **Stand: 12** | | **FSVeg Std ID:** |
|---|---|---|---|
| **VGS Points:** | | | |
| **PB03:** 44.367426, -71.252206 | **Slope (%):** 14 | **Aspect:** 438 | **Wet:** Intermittent Stream present |
| **PB04:** 44.366276, 44.366276 | **Slope (%):** 18 | **Aspect:** 18 | **Wet:** Intermittent Stream nearby |
| **PB04_revisit:** 44.366311, -71.245918 | **Slope (%):** 18 | **Aspect:** 18 | **Wet:** Intermittent Stream present |
| **PB05:** 44.366048, -71.239798 | **Slope (%):** 58 | **Aspect:** 40 | **Wet:** Intermittent Stream present |
| **PB05_revisit:** 44.36606, -71.239779 | **Slope (%):** 58 | **Aspect:** 40 | **Wet:** Seep nearby |
| **PB07:** 44.361804, -71.235961 | **Slope (%):** 100 | **Aspect:** 345 | **Wet:** NA |
| **Date:** 08/25/2020<br>**Observer(s):** NH NATURAL HERITAGE BUREAU, ESD | | | |
| **TES/TES Habitat:** none found | | | |
| **NNIS:** none found | | | |
| **Cultural:** | | | |
| **Special Notes:** | | | |

**Summary:**

**VGS Descriptions**

**PB03:** [Sugar Maple-Beech-Yel Birch] The site is a maturing northern hardwood forest, with a number of trees above 16". Sugar maple is dominant in the canopy, with hobblebush dominant in the shrub layer. The herb layer is fairly diverse. The terrain is a gentle north-facing slope, with an incised intermittent stream channel within the plot.

**PB04:** [Hemlock – spruce – northern hardwood] forest in young to maturing condition and relatively open canopy is situated on the height of land between incised stream channels. Red maple and bigtooth aspen are the current co-dominant canopy species. Striped maple is the dominant subcanopy species. The relatively open canopy has encouraged a diverse herbaceous stratum with 18 species documented.

**PB04_revisit:** There are many larger mature trees mostly upslope from here and concentrated along the stream. Several individuals of sugar maple, red spruce, yellow birch, hemlock. Very rich understory.

**PB05:** [Sugar maple - beech - yellow birch forest] Maturing to mature sugar maple – beech – yellow birch forest at the base of a slope near a seepy stream drainage. The light provided by a sparse understory has encouraged a diverse and full herbaceous stratum with 19 species documented, including a dense seedling cover of sugar maple and a few semi-rich herbaceous indicator species.

**PB05_revist:** In a low wet area, relatively flat where creek slows. Many fallen dead trees. Canopy dominated by sugar maple, red spruce and larger quaking aspens. Some Ash, hemlock and yellow birch also present and sphagnum in wetter places.

**PB07:** [Sugar maple - beech - yellow birch forest] This young to maturing sugar maple – beech – yellow birch forest on the side of a steep slope is in a seral stage following earlier disturbance that has allowed a presence of paper birch in the canopy. Red maple and yellow birch are common in the canopy, with red spruce also present in the sub-canopy. The herbaceous stratum is relatively sparse, but somewhat diverse. slope 100%.

## Comp 33_Stand 13: Hemlock - spruce - northern hardwood forest

| **Compartment:** 33 | **Stand: 13** | **FSVeg Std ID:** | |
|---|---|---|---|
| **VGS Points:** | | | |
| **PB01:** 44.36404, -71.248497 | **Slope (%):** 70 | **Aspect:** 5 | **Wet:** NA |
| **PB02:** 44.361782, -71.24523 | **Slope (%):** 27 | **Aspect:** 48 | **Wet:** NA |
| **Date:** 08/25/2020<br>**Observer(s):** NH NATURAL HERITAGE BUREAU | | | |
| **TES/TES Habitat:** none found | | | |
| **NNIS:** none found | | | |
| **Cultural:** | | | |
| **Special Notes:** | | | |

**Summary:**

The forest is a maturing to mature hemlock forest along the Townline brook and spans at least 200 ft on either side of the brook. Levels of prior harvesting are non-existent to low and several very large (>20” DBH) trees are scattered along the length of the brook.

**VGS Descriptions**

**PB01**: [Hemlock forest] Maturing to mature hemlock forest at the top of a slope with a moderate herbaceous cover and sparse shrub cover. Beech is an occasional associate in all strata, and intermediate woodfern is the dominant herbaceous species, with sugar maple and hobblebush present as common shrubs.

**PB02:** [Hemlock - spruce - northern hardwood forest] This is a mixed forest at the top of a ravine slope. The shrub and herbaceous layers are sparse. Beech bark disease is impacting canopy beech trees. To the west the forest is much younger.

## Comp 33_Stand 14: Mixed forest

| | | | |
|---|---|---|---|
| **Compartment:** 33 | **Stand:** 14 | **FSVeg Std ID:** | |
| **VGS Points:** | | | |
| **PB14:** 44.361572, -71.24337 | **Slope (%):** 21 | **Aspect:** 350 | **Wet:** Intermittent Stream nearby |
| **PB15**: 44.358248, -71.239086 | **Slope (%):** 27 | **Aspect:** 5 | **Wet:** Intermittent Stream present |
| **Date:** 08/25/2020<br>**Observer(s):** NH NATURAL HERITAGE BUREAU | | | |
| **TES/TES Habitat:** none found | | | |
| **NNIS:** none found | | | |
| **Cultural:** | | | |
| **Special Notes:** | | | |

**Summary:**

**VGS Descriptions**

**PB14:** [Hemlock - spruce - northern hardwood forest] This site is vegetated by maturing to mature, but uneven-aged hemlock – spruce – northern hardwood forest with several large old hemlock canopy trees, and younger sugar maples and beech in canopy. The understory is dense with beech and striped maple, but the herbaceous stratum is sparse, but somewhat diverse.

**PB15:** [Sugar maple - beech - yellow birch forest] Maturing to mature sugar maple – beech – yellow birch forest occurs here on a gently sloped site above an intermittent stream course. Several large canopy trees are present, most notably red maple, and a dense shrub layer of primarily hobblebush. A recently-cut area is close by. The herbaceous stratum is fairly sparse.

## Comp 33_Stand 15: Mixed forest

| | | | |
|---|---|---|---|
| **Compartment:** 33 | **Stand:** 15 | **FSVeg Std ID:** | |
| **VGS Points:** | | | |
| **PB11:** 44.356693, -71.233904 | **Slope (%):** 21 | **Aspect:** 20 | **Wet:** NA |
| **PB12:** 44.361583, -71.237943 | **Slope (%):** 9 | **Aspect:** 325 | **Wet:** NA |
| **PB13** 44.364595, -71.242448 | **Slope (%):** 47 | **Aspect:** 153 | **Wet:** Intermittent Stream nearby |
| **Date(s):** 08/25/2020; 09/15/2020<br>**Observer(s):** NH NATURAL HERITAGE BUREAU | | | |
| **TES/TES Habitat:** none found | | | |
| **NNIS:** none found | | | |
| **Cultural:** | | | |
| **Special Notes:** | | | |

**Summary:**

**VGS Descriptions**

**PB11:** This maturing **sugar maple – beech – yellow birch forest** on a mid-slope situation has a fairly open canopy. Sugar maple and yellow birch are strong canopy dominants, with beech and striped maple strong subcanopy species. The herbaceous stratum is quite diverse and robust (11 species).

**PB12:** Young to maturing **sugar maple – beech – yellow birch forest** occurs here on small unmanaged forested "island" between old skid roads and cut areas. The assigned point was moved to avoid these disturbed areas. The somewhat sparse canopy and light from adjacent openings has favored a dense shrub growth of hobblebush and red spruce.

**PB13:** This maturing **northern hardwood – spruce – fir forest** is strongly dominated in the canopy by sugar maple and red maple at the edge of an intermittent stream channel. There is clearly evident pit and mound topography and a modest herbaceous stratum present. A recently-cut area nearby is densely vegetated by hobblebush.

## Comp 33_Stand 16: Mixed forest

| | | | |
|---|---|---|---|
| **Compartment:** 33 | **Stand:** 16 | **FSVeg Std ID:** | |
| **VGS Point ID(s):** | | | |
| **PB10:** 44.354832, -71.232381 | **Slope (%):** 16 | **Aspect:** 350 | **Wet:** NA |
| **PB55:** 44.355684, -71.229943 | **Slope (%):** 27 | **Aspect:** 340 | **Wet:** NA |
| **Date(s):** 9/15/2020<br>**Observer(s):** NH NATURAL HERITAGE BUREAU | | | |
| **TES/TES Habitat:** none found | | | |
| **NNIS:** none found | | | |
| **Cultural:** | | | |
| **Special Notes:** | | | |

**Summary:**

**VGS Descriptions**

**PB10:** This maturing sugar maple – beech – yellow birch forest occurs on an upper slope. The canopy and understory are fairly sparse, with beech becoming the dominant in the understory. Sugar maple is poised to strongly occupy the shrub stratum in the future with numerous seedlings present.

**PB55:** Young to maturing northern hardwood – spruce – fir forest occurs at this site on the side of a dry forested knoll. Paper birch is a canopy co-dominant along with red spruce, while balsam fir is a strong shrub stratum dominant. The herbaceous stratum is quite dense, as is the subcanopy.

## Comp 33_Stand 17: Mixed hardwoods

| | | |
|---|---|---|
| **Compartment:** 33 | **Stand:** 17 | **FSVeg Std ID:** |

| **VGS Point ID(s):** | | | |
|---|---|---|---|
| **PB16:** 44.359099, -71.228646 | **Slope (%):** 70 | **Aspect:** 22 | **Wet:** Intermittent Stream present |
| **PB17:** 44.363814, -71.226739 | **Slope (%):** 23 | **Aspect:** 240 | **Wet:** NA |
| **PB20:** 44.364038, -71.221127 | **Slope (%):** 29 | **Aspect:** 239 | **Wet:** Intermittent Stream nearby |
| **PB21:** 44.360343, -71.220308 | **Slope (%):** 14 | **Aspect:** 189 | **Wet:** NA |
| **PB22:** 44.356946, -71.221635 | **Slope (%):** 16 | **Aspect:** 141 | **Wet:** NA |
| **PB23:** 44.356382, -71.225509 | **Slope (%):** 21 | **Aspect:** 191 | **Wet:** NA |

**Date(s):** 08/25&26/2020

**Observer(s):** NH NATURAL HERITAGE BUREAU

**TES/TES Habitat:** none found

**NNIS:** none found

**Cultural:**

**Special Notes:**

## Summary:

**VGS Descriptions**

**PB16:** Young to maturing sugar maple – beech – yellow birch forest is situated here on the side of a fairly steep ravine. The canopy cover is relatively low, with dominance shared by yellow birch, paper birch, beech and sugar maple. Hobblebush is the herbaceous dominant in this otherwise sparse stratum.

**PB17:** This is a maturing northern hardwood forest on a modest slope, with an average diameter of 12". Sugar maple and red maple are the most frequent canopy trees, and striped maple is abundant in the subcanopy. There are numerous channels with what appeared to be accumulations of storm-washed leaf litter.

**PB20:** This is a maturing northern hardwood stand on a moderate slope just downhill from Pine Mountain Road, which is within sight of the plot. The average canopy tree diameter is 10-12". Sugar maple, beech, and paper birch are all common in the canopy, with striped maple abundant in the subcanopy. There is an intermittent stream and a forest seep near the plot.

**PB21:** This is a young beech stand on a gentle slope. The stand is heavily infected by beech bark disease. The average canopy tree diameter is 8". There are several canopy gaps that are dominated by striped maple.

**PB22:** This is a sugar maple dominated stand with a dense subcanopy of beech. This site is a gentle, south-facing slope. The average canopy diameter is 10-12".

**PB23:** This is a maturing northern hardwood stand on moderately bouldery terrain. The average canopy tree diameter is 8-10". Sugar maple dominates the canopy, with striped maple abundant in the subcanopy. This is a moderately-sloped, south-facing site.

## Comp 33_Stand 33: Lowland Softwood

| **Compartment:** 33 | **Stand:** 33 | **FSVeg Std ID:** |
|---|---|---|

| VGS Points: | | | |
|---|---|---|---|
| **PB09:** 44.355589, -71.227016 | **Slope (%):** 9 | **Aspect:** 176 | **Wet:** NA |
| **PB56:** 44.354567, -71.228344 | **Slope (%):** 9 | **Aspect:** 18 | **Wet:** NA |

**Date(s):** 08/26/2020

**Observer(s):** NH NATURAL HERITAGE BUREAU

**TES/TES Habitat:** none found

**NNIS:** none found

**Cultural:**

**Special Notes:**

## Summary:

**VGS Descriptions**

**PB09:** This is a lowland softwood stand with trees averaging 8- 10" in diameter at the headwaters of Bear Spring Brook. Red spruce is dominant in the canopy, and hobblebush is dominant in the shrub layer. The herb layer is diverse, with bunchberry and goldthread the most abundant.

**PB56:** This is a lowland softwood stand at the headwaters of Bear Spring Brook. Red spruce is dominant in the canopy, with red maple as a common associate. The average canopy tree diameter is 8-10" The herbaceous layer is relatively lush, with goldthread and bluebead lily as the most abundant species.

## Comp 33_Stand 19: Sugar maple-beech-yellow birch

| **Compartment:** 33 | **Stand:** 19 | **FSVeg Std ID:** | |
|---|---|---|---|
| **VGS Points:** | | | |
| **PB25:** 44.362473, -71.210824 | **Slope (%):** 34 | **Aspect:** 141 | **Wet:** NA |

**Date(s):** 08/26/2020

**Observer(s):** NH NATURAL HERITAGE BUREAU

**TES/TES Habitat:** none found

**NNIS:** none found

**Cultural:**

**Special Notes:**

## Summary:

**VGS Descriptions**

**PB25:** This is a Sugar maple-beech-yellow birch forest on a relatively flat bench on an otherwise moderately steep, southeastfacing slope. Sugar maple is the most abundant canopy species, while beech dominates the subcanopy. The average canopy tree diameter is 8-10".

## Comp 33_Stand 21: High Elevation Spruce-fir/hardwood

| **Compartment:** 33 | **Stand:** 21 | | **FSVeg Std ID:** |
|---|---|---|---|
| **VGS Points:** | | | |
| **PB43:** 44.368745, -71.208407 | **Slope (%):** 42 | **Aspect:** 158 | **Wet:** Intermittent Stream present |
| **PB44:** 44.369415, -71.208734 | **Slope (%):** 100 | **Aspect:** 172 | **Wet:** NA |
| **Date(s):**<br>**Observer(s):** NH NATURAL HERITAGE BUREAU | | | |
| **TES/TES Habitat:** none found | | | |
| **NNIS:** none found | | | |
| **Cultural:** | | | |
| **Special Notes:** | | | |

**Summary:**

**VGS Descriptions**

**PB43:** This is a hardwood forest with a broken canopy of red maple over a dense subcanopy of beech and striped maple. The beech is heavily infested by beech bark disease. The shrub and herbaceous layers are sparse. There is a (dry) intermittent stream running through the plot.

**PB44:** This is a high-elevation spruce - fir forest on a steep, east-facing slope. The plot is in a canopy gap from blown down trees. The gap has been occupied by dense red spruce regeneration. Herbaceous species are almost entirely absent beneath the dense spruce saplings.

## Comp 33_Stand 10: Mixed forest

| **Compartment:** 33 | **Stand:** 10 | | **FSVeg Std ID:** |
|---|---|---|---|
| **VGS Points:** | | | |
| **PB38:** 44.363591, -71.1871 | **Slope (%):** 0 | **Aspect:** 0 | **Wet:** NA |
| **PB39:** 44.365596, -71.187217 | **Slope (%):** 19 | **Aspect:** 110 | **Wet:** Intermittent Stream nearby |
| **PB40:** 44.368621, -71.184856 | **Slope (%):** 5 | **Aspect:** 170 | **Wet:** NA |
| **PB41:** 44.368976, -71.187712 | **Slope (%):** 42 | **Aspect:** 87 | **Wet:** Intermittent Stream nearby |
| **Date(s):**<br>**Observer(s):** NH NATURAL HERITAGE BUREAU | | | |
| **TES/TES Habitat:** none found | | | |
| **NNIS:** PB40: 1 Japanese barberry | | | |

| | |
|---|---|
| **Cultural:** | |
| **Special Notes:** | |

**Summary:**

**VGS Descriptions**

**PB38:** This is a mixed stand on a flat crest between drainages. The canopy is a mix of beech and hemlock, with an average canopy tree diameter of 12-14". The shrub and herbaceous layers are quite sparse.

**PB39:** This is a mixed stand with a small headwater seep in a bowl-like, east-facing drainage. The canopy at the center of the plot is a mix of red maple, red spruce, paper birch, and yellow birch. Large hemlocks are scattered on the edge of the plot. The average diameter of canopy trees is 8-10".

**PB40:** This is an early successional on a flat terrace. The canopy is a mix of paper birch, red maple, and bigtooth aspen. The average canopy tree diameter is 8-10". There was 1 small Japanese barberry shrub in the plot. It was pulled by hand and hung on a nearby branch.

**PB41:** This is a young mixed stand on rolling terrain with variable slope. There is a perennial stream just downslope. The canopy is a mix of paper birch, red maple, and bigtooth aspen, with some balsam fir. Striped maple is dominant in the subcanopy, and the shrub and herbaceous layers are sparse.

## Comp 33_Stand 24: Mixed forest

| | | | |
|---|---|---|---|
| **Compartment:** 33 | **Stand:** 24 | | **FSVeg Std ID:** |
| **VGS Points:** | | | |
| **PB37:** 44.360674, -71.192641 | **Slope (%):** 0 | **Aspect:** 0 | **Wet:** Seep nearby |
| **Date(s):**<br>**Observer(s):** NH NATURAL HERITAGE BUREAU | | | |
| **TES/TES Habitat:** none found | | | |
| **NNIS:** none found | | | |
| **Cultural:** | | | |
| **Special Notes:** | | | |

**Summary:**

**VGS Descriptions**

**PB37:** This is a maturing mixed stand on a flat bench above slope. The canopy is a mix of hemlock, red maple, and red spruce. There is a canopy gap in the center of the plot, which accounts for the dense subcanopy of beech and striped maple. Average canopy tree diameter is 10- 12" There is a small herbaceous seep just outside the plot.

## Comp 33_Stand 38: Mixed forest

| **Compartment:** 33 | **Stand:** 38 | | **FSVeg Std ID:** |
|---|---|---|---|
| **VGS Points:** | | | |
| **PB27:** 44.351888, -71.211409 | **Slope (%):** 0 | **Aspect:** 0 | **Wet:** NA |
| **PB28:** 44.354881, -71.211834 | **Slope (%):** 3 | **Aspect:** 71 | **Wet:** NA |
| **PB29:** 44.355779, -71.205174 | **Slope (%):** 5 | **Aspect:** 71 | **Wet:** Intermittent Stream nearby |
| **Date(s):**<br>**Observer(s):** NH NATURAL HERITAGE BUREAU | | | |
| **TES/TES Habitat:** none found | | | |
| **NNIS:** none found | | | |
| **Cultural:** | | | |
| **Special Notes:** Point 56 from 2013 (44.34569, -71.22452): rich spots nearby | | | |

**Summary:**

**VGS Descriptions**

**PB27:** This is a maturing northern hardwood **[Sugar Maple-Beech-Yellow Birch]** stand on flat terrain. The average canopy tree diameter is 10-12". Yellow birch, beech, and red maple are all common in the canopy. There are some canopy gaps near plot, with dense beech regeneration.

**PB28:** This is a young mixed stand **[Hemlock-Spruce-Northern Hardwood]** with a few larger trees on flat terrain. The canopy is a mix of balsam fir, hemlock, red spruce, and yellow birch. The average tree diameter is 5-7". The one larger hemlock was outside the 10- meter radius plot. The herbaceous layer is very sparse.

**PB29:** This is a mixed stand **[Hemlock-Spruce-Northern Hardwood]** that is heavy to beech with scattered larger hemlocks. The average canopy tree diameter is 6-8". The terrain is very gently sloped to the east.

## Comp 33_Stand 47: Sugar maple-beech-yellow birch

| **Compartment:** 33 | **Stand:** 47 | | **FSVeg Std ID:** |
|---|---|---|---|
| **VGS Points:** | | | |
| **PB31:** 44.354448, -71.202778 | **Slope (%):** 7 | **Aspect:** 58 | **Wet:** NA |
| **Date(s):**<br>**Observer(s):** NH NATURAL HERITAGE BUREAU | | | |
| **TES/TES Habitat:** none found | | | |
| **NNIS:** none found | | | |
| **Cultural:** | | | |

| |
|---|
| **Special Notes:** |
| |
| **Summary:**<br><br>**VGS Descriptions**<br>**PB31:** This stand **[Sugar Maple-Beech-Yellow Birch]** is characterized by a mix of white ash and red maple on relatively flat terrain. The average canopy tree diameter is 8-10". Beech is dominant in the subcanopy and shrub layers. |

## Comp 33_Stand 46: Northern hardwood

| | | | |
|---|---|---|---|
| **Compartment:** 33 | **Stand:** 46 | | **FSVeg Std ID:** |
| **VGS Points:** | | | |
| **PB30:** 44.350722, -71.20256 | **Slope (%):** 12 | **Aspect:** 86 | **Wet:** NA |
| **Date(s):**<br>**Observer(s):** NH NATURAL HERITAGE BUREAU | | | |
| **TES/TES Habitat:** none found | | | |
| **NNIS:** none found | | | |
| **Cultural:** | | | |
| **Special Notes:** | | | |
| | | | |
| **Summary:**<br><br>**VGS Descriptions**<br>**PB30:** This is a maturing northern hardwood forest on a gentle slope. White ash is dominant in the canopy, with beech dense in the subcanopy. The larger red maples that were recorded were outside the 10-meter radius plot. | | | |

## Comp 33_Stand 55: Mixed forest

| | | | |
|---|---|---|---|
| **Compartment:** 33 | **Stand:** 55 | | **FSVeg Std ID:** |
| **VGS Points:** | | | |
| **PB32:** 44.349535, -71.213941 | **Slope (%):** 0 | **Aspect:** 127 | **Wet:** NA |
| **PB33:** 44.348074, -71.211059 | **Slope (%):** 5 | **Aspect:** 256 | **Wet:** NA |
| **Date(s):**<br>**Observer(s):** NH NATURAL HERITAGE BUREAU | | | |
| **TES/TES Habitat:** none found | | | |
| **NNIS:** none found | | | |
| **Cultural:** | | | |

| **Special Notes:** |
|---|
| |
| **Summary:**<br><br>**VGS Descriptions**<br>**PB32:** This is a mixed wood stand **[Hemlock-Spruce-Northern Hardwood]** dominated by hemlock and beech. The beech is heavily infested by beech bark disease. The average canopy tree diameter is 10-12". The site is southeast-facing, with a variable slope.<br>**PB33:** This is a mixed forest **[Hemlock-Spruce-Northern Hardwood]** on gentle terrain. It is characterized by a mix of yellow birch, red spruce, and red maple. The subcanopy and shrub layers are dominated by beech. The average canopy tree diameter is 10-12". |

## Comp 33_Stand 61:

| **Compartment:** 33 | **Stand:** 61 | **FSVeg Std ID:** | |
|---|---|---|---|
| **VGS Points:** | | | |
| **PB** | **Slope (%):** 0 | **Aspect:** | **Wet:** |
| **PB33** | **Slope (%):** | **Aspect:** | **Wet:** |
| **Date(s):**<br>**Observer(s):** NH Natural Heritage Bureau | | | |
| **TES/TES Habitat:** none found | | | |
| **NNIS:** none found | | | |
| **Cultural:** | | | |
| **Special Notes:** | | | |
| | | | |
| **Summary:**<br><br>**VGS Descriptions** | | | |

## Ski Glade/Track

| **Compartment:** 33 | **Stand:** 3, 4, 92, 93, 17, 18 | **FSVeg Std ID:** | |
|---|---|---|---|
| **VGS Points:** | | | |
| **PB18:** 44.368136, -71.22539 | **Slope (%):** 36 | **Aspect:** 345 | **Wet:** |
| **PB19:** 44.367072, -71.222027 | **Slope (%):** 23 | **Aspect:** 277 | **Wet:** |
| **PB48:** 44.371335, -71.2212 | **Slope (%):** 34 | **Aspect:** 271 | **Wet:** |
| **PB46:** 44.378475, -71.224188 | **Slope (%):** 23 | **Aspect:** 337 | **Wet:** Seep nearby |
| **PB50:** 44.382121, -71.221546 | **Slope (%):** 16 | **Aspect:** 267 | **Wet:** |

| **PB45:** 44.376484, -71.206437 | **Slope (%):** 12 | **Aspect:** 359 | **Wet:** Intermittent stream nearby |
|---|---|---|---|
| **Date:** 08/25/2020<br>**Observer(s):** NH NATURAL HERITAGE BUREAU | | | |
| **TES/TES Habitat:** none found | | | |
| **NNIS:** none found | | | |
| **Cultural:** | | | |
| **Special Notes:** | | | |

## Summary:

**VGS Descriptions**

**PB18:** (Sugar maple - beech - yellow birch forest) on proposed ski glade. This is a maturing northern hardwood forest on a moderate, northwest-facing slope. Canopy trees average 12" in diameter. Sugar maple is dominant in the canopy, and striped maple is dominant in the subcanopy. Sessileleaf bellwort is the most abundant species in the herbaceous layer.

**PB19:** (Sugar maple - beech - yellow birch forest) On proposed ski glade. This is a paper birch - red maple stand with a dense striped maple understory. Clubmosses are abundant throughout stand. Average canopy tree diameter is 8-10". It was difficult to separate canopy from subcanopy trees, due to the early successional structure.

**PB48:** (Sugar maple - beech - yellow birch forest) On proposed ski glade. This is a paper birch stand with a dense striped maple subcanopy. The average diameter of canopy trees is 8-10". The site is a moderately steep, west-facing slope.

**PB50:** (Hemlock - spruce - northern hardwood forest) On proposed ski glade. This is a second-growth mixed forest on a low slope. Quaking aspen and hemlock are the most abundant canopy species, with red and striped maple most frequent in the subcanopy. The average diameter of canopy tree is 5-7". There are numerous seepy drainages along the lower slope, including in the plot, which has a number of herbaceous seepage indicators, including foamflower, rough sedge, and dwarf raspberry.

**PB46:** (Sugar maple - beech - yellow birch forest) On proposed ski glade. This is a second growth northern hardwood stand at the base of a moderately steep slope. Sugar maple is dominant in the canopy and subcanopy. The average diameter of canopy trees is 5-7".

**PB45:** (Sugar maple - beech - yellow birch forest) On proposed ski track. This is a second-growth northern hardwood stand on a gentle lower slope. Sugar maple dominates the canopy, with beech most abundant in the subcanopy and shrub layers.

# Compartment 34

Surveyed Stands

## Comp 34_Stand 67: Sugar maple – beech- yellow birch

| **Compartment:** 34 | **Stand:** 67 | **FSVeg Std ID:** | |
|---|---|---|---|
| **VGS Points:** | | | |
| **WP16:** 44.33823, -71.22744 | **Slope (%):** 0 | **Aspect:** 127 | **Wet:** Seep nearby |

| |
|---|
| **Date(s):**<br>**Observer(s):** NH Natural Heritage Bureau |
| **TES/TES Habitat:** none found |
| **NNIS:** none found |
| **Cultural:** |
| **Special Notes:** |
| **Summary:**<br><br>**VGS Descriptions**<br>**WP16:** Some big sugar maple & white ash around. Dense beech regen. Multiple canopy openings nearby. Seepy area ~50x20' nearby |

## Comp 34_Stand 89: Northern hardwood

| | | | |
|---|---|---|---|
| **Compartment:** 34 | **Stand:** 89 | | **FSVeg Std ID:** |
| **VGS Points:** | | | |
| **PB79:** 44.338774, -71.221088 | **Slope (%):** 71 | **Aspect:** 258 | **Wet:** |
| **Date(s):** 09/21/21<br>**Observer(s):** ESD | | | |
| **TES/TES Habitat:** none found | | | |
| **NNIS:** none found | | | |
| **Cultural:** | | | |
| **Special Notes:** | | | |
| **Summary:**<br><br>**VGS Descriptions**<br>**PB79:** This site has definitely had some disturbance in the past as evidenced by and old road, now a meadow, piles of dumped rock and concrete, and proximity to current road and dumping site. Early successional forest dominated by paper birch and quaking aspen and younger red maple and ash | | | |

## Comp 34_Stand 79

| | | | |
|---|---|---|---|
| **Compartment:** 34 | **Stand:** 79 | | **FSVeg Std ID:** |
| **VGS Points:** | | | |
| **PB72:** 44.336723, -71.21508 | **Slope (%):** 0 | **Aspect:** 0 | **Wet:** Perennial stream nearby |
| **Date(s):** 09/15/21<br>**Observer(s):** ESD | | | |

| | |
|---|---|
| **TES/TES Habitat:** none found | |
| **NNIS:** none found | |
| **Cultural:** possibly site of former farm field | |
| **Special Notes:** | |

**Summary:**

Signs of old fence line along the higher bench.; barbed wire wrapped around some larger trees. In the north part of the stand, there is a lower elevation bench and is basically in the water channel intermittently.

**VGS Descriptions**

**PB72:**

## Comp 34_Stand 80: Hemlock-spruce-northern hardwood

| **Compartment:** 34 | **Stand:** 80 | **FSVeg Std ID:** | |
|---|---|---|---|
| **VGS Points:** | | | |
| **PB70:** 44.335213, -71.215557 | **Slope (%):** 0 | **Aspect:** 0 | **Wet:** seep nearby |
| **Date(s):** 09/10/21<br>**Observer(s):** ESD | | | |
| **TES/TES Habitat:** none found | | | |
| **NNIS:** none found | | | |
| **Cultural:** part of Dolly Copp homestead? | | | |
| **Special Notes:** A trail from the campground traverses the northern part of this stand, although it appears that it gets relatively low use and could use some maintenance. | | | |

**Summary:**

**VGS Descriptions**

**PB70:** Mature hemlock spruce northern hardwood forest in benched terrace as part of greater Peabody river floodplain. Several very large red maples in plot and several very large yellow birch just outside of plot. A couple of potential old cut stumps. Trail from campground goes through northern part of this stand.

## Comp 34_Stand 68: Sugar maple-beech-yellow birch

| **Compartment:** 34 | **Stand:** 68 | **FSVeg Std ID:** | |
|---|---|---|---|
| **VGS Points:** | | | |
| **PB82:** 44.326591, -71.226801 | **Slope (%):** 62 | **Aspect:** 35 | **Wet:** Perennial stream and seep nearby |
| **Date(s):** 10/08/21<br>**Observer(s):** ESD | | | |
| **TES/TES Habitat:** none found | | | |

**NNIS:** none found

**Cultural:**

**Special Notes:**

## Summary:

Generally, an E/SE facing slope with a high component of sugar maple in the canopy and many mid-sized beeches with bear claw marks. A lot of seepy channels flow parallel with each other across the entire stand and seepy wetlands emerge throughout the W portion of the stand. The Daniel Webster Trail traverses the NE section of the stand and there are remnants of old roads throughout.

**VGS Descriptions**

**PB82:** Mixed aged sugar maple-beech-birch forest on NE facing slope with medium sized boulders throughout and large tree snag in plot. Many beech are infected with canker and many are bear clawed. Understory regen composed of striped maple, beech, hemlock, sugar maple. Fairly dense and diverse understory throughout.

## Comp 34_Stand 74: Sugar maple-beech-yellow birch

| **Compartment:** 34 | **Stand:** 74 | **FSVeg Std ID:** | |
|---|---|---|---|
| **VGS Points:** | | | |
| **PB82:** 44.326591, -71.226801 | **Slope (%):** 62 | **Aspect:** 35 | **Wet:** seepy channels throughout |

**Date(s):** 10/08/21

**Observer(s):** ESD

**TES/TES Habitat:** none found

**NNIS:** none found

**Cultural:**

**Special Notes:**

## Summary:

Generally, an E/SE facing slope with a high component of sugar maple in the canopy and many mid-sized beeches with bear claw marks. A lot of seepy channels flow parallel with each other across the entire stand and seepy wetlands emerge throughout the W portion of the stand. The Daniel Webster Trail traverses the NE section of the stand and there are remnants of old roads throughout.

**VGS Descriptions**

**PB82:** Mixed aged sugar maple-beech-birch forest on NE facing slope with medium sized boulders throughout. Many beech are infected with canker and many are bear clawed. Understory regen composed of striped maple, beech, hemlock, sugar maple. Fairly dense and diverse understory throughout.

# Stand of Interest: Compartment 33

## Comp 33_Stand 60: Lowland Spruce-Fir Forest/Swamp System

| | | | |
|---|---|---|---|
| **Compartment:** 33 | **Stand ID:** 60 | **FSVeg Std ID:** | |
| **VGS Points:** | | | |
| **PB34:** 44.346596, -71.209867 | **Slope (%):** 19 | **Aspect:** 189 | **Wet:** seep nearby |
| **PB35:** 44.344242, -71.212722 | **Slope (%):** 14 | **Aspect:** 12 | **Wet:** seep present |
| **PB36:** 44.345448, -71.214739 | **Slope (%):** 3 | **Aspect:** 130 | **Wet:** seep present |
| **PB53:** 44.345832, -71.213738 | **Slope (%):** 11 | **Aspect:** 105 | **Wet:** seep present |
| **PB54:** 44.345384, -71.212694 | **Slope (%):** 12 | **Aspect:** 110 | **Wet:** seep present |

**Date(s):** Aug/Sept 2020 & Oct 2021

**Observer(s):** ESD, DDS, NH Natural Heritage Bureau

**TES/TES Habitat/Natural Communities:** Habitat for RFSS plants *Neottia convallarioides* (lily-leaved twayblade) and *Neottia cordata* (heart-leaved twayblade), but none were observed during partial surveys. Exemplary natural community system (Lowland Spruce-Fir Forest; Red Spruce Swamp; Hemlock-Spruce Forest).

**NNIS:** none

**Cultural:** Cast iron stove found on west end of stand, downhill of Bear Springs Snomo trail, possibly was disposed of there.

**Special Notes:** multiple perennial streams, not all on hydrology layer in GIS

**Summary:**

Lowland spruce-fir forest/swamp systems occur in lowland settings below 2,500 ft. They are most well developed north of the White Mountains and are less frequent and form smaller patch sizes within the White Mountains due to topography. The lowland spruce-fir forest/swamp system is about 35-40 acres at this site and includes very poorly drained soils in the wettest areas ranging to moderately well drained soils on higher ground. The degree of wetness determines the natural community gradient within the basin: hemlock – spruce and lowland spruce-fir forests are found on moderately well to poorly drained soils on somewhat higher ground, and red spruce swamp is found in poorly to very poorly drained areas. *Picea rubens* and *Abies balsamifera* (see species list for PB36,54) dominate canopy and understory, with lesser amounts of *Tsuga canadensis* (hemlock). There is high bryophyte cover, a broad diversity of herbs, and complex vertical and horizontal structure, perennial and ephemeral streams, seeps and springs scattered through the basin. In areas, streams drop beneath rocks and roots on the forest floor before reemerging downstream. At least two historic beaver dams have altered the hydrology within pockets of the forest, which created wet meadow/wetland openings that support a high diversity of wetland herbaceous and shrub species. Overall, the basin forms a cold-air pocket that contributes to the micro-climate the montane and boreal plants thrive in.

Geologically, the low, flat basin within Stand 60 (see lidar map) may be the result of water-deposited fine sediments (silt and sand) in a small glacial lake behind an ice or debris dam; subsequent failure of

the dam and rapid drainage of the lake may have produced the deeply entrenched ravine immediately below the outlet of the basin. Other evidence of post-glacial depositional environment includes what appear to be sandy kame deposits with small pock-mark depressions (see lidar) covering dozens of acres north and south of the basin, and possibly the result of ice blocks being stranded in an active depositional environment. The tree canopy in mature lowland spruce-fir forests tends to be patchy, with areas of dense young trees, standing dead trees, and areas of large trees with an open understory. This patchy character is the result of wind storms, naturally-occurring insect outbreaks, and openings created by beaver impoundments. Signs of this kind of vertical and horizontal complexity are evident in this stand.

There are not many exemplary or old growth examples of lowland spruce-fir forests in NH; large exemplary examples in the White Mountain National Forest are even rarer, and there are no documented old growth examples. This is primarily due to good accessibility and the history of logging in these areas. This example is mature and approaching late successional, with 110-150 year old spruces, and 150-200 year old scattered hemlocks. It was likely partially harvested around 1880, with some more recent cutting around the margins since then.

The lowlands around Church Pond and Elbow Pond are two examples of low elevation spruce-fir forest on WMNF. Norton Pool in Pittsburg is the only documented old growth lowland spruce-fir forest in the state.

(Sources: New Hampshire Wildlife Action Plan, NH Fish and Game, 2015; Natural Community Systems of New Hampshire, NH Natural Heritage Bureau, 2005)

ELT 115a: Softwood-Hardwood Lower Slopes and Depressions with Thick Compacted Sediments (see appendix)

**VGS Point Descriptions**

**PB34:** This is a mixed forest on gentle terrain. The canopy is a mix of hemlock, yellow birch, and red maple. Beech and red spruce saplings are common in the shrub layer. The average canopy tree diameter is 10-12".

**PB35:** (Hemlock - spruce - northern hardwood forest) This site supports young (to maturing) hemlock – spruce – northern hardwood forest which is currently dominated primarily by red spruce and paper birch. Balsam fir and hemlock have strong regeneration in the shrub and/or herbaceous strata. Pit and mound topography is strongly evident at this site. The herbaceous stratum is dense in moister locations while the shrub stratum is dense throughout.

**PB36:** (Lowland spruce - fir forest) Young to maturing lowland spruce – fir forest occurs here on very hummocky ground with groundwater seepage close to surface under the hummocks, and numerous stream courses nearby. The herbaceous stratum is fairly dense and diverse; includes twinflower, creeping wintergreen and three-seeded sedge. The shrub stratum is sparse and is solely occupied by striped maple.

**PB53:** (Lowland spruce - fir forest) This site supports young to maturing lowland spruce – fir forest on seepy and rocky terrain, with seepage flowing directly below tree root masses. The community has very notable red spruce, hemlock and balsam fir regeneration in the shrub and herbaceous strata on rocky, hummocky terrain.

**PB54:** (Lowland spruce - fir forest) Young to maturing lowland spruce – fir forest occurs here adjacent to a seepage wetland. The canopy is fairly open, while the herb stratum is dense and diverse and

includes a number of wetland species. The seepage wetland is dominated by speckled alder, sedges and Sphagnum moss.

**Tree Cores:**

| Tree ID | Lat | Long | DBH (in) | Oldest Ring | Ring count (est. min age) | Notes |
|---|---|---|---|---|---|---|
| Picea rubens 1 | 44.346974 | -71.217137 | 19.2 | 1886 | 135 | |
| Picea rubens 2 | 44.346932 | -71.217545 | 15.6 | 1913 | 108 | |
| Picea rubens 3 | 44.346932 | -71.217545 | 18.2 | 1878 | 143 | |
| Tsuga canadensis 1 | 44.346932 | -71.217545 | 16 | 1914 | 107 | missing center |
| Tsuga canadensis 2 | 44.346932 | -71.217545 | 21.1 | 1829 | 192 | Release date: 1882 |
| Tsuga canadensis 3 | 44.345924 | -71.216646 | 17.4 | 1871 | 150 | Release date: 1881 |

192
108
135
107
143
150
VGS Points Stand 60
Comp 33 Stand 60
Tree ages (min)
1,000
500
0
1,000 Feet
N

Peabody W C33S60 Lidar Map
Peabody River
Barnes Brook
Comp 33 Stand 60
2,600 1,300 0 2,600 Feet
N

# Stand of interest: Compartment 34

## Comp 34_Stands 81 and 77: Hemlock -Spruce – Northern Hardwood Forest (Late Successional/ Old Growth and Exemplary Natural Community)

| | | | |
|---|---|---|---|
| **Compartment:** 34 | | **Stand:** 81 (& 77) | **FSVeg Std ID:** |
| **VGS Point** | | | |
| **PB80:** 44.33961, -71.21605 | **Slope:** 21 | **Aspect:** 177 | **Wet:** seep/perennial stream nearby |
| **Dates:** 07/26/2021, 09/29/2021, 10/20/2021<br>**Observer(s):** ESD, AB, AW (volunteer), DDS | | | |
| **TES/TES Habitat:** none found | | | |
| **NNIS:** none found | | | |
| **Cultural:** none found | | | |
| **Special Notes:** Stand 81 is an apparent continuation of the OG/LS forest of Stand 77 | | | |
| **Summary:**<br>Stand 81 is a continuation of old growth/late successional (OG/LS) forest from S77 with mature hemlock, red spruce, and red maple. Strong pit and mound topography, no obvious sign of logging, although there are some old skid roads that lead to the stand to the north (Stand 61) | | | |

where there is much more obvious evidence of logging, i.e. stumps present and forest is comprised of younger, shade intolerant hardwoods, such as *Acer rubrum*, *Betula papyifera*, *Fagus grandifolia*.

Stand 77 is also clearly late successional and probable old growth. Spruce and hemlock exceeding 200 years of age are frequent, with some hemlock exceeding 280 years (some ring counts in the mid-100s were rotten or not near pith, so ages likely exceed the ring counts in these cases). There is a diversity of coarse woody debris and standing dead or snapped trees of various sizes and degrees of decomposition, including many large dead and downed trees. The Manomet Late Succession Index confirmed that the density of large (16" +) trees is consistent with documented old growth characteristics of upland spruce – fir forest in New England.

Hemlock – Spruce – Northern Hardwood Forest communities are common in the lowlands of the WMNF, being more common than lowland spruce-fir forest below 2000 ft. elevation. Examples on terrace flats, and those on slopes of ravines and stream drainages, are more commonly dominated by hemlock and spruce with fewer northern hardwoods. More mixed composition of this type with northern hardwoods are found on finer till or terrace sediments, and in early to mid-successional examples.

**PB80:** Hemlock-spruce northern hardwood, possible late successional. Tree cored within plot. Canopy gaps have a lot of hemlock regen. There is a seep in the lower area with herbaceous growth, but otherwise the herb layer is fairly sparse.

**Tree Cores:**

Mature tress within stand are up to and over 200 years old.

| Tree ID | DBH (in) | Oldest Ring | Ring count (min age) | Notes |
|---|---|---|---|---|
| Picea rubens 1 | 19.6 | 1820 | 201 | stand 81 |
| Tsuga canadensis 1 | 24.7 | 1892 | 129 | stand 81; Missing curvature |
| Tsuga canadensis 2 | 24.9 | 1874 | 147 | stand 81; Missing curvature |
| Picea rubens 1* | 21.9 | 1857 | 164 | *stand 77 |
| Picea rubens 2* | 32.1 | 1815 | 206 | *stand 77 |
| Tsuga canadensis 1* | 14.5 | 1741 | 280 | *stand 77 |
| Tsuga canadensis 2* | | 1907 | 114 | *stand 77, only have outer 3.75" of core |

**Manomet Late Successional Index (LSI) Score**

All plots that were measured surpassed the threshold of economically mature/late successional forest according to the Manomet LSI except for one, which is on the far west of the stand outside the boundary of the LS forest (see map below). Ten of the thirteen plots measured surpass the threshold for old growth according to the Manomet LSI with an LSI score of 9 or 10.

| Site | Lat | Long | Trees/plot (0.25 acre) | LSI Score |
|---|---|---|---|---|
| LS1 | 44.33948 | -71.2162 | 16 | 10 |
| LS2 | 44.33988 | -71.2157 | 26 | 10 |

| | | | | |
|---|---|---|---|---|
| LS3 | 44.33993 | -71.217 | 9 | 9 |
| LS4 | 44.3401 | -71.2178 | 2 | 5 |
| LS5 | 44.34963 | -71.2147 | 8 | 8 |
| LS6 | 44.33963 | -71.2147 | 22 | 10 |
| LS7 | 44.34023 | -71.2127 | 19 | 10 |
| LS8 | 44.34011 | -71.2114 | 20 | 10 |
| LS9 | 44.34006 | -71.2098 | 17 | 10 |
| LS10 | 44.33952 | -71.2116 | 19 | 10 |
| OG1 (St77) | 44.33817 | -71.2161 | 12 | 10 |
| OG2 (St77) | 44.33829 | -71.2151 | 14 | 10 |
| PB80 (St77) | 44.33961 | -71.2161 | 6 | 7 |

Late Successional Index Score
Stands 77 & 81
61
19
20
17
2
9
26
6
16
81
22
10
94
12
14
Bear Spring Brook
Peabody River
Barnes Brook
79
Legend
Large Trees Plot (0.25 acre)
Peabody_Proposed_Units_2021_0505
500 250 0 500 Feet
N

**Manomet Late Successional Index (LSI) Table** (Whitman & Hagan 2007)

| LS Index Score | Number of large (≥ 16" DBH) trees (alive or dead) | | | |
|---|---|---|---|---|
| | Percentile of OG stands | / plot | / acre | / ha |
| 0 | 0 | 0 | 0 | 0 |
| 1 | 0 | 1 | 1-2 | 1-9 |
| 2 | 0 | 2 | 3-5 | 10-14 |
| 3 | 0 | 3-4 | 6-9 | 15-24 |
| 4 | 0 | 5-6 | 10-13 | 25-34 |
| 5 | 0 | 7-8 | 14-17 | 35-44 |
| 6 | < 4 | 9-10 | 18-21 | 45-54 |
| 7 | 20 | 11-13 | 22-27 | 55-69 |
| 8 | 48 | 14-17 | 28-35 | 70-89 |
| 9 | 76 | 18-20 | 36-40 | 90-100 |
| 10 | 100 | >20 | >40 | >100 |

Threshold between economic mature and LS stages (between scores 5 and 6)

Threshold above which a stand is old-growth or is statistically similar to old-growth (between scores 9 and 10)

**Historic Evidence for Forest Continuity**

- Dolly Copp Homestead (dates)
- 1921 became public campground
- Map drawn in 1915 after USFS purchased land from Libby & Sons indicated the areas in current day stand 77 & 81 were forested.

## Comp 34_Stand 71, 72, 75: Hemlock -Spruce – Northern Hardwood Forest (Late Successional/ Old Growth and Exemplary Natural Community)

| **Compartment:** 34 | **Stand:** 71, 72, 75 | | **FSVeg Std ID:** |
|---|---|---|---|
| **VGS Point IDs:** | | | |
| **PB73:** 44.310045, -71.225427 | **Slope:** 5 | **Aspect:** 34 | **Wet:** perennial stream nearby |
| **PB74:** 44.311991, -71.223387 | **Slope:** 2 | **Aspect:** 65 | **Wet:** intermittent stream nearby |
| **PB75:** 44.316108, -71.218666 | **Slope:** 0 | **Aspect:** 0 | **Wet:** perennial stream nearby |
| **SOI:** 44.31357, -71.220008 | **Slope:** 0 | **Aspect:** 0 | **Wet:** perennial stream nearby |
| **PB84:** 44.302024, -71.238655 | **Slope:** 40 | **Aspect:** 73 | **Wet:** |
| **Date:** 9/16/2021, 9/17/2021, 10/22/2021<br>**Observer(s):** ESD, DDS | | | |
| **TES/TES Habitat:** *Vaccinium cespitosum* (alpine bilberry) – NH state listed.<br>Potential *Neottia auriculata*, *Pyrola asarifolia* habitat on floodplains, terraces, and overflow channels**.**<br>Wet, mossy stream channel cutting through terrace forest (*P. asarifolia*).<br>*N. auriculata* is strongly associated with rivers that deposit sediments and are routinely scoured—usually in floodplain---within sandy alluvial or outwash deposits (NHNHI 2001). | | | |
| **NNIS:** A small amount of Tansy (*Tanacetum vulgare*) and colt's foot (*Tussalago farfara*) along riverbank. | | | |
| **Cultural:** A large metal tub and glass bottles within the floodplain of the north part of the stand. | | | |
| **Special Notes:** The primary area of late-successional and old growth forest occurs along the lower portion of the West Branch of the Peabody River down to and beyond the confluence with the Peabody River. | | | |
| | | | |
| **Summary:**<br>This mature hemlock – spruce forest occurs along the north side, lower section of the West Branch of the Peabody River and the adjacent terrace/floodplain by the junction with the Peabody River mainstem. This narrow band of forest along the river contains the lower part of the Great Gulf trail. Numerous areas exceed the index threshold for late successional/old growth using the Manomet LS | | | |

index (Whitman and Hagan 2007). Some cored spruce and hemlock exceeded 200 years of age, at least one cored spruce exceeded 300 years. There is a diversity of coarse woody debris and standing dead or snapped trees of different sizes and degrees of decomposition, including many large dead and downed trees in some places, particularly the lower southern? 2/3 of the mapped area. Strong pit and mound topography is evident, with no obvious signs of logging. A short distance upslope into hardwoods there is more obvious evidence of logging, i.e. stumps present and younger forest including shade intolerant hardwoods, *Acer rubrum* (red maple), *Betula papyifera* (paper birch), as well as *Fagus grandifolia* (American beech).

The old and maturing hemlock and red spruce are accompanied by scattered old red maples, *Betula allegheniensis* (yellow birch), and other hardwoods, but this is primarily a softwood dominated stand.

Much of the EO along the West Branch is on high terrace and not currently flooded, but lower terrace areas have some channels that flooded historically or may still flood at high water. These old channel features have embedded seeps and swampy areas and floodplain characteristics. The low terrace area on the east side of the Peabody River by the junction with the West Branch contains numerous active and ancient overflow channels with a diversity of plant species. Dominant and common species in the understory include *Medeola virginiana, Oxalis montana, Dryopteris intermedia, Mitchella repens, Pyrola elliptica, Oclemena acuminata, Cinna latifolia, Osmunda cinnamomea, Uvularia sessilifolia, Mainanthemum canadense, Aralia nudicaulis*. In lower terrace floodplain regions, typical herbaceous species of floodplain forests including *Brachyelytrum aristosum, Vaccinium angustifolium, Thelypteris noveboracensis,* are present, while in perennially flooded river channels at higher elevations, large areas of sphagnum moss and *Pyrola* sp. colonies abound.

Hemlock – Spruce – Northern Hardwood Forest communities are common below 2000 ft. elevation in the lowlands of the WMNF (more common than lowland spruce-fir forest). Examples on terrace flats, and those on slopes of ravines and stream drainages, are more commonly dominated by hemlock and spruce with fewer northern hardwoods, as is this example. More mixed composition of this type (with northern hardwoods mixed in) are found on finer till or terrace sediments, and in early to mid-successional examples, and gaps among the hemlock and spruce.

**VGS Descriptions**

**PB73:** On benched slope next to W branch of Peabody. Uphill of here, to NW, there is evidence of logging; younger forest and increased beech component. No evidence of logging here in this maturing hemlock-spruce northern hardwood forest. Ski trail is about 500ft to NW. Some places in stand have a much more diverse understory along with similar forest type.

**PB74:** More representative of lower floodplain area. Hemlock-spruce northern hardwood forest, high diversity, fairly mature forest.

**PB75:** Bench between two main channels of Peabody River. Fairly young forest dominated by paper birch. One very large (>36' DBH) white pine nearby.

**SOI:** Several very mature hemlocks along river. (Point taken for LSI score)

**PB84:** Fairly open canopy and subcanopy, mainly dominated by *Acer rubrum* and *Betula allegeniensis*. Dense hobblebush layer with moderate *Picea rubens* regen. in shrub layer. Deep layer of leaf litter and since it's late in season, likely an incomplete herb layer documented. Gently sloping and with many large erratic boulders, more boulders outside of plot. Elev. 1650ft.

## Manomet Late Successional Index (LSI) Score

All plots that were measured surpassed the threshold of economically mature/late successional forest according to the Manomet LSI. Twelve of the fourteen plots measured surpass the threshold for old growth according to the Manomet LSI with an LSI score of 9 or 10 (yellow highlight).

| Site | Lat | Long | Trees/plot (0.25 acre) | LSI Score |
|---|---|---|---|---|
| LSI11 | 44.31163 | -71.2224 | 23 | 10 |
| PB74 | 44.31199 | -71.2234 | 7 | 8 |
| PB73 | 44.31005 | -71.2254 | 8 | 8 |
| LSI10A | 44.31196 | -71.2222 | 16 | 10 |
| LSI11A | 44.31304 | -71.2218 | 9 | 9 |
| LSI12 | 44.31166 | -71.2229 | 14 | 10 |
| LSI13 | 44.3052 | -71.2316 | 10 | 9 |
| LSI14 | 44.31145 | -71.2193 | 9 | 9 |
| LSI15 | 44.31183 | -71.2194 | 15 | 10 |
| LSI16 | 44.31292 | -71.2196 | 18 | 10 |
| LSI17 | 44.31351 | -71.2188 | 11 | 10 |
| LSI18 | 44.31404 | -71.2189 | 14 | 10 |
| LSI19 | 44.31364 | -71.2196 | 11 | 10 |
| LSI20 | 44.31311 | -71.2201 | 13 | 10 |

Peabody W Comp 34 Stand 71
# of large trees/plot (0.25 acres)
West Branch Peabody River
Peabody River
N
Lg Trees/plot
Hike
Cross Country Ski
Peabody_Stands_2020_0714
Peabody_Proposed_Units_2021_0505
1,100 550 0 1,100 Feet

**Tree Cores:**

Mature tress within stand are up to and over 300 years old.

| Compt/Stand/Species/ID | DBH (in) | Origin | Ring Count (min age) | Notes |
|---|---|---|---|---|
| PW_C34S71_BETALL | 15.9 | 1888 | 133 | wide curvature |
| PW_C34S71_PICRUB_1 | 19.7 | 1839 | 182 | close to pith; release dates: 1857 & 1888-present |
| PW_C34S71_PICRUB_2 | 24 | 1722 | 299 | curvature; release date: 1875 |
| PW_C34S71_PICRUB_3 | 21.7 | 1874 | 147 | close to pith |
| PW_C34S71_PICRUB_4 | 25.2 | 1881 | 140 | missing curvature |
| PW_C34S71_PICRUB_5 | 19.3 | 1832 | 189 | wide curvature |
| PW_C34S71_PICRUB_6 | 21.8 | 1822 | 199 | curvature |
| PW_C34S71_PICRUB_7 | 16.9 | 1839 | 182 | curvature |
| PW_C34S71_TSUCAN_1 | 7.9 | 1920 | 101 | close to pith; understory tree |
| PW_C34S71_TSUCAN_2 | 23.3 | 1927 | 94 | curvature |
| PW_C34S71_TSUCAN_3 | 22.6 | 1837 | 184 | missing curvature |
| PW_C34S71_TSUCAN_4 | 24.6 | 1854 | 167 | curvature; release date: 1886 or 1888 |
| PW_C34S71_TSUCAN_5 | 24.7 | 1855 | 166 | curvature |
| PW_C34S71_TSUCAN_6 | 23.6 | 1750 | 271 | some curvature; missing center |
| PW_C34S71_TSUCAN_7 | 22.4 | 1860 | 161 | curvature; missing rings |
| PW_C34S72_PICRUB_1 | 21.5 | 1846 | 175 | curvature; release date: 1888 |
| PW_C34S72_PICRUB_2 | 22 | 1905 | 116 | wide curvature |
| PW_C34S75_PICRUB_1 | 18.5 | 1883 | 138 | close to pith |

*note: highlighted ring counts are likely 150+ year old trees, based on proximity to pith (curvature) and addition of years (est. 10) to reach core height.

Peabody W Comp 34 Stand 71-North
Min Tree Age
182
271
199
166
133
182
101
147
189
140
299
161
Peabody River
West Branch Peabody River
N
Tree cores (min age)
Peabody_Stands_2020_0714
Hike
Cross Country Ski
520 260 0 520 Feet

Peabody W Comp 34 Stand 71, 72, 75
Min Tree Age
94
184
175
138
West Branch Peabody River
N
Hike
Cross Country Ski
Tree cores (min age)
Peabody_Stands_2020_0714
Peabody_Proposed_Units_2021_0505
900 450 0 900 Feet

# Appendix A

**Ecologic Land Type 115a (Comp33 Stand 60)**

**Softwood-Hardwood Lower Slopes and Depressions with Thick Compacted Sediments**

Geomorphic History and Typical Landforms – Slack water, glaciofluvial deposition and subsequent sub-glacial compaction forming overall concave shaped lower mountain slopes and depressional areas on broad basin-like positions. Slope gradients and local relief are very low and surface drainageways are very closely spaced, well-branched and unentrenched to slightly entrenched.

Soil Substrata – Soil materials beneath the surface one to three feet are very thick, slightly to densely compact, very firm, typically slightly plastic, poorly graded fine sandy loam to silt loam. Subrounded cobbles and boulders are typically less than 20% by volume, and substrata are wet throughout the year.

Forest Association – The climax tree association is red spruce and balsam fir, locally ranging from a dominance of spruce to about equal proportions of both species. Beech and hemlock may be part of the climax association. The subclimax consists of red maple, yellow and paper birch. The pre-subclimax includes aspen and striped maple.

Inclusions – Included in this map unit are small, scattered areas of land types 115c and 111, which comprise up to 30% of the total area of the unit. Also, substrata contain up to 40% by volume of subangular boulders.

Variants – Several areas, up to 200-300 acres each in extent of variant of this land type, having substrata of silty cobbles, with the cobbles rounded and up to 60% by volume; but with otherwise typical landforms and tree associations, is located in the vicinity of Josh and Schoolhouse Brooks. Another variant totaling about 700 acres is distributed as several areas, two of these along the Madison Gulf Trail south of the West Branch of the Peabody River, another just north of New River and another just north of the Seven-Mile post along the Jefferson Notch Road. This variant has a very bouldary, compact, impermeable, poorly graded, imperfectly drained sandy loams, surface drainageways are very closely spaced and slightly to well-entrenched and slopes are moderately steep to gentle and the landforms occur at moderately high elevations. Tree associations are essentially the same as modal land type 115a.

# Appendix B: Species Lists

## Comp33_Stand 60: Species List

| Date | VGS Point | Strata | Species | Abundance |
|---|---|---|---|---|
| 8/27/2020 | PB34 | canopy | *Tsuga canadensis* | Common |
| 8/27/2020 | PB34 | canopy | *Betula alleghaniensis* | Common |
| 8/27/2020 | PB34 | canopy | *Acer rubrum* | Common |
| 9/15/2020 | PB35 | canopy | *Picea rubens* | Dominant |
| 9/15/2020 | PB35 | canopy | *Betula papyrifera* | Common |
| 9/15/2020 | PB35 | canopy | *Acer rubrum* | Occasional |
| 9/15/2020 | PB36 | canopy | *Picea rubens* | Dominant |
| 9/15/2020 | PB36 | canopy | *Abies balsamea* | Dominant |
| 9/15/2020 | PB36 | canopy | *Betula papyrifera* | Common |
| 9/15/2020 | PB36 | canopy | *Acer rubrum* | Occasional |
| 9/15/2020 | PB36 | canopy | *Pinus strobus* | Occasional |
| 9/15/2020 | PB53 | canopy | *Picea rubens* | Dominant |
| 9/15/2020 | PB53 | canopy | *Acer rubrum* | Common |
| 9/15/2020 | PB53 | canopy | *Betula papyrifera* | Common |
| 9/15/2020 | PB53 | canopy | *Tsuga canadensis* | Occasional |
| 9/15/2020 | PB54 | canopy | *Picea rubens* | Dominant |
| 9/15/2020 | PB54 | canopy | *Abies balsamea* | Dominant |
| 8/27/2020 | PB34 | subcanopy | *Picea rubens* | Occasional |
| 8/27/2020 | PB34 | subcanopy | *Acer pensylvanicum* | Occasional |
| 8/27/2020 | PB34 | subcanopy | *Fagus grandifolia* | Occasional |
| 8/27/2020 | PB34 | subcanopy | *Acer rubrum* | Occasional |
| 9/15/2020 | PB35 | subcanopy | *Picea rubens* | Common |
| 9/15/2020 | PB35 | subcanopy | *Betula alleghaniensis* | Occasional |
| 9/15/2020 | PB35 | subcanopy | *Acer rubrum* | Occasional |
| 9/15/2020 | PB35 | subcanopy | *Abies balsamea* | Occasional |
| 9/15/2020 | PB36 | subcanopy | *Picea rubens* | Common |
| 9/15/2020 | PB36 | subcanopy | *Abies balsamea* | Occasional |
| 9/15/2020 | PB53 | subcanopy | *Picea rubens* | Common |
| 9/15/2020 | PB53 | subcanopy | *Tsuga canadensis* | Occasional |
| 9/15/2020 | PB53 | subcanopy | *Betula papyrifera* | Occasional |
| 9/15/2020 | PB54 | subcanopy | *Abies balsamea* | Common |
| 8/27/2020 | PB34 | shrub | *Fagus grandifolia* | Common |
| 8/27/2020 | PB34 | shrub | *Picea rubens* | Common |
| 8/27/2020 | PB34 | shrub | *Viburnum lantanoides* | Occasional |
| 8/27/2020 | PB34 | shrub | *Pinus strobus* | Occasional |
| 9/15/2020 | PB35 | shrub | *Abies balsamea* | Dominant |
| 9/15/2020 | PB35 | shrub | *Tsuga canadensis* | Common |

| | | | | |
|---|---|---|---|---|
| 9/15/2020 | PB35 | shrub | *Acer pensylvanicum* | Common |
| 9/15/2020 | PB35 | shrub | *Fagus grandifolia* | Occasional |
| 9/15/2020 | PB35 | shrub | *Viburnum lantanoides* | Occasional |
| 9/15/2020 | PB35 | shrub | *Betula alleghaniensis* | Occasional |
| 9/15/2020 | PB36 | shrub | *Acer pensylvanicum* | Occasional |
| 9/15/2020 | PB53 | shrub | *Tsuga canadensis* | Dominant |
| 9/15/2020 | PB53 | shrub | *Picea rubens* | Dominant |
| 9/15/2020 | PB53 | shrub | *Abies balsamea* | Occasional |
| 9/15/2020 | PB53 | shrub | *Sorbus americana* | Occasional |
| 9/15/2020 | PB53 | shrub | *Ilex mucronata* | Occasional |
| 9/15/2020 | PB53 | shrub | *Fagus grandifolia* | Occasional |
| 9/15/2020 | PB54 | shrub | *Alnus incana* | Dominant |
| 9/15/2020 | PB54 | shrub | *Abies balsamea* | Common |
| 9/15/2020 | PB54 | shrub | *Sorbus americana* | Occasional |
| 8/27/2020 | PB34 | herb | *Maianthemum canadense* | Common |
| 8/27/2020 | PB34 | herb | *Abies balsamea* | Common |
| 8/27/2020 | PB34 | herb | *Medeola virginiana* | Common |
| 8/27/2020 | PB34 | herb | *Trientalis borealis* | Occasional |
| 8/27/2020 | PB34 | herb | *Acer rubrum* | Occasional |
| 8/27/2020 | PB34 | herb | *Fagus grandifolia* | Occasional |
| 8/27/2020 | PB34 | herb | *Amelanchier* | Occasional |
| 8/27/2020 | PB34 | herb | *Tsuga canadensis* | Occasional |
| 8/27/2020 | PB34 | herb | *Cypripedium acaule* | Occasional |
| 8/27/2020 | PB34 | herb | *Acer pensylvanicum* | Occasional |
| 8/27/2020 | PB34 | herb | *Viburnum nudum* | Occasional |
| 8/27/2020 | PB34 | herb | *Viburnum lantanoides* | Occasional |
| 8/27/2020 | PB34 | herb | *Lycopodium obscurum* | Occasional |
| 8/27/2020 | PB34 | herb | *Dennstaedtia punctilobula* | Occasional |
| 8/27/2020 | PB34 | herb | *Trillium undulatum* | Occasional |
| 9/15/2020 | PB35 | herb | *Acer pensylvanicum* | Dominant |
| 9/15/2020 | PB35 | herb | *Abies balsamea* | Dominant |
| 9/15/2020 | PB35 | herb | *Sorbus americana* | Common |
| 9/15/2020 | PB35 | herb | *Cornus canadensis* | Common |
| 9/15/2020 | PB35 | herb | *Coptis groenlandica* | Common |
| 9/15/2020 | PB35 | herb | *Gaultheria hispidula* | Occasional |
| 9/15/2020 | PB35 | herb | *Clintonia borealis* | Occasional |
| 9/15/2020 | PB35 | herb | *Trientalis borealis* | Occasional |
| 9/15/2020 | PB35 | herb | *Betula alleghaniensis* | Occasional |
| 9/15/2020 | PB35 | herb | *Dryopteris intermedia* | Occasional |
| 9/15/2020 | PB35 | herb | *Linnaea borealis* | Occasional |
| 9/15/2020 | PB35 | herb | *Ilex mucronata* | Occasional |
| 9/15/2020 | PB36 | herb | *Acer rubrum* | Common |
| 9/15/2020 | PB36 | herb | *Hydrocotyle americana* | Common |

| | | | | |
|---|---|---|---|---|
| 9/15/2020 | PB36 | herb | *Carex trisperma* | Common |
| 9/15/2020 | PB36 | herb | *Cornus canadensis* | Common |
| 9/15/2020 | PB36 | herb | *Osmunda cinnamomea* | Common |
| 9/15/2020 | PB36 | herb | *Sorbus americana* | Occasional |
| 9/15/2020 | PB36 | herb | *Abies balsamea* | Occasional |
| 9/15/2020 | PB36 | herb | *Gaultheria hispidula* | Occasional |
| 9/15/2020 | PB36 | herb | *Coptis groenlandica* | Occasional |
| 9/15/2020 | PB36 | herb | *Linnaea borealis* | Occasional |
| 9/15/2020 | PB36 | herb | *Dryopteris intermedia* | Occasional |
| 9/15/2020 | PB36 | herb | *Oxalis montana* | Occasional |
| 9/15/2020 | PB36 | herb | *Ilex mucronata* | Occasional |
| 9/15/2020 | PB36 | herb | *Vaccinium angustifolium* | Occasional |
| 9/15/2020 | PB53 | herb | *Cornus canadensis* | Common |
| 9/15/2020 | PB53 | herb | *Coptis groenlandica* | Common |
| 9/15/2020 | PB53 | herb | *Osmunda cinnamomea* | Occasional |
| 9/15/2020 | PB53 | herb | *Sorbus americana* | Occasional |
| 9/15/2020 | PB53 | herb | *Vaccinium angustifolium* | Occasional |
| 9/15/2020 | PB53 | herb | *Dryopteris intermedia* | Occasional |
| 9/15/2020 | PB53 | herb | *Picea rubens* | Occasional |
| 9/15/2020 | PB53 | herb | *Abies balsamea* | Occasional |
| 9/15/2020 | PB54 | herb | *Cornus canadensis* | Dominant |
| 9/15/2020 | PB54 | herb | *Osmunda cinnamomea* | Dominant |
| 9/15/2020 | PB54 | herb | *Abies balsamea* | Common |
| 9/15/2020 | PB54 | herb | *Carex trisperma* | Common |
| 9/15/2020 | PB54 | herb | *Carex gynandra* | Common |
| 9/15/2020 | PB54 | herb | *Glyceria melicaria* | Common |
| 9/15/2020 | PB54 | herb | *Rubus pubescens* | Common |
| 9/15/2020 | PB54 | herb | *Acer rubrum* | Occasional |
| 9/15/2020 | PB54 | herb | *Betula alleghaniensis* | Occasional |
| 9/15/2020 | PB54 | herb | *Ilex mucronata* | Occasional |
| 9/15/2020 | PB54 | herb | *Viburnum nudum* | Occasional |
| 9/15/2020 | PB54 | herb | *Maianthemum canadense* | Occasional |
| 9/15/2020 | PB54 | herb | *Coptis groenlandica* | Occasional |
| 10/8/2021 | Other Sp in stand | | *Carex gynandra* | |
| 10/8/2021 | Other Sp in stand | | *Carex trisperma* | |
| 10/8/2021 | Other Sp in stand | | *Calamagrostis canadensis* | |
| 10/8/2021 | Other Sp in stand | | *Carex lurida* | |
| 10/8/2021 | Other Sp in stand | | *Eleocharis palustris* | |
| 10/8/2021 | Other Sp in stand | | *Eupatoriam perforiatum* | |
| 10/8/2021 | Other Sp in stand | | *Juncus effusus* | |
| 10/8/2021 | Other Sp in stand | | *Carex utriculata* | |
| 10/8/2021 | Other Sp in stand | | *Chelone glabra* | |
| 10/8/2021 | Other Sp in stand | | *Carex scoparia* | |

| | | | | |
|---|---|---|---|---|
| 10/8/2021 | Other Sp in stand | | *Carex stipata* | |
| 10/8/2021 | Other Sp in stand | | *Glyceria striata* | |
| 10/8/2021 | Other Sp in stand | | *Glyceria grandis* | |
| 10/8/2021 | Other Sp in stand | | *Potentilla sp.* | |

## Comp 34_Stand 81: Species List

| VGS Point | Strata | Species | Abundance |
|---|---|---|---|
| PB80 | canopy | *Tsuga canadensis* | Dominant |
| PB80 | canopy | *Picea rubens* | Dominant |
| PB80 | canopy | *Acer rubrum* | Common |
| PB80 | canopy | *Betula papyrifera* | Occasional |
| PB80 | canopy | *Populus grandidentata* | Occasional |
| PB80 | subcanopy | *Tsuga canadensis* | Dominant |
| PB80 | subcanopy | *Picea rubens* | Common |
| PB80 | subcanopy | *Acer rubrum* | Common |
| PB80 | subcanopy | *Acer pensylvanicum* | Common |
| PB80 | subcanopy | *Betula papyrifera* | Occasional |
| PB80 | subcanopy | *Fagus grandifolia* | Occasional |
| PB80 | subcanopy | *Abies balsamea* | Occasional |
| PB80 | shrub | *Acer pensylvanicum* | Common |
| PB80 | shrub | *Tsuga canadensis* | Common |
| PB80 | shrub | *Fagus grandifolia* | Common |
| PB80 | herb | *Acer rubrum* | Common |
| PB80 | herb | *Tsuga canadensis* | Occasional |
| PB80 | herb | *Abies balsamea* | Occasional |
| PB80 | herb | *Viburnum lantanoides* | Occasional |
| PB80 | herb | *Cypripedium acaule* | Occasional |

## Comp 34_Stand 71: Species List

| VGS Point | Strata | Species | Abundance |
|---|---|---|---|
| PB73 | canopy | *Picea rubens* | Dominant |
| PB73 | canopy | *Tsuga canadensis* | Dominant |
| PB73 | canopy | *Acer rubrum* | Occasional |
| PB73 | canopy | *Betula papyrifera* | Occasional |
| PB74 | canopy | *Tsuga canadensis* | Dominant |
| PB74 | canopy | *Picea rubens* | Dominant |

| | | | |
|---|---|---|---|
| PB74 | canopy | *Betula alleghaniensis* | Dominant |
| PB74 | canopy | *Acer rubrum* | Common |
| PB74 | canopy | *Betula papyrifera* | Common |
| PB75 | canopy | *Betula papyrifera* | Dominant |
| PB75 | canopy | *Acer rubrum* | Common |
| PB73 | subcanopy | *Acer rubrum* | Common |
| PB73 | subcanopy | *Betula alleghaniensis* | Common |
| PB73 | subcanopy | *Tsuga canadensis* | Common |
| PB73 | subcanopy | *Picea rubens* | Common |
| PB74 | subcanopy | *Betula alleghaniensis* | Common |
| PB74 | subcanopy | *Picea rubens* | Common |
| PB74 | subcanopy | *Tsuga canadensis* | Common |
| PB74 | subcanopy | *Abies balsamea* | Occasional |
| PB75 | subcanopy | *Betula papyrifera* | Common |
| PB75 | subcanopy | *Abies balsamea* | Common |
| PB75 | subcanopy | *Acer pensylvanicum* | Common |
| PB75 | subcanopy | *Fagus grandifolia* | Common |
| PB75 | subcanopy | *Acer rubrum* | Common |
| PB75 | subcanopy | *Betula alleghaniensis* | Occasional |
| PB75 | subcanopy | *Picea rubens* | Occasional |
| PB75 | subcanopy | *Fraxinus americana* | Occasional |
| PB73 | shrub | *Tsuga canadensis* | Dominant |
| PB73 | shrub | *Picea rubens* | Common |
| PB73 | shrub | *Abies balsamea* | Common |
| PB73 | shrub | *Viburnum lantanoides* | Occasional |
| PB74 | shrub | *Viburnum lantanoides* | Dominant |
| PB74 | shrub | *Tsuga canadensis* | Common |
| PB74 | shrub | *Picea rubens* | Common |
| PB74 | shrub | *Acer spicatum* | Common |
| PB74 | shrub | *Abies balsamea* | Common |
| PB74 | shrub | *Fraxinus americana* | Occasional |
| PB74 | shrub | *Fagus grandifolia* | Occasional |
| PB74 | shrub | *Acer saccharum* | Occasional |
| PB75 | shrub | *Pinus strobus* | Common |
| PB75 | shrub | *Picea rubens* | Common |
| PB75 | shrub | *Abies balsamea* | Common |
| PB75 | shrub | *Acer pensylvanicum* | Common |
| PB75 | shrub | *Fagus grandifolia* | Common |
| PB75 | shrub | *Viburnum lantanoides* | Common |
| PB73 | herb | *Picea rubens* | Common |
| PB73 | herb | *Tsuga canadensis* | Common |
| PB73 | herb | *Vaccinium angustifolium* | Occasional |

| | | | |
|---|---|---|---|
| PB73 | herb | *Acer rubrum* | Occasional |
| PB73 | herb | *Cypripedium acaule* | Occasional |
| PB74 | herb | *Acer rubrum* | Common |
| PB74 | herb | *Viburnum lantanoides* | Common |
| PB74 | herb | *Dryopteris intermedia* | Common |
| PB74 | herb | *Rubus pubescens* | Common |
| PB74 | herb | *Oxalis montana* | Common |
| PB74 | herb | *Medeola virginiana* | Common |
| PB74 | herb | *Thelypteris noveboracensis* | Common |
| PB74 | herb | *Acer saccharum* | Occasional |
| PB74 | herb | *Acer spicatum* | Occasional |
| PB74 | herb | *Lonicera canadensis* | Occasional |
| PB74 | herb | *Fraxinus americana* | Occasional |
| PB74 | herb | *Osmunda cinnamomea* | Occasional |
| PB74 | herb | *Mitchella repens* | Occasional |
| PB74 | herb | *Viburnum nudum* | Occasional |
| PB74 | herb | *Carex gracillima* | Occasional |
| PB74 | herb | *Cinna latifolia* | Occasional |
| PB75 | herb | *Abies balsamea* | Common |
| PB75 | herb | *Acer rubrum* | Common |
| PB75 | herb | *Medeola virginiana* | Common |
| PB75 | herb | *Acer saccharum* | Occasional |
| PB75 | herb | *Quercus rubra* | Occasional |
| PB75 | herb | *Betula* sp. | Occasional |
| PB75 | herb | *Viburnum lantanoides* | Occasional |
| PB75 | herb | *Oclemena acuminata* | Occasional |
| PB75 | herb | *Maianthemum canadense* | Occasional |
| PB75 | herb | *Uvularia sessilifolia* | Occasional |
| PB75 | herb | *Aralia nudicaulis* | Occasional |
| PB75 | herb | *Brachyelytrum aristosum* | Occasional |
| PB75 | herb | *Tsuga canadensis* | Occasional |

# Appendix C

## Wetland Comparative Size Rating

ECOLOGICAL INTEGRITY ASSESSMENT MANUAL FOR NEW HAMPSHIRE WETLAND SYSTEMS

(Nichols & Faber-Langendoen, 2021)

| ***8/6/2021 DRAFT*** **– Comparative Size Rating Table** | | | | |
|---|---|---|---|---|
| | **Metric Rating** | | | |
| **Spatial Pattern Type**<br>Wetland System Type | **Excellent (A)** | **Good (B)** | **Fair (C)** | **Poor (D)** |
| **Major Small Patch**<br>Black spruce peat swamp system (southern variant)<br>Coastal conifer peat swamp system<br>Montane/near-boreal minerotrophic peat swamp sys.<br>Temperate minerotrophic swamp system<br>Temperate peat swamp system | >100 ac | 100–20 ac | 20–2 ac | <2 ac |
| **Minor Small Patch**<br>Alpine/subalpine bog system<br>Calcareous sloping fen system<br>Forest seep/seepage forest system<br>Sand plain basin marsh system (montane type) | >5 ac | 5–1 ac | 1–0.25 ac | <0.25 ac |

# References

Crew, Jonathan Cushing. 2021. Dolly Copp and the Peabody Valley, White Mountains, New Hampshire. Article: www.dollycopp.com.

NH Fish and Game, 2015. NH Wildlife Action Plan. Concord, NH.

Nichols, W. F. and D. Faber-Langendoen. 2021. Level 2 Ecological Integrity Assessment Manual for New Hampshire: Wetland Systems. New Hampshire Natural Heritage Bureau, Concord, NH.

Sperduto, D. 2005. Natural Community Systems of New Hampshire. New Hampshire Natural Heritage Bureau, Concord, NH.

Whitman, A.A. and J.M. Hagan. 2004. A rapid-assessment late-successional index for northern hardwoods and spruce-fir forest. Mosaic Science Notes 2004-3. Manomet Center for Conservation Sciences, Brunswick, ME. 8 pp.

Whitman, A.A., and J.M. Hagan. 2007. A late-successional index for temperate and boreal forest. For. Ecol. Manag. 246:144 –154.

Nichols, W. F. and D. Faber-Langendoen. 2021. Level 2 Ecological Integrity Assessment Manual for New Hampshire: Wetland Systems. New Hampshire Natural Heritage Bureau, Concord, NH.

# Appendix D: Maps

Peabody W Comp 34&35-North
VGS Sites
PB80
PB79
OG02
OG01
PB72
PB71
PB70
PB78
PB76
PB82
WP20
Peabody River
N
C34_35_VGS
C34_35_units
Compartments_34_35
Peabody_Proposed Bike Trail
Hike
Snowmobile
Cross Country Ski
2,000
1,000
0
2,000 Feet

Peabody W Comp 34&35-South
VGS Sites
WP20
PB75
SOI
PB74
PB73
PB84
00034
00035
West Branch Peabody River
Peabody River
Cowboy Brook
N
C34_35_VGS
C34_35_units
Compartments_34_35
Hike
Cross Country Ski
2,000 1,000 0 2,000 Feet

Peabody W Compartment 32&33 - West
VGS Sites
C32_33_units
C32_33_units
Compartments_32_33
Peabody_Proposed Bike Trail
Peabody_RecreationProposedGlade
Hike
Snowmobile
PB50-ski
PB46-ski
PB48-ski
PB18-ski
PB19-ski
00033
PB03
PB04_revisit
PB04
PB05_revisit
PB05
PB13
PB01
PB17
PB20
PB02
PB14
PB12
PB07
PB21
PB16
PB15
PB11
PB23
PB22
PB55
PB09
PB10
PB56
Townline Brook
Moose River
00032
PB32
PB53
PB36
PB54
PB35
PB83
N
2,500
1,250
0
2,500 Feet

Peabody W Compartment 32&33 - East
VGS Sites
PB45-ski
PB48-ski
PB44
PB43
PB19-ski
PB20
PB25
PB21
PB22
PB28
PB29
PB31
PB27
PB30
PB32
PB33
PB53
PB34
PB34
PB36
PB54
PB35
PB81
PB41
PB40
PB39
PB38
PB37
PB58
PB57
00033
Peabody River
Townline Brook
N
C32_33_units
C32_33_units
Compartments_32_33
Peabody_Proposed Bike Trail
Peabody_RecreationProposedGlade
Hike
Snowmobile
Cross Country Ski
2,500 1,250 0 2,500 Feet

# Project-level carbon assessment for the Peabody West Integrated Resource Project

Prepared by: Robert Colter

For: Androscoggin Ranger District, White Mountain National Forest

Date: 11/1/2021

## 1.1 Overview of Carbon and Greenhouse Gas Emissions

Forests play a significant role in the global carbon cycle by storing about 1.4 billion metric tons every year. In addition, forests worldwide store over one trillion metric tons of carbon in plants and soil. Forestry has gained attention in recent decades because of its potential to influence the exchange of carbon with the atmosphere, either by increasing storage or releasing carbon emissions. Forests can take up and store atmospheric carbon through photosynthesis and release carbon through mortality, plant respiration, microbial decay, fire, and use of wood fiber. Forests can store carbon in soils and plant material as well as in harvested wood products that store carbon outside of the forest ecosystem. In addition, wood fiber can be used to substitute for products that are more energy-intensive to produce, such as concrete and steel, creating a substitution effect which can result in lower overall greenhouse gas emissions.

A complete and quantitative assessment of forest carbon stocks and the factors that influence carbon trends (management activities, disturbances, and environmental factors) for the White Mountain National Forest is available in the project record (Dugan et al. 2019). This carbon assessment contains additional supporting information as well as references for this proposed action.

## 1.2 Affected Environment

The carbon legacy of the White Mountain National Forest is tied to the history of Euro-American settlement, land management, and disturbances. As the first region to be widely settled in the United States, eastern forests have had a long history of intensive harvesting and conversion of forests to agriculture. Historical disturbance dynamics, forest regrowth and recovery, and forest aging have been most responsible in driving carbon accumulation trends since 1950. Forest carbon stocks in the White Mountain National Forest increased by about 22 percent between 1990 and 2013, which suggests that the National Forest is maintaining a carbon sink (USDA Forest Service, 2015). Any negative effects on carbon stocks caused by disturbances and environmental conditions appear to have been modest and exceeded by forest growth (Dugan et al. 2019).

According to satellite imagery, timber harvesting was the dominant disturbance type on the White Mountain National Forest from 1990 to 2011, although harvesting during this time affected no more than 0.3 percent of the forested area in any given year (USDA Forest Service, in review). During this period, about 2.3 percent of the forested area experienced some level of harvest including even-aged (clearcut, seed tree, shelterwood, and thinning) and uneven-aged (individual and group selection) treatments. Carbon removals from the forest ecosystem associated with harvests have been relatively small compared to the total amount of carbon stored in the forest, with removals from the ecosystem from 1990 to 2011 equivalent to about 1 percent of non-soil carbon stocks (USDA Forest Service, in review). However, these estimates represent an upper bound, because they do not account for continued storage of harvested carbon in wood products or the effect of substitution.

## 1.3 Direct, Indirect, and Cumulative Effects of the Proposed Action

The proposed timber project would be conducted on less than 3,000 acres. This scope and degree of change would be minor, affecting a maximum of 0.5 percent of the approximately 800,000 acres of forested land in the White Mountain National Forest. Aboveground carbon stocks stored as live woody vegetation comprise about 35 percent of the total ecosystem carbon stocks of the White Mountain National Forest (USDA Forest Service 2015). About 39 percent or more of the ecosystem carbon is in the soils, a very stable and long-lived carbon pool (McKinley et al.

2011, USDA Forest Service 2015, Domke et al. 2017). This analysis focuses on effects to aboveground carbon stocks in the Peabody West Integrated Resource Project area.

Climate change is a global phenomenon, because major greenhouse gasses (GHGs)[1] mix well throughout the planet's lower atmosphere (IPCC 2013). Considering emissions of GHGs in 2010 were estimated at 13,336 ± 1,227 teragrams[2] carbon globally (IPCC 2014) and 1,881 teragrams carbon nationally (US EPA, 2015), the Peabody West Project contributes an extremely small amount to overall emissions. Because local GHG emissions mix readily into the global pool of GHGs, it is difficult and highly uncertain to ascertain the indirect effects of emissions from single or multiple projects of this size on global climate. However, given the limited contribution to GHGs at the project-level, it is reasonable to assume that the direct and indirect contribution of the proposed action to GHGs at the global and national scales would be negligible. In addition, because the direct and indirect effects would be negligible, the proposed action's contribution to cumulative effects on global GHGs and climate change would also be negligible. Lastly, carbon emissions during the implementation of the proposed action would have a short-term influence on atmospheric carbon concentrations because carbon will be removed from the atmosphere with time as the forest regrows, further minimizing or mitigating any potential cumulative effects.

The Fifth Assessment Report of the Intergovernmental Panel on Climate Change (IPCC) summarized the contributions of global human activity sectors to climate change (IPCC 2014). From 2000 to 2009, forestry and other land uses contributed just 12 percent of the human-caused global $CO_2$ emissions[3]. The forestry sector's contribution to GHG emissions has declined over the last decade (IPCC 2014, Smith et al. 2014, FAOSTAT 2013). The largest source of GHG emissions in the forestry sector globally is deforestation (Pan et al. 2011, Houghton et al. 2012, IPCC 2014), which is defined as the removal of all trees to convert forested land to other land uses that do not support trees or allow trees to regrow for an indefinite period of time (IPCC 2000) (e.g., conversion of forest land to agricultural or developed landscapes). However, forest land in the United States has had a net increase since the year 2000, and this trend is expected to continue for at least another decade (Wear et al. 2013, USDA Forest Service 2016). In addition, estimates of forested area on the White Mountain National Forest have increased since 1990 (USDA Forest Service 2015).

The proposed activities in the Peabody West Project are not considered a major source of GHG emissions. Forested land would not be converted into a developed or agricultural condition or otherwise result in the loss of forested area. In fact, forest stands are being retained and thinned and/or regenerated to maintain a vigorous condition that supports enhanced tree growth and productivity, thus contributing to long-term carbon uptake and storage. In 2010, forests in the United States removed about 757 megatonnes[4] of $CO_2$ from the atmosphere after accounting for natural emissions (e.g., wildfire and decomposition) (US EPA 2015).

Some assessments suggest that the effects of climate change in some United States forests may cause shifts in forest composition and productivity or prevent forests from fully recovering after severe disturbance (Anderson-Teixeira et al. 2013), thus impeding their ability to take up and store carbon[5] and retain other ecosystem functions and services. Climate change is likely already increasing the frequency and extent of droughts, fires, and insect outbreaks, which can influence forest carbon cycling (Kurz et al. 2009, Allen et al. 2010, Joyce et al. 2014, Vose et al. 2018). In fact, reducing stand density, one of the objectives of this proposed action, is consistent with adaptation practices to increase resilience of forests to climate-related environmental changes (Joyce et al. 2014). This proposed action is consistent with options proposed by the IPCC for minimizing the impacts of climate change on forests, thus meeting objectives for both adapting to climate change and mitigating GHG emissions (McKinley et al. 2011).

---

[1] Major greenhouse gases released as a result of human activity include carbon dioxide ($CO_2$), methane, nitrous oxide, hydrofluorocarbons, and perfluorocarbons.

[2] This report uses carbon mass, not carbon dioxide (CO2) mass, because carbon is a standard unit and can easily be converted to any other unit. To convert carbon mass to CO2 mass, multiply by 3.67 to account for the mass of the oxygen (O2).

[3] Fluxes from forestry and other land use (FOLU) activities are dominated by $CO_2$ emissions. Non-$CO_2$ greenhouse gas emissions from FOLU are small and mostly due to peat degradation releasing methane and were not included in this estimate.

[4] A megatonne is one million metric tons; equal to about 2.2 billion pounds.

[5] The term "carbon" is used in this context to refer to carbon dioxide.

Forests have a "boom and bust" cycle with respect to carbon, as forests establish and grow, experience mortality with age or disturbances, and regrow over time. Forest management activities such as harvests and hazardous fuels reduction have characteristics similar to disturbances that reduce stand density and promote regrowth through thinning and removal, making stands and carbon stores more resilient to environmental change (McKinley et al. 2011, Swanston et al. 2016). The relatively small quantity of carbon released to the atmosphere and the short-term nature of the effect of the proposed action on the forest ecosystem are justified, given the overall change in condition increases the resistance to wildfire, drought, insects and disease, or a combination of disturbance types that can reduce carbon storage and alter ecosystem functions (Millar et al. 2007, Amato et al. 2011). Furthermore, any initial carbon emissions from this proposed action would be balanced and possibly eliminated as the stand recovers and regenerates, because the remaining trees and newly established trees typically have higher rates of growth and carbon storage (Hurteau and North 2009, Dwyer et al. 2010, McKinley et al. 2011).

In the absence of forest harvest, the forest where this proposed action would take place will thin naturally from mortality-inducing natural disturbances and other processes resulting in dead trees that will decay over time, emitting carbon to the atmosphere. Conversely, the wood and fiber removed from the forest in this proposed action would be transferred to the wood products sector for a variety of uses, each of which has different effects on carbon (Skog et al. 2014). Carbon can be stored in wood products for a variable length of time, depending on the commodity produced. It can also be burned to produce heat or electrical energy or converted to liquid transportation fuels and chemicals that would otherwise come from fossil fuels. In addition, a substitution effect occurs when wood products are used in place of other products that emit more GHGs in manufacturing, such as concrete and steel (Gustavasson et al. 2006, Lippke et al. 2011, McKinley et al. 2011). In fact, removing carbon from forests for human use can result in a lower net contribution of GHGs to the atmosphere than if the forest were not managed (McKinley et al. 2011, Bergman et al. 2014, Skog et al. 2014). The IPCC recognizes wood and fiber as a renewable resource that can provide lasting climate-related mitigation benefits that can increase over time with active management (IPCC 2000). Furthermore, by reducing stand density, the proposed action may also reduce the risk of more severe disturbances, such as insect and disease outbreak and severe wildfires, which may result in lower forest carbon stocks and greater GHG emissions. The prescribed treatments would also enhance the diversity of tree species, ages, and structures that are present in forest ecosystems, and this diversity can increase the ability of forests to withstand increasing pressures from climate change and other stressors.

In summary, this proposed project affects a relatively small amount of forest land and carbon on the White Mountain National Forest and, in the near-term, might contribute an extremely small quantity of GHG emissions relative to national and global emissions. This proposed action would not convert forest land to other non-forest uses, thus allowing any carbon initially emitted from the proposed action to have a temporary influence on atmospheric GHG concentrations, because carbon will be removed from the atmosphere over time as the forest regrows. Furthermore, the proposed project would transfer carbon in the harvested wood to the product sector, where it may be stored for up to several decades and substitute for more emission intensive materials or fuels. This proposed action is consistent with internationally recognized climate change adaptation and mitigation practices.

## 1.4 References

Addington, R.N., S.J. Hudson, J.K. Hiers, M.D. Hurteau, T.F. Hutcherson, G. Matusick, and J.M. Parker. 2015. Relationships among wildfire, prescribed fire, and drought in a fire-prone landscape in the south-eastern United States. International Journal of Wildland Fire 24: 778-783.

Agee, J.K. 1998. The landscape ecology of Western forest fire regimes. Northwest Science. 72(Spec. issue): 24–34.

Agee, J. K. and C.N. Skinner. 2005. Basic principles of forest fuel reduction treatments. Forest Ecology and Management 211: 83–96.

Anderson-Teixeira, K.J., A.D. Miller, J.E. Mohan, T.W. Hudiburg, B.D. Duval, and E.H. DeLucia. 2013. Altered dynamics of forest recovery under a changing climate. Global Change Biology 19: 2001–2021.

Allen, C.D., A.K. Macalady, H. Chenchouni, D. Bachelet, N. McDowell, M. Vennetier, and N. Cobb. 2010. A global overview of drought and heat-induced tree mortality reveals emerging climate change risks for forests. Forest Ecology and Management 259: 660–684.

Bergman, R., M.E. Puettman, A. Taylor, and K.E. Skog. 2014. The carbon impacts of wood products. Forest Products Journal 64: 220-231.

Carter, M.C. and C.D. Foster. 2004. Prescribed burning and productivity in southern pine forests: a review. Forest Ecology and management 191: 93–109.

D'Amato, A.W., J.B. Bradford, S. Fraver, and B.J. Palik. 2011. Forest management for mitigation and adaptation to climate change: Insights from long-term silviculture experiments. Forest Ecology and Management 262: 803–816.

Domke, G.M., C.H. Perry, B.F. Walters, L.E. Nave, C.W. Woodall, and C.W. Swanston. 2017. Toward inventory-based estimates of soil organic carbon in forests of the United States. Ecological Applications 27: 1223-1235.

Dugan A, M. Janowiak, and D. McKinley. 2018. Forest carbon assessment for the White Mountain National Forest. March 12, 2019. Report on file at the White Mountain National Forest Supervisor's Office.

Dwyer, J.M., R. Fensham, and Y.M. Buckley. 2010. Restoration thinning accelerates structural development and carbon sequestration in an endangered Australian ecosystem. Journal of Applied Ecology 47: 681–691.

FAOSTAT. 2013. FAOSTAT database. Food and Agriculture Organization of the United Nations, available at http://faostat.fao.org/.

Fowler, C. and E. Konopik. 2007. The history of fire in the southern United States. Human Ecology Review 14: 165-176.

Gustavsson, L., R. Madlener, H.F. Hoen, G. Jungmeier, T. Karjalainen, S. Klöhn, et al. 2006. The role of wood material for greenhouse gas mitigation. Mitigation and Adaptation Strategies for Global Change 11: 1097–1127.

Haffey, C., T.D. Sisk, C.D. Allen, A.E. Thode, and E. Margolis. 2018. Limits to ponderosa pine regeneration following large high-severity forest fires in the United States Southwest. Fire Ecology 14: 143-163.

Houghton, R.A., J.I. House, J. Pongratz, G.R. van der Werf, R.S. DeFries, M.C. Hansen, et al. M.C. 2012. Carbon emissions from land use and land-cover change. Biogeosciences 9: 5125–5142.

Hurteau, M. and M. North. 2009. Fuel treatment effects on tree-based forest carbon storage and emissions under modeled wildfire scenarios. Frontiers in Ecology and the Environment 7: 409-414.

IPCC, 2013. Climate Change 2013: The Physical Science Basis. Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change. Stocker, T.F., D. Qin, G.-K. Plattner, M. Tignor, S.K. Allen, J. Boschung, A. Nauels, Y. Xia, V. Bex and P.M. Midgley (eds.). Cambridge University Press, Cambridge, United Kingdom and New York, NY, USA, 1535 pp. http://www.ipcc.ch/report/ar5/wg1/

IPCC, 2014: Climate Change 2014: Synthesis Report. Contribution of Working Groups I, II and III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change [Core Writing Team, R.K. Pachauri and L.A. Meyer (eds.)]. IPCC, Geneva, Switzerland, 151 pp.

IPCC 2000. Intergovernmental Panel on Climate Change (IPCC), Special Report on Land Use, Land Use Change and Forestry, Summary for Policy Makers, 2000. IPCC, Geneva, Switzerland. 20 pp.

Vose, J.M., D.L. Peterson, G.M. Domke, C.J. Fettig, L.A. Joyce, R.E. Keane, C.H. Luce, J.P. Prestemon, L.E. Band, J.S. Clark, N.E. Cooley, A. D'Amato, and J.E. Halofsky, 2018: Forests. In *Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II* [Reidmiller, D.R., C.W. Avery, D.R. Easterling, K.E. Kunkel, K.L.M. Lewis, T.K. Maycock, and B.C. Stewart (eds.)]. U.S. Global Change Research Program, Washington, DC, USA, pp. 223–258. doi: 10.7930/NCA4.2018.CH6

Kurz, W.A., C.C. Dymond, G. Stinson, G.J. Rampley, E.T. Neilson, A.L. Carroll, T. Ebata, and L. Safranyik. 2008. Mountain pine beetle and forest carbon feedback to climate change. Nature 452: 987–990.

Lippke, B., E. Oneil, R. Harrison, K. Skog, L. Gustavsson, and R. Sathre. 2011. Life cycle impacts of forest management and wood utilization on carbon mitigation: knowns and unknowns. Carbon Management 2:303-333.

McKinley, D.C., M.G. Ryan, R.A. Birdsey, C.P. Giardina, M.E. Harmon, L.S. Heath, et al. 2011. A synthesis of current knowledge on forests and carbon storage in the United States. Ecological Applications 21: 1902-1924.

Millar, C.I., N.L. Stephenson, S.L. Stephens. 2007. Climate change and forests of the future: Managing in the face of uncertainty. Ecological Applications 17: 2145-2151.

Pan, Y., R.A. Birdsey, J. Fang, R. Houghton, P.E. Kauppi, W.A. Kurz, O.L. Phillips, et al. 2011. A large and persistent carbon sink in the world's forests. Science 333: 988–993.

Roccaforte J.P., P.Z. Fule, W.W. Chancellor, and D.C. Laughlin. 2012. Woody debris and tree regeneration dynamics following severe wildfires in Arizona ponderosa pine forests. Canadian Journal of Forest Research 42: 593–604.

Skog, K.E., D.C. McKinley, R.A. Birdsey, S.J. Hines, C.W. Woodall, E.D. Reinhardt, and J.M. Vose. 2014. Chapter 7: Managing Carbon. In: Climate Change and United States Forests, Advances in Global Change Research 57, pp. 151-182.

Smith P., M. Bustamante, H. Ahammad, H. Clark, H. Dong, E.A. Elsiddig, H. Haberl, et al. 2014. Agriculture, Forestry and Other Land Use (AFOLU). In: Climate Change 2014: Mitigation of Climate Change. Contribution of Working Group III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change [Edenhofer, O., R. Pichs-Madruga, Y. Sokona, et al. (eds.)]. Cambridge University Press, Cambridge, United Kingdom and New York, NY, USA. 121 pp.

Stephens, S. L., J.K. Agee, P.Z. Fulé, M.P. North, W.H. Romme, T.W. Swetnam, and M.G. Turner. 2013. Managing Forests and Fire in Changing Climates. Science 342: 41–42.

Swanston, C.W., M.K Janowiak, L.A. Brandt, P.R. Butler, S.D. Handler, P.D. Shannon, A.D. Lewis, K. Hall, R.T. Fahey, L. Scott, A. Kerber, L.R. Parker, and M. St. Pierre. 2016. Forest adaptation resources: climate change tools and approaches for land managers. Gen. Tech. Rep. NRS-GTR-87-2. Newtown Square, PA: US Department of Agriculture, Forest Service, Northern Research Station. 161 p.

USDA Forest Service. 2015. Baseline estimates of carbon stocks in forests and harvested wood products for National Forest System Units, Southern Region. 45 pp.

USDA Forest Service. 2016. Future of America's forests and rangelands: update to the 2010 Resources Planning Act Assessment. General Technical Report WO-GTR-94. Washington, DC. 250 p.

USDA Forest Service. In review. Assessment of the influence of disturbance, management activities, and environmental factors on carbon stocks, Southern Region. 90 pp.

US EPA. 2015. US inventory of greenhouse gas emissions and sinks: 1990 – 2013. Executive Summary. EPA 430-R15-004 United States Environmental Protection Agency. Washington, D.C. 27 pp.

Vose, J.M., D.L. Peterson, G.M. Domke, C.J. Fettig, L.A. Joyce, R.E. Keane, C.H. Luce, J.P. Prestemon, L.E. Band, J.S. Clark, N.E. Cooley, A. D'Amato, and J.E. Halofsky, 2018: Forests. In Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II [Reidmiller, D.R., C.W. Avery, D.R. Easterling, K.E. Kunkel, K.L.M. Lewis, T.K. Maycock, and B.C. Stewart (eds.)]. U.S. Global Change Research Program, Washington, DC, USA.

Waldrop, T. A. and S.L. Goodrick. 2012. Introduction to prescribed fires in Southern ecosystems. Science Update SRS-054.Asheville, NC: U.S. Department of Agriculture Forest Service, Southern Research Station.80 p.

Wear, D.N., R. Huggett, R. Li, B. Perryman, and S. Liu. 2013. Forecasts of forest conditions in regions of the United States under future scenarios: A technical document supporting the Forest Service 2010 RPA Assessment. US Department of Agriculture Forest Service, General Technical Report SRS-170.

Westerling, A.L., H.G. Hidalgo, D.R. Cayan, and T.W. Swetnam. 2006. Warming and Earlier Spring Increase Western U.S. Forest Wildfire Activity. *Science* 313: 940–43.

Wiedinbyer, C. and M.D. Hurteau. 2010. Prescribed fire as a means of reducing forest carbon emissions in the western United States. Environmental Science and Technology 44: 1926-1932.

# Albany South
# Integrated Resource Project

## Water Resources Report

Prepared by:

Sheela Johnson

Revised by:

Landon Gryczkowski

Androscoggin Ranger District
White Mountain National Forest

**Revision dates:** November 23, 2015, April 27, 2017, and June 27, 2017 (Landon Gryczkowski), December 1, 2017

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer and lender.

# Table of Contents

Introduction ... 1
Forest Plan Direction ... 1
Project Design Features ... 3
Affected Environment ... 5
Existing Condition ... 5
Desired Condition ... 9
Environmental Consequences ... 10
Resource Indicators and Measures ... 10
Methodology ... 11
Spatial and Temporal Context for Effects Analysis ... 17
Alternative 1 – No Action ... 19
Alternatives 2, 3, 4, 5 and 6 (Action Alternatives) ... 21
References (Literature Cited) ... 54

**List of Tables**

Table 1 Existing data for selected water quality parameters in the Albany South project area ... 6
Table 2 Resource indicators and measures for assessing effects to water resources ... 10
Table 3 Percentage of basal area removed by subwatershed, alternatives 2, 3, 4, 5, and 6 ... 22
Table 4 Percentage of watershed with prescribed fire proposed ... 25
Table 5 Potential mineral soil disturbance by alternative ... 27
Table 6 Number of stream crossings on project area roads, by alternative ... 30
Table 7 Summary of riparian management measures related to water quality for various water body types; see EA Appendix B and Forest Plan 2005 for complete description and additional measures. ... 36
Table 8 Acres of mineral soil disturbance within 100 feet of streams, ponds and lakes, including stream crossing approaches ... 40

**List of Figures**

Figure 1. Signs of water flowing down an entrenched road bed. Small woody material begins to dissipate flow, but is insufficient to disperse water out of the corridor. ... 25
Figure 2. Landing in Peaked Hill sale area, 6 years after use ... 28
Figure 3. A skid trail one year after a winter operation ... 29
Figure 4. Accumulation of sediment upstream from an undersized culvert in the project area ... 37
Figure 5. Water bar added to a legacy road decommissioned in 2012, within two weeks of completion ... 39
Figure 6. Close-out of a temporary road crossing (culvert) on the Kennison sale shortly after closure ... 42
Figure 7. Bank sloughing as a natural source of sediment in the Beaver Brook watershed ... 43
Figure 8a Streams and ponds in the direct and indirect effects analysis area. ... 60
Figure 9 Subwatersheds used in direct and indirect effects analysis ... 62
Figure 10 Watersheds used in direct, indirect and cumulative effects analysis of water quantity and water quality effects. ... 63
Figure 11 Additional points mapped for streams, wetlands, pools, springs, seeps or other water features, including those provided by L. LaCasse and F. Robey. Note: not all points provided by public had attribute information; some may not depict water resources ... 65

# Introduction

This report contains an analysis of the effects of the Albany South Integrated Resource Project (Albany South) on water resources. Both effects on water quantity and water quality will be examined. A map of streams and subwatersheds analyzed in this report is attached (see Figures 7, 8 and 9).

## *Forest Plan Direction*

Concerns addressed in this analysis are related to compliance with the White Mountain National Forest Land and Resource Management Plan (Forest Plan) (USDA Forest Service 2005) goals for water resources, in particular:

- "Surface waters on the White Mountain National Forest are considered "outstanding resource waters," and water quality is maintained or improved to protect existing and designated instream water uses such as aquatic life (pp. 1-18 and 1-19);
- The Forest Service will manage streams at proper functioning condition (PFC) to dissipate stream energy associated with high water flows, thereby decreasing erosion, reducing flood damage, and improving water quality (p. 1-19).

The following Forest Plan Standards and Guidelines are emphasized for this project.

***Riparian and Aquatic Habitats Standards and Guidelines***

- Uneven-aged silvicultural practices should be used within the Riparian Management Zone (RMZ) along all perennial streams, lakes, ponds, and vernal pools. Cuts should be designed to maintain continuous forest canopy for the protection and maintenance of water quality, dead wood recruitment, hydrologic function, wildlife habitat, and scenic values. Regeneration group cuts should be limited to less than one acre in size. Exceptions may apply in areas deemed important for maintaining beaver colonies. In the absence of on-the-ground riparian mapping, width of RMZs should be defined as in Table 2-01 (Forest Plan, Riparian and Aquatic Habitats, G-2, p. 2-25, pp. 2-24 and 2-25).

*Table 2-01. Width of RMZ for Specific Aquatic Features*

| Aquatic Feature | Width of RMZ* (feet) |
|---|---|
| 1st and 2nd order streams | 75' |
| 3rd order streams | 275' |
| 4th and larger order streams | 575' |
| Lakes, ponds, and vernal pools | 75' |

* These widths may vary on the ground and may be modified at the project level if a hydrologist or biologist maps the actual riparian zone.

- Tree cutting and harvest should not occur within 25 feet of the bank of mapped perennial streams, the high water mark of a pond, or a identified natural vernal pool, unless prescribed to benefit hydrological or ecological function of the associated stream, pond, or riparian area. Exceptions to this include tree removals needed to clear a designated stream crossing, maintaining an existing road or previously cleared skid road that cannot be relocated, or protecting human safety or infrastructure. Trees (greater than 4 inch DBH) cut or moved in this zone should be placed in a fashion that benefits riparian functions or aquatic habitats

when possible. (Forest Plan, Riparian and Aquatic Habitats, G-1, p. 2-25, pp. 2-24). *Mapped perennial streams* include those identified as perennial on USGS topographic maps at the 1:24,000 scale.

- Intermittent and ephemeral streams should not be permanently filled or relocated because of skidding operations. Sites where temporary water diversions or channel fill is necessary will be functionally restored after project completion. (Forest Plan, Riparian and Aquatic Habitats, G-9, p. 2-25). See *Project-specific Design Features* section for these protection measures and *Methodology* section for definitions of stream types.
- Trees that directly provide structure to the streambanks and channels of intermittent streams should be retained (Forest Plan, Riparian and Aquatic Habitats, G-15, p. 2-26).
- New skid roads, classified roads, trails, and walk-in campsites should not be located within the stream or pond management zone, which is a minimum of 50 feet in width. The width of the zone increases 20 feet in width with each increase of 10 percent in side slope. If any of the above need to be located within the zone, additional measures to minimize sedimentation should be taken. (Forest Plan, Riparian and Aquatic Habitat G-5, p. 2-25) Temporary stream crossings shall be constructed only at approved locations.
- New timber log landings, developed campsites, and permanent facilities should not be located within 100 feet of a perennial stream or the high water mark of a pond. If they need to be located within 100 feet, additional measures to prevent direct runoff into surface waters and to minimize sedimentation should be taken. (Forest Plan, Riparian and Aquatic Habitats G-6, p. 2-25)
- Existing roads, facilities, campsites, or trails within 100 feet of perennial streams or ponds should be considered for relocation as part of normal project planning, except when doing so would result in greater overall impact to the land or water resource. (Forest Plan, Riparian and Aquatic Habitats G-7, p.2-25)
- Known springs should be protected from human impact. (Forest Plan, Riparian and Aquatic Habitats G-8, p. 2-25)
- Naturally occurring vernal pools identified during project planning should not be altered as a result of skidding or construction activities. (Forest Plan, Riparian and Aquatic Habitats G-11, p. 2-26)

***Vegetation Management Standards and Guidelines***

- State of Maine and State of New Hampshire *Best Management Practices* must be met or exceeded. (Forest Plan, Vegetation Management S-4, p. 2-29)
- No more than 15 percent of the area of watersheds of first and second order perennial streams should be treated with even-age regeneration methods in a five year period (Forest Plan, Vegetation Management G-1, p. 2-29)

***Water Resources Standards and Guidelines***

Soil and Water Conservation Practices

- Effective, proven methods (e.g., silt fencing) to reduce concentrated runoff and erosion from construction activities must be used (Forest Plan, Water Resources S-3, p. 2-30).
- Where used, sediment traps must be maintained until disturbed sites and/or cut and fill slopes are stabilized (Forest Plan, Water Resources S-4, p. 2-30).
- New or reconstructed features (e.g., ditches and water bars) intended to capture runoff water should be designed to drain into areas suitable for trapping sediment and not directly into streams, wetlands or vernal pools. (Forest Plan, Water Resources G-1, p.2-31)
- Fords must not be used on perennial streams, except on a temporary basis during construction, unless approved for administrative use at designated locations with appropriate mitigations (Forest Plan, Water Resources S-6, p. 2-30).

Stream Crossings

- Permanent stream crossings must be designed to pass the bankfull discharge unimpeded (Forest Plan, Water Resources S-5, p. 2-31).

## Project Design Features

***The following design features are integrated into all action alternatives for this project***:

- Forest Plan Standards and Guidelines (USDA Forest Service 2005, Chapters 2 and 3), and
- Maine Forest Service (MFS). 2004. Best Management Practices for Forestry: Protecting Maine's Water Quality. Maine Department of Conservation.
- Maine Forest Service Rules, Chapter 21: Statewide Standards for Timber Harvesting and Related Activities in Shoreland Areas (MFS 2016); applicable in Stoneham and Lovell.
- Maine Forest Service Rules, Chapter 27: Standards for Timber Harvesting and Timber Harvesting Related Activities within Unorganized and Deorganized Areas of the State (MFS 2013); applicable in Albany and Mason Townships.

***The following Best Management Practices for water resources are emphasized for this project***:

- Intermittent and perennial streams shall have filter areas at least as wide as those specified by Maine Best Management Practices (MFS 2004, p. 22). Within this zone, appropriate BMPs described in this manual shall be applied to protect the integrity of soil and water.
- Treat ephemeral flow areas draining into water bodies as part of the filter area for that water body (MFS 2004, p. 23). Minimize exposing soil within these ephemeral flow areas, and stabilize exposed soil if it occurs.
- Locate roads, landings and skid trails to minimize the number of stream crossings needed and maximize the harvest area accessed by each crossing. (MFS 2004, p. 38).
- Minimize disturbance to the stream banks, channel and streambed during installation, use and removal of stream crossings (MFS 2004, p. 42).
- Stabilize stream crossing approaches with brush or similar materials, before and during operations. Maintain approaches in a stable condition through close out (MFS 2004, p. 42).
- Trail grades approaching stream crossings shall be broken and surface water dispersed so it will not reach the water course. Silt fencing, haybale erosion checks or water diversions shall

be used to prevent soil from skid trails from entering streams and other surface waters (State of NH 2004, p. 19).

- When closing out a stream crossing, remove temporary structures from the stream, leave brush in place on approaches and banks, and stabilize exposed soil in approaches to the riparian area using brush, hay or seeding and mulching (MFS 2004, p.51).
- National Best Management Practices for Water Quality Management on National Forest System Lands, Volume 1: National Core BMP Technical Guide. FS-990a. (USDA Forest Service 2012b). Considerations for activities AqEco-2; Rec-3 & 4; Road-2- 4; Road 6-10; Veg 2-4 and 6-7 should be reviewed and applied as appropriate.

***Project-specific design features for water resources:***

- In addition to the designated RMZ for first order streams, the following previously unmapped perennial streams shall have no cutting within 25 feet of the bank (see maps in Figures 11 and 12):
    - *Beaver Brook Tributary 5 in unit 47*
    - *Beaver Brook Tributary 1 in unit 49*
    - *Beaver Brook Tributary 8 in units 23 and 30*
    - *Great Brook Tributary 2 in units 11 and 9*
    - *Great Brook Tributary 3 in unit 13*
    - *Meadow Brook Tributary 4 in units 92 and 94*
    - *Meadow Brook Tributary 1 in unit 92*

    The purpose of prescribing a no-cut zone is to provide a continuous supply of woody material to streams with quality fish habitat and (for Great Brook Tributaries 2 and 3) to avoid operation on steep banks.
- In accordance with *Riparian and Aquatic Habitats* G-9 (p. 2-25), the following design features are prescribed for intermittent streams:
    - Intermittent streams shall have filter areas at least as wide as those specified by Maine Best Management Practices (MFS 2004, p. 22). Within this zone, appropriate BMPs described in the BMP manual shall be applied to protect the integrity of soil and water.
    - No even-age regeneration treatments shall occur within 100 feet of intermittent streams in units 3, 56, 69, 115 and 116.
- If additional streams, wetlands or other water bodies are located or found to have a different flow regime (i.e. intermittent or perennial), design features will be applied to comply with the Forest Plan, Maine BMPs, MFS standards for timber harvest in shoreland, and any additional site-specific protection deemed necessary by a watershed specialist.
- Landings near units 13, 49 and 92 are located near the 100 foot distance from perennial streams. The 100 foot buffer will be delineated on the ground to prevent extension of the landing into this zone. If a landing must be within 100 feet of the stream it must be reviewed by a watershed specialist during implementation to ensure that all necessary soil and water conservation practices have been applied. This design feature will facilitate compliance with Riparian and Aquatic Habitats G-6 in the Forest Plan.

- During maintenance of FR308 east of Virginia Lake, additional measures to prevent sedimentation, such as sediment traps on cross drain inlets, silt fence or similar sediment barriers downslope from disturbed soil, and seed/mulch or rock lining of ditches and road cuts must be in place until the disturbed area is stabilized with permanent vegetation. This design feature is intended to facilitate compliance with Water Resources S-1 and S-3 in the Forest Plan at a sensitive location.
- Ground-disturbing activity for watershed restoration projects, campsite relocation and road or trail decommissioning will be done during appropriate seasons and conditions to prevent excessive erosion and sedimentation. Temporary and permanent erosion control will be used on disturbed areas in accordance with State BMPs until the ground has stabilized. This design feature is intended to meet Forest Service National Core BMP AqEco-2, Rec-3 and Road-6.

## Affected Environment

### *Existing Condition*

The Albany South Project Area is located in Stoneham, Lovell, Mason Township, and Albany Township in Oxford County, Maine. The project area is approximately 7,500 acres, located in the Kezar Lake (HUC 010600020402) and Songo Pond-Upper Crooked River (HUC 010600010101) subwatersheds. The Kezar Lake subwatershed is approximately 35,606 acres (54.1 sq. mi) and drains into the Saco River just east of the New Hampshire state border in Maine. The Songo Pond-Crooked River subwatershed is approximately 28,583 acres (44.7 sq. mi) and drains into Sebago Lake.

Perennial streams in the project area include Great Brook, Beaver Brook, Goodwin Brook, Hannah Brook, Bartlett Brook, Meadow Brook, Albany Brook, Willard Brook and unnamed perennial streams. The Crooked River is adjacent to and immediately downstream from the east side of the project area. Other water bodies in the project area include Virginia Lake, Number 8 Pond, Lombard Pond, Kneeland Pond, Round Pond, Crocker Pond, unnamed wetlands, seeps and vernal pools. Kezar Lake and Kewaydin Lake are major water bodies immediately downstream from the project area. Unnamed and/or unmapped perennial, intermittent and ephemeral streams exist in the project area and were mapped as part of this analysis. See Figure 8 and the Albany South Project record for location of these streams and ponds.

## Water Quality

Basic water quality data and water samples were collected from representative streams in or near the Project Area (Table 1). Water quality monitoring in the project area began in 2011. A complete record of sampling locations and dates is in the Albany South project record.

**Table 1 Existing data for selected water quality parameters in the Albany South project area**

| Stream | pH | Alkalinity (mg/L) | Apparent color (PCU) | Total Al (ppb) | Inorganic monomeric Al (ppb) | Nitrate (ppm) | Turbidity (NTU) | Specific conductance (uS/cm) |
|---|---|---|---|---|---|---|---|---|
| Bartlett Brook below Virginia Lake | 6.6 | 2.7 | 32 | 83 | 2 | 0.038 | 0.5 | 14 |
| Meadow Brook above Kewaydin Lake | 5.8 | 2.2 | 65 | 100 | 4 | 0.004 | 0.4 | 15 |
| Beaver Brook at FR308B | 6.4 | 4.2 | 23 | 56 | 4 | 0.006 | 0.1 | 19 |
| Beaver Brook at Hut Road | 6.4 | 4.4 | 27 | 61 | 5 | 0.010 | 0.3 | 19 |
| Great Brook above Hut Road Bridge | 6.1 | 2.4 | 15 | 62 | 5 | 0.005 | 0.0 | 16 |
| Great Brook at Adams Road | 6.2 | 3.1 | 26 | 80 | 5 | 0.008 | 0.3 | 18 |
| Willard Brook[1] | 6.1 | 2.3 | 8 | 76 | 6 | 0.001 | 0.1 | 14 |

[1]Willard Brook is a control watershed with no harvest proposed

The pH values range from acidic (less than the Maine recommended standard of 6.0) to moderately acidic. The lower pH values, in combination with low alkalinity, indicate these waters

are somewhat poorly buffered. Aluminum concentrations are of interest, because some forms of aluminum (inorganic monomeric aluminum) can be toxic to fish. While total aluminum was relatively high in some waters, inorganic monomeric aluminum concentrations were typically at or below the detection limit. The low baseline pH and high total aluminum concentrations are typical across the National Forest (Hornbeck et al. 2001), and may be due to naturally low buffering capacity in the soil and bedrock of these watersheds, naturally occurring organic acids, and human-caused acid deposition effects.

As the low turbidity values in Table 1 indicate, streams in the project area are generally free of suspended sediment. Values are higher than this average during high flow periods. During a week of continuous monitoring by an outside group in 2012, turbidity values over 1,000 NTU were recorded downstream from a housing development on Great Brook over a few hours during a storm event (FB Environmental 2012). Interpretation of these results is somewhat complicated by the potential for temporary burial, stream bed disturbance or sensor fouling during large storms. Based on observation of bed material, sedimentation is generally limited to a localized area near a disturbance source (Johnson 2014).

Within the project area, the Crooked River and its tributaries and minor tributaries to the Saco River have been assessed as *Category 2: Rivers and Streams Attaining Some Designated Uses - Insufficient Information for Other Uses* (MDEP 2012). This means that where information was available to make an assessment, water quality was sufficient to support designated uses. All freshwaters in Maine have an impaired Fish Consumption Use due to mercury from acid deposition; these waters are listed in Category 4A due to development of a Regional Mercury Total Maximum Daily Load for New England states in 2007 (MDEP 2012). Otherwise, these waters appear to meet State Water Quality Standards related to the use of aquatic life, such as fish and macroinvertebrates (MDEP 2012).

## Water Quantity and Watershed Condition

The water cycle includes the movement of water from the atmosphere to the earth's surface (precipitation), from contact with land to surface water (runoff) or ground water (infiltration), and its return to the atmosphere (evapotranspiration or sublimation). The amount of water in lakes, streams, and wetlands is the result of the water that enters the system via precipitation minus how much is used or stored along the way.

Water quantity in streams in the Albany South Project Area is directly related to the amount of precipitation that occurs throughout the year. At Hubbard Brook, an experimental forest within the White Mountain National Forest, 62 percent of approximately 130 cm of precipitation becomes streamflow (Likens and Bormann, 1995, p.16), and most of the rest is lost to evapotranspiration. The research at Hubbard Brook is in a forested environment similar to the environment found in the Albany South Project Area. Therefore, the results of this research can be applied to the Modified Proposed Action and the alternatives.

Human alterations to the project area include a network of roads and trails, which have associated stream crossing structures (bridges and culverts). Some existing crossing structures have inadequate hydraulic capacity or are barriers to fish passage. Virginia Lake has a dam on the outlet, as do Kezar Lake and Kewaydin Lake downstream from the project area.

Both the Kezar Lake and Songo Pond-Upper Crooked River subwatersheds were classified as *Properly Functioning* (Class I) based on the Watershed Condition Classification performed in 2011. This classification was a nationwide Forest Service effort, and results were based on

conditions on National Forest System Lands. Some indicators, such as atmospheric deposition impacts and water quality impairments, reflect trends at a larger scale.

Watershed assessments have also been completed by external groups. A Crooked River Watershed Survey in 2011 identified the following sources of nonpoint source pollution at 6 impact sites on private land in the upper portion of the Crooked River watershed: unstable road construction, road shoulder/ditch erosion, stream bank erosion/failure, inadequate buffers, unstable, misaligned or hanging culverts, and bare soil on recreational trails (Williams 2012). The Conservation Plan for the Kezar River, Kezar Lake, and Cold River Watersheds ranked residential development, new and existing roads, and invasive species as "very high" level threats and residential practices, recreational vehicles and practices, and point source pollution as "high" level threats; several other factors, including poor forest harvest practices, were listed as "medium" level threats (Ward and Duffy, 2008). The same report characterized stresses on lakes and ponds from nutrient runoff (nitrogen and phosphorus) as "medium" and stress from sedimentation as "low," while stresses to streams/rivers from nutrient runoff were "medium" and from sedimentation were "medium/high" throughout the watersheds.

## Special Designations or Management Requirements

Within the project area, Great Brook below the confluence of Willard Brook is listed as a third order stream in the 2005 Forest Plan FEIS (p. J-3 and J-4) for the purpose of riparian management. No fourth order streams are in the project area. All other streams in the project area are first and second order streams.

Certain water bodies are subject to additional protection under Maine Standards for Timber Harvesting and Related Activities in Shoreland Areas based on their size. Virginia Lake and wetlands greater than 10 acres in the towns of Stoneham and Lovell are protected under MFS rules. These measures include preservation of shoreline integrity, shade retention within a 250 foot buffer, and standards for skid trails, yards (landings), roads and stream crossings. Water bodies with greater than 300 acre drainage are subject to similar standards under MFS rules, though the shade retention zone is 75 feet. See MFS Rules Chapter 21 (MFS 2016) and Chapter 27 (MFS 2013) for further detail. Geographic information for these water bodies is included in the project record.

The State of Maine designates tributaries to the Saco River within the project area as Class A waters (State of Maine 2009a). This classification indicates that these waters are considered suitable for the designated uses of drinking water supply after treatment, fishing, recreation in and on the water, industrial process and cooling water supply, hydroelectric power generation, navigation, and habitat for fish and other aquatic life (State of Maine 2009b). The Crooked River and its tributaries are designation as Class AA waters by the State of Maine (State of Maine 2009a). Class AA waters are considered suitable for the designated uses of drinking water after disinfection, fishing, agriculture, recreation in and on the water, navigation and as habitat for fish and other aquatic life. The habitat must be characterized as free-flowing and natural (State of Maine 2009b).

The State of Maine designates waters on the White Mountain National Forest as outstanding natural resources, in which water quality must be protected and maintained under state anti-degradation provisions (State of Maine 2009b). Aquatic life, dissolved oxygen and bacteria should be at naturally occurring levels, and discharge of pollutants to these waters should not occur, with the exception of storm water discharges in compliance with state and local requirements, or as allowed under a discharge permit.

The analysis area watersheds lie within two different municipal water supply watersheds. Surface water intakes for municipalities are downstream from the cumulative effects area boundary for both analyzed watersheds. The water supply watersheds have areas of over 400 square miles, with intakes on much larger water bodies 25 miles or more downstream from the project area. There are no public water supply wells within the project area (MDEP 2014). Information about the location of public water supplies is restricted for security purposes.

### *Desired Condition*

In accordance with the Forest Plan, temporary and short-term degradation shall only be allowed after all practical means of minimizing such degradation are implemented (Forest Plan 2005, p. 2-30). Site specific Standards and Guidelines, Best Management Practices (BMPs), Soil and Water Conservation Practices, and other mitigations elsewhere in the EA are designed to protect water quality and quantity by maintaining designated uses and preventing degradation.

Special designations described in the previous section indicate areas or values that are to be protected.

# Environmental Consequences

## *Resource Indicators and Measures*

**Table 2 Resource indicators and measures for assessing effects to water resources**

| Resource Element | Resource Indicator | Measure | Source |
|---|---|---|---|
| Water quantity | Stream flow does not significantly increase or decrease due to management activities | Basal area removed does not exceed 25% of a watershed | Hornbeck et al. 1993 |
| Water quantity | Concentration of surface runoff is minimized | Percent of watershed with mineral soil disturbance (comparative)*<br><br>BMPs for drainage are considered and incorporated into proposal (qualitative) | Aust and Blinn 2004<br><br>Stafford et al. 1996, Croke and Hairsine 2006, MFS 2004 |
| Water quantity and water quality | Change in runoff and peak flows; sediment and nutrient impacts | Percentage of a watershed burned (comparative)* | Elliot and Vose 2005 |
| Water quantity and water quality | Channel capacity, shape and velocity; sediment and phosphorus inputs | Number of stream crossings<br><br>Capacity of stream crossings to withstand high flows | MFS 2012<br><br>2005 Forest Plan, Water Resources, Stream Crossings G-3 (p.2-31) |
| Water quantity and water quality | Change in runoff and peak flows; sediment, nutrient, dissolved oxygen impacts | Impervious cover does not exceed 10% of cumulative effects area watersheds | Center for Watershed Protection 2003;<br>Morse and Kahl 2003 |
| Water quality | Chemical changes (pH, aluminum, nitrate) are below thresholds harmful to aquatic life and human uses | Basal area removed does not exceed 20% of a watershed<br><br>No more than 15% harvested with even age regeneration | Siemion et al. 2011; Wang et al. 2006; Baldigo et al. 2005; Lawrence and Driscoll, 1988<br>2005 Forest Plan Vegetation Guideline G-1 (p. 2-29) |
| Water quality | Sediment loads/ total phosphorus | Length/area of soil disturbance within 100 feet of stream or pond (comparative)* | 2005 Forest Plan Riparian and Aquatic Habitat Guidelines 5, 6 and 7, (p. 2-25) |
| Water quality | Water quality impacts are limited to temporary, short-term changes | BMPs for sedimentation and/or spill prevention are incorporated into proposal where ground disturbance and/or chemical use occurs(qualitative) | MFS 2004; 2005 Forest Plan, Water Resources, Soil and Water Conservation S-2 |

*comparative indicators do not have a defined threshold based on literature, so analysis will focus on comparisons among alternatives, including the no action alternative, and outcomes of similar activities in other areas

## *Methodology*

This analysis considers effects of the project on water quantity and quality. Activities like those occurring in the project area have been known to affect water resources in the ways described below.

### Mapping

Many streams (perennial, intermittent, and ephemeral) and wetlands in the project area were not mapped on existing USGS topographic maps or as part of the National Hydrography Dataset, since the methods and scale of these nationwide datasets did not allow for a complete inventory. Some streams in the existing dataset had an incorrect flow regime (intermittent or perennial). The analysis for this project included many field visits throughout the project area by the Forest Hydrologist and others trained to map and identify flow regimes, and mapping corrections and additional stream delineations were completed for the purposes of this project.

Stream flow regimes are defined as follows in the 2005 Forest Plan:

- **Perennial Streams:** Permanently present surface water. Flows occur throughout the year, except possibly during extreme drought or during extreme cold when ice forms.
- **Intermittent Stream:** A watercourse that only flows at certain times of the year, when it receives water from some surface source (rainfall or snowmelt) or from the intermittent spring, and ceases to flow during other periods of the year.
- **Ephemeral stream:** A watercourse or portion of stream which flows briefly in direct response to precipitation or snowmelt in the immediate area.

The primary indicator of perennial streams is persistent stream flow throughout the year. Therefore, streams that were observed to be dry during a portion of the year were defined as intermittent. When streams could not be observed during the driest portion of the year due to staff availability and/or recent rain events, secondary indicators were used to make the distinction. Secondary indicators of perennial stream flow include:

- Presence of fish (fish-bearing streams were always defined as perennial)
- Continuous surface flow during low flow periods, rather than occasional pools interrupted by subsurface flow
- Vegetation growth in stream bed indicative of consistently wet conditions
- Presence of groundwater outflow upstream, such as a spring or seep
- Presence of a grade break that causes the stream to intercept the water table
- Stream flow greater than or equal to other known perennial streams in the area

Since intermittent and ephemeral streams can be difficult to distinguish without frequent observation, many ephemeral streams are likely mapped as intermittent streams. Upstream areas without defined, continuous channels or mineral soil or bedrock exposure were considered “ephemeral flow areas” in accordance with Maine BMPs (MFS 2004).

Definitions of stream type were used for mapping and analysis to define the minimum level of protection required. Should conditions on the ground be found to differ during implementation, reclassification and/or greater protection may be added as necessary to protect water quality and comply with the Forest Plan, applicable laws and State BMPs (see Design Features).

## Water Quantity

The evaluation of water quantity includes the assessment of activities that affect the quantity, timing, duration, or direction of water flowing through the watershed. It will also include the related property of channel function. Stream channels adjust their shape based on flow (volume of water over time) and sediment load (including particles from silt to boulders). If stream flow increases over historic levels, it will tend to carry more sediment and scour the stream bottom and banks. If stream flow decreases, the stream will tend to deposit sediment. Thus, changes in water quantity affect the ability of channels to adjust to transport water and sediment without becoming highly unstable.

Research has shown that removal of vegetation through timber harvesting can alter evapotranspiration rates. These altered evapotranspiration rates result in changes in streamflow. The magnitude of this change depends on the extent of change in the vegetation (Hornbeck et al. 1997). Research at Hubbard Brook indicates that when reductions in basal area reach 25 percent of the watershed, a measurable response in annual water yield may be seen (Hornbeck et al. 1993). Most of the increase in water yield occurs during summer low flow periods, and effects dissipate within a decade (Hornbeck et al. 1997; Hornbeck et al. 1993). Removal of less than 25 percent of the basal area in a watershed is a surrogate measure for thresholds of effects of vegetation management on water quantity. Percent basal area removal is calculated for subwatersheds of perennial streams draining at least 200 acres in size using information from stand exams and silvicultural prescriptions. Since only merchantable timber is considered in these exams, the estimates may be higher than the actual percentage of basal area removed, particularly when the prescription is intended to release understory growth.

Transportation systems associated with vegetation and wildlife management, recreation and watershed improvement can affect hydrology. Roads and some skid trails have the potential to directly affect hydrology by changing the direction of flow, intercepting surface or ground water or concentrating flow in areas such as ditches (Gucinski et al. 2001). Compacted surfaces such as roads, trails, parking lots and roofs reduce infiltration of water into the soil, which increases runoff in that area. The effect of increased runoff and decreased infiltration is that water entering the project area (precipitation) passes out of it more quickly as surface water, rather than being stored in soil or groundwater. These impacts are permanent in the case of permanent infrastructure. In areas that are allowed to revegetate, such as skid trails and landings, soil and litter layers recover much of their permeability within a period of about 5 years (Croke and Hairsine 2006). General harvest or prescribed burn areas outside skid trails and firelines are less likely to concentrate flows, since any changes in soil permeability are patchy (Croke and Hairsine 2006; Edwards and Troendle 2012). When concentrated flows can be dispersed into vegetated areas in small quantities, the forest floor has the ability to reduce the velocity and allow it to filter into the soil (Stuart and Edwards 2006, MFS 2004). Thus, the amount of mineral soil disturbance in the analysis area will be a measure of potential hydrologic impacts. General harvest and burn areas will not be included in this indicator based on the literature cited above.

Transportation systems with minimum impacts are designed to avoid concentrating large volumes of water through proper location and spacing of drainage features (e.g. ditch relief culverts, water bars, drainage dips); by keeping this infrastructure a sufficient distance from water bodies to allow infiltration; and by maintaining an intact forest floor as a "filter area" around water bodies (Stafford et al. 1996, Croke and Hairsine 2006, MFS 2004). Supplemental BMPs such as rock aprons, slash filters, settling basins or seeding can assist in slowing or dispersing concentrated flows, thus reducing their ability to erode new channels (MFS 2004). This analysis will

qualitatively evaluate whether Best Management Practices to minimize hydrologic impacts are incorporated into the proposal.

Activities that may affect channel function by changing water volume, velocity, or channel and floodplain characteristics will be evaluated based on potential to change the stream flow-sediment balance. Since stream crossing structures such as bridges, culverts and fords are particularly prone to changing stream shape, velocity and sediment loads, the number of stream crossings will be one surrogate measure for impacts on channel function. Since both permanent and temporary structures will be used, the number of permanent crossing structures is particularly important to the long-term function of channels. The adequacy of these crossings to withstand high flows will also be qualitatively assessed.

The amount of impervious cover in the watershed is a surrogate measure for cumulative effects of existing and proposed infrastructure on water quantity. Impervious surfaces such as roads, parking lots, trails and rooftops affect water quantity by increasing runoff and peak flows, particularly if the watershed exceeds 10 percent impervious cover (Center for Watershed Protection 2003). In this assessment, skid trails (with 3 or more passes) and landings will be conservatively counted as impervious surfaces, though the majority of these areas are expected to revegetate and have hydrology at least partially restored. This measure is used for cumulative effects only, since meaningful results must consider all impervious surfaces in the watershed, even if they are not related to the project proposal. Preliminary screening indicates the undeveloped subwatersheds on the National Forest would not approach this threshold, so this analysis will be performed at the cumulative effects watershed scale, to include the more extensive and potentially detrimental impacts on private land.

## Water Quality

There are two primary aspects of water quality that may be affected by proposed activities in the project area. There may be effects on *water chemistry* from changes that occur in streams after vegetation is removed or pollutants are introduced. The second aspect is *sedimentation* related to the roads, skid trails, and other disturbed surfaces that cause erosion and subsequent transport of sediment into water bodies. The potential for temperature change in project area streams is discussed in the *Riparian and Aquatic Habitats* report in this analysis document and the project record.

Research at Hubbard Brook has indicated that intensive forest harvesting practices, such as whole-tree harvest of an entire watershed, have the potential to lower the pH in water (Lawrence and Driscoll 1988). This is a concern in areas already affected by acid deposition. Acidity has been shown to mobilize chemicals such as nitrate and inorganic aluminum in the soils, which then enter stream water (Lawrence and Driscoll 1988). Inorganic monomeric aluminum is of particular concern, since it is harmful to aquatic life at sufficient concentrations (Baldigo et al. 2005). While sampling in this watershed indicates that the pH and inorganic monomeric aluminum levels are not likely to be harmful at present, further decreases in pH are a concern. Though most studies focus on a higher level of basal area removal than that proposed in this project, a compilation of research on water quality effects of timber harvesting in the northeastern U.S. showed no change in downstream water chemistry when as much as 15 to 19 percent of the basal area within a watershed was removed (Martin et al. 1986; Wang et al. 2006; Baldigo et al. 2005; Lawrence and Driscoll, 1988). The current practice of maintaining vegetated riparian buffers is likely to mitigate a portion of this effect (Martin et al. 2000). A recent study compiling results from five watersheds in the Catskills indicated that keeping basal area removal below the 40 to 68 percent threshold would be expected to avoid detrimental effects to aquatic life or human health related to

water chemistry in that region (Siemion et al. 2011), which is generally more acid-sensitive than the project area. Based on the moderate buffering capacity (based on alkalinity measurements) in the analysis area relative to other portions of the White Mountains, a 20 percent threshold for basal area removal was selected to evaluate effects of harvest on water chemistry, including changes in nitrate, pH and inorganic aluminum. This is a conservative value that can be applied to project area watersheds with confidence that no detrimental effect on water quality will occur if basal area removal remains below 20 percent. It is likely that more harvest could occur in a watershed without impairing water quality, but further research is needed to determine the precise relationship between watershed characteristics, vegetation removal, and water chemistry effects (McHale et al. 2008). Monitoring and research projects are underway in portions of the White Mountain National Forest with past or future harvest to better define these thresholds. Preliminary water quality results for ongoing projects (including the adjacent Four Ponds project) suggest that harvest meeting these thresholds had minimal effect on water quality and did not pose a threat to beneficial uses of water bodies (USFS 2015).

Phosphorus concentrations are a concern in project area watersheds, since increases in this nutrient can fuel excessive algal growth in lakes, leading to loss of water clarity and lower dissolved oxygen. Monitoring in Kezar Lake indicates it is an oligotrophic (low-nutrient) lake. Phosphorus levels in the lake and streams draining into it are generally low (see FBEA 2011 and WMNF monitoring data in project record). Harvest activities generally do not directly increase available phosphorus (Binkley and Brown 1993). However, phosphorus can enter the water bound to sediment. Thus, potential impacts on sediment yields will also be considered potential impacts on total phosphorus.

Due to the well-drained, coarse-textured soil types, erosion and sediment yields are low in much of New England (Martin and Hornbeck 1994). Typical background sediment yields reported for undisturbed forests range from 40 to 150 kilograms/hectare/year (Martin et al. 2000). Impacts of forest management on sedimentation are difficult to quantify due to the high level of variability in erosion and sedimentation rates, but such impacts have been documented in some areas (Binkley and Brown 1993). Most forestry-related sedimentation and increases in stream turbidity are associated with transportation systems (Martin and Hornbeck 1994). Additional sediment sources are other activities that expose mineral soil, such as construction of trails or firelines, or stumping wildlife openings. The magnitude of effects caused by sediment transport is related to area of bare soil (Aust and Blinn 2004). Areas that lack vegetation and have disturbed soils become the source for sediment transport, particularly near stream crossings. The potential for this disturbed soil to reach water bodies can be better understood by characterizing: 1) the ability of a soil-disturbing activity to increase runoff in the watershed, and 2) the connectivity of that runoff source to water bodies (Croke and Hairsine 2006). Assessment of runoff potential has been discussed above; the probability of reaching water bodies relates to BMPs implementation.

The 2005 Forest Plan EIS stated that impacts to water quality are minimized through the use of Standards and Guidelines and Best Management Practices. These include the use of riparian buffers, watersheds being only partially harvested and staggering harvest activities (FEIS 2005b, p. 3-51). Riparian buffers are considered one of the most effective factors for preventing nutrients (particularly phosphorus) and sediment from reaching water resource features (Gilliam 1994). Riparian buffers are vegetated areas adjacent to water bodies that are managed “to protect the functions and values of the water body and its associated riparian area from the impact of site-level activities” (Blinn and Kilgore 2004). This general term will be considered equivalent to the terms Riparian Management Zone (RMZ), Streamside Management Zone (SMZ) and filter area within this report. Riparian buffers protect streams from sediment and associated nutrients

through a rough, porous forest floor and litter layer (Croke and Hairsine 2006; Stuart and Edwards 2006), therefore protecting these functions is an essential characteristic of a buffer.

Numerous studies have examined the effectiveness of riparian buffers in preventing sedimentation during forestry operations. Buffer width recommendations for other uses (e.g. urban development, agriculture) may be substantially different due to the type and extent of disturbance involved (Lakel et al. 2010). Many studies cited for forestry impacts on sedimentation in the Northeastern U.S. focus on intensive harvest practices such as cutting 80 to 100 percent of a watershed (Binkley and Brown 1993; Stuart and Edwards 2006), which differ from current practice on the National Forest and many contemporary operations. Studies at Hubbard Brook Experimental Forest (HBEF) in New Hampshire examined changes in turbidity, sediment yield and water chemistry during intensive harvest operations (clearcut or multi-year strip cut over entire watersheds). In harvested watersheds with buffers, turbidity exceeded 10 Jackson Turbidity Units (JTU) in 1 to 3 percent of samples, and never exceeded 40 JTU (Martin and Hornbeck 1994). Sediment yields from the strip cut watershed with a variable width buffer (49 to 148 feet) were not significantly different from control watersheds, in contrast to the whole-tree harvested watershed with no buffer (Martin et al. 2000). In a study of 15 first-order streams in Maine, neither clearcuts with 0, 36, or 75-foot buffers nor selective cuts with no additional buffer resulted in significant changes in turbidity or soluble reactive phosphorus (Wilkerson et al. 2010). Consistent with state BMPs, no soil compaction or scarification was allowed within 26 ft of the stream channel (Wilkerson et al. 2010). Kreutzweiser and others (2009) found that in Canadian boreal forests, partially harvested riparian areas adjacent to large clearcuts prevented statistically significant changes in sedimentation rates at all but one site, which had a higher rate for one season. A study in the Virginia Piedmont indicated that 25 to 100-foot buffers effectively trapped 97 percent of erosion from clearcut and burned watersheds whether the buffers were thinned or had no cutting (Lakel et al. 2010). Studies in Georgia and North Carolina documented no change in total suspended solids (TSS) or a decrease in TSS in watersheds with 0 to 98-foot buffers and 45 to 90 percent of the watershed clearcut (Clinton 2011; Terrell et al. 2011). These results are generally consistent with BMP effectiveness reviews that found a 33 to 98-foot buffer protected streams in New Hampshire and Maine from significant increases in turbidity (Aust and Blinn 2004). Reviews of riparian buffer guidelines in jurisdictions across the U.S. and Canada found the mean buffer width to be 50 to 95 feet, with 80 percent of jurisdictions allowing selective harvest within buffers (Lee et al. 2004; Blinn and Kilgore 2004). A consistent pattern across several studies is that harvest units were less likely to cause sedimentation than the associated transportation system or fire breaks, and impacts were often traceable to specific features (e.g. waterbar outlets or stream crossings) where BMP implementation needed improvement (Stafford et al. 1996; Aust and Blinn 2004; Litschert and MacDonald 2009; Lakel et al. 2010; Terrell et al. 2011).

Given the greater probability of sedimentation from disturbed or compacted areas such as roads, skid trails. recreational trails and campsites, it is appropriate to give greater consideration to the occurrence of these areas in close proximity to water bodies. Provided the forest floor is protected, the effective buffer width varies depending on the layout of transportation systems and recreation facilities. The buffer between compacted areas and water bodies should consider slope, since erosion is more likely on steeper slopes (Croke and Hairsine 2006; MFS 2004).

Given the above information about sediment sources and the ability of buffers to mitigate sediment impacts, the length and area of soil disturbance within 100 feet of streams and ponds will be an indicator of potential sedimentation and related phosphorus inputs. This distance corresponds to the Forest Plan guidelines for stream or pond management zone width in areas

with 25 percent slope, as well as new road and landing distance from water bodies. Since the Forest Plan limits equipment operation on slopes steeper than this, the 100 foot screening criteria would be expected to identify roads and skid trail segments that pose the greatest risk of sedimentation. For activities with impacts within the 100 foot zone, qualitative analysis of potential for sedimentation will be completed, based on studies of similar activities and consideration of design features to prevent sediment impacts.

While riparian buffers can effectively capture diffuse flow, they are only the last line of containment for sediment transport. A growing body of literature shows that interconnected features such as headwater streams, wetlands, springs, and seeps exert an important influence on water quality and quantity (U.S. EPA 2015). Given the wide dispersal of these features, watershed-wide application of is essential to minimize disturbance and connectivity of disturbed areas to drainage networks (Litschert and MacDonald 2009; Croke and Hairsine 2006). Soil should be contained close to the disturbance source and only rarely reach the buffer zone. Application of BMPs to prevent sedimentation and chemical pollution will be qualitatively considered to the extent they can be assessed as this phase of the project.

The Maine Forest Service has evaluated BMP effectiveness at randomly selected sites throughout the state since 2000. The most recent assessment found that in 2010 and 2011, no sediment entered a waterbody at 90 percent of evaluation points, an improvement from 83 percent in 2005 (MFS 2012). Appropriately applied BMPs prevented soil deposition into water bodies at 81 percent of crossing structures and 92 percent of approaches; BMPs were appropriately applied at 93 percent of crossings and approaches (MFS 2012). Since operators on the proposed project would be working under the same set of BMPs, training and certification programs, these data are highly relevant to the project. Outcomes on the National Forest are likely to be somewhat better than these results, due to consistent review by a timber sale administrator, advance planning, and Forest Plan requirements that are more stringent than state BMPs (e.g., stream or pond management zones wider than Maine BMP filter areas). The White Mountain National Forest began implementing a similar BMP implementation and effectiveness monitoring protocol on randomly selected sites in 2013, which will be used to identify and address means for further improvement. Since a small number of sales have been formally evaluated under this protocol, statistically meaningful data are not available for this effort. Because stream crossings and their approaches were the most common sources of sediment entering water (MFS 2009), the number of stream crossings will also be an indicator of potential sedimentation. Because there is no absolute threshold for number of stream crossings, it will be used to compare relative risk of various alternatives.

As stated previously, impervious cover is associated with increased runoff, which may lead to higher sediment loads, decreased dissolved oxygen and increased nitrogen and phosphorus (Morse and Kahl 2003). Research in Maine indicates watersheds with less than 10 percent disturbed area are unlikely to have water quality impaired by impervious surfaces (Morse and Kahl 2003), so this threshold will be used as an indicator of cumulative effects on water quality.

## Incomplete and Unavailable Information

Water quality data are not available for every water body in the project area. Representative streams have been selected to represent different watershed characteristics and sizes. These sites provide a reasonable representation because they are distributed among the major watersheds in the project area, and abbreviated sampling at other points in the area did not find conditions that were significantly different.

Geographic data (including streams and water bodies) have varying levels of accuracy depending on the method used to collect data. For example, handheld GPS devices used in mapping have an accuracy of approximately 15 to 20 feet, depending on conditions. Existing shapefiles for streams, water bodies and wetlands were based on USGS topographic maps accurate at the 1:24,000 scale and may be based on remotely sensed data such as aerial photos, but were field verified in critical locations. This level of accuracy is sufficient to identify areas of greatest concern since screening for impacts is within a conservative 100 foot zone, and random errors are likely to balance one another out. Standards and Guidelines, BMPs and design features are applied based on distances on the ground, so accuracy of mapping does not affect the level of protection afforded by these measures.

Treatments such as road locations, skid trail locations, harvested areas and prescribed burn units are subject to further refinement during the implementation process. Due to sideboards that place limits on activity in water bodies or riparian areas, assumptions related to roads and skid trails are reasonably likely to be consistent with this analysis. Analysis of harvest areas and prescribed burning includes the maximum area that could be harvested or burned, so the assumptions in this analysis represent the maximum potential effect of these activities.

### *Spatial and Temporal Context for Effects Analysis*

The analysis area for direct and indirect effects on water resources is the Great Brook watershed, Kewaydin Lake watershed, and tributaries to Crooked River in which the project is located, totaling approximately 16,145 acres (25 square miles). While this analysis focuses on streams within the 7,500-acre Project Area, lands outside this boundary will be included to analyze complete watersheds. This area was chosen because it includes all streams draining the project area. The analysis period for direct and indirect effects is 10 years in the past and 20 years in the future. Water quality and quantity effects from vegetation management and temporary disturbance would be expected to subside within 10 years of implementation (Hornbeck et al. 1993; Martin et al. 2000). Implementation is expected to occur over approximately ten years.

The analysis area for cumulative effects on water resources is the entire Kezar Lake watershed (010600020402) and the Songo Pond- Upper Crooked River watershed (010600010101), totaling 64,185 acres (100 square miles). This area was chosen to adequately analyze the cumulative effect of activities in other parts of the Kezar Lake, Kewaydin Lake, and Crooked River watersheds along with the proposed activities, including portions of the Four Ponds project within the Songo Pond-Upper Crooked River watershed. Effects of project activities would be expected to be masked by dilution further downstream, as these water bodies mix with much larger ones. The analysis period for cumulative effects is 10 years in the past and 20 years into the future (2004-2034), because water quality and quantity effects from vegetation management would be expected to subside in this period due to vegetation regrowth (Hornbeck et al. 1993; Martin et al. 2000). This project proposes changes to infrastructure that have a longer lifetime than 20 years, but trends should become apparent within ten years of implementation.

It is known that the Province project is currently under implementation, part of which would occur in the Saco watershed approximately 10 miles away. The need to review the combined effects of these two proposals was considered. The Province project is in a different (HUC12) watershed that does not drain into the Albany South project area, and would therefore generally not be included in a cumulative effects analysis area. To consider the smallest watershed containing portions of the two projects, one would have to consider the 134 square-mile (85,700 acre) watershed of the Saco River in addition to other areas already being analyzed. The small area of project activity, dilution by larger water bodies, passage of water through large lakes and

| Watershed ID | Watershed Scale | Acres | HU16 Name | HU16 Code | HUC16 Stream Order | HU14 Name | HUC14 Code | HU12 Name | HUC12 Code | % Basal Area Reduction | % Even Age harvest | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 35 | HUC16 | 75 | Unnamed | 18397 | 1 | Lower Peabody River | 01040002010206 | Peabody River | 010400020102 | 39.6 | 7.2 | Not fish habitat |
| 26 | HUC16 | 163 | Unnamed | 18688 | 1 | Lower Peabody River | 01040002010206 | Peabody River | 010400020102 | 34.9 | 14.8 | Not fish habitat |
| 45 | HUC16 | 128 | Unnamed | 17002 | 1 | Middle Peabody River | 01040002010204 | Peabody River | 010400020102 | 32.3 | 5.5 | Not fish habitat |
| 17 | HUC16 | 338 | Unnamed | 18350 | 2 | Lower Peabody River | 01040002010206 | Peabody River | 010400020102 | 27.3 | 2.3 | Possible fish habitat, not Jurassic granite |
| 50 | HUC16 | 9 | Unnamed | 17953 | 1 | Middle Peabody River | 01040002010204 | Peabody River | 010400020102 | 27.2 | 0.9 | Not fish habitat |
| 42 | HUC16 | 70 | Bear Spring Brook | 21754 | 1 | Middle Peabody River | 01040002010204 | Peabody River | 010400020102 | 25.7 | 11.0 | Possible fish habitat, not Jurassic granite |
| 24 | HUC16 | 266 | Unnamed | 17927 | 1 | Middle Peabody River | 01040002010204 | Peabody River | 010400020102 | 25.1 | 3.6 | Possible fish habitat, not Jurassic granite |
| 7 | HUC16 | 698 | Unnamed | 18498 | 2 | Lower Peabody River | 01040002010206 | Peabody River | 010400020102 | 25.0 | 4.7 | Possible fish habitat, not Jurassic granite |
| 48 | HUC16 | 161 | Unnamed | 17115 | 1 | Middle Peabody River | 01040002010204 | Peabody River | 010400020102 | 23.6 | 0.6 | Possible fish habitat, not Jurassic granite |
| 41 | HUC16 | 48 | Unnamed | 19412 | 1 | Lower Peabody River | 01040002010206 | Peabody River | 010400020102 | 23.3 | 7.5 | Not fish habitat |
| 27 | HUC16 | 141 | Unnamed | 19107 | 1 | Lower Moose River | 01040002010402 | Moose River | 010400020104 | 22.8 | 0.5 | Not fish habitat |
| 4 | HUC16 | 249 | Unnamed | 17566 | 2 | Middle Peabody River | 01040002010204 | Peabody River | 010400020102 | 22.8 | 3.8 | Not fish habitat |
| 40 | HUC16 | 133 | Unnamed | 19200 | 1 | Lower Peabody River | 01040002010206 | Peabody River | 010400020102 | 19.6 | 3.9 | |
| 38 | HUC16 | 43 | Unnamed | 19675 | 1 | Lower Peabody River | 01040002010206 | Peabody River | 010400020102 | 19.5 | 0.0 | |
| 8 | HUC16 | 392 | Unnamed | 18615 | 2 | Lower Moose River | 01040002010402 | Moose River | 010400020104 | 19.0 | 0.2 | |
| 3 | HUC16 | 241 | Bear Spring Brook | 17114 | 2 | Middle Peabody River | 01040002010204 | Peabody River | 010400020102 | 18.6 | 3.5 | |
| 29 | HUC16 | 91 | Unnamed | 19762 | 1 | Lower Peabody River | 01040002010206 | Peabody River | 010400020102 | 18.3 | 0.0 | |
| 28 | HUC16 | 149 | Unnamed | 19724 | 1 | Lower Peabody River | 01040002010206 | Peabody River | 010400020102 | 17.8 | 0.0 | |
| 37 | HUC16 | 56 | Unnamed | 18960 | 1 | Lower Peabody River | 01040002010206 | Peabody River | 010400020102 | 14.3 | 0.7 | |
| 25 | HUC16 | 94 | Unnamed | 18607 | 1 | Lower Peabody River | 01040002010206 | Peabody River | 010400020102 | 14.0 | 0.0 | |
| 47 | HUC16 | 18 | Unnamed | 15632 | 1 | Middle Peabody River | 01040002010204 | Peabody River | 010400020102 | 13.2 | 0.0 | |
| 6 | HUC16 | 303 | Unnamed | 17983 | 1 | Lower Moose River | 01040002010402 | Moose River | 010400020104 | 12.9 | 0.0 | |
| 0 | HUC16 | 1045 | Barnes Brook | 16435 | 3 | Middle Peabody River | 01040002010204 | Peabody River | 010400020102 | 12.7 | 1.0 | |
| 34 | HUC16 | 65 | Unnamed | 18227 | 1 | Lower Moose River | 01040002010402 | Moose River | 010400020104 | 12.5 | 0.4 | |
| 32 | HUC16 | 39 | Unnamed | 16594 | 1 | Middle Peabody River | 01040002010204 | Peabody River | 010400020102 | 12.2 | 0.0 | |
| 49 | HUC16 | 49 | Unnamed | 14761 | 1 | West Branch Peabody River | 01040002010203 | Peabody River | 010400020102 | 11.4 | 0.0 | |
| 54 | HUC14 | 3362 | | | | Lower Peabody River | 01040002010206 | Peabody River | 010400020102 | 11.2 | 1.2 | |
| 13 | HUC16 | 731 | Barnes Brook | 16544 | 2 | Middle Peabody River | 01040002010204 | Peabody River | 010400020102 | 8.8 | 0.2 | |
| 23 | HUC16 | 106 | Unnamed | 17566 | 1 | Middle Peabody River | 01040002010204 | Peabody River | 010400020102 | 8.2 | 0.0 | |
| 15 | HUC16 | 128 | Unnamed | 19868 | 1 | Lower Moose River | 01040002010402 | Moose River | 010400020104 | 7.6 | 7.6 | |
| 19 | HUC16 | 106 | Unnamed | 14748 | 1 | Middle Peabody River | 01040002010204 | Peabody River | 010400020102 | 7.3 | 4.0 | |
| 36 | HUC16 | 74 | Unnamed | 18570 | 1 | Lower Moose River | 01040002010402 | Moose River | 010400020104 | 7.0 | 0.0 | |
| 10 | HUC16 | 726 | Unnamed | 20003 | 2 | Lower Peabody River | 01040002010206 | Peabody River | 010400020102 | 6.8 | 0.0 | |
| 39 | HUC16 | 76 | Unnamed | 12670 | 1 | Middle Peabody River | 01040002010204 | Peabody River | 010400020102 | 5.8 | 5.8 | |
| 2 | HUC16 | 277 | Unnamed | 14662 | 2 | Middle Peabody River | 01040002010204 | Peabody River | 010400020102 | 5.5 | 4.2 | |
| 20 | HUC16 | 270 | Unnamed | 16043 | 1 | Middle Peabody River | 01040002010204 | Peabody River | 010400020102 | 4.2 | 0.0 | |
| 53 | HUC14 | 8823 | | | | Middle Peabody River | 01040002010204 | Peabody River | 010400020102 | 4.0 | 0.6 | |
| 56 | HUC12 | 29783 | | | | | | Peabody River | 010400020102 | 2.6 | 0.3 | |
| 44 | HUC16 | 58 | Unnamed | 14830 | 1 | Middle Peabody River | 01040002010204 | Peabody River | 010400020102 | 2.5 | 2.5 | |
| 55 | HUC14 | 6865 | | | | Lower Moose River | 01040002010402 | Moose River | 010400020104 | 2.4 | 0.2 | |
| 51 | HUC16 | 116 | Unnamed | 19420 | 1 | Lower Moose River | 01040002010402 | Moose River | 010400020104 | 1.6 | 0.0 | |
| 16 | HUC16 | 1231 | Unnamed | 15704 | 2 | Middle Peabody River | 01040002010204 | Peabody River | 010400020102 | 1.6 | 0.0 | |
| 12 | HUC16 | 427 | Townline Brook | 17635 | 1 | Lower Moose River | 01040002010402 | Moose River | 010400020104 | 1.4 | 0.0 | |
| 14 | HUC16 | 540 | Culhane Brook | 11990 | 2 | West Branch Peabody River | 01040002010203 | Peabody River | 010400020102 | 1.2 | 0.5 | |
| 57 | HUC12 | 14988 | | | | | | Moose River | 010400020104 | 1.1 | 0.1 | |
| 30 | HUC16 | 57 | Unnamed | 20524 | 1 | Lower Moose River | 01040002010402 | Moose River | 010400020104 | 1.1 | 1.1 | |
| 1 | HUC16 | 177 | Unnamed | 11101 | 2 | West Branch Peabody River | 01040002010203 | Peabody River | 010400020102 | 1.1 | 0.0 | |
| 52 | HUC14 | 7415 | | | | West Branch Peabody River | 01040002010203 | Peabody River | 010400020102 | 0.5 | 0.1 | |
| 31 | HUC16 | 154 | Unnamed | 22443 | 1 | Lower Moose River | 01040002010402 | Moose River | 010400020104 | 0.4 | 0.0 | |
| 11 | HUC16 | 262 | Unnamed | 11607 | 2 | West Branch Peabody River | 01040002010203 | Peabody River | 010400020102 | 0.3 | 0.0 | |
| 18 | HUC16 | 381 | Unnamed | 20823 | 2 | Lower Moose River | 01040002010402 | Moose River | 010400020104 | 0.3 | 0.2 | |
| 9 | HUC16 | 340 | Unnamed | 18828 | 1 | Lower Moose River | 01040002010402 | Moose River | 010400020104 | 0.2 | 0.0 | |
| 21 | HUC16 | 67 | Unnamed | 16818 | 1 | Middle Peabody River | 01040002010204 | Peabody River | 010400020102 | 0.0 | 0.0 | |
| 22 | HUC16 | 34 | Unnamed | 16859 | 1 | Middle Peabody River | 01040002010204 | Peabody River | 010400020102 | 0.0 | 0.0 | |
| 33 | HUC16 | 65 | Unnamed | 17368 | 1 | Middle Peabody River | 01040002010204 | Peabody River | 010400020102 | 0.0 | 0.0 | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 46 | HUC16 | 75 | Unnamed | 20760 | 1 | Lower Moose River | 01040002010402 | Moose River | 010400020104 | 0.0 | 0.0 |
| 43 | HUC16 | 70 | Unnamed | 22986 | 1 | Lower Moose River | 01040002010402 | Moose River | 010400020104 | 0.0 | 0.0 |

# Peabody West Recreation Effects Analysis

Prepared by: Travis Pellerin, Assistant District Ranger for Recreation and Wilderness

For: Androscoggin Ranger District, White Mountain National Forest

Date: 9/20/2022

## Effects Addressed

### Is there potential for a significant environmental effect to your resource from the proposed activities?

**NO**

### Would project effects approach a threshold for your resource?

**NO**

### Is your resource related to an effect identified and approved by the responsible official for analysis?

**NO**

## Consistency with Relevant Laws, Regulations, and Policy

### National Forest Management Act (NFMA) Land Management Plan Consistency

The White Mountain National Forest Land Management Plan (forest plan) provides goals, standards, and guidelines for Recreation (U.S. Department of Agriculture, Forest Service, 2005).

**Manage the Forest recreation program consistent with the Recreation Opportunity Spectrum (ROS) framework.**

Forestwide Recreation Goal (forest plan, p. 1-10)

The project area consists of Rural, Roaded Natural, Semi-Primitive Motorized, and Semi-Primitive Non-Motorized ROS classes. Proposed recreation activities would be located in Roaded Natural and Rural ROS classes. Proposed project activities are consistent with the ROS framework objectives and no changes in ROS classifications as described in the forest plan FEIS Appendix H, ROS Classes would occur due to project activities (U.S. Department of Agriculture, Forest Service, 2005).

**G-4 No additional trails should be constructed or authorized unless clearly needed to: provide public access to the existing system, address resource impacts, resolve public safety issues, meet recreation management or accessibility goals, or best meet the recreation management approaches. New trails should be evaluated and prioritized consistent with supplemental direction in [Forest Service Handbook] FSH 2309.18.**

Forestwide Non-motorized Dispersed Recreation—Trails G-4 as amended (U.S. Department of Agriculture, Forest Service, 2008)

Proposed project activities are consistent with trail management objectives and direction found in FSH 2309.18. The proposed recreation activities would advance recreation management goals by providing public access to recreational opportunities on National Forest System lands from the community of Gorham, NH, and the existing community trail system.

The Forest Service Handbook (FSH) Trails Management Supplement 2309.18-2010-1 provides further direction regarding net trail mileage limitations and tracking, and the prioritization process for new trail construction proposals. The proposed action would be implemented consistent with FSH 2309.18 and supplemental direction.

## Environmental Impacts

### Potentially Affected Environment

Within the project area, potentially affected recreation resources include hiking opportunities, non-motorized winter recreation trails, motorized winter recreation trails, campgrounds, trailheads, hunting fishing, swimming, and other dispersed recreation opportunities. Impacts to recreation resources are considered in the context of overall recreation experience, or project-related conflicts with recreation activities, in the local area.

### Environmental Impacts of the Proposed Action

Under the proposed action, recreation impacts would be minor and short term in nature. Recreation resources (e.g., trails and campgrounds, dispersed recreation) within the project area would experience noise, closures, or other disruptions in use associated with project construction or timber harvest activities. For example, snowmobile users would be temporarily displaced during harvest operations or noise from project activities would be heard by recreationists in the area. Project design elements such as limitations on hauling periods, season of harvest, and trail closures would be used to safely manage these activities and reduce the impacts of noise by restricting implementation to periods of lower recreation use levels (refer to EA Table 2). Overall, effects from closures or other restrictions on recreation activities would be minimal, localized, and would not persist past project implementation. Forest plan standards and guidelines would be incorporated into project activities to minimize short term effects. Because of the limited scope and dispersed nature of proposed recreation activities, the proposed action is not expected to have substantial cumulative impacts on recreation resources in the analysis area.

## References

U.S. Department of Agriculture, Forest Service. (2005). *White Mountain National Forest Final Environmental Impact Statement for the Land and Resource Management Plan.* Laconia, NH: White Mountain National Forest. Retrieved from https://www.fs.usda.gov/detail/whitemountain/landmanagement/planning/?cid=STELPRDB5199941

U.S. Department of Agriculture, Forest Service. (2005). *White Mountain National Forest Land and Resource Management Plan.* Campton, NH.

U.S. Department of Agriculture, Forest Service. (2008). Forest Plan Trail Management Objectives (File Code 1920-2). Campton, NH.

# Peabody West Wilderness and Roadless Areas Effects Analysis

Prepared by: Johnida S. Dockens

For: Androscoggin Ranger District, White Mountain National Forest

Date: 5/18/2022

## Effects Addressed

### Is there potential for a significant environmental effect to your resource from the proposed activities?

**NO**

### Would project effects approach a threshold for your resource?

**NO**

### Is your resource related to an effect identified and approved by the responsible official for analysis?

**NO**

## Methodology

The project-level analysis considers whether any activities are proposed in Roadless Area Conservation Rule (RACR) inventory areas and documents that no timber harvest or road construction or reconstruction would occur in these areas. The project-level analysis also considers the potential for project activities to affect inventory criteria on lands in the forest plan inventory areas (forest plan IRAs). Forest plan IRAs are those areas which were inventoried and evaluated for roadless and wilderness characteristics during the forest plan revision process. The sole purpose of this inventory was to identify lands that could be considered for wilderness recommendation. Following this evaluation, lands within these inventoried areas were allocated to management areas and are therefore managed consistent with management area direction as per the forest plan. Management on lands that are part of only the forest plan revision inventory must be consistent with forest plan direction; impacts to roadless inventory characteristics are allowed.

Project-level environmental analyses evaluate potential effects to the inventory characteristics of forest plan IRAs if the concern is raised by the public. This meets our responsibility under the National Environmental Policy Act to consider public concerns with our proposal and disclose potential effects. More information regarding forest plan IRAs can be found in the Inventoried Roadless Area background document (U.S. Department of Agriculture, Forest Service, 2018).

Acreage calculations for roadless areas were made using GIS data. Calculations of potential impacts to roadless areas are included in the project record.

## Consistency with Relevant Laws, Regulations, and Policy

### Roadless Area Conservation Rule

No project activities are proposed in designated wilderness or RACR areas.

### Forest Plan Inventoried Roadless Areas

The Great Gulf IRA comprises about 17,000 acres, a portion of which occurs in the project area. Potential impacts to the Great Gulf IRA for this project were evaluated in the context of the designated management area, and for roadless and wilderness characteristics of the area as they relate to the future

eligibility of that area as potential wilderness. Less than 4 percent (about 600 acres) of the total IRA acreage is proposed for timber harvest, of which less than 1 percent (about 80 acres) comprises even-aged treatment. No new roads are proposed in the Great Gulf IRA. In addition, no timber harvest has occurred in the Great Gulf IRA in the past 10 years. The proposed action would have limited, short term effects on the Great Gulf IRA and would therefore not impact future eligibility for the Great Gulf IRA as potential wilderness.

## References

U.S. Department of Agriculture, Forest Service. (2018). *Inventoried Roadless Area Background.* Campton, NH: White Mountain National Forest.

# Peabody West Integrated Resource Project Scenery Management Effects Analysis

Prepared by: Kenneth Allen, Landscape Architect

For: Androscoggin Ranger District, White Mountain National Forest

Date: 6/17/2022

## Effects Addressed

### Is there potential for a significant environmental effect to your resource from the proposed activities?

NO

### Would project effects approach a threshold for your resource?

NO

### Is your resource related to an effect identified and approved by the responsible official for analysis?

YES

This document includes effects pertaining to scenery management that have been identified for detailed analysis.

Effect 1: The potential impacts of vegetation management activities on scenery in the analysis area.

## Methods

Two multiple-step modeling efforts were used to evaluate potential impacts to scenery resources from each viewshed: Google Earth and ArcGIS. Harvest units included in this analysis include regeneration-type treatments and those which visually mimic them (e.g., clearcuts, patch clearcuts, improvement cuts, overstory removal, seed tree and shelterwood). Group selection treatments were considered throughout the project area, as they relate to the other treatments visual effects but were not individually analyzed in this project. Views were modeled to determine how the landscape would appear following proposed treatments based on visible units and the amount of visible acres.

### Google Earth Isometric Modeling

Google Earth was used to create isometric views which include map, model, and photographic renderings from viewpoints. Due to modeling limitations of Google Earth, foreground vegetation shadowing is not taken into consideration by the model. The technology overlays a 2D mapping image atop a semi-3D satellite image. Therefore, the model creates an illusion of more bare ground being visible than would be visible under normal circumstances by on-the-ground users (e.g., hikers) or unless viewed directly down upon and into an opening, such as from an aircraft.

The isometric model view creates a reasonable photo-realistic view but cannot accurately depict actual visible acres, which would be lower than those modeled. For example, on-the-ground leading-edge vegetation and other minor topographic features would block some of the actual visible modeled acres in the foreground compared to the modeled visible acres. High-contrast colors are incorporated in the modeling to make the visible units stand out on the landscape model for analysis. In actuality, natural colors of the landscape will also diminish contrast and overall visibility.

### ArcGIS Workflow

The ArcGIS workflow is designed to show any visibility of the proposed regeneration treatment units by calculating the canopy height from LiDAR data and cutting out the proposed treatment units. This GIS workflow is used to calculate the amount and locations of potential visible acres.

Because mapping products and or models are created from different sources of information, differences in modeled feature visibility may occur. Where these differences are found, the analysis is conducted based upon the feature(s) depicting the greatest visibility.

### Additional Data Considerations

Views differ according to the viewpoint's position in the landscape, elevation, and proximity to the units, the project area's aspect of the slope in relation to the viewpoint, season, and weather. From the analyzed viewpoints, the intensity of effects from proposed activities is a function of the distance, size and shape of new visible opening, topography it lays on, vegetation height it is surround by, as well as their proximity to other proposed visible openings, older visible openings and other features that attract the observer's attention.

The visibility of any opening would be greatest for the first year's post-treatment. As species grow, the color and texture begin to return. The shadow lines and lighting differences would be evident depending on the characteristics noted above and for much longer into the future would be the color and texture. The casual observer would probably stop noticing the typical regen treatment opening as an individual and distinct feature approximately 20 years after regeneration.

Larger visible openings located higher on the hillsides would appear less natural and would be noticeable by many casual observers for more years into the future.

Over time, the keen observer's eye may notice a shadow created by the difference in height between the top of canopy of newly grown vegetation and the far edge of the previously existing (taller) timber. Sun angles, cloud effects (shadows) or certain kinds of weather conditions may fade these shadow lines and as a result opening maybe generally unnoticeable to the casual observer.

## Consistency with Relevant Laws, Regulations, and Policy

### National Forest Management Act (NFMA) Land Management Plan Consistency

The White Mountain National Forest Land Management Plan (forest plan) provides standards and guidelines for Scenery Management. A preliminary scenery management analysis, including multiple modeling efforts, was performed during proposal development. The interdisciplinary team and District Ranger coordinated extensively throughout the proposal development process, including reviewing potential visibility from each proposed harvest unit, as documented in the project record. Harvest unit layouts and prescriptions were adjusted as needed consistent with forest plan direction for Scenery Management. The Peabody West IRP draft environmental assessment (EA) includes the design resulting from these early analyses, viewpoint selection, and adjustments to proposed harvest units.

## Environmental Impacts

### Potentially Affected Environment

The analysis area for the direct and indirect effects is the portion of the landscape that is visible from the selected viewpoints and includes the project area. This analysis area is the zone within which the proposed vegetative management activities would alter the scenery.

The analysis area for cumulative effects is the viewshed from the viewpoints and the timeframe is from 30 years in the past to 30 years in the future. This timeframe allows for all the harvested openings to fully restock, develop a full canopy of vegetation, and reach a height with enough spread and density to allow the shadow and textural differences to begin to blend with the adjacent surroundings. This is as seen

from a typical viewing distance by the casual observer. This distance is dependent upon the viewpoint, topography, season, and weather and other conditions, but typically ranges between 0 and 8 miles and up to 10 miles in some cases. The viewsheds within the project area range from about 2 to 6 miles from any viewpoint to any proposed harvest unit.

Nine viewpoints were selected for initial analysis. Four were chosen to be modeled and analyzed further (Howker, Osgood, Moriah and Carter; refer to Figure 6 in the Peabody West IRP draft EA). The analysis and calculations are based on their viewsheds. The chosen viewpoints are on National Forest System lands, provide the best perspectives of the project area and are areas considered to be of reasonable access and highest visitation by the public recreationalists. Unauthorized or user-created trails and non-Forest Service system trails are not typically analyzed for viewpoints.

Models and effects analyses for individual viewpoints and associated viewshed models are provided below (see Figures section).

There are 11 units and 1 permanent wildlife opening expansion (PWO) that were determined to be visible from the selected viewpoints and analyzed in detail (Table 1).

**Table 1. List of potentially visible units analyzed in detail, including proposed silvicultural treatment type.**

| Unit Number | Silvicultural Treatment |
|---|---|
| 19 | Clearcut with reserves |
| 20 | Patch clearcut |
| 44a | Patch clearcut |
| 44b | Patch clearcut |
| 69a | Patch clearcut |
| 69b | Patch clearcut |
| 69c | Patch clearcut |
| 70a | Patch clearcut |
| 70b | Patch clearcut |
| 70c | Patch clearcut |
| Permanent wildlife opening | Patch clearcut |

## Environmental Impacts of the Proposed Action

The proposed action would have visual impacts similar to other vegetation management activities. These impacts would vary in perceived intensity based on prescription type, acreage, distance, angle from which units maybe observed, and their context within the overall landscape. These impacts would fade and blend over time. The PWO would remain open to meet wildlife habitat management objectives.

Of note, group selection treatments will be minimized in scale to be sensitive to the scenic quality and reduce the potential for visual effects. Improvement Cut treatments will maintain over 50 percent of existing canopy and will have more of the appearance of a thinning treatment, not an opening, also reducing and potential for impacts to the observed scenic quality of the project area's landscape.

### Cumulative Effects

Relevant forest plan guidelines for evaluating cumulative effects in MA 2.1 lands are found on p. 3-6 of the forest plan.

The proposed regeneration treatments do not exceed 4 percent of the viewshed acreage per entry threshold, and are therefore consistent with forest plan guidance. No known even-aged harvesting has occurred in the analysis area in the past 30 years. Therefore, total area of regeneration treatment per view would not exceed 9 percent, consistent with forest plan guidelines for cumulative effects.

## Figures

Andro - Peabody
Isometric Model Image - Proposed Units from Howker Viewpoint - Scenery Management
Legend
CC
PCC
PWO PCC
N
1000 ft

**Figure 1. Google Earth satellite model image of potentially visible portions of the proposed project area as seen from the Howker viewpoint.**

Scenery Analysis
Howker Viewpoints
Legend
Clearcut
Overstory Removal
Patchcut
Visible from Howker Viewpoints
Howker View 1 & 2
20
19
36
44a
44b
90
89
88
69a
69b
70c
70b
70a
69c
0 0.25 0.5 1 Miles
N

| Unit ID | Viewpoints | Visible Acres |
|---|---|---|
| 19 | Howker Views | 9.44 |
| 20 | Howker Views | 5.97 |
| 44b | Howker Views | 2.47 |
| 69a | Howker Views | 2.36 |
| 69b | Howker Views | 1.9 |
| 69c | Howker Views | 0.5 |
| 88 | Howker Views | 4.06 |
| 89 | Howker Views | 4.57 |
| 90 | Howker Views | 1.57 |

**Figure 2. Howker viewpoint visibility map data and visible acres.**

Andro - Peabody
Isometric Model Image - Proposed Units from Carter Viewpoint - Scenery Management
Legend
CC
PCC
PWO PCC
N
2 mi

**Figure 3. Google Earth satellite model image of the potentially visible portions of the proposed project area as seen from the Carter viewpoint.**

Scenery Analysis
Mt Carter Viewpoint
Legend
Clearcut
Overstory Removal
Patchcut
Visible from Mt Carter
20
19
36
44a
44b
90
89
88
69a
69b
70c
70b
70a
69c
Mt Carter Summit
N
0 0.25 0.5 1 Miles

| Unit ID | Viewpoint | Visible Acres |
|---|---|---|
| 19 | Mt Carter | 19.1 |
| 20 | Mt Carter | 8.3 |
| 36 | Mt Carter | 5.28 |
| 44a | Mt Carter | 4 |
| 44b | Mt Carter | 1.27 |
| 69a | Mt Carter | 6.29 |
| 69b | Mt Carter | 6.42 |
| 69c | Mt Carter | 6.65 |
| 70a | Mt Carter | 3.76 |
| 70b | Mt Carter | 2.2 |
| 70c | Mt Carter | 4.55 |
| 88 | Mt Carter | 4.25 |
| 89 | Mt Carter | 4.95 |
| 90 | Mt Carter | 2.52 |

**Figure 4. Carter viewpoint visibility data and visible acres.**

Andro - Peabody
Isometric Model Image - Proposed Units from Moriah Viewpoint - Scenery Management
Legend
CC
PCC
PWO PCC
N
1 mi

**Figure 5. Google Earth satellite model image of the potentially visible portions of the proposed project area as seen from the Moriah viewpoint.**

Scenery Analysis
Mt Moriah Viewpoint
Legend
Clearcut
Overstory Removal
Patchcut
Visible from Mt Moriah
20
19
36
44a
44b
90
89
88
Mt Moriah
Summit
69a
69b
70c
70b
70a
69c
N
0 0.25 0.5 1 Miles

| Unit ID | Viewpoint | Visible Acres |
|---|---|---|
| 19 | Mt Moriah | 19.09 |
| 20 | Mt Moriah | 8.09 |
| 36 | Mt Moriah | 4.25 |
| 44a | Mt Moriah | 3.81 |
| 44b | Mt Moriah | 0.98 |
| 69a | Mt Moriah | 6.19 |
| 69b | Mt Moriah | 5.81 |
| 88 | Mt Moriah | 3.61 |
| 89 | Mt Moriah | 4.2 |
| 90 | Mt Moriah | 1.54 |

**Figure 6. Moriah viewpoint visibility map data and visible acres.**

Andro - Peabody
Isometric Model Image - Proposed Units from Osgood Viewpoint - Scenery Management
Legend
CC
PCC
PWO PCC
N
3000 ft

**Figure 7. Google Earth satellite model image of potentially visible portions of the proposed project area as seen from the Osgood viewpoint.**

Scenery Analysis
Osgood AT Viewpoint
Legend
Clearcut
Overstory Removal
Patchcut
Visible from Osgood AT
Osgood AT Viewpoint Location
20
19
36
44a
44b
90
89
88
69a
69b
70c
70b
70a
69c
N
0 0.25 0.5 1 Miles

| Unit ID | Viewpoint | Visible Acres |
|---|---|---|
| 19 | Osgood - AT | 14.51 |
| 20 | Osgood - AT | 6.71 |
| 36 | Osgood - AT | 1.62 |
| 44a | Osgood - AT | 3.01 |
| 44b | Osgood - AT | 2.55 |
| 69a | Osgood - AT | 1.56 |
| 69b | Osgood - AT | 2.44 |
| 88 | Osgood - AT | 4.25 |
| 89 | Osgood - AT | 4.75 |
| 90 | Osgood - AT | 1.81 |

**Figure 8. Osgood viewpoint visibility map data and visible acres.**

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer and lender.

# Peabody West Integrated Resource Project Scenery Management Effects Analysis

Prepared by: Kenneth Allen, Landscape Architect

For: Androscoggin Ranger District, White Mountain National Forest

Date: 12/19/2023

## Effects Addressed

### Is there potential for a significant environmental effect to your resource from the proposed activities?

NO

### Would project effects approach a threshold for your resource?

NO

### Is your resource related to an effect identified and approved by the responsible official for analysis?

YES

This document includes effects pertaining to scenery management that have been identified for detailed analysis.

Effect 1: The potential impacts of vegetation management activities on scenery in the analysis area.

## Methods

Two multiple-step modeling efforts were used to evaluate potential impacts to scenery resources from each viewshed utilizing Google Earth and ArcGIS. Harvest units included in this analysis include regeneration-type treatments and those which visually mimic them (e.g., clearcuts, patch clearcuts, improvement cuts, and shelterwood). For scenery analysis purposes regeneration cuts are any treatment that removes 50 percent or more of the canopy. Group selection treatments were considered but were not individually analyzed in this project. Views were modeled to determine how the landscape would appear following proposed treatments based on visible units and the amount of visible acres per unit.

### Google Earth Isometric Modeling

Google Earth was used to create isometric views which include a map, model, and photographic rendering for each selected viewpoint. The technology overlays a 2D mapping image atop a semi-3D satellite image. Due to modeling limitations of Google Earth, foreground vegetation shadowing is not taken into consideration by the model. Therefore, the model creates an illusion of more bare ground being visible than would be visible under normal circumstances by on-the-ground users (e.g., hikers) unless viewed directly down upon and into an opening, such as from an aircraft.

The isometric model view creates a reasonable photo-realistic view but cannot accurately depict actual visible acres, which would be lower than those modeled. The model overpredicts the amount of ground disturbance visible. For example, on-the-ground leading-edge vegetation (vegetation closest to the viewer) and minor topographic features would block some of the actual visible acres in the foreground compared to the modeled visible acres. High-contrast colors are used rather than natural colors to make the visible units stand out on the modeled landscape.

### ArcGIS Workflow

The ArcGIS workflow is designed to show any visibility of the proposed regeneration treatment units by calculating the canopy height from LiDAR data and cutting out the proposed treatment units. This GIS workflow is used to calculate the amount and locations of potential visible acres.

The ArcGIS workflow calculates areas visible from the established viewpoints using a digital surface model (DSM) from National Agriculture Imagery Program (NAIP) imagery (collected in 2018) to model the surrounding topography and vegetation, in combination with a digital elevation model (DEM) from LiDAR to model the ground within cleared units for treatments with 50 percent or more canopy removal.

Because mapping products and models may be created from different sources of information, differences in modeled feature visibility may occur. Where these differences are found, the analysis is conducted based upon the feature(s) depicting the greatest visibility.

### Additional Data Considerations

Views differ according to the viewpoint's position in the landscape, elevation, proximity to the units, the project area's aspect of slope in relation to the viewpoint, season, and weather. For the analyzed viewpoints, the intensity of effects from proposed activities is a function of the distance, size and shape of new visible opening, topography it lays on, vegetation height it is surround by, as well as their proximity to other proposed visible openings, older visible openings and other features that attract the observer's attention.

The visibility of any opening would be greatest for the first year post-treatment. As vegetation becomes established and grows the color and texture of the opening begins to return. The shadow lines and lighting differences would be evident depending on the characteristics noted above and for much longer into the future than would color and texture. After 20 years the casual observer would probably not notice the typical regeneration treatment openings as an individual and distinct feature. Larger visible openings located higher on the hillsides would appear less natural and would be noticeable by many casual observers for additional years into the future.

Over time, the keen observer's eye may notice a shadow created by the difference in height between the top of canopy of newly grown vegetation and the far edge of the previously existing (taller) timber. Sun angles, cloud effects (shadows) or certain kinds of weather conditions may fade these shadow lines and as a result openings may be generally unnoticeable to the casual observer.

It is understood that treatments may result in some type of 'visible' change to the overall landscape. The term 'visibility' as used in scenery analysis is synonymous with 'visible acres' and 'seen area". 'Visibility' is based upon measurable ground (bare earth) as visible from a viewpoint or multiple viewpoints. The bare earth meaning is directly related to actual earth surface or ground; not shapes, textures, colors, shadows or parts of visible vegetation.

## Consistency with Relevant Laws, Regulations, and Policy

### National Forest Management Act (NFMA) Land Management Plan Consistency

The White Mountain National Forest Land Management Plan (forest plan) provides standards and guidelines for Scenery Management. Scenic Integrity Objectives (SIO's) provide an indication of the alteration or disturbance allowed in the viewed landscape. They are defined in terms of Very High, High, Moderate, and Low. SIO's are defined by the Scenery Management System. The Forest Plan guidelines (Chapter 3) define a specified limit to the amount of open visible acres or seen acres per the individual unit's SIO (Figure 16). The guidelines for Management Area 2.1 (General Forest) state that areas of High SIO may have an opening with a maximum of 4 to 5 visible acres, Moderate SIO's may have with up to 10 visible acres and Low SIO's over 10 visible acres (Forest Plan pp. 3-6 to 3-7).

A preliminary scenery management analysis, including multiple modeling efforts, was performed during proposal development. The interdisciplinary team and District Ranger coordinated extensively throughout the proposal development process, including reviewing potential visibility from each proposed harvest unit multiple times during the process, as documented in the project record. Harvest unit layouts and prescriptions were adjusted as needed to be as consistent with Forest Plan direction for Scenery Management as possible given the project's needs and desired future condition. When units proposed exceed the SIO's, Forest Plan Guidelines, the rationale is documented in the Environmental Assessment and the Decision Notice.

The Peabody West IRP Environmental Assessment (EA) includes the design resulting from these early analyses, viewpoint selection, and adjustments to proposed harvest units.

## Environmental Impacts

### Potentially Affected Environment

The analysis area for the direct and indirect effects is the portion of the landscape that is visible from the selected viewpoints and includes the project area. This analysis area is the zone within which the proposed vegetative management activities would alter the scenery.

The analysis area for cumulative effects is the viewshed from the viewpoints and the timeframe is from 30 years in the past to 30 years in the future. This timeframe allows for all the harvested openings to fully restock, develop a full canopy of vegetation, and reach a height with enough spread and density to allow the shadow and textural differences to begin to blend with the adjacent surroundings as seen from a typical viewing distance by the casual observer. This distance is dependent upon the viewpoint, topography, season, and weather and other conditions, but typically ranges between 0 and 8 miles and up to 10 miles in some cases. The viewsheds within the project area range from about 2 to 6 miles from any viewpoint to any proposed harvest unit.

Fifteen potential viewpoints were originally proposed for review: Howker Ridge 1 & 2, Mount Madison, Osgood-AT, Pine Mountain, Imp Trail 1, Imp Trail 2, Imp Face, South Carter Mountain, Carter Moriah Trail, Mount Carter, Imp Mountain, Imp Shelter, Mount Moriah, Mount Surprise, Wildcat (see Figure 2). Six of the originally proposed viewpoints were found to not be oriented toward the project area and or otherwise not providing much visibility and were dismissed from consideration by the Team.

Nine viewpoints remaining were then selected for initial analysis: Howker Ridge 1 & 2, Mount Madison, Osgood-AT, Pine Mountain, South Carter Mountain, Mount Carter, Mount Moriah, Mount Surprise, Wildcat. Five of these proposed viewpoints were repetitive and or similar or of less value in visibility of the proposed project, so only four viewpoints were moved forward in the analysis. These four viewpoints had the best potential for visibility and were chosen to be modeled and analyzed further by the Responsible Official (Howker, Osgood, Moriah and Carter; refer to Figure 5 in the Peabody West IRP EA). The analysis and calculations are based on their viewsheds. Models and effects analyses for individual viewpoints and associated viewshed models are provided below (see Figures section).

The chosen viewpoints are on public lands, provide the best perspectives of the project area, are of opposing angles exposing the maximum amount of potential for visibility and are areas considered to be of reasonable access and highest visitation by the general public as well as recreationalists and tourists. 'User-created' trails or non-Forest Service system trails are not typically analyzed for viewpoints. There are eleven units and one permanent wildlife opening (PWO) expansion that were determined to be visible from the selected viewpoints and analyzed in detail (Table 1).

**Table 1. List of potentially visible units analyzed in detail, including proposed silvicultural treatment type.**

| Unit Number | Silvicultural Treatment |
|---|---|
| 19 | Clearcut with reserves |

| Unit Number | Silvicultural Treatment |
|---|---|
| 20 | Patch clearcut |
| 44a | Patch clearcut |
| 44b | Patch clearcut |
| 69a | Patch clearcut |
| 69b | Patch clearcut |
| 69c | Patch clearcut |
| 70a | Patch clearcut |
| 70b | Patch clearcut |
| 70c | Patch clearcut |
| Permanent wildlife opening | Patch clearcut |

## Environmental Impacts of the Proposed Action

The proposed units were designed to follow Forest Standards and Guidelines, the proposal will have some visual impacts, as would be expected due to the prescriptions, size, distance, and angle from which units maybe observed and their context within the overall landscape. The visibility of timber management activities will fade and blend over time.

Improvement Cut treatments will maintain over 50 percent of existing canopy and will have more of the appearance of a thinning treatment, not an opening, also reducing the potential for impacts to the observed scenic quality of the project area's landscape. Group selection treatments located within 'High' SIO Areas will range in size from one-quarter to two acres. The permanent wildlife opening would remain open to meet wildlife habitat management objectives.

## Cumulative Effects

Relevant forest plan guidelines for evaluating cumulative effects in MA 2.1 lands are found on p. 3-6 of the forest plan.

The proposed regeneration treatments do not exceed 4 percent of the viewshed acreage threshold per entry and are therefore consistent with forest plan guidance. No known even-aged harvesting has occurred in the analysis area in the past 30 years. Therefore, total area of regeneration treatment per view would not exceed 9 percent, consistent with forest plan guidelines for cumulative effects.

Peabody Project Orientation Map
Orientation Map including Proposed Units / Treatments
N
1 mi
Legend
CC
Horton Center
Mt Madison
PCC
PCC
PWO PCC
Trailhead
WILDLIFE REFUGE
APPALACHIA
Horton Center
20 PCC
19 CC
36 CC
Stony Brook Trailhead
Pine Mountain Trailhead
44a PCC
44b PCC
PWO
Barnes Field Group Campground
Dolly Copp Campground
Mt Madison
Imp Shelter
69a PCC
69b PCC
70c PCC
70b PCC
70a PCC
Great Gulf Wilderness
Osgood Tentsite
69c PCC
Great Gulf Wilderness Trailhead

**Figure 1. Google Earth Orientation Map including Proposed Units and Treatments**

Peabody West Viewpoints
Pine Mountain
Mount Surprise
Howker Ridge Trail 1
Howker Ridge Trail 2
Mount Moriah
Mount Madison
Imp Shelter
Imp Trail 2
Imp Mountain
Imp Face
Osgood-AT
Mount Carter Mountain
Imp Trail 1
Carter Moriah Trail
South Carter Mountain
Wildcat D

**Figure 2. Preliminary Viewpoints Location Map**

Randolph
2
16
2
Gorham
Pinkham B
Dolly Copp Rd
16
Mount Moriah
Howker Ridge
Osgood- AT
Carter Mountain
Peabody River
N
W
E
S
USDA
Forest Service
U.S. DEPARTMENT OF AGRICULTURE
Peabody West Viewpoint Map
Map Legend
Road
Hiking Trail
Snowmobile Trail
Viewpoint
River
Proposed Evenage Harvest Units
Proposed Harvest Units
National Forest Land
0
1
2 Miles
Date: 6/28/2022

**Figure 3. Final Four Viewpoints Location Map with Proposed Treatments**

## Figures

Andro - Peabody
Isometric Model Image - Proposed Units from Howker Viewpoint - Scenery Management
Legend
CC
PCC
PWO PCC
N
1000 ft

**Figure 4. Google Earth satellite model image of potentially visible portions of the proposed project area as seen from the Howker viewpoint.**

Howker Ridge Trail 1
Howker Ridge Trail 2

Figure 5. Viewpoint Location Map – Howker Ridge 1 & 2

Scenery Analysis
Howker Viewpoints
Legend
Clearcut
Overstory Removal
Patchcut
Visible from Howker Viewpoints
Howker View 1 & 2
20
19
36
44a
44b
90
89
88
69a
69b
70c
70b
70a
69c
0
0.25
0.5
1 Miles
N

| Unit ID | Viewpoints | Visible Acres |
|---|---|---|
| 19 | Howker Views | 9.44 |
| 20 | Howker Views | 5.97 |
| 44b | Howker Views | 2.47 |
| 69a | Howker Views | 2.36 |
| 69b | Howker Views | 1.9 |
| 69c | Howker Views | 0.5 |
| 88 | Howker Views | 4.06 |
| 89 | Howker Views | 4.57 |
| 90 | Howker Views | 1.57 |

**Figure 6. Howker Viewpoint Visibility Map with data and visible acres.**

Andro - Peabody
Isometric Model Image - Proposed Units from Carter Viewpoint - Scenery Management
Legend
CC
PCC
PWO PCC
N
2 mi

**Figure 7. Google Earth satellite model image of the potentially visible portions of the proposed project area as seen from the Mount Carter viewpoint.**

Pine Mountain
Mount Carter
Mountain
Carter
1

**Figure 8. Viewpoint Location Map – Mount Carter**

Scenery Analysis
Mt Carter Viewpoint
Legend
Clearcut
Overstory Removal
Patchcut
Visible from Mt Carter
20
19
36
44a
44b
90
89
88
69a
69b
Mt Carter Summit
70c
70b
70a
69c
N
0
0.25
0.5
1 Miles

| Unit ID | Viewpoint | Visible Acres |
|---|---|---|
| 19 | Mt Carter | 19.1 |
| 20 | Mt Carter | 8.3 |
| 36 | Mt Carter | 5.28 |
| 44a | Mt Carter | 4 |
| 44b | Mt Carter | 1.27 |
| 69a | Mt Carter | 6.29 |
| 69b | Mt Carter | 6.42 |
| 69c | Mt Carter | 6.65 |
| 70a | Mt Carter | 3.76 |
| 70b | Mt Carter | 2.2 |
| 70c | Mt Carter | 4.55 |
| 88 | Mt Carter | 4.25 |
| 89 | Mt Carter | 4.95 |
| 90 | Mt Carter | 2.52 |

**Figure 9. Carter Viewpoint Visibility Map with data and visible acres.**

Andro - Peabody
Isometric Model Image - Proposed Units from Moriah Viewpoint - Scenery Management
Legend
CC
PCC
PWO PCC
N
1 mi

**Figure 10. Google Earth satellite model image of the potentially visible portions of the proposed project area as seen from the Mount Moriah viewpoint.**

Mount Moriah

**Figure 11. Viewpoint Location Map – Mount Moriah**

Scenery Analysis
Mt Moriah Viewpoint
Legend
Clearcut
Overstory Removal
Patchcut
Visible from Mt Moriah
Mt Moriah
Summit
20
19
36
44a
44b
90
89
88
69a
69b
70c
70b
70a
69c
0 0.25 0.5 1 Miles
N

| Unit ID | Viewpoint | Visible Acres |
|---|---|---|
| 19 | Mt Moriah | 19.09 |
| 20 | Mt Moriah | 8.09 |
| 36 | Mt Moriah | 4.25 |
| 44a | Mt Moriah | 3.81 |
| 44b | Mt Moriah | 0.98 |
| 69a | Mt Moriah | 6.19 |
| 69b | Mt Moriah | 5.81 |
| 88 | Mt Moriah | 3.61 |
| 89 | Mt Moriah | 4.2 |
| 90 | Mt Moriah | 1.54 |

**Figure 12. Mount Moriah Viewpoint Visibility Map with data and visible acres.**

Andro - Peabody
Isometric Model Image - Proposed Units from Osgood Viewpoint - Scenery Management
Legend
CC
PCC
PWO PCC
N
3000 ft

**Figure 13. Google Earth satellite model image of potentially visible portions of the proposed project area as seen from the Osgood viewpoint.**

Pine Mountain
Osgood-AT

**Figure 14. Viewpoint Location Map – Osgood AT**

Scenery Analysis
Osgood AT Viewpoint
Legend
Clearcut
Overstory Removal
Patchcut
Visible from Osgood AT
Osgood AT Viewpoint Location
20
19
36
44a
44b
90
89
88
69a
69b
70c
70b
70a
69c
0
0.25
0.5
1 Miles
N

| Unit ID | Viewpoint | Visible Acres |
|---|---|---|
| 19 | Osgood - AT | 14.51 |
| 20 | Osgood - AT | 6.71 |
| 36 | Osgood - AT | 1.62 |
| 44a | Osgood - AT | 3.01 |
| 44b | Osgood - AT | 2.55 |
| 69a | Osgood - AT | 1.56 |
| 69b | Osgood - AT | 2.44 |
| 88 | Osgood - AT | 4.25 |
| 89 | Osgood - AT | 4.75 |
| 90 | Osgood - AT | 1.81 |

**Figure 15. Osgood Viewpoint Visibility Map with data and visible acres.**

20
19
36
44a
44b
90
89
88
Mt Moriah
Howker Ridge
Trail 1 & 2
Mt Carter
Osgood-AT
69a
69b
70c
70b
70a
16
69c
USDA
Viewpoints
Road
Hiking Trail
Evenage Harvest Visible from Viewpoints
Proposed Harvest Units (white outline)
Scenic Integrity Objective:
High-Very High
Very High
High
Moderate
Low
0
0.5
1
Mile
N
The Forest Service uses the most current and complete data available. GIS data and product accuracy may vary. They may be: developed from sources of differing accuracy, accurate only at certain scales, based on modeling or interpretation, incomplete while being created or revised, etc. Using GIS products for purposes other than those for which they were created, may yield inaccurate or misleading results. The Forest Service reserves the right to correct, update, modify, or replace GIS products without notification.

**Figure 16: Scenic Integrity Objective Map**

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer and lender.

# Peabody West Integrated Resource Project Soils Specialist Report

Prepared by Robert A. Colter, Forest Soil Scientist and Ecologist
November 2021

## Affected Environment

Soils in the project area are characteristic of those found throughout the White Mountain National Forest (WMNF): shallow to ledge to moderately deep, well- and moderately-well drained, fine sandy loams on 0 to 35 percent slopes. Based on field reviews of topography and soil characteristics in the project area, the risk of dry debris slides or deep soil slumps does not exist.

The proposed project area comprises about 3,000 acres, within which about 2,610 stand acres of northern hardwood and softwood Ecological Land Types (ELTs) are proposed for silvicultural treatment. ELTs are useful for making management decisions about which treatment method of harvesting to use (even- or uneven-aged management) and in which seasons harvesting should occur to minimize soil disturbance. Assuming this project area was harvested typical of other areas of the WMNF in the early 20th century, the project area would have experienced a mixture of heavy to light tree cutting including softwoods, with conventional bole-only harvests. Bole-only harvest typically results in about 35 percent of the calcium that could have been removed from the forest through harvesting being left on-site. The Forest Plan FEIS provides a comprehensive analysis of the effects of timber harvesting, and road and trail construction and reconstruction on soil productivity and erosion (FEIS pp. 3-7 to 3-36). This includes estimated calcium removal by different harvest methods (FEIS, Table 3-02 and 3-03, p. 3-19). Additional information on how soils influence silvicultural proposal development and the assessment of effects on soils from the proposed activities is summarized in Colter 2021.

After harvesting, the WMNF completes stocking surveys on all harvest units with a regeneration objective to determine if objectives were met. These data are collected on a variety of soils, aspects, and topographic positions and are indicative of soil productivity. Field examinations of representative stands within the project area indicate that soil productivity has been maintained following previous harvest (Colter 2021). These results are consistent with monitoring data collected Forest-wide which indicates that the WMNF has been successful in achieving objectives (i.e., desired condition for the stand) on managed softwood, mixedwood, and hardwood stands (USDA FS 2018). This is important because restocking is the first step in the re-accumulation of biomass, which is the measurement used by the Forest Service to assure that soil nutrient cycling is not impaired. Impairment of nutrient cycling would lead to a loss of long-term soil productivity. It shows that the forest response to harvest treatment is consistent with the expectations of silvicultural guides referenced in the Forest Plan (USDA Forest Service 2005a) and that acid deposition is not currently impacting soil productivity in the project area.

The Peabody project area includes an existing extensive skid trail and landing network that supported various winter timber operations in the past. Field examinations of representative stands found minimal erosion, compaction, and nutrient loss within the stands proposed for harvest (project record). This indicates that previous harvesting has not impacted the existing sites

to a detrimental condition and that the inherent capacity of the soil to support the growth of specified plants, plant communities, or sequences of plant communities still exists. Studies in Maine and Vermont found that soil compaction on log landings and skid trails from winter harvesting lasts two to three years after operations cease (Donnelly et al. 1991; Holman et al. 1978, NCASI 2004, USDA Forest Service, 2018). Restocking surveys and field reviews on the White Mountain National Forest indicate that skid trails and log landings are revegetating naturally. Well-distributed rainfall, abundant seed sources, and favorable seedbeds all contribute to this rapid revegetation. Log landings typically revegetate first with raspberries and other herbaceous species and then with forest tree species. Skid trails typically revegetate with forest tree species because the trails are narrow enough that sunlight is limited, so herbaceous plants do not generally revegetate these locations.

# Environmental Impacts

## Spatial and Temporal Context for Effects Analysis

### Soil Displacement (Erosion) and Soil Compaction

The analysis area for direct, indirect, and cumulative effects to soil productivity as measured by the indicators of soil displacement (erosion) and soil compaction is the project area proposed for treatment. The area has been selected because the expected effects are limited to this area.

Part of analyzing the direct, indirect, and cumulative effects on soil productivity is to consider how the soils have responded to the indictors of soil displacement (erosion) and compaction in the past. The temporal scope for cumulative effects on soil displacement (erosion) and soil compaction is ten years in the past to ten years beyond the implementation of the project. This period was chosen to incorporate the time it has been shown in literature for soils to shows little effects from the previous timber harvesting operations on National Forest System lands. This analysis takes into consideration effects on soil resources from 1) past soil disturbing actions that are still present and measurable, 2) implementation and completion of this project along with other on-going activities, and 3) reasonably foreseeable future soil disturbing activities that would overlap in time and space with project activity effects. This timeframe enables consideration of multiple uses and provides enough time for the expected recovery of soil productivity from soil displacement (erosion) and soil compaction.

### Soil Nutrient Cycling

The analysis area for direct, indirect, and cumulative effects on soil productivity from impaired soil nutrient cycling is the location of the actual proposed activities since site-specific impacts related to soil or forest productivity are not likely to extend further. The temporal scope for cumulative effects on soil nutrient cycling is from early harvesting and associated activities known approximately in the early 1900s to ten years beyond present. Early harvesting is considered because land use history may affect soil nutrients, including soil calcium (Hornbeck et al., 1990). Because atmospheric deposition may remove calcium from the soil irrespective of timber harvesting, future harvesting and atmospheric deposition are considered in this analysis. The total percentage of calcium loss includes recorded calcium depletion from atmospheric deposition for the last 65 years (USDA Forest Service, 2005b) and foreseeable calcium depletion over the next 10 years.

### Past, Present, and Reasonably Foreseeable Future Activities Relevant to Cumulative Effects Analysis

**Reasonably Foreseeable Future Projects:** Management activities during this timeframe include ongoing maintenance of permanent wildlife openings through prescribed fire or mechanical methods, road maintenance, ongoing invasive plant eradication, and ongoing maintenance of trails and backcountry campsites.

## No Action Alternative

Under a No Action alternative, no timber harvesting or road and trail building would occur. Therefore, no changes in soil erosion, compaction, or nutrient cycling would occur.

## Proposed Action

### Direct and Indirect Effects

#### *Soil Erosion, Compaction and Soil Nutrient Cycling*

**New Mountain Bike Trail Construction**

For this soil effects discussion, proposed trail segments are considered new construction because they are currently productive sites, as they grow forbs and grasses, and other biological processes are intact during the periods between forestry conservation activities. Approximately 5 miles or 3 acres of new trail construction is proposed. The area of effects from this action include the new trail mileage along with a five-foot-wide zone of surface compaction of the soil. As long as these trails exist, soil under the trail is detrimentally impacted by compaction. During construction, soil could be compacted, graded, sloped, or vegetation removed by workers for up to two feet out from the new trail on either side. This would expose the previously protected soil to rainfall, and the top, organic-rich layer of soil could more easily erode away from the site. The resulting soil displacement and soil compaction would temporarily decrease soil productivity while the activities are occurring, but implementation of best management practices (BMPs) would enable soil productivity near the trail to be restored. Implementing Forest Plan Standards and Guidelines, and BMPs designed to prevent surface erosion at trail sites, timing the construction activities to suitably dry periods, and controlling road drainage would effectively rehabilitate the temporarily disturbed area, prevent soil erosion, and protect soil productivity adjacent to the construction site.

Detrimental soil displacement (erosion) and soil compaction are anticipated as a result of new trail construction. However, the impacts would be very small in scale (limited to 5 miles or 3 acres). No impacts to soil nutrient cycling are anticipated from this activity.

**Pine Mountain Glade, Third Hole Access, Hermit Lake Complex**

No detrimental soil displacement (erosion) or soil compaction is anticipated with this project. No impacts to soil nutrient cycling are anticipated with this project.

**New Road Construction**

Approximately 0.6 mile of new road construction and three access roads, each less than 500 feet in length is proposed. For this soil effects discussion, these road segments are considered new construction because they are currently productive sites, as they grow forbs and grasses, and other biological processes are intact during the periods between forestry conservation activities. The new construction road segments would be added to the White Mountain National Forest

inventory of roads and would be managed in accordance with its designated maintenance level. Construction footprint would comprise the mileage of each alternative with a 20-foot-wide zone of surface compaction of the soil. As long as these roads exist, soil under the road is detrimentally impacted by compaction. During construction, soil could be compacted, graded, sloped, or vegetation removed by workers for up to six feet out from the new road on either side. This would expose the previously protected soil to rainfall, and the top, organic-rich layer of soil could more easily erode away from the site versus before the soil disturbing construction activities occurred, thus temporary decreasing soil productivity while the activities are occurring from soil displacement and soil compaction. However, potential impacts to soil productivity would be restored afterwards by following BMPs. Following Forest Plan direction and BMPs related to surface erosion control at road sites, timing the construction activities, and controlling road drainage should effectively rehabilitate the temporarily disturbed area, preventing soil erosion and protecting the soil adjacent to the construction site.

Detrimental soil displacement (erosion) or soil compaction is anticipated with this project. No impacts to soil nutrient cycling are anticipated with this project.

**Timber Harvesting**

Most of the activity area is gently to moderately sloped, and harvesting would occur on slopes suitable for timber management. The lengths of these slopes are short enough to limit potential for measurable soil erosion. The combination of moderately sloped terrain with post-harvesting measures in accordance with Forest standards and guidelines and BMPs, such as soil stabilization and waterbars, would avoid or minimize those effects and promote revegetation in disturbed areas (State of NH, BMP, 2016, Maine Forest Service 2005, 2006 and 2012; Stafford et al. 1996).

Some stands would be harvested only in the winter months, while some stands have the option of summer, fall or winter harvesting based on the soils or other resource needs and concerns. With frozen soils, proper skid trail location, and careful closeout at the end of operations, minimum surface soil erosion or soil compaction is likely to occur (State of NH, BMP, 2016, Maine Forest Service 2005, 2006 and 2012; Stafford et al. 1996). Frozen operations would produce very little compaction since operations would not have direct contact with mineral soil, and any effects from compaction should dissipate by the following winter after harvest (NCASI, 2004). Harvesting and skidding during summer/fall would most likely expose mineral soil, particularly on the main skid trails, and it is likely there would be site-specific instances of surface soil erosion and compaction from loss of organic cover. The Proposed Action has planned layout and management of approximately 41 miles of skid trails, utilizing breaks in terrain, and avoiding steep slopes where feasible, and limiting operations to dry soil conditions (per BMPs) would largely minimize or avoid detrimental soil erosion. Vegetation management guideline G-5 (USDA Forest Service 2005a, p. 2-30) states, “Where exposure of mineral soil is expected, skid trails should generally be located on grades of less than 20 percent, with only short steeper pitches.” Given that slopes in the project area can be up to 35 percent, there may be instances where skids trails will need to be on grades exceeding 20 percent for more than a short pitch. If so, those skid trails would not be consistent with this guideline. However, detrimental effects to soil productivity would be avoided in the project area, even if skid trails in units are inconsistent with the guideline with the implementation of soil and water BMPs and design features. Some temporary compaction would be expected on main skid trails, but this would also be minimized by BMPs and design features, and the soils should recover from compaction within three to six years of the end of operations (Donnelly et al. 1991, NCASI, 2004).

Short-term negative effects including soil displacement and soil compaction are anticipated from the proposed action. However, based on review of the best science, and the context and intensity of effects, no detrimental impacts to soil productivity as measured by soil displacement (erosion) or soil compaction are anticipated from timber harvesting (Colter 2021).

Proposed harvesting in the Peabody project area would be a bole only-tree removal. The direct effect of timber harvesting on soil nutrient cycling is the removal of calcium through the removal of forest products (tree boles). In general, harvesting that removes only the bole of a tree, removes only a portion of the calcium in the tree. Tree species vary in the content level amounts and distribution of calcium. Sugar maple is one of the most calcium rich trees, and the tops, limbs, and leaves equal about 35 percent of the calcium within a tree (USDA Forest Service 2005b, p 3-17). Assuming this project area was harvested typical of other areas of the WMNF in the early 20th century, the project area would have experienced a mixture of heavy to light tree cutting including softwoods, with conventional bole-only harvests. Based on soil nutrient depletion tables, this may have removed more than 1 percent of the calcium per acre of harvest (Fay 2003).

These estimates of calcium removed in forest products indicates that, clearcuts result in greater calcium being removed from site. Based on current science, clearcutting northern hardwoods removes approximately 350 Kg/ha of calcium when bole-only removal is used, while the other methods remove about 25% of this, or approximately 88 Kg/ha with bole only.

Atmospheric deposition may also remove calcium from the soil irrespective of timber harvest treatments and activities. The most recent small watershed studies suggest that the cumulative loss of calcium due to atmospheric deposition, considering the buffering effect of mineral weathering, is about 4 percent over 120 years (USDA-Forest Service 2005b pg. 3-24). Given that the cumulative effects analysis for soil nutrient cycling considers the previous 100 years, it is possible that up to 3 percent of the total soil calcium may have been removed during that time due to atmospheric deposition, and up to another 1 percent due to early harvesting methods. Atmospheric deposition may continue to deplete soil calcium though it appears that soil and streams in the Northeast are recovering from the possible impacts as the rate of atmospheric deposition has decreased (USDA-Forest Service 2005b, 3-26). In summary, it is estimated that about 4 percent soil calcium may have been lost over the past 120 years (USDA-Forest Service 2005b 3-24). It is assumed there are inputs to calcium due to natural mineral weathering; however, in terms of this analysis that is not included because the exact amount is unknown.

The effects of the proposed action on calcium removal are summarized in Table 2. The table is organized by harvesting activity, including even-aged management such as clearcut, patchcut, seed tree cut, shelterwood cuts and thinning and uneven-aged management such as group selection, single tree and improvement cuts. Bole-only, clearcut harvesting would remove an estimated 2 percent of the calcium from each proposed stand. The other bole-only harvesting methods would remove up to 1 percent of the total calcium from each proposed stand (USDA-Forest Service 2005b, FEIS, pp 3-19). The proposed action includes bole-only removal on approximately 2,926 acres and no whole tree removal.

Indirect effects include possible changes in available (exchangeable) soil calcium, and base saturation that are attributed to forest harvesting, skid trails, log landings, watershed restoration and road decommissioning.

Based on review of long-term monitoring data collected at Hubbard Brook Experimental Forest, the proposed action including design features and BMPs is not expected to result in detrimental

effects soil nutrient cycling in the analysis area (USDA-Forest Service 2005b, FEIS, pp 3-23 to 3-25).

The proposed action includes up to 13 new and 25 existing log landings; each would be approximately 0.75 acre. The log landings are well-placed on gentle terrain. The combination of careful site selection, implementation of BMPs, and management of the log landing during use would limit the extent of erosion and prevent long-term soil erosion impacts from truck traffic and skidder operation. Therefore, no detrimental soil displacement (erosion), soil compaction or soil nutrient cycling is anticipated from construction or use of log landings.

Indirect effects of non-detrimental soil erosion or compaction are based on the rate and success of revegetation of skid trails, log landings, watershed restoration and road decommissioning.

**Table 1. Estimated Calcium Removal by a single Harvest Practice (Kg/ha and % Total Estimated Pool).**

| Forest Type | CONV Thin[1] | CONV Clearcut[2] | CONV UEA[5] |
|---|---|---|---|
| **Hardwood** | 88 (<1) | 350 (2) | 88 (1) |

1. Conventional thinning 25% of tree stems or basal area (tops and branches left in woods).
2. Conventional clearcutting all tree stems or basal area (tops and branches left in woods).
5. Conventional uneven aged harvest of 25% of stems or basal area (tops left in the woods).

**Table 2. Estimated Calcium (Ca) Removal Cumulative Effect total loss by Harvest Practice over the Cumulative Effects Time Period**

| Activity | Estimated Ca loss (percent) |
|---|---|
| No Action | 5.9 |
| No Action Plus One Bole-only Clearcut Harvest | 9.1 |
| No Action Plus Bole-only Thin Harvest | 6.7 |

The estimated calcium (Ca) loss percentage for Table 2 is calculated as follows:

1. Bole only clear-cut harvest removal (i.e., just the trees):
    - 539(whole-tree) - 189(branches, tops, leaves} = 350/10812 = 3.2%
2. Calcium depletion with no harvest over 120 years:
    - (120 * 3.2) + ((120 * 1.2) - (120 * 8.2) = 528- 984 = 456/10812 = 4.2%
    - Calcium depletion since 1950 (initial acid rain):
3. 69/120 = 0.56(4.2) = 2.4%
4. Calcium depletion for 10 years after cut:
    - 10/120 = 0.08(4.2) = 0.3%
5. No Action Cumulative:
    - 3.2% (early century harvest) + 2.4% (acid rain 69 years) + 0.3% (Acid rain 10 years) = 5.9%
6. Action alternatives where bole-only harvest is used is "No action cumulative effects plus one clear-cut harvest”:

JA-1161

PBWTAR_6638

- 5.9%+ 3.2% = 9.1% estimated Ca - depletion.

7. Action alternatives where bole-only harvest is used, but uneven-aged harvest is applied, not clear-cut:
    - 5.9% + 0.8% = 6.7%
    - The 0.8% is derived by taking 25% of the biomass harvested by clear cut, because a thinning or selection harvest generally removes about 25% of the basal area of a hardwood stand.

**Permanent Wildlife Opening**

Up to 15 acres of new permanent wildlife opening acreage are included in the proposed action. The opening is well placed because of the gentle terrain and well-drained soils. Trees would be removed to allow grasses and plants to develop on the site. A stumping operation to take the stumps out would churn the soil surface and temporarily expose mineral soil leading to short-term on-site soil erosion within the boundary of the openings. However, the combination of careful site selection and application of BMPs during implementation would limit the extent of erosion and compaction to the site and prevent long-term soil erosion impacts to adjacent soil. After a period of three to five years the openings would be mowed or burned depending on the time of year, consistent with the ongoing wildlife opening maintenance program, to keep the vegetation lush for the animals to feed on and to keep trees from growing and taking over the site. Neither activity would produce measurable erosion or compaction impacts because the soil would not be devoid of ground cover.

Prescribed burning would occur either in late spring, when the snow cover has melted, or in late summer or early fall, when soil temperatures have cooled. While some surface soil organic matter may be lost, past forest monitoring indicates that prescribed burning does not affect rainfall infiltration rates. This is because most of the site would continue to remain covered by organic matter, and mineral soil aggregation would not be changed even after multiple years of burning. The magnitude of the potential effects after prescribed fire is less than those of wildfires since the prescribed fire is typically of a lower severity (Landsburg and Tiedemann 2000). Based on past monitoring, the fires on this forest do not get hot enough to burn all the surface organic material. A fire line could be constructed around the perimeter of the permanent wildlife openings, consisting of a breakup of the organic matter layer. However, the fire line would be designed to have minimal impact, and no detrimental erosion is expected.

Based on this analysis, expanding permanent wildlife openings is not expected to result in detrimental soil displacement (erosion), soil compaction or soil nutrient cycling.

**Road Decommissioning**

Approximately 0.8 mile of road is proposed for decommissioning in the proposed action. Decommissioning of roads may consist of an administrative exercise in the database to take it off the system, or it may consist of rehabilitation work such as water barring, restoring the contour, and seeding. There is no detrimental soil productivity effect as the soil is being put back into a productive state. Therefore, road decommissioning is not expected to result in detrimental soil displacement (erosion), soil compaction or soil nutrient cycling.

**Table 3 Proposed ground-disturbing activities under the Proposed Action, provided in linear miles and equivalent acres (if applicable)**

| Activity Type | Non-detrimental Soil Displacement (Erosion) | | Non-detrimental Soil Compaction | | Non-Detrimental Nutrient Cycling | Detrimental Effect On Soil Productivity |
|---|---|---|---|---|---|---|
| | **Linear Miles** | **Acres** | **Linear Miles** | **Acres** | **Acres** | **Acres** |
| Log Landings (n = 38 Landings)[1] | -- | 28.50 | -- | 28.50 | -- | -- |
| Timber Harvest | -- | -- | -- | -- | 2926 | -- |
| Wildlife Opening | -- | 15 | -- | 15 | -- | -- |
| Skid Trails[2] | 41 | 98 | 41 | 98 | -- | -- |
| New Bike Trail Construction[3] | 5 | 3 | 5 | 3 | -- | 3 |
| New Road Construction[2] | 0.9 | 2.16 | 0.9 | 2.16 | | 2.16 |
| Decommission Road[2] (Restored Soil Productivity) | -0.8 | -1.92 | -0.8 | -1.92 | | |
| **Total Disturbed Area** | 47 | 146.66 | 47 | 146.66 | 2926 | 5.16 |

1 Landing size =0.75 acres
2 One (1) mile of road, skid trail, or ski trail at an average disturbance width of 20 ft = 2.4 acres of disturbance/mile
3 Bike/Hiking trail width of 5 ft = 0.61 acre of disturbance/miles

## Summary of Direct and Indirect Effects

The Peabody project would result in a short-term increase in the amount of non-detrimental soil displacement (erosion) in the analysis area. Table 3 shows soil disturbance under the proposed action on approximately 143 acres or 4.9 percent of the approximately 3,000-acre analysis gross stand area.

The Peabody project would result in a short-term increase in the amount of non-detrimental soil compaction in the analysis area. Table 3 shows soil disturbance under the proposed action on approximately 143 acres, or 4.9 percent of the approximately 3,000-acre gross stand analysis area.

The Peabody project would result in a short-term increase in the amount of non-detrimental soil nutrient cycling from the timber harvesting with the most nutrients taken from the proposed action. Table 3 shows soil disturbance under the proposed action on approximately 3,000 acres, or 59 percent of the approximately 4920-acre gross analysis area.

The Peabody project would result in an increase in the amount of detrimental soil productivity in the analysis area. Table 3 shows soil productivity disturbance under the proposed action on up to approximately 5.16 acres or 0.2 percent of the approximately 3,000-acre gross stand analysis area.

However, the Peabody project would result in an increase in the amount of restored soil productivity in the analysis area. Table 4 shows soil productivity restored under the proposed action on approximately 0.8 acres, or 0.03 percent of the approximately 3,000-acre gross stand analysis area.

## Cumulative Effects

Based on current climate change literature related to soil productivity, no detrimental effects from climate change are expected within the cumulative effects time period.

Potential cumulative effects on soil erosion and compaction could occur as a result of timber harvest and other activities. No reasonably foreseeable timber harvest activities have been identified in the analysis area for soils. Ongoing Forest Service activities occurring in the affected area would implement applicable Forest Plan Standards and Guidelines and BMPs; therefore, project activities would not contribute substantially to cumulative effects on soils.

## Summary of Effects for Soil Productivity

The Soil Quality Standards for the Eastern Region of the Forest Service are designed to allow non-detrimental soil disturbance (exposure of mineral soil, compaction and nutrient cycling) and provide the context to determine how the potential soil property change may affect ecosystem composition, processes and function (productivity). (USDA-Forest Service Manual, Supplement R9 RO 2550-2012-1).

The Peabody project would result in a short-term increase in the amount of non-detrimental soil erosion in the analysis area. Table 3 shows soil disturbance under the proposed action on approximately 143 acres, or 4.9 percent of the approximately 3,000-acre gross stand analysis area. However, by following the recommended Best Management Practices and design features related to this project and prior monitoring of like projects no detrimental effects are anticipated within these acres as a result of this project.

The Peabody project would result in a short-term increase in the amount of non-detrimental soil compaction in the analysis area.  Table 3 shows soil disturbance under the proposed action on approximately 143 acres, or 4.9 percent of the approximately 3,000-acre gross stand analysis area. However, by following the recommended Best Management Practices and design features related to this project and prior monitoring of like projects no detrimental effects are anticipated within these acres as a result of this project.

The Peabody project would result in a short-term increase in the amount of non-detrimental soil nutrient cycling from the timber harvesting with the most nutrients taken from the proposed action. Table 3 shows soil disturbance under the proposed action on approximately 3,000 acres, or 59 percent of the approximately 4920-acre gross analysis area. However, by following the recommended BMPs and design features related to this project and prior monitoring of like projects no detrimental effects are anticipated within these acres as a result of this project.

The Peabody project would result in some amount of detrimental soil productivity in the analysis area. Table 3 shows detrimental soil productivity disturbance under the proposed action on up to approximately 5.16 acres, or 0.2 percent of the approximately 3,000-acre gross stand analysis area. This is the soil that sits directly under the proposed roads and trails. This soil would be displaced, compacted and would not produce plants and other microorganisms that allow the soil to cycle nutrients until the trail is decommissioned. Soil productivity would be lost while the soil is maintained as roads and trails but the Forest Plan FEIS (pp 3-29 to 3-36) analyzed and allowed up to a certain amount of new construction within the life of the plan and based on current monitoring the forest has yet to meet that threshold.

However, the Peabody project would result in an increase in the amount of restored soil productivity in the analysis area.  Table 4 shows soil productivity restored under the proposed action on approximately 0.8 acres, or 0.03 percent of the approximately 3,000-acre gross stand analysis area.

The cumulative effects project area which totals approximately 4,920 acres this area was chosen to adequately analyze the cumulative effect of activities in other parts of the project area along with the proposed activities. Table 3 shows the proposed action has approximately 3,217 acres combined non detrimental and detrimental soil displacement, soil compaction and impaired soil nutrient cycling). This would mean 65% of the soil in the project area would see some disturbance.

## Monitoring Recommendations

Forest-plan monitoring will occur by the Forest Soil Scientist to ensure soil objectives and standards are being met; and project adjustments will be made as appropriate, consistent with the environmental analysis and decision. It is recommended that long-term monitoring to be established on harvested and non-harvested whole-tree and bole-only harvest plots to monitor for soil nutrient cycling to maintain soil productivity and inform future management activities.

## References

Colter, R. A. 2020. Soils background information for how effects are determined in NEPA for soil productivity.

Colter, R. A. 2021. Peabody Integrated Resource Project Soil Assessment Report. White Mountain National Forest, Campton, NH.

Donnelly, J.R., J. B. Shane and H.W. Yawney. 1991. Harvesting Causes Only Minor Changes in Physical Properties of an Upland Vermont Soil. Northern Journal of Applied Forestry. Vol. 8, No. 1. pp.33-35.

Fay, S. 2003. Re-Calculations of Calcium Depletion. Administrative Record.

Holman, Gregory T., Fred B. Knight, and Roland A. Struchtemeyer. 1978. The Effects Of Mechanized Harvesting On Soil Conditions In The Spruce-Fir Region Of North-Central Maine. Life Sciences and Agriculture Experiment Station University of Main at Orono. Bulletin 751.

Hornbeck, J.W., C.T. Smith, C.Wayne. Martin, L.M. Tritton, and R.S. Pierce. 1990. Effects of Intensive Harvest on Nutrient Capitals of Three Forest Types in New England. Forest Ecology and Management 30: 55-64.

Landsburg, J.D., and A.R. Tiedemann. 2000. Drinking Water from Forests and Grasslands: A Synthesis of the Scientific Literature: Chapter 12 – Fire Management. USDA Forest Service Southern Research Station General Technical Report SRS-39. http://www.srs.fs.usda.gov/pubs/gtr_srs039/index.htm

Maine Forest Service. Department of Conservation. 2012. Maine Forestry Best Management Practices Use and Effectiveness 2010 – 2011.

Maine Forest Service. Department of Conservation. 2006. Maine Forestry Best Management Practices Use and Effectiveness 2001 – 2005.

Maine Forest Service. Department of Conservation 2005. Maine Forestry Best Management Practices Use and Effectiveness 2001 – 2003. 12pp.

National Council for Air and Stream Improvement, Inc. (NCASI). 2004. Effects of Heavy Equipment on Physical Properties of Soils and on Long-Term Productivity: A Review of Literature and Current Research. Technical Bulletin No. 887. Research Triangle Park, N.C.: National Council for Air and Stream Improvement, Inc.

Stafford, C., M. Leathers, and R. Briggs. 1996. Forestry Related Nonpoint Source Pollution in Maine: A Literature Review. Maine Agricultural and Forest Experiment Station, College of Natural Resources, Forestry and Agriculture, University of Maine, Orono, ME, Misc Report, 399.

State of New Hampshire. 2016. New Hampshire Best Management Practices for Erosion Control on Timber Harvesting Operations. Concord, NH 90pp.

USDA Forest Service, 2005a. White Mountain National Forest Land and Resource Management Plan. Laconia, NH.

USDA-Forest Service, 2005b. Final Environmental Impact Statement for White Mountain National Forest Land and Resource Management Plan. Laconia, NH.

USDA-Forest Service Manual, Supplement R9RO 2550-2012-1 – Soil Management.

USDA Forest Service, 2018. 2018 Biennial Monitoring and Evaluation Report for Fiscal Years 2015, 2016, and 2017. White Mountain National Forest. Campton, NH.

00034
71A
71D
71B
71F
71I
71K
71J
71N
71L
71P
72
67
68
69
70
71
72
73
74
75
385
2269
0
435
870
1,740
2,610
3,480
Feet
USDA-APFO; USDA - USFS - RSAC

Peabody Features
Base-line Data
N
Landing
Landing1
Spring
Xing7
Xing6
Xing5
Endeasyrd
AspenPB
Xing4
Xing2
Xing1
Xing3
Heavywooded
Typechange
CCUT
Bear Nests
Valley
Knob
Sfthicket
Treat
Strmxing
Xing
Take375
Legend
Feautures_Peabody_GW_2020
StandRecon_2020_0214
StandRecon_2020_0327
StandRecon_ASPB_2020_0221
1562_old_forest
Landings
StandRecon_Track_2020_0214
StandRecon_Track_2020_0221
Track_Peabody_2020_0312
Track_Peabody_Williams_Wigler_2020_0312
Track_Peabody_Williams_Wigler_2020_0327
Track_Peabody_Williams_Wigler_Farina_Gibbons_2020_0507
Track1_Peabody_Williams_Wigler_2020_0327
Track1_Peabody_Williams_Wigler_2020_0409
Track1_Peabody_Williams_Wigler_newroad_2020_0409
FS Road (NRM all roads)
SALE_NAME
Peabody_West_Botany_Reserves_gw_draft
0 0.15 0.3 0.6 0.9 1.2
Miles

| Stand ID | Comp | Stand | Cover Sheet | ACRES | EV CODE | New EV | LT | CF Pulp | CF Saw | BF | Gross cords | Gross MBF | Pulp Cords | MBF Conv. | Rx1 | Rx2 | Type | Pre BA | Post BA | Calc BA | ABBA | %ran | ACRU | %ran | ACSA3 | %ran | BEAL2 | %ran | BEPA | %ran | FAGR | %ran | FRAM2 | %ran | PIRU | %ran | POTR5/GRA | %ran | TSCA | Percent | PIST | %ran | PIRE | Percent | QURU | Percent | AGS | UGS | AGS(%) | UGS(%) | Yr | LSC | DBH | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 00033 | 25 | Y | 32 | 13 | 81 | 115a | 3344 | 1936 | 11170 | 41.5 | 19.4 | 16.6 | 1.73 | 151 | | SW | 100 | 139 | 136 | 4 | 3% | 14 | 10% | 4 | 3% | 6 | 4% | 9 | 7% | 2 | 1% | 0 | 0% | 25 | 18% | 21 | 15% | 51 | 37% | | | | | | | 135.5 | 28.8 | 82% | 18% | 1952 | 500 | 9.3 | |
| 2 | 00033 | 26 | | 23 | 89 | 89 | 11 | 2457 | 884 | 4791 | 31.1 | 14.7 | 19.9 | 1.85 | 113 | | SW | 100 | 108 | 102 | 0 | 0% | 36 | 34% | 16 | 15% | 8 | 7% | 6 | 6% | 26 | 24% | 3 | 2% | 0 | 0% | 6 | 6% | 0 | 0% | | | | | | | 68.3 | 58.3 | 54% | 46% | 1938 | 500 | 8.7 | RED MAPLE PAPER BIRCH BEECH YELLOW BIRCH |
| 3 | 00033 | 23 | Y | 116 | 91 | 81 | 115c/115a | 2207 | 681 | 3772 | 27.9 | 13.2 | 19.3 | 1.81 | 113 | | HW/SW | 20 | 99 | 94 | 0 | 0% | 7 | 7% | 36 | 37% | 10 | 10% | 9 | 9% | 13 | 14% | 8 | 8% | 0 | 0% | 9 | 0% | 0 | 0% | | | | | | | 72.9 | 45.3 | 62% | 38% | 1981 | 500 | 8.1 | |
| 4 | 00033 | 98 | | 14 | 89 | | 115g/115c | | | | | | | | | | HW | 20 | 20 | 0 | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | | | | | | 0.0 | 0.0 | #DIV/0! | #DIV/0! | 1979 | 500 | 1.0 | Stand was not done to due heavy previous harves with little to no merchantable stems present. |
| 5 | 00033 | 94 | Y | 6 | 89 | 89 | 115c | 1844 | 472 | 2720 | 23.3 | 11.0 | 17.4 | 1.74 | Defer | | HW | 20 | 90 | 77 | 3 | 3% | 12 | 13% | 6 | 7% | 12 | 13% | 11 | 12% | 27 | 30% | 2 | 2% | 2 | 2% | 0 | 0% | 3 | 3% | | | | | | | 26.0 | 86.5 | 23% | 77% | 1979 | 500 | 7.3 | Defer- young stand |
| 6 | 00033 | 99 | Y | 16 | 87 | 87 | 115c | | | | 0.0 | 0.0 | 0.0 | #DIV/0! | 151 | | HW | 20 | 126 | 125 | 9 | 7% | 23 | 18% | 0 | 0% | 14 | 11% | 19 | 15% | 14 | 11% | 0 | 0% | 20 | 16% | 0 | 0% | 27 | 21% | | | | | | | 88.8 | 66.5 | 57% | 43% | 1979 | 500 | 9.3 | |
| 7 | 00033 | 29 | | 170 | 89 | 81 | 115c/105 | 2083 | 639 | 3626 | 26.4 | 12.5 | 18.3 | 1.76 | 113 | | HW | 20 | 94 | 93 | 0 | 0% | 9 | 9% | 19 | 20% | 14 | 15% | 2 | 2% | 41 | 44% | 1 | 1% | 4 | 4% | 0 | 0% | 2 | 2% | | | | | | | 49.0 | 63.1 | 44% | 56% | 1979 | 500 | 7.9 | |
| 8 | 00033 | 30 | | 15 | 13 | 81 | 105 | 1814 | 888 | 4847 | 23.0 | 10.9 | 11.7 | 1.83 | 151 | | HW | 70 | 76 | 77 | 1 | 2% | 11 | 14% | 1 | 2% | 6 | 7% | 12 | 16% | 11 | 14% | 0 | 0% | 34 | 45% | 0 | 0% | 0 | 0% | | | | | | | 55.5 | 42.7 | 57% | 43% | 1927 | 500 | 9.8 | Ice storm damage 1998 |
| 9 | 00033 | 20 | Y | 23 | 89 | 81 | 115c | 2747 | 640 | 3282 | 34.8 | 16.4 | 26.7 | 1.89 | 113 | | HW | 31 | 128 | 125 | 0 | 0% | 40 | 31% | 9 | 7% | 3 | 3% | 10 | 8% | 48 | 37% | 8 | 6% | 0 | 0% | 5 | 5% | 0 | 0% | | | | | | | 70.8 | 72.1 | 50% | 50% | 1927 | 500 | 7.9 | Pine Mountain TS 2004. |
| 10 | 00033 | 89 | Y | 31 | 89 | 87 | 115c | 2425 | 913 | 4861 | 30.7 | 14.5 | 19.1 | 1.88 | 151 | | HW | 98 | 110 | 111 | 9 | 8% | 46 | 42% | 4 | 3% | 6 | 6% | 13 | 12% | 7 | 6% | 0 | 0% | 11 | 10% | 5 | 5% | 10 | 9% | | | | | | | 117.6 | 24.7 | 83% | 17% | 1923 | 500 | 8.4 | A upland hardwood overstory with a very healthy/thick and advanced regeneration of spruce/fir. Should be managed for understory softwoods. |
| 11 | 00033 | 34 | Y | 18 | 13 | 13 | 11/115a | 3289 | 1800 | 10262 | 41.6 | 19.7 | 18.8 | 1.77 | 113 | | SW | 100 | 144 | 143 | 8 | 5% | 24 | 17% | 4 | 3% | 6 | 4% | 6 | 4% | 4 | 3% | 0 | 0% | 54 | 37% | 0 | 0% | 40 | 28% | | | | | | | 138.3 | 19.6 | 88% | 12% | 1937 | 500 | 9.5 | |
| 12 | 00033 | 2 | Y | 112 | 87 | 87 | 11 | 3022 | 1405 | 7991 | 38.3 | 18.1 | 20.5 | 1.76 | 153 | | SW | 130 | 129 | 129 | 10 | 8% | 37 | 29% | 14 | 11% | 19 | 15% | 17 | 13% | 1 | 1% | 1 | 1% | 18 | 14% | 10 | 8% | 1 | 1% | | | | | | | 103.6 | 40.2 | 72% | 28% | 1913 | 500 | 9.2 | 010 OLD STANDS 2 & 14 |
| 13 | 00033 | 97 | Y | 25 | 81 | 20 | 115c/115g | 2607 | 1381 | 8209 | 33.0 | 15.6 | 15.5 | 1.68 | 151 | | HW | 110 | 104 | 102 | 3 | 3% | 10 | 10% | 30 | 29% | 20 | 19% | 1 | 1% | 21 | 20% | 9 | 8% | 0 | 0% | 6 | 6% | 7 | 7% | | | | | | | 90.8 | 25.8 | 78% | 22% | 1889 | 500 | 10.3 | PLOTS 1-5 ON WEST SIDE OF TOWN LINE BROOK; 6-10 ON EAST SIDE; HEMLOCK ON PLOT 8 LINE 3 OVER 200 YRS OLD - PROTECT OLD HEMLOCKS |
| 14 | 00033 | 5 | Y | 59 | 81 | 20 | 115c/115g | 3813 | 2098 | 16289 | 48.3 | 22.8 | 14.1 | 1.66 | 153 | | SW | 110 | 143 | 143 | 2 | 1% | 18 | 13% | 24 | 17% | 26 | 18% | 0 | 0% | 13 | 9% | 0 | 0% | 14 | 10% | 3 | 2% | 43 | 30% | | | | | | | 126.4 | 28.2 | 82% | 18% | 1889 | 500 | 11.6 | Pine Mountain TS 2004. |
| 15 | 00033 | 4 | | 79 | 81 | 89 | 115c | 1867 | 1094 | 7709 | 26.3 | 12.2 | 16.6 | 1.77 | 113 | | HW | 110 | 120 | 121 | 6 | 5% | 46 | 38% | 24 | 20% | 18 | 15% | 4 | 4% | 11 | 9% | 4 | 3% | 4 | 3% | 4 | 3% | 1 | 1% | | | | | | | 91.5 | 37.3 | 71% | 29% | 1915 | 500 | 9.8 | Pine Mountain TS 2004. |
| 16 | 00033 | 17 | Y | 18 | 95 | 89 | 115c | 2208 | 1001 | 5432 | 27.9 | 13.2 | 15.3 | 1.84 | 151 | | HW | 167 | 93 | 94 | 7 | 7% | 25 | 26% | 11 | 12% | 16 | 18% | 15 | 16% | 7 | 7% | 3 | 3% | 3 | 3% | 3 | 3% | 4 | 4% | | | | | | | 68.6 | 40.0 | 63% | 37% | 1915 | 500 | 9.4 | Pine Mountain TS 2004. |
| 17 | 00033 | 16 | Y | 232 | 89 | 89 | 115c/115g | 2444 | 1276 | 7129 | 31.5 | 15.8 | 17.3 | 1.79 | 153 | | HW | 90 | 111 | 110 | 2 | 2% | 23 | 21% | 26 | 24% | 16 | 14% | 12 | 11% | 12 | 11% | 3 | 3% | 7 | 6% | 12 | 10% | [illegible] | [illegible] | | | | | | | 88.8 | 49.3 | 64% | 36% | 1913 | 500 | 9.2 | Pine Mountain TS 2004. |
| 18 | 00033 | 11 | Y | 22 | 89 | 91 | 115c | 1691 | 161 | 959 | 21.4 | 10.1 | 19.4 | 1.68 | Defer | | HW | 0 | 79 | 80 | 0 | 0% | 24 | 30% | 0 | 0% | 4 | 5% | 9 | 11% | 0 | 0% | 0 | 0% | 0 | 0% | 43 | 54% | 0 | 0% | | | | | | | 72.9 | 45.0 | 62% | 38% | 1976 | 500 | 7.5 | Pine Mountain TS 2004. |
| 19 | 00033 | 61 | Y | 101 | 81 | 89 | 105/115c | 1870 | 567 | 3031 | 23.7 | 11.2 | 16.5 | 1.87 | 113 | | HW | 81 | 80 | 81 | 0 | 0% | 19 | 24% | 11 | 14% | 10 | 13% | 10 | 13% | 20 | 25% | 2 | 3% | 4 | 5% | 4 | 5% | 0 | 0% | | | | | | | 36.8 | 62.5 | 37% | 63% | 1927 | 500 | 8.9 | Mostly a young regenerating hardwood stand. Some areas harvested or thinned more than others. A lot of ice damage. Paper birch hit hard by ice and decline. Some qulity timber in scattered patches. Good potential for future. |
| 20 | 00033 | 56 | Y | 39 | 89 | 81 | 105 | 2462 | 742 | 4379 | 31.2 | 14.7 | 21.8 | 1.69 | 113 | | HW | 40 | 105 | 105 | 0 | 0% | 4 | 4% | 26 | 25% | 15 | 14% | 6 | 6% | 52 | 50% | 1 | 1% | 0 | 0% | 0 | 0% | 0 | 0% | | | | | | | 37.3 | 84.6 | 31% | 69% | 1935 | 500 | 8.4 | Ice Storm Damage 1998 killed most of paper birch and the overstory is allowing northern hardwoods to regenerate. |
| 21 | 00033 | 18 | Y | 5 | 89 | | 105 | | | | | | | | | | HW | 40 | 40 | 0 | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | | | | | | 0.0 | 0.0 | #DIV/0! | #DIV/0! | 1935 | 500 | 8.0 | Pine Mountain TS 2004. |
| 22 | 00033 | 51 | | 49 | 81 | 89 | 115c | 2044 | 537 | 2900 | 25.9 | 12.2 | 19.1 | 1.85 | 153 | | HW | 96 | 92 | 93 | 3 | 3% | 26 | 28% | 14 | 15% | 5 | 5% | 2 | 2% | 27 | 29% | 4 | 4% | 7 | 8% | 4 | 4% | 0 | 0% | | | | | | | 48.2 | 61.5 | 44% | 56% | 1927 | 500 | 8.4 | Mostly regenerating hardwoods. Soome areas have more large diameter residuals than others. A significant amount of broken tops and ice damage in isolated areas. Needs 10-20 years before thinking about any substantial management. |
| 23 | 00033 | 53 | | 89 | 87 | 87 | 115c/11 | 2638 | 1212 | 6374 | 33.4 | 15.8 | 18.1 | 1.90 | 151 | | HW/SW | 40 | 111 | 111 | 1 | 1% | 46 | 41% | 15 | 14% | 12 | 11% | 1 | 1% | 10 | 9% | 6 | 5% | 3 | 3% | 0 | 0% | 16 | 14% | | | | | | | 83.3 | 46.7 | 64% | 36% | 1983 | 500 | 9.9 | |
| 24 | 00033 | 36 | Y | 14 | 20 | 20 | 11 | 3391 | 1897 | 10526 | 42.9 | 20.3 | 18.9 | 1.80 | 151 | | SW | 137 | 139 | 140 | 1 | 1% | 61 | 44% | 6 | 4% | 6 | 4% | 0 | 0% | 10 | 7% | 8 | 6% | 11 | 8% | 6 | 4% | 31 | 23% | | | | | | | 116.4 | 45.0 | 72% | 28% | 1923 | 500 | 10.5 | A fairly wet and rocky area. Lots of moisture in the soil. A lot of standing dead and down timber. Mostly conifers. |
| 25 | 00033 | 62 | Y | 17 | 89 | 89 | 105d/115c | 2737 | 1196 | 6670 | 34.6 | 16.4 | 19.5 | 1.79 | 151 | | MW/HW | 40 | 113 | 115 | 0 | 0% | 5 | 4% | 37 | 33% | 20 | 18% | 9 | 8% | 31 | 27% | 3 | 3% | 0 | 0% | 0 | 0% | 9 | 8% | | | | | | | 74.5 | 50.0 | 60% | 40% | 1975 | 500 | 9.2 | |
| 26 | 00033 | 58 | | 64 | 81 | 87 | 115c/105d | 2356 | 1261 | 7316 | 29.8 | 14.1 | 13.9 | 1.72 | 153 | | HW/MW | 149 | 98 | 100 | 0 | 0% | 11 | 11% | 4 | 4% | 20 | 20% | 4 | 4% | 18 | 18% | 2 | 2% | 7 | 7% | 4 | 4% | 29 | 30% | | | | | | | 68.1 | 48.4 | 58% | 42% | 1928 | 500 | 9.6 | Mostly regenerating hardwoods. Area has been thinned in the past. Some pockets of really nice merchantable timber. Good spacing in thinned out areas. |
| 27 | 00033 | 49 | | 49 | 91 | 89 | 115c | 2404 | 1150 | 6507 | 30.4 | 14.4 | 15.9 | 1.77 | 111 | | HW | 30 | 100 | 101 | 0 | 0% | 19 | 19% | 8 | 8% | 13 | 13% | 1 | 1% | 18 | 18% | 9 | 9% | 0 | 0% | 21 | 21% | 11 | 11% | | | | | | | 81.7 | 34.3 | 70% | 30% | 1976 | 500 | 9.8 | |
| 28 | 00033 | 50 | | 32 | 91 | 89 | 115c | 2743 | 926 | 4980 | 34.7 | 16.4 | 23.0 | 1.86 | 153 | | HW | 40 | 113 | 115 | 1 | 1% | 22 | 19% | 16 | 14% | 6 | 5% | 7 | 6% | 28 | 25% | 9 | 8% | 0 | 0% | 20 | 18% | 5 | 4% | | | | | | | 87.7 | 43.8 | 67% | 33% | 1978 | 500 | 9.6 | Pine Mountain TS 2004. |
| 29 | 00033 | 40 | Y | 28 | 89 | 89 | 115a/11 | 3211 | 1715 | 9915 | 40.6 | 19.2 | 18.9 | 1.73 | 151 | | SW | 40 | 129 | 129 | 3 | 2% | 34 | 26% | 28 | 21% | 4 | 3% | 4 | 3% | 14 | 11% | 25 | 19% | 4 | 3% | 3 | 2% | 11 | 9% | | | | | | | 124.2 | 29.2 | 81% | 19% | 1983 | 500 | 10.3 | |
| 30 | 00033 | 41 | Y | 70 | 89 | 87 | 11/115a | 3626 | 2015 | 10983 | 45.9 | 21.7 | 20.4 | 1.83 | 153 | | SW | 138 | 152 | 152 | 6 | 4% | 66 | 44% | 6 | 4% | 6 | 4% | 10 | 7% | 3 | 2% | 10 | 6% | 15 | 10% | 5 | 3% | 25 | 17% | 4 | 3% | | | | | 79.7 | 79.7 | 50% | 50% | 1930 | 500 | 10.1 | Lots of standing dead and down woody debris. Windthrow and possible ice damage. |
| 31 | 00033 | 35 | Y | 48 | 87 | 20 | 11 | 3314 | 2190 | 12606 | 41.9 | 19.8 | 14.2 | 1.74 | 151 | | SW | 131 | 131 | 119 | 2 | 2% | 43 | 33% | 3 | 2% | 4 | 3% | 6 | 5% | 1 | 1% | 1 | 1% | 16 | 12% | 2 | 2% | 39 | 30% | | | | | | | 93.2 | 58.2 | 62% | 38% | 1927 | 500 | 11.3 | Large portion of the stand is full of dead standing timber and large diameter down woody debris. Conifers are most affected by this. The stand is also a mosaic of timber types. It is hard to determine the most dominant forest type. |
| 32 | 00033 | 37 | Y | 8 | 92 | 13 | 11 | 3860 | 2474 | 14648 | 48.9 | 23.1 | 17.5 | 1.69 | 153 | | SW | 90 | 152 | 146 | 12 | 8% | 35 | 23% | 11 | 7% | 5 | 3% | 9 | 6% | 0 | 0% | 3 | 2% | 20 | 13% | 2 | 1% | 51 | 34% | | | | | | | 98.0 | 55.5 | 64% | 36% | 1937 | 500 | 10.6 | |
| 33 | 00033 | 69 | Y | 32 | 13 | 13 | 115c/115a | 3179 | 1527 | 8449 | 40.2 | 19.0 | 20.9 | 1.81 | 131 | | HW/SW | 110 | 142 | 143 | 14 | 10% | 21 | 15% | 0 | 0% | 8 | 6% | 21 | 15% | 2 | 1% | 0 | 0% | 75 | 53% | 0 | 0% | 1 | 1% | | | | | | | 136.0 | 30.0 | 82% | 18% | 1927 | 500 | 9.2 | |
| 34 | 00033 | 38 | Y | 14 | 92 | 13 | 11 | 1316 | 639 | 3765 | 16.7 | 7.9 | 8.6 | 1.70 | 141 | | SW | 90 | 65 | 59 | 33 | 51% | 5 | 7% | 9 | 14% | 0 | 0% | 2 | 2% | 0 | 0% | 0 | 0% | 0 | 0% | 3 | 5% | 8 | 12% | | | | | | | 57.5 | 23.0 | 71% | 29% | 1937 | 500 | 8.3 | |
| 35 | 00033 | 65 | Y | 26 | 89 | 81 | 105d/115c | 2906 | 1269 | 6990 | 36.8 | 17.4 | 20.7 | 1.82 | 220 | | HW | 80 | 120 | 121 | 5 | 4% | 28 | 23% | 31 | 26% | 10 | 8% | 1 | 1% | 40 | 33% | 0 | 0% | 3 | 3% | 1 | 1% | 1 | 1% | | | | | | | 74.6 | 58.3 | 56% | 44% | 1978 | 500 | 9.6 | |
| 36 | 00033 | 64 | | 11 | 92 | | 105d/115c | | | | | | | | | | MW/HW | 120 | 120 | 0 | 0 | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | | | | | | | | #DIV/0! | #DIV/0! | 1927 | 500 | 9.0 | Stand did not have plots assigned to it |
| 37 | 00033 | 66 | Y | 16 | 87 | 87 | 105d/115a | 3661 | 1826 | 10439 | 46.3 | 21.9 | 23.2 | 1.75 | 153 | | MW/SW | 20 | 161 | 159 | 6 | 4% | 32 | 20% | 6 | 4% | 18 | 11% | 9 | 6% | 47 | 29% | 2 | 1% | 12 | 7% | 3 | 2% | 23 | 14% | | | | | | | 104.5 | 66.5 | 61% | 39% | 1976 | 500 | 8.4 | |
| 38 | 00033 | 59 | Y | 78 | 81 | 89 | 115a/115c | | | | 0.0 | 0.0 | 0.0 | #DIV/0! | 111 | | SW/HW | 110 | 110 | 130 | 1 | 1% | 32 | 29% | 10 | 9% | 15 | 14% | 8 | 7% | 26 | 23% | 4 | 4% | 6 | 6% | 6 | 6% | 21 | 19% | | | | | | | 56.5 | 78.8 | 42% | 58% | 1927 | 500 | 10.2 | Nice hardwood stand. A lot of young timber. Not much large merchantable timber. Some areas need daylighting and thinning but not a large scale harvest. |
| 39 | 00033 | 39 | Y | 24 | 87 | 87 | 11 | 2743 | 1321 | 7793 | 34.7 | 16.4 | 18.0 | 1.70 | 153 | | SW | 70 | 116 | 107 | 15 | 13% | 13 | 11% | 34 | 29% | 8 | 6% | 8 | 6% | 1 | 1% | 13 | 11% | 0 | 0% | 3 | 2% | 14 | 12% | | | | | | | 78.7 | 56.2 | 58% | 42% | 1928 | 500 | 9.3 | |
| 40 | 00032 | 11 | | 8 | 81 | Need to | 115c | | | | 0.0 | 0.0 | 0.0 | #DIV/0! | 151 | | HW | 110 | 103 | 104 | 2 | 2% | 6 | 5% | 17 | 16% | 19 | 18% | 2 | 2% | 24 | 24% | 8 | 7% | 4 | 4% | 0 | 0% | 23 | 22% | | | | | | | 52.5 | 57.5 | 48% | 52% | 1870 | 500 | 11.2 | 006 THIN & WERE REPRO GOOD-SHELTERWOOD REMOVAL |
| 41 | 00032 | 18 | | 3 | 81 | 89 | 102c/115c | 2327 | 1143 | 6674 | 29.5 | 13.9 | 15.0 | 1.71 | 111 | | HW | 120 | 95 | 96 | 10 | 11% | 20 | 21% | 15 | 16% | 8 | 8% | 35 | 37% | 3 | 3% | 0 | 0% | 5 | 5% | 0 | 0% | 0 | 0% | | | | | | | 107.5 | 16.7 | 87% | 13% | 1901 | 500 | 9.5 | DATA TAKEN FROM STAND 13. |
| 42 | 00032 | 9 | Y | 10 | 92 | 81 | 102c/115c | 2547 | 782 | 4336 | 32.2 | 15.3 | 22.3 | 1.80 | 151 | | HW | 130 | 117 | 118 | 11 | 9% | 41 | 35% | 30 | 26% | 14 | 12% | 6 | 5% | 9 | 8% | 2 | 1% | 6 | 5% | 0 | 0% | 0 | 0% | | | | | | | 81.0 | 56.0 | 59% | 41% | 1930 | 500 | 8.2 | 005 MA3E PINE LINK TRAIL IN STAND |
| 43 | 00033 | 1 | Y | 12 | 81 | 81 | 115c/115a | 2222 | 943 | 4916 | 28.1 | 13.3 | 16.2 | 1.92 | 151 | | HW/SW | 80 | 93 | 94 | 5 | 5% | 20 | 21% | 26 | 27% | 12 | 13% | 14 | 15% | 12 | 13% | 2 | 2% | 5 | 5% | 0 | 0% | 0 | 0% | | | | | | | 64.5 | 52.0 | 55% | 45% | 1944 | 500 | 9.4 | SPRING BROOK SALE |
| 44 | 00033 | 67 | Y | 29 | 86 | 86 | 105d | 2955 | 1470 | 8411 | 37.4 | 17.7 | 18.8 | 1.75 | 113 | | MW | 140 | 118 | 120 | 0 | 0% | 9 | 8% | 5 | 4% | 16 | 14% | 9 | 8% | 60 | 51% | 0 | 0% | 1 | 1% | 0 | 0% | 19 | 16% | | | | | | | 56.2 | 74.2 | 43% | 57% | 1927 | 500 | 9.8 | A lot of low quality timber in overstory. Beech dominated with moderate canker throughout. Either needs a heavy thinning or to be left alone to develope naturally. |
| 45 | 00033 | 74 | Y | 33 | 87 | 20 | 115a/ | 3501 | 1882 | 10691 | 44.3 | 21.0 | 20.5 | 1.76 | 113 | | SW | 118 | 141 | 143 | 0 | 0% | 15 | 11% | 0 | 0% | 18 | 13% | 9 | 6% | 57 | 40% | 0 | 0% | 13 | 9% | 0 | 0% | 30 | 21% | | | | | | | 61.7 | 90.8 | 40% | 60% | 1927 | 500 | 9.7 | A mixed hardwood/softwood stand. Timber can definitely be removed throughout stand on some level or another. |
| 46 | 00033 | 48 | Y | 182 | 91 | 89 | 115a/115c | | | | 0.0 | 0.0 | 0.0 | #DIV/0! | 113 | | SW/HW | 20 | 139 | 140 | 2 | 1% | 23 | 17% | 16 | 12% | 12 | 8% | 14 | 10% | 12 | 9% | 6 | 4% | 3 | 2% | 37 | 27% | 14 | 10% | | | | | | | 49.4 | 96.5 | 34% | 66% | 1972 | 500 | 9.1 | |
| 47 | 00033 | 42 | Y | 29 | 89 | 89 | 115a | | | | 0.0 | 0.0 | 0.0 | #DIV/0! | 153 | | SW | 133 | 159 | 160 | 0 | 0% | 35 | 22% | 24 | 15% | 15 | 9% | 18 | 11% | 20 | 13% | 39 | 24% | 0 | 0% | 3 | 2% | 6 | 4% | | | | | | | 58.8 | 53.3 | 52% | 48% | 1925 | 500 | 9.8 | Very nice stand of mixed upland hardwoods. A lot of timber is marked with blue paint. Some very nice merchantable timber present and a good crop in the middle and understory. |
| 48 | 00033 | 44 | Y | 38 | 87 | 20 | 11 | 3372 | 2128 | 12519 | 42.7 | 20.2 | 15.7 | 1.70 | 153 | | SW | 130 | 142 | 133 | 12 | 8% | 21 | 15% | 5 | 3% | 13 | 9% | 4 | 2% | 1 | 1% | 1 | 1% | 21 | 15% | 4 | 2% | 53 | 37% | | | | | | | 135.4 | 19.2 | 88% | 12% | 1938 | 500 | 9.3 | |
| 49 | 00032 | 8 | Y | 33 | 81 | 81 | 115c | 2519 | 1385 | 7859 | 31.9 | 15.1 | 14.4 | 1.76 | 153 | | HW | 70 | 99 | 100 | 0 | 0% | 10 | 10% | 46 | 47% | 9 | 9% | 0 | 0% | 30 | 30% | 4 | 4% | 0 | 0% | 0 | 0% | 0 | 0% | | | | | | | 71.2 | 51.9 | 58% | 42% | 1935 | 500 | 10.2 | 003 POSSIBLE FUELWOOD AREA ADJ PINKHAM B ROAD. |
| 50 | 00033 | 70 | Y | 12 | 87 | 81 | 115c | 2792 | 1442 | 8212 | 35.3 | 16.7 | 17.1 | 1.76 | 153 | | HW | 100 | 113 | 114 | 1 | 1% | 37 | 33% | 11 | 10% | 4 | 4% | 11 | 10% | 40 | 35% | 1 | 1% | 3 | 3% | 3 | 3% | 2 | 2% | | | | | | | 65.0 | 63.0 | 51% | 49% | 1927 | 500 | 10.0 | A mixed hardwood/softwood stand. Patchwork of forest types. Some quality timber is sporadically spaced out. |
| 51 | 00033 | 68 | Y | 16 | 87 | 87 | 115a | 2869 | 1697 | 9480 | 36.3 | 17.2 | 14.8 | 1.79 | 153 | | SW | 126 | 123 | 123 | 8 | 7% | 36 | 29% | 15 | 12% | 9 | 7% | 3 | 2% | 31 | 25% | 0 | 0% | 20 | 16% | 0 | 0% | 0 | 0% | | | | | | | 90.5 | 55.5 | 62% | 38% | 1927 | 500 | 9.3 | Most of this stand should probably be left alone but in some areas a shellerwood or single tree selection may benefit. Some nice wildlife trees here. |
| 52 | 00033 | 71 | Y | 55 | 81 | 86 | 115c/115a | 2803 | 1445 | 8231 | 35.5 | 16.8 | 17.2 | 1.76 | 113 | | HW/SW | 180 | 113 | 111 | 0 | 0% | 10 | 9% | 17 | 15% | 6 | 5% | 0 | 0% | 53 | 47% | 5 | 4% | 0 | 0% | 0 | 0% | 19 | 17% | | | | | | | 59.2 | 62.7 | 49% | 51% | 1927 | 500 | 9.6 | Pine Mountain TS 2004. |
| 53 | 00033 | 73 | Y | 7 | 87 | 20 | 115a/105d | 3812 | 2350 | 13490 | 48.3 | 22.8 | 18.5 | 1.74 | 153 | | SW/MW | 128 | 159 | 153 | 11 | 7% | 18 | 11% | 5 | 3% | 21 | 13% | 4 | 3% | 17 | 11% | 0 | 0% | 21 | 13% | 0 | 0% | 55 | 35% | | | | | | | 92.0 | 83.5 | 52% | 48% | 1887 | 500 | 9.8 | A lot of softwoods in this stand. With a good understory stock of softwoods this stand may be best suited for softwood management. |
| 54 | 00033 | 76 | Y | 15 | 89 | 86 | 105d | 2655 | 1446 | 8547 | 33.6 | 15.9 | 15.3 | 1.69 | 113 | | MW | 70 | 106 | 107 | 3 | 2% | 4 | 4% | 1 | 1% | 1 | 1% | 4 | 4% | 66 | 63% | 0 | 0% | 3 | 2% | 0 | 0% | 25 | 24% | | | | | | | 59.6 | 60.0 | 50% | 50% | 1983 | 500 | 9.0 | Spring Brook Sale Cut 1997 |
| 55 | 00033 | 75 | Y | 27 | 20 | 20 | 115a/105d | 3414 | 1705 | 9564 | 43.2 | 20.4 | 21.6 | 1.78 | 153 | | SW/MW | 138 | 144 | 144 | 1 | 1% | 46 | 32% | 3 | 2% | 20 | 14% | 6 | 4% | 33 | 23% | 0 | 0% | 9 | 6% | 0 | 0% | 26 | 18% | | | | | | | 69.6 | 90.4 | 44% | 57% | 1887 | 500 | 9.4 | A patchwork of timber types. Majority of stand is dominated by conifers. A lot of hardwoods mixed in. Entire stand could use some timber removal management. |
| 56 | 00032 | 22 | Y | 21 | 89 | 89 | 115c/15g | | | | 0.0 | 0.0 | 0.0 | #DIV/0! | 113 | | HW | 100 | 101 | 102 | 0 | 0% | 15 | 15% | 20 | 20% | 5 | 5% | 1 | 1% | 24 | 24% | 1 | 1% | 5 | 5% | 16 | 16% | 14 | 14% | | | | | | | 38.3 | 69.2 | 36% | 64% | 1927 | 500 | 9.5 | |
| 57 | 00032 | 20 | Y | 12 | 91 | 81 | 115c | 3243 | 1521 | 8700 | 41.0 | 19.4 | 21.8 | 1.75 | 113 | | HW | 20 | 130 | 131 | 0 | 0% | 20 | 15% | 49 | 38% | 8 | 6% | 10 | 7% | 27 | 21% | 7 | 5% | 0 | 0% | 8 | 6% | 1 | 1% | | | | | | | 57.3 | 78.2 | 42% | 58% | 1977 | 500 | 9.9 | |
| 58 | 00032 | 19 | Y | 12 | 81 | 89 | 11/115c | | | | 0.0 | 0.0 | 0.0 | #DIV/0! | 153 | | SW/HW | 70 | 135 | 135 | 0 | 0% | 22 | 16% | 24 | 17% | 3 | 2% | 3 | 2% | 48 | 35% | 4 | 3% | 0 | 0% | 0 | 0% | 31 | 23% | | | | | | | 51.4 | 94.1 | 35% | 65% | 1900 | 500 | 10.1 | |
| 59 | 00033 | 72 | Y | 29 | 13 | 87 | 11 | 2803 | 1445 | 8231 | 35.5 | 16.8 | 17.2 | 1.76 | 153 | | SW | 118 | 113 | 111 | 0 | 0% | 10 | 9% | 17 | 15% | 6 | 5% | 0 | 0% | 53 | 47% | 5 | 4% | 0 | 0% | 0 | 0% | 19 | 16% | | | | | | | 137.0 | 62.7 | 69% | 31% | 1937 | 500 | 9.6 | A lot of windthrow and ice damage among Spruce and Fir. A lot of broken tops and standing dead. Where Beech is present there is pretty bad canker. The few black cherry observed had black knot. A lot of fungus on hardwoods. |
| 60 | 00033 | 77 | Y | 70 | 17 | 20 | 115a | 3838 | 2002 | 11298 | 48.6 | 23.0 | 23.2 | 1.77 | 153 | | SW | 126 | 173 | 173 | 14 | 8% | 40 | 23% | 0 | 0% | 14 | 8% | 9 | 5% | 3 | 2% | 0 | 0% | 59 | 34% | 2 | 1% | 30 | 17% | | | | | | | 128.4 | 63.1 | 67% | 33% | 1889 | 500 | 8.9 | Large portion of stand is choked with standing dead and down timber. Quality straight spruce throughout. Some thinning and harvesting would be appropriate. |
| 61 | 00033 | 79 | Y | 53 | 89 | 89 | 11 | | | | 0.0 | 0.0 | 0.0 | #DIV/0! | 111 | | SW | 160 | 140 | 139 | 3 | 2% | 34 | 24% | 0 | 0% | 5 | 4% | 31 | 22% | 35 | 25% | 0 | 0% | 6 | 5% | 0 | 0% | 23 | 16% | | | | | | | 96.8 | 52.5 | 65% | 35% | 1936 | 500 | 9.0 | Hardwood dominated stand with large pockets of conifers. Most of the stand could be thinned or harvested on some level. Various degrees of standing dead and down timber. |
| 62 | 00033 | 78 | Y | 22 | 20 | 20 | 115a | 3696 | 2470 | 14501 | 46.8 | 22.1 | 15.5 | 1.70 | 153 | | SW | 129 | 148 | 148 | 5 | 3% | 34 | 23% | 1 | 1% | 19 | 13% | 5 | 3% | 19 | 13% | 1 | 1% | 11 | 8% | 1 | 1% | 51 | 35% | | | | | | | 130.0 | 31.7 | 80% | 20% | 1865 | 500 | 10.5 | Some forest type issues. Stand consists mostly of conifers but species dominance is an issue. Hardwoods present throughout but a softwood dominated stand for sure. |
| 63 | 00033 | 45 | | 58 | 92 | 87 | 11 | 3122 | 1563 | 8884 | 39.5 | 18.7 | 19.7 | 1.76 | 153 | | SW | 100 | 132 | 131 | 19 | 14% | 33 | 25% | 8 | 6% | 21 | 16% | 18 | 14% | 3 | 2% | 8 | 6% | 8 | 6% | 0 | 0% | 12 | 9% | | | | | | | 117.3 | 26.0 | 82% | 18% | 1937 | 500 | 9.4 | |
| 64 | 00032 | 26 | | 14 | 87 | | 6d/2 | | | | | | | | | | SW | 100 | 100 | 0 | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | | | | | | 0.0 | 0.0 | #DIV/0! | #DIV/0! | 1903 | 500 | 9.0 | Stand assigned to Steve not yet completed. |
| 65 | 00032 | 25 | | 59 | 81 | 81 | 2/6d | | | | 0.0 | 0.0 | 0.0 | #DIV/0! | | | SW | 80 | 118 | 119 | 15 | 13% | 23 | 19% | 38 | 32% | 30 | 26% | 3 | 2% | 5 | 4% | 5 | 4% | 0 | 0% | 0 | 0% | 0 | 0% | | | | | | | 80.8 | 55.8 | 59% | 41% | 1863 | 500 | 10.3 | LEAVE FOR WILDLIFE OLD GROWTH |
| 66 | 00032 | 21 | Y | 46 | 89 | 81 | 15g/115g | 3445 | 1970 | 11494 | 43.6 | 20.6 | 18.7 | 1.71 | 153 | | HW | 70 | 132 | 133 | 0 | 0% | 3 | 2% | 50 | 38% | 10 | 7% | 9 | 7% | 23 | 17% | 35 | 27% | 0 | 0% | 2 | 2% | 0 | 0% | | | | | | | 91.1 | 48.9 | 65% | 35% | 1927 | 500 | 10.9 | |
| 67 | 00034 | 10 | | 192 | 81 | 81 | 115c/15g | | | | 0.0 | 0.0 | 0.0 | #DIV/0! | 30 | | HW | 110 | 105 | 106 | 0 | 0% | 10 | 10% | 15 | 14% | 24 | 23% | 0 | 0% | 25 | 23% | 2 | 2% | 0 | 0% | 0 | 0% | 30 | 29% | | | | | | | 58.1 | 55.6 | 51% | 49% | 1870 | 500 | 11.7 | Pine Mountain TS 2004. |
| 68 | 00034 | 13 | | 151 | 81 | 81 | 115c/15g | | | | 0.0 | 0.0 | 0.0 | #DIV/0! | 141 | | HW | 140 | 140 | 95 | 0 | 0% | 4 | 3% | 30 | 21% | 19 | 14% | 0 | 0% | 26 | 18% | 2 | 2% | 4 | 3% | 0 | 0% | 9 | 6% | | | | | | | 61.4 | 51.4 | 54% | 46% | 1870 | 500 | 9.3 | POWERLINE SALE. 154 ac west of road 6 acres east of road for the Pine Mountain TS 2004. |
| 69 | 00034 | 2 | Y | 244 | 81 | 81 | 15g/115c/115a | 3241 | 2013 | 11902 | 41.0 | 19.4 | 15.5 | 1.69 | 142 | | HW/SW | 108 | 124 | 123 | 1 | 1% | 6 | 4% | 52 | 42% | 21 | 17% | 1 | 0% | 37 | 30% | 0 | 0% | 2 | 1% | 0 | 0% | 5 | 4% | | | | | | | 82.7 | 63.8 | 56% | 44% | 1895 | 500 | 10.9 | A nice large two-aged stand. Some nice overstory hardwoods. Thinnings-shelterwood cuts-and group selections to release the nice understory regeneration would be recommended. |
| 70 | 00034 | 3 | Y | 43 | 87 | 81 | 115a/15g | 3114 | 2143 | 12969 | 39.4 | 18.6 | 12.3 | 1.65 | 142 | | SW/HW | 102 | 115 | 114 | 0 | 0% | 3 | 3% | 25 | 21% | 9 | 8% | 1 | 1% | 50 | 44% | 2 | 2% | 1 | 1% | 0 | 0% | 23 | 20% | | | | | | | 78.9 | 57.5 | 58% | 42% | 1895 | 500 | 11.3 | Mostly northern hardwood stand with patches of conifers throughout. Most of the stand doesn't need management yet. Some areas could use a shelterwood or thinning prescription. |
| 71 | 00034 | 41 | Y | 113 | 87 | 87 | 11 | | | | 0.0 | 0.0 | 0.0 | #DIV/0! | 153 | | SW | 157 | 156 | 157 | 9 | 6% | 33 | 21% | 1 | 0% | 39 | 25% | 8 | 5% | 2 | 1% | 1 | 0% | 30 | 19% | 0 | 0% | 33 | 21% | | | | | | | 145.2 | 24.3 | 86% | 14% | 1920 | 500 | 10.6 | A large stand of several forest types. Most commonly occurring is the mixed hardwood/softwoods. |
| 72 | 00034 | 4 | Y | 33 | 81 | 81 | 105/6 | 2631 | 1813 | 11011 | 33.3 | 15.8 | 10.4 | 1.65 | 142 | | HW/SW | 130 | 98 | 99 | 0 | 0% | 1 | 1% | 38 | 39% | 19 | 19% | 1 | 1% | 31 | 32% | 1 | 1% | 2 | 2% | 0 | 0% | 5 | 5% | | | | | | | 59.2 | 58.1 | 50% | 50% | 1860 | 500 | 11.2 | |
| 73 | 00034 | 20 | Y | 80 | 87 | 87 | 6d/105/2 | 3296 | 2157 | 12528 | 41.7 | 19.7 | 14.4 | 1.72 | 153 | | SW/HW | 130 | 132 | 133 | 8 | 6% | 16 | 12% | 4 | 3% | 50 | 38% | 12 | 9% | 3 | 2% | 0 | 0% | 22 | 17% | 0 | 0% | 17 | 13% | | | | | | | 130.0 | 21.8 | 86% | 14% | 1895 | 500 | 10.8 | ALONG GREAT GULF TR & HAYES COPP SKI TR & UP INTO DRAINAGE - SOME BIG TREES BROWN ASH BY STREAMS @ LOWER ELEVATIONS |
| 74 | 00034 | 6 | Y | 43 | 87 | 81 | 115a/105 | 3425 | 2286 | 14009 | 43.4 | 20.5 | 14.4 | 1.63 | 153 | | SW/HW | 100 | 124 | 125 | 1 | 1% | 0 | 0% | 40 | 32% | 28 | 22% | 2 | 2% | 30 | 24% | 0 | 0% | 2 | 2% | 0 | 0% | 21 | 17% | | | | | | | 90.0 | 54.3 | 62% | 38% | 1895 | 500 | 12.2 | A fair amount of disease and problems in this stands overstory. Maybe an overstory thinning to release regeneration for a better future crop. |
| 75 | 00035 | 23 | Y | 13 | 87 | 87 | 6d/115a | 3777 | 2538 | 14697 | 47.8 | 22.6 | 15.7 | 1.73 | 153 | | SW | 143 | 151 | 152 | 3 | 2% | 36 | 23% | 1 | 1% | 45 | 30% | 4 | 3% | 14 | 9% | 0 | 0% | 44 | 29% | 0 | 0% | 6 | 4% | | | | | | | 132.3 | 30.5 | 81% | 19% | 1895 | 500 | 10.9 | Very rocky stand. Large boulders. Seems like a tough stand to get machines into for harvesting or management. |
| 76 | 00034 | 12 | | 35 | 87 | 87 | 6d | | | | 0.0 | 0.0 | 0.0 | #DIV/0! | 220 | | MW | 90 | | 153 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 77 | 00034 | 53 | Y | 15 | 89 | 87 | 11 | 4478 | 2924 | 16725 | 56.7 | 26.8 | 19.7 | 1.75 | 153 | | MW | 190 | 183 | 182 | 4 | 2% | 63 | 34% | 0 | 0% | 16 | 9% | 1 | 1% | 1 | 1% | 0 | 0% | 45 | 25% | 0 | 0% | 51 | 28% | | | | | | | 166.8 | 35.5 | 82% | 18% | 1888 | 810 | 10.6 | |
| 78 | 00034 | 67 | Y | 2 | 2 | 2 | 11 | 5194 | 3095 | 17585 | 65.7 | 31.1 | 26.6 | 1.76 | 153 | | SW | 20 | 218 | 218 | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 15 | 7% | 203 | 93% | | | 227.5 | 0.0 | 100% | 0% | 1971 | 810 | 9.4 | |
| 79 | 00034 | 47 | | 20 | 92 | 87 | 11 | 3311 | 1463 | 8358 | 41.9 | 19.8 | 23.4 | 1.75 | 152 | | MW | 130 | 141 | 136 | 3 | 2% | 36 | 25% | 0 | 0% | 10 | 7% | 42 | 30% | 1 | 1% | 3 | 2% | 14 | 10% | 0 | 0% | 27 | 19% | | | | | | | 133.2 | 12.7 | 91% | 9% | 1925 | 810 | 9.0 | |
| 80 | 00034 | 60 | | 14 | 81 | 20 | 11 | 3564 | 2762 | 16549 | 45.1 | 21.3 | 10.2 | 1.67 | 151 | | MW | 140 | 132 | 132 | 5 | 4% | 38 | 29% | 7 | 5% | 18 | 14% | 4 | 3% | 5 | 4% | 5 | 4% | 15 | 11% | 0 | 0% | 34 | 26% | | | | | | | 95.5 | 48.2 | 66% | 34% | 1865 | 810 | 12.9 | |
| 81 | 00034 | 56 | Y | 29 | 87 | 20 | 11 | 4748 | 3022 | 18006 | 60.1 | 28.4 | 21.8 | 1.68 | | | MW | 170 | 196 | 197 | 4 | 2% | 18 | 9% | 0 | 0% | 36 | 18% | 1 | 1% | 13 | 7% | 0 | 0% | 19 | 10% | 0 | 0% | 105 | 54% | | | | | | | 155.0 | 50.9 | 75% | 25% | 1887 | 810 | 9.8 | |
| 82 | 00033 | 81 | Y | 34 | 89 | 89 | 11 | 2961 | 822 | 4639 | 37.5 | 17.7 | 27.1 | 1.77 | | | HW | 60 | 134 | 132 | 10 | 8% | 27 | 20% | 2 | 2% | 2 | 2% | 17 | 13% | 51 | 38% | 0 | 0% | 7 | 5% | 1 | 1% | 14 | 10% | | | | | | | 58.5 | 94.2 | 38% | 62% | 1997 | 810 | 8.1 | |
| 83 | 00034 | 51 | Y | 34 | 81 | 87 | 11 | 3898 | 2341 | 13962 | 49.3 | 23.3 | 19.7 | 1.68 | | | MW | 120 | 161 | 133 | 26 | 16% | 29 | 18% | 23 | 14% | 21 | 13% | 3 | 2% | 0 | 0% | 20 | 12% | 6 | 4% | 2 | 1% | 5 | 3% | | | | | | | 124.5 | 60.0 | 67% | 33% | 1880 | 810 | 9.1 | |
| 84 | 00034 | 57 | Y | 40 | 89 | 87 | 11 | 3230 | 1641 | 9180 | 40.9 | 19.3 | 20.1 | 1.79 | | | MW | 130 | 137 | 137 | 10 | 7% | 34 | 25% | 4 | 3% | 25 | 18% | 26 | 19% | 1 | 1% | 8 | 6% | 16 | 12% | 0 | 0% | 12 | 9% | | | | | | | 99.0 | 56.3 | 64% | 36% | 1880 | 810 | 9.2 | |
| 85 | 00034 | 54 | | 44 | 87 | 87 | 11 | 3553 | 2683 | 15872 | 45.0 | 21.3 | 11.0 | 1.69 | | | MW | 180 | 135 | 135 | 11 | 8% | 29 | 21% | 4 | 3% | 12 | 9% | 6 | 5% | 0 | 0% | 3 | 2% | 30 | 22% | 0 | 0% | 23 | 17% | 3 | 2% | | | 13 | 10% | 102 | 43 | 70% | 30% | 1880 | 810 | 11.8 | |
| 86 | 00033 | 33 | Y | 107 | 89 | 81 | 115C | 2230 | 598 | 3232 | 28.2 | 13.4 | 20.7 | 1.85 | | | HW | 30 | 99 | 98 | 0 | 0% | 23 | 23% | 15 | 15% | 0 | 0% | 6 | 6% | 15 | 15% | 13 | 13% | 2 | 2% | 24 | 25% | 0 | 0% | | | | | | | 52.5 | 66.9 | 44% | 56% | 1986 | 500 | 8.4 | |
| 87 | 00033 | 54 | | 41 | 89 | 89 | 115c | 2089 | 648 | 3616 | 26.4 | 12.5 | 18.2 | 1.79 | | | HW | 40 | 88 | 89 | 1 | 1% | 10 | 11% | 16 | 18% | 11 | 12% | 6 | 7% | 39 | 44% | 4 | 5% | 0 | 0% | 1 | 1% | 0 | 0% | | | | | | | 36.8 | 67.5 | 35% | 65% | 1986 | 500 | 8.9 | |
| 88 | 00034 | 50 | | 5 | 13 | | 11 | | | | | | | | | | SW | 160 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 1880 | 810 | 12.0 | |
| 89 | 00034 | 31 | | 6 | 89 | | 11 | | | | | | | | | | HW | 0 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 1860 | 200 | 0.0 | |
| 90 | 00032 | 17 | | 4 | 92 | | 11 | | | | | | | | | | HW | 0 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 200 | 0.0 | |
| 91 | 00033 | 23 | | 47 | 81 | | 15G | | | | | | | | | | HW | 100 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 1903 | 720 | 14.0 | |
| 92 | 00033 | 33 | Y | 180 | 89 | 89 | 115C | | | | | | | | | | HW | 150 | 114 | 115 | 1 | 1% | 31 | 27% | 15 | 13% | 16 | 14% | 23 | 20% | 3 | 3% | 4 | 4% | 4 | 4% | 16 | 14% | 3 | 2% | | | | | | | 54 | 60 | 47% | 53% | 1915 | 720 | 9.8 | |
| 93 | 00033 | 63 | | 46 | 92 | 89 | 105 | | | | | | | | | | HW | 110 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 1927 | 720 | 8.0 | |
| | | | | 4613 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| | FAGR | | FRAM2 | | PIRU | | POTR5/GR4 | | TSCA | | PIST | | PIRI | | AGS | UGS | AGS(%) | UGS(%) | Yr | LSC | DBH | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7% | 2 | 2% | 0 | 0% | 25 | 18% | 21 | 15% | 51 | 37% | | | | | 131.5 | 28.8 | 82% | 18% | 1952 | 500 | 4.0 | |
| 6% | 26 | 24% | 3 | 2% | 0 | 0% | 6 | 6% | 0 | 0% | | | | | 68.3 | 58.3 | 54% | 46% | 1938 | 500 | 9.0 | RED MAPLE, PAPER B RCH, BEECH, YELLOW B |
| 9% | 13 | 14% | 8 | 8% | 0 | 0% | 9 | 9% | 0 | 0% | | | | | 72.9 | 45.3 | 62% | 38% | 1981 | 500 | 1.0 | |
| 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | | | | 0 0 | 0 0 | D V/0! | D V/0! | 1979 | 500 | 1.0 | Stand was not done to due heavy p ev ous |
| 12% | 27 | 30% | 2 | 2% | 2 | 2% | 0 | 0% | 3 | 3% | | | | | 26.0 | 86.5 | 23% | 77% | 1979 | 500 | 1.0 | |
| 15% | 14 | 11% | 0 | 0% | 20 | 16% | 0 | 0% | 27 | 21% | | | | | 88.8 | 66.5 | 57% | 43% | 1979 | 500 | 1.0 | |
| 2% | 41 | 44% | 1 | 1% | 4 | 4% | 0 | 0% | 2 | 2% | | | | | 49.0 | 63.1 | 44% | 56% | 1979 | 500 | 1.0 | |
| 16% | 11 | 14% | 0 | 0% | 34 | 45% | 0 | 0% | 0 | 0% | | | | | 55.5 | 42.7 | 57% | 43% | 1927 | 500 | 8.0 | Ice sto m damage 1998 |
| 8% | 48 | 37% | 8 | 6% | 0 | 0% | 6 | 5% | 0 | 0% | | | | | 70.8 | 72.1 | 50% | 50% | 1927 | 500 | 7.5 | P ne Mounta n TS 2004. |
| 12% | 7 | 6% | 0 | 0% | 11 | 10% | 5 | 5% | 10 | 9% | | | | | 117.6 | 24.7 | 83% | 17% | 1923 | 500 | 7.8 | A upland ha dwood ove sto y w th a ve y h |
| 4% | 4 | 3% | 0 | 0% | 54 | 37% | 0 | 0% | 40 | 28% | | | | | 138.3 | 19.6 | 88% | 12% | 1937 | 500 | 8.0 | |
| 13% | 1 | 1% | 1 | 1% | 18 | 14% | 10 | 8% | 1 | 1% | | | | | 103.6 | 40.2 | 72% | 28% | 1913 | 500 | 11 0 | 010, OLD STANDS 2 & 14 |
| 1% | 21 | 20% | 9 | 8% | 0 | 0% | 0 | 0% | 8 | 7% | | | | | 90.8 | 25.8 | 78% | 22% | 1889 | 500 | 12 0 | PLOTS 1-5 ON WEST SIDE OF TOWN LINE BRO |
| 0% | 13 | 9% | 0 | 0% | 14 | 10% | 3 | 2% | 43 | 30% | | | | | 126.4 | 28.2 | 82% | 18% | 1889 | 500 | 12 0 | P ne Mounta n TS 2004. |
| 4% | 11 | 9% | 4 | 3% | 4 | 3% | 4 | 3% | 1 | 1% | | | | | 91.5 | 37.1 | 71% | 29% | 1925 | 500 | 12 0 | P ne Mounta n TS 2004. |
| 16% | 7 | 7% | 3 | 3% | 3 | 3% | 3 | 3% | 4 | 4% | | | | | 68.6 | 40.0 | 63% | 37% | 1915 | 500 | 8.4 | P ne Mounta n TS 2004. |
| 11% | 12 | 11% | 3 | 2% | 7 | 6% | 12 | 10% | 0 | 0% | | | | | 88.8 | 49.3 | 64% | 36% | 1913 | 500 | 10 0 | P ne Mounta n TS 2004. |
| 11% | 0 | 0% | 0 | 0% | 0 | 0% | 43 | 54% | 0 | 0% | | | | | 72.9 | 45.0 | 62% | 38% | 1976 | 500 | 4.0 | P ne Mounta n TS 2004. |
| 13% | 20 | 25% | 2 | 3% | 4 | 5% | 4 | 5% | 0 | 0% | | | | | 36.8 | 62.5 | 37% | 63% | 1927 | 500 | 10 2 | Mostly a young egene at ng ha dwood sta |
| 6% | 52 | 50% | 1 | 1% | 0 | 0% | 0 | 0% | 0 | 0% | | | | | 37.3 | 84.6 | 31% | 69% | 1935 | 500 | 8.0 | Ice Sto m Damage 1998 k lled most of pape |
| 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | | | | 0 0 | 0 0 | D V/0! | D V/0! | 1935 | 500 | 8.0 | P ne Mounta n TS 2004. |
| 2% | 27 | 29% | 4 | 4% | 7 | 8% | 4 | 4% | 0 | 0% | | | | | 48.2 | 61.5 | 44% | 56% | 1927 | 500 | 9.2 | Mostly egene at ng ha dwoods. Soome a |
| 1% | 10 | 9% | 6 | 5% | 3 | 3% | 0 | 0% | 16 | 14% | | | | | 83.3 | 46.7 | 64% | 36% | 1983 | 500 | 8.0 | |
| 0% | 10 | 7% | 8 | 6% | 11 | 8% | 6 | 4% | 31 | 23% | | | | | 116.4 | 45.0 | 72% | 28% | 1923 | 500 | 9.8 | A fa ly wet and ocky a ea. Lots of mo stu |
| 8% | 31 | 27% | 3 | 3% | 0 | 0% | 0 | 0% | 9 | 8% | | | | | 74.5 | 50.0 | 60% | 40% | 1975 | 500 | 2.0 | |
| 4% | 18 | 18% | 2 | 2% | 7 | 7% | 4 | 4% | 29 | 30% | | | | | 68.1 | 48.4 | 58% | 42% | 1928 | 500 | 9.2 | Mostly egene at ng ha dwoods. A ea has |
| 1% | 18 | 18% | 9 | 9% | 0 | 0% | 21 | 21% | 11 | 11% | | | | | 81.7 | 34.3 | 70% | 30% | 1976 | 500 | 2.0 | |
| 6% | 28 | 25% | 9 | 8% | 0 | 0% | 20 | 18% | 5 | 4% | | | | | 87.7 | 43.8 | 67% | 33% | 1978 | 500 | 9.6 | P ne Mounta n TS 2004. |
| 3% | 14 | 11% | 25 | 19% | 4 | 3% | 3 | 2% | 11 | 9% | | | | | 124.2 | 29.2 | 81% | 19% | 1983 | 500 | 10 0 | |
| 7% | 3 | 2% | 10 | 6% | 15 | 10% | 5 | 3% | 25 | 17% | | | | | 79.7 | 79.7 | 50% | 50% | 1930 | 500 | 10 0 | Lots of stand ng dead and down woody deb |
| 5% | 1 | 1% | 1 | 1% | 16 | 12% | 2 | 2% | 39 | 30% | | | | | 93.2 | 58.2 | 62% | 38% | 1927 | 500 | 10 6 | La ge po t on of the stand s full of dead sta |
| 6% | 0 | 0% | 3 | 2% | 20 | 13% | 2 | 1% | 51 | 34% | | | | | 98.0 | 55.5 | 64% | 36% | 1937 | 500 | 8.0 | |
| 15% | 2 | 1% | 0 | 0% | 75 | 53% | 0 | 0% | 1 | 1% | | | | | 136.0 | 30.0 | 82% | 18% | 1927 | 500 | 9.0 | |
| 2% | 0 | 0% | 0 | 0% | 0 | 0% | 3 | 5% | 8 | 12% | | | | | 57.5 | 23.0 | 71% | 29% | 1937 | 500 | 8.0 | |
| 1% | 40 | 33% | 0 | 0% | 3 | 3% | 1 | 1% | 1 | 1% | | | | | 74.6 | 58.3 | 56% | 44% | 1978 | 500 | 0.0 | |
| 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | | | | | | #DIV/0! | #DIV/0! | 1927 | 500 | 9.0 | Stand d d not have plots ass gned to t |
| 6% | 47 | 29% | 2 | 1% | 12 | 7% | 3 | 2% | 23 | 14% | | | | | 104.5 | 66.5 | 61% | 39% | 1976 | 500 | 1.0 | |
| 7% | 26 | 23% | 4 | 4% | 6 | 6% | 6 | 6% | 21 | 19% | | | | | 56.5 | 78.8 | 42% | 58% | 1927 | 500 | 9.0 | N ce ha dwood stand. A lot of young t mbe |
| 6% | 1 | 1% | 13 | 11% | 0 | 0% | 3 | 2% | 14 | 12% | | | | | 78.7 | 56.2 | 58% | 42% | 1928 | 500 | 8.0 | |
| 2% | 24 | 24% | 8 | 7% | 4 | 4% | 0 | 0% | 23 | 22% | | | | | 52.5 | 57.5 | 48% | 52% | 1870 | 500 | 13 0 | 006 THIN & WERE REPRO GOOD-SHELTERWO |
| 37% | 3 | 3% | 0 | 0% | 5 | 5% | 0 | 0% | 0 | 0% | | | | | 107.5 | 16.7 | 87% | 13% | 1901 | 500 | 10 0 | DATA TAKEN FROM STAND 13. |
| 5% | 9 | 8% | 2 | 1% | 6 | 5% | 0 | 0% | 0 | 0% | | | | | 81.0 | 56.0 | 59% | 41% | 1930 | 500 | 9.0 | 005 MA3E PINE LINK TRAIL IN STAND |
| 15% | 12 | 13% | 2 | 2% | 5 | 5% | 0 | 0% | 0 | 0% | | | | | 64.5 | 52.0 | 55% | 45% | 1944 | 500 | 10 0 | SPRING BROOK SALE |
| 8% | 60 | 51% | 0 | 0% | 1 | 1% | 0 | 0% | 19 | 16% | | | | | 56.2 | 74.2 | 43% | 57% | 1927 | 500 | 9.7 | A lot of low qual ty t mbe n ove sto y. Bee |
| 6% | 57 | 40% | 0 | 0% | 13 | 9% | 0 | 0% | 30 | 21% | | | | | 61.7 | 90.8 | 40% | 60% | 1927 | 500 | 8.8 | A m xed ha dwood/softwood stand. T mbe |
| 10% | 12 | 9% | 6 | 4% | 3 | 2% | 37 | 27% | 14 | 10% | | | | | 49.4 | 96.5 | 34% | 66% | 1972 | 500 | 2.0 | |
| 9% | 10 | 9% | 30 | 28% | 3 | 2% | 0 | 0% | 3 | 2% | | | | | 58.8 | 53.3 | 52% | 48% | 1925 | 500 | 10 5 | Ve y n ce stand of m xed upland ha dwood |
| 2% | 1 | 1% | 1 | 1% | 21 | 15% | 4 | 2% | 53 | 37% | | | | | 135.4 | 19.2 | 88% | 12% | 1938 | 500 | 8.0 | |
| 0% | 30 | 30% | 4 | 4% | 0 | 0% | 0 | 0% | 0 | 0% | | | | | 71.2 | 51.9 | 58% | 42% | 1935 | 500 | 8.0 | 003 POSS BLE FUELWOOD AREA ADJ PINKHA |
| 10% | 40 | 35% | 1 | 1% | 3 | 3% | 3 | 3% | 2 | 2% | | | | | 65.0 | 63.0 | 51% | 49% | 1927 | 500 | 9.2 | A m xed ha dwood/softwood stand. Patch |
| 2% | 31 | 25% | 0 | 0% | 20 | 16% | 0 | 0% | 0 | 0% | | | | | 90.5 | 55.5 | 62% | 38% | 1927 | 500 | 9.2 | Most of th s stand should p obably be left a |
| 0% | 53 | 47% | 5 | 4% | 0 | 0% | 0 | 0% | 19 | 17% | | | | | 59.2 | 62.7 | 49% | 51% | 1927 | 500 | 9.0 | P ne Mounta n TS 2004. |
| 3% | 17 | 11% | 0 | 0% | 21 | 13% | 0 | 0% | 55 | 35% | | | | | 92.0 | 83.5 | 52% | 48% | 1887 | 500 | 9.6 | A lot of softwoods n th s stand. W th a goo |
| 4% | 66 | 63% | 0 | 0% | 3 | 2% | 0 | 0% | 25 | 24% | | | | | 59.6 | 60.0 | 50% | 50% | 1983 | 500 | 10 0 | Sp ng B ook Sale Cut 1997 |
| 4% | 33 | 23% | 0 | 0% | 9 | 6% | 0 | 0% | 26 | 18% | | | | | 69.6 | 90.4 | 44% | 57% | 1887 | 500 | 9.4 | A patchwo k of t mbe types. Ma o ty of st |
| 1% | 24 | 24% | 1 | 1% | 5 | 5% | 16 | 16% | 14 | 14% | | | | | 38.3 | 69.2 | 36% | 64% | 1927 | 500 | 8.0 | |
| 7% | 27 | 21% | 7 | 5% | 0 | 0% | 8 | 6% | 1 | 1% | | | | | 57.3 | 78.2 | 42% | 58% | 1977 | 500 | 1.0 | |
| 2% | 48 | 35% | 4 | 3% | 0 | 0% | 0 | 0% | 31 | 23% | | | | | 51.4 | 94.1 | 35% | 65% | 1900 | 500 | 11 0 | |
| 0% | 53 | 47% | 5 | 4% | 0 | 0% | 0 | 0% | 19 | 16% | | | | | 137.0 | 62.7 | 69% | 31% | 1937 | 500 | 9.1 | A lot of w ndth ow and ce damage among |
| 5% | 3 | 2% | 0 | 0% | 59 | 34% | 2 | 1% | 30 | 17% | | | | | 128.4 | 63.1 | 67% | 33% | 1889 | 500 | 8.3 | La ge po t on of stand s choked w th stand |
| 22% | 35 | 25% | 0 | 0% | 6 | 5% | 0 | 0% | 23 | 16% | | | | | 96.8 | 52.5 | 65% | 35% | 1936 | 500 | 8.4 | Ha dwood dom nated stand w th la ge poo |
| 3% | 19 | 13% | 1 | 1% | 11 | 8% | 1 | 1% | 51 | 35% | | | | | 130.0 | 31.7 | 80% | 20% | 1865 | 500 | 9.4 | Some fo est type ssues. Stand cons sts mo |
| 14% | 3 | 2% | 8 | 6% | 8 | 6% | 0 | 0% | 12 | 9% | | | | | 117.3 | 26.0 | 82% | 18% | 1937 | 500 | 8.0 | |
| 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | | | | 0 0 | 0 0 | D V/0! | D V/0! | 1903 | 500 | 9.0 | Stand ass gned to Steve, not yet complete |
| 2% | 5 | 4% | 5 | 4% | 0 | 0% | 0 | 0% | 0 | 0% | | | | | 80.8 | 55.8 | 59% | 41% | 1863 | 500 | 13 0 | LEAVE FOR WILDLIFE OLD GROWTH |
| 7% | 23 | 17% | 35 | 27% | 0 | 0% | 2 | 2% | 0 | 0% | | | | | 91.1 | 48.9 | 65% | 35% | 1927 | 500 | 10 0 | |
| 0% | 19 | 19% | 0 | 0% | 0 | 0% | 0 | 0% | 36 | 36% | | | | | 58.1 | 55.6 | 51% | 49% | 1870 | 500 | 12 0 | P ne Mounta n TS 2004. |

00034
DANIEL WEBSTER
DOLLY COPP
GREAT GULF
NINETEEN MILE BROOK
IMP N
IMP S
Camp Dodge
Culhane Brook
Cowboy
Branch
GREENS GRANT
MARTINS LOCATION
0 435 870 1,740 2,610 3,480 Feet

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09220200033002 | 1913 | 87 | 500 | 11 | 0 | | 0.032916548 | mixedwood | spruce-fir | mature | Peabody West | 0922020003300211 |
| 09220200035023 | 1895 | 87 | 500 | 115a | 0 | 2.1 | 4.012187392 | mixedwood | strong spruce-fir | mature | Peabody West | 092202000350232.1115a |
| 09220200035023 | 1895 | 87 | 500 | 6d | 0 | 2.1 | 10.36311352 | mixedwood | strong spruce-fir | mature | Peabody West | 092202000350232.16d |
| 09220200035023 | 1895 | 87 | 500 | 6d | 0 | 5.1 | 1.209606133 | mixedwood | strong spruce-fir | mature | Peabody West | 092202000350235.16d |
| 09220200032022 | 1927 | 89 | 500 | 11 | 0 | 2.1 | 1.670641637 | hardwood | spruce-fir | mature | Peabody West | 092202000320222.111 |
| 09220200032022 | 1927 | 89 | 500 | 115c | 0 | 2.1 | 14.33235351 | hardwood | hardwood | mature | Peabody West | 092202000320222.1115c |
| 09220200032022 | 1927 | 89 | 500 | 15g | 0 | 2.1 | 5.162004812 | hardwood | hardwood | mature | Peabody West | 092202000320222.115g |
| 09220200034062 | 1895 | 87 | 810 | 11 | 0 | 2.1 | 15.58721501 | mixedwood | spruce-fir | mature | Peabody West | 092202000340622.111 |
| 09220200034071 | 1888 | 89 | 810 | 115a | 0 | 2.1 | 0.00082615 | hardwood | strong spruce-fir | mature | Peabody West | 092202000340712.1115a |
| 09220200034071 | 1888 | 89 | 810 | 11 | 0 | 2.1 | 22.76153828 | hardwood | spruce-fir | mature | Peabody West | 092202000340712.111 |
| 09220200032028 | 1903 | 81 | 720 | 115c | 0 | 2.1 | 3.48344598 | hardwood | hardwood | mature | Peabody West | 092202000320282.1115c |
| 09220200034059 | 1935 | 89 | 810 | 11 | 0 | 2.1 | 12.95156739 | hardwood | spruce-fir | mature | Peabody West | 092202000340592.111 |
| 09220200034059 | 1935 | 89 | 810 | 15g | 0 | 2.1 | 0.833621394 | hardwood | hardwood | mature | Peabody West | 092202000340592.115g |
| 09220200034059 | 1935 | 89 | 810 | 105 | 0 | 2.1 | 0.795123656 | hardwood | hardwood | mature | Peabody West | 092202000340592.1105 |
| 09220200033052 | 1986 | 11 | 500 | 11 | 0 | 2.1 | 2.390313503 | spruce-fir | spruce-fir | young | Peabody West | 092202000330522.111 |
| 09220200033052 | 1986 | 11 | 500 | 115c | 0 | 2.1 | 1.138282355 | spruce-fir | hardwood | young | Peabody West | 092202000330522.1115c |
| 09220200033014 | 0 | 99 | 200 | 115c | 68 | 2.1 | 2.792070823 | opening | hardwood | open | Peabody West | 092202000330142.1115c |
| 09220200034040 | 1870 | 81 | 500 | 6d | 0 | 2.1 | 16.90140148 | hardwood | strong spruce-fir | mature | Peabody West | 092202000340402.16d |
| 09220200034040 | 1870 | 81 | 500 | 102c | 0 | 2.1 | 0.455762351 | hardwood | hardwood | mature | Peabody West | 092202000340402.1102c |
| 09220200034040 | 1870 | 81 | 500 | 105 | 0 | 2.1 | 10.54984278 | hardwood | hardwood | mature | Peabody West | 092202000340402.1105 |
| 09220200034040 | 1870 | 81 | 500 | 115c | 0 | 2.1 | 35.14685671 | hardwood | hardwood | mature | Peabody West | 092202000340402.1115c |
| 09220200034040 | 1870 | 81 | 500 | 2 | 0 | 2.1 | 8.564731647 | hardwood | strong spruce-fir | mature | Peabody est | 092202000340402.12 |
| 09220200033085 | 0 | 99 | 200 | 11 | 0 | 2.1 | 0.414248986 | opening | spruce-fir | open | Peabody West | 092202000330852.111 |
| 09220200034011 | 1905 | 87 | 720 | 6d | 0 | 2.1 | 78.51656041 | mixedwood | strong spruce-fir | mature | Peabody West | 092202000340112.16d |
| 09220200032021 | 1927 | 89 | 500 | 115c | 0 | 2.1 | 11.35593577 | hardwood | hardwood | mature | Peabody West | 092202000320212.1115c |
| 09220200032021 | 1927 | 89 | 500 | 15g | 0 | 2.1 | 33.78635197 | hardwood | hardwood | mature | Peabody West | 092202000320212.115g |
| 09220200032021 | 1927 | 89 | 500 | 102c | 0 | 2.1 | 1.261026673 | hardwood | hardwood | mature | Peabody West | 092202000320212.1102c |
| 09220200033001 | 1944 | 81 | 500 | 115a | 0 | 2.1 | 3.889493953 | hardwood | strong spruce-fir | mature | Peabody West | 092202000330012.1115a |
| 09220200033001 | 1944 | 81 | 500 | 115c | 0 | 2.1 | 12.32616969 | hardwood | hardwood | mature | Peabody West | 092202000330012.1115c |
| 09220200033036 | 1923 | 20 | 500 | 11 | 0 | 2.1 | 10.54113631 | mixedwood | spruce-fir | mature | Peabody West | 092202000330362.111 |
| 09220200033036 | 1923 | 20 | 500 | 115c | 0 | 2.1 | 1.242619987 | mixedwood | hardwood | mature | Peabody West | 092202000330362.1115c |
| 09220200035002 | 1900 | 13 | 300 | 6e | 0 | 5.1 | 0.066643516 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000350025.16e |
| 09220200035002 | 1900 | 13 | 300 | 8 | 0 | 5.1 | 40.22347378 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000350025.18 |
| 09220200035002 | 1900 | 13 | 300 | 14 | 0 | 5.1 | 29.83422871 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000350025.114 |
| 09220200033013 | 1989 | 99 | 200 | 115c | 53 | 2.1 | 1.029953285 | opening | hardwood | open | Peabody West | 092202000330132.1115c |
| 09220200034053 | 1888 | 89 | 810 | 11 | 0 | 2.1 | 15.431555 | hardwood | spruce-fir | mature | Peabody West | 092202000340532.111 |
| 09220200033021 | 0 | 99 | 200 | 105 | 50 | 2.1 | 3.764051647 | opening | hardwood | open | Peabody West | 092202000330212.1105 |
| 09220200033021 | 0 | 99 | 200 | 115c | 50 | 2.1 | 1.876986811 | opening | hardwood | open | Peabody West | 092202000330212.1115c |
| 09220200033021 | 0 | 99 | 200 | 2 | 50 | 2.1 | 0.414353673 | opening | strong spruce-fir | open | Peabody West | 092202000330212.12 |
| 09220200033021 | 0 | 99 | 200 | 2 | 50 | inhold | 0.608733208 | opening | strong spruce-fir | open | Peabody West | 09220200033021inhold2 |
| 09220200034036 | 1860 | 13 | 720 | 2 | 0 | 8.3 | 6.530713216 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000340368.32 |
| 09220200034036 | 1860 | 13 | 720 | 8 | 0 | 6.2 | 10.85182631 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000340366.28 |
| 09220200034036 | 1860 | 13 | 720 | 8 | 0 | 8.1 | 0.164975103 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000340368.18 |
| 09220200034036 | 1860 | 13 | 720 | 13b | 0 | 8.3 | 19.41674808 | spruce-fir | non-forest | mature | Peabody West | 092202000340368.313b |
| 09220200034036 | 1860 | 13 | 720 | 2 | 0 | 8.1 | 2.072520197 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000340368.12 |
| 09220200034036 | 1860 | 13 | 720 | 13b | 0 | 8.1 | 57.04323169 | spruce-fir | non-forest | mature | Peabody West | 092202000340368.113b |
| 09220200034036 | 1860 | 13 | 720 | 13a | 0 | 8.1 | 13.04452477 | spruce-fir | non-forest | mature | Peabody West | 092202000340368.113a |
| 09220200034036 | 1860 | 13 | 720 | 8 | 0 | 8.3 | 20.86958994 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000340368.38 |
| 09220200034058 | 1895 | 89 | 810 | 11 | 0 | 2.1 | 5.781145776 | hardwood | spruce-fir | mature | Peabody West | 092202000340582.111 |
| 09220200034043 | 1989 | 99 | 200 | 115a | 52 | 2.1 | 1.398035565 | opening | strong spruce-fir | open | Peabody West | 092202000340432.1115a |
| 09220200032014 | 1928 | 81 | 720 | 6d | 0 | 6.1 | 4.302783014 | hardwood | strong spruce-fir | mature | Peabody West | 092202000320146.16d |
| 09220200032014 | 1928 | 81 | 720 | 115c | 0 | 2.1 | 63.64062731 | hardwood | hardwood | mature | Peabody West | 092202000320142.1115c |
| 09220200032014 | 1928 | 81 | 720 | 115c | 0 | 6.1 | 7.118008143 | hardwood | hardwood | mature | Peabody West | 092202000320146.1115c |
| 09220200032014 | 1928 | 81 | 720 | 115c | 0 | inhold | 4.549602712 | hardwood | hardwood | mature | Peabody West | 09220200032014inhold115c |
| 09220200032014 | 1928 | 81 | 720 | 6d | 0 | 2.1 | 3.506700372 | hardwood | strong spruce-fir | mature | Peabody West | 092202000320142.16d |
| 09220200034003 | 1895 | 87 | 500 | 15g | 0 | 2.1 | 13.03992877 | mixedwood | hardwood | mature | Peabody West | 092202000340032.115g |
| 09220200034003 | 1895 | 87 | 500 | 15g | 0 | 6.2 | 0.824972862 | mixedwood | hardwood | mature | Peabody West | 092202000340036.215g |
| 09220200034003 | 1895 | 87 | 500 | 115c | 0 | 2.1 | 1.009840927 | mixedwood | hardwood | mature | Peabody West | 092202000340032.1115c |
| 09220200034003 | 1895 | 87 | 500 | 115a | 0 | 2.1 | 27.52424445 | mixedwood | strong spruce-fir | mature | Peabody West | 092202000340032.1115a |
| 09220200034003 | 1895 | 87 | 500 | 105 | 0 | 6.2 | 9.13415E-05 | mixedwood | hardwood | mature | Peabody West | 092202000340036.2105 |
| 09220200034003 | 1895 | 87 | 500 | 105 | 0 | 2.1 | 1.012064124 | mixedwood | hardwood | mature | Peabody West | 092202000340032.1105 |
| 09220200034045 | 1990 | 99 | 200 | 115c | 52 | 2.1 | 0.574199709 | opening | hardwood | open | Peabody West | 092202000340452.1115c |
| 09220200034038 | 1860 | 99 | 200 | 115c | 50 | 2.1 | 0.561581084 | opening | hardwood | open | Peabody West | 092202000340382.1115c |
| 09220200033099 | 1979 | 87 | 500 | 115c | 0 | 2.1 | 16.05129219 | mixedwood | hardwood | young | Peabody West | 092202000330992.1115c |
| 09220200033048 | 1972 | 91 | 500 | 115c | 0 | 2.1 | 11.08340076 | aspen-birch | hardwood | mature | Peabody West | 092202000330482.1115c |
| 09220200033048 | 1972 | 91 | 500 | 11 | 0 | 2.1 | 3.284527671 | aspen-birch | spruce-fir | mature | Peabody West | 092202000330482.111 |
| 09220200033048 | 1972 | 91 | 500 | 115a | 0 | 2.1 | 157.3955619 | aspen-birch | strong spruce-fir | mature | Peabody West | 092202000330482.1115a |
| 09220200033030 | 1927 | 13 | 500 | 105 | 0 | 2.1 | 12.77883515 | spruce-fir | hardwood | mature | Peabody West | 092202000330302.1105 |
| 09220200033030 | 1927 | 13 | 500 | 2 | 0 | 2.1 | 2.18684581 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000330302.12 |
| 09220200033067 | 1927 | 86 | 500 | 105d | 0 | 2.1 | 28.78526201 | hardwood | mixedwood | mature | Peabody West | 092202000330672.1105d |
| 09220200033037 | 1927 | 87 | 500 | 11 | 0 | 2.1 | 9.374395897 | mixedwood | spruce-fir | mature | Peabody West | 092202000330372.111 |
| 09220200032007 | 1920 | 87 | 810 | 8 | 0 | 6.2 | 0.536407058 | mixedwood | strong spruce-fir | mature | Peabody West | 092202000320076.28 |
| 09220200032007 | 1920 | 87 | 810 | 2 | 0 | 6.1 | 2.175261207 | mixedwood | strong spruce-fir | mature | Peabody West | 092202000320076.12 |
| 09220200032007 | 1920 | 87 | 810 | 2 | 0 | 6.2 | 112.0577363 | mixedwood | strong spruce-fir | mature | Peabody West | 092202000320076.22 |
| 09220200032007 | 1920 | 87 | 810 | 2 | 0 | 8.1 | 4.834944731 | mixedwood | strong spruce-fir | mature | Peabody West | 092202000320078.12 |
| 09220200032007 | 1920 | 87 | 810 | 6d | 0 | 2.1 | 1.666146454 | mixedwood | strong spruce-fir | mature | Peabody West | 092202000320072.16d |
| 09220200032007 | 1920 | 87 | 810 | 6d | 0 | 6.1 | 31.49618568 | mixedwood | strong spruce-fir | mature | Peabody West | 092202000320076.16d |
| 09220200032007 | 1920 | 87 | 810 | 6d | 0 | 6.2 | 8.278461178 | mixedwood | strong spruce-fir | mature | Peabody West | 092202000320076.26d |
| 09220200035008 | 1900 | 13 | 300 | 6 | 0 | 8.5 | 3.249294755 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000350088.56 |
| 09220200035008 | 1900 | 13 | 300 | 2 | 0 | 8.5 | 8.701536763 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000350088.52 |
| 09220200035008 | 1900 | 13 | 300 | 2 | 0 | 5.1 | 57.38261344 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000350085.12 |
| 09220200035008 | 1900 | 13 | 300 | 115a | 0 | 5.1 | 2.637132574 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000350085.1115a |
| 09220200035008 | 1900 | 13 | 300 | 105 | 0 | 5.1 | 0.760160537 | spruce-fir | hardwood | mature | Peabody West | 092202000350085.1105 |
| 09220200035008 | 1900 | 13 | 300 | 6d | 0 | 5.1 | 29.60013722 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000350085.16d |
| 09220200032005 | 1895 | 13 | 810 | 6d | 0 | inhold | 0.255574083 | spruce-fir | strong spruce-fir | mature | Peabody West | 09220200032005inhold6d |
| 09220200032005 | 1895 | 13 | 810 | THETA2 | 0 | 6.1 | 0.649824717 | spruce-fir | non-forest | mature | Peabody West | 092202000320056.1THETA2 |
| 09220200032005 | 1895 | 13 | 810 | THETA2 | 0 | 6.2 | 1.873301963 | spruce-fir | non-forest | mature | Peabody West | 092202000320056.2THETA2 |
| 09220200032005 | 1895 | 13 | 810 | 6d | 0 | 6.1 | 9.357900742 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000320056.16d |
| 09220200032005 | 1895 | 13 | 810 | 115c | 0 | 6.1 | 1.106289703 | spruce-fir | hardwood | mature | Peabody West | 092202000320056.1115c |
| 09220200032005 | 1895 | 13 | 810 | 115c | 0 | inhold | 0.399110042 | spruce-fir | hardwood | mature | Peabody West | 09220200032005inhold115c |
| 09220200032005 | 1895 | 13 | 810 | 6d | 0 | 6.2 | 2.885668115 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000320056.26d |
| 09220200033004 | 1925 | 81 | 500 | 11 | 0 | 2.1 | 7.12516421 | hardwood | spruce-fir | mature | Peabody West | 092202000330042.111 |
| 09220200033004 | 1925 | 81 | 500 | 115c | 0 | 2.1 | 77.55937304 | hardwood | hardwood | mature | Peabody West | 092202000330042.1115c |
| 09220200033004 | 1925 | 81 | 500 | 115g | 0 | 2.1 | 0.046359644 | hardwood | hardwood | mature | Peabody West | 092202000330042.1115g |
| 09220200034006 | 1895 | 87 | 500 | 105 | 0 | 2.1 | 16.78931423 | mixedwood | hardwood | mature | Peabody West | 092202000340062.1105 |
| 09220200034006 | 1895 | 87 | 500 | 115a | 0 | 2.1 | 18.80637177 | mixedwood | strong spruce-fir | mature | Peabody West | 092202000340062.1115a |
| 09220200034006 | 1895 | 87 | 500 | 15g | 0 | 2.1 | 8.756641777 | mixedwood | hardwood | mature | Peabody West | 092202000340062.115g |
| 09220200033016 | 1913 | 89 | 500 | 115g | 0 | 2.1 | 38.84297912 | hardwood | hardwood | mature | Peabody West | 092202000330162.1115g |
| 09220200033016 | 1913 | 89 | 500 | 115c | 0 | 2.1 | 232.100603 | hardwood | hardwood | mature | Peabody West | 092202000330162.1115c |
| 09220200033016 | 1913 | 89 | 500 | 11 | 0 | 2.1 | 0.233101453 | hardwood | spruce-fir | mature | Peabody West | 092202000330162.111 |
| 09220200033016 | 1913 | 89 | 500 | 105 | 0 | 2.1 | 0.991531595 | hardwood | hardwood | mature | Peabody West | 092202000330162.1105 |
| 09220200032013 | 1773 | 81 | 720 | 115c | 0 | 6.2 | 0.061356115 | hardwood | hardwood | mature | Peabody West | 092202000320136.2115c |
| 09220200032013 | 1773 | 81 | 720 | 6d | 0 | 6.1 | 75.73607557 | hardwood | strong spruce-fir | mature | Peabody West | 092202000320136.16d |
| 09220200032013 | 1773 | 81 | 720 | 6d | 0 | 2.1 | 7.393498535 | hardwood | strong spruce-fir | mature | Peabody West | 092202000320132.16d |
| 09220200032013 | 1773 | 81 | 720 | 2 | 0 | 6.2 | 0.029002982 | hardwood | strong spruce-fir | mature | Peabody West | 092202000320136.22 |
| 09220200032013 | 1773 | 81 | 720 | 115c | 0 | 6.1 | 1.852683452 | hardwood | hardwood | mature | Peabody West | 092202000320136.1115c |
| 09220200032013 | 1773 | 81 | 720 | 115c | 0 | 2.1 | 64.29033499 | hardwood | hardwood | mature | Peabody West | 092202000320132.1115c |
| 09220200032013 | 1773 | 81 | 720 | 115g | 0 | 2.1 | 15.24800568 | hardwood | hardwood | mature | Peabody West | 092202000320132.1115g |
| 09220200032013 | 1773 | 81 | 720 | 2 | 0 | 6.1 | 5.057803146 | hardwood | strong spruce-fir | mature | Peabody West | 092202000320136.12 |
| 09220200035014 | 1621 | 13 | 300 | 13c | 0 | 5.1 | 17.16449895 | spruce-fir | non-forest | mature | Peabody West | 092202000350145.113c |
| 09220200035014 | 1621 | 13 | 300 | 6 | 0 | 5.1 | 82.20766204 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000350145.16 |
| 09220200035014 | 1621 | 13 | 300 | THETA2 | 0 | 5.1 | 20.16489205 | spruce-fir | non-forest | mature | Peabody West | 092202000350145.1THETA2 |
| 09220200035014 | 1621 | 13 | 300 | THETA14 | 0 | 8.5 | 1.503129995 | spruce-fir | non-forest | mature | Peabody West | 092202000350148.5THETA14 |
| 09220200035014 | 1621 | 13 | 300 | THETA14 | 0 | 5.1 | 26.93901324 | spruce-fir | non-forest | mature | Peabody West | 092202000350145.1THETA14 |
| 09220200035014 | 1621 | 13 | 300 | 8 | 0 | 5.1 | 345.5125755 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000350145.18 |
| 09220200035014 | 1621 | 13 | 300 | 6e | 0 | 5.1 | 473.7962698 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000350145.16e |
| 09220200035014 | 1621 | 13 | 300 | 6d | 0 | 5.1 | 24.79510912 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000350145.16d |
| 09220200035014 | 1621 | 13 | 300 | 6 | 0 | 8.5 | 0.955333377 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000350148.56 |
| 09220200035014 | 1621 | 13 | 300 | 13a | 0 | 5.1 | 40.18889405 | spruce-fir | non-forest | mature | Peabody West | 092202000350145.113a |
| 09220200035014 | 1621 | 13 | 300 | 2 | 0 | 5.1 | 178.5981577 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000350145.12 |
| 09220200035014 | 1621 | 13 | 300 | 14 | 0 | 8.5 | 19.05584848 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000350148.514 |
| 09220200035014 | 1621 | 13 | 300 | 115a | 0 | 5.1 | 35.21478281 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000350145.1115a |
| 09220200035014 | 1621 | 13 | 300 | 14 | 0 | 5.1 | 370.1696849 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000350145.114 |
| 09220200035014 | 1621 | 13 | 300 | 14 | 0 | 8.1 | 0.490315477 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000350148.114 |
| 09220200035014 | 1621 | 13 | 300 | 13b | 0 | 5.1 | 14.66733406 | spruce-fir | non-forest | mature | Peabody West | 092202000350145.113b |
| 09220200035014 | 1621 | 13 | 300 | 2 | 0 | 8.5 | 25.41001826 | spruce-fir | strong spruce-fir | mature | Peabody West | 092202000350148.52 |
| 09220200034025 | 1860 | 99 | 200 | 115c | 50 | 2.1 | 0.508657057 | opening | hardwood | open | Peabody West | 092202000340252.1115c |
| 09220200033098 | 1979 | 89 | 500 | 115c | 0 | 2.1 | 3.004222281 | hardwood | hardwood | young | Peabody West | 092202000330982.1115c |
| 09220200033098 | 1979 | 89 | 500 | 115g | 0 | 2.1 | 6.377749099 | hardwood | hardwood | young | Peabody West | 092202000330982.1115g |
| 09220200033098 | 1979 | 89 | 500 | 105 | 0 | 2.1 | 4.373044396 | hardwood | hardwood | young | Peabody West | 092202000330982.1105 |
| 09220200035019 | 1880 | 87 | 300 | 6d | 0 | 5.1 | 32.57779702 | mixedwood | strong spruce-fir | mature | Peabody West | 092202000350195.16d |
| 09220200035019 | 1880 | 87 | 300 | 6e | 0 | 5.1 | 0.438013662 | mixedwood | strong spruce-fir | mature | Peabody West | 092202000350195.16e |
| 09220200035019 | 1880 | 87 | 300 | 6 | 0 | 5.1 | 60.8073878 | mixedwood | strong spruce-fir | mature | Peabody West | 092202000350195.16 |
| 09220200035019 | 1880 | 87 | 300 | 2 | 0 | 5.1 | 19.88425947 | mixedwood | strong spruce-fir | mature | Peabody West | 092202000350195.12 |
| 09220200035019 | 1880 | 87 | 300 | 115a | 0 | 5.1 | 12.91454454 | mixedwood | strong spruce-fir | mature | Peabody West | 092202000350195.1115a |
| 09220200034033 | 1860 | 89 | 720 | 8 | 0 | 2.1 | 2.055205778 | hardwood | strong spruce-fir | mature | Peabody West | 092202000340332.18 |
| 09220200034033 | 1860 | 89 | 720 | 8 | 0 | 6.2 | 68.92704926 | hardwood | strong spruce-fir | mature | Peabody West | 092202000340336.28 |

# Peabody West Integrated Resource Project: Biological Evaluation and Wildlife Report

For: Androscoggin Ranger District, White Mountain National Forest

Date: 4/20/2023

## Table of Contents

Introduction ....3
- Consultation History ....3

Project Description ....3
- Action Area ....3

Species and Critical Habitats Considered ....4
- Methods ....4
- Species List ....5

Species Status and Effects of the Action ....6
- Effects Analysis of the Proposed Action ....6
- Northern Long-eared Bat ....6
  - Life History and Environmental Baseline ....6
  - Habitat Suitability and Effects Analysis ....7
  - Determination ....7
- Tricolored Bat ....8
  - Life History and Environmental Baseline ....8
  - Habitat Suitability and Effects Analysis ....8
  - Determination ....8
- Eastern Small-footed bat and Little Brown Bat ....8
  - Life History and Environmental Baseline ....8
  - Habitat Suitability and Effects Analysis ....9
  - Determination ....9
- Monarch Butterfly and Yellow-banded Bumblebee ....9
  - Life History and Environmental Baseline ....9
  - Habitat Suitability and Effects Analysis ....9
  - Determination ....9

National Forest Management Act (NFMA) Land Management Plan Consistency .... 10

Other Issues Identified for Analysis .......... 10
Effects of Mountain Bike Trail Construction on Wildlife .......... 10
References .......... 11
Preparers .......... 13
Appendix A—Species Not Evaluated in Detail .......... 14
Appendix B—Forest Plan Compliance Checklist for Canada Lynx .......... 16

## List of Tables

Table 1. Federally listed and Regional Forester sensitive species (RFSS) reasonably expected to occur in the action area. These species are evaluated in detail in the following section. .......... 5
Table 2. List of preparers .......... 13
Table 3. Plant species with potential to occur in the project area with rationale .......... 14
Table 4. Wildlife species with potential to occur in the project area with rationale. .......... 15
Table 5. Checklist for compliance with forest plan standards and guidelines for Canada lynx. .......... 16

# Introduction

The purpose of this document is to assess the potential effects of the proposed action in the Peabody West habitat management unit (HMU) on federally listed, proposed, candidate, and Regional Forester sensitive species pursuant to section 7 of the Endangered Species Act (16 U.S.C. 1536 (c)), Forest Service Manual (FSM) 2672.42, and the White Mountain National Forest (WMNF) Land and Resource Management Plan (forest plan) (U.S. Department of Agriculture, Forest Service 2005). Wildlife biologists and botanists have reviewed this project, and investigated available information on species distributions and habitat (using topographic maps, aerial photos, field reconnaissance, previous surveys, vegetation data, and/or habitat requirement data for each species) to assess the potential for effects to federally-listed and Region 9 Regional Forester sensitive species (RFSS). The Biological Evaluation (BE) process is intended to identify and document activities that may affect any threatened, endangered, proposed or sensitive wildlife, fish, and plant species; and designated and proposed critical habitat of record for the action area.

## Consultation History

An official species list from the U.S. Fish and Wildlife Service (FWS) New England Ecological Services Field Office was generated using the Information for Planning and Consultation (IPaC) tool on November 27, 2019, and updated on January 10, 2022. A general resource list was generated using the IPaC tool on November 25, 2019. A consultation letter was received from the FWS on January 12, 2022, verifying that the Programmatic Biological Opinion satisfied and concluded Forest Service responsibilities for the Project Action under the Endangered Species Act Section 7(a)(2) with respect to the northern long-eared bat (NLEB). Initially, it was determined the Proposed Action would have no effects beyond those previously disclosed in the programmatic biological opinion on implementing the final 4(d) rule dated January 5, 2016 (U.S. Fish and Wildlife Service 2016). Streamlined consultation with the United States Fish and Wildlife Service (USFWS) under Section 7 of the Endangered Species Act was completed in January 2022. However, on November 29, 2022, the FWS published a final rule to reclassify the northern long-eared bat as endangered under the Endangered Species Act which became effective on March 31, 2023 and officially removed the 4(d) rule (U.S. Fish and Wildlife Service 2022). On November 30, the FWS published a rule to reclassify the NLEB as endangered (U.S. Fish and Wildlife Service 2022). On August 22, 2022, the Eastern and Southern Regions of the Forest Service reinitiated consultation with the FWS and a Biological Opinion was provided on March 31, 2023. The FWS determined that the proposed project may affect, but is not likely to adversely affect (NLAA) the northern long-eared bat (U.S. Fish and Wildlife Service 2023).

# Project Description

The Purpose and Need for the Proposed Action is described in the environmental assessment (pp. 1-3). The project area includes portions of the Peabody West habitat management unit (HMU) on National Forest System lands in Coos County, New Hampshire. Project maps are included in the environmental assessment for the project. The Peabody West HMU is about 15,500 acres comprising Management Area (MA) 2.1 (General Forest Management) lands, MA 6.2 (Semi-Primitive Recreation) and 6.2 (Semi-Primitive Non-Motorized Recreation) lands, MA 8.1 (Alpine Zone), and MA 8.5 (Scenic Areas). Project activities are proposed on a subset of about 3,000 acres of MA 2.1 lands, as described in the Proposed Action section of the environmental assessment (pp. 3-14), consistent with forest plan direction.

## Action Area

The analysis area for direct and indirect effects on federally listed and sensitive species includes stands proposed for harvest and the immediate areas associated with the connected actions of road reconstruction and maintenance, landing construction and reconstruction, skid trails, expansion and maintenance of a wildlife opening, and recreation projects that include a mountain bike trail and a backcountry skiing glades. The project area comprises about 3,000 acres. The temporal scope for direct and indirect effects on federally listed and sensitive species is the time period that encompasses active

harvest operations and connected actions because this is when species would most likely be affected by the proposed activities. This timeframe is estimated to continue for about 15 years after project activities begin. For recreation activities, the temporal scope for direct effects includes only the time when projects are being implemented. For indirect effects, there is no time limit because activities that change recreational use patterns may effect species for the foreseeable future.

The following activities are included under the Proposed Action:

1. Vegetation and wildlife habitat objectives:

    A. Conduct a variety of silvicultural treatments within about 2,220 acres of MA 2.1 forest stands in the Project Area:

    - Increase spruce-fir habitat over the long-term
    - Increase age-class diversity and foster the regeneration of stands
    - Improve growing conditions for residual trees
    - Maintain or increase aspen-birch habitat
    - Maintain current levels of hemlock
    - Gradually convert stands situated on non-compatible ecological land types to forest types consistent with land capability

    B. Expand existing permanent wildlife opening to 19 acres and improve access for maintenance

2. Transportation system improvements:

    A. Construct and maintain about 0.6 mile of new road

    B. Reconstruct 9 miles of existing and non-system roads

3. Recreation activities:

    A. Designate 6 miles of mountain bike trails that includes 4 miles of new trails

    B. Create a backcountry ski area with up to 5 braided lines

    C. Grade and harden trail access to Third Hole swimming area

    D. Thin vegetation at the Androscoggin Ranger District office

# Species and Critical Habitats Considered

## Methods

In preparation for this biological evaluation, forest subject matter experts reviewed the proposed project, the list of Regional Forester sensitive species (RFSS), and those federally listed species identified via IPaC and the FWS. Available information on species distributions and habitat using available literature, topographic maps, aerial photos, previous survey data, vegetation data, and habitat requirement data were assessed for each species. Baseline habitat conditions were determined using existing field data and current landscape-scale field surveys conducted in the action area on. For plant species, field surveys were conducted in suitable habitat as needed. Species-specific occurrence and survey information is provided in the Species Status and Effects of the Action section or the RFSS effects summary, as applicable.

Literature reviews were conducted to determine the life histories and habitat requirements of each federally listed or Regional Forester sensitive species. Regional Forester sensitive species are designated based on Global Taxonomic National rank, which is developed by the nature conservancy and

is maintained by NatureServ, and a risk evaluation that is updated yearly by the Regional Forester (U.S. Department of Agriculture, Forest Service n.d.). In addition, all past field surveys and other sources of occurrence information were reviewed to determine known locations of federally listed and sensitive species relative to the action area.

Biologists and other Forest Service staff determined the general habitat condition of the action area by reviewing stand conditions documented in compartment records, and by conducting field visits within the action area in 2020 and 2021. Biologists used field visits to assess habitat conditions and determine the presence of important or rare habitat features (e.g., vernal pools, milkweed, deer wintering areas, bear-clawed trees, raptor nests, etc.).

Botany staff conducted field surveys during the 2020-21 field seasons (unpublished WMNF data, Campton, NH). Prior to surveys, Botany staff reviewed information on federally listed and sensitive plant occurrences in the vicinity of the project area and similar geographic settings on the WMNF. Comprehensive data on occurrences of rare plants in New Hampshire are available to the WMNF through regular updates from the New Hampshire Natural Heritage Bureau (Biotics database). Botanical surveys were conducted within the action area as well as surrounding areas that are not proposed for activities. All species encountered within a stand were recorded in a network of plots, and other habitat and ecological characteristics were documented in these plots, and as appropriate between plot points. Follow-up surveys were conducted in stands that contained appropriate habitat for particular rare plants.

## Species List

Per FSM 2672.42, only those “listed, proposed, and sensitive species known or expected to be in the project area or that the project potentially affects” need to be identified during the biological evaluation process including any occupied and unoccupied habitat recognized as essential for listed or proposed species recovery (i.e., proposed or designated critical habitat). In addition, the biological evaluation process needs to consider any relevant forest plan objectives for sensitive species (i.e., compliance with the forest plan). The FWS IPaC website was used to determine which federally listed species may occur within the action area. All federally listed and RFSS were considered for evaluation of effects resulting from the Proposed Action. Species with no potential to occur in the action area (e.g., due to lack of potentially suitable habitat) were dismissed from further evaluation and are documented in the project record.

Based on the review of all available information, the species listed in Table 1 have potential to occur or are documented within the project area and are analyzed in detail in the following section. Those species which have potential to occur but which were not analyzed in detail are included in Appendix A—Species Not Evaluated in Detail with their findings and rationale.

**Table 1. Federally listed and Regional Forester sensitive species (RFSS) reasonably expected to occur in the action area. These species are evaluated in detail in the following section.**

| Species | Status | Habitat and Range |
|---|---|---|
| Northern long-eared bat | Endangered | Winter hibernacula includes caves and mines. Summer roost sites include tree cavities, crevices, or under loose bark often in hardwood trees; may also take shelter in outbuildings and human dwellings. Forages in forest interiors, riparian areas, and vernal pools. |
| Canada lynx | Threatened | Denning habitat is spruce-fir or mixedwood 120 or more years old, and white pine/hemlock 150 or more years old. Foraging habitat is spruce-fir, coniferous, mixedwood forests and brushy wetlands frequented by snowshoe hare and red squirrel. Travel corridors include ridges, saddles, and riparian corridors. See Appendix B for Forest Plan compliance |
| Tri-colored bat | Proposed endangered | Hibernates in caves, mines, and other structures. Roosts in live or dead foliage of deciduous trees. |
| Eastern small-footed bat | RFSS | Uses caves, mines, and old buildings for winter hibernacula. Uses rock outcrops and crevices in cliffs exposed to sun, buildings, and bridges. Most likely forages in openings and along forest roads and wetlands. |

| Species | Status | Habitat and Range |
|---|---|---|
| Little brown bat | RFSS | Hibernates in abandoned caves and mines. Roosts in barns, attics, outbuildings, and tree cavities. Feeds over wetlands and still water. Unlikely to occur in high elevation forests. |
| Yellow-banded bumblebee | RFSS | Frequents meadows, crop fields, orchards, gardens, wetlands and other locations with flowering plants. Requires loose soil and decomposing logs for overwintering and abandoned burrows for their underground nests. |
| Monarch butterfly | RFSS | General breeding habitat occurs in openings and fields with abundant milkweed and wildflowers. |

# Species Status and Effects of the Action

## Effects Analysis of the Proposed Action

For each species listed in Table 1, the direct, indirect, and cumulative effects are evaluated in this section. For the purposes of this document, cumulative effects analysis are discussed in the context of the National Environmental Policy Act. The spatial and temporal scale of the effects analysis are defined here. The analysis area for direct and indirect effects on species includes stands proposed for harvest and the immediate areas associated with the connected actions of road reconstruction and maintenance, gate installation, landing construction and reconstruction, skid trails, expansion of wildlife opening, bike trail construction and glade ski braids. The temporal scope for direct effects on species is the time period that encompasses active timber harvest operations and all other ground disturbing and tree removal activities because this is when species would most likely be affected by the proposed activities. The temporal scope for indirect effects is on the order of several decades to centuries because that is how long it can take for forested stands to provide similar habitat structure post-harvest compared to pre-harvest.

The analysis area for cumulative effects for endangered, threatened, and RFSS resulting from the activities included under the Proposed Action encompasses National Forest System lands located within the Peabody West HMU. This area was chosen because the habitat objectives for the HMU provide a measurable assessment of how the Proposed Action contributes to the habitat objectives of the WMNF, as defined in the 2005 Forest Plan. This area is large enough to cover the home ranges of both wildlife and plant species and to account for effects to habitat connectivity and travel and migration corridors of some of the species discussed in this document. This large area also provides for the consideration of habitat diversity at the landscape level as well as recent or proposed projects near the Project Area that may affect habitat diversity. Activities on private land adjacent to the HMU was also considered. The temporal scope for cumulative effects for endangered, threatened, and RFSS is ten years in the past and fifteen years in the future (2012 to 2037) because this time period encompasses recent and active harvest operations and connected actions as well as reasonably foreseeable future actions that have or would occur concurrently within the cumulative effects analysis area. It also includes the timeframe when any regeneration harvests would move into a young age class.

## Northern Long-eared Bat

### Life History and Environmental Baseline

A summary of the northern long-eared bat's (NLEB) life history and occurrence information is available in the project record (U.S. Forest Service 2019a) and a brief overview of key habitat requirements is included in Table 2.

Under the Endangered Species Act, cumulative effects resulting from future state or private activities that are reasonably certain to occur within the action area must be considered. The Forest Service is not aware of any such activities, although timber harvests and other vegetation management activities on non-federal land within the action area are likely to occur. The FWS estimates up to 1.0 percent of the New Hampshire NLEB population will be disturbed and 0.1 percent of the pup population and less than 0.05 percent of the adult population will be harmed annually from the combination of timber harvest,

prescribed fire, and forest conversion, and wind turbine operation. Therefore, the vast majority of individuals and populations that survive white-nose syndrome would be unaffected by these activities. This degree of take is not expected to lead to population-level declines in this species (U.S. Fish and Wildlife Service 2016, 2023). The cumulative loss of roosting habitat is also not anticipated to be adverse because the NLEB is not considered to be limited by the availability of such habitat (Sease and Prout 2015).

Northern long-eared bats have been documented throughout the WMNF. Roosting and foraging habitat exists in the project area and across the forest prior to the advent of white-nose syndrome. Although the New Hampshire Fish and Game Department (NHFGD) did not capture any NLEB's during a two-night repeated effort across the WMNF in July 2019 (New Hampshire Fish and Game 2019), the presence of the NLEB is assumed. There are no known hibernacula or maternity roosts within the project area.

## Habitat Suitability and Effects Analysis

This effects analysis assumes that all Forest Plan Standards and Guidelines, in particular those applicable to wildlife reserve trees (White Mountain National Forest 2005), and the northern long-eared bat (NLEB) conservation measures developed by the Eastern Region of the USDA Forest Service (Sandeno 2015) would be followed.

Direct effects to NLEB include timber harvest activities during the summer and fall seasons from trees over 3 inches diameter at breast height, especially during the pupping season (June 1-July 31). Bike trail construction would directly impact NLEB if large trees need to be removed but these effects would be minimized by using appropriate trail design and coordinating implementation between WMNF recreation and biology staff. No known hibernacula exist within the project area and there are no other activities included in the Proposed Action that would take place during the NLEB active season (April 15 to October 30) that would directly affect the NLEB.

Indirect effects include those that affect bats through alteration of habitat, such as timber harvest and bike trail construction, which would remove potential roost trees when bats are not present. While there would still be ample roost trees available within the HMU and the surrounding area after the proposed timber harvests have been conducted, bats may be impacted if existing maternity roost trees are removed. Site fidelity is common in NLEB and females often return to the same maternity area over multiple years (U.S. Forest Service, Eastern Region 2014). While research has shown that an NLEB maternity colony can persist with a 20 percent reduction of the roost trees associated that colony, which would be consistent with the ephemeral nature of snags (Silvas, Ford and Britzke 2015), there is still a risk of impacting maternity colonies with the degree of tree removal proposed.

While foraging habitat may be impacted by project activities, these impacts may be beneficial since the NLEB forages over open habitats. Bats appear to follow physical land features such as roads, trails, streams, and ridge lines. Therefore, there may be indirect beneficial effects to foraging habitat resulting from the creation of new roads and trails, including skid trails, under the Proposed Action. There would be no indirect effects to foraging habitat adjacent to riparian areas and wetlands as these areas are protected (White Mountain National Forest 2005) (U.S. Forest Service 2005).

## Determination

The Peabody West project was submitted to the FWS and included in a large project BA across multiple regions of the Forest Service and was covered in the programmatic biological opinion. The FWS concluded that the Peabody West Project may affect, but is not likely to adversely affect northern long-eared bats (U.S. Fish and Wildlife Service 2023). Therefore, the programmatic biological opinion satisfies the Forest Service's responsibilities under the Endangered Species Act section 7(a)(2) relative to the northern long-eared bat for this project.

## Tricolored Bat

### Life History and Environmental Baseline

A summary of the tricolored bat's life history and occurrence information is available in the project record (U.S. Forest Service 2019c) and a brief overview of key habitat requirements is included in Table 1. Like the NLEB, the tricolored bat has suffered population declines due to white-nose syndrome. The tricolored bat has been documented on the WMNF, although far less frequently than the other species considered in this document. This species was likely rare, or at least uncommon compared to other species, even before the advent of white-nose syndrome. However, roosting and foraging habitat exist within the action area and the presence of the species is assumed. There are no known hibernacula or roost trees within the action area, so there are no habitat features that would require a buffer from project activities.

### Habitat Suitability and Effects Analysis

This effects analysis assumes that all Forest Plan Standards and Guidelines, in particular those applicable to wildlife reserve trees (White Mountain National Forest 2005) (U.S. Forest Service 2005), and the NLEB conservation measures developed by the Eastern Region of the USDA Forest Service (Sandeno 2015) would be followed.

Early in the planning stages of this project, the tricolored bat was not listed under the Endangered Species Act. However, effects were considered since the species was listed as an RFSS. It was determined the Proposed Action may impact individuals but would not likely cause a trend toward federal listing or loss of viability. On September 14, 2022, the USFWS issued a proposed rule to list the tricolored bat as endangered ( (U.S. Fish and Wildlife Service 2021) (U.S. Fish and Wildlife Service 2022)). The BE has been updated to address the new federal status of the tricolored bat.

As with the NLEB, no hibernacula for these species are known to exist within the project area. Direct effects to tricolored bats, most likely may occur during timber harvest during the pupping season.

Timber harvest and connected actions and bike trail construction could result in the removal of roost trees. Even if bats are not present, this loss of habitat represents an indirect effect. As was the case with the NLEB, it is not believed that bats discussed here are limited by availability of roosting habitat. Since project-related effects to tricolored are limited in scope, this project would not contribute measurably to cumulative impacts to tricolored bat species in the action area.

Indirect effects include those that affect bats through alteration of habitat, such as the removal of unidentified roost trees when bats are not present. While the tricolored bat is not limited by the availability of roosting habitat (U.S. Fish and Wildlife Service 2022) and ample roost trees would still be available within the action area and the surrounding area after the proposed timber harvests have been conducted, bats may be impacted if existing maternity roost trees are removed.

### Determination

The Proposed Action would not jeopardize the continued existence of tricolored bats. Conferencing with the USFWS on tricolored bats is not required.

## Eastern Small-footed bat and Little Brown Bat

### Life History and Environmental Baseline

Summaries of each species' life history and occurrence information can be found in the project record (U.S. Forest Service 2019b) (U.S. Forest Service 2019d). These two bat species have habitat requirements similar to the NLEB, although the eastern small-footed bat is less likely to be found roosting in the action area because it prefers roosting in areas containing exposed rock. Like the northern long-

eared bat, these species can be found throughout the WMNF. The presence of these two bat species within the project area during the active season is assumed.

#### Habitat Suitability and Effects Analysis

As with the NLEB, no hibernacula for these species are known to exist within the project area. Direct effects to eastern small-footed bats and little brown bats, most likely may occur during timber harvest during the pupping season.

Timber harvest and connected actions and bike trail construction could result in the removal of roost trees. Even if bats are not present, this loss of habitat represents an indirect effect. As was the case with the NLEB, it is not believed that bats discussed here are limited by availability of roosting habitat. Because project-related effects to eastern small-footed bats and little brown bats are limited in scope, this project would not contribute measurably to cumulative impacts on these two bat species in the action area.

#### Determination

The Proposed Action may impact individual eastern small-footed bats and little brown bats, but would not likely cause a trend toward federal listing or loss of viability.

### Monarch Butterfly and Yellow-banded Bumblebee

#### Life History and Environmental Baseline

The monarch butterfly (*Danaus plexippus*) and yellow-banded bumblebee (*Bombus terricola*) are pollinator species that require ample floral resources throughout the growing season. Detailed life history information for the monarch (U.S. Forest Service 2019k) and yellow-banded bumblebee (U.S. Forest Service 2019l) can be found in the project record. The monarch butterfly has been observed within the project area and the presence of the yellow-bellied bumblebee is assumed.

#### Habitat Suitability and Effects Analysis

Direct impacts to both species could occur from the expansion of upland openings, log landings, and roadsides if individuals are present when activities take place during the summer months. While adults may be able to fly away from equipment as it approaches, monarch caterpillars and bumblebee colonies, if present on the site, could be directly impacted.

Overall, indirect impacts to both species would be beneficial. The expansion and continued maintenance of openings and maintenance of roadsides would perpetuate the habitat into the future. Timber harvests would temporarily create new habitat since the forb and shrub species that colonize harvested areas would provide floral resources that did not exist prior to tree removal.

Past, present, and future vegetation management and connected actions associated with vegetation management including road and landing construction, reconstruction, or maintenance and ongoing maintenance of existing roads, invasive plant control, and continued maintenance of permanent wildlife openings in the cumulative effects analysis area could result in the loss of some existing herbaceous vegetation used by this species. The Forest Service implements standard maintenance procedures under the permanent wildlife opening program to minimize or avoid direct impacts associated with the maintenance of permanent upland openings including limiting mowing and other mechanical treatments to October and November. These effects would be of short duration, as these areas would revegetate upon completion of these activities.

#### Determination

The Proposed Action may impact individuals Monarch butterfly and yellow-banded bumblebee but would not likely cause a trend toward federal listing or loss of viability.

# National Forest Management Act (NFMA) Land Management Plan Consistency

The White Mountain National Forest Land Management Plan provides standards and guidelines for Rare and Unique Features, such as Canada lynx, among others. Specific standards and guidelines for Canada lynx are included in Appendix B—Forest Plan Compliance Checklist for Canada Lynx. Based on the analysis provided in this document, the proposed action is consistent with forest plan direction. Key forest plan standards and guidelines are discussed below.

**Wildlife Habitat Management S-3 (Forest Plan p. 2-33): Known active raptor nest areas must be protected. Extent of the protection should be based on proposed management activities, human activities, species, topography, vegetative cover and other factors. A no-disturbance buffer of at least 66 feet is required around the nest sites from nest site selection to fledging generally March through July. At many sites, conditions will result in the need for a larger buffer to provide adequate protection.**

Harvest units that contain historic and new raptor nests will be surveyed by the biologist to determine species and no-disturbance buffer distances prior to harvest activities.

**Wildlife Habitat Management G-11 (Forest Plan p. 2-34): Protection of sensitive habitats, such as wetlands, and den and nest sites for key species, should be considered for protection at the project-level.**

Trees with visible raptor nests will be protected from harvest activities. Some raptor species will use the same nest but not consistently from year to year. It is important to leave the nest tree for that reason that it could be used at a later year.

# Other Issues Identified for Analysis

## Is there potential for a significant environmental effect to your resource from the proposed activities?

**NO**

## Would project effects approach a threshold for your resource?

**NO**

## Is your resource related to an effect identified and approved by the responsible official for analysis?

**NO**

### Effects of Mountain Bike Trail Construction on Wildlife

Project effects on general wildlife and suitable habitat would be similar to those discussed in the Special Status Species and Vegetation sections. Under the Proposed Action, project activities would result in some displacement, avoidance, or harm to wildlife in the affected area due to noise or physical disturbance. These adverse effects would be short-term and limited to the duration of project implementation.

The activities involved with the mountain bike trail component of this project are likely to negatively affect wildlife; effects of mountain biking on wildlife have been documented in numerous studies (Miller, Knight and Miller 1998), (Taylor and Knight 2003), (Davis, et al. 2010), (Quinn and Chernoff 2010). For example, large mammals occurring near trails are likely to flee, and nesting birds may be flushed from their nests, when a mountain biker nears the vicinity. These disturbances may result in impacts such as decreased reproductive success and increased exposure to predators. Mountain biking may also alter species composition, favoring species more tolerant of regular disturbance and human activity in general, including the introduction of non-native invasive species along recreation corridors (U.S. Forest Service 2010), in which the WMNF formalized incidental mountain biking trails, described potential effects on

wildlife (pp. 30-38) similar to those described above. The Moat Mountain Trail System is a much larger bike trail network consisting of 12 miles in a localized area for mountain bikes compared to Peabody's mountain bike trail. The proposed Peabody mountain bike trail is half the size of Moat Mountain, comprising 4 miles of new mountain bike trail construction and improvements to about 2 miles of an existing road used during the winter for snowmobiles. Because of the similarities in the scope between the Moat Mountain Trail System Project and the Proposed Action, impacts on wildlife would be consistent with those disclosed in that analysis: effects of the Proposed Action would be minor and localized due to the existing level of disturbance on trails and along the Bear Springs Road.

## References

Anderson, H. W., and A. G. Gordon. 1994. *The tolerant conifers: eastern hemlock and red spruce, their ecology and management.* Research Information Paper No. 113, Ministry of Natural Resources, Ontario Forestry Research Institute, Ontario: Ontario Forestry Research Institute, 48.

Costello, Christine A., Mariko Yamasaki, Peter J. Pekins, William B. Leak, and Christopher D. Neefus. 2000. "Songbird response to group selection harvests and clearcuts in a New Hampshire northern hardwood forest." *Forest Ecology and Management 127* 127: 41-54. https://www.fs.usda.gov/treesearch/pubs/19577.

Davis, C.A., D. M. Leslie, W. D. Walter, and A. E. Graber. 2010. "Mountain Biking Trail Use Affects Reproductive Success of Nesting Golden-Cheeked Warblers." *The Wilson Journal of Ornithology* 122: 465-474.

DeGraaf, Richard M., Mariko Yamasaki, William B. Leak, and Anna M. Lester. 2006. *Technical guide to forest wildlife habitat management in New England.* Technical Guide, Lebanon: University Press of New England. https://www.fs.usda.gov/treesearch/pubs/58319.

Leak, William B., Mariko Yamasaki, and Robbo Holleran. 2014. *Silvicultural guide for northern hardwoods in the northeast.* General Technical Report NRS-132, U.S. Department of Agriculture, Forest Service, Durham: Northern Research Station, 52. https://www.fs.fed.us/nrs/pubs/gtr/gtr_nrs132.pdf.

Miller, S.G., R. L. Knight, and C. K. Miller. 1998. "Influence of Recreational Trails on Breeding Bird Communities." *Ecological Applications* 8: 162-169.

New Hampshire Fish and Game. 2019. "New Hampshire northern long-eared bat survey. Modified by S. Houghton to include only data from the White Mountain National Forest." 22.

Prout, L. 2018. *LAU acres suitable/denning habitat.* Excel Spreadsheet, U.S. Department of Agriculture, U.S. Forest Service.

Prout, L. 2017. "Personal communication via email to Bonnie Woods, Assistant District Ranger-Wildlife." Campton, NH, December 4.

Quinn, M., and G. Chernoff. 2010. "Mountain Biking: A Review of the Ecological Effects." *Miistakis Institute* (Parks Canada National Office - Visitor Experience Branch).

Ruediger, Bill, Jim Claar, Steve Mighton, Bob Naney, and Tony Rinaldi. 2000. *Canada Lynx Conservation Assessment and Strategy.* U.S. Fish & Wildlife Publications, 197. https://digitalcommons.unl.edu/cgi/viewcontent.cgi?article=1196&context=usfwspubs.

Sandeno, C. 2015. *Programmatic Biological Assessment Northern Long-Eared Bat for Land and Resource Management Plans of the U.S. Forest Service Eastern Region.* Milwaukee: U.S. Forest Service Eastern Regional Office, 219.

Sease, J., and L. Prout. 2015. *Biological assessment for ongoing project activities with determinations of no effect or may affect, not likely to adversely affect for the northern long-eared bat on the Green Mountain and White Mountain National Forest.* White Mountain National Forest, 120.

Silvas, A., W. M. Ford, and E. R. Britzke. 2015. "Effects of hierarchical roost removal on northern long-eared bat (Myotis septentrionalis) maternity colonies." *PLoS ONE* 10 (1). doi:doi:10.1371/journal.pone.0116356.

Taylor, A.R., and R. L. Knight. 2003. "Wildlife responses to recreation and associated visitor perceptions." *Ecological Applications* 13: 951-963.

U.S Forest Service. 2007a. *Canada lynx analysis unit (LAU) mapping and habitat designation for the White Mountain National Forest, New Hampshire and Maine.* U.S. Department of Agriculture, Campton: U.S. Department of Agriculture.

U.S. Department of Agriculture, Forest Service. n.d. *Endangered, threatened, and sensitive species list.* Accessed July 22, 2022. https://www.fs.usda.gov/detail/r9/plants-animals/?cid=stelprdb5250780.

U.S. Department of Agriculture, Forest Service. 2005. "White Mountain National Forest Land and Resource Management Plan." Campton, NH.

U.S. Fish and Wildlife Service. 2023. *Biological Opinion: Effects to the Northern Long-Eared Bat from Planned and Ongoing Activities Being Implemented in the Eastern and Southern Regionsof the U.S. Forest Service.* United States Department of the Interior.

U.S. Fish and Wildlife Service. 2022. *Endangered and Threatened Wildlife and Plants; Endangered Species Status for Northern Long-Eared Bat.* Federal Register. https://www.federalregister.gov/documents/2022/11/30/2022-25998/endangered-and-threatened-wildlife-and-plants-endangered-species-status-for-northern-long-eared-bat.

U.S. Fish and Wildlife Service. 2022. *Endangered and Threatened Wildlife and Plants; Endangered Species Status for Tricolored Bat.* Federal Register. https://www.federalregister.gov/documents/2022/09/14/2022-18852/endangered-and-threatened-wildlife-and-plants-endangered-species-status-for-tricolored-bat.

U.S. Fish and Wildlife Service. 2016. *Programmatic Biological Opinion on Final 4(d) Rule for the Northern Long-Eared Bat and Activities Excepted from Take Prohibitions.* Bloomington, MN: U.S. Fish and Wildlife Service, Midwest Regional Office. https://www.fws.gov/midwest/endangered/mammals/nleb/pdf/BOnlebFinal4d.pdf.

U.S. Fish and Wildlife Service. 2021. *Species Status Assessment (SSA) Report for the Tricolored Bat (Perimyotis subflavus).* United States Department of the Interior. https://ecos.fws.gov/ServCat/DownloadFile/221212.

U.S. Forest Service. 2007b. *Delineation of Habitat Management Unit Boundaries on the White Mountain National Forest.* U.S. Department of Agriculture, U.S. Department of Agriculture, 2.

U.S. Forest Service. 2005. *Final Environmental Impact Statement for the White Mountain National Forest Land and Resource Management Plan.* Environmental Impact Statement, U.S. Department of Agriculture, Campton: U.S. Department of Agriculture.

U.S. Forest Service. 2010. *Moat Mountain Trail System Environmental Assessment.* Environmental Assessment, U.S. Department of Agriculture, U.S. Department of Agriculture, 30-38.

U.S. Forest Service. 2019d. *Species abstract - eastern small-footed bat.* U.S. Department of Agriculture, 21: U.S. Department of Agriculture.

U.S. Forest Service. 2019b. *Species abstract – little brown bat.* U.S. Department of Agriculture, U.S. Department of Agriculture, 18.

U.S. Forest Service. 2019k. *Species abstract - monarch butterfly.* U.S. Department of Agriculture, U.S. Department of Agriculture, 13.

U.S. Forest Service. 2019a. *Species abstract - northern long-eared bat.* U.S. Department of Agriculture, 19.

U.S. Forest Service. 2019c. *Species Abstract - tricolored bat.* U.S Department of Agriculture, U.S Department of Agriculture, 19.

U.S. Forest Service. 2019l. *Species abstract - yellow-banded bumblebee.* U.S. Department of Agriculture, U.S. Department of Agriculture, 14.

U.S. Forest Service, Eastern Region. 2014. *Northern long-eared bat species data summary.* U.S. Department of Agriculture, Milwaukee: U.S. Department of Agriculture, 42.

White Mountain National Forest. 2005. *White Mountain National Forest Land and Resource Management Plan.* U.S. Department of Agriculture, Campton: U.S. Forest Service, 2-35.

White Mountain National Forest. 2005. *White Mountain National Forest Land and Resource Management Plan.* U.S. Department of Agriculture, Campton: U.S. Forest Service, 2-24 to 2-26.

# Preparers

**Table 2. List of preparers.**

| Name | Position/Title |
|---|---|
| William O'Neill | Wildlife Biologist |
| Dan Sperduto | Forest Botanist |

# Appendix A—Species Not Evaluated in Detail

**Table 3. Plant species with potential to occur in the project area with rationale.**

| Scientific Name | Common Name | Habitat Category | Life History | Known or Potential to Occur in the Project Area | Effects Determination | Analysis and Rationale |
|---|---|---|---|---|---|---|
| *Osmorhiza berteroi* | Mountain Sweet-Cicely | Rich Hardwood Forests and Talus Slopes | Rich to semi-rich, moist, deciduous, montane woods in northern New Hampshire; also roadside embankments within these forests. | Historic occurrence in project area; suitable habitat may occur within action area. | May adversely affect individuals but not likely to result in a trend toward federal listing or loss of viability. | Semi-rich hardwood habitats observed, but no diverse rich sites. The species was not documented from surveys in these areas despite deliberate searches. No further analysis required. |
| *Triphora trianthophora* | Nodding Pogonia | Hardwood and Mixed Forests | Mid-elevation beech hardwoods usually on south-facing slopes. Deep leaf litter with humus. | No suitable habitat within action area, although areas strong to beech were searched. | No effect. | Only occurs in eastern and southern portions of the National Forest east of the Pemigewasset River. Not known north of the major notches. |
| *Galium kamtschaticum* | Boreal Bedstraw | Forest Seeps and Swamps | Prefers cool, somewhat rich seep habitat in the mountains with non-channelized flowing near-surface water within wet hardwood, mixed, or conifer woods, swamps, and streamsides. | Some suitable habitat within action area, but mostly in non-action areas and at higher elevations. | May adversely affect individuals but not likely to result in a trend toward federal listing or loss of viability. | No further analysis required. Potentially suitable seep habitats encountered were searched for this species, but no occurrences were documented. The species is more likely to occur at higher elevations than occur in the action areas of the project. |
| *Listera convallarioides* | Broad-leaved Twayblade | Forest Seeps and Swamps | Wet, cold woods, usually in deep shade; peaty glades, spruce/fir woods; thickets, nutrient poor mossy-forested seeps. | Some suitable habitat within action area, but mostly in non-action areas and at higher elevations. | May adversely affect individuals but not likely to result in a trend toward federal listing or loss of viability. | No further analysis required. Potentially suitable seep habitats encountered were searched for this species, but no occurrences were documented. |
| *Listera cordata* | Heartleaf Twayblade | Forest Seeps and Swamps | Seeps and wet, cold woods, sphagnum bogs, and ascending to sub-alpine scrub; bases of wet, seepy ledges, outcrops/cliffs, spruce/fir woods on lime. | Some suitable habitat within action area, but mostly in non-action areas and at higher elevations. | May adversely affect individuals but not likely to result in a trend toward federal listing or loss of viability. | No further analysis required. Potentially suitable seep habitats encountered were searched for this species, but no occurrences were documented. |
| *Ophioglossum pusillum* | Northern Adder's Tongue | Swamps and Open Swamplands | Variety of early-successional, seasonally moist to wet habitats, including open fens, bogs, marsh edges, pastures, old fields, grassy shores, wet thickets, cedar and hardwood swamps, floodplain woods, wet swales, damp sand, and roadside ditches. WMNF occurrence is in an old log landing that has been mowed during roadside mowing. | Potentially suitable habitat within action area, but species not known or observed during field surveys. | No effect. | No further analysis required. Potentially suitable habitats were searched during field surveys, but the species was not observed. |
| *Listera auriculata* | Auricled Twayblade | Riparian | Temporarily flooded and seasonally ice-scoured riverbanks with calcareous soils. Stream banks, mossy woods, alder thickets, boggy alluvial woods, cedar swamps, gravel riverbank, and lake and pond shores | Suitable habitat may occur within the floodplain and river terrace areas of the West Branch, Peabody, and Moose Rivers. Harvesting is not proposed in the areas with potential habitat. | No effect. | No further analysis required. This species was searched for in appropriate habitat but was not observed. |
| *Pyrola asarifolia* | Pink Wintergreen | Riparian | Rich or moist woods and swamps; moist alluvial woods of low river terrace forests. In broader region, in calcium-rich soil areas, including northern white cedar swamps | Suitable habitat may occur within the floodplain and river terrace areas of the West Branch, Peabody, and Moose Rivers. A historic occurrence occurs along the Peabody River but was not relocated. Harvesting is not proposed in the areas with potential habitat. | No effect. | No further analysis required. This species was searched for in appropriate habitat but was not observed. |

**Table 4. Wildlife species with potential to occur in the project area with rationale.**

| Taxon | Scientific Name | Common Name | Life History | Known or Potential to Occur in the Project Area | Effects Determination | Analysis and Rationale |
|---|---|---|---|---|---|---|
| Birds | *Catharus bicknelli* | Bicknell's thrush | Occupied habitats are characterized by high numbers of standing dead conifers with a dense understory of red spruce, black spruce balsam fir, birch, and krummholz communities of high elevations above 2,500 feet. | Suitable habitat within action area; species presence assumed. | No effect. | Project activities are not proposed in suitable habitat areas within the HMU. No further analysis required. |
| Birds | *Pandion haliaetus* | Osprey | Nests in dead snags, living trees, cliffs, utility poles, wooden platforms on poles usually near or above rivers, lakes, ponds, and water bodies. Typically feed on fish. | Suitable habitat within the action area along the Peabody River West Branch. | No effect. | No known territories in the action area. Forest plan standards and guidelines ensure protection of raptors nests; buffers would be established if nests are discovered during implementation consistent with SOP-13 (EA, p. 13). No further analysis required. |
| Arthropods | *Ameletus browni* | Brown's ameletus mayfly | Larvae prefer erosional areas in cold, fast moving, well-oxygenated headwater streams of relatively high pH, with canopy cover, rocks or boulders present | Suitable habitat within action area; species presence assumed. | No effect. | No measurable impacts to suitable headwater stream habitat are expected. Therefore, no further analysis required. |
| Arthropods | *Ameletus tertius* | Third ameletus mayfly | Larvae found in well oxygenated small and large streams with high pH, canopy cover and rocks or eroding banks in depositional areas, submerged grasses and detritus along margins of riffles, and transitional areas. | Suitable habitat within action area; species presence assumed. | No effect. | No measurable impacts to suitable headwater stream habitat are expected. Therefore, no further analysis is required. |
| Arthropods | *Cicindela ancocisconensis* | Appalachian tiger beetle | Open sand or mix of sand and cobble of mid-sized rivers; feed and live on the sandy areas exposed by receding rivers. | Suitable habitat within the action area along the Peabody River West Branch. Presence of the species is assumed. | No effect. | No measurable impacts to the West Branch of the Peabody River are expected. Therefore, no further analysis is required. |

# Appendix B—Forest Plan Compliance Checklist for Canada Lynx

The Canada Lynx Conservation Assessment and Strategy describes a process to define suitable, unsuitable, and non-lynx habitat and management units for lynx on federal lands (Ruediger, et al. 2000). The WMNF used these criteria to define Lynx Analysis Units (LAUs) and determine the percentage of suitable, unsuitable, denning, and non-lynx habitat within each one (U.S Forest Service 2007a) (U.S. Forest Service 2007b). Table 5 shows current suitable and unsuitable habitat for LAUs within the action area based on GIS analysis.

**Table 5. Checklist for compliance with forest plan standards and guidelines for Canada lynx.**

| Standard (S) or guideline (G) number | Measure | Description regarding how measure would be met |
|---|---|---|
| S-1 | Standards and Guidelines for lynx apply only to lynx habitat within a Lynx Analysis Unit (LAU). | The 15,000-acre Peabody West HMU is located in the northwestern portion of LAU 5. Only 3,000 acres are available for timber treatments and do contain lynx habitat |
| S-2 | LAUs shall not be adjusted without agreement between the USDA Forest Service and U.S. Fish and Wildlife Service. | The proposed action and alternatives will not adjust or change the LAU 5 boundary |
| S-3 | Unless a broad-scale assessment of landscape patterns that compares historical and current ecological processes and vegetation patterns is developed, disturbance must be limited in the following manner:<br>If more than 30 percent of lynx habitat within a LAU is currently in unsuitable condition, no further reduction of suitable conditions shall occur because of vegetation management activities by federal agencies unless the activity is proposed specifically to improve future snowshoe hare habitat.<br>Vegetation management projects in lynx habitat should promote increases in suitable snowshoe hare habitat and retain/enhance habitat conditions for important alternate prey (particularly red squirrel) where possible. Overstory harvest treatments that retain or enhance existing softwood understories are allowed provided denning habitat within the LAU does not fall below 10 percent. | The Peabody West Project Proposed Action would not reduce suitable lynx habitat in the LAU. The objective for some of the treatments in the project area are to increase softwood within the HMU. |

| Standard (S) or guideline (G) number | Measure | Description regarding how measure would be met |
|---|---|---|
| S-4 | Prior to any action that may affect lynx, lynx habitat within affected LAUs must be mapped, including potential foraging and denning habitat. Mapping should also include identification of topographic features that may be important for lynx movement (e.g., major ridge systems, prominent saddles, riparian corridors). | The WMNF delineated LAUs forest-wide and mapped foraging and denning habitat using the previously described criteria. Field ground truthing of the broad scale LAU mapping during individual projects may result in minor map changes due to habitat validations at the ground level. Suitable lynx foraging and denning habitat was mapped within LAU 5. Ridge systems, prominent saddles, and riparian corridors within the Project Area that are important for wildlife movement would be protected and/or avoided under the Proposed Action. The Proposed Action would not interrupt habitat connectivity in or between LAUs. |
| S-5 | Within an LAU, denning habitat in patches generally larger than five acres, comprising at least 10 percent of lynx habitat must be maintained. Where less than 10 percent denning habitat is currently present within an LAU, management actions that would delay development of denning habitat structure must be deferred. Projects may still move forward if other lynx habitat areas within the LAU can be identified that will not be treated (e.g., RNAs) and which will subsequently move into denning conditions at some future time. | LAU 5 exceeds the 10 percent threshold for denning habitat. The Proposed Action would maintain the existing 27 percent denning habitat in LAU 5 (Prout, LAU acres suitable/denning habitat. 2018) |
| S-6 | On-the-ground management actions must not change more than 15 percent of lynx habitat within an LAU to an unsuitable condition within a 10-year period. | Cumulatively, the Peabody West Proposed Action, combined with past projects would not change more than 15 percent of lynx habitat within LAU 5 to an unsuitable condition within a 10-year period. |
| S-7 | Existing and potential diurnal security habitat around highly disturbed recreation developments (e.g., ski areas) must be maintained. | The Peabody West Project Area does not contain large developed winter recreational sites. Low to moderate levels of dispersed winter hiking, cross country skiing, and snowmobiling on the Bear Springs Road and Pinkham B. Road snowmobile trail occurs. The Proposed Action would not reduce diurnal security habitat (secure winter daytime bedding sites for lynx) in the Project Area and this habitat would be available to lynx in other parts of the large LAU 5. |

JA-1189

| Standard (S) or guideline (G) number | Measure | Description regarding how measure would be met |
|---|---|---|
| G-1 | In lynx habitat, no net increase in groomed or designated over-the-snow routes and snowmobile play areas by LAU is allowed unless:<br>• The designation serves to consolidate unregulated use and improves lynx habitat.<br>• Existing snowmobile trails must be temporarily rerouted to avoid conflicts around active timber sales.<br>• Preexisting trails or corridors on private land come into National Forest ownership.<br>Groomed or designated over-the-snow routes include the following: designated winter route, groomed winter route, and authorized winter route/use area. Groomed or designated over-the-snow routes are generally compacted during the winter season, but do not include plowed roads or roads/trails accessing private land. Winter logging and alpine ski areas are not subject to this guideline. Nordic ski areas should have a “concentrated trail area” delineated by a Forest Service biologist within which existing trails are so networked that a competitive advantage for lynx does not likely exist. These “concentrated trail areas” are not subject to this guideline. | The Proposed Action proposes to consolidate unregulated use per the Transportation Analysis Plan to prevent unregulated motorized use. Gated roads would be re-gated post-harvest activities. No reroutes would be required for logging. WMNF would coordinate with local club if needed (e.g., weekend logging restrictions). No changes are being considered to the existing snowmobile trail. There are some pre-existing trails or corridors on private land that come into National Forest ownership, which are exempt from this guideline. Glade ski trails are not subject to this G-1 criteria of over-the-snow routes as there are no groomed trails and the skiing area is not in designated lynx habitat. |
| G-2 | For trails constructed primarily for summer use but which may also be used in winter (e.g., hiking trails), new construction should result in no net increase in trail mileage in lynx habitat by LAU. Designating or grooming these routes for winter use should include closures of other similar routes in lynx habitat so no net increase in routes occurs by LAU.<br>Exceptions to this guideline may be considered when an increase in over-the-snow routes would not increase the potential for competitors to gain access to an area, e.g., constructing a snowmobile trail that closely parallels an existing winter road. Exceptions may also be allowed in areas where snow depth or snow condition is insufficient to limit competing predators in winter, and consistent presence by competing predators off-trail is documented. Exceptions must be recommended by a Forest Service wildlife biologist. | There would be no change to the existing hiking or snowmobile trail system in the Project Area. The new bike trail will be constructed outside of any mapped lynx habitat and is for summer use only, no winter component |

JA-1191

| Standard (S) or guideline (G) number | Measure | Description regarding how measure would be met |
|---|---|---|
| G-3 | Following disturbances such as blow down, fire, or insects/pathogens resulting in mortality that could contribute to lynx denning habitat, salvage harvest should not occur when the affected area is smaller than five acres. Exceptions to this include:<br>• Areas such as developed recreation sites or other areas of high human concentration; and<br>• LAUs where denning habitat has been mapped and field-validated (not simply modeled or estimated) and comprises more than 10% of lynx habitat within a LAU. In these cases, salvage harvest may occur, if at least the minimum amount of denning habitat is maintained in a well-distributed pattern.<br>• Already active timber sales where removal of blowdown trees is necessary to ensure access, reduce safety hazards, or otherwise meet the project objectives. | No salvage harvest is proposed in lynx habitat. Denning habitat in LAU 5 is 27 percent (exceeds 10 percent threshold). |
| G-4 | In lynx habitat, pre-commercial thinning may be allowed only when stands no longer provide snowshoe hare habitat (e.g., self-pruning processes have eliminated snowshoe hare cover and forage availability during winter conditions with average snowpack). However, timber stand improvement may be used in softwoods or mixed wood stands to enhance or maintain softwood regeneration. This practice would be acceptable in stands that have suitable stem density (greater than or equal to 7,000 stems per acre in softwoods or mixed woods) for snowshoe hare cover if that stem density is retained across most of the stand. | All proposed removal of understory trees in lynx habitat would be to promote softwoods and mixedwood regeneration |
| G-5 | Key linkage areas must be maintained to allow lynx movement. Native plant communities and patterns, and habitat for potential lynx prey, should be maintained or enhanced within identified key lynx linkage areas where feasible. Habitat connectivity (e.g. along large riparian zones and across major ridges, and prominent saddles) should be retained across the landscape to support lynx movement. Creation of permanent linear routes (e.g., roads, fuel breaks, trails) that could facilitate increased over-the-snow access by competitors should not be built on ridges and saddles or in riparian zones. Clearcuts should be placed near softwood cover where possible. | There would be no change in linkages between suitable lynx habitat in the LAU. |
| G-6 | Snow compaction off designated trails and roads should be minimized when authorizing and monitoring special uses in lynx habitat. | The Proposed Action does not authorize new special uses that would allow snow compaction off designated trails or roads |

| Standard (S) or guideline (G) number | Measure | Description regarding how measure would be met |
|---|---|---|
| G-7 | New temporary roads constructed in lynx habitat should be closed to public use. The ability to implement effective closures should be provided in the initial road designs. Upon project completion these roads should be reclaimed or obliterated if not needed for other forest management objectives. | Existing forest roads used in the Project Area (normally gated) would be closed to vehicle traffic after project use. |
| G-8 | Dirt and gravel roads (particularly those that could become highways) traversing lynx habitat should not be paved or otherwise upgraded (e.g., straightening of curves, widening of roadway) in a manner that is likely to lead to significant increases in traffic volumes, traffic speeds, or would contribute to development or increases in human activity in lynx habitat, unless road safety hazards exist. | Under the Proposed Action, the existing dirt or gravel roads in the Project Area would not be paved or upgraded that would lead to significant increases in traffic volumes, speed, or contribute to development or increases in human activity in lynx habitat. |

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer and lender.

# Peabody West Integrated Resource Project: Biological Evaluation and Wildlife Report

For: Androscoggin Ranger District, White Mountain National Forest

Date: 7/29/2022

## Table of Contents

Introduction .......... 3
Consultation History .......... 3
Project Description .......... 3
Action Area .......... 3
Species and Critical Habitats Considered .......... 4
Methods .......... 4
Species List .......... 5
Species Status and Effects of the Action .......... 5
Effects Analysis of the Proposed Action .......... 5
Northern Long-eared Bat .......... 6
Life History and Environmental Baseline .......... 6
Habitat Suitability and Effects Analysis .......... 6
Determination .......... 7
Woodland Bats .......... 7
Life History and Environmental Baseline .......... 7
Habitat Suitability and Effects Analysis .......... 7
Determination .......... 8
Monarch Butterfly and Yellow-banded Bumblebee .......... 8
Life History and Environmental Baseline .......... 8
Habitat Suitability and Effects Analysis .......... 8
Determination .......... 8
National Forest Management Act (NFMA) Land Management Plan Consistency .......... 8
Other Issues Identified for Analysis .......... 9
Effects of Mountain Bike Trail Construction on Wildlife .......... 9
References .......... **Error! Bookmark not defined.**
Preparers .......... 11
Appendix A—Species Not Evaluated in Detail .......... 12

the National Environmental Policy Act. The spatial and temporal scale of the effects analysis are defined here. The analysis area for direct and indirect effects on species includes stands proposed for harvest and the immediate areas associated with the connected actions of road reconstruction and maintenance, gate installation, landing construction and reconstruction, skid trails, expansion of wildlife opening, bike trail construction and glade ski braids. The temporal scope for direct effects on species is the time period that encompasses active timber harvest operations and all other ground disturbing and tree removal activities because this is when species would most likely be affected by the proposed activities. The temporal scope for indirect effects is on the order of several decades to centuries because that is how long it can take for forested stands to provide similar habitat structure post-harvest compared to pre-harvest.

The analysis area for cumulative effects for threatened and RFSS resulting from the activities included under the Proposed Action encompasses National Forest System lands located within the Peabody West HMU. This area was chosen because the habitat objectives for the HMU provide a measurable assessment of how the Proposed Action contributes to the habitat objectives of the WMNF, as defined in the 2005 Forest Plan. This area is large enough to cover the home ranges of both wildlife and plant species and to account for effects to habitat connectivity and travel and migration corridors of some of the species discussed in this document. This large area also provides for the consideration of habitat diversity at the landscape level as well as recent or proposed projects near the Project Area that may affect habitat diversity. Activities on private land adjacent to the HMU was also considered. The temporal scope for cumulative effects for threatened and RFSS is ten years in the past and fifteen years in the future (2012 to 2037) because this time period encompasses recent and active harvest operations and connected actions as well as reasonably foreseeable future actions that have or would occur concurrently within the cumulative effects analysis area. It also includes the timeframe when any regeneration harvests would move into a young age class.

## Northern Long-eared Bat

### Life History and Environmental Baseline

A summary of the northern long-eared bat's (NLEB) life history and occurrence information is available in the project record (USDA Forest Service 2019a) and a brief overview of key habitat requirements is included in Table 2.

Under the Endangered Species Act (ESA), cumulative effects resulting from future state or private activities that are reasonably certain to occur within the action area must be considered. The Forest Service is not aware of any such activities, although timber harvests and other vegetation management activities on non-federal land within the action area are likely to occur. The FWS estimates up to 1.0 percent of the New Hampshire NLEB population will be disturbed and 0.1 percent of the pup population and less than 0.05 percent of the adult population will be harmed annually from the combination of timber harvest, prescribed fire, and forest conversion, and wind turbine operation. Therefore, the vast majority of individuals and populations that survive white-nose syndrome would be unaffected by these activities. This degree of take is not expected to lead to population-level declines in this species (FWS 2016). The cumulative loss of roosting habitat is also not anticipated to be adverse because the NLEB is not considered to be limited by the availability of such habitat (Sease and Prout 2015).

Northern long-eared bats have been documented throughout the WMNF. Roosting and foraging habitat exists in the project area and across the forest prior to the advent of white-nose syndrome. Although the New Hampshire Fish and Game Department (NHFGD) did not capture any NLEB's during a two-night repeated effort across the WMNF in July 2019 (NHFGD 2019), the presence of the NLEB is assumed. There are no known hibernacula or maternity roosts within the project area.

### Habitat Suitability and Effects Analysis

This effects analysis assumes that all Forest Plan Standards and Guidelines, in particular those applicable to wildlife reserve trees (USDA Forest Service 2005, p. 2-35), and the northern long-eared bat

(NLEB) conservation measures developed by the Eastern Region of the USDA Forest Service (Sandeno 2015) would be followed.

Direct effects to NLEB include timber harvest activities during the summer and fall seasons from trees over 3 inches diameter at breast height, especially during the pupping season (June 1-July 31). Bike trail construction would directly impact NLEB if large trees need to be removed but these effects would be minimized by using appropriate trail design and coordinating implementation between WMNF recreation and biology staff. No known hibernacula exist within the project area and there are no other activities included in the Proposed Action that would take place during the NLEB active season (April 15 to October 30) would directly affect the NLEB. Therefore, no direct effects are anticipated.

Indirect effects include those that affect bats through alteration of habitat, such as timber harvest and bike trail construction, which would remove potential roost trees when bats are not present. While there would still be ample roost trees available within the HMU and the surrounding area after the proposed timber harvests have been conducted, bats may be impacted if existing maternity roost trees are removed. Site fidelity is common in NLEB and females often return to the same maternity area over multiple years (USDA Forest Service 2014). While research has shown that an NLEB maternity colony can persist with a 20 percent reduction of the roost trees associated that colony, which would be consistent with the ephemeral nature of snags (Silvis et al. 2015), there is still a risk of impacting maternity colonies with the degree of tree removal proposed.

While foraging habitat may be impacted by project activities, these impacts may be beneficial since the NLEB forages over open habitats. Bats appear to follow physical land features such as roads, trails, streams, and ridge lines. Therefore, there may be indirect beneficial effects to foraging habitat resulting from the creation of new roads and trails, including skid trails, under the Proposed Action. There would be no indirect effects to foraging habitat adjacent to riparian areas and wetlands as these areas are protected (USDA Forest Service 2005, pages 2-24 to 2-26).

### Determination

The proposed project may affect northern long-eared bat, although there are no effects beyond those previously disclosed in the programmatic biological opinion on implementing the final 4(d) rule dated January 5, 2016 (U.S. Fish and Wildlife Service 2016). Therefore, the programmatic biological opinion satisfies the Forest Service's responsibilities under ESA section 7(a)(2) relative to the northern long-eared bat for this project.

## Woodland Bats

### Life History and Environmental Baseline

Summaries of each species' life history and occurrence information can be found in the project record (USDA Forest Service 2019b, 2019c, 2019d). These three bat species have habitat requirements similar to the NLEB, although the eastern small-footed bat is less likely to be found roosting in the action area because it prefers roosting in areas containing exposed rock. Like the northern long-eared bat, these species can be found throughout the WMNF. The presence of all three species within the project area during the active season is assumed.

### Habitat Suitability and Effects Analysis

As with the NLEB, no hibernacula for these species are known to exist within the project area. Direct effects to eastern small-footed bats, little brown bats, and tri-colored bats most likely may occur during timber harvest during the pupping season.

Timber harvest and connected actions and bike trail construction could result in the removal of roost trees. Even if bats are not present, this loss of habitat represents an indirect effect. As was the case with the NLEB, it is not believed that the woodland bats discussed here are limited by availability of roosting

| Wild and Scenic Inventory River Name | Type of Silviculture Treatment | Proposed Treatment | Estimated Acres of Proposed Units with in 1/4 mile of River |
|---|---|---|---|
| Peabody River | Even Age | Patch Cut | 9.7 |
| | Uneven Age | Group Selection | 4.7 |
| | | Single Tree Selection | 39.8 |
| | | Single Tree and Group Selection | 306.7 |
| | | Thinning | 1.0 |
| West Branch of Peabody | Even Age | Patch Cut | 4.1 |
| | Uneven Age | Single Tree and Group | 84.7 |

| Wild and Scenic Inventory River Name | Estimated Miles of River within 1/4mile of a Proposed Unit |
|---|---|
| Peabody River | 4.4 |
| West Branch Peabody | 1.5 |

Miles Between River and Nearest Proposed Even Age Unit

| |
|---|
| 0.12 |

| FID | Shape * | DISTRICT | SALE_NAM | EA_NAME | PAY_UNIT | RX_CODE | RX | ACRES | COMMENT | COMP_ST | StandID | BARemova | BA | SO | DBH | EVCode | AcresCalc |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | Polygon | | | | | 111 | PC | 4.185318 | | | 70 | 100 | 115 | | 11.27 | 81 | 3.465529 |
| 1 | Polygon | | | | | 111 | PC | 2.427075 | | | 70 | 100 | 115 | | 11.27 | 81 | 0.024128 |
| 2 | Polygon | | | | | 111 | PC | 9.017892 | | | 69 | 100 | 124 | | 10.99 | 81 | 0.601168 |
| 3 | Polygon | | | | | 153 | STS-G | 33.734394 | | | 72 | 40 | 132 | | 10.82 | 87 | 32.10576 |
| 4 | Polygon | | | | | 153 | STS-G | 53.976696 | | | 74 | 40 | 124 | | 12.24 | 81 | 52.54636 |

| Row Labels | Sum of AcresCalc |
|---|---|
| PC | 4.090825 |
| STS-G | 84.652118 |
| **Grand Total** | **88.742943** |

| FID | Shape * | STREAMS_ | STREAMS_ | LLID | NAME | WILD | SCENIC | RECREATION | HYDROLO( | GEOLOGIC | FISH | FEIS_D1 | Z991_LIST | REV_DATE | SOURCE | SHAPE_LEN | MilesCalc |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Polyline | 326 | 327 | 7.12208E+11 | West Bran | wild | | | | | | d1 | w | <Null> | | 30457.32 | 1.487176 |

| FID | Shape * | DISTRICT | SALE_NAM | EA_NAME | PAY_UNIT | RX_CODE | RX | ACRES | COMMENT | COMP_STA | StandID | BARemova | BA | SO | DBH | EVCode | AcresCalc |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | Polygon | | | | | 151 | ST | 50.81516 | | | 10 | 35 | 110 | | 8.41 | 87 | 17.38771 |
| 1 | Polygon | | | | | 153 | STS-G | 17.06586 | | | 11 | 40 | 144 | | 9.46 | 13 | 11.73147 |
| 2 | Polygon | | | | | 153 | STS-G | 55.23716 | | | 23 | 40 | 111 | | 9.87 | 87 | 18.05185 |
| 3 | Polygon | | | | | 151 | ST | 13.9009 | | | 24 | 35 | 39 | | 10.47 | 20 | 6.671531 |
| 4 | Polygon | | | | | 151 | ST | 27.81902 | | | 29 | 35 | 129 | | 10.34 | 89 | 14.88371 |
| 5 | Polygon | | | | | 153 | STS-G | 70.28484 | | | 30 | 40 | 152 | | 10.09 | 87 | 49.86127 |
| 6 | Polygon | | | | | 153 | STS-G | 10.06608 | | | 32 | 40 | 152 | | 10.55 | 13 | 10.06608 |
| 7 | Polygon | | | | | 153 | STS-G | 25.62415 | | | 39 | 40 | 116 | | 9.29 | 87 | 25.62415 |
| 8 | Polygon | | | | | 153 | STS-G | 167.0376 | | | 46 | 40 | 139 | | 9.11 | 89 | 42.96467 |
| 9 | Polygon | | | | | 153 | STS-G | 29.21542 | | | 47 | 40 | 109 | | 9.79 | 89 | 6.859086 |
| 10 | Polygon | | | | | 153 | STS-G | 32.99961 | | | 48 | 40 | 142 | | 9.31 | 20 | 32.99961 |
| 11 | Polygon | | | | | 153 | STS-G | 60.43891 | | | 61 | 40 | 140 | | 9.01 | 89 | 44.61203 |
| 12 | Polygon | | | | | 153 | STS-G | 43.97035 | | | 63 | 40 | 132 | | 9.41 | 87 | 43.97035 |
| 13 | Polygon | | | | | 152 | GS | 158.0246 | | | 68 | 20 | 94 | | 9.34 | 81 | 4.689636 |
| 14 | Polygon | | | | | 111 | PC | 6.659066 | | | 69 | 100 | 124 | | 10.99 | 81 | 6.659066 |
| 15 | Polygon | | | | | 111 | PC | 2.427075 | | | 70 | 100 | 115 | | 11.27 | 81 | 0.064953 |
| 16 | Polygon | | | | | 111 | PC | 4.998918 | | | 70 | 100 | 115 | | 11.27 | 81 | 2.929798 |
| 17 | Polygon | | | | | 220 | THIN | 0.999493 | | | 78 | 30 | 218 | | 9.41 | 2 | 0.999493 |
| 18 | Polygon | | | | | 153 | STS-G | 18.02561 | | | 79 | 40 | 141 | | 9.03 | 87 | 12.25168 |
| 19 | Polygon | | | | | 153 | STS-G | 8.53206 | | | 80 | 35 | 132 | | 12.94 | 20 | 7.716119 |
| 20 | Polygon | | | | | 151 | ST | 14.13682 | | | 94 | 40 | 160 | | 12 | 89 | 0.900902 |

| Row Labels | Sum of AcresCalc |
|---|---|
| GS | 4.689636 |
| PC | 9.653817 |
| ST | 39.843847 |
| STS-G | 306.708356 |
| THIN | 0.999493 |
| **Grand Total** | **361.895149** |

| FID | Shape * | STREAMS_ | STREAMS_ | LLID | NAME | WILD | SCENIC | RECREATIC | HYDROLOG | GEOLOGIC | FISH | FEIS_D1 | Z991_LIST | REV_DATE | SOURCE | SHAPE_LEI | MilesCalc |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | Polyline | 257 | 258 | 7.12E+11 | Peabody F | | | | hydro | | | d1 | wsr | <Null> | | 60625.31 | 4.402135 |

| Commenter | CommentText | ResponseText |
| --- | --- | --- |
| Acharya, Baibhav | I would thus like to sincerely request that the project honor the present tradition and practices and help preserve the mystique and beauty of this region. | No response needed |
| Acharya, Baibhav | While I believe in proper forest management to promote the diversity of flora and fauna in the region, increased commercial logging would be detrimental to the area's natural beauty. | A Scenery Analysis will be performed in accordance with Forest Plan Standards and Guidelines. |
| Acharya, Sara | While I can completely understand and support the need to keep our forest healthy for generations to come, I implore you to make sure whatever needs doing is done outside of our viewshed. Imagining the oasis of Lake Tarleton, but with visible logging and maintenance, is sickening. | A Scenery Analysis will be performed in accordance with Forest Plan Standards and Guidelines. |
| Ascher, Peter | Our house has a lovely view of the Forest and its value would be greatly diminished by any development on the opposite shore. | A Scenery Analysis will be performed in accordance with Forest Plan Standards and Guidelines. |
| Ascher, Peter | Further, because of the inaccessibility of the far shore we would be very concerned about the fire risk to the shoreline and the slopes of Mount Serrano and Ore. It is for this reason that we object to even marked trails or day camping in the area. | No campsite work has been proposed. The area on the back side of the Lake needs attention from an LNT perspective, but there are no proposals for this project to address this. The Fire concern will be analyzed by the WMNF fire shop |
| Dennison, Lynn | We found no mention of invasive species control. Specifically, there are a number of Japanese Knot Weed infestations within the project limits that should be eliminated as part of the management plan. There may be other invasive plants unknown to us that should be eliminated. We suggest a detailed inventory of invasive species and treatment plan be included in the plan. | NNIS management is already covered under separate environmental analysis. The forest botanist will survey the area for NNIP and add to the NNIS treatment schedule based on forest priority and needs. |
| Dennison, Lynn | A detailed map of the limits of each of the silvicultural treatments shown on Table 1 on page 5 should be included in the plan. | Items would be included in the Draft/Final EA including detailed maps |
| Dennison, Lynn | The plan should include proposed locations of the 160 acres of "clear cut with reserves" be shown on the project map. We are concerned about a negative visual impact created by this activity. | A Scenery Analysis will be performed in accordance with Forest Plan Standards and Guidelines. |
| Dennison, Lynn | The scoping document mentions nine log landings necessary for the forest management activities. We would like proposed log landing sites shown on the project map in the plan. | Items would be included in the Draft/Final EA including detailed maps |
| Dennison, Lynn | Page 4 of the draft scoping document (newsletter) mentions adding woody debris generated by the removal of non-native Scots pine to Lake Katherine. We concerned about this statement and would like clarification about how that activity will impact water quality of Lake Katherine. | The proposal to drop/place scotch pine into Lake Katherine will be more clearly defined. The environmental effects section of the EA will describe the effects of this action on aquatic habitats, water quality, and recreation. |
| Dennison, Lynn | The roadway improvements proposed end in gated dead ends. Will there be connections between them in the form of hiking/bike trails? We encourage those connections be made. | This concern is focused on improving or reviving what are currently non-system trails. The EA will address this with a discussion about Forest Plan direction regarding how we evaluate and consider adding trails to the system. Presently, these historic trails do not meet the criteria to be considered for formally adopting them as system trails and the EA will describe why. |
| Dennison, Lynn | Will motorized vehicles be permitted on the roadway system? We encourage motorized vehicles to be prohibited except snow machines. | Road maintenance and use will be discussed in the EA |
| Dennison, Lynn | Will the bridges or culverts needed to reestablish stream crossings be reconstructed? Specifically on the Charlestown Road where the existing stream crossings have been washed out by storms. | Road maintenance and use will be discussed in the EA |
| Dennison, Lynn | The proposed scope of work for the Lake Katherine boat launch site is a necessary improvement. | No response needed |
| Dennison, Lynn | Removal of the Lake Tarleton Club foundations is a good idea. | No response needed |
| Dennison, Lynn | Implementation of the plan will result in construction/logging operations. The environmental impact of these temporary activities should be discussed. Noise, air and water quality and truck traffic mitigation should be addressed. | Items would be included in the Draft/Final EA including detailed maps |

| | | |
|---|---|---|
| DiPietro, Mike | Please do not disturb the old cellar holes, stone walls, culverts, cemeteries, and other remnants of the old Charleston Village during logging/skidding operations.Some good info about old Charleston; https://lymecellarholes.wordpress.com/tag/lake-tarleton/ | All known Cultural Resources Sites (cellar-holes/ historic farmstead features: wells, outbuildings, dumps, etc.) will be avoided during proposed project work, They have a 50' no entry zone around each. other historic features such as stone walls are protected by standard clauses such as: ("all tree falling near stones walls will occur away from the walls"; so no trees fall on the stone walls.) We are aware of the "Lymecellerholes" blog and have worked in the field with the Author to identify historic resources. |
| DiPietro, Mike | Please consider using the existing roadway between NH Rt 25c and the west side of Lake Tarleton for day use access such as a scenic overview /picnic area. Snowmobiling access and travel on Charleston Rd would also be an economical benefit to the area. | Recreation improvements are solely focused on the Lake Katherine boat launch area at this time. |
| Donelon, Tim | One major concern of the Tarleton Project is logging on the west side of Lake Armington. New Hampshire land owners are required by law to minimize impacts in close proximity to water bodies. Activity is limited within the boundaries set forth in the Shoreland Water Quality Protection Act. The Tarleton Project must adhere to these minimum standards when logging on the west side of Lake Armington. The west side steep slopes require careful operation to minimize sediment run-off into Lake Armington. At the very least the logging on the west side should only be allowed at the very higher elevations and sediment barrier systems used at all times. | The Forest Plan states:"Tree cutting and harvest should not occur within 25 feet of the bank of mapped perennial streams, the high water mark of a pond, or a identified natural vernal pool, unless prescribed to benefit hydrological or ecological function of the associated stream, pond, or riparian area. Exceptions to this include tree removals needed to clear a designated stream crossing, maintaining an existing road or previously cleared skid road that cannot be relocated, or protecting human safety or infrastructure. Trees (greater than 4 inch DBH) cut or moved in this zone should be placed in a fashion that benefits riparian functions or aquatic habitats when possible."and"Uneven-aged silvicultural practices should be used within the Riparian Management Zone (RMZ) along all perennial streams, lakes, ponds, and vernal pools. Cuts should be designed to maintain a relatively continuous forest canopy for the protection and maintenance of water quality, dead wood recruitment, hydrologic function, wildlife habitat, and scenic values. Regeneration group cuts should be limited to less than one acre in size. Exceptions may apply in areas deemed important Chapter 2— Forest-Wide Management Direction 2-25 important for maintaining beaver colonies. In the absence of on-the-ground riparian mapping, width of RMZs should be defined as in Table 2-01." The RMZ for lakes and ponds is 75 feet.Note that the Forest Plan was published before the current version of the Shoreland Water Quality Protection Act (SWQPA) for the State of New Hampshire. In addition to adhering to the Forest Plan, the White Mountain National Forest will follow all vegetation management and buffer requirements set forth in the SWQPA. |
| Horning, Andy | I believe the view shed should be protected if you are to log. It is such a stunning view from 25C and along the lake that logging in a way so as to keep the view and beauty of the area is paramount. | A Scenery Analysis will be performed in accordance with Forest Plan Standards and Guidelines. |
| Horning, Andy | I also think the logging, if you have to log, should be done in the winter months. | All harvest units within the Tarleton IRP are planned for Winter harvest due to characteristics of the existing road systems and to protect existing ground vegetation and moist soils. Winter harvesting season is generally from 12/15 - 3/15 but is permitted outside of those dates when the soil is thoroughly frozen. |
| Metheny, Hawk | It is the intention of the Appalachian Trail Conservancy (ATC) to work in close partnership with the White Mountain National Forest (WMNF) to ensure that both the purpose and desired condition of the land of MA 8.3 Appalachian National Scenic Trail (ANST) on the Forest is upheld. Representatives from ATC and WMNF had a productive meeting on February 24th, 2020 where we discussed several relevant topics to the project area including delineation between MA 8.3 ANST and MA 2.1 General Forest Management, particularly on the former state of New Hampshire (NH) managed Sentinel Mountain parcel in Warren, NH. | The proposed action will be in compliance with all Forest Plan standards and guidelines. A Forest Plan Amendment may be applied to give more options for the Appalachian trail corridor. |
| nicol, shirley | My main concern is that when finished, it will be a place to enjoy outdoor activities. The walking trails are very important for residents as well as the two camps on the lakes. | This concern is focused on improving or reviving what are currently non-system trails. The EA will address this with a discussion about Forest Plan direction regarding how we evaluate and consider adding trails to the system. Presently, these historic trails do not meet the criteria to be considered for formally adopting them as system trails and the EA will describe why. |

| | | |
|---|---|---|
| nicol, shirley | It should be esthetically appropriate and done so that it does not disrupt the beauty and tranquilly of our beloved lakes. | A Scenery Analysis will be performed in accordance with Forest Plan Standards and Guidelines. |
| Ryan, Bret | In the past there have been known problems with people using the backside of Tarleton Lake for a remote place to party, at times leaving trash behind as well as abandoned campfires that are not always completely extinguished. There are frequent strong winds coming off the lake that only serve to aggravate this problem. There have been people that stay for extended periods of time on the backside of the lake and occasionally been asked to move along. On other occasions there have been issues with people entering private cabins on the back of the lake. To bring more people to this section of the lake through primitive camping along the Charleston Road will likely leave the door open to this issue, possibly even becoming more prevalent. | No campsite work has been proposed. The area on the back side of the Lake needs attention from an LNT perspective, but there are no proposals for this project to address this. The Fire concern will be analyzed by the WMNF fire shop |
| Ryan, Bret | One of the objectives is to encourage more wildlife habitat diversity. Opening this area up for primitive campsites and other recreational use does not seem like a productive way to encourage wildlife to move into this area. | No campsite work has been proposed. The area on the back side of the Lake needs attention from an LNT perspective, but there are no proposals for this project to address this. The Fire concern will be analyzed by the WMNF fire shop |
| Ryan, Bret | There are private trails that have been managed on the back of the lake that I believe are at odds with the forest service's policies and these will only serve to be conduits to the lake. I fear they will bring more issues with the private lands on the back of the lake not to mention the potential increase of campfires. More than a few times I have observed these fires along the lake and wondered if there would be a forest fire by the next day. | No campsite work has been proposed. The area on the back side of the Lake needs attention from an LNT perspective, but there are no proposals for this project to address this. The Fire concern will be analyzed by the WMNF fire shop |
| Ryan, Bret | There are serious concerns for opening the Charleston Road to more access and primitive camping as it seems that this will only become a more accessible place for potential vandalization and forest fire risks to occur, not to mention increasing the likelihood of more places for people to hang out and party by other non hikers. This particular location is more than 5 miles from any of the surrounding fire departments, with significant time delays due to the uphill access to this area. It has been proven to be a long response time even with early 911 calls reported. | No campsite work has been proposed. The area on the back side of the Lake needs attention from an LNT perspective, but there are no proposals for this project to address this. The Fire concern will be analyzed by the WMNF fire shop |
| Ryan, Bret | In a place that the Forest Service would like to attract more people; who will be responsible for law enforcement or general policing of this somewhat remote area? | Increasing public use of the area is not a current need the Forest Service is pursuing at this time. Law Enforcement will be the responsibility of the Ranger District's Law Enforcement Officer with possible support from state and local police departments. |
| Ryan, M Sue | Thank you for the summarized plans for forest management and the creation of wildlife habitat in the project location. In my review of website material I could not find specific plans for logging and log landings. I hope those plans will be available for public review in the near future so site specific comments can be made. | Items would be included in the Draft/Final EA including detailed maps |
| Ryan, M Sue | When undertaking improvements to the Charlestown Road I ask that consideration be given to private landowners on that side of the lake. I realize prevention of inappropriate use, or vandalism cannot be guaranteed, but leaving portions of the Charlestown Road in its current condition will go a long way to preventing unintended consequences. | At this time the only 0.3 miles of improvements on the westerly end of Charlestown Road are being considered. Any improvements will be discussed in the roads impact portion of the EA. |
| Ryan, M Sue | I have heard talk of primitive camp sites in the area of the Charlestown Road. I hope such camp sites will not be created. | No campsite work has been proposed. The area on the back side of the Lake needs attention from an LNT perspective, but there are no proposals for this project to address this. The Fire concern will be analyzed by the WMNF fire shop |
| Ryan, M Sue | I hope that incidental trails around the lake on WMNF land will be curtailed. | This concern is focused on improving or reviving what are currently non-system trails. The EA will address this with a discussion about Forest Plan direction regarding how we evaluate and consider adding trails to the system. Presently, these historic trails do not meet the criteria to be considered for formally adopting them as system trails and the EA will describe why. |
| Ryan, M Sue | I'm pleased to see that removal of "old foundations" is in the plan presented. | No response needed |

| | | |
|---|---|---|
| Settel, Kenneth | On Lake Tarleton: The West shore just North of the Lake boat launch, extending 1/2 mile The West shore from the parking area to the public beach On Lake Armington The North shore, along Sirecho Shores The Dam area extending to the nearby beaver pond. These are areas of exceptionally bird diversity, that doesn't seem to exist at other points around any of the lakes. This summer there were nesting colonies that included a higher number of Canada Warblers as well as Chestnut sided warblers and the more usual Redstarts, Parulas, Yellowthroats, Northern Waterthrush and other species. | The Forest Service reached out to the commenter to learn more about his and his wife's knowledge of the bird community in the project area. The Wildlife Biologist learned a great deal from these discussions and thanks the commenter and his wife for the information they shared. |
| Settel, Kenneth | There has been a progressive deterioration to old trails and logging roads that have given us past access to hiking, walking, and cross country skiing. Some of these roads and trails are indicated on your project scoping plans, and many are not indicated on the map. Some of these trails and roads go back well over 100 years, as I can demonstrate on on a copy of an old historic 100 year old map of the Lake Tarleton Club Trails from 1921 of the area. The restoration of many of these now overgrown trails and roads would restore pleasure, recreational and wildlife access to these areas. | This concern is focused on improving or reviving what are currently non-system trails. The EA will address this with a discussion about Forest Plan direction regarding how we evaluate and consider adding trails to the system. Presently, these historic trails do not meet the criteria to be considered for formally adopting them as system trails and the EA will describe why. |
| Settel, Kenneth | Missing, for example is the old snowmobile maintained logging road from the Lake Armington dam to Lake Katherine. This trail has slowly been overgrown over just the past five years, with reduced access. Also missing are the trails from the Charleston Road, up Aloha Hill past the "historic monument". Also missing is the trail from the Charleston Road towards the lake, past what remains of the "historic cemetery" with old crumbling gravestones. These and other trails, such as the old trail circumnavigating Lake Tarleton, would be wonderful to restore for recreational value to hikers and birders. | This concern is focused on improving or reviving what are currently non-system trails. The EA will address this with a discussion about Forest Plan direction regarding how we evaluate and consider adding trails to the system. Presently, these historic trails do not meet the criteria to be considered for formally adopting them as system trails and the EA will describe why. |
| Teschner, Douglass | Please be sure to protect the shoreland of all three lakes.with approriate buffer zones. Your maps show forestry activity coming right down to the edge of Lake Tarleton. How much buffer have you planned? | The Forest Plan states:"Tree cutting and harvest should not occur within 25 feet of the bank of mapped perennial streams, the high water mark of a pond, or a identified natural vernal pool, unless prescribed to benefit hydrological or ecological function of the associated stream, pond, or riparian area. Exceptions to this include tree removals needed to clear a designated stream crossing, maintaining an existing road or previously cleared skid road that cannot be relocated, or protecting human safety or infrastructure. Trees (greater than 4 inch DBH) cut or moved in this zone should be placed in a fashion that benefits riparian functions or aquatic habitats when possible."and"Uneven-aged silvicultural practices should be used within the Riparian Management Zone (RMZ) along all perennial streams, lakes, ponds, and vernal pools. Cuts should be designed to maintain a relatively continuous forest canopy for the protection and maintenance of water quality, dead wood recruitment, hydrologic function, wildlife habitat, and scenic values. Regeneration group cuts should be limited to less than one acre in size. Exceptions may apply in areas deemed important Chapter 2— Forest-Wide Management Direction 2-25 important for maintaining beaver colonies. In the absence of on-the-ground riparian mapping, width of RMZs should be defined as in Table 2-01." The RMZ for lakes and ponds is 75 feet.Note that the Forest Plan was published before the current version of the Shoreland Water Quality Protection Act (SWQPA) for the State of New Hampshire. In addition to adhering to the Forest Plan, the White Mountain National Forest will follow all vegetation management and buffer requirements set forth in the SWQPA. |

| | | |
|---|---|---|
| Tompkins, Joyce | The idea of diversification of wildlife habitat and best woodland management practices sounds good. I am a bit concerned about the 160 acres of clear cut. Since the map shows the area that will used for harvest treatments abutting the lake for quite a stretch I hope a buffer along the lake can be maintained. | The Forest Plan states:"Tree cutting and harvest should not occur within 25 feet of the bank of mapped perennial streams, the high water mark of a pond, or a identified natural vernal pool, unless prescribed to benefit hydrological or ecological function of the associated stream, pond, or riparian area. Exceptions to this include tree removals needed to clear a designated stream crossing, maintaining an existing road or previously cleared skid road that cannot be relocated, or protecting human safety or infrastructure. Trees (greater than 4 inch DBH) cut or moved in this zone should be placed in a fashion that benefits riparian functions or aquatic habitats when possible."and"Uneven-aged silvicultural practices should be used within the Riparian Management Zone (RMZ) along all perennial streams, lakes, ponds, and vernal pools. Cuts should be designed to maintain a relatively continuous forest canopy for the protection and maintenance of water quality, dead wood recruitment, hydrologic function, wildlife habitat, and scenic values. Regeneration group cuts should be limited to less than one acre in size. Exceptions may apply in areas deemed important Chapter 2— Forest-Wide Management Direction 2-25 important for maintaining beaver colonies. In the absence of on-the-ground riparian mapping, width of RMZs should be defined as in Table 2-01." The RMZ for lakes and ponds is 75 feet.Note that the Forest Plan was published before the current version of the Shoreland Water Quality Protection Act (SWQPA) for the State of New Hampshire. In addition to adhering to the Forest Plan, the White Mountain National Forest will follow all vegetation management and buffer requirements set forth in the SWQPA. |
| Tompkins, Joyce | I would like to see the location of the various harvest treatments shown on the map including the nine log landings. | Items would be included in the Draft/Final EA including detailed maps |
| Tompkins, Joyce | I see you plan to add woody debris to Lake Katherine. It is a pretty shallow lake and I'd like to know more about the research supporting that practice. | The proposal to drop/place scotch pine into Lake Katherine will be more clearly defined. The environmental effects section of the EA will describe the effects of this action on aquatic habitats, water quality, and recreation. |
| Tompkins, Joyce | Also, I am hoping we can work to eliminate the invasive vegetation such as Japanese knotweed that is becoming an issue. | NNIS management is already covered under separate environmental analysis. The forest botanist will survey the area for NNIP and add to the NNIS treatment schedule based on forest priority and needs. |
| Tompkins, Joyce | I would certainly like to see the Old Charleston Road improved but I'm not sure I understand the gates and bars. At this time there is some motorized traffic on that road. Would that stop? I am quite sure that 4-wheelers are not allowed in the National Forest. Is that true? | Road maintenance and use will be discussed in the EA |
| Tompkins, Joyce | The area people use to utilize Lake Katherine definitely needs work and the plan sounds very feasible. I feel that those who use the lake will greatly appreciate a safe place to park as well as a picnic table. | No response needed |
| Tompkins, Joyce | I applaud the removal of the foundations and cleaning up of old dump sites. | No response needed |
| Uline, Nancy | I think the harvest treatments are a good idea, however, any roads used for this purpose, when completed, should be subject to gates or barriers at the beginning of those areas. | Road maintenance and use will be discussed in the EA |
| Uline, Nancy | What is the benefit of putting the non-native Scots pine that you will be cutting into Lake Katherine? I realize the fish like trees for shade and protection, etc, however, this is a very shallow lake and the level can be low at times. Certainly do not want logs or branches, coming up especially in rough water, to hit or puncture any watercraft. Also, do not need loose wood for beavers, which might block the flow out. | The proposal to drop/place scotch pine into Lake Katherine will be more clearly defined. The environmental effects section of the EA will describe the effects of this action on aquatic habitats, water quality, and recreation. |
| Uline, Nancy | Think having the boat launch area there improved and a picnic table added is good. | No response needed |
| Uline, Nancy | The removal of the old foundation sites will be an improvement. | No response needed |
| Uline, Nancy | Do not think it is necessary to cut any new trails, the Appalachian Trail is nearby for hiking. Laws regarding others cutting trails need to be respected and enforced. | This concern is focused on improving or reviving what are currently non-system trails. The EA will address this with a discussion about Forest Plan direction regarding how we evaluate and consider adding trails to the system. Presently, these historic trails do not meet the criteria to be considered for formally adopting them as system trails and the EA will describe why. |

| | | |
|---|---|---|
| Uline, Nancy | Regarding semi-primitive campsites, there are concerns about fires and garbage, as well as human waste. | No campsite work has been proposed. The area on the back side of the Lake needs attention from an LNT perspective, but there are no proposals for this project to address this. The Fire concern will be analyzed by the WMNF fire shop |
| Uline, Nancy | This is a beautiful area which many people have had the opportunity to enjoy for years. Let's continue to enjoy the wildlife and clean water that has been around for generations. | No response needed |
| Wellington, Roger | Regarding the Lake Tarleton area, people who currently want to fish or otherwise access Lake Katherine across the road from Lake Tarleton have made a muddy, rutted mess. The area in question needs to be re-graded and some small provision for parking needs to be made to prevent erosion and degradation of the pristine quality of the lake. | The newsletter contains how the Forest plans to address the current situation at Lake Katherine |
| Wellington, Roger | It would also be nice to have a trail starting at the public beach area at Lake Tartleton and going around the back side of the lake. | This concern is focused on improving or reviving what are currently non-system trails. The EA will address this with a discussion about Forest Plan direction regarding how we evaluate and consider adding trails to the system. Presently, these historic trails do not meet the criteria to be considered for formally adopting them as system trails and the EA will describe why. |
| Wellington, Roger | Finally, we like picking blueberries in the open fields on the Lake Katherine side of Rte 25C. Encouraging that kind of habitat would be good for humans and wildlife! | As part of this project, the Forest Service would continue to maintain the open fields adjacent to Lake Katherine. Parts of the opening that have not been maintained in many years would also be reopened, so there is the potential for the project to result in additional berry habitat. |
| Wipfler, Alice | We would be devastated to have this experience changed by not thinking thoroughly how we want to preserve and share Lake Tarleton and the view shed. I understand that the forest needs to be healthy and thus certain trees and growth cut down or tamed. Will this thinning be aesthetic? | A Scenery Analysis will be performed in accordance with Forest Plan Standards and Guidelines. |
| Wipfler, Alice | I would not like ATV's to ruin the woodlands, nor would I like recreational use get out of hand. Where would hikers park? Would we have to worry about trash, fires, noise? Fishermen come to Lake Tarleton early in the morning because they like the serene lake, and we welcome them. Will recreational users be as respectful? | Recreation improvements are solely focused on the Lake Katherine boat launch area at this time. |
| Wipfler, Michael | To the extent that it is possible, please do the logging in the winter months. This will reduce the impact on the land and make access to these remote locations easier (since the ground will be frozen), and since the surrounding area has fewer people in the winter months, the noise of the logging will impact fewer people. | All harvest units within the Tarleton IRP are planned for Winter harvest due to characteristics of the existing road systems and to protect existing ground vegetation and moist soils. Winter harvesting season is generally from 12/15 - 3/15 but is permitted outside of those dates when the soil is thoroughly frozen. |
| Wipfler, Michael | As you finalize your forest management plan, please consider including a plan to help combat invasive species, such as knotweed. The Lake Tarleton Association has done great work keeping milfoil and other invasive species out of the lake - and maintaining its pristine condition - but we all need to work in partnership to control the spread of invasive species that threaten the natural ecology of the region. | NNIS management is already covered under separate environmental analysis. The forest botanist will survey the area for NNIP and add to the NNIS treatment schedule based on forest priority and needs. |
| Wipfler, Michael | As you consider which areas to classify as recreational, please think about the area to the north of Lake Tarleton (along the Charlestown Road). There are several unique and interesting sites in that region. For instance, there are several nice rock outcroppings with very pleasant views. One is located just east of Rt. 25C, and it provides a unique experience with very little hiking. Another area with exposed rock outcroppings is on the northwest side of Aloha Hill. There are two other points of interest in the area: The Manning Plaque (located on the southwest slope of Aloha Hill, just north of the apple orchard) and the Lund cemetery (just on the other side of the Charlestown Road from the apple orchard). There are also many ponds in the area which are home to newts and frogs. But perhaps the most unique area is the land southwest and west of Lake Constance; please check out these woods - they are gorgeous! | Recreation improvements are solely focused on the Lake Katherine boat launch area at this time. |

| | | |
|---|---|---|
| Wipfler, Michael | Please be mindful of the impact forestry work will have on the views from the lake and the shore. We understand the importance of having mixed age forests and that selective cutting enhances the health of the forest. But some of the proposed harvest treatment areas (as shown in the Tarleton scoping map) are along the eastern shore of the lake. Any significant clearing in that region would have a tremendous impact on the feel of the lake. As a camp, we try to instill in our campers (over 300 boys each summer) a love and appreciation for the natural world. The lake and our east facing view towards the White Mountains is the focal point of our camp. We make sure that our community recognizes how fortunate we are, and how truly unique Lake Tarleton is. There are few shorelines in America that are essentially untouched and remain the same, in essence, as they were 100 years ago or 1000 years ago. Our hope is that the view from the lake would be a prime consideration when thinking about where to log and which methods to employ. | A Scenery Analysis will be performed in accordance with Forest Plan Standards and Guidelines. |
| Wipfler, Robert | It is our strong opinion that the project should act in a manner that protects the view shed of the entire Lake Tarleton area. Whether on the lake, standing along its shore or even driving along Route 25C in the vicinity of Lake Tarleton, there should be no visible evidence of the long landings or access to them. | A Scenery Analysis will be performed in accordance with Forest Plan Standards and Guidelines. |
| Wipfler, Robert | To do the least damage to the environment in the vicinity, we suggest the project be completed in the winter months, when the ground is mostly frozen. | All harvest units within the Tarleton IRP are planned for Winter harvest due to characteristics of the existing road systems and to protect existing ground vegetation and moist soils. Winter harvesting season is generally from 12/15 - 3/15 but is permitted outside of those dates when the soil is thoroughly frozen. |
| Wipfler, Robert | Here is a more "poetic" version of Kingswood's support for the careful management of the forest area surrounding Lake Tarleton: | No response needed |
| Wright, Teresa | The project should act in a manner that protects the view shed of the entire Lake Tarleton area. I believe that there should be no visible evidence of logging whether on the lake, standing along its shore or even driving along Route 25C in the vicinity of Lake Tarleton. | A Scenery Analysis will be performed in accordance with Forest Plan Standards and Guidelines. |
| Wright, Teresa | To do the least damage to the environment in the vicinity, we suggest the project be completed in the winter months, when the ground is mostly frozen. | All harvest units within the Tarleton IRP are planned for Winter harvest due to characteristics of the existing road systems and to protect existing ground vegetation and moist soils. Winter harvesting season is generally from 12/15 - 3/15 but is permitted outside of those dates when the soil is thoroughly frozen. |

UNITED STATES DEPARTMENT OF AGRICULTURE

# Tarleton Integrated Resource Project

White Mountain National Forest, Pemigewasset Ranger District
January 2020

## GREETINGS!

This newsletter is a new format I am trying out to share information about projects. It is intended to give a brief overview of why we are developing this project, what actions we propose, and what results we would like to see on the ground. The public's input from our pre-scoping open houses has helped us shape our proposal. Your comments about the project are welcome during this initial scoping period. There will be another opportunity to provide comments in the future, once we have completed our analysis.

Figure 1. Project Location Map

Vermont
White Mountain National Forest
Project Location
Maine
New Hampshire

### Where is this project?

The Tarleton Integrated Resource Project, or Tarleton Project, is located on National Forest System lands in the Pemigewasset Ranger District of the White Mountain National Forest (WMNF). The project area is in the towns of Piermont and Warren in Grafton County, New Hampshire (Figure 1).

### Why are we proposing this project?

The primary focus of the Tarleton Project is to implement the management direction in the 2005 WMNF Land and Resource Management Plan (Forest Plan) by comparing the existing conditions in the project area with the desired conditions established in the Forest Plan. The purpose and need for action, and the proposed project activities, are described in this document. Additional project information is available on the project website: https://www.fs.usda.gov/project/?project=56394.

Please send me your thoughts or concerns about this project. I also welcome comments about this newsletter format.

*- Brooke M. Brown, Pemigewasset District Ranger*

This project is also needed to improve accessibility and the visitor experience, address resource and safety concerns related to existing facilities, and provide a sustainable range of quality recreation opportunities consistent with the Forest Plan and Recreation Opportunity Spectrum assigned to lands within the project area. In addition, based on the 2015 Forest-wide Transportation Analysis Process (TAP), this project is needed to complete a site-specific transportation analysis and implement or modify the 2015 recommendations within the project area.

## PROJECT-LEVEL OBJECTIVES

- Provide sustainably managed forest products to benefit local economies and communities
- Meet project-level wildlife habitat objectives:
    - Gradually convert stands situated on non-compatible Ecological Land Types to forest types consistent with land capability
    - Increase spruce-fir habitat over the long-term
    - Increase age-class diversity and foster regeneration of stands
    - Maintain or increase aspen-birch habitat
    - Maintain current levels of oak, pine, and hemlock within stands
    - Assess and modify current permanent wildlife openings
- Complete a site-specific assessment of the transportation system for public and administrative access
- Improve recreational opportunities, visitor access, and address resource and safety concerns

## PROPOSED PROJECT ACTIVITIES

The WMNF proposes to conduct the following activities to address the need for management in the project area. Applicable Forest Plan Standards and Guidelines and National Core and New Hampshire Best Management Practices (BMPs) would be implemented under the proposed action. Project-specific measures to avoid, minimize, or mitigate known or potential adverse effects from the proposed project activities would be developed during the environmental analysis process. As the project progresses, resource specialists will gather additional information, including public input, to further refine the project's objectives and more fully develop the proposed action. The proposed project is expected to be implemented starting in 2022. The proposed project activities are described below.

### Vegetation & Wildlife Habitat Management

The WMNF proposes to conduct commercial and non-commercial treatments within about 1,350 gross acres of forest stands in the Project Area; about 890 acres within those stands are proposed for silvicultural treatment. All proposed timber harvest activities are on MA 2.1 lands or on MA 8.3 lands adjacent to MA 2.1 lands in the Lake Tarleton HMU. Each stand has site-specific objectives to improve habitat conditions and the vigor, health, and diversity of forest vegetation. Additional field reconnaissance would be conducted prior to finalizing the stand acres and boundaries and modifications would be made to account for specific ground conditions (e.g., wet areas, steep or rocky slopes, and forest type changes). In addition, the stand acres may be modified to meet visual and water quality objectives, to account for the incorporation of reserve patches of uncut trees in final-harvest stands, and to include protective buffers around features such as vernal pools, cultural resources, nest trees, and riparian zones.

A range of silvicultural treatments (Table 1) would be used to provide commercial wood products; create openings of various sizes in the forest to allow regeneration of trees and other vegetation and increase wildlife habitat diversity; provide additional growing space to enhance crown and bole development; and encourage the establishment of shade-intolerant species in the understory. The proposed action would include specific silvicultural strategies tied to objectives

Table 1. Proposed silvicultural treatments with approximate acres.

| Silvicultural Treatment | Harvest Method[1] | Estimated Acres[2] |
|---|---|---|
| **Even-Aged Regeneration** | Clearcut with Reserves | 160 |
| | Overstory Removal | 10 |
| | Seed Tree | 10 |
| **Intermediate** | Commercial Thinning | 165 |
| | Improvement Cut | 70 |
| **Uneven-Aged Regeneration** | Group Selection | 120 of 600 |
| | Single Tree Selection/Group Selection Combined | 350 |
| **Wildlife Opening Expansions** | Commercial Thinning | 5 |
| | Total Acres | 890 |

1 Descriptions of harvest methods can be found in the Forest Plan Glossary.

2 Estimated treatment acres include reserve patches of uncut trees, as well as protective buffers for vernal pools, streams and riparian zones, cultural resources, nest trees, and other sensitive resources as needed.

## Transportation System Management

The WMNF proposes to reconstruct and maintain about 1.7 miles of road. No new road construction is proposed, and no unauthorized roads have been identified for decommissioning. About 2.2 miles of unauthorized roads would be added to the Forest Service road system. Up to seven barriers or gates may be installed to control access for resource protection and administrative use within the project area.

## Lake Katherine Boat Launch

The WMNF proposes to redesign the Lake Katherine boat launch to address safety and resource concerns. The scope of work would include the following:

- Install a boat launch designed for hand-launched watercraft (e.g., canoes, kayaks, paddleboards)
- Reconfigure the parking lot to accommodate up to 6 vehicles, including a turn-around
- Install barriers to restrict motorized vehicle access to portions of the site
- Install hardened surfacing (e.g. gravel, concrete) for parking lot, approach areas, and footpath
- Install drainage features to manage site run-off
- Install a site kiosk and other standard site signage
- Install a picnic table

## Foundation Sites

The WMNF proposes to remove four remnant building foundations within a one-acre area on the southeast side of Lake Katherine. These foundations existed prior to WMNF obtaining ownership in the late 1990s. The WMNF proposes to remove the foundations and allow the site to naturally revegetate. In addition, several incidental dump sites located around the foundations would be removed.

## Hillman, Brett - FS

**From:** Prout, Leighlan -FS
**Sent:** Tuesday, July 16, 2019 1:32 PM
**To:** Houghton, Sandra; Dave Yates (dave.yates@briloon.org)
**Cc:** Hillman, Brett - FS; VanGorden, Keith D -FS
**Subject:** bat data from Tarleton
**Attachments:** Tarleton_analysis_results.xlsx

HI Sandi – Keith collected the cards from the bat detectors we set out with you at Lake Tarleton the other day. Attached are the results in case you're interested. I ran the data through Sonobat and hand vetted the little brown calls, but not the low frequency ones. No NLEB or other bats of concern. Pretty typical of most of our WMNF survey sites post-WNS.

For some reason there seemed to be a glitch with the detector at site #2. Even though it was out the same number of nights it didn't record anything past the third night.

**Leighlan Prout**
**Wildlife Program Leader**

**Forest Service**
**White Mountain National Forest**

**p: 603-536-6223**
**f: 603-536-3673**
*Please note my new email address:*
**Leighlan.Prout@usda.gov**

71 White Mountain Drive
Campton, NH 03223
www.fs.fed.us

**Caring for the land and serving people**

| | |
|---|---|
| **From:** | Corless, Theresa - FS, NH |
| **To:** | Rob Wipfler |
| **Cc:** | Brown, Brooke - FS, NH |
| **Subject:** | Wipfler FOIA Response 2023-FS-R9-03022-F |
| **Date:** | Friday, April 14, 2023 12:40:00 PM |
| **Attachments:** | Wipfler FOIA Response 2023-FS-R9-03022-F (1).pdf<br>image001.png<br>image002.png<br>image003.png<br>image004.png<br>Lake Tarleton HMU Stand YOO.pdf<br>Tarleton2nd30DayResponseToCommentReportDraft.pdf<br>Copy of TarletonLongFormPDFRTCDRAFTWorking.xlsx |

---

Hi Rob,

Attached please find our response to your FOIA request and the three records that are responsive to that request.

Best,
Theresa

**Theresa Corless (she/her)**
**Forest Planner and Environmental Coordinator**

**Forest Service**
**White Mountain National Forest**

**p: 603-536-6135**
**theresa.corless@usda.gov**

71 White Mountain Drive
Campton, NH 03223
www.fs.fed.us

**Caring for the land and serving people**

Lake Tarleton HMU

3-28-2019

Stand age is determined by core sample, destructive sample, or visual estimation of a representative tree in the dominant or codominant crown class.

| STAND_ID | YEAR_OF_ORIGIN | NEPA Unit |
|---|---|---|
| 09220400155011 | 1891 | |
| 09220400155012 | 1894 | |
| 09220400155012 | 1894 | |
| 09220400155012 | 1894 | |
| 09220400155012 | 1894 | |
| 09220400155012 | 1894 | |
| 09220400155013 | 1915 | |
| 09220400155013 | 1915 | |
| 09220400155013 | 1915 | |
| 09220400155014 | 1909 | |
| 09220400155014 | 1909 | |
| 09220400155015 | 1898 | |
| 09220400155015 | 1898 | 15 |
| 09220400155016 | 1889 | 16 |
| 09220400155016 | 1889 | 16 |
| 09220400155017 | 1927 | 17 |
| 09220400155018 | 1941 | 18 |
| 09220400155019 | 1909 | 19 |
| 09220400155020 | 1907 | 20 |
| 09220400155020 | 1907 | 20 |
| 09220400155021 | 1890 | 21 |
| 09220400155021 | 1890 | 21 |
| 09220400155021 | 1890 | 21 |
| 09220400155022 | 1894 | 22 |
| 09220400155022 | 1894 | 22 |
| 09220400155022 | 1894 | 22 |
| 09220400155023 | 1928 | |
| 09220400155023 | 1928 | |
| 09220400155023 | 1928 | |
| 09220400155024 | 1927 | 24 |
| 09220400155024 | 1927 | 24 |
| 09220400155025 | 1894 | 25 |
| 09220400155025 | 1894 | 25 |
| 09220400155026 | 1886 | |
| 09220400155026 | 1886 | |
| 09220400155026 | 1886 | |
| 09220400155026 | 1886 | |
| 09220400155026 | 1886 | |

| | | |
|---|---|---|
| 09220400155027 | 1919 | 27 |
| 09220400155028 | 1909 | 28 |
| 09220400155028 | 1909 | 28 |
| 09220400155029 | 1928 | |
| 09220400155029 | 1928 | |
| 09220400155029 | 1928 | |
| 09220400155029 | 1928 | |
| 09220400155029 | 1928 | |
| 09220400155030 | 1879 | |
| 09220400155031 | 1906 | |
| 09220400155031 | 1906 | |
| 09220400155032 | 1925 | |
| 09220400155032 | 1925 | |
| 09220400155033 | 0 | |
| 09220400155033 | 0 | |
| 09220400155034 | 1891 | |
| 09220400155034 | 1891 | |
| 09220400155034 | 1891 | |
| 09220400155035 | 1930 | |
| 09220400155035 | 1930 | |
| 09220400155035 | 1930 | |
| 09220400155035 | 1930 | |
| 09220400155035 | 1930 | |
| 09220400155036 | 1889 | |
| 09220400155036 | 1889 | |
| 09220400155037 | 1941 | |
| 09220400155037 | 1941 | |
| 09220400155038 | 1883 | |
| 09220400155038 | 1883 | |
| 09220400155039 | 1894 | |
| 09220400155039 | 1894 | |
| 09220400155040 | 1930 | |
| 09220400155040 | 1930 | |
| 09220400155040 | 1930 | |
| 09220400155040 | 1930 | |
| 09220400155041 | 1891 | |
| 09220400155041 | 1891 | |
| 09220400155041 | 1891 | |
| 09220400155042 | 1910 | |
| 09220400155043 | 1894 | 26 |
| 09220400155043 | 1894 | 26 |
| 09220400155044 | 1915 | |
| 09220400160001 | 1928 | |
| 09220400160001 | 1928 | |
| 09220400160001 | 1928 | |
| 09220400160001 | 1928 | |
| 09220400160002 | 1953 | |
| 09220400160002 | 1953 | |
| 09220400160003 | 1990 | |

| | | |
|---|---|---|
| 09220400160003 | 1990 | |
| 09220400160003 | 1990 | |
| 09220400160004 | 1990 | |
| 09220400160004 | 1990 | |
| 09220400160004 | 1990 | |
| 09220400160004 | 1990 | |
| 09220400018007 | 1991 | |
| 09220400018008 | 1929 | |
| 09220400018008 | 1929 | |
| 09220400018023 | 1880 | |
| 09220400018023 | 1880 | |
| 09220400018033 | 1886 | |
| 09220400019017 | 1940 | |
| 09220400019017 | 1940 | |
| 09220400019020 | 1950 | |
| 09220400019024 | 1910 | |
| 09220400019025 | 1900 | |
| 09220400019025 | 1900 | |
| 09220400019025 | 1900 | |
| 09220400020019 | 1925 | |
| 09220400020019 | 1925 | |
| 09220400020024 | 1930 | |
| 09220400020024 | 1930 | |
| 09220400020025 | 1900 | |
| 09220400020025 | 1900 | |
| 09220400021019 | 1938 | |
| 09220400021019 | 1938 | |
| 09220400155001 | 1941 | 1 |
| 09220400155001 | 1941 | 1 |
| 09220400155001 | 1941 | 1 |
| 09220400155001 | 1941 | 1 |
| 09220400155001 | 1941 | 1 |
| 09220400155002 | 1937 | 2 |
| 09220400155002 | 1937 | 2 |
| 09220400155002 | 1937 | 2 |
| 09220400155002 | 1937 | 2 |
| 09220400155002 | 1937 | 2 |
| 09220400155003 | 1944 | 3 |
| 09220400155003 | 1944 | 3 |
| 09220400155003 | 1944 | 3 |
| 09220400155004 | 1905 | 4 |
| 09220400155004 | 1905 | 4 |
| 09220400155004 | 1905 | 4 |
| 09220400155004 | 1905 | 4 |
| 09220400155005 | 1923 | |
| 09220400155005 | 1923 | |
| 09220400155006 | 1908 | |
| 09220400155006 | 1908 | |
| 09220400155007 | 1894 | |

| | | | |
|---|---|---|---|
| 09220400155007 | 1894 | | |
| 09220400155008 | 1928 | | |
| 09220400155008 | 1928 | | |
| 09220400155009 | 0 | | |
| 09220400155010 | 1936 | | |
| 09220400155010 | 1936 | | |
| 09220400155010 | 1936 | | |
| 09220400155011 | 1891 | | |
| 09220400155011 | 1891 | | |
| 09220400155011 | 1891 | | |
| 09220400155011 | 1891 | | |
| 09220400155011 | 1891 | | |
| 09220400160005 | 1934 | | 35 |
| 09220400160005 | 1934 | | 35 |
| 09220400160005 | 1934 | | 35 |
| 09220400160006 | 1940 | 13/14 | |
| 09220400160006 | 1940 | 13/14 | |
| 09220400160006 | 1940 | 13/14 | |
| 09220400160006 | 1940 | 13/14 | |
| 09220400160007 | 1947 | | 31 |
| 09220400160008 | 1942 | | 34 |
| 09220400160009 | 1946 | | |
| 09220400160009 | 1946 | | |
| 09220400160010 | 1960 | | |
| 09220400160011 | 1964 | | |
| 09220400160011 | 1964 | | |
| 09220400160011 | 1964 | | |
| 09220400160011 | 1964 | | |
| 09220400160011 | 1964 | | |
| 09220400160012 | 1942 | | |
| 09220400160013 | 1954 | | 32 |
| 09220400160013 | 1954 | | 32 |
| 09220400160013 | 1954 | | 32 |
| 09220400160014 | 1990 | | |
| 09220400160014 | 1990 | | |
| 09220400160015 | 1943 | | |
| 09220400160015 | 1943 | | |
| 09220400160016 | 1960 | | |
| 09220400160016 | 1960 | | |
| 09220400160017 | 1960 | | |
| 09220400160017 | 1960 | | |
| 09220400160017 | 1960 | | |
| 09220400160017 | 1960 | | |
| 09220400160017 | 1960 | | |
| 09220400160018 | 1937 | | |
| 09220400160018 | 1937 | | |
| 09220400160018 | 1937 | | |
| 09220400160018 | 1937 | | |
| 09220400160018 | 1937 | | |

| | | |
|---|---|---|
| 09220400160019 | 1947 | |
| 09220400160019 | 1947 | |
| 09220400160020 | 1901 | |
| 09220400160020 | 1901 | |
| 09220400160021 | 1943 | |
| 09220400160021 | 1943 | |
| 09220400160022 | 1984 | |
| 09220400160022 | 1984 | |
| 09220400160023 | 1989 | |
| 09220400160024 | 1986 | |
| 09220400160024 | 1986 | |
| 09220400160024 | 1986 | |
| 09220400160024 | 1986 | |
| 09220400160025 | 1960 | |
| 09220400160025 | 1960 | |
| 09220400160026 | 1959 | |
| 09220400160027 | 1965 | 33 |
| 09220400160027 | 1965 | 33 |
| 09220400160028 | 1900 | |
| 09220400160029 | 1948 | 29 |
| 09220400160029 | 1948 | 29 |
| 09220400160030 | 1963 | 30 |
| 09220400160031 | 1940 | |
| 09220400160031 | 1940 | |
| 09220400160031 | 1940 | |
| 09220400160031 | 1940 | |
| 09220400160032 | 1986 | |
| 09220400160032 | 1986 | |
| 09220400160032 | 1986 | |
| 09220400160032 | 1986 | |
| 09220400160032 | 1986 | |
| 09220400160032 | 1986 | |
| 09220400160032 | 1986 | |
| 09220400160032 | 1986 | |
| 09220400160033 | 1930 | |
| 09220400160033 | 1930 | |
| 09220400160033 | 1930 | |
| 09220400160034 | 1895 | |
| 09220400160034 | 1895 | |
| 09220400160034 | 1895 | |
| 09220400160035 | 1986 | |
| 09220400160035 | 1986 | |
| 09220400160036 | 1953 | 36 |
| 09220400160036 | 1953 | 36 |
| 09220400160037 | 1947 | |
| 09220400160037 | 1947 | |
| 09220400160038 | 1970 | |
| 09220400160038 | 1970 | |
| 09220400160038 | 1970 | |

| | | |
|---|---|---|
| 09220400160039 | 1938 | 12 |
| 09220400160039 | 1938 | 12 |
| 09220400160039 | 1938 | 12 |
| 09220400160040 | 1940 | 11 |
| 09220400160040 | 1940 | 11 |
| 09220400160040 | 1940 | 11 |
| 09220400160040 | 1940 | 11 |
| 09220400160041 | 1937 | |
| 09220400160041 | 1937 | |
| 09220400160041 | 1937 | |
| 09220400160042 | 1949 | 10 |
| 09220400160042 | 1949 | 10 |
| 09220400160042 | 1949 | 10 |
| 09220400160042 | 1949 | 10 |
| 09220400160043 | 1938 | 9 |
| 09220400160043 | 1938 | 9 |
| 09220400160043 | 1938 | 9 |
| 09220400160043 | 1938 | 9 |
| 09220400160043 | 1938 | 9 |
| 09220400160043 | 1938 | 9 |
| 09220400160044 | 1903 | |
| 09220400160044 | 1903 | |
| 09220400160044 | 1903 | |
| 09220400160045 | 1962 | 23 |
| 09220400160045 | 1962 | 23 |
| 09220400160045 | 1962 | 23 |
| 09220400160046 | 1962 | 5 |
| 09220400160046 | 1962 | 5 |
| 09220400160046 | 1962 | 5 |
| 09220400160046 | 1962 | 5 |
| 09220400160046 | 1962 | 5 |
| 09220400160047 | 1988 | 6 |
| 09220400160047 | 1988 | 6 |
| 09220400160048 | 1986 | |
| 09220400160049 | 1951 | |
| 09220400160049 | 1951 | |
| 09220400160049 | 1951 | |
| 09220400160050 | 0 | |
| 09220400160050 | 0 | |
| 09220400160051 | 0 | |
| 09220400160052 | 0 | |
| 09220400160052 | 0 | |
| 09220400160052 | 0 | |
| 09220400160052 | 0 | |
| 09220400160053 | 1900 | |
| 09220400160054 | 0 | |
| 09220400160054 | 0 | |
| 09220400160055 | 0 | |
| 09220400160056 | 0 | |

| | | |
|---|---|---|
| 09220400160057 | 0 | |
| 09220400160057 | 0 | |
| 09220400160057 | 0 | |
| 09220400160058 | 1925 | 7 |
| 09220400160058 | 1925 | 7 |
| 09220400160058 | 1925 | 7 |
| 09220400160058 | 1925 | 7 |
| 09220400160058 | 1925 | 7 |
| 09220400160059 | 1931 | 8 |
| 09220400160060 | 1948 | |
| 09220400160060 | 1948 | |
| 09220400160060 | 1948 | |
| 09220400160061 | 1990 | |
| 09220400160061 | 1990 | |
| 09220400160061 | 1990 | |
| 09220400160062 | 1970 | |
| 09220400160062 | 1970 | |
| 09220400160063 | 0 | |
| 09220400160063 | 0 | |
| 09220400160064 | 1940 | |
| 09220400160064 | 1940 | |
| 09220400160064 | 1940 | |
| 09220400160064 | 1940 | |
| 09220400160065 | 1990 | |
| 09220400160065 | 1990 | |
| 09220400160065 | 1990 | |
| 09220400160065 | 1990 | |
| 09220400160066 | 1990 | |
| 09220400160066 | 1990 | |
| 09220400160066 | 1990 | |
| 09220400160066 | 1990 | |
| 09220400160066 | 1990 | |
| 09220400160067 | 1989 | |
| 09220400160067 | 1989 | |
| 09220400160068 | 1940 | |
| 09220400160068 | 1940 | |
| 09220400160068 | 1940 | |
| 09220400160068 | 1940 | |
| 09220400160068 | 1940 | |
| 09220400160068 | 1940 | |
| 09220400160068 | 1940 | |
| 09220400160068 | 1940 | |
| 09220400160068 | 1940 | |
| 09220400160069 | 1938 | |
| 09220400160069 | 1938 | |
| 09220400160069 | 1938 | |
| 09220400160069 | 1938 | |
| 09220400160069 | 1938 | |
| 09220400160069 | 1938 | |

| | |
|---|---|
| 09220400160070 | 1942 |
| 09220400160070 | 1942 |
| 09220400160070 | 1942 |
| 09220400160070 | 1942 |
| 09220400160071 | 1938 |
| 09220400160071 | 1938 |
| 09220400160071 | 1938 |
| 09220400160071 | 1938 |
| 09220400160071 | 1938 |
| 09220400160071 | 1938 |
| 09220400160071 | 1938 |
| 09220400160071 | 1938 |
| 09220400160071 | 1938 |
| 09220400160072 | 1982 |
| 09220400160072 | 1982 |
| 09220400160072 | 1982 |
| 09220400160072 | 1982 |
| 09220400160072 | 1982 |
| 09220400160072 | 1982 |
| 09220400160072 | 1982 |
| 09220400160073 | 1962 |
| 09220400160073 | 1962 |
| 09220400160073 | 1962 |
| 09220400160073 | 1962 |
| 09220400160074 | 1909 |
| 09220400160075 | 1934 |
| 09220400160075 | 1934 |
| 09220400160076 | 1929 |
| 09220400160076 | 1929 |
| 09220400160077 | 1953 |
| 09220400160077 | 1953 |
| 09220400160090 | 0 |
| 09220400160090 | 0 |
| 09220400160090 | 0 |
| 09220400160090 | 0 |
| 09220400160090 | 0 |
| 09220400160090 | 0 |
| 09220400160091 | 0 |
| 09220400160091 | 0 |
| 09220400160102 | 0 |
| 09220400160102 | 0 |
| 09220400160103 | 0 |
| 09220400160103 | 0 |
| 09220400160103 | 0 |
| 09220400160104 | 0 |
| 09220400160104 | 0 |
| 09220400160104 | 0 |
| 09220400160104 | 0 |
| 09220400160105 | 0 |

| | | |
|---|---|---|
| 09220400163007 | 1922 | 37 |
| 09220400163007 | 1922 | 37 |
| 09220400163007 | 1922 | 37 |
| 09220400163007 | 1922 | 37 |
| 09220400163008 | 0 | |
| 09220400163008 | 0 | |
| 09220400163009 | 1916 | 39 |
| 09220400163009 | 1916 | 39 |
| 09220400163009 | 1916 | 39 |
| 09220400163010 | 0 | |
| 09220400163011 | 0 | |
| 09220400163012 | 1939 | 38 |
| 09220400163012 | 1939 | 38 |
| 09220400163012 | 1939 | 38 |
| 09220400163012 | 1939 | 38 |
| 09220400163012 | 1939 | 38 |

## Lake Tarleton Project

Legend
USDA FOREST SERVICE
Tarleton Treatment Stands
National Park Service Park Boundary
2.1 MA General Forest Management
8.3 MA Appalachian Trail
Hike
Snowmobile
State / Town Roads
Tarleton Project Roads
N
State Rte 25C
Lake Tarleton Rd
Piermont Pl
Lake Armington Rd
Cape Moonshine Rd
Kelley Rd
Ore Hill Rd
Dinsmore
CHARLESTOWN RD SNOMO
POWERLINE LOOP TRAIL SNOMO
POWERLINE SNOMO
ORE HILL LOOP SNOMO
WACHIPAUKA POND
ORE HILL
0 0.2 0.4 0.8 1.2 1.6 2 Miles
Created by Ben Farina
Pemi Timber Management Team
January 2020

JA-1222

PBWTAR_10227

| UniqueComment# | Comment | Page | Submitted Literature and Citation(s) | Keyword | Response | Complete? (Y/N) |
|---|---|---|---|---|---|---|
| 1 | Far from plateauing in terms of carbon sequestration (or added wood) at a relatively young age as was long believed, older forests (e.g., >200 years of age without intervention) contain a variety of habitats, typically continue to sequester additional carbon for many decades or even centuries, and sequester significantly more carbon than younger and managed stands | 10 | Luyssaert, S., Schulze, ED., Börner, A. et al. Old-growth forests as global carbon sinks. Nature 455, 213–215 (2008). https://doi.org/10.1038/nature07276 | | Article refers to a study that finds old growth forest sequester carbon for centuries and that disturbing old growth forest could move the carbon back to the atmosphere. This is no old growth forest identified in the project area, the age class composition was determined to be about 35 percent young forest and about 65 percent mature forest. This determination is recorded in the HMU rationale document which will be published on the project website. Active vegetation management is only permitted on about 40 percent of the WMNF in MA 2.1 land, so about 60 percent of the forest is being left to age and establish old growth characteristics. | |
| 2 | Far from plateauing in terms of carbon sequestration (or added wood) at a relatively young age as was long believed, older forests (e.g., >200 years of age without intervention) contain a variety of habitats, typically continue to sequester additional carbon for many decades or even centuries, and sequester significantly more carbon than younger and managed stands | 10 | Askins, Robert A.. Saving the World's Deciduous Forests: Ecological Perspectives from East Asia, North America, and Europe, New Haven: Yale University Press, 2014. https://doi.org/10.12987/9780300167405 | | The reviewing team was not able to access the full version of this book. Based on the overview, the book discusses the resiliency of deciduous forests in a general sense when stressed by climate change and deforestation acitivity, the history of certain forest types, ecological similarities between different forest types, and conservation meaures that have been attempted to recover these forest types. See C/R # 63 in CARA. | |
| 3 | Far from plateauing in terms of carbon sequestration (or added wood) at a relatively young age as was long believed, older forests (e.g., >200 years of age without intervention) contain a variety of habitats, typically continue to sequester additional carbon for many decades or even centuries, and sequester significantly more carbon than younger and managed stands | 10 | McGarvey et. al., 2015. Carbon storage in old-growth forests of the Mid-Atlantic: toward better understanding the eastern forest carbon sink. Ecology, volume 96, pp. 311-317. https://doi.org/10.1890/14-1154.1 | | Article refers to a study in the Eastern United States that determined old growth forest stored more carbon in both live and dead stands than surrounding younger forest. See response to comment #1. | |
| 4 | Far from plateauing in terms of carbon sequestration (or added wood) at a relatively young age as was long believed, older forests (e.g., >200 years of age without intervention) contain a variety of habitats, typically continue to sequester additional carbon for many decades or even centuries, and sequester significantly more carbon than younger and managed stands | 10 | Keeton, W.S. (2018). Source or Sink? Carbon Dynamics in Eastern Old-Growth Forests and Their Role in Climate Change Mitigation. In: Barton, A.M., Keeton, W.S. (eds) Ecology and Recovery of Eastern Old-Growth Forests. Island Press, Washington, DC. https://doi.org/10.5822/978-1-61091-891-6_14 | | Article refers to a study that finds old growth forest sequester carbon far better than previously thought and managing forest for old growth may be an effective strategy in reducing global carbon dioxide emissions. See response to comment #1. | |
| 5 | For example, intact forests in Eastern U.S. national parks have greater tree diversity, live and dead standing basal area, and coarse woody debris, than forests that are managed for timber | 10 | Miller, K. M., D effenbach, F. W., Campbell, J. P., Cass, W. B., Comiskey, J. A., Matthews, E. R., McGill, B. J., Mitchell, B. R., Perles, S. J., Sanders, S., Schmit, J. P., Smith, S., and Weed, A. S. 2016. National parks in the eastern United States harbor important older forest structure compared with matrix forests. Ecosphere 7( 7):e01404. doi.org/10.1002/ecs2.1404 | | The National Park Service and The Forest Service have different goals and ob ectives when it comes to land management. The purpose and need for the Tarleton IRP is to get closer to our forestwide goals and objectives. More can be found on project purpose and need on pgs. 5-8 of the EA. | |
| 6 | For example, intact forests in Eastern U.S. national parks have greater tree diversity, live and dead standing basal area, and coarse woody debris, than forests that are managed for timber | 10 | Miller K.M. et. al. 2018. Eastern national parks protect greater tree species diversity than unprotected matrix forests. Forest Ecology and Management, Volume 414, pp. 74-84. | | Article refers to a comparison of several ecological dynamics between forest in Eastern US national parks and their surrounding matrix forest surveyed by USFS FIA plots. USFS FIA plots are not comparable to land maganed under a land management plan where vegetation management is conducted to increase species and age class diversity. | |
| 7 | The density of cavit es in older trees and the spatial and structural heterogeneity of the forest increases with stand age | 10 | Ranius, M. et. al. 2009. Development of tree hollows in pedunculate oak (Quercus robur). Forest Ecology and Management, Volume 257-1, pp. 303-310. | | See response to comment #1 | |
| 8 | The density of cavit es in older trees and the spatial and structural heterogeneity of the forest increases with stand age | 10 | Larson et. al. 2015. Spat al aspects of tree mortality strongly differ between young and old-growth forests. Ecology. Volume 96-11, pp. 2855-2861. https://doi.org/10.1890/15-0628.1 | | See response to comment #1 | |
| 9 | Large canopy gaps develop as a result of mortality of large trees, which result in dense patches of regeneration | 10 | Askins, Robert A.. Saving the World's Deciduous Forests: Ecological Perspectives from East Asia, North America, and Europe, New Haven: Yale University Press, 2014. https://doi.org/10.12987/9780300167405 | | See CONA section in EA for information on outcomes from canopy gaps created from large tree mortality. See response to comment #2. | |
| 10 | These complex structures and habitat features support a greater diversity of lichens and bryophytes in old, intact forests than in nearby managed forests | 10 | Peter Lesica, Bruce McCune, Stephen V. Cooper, and Won Shic Hong. Differences in lichen and bryophyte communit es between old-growth and managed second-growth forests in the Swan Valley, Montana. Canadian Journal of Botany. 69(8): 1745-1755. https://doi.org/10.1139/b91-222 | | See response to comment #1 | |
| 11 | These complex structures and habitat features support a greater density and diversity of salamanders in old, intact forests than in nearby managed forests | 10 | Petranka, J.W., Eldridge, M.E. and Haley, K.E. (1993), Effects of Timber Harvesting on Southern Appalachian Salamanders. Conservation Biology, 7: 363-370. https://doi.org/10.1046/j.1523-1739.1993.07020363.x | | See response to comment #1 | |
| 12 | These complex structures and habitat features support a greater density and diversity of salamanders in old, intact forests than in nearby managed forests | 10 | Herbeck, L.A. and Larsen, D.R. (1999), Plethodontid Salamander Response to Silvicultural Practices in Missouri Ozark Forests. Conservation Biology, 13: 623-632. https://doi.org/10.1046/j.1523-1739.1999.98097.x | | See response to comment #1 | |
| 13 | These complex structures and habitat features support a greater diversity and abundance of birds in old, intact forests than in nearby managed forests | 10 | Zlonis E.J. and N emi, G J. 2014. Avian communities of managed and wilderness hemiboreal forests. Forest Ecology and Management. Volume 328, pp. 26-34. | | See response to comment #1 | |
| 14 | Forest bird guilds also benefit from small intact forests in urban landscapes relative to unprotected matrix forests | 10 | Goodwin, S.E., Shriver, W.G. Using a bird community index to evaluate national parks in the urbanized national capital region. Urban Ecosyst 17, 979–990 (2014). https://doi.org/10.1007/s11252-014-0363-2 | | See response to comment #5 in regards to comparing NPS and USFS land management practices. Unprotected privately owned forest is not comparable to federally owned forest following a land management plan and all state and federal laws and best management practices. | |
| 15 | Several bird spec es in the U.S. that are globally threatened—including the wood thrush, cerulean warbler, marbled murrelet, and spotted owl are, in part, dependent on intact, older forests with large trees | 11 | Vié, J. C., Hilton-Taylor, C., & Stuart, S. N. (Eds.). (2009). Wildlife in a changing world: an analysis of the 2008 IUCN Red List of threatened species. IUCN. | | See response to comment #1 | |
| 16 | Two species that are extinct today—Bachman's warbler and Ivory-billed woodpecker—likely suffered from a loss of habitat features associated with old forests | 11 | Askins, Robert A.. Saving the World's Deciduous Forests: Ecological Perspectives from East Asia, North America, and Europe, New Haven: Yale University Press, 2014. https://doi.org/10.12987/9780300167405 | | See response to comment #2. Effects to Threatened and Endangered species are disclosed in the project Biological Evaluation and EA. | |
| 17 | Today, forest managers often ustify management to maintain heterogeneity of age structures to enhance wildlife habitat and maintain "forest health" | 11 | Alverson, W. S., Waller, D., & Kuhlmann, W. (2013). Wild forests: conservation biology and public policy. Island Press. | | See response to comment #1 | |
| 18 | Early successional forest species (e.g., chestnut-sided warbler and New England cottontail) that are common targets for forest management may be less dependent on forest management than is commonly believed | 11 | Buffum, B., McGreevy Jr, T. J., Gottfr ed, A. E., Sullivan, M. E., & Husband, T. P. (2015). An analysis of overstory tree canopy cover in sites occupied by native and introduced cottontails in the Northeastern United States with recommendations for habitat management for new England Cottontail. PLoS One, 10(8), e0135067. | | See response to comment #1 | |
| 19 | Management also results in undesirable consequences such as soil erosion, introduction of invasive and non-native species | 11 | McDonald, R. I., Motzkin, G., & Foster, D. R. (2008). Assessing the influence of historical factors, contemporary processes, and environmental conditions on the distribution of invasive species1. The Journal of the Torrey Botanical Society, 135(2), 260-271. | | See response to comment #1 | |
| 20 | Management also results in undesirable consequences such as soil erosion, introduction of invasive and non-native species | 11 | Riitters, K., Potter, K. M., Iannone III, B. V., Oswalt, C., Guo, Q., & Fei, S. (2018). Exposure of protected and unprotected forest to plant invasions in the eastern United States. Forests, 9(11), 723. | | See response to comment #1 | |
| 21 | Management also results in undesirable consequences such as loss of carbon—including soil carbon | 11 | Lacroix, E. M., Petrenko, C. L., & Friedland, A. J. (2016). Ev dence for losses from strongly bound SOM pools after clear cutting in a northern hardwood forest. Soil Science, 181(5), 202-207. | | See response to comment #1 | |
| 22 | Management also results in undesirable consequences such as increased densities of forest ungulates such as white-tailed deer | 11 | Whitney, G. G. (1990). The history and status of the hemlock-hardwood forests of the Allegheny Plateau. The Journal of Ecology, 443-458. | | See response to comment #1 | |
| 23 | White-Tailed Deer is a spec es that can limit forest regeneration | 11 | Waller, D. M. (2014). Effects of deer on forest herb layers. The herbaceous layer in forests of Eastern North America, 369-399. | | See response to comment #1 | |
| 24 | Management also results in undesirable consequences such as a loss of a sense of wildness | 11 | Thoreau, H. D. (1862). Walking. The Atlantic. | | See response to comment #1 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 25 | The USFS site and all USFS documents should be linked to the 2022 IPCC report, rather than the 2018 report. | 14 | | | The effects analysis for the Tarleton IRP was conducted before 2022, and the 2022 IPCC report is not available as of September 2022. | |
| 26 | The Lake Tarleton documents failed to account for the effects of logging on carbon sequestration, diversity and severe dearth of old growth forests in WMNF. | 14 | | | See C/R #'s 50, 63, 133, and 135 in CARA | |
| 27 | The Lake Tarleton logging documents failed to account for the cumulative effects of logging on global warming | 14 | | | See C/R #63 in CARA | |
| 28 | "Forest Service Categorical Exclusions Challenged in Virginia Federal Court. A lawsuit filed in the federal district court for the Western District of Virginia challenged three categorical exclusions adopted by the U.S. Forest Service to exempt certain projects from NEPA review. The three categorical exclusions are for commercial logging projects up to 2,800 acres and construction of up to three miles of logging roads; construction of up to two miles of permanent road for any purpose; and "special use" authorizations for private uses affecting up to 20 acres of national forest lands. The complaint asserted that the final rule violated NEPA and the Administrative Procedure Act, including because the ForestService did not consider the exclusions' impacts in l ght of conditions that are rap dly changing due to climate change. The complaint also alleged that the final rule would allow significant climate impact to occur without analysis "[b]ecause there is no programmatic analysis of the cumulative impact of successive projects on carbon storage." The plaintiffs contended that the Forest Service should have prepared an environmental impact statement or an environmental assessment to address, among other subjects, the rule's impact on efforts to limit greenhouse gas emissions." | 14 | | | Lawsuit has to do with a new category - 36 CFR 220.6 (e) 25: Forest and grassland management activities with a primary purpose of meeting restoration objectives or increasing resilience. Activities to improve ecosystem health, resilience, and other watershed and habitat conditions may not exceed 2,800 acres. The Pemigewasset Ranger District is not proposing to use this category as a NEPA option for the Tarleton IRP, and has prepared an Environmental Assessment that was made available to the public. | |
| 29 | The Lake Tarleton Logging Pro ect EA and other documents failed to take the best science into account, most importantly, recent data on climate change which shows that intact forests accomplish USFS habitat diversity and carbon sequestration goals. | 14 | | | See C/R #'s 63, 69, 133, and 135 in CARA | |
| 30 | USFS failed to ustify the Tarleton Pro ect as a means of increasing forest diversity, because "Old-growth forests are unique, tremendously biodiverse, and unfortunately, very rare, with less than 1% of our forests now cons dered old-growth." | 15 | | | See C/R #50 in CARA | |
| 31 | Since WMNF is in a serious state of imbalance, with 99% of the forest unable to reach its natural state, the Tarleton area should be left unlogged to promote age diversity and species diversity. 1950s levels of clearing were not a natural state which is being lost, but he result of 150 years of huge alteration of the natural landscape by an industrial culture. Using this as a baseline for conditions which should be maintained is arbitrary, capricious and damaging to the ecosystem. | 15 | | | Active vegetation management is only permitted on about 40 percent of the WMNF in MA 2.1 land, so about 60 percent of the forest is being left to age and establish old growth characteristics. | |
| 32 | The EA describes old growth in a misleading and inaccurate way. It gives the impression that old growth forest is dark and smothering, without forest openings or young trees. | 15 | | | Old growth is not mentioned in the EA because no old growth is identified in the pro ect area. The CONA section describes the likely outcomes if the project does not move forward, and the vegetation section in chapter 3 on pg. 21 describes the effect of the project on vegetation as a resource. | |
| 33 | USFS improperly failed to do an EIS for the Lake Tarleton logging project. | 15 | | | See C/R #19 in CARA | |
| 34 | Engaging in the tragedy of the commons is not an adequate response to climate change. | 15 | | | The tragedy of the commons describes the effects of unregulated resource extraction from multiple users leading to resource depletion. This is not the case for vegetation management on USFS lands. All projects on the WMNF abide by all state and federal laws, all WMNF forest plan standards and guidelines, and all New Hampshire state best management practices. Vegetation management projects are monitored post implementation and a monitoring report is published on the WMNF website every two years. | |
| 35 | The Tarleton pro ect documents provide no real comparison between carbon sequestered by a forest left alone for 100 years and one logged. | 15 | | | No comparison exist for the pro ect area forest type for that time frame known to FS personnel. | |
| 36 | "Temporary influence" is meaningless now that we have dumped so much CO2 into the atmosphere that at least 3 degrees warming is inevitable even if we stop emitting CO2 right now, which we won't. This statement is grossly irresponsible, misleading and calls into question the accuracy of the whole document. The graphs in the Carbon report submitted with the rest of the Lake Tarleton documents show that WMNF is losing carbon through logging. We have no sequestering capacity we can "give up" at this point, without increasing the rate of ecological collapse. | 15-16 | | | See C/R #63 in CARA | |
| 37 | The Lake Tarleton EA provided no sources to support the statement that: "The prescribed treatments enhance the diversity of tree species, ages, and structures that are present in forest ecosystems, and this diversity can increase the ability of forests to withstand increasing pressures from climate change and other stressors." This assertion is contradicted by this 2019 paper: "Intact forests—largely free from human intervention except primarily for trails and hazard removals—are the most carbon-dense and biodiverse terrestrial ecosystems, with additional benefits to society and the economy. Internationally, focus has been on preventing loss of tropical forests, yet U.S. temperate and boreal forests remove sufficient atmospheric CO2 to reduce national annual net emissions by 11%. U S. forests have the potential for much more rapid atmospheric CO2 removal rates and biological carbon sequestration by intact and/or older forests. The recent 1.5 Degree Warming Report by the Intergovernmental Panel on Climate Change identifies reforestation and afforestation as important strategies to increase negative emissions..." | 16 | https://www.frontiersin.org/articles/10.3389/ff gc 2019.00027/full | | See C/R #63 in CARA. The pro ect will move the HMU closer towards the forest plan wildlife habitat goals and objectives, which will be laid out in the HMU rationale and published along with the Final EA. | |
| 38 | The pro ect documents provides no f gures comparing the tree loss from the proposed logging to the tree loss that would happen over the next 200 years if the forest was left alone. | 16 | | | A no-logging scenario is addressed in the climate change white paper. There is no practice in place to make figures for projected scenarios. Future conditions up to 200 years have too many variables to provide an accurate estimate of natural mortality. | |
| 39 | The pro ect documents provide no data showing that logging does not adversely affect watersheds. The following sources contradict the EA: | 16 | | | See C/R #34 in CARA. | |
| 40 | 1.) "In addition to terrestr al impacts, timber harvesting may have significant effects on stream discharge and water quality. Loss of mature vegetative cover leads to decreased evapotranspiration and correspondingly increased peak flows. These effects are compounded by road construction, which creates permanently bare surfaces and compacts soil, resulting in decreased infiltration and increased surface runoff. Logging roads also fragment and isolate habitat patches from smaller, less mobile animals such as salamander species, and roads' stream crossings and culverts sometimes become barriers to fish passage. Surface runoff on or near logging roads effectively increases stream density in logged watersheds, resulting in more rapid drainage and higher fluctuations between peak flows and base flow. Increased surface runoff, along with fewer trees for bank stabilization, generally causes increased erosion and siltation, while road construction on steep slopes often results in slope failure andexcess sediment delivery to streams. Overall effects can also include elevated and more variable water temperature, increased turbidity, and higher uniformity of substrates, which generally impair habitat fora number of fish and invertebrate species.Riparian buffers are required in many jurisdictions, but these have not always been successful in mitigating effects on streams. In general, it should be recognized that the effects of logging on stream discharge and temperature are caused by watershed-level processes and, as such, are unlikely to be completely mitigated by riparian buffers alone. (Harr 1986, Murphy 1995, Jones and Grant 1996) A major change in federal land management policy in the 1990s has begun integrating watershed analysisinto timber management and multi-purpose land management on federal lands across the US." US EPA | 17 | | | See C/R #34 in CARA. | |
| 41 | 2.) "In the humid Northeast, the greatest increase in streamflow occurs during the first growing season after the clearcut. But in following years, as the area begins to revegetate, the increased flow lessens. Five to ten years after the cut, streamflow may return to precut levels. This effect on quantity is most important to managers of water-supply watersheds. | 17 | | | See C/R #42 in CARA | |
| 42 | Of greater concern to woodland owners is the effect of timber harvesting on water quality. Because of the possibility of accelerating erosion, logging can contribute to sedimentation—the most damaging and widespread water pollutant from forested watersheds. Sediment harms water resources by destroying fish habitat, reducing the storage capacity of reservoirs, and increasing treatment costs for municipal water supplies. The greatest problems do not occur as a result of the actual cutting of trees, but from moving them out of the forest, which requires the use of heavy equipment on a system of trails and roads. If the transportation system is not carefully designed and maintained, erosion on the watershed can be greatly increased because roads account for the vast majority of sediment associated with timber harvesting." | 17 | | | See C/R #34 in CARA | |
| 43 | 3.) "Nitrogen (N) and phosphorus (P) concentrations and loads increase in receiving waters after clear-cutting because the removal of trees decreases water and nutrient uptake and increases runoff (Vitousek et al. 1979; Stednick 1996; Kreutzweiser et al. 2008). In addition, increased soil temperatures following clear-cutting accelerate mineralization and nitrification in the soil (Paavolainen and Smolander 1998; Smolander et al. 2001) and nutrients are released from decomposing logging residues (Palviainen et al. 2004). Clear-cutting may also increase total or dissolved organic carbon (TOC, DOC) export (Lamontagne et al. 2000; Schelker et al. 2012, 2014), which have implications for catchment carbon budgets (Schelker et al. 2012), the structure of aquatic food webs (Jansson et al. 2000), the acid–base chemistry of surface waters (Buffam et al. 2008), and the mobility, toxicity, and bioavailability of trace metals and organic pollutants (Porvari et al. 2003; Bergknut et al. 2011). The impacts on water quality are long-term and they are generally at its greatest during the first years after clear-cutting (Rose:n et al. 1996; Ahtiainen and Huttunen 1999; Palviainen et al. 2014). https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4552712/ | 17 | | | See C/R #'s 34, 35, 63, 75, and 86 in CARA | |
| 44 | The Tarleton Lake logging documents prov de no cumulative measure of the carbon loss caused by its logging and its effect on climate change. | 19 | | | See C/R #63 in CARA | |
| 45 | The Tarleton Lake EA and other pro ect documents failed to prov de an assessment of the cumulative effects of these projects, or the projects of the past 50 years, on climate change, wildlife, diversity, fragmentation, pollution, loss of cultural resources, scenic impacts. | 21 | | | See C/R #120 in CARA | |

| UniqueComment# | Comment | Page | Submitted Literature and Citation(s) | Keyword | Response | Complete? (Y/N) |
|---|---|---|---|---|---|---|
| 1 | The Lake Tarleton EA failed to incorporate/address the impairments and restoration plans for the water bodies in the proposed project area. | 1 | Commenter is referring to state restoration plans for every lake in the state for acidity and mercury impairments. | | Information on impaired waters will be added to the Hydrology section of the EA. By following project specific design features and forest plan direction, and by implementation of national core and state best management practices, the project will not have measurable increases to mercury or acidity for either Lake Tarleton or Lake Katherine. | Y |
| 2 | The Lake Tarleton Logging Project ("IRP") documents failed to incorporate the data on potential of logging to increase mercury concentrations in nearby water bodies. | 4 | | | See response to comment #1 | Y |
| 3 | The documents failed to account for the combined effect of beaver dams, climate change and logging, on mercury concentrations. | 4 | | | See response to comment #1 | Y |
| 4 | Neither the Lake Tarleton Draft Environmental Assessment nor the Biological Assessment contain the word mercury. | 4 | | | See response to comment #1 | Y |
| 5 | Carbon, Nutrients and Methylmercury in Water from Small Catchments Affected by Various Forest Management Operations | 4 | https://www.mdpi.com/1999-4907/12/9/1278/htm | | Article is about forestry activities in Latvia, a country in Eastern Europe. Latvian foresters do not have to abide by United States federal law, the WMNF Forest Plan standards and guidelines, and New Hampshire best management practices, therefore it is not applicible to the Tarleton IRP. | |
| 6 | Timber harvest alters mercury bioaccumulation and food web structure in headwater streams | 4 | https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6799996/ | | Article refers to a study conducted in Oregon measuring Mercury levels in water and in the food web. Study included a control, 8 meter buffered clearcuts, and no buffered clearcuts to riparian areas. Study found that the most mercury concentrations were found in the non buffered clearcuts, followed by the control areas, and the least amount of Mercury was found in the buffered clearcuts. Any vegetation management done for the Tarleton IRP near perennial streams or riparian areas will be given a similar buffer of at least 25 feet. Regardless, this study done in the western U.S. is not comparable to vegetation management in the WMNF, in the eastern U.S. Study also does not include the size of the clear cuts, only the basal area lost, which was over 80% in all cases. Vegetation management in the WMNF is prohibited to take more than 20% of the basal area for any specific watershed. | |
| 7 | Forest clear-cutting effects on mercury bioaccumulation in Swedish lacustrine ecosystems | 4 | https://ui.adsabs.harvard.edu/abs/2018EGUGA..20.9260W/abstract | | Abstract refers to mercury levels in lacustrine ecosystems due to forestry management in Sweden. Response is similar to comment response #5. | |
| 8 | Challenges and opportunities for managing aquatic mercury pollution in altered landscapes | 4 | https://link.springer.com/article/10.1007/s13280-017-1006-7 | | Article refers to the general complexities of mercury level fluctuations in land altered by human activity. Article states that forestry practices in general have higher mercury fluctuations than undistrubed forests. Article does not differentiate forest management from deforestation or single out any one area. The WMNF practices sustainable forest management by following federal laws, the WMNF land and resource management plan, and state best management practices. By following these rules, mercury input into waterbodies is not expected. A WMNF timber sales administrator will be on site during the entirety of the vegetation harvest to ensure the rules are being followed. | |
| 9 | Impact of Forestry on Total and Methyl-Mercury in Surface Waters: Distinguishing Effects of Logging and Site Preparation | 4 | https://www.researchgate.net/publication/261101818_Impact_of_Forestry_on_Total_and_Methyl-Mercury_in_Surface_Waters_Distinguishing_Effects_of_Logging_and_Site_Preparation | | Article refers to different forestry practices having different effects on mercury input into nearby waterbodies. Article is general in nature, response is similar to comment response #8. | |
| 10 | Does forestry contribute to mercury in Swedish fish? | 4 | https://www.ksla.se/wp-content/uploads/2011/03/KSLAT-2009-1-Forest-mercury.pdf | | Article refers to forestry practices influencing mercury levels in waterbodies in Sweden. Response is similar to comment response #5. | |
| 11 | Clear-cutting increases mercury in runoff | 4 | https://pubs.acs.org/doi/10.1021/es032463l | | Article refers to clear cutting and soil treatment leading to significant mercury input from runoff in Sweden and Finland. Response is similar to comment response #5. | |
| 12 | The effect of beaver dams on organic carbon, nutrients and methyl mercury distribution in impounded waterbodies | 4 | https://onlinelibrary.wiley.com/doi/10.1111/wlb.00678 | | Article refers to beaver dam activity and its effect on waterbodies. Article is from a study conducted in Lithuania. Response is similar to comment response #5. Any beaver dam found in the project area will be buffered to protect it from forestry management activities. | |
| 13 | Impacts of Pollutants on Beavers and Otters with Implications for Ecosystem Ramifications | 4 | https://onlinelibrary.wiley.com/doi/full/10.1111/j.1936-704X.2016.03212.x | | Article refers to the hazards of pollutants and contaminants on Beavers and River Otters. Article does not mention forest management or any other activity that can be compared to the Tarleton IRP. See comment response #12. | |
| 14 | Headwaters to Estuaries: Advances in Watershed Science and Management | 4 | https://www.srs.fs.usda.gov/pubs/gtr/gtr_srs211.pdf | | Article is a USFS report out from the The Fifth Interagency Conference on Research in the Watersheds. | |
| 15 | The Lake Tarleton Logging Project EA and other documents failed to take the best science into account, most importantly, recent data on climate change which shows that intact forestsaccomplish USFS habitat diversity and carbon sequestration goals | 5 | | | See C/R # 63 in CARA | |
| 16 | The revised Tarleton Logging Project EA and Biological Evaluation failed to adequately address the threats posed by logging, mercury, and herbicides to the Northern Long Eared Bat and Tri-colored Bat, the former which may soon be listed as endangered. | 15 | | | See C/R # 79 in CARA | |
| 17 | A FOIA should not be required (it was) to obtain supporting documents in a public report | 15 | | | The documents in question contain sensitive cultural resource information that because of their content are not readily available to the public. | |
| 18 | WMNF must take into account that there are political and financial reasons for USFW's failure to list many bats, other animals and plants as endangered and protect species according to their true status | 16 | | | The USFWS has to review a species petition before a determination can be made and it can be officially listed. Until a determination is made there is no legal standing for section 7 consultation. We have three listed bat species on the Regional Forester Sensitive Species list and these species are considered during the effects analysis. | |
| 19 | Is WMNF combining impacts from all its logging projects, or simply claiming that no one project will have significant while ignoring the collected and cumulative effects? | 16 | | Cumulative Effects | See C/R # 120 in CARA | |
| 20 | The report produces no documentation showing that removal of the Scots Pine will not affect the Peregrines. | 16 | | Peregrine Falcon | Removing Scots Pine is not anticipated to have an effect on roosting availibility for Peregrine Falcons or any other bird species due to the availability of other trees in the general area, including the buffer that will be allowed to grow along Lake Katherine. | |
| 21 | The EA and Biological Report fail to address the effects of climate change, which is increased by logging, on loons. | 17 | | Common Loon | See C/R # 84 in CARA | |
| 22 | Evaluation of Disturbance Factors and Their Effect on Breeding Common Loons at Lake Umbagog National Wildlife Refuge, New Hampshire and Maine | 17 | https://scholarworks.umass.edu/cgi/viewcontent.cgi?article=1161&context=open_access_dissertations | Common Loon | Article refers to several different factors affecting Common Loon vulnerability including climate change, deforestation, land conversion due to agriculture, and resource extraction. See C/R #'s 63 and 84 in CARA for responses to climate change and Loon effects. | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 23 | "Headwater Ameletus Mayflies""It is believed that minimizing sedimentation through the use of best management practices and design features during project implementation is sufficient to protect these species (Prout 2019)."Prout, M. (Fisheries Biologist, Supervisor's Office, WMNF). 2019. Personal communication viaemail to Brett Hillman, Assistant District Ranger - Wildlife, Pemigewasset Ranger District,WMNF. April 19, 2019. "It is believed" is not a high enough standard of evidence, especially when provided from an employee of WMNF who will be under pressure to provide the opinion sought. | 17 | | Headwater Ameletus Mayflies | Due to the district following Forest Plan direction, national core and state best management practices, and project specific design features, there is not expected to be measurable effects to any waterbodies in the project area. Effects to Mayflies are disclosed in the Biological Evaluation. | |
| 24 | The Tarleton EA and Biological Report provide no documentation to support the assertion that more forb and shrub species will benefit the Yellow-banded Bumblebee and Monarch Butterfly. There is no mention of Milkweed being present at the proposed logging areas. The report says: "May adversely impact individuals, but not likely to result in a loss of viability in the Planning Area, nor cause a trend toward federal listing." which contradicts the earlier statement. The report says Milkweed has been documented at the powerline, which is mowed regularly. | 17 | | Monarch Butterfly | Monarchs and Bumblebees are known to use open areas where flowering plant species grow. There is Milkweed existing in other areas of the project area and may be recruited temporarily in logged areas. | |
| 25 | "Insecticide application on Forest Service managed public lands for spruce budworm has been shown to cause massive kills of bumble bees." | 20 | | Spruce Budworm | Effects to RFSS species including the Yellow Banded Bumblebee due to herbicide are disclosed in the NNIS EA. | |
| 26 | There are only six references in the Biological Evaluation that were not produced by USFS. | 20 | | References | The references in the Biological Evaluation include abstracts for each species built from comprehensive literature reviews that include extensive references. | |
| 27 | The most recent bat data is from 2019. | 20 | | Data | We are not required to collect bat data by the USFWS to comply with the Endangered Species Act. | |
| 28 | The Lake Tarleton EA and Biological Report failed to address the soil compression caused by logging. | 20 | Logging can decrease water infiltration into forest soils, study finds. https://www.sciencedaily.com/releases/2016/08/160817132059.htm | Soil Compression | Article refers to a soil study conducted in the Mark Twain National Forest in Missouri. See C/R #78 in CARA for a response to potential effects on soils due to project activities. | |
| 29 | The Lake Tarleton project (IRP) requires an Environmental Impact Analysis, because the EA;1. failed to address the effects of logging, climate change and beavers on mercury concentrations in abutting waterbodies and wetlands and the effects of this potential increase in mercury on insects, fish, invertebrates, plants, birds and people,2. failed to address the danger of herbicides and insecticides on insects and the animals that consume them,3. failed to acknowledge and be guided by current data on logged (managed) forests vs. intact forest in providing habitat diversity, carbon sequestration and scenic value,4. failed to provide of a complete assessment of the cultural resources in the project area, 5. failed to acknowledge their cultural value and give them adequate protection and restoration,6. failed to acknowledge the role of transportation corridors (logging and skidder roads and OHRV trails) in dispersing invasive species and7. failed to incorporate private early successional forests in the area of the project into their assessment of need. | 20 | | EIS | All factors the individual claims to warrant the need for an EIS have been addressed elsewhere in the response to comment effort. The responsible official found no effects that were of the significance that would warrant the preparation of an environmental impact statement. | |
| 30 | Has any WMNF logging project (IRP) produced an Environmental Impact Analysis? | 20 | | | Since 2005, the Forest Plan revision has been the only EIS prepared by the WMNF. | |
| 31 | If not, where has WMNF provided documentation of their assertion that 50 years of logging WMNF has not produced significant effects on the climate, terrain, bats, watersheds, any animals or plants, scenic values, recreational experiences, soil health of WMNF? | 20 | | | The WMNF conducts annual monitoring on vegetation management, recreation, and fire manegement activities. The results of this monitoring can be found in the bienniel monitoring reports published on the WMNF website. | |
| 32 | Has WMNF ever made substantial changes in a logging project (IRP) because of public input? | 20 | | | Based on public input, the WMNF has made the following changes to the Tarleton IRP: 300 foot no-cut buffer added to Lake Tarleton and max group sizes lowered from 2 to 1 acre. | |
| 33 | Has WMNF ever chosen the 'no action' alternative in a logging project (IRP)? | 21 | | | The no action alternative is not a requirement for EA level analysis under NEPA. | |
| 34 | Is WMNF more likely to produce a FONSI when it feels that a lawsuit challenging this decision is unlikely and has WMNF assessed this as an act of economic injustice? | 21 | | | During the NEPA process, a FONSI is reached at the end of the EA effects analysis if no resource specialist or the responsible official determined a significant effect was likely due to the proposed action. | |
| 35 | "Mortimer et al. (2011) surveyed NEPA team leaders and found that decisions about the level of analysis to pursue (i.e., EA versus EIS) were primarily decided not based on a project's potential impacts but rather based on the risk of public controversy and litigation." | 21 | https://academic.oup.com/jof/article/118/4/403/5825558 | | The responsible official for every NEPA project takes everything into account when determining which level of NEPA is best used in analyzing effects for a proposed action, including effects to the natural and human environments and public input. | |

| UniqueComment# | Comment | Page | Submitted Literature and Citation(s) | Keyword | Response | Complete? (Y/N) |
|---|---|---|---|---|---|---|
| 1 | The above report is not accurate in stating that all known potential adverse impact on cultural resourcescould be removed with the measures outlined in c. Only known resources will have a 50' buffer, so feller bunchers and skidders are likely to damage unknown resources, for example the missing graveyard mention in Fillion's pamphlet, wells, dumps and stone piles. | 1 | Commenter references the Cultural Resource Reconnaissance Report (CRRR) submitted by Sarah Jordan, WMNF Forest Archeologist to the New Hampshire SHPO. Commenter has a paragraph from the CRRR attached to page one of her response letter. | | Under the design features table on page 16 of the EA the following standard operating procedure is laid out in the case of unknown cultural resources being discovered: "Cultural sites not identified or relocated during survey may be present in project activity areas. If cultural features are encountered during project implementation, work in the area will stop and the Forest Archaeologist will be contacted. No work shall continue until directed by the Forest Archaeologist." | Y |
| 2 | The EA fails to justify "improving" and realigning a historic resource for a logging project of unproven need. The EA fails to explain what types of users are accessing the Charleston Road illegally, and thus fails to open for public input other ways of limiting this presumably motorized access. | 1, 2 | | | The need for road reconstruction is on page 7 of the EA. | Y |
| 3 | The Cultural Resource Review found resources scattered throughout the proposed logging areas, and it was by no means a complete survey. Given the pre and post-contact richness of this area, there are obviously undiscovered resources and logging should not be allowed, except chain-saw clearing around the apple orchards and smaller trees that are damaging foundations. Pruning of the orchards should also be done, and identification of apple varieties if grafted tress remain. The apple trees are historic resources. | 2 | CRRR | | Commenter does not state which cultural resources were not included in the CRRR nor provides any information as to the location of any unsurveyed resources. For protection measures to any cultural resources previously undiscovered, see response to comment #2. All apple orchards save for the one proposed for adoption into the Permanent Wildlife Opening program will remain in their natural state. | Y |
| 4 | The Revised Lake Tarleton Logging Project Environmental Assessment states: "The proposed action is consistent with Forest Plan standards and guidelines for scenery management. Nine viewpoints were used for scenery analysis and the timber units were modeled and adjusted to minimize visual impacts and ensure Forest Plan compliance (Figure 4). Some visual impacts from the proposal can be expected, however these impacts would be most apparently immediately following timber harvest and would fadeand blend over time as the forest regenerates." To sum up scenic impacts by stating there will be huge visual impacts that will become less noticeable over the next 50 years is not an adequate response. | 3 | | Visuals | See C/R #126 in CARA | Y |
| 5 | The EA provided no data showing less than 9% of the view with visual impacts from the proposed logging. The EA provided no data incorporating previous logging. Did the viewshed analysis take into account the increased viewshed that would be created by the logging, for example, the view from the powerline? The EA provided no data showing that 9% is an acceptable scenic impact. | 3 | | Visuals Threshold | Forest Plan Chapter 3, page 6 Guideline 1 applies: In evaluating cumulative effects for viewed landscapes from established concern level 1, open, higher elevation viewpoints affording expansive or large scale views, no more than 9 percent of the acreage within the view should be treated with regeneration vegetation management activities within a 30 year period. Total area affected during any one entry period with new regeneration treatment should not exceed 4 percent of the acreage. Assessment may need to be made from multiple viewpoints (that view a common land base). The assessment will apply to each view separately. Commenter quoted the above guideline on page 4 of her comment letter. | Y |
| 6 | The EA failed to consider the Charleston Road viewshed in its analysis. | 3 | | Viewshed | Viewpoints are based off the highest level of access and visibility to the general public. Charleston road was not identified as a highly used viewpoint in comparison to the viewpoints chosen. | Y |
| 7 | The EA provided no records of the logging that has been done in the Tarleton area over the past 30 years. | 4 | | Logging History | Since the WMNF was not able to locate any documentation of logging activity in the area, historical harvesting of the area had to be deduced through on the ground conditions and the expertise of the district foresters. The summary of their findings can be found in the "Vegetation Management History" section of the EA on page 7. | Y |
| 8 | It would be impossible for anything other than a several thousand acre clearcut to be more than 9% of a viewshed, unless that viewshed was extremely limited. USFS failed to provide the percentages of proposed logging areas visible from each of the chosen visual impact locations. | 4 | | | A table will be created to add to the EA breaking down how many acres of each unit is visible from each viewpoint. | Y |
| 9 | WMNF has been approached by the Board of Trails (DNCR) which hopes to gain FS permission for OHRV useof the snowmobile trail on the powerline that abuts the old Charleston Road. This would be a cumulative impact in terms of noise, wildlife and terrain damage and would also threaten the cultural resources in and around that section of trail/powerline. | 4 | | | The Pemigewasset ranger district not been approached by DNCR for permission for recreational OHRV use of the snowmobile trail on the powerline corridor. Cumulative impacts are considered on pg. 21 of the EA and in the project record. | Y |
| 10 | WMNF needs to disclose all potential cumulative cultural impacts in the area of the proposed logging. | 4 | | | See C/R # 120 in CARA | Y |
| 11 | WMNF failed to provide an adequate assessment of the visual impacts of the proposed logging project on the Appalachian Trail and the Charleston Road. | 5 | | | Potential visual impacts from the Appalachian Trail corridor were analyzed from the Webster Slide 1 and 2 viewpoints, the Moosilauke 1 and 2 viewpoints, and from the Powerline viewpoint. See response to comments 6 and 8 for visual impacts to the Charleston road and adequate visual assessment. | Y |
| 12 | The Environmental Assessment failed to assess the scenic and recreational value of the Lake Tarleton area as a mature forest. | 7 | | | See C/R # 126 in CARA. The responsible official has extended the no cut buffer off of Lake Tarleton to 300 feet specifically to preserve the dispersed recreation character along the Northeast side of the lake. | Y |
| 13 | WMNF failed to do an adequate Section 106/NEPA analysis, including VIAs for the AT and the Charleston Road. | 7 | | | See C/R # 23 for cultural resource protection and C/R # 126 for visual analysis in CARA. | Y |
| 14 | The proposed Lake Tarleton logging project EA scenic evaluation is invalidated by its limited KOP (Key Observation Points) analysis. Relying solely on KOP analysis in Visual Impacts Analysis is problematic, because as land uses and people's viewing behaviors and locations change over time, KOPs and viewer sensitivities may also change. | 8 | | | The view points chosen for anlaysis were fixed viewpoints that are publicly owned and publicly assessed. We anticipate that those land uses would not change over time. These locations were chosen because they are highly used and highly accessible by the public, and we are not expecting that to change significantly over time. | Y |
| 15 | The Cultural Resource Reconnaissance Report finding of No Effect ignored the important historic landscape of the Lake Tarleton area, which includes Lake Tarleton and Lake Katherine, the Cross Mine, the old Tarleton Club trails and the Charleston Road itself, with its associated cellar holes, stone piles, foundations, old dumps, foundations, springs, wells and orchards. | 8 | | | See C/R # 23 in CARA. | Y |
| 16 | The Charleston Road, Lake Tarleton and Lake Katherine area is eligible for listing to the National Register. | 8 | | | Charleston road has not been evaluated for national registry eligibility. | Y |
| 17 | The Cultural Resource Reconnaissance Report incorrectly arrived at a finding of No Significant Effect. 2,687 acres were incompletely surveyed, the proposed project would affect 5,375 acres, cultural resources were found in an area with a pattern of settlement and pre-contact use that indicates that far more extensive resources exist. | 9 | | | Th project will not affect 5,375 acres. As stated on page 5 of the EA, the proposed project activities will comprise about 945 of the 5,375 acres that comprise the Tarleton Habitat Management Unit. For response to project affecting unknown cultural resources in the area, see response to comment #2. | Y |

| UniqueComment# | Comment | Page | Submitted Literature and Citation(s) | Keyword | Response | Complete? (Y/N) |
|---|---|---|---|---|---|---|
| 1 | WMNF/USFS reliance on outdated and industry-influenced data for the effects of logging on the carbon sequestration in the forest invalidates every environmental conclusion presented in the project reports. | 1 | https://scholarworks.umass.edu/cgi/viewcontent.cgi?article=1161&context=open_access_dissertations | climate | The project record and analysis reflects best available science, developed in coordination with the NIACS. | Y |
| 2 | The project documents fail to address the sixth great extinction. WMNF/USFS decisions in the Tarleton Logging Project are driven by political power rather than evidence-based | 1 | https://www americanbar.org/groups/environment_energy_resources/publications/fr/20210510-the-usforest-services-expanding-use-of-condition-based-management/ | ESA | Comment is not project-specific and cites an opinion piece regarding condition-based management. This project does not propose condition-based management. The project is in compliance with NFMA and ESA regarding impacts to federally listed and sensitive species. Refer to EA and Biological Evaluation. | Y |
| 3 | The proposed Lake Tarleton Logging project documents fail to address the effects of noise on animals, including people: | 2 | https://sites.warnercnr.colostate.edu/soundandlightecologyteam/wp-content/uploads/sites/146/2020/11/biologicalreviews2015.pdf | noise | Article is relative to sustained moderate- to high-levels of noise pollution affecting wildlife. The effects of the project related to noise are disclosed in the record and would be minor due to the timber harvesting be ng conducted in the winter months when recreation activity in the area would be low. | Y |
| 4 | The proposed Lake Tarleton Logging documents failed to provide alternatives, including limiting actions to orchard and water supply restoration, outhouse/composting toilet construction, small field clearings around four or five of the former homesteads that have foundations, and reconstruction of the foundations and the construction of historically accurate structures (this would exclude the foundation with the huge ash trees in it) or designating the area as a Scenic Area. | 2 | | alternatives | While regulations require that a range of alternatives be analyzed, there is no set number of alternatives required in order to reflect a reasonable range. Alternatives are not required for environmental assessments except in some specific cases. Agencies have discretion to determine appropriate alternatives based on the purpose of the proposal. Options presented by the commenter would not address the needs for the project as stated in the EA. In addition, these actions could be considered as stand-alone proposals in the future, consistent with forest plan direction and subject to separate analysis and decision-making processes. | Y |
| 5 | Restored structures could be rented out as hiking or simple vacation cabins. The forest would be preserved while being made accessible in a less common and less expensive (than the AMC huts) way. These structures could also serve as housing for those interested in volunteering to work on Pre- and post contact archaeology. The apple trees that are not heritage varieties could be top-worked with historic scions. | 2 | | alternatives | Comments regarding construction of new structures on historic foundations is outside the scope of the current proposal and would require additional consultation with the State Historic Preservation Office. In addition, the forest plan does not allow for new huts on National Forest System lands. [Check on recreation requirements and limitations in forest plan.] | Y |
| 6 | The Tarleton Logging document failed to asses the cultural, social, cash, aesthetic and environmental value of the trees left standing, as compared to trees as saw-logs, incorporating of course the money and environmental costs of the logging. The Tarleton Logging document failed to asses the social, cash and cultural value of the archaeological resources in a standing, mature, forest. | | | socioeconomics | Socioeconomics were considered at the forest plan level. Tax benefits to local economies are consistent project to project. No other measurable socioeconomic impacts have been identified relevant to the proposed action.<br>The proposed project considered impacts to cultural resources and is compliant with section 106 of the National Historic Preservation Act (see EA p. 19 and project record). Project-level cost feasibility was assessed prior to scoping. The proposed action would help move the forest toward desired conditions, the benefits of which are not monetary and cannot be captured in an economic efficiency analysis. | Y |
| 7 | The visual assessment in the proposed Lake Tarleton Logging EA is inadequate because: Some visual impacts from the proposal can be expected and though they would fade and blend this will take fifty years to 120 years, especially because "recent warmer temperatures and precipitation variability may have stressed forests..." (p. 21, Forest Carbon Assessment) The Crawford document is 180 pages, the Tarleton EA is 30 pages. Is that why the Tarleton EA does not contain this unsupported claim WMNF makes about the Crawford area trails? | 4 | | scenery | The commenter compares the visual effects analysis and document length between the Crawford Stewardship project and the Tarleton Project. The scenery analysis is consistent with current GIS analysis methods and forest plan guidance for scenery management. | Y |
| 8 | WMNF provides no documentation that people prefer the type of trail vista shown to the right (Jericho Trail, Easton, 2022) to the one above. WMNF provides no documentation that the logging abutting the Old Charleston Rd. will not damage the scenic quality of the road. | 5 | | scenery | The scenery analysis is consistent with current GIS analysis methods and forest plan guidance for scenery management. In particular, analysis considers visibility of even-aged treatment units but not does ascribe personal values to such treatments as those values vary widely by individual. | Y |
| 9 | | 5 | https://www.hcn.org/issues/41.12/who-can-capture-the-forest-service | | Comment expresses an opinion with no rationale. Submitted literature is a popular article and not best available science. | Y |
| 10 | Since "stands on the WMNF are now mostly middle to older aged (Fig. 4)."(p. 21 Carbon document), the Tarleton Logging Project needs to be placed on hold while WMNF assesses our forests and maps the middle to older aged stands (this would include the Kinsman and Gordon Pond-Bog Pond areas) as directed by President Biden's recent order, so it can leave them alone and formalize their protected state. | 6 | | vegetation mgmt | Executive Order provides direction for federal agencies to inventory and develop plans within 1 year for mature and old growth forests. This EO is outside the scope of the current project proposal. However, the forest plan currently requires that old growth areas be placed in reserve; therefore, old growth patches in units proposed for treatment would be protected on-site. Other stands would be managed consistent with current forest plan goals for desired conditions. | Y |
| 11 | | | https://www.fs.fed.us/pnw/pubs/journals/pnw_2010_swanson001.pdf | | Article refers to the benefits of early successional habitat caused by natural disturbance events. One of the goals of timber harvesting is to mimic these natural disturbance events which are rare in New Hampshire, and producing the same types of benefits. | Y |
| 12 | WMNF engaged in economic injustice in failing to provide a thorough visual and auditory impact assessment of the proposed Lake Tarleton Logging Project. | 3 | | visuals, noise | Pages 19-20 of the EA and project record include analysis of scenery and noise impacts. | Y |
| 13 | WMNF failed to address the needs of those who prefer unbroken/unmanaged forests, by developing any alternative logging plans for Lake Tarleton, that would reduce the visual impact from viewpoints and from the Charleston Road. Again, economic injustice. | 3 | | alternatives | Refer to responses for #7, 8, and 12 above. | Y |
| 14 | The visual assessment in the proposed Lake Tarleton Logging EA is inadequate because: Some visual impacts from the proposal can be expected and though they would fade and blend this will take fifty years to 120 years, especially because "recent warmer temperatures and precipitation variability may have stressed forests..." (p. 21, Forest Carbon Assessment) | 4 | | visuals | The temporal boundary for visual impacts is thirty years and is recorded in the project record. This is the time period where a casual observer would less likely see any changes to the landscape. | Y |
| 15 | The Crawford document is 180 pages, the Tarleton EA is 30 pages. Is that why the Tarleton EA does not contain this unsupported claim WMNF makes about the Crawford area trails? | 4 | | analysis | The Tarleton IRP is a different NEPA project than the Crawford Stewardship Project that had a final decision signed in 2010. The two projects have different areas with different recreation situations, goals, and objectives. | Y |
| 16 | WMNF provides no documentation that people prefer the type of trail vista shown to the right (Jericho Trail, Easton, 2022) to the one above. | 5 | Commenter refers to a clearcut area recently harvested as part of the Bowen Brook project comparing it to an unnamed trial used as an example of a trail with uniformed vegetation (Crawford Stewardship project EA, pg. 11) | analysis, recreation | The effects analysis has been completed for the Bowen Brook project and a decision was signed in May 2016. | Y |
| 17 | WMNF provides no documentation that the logging abutting the Old Charleston Rd. will not damage the scenic quality of the road. | 5 | | visuals | Viewpoints are based off the highest level of access and visibility to the general public. Charleston road was not identified as a highly used viewpoint in comparison to the viewpoints chosen. | Y |
| 18 | Since "stands on the WMNF are now mostly middle to older aged (Fig. 4)."(p. 21 Carbon document), the Tarleton Logging Project needs to be placed on hold while WMNF assesses our forests and maps the middle to older aged stands (this would include the Kinsman and Gordon Pond-Bog Pond areas) as directed by President Biden's recent order, so it can leave them alone and formalize their protected state. | 6 | | EO | The Forest Service assesses the WMNF based on specific HMU analysis and documents the findings in a rationale which will be published along with the final EA. President Biden's executive order will be managed by the Secretary and is beyond the scope of the Tarleton IRP. | Y |
| 19 | The proposed Lake Tarleton Logging Project documents failed to incorporate this USFS data on increased precipitation in its assessment of the affects of logging on erosion, soil structure, the watershed and mercury concentrations | 6 | Statement " This projection would result in the 20 year storm becoming approximately the 5 year storm by 2100." quoted by the USFS. | water quantity | See C/R #'s 34, 42, 63, 78, and 86 on CARA. Any effects project activities would have on climate change would be negligible due to the small proximity of the project area on the global scale, and would be dissapated by the year 2100. | Y |
| 20 | The proposed Lake Tarleton Logging Project documents failed to address the assertions in its Climate Change Report that "Other work suggests that as climate warms through the end of the century (2100), greenhouse gases will be released from soils, the availability of important nutrients will change, and the water quality in sensitive watersheds will decrease | 7 | | climate change | See C/R # 63 in CARA. | Y |
| 21 | The proposed Lake Tarleton Logging Project documents failed to address regeneration issues caused by climate change. | 7 | One aspect of a changing climate is how warming temperatures and changes in precipitation may affect plant regeneration. Various studies point to the higher sensitivity of seedlings to climate change as they are likely more sensitive to extremes of temperature and drought than adult plants. Seedlings have shallower root systems and less access to deep soil water reserves andthey also possess smaller non- structural carbon reserves that allow larger plants to cope with stress more effectively (Niinemets U. , 2010). Beyond just the gross variation in temperature and precipitation, there are other species specific complexities (germination phenology, seed maturation, seed persistence in soil) that will likely affect the ability of individual species to compete and thrive in a changing climate (Walck, 2011)." (USFS Climate Change Report p. 6) | climate change | If this is the case, it is good that we are regenerating tree species now before the climate crisis makes conditions more difficult for young trees to regenerate. Even if the temperature rises in the future, it would not change the soil composition. Young trees are generally more resilient than older trees and are adaptable to changing climate conditions. | Y |
| 22 | The Lake Tarleton Proposed Logging Project data states: "The proposed action affects a relatively small amount of forest land and carbon on the White Mountain National Forest and, in the near-term, might contribute an extremely small quantity of greenhouse gas emissions relative to national and global emissions (Dugan and McKinley 2019)." By this "logic" no action should be taken on climate change or greenhouse gasses by any single entity, even a third world country. | 7 | | climate change | See C/R #63 in CARA. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 23 | The proposed Tarleton Logging Project data failed to provide documentation showing that logging combined with climate change would not lead to unacceptable damages to heritage resources | 7 | "Heritage resources are vulnerable in many of the same ways that natural resources are vulnerable, though the specific mechanisms that impact heritage resources are different. The environment is the greatest threat to fragile site materials such as wood and stone masonry. Water, wind, soil chemistry, floods, extreme temperatures, fluctuations in humidity, and freeze/thaw and wet/dry cycling are the primary threats to these resources. Predicted climatic changes include changes in the frequency, duration, and intensity of all of the above, and these changes, where they occur, will impact preservation (National Park Service, 2010). As a local example, higher flood flows at stream crossings have potential to compromise the structural integrity of historically significant stone masonry culverts. This issue was highlighted when several historical masonry culverts were at risk after Tropical Storm Irene passed over the White Mountain National Forest in 2011." (USFS Climate Change Report p. 10) | climate change, cultural resources | See C/R #'s 23 and 63 in CARA. | Y |
| 24 | The proposed Lake Tarleton Logging Project data failed to address the effects of the proposed logging on bird, insect, mammal, and amphibian species that may migrate north with climate change in the 100 years before the logged areas approach recovery | 8 | "Changes in habitat suitability for many bird species of interest in the project area have also beenmodeled under a range of climate change scenarios. The mean centers of the suitable habitats for 147species are projected to move, on average, between 98 and 203 km to the north-northeast by the endof the century, depending on the climate change scenario (Matthews, Iverson, Prasad, & Peters, 2011).A separate study that modeled projected change in suitable habitat under four climate change scenariosindicated the potential for relatively large changes in the bird community throughout the Northeast(Rodenhouse, et al., 2008) with the largest changes occurring under the higher emission scenarios(A1FI)." (USFS Climate Change Report p.10" | climate change | See C/R # 63 in CARA and response to comment # 19 | Y |
| 25 | The Lake Tarleton EA states a need for regeneration age forest habitat and that: "No regeneration-age (0-9 years old) forest habitat occurs except for one permanent wildlife opening actively managed by the Forest Service and two smaller apple orchards not currently managed by the Forest Service. The Forest Service manages designated permanent wildlife openings to maintain valuable grassland and shrubland habitats." (pgs. 5-6) This is incorrect. The powerline corridor contains approximately 110 acres of land cleared on a 5-7 year rotation. This corridor is also supposed to contain wildlife crossing buffers, which would have older yet not mature trees. | 9 | | early successional habitat | See C/R #66 in CARA. | Y |
| 26 | The proposed Lake Tarleton Logging Project data failed to show that early successional habitat created by logging is comparable to that created by natural disturbances in mature forest and failed to address its own data showing that clear cutting reduces natural, high-quality early-successional habitat | 9 | | early successional habitat | Clearcutting creates early successional habitat that is beneficial to species requring abundant sunlight such as Aspen, Birch, Oak, Ash, and Cherry. | Y |
| 27 | The proposed Lake Tarleton Logging Project data failed to prove that trees that are suppressed or "poor quality" do not possess ecological values that require they should be left standing. | 11 | "Trees targeted for retention would include mature white pine, windfirm trees, and other trees exhibiting good quality and health. Conversely, the trees targeted for removal would primarily besuppressed and/or poor-quality trees. Due to the emphasis of trees targeted for retention andremoval, this treatment would result in an overall increase in tree quality." (Tarleton EA p. 10) | poor quality | Area is a mostly pine stand starting to undergo individual tree blowdown, which indicates blowdown will continue, and there are limits to management, either they call all be removed or select trees can be identified and preserved to retain a seed source. Area is dominated by softwoods as a result of past agricultural practices, however the habitat is best suited for hardwood species. | Y |
| 28 | The Lake Tarleton Logging Report failed to address the data showing that "Amphibians are also expected to be increasingly vulnerable to climate change. | 11 | | wildlife, climate change | Effects to amphibians would be minimized by only conducting harvests in winter during frozen ground conditions, and adhering to design feature SS-1 (EA, pg. 16) and Forest Plan Standards and Guidelines in place to protect aquatic habitats (pp. 2-24 to 2-26 and 2-30 to 2-32) and dead and down trees (2-36). While some upland amphibian habitat may be negatively impacted by even-aged harvests, amphibians would recolonize these areas after they succeed back into forested stands. Project activities are not likely to lead to the loss of any amphibian species from the project area. | Y |
| 29 | The 2005 WMNF Forest Plan is invalidated by climate change, especially feedback cycles which are increasing the rate of climate change. | 12 | | forest plan | Forest Plan revision is beyond the scope of the Tarleton IRP | Y |
| 30 | The proposed Lake Tarleton Logging Project fails to fulfill the sustained yield goal | 12 | | goals and objectives | The Tarleton IRP explains the project's need to meet the goals and objectives of the Forest Plan on pg. 6 of the EA. | Y |
| 31 | The proposed Lake Tarleton Project documents fail to give the proportion of young to mature forest that is the "desired" condition and thus proof that this proportion is "sustainable." | 12 | | age class objectives | Current stand condition is laid out in the HMU rationale document that will be published along with the Final EA. | Y |
| 32 | The Lake Tarleton Logging Project documents fail to provide proof of inadequate early successional habitat, by any legitimate historic measure, thus fails to provide proof of need to create this by logging. | 12 | | early successional habitat | See response to comment #31. | Y |
| 33 | The Lake Tarleton Logging Project documents fail to show protection of Threatened Species. | 13 | | T&E species | Effects to T&E species are laid out on pg. 18 of the EA. | Y |
| 34 | TES species is not defined nor are they listed in this document. TES Species does not come up in a word search in the Lake Tarleton Biological Evaluation. | 13 | | T&E species | "Federally Listed" is synonymous with "TES" when referring to federally listed threatened and endangered species. The acronym TEPS (Endangered, Threatened and Proposed species and USDA Forest Service (FS) Region 9 Regional Forester Sensitive Species) is established on pg. 4 of the biological evaluation. | Y |
| 35 | The Lake Tarleton Logging Project documents fail to show that clearcutting and shelterwood cutting accomplish rather than undermine, its goals of increasing species diversity and forest health | 14 | "600 leading biologists, ecologists, foresters, and scientists including E.O. Wilson wrote to Congress stating: "Clearcutting and other even aged silvicultural practices and timber road construction have caused widespread forest ecosystem fragmentation and degradation. The result is species extinction, soil erosion, flooding, destabilizing climate change, the loss of ecological processes, declining water quality, diminishing commercial and sport fisheries...... Even-age logging includes the application of clearcutting, high grading, seed-tree cutting, shelterwood cutting, or any other logging method in a manner inconsistent with selection management." | age class objectives | The bienniel monitoring reports show that the WMNF is accomplishing its wildlife habitat management goals. The monitoring report is referenced in the DEA. | Y |
| 36 | The proposed Lake Tarleton Logging project documents failed to provide maps of post-contact settlement and present conditions (including general stand ages) for the proposed Lake Tarleton Logging Project to provide a meaningful baseline for historic levels of early successional habitat and natural species. | 14 | Maps on pg. 14 of this pdf | vegetation management history | Current stand condition is laid out in the HMU rationale document that will be published along with the Final EA. | Y |
| 37 | WMNF public outreach for notification of logging projects in inadequate. | | | public involvement | Agencies have discretion to choose appropriate communication methods for effective public involvement. For this project, the original mailing list in 2019 included potentially interested parties and affected stakeholders, including property owners adjacent to the affected area. Hardcopy letters were sent to the full mailing list, inviting parties to join the electronic mailing list. Public involvement began prior to the COVID-19 pandemic, and included coordination with the Piermont and Warren board of selectment, and an open house in 2019 at the Warren town hall. Specific contact information is provided in various public materials and on the project website. The public notification and involvement process is consistent with NEPA implementing procedures, and appropriate given the project scope and scale. | Y |
| 38 | Public input has had no substantive effect on WMNF plans, and is a pretense at fulfilling requirements for input. | | | public involvement | All comments are considered by the responsible official before a final decision is made. | Y |

| UniqueComment# | Comment | Page | Submitted Literature and Citation(s) | Keyword | Response | Complete? (Y/N) |
|---|---|---|---|---|---|---|
| 1 | The alternative: White Mountain National Park | 1 | | Alternative | This is not considered a reasonable alternative because the proposal of changing the White Mountain National Forest to a National Park is far beyond the scope of the Tarleton IRP and does not meet the purpose and need for the project. | Y |
| 2 | WMNF's own documentation shows carbon loss in the forest caused by its logging. WMNF is required by its management plan to produce sustained yield. The proposed Lake Tarleton Logging plan, in promoting climate change, promotes unsustainable yields of lumber. The Tarleton Logging plan, as one of a continuous series of ecologically unsound logging plans written and enacted by WMNF, demoralizes the affected New Hampshire and Maine towns and impairs the cultural will to fight climate change. | 1 | | Carbon | See C/R #63 in CARA. | Y |
| 3 | This graph does not show how much carbon would have been gained in WMNF if it hadn't been logged since 1990. | 1 | Figure 7 in submitted pdf | Carbon | Comment refers to a graph submitted in the 2019 WMNF Forest Carbon Assessment. Commenter does not state how this is related to the Tarleton project. | Y |
| | This graph does not mention that the forested area in WMNF increased from 738,878 acres in 1990 to 868,848 acres in 2013. | 1 | Figure 7 in submitted pdf | WMNF | See response to comment #3. | Y |
| 4 | This figure does not take into account the carbon costs of logging, trucking, processing the trees into boards, trucking those boards to the lumber stores, and trucking them from the lumber store to where they were used, or the waste wood. | 2 | Figure 7 in submitted pdf | Carbon | See response to comment #3. | Y |
| 5 | This figure does not take into account the probable shorter lifespan (thus carbon sequestration) of the trees that grow up in clear-cuts or "selective" cuts due to the existing root system of the stumps that will sprout, and increased sun and CO2: "On average, tree lifespan decreased exponentially with 23% reduction in lifespan for a 50% early growth increase." | 2 | Figure 7 in submitted pdf. Forest carbon sink neutralized by pervasive growth-lifespan trade-offs. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7479146/#:~:text=On%20average%2C%20tree%20lifespan%20decreased,Fig.%205a%E2%80%93e). | Carbon | See response to comment #3. | Y |
| 6 | This figure does not take into account the negative correlation between temperature and tree lifespan, thus potential for carbon sequestration over a longer time span. | 2 | Figure 2 in submitted pdf. Forest carbon sink neutralized by pervasive growth-lifespan trade-offs. https://www.nature.com/articles/s41467-020-17966-z | Carbon | See response to comment #3. | Y |
| 7 | These costs can't be paid, they represent damage that cannot be undone, at this point. They can be avoided in the future by stopping the logging in WMNF. The proposed Lake Tarleton logging project failed to take these costs into consideration and adequately assess them. | 2 | | Carbon | See C/R #63 in CARA. | Y |
| 8 | If White Mountain National Forest, Nash Stream State Forest (40,000 acres) and the Connecticut Lakes Headwaters (171,000) were joined into a National Park, it would be 1,051,000 acres. Connecting these large forests would increase their ecological and social values. Logging would be precluded. If one prohibited motorized recreation, avoiding the noise, dust and pollution problems have plagued National 2 Parks like Yellowstone, a White Mountain National Park would provide high quality habitat for people and animals. | 2,3 | | Alternative | See response to comment #1. Prohibiting all motorized recreation on the White Mountain National Forest does not meet the forest winter recreation goals and objectives and is not being considered by the WMNF at this time. | Y |
| 9 | This land would be 1/6 of New Hampshire, half-way to the goal of 30% protected lands by 2030. | 3 | | Alternative | See response to comment #1. | Y |
| 10 | By using extractive, ugly and damaging logging practices, WMNF threatens its existence by driving the movement to turn White Mountain National Forest into White Mountain National Park. | 3 | | Alternative | See response to comment #1. | Y |
| 11 | WMNF acknowledges that many logging access roads it 'owns' are historic and damaged by use for logging, yet failed to integrate this knowledge into the logging plan for Lake Tarleton. | 3 | | Roads | A road package is included in all vegetation management projects that include improvements to the roads such as bank stabalization and infrastructure installation. | Y |
| 12 | WMNF's proposed Lake Tarleton Logging Plan failed to incorporate WMNF's knowledge and promises regarding logging and its effect on cultural resources because it incompletely surveyed the proposed logging area, failed to consider viewshed effects of logging on the Old Charleston Road and failed to consider the road, above, on, and below ground, as well as it's bordering walls and forest, as a historic resource. | 3 | | Cultural Resources | Conducting activities along Charleston road in winter during frozen ground conditions and following project-specific design features would minimize effects on Charleston road that may occur due to project activities. Viewpoints are based off the highest level of access and visibility to the general public. Charleston road was not identified as a highly used viewpoint in comparison to the viewpoints chosen. | Y |
| 13 | The proposed Lake Tarleton Logging plan failed to consider that mature forests appear resistant to insect outbreaks and that severely limiting logging should be used as a control measure. | 3 | | Insect and Disease | Best available science suggest that non-native insect and disease outbreaks are susceptible to all age classes of tree species. | Y |
| 14 | WMNF in general, and the proposed Tarleton Lake Logging plan specifically, have failed to address logging's potential contribution to the vulnerability of forests to disease and the rare invasive species. | 4 | | Insect and Disease | See C/R #54 in CARA and response to comment #13. | Y |
| 15 | The proposed Lake Tarleton Logging plan fails to provide documentation supporting its rationale that logging increases wildlife habitat or diversity. | 5 | https://www.adfg.alaska.gov/static/home/library/pdfs/wildlife/research_pdfs/wildlife_forest_relastionships.pdf | Wildlife Habitat | Article discusses the relationship between old-growth forest and wildlife habitat diversity. Purpose of the project is to increase age-class diversity, this will be laid out in the HMU rationale document which will be published with the final EA. | Y |
| 16 | The proposed Lake Tarleton Logging plan failed to adequately assess the proposed log landing areas for visual impact, damage to the historic resource of the Old Charleston Rd., and damage to environmental and historical/cultural resources | 5 | | Cultural Resources | See response to comment #12 and C/R #23 in CARA. | Y |
| 17 | The Lake Tarleton Logging plan, by preventing old growth, is contrary to the best science and to the WMNF 2005 Plan. The Plan will decrease WMNF stated goal of habitat diversity by preventing the establishment of a natural percentage of mature and old growth forest. | 8 | | Old Growth | The purpose and need for the project includes creating regeneration early sucessional habitat, of which there is none in the project area, which in turn diverisifies the habitat available for wildlife. About 40 percent of the forest is considered general forest management, which leaves about 60 percent of the forest to age naturally. | Y |
| 23 | The public outreach for the Lake Tarleton Logging Project was inadequate. Even if the SOPA was sent to 500 people, and notice sent to Warren and Piermont and notice published in local papers, this project is in a National Forest and the population of the Nation is 329 million. | 11 | | Public Outreach | See response to comment #37 on PDF letter #4. | Y |
| 24 | In its proposed Lake Tarleton Logging plan WMNF failed to consider "Whether the action (C02 production) is related to other actions with individually insignificant but cumulatively significant impacts. | 11 | | Cumulative Effects | See C/R #120 in CARA. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 25 | Your response to comment #11 in the Chatham Logging Project was: "Mitigating climate change is not one of the purposes of the 2005 Forest plan..." Far before 2005 the world reached a point where following (industry-influenced) rules no longer relieved an agency from responsibility for its actions in contributing to climate change. Though WMNF has changed its response to global warming in the proposed Lake Tarleton Logging document, its new rationale that the CO2 produced by the project is small as to be globally inconsequential involves the same abdication of moral responsibility. In allowing itself to being guided by propaganda disseminated by the fossil fuel companies to discredit the climate change data that threatened to lower their profits, WMNF is guilty of crimes against humanity/the ecosystem. | 12 | | Climate Change | A decision for the North Chatham IRP was signed on October 19, 2018 and is separate from the Tarleton IRP. See C/R #63 in CARA. | Y |

| UniqueComment# | Comment | Page | Submitted Literature and Citation(s) | Keyword | Response | Complete? (Y/N) |
|---|---|---|---|---|---|---|
| 1 | The Lake Tarleton EA failed to assess the potential for increased risk of fire and fire spread caused by logging, | 1 | | | The project will increase forest health and vitalilty, and make it less susceptible to wildfire. | Y |
| 2 | The Lake Tarleton EA failed to assess the potential for environmental contamination by the fire retardant chemicals WMNF plans to give itself permission to use in WMNF. | 1 | https://www.fs.usda.gov/project/?project=60450 | | This Forest Service project is an agency wide Supplemental EIS that supplements portions of the Nationwide Aerial Application of Fire Retardant Final EIS of 2011, which established guidelines to allow aerial application of fire retardant on all National Forest Service lands that replaced the guidelines set in the year 2000. While this project will allow the use of aerial fire retardant on the WMNF if the need arises, no need for this fire suppression strategy has yet been identified in the Tarleton area. | Y |

| UniqueComment# | Comment | Page | Submitted Literature and Citation(s) | Keyword | Response | Complete? |
|---|---|---|---|---|---|---|
| 1 | | | Brown et.al., Issues with data and analyses, Errors, underlying themes, and potential solutions. | | Article refers to errors exsting in scientific research, what types of errors exist, how they are caused, and tips to minimize errors. | Y |
| 2 | | | Callieri et. al., Lake Level Fluctuations Boost Toxic Cyanobacterial 2014 ''Oligotrophic Blooms''. | | Article refers to cyanobacteria abundance in Lake Maggoria, a lake in Northern Italy, also that cyanobacteria favor conditions caused by pollution and rising water temperatures due to global warming. | Y |
| 3 | | | Carey Cayelan et. al., Occurrence and toxicity of the cyanobacterium Gloeotrichia echinulata in low-nutrient lakes in the northeastern United States, Aquatic Ecology, 2012. | | Article refers to toxic cyanobacteria levels in low nutrient level lakes in New York, Vermont, New Hampshire, and Maine. Article suggest that increasing toxic cyanobacteria levels in Northeastern U.S. lakes will raise toxicity to a point where it will affect aquatic organisms and potentially human health. | Y |
| 4 | | | Chaudhary, et. al., Impact of Forest Management on Species Richness Global Meta-Analysis and Economic Trade-Offs. | | Article refers to trade offs in forestry management for both species diversity and economic value. Article suggest land managers should not dismiss any one forestry strategy solely based on species diversity impacts for any one particular ecosystem. | Y |
| 5 | | | Durall et. al., Effects of Clearcut Logging and Tree Species Composition on the Diversity and Community Composition of Epigeous Fruit Bodies Formed by Ectomycorrhizal Fungi' 2006 | | Article refers to a study of the effects of clearcutting plantations on ecto-mycorrhizal fungi fruit body abundance. Study was conducted on clearcut Douglas-Fir plantations in British Columbia, Canada, an area with a different habitat compisition than northern New England. Clearcut Douglas-Fir plantations are also not comparable to a federally owned forest managed for species and age-class diversity, that follow very strict standards and guidelines and follow state best management practices. Article does not state if the forest is owned by local or government bodies. | Y |
| 6 | | | Gustafson, et. al., 2012, Retention forestry to maintain multifunctional forests A world perspective. | | Article refers to using retention forestry as an option to clear-cutting as a general practice. | Y |
| 7 | | | Ives et. al. Stability and Diversity of Ecosystems, Science, 2007. | | Article is a thought exercise regarding the relationship between ecosystem stability and the diversity of that ecosystem. Article is very general in nature and does not discuss the relationship between terrestrial forest ecosystem diversity and the temporary instability that comes from active forest management. All effects from project activities have been disclosed in the EA, effects will be minor or avoided due to project design features, Forest Plan standards and guidelines, and state best management practices being followed. No effects were found to be significant by the responsible official. | Y |
| 8 | | | Karp, et. al, Ecology Letters, Intensive Agriculture errodes b-diversity at LArge Scales, 2012. | | Article refers to high-intensity non-forested agricultural farms and ranches used for food production and their impacts to diversity compared to low-intensity agriculture and forest biomes in Costa Rica. The proposed project activities are not comparable to agricultural practices in non-forested farms used for livestock and food production. | Y |
| 9 | | | Lutz et. al. Global Importance of Large-Diameter Trees, 2018 1-16, Global Ecol Biogeography, wileyonlinelibrary.comjournalgeb. | | Article determines that across several primary and older secondary forests worldwide, over half of all biomass is contributed by the largest one percent of the trees, and that the conservation of large-diameter trees in tropical and temperate forests is imperative to maintain full ecosystem function. | Y |
| 10 | | | Mildrexler, David et.al., Large Trees Dominate Carbon Storage in Forests East of the Cascade Crest in the United States Pacific Northwest. | | Article refers to a study done in the Pacific NW of the United States that found all trees larger than 21 inches in DBH stored about 42% of the aboveground carbon across 11.5 millions acres of NFS land. | Y |
| 11 | | | Popkin, G., Forest Fight, Science, December 2021 Vol 374 Issue 6572. | | Article refers to a challenge occuring in Germany on how to best manage their forest. Germany has a vastly different climate and forest ecosystem than the Northeastern United States managed by the USFS, the two areas are not comparable. | Y |
| 12 | | | Reinl et.al., Cyanobacterial Blooms in Oligotrophic Lakes, Shifting the High-Nutrient Paradigm, Freshwater Biology, 2021. | | Article refers to a study that measured influxes of cyanobacteria creating algae blooms and thus shifting the oxygen/nutrient balance in oligotrophic lakes across the world, including the Northeastern U.S., and the overall resiliency and genetic fitness of cyanobacteria. The Tarleton IRP will follow all state and federal best management practices, all forest plan standards and guidelines when conducting harvesting activities. All harvesting will occur in the winter during frozen ground conditions. These design features will minimize runoff that may occur due to vegetation harvesting activities. | Y |
| 13 | | | Simard, S, et. al., David A. Perry†, Melanie D. Jones‡, David D. Net Transfer of Carbon Between Ectomycorrhizal Tree Species In The Field, 1997. | | Article refers to the transfer relationship between ectomycorrhizal fungi and different tree species in the Pacific Northwest in the United States and Canada. See C/R #76 in CARA in regards to ectomycorrhizal fungi and the Tarleton IRP project activities. | Y |
| 14 | | | Swanson et. al., Chapter 9, Land-Water Interactions The Riparian Zone. Analysis of Coniferous Forest Ecosystems In The Western United States, 1982. | | Article discusses the composition and functions of riparian zones in forest ecosystems, article states that even aged management such as clearcutting as the same as other major disturbances such as wildfire and floods in causing temporal variations in vegetative succession. One of the goals and objectives in even-aged management is on the WMNF is to mimic those types of natural disturbances which do not often occur in the New England area. | Y |
| 15 | | | Zhang et. al. Changes of soil prokaryotic communities after clear-cutting in a karst forest. | | Article refers to a study conducted observing changes in bacteria community dynamic shifts in response to clearcutting harvest disturbances. Study found significant alteration of bacterial communities after clearcutting harvest, bacterial regeneration was found to be similar to intact forest areas surrounding the clearcut and was determined to be an important process in shaping bacterial communities. | Y |

| UniqueComment# | Column1 | Page | Submitted Liter | Keyword | Response | Complete? (Y/N) |
|---|---|---|---|---|---|---|
| 1 | The Tarleton Integrated Resource Project puts a long history of community-led conservation at risk. In 1994, developers proposed a massive resort surrounding Lake Tarleton. The proposal inspired a multi-year conservation effort, led by the Trust for Public Land, to preserve Lake Tarleton and the surrounding landscape in its natural state. A dozen organizations, 600 individuals and businesses, the State of New Hampshire and the US Congress worked in partnership to raise $7.5 million to purchase 5,300 acres around the lake, securing public ownership forever as part of the nearly one-million-acre White Mountain National Forest. | 3, 4 | | Land Acquisition | See C/R #6 in CARA | Y |
| 2 | Conservation partners gathered to celebrate the protection effort in August 2000. At the ceremony, Senator Judd Gregg commented, "Many of us here today have worked hard for a number of years to reach the point we are at today where we can proudly say that this pristine New Hampshire wilderness has been saved." In the twenty-two years that have elapsed since this small "w" "wilderness" was transferred to public ownership, has the White Mountain National Forest forgotten why these lands and waters were so important to protect, and how much they mean to the surrounding community? Few recreation-related components of the Lake Tarleton vision have been realized. Many Lake Tarleton stakeholders who helped to lead the protection campaign in the 1990s feel as though the WMNF turned its back on the lake for two decades, only to reappear with an outof-touch logging proposal that treats one of New Hampshire's largest, cleanest, and least developed lakes as a woodlot instead of a scenic treasure. | 4 | | Land Acquisition | See C/R #6 in CARA | Y |
| 3 | The White Mountain National Forest again showed little regard for Lake Tarleton-area stakeholders when it pressed ahead with the Tarleton IRP initial Draft EA comment period in the summer of 2021, despite the ongoing Covid-19 pandemic. Indeed, throughout much of the Tarleton IRP NEPA process, the public has had justifiable reasons (some would say a civic responsibility) to avoid in-person gatherings or even to visit town offices where information was posted about the project. What's more, in rural New Hampshire, broadband internet remains a luxury item that is inaccessible to many citizens, whether due to geographic isolation or economics. According the U.S. Census' American Community Survey, an estimated 40% of households in Warren and 25% in Piermont do not have high-speed internet. These statistics effectively prohibited a significant percentage of the local population from participating in the NEPA process for the Tarleton Integrated Resource Project. | 4 | | Public Involvement | Agencies have discretion to choose appropriate communication methods for effective public involvement. For this project, the original mailing list in 2019 included potentially interested parties and affected stakeholders, including property owners adjacent to the affected area. Hardcopy letters were sent to the full mailing list, inviting parties to join the electronic mailing list. Public involvement began prior to the COVID-19 pandemic, and included coordination with the Piermont and Warren board of selectment, and an open house in 2019 at the Warren town hall. Specific contact information is provided in various public materials and on the project website. The public notification and involvement process is consistent with NEPA implementing procedures, and appropriate given the project scope and scale. | Y |
| 4 | Although we are grateful for the second comment opportunity afforded by the White Mountain National Forest, it seems that little has changed from the initial Draft EA to the current, revised version. In the time since the Tarleton IRP's initial Draft Environmental Assessment comment period concluded, over 1,600 concerned citizens have signed a petition requesting that the WMNF revise the project to live up to the spirit of the Lake Tarleton protection campaign of two decades prior. | 5 | | Public Involvement | Regardless of petition efforts, the NEPA process is not a voting or referendum process. The number of negative comments an agency receives does not prevent an action from moving forward. Agencies may respond collectively to numerous comments that repeat the same basic message of support or opposition. Responses to comments are focused on adjusting the analysis and decision-making process to make the best informed decision. | Y |
| 5 | The Tarleton IRP continues to present an all-or-nothing proposition: 900 acres of logging along with relatively modest recreation improvements, or nothing at all. This is a false choice. We demand better from the federal agency that was entrusted as caretaker of Lake Tarleton. | 5 | | Proposed Action | See C/R #16 in CARA. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 6 | The Granite State is home to many treasures that are best left as nature intended. The White Mountain National Forest protects nine of these treasures as Scenic Areas, including Mt. Chocorua, Pinkham Notch, Lincoln Woods, and Greeley Ponds. The White Mountain National Forest has never designated a Scenic Area west of I-93. For the benefit of the local tourism and recreation economy, and for the integrity of this treasured landscape, including Abenaki and early colonial historical resources, it's past time to permanently remove the threat of logging and development from Lake Tarleton, as intended with the lake's protection in 2000. The best way the White Mountain National Forest can honor the effort that added Lake Tarleton to the public domain is to drop current logging plans, and instead conduct a Forest Plan amendment that designates a Lake Tarleton-Webster Slide Scenic Area. | 5 | | Forest Plan | See C/R #2 in CARA. | Y |
| 7 | The 2022 DEA is inadequate under NEPA and new analysis must be conducted. | 9 | | NEPA | See C/R #19 in CARA. | Y |
| 8 | The overarching flaw for this "integrated resource project" is the Forest Service's failure to provide more than mere conclusory statements to support its finding of no significant impact. The analysis is sparse, and sometimes non-existent, for a number of impacted resources. As a result, it is nearly impossible for the public to meaningfully engage with agency's data and analysis presumably underlying the 2022 DEA. | 9 | | NEPA | The commenter has not identified a project-specific issue, cause-effect relationship, or specific flaw in the analysis for response. The Tarleton project is an issues-focused analysis. No specific issues were identified for detailed evaluation. As described in the Environmental Impacts section (EA, pp 18-21) and project, the interdisciplinary team provided analysis for their resource commensurate with the degree of potential effects. The FONSI provides a summary of the environmental analysis based on appropriate context and the 10 intensity factors consistent with CEQ NEPA implementing regulations (1978 regulations version). | Y |
| 9 | Here, public involvement has been impeded by the unavailability of relevant supporting documents, the failure of the 2022 DEA to clearly identify other supporting documents, and the failure to include sufficient detail in the DEA to allow the public to engage the substantive analysis underlying the agency's review of project impacts on relevant resources, and its subsequent finding of no significant impact. | 9 | | Material Availability | More specialist reports and the HMU rationale will be published for reference along with the final EA and DDN during the objection period. | Y |
| 10 | For example, although the 2022 DEA was made available to the public on April 12, 2022, supporting documentation such as the Soils Specialist Report and the New Hampshire SHPO concurrence letter were not made available to the public until weeks later. Although the Soils Specialist Report was specifically referenced in the 2022 DEA (page 20), it was only posted to the Forest Service's project page after Standing Trees requested that it do so. The SHPO letter, which was referenced but not incorporated into 2022 DEA (page 24), was provided directly to Standing Trees after it requested this document, but to our know edge it has not yet been made available to the general public. | 9, 10 | | Material Availability | See response to comment #9, any document that does not contain sensitive information is readily available to the public by request. For example, when standing trees requested the soils specialist report, it was posted to the online website that same day. The SHPO concurrence letters are not typically published on project websites. | Y |
| 11 | In addition, numerous references are made to other unspecified authorities to support conclusions advanced by the Forest Service in the 2022 DEA. For example, the DEA states that "[a]n analysis of the current habitat conditions indicates that the Tarleton HMU is not meeting the MA 2.1 Habitat Composition and Age Class Objectives." 2022 DEA at 6. It then references the section of the WMNF Plan that contains these objectives, but no reference or citation is provided for where the public can review this "analysis of current habitat conditions." If an analysis was already conducted it could have been included in the 2022 DEA, or at least cited so that the public could review it. Instead, we are left to wonder if this analysis is contained in one of the other documents provided on the Forest Service project webpage. This does not appear to be the case. The closest contender would appear to be the USDA Forest Service 2019 Terrestrial Habitat Management Reference Document, but that document makes no mention of the Tarleton HMU, and thus could not be said to be an analysis of current habitat conditions in the project area. A member of the Lake Tarleton Coalition requested a stand age class map on November 15, 2021 for the areas proposed for harvest in the Tarleton IRP and was refused such map by the WMNF. | 10 | | Current Conditions | Information can be found in the HMU rationale document which will be published along with the final EA. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 12 | Further, the 2022 DEA makes repeated reference to similar, unspecified past projects to support its conclusions of no impact, yet no references or citations are provided so that the public can verify these claims. See 2022 DEA at 20, 21, 22, 23. The above are merely illustrations of the types of documents that were not timely provided to the public, and it is possible that others were not provided as well. | 10 | | Past Actions | Past vegetation management projects are available to the public on the WMNF projects webpage: https://www.fs.usda.gov/projects/whitemountain/landmanagement/projects. If the project cannot be found on this page, they can be found in the project archive here: https://www.fs.usda.gov/projects/whitemountain/landmanagement/projects?archive=1&sortby=1 | Y |
| 13 | The public is not able to properly scrutinize agency decisions and analysis when relevant documentation is not made available or when available documents do not actually contain the analysis necessary to support the Service's conclusory statements. The overall effect is to impede public participation, in violation of NEPA's clear mandate to "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment." 40 C.F.R. § 1506.6(a). | 10 | | Material Availability | See response to comment #10. | Y |
| 14 | In addition, the failure to provide clear analysis, or sometimes any analysis, violates NEPA's mandate that NEPA documents "shall be written in plain language . . . so that decisionmakers and the public can readily understand them." 40 C.F.R. § 1502.8. The public cannot understand what it is not told. | 10 | | NEPA | The Forest Service follows plain language guidance consistent with the Plain Language Act. The commenter has not provided any specific reference to sections needing clarification. No further response required. | Y |
| 15 | Without providing actual analysis, it is impossible to gauge the actual anticipated impact to project-area resources, the significance of those impacts, and whether they violate WMNF Plan standards and guidelines. | 10 | "[T]he public should not be required to parse the agency's statements to determine how an area will be impacted[.]" League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton, 752 F.3d 755, 761 (9th Cir. 2014). | NEPA | See response to comment #8. | Y |
| 16 | The 2022 DEA does not describe any outreach to potentially affected Tribes. Whether Federally recognized or not, affected Tribes deserve advanced notification of the action, and it is unclear whether Tribes or Tribal organizations have been notified at all. Not only should the Tribes be included in NEPA outreach, they should be included in project development ahead of NEPA so we strongly recommend a return to the planning phase with proper and complete engagement. We further recommend explaining the nature and scope of this engagement as part of any future NEPA analysis. | 10, 11 | | Public Involvement | Project is consistent with the National Historic Preservation Act. The four federally recognized tribes in Maine have been contacted for engagement during the public involvement process, and are contacted for every project that has a mailing list. No one from the four tribes has commented or inquired about the project as of September 2022. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 17 | the 2022 DEA defines its objectives in unreasonably narrow terms by ignoring key standards from the WMNF Plan. As a result of this unreasonably narrow purpose and need statement the Forest Service necessarily considered a narrower range of alternatives than it should have. Indeed, as described below, the Forest Service did not consider any alternatives to the proposed Project. Both the unreasonably narrow purpose and need statement and the resulting lack of alternatives analysis violate NEPA. Nat'l Parks & Conservation Ass'n v. BLM, 606 F.3d 1058, 1070-72 (9th Cir. 2010). | 11 | The reasonableness of a purpose and need statement is assessed by considering the "statutory context of the federal action." League of Wilderness Defenders v. U.S. Forest Serv., 689 F.3d 1060, 1069–70 (9th Cir. 2012). | Alternatives | Commenter does not specify which Forest Plan standards the Forest Service was ignoring by moving forward with the project and does not present a reasonable alternative for consideration. By incorporating project specific design features and national core and state best management practices, the Forest Service will follow Forest Plan direction. 36 CFR 220.7 (b)(2) states "Proposed action and alternative(s). The EA shall briefly describe the proposed action and alternative(s) that meet the need for action. No specific number of alternatives is required or prescribed." 40 CFR 1508.1 (z) defines a reasonable alternative as "a reasonable range of alternatives that are technically and economically feasible, and meet the purpose and need for the proposed action." | Y |
| 18 | The 2022 DEA describes the primary purpose of the proposed project as "to implement the management direction in the Forest Plan by comparing the existing conditions in the project area with the desired conditions as established in the Forest Plan." 2022 DEA at 5. As an initial matter, the WMNF Plan is nearly 17 years old. Prior to undertaking any projects to "implement the management direction in the Forest Plan," the Forest Service should update the WMNF Plan as it is required to do under NFMA. 16 U.S.C. § 1604(f)(5). | 11 | | Forest Plan | See C/R #28 in CARA. | Y |
| 19 | There is no need to undertake the Project in order to compare existing conditions in the project area with the Forest Plan's desired conditions. That analysis can be done separate and apart from the project activities proposed. Finally, this purpose fails to demonstrate a need for the action at the current time. | 11 | | NEPA | The need for action can be found on pgs. 6-7 of the DEA. | Y |
| 20 | A properly crafted purpose and need statement would integrate purposes of the Forest Plan with current executive orders, see Exhibit 6 (Executive Order 14072), to identify the best management approaches for current stand conditions. Instead, the 2022 DEA states the purpose of the proposed action is to implement the Forest Plan. This inherently structures the 2022 DEA to presuppose that the Forest Plan could only be implemented by the proposed action and fails to explain the management context (i.e., is the management needed and is this the most appropriate management for the subject stands) to demonstrate the need component of the purpose and need statement. In order to demonstrate the need for the action, the Forest Service must do more than simply state a preference for "open forest conditions[,] " 2022 DEA at 6, but must actually connect stand conditions, best science, and desired future conditions to this supposed need. Without this, the purpose and need statement in the 2022 DEA is an insufficient approach to NEPA. | 11, 12 | | NEPA | More information on current stand conditions is located in the HMU rationale document which will be published along with the final EA. The Forest plan is the guiding document for development of the proposed action, and the need for action is defined by comparing existing conditions with desired conditions as described in the plan. Presidential executive orders pertaining to national forests are managed by the Secretary and are beyond the scope of the Tarleton IRP. Any goals and objectives pertaining to the executive order will be directed by the Chief and addressed at a later date.Presidential executive orders pertaining to national forests are managed by the Secretary and are beyond the scope of the Tarleton IRP. Any goals and objectives pertaining to the executive order will be directed by the Chief and addressed at a later date.<br><br>EOs are considered during the analysis process, to ensure consistency with applicable law, regulation, and policy. | Y |
| 21 | A more accurate purpose and need statement would promote exploration of other forest management prescriptions that could better implement the Forest Plan, better avoid significant impacts on scenic and cultural resources and mature forests, and better support wildlife. A more accurate purpose and need statement would also promote detailed evaluations of current natural and cultural resources lacking in the current 2022 DEA, and other reasonable alternatives. | 12 | | NEPA | The purpose and need does not promote or suggest any one action to meet project goals and objectives, it simply states the need for action and compares current conditions with desired future conditions. The treatments proposed in the proposed action section of the DEA would best meet the habitat managment goals and objectives for the area. By incorporating project specific design features, Forest Plan S&G's, and national core and state BMP's, no resource would be significantly affected by the proposed activities. No reasonable alternatives have been brought forward thus far. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 22 | For the proposed Project, the Forest Service issued a 2022 DEA and Preliminary Finding of No Significant Impact. An Environmental Assessment must include a "brief discussion[ ]" of reasonable alternatives to the proposed action. Myersville Citizens for a Rural Cmty., Inc. v. FERC, 783 F.3d 1301, 1323 (D.C. Cir. 2015) (quoting 40 C.F.R. § 1508.9(b)). "An alternative is reasonable if it is objectively feasible as well as 'reasonable in light of [the agency's] objectives.'" Id. (quoting Theodore Roosevelt Conservation P'ship v. Salazar, 661 F.3d 66, 72 (D.C. Cir. 2011)). Although the obligation to consider reasonable alternatives in an EA is a lesser one than in an EIS, the obligation nevertheless exists. See Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs, 470 F. Supp. 2d 30, 62 (D.N.H. 2007) (Woodcock, J.) (quoting Native Ecosystems Council v. U.S. States Forest Serv., 428 F.3d 1233, 1246 (9th Cir. 2005)). The 2022 DEA fails to even meet its lesser obligation for an alternatives analysis under an EA for several reasons. | 12 | | Alternatives | No reasonable alternatives have been brought forward at this time. 36 CFR 220.7 (b)(2)(i) states: "When there are no unresolved conflicts concerning alternative uses of available resources (NEPA, section 102(2)(E)), the EA need only analyze the proposed action and proceed without consideration of additional alternatives.". No unresolved conflicts have been brought forward at this time. | Y |
| 23 | First, the Forest Service in the EA only included a discussion of the proposed Project. Rather than discuss any number of reasonable alternatives to the Project, including a No Action alternative, the Forest Service chose to add to its updated EA a section called "Consequences of No Action." 2022 DEA at 7–8. This is not the equivalent to a No Action Alternative, which is the bare minimum alternative analysis an agency should undertake. One of the most critical purposes of a No Action alternative is to establish a baseline against which the proposed Project can be measured. In framing the "no action" discussion in the way that it did, the Forest Service made no attempt to establish such a baseline. | 12 | | Alternatives | 36 CFR 220.7 (b)(2)(ii) states: "The EA may document consideration of a no-action alternative through the effects analysis by contrasting the impacts of the proposed action and any alternative(s) with the current condition and expected future condition if the proposed action were not implemented." Documenting consideration of a no-action alternative is not required for an EA under NEPA. The line officer has discretion to include a no action alternative, if needed or wanted to assist in the decision-making process. The line officer, in this case, has not chosen to include one. | Y |
| 24 | By labeling its analysis as "Consequences," the Forest Service inappropriately put a qualitative thumb on the scale against that outcome. The negative connotation of the "Consequences" label was reinforced by the Forest Service's discussion, which was not an analysis, but rather a list of potential detrimental effects of not moving forward with the Project. But NEPA requires agencies consider both the detriments and benefits of proposed projects, which would include considering the benefits of reasonable alternatives as well. There are numerous benefits of not moving ahead with the Project (i.e., taking No Action), including, but not limited to, climate benefits of retaining older, mature trees, habitat benefits for the Northern Long-eared Bat and other species that benefit from mature or interior forests or are sensitive to harvest impacts, avoiding potential detrimental impacts to water quality due to runoff, sedimentation, and potential herbicide contamination, avoiding loss or damage to historic and cultural resources located within the project area, avoiding visual impacts to the recreating public, and potential violation of Forest Plan standards to maintain very high visual quality standards for MA 8.3 (Appalachian Trail) lands, among many others. Accordingly, the Forest Service cannot rationally claim the "Consequences" section of the 2022 DEA is an analysis of a no-action alternative. | 12, 13 | | Alternatives | The Forest Service makes no claim that the Consequences of No Action (CONA) section is equivalent to an analysis of a no-action alternative as the commenter suggest. The CONA describes what will happen if the project is not implemented and provides a contrast with the proposed action. The HMU rationale document, which will be made available with the final EA, includes additional detail on existing conditions. This information provides a reasonable baseline for contrast against the proposed action. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 25 | Second, even if the "Consequences of No Action" is considered the equivalent to a No Action Alternative, the Forest Service's consideration of alternatives is still insufficient. CEQ regulations mandate that federal agencies "shall to the fullest extent possible . . . [u]se the NEPAprocess to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 C.F.R. § 1500.2(e) (emphasis added). It is also incumbent upon federal agencies to "[s]tudy, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." Id. § 1501.2(c); see also 42 U.S.C. § 4332(2)(E). Given the many different facets of the Project and the broad primary purpose articulated in the 2022 DEA—"to implement the management direction in the Forest Plan by comparing the existing conditions in the project area with the desired conditions as established in the Forest Plan"—it is inconceivable that there was only one way to achieve that purpose. This is especially true for the logging portions of the Project. While reasonable alternatives may not be available for certain recreational enhancement portions of the Project (for example, improvements to the Lake Katherine boat launch), the logging activities are different in kind. The sheer number of different silviculture prescriptions for the proposed action demonstrates that even if logging is needed—which Standing Trees asserts it is not—there is a wide variability in how the logging can achieve desired conditions. This variability necessarily implies additional reasonable alternatives exist that the Forest Service either did not identify, or, at a minimum, did not consider. | 13 | A recent case in the federal district court in New Hampshire is instructive on this issue. In Conservation L. Found. v. U.S. Army Corps of Eng'rs, 457 F. Supp. 3d 33 (D.N.H. 2019), a recent preliminary injunction opinion regarding the range of alternatives considered in an EA, the Court emphasized 40 C.F.R. § 1502.14, quoting from the regulation | Alternatives | The commenter does not suggest a reasonable alternative to the proposed action. See response to comment #21. | Y |
| 26 | The Forest Service did not analyze any alternatives to the Project, much less provide any rationale, quantitative or otherwise, for why it rejected them. To be sure, numerous reasonable alternatives exist – alternatives apparent to the agency and the public alike – and the Forest Service could have analyzed any of them, but failed to do so. Below, Standing Trees provides suggested reasonable alternatives the Forest Service could and should have considered. As stated elsewhere in this comment, to the extent the Forest Service intends to move forward with the Project, it must complete an Environmental Impact Statement, and as part of that EIS, it must consider all reasonable alternatives, including a true no-action alternative. | 14 | | Alternatives | See response to comment #23 and C/R #19 in CARA. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 27 | In addition to a No Action alternative, the Lake Tarleton Coalition suggests the following as one of several possible combinations of project components: Alternative 3. Combine improvements to recreation resources with small-scale habitat restoration and a Forest Plan amendment designating the Lake Tarleton-Webster Slide Scenic Area while omitting the unnecessary harvest and treatment activities included in the current proposed action. In this alternative, the WMNF could consider small-scale habitat restoration and recreation improvements including: oNatural woody debris inputs into Lake Katherine to improve fish habitat; oRestoration of natural buffer along the shore of Lake Katherine through removal of non-native species, tree planting, etc.; oRestoration of historic apple orchards; oRestoration of non-native tree plantations on former Mt. Sentinel State Forest if and where project goals do not conflict with standards and guidelines for MA 8.3 (Appalachian National Scenic Trail); oConduct a narrowly-focused, geographically-explicit Forest Plan amendment to designate the Lake Tarleton-Webster Slide Scenic Area according to WMNF Plan Management Area 8.5. Like the nine other Scenic Areas on the WMNF, this one would be managed to prohibit timber management, maintain outstanding scenic integrity, and promote well-managed, low-impact recreation in balance with protection of the Appalachian Trail corridor and cultural and natural resources including archaeological sites, fish and wildlife, and water quality. | 14 | | Alternatives | 40 CFR 1508.1 (z) defines a reasonable alternative as "a reasonable range of alternatives that are technically and economically feasible, and meet the purpose and need for the proposed action." This is not considered a reasonable alternative that meets the purpose and need for the project, and a forest plan amendment to change the designated MA is considered beyond the scope of the Tarleton IRP. | Y |
| 28 | A process to consider alternatives for the Lake Tarleton acquisition other than the current Management Area allocations should have taken place during revision of the 2005 WMNF Plan. However, to the best of our knowledge, this analysis never occurred. All four alternatives considered in the 2005 Forest Plan Final EIS contain identical Management Area allocations for Lake Tarleton and surrounding lands. This is difficult to comprehend, considering how recently the 5,300 acres surrounding Lake Tarleton had been acquired, and how clear the intent was to put this landscape into management for outstanding scenic integrity. | 14, 15 | | Alternatives | Forest plan revision is beyond the scope of the Tarleton IRP. | Y |
| 29 | Further, according to Ch. 70 of the 1992 Directives for the 1982 Planning Rule, the forest block stretching from Lake Tarleton to Webster Slide and Wachipauka Pond should have been identified as an Inventoried Roadless Area and evaluated for its potential for wilderness designation by Congress. | 15 | Forest Service Handbook 1909.12, Chapter 70 | Roadless | The WMNF forest plan roadless inventory was comprehensive and inclusive of all lands managed by the WMNF at the timeof forest plan revision. The forest plan EIS used the best available science, and included a robust public involvement process. The public was provided ample opportunity during the revision process to comment on the proposed forest plan, including proposed management area designations. All comments were considered and documented in the record. The sole purpose of the forest plan inventory was to consider areas recommended to Congress for wilderness designation. Lands not recommended for wilderness designation were assigned to other (not 9.1) management areas and are currently managed consistent with MA direction. The question of potential wilderness designation is outside the scope of the current project; potential wilderness designation will be considered during forest plan revision. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 30 | The Tarleton IRP presents an opportunity to modify the 2005 WMNF Plan to match the reasons why Lake Tarleton was protected. Scenic Areas on the White Mountain National Forest include Gibbs Brook, Greeley Ponds, Lafayette Brook, Lincoln Woods, Mount Chocorua, Pinkham Notch, Rocky Gorge, Sawyer Pond, and Snyder Brook. All of these are located east of I-93. As recreational focal-points, Scenic Areas are important economic drivers for nearby communities. Lake Tarleton and Webster Slide are located along the Appalachian Trail corridor at the westernmost end of the White Mountain National Forest. Although this is a relatively quiet region of the WMNF, it is within a short distance of the Hanover/White River Junction area, and the most easily-accessed portion of the WMNF from points south along I-91, including large metropolitan areas in western Massachusetts and central Connecticut. Scenic Areas are underrepresented in the western WMNF, a situation that can easily be corrected with a Forest Plan amendment. | 15 | | Forest Plan | See response to comment #27. | Y |
| 32 | On March 23, 2022, the USFWS announced a proposed rule to reclassify the northern long-eared bat from threatened to endangered and remove the bat's species-specific 4(d) rule. Endangered Species Status for Northern Long-Eared Bat, 87 Fed. Reg. 16,442 (March 23, 2022). Exhibit 7. Even though the 2022 Draft EA was released after the proposed up-listing of the Northern Long-Eared Bat and removal of the 4(d) rule, the Draft EA does not address this significant event. This status change is new information that requires both re-initiation of ESA Section 7 consultation between the Forest Service and USFWS, and an EIS. | 17 | | Bats | The uplisting of the NLEB from Threatened to Endangered was addressed in the Final EA and Biological Evaluation. The Forest Service reinitiated consultation with the USFWS in August 2022. Any reasonable and prudent measures and term and conditions listed in the Biological Opinion from USFWS published on March 31, 2023 will be adhered to for the Tarleton IRP. | Y |
| 33 | The Biological Evaluation for the Project acknowledged that "project activities may affect the Northern Long-eared Bat," but concluded that "[a]ny taking that may occur incidental to this project is not prohibited under the final 4(d) rule." USDAFOREST SERV.,TARLETON INTEGRATED RESOURCE PROJECT BIOLOGICAL EVALUATION, at 10 (February 2021) (hereinafter "BE") . The Northern Long-eared Bat occurs throughout the project area, and the BE observed that timber harvests could impact the species by removal of roost trees. BE at 10. However, the BE concluded that the Project's actions would not violate the ESA in regards to the Northern Long-eared Bat because they would be shielded by the 4(d) Rule. But the up-listing of the bat, if finalized, will remove its species-specific 4(d) Rule and make all take of the bat unlawful. 87 Fed. Reg. 16,442. The BE suggests that at least some bats may be taken, especially under its cumulative impacts analysis, but the Forest Service has never evaluated the impacts of such take on the species in the absence of the 4(d) Rule. The proposed up-listing and removal of the 4(d) rule is thus new information that warrants re-initiation of consultation. | 17 | | Bats | See C/R #79 in CARA. | Y |
| 34 | Northern Long-eared Bat habitat requirements are the opposite of the type of habitat that will be generated from the Project. According to the USFWS Species Status Assessment Report for the Northern Long-eared Bat ("NLEB Report"), dated March 22, 2022, the bat depends on mature and old forests for roosting and foraging. Preferred roosting habitat is large diameter live or dead trees of a variety of species, with exfoliating bark, cavities, or crevices. Bats change roosts approximately every two days. Preferred foraging habitat is old forest with complex vertical structure on hillsides and ridges. The WMNF, including the Lake Tarleton project area, contains extensive mature forests that are beginning to acquire the characteristics of an old forest, likely providing some of the highest-quality Northern Long-eared Bat habitat in New England. Some of the silviculture treatment prescriptions involve the removal of mature trees. 4 In combination with recently-approved projects (including Bowen Brook Integrated Resource Project, Deer Ridge Integrated Resource Project, Wanosha Integrated Resource Project, and others), and anticipated logging projects (including the Sandwich Vegetation Management Project and Peabody West Integrated Resource Project), WMNF is set to eliminate or degrade thousands of acres of Northern Long-eared Bat habitat across a large region. As discussed in further detail below, the Forest Service failed to evaluate the cumulative impact of these combined and geographically proximate projects. | 18 | | Bats | See C/R #79 in CARA. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 35 | Where "new circumstances or information" arise that are "relevant to environmental concerns and bear[] on the proposed action or its impacts," and "a major Federal action remains to occur," the agency must prepare supplemental NEPA documentation. 40 C.F.R. § 1502.9(d). See Marsh v. Or. Natural Resources Council, 490 U.S. 360, 374 (1989) (An agency must at least take a "hard look" at the environmental impacts of the planned action, even after a proposal has received initial approval). | 18 | | In regard to the uplisting of NLEB | See C/R #79 in CARA. | Y |
| 36 | The 2022 DEA gives woefully short shrift to the discussion of project impacts on historic and cultural resources. The DEA initially obfuscates this issue by failing to make clear whether historic and cultural resources even exist within the project area. The scant discussion of this resource merely indicates that "archeologists completed a cultural resource review" and "[n]o historic properties will be affected by the proposed project activities." 2022 DEA at 19. It is not made clear whether no properties will be affected because none exist in the project area, or whether they do exist, but the Service anticipates that potential impacts would be mitigated. This ambiguity persists until the DEA's subsequent mention of historic properties in its "significance" discussion that states "[a]s a result of project design, the project would not adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places." Id. at 24. Here, the reader must infer the existence of historic and cultural resources, but again, no details are provided regarding what resources are actually present in the project area. Further, no analysis is provided to explain how impacts to project-specific resources would be mitigated. The lack of any detail or analysis is yet another example of this DEA's failure to provide clear NEPA documentation to allow for public review and scrutiny. | 18, 19 | | Heritage | Project design features meant to avoid impacts to any cultural resources in the project area can be found in the Design Features table on pg. 16 of the DEA. | Y |
| 37 | To be certain, historic and cultural resources do exist within the project area, as known by local citizens, including members of the Lake Tarleton Coalition, and as documented by the recent Cultural Resource Reconnaissance Report ("CRRR") prepared for the Tarleton IRP. It is also possible that the project area may contain significant Abenaki resources that would have been discovered through more rigorous consultation and research. This document, which to our knowledge has still not been made available to the general public, reveals that the project area contains at least 29 known cultural resources, including 19th century farmstead sites, cellar holes, building foundations, wells, stone walls, historic roads, and pre-contact lithic scatter, among others. CRRR at 4. That same document concluded that the project had potential to directly impact these cultural resources. The failure of the Forest Service to even mention these resources in the DEA, much less analyze potential impacts and actually explain how direct impacts may be avoided is so egregious it almost appears to intentionally mislead the public regarding cultural resources in the project area. | 19 | | Heritage | See response to comment #36. Cultural resource locations are considered confidential due to concerns of vandalism, theft, etc, and are not publicly available (36 CFR 296.18 - Protection of Archaeological Resources: Uniform Regulations, Confidentiality of archaeological resource information, 36 CFR 800.11(c) - Protection of Historic Properties), and are exempt from the Freedom of information Act (FOIA GUIDE, 2004 EDITION: EXEMPTION 3, United States Department of Justice). This project is consistent with section 106 of NHPA. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 38 | Standing Trees was only able to obtain a copy of this report through a FOIA request submitted by one of its members. Members of the public should not be required to submit FOIA requests in order to view project documents. The Tarleton IRP Cultural Reconnaissance Report was decidedly prepared to evaluate the Tarleton IRP, and as such, it should be considered part of the Project Record. The DEA states that "the project record is incorporated by reference and contains all relevant data, methods, analyses, references, and other technical documentation used in this assessment." 2022 DEA at 18. Firstly, this general incorporation does not fulfill NEPA's requirement that "incorporated material shall be cited in the statement and its content briefly described[,]" 40 C.F.R. § 1502.21, and thus the project record is not properly incorporated by reference. Secondly, even if it was properly incorporated, "[n]o material may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment." The Cultural Resources Reconnaissance Report was not reasonably available for inspection during the comment period because the only reason it was available for review is because a member of Standing Trees had the forethought to request this report months prior to the opening of the comment period. Had they not done so, Standing Trees may not have even been made aware of this report and its ability to review this document and fully participate in the public comment process would have been prejudiced. | 19 | | In regard to the CRRR | Cultural resource information is considered confidential due to the fragility of cultural resource sites and concerns about vandalism, theft, etc. Due to the amount of cultural resource information contained in a Cultural Resources Reconnaissance Report, it is not considered a publicly available document. See response to comment #37. | Y |
| 39 | On the global scale, forest protection represents approximately half or more of the climate change mitigation needed to hold temperature rise to 1.5 degrees Celsius. New Hampshire may be a relatively small state, but its temperate deciduous forests are among the planet's most effective carbon sinks. In the US, New England's in-situ carbon storage potential is second only to that of the Pacific Northwest, but carbon storage levels remain artificially low due to timber harvest frequency and intensity. Across the Northeast US and Upper Midwest, timber harvest accounts for 86% of annual forest carbon loss. In comparison only 9% of forest carbon in the same geographic area is lost annually from insect damage, and 3% from conversion to other land uses. Other recent studies show that among land uses in New England, timber harvest is the leading cause of tree mortality and has the greatest impact on aboveground carbon storage. | 20 | | Climate Change | See C/R #63 in CARA. | Y |
| 40 | The Tarleton IRP DEA climate analysis rests on suggestions that the project "might contribute an extremely small quantity of greenhouse gas emissions relative to national and global emissions," that the project "would not convert forest land to other non-forest uses," and that the "prescribed treatments" are the best way to increase climate resilience and age diversity within the forest. The EA claims that we should be most afraid of "mortality-inducing natural disturbances and other processes resulting in dead trees." All of these claims are easily refuted in the recent papers cited and quoted above, and yet this information is ignored in the DEA and supporting materials. Either the Forest Service is cherry picking the science it wishes to use, or it has failed to take a hard look at climate change and climate resilience as they related to the White Mountain National Forest and the Tarleton IRP. | 23 | | Climate Change | See C/R #63 in CARA. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 41 | The DEA fails to take a hard look at impacts to water quality, both within the context of the project area and at a broader basin or watershed scale. The Forest Service has assured Standing Trees that with the exception of soils, wildlife, and botany, all other specialists "wrote directly into the EA." Based on the scant 3-sentence "analysis" of environmental impacts to Hydrology, it is unclear whether a specialist was engaged to review impacts to this resource at all. This section contains zero analysis, instead consisting of three conclusory statements regarding impacts to water quality. Potential impacts to water quality are not even identified, yet are summarily dismissed as being preemptively mitigated. It is impossible for the public to evaluate or weigh in on the adequacy of the agency's analysis here, because there is nothing to evaluate. This section should, at a minimum, address erosion, run-off, sedimentation, loss of stream shading, and the potential impacts of, and specific mitigation for, harvest activities. The same can be said for anticipated management needed to place the proposed woody debris into Lake Katherine, the changes to hydrology resulting from the proposed forested buffer between the wildlife opening and Lake Katherine, and the expansion of the Lake Katherine parking lot. | 24 | | Water Quality | See C/R # 34 in CARA. Design features regarding water resources that will be incorporated during implementation can be found on pgs. 16-17 of the DEA. | Y |
| 42 | In contrast, the DEA had no trouble mentioning the potential issue of sedimentation and impacts to water quality when describing the alleged perils of not undertaking the project. In that section, the DEA alludes to the fact that current conditions, for Lake Katherine at least, involve "poor water quality overall." Why is this baseline condition not mentioned within the "Hydrology" discussion? Was it taken into account when the DEA proclaimed that project activities would not impact water quality? What is the current status of the water quality within Lake Tarleton and its tributaries? In fact, although the DEA makes no mention of it, Lake Tarleton, Lake Katherine, and Lake Armington are known to have exceptional water quality. All three are free of aquatic invasive species. Lake Armington served as one of only two reference lakes, statewide, for a 2020 New Hampshire study on PFAS contamination in fish, surface water, and sediment. This should have all been discussed, or at least mentioned, in the discussion of the project's environmental impacts. | 24 | | Water Quality | The Consequences of No Action section referenced will be edited in preperation of Final EA publishing. No measurable effects to Lake Tarleton, Katherine, and Armington are aniticipated due to project activities. | Y |
| 43 | Pursuant to NEPA's "hard look" mandate, an agency must rely on adequate baseline data that enables the agency to carefully consider information about direct environmental impacts and may not rely on outdated data to do so. Indeed, "establishing appropriate baseline conditions is critical to any NEPA analysis," because without establishing a baseline, "there is simply no way to determine what effect the [project] will have on the environment and, consequently, no way to comply with NEPA." It is unclear if baseline data was even gathered for use in the DEA's analysis, because no analysis was presented. | 24 | | Baseline Conditons | See response to comment #11. | Y |
| 44 | The WMNF Plan forest-wide guideline for vegetation management G-1 requires that "[n]o more than 15 percent of the area of watersheds of first and second order perennial streams should be treated with even-age regeneration methods in a five year period." The DEA makes no mention of this standard, either in the Hydrology discussion or within its cumulative impacts discussion. Eastman Brook, both a tributary and outflow of Lake Tarleton, is one such stream. Did the Forest Service determine what percent of the watershed had been, or will be, treated with even-age (clear-cutting) methods? The DEA does not indicate this, and the public cannot be expected to complete this analysis for them in order to understand whether or not this standard is being followed. In addition, the DEA makes no mention of Eastman Brook being a 303(d) impaired water under the CWA. Surely this warrants a mention and attendant impact analysis. | 25 | | Basal Area | The NFMA requires the National Forests to create a Land Management Plan that guides all work conducted for each forest. Therefore it is inferred that all Forest Plan Standards and Guidelines must be followed, and do not need to be quoted in the EA. The WMNF Forest Plan is publicly available on the WMNF website and by request. Only 2.4% of the Eastman Brook watershed will be removed through harvesting activities proposed in the Tarleton IRP. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 45 | The DEA states that there will be field visits prior to project implementation "to refine treatment unit boundaries and acres including modifications to address on-site conditions[,] " including potentially "reduc[ing acres] to meet visual and water quality objectives, to incorporate reserve patches of uncut trees in final harvest stands, and to incorporate protective buffers around features such asvernal pools, cultural resources, nest trees, and riparian zones." Emphasis to this statement was clearly added to highlight the water-related resources, but for all resources mentioned, these on-site baseline conditions should have been identified prior to conducting the NEPA analysis. That information could and should have been used to describe the impacted environment, actually provide analysis of how these resources may be impacted, and describe how the agency might propose to address those impacts. | 25 | | Baseline Conditons | Although the Forest Service has conducted extensive site visits and stand exams within the project area, not all on-site conditions can be known. The purpose of including this statement is to clarify that, should on-site conditions warrant, forest plan guidance and project-specific direction (project design features) would be implemented as needed consistent with the project analysis and decision. Therefore, no further analysis is needed (i.e., conditions would ensure avoidance of previously undiscovered sensitive resources). | Y |
| 46 | It seems especially important that the treatment unit boundaries be defined prior to any implementation because of the potential for boundaries to stray into protected riparian areas. Specifically, the WMNF Plan forest-wide guideline G-1 for Riparian and Aquatic Habitats states that "[t]ree cutting and harvest should not occur within 25 feet of the bank of mapped perennial streams[.]" To our knowledge, no map of the project area was provided that shows both the location of Eastman Brook along with the harvest unit boundaries. However, by comparing the "Conceptual Planning Area Map" provided as part of the pre-scoping package with the Proposed Treatment Harvest Units map contained in the 2022 DEA at 27, it appears that unit boundaries for both clearcut and group selection logging come precipitously close to Eastman Brook. The 2022 DEA does not mention this guideline, nor does it make clear that these 25' buffers are integrated into the project design. Without this information, it is impossible to tell if this WMNF Plan guideline is being met, and further demonstrates the failure of the Forest Service to take a hard look at this matter. | 25 | | Unit Boundaries | The National Forest Management Act requires the Forest Service to follow Forest Plan direction for all management actions. Monitoring of management activities post-implementation have verified consistency with forest plan direction for all past timber harvests. Monitoring reports are available for public viewing on the wmnf website https://www.fs.usda.gov/detail/whitemountain/landmanagement/planning/?cid=stelprdb5187780. | Y |
| 47 | The DEA also fails to mention or analyze potential impacts of the addition of the boat launch to Lake Katherine. The installation of the boat launch will invite additional use, and the risk of introduction of aquatic invasive species will commensurately be raised. In addition to failing to take a "hard look" at these direct and indirect impacts, as discussed below, the Forest Service also ignored the cumulative effects of these reasonably foreseeable impacts. | 26 | | Invasive Species | Minimizing the chance of introducing aquatic invasive species to Lake Katherine due to project activities will be conducted by the following disclosed in the EA: "Install a boat launch designed for hand-launched watercraft (e.g., canoes, kayaks, paddleboards)" (proposed action, pg. 15), "Install a site kiosk and other standard site signage" (proposed action, pg. 15), "The WMNF will explore options with local organizations for opportunities for a Lake Host program at Lake Katherine to minimize spread of aquatic NNIS." (design features table, pg. 17). The WMNF also disclosed a detrimental effect on soil productivity due to the Lake Katherine boat launch redesign on pg. 20 of the DEA. | Y |
| 48 | One of the 2022 DEA's few additions was a description of types and methods of herbicide use to the "botany resource design features." The addition of this information indicates that the project will involve the use of herbicide treatments, but other than listing these "design features," herbicides and their potential impacts to water resources (or any resources for that matter) are not mentioned anywhere in the DEA. The Forest Service must complete adequate analysis of the impacts to water quality and hydrology, at a minimum, at the watershed scale, since water quality impacts may compound as water from brooks, rivers, and streams meet and intermix. | 26 | | Herbicide | Potential effects to resources due to NNIS management activities have already been disclosed in the Forest-wide NNIS EA from 2007 (cited under NNIS design feature 1 on pg. 17 of the DEA). | Y |
| 49 | The WMNF makes no attempt to assess potential impacts to the aforementioned long-running businesses dependent upon the unique scenery and recreational opportunities afforded by Lake Tarleton. | 26 | | Scenery, Socioeconomics | Potential effects to scenery are considered in the EA (pg. 20). To the extent that timber harvest may impact the user experience at Lake Tarleton, those impacts are considered in the Recreation section (pg. 20). More broadly, socioeconomic impacts associated with general forest management were considered at the forest plan level and are outside the scope of this analysis. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 50 | Nor does the WMNF assess potential impacts on the public's ability to enjoy long-established recreational resources in the project area, with the exception of a brief review of possible impacts to the Appalachian Trail. | 26 | | Recreation | Effects to recreation can be found on pg. 19 of the DEA. See C/R #'s 25, 89, 91, 92, and 96 in CARA. | Y |
| 51 | The Tarleton DEA also only briefly considers the likelihood and impacts of illegal motorized use, including both wheeled and oversnow vehicles, in harvested areas and on improved roads and skid trails. | 26 | | Access | Part of the proposed action is to install gates at several locations in the project area. Currently there is no designation of Charleston road., part of the proposed action is the designate and gate the road. In addition, unauthorized activities are addressed via law enforcement actions. Because these activities are speculative (unpredictable), a reasonable assessment of potential effects is not required or possible. | Y |
| 52 | When the Trust for Public Land ("TPL") unveiled its proposal to protect Lake Tarleton to the Piermont and Warren, NH Selectboards, to the general public, and to donors, TPL was clear in its vision and expectations for White Mountain National Forest management. As noted in the introduction, A September 5, 2001 article in the Bradford Opinion Journal reported TPL's goal to "protect and conserve the 'wilderness' quality of the Lake Tarleton area, stressing low impact recreational activities." While the 2022 DEA makes passing reference to some of these recreational activities, some are ignored entirely, and those that do make the cut are quickly dismissed as not being negatively impacted, or at least for not long. For example, despite concerns raised by birdwatchers and enthusiasts during previous comment periods, no analysis or discussion is provided addressing impacts to bird population, diversity, or distribution resulting from the proposed logging activities. | 26, 27 | | Birds | See C/R #105 in CARA. | Y |
| 53 | There is also no discussion of the project's potential to displace recreational use of the area. In the Socioeconomics section of the DEA, it states: "As described in the Recreation section, timber harvest and other construction activities during project implementation may affect levels of recreational use by displacing users due to noise or physical disturbance." 2022 DEA at 20. However, the Recreation section does not discuss or even mention potential displacement; instead, it merely states that "[p]otential noise impacts to hikers . . . would be minimized[.]" Id. at 19. If the Forest Service believes that recreationists will be displaced as a result of the project, it should actually address those potential impacts. | 27 | | Recreation | The recreation and socioeconomic sections will be revised prior to final EA publishing. | Y |
| 54 | Another primary concern, only given scant attention in the DEA, is the issue of impacts to the Appalachian Trail. The Appalachian Trail travels through the Project area in two separate places. 2022 DEA at 26 (Figure 1). The proposed Project activities occur within two Forest Management Areas—MA 8.3, which is Appalachian National Scenic Trail (Appalachian Trail), and MA 2.1, which is General Forest Management. Id. at 5. Despite the close proximity of the iconic Appalachian Trail, there is little analysis of impacts to that resource and the multitude of hikers that use and enjoy it. | 27 | | Appalachian Trail | Six points along the AT were analyzed for visual effects, which were disclosed on pg. 20 of the DEA. The foreground of the AT was determined during a Fall 2022 field visit and disclosed in the Final EA. No timber harvesting will occur in the foreground of the AT corridor. | Y |
| 55 | Even though the Appalachian Trail is managed in conjunction with the National Park Service (NPS), there is no indication in the 2022 DEA that the Forest Service consulted with NPS. Nor is there any indication that the Forest Service consulted with the Appalachian Trail Conservancy, the Appalachian Mountain Club, or the Dartmouth Outing Club, as required by the WMNF Plan MA 8.3 standard S-2, for when management actions affect AT values. All of these groups are conspicuously absent from the list of "Agencies or Persons Consulted" in the 2022 DEA. | 27 | | Agencies Consulted | All organizations listed by the commenter were included on the mailing list for the entirety of the project. The WMNF works closely with ATC for all projects that occur along the AT corridor. Members of ATC were present during the open house held in Warren in November 2019. Chapter 4 will be updated prior to Final EA publishing. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 56 | For MA 8.3, the Forest Plan sets forth Desired Conditions including emphasizing “a remote backcountry recreation experience in a predominantly natural or natural-appearing landscape.” Even though the purported purpose of the Project is “to implement the management direction in the Forest Plan,” there is no mention in the 2022 DEA as to how the Project will support this desired condition. To the contrary, the project activities—specifically, the clear-cuts and overstory removal—will alter the landscape to make it less natural or natural-appearing. And while the logging is occurring, it will detract from any sense of “a remote backcountry recreation experience” along those portions of the Appalachian Trail. | 27 | | Appalachian Trail | As the commenter quotes on pg. 28 of the pdf comment he submitted, Forest Plan 3-53 G-1 states: "Where the AT management area adjoins MA 2.1, commercial timber management and salvage operations are allowed in that portion of the Appalachian Trail MA between the trail footpath and the 2.1 Management Area, but only outside the foreground area as defined in the Scenery Management System (SMS). The foreground zone is determined by site-specific analysis of the area as seen from the AT. Everywhere else in the AT management area, commercial timber management and salvage sales are prohibited." Project activities comply with forest plan standards and guidelines related to the AT corridor. The scenery analysis concluded that any visual impact from the AT will be unnoticable to minor, which the ATC concurred with (C/R #56 in CARA). Foreground determination will be added to the scenery section of the EA. | Y |
| 57 | MA 8.3 (the Appalachian Trail management area) “adjoins” MA 2.1. 2022 D EA at 5 (stating that the project activities will occur within management areas MA 2.1 and 8.3).31 Thus, commercial timber management is prohibited in MA 8.3 unless it occurs between the trail footpath and MA 2.1, but “only outside the foreground area as defined in the Scenery Management System” The 2022 DEA does not define or establish the foreground zone—which is supposed to be determined by a site-specific analysis—and therefore there is no way to understand whether or not the project activities are complying with this condition of the Forest Plan. | 28 | | Appalachian Trail | The foreground for the AT in the Sentinel Mountain area was determined during a field visit in July 2020 to be 200 feet. For the length of the AT that stretches from north and south of Mt. Mist, field data was collected and analyzed by the WMNF landscape architect, and the foreground determination will be added to the scenery effects section of the EA. | Y |
| 58 | The DEA claims that the project is consistent with Forest Plan standards and guidelines for scenery management, but does not even cite to or mention the separate standards that apply to the two management areas located within the project boundary. It is difficult for the public to meaningfully comment on visual impacts and the Service’s analysis thereof, when they are not even told what standards the project allegedly meets, nor given any analysis explaining why the standards are met. | 29 | | Scenery | The forest plan is available on the WMNF website for public viewing at any time. | Y |
| 59 | Because the AT is a Concern Level 1 travelway, on MA 2.1 lands visible from the trail “no more than 9 percent of the acreage within the view should be treated with regeneration vegetation management activities within a 30 year period. . . [and t]otal area affected during any one entry period with new regeneration treatment should not exceed 4 percent of the acreage.” Did the Forest Service analyze the amount of acreage within the view that would be impacted by these management activities to confirm that this standard was being met? How many acres, if any, had already been impacted within the last 30 years? If this analysis was done, why did the Service not show its work by simply including this information in the DEA? | 29 | | Scenery | The data requested will be published in a specialist report with the Final EA. | Y |
| 60 | It is not clear how the proposed project, which includes approximately 120 acres of large clear-cuts, some of which will be done relatively close to the AT itself, will meet the “high” to “very high” Scenic Integrity Objectives assigned to views from MA 8.3 lands. Very High scenic integrity is characterized as “unaltered” and “refers to landscapes where the valued landscape character ‘is’ intact with only minute if any deviations. The existing landscape character and sense of place is expressed at the highest possible level.” USDA FOREST SERV.,LANDSCAPE AESTHETICS:A HANDBOOK FOR SCENERY MANAGEMENT at 2-4 (1995) (Exhibit 36). High scenic integrity is characterized by appearing unaltered and “refers to landscapes where the valued landscape ‘appears’ intact. Deviations may be present but must repeat the form, line, color, texture, and pattern common to the landscape character so completely and at such scale that they are not evident.” | 30 | | Scenery | The data requested will be published in a specialist report with the Final EA. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 61 | The 2022 DEA claims that a "scenery analysis" was done, but aside from identifying the nine viewpoints used, it does not describe the methodology for the analysis.Id. It also does not explain how or why the nine particular viewpoints were chosen versus other potential viewpoints. Even with the vague description of the scenery analysis, the Forest Service acknowledges that "[s]ome visual impacts from the proposal can be expected," id., however, the agency never measures those expected impacts against the Forest Plan standard that requires all management activities meet a High or Very High Scenery Integrity Objective. The 2022 DEA also states that the visual impacts will "fade and blend over time as the forest regenerates." This statement may mislead the public to believe that visual impacts will be short-lived, but the Service itself admits that the impacts of its suggested logging "is on the order of decades to centuries because that is how long it can take for forested stands" to return to pre-harvest condition. BE at 8. | 30 | | Scenery | A scenery specialist report will be published along with the Final EA. The high or very high scenery integrity objective is only required in MA 8.3 land which encompasses a small percentage of the project area. | Y |
| 62 | Even if the existing scenery impacts analysis was sufficient, which Standing Trees contests, the DEA failed to evaluate scenic impacts as viewed from, Piermont Mountain, just across the lake from the proposed action, and which hosts a popular hiking trail and scenic views facing the project area. Piermont Mountain is the most prominent open summit overlooking the forest surrounding Lake Tarleton, with a popular trail that is highly prized and utilized by members of the local community, including Kingswood Camp and Camp Walt Whitman, also located in the area. Despite the obvious reasons for assessing visual impacts from this viewpoint, the WMNF failed to conduct this analysis. | 30 | | Scenery | See C/R #64 in CARA. | Y |
| 63 | The DEA focuses its discussion of socioeconomic impacts on the displacement of recreational opportunities, and concludes that "socioeconomic changes to the local communities are expected to be negligible." 2022 DEA at 20. The analysis of this impact is insufficient in one of two ways. Either (1) the Forest Service entirely neglected to analyze socioeconomic impacts flowing from the supposed "sustainable yield of high-quality timber products to support local economies and communities, in which case it failed to take a hard look at socioeconomic impacts; or (2) it did analyze these impacts, but concluded that these supposed benefits, in fact, were expected to be negligible, in which case the economic benefit of the proposed logging cannot be used to justify the project's implementation. | 30, 31 | | Socioeconomics | Socioeconomic impacts are expected to be negligible however the timber harvesting is justified because it is needed to accomplish the goals and objectives described in the Purpose and Need. The environmental analysis process considers potential socioeconomic impacts associated with the project. Additionally, the Proposed Action would help move the forest toward desired conditions, which provide non-monetary benefits and cannot be captured in an economic efficiency analysis. The question of operating budgets alone is beyond the scope of this project, and overall forest management was addressed at the Forest Plan level. | Y |
| 64 | While the DEA gives more attention to its discussion of impacts to Soils than to most of the other identified resources, it still fails to provide adequate discussion and clarity surrounding impacts to this resource. The section repeatedly mentions "non-detrimental soil disturbance" in relation to meeting Forest Service Soil Quality Standards, but the referenced guidance does not in fact include that term at all. (USDA FSM Supplement R9 RO 225-2012-1). Instead, it merely identifies types of soil disturbance, without categorizing them as detrimental or non-detrimental. It is unclear where this term came from, and its repeated use in the DEA belies the actual potential impacts to the project area, which the Soils Specialist Report concluded may include soil disturbance on up to 20% of the project area. | 31 | | Soil | The Forest Soil Disturbance Monitoring Protocol is used to monitor forest sites before and after ground disturbing management activities for physical attributes that could influence site resilience and long-term sustainability. Monitoring points are randomly generated within a project area and are given a disturbance class to determine is there is detrimental soil disturbance. Detrimental soil disturbance is generally defined as potentially plant growth limiting. https://www.fs.usda.gov/treesearch/pubs/34427 | Y |
| 65 | The only "detrimental" soil impact that the DEA admits to, the impact of expanding the Lake Katherine parking lot, is ostensibly justified by pointing to the fact that the WMNF Plan FEIS (not even the plan itself) "allowed up to a certain amount of new construction to be built within the life of the plan and based on current monitoring the forest has yet to meet that threshold." This "certain amount" is not identified, nor is the unspecified "threshold." These ambiguous references and unsupported conclusions do not meet the Service's obligation to take a hard look at impacts, nor to provide the public with clear NEPA documentation. If the Service has truly been monitoring the amount of construction encompassed within this allocation, why is it not simply listed in the DEA? | 31 | | Soil | The total impact on soils caused by the Lake Katherine parking area improvements is less than one acre (EA, pg. 19). When considering the total project area this acreage is considered insignificant. | Y |
| 66 | The Tarleton IRP uses outdated science and misinterprets the concept of habitat diversity to justify extensive logging totaling 880 acres, nearly half of which is slated to be even-aged management. | 31 | | Proposed Action | See C/R #69 in CARA. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 67 | the Tarleton IRP fails to explain how proposed logging will comply with Forest Plan standards and prohibitions, as well as President Biden's Executive Order 14072, Strengthening the Nation's Forests, Communities, and Local Economies. | 31 | | Executive Orders | The project is being conducted to meet the goals and objectives list in Chapter 1 of the forest plan and the HMU rationale document, which will be published along with the final EA. See C/R #24 in CARA. | Y |
| 68 | To date, the Forest Service, including the White Mountain National Forest, has not revealed how it intends to implement EO 14008. | 33 | | Executive Orders | See C/R #24 in CARA. | Y |
| 69 | The 2022 DEA states that its vegetation management goals include creation of "small and large openings in the forest" to "improve wildlife habitat diversity," as well as "discouraging beech regeneration." The DEA suggests that "an analysis of the current habitat conditions indicates that the Tarleton [Habitat Management Unit ("HMU")] is not meeting the MA 2.1 Habitat Composition and Age Class Objectives" outlined in the 2005 WMNF Plan. However, the DEA fails to include any description of this supposed analysis, and it is unclear that the WMNF has sound information about stand ages classes in the Tarleton HMU. Despite repeated requests, the WMNF has failed to produce a stand age class map or detailed records of past harvest activity. Nor does the DEA contain an analysis of whether the age class objectives for regeneration and young age classes have already been met, forest-wide, in the 17 years since the signing of the WMNF Plan. Indeed, the Forest Plan expects that regeneration age-class objectives will be met by year 10 of the Forest Plan. | 33, 34 | | Habitat Conditions | Project area age class information will be included in the HMU rationale document that will be published with the final EA. Biennial monitoring reports contain the progress of meeting Forest Plan goals and objectives forest-wide, not individual project EAs. | Y |
| 70 | Which species does the Tarleton IRP stand to benefit most? Why does the Tarleton IRP seem to favor game species, which already exist in abundance elsewhere in New Hampshire? Why are interior and mature forest species devalued in the project area? | 34 | | Habitat Conditions | See C/R #70 in CARA. Management framework does not focus on any single wildlife species but rather an ecosystem approach for diversifying wildlife habitat overall. Project proposes management on a portion of MA 2.1 lands out of a total 5375 acres in the Tarleton HMU. | Y |
| 71 | Why does the WMNF plan to dramatically reduce the beech population, despite the fact that it is a critical wildlife food source and that it was historically the dominant species on this site? By removing all beech, how can we identify strains that are resistant to beech bark disease? | 34 | | Habitat Conditions | See C/R #85 in CARA. | Y |
| 72 | How should the public reconcile extensive areas of even-age management with the fact that such openings bear little resemblance to the natural disturbance regime of a Northern Hardwood forest? | 34 | | Habitat Conditions | The Forest Service conducts vegetation management based on stand boundaries that are alike in species and age class composition. | Y |
| 73 | The presence of a high-voltage powerline corridor through the project area raises another flaw in the analysis of existing forest age-classes, desired future conditions, and alternatives considered by the WMNF. The DEA mentions that "the powerline corridor is privately owned and managed for low-growing vegetation for safety purposes related to the powerline." However, the WMNF makes no attempt to describe the "low-growting vegetation" or its age, nor does it consider whether a Memorandum-of-Understanding could be reached with the electric utility company to manage the right-of-way to improve regeneration and young-age class forest habitat, thereby meeting Forest Plan objectives without the need for hundreds of acres of additional timber harvest. It is possible that certain age class objectives in the Forest Plan are already met in the Tarleton HMU if the powerline corridor is considered. In fact, upon completion of the Tarleton IRP, the WMNF may exceed the age class objectives in the Forest Plan for the Tarleton HMU by failing to consider the powerline corridor. | 34 | | Habitat Conditions | See C/R #66 in CARA. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 74 | The Tarleton IRP DEA fails to take a hard look at stand ages within the Tarleton Habitat Management Unit, and it similarly fails to identify whether there are any outstanding natural communities present within the project area. Without such analysis, it is impossible for the public to determine whether the WMNF can comply with at least two Forest Plan standards and prohibitions. Standard S-3 in WMNF Plan Ch 2-Forest-Wide Management Direction states that "Timber harvest is prohibited in old growth forest." Further, Guideline G-1 states that "Outstanding natural communities should be conserved." Old-growth is defined in the WMNF Plan as "Uneven-aged (three or more age classes) forest with an abundance of trees at least 200 years old, multiple canopy layers, large diameter snags and down logs, and a forest floor exhibiting pit-and-mound topography. There should be little or no evidence of past timber harvest or agriculture. Northern hardwood old growth consists primarily of sugar maple and American beech; softwood old growth is largely made up of spruce and hemlock. Stands need to be at least 10 acres in size to be identified as old growth. Anything smaller is a patch of old trees within a younger stand, not a habitat type in its own right." | 34 | | Habitat Conditions | Project area age class information will be included in the HMU rationale document that will be published with the final EA. | Y |
| 75 | The WMNF Plan further defines Mature Forest as "Stands in which the overstory is in the mature age class. Mature forest habitat is typically made up of trees that are eight inches or more in diameter. Mortality is just beginning in these stands, resulting in a few scattered canopy gaps and a small number of snags and cavities in the overstory. Most snags and down logs are small in diameter and within the intermediate or understory layers. Depending on site conditions, thinning and uneven-aged harvest methods can be used in this habitat without negatively impacting habitat quality. Some uneven-aged harvest may enhance vegetative and structural diversity" This definition clearly implies that even-aged management in mature forest may "negatively [impact] habitat quality." Despite this instruction to avoid even-aged management in mature forest habitat, the WMNF offers no explanation for how such negative impacts will be avoided or mitigated in the Tarleton IRP. | 35 | | Habitat Conditions | Even-age management is similar to uneven-aged management, just on a broader scale. Even-age management targets specific species that need abundant sunlight such as aspen, birch, oak ash, and cherry, and are beneficial for regeneration of these species. HMU rationale includes relevant age class information by habitat or composition type (pg. 5). The HMU rationale will be published with the Final EA. | Y |
| 76 | The WMNF Plan gives the forest a distinct advantage in meeting its NFMA and EO obligations by already clearly defining mature, old, and old-growth forests. However, to date, the WMNF has failed to clearly identify, inventory, and conserve mature, old, and old-growth forests in the case of the Tarleton HMU. Although we do not address the broader implications for WMNF management here, this failure to identify, inventory, and conserve mature, old, and old-growth forest may also extend across the entirety of the National Forest. Until detailed analysis is completed to comply with Forest Plan and EO requirements, the Tarleton IRP cannot legally proceed. | 36 | | Old Growth | This information is available in the HMU rationale which will be published along with the Final EA. | Y |
| 77 | Although "Transportation" and the need for a transportation analysis is included as one of the "needs" for the project, there is no analysis of transportation or the impacts of roads in the Environmental Impacts discussion. | 37 | | Transportation | Adopting the road infrastructure that exist in the project area is part of the proposal and the roads system would benefit from the project. Hauling will occur in winter during frozen ground conditions which would minimize compaction effects on the roads. | Y |
| 78 | The only discussion surrounding transportation is in the description of the proposed action, which states that "no new road construction or decommissioning is included under the Proposed Action," but then immediately notes that "system roads and log landings would be constructed, maintained, or reconstructed to provide safe access to vegetation management areas and to meet modern design standards." Thus, on its face, the DEA is internally inconsistent on this point, and again, the Service neither provides nor cites to these referenced standards. | 37 | | Transportation | Log landings and associated access are not part of the transportation system, but are considered connected actions for vegetation management. Final log landing locations are negotiated with timber sale contractors. All information on log landings will be moved from the transportation section and concentrated in the vegetation management section. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 79 | At a minimum, the DEA should have analyzed, or at least mentioned, the potential for roads to contribute to water quality issues through increased erosion and sedimentation, soil compaction resulting from the use of heavy machinery used to achieve the proposed roading activities, and renewed fragmentation of wildlife habitat, among other things. For example, although no "new" roads are proposed, the reconstruction of some of these roads may be equivalent to opening a new road, where those roads may have already been reclaimed by the forest. This is another example of a persistent theme of the DEA of not identifying a baseline against which impacts can be measured. Because the existing condition of roads in the project area have not been described, it is impossible for the public to tell whether or not road reconstruction may result in significant impacts. | 37 | | Transportation | See C/R #34 in CARA. Design features regarding water resources that will be incorporated during implementation can be found on pgs. 16-17 of the DEA. Reconstruction activities will include installation of infrastructure that will address current erosion issues along Charleston road. | Y |
| 80 | The 2022 DEA failed to identify or explain the geographic scope of its cumulative impacts analysis. Although it acknowledges that such analysis must address activities "overlap[ping] in space and time with effects of the proposed project[,]" 2022 DEA at 21, and makes a vague reference to the "analysis area[,]" id., it does not actually define that "space" or "analysis area." References are made to private lands outside of the WMNF, as well as projects occurring within it, id., but it neither defines nor "provide[s] support for its choice of the analysis area[.]" Dombeck, 304 F.3d at 902. | 38 | | Cumulative Effects | See C/R #120 in CARA. | Y |
| 81 | The DEA's "cumulative impacts analysis" contains no actual analysis at all. As noted, it merely alludes to past private activities and future federal activities, and in a conclusory manner says that guidelines will be followed, thus there will be no impacts. The Forest Service cannot just make a blanket statement about impacts without supporting it with actual analysis or some level of detail. As-is, the public has no way of actually evaluating the Forest Service's claims regarding impacts, because the public is not even given enough detail to look into the matter themselves. | 38 | | Cumulative Effects | See C/R #120 in CARA. | Y |
| 82 | The Forest Service did not include an assessment of past activities on National Forest System lands. As discussed below, the agency only touched on current (or ongoing) and future projects on WMNF land. There is no definitive statement that no past project, including logging projects, have occurred in the WMNF or have occurred in the vicinity of the Project; rather that category of past projects on WMNF land is simply absent from the analysis. | 38 | | Cumulative Effects | See C/R #120 in CARA. This will be the first time the WMNF has conducted vegetation management in the Tarleton area since it was purchased over 20 years ago. NEPA assessments of all past activities (implementation has been completed) on forest system lands has been completed and are available to the public on the WMNF projects website. | Y |
| 83 | The Forest Service states the "[k]nown, recent private timber cuts have been relatively small in scale (e.g., less than 75 acres) and scattered throughout the landscape." 2022 DEA at 21. This ambiguous statement raises several questions. What method did the agency employ to identify relevant timber cuts? How many timber cuts did the Forest Service identify? It does little good to know that the timber cuts are less than 75 acres if it is not known how many there are. There is no indication of the quantity of private timber cuts so there is no way to assess the total acreage cut, which in turn makes it impossible to assess cumulative impacts. How far back in time is "recent"? | 38 | | Cumulative Effects | New Hampshire Department of Revenue Administration keeps Notices of Intent to Cut on file for ten years after the Notice is accepted. The WMNF requested all NOI's going back ten years for Warren and Piermont. | Y |
| 84 | The past actions include an undefined category of "other residential activities." 2022 DEA at 21. The Cumulative Actions section does not define what these other residential activities are, nor does it quantify them. It only says they, along with the private timber cuts, are "scattered throughout the landscape." In sum, the Forest Service does not identify the type of activity, the locations of the activity, or the number and scope of the activities, which makes it impossible to evaluate whether the Project, when added to these unidentified activities will have a significant effect cumulatively. | 38 | | Cumulative Effects | "Other residential activities" is meant to acknowledge that private landowners conduct land management as their needs entail. Since no one can know every individual activity all property owners conduct on their land, this is speculative at best. The cumulative effects section will be updated for Final EA. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 85 | With respect to present and reasonably foreseeable future activities, the Forest Service fares no better. On WMNF land, the agency identifies three other projects that it says were considered—"the ongoing Bowen Brook and future Pemi Northwest and Wanosha Integrated Resource Projects." But other than mentioning the other three projects, it does not discuss what those projects entail, or how the impacts and potential impacts from those projects relate to the Project at issue. More troubling is the Forest Service's contention that "[d]ue to the implementation of forest plan standards and guidelines and other design features for each of these projects, no measurable cumulative impacts are expected with the proposed action." This is nonsensical. Individual projects' compliance with Forest Plan standards and guidelines is irrelevant to whether those projects, cumulatively, will have a significant effect on the human environment. That is the point of asking the cumulative effects question—to understand whether or not separate actions, even if they are presumed to be in compliance individually, nevertheless have a cumulative effect. | 38, 39 | | Cumulative Effects | The NEPA for the projects in question has been completed and a FONSI was determined for all three. The NEPA documents for each project can be found at their respective project websites on the WMNF projects webpage. See C/R #120 in CARA for response to cumulative effects. Monitoring of management activities post-implementation have verified consistency with forest plan direction for all past timber harvests. Monitoring reports are available for public viewing on the wmnf website https://www.fs.usda.gov/detail/whitemountain/landmanagement/planning/?cid=stelprdb5187780. | Y |
| 86 | The cumulative effects analysis failed to consider effects of the action on climate change or effects of climate change on the action. | 39 | | Cumulative Effects | See C/R #'s 63 and 120 in CARA. | Y |
| 87 | The analysis also failed to consider the unauthorized access that will inevitably result during and after the proposed action as a result of improvements to Charleston Road. | 39 | | Access | Unauthorized access is already an issue in the Tarleton area. See response to comment #51. | Y |
| 88 | By excluding these important components of a cumulative effects analysis, the 2022 DEA only considered the subset of trends and planned actions that support a finding of no significance. | 39 | | Cumulative Effects | See C/R #120 in CARA. | Y |
| 89 | Prior to the Forest Service issuing the 2022 DEA the U.S. Fish & Wildlife Service proposed to change the status of the Northern Long-eared Bat from threatened to endangered. The 2022 DEA does not discuss this development at all, and specifically does not address it in its cumulative impacts section. Because the Project may result in logging of mature trees that the bats use for roosting and foraging, the Forest Service must analyze the cumulative effects this Project will have on bat habitat. | 39 | | Bats | See C/R #120 in CARA. | Y |
| 90 | The Forest Service's cumulative impacts analysis falls far short of the standard required by NEPA and its implementing regulations. The lack of detail and any real analysis in the 2022 DEA is evidence that no analysis occurred, and to the extent any did, the Forest Service has hidden it from the public. | 39 | | Cumulative Effects | See C/R #120 in CARA. | Y |
| 91 | The 2022 DEA's preliminary finding of no significant impact ("FONSI") violates NEPA because it finding is conclusory and unsupported by the facts, and because the proposed project is a major federal action significantly impacting the quality of the human environment, and thus requires an environmental impact statement ("EIS"). | 39 | | FONSI | Commenter does not specify which parts of the proposed action will have a significant effect on the human environment and for what reason that justifies preparation of an EIS. | Y |
| 92 | DEA fails to properly describe the impacted environment and resources, and subsequently fails to take a hard look at impacts to those resources. Despite this, the Forest Service has still advanced a finding of no significant impact without providing convincing reasoning to support this finding. | 40 | | FONSI | Chapter 3 of the DEA and the project record discloses the environmental impacts that may occur due to project activities. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 93 | The discussion surrounding the FONSI starts by noting that its finding is "[b]ased upon the analysis in this EA[.]" Even a cursory review of the discussion that follows that statement reveals that this is not accurate. Much of the limited discussion of context and the intensity factors leans heavily on the claim that similar projects have been done in the past, therefore no impacts are expected for this project. ("The WMNF has implemented this type of project and similar proposed activities...many times on the Forest and in the region, without substantial impacts to public health or safety."); (concluding there are no substantial or unusual risks based on "experience with similar projects"; no unique or unknown risks exist "[b]ased on consideration of past projects"; the project does not set precedent for future actions "because actions [allegedly] similar to the ones proposed have been considered...in the past"). Despite the claim that the FONSI is "[b]ased upon the analysis in this EA," no analysis regarding past WMNF projects or their alleged lack of impact is actually included in the EA, nor does the DEA point to these examples so the public can review them. The closest the DEA even comes to discussing past activities is two sentences in the "cumulative actions" section that only mentions private timber sales and residential activities, but not federal actions. | 40 | | FONSI | The FONSI is a summary finding supported by the contents of the EA and project record. | Y |
| 94 | The Forest Service cannot simply claim that because past projects have allegedly not resulted in impacts, that this project will also not have impacts. Doing so is tantamount to treating prior, undisclosed, NEPA analyses as categorical exclusions that excuse this project from actual substantive analysis. What's more, even if prior similar projects did not, in fact, have negative impacts, that analysis is not provided nor even identified in the EA, leaving its contention entirely unsupported. The FONSI must "present[] the reasons why an action. . . will not have a significant effect[.]" 40 C.F.R. § 1508.13. It is not sufficient to simply state that other actions did not have a significant impact, thus this one, by extension, will also have no such effect. | 40, 41 | | FONSI | See response to comment #93. Monitoring of management activities post-implementation have verified consistency with forest plan direction for all past timber harvests. Monitoring reports are available for public viewing on the wmnf website https://www.fs.usda.gov/detail/whitemountain/landmanagement/planning/?cid=stelprdb5187780. | Y |
| 95 | The DEA's failure to support its FONSI is alone sufficient to require additional or supplement NEPA analysis. That additional analysis, however, should be done in an EIS because a proposed project of this scale and impact requires the heightened level of analysis required by that more rigorous document. | 41 | | FONSI | The proposed project is similar in scope and scale as several past timber management projects on the WMNF, all which had a Finding Of No Significant Impact. Monitoring of past timber harvest verifies forest plan compliance and no significant effects. Monitoring reports are available for public viewing on the WMNF website https://www.fs.usda.gov/detail/whitemountain/landmanagement/planning/?cid=stelprdb5187780. Commenter does not explain how the environmental impacts that may be caused by Tarleton are at the level of significance that would justify preparation of an EIS. | Y |
| 96 | 40 C.F.R. § 1508.27(a). Establishing the proper setting and scale ("context") within which to evaluate the impact of an action is critical, yet the EA/FONSI's discussion of "context" does not appear to actually establish the context for the analysis of resources impacted by the project at all. The DEA's "Context" section starts with the conclusory statement that "[t]he project is not a major federal action significantly affecting the quality of the human environment." 2022 DEA at 22. It then states that "effects of the proposed action are limited in context[,]" but does not provide any discussion or detail of what that context actually is. Id. The only sentence conceivably addressing the matter of context is the statement that "[p]roject activities would occur over an area totaling less than about one percent of the total acreage within the WMNF." Based on the preceding sentence, we must assume this statement is intended to identify the project area – that "less than one percent" of the WMNF – as the context. However, the Service failed to provide any actual analysis explaining the impacts of the project on the local area. | 41, 42 | | FONSI | The HMU rationale establishes the framework for setting the need and objectives for the project and will be published with final EA. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 97 | Nor do individual sections of the DEA properly establish the context for its "analysis" of those resources. For example, under the "Environmental Impacts" discussion of the National Historic Preservation Act ("NHPA") which the DEA later identifies as "Heritage", the DEA does not even allude to the context of its discussion, and the reader is left guessing. The Climate Change section similarly lacks clarity, first appearing to limit the context of the discussion to "a relatively small amount of forest land" in the project area, but then attempting to minimize the appearance of any potential impacts by stating that any emissions would be "extremely small. . . relative to national and global emissions." Is the context the project area? The nation? The world? All of them? If so, where is the analysis for each scale? | 42 | | FONSI | The project is in compliance with NHPA and forest plan direction regarding climate change. The analysis in the EA and project record provide the decisionmaker with adequate information to decide whether or not to implement the proposed action. | Y |
| 98 | There is also no hint of the context or scope at which impacts to hydrology or water quality was analyzed. Instead, that section – only three sentences long – states in a conclusory manner than the proposed action is consistent with relevant laws, and that any impacts (whatever they might be – we are not told) would be successfully mitigated, and therefore no adverse effects are expected. The context of analysis for other resource sections are similarly amorphous or unclear – the Vegetation section indicates that "[i]mpacts to vegetation are considered in the context of forest health." Presumably this analysis is at the forest scale, but then it appears to switch the relevant context by declaring that "[o]verall, effects on vegetation would be minor and local." The discussions of Scenery, Socioeconomics, and Soils fare no better. In fact, the only sections that remotely appropriately define the context of their analyses are the discussions of Federally Listed and Regional Forester Sensitive Species, and Soils. Even then, the context is not discussed in the EA, but in separate documents. 2021 Biological Evaluation; Soils Specialist Report. This goes to show that the Forest Service is capable of properly defining the context of its analysis for the purpose of determining significance, but did not do so for the vast majority of its resource analyses. | 42 | | FONSI | The analysis in the EA and the project record provide the decisionmaker with adequate information to decide whether or not to implement the proposed action. | Y |
| 99 | The EA's failure to appropriately identify, or in some instances failure to identify at all, the context within which to evaluate impacts of the proposed project is a critical failure. Without first establishing the proper context within with to conduct its analysis, it is impossible for the Forest Service to properly evaluate the intensity of project impacts. While a single housefire may be inconsequential on the scale of the city, the impacts on the effected home are devasting. Context is the key to determining the significance of an impact, and that is why context must be properly defined and supported for each resource being evaluated. | 42 | | FONSI | See response to comment #98. | Y |
| 100 | The Forest Service needs to correct these omissions and prepare an EIS to address the significant impacts of the proposed federal action, or at the very least conduct additional analysis and prepare a supplemental EA that clearly defines the context of its proffered "analysis." The failure to properly address the significance of the local impacts is a fatal and "major analytical lapse." See Anderson v. Evans, 371 F.3d 475, 490–92 (9th Cir. 2004) ("In short, the record establishes that there are 'substantial questions' as to the significance of the effect on the local area . . . And because the EA simply does not adequately address the local impact of the Tribe's hunt [for whales], an EIS is required."); Sierra Club v. Marsh, 769 F.2d 868, 881 (1st Cir. 1985) (finding it improper for the Corps to look at impacts to the entire Maine coast linewhen evaluating the impacts of a development on a particular island. "Here, the nature of the action, and the geographical character of Sears Island, suggest that the appropriate 'locale' is Sears Island and its immediate surroundings.") | 42, 43 | | NEPA | Commenter does not specify which actions will have significant impacts to the human environment which would justify the preparation of an EIS. | Y |
| 101 | The FONSI's ultimate conclusion regarding significance is based, in part, on the Project's impacts being "limited in context." It is unclear how that conclusion was reached when the DEA itself fails, in nearly all of its resource discussions, to define the context of its significance analysis. | 43 | | FONSI | See response to comment #93. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 102 | The Forest Service's choice to begin the "Context" discussion by noting that the project area accounts for "less than about one percent" of the forest is a clear attempt to improperly minimize and obfuscate the localized impacts to the Lake Tarleton Area. The Service is not allowed to sweep the significant impacts to the Lake Tarleton area under the rug by pointing to the vastness of the forest surrounding it. See Pac. Coast Fed'n of Fisherman's Ass'ns v. Nat'l Marine Fisheries Serv., 265 F.3d 1028, 1035-37 (9th Cir. 2001) (agency cannot minimize the impact of an activity by adopting a scale of analysis so broad that it trivializes the site-level impact). This is equivalent to the Forest Service proposing to burn the house down and telling the family that impacts are minimal because the rest of the city is still there. | 43 | | FONSI | Environmental impacts due to project activities will be minimized by Federal and State law and Forest Plan compliance, through implementation of National Core and State Best Management Practices, and through project specific design features. Effects were disclosed in the EA and did not warrant the preparation of an EIS by the responsible official. See response to comment #93. | Y |
| 103 | Because the Forest Service failed to define the context of its analysis for most project-area resources, its analysis of intensity, which is intrinsically linked to the context within which it is evaluated, is also necessarily inadequate. Beyond this broad failure, the discussion provided for the majority of the 10 consideration factors is cursory, often pointing to the supposed success of prior unnamed projects, and referring to unspecified "analysis" in order to make findings that each factor weighs against a finding of significance. These shortcomings are addressed individually below. Review of these factors reveals that many of these considerations are implicated by the Tarleton Project. The presence of even just "one of these factors may be sufficient to require an EIS in appropriate circumstances." Ocean Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846, 865 (9th Cir. 2005). | 43 | | FONSI | See response to comment #93. | Y |
| 104 | Despite the EA's claim to the contrary, it does not describe potential adverse effects of the proposed project, focusing instead on the purported benefits of the action. For example, in the discussion of "Clearcuts with Reserves" the DEA describes purported benefits of clear-cutting, such as increasing species diversity, stimulating germination of herbaceous vegetation, and promoting asexual reproduction of certain tree species. However, there is no mention of known detrimental impacts of clear-cut logging, such as the potential to spread invasive plants post-logging, the removal of mature forest impacting habitat for sensitive species reliant upon that forest structure, erosion, increased stream temperatures, other water quality impacts, compaction from logging activities, and windthrow, among others. The failure to acknowledge and/or adequately address potential adverse impacts is consistent throughout the discussion of all planning area resources. | 43, 44 | | Effects Analysis | See response to comment #102. | Y |
| 106 | In its discussion of this consideration factor, the DEA points repeatedly to the fact that similar projects have been done in the past without resulting in substantial impacts to public health or safety. This entirely ignores the fact that even if similar categories of actions have been completed before ("e.g. recreation site construction and maintenance, transportation, and vegetation management"), each project location is unique and therefore analysis of potential impacts, here to public health and safety, must be done on a project-specific basis. It would completely defeat the purpose of requiring NEPA analysis if it were sufficient to simply point to past types of actions occurring successfully to justify future actions. | 44 | | FONSI | The key phrase in this intensity factor is "substantial impacts to public health or safety." The proposed project would be conducted using standard equipment and methods, similar to similar actions conducted elsewhere locally and in the region. Neither public health nor public safety were identified as issues warranting detailed analysis. Based on the scope of work and Forest Service experience with similar actions, no substantial impacts to public health or safety are expected. | Y |
| 107 | The DEA also claims that necessary standards and practices will be applied to "further ensure that potential impacts to public health and safety are minimized and avoided[,]" but fails to discuss anywhere in the EA what those potential impacts could be. Again, it is unclear how this consideration weighs against a finding of significance when it doesn't appear to have been considered at all. | 44 | | FONSI | The phrase "standards and practices" is not in the EA. Project specific design features to minimize or avoid potential impacts to safety are disclosed in the design features table on pg. 18 of the EA. | Y |

PBWTAR_10568

| | | | | | | |
|---|---|---|---|---|---|---|
| 108 | The 2022 DEA failed to address public safety concerns raised in comments to the 2021 DEA related to the expansion of the Lake Katherine parking lot and boat launch. One comment by the administrators of the Lake Tarleton Association Lake Host program noted that there are already typically 25-30 non-motorized boats launched each weekend day, and the expansion will encourage additional use. The concern surrounds the associated increase in vehicles and trailers that will invariably park along Route 25C, causing traffic concerns, and safety concerns for those traversing the road to access the small parking lot. This factor also weighs in favor of requiring an EIS. | 44 | | Safety | See C/R #41 in CARA. The WMNF does not anticipate the minor improvements to Lake Katherine boat launch to incease visitation to this level, especially since a well established boat launch already exist on Lake Tarleton that can accommodate motorized watercraft. The proposed action would accomodate up to six vehicles (EA, pg. 15) | Y |
| 109 | The DEA claims that the project area "is not unique in its geographic setting[.]" In support of this statement, it cites to the lack of "parklands, prime farmlands, or ecologically critical areas[,]" and noting that "[e]ligible Wild and Scenic Rivers or Forest Plan Inventoried Roadless Areas do not occur in the project area." Standing Trees does not take issue with the statement regarding prime farmland or Wild and Scenic Rivers, but does not agree regarding Inventoried Roadless Areas, park lands or ecologically critical areas. | 45 | | FONSI | See Response to Comment #29 | Y |
| 111 | Even if the project area was not previously considered to be ecologically critical, which Standing Trees contests, it certainly should be now considering the recent proposed up-listing of the Northern Long-eared Bat ("NLEB") from Threatened to Endangered under the Endangered Species Act. See Section I(d)(i) for detailed discussion on this matter. For purposes of the significance factor, it is sufficient to note that the DEA's supporting February 2021 Biological Evaluation admits that NLEB are known to occur the project area, that they may forage and roost in mature stands in the project area, that the project proposes to log at least 120 acres of mature forest, and that habitat loss is one of the primary drivers of mortality for this species. Species Status Assessment Report for the Northern long-eared bat, March 22, 2022, at iii. | 45 | | Bats | See C/R #79 in CARA. | Y |
| 112 | The DEA admits that wetlands (an enumerated "unique" characteristic) are found in the project area, but immediately concludes that "these areas would not be measurably impacted by the project" and cites to its Environmental Impacts section in apparent support. First, whether or not the Service thinks the wetlands will be impacted does not make their existence any less of a "unique" factor within the geographic area. Second, the reference to the "Environmental Impacts" section, presumably to the sub-section titled "Hydrology", does not say anything about wetlands in its sparse three sentences. In fact, wetlands, and potential impacts to them, are not directly addressed anywhere in the DEA at all. See Section I(d)(iv) for further discussion on failure to take a hard look at impacts to water quality in general. | 45, 46 | | Wetlands | Impacts to wetlands would be minimized by conducted harvest in winter during frozen ground conditions, and by adhering to design feature SS-1 on pg. 16 of the DEA. | Y |
| 113 | According to Ch. 70 of the 1992 Directives for the 1982 Planning Rule, the forest block encompassing Lake Tarleton, Webster Slide, and Wachipauka Pond should have been identified during the 2005 Forest Plan revision process as an Inventoried Roadless Area and evaluated for its potential for wilderness designation by Congress. | 46 | | Roadless | See Response to Comment #29 | Y |
| 114 | The WMNF seems to have failed its obligation to identify an Inventoried Roadless Area encompassing Lake Tarleton and surrounding lands. This omission can be corrected in future Forest Plan revisions, but the inventory and evaluation of the area's roadless qualities and wilderness potential will be harmed by the actions proposed in the Tarleton IRP. The DEA should analyze these foreseeable impacts and constraints on future management decisions as it assesses the scale and scope of the Tarleton IRP and considers a range of alternatives. | 46 | | Roadless | See Response to Comment #29 | Y |
| 115 | As detailed in Section I(d)(ii) of these comments, there are also numerous historic and cultural resources located within the project area that contribute to the uniqueness of the geographical area and that weigh in favor of a finding of significance and the preparation of an EIS. | 47 | | Heritage | By adhering to project specific design features laid out on pg. 17 of the DEA, potential impacts to cultural resources will be avoided. Project is in compliance with NHPA. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 116 | Even if the none of the above listed characteristics qualify the project area as "unique," this would not preclude the area from being considered "unique" for purposes of significance. 40 C.F.R. § 1508.27(b)(3)'s list of examples are just that – examples – as indicated by the use of "such as" in the language of the consideration factor. Tarleton Lake and the surrounding area are unique in their own right because it is a popular and beloved recreation area held in high esteem not only by locals, but by others who travel great distances to recreate and enjoy the scenic values offered by the area in its current undisturbed state. This is evidenced by the massive effort undertaken to purchase the land surrounding the lake to protect it from development in the first place. In 2000, the New Hampshire Congressional Delegation, the Governor, numerous non-governmental organizations, and 600 individual donors came together to purchase the 5,300+ acres surrounding Lake Tarleton. This collective effort was well-documented in local news publications at the time. The land was given to the Forest Service preserve the land for the public in its natural state. Despite clear intent and purpose behind this transfer of land, the Service failed to integrate the necessary protections for this beloved area when it later revised and issued the 2005 WMNF Plan. This area and its unique character galvanized a regional movement to protect and preserve this land. To deny the unique character of this geographic area would be an affront to the hundreds, if not thousands, of people who worked so hard to preserve this unique and beloved area. | 47 | | FONSI | See C/R #6 in CARA. | Y |
| 117 | Considering all of the above outlined unique characteristics of the geographic area and the proposed project activities, the intensity of potential impacts to this area are high, and thus this consideration weighs heavily toward a finding of significance, and the preparation of an EIS. | 47 | | FONSI | See C/R #19 in CARA. | Y |
| 118 | the DEA claims that "this project considered current scientific research, including that submitted by the public, to determine its applicability to the project and found no controversy related to the predicted effects." This is not correct. As noted previously in this document, there is a high degree of scientific controversy and significant disagreement with Forest Service scientific assertions related to: •Management for early successional habitat; •Management to improve carbon storage and sequestration, as well as climate adaptation and resilience; •Management of beech trees, among other issues. The existence of this controversy weighs in favor of a finding of significance and the preparation of an EIS. | 48 | | FONSI | See C/R #69 in CARA. | Y |
| 119 | The Tarleton IRP Proposed Action could irretrievably harm the forests surrounding Lake Tarleton while there is an active effort to reclassify the Management Area to 8.5 (Scenic Area), the MA that most accurately fits the project area. Further, the Proposed Action could harm or even disqualify the contiguous landscape stretching from Lake Tarleton to Webster Slide from Ch. 70 wilderness inventory and evaluation in subsequent Forest Plan revisions. | 48 | | Forest Plan | None of the actions stated are being considered by the WMNF at this time and are not relevent to the current proposal or effects analysis. The potential effects to the area due to project activities are disclosed in the DEA, no significant effects were identified by the responsible official. | Y |
| 120 | Similar to its consideration of public health and safety, here again the Service points to the prior use of the same types of activities having occurred in the forest before. ("The proposed activities are well established on the Forest, and elsewhere in the region and nation."). Again, prior implementation of a type of activity says nothing about the impact of that activity on a specific project location. | 48 | | FONSI | Project would be implemented using standard equipment, methods, and practices. There is no reasonable expectation of substantial impacts to public health or safety. | Y |
| 121 | As explained above in these comments, it is reasonable to anticipate a number of potential cumulative impacts flowing from this project, and thus this consideration factor also weighs in favor of a finding of significance and the preparation of an EIS. | 48 | | Cumulative Effects | See C/R #120 and 19 in CARA. | Y |

| | | | | | | |
|---|---|---|---|---|---|---|
| 122 | As already discussed in these comments, a number of historic and cultural resources exist within the project area. Despite failing to actually analyze impacts to these resources, we know that a rough inventory of some of these sites was taken. See Exhibit 9. However, even that document fails to catalogue or acknowledge known gravesites within the project area, including some specifically raised by commenters during initial scoping and during the 2021 DEA comment period. Without some sort of official acknowledgement of these historic resources, it is possible, if not likely, that they will be lost or damaged during project implementation because no protections or buffers will be observed to avoid these un-acknowledged resources. The potential loss or destruction of these historic sites weighs in favor of significance and the preparation of an EIS. | 49 | | Heritage | See C/R #23 in CARA. | Y |
| 123 | See Section I(d)(i) of these comments for a detailed discussion regarding potential project impacts on the Northern Long-Eared Bat, an ESA Threatened species that has recently been proposed for up-listing to Endangered. 87 Fed. Reg. 16442 (March 23, 2022), Exhibit 7. These potential impacts to the NLEB in light of its recent proposed up-listing weighs heavily in favor of a finding of significance, and needs to be fully analyzed in an EIS. | 49 | | Bats | See C/R #79 in CARA. | Y |
| 124 | If the Forest Service fails or refuses to reinitiate consultation with the USFWS in light of a completed up-listing of the NLEB and moves forward with proposed logging activities, it will be in violation of Section 7 of the ESA, which requires every federal agency to consult with USFWS to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). See Section I(d)(i) and Section 3 (ESA). Additionally, as outlined below, the proposed logging in the MA 8.3 designation (Appalachian Trail), would likely be in violation of the Forest Plan, and thus a violation of the National Forest Management Act. 16 U.S.C. § 1604. For all of the reasons outlined above the Forest Service should rescind its FONSI and prepare an EIS to evaluate the significant impacts posed by this proposed project. | 49 | | Bats | See C/R #79 in CARA. No proposed activities will be in violation of any Forest Plan standards or guidelines pertaining to MA 8.3 land. | Y |
| 125 | The DEA makes numerous references to project design features and protective measures that will or could be put into place to allegedly mitigate the undisclosed project impacts. However, the Service may not reply upon mitigation measures to avoid preparing an EIS, if those impacts may have been significant prior to implementation of those measures. | 49 | | Design Features | Project design features and mitigation measures are not the same thing. Mitigation measures are used to minimize to the extent possible already significant effects that cannot be avoided. Project design features ensure that project activities never reach the level of significant since the resource would be avoided or protected. | Y |
| 126 | For example, the Cultural Resource Reconnaissance Report indicates that there would be direct impacts to the resources. There is no analysis provided regarding the potential significance of the impact, because they immediately say impacts will be avoided based on mitigation measures. While binding mitigation measures may be used to ultimately avoid impacts, the agency must still acknowledge the significant impact of the unmitigated action and fully analyze and disclose it before making this decision. | 50 | | Heritage | The report discloses effects that may occur due to project activity, however, project-specific design features were created and disclosed on pgs. 16-17 of the DEA specifically to avoid these potential impacts. | Y |

Data Submited (UTC 11): 5/11/2022 10:20:09 PM
First name: Zack
Last name: Porter
Organization: Standing Trees, on behalf of the Lake Tarleton Coalition
Title:
Comments: Hello District Ranger Brown,

Attached please find Standing Trees' and the Lake Tarleton Coalition's combined comments on the April 2022 revised Draft EA regarding the Tarleton Integrated Resource Project. These comments are being submitted electronically via the Forest Service website project page at https://cara.fs2c.usda.gov/Public//CommentInput?Project=56394, via email, and as a physical copy sent via U.S. Certified Mail (#7020 3160 0001 6335 9262) to the address provided on the April 12, 2022, comment notice. Please note that a list of all exhibits is provided at the end of the attached comments, but the files are too large to send all of them via the Forest Service project webpage or via email. All exhibits are provided on a USB drive which was mailed with the physical copy of the comment letter. A return mailing address is provided at the conclusion of the comment letter. For all email communication, please contact me directly at zporter@standingtrees.org.

As detailed in the attached comment letter, in order to comply with the National Environmental Policy Act ("NEPA"), the National Forest Management Act ("NFMA"), and the Endangered Species Act ("ESA"), an Environmental Impact Statement ("EIS") is required for the proposed project. The Forest Service erred when it initially completed only a draft Environmental Assessment ("EA") for the Project in July of 2021 ("2021 DEA") and again in April of 2022 ("2022 DEA"), along with each EA's Finding of No Significant Impact ("FONSI"). The environmental harms of the Project are significant, or at the very least uncertain, because of the unique nature of the land involved, the intensity of potential impacts, the recent proposal by the U.S. Fish and Wildlife Service ("USFWS") to classify the Northern Long-eared Bat as endangered under the ESA, and the 2022 DEA's failure to adequately analyze Project impacts in sufficient detail, among other things.

To comply with its statutory and regulatory obligations, the Forest Service must complete an EIS for the Project, or at the very least complete supplemental NEPA analysis in the form of a new or supplemental EA - including necessary public outreach and another public comment period - to correct the deficiencies identified in the comments below. Standing Trees emphasizes the need for the Forest Service to carefully review and address these issues because despite the Service having had the benefit of obtaining numerous comments from the public during the prior scoping and 2021 DEA comment periods, comments raising a number of public concerns have so far gone unacknowledged and unaddressed.

The Tarleton IRP is a major federal action that is likely to significantly affect the quality of the human environment and harm New Hampshire's treasured Lake Tarleton area within the White Mountain National Forest, an area that, as described in detail below, the public fought to protect from harmful projects such as this. NEPA requires that before undertaking such a project, the Forest Service must gather sufficient information to make an informed decision, and provides for public involvement in this decision-making process. Nevertheless, the Forest Service's 2022 DEA failed to provide adequate analysis of the impacts of the Project, sometimes failing to provide any analysis at all for certain impacted resources. This failure not only violated NEPA's requirement that agencies take a "hard look" at environmental impacts, but also made it impossible for the public to fully and meaningfully participate in the public review process because the document was not written in plain language so that decisionmakers and the public could readily understand potential impacts.

The Forest Service is required to prepare an EIS for the Project because, in light of the deficient 2022 DEA, the environmental impacts of the Project are at the very least uncertain. The Service's deficient analysis aside, it is clear that the project will result in significant impacts, thus triggering the need to evaluate these impacts in an EIS. In the 2022 DEA the Forest Service failed to establish a baseline for numerous resources, explain impacts

to those resources, establish consistency with relevant standards, values, and desired future conditions, and explain how it will avoid impacts to project area resources. Without these required analyses, the Forest Service cannot conclude that the impacts of the Project are certainly not significant. The Forest Service has thus failed to explain how the facts found in the record justify its conclusion that no significant impacts will result from the Project. See Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 105 (1983) (courts will uphold an administrative action if the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made."); Strahan v. Linnon, 967 F. Supp. 581, 602 (Mass. Dist. Ct. 1997) (an agency decision must be "fully informed and well-considered" to be entitled to judicial deference).

Additionally, in light of the recent proposed reclassification of the Northern Long-eared Bat from "threatened" to "endangered" and the potential removal of the species' ESA §4(d) Rule, the Forest Service must reinitiate ESA Section 7 consultation with USFWS and complete an EIS to address this new information and changed circumstance. To correct these many errors and bring itself to a properly informed decision in which the public is adequately involved and can have confidence, the Forest Service must complete an EIS.

Founded in the fall of 2021, the Lake Tarleton Coalition is a group of local business owners, scientists, frequent users of the WMNF, and concerned citizens united for permanent protection of Lake Tarleton and surrounding lands on the White Mountain National Forest. Many of the Coalition's members have been involved in efforts to protect Lake Tarleton since before it was threatened by resort development in the 1990s, prompting its purchase by the Trust for Public Land and subsequent transfer to the White Mountain National Forest.

Standing Trees is a grassroots community non-profit founded by volunteers in 2020 for the purpose of advancing policy and legal solutions that protect and restore New England's native forests, with a focus on Vermont and New Hampshire. The organization came together, in part, as a response to concerns over logging on the White Mountain National Forest ("WMNF"). Standing Trees works, inter alia, to ensure that New England's public lands are managed using just and equitable policies and practice to support the region's citizens and natural ecosystems alike. This includes managing public lands and waters to maximize carbon storage and protect clean water, clean air, public health, and intact habitat for the region's native biodiversity. Standing Trees has many members who regularly visit and recreate throughout WMNF, including in the areas that would be impacted by the Tarleton IRP.

Our comments continue in the attached letter.

We appreciate your careful consideration and look forward to discussing the future of Lake Tarleton with you and your staff.

Thank you and best regards,

Zack Porter
Executive Director
Standing Trees

Steering Committee Member
Lake Tarleton Coalition

**United States Department of Agriculture**

# Tarleton Integrated Resource Project

## Grafton County, New Hampshire

## Draft Environmental Assessment and Preliminary Finding of No Significant Impact

**Forest Service**

**White Mountain National Forest, Pemigewasset Ranger District April 2022**

## Vegetation and Wildlife Habitat Management

This project is needed to improve wildlife habitat diversity within the Tarleton HMU, thereby helping to achieve desired future conditions for wildlife, vegetation, and recreation described in Chapter 1 of the Forest Plan. The Forest Plan HMU framework guides management in the project area to ensure that diverse habitats are distributed across the WMNF where soils and other ecological site conditions are suitable. The project is needed to help meet the goals and objectives for wildlife and vegetation described in the Forest Plan and to increase forest health, vitality, and resiliency within the project area, including the effects of climate change, and insect and disease outbreaks. An analysis of the current habitat conditions indicates that the Tarleton HMU is not meeting the MA 2.1 Habitat Composition and Age Class Objectives (Forest Plan pp. 1-20 to 1-21). Prior to WMNF ownership, the greater Lake Tarleton area was heavily harvested by private timber companies and the Sentinel Mountain tract was managed by the state of New Hampshire. The Forest Service acquired these areas in the early 2000s.

The project area currently contains a mosaic of forest types and habitats typical throughout the WMNF, including northern hardwood, mixedwood, spruce-fir, aspen-birch, oak-pine, and wildlife openings. All these habitats comprise a mix of mature and young forests. The general lack of open forest conditions tends to promote the development of shade-tolerant species, limiting birch and aspen species, which need abundant sunlight. No regeneration-age (0-9 years old) forest habitat occurs except for one permanent wildlife opening actively managed by the Forest Service and two smaller apple orchards not currently managed for wildlife benefits by the Forest Service. The Forest Service manages designated permanent wildlife openings to maintain valuable grassland and shrubland habitats.

The proposed vegetation management would provide a sustainable yield of high-quality timber products to support local economies and communities and promote wildlife habitat objectives for the Tarleton HMU, including the following:

- Increase spruce-fir habitat over the long-term
- Increase age-class diversity and foster the regeneration of stands
- Maintain or increase aspen-birch habitat
- Maintain current levels of hemlock within stands
- Gradually convert stands situated on non-compatible Ecological Land Types to forest types consistent with land capability
- Convert known stands of non-native species to native species that are suited to site conditions. Target stands include the following:
    - Norway spruce plantation in the vicinity of Sentinel Mountain, where appropriate adjacent to Appalachian Trail buffers
    - Scots pine associated with an existing permanent wildlife opening near Lake Katherine

In addition, there is a need to address the lack of a forested buffer along the shoreline at Lake Katherine adjacent to the permanent wildlife opening. Currently, the lack of a forested buffer between the opening and the lake likely increases temperature and sedimentation rates while limiting recruitment of wood into the lake. The creation of a 75-foot-wide buffer would also better align management of the opening with standards and guidelines pertaining to buffers around waterbodies (Forest Plan, Riparian and Aquatic Habitats, G-2, pp. 2-24 to 2-25). Because the shoreline is not forested, there has been less accumulation of large woody debris into this section of the lake compared to where the shoreline is forested. There is an additional need to

| authors | commentText | responseText |
| --- | --- | --- |
| Adrian, Gail | This plan is contradictory to latest science behind timber logging. By removing so many tees, you will remove a first line and dependable source of carbon sequestration. | The effects of the proposed action on climate change are addressed on pages 17-18 of the project EA. The compositional and structural goals of proposed action are a priority with a focus to strengthen the adaptive capability to the potential effects of climate change. This project area contains many species, representing a broad mix of tolerances and reproductive strategies. The best strategy is to foster adaptation by maintaining compositionally and structurally complex forests (Ruddell et al. 2007). This strategy aims to manage the project area for the greatest degree of diversity within species, ages, and size classes. |
| Adrian, Gail | The "habitat you claim to be protecting is invasive and opportunistic (Deer, rabbits, etc.) as well as the fauna which will grow in the resulting forest gap. | Included in the EA on page 16 are multiple project design features meant to lessen the chance of invasive species spread. |
| Anon, Anon | Steep slopes must remain undisturbed to protect the whole natural system of erosion through areas of roots and native vegetation. | Forest Plan Standards and Guidelines are being followed regarding timber harvesting. Both the soil scientist, Timber Sale Administrator, and district foresters have reviewed and will monitor the site before, during, and after implementation. Best management practices will be followed pertaining to soil and watershed management during the project. Due to the vegetation being harvested strictly in winter the effects on soil should be minimal. |
| Anon, Anon | Increased precipitation in concentrated storms will devastate disturbed areas-want an example? Look at what's happening in Glen Canyon, CO-devastating to local communities, closing highways, destroying a major river system with land and silt slides filling it in and changing it's course. | The hydrology effects section of the EA on pg. 18 states "No measurable adverse effects to water quality or quantity are expected due to project implementation." Project design features pertaining to water resources can be found on pg. 15 of the EA. |
| Anonymous, Anonymous | The area contains an immense variety of birds within the forested area, at the shoreline on berry bushes, and in the lakes, our water birds. Native and migrating birds visit this area and depend on the forests and lakes to be there in their current condition. As we continue to change the environment, it is to the detriment of ourselves and to the area's wildlife, and with our current rapid rate of climate change, leaving this area untouched seems the wiser thing to do. This project involves change which will impact the two pristine, unspoiled lakes which support a great variety of birds and other wildlife. Cutting forest reduces the habitat available for already-suffering avian wildlife of NH and migrants in the spring and fall, and these birds will be forced into smaller and smaller pockets of land. In particular, pileated woodpeckers have an affinity for beech trees and this project's plans seems to eradicate many of the beech trees in the area as the land is logged. Woodpeckers, in particular pileated woodpeckers (Dryocopus pileatus), are known to prefer foraging in dead and dying trees (Lemaître and Villard 2005). Additionally, in deciduous forests they also demonstrate a preference for American beech trees (Lemaître and Villard 2005). | Because of the intense timber harvest history within the project area and on the Forest as a whole, the existing habitat composition is different than what would be expected had natural processes been allowed to continue unchecked. A key objective of the Forest Plan is to bring the habitat composition back into alignment with what would be expected under natural conditions (USDA Forest Service 2005, pp. 1-20 to 1-21). Documents outlining the rationale for this management approach can be found in the project record (USDA Forest Service 2005, USDA Forest Service 2019a, USDA Forest Service 2019b, USDA Forest Service 2020).The Tarleton IRP proposes using silvicultural treatments to both promote and maintain a balance of regeneration, young, and mature forested age class compositions on suitable lands across the Lake Tarleton Habitat Management Unit (HMU). Even-aged regeneration treatments, including clearcutting, are proposed on up to 145 acres (Table 1, Page 7 of EA) to stimulate the growth of mid and shade intolerant woody and herbaceous species. Absent catastrophic stand replacing disturbance, such as wildfire, hurricane, extreme wind, etc., these species cannot compete under shaded canopy. As these stands develop and senescence occurs over time, the seed source and resprouting vigor will be lost. Even-aged regeneration is proposed on less than 3% of the HMU's acreage. The larger majority of the HMU's acreage will be left untouched to develop naturally or managed with intermediate and uneven-aged treatments to further diversify the composition and structure of the landscape. An objective of the Forest Plan is to maintain high quality mature forest and old forest habitats on a majority of the Forest (USDA Forest Service 2005, pp. 1-20) and the area within the Lake Tarleton HMU is no exception.Clearcutting is the ideal system for encouraging early-successional bird species, as well as providing post-fledging habitat for forest songbirds (Chandler et al. 2012, King et al. 2011). Clearcutting also produces considerable vertebrate wildlife diversity (Leak et al. 2014). Early successional woody and herbaceous species promote the availability of preferred browse species and soft mass, such as raspberries and blackberries, that are utilized as food for a wide variety of wildlife.Harvesting operations will follow Riparian and Aquatic Habitat guidelines detailed on pages 2-24 and 2-25 to protect streams, lakes, ponds, and vernal pools within the project area. Operations would occur during the winter when wildlife are less sensitive to disturbance. As such, no timber harvest activities would occur during the height of the breeding season for birds. |

| | | |
|---|---|---|
| Anonymous, Anonymous | Logging opens land up to runoff and more acid rain reaching the pristine lakes below. | The forest is going to implement applicable state and federal best management practices (BMPS) and forest plan standards and guidelines during project vegetation management implementation in regards to buffers around waterways including 25 foot no cut zones plus 75 foot zones of uneven age only management. The forest performs annual monitoring of timber sales to ensure proper implementation effectiveness of BMPS.Forest Plan Guidelines on pgs 2-24 and 2-25 state: "Tree cutting and harvest should not occur within 25 feet of the bank of mapped perennial streams, the high water mark of a pond, or a identified natural vernal pool, unless prescribed to benefit hydrological or ecological function of the associated stream, pond, or riparian area. Exceptions to this include tree removals needed to clear a designated stream crossing, maintaining an existing road or previously cleared skid road that cannot be relocated, or protecting human safety or infrastructure. Trees (greater than 4 inch DBH) cut or moved in this zone should be placed in a fashion that benefits riparian functions or aquatic habitats when possible."and"Uneven-aged silvicultural practices should be used within the Riparian Management Zone (RMZ) along all perennial streams, lakes, ponds, and vernal pools. Cuts should be designed to maintain a relatively continuous forest canopy for the protection and maintenance of water quality, dead wood recruitment, hydrologic function, wildlife habitat, and scenic values. Regeneration group cuts should be limited to less than one acre in size. Exceptions may apply in areas deemed important for maintaining beaver colonies. In the absence of on-the ground riparian mapping, width of RMZs should be defined as in Table 2-01."Table 2-01 can be found on pg. 2-25 of the forest plan, which is publicly available on the White Mountain National Forest website here: https://www.fs.usda.gov/main/whitemountain/landmanagement/planning. |
| Anonymous, Anonymous | Logging operations greatly alter the natural structure of a forest by changing the amount of downed woody material, the incidence of snags or standing dead trees with cavities that provide wildlife habitat, and reducing the canopy cover of the immediate area, with the result of a homogenized or less diverse forest. | Because of the intense timber harvest history within the project area and on the Forest as a whole, the existing habitat composition is different than what would be expected had natural processes been allowed to continue unchecked. A key objective of the Forest Plan is to bring the habitat composition back into alignment with what would be expected under natural conditions (USDA Forest Service 2005, pp. 1-20 to 1-21). Documents outlining the rationale for this management approach can be found in the project record (USDA Forest Service 2005, USDA Forest Service 2019a, USDA Forest Service 2019b, USDA Forest Service 2020).The Tarleton IRP proposes using silvicultural treatments to both promote and maintain a balance of regeneration, young, and mature forested age class compositions on suitable lands across the Lake Tarleton Habitat Management Unit (HMU). Even-aged regeneration treatments, including clearcutting, are proposed on up to 145 acres (Table 1, Page 7 of EA) to stimulate the growth of mid and shade intolerant woody and herbaceous species. Absent catastrophic stand replacing disturbance, such as wildfire, hurricane, extreme wind, etc., these species cannot compete under shaded canopy. As these stands develop and senescence occurs over time, the seed source and resprouting vigor will be lost. Even-aged regeneration is proposed on less than 3% of the HMU's acreage. The larger majority of the HMU's acreage will be left untouched to develop naturally or managed with intermediate and uneven-aged treatments to further diversify the composition and structure of the landscape. An objective of the Forest Plan is to maintain high quality mature forest and old forest habitats on a majority of the Forest (USDA Forest Service 2005, pp. 1-20) and the area within the Lake Tarleton HMU is no exception.Clearcutting is the ideal system for encouraging early-successional bird species, as well as providing post-fledging habitat for forest songbirds (Chandler et al. 2012, King et al. 2011). Clearcutting also produces considerable vertebrate wildlife diversity (Leak et al. 2014). Early successional woody and herbaceous species promote the availability of preferred browse species and soft mass, such as raspberries and blackberries, that are utilized as food for a wide variety of wildlife.Harvesting operations will follow Riparian and Aquatic Habitat guidelines detailed on pages 2-24 and 2-25 to protect streams, lakes, ponds, and vernal pools within the project area. Operations would occur during the winter when wildlife are less sensitive to disturbance. As such, no timber harvest activities would occur during the height of the breeding season for birds. |
| Anonymous, Anonymous | The loss of trees and other vegetation can cause climate change, desertification, soil erosion, flooding, and increased greenhouse gases in the atmosphere. | The effects of the proposed action on climate change are addressed on pages 17-18 of the project EA. The compositional and structural goals of proposed action are a priority with a focus to strengthen the adaptive capability to the potential effects of climate change. This project area contains many species, representing a broad mix of tolerances and reproductive strategies. The best strategy is to foster adaptation by maintaining compositionally and structurally complex forests (Ruddell et al. 2007). This strategy aims to manage the project area for the greatest degree of diversity within species, ages, and size classes. |

| | | |
|---|---|---|
| Anonymous, Anonymous | Forest harvesting can lead to higher levels of sediment in nearby water bodies. Removal of vegetation can leave the land exposed to erosion by wind or water; for example, without the interception of raindrops by vegetation, the impact of the water on exposed soils can dislodge soil particles that can then be carried into the lakes by surface runoff. Forest harvesting such as this can lead to changes in the amount of water entering the lakes as well as the timing of these flows. In forested areas, trees take up water from the soil and release it to the atmosphere through transpiration. Trees also provide shade that leads to slower melting of the snowpack. When trees are harvested, less precipitation is taken up by trees and water can move quickly over the land, especially if soil has been compacted. | The forest is going to implement applicable state and federal best management practices (BMPS) and forest plan standards and guidelines during project vegetation management implementation in regards to buffers around waterways including 25 foot no cut zones plus 75 foot zones of uneven age only management. The forest performs annual monitoring of timber sales to ensure proper implementation effectiveness of BMPS.Forest Plan Guidelines on pgs 2-24 and 2-25 state: "Tree cutting and harvest should not occur within 25 feet of the bank of mapped perennial streams, the high water mark of a pond, or a identified natural vernal pool, unless prescribed to benefit hydrological or ecological function of the associated stream, pond, or riparian area. Exceptions to this include tree removals needed to clear a designated stream crossing, maintaining an existing road or previously cleared skid road that cannot be relocated, or protecting human safety or infrastructure. Trees (greater than 4 inch DBH) cut or moved in this zone should be placed in a fashion that benefits riparian functions or aquatic habitats when possible."and"Uneven-aged silvicultural practices should be used within the Riparian Management Zone (RMZ) along all perennial streams, lakes, ponds, and vernal pools. Cuts should be designed to maintain a relatively continuous forest canopy for the protection and maintenance of water quality, dead wood recruitment, hydrologic function, wildlife habitat, and scenic values. Regeneration group cuts should be limited to less than one acre in size. Exceptions may apply in areas deemed important for maintaining beaver colonies. In the absence of on-the ground riparian mapping, width of RMZs should be defined as in Table 2-01."Table 2-01 can be found on pg. 2-25 of the forest plan, which is publicly available on the White Mountain National Forest website here: https://www.fs.usda.gov/main/whitemountain/landmanagement/planning. |
| Anonymous, Anonymous | Birds are forced to live in smaller habitats, pileated woodpeckers will lose their beech trees, the cedar waxwings that thrive on the blueberries will lose those bushes, and the water birds that rely on the two lakes will potentially see water quality changes. | Because of the intense timber harvest history within the project area and on the Forest as a whole, the existing habitat composition is different than what would be expected had natural processes been allowed to continue unchecked. A key objective of the Forest Plan is to bring the habitat composition back into alignment with what would be expected under natural conditions (USDA Forest Service 2005, pp. 1-20 to 1-21). Documents outlining the rationale for this management approach can be found in the project record (USDA Forest Service 2005, USDA Forest Service 2019a, USDA Forest Service 2019b, USDA Forest Service 2020).The Tarleton IRP proposes using silvicultural treatments to both promote and maintain a balance of regeneration, young, and mature forested age class compositions on suitable lands across the Lake Tarleton Habitat Management Unit (HMU). Even-aged regeneration treatments, including clearcutting, are proposed on up to 145 acres (Table 1, Page 7 of EA) to stimulate the growth of mid and shade intolerant woody and herbaceous species. Absent catastrophic stand replacing disturbance, such as wildfire, hurricane, extreme wind, etc., these species cannot compete under shaded canopy. As these stands develop and senescence occurs over time, the seed source and resprouting vigor will be lost. Even-aged regeneration is proposed on less than 3% of the HMU's acreage. The larger majority of the HMU's acreage will be left untouched to develop naturally or managed with intermediate and uneven-aged treatments to further diversify the composition and structure of the landscape. An objective of the Forest Plan is to maintain high quality mature forest and old forest habitats on a majority of the Forest (USDA Forest Service 2005, pp. 1-20) and the area within the Lake Tarleton HMU is no exception.Clearcutting is the ideal system for encouraging early-successional bird species, as well as providing post-fledging habitat for forest songbirds (Chandler et al. 2012, King et al. 2011). Clearcutting also produces considerable vertebrate wildlife diversity (Leak et al. 2014). Early successional woody and herbaceous species promote the availability of preferred browse species and soft mass, such as raspberries and blackberries, that are utilized as food for a wide variety of wildlife.Harvesting operations will follow Riparian and Aquatic Habitat guidelines detailed on pages 2-24 and 2-25 to protect streams, lakes, ponds, and vernal pools within the project area. Operations would occur during the winter when wildlife are less sensitive to disturbance. As such, no timber harvest activities would occur during the height of the breeding season for birds. |
| Anonymous, Anonymous | Additionally, NH residents who simply enjoy this pristine area as a birding hotspot will see another area in NH altered or possibly disappear. I heartily support LEAVING THIS AREA JUST AS IT IS for the birds and wildlife who can't leave comments here. Please don't "log" paradise. Thank you. | The White Mountain National Forest Interdisciplinary Team has used the best science available to conduct our effects analysis and preliminary finding of no significant impact. Resources analyzed for effects include wildlife habitat, hydrology, soil, botany, recreation, socioeconomics, transportation, and cultural resources, all important for the human environment. More can be found in the Environmental Impacts section of the Tarleton EA. |

| | | |
|---|---|---|
| Ascher, Peter & Robin | Currently, Lake Katherine and surrounding waterbodies are free of Aquatic Invasive Species (AIS). Impacts of infestations are far reaching; they disrupt the ecological balance, reduce shoreline property values, impact aesthetic and recreational uses, and are difficult and very expensive to control once they infest a waterbody. In response to the proposed Lake Katherine boat launch, our association strongly advocates for implementation of AIS best management practices. According to the Forest Service Handbook Chapter 10 #13.5, development of boat launches requires the incorporation of "amenities for cleaning recreational equipment to prevent aquatic invasive species transport." We agree with NH Lakes that the USFS should use the best available technology by installing a CD3 waterless cleaning system to prevent the introduction of AIS in Lake Katherine. The Lake Host Program at Lake Tarleton has been working hard to discourage visitors from launching boats at the State Beach and thus avoiding weed inspection. We have requested and received signage and a swim line from the State of New Hampshire and this has greatly helped. We feel that putting an improved boat launch near the State Park will be a setback to these efforts. | Included in the Lake Katherine boat launch enhancement proposal is installation of an information kiosk that will include best practices for boat and equipment cleaning to reduce spread of invasive species. |
| Ascher, Peter & Robin | As we pointed out at your open meeting, we feel that expanding the user-created boat launch will lead to cars being parked along Route 25C at the top of the hill to the Eastman plateau. Currently, 25-30 non-motorized boats are launched at the Lake Tarleton boat launch per day on weekends and a 6 car parking lot at Lake Katherine would certainly not accommodate this level of traffic. Boaters will park their cars, trucks and trailers along Route 25C. We feel this would be a significant traffic hazard and encourage you to obtain guidance from the New Hampshire DOT. In addition, the view of Piermont Mountain from the top of the Eastman plateau is one of the most beautiful in the state, especially in the Fall. To mar this with a row of cars and trailers would be a terrible loss. Historical documentation clearly shows that access to Lake Katherine was carefully concealed so as not to impact Route 25C. We are happy to share this documentation if requested. We encourage you to consider moving the Lake Katherine boat launch to a more appropriate location. | Thank you for your comment. The proposed action to harden the access at Lake Katherine is primarily for resource protection. The existing access point is muddy and subject to rutting by vehicles accessing the lake. Development here would be minimal and not intended to attract additional use but rather to accommodate current use while protecting the shoreline environment. |
| Bordeau, Karen | We support the proposal to expand, release and maintain the existing apple orchards. We also support the proposed clearcuts with reserves in this project area layout; especially the opportunities to regenerate the aspen and birch timber type | Thank you for your comment and for your continuing interest of the management of the White Mountain National Forest. |

| | | |
|---|---|---|
| Bordeau, Karen | •Oak -The project area has an important oak component and trees are growing well in some of the stands proposed for clearcuts. We recommend that every effort be taken to retain large diameter oak trees and design these retentions to be the reserve areas. The oak trees in the project area have healthy crowns and will produce acorns (hard mast, wildlife food) for years to come. Large diameter oak trees in the proposed group, improvement cut and seed trees areas should be retained.•Beech -NH Fish and Game always recommends retaining beech trees with bear clawed marks on the trunk or clumps of broken branches in the crown through the project area. These trees are the best mast producing trees and are likely to be used in the future. Bear clawed beech trees should be buffered from equipment as to minimize root damage as much as operationally possible. When harvesting around these beech trees, retain three sides of cover in the canopy to provide cover for foraging bears.•Black Cherry and Apple -Retain large diameter black cherry and single apple trees for soft mast when applicable throughout the project area.•Black ash -avoid harvesting black ash when present in the Sentinel Mountain tract.•White Pine -retain super canopy white pine when present within forested blocks. These trees offer a unique structure in the forest canopy that provide perches for raptors and nesting habitat for warblers. They also provide an excellent seed source for regenerating white pine. The Sentinel Mountain tract had some of these super canopy trees. | The importance of maintianing these species is of great importance for the present and future. In general, these considerations will be taken into account during implementation, specifially the opportunities for balancing the need for retention and success of regenerating for the future. In species specific considerations, red oak and black cherry are mid tolerant species that require open conditions to successfully compete in regenerating stands. They are both prolific coppicing species that generate vigorously when cut. Prior to implementation, the abundance of these species will be identified for unique characteristics and larger, highly productive mast producing trees will be retained given other considerations. Similarly, super canopy white pine, bear-clawed or nested beech trees will be treated as unique and retained, preferably buffered in a closed canopy structure. Apple trees are not considered to be a commercial species and will be retained when encountered. Black ash most often occurs in wet or saturated soils that are not suitabe to heavy equipment and will be retained. Black ash is also a prolific coppicing species that will be considered for regeneration when encountered on sites suitable for heavy equipment. |
| Coffey, Gail | It also states that the project will be implemented in May 2022 at the height of bird breeding season!!! | As stated in the EA, all timber management activities are proposed strictly for winter harvest. The EA stating the project may begin as soon as May 2022 refers to the recreation, wildlife opening, and transportation improvement activities of the project. |
| Coffey, Gail | I am opposed to this project for several reasons which include impacts on Lake Tarleton breeding bird habitat, vernal pools, fisheries, water quality and rare plants which is one of the goals of the project. I find this extremely ironic. It lists on the SOPA application that one of the goals is: Recreation management; Wildlife, Fish, Rare plants. | Because of the intense timber harvest history within the project area and on the Forest as a whole, the existing habitat composition is different than what would be expected had natural processes been allowed to continue unchecked. A key objective of the Forest Plan is to bring the habitat composition back into alignment with what would be expected under natural conditions (USDA Forest Service 2005, pp. 1-20 to 1-21). Documents outlining the rationale for this management approach can be found in the project record (USDA Forest Service 2005, USDA Forest Service 2019a, USDA Forest Service 2019b, USDA Forest Service 2020).The Tarleton IRP proposes using silvicultural treatments to both promote and maintain a balance of regeneration, young, and mature forested age class compositions on suitable lands across the Lake Tarleton Habitat Management Unit (HMU). Even-aged regeneration treatments, including clearcutting, are proposed on up to 145 acres (Table 1, Page 7 of EA) to stimulate the growth of mid and shade intolerant woody and herbaceous species. Absent catastrophic stand replacing disturbance, such as wildfire, hurricane, extreme wind, etc., these species cannot compete under shaded canopy. As these stands develop and senescence occurs over time, the seed source and resprouting vigor will be lost. Even-aged regeneration is proposed on less than 3% of the HMU's acreage. The larger majority of the HMU's acreage will be left untouched to develop naturally or managed with intermediate and uneven-aged treatments to further diversify the composition and structure of the landscape. An objective of the Forest Plan is to maintain high quality mature forest and old forest habitats on a majority of the Forest (USDA Forest Service 2005, pp. 1-20) and the area within the Lake Tarleton HMU is no exception.Clearcutting is the ideal system for encouraging early-successional bird species, as well as providing post-fledging habitat for forest songbirds (Chandler et al. 2012, King et al. 2011). Clearcutting also produces considerable vertebrate wildlife diversity (Leak et al. 2014). Early successional woody and herbaceous species promote the availability of preferred browse species and soft mass, such as raspberries and blackberries, that are utilized as food for a wide variety of wildlife.Harvesting operations will follow Riparian and Aquatic Habitat guidelines detailed on pages 2-24 and 2-25 to protect streams, lakes, ponds, and vernal pools within the project area. Operations would occur during the winter when wildlife are less sensitive to disturbance. As such, no timber harvest activities would occur during the height of the breeding season for birds. |

| | | |
|---|---|---|
| Coffey, Gail | The forestry work should not occur during bird breeding season-these birds rely on spruce and fir trees for caterpillars to feed their young and the other deciduous trees like birches and beeches. | As stated in the EA, all timber management activities are proposed strictly for winter harvest. The EA stating the project may begin as soon as May 2022 refers to the recreation, wildlife opening, and transportation improvement activities of the project. |
| Coffey, Gail | There is limited information on forestry practices and buffer zones around the lake which are regulated by the state as it is a prime wetland. Cutting around the lake will cause runoff due to the increased precipitation rates we are experiencing due to climate change-we have had over 15" of rain in July alone and this will only increase. | The forest is going to implement applicable state and federal best management practices (BMPS) and forest plan standards and guidelines during project vegetation management implementation in regards to buffers around waterways including 25 foot no cut zones plus 75 foot zones of uneven age only management. The forest performs annual monitoring of timber sales to ensure proper implementation effectiveness of BMPS.Forest Plan Guidelines on pgs 2-24 and 2-25 state: "Tree cutting and harvest should not occur within 25 feet of the bank of mapped perennial streams, the high water mark of a pond, or a identified natural vernal pool, unless prescribed to benefit hydrological or ecological function of the associated stream, pond, or riparian area. Exceptions to this include tree removals needed to clear a designated stream crossing, maintaining an existing road or previously cleared skid road that cannot be relocated, or protecting human safety or infrastructure. Trees (greater than 4 inch DBH) cut or moved in this zone should be placed in a fashion that benefits riparian functions or aquatic habitats when possible."and"Uneven-aged silvicultural practices should be used within the Riparian Management Zone (RMZ) along all perennial streams, lakes, ponds, and vernal pools. Cuts should be designed to maintain a relatively continuous forest canopy for the protection and maintenance of water quality, dead wood recruitment, hydrologic function, wildlife habitat, and scenic values. Regeneration group cuts should be limited to less than one acre in size. Exceptions may apply in areas deemed important for maintaining beaver colonies. In the absence of on-the ground riparian mapping, width of RMZs should be defined as in Table 2-01."Table 2-01 can be found on pg. 2-25 of the forest plan, which is publicly available on the White Mountain National Forest website here: https://www.fs.usda.gov/main/whitemountain/landmanagement/planning. |
| Coffey, Gail | Cutting the forestland on the north side of the lake, will open it up to invasive species and impact a host of breeding insects-soil and leaves-vernal pool species like wood frogs and salamanders. I see on the map that there are quite a few vernal pools which should have significant buffers around them. I have certified and documented vernal pools in Massachusetts and NH. Significant 300' buffers are needed around the pools for the obligate species to survive in their primary -year round habitat. | Included in the EA on page 16 are multiple project design features meant to lessen the chance of invasive species spread. |
| Coffey, Gail | There is no need for additional recreation at Lake Tarleton, there are sufficient canoe campsites, a boat launch and a beach. It is already getting too busy with motorboats, waterskiing, and fishing. The Common Loons are affected by all this activity as well-you should contact the Loon Preservation Committee of NH about potential impacts as well. | There are no proposed recreation activities around Lake Tarleton. As stated in the EA, the focused recreation improvements around Lake Katherine are not expected to increase visitation to a level that would change current use levels initially. Over time, this recreation area may attract more users which could positively contribute to the local economy. Overall, socioeconomic changes to the local communities are expected to be negligible. The Loon Preservation Committee has been consulted on this project. |
| Coffey, Gail | The map showing the proposed work shows a substantial area directly adjacent to the lake for harvesting and harvesting treatment-it appears that almost 2/3 of the forestland will be cut on the northeast side of the lake opening it up for potential invasive species, chemical treatments, and runoff. I have attached the UNH Best Forestry Practices document which raises questions about the goals of the project-see page 20 for details. Is this really necessary or are there economic incentives that taint project objectives and create more harm than good ? | The forest is going to implement applicable state and federal best management practices (BMPS) and forest plan standards and guidelines during project vegetation management implementation in regards to buffers around waterways including 25 foot no cut zones plus 75 foot zones of uneven age only management. The forest performs annual monitoring of timber sales to ensure proper implementation effectiveness of BMPS.Forest Plan Guidelines on pgs 2-24 and 2-25 state: "Tree cutting and harvest should not occur within 25 feet of the bank of mapped perennial streams, the high water mark of a pond, or a identified natural vernal pool, unless prescribed to benefit hydrological or ecological function of the associated stream, pond, or riparian area. Exceptions to this include tree removals needed to clear a designated stream crossing, maintaining an existing road or previously cleared skid road that cannot be relocated, or protecting human safety or infrastructure. Trees (greater than 4 inch DBH) cut or moved in this zone should be placed in a fashion that benefits riparian functions or aquatic habitats when possible."and"Uneven-aged silvicultural practices should be used within the Riparian Management Zone (RMZ) along all perennial streams, lakes, ponds, and vernal pools. Cuts should be designed to maintain a relatively continuous forest canopy for the protection and maintenance of water quality, dead wood recruitment, hydrologic function, wildlife habitat, and scenic values. Regeneration group cuts should be limited to less than one acre in size. Exceptions may apply in areas deemed important for maintaining beaver colonies. In the absence of on-the ground riparian mapping, width of RMZs should be defined as in Table 2-01."Table 2-01 can be found on pg. 2-25 of the forest plan, which is publicly available on the White Mountain National Forest website here: https://www.fs.usda.gov/main/whitemountain/landmanagement/planning. |

| | | |
|---|---|---|
| Coffey, Gail | Finally, opening up the forest will create the necessity for managing invasive species which take advantage of disturbed sites creating the need to manage these areas with herbicide and pesticides in a watershed area. This is shameful -to open up a habitat supposedly for early successional species and then create more expense and management of it by using toxic chemicals. Shame on the Forest Service for this unnecessary use of tax dollars and damaging more wildlife by such a practice. | Included in the EA on page 16 are multiple project design features meant to lessen the chance of invasive species spread. |
| Cooley, John | I recommend that any timber harvesting near the lake be planned to avoid disturbance to nesting loons, and look forward to close communication with Forest Service staff to provide detailed recommendations, as warranted. | As stated in the EA, all timber management activities are proposed strictly for winter harvest. The EA stating the project may begin as soon as May 2022 refers to the recreation, wildlife opening, and transportation improvement activities of the project. |
| Cooley, John | Best management practices to prevent any impact to water quality in the lake from project activity in the watershed will safeguard the lake as highly suitable loon habitat. | The forest is going to implement applicable state and federal best management practices (BMPS) and forest plan standards and guidelines during project vegetation management implementation in regards to buffers around waterways including 25 foot no cut zones plus 75 foot zones of uneven age only management. The forest performs annual monitoring of timber sales to ensure proper implementation effectiveness of BMPS.Forest Plan Guidelines on pgs 2-24 and 2-25 state: "Tree cutting and harvest should not occur within 25 feet of the bank of mapped perennial streams, the high water mark of a pond, or a identified natural vernal pool, unless prescribed to benefit hydrological or ecological function of the associated stream, pond, or riparian area. Exceptions to this include tree removals needed to clear a designated stream crossing, maintaining an existing road or previously cleared skid road that cannot be relocated, or protecting human safety or infrastructure. Trees (greater than 4 inch DBH) cut or moved in this zone should be placed in a fashion that benefits riparian functions or aquatic habitats when possible."and"Uneven-aged silvicultural practices should be used within the Riparian Management Zone (RMZ) along all perennial streams, lakes, ponds, and vernal pools. Cuts should be designed to maintain a relatively continuous forest canopy for the protection and maintenance of water quality, dead wood recruitment, hydrologic function, wildlife habitat, and scenic values. Regeneration group cuts should be limited to less than one acre in size. Exceptions may apply in areas deemed important for maintaining beaver colonies. In the absence of on-the ground riparian mapping, width of RMZs should be defined as in Table 2-01."Table 2-01 can be found on pg. 2-25 of the forest plan, which is publicly available on the White Mountain National Forest website here: https://www.fs.usda.gov/main/whitemountain/landmanagement/planning. |
| Davis, Michelle | NH LAKES supports the intent of the project to ensure "healthy ecosystems and sustainable yield of high quality forest products" as well as improving conditions for wildlife, vegetation, and recreation by using sustainable ecosystem management practices. NH LAKES is a statewide, publicly-supported nonprofit organization dedicated to keeping New Hampshire's lakes clean and healthy, and advocates for laws, public policies, and other programs designed to achieve this mission. We work with partners, promote clean water policies and responsible use, and inspire the public to care for our lakes. In particular, NH LAKES is in support of addressing the lack of forested buffer along the shoreline at Lake Katherine as an opportunity to improve water quality and aquatic habitat. Though not squarely held within NH LAKES' mission and priorities, NH LAKES is supportive of public access on waterbodies in New Hampshire that are held in trust for the public. There is a significant opportunity to improve accessibility to Lake Katherine and address safety issues while simultaneously decreasing the environmental impact of the existing unplanned, user-created boat launch. | Thank you for your comment and for your continuing interest of the management of the White Mountain National Forest. |

| | | |
|---|---|---|
| Davis, Michelle | Currently, Lake Katherine and surrounding waterbodies are free of aquatic invasive species (AIS). Impacts of infestations are far reaching; they disrupt the ecological balance, reduce shoreline property values, impact aesthetic and recreational uses, and are difficult and expensive to control once they infest a waterbody. In response to the proposed boat launch, NH LAKES strongly advocates for implementation of AIS best management practices. According to the Forest Service Handbook Chapter 10 §13.5, development of boat launches requires the incorporation of "amenities for cleaning recreational equipment to prevent aquatic invasive species transport." NH LAKES urges USFS to use the best available technology by installing a CD3 waterless cleaning system (Clean, Drain, Dry, and Dispose) to prevent the introduction of AIS in Lake Katherine. CD3 products offer a variety of size and technology options, like the "Outpost" or "Roadside" models. This technology is a cost-efficient alternative to relying on local implementation of a Lake Host courtesy boat inspection program. Furthermore, as there is no lake association on Lake Katherine, there is no local group to implement a lake host program to prevent the introduction of AIS into Lake Katherine, making the installation of a CD3 unit even more imperative. | Included in the Lake Katherine boat launch enhancement proposal is installation of an information kiosk that will include best practices for boat and equipment cleaning to reduce spread of invasive species. |
| DiPietro, Mike | Vegetation and Wildlife The timber harvest proposal is very detailed, it will provide local forest products, and improve wildlife habitat. I especially like the plan for upgrading the wildlife opening at Lake Katherine and expanding of the old orchard on the Charleston Rd. for wildlife. | Thank you for your comment and for your continuing interest of the management of the White Mountain National Forest. |
| DiPietro, Mike | Please do not disturb the old cellar holes, stone walls, culverts, cemeteries, and other remnants of the old Charleston Village during logging/skidding operations. | Measures to protect historic archaeological sites and provisions for the inadvertent discovery of previously unknown archaeological sites are described in Table 2 on page 15 of the draft EA, and in the Cultural Resources Reconnaissance Report in the project record. The New Hampshire State Historic Preservation Office (New Hampshire Division of Historic Resources) was consulted and concurred with the finding of No Historic Properties Affected subject to the protection measures described. |
| DiPietro, Mike | Recreation and Visitor Access Except for the upgrades at the Lake Katherine Boat Launch there is not much else about recreation and access in the plan. Please consider using the existing roadway between NH Rt 25c and the west side of Lake Tarleton for day use access such as a scenic overview /picnic area. Snowmobiling access and travel on Charleston Rd would also be an economical benefit to the area. | Additional recreation access was considered for the Tarleton area, however due to existing and predicted use patterns, there are currently no proposals for additional access/improvements except for improving Lake Katherine Access at this time. |
| Eastburn, Catherine | Please, please do not allow this project to happen. It will totally destroy the wildlife and landscape for ever. Such an awful and sad thing to do to our beautiful NH . | The White Mountain National Forest Interdisciplinary Team has used the best science available to conduct our effects analysis and preliminary finding of no significant impact. Resources analyzed for effects include wildlife habitat, hydrology, soil, botany, recreation, socioeconomics, transportation, and cultural resources, all important for the human environment. More can be found in the Environmental Impacts section of the Tarleton EA. |

| | | |
|---|---|---|
| Faletra, Elaine | Although the use of herbicides is not mentioned in the Tarleton Project, I asked the Forest Service on 08.05.21, "Will there be any herbicides used at any stage of the process". The answer I received was this, "Herbicide use for NNIS (non-native invasive species) control was covered under separate NEPA (National Environmental Policy Act) for the entire forest. It is not a part of the Tarleton project, but it almost certainly will be used to control NNIS in the Tarleton area at some point, as it is on the rest of the forest." In other words, the document that outlines why, when and where herbicides can be used in NH forests - the NNIS Project Final EA document - was not even listed on the Tarleton Project page until the final day for public comments and not brought to the attention of the public who attended their meetings. Shameful. | Herbicide use was analyzed under a 2007 forest-wide project EA regarding NNIS control. Herbicides may be used at any time at any point on the forest to control NNIS. Tarleton has included multiple design features to guide the project during implementation to avoid NNIS spread. Any document that is not readily available on the forest website can be requested at any time by contacting the project lead by email, phone, or official FOIA request. Any documentation request will be answered in a timely manner. |
| Faletra, Elaine | Foremost, I believe the 30-day notice of the project should be invalidated because an important document - the "NNIS Project Final EA" regarding the WMNF-Wide Invasive Plant Control Project was not included in the "Supporting Documents" tab on the Forest Service website until 08-05-2021, the deadline date for public comments. Meeting attendees were not made aware of this "almost certain" application of herbicides in the Tarleton area. Read on and you will see why this document is so important for this project that surrounds two pristine lakes and the watersheds that supply them and the wetlands where they exit. | Herbicide use was analyzed under a 2007 forest-wide project EA regarding NNIS control. Herbicides may be used at any time at any point on the forest to control NNIS. Tarleton has included multiple design features to guide the project during implementation to avoid NNIS spread. Any document that is not readily available on the forest website can be requested at any time by contacting the project lead by email, phone, or official FOIA request. Any documentation request will be answered in a timely manner. |
| Faletra, Elaine | I am against creating the need for any herbicide use in the Tarleton area. Semi-mature forests like the Tarleton area do not support the wide-spread growth of invasive species like knotweed, bittersweet, etc. that are listed on pg. 9 of the document sited above. As you say on pg. 3 regarding where the Forest Service typically uses herbicides, "Most such areas occur along roads, parking areas, skid trails, and recreation trails, in gravel pits, disturbed sites, and power line corridors but some do occur in less disturbed areas." This is exactly what you will create in large-scale with this logging operation and then you will have complete freedom to apply herbicides to rescue a faltering forest, all without further public input. | Herbicide use was analyzed under a 2007 forest-wide project EA regarding NNIS control. Herbicides may be used at any time at any point on the forest to control NNIS. Tarleton has included multiple design features to guide the project during implementation to avoid NNIS spread. Any document that is not readily available on the forest website can be requested at any time by contacting the project lead by email, phone, or official FOIA request. Any documentation request will be answered in a timely manner. |
| Faletra, Elaine | I object to cutting down mature and semi-mature forests on steep slopes that drain into pristine lakes for the goal of increasing biodiversity of species these reasons. | Forest Plan Standards and Guidelines are being followed regarding timber harvesting. Both the soil scientist, Timber Sale Administrator, and district foresters have reviewed and will monitor the site before, during, and after implementation. Best management practices will be followed pertaining to soil and watershed management during the project. Due to the vegetation being harvested strictly in winter the effects on soil should be minimal. |

| | | |
|---|---|---|
| Faletra, Elaine | I have frequented Lake Tarleton since the early 1980's and in every season. Logging will bring an influx of different species but it will evict the ones that are already established. As a bird enthusiast, I have documented many boreal bird species just on the trail around the lake's edge - Swainson's thrush, Hermit thrush, Black-throated green and blue warblers, Canada warblers, Magnolia warblers, etc. These species thrive in a deep forest, shaded habitat, at elevation. Wildlife and plant species do flourish in old-growth shaded forests near pristine lakes too!! | Because of the intense timber harvest history within the project area and on the Forest as a whole, the existing habitat composition is different than what would be expected had natural processes been allowed to continue unchecked. A key objective of the Forest Plan is to bring the habitat composition back into alignment with what would be expected under natural conditions (USDA Forest Service 2005, pp. 1-20 to 1-21). Documents outlining the rationale for this management approach can be found in the project record (USDA Forest Service 2005, USDA Forest Service 2019a, USDA Forest Service 2019b, USDA Forest Service 2020).The Tarleton IRP proposes using silvicultural treatments to both promote and maintain a balance of regeneration, young, and mature forested age class compositions on suitable lands across the Lake Tarleton Habitat Management Unit (HMU). Even-aged regeneration treatments, including clearcutting, are proposed on up to 145 acres (Table 1, Page 7 of EA) to stimulate the growth of mid and shade intolerant woody and herbaceous species. Absent catastrophic stand replacing disturbance, such as wildfire, hurricane, extreme wind, etc., these species cannot compete under shaded canopy. As these stands develop and senescence occurs over time, the seed source and resprouting vigor will be lost. Even-aged regeneration is proposed on less than 3% of the HMU's acreage. The larger majority of the HMU's acreage will be left untouched to develop naturally or managed with intermediate and uneven-aged treatments to further diversify the composition and structure of the landscape. An objective of the Forest Plan is to maintain high quality mature forest and old forest habitats on a majority of the Forest (USDA Forest Service 2005, pp. 1-20) and the area within the Lake Tarleton HMU is no exception.Clearcutting is the ideal system for encouraging early-successional bird species, as well as providing post-fledging habitat for forest songbirds (Chandler et al. 2012, King et al. 2011). Clearcutting also produces considerable vertebrate wildlife diversity (Leak et al. 2014). Early successional woody and herbaceous species promote the availability of preferred browse species and soft mass, such as raspberries and blackberries, that are utilized as food for a wide variety of wildlife.Harvesting operations will follow Riparian and Aquatic Habitat guidelines detailed on pages 2-24 and 2-25 to protect streams, lakes, ponds, and vernal pools within the project area. Operations would occur during the winter when wildlife are less sensitive to disturbance. As such, no timber harvest activities would occur during the height of the breeding season for birds. |
| Faletra, Elaine | Much of your proposed logging will be on steep slopes and the potential for erosion and runoff is too risky, especially with the current increased precipitation and the prediction by climatologist for that to continue in the coming years. | Forest Plan Standards and Guidelines are being followed regarding timber harvesting. Both the soil scientist, Timber Sale Administrator, and district foresters have reviewed and will monitor the site before, during, and after implementation. Best management practices will be followed pertaining to soil and watershed management during the project. Due to the vegetation being harvested strictly in winter the effects on soil should be minimal. |
| Faletra, Elaine | Do your studies thoroughly examine the effect of global climate predictions for the northeast and the impact on areas post logging? | The effects of the proposed action on climate change are addressed on pages 17-18 of the project EA. The compositional and structural goals of proposed action are a priority with a focus to strengthen the adaptive capability to the potential effects of climate change. This project area contains many species, representing a broad mix of tolerances and reproductive strategies. The best strategy is to foster adaptation by maintaining compositionally and structurally complex forests (Ruddell et al. 2007). This strategy aims to manage the project area for the greatest degree of diversity within species, ages, and size classes. |

| | | |
|---|---|---|
| Faletra, Elaine | I understand your various methods for extracting your "estimated five million board feet of forest products" but each one brings direct and collateral damage to the health and well-being of existing wildlife and surrounding habitats. | Because of the intense timber harvest history within the project area and on the Forest as a whole, the existing habitat composition is different than what would be expected had natural processes been allowed to continue unchecked. A key objective of the Forest Plan is to bring the habitat composition back into alignment with what would be expected under natural conditions (USDA Forest Service 2005, pp. 1-20 to 1-21). Documents outlining the rationale for this management approach can be found in the project record (USDA Forest Service 2005, USDA Forest Service 2019a, USDA Forest Service 2019b, USDA Forest Service 2020).The Tarleton IRP proposes using silvicultural treatments to both promote and maintain a balance of regeneration, young, and mature forested age class compositions on suitable lands across the Lake Tarleton Habitat Management Unit (HMU). Even-aged regeneration treatments, including clearcutting, are proposed on up to 145 acres (Table 1, Page 7 of EA) to stimulate the growth of mid and shade intolerant woody and herbaceous species. Absent catastrophic stand replacing disturbance, such as wildfire, hurricane, extreme wind, etc., these species cannot compete under shaded canopy. As these stands develop and senescence occurs over time, the seed source and resprouting vigor will be lost. Even-aged regeneration is proposed on less than 3% of the HMU's acreage. The larger majority of the HMU's acreage will be left untouched to develop naturally or managed with intermediate and uneven-aged treatments to further diversify the composition and structure of the landscape. An objective of the Forest Plan is to maintain high quality mature forest and old forest habitats on a majority of the Forest (USDA Forest Service 2005, pp. 1-20) and the area within the Lake Tarleton HMU is no exception.Clearcutting is the ideal system for encouraging early-successional bird species, as well as providing post-fledging habitat for forest songbirds (Chandler et al. 2012, King et al. 2011). Clearcutting also produces considerable vertebrate wildlife diversity (Leak et al. 2014). Early successional woody and herbaceous species promote the availability of preferred browse species and soft mass, such as raspberries and blackberries, that are utilized as food for a wide variety of wildlife.Harvesting operations will follow Riparian and Aquatic Habitat guidelines detailed on pages 2-24 and 2-25 to protect streams, lakes, ponds, and vernal pools within the project area. Operations would occur during the winter when wildlife are less sensitive to disturbance. As such, no timber harvest activities would occur during the height of the breeding season for birds. |
| Faletra, Elaine | Just when the forests are coming into maturity from the last overzealous logging campaigns of the early 1900's, it seems we're back at it again. I understand the need for wood and lumber etc. but to choose such a delicate, pristine area that is loved by so many people and wildlife is beyond my comprehension. I believe your intention is to log over and over again in a sort of 70-year cycle. Our forests under today's global climate conditions are well-adapted to reclaiming themselves if given decades, but if we keep destroying them in order to reclaim them, then they will never reach full maturity. You will never stop logging the forests, but we should keep special places like the Tarleton area off limits. | The White Mountain National Forest Interdisciplinary Team has used the best science available to conduct our effects analysis and preliminary finding of no significant impact. Resources analyzed for effects include wildlife habitat, hydrology, soil, botany, recreation, socioeconomics, transportation, and cultural resources, all important for the human environment. More can be found in the Environmental Impacts section of the Tarleton EA. |
| Faletra, Peter | I have a major concern that there is no planned buffer for zero disturbance of the lakeshore and a disregard for any buffer zones around streams and vernal pools. Timber harvesting that occurs with 300 feet of the lakeshore is likely to degrade the water quality of these sources. I am concerned that not only will the lake's water quality be compromised by the soil run-off, but the numerous small streams that feed Lake Tarleton will be diverted and the vernal habitats they support destroyed. I have identified numerous amphibians thriving in these streams and pools within a few hundred feet of the shoreline and I see no chance of them being anything but nearly destroyed by this plan. What are the plans for preventing runoff in an age of climate change where heavy rains are and will be far more common? | The forest is going to implement applicable state and federal best management practices (BMPS) and forest plan standards and guidelines during project vegetation management implementation in regards to buffers around waterways including 25 foot no cut zones plus 75 foot zones of uneven age only management. The forest performs annual monitoring of timber sales to ensure proper implementation effectiveness of BMPS.Forest Plan Guidelines on pgs 2-24 and 2-25 state: "Tree cutting and harvest should not occur within 25 feet of the bank of mapped perennial streams, the high water mark of a pond, or a identified natural vernal pool, unless prescribed to benefit hydrological or ecological function of the associated stream, pond, or riparian area. Exceptions to this include tree removals needed to clear a designated stream crossing, maintaining an existing road or previously cleared skid road that cannot be relocated, or protecting human safety or infrastructure. Trees (greater than 4 inch DBH) cut or moved in this zone should be placed in a fashion that benefits riparian functions or aquatic habitats when possible."and"Uneven-aged silvicultural practices should be used within the Riparian Management Zone (RMZ) along all perennial streams, lakes, ponds, and vernal pools. Cuts should be designed to maintain a relatively continuous forest canopy for the protection and maintenance of water quality, dead wood recruitment, hydrologic function, wildlife habitat, and scenic values. Regeneration group cuts should be limited to less than one acre in size. Exceptions may apply in areas deemed important for maintaining beaver colonies. In the absence of on-the ground riparian mapping, width of RMZs should be defined as in Table 2-01."Table 2-01 can be found on pg. 2-25 of the forest plan, which is publicly available on the White Mountain National Forest website here: https://www.fs.usda.gov/main/whitemountain/landmanagement/planning. |

| | | |
|---|---|---|
| Faletra, Peter | "This project is needed to improve wildlife habitat diversity.", has, at best, minimal basis in science. When taken in long-term, a mature forest is far more conducive to supporting a stable diverse population of flora and fauna, and to posit that the area needs timber harvesting to improve wildlife habitat diversity is in conflict with how habitat diversity is established and maintained. As a scientist who has published scientific research on endangered species and habitat degradation, this proposal has little basis in either logic or science, and seems to be using a bizarre argument that the current forest has little diversity and a habitat that needs improvement by logging the area. In the shoreline of lake Tarleton, I have identified over 100 species of vascular herbaceous plants, including the state wildflower Cypripedium acaule (Pink lady's slipper) that has a healthy and expanding population on the northeast side of the lakeshore. To suggest that stripping a pristine forest of its mature trees, using heavy machinery to log that area, creating and expanding nine 0.75-acre log landings, and do so with no stated significant buffer to protect the adjoining lake and its delicate habitat is a poorly thought-out plan with disregard to the facts of habitat degradation. | Because of the intense timber harvest history within the project area and on the Forest as a whole, the existing habitat composition is different than what would be expected had natural processes been allowed to continue unchecked. A key objective of the Forest Plan is to bring the habitat composition back into alignment with what would be expected under natural conditions (USDA Forest Service 2005, pp. 1-20 to 1-21). Documents outlining the rationale for this management approach can be found in the project record (USDA Forest Service 2005, USDA Forest Service 2019a, USDA Forest Service 2019b, USDA Forest Service 2020).The Tarleton IRP proposes using silvicultural treatments to both promote and maintain a balance of regeneration, young, and mature forested age class compositions on suitable lands across the Lake Tarleton Habitat Management Unit (HMU). Even-aged regeneration treatments, including clearcutting, are proposed on up to 145 acres (Table 1, Page 7 of EA) to stimulate the growth of mid and shade intolerant woody and herbaceous species. Absent catastrophic stand replacing disturbance, such as wildfire, hurricane, extreme wind, etc., these species cannot compete under shaded canopy. As these stands develop and senescence occurs over time, the seed source and resprouting vigor will be lost. Even-aged regeneration is proposed on less than 3% of the HMU's acreage. The larger majority of the HMU's acreage will be left untouched to develop naturally or managed with intermediate and uneven-aged treatments to further diversify the composition and structure of the landscape. An objective of the Forest Plan is to maintain high quality mature forest and old forest habitats on a majority of the Forest (USDA Forest Service 2005, pp. 1-20) and the area within the Lake Tarleton HMU is no exception.Clearcutting is the ideal system for encouraging early-successional bird species, as well as providing post-fledging habitat for forest songbirds (Chandler et al. 2012, King et al. 2011). Clearcutting also produces considerable vertebrate wildlife diversity (Leak et al. 2014). Early successional woody and herbaceous species promote the availability of preferred browse species and soft mass, such as raspberries and blackberries, that are utilized as food for a wide variety of wildlife.Harvesting operations will follow Riparian and Aquatic Habitat guidelines detailed on pages 2-24 and 2-25 to protect streams, lakes, ponds, and vernal pools within the project area. Operations would occur during the winter when wildlife are less sensitive to disturbance. As such, no timber harvest activities would occur during the height of the breeding season for birds. |
| Faletra, Peter | I have great concern that in this plan and/or as a consequence of this proposed plan, the area will be treated in part with herbicides to control unwanted species of plants from establishing themselves in the vacuum of an ecosystem in balance. What are the plans if invasive species such as knotweed take over in areas that were held in balance by native species, and are the open? What if any herbicides will be used, when and how? I ask but I know the answer - herbicides WILL LIKELY be used. This is clearly laid out in the "NNIS Project Final EA" document regarding the White Mountain National Forest-wide Invasive Plant Control Project documents that suddenly got uploaded to your website on the last day of public comment. | Herbicide use was analyzed under a 2007 forest-wide project EA regarding NNIS control. Herbicides may be used at any time at any point on the forest to control NNIS. Tarleton has included multiple design features to guide the project during implementation to avoid NNIS spread. Any document that is not readily available on the forest website can be requested at any time by contacting the project lead by email, phone, or official FOIA request. Any documentation request will be answered in a timely manner. |
| Faletra, Peter | Finally, the notion that the forest service's specious interest is in maintain biodiversity as a sound reason for logging in an area that is enjoyed by many outdoor enthusiasts for its undisturbed beauty that is a fundamental natural resource and reason for us to live in and visit NH is beyond comprehension and antithetical to how a forest service should go about its business. If you wish to log an area for its timber, at least be honest about your intentions and do not attempt to greenwash it. | The White Mountain National Forest Interdisciplinary Team has used the best science available to conduct our effects analysis and preliminary finding of no significant impact. Resources analyzed for effects include wildlife habitat, hydrology, soil, botany, recreation, socioeconomics, transportation, and cultural resources, all important for the human environment. More can be found in the Environmental Impacts section of the Tarleton EA. |

| | | |
|---|---|---|
| Foote, Charles | I am writing to make a comment on the Tarleton Integrated Resource Project. I would like to point out the locations of the Manning Monument, the Lund Cemetery, and the Charleston Cemetery. The Manning Monument can be found at: N 43 59.734, W 071 57.554 The Lund Cemetery can be found at: N 43 59.273, W 071 57.531 The Charleston Cemetery can be found at: N 43 59.092, W 071 56.830 Looking at the map the apple orchard is next to the Charleston Cemetery, it was known as the Copper Orchard. There was an epidemic in the area in the 1800's. Charleston Cemetery is believed to contain at least 75 graves, the graves are poorly marked and at least 200 years overgrown. Some research has been done in the area and some of the graves are marked with red flags on wire pushed in to the ground. The Lund Cemetery has slate grave stones that are mostly laying on the ground, the lettering can still be seen on most stones. The Manning Monument is to three brothers killed by a train in Glencliff, NH in 1922. It is a concrete marker about three feet tall and two feet wide with a plaque. Any question about the history of Charleston should be addressed to Roland Bixby in Wentworth, NH at 603-764-6149. | Measures to protect historic archaeological sites and provisions for the inadvertent discovery of previously unknown archaeological sites are described in Table 2 on page 15 of the draft EA, and in the Cultural Resources Reconnaissance Report in the project record. The New Hampshire State Historic Preservation Office (New Hampshire Division of Historic Resources) was consulted and concurred with the finding of No Historic Properties Affected subject to the protection measures described. |
| Ganey, Karen | In a time of unprecedented climate change, we need to protect swaths of forests that can mature over years to support both carbon sequestration and late succession forest species diversity. | The effects of the proposed action on climate change are addressed on pages 17-18 of the project EA. The compositional and structural goals of proposed action are a priority with a focus to strengthen the adaptive capability to the potential effects of climate change. This project area contains many species, representing a broad mix of tolerances and reproductive strategies. The best strategy is to foster adaptation by maintaining compositionally and structurally complex forests (Ruddell et al. 2007). This strategy aims to manage the project area for the greatest degree of diversity within species, ages, and size classes. |
| Ganey, Karen | Too much of the proposed area is on a steep slope and will cause erosion and major habitat loss. | Forest Plan Standards and Guidelines are being followed regarding timber harvesting. Both the soil scientist, Timber Sale Administrator, and district foresters have reviewed and will monitor the site before, during, and after implementation. Best management practices will be followed pertaining to soil and watershed management during the project. Due to the vegetation being harvested strictly in winter the effects on soil should be minimal. |
| Ganey, Karen | They are claiming that, "One outcome of clearcutting would be an increase in species diversity within units and across the project area." They make this claim without acknowledging the millions of species that thrive in semi-mature forests, nevermind the ecosystem functions that they provide to protect the lake and surrounding areas! We depend on these forests and refuse to accept that clear cutting is a means to greater ecological health! While the overall plan claims to provide buffers and corridors, we see through the greenwashing and recognize this project as a major threat to the health and well-being of the existing wildlife and surrounding communities! | Because of the intense timber harvest history within the project area and on the Forest as a whole, the existing habitat composition is different than what would be expected had natural processes been allowed to continue unchecked. A key objective of the Forest Plan is to bring the habitat composition back into alignment with what would be expected under natural conditions (USDA Forest Service 2005, pp. 1-20 to 1-21). Documents outlining the rationale for this management approach can be found in the project record (USDA Forest Service 2005, USDA Forest Service 2019a, USDA Forest Service 2019b, USDA Forest Service 2020).The Tarleton IRP proposes using silvicultural treatments to both promote and maintain a balance of regeneration, young, and mature forested age class compositions on suitable lands across the Lake Tarleton Habitat Management Unit (HMU). Even-aged regeneration treatments, including clearcutting, are proposed on up to 145 acres (Table 1, Page 7 of EA) to stimulate the growth of mid and shade intolerant woody and herbaceous species. Absent catastrophic stand replacing disturbance, such as wildfire, hurricane, extreme wind, etc., these species cannot compete under shaded canopy. As these stands develop and senescence occurs over time, the seed source and resprouting vigor will be lost. Even-aged regeneration is proposed on less than 3% of the HMU's acreage. The larger majority of the HMU's acreage will be left untouched to develop naturally or managed with intermediate and uneven-aged treatments to further diversify the composition and structure of the landscape. An objective of the Forest Plan is to maintain high quality mature forest and old forest habitats on a majority of the Forest (USDA Forest Service 2005, pp. 1-20) and the area within the Lake Tarleton HMU is no exception.Clearcutting is the ideal system for encouraging early-successional bird species, as well as providing post-fledging habitat for forest songbirds (Chandler et al. 2012, King et al. 2011). Clearcutting also produces considerable vertebrate wildlife diversity (Leak et al. 2014). Early successional woody and herbaceous species promote the availability of preferred browse species and soft mass, such as raspberries and blackberries, that are utilized as food for a wide variety of wildlife.Harvesting operations will follow Riparian and Aquatic Habitat guidelines detailed on pages 2-24 and 2-25 to protect streams, lakes, ponds, and vernal pools within the project area. Operations would occur during the winter when wildlife are less sensitive to disturbance. As such, no timber harvest activities would occur during the height of the breeding season for birds. |

| | | |
|---|---|---|
| Hutslar, Jan | We must protect the millions of species that thrive in semi-mature forests, and the ecosystem functions that they provide to protect the lake and surrounding areas! We depend on these forests and refuse to accept that clear cutting is a means to greater ecological health! While the overall plan claims to provide buffers and corridors, we see through the greenwashing and recognize this project as a major threat to the health and well-being of the existing wildlife and surrounding communities! | Because of the intense timber harvest history within the project area and on the Forest as a whole, the existing habitat composition is different than what would be expected had natural processes been allowed to continue unchecked. A key objective of the Forest Plan is to bring the habitat composition back into alignment with what would be expected under natural conditions (USDA Forest Service 2005, pp. 1-20 to 1-21). Documents outlining the rationale for this management approach can be found in the project record (USDA Forest Service 2005, USDA Forest Service 2019a, USDA Forest Service 2019b, USDA Forest Service 2020).The Tarleton IRP proposes using silvicultural treatments to both promote and maintain a balance of regeneration, young, and mature forested age class compositions on suitable lands across the Lake Tarleton Habitat Management Unit (HMU). Even-aged regeneration treatments, including clearcutting, are proposed on up to 145 acres (Table 1, Page 7 of EA) to stimulate the growth of mid and shade intolerant woody and herbaceous species. Absent catastrophic stand replacing disturbance, such as wildfire, hurricane, extreme wind, etc., these species cannot compete under shaded canopy. As these stands develop and senescence occurs over time, the seed source and resprouting vigor will be lost. Even-aged regeneration is proposed on less than 3% of the HMU's acreage. The larger majority of the HMU's acreage will be left untouched to develop naturally or managed with intermediate and uneven-aged treatments to further diversify the composition and structure of the landscape. An objective of the Forest Plan is to maintain high quality mature forest and old forest habitats on a majority of the Forest (USDA Forest Service 2005, pp. 1-20) and the area within the Lake Tarleton HMU is no exception.Clearcutting is the ideal system for encouraging early-successional bird species, as well as providing post-fledging habitat for forest songbirds (Chandler et al. 2012, King et al. 2011). Clearcutting also produces considerable vertebrate wildlife diversity (Leak et al. 2014). Early successional woody and herbaceous species promote the availability of preferred browse species and soft mass, such as raspberries and blackberries, that are utilized as food for a wide variety of wildlife.Harvesting operations will follow Riparian and Aquatic Habitat guidelines detailed on pages 2-24 and 2-25 to protect streams, lakes, ponds, and vernal pools within the project area. Operations would occur during the winter when wildlife are less sensitive to disturbance. As such, no timber harvest activities would occur during the height of the breeding season for birds. |
| Jenkins, Pam | Logging mature forest areas worsens habitat for wildlife. | Because of the intense timber harvest history within the project area and on the Forest as a whole, the existing habitat composition is different than what would be expected had natural processes been allowed to continue unchecked. A key objective of the Forest Plan is to bring the habitat composition back into alignment with what would be expected under natural conditions (USDA Forest Service 2005, pp. 1-20 to 1-21). Documents outlining the rationale for this management approach can be found in the project record (USDA Forest Service 2005, USDA Forest Service 2019a, USDA Forest Service 2019b, USDA Forest Service 2020).The Tarleton IRP proposes using silvicultural treatments to both promote and maintain a balance of regeneration, young, and mature forested age class compositions on suitable lands across the Lake Tarleton Habitat Management Unit (HMU). Even-aged regeneration treatments, including clearcutting, are proposed on up to 145 acres (Table 1, Page 7 of EA) to stimulate the growth of mid and shade intolerant woody and herbaceous species. Absent catastrophic stand replacing disturbance, such as wildfire, hurricane, extreme wind, etc., these species cannot compete under shaded canopy. As these stands develop and senescence occurs over time, the seed source and resprouting vigor will be lost. Even-aged regeneration is proposed on less than 3% of the HMU's acreage. The larger majority of the HMU's acreage will be left untouched to develop naturally or managed with intermediate and uneven-aged treatments to further diversify the composition and structure of the landscape. An objective of the Forest Plan is to maintain high quality mature forest and old forest habitats on a majority of the Forest (USDA Forest Service 2005, pp. 1-20) and the area within the Lake Tarleton HMU is no exception.Clearcutting is the ideal system for encouraging early-successional bird species, as well as providing post-fledging habitat for forest songbirds (Chandler et al. 2012, King et al. 2011). Clearcutting also produces considerable vertebrate wildlife diversity (Leak et al. 2014). Early successional woody and herbaceous species promote the availability of preferred browse species and soft mass, such as raspberries and blackberries, that are utilized as food for a wide variety of wildlife.Harvesting operations will follow Riparian and Aquatic Habitat guidelines detailed on pages 2-24 and 2-25 to protect streams, lakes, ponds, and vernal pools within the project area. Operations would occur during the winter when wildlife are less sensitive to disturbance. As such, no timber harvest activities would occur during the height of the breeding season for birds. |
| Jenkins, Pam | Recreation opportunities are already available and do not need further support. Erosion at the Lake Katherine boat launch is not unusual and can be easily repaired without logging the area. | Thank you for your comment. The proposed action to harden the access at Lake Katherine is primarily for resource protection. The existing access point is muddy and subject to rutting by vehicles accessing the lake. Development here would be minimal and not intended to attract additional use but rather to accommodate current use while protecting the shoreline environment. |
| Jenkins, Pam | Logging will decrease enjoyment of the AT. | Thank you for your comment. All vegetation management activities described in the proposed action will maintain Best Management Practices and will include a visual buffer for the Appalachian Trail. All harvesting in proximity to the Appalachian Trail will include enough buffer so that logging operations should not be visible from the trail. All harvesting is proposed for winter only during minimal use of the AT corridor. |

| | | |
|---|---|---|
| Jones, Eric | What is the average diameter at breast high of the trees you intend to cut on the Tarleton section of the project? What is the average diameter at breast high of the trees you intend to cut on the Sentinel Mountain section of the project? When was the last cutting on each of those sections? | Average size of trees proposed to be harvested is dependent on treatment type and influenced by age, species, site conditions, and past management history, among other factors. Given these variables, it is irrelevent to estimate an average size across a broad-scale area of different proposed treatments and forest types. This comment is suitable to individual units or proposed treatments.The last harvest in the Lake Tarleton area is estimated to be in the mid-late 1990's during private ownership. The last harvest in the Sentinel Mountain area was in the late 1990's by the State of New Hampshire. |
| Jones, Eric | The Project Map shows no buffer between the cutting and any water body (Lake/stream or pond)(except for the buffer adjacent to the Lake Tarleton Boat Launch. What is that buffer (beauty strip)dimension depth? | The project will follow all Forest Plan standards and guidelines and National and State best management practices regarding adjacent waterbodies to timber management. Forest Plan guideline G-2, 2-24 which best applies to this situation states "Uneven-aged silvicultural practices should be used within the Riparian Management Zone (RMZ) along all perennial streams, lakes, ponds, and vernal pools. Cuts should be designed to maintain a relatively continuous forest canopy for the protection and maintenance of water quality, dead wood recruitment, hydrologic function, wildlife habitat, and scenic values. Regeneration group cuts should be limited to less than one acre in size. Exceptions may apply in areas deemed important for maintaining beaver colonies." |
| Jones, Eric | The Project Map shows no buffer (beauty strip) between the cutting on the Sentinel Mountain section and the Appalachian Trail. What is that buffer depth? | The project will follow all Forest Plan standards and guidelines and National and State best management practices regarding adjacent waterbodies to timber management. Forest Plan guideline G-2, 2-24 which best applies to this situation states "Uneven-aged silvicultural practices should be used within the Riparian Management Zone (RMZ) along all perennial streams, lakes, ponds, and vernal pools. Cuts should be designed to maintain a relatively continuous forest canopy for the protection and maintenance of water quality, dead wood recruitment, hydrologic function, wildlife habitat, and scenic values. Regeneration group cuts should be limited to less than one acre in size. Exceptions may apply in areas deemed important for maintaining beaver colonies." |
| Jones, Eric | The Project Map shows no buffer (beauty strip) between Lake Katherine and the proposed permanent wildlife opening. What is the buffer depth? | The project will follow all Forest Plan standards and guidelines and National and State best management practices regarding adjacent waterbodies to timber management. Forest Plan guideline G-2, 2-24 which best applies to this situation states "Uneven-aged silvicultural practices should be used within the Riparian Management Zone (RMZ) along all perennial streams, lakes, ponds, and vernal pools. Cuts should be designed to maintain a relatively continuous forest canopy for the protection and maintenance of water quality, dead wood recruitment, hydrologic function, wildlife habitat, and scenic values. Regeneration group cuts should be limited to less than one acre in size. Exceptions may apply in areas deemed important for maintaining beaver colonies." |
| Jones, Eric | The Project Map shows no buffer (beauty strip) between the Power Line nor the Lake Tarleton in-holding and the cutting. What is the buffer depth? | The project will follow all Forest Plan standards and guidelines and National and State best management practices regarding adjacent waterbodies to timber management. Forest Plan guideline G-2, 2-24 which best applies to this situation states "Uneven-aged silvicultural practices should be used within the Riparian Management Zone (RMZ) along all perennial streams, lakes, ponds, and vernal pools. Cuts should be designed to maintain a relatively continuous forest canopy for the protection and maintenance of water quality, dead wood recruitment, hydrologic function, wildlife habitat, and scenic values. Regeneration group cuts should be limited to less than one acre in size. Exceptions may apply in areas deemed important for maintaining beaver colonies." |
| Jones, Eric | The Project Map shows no buffer (beauty strip) between the cutting and Cape Moonshine Rd./NH Route 25C/and the Charleston Rd. What is the dimension depth of these buffers (beauty strips)? The Project Map shows no buffer (beauty strip) between the cutting and the adjacent private land along Eastman Brook. What is the dimension depth of this buffer (beauty strip)? | The project will follow all Forest Plan standards and guidelines and National and State best management practices regarding adjacent waterbodies to timber management. Forest Plan guideline G-2, 2-24 which best applies to this situation states "Uneven-aged silvicultural practices should be used within the Riparian Management Zone (RMZ) along all perennial streams, lakes, ponds, and vernal pools. Cuts should be designed to maintain a relatively continuous forest canopy for the protection and maintenance of water quality, dead wood recruitment, hydrologic function, wildlife habitat, and scenic values. Regeneration group cuts should be limited to less than one acre in size. Exceptions may apply in areas deemed important for maintaining beaver colonies." |
| Jones, Eric | Is there any intent to leave any part of the project area to mature into permanent "Old Growth"? | The Lake Tarleton Habitat Management Unit (HMU) encompasses over 5,000 acres of forested land. 1,600 acres are located within Semi-Primative Recreation Management Area (MA) where timber harvest is prohibited. 840 acres are located within Appalachian National Scenic Trail MA where timber harvest is permitted with restrictions. Given these considerations, a large amount of the HMU will be retained unmanaged in a mature state for the forseeable future. The Tarleton IRP proposes silvicultural treatments on up 880 acres (Table 1, Page 7 of EA) to achieve the project Vegetation and Wildlife Habitat Management objectives to meet the desired future conditions for wildlife and vegetation, described in Chapter 1 of the Forest Plan. There are no stands proposed for harvest within the Tarleton IRP that meet Old Growth Forest Criteria, defined on page 21 of the Forest Plan. |

PBWTAR_11890

| | | |
|---|---|---|
| Jones, Eric | What is the carbon emission calculated for this cutting and how will it be offset? | As stated in the EA on page 17 "The proposed action affects a relatively small amount of forest land and carbon on the White Mountain National Forest and, in the near-term, might contribute an extremely small quantity of greenhouse gas emissions relative to national and global emissions (Dugan and McKinley 2019). The proposed action would not convert forest land to other non-forest uses, thus allowing any carbon initially emitted from the proposed action to have a temporary influence on atmospheric greenhouse gas concentrations, because carbon will be removed from the atmosphere over time as the forest regrows." |
| lather, bruce | I am 100 percent opposed to this project! | The White Mountain National Forest Interdisciplinary Team has used the best science available to conduct our effects analysis and preliminary finding of no significant impact. Resources analyzed for effects include wildlife habitat, hydrology, soil, botany, recreation, socioeconomics, transportation, and cultural resources, all important for the human environment. More can be found in the Environmental Impacts section of the Tarleton EA. |
| MacKenzie, Rebecca | I am opposed to the Tarleton Integrated Resource Project #56394, or the logging of massive acreage of NH forests, due to its effects on the ecosystems of the region, the effects of erosion on the land, water quality of the region due to deforestation, and reduction of sequestration of carbon due to the loss of carbon-sequestering trees. | The effects of the proposed action on climate change are addressed on pages 17-18 of the project EA. The compositional and structural goals of proposed action are a priority with a focus to strengthen the adaptive capability to the potential effects of climate change. This project area contains many species, representing a broad mix of tolerances and reproductive strategies. The best strategy is to foster adaptation by maintaining compositionally and structurally complex forests (Ruddell et al. 2007). This strategy aims to manage the project area for the greatest degree of diversity within species, ages, and size classes. |
| MacKenzie, Rebecca | As an environmental advocate, I understand the complexity of ecosystems and our dependence, as human beings, on a robust natural environment. Forestry management has touted the practice of "release cut," or logging, to increase the diversity of species in the last century, and some still promote this outdated practice as viable forestry practice. I name it for what it is, an economic choice, without regard to the aforementioned negative results. | Because of the intense timber harvest history within the project area and on the Forest as a whole, the existing habitat composition is different than what would be expected had natural processes been allowed to continue unchecked. A key objective of the Forest Plan is to bring the habitat composition back into alignment with what would be expected under natural conditions (USDA Forest Service 2005, pp. 1-20 to 1-21). Documents outlining the rationale for this management approach can be found in the project record (USDA Forest Service 2005, USDA Forest Service 2019a, USDA Forest Service 2019b, USDA Forest Service 2020).The Tarleton IRP proposes using silvicultural treatments to both promote and maintain a balance of regeneration, young, and mature forested age class compositions on suitable lands across the Lake Tarleton Habitat Management Unit (HMU). Even-aged regeneration treatments, including clearcutting, are proposed on up to 145 acres (Table 1, Page 7 of EA) to stimulate the growth of mid and shade intolerant woody and herbaceous species. Absent catastrophic stand replacing disturbance, such as wildfire, hurricane, extreme wind, etc., these species cannot compete under shaded canopy. As these stands develop and senescence occurs over time, the seed source and resprouting vigor will be lost. Even-aged regeneration is proposed on less than 3% of the HMU's acreage. The larger majority of the HMU's acreage will be left untouched to develop naturally or managed with intermediate and uneven-aged treatments to further diversify the composition and structure of the landscape. An objective of the Forest Plan is to maintain high quality mature forest and old forest habitats on a majority of the Forest (USDA Forest Service 2005, pp. 1-20) and the area within the Lake Tarleton HMU is no exception.Clearcutting is the ideal system for encouraging early-successional bird species, as well as providing post-fledging habitat for forest songbirds (Chandler et al. 2012, King et al. 2011). Clearcutting also produces considerable vertebrate wildlife diversity (Leak et al. 2014). Early successional woody and herbaceous species promote the availability of preferred browse species and soft mass, such as raspberries and blackberries, that are utilized as food for a wide variety of wildlife.Harvesting operations will follow Riparian and Aquatic Habitat guidelines detailed on pages 2-24 and 2-25 to protect streams, lakes, ponds, and vernal pools within the project area. Operations would occur during the winter when wildlife are less sensitive to disturbance. As such, no timber harvest activities would occur during the height of the breeding season for birds. |
| MacKenzie, Rebecca | Gone are the days we can refuse to look at the bigger picture of what a "release cut" means. Human beings are dependent on these forests to remain healthy so that we can best deal with the climate crisis as best we can. There is another term used in forestry to talk about managing our forests. Today's educated foresters know that the "facilitation" of forests is one of the important solutions to the climate crisis. How can we look down on those in other countries who are deforesting their lands when we are guilty of the same? | The effects of the proposed action on climate change are addressed on pages 17-18 of the project EA. The compositional and structural goals of proposed action are a priority with a focus to strengthen the adaptive capability to the potential effects of climate change. This project area contains many species, representing a broad mix of tolerances and reproductive strategies. The best strategy is to foster adaptation by maintaining compositionally and structurally complex forests (Ruddell et al. 2007). This strategy aims to manage the project area for the greatest degree of diversity within species, ages, and size classes. |

| | | |
|---|---|---|
| MacKenzie, Rebecca | Let us not look at the economic incentives for this project, but rather, the cost to human and other species health and suffering. The climate crisis is creating a greater economic burden on all the world's economies and the health and happiness of future generations. Please look at the bigger picture, not just the immediate need for an economic incentive. Your grandchildren and great grandchildren will thank you for it. Do not proceed with the plan to follow through with the Tarleton Integrated Resource Project #56394. It is a mistake, not only today, but forever. "How dare you!" said the child to the room full of diplomats. "You have stolen my dreams and my childhood with your empty words. And yet I'm one of the lucky ones. People are suffering. People are dying. Entire ecosystems are collapsing. We are in the beginning of a mass extinction, and all you can talk about is money and fairy tales of eternal economic growth. How dare you!" | The White Mountain National Forest Interdisciplinary Team has used the best science available to conduct our effects analysis and preliminary finding of no significant impact. Resources analyzed for effects include wildlife habitat, hydrology, soil, botany, recreation, socioeconomics, transportation, and cultural resources, all important for the human environment. More can be found in the Environmental Impacts section of the Tarleton EA. |
| MacKenzie, Rebecca | In the NH Climate Action Plan, p. 23, Section 7 titled "Protect natural resources (land, water, wildlife) to maintain the amount of carbon fixed or sequestered." (attached file) Though there is evidence of contradiction in this section, allowing for the logging of our forests for economic advantage, the intent is in the title and narrative of that section, not in the bullets after the first bullet. | Page 6 of the 2009 NH climate action plan states "In addition to playing a role mitigating climate change,this extensive natural resource provides a broad range of benefits including:• Renewable supply of wood for heating, lumber, and avariety of forest products.• Water cycle regulation.• Groundwater recharge and water quality protection.• Wildlife habitat.• Recreational opportunities.New Hampshire's forest lands, therefore, play a critical role in maintaining the quality of life in our state. The forestproducts industry has been and will continue to be a key component of our state's economy. In addition, our tourism andoutdoor recreation economies are also heavily dependent on the existence of healthy forests. In 2005, forest-basedmanufacturing and forest-related recreation and tourism in the state contributed over $2.3 billion to the state economy."The Tarleton IRP works towards these goals as well as the goals lined out in the 2005 Forest Plan. |
| McLaughlin, Andrew | tHIS PROJECT IS DESTRUCTIVE OF FORESTS WHICH ARE DEPERATELY NEEDED FOR CARBON SEQUESTRATION. i CAN SEE NO GOOD REASON TO PROCEED AND MANY REASONS TO LEAVE THE FOREST INTACT AND LET IT GROW. | The effects of the proposed action on climate change are addressed on pages 17-18 of the project EA. The compositional and structural goals of proposed action are a priority with a focus to strengthen the adaptive capability to the potential effects of climate change. This project area contains many species, representing a broad mix of tolerances and reproductive strategies. The best strategy is to foster adaptation by maintaining compositionally and structurally complex forests (Ruddell et al. 2007). This strategy aims to manage the project area for the greatest degree of diversity within species, ages, and size classes. |
| Meyers, Lisy | Project 56394 at Tarleton Lake in Grafton County, New Hampshire, sounds fine except for the logging you plan to do. Taking down 880 acres of trees would be a drastic change to the landscape and to the whole area. We are not in favor of this plan. We need to see trees being planted, not logged. Forests are the carbon sink in this warming climate. Logging makes no sense. We would like to see a change in your plans regarding the timber harvest. | The effects of the proposed action on climate change are addressed on pages 17-18 of the project EA. The compositional and structural goals of proposed action are a priority with a focus to strengthen the adaptive capability to the potential effects of climate change. This project area contains many species, representing a broad mix of tolerances and reproductive strategies. The best strategy is to foster adaptation by maintaining compositionally and structurally complex forests (Ruddell et al. 2007). This strategy aims to manage the project area for the greatest degree of diversity within species, ages, and size classes. |
| Miller, Joann | It is so disheartening to learn of these logging plans at such beautiful areas. While I understand there needs to be maintenance, we all know how things go and more logging will disrupt the environment and beauty of the locations. I havd been to both lakes and know how great it has been to enjoy. Hopefully it will be the same for future generations. | The White Mountain National Forest Interdisciplinary Team has used the best science available to conduct our effects analysis and preliminary finding of no significant impact. Resources analyzed for effects include wildlife habitat, hydrology, soil, botany, recreation, socioeconomics, transportation, and cultural resources, all important for the human environment. More can be found in the Environmental Impacts section of the Tarleton EA. |

| | | |
|---|---|---|
| Mueller, Helga | As a member of the Piermont Historical Society I have a concern regarding your proposed logging in the area of the former Sentinel Mountain State Forest. In 1992 the Society flagged a small family cemetery off Cape Moonshine Road near the Sentinel Forest known as the Hurd Spring Cemetery with graves that are believed to be of Amos Hurd, his wife, daughter, and a cousin. Then located off a logging road, the cemetery contained several broken stones. The cemetery was about 40x60 feet and was enclosed by stone walls. Amos Hurd was a soldier of the Revolutionary War and a former Piermont Town treasurer. The Society placed a war marker with Amos Hurd's name at the largest grave. I am writing this note to advise you of a historic site that you might encounter during your logging activities. | Measures to protect historic archaeological sites and provisions for the inadvertent discovery of previously unknown archaeological sites are described in Table 2 on page 15 of the draft EA, and in the Cultural Resources Reconnaissance Report in the project record. The New Hampshire State Historic Preservation Office (New Hampshire Division of Historic Resources) was consulted and concurred with the finding of No Historic Properties Affected subject to the protection measures described. |
| Puleo, Cheryl | propose that a trail from the power-line, located 2/10ths of a mile from the Greenhouse, at the edge of the National Forest along Route 25C, be included in this project. | Additional recreation access was considered for the Tarleton area, however due to existing and predicted use patterns, there are currently no proposals for additional access/improvements except for improving Lake Katherine Access at this time. |
| Robey, Frank | What is this the 20th project since the Forest Plan in 2005? Each one tears more of the trees out, trees that could be helping to alleviate climate change if YOU WOULD LEAVE THEM ALONE!!! Stop, please stop killing trees. You talk about making the forest more reslilient to climate change yet you don't have a clue what you're talking about. Logging increases the temperature of streams, the ground, the atmosphere. Logging increases the suseptibility to fires. | The effects of the proposed action on climate change are addressed on pages 17-18 of the project EA. The compositional and structural goals of proposed action are a priority with a focus to strengthen the adaptive capability to the potential effects of climate change. This project area contains many species, representing a broad mix of tolerances and reproductive strategies. The best strategy is to foster adaptation by maintaining compositionally and structurally complex forests (Ruddell et al. 2007). This strategy aims to manage the project area for the greatest degree of diversity within species, ages, and size classes. |
| Robey, Frank | I'm not going to bother to submit any substantial comments because you are going to do what you want anyone, no matter what the Public says...the only way to stop you is to drag all of you in court and have a judge tell you to stop...unfortunately I haven't been able to find an attorney to do this. How do you looks at yourselves in the mirror knowing that you are killing the WMNF one logging project at a time. Stop killing the lungs of our planet just to check the boxes that show your obedience to the loggers...and allow them to rape and pillage our planet. | The White Mountain National Forest Interdisciplinary Team has used the best science available to conduct our effects analysis and preliminary finding of no significant impact. Resources analyzed for effects include wildlife habitat, hydrology, soil, botany, recreation, socioeconomics, transportation, and cultural resources, all important for the human environment. More can be found in the Environmental Impacts section of the Tarleton EA. |

| | | |
|---|---|---|
| Sheehan, Margaret | This forest should be left in tact to regenerate after hundreds of years of cutting and logging. Our biodiversity is threatened with extinction as the UN IBPES warns. | Because of the intense timber harvest history within the project area and on the Forest as a whole, the existing habitat composition is different than what would be expected had natural processes been allowed to continue unchecked. A key objective of the Forest Plan is to bring the habitat composition back into alignment with what would be expected under natural conditions (USDA Forest Service 2005, pp. 1-20 to 1-21). Documents outlining the rationale for this management approach can be found in the project record (USDA Forest Service 2005, USDA Forest Service 2019a, USDA Forest Service 2019b, USDA Forest Service 2020).The Tarleton IRP proposes using silvicultural treatments to both promote and maintain a balance of regeneration, young, and mature forested age class compositions on suitable lands across the Lake Tarleton Habitat Management Unit (HMU). Even-aged regeneration treatments, including clearcutting, are proposed on up to 145 acres (Table 1, Page 7 of EA) to stimulate the growth of mid and shade intolerant woody and herbaceous species. Absent catastrophic stand replacing disturbance, such as wildfire, hurricane, extreme wind, etc., these species cannot compete under shaded canopy. As these stands develop and senescence occurs over time, the seed source and resprouting vigor will be lost. Even-aged regeneration is proposed on less than 3% of the HMU's acreage. The larger majority of the HMU's acreage will be left untouched to develop naturally or managed with intermediate and uneven-aged treatments to further diversify the composition and structure of the landscape. An objective of the Forest Plan is to maintain high quality mature forest and old forest habitats on a majority of the Forest (USDA Forest Service 2005, pp. 1-20) and the area within the Lake Tarleton HMU is no exception.Clearcutting is the ideal system for encouraging early-successional bird species, as well as providing post-fledging habitat for forest songbirds (Chandler et al. 2012, King et al. 2011). Clearcutting also produces considerable vertebrate wildlife diversity (Leak et al. 2014). Early successional woody and herbaceous species promote the availability of preferred browse species and soft mass, such as raspberries and blackberries, that are utilized as food for a wide variety of wildlife.Harvesting operations will follow Riparian and Aquatic Habitat guidelines detailed on pages 2-24 and 2-25 to protect streams, lakes, ponds, and vernal pools within the project area. Operations would occur during the winter when wildlife are less sensitive to disturbance. As such, no timber harvest activities would occur during the height of the breeding season for birds. |
| Sheehan, Margaret | Here in this area we have a unique opportunity to leave the forest alone so that the plants, animals and fungi can have a fighting chance of surviving in this Sixth Great Extinction. Further, in a time of unprecedented climate change, we need to protect swaths of forests that can mature over years to support both carbon sequestration and late succession forest species diversity | The effects of the proposed action on climate change are addressed on pages 17-18 of the project EA. The compositional and structural goals of proposed action are a priority with a focus to strengthen the adaptive capability to the potential effects of climate change. This project area contains many species, representing a broad mix of tolerances and reproductive strategies. The best strategy is to foster adaptation by maintaining compositionally and structurally complex forests (Ruddell et al. 2007). This strategy aims to manage the project area for the greatest degree of diversity within species, ages, and size classes. |
| Sheehan, Margaret | Too much of the proposed area is on a steep slope and will cause erosion and major habitat loss. | Forest Plan Standards and Guidelines are being followed regarding timber harvesting. Both the soil scientist, Timber Sale Administrator, and district foresters have reviewed and will monitor the site before, during, and after implementation. Best management practices will be followed pertaining to soil and watershed management during the project. Due to the vegetation being harvested strictly in winter the effects on soil should be minimal. |
| Sheehan, Margaret | The environmental impact studies that have been conducted are based on guidelines from 20+ years ago and do not account for the increased precipitation this region is expected to receive in the coming years. | The hydrology effects section of the EA on pg. 18 states "No measurable adverse effects to water quality or quantity are expected due to project implementation." Project design features pertaining to water resources can be found on pg. 15 of the EA. |

| | | |
|---|---|---|
| Sheehan, Margaret | They are claiming that, "One outcome of clearcutting would be an increase in species diversity within units and across the project area." They make this claim without acknowledging the millions of species that thrive in semi-mature forests, and without taking into account the ecosystem functions that they provide to protect the lake and surrounding areas. | Because of the intense timber harvest history within the project area and on the Forest as a whole, the existing habitat composition is different than what would be expected had natural processes been allowed to continue unchecked. A key objective of the Forest Plan is to bring the habitat composition back into alignment with what would be expected under natural conditions (USDA Forest Service 2005, pp. 1-20 to 1-21). Documents outlining the rationale for this management approach can be found in the project record (USDA Forest Service 2005, USDA Forest Service 2019a, USDA Forest Service 2019b, USDA Forest Service 2020).The Tarleton IRP proposes using silvicultural treatments to both promote and maintain a balance of regeneration, young, and mature forested age class compositions on suitable lands across the Lake Tarleton Habitat Management Unit (HMU). Even-aged regeneration treatments, including clearcutting, are proposed on up to 145 acres (Table 1, Page 7 of EA) to stimulate the growth of mid and shade intolerant woody and herbaceous species. Absent catastrophic stand replacing disturbance, such as wildfire, hurricane, extreme wind, etc., these species cannot compete under shaded canopy. As these stands develop and senescence occurs over time, the seed source and resprouting vigor will be lost. Even-aged regeneration is proposed on less than 3% of the HMU's acreage. The larger majority of the HMU's acreage will be left untouched to develop naturally or managed with intermediate and uneven-aged treatments to further diversify the composition and structure of the landscape. An objective of the Forest Plan is to maintain high quality mature forest and old forest habitats on a majority of the Forest (USDA Forest Service 2005, pp. 1-20) and the area within the Lake Tarleton HMU is no exception.Clearcutting is the ideal system for encouraging early-successional bird species, as well as providing post-fledging habitat for forest songbirds (Chandler et al. 2012, King et al. 2011). Clearcutting also produces considerable vertebrate wildlife diversity (Leak et al. 2014). Early successional woody and herbaceous species promote the availability of preferred browse species and soft mass, such as raspberries and blackberries, that are utilized as food for a wide variety of wildlife.Harvesting operations will follow Riparian and Aquatic Habitat guidelines detailed on pages 2-24 and 2-25 to protect streams, lakes, ponds, and vernal pools within the project area. Operations would occur during the winter when wildlife are less sensitive to disturbance. As such, no timber harvest activities would occur during the height of the breeding season for birds. |
| Sheehan, Margaret | We depend on these forests for a sustainable future and for clean water. Logging under the guise of forest health is no longer a viable claim and does not pass muster either with the general public or scientists. There is no credible science that has been produced to support the claim that this clear cutting is a means to greater ecological health. While the overall plan claims to provide buffers and corridors, we see through the greenwashing and recognize this project as a major threat to the health and well-being of the existing wildlife and surrounding communities. Please cancel this project immediately. | The White Mountain National Forest Interdisciplinary Team has used the best science available to conduct our effects analysis and preliminary finding of no significant impact. Resources analyzed for effects include wildlife habitat, hydrology, soil, botany, recreation, socioeconomics, transportation, and cultural resources, all important for the human environment. More can be found in the Environmental Impacts section of the Tarleton EA. |
| Smith, Douglas | It is discouraging that the Forest Service appears unaware of the critical role of mature forests in mitigating climate change and in fostering biodiversity of a deep and stable kind. The logging -- some of it clearcutting -- proposed in this area is diametrically opposed to the latest science regarding the role of forests and forest soils in sequestering carbon. Please reconsider these proposals. | The effects of the proposed action on climate change are addressed on pages 17-18 of the project EA. The compositional and structural goals of proposed action are a priority with a focus to strengthen the adaptive capability to the potential effects of climate change. This project area contains many species, representing a broad mix of tolerances and reproductive strategies. The best strategy is to foster adaptation by maintaining compositionally and structurally complex forests (Ruddell et al. 2007). This strategy aims to manage the project area for the greatest degree of diversity within species, ages, and size classes. |
| Smolker, Rachel | It is long past due for the Forest Service to stop supporting timber extraction as the primary goal of "management". Science has been demonstrating that forests are intricate systems easily disrupted by logging, resulting in damage to soils, waterways, resistance to pests and pathogens, resilience in the face of global climate change and more. | The White Mountain National Forest Interdisciplinary Team has used the best science available to conduct our effects analysis and preliminary finding of no significant impact. Resources analyzed for effects include wildlife habitat, hydrology, soil, botany, recreation, socioeconomics, transportation, and cultural resources, all important for the human environment. More can be found in the Environmental Impacts section of the Tarleton EA. |
| Smolker, Rachel | Most importantly, we know that allowing forests to grow unhindered - to attain "old growth" characteristics, including very old trees, lots of deadwood and intact soil microbiome, is the best available "technology" for sequestering carbon from our overburdened atmosphere. | The Lake Tarleton Habitat Management Unit (HMU) encompasses over 5,000 acres of forested land. 1,600 acres are located within Semi-Primative Recreation Management Area (MA) where timber harvest is prohibited. 840 acres are located within Appalachian National Scenic Trail MA where timber harvest is permitted with restrictions. Given these considerations, a large amount of the HMU will be retained unmanaged in a mature state for the forseeable future. The Tarleton IRP proposes silvicultural treatments on up 880 acres (Table 1, Page 7 of EA) to achieve the project Vegetation and Wildlife Habitat Management objectives to meet the desired future conditions for wildlife and vegetation, described in Chapter 1 of the Forest Plan. There are no stands proposed for harvest within the Tarleton IRP that meet Old Growth Forest Criteria, defined on page 21 of the Forest Plan. |

| | | |
|---|---|---|
| Solaun, Silvia | With today's climate crisis protecting and preserving large swaths of forest is even more important than ever. Natural, like windstorms and "unnatural" disturbances, like EAB, Hemlock Woolly Adelgid, Oak Wilt, and other insect and fungi infections, have caused openings in our forests without the use of heavy commercial logging equipment. | Disturbances described by the commenter are infrequent and/or at largest, multiple trees in scale. These individual to multiple tree openings are not large enough to establish areas suitable to early successional vegetative species, used by a variety of wildlife species. |
| Solaun, Silvia | The area that is proposed is on a steep slope and will cause erosion and major habitat loss. | Forest Plan Standards and Guidelines are being followed regarding timber harvesting. Both the soil scientist, Timber Sale Administrator, and district foresters have reviewed and will monitor the site before, during, and after implementation. Best management practices will be followed pertaining to soil and watershed management during the project. Due to the vegetation being harvested strictly in winter the effects on soil should be minimal. |
| Solaun, Silvia | The environmental impact studies that have been conducted are based on guidelines from 20+ years ago and do not account for the increased precipitation this region is expected to receive in the coming years. Removal of intact tree canopy will cause extreme flooding, stormwater runoff and will degrade the water quality of the nearby lakes and waterways. | The hydrology effects section of the EA on pg. 18 states "No measurable adverse effects to water quality or quantity are expected due to project implementation." Project design features pertaining to water resources can be found on pg. 15 of the EA. |
| Solaun, Silvia | The proposed logging plan states that, "one outcome of clearcutting would be an increase in species diversity within units and across the project area." This false claim is made without acknowledging the millions of species that thrive in semi-mature forests, never mind the ecosystem functions that they provide to protect the lake and surrounding areas! Additionally, what about the forest interior dependent species? Why are you knowingly destroying their habitat? | Because of the intense timber harvest history within the project area and on the Forest as a whole, the existing habitat composition is different than what would be expected had natural processes been allowed to continue unchecked. A key objective of the Forest Plan is to bring the habitat composition back into alignment with what would be expected under natural conditions (USDA Forest Service 2005, pp. 1-20 to 1-21). Documents outlining the rationale for this management approach can be found in the project record (USDA Forest Service 2005, USDA Forest Service 2019a, USDA Forest Service 2019b, USDA Forest Service 2020).The Tarleton IRP proposes using silvicultural treatments to both promote and maintain a balance of regeneration, young, and mature forested age class compositions on suitable lands across the Lake Tarleton Habitat Management Unit (HMU). Even-aged regeneration treatments, including clearcutting, are proposed on up to 145 acres (Table 1, Page 7 of EA) to stimulate the growth of mid and shade intolerant woody and herbaceous species. Absent catastrophic stand replacing disturbance, such as wildfire, hurricane, extreme wind, etc., these species cannot compete under shaded canopy. As these stands develop and senescence occurs over time, the seed source and resprouting vigor will be lost. Even-aged regeneration is proposed on less than 3% of the HMU's acreage. The larger majority of the HMU's acreage will be left untouched to develop naturally or managed with intermediate and uneven-aged treatments to further diversify the composition and structure of the landscape. An objective of the Forest Plan is to maintain high quality mature forest and old forest habitats on a majority of the Forest (USDA Forest Service 2005, pp. 1-20) and the area within the Lake Tarleton HMU is no exception.Clearcutting is the ideal system for encouraging early-successional bird species, as well as providing post-fledging habitat for forest songbirds (Chandler et al. 2012, King et al. 2011). Clearcutting also produces considerable vertebrate wildlife diversity (Leak et al. 2014). Early successional woody and herbaceous species promote the availability of preferred browse species and soft mass, such as raspberries and blackberries, that are utilized as food for a wide variety of wildlife.Harvesting operations will follow Riparian and Aquatic Habitat guidelines detailed on pages 2-24 and 2-25 to protect streams, lakes, ponds, and vernal pools within the project area. Operations would occur during the winter when wildlife are less sensitive to disturbance. As such, no timber harvest activities would occur during the height of the breeding season for birds. |
| Solaun, Silvia | There are plenty of species that depend on these intact maturing forests and we refuse to accept that clear cutting is a means to "greater ecological health"! In fact, it is just the opposite. This is a greenwashing campaign to try to sell the public that logging public lands is good for us all. | The White Mountain National Forest Interdisciplinary Team has used the best science available to conduct our effects analysis and preliminary finding of no significant impact. Resources analyzed for effects include wildlife habitat, hydrology, soil, botany, recreation, socioeconomics, transportation, and cultural resources, all important for the human environment. More can be found in the Environmental Impacts section of the Tarleton EA. |
| Teschner, Douglass | It appears on your documents that you plan to harvest timber right down to the shore of Lake Tarleton. I suggest an appropriate buffer zone to keep the lake edge forested. | The project will follow all Forest Plan standards and guidelines and National and State best management practices regarding adjacent waterbodies to timber management. Forest Plan guideline G-2, 2-24 which best applies to this situation states "Uneven-aged silvicultural practices should be used within the Riparian Management Zone (RMZ) along all perennial streams, lakes, ponds, and vernal pools. Cuts should be designed to maintain a relatively continuous forest canopy for the protection and maintenance of water quality, dead wood recruitment, hydrologic function, wildlife habitat, and scenic values. Regeneration group cuts should be limited to less than one acre in size. Exceptions may apply in areas deemed important for maintaining beaver colonies." |

| | | |
|---|---|---|
| Tompkins, Joyce | I was one of those who recommended improving the area at Lake Katherine where visitors entered. Over the years a great deal of damage has occurred at that site. The proposal to prepare a place to park and to restrict access to carry in water craft is great. I think it might be a little overkill to have parking for six vehicles as I have never seen that many in the area. Katherine is a small, shallow lake and encouraging too many visitors might be problematic. | Thank you for your comment. The proposed action to harden the access at Lake Katherine is primarily for resource protection. The existing access point is muddy and subject to rutting by vehicles accessing the lake. Development here would be minimal and not intended to attract additional use but rather to accommodate current use while protecting the shoreline environment. |
| Tompkins, Joyce | My other concern is about the harvesting close to Lake Tarleton. I know you will follow state and local requirements for leaving a buffer around the lake but I suggest a 300 foot buffer. | The project will follow all Forest Plan standards and guidelines and National and State best management practices regarding adjacent waterbodies to timber management. Forest Plan guideline G-2, 2-24 which best applies to this situation states "Uneven-aged silvicultural practices should be used within the Riparian Management Zone (RMZ) along all perennial streams, lakes, ponds, and vernal pools. Cuts should be designed to maintain a relatively continuous forest canopy for the protection and maintenance of water quality, dead wood recruitment, hydrologic function, wildlife habitat, and scenic values. Regeneration group cuts should be limited to less than one acre in size. Exceptions may apply in areas deemed important for maintaining beaver colonies." |
| Tompkins, Joyce | I, like others, have concerns about bringing invasive weeds into the lakes. | Included in the Lake Katherine boat launch enhancement proposal is installation of an information kiosk that will include best practices for boat and equipment cleaning to reduce spread of invasive species. |
| Williamson, Kevin | Care should be taken to protect the tiny Lund Cemetery, which was badly damaged when the last timber harvest in this area was conducted. It is located at the following coordinates: 43°59'18.0"N 71°57'32.4"W | Measures to protect historic archaeological sites and provisions for the inadvertent discovery of previously unknown archaeological sites are described in Table 2 on page 15 of the draft EA, and in the Cultural Resources Reconnaissance Report in the project record. The New Hampshire State Historic Preservation Office (New Hampshire Division of Historic Resources) was consulted and concurred with the finding of No Historic Properties Affected subject to the protection measures described. |

# Decision Notice

Tarleton Integrated Resource Project

U.S. Department of Agriculture, Forest Service

Pemigewasset Ranger District, White Mountain National Forest

Grafton County, New Hampshire

The Decision Notice incorporates all previous information in the Tarleton Integrated Resource Project Environmental Assessment and Finding of No Significant Impact (EA/FONSI), as well as information included in the project record.

## Decision and Rationale

I have decided to authorize the activities described in the "Purpose and Need" and "Proposed Action" sections of the project EA/FONSI, including modifications identified during environmental analysis and review of legal and regulatory compliance. The public will note their comments and concerns were considered throughout the analysis with alterations to the proposal from the first draft EA, the second draft EA, and to the final EA.

Under the proposed action, management actions for habitat, vegetation, and recreation management would occur within about 755 acres of management area (MA) 2.1- General Forest Management and MA 8.3- Appalachian National Scenic Trail (Appalachian Trail) lands. The project will advance forest plan goals and objectives by diversifying wildlife habitat and addressing other recreation and transportation management needs. Refer to the EA/FONSI for a complete project description. The proposed action is summarized below.

- Conduct silvicultural treatment over about 690 acres of management area 2.1 and management area 8.3 lands within the Tarleton habitat management unit (HMU).
- Reconfigure the Lake Katherine permanent wildlife opening to bring into Forest Plan compliance.
    - Establish a minimum 75-foot-wide forested buffer between Lake Katherine and the wildlife opening by foregoing maintenance in those areas and allowing natural revegetation to occur. White pine may also be planted within this buffer to hasten the establishment of desirable woody vegetation.
    - Retain an existing forested segment within the 63-acre area to create separation and establish two smaller openings on either side.
    - Re-establish portions of the openings by removing existing trees and saplings, including non-native Scots pine.
- Adopt an apple orchard on the northeast side of Charleston Road and expand from one to two acres.
- Distribute no more than ten Scots pine felled from the Lake Katherine wildlife opening along the Lake Katherine shoreline.
- Reconstruct about 1.5 miles of existing system and non-system roads.
- Add about 5 miles of unauthorized roads to the forest road system for future administrative use.
- Install up to ten gates at various points in the project area to enhance restriction of unauthorized vehicles.
- Adopt and redesign the Lake Katherine Boat Launch.
    - Create a boat launch designed for hand-launched watercraft (e.g., canoes, kayaks, paddleboards).

- Reconfigure the user-made parking lot to accommodate up to six vehicles, including space for a vehicle turn-around.
- Install barriers to restrict motorized vehicle access to portions of the site not designed for vehicle traffic.
- Install hardened surfacing (e.g. gravel, concrete) for parking lot, approach areas, and footpath from the parking area to the shoreline.
- Stabilize the shoreline with rock at the launch site as needed to control erosion.
- Install drainage features to manage site run-off.
- Install a site kiosk and other standard site signage.
- Install up to two picnic tables.

In arriving at this decision, I followed the standard process as outlined in Forest Service Manuals and Handbooks along with the National Environmental Policy Act (NEPA). In addition, I chose to exceed these requirements and released a second draft EA and opened a second public comment period based on feedback and to ensure the public felt they had an opportunity to comment and be heard throughout the process.

I was particularly moved with the dialogue at the public meeting and passionate comments during the second public comment period and appreciated the personal connection people have with this landscape. For example, the privately owned parcel of land surrounding Lake Tarleton became a grassroots effort to ensure the land would be conserved and protected from future development. With the support of the State of New Hampshire, congressional staff, partners, and the public, the Forest Service added these lands to its multiple use portfolio, conserving them for the enjoyment of future generations.

WMNF has managed lands in New Hampshire and Maine for over 100 years. The history of the Weeks Act and why the WMNF was established due to unsustainable timber activities prior to its creation is well known. Numerous over harvested landscapes came under the U.S. Forest Service’s multiple use mission and these landscapes now thrive in a healthy, productive, and species diverse manner. These are the landscapes that are comprised of special places that are visited by approximately 6 million visitors annually, seeking nature and to be one with the land. This theme is also true for the lands around Lake Tarleton, where the private lands were heavily harvested, or liquidated, prior to federal acquisition.

The decision I am making in this document is based on and consistent with management decisions made when the parcels were acquired by the federal government. Timber harvest records prior to the parcels being transferred to federal ownership in 1998 are not available. Based on professional knowledge, the majority of the project area was heavily harvested prior to federal acquisition of the lands, and when determining future management of new acquisitions, the previous land use helps inform how these parcels would be managed moving forward. Additionally, as part of the Forest Plan revision process, the Tarleton lands were proposed to be managed under MA 2.1- General Forest Management, as well as MA 8.3- Appalachian National Scenic Trail (Appalachian Trail). Throughout the Forest Plan revision process there was extensive public input on how all WMNF lands would be managed at the habitat management unit levels. Ultimately, the Forest Plan revision received incredible support from the public, congressional staff, State of New Hampshire, and its numerous partners prior to the final decision was made.

After acquisition of the Tarleton lands, the WMNF allowed the landscape to grow and restock, this timeframe has brought it into silviculture alignment with treating landscapes every 20 to 30 years as part of the habitat and forest management cycle. It is now ready for active management to advance the Forest Plan’s goals, objectives, and desired conditions for vegetation as a working forest.

Applicable forest plan standards and guidelines, national core and state best management practices, and project-specific design features identified by the interdisciplinary team will be implemented as part of the proposed action. A number of additional design features were also developed and incorporated into the final proposed action based on public input.

Questions about what the landscape would look post treatment was a frequent public comment. The activity units were designed to meet minimum scenery requirements, but also best minimize visuals while still balancing the purpose and need, which often resulted in exceeding minimum standards. Visual changes would be consistent with the historic patchwork of forest and openings indicative of the region. Due to the types of proposed treatments, unit design features, and 'light touch' approach, most of the changes that may be potentially visible in the area may be seen as color, shadows, lighting and textural changes on the landscape and not as bare ground. The scenery post-implementation would be similar to the WMNF's former Sebosis timber sale located on the hills across from the viewshed of Mt. Washington Resort, Mt. Washington and the adjacent Bretton Woods Ski Resort.

I have considered public comments received throughout the analysis and balanced them with the best available science in making this decision. Changes made to the EA based on public comments are bulleted below in the 'Summary of Public Invovlement' section. For example, increasing the no-cut buffer on the backside of Lake Tarleton resulted from comments regarding the dispersed recreation values for this area. Reducing the project's forestry activities by 21.5 percent and adjusting group selection harvest unit sizes are also changes made to the project based on reasonable public feedback. Every comment letter was also read, analyzed, considered, and recorded in the project record.

The Forest Service consulted with the U.S. Fish and Wildlife Service (USFWS) under section 7 of the Endangered Species Act on the northern long-eared bat in 2021. Initially, it was determined the Proposed Action would have no effects beyond those previously disclosed in the programmatic Biological Opinion (BO) on implementing the final 4(d) rule. However, on August 22, 2022, the Forest Service reinitiated consultation with the USFWS on the anticipated reclassification of the northern long-eared bat from threatened to endangered under the Endangered Species Act; this ruling went into effect on March 31, 2023 and the 4(d) rule was removed. An updated BO was received from the USFWS on March 31, 2023. The agency concurred with the Forest Service's determination that the project may affect, but is not likely to adversely affect, the northern long-eared bat. As this is a "may effect", but "not likely to adversely affect" determination, there are no reasonable or prudent measures to incorporate. Therefore, the action, as proposed, is in compliance with the Endangered Species Act.

An interdisciplinary team fully evaluated and disclosed the environmental effects of the proposed project based upon field study, resource inventory and survey, best available science applicable, and professional expertise. The project record demonstrates a thorough review of relevant scientific information and the consideration of opposing views.

I would like to thank those we heard from related to the project, both supportive and those who shared their concerns, and ask that they consider the reasons for this project with an open mind. No substantive alternatives were brought forward by the public that met the purpose and need, although the comments received were evaluated and the proposed action was continuously updated throughout the analysis based on public input. The final proposed action is a well-balanced consideration for the purpose and need and an incorporation of public input.

I considered the need for action and the issues identified during scoping in making my decision. I weighed the effects of the proposed action against taking no action. While taking no action would allow the natural successional processes to continue, it would not advance the goals and objectives of the forest plan for which I am charged to implement. Therefore, taking no action would not meet the need for the project. The proposed action will have minimal impact on the environment and will benefit multiple resources.

## Summary of Public Involvement

The project was first introduced to the public in October 2019 to seek their feedback. The conceptual project was published on the Forest Service's schedule of proposed actions (SOPA) in October 2019, and a proposal development open house was held in-person with the public on November 21, 2019. Presentations were also given to the Warren and Piermont Board of Selectmen in August and September 2019 on the developing proposal.

In January 2020 WMNF initiated a scoping comment period for the Tarleton Project. A notice of the availability of the scoping newsletter and request for comments was sent to about 500 parties. Based on public input gathered during this initial comment period, and additional interdisciplinary review, we modified the scope of the proposed project. In May 2021, Forest Service staff conducted a field visit with the National Grid power company to the powerline corridor they own within the project area. In July 2021, we initiated the formal 30-day comment period on the draft EA and preliminary FONSI for the project. A notice of the availability of the draft EA/FONSI was published in the New Hampshire Union Leader newspaper. In addition, a notice of this comment period was sent to over 650 parties and visitations to the Piermont and Warren Board of Selectmen were conducted. On July 14, 2021, WMNF held a virtual public meeting to provide an overview of the project and assist the public with the commenting process. This virtual public meeting also included an open question-and-answer session with public. On November 3, 2021 WMNF responded to a request from the Lake Tarleton Association to present the project and scenery analysis at Kingswood Camp for Boys. At the offering of the Forest Service, on December 14, 2021 and WMNF conducted field visits with members of the public. On April 11, 2022, WMNF held a project information session with the New Hampshire Congressional Staffers about the project. Following public input and delayed interest in the project, on April 12, 2022, I decided to exceed standard practices by initiating a second formal 30-day comment period on the updated and released second Draft EA and preliminary FONSI for the project. A notice of availability was published in the Valley News newspaper. In addition, notices of this comment period were sent to over 600 parties. At their request, WMNF visited the project area with the Society for the Protection of New Hampshire Forests on May 13, 2022. At their invitation, the Forest Service met with the Lake Tarleton Association in person on July 13, 2022, for additional conversations on the proposed project. On August 3, 2022, WMNF presented the project and explained the public involvement timeline at the request of the Lake Armington Association. Additional meetings with members of the Lake Tarleton Coalition occurred November 10, 2022, and December 6, 2022, to discuss the proposed project. WMNF staff met with the Appalachian Trail Conservancy (ATC) in February 2020 to discuss the potential impacts to the Appalachian Trail due to proposed project activities. The Appalachian Trail Conservancy commented several times throughout the NEPA process and submitted a letter of support during the objection period. In July 2023 WMNF staff reached out to Dartmouth Outing Club requesting their feedback on effects on the Appalachian Trail. No response has been received as of November 2023.

Since December 2019, WMNF has received 604 unique comment letters, all of which have been reviewed by the project team and are saved in the project record.

Public comments have been considered and many adjustments are reflected in the final proposed project. These changes based on public feedback and internal review include:

- Group selection harvest units, maximum group size has been reduced from two to one acre per group
- More clarifications on herbicides previously approved on WMNF and methodology on application was included
- A design feature was established to retain white pine at Lake Katherine to preserve potential bald eagle habitat up to 100 feet from the shoreline
- Additional detail was added to the scenery effects analysis in Chapter 3
- Added a design feature for a sensitive plant species in the design features table
- Better defined the foreground for the Appalachian Trail from Route 25C trailhead to the Wachipauka Pond trail junction
- A consequence of no action section was added
- A no-cut buffer along Lake Tarleton was extended from minimum state and federal requirements to 300 feet based on feedback regarding dispersed recreation values for this area

- Additional information related to the section 303(d) Clean Water Act related to impaired waters and basal area removal for pertinent watersheds was explained
- Added additional information related to the current condition of the existing road network
- Added additional information related to the current recreational use at Lake Katherine
- Reduced forestry activities by 21.5% or from occurring on 880 acres to 690 acres based on public input

Changes made due to the anticipated reclassification of bats:

- Added additional information related to the changing in listing status for the northern long-eared and tri-colored bats

A list of agencies, organizations and persons consulted regarding this proposal is also provided in the "Agencies and Persons Consulted" section of the EA/FONSI.

## Findings Required by Other Laws and Regulations

My decision complies with other law, regulation, and policy applicable to the proposal as documented in the environmental assessment ("Environmental Impacts" section) and finding of no significant impact.

## Implementation

Pursuant to regulations found at 36 CFR 218.12, the responsible official may not sign the decision notice until the reviewing officer has responded in writing to all pending objections. If no objections are received, the responsible official may sign the decision notice five (5) business days after expiration of the opportunity to object. Implementation may begin immediately after the decision notice is signed. Implementation of the project is expected to begin in summer 2024.

## Administrative Review and Objection Opportunities

This decision was subject to the pre-decisional objection process pursuant to 36 CFR 218, subparts A and B. Only individuals or organizations who submitted timely and specific written comments (section 218.2) about this project during designated opportunities for public comment are eligible to file an objection in accordance with section 218.5. Issues raised in objections must be based on previously submitted timely, specific written comments regarding the proposed project unless based on new information arising after designated comment opportunities (section 218.8(c)). The burden is on the objector to demonstrate compliance with this requirement for objection issues. The objection must contain the minimum content requirements specified in section 218.8(d). Incorporation of documents by reference is permitted only as provided in section 218.8(b).

The opportunity to object ends 45 days following the date of publication of the legal notice in the newspaper of record, the New Hampshire Union Leader. Written objections must be postmarked or received during this time period. The publication date in the newspaper of record is the exclusive means for calculating the time to file an objection, and those wishing to object should not rely upon dates or timeframe information provided by any other source. The 45-day period is computed using calendar days, including Saturdays, Sundays, and federal holidays. When the period expires on a Saturday, Sunday, or federal holiday, the time is extended to the end of the next federal working day. The regulations prohibit extending the length of the comment period. It is the objector's responsibility to ensure timely filing of a written objection with the reviewing officer. All objections are available for public inspection during and after the objection process. Names and contact information submitted with objections will become part of the public record and may be released under the Freedom of Information Act. A legal notice was published in the Manchester Union Leader on March 16, 2023. The objection period ended on May 1, 2023. Nineteen objections were received, of which seventeen objectors had standing. The reviewing officer, WMNF Forest Supervisor Derek Ibarguen held an objection resolution meeting on June 28, 2023, where twelve objectors participated. The reviewing officer issued an objection response letter on

September 27, 2023. All instructions issued by the reviewing officer in his objection response letter have been addressed.

## Contact

For additional information concerning this decision, contact Brooke Brown, District Ranger, by email at brooke.brown@usda.gov or by phone at 603-536-6101. For more information regarding the environmental analysis process, please contact Scott Hall, NEPA Planner, by email at scott.hall@usda.gov or by phone at 603-536-6226.

Thank you for your interest in the management of the White Mountain National Forest.

BROOKE BROWN Digitally signed by BROOKE BROWN
Date: 2023.11.13 11:13:23 -05'00'

Brooke M. Brown

Pemigewasset District Ranger

United States Department of Agriculture

# Tarleton Integrated Resource Project

## Grafton County, New Hampshire

## Final Environmental Assessment and Finding of No Significant Impact

Forest Service

**White Mountain National Forest, Pemigewasset Ranger District November 2023**

**For More Information Contact:**

Scott Hall
White Mountain National Forest
Pemigewasset Ranger District
71 White Mountain Dr.
Campton, NH, 03223
(603) 536-6226
https://www.fs.usda.gov/whitemountain

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, sex, religious creed, disability, age, political beliefs, or reprisal or retaliation for prior civil rights activity in any program or activity conducted or funded by USDA.

Persons with disabilities who require alternative means of communication for program information (e.g. Braille, large print, audiotape, American Sign Language, etc.), should contact the Agency (State or local) where they applied for benefits. Individuals who are deaf, hard of hearing or have speech disabilities may contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, (AD-3027) found online at: How to File a Complaint, and at any USDA office, or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by:

(1) mail: U.S. Department of Agriculture
Office of the Assistant Secretary for Civil Rights
1400 Independence Avenue, SW
Washington, D.C. 20250-9410;

(2) fax: (202) 690-7442; or

(3) email: program.intake@usda.gov.

The Forest Service uses the most current and complete data available. GIS data and product accuracy may vary. They may be developed from sources of differing accuracy, accurate only at certain scales, based on modeling or interpretation, incomplete while being created or revised, etc. Using GIS products for purposes other than those for which they were created, may yield inaccurate or misleading results. The Forest Service reserves the right to correct, update, modify, or replace GIS products without notification.

USDA is an equal opportunity provider.

# Table of Contents

Introduction ... 4
Relationship to Other Documents ... 4
Changes since Draft EA ... 4
Proposed Project Location ... 5
Need for the Proposal ... 5
Vegetation and Wildlife Habitat Management ... 6
Vegetation Management History of the Tarleton Area ... 7
Transportation ... 7
Recreation ... 7
Consequences of No Action ... 8
Proposed Action ... 9
Vegetation and Wildlife Habitat Management ... 9
Silvicultural Treatments ... 10
Transportation ... 15
Recreation ... 16
Project Design Features and Other Measures ... 16
Environmental Impacts ... 19
Federally Listed and Regional Forester Sensitive Species ... 19
National Historic Preservation Act ... 20
Climate Change ... 20
Hydrology ... 20
Recreation ... 21
Scenery ... 21
Socioeconomics ... 22
Soils ... 22
Vegetation ... 22
Agencies or Persons Consulted ... 23
Finding of No Significant Impact ... 24
Degree of Effects ... 24
References ... 27
Appendix A. Figures ... 28
Appendix B. Proposed Silvicultural Units and Acres ... 33
Appendix C. Proposed Transportation Activities ... 34

**Tables**

Table 1. Proposed silvicultural treatment acres for MA 2.1 and 8.3 lands in the Tarleton HMU ... 9
Table 2. Project-specific Minimization Measures and Standard Operating Procedures (SOPs) ... 16

**Figures**

Figure 1. Project area and overview of proposed activities ... 28
Figure 2. Proposed treatment harvest units ... 29
Figure 3. Three-hundred foot no-cut buffer around Lake Tarleton ... 30
Figure 4. Proposed travel management activities ... 31
Figure 5. Tarleton viewpoints selected for scenery analysis ... 32

- Added a design feature for a sensitive plant species in the design features table.
- Reduced total acreage of forestry activities from 880 to 690 acres.
- Added current condition information to the Transportation Need section and Appendix C.
- Added current use of Lake Katherine to the Recreation Need section.
- Foreground for the Appalachian National Scenic Trail was defined from the route 25c trailhead to the Wauchipauka Pond junction.

## Proposed Project Location

The project is located within the Tarleton Habitat Management Unit (HMU). This HMU comprises about 5,375 acres on National Forest System lands: about 2,645 acres occur within management area (MA) 2.1 land, about 1,560 acres occur within MA 6.1 land, about 830 acres occur within MA 8.3 land, and about 240 acres are private inholdings. Vegetation management, wildlife, and recreation project activities are proposed on about 755 acres within the Tarleton HMU (Figure 1).

Proposed project activities occur within the following Forest Plan MAs. No project activities are proposed on private land:

- MA 2.1—General Forest Management: The purpose of this area is to provide a sustained yield of high-quality timber products; provide a balanced mix of habitats for wildlife; provide a variety of recreation opportunities; and manage high-use or highly developed recreation areas to acceptable social and ecological standards while retaining some low-use and less developed areas.

- MA 8.3—Appalachian National Scenic Trail (Appalachian Trail): The purpose of this area is to manage the segment of the Appalachian Trail on Federal lands that traverses the state of New Hampshire and the White Mountain National Forest; to provide for the conservation and enjoyment of the nationally significant scenic, historic, natural, and cultural qualities of the land through which the trail passes; to provide opportunities for high quality outdoor recreation experiences, including a sense of remoteness and solitude; and to recognize and strengthen the level of partnership, cooperation and volunteer efforts integral to Appalachian Trail management.

# Need for the Proposal

The primary purpose of the Tarleton Project is to implement the management direction in the Forest Plan by advancing forest plan goals, objectives, and desired conditions for vegetation, wildlife, and other resources. The Forest Plan guides management in the project area to “use an ecological approach to provide both healthy ecosystems and a sustainable yield of high-quality forest products” (Forest Plan, p. 1-17) and to “use sustainable ecosystem management practices to provide a diversity of habitats across the Forest, including various habitat types, age classes, and non-forested habitats” (Forest Plan, p. 1-20). The Proposed Action section provides a detailed description of the proposed project activities.

# Vegetation and Wildlife Habitat Management

This project is needed to improve wildlife habitat diversity within the Tarleton HMU, thereby helping to achieve desired future conditions for wildlife, vegetation, and recreation described in Chapter 1 of the Forest Plan. The Forest Plan HMU framework guides management in the project area to ensure that diverse habitats are distributed across the WMNF where soils and other ecological site conditions are suitable. The project is needed to help meet the goals and objectives for wildlife and vegetation described in the Forest Plan and to increase forest health, vitality, and resiliency within the project area, including the effects of climate change, and insect and disease outbreaks. An analysis of the current habitat conditions indicates that the Tarleton HMU is not meeting the MA 2.1 Habitat Composition and Age Class Objectives (Forest Plan pp. 1-20 to 1-21) (B. Hillman 2020). Prior to WMNF ownership, the greater Lake Tarleton area was heavily harvested by private timber companies and the Sentinel Mountain tract was managed by the state of New Hampshire. The Forest Service acquired these areas in the early 2000s.

The project area currently contains a mosaic of forest types and habitats typical throughout the WMNF, including northern hardwood, mixedwood, spruce-fir, aspen-birch, oak-pine, and wildlife openings. All these habitats comprise a mix of mature and young forests. The general lack of open forest conditions tends to promote the development of shade-tolerant species, limiting birch and aspen species, which need abundant sunlight. No regeneration-age (0-9 years old) forest habitat occurs except for one permanent wildlife opening actively managed by the Forest Service and two smaller apple orchards not currently managed for wildlife benefits by the Forest Service. The Forest Service manages designated permanent wildlife openings to maintain valuable grassland and shrubland habitats.

The proposed vegetation management would provide a sustainable yield of high-quality timber products to support local economies and communities and promote wildlife habitat objectives for the Tarleton HMU, including the following:

- Increase spruce-fir habitat over the long-term
- Increase age-class diversity and foster the regeneration of stands
- Maintain or increase aspen-birch habitat
- Maintain current levels of hemlock within stands
- Gradually convert stands situated on non-compatible Ecological Land Types to forest types consistent with land capability
- Convert known stands of non-native species to native species that are suited to site conditions. Target stands include the following:
    - Norway spruce plantation in the vicinity of Sentinel Mountain, where appropriate adjacent to Appalachian Trail buffers
    - Scots pine within an existing permanent wildlife opening near Lake Katherine

In addition, there is a need to address the lack of an adequate forested buffer along the shoreline of Lake Katherine adjacent to the permanent wildlife opening. Currently, the existing narrow forested buffer, when compared to an adequately sized, wider buffer, likely results in higher water temperatures and sedimentation rates while limiting recruitment of wood into the lake. Further, the New Hampshire Department of Environmental Services notes that phosphorus levels in Lake Katherine often fluctuate above desirable levels for oligotrophic waterbodies (New Hampshire Department of Environmental Services 2021). A properly sized forested buffer could intercept phosphorus and sediment before they enter Lake Katherine. The creation of a 75-foot-wide buffer would also better align management of the opening with standards and guidelines

pertaining to buffers around waterbodies (Forest Plan, Riparian and Aquatic Habitats, G-2, pp. 2-24 to 2-25). There is an additional need to improve aquatic habitat by mimicking the natural contribution of large wood to the lake that would be taking place if a proper forested buffer were present.

There is a need to expand the opening of one existing apple orchard located on the northeast side of Charleston Road to increase the amount of early successional habitat available to wildlife. A larger opening would encompass several apple trees that are now struggling to compete under a canopy of taller trees. Removing the competing trees would increase the fruit production potential of the orchard and therefore increase the amount of soft mast available for bear, deer, turkey, pollinators, and many other wildlife species.

There is also a need to redesign the Tarleton Fields Wildlife Opening adjacent to Lake Katherine. The opening is mapped to contain about 63 acres although only 30 acres have been actively managed as open habitat in recent years. The 63-acre opening existed when the land was acquired by the Forest Service. The recommended size of permanent wildlife openings on the WMNF is 30 acres or smaller (U.S. Department of Agriculture, Terrestrial Habitat Management Reference Document 2019). Therefore, there is a need to address the configuration of the current opening to meet forest plan requirements. The apple orchard and wildlife opening actions would improve wildlife habitat diversity in the Lake Tarleton HMU.

### Vegetation Management History of the Tarleton Area

Timber harvest records prior to the parcels being transferred to federal ownership in 1998 are not available. Based on the current ground conditions, LiDar analysis, and professional knowledge from the Pemigewasset District forestry team, the area within the Tarleton HMU was heavily harvested with over 2,000 acres being cut between the late 1980’s and early 1990’s. The units surrounding the three lakes are estimated to have been harvested with about 700 acres of clearcut and about 1300 acres of selection cut. The state-owned Sentinel Mountain area had a 40-acre clearcut in the 1970’s and an 84-acre group selection harvest in 1998. The areas east of the powerline corridor have been owned by the Forest Service since the 1930’s, the last harvest in that area was a 50-acre harvest in several units using both clearcut and selective techniques in the 1960’s. Additionally, the powerline corridor is privately owned and managed for low-growing vegetation for safety purposes related to the powerline.

## Transportation

A transportation analysis has not previously been conducted for the project area. Currently the roads in the project area are composed of dirt and gravel and lack functional drainage infrastructure. The proposed project is needed to provide recommendations for long term use; to meet project-specific needs within the project area; and to plan for and manage public and administrative access.

## Recreation

The Forest Plan includes a goal of providing a range of quality recreation activities and opportunities (Forest Plan, p. 1-10). The boat launch at the Lake Katherine area is user created and does not meet Forest Service safety and recreation standards. Currently the use of Lake Katherine is light and consists of hand-launched watercraft and fishing activities. This project is needed to improve water, vegetation, and shoreline values, accessibility, safety, and the visitor

experience at the user-created boat launch at the Lake Katherine area consistent with the Forest Plan.

# Consequences of No Action

Should the project not be implemented, natural successional processes would continue in the Lake Tarleton HMU. Diversity of age and structure in the HMU would remain relatively limited, and a wildlife habitat diversity objective of the forest plan would not be met as wildlife habitat diversity would continue to decline. All forested stands would continue to mature and crowded stands would continue to grow at slow rates. In the absence of a substantial disturbance, understory shade would delay, suppress, and restrict regeneration to shade tolerant species. Herbaceous vegetation would continue to be limited due to a lack of light. Mortality of white ash, aspen, and paper birch would continue as trees age and seed sources would be eventually lost. Beech, sugar maple, hemlock, and red spruce would progressively dominate the overstory though some would prematurely succumb to disease and die. White ash, white pine, black cherry, and red oak may have an opportunity to germinate, establish, and potentially release in small groups as overstory trees age or fall from small scale disturbance. Gaps created by fallen trees would quickly close as adjacent overstory trees take advantage of available light and growing space making establishment unlikely and infrequent. Young regenerating stands would not establish and over time the landscape would trend toward a homogeneous even-aged structure and species mix. Therefore, taking no action would not meet the need to advance forest plan goals or wildlife habitat diversity objectives in the Tarleton HMU.

Young forest habitat and upland openings would be created only through natural means, such as windthrow and beaver activity. There would be less young forest habitat overall which would favor wildlife species preferring older forests, likely reducing overall wildlife species diversity in the project area over the long-term.

The existing Lake Tarleton permanent wildlife opening would continue to be managed as a single 30-acre opening instead of three openings totaling 49 acres. In addition, the two-acre apple orchard proposed as a permanent wildlife opening would remain forested and the existing apple trees would eventually die as the canopy closes above them. In all, there would be 21 fewer acres of permanent wildlife openings in the project area.

Without management action, no improvements to the shoreline or aquatic habitat at Lake Katherine would occur. Without an adequate forested buffer along the shoreline, stormwater would continue to runoff into the lake before it can be fully filtered of phosphorus, sediment, and possibly other pollutants. Additionally, water temperatures would be higher (due to less shading) and there would be less recruitment of woody material into the lake if trees were not allowed to grow along the shoreline. The current condition would also provide less cover for fish and invertebrates as well as limited roosting and basking sites for birds, reptiles, and amphibians.

The unauthorized use of the shoreline at Lake Katherine for launching boats on public lands would likely continue to be an enforcement challenge. Visitor use experience would remain unchanged, and the site would continue to present public safety and resource damage issues (e.g., water quality) due to soil instability and runoff into Lake Katherine. In conclusion, the consequences of no action (or no active management) would result in no improvement of the landscape condition and wildlife habitat availability. Therefore, it is important to consider how management is a tool for improvement.

# Proposed Action

To address the above needs, the WMNF is proposing of variety of activities as described below and shown in Figures 1 and 2. Applicable Forest Plan standards and guidelines, national core and best management practices, and project-specific design criteria would be implemented under the Proposed Action (see Project Design Features and Other Measures). Project implementation is expected to start in summer 2024.

## Vegetation and Wildlife Habitat Management

In 2019 and 2020, project specialists delineated forest stands in MA 2.1 and completed a preliminary assessment of current conditions including general stand type (hardwood and softwood) and tree heights using LiDAR and aerial photography. These data and mapped Ecological Land Types were used to prioritize field assessments of current stand conditions and characteristics.

The WMNF proposes to conduct commercial and non-commercial vegetation treatments across about 1,230 gross acres of forest stands on National Forest System lands in the project area, 690 acres of which would be treated (Table 1, Figure 2). Proposed units, unit acres, and seasons of harvest are provided in Appendix A. All treatments would occur on MA 2.1 and MA 8.3 adjacent to MA 2.1 lands (Forest Plan, Ch. 3 pgs. 3-52, 3-53). All stands proposed for timber harvest have a site-specific objective and corresponding silvicultural prescriptions to meet the design conditions for vegetation and/or wildlife habitat. Proposed treatment types are summarized in the following section. The Forest Plan glossary also provides definitions of silvicultural treatments.

**Table 1. Proposed silvicultural treatment acres for MA 2.1 and 8.3 lands in the Tarleton HMU**

| Silvicultural Treatment or Objective | Prescription Type | Estimated Treatment Acres[1] |
|---|---|---|
| Even-aged Regeneration | Clearcut with Reserves | 100 |
| | Overstory Removal | 15 |
| | Shelterwood Seed Cut | 20 |
| | Patch Clearcut | 5 |
| Intermediate Treatments | Improvement Cut | 125 |
| | Commercial Thinning | 60 |
| Uneven-aged Regeneration | Group Selection | 80 OF 400[2] |
| | Single Tree/Group Selection Combined | 285 |
| **Total[3]** | | 690 |

[1] Acres are gross estimates, including reserve patches of uncut trees, as well as protective buffers for sensitive resources where cutting would not occur.
[2] About 20 percent of the gross acreage in Group Selection will be treated with up to 1-acre openings.
[3] Acres are approximate and may not sum due to rounding.

A range of silvicultural treatments would be used to provide commercial wood products, create small and large openings in the forest to allow regeneration of trees and other vegetation and increase wildlife habitat diversity, provide additional growing space to enhance crown and bole development, and encourage the establishment of shade-intolerant species in the understory. Other project objectives include retaining existing disease-free mast producing trees for wildlife,

discouraging beech regeneration, and removing beech saplings during treatment to reduce their dominance in the new stands. Prior to implementation, field visits would occur to refine treatment unit boundaries and acres including modifications to address on-site conditions (e.g., wet areas, steep or rocky slopes, and forest type changes). In addition, treatment acres may be reduced to meet visual and water quality objectives, to incorporate reserve patches of uncut trees in final harvest stands, and to incorporate protective buffers around features such as vernal pools, cultural resources, nest trees, and riparian zones. Typical harvesting equipment would be used to implement treatments including chainsaws, skidders, feller bunchers, and harvesters.

Each unit proposed for vegetation management has been assigned an operating season based primarily on silvicultural and wildlife objectives as well as soil and other site conditions. For example, botanical, cultural, and recreational concerns also influence the selection of an operating season. The only proposed operating season for vegetation management for this project would be winter (Appendix B). No vegetation management activities would occur during the spring, summer, or fall due to anticipated wet conditions that could result in adverse impacts to soil, water, vegetation, and/or recreation.

About five previously existing log landings would be reconstructed and expanded, and about four new log landings would be constructed to support vegetation management activities. Log landings are typically 0.75 acre or smaller in size. Three temporary access driveways, each less than 500 feet in length, would be constructed or reconstructed to access log landings. Final locations of log landings and associated access roads may be modified during implementation planning (i.e., layout), subject to applicable Forest Plan standards and guidelines, best management practices, and other site-specific requirements.

Vegetation management activities would be implemented primarily through commercial timber harvest, providing an estimated five million board feet of forest products. Typically, vegetation management, including commercial timber harvests, would be conducted on smaller portions of the project area for weeks at a time during the appropriate seasons of harvest. For example, a forest stand subject to winter harvest would undergo active management when the ground has adequate snow cover, or the soil is frozen. Depending on conditions, a stand or group of stands may be harvested in a single winter; however, variability in weather may result in extended periods of inactivity and the need for additional seasons to complete management activities. A Forest Service Timber Sale Administrator would monitor changing conditions and determines if logging can proceed on any given day.

In addition to commercial timber harvesting, non-commercial site preparation and release treatments would occur in units proposed for commercial treatments within three years following harvest. These and other proposed silvicultural treatments are described in the following section.

## Silvicultural Treatments

This section provides a description of proposed silvicultural treatments. Refer to Table 1 for estimated acres by treatment type and Figure 2 for a map of proposed treatments.

### Even-Aged Management

#### Clearcuts with Reserves

This type of treatment creates large openings (greater than 10 acres but no more than 30 acres) by removing all trees in a stand, except for trees located within reserve areas. Five percent of the

acreage of each stand would remain uncut in reserve areas as directed by the Forest Plan. These large openings allow a high level of sunlight to reach the forest floor. All units proposed for clearcutting would result in an immediate change from mature to regeneration age structure.

One outcome of clearcutting would be an increase in species diversity within units and across the project area. Compared to other silvicultural treatments, clearcutting would produce the greatest amount of early-successional habitat. Clearcutting would stimulate the germination of woody and herbaceous vegetation that have seeds with a relatively long period of dormancy. These include raspberries, blackberries, pin cherry, and various forbs and grasses. In response to clearcutting, the seeds of these plants would germinate due to the abundance of light and corresponding warming of the forest floor. Herbaceous cover would remain an important component of the new stand until the tree canopy of the new trees begins to close. Clearcutting would likely result in the germination and establishment of fast-growing shade-intolerant tree species such as pin cherry, paper birch, trembling aspen and/or bigtooth aspen. Clearcutting would also promote asexual regeneration via root suckers and stump sprouts of hardwood species such as beech, bigtooth aspen, trembling aspen, and red maple.

### Patch Clearcuts

Patch clearcuts differ from clearcuts primarily in opening size and the light environment created. All patch clearcuts would be between two and ten acres in size to facilitate the regeneration and establishment of the same diversity of tree species expected from a clearcut. The reduced size of openings created by patch cuts could result in some minor differences in direct and indirect effects to vegetation. The lack of reserve areas in patch clearcuts would influence the light environment through decreased shading of the treated area. Also, due to the lack of reserve areas, the age structure in a patch cut would be more simplified than a clearcut. Differences in species diversity would thus be negligible compared to the regeneration response in a clearcut.

Due to the inherently smaller opening sizes, the effects on neighboring stands from changes in micro-climate conditions would likely be reduced (assuming similar site, landform, topography, slope, aspect, elevation, and shape of unit) compared to those adjacent to a clearcut. Though growth rates of perimeter trees could increase as much as those adjacent to a clearcut, fewer trees would likely be affected due to the smaller size of the units. Similarly, fewer boundary trees would likely experience degradation in tree quality due to epicormic[1] branching or sun scald. Because the probability of windthrow tends to increase as opening size increases, fewer trees would likely be affected by windthrow compared to those along a perimeter of a clearcut. The risk of tree damage or mortality from wind would thus be less than a clearcut.

### Shelterwood Seed Cut

Shelterwood seed cuts would involve the removal of two thirds to three quarters of the midstory and/or overstory of a stand. Following implementation, residual stands would retain about 20 to 40 square feet of basal area per acre. This treatment would create a moderately open forest canopy that would allow a moderate amount of light to reach the forest floor. Shelterwood seed cuts would result in the release of existing advance regeneration while stimulating new seedlings and stump sprouts. This treatment would thereby foster a two-age structure until the overstory is removed or trees die from natural causes.

[1] Epicormic refers to growth occurring from a previously dormant bud on the trunk or a limb of a tree.

The felling and skidding of trees within units proposed for shelterwood seed tree treatments would likely result in a very limited amount of residual tree damage. The disturbance of leaf litter and exposure of mineral soil (also known as incidental scarification) associated with logging operations would also provide favorable conditions for the establishment of oak and pine seedlings.

Trees targeted for retention would include mature white pine, windfirm trees, and other trees exhibiting good quality and health. Conversely, the trees targeted for removal would primarily be suppressed and/or poor-quality trees. Due to the emphasis of trees targeted for retention and removal, this treatment would result in an overall increase in tree quality. Additionally, the growth of residual trees (i.e., trees remaining after initial treatment) would likely increase due to the increase in available light which would stimulate crown development. The increase in tree growth and tree quality would also generally result in a greater resilience to insects and disease. Tree mortality resulting from natural causes thus would likely decrease in the near future.

#### Overstory Removal

Overstory removal is the removal of the majority of the mature overstory within a stand to help release existing understory vegetation. The result would be an even-age stand of healthy, high-quality seedlings, saplings, and poles.

#### Commercial Thinning

Commercial thinning would focus on the removal of poor quality and/or low vigor trees while providing adequate growing space for residual trees to increase growth rates. Reducing overstory density would also facilitate the harvest of timber that would otherwise be lost due to mortality associated with overstocked stand conditions and increase the amount of sawtimber in the residual stand.

### Uneven-Age Management

#### Group Selection

The degree to which this treatment would facilitate regeneration of shade-intolerant, intermediate, or tolerant tree species would depend, in part, on group size. The size of individual openings under this treatment would be up to about one acre. Large groups would result in a comparatively greater amount of light than smaller groups. Accordingly, large groups would result in higher temperatures, greater amounts of evapotranspiration and reduced amounts of humidity at the forest floor than smaller groups. These conditions would facilitate the regeneration of a broad diversity of tree species particularly northern hardwoods characterized as intermediate or intolerant of shade such as white ash, yellow birch, and paper birch. Small groups would promote the regeneration of tree species characterized as intermediate and tolerant of shade such as maple species, hemlock, spruce, and fir. Some variation in regeneration responses would also be expected due to variation in seed periodicity, seed dispersal, and other silvicultural characteristics.

Advance regeneration in areas designated for group selection would comprise a proportion of small trees within many groups immediately following treatment. Advanced regeneration is the presence or development of seedlings or saplings in the understory. Where advance regeneration is lacking, regeneration-age trees and other woody plants would begin to occupy growing space within a few years following the treatment. Trees around the perimeter of groups would expand their crowns and begin to occupy a portion of the groups within this five-year period. Over time, this treatment would lead to complex vertical and horizontal vegetative structure.

Though only about 20 percent of each unit would be treated, the targeted removal of poor-quality and low-vigor trees would likely result in an increase in tree quality and tree growth of residual trees while reducing the amount of mortality expected to occur in the absence of a treatment. Consequently, this treatment would also likely decrease each unit's susceptibility to insects and disease.

### Single Tree Selection

Single-tree selection would create or foster the development of an uneven-aged structure by releasing advance reproduction and/or regenerating a diversity of northern hardwood and/or softwood trees. About one third of the trees would be cut and harvested from all merchantable size classes. Trees targeted for removal would include those exhibiting poor quality and low vigor. Residual stands would contain trees of variable sizes (heights and diameters). Over time, this treatment would lead to an increase in complexity of vertical vegetative structure. Trees and other plants would begin to occupy growing space created by the individual harvest of trees within five years following the treatment. The presence of shade-intolerant tree species such as paper birch, trembling aspen, and bigtooth aspen would decline in importance within each unit proposed for treatment. Though small gaps would be created, trees within residual stands would restrict and filter sunlight thereby favoring shade-tolerant plants such as spruce, hemlock, fir, beech, and sugar maple.

Vigorous trees of all size classes exhibiting good quality would be retained. Unlike group selection, single-tree selection would involve treatment throughout the entirety of each unit. This treatment would result in improving tree quality and growth of most residual trees while reducing the amount of mortality expected to occur in the absence of treatment. However, due to the greater density of residual trees, there would be less room for logging equipment to maneuver. Ultimately, this treatment would likely decrease each unit's susceptibility to insects and disease because the potential adverse effect of residual tree damage would be minor compared to the increase in growth and quality of residual trees.

### Group and Single Tree Selection

Outcomes from this treatment would be consistent with those outlined in the preceding subsections for group selection and single tree selection. A maximum of 15 percent of each unit's area is proposed for groups under this combined treatment. Groups would be placed in areas where desirable advance regeneration could be released to enhance species composition and/or increase softwood habitat. The size of individual openings under this treatment would range from a single tree crown width up to about one acre.

### Improvement Cutting

Under this method, damaged and poor-quality trees would be selectively removed to improve future timber stand quality and value while shifting the stand toward an uneven-aged structure. Improvement cuts remove about one third of the trees in each stand and are typically proposed in softwood and northern hardwood stands to maintain and promote hemlock, white pine, and northern hardwood species. Improvement cutting would be conducted within a mixedwood stand in the Sentinel Mountain portion of the project area to remove the non-native Norway spruce component.

## Permanent Wildlife Openings

Under the Proposed Action, the Tarleton Fields opening would be redesigned by dividing the current 63-acre opening into three smaller openings measuring 12, 14, and 23 acres, totaling 49 acres in size. The remaining 14 acres would be left to naturalize without management. Continued maintenance of these openings would be conducted under the existing permanent wildlife openings program and would involve regular mowing, masticating, and/or mulching as well as treating infestations of non-native invasive species as necessary. The scope of work would include the following:

- Establish a minimum 75-foot-wide forested buffer between Lake Katherine and the wildlife opening by foregoing maintenance in those areas and allowing natural revegetation to occur. White pine may also be planted within this buffer to hasten the establishment of desirable woody vegetation.

- Retain an existing forested segment within the 63-acre area to create separation and establish two smaller openings on either side.

- Re-establish portions of the openings by removing existing trees and saplings, including non-native Scots pine, that have become established since these areas were last managed. This work would be accomplished using hand tools (e.g. chainsaws) and large equipment capable of masticating or mulching whole trees. Most of the Scots pine removed from the wildlife opening would be cut and/or chipped and left on site. Some Scots pine would be used for shoreline enhancement in Lake Katherine as described below.

No more than ten Scots pine trees and limbs five inches in diameter or larger would be distributed along the Lake Katherine shoreline to provide food and cover for fish and aquatic insects. The density of large wood, in terms of pieces per unit length of shoreline, would not exceed the density of the unmanaged sections of shoreline. Additionally, no trees or limbs would be placed where they could impact recreational uses (e.g., near the boat launch).

Additionally, an existing apple orchard would be adopted and maintained under the permanent wildlife opening program. The orchard is located northeast of Lake Tarleton near where Charleston Road meets the powerline corridor. It is currently about 1 acre in size and would be expanded to 2 acres. Expansion would require tree clearing and stump removal. This work would require an excavator with a thumb attachment and/or a bulldozer.

## Site Preparation and Release Treatments

Site preparation treatments would include the non-commercial cutting and/or girdling of sub merchantable trees (i.e., trees below a quality fit for market). Sub merchantable trees include those less than five inches diameter at breast height. These treatments would be implemented with the use of heavy equipment (e.g. feller buncher) and/or a crew of workers using chainsaws, brush saws, or hand saws. The timing of the treatment would occur during or following commercial timber harvest operations. Areas targeted for site preparation treatments include all units proposed for clearcuts with reserves, patch cuts, and group selection where whole tree harvesting is not proposed. However, the need to implement site preparation treatments would depend on residual conditions in each unit following the completion of timber harvest activities. Specifically, site preparation treatments would occur in units containing an abundance of undesirable residual sub-merchantable trees. For clearcut and patch clearcut treatments, the objectives are to create even-aged structure and provide favorable growing conditions for the

establishment of shade-intolerant trees. These treatments would occur within three growing seasons following the commercial timber harvest activities.

Release treatments would include the non-commercial cutting or girdling of sub merchantable trees in all units proposed for overstory removal and shelterwood seed cuts. These treatments would be implemented by a crew of workers using chainsaws, brush saws, or hand saws. Individual trees targeted for release include desirable seedlings and saplings of red oak, white pine and spruce. Trees targeted for cutting or girdling would be those trees that compete with the crowns of trees targeted for release. A maximum of about 300 trees per acre would be released. At least three sides of the trees targeted for release would be freed from competition. No trees would be removed from the site for commercial use. The objective of these treatments is to provide adequate light and space for oak, pine, or spruce seedlings and saplings to grow free from competition.

The development of advance oak and pine regeneration in these units is currently impeded by midstories and/or understories of other trees, particularly beech. Mechanical control of beech has been found to be effective at promoting the development of desirable advanced regeneration (Smallidge and Nyland 2009). Release treatments would be conducted following the completion of commercial logging operations. Implementation of these treatments would depend on the residual conditions of each unit following the commercial logging operations. One or more release treatments per unit may be implemented, as necessary, to achieve desired conditions outlined in the silvicultural prescriptions.

## Transportation

Transportation system management actions would occur to facilitate proposed project activities as well as long-term forest management in the project area (Figure 3). Under the Proposed Action, about five miles of unauthorized road (not included in the Forest Service road system) in the project area would be added to the Forest Service road system as maintenance level (ML) 1 and 1.2 miles as ML 2 for future administrative management. No new road construction or decommissioning is included under the Proposed Action. Up to ten gates or barriers would be installed at several locations in the project area (Figure 1). Appendix C contains a list of specific proposed transportation system actions, and the scope of activities is summarized below. Refer to the Forest Plan glossary for definitions of road operation maintenance levels (pages 25-26).

System roads would be maintained or reconstructed to provide safe access to vegetation management areas and to meet modern design standards. Upon completion of vegetation management, ML 1 roads would be closed to vehicles but may be open for non-motorized uses. Temporary culverts and bridges would be removed, water bars would be installed, and the entrance would be closed to vehicles with gates or barriers. System roads proposed for reconstruction in recreation areas and system roads of ML 2 or higher would remain accessible for the public and/or administrative access depending on the long-term management objective of the road.

Reconstruction and maintenance activities are used to restore or regain the management objective of the road and improve or realign the roadway. Activities may include surface blading, ditch cleaning and reshaping, aggregate placement, installation or cleaning of drainage structures or features, roadside brushing, curve widening, clearing, and grubbing, excavation and embankment work, and removing culverts. Vegetation would be removed or trimmed in proposed road rights-of-way to accommodate construction equipment and commercial vehicles, and to improve line of

sight where needed. Most work would be conducted during the driest weather conditions under the guidance of the Forest Service to minimize potential impacts to resources and roads.

## Recreation

The WMNF proposes to adopt and improve a user-created boat launch and access site on Lake Katherine. The site would be maintained in accordance with Forest Plan standards and guidelines and Forest Service Handbook (FSH) 2309.13. The scope of work would include the following:

- Install a boat launch designed for hand-launched watercraft (e.g., canoes, kayaks, paddleboards)
- Reconfigure the parking lot to accommodate up to six vehicles, including space for a vehicle turn-around
- Install barriers to restrict motorized vehicle access to portions of the site not designed for vehicle traffic
- Install hardened surfacing (e.g. gravel, concrete) for parking lot, approach areas, and footpath from the parking area to the shoreline
- Stabilize the shoreline with rock at the launch site as needed to control erosion
- Install drainage features to manage site run-off
- Install a site kiosk and other standard site signage
- Install up to two picnic tables

## Project Design Features and Other Measures

Applicable Forest Plan standards and guidelines, national core and state best management practices (BMPs) (U.S. Department of Agriculture, Forest Service 2012) (New Hampshire Division of Lands and University of New Hampshire (UNH) Cooperative Extension. 2016), standard operating procedures (SOPs), and project-specific minimization measures would be implemented as part of the Proposed Action (Table 2). BMPs are those methods found to be the most effective and practical in meeting objectives (e.g., minimizing erosion). BMPs are not one-size-fits-all, can be an effective adaptive-management tool, and are therefore not listed here. SOPs are practices carried out regularly based on law, regulation, policy, and planning documents. SOPs describe workflow processes and roles and responsibilities for project implementation.

**Table 2. Project-specific Minimization Measures and Standard Operating Procedures (SOPs)**

| ID | Description |
|---|---|
| Wildlife | |
| SS-1 | When timber sales are laid out in Unit 29, staff shall consult the Pemigewasset Ranger District Wildlife Biologist or Forest Watershed team to ensure impacts to wetlands and the amphibian species they support are minimized or avoided. |
| SS-2 | To protect potential bald eagle nest trees along the Lake Katherine shoreline, several white pines at a height equal to or above the main canopy would be retained within Unit 33 located 100 feet or less from the shoreline. These trees would be flagged by the Pemigewasset Ranger District Wildlife Biologist prior to or during timber sale layout. |
| Cultural Resources | |

| ID | Description |
|---|---|
| SOP | A 50-foot buffer zone shall be established and flagged or otherwise designated around each cultural site located in project work zones to mark avoidance areas. No project activities shall take place within, and no equipment shall enter, flagged avoidance areas. |
| SOP | Cultural sites not identified or relocated during survey may be present in project activity areas. If cultural features are encountered during project implementation, work in the area will stop and the Forest Archaeologist will be contacted. No work shall continue until directed by the Forest Archaeologist. |
| SOP | Road reconstruction and timber harvest in areas near stone walls will take measures to avoid damaging the walls, such as directional tree falling to avoid dropping trees on walls and protection of the walls during road work. Existing breaches in stone walls may be reused; if an additional wall crossing is necessary it will occur perpendicular to the current wall and planned with the Forest Archaeologist's input and approval. |
| Recreation | |
| R-1 | For all units adjacent to Lake Tarleton, a no-cut buffer of at least 300 feet from the water's edge will be designated to provide increased vegetative screening for the dispersed recreation features in the area. |
| Scenery | |
| SCM-1 | Final implementation plans for timber harvest units visible from the Mount Cube viewpoint shall be reviewed by the WMNF Landscape Architect for compliance with SIOs (Forest Plan, pp. 2-26 and 27). |
| Water Resources | |
| SOP | The WMNF and its contactors shall implement appropriate National core and state BMPs to minimize soil loss and erosion and to protect water quality. |
| SOP | Ground-disturbing activity (e.g., for parking area construction, road maintenance and reconstruction) shall be done during appropriate seasons and conditions to prevent excessive erosion and sedimentation. |
| SOP | Roads, landings, skid trails, and other travel corridors and trails shall be located such that the number of stream crossings are minimized to the extent practical. Crossings and approaches shall be stabilized and maintained throughout project implementation. |
| SOP | The National Hydrography Dataset (NHD), maintained by the US Geological Survey, is the official water resources inventory for the Nation. The NHD will serve as the official water resources inventory for this project. If streams or water bodies are discovered in the project area during project planning or implementation that are not included in the NHD or found to have a different flow regime (i.e., intermittent or perennial) than indicated by the NHD, appropriate Forest Plan Standards and guidelines for Riparian and Aquatic Habitats, National Core and State BMPs, and other project design features shall be implemented to provide the necessary resource protections. While the NHD may be updated based on new information, the current version of the NHD at the time of the publication of this document will remain the version of record for the duration of this project. |
| Botany Resources | |
| SS-3 | Additional reserve areas may be designated, as needed, for protection of newly documented populations of sensitive species prior to or during layout within the project area, based on consultation with the Forest Botanist. |
| SS-4 | The Butternut tree on the west side of Charleston Road shall be flagged and avoided during road reconstruction and vegetation management activities. |

| ID | Description |
|---|---|
| SOP | District staff shall review the locations and status of NNIS with the Forest Botanist prior to implementation. Prior to the start of ground-disturbing activities, an NNIS control plan shall be prepared and implemented consistent with the Forest-wide Invasive Plant Control Project EA to reduce or avoid the risk of spread of NNIS within the project area (U.S. Department of Agriculture, White Mountain National Forest Forest-wide Invasive Plant Control Project Environmental Assessment. 2007a) (U.S. Department of Agriculture, White Mountain National Forest Forest-wide Invasive Plant Control Project decision notice and finding of no significant impact. 2007b, Mendelsohn 2017). |
| NNIS-1 | The Forest Botanist shall develop a project-level NNIS control plan for high level infestations consistent with the above SOP. The plan shall include the following:<br>• Strategy for manual removal and spot herbicide treatments (NNIS EA, page 7-8) of infestations with moderate or high-risk of spread.<br>• Botany or other qualified staff shall monitor the project area within 3 years of completed implementation to check for new NNIS infestations or the spread of existing populations. If new infestations are found, they shall be added to the Forest-wide list of sites annually considered for treatment per the Forest Wide Invasive Plant Control Plan.<br>• Consistent with the Forest-wide Invasive Plant Control Project EA, three herbicides may be included as part of control treatments: glyphosate, triclopyr, and clopyralid (NNIS EA, page 9). Selection of a specific herbicide depends on considerations such as target species, proximity to water, and time of year. The Rodeo form of glyphosate is used over 95 percent of the time due to its formulation for use near water. Herbicides are applied as spot-applications to foliage or cut-stumps by a state licensed applicator. |
| NNIS-2 | The WMNF will explore options with local organizations for opportunities for a Lake Host program at Lake Katherine to minimize spread of aquatic NNIS. |
| Timber | |
| T-1 | Before implementation begins, the Forest Service shall have an agreement in place with the National Grid power company to allow Forest Service personnel to use the powerline corridor to conduct vegetation management operations for the duration of the project. |
| SOP | Caution or closure signs shall be placed as needed along trails, trailheads and roads affected by the proposed vegetation management activities to alert visitors to logging operations and ensure public safety. |
| SOP | To minimize damage to residual trees, skid trails shall be planned to include trees marked for removal while providing an adequate working space for project equipment. |
| Safety | |
| S-1 | The Forest Service shall cover the in-ground wire attached to the main power structure along the middle of the National Grid powerline corridor with panels or gravel before skidding begins. |
| S-2 | Along with the National Grid power company, the Forest Service shall mark all hazard trees along both sides of the opening's edge along the powerline corridor where harvesting has been proposed. |
| S-3 | The National Grid powerline company will conduct a linear clearcut in units 13, 17, and 25 to bring down all potential hazard trees before project activities begin. Felled hazard trees will be left grounded on site. |
| S-4 | All logging equipment shall maintain a minimum distance of ten feet from any conductor and 25 feet from all other infrastructure along the National Grid powerline corridor. |
| S-5 | A 50-foot no-cut buffer shall be established between units 2, 3, 4, 5, 14, and 24 at the edge of the powerline corridor. |

# Environmental Impacts

Based on preliminary analysis by the interdisciplinary project team, including site-specific data and available scientific information, the following key resources were selected by the Responsible Official for summary in this environmental assessment. The interdisciplinary team considered direct and indirect effects of the proposal, and those cumulative actions that occur in the relevant spatial and temporal boundaries for their resource, as documented in the project record. These analysis boundaries vary by resource. For example, water quality considered effects on a watershed scale, while scenery considered effects on a viewshed scale. Cumulative impacts, defined as "effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative effects can result from individually minor but collectively significant actions taking place over a period of time." (40 CFR 1508.1). Cumulative impacts occur when the effects of an activity, or activities, overlap in space and time with effects of the proposed project. Per the Council on Environmental Quality (2005), "Generally, agencies can conduct an adequate cumulative effects analysis by focusing on the current aggregate effects of past actions without delving into the historical details of individual past actions." Consistent with this guidance and Forest Service regulations for cumulative effects analysis (36 CFR 220.4(f)), this analysis considers past, present, and reasonably foreseeable future actions relevant to the proposal, including how they may have contributed to existing conditions and trends. Unless specifically stated otherwise, the project record is incorporated by reference and contains all relevant data, methods, analyses, references, and other technical documentation used in this assessment.

## Federally Listed and Regional Forester Sensitive Species

A Biological Evaluation was prepared for this project (B. a. Hillman 2022), and is incorporated here by reference. The Biological Evaluation determined that two federally listed or proposed species, the northern long-eared bat and the tricolored bat, have potential to occur in the analysis area.

The Proposed Action may affect, but is not likely to adversely affect, the northern long-eared bat. Initially, it was determined the Proposed Action would have no effects beyond those previously disclosed in the programmatic Biological Opinion (BO) on implementing the final 4(d) rule dated January 5, 2016 (USFWS 2016). Streamlined consultation with the United States Fish and Wildlife Service (USFWS) under Section 7 of the Endangered Species Act was completed in February 2021. However, on November 30, 2022, the USFWS issued a rule to reclassify the northern long-eared bat as endangered. This action removed the final 4(d) rule because such rules only apply to species designated as threatened. As a result, the Forest Service reinitiated consultation on August 22, 2022 (USDA Forest Service 2022a, 2022b, 2022c) and the USFWS issued its corresponding BO on March 31, 2023 (USFWS 2023a, 2023b). The agency concurred with the Forest Service's determination that the project may affect, but is not likely to adversely affect, the northern long-eared bat. As this is a "may effect", but "not likely to adversely affect" determination, there are no reasonable or prudent measures to incorporate. Therefore, the project, as proposed, is in compliance with the Endangered Species Act. The Biological Evaluation determined the project would not jeopardize the continued existence of the proposed tricolored bat. Consultation with USFWS on this determination is not required.

The Biological Evaluation also found that 12 Regional Forester Sensitive Species have potential to occur in the analysis area: little brown bat, eastern small-footed bat, peregrine falcon, common loon, osprey, pied-bill grebe, two species of headwater *Ameletus* mayflies, monarch butterfly, yellow-banded bumblebee, butternut, and American ginseng. The Proposed Action may impact individuals of these 12 species but would not likely contribute to a trend towards federal listing or loss of viability to these populations or species.

## National Historic Preservation Act

White Mountain National Forest archaeologists completed a cultural resource review for this project pursuant to the regulations (36 CFR 800) implementing Section 106 of the National Historic Preservation Act (16 USC 470f). Consultation with the New Hampshire State Historic Preservation Office (SHPO) has been completed, SHPO concurred with the effects determination that no historic properties will be affected by the proposed project activities. Application of project design features would ensure newly discovered historic properties and cultural sites would be protected during implementation.

## Climate Change

The proposed action affects a relatively small amount of forest land and carbon on the White Mountain National Forest and, in the near-term, might contribute an extremely small quantity of greenhouse gas emissions relative to national and global emissions (Dugan and McKinley 2019). The proposed action would not convert forest land to other non-forest uses, thus allowing any carbon initially emitted from the proposed action to have a temporary influence on atmospheric greenhouse gas concentrations, because carbon will be removed from the atmosphere over time as the forest regrows. The prescribed treatments enhance the diversity of tree species, ages, and structures that are present in forest ecosystems, and this diversity can increase the ability of forests to withstand increasing pressures from climate change and other stressors. In the absence of forest harvest, the forest where this proposed action would take place would thin naturally from mortality-inducing natural disturbances and other processes resulting in dead trees that would decay over time, emitting carbon to the atmosphere. Furthermore, the proposed project would transfer carbon in the harvested wood to the product sector, where it may be stored for up to several decades and substitute for more emission intensive materials or fuels. This proposed action is consistent with internationally recognized climate change adaptation and mitigation practices.

## Hydrology

The proposed action is consistent with the laws and policies related to the Clean Water Act, including section 303(d) related to impaired waters. There are three 303(d) impaired waters in the project area, Lake Tarleton, Lake Katherine, and Eastman Brook. Lake Tarleton is impaired due to mercury contamination and acidity (ENSR Corporation 2007), Lake Katherine for mercury contamination (New England Interstate Water Pollution Control Commission 2007), and Eastman Brook for mercury contamination and acidity (New England Interstate Water Pollution Control Commission 2007). Project design, including design features, and best management practices would reduce or avoid impacts to water quality or quantity to de minimis levels. Measurable increases in acidity or mercury are not expected. The measure used to assess the impacts of timber harvesting on water quality in the White Mountain National Forest is the percent basal area removed in a watershed that contains a perennial stream. Discussion on the general impacts of timber harvesting on water quality and basal area thresholds can be found in the Albany South

EA (pp. 131-149) (USDA 2022). Because of the similar types of activities included in the Tarleton Project, the potential impacts to riparian and aquatic resources and water quality discussed in the Albany South EA would be broadly applicable to the current proposal. Studies in the White Mountains have shown that water quality changes are not measurable at harvest levels below about 20 percent of the basal area of a watershed, and water quantity changes are not measurable when less than about 25 percent of the basal area within a watershed is removed as part of vegetation management activities. The highest amount of harvest in a watershed as part of this project would be 15.5 percent basal area removal, while the project would remove 4.2 percent of the basal area in the Lake Tarleton watershed and 2.4 percent of the Eastman Brook watershed, of which Lake Katherine is a part of. The watershed with 15.5 percent of proposed basal area removal contains strictly uneven-age units, so the project is in compliance with Forest Plan guideline G-1 related to vegetation management in first and second order perennial watersheds (U.S. Department of Agriculture, Forest Service 2005). No measurable adverse effects to water quality or quantity are expected due to project implementation.

## Recreation

Recreation impacts are considered in the context of the affected local community and potential changes in visitor use levels in the project area. Project activities at the Lake Katherine Boat Launch may impact users by resulting in some increased use due to the improved site design and changes to the character of the site. The wildlife habitat and transportation improvements near Lake Katherine may also result in increased opportunities for hunting and birdwatching by expanding available wildlife habitat and improving access to the adjacent wildlife openings.

Potential noise impacts to hikers along the Appalachian Trail resulting from operation of timber harvest equipment would be minimized due to harvesting being at least 500 feet away from the footpath, and by limiting harvest to the winter when the trail is minimally used. Visual impacts resulting from timber harvest and associated changes to vegetation structure would also be minimized by vegetation. Harvested areas would gradually regenerate following project completion, further minimizing potential visual impacts to recreating visitors. Potential noise impacts to winter recreation users (ice fishing, snowshoeing, and cross-country skiing) would be reduced from the lake with the 300 foot no-cut buffer (see Project Design Features and Other Measures), and would be short-term and localized to areas where project activities are occurring for the duration of project implementation.

## Scenery

The proposed action is consistent with Forest Plan standards and guidelines for scenery management. Nine viewpoints were used for scenery analysis and the timber units were modeled and adjusted during project design to minimize visual impacts and ensure Forest Plan compliance (Figure 4). Some visual impacts from the proposal can be expected, however these impacts would be most apparently immediately following timber harvest and would fade and blend over time as the forest regenerates. For the powerline corridor viewpoint, no harvest treatments are expected to be directly visible, and changes in color, texture, lines, and shadows are not expected to be noticeable. For the state boat launch, route 25c, and state beach viewpoints, the observer is close enough to expect to see color, texture, lines, and shadows of proposed units with the possibility of minimal ground visibility. For the Mount Moosilauke and Mount Cube viewpoints, the observer is too distant to expect to see detail of color, minimal texture, blurred lines, and shadows of proposed units, with a low possibility of minimal ground visibility.

Due to harvesting activities being proposed in MA 8.3, a foreground determination is required per the Forest Plan (Forest Plan G-1, pg. 3-53). Based on site specific analysis, the foreground was determined to be up to 180 feet for the section of trail from the trailhead on Route 25c to the Wachipauka Pond junction (Allen 2022). A narrow side view through immediate foreground is visible on the Webster Slide Spur trail up to about 2500 feet, however there are no proposed units visible in that narrow view. No proposed units in MA 8.3 will be within the foreground of the Appalachian Trail (Allen 2022).

## Socioeconomics

Socioeconomic effects that may be caused by timber harvesting activities to recreational users of the area would be localized, as project activities would occur in discrete portions of the project area at any given time (i.e., not the entire project footprint), and recreational users are likely to disperse to other recreation sites. Socioeconomic effects resulting from this displacement, such as changes in tourism patterns or resident use, would occur locally over the short-term for the duration of project implementation or shortly thereafter. These impacts would not result in measurable disruption to local socioeconomic conditions. The Lake Katherine Boat Launch proposed activities are not expected to increase visitation to a level that would change current use levels initially. Over time, this recreation area may attract more users which could positively contribute to the local economy. Overall, socioeconomic changes to the local communities are expected to be negligible.

## Soils

The Soil Quality Standards for the Eastern Region of the Forest Service are designed to allow non-detrimental soil disturbance (exposure of mineral soil, compaction, and nutrient cycling) and provide the context to determine how the potential soil property change may affect ecosystem composition, processes, and function (productivity) (USDA-Forest Service Manual, Supplement R9 RO 2550-2012-1).

The proposed harvest treatments, wildlife opening redesign, apple orchard adoption, and transportation management activities would result in a short-term increase in the amount of non-detrimental soil erosion, compaction, and nutrient cycling in the project area (Coltor 2020) . However, by following BMPs and the design features related to this project, and based on monitoring of previous similar projects, no detrimental effects are anticipated.

The Lake Katherine Boat Launch improvement would result in some amount of detrimental impacts to soil productivity in the analysis area. About one acre of the soil that sits directly under the proposed parking lot would be displaced, compacted, and would not produce plants and other microorganisms that allow the soil to cycle nutrients until the lot is decommissioned. Soil productivity would be lost as long as the soil is maintained as a parking lot. The Forest Plan does not have a limit to amount of parking area construction in regard to soil disturbance. Impacts to soil resources are consistent with the Forest Plan and would not contribute measurably to other cumulative soil impacts in the analysis area.

## Vegetation

Impacts to vegetation are considered in the context of forest health. The extent to which timber management activities would affect vegetation would vary according to the specific treatments implemented, as well as operating season, or time of year when vegetation management activities

would occur. Vegetation would primarily be affected by direct tree removal, and the indirect effects of increased exposure to sunlight resulting in more herbaceous cover and seed germination. Vegetation located next to proposed clearcuts, overstory removals, and large group cuts may be affected by increased windthrow relative to areas near smaller cuts. However, field reconnaissance within the project area and experience with similar timber management activities on the WMNF indicates that tree mortality resulting from damage due to windthrow in stands next to old clearcuts is negligible. Vegetation would also be affected by incidental damage caused by felling or skidding equipment, although skid trails are often planned adjacent to trees marked for removal in order to provide adequate working space for logging equipment.

Overall, effects on vegetation would be minor and local. Because the goals and objectives of the Proposed Action include regenerating vegetation, and promoting forest health and vigor, the Proposed Action would not result in the loss of integrity of the affected vegetative communities. In addition, under the Forest Plan, within five years following a harvest, stands must be certified that an adequate number of seedlings have been established in accordance to the National Forest Management Act. Monitoring reports from 1999 to 2018 show that all surveyed stands (over 15,000 acres) were adequately restocked with seedlings (U.S. Department of Agriculture, 2018).

# Agencies or Persons Consulted

The Forest Service consulted the following federal, state, local, and federally recognized tribal agencies during the development of this EA:

- United States Fish and Wildlife Service
- New Hampshire Fish and Game Department
- Town of Piermont
- Town of Warren
- Appalachian Trail Conservancy
- Appalachian Mountain Club
- Dartmouth Outing Club
- Lake Tarleton Association
- Lake Armington Association
- Lake Tarleton Coalition
- Society for the Protection of New Hampshire Forests
- New Hampshire Department of Environmental Services
- Grafton County
- National Grid
- New Hampshire Division of Historical Resources (State Historic Preservation Office)
- Passamaquoddy Tribe of Indians
- Penobscot Indian Nation

- Houlton Band of Maliseet Indians
- Mi'Kmaq Nation
- Office of Senator Jeanne Shaheen
- Office of Senator Maggie Hassan
- Office of Representative Ann McLane Kuster
- Office of Representative Christopher Pappas

# Finding of No Significant Impact

Based on the analysis in this EA, the preliminary finding is that the proposed project will not significantly affect the quality of the human environment and therefore an environmental impact statement is not required. This preliminary finding is based on consideration of the Council on Environmental Quality's requirements under 40 CFR 1501.6, as discussed below and in the Environmental Assessment.

## Degree of Effects

Project activities would occur over an area totaling less than about one percent of the total acreage within the WMNF. Management actions are anticipated to begin in summer 2024 continuing over a 5- to 10-year period. Based on consideration of past projects, the project is a continuation of similar types of management actions that have occurred for the past 18 years under the current Forest Plan.

The following discloses effects that focus on changes to the human environment from the proposed action and is analyzed in the Environmental Assessment.

1. *Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.*

The EA describes both the potential beneficial and adverse impacts of the Proposed Action in terms of context and intensity. The EA provides the rationale for a determination that there will be no significant effects as a result of the proposed project activities.

2. *The degree to which the proposed action affects public health or safety.*

The WMNF has implemented this type of project and similar activities (e.g., recreation site construction and maintenance, transportation, and vegetation management) many times on the Forest and in the region, without substantial impacts to public health or safety. Project activities would be conducted using standard equipment and methods. Application of Forest Plan standards and guidelines and project design features (Table 2) further ensure that potential impacts to public health and safety are minimized or avoided. Based on these factors, and experience with similar past projects, there are no circumstances or conditions that indicate that the Proposed Action would result in substantial or unusual risks to public health or safety.

3. *Unique characteristics of the geographic area such as the proximity to historical or cultural resources, parklands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.*

The project area is not unique in its geographic setting, and there are no unique geographic areas such as parklands, prime farmlands, or ecologically critical areas near the project. The project area is typical in its setting and similar areas can be found on several parts of the forest. Eligible Wild and Scenic Rivers, Roadless Areas designated under the Roadless Area Conservation Rule, or Forest Plan Inventoried Roadless Areas do not occur in the project area. Wetlands occur in the project area; however, these areas would not be measurably impacted by the project (Environmental Impacts). The project design is consistent with management direction for the Appalachian Trail. See intensity factor 8 for more information related to historical or cultural resources.

4. *The degree to which the effects on the quality of the human environment are likely to be highly controversial.*

The term "controversial" in this context refers to cases where substantial scientific dispute exists as to the size, nature, or effects of a major federal action on some human environmental factor, rather than to public opposition of a proposed action or alternative. The interdisciplinary team for this project considered current scientific research, including that submitted by the public, to determine its applicability to the project and found no controversy related to the predicted effects. Based on these factors, and the analysis provided in the EA and project record, the effects on the human environment are not likely to be highly controversial.

5. *The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.*

Based on consideration of past projects, the Proposed Action is not new or unique to the WMNF. Similar actions have been implemented on the Forest, and elsewhere in the region, for many years. The proposed project activities are consistent with the Forest Plan. The analysis shows that the effects are not uncertain and do not involve any unique or unknown risk that may result in significant impacts to the human environment.

6. *The degree to which the action may establish precedent for future actions with significant effects or represents a decision in principle about a future consideration.*

The proposed project activities are well established on the Forest, and elsewhere in the region and nation. The actions will not establish precedent for future actions with significant effects because actions similar to the ones proposed have been considered in the Forest Plan and have occurred in the past. There is no unusual circumstance associated with the proposed management actions that would indicate that it is substantially different from past actions. Further, the scope of the decision to be made is limited to the actions proposed and analyzed in the EA.

7. *Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.*

Cumulative impacts are disclosed in the Environmental Impacts section of this EA. The incremental impacts of this project when overlapped in time and space with other projects with similar impacts would be minor or less. Therefore, there would be no significant cumulative impacts as a result of implementing this project.

8. *The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.*

As a result of project design, the project would not adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places. The New Hampshire SHPO has concurred with the Forest determination of effects (Heritage). Proposed project activities are in compliance with the National Historic Preservation Act.

9. *The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.*

All federally listed species with potential to occur in the affected area were evaluated in the Biological Evaluation. The Proposed Action may affect, but is not likely to adversely affect the northern long-eared bat. The Forest Service reinitiated consultation on August 22, 2022, and the USFWS issued its corresponding BO on March 31, 2023. The agency concurred with the Forest Service's determination that the project may affect, but is not likely to adversely affect, the northern long-eared bat. As this is a "may effect", but "not likely to adversely affect" determination, there are no reasonable or prudent measures to incorporate. Therefore, the project, as proposed, is in compliance with the Endangered Species Act. The Biological Evaluation determined that the project would not jeopardize the proposed tricolored bat.

10. *Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.*

The proposed project will not violate any federal, state, or local environmental laws or regulations, including Forest Plan requirements.

# References

Allen, K. 2022. "Tarleton Scenery Management Specialist Report and Summary." Campton, NH.

Coltor, R. 2020. "Soils Specialist Report." Campton, NH.

Dugan, Alexa' Janowiak, Maria, and Duncan McKinley. 2019. "Forest Carbon Assessment for the White Mountain National Forest." Campton, NH.

ENSR Corporation. 2007. *Determination of Total Maximum Daily Load (TMDL) for 158 Acid Impaired and 21 Aluminum Impaired New Hampshire Ponds.* https://attains.epa.gov/attains-public/api/documents/actions/11113300/33878/107319.

Hillman, B. and Sperduto, D. 2022. "Tarleton Intergrated Resource Project, Biological Evaluation." Campton, NH.

Hillman, B. 2020. "Rationale for Habitat Objectives in the Lake Tarleton Habitat Management Unit." Campton, NH.

Mendelsohn, C.M. 2017. *Forest-wide invasive plant control project –SIR (supplemental information report).* Campton, NH: U.S. Department of Agriculture, Forest Service, White Mountain National Forest.

New England Interstate Water Pollution Control Commission. 2007. *Northeast Regional Mercury Total Maximum Daily Load.* https://neiwpcc.org/wp-content/uploads/2020/08/FINAL-Northeast-Regional-Mercury-TMDL.pdf.

New Hampshire Department of Environmental Services. 2021. "Lake Katherine, Piermont: 2021 Data Summary." Volunteer Lake Assessment Program Individual Lake Reports.

New Hampshire Department of Environmental Services. 2021. *Volunteer Lake Assessment Program Individual Lake Reports, Lake Katherine, Piermont.* 2021 Data Summary, Piermont: New Hampshire Department of Environmental Services.

New Hampshire Division of Lands and University of New Hampshire (UNH) Cooperative Extension. 2016. "New Hampshire Best Management Practices for Erosion Control on Timber Harvesting Operations." 90. https://extension.unh.edu/sites/default/files/migrated_unmanaged_files/Resource000247_Rep266.pdf.

Smallidge, Peter J, and Ralph D Nyland. 2009. "Woodland guidelines for the control and management of American beech." Edited by Peter Smallidge. *Cornell University Cooperative Extension ForestConnect Fact Sheet* 6.

U.S. Department of Agriculture, Forest Service. 2018. "Biennial monitoring and evaluation report for fiscal years 2015, 2016, and 2017." Campton, NH.

U.S. Department of Agriculture, Forest Service. 2012. "National Best Management Practices for Water Quality Management on National Forest System Lands. Volume 1: National Core BMP Technical Guide." 165. https://www.fs.usda.gov/sites/default/files/FS_National_Core_BMPs_April2012_sb.pdf.

U.S. Department of Agriculture, Forest Service. 2019. "Terrestrial Habitat Management Reference Document." Campton, NH.

U.S. Department of Agriculture, Forest Service. 2007b. "White Mountain National Forest Forest-wide Invasive Plant Control Project decision notice and finding of no significant impact." Campton, NH.

U.S. Department of Agriculture, Forest Service. 2007a. "White Mountain National Forest Forest-wide Invasive Plant Control Project Environmental Assessment." Campton, NH.

U.S. Department of Agriculture, Forest Service. 2005. "White Mountain National Forest Land and Resource Management Plan." Campton, NH.

USDA. 2022. *WMNF Projects Page.* Accessed September 26, 2022. https://www.fs.usda.gov/projects/whitemountain/landmanagement/projects.

# Appendix A. Figures

Benton
Haverhill
Charleston Rd
Eastman Brook
Apple orchard
25
Lake Katherine
Lake Tarleton
Piermont
Warren
Cape Moonshine Rd
Sentinal Mountain Area
Orford
Wentworth
VICINITY MAP
VT
ME
NH
Project Location
White Mountain National Forest
USDA
0
0.5
1
Mile
Proposed Actions
Gates or Barriers
Boat Launch
Road Maintenance
Apple Orchard
Wildlife Opening
Proposed Harvest Treatments
N
Map Legend
Road
Appalachian Trail
Project Area
Town
National Forest Land

**Figure 1. Project area and overview of proposed activities**

Charleston Rd
Lake Katherine
Lake Tarleton
25C
USDA
0
0.5
1
Mile
Proposed Action
Harvest Unit Treatment
Clearcut
Group Selection
Improvement Cut
Overstory Removal
Seed Tree
Single Tree Selection with Groups
Thinning
Map Legend
Road
Appalachian Trail
Contour 100ft
National Forest Land
Sentinal Mountain Area Inset Map
Same legend and scale as the main map

**Figure 2. Proposed treatment harvest units**

Lake
Tarleton
25C
9
7
USDA
0 500 1,000 Feet
Proposed Action
Harvest Unit Treatment
Group Selection
300 Foot Shoreline Buffer
N
Map Legend
Road
Contour 100 ft
National Forest Land

**Figure 3. Three-hundred foot no-cut buffer around Lake Tarleton**

25
ML 2
Charleston Road
Eastman Brook
ML 1
25C
Lake Katherine
ML 2
Lake Tarleton
ML 1
ML 2
ML 2
Cape Moonshine Rd
USDA
N
0
0.5
1
Mile
Proposed Action
Landing
Proposed Maintenance Level (ML)
1 - Basic Custodial Care (Closed)
2 - High Clearance Vehicles
Map Legend
Existing Road
National Forest Land

**Figure 4. Proposed travel management activities**

Moosilauke 1 & 2
25C
Webster
Slide 1 & 2
25
State
Beach
Rt 25C
Boat
Launch
Powerline
118
Mt. Cube 1
25A
USDA
0
0.5
1 Mile
N
View Point
Proposed Harvest
Treatments
Map Legend
Road
Appalachian Trail
National Forest Land

**Figure 5. Tarleton viewpoints selected for scenery analysis**

# Appendix B. Proposed Silvicultural Units and Acres

| Unit Number | Estimated Acres | Silvicultural Treatment | Other Treatment | Acres |
|---|---|---|---|---|
| 2 | 30 | Stand Clearcut | Site Preparation | 30 |
| 3 | 29 | Single Tree Selection w/Groups | Site Preparation | 6 |
| 4 | 33 | Single Tree Selection w/Groups | Site Preparation | 3 |
| 5 | 9 of 45 | Group Selection | Site Preparation | 9 |
| 6 | 6 of 30 | Group Selection | Site Preparation | 6 |
| 7 | 19 of 101 | Group Selection | Site Preparation | 19 |
| 9 | 11of 70 | Group Selection | Site Preparation | 11 |
| 11 | 17 | Commercial Thinning | Not Applicable | N/A |
| 13 | 14 | Stand Clearcut | Site Preparation | 14 |
| 14 | 37 | Commercial Thinning | Not Applicable | N/A |
| 15 | 5 | Single Tree Selection w/ Groups | Site Preparation | 1 |
| 16 | 12 | Single Tree Selection w/Groups | Site Preparation | 3 |
| 17 | 6 | Stand Clearcut | Site Preparation | 6 |
| 18 | 10 | Single Tree Selection w/ Groups | Site Preparation | 2 |
| 20 | 12 | Single Tree Selection w/Groups | Site Preparation | 2 |
| 23 | 16 | Stand Clearcut | Site Preparation | 16 |
| 24 | 11 | Single Tree Selection w/ Groups | Site Preparation | 2 |
| 25 | 10 | Stand Clearcut | Site Preparation | 10 |
| 26 | 10 | Single Tree Selection w/ Groups | Site Preparation | 2 |
| 27 | 6 | Commercial Thinning | Not Applicable | N/A |
| 28 | 8 | Stand Clearcut | Site Preparation | 8 |
| 29 | 18 of 91 | Group Selection | Site Preparation | 18 |
| 30 | 20 | Improvement Cut | Release and Weed | 20 |
| 31 | 20 | Improvement Cut | Release and Weed | 20 |
| 32 | 71 | Single Tree Selection w/ Groups | Site Preparation | 15 |
| 33 | 68 | Single Tree Selection w/Groups | Site Preparation | 14 |
| 34 | 14 | Stand Clearcut | Site Preparation | 14 |
| 35 | 38 | Improvement Cut | Release and Weed | 38 |
| 36 | 12 | Overstory Removal | Release and Weed | 12 |
| 37 | 17 of 84 | Group Selection | Site Preparation | 17 |
| 38 | 4 of 14 | Group Selection | Site Preparation | 4 |
| 39 | 2 | Patch Clearcut | Site Preparation | 2 |
| 40 | 23 | Single Tree Selection w/ Groups | Site Preparation | 5 |
| 41 | 40 | Improvement Cut | Not Applicable | N/A |
| 42 | 17 | Shelterwood Seed Cut | Release and Weed | 17 |
| 45 | 7 | Improvement Cut | Release and Weed | 7 |

# Appendix C. Proposed Transportation Activities

| System Road Name | Road Length | Current Condition | Proposed ML[1] | Proposed Action |
|---|---|---|---|---|
| Charleston Road | 4.5 miles | Dirt and Gravel Composition<br>Lacking Functional Drainage[2]<br>Open Access | ML 1 – 4 miles<br>ML 2 – 0.5 mile | Reconstruct 1.43 miles<br>Classify ML<br>Gate Installations |
| Piermont Mountain North | 0.1 mile | Dirt and Gravel Composition<br>Lacking Functional Drainage[2]<br>Open Access | ML 1 | Reconstruct 0.1 mile<br>Classify ML<br>Gate Installations |
| Piermont Mountain East | 0.43 mile | Dirt and Gravel Composition<br>Lacking Functional Drainage[2]<br>Open Access | ML 2 | Classify ML<br>Gate Installations |
| Lake Armington Dam | 0.21 mile | Dirt and Gravel Composition<br>Lacking Functional Drainage[2]<br>Open Access | ML 2 | Classify ML |

[1] ML – Maintenance Level
[2] Functional drainage includes ditch lines, functional culverts, and water bars

Charleston Rd
Lake Katherine
Lake Tarleton
25C
1
2
3
4
5
6
7
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
USDA
0
0.5
1
Mile
Proposed Action
Harvest Unit Treatment
Clearcut
Group Selection
Improvement Cut
Overstory Removal
Seed Tree
Single Tree Selection with Groups
Thinning
N
Map Legend
Road
Appalachian Trail
Contour 100ft
National Forest Land
Sentinal Mountain Area Inset Map
37
38
39
40
41
42
45
Same legend and scale as the main map

JA-1325

PBWTAR_12060

The Lake Tarleton Coalition

STANDING TREES

May 11, 2022

Brooke M. Brown
Pemigewasset District Ranger
White Mountain National Forest
Pemigewasset Ranger District
71 White Mountain Drive
Campton, NH 03223
603-536-6101
brooke.brown@usda.gov

RE: Standing Trees' and the Lake Tarleton Coalition's joint comments on the Lake Tarleton Integrated Resource Project, submitted via certified U.S. mail (#7020 3160 0001 6335 9262) and electronically via https://cara.fs2c.usda.gov/Public//CommentInput?Project=56394.

Dear District Ranger Brown:

These comments are submitted on behalf of Standing Trees and the Lake Tarleton Coalition (collectively "Standing Trees") on the U.S. Forest Service's ("Forest Service" or "Service") April 2022 revised Draft Environmental Assessment ("DEA") for the Tarleton Integrated Resource Project (the "Project" or "Tarleton IRP") located in the White Mountain National Forest in the Pemigewasset Ranger District.

Standing Trees submits these comments via certified U.S. mail and electronically. The certified mail copy includes a thumb drive containing electronic copies of all of the exhibits cited below in these comments. Those exhibits are too large to submit along with the electronic version of these comments. A list of those exhibits is included at the end of this comment.

As detailed below, in order to comply with the National Environmental Policy Act ("NEPA"), the National Forest Management Act ("NFMA"), and the Endangered Species Act ("ESA"), an Environmental Impact Statement ("EIS") is required for the proposed project. The Forest Service erred when it initially completed only a draft Environmental Assessment ("EA") for the Project in July of 2021 ("2021 DEA") and again in April of 2022 ("2022 DEA"), along with each EA's Finding of No Significant Impact ("FONSI"). The environmental harms of the Project are significant, or at the very least uncertain, because of the unique nature of the land involved, the intensity of potential impacts, the recent proposal by the U.S. Fish and Wildlife Service ("USFWS") to classify the Northern Long-eared Bat as endangered under the ESA, and the 2022 DEA's failure to adequately analyze Project impacts in sufficient detail, among other things.

To comply with its statutory and regulatory obligations, the Forest Service must complete an EIS for the Project, or at the very least complete supplemental NEPA analysis in the form of a new or supplemental EA – including necessary public outreach and another public comment period – to correct the deficiencies identified in the comments below. Standing Trees emphasizes the need for the Forest Service to carefully review and address these issues because despite the Service having had the benefit of obtaining numerous comments from the public during the prior scoping and 2021 DEA comment periods, comments raising a number of public concerns have so far gone unacknowledged and unaddressed.

The Tarleton IRP is a major federal action that is likely to significantly affect the quality of the human environment and harm New Hampshire's treasured Lake Tarleton area within the White Mountain National Forest, an area that, as described in detail below, the public fought to protect from harmful projects such as this. NEPA requires that before undertaking such a project, the Forest Service must gather sufficient information to make an informed decision, and provides for public involvement in this decision-making process. Nevertheless, the Forest Service's 2022 DEA failed to provide adequate analysis of the impacts of the Project, sometimes failing to provide any analysis at all for certain impacted resources. This failure not only violated NEPA's requirement that agencies take a "hard look" at environmental impacts, but also made it impossible for the public to fully and meaningfully participate in the public review process because the document was not written in plain language so that decisionmakers and the public could readily understand potential impacts.

The Forest Service is required to prepare an EIS for the Project because, in light of the deficient 2022 DEA, the environmental impacts of the Project are at the very least uncertain. The Service's deficient analysis aside, it is clear that the project will result in significant impacts, thus triggering the need to evaluate these impacts in an EIS. In the 2022 DEA the Forest Service failed to establish a baseline for numerous resources, explain impacts to those resources, establish consistency with relevant standards, values, and desired future conditions, and explain how it will avoid impacts to project area resources. Without these required analyses, the Forest Service cannot conclude that the impacts of the Project are certainly not significant. The Forest Service has thus failed to explain how the facts found in the record justify its conclusion that no significant impacts will result from the Project. *See Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983) (courts will uphold an administrative action if the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made."); *Strahan v. Linnon*, 967 F. Supp. 581, 602 (Mass. Dist. Ct. 1997) (an agency decision must be "fully informed and well-considered" to be entitled to judicial deference).

Additionally, in light of the recent proposed reclassification of the Northern Long-eared Bat from "threatened" to "endangered" and the potential removal of the species' ESA §4(d) Rule, the Forest Service must reinitiate ESA Section 7 consultation with USFWS and complete an EIS to address this new information and changed circumstance. To correct these many errors and bring itself to a properly informed decision in which the public is adequately involved and can have confidence, the Forest Service must complete an EIS.

Founded in the fall of 2021, the Lake Tarleton Coalition is a group of local business owners, scientists, frequent users of the WMNF, and concerned citizens united for permanent

protection of Lake Tarleton and surrounding lands on the White Mountain National Forest. Many of the Coalition's members have been involved in efforts to protect Lake Tarleton since before it was threatened by resort development in the 1990s, prompting its purchase by the Trust for Public Land and subsequent transfer to the White Mountain National Forest.

Standing Trees is a grassroots community non-profit founded by volunteers in 2020 for the purpose of advancing policy and legal solutions that protect and restore New England's native forests, with a focus on Vermont and New Hampshire. The organization came together, in part, as a response to concerns over logging on the White Mountain National Forest ("WMNF"). Standing Trees works, inter alia, to ensure that New England's public lands are managed using just and equitable policies and practice to support the region's citizens and natural ecosystems alike. This includes managing public lands and waters to maximize carbon storage and protect clean water, clean air, public health, and intact habitat for the region's native biodiversity. Standing Trees has many members who regularly visit and recreate throughout WMNF, including in the areas that would be impacted by the Tarleton IRP.

## INTRODUCTION

Imagine dipping your canoe paddle into the clear, cold waters of a quiet mountain lake, surrounded by undisturbed forests sloping to the shoreline, loons calling through the mist, and the alpine tundra-topped Mt. Moosilauke looming in the distance. You land your canoe to hike a narrow trail that follows the rocky, undeveloped shoreline, surrounded by massive hemlocks, stately white pines, and a variety of hardwoods. Songbirds call from the branches, and a Bald Eagle soars overhead.

This is what you can experience today on Lake Tarleton in Piermont and Warren, NH. Thousands of visitors each year come to the lake to boat, fish, swim, hike, camp, ski, snowshoe and birdwatch in this spectacular natural environment – a true gem of the White Mountains and the largest lake in the White Mountain National Forest. Nearby, the Appalachian Trail traverses babbling brooks and rugged ridgelines, climbing to the breathtaking view from Webster Slide over Wachipauka Pond.

The U.S. Forest Service's founding motto implores us to manage our public forests for the benefit of *the greatest good for the greatest number for the longest time*. In this iconic corner of the White Mountain National Forest, the public interest is best served by protecting Lake Tarleton's exceptional water quality and maintaining the ecological integrity of the wild Appalachian Trail corridor.

President Johnson once wrote, "If future generations are to remember us with gratitude rather than contempt, we must leave them more than the miracles of technology. We must leave them a glimpse of the world as it was in the beginning, not just after we got through with it." We have a chance to do just that in the forests surrounding Lake Tarleton.

The Tarleton Integrated Resource Project puts a long history of community-led conservation at risk. In 1994, developers proposed a massive resort surrounding Lake Tarleton. The proposal inspired a multi-year conservation effort, led by the Trust for Public Land, to

preserve Lake Tarleton and the surrounding landscape in its natural state. A dozen organizations, 600 individuals and businesses, the State of New Hampshire and the US Congress worked in partnership to raise $7.5 million to purchase 5,300 acres around the lake, securing public ownership forever as part of the nearly one-million-acre White Mountain National Forest.

In making its case to the Piermont and Warren Selectboards, the Trust for Public Land ("TPL") made it clear that its vision was for a wild Lake Tarleton. According to the September 5th, 2001 edition of the Bradford *Journal Opinion* (Exhibit 1):

> *Under the motto "Less is More," the plan as presented by [TPL representative Rodger] Krussman "will protect and conserve the 'wilderness' quality of the Lake Tarleton area," stressing low impact recreational activities. Some of the proposals set forth in the plan include a visitors center in the former Santucci house with a small crushed stone parking lot serving both the center and the beach area; a handicapped accessible trail with an overlook onto the lake and access to the beach; a foot trail loop around the lake with spurs to Lake Constance, Piermont Mountain and a spur connecting to the Appalachian Trail. The plan also calls for lobbying the NH legislature for a horsepower limit of five or less on the lake and a banning of the use of jet skis[.]*

Conservation partners gathered to celebrate the protection effort in August 2000. At the ceremony, Senator Judd Gregg commented, "Many of us here today have worked hard for a number of years to reach the point we are at today where we can proudly say that this pristine New Hampshire wilderness has been saved."

In the twenty-two years that have elapsed since this small "w" "wilderness" was transferred to public ownership, has the White Mountain National Forest forgotten why these lands and waters were so important to protect, and how much they mean to the surrounding community? Few recreation-related components of the Lake Tarleton vision have been realized. Many Lake Tarleton stakeholders who helped to lead the protection campaign in the 1990s feel as though the WMNF turned its back on the lake for two decades, only to reappear with an out-of-touch logging proposal that treats one of New Hampshire's largest, cleanest, and least developed lakes as a woodlot instead of a scenic treasure.

The White Mountain National Forest again showed little regard for Lake Tarleton-area stakeholders when it pressed ahead with the Tarleton IRP initial Draft EA comment period in the summer of 2021, despite the ongoing Covid-19 pandemic. Indeed, throughout much of the Tarleton IRP NEPA process, the public has had justifiable reasons (some would say a civic responsibility) to avoid in-person gatherings or even to visit town offices where information was posted about the project. What's more, in rural New Hampshire, broadband internet remains a luxury item that is inaccessible to many citizens, whether due to geographic isolation or economics. According the U.S. Census' American Community Survey, an estimated 40% of households in Warren and 25% in Piermont do not have high-speed internet. These statistics effectively prohibited a significant percentage of the local population from participating in the NEPA process for the Tarleton Integrated Resource Project.

Although we are grateful for the second comment opportunity afforded by the White Mountain National Forest, it seems that little has changed from the initial Draft EA to the current, revised version. In the time since the Tarleton IRP's initial Draft Environmental Assessment comment period concluded, over 1,600 concerned citizens have signed a petition requesting that the WMNF revise the project to live up to the spirit of the Lake Tarleton protection campaign of two decades prior. And yet, the Tarleton IRP continues to present an all-or-nothing proposition: 900 acres of logging along with relatively modest recreation improvements, or nothing at all. This is a false choice. We demand better from the federal agency that was entrusted as caretaker of Lake Tarleton.

The Granite State is home to many treasures that are best left as nature intended. The White Mountain National Forest protects nine of these treasures as Scenic Areas, including Mt. Chocorua, Pinkham Notch, Lincoln Woods, and Greeley Ponds. The White Mountain National Forest has never designated a Scenic Area west of I-93. For the benefit of the local tourism and recreation economy, and for the integrity of this treasured landscape, including Abenaki and early colonial historical resources, it's past time to permanently remove the threat of logging and development from Lake Tarleton, as intended with the lake's protection in 2000. The best way the White Mountain National Forest can honor the effort that added Lake Tarleton to the public domain is to drop current logging plans, and instead conduct a Forest Plan amendment that designates a Lake Tarleton-Webster Slide Scenic Area.

## LEGAL BACKGROUND

### 1. National Environmental Policy Act ("NEPA")[1]

Under NEPA, federal agencies must assess the environmental impact of any major federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(C). If the action will significantly affect the quality of the human environment, the federal agency must complete an EIS. 40 C.F.R. § 1502.3. If the action is not likely to significantly affect the quality of the human environment, or the significance of the effects are unknown, the agency must complete an EA. 40 C.F.R. § 1501.5(a). Under the statute's implementing regulations, a NEPA analysis must include several specific components, including an analysis of the cumulative impacts of the proposed project and a discussion of reasonable alternatives. 40 C.F.R. §§ 1502.14, 1508.7.5.

[1] The Council on Environmental Quality ("CEQ") promulgates regulations to implement NEPA that are binding on all federal agencies. Those regulations are found at 40 C.F.R. §§ 1500–1508. The CEQ amended its regulations effective September 14, 2020. *See* 40 C.F.R. § 1506.13 (2020) (effective date). This Project, however, was developed and analyzed under the prior 1978 (as amended) version of the CEQ regulations. *See* 2022 DEA at 4. We will refer to that prior version here as the "2019" version. Because the 2020 regulations are not retroactive and the Service's NEPA analysis followed the 2019 version of the regulations, all references to these regulations throughout these comments are to the 2019 version. *See Bair v. California Dep't of Transp.*, 982 F.3d 569, 582 n.20 (9th Cir. 2020).

The agency's NEPA responsibilities do not, however, end with the conclusion of the initial NEPA process. Following the completion of the initial NEPA review process, if the agency makes "substantial changes to the proposed action" or "new circumstances or information" arise that are "relevant to environmental concerns and bear[] on the proposed action or its impacts," and "a major Federal action remains to occur," the agency must prepare supplemental NEPA documentation. 40 C.F.R. § 1502.9(d). The agency must at least take a "hard look" at the environmental impacts of the planned action, even after a proposal has received initial approval. *Marsh v. Or. Natural Resources Council*, 490 U.S. 360, 374 (1989).

**2. National Forest Management Act ("NFMA")**

NFMA requires the Forest Service to develop long-term land and resource management plans ("Forest Plans") for the nation's National Forests. National Forest Management Act of 1976, 16 U.S.C. § 1600 et seq. The Forest Plan for WMNF was developed in 2005 ("WMNF Plan") and includes "Goals and Objectives" for the WMNF.

Forest Plan goals are "broad statements of intent, other than desired conditions, that are usually related to process or interaction with the public." USDA FOREST SERV., CITIZEN'S GUIDE TO NATIONAL FOREST PLANNING, 21 (2016) (hereinafter "Forest Planning Citizen's Guide"), attached as Exhibit 2. Objectives are measurable statements of a "desired rate of progress toward a desired condition." *Id.* The WMNF Plan also includes "Standards and Guidelines" for the forest.

> Standards and guidelines are the specific, technical direction for managing resources. A ***standard*** is a course of action that *must be followed*, or a level of attainment that *must be reached*, to achieve management goals and objective, and can only be changed through an amendment to the Plan. A ***guideline*** also is a *required course of action* or level of attainment, but permits operational flexibility to respond to variations in conditions. Guidelines can be modified or not implemented, but *the rationale for doing so must be documented* in a project-level analysis and signed decision.

WMNF Plan at 2-3 (emphasis added).

The WMNF Plan includes numerous *forest-wide* standards and guidelines, including relevant standards and guidelines for Heritage Resources (WMNF Plan at 2-6 to 2-8), Lands (WMNF Plan at 2-8 to 2-11), Native American Relationships (WMNF Plan at 2-11), Non-Native Invasive Species (WMNF Plan at 2-11 to 2-12), Rare and Unique Features (WMNF Plan at 2-13 to 2-16), Recreation (WMNF Plan at 2-17 to 2-24), Riparian and Aquatic Habitats (WMNF Plan at 2-24 to 2-26), Scenery Management (WMNF Plan at 2-26 to 2-27), Vegetation Management (WMNF Plan 2-29 to 2-30), Water Resources (WMNF Plan at 2-30 to 2-32), Wildlife (WMNF Plan at 2-33 to 2-36), among others.

The WMNF Plan also includes management direction for *specific management areas*, including the lands designated as General Forest Management (MA 2.1), as well as designated for use as part of the Appalachian Trail (MA 8.3). According to the WMNF Plan, the

Appalachian Trail ("AT") designation was established for the purpose of "[p]rovid[ing] for the conservation and enjoyment of the nationally significant scenic, historic, natural, and cultural qualities of the land through which the trail passes[,]" as well as to "[p]rovide opportunities for high quality outdoor recreation experiences, including a sense of remoteness and solitude[,]" among other things. WMNF Plan at 3-45.

The desired future condition of the AT emphasizes "a remote backcountry recreation experience in a predominately natural or natural-appearing landscape" and management that will "protect cultural and natural resources and to minimize visual disturbance" making specific note that stands in the management area will be "visually dominated by mature trees." *Id.* at 3-45 to 3-46. The Standards and Guidelines for MA 8.3 (Appalachian Trail) lands most relevant to the Tarleton IRP are the following:

**General**

- **Standard S-2:** Consistent with existing agreements, the White Mountain National Forest will consult with the Appalachian Trail Conservancy, the Appalachian Mountain Club, and Dartmouth Outing Club (local Appalachian Trail clubs) on management actions that affect AT values.

**Rare and Unique Features**

- **Guideline G-1:** Vegetation manipulation may be implemented to protect or improve habitat for threatened, endangered, or sensitive species.

**Scenery Management**

- **Standard S-1:** The AT is a Concern Level 1 Travelway, and middleground and background areas on the National Forest Lands seen from the AT must be managed for scenery in accordance with Scenic Integrity Objectives identified through the Scenery Management System.
- **Standard S-2:** All management activities will meet a Scenic Integrity Objective of High or Very High.

**Vegetation Management**

- **Standard S-1:** On all National Park Service (NPS) acquired corridor lands, commercial timber management and salvage operations are prohibited.
- **Guideline G-1:** Where the AT management area adjoins MA 2.1, commercial timber management and salvage operations are allowed in that portion of the Appalachian Trail MA between the trail footpath and the 2.1 Management Area, but only outside the foreground area as defined in the Scenery Management System (SMS). The foreground zone is determined by site-specific analysis of the area as seen from the AT. Everywhere else in the AT management area, commercial timber management and salvage sales are prohibited.

**Wildlife**

- **Standard S-1:** Creation of regeneration forest habitat must occur only through natural disturbance events, except for areas adjacent to Management Area 2.1, in

> that portion of the Appalachian Trail MA between the trail footpath and the 2.1 Management Area outside of the foreground zone.

WMNF Plan 3-47 – 3-53.

### 3. Endangered Species Act ("ESA")

Congress passed the Endangered Species Act in 1973 for the purpose of conserving endangered and threatened species and the ecosystems upon which they rely. 16 U.S.C. § 1531(b). According to the Supreme Court, the "plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). The ESA requires the Secretary of the Interior to determine whether any species is "endangered" or "threatened." The Secretary of the Interior has delegated this listing authority to the USFWS. An "endangered species" is one "which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A "threatened species" is one "which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). Whether a species is threatened or endangered is evaluated based on several factors, including "the present or threatened destruction, modification, or curtailment of its habitat or range," disease or predation, and "other natural or manmade factors affecting its continued existence." *Id.* § 1532(a)(1). USFWS makes its listing determination based on the "best scientific and commercial data available." *Id.* § 1533(b)(1)(A).

Section 4 of the ESA provides for the listing of species as either endangered or threatened. *Id.* § 1533. When a species is listed as threatened, the Secretary must issue regulations "to provide for the conservation of such species." *Id.* § 1533(d). Such regulations are commonly referred to as the species' "4(d) Rule." *See, e.g*., 4(d) Rule for the Northern Long-Eared Bat, 81 Fed. Reg. 1900 (Jan. 14, 2016). Section 9 of the ESA broadly prohibits the "take" of any listed species. 16 U.S.C. § 1538(a). "Take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). Section 7 of the ESA requires every federal agency to consult with USFWS to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species."16 U.S.C. § 1536(a)(2). To assist in the completion of this statutory requirement, the agency undertaking the action ("action agency") must complete a Biological Assessment ("BA"). *Id.* § 1536(c)(1). The purpose of the BA is to "evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat." 50 C.F.R. § 402.12. USFWS reviews the BA, and if the agency determines that the proposed action may affect listed species or critical habitat, USFWS must formally consult with the action agency. 50 C.F.R. § 402.14. USFWS then produces a Biological Opinion ("BiOp") to determine whether the agency action is likely to jeopardize the continued existence of a listed species. *Id.* § 402.14(h). If the action is likely to jeopardize listed species, the BiOp must include reasonable and prudent alternatives to the action as proposed. *Id.* § 402.12(h)(2).

The action agency must reinitiate consultation under four circumstances: (1) if the amount of take contemplated in the incidental take statement is exceeded; (2) if new information shows that the action may affect listed species or critical habitat "in a manner or to an extent not previously considered": (3) if the action is modified such that it causes an effect to the listed species or critical habitat not previously considered; or (4) "if a new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. § 402.16(a).

## DISCUSSION

## I. The 2022 DEA is inadequate under NEPA and new analysis must be conducted.

"Federal agencies shall to the fullest extent possible… [u]se all practicable means, consistent with the requirements of [NEPA] and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment." 40 C.F.R. § 1500.2(f).

The overarching flaw for this "integrated resource project" is the Forest Service's failure to provide more than mere conclusory statements to support its finding of no significant impact. The analysis is sparse, and sometimes non-existent, for a number of impacted resources. As a result, it is nearly impossible for the public to meaningfully engage with agency's data and analysis presumably underlying the 2022 DEA.

### a. Public Involvement Process

Public participation is a critical aspect of the NEPA process. *See* 40 C.F.R. § 1500.1(b) ("[P]ublic scrutiny [is] essential to implementing NEPA."); § 1500.2(d) ("Federal agencies shall to the fullest extent possible… [e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment."); 40 C.F.R. § 1506.6(a) ("Agencies shall . . . [m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures.").

Here, public involvement has been impeded by the unavailability of relevant supporting documents, the failure of the 2022 DEA to clearly identify other supporting documents, and the failure to include sufficient detail in the DEA to allow the public to engage the substantive analysis underlying the agency's review of project impacts on relevant resources, and its subsequent finding of no significant impact.

For example, although the 2022 DEA was made available to the public on April 12, 2022, supporting documentation such as the Soils Specialist Report and the New Hampshire SHPO concurrence letter were not made available to the public until weeks later. Although the Soils Specialist Report was specifically referenced in the 2022 DEA (page 20), it was only posted to the Forest Service's project page after Standing Trees requested that it do so. The SHPO letter, which was referenced but not incorporated into 2022 DEA (page 24), was provided directly to Standing Trees after it requested this document, but to our knowledge it has not yet been made

available to the general public. *See* Exhibits 3 (email chain requesting report and letter) and 4 (SHPO concurrence letter).

In addition, numerous references are made to other unspecified authorities to support conclusions advanced by the Forest Service in the 2022 DEA. For example, the DEA states that "[a]n analysis of the current habitat conditions indicates that the Tarleton HMU is not meeting the MA 2.1 Habitat Composition and Age Class Objectives." 2022 DEA at 6. It then references the section of the WMNF Plan that contains these objectives, but no reference or citation is provided for where the public can review this "analysis of current habitat conditions." If an analysis was already conducted it could have been included in the 2022 DEA, or at least cited so that the public could review it. Instead, we are left to wonder if this analysis is contained in one of the other documents provided on the Forest Service project webpage. This does not appear to be the case. The closest contender would appear to be the USDA Forest Service 2019 Terrestrial Habitat Management Reference Document, but that document makes no mention of the Tarleton HMU, and thus could not be said to be an analysis of current habitat conditions in the project area. A member of the Lake Tarleton Coalition requested a stand age class map on November 15, 2021 for the areas proposed for harvest in the Tarleton IRP and was refused such map by the WMNF. *See* Exhibit 5.

Further, the 2022 DEA makes repeated reference to similar, unspecified past projects to support its conclusions of no impact, yet no references or citations are provided so that the public can verify these claims. *See* 2022 DEA at 20, 21, 22, 23. The above are merely illustrations of the types of documents that were not timely provided to the public, and it is possible that others were not provided as well.

The public is not able to properly scrutinize agency decisions and analysis when relevant documentation is not made available or when available documents do not actually contain the analysis necessary to support the Service's conclusory statements. The overall effect is to impede public participation, in violation of NEPA's clear mandate to "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment." 40 C.F.R. § 1506.6(a). In addition, the failure to provide clear analysis, or sometimes any analysis, violates NEPA's mandate that NEPA documents "shall be written in plain language . . . so that decisionmakers and the public can readily understand them." 40 C.F.R. § 1502.8. The public cannot understand what it is not told.

Without providing actual analysis, it is impossible to gauge the actual anticipated impact to project-area resources, the significance of those impacts, and whether they violate WMNF Plan standards and guidelines. "[T]he public should not be required to parse the agency's statements to determine how an area will be impacted[.]" *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 761 (9th Cir. 2014). Instances of this persistent defect are identified throughout these comments.

Finally, but importantly, the 2022 DEA does not describe any outreach to potentially affected Tribes. Whether Federally recognized or not, affected Tribes deserve advanced notification of the action, and it is unclear whether Tribes or Tribal organizations have been notified at all. Not only should the Tribes be included in NEPA outreach, they should be

included in project development ahead of NEPA so we strongly recommend a return to the planning phase with proper and complete engagement. We further recommend explaining the nature and scope of this engagement as part of any future NEPA analysis.

### b. Purpose and Need

The reasonableness of a purpose and need statement is assessed by considering the "statutory context of the federal action." *League of Wilderness Defenders v. U.S. Forest Serv.*, 689 F.3d 1060, 1069–70 (9th Cir. 2012). In this case, the 2022 DEA defines its objectives in unreasonably narrow terms by ignoring key standards from the WMNF Plan. As a result of this unreasonably narrow purpose and need statement the Forest Service necessarily considered a narrower range of alternatives than it should have. Indeed, as described below, the Forest Service did not consider any alternatives to the proposed Project. Both the unreasonably narrow purpose and need statement and the resulting lack of alternatives analysis violate NEPA. *Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058, 1070-72 (9th Cir. 2010).

As explained by the court in *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664, 666 (7th Cir. 1997), under NEPA, "the first thing an agency must define is the project purpose." The court further explained the importance of properly defining a project's purpose:

> The 'purpose' of a project is a slippery concept, susceptible of no hard-and-fast definition. One obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence). The federal courts cannot condone an agency's frustration of Congressional will. If the agency constricts the definition of the project's purpose and thereby excludes what truly are reasonable alternatives, the EIS cannot fulfill its role. Nor can the agency satisfy [NEPA].

*Id*.

The 2022 DEA describes the primary purpose of the proposed project as "to implement the management direction in the Forest Plan by comparing the existing conditions in the project area with the desired conditions as established in the Forest Plan." 2022 DEA at 5. As an initial matter, the WMNF Plan is nearly 17 years old. Prior to undertaking any projects to "implement the management direction in the Forest Plan," the Forest Service should update the WMNF Plan as it is required to do under NFMA. 16 U.S.C. § 1604(f)(5). Further, there is no need to undertake the Project in order to compare existing conditions in the project area with the Forest Plan's desired conditions. That analysis can be done separate and apart from the project activities proposed. Finally, this purpose fails to demonstrate a need for the action at the current time.

A properly crafted purpose and need statement would integrate purposes of the Forest Plan with current executive orders, *see* Exhibit 6 (Executive Order 14072), to identify the best management approaches for current stand conditions. Instead, the 2022 DEA states the purpose of the proposed action is to implement the Forest Plan. This inherently structures the 2022 DEA to presuppose that the Forest Plan could only be implemented by the proposed action and fails to explain the management context (i.e., is the management needed and is this the most appropriate

management for the subject stands) to demonstrate the need component of the purpose and need statement. In order to demonstrate the need for the action, the Forest Service must do more than simply state a preference for "open forest conditions[,]" 2022 DEA at 6, but must actually connect stand conditions, best science, and desired future conditions to this supposed need. Without this, the purpose and need statement in the 2022 DEA is an insufficient approach to NEPA.

A more accurate purpose and need statement would promote exploration of other forest management prescriptions that could better implement the Forest Plan, better avoid significant impacts on scenic and cultural resources and mature forests, and better support wildlife. A more accurate purpose and need statement would also promote detailed evaluations of current natural and cultural resources lacking in the current 2022 DEA, and other reasonable alternatives.

**c. Range of Alternatives**

For the proposed Project, the Forest Service issued a 2022 DEA and Preliminary Finding of No Significant Impact. An Environmental Assessment must include a "brief discussion[ ]" of reasonable alternatives to the proposed action. *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1323 (D.C. Cir. 2015) (quoting 40 C.F.R. § 1508.9(b)). "An alternative is reasonable if it is objectively feasible as well as 'reasonable in light of [the agency's] objectives.'" *Id.* (quoting *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 72 (D.C. Cir. 2011)). Although the obligation to consider reasonable alternatives in an EA is a lesser one than in an EIS, the obligation nevertheless exists. *See Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 470 F. Supp. 2d 30, 62 (D.N.H. 2007) (Woodcock, J.) (quoting *Native Ecosystems Council v. U.S. States Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005)). The 2022 DEA fails to even meet its lesser obligation for an alternatives analysis under an EA for several reasons.

First, the Forest Service in the EA only included a discussion of the proposed Project. Rather than discuss any number of reasonable alternatives to the Project, including a No Action alternative, the Forest Service chose to add to its updated EA a section called "Consequences of No Action." 2022 DEA at 7–8. This is not the equivalent to a No Action Alternative, which is the bare minimum alternative analysis an agency should undertake. One of the most critical purposes of a No Action alternative is to establish a baseline against which the proposed Project can be measured. In framing the "no action" discussion in the way that it did, the Forest Service made no attempt to establish such a baseline.

Further, by labeling its analysis as "Consequences," the Forest Service inappropriately put a qualitative thumb on the scale against that outcome. The negative connotation of the "Consequences" label was reinforced by the Forest Service's discussion, which was not an analysis, but rather a list of potential detrimental effects of not moving forward with the Project. But NEPA requires agencies consider both the detriments *and benefits* of proposed projects, which would include considering the benefits of reasonable alternatives as well. There are numerous benefits of not moving ahead with the Project (i.e., taking No Action), including, but not limited to, climate benefits of retaining older, mature trees, habitat benefits for the Northern Long-eared Bat and other species that benefit from mature or interior forests or are sensitive to harvest impacts, avoiding potential detrimental impacts to water quality due to runoff,

sedimentation, and potential herbicide contamination, avoiding loss or damage to historic and cultural resources located within the project area, avoiding visual impacts to the recreating public, and potential violation of Forest Plan standards to maintain very high visual quality standards for MA 8.3 (Appalachian Trail) lands, among many others. Accordingly, the Forest Service cannot rationally claim the "Consequences" section of the 2022 DEA is an analysis of a no-action alternative.

Second, even if the "Consequences of No Action" is considered the equivalent to a No Action Alternative, the Forest Service's consideration of alternatives is still insufficient. CEQ regulations mandate that federal agencies "*shall to the fullest extent possible* . . . [u]se the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 C.F.R. § 1500.2(e) (emphasis added). It is also incumbent upon federal agencies to "[s]tudy, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." *Id.* § 1501.2(c); *see also* 42 U.S.C. § 4332(2)(E). Given the many different facets of the Project and the broad primary purpose articulated in the 2022 DEA—"to implement the management direction in the Forest Plan by comparing the existing conditions in the project area with the desired conditions as established in the Forest Plan"—it is inconceivable that there was only one way to achieve that purpose. This is especially true for the logging portions of the Project. While reasonable alternatives may not be available for certain recreational enhancement portions of the Project (for example, improvements to the Lake Katherine boat launch), the logging activities are different in kind. The sheer number of different silviculture prescriptions for the proposed action demonstrates that even if logging is needed—which Standing Trees asserts it is not—there is a wide variability in how the logging can achieve desired conditions. This variability necessarily implies additional reasonable alternatives exist that the Forest Service either did not identify, or, at a minimum, did not consider.

A recent case in the federal district court in New Hampshire is instructive on this issue. In *Conservation L. Found. v. U.S. Army Corps of Eng'rs*, 457 F. Supp. 3d 33 (D.N.H. 2019), a recent preliminary injunction opinion regarding the range of alternatives considered in an EA, the Court emphasized 40 C.F.R. § 1502.14, quoting from the regulation that agencies must:

> (a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, *briefly discuss* the reasons for their having been eliminated.
>
> (b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

*Conservation L. Found.,* 457 F. Supp. 3d at 56 (emphasis in original). The Court went on to hold that the agency was likely to succeed on the merits "because the EA provided reasonable, common-sense explanations for rejecting alternatives." *Id.* In that case the agency considered five alternatives, including a true no-action alternative. *Id.* at 57. The agency assessed the alternatives in quantitative terms, and for each alternative, the agency provided a rationale for why it was rejecting it in favor of the proposed action. *Id.* at 57–58.

By contrast, here, the Forest Service did not analyze *any* alternatives to the Project, much less provide any rationale, quantitative or otherwise, for why it rejected them. To be sure, numerous reasonable alternatives exist – alternatives apparent to the agency and the public alike – and the Forest Service could have analyzed any of them, but failed to do so. Below, Standing Trees provides suggested reasonable alternatives the Forest Service could and should have considered. As stated elsewhere in this comment, to the extent the Forest Service intends to move forward with the Project, it must complete an Environmental Impact Statement, and as part of that EIS, it must consider all reasonable alternatives, including a true no-action alternative.

*Reasonable Alternatives Not Considered by the Forest Service*

As stated in the previous section, the White Mountain National Forest presents the Tarleton IRP as an all or nothing proposition. In addition to a No Action alternative, the Lake Tarleton Coalition suggests the following as one of several possible combinations of project components:

- Alternative 3. Combine improvements to recreation resources with small-scale habitat restoration and a Forest Plan amendment designating the Lake Tarleton-Webster Slide Scenic Area while omitting the unnecessary harvest and treatment activities included in the current proposed action. In this alternative, the WMNF could consider small-scale habitat restoration and recreation improvements including:
    - Natural woody debris inputs into Lake Katherine to improve fish habitat;
    - Restoration of natural buffer along the shore of Lake Katherine through removal of non-native species, tree planting, etc.;
    - Restoration of historic apple orchards;
    - Restoration of non-native tree plantations on former Mt. Sentinel State Forest if and where project goals do not conflict with standards and guidelines for MA 8.3 (Appalachian National Scenic Trail);
    - Conduct a narrowly-focused, geographically-explicit Forest Plan amendment to designate the Lake Tarleton-Webster Slide Scenic Area according to WMNF Plan Management Area 8.5. Like the nine other Scenic Areas on the WMNF, this one would be managed to prohibit timber management, maintain outstanding scenic integrity, and promote well-managed, low-impact recreation in balance with protection of the Appalachian Trail corridor and cultural and natural resources including archaeological sites, fish and wildlife, and water quality.

Since early 2022, over 1,600 concerned citizens have petitioned the White Mountain National Forest to permanently protect Lake Tarleton from logging and development as was intended and envisioned at the time that the land was acquired for public ownership in 2000.

A process to consider alternatives for the Lake Tarleton acquisition other than the current Management Area allocations should have taken place during revision of the 2005 WMNF Plan. However, to the best of our knowledge, this analysis never occurred. All four alternatives considered in the 2005 Forest Plan Final EIS contain identical Management Area allocations for Lake Tarleton and surrounding lands. This is difficult to comprehend, considering how recently

the 5,300 acres surrounding Lake Tarleton had been acquired, and how clear the intent was to put this landscape into management for outstanding scenic integrity. Further, according to Ch. 70 of the 1992 Directives for the 1982 Planning Rule, the forest block stretching from Lake Tarleton to Webster Slide and Wachipauka Pond should have been identified as an Inventoried Roadless Area and evaluated for its potential for wilderness designation by Congress. Exhibit 23.

The Tarleton IRP presents an opportunity to modify the 2005 WMNF Plan to match the reasons why Lake Tarleton was protected. Forest Plan Management Area 8.5, Scenic Areas, are managed to:

> *"meet the objectives for which each has been designated. Most have been recognized as having 'outstanding natural beauty.' They will exhibit late successional vegetation with related wildlife species. Others have been identified for their recreation potential. As a result, evidence of human activity will range from substantially unnoticeable to very evident, and road networks vary from none to high density."*

WMNF Plan at 3-61.

Scenic Areas on the White Mountain National Forest include Gibbs Brook, Greeley Ponds, Lafayette Brook, Lincoln Woods, Mount Chocorua, Pinkham Notch, Rocky Gorge, Sawyer Pond, and Snyder Brook. All of these are located east of I-93. As recreational focal-points, Scenic Areas are important economic drivers for nearby communities. Lake Tarleton and Webster Slide are located along the Appalachian Trail corridor at the westernmost end of the White Mountain National Forest. Although this is a relatively quiet region of the WMNF, it is within a short distance of the Hanover/White River Junction area, and the most easily-accessed portion of the WMNF from points south along I-91, including large metropolitan areas in western Massachusetts and central Connecticut. Scenic Areas are underrepresented in the western WMNF, a situation that can easily be corrected with a Forest Plan amendment.

The Forest Service's own 2015 Planning Rule Directives outline the reasons why Forest Plan amendments are an important tool for keeping plans up to date, especially those that continue beyond a plan's 15-year intended lifespan as outlined in the National Forest Management Act. *See* Exhibit 55. According to the 2015 Directives:

> *"Plan amendments are intended to be an adaptive management tool to keep plans current, effective, and relevant between required plan revisions (every 15 years). Amendments help Responsible Officials adapt an existing plan to new information and changed conditions. Maintaining plans through amendment also may reduce the workload for subsequent plan revisions.*
>
> *Amendments may be broad or narrow in scope, depending on the need to change the plan. An assessment for a plan amendment is not required, but may be developed at the discretion of the Responsible Official[.]"*

FSH 1909.12 Land Management Planning Handbook Chapter 20. The Forest Service's NEPA-implementing regulations echo this, providing that "[a] plan may be amended at any time…and

should be used to keep plans current and help units adapt to new information or changing conditions. The responsible official has the discretion to determine whether and how to amend the plan and to determine the scope and scale of any amendment." 36 C.F.R. § 219.13(a). Section 219.13 provides further instruction regarding the amendment process. *See also* 16 U.S.C. § 1604(f)(4)-(5) (identifying when and how forest plan revisions and amendments may be completed).

**d. The DEA fails to take a "hard look" at numerous project-area environmental resources**

NEPA requires agencies to take a "hard look" at their actions by considering all foreseeable direct, indirect impacts and cumulative impacts.[2] *Earth Island Inst. v. Forest Serv.*, 442 F.3d 1147, 1159 (9th Cir. 2006); 40 C.F.R. §§ 1508.7, 1508.8 (2019); *see also Klamath Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 993–97 (9th Cir. 2004) (applying NEPA's hard look requirement to EAs); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("The sweeping policy goals . . . of NEPA are . . . realized through a set of 'action-forcing' procedures that require that agencies take a 'hard look at environmental consequences,' and that provide for broad dissemination of relevant environmental information." (internal citations omitted)).

The hard look requirement includes "both a complete discussion of relevant issues as well as meaningful statements regarding the actual impact of proposed projects." *Earth Island*, 442 F.3d at 1172. An agency may not rely on future remedial measures to avoid taking the necessary "hard look" in its NEPA analysis. *Nat'l Parks Conservation Ass'n v. Babbitt,* 241 F.3d 722, 733–36 (9th Cir. 2001) ("A perfunctory description, or mere listing of mitigation measures, without supporting analytical data, is insufficient to support a finding of no significant impact.").

> Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

40 C.F.R. § 1508.8. The Service's NEPA analysis failed to take a hard look at impacts to nearly all of the resources in the project area, including providing only sparse detail of these resources and conclusory statements of no impact. The discussion below highlights merely some of the issues with the DEA's impacts analysis for the selected resources. It is not possible or practicable for Standing Trees to address every issue with the DEA's impacts analyses, and thus we reserve the right to raise additional concerns regarding the adequacy of its analysis at a later time.

[2] As noted by the CEQ NEPA-implementing regulations, "effects" and "impacts" are synonymous in the context of NEPA discussion. 40 C.F.R. § 1508.8.

### i. Federally Listed and Regional Forester Sensitive Species

On March 23, 2022, the USFWS announced a proposed rule to reclassify the northern long-eared bat from threatened to endangered and remove the bat's species-specific 4(d) rule. *Endangered Species Status for Northern Long-Eared Bat*, 87 Fed. Reg. 16,442 (March 23, 2022). Exhibit 7. Even though the 2022 Draft EA was released after the proposed up-listing of the Northern Long-Eared Bat and removal of the 4(d) rule, the Draft EA does not address this significant event. This status change is new information that requires both re-initiation of ESA Section 7 consultation between the Forest Service and USFWS, and an EIS.

According to the ESA implementing regulations, consultation must be reinitiated "where discretionary Federal involvement or control over the action has been retained" and "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," among other reasons. 50 C.F.R. § 402.16. The proposed up-listing of the Northern Long-eared Bat and the revocation of the 4(d) rule for the bat constitutes such new information and demands the re-initiation of consultation.

The Biological Evaluation for the Project acknowledged that "project activities may affect the Northern Long-eared Bat," but concluded that "[a]ny taking that may occur incidental to this project is not prohibited under the final 4(d) rule." USDA FOREST SERV., TARLETON INTEGRATED RESOURCE PROJECT BIOLOGICAL EVALUATION, at 10 (February 2021) (hereinafter "BE"). The Northern Long-eared Bat occurs throughout the project area, and the BE observed that timber harvests could impact the species by removal of roost trees. BE at 10. However, the BE concluded that the Project's actions would not violate the ESA in regards to the Northern Long-eared Bat because they would be shielded by the 4(d) Rule.

But the up-listing of the bat, if finalized, will remove its species-specific 4(d) Rule and make all take of the bat unlawful. 87 Fed. Reg. 16,442. The BE suggests that at least some bats may be taken, especially under its cumulative impacts analysis[3], but the Forest Service has never evaluated the impacts of such take on the species in the absence of the 4(d) Rule. The proposed up-listing and removal of the 4(d) rule is thus new information that warrants re-initiation of consultation.

The proposed up-listing itself also provides new information that demands the re-initiation of consultation. The up-listing was, by definition, motivated by an increased likelihood that the Northern Long-eared Bat is in danger of extinction throughout all of its range. *See* 87 Fed. Reg. 16,449. The bat's abundance "has and will continue to decline substantially under current demographic and stressor conditions;" extant winter colonies have declined range-wide by 81%; and range-wide abundance is projected to decline by 95% from historical conditions by 2030. *Id.* at 16,446. Further, there has been a 96–100% decline in the number of large hibernacula. *Id.* Such low population sizes "exacerbate the effects of current and future declines

[3] "The USFWS estimates up to 1.0 percent of the New Hampshire NLEB population will be disturbed and 0.1 percent of the pup population and less than 0.05 percent of the adult population will be harmed annually from the combination of timber harvest, prescribed fire, forest conversion, and wind turbine operation." BE at 10.

due to continued exposure to [white nose syndrome], mortality from wind turbines, and impacts associated with habitat loss and climate change." *Id*. at 16,447.

Northern Long-eared Bat habitat requirements are the opposite of the type of habitat that will be generated from the Project. According to the USFWS Species Status Assessment Report for the Northern Long-eared Bat ("NLEB Report"), dated March 22, 2022, the bat depends on mature and old forests for roosting and foraging. Exhibit 8. Preferred roosting habitat is large diameter live or dead trees of a variety of species, with exfoliating bark, cavities, or crevices. Bats change roosts approximately every two days. Preferred foraging habitat is old forest with complex vertical structure on hillsides and ridges.

The WMNF, including the Lake Tarleton project area, contains extensive mature forests that are beginning to acquire the characteristics of an old forest, likely providing some of the highest-quality Northern Long-eared Bat habitat in New England. Some of the silviculture treatment prescriptions involve the removal of mature trees.[4] In combination with recently-approved projects (including Bowen Brook Integrated Resource Project, Deer Ridge Integrated Resource Project, Wanosha Integrated Resource Project, and others), and anticipated logging projects (including the Sandwich Vegetation Management Project and Peabody West Integrated Resource Project), WMNF is set to eliminate or degrade thousands of acres of Northern Long-eared Bat habitat across a large region. As discussed in further detail below, the Forest Service failed to evaluate the cumulative impact of these combined and geographically proximate projects.

In light of this new information that Northern Long-eared Bat populations have become so decimated that the species is now in danger of extinction throughout all of its range and has thus been proposed for up-listing to endangered status, the Forest Service must reinitiate consultation with USFWS. 50 C.F.R. § 402.16; *see also Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 672 F.3d 1160 (9th Cir. 2012) (potential status change of loggerhead turtles from threatened to endangered was a sufficient factual basis for revision of Biological Opinion). The failure to do so would not only be a violation of the ESA, but of NEPA, which holds an independent obligation that agencies continue to take a "hard look" at project impacts. Where "new circumstances or information" arise that are "relevant to environmental concerns and bear[] on the proposed action or its impacts," and "a major Federal action remains to occur," the agency must prepare supplemental NEPA documentation. 40 C.F.R. § 1502.9(d). *See Marsh v. Or. Natural Resources Council*, 490 U.S. 360, 374 (1989) (An agency must at least take a "hard look" at the environmental impacts of the planned action, even after a proposal has received initial approval).

### ii. Historic and Cultural Resources

The 2022 DEA gives woefully short shrift to the discussion of project impacts on historic and cultural resources. The DEA initially obfuscates this issue by failing to make clear whether historic and cultural resources even exist within the project area. The scant discussion of this

[4] For example, an estimated 115 acres will be clear-cuts with reserves, which "would result in an immediate change from mature to regeneration age structure." Draft EA at 10. Overstory removal also removes "the majority of the mature overstory within a stand." *Id*. at 12.

resource merely indicates that "archeologists completed a cultural resource review" and "[n]o historic properties will be affected by the proposed project activities." 2022 DEA at 19. It is not made clear whether no properties will be affected because none exist in the project area, or whether they do exist, but the Service anticipates that potential impacts would be mitigated. This ambiguity persists until the DEA's subsequent mention of historic properties in its "significance" discussion that states "[a]s a result of project design, the project would not adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places." *Id.* at 24. Here, the reader must infer the existence of historic and cultural resources, but again, no details are provided regarding what resources are actually present in the project area. Further, no analysis is provided to explain how impacts to project-specific resources would be mitigated. The lack of any detail or analysis is yet another example of this DEA's failure to provide clear NEPA documentation to allow for public review and scrutiny.

To be certain, historic and cultural resources *do* exist within the project area, as known by local citizens, including members of the Lake Tarleton Coalition, and as documented by the recent Cultural Resource Reconnaissance Report ("CRRR") prepared for the Tarleton IRP. Exhibit 9 (CRRR); Exhibit 30 (public comment regarding these resources). It is also possible that the project area may contain significant Abenaki resources that would have been discovered through more rigorous consultation and research.[5] This document, which to our knowledge has still not been made available to the general public[6], reveals that the project area contains at least 29 known cultural resources, including 19th century farmstead sites, cellar holes, building foundations, wells, stone walls, historic roads, and pre-contact lithic scatter, among others. CRRR at 4. That same document concluded that the project had potential to directly impact these cultural resources. *Id.* The failure of the Forest Service to even mention these resources in the DEA, much less analyze potential impacts and actually explain how direct impacts may be avoided is so egregious it almost appears to intentionally mislead the public regarding cultural resources in the project area.

---

[5] The CRRR indicated that it entailed only a "sample" field survey instead of a "complete" one, thus a more thorough review may yield the discovery of numerous additional cultural and historic resources. CRRR at 3.

[6] In fact, Standing Trees was only able to obtain a copy of this report through a FOIA request submitted by one of its members. Members of the public should not be required to submit FOIA requests in order to view project documents. The Tarleton IRP Cultural Reconnaissance Report was decidedly prepared to evaluate the Tarleton IRP, and as such, it should be considered part of the Project Record. The DEA states that "the project record is incorporated by reference and contains all relevant data, methods, analyses, references, and other technical documentation used in this assessment." 2022 DEA at 18. Firstly, this general incorporation does not fulfill NEPA's requirement that "incorporated material shall be cited in the statement and its content briefly described[,]" 40 C.F.R. § 1502.21, and thus the project record is not properly incorporated by reference. Secondly, even if it was properly incorporated, "[n]o material may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment." *Id.* The Cultural Resources Reconnaissance Report was not reasonably available for inspection during the comment period because the only reason it was available for review is because a member of Standing Trees had the forethought to request this report months prior to the opening of the comment period. Had they not done so, Standing Trees may not have even been made aware of this report and its ability to review this document and fully participate in the public comment process would have been prejudiced.

### iii. Climate Change

Climate change is driving and exacerbating a range of threats to New Hampshire, the New England region, and the globe. The 2009 New Hampshire Climate Action Plan notes that climate change is already "Increasing the frequency and severity of heavy, damaging precipitation events and the associated major economic impacts of cleanup, repair, and lost productivity and economic activity." In addition, climate change is "Increasing the frequency of short-term (i.e., one to three month) summer droughts from every two to three years to annually, resulting in increased water costs, and agricultural and forestry stress." Exhibit 10. Although perhaps not a primary driver of the spread of invasive species, ticks, and disease, climate change can amplify these threats.

The Intergovernmental Panel on Climate Change Report released in February 2022 found, "Safeguarding biodiversity and ecosystems is fundamental to climate resilient development … and to [climate] mitigation and adaptation." Exhibit 11. On November 12th, 2021, the US joined 140 other nations in signing a commitment at the COP 26 UN Climate Change Conference in Glasgow, Scotland. The "Glasgow Leaders' Declaration on Forests and Land Use" promised to "to halt and reverse forest loss and *land degradation* by 2030" (emphasis added). Exhibit 12.

On the global scale, forest protection represents approximately *half or more* of the climate change mitigation needed to hold temperature rise to 1.5 degrees Celsius.[7] New Hampshire may be a relatively small state, but its temperate deciduous forests are among the planet's most effective carbon sinks. In the US, New England's in-situ carbon storage potential is second only to that of the Pacific Northwest, but carbon storage levels remain artificially low due to timber harvest frequency and intensity. Across the Northeast US and Upper Midwest, timber harvest accounts for 86% of annual forest carbon loss. In comparison only 9% of forest carbon in the same geographic area is lost annually from insect damage, and 3% from conversion to other land uses.[8] Other recent studies show that among land uses in New England, timber harvest is the leading cause of tree mortality[9] and has the greatest impact on aboveground carbon storage.[10]

The WMNF is an insurance policy against a changing climate and increasing extinction rates. The WMNF contains many of the oldest and most carbon-dense ecosystems in New England, much less New Hampshire, supporting native biodiversity and protecting critical headwaters. Its management should reflect its unique values in the broader landscape, serving the greatest good for the greatest number by maximizing carbon and water storage, water quality, and habitat for species that require old and unfragmented forests.

---

[7] Erb et al., UNEXPECTEDLY LARGE IMPACT OF FOREST MANAGEMENT AND GRAZING ON GLOBAL VEGETATION BIOMASS (2018) [Exhibit 13]
[8] Harris et al., ATTRIBUTION OF NET CARBON CHANGE BY DISTURBANCE TYPE ACROSS FOREST LANDS OF THE COTERMINOUS UNITED STATES (2016) [Exhibit 14]
[9] Brown et al., TIMBER HARVEST AS THE PREDOMINANT DISTURBANCE REGIME IN NORTHEASTERN U.S. FORESTS: EFFECTS OF HARVEST INTENSIFICATION (2018) [Exhibit 15].
[10] Duveneck and Thompson, SOCIAL AND BIOPHYSICAL DETERMINATIONS OF FUTURE FOREST CONDITIONS IN NEW ENGLAND: EFFECTS OF A MODERN LAND-USE REGIME (2019) [Exhibit 16] (hereinafter "Duveneck and Thompson (2019)")

The 2018 Vermont Conservation Design Natural Community and Habitat Technical Report, jointly produced by the Vermont Departments of Forests, Parks and Recreation and Fish and Wildlife, puts it this way:

> *"As a result of the persistent structural and vegetative complexity above ground and the diverse biome belowground and associated complex biotic and abiotic relationships that develop over time, old forests also protect water quality, and sequester and store carbon, provide opportunities for adaptation of species and community relationships to climate and other environmental changes, and an ecological benchmark against which to measure active management of Vermont's forests."*[11]

There is a common misconception that young forests are better than old when it comes to removing carbon in the atmosphere. First of all, old forests store much more carbon than young forests, and they continue to accumulate carbon over time.[12,13,14] What's more, the rate of carbon sequestration also increases as trees age.[15]

Today, despite tree cover across 84% of New Hampshire, the state's forests do not produce high levels of ecosystem services due to current management practices, including harvest frequency and intensity, and are still recovering from extensive clearing in the eighteenth and nineteenth centuries. A 2019 paper by Harvard Forest researchers found that:

> *"Among land uses, timber harvesting [has] a larger effect on [aboveground carbon] storage and changes in tree composition than did forest conversion to non-forest uses… Our results demonstrate a large difference between the landscape's potential to store carbon and the landscape's current trajectory."*[16]

Northeast secondary forests have the potential to increase biological carbon sequestration 2.3–4.2-fold.[17] A 2011 paper by UVM Professor Bill Keeton found that:

> *"…there is a significant potential to increase total carbon storage in the Northeast's northern hardwood-conifer forests. Young to mature secondary forests in the northeastern United States today have aboveground biomass (live and dead) levels of 107 Mg/ha on average (Turner et al. 1995, Birdsey and Lewis 2003). Thus, assuming a maximum potential aboveground biomass range for old-growth of approximately 250–450 Mg/ha, a range consistent with upper thresholds in our data set and the lower*

---

[11] Zaino et al., VERMONT CONSERVATION DESIGN – NATURAL COMMUNITY AND HABITAT TECHNICAL REPORT (2018) [Exhibit 17] (hereinafter "Zaino et al. (2018)")
[12] Keith et al., RE-EVALUATION OF FOREST BIOMASS CARBON STOCKS AND LESSONS FROM THE WORLD'S MOST CARBON-DENSE FORESTS (2009) [Exhibit 18]
[13] Luyssaert et al., OLD-GROWTH FORESTS AS GLOBAL CARBON SINKS (2008) [Exhibit 19]
[14] Masino et al., OLDER EASTERN WHITE PINE TREES AND STANDS SEQUESTER CARBON FOR MANY DECADES AND MAXIMIZE CUMULATIVE CARBON (2021) [Exhibit 20]
[15] Stephenson et al., RATE OF TREE CARBON ACCUMULATION INCREASES CONTINUOUSLY WITH TREE SIZE (2014) [Exhibit 21]
[16] Duveneck and Thompson (2019)
[17] Keeton et al., LATE-SUCCESSIONAL BIOMASS DEVELOPMENT IN NORTHERN HARDWOOD-CONIFER FORESTS OF THE NORTHEASTERN UNITED STATES (2011) [Exhibit 22] (hereinafter "Keeton et al. (2011)")

*threshold observed at Hubbard Brook, our results suggest a potential to increase in situ forest carbon storage by a factor of 2.3–4.2, depending on site-specific variability. This would sequester an additional 72–172 Mg/ha of carbon.“*[18]

Forests in temperate zones such as in the Eastern U.S. have a particularly high untapped capacity for carbon storage and sequestration because of high growth and low decay rates, along with exceptionally long periods between stand replacing disturbance events, similar to the moist coastal forests of the Pacific Northwest. Further, because of recent recovery from an extensive history of timber harvesting and land conversion for agriculture in the 18th, 19th, and early 20th centuries, median forest age is about 75 years,[19] which is only about 25–35% of the lifespan of many of the common tree species in these forests.[20] Because of our remarkable forest ecosystems here in Northeastern North America, several global studies have highlighted the unique potential of our temperate deciduous forests to contribute on the global stage to climate stabilization and resilience.[21,22]

Old forests are also the most resilient to changes in the climate, producing the highest outputs of ecosystem services like clean water, and reducing the impacts of droughts and floods. These ecosystem services protect downstream communities from flooding, purify drinking water at low cost, and maintain base flows and low temperatures in rivers during hot summers for the benefit of fish and wildlife.

In New England, frequent flooding and nutrient-driven water quality degradation are two of our most costly environmental crises, and both are compounded by climate change. Mature and old forests naturally mitigate against flooding and drought by slowing, sinking, and storing water that would otherwise rapidly flow into our streams, rivers, and lakes.[23] Scientists have also shown that old forests are exceptional at removing nutrients that drive harmful algae blooms.[24]

After Tropical Storm Irene ravaged New England in 2011, Vermont's Department of Forests, Parks, and Recreation commissioned a report entitled "Enhancing Flood Resiliency of Vermont State Lands." According to the report:

*"There may be a tendency to assume that lands in forest cover are resilient to the effects of flooding simply by virtue of their forested status. However, forest cover does not necessarily equate to forest health and forest flood resilience. Headwater forests of Vermont include a legacy of human modifications that have left certain land areas with a*

---

[18] *See* Keeton et al. (2011)
[19] U.S. Department of Agriculture, Forest Service, Northern Research Station, Forest Inventory and Analysis National Program, Forest Inventory EVALIDator web-application Version 1.8.0.00. (2019)
[20] *See* Moomaw et al., INTACT FORESTS IN THE UNITED STATES: PROFORESTATION MITIGATES CLIMATE CHANGE AND SERVES THE GREATEST GOOD (2019) [Exhibit 24] (hereinafter "Moomaw et al. (2019)")
[21] Dinerstein et al., A GLOBAL SAFETY NET TO REVERSE BIODIVERSITY LOSS (2020) [Exhibit 25] (hereinafter "Dinerstein et al. (2020)")
[22] Jung et al., AREAS OF GLOBAL IMPORTANCE FOR TERRESTRIAL BIODIVERSITY, CARBON, AND WATER (2020) [Exhibit 26]
[23] Underwood and Brynn, ENHANCING FLOOD RESILIENCY OF VERMONT STATE LANDS (2015) [Exhibit 27] (hereinafter "Underwood and Brynn (2015)")
[24] Warren et al., FOREST STREAM INTERACTIONS IN EASTERN OLD-GROWTH FORESTS (2018) [EXHIBIT 28]

*heightened propensity to generate runoff, accelerate soil erosion, and sediment streams. These legacy impacts affect forest lands across the state... The quality of [today's] forests is not the same as the pre-Settlement old growth forests. The legacy of early landscape development and a history of channel and floodplain modifications continue to impact water and sediment routing from the land."*[25]

A 2019 study led by the University of Vermont looked into the climate resilience of older compared to younger forests. The research found that:

> *"[older forests] simultaneously support high levels of carbon storage, timber growth, and species richness. Older forests also exhibit low climate sensitivity…compared to younger forests… Strategies aimed at enhancing the representation of older forest conditions at landscape scales will help sustain [ecosystem services and biodiversity] in a changing world… Although our analysis suggests that old forests exhibit the highest combined [ecosystem services and biodiversity (ESB)] performance, less than 0.2% of the investigated sites are currently occupied by forests older than 200 years. This suggests a large potential to improve joint ESB outcomes in temperate and boreal forests of eastern North America by enhancing the representation of late-successional and older forest stand structures…"* [26]

The Tarleton IRP DEA climate analysis rests on suggestions that the project "might contribute an extremely small quantity of greenhouse gas emissions relative to national and global emissions," that the project "would not convert forest land to other non-forest uses," and that the "prescribed treatments" are the best way to increase climate resilience and age diversity within the forest. The EA claims that we should be most afraid of "mortality-inducing natural disturbances and other processes resulting in dead trees." DEA at 19. All of these claims are easily refuted in the recent papers cited and quoted above, and yet this information is ignored in the DEA and supporting materials. Either the Forest Service is cherry picking the science it wishes to use, or it has failed to take a hard look at climate change and climate resilience as they related to the White Mountain National Forest and the Tarleton IRP.

#### iv. Water Quality Impacts/Hydrology

The DEA fails to take a hard look at impacts to water quality, both within the context of the project area and at a broader basin or watershed scale. The Forest Service has assured Standing Trees that with the exception of soils, wildlife, and botany, all other specialists "wrote directly into the EA." *See* Exhibit 3. Based on the scant 3-sentence "analysis" of environmental impacts to Hydrology, it is unclear whether a specialist was engaged to review impacts to this resource at all. In its entirety, the section states the following:

> The proposed action is consistent with the laws and policies related to the Clean Water Act. Project Design, including design features, and best management practices would reduce or avoid impacts to water quality or quantity to de

---

[25] Underwood and Brynn (2015)

[26] Thom et al., THE CLIMATE SENSITIVITY OF CARBON, TIMBER, AND SPECIES RICHNESS COVARIES WITH FOREST AGE IN BOREAL-TEMPERATE NORTH AMERICA (2019) [Exhibit 29]

minimis levels. No measurable adverse effects to water quality or quantity are expected due to project implementation.

DEA at 19. This section contains zero analysis, instead consisting of three conclusory statements regarding impacts to water quality. Potential impacts to water quality are not even identified, yet are summarily dismissed as being preemptively mitigated. It is impossible for the public to evaluate or weigh in on the adequacy of the agency's analysis here, because there is nothing to evaluate. This section should, at a minimum, address erosion, run-off, sedimentation, loss of stream shading, and the potential impacts of, and specific mitigation for, harvest activities. The same can be said for anticipated management needed to place the proposed woody debris into Lake Katherine, the changes to hydrology resulting from the proposed forested buffer between the wildlife opening and Lake Katherine, and the expansion of the Lake Katherine parking lot. Additionally, although the DEA makes passing references to vernal pools, riparian zones, and wetlands, these resources are not actually identified to the reader. Without knowing the location of these resources, it is impossible for the public to meaningfully comment on the impacts to these resources because it is unclear which project activities will be taking place within or adjacent to them.

In contrast, the DEA had no trouble mentioning the potential issue of sedimentation and impacts to water quality when describing the alleged perils of not undertaking the project.[27] 2022 DEA at 8. In that section, the DEA alludes to the fact that current conditions, for Lake Katherine at least, involve "poor water quality overall." *Id.* Why is this baseline condition not mentioned within the "Hydrology" discussion? Was it taken into account when the DEA proclaimed that project activities would not impact water quality? What is the current status of the water quality within Lake Tarleton and its tributaries? In fact, although the DEA makes no mention of it, Lake Tarleton, Lake Katherine, and Lake Armington are known to have exceptional water quality. All three are free of aquatic invasive species. Lake Armington served as one of only two reference lakes, statewide, for a 2020 New Hampshire study on PFAS contamination in fish, surface water, and sediment. This should have all been discussed, or at least mentioned, in the discussion of the project's environmental impacts.

Pursuant to NEPA's "hard look" mandate, an agency must rely on adequate baseline data that enables the agency to carefully consider information about direct environmental impacts and may not rely on outdated data to do so. *See N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1083–87 (9th Cir. 2011); *Cascade Forest Conservancy v. Heppler*, 2021 WL 641614, at *17–20 (D. Or. Feb. 15, 2021). Indeed, "establishing appropriate baseline conditions is critical to any NEPA analysis," because without establishing a baseline, "there is simply no way to determine what effect the [project] will have on the environment and, consequently, no way to comply with NEPA." *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1101 (9th Cir. 2016). It is unclear if baseline data was even gathered for use in the DEA's analysis, because no analysis was presented.

[27] For reasons discussed elsewhere in these comments, Standing Trees is hesitant to characterize that discussion as a "no-action alternative" because it is not presented as an alternative, nor is it properly detailed or evaluated in the manner a no-action alternative should be or typically is by the Forest Service and other federal agencies.

Further, the WMNF Plan forest-wide guideline for vegetation management G-1 requires that "[n]o more than 15 percent of the area of watersheds of first and second order perennial streams should be treated with even-age regeneration methods in a five year period." WMNF Plan at 2-29. The DEA makes no mention of this standard, either in the Hydrology discussion or within its cumulative impacts discussion. Eastman Brook, both a tributary and outflow of Lake Tarleton, is one such stream.[28] Did the Forest Service determine what percent of the watershed had been, or will be, treated with even-age (clear-cutting) methods? The DEA does not indicate this, and the public cannot be expected to complete this analysis for them in order to understand whether or not this standard is being followed. In addition, the DEA makes no mention of Eastman Brook being a 303(d) impaired water under the CWA. Surely this warrants a mention and attendant impact analysis. *See* Exhibit 31 (New Hampshire's 2020-2022 303(d) list).

Additionally, the DEA states that there will be field visits prior to project implementation "to refine treatment unit boundaries and acres including modifications to address on-site conditions[,]" including potentially "reduc[ing acres] to meet visual and *water quality objectives*, to incorporate reserve patches of uncut trees in final harvest stands, and *to incorporate protective buffers around features such as vernal pools*, cultural resources, nest trees, and *riparian zones*." DEA at 9. Emphasis to this statement was clearly added to highlight the water-related resources, but for *all* resources mentioned, these on-site baseline conditions should have been identified *prior* to conducting the NEPA analysis. That information could and should have been used to describe the impacted environment, actually provide analysis of *how* these resources may be impacted, and describe how the agency might propose to address those impacts.[29] Further, it seems especially important that the treatment unit boundaries be defined prior to any implementation because of the potential for boundaries to stray into protected riparian areas. Specifically, the WMNF Plan forest-wide guideline G-1 for Riparian and Aquatic Habitats states that "[t]ree cutting and harvest should not occur within 25 feet of the bank of mapped perennial streams[.]" WMNF at 2-24. To our knowledge, no map of the project area was provided that shows both the location of Eastman Brook along with the harvest unit boundaries. However, by comparing the "Conceptual Planning Area Map" provided as part of the pre-scoping package with the Proposed Treatment Harvest Units map contained in the 2022 DEA at 27, it appears that unit boundaries for both clearcut and group selection logging come precipitously close to Eastman Brook. The 2022 DEA does not mention this guideline, nor does it make clear that these 25' buffers are integrated into the project design. Without this information, it is impossible to tell if this WMNF Plan guideline is being met, and further demonstrates the failure of the Forest Service to take a hard look at this matter.

---

[28] According to Table 2-01 in the WMNF Plan, only four orders of streams exist: 1st, 2nd, 3rd, and 4th. WMNF Plan at 2-25. Appendix H of the WMNF Plan contains a list of third- and fourth- order streams; on which Eastman Brook is not listed.

[29] The same issue is present with regard to the planned transportation system changes – "access roads, each less than 500 feet in length, would be constructed or reconstructed to access log landings. Final locations of log landings and associated access roads may be modified during implementation planning[.]" Because the location of roads and landings will affect the type and intensity of impacts to surrounding resources, this information should be known *prior* to making a finding of no significant impact. Otherwise the Service could claim no impacts will result from the currently proposed positioning but then change the proposed road and landing locations while evading public scrutiny of the impacts they've newly catalyzed.

The DEA also fails to mention or analyze potential impacts of the addition of the boat launch to Lake Katherine. The installation of the boat launch will invite additional use, and the risk of introduction of aquatic invasive species will commensurately be raised. In addition to failing to take a "hard look" at these direct and indirect impacts, as discussed below, the Forest Service also ignored the cumulative effects of these reasonably foreseeable impacts.

One of the 2022 DEA's few additions was a description of types and methods of herbicide use to the "botany resource design features." *Id.* at 4, 17. The addition of this information indicates that the project will involve the use of herbicide treatments, but other than listing these "design features," herbicides and their potential impacts to water resources (or any resources for that matter) are not mentioned anywhere in the DEA. The Forest Service must complete adequate analysis of the impacts to water quality and hydrology, at a minimum, at the watershed scale, since water quality impacts may compound as water from brooks, rivers, and streams meet and intermix.

**v. Recreation**

The Lake Tarleton area is beloved for a number of recreational opportunities it provides, including camping, hiking, swimming, fishing, boating, birdwatching, photography, observing wildlife, and generally relaxing in a pristine natural setting. Lake Tarleton State Park, which was established concurrently with the addition of the lands surrounding the lake to the WMNF, is a popular area for water-based recreation. Kingswood Camp is a long-running summer overnight camp, first established as Camp Serrana in 1909, that is located on the west shore of the lake. The Dartmouth Outing Club operates a cabin on the lakeshore. The ridgeline that forms the southern and eastern boundary of the Lake Tarleton watershed is traversed by the Appalachian National Scenic Trail. Piermont Mountain, rising to the west of Lake Tarleton and Lake Katherine and accessed via two popular user-created trails, provides a stunning vista over the lake basin, Webster Slide, and Mount Moosilauke. Several user-created campsites exist around the shore of Lake Tarleton, accessible by either boat (typically canoe or kayak) or by foot using a user-created trail around the southern shore of the lake. Both the lakeside trail and campsites fall within the proposed harvest areas.

The WMNF makes no attempt to assess potential impacts to the aforementioned long-running businesses dependent upon the unique scenery and recreational opportunities afforded by Lake Tarleton. Nor does the WMNF assess potential impacts on the public's ability to enjoy long-established recreational resources in the project area, with the exception of a brief review of possible impacts to the Appalachian Trail. The Tarleton DEA also only briefly considers the likelihood and impacts of illegal motorized use, including both wheeled and oversnow vehicles, in harvested areas and on improved roads and skid trails.

When the Trust for Public Land ("TPL") unveiled its proposal to protect Lake Tarleton to the Piermont and Warren, NH Selectboards, to the general public, and to donors, TPL was clear in its vision and expectations for White Mountain National Forest management. As noted in the introduction, A September 5, 2001 article in the Bradford *Opinion Journal* reported TPL's goal to "protect and conserve the 'wilderness' quality of the Lake Tarleton area, stressing low impact recreational activities." *See* Exhibit 1.

While the 2022 DEA makes passing reference to some of these recreational activities, *id.* at 19, some are ignored entirely, and those that do make the cut are quickly dismissed as not being negatively impacted, or at least for not long. For example, despite concerns raised by birdwatchers and enthusiasts during previous comment periods[30], no analysis or discussion is provided addressing impacts to bird population, diversity, or distribution resulting from the proposed logging activities.

There is also no discussion of the project's potential to displace recreational use of the area. In the Socioeconomics section of the DEA, it states: "As described in the Recreation section, timber harvest and other construction activities during project implementation may affect levels of recreational use by displacing users due to noise or physical disturbance." 2022 DEA at 20. However, the Recreation section does not discuss or even mention potential displacement; instead, it merely states that "[p]otential noise impacts to hikers . . . would be minimized[.]" *Id.* at 19. If the Forest Service believes that recreationists will be displaced as a result of the project, it should actually address those potential impacts.

Another primary concern, only given scant attention in the DEA, is the issue of impacts to the Appalachian Trail. The Appalachian Trail travels through the Project area in two separate places. 2022 DEA at 26 (Figure 1). The proposed Project activities occur within two Forest Management Areas—MA 8.3, which is Appalachian National Scenic Trail (Appalachian Trail), and MA 2.1, which is General Forest Management. *Id.* at 5. Despite the close proximity of the iconic Appalachian Trail, there is little analysis of impacts to that resource and the multitude of hikers that use and enjoy it. Further, even though the Appalachian Trail is managed in conjunction with the National Park Service (NPS), there is no indication in the 2022 DEA that the Forest Service consulted with NPS. Nor is there any indication that the Forest Service consulted with the Appalachian Trail Conservancy, the Appalachian Mountain Club, or the Dartmouth Outing Club, as required by the WMNF Plan MA 8.3 standard S-2, for when management actions affect AT values. All of these groups are conspicuously absent from the list of "Agencies or Persons Consulted" in the 2022 DEA. *Id.* at 22.

For MA 8.3, the Forest Plan sets forth Desired Conditions including emphasizing "a remote backcountry recreation experience in a predominantly natural or natural-appearing landscape." Forest Plan at 3-45. Even though the purported purpose of the Project is "to implement the management direction in the Forest Plan," there is no mention in the 2022 DEA as to how the Project will support this desired condition. To the contrary, the project activities—specifically, the clear-cuts and overstory removal—will alter the landscape to make it less natural or natural-appearing. And while the logging is occurring, it will detract from any sense of "a remote backcountry recreation experience" along those portions of the Appalachian Trail. The visual impacts to the trail are discussed below in the section addressing Scenic Values.

The 2022 DEA also ignores several other standards and guidelines set forth in the Forest Plan for MA 8.3. For example, the Vegetation Management Guideline G-1 states:

---

[30] *See generally* Exhibit 32 (G. Coffey comment on 2021 DEA), Exhibit 33 (Anonymous comment on 2021 DEA), Exhibit 34 (J. Cooley comment on 2021 DEA), Exhibit 35 (E. Faletra Comment on 2021 DEA), among others.

> Where the AT management area adjoins MA 2.1, commercial timber management and salvage operations are allowed in that portion of the Appalachian Trail MA between the trail footpath and the 2.1 Management Area, *but only outside the foreground area as defined in the Scenery Management System* (SMS). The foreground zone is determined by site-specific analysis of the area as seen from the AT. *Everywhere else in the AT management area, commercial timber management and salvage sales are prohibited.*

Forest Plan at 3-53 (emphasis added). This is precisely the situation present for this Project—MA 8.3 (the Appalachian Trail management area) "adjoins" MA 2.1. 2022 DEA at 5 (stating that the project activities will occur within management areas MA 2.1 and 8.3).[31] Thus, commercial timber management is prohibited in MA 8.3 unless it occurs between the trail footpath and MA 2.1, but "only outside the foreground area as defined in the Scenery Management System" *Id*. The 2022 DEA does not define or establish the foreground zone—which is supposed to be determined by a site-specific analysis—and therefore there is no way to understand whether or not the project activities are complying with this condition of the Forest Plan.

The 2022 DEA also ignores the MA 8.3 Wildlife Standard S-1, which states that the "[c]reation of regeneration forest habitat must occur only through natural disturbance events, except for areas adjacent to MA 2.1, in that portion of the AT MA between the trail footpath and the 2.1 Management Area outside the foreground zone." Forest Plan 3-53. Like the Vegetation Management guideline, this standard requires a determination by the Forest Service of the foreground zone between the AT footpath and MA 2.1, in order to ensure that project activities are not occurring in that zone. As mentioned, the 2022 DEA does not define or establish the foreground zone, and therefore it is unclear how or if the Forest Service was able to determine the Project's compliance with this standard.

In sum, the 2022 DEA's conclusory statement that "[t]he project design is consistent with management direction for the Appalachian Trail" (2022 DEA at 23) is not supported by any analysis or accompanying documentation and appears inconsistent with several Forest Plan standards and guidelines. The Forest Service compounded this lack of analysis by failing to consult with NPS or other necessary organizations. The Forest Service needs to provide adequate analysis of project impacts and cumulative impacts to recreation. This should be evaluated within the context of the local project planning area and at the forest level, because impacts to Lake Tarleton, Lake Katherine, Lake Armington, Mt. Piermont, Webster Slide, the Appalachian Trail, and surrounding recreation areas will be felt most acutely at the local level. In addition, the WMNF Plan itself requires that such "projects must be evaluated in terms of their effects on both the individual sites and on Forest-wide development levels." WMNF Plan at 2-17, *Developed Recreation Standard* S-1.

---

[31] The 2022 DEA does not contain a map that delineates the borders of the two management areas. *See, e.g.*, 2022 DEA, at 26–30 (Appendix A – containing several maps, none of which show the locations of the management areas). The pre-scoping materials contain a Conceptual Planning Area map that appears to delineate the two management areas, but does not identify them by their management area numbers. A clear map is needed to fully understand where the logging will take place in relation to the two management areas.

#### vi. Scenic Values

The DEA claims that the project is consistent with Forest Plan standards and guidelines for scenery management, but does not even cite to or mention the separate standards that apply to the two management areas located within the project boundary. 2022 DEA at 20. It is difficult for the public to meaningfully comment on visual impacts and the Service's analysis thereof, when they are not even told what standards the project allegedly meets, nor given any analysis explaining why the standards are met. For example, the Scenery Management Standards for MA 8.3 (Appalachian Trail) are as follows:

> **S-1:** The AT is a Concern Level 1 Travelway, and middleground and background areas on National Forest lands seen from the AT must be managed for scenery in accordance with Scenic Integrity Objectives identified through the Scenery Management System.
>
> **S-2:** All management activities will meet a Scenic Integrity Objective of High or Very High.

2005 Forest Plan at 3-52. Relevant MA 2.1 (General Forest Management) guidelines include:

> **G-1:** In evaluating cumulative effects for viewed landscapes from established concern level 1, open, higher elevation viewpoints affording expansive or large scale views, no more than 9 percent of the acreage within the view should be treated with regeneration vegetation management activities within a 30 year period. Total area affected during any one entry period with new regeneration treatment should not exceed 4 percent of the acreage. Assessment may need to be made from multiple viewpoints (that view a common land base). The assessment will apply to each view separately.
>
> **G-3:** For areas with a "High" Scenic Integrity Objective, created openings should be minimally evident from trail, road, or use area vantage points. Maximum observed size should not exceed 4-5 acres. If openings occur, they should appear as natural occurrences and be well distributed in the viewed landscape.
>
> **G-7:** For projects where group cutting is the preferred prescription, and views from a superior viewpoint are a concern, groups should be laid out in an informal distribution pattern and varied in size.

WMNF Plan 3-6 to 3-8. Based on the above standards and guidelines, because the AT is a Concern Level 1 travelway, on MA 2.1 lands visible from the trail "no more than 9 percent of the acreage within the view should be treated with regeneration vegetation management activities within a 30 year period. . . [and t]otal area affected during any one entry period with new regeneration treatment should not exceed 4 percent of the acreage." Did the Forest Service analyze the amount of acreage within the view that would be impacted by these management activities to confirm that this standard was being met? How many acres, if any, had already been impacted within the last 30 years? If this analysis was done, why did the Service not show its work by simply including this information in the DEA?

Further, it is not clear how the proposed project, which includes approximately 120 acres of large clear-cuts[32], 2022 DEA at 9, some of which will be done relatively close to the AT itself, *id.* at 27, will meet the "high" to "very high" Scenic Integrity Objectives assigned to views from MA 8.3 lands. *Very High* scenic integrity is characterized as "unaltered" and "refers to landscapes where the valued landscape character 'is' intact with only minute if any deviations. The existing landscape character and sense of place is expressed at the highest possible level." USDA FOREST SERV., LANDSCAPE AESTHETICS: A HANDBOOK FOR SCENERY MANAGEMENT at 2-4 (1995) (Exhibit 36). *High* scenic integrity is characterized by *appearing* unaltered and "refers to landscapes where the valued landscape 'appears' intact. Deviations may be present but must repeat the form, line, color, texture, and pattern common to the landscape character so completely and at such scale that they are not evident." *Id.*

The 2022 DEA claims that a "scenery analysis" was done, but aside from identifying the nine viewpoints used, it does not describe the methodology for the analysis. *Id*. It also does not explain how or why the nine particular viewpoints were chosen versus other potential viewpoints. Even with the vague description of the scenery analysis, the Forest Service acknowledges that "[s]ome visual impacts from the proposal can be expected," *id*., however, the agency never measures those expected impacts against the Forest Plan standard that requires all management activities meet a High or Very High Scenery Integrity Objective. The 2022 DEA also states that the visual impacts will "fade and blend over time as the forest regenerates." 2022 DEA at 20. This statement may mislead the public to believe that visual impacts will be short-lived, but the Service itself admits that the impacts of its suggested logging "is on the order of decades to centuries because that is how long it can take for forested stands" to return to pre-harvest condition. BE at 8.

Even if the existing scenery impacts analysis was sufficient, which Standing Trees contests, the DEA failed to evaluate scenic impacts as viewed from, Piermont Mountain, just across the lake from the proposed action, and which hosts a popular hiking trail and scenic views facing the project area. Piermont Mountain is the most prominent open summit overlooking the forest surrounding Lake Tarleton, with a popular trail that is highly prized and utilized by members of the local community, including Kingswood Camp and Camp Walt Whitman, also located in the area. Despite the obvious reasons for assessing visual impacts from this viewpoint, the WMNF failed to conduct this analysis.

#### vii. Socioeconomics

The DEA focuses its discussion of socioeconomic impacts on the displacement of recreational opportunities, and concludes that "socioeconomic changes to the local communities are expected to be negligible." 2022 DEA at 20. The analysis of this impact is insufficient in one of two ways. Either (1) the Forest Service entirely neglected to analyze socioeconomic impacts flowing from the supposed "sustainable yield of high-quality timber products to support local economies and communities[,]" *id.* at 6, in which case it failed to take a hard look at socioeconomic impacts; or (2) it did analyze these impacts, but concluded that these supposed

[32] This total includes only the proposed "clearcut with reserves" (115 acres) and "patch clearcut" (5 acres). This total is much higher (approximately 100 additional acres) when accounting for the mini clear-cuts authorized as part of the "group selection" harvest prescription. 2022 DEA at 9.

benefits, in fact, were expected to be negligible, in which case the economic benefit of the proposed logging cannot be used to justify the project's implementation.

### viii. Soils

While the DEA gives more attention to its discussion of impacts to Soils than to most of the other identified resources, it still fails to provide adequate discussion and clarity surrounding impacts to this resource. The section repeatedly mentions "non-detrimental soil disturbance" in relation to meeting Forest Service Soil Quality Standards, 2022 DEA at 20, but the referenced guidance does not in fact include that term at all. Exhibit 37 (USDA FSM Supplement R9 RO 225-2012-1). Instead, it merely identifies types of soil disturbance, without categorizing them as detrimental or non-detrimental. It is unclear where this term came from, and its repeated use in the DEA belies the actual potential impacts to the project area, which the Soils Specialist Report concluded may include soil disturbance on up to 20% of the project area. Soils Specialist Report at 12.

The only "detrimental" soil impact that the DEA admits to, the impact of expanding the Lake Katherine parking lot, is ostensibly justified by pointing to the fact that the WMNF Plan FEIS (not even the plan itself) "allowed up to a certain amount of new construction to be built within the life of the plan and based on current monitoring the forest has yet to meet that threshold." 2022 DEA at 20. This "certain amount" is not identified, nor is the unspecified "threshold." These ambiguous references and unsupported conclusions do not meet the Service's obligation to take a hard look at impacts, nor to provide the public with clear NEPA documentation. If the Service has truly been monitoring the amount of construction encompassed within this allocation, why is it not simply listed in the DEA?

### ix. Vegetation & Forest Health

The Tarleton IRP uses outdated science and misinterprets the concept of habitat diversity to justify extensive logging totaling 880 acres, nearly half of which is slated to be even-aged management. Furthermore, the Tarleton IRP fails to explain how proposed logging will comply with Forest Plan standards and prohibitions, as well as President Biden's Executive Order 14072, Strengthening the Nation's Forests, Communities, and Local Economies. Exhibit 6.

New Hampshire's intact forests are the state's greatest natural asset in the fight against climate change. And yet, a century and a half since New Hampshire was largely deforested by European settlers, its forests are still in the early stages of recovery. Today, less than 1/10 of 1% of New England's landscape resembles the complex, interconnected, biodiverse forests that evolved over millennia alongside the region's sophisticated indigenous cultures.[33] Elk, caribou, wolverine, wolves, cougars, pine marten, and salmon, once common in New Hampshire, have either been entirely eliminated or have long since failed to naturally reproduce. By any objective measure of ecosystem health, New Hampshire's ecosystems remain in the ICU.

Despite the clear scientific evidence for increased amounts of old, wild forest, only 3% of New Hampshire (and a similar amount across New England) is managed to permanently protect

---

[33] Zaino et al. (2018)

or restore old forest conditions, with a primary emphasis on supporting native biodiversity, natural processes, and climate stabilization.[34]

New Hampshire was historically dominated by old forests, and it remained that way for millennia prior to European arrival.[35] Although the Abenaki people and other indigenous communities developed a sophisticated culture and cleared and managed some of the New England landscape with fire, recent science demonstrates that their impacts were highly concentrated, with the majority of historic New England forests primarily impacted by forces such as wind, ice, and beavers.[36] Much of New Hampshire's landscape evolved with relatively minor human influence over thousands of years since the last glaciation.

According to the definitive paper on disturbance frequency and intensity in New England, "the proportion of the presettlement landscape in seedling–sapling forest habitat (1–15 years old) ranged from 1 to 3% in northern hardwood forests (Fagus–Betula–Acer–Tsuga) of the interior uplands." "The current estimates of 9-25% [seedling-sapling habitat] for the northern New England states are probably several times higher than presettlement levels." Gap size in Hemlock-Northern Hardwood forests averaged less than .75 acres. Beech was the dominant species among Northern Hardwoods, comprising perhaps 30% of the forest. Stand replacing events occurred, on average, only every 1,000 to 7,500 years.[37]

A 2008 paper builds on these themes: "Although humans have a long history (about 12,000 years) on the North American continent, the magnitude of change wrought by European settlement has no parallel since the last glaciation... In New England, rates of landscape change have been far greater in the past 300 years than in the previous 1000 years as a result of forest cutting, agricultural conversion, urban development, altered fire regimes and herbivore populations, nonnative species introductions, and atmospheric pollution… There has been no return to presettlement conditions because of continuing low-level disturbance and perhaps insufficient recovery time."[38]

We can measure New Hampshire's progress towards forest ecosystem restoration against several large landscape conservation visions that have gained traction in the past fifteen years. In 2006, Wildlands and Woodlands, a program of Harvard Forest and Highstead Foundation, produced a widely supported vision for New England that included a goal for 10% of all regional forestlands to be conserved as wildlands. Fifteen years later, only 3% of New England is in wildlands, and relatively little progress has been made toward the 10% goal, despite excellent progress towards conserving forests for extraction of wood products.

---

[34] Moomaw et al. (2019)
[35] Lorimer and White, SCALE AND FREQUENCY OF NATURAL DISTURBANCES IN THE NORTHEASTERN US: IMPLICATIONS FOR EARLY SUCCESSIONAL FOREST HABITATS AND REGIONAL AGE DISTRIBUTIONS (2003) [Exhibit 38] (hereinafter "Lorimer and White (2003)")
[36] Oswald et al., CONSERVATION IMPLICATIONS OF LIMITED NATIVE AMERICAN IMPACTS IN PRE-CONTACT NEW ENGLAND (2020) [EXHIBIT 39]
[37] Lorimer and White (2003)
[38] Nowacki and Abrams, THE DEMISE OF FIRE AND "MESOPHICATION" OF FORESTS IN THE EASTERN UNITED STATES (2008) [Exhibit 40]

More recently, based on the rapid decline of wildlife populations[39] and the rapid degradation of the climate,[40] scientists have suggested that much more aggressive measures must be taken to stave off climate and extinction catastrophe. The 2019 Global Deal for Nature (the inspiration for "30x30") calls for 30% of lands and waters to be permanently protected in GAP 1 and 2[41] protected areas[42] by 2030 to maintain and restore biodiversity, with an additional 20% percent conserved to stabilize the climate.[43] This vision was partially endorsed by the Biden Administration in Executive Order 14008, "Tackling the Climate Crisis at Home and Abroad." Exhibit 45. To date, the Forest Service, including the White Mountain National Forest, has not revealed how it intends to implement EO 14008.

Large blocks of intact forest minimize harmful vectors for the spread of invasive species, and allow natural disturbances to play out across a sufficiently large landscape to ensure that there is a mix of early and late successional habitats required by the full spectrum of New England's forest-dependent species.

Although passive management is most often all that's required to restore old forest conditions,[44] it takes centuries to develop forest complexity, requiring permanent protection from timber harvest if restoration is to be successful. [45,46,47,48,49]

The 2022 DEA states that its vegetation management goals include creation of "small and large openings in the forest" to "improve wildlife habitat diversity," as well as "discouraging beech regeneration." *Id.* at 9. The DEA suggests that "an analysis of the current habitat conditions indicates that the Tarleton [Habitat Management Unit ("HMU")] is not meeting the MA 2.1 Habitat Composition and Age Class Objectives" outlined in the 2005 WMNF Plan. 2022 DEA at 6. However, the DEA fails to include any description of this supposed analysis, and it is unclear that the WMNF has sound information about stand ages classes in the Tarleton HMU. Despite repeated requests, the WMNF has failed to produce a stand age class map or detailed records of past harvest activity. Exhibit 5. Nor does the DEA contain an analysis of whether the age class objectives for regeneration and young age classes have already been met, forest-wide,

[39] Ceballos et al., VERTEBRATES ON THE BRINK AS INDICATES OF BIOLOGICAL ANNIHILATION AND THE SIXTH MASS EXTINCTION (2020) [Exhibit 41]
[40] "Climate Change 2021: The Physical Science Basis" (Working Group I contribution to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change) [Exhibit 42]
[41] The US Geological Survey maintains the nation's protected area database and has created a "GAP Status Code Assignment" to categorize types of conservation across all land ownerships, public and private.
[42] Dreiss and Malcom, GETTING TO 30X30: GUIDELINES FOR DECISION-MAKERS (2020) [Exhibit 43]
[43] Dinerstein et al., A GLOBAL DEAL FOR NATURE: GUIDING PRINCIPLES, MILESTONES, AND TARGETS (2019) [Exhibit 44]
[44] *See* Zaino et al. (2018)
[45] Watson et al., THE EXCEPTIONAL VALUE OF INTACT FOREST ECOSYSTEMS (2019) [Exhibit 46]
[46] DiMarco et al., WILDERNESS AREAS HALVE THE EXTINCTION RISK OF TERRESTRIAL BIODIVERSITY (2019) [Exhibit 47]
[47] Dinerstein et al. (2020)
[48] Miller et al., EASTERN NATIONAL PARKS PROTECT GREATER TREE SPECIES DIVERSITY THAN UNPROTECTED MATRIX FORESTS (2018) [Exhibit 48]
[49] Miller et al., NATIONAL PARKS IN THE EASTERN UNITED STATES HARBOR IMPORTANT OLDER FOREST STRUCTURE COMPARED WITH MATRIX FORESTS (2016) [Exhibit 49]

in the 17 years since the signing of the WMNF Plan. Indeed, the Forest Plan expects that regeneration age-class objectives will be met by year 10 of the Forest Plan. WMNF Plan at 1-21.

Taking the aforementioned science into account, the public is also left to wonder what science the White Mountain National Forest is basing its management decisions off of. Which species does the Tarleton IRP stand to benefit most? Why does the Tarleton IRP seem to favor game species, which already exist in abundance elsewhere in New Hampshire? Why are interior and mature forest species devalued in the project area? Why does the WMNF plan to dramatically reduce the beech population, despite the fact that it is a critical wildlife food source and that it was historically the dominant species on this site? By removing all beech, how can we identify strains that are resistant to beech bark disease? How should the public reconcile extensive areas of even-age management with the fact that such openings bear little resemblance to the natural disturbance regime of a Northern Hardwood forest?

The presence of a high-voltage powerline corridor through the project area raises another flaw in the analysis of existing forest age-classes, desired future conditions, and alternatives considered by the WMNF. The DEA mentions that “the powerline corridor is privately owned and managed for low-growing vegetation for safety purposes related to the powerline.” However, the WMNF makes no attempt to describe the “low-growting vegetation” or its age, nor does it consider whether a Memorandum-of-Understanding could be reached with the electric utility company to manage the right-of-way to improve regeneration and young-age class forest habitat, thereby meeting Forest Plan objectives without the need for hundreds of acres of additional timber harvest. It is possible that certain age class objectives in the Forest Plan are already met in the Tarleton HMU if the powerline corridor is considered. In fact, upon completion of the Tarleton IRP, the WMNF may exceed the age class objectives in the Forest Plan for the Tarleton HMU by failing to consider the powerline corridor.

As mentioned previously, the Tarleton IRP DEA fails to take a hard look at stand ages within the Tarleton Habitat Management Unit, and it similarly fails to identify whether there are any outstanding natural communities present within the project area. Without such analysis, it is impossible for the public to determine whether the WMNF can comply with at least two Forest Plan standards and prohibitions.

Standard S-3 in WMNF Plan Ch 2-Forest-Wide Management Direction states that “Timber harvest is prohibited in old growth forest.” Further, Guideline G-1 states that “Outstanding natural communities should be conserved.” WMNF Plan 2-13. Old-growth is defined in the WMNF Plan as “Uneven-aged (three or more age classes) forest with an abundance of trees at least 200 years old, multiple canopy layers, large diameter snags and down logs, and a forest floor exhibiting pit-and-mound topography. There should be little or no evidence of past timber harvest or agriculture. Northern hardwood old growth consists primarily of sugar maple and American beech; softwood old growth is largely made up of spruce and hemlock. Stands need to be at least 10 acres in size to be identified as old growth. Anything smaller is a patch of old trees within a younger stand, not a habitat type in its own right.” WMNF Plan Abbreviations, Acronyms, and Glossary at 21.

The WMNF Plan goes beyond protections for *existing* old-growth forest, however, clearly looking to how the WMNF can facilitate recovery of old-growth forest across a larger percentage of the forest in the future. The WMNF Plan defines old forest as beginning at 70 years of age in Aspen-birch habitat types, 90 years of age in Spruce-Fir, 120 years of age in Northern hardwoods, Mixed wood, Oak-Pine, and Hemlock. WMNF Plan D-2. The WMNF Plan defines Old Forest Habitat as: "Desired habitat conditions start with those for mature forest and can include greater size, decadence, structural complexity, etc. *No harvest will occur in stands identified to provide old forest habitat"* [emphasis added]. WMNF Plan Abbreviations, Acronyms, and Glossary at 21.

Given the descriptions above, it is also instructive to consider the WMNF Plan definition of Mature Forest Habitat. The mature age class ranges from 40-89 years for Spruce-Fir habitat types, 60-119 years for Mixed wood and Northern hardwood, 40-69 years for Aspen-birch, and 70-119 years for Oak-Pine and Hemlock. WMNF Plan D-2. The WMNF Plan further defines Mature Forest as "Stands in which the overstory is in the mature age class. Mature forest habitat is typically made up of trees that are eight inches or more in diameter. Mortality is just beginning in these stands, resulting in a few scattered canopy gaps and a small number of snags and cavities in the overstory. Most snags and down logs are small in diameter and within the intermediate or understory layers. *Depending on site conditions, thinning and uneven-aged harvest methods can be used in this habitat without negatively impacting habitat quality.* Some uneven-aged harvest may enhance vegetative and structural diversity" [emphasis added]. WMNF Plan Abbreviations, Acronyms, and Glossary at 18. This definition clearly implies that even-aged management in mature forest may "negatively [impact] habitat quality." Despite this instruction to avoid even-aged management in mature forest habitat, the WMNF offers no explanation for how such negative impacts will be avoided or mitigated in the Tarleton IRP.

On April 22, 2022, President Joseph R. Biden issued Executive Oder (EO) 14072, "Strengthening the Nation's Forests, Communities, and Local Economies." Exhibit 6. The EO reads:

> *"**Sec. 2** . Restoring and Conserving the Nation's Forests, Including Mature and Old-Growth Forests . My Administration will manage forests on Federal lands, which include many mature and old-growth forests, to promote their continued health and resilience; retain and enhance carbon storage; conserve biodiversity; mitigate the risk of wildfires; enhance climate resilience; enable subsistence and cultural uses; provide outdoor recreational opportunities; and promote sustainable local economic development."*

The EO continues:

> *"(b) The Secretary of the Interior, with respect to public lands managed by the Bureau of Land Management, and the Secretary of Agriculture, with respect to National Forest System lands, shall, within 1 year of the date of this order, define, identify, and complete an inventory of old-growth and mature forests on Federal lands, accounting for regional and ecological variations, as appropriate, and shall make such inventory publicly available.*

*(c) Following completion of the inventory, the Secretaries shall:*

*(i) coordinate conservation and wildfire risk reduction activities, including consideration of climate-smart stewardship of mature and old-growth forests, with other executive departments and agencies (agencies), States, Tribal Nations, and any private landowners who volunteer to participate;*

*(ii) analyze the threats to mature and old-growth forests on Federal lands, including from wildfires and climate change; and*

*(iii) develop policies, with robust opportunity for public comment, to institutionalize climate-smart management and conservation strategies that address threats to mature and old-growth forests on Federal lands."*

The WMNF Plan gives the forest a distinct advantage in meeting its NFMA and EO obligations by already clearly defining mature, old, and old-growth forests. However, to date, the WMNF has failed to clearly identify, inventory, and conserve mature, old, and old-growth forests in the case of the Tarleton HMU. Although we do not address the broader implications for WMNF management here, this failure to identify, inventory, and conserve mature, old, and old-growth forest may also extend across the entirety of the National Forest. Until detailed analysis is completed to comply with Forest Plan and EO requirements, the Tarleton IRP cannot legally proceed.

**x. Wildlife**

The 2018 Vermont Conservation Design Natural Community and Habitat Technical Report is instructive for the state of New Hampshire and the White Mountain National Forest:

*"The state's native flora and fauna that have been here prior to European settlement are adapted to this landscape of old, structurally complex forest punctuated by natural disturbance gaps and occasional natural openings such as wetlands or rock outcrops. The complex physical structure of old forests creates diverse habitats, many of which are absent or much less abundant in younger forests."*[50]

What the White Mountain National Forest calls "old forests" are northern New England's *natural forests*. As such, much of New Hampshire's community of life evolved over millennia within these remarkable original forests. In just the blink of an eye, a combination of overhunting and habitat loss following European settlement led to the disappearance of wide-ranging carnivores such as cougars, wolves and wolverines. Elk and caribou met a similar fate. Some species we might take for granted today, such as bear, moose, beaver, and loons, were on the brink of extirpation only a short while ago. Lynx, Northern Long-eared Bat, and pine marten currently teeter on the edge. Salmon, once prolific in the Connecticut River system, struggle to naturally reproduce. Many of New Hampshire's imperiled bird species are adapted to interior

[50] *See* Zaino et al. (2018)

forests and reliant upon complex forest structure for their survival, including standing snags and large living trees.[51] Indeed, the availability of dead and dying trees and downed wood is critical for the health of many species, from bats to pine marten to invertebrates.[52,53]

Our native ecosystems preserve – and present the opportunity to restore – the greatest levels of biodiversity.

### xi. Impacts of Road Construction

Although "Transportation" and the need for a transportation analysis is included as one of the "needs" for the project, 2022 DEA at 7, there is no analysis of transportation or the impacts of roads in the Environmental Impacts discussion. Instead, the only discussion surrounding transportation is in the description of the proposed action, which states that "no new road construction or decommissioning is included under the Proposed Action," but then immediately notes that "system roads and log landings would be constructed, maintained, or reconstructed to provide safe access to vegetation management areas and to meet modern design standards." *Id.* at 15. Thus, on its face, the DEA is internally inconsistent on this point, and again, the Service neither provides nor cites to these referenced standards.

At a minimum, the DEA should have analyzed, or at least mentioned, the potential for roads to contribute to water quality issues through increased erosion and sedimentation, soil compaction resulting from the use of heavy machinery used to achieve the proposed roading activities, and renewed fragmentation of wildlife habitat, among other things. For example, although no "new" roads are proposed, the reconstruction of some of these roads may be equivalent to opening a new road, where those roads may have already been reclaimed by the forest. This is another example of a persistent theme of the DEA of not identifying a baseline against which impacts can be measured. Because the existing condition of roads in the project area have not been described, it is impossible for the public to tell whether or not road reconstruction may result in significant impacts.

### xii. Cumulative Impacts

The Forest Service was required by NEPA to consider the cumulative impacts of the Project. 40 C.F.R. § 1508.7. A lawful cumulative impacts analysis includes consideration of "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . ." *Id*. Moreover, "cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id*. Cumulative effects analysis requires that the agency define and apply a consistent geographic scope in which to analyze cumulative effects. *LOWD/BMBP v. Connaughton,* 2014 WL 6977611, at *9–11 (D. Or. Dec. 9, 2014). The geographic scope determines which nearby projects will be included in its

---

[51] Askins, Robert A., THE CRITICAL IMPORTANCE OF LARGE EXPANSES OF CONTINUOUS FOREST FOR BIRD CONSERVATION (2015) [EXHIBIT 50]
[52] Thorn et al., THE LIVING DEAD: ACKNOWLEDGING LIFE AFTER TREE DEATH TO STOP FOREST DEGRADATION (2020) [EXHIBIT 51]
[53] Evans and Mortelliti, EFFECTS OF FOREST DISTURBANCE SNOW DEPTH AND INTRAGUILD DYNAMICS ON AMERICAN MARTEN AND FISHER (2022) [Exhibit 52]

analysis, and agencies "must provide support for its choice of analysis area[.]" *Id.* at *9, citing *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902 (9th Cir. 2002).

The 2022 DEA failed to identify or explain the geographic scope of its cumulative impacts analysis. Although it acknowledges that such analysis must address activities "overlap[ping] in space and time with effects of the proposed project[,]" 2022 DEA at 21, and makes a vague reference to the "analysis area[,]" *id.,* it does not actually define that "space" or "analysis area." References are made to private lands outside of the WMNF, as well as projects occurring within it, *id.*, but it neither defines nor "provide[s] support for its choice of the analysis area[.]" *Dombeck*, 304 F.3d at 902.

In addition to the failure to define the geographic scope of the cumulative impacts analysis, the DEA's "cumulative impacts analysis" contains no actual analysis at all. As noted, it merely alludes to past private activities and future federal activities, and in a conclusory manner says that guidelines will be followed, thus there will be no impacts. The Forest Service cannot just make a blanket statement about impacts without supporting it with actual analysis or some level of detail. As-is, the public has no way of actually evaluating the Forest Service's claims regarding impacts, because the public is not even given enough detail to look into the matter themselves.

The Forest Service identifies only one category of past activities—private timber cuts and other residential activities "on surrounding, non-National Forest System lands"—that may have present effects that should be assessed in conjunction with the Project to determine cumulative impacts. 2022 DEA at 21. There are several problems with the agency's vague description of past activities:

(1) The Forest Service did not include an assessment of past activities on National Forest System lands. As discussed below, the agency only touched on current (or ongoing) and future projects on WMNF land. There is no definitive statement that no past project, including logging projects, have occurred in the WMNF or have occurred in the vicinity of the Project; rather that category of past projects on WMNF land is simply absent from the analysis.

(2) The Forest Service states the "[k]nown, recent private timber cuts have been relatively small in scale (e.g., less than 75 acres) and scattered throughout the landscape." 2022 DEA at 21. This ambiguous statement raises several questions. What method did the agency employ to identify relevant timber cuts? How many timber cuts did the Forest Service identify? It does little good to know that the timber cuts are less than 75 acres if it is not known how many there are. There is no indication of the quantity of private timber cuts so there is no way to assess the total acreage cut, which in turn makes it impossible to assess cumulative impacts. How far back in time is "recent"?

(3) The past actions include an undefined category of "other residential activities." 2022 DEA at 21. The Cumulative Actions section does not define what these other residential activities are, nor does it quantify them. It only says they, along with the

private timber cuts, are "scattered throughout the landscape." *Id*. In sum, the Forest Service does not identify the type of activity, the locations of the activity, or the number and scope of the activities, which makes it impossible to evaluate whether the Project, when added to these unidentified activities will have a significant effect cumulatively.

With respect to present and reasonably foreseeable future activities, the Forest Service fares no better. On WMNF land, the agency identifies three other projects that it says were considered—"the ongoing Bowen Brook and future Pemi Northwest and Wanosha Integrated Resource Projects." 2022 DEA at 21. But other than mentioning the other three projects, it does not discuss what those projects entail, or how the impacts and potential impacts from those projects relate to the Project at issue. More troubling is the Forest Service's contention that "[d]ue to the implementation of forest plan standards and guidelines and other design features for each of these projects, no measurable cumulative impacts are expected with the proposed action." 2022 DEA at 21. This is nonsensical. Individual projects' compliance with Forest Plan standards and guidelines is irrelevant to whether those projects, *cumulatively*, will have a significant effect on the human environment. That is the point of asking the cumulative effects question—to understand whether or not separate actions, even if they are presumed to be in compliance individually, nevertheless have a cumulative effect.

Further, the cumulative effects analysis failed to consider effects of the action on climate change or effects of climate change on the action. The analysis also failed to consider the unauthorized access that will inevitably result during and after the proposed action as a result of improvements to Charleston Road. By excluding these important components of a cumulative effects analysis, the 2022 DEA only considered the subset of trends and planned actions that support a finding of no significance.

Finally, as discussed above, prior to the Forest Service issuing the 2022 DEA the U.S. Fish & Wildlife Service proposed to change the status of the Northern Long-eared Bat from threatened to endangered. The 2022 DEA does not discuss this development at all, and specifically does not address it in its cumulative impacts section. Because the Project may result in logging of mature trees that the bats use for roosting and foraging, the Forest Service must analyze the cumulative effects this Project will have on bat habitat, "when added to other past, present, and reasonably foreseeable future actions . . . ." 40 C.F.R. § 1508.7.

For all of the reasons set forth above, the Forest Service's cumulative impacts analysis falls far short of the standard required by NEPA and its implementing regulations. The lack of detail and any real analysis in the 2022 DEA is evidence that no analysis occurred, and to the extent any did, the Forest Service has hidden it from the public.

#### e. The Project is Significant and Requires an EIS

The 2022 DEA's preliminary finding of no significant impact ("FONSI") violates NEPA because it finding is conclusory and unsupported by the facts, and because the proposed project is a major federal action significantly impacting the quality of the human environment, and thus requires an environmental impact statement ("EIS").

### i. The FONSI is Conclusory and Unsupported by the Facts

A FONSI must "present[] the reasons why an action. . . will not have a significant effect[.]" 40 C.F.R. § 1508.13. Review of an agency's FONSI is conducted under a four part analysis:

> First, the agency must have accurately identified the relevant environmental concern. Second, once the agency has identified the problem it must have taken a hard look at the problem in preparing the EA. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Nw. Bypass Grp. v. United States Army Corps of Eng'rs*, 470 F. Supp. 2d 30, 61 (D.N.H. 2007) (quoting *Coal. On Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66-67 (1987)). As discussed above, the DEA fails to properly describe the impacted environment and resources, and subsequently fails to take a hard look at impacts to those resources. Despite this, the Forest Service has still advanced a finding of no significant impact without providing convincing reasoning to support this finding.

The discussion surrounding the FONSI starts by noting that its finding is "[b]ased upon the analysis in this EA[.]" 2022 DEA at 22. Even a cursory review of the discussion that follows that statement reveals that this is not accurate. Much of the limited discussion of context and the intensity factors leans heavily on the claim that *similar* projects have been done in the past, therefore no impacts are expected for *this* project. *See* 2022 DEA at 22 ("The WMNF has implemented this type of project and similar proposed activities…many times on the Forest and in the region, without substantial impacts to public health or safety."); 23 (concluding there are no substantial or unusual risks based on "experience with similar projects"; no unique or unknown risks exist "[b]ased on consideration of past projects"; the project does not set precedent for future actions "because actions [allegedly] similar to the ones proposed have been considered…in the past"). Despite the claim that the FONSI is "[b]ased upon the analysis in this EA," no analysis regarding past WMNF projects or their alleged lack of impact is actually included in the EA, nor does the DEA point to these examples so the public can review them.[54] The closest the DEA even comes to discussing past activities is two sentences in the "cumulative actions" section that only mentions private timber sales and residential activities[55], but not federal actions. 2022 DEA at 21.

The Forest Service cannot simply claim that because past projects have allegedly not resulted in impacts, that this project will also not have impacts. Doing so is tantamount to treating prior, undisclosed, NEPA analyses as categorical exclusions that excuse this project from actual substantive analysis. What's more, even if prior similar projects did not, in fact, have

---

[54] The heavy reliance in the FONSI on purported lack of impacts from past, similar projects to justify this Project stands in stark contrast to omission of any discussion of these past projects in the cumulative impacts analysis. *See* 2022 DEA at 21.
[55] Even then does not actually analyze those past actions.

negative impacts, that analysis is not provided nor even identified in the EA, leaving its contention entirely unsupported. The FONSI must "present[] the reasons why an action. . . will not have a significant effect[.]" 40 C.F.R. § 1508.13. It is not sufficient to simply state that *other actions* did not have a significant impact, thus this one, by extension, will also have no such effect.

The DEA's failure to support its FONSI is alone sufficient to require additional or supplement NEPA analysis. That additional analysis, however, should be done in an EIS because a proposed project of this scale and impact requires the heightened level of analysis required by that more rigorous document.

**ii. The DEA Failed to adequately define the context or discuss the intensity of project impacts, but these factors weigh heavily in favor of a finding of significance.**

An EIS is required for all "major federal actions significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332(2)(C). Under NEPA, the analysis of significance "requires consideration of both context and intensity[.]" 40 C.F.R. § 1508.27.

The DEA claims that its FONSI is "based on consideration of the [CEQ] criteria for significance (40 CFR 1508.27), both with regard to the context and intensity of impacts described in the EA." 2022 DEA at 22. However, as discussed below, the Forest Service's "analysis" of these factors is cursory and incomplete, and when properly evaluated, these considerations weigh heavily toward a finding of significance and the preparation of an EIS.

**1. Context**

The CEQ's NEPA-implementing regulations provide that:

> [T]he significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend on the effects in the locale rather than in the world as a whole. Both short and long-term effects are relevant.

40 C.F.R. § 1508.27(a). Establishing the proper setting and scale ("context") within which to evaluate the impact of an action is critical, yet the EA/FONSI's discussion of "context" does not appear to actually establish the context for the analysis of resources impacted by the project at all.

The DEA's "Context" section starts with the conclusory statement that "[t]he project is not a major federal action significantly affecting the quality of the human environment." 2022 DEA at 22. It then states that "effects of the proposed action are limited in context[,]" but does not provide any discussion or detail of what that context actually is. *Id.* The only sentence conceivably addressing the matter of context is the statement that "[p]roject activities would

occur over an area totaling less than about one percent of the total acreage within the WMNF." *Id.* Based on the preceding sentence, we must assume this statement is intended to identify the project area – that "less than one percent" of the WMNF – as the context. However, the Service failed to provide any actual analysis explaining the impacts of the project on the local area.

Nor do individual sections of the DEA properly establish the context for its "analysis" of those resources. For example, under the "Environmental Impacts" discussion of the National Historic Preservation Act ("NHPA") which the DEA later identifies as "Heritage", the DEA does not even allude to the context of its discussion, and the reader is left guessing. 2022 DEA at 19. The Climate Change section similarly lacks clarity, first appearing to limit the context of the discussion to "a relatively small amount of forest land" in the project area, but then attempting to minimize the appearance of any potential impacts by stating that any emissions would be "extremely small. . . relative to national and global emissions." *Id.* Is the context the project area? The nation? The world? All of them? If so, where is the analysis for each scale?

There is also no hint of the context or scope at which impacts to hydrology or water quality was analyzed. Instead, that section – only three sentences long – states in a conclusory manner than the proposed action is consistent with relevant laws, and that any impacts (whatever they might be – we are not told) would be successfully mitigated, and therefore no adverse effects are expected. 2022 DEA at 19. The context of analysis for other resource sections are similarly amorphous or unclear – the Vegetation section indicates that "[i]mpacts to vegetation are considered in the context of forest health." *Id.* at 21. Presumably this analysis is at the forest scale, but then it appears to switch the relevant context by declaring that "[o]verall, effects on vegetation would be minor and local." *Id.* The discussions of Scenery, Socioeconomics, and Soils fare no better. In fact, the only sections that remotely appropriately define the context of their analyses are the discussions of Federally Listed and Regional Forester Sensitive Species, and Soils. Even then, the context is not discussed in the EA, but in separate documents. 2021 Biological Evaluation; Soils Specialist Report. This goes to show that the Forest Service is capable of properly defining the context of its analysis for the purpose of determining significance, but did not do so for the vast majority of its resource analyses.

The EA's failure to appropriately identify, or in some instances failure to identify at all, the context within which to evaluate impacts of the proposed project is a critical failure. Without first establishing the proper context within with to conduct its analysis, it is impossible for the Forest Service to properly evaluate the intensity of project impacts. While a single housefire may be inconsequential on the scale of the city, the impacts on the effected home are devasting. Context is the key to determining the significance of an impact, and that is why context must be properly defined and supported for each resource being evaluated.

The Forest Service needs to correct these omissions and prepare an EIS to address the significant impacts of the proposed federal action, or at the very least conduct additional analysis and prepare a supplemental EA that clearly defines the context of its proffered "analysis."

The failure to properly address the significance of the local impacts is a fatal and "major analytical lapse." *See Anderson v. Evans*, 371 F.3d 475, 490–92 (9th Cir. 2004) ("In short, the record establishes that there are 'substantial questions' as to the significance of the effect on the

*local* area . . . And because the EA simply does not adequately address the local impact of the Tribe's hunt [for whales], an EIS is required."); *Sierra Club v. Marsh*, 769 F.2d 868, 881 (1st Cir. 1985) (finding it improper for the Corps to look at impacts to the entire Maine coast line when evaluating the impacts of a development on a particular island. "Here, the nature of the action, and the geographical character of Sears Island, suggest that the appropriate 'locale' is Sears Island and its immediate surroundings.")

The FONSI's ultimate conclusion regarding significance is based, in part, on the Project's impacts being "limited in context." 2022 DEA at 22. It is unclear how that conclusion was reached when the DEA itself fails, in nearly all of its resource discussions, to define the context of its significance analysis.

Further, the Forest Service's choice to begin the "Context" discussion by noting that the project area accounts for "less than about one percent" of the forest is a clear attempt to improperly minimize and obfuscate the localized impacts to the Lake Tarleton Area. The Service is not allowed to sweep the significant impacts to the Lake Tarleton area under the rug by pointing to the vastness of the forest surrounding it. *See Pac. Coast Fed'n of Fisherman's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1035-37 (9th Cir. 2001) (agency cannot minimize the impact of an activity by adopting a scale of analysis so broad that it trivializes the site-level impact). This is equivalent to the Forest Service proposing to burn the house down and telling the family that impacts are minimal because the rest of the city is still there.

### 2. Intensity

Intensity refers to the "severity of impact." 40 C.F.R. § 1508.27(b). NEPA provides a list of 10 non-exclusive factors to consider when evaluating intensity. 40 C.F.R. § 1508.27(b)(1)-(10). Because the Forest Service failed to define the context of its analysis for most project-area resources, its analysis of intensity, which is intrinsically linked to the context within which it is evaluated, is also necessarily inadequate. Beyond this broad failure, the discussion provided for the majority of the 10 consideration factors is cursory, often pointing to the supposed success of prior unnamed projects, and referring to unspecified "analysis" in order to make findings that each factor weighs against a finding of significance. These shortcomings are addressed individually below. Review of these factors reveals that many of these considerations are implicated by the Tarleton Project. The presence of even just "one of these factors may be sufficient to require an EIS in appropriate circumstances." *Ocean Advocates v. U.S. Army Corps of Eng'rs,* 402 F.3d 846, 865 (9th Cir. 2005).

***"The following should be considered in evaluating intensity …"***

***"Impacts that may be both beneficial and adverse. A significant effect may exist even if the federal agency believes that on balance the effect will be beneficial." 40 C.F.R. § 1508.27(b)(1)***

Despite the EA's claim to the contrary, it does not describe potential adverse effects of the proposed project, focusing instead on the purported benefits of the action. For example, in the discussion of "Clearcuts with Reserves" the DEA describes purported benefits of clear-cutting,

such as increasing species diversity, stimulating germination of herbaceous vegetation, and promoting asexual reproduction of certain tree species. However, there is no mention of known detrimental impacts of clear-cut logging, such as the potential to spread invasive plants post-logging, the removal of mature forest impacting habitat for sensitive species reliant upon that forest structure, erosion, increased stream temperatures, other water quality impacts, compaction from logging activities, and windthrow, among others. The failure to acknowledge and/or adequately address potential adverse impacts is consistent throughout the discussion of all planning area resources.

If the Forest Service disagrees with the above characterization and believes that it did adequately address potential adverse impacts of the proposed project for all relevant resources, Standing Trees requests that it identify where in the DEA or supporting documentation these impacts to each resource are discussed and analyzed.

Without actually analyzing, or at least disclosing, potential adverse impacts of the proposed activities, the Forest Service has not met its obligation to "consider… [i]mpacts that may be both beneficial and adverse[,]" 40 C.F.R. § 1508.27(b)(1), as part of its significance determination.

***"The degree to which the proposed action affects public health or safety." 40 C.F.R. § 1508.27(b)(2)***

In its discussion of this consideration factor, the DEA points repeatedly to the fact that *similar* projects have been done in the past without resulting in substantial impacts to public health or safety. This entirely ignores the fact that even if similar categories of actions have been completed before ("e.g. recreation site construction and maintenance, transportation, and vegetation management"), each project location is unique and therefore analysis of potential impacts, here to public health and safety, must be done on a project-specific basis. It would completely defeat the purpose of requiring NEPA analysis if it were sufficient to simply point to past *types* of actions occurring successfully to justify future actions.

The DEA also claims that necessary standards and practices will be applied to "further ensure that potential impacts to public health and safety are minimized and avoided[,]" *id.* at 23, but fails to discuss anywhere in the EA what those potential impacts could be. Again, it is unclear how this consideration weighs against a finding of significance when it doesn't appear to have been considered at all.

Further, the 2022 DEA failed to address public safety concerns raised in comments to the 2021 DEA related to the expansion of the Lake Katherine parking lot and boat launch. One comment by the administrators of the Lake Tarleton Association Lake Host program noted that there are already typically 25-30 non-motorized boats launched each weekend day, and the expansion will encourage additional use. The concern surrounds the associated increase in vehicles and trailers that will invariably park along Route 25C, causing traffic concerns, and safety concerns for those traversing the road to access the small parking lot. This factor also weighs in favor of requiring an EIS.

***"Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." 40 C.F.R. § 1508.27(b)(3)***

The DEA claims that the project area "is not unique in its geographic setting[.]" 2022 DEA at 23. In support of this statement, it cites to the lack of "parklands, prime farmlands, or ecologically critical areas[,]" and noting that "[e]ligible Wild and Scenic Rivers or Forest Plan Inventoried Roadless Areas do not occur in the project area." *Id*. Standing Trees does not take issue with the statement regarding prime farmland or Wild and Scenic Rivers, but does not agree regarding Inventoried Roadless Areas, park lands or ecologically critical areas.

***Parklands***

Although no longer under the direct management of the National Park Service after an administrative transfer to the U.S. Forest Service in 1994, the portion of the project area designated as MA 8.3 (Appalachian Trail) still retains a higher park-like protection than other Forest Service lands. In fact, the Appalachian Scenic Trail is described by the 2008 Appalachian National Scenic Trail Resource Management Plan (the "2008 AT Plan") as "a 2,175-mile long unit of the National Park System." *See* Exhibit 53. The WMNF Plan notes that these NPS acquired and transferred lands are "commonly referred to as either 'corridor lands' or 'transfer lands'[.]" WMNF Plan at 3-45. It also indicates that "commercial timber management and salvage operations are prohibited" on "all National Park Service (NPS) acquired corridor lands." Vegetation Management Standard S-1, WMNF Plan at 3-52 (parenthetical in original). Despite claiming that the project area contains no park lands, the Forest Service seems to anticipate that it would be called out on this issue, by stating that "project design is consistent with management direction for the Appalachian Trail." DEA at 23. Standing Trees disagrees, and discusses this further in Section I(d)(v) below.

***Ecologically Critical Areas***

Even if the project area was not previously considered to be ecologically critical, which Standing Trees contests, it certainly should be now considering the recent proposed up-listing of the Northern Long-eared Bat ("NLEB") from Threatened to Endangered under the Endangered Species Act. *See* Section I(d)(i) for detailed discussion on this matter. For purposes of the significance factor, it is sufficient to note that the DEA's supporting February 2021 Biological Evaluation admits that NLEB are known to occur the project area, *id.* at 8, that they may forage and roost in mature stands in the project area, *id.*, that the project proposes to log at least 120 acres of mature forest, 2022 DEA at 10, 31, and that habitat loss is one of the primary drivers of mortality for this species. *Species Status Assessment Report for the Northern long-eared bat,* March 22, 2022, at iii.

***Wetlands***

The DEA admits that wetlands (an enumerated "unique" characteristic) are found in the project area, but immediately concludes that "these areas would not be measurably impacted by the project" and cites to its Environmental Impacts section in apparent support. 2022 DEA at 23.

First, whether or not the Service thinks the wetlands will be impacted does not make their existence any less of a "unique" factor within the geographic area. Second, the reference to the "Environmental Impacts" section, presumably to the sub-section titled "Hydrology", does not say anything about wetlands in its sparse three sentences. 2022 DEA at 19. In fact, wetlands, and potential impacts to them, are not directly addressed anywhere in the DEA at all. *See* Section I(d)(iv) for further discussion on failure to take a hard look at impacts to water quality in general.

***Inventoried Roadless Areas***

According to Ch. 70 of the 1992 Directives for the 1982 Planning Rule, the forest block encompassing Lake Tarleton, Webster Slide, and Wachipauka Pond should have been identified during the 2005 Forest Plan revision process as an Inventoried Roadless Area and evaluated for its potential for wilderness designation by Congress. Exhibit 23. The 1992 Directives state:

> *7.11 - Inventory Criteria. Roadless areas qualify for placement on the inventory of potential wilderness if, in addition to meeting the statutory definition of wilderness, they meet one or more of the following criteria:*
> *1. They contain 5,000 acres or more.*
> *2. They contain less than 5,000 acres but:*
> *a. Due to physiography or vegetation, they are manageable in their natural condition.*
> *b. They are self-contained ecosystems such as an island.*
> *c. They are contiguous to existing wilderness, primitive areas, Administration-endorsed wilderness, or roadless areas in other Federal ownership, regardless of their size.*
> *3. They do not contain improved roads maintained for travel by standard passenger-type vehicles, except as permitted in areas east of the 100th meridian (sec. 7.11b).*
>
> *7.11a - Criteria for Including Improvements. Roadless areas may qualify for inventory as potential wilderness even though they include the following types of areas or features.*
> *1. Airstrips and heliports.*
> *2. Cultural treatments involving plantations or plantings where the use of mechanical equipment is not evident.*
> *3. Electronic installations, such as television, radio, and telephone repeaters, and the like, provided their impact is minimal.*

Given the criteria listed above, the WMNF seems to have failed its obligation to identify an Inventoried Roadless Area encompassing Lake Tarleton and surrounding lands. This omission can be corrected in future Forest Plan revisions, but the inventory and evaluation of the area's roadless qualities and wilderness potential will be harmed by the actions proposed in the Tarleton IRP. The DEA should analyze these foreseeable impacts and constraints on future management decisions as it assesses the scale and scope of the Tarleton IRP and considers a range of alternatives.

***Historic and Cultural Resources***

As detailed in Section I(d)(ii) of these comments, there are also numerous historic and cultural resources located within the project area that contribute to the uniqueness of the geographical area and that weigh in favor of a finding of significance and the preparation of an EIS.

***Other Unique Characteristics***

Even if the none of the above listed characteristics qualify the project area as "unique," this would not preclude the area from being considered "unique" for purposes of significance. 40 C.F.R. § 1508.27(b)(3)'s list of examples are just that – examples – as indicated by the use of "such as" in the language of the consideration factor.

Tarleton Lake and the surrounding area are unique in their own right because it is a popular and beloved recreation area held in high esteem not only by locals, but by others who travel great distances to recreate and enjoy the scenic values offered by the area in its current undisturbed state. This is evidenced by the massive effort undertaken to purchase the land surrounding the lake to protect it from development in the first place. In 2000, the New Hampshire Congressional Delegation, the Governor, numerous non-governmental organizations, and 600 individual donors came together to purchase the 5,300+ acres surrounding Lake Tarleton. This collective effort was well-documented in local news publications at the time, as evidenced in Exhibit 54. The land was given to the Forest Service preserve the land for the public in its natural state. Despite clear intent and purpose behind this transfer of land, the Service failed to integrate the necessary protections for this beloved area when it later revised and issued the 2005 WMNF Plan. This area and its unique character galvanized a regional movement to protect and preserve this land. To deny the unique character of this geographic area would be an affront to the hundreds, if not thousands, of people who worked so hard to preserve this unique and beloved area.

Considering all of the above outlined unique characteristics of the geographic area and the proposed project activities, the intensity of potential impacts to this area are high, and thus this consideration weighs heavily toward a finding of significance, and the preparation of an EIS.

***"The degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4)***

Controversy exists where "a substantial dispute exists as to the size, nature, or effect of the major federal action rather than to the existence of opposition to a use." *Found. For N. Am. Wild Sheep v. U.S. Dep't of Agric*., 681 F.2d 1172, 1182 (9th Cir. 1982); *see also Northwest Bypass Group v. U.S. Army Corps of Eng'rs*, 552 F. Supp. 2d 97, 136 (D.N.H. 2008). "A substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI … casts serious doubt upon the reasonableness of an agency's conclusions." *Nat'l Parks Conservation Ass'n.,* 241 F.3d 722, 736 (9th Cir. 2001).

Here, the DEA claims that "this project considered current scientific research, including that submitted by the public, to determine its applicability to the project and found no controversy related to the predicted effects." 2022 DEA at 23. This is not correct. As noted previously in this document, there is a high degree of scientific controversy and significant disagreement with Forest Service scientific assertions related to:

- Management for early successional habitat;
- Management to improve carbon storage and sequestration, as well as climate adaptation and resilience;
- Management of beech trees, among other issues.

The existence of this controversy weighs in favor of a finding of significance and the preparation of an EIS.

***"The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration. 40 C.F.R. § 1508.27(b)(6)***

The Tarleton IRP Proposed Action could irretrievably harm the forests surrounding Lake Tarleton while there is an active effort to reclassify the Management Area to 8.5 (Scenic Area), the MA that most accurately fits the project area. Further, the Proposed Action could harm or even disqualify the contiguous landscape stretching from Lake Tarleton to Webster Slide from Ch. 70 wilderness inventory and evaluation in subsequent Forest Plan revisions.

Similar to its consideration of public health and safety, here again the Service points to the prior use of the same types of activities having occurred in the forest before. 2022 DEA at 23 ("The proposed activities are well established on the Forest, and elsewhere in the region and nation."). Again, prior implementation of a *type* of activity says nothing about the impact of that activity on a specific project location.

***"Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." 40 C.F.R. § 1508.27(b)(7)***

See Section I(d)(xii) of these comments for a detailed discussion regarding the 2022 DEA's lack of analysis regarding cumulative impacts. As explained above in these comments, it is reasonable to anticipate a number of potential cumulative impacts flowing from this project, and thus this consideration factor also weighs in favor of a finding of significance and the preparation of an EIS.

***"The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historic resources." 40 C.F.R. § 1508.27(b)(8)***

As already discussed in these comments, a number of historic and cultural resources exist within the project area. Despite failing to actually analyze impacts to these resources, we know that a rough inventory of some of these sites was taken. *See* Exhibit 9. However, even that document fails to catalogue or acknowledge known gravesites within the project area, including some specifically raised by commenters during initial scoping and during the 2021 DEA comment period. Without some sort of official acknowledgement of these historic resources, it is possible, if not likely, that they will be lost or damaged during project implementation because no protections or buffers will be observed to avoid these un-acknowledged resources. The potential loss or destruction of these historic sites weighs in favor of significance and the preparation of an EIS.

***"The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973. 40 C.F.R. § 1508.27(b)(9)***

See Section I(d)(i) of these comments for a detailed discussion regarding potential project impacts on the Northern Long-Eared Bat, an ESA Threatened species that has recently been proposed for up-listing to Endangered. 87 Fed. Reg. 16442 (March 23, 2022), Exhibit 7. These potential impacts to the NLEB in light of its recent proposed up-listing weighs heavily in favor of a finding of significance, and needs to be fully analyzed in an EIS.

***"Whether the action threatens a violation of federal, state, or local law or requirements imposed for the protection of the environment. 40 C.F.R. § 1508.27(b)(10)***

If the Forest Service fails or refuses to reinitiate consultation with the USFWS in light of a completed up-listing of the NLEB and moves forward with proposed logging activities, it will be in violation of Section 7 of the ESA, which requires every federal agency to consult with USFWS to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). *See* Section I(d)(i) and Section 3 (ESA).

Additionally, as outlined below, the proposed logging in the MA 8.3 designation (Appalachian Trail), would likely be in violation of the Forest Plan, and thus a violation of the National Forest Management Act. 16 U.S.C. § 1604.

For all of the reasons outlined above the Forest Service should rescind its FONSI and prepare an EIS to evaluate the significant impacts posed by this proposed project.

#### iii. The DEA unlawfully relies on mitigation measures to avoid a finding of significance

The DEA makes numerous references to project design features and protective measures that will or could be put into place to allegedly mitigate the undisclosed project impacts. However, the Service may not reply upon mitigation measures to avoid preparing an EIS, if those impacts may have been significant prior to implementation of those measures.

> Mitigation measures may be relied upon to make a finding of no significant impact only if they are imposed by statute or regulation, or submitted by an applicant or agency as part of the original proposal. As a general rule, the regulations contemplate that agencies . . . should not rely on the possibility of mitigation to avoid the EIS requirement.
>
> If a proposal appears to have adverse effects which would be significant, and certain mitigation measures are then developed during the scoping or EA stages, the existence of such *possible* mitigation does not obviate the need for an EIS . . . [Preparation of an EIS] is essential to ensure that the final decision is based on all the relevant factors and that the full NEPA process will result in enforceable mitigation measures through the Record of Decision."

*Sierra Club v. Marsh*, 769 F.2d 868, 877 (1st Cir. 1985) (quoting *Forty Most Asked Questions, supra*, 46 Fed. Reg. 18028, 18038 (1981)) (citations omitted) (emphasis in original).

For example, the Cultural Resource Reconnaissance Report indicates that there would be direct impacts to the resources. There is no analysis provided regarding the potential significance of the impact, because they immediately say impacts will be avoided based on mitigation measures. While binding mitigation measures may be used to ultimately avoid impacts, the agency must still acknowledge the significant impact of the unmitigated action and fully analyze and disclose it before making this decision.

#### f. The proposed up-listing of the Northern Long-Eared Bat requires additional NEPA analysis

For the same reasons discussed above in Section I(d)(i), the proposed up-listing of the Northern Long-eared Bat is a "significant new circumstance[]" and provides "information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d). The Forest Service must therefore complete additional NEPA analysis to adequately address the impacts of these significant new circumstances. As outlined above, this analysis should be done in an EIS, in addition to reinitiating consultation under the ESA.

## II. NFMA Violations

The NFMA, 16 U.S.C. §§ 1600–1614, requires the Forest Service to develop and implement a Forest Plan for each unit of the National Forest System. 16 U.S.C. § 1604. Projects in each forest must be consistent with its relevant Forest Plan, *see Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 850 (9th Cir. 2013), and reviewing courts must be able to reasonably ascertain that the Forest Service complied with that Forest Plan. *Native Ecosystems Council v. U.S. Forest Serv.,* 418 F.3d 953, 963 (9th Cir. 2005).

The above comments have outlined a number of WMNF Plan standards and guidelines that this project threatens to violate, including those for scenery, vegetation management, wildlife, and general management. The relative dearth of analysis or underlying supporting data

or documentation for the Service's claims means that the public is unable to reasonably ascertain whether the Service has complied with these standards. Standing Trees and the Lake Tarleton Coalition are confident that any court would agree.

To avoid potentially violating NFMA by approving a project that not only permits, but calls for, violations of the Forest Plan, the Forest Service must reopen or restart its NEPA analysis to address the deficiencies identified in these comments.

**CONCLUSION**

For the reasons discussed above, in order to comply with the NEPA, NFMA, and the ESA, the Forest Service must prepare additional NEPA analysis to adequately evaluate the potential significant environmental impacts of the proposed Tarleton IRP. The Forest Service should also reinitiate consultation with the USFWS to address Project impacts to the Northern Long-Eared Bat, which has been recently proposed for up-listing from Threatened to Endangered. To meet its statutory and regulatory obligations, the Forest Service must complete an EIS for the Project, or at the very least complete supplemental NEPA analysis in the form a new EA or supplemental EA, to correct the deficiencies identified in these comments.

Please direct any email correspondence to zporter@standingtrees.org. Please direct any mail correspondence to:

Standing Trees & Lake Tarleton Coalition
c/o Tom Buchele, Earthrise Law Center
Lewis and Clark Law School
10101 S. Terwilliger Blvd.
Portland, OR 97219-7799

Sincerely,

Standing Trees and the Steering Committee of the Lake Tarleton Coalition:

**Zack Porter**
*Executive Director, Standing Trees*
*Montpelier, VT*

**Stephen Alden**
*President, Trylon Data Management, LLC*
*Hanover, NH*

**Gail Coffey**
*Lake Tarleton User and Concerned Citizen*
*Wentworth, NH*

**Gerry Coffey**
*Lake Tarleton User and Concerned Citizen*
*Wentworth, NH*

**Elaine Faletra**
*Lake Tarleton User and Concerned Citizen*
*Warren, NH*

**Peter Faletra, PhD**
*Executive Director, NH Academy of Science*
*Warren, NH*

**Geoffrey Gardner**
*Board Member, Standing Trees*
*Bradford, VT*

Signatures continue on the following page…

**Paul Guyre, PhD**
*VP for Research and Discovery, Celdara Medical LLC*
*Active Professor Emeritus, Geisel School of Medicine, Dartmouth*
*Lyme, NH*

**Eric Jones**
*Legacy Forest Trust*
*Glencliff, NH*

**Margaret Jones**
*Legacy Forest Trust*
*Glencliff, NH*

**Rebecca Lovejoy**
*Lake Tarleton User and Concerned Citizen*
*Lyme, NH*

**Jaxon Morgan**
*Lake Tarleton User and Concerned Citizen*
*Lyme, NH*

**Kris Pastoriza**
*WMNF User and Concerned Citizen*
*Easton, NH*

**Kevin A. Peterson**
*Former N.E. Regional Director, Appalachian Trail Conservancy*
*Lyme, NH*

**Jake Reder, PhD**
*CEO, Celdara Medical LLC*
*Director, New Ventures, Geisel School of Medicine, Dartmouth*
*Moultonborough, NH*

**Margaret Sheehan, JD**
*Public Interest Environmental Lawyer*
*Lyme, NH*

**Mike Wipfler**
*Co-Director, Kingswood Camp for Boys*
*Piermont, NH*

**Rob Wipfler**
*Co-Director, Kingswood Camp for Boys*
*President Elect, Lake Tarleton Association*
*Piermont, NH*

**Exhibits**

1. September 5, 2001 article in the Bradford *Opinion Journal*
2. USDA FOREST SERV., CITIZEN'S GUIDE TO NATIONAL FOREST PLANNING (2016)
3. Hall and Porter email chain regarding Soils Report and SHPO letter dated May 2, 2022
4. New Hampshire State Historic Preservation Office concurrence letter dated 2/18/2021
5. Faletra and Hall email chain regarding availability of age-class map, dated November 19, 2021
6. Executive Order 14072 on Strengthening the Nation's Forests, Communities, and Local Economies (April 22, 2022)
7. US FISH & WILDLIFE SERV., ENDANGERED AND THREATENED WILDLIFE AND PLANTS; ENDANGERED SPECIES STATUS FOR NORTHERN LONG-EARED BAT, 87 Fed. Reg. 16442 (March 23, 2022)
8. US FISH & WILDLIFE SERV., SPECIES STATUS ASSESSMENT REPORT FOR THE NORTHERN LONG-EARED BAT (MYOTIS SEPTENTRIONALIS) VERSION 1.1 (MARCH 22, 2022)
9. White Mountain National Forest Cultural Reconnaissance Report for Tarleton IRP dated 1/29/2021, Reviewed 2/4/2021 (CRRR# 2019-04-07)
10. New Hampshire Climate Action Plan (2009)
11. Intergovernmental Panel On Climate Change, Summary for Policymakers
12. Glasgow Leaders' Declaration
13. Erb et al., UNEXPECTEDLY LARGE IMPACT OF FOREST MANAGEMENT AND GRAZING ON GLOBAL VEGETATION BIOMASS (2018)
14. Harris et al., ATTRIBUTION OF NET CARBON CHANGE BY DISTURBANCE TYPE ACROSS FOREST LANDS OF THE COTERMINOUS UNITED STATES (2016)
15. Brown et al., TIMBER HARVEST AS THE PREDOMINANT DISTURBANCE REGIME IN NORTHEASTERN U.S. FORESTS: EFFECTS OF HARVEST INTENSIFICATION (2018)
16. Duveneck and Thompson, SOCIAL AND BIOPHYSICAL DETERMINATIONS OF FUTURE FOREST CONDITIONS IN NEW ENGLAND: EFFECTS OF A MODERN LAND-USE REGIME (2019)
17. Zaino et al., VERMONT CONSERVATION DESIGN – NATURAL COMMUNITY AND HABITAT TECHNICAL REPORT (2018)

18. Keith et al., RE-EVALUATION OF FOREST BIOMASS CARBON STOCKS AND LESSONS FROM THE WORLD'S MOST CARBON-DENSE FORESTS (2009)

19. Luyssaert et al., OLD-GROWTH FORESTS AS GLOBAL CARBON SINKS (2008)

20. Masino et al., OLDER EASTERN WHITE PINE TREES AND STANDS SEQUESTER CARBON FOR MANY DECADES AND MAXIMIZE CUMULATIVE CARBON (2021)

21. Stephenson et al., RATE OF TREE CARBON ACCUMULATION INCREASES CONTINUOUSLY WITH TREE SIZE (2014)

22. Keeton et al., LATE-SUCCESSIONAL BIOMASS DEVELOPMENT IN NORTHERN HARDWOOD-CONIFER FORESTS OF THE NORTHEASTERN UNITED STATES (2011)

23. Forest Service 1992 Directives for the 1982 Planning Rule

24. Moomaw et al., INTACT FORESTS IN THE UNITED STATES: PROFORESTATION MITIGATES CLIMATE CHANGE AND SERVES THE GREATEST GOOD (2019)

25. Dinerstein et al., A GLOBAL SAFETY NET TO REVERSE BIODIVERSITY LOSS (2020)

26. Jung et al., AREAS OF GLOBAL IMPORTANCE FOR TERRESTRIAL BIODIVERSITY, CARBON, AND WATER (2020)

27. Underwood and Brynn, ENHANCING FLOOD RESILIENCY OF VERMONT STATE LANDS (2015)

28. Warren et al., FOREST STREAM INTERACTIONS IN EASTERN OLD-GROWTH FORESTS (2018)

29. Thom et al., THE CLIMATE SENSITIVITY OF CARBON, TIMBER, AND SPECIES RICHNESS COVARIES WITH FOREST AGE IN BOREAL-TEMPERATE NORTH AMERICA (2019)

30. Comments of Stephen Alden on Tarleton IRP

31. US ENVIRONMENTAL PROTECTION AGENCY, 2020–2022 NEW HAMPSHIRE 303(D) LIST OF IMPAIRED WATERS (downloaded on May 6, 2022, from: https://www.epa.gov/tmdl/new-hampshires-2020-2022-303d-list-report-and-related-documents , https://www.epa.gov/system/files/documents/2022-03/2020-2022-nh-303d-list.pdf )

32. G. Coffey comment on 2021 DEA dated 8/5/2021

33. Anonymous comment on 2021 DEA dated 8/5/2021

34. J. Cooley comment on 2021 DEA dated 8/5/2021

35. E. Faletra Comment on 2021 DEA dated 8/5/2021

36. USDA FOREST SERV., LANDSCAPE AESTHETICS: A HANDBOOK FOR SCENERY MANAGEMENT (1995)

37. USDA FOREST SERV., FOREST SERVICE MANUAL EASTERN REGION; SUPPLEMENT NO. R9 RO 2550-2012-1; FSM 2500 – WATERSHED AND AIR MANAGEMENT, CHAPTER 2550 – SOIL MANAGEMENT (JAN. 31, 2012)

38. Lorimer and White, SCALE AND FREQUENCY OF NATURAL DISTURBANCES IN THE NORTHEASTERN US: IMPLICATIONS FOR EARLY SUCCESSIONAL FOREST HABITATS AND REGIONAL AGE DISTRIBUTIONS (2003)

39. Oswald et al., CONSERVATION IMPLICATIONS OF LIMITED NATIVE AMERICAN IMPACTS IN PRE-CONTACT NEW ENGLAND (2020)

40. Nowacki and Abrams, THE DEMISE OF FIRE AND "MESOPHICATION" OF FORESTS IN THE EASTERN UNITED STATES (2008)

41. Ceballos et al., VERTEBRATES ON THE BRINK AS INDICATES OF BIOLOGICAL ANNIHILATION AND THE SIXTH MASS EXTINCTION (2020)

42. "Climate Change 2021: The Physical Science Basis" (Working Group I contribution to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change)

43. Dreiss and Malcom, GETTING TO 30X30: GUIDELINES FOR DECISION-MAKERS (2020)

44. Dinerstein et al., A GLOBAL DEAL FOR NATURE: GUIDING PRINCIPLES, MILESTONES, AND TARGETS (2019)

45. Executive Order 14008 on Tackling the Climate Crisis at Home and Abroad (January 27, 2021)

46. Watson et al., THE EXCEPTIONAL VALUE OF INTACT FOREST ECOSYSTEMS (2019)

47. DiMarco et al., WILDERNESS AREAS HALVE THE EXTINCTION RISK OF TERRESTRIAL BIODIVERSITY (2019)

48. Miller et al., EASTERN NATIONAL PARKS PROTECT GREATER TREE SPECIES DIVERSITY THAN UNPROTECTED MATRIX FORESTS (2018)

49. Miller et al., NATIONAL PARKS IN THE EASTERN UNITED STATES HARBOR IMPORTANT OLDER FOREST STRUCTURE COMPARED WITH MATRIX FORESTS (2016)

50. Askins, Robert A., THE CRITICAL IMPORTANCE OF LARGE EXPANSES OF CONTINUOUS FOREST FOR BIRD CONSERVATION (2015)

51. Thorn et al., THE LIVING DEAD: ACKNOWLEDGING LIFE AFTER TREE DEATH TO STOP FOREST DEGRADATION (2020)

52. Evans and Mortelliti, EFFECTS OF FOREST DISTURBANCE SNOW DEPTH AND INTRAGUILD DYNAMICS ON AMERICAN MARTEN AND FISHER (2022)

53. US NATIONAL PARK SERV., APPALACHIAN NATIONAL SCENIC TRAIL RESOURCE MANAGEMENT PLAN (2008)

54. Various newspaper clippings and letters detailing history of Lake Tarleton purchase (various dates)

55. Forest Service 2015 Planning Direction

United States Department of Agriculture
Forest Service

# Lake Tarleton Integrated Resource Project

## Rationale for Habitat Objectives in the Lake Tarleton Habitat Management Unit

**Pemigewasset Ranger District, White Mountain National Forest, Grafton County, New Hampshire**

**August 2020**

**For More Information Contact:**

Brett Hillman
Pemigewasset Ranger District, White Mountain National Forest
71 White Mountain Drive
Campton, NH 03223
Phone: 603-536-6127
Email: brett.hillman@usda.gov

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.

*El USDA es un proveedor, empleador y prestamista que ofrece igualdad de oportunidad.*

# Contents

Introduction ........ 1
Background Information ........ 1
Existing Condition ........ 3
  Methodology ........ 3
  Suitability of Harvest ........ 3
  Habitat Composition ........ 4
  Age Class Composition ........ 5
Desired Future Condition ........ 6
  Habitat Composition Objectives ........ 6
  Age Class Objectives ........ 8
References ........ 10

## List of Tables

Table 1: General Forest Management MA lands unsuitable for timber harvest by habitat type within the Lake Tarleton HMU. ........ 4
Table 2: Actual and potential habitat composition of the General Forest Management MA lands within the Lake Tarleton HMU. ........ 4
Table 3: Relationship between current habitat and PNV on General Forest Management MA lands within the Lake Tarleton HMU. ........ 5
Table 4: Current age class composition by habitat type in the lands within the General Forest Management MA in the Lake Tarleton HMU. ........ 6
Table 5: Long term habitat composition objectives for each habitat type. ........ 7
Table 6: Desired future age class composition of on suitable lands within the General Forest Management MA lands of the HMU. ........ 9

## List of Figures

Figure 1: Vicinity map. ........ 2

# Introduction

The White Mountain National Forest (WMNF) Land and Resource Management Plan, or Forest Plan (USDA Forest Service 2005), includes goals and objectives to move the WMNF toward a stated desired future condition. The Forest Plan addresses a variety of concepts and processes to ensure landscape level goals and objectives are accomplished during project development and implementation.

The Forest Service has developed a strategy to manage wildlife habitat on the WMNF within delineated Habitat Management Units (HMU). Watershed, compartment boundaries, and transportation systems were considered when delineating HMUs across the WMNF. Within each HMU, vegetation is managed to provide a diversity of habitats, to conserve existing wildlife populations, and to ensure habitats are distributed across the landscape in an ecologically appropriate way (USDA Forest Service 2005, pp. 1-20 to 1-22). The rationale for using the HMU concept in managing the WMNF can be found in the project record (USDA Forest Service 2019a, 2019b).

According to the Forest Plan:

> "Habitat management objectives must be developed for an individual Habitat Management Unit (HMU) prior to implementation of vegetative management in that HMU. These objectives must be based on land capability, current condition in the HMU, and landscape needs to meet management area objectives" (USDA Forest Service 2005, p. 2-33).

HMUs can encompass a variety of management areas within which different types of vegetation management activities are and are not permitted.

This document summarizes information used by an interdisciplinary team in developing the long-term habitat objectives in the Lake Tarleton HMU. The raw data and calculations used in this analysis can be found in the project record (USDA Forest Service 2020).

# Background Information

The Lake Tarleton HMU is located on National Forest System lands in the Towns of Piermont and Warren in Grafton County, NH (Figure 1). The elevation of the HMU ranges from 1060 to 2180 feet above sea level. Three lakes (Tarleton, Katherine, and Constance) are contained within, and another (Armington) abuts the area.

The HMU consists of two parcels of land separated by about two miles. In all, the HMU consists of about 5,375 acres, including waterbodies, of National Forest System lands in addition to some private and State-owned land. The smaller parcel, which is nearly 250 acres in size, is located to the south and is the former Sentinel Mountain State Forest. A newer acquisition, this parcel was added to the Tarleton HMU because of its proximity.

USDA
Lake Tarleton HMU
Lake Tarleton Integrated Resource Project
Haverhill
Benton
Miles
0 0.5 1
N
Lake Constance
Oliverian Pond
25C
Charleston Road
Eastman Brook
Eastman Brook
25
Lake Katherine
Wachipauka Pond
Lake Tarleton
Piermont
Lake Armington
Warren
25C
118
Indian Pond
118
Orford
Upper Baker Pond
25A
Wentworth
Vicinity Map
Vermont
White Mountain National Forest
Maine
New Hampshire
State Highway
Snowmobile Trail
Waterbody
Town Boundaries
Lake Tarleton HMU
The Forest Service uses the most current and complete data available. GIS data and product accuracy may vary. They may be: developed from sources of differing accuracy, accurate only at certain scales, based on modeling or interpretation, incomplete while being created or revised, etc. Using GIS products for purposes other than those for which they were created, may yield inaccurate or misleading results. The Forest Service reserves the right to correct, update, modify, or replace GIS products without notification.
Management Areas
General Forest Management
Wilderness
Semi-Primitive Recreation
Semi-Primitive Non-Motorized
Semi-Primitive Winter-Motorized
Alpine Ski Area Permits
Alpine Zone
Research Forests
Appalachian Trail
Research Natural Areas
Scenic Areas
Recommended Wilderness
Potential Ski Areas
Candidate Research Natural Areas

**Figure 1: Vicinity map.**

JA-1387

PBWTAR_12349

The HMU encompasses three different management areas (MA). A total of 1,600 acres (31 percent of the HMU area) are within the Semi-primitive Recreation MA; vegetation management, in the form of timber harvest, is not permitted. Another 840 acres (16 percent) are located within the Appalachian National Scenic Trail MA where some harvesting of timber is allowed. The remainder of the land base under Forest Service ownership (2,660 acres or 52 percent of the HMU area) is located within the General Forest Management MA where large-scale vegetation management activities, including commercial timber harvests, are permitted. From this point forward, only those stands that fall within the General Forest Management MA will be considered because Forest Plan objectives regarding the composition of habitat types and age classes only pertain to lands within that MA (USDA Forest Service 2005, pp. 1-20 to 1-21).

There are 26 HMUs distributed across the Pemigewasset Ranger District. The Pemigewasset Wilderness, Hubbard Brook, and Appalachian Trail Corridor HMUs have no General Forest Management MA land and/or little to no opportunity for vegetation management. Therefore, the district has 23 HMUs on which it may conduct vegetation management to reach the goals and objectives in the Forest Plan. Several other HMUs on the Pemigewasset Ranger District were recently analyzed for their inclusion in IRPs (e.g. Ammonoosuc South, Bretton Woods, and Wild Ammonoosuc North). The Lake Tarleton HMU has the following characteristics that make it a good candidate for vegetation management at this time:

- No management has been conducted within this HMU since the land was acquired by the Forest Service in 2000 (and since 2008 for the Sentinel Mountain tract).
- There is a lack of regeneration age class habitat in all habitat types across the HMU.
- Opportunities exist to increase habitat diversity by enhancing the aspen-birch and spruce-fir habitat types.
- Opportunities exist to match actual habitat types to expected habitat types given the capability of the land to produce different natural communities.
- Opportunities exist to maintain and possibly expand wildlife openings.

# Existing Condition

## Methodology

Existing conditions of the Lake Tarleton HMU were determined through field stand exams conducted by the district silviculturist in 2018. The results of the stand exams were recorded in the Forest Service Geographical Information Systems (GIS) vegetation database. An analysis of the data was conducted by exporting stand-level information from the GIS database into a spreadsheet where the tabulated data described in the proceeding sections were calculated.

## Suitability of Harvest

Of the 2,660 acres of the HMU that is located within the General Forest Management MA, 167 acres (6 percent) are considered unsuitable for harvest because of steep slopes and/or excessively wet soils. Another 382 acres (14 percent) included in this MA comprise Lake Tarleton and Lake Katherine. Therefore, about 2,111 acres are suitable for vegetation management in the Lake Tarleton HMU. The forested acreage that is unsuitable for harvest is divided across several habitat

types (Table 1). Since these stands would never be harvested, they would eventually attain old-growth characteristics.

**Table 1: General Forest Management MA lands unsuitable for timber harvest by habitat type[1] within the Lake Tarleton HMU.**

| Habitat Type | Area (acres) | Percent of total |
|---|---|---|
| Hardwood | 43 | 26% |
| Mixedwood | 7 | 4% |
| Spruce-fir | 77 | 46% |
| Aspen-Birch | 11 | 7% |
| Oak-Pine | 18 | 11% |
| Hemlock | 11 | 7% |
| **Total acres** | **167** | |

[1] This table includes only unsuitable lands that are forested, i.e. the 382 acres making up lakes are not included.

# Habitat Composition

The existing habitat composition for the land base within the General Forest Management MA on the HMU is summarized in Table 2. The table includes a column that represents the potential for the forest to produce each habitat type based on the ecological land type (ELT) of a stand. Each ELT, which is determined based on factors such as soil type and slope, is likely to produce a certain climax, or late successional, forest community. This community is known as the potential natural vegetation (PNV) of a given ELT. Because of the intense timber harvest history on the WMNF, the ELTs of many forested stands are no longer supporting the natural vegetation that would be expected. Restoring habitat composition so that the actual vegetation reflects the PNV is a key habitat management objective in the Forest Plan (USDA Forest Service 2005, pp. 1-20). See the project record for more information on the rationale for managing land based on its ELT and corresponding PNV (USDA Forest Service 2019a, 2019b).

**Table 2: Actual and potential habitat composition of the General Forest Management MA lands within the Lake Tarleton HMU.**

| Habitat Type | Actual Composition | | Potential Composition[1] | |
|---|---|---|---|---|
| | Area (acres) | Percent of HMU | Area (acres) | Percent of HMU |
| Hardwood | 1,573 | 59% | 632 | 24% |
| Mixedwood | 296 | 11% | 344 | 13% |
| Spruce-fir | 147 | 6% | 1,303 | 49% |
| Aspen-Birch | 43 | 2% | 0 | 0% |
| Oak-Pine | 38 | 1% | 0 | 0% |
| Hemlock | 11 | 0% | (2) | N/A |
| Wildlife Openings | 62 | 2% | 0 | 0% |
| Other[3] | 491 | 18% | 381 | 14% |
| **Total acres** | **2,660** | | **2,660** | |

[1] Potential acreage is based on ELT capability.

[2] While hemlock can be a climax forest type, ELTs have not been identified that are more likely to become hemlock than spruce-fir in the long-term, so hemlock potential is part of the spruce-fir and strong spruce-fir PNV numbers.

[3] Other habitats include those that do not have a forest type coded in the GIS database or that are not an identified wildlife opening or forested stand, such as wetland or open water habitat. Potential acres are those that ELTs indicate are unlikely to be forested (e.g. lakes).

Based on the PNV, there is far more hardwood and far less spruce-fir habitat on the landscape than the natural capability of the land would indicate. This is likely due to the intensive forestry conducted in the region during the late 19th century and the slow successional processes since that time (USDA Forest Service 2019b, DeGraaf et al. 2006). Natural successional processes were further arrested in the late 20th century when a high percentage of the HMU was harvested again prior to the Forest Service's acquisition of the land.

Roughly the same amount of mixedwood habitat type is likely to persist in the analysis area as currently exists, although perhaps not in the same locations. Other less common habitat types, such as aspen-birch and oak-pine, are created and maintained by disturbance and therefore don't represent climax communities (Leak 2014); as such, they will make up zero percent of the future acreage of these stands barring any disturbance. On the other hand, hemlock is a very shade tolerant species with a tendency to seed into areas that have low to no disturbance and are warm or mesic. Its development is facilitated by small micro-gaps encouraging recruitment to the mid- and overstory (Anderson and Gordon 1994).

Table 3 displays the percentage of each habitat that occurs on each stand by PNV. According to this table, hardwood and mixedwood make up a great deal of the habitat type composition present on strong softwood sites. Of the 1,175 of acres that show strong spruce-fir characteristics based on ELTs, only 109 of the acres (9 percent) are currently dominated by spruce-fir. While the current percentage of mixedwood stands (11 percent) is close to the potential percentage based on ELTs (13 percent; see Table 2), a very high percentage of those currently existing stands are growing on strong spruce-fir sites (79 percent) while a disproportionately small percentage of mixedwood stands are growing on sites that would favor that habitat type (6 percent).

**Table 3: Relationship between current habitat and PNV on General Forest Management MA lands within the Lake Tarleton HMU.**

| Habitat | Area (acres) | Area on HW[1] sites | % on HW sites | Area on MW[1] sites | % on MW sites | Area on SF[1] sites | % on SF sites |
|---|---|---|---|---|---|---|---|
| Hardwood | 1,573 | 535 | 34% | 269 | 17% | 769 | 49% |
| Mixedwood | 296 | 46 | 16% | 17 | 6% | 233 | 79% |
| Spruce-Fir | 147 | 0 | 0% | 38 | 26% | 109 | 74% |
| Aspen-Birch | 43 | 15 | 35% | 0 | 0% | 28 | 65% |
| Oak-Pine | 38 | 3 | 8% | 0 | 0% | 35 | 92% |
| Hemlock | 11 | 0 | 0% | 10 | 90% | 1 | 10% |
| **Total** | **2,107**[2] | **599** | | **333** | | **1,175** | |

[1] HW = hardwood; MW = mixedwood; SF = strong spruce-fir.

[2] Wildlife openings and other habitat types were removed for this analysis.

## Age Class Composition

In addition to habitat composition in terms of natural community types, the Forest Plan instructs that the WMNF be managed to provide a variety of habitat conditions in terms of age class composition (USDA Forest Service 2005, pp. 1-21). Three age classes are recognized: regeneration (0 to 9 years old for all habitat types), young (10 to 59 years for northern hardwoods

and mixedwood and 10 to 39 years for all other habitat types), and mature (60 to 119 years for northern hardwood and mixedwood, 40 to 89 years for spruce-fir, and 40 to 69 years for aspen-birch). The age class composition of the lands within the General Forest Management MA is provided in Table 4.

**Table 4: Current age class composition by habitat type in the lands within the General Forest Management MA in the Lake Tarleton HMU.**

| Age class | HW area (acres) | HW[1] % | MW area | MW % | SF Area | SF % | AB area | AB % | OP area | OP % | H area | H % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Regen | - | 0% | - | 0% | - | 0% | - | 0% | - | 0% | - | 0% |
| Young | 606 | 39% | 108 | 36% | - | 0% | - | 0% | 16 | 44% | - | 0% |
| Mature | 966 | 61% | 188 | 64% | 147 | 100% | 43 | 100% | 21 | 56% | 11 | 100% |
| **Total** | **1,572** | | **296** | | **147** | | **43** | | **38** | | **11** | |

[1] HW = hardwood; MW = mixedwood; SF = spruce-fir; AB = aspen-birch; OP = oak-pine; H = hemlock

The mature age class is dominant among all habitat types although there is still a high percentage of young forest owing to the extensive logging that occurred in the project area at the end of the 20th century. All of the aspen-birch habitat type is mature and therefore may not persist for much longer. Regeneration-aged forest is currently not a component of the age class composition of any of the habitat types.

# Desired Future Condition

On the 167 forested acres within the General Forest Management MA of the HMU that are unsuitable for timber harvests, the trends that already predominate on the landscape will continue. These stands will mature slowly, and natural disturbance may still occur at small scales through single-tree or group mortality. Stand-replacing disturbances, which lead to stand regeneration and young forest age classes, are typically infrequent and small in scale. Therefore, regenerating forests are likely to remain limited. Trends that predominate on the 382 acres of unsuitable lands that represent the two lakes will also continue as there are no plans to significantly alter these lakes. However, it should be noted that the Forest Service is proposing to add a small amount of woody debris to the Lake Katherine shoreline.

Although most of the forest is mature and wildlife species that rely on mature forest have populations that are resilient, there have been declines in populations of species that rely on regenerating forest habitat and openings during their life cycles (DeGraaf et al. 2006). For these species, patch size is critical in providing food and cover, with the diversity of species increasing as regenerating patch size increases to 30 acres (DeGraaf et al 2006, Costello et al 2000).

About 2,111 acres of land suitable for management occurs in General Forest Management MA land in which there are opportunities to diversify age classes, encourage forest composition to better reflect the ecological capability of the land, and allow for the maintenance or enhancement of less common or declining forested habitat types such aspen-birch, oak-pine, and hemlock.

## Habitat Composition Objectives

A detailed description of the desired forest composition objectives can be found below in Table 5.

**Table 5: Long term habitat composition objectives for each habitat type.**

| Habitat type | Objective | Rationale |
|---|---|---|
| Hardwood | Decrease current level of hardwood habitat. | Northern hardwood is the current dominant forest type on General Forest Management MA lands in the HMU (59 percent); most of these stands are mature (61 percent). Only 34 percent of hardwood habitat is located on potential hardwood sites that would be managed to sustain hardwood forests, including the even-aged regeneration of stands. A high percentage of hardwood stands (49 percent) are located on sites with a very strong potential to transition into spruce-fir and could be managed to promote softwood using uneven-aged methods or to promote aspen-birch habitat using even-aged methods, which would then transition into spruce-fir over time. |
| Mixedwood | Maintain current level of mixedwood habitat overall while adjusting where it is located. | The current level of mixedwood stands is close to the land's ecological capability, although only 17 percent of existing mixedwood stands occur on mixedwood sites. The vast majority of mixedwood stands (79 percent) are located on strong spruce-fir sites. These would be managed to transition into spruce-fir habitat types using uneven-aged methods. Most mixedwood sites (81 percent) are currently occupied by hardwood forest. These sites can also be managed to hasten the transition of hardwood forest to mixedwood. |
| Spruce-fir | Increase current level of spruce-fir habitat**.** | Because of the high potential for spruce-fir within this HMU, most spruce-fir stands would be managed to retain that spruce-fir habitat. The mixedwood and hardwood sites located on sites with strong spruce-fir potential would be managed to transition into spruce-fir over the long-term. The aspen-birch habitat type could occur in the short term as part of this process. |
| Aspen-birch | Increase the current level of aspen-birch habitat. | All of the aspen-birch is mature within the HMU and would be lost if no management is conducted to regenerate this habitat type. Hardwood and strong spruce-fir sites have an aspen-birch component, so clearcut, patch cut, and group selection harvests could maintain these areas as aspen-birch habitat or increase the size of them. Group selection harvest would perpetuate the healthy paper birch component within a stand. Well-timed re-entry would be needed to perpetuate full regeneration of aspen-birch groves. In other cases, without frequent re-entry, aspen-birch would occur as a more ephemeral component of forest succession. |
| Oak-pine | Where present, retain oak and pine as components of forested stands. | Some young and mature white pine and oak exists in this HMU from past land use. These stands enhance forest diversity and provide seed sources and wildlife habitat. Improvement cutting and group selection would maintain these stands for the long-term, providing multiple age classes while retaining the mature character of the stands. Clearcutting and seed tree treatments would provide larger areas of young oak-pine habitat. |
| Hemlock | Maintain or increase the current level of hemlock habitat. | Hemlock stands are not abundant in this HMU. Retention of existing acres of hemlock in the HMU is feasible through uneven-aged management. Uneven-aged management facilitates understory development by creating small gaps and recruitment to the mid- and overstory. Individual hemlock trees, where present, would be retained as inclusions in stands to increase forest diversity. |
| Wildlife openings | Maintain or slightly increase current level of wildlife openings | 62 acres, or two percent, of General Forest Management MA land in the HMU are mapped as wildlife openings. This percentage exceeds the objective of one percent in the Forest Plan (USDA Forest Service 2005, p. 1-21). However, only about half of this area is regularly maintained and kept open. The proposed changes to the management of that opening and the proposed addition of a new two-acre opening within the project area would result in approximately 51 acres of wildlife openings and would still make up around two percent of the land base. |
| Other | No change from current level. | There are no composition goals associated with the other habitats (i.e., wetlands and open water) that can be reached with vegetation management activities. Wetlands created by beaver are expected to succeed to the PNV after beavers abandon them but may revert back to wetlands further into the future if beavers return. Changes to the open water habitat within the project area are not anticipated. |

## Age Class Objectives

Age class objectives for the suitable lands within this HMU should be similar to the objectives outlined in the Forest Plan except where local ecological or social conditions make it appropriate and desirable to have more or less regeneration age habitat in the HMU. See Table 6 for the desired future condition of the General Forest Management MA lands within the HMU.

There is a lack of stands in the regeneration age class for all habitat types on lands within the General Forest Management MA. Forest-wide, the Forest Service estimated that it would create about 9,400 acres of even-aged regeneration habitat during the first decade of the Forest Plan, or about 940 acres annually. By 2017, the Forest Service should have created about 11,280 acres (940 acres annually over 12 years) of regeneration-age stands via clearcuts, patch cuts, and shelterwood cuts. As of the end of 2017, the WMNF had created about 4,660 acres of this age class, less than half of what was planned (Prout 2017). Therefore, a number of even-aged harvest treatments have been proposed to increase the amount of regenerating forest.

The desired long-term future age class composition for this HMU aligns with Forest Plan goals and objectives. In the short-term, the proportion of aspen-birch habitat in the regeneration age class will likely be above the long-term goal. This is because there are currently no aspen-birch stands within the young age class. Stands within the young age class cannot be created immediately by silvicultural treatments but would exist in the future as the regeneration age class continues to grow. Therefore, the regeneration age class is needed now to provide the young age class in the future.

Over 65 percent of all habitat types are in the mature age class. A relatively low percentage of the General Forest Management MA (6 percent) that is forested is unsuitable for harvest and would continue to grow older as the forest matures. The mature age class objective is based on the portion of General Forest Management MA land in the HMU that is suitable for harvest and is not committed at any one time to the other age class objectives.

**Table 6: Desired future age class composition on suitable lands within the General Forest Management MA lands of the HMU.**

| | Age Class (%)[1] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Regeneration | | | Young | | | Mature | | |
| **Habitat Type** | Current | Forest Plan Objective | Desired Objective | Current | Forest Plan Objective | Desired Objective | Current | Forest Plan Objective | Desired Objective |
| Hardwood | 0 | 3 to 4 | 3 to 4 | 39 | 15 to 20 | 15 to 20 | 61 | 73 to 79 | 73 to 79 |
| Mixed-wood | 0 | 1 | 1 | 36 | 5 | 5 | 64 | 92 | 92 |
| Spruce-fir | 0 | 1 to 2 | 1 to 2 | 0 | 3 to 6 | 3 to 6 | 100 | 43 to 47 | 43 to 47 |
| Aspen-birch | 0 | 12 to 15 | 12 to 15 | 0 | 36 to 45 | 36 to 45 | 100 | 15 to 27 | 15 to 27 |
| Oak-pine[2] | 0 | N/A | N/A | 44 | N/A | N/A | 56 | N/A | N/A |
| Hemlock[2] | 0 | N/A | N/A | 0 | N/A | N/A | 100 | N/A | N/A |

[1] Remaining percentages less than 100% are attributed to unsuitable lands that would continue aging for the long-term

[2] There are no age class objectives for the oak-pine or hemlock habitat types in the Forest Plan.

JA-1394

PBWTAR_12356

# Volunteer Lake Assessment Program Individual Lake Reports
# Lake Katherine, Piermont
# 2021 Data Summary

**Observations** (*Refer to Table 1 and Historical Deep Spot Data Graphics*)

- **Chlorophyll-a:** 2021 chlorophyll data was invalidated as the sample contained heavy sediment and organic matter which yielded inaccurate results of water column algal growth. Historical trend analysis indicates relatively stable chlorophyll levels since monitoring began.
- **Conductivity/Chloride:** Epilimnetic (upper water layer) and Hypolimnetic (lower water layer) conductivity levels were within a low range for NH lakes and slightly less than the state median. Epilimnetic chloride level was also low and approximately equal to the state median. Historical trend analysis indicates stable epilimnetic conductivity levels since monitoring began.
- **Color:** Apparent color measured in the epilimnion indicates the water was clear with little to no tea, or brown, coloring in August.
- **Total Phosphorus:** Epilimnetic phosphorus level was within a low range in August, decreased slightly from 2019, was less than the state median, and was approximately equal to the threshold for oligotrophic lakes. Historical trend analysis indicates relatively stable epilimnetic phosphorus levels since monitoring began. Hypolimnetic phosphorus level was within a moderate range and increased slightly from 2019.
- **Transparency:** Transparency measured without the viewscope (NVS) was within an average range for the lake, increased (improved) from 2019, and was higher (better) than the state median. Historical trend analysis indicates relatively stable NVS transparency since monitoring began. Viewscope (VS) transparency was higher (better) than NVS transparency and likely a better measure of actual conditions.
- **Turbidity:** Epilimnetic and Hypolimnetic turbidity levels were within a low range for the lake.
- **pH:** Epilimnetic pH level was less than desirable range 6.5-8.0 units and was the most acidic value recorded since monitoring began and likely due to the record rainfall that occurred in July. Hypolimnetic pH level was within the desirable range.

| Station Name | Table 1. 2021 Average Water Quality Data for LAKE KATHERINE - PIERMONT | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Alk. (mg/L) | Chlor-a (ug/L) | Chloride (mg/L) | Color (pcu) | Cond. (us/cm) | Total P (ug/L) | Trans. (m) | | Turb. (ntu) | pH |
| | | | | | | | NVS | VS | | |
| Epilimnion | 6.3 | 20.83 | 7 | 20 | 37.2 | 8 | 4.00 | 5.00 | 0.40 | 6.22 |
| Hypolimnion | | | | | 36.4 | 10 | | | 0.44 | 6.64 |

**NH Median Values**

Median values generated from historic lake monitoring data.

**Alkalinity:** 4.5 mg/L **Chlorophyll-a:** 4.39 ug/L
**Conductivity:** 42.3 uS/cm **Chloride:** 5 mg/L
**Total Phosphorus:** 11 ug/L **Transparency:** 3.3 m
**pH:** 6.6

**NH Water Quality Standards**

Numeric criteria for specific parameters. Water quality violation if thresholds exceeded.

**Chloride:** > 230 mg/L (chronic) **Turbidity:** > 10 NTU above natural
**E. coli:** > 88 cts/100 mL (beach)
**E. coli:** > 406 cts/100 mL (surface waters)
**pH:** between 6.5-8.0 (unless naturally occurring)

## Hillman, Brett - FS

**From:** DES: Environmental Monitoring Database <DES.EMD@des.nh.gov>
**Sent:** Thursday, August 18, 2022 10:48 AM
**To:** Hillman, Brett - FS
**Cc:** Neils, David; DES: Environmental Monitoring Database; Wood, Matt; Hugger, Kirsten
**Subject:** RE: Lake Katherine Water Quality

Brett

I reached out to several of our staff who had the following suggestions or information for you:

The Lake information Mapper has a lot of information in one place. Additionally, Lake Katherine is a VLAP lake, so there are a couple VLAP reports on the new website (Publications | NH Department of Environmental Services), though the newest report doesn't address dissolved oxygen. Lake Katherine is a Class B waterbody, so bottom DO values would not have been examined/considered for assessments.

We don't have hypolimnion standards for DO for Class B waterbodies. A good rule of thumb would be to apply the level used for the epilimnion (greater than / equal to 5 mg/L). From a brief glance at VLAP/ lake trophic reports, nothing stands out as problematic for DO. In general, if he's trying to make sense of low DO readings, he should consider how close the reading is to the bottom (eg sediment interference) and time of year (late summer is most likely to have low bottom DO).

All the data in the EMD was analyzed as part of the 2020/2022 assessment process, so the work of apply the data to the state WQ standards has already been done (see report card below). Although there are a few lower DO values, all of the current data is well above standards. The lake was assessed as category 3 (insufficient information) for DO because there are <10 samples available in the critical time and period to make a full assessment. Below are a few charts of the DO data.

LAKE KATHERINE
(NHLAK801040201-02)
DO (mg/L)
0
1
2
3
4
5
6
7
8
9
10
1990
1992
1994
1996
1998
2000
2002
2004
2006
2008
2010
2012
2014
2016
2018
2020
"Current" Line for 2020
DO Min
DO Min- (Magex)
DO-PPM-GRAB-NCT-CP
DO-PPM-GRAB-CT-CP

LAKE KATHERINE
(NHLAK801040201-02)
"Current" Line for 2020
DOSat Min
DOSat Min- (Magex)
DO-PERC-GRAB-NCT-CP
DO-PERC-GRAB-CT-CP
Dissolved Oxygen (percent saturation)
120
110
100
90
80
70
60
50
40
30
20
10
0
1990 1992 1994 1996 1998 2000 2002 2004 2006 2008 2010 2012 2014 2016 2018 2020

***Jocelyn***
(603)271-3287
Pronouns: she, her, hers

---

**From:** DES: Environmental Monitoring Database <DES.EMD@des.nh.gov>
**Sent:** Monday, August 15, 2022 11:05 AM
**To:** Wood, Matt <Matthew.A.Wood@des.nh.gov>; Hugger, Kirsten <Kirsten.A.Hugger@des.nh.gov>
**Cc:** Neils, David <DAVID.E.NEILS@des.nh.gov>
**Subject:** FW: Lake Katherine Water Quality

I'm not sure which of you would be best to answer Brett's questions at this point. I did a full download of all the data for this waterbody and then sent him to the assessment viewer as well.

Thanks!

***Jocelyn***
(603)271-3287
Pronouns: she, her, hers

---

**From:** Hillman, Brett - FS <brett.hillman@usda.gov>
**Sent:** Wednesday, August 10, 2022 4:09 PM
**To:** DES: Environmental Monitoring Database <DES.EMD@des.nh.gov>
**Subject:** RE: Lake Katherine Water Quality

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

---

This is great! Thanks, Jocelyn!

Is there any chance these numbers have been analyzed by anyone? Or are there standards I could compare them to? I see a few low dissolved oxygen readings over the years and I'm wondering what to make of them.

Best,
Brett

**Brett Hillman**
**Pronouns: he/him/his**
**Wildlife Biologist**

**Forest Service**
**White Mountain National Forest, Pemigewasset Ranger District**

**p: 508-277-2491**
**f: 603-536-3685**
**brett.hillman@usda.gov**

71 White Mountain Drive
Campton, NH 03223
www.fs.fed.us

**Caring for the land and serving people**

---

**From:** DES: Environmental Monitoring Database <DES.EMD@des.nh.gov>
**Sent:** Tuesday, August 2, 2022 6:26 AM
**To:** Hillman, Brett - FS <brett.hillman@usda.gov>; DES: Environmental Monitoring Database <DES.EMD@des.nh.gov>
**Subject:** RE: Lake Katherine Water Quality

Good Morning

I have attached all of the data we have in our Environmental Monitoring database for Lake Katherine. You may also find useful information in our Surface Water Quality Assessment Viewer (note Lake Katherine is waterbody id NHLAK801040201-02, you can easily enter that #into the search and it should take you right to it.)

If you have any other questions please feel free to reach out.

*Jocelyn*
(603)271-3287
Pronouns: she, her, hers

---

**From:** Hillman, Brett - FS <brett.hillman@usda.gov>
**Sent:** Monday, August 1, 2022 10:13 AM
**To:** DES: Environmental Monitoring Database <emd@des.nh.gov>
**Subject:** Lake Katherine Water Quality

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Hello,

I'm working on a project for the Forest Service that would involve widening the forested buffer along Lake Katherine in Piermont, NH. Is there any chance you have some water quality data for this lake? I'd be interested to know if there have been any documented impairments.

Thank you!
Brett

**Brett Hillman**
**Pronouns: he/him/his**
**Wildlife Biologist**

**Forest Service**
**White Mountain National Forest, Pemigewasset Ranger District**

**p: 508-277-2491**
**f: 603-536-3685**
**brett.hillman@usda.gov**

71 White Mountain Drive
Campton, NH 03223
www.fs.fed.us

**Caring for the land and serving people**

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

# NEW HAMPSHIRE NORTHERN LONG-EARED BAT SURVEY

Prepared by
Biodiversity Research Institute

For
Sandra Houghton, New Hampshire Fish and Game Department

Submitted by:
David Yates
Caroline Byrne

BIODIVERSITY RESEARCH INSTITUTE
November 14, 2018

Modified by S. Houghton to include only data from the White Mountain National Forest 12/30/19

BIODIVERSITY RESEARCH INSTITUTE
innovative wildlife science

# Table of Contents

**Introduction** ........ 3

**Methods** ........ 3

**Results and Discussion** ........ 5

**Literature Cited** ........ 6

Tables ........ 7

Figures ........ 8

APPENDIX A: Photographic Documentation of Capture Sites ........ 10

Site: Rob Brook ........ 11

Site: Tarleton Lake ........ 13

APPENDIX B: Photographic Documentation of Bat Captures by Date ........ 15

Date: 01 August 2019 ........ 16

Date: 02 August 2019 ........ 17

APPENDIX C: Capture Site Habitat Assessment Database ........ 18

APPENDIX D: Capture Site Drawings ........ 19

APPENDIX E: Bat Capture Database ........ **Error! Bookmark not defined.**

# Introduction

White-nose Syndrome (WNS) was first documented in New Hampshire during the winter of 2008-2009 and has decimated bat populations. The northern long-eared bat (*Myotis septentrionalis,* MYSE) has been so decimated by WNS that the US Fish and Wildlife Service (USFWS) has listed it as threatened in May 2015. In addition, both the tricolored bat (*Perimyotis subflavus,* PESU) and little brown bat (*Myotis lucifugus,* MYLU) have been petitioned for listing under the Endangered Species Act. In response New Hampshire Fish and Game (NHFG) is working on the conservation and recovery of bat populations that have survived WNS. All 8 species of native bats are listed as Species of Greatest Conservation Need in the NH Wildlife Action Plan. (https://wildlife.state.nh.us/wildlife/documents/wap/appendixa-mammals.pdf)

To assist in the recovery of bat populations in New Hampshire there is critical need to first understand the distribution and status of surviving bats. More specifically, the distribution of bats that have survived WNS is mostly unknown and few roosts have been documented. Monitoring is identified as a critical action. However, without knowledge of roosting habitat use, site-specific habitat management, and technical assistance to landowners this can't occur. In addition, there are gaps in our knowledge regarding habitat use that this study will inform (e.g., how often do bats roost in structures? Where are the remaining maternity colonies? How far from forest patches will bats travel to roost?).

# Methods

All field activities relevant to this study were carried out in accordance with the most current version of survey protocols. Current protocols for determining potential presence or likely absence of MYSE are outlined in the 2016 Range-Wide Indiana Bat Summer Survey Guidelines (USFWS, April 11, 2016). While the title suggests that this protocol is only for Indiana bats, the Northern Long-eared Bat Interim Conference and Planning Guidance, which is referenced within the 2016 Range-Wide Indiana Bat Summer Survey Guidelines (hereinafter "Indiana Bat Guidelines"), also allows for the use of the Indiana Bat Guidelines for northern long-eared bats.

Capture sites were chosen with priority given to sites where historical data (e.g. acoustic surveys) indicate the probable presence of MYSE, PESU, and MYLU. Net locations were further refined by the presence of key habitat characteristics, canopy cover, non-obstructed fly-way, and forest condition.

In accordance with the Indiana Bat Guidelines, habitat assessments along with photographic documentation were performed at all capture sites. Habitat assessments included identifying potential structures for roosting, documenting water resources, and describing forest structure and land cover. Wind speed was assessed using the Beaufort scale (0-5):

| Beaufort Number | Wind Speed (mph) | Description | Land Condition |
|---|---|---|---|
| 0 | <1 | Calm | Smoke rises vertically |
| 1 | 1-3 | Light Air | Motion visible in smoke |
| 2 | 4-7 | Light Breeze | Wind felt on skin; leaves rustle |
| 3 | 8-12 | Gentle Breeze | Leaves and smaller twigs in constant motion; light flags extended |
| 4 | 13-18 | Moderate Breeze | Dust and loose paper raised; small branches begin to move (no surveying) |
| 5 | 19-24 | Fresh Breeze | Branches of moderate size move; small trees begin to sway<br>(no surveying) |

All sites were netted two nights each. Grafton County sites include Tarleton Lake and Rob Brook (**Figure 2)**. Both sites are forested logging roads through a beaver complex medium age forest (a mix of age classes); with semi-cluttered understory (cluttered but gaps present to facilitate flight of bats) about 10 meters from a pond. The same federally and state permitted surveyor David Yates conducted all surveys for this study.

Weather conditions were monitored on each capture night. Recorded information included start and end temperatures (ºF), wind speed, and moon phase. A digital thermometer was used to record temperature. Wind speed was measured using a Kestrel wind speed meter (Kestrel, Downingtown, PA). Mist nets were opened for at least five hours each night and were closed if weather (temperatures below 50ºF, high winds, or rain) inhibited capture. Nets and traps were checked at ten-minute intervals. Due to concerns regarding white-nose syndrome (WNS), equipment was decontaminated following USFWS protocols (USFWS 2016b).

All bats were live captured using mist-nets. Mist-netting efforts utilized various net setups as appropriate to each site. During each night two to three triple high pole sets (Avinet, Portland, ME) were deployed. Mist-nets were placed across travel corridors such as roads and streams, with appropriate lengths to fully cover the travel corridor (6–12 m). Capture site habitat assessments were performed at all sites; photos and data from these assessments is provided in Appendix I-V.

Each captured bat was processed and released at the capture site. All bat handling was performed by qualified biologists following Sikes and Animal Care and Use Committee of the American Society of Mammalogists, 2016. Data gathered for each captured bat included species, sex, age-class, mass, forearm length, reproductive condition, and visible WNS damage. Age was determined by examining the epiphyseal diaphyseal fusion of long bones in the wing (Kunz & Anthony, 1982). Reproductive condition of female bats was recorded as pregnant (based on gentle

abdominal palpation), lactating, post-lactating, or non-reproductive. Reproductive condition for male bats was recorded as testes-descended or non-reproductive. WNS damage was assessed using the Reichard Wing Damage Index (Reichard & Kunz, 2009).

## Results and Discussion

Rob Brook had four individual bats captured and two species; Tarleton Lake had one myotis escape. MYLU were captured at Rob Brook. No MYSE were captured, leading to no transmitters being deployed.

Of the two species captured the little brown are state endangered. No federally listed species were captured during survey efforts.

## Literature Cited

Kunz, T.H., and E.L. Anthony. (1982) Age estimation and post-natal growth in the bat Myotis lucifugus. Journal of Mammalogy 63(1), 23-32.

Reichard, J.D., and T.H. Kunz. 2009. White-nose syndrome inflicts lasting injuries to the wings of little brown myotis (Myotis lucifugus). Acta Chiropterologica 11: 457-464.

Sikes, Robert S., and Animal Care and Use Committee of the American Society of Mammalogists. "2016 Guidelines of the American Society of Mammalogists for the use of wild mammals in research and education." *Journal of Mammalogy* 97, no. 3 (2016): 663-688.

U.S. Fish and Wildlife Service (2016b). National White-Nose Syndrome Decontamination Protocol - Version 04-12-2016. Retrieved December 19, 2017 from: https://www.whitenosesyndrome.org/sites/default/files/resource/national_wns_decon_protocol_04.12.2016.pdf

U.S. Fish and Wildlife Service (2017). 2017 Range-wide Indiana Bat Summer Survey Guidelines. U.S. Fish and Wildlife Service, Bloomington, Indiana. From https://www.fws.gov/midwest/endangered/mammals/inba/surveys/pdf/2017INBASummerSurveyGuidelines9May2017.pdf

# Tables

## Table 1. Capture results by site for NH Bat Survey 2019.

| Site | Big Brown Bat | Eastern Red Bat | Eastern Small-footed Bat | Little Brown Bat | Grand Total |
|---|---|---|---|---|---|
| *Rob Brook* | | 1 | | 3 | 4 |
| *Tarleton Lake* | | | | | 0 |
| *Grand Total* | | 1 | | | |

# Figures

NH Capture Survey Sites
Northern long-eared bat 2019 survey
Tarleton Lake
Rob Brook
Ossipee
Claremont
Concord
New Hampshire
Pawtuckaway Lake State Park
WMA Crommet Creek
Ferry Way Trail
Manchester
Keene
Google Earth
Data SIO, NOAA, U.S. Navy, NGA, GEBCO
Image Landsat / Copernicus
© 2018 Google
Image U.S. Geological Survey

Figure 1. Bat capture locations for 2019 NH State Survey.

NH: Grafton County Capture Survey Sites
Northern long-eared bat 2019 survey
Howard Island
Haverhill
Lincoln
Bradford
Tarleton Lake
Piermont
Woodstock
Waterville Valley
Warren
Grafton
Fairlee
Thornton
Wentworth
Ellsworth
Campton
Rumney
Google Earth
©2018 Google
Hoag Island

Figure 2. Grafton County bat capture locations for 2019.

# APPENDIX A: Photographic Documentation of Capture Sites

## Site: Rob Brook

*Net A for Rob Brook Capture Site 2019*

*Net B for Rob Brook Capture Site 2019*

## Site: Rob Brook continued

*Net C for Rob Brook Capture Site 2019*

## Site: Tarleton Lake

*Net A for Tarleton Lake Capture Site 2019*

*Net B for Tarleton Lake Capture Site 2019*

## Site: Tarleton Lake continued

*Net C for Tarleton Lake Capture Site 2019*

# APPENDIX B: Photographic Documentation of Bat Captures by Date

## Date: 01 August 2019

MYLU capture time 21:00

MYLU capture time 22:00

## Date: 02 August 2019

MYLU capture time 22:15

LABO capture time 23:15

# APPENDIX C: Capture Site Habitat Assessment Database

| Date | Site | Start Time | End Time | Total Number of Bats Captured | Start Temp | End Temp | Moon Rise | Moon Set | Moon Phase | % Illumination | Sun Rise | Sun Set | Wind | Sky condition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/23/19 | Tarleton Lake | 20:30 | 1:30 | 0 | 64 | 58 | 23:55 | 11:50 | Quarter | 60 | 5:27 | 20:22 | 1 | Partly_cloudy |
| 07/24/19 | Tarleton Lake | 20:30 | 1:30 | 0 | 63 | 50 | 0:51 | 13:51 | Half | 50 | 5:28 | 20:28 | 1 | Clear_few_clouds |
| 08/01/19 | Rob Brook | 20:15 | 0:00 | 2 | 57 | 49 | 5:52 | 20:48 | Half | 1 | 5:32 | 20:16 | 1 | Clear_few_clouds |
| 08/02/19 | Rob Brook | 20:15 | 1:15 | 2 | 60 | 49 | 7:10 | 21:31 | Crescent | 5 | 5:33 | 20:07 | 1 | Clear_few_clouds |

JA-1418

PBWTAR_12498

# APPENDIX D: Capture Site Drawings

Rob Brook
N
Beaver Pond
Clearing
17 m net
trail
9m net
6m net
Stream
Beaver pond
Rob Brook trail

*Site drawing for 2019 Rob Brook capture survey site*

**JA-1420**

PBWTAR_12500

N
Tarleton Lake
beaver dam
beaver pond
parking area
6m net
6m net
Rt 25C

*Site drawing for 2019 Tarleton Lake capture survey site*

# APPENDIX E: Bat Capture Database

| Date | Capture Time | Site | Species Code | Age | Sex | Reproductive Status | Forearm | Mass | Ear | Net of Capture | Height in Net | Wing Score | Band | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 08/01/19 | 2200 | Rob Brook | MYLU | Adult | Male | Non-reproductive | 38.8 | 7.8 | 11 | C | 2 | 0 | | |
| 08/01/19 | 2100 | Rob Brook | MYLU | Juvenile | Male | Non-reproductive | 35.7 | 7.1 | 11 | C | 7 | 0 | | |
| 08/02/19 | 2215 | Rob Brook | MYLU | Adult | Male | Testes-descended | 38.4 | 9.2 | 11 | A | 7 | 0 | | |
| 08/02/19 | 2315 | Rob Brook | LABO | Adult | Female | Non-reproductive | 42.7 | 15.8 | 7 | A | 6 | 0 | | |

# SPECIES ABSTRACT – *Northern long-eared bat*

## NOMENCLATURE & TAXONOMY

**Scientific name (with authority)**: *Myotis septentrionalis* (Trovessart 1897)

**Synonymy**: *Myotis keenii septentrionalis* (Trovessart 1897)

**Family**: Vespertilionidae

**Common name(s)**: Northern Bat, Northern Long-eared Myotis, northern long-eared bat

### Taxonomic history

*Myotis septentrionalis* formerly was regarded as conspecific with *Myotis keenii*. Some experts regarded *Myotis keenii* and *M. septentrionalis* as separate species; others included *septentrionalis* in *Myotis keenii*, noting that they may be separate species. Later, researchers recognized *M. septentrionalis* and *M. keenii* as distinct species. Older literature using the name *Myotis keenii* actually pertains to *Myotis septentrionalis*. No subspecies are recognized. No genetically distinctive subpopulations have been identified (NatureServe 2023).

## STATUS & DISTRIBUTION

All information on status and rankings is from NatureServe (2023).

### General Status

Global rank: G2G3
US national status: N1N2
Canada national status: N2N4B,NNRN,NNRM

| RANKED AS S1, S2 or LISTED as T or E by State/Province | RANKED AS S3-S5 OR S? | RANKED as SR or SRF | RANKED as SH or SX |
|---|---|---|---|
| Alabama (S2), Arkansas (S1S2), Connecticut (S1), Delaware (S1), Georgia (S1), Indiana (S2S3), Illinois (S1?), Kentucky (S1), Louisiana (S1), Maine (S1S2), Maryland (S1), Michigan (S1), Mississippi (S1N), Missouri (S1), Montana (S2), Nebraska (S1S2), New Hampshire (S1), New Jersey (S1), New York (S1), North Carolina (S2), Ohio (S1), Oklahoma (S2), Pennsylvania (S1), Rhode Island (S2), South Carolina (S1), South Dakota (S2), Tennessee (S1S2), Vermont (S1), Virginia (S1S3), West Virginia (S1S2), Wisconsin (S1S2), Wyoming (S1B,S1N), Alberta (S2S3), British Columbia (S3S4), Labrador (S2S3), New Brunswick (S1), Newfoundland Island (S2S3), Northwest Territories (S2S3), Nova Scotia (S1), Prince Edward Island (S1), Quebec (S1) | District of Columbia (S4), Iowa (S4), Kansas (S3), Massachusetts (S4), Minnesota (S3), Manitoba (S3S4N,S4B), Ontario (S3), Saskatchewan (S3), Yukon Territory (S3B) | | Florida (SH) |

**Northern New England Status (New Hampshire, Maine, Vermont):**

| State | State rank | # of state occurrences (Winter[1]/Summer[2]) | | WMNF occurrences (Winter/Summer) | |
|---|---|---|---|---|---|
| | | Total | Historic | Total | Historic |
| New Hampshire | S1/E | 1/? | 7/? | 0/2 | 0/? |
| Maine | S1/E | 0/? | 3/? | 0/? | 0/? |
| Vermont | S1/E | ?/? | ?/? | N/A | N/A |

[1] Known hibernacula
[2] Known summer roost colonies

Surveys over the winters of 2014 and 2015 in NH turned up only one individual in one of the 8 regularly surveyed hibernacula (NHFGD 2015).

Information on Maine occurrences is from Wight (2022) and MDGIF (2016).

Sasse (1995a) noted two loosely defined clusters of roosting northern long-eared bats on the WMNF in NH that are considered to be maternity colonies.

**Legal status**

| | | | |
|---|---|---|---|
| X | Federal Endangered | X | ME State Endangered |
| | Federal Threatened | | ME State Threatened |
| | USFS, WMNF Sensitive | | ME State Special Concern |
| | USFS, GMNF Sensitive | | ME Possibly Extirpated |
| X | NH State Endangered | X | VT State Endangered |
| | NH State Threatened | | VT State Threatened |
| | NH State Candidate | | VT State Special Concern |
| | None of the above | | |

**Distribution**

*M. septentrionalis* occurs throughout most of the Eastern United States and southern Canada. The northern border of the range is Newfoundland, Quebec, and the Northwest Territories of Canada. The range extends southward along the East Coast to Florida and then westward through Alabama, Arkansas, and the eastern Great Plains. Although *M. septentrionalis* is widespread, its distribution may be irregular or patchy. It is more common in the northern part of its range than in the southern and western areas (Thompson et al. 2006).

**Current distribution in northern New England relative to species global range**

| | | | |
|---|---|---|---|
| | Endemic to New Hampshire | | Disjunct in Vermont |
| | Endemic to Maine | | Disjunct in northern New England |
| | Endemic to Vermont | X | Center of range in northern New England |
| | Endemic to northern New England | | Edge of range in northern New England |
| | Disjunct in New Hampshire | | Long distance migratory |
| | Disjunct in Maine | | Extirpated in northern New England |

**Current distribution in northern New England by county and town**

In New Hampshire, winter distribution of the northern long-eared bat prior to White-Nose Syndrome included each of the state's seven known mine hibernacula. In addition, a newly discovered hibernacula in a WWII bunker was found to house northern long-eared bats. The concentration of northern long-eared bats among the hibernacula ranged from less than 1% (Mascot Lead Mine) to 47% (Bristol Mine) of the total bat population. Northern long-eared bats in New Hampshire tended to be less common (fewer than 1% of hibernating bats) in the large hibernacula such as Mascot Lead Mine, intermediate (less than 20%) at medium-sized mines such as Paddock Copper Mine and Mt. Kearsarge Lead Mine, and relatively abundant in small hibernacula such as Bristol Mine, Beebe River Mine, and the Red Mine (NHFGD 2015). The known hibernacula are located in the following towns: Acworth, Alstead, Alexandria, Bristol, Campton, Gorham, Groton, Lyman, Rye, Warner, and Woodstock (NHFGD 2015).

Summer records are known from Carroll, Coos, Cheshire, Grafton, Hillsborough, and Rockingham counties. Of 141 summer captures of northern long-eared bats in New Hampshire prior to WNS, 74.2% are from the White Mountain National Forest, 24.3% are from northern Cheshire County, and 3.5% are from Merrimack and Hillsborough County. Data from Rockingham County comes from one site and includes just a few individuals (NHFGD 2015).

Less information is available from Maine. There are three known bat hibernacula in the state (Maine Audubon 2015), but none contained hibernating northern long-eared bats in recent years (Wight 2022). The species is still encountered during summer surveys, however (Wight 2022).

**Current distribution in National Forests relative to species' global, North American, and state range**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| WMNF's position within N. Am. range | X | Central | | Peripheral | | Disjunct | | N/A |
| WMNF's position within NH range | X | Central | | Peripheral | | Disjunct | | N/A |
| WMNF's position within ME range | X | Central | | Peripheral | | Disjunct | | N/A |

**Current occurrences on the WMNF**

There are no known hibernacula on the WMNF. However, it is worth noting that a suspected bat hibernaculum occurs near Mount Washington (Prout 2019). While only little brown bats have been noted in the area, other species, including the northern long-eared bat, may also be found here. More work is needed to determine this.

During the active season, individuals are encountered via acoustic surveys sporadically throughout the Forest. Within the Wanosha Mountain Integrated Resource Project (IRP) area, the little brown bat was recorded at 9 of the 110 surveys sites (8.2 percent) (Prout 2018). The species has been recorded in surveys supporting other IRPs as well, including the Bowen Brook IRP, North Chatham IRP, and Northwest Swift IRP (USFS, unpublished data).

In 1992 and 1993, prior to white-nose syndrome, only little brown bats were captured and recorded on bat detectors more commonly than northern long-eared bats by Krusic et al. (1996). In 1993 and 1994, 27% percent of bats captured on the WMNF were identified as northern long-eared bats (Sasse 1995, Sasse and Pekins 1996); again, only little brown bats were caught more frequently. Chenger (2004) captured individuals at seven of eight locations located across the Forest. It was the third most frequently caught species during this trapping effort following little brown and big brown bats.

Using radio-telemetry, 47 northern long-eared bat roost trees were found on the WMNF (Sasse 1995a, Sasse and Pekins 1996) found. Some roost sites appeared to be "clustered" together, rather than dispersed in a random pattern throughout the forest. These clusters likely represent maternity colonies. Exact trapping locations can be found in Sasse (1995b).

The two loosely defined clusters of roosting northern long-eared bats on the WMNF noted by Sasse (1995a) that can be considered maternity colonies are located in Grafton County and Carroll County.

**Historic occurrences on the forests**

It is likely that some of the occurrences discussed above are no longer current because of population declines caused by WNS and because snags are ephemeral features. Sixteen to seventeen years after roost trees were discovered on the Forest by Sasse (1995a), only 7 of the 33 (21%) that could be relocated were still usable as roosts (Sasse 2010). While individual roosts are lost from time to time, the colony will likely remain as long as a sufficient number of roosts can still be found in the vicinity (Silvis et al. 2015).

**Population Trend**

| Spatial Scale | Documented Decline | Suspected Decline | Stable or Increasing | Unknown |
|---|---|---|---|---|
| Within WMNF | X | | | |
| Within GMNF | X | | | |
| Within New Hampshire | X | | | |
| Within Maine | X | | | |
| Within Vermont | X | | | |
| Within northern New England | X | | | |
| Within North America | X | | | |
| Globally | X | | | |

As with other species of bats that hibernate in caves and mines, the northern long-eared bat has experienced widespread population declines due to white-nose syndrome (WNS), a fungal disease that affects bats during hibernation. The fungus, *Psuedogymnoascus destructans*, grows into the wings, muzzles and ears of the bats, disrupting metabolic functions and causing bats to arouse from hibernation more frequently and stay awake longer than uninfected bats. This causes them to use up stored energy (fat) at a much higher rate. Bats cannot replenish their fat stores in winter as their food source is unavailable. They perish from starvation, some first flying out the hibernacula in mid-winter in a desperate search. Since bats are in hibernation they do not mount an immune response to this disease. First discovered in 2006-2007 by cavers near Albany, New York, the disease quickly spread (NHFGD 2015).

Range-wide, the number of subpopulations as well as the overall population size clearly have declined to a large degree. Abundance has declined sharply (approximately 99 percent based on hibernacula counts, 93-98 percent based on summer survey data) over past decade in the northeastern portion of the range. (NatureServe 2023). As of 2022, WNS has caused estimated NLEB population declines of 97–100% across 79% of the species' range (USFWS 2022).

Available evidence, including both winter and summer data, indicates NLEB abundance has and will continue to decline substantially over the next 10 years under current demographic conditions. Winter abundance (from known hibernacula) has declined rangewide (49%). In addition, the number of extant winter colonies declined rangewide (81%). By 2030, rangewide abundance is predicted to decline by 95% and the spatial extent will decline by 75%. There has also been a noticeable shift towards smaller colony sizes, with a 96–100% decline in the number of large hibernacula (≥100 individuals). Declining trends in abundance and occurrence are also evident across much of NLEB's summer range. Rangewide summer occupancy declined by 80% from 2010–2019. Data collected from mobile acoustic transects found a 79% decline in rangewide relative abundance from 2009–2019 and summer mist-net captures declined by 43–77% compared to pre-WNS capture rates (USFWS 2022).

Since the northern long-eared bat is found in relatively rare, at-risk habitats during winter (caves/mines), they are at risk of population decline if such habitats are lost or degraded. Their slow reproductive rate would, in turn, lead to a slow population recovery time. This has proven to be the case since the onset of WNS. Northern long-eared bats have been decimated by WNS, with NH seeing its first cases during the winter of 2009. By 2015, WNS had been found in 24 states and 4 Canadian provinces. Winter surveys in 2010 showed a 54% decline in northern long-eared bats and by 2011 declines had reached 99%. Surveys over the winters of 2014 and 2015 echoed this with one individual found in one of the 8 regularly surveyed hibernacula (down from the 2008 high of 721) (NHFGD 2015).

In Maine, the number of hibernating northern long-eared bats has declined by at least 95% since pre-WNS surveys were conducted (MDGIF 2016). The three known hibernacula once contained up to a total of 100 northern long-eared bats; surveys in 2019 and 2020 yielded none (Wight 2022).

There is no evidence to suggest an imminent reversal in this range-wide population decline (USFWS 2022). Further, given the projected low abundance and the few number and restricted distribution of winter colonies, NLEB's currently impaired ability to withstand stochasticity, catastrophic events, and novel changes will worsen under the range of plausible future scenarios (USFWS 2022).

## LIFE HISTORY INFORMATION

**Food and feeding behavior**

This species is likely an opportunistic insectivore. Analysis of stomach contents and fecal pellets revealed that the diet of *M. septentrionalis* consists of species of lepidopterans, coleopterans, trichopterans, and dipterans. Prey items such as spiders and lepidopteran larvae made up 12.7 percent of the food found in the bats' stomachs, further supporting the gleaning foraging strategy of this species (Thompson et al. 2006). Gleaning bats use passive listening as well as echolocation to locate insects resting on leaves, tree trunks, or against buildings (Caceres and Barclay 2000).

In a New Hampshire and Massachusetts study, Thomas et al. (2012) found that moths made up the bulk of the NLEB's diet (43% of stomach contents). Spiders made up a higher percentage (8.1%) of the stomach contents of NLEB than the other 5 bat species studied. Beetles also made up a significant portion of the species' diet.

# Terrestrial Habitat Management Reference Document

## Introduction

The Wildlife Standards and Guidelines in Chapter 2 of the revised 2005 White Mountain National Forest (WMNF) Land and Resource Management Plan (Forest Plan) include a guideline (G-1, p. 2-33) that says, "Habitat should be managed according to guidance provided in the Forest's Terrestrial Habitat Management reference document." The guidance in this document is provided to increase consistency across the WMNF Districts and further convey the intent of the Forest Plan for wildlife and plant habitat management. This guidance may be modified to meet situational conditions or as new information is gathered without amending the Forest Plan as long as the changes do not affect the Forest-wide objectives, standards, or guidelines that are defined in the Forest Plan. Because implementation of this document is a guideline in the Forest Plan, deviations from the guidance in this document need to be explained in project decisions.

This document incorporates the 2005 Forest Plan by reference (U.S. Department of Agriculture [USDA] Forest Service 2005*a*), and provides guidance in several separate areas relating to wildlife and plant habitat management on the WMNF: development of objectives for individual Habitat Management Units (HMUs), management for Canada lynx, management of wildlife openings, and preventing and addressing wildlife-human conflicts. It also provides definitions and background information that is useful in understanding the guidance here and in the Forest Plan.

## Habitat Management Units

### Background

Every Forest Plan includes habitat goals and objectives to move the Forest toward a stated desired future condition. Each Forest also has some mechanism for ensuring that landscape-level goals and objectives are met and that habitats are distributed across the Forest in a way that is ecologically appropriate. Some accomplish this through extensive standards and guidelines; others divide the Forest into many small Management Areas (MAs) with unique management goals and objectives; still others leave it to specialists to determine the best approach during project development and then explain their rationale in each environmental analysis.

The 1986 WMNF Forest Plan included HMUs as a way to meet the Forest's habitat goals and objectives and provide a diversity of habitats (including forest types, age-classes, and non-forested habitats) across the forest landscape. During Forest Plan revision, the Forest Service decided to retain the HMU framework because it has been an effective way to ensure that projects will move the Forest toward habitat composition and age class objectives for MA 2.1 lands (Forest Plan, pp. 20-22).

The HMU framework is specific to the WMNF. HMUs are simply a tool to achieve landscape-level habitat goals and objectives; they were not used to develop those goals and objectives. Habitat goals and objectives were set during Forest Plan revision based on interdisciplinary discussion of desired future conditions for all resources and the ecology of the Forest. The revised Forest Plan requires development of habitat composition and age class objectives for each HMU

(Forest Plan, Wildlife Habitat Management S-1 p. 2-33) to ensure that the connection between landscape-levels goals and objectives and project-level ecological conditions is considered during project development.

Input from internal and external forestry and wildlife experts, including input from research, supported the HMU approach as a reasonable way to help the forest achieve our habitat objectives. A more detailed description of the ecological perspective used during Forest Plan revision to develop habitat goals and objectives, and discussion of the role of HMUs in achieving the desired future conditions is available in a document in the Forest Plan revision administrative record titled “White Mountain National Forest Ecological Approach” (U.S. Department of Agriculture (USDA) Forest Service 2019).

## General Information and Guidance

During Forest Plan revision, the Forest Service debated whether and how to modify the age class objectives that were in the 1986 Forest Plan. Many members of the public expressed a strong interest in prohibiting harvest in a portion of MA 2.1 to increase age class diversity on the managed landscape. In evaluating how to meet this concern and ensure a high level of habitat diversity in MA 2.1, the Forest Service recognized that nearly one-quarter of the forest land in MA 2.1 is unsuitable for timber harvest and therefore will not be harvested in the foreseeable future. These stands are currently young, mature, or old forest habitat, and they will continue to age and evolve into old forest. The Forest Service determined that so much forest habitat within MA 2.1 is unsuitable for harvest that it would result in a diverse landscape and meet public concerns without altering management on other lands. In order to capture this intent, the acres of land unsuitable for timber harvest were totaled to create an old age class objective. At both the Forest and HMU scale, the old age class objective is based on the “unsuited” land base; it is not affected by classification of current habitat conditions.

During Forest Plan revision, setting long-term objectives was the first step. Associated with that was determining how much land fell into each age class at that time. Stand-level year of origin data does not always provide an accurate picture of habitat condition because it is derived from a few of the largest and oldest trees. From a habitat perspective, stands that have had trees removed every couple of decades often function as mature habitat, regardless of the age of the oldest trees, because there is less decadence, dead wood, and fewer large trees and snags than would occur in unmanaged old forest. Data was not available that would accurately reflect these habitat traits in each stand. Therefore additional data (land suitability class and even-aged versus uneven-aged management classification) were considered during Forest Plan revision to estimate how much of the Forest provided mature versus old habitat. At a landscape scale, where the condition in individual stands is not critical because the goal is a broad picture of the 800,000-acre Forest, this estimate was determined to be reasonable and sufficient for evaluating the effects on habitat abundance from meeting the age class objectives in each alternative.

However, at an HMU level, where the classification of individual stands should be more accurate, this approach is inadequate. It would result in a number of stands in an HMU being misclassified as old when they currently offer mature habitat or vice versa. Regeneration and young age classes can be reasonably identified using year of origin data because these stands are generally the result of even-aged treatments where the obvious majority of the stand is the same age, but that is not the case with many older stands. As implementation of the revised Forest Plan began, the wildlife cadre on the Forest realized that there is no reasonable way to distinguish mature forest habitat stands from those that provide old forest habitat across an HMU using currently available data. Therefore the Forest was left with two choices:

- Use the landscape-level approach at the project scale, verifying age class of stands within the project area and assuming that information for other stands in the HMU presents a reasonably accurate picture of the area, or
- Combine the mature and old age classes into one category when presenting and evaluating the current condition of an HMU.

There are no species on the WMNF that require old (instead of mature) forest habitat, so combining the two age classes does not substantially alter the analysis of habitat suitability in an HMU. The intent of the old age class objective in the Forest Plan was simply to be a placeholder for unsuited lands that will eventually grow old and remain unharvested, not to be an objective that is managed for from the suited land base if the current amount of unsuited land isn't presently "old." Therefore the decision was made to combine the mature and old age classes for HMU-level analysis, labeling it mature forest habitat since all of it meets or exceeds the criteria for that habitat. To minimize potential for confusion from having an old objective but no old current condition, it was decided to change the label for lands that will provide old forest habitat in the future from "old objective" to "land unsuitable for harvest."

## Other Considerations

HMUs range from roughly 6,000 to 49,000 acres in size. While the boundaries of these HMUs can change without a Forest Plan amendment or correction, they should remain fairly constant over the next 10 to 15 years.

Conditions that should be considered when developing HMU-specific objectives are provided here to increase consistency among Districts and as reminders of the many factors that influence habitat objectives on the WMNF.

- Although Forest-wide composition objectives only address northern hardwood, mixedwood, softwood, aspen-birch, and opening habitat types, HMU-specific objectives should be developed for each habitat type that the HMU can provide, which might include oak-pine and hemlock forest.
- HMU-specific objectives should be developed for age classes as well as habitat composition. Typically regeneration-age objectives will match the MA-level objectives, but deviations may be appropriate for some locations.
- HMU-specific objectives should reflect land capability and social and resource factors in the HMU. Refer to the following examples:
    - The Ecological Land Type (ELT) on which the aspen-birch, oak-pine or hemlock is growing should determine which other composition objective is reduced. If oak-pine stands occur in MA 2.1 of an HMU on a hardwood capable ELT, the northern hardwood objective should be reduced, relative to land capability, proportional to the amount of oak-pine desired.
    - Regenerating forest habitat that is created by stand-replacing natural disturbance on MA 2.1 lands should be counted toward meeting the regenerating forest objective in an HMU.
    - In developing HMU-specific objectives, consider the condition of private lands or lands in other MAs in the HMU.

- E.g., if the HMU includes a large blowdown area in MA 6.1, a patch of regeneration forest habitat created through noncommercial cutting, or a large private clearcut, HMU objectives for regeneration forest might be reduced for as long as that non-MA 2.1 habitat exists.

    - Social factors may indicate that higher or lower levels of even-aged regeneration harvest are appropriate. This could affect age-class objectives in an individual HMU, as long as MA 2.1 regeneration habitat objectives are achieved at the Forest level.

        - E.g., if the HMU includes an area popular for moose viewing or hunting, even-aged regeneration harvest at levels higher than proposed in the MA 2.1 objectives would be beneficial.

- Lands in MA 2.1 that have been identified as unsuitable for timber harvest due to topography, soil moisture, or for other reasons (Land Suitability Classes, or LSCs, other than 500) count toward objectives for the old age class.

- In evaluating where to place aspen habitat, consider riparian areas where beaver activity occurs or is desirable.

- Salvage may be appropriate after stand-replacing natural disturbance in MA 2.1.

## Additional Notes on Habitat Objectives

As discussed in Chapter 1 of the Forest Plan, the composition objectives are long-term in nature; they will not be achieved at the Forest level for centuries. Our management should be designed to move the landscape toward those objectives, but that movement will be incremental because stand-level composition changes rarely happen in one rotation.

Because these objectives are long-term in nature, documentation is essential. If management in an area is conducted with the intent of moving it in a given direction (e.g., to increase the spruce-fir component so it moves toward spruce-fir or mixedwood habitat), that intent should be documented so future management can continue in the same direction (for as long as the Forest objectives remain similar).

At the time of the Forest Plan revision (2005), aspen-birch was a concern on the WMNF. Much of it was so old that it is falling apart and even immediate regeneration might not result in stands that are primarily aspen and birch. Implementing only enough regeneration harvest to meet the identified age class objectives for the next 10 years would result in further loss of aspen-birch habitat and greater time and cost to regain that habitat. Therefore the EIS described an expected deviation from the age class objectives for the first decade to allow the Forest to regenerate higher levels of aspen-birch forest before it degenerates further. This management would return the aspen-birch forest to active management that would eventually allow for long-term maintenance within the specified age-class regime.

The number of HMUs that are managed through timber harvest each year will affect whether meeting these age class objectives will achieve the desired output of about 940 acres of even-aged regeneration harvest per year. If monitoring indicates that HMU objectives are being met but outputs are not and implementing projects in additional HMUs is infeasible, HMU-specific objectives for regeneration age class may need to be increased above the MA-level objectives to account for the limited number of HMUs that can be managed in during each decade.

## Potential Natural Vegetation

As discussed in the Forest Plan Final Environmental Impact Statement (FEIS; USDA Forest Service 2005*b*:3–74), each ELT indicates a tendency of that piece of ground to grow a certain type of forest (hardwood, mixedwood or spruce-fir/softwood). This tendency is also known as the potential natural vegetation (PNV) for that piece of ground. ELTs and PNV were used to develop the MA 2.1-wide habitat composition objectives and are referenced in the above guidance for determining HMU-specific composition objectives. To implement this guidance, it is important to know which PNV categories are indicated by each ELT:

- Softwood ELTs
  Moderately strong = 11, 111, 311, 411
  Strongest = 2, 2b, 2d, 115a, 315a, 415a, 6, 6d, 6e, theta11, 14, 15h, 15k, 315b, 8, 12, delta15, theta15, r15

- Mixedwood ELTs
  5d, 105d, 305d, 15j, 305, 315d, 405d[1] , 415b

- Hardwood ELTs
  2c, 102c, 105, 105c, 305c[2], 315, 315c[2], 315f[2], 402c, 405, 405c, 115c, 415c, 415f, 15g, 115g, 315g, 415g, 5, 415d, r2c

- Non-Forest ELTs
  13a, 13b, 13c, 1, theta1, theta2, theta6, theta8, theta14, bog, delta1, delta2, delta6, muck, r2, r6

# Lynx

The Goals, Objectives, Standards, and Guidelines in the 2005 Forest Plan and the additional guidance provided here are all designed to help implement the Canada Lynx Conservation Assessment and Strategy (CLCAS) (Ruediger et al. 2000, Interagency Lynx Biology Team 2013). This strategy was designed, and is periodically modified, by a national team of scientists, as needed, based on new information. In addition new, locally applicable information is being gathered.

- In lynx habitat, design vegetation management practices to produce forest composition, structure, and patterns that support lynx habitat. Considerations should include natural disturbance regimes, age-class distributions, and patch size characteristics. The amount of suitable habitat should at least be maintained through time, with an emphasis on continued availability of high quality foraging habitat in proximity to denning habitat.

- Maintain a map of lynx habitat that is developed using criteria specific to the WMNF to identify appropriate vegetation and environmental conditions.

- Use Lynx Analysis Units (LAUs) to help ensure that lynx habitat is well distributed across the planning area.

- In mapping lynx habitat and LAUs, primary vegetation includes only those types necessary to support lynx reproduction and survival. It is recognized that lynx will use other vegetation types that are intermixed with the primary vegetation, but those types are

[1] Changed from hardwood in 2017 (See ELT_FT meeting notes 20170711 for details)
[2] Changed from mixedwood in 2017 (See ELT_FT meeting notes 20170711 for details)

considered to contribute to lynx habitat only where they are associated with primary vegetation.

- LAUs have been identified for the WMNF for use in program work and project-level analysis. If the LAUs need to be modified in the future, a couple of key points should be considered:
    - The size of LAUs should generally be 6,500 to 10,000 ha (16,000 to 25,000 acres or 25 to 50 square miles) in size when located in contiguous habitat. They likely should be larger in less contiguous, poorer quality, or naturally fragmented habitat. To allow for assessment of the potential effects of the project on an individual lynx, LAUs should be at least the size or area used by a resident lynx and contain sufficient year-round habitat.
    - LAUs with only insignificant amounts of lynx habitat may be discarded, or lynx habitat within the unit incorporated into neighboring LAUs. Based on studies at the southern part of lynx range in the western U.S., it appears that at least ten square miles of primary vegetation should be present within each LAU to support survival and reproduction. The distribution of habitat across the LAU should consider daily movement distances of resident females (typically three to six miles).
- Opportunities for cooperation with other landowners should be pursued.

## Permanent Wildlife Opening Guidance and Ranking Criteria

A variety of non-forest habitat types occur in the New England landscape that provide habitat for wildlife (DeGraaf and Yamasaki 2001). These are divided into upland and wetland non-forested habitats. Openings occur across the landscape naturally from treefalls resulting from wind, disease or beaver activity or through climatic conditions that result in alpine and krummholz habitat. Terrestrial openings also may occur as a result of human activities including agricultural practices (old farm fields, homesteads, apple orchards), harvesting activities (clearcuts, patch cuts, log landings, and old skid road), maintenance of recreation sites, and powerlines.

Vegetation management on the WMNF is one mechanism to create and maintain non-forested upland openings across the landscape. Clearcuts or patch cuts may provide non-forested habitat for approximately ten years. However, these areas are usually dominated by woody growth within one or two years of the initial harvest. A wide variety of wildlife species prefer non-forested habitats that are dominated by grasses, forbs, or shrubs for all or part of the life cycle (DeGraaf and Yamasaki 2001). DeGraaf and Yamasaki (2001) describe several types of non-forested upland openings that occur across the New England landscape including cultivated, grass, forb, or shrubby old fields, pastures, savannas, and orchards. Some examples of wildlife species that use non-forested terrestrial habitats include eastern smooth green snake, American woodcock, brown thrasher, mourning warbler, indigo bunting, masked shrew, snowshoe hare, meadow vole, black bear, ermine, and moose.

There has been a significant decline in non-forested upland openings across the New England landscape in the past one hundred years (DeGraaf 1991). On the Forest, most old fields or apple orchards have succeeded to forested habitats. With careful site selection, opportunities exist on the Forest to create and maintain permanent wildlife openings that provide grass, forb, or

shrubland/old field conditions. If managed, old apple orchards also can provide a non-forested terrestrial habitat component for wildlife.

Depending on size, permanent wildlife openings may be components of the overall forest composition or provide a separate habitat for a specialized wildlife community. To the extent possible, they will be placed across the landscape. In most instances, the Forest will not manage for large grassy areas such as grasslands, pastures, or savannas that would provide for grassland species such as eastern meadowlarks and bobolinks. These habitats would not have occurred naturally in the mountains of the Forest, so they will not be created. However, consideration may be given to managing existing grassland habitats located in lower elevation areas of the Connecticut River Valley, where lands are flatter and surrounding agricultural lands may provide a complex that supports grassland species.

## Guidance

- Seeded roads, between use periods, can contribute to the wildlife opening requirement.
- Areas with an existing concentration of apple trees can be managed as wildlife openings and in support of historic landscape management.
- Sites for wildlife openings may be selected based on characteristics such as current vegetation, likely speed of reforestation, and accessibility for maintenance.
- Wildlife openings should have an average size of 5 to 10 acres. On a case-by-case basis, a wildlife opening may be as small as 0.25 acre or as large as 30 acres. This may occur as a result of managing for an existing habitat feature, such as a concentration of blueberries (in the case of a very small opening) or where an opening is already established (in the case of a very large opening).
- Small brush piles may be created and left in an opening to provide small animal cover.
- Wildlife openings may be established and maintained using prescribed fire, herbicides, mowing, stumping, brushing, or other methods based on a site-specific prescription.
- Wildlife openings should be managed as needed to allow herbaceous and shrubby vegetative structure to develop in the opening between maintenance periods.
- Apple tree pruning or alder cutting should occur during the months when vegetation is dormant.

## Ranking Criteria

Several types of openings occur in MA 2.1 that provide non-forested terrestrial habitat including areas currently being managed as wildlife openings, seeded skid roads, log landings, recreation sites, and powerlines. The Forest is only able to actively maintain a small percentage of wildlife openings. To determine which areas to target for maintenance, the quality of upland openings in MA 2.1 will be ranked based on habitat features (Table 1). Priority for management will be given to upland openings that rank high in providing herbaceous or shrubby habitat features and have some type of access for maintenance.

This ranking system helps to prioritize which upland openings will be maintained as wildlife openings using stumping, mowing, prescribed fire, or brushing to maximize an herbaceous or shrubby condition to benefit wildlife that use this type of habitat for all or part of their life cycle.

Wildlife openings will be maintained as needed to allow herbaceous and shrubby vegetative structure to develop in the opening between maintenance periods. For larger openings, maintenance can occur on a two-tier system so one-half of the opening is maintained during one year and the other half is maintained one or two years later.

**Table 1. Criteria for ranking habitat quality**

| **QUALITY RANK CRITERIA**<br>**1= excellent, 2 = good, 3 = medium, 4 = fair, 5 = poor** | **RANK** | **REMARKS** |
|---|---|---|
| 1. SIZE<br>1 = >6 acres<br>2 = 4 - 6 acres<br>3 = 2- 4 acres<br>4 = 1 – 2 acres<br>5 = < 1 acre or skid road | | |
| 2. DIVERSITY OF HERBACEOUS SHRUB COVER<br>1 = presence of grass, sedges, herbs, and shrubs<br>2 = presence of only two or three of the above<br>3 = presence of only one of the above | | |
| 3. SOFT MAST (raspberries, blackberries, blueberries)<br>1 = 25-50% area<br>2 = 10-25% area<br>3 = 0-10% area | | |
| 4. GRASSES, SEDGES, HERBS (e.g. goldenrod, ferns)<br>1 = 25-50% area<br>2 = 10-25% area<br>3 = 0-10% area | | |
| 5. FRUIT TREES PRESENT<br>1 = > 15 trees/acre<br>2 = 10 to 15 trees/acre<br>3 = 5 – 10 trees/acre<br>4 = 1-5 trees/acre<br>5 = none | | |
| 6. AMOUNT OF WOODY SAPLINGS<br>1 = <10%<br>2 = 10-25%<br>3 = 25-50%<br>4 = 50-75%<br>5 = >75% | | |
| 7. STRUCTURE (snags, live reserve trees, large woody material on ground)<br>1= meets Forest Plan S&Gs for structure<br>3 = structure present but below Forest Plan S&Gs<br>5 = no structure present | | |
| 8. SOFTWOOD COVER IN OR NEAR OPENING<br>1 = abundant<br>2 = sparse<br>3 = none | | |

**JA-1434**

PBWTAR_12660

| **QUALITY RANK CRITERIA**<br>**1= excellent, 2 = good, 3 = medium, 4 = fair, 5 = poor** | **RANK** | **REMARKS** |
|---|---|---|
| 9. ACCESS TO OPENING<br>1 = within 0.25 miles maintained road and no barriers<br>3 = within 0.5 miles maintained road and no barriers<br>5 = over 0.5 miles from maintained road or has barriers | | |
| 10. TOPOGRAPHY<br>1 = Flat<br>3 = Average slope less than 30%<br>5 = Average slope greater than 30% | | |
| 11. % OF WILDLIFE OPENING COVERED WITH TOP SOIL.<br>1 = >75% of area<br>3 = 25 – 50% of area<br>5 = < 25% | | |
| 12. WATER IN VICINITY (maintain 100' foot no-cut buffer from streams, ponds, wetlands, vernal pools)<br>1 = 100 – 500 feet<br>3 = 500 -1000 feet<br>5 = >1000' | | |
| 13. USED AS LOG LANDING<br>1 = Never<br>3 = > 15 year intervals<br>5 = < or equal to 15 yr intervals | | |
| QUALITY RANK = SUM OF RANKS / 13 CRITERIA<br>1= excellent, 2 = good, 3 = medium, 4 = fair, 5 = poor | | |

# White Mountain National Forest Protocol for Avoiding Wildlife-Human Conflicts

**Goals:** Recognize that visitor safety and the well-being of wildlife are both important components of National Forest management. Manage at recreation sites to allow for wildlife viewing while reducing the potential for human-wildlife conflicts.

**Wildlife-human conflict:** An occasional sighting of a bear or other wildlife in the vicinity of recreation sites does not necessarily indicate a problem. However, visits on a regular basis that result in theft of food, destruction of property, or any indication of aggression do constitute wildlife-human conflicts. Rely on biologists to evaluate wildlife behavior.

**Protocol:** Preventative measures and education will be used to avoid wildlife-human conflicts. If these measures do not work, deterrents, trapping, or other measures may be used to remove the problem animal. If an animal becomes aggressive towards a person, the Forest will immediately contact the New Hampshire Fish and Game Department or Maine Department of Inland Fisheries and Wildlife to remove the aggressive individual.

This protocol provides information on: ways to prevent wildlife-human conflicts through preventative measures and education, prevention enforcement, when and how to report wildlife-human conflicts, procedures to follow to eliminate nuisance wildlife from an area, and when site closure may be necessary.

I. Preventative Measures

A. All dumpsters, garbage cans, and recycling bins at developed recreation sites should be wildlife-resistant.

B. No open compost sites should be allowed on the Forest. Any established compost site should be wildlife-resistant.

C. No bird feeding should occur at Forest Service facilities from April through November.

D. Place food storage lines or wildlife-resistant food boxes at developed backcountry sites (e.g., cabins, tents, platforms, shelters) where there is a known problem.

E. Any work crews (i.e., trail crews) that are spending extended time camping in backcountry at a non-developed site should store food in wildlife-resistant containers.

II. Education

A. Employees, concessionaires, and permittees should be made aware of the Forest Protocol for avoiding wildlife-human conflicts.

B. To the degree feasible, campers and hikers should be advised when there is a known nuisance wildlife problem in developed or backcountry areas near where they are recreating.

C. Information about proper food storage should be available to campers and recreationists at recreation sites.

D. Provide educational displays, brochures, and campground talks to educate the public about wildlife and ways to prevent wildlife-human conflicts, including proper food storage and not feeding wildlife.

III. Enforcement

A. On June 3, 1991, a Forest Supervisor's Order was signed enabling us to enforce negligent food storage. The collateral forfeiture (per the CFR) for this is $50. Use that option if needed.

IV. Reporting Wildlife Nuisance Incidents

A. Have frontliners, campground hosts, concessionaires, public, and staff monitor and document nuisance wildlife activity. Wildlife-human conflicts should be reported to the District biologist and line officer to determine if there is a problem that needs to be addressed. Do not contact State personnel prior to contacting the biologist or line officer. This is to ensure that a culvert trap is not set up at a recreational site without the knowledge of key Forest Service staff.

B. If the biologist or line officer determines that the wildlife nuisance problem could result in human harm and preventative and education measures have been taken, they should notify New Hampshire Fish and Game Department or Maine Department of Inland Fisheries and Wildlife.

C. State wildlife officials will respond to verify aggressive behavior and take action. Certain deterrent measures may be used to move the nuisance wildlife from the area including dogs, pyrotechnics, and sprays.

D. If it is determined that all preventative measures have been taken, adequate time has been given for the animal to leave the area, and the animal still poses a threat to property or human safety, the New Hampshire Fish and Game Department or Maine Department of Inland Fisheries and Wildlife will initiate removal of the nuisance animal.

E. If a culvert trap is set, it must be manned at all times to prevent any harm to people in the area.

F. A short written report should be filed for each animal removed from the Forest. This should include a description of the nuisance problems and the date the animal was trapped. These reports will be sent to the Forest Wildlife Biologist.

V. Site Closure

A. When education and deterrents do not eliminate wildlife-human conflicts, or when necessary to maintain public safety, dispersed or developed recreation sites may be closed.

# Habitat Definitions

## Forest Type

Some Forest Service databases categorize habitat at a coarse scale or may not always be up to date. For all habitat, actual on-the-ground field conditions may override database stand typing in defining habitat.

Aspen-birch habitat: Forest habitat in which the canopy is comprised almost entirely of aspen species or paper birch. For implementation purposes, this habitat includes forest types 91 to 95.

Mixedwood Forest Habitat: Also referred to as hardwood-softwood forest habitat. Forest habitat in which the canopy comprises a mix of northern hardwoods and hemlock, pine, spruce, or fir. Typically this is a northern hardwood stand with at least 25 percent made up of softwood species. For implementation purposes, this habitat is usually typed as forest type 87.

Northern Hardwood Forest Habitat: Forest habitat in which the canopy is comprised almost entirely of deciduous hardwood trees, such as sugar maple, American beech, yellow birch, etc. For implementation purposes, this habitat includes forest types 76, 81-86, and 88-89.

Oak-Pine Forest Habitat: Forest habitat in which the canopy is comprised primarily of oak or pine species. For implementation purposes, this habitat includes forest types 1-3, and 41-55.

Softwood Forest Habitat: Forest habitat in which the canopy is comprised almost entirely of balsam fir, hemlock, or spruce species. For implementation purposes, this habitat includes forest types 1-5 and 11-19.

Spruce-Fir Forest Habitat: Forest habitat in which the canopy is comprised almost entirely of balsam fir and spruce species. For implementation purposes, this habitat includes forest types 11-19.

Wildlife Opening: Terrestrial opening dominated by native grasses, forbs (e.g. goldenrod, ferns, meadowsweet), and/or shrubs (e.g. blackberries, raspberries, blueberries, alder) that is maintained in an non-forested condition naturally or through stumping, mowing, prescribed burning, brushing, or other means to benefit wildlife. It must remain in shrubby or herbaceous vegetation and have minimal (<15%) overstory canopy conditions. Only areas that are maintained primarily for wildlife benefits are considered wildlife openings; other herbaceous openings exist on the Forest and may provide wildlife habitat, but they are not considered wildlife openings for the purposes of this Plan. For implementation purposes, this habitat is labeled forest type 99 with vegetation codes 50-56 in our vegetation database.

Early-successional Forest Habitat: Forest habitat that is comprised primarily of tree species that require an open canopy and high levels of light and that typically colonize an area after stand-replacing disturbance (e.g. aspen-birch forest).

Mature Forest Habitat: Stands in which the overstory is in the mature age class (see Forest Plan, Appendix D). Mature forest habitat is typically made up of trees that are eight inches or more in diameter. Mortality is just beginning in these stands, resulting in a few scattered

canopy gaps and a small number of snags and cavities in the overstory. Most snags and down logs are small in diameter and within the intermediate or understory layers. Depending on site conditions, thinning and uneven-aged harvest methods can be used in this habitat without negatively impacting habitat quality. Some uneven-aged harvest may enhance vegetative and structural diversity.

Old Forest Habitat: Stands in which the overstory is in the old age class (see Forest Plan, Appendix D). Desired habitat conditions start with those for mature forest and can include greater size, decadence, structural complexity, etc. No harvest will occur in stands identified to provide old forest habitat, most of which are unsuitable (not Land Suitability Class (LSC) 500) or inaccessible for timber harvest.

Old Growth: Uneven-aged (three or more age classes) forest with an abundance of trees at least 200 years old, multiple canopy layers, large diameter snags and down logs, and a forest floor exhibiting pit-and-mound topography. There should be little or no evidence of past timber harvest or agriculture. Northern hardwood old growth consists primarily of sugar maple and American beech; softwood old growth is largely made up of spruce and hemlock. Stands need to be at least 10 acres in size to be identified as old growth. Anything smaller is a patch of old trees within a younger stand, not a habitat type in its own right.

Regeneration Forest Habitat: Forest with less than 30 square feet of basal area in the overstory in which almost all the trees are 0-9 years old. Can be created through natural disturbance, clearcutting, seed tree harvest, shelterwood harvest to 30 basal area or less, or shelterwood harvest with removal harvest within 10 years of original harvest.

Young Forest Habitat: This habitat results from growth of regenerating forest habitat. It also is created when the overstory is removed from a shelterwood harvest more than 10 years after the original harvest. Canopy trees are typically shorter than at maturity and small in diameter, usually less than eight inches. See Appendix D of the revised Forest Plan for ages.

## Forest Age Classes

Forest habitats on the WMNF have been divided into four broad age classes: regeneration, young, mature, and old. Regeneration forest is typically 0-9 years old, following a stand-replacing natural disturbance or harvest. Young forest starts at age 10 and lasts 30 to 60 years, depending on the forest type. Mature forest encompasses the ages at which harvest is most desirable for each forest type, while old forest starts after the traditional rotation age for each forest type. Table 2 documents the ages at which each age class starts and ends by habitat type.

**Table 2 Forest age classes by habitat type**

| Habitat type | Age class | Age in years |
|---|---|---|
| Spruce-fir | Regeneration | 0-9 |
| | Young | 10-39 |
| | Mature | 40-89 |
| | Old | 90+ |
| Mixedwood | Regeneration | 0-9 |
| | Young | 10-59 |

| Habitat type | Age class | Age in years |
|---|---|---|
| | Mature | 60-119 |
| | Old | 120+ |
| Northern Hardwood | Regeneration | 0-9 |
| | Young | 10-59 |
| | Mature | 60-119 |
| | Old | 120+ |
| Aspen-birch | Regeneration | 0-9 |
| | Young | 10-39 |
| | Mature | 40-69 |
| | Old | 70+ |
| Oak-pine | Regeneration | 0-9 |
| | Young | 10-69 |
| | Mature | 70-119 |
| | Old | 120+ |
| Hemlock | Regeneration | 0-9 |
| | Young | 10-69 |
| | Mature | 70-119 |
| | Old | 120+ |

# References

DeGraaf, R. M. 1991. Breeding Bird Assemblages in Managed Northern Hardwood Forests in New England. Pages 152–171 *in*. Wildlife and Habitats in Managed Landscapes. Ed. Jon E. Rodiek and Eric G. Bolen. Island Press, Washington, D.C.

DeGraaf, R. M., and M. Yamasaki. 2001. New England Wildlife: Habitat, Natural History, and Distribution. University Press of New England, Hanover, NH.

Interagency Lynx Biology Team. 2013. Canada lynx conservation assessment and strategy, 3rd edition. USDA Forest Service, USDI Fish and Wildlife Service, USDI Bureau of Land Management, and USDI National Park Service., Missoula, MT.

Ruediger, B., J. Claar, S. Gniadek, B. Holt, L. Lewis, S. Mighton, B. Naney, G. Patton, T. Rinaldi, J. Trick, A. Vandehey, F. Wahl, N. Warren, D. Wenger, and A. Williamson. 2000. Canada Lynx Conservation Assessment and Strategy. USDA Forest Service, USDI Fish and Wildlife Service, USDI Bureau of Land Management, and USDI National Park Service, Missoula, MT.

United States Department of Agriculture Forest Service. 2005*a*. White Mountain National Forest Land and Resource Management Plan. Laconia, NH. <https://www.fs.usda.gov/detailfull/whitemountain/landmanagement/planning/?cid=STELPRDB5199941&width=full>.

United States Department of Agriculture Forest Service. 2005*b*. Final Environmental Impact Statement for the White Mountain National Forest Land and Resource Management Plan. Laconia, NH. <https://www.fs.usda.gov/detailfull/whitemountain/landmanagement/planning/?cid=STELPRDB5199941&width=full>.

United States Department of Agriculture Forest Service. 2019. White Mountain National Forest Ecological Approach.

# Ecological Approach

## November 2002 (Edited February2019)

### *Background*

*The following document was written in 2002 during the revision of the White Mountain National Forest (WMNF) Land and Resource Management Plan (Forest Plan). Its purpose was to explain in detail the ecological principles on which the vegetation and wildlife habitat management direction in the Forest Plan would be based. Minor edits were made in 2019 to improve readability.*

## Introduction

This document describes the ecological setting, locally and regionally, that is the basis for timber and habitat management on the White Mountain National Forest (WMNF). It then summarizes the habitat goals and ecological desired future conditions envisioned by the Forest's biologists, silviculturists, and soil scientist during the revision of the WMNF Forest Plan. Goals for timber, visuals, and other resources also play into the desired future conditions, but they are presented elsewhere in the Forest Plan revision record. Finally, this document discusses the role of Habitat Management Units (HMUs) in achieving the desired future conditions.

## Ecological Setting

The WMNF resides in one ecological subsection: White Mountain Subsection. This is distinguished from our neighboring subsections by the generally higher elevation, greater maximum elevation, and steep environmental gradients reflected in distinct elevation patterns of vegetation. There are also differences in factors such as weather patterns and natural disturbance regimes.

Literature on natural disturbance history in the Northeast indicates that small partial disturbances occur regularly, and large stand replacing disturbances occur at much longer intervals. Natural disturbance in this and nearby subsections includes wind, disease, ice storms, hurricanes, and fire. Within the White Mountain Subsection, wind is the most common disturbance. Evidence indicates the most frequent disturbance is very small in size (less than 0.2 acre). In general, disturbances are smallest in the hardwood portion of the Forest, and relatively larger in softwoods at both low and high elevations. In most instances, these are not "stand replacing events" (i.e. all trees blown down in a large enough area to be recognized as a "stand" with a new regenerating forest), but instead leave a ragged forest canopy of broken tops and blown down trees. A review of 300 years of records indicates hurricane events occur about every 15 years, but these are not very strong tornado-like events. By comparison, the magnitude of wind events, especially, is far more significant in nearby subsections. For example, the eastern Adirondacks sustain significant tornado-like events that affect many thousands of acres, with individual areas of impact hundreds of acres in size. Insect and wind events in northern Maine also lead to significant openings hundreds of acres in size.

### Land Type Associations

The White Mountain Subsection is divided into four Land Type Associations (LTAs): Valley Bottoms, Mountain Slopes, Upper Mountain Slopes, and Mountaintops. LTAs are broad

There are caveats to using land capability (also known as potential natural vegetation) in our proposal. Oak, pine, and hemlock stands are uncommon on the Forest and are important ecologically as separate habitat types and components of other habitats. Their presence on the landscape increases ecological and biological diversity. Therefore we propose to maintain stands comprised primarily of these species many places where they occur and components of these species where they are within-stand habitat features, even if that is counter to land capability.

Aspen-birch habitat is important to a number of wildlife species, and is visually desirable in some locations. Paper birch can be a desirable timber species as well. These species are opportunists that will take advantage of conditions that favor their regeneration and growth. As a result, lands are not identified as tending toward aspen-birch habitat. Stands dominated by aspen or birch are most common on softwood capable lands, but also occur elsewhere. This habitat would not be abundant on the Forest naturally. Therefore the objective for stands dominated by aspen or birch is low, essentially retaining the current level. Managing to retain these species in stands where they are minor components helps maintain biological diversity at the stand level.

Minor tree species are often important to wildlife species due to their unique structural aspects or mast production. In addition, maintaining minor species is important in protecting the health and integrity of the forest community.

Like aspen-birch habitat, permanent upland openings would not be abundant on the Forest naturally. Therefore the proposed management objective for this habitat is minimal. The Forest should not be providing habitat for grassland species, which do not and should not occur on the Forest. However small patches of this habitat provide an important habitat component for many species, making them desirable in managing for biological diversity.

Most of the wildlife species on the WMNF need more than one forest age class to meet their life requirements. Many use both mature and regenerating forest, or even mature forest and permanent openings. A few birds require permanent openings or the earliest stages of regenerating forest to meet most of their needs. There are no vertebrate animals or vascular plants in this area that are old growth forest obligates. There are a few invertebrate animals, non-vascular plants, and lichens that may require old growth conditions, but more information is needed to determine if these species are old growth obligates. Most plant species do well either in mature or regenerating forest, not both. The WMNF has species that need each of these habitats, and others that rely on upland or wet openings. Therefore, maintaining ecological sustainability requires that we provide a mix of habitats across the landscape.

Historically almost the entire forest, aside from alpine, subalpine, and wetland or aquatic habitats, was in a mature or old forest condition. Given the amount of time required for mature and old forest habitat to develop, it is much easier to create open and young forest habitat than mature and old forest habitat. Therefore a majority of the Forest should remain in mature and old forest habitat to provide for dependent species now and in the future.

A number of the species dependent on openings and regenerating forest habitats have experienced substantial population declines in recent decades due to the reforestation of farmland, changes in harvest practices, and loss of forest and farmland to development. Although viability is not a concern for these species in this planning cycle, the Forest should provide suitable habitat for these species at a level that will soften the effects of habitat loss on surrounding lands and ensure that viability on the Forest will not become a concern in the foreseeable future. All experts questioned agree that the Forest could provide even more regeneration and young forest habitat than is proposed in the current Forest Plan while maintaining ecological sustainability of mature

and old forest habitats on the landscape. By contrast, a segment of the public is strongly opposed to regeneration harvest on the Forest. The level of regeneration harvest used as an example in the desired future conditions above is a compromise between the preferred level for habitat (the current Forest Plan) and the amount of regeneration harvest we currently accomplish (about 300 acres per year). Natural disturbance will provide small amounts of this habitat across the Forest, mostly in small, scattered patches. As the forest ages, the natural disturbance regime will return to normal. The proposed level of harvest would not result in a substantial change from the natural range of variability and would help provide the mix of habitats needed by so many species.

Our proposal for where to focus regeneration harvest (primarily in hardwood forest) varies from the natural disturbance regime, which indicates that most stand-replacing natural disturbance occurs in LTAs with strong softwood tendencies. Regenerating spruce-fir stands provide an important habitat for some species, such as lynx, that is not available in many areas on the Forest. However, on many softwood tendency ELTs, even-aged management of softwoods, without intensive pre-commercial treatments, results in an increased component of hardwood species or near conversion of the stand to northern hardwood, mixedwood, or aspen-birch habitat. Similarly, mixedwood habitat is often moved toward hardwood habitat through even-aged management. These changes are counter-productive to our objective to manage the land based on ecological land type, which would increase softwood habitat. Therefore regeneration harvest would occur primarily in northern hardwood forest habitat. The exceptions will be on ELTs where regeneration harvest is likely to retain or enhance the existing softwood component or in places where the desire is to create aspen-birch habitat. In these places, and where natural disturbance occurs, softwood and mixedwood habitats will be regenerated to provide for associated species.

## How do Habitat Management Units fit in?

Habitat Management Units (HMUs) are a tool used in project planning and analysis to help move the Forest toward the desired future condition described above. There are three key benefits to HMUs:

1. Help prioritize habitat needs in a local area, which facilitates project planning,
2. Answer the questions “why here” and “why now” for harvest activities, and
3. Provide a reasonable cumulative effects area for most species with habitat objectives appropriate to the area, which improves our project analysis and habitat management.

The intent during Forest Plan Revision is to improve and simplify the HMU process and the project-level analysis process as much as possible. Goals for improving these processes include the following:

- Enlarging the HMUs to accomplish the following:
    - Provide a broader area in which to evaluate the landscape-level effects of projects;
    - Encompass each vegetation management project entirely within one HMU.
- Establish a process for developing HMU objectives that are appropriate to local conditions, and that prevent attempts to force stands to be something they are not ecologically capable of.

# WMNF Ecological Approach

November 2002

(edited February 2019 to facilitate public understanding)

Formatted: Font: 11 pt

Formatted: Font: 11 pt

Formatted: Font: 11 pt

Formatted: Font: 11 pt

## Introduction

This document describes the ecological setting, locally and regionally, that is the basis for timber and habitat management on the White Mountain National Forest. It then summarizes the habitat goals and ecological desired future conditions envisioned by the Forest's biologists, silviculturists, and soil scientist during the revision of the WMNF Forest Plan (2005). Goals for timber, visuals, and other resources also play into the desired future conditions, but they are presented elsewhere in the Forest Plan revision record. Finally, this document discusses the role of Habitat Management Units (HMUs) in achieving the desired future conditions.

## Ecological Setting

The WMNF resides in one ecological subsection: White Mountain Subsection. This is distinguished from our neighboring subsections by the generally higher elevation, greater maximum elevation, and steep environmental gradients reflected in distinct elevation patterns of vegetation. There are also differences in factors such as weather patterns and natural disturbance regimes.

Literature on natural disturbance history in the Northeast indicates that small partial disturbances occur regularly, and large stand replacing disturbances occur at much longer intervals. Natural disturbance in this and nearby subsections includes wind, disease, ice storms, hurricanes, and fire. Within the White Mountain Subsection, wind is the most common disturbance. Evidence indicates the most frequent disturbance is very small in size (<0.2 acre). In general, disturbances are smallest in the hardwood portion of the Forest, and relatively larger in softwoods at both low and high elevations. In most instances, these are not "stand replacing events", but instead leave a ragged forest canopy of broken tops and blown down trees. A review of 300 years of records indicates hurricane events occur approximately every 15 years, but these are not very strong tornado-like events. By comparison, the magnitude of wind events, especially, is far more significant in nearby subsections. For example, the eastern Adirondacks sustain significant tornado-like events that affect many thousands of acres, with individual areas of impact hundreds of acres in size. Insect and wind events in northern Maine also lead to significant openings 100's of acres in size.

### Land Type Associations

The White Mountain Subsection is divided into 4 Land-type Associations (LTAs): Valley Bottoms, Mountain Slopes, Upper Mountain Slopes, and Mountaintops. Land Type Associations are broad categories of land capability that reflect differences in geomorphology, elevation, and climax forest composition.

Ecological communities on the WMNF can be divided into eight broad groupings for discussion of management at a landscape-scale: softwood, mixed wood, northern hardwood, aspen-birch, oak-pine, hemlock, permanent openings, and alpine. These habitat types reflect the vegetation

that currently dominates an area. Their distribution is the result of land capability and past management practices. The differences between softwood, mixed wood, and northern hardwood habitats are not always distinct. Most softwood habitats have a small component of hardwood species and most northern hardwood habitats have a small softwood component. Northern hardwood habitat is comprised almost entirely of hardwood species, with little softwood component. The mixed wood habitat is intended to be predominantly northern hardwood forest with a substantial softwood component. Once a stand is comprised primarily of softwood species, it is considered softwood habitat regardless of the hardwood component.

Mountaintop LTA (approx. 183,000 acres) is primarily a balsam fir (softwood) forest at elevations generally above 2900 feet with ridges that reach into lower slope positions. It currently includes the alpine zone. Upper Mountain Slopes (approx. 161,000 acres) occur between about 2500 and 2900 feet in elevation. They are primarily softwood forest, dominated by red spruce, balsam fir and paper birch on steep, bouldery land. Mountain Slopes (approx. 270,000 acres) are northern hardwood and mixedwood forest on deep soils in elevations from approximately 1000 to 2500 feet. Valley Bottoms (approx. 155,000 acres) are typically softwood and mixedwood forest, consisting of red spruce, balsam fir, hemlock, and mixed hardwood-hemlock or hardwood-spruce-fir below 1000 feet. At the higher elevations, paper birch is a common succession species, while at the lower elevations paper birch and aspen both play this role. The four land type associations occur in these general elevation zones throughout all parts of the White Mountain National Forest.

Each of the four land type associations is comprised of a unique set of ecological land types (ELTs). An ELT ranges in size from a few hundred to a few thousand acres on unique soil materials with well-known succession patterns. The basis for classification is a combination of climax forest association, geomorphic history, and nature of the soil substrata. For example, a rich northern hardwood forest of sugar maple, beech and white ash on basal till soil is a common ecological land type found in the Mountain Slope land type association.

The WMNF is also categorized by a series of Management Areas, which are groupings of land with similar management goals. For the purposes of this analysis, Management Areas were grouped according to how actively vegetation can be managed. Management Areas 2.1, 3.1, 7.1, 9.2, 9.4, and 2.1a from the original 1986 Forest Plan were combined into one group and Management Areas 5.1, 6.1, 6.2, 6.3, 8.1, 9.1, and 9.3 into another. During Forest Plan revision, the amount of land in some MAs will vary by Alternative.

It is possible to summarize the occurrence of the four-land type association by these two groups to obtain a sense of the disposition of all our lands in a broad ecological sense. Table 1 displays the summary.

*Table 1*. Summary of Land Type Associations and Management Areas

| Broad Community | Totals Acres | Acres in 5.1,6.1, 6.2,6.3,8.1,9.1,9.3 | Acres in 2.1,3.1,7.1, 9.2, 9.4, 2.1a |
|---|---|---|---|
| Mountaintop/Alpine | 182,913 | 174,000 | 8913 |
| Upper Mountain | 160,868 | 123,500 | 37,368 |
| Mountain | 270,271 | 74,000 | 196,271 |

| | | | |
|---|---|---|---|
| Valley | 154,903 | 33,000 | 121,903 |
| Total Acres | 768,955 | 404,500 | 364,455 |

Note: numbers are not as precise as they appear and should be rounded for public distribution

As shown in Table 1, about 95% of the Mountaintop and 77% Upper Mountain Slope LTA's have no active vegetation management. These are lands that are primarily used for non-motorized dispersed recreation. In comparison, about 78% of the Mountain Slope and 79% of the Valley Bottom LTA's do have active vegetation management, in addition to motorized and non-motorized recreation use. Overall, about 53% of the White Mountain National Forest is in lands without active vegetation management, and 47% allows active vegetation management.

Valley Bottom Land Type Association

This land type association tends over time to become mainly softwood forest, including spruce, fir and hemlock. The natural disturbance pattern is mainly caused by wind, and includes a combination of stand-damaging events (i.e. broken tops, small areas of blow-down) and stand-replacing events (all trees blown down in a large enough area to be recognized as a "stand" with a new regenerating forest). Based on data for the Northeast, it is estimated that stand-replacing natural disturbance might place 3% to 6% of the landscape in this LTA in seedling or sapling conditions. It is likely that the WMNF is on the low end of this range. Experience indicates many disturbances are small, frequent, and most common on shallow or poorly drained soils. Some mid- to large-size disturbances do occur, but they are much less frequent.

This land type association is in a landscape position where it has been heavily "managed" for a variety of uses including agriculture, grazing, forestry, homesteading and recreation. Therefore, its current forest composition is least reflective of its true land capability; i.e. there are fewer softwood dominated stands than what could be achieved based on land capability alone.

There are 155,000 acres of Valley LTA across all management areas on the Forest. Of these, there are approximately 123,800 acres, or 80%, in management areas with active vegetation management. Table 2 shows the current distribution of forest types for this LTA within the active vegetation management lands. In these management areas, about 1% is the 0-9 year old age class as a result of even-aged harvest—this does not include group cuts from uneven-age harvest. Less than 1% is in permanent wildlife openings. Table 3 shows the composition of the remaining 33,000 acres of Valley Bottom LTA found in wilderness, scenic areas, research natural areas, and semi-primitive recreation areas.

*Table 2*. Current habitats in MAs 2.1, 3.1, 7.1, 9.2, 9.4, and 2.1a in the Valley Bottom LTA.

| **Forest type group** | **Acres** |
|---|---|
| Spruce-fir (forest type 11-19) | 19,000 |
| Mixed wood (forest type 87) | 31,500 |
| Hardwoods (forest type 71-89, except 87) | 48,800 |
| Aspen/paper birch (forest type 90-96) | 5,200 |
| Hemlock (forest type 5) | 4,800 |
| Oak/pine (forest type 2, 3, 41, 49, 55) | 2,800 |
| Permanent openings (forest type 99, veg | 1,100 |

| | |
|---|---|
| type 50-56) | |
| Total | 113,200[1] |

[1] Sum acres is <123,800 probably because of GIS analysis

*Table 3*. Current habitats in MAs 5.1, 6.1, 6.2, 6.3, 8.1 and 9.3 in the Valley Bottom LTA

| **Forest type group** | **Acres** |
|---|---|
| Spruce-fir (forest type 11-19) | 9,000 |
| Mixed wood (forest type 87) | 7,600 |
| Hardwoods (forest type 71-89, except 87) | 12,600 |
| Aspen/paper birch (forest type 90-96) | 2,900 |
| Hemlock (forest type 5) | 300 |
| Oak/pine (forest type 2, 3, 41, 49, 55) | 200 |
| Permanent openings (forest type 99, veg type 50-56) | 1,200 |
| Other Openings | 1,700 |
| Total | 35,500[1] |

[1] Sum acres is >33,000 probably because of GIS analysis.
Note: numbers have been rounded to nearest hundred

While it is important to see the "whole picture" in the entire Valley Bottom LTA, the separation was made in the Tables 2 and 3 to expedite an understanding of the opportunity for change in the lands actively managed for vegetation. The other lands will change naturally over time to mainly a softwood forest or mixedwood forest.

Ecological land types in this LTA can be categorized by how likely they are to naturally become softwoods. Of the 123,500 acres in MAs with active vegetation management, approximately 80% (98,300 acres) could become mainly softwood forest if allowed to develop naturally for many decades. This is based on the strength of the softwood tendency of particular ecological land types that exist within the Valley Bottom LTA. About 60,000 acres are currently softwood forest. This means there is an opportunity to move about 38,000 acres toward predominantly softwood conditions. Alternately we could manage a portion of the 38,000 acres not currently softwood forest for aspen-birch or opening habitat.

Approximately 17% (21,700 acres) of this LTA has a weaker softwood tendency that most likely will lead to substantial, but lower and varying, proportions of softwood. It is noteworthy that even a few softwoods in an otherwise hardwood forest yield a large gain in songbird diversity.

The remaining acres in the LTA (about 3%) are hardwood tendency lands that occur as islands or in-holdings in the matrix of softwood tendency lands. These lands are, and naturally would be, hardwood forest. In addition, there are naturally occurring and disturbance caused oak-pine and hemlock stands in this LTA that are a small, but important component. In the same vein, there is a scattering of individual oak, pine and hemlock on certain ecological land types that do not constitute a "stand", but are nonetheless an important part of the forests diversity.

In the lands without active vegetation management, there still remain lands not in softwood, or mixedwood, forest, but we need to remember that (a) return of softwood can be slow after intensive harvest in the late 1800's and early 1900's and (b) stand typing intensity may be low on these lands. No judgment is made here about the merits of hardwoods vs. softwoods or succession species; this is only a perspective of what grows where, and why.

Mountain Slope Land Type Association

This land type association tends over time to become mainly northern hardwood forest, including sugar maple, beech and yellow birch. The disturbance pattern is mainly caused by wind, and includes a combination of stand-damaging events (i.e. broken tops, small areas of blow-down) and stand replacing events (all trees blown down in a large enough area to be recognized as a "stand" with a new regenerating forest). Northern hardwood forest is considered a "gap-phase" dynamic community. This means that most disturbances over time lead to small openings in the forest canopy, or gaps, that are re-invaded by succession species such as paper birch, yellow birch, or aspen. Even in the 1938 hurricane, for example, only 10% of the hardwood forest at Bartlett Experimental Forest was damaged, and most of this was not stand replacing. The same degree of damage occurred in the 1998 ice storm. Therefore this LTA is the least likely to endure large catastrophic natural disturbances, although such disturbances do occur. By some estimates for the Northeast, 1% to 3% of the northern hardwood forest may be in the 0-15 year-old seedling or sapling stages at any one time as a result of natural disturbance.

The tendency toward hardwood forest of various kinds is very strong in most of this LTA, the exception being that there are areas of northern hardwood-spruce and small islands of spruce-fir-hemlock on ridges and knolls. While this part of the landscape has been harvested since the late 1800's, the assemblage of forest species is not as confused as seen in the Valley Land Type Association, and is more reflective of land capability. Ultimately, soil mineralogy will refine hardwood tendency in this LTA, resulting in the greatest occurrence of calcium-demanding sugar maple in the northwest part of the Forest, and the least in the southeast.

There are 270,000 acres of Mountain Slope LTA across all management areas on the Forest. Of these approximately 196,000 acres, or 73%, occur in management areas with active vegetation management.

Table 4 shows the current distribution of forest types within the active vegetation management lands. In this LTA, less than 1% is permanent forest openings, and roughly 2% is in the 0-9 year old age class as a result of even-aged management. Table 5 shows the current composition of the roughly 75,000 acres of this LTA found in other management areas.

*Table 4*. Current habitats within MAs 2.1, 3.1, 7.1, 9.2, and 2.1a in the Mountain Slope LTA

| **Forest type group** | **Acres** |
|---|---|
| Spruce-fir (forest type 11-19) | 10,100 |
| Mixed wood (forest type 87) | 29,600 |
| Hardwoods (forest type 71-89, except 87) | 128,600 |
| Aspen/paper birch (forest type 90-96) | 7,600 |
| Hemlock (forest type 5) | 3,700 |
| Oak/pine (forest type 2, 3, 41, 49, 55) | 3,200 |
| Permanent openings (forest type 99, veg type 50-56) | 1,000 |
| Total | 183,800 |

Note: numbers have been rounded to nearest hundred

*Table 5*. Current habitats within MAs 5.1, 6.1, 6.2, 6.3, 8.1 and 9.3 in the Mountain Slope LTA

| **Forest type group** | **Acres** |
|---|---|
| Spruce-fir (forest type 11-19) | 8,500 |
| Mixed wood (forest type 87) | 10,800 |
| Hardwoods (forest type 71-89, except 87) | 47,300 |
| Aspen/paper birch (forest type 90-96) | 6,500 |
| Hemlock (forest type 5) | 400 |
| Oak/pine (forest type 2, 3, 41, 49, 55) | 1,100 |
| Permanent openings (forest type 99, veg type 50-56) | 600 |
| Other Openings | 100 |
| Total | 75,300 |

Note: numbers have been rounded to nearest hundred

The preponderance of northern hardwood forest in both categories of management areas is consistent with land capability. Analysis of land capability based on ecological land types indicates that 90% of the Mountain Slope LTA is strong hardwood sites, about 8% is mixed wood, and the remaining 2% is strong softwood sites. Other forest types (aspen-birch and permanent openings) account for most of the disparity between current condition and land capability. As in the Valley Bottom LTA, there are naturally occurring and disturbance caused oak-pine and hemlock stands in this LTA that are a small, but important component. There also is a scattering of individual oak, pine and hemlock trees on certain ecological land types that are an important part of the Forest's diversity.

In MAs with active vegetation management (Table 4), the Mountain Slope LTA is about 65% northern hardwood forest compared to nearly 90% indicated by land capability alone. In general, even in the absence of harvesting, areas of aspen and paper birch and spruce-fir islands would be part of the forest composition in this LTA, so 90% northern hardwood would never be achieved. Variable typing of the mixedwood forest type during stand exams could explain additional deviation from land capability. Some stands typed as mixedwood may be almost entirely hardwood forest with just one or two softwood trees per acre. While these conditions are

valuable to some species, areas identified as mixedwood habitat should be roughly 25-49% softwood species.

Upper Mountain and Mountaintop Land Type Associations
These two LTA's are the remainder of the Forest. Both are dominated by softwood forest. They are a distinct part of the landscape well known by all users of the Forest. In the Upper Mountain LTA the softwood forest is a combination of red spruce and balsam fir. Here, hardwood forest of any type other than paper birch is unable to survive, and species such as hemlock and white pine do not occur in the softwood composition. Wind and previous land use have left their mark, with paper birch and heart-leaved birch being evident at some locations. The size of openings from wind events is larger that the hardwood forest immediately down-slope, and is believed by some to also be larger than softwoods in the Valley Bottom LTA. Further upslope, the Mountaintop LTA turns mostly to balsam fir, with black and red spruce in places. Here, wind events can also be significant, and paper and heart-leaved birch may occur. Similar to Upper Mountain Slopes, stand-damaging events can be relatively large. While these softwood forests may be similar in composition to portions of the Valley Bottom LTA, wildlife communities would be significantly different, so at least from this perspective, they should be considered as different communities. Most of these LTA's have not been affected by harvest activity, and current composition and land capability are essentially one and the same.

**Proposed Management Approach**

Broad Resource Objectives
In developing our ecological desired future condition (below), biologists, silviculturists, and the soil scientist met repeatedly to discuss our objectives for the Forest:

- Use sustainable ecosystem management practices to provide a diversity of habitats across the landscape, including various age classes, forest types, and non-forested habitats
- Gradually move forest composition toward land capability, as determined by ecological land types
- Provide high quality hardwood, mixed wood, and softwood sawtimber and other timber products on a sustained yield basis
- Maintain high quality mature and old forest habitats on a majority of the Forest
- Provide open and young forest habitats at a slightly higher than natural level to sustain biological diversity and support species that prefer those habitats
- Maintain the health and integrity of all habitats by protecting and enhancing within stand habitat features and processes, such as minor tree species, vegetative layers, dead wood, and nutrient cycling

Other resource areas, such as visuals, recreation, and riparian, were considered during development of the desired future condition.

Desired Future Condition
The Forest will continue to provide a combination of the hardwood, mixedwood, and softwood forest habitats that naturally occur on the WMNF. In the long-term, quantity and distribution of

these habitats will be determined primarily based on land capability, as indicated by ecological land types. All three broad habitat types will be scattered across the Forest, although a majority of the mixedwood habitat naturally occurs in the eastern portion of the Forest. Hardwood and mixedwood habitats will occur primarily in the Mountain Slope LTA. Softwoods will dominate the Valley Bottom, Upper Mountain Slope, and Mountaintop LTAs, except in the alpine zone. The change from northern hardwood and mixedwood habitat to softwood habitat at the low elevations, where current condition is farthest from land capability, will take a long time because hardwood forests are long-lived and softwood forest habitat is slow to develop. Active management can accelerate this process, but it will take many decades even with management.

Oak, pine, and hemlock-dominated habitats will continue to be limited in quantity and distribution. The majority of these habitats occur in the eastern and southern parts of the Forest. In MA 2.1, management will maintain stands dominated by these species where they currently occur, regardless of land capability. These species also will be components in hardwood, mixedwood, and softwood stands dominated by other species. Management will retain a component of these species within stands where they currently occur.

Aspen and birch-dominated habitat also will be maintained at about the current level, distributed across the Forest as it is now. Aspen and paper birch also will be components of hardwood, mixedwood, and softwood stands. Management will retain these species within stands where they currently occur, and enhance their presence in these stands where feasible and appropriate, given other resource objectives.

Within every type of forest habitat, there are species that occur in the canopy and understory in limited amounts, such as red maple and yellow birch. Management will retain minor species in stands where they currently occur and enhance their presence in these stands where feasible and appropriate.

Non-forested habitats (upland openings, wetlands, lakes, cliffs, etc) will primarily occur where they form naturally. Upland openings may be created on a limited basis where they are currently lacking from the landscape or where an opportunity for high quality habitat is present. Existing upland openings will be maintained on less than 0.5% of the Forest, almost entirely within MA 2.1. Openings will be prioritized for maintenance based on habitat parameters such as vegetative composition, size, and topography.

A significant portion of the Forest will provide mature and old forest habitat for the long-term. All the land in MAs 5.1, 6.x, 8.x, and 9.1, which is more than 50% of the Forest, will continue to mature with time. In addition, a majority of the land in MA 2.1 will be in the mature and old age classes at any given time. This will include areas without active vegetation management, those that are managed through uneven-aged techniques, and areas in the late stages of even-aged management. As a result, high quality mature and old forest habitats will be abundant and well distributed across the Forest.

Regenerating forest habitat will continue to result from natural disturbance, even-aged management, and group selection harvest. Regenerating forest habitat resulting from management will be scattered across MA 2.1. How much of this habitat will be created, and

whether it will result from even-aged management or group selection harvest, will vary by alternative. One alternative, used here as an example because it is not at either end of the spectrum, would have regeneration forest from even-aged management on about 9,000 acres at any one time, which equates to about 1% of the whole Forest and less than 3% of the MA. This management objective will require an average of about 1,000 acres of regeneration harvest per year. Other alternatives will be both higher and lower than this. Regeneration harvest will occur primarily on northern hardwood capable lands, with only minimal amounts in mixed wood and softwood habitats. The portion of regeneration harvest intended to create or maintain aspen/birch habitat will vary by alternative. In the alternative described here, just over 25% of the regeneration harvest will be planned to create or maintain aspen/birch habitat; most of this will be on softwood capable lands.

Difference from current condition

Using land capability to determine composition objectives will result in reductions in hardwood and mixedwood forest, and an increase in softwood forest in the long-term compared to the current condition. Across the Forest, these changes will not be dramatic, as many of the non-MA 2.1 lands are currently softwood forest. However in MA 2.1, the amount of predominantly softwood habitat would increase substantially in the long-term, with much of it coming from current mixed wood habitat. This conversion would be gradual, occurring as natural development and uneven-aged management result in increased softwood proportions in stands on lands with softwood tendencies.

The objective for regenerating forest habitat will change among alternatives. The level proposed here is about half of that in the current Forest Plan, and about three times what is currently being implemented annually.

Reasoning for proposed DFC

A Species Viability Evaluation for Forest Plan revision indicates that in the reasonably near future, the kind and intensity of harvest used on the Forest, including no harvest, will not result in a loss of viability for any species. This analysis included consideration of the range of wildlife species, and an understanding of changing land use patterns surrounding the Forest. This suggests we have considerable freedom in devising a harvest program to meet timber, wildlife and social needs or desires.

At a landscape level, our goal is ecological sustainability. One way to achieve this goal that is accepted by much of the public is to manage toward pre-settlement conditions. Reaching actual pre-settlement conditions may be impossible due to environmental factors, such as atmospheric deposition, and species extinctions. However much of the scientific community believes that forests are "shifting mosaics" in which incremental changes in environmental factors, such as increased acid deposition and loss of species, prevent attainment of past conditions. A review of pond cores across the Forest makes it clear that over time there have been substantial natural shifts in species composition, including non-forest, on the White Mountain National Forest landscape. In addition, conditions surrounding the forest are continually changing naturally and as a result of human presence. Managing for pre-settlement conditions in a world where settlement continues expanding and altering ecological conditions probably is not realistic.

Therefore our long-term objective is to manage for current, not past, ecological land capability, as indicated by ecological land types. In other words, doing what the land tells us would happen ecologically in the current climate if systems were allowed to develop on their own over time. This approach has a common sense aspect, so people can understand it. In addition, many hardwood species tend to be mediocre in size and quality where they occur on softwood tendency sites. Some evidence suggests the defect may be greater. This has implications for product quality and value. Larger sized softwoods may be grown on softwood tendency sites, leading to a potential source of large dens for wildlife and high quality softwood sawtimber. Promoting some softwoods, especially hemlock, in more areas may lead to conservation of soil calcium, as scientists are starting to believe hemlock is a "calcium pumping species" that provides calcium for species such as sugar maple that may intermittently occur on a site.

There are caveats to using land capability (also known as potential natural vegetation) in our proposal. Oak, pine, and hemlock stands are uncommon on the Forest and are important ecologically as separate habitat types and components of other habitats. Their presence on the landscape increases our ecological and biological diversity. Therefore we propose to maintain stands comprised primarily of these species many places where they occur and components of these species where they are within-stand habitat features, even if that is counter to land capability.

Aspen/birch habitat is important to a number of wildlife species, and is visually desirable in some locations. Paper birch can be a desirable timber species as well. These species are "opportunists" that will take advantage of conditions that favor their regeneration and growth. As a result, lands are not identified as tending toward aspen/birch habitat. Stands dominated by aspen or birch are most common on softwood capable lands, but also occur elsewhere. This habitat would not be abundant on the Forest naturally. Therefore the objective for stands dominated by aspen or birch is low, essentially retaining the current level. Managing to retain these species in stands where they are minor components helps maintain biological diversity at the stand level.

Minor tree species are often important to wildlife species due to their unique structural aspects or mast production. In addition, maintaining minor species is important in protecting the health and integrity of the forest community.

Like aspen/birch habitat, permanent upland openings would not be abundant on the Forest naturally. Therefore the proposed management objective for this habitat is minimal. The Forest should not be providing habitat for grassland species, which do not and should not occur on the Forest. However small patches of this habitat provide an important habitat component for many species, making them desirable in managing for biological diversity.

Most of the wildlife species on the WMNF need more than one forest age-class to meet their life requirements. Many use both mature and regenerating forest, or even mature forest and permanent openings. A few birds require permanent openings or the earliest stages of regenerating forest to meet most of their needs. There are no vertebrate animals or vascular plants in this area that are old growth forest obligates. There are a few invertebrate animals, non-vascular plants, and lichens that may require old growth conditions, but more information is

needed to determine if these species are old growth obligates. Most plant species do well either in mature or regenerating forest, not both. The WMNF has species that need each of these habitats, and others that rely on upland or wet openings. Therefore, maintaining ecological sustainability requires that we provide a mix of habitats across the landscape.

Historically almost the entire forest, aside from alpine, subalpine, and wetland or aquatic habitats, was in a mature or old forest condition. Given the amount of time required for mature and old forest habitat to develop, it is much easier to create open and young forest habitat than mature and old forest habitat. Therefore a majority of the Forest should remain in mature and old forest habitat to provide for dependent species now and in the future.

A number of the species dependent on openings and regenerating forest habitats have experienced substantial population declines in recent decades due to the reforestation of farmland, changes in harvest practices, and loss of forest and farmland to development. Although viability is not a concern for these species in this planning cycle, the Forest should provide suitable habitat for these species at a level that will soften the effects of habitat loss on surrounding lands and ensure that viability on the Forest will not become a concern in the foreseeable future. All experts questioned agree that the Forest could provide even more young forest habitat than is proposed in the current Forest Plan while maintaining ecological sustainability of mature and old forest habitats on the landscape. By contrast, a segment of the public is strongly opposed to regeneration harvest on the Forest. The level of regeneration harvest used as an example in the DFC above is a compromise between the preferred level for habitat (the current Plan) and the amount of regeneration harvest we currently accomplish (about 300 acres/year). Natural disturbance will provide small amounts of this habitat across the Forest, mostly in small, scattered patches. As the forest ages, the natural disturbance regime will return to normal. The proposed level of harvest would not result in a substantial change from the natural range of variability and would help provide the mix of habitats needed by so many species.

Our proposal for where to focus regeneration harvest (primarily in hardwood forest) varies from the natural disturbance regime, which indicates that most stand-replacing natural disturbance occurs in LTAs with strong softwood tendencies. Regenerating spruce-fir stands provide an important habitat for some species, such as lynx, that is not available much on the Forest. However on many softwood tendency ELTs, even-aged management of softwoods, without intensive pre-commercial treatments, results in an increased component of hardwood species or near conversion of the stand to northern hardwood, mixedwood, or aspen-birch habitat. Similarly, mixedwood habitat is often moved toward hardwood habitat through even-aged management. These changes are counter-productive to our objective to manage the land based on ecological land type, which would increase softwood habitat. Therefore regeneration harvest would occur primarily in northern hardwood forest habitat. The exceptions will be on ELTs where regeneration harvest is likely to retain or enhance the existing softwood component or in places where the desire is to create aspen/birch habitat. In these places, and where natural disturbance occurs, softwood and mixedwood habitats will be regenerated to provide for associated species.

**Where do HMUs fit in?**

HMUs are simply a tool for biologists and others to use in project planning and analysis to help move us toward the desired future condition described above. There are three key benefits to HMUs. They:

1. Help prioritize habitat needs in a local area, which facilitates project planning,
2. Answer the questions "why here" and "why now" for harvest activities, and
3. Provide a reasonable cumulative effects area for most species with habitat objectives appropriate to the area, which improves our project analysis and habitat management.

Through Forest Plan Revision, we intend to improve and simplify the HMU process as much as possible. We will:

- o enlarge the Habitat Management Units
  - provides a broader area in which to evaluate the landscape-level effects of projects
  - each vegetation management project should occur entirely within one unit
  - makes analysis cleaner and easier
- o establish a process for developing HMU objectives that are appropriate to local conditions
  - addresses local concerns
  - prevents attempts to force stands to be something they are not ecologically capable of
  - simplifies project-level analysis
- o combine aspen and paper birch habitats
  - reduces number of habitats to be analyzed
  - eliminates need to distinguish benefits of each when differences are questionable
- o drop age-class objectives by even and uneven-aged management
  - reduces amount of analysis to determine management needs and to assess project impacts
  - makes process less complex and, hopefully, easier to understand
- o exchange the overmature (extended rotation) age class for a long-term old forest age class
  - results in an age class that will eventually provide unique habitat conditions
  - acknowledges long-term habitat value associated with unsuitable timber lands in MA 2.1
- o separate current northern hardwoods into northern hardwood and northern hardwood-spruce fir (mixedwood) communities
  - presents a clearer picture of the Forests habitat diversity
  - helps focus management to gradually move some mixedwood stands toward softwood habitat

Even with these simplifications, the details of the HMU process can be confusing to anyone who does not use it regularly. The process guides habitat management at the landscape and local scales. The number of wildlife species, vegetative communities, and ecological processes that need to be considered makes management at this scale necessarily complicated. Most people, on and off the Forest, do not need to understand all the details. They need to understand the basic ecology of the area, the current condition, and the desired future ecological condition for the Forest, all of which have been described in this document. The details of the HMU process simply provide a tool for biologists and silviculturists to use in project planning and analysis to evaluate possible ways to move from the current condition toward the desired future condition.

Other options considered during Forest Plan revision

Most, if not all, National Forests have the same stated goals of providing a variety of wildlife habitat. However, they may work towards those goals using methods other than HMUs. One common approach is to use a variety of Management Areas, each with different timber and habitat objectives, to provide a mix of habitat types across the landscape. This approach works on these Forests because they have multiple LTAs, each with very specific habitat capabilities, where active vegetation management can occur. On the WMNF, we have essentially two LTAs in the MAs in which active vegetation management can occur. Some of the habitats important to maintaining our biological diversity, such as aspen-birch and oak-pine, are not associated with their own LTA. Managing with an LTA-specific approach would not facilitate distribution of habitats across the landscape or address the differences in communities within an LTA. Standards and guidelines such as those used in the HMU approach would still be necessary. Alternately, we would need to create small pockets of many MAs wherever oak-pine, hemlock, or aspen-birch habitats occur to address their management. This would be cumbersome at best.

Alternatively, having just one MA with MA-wide objectives and no HMUs would require a large number of standards and guidelines to provide some consistency in habitat management. In addition, project analysis would be more intensive to adequately explain the need for each treatment at that time and place. Cumulative effects analysis would still require landscape-scale analysis of composition and age classes, so the work associated with developing HMU objectives would still be done, just in a slightly different way and as part of project-level NEPA. This approach would risk reduced consistency and place a greater burden on individual biologists to adequately describe the rationale for each proposed activity without the HMU framework as a basis.

In short, other approaches could be used to accomplish our habitat objectives. However, each would require equally complex standards and guidelines or other direction, and they would shift more of the work to the project level. HMUs require an intermediate level of planning (developing HMU objectives), but with guidance to make it relatively easy, and it needs to only be done once and can then be used for multiple projects. The biologists and silviculturists of the Forest believe the HMU approach is the best choice in the long-term for producing quality projects to meet our habitat objectives.

| STAND_ID | YEAR_OF_ORIGIN | FOREST_TYPE | LSC | ELTCODE | VEGETATION_TYPE | HMACODE | GIS_ACRES | HABITAT | PNV | AGE_CLASS | HMU_Name | Join1 | TOTAL_BA | EVEN_UNEVEN | OPPORTUNITY_AREA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09220400018007 | 1891 | 81 | 810 | 415g | 0 | 8.3 | 0.016789115 | hardwood | hardwood | mature | Lake Tarleton | 092204001550118.3415g | | | |
| 09220400018008 | 1894 | 81 | 810 | 102c | 0 | 8.3 | 0.078152432 | hardwood | hardwood | mature | Lake Tarleton | 092204001550128.3102c | | | |
| 09220400018008 | 1894 | 81 | 810 | 115a | 0 | 8.3 | 8.657614078 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550128.3115a | | | |
| 09220400018023 | 1894 | 81 | 810 | 115c | 0 | 8.3 | 15.4643403 | hardwood | hardwood | mature | Lake Tarleton | 092204001550128.3115c | | | |
| 09220400018023 | 1894 | 81 | 810 | 115g | 0 | 8.3 | 0.520618108 | hardwood | hardwood | mature | Lake Tarleton | 092204001550128.3115g | | | |
| 09220400018033 | 1894 | 81 | 810 | 405d | 0 | 8.3 | 0.548213903 | hardwood | mixedwood | mature | Lake Tarleton | 092204001550128.3405d | | | |
| 09220400019017 | 1915 | 81 | 810 | 102c | 0 | 8.3 | 2.515667941 | hardwood | hardwood | mature | Lake Tarleton | 092204001550138.3102c | | | |
| 09220400019017 | 1915 | 81 | 810 | 115c | 0 | 8.3 | 10.37784042 | hardwood | hardwood | mature | Lake Tarleton | 092204001550138.3115c | | | |
| 09220400019020 | 1915 | 81 | 810 | 415g | 0 | 8.3 | 4.375977246 | hardwood | hardwood | mature | Lake Tarleton | 092204001550138.3415g | | | |
| 09220400019024 | 1909 | 89 | 500 | 102c | 0 | 8.3 | 1.847271342 | hardwood | hardwood | mature | Lake Tarleton | 092204001550148.3102c | | | |
| 09220400019025 | 1909 | 89 | 500 | 415g | 0 | 8.3 | 25.11395112 | hardwood | hardwood | mature | Lake Tarleton | 092204001550148.3415g | | | |
| 09220400019025 | 1898 | 81 | 500 | 102c | 0 | 8.3 | 0.720612087 | hardwood | hardwood | mature | Lake Tarleton | 092204001550158.3102c | | | |
| 09220400019025 | 1898 | 81 | 500 | 415g | 0 | 8.3 | 5.636092709 | hardwood | hardwood | mature | Lake Tarleton | 092204001550158.3415g | | | |
| 09220400020019 | 1889 | 81 | 720 | 102c | 0 | 8.3 | 0.139073656 | hardwood | hardwood | mature | Lake Tarleton | 092204001550168.3102c | | | |
| 09220400020019 | 1889 | 81 | 720 | 415g | 0 | 8.3 | 12.03135883 | hardwood | hardwood | mature | Lake Tarleton | 092204001550168.3415g | | | |
| 09220400020024 | 1927 | 81 | 500 | 415g | 0 | 8.3 | 7.152784506 | hardwood | hardwood | mature | Lake Tarleton | 092204001550178.3415g | | | |
| 09220400020024 | 1941 | 81 | 500 | 415g | 0 | 8.3 | 10.07280485 | hardwood | hardwood | mature | Lake Tarleton | 092204001550188.3415g | | | |
| 09220400020025 | 1909 | 81 | 500 | 415g | 0 | 8.3 | 13.21367067 | hardwood | hardwood | mature | Lake Tarleton | 092204001550198.3415g | | | |
| 09220400020025 | 1907 | 81 | 500 | 415g | 0 | 2.1 | 0.000623111 | hardwood | hardwood | mature | Lake Tarleton | 092204001550202.1415g | | | |
| 09220400021019 | 1907 | 81 | 500 | 415g | 0 | 8.3 | 11.34637217 | hardwood | hardwood | mature | Lake Tarleton | 092204001550208.3415g | | | |
| 09220400021019 | 1890 | 81 | 500 | 115a | 0 | 8.3 | 2.909343886 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550218.3115a | | | |
| 09220400155001 | 1890 | 81 | 500 | 415g | 0 | 2.1 | 0.002789699 | hardwood | hardwood | mature | Lake Tarleton | 092204001550212.1415g | | | |
| 09220400155001 | 1890 | 81 | 500 | 415g | 0 | 8.3 | 28.07676686 | hardwood | hardwood | mature | Lake Tarleton | 092204001550218.3415g | | | |
| 09220400155001 | 1894 | 89 | 500 | 115a | 0 | 2.1 | 5.003768949 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550222.1115a | | | |
| 09220400155001 | 1894 | 89 | 500 | 415g | 0 | 2.1 | 16.87875083 | hardwood | hardwood | mature | Lake Tarleton | 092204001550222.1415g | | | |
| 09220400155001 | 1894 | 89 | 500 | 415g | 0 | 8.3 | 5.12552E-05 | hardwood | hardwood | mature | Lake Tarleton | 092204001550228.3415g | | | |
| 09220400155002 | 1928 | 81 | 500 | 102c | 0 | 8.3 | 13.95127302 | hardwood | hardwood | mature | Lake Tarleton | 092204001550238.3102c | | | |
| 09220400155002 | 1928 | 81 | 500 | 115a | 0 | 8.3 | 4.678387561 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550238.3115a | | | |
| 09220400155002 | 1928 | 81 | 500 | 415g | 0 | 8.3 | 17.79658401 | hardwood | hardwood | mature | Lake Tarleton | 092204001550238.3415g | | | |
| 09220400155002 | 1927 | 81 | 0 | 102c | 0 | 8.3 | 0.016113764 | hardwood | hardwood | mature | Lake Tarleton | 092204001550248.3102c | | | |
| 09220400155002 | 1927 | 81 | 0 | 415g | 0 | 8.3 | 10.53444932 | hardwood | hardwood | mature | Lake Tarleton | 092204001550248.3415g | | | |
| 09220400155003 | 1894 | 96 | 500 | 415g | 0 | 2.1 | 10.04432084 | aspen-birch | hardwood | mature | Lake Tarleton | 092204001550252.1415g | | | |
| 09220400155003 | 1894 | 96 | 500 | 415g | 0 | 8.3 | 0.005496304 | aspen-birch | hardwood | mature | Lake Tarleton | 092204001550258.3415g | | | |
| 09220400155003 | 1886 | 55 | 720 | 102c | 0 | 6.1 | 49.63210488 | oak-pine | hardwood | mature | Lake Tarleton | 092204001550266.1102c | | | |
| 09220400155004 | 1886 | 55 | 720 | 102c | 0 | 8.3 | 0.080350384 | oak-pine | hardwood | mature | Lake Tarleton | 092204001550268.3102c | | | |
| 09220400155004 | 1886 | 55 | 720 | 115a | 0 | 6.1 | 0.624250121 | oak-pine | strong spruce-fir | mature | Lake Tarleton | 092204001550266.1115a | | | |
| 09220400155004 | 1886 | 55 | 720 | 115c | 0 | 6.1 | 10.17352041 | oak-pine | hardwood | mature | Lake Tarleton | 092204001550266.1115c | | | |
| 09220400155004 | 1886 | 55 | 720 | 115c | 0 | 8.3 | 2.47622E-06 | oak-pine | hardwood | mature | Lake Tarleton | 092204001550268.3115c | | | |
| 09220400155005 | 1919 | 89 | 500 | 415g | 0 | 2.1 | 10.8368971 | hardwood | hardwood | mature | Lake Tarleton | 092204001550272.1415g | | | |
| 09220400155005 | 1909 | 89 | 500 | 115a | 0 | 2.1 | 0.302984737 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550282.1115a | | | |
| 09220400155006 | 1909 | 89 | 500 | 415g | 0 | 2.1 | 9.84641686 | hardwood | hardwood | mature | Lake Tarleton | 092204001550282.1415g | | | |
| 09220400155006 | 1928 | 81 | 720 | 102c | 0 | 8.3 | 15.60503976 | hardwood | hardwood | mature | Lake Tarleton | 092204001550298.3102c | | | |
| 09220400155007 | 1928 | 81 | 720 | 115a | 0 | 8.3 | 6.58208843 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550298.3115a | | | |
| 09220400155007 | 1928 | 81 | 720 | 115c | 0 | 8.3 | 2.148539889 | hardwood | hardwood | mature | Lake Tarleton | 092204001550298.3115c | | | |
| 09220400155008 | 1928 | 81 | 720 | 405 | 0 | 8.3 | 0.076482396 | hardwood | hardwood | mature | Lake Tarleton | 092204001550298.3405 | | | |
| 09220400155008 | 1928 | 81 | 720 | 415g | 0 | 8.3 | 0.455392264 | hardwood | hardwood | mature | Lake Tarleton | 092204001550298.3415g | | | |
| 09220400155009 | 1879 | 81 | 720 | 102c | 0 | 8.3 | 57.09853894 | hardwood | hardwood | mature | Lake Tarleton | 092204001550308.3102c | | | |
| 09220400155010 | 1906 | 81 | 720 | 102c | 0 | 8.3 | 15.64994015 | hardwood | hardwood | mature | Lake Tarleton | 092204001550318.3102c | | | |
| 09220400155010 | 1906 | 81 | 720 | 415g | 0 | 8.3 | 0.020178231 | hardwood | hardwood | mature | Lake Tarleton | 092204001550318.3415g | | | |
| 09220400155010 | 1925 | 81 | 810 | 102c | 0 | 8.3 | 26.14968953 | hardwood | hardwood | mature | Lake Tarleton | 092204001550328.3102c | | | |
| 09220400155011 | 1925 | 81 | 810 | 115c | 0 | 8.3 | 0.977398033 | hardwood | hardwood | mature | Lake Tarleton | 092204001550328.3115c | | | |
| 09220400155011 | 1891 | 87 | 720 | 102c | 0 | 6.1 | 0.007110243 | mixedwood | hardwood | mature | Lake Tarleton | 092204001550346.1102c | | | |
| 09220400155011 | 1891 | 87 | 720 | 102c | 0 | 8.3 | 28.79462703 | mixedwood | hardwood | mature | Lake Tarleton | 092204001550348.3102c | | | |
| 09220400155011 | 1891 | 87 | 720 | THETA2 | 0 | 8.3 | 8.663328922 | mixedwood | non-forest | mature | Lake Tarleton | 092204001550348.3THETA2 | | | |
| 09220400155011 | 0 | 99 | 200 | 115a | 50 | 8.3 | 1.867085715 | opening | strong spruce-fir | open | Lake Tarleton | 092204001550338.3115a | | | |
| 09220400155011 | 0 | 99 | 200 | 115a | 50 | inhold | 0.009577908 | opening | strong spruce-fir | open | Lake Tarleton | 09220400155033inhold115a | | | |
| 09220400155012 | 1930 | 81 | 720 | 115a | 0 | 2.1 | 9.555956962 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550352.1115a | | | |
| 09220400155012 | 1930 | 81 | 720 | 115a | 0 | 6.1 | 0.004224353 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550356.1115a | | | |
| 09220400155012 | 1930 | 81 | 720 | 115a | 0 | 8.3 | 0.02649365 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550358.3115a | | | |
| 09220400155012 | 1930 | 81 | 720 | 115c | 0 | 2.1 | 0.103924344 | hardwood | hardwood | mature | Lake Tarleton | 092204001550352.1115c | | | |
| 09220400155012 | 1930 | 81 | 720 | 115c | 0 | 6.1 | 0.004376608 | hardwood | hardwood | mature | Lake Tarleton | 092204001550356.1115c | | | |
| 09220400155013 | 1889 | 81 | 720 | 102c | 0 | 8.3 | 6.530899454 | hardwood | hardwood | mature | Lake Tarleton | 092204001550368.3102c | | | |
| 09220400155013 | 1889 | 81 | 720 | 415g | 0 | 8.3 | 0.748941222 | hardwood | hardwood | mature | Lake Tarleton | 092204001550368.3415g | | | |
| 09220400155013 | 1941 | 81 | 720 | 102c | 0 | 8.3 | 6.649366058 | hardwood | hardwood | mature | Lake Tarleton | 092204001550378.3102c | | | |
| 09220400155014 | 1941 | 81 | 720 | 415g | 0 | 8.3 | 0.513906034 | hardwood | hardwood | mature | Lake Tarleton | 092204001550378.3415g | | | |
| 09220400155014 | 1883 | 81 | 720 | 102c | 0 | 8.3 | 8.367362057 | hardwood | hardwood | mature | Lake Tarleton | 092204001550388.3102c | | | |
| 09220400155015 | 1883 | 81 | 720 | 415g | 0 | 8.3 | 8.330301464 | hardwood | hardwood | mature | Lake Tarleton | 092204001550388.3415g | | | |
| 09220400155015 | 1894 | 81 | 500 | 102c | 0 | 8.3 | 2.8472598 | hardwood | hardwood | mature | Lake Tarleton | 092204001550398.3102c | | | |
| 09220400155016 | 1894 | 81 | 500 | 415g | 0 | 8.3 | 5.197756342 | hardwood | hardwood | mature | Lake Tarleton | 092204001550398.3415g | | | |
| 09220400155016 | 1930 | 81 | 720 | 102c | 0 | 8.3 | 5.307348633 | hardwood | hardwood | mature | Lake Tarleton | 092204001550408.3102c | | | |
| 09220400155017 | 1930 | 81 | 720 | 115a | 0 | 8.3 | 4.136300777 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550408.3115a | | | |
| 09220400155018 | 1930 | 81 | 720 | 115c | 0 | 6.1 | 0.000130763 | hardwood | hardwood | mature | Lake Tarleton | 092204001550406.1115c | | | |
| 09220400155019 | 1930 | 81 | 720 | 115c | 0 | 8.3 | 3.974636802 | hardwood | hardwood | mature | Lake Tarleton | 092204001550408.3115c | | | |
| 09220400155020 | 1891 | 87 | 720 | 102c | 0 | 6.1 | 0.060674548 | mixedwood | hardwood | mature | Lake Tarleton | 092204001550416.1102c | | | |
| 09220400155020 | 1891 | 87 | 720 | 102c | 0 | 8.3 | 15.38570548 | mixedwood | hardwood | mature | Lake Tarleton | 092204001550418.3102c | | | |
| 09220400155021 | 1910 | 81 | 720 | 115a | 0 | 8.3 | 2.995134132 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550428.3115a | | | |
| 09220400155021 | 1894 | 81 | 0 | 415g | 0 | 2.1 | 0.004456539 | hardwood | hardwood | mature | Lake Tarleton | 092204001550432.1415g | | | |
| 09220400155021 | 1891 | 87 | 720 | THETA2 | 0 | 8.3 | 4.382127605 | mixedwood | non-forest | mature | Lake Tarleton | 092204001550418.3THETA2 | | | |
| 09220400155022 | 1894 | 81 | 0 | 415g | 0 | 8.3 | 9.72426971 | hardwood | hardwood | mature | Lake Tarleton | 092204001550438.3415g | | | |
| 09220400155022 | 1915 | 87 | 700 | 115a | 0 | 8.3 | 7.917419337 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204001550448.3115a | | | |
| 09220400155022 | 1928 | 20 | 165 | 115a | 0 | 2.1 | 6.803168579 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204001600012.1115a | | | |
| 09220400155023 | 1928 | 20 | 165 | 115a | 0 | 6.1 | 2.96747E-06 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204001600016.1115a | | | |
| 09220400155023 | 1928 | 20 | 165 | 115c | 0 | 2.1 | 0.0009308 | mixedwood | hardwood | mature | Lake Tarleton | 092204001600012.1115c | | | |
| 09220400155023 | 1928 | 20 | 165 | 115c | 0 | 6.1 | 0.019454706 | mixedwood | hardwood | mature | Lake Tarleton | 092204001600016.1115c | | | |
| 09220400155024 | 1953 | 20 | 500 | 115a | 0 | | 0.00030911 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 0922040016002115a | | | |
| 09220400155024 | 1953 | 20 | 500 | 115a | 0 | 2.1 | 9.381249365 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204001600022.1115a | | | |
| 09220400155025 | 1990 | 89 | 500 | 115a | 0 | 2.1 | 14.96729802 | hardwood | strong spruce-fir | young | Lake Tarleton | 092204001600032.1115a | | | |
| 09220400155025 | 1990 | 89 | 500 | 415g | 0 | 2.1 | 11.10904893 | hardwood | hardwood | young | Lake Tarleton | 092204001600032.1415g | | | |
| 09220400155026 | 1990 | 89 | 500 | 415g | 0 | 6.1 | 0.000610506 | hardwood | hardwood | young | Lake Tarleton | 092204001600036.1415g | | | |
| 09220400155026 | 1990 | 89 | 500 | 115a | 0 | 2.1 | 64.29260118 | hardwood | strong spruce-fir | young | Lake Tarleton | 092204001600042.1115a | | | |
| 09220400155026 | 1990 | 89 | 500 | 115a | 0 | 6.1 | 4.02403E-05 | hardwood | strong spruce-fir | young | Lake Tarleton | 092204001600046.1115a | | | |
| 09220400155026 | 1990 | 89 | 500 | 415g | 0 | 2.1 | 40.17233763 | hardwood | hardwood | young | Lake Tarleton | 092204001600042.1415g | | | |
| 09220400155026 | 1990 | 89 | 500 | 415g | 0 | 6.1 | 0.091315937 | hardwood | hardwood | young | Lake Tarleton | 092204001600046.1415g | | | |
| 09220400155027 | 1991 | 92 | 500 | 405 | 0 | 2.1 | 4.86845E-05 | aspen-birch | hardwood | young | Lake Tarleton | 092204000180072.1405 | | | |
| 09220400155028 | 1929 | 81 | 500 | 102c | 0 | 2.1 | 1.30855E-05 | hardwood | hardwood | mature | Lake Tarleton | 092204000180082.1102c | | | |
| 09220400155028 | 1929 | 81 | 500 | 102c | 0 | 6.1 | 0.000369441 | hardwood | hardwood | mature | Lake Tarleton | 092204000180086.1102c | | | |
| 09220400155029 | 1886 | 81 | 500 | 2d | 0 | 2.1 | 3.42294E-07 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204000180332.12d | | | |
| 09220400155029 | 1940 | 81 | 810 | 102c | 0 | 8.3 | 4.14123E-05 | hardwood | hardwood | mature | Lake Tarleton | 092204000190178.3102c | | | |
| 09220400155029 | 1940 | 81 | 810 | 405 | 0 | 8.3 | 8.63356E-05 | hardwood | hardwood | mature | Lake Tarleton | 092204000190178.3405 | | | |
| 09220400155029 | 1880 | 13 | 710 | 102c | 0 | 6.1 | 0.000211089 | spruce-fir | hardwood | mature | Lake Tarleton | 092204000180236.1102c | | | |
| 09220400155029 | 1880 | 13 | 710 | 102c | 0 | 8.3 | 3.00367E-05 | spruce-fir | hardwood | mature | Lake Tarleton | 092204000180238.3102c | | | |
| 09220400155030 | 1950 | 81 | 710 | 102c | 0 | 8.3 | 5.86344E-05 | hardwood | hardwood | mature | Lake Tarleton | 092204000190208.3102c | | | |
| 09220400155031 | 1910 | 81 | 710 | 102c | 0 | 8.3 | 0.000242258 | hardwood | hardwood | mature | Lake Tarleton | 092204000190248.3102c | | | |
| 09220400155031 | 1900 | 13 | 710 | 102c | 0 | 8.3 | 0.000203266 | spruce-fir | hardwood | mature | Lake Tarleton | 092204000190258.3102c | | | |
| 09220400155032 | 1900 | 13 | 710 | 405 | 0 | 8.3 | 4.65239E-06 | spruce-fir | hardwood | mature | Lake Tarleton | 092204000190258.3405 | | | |
| 09220400155032 | 1900 | 13 | 710 | THETA2 | 0 | 8.3 | 7.02644E-05 | spruce-fir | non-forest | mature | Lake Tarleton | 092204000190258.3THETA2 | | | |
| 09220400155033 | 1925 | 87 | 810 | 115a | 0 | 8.3 | 0.000131365 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204000200198.3115a | | | |
| 09220400155033 | 1925 | 87 | 810 | 115g | 0 | 8.3 | 6.96603E-06 | mixedwood | hardwood | mature | Lake Tarleton | 092204000200198.3115g | | | |
| 09220400155034 | 1930 | 92 | 720 | 115g | 0 | 8.3 | 0.00016296 | aspen-birch | hardwood | mature | Lake Tarleton | 092204000200248.3115g | | | |
| 09220400155034 | 1930 | 92 | 720 | 405d | 0 | 8.3 | 0.000394776 | aspen-birch | mixedwood | mature | Lake Tarleton | 092204000200248.3405d | | | |
| 09220400155034 | 1900 | 81 | 710 | 102c | 0 | 8.3 | 7.72846E-05 | hardwood | hardwood | mature | Lake Tarleton | 092204000200258.3102c | | | |
| 09220400155035 | 1900 | 81 | 710 | 115c | 0 | 8.3 | 2.75917E-05 | hardwood | hardwood | mature | Lake Tarleton | 092204000200258.3115c | | | |
| 09220400155035 | 1941 | 81 | 500 | 115g | 0 | | 1.110037689 | hardwood | hardwood | mature | Lake Tarleton | 09220400155001115g | | | |
| 09220400155035 | 1941 | 81 | 500 | 115g | 0 | 8.3 | 2.594531357 | hardwood | hardwood | mature | Lake Tarleton | 092204001550018.3115g | | | |
| 09220400155035 | 1938 | 87 | 810 | 115g | 0 | | 0.000145997 | mixedwood | hardwood | mature | Lake Tarleton | 09220400021019115g | | | |
| 09220400155035 | 1938 | 87 | 810 | 115g | 0 | 8.3 | 3.20061E-05 | mixedwood | hardwood | mature | Lake Tarleton | 092204000210198.3115g | | | |
| 09220400155036 | 1941 | 81 | 500 | 115g | 0 | inhold | 0.068891429 | hardwood | hardwood | mature | Lake Tarleton | 09220400155001inhold115g | | | |
| 09220400155036 | 1941 | 81 | 500 | 405d | 0 | 8.3 | 13.84103104 | hardwood | mixedwood | mature | Lake Tarleton | 092204001550018.3405d | | | |
| 09220400155037 | 1941 | 81 | 500 | 405d | 0 | inhold | 0.337910514 | hardwood | mixedwood | mature | Lake Tarleton | 09220400155001inhold405d | | | |
| 09220400155037 | 1937 | 81 | 500 | 115a | 0 | 8.3 | 16.17825272 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550028.3115a | | | |
| 09220400155038 | 1937 | 81 | 500 | 115a | 0 | inhold | 0.038238491 | hardwood | strong spruce-fir | mature | Lake Tarleton | 09220400155002inhold115a | | | |
| 09220400155038 | 1937 | 81 | 500 | 115g | 0 | 8.3 | 3.348893592 | hardwood | hardwood | mature | Lake Tarleton | 092204001550028.3115g | | | |
| 09220400155039 | 1937 | 81 | 500 | 405d | 0 | 8.3 | 16.9594448 | hardwood | mixedwood | mature | Lake Tarleton | 092204001550028.3405d | | | |
| 09220400155039 | 1937 | 81 | 500 | 405d | 0 | inhold | 0.847330248 | hardwood | mixedwood | mature | Lake Tarleton | 09220400155002inhold405d | | | |
| 09220400155040 | 1905 | 81 | 500 | 105d | 0 | 2.1 | 1.188188218 | hardwood | mixedwood | mature | Lake Tarleton | 092204001550042.1105d | | | |
| 09220400155040 | 1944 | 87 | 500 | 115a | 0 | 2.1 | 2.059475853 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204001550032.1115a | | | |
| 09220400155040 | 1944 | 87 | 500 | 115a | 0 | 8.3 | 26.98229741 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204001550038.3115a | | | |
| 09220400155040 | 1944 | 87 | 500 | 115a | 0 | inhold | 0.236195544 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 09220400155003inhold115a | | | |
| 09220400155041 | 1905 | 81 | 500 | 105d | 0 | 8.3 | 20.98026344 | hardwood | mixedwood | mature | Lake Tarleton | 092204001550048.3105d | | | |
| 09220400155041 | 1905 | 81 | 500 | 115a | 0 | 2.1 | 1.752155459 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550042.1115a | | | |
| 09220400155041 | 1905 | 81 | 500 | 115a | 0 | 8.3 | 9.312781924 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550048.3115a | | | |
| 09220400155042 | 1923 | 87 | 720 | 115g | 0 | 8.3 | 0.309506036 | mixedwood | hardwood | mature | Lake Tarleton | 092204001550058.3115g | | | |
| 09220400155043 | 1923 | 87 | 720 | 405d | 0 | 8.3 | 32.87555235 | mixedwood | mixedwood | mature | Lake Tarleton | 092204001550058.3405d | | | |
| 09220400155043 | 1908 | 87 | 810 | 115g | 0 | 8.3 | 3.841076126 | mixedwood | hardwood | mature | Lake Tarleton | 092204001550068.3115g | | | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 09220400155044 | 1908 | 87 | 810 | 405d | 0 | 8.3 | 13.62224345 | mixedwood | mixedwood | mature | Lake Tarleton | 092204001550068.3405d |
| 09220400160001 | 1894 | 81 | 810 | 115a | 0 | 8.3 | 5.064590339 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550078.3115a |
| 09220400160001 | 1894 | 81 | 810 | 405d | 0 | 8.3 | 13.33846813 | hardwood | mixedwood | mature | Lake Tarleton | 092204001550078.3405d |
| 09220400160001 | 1928 | 87 | 810 | 115a | 0 | 8.3 | 9.712845871 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204001550088.3115a |
| 09220400160001 | 1928 | 87 | 810 | 405d | 0 | 8.3 | 0.221206345 | mixedwood | mixedwood | mature | Lake Tarleton | 092204001550088.3405d |
| 09220400160002 | 1936 | 81 | 810 | 115a | 0 | 8.3 | 14.83701037 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550108.3115a |
| 09220400160002 | 0 | 99 | 200 | 115a | 0 | 8.3 | 1.161978974 | other | strong spruce-fir | open | Lake Tarleton | 092204001550098.3115a |
| 09220400160003 | 1936 | 81 | 810 | 115a | 0 | inhold | 0.123810222 | hardwood | strong spruce-fir | mature | Lake Tarleton | 0922040015501 0inhold115a |
| 09220400160003 | 1936 | 81 | 810 | 115c | 0 | 8.3 | 1.147297767 | hardwood | hardwood | mature | Lake Tarleton | 092204001550108.3115c |
| 09220400160003 | 1891 | 81 | 810 | 102c | 0 | 8.3 | 10.78155194 | hardwood | hardwood | mature | Lake Tarleton | 092204001550118.3102c |
| 09220400160004 | 1891 | 81 | 810 | 115a | 0 | 8.3 | 7.789559181 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550118.3115a |
| 09220400160004 | 1891 | 81 | 810 | 115a | 0 | inhold | 0.028672436 | hardwood | strong spruce-fir | mature | Lake Tarleton | 0922040015501 1inhold115a |
| 09220400160004 | 1891 | 81 | 810 | 115c | 0 | 8.3 | 42.44649659 | hardwood | hardwood | mature | Lake Tarleton | 092204001550118.3115c |
| 09220400160004 | 1891 | 81 | 810 | 405d | 0 | 8.3 | 2.472572366 | hardwood | mixedwood | mature | Lake Tarleton | 092204001550118.3405d |
| 09220400160005 | 1934 | 84 | 500 | 115a | 0 | 2.1 | 14.41159879 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001600052.1115a |
| 09220400160005 | 1934 | 84 | 500 | 415g | 0 | 2.1 | 14.32900363 | hardwood | hardwood | mature | Lake Tarleton | 092204001600052.1415g |
| 09220400160005 | 1934 | 84 | 500 | 415g | 0 | 6.1 | 0.022065797 | hardwood | hardwood | mature | Lake Tarleton | 092204001600056.1415g |
| 09220400160006 | 1940 | 89 | 500 | 115a | 0 | 2.1 | 25.6739929 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001600062.1115a |
| 09220400160006 | 1940 | 89 | 500 | 115c | 0 | 2.1 | 10.4029186 | hardwood | hardwood | mature | Lake Tarleton | 092204001600062.1115c |
| 09220400160006 | 1940 | 89 | 500 | 115c | 0 | 6.1 | 4.71702E-05 | hardwood | hardwood | mature | Lake Tarleton | 092204001600066.1115c |
| 09220400160006 | 1940 | 89 | 500 | 415g | 0 | 2.1 | 17.49280856 | hardwood | hardwood | mature | Lake Tarleton | 092204001600062.1415g |
| 09220400160007 | 1947 | 89 | 500 | 115a | 0 | 2.1 | 20.58900945 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001600072.1115a |
| 09220400160008 | 1942 | 84 | 500 | 115a | 0 | 2.1 | 23.47513093 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001600082.1115a |
| 09220400160009 | 1946 | 84 | 500 | 105d | 0 | 2.1 | 16.82422237 | hardwood | mixedwood | mature | Lake Tarleton | 092204001600092.1105d |
| 09220400160009 | 1946 | 84 | 500 | 115a | 0 | 2.1 | 11.936308 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001600092.1115a |
| 09220400160010 | 1960 | 10 | 700 | 115a | 0 | 2.1 | 17.30639642 | spruce-fir | strong spruce-fir | mature | Lake Tarleton | 092204001600102.1115a |
| 09220400160011 | 1964 | 85 | 500 | 115a | 0 | | 0.00010273 | hardwood | strong spruce-fir | young | Lake Tarleton | 09220400160011115a |
| 09220400160011 | 1964 | 85 | 500 | 115a | 0 | 2.1 | 73.08044696 | hardwood | strong spruce-fir | young | Lake Tarleton | 092204001600112.1115a |
| 09220400160011 | 1964 | 85 | 500 | 115a | 0 | 6.1 | 0.018432223 | hardwood | strong spruce-fir | young | Lake Tarleton | 092204001600116.1115a |
| 09220400160011 | 1964 | 85 | 500 | 115c | 0 | 2.1 | 2.363775115 | hardwood | hardwood | young | Lake Tarleton | 092204001600112.1115c |
| 09220400160011 | 1964 | 85 | 500 | 115c | 0 | 6.1 | 0.004781208 | hardwood | hardwood | young | Lake Tarleton | 092204001600116.1115c |
| 09220400160012 | 1942 | 96 | 700 | 115a | 0 | 2.1 | 10.88162192 | aspen-birch | strong spruce-fir | mature | Lake Tarleton | 092204001600122.1115a |
| 09220400160013 | 1954 | 81 | 500 | 115a | 0 | 2.1 | 17.64541085 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001600132.1115a |
| 09220400160013 | 1954 | 81 | 500 | 115a | 0 | 6.1 | 0.000142521 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001600136.1115a |
| 09220400160013 | 1954 | 81 | 500 | 115c | 0 | 2.1 | 47.37112344 | hardwood | hardwood | mature | Lake Tarleton | 092204001600132.1115c |
| 09220400160014 | 1990 | 89 | 500 | 115a | 0 | 2.1 | 13.02523634 | hardwood | strong spruce-fir | young | Lake Tarleton | 092204001600142.1115a |
| 09220400160014 | 1990 | 89 | 500 | 115c | 0 | 2.1 | 0.552697789 | hardwood | hardwood | young | Lake Tarleton | 092204001600142.1115c |
| 09220400160015 | 1943 | 13 | 700 | 115a | 0 | | 0.986458119 | spruce-fir | strong spruce-fir | mature | Lake Tarleton | 09220400160015115a |
| 09220400160015 | 1943 | 13 | 700 | 115a | 0 | 2.1 | 38.41952689 | spruce-fir | strong spruce-fir | mature | Lake Tarleton | 092204001600152.1115a |
| 09220400160016 | 1960 | 11 | 500 | 115a | 0 | | 0.000205004 | spruce-fir | strong spruce-fir | mature | Lake Tarleton | 09220400160016115a |
| 09220400160016 | 1960 | 11 | 500 | 115a | 0 | 2.1 | 20.18444197 | spruce-fir | strong spruce-fir | mature | Lake Tarleton | 092204001600162.1115a |
| 09220400160017 | 1960 | 87 | 500 | 115a | 0 | | 0.871980127 | mixedwood | strong spruce-fir | young | Lake Tarleton | 09220400160017115a |
| 09220400160017 | 1960 | 87 | 500 | 115a | 0 | 2.1 | 15.08216107 | mixedwood | strong spruce-fir | young | Lake Tarleton | 092204001600172.1115a |
| 09220400160017 | 1960 | 87 | 500 | 115a | 0 | inhold | 0.000191085 | mixedwood | strong spruce-fir | young | Lake Tarleton | 09220400160017inhold115a |
| 09220400160017 | 1960 | 87 | 500 | INHOLD | 0 | 2.1 | 0.00013119 | mixedwood | inhold | young | Lake Tarleton | 092204001600172.1INHOLD |
| 09220400160017 | 1960 | 87 | 500 | INHOLD | 0 | inhold | 2.284592742 | mixedwood | inhold | young | Lake Tarleton | 09220400160017inholdINHOLD |
| 09220400160018 | 1937 | 84 | 500 | 115a | 0 | | 0.536713786 | hardwood | strong spruce-fir | mature | Lake Tarleton | 09220400160018115a |
| 09220400160018 | 1937 | 84 | 500 | 115a | 0 | 2.1 | 26.36381808 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001600182.1115a |
| 09220400160018 | 1937 | 84 | 500 | 115a | 0 | inhold | 0.000252944 | hardwood | strong spruce-fir | mature | Lake Tarleton | 09220400160018inhold115a |
| 09220400160018 | 1937 | 84 | 500 | INHOLD | 0 | 2.1 | 0.000201884 | hardwood | inhold | mature | Lake Tarleton | 092204001600182.1INHOLD |
| 09220400160018 | 1937 | 84 | 500 | INHOLD | 0 | inhold | 4.920020091 | hardwood | inhold | mature | Lake Tarleton | 09220400160018inholdINHOLD |
| 09220400160019 | 1947 | 87 | 500 | 115a | 0 | | 6.67806E-05 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 09220400160019115a |
| 09220400160019 | 1947 | 87 | 500 | 115a | 0 | 2.1 | 24.96947344 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204001600192.1115a |
| 09220400160020 | 1901 | 5 | 700 | 105d | 0 | 2.1 | 9.981347674 | hemlock | mixedwood | mature | Lake Tarleton | 092204001600202.1105d |
| 09220400160020 | 1901 | 5 | 700 | 115a | 0 | 2.1 | 1.08189149 | hemlock | strong spruce-fir | mature | Lake Tarleton | 092204001600202.1115a |
| 09220400160021 | 1943 | 87 | 500 | 115a | 0 | | 0.000464024 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 09220400160021115a |
| 09220400160021 | 1943 | 87 | 500 | 115a | 0 | 2.1 | 11.72291117 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204001600212.1115a |
| 09220400160022 | 1984 | 3 | 268 | 115a | 0 | 2.1 | 15.55615348 | oak-pine | strong spruce-fir | young | Lake Tarleton | 092204001600222.1115a |
| 09220400160022 | 1984 | 3 | 268 | 115c | 0 | 2.1 | 0.916173316 | oak-pine | hardwood | young | Lake Tarleton | 092204001600222.1115c |
| 09220400160023 | 1989 | 89 | 500 | 115a | 0 | 2.1 | 65.7172745 | hardwood | strong spruce-fir | young | Lake Tarleton | 092204001600232.1115a |
| 09220400160024 | 1986 | 87 | 500 | 115a | 0 | | 0.087158697 | mixedwood | strong spruce-fir | young | Lake Tarleton | 09220400160024115a |
| 09220400160024 | 1986 | 87 | 500 | 115a | 0 | 2.1 | 27.31622488 | mixedwood | strong spruce-fir | young | Lake Tarleton | 092204001600242.1115a |
| 09220400160024 | 1986 | 87 | 500 | 115a | 0 | 8.3 | 13.83962322 | mixedwood | strong spruce-fir | young | Lake Tarleton | 092204001600248.3115a |
| 09220400160024 | 1986 | 87 | 500 | 115g | 0 | 8.3 | 0.984242936 | mixedwood | hardwood | young | Lake Tarleton | 092204001600248.3115g |
| 09220400160025 | 1960 | 89 | 500 | 115a | 0 | 2.1 | 29.1033136 | hardwood | strong spruce-fir | young | Lake Tarleton | 092204001600252.1115a |
| 09220400160025 | 1960 | 89 | 500 | 115c | 0 | 2.1 | 1.971452766 | hardwood | hardwood | young | Lake Tarleton | 092204001600252.1115c |
| 09220400160026 | 1959 | 74 | 720 | 115c | 0 | 2.1 | 9.779198321 | hardwood | hardwood | mature | Lake Tarleton | 092204001600262.1115c |
| 09220400160027 | 1965 | 81 | 500 | 115a | 0 | 2.1 | 10.13416575 | hardwood | strong spruce-fir | young | Lake Tarleton | 092204001600272.1115a |
| 09220400160027 | 1965 | 81 | 500 | 115c | 0 | 2.1 | 58.08075999 | hardwood | hardwood | young | Lake Tarleton | 092204001600272.1115c |
| 09220400160028 | 1900 | 11 | 268 | 115a | 0 | 2.1 | 10.23242119 | spruce-fir | strong spruce-fir | mature | Lake Tarleton | 092204001600282.1115a |
| 09220400160029 | 1948 | 89 | 500 | 115a | 0 | 2.1 | 91.11221094 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001600292.1115a |
| 09220400160029 | 1948 | 89 | 500 | 115a | 0 | 6.1 | 1.87296E-05 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001600296.1115a |
| 09220400160030 | 1963 | 11 | 500 | 115a | 0 | 2.1 | 19.62272 | spruce-fir | strong spruce-fir | mature | Lake Tarleton | 092204001600302.1115a |
| 09220400160031 | 1940 | 87 | 500 | 115a | 0 | 2.1 | 25.14981881 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204001600312.1115a |
| 09220400160031 | 1940 | 87 | 500 | 115c | 0 | 2.1 | 0.048416712 | mixedwood | hardwood | mature | Lake Tarleton | 092204001600312.1115c |
| 09220400160031 | 1940 | 87 | 500 | 415g | 0 | 2.1 | 20.04223622 | mixedwood | hardwood | mature | Lake Tarleton | 092204001600312.1415g |
| 09220400160031 | 1940 | 87 | 500 | 415g | 0 | 6.1 | 0.000344828 | mixedwood | hardwood | mature | Lake Tarleton | 092204001600316.1415g |
| 09220400160032 | 1986 | 81 | 500 | 115a | 0 | 2.1 | 20.64777705 | hardwood | strong spruce-fir | young | Lake Tarleton | 092204001600322.1115a |
| 09220400160032 | 1986 | 81 | 500 | 115a | 0 | 6.1 | 0.000341233 | hardwood | strong spruce-fir | young | Lake Tarleton | 092204001600326.1115a |
| 09220400160032 | 1986 | 81 | 500 | 115c | 0 | 2.1 | 8.176160746 | hardwood | hardwood | young | Lake Tarleton | 092204001600322.1115c |
| 09220400160032 | 1986 | 81 | 500 | 115c | 0 | 6.1 | 0.000150171 | hardwood | hardwood | young | Lake Tarleton | 092204001600326.1115c |
| 09220400160032 | 1986 | 81 | 500 | 2c | 0 | 2.1 | 0.039937199 | hardwood | hardwood | young | Lake Tarleton | 092204001600322.12c |
| 09220400160032 | 1986 | 81 | 500 | 2c | 0 | 6.1 | 7.60026E-05 | hardwood | hardwood | young | Lake Tarleton | 092204001600326.12c |
| 09220400160032 | 1986 | 81 | 500 | 415g | 0 | 2.1 | 0.000266602 | hardwood | hardwood | young | Lake Tarleton | 092204001600322.1415g |
| 09220400160032 | 1986 | 81 | 500 | 415g | 0 | 6.1 | 1.4188E-06 | hardwood | hardwood | young | Lake Tarleton | 092204001600326.1415g |
| 09220400160033 | 1930 | 84 | 500 | 115a | 0 | 2.1 | 5.371363717 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001600332.1115a |
| 09220400160033 | 1930 | 84 | 500 | 115c | 0 | 2.1 | 24.1750987 | hardwood | hardwood | mature | Lake Tarleton | 092204001600332.1115c |
| 09220400160033 | 1930 | 84 | 500 | 115c | 0 | 6.1 | 7.45123E-05 | hardwood | hardwood | mature | Lake Tarleton | 092204001600336.1115c |
| 09220400160034 | 1895 | 20 | 500 | 115a | 0 | 2.1 | 4.632062807 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204001600342.1115a |
| 09220400160034 | 1895 | 20 | 500 | 115a | 0 | inhold | 0.000126986 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 09220400160034inhold115a |
| 09220400160034 | 1895 | 20 | 500 | INHOLD | 0 | 2.1 | 5.37152E-05 | mixedwood | inhold | mature | Lake Tarleton | 092204001600342.1INHOLD |
| 09220400160035 | 1986 | 85 | 500 | 105d | 0 | 2.1 | 28.25652437 | hardwood | mixedwood | young | Lake Tarleton | 092204001600352.1105d |
| 09220400160035 | 1986 | 85 | 500 | 115a | 0 | 2.1 | 0.010215227 | hardwood | strong spruce-fir | young | Lake Tarleton | 092204001600352.1115a |
| 09220400160036 | 1953 | 96 | 500 | 115a | 0 | 2.1 | 11.41838175 | aspen-birch | strong spruce-fir | mature | Lake Tarleton | 092204001600362.1115a |
| 09220400160036 | 1953 | 96 | 500 | 415g | 0 | 2.1 | 0.216321728 | aspen-birch | hardwood | mature | Lake Tarleton | 092204001600362.1415g |
| 09220400160037 | 1947 | 20 | 500 | 105d | 0 | 2.1 | 3.681698679 | mixedwood | mixedwood | mature | Lake Tarleton | 092204001600372.1105d |
| 09220400160037 | 1947 | 20 | 500 | 115a | 0 | 2.1 | 14.98168011 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204001600372.1115a |
| 09220400160038 | 1970 | 84 | 500 | 105d | 0 | 2.1 | 16.66035978 | hardwood | mixedwood | young | Lake Tarleton | 092204001600382.1105d |
| 09220400160038 | 1970 | 84 | 500 | 115a | 0 | 2.1 | 18.60235741 | hardwood | strong spruce-fir | young | Lake Tarleton | 092204001600382.1115a |
| 09220400160038 | 1970 | 84 | 500 | 415g | 0 | 2.1 | 0.09050853 | hardwood | hardwood | young | Lake Tarleton | 092204001600382.1415g |
| 09220400160039 | 1938 | 96 | 500 | 115a | 0 | 2.1 | 5.581937737 | aspen-birch | strong spruce-fir | mature | Lake Tarleton | 092204001600392.1115a |
| 09220400160039 | 1938 | 96 | 500 | 115c | 0 | 2.1 | 4.654748679 | aspen-birch | hardwood | mature | Lake Tarleton | 092204001600392.1115c |
| 09220400160039 | 1938 | 96 | 500 | 115c | 0 | 6.1 | 0.000175046 | aspen-birch | hardwood | mature | Lake Tarleton | 092204001600396.1115c |
| 09220400160040 | 1940 | 89 | 500 | 105d | 0 | 2.1 | 11.49926946 | hardwood | mixedwood | mature | Lake Tarleton | 092204001600402.1105d |
| 09220400160040 | 1940 | 89 | 500 | 115a | 0 | 2.1 | 10.05316094 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001600402.1115a |
| 09220400160040 | 1940 | 89 | 500 | 115c | 0 | 2.1 | 92.2571308 | hardwood | hardwood | mature | Lake Tarleton | 092204001600402.1115c |
| 09220400160040 | 1940 | 89 | 500 | 115c | 0 | 6.1 | 0.000371938 | hardwood | hardwood | mature | Lake Tarleton | 092204001600406.1115c |
| 09220400160041 | 1937 | 84 | 500 | 105d | 0 | 2.1 | 0.361150607 | hardwood | mixedwood | mature | Lake Tarleton | 092204001600412.1105d |
| 09220400160041 | 1937 | 84 | 500 | 115a | 0 | 2.1 | 12.09964954 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001600412.1115a |
| 09220400160041 | 1937 | 84 | 500 | 115c | 0 | 2.1 | 0.042171236 | hardwood | hardwood | mature | Lake Tarleton | 092204001600412.1115c |
| 09220400160042 | 1949 | 89 | 500 | 105d | 0 | 2.1 | 13.274326 | hardwood | mixedwood | mature | Lake Tarleton | 092204001600422.1105d |
| 09220400160042 | 1949 | 89 | 500 | 115a | 0 | 2.1 | 4.059141672 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001600422.1115a |
| 09220400160042 | 1949 | 89 | 500 | 115c | 0 | 2.1 | 48.29917076 | hardwood | hardwood | mature | Lake Tarleton | 092204001600422.1115c |
| 09220400160042 | 1949 | 89 | 500 | 115c | 0 | 6.1 | 0.000150348 | hardwood | hardwood | mature | Lake Tarleton | 092204001600426.1115c |
| 09220400160043 | 1938 | 89 | 500 | 105d | 0 | 2.1 | 53.13818035 | hardwood | mixedwood | mature | Lake Tarleton | 092204001600432.1105d |
| 09220400160043 | 1938 | 89 | 500 | 105d | 0 | inhold | 1.52261E-05 | hardwood | mixedwood | mature | Lake Tarleton | 09220400160043inhold105d |
| 09220400160043 | 1938 | 89 | 500 | 115a | 0 | 2.1 | 6.18280833 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001600432.1115a |
| 09220400160043 | 1938 | 89 | 500 | 115c | 0 | 2.1 | 10.51261447 | hardwood | hardwood | mature | Lake Tarleton | 092204001600432.1115c |
| 09220400160043 | 1938 | 89 | 500 | INHOLD | 0 | 2.1 | 1.83344E-05 | hardwood | inhold | mature | Lake Tarleton | 092204001600432.1INHOLD |
| 09220400160043 | 1938 | 89 | 500 | INHOLD | 0 | inhold | 0.007819341 | hardwood | inhold | mature | Lake Tarleton | 09220400160043inholdINHOLD |
| 09220400160044 | 1903 | 20 | 500 | 105d | 0 | 2.1 | 13.11635355 | mixedwood | mixedwood | mature | Lake Tarleton | 092204001600442.1105d |
| 09220400160044 | 1903 | 20 | 500 | 115a | 0 | 2.1 | 3.300242935 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204001600442.1115a |
| 09220400160044 | 1903 | 20 | 500 | 115c | 0 | 2.1 | 0.087876502 | mixedwood | hardwood | mature | Lake Tarleton | 092204001600442.1115c |
| 09220400160045 | 1990 | 81 | 500 | 115a | 0 | 2.1 | 6.343249447 | hardwood | strong spruce-fir | young | Lake Tarleton | 092204001600452.1115a |
| 09220400160045 | 1990 | 81 | 500 | 415g | 0 | 2.1 | 53.72473943 | hardwood | hardwood | young | Lake Tarleton | 092204001600452.1415g |
| 09220400160045 | 1990 | 81 | 500 | 415g | 0 | 8.3 | 1.118037233 | hardwood | hardwood | young | Lake Tarleton | 092204001600458.3415g |
| 09220400160046 | 1972 | 87 | 500 | 105d | 0 | 8.3 | 2.041164695 | mixedwood | mixedwood | young | Lake Tarleton | 092204001600468.3105d |
| 09220400160046 | 1972 | 87 | 500 | 115a | 0 | 2.1 | 11.35280687 | mixedwood | strong spruce-fir | young | Lake Tarleton | 092204001600462.1115a |
| 09220400160046 | 1972 | 87 | 500 | 115a | 0 | 8.3 | 29.79578376 | mixedwood | strong spruce-fir | young | Lake Tarleton | 092204001600468.3115a |
| 09220400160046 | 1972 | 87 | 500 | 415g | 0 | 2.1 | 0.273624605 | mixedwood | hardwood | young | Lake Tarleton | 092204001600462.1415g |
| 09220400160046 | 1972 | 87 | 500 | 415g | 0 | 8.3 | 1.843892919 | mixedwood | hardwood | young | Lake Tarleton | 092204001600468.3415g |
| 09220400160047 | 1988 | 81 | 500 | 105d | 0 | 2.1 | 8.717987362 | hardwood | mixedwood | young | Lake Tarleton | 092204001600472.1105d |
| 09220400160047 | 1988 | 81 | 500 | 115a | 0 | 2.1 | 18.54548131 | hardwood | strong spruce-fir | young | Lake Tarleton | 092204001600472.1115a |
| 09220400160048 | 1986 | 87 | 500 | 115a | 0 | 2.1 | 32.59828541 | mixedwood | strong spruce-fir | young | Lake Tarleton | 092204001600482.1115a |
| 09220400160049 | 1951 | 10 | 500 | 105d | 0 | 2.1 | 37.597445 | spruce-fir | mixedwood | mature | Lake Tarleton | 092204001600492.1105d |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09220400160049 | 1951 | 10 | 500 | 115a | 0 | 2.1 | 0.531793389 | spruce-fir | strong spruce-fir | mature | Lake Tarleton | 092204001600492.1115a |
| 09220400160049 | 1951 | 10 | 500 | 115c | 0 | 2.1 | 0.024161027 | spruce-fir | hardwood | mature | Lake Tarleton | 092204001600492.1115c |
| 09220400160050 | 0 | 99 | 100 | 115a | 0 | 2.1 | 44.39670003 | other | strong spruce-fir | open | Lake Tarleton | 092204001600502.1115a |
| 09220400160050 | 0 | 99 | 100 | 115c | 0 | 2.1 | 2.77424626 | other | hardwood | open | Lake Tarleton | 092204001600502.1115c |
| 09220400160051 | 0 | 99 | 500 | 115a | 0 | 2.1 | 14.5499635 | other | strong spruce-fir | open | Lake Tarleton | 092204001600512.1115a |
| 09220400160052 | 0 | 99 | 0 | 115a | 0 | 2.1 | 47.66414901 | other | strong spruce-fir | open | Lake Tarleton | 092204001600522.1115a |
| 09220400160052 | 0 | 99 | 0 | 115a | 0 | inhold | 0.000366946 | other | strong spruce-fir | open | Lake Tarleton | 09220400160052inhold115a |
| 09220400160052 | 0 | 99 | 0 | INHOLD | 0 | 2.1 | 0.008295521 | other | inhold | open | Lake Tarleton | 092204001600522.1INHOLD |
| 09220400160052 | 0 | 99 | 0 | INHOLD | 0 | inhold | 0.000108836 | other | inhold | open | Lake Tarleton | 09220400160052inholdINHOLD |
| 09220400160053 | 1900 | 11 | 268 | 115a | 0 | 2.1 | 9.625401858 | spruce-fir | strong spruce-fir | mature | Lake Tarleton | 092204001600532.1115a |
| 09220400160054 | 0 | 99 | 268 | 115a | 0 | 2.1 | 16.4698594 | other | strong spruce-fir | open | Lake Tarleton | 092204001600542.1115a |
| 09220400160054 | 0 | 99 | 268 | INHOLD | 0 | 2.1 | 9.37543E-05 | other | inhold | open | Lake Tarleton | 092204001600542.1INHOLD |
| 09220400160055 | 0 | 99 | 500 | 115a | 0 | 2.1 | 3.11908934 | other | strong spruce-fir | open | Lake Tarleton | 092204001600552.1115a |
| 09220400160056 | 0 | 99 | 268 | 105d | 0 | 2.1 | 10.6016427 | other | mixedwood | open | Lake Tarleton | 092204001600562.1105d |
| 09220400160057 | 0 | 99 | 268 | 115a | 0 | 2.1 | 24.13524269 | other | strong spruce-fir | open | Lake Tarleton | 092204001600572.1115a |
| 09220400160057 | 0 | 99 | 268 | 115c | 0 | 2.1 | 0.619267218 | other | hardwood | open | Lake Tarleton | 092204001600572.1115c |
| 09220400160057 | 0 | 99 | 268 | 415g | 0 | 2.1 | 0.001464766 | other | hardwood | open | Lake Tarleton | 092204001600572.1415g |
| 09220400160058 | 1925 | 81 | 500 | 105d | 0 | 2.1 | 95.24384436 | hardwood | mixedwood | mature | Lake Tarleton | 092204001600582.1105d |
| 09220400160058 | 1925 | 81 | 500 | 105d | 0 | 8.3 | 0.348401314 | hardwood | mixedwood | mature | Lake Tarleton | 092204001600588.3105d |
| 09220400160058 | 1925 | 81 | 500 | 105d | 0 | inhold | 7.66658E-05 | hardwood | mixedwood | mature | Lake Tarleton | 09220400160058inhold105d |
| 09220400160058 | 1925 | 81 | 500 | 115a | 0 | 2.1 | 4.945787248 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001600582.1115a |
| 09220400160058 | 1925 | 81 | 500 | 115a | 0 | 8.3 | 0.243353965 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001600588.3115a |
| 09220400160059 | 1931 | 87 | 500 | 115a | 0 | 2.1 | 42.23684921 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204001600592.1115a |
| 09220400160060 | 1948 | 87 | 720 | 115a | 0 | 6.1 | 1.250755152 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204001600606.1115a |
| 09220400160060 | 1948 | 87 | 720 | 415g | 0 | | 0.003367412 | mixedwood | hardwood | mature | Lake Tarleton | 09220400160060415g |
| 09220400160060 | 1948 | 87 | 720 | 415g | 0 | 6.1 | 232.2429262 | mixedwood | hardwood | mature | Lake Tarleton | 092204001600606.1415g |
| 09220400160061 | 1990 | 89 | 699 | 102c | 0 | 6.1 | 7.948022684 | hardwood | hardwood | young | Lake Tarleton | 092204001600616.1102c |
| 09220400160061 | 1990 | 89 | 699 | 415g | 0 | | 0.000325899 | hardwood | hardwood | young | Lake Tarleton | 09220400160061415g |
| 09220400160061 | 1990 | 89 | 699 | 415g | 0 | 6.1 | 41.5051053 | hardwood | hardwood | young | Lake Tarleton | 092204001600616.1415g |
| 09220400160062 | 1970 | 87 | 720 | 102c | 0 | 6.1 | 20.53303795 | mixedwood | hardwood | young | Lake Tarleton | 092204001600626.1102c |
| 09220400160062 | 1970 | 87 | 720 | 415g | 0 | 6.1 | 46.52787622 | mixedwood | hardwood | young | Lake Tarleton | 092204001600626.1415g |
| 09220400160063 | 0 | 99 | 200 | 102c | 0 | 6.1 | 18.21906545 | other | hardwood | open | Lake Tarleton | 092204001600636.1102c |
| 09220400160063 | 0 | 99 | 200 | 415g | 0 | 6.1 | 0.903938972 | other | hardwood | open | Lake Tarleton | 092204001600636.1415g |
| 09220400160064 | 1940 | 11 | 699 | 102c | 0 | | 6.35961E-05 | spruce-fir | hardwood | mature | Lake Tarleton | 09220400160064102c |
| 09220400160064 | 1940 | 11 | 699 | 102c | 0 | 6.1 | 19.72524046 | spruce-fir | hardwood | mature | Lake Tarleton | 092204001600646.1102c |
| 09220400160064 | 1940 | 11 | 699 | 115g | 0 | | 0.000319854 | spruce-fir | hardwood | mature | Lake Tarleton | 09220400160064115g |
| 09220400160064 | 1940 | 11 | 699 | 115g | 0 | 6.1 | 62.73194153 | spruce-fir | hardwood | mature | Lake Tarleton | 092204001600646.1115g |
| 09220400160065 | 1990 | 60 | 699 | 115g | 0 | | 0.001764614 | oak-pine | hardwood | young | Lake Tarleton | 09220400160065115g |
| 09220400160065 | 1990 | 60 | 699 | 115g | 0 | 6.1 | 57.6057948 | oak-pine | hardwood | young | Lake Tarleton | 092204001600656.1115g |
| 09220400160065 | 1990 | 60 | 699 | 415g | 0 | | 0.001098761 | oak-pine | hardwood | young | Lake Tarleton | 09220400160065415g |
| 09220400160065 | 1990 | 60 | 699 | 415g | 0 | 6.1 | 12.93696064 | oak-pine | hardwood | young | Lake Tarleton | 092204001600656.1415g |
| 09220400160066 | 1990 | 60 | 800 | 102c | 0 | 6.1 | 10.11584425 | oak-pine | hardwood | young | Lake Tarleton | 092204001600666.1102c |
| 09220400160066 | 1990 | 60 | 800 | 115a | 0 | 6.1 | 5.88661536 | oak-pine | strong spruce-fir | young | Lake Tarleton | 092204001600666.1115a |
| 09220400160066 | 1990 | 60 | 800 | 115g | 0 | 6.1 | 59.37056282 | oak-pine | hardwood | young | Lake Tarleton | 092204001600666.1115g |
| 09220400160066 | 1990 | 60 | 800 | 415g | 0 | 2.1 | 8.82471E-05 | oak-pine | hardwood | young | Lake Tarleton | 092204001600662.1415g |
| 09220400160066 | 1990 | 60 | 800 | 415g | 0 | 6.1 | 52.24222568 | oak-pine | hardwood | young | Lake Tarleton | 092204001600666.1415g |
| 09220400160067 | 1989 | 87 | 699 | 115g | 0 | 6.1 | 13.01289385 | mixedwood | hardwood | young | Lake Tarleton | 092204001600676.1115g |
| 09220400160067 | 1989 | 87 | 699 | 415g | 0 | 6.1 | 54.29743674 | mixedwood | hardwood | young | Lake Tarleton | 092204001600676.1415g |
| 09220400160068 | 1940 | 24 | 720 | 2c | 0 | 6.1 | 1.957980605 | spruce-fir | hardwood | mature | Lake Tarleton | 092204001600686.12c |
| 09220400160068 | 1940 | 24 | 720 | 2d | 0 | 2.1 | 0.935257346 | spruce-fir | strong spruce-fir | mature | Lake Tarleton | 092204001600682.12d |
| 09220400160068 | 1940 | 24 | 720 | 2d | 0 | 6.1 | 18.80317976 | spruce-fir | strong spruce-fir | mature | Lake Tarleton | 092204001600686.12d |
| 09220400160068 | 1940 | 24 | 720 | 2d | 0 | inhold | 1.871052683 | spruce-fir | strong spruce-fir | mature | Lake Tarleton | 09220400160068inhold2d |
| 09220400160068 | 1940 | 24 | 720 | 405 | 0 | 2.1 | 0.020508137 | spruce-fir | hardwood | mature | Lake Tarleton | 092204001600682.1405 |
| 09220400160068 | 1940 | 24 | 720 | 405 | 0 | 6.1 | 4.928678317 | spruce-fir | hardwood | mature | Lake Tarleton | 092204001600686.1405 |
| 09220400160068 | 1940 | 24 | 720 | 405 | 0 | inhold | 0.156166711 | spruce-fir | hardwood | mature | Lake Tarleton | 09220400160068inhold405 |
| 09220400160068 | 1940 | 24 | 720 | 415g | 0 | 6.1 | 14.47004853 | spruce-fir | hardwood | mature | Lake Tarleton | 092204001600686.1415g |
| 09220400160068 | 1940 | 24 | 720 | 415g | 0 | inhold | 0.008991365 | spruce-fir | hardwood | mature | Lake Tarleton | 09220400160068inhold415g |
| 09220400160069 | 1938 | 87 | 720 | 115a | 0 | 6.1 | 1.015304779 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204001600696.1115a |
| 09220400160069 | 1938 | 87 | 720 | 2c | 0 | 6.1 | 22.81457226 | mixedwood | hardwood | mature | Lake Tarleton | 092204001600696.12c |
| 09220400160069 | 1938 | 87 | 720 | 2d | 0 | 6.1 | 0.400700361 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204001600696.12d |
| 09220400160069 | 1938 | 87 | 720 | 405 | 0 | 6.1 | 0.843624601 | mixedwood | hardwood | mature | Lake Tarleton | 092204001600696.1405 |
| 09220400160069 | 1938 | 87 | 720 | 415g | 0 | 2.1 | 2.9456E-05 | mixedwood | hardwood | mature | Lake Tarleton | 092204001600692.1415g |
| 09220400160069 | 1938 | 87 | 720 | 415g | 0 | 6.1 | 34.31811494 | mixedwood | hardwood | mature | Lake Tarleton | 092204001600696.1415g |
| 09220400160070 | 1942 | 55 | 720 | 102c | 0 | 6.1 | 0.000425259 | oak-pine | hardwood | mature | Lake Tarleton | 092204001600706.1102c |
| 09220400160070 | 1942 | 55 | 720 | 2d | 0 | 6.1 | 6.680196202 | oak-pine | strong spruce-fir | mature | Lake Tarleton | 092204001600706.12d |
| 09220400160070 | 1942 | 55 | 720 | 405 | 0 | 2.1 | 1.994905524 | oak-pine | hardwood | mature | Lake Tarleton | 092204001600702.1405 |
| 09220400160070 | 1942 | 55 | 720 | 405 | 0 | 6.1 | 23.4053089 | oak-pine | hardwood | mature | Lake Tarleton | 092204001600706.1405 |
| 09220400160071 | 1938 | 81 | 720 | 102c | 0 | 6.1 | 25.41110845 | hardwood | hardwood | mature | Lake Tarleton | 092204001600716.1102c |
| 09220400160071 | 1938 | 81 | 720 | 115a | 0 | 6.1 | 0.237806874 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001600716.1115a |
| 09220400160071 | 1938 | 81 | 720 | 115c | 0 | 2.1 | 0.082288729 | hardwood | hardwood | mature | Lake Tarleton | 092204001600712.1115c |
| 09220400160071 | 1938 | 81 | 720 | 115c | 0 | 6.1 | 98.03771141 | hardwood | hardwood | mature | Lake Tarleton | 092204001600716.1115c |
| 09220400160071 | 1938 | 81 | 720 | 2c | 0 | 6.1 | 6.090356498 | hardwood | hardwood | mature | Lake Tarleton | 092204001600716.12c |
| 09220400160071 | 1938 | 81 | 720 | 2d | 0 | 2.1 | 0.021120494 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001600712.12d |
| 09220400160071 | 1938 | 81 | 720 | 2d | 0 | 6.1 | 69.74172011 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001600716.12d |
| 09220400160071 | 1938 | 81 | 720 | 405 | 0 | 2.1 | 0.058891116 | hardwood | hardwood | mature | Lake Tarleton | 092204001600712.1405 |
| 09220400160071 | 1938 | 81 | 720 | 405 | 0 | 6.1 | 1.427285538 | hardwood | hardwood | mature | Lake Tarleton | 092204001600716.1405 |
| 09220400160072 | 1982 | 81 | 699 | 102c | 0 | | 1.07854E-07 | hardwood | hardwood | young | Lake Tarleton | 09220400160072102c |
| 09220400160072 | 1982 | 81 | 699 | 102c | 0 | 6.1 | 49.84757321 | hardwood | hardwood | young | Lake Tarleton | 092204001600726.1102c |
| 09220400160072 | 1982 | 81 | 699 | 115a | 0 | 2.1 | 0.022323806 | hardwood | strong spruce-fir | young | Lake Tarleton | 092204001600722.1115a |
| 09220400160072 | 1982 | 81 | 699 | 115a | 0 | 6.1 | 11.19877971 | hardwood | strong spruce-fir | young | Lake Tarleton | 092204001600726.1115a |
| 09220400160072 | 1982 | 81 | 699 | 115c | 0 | | 9.2084E-05 | hardwood | hardwood | young | Lake Tarleton | 09220400160072115c |
| 09220400160072 | 1982 | 81 | 699 | 115c | 0 | 2.1 | 0.000212762 | hardwood | hardwood | young | Lake Tarleton | 092204001600722.1115c |
| 09220400160072 | 1982 | 81 | 699 | 115c | 0 | 6.1 | 126.5259787 | hardwood | hardwood | young | Lake Tarleton | 092204001600726.1115c |
| 09220400160073 | 1962 | 81 | 699 | 115a | 0 | 2.1 | 0.000196837 | hardwood | strong spruce-fir | young | Lake Tarleton | 092204001600732.1115a |
| 09220400160073 | 1962 | 81 | 699 | 115a | 0 | 6.1 | 0.528308711 | hardwood | strong spruce-fir | young | Lake Tarleton | 092204001600736.1115a |
| 09220400160073 | 1962 | 81 | 699 | 115c | 0 | 2.1 | 0.040491776 | hardwood | hardwood | young | Lake Tarleton | 092204001600732.1115c |
| 09220400160073 | 1962 | 81 | 699 | 115c | 0 | 6.1 | 161.9231132 | hardwood | hardwood | young | Lake Tarleton | 092204001600736.1115c |
| 09220400160074 | 1909 | 81 | 810 | 115c | 0 | 6.1 | 14.56553555 | hardwood | hardwood | mature | Lake Tarleton | 092204001600746.1115c |
| 09220400160075 | 1934 | 81 | 720 | 115c | 0 | 2.1 | 0.000296423 | hardwood | hardwood | mature | Lake Tarleton | 092204001600752.1115c |
| 09220400160075 | 1934 | 81 | 720 | 115c | 0 | 6.1 | 37.15234525 | hardwood | hardwood | mature | Lake Tarleton | 092204001600756.1115c |
| 09220400160076 | 1929 | 81 | 720 | 115c | 0 | 2.1 | 0.640272832 | hardwood | hardwood | mature | Lake Tarleton | 092204001600762.1115c |
| 09220400160076 | 1929 | 81 | 720 | 115c | 0 | 6.1 | 50.62949182 | hardwood | hardwood | mature | Lake Tarleton | 092204001600766.1115c |
| 09220400160077 | 1953 | 81 | 500 | 105d | 0 | 2.1 | 16.62890029 | hardwood | mixedwood | mature | Lake Tarleton | 092204001600772.1105d |
| 09220400160077 | 1953 | 81 | 500 | 115a | 0 | 2.1 | 39.59051749 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001600772.1115a |
| 09220400160090 | 0 | 99 | 100 | 105d | 0 | 2.1 | 1.27003838 | other | mixedwood | open | Lake Tarleton | 092204001600902.1105d |
| 09220400160090 | 0 | 99 | 100 | 105d | 0 | inhold | 5.41896E-06 | other | mixedwood | open | Lake Tarleton | 09220400160090inhold105d |
| 09220400160090 | 0 | 99 | 100 | 115a | 0 | 2.1 | 332.8426959 | other | strong spruce-fir | open | Lake Tarleton | 092204001600902.1115a |
| 09220400160090 | 0 | 99 | 100 | 115a | 0 | inhold | 0.055440371 | other | strong spruce-fir | open | Lake Tarleton | 09220400160090inhold115a |
| 09220400160090 | 0 | 99 | 100 | INHOLD | 0 | 2.1 | 0.001319501 | other | inhold | open | Lake Tarleton | 092204001600902.1INHOLD |
| 09220400160090 | 0 | 99 | 100 | INHOLD | 0 | inhold | 0.464596444 | other | inhold | open | Lake Tarleton | 09220400160090inholdINHOLD |
| 09220400160091 | 0 | 81 | 0 | 105d | 0 | 2.1 | 2.291863778 | hardwood | mixedwood | mature | Lake Tarleton | 092204001600912.1105d |
| 09220400160091 | 0 | 81 | 0 | 115a | 0 | 2.1 | 0.10081088 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001600912.1115a |
| 09220400160102 | 0 | 81 | 0 | 115a | 0 | | 0.041267164 | hardwood | strong spruce-fir | mature | Lake Tarleton | 09220400160102115a |
| 09220400160102 | 0 | 81 | 0 | 115a | 0 | 2.1 | 0.985185303 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001601022.1115a |
| 09220400160103 | 0 | 81 | 0 | 115a | 0 | | 0.279002585 | hardwood | strong spruce-fir | mature | Lake Tarleton | 09220400160103115a |
| 09220400160103 | 0 | 81 | 0 | 115a | 0 | 2.1 | 5.520623611 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001601032.1115a |
| 09220400160103 | 0 | 81 | 0 | INHOLD | 0 | 2.1 | 0.000107312 | hardwood | inhold | mature | Lake Tarleton | 092204001601032.1INHOLD |
| 09220400160104 | 0 | 81 | 0 | 115a | 0 | 2.1 | 0.261127985 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001601042.1115a |
| 09220400160104 | 0 | 81 | 0 | 115a | 0 | inhold | 0.031343856 | hardwood | strong spruce-fir | mature | Lake Tarleton | 09220400160104inhold115a |
| 09220400160104 | 0 | 81 | 0 | INHOLD | 0 | 2.1 | 0.001741829 | hardwood | inhold | mature | Lake Tarleton | 092204001601042.1INHOLD |
| 09220400160104 | 0 | 81 | 0 | INHOLD | 0 | inhold | 62.68746442 | hardwood | inhold | mature | Lake Tarleton | 09220400160104inholdINHOLD |
| 09220400160105 | 0 | 81 | 0 | 115a | 0 | 2.1 | 1.711549678 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001601052.1115a |
| 09220400160106 | 0 | 97 | 500 | 102c | 0 | 2.1 | 1.096639004 | other | hardwood | open | Lake Tarleton | 092204001601062.1102c |
| 09220400160106 | 0 | 97 | 500 | 102c | 0 | 6.1 | 15.27367634 | other | hardwood | open | Lake Tarleton | 092204001601066.1102c |
| 09220400160106 | 0 | 97 | 500 | 105d | 0 | 8.3 | 0.291721182 | other | mixedwood | open | Lake Tarleton | 092204001601068.3105d |
| 09220400160106 | 0 | 97 | 500 | 105d | 0 | inhold | 11.10188013 | other | mixedwood | open | Lake Tarleton | 09220400160106inhold105d |
| 09220400160106 | 0 | 97 | 500 | 115a | 0 | 2.1 | 7.164889996 | other | strong spruce-fir | open | Lake Tarleton | 092204001601062.1115a |
| 09220400160106 | 0 | 97 | 500 | 115a | 0 | 8.3 | 2.56052847 | other | strong spruce-fir | open | Lake Tarleton | 092204001601068.3115a |
| 09220400160106 | 0 | 97 | 500 | 115a | 0 | inhold | 50.50239922 | other | strong spruce-fir | open | Lake Tarleton | 09220400160106inhold115a |
| 09220400160106 | 0 | 97 | 500 | 115c | 0 | 2.1 | 3.50833337 | other | hardwood | open | Lake Tarleton | 092204001601062.1115c |
| 09220400160106 | 0 | 97 | 500 | 115c | 0 | 6.1 | 4.291990752 | other | hardwood | open | Lake Tarleton | 092204001601066.1115c |
| 09220400160106 | 0 | 97 | 500 | 115c | 0 | 8.3 | 0.046805453 | other | hardwood | open | Lake Tarleton | 092204001601068.3115c |
| 09220400160106 | 0 | 97 | 500 | 115c | 0 | inhold | 0.158952967 | other | hardwood | open | Lake Tarleton | 09220400160106inhold115c |
| 09220400160106 | 0 | 97 | 500 | 115g | 0 | 8.3 | 1.921769931 | other | hardwood | open | Lake Tarleton | 092204001601068.3115g |
| 09220400160106 | 0 | 97 | 500 | 115g | 0 | inhold | 1.308591317 | other | hardwood | open | Lake Tarleton | 09220400160106inhold115g |
| 09220400160106 | 0 | 97 | 500 | 2d | 0 | 6.1 | 7.97175E-05 | other | strong spruce-fir | open | Lake Tarleton | 092204001601066.12d |
| 09220400160106 | 0 | 97 | 500 | 405 | 0 | 2.1 | 3.258591818 | other | hardwood | open | Lake Tarleton | 092204001601062.1405 |
| 09220400160106 | 0 | 97 | 500 | 405 | 0 | 6.1 | 5.101502054 | other | hardwood | open | Lake Tarleton | 092204001601066.1405 |
| 09220400160106 | 0 | 97 | 500 | 405d | 0 | 8.3 | 1.022815981 | other | mixedwood | open | Lake Tarleton | 092204001601068.3405d |
| 09220400160106 | 0 | 97 | 500 | 405d | 0 | inhold | 15.22485443 | other | mixedwood | open | Lake Tarleton | 09220400160106inhold405d |
| 09220400160106 | 0 | 97 | 500 | 415g | 0 | 2.1 | 25.19101722 | other | hardwood | open | Lake Tarleton | 092204001601062.1415g |
| 09220400160106 | 0 | 97 | 500 | 415g | 0 | 8.3 | 17.29485138 | other | hardwood | open | Lake Tarleton | 092204001601068.3415g |
| 09220400160106 | 0 | 97 | 500 | 415g | 0 | inhold | 7.298861161 | other | hardwood | open | Lake Tarleton | 09220400160106inhold415g |
| 09220400160107 | 0 | 81 | 0 | 105d | 0 | 2.1 | 0.112867852 | hardwood | mixedwood | mature | Lake Tarleton | 092204001601072.1105d |
| 09220400160107 | 0 | 81 | 0 | 115a | 0 | 2.1 | 3.931837507 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001601072.1115a |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09220400160108 | 0 | 81 | 0 | 105d | 0 | 2.1 | 4.579411679 | hardwood | mixedwood | mature | Lake Tarleton | 092204001601082.1105d |
| 09220400160108 | 0 | 81 | 0 | 115a | 0 | 2.1 | 0.231048624 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001601082.1115a |
| 09220400160109 | 0 | 81 | 0 | INHOLD | 0 | 2.1 | 6.39445E-05 | hardwood | inhold | mature | Lake Tarleton | 092204001601092.1INHOLD |
| 09220400160109 | 0 | 81 | 0 | INHOLD | 0 | inhold | 1.507054154 | hardwood | inhold | mature | Lake Tarleton | 09220400160109inholdINHOLD |
| 09220400163001 | 1926 | 3 | 500 | 115a | 0 | | 1.411962271 | oak-pine | strong spruce-fir | mature | Lake Tarleton | 09220400163001115a |
| 09220400163001 | 1926 | 3 | 500 | 115a | 0 | 2.1 | 15.26310013 | oak-pine | strong spruce-fir | mature | Lake Tarleton | 092204001630012.1115a |
| 09220400163001 | 1926 | 3 | 500 | 115a | 0 | 8.3 | 0.003494309 | oak-pine | strong spruce-fir | mature | Lake Tarleton | 092204001630018.3115a |
| 09220400163001 | 1926 | 3 | 500 | 115g | 0 | 2.1 | 0.008275976 | oak-pine | hardwood | mature | Lake Tarleton | 092204001630012.1115g |
| 09220400163002 | 1973 | 89 | 500 | 115a | 0 | | 0.001792333 | hardwood | strong spruce-fir | young | Lake Tarleton | 09220400163002115a |
| 09220400163002 | 1973 | 89 | 500 | 115a | 0 | 2.1 | 41.37929224 | hardwood | strong spruce-fir | young | Lake Tarleton | 092204001630022.1115a |
| 09220400163002 | 1973 | 89 | 500 | 115a | 0 | 8.3 | 4.098956637 | hardwood | strong spruce-fir | young | Lake Tarleton | 092204001630028.3115a |
| 09220400163002 | 1973 | 89 | 500 | 115g | 0 | | 0.000836517 | hardwood | hardwood | young | Lake Tarleton | 09220400163002115g |
| 09220400163002 | 1973 | 89 | 500 | 115g | 0 | 2.1 | 0.42649287 | hardwood | hardwood | young | Lake Tarleton | 092204001630022.1115g |
| 09220400163003 | 1916 | 7 | 500 | 115a | 0 | 8.3 | 7.524622075 | spruce-fir | strong spruce-fir | mature | Lake Tarleton | 092204001630038.3115a |
| 09220400163003 | 1916 | 7 | 500 | 2d | 0 | 8.3 | 5.913056836 | spruce-fir | strong spruce-fir | mature | Lake Tarleton | 092204001630038.32d |
| 09220400163004 | 1912 | 3 | 500 | 115a | 0 | | 3.435850641 | oak-pine | strong spruce-fir | mature | Lake Tarleton | 09220400163004115a |
| 09220400163004 | 1912 | 3 | 500 | 115a | 0 | 2.1 | 3.805020253 | oak-pine | strong spruce-fir | mature | Lake Tarleton | 092204001630042.1115a |
| 09220400163004 | 1912 | 3 | 500 | 115g | 0 | | 0.006918672 | oak-pine | hardwood | mature | Lake Tarleton | 09220400163004115g |
| 09220400163004 | 1912 | 3 | 500 | 115g | 0 | 2.1 | 0.007460784 | oak-pine | hardwood | mature | Lake Tarleton | 092204001630042.1115g |
| 09220400163005 | 1916 | 87 | 500 | 115a | 0 | 2.1 | 5.29839E-05 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204001630052.1115a |
| 09220400163005 | 1916 | 87 | 500 | 115g | 0 | 2.1 | 6.04006674 | mixedwood | hardwood | mature | Lake Tarleton | 092204001630052.1115g |
| 09220400163006 | 1966 | 87 | 500 | 115a | 0 | | 0.009102766 | mixedwood | strong spruce-fir | young | Lake Tarleton | 09220400163006115a |
| 09220400163006 | 1966 | 87 | 500 | 115a | 0 | 2.1 | 1.666679007 | mixedwood | strong spruce-fir | young | Lake Tarleton | 092204001630062.1115a |
| 09220400163006 | 1966 | 87 | 500 | 115g | 0 | | 1.691977302 | mixedwood | hardwood | young | Lake Tarleton | 09220400163006115g |
| 09220400163006 | 1966 | 87 | 500 | 115g | 0 | 2.1 | 19.53330035 | mixedwood | hardwood | young | Lake Tarleton | 092204001630062.1115g |
| 09220400163007 | 1922 | 89 | 500 | 115a | 0 | 2.1 | 0.469238624 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001630072.1115a |
| 09220400163007 | 1922 | 89 | 500 | 115g | 0 | | 0.398232052 | hardwood | hardwood | mature | Lake Tarleton | 09220400163007115g |
| 09220400163007 | 1922 | 89 | 500 | 115g | 0 | 2.1 | 44.94712859 | hardwood | hardwood | mature | Lake Tarleton | 092204001630072.1115g |
| 09220400163007 | 1922 | 89 | 500 | 2d | 0 | 2.1 | 34.16536936 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001630072.12d |
| 09220400163007 | 1922 | 89 | 500 | 2d | 0 | 8.3 | 4.453221578 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001630078.32d |
| 09220400163008 | 0 | 99 | 165 | 115a | 0 | | 2.163142791 | other | strong spruce-fir | open | Lake Tarleton | 09220400163008115a |
| 09220400163008 | 0 | 99 | 165 | 115a | 0 | 2.1 | 3.435397866 | other | strong spruce-fir | open | Lake Tarleton | 092204001630082.1115a |
| 09220400163009 | 1916 | 7 | 500 | 115a | 0 | 2.1 | 0.411718452 | spruce-fir | strong spruce-fir | mature | Lake Tarleton | 092204001630092.1115a |
| 09220400163009 | 1916 | 7 | 500 | 2d | 0 | 2.1 | 1.732510632 | spruce-fir | strong spruce-fir | mature | Lake Tarleton | 092204001630092.12d |
| 09220400163009 | 1916 | 7 | 500 | 2d | 0 | 8.3 | 1.132796491 | spruce-fir | strong spruce-fir | mature | Lake Tarleton | 092204001630098.32d |
| 09220400163010 | 0 | 99 | 268 | 115a | 0 | 2.1 | 1.456026349 | other | strong spruce-fir | open | Lake Tarleton | 092204001630102.1115a |
| 09220400163011 | 0 | 81 | 268 | 115a | 0 | 2.1 | 3.238761242 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001630112.1115a |
| 09220400163012 | 1939 | 81 | 500 | 115a | 0 | 2.1 | 10.83754766 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001630122.1115a |
| 09220400163012 | 1939 | 81 | 500 | 115a | 0 | 8.3 | 5.517106524 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001630128.3115a |
| 09220400163012 | 1939 | 81 | 500 | 115g | 0 | 2.1 | 0.085406994 | hardwood | hardwood | mature | Lake Tarleton | 092204001630122.1115g |
| 09220400163012 | 1939 | 81 | 500 | 2d | 0 | 2.1 | 1.589916467 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001630122.12d |
| 09220400163012 | 1939 | 81 | 500 | 2d | 0 | 8.3 | 13.84163986 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001630128.32d |

# HMU ANALYSIS TOOL *ver. 3.0*

HMU Name & Date: Lake Tarleton_3-28-2019 Date analysis completed: 2-26-2020

**Table 1: Current Condition, PNV, and Objectives by Habitat Type**

| Habitat | Current acres in entire HMU | % of HMU | Potential acres in entire HMU | % of HMU | Current acres in MA 2.1 | % of MA in HMU | Potential acres in 2.1 | % of MA in HMU | HMU Objectives MA 2.1 (acres) | HMU objective (% of MA 2.1) |
|---|---|---|---|---|---|---|---|---|---|---|
| Hardwood | 2,957 | 56% | 2,616 | 50% | 1,573 | 59% | 635 | 24% | 452 | 17% |
| Mixedwood | 930 | 18% | 491 | 9% | 296 | 11% | 345 | 13% | 745 | 28% |
| Spruce-fir | 297 | 6% | 0 | 0% | 157 | 6% | 0 | 0% | 1,410 | 53% |
| Strong Spruce-Fir | | | 2,079 | 40% | | | 1,680 | 63% | | |
| Aspen-Birch | 43 | 1% | | | 43 | 2% | | | 27 | 1% |
| Oak-Pine | 331 | 6% | | | 38 | 1% | | | 0 | 0% |
| Hemlock | 11 | 0% | * | | 11 | 0% | | | 0 | 0% |
| WL Openings | 2 | 0% | | | 0 | 0% | | | 27 | 1% |
| Other** | 700 | 13% | 13 | | 544 | 20% | 0 | | 0 | 0% |
| Total acres | 5,271 | | 5,199 | | 2,660 | | 2,660 | | 2,660 | |

Potential acres are based on ELT capability
* While hemlock can be a climax forest type, ELTs have not been identified that are more likely to become hemlock than spruce-fir in the long-term, so hemlock potential is part of the spruce-fir and strong spruce-fir PNV numbers.
** Current acres are those that do not have a forest type coded in CDS or that are not an identified wildlife opening or forested, such as wetlands, rock, and alpine habitat. Potential acres are those that ELTs indicate are unlikely to be forested (e.g. bogs, rocks).

**Table 2: Relationship between Current Habitat and PNV in MA 2.1**

| Habitat | MA 2.1 acres | MA 2.1 acres on HW sites | % on HW sites | MA 2.1 acres on MW sites | % on MW sites | MA 2.1 acres on SF sites | % on SF sites | MA 2.1 acres on Strong SF sites | % on Strong SF sites |
|---|---|---|---|---|---|---|---|---|---|
| Hardwood | 1,573 | 535 | 34% | 269 | 17% | 0 | 0% | 769 | 49% |
| Mixedwood | 296 | 46 | 16% | 17 | 6% | 0 | 0% | 233 | 79% |
| Spruce-fir | 157 | 0 | 0% | 38 | 24% | 0 | 0% | 119 | 76% |
| Aspen-Birch | 43 | 15 | 35% | 0 | 0% | 0 | 0% | 28 | 65% |
| Oak-Pine | 38 | 3 | 8% | 0 | 0% | 0 | 0% | 35 | 92% |
| Hemlock | 11 | 0 | 0% | 10 | 90% | 0 | 0% | 1 | 10% |
| Total | 2,117 | 599 | | 333 | | 0 | | 1,185 | |

HMU Name & Date: Lake Tarleton_3-28-2019

**Table 3: Age Class - Current Condition and Objectives by Habitat Type**

| | Hardwood Acres | Hardwood % | Mixedwood Acres | Mixedwood % | Spruce-fir Acres | Spruce-fir % | Aspen-Birch Acres | Aspen-Birch % | Oak-Pine Acres | Oak-Pine % | Hemlock Acres | Hemlock % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ALL LANDS IN HMU** | | | | | | | | | | | | |
| Regen in HMU | - | 0% | - | 0% | - | 0% | - | 0% | - | 0% | - | 0% |
| Young in HMU | 1,011 | 34% | 296 | 32% | - | 0% | 0 | 0% | 215 | 65% | - | 0% |
| Mature in HMU | 1,946 | 66% | 634 | 68% | 297 | 100% | 43 | 100% | 117 | 35% | 11 | 100% |
| Total in HMU | 2,957 | | 930 | | 297 | | 43 | | 331 | | 11 | |
| **MA 2.1 LANDS IN HMU** | | | | | | | | | | | | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Regen in MA 2.1 | - | 0% | - | 0% | - | 0% | - | 0% | - | 0% | - | 0% |
| Young in MA 2.1 | 606 | 39% | 108 | 36% | - | 0% | 0 | 0% | 16 | 44% | - | 0% |
| Mature in MA 2.1 | 966 | 61% | 188 | 64% | 157 | 100% | 43 | 100% | 21 | 56% | 11 | 100% |
| Total in MA 2.1 | 1,573 | | 296 | | 157 | | 43 | | 38 | | 11 | |
| HMU DEFAULT MA 2.1 AGE CLASS OBJECTIVES | | | | | | | | | | | | |
| HMU Default regen objective in 2.1 | 47-63 | 3%-4% | 3 | 1% | 2-3 | 1%-2% | 5-6 | 12%-15% | | | | |
| HMU Default young objective in 2.1 | 236-315 | 15%-20% | 15 | 5% | 5-9 | 3%-6% | 15-19 | 36%-45% | | | | |
| HMU Default mature objective in 2.1 | 1,152-1,246 | 73%-79% | 272 | 92% | 68-74 | 43%-47% | 6-11 | 15%-27% | | | | |
| Land Unsuitable for Harvest in 2.1 | 43 | 3% | 7 | 2% | 77 | 49% | 11 | 25% | 18 | 49% | 11 | 100% |
| **HMU default regeneration and young forest habitat objectives were assumed to be the same as Forest-wide objectives; this may be modified by the District bio.** | | | | | | | | | | | | |
| *HMU regen objective in 2.1* | 63 | 4% | 3 | 1% | 2 | 1% | 48 | 112% | 0 | | 0 | |
| *HMU young objective in 2.1* | 126 | 8% | 15 | 5% | 5 | 3% | 9 | 22% | 0 | | 0 | |
| *HMU mature objective in 2.1* | 1,321 | 84% | 234 | 79% | 110 | 70% | 11 | 26% | 0 | | 0 | |
| *Land Unsuitable for Harvest in 2.1* | 43 | 3% | 7 | 2% | 77 | 49% | 11 | 25% | 18 | 49% | 11 | 100% |

* Because of the overall age of aspen-birch habitat on the Forest, management in the next 10-20 years should regenerate far more than is strictly necessary to meet the age-class objectives or the Forest risks losing aspen-birch habitat. This is accounted for in the FEIS and means that the aspen-birch regen needed in MA 2.1 in every HMU will be higher than indicated here.

*HMU Name & Date: Lake Tarleton_3-28-2019*

**Table 4a: PNV and Current Age Class for Hardwood on MA 2.1 and LSC 500 Lands**

| Hard-wood Habitat | Hardwood Acres | Hardwood % | Mixedwood Acres | Mixedwood % | Spruce-fir Acres | Spruce-fir % | Strong Spruce-fir Acres | Strong Spruce-fir % |
|---|---|---|---|---|---|---|---|---|
| Regen | - | 0% | - | 0% | - | 0% | - | 0% |
| Young | 177 | 33% | 54 | 20% | - | 0% | 376 | 49% |
| Mature | 358 | 67% | 215 | 80% | - | 0% | 393 | 51% |
| Total | 535 | | 269 | | - | | 769 | |

**Table 4b: PNV and Current Age Class for Mixedwood on MA 2.1 and LSC 500 Lands**

| Mixed-wood Habitat | Hardwood Acres | Hardwood % | Mixedwood Acres | Mixedwood % | Spruce-fir Acres | Spruce-fir % | Strong Spruce-fir Acres | Strong Spruce-fir % |
|---|---|---|---|---|---|---|---|---|
| Regen | - | 0% | - | 0% | - | 0% | - | 0% |
| Young | 20 | 43% | - | 0% | - | 0% | 88 | 38% |
| Mature | 26 | 57% | 17 | 100% | - | 0% | 145 | 62% |
| Total | 46 | | 17 | | - | | 233 | |

**SUMMARY TABLES**

| Available for Regeneration (by the numbers) | |
|---|---|
| Mature AB on HW, MW, SF: | 15 |
| Mature HW on HW: | 358 |
| Mature MW on MW: | 17 |
| Mature SF on Strong SF: | 119 |
| **Total:** | 509 |

**Note:** AB: As en-Birch, HW: Hardwood, MW: Mixedwood, SF: Spruce-Fir

| Mature or Old Not Available for Regeneration | |
|---|---|
| Mature AB on Strong SF: | 28 |
| Mature HW on MW, SF, or Strong SF: | 608 |
| Mature MW on HW: | 26 |
| Mature MW on SF or Strong SF: | 145 |
| Mature SF on HW, MW, or SF: | 157 |

# HMU ANALYSIS TOOL *ver. 3.0*

| | |
|---|---|
| **Total:** | 964 |

**Table 4c: PNV and Current Age Class for Spruce-Fir on MA 2.1 and LSC 500 Lands**

| Spruce-Fir Habitat | Hardwood Acres | Hardwood % | Mixedwood Acres | Mixedwood % | Spruce-fir Acres | Spruce-fir % | Strong Spruce-fir Acres | Strong Spruce-fir % |
|---|---|---|---|---|---|---|---|---|
| Regen | - | 0% | - | 0% | - | 0% | - | 0% |
| Young | - | 0% | - | 0% | - | 0% | - | 0% |
| Mature | 0 | 100% | 38 | 100% | - | 0% | 119 | 100% |
| Total | 0 | | 38 | | - | | 119 | |

**Table 4d: PNV and Current Age Class for Aspen Birch on MA 2.1 and LSC 500 Lands**

| Aspen-Birch Habitat | Hardwood Acres | Hardwood % | Mixedwood Acres | Mixedwood % | Spruce-fir Acres | Spruce-fir % | Strong Spruce-fir Acres | Strong Spruce-fir % |
|---|---|---|---|---|---|---|---|---|
| Regen | - | 0% | - | 0% | - | 0% | - | 0% |
| Young | 0 | 0% | - | 0% | - | 0% | - | 0% |
| Mature | 15 | 100% | - | 0% | - | 0% | 28 | 100% |
| Total | 15 | | - | | - | | 28 | |

**All Age Classes (for context)**

| | |
|---|---|
| AB on HW, MW, SF: | 15 |
| AB on Strong SF: | 28 |
| HW on HW: | 535 |
| HW on MW, SF or Strong SF: | 1,038 |
| MW on MW: | 17 |
| MW on HW: | 46 |
| MW on SF or Strong SF: | 233 |
| SF on Strong SF: | 119 |
| SF on HW, MW, or SF: | 38 |
| **Total:** | 2,068 |

JA-1464

*HMU Name & Date: Lake Tarleton_3-28-2019 Date analysis completed: 2-26-2020*

**Table 1: Current Condition, PNV, and Objectives by Habitat Type**

| Habitat | Current acres in entire HMU | % of HMU | Potential acres in entire HMU | % of HMU | Current acres in MA 2.1 | % of MA in HMU | Potential acres in 2.1 | % of MA in HMU | HMU Objectives MA 2.1 (acres) | HMU objective (% of MA 2.1) |
|---|---|---|---|---|---|---|---|---|---|---|
| Hardwood | 2,957 | 56% | 2,613 | 50% | 1,573 | 59% | 632 | 24% | 452 | 17% |
| Mixedwood | 930 | 18% | 490 | 9% | 296 | 11% | 344 | 13% | 745 | 28% |
| Spruce-fir | 287 | 5% | 0 | 0% | 147 | 6% | 0 | 0% | 1,410 | 53% |
| Strong Spruce-Fir | | | 1,702 | 33% | | | 1,303 | 49% | | |
| Aspen-Birch | 43 | 1% | | | 43 | 2% | | | 27 | 1% |
| Oak-Pine | 331 | 6% | | | 38 | 1% | | | 0 | 0% |
| Hemlock | 11 | 0% | * | | 11 | 0% | | | 0 | 0% |
| WL Openings | 62 | 1% | | | 62 | 2% | | | 27 | 1% |
| Other** | 650 | 12% | 394 | | 491 | 18% | 381 | 14% | 0 | 0% |
| Total acres | 5,271 | | 5,199 | | 2,660 | | 2,660 | | 2,660 | |

Potential acres are based on ELT capability
* While hemlock can be a climax forest type, ELTs have not been identified that are more likely to become hemlock than spruce-fir in the long-term, so hemlock potential is part of the spruce-fir and strong spruce-fir PNV numbers.
** Current acres are those that do not have a forest type coded in CDS or that are not an identified wildlife opening or forested, such as wetlands, rock, and alpine habitat. Potential acres are those that ELTs indicate are unlikely to be forested (e.g. bogs, rocks).

Guide to changes:

Red text - 9.6 acres of mature SW on a strong SW are a beaver flowage. PNV not changed since flowage will succeed to forest in time.
Blue text - Moved 60 acres (entire HMU) and then 62 acres (2.1 only) from "Other" to "WL Openings" to account for managed PWO along Rte. 25C. Did not adjust PNV because openings would naturally succeed to forest.
Purple text - 3 acres of lake Katherine was removed from HW PNV to Other.
Orange text - 1 acre of Lake Tarleton was removed from MW PNV to Other.
Green text - 377 combined acres of Lake Tarleton and Lake Katherine was removed from strong spruce-fir PNV to Other.

The PNVs of beaver flowages and openings remain unchanged because natural succession would likely bring them to their PNVs. These adjusments were mainly made to account for the PNVs attributed to the permanent water bodies and to ensure that the existing opening is inlcuded in the current acres category. It was also noticed than a 9.6 acre beaver flowage was

**Table 2: Relationship between Current Habitat and PNV in MA 2.1**

| Habitat | MA 2.1 acres | MA 2.1 acres on HW sites | % on HW sites | MA 2.1 acres on MW sites | % on MW sites | MA 2.1 acres on SF sites | % on SF sites | MA 2.1 acres on Strong SF sites | % on Strong SF sites |
|---|---|---|---|---|---|---|---|---|---|
| Hardwood | 1,573 | 535 | 34% | 269 | 17% | 0 | 0% | 769 | 49% |
| Mixedwood | 296 | 46 | 16% | 17 | 6% | 0 | 0% | 233 | 79% |
| Spruce-fir | 147 | 0 | 0% | 38 | 26% | 0 | 0% | 109 | 74% |
| Aspen-Birch | 43 | 15 | 35% | 0 | 0% | 0 | 0% | 28 | 65% |
| Oak-Pine | 38 | 3 | 8% | 0 | 0% | 0 | 0% | 35 | 92% |
| Hemlock | 11 | 0 | 0% | 10 | 90% | 0 | 0% | 1 | 10% |
| Total | 2,107 | 599 | | 333 | | 0 | | 1,175 | |

*HMU Name & Date: Lake Tarleton_3-28-2019*

**Table 3: Age Class - Current Condition and Objectives by Habitat Type**

| | Hardwood Acres | Hardwood % | Mixedwood Acres | Mixedwood % | Spruce-fir Acres | Spruce-fir % | Aspen-Birch Acres | Aspen-Birch % | Oak-Pine Acres | Oak-Pine % | Hemlock Acres | Hemlock % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ALL LANDS IN HMU** | | | | | | | | | | | | |
| Regen in HMU | - | 0% | - | 0% | - | 0% | - | 0% | - | 0% | - | 0% |
| Young in HMU | 1,011 | 34% | 296 | 32% | - | 0% | 0 | 0% | 215 | 65% | - | 0% |
| Mature in HMU | 1,946 | 66% | 634 | 68% | 287 | 100% | 43 | 100% | 117 | 35% | 11 | 100% |
| Total in HMU | 2,957 | | 930 | | 287 | | 43 | | 331 | | 11 | |
| **MA 2.1 LANDS IN HMU** | | | | | | | | | | | | |
| Regen in MA 2.1 | - | 0% | - | 0% | - | 0% | - | 0% | - | 0% | - | 0% |
| Young in MA 2.1 | 606 | 39% | 108 | 36% | - | 0% | 0 | 0% | 16 | 44% | - | 0% |
| Mature in MA 2.1 | 966 | 61% | 188 | 64% | 147 | 100% | 43 | 100% | 21 | 56% | 11 | 100% |
| Total in MA 2.1 | 1,573 | | 296 | | 147 | | 43 | | 38 | | 11 | |
| **HMU DEFAULT MA 2.1 AGE CLASS OBJECTIVES** | | | | | | | | | | | | |
| HMU Default regen objective in 2.1 | 47-63 | 3%-4% | 3 | 1% | 1-3 | 1%-2% | 5-6 | 12%-15% | | | | |
| HMU Default young objective in 2.1 | 236-315 | 15%-20% | 15 | 5% | 4-9 | 3%-6% | 15-19 | 36%-45% | | | | |
| HMU Default mature objective in 2.1 | 1,152-1,246 | 73%-79% | 272 | 92% | 59-65 | 40%-44% | 6-11 | 15%-27% | | | | |
| Land Unsuitable for Harvest in 2.1 | 43 | 3% | 7 | 2% | 77 | 52% | 11 | 25% | 18 | 49% | 11 | 100% |
| **HMU default regeneration and young forest habitat objectives were assumed to be the same as Forest-wide objectives; this may be modified by the District bio.** | | | | | | | | | | | | |
| *HMU regen objective in 2.1* | 79 | 5% | 6 | 2% | 7 | 5% | 11 | 25% | 0 | | 0 | |
| *HMU young objective in 2.1* | 126 | 8% | 15 | 5% | 4 | 3% | 9 | 22% | 0 | | 0 | |
| *HMU mature objective in 2.1* | 1,321 | 84% | 234 | 79% | 103 | 70% | 11 | 26% | 0 | | 0 | |
| *Land Unsuitable for Harvest in 2.1* | 43 | 3% | 7 | 2% | 77 | 52% | 11 | 25% | 18 | 49% | 11 | 100% |

* Because of the overall age of aspen-birch habitat on the Forest, management in the next 10-20 years should regenerate far more than is strictly necessary to meet the age-class objectives or the Forest risks losing aspen-birch habitat. This is accounted for in the FEIS and means that the aspen-birch regen needed in MA 2.1 in every HMU will be higher than indicated here.

*HMU Name & Date: Lake Tarleton_3-28-2019*

**Table 4a: PNV and Current Age Class for Hardwood on MA 2.1 and LSC 500 Lands**

| Hard-wood Habitat | Hardwood Acres | Hardwood % | Mixedwood Acres | Mixedwood % | Spruce-fir Acres | Spruce-fir % | Strong Spruce-fir Acres | Strong Spruce-fir % |
|---|---|---|---|---|---|---|---|---|
| Regen | - | 0% | - | 0% | - | 0% | - | 0% |
| Young | 177 | 33% | 54 | 20% | - | 0% | 376 | 49% |
| Mature | 358 | 67% | 215 | 80% | - | 0% | 393 | 51% |
| Total | 535 | | 269 | | - | | 769 | |

**Table 4b: PNV and Current Age Class for Mixedwood on MA 2.1 and LSC 500 Lands**

| Mixed-wood Habitat | Hardwood Acres | Hardwood % | Mixedwood Acres | Mixedwood % | Spruce-fir Acres | Spruce-fir % | Strong Spruce-fir Acres | Strong Spruce-fir % |
|---|---|---|---|---|---|---|---|---|
| Regen | - | 0% | - | 0% | - | 0% | - | 0% |
| Young | 20 | 43% | - | 0% | - | 0% | 88 | 38% |
| Mature | 26 | 57% | 17 | 100% | - | 0% | 145 | 62% |
| Total | 46 | | 17 | | - | | 233 | |

**Table 4c: PNV and Current Age Class for Spruce-Fir on MA 2.1 and LSC 500 Lands**

| Spruce-Fir Habitat | Hardwood Acres | Hardwood % | Mixedwood Acres | Mixedwood % | Spruce-fir Acres | Spruce-fir % | Strong Spruce-fir Acres | Strong Spruce-fir % |
|---|---|---|---|---|---|---|---|---|
| Regen | - | 0% | - | 0% | - | 0% | - | 0% |
| Young | - | 0% | - | 0% | - | 0% | - | 0% |
| Mature | 0 | 100% | 38 | 100% | - | 0% | 119 | 100% |
| Total | 0 | | 38 | | - | | 119 | |

**Table 4d: PNV and Current Age Class for Aspen Birch on MA 2.1 and LSC 500 Lands**

**SUMMARY TABLES**

| **Available for Regeneration (by the numbers)** | |
|---|---|
| Mature AB on HW, MW, SF: | 15 |
| Mature HW on HW: | 358 |
| Mature MW on MW: | 17 |
| Mature SF on Strong SF: | 119 |
| **Total:** | 509 |

**Note:** AB: As en-Birch, HW: Hardwood, MW: Mixedwood, SF: Spruce-Fir

| **Mature or Old Not Available for Regeneration** | |
|---|---|
| Mature AB on Strong SF: | 28 |
| Mature HW on MW, SF, or Strong SF: | 608 |
| Mature MW on HW: | 26 |
| Mature MW on SF or Strong SF: | 145 |
| Mature SF on HW, MW, or SF: | 157 |
| **Total:** | 964 |

| **All Age Classes (for context)** | |
|---|---|
| AB on HW, MW, SF: | 15 |
| AB on Strong SF: | 28 |
| HW on HW: | 535 |
| HW on MW, SF or Strong SF: | 1,038 |
| MW on MW: | 17 |
| MW on HW: | 46 |

| Aspen-Birch Habitat | Hardwood Acres | Hardwood % | Mixedwood Acres | Mixedwood % | Spruce-fir Acres | Spruce-fir % | Strong Spruce-fir Acres | Strong Spruce-fir % |
|---|---|---|---|---|---|---|---|---|
| Regen | - | 0% | - | 0% | - | 0% | - | 0% |
| Young | 0 | 0% | - | 0% | - | 0% | - | 0% |
| Mature | 15 | 100% | - | 0% | - | 0% | 28 | 100% |
| Total | 15 | | - | | - | | 28 | |

| | |
|---|---|
| MW on SF or Strong SF: | 233 |
| SF on Strong SF: | 119 |
| SF on HW, MW, or SF: | 38 |
| **Total:** | 2,068 |

| STAND_ID | YEAI | FOF | LSC | ELTCODE | VEGETATI | HMACODE | GIS_ACRE | HABITAT | PNV | AGE_CLASS | HMU_Name | Join1 | Actual Habitat Type | Description |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09220400160050 | 0 | 99 | 100 | 115a | 0 | 2.1 | 44.3967 | other | strong spruce-fir | open | Lake Tarleton | 092204001600502.111 | Open water | Lake Katherine |
| 09220400160050 | 0 | 99 | 100 | 115c | 0 | 2.1 | 2.774246 | other | hardwood | open | Lake Tarleton | 092204001600502.111 | Open water | Lake Katherine |
| 09220400160051 | 0 | 99 | 500 | 115a | 0 | 2.1 | 14.54996 | other | strong spruce-fir | open | Lake Tarleton | 092204001600512.111 | Opening | PWO @ Rte. 25C |
| 09220400160052 | 0 | 99 | 0 | 115a | 0 | 2.1 | 47.66415 | other | strong spruce-fir | open | Lake Tarleton | 092204001600522.111 | Opening | PWO @ Rte. 25C |
| 09220400160054 | 0 | 99 | 268 | 115a | 0 | 2.1 | 16.46986 | other | strong spruce-fir | open | Lake Tarleton | 092204001600542.111 | Open wetland | Beaver flowage |
| 09220400160055 | 0 | 99 | 500 | 115a | 0 | 2.1 | 3.119089 | other | strong spruce-fir | open | Lake Tarleton | 092204001600552.111 | Old opening | No longer maintained |
| 09220400160056 | 0 | 99 | 268 | 105d | 0 | 2.1 | 10.60164 | other | mixedwood | open | Lake Tarleton | 092204001600562.110 | Open wetland | Beaver flowage |
| 09220400160057 | 0 | 99 | 268 | 115a | 0 | 2.1 | 24.13524 | other | strong spruce-fir | open | Lake Tarleton | 092204001600572.111 | Open wetland | Beaver flowage |
| 09220400160057 | 0 | 99 | 268 | 115c | 0 | 2.1 | 0.619267 | other | hardwood | open | Lake Tarleton | 092204001600572.111 | Open wetland | Beaver flowage |
| 09220400160057 | 0 | 99 | 268 | 415g | 0 | 2.1 | 0.001465 | other | hardwood | open | Lake Tarleton | 092204001600572.141 | Open wetland | Beaver flowage |
| 09220400160090 | 0 | 99 | 100 | 105d | 0 | 2.1 | 1.270038 | other | mixedwood | open | Lake Tarleton | 092204001600902.110 | Open water | Lake Tarleton |
| 09220400160090 | 0 | 99 | 100 | 115a | 0 | 2.1 | 332.8427 | other | strong spruce-fir | open | Lake Tarleton | 092204001600902.111 | Open water | Lake Tarleton |
| 09220400160106 | 0 | 97 | 500 | 102c | 0 | 2.1 | 1.096639 | other | hardwood | open | Lake Tarleton | 092204001601062.110 | Opening | Powerlines |
| 09220400160106 | 0 | 97 | 500 | 115a | 0 | 2.1 | 7.16489 | other | strong spruce-fir | open | Lake Tarleton | 092204001601062.111 | Opening | Powerlines |
| 09220400160106 | 0 | 97 | 500 | 115c | 0 | 2.1 | 3.508333 | other | hardwood | open | Lake Tarleton | 092204001601062.111 | Opening | Powerlines |
| 09220400160106 | 0 | 97 | 500 | 405 | 0 | 2.1 | 3.258592 | other | hardwood | open | Lake Tarleton | 092204001601062.140 | Opening | Powerlines |
| 09220400160106 | 0 | 97 | 500 | 415g | 0 | 2.1 | 25.19102 | other | hardwood | open | Lake Tarleton | 092204001601062.141 | Opening | Powerlines |
| 09220400163008 | 0 | 99 | 165 | 115a | 0 | 2.1 | 3.435398 | other | strong spruce-fir | open | Lake Tarleton | 092204001630082.111 | Open wetland | Beaver flowage |
| 09220400163010 | 0 | 99 | 268 | 115a | 0 | 2.1 | 1.456026 | other | strong spruce-fir | open | Lake Tarleton | 092204001630102.111 | Open wetland | Beaver flowage |
| 09220400160053 | ### | 11 | 268 | 115a | 0 | 2.1 | 9.625402 | spruce-fir | strong spruce-fir | mature | Lake Tarleton | 092204001600532.111 | Open wetland | Beaver flowage |

Total 543.5553

| Sum of GIS_ACRES | | Actual Habitat Type | | | | |
|---|---|---|---|---|---|---|
| HABITAT | PNV | Old opening | Open water | Open wetland | Opening | Grand Total |
| other | hardwood | | 2.77424626 | 0.620731985 | 33.05458141 | 36.44955965 |
| | mixedwood | | 1.27003838 | 10.6016427 | | 11.87168108 |
| | strong spruce-fir | 3.11908934 | 377.2393959 | 45.4965263 | 69.3790025 | 495.2340141 |
| other Total | | 3.11908934 | 381.2836806 | 56.71890099 | 102.4335839 | 543.5552548 |
| spruce-fir | strong spruce-fir | | | 9.625401858 | | 9.625401858 |
| spruce-fir Total | | | | 9.625401858 | | 9.625401858 |
| Grand Total | | 3.11908934 | 381.2836806 | 66.34430285 | 102.4335839 | 553.1806567 |

| Add to: | PNV to take from: | Total acreage |
|---|---|---|
| Openings | Strong SF | 62.2141125 |
| Other | hardwood | 2.77424626 |
| Other | mixedwood | 1.27003838 |
| Other | strong spruce-fir | 377.2393959 |

| | |
|---|---|
| Total beaver flowage acreage: | 66.34430285 |
| Total powerline acreage: | 105.5526733 |
| Total: | 171.8969761 |

**Table 1: Current Condition, PNV, and Objectives by Habitat Type**

| Habitat | Current acres in entire HMU | % of HMU | Potential acres in entire HMU | % of HMU | Current acres in MA 2.1 | % of MA in HMU | Potential acres in 2.1 | % of MA in HMU | HMU Objectives MA 2.1 (acres) | HMU objective (% of MA 2.1) | Rationale |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hardwood | 2,957 | 56% | 2,616 | 50% | 1,573 | 59% | 635 | 24% | 791 | 30% | Not likely possible to reach target PNV % in one entry… is it? |
| Mixedwood | 930 | 18% | 491 | 9% | 296 | 11% | 345 | 13% | 345 | 13% | We're very close to the target PNV % |
| Spruce-fir | 297 | 6% | 0 | 0% | 157 | 6% | 0 | 0% | 798 | 30% | Going from 157 to 1,680 acres of spruce-fir in one entry isn't likely… is it? |
| Strong Spruce-Fir | | | 2,079 | 40% | | | 1,680 | 63% | | | |
| Aspen-Birch | 43 | 1% | | | 43 | 2% | | | 133 | 5% | Opportunities exists to reach Forest Plan goal of 5% |
| Oak-Pine | 331 | 6% | | | 38 | 1% | | | 38 | 1% | Maintain existing |
| Hemlock | 11 | 0% | * | | 11 | 0% | | | 11 | <1% | Maintain existing |
| WL Openings | 172 | 3% | | | 74 | 3% | | | 74 | 3% | Maintain existing. No need to create more as we are well above Forest Plan level (Keith and Leighlan may disagree) |
| Other** | 530 | 10% | 13 | | 470 | 18% | 0 | | 470 | 18% | Maintain existing |
| Total acres | 5,271 | | 5,199 | | 2,660 | | 2,660 | | 2,660 | | |

Potential acres are based on ELT capability

* While hemlock can be a climax forest type, ELTs have not been identified that are more likely to become hemlock than spruce-fir in the long-term, so hemlock potential is part of the spruce-fir and strong spruce-fir PNV numbers.

** Current acres are those that do not have a forest type coded in CDS or that are not an identified wildlife opening or forested, such as wetlands, rock, and alpine habitat. Potential acres

| Opening | HMU Area | Opening | 2.1 area |
|---|---|---|---|
| Powerline | 136 | Powerline | 38 |
| Lake Katherine | 36 | Lake Katherine | 36 |
| Total | 172 | Total | 74 |

USDA United States Department of Agriculture | Forest Service | White Mountain National Forest | 71 White Mountain Drive
Campton, NH 03223
603-536-6100

**File Code:** 1570
**Date:** September 27, 2023

Dear Objector to the Tarleton Integrated Resource Project:

This letter is in response to the objections filed (# 23-09-22-001-218 through #23-09-22-019-218) on the Tarleton Integrated Resource Project (henceforth Tarleton project) Environmental Assessment/Finding of No Significant Impact (EA/FONSI) and Draft Decision Notice (DDN). This project is located on the Pemigewasset Ranger District of the White Mountain National Forest (WMNF). As the Reviewing Officer for the Tarleton project's objections, I have completed the review of your objection issues and concerns following the pre-decisional administrative review regulations provided by 36 CFR 218, Subparts A and B. The 45-day objection filing period for this project was initiated by the publication of a legal notice in the newspaper of record, the Union Leader, on March 16, 2023. The Responsible Official for this project is Brooke Brown, District Ranger. Your written objection was timely. This letter responds to your objection as well as the objections received from 14 other objectors withstanding to object. Three additional objections were set aside from review because they failed to meet the requirements of 36 CFR 218.10 and two letters of support were received during the objection period.

The Tarleton project's proposed action was developed to meet desired conditions as provided by the WMNF's 2005 Land and Resource Management Plan (henceforth referred to as the Forest Plan). The project is located within the Tarleton Habitat Management Unit (HMU). This HMU comprises about 5,375 acres on National Forest System lands: about 2,645 acres occur within the General Forest Management Area (MA 2.1); about 1,560 acres occur within Semi-Primitive Recreation Area (MA 6.1) lands; about 830 acres occur within the Appalachian National Scenic Trail (MA 8.3) lands; and about 240 acres are private inholdings. Vegetation management, wildlife, and recreation project activities are proposed on about 755 acres within the project area.

A virtual objection resolution meeting was held on June 28, 2023, using Microsoft Teams. No resolutions were achieved.

I have reviewed the project's supporting record including the Final EA/FONSI and DDN relative to the issues raised in your objection. A team of natural resource professionals assisted me in this review. The following sections of this letter provide my written response to your objection issues as required by 36 CFR 218.11(b). Note that the objectors withstanding on each issue are denoted in parentheses.

Issue 1 (Porter, Kline, Faletra, Mandeau, Marvelle)

Commercial timber harvesting in the Tarleton project is inconsistent with protection of the area and the perceived purpose of the land acquisition of the project area.

Response: The project record contains documentation of the acquisition of parcels in the Tarleton project area in 2000, showing that there were no encumbrances or deed restrictions in the project area. Consistent with the National Forest Management Act (NFMA) of 1976, the lands were included in the analysis for the 2005 Forest Plan revision and assigned to MA 2.1 – General Forest Management of the Forest Plan. The DDN (p. 2) briefly summarizes this acquisition history. The acquisition was described in more detail in a May 10, 2022 public comment by Tom Wagner, the WMNF Forest Supervisor at that time of the acquisition (located in the project record, hereafter indicated by PR: Public_Comment_Tom_Wagner_3804046.pdf). The acquisition occurred prior to the completion of the 2005 Forest Plan, which, through an interdisciplinary process and with public engagement, resulted in a decision to assign most of the project area to MA 2.1 as noted in the project record (PR: 20230404_ResponseToCommentReportDraft, RTC #6).

Issue 2 (Porter, Pastoriza)

The Forest Service did not adequately involve the public in the development of the project and evaluation of its effects.

Response: The project record indicates that public involvement began in the summer of 2019 with pre-scoping meetings and open houses to seek public input for the Tarleton project. In October 2019, the Tarleton project was added to the Schedule of Proposed Actions. Scoping was then initiated in January 2020 with a notice of availability, scoping newsletter, and request for comments sent to 500 parties and posted to the WMNF website. The first (of two) 30-day designated comment periods began in July 2021 and the second in April 2022. During that period, there were a number of meetings and open houses involving the public and local and state entities. In addition to mailings, designated comment periods were announced by publication of a legal notice in the newspaper of record for the WMNF and posted to the WMNF website.

Public comments during formal scoping and comment periods, comments from open houses, and input from meetings were considered by the interdisciplinary team and the Responsible Official. A summary of public involvement is presented in the Final EA (pp. 3-5). In that summary, changes to the project and effects analyses were outlined. However, not all input resulted in changes to the project or its analysis for several reasons, such as the commenter's concerns were adequately addressed by the current proposed action or effects analysis or the commentor's suggestions would prevent the project from achieving its stated purpose and need. Although a response to comments is not required for an Environmental Assessment (36 CFR 220.7 (b)), a summary of how public comments were considered would improve transparency.

Members of the public made Freedom of Information Act (FOIA) requests to the WMNF, to an adjacent National Forest, and to the Forest Service's Eastern Region for information about the Tarleton project and about broader topics. Timeliness of the Forest Service's FOIA responses is often related to the scope and scale of the request. The request for stand inventory data made by Rob Wipfler, a party to the Standing Trees objection, was fulfilled within 13 days because it was sufficiently specific (PR: Wipfler FOIA Response 2023-FS-R9-03022-F.pdf). Additional FOIA requests #2023-FS-R9-02877-F and #2023-FS-R9-02394 spanned multiple Forest Service units and years of records; thus, the responses could not be gathered by the close of the comment

period for the Tarleton project. FOIA requestors are given the opportunity to refine the scope of their request to receive a quicker turnaround time. In this case, the requestors have not done so.

Instruction: Make available with the final decision a summary of how public comments were considered in the development and effects analysis for the project.

Issue 3 (Porter)

The Forest Service did not adequately demonstrate how best available science was considered in project effects analysis.

Response: The Porter objection alleges that the Final EA failed to demonstrate how best available science was considered, citing requirements in the Forest Plan and NFMA. Direction found at 36 CFR 219 Subpart A (specifically, 36 CFR 219.3) discusses the requirement for documenting the use of best available science. The Tarleton project does not involve development of a forest plan, plan amendment, revision, or monitoring directed under the plan.

Nonetheless, the project record includes project-specific specialist reports citing accurate, reliable, and relevant peer-reviewed scientific information for relevant natural resource areas specific to the project area, prepared by an interdisciplinary team of specialists with formal training and experience in their respective fields. Furthermore, the project record documents consideration of the scientific papers brought forward by the public, with an item-by-item response (PR: 20230404_LongFormPDFRTCDRAFTWorking).

Forest Service National Environmental Policy Act (NEPA) analysis is prepared by qualified professionals using the best available information to inform sound decisions regarding resource management actions directed by the Forest Plan and other applicable laws and policies. During the analysis, the proposed action and alternatives (if any) are evaluated for whether they will have a significant effect on the environment. An EA discloses the anticipated environmental consequences of the alternatives. The best available science was considered in preparation of the Tarleton project's EA; however, what constitutes best available science might vary over time and across scientific disciplines.

The conclusions in a FONSI should be supported by references to the relevant sections of the EA; see Forest Service Handbook (FSH) 1909.15(43.1). The finding itself need not be detailed but must succinctly state the reasons for deciding that the action will have no significant environmental effects and, if relevant, must show which factors were weighted most heavily in the determination; see Council on Environmental Quality (CEQ) Forty Most Asked Questions (#37). The Tarleton project's EA and accompanying project record identifies methods used, references reliable scientific sources, discusses responsible opposing views, and discloses incomplete or unavailable information, scientific uncertainty, and risk.

The Tarleton project record references all scientific information considered: papers, reports, literature reviews, review citations, academic peer reviews, science consistency reviews, and results of ground-based observations to validate best available science. The Final EA incorporates by reference the project record, including specialist reports and other technical documentation and reflects technical and scientific matters within the Forest Service's area of expertise.

Issue 4 (Porter)

The Forest Service inappropriately concluded analysis with a FONSI despite uncertain or adverse impacts and lack of consideration of context and intensity of effects and the high controversy with this project.

Response: In determining the significance of a proposal, CEQ regulations require an agency to consider "the degree to which the possible effects on the human environment are likely to be highly controversial" (40 CFR 1508.27(b)(5)). However, "controversy" as set forth in this regulation does not equate with public opposition. Instead, controversy concerns disputes regarding the size, nature, or effect of an action, which are not present in the Tarleton project.

In support of the FONSI, the degree of effects of the project are summarized in the Final EA (pp. 23-25) and further supported by WMNF monitoring results as noted in the consideration of public comments in the project record (PR: LongFormPDFRTCDRAFTWorking.xlsx; sheet: PorterStandingTrees, lines 90-105). The FONSI indicated no significant effects or extraordinary circumstances after consideration of broad and site-specific effects of the proposed action and alternatives. Analysis was completed for silviculture, wildlife, botany, sensitive species, fire/fuels, economics, soils, watershed and fisheries, access and travel management, range, noxious weeds, cultural/heritage, and recreation/visuals. The Tarleton project is consistent with the Forest Plan and other laws and regulations.

NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail (40 CFR 1500.1(b)). Issues that are not significant or have been covered by prior environmental reviews may be eliminated from detailed study as part of the scoping process (40 CFR 1505.9(f)(1)). The selection of which type of analysis should be performed is detailed by CEQ and described in 40 CFR 1501.3. Where the determination was made that there was no uncertainty as to significant effects resulting from the proposed action, an EA/FONSI and Decision Notice were determined by the Responsible Official as the appropriate level of analysis.

Issue 5 (Porter)

The determination of a FONSI was incorrect because the project's actions could disqualify the area from future consideration for Wilderness designation.

Response: The Wilderness Act provides for the recommendation of designation of lands greater than 5,000 acres (contiguous) or of sufficient size to make it practical for preservation and use in an unimpaired condition. Lands found eligible and proposed for designation are subject to intensive inventory, analysis, and recommendation to Congress to formally designate the lands as Wilderness.

The 2005 Forest Plan final environmental impact statement (pp. 2-6 to 2-7) also describes the criteria used in consideration for designation as Wilderness, including an alternative to convert all Inventoried Roadless Areas. The analysis and subsequent designation indicated that the lands were found not eligible for designation under the Wilderness Act and subsequently assigned the designation MA 2.1, General Forest Management. The Tarleton project's Scenery Specialist Report (PR: PemiTarletonSMReport.pdf) provides additional evidence concerning the

incompatible nature of the area adjacent to the project area when compared with the criteria for Wilderness designation.

Furthermore, the WMNF considered the request to consider the Tarleton area for Wilderness designation in consideration of comments during the second formal comment period, concluding that public input regarding management area assignments occurred during development of the Forest Plan and that reassignment was outside of the scope of the Tarleton project (PR: LongFormPDFRTCDRAFTWorking.xlsl, RTC #29). There were no deed restrictions placed on the lands in this project area (committing them to Wilderness or other designation) when they were acquired in 2000 (see RTC #6 from Response to CommentReportDraft.docx). See also Response to Issue #1.

In conclusion, the project area does not qualify as a Congressionally designated Wilderness based on criteria set forth in the Wilderness Act and analysis conducted for the Forest Plan. Because the project area does not meet size requirements and because existing permanent facilities and other attributes do not support future designation as Wilderness, the assignment of MA 2.1 in the Forest Plan is appropriate. Revision of the designation is beyond the scope of the proposed action for the Tarleton project.

Issue 6 (Porter, P. Ascher, T. Ascher, Turanski, Hochschild)

The purpose and need of the project is unreasonably narrow such that there is not an adequate range of alternatives.

Response: In the preparation of an EA, a no-action alternative may be included but is not required. An EA may document consideration of a no-action alternative through the effects analysis by contrasting the impacts of the proposed action and any alternative(s) with the current condition and expected future condition if the proposed action were not implemented (36 CFR 220.7(b)(2)(ii)).

The need for the Tarleton project emphasizes an integrated resource project incorporating sub-projects each with separate but highly focused proposals. A well-defined "need" or "purpose and need" statement, as provided in the EA (pp. 5-7), narrows the range of alternatives that may need to be considered (FSH 1909.15 11.2). No specific number of alternatives is required or prescribed (36 CFR 220.7(b)(2) and FSH 1909.15 14).

A no-action alternative was proposed by commenters during the second formal comment period, as was an alternative for recreation development and a plan amendment changing the management area designation from MA 2.1 (General Forest Management) to MA 8.5 (Scenic Areas). A no-action alternative was included in the effects analysis by "contrasting the impacts of the proposed action and any alternatives(s) with the current condition and expected future condition if the proposed action were not implemented" (36 CFR 220.7(b)(2)(ii)).

While the Final EA does consider baseline conditions in the sense of no-action, the comment analysis states that a no-action alternative is not necessary, nor are alternatives that are unreasonable or outside the scope of the proposed action. Commenter Porter proposed a third project alternative, but this alternative was not considered reasonable because it failed to achieve the purpose and need of the project (RTC #27 in PR: LongFormPDFRTCDRAFTWorking.xlsl).

The objectors' contention that a no-action alternative or additional action alternatives should have been considered is unsupported, as the effects analysis discloses the range of effects of the proposed action in comparison to the absence of any activity. The Final EA is consistent with law, regulation, and policy regarding the range of alternatives and the no-action alternative.

Issue 7 (Porter, Pastoriza)

The Forest Service failed to address the impacts of the project on climate change and did not consider recent executive orders and scientific literature.

Response: The Final EA (p. 20) included analysis of the Tarleton project's climate change effects, which referenced the WMNF's 2019 forest-level carbon assessment (Dugan et al., 2019; available on Pinyon Public) to provide proper context. The project record also includes a project-specific carbon analysis (PR: Carbon AssessmenTarletonCarbonFinal021921) that uses the best available climate science and considers how forests affect — and are affected by — changes in atmospheric carbon over the long term. The project-specific carbon analysis concludes that (p. 3):

*Forest management activities such as harvests and hazardous fuels reduction have characteristics similar to disturbances that reduce stand density and promote regrowth through thinning and removal, making stands and carbon stores more resilient to environmental change (McKinley et al. 2011, Swanston et al. 2016). The relatively small quantity of carbon released to the atmosphere and the short-term nature of the effect of the proposed action on the forest ecosystem are justified, given the overall change in condition increases the resistance to wildfire, drought, insects and disease, or a combination of disturbance types that can reduce carbon storage and alter ecosystem functions (Millar et al. 2007, Amato et al. 2011).*

Literature submitted by commenters was considered and documented in the project record. See RTC report #63, #69, and #120 and references to these responses in the project record: LongFormPDFRTCDRAFTWorking.xlsl, where Porter's and Pastoriza's comments (including, but not exclusively, L1- C1, L1-C29, L1-C38, L4-C19, and L5-C25) are considered (L denotes letter, C denotes comment).

The Forest Service's July 2022 Climate Adaptation Plan describes how the Forest Service, as an agency, will adapt its priorities, organization, and policies to better incorporate climate change mitigation strategies. It does not provide specific direction or requirements for how National Forest System units conduct planning or analysis. The Tarleton project's climate change analysis, as described above, is consistent with this adaptation plan.

At the time the Tarleton project was initiated with a pre-scoping meeting in November 2019, the incorporation of climate change analysis was at the discretion of the Responsible Official. Climate change was incorporated into the analysis using the most recent climate information (Dugan et al., 2019). The project record also contains a project-specific specialist report completed in February 2021.

The objections also faulted the WMNF for not considering Executive Orders (EO) and CEQ guidance related to carbon and climate change. EO 14072 (Strengthening the Nation's Forests, Communities, and Local Economies) was signed by President Biden on April 22, 2022. Section

2 applies to National Forest System lands, requiring the Secretaries of Agriculture and Interior to "complete an inventory of old-growth and mature forests on Federal lands" within one year (by May 22, 2023) and directing the Forest Service and Bureau of Land Management to develop mature and old-growth definitions and inventory on Federal lands by April 22, 2023. The initial inventory was released in April 2023 but has yet to be followed by the development of "climate-smart" management and conservation strategies to address threats to mature and old-growth forests on Federal lands. It's important to note, however, that EO 14072 does not promulgate a specific policy regarding operating (or not operating) in stands identified as old growth or mature forest; therefore, for the Tarleton project, the relevant guidance for forest management comes from the Forest Plan.

EO 14008 (Tackling the Climate Crisis at Home and Abroad), signed January 27, 2021, required the Secretary of Agriculture to "submit to the Task Force within 90 days of the date of this order a report making recommendations for an agricultural and forestry climate strategy" (Sec. 216(ii)). The EO contains no specific references to the USDA Forest Service or NEPA; it is relevant at the Department level and is beyond the scope of the Tarleton project. That said, the Tarleton project is consistent with direction provided in EO 14008. For example, the Forest Service takes a consistent approach to the engagement of external partners in managing all resources, including climate change.

The CEQ guidance (National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change) is an interim document intended to facilitate compliance with existing NEPA requirements, improving the efficiency and consistency of reviews of proposed major Federal actions. Agencies are encouraged to follow the interim guidance for new projects (initiated after the publication date in the Federal Register, January 9, 2023). The Tarleton project was initiated more than three years before this guidance was released. The guidance further encourages agencies to "exercise judgment" if applying the recommendations to ongoing NEPA analyses.

The Tarleton project had already incorporated climate change analysis at the time the CEQ guidance was published and is therefore consistent with current law, regulation, and policy. Furthermore, the recommendations made in the guidance are, in general, already in use by the Forest Service and have been integrated in the Tarleton project analysis. Greenhouse gas (GHG) emissions were not quantified for this project but were described in the project-level analysis as "an extremely small quantity" (PR: TarletonCarbonFinal021921.docx, p. 4). This level of estimate is consistent with the current, standard approach at the time of analysis. As the Forest Service incorporates new tools and methods for quantifying GHG into its NEPA process, future projects may have more detailed GHG emission estimates; however, the CEQ guidance allows that "actions with only small GHG emissions may be able to rely on less detailed emissions estimates."

In conclusion, the carbon and climate change section of the Final EA is brief, but its findings that the proposed forest management activities represent a long-term net benefit in terms of resiliency to climate change and GHG emission are well supported by more detailed analysis in the project record. Public comments on climate change and carbon management were considered in the project record. Policies and interim direction related to climate change analysis were released after the beginning of scoping and comment periods, but none that would require the WMNF to

revisit its 2021 project-specific analysis.

Issue 8 (Pastoriza, Porter)

The DDN refers to previous decisions made over 30 years ago to which the Tarleton project is tiered but does not name them.

Response: The DDN (p. 2) discusses the land's condition when it was acquired, including some areas that were heavily harvested before they became national forest land. The "previous decisions" to which the DDN refers are management decisions by previous owners of the land and the management area designation during Forest Plan revision. In the development of the Forest Plan, these areas were assigned to MA 2.1 (General Forest Management). The project record includes background information on the land acquisition, including the Mittersill–Sentinel Mountain Decision Notice & FONSI (pp. 9-10) and Tract 1067A Deed. The WMNF's Forest Plan was completed in 1985 and revised in 2005. Landscape-level decisions, including MA assignments to parcels, remain in effect until the plan is revised or amended.

Issue 9 (P. Faletra, Porter)

The Forest Service failed to consider the cumulative effects of past, ongoing, and proposed projects involving substantial logging, carbon emissions, and/or habitat alteration. The Forest Service also failed to define the temporal and geographic scopes of its cumulative impacts analysis for a majority of the resources.

Response: The Final EA (pp. 18-19) defines and discusses cumulative effects, stating that:

Generally, agencies can conduct an adequate cumulative effects analysis by focusing on the current aggregate effects of past actions without delving into the historical details of individual past actions. Consistent with this guidance and Forest Service regulations for cumulative effects analysis (36 CFR 220.4(f)), this analysis considers past, present, and reasonably foreseeable future actions relevant to the proposal, including how they may have contributed to existing conditions and trends.

The Final EA (p. 20) also discusses carbon emissions, citing the forest-level carbon assessment (Dugan et al., 2019; available on Pinyon Public). The project record contains several documents that outline past and current conditions of the Lake Tarleton HMU, including the Rationale for Habitat Objectives in the Lake Tarleton Habitat Management Unit (on Pinyon Public; henceforth called Rationale for Habitat Objectives) and Wildlife Specialist Report (PR: WildlifeSpecialistReport.docx). The Biological Evaluation was clear in defining geographic and temporal cumulative effects boundaries. Cumulative effects boundaries for wildlife and other resources can also be found in the Effects Tracking Spreadsheet document (PR: TarletonEffectsTrackingWorksheetWorking.xlsx). Historic timber harvest records for the area are in PR folder: L-Cumulative Effects. Harvest history contributes to the age structure of the forests in this HMU, as summarized in Table 6 of Rationale for Habitat Objectives (p. 9).

In conclusion, the project record includes multiple documents, as well as cutting cards documenting volumes of timber removal on private land, that show how cumulative effects were considered for the Tarleton project.

Issue 10 (Porter)

The Forest Service failed to consider impacts of the project on public health and safety.

Response: Based on a review of comments received in 30-day comment periods 1 and 2, members of the public are concerned that improving the parking area at the Lake Katherine boat launch for hand-launched watercrafts (such as canoes, kayaks and paddleboards) would result in increased use and a spillover of vehicles parking along Route 25C (RTC report draft, #39, #41; p. 14). The Final EA acknowledges that the proposed improvements of the Lake Katherine boat launch may "result in some increased use due to the improved site design and changes to the character of the site" (p. 21) but "are not expected to increase visitation to a level that would change current use levels initially" (p. 21). If use exceeds capacity of the lot, it is expected that users would go elsewhere or find safe and legal alternatives to park.

Regarding safety concerns related to log truck traffic, Forest Service timber sale contracts include standard provisions (BT6.33) requiring timber purchasers to prepare Traffic Control Plans and place adequate signage to provide the public "with adequate warning of hazardous or potentially hazardous conditions associated with Purchaser's Operations." When using public highways, timber purchasers and their subcontractors are expected to follow all applicable local, State, and Federal traffic laws to keep themselves and other highway users safe.

The Final EA considers the potential overall impacts to public health and safety and concludes that the Tarleton project does not present any unusual or substantial risks because the proposed activities are not novel to the WMNF (p. 21). Safety-specific design features are provided for the powerline (Final EA, p. 18). In conclusion, the issue of public health and safety and application of design features to mitigate safety concerns have been addressed. There is no expectation that traffic levels would increase to a level that would surpass the capacity of existing or proposed infrastructure or traffic laws.

Issue 11 (Porter)

The Forest Service has not adequately demonstrated how the transportation system will be affected by project activities and how the transportation system activities will affect soil, water, and habitat fragmentation.

Response: The Porter objection letter's claim that the EA is "internally inconsistent" (p. 46) is related to language in the Draft EA that was corrected following the second 30-day comment period. The Draft EA stated that "system roads and log landings would be constructed, maintained, or reconstructed to provide safe access to vegetation management areas and to meet modern design standards" (p. 15). That language was corrected in the Final EA to "system roads would be maintained or reconstructed to provide safe access to vegetation management areas and to meet modern design standards" (Final EA, p. 15).

Existing roads in the project area are not currently part of the Forest Service system but would be classified in the WMNF road inventory through this decision document. The project record includes detailed descriptions of the existing condition of Old Charleston Road (PR: OldCharlestonRoadFieldReview.docx). The Final EA Appendix C (p. 33) describes the existing condition and proposed management actions of each road in the project area. Because these are

existing roads and no new construction is proposed, the only on-the-ground impacts would be related to maintenance and reconstruction activities on a total of 5.24 miles of existing road. No existing habitat will be fragmented as a result of these activities.

The Soils Specialist Report (PR: Tarleton_IRP_SoilsSpecialistRpt021921.docx) and Final EA (p. 15) document how these activities may affect soil and water resources. The Final EA (p. 17) notes the Standard Operating Practice whereby most of the road work would be completed during dry conditions or in winter when impacts would be minimized.

Issue 12 (Porter)

The Forest Service did not properly evaluate and disclose the economic impacts of the project, including wood product value and recreationist spending in the area.

Response: The forestry-derived economic benefits associated with the proposed action are detailed in the Socioeconomics Specialist Report (PR: Tarleton Socio Economic Write Up.docx). However, the Final EA does not list generating timber revenue as a specific need for the proposal, so revenue is not a factor in the decision. The Socioeconomics Specialist Report (p. 1) and Final EA both note that timber harvesting activities could cause recreation users "to disperse to other recreation sites"; in context, this statement suggests that users would still stay within or near the project area since individual timber harvests would be localized and short term. Other proposed actions (wildlife opening enhancement and an improved parking lot at Lake Katherine) are expected to slightly increase recreation use.

In conclusion, the Final EA and Socioeconomics Specialist Report consider both the potential positive and negative economic impacts of the proposed action and conclude that any negative impacts would be short term and localized.

Issue 13 (Porter)

The Forest Service did not properly evaluate and disclose effects to soil resources, including defining the allowable amount of detrimental soil impact per the Forest Plan.

Response: The Soils Specialist Report (p. 12) and Final EA (p. 22) list up to 1 acre of detrimental disturbance for Lake Katherine boat launch parking area improvement (0.08 percent of the project area). From the language in EA (p. 22) and Soils Specialist Report (p. 1), "detrimental soil disturbance" is the loss of the soil capacity to support the growth of specified plants, plant communities, or sequences of plant communities because of soil displacement or compaction. Both the Final EA and Soils Specialist Report reference the Forest Plan FEIS (pp. 3-29 through 3-36) to contextualize the effect of this project by considering its effects as similar to road construction. During the life of the Forest Plan (Forest Plan FEIS; Table 3-04) the WMNF projected to average no more than one mile of new road construction per year. The improvements at the Lake Katherine boat launch parking lot could be considered to contribute to this the total and the Final EA (p. 22) indicated that the projected total had not yet been met forest-wide.

Issue 14 (T. Ascher, P. Faletra, Porter)

The Forest Service did not properly disclose the occurrences of cultural resources in the project

area and how impacts to these resources were analyzed or avoided.

Response: My review found that the project record includes documentation that cultural resources in the project area were considered and impacts to these resources were analyzed or avoided. These documents include cultural resources (survey) reports (PR: Cultural Resource Reconnaissance Report) and consultation correspondence with the New Hampshire State Historic Preservation Office (SHPO). The Forest Service analysis resulted in a determination of "no historic properties affected," to which the SHPO concurred. Multiple archaeological surveys and site documentation efforts occurred in the analysis area, all of which were completed to professional standards and demonstrate a reasonable and good faith effort to avoid, minimize, or mitigate impacts to cultural resources. Through project planning and design, treatment units have been altered, dropped, buffered, and constructed to avoid impacts to documented sites in the area. In this respect, the National Historic Preservation Act (NHPA) Section 106 process itself is deemed sufficient and justifiable to support the proposed action and decision.

Both NHPA and the Archaeological Resources Preservation Act address confidentiality and informational integrity of historic properties and (by extension) unevaluated cultural resources, and it is within the discretion of the agency to withhold information specifically regarding the location and integrity of sites and cultural resources, if there is reason to believe disclosure of information or data may lead to direct or indirect impacts to these sites and resources. In this case, the objector is not specifically requesting site-level information or data; instead, it's mostly a matter of general disclosure, documenting awareness that cultural resources do exist in the analysis area and that protective measures are in place (design criteria) that will protect these resource values. The standard operating practices at sites identified (or sites discovered during implementation of the project) were disclosed in the Final EA (pp. 16-17) and noted in the comment analysis from both the scoping and comment periods (though this analysis was not made available to the public). In conclusion, the project record demonstrates that the WMNF upheld its responsibilities to comply with NHPA Section 106; however, due to confidentiality concerns, detailed information was not shared with the public.

Issue 15 (Donelon, E. Faletra, P. Faletra, Porter)

The Forest Service did not properly evaluate and disclose the impacts of the project on water quality, nutrient runoff, and harmful algal blooms or cyanobacteria proliferation in Lakes Tarleton and Katherine. The 300-foot buffer is inadequate to protect water quality.

Response: The Albany South project's EA was relied upon as supporting analysis for the Tarleton project's EA because "similar types of activities included in the Tarleton Project, the potential impacts to riparian and aquatic resources and water quality discussed in the Albany South EA would be broadly applicable to the current proposal" (Final EA, p. 20). Best management practices (BMPs) prevent the directing of concentrated runoff into water bodies (Albany South EA, p. 145).

The Albany South EA and its Hydrology Specialist Report were prepared in 2017 and include references to scientific literature that vary in age. The analysis protocols used for the Albany South project were used again for the Tarleton project because studies in the White Mountains indicate the validity of this method. Those studies are referenced in the Albany South

Hydrologist Specialist Report (in the Tarleton project record).

The April 2022 Draft EA (p. 19) included a brief analysis explaining how impacts to water quality will be avoided or reduced to de minimis levels. After consideration of comments, the Final EA section on hydrology (p. 20) was expanded to provide more detail on design features and BMPs that will be used to protect these resource values and for an explanation of how effects of timber harvest are evaluated at the watershed scale based on timber basal area removed.

The soils section of the Final EA (p. 22) states that the soil quality standards issued by the Forest Service's Eastern Region are designed to allow for non-detrimental disturbances. Several standard operating procedures and BMPs are listed in Table 2 of the Final EA (pp. 16-17), which are designed to reduce impacts of disturbances to water quality. Examples of these include following all national core and State BMPs to minimize soil loss and erosion; limiting ground-disturbing activities to appropriate seasons and conditions to minimize erosion and sedimentation; minimizing stream crossings; and implementing BMPs if a body of water is discovered that is absent from the National Hydrography Dataset (NHD).

The Forest Plan (p. 2-29) indicates that whole tree removal is limited to soils with sufficient nutrient concentration and replenishment capacity (Vegetation Management S-2). It further states that all State of New Hampshire BMPs must be met or exceeded (Vegetation Management S-4). The Forest Plan (p. 2-30) also states that Soil and Water Conservation Practices (FSH 2509.22) must be developed for any activity that could impact water and soil resources (Soil and Water Conservation Practices S-1), and that any construction activity must use methods proven to be effective at reducing runoff and erosion (Soil and Water Conservation Practices S-3). Additionally, sediment traps must be used on disturbed ground until sites are stabilized (Soil and Water Conservation Practices S-4). Table 2 of the Final EA (p. 16) states that the district wildlife biologist or the WMNF watershed team will be consulted regarding Timber Unit 29 to ensure that impacts to wetlands are minimized or avoided (SS-1).

Regarding effects specifically to Lake Katherine, the New Hampshire Department of Environmental Services indicates in their 2021 data summary (PR: NHDES 2021_Lake Katherine VLAP Report.pdf) that the user-created boat launch at Lake Katherine is a mechanism for runoff and erosion. The proposed activity to adopt and improve the Lake Katherine boat launch and install drainage features will help to address existing resource degradation (i.e., water quality) and soil instability through shoreline stabilization (Final EA, p. 15). The current condition of Lake Katherine indicates that the lack of forested buffer along the shoreline parallel to the permanent wildlife opening increases lake temperatures and decreases the input of woody debris, impacting overall water quality. Lake Katherine will be buffered from timber harvest activities by 100 feet, which will allow for natural revegetation to occur, and white pines may be planted to supplement this process (Final EA, pp. 5, 13). Riparian vegetation helps to intercept and slow the impact of precipitation and water flowing over the soil, thereby reducing overall runoff and erosion.

Numerous BMPs (Final EA, pp. 16-17) and Forest Plan standards and guidelines (Chapter 2) would be followed throughout the Tarleton project to minimize erosion and sedimentation, thereby minimizing the amount of phosphorus (the limiting nutrient for algae in the region)

entering water bodies throughout the watershed. While oligotrophic lakes can experience cyanobacterial blooms, the risk comes from changing land uses, which, with the exception of the small parking lot for the Lake Katherine boat launch site, is not proposed in the Tarleton project. Silvicultural treatments by the WMNF in the Lake Tarleton drainages will maintain these catchments as forested. Treatments will result in natural reforestation as compared to deforestation, which coverts forests to non-forest use.

No pronounced negative impacts to water quality or quantity are anticipated due to national core and State BMPs and Forest Plan standards and guidelines. These are implemented to minimize erosion and sedimentation due to project activities. Based on monitoring of vegetation management activities in the WMNF, and following the National BMP Monitoring Program, the 75-foot buffer has been effective in preventing sediment from reaching waterways; however, to preserve the dispersed recreation features adjacent to Lake Tarleton, the Responsible Official has approved extending the buffer to 300 feet. It has been well documented that larger forested buffers benefit water quality by slowing and filtering stormwater runoff and providing shade. Increasing the width of a buffer strip improves water quality by lowering sedimentation, decreasing the loading of nutrients (including phosphorus), lowering water temperature, and increasing the concentration of dissolved oxygen.

The Tarleton project is consistent with law, regulation, and policy regarding hydrologic concerns raised by commentors. The project record, including analysis incorporated by reference, sufficiently demonstrates compliance.

Issue 16 (P. Faletra, Porter)

The Forest Service's water quality effects analysis is inadequate because it relied on outdated lake water quality data or imprecise field data.

Response: In New Hampshire, the USDA Forest Service relies on the New Hampshire Department of Environmental Services to collect and maintain water quality records and reports. The most recent water quality data was obtained from the State and used in the Tarleton EA. The data is located in the project record. According to the Final EA, "Applicable Forest Plan standards and guidelines, national core and state best management practices (BMPs) (U.S. Department of Agriculture, Forest Service 2012) (New Hampshire Division of Lands and University of New Hampshire (UNH) Cooperative Extension. 2016), standard operating procedures (SOPs), and project-specific minimization measures would be implemented as part of the Proposed Action (Table 2)" (Final EA, p. 16).

The responses to comments describe how buffer strips, BMPs, and timber harvest basal area limits by watershed will protect water quality (PR: ResponseToCommentReportDraft.docx, pp. 10-17). The responses explain how BMPs will limit impacts to Lake Tarleton and Lake Katherine, and they reference analyses completed in support of the Forest Plan as well as published research papers that present evidence of the effectiveness of BMPs and analytical approaches to evaluating watershed impacts. See also the response to the previous issue.

In conclusion, the proposed action is consistent with laws and policies related to the protection of water quality. The Final EA discloses that implementing Forest Plan standards and guidelines,

as well as State and Federal BMPs, is expected to adequately protect water quality.

Issue 17 (Porter)

The Forest Service failed to disclose the impact of the project in relation to Forest Plan guideline G1 regarding even-aged management in first and second order watersheds.

Response: Forest Plan vegetation management guideline G-1 states that "No more than 15 percent of the area of watersheds of first and second order perennial streams should be treated with even-age regeneration methods in a five-year period" (Forest Plan, p. 2-29). The GIS analysis that calculated basal area reduction as a result of the Tarleton project is located in GIS working files in the T-drive at: ...Tarleton\GIS\Data\Hydrology\Tarleton_Watshd_BAstats_pre-update-tounits.shp and ...Tarleton\GIS\Data\ProjectRecord\FinalEA_copied20220816

The basal area reduction analysis did find two watersheds (within the Eastman Brook watershed) that would reduce basal area by 15.5 percent and 16.9 percent. The Eastman Brook watershed is listed as impaired for acidity. This guideline may not be applicable, though, if the basal area reduction is from silvicultural treatments that are not considered even-aged management.

Instruction: Explain in the Final EA, decision document or project record that the Eastman Brook is listed as "impaired" for acidity and clarify if the Tarleton project's timber harvest will affect residual basal area in the impaired reach of Eastman Brook such that the threshold of vegetation management guideline G-1 will be exceeded and explain the rationale for exceedance.

Issue 18 (Porter)

The Forest Service failed to address the increased risk of introducing aquatic invasive species in the analysis of effects of the Lake Katherine boat launch.

Response: The current state of the existing user-created boat launch at Lake Katherine does not meet Forest Service safety and recreation standards (Final EA, p. 7). Improvements are needed to address these concerns. The Forest Plan (pp. 2-11 to 2-12) contains standards and guidelines to prevent the spread of aquatic invasive species, including weed prevention measures (S-2), required equipment cleaning (S-6), non-native invasive species (NNIS) eradication efforts (S-7), and roadside maintenance for NNIS suppression (Transportation System G-1 & G-2).

The primary avenue for aquatic invasive species establishment is through motorboats, and the Lake Katherine boat launch will be designed for hand-launched vessels only, as stated in the Final EA (p. 15).

Included in the proposed action (Final EA, p. 16) is the installation of a kiosk that will include standard signage with best practices for boat equipment cleaning to reduce the spread of aquatic invasive species. Additionally, according to the Final EA's design features (p. 16), the WMNF and its contractors shall implement national core and State BMPs to protect water quality.

The Final EA's design features (p. 17) provide for district staff review of the location and status of NNIS with the Forest Botanist prior to project implementation. The project will be carried out in conjunction with the Forest-wide Invasive Plant Control Project EA (NNIS-1). The WMNF

will also explore options with relevant local organizations to establish a Lake Host program at Lake Katherine to help inform boaters about reducing NNIS spread (NNIS-2).

Issue 19 (Porter)

The Forest Service's "may affect – not likely to adversely affect" determination is inconsistent with the Standing Analysis and Implementation Plan – Northern Long-Eared Bat Assisted Determination Key (DKey), monitoring data, and the U.S. Fish and Wildlife Service's published information on northern long-eared bat (NLEB) and violates the NFMA requirement to maintain or restore viability for the species in the project area.

Response: The Biological Evaluation (BE) (pp. 9-11) explains the process used to reach the Tarleton project's "may affect – not likely to adversely affect" determination for NLEB. The process considered information including life history, species status, and habitat suitability to reach this determination. The BE also explains that "it was initially determined the Proposed Action would have no effects beyond those previously disclosed in the programmatic biological opinion on implementing the final 4(d) rule dated January 5, 2016 (USFWS 2016)" (p. 10). Streamlined consultation with the U.S. Fish and Wildlife Service under Section 7 of the Endangered Species Act was completed in February 2021. However, on November 30, 2022, the U.S. Fish and Wildlife Service issued a rule to reclassify the NLEB as endangered. This action removed the final 4(d) rule when the uplisting became effective March 31, 2023. As a result, the Forest Service reinitiated consultation on August 22, 2022. The BE was signed and consulted upon prior to March 31, 2023, but it states that "Any reasonable and prudent measures or terms and conditions that result from the Biological Opinion will be incorporated into the Proposed Action and final decision to ensure compliance with the Endangered Species Act" (p. 11).

The U.S. Fish and Wildlife Service's Standing Analysis and Implementation Plan Northern Long-Eared Bat Assisted Determination Key (DKey) was released after the objection period was initiated and was therefore not considered in the Tarleton project. The project record documents the consultation history with U.S. Fish and Wildlife Service, including NLEB (PR: Tarleton IRP - NLEB Verification Letter.pdf; PR: Tarleton IRP - IPaC Species List_20221122.pdf). The BE provides sufficient analysis and clear rationale for the Tarleton project and provides baseline/monitoring data on NLEB in the project area and a rationale for the "may affect – not likely to adversely affect" determination.

Instruction: Incorporate in the Tarleton project any reasonable and prudent measures, or terms and conditions resulting from the March 2023 Biological Opinion from the U.S. Fish and Wildlife Service, concerning NLEB conservation.

Issue 20 (Pastoriza, Porter)

The Forest Service failed to fully evaluate and disclose the effects of the Tarleton project and cumulative effects of other projects on NLEB. Further, in violation of its Forest Plan goal, the Forest Service has not developed conservation approaches for NLEB within the WMNF.

Response: The BE discusses direct, indirect, and cumulative effects on NLEB and lays out the life history, species status, and habitat suitability in the project area (pp. 7-11). It assumes presence although "white-nose syndrome has decimated the NLEB across its range, including

within the action area" (BE, p. 9). It provides clear rationale for how the existing conditions and survey results were used to analyze these effects. It ties NLEB to the March 31, 2023, Biological Opinion (PR: Biological Opinion NLEB Reinitiation Forest Service R8 and R9_final.pdf). The BE was signed and consulted upon prior to March 31, 2023, but it states that "Any reasonable and prudent measures or terms and conditions that result from the Biological Opinion will be incorporated into the Proposed Action and final decision to ensure compliance with the Endangered Species Act" (p. 11). Reasonable and prudent measures or terms and conditions, in part, address conservation, monitoring, and reporting requirements issued by the U.S. Fish and Wildlife Service for the Southern and Eastern Regions of the Forest Service. Furthermore, the BO provides conservation recommendations including to continue the practices contributing to the conservation of NLEB and other forest bat species (pp. 54-55).

Finally, regarding cumulative effects, the BE states that "activities considered for the cumulative effects analysis include past timber sales, ongoing hazard tree removal, future timber stand improvement work, treatment and removal of non-native invasive plant species, and all other vegetation management activities" (p. 8). It defines temporal and geographic boundaries and provides reasoning for how those parameters were determined.

The Final EA defines and discusses cumulative effects, stating that (pp.18-19):

Generally, agencies can conduct an adequate cumulative effects analysis by focusing on the current aggregate effects of past actions without delving into the historical details of individual past actions. Consistent with this guidance and Forest Service regulations for cumulative effects analysis (36 CFR 220.4(f)), this analysis considers past, present, and reasonably foreseeable future actions relevant to the proposal, including how they may have contributed to existing conditions and trends. Unless specifically stated otherwise, the project record is incorporated by reference and contains all relevant data, methods, analyses, references, and other technical documentation used in this assessment.

Additional documents incorporated by reference that support the cumulative effects analysis include Rationale for Habitat Objectives and Wildlife Specialist Report. The BE also explains the situation regarding the new NLEB BO and ensures adherence to it, which addresses conservation measures for NLEB and addresses the Forest Plan Goal.

Issue 21 (Pastoriza, Porter)

The WMNF has not disclosed its conservation methods and recovery strategy for federally listed and sensitive species, including NLEB.

Response: The Forest Service developed a strategy to manage wildlife habitat on the WMNF within delineated HMUs, as discussed in the Rationale for Habitat Objectives document (p. 5). Watershed, compartment boundaries, and transportation systems were considered when delineating HMUs across the WMNF. Within each HMU, vegetation is managed to provide a diversity of habitats, to conserve existing wildlife populations, and to ensure habitats are distributed across the landscape in an ecologically appropriate way (Forest Plan, pp. 1-20 to 1-22). The Rationale for Habitat Objectives document summarizes information used by an interdisciplinary team in developing the long-term habitat objectives in the Lake Tarleton HMU.

Threatened, endangered, and designated sensitive species in the Tarleton project area require habitats in a variety of age classes, including both early successional and mature. The project followed Forest Plan direction to provide a mosaic of conditions to benefit those species.

The BE (p. 9) states that all Forest Plan standards and guidelines, including those for wildlife reserve trees (Forest Plan, p. 2-35), and the NLEB conservation measures from the Forest Service Eastern Region 2015 Programmatic BA will be followed (PR: Sandeno 2015_Final_Programatic_BA_Eastern_Region.pdf, pp. 58-59). Furthermore, the BE (p. 11) states that "a Biological Opinion is anticipated from the USFWS by March 31, 2023. Any reasonable and prudent measures or terms and conditions that result from the Biological Opinion will be incorporated into the Proposed Action and final decision to ensure compliance with the Endangered Species Act." These actions will minimize incidental take of the species.

In conclusion, the Tarleton project is consistent with WMNF Forest Plan goals and objectives that were developed, in part, to manage wildlife populations. Standards and guidelines that conserve those species are also outlined in the Forest Plan.

Issue 22 (P. Ascher, Bald, Porter)

The Forest Service failed to adequately address the environmental effects of invasive species spread and herbicide use in the project area.

Response: The Final EA references the 2007 WMNF Forest-wide Invasive Plant Control Project EA (hereafter NNIS EA), which documents the analysis of effects to the environment resulting from the mechanical, chemical, and biological control of invasive plants on the WMNF. Project-specific minimization measures and standard operating procedures, consistent with the NNIS EA, are listed in the Final EA (pp. 17-18). Monitoring is included in NNIS control in the EA/FONSI. The Effects Tracking Worksheet provides cumulative effects geographical and temporal boundaries used to analyze effects on the environment.

In addition, the requirement for equipment cleaning, as part of NNIS prevention practices, is a standard provision in Forest Service timber sale contracts (see BT6.35, pp. 127-128). Furthermore, the Tarleton project's NNIS Risk Assessment (PR: TarletonNNISRiskAssessmentCurrent2022.docx, p. 5) identified standard S-6 as a requirement for heavy equipment to be inspected and cleaned such that they are free of seeds or plant material prior to project implementation.

In conclusion, the effects of invasive species and control actions were fully addressed in the evaluation of the Tarleton EA and supporting documents.

Issue 23 (P. Faletra, Porter)

The Forest Service failed to address how the prescribed treatments creating early successional habitat are justified given scientific information provided by commenters.

Response: The main goal of vegetation management on the WMNF is to "manage vegetation using an ecological approach to provide both healthy ecosystems and a sustainable yield of high-quality forest products, with special emphasis on sawtimber and veneer" (Forest Plan, p. 1-17).

The Tarleton project helps move the WMNF toward this goal, in addition to providing habitat for sensitive species. The Forest Service Manual (FSM 2620.1) directs the agency to manage habitats for all existing native and desired non-native plants, fish, and wildlife species in order to maintain at least viable populations of such species and (FSM 2672.41) to ensure that Forest Service actions do not contribute to loss of viability of any native or desired non-native plant or contribute to animal species or trends toward Federal listing of any species.

Per Forest Plan wildlife guideline G-1 (p. 2-33), habitats are managed according to the WMNF Terrestrial Habitat Management Reference Document (2019; available on Pinyon Public), which provides guidance on the management of apple trees, wildlife opening maintenance and accessibility, and opening size and vegetation features (pp. 6-9). The Tarleton project is consistent with this guidance (Final EA, p. 20).

The monarch butterfly and yellow-banded bumblebee are sensitive species requiring floral resources throughout the growing season (BE, pp. 16-17). These resources would be provided and managed in early successional areas to the benefit of both species (BE, p. 17), consistent with Forest Service Manual direction above.

Furthermore, the WMNF considered comments regarding early successional forest from objectors. The Porter objection letter references Kellett et al. (2023), which argues against the creation of early successional forests and minimal harvesting in mature and old-growth forests, as well as the protection and expansion of parks and preserves. Because this publication was not previously submitted in comments, it could not be considered at that time. It was considered during the objection review.

In conclusion, the Tarleton project follows guidance in the WMNF Forest Plan FEIS, Forest Plan, and the Terrestrial Habitat Management Reference Document concerning management of early successional habitats. The BE documents the rationale for management of early successional habitat and conservation of sensitive species.

Issue 24 (Pastoriza, Porter)

The Forest Service fails to acknowledge the project's impacts on wildlife and the important role that mature and old-growth forests play in this delicate ecosystem.

Response: The Rationale for Habitat Objectives document for the Tarleton project points out that wildlife species in the project area that rely on mature forest have resilient populations because mature forests are abundant there; however, it notes, "there have been declines in populations of species that rely on regenerating forest habitat and openings […]. For these species, patch size is critical in providing food and cover, with the diversity of species increasing as regenerating patch size increases to 30 acres" (p. 6).

Later, the Rationale for Habitat Objectives states, "Over 65 percent of all habitat types are in the mature age class. A relatively low percentage of the General Forest Management MA (6 percent) that is forested is unsuitable for harvest and would continue to grow older as the forest matures. The mature age class objective is based on the portion of General Forest Management MA land in the HMU that is suitable for harvest and is not committed at any one time to the other age class objectives" (p. 8).

The Forest Plan also addresses old-growth and mature timber. One of the Forest Plan's wildlife objectives is to "Maintain high quality mature forest and old forest habitats on a majority of the Forest" (p. 1-20). The Forest Plan also presents age class objectives for the WMNF and points out that land "unsuitable for harvest is not available for timber harvest" and will "continue aging for the long-term" (p. 1-21), which contributes to long-term old-growth forest. Among the Forest Plan's standards and guidelines is standard S-3, which states that "Timber harvest is prohibited in old growth forest" (p. 2-13). The Forest Plan also addresses the management of wildlife reserve trees in harvested areas to provide mature characteristics for species that rely on them (p. 2-35).

The BE clearly addresses impacts on threatened, endangered, and sensitive species, which require a variety of habitats, including closed canopy/mature forests with snags, as well as early successional and open habitats with floral resources. Old-growth conditions were not identified as a requirement for any of those species, but mature forests and the role of snags in the life history of some of those species is discussed. The Wildlife Specialist Report also discusses forested habitat and provides the composition with a breakdown of age classes in the project area.

In conclusion, the project record documents the consideration of mature and old-growth forest and the importance of those resources to wildlife. Those documents include the Forest Plan, Forest Plan FEIS, Rationale for Habitat Objectives, and BE.

Issue 25 (Porter)

The Forest Service's wildlife habitat improvement actions in the Tarleton project are capricious because they would benefit species that are not "habitat limited."

Response: The Forest Plan includes wildlife guideline G-1, which states that "Habitat should be managed according to guidance provided in the Forest's Terrestrial Habitat Management reference document" (p. 2-33). This document's guidance is intended to increase consistency across the WMNF districts and further convey the Forest Plan's intent for wildlife and plant habitat management and was relied upon WMNF.

In addition, the Tarleton project's Wildlife Specialist Report provides existing age class and species composition tables for the Tarleton HMU, stating that the "age class composition of the forested habitat types described above can be found in Table 2. The regenerating age class is absent across the HMU which is indicative of the lack of stand-replacing disturbance events (e.g. timber harvests) in the last ten years. However, it should be noted that there is young forest and shrubby habitat within the HMU in small patches (i.e. smaller than the stand level), much of which is the result of beaver activity" (p. 7).

The WMNF acknowledges that project activities will attract game species such as deer, moose, grouse, bear, and turkey, which are wide-ranging. However, the main goal of vegetation management on the WMNF is to "manage vegetation using an ecological approach to provide both healthy ecosystems and a sustainable yield of high quality forest products, with special emphasis on sawtimber and veneer" (Forests Plan, p. 1-17). The project helps the WMNF move toward this goal.

In conclusion, the wildlife habitat improvement actions proposed in the Tarleton project are consistent with the Forest Plan and the Terrestrial Habitat Management Reference document and are adequately addressed in the project record and are therefore not capricious.

Issue 26 (Porter)

The Forest Service has not adequately demonstrated how the project will achieve age class and species diversity in the project area because an accurate baseline of this data is not provided.

Response: Existing and desired species composition and age class distribution goals are described in the Rationale for Habitat Objectives document. Current species composition and age class information is based on field inventory done in 2018-2019 (field notes are in the project record and summary data is stored in the Field Sampled Vegetation (FSVeg) spatial database). A summary report (PR: 20200811LakeTarletonHMUFinal) was provided to the public during the second formal comment period, and stand-by-stand age information was provided in April 2023 in response to a FOIA request.

HMU-specific species composition and age class distribution objectives are tiered to Forest Plan objectives that include managing for mature and old forest habitats and a mix of northern hardwood, mixedwood, and spruce-fir, as well as “less common habitat types, such as aspen-birch and oak/pine, where ecologically feasible” and “regeneration age forest and open habitats to sustain biological diversity and support species that prefer those habitats” (Forest Plan, p. 1-20). Forest Plan Tables 1-03 and 1-04 show composition and age class goals for MA 2.1. The Rationale for Habitat Objectives describes how the proposed management activities in the project area will contribute to meeting these forest-wide habitat objectives.

During field examination, each stand was classified based on its suitability for timber management. Only suitable stands are proposed for timber harvest. None of the stands proposed for management in the project area meet the Forest Plan definition of “old-growth” forest (Forest Plan Glossary), nor were any Outstanding Natural Communities identified, so neither S-3 nor G-1 (Forest Plan, p. 2-21) apply.

Issue 27 (Kline, Porter)

The Forest Service did not evaluate and disclose the noise impacts on recreationists (ice fishermen, hikers, campers) and the local communities.

Response: The Final EA (p. 21) describes the design features to minimize noise heard from the Appalachian Trail. More detail on the consideration of these noise impacts is documented in the Recreation Specialist Report (PR: TarletonRecreationSpecialistReport.docx, pp. 2-4). It is reasonable to conclude that — given distances much greater than 30 meters between harvest activities and the Appalachian Trail, in conjunction with the noise buffer provided by the intervening vegetation — the actual noise impacts experienced by the relatively few winter trail users would be minimal. The majority of the timber harvest activities would occur in the winter.

As noted by objectors, the Final EA, Recreation Specialist Report, and Socioeconomics Specialist Report do not explicitly evaluate or disclose potential noise impacts to winter recreation activities (other than Appalachian Trail use) and recreation-related businesses in the

project area. In general terms, both the Final EA (pp. 21-22) and Socioeconomic Specialist Report (pp. 1-2) state that "socioeconomic effects that may be caused by timber harvesting activities to recreational users of the area would be localized [...] over the short-term for the duration of project implementation or shortly thereafter" and "would not result in measurable disruption to local socioeconomic conditions," with the socioeconomic changes to the local communities expected to be negligible. The potential noise impacts to recreational use on Lake Tarleton itself would be lessened by the "no cut buffer of at least 300 feet from the water's edge" (Final EA, p. 17) that is specified as a project design feature and would buffer noise generated by harvest activities.

The project record documents additional consideration of noise impact in response to concerns raised by the public during the second 30-day comment period (PR: ResponseToCommentReportDraft.docx), including the anticipated effects to winter recreationists in the project area overall (Seq #89), in the Sentinel Mountain area specifically (Seq #24), and to tent campers at Ore Hill (Seq #90).

Although the Final EA does not present an evaluation of how the project's potential noise impacts could affect local residents and property values, this claim was not raised by objectors prior to the objection period. Nonetheless, the Recreation Specialist Report (p. 1) states that "recreation impacts are considered in the context of the affected local community" and that "the local community in the project area includes the year-round residents in the towns of Warren and Piermont and the seasonal residents who occupy second homes or camps that are scattered throughout the project area."

In conclusion, the WMNF disclosed that potential noise impacts from the Tarleton project would be of short duration, localized, equal to or quieter than specified benchmark noises (e.g., truck traffic), experienced by relatively few recreationists due to the season of occurrence, and buffered by intervening vegetation at critical locations such as the Appalachian Trail and Lake Tarleton. Further consideration of the impacts of noise are documented in the project record.

Issue 28 (Pastoriza, Porter)

The Forest Service did not evaluate the risk of increased illegal motorized use in harvested areas.

Response: While the Final EA does not specifically discuss the potential for illegal or increased motorized use as a result of the Tarleton project, it can be inferred that such impacts would have a low likelihood of occurring, given the 300-foot no-cut buffer along Lake Tarleton (Final EA, p. 17); no new road construction in the project area (Final EA, p. 15); and the installation of gates or other barriers to motorized traffic (Final EA, Appendix C). Because of the gate installations and removal of temporary gates and bridges on the maintenance level 1 roads (including Charleston Road), illegal or increased motorized use would not be expected. Instead, the 1.2 miles of maintenance level 2 roads would be publicly accessible and would thus be the travelways over which increased motorized use was more likely to occur. Furthermore, it is worth noting that the travelways in the project area already exist as unauthorized roads.

In all cases, illegal motorized activities would be addressed via law enforcement actions, and because such activities are speculative (unpredictable), a reasonable assessment of potential

effects is not required or possible.

Regarding motorized use along skid trails, the Recreation Specialist Report (p. 6) states that "newly created skid trails [would be] covered with slash, fresh stumps and an abundance of limbs and woody debris carpeting the forest floor." Such conditions would not be conducive to motorized use and would help prevent, rather than contribute to, illegal or increased motorized use.

Forest-wide Winter Motorized Trails Standards S-2 and S-3 clearly state that the WMNF "will remain closed unless designated open to snowmobile and all-terrain vehicle (ATV) use" and that "motorized use is permitted on designated motorized trails only. Off-trail cross-country use is prohibited" (Forest Plan, p. 2-18). Similarly, Forest-wide Summer Motorized Trail Standard S-1 clearly states that "summer motorized trail use is prohibited" (Forest Plan, p. 2-19). Regarding motorized use along the powerline corridor, previous Forest Service comment analysis from the second formal comment period (PR: LongFormPDRFTCDRAFTWorking.xlsx) indicates that the WMNF has not been approached by the New Hampshire Board of Trails (Department of Natural & Cultural Resources) for permission for recreational OHRV use of the existing snowmobile trail along that corridor. Additionally, project design features show that there would be a 50-foot no-cut buffer between most of the treatment units and the edge of the powerline corridor, but that "the National Grid powerline company will conduct a linear clearcut in units 13, 17, and 25 to bring down all potential hazard trees before project activities begin. Felled hazard trees will be left grounded on site" (Final EA, p. 18). Therefore, in most cases, project activities would not change the existing conditions of the powerline corridor; where changes in the powerline corridor would occur (limited hazard tree felling), such activities would not be expected to facilitate illegal or increased motorized use.

In conclusion, while the project record does not specifically focus on potential motorized use impacts, there does not appear to be any evidence that illegal or increased motorized use is a likely result of project activities.

Issue 29 (Porter)

The Forest Service did not properly evaluate and disclose the potential effect of displacing recreation use due to timber harvesting activities.

Response: Recreation impacts were considered in the context of the affected local community and potential changes in visitor use levels in the project area (Final EA, p. 21). Though the Recreation Specialist Report does not provide an in-depth analysis of potential changes in visitor use levels, it does forecast an increase in use of Lake Katherine because of the improved boat launch (p. 1) and that increased use of Lake Katherine would still conform with the recreation experience characteristics that are expected for the Roaded Natural Recreation Opportunity Spectrum (ROS) class (p. 2). The report also concludes that, as far as the Appalachian Trail is concerned, recreational use displacement would be minimal due to the fact that "the number of winter users of the Lake Tarleton project area's section of the AT is very low" (p. 3).

The Final EA (p. 21) disclosed that the effects of timber harvesting on "recreational users of the area would be localized […] and recreational users are likely to disperse to other recreation

sites." The Socioeconomics Specialist Report (p. 1) disclosed that the noise or physical disturbance associated with timber harvest and other construction activities could result in potential dispersal of recreational users to other sites, but again notes that "these effects would be localized, as project activities would occur in discrete portions of the project area at any given time" (p. 1), not the entire project area. Given this, the Socioeconomics Specialist Report concluded that "changes in tourism patterns or resident use, resulting from this displacement would occur locally over the short-term, for the duration of project implementation or shortly thereafter. These impacts would be minor or less, as they would not result in measurable disruption to local socioeconomic conditions" (pp. 1-2).

The Final EA (p. 21) and the Socioeconomics Specialist Report (p. 2) state that the improvements to the Lake Katherine boat launch could increase recreational use and contribute positively to the local economy because the boat launch improvements may attract more users who would positively contribute to the local economy, particularly at local restaurants, convenience stores, and gas stations.

In conclusion, the Final EA and project record document the consideration of potential recreational use displacement during vegetation management activities and disclose that any effect would be localized and short-term, with neutral or even positive impacts (in the case of Lake Katherine, boat launch improvements) to local socioeconomic conditions. Given the anticipated localized and short-term nature of potential effects to recreational use, lower recreational use patterns during the winter months when project activities would occur, and the consistency of project activities with the recreation experience characteristics of the applicable ROS classes, there is no indication that measurable recreation use dispersal should be expected throughout the Tarleton project area.

Issue 30 (Porter)

The Forest Service did not properly evaluate the impacts of the project on the Appalachian Trail.

Response: The Final EA (p. 21) and the Recreation Specialist Report (p. 2) disclose that trail users will be exposed to the noise, smell, and, in some areas, sights of the operations and their aftereffects; at the same time, they note that timber harvesting is proposed only for winter, when the number of trail users is considerably less than in other seasons. Scenery impacts of the project are disclosed in the Scenery Specialist Report (p. 2), including analysis at multiple viewpoint locations along the trail and the project's potential visibility from it, in compliance with Forest Plan guideline G-1 (Forest Plan, p. 3-53). It should also be noted that a May 1, 2023, letter (during the objection period) from the Appalachian Trail Conservancy (ATC) states that "ATC anticipates no significant impact within the Appalachian Trail visual foreground provided that no harvesting takes place within the stated 500-foot buffer area and that all such activity be conducted only in winter." This is consistent with the disclosure in the Final EA (p. 21) that harvesting would be limited to the winter and would occur at least 500 feet away from the trail.

Per the Scenery Specialist Report, the only identified viewpoints along the Appalachian Trail where middleground or background views of the project area were identified, and where the visualization of treatment units was performed, were at the State Route 25C/powerline corridor crossing (p. 12), Mt. Moosilauke (pp. 16-17), and Mt. Cube (p. 18). The visualizations for those

viewpoints show that no treatment units would be visible from the powerline corridor crossing and would be only marginally visible in the background from Mt. Moosilauke, thereby meeting the High Scenic Integrity Objective. The view from Mt. Cube (Sentinel Mountain area), on the other hand, would include limited middleground visibility of portions of two regeneration units and two improvement cuts (which would have a thinning, rather than clearcut, appearance). These units would be located in MA 8.3 rather than MA 2.1 and would therefore be subject to a minimum Scenic Integrity Objective of High. The units visible from the Mt. Cube viewpoint would at least meet the Moderate Scenic Integrity Objective, if not the High Scenic Integrity Objective, since the corresponding visualization indicates that they would be subordinate to the surrounding scenic character. However, it is not clear from the visualization that a High Scenic Integrity Objective would be met.

To ensure that project activities meet the applicable Scenic Integrity Objective, "prior to implementation, field visits would occur to refine treatment unit boundaries and acres including modification to address on-site conditions" and "treatment acres may be reduced to meet visual and water quality objectives, to incorporate reserve patches of uncut trees in final harvest stands, and to incorporate protective buffers around features" (Final EA, p. 10).

As the Forest Plan is publicly accessible on the WMNF website, it is unreasonable to expect that applicable Forest Plan content would be restated in full in the Final EA or specialist reports. However, the Scenery Specialist Report (p. 3) states that "the proposed project was designed to meet the intent and spirit of the Forest Plan's Standards and Guidelines for Scenery Management," and the Final EA (p. 2) states that "the proposed action is consistent with Forest Plan standards and guidelines for scenery management." From those broad disclosures, it is reasonable for the public to conclude that the project would be consistent with the scenery management standards and guidelines for MA 2.1, even if those standards and guidelines are not specifically cited.

In conclusion, the WMNF complied with all applicable laws, regulations, and policies in its evaluation and disclosure of the project's potential impacts to the Appalachian Trail. A foreground distance zone was established for the trail in which no harvest activities would occur, thereby maintaining existing scenery conditions along the trail. Viewpoints along the trail from which middleground or background views of the project area may exist were identified, and visualizations of the treatment units potentially visible from those locations were generated.

Issue 31 (Porter)

The Forest Service did not properly evaluate the effects of the project on recreation in the context of the local project planning area.

Response: The Recreation Specialist Report (p. 1) states that recreation impacts are considered in the context of the affected local community and the influx of visitors to the area seeking to enjoy recreational activities. In particular, the report discusses (pp. 1-2) local-level impacts to Lake Katherine specifically in the context of the boat launch parking proposal. Local-level impacts to Lake Tarleton were also considered and addressed through the specification of a minimum 300-foot no-cut buffer from the water's edge as one of the project design features (Final EA, p. 17). As discussed in the Scenery Specialist Report (p. 2), the potential impacts to Webster Slide were

considered and no clear viewpoint or viewshed of the proposed project area was identified.

Regarding local-level impacts to the recreation settings of the various locations identified by the objector, only Webster Slide is located in an area that is associated with the Semi-Primitive Non-Motorized ROS class, in which the recreation setting characterization should be "predominantly natural or natural-appearing" and the recreation experience characterization should include a "high, but not an extremely high, probability of experiencing isolation from the sights and sounds of humans" (Forest Plan FEIS, p. H-2). As discussed above, no clear viewpoint or viewshed of the project area was identified from Webster Slide, and therefore the project would achieve the visual criteria of the applicable recreation setting for that location. The other locations identified by the objector are instead located within or immediately adjacent to areas associated with the Roaded Natural ROS class, in which "moderate evidences of the sights and sounds of human activity" would be expected (Forest Plan FEIS, p. H-3), and with which the project's visual impacts to the recreation setting would be consistent. The Recreation Specialist Report provides additional discussion of the project's recreation setting impacts relative to both ROS classes (pp. 2, 5, 6).

The Final EA notes that "wildlife habitat and transportation improvements near Lake Katherine may also result in increased opportunities for hunting and birdwatching by expanding available wildlife habitat and improving access to the adjacent wildlife openings" (p. 21).

In conclusion, WMNF complied with all applicable laws, regulations, and policies in its evaluation and disclosure of the project's potential local-level impacts to recreation settings and other recreation-related resources.

Issue 32 (Porter)

For treatment units in Management Area 2.1 that are visible from Concern Level 1 higher-elevation viewpoints, the Forest Service didn't sufficiently evaluate the project's consistency with applicable Forest Plan scenery management direction.

Response: The only Concern Level 1 higher-elevation viewpoints in the project area would occur along the Appalachian Trail. Thus, MA 2.1 scenery management guideline G-1 (Forest Plan, p. 3-6) would only apply to regeneration units visible from the Appalachian Trail, rather than to views from other locations in the project area (which would not be Concern Level 1 viewpoints) or to views of treatment units that are not regeneration units. As a result, the applicability of this guideline is very limited within the project area. Per the Scenery Specialist Report, the only identified viewpoints along the Appalachian Trail where the visualization of treatment units was performed were at the State Route 25C/powerline corridor crossing (p. 12), Mt. Moosilauke (pp. 16-17), and Mt. Cube (p. 18). At the powerline corridor crossing, no treatment units are anticipated to be visible. From Mt. Moosilauke, only 4.1 acres of regeneration unit #2 are anticipated to be visible. From Mt. Cube, only 0.8 acres of regeneration unit #39 and 6 acres of regeneration unit #42 are anticipated to be visible. Based on the referenced visualizations, the visible acreage of regeneration units at any of the viewpoints identified above would not exceed the 4 percent threshold for a single-entry period (Forest Plan, p. 3-6, G-1) in comparison to the expansive surrounding viewshed.

In order to evaluate cumulative effects and demonstrate consistency with guideline G-1, the visible regeneration acreage associated with the project must be considered in conjunction with the acreage of previous (within the preceding 30 years) regeneration units visible from the identified viewpoints and, in congregate, must not exceed 9 percent of the visible landscape (Forest Plan, p. 3-6, G-1). Given that project implementation would occur in the future, the 30-year timeframe for evaluating cumulative effects would begin at some point after 1993, depending on the actual project implementation date. The Final EA (p. 7) states that approximately 700 acres of regeneration harvest is believed to have occurred in the project area between the late 1980s and early 1990s prior to Federal ownership. While an exact calculation of the portion of the 700 acres of previous regeneration harvest that may be visible from the Mt. Moosilauke and Mt. Cube viewpoints was not documented, there is only a low probability that any of the regeneration harvest activities in question occurred within the 30-year evaluation timeframe that currently exists, with that probability becoming even lower by the time that the project would actually be implemented.

In conclusion, because of the limited availability of records and reliance primarily on "on the ground and LiDAR analysis and professional knowledge from the Pemigewasset District forestry team" (Final EA, p. 7), there remains some uncertainty around the timeframe and location of the previous regeneration harvests, and it cannot be said with absolute certainty that the project would be consistent with guideline G-1. Thus, it is necessary to accept the risk of not achieving consistency with that guideline in order to implement the project. While it can be determined that the proposed action in isolation would be consistent with guideline G-1, there is a remote possibility that the 9 percent threshold visible from either Mt. Moosilauke or Mt. Cube could be exceeded if portions of the previous regeneration harvest areas were visible within the respective viewsheds from those locations and if the visible regeneration harvest activities had fully occurred within a 30-year time frame prior to project implementation. However, the likelihood of such a scenario is reasonably small and will become increasingly so with each passing year.

Instruction: Clarify the Vegetation Management History of the Tarleton Area section in the Final EA (p. 7) to note the uncertainty regarding the exact locations and timing of regeneration harvests prior to the lands entering Federal ownership.

Issue 33 (George, Porter)

The Forest Service did not properly evaluate and disclose effects to scenery because the set of viewpoints was inadequate.

Response: Neither the Forest Service Landscape Aesthetics Handbook (PR: Landscape_Aesthetics_Handbook_USFS.pdf) nor the Forest Plan provides specific guidance for the selection of viewpoints for scenery analysis on a given project. On the WMNF, the selection of viewpoints is a multidisciplinary approach that not only relies on review of Google Earth imagery and LiDAR data for the project area, as discussed throughout the Scenery Specialist Report, but also incorporates informed knowledge of the project area from field-going staff to identify those locations with the greatest likelihood of views and highest concern levels for scenery, and those locations that afford different perspectives of the project area. Given this, there is no clear basis on which to argue that a greater number of viewpoints should have been selected for analysis.

Selection of viewpoints for scenery analysis was limited to fixed points in high use areas that are publicly owned and publicly accessible, where land use and visitation patterns are not anticipated to change over time. Kingswood Camp and Camp Walt Whitman are privately owned and do not meet these criteria. Piermont Mountain, while located on public land, lacks a publicly accessible Forest Service system trail to its summit and is subject to lower visitation, and was therefore not selected as a viewpoint. Viewpoints within the boundary of Lake Tarleton itself were not selected because they would not be fixed points that could be precisely revisited for scenery monitoring over time. Charleston Road currently has open access but would be converted to maintenance level 1 and have gates installed as part of the project, making it no longer accessible to public vehicular traffic and limiting visitation. Thus, viewpoints along Charleston Road were not selected for analysis in favor of other viewpoint locations that would have greater potential opportunity and volume of public access. Thus, none of the locations suggested by the objector met the WMNF's criteria for viewpoint selection.

For the Tarleton project, the spatial and temporal boundaries for scenery analysis are defined in the Scenery Specialist Report (p. 1) as "30 years into the future" and up to "8 miles from any [selected] viewpoint." The perceived visual recovery of regeneration units may actually be achieved in a shorter timeframe on a site-by-site basis, as evidenced by forest-wide vegetation management guideline G-4 (Forest Plan, p. 2-30), which allows for new even-aged regeneration harvest to occur adjacent to previous regeneration areas once the average height of the first harvest area is at least 15 feet (which would be anticipated to occur on a much shorter than 30-year timeframe for most species). The spatial analysis boundary is based on the maximum distance between each of the selected viewpoints and the various harvest units and may actually be less than 8 miles for some viewpoints but would not exceed that distance for any of the viewpoints. The selected viewpoints are identified in the Scenery Specialist Report (pp. 1-2) and mapped in Figures 2-4 (pp. 8-10) of that report.

Regarding the significance of effects, Figures 6-17 in the Scenery Specialist Report (pp. 12-18) provide photographs of views from the viewpoints toward the project area and visualizations of the extent of the treatment units that would be visible from each of those viewpoints. These visualizations clearly show the limited extent to which the treatment units would be visible from the different viewpoints. The Scenery Specialist Report (pp. 5-6) also discusses in general terms the intensity, nature, and duration of potential impacts to scenery, based on different visibility factors and treatment prescriptions, with recognition that there would be site-specific differences at the different viewpoints. Additional viewpoint-specific information regarding the extent and nature of the potential impacts is also provided in the report (pp. 12-18). Disclosure of the duration of potential impacts in the report is limited to general discussion (pp. 5-6) rather than on a viewpoint-by-viewpoint basis, but it can be assumed that the duration of potential impacts would be similar among the different viewpoints (potentially up to 20 years, as stated in the report, but no longer than 30 years). While the Final EA's discussion of potential impacts to scenery (p. 21) is much more generalized, the Scenery Specialist Report provides sufficient detail to understand and visualize the anticipated effects within the temporal and spatial boundaries for scenery analysis, and to recognize the limited visual extent of the treatment units, as viewed from the selected viewpoints.

In conclusion, the WMNF complied with all applicable laws, regulations, and policies in its selection of viewpoints and evaluation and disclosure of the project's potential impacts to

scenery as viewed from those locations.

Objection Review Conclusion

My review of your objection issues finds that the Tarleton Integrated Resource Project's EA/FONSI, DDN, and supporting documents in the project record comply with all applicable laws, regulations, and policies, and with the White Mountain's Forest Plan. The only exceptions to my findings concern Issues 2, 17, 19, and 32, which are discussed earlier in this letter. I am instructing the Responsible Official to address these concerns as follows:

- Issue 2: Make available with the final decision a summary of how public comments were considered in the development and effects analysis for the project.

- Issue 17: Explain in the Final EA , decision document or project record that the Eastman Brook is listed as "impaired" for acidity and clarify if the Tarleton project's timber harvest will affect residual basal area in the impaired reach of Eastman Brook such that the threshold of vegetation management guideline G-1 will be exceeded and explain the rationale for exceedance

- Issue 19: Incorporate in the Tarleton project any reasonable and prudent measures, or terms and conditions resulting from the March 2023 Biological Opinion from the U.S. Fish and Wildlife Service, concerning NLEB conservation.

- Issue 32: Clarify the Vegetation Management History of the Tarleton Area section in the Final EA (p. 7) to note the uncertainty regarding the exact locations and timing of regeneration harvests prior to the lands entering Federal ownership.

The Responsible Official may not sign the final Decision Notice until these instructions have been addressed (36 CFR 218.12(b)). My review constitutes the final administrative determination of the Department of Agriculture. No further review from any other Forest Service or Department of Agriculture official of my written response to your objection is available (36 CFR 218.11(b)(2)).

Sincerely,

X Derek J.S. Ibarguen

Derek J.S. Ibarguen,

Forest Supervisor / Reviewing Officer

Cc: Brooke Brown, Matt St. Pierre, Theresa Corless, Scotty Hall

VERMONT
LAW & GRADUATE SCHOOL

STANDING TREES

The Lake Tarleton Coalition

Environmental Advocacy Clinic
Vermont Law and Graduate School
PO Box 96, 164 Chelsea Street
South Royalton, VT 05068
802.831.1630 (p) | 802.831.1631 (f)

May 1, 2023

Derek Ibarguen, Reviewing Officer
Attn.: PAL-LSC Objections, Administrative Review Coord., Suite 700
USDA Forest Service, Eastern Region
626 East Wisconsin Avenue
Milwaukee, WI 53202

*Submitted via*: https://cara.fs2c.usda.gov/Public//CommentInput?Project=56394 and certified U.S. mail (#7018 3090 0001 5600 9072).

**Re: Objection Pursuant to 36 C.F.R. § 218.8 to Tarleton IRP, Pemigewasset Ranger District, White Mountain National Forest**

Dear Objection Reviewing Officer:

Standing Trees and The Lake Tarleton Coalition respectfully file[1] this objection to the Tarleton Integrated Resource Project ("IRP") (the "Project") under the process identified in 36 C.F.R. § 218.8. Notice of availability of the Draft Decision Notice ("DDN"), Final Environmental Assessment ("Final EA"), and Finding of No Significant Impact ("FONSI") was published in the newspaper of record, New Hampshire Union Leader, on March 16, 2023. This objection is timely as the deadline to submit objections is May 1, 2023. We submit this objection via certified U.S. mail and electronically. The certified mail copy includes a thumb drive containing electronic copies of all the exhibits cited below.[2] A list of those exhibits is included at the end of this objection.

[1] Standing Trees and The Lake Tarleton Coalition wish to thank Vermont Law and Graduate School Spring 2023 Environmental Advocacy Clinic students, Isabella Pardales and Sarah Christopherson, for authoring this objection.

[2] The thumb drive also contains electronic copies of all exhibits cited in our May 11, 2022 comment. Exhibits included in the May 11, 2022 Standing Trees and The Lake Tarleton Coalition comment on the Tarleton IRP Updated Draft EA are referred to below as "(Comment Exhibit __)." New exhibits referenced in this objection are referred to below as "(Exhibit __)."

## PROJECT

Pursuant to 36 C.F.R. § 218.8(d)(4), we object to the following project:

*Project*: Tarleton Integrated Resource Project, Grafton County, New Hampshire

*Responsible Official and Forest/Ranger District:* Derek Ibarguen, White Mountain National Forest Supervisor and Pemigewasset Ranger District, White Mountain National Forest

## ELIGIBILITY TO OBJECT

Standing Trees is a grassroots membership organization that works to protect and restore New England's forests, with a focus on state and federal public lands in Vermont and New Hampshire. Standing Trees works to ensure New England's public lands are managed using just and equitable policies and practices to support the region's citizens and natural ecosystems alike. This includes managing public lands and waters to maximize carbon storage and protect clean water, clean air, public health, and intact habitat for the region's native biodiversity. Standing Trees has many members who regularly visit and recreate throughout the White Mountain National Forest ("WMNF"), including the area impacted by the Tarleton IRP. The Environmental Advocacy Clinic at Vermont Law and Graduate School submits this objection on behalf of Standing Trees.

The Lake Tarleton Coalition also joins this objection. The Lake Tarleton Coalition is a group of local business owners, scientists, frequent users of the WMNF, and concerned citizens united for permanent protection of Lake Tarleton and surrounding lands in the WMNF. Many of the Coalition's members have been involved in efforts to protect Lake Tarleton for decades.

Standing Trees and The Lake Tarleton Coalition jointly filed a timely, specific, and substantive comment during the Draft Environmental Assessment Comment Period for the Project at issue on May 11, 2022. An additional group of individuals filed an identical comment on May 11, 2022. These individuals are Lake Tarleton residents and users, and they join this objection. Throughout this objection, the use of "we" and "our" refers to all Objectors collectively: Standing Trees, The Lake Tarleton Coalition, and the additional individuals mentioned above. Under 36 C.F.R. § 218.8, we have standing to file an objection. All points and issues raised in this objection refer to issues raised in our May 11, 2022 comments on the Updated Draft EA or are related to new information, pursuant to 36 C.F.R. § 218.8(c).

## LEAD OBJECTOR

Pursuant to 36 C.F.R. § 218.8(d)(3), the "Lead Objector" is:

Zack Porter
Executive Director, Standing Trees
PO Box 132
Montpelier, VT 05601
(802) 552-0160, zporter@standingtrees.org

## OBJECTOR CONTACT INFORMATION

**Robin Ascher**
879 Route 25C
Piermont, NH 03779
(603) 989-9829

**Peter Ascher**
879 Route 25C
Piermont, NH 03779
(603) 989-9829

**Paul Guyre, PhD**
PO Box 141
Lyme, NH 03768
(603) 667-6767

Paul M Guyre

**Veronica Guyre**
PO Box 141
Lyme, NH 03768
(603) 667-6767

Veronica Guyre

**Rebecca Lovejoy**
44 Britton Lane
Lyme, NH 03768
802-552-0160

**Gail Coffey**
956 Mason Rd
Wilton, NH 03086
(603)-809-2883

Gail Coffey

**Gerry Coffey**
956 Mason Rd
Wilton, NH 03086
(603)-809-0108

**Elaine Faletra**
49 Mountain Meadow Rd
Warren NH 03279
603-764-5284

**Peter Faletra**
49 Mountain Meadow Rd
Warren NH 03279
603-764-5284

**Eric Jones**
c/o Standing Trees
PO Box 132
Montpelier, VT, 05601
(603) 989-8004

Eric Jones

**Kevin A. Peterson**
44 Britton Lane
Lyme, NH 03768
802-552-0160

**Kris Pastoriza**
294 Gibson Rd.
Easton, N.H. 03580
603-823-9063

**Jake Reder, PhD**
8 Rip Rd
Hanover, NH 03755
(603) 277-9589

**Margaret Sheehan, JD**
PO Box 87
Lyme, NH 03768
802-552-0160

**Michael Wipfler**
23545 Old Meadow Lane
Middleburg, VA 20117
(301) 801-1478

**Rob Wipfler**
41 Culver Hill Road
Lyme, NH 03768
603-667-8578

**Kassia Randzio**
17 North Park Dr
Montpelier, VT 05602
406-830-6035

**Geoffrey Gardner**
938 Old Post Road
Bradford, VT 05033
(802) 222-3460

## INTRODUCTION

Lake Tarleton is a clear, cold, and quiet mountain lake in Grafton County, New Hampshire. It is surrounded by undisturbed forests sloping to the shoreline, loons calling through the mist, and the alpine tundra-topped Mt. Moosilauke looming in the distance. It is an iconic corner of the WMNF, with a rocky, undeveloped shoreline surrounded by massive hemlocks and stately white pines. As conceived by the Forest Service, the Tarleton IRP puts a long history of community-led conservation at risk. In 1994, the proposal of a massive resort surrounding Lake Tarleton inspired a multi-year conservation effort, led by the Trust for Public Land ("TPL") to preserve Lake Tarleton. Organizations, countless individuals, businesses, the State of New Hampshire, and the U.S. Congress worked to raise $7.5 million to secure public ownership forever as part of the WMNF. Their vision of permanent conservation was unmistakable, and this flawed Project threatens to destroy that vision.

In making its case to the Piermont and Warren Selectboards, TPL made it clear that its vision was for a wild Lake Tarleton. According to the September 5, 2001 edition of the Bradford *Journal Opinion*:

> Under the motto 'Less is More,' the plan as presented by [TPL representative Rodger] Krussman 'will protect and conserve the 'wilderness' quality of the Lake Tarleton area,' stressing low impact recreational activities. Some of the proposals set forth in the plan include a visitors center in the former Santucci house with a small crushed stone parking lot serving both the center and the beach area; a handicapped accessible trail with an overlook onto the lake and access to the beach; a foot trail loop around the lake with spurs to Lake Constance, Piermont Mountain and a spur connecting to the Appalachian Trail. The plan also calls for lobbying the NH legislature for a horsepower limit of five or less on the lake and a banning of the use of jet skis[.][3]

Conservation partners gathered to celebrate the protection effort in August 2000. At the ceremony, Senator Judd Gregg commented, "Many of us here today have worked hard for a number of years to reach the point we are at today where we can proudly say that this pristine New Hampshire wilderness has been saved."[4]

This Project disregards the importance of these lands and waters to the community and treats one of New Hampshire's largest, cleanest, and least developed lakes as a woodlot. It is far

---

[3] September 5, 2001 article in the Bradford Opinion Journal (Comment Exhibit 1).
[4] Trust for Public Land, *Residents Celebrate Protection of Lake Tarleton (NH)* (Aug. 23, 2000) https://www.tpl.org/media-room/residents-celebrate-protection-lake-tarleton-nh#:~:text=Warren%2C%20New%20Hampshire%3A%20Today%20U.S.,Warren%2C%20Piermont%2C%20and%20Benton (Exhibit 34).

past time to permanently remove the threat of logging and development from Lake Tarleton, as the community was led to believe this was the result of the lake's protection.

The Forest Service's founding motto implores the agency to *manage our public forests for the benefit of the greatest good for the greatest number for the longest time*. The public interest is best served by protecting Lake Tarleton, and its exceptional ecological integrity. The Forest Service has failed to meaningfully engage local stakeholders in project development and ignored the imperative to protect the many intact values of Lake Tarleton. The Project offends the purpose of the WMNF Plan and threatens forest health, climate resilience, water quality, habitat for imperiled species, and the scenic beauty and recreational opportunities for which this treasured landscape is prized. We next provide the specific reasons for this objection and our requested remedies, along with related evidence and rationale on why the Project violates applicable laws and regulations.

## CONCISE STATEMENT OF OBJECTIONS

The Tarleton IRP authorizes various actions such as logging, road construction, and the creation of a boat launch in the WMNF. Without meaningful justification and after sidestepping substantive and procedural requirements of federal law, the Forest Service has erroneously decided the Tarleton IRP is needed to implement the management direction in the WMNF Plan and meet the Plan's goals, objectives, and desired conditions for vegetation, wildlife, and other resources. We identify concerns as raised in our comment submitted on May 11, 2022, and issues based on new information that arose after the opportunity to comment closed, pursuant to 36 C.F.R. § 218.8(c).

The Forest Service failed to demonstrate compliance with the National Environmental Policy Act ("NEPA"), National Forest Management Act ("NFMA"), Clean Water Act ("CWA"), Endangered Species Act ("ESA"), and Administrative Procedure Act ("APA"). The Draft Decision Notice ("DDN")[5], Environmental Assessment ("EA"),[6] and Finding of No Significant Impact ("FONSI")[7] violate specific provisions of NEPA, NFMA, ESA, Council on Environmental Quality ("CEQ") guidance, and recent executive orders. Of particular concern is the Forest Service's continued failure to: (1) meaningfully involve the public; (2) take a hard look at impacts on the human environment; (3) consider reasonable alternatives in detail; (4) use

---

[5] *Tarleton Integrated Resource Project: Draft Decision Notice*, U.S. FOREST SERVICE 1 (March 15, 2023), https://usfs-public.app.box.com/v/PinyonPublic/file/1165699833894 (in Tarleton IRP project file at filename Tarleton Draft Decision Notice.pdf) (hereinafter "DDN").

[6] *Tarleton Integrated Resource Project: Final Environmental Assessment and Finding of No Significant Impact*, U.S. FOREST SERVICE 1 (March 16, 2023) https://usfs-public.app.box.com/v/PinyonPublic/file/1165697234983 (in Tarleton IRP project file at filename Tarleton Environmental Assessment and Finding of No Significant Impact.pdf) (hereinafter "Final EA").

[7] *Id.* at 23.

the best available science; (5) and adequately consider the Project's impact on the endangered Northern Long-eared Bat ("NLEB").

The Forest Service should implement our suggested Alternative #3 discussed in Section I(c) below. This alternative would improve recreation resources, habitat restoration, and designate the land as a protected Scenic Area through a Forest Plan amendment—as the public intended when the land was acquired by the WMNF over 20 years ago. Alternatively, to cure the manifest errors in the Final EA and FONSI, and given the significance of this Project, the Forest Service should prepare an Environmental Impact Statement ("EIS") to adequately evaluate the significant impacts posed by the Tarleton IRP. If needed, the Forest Service should also update the WMNF Plan as required under NFMA to clarify and protect the outstanding resource value of the area around Lake Tarleton.

## Table Of Contents

**I. The Final EA Is Inadequate Under NEPA and New Analysis Must Be Conducted** .......... 9

- **a. The Public Involvement Process Was Burdened in Violation of NEPA** .......... 9
- **b. The Purpose and Need Statement Is Legally Deficient Under NEPA, NFMA, and Relevant Executive Orders** .......... 13
- **c. The Final EA Failed to Analyze an Adequate Range of Alternatives** .......... 15
- **d. The Final EA Failed to Take a "Hard Look" at Numerous Project-Area Environmental Resources** .......... 20
  - **i. Sensitive Species** .......... 20
  - **ii. Historic and Cultural Resources** .......... 23
  - **iii. Climate Change** .......... 25
  - **iv. Water Quality Impacts/Hydrology** .......... 29
  - **v. Recreation** .......... 34
  - **vi. Scenic Values** .......... 36
  - **vii. Socioeconomics** .......... 39
  - **viii. Soils** .......... 40
  - **ix. Vegetation & Forest Health** .......... 40
  - **x. Wildlife** .......... 44
  - **xi. Impacts of Road Construction** .......... 46
  - **xii. Cumulative Impacts** .......... 47

**II. The Tarleton IRP Is Significant and Requires an EIS** .......... 49

- **a. The FONSI Is Conclusory and Unsupported by the Facts** .......... 50
- **b. The Final EA Fails to Adequately Define the Context or Discuss the Intensity of Project Impacts, Which Weigh in Favor of a Finding of Significance** .......... 50
  - **i. Context** .......... 51
  - **ii. Intensity** .......... 53

**III. The Analyses and Protections for the Endangered Northern Long-eared Bat Are Deficient** .......... 57

- **a. The Tarleton IRP Fails to Comply with the ESA** .......... 57
- **b. The Biological Evaluation for the Tarleton IRP Is Insufficient** .......... 59
- **c. The Forest Service Fails to Meet NFMA Requirements** .......... 61

**IV. The Project Violates NFMA** .......... 62

## OBJECTIONS

### I. The Final EA Is Inadequate Under NEPA and New Analysis Must be Conducted.

The Tarleton IRP is a major federal action that is likely to significantly affect the quality of the human environment, warranting an Environmental Impact Statement ("EIS") pursuant to 40 C.F.R. § 1502.3.[8] NEPA has "twin aims," imposing on "an agency the obligation to consider every significant aspect of the environmental impact of a proposed action . . . and ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision making process."[9] Preparation of an EIS is required when an agency's action *may* have a significant effect on the environment.[10] Over multiple comment periods, the public raised serious and substantiated concerns about the Forest Service's failure to fully evaluate the Tarleton IRP in accordance with NEPA. These concerns went unacknowledged by the Forest Service.

***Requested Remedy: The Forest Service must complete an EIS for the Tarleton IRP to cure deficiencies in the Final EA as outlined in our comment and expanded upon below.***

#### a. The Public Involvement Process Was Burdened in Violation of NEPA.

Public involvement in the Tarleton IRP has consistently been thwarted by the unavailability of supporting documents, a lack of sufficient detail, and inadequate public engagement in project development. The Project was initially presented to the public at the height of the COVID-19 pandemic, at a time when the public rightly avoided in-person gatherings or visits to town offices where relevant information was posted. A significant percentage of the local population continues to lack access to high-speed internet, preventing many from participating in the NEPA process. Notwithstanding the second comment opportunity, little has changed, with regards to public engagement and availability of supporting information, from the Updated Draft EA to the Final EA. The public is unable to properly scrutinize agency decisions and analysis when relevant documentation is not made available or when available documents do not actually contain the analysis necessary to support conclusory statements. Agency conclusions in an EA "must be supported by some quantified or detailed information, and the underlying environmental data relied upon. . . must be made available to the

---

[8] The Council on Environmental Quality ("CEQ") promulgates regulations to implement NEPA that are binding on all federal agencies. Those regulations are found at 40 C.F.R. §§ 1500–1508. The CEQ amended its regulations effective September 14, 2020. *See* 40 C.F.R. § 1506.13 (2020) (effective date). This Project, however, was developed and analyzed under the prior 1978 (as amended) version of the CEQ regulations. *See* Final EA at 4. Because the 2020 regulations are not retroactive and the Service's NEPA analysis followed the 2019 version of the regulations, all references to these regulations throughout this objection are to the 2019 version. *See Bair v. California Dep't of Transp.*, 982 F.3d 569, 582 (9th Cir. 2020).

[9] *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983).

[10] *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 444 F. Supp. 3d 832, 854 (S.D. Ohio 2020) (quoting *Mont. Wilderness Ass'n v. Fry*, 310 F. Supp 2d 1127, 1144 (D. Mont. 2004)).

public to allow for informed public comment on the project."[11] The Final EA contains "simple, conclusory statements" without carefully analyzing environmental impacts.[12] It offers little more than a "checklist of assurances and alternatives," void of reasoned thought and analysis.[13] Agencies must make genuine efforts to involve the public in their NEPA procedures,[14] and we continue to demand better from the federal agency entrusted as caretaker of Lake Tarleton.

As raised initially in our comment on the Updated Draft EA, supporting documentation has consistently lagged behind the Forest Service's release of documents triggering time-limited public comment opportunities. We have consistently requested information from the Forest Service that should have accompanied the Project's public documents, only to be met with delays, refusals, and the cumbersome need to compel disclosures under the Freedom of Information Act ("FOIA").[15] The Soils Specialist Report and the New Hampshire State Historic Preservation Officer ("SHPO") concurrence letter were not made available to the public until weeks after the publication of the Updated Draft EA, and only at our request.[16] In November 2021, we requested a stand age class map for the areas proposed for harvest in the Tarleton IRP, but the WMNF refused to provide it.[17] On March 7, 2023, we requested information on the age of the stands proposed for harvest.[18] The Forest Service directed us to the Habitat Management Unit Rationale, which does not provide information about stand age for those proposed for harvest.[19] We submitted a request under FOIA on March 2, 2023, for information related to the Tarleton IRP, only to be told our request would take up to six months to review internally, far past the end of this objection period.[20] Only after submission of another FOIA request on March 30, 2023, did we receive some information of interest, information that should have been publicly available from the start—with only about two weeks to review and understand the

---

[11] *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 444 F. Supp. 3d at 858-59.
[12] *Touret v. NASA*, 485 F. Supp. 2d 38, 45 (D.R.I. 2007).
[13] *Id.*
[14] 40 C.F.R. § 1506.6(a).

[15] In responding to these documents, we do not concede that these disclosures represent final, definitive statements by the agency as they are ambiguous, often with non-cognizable rationale.

[16] E-mail from Scott Hall, USFS NEPA Planner, to Zack Porter (May 2, 2022) (Comment Exhibit 3).
[17] E-mail from Scott Hall, USFS NEPA Planner, to Elaine Faletra (November 19, 2021) (Comment Exhibit 5).

[18] E-mail from Brooke Brown, Pemigewasset District Ranger, to Rob Wipfler (March 30, 2023, 9:07AM) (Exhibit 1).
[19] *Id.*
[20] The six-month estimated review time does not include anticipated time for processing the records themselves. E-mail from Isabella Pardales to Region 9 FOIA Coordinator (March 2, 2023, 8:01 AM) (Exhibit 2); E-mail from Marry Stewart, Acting Regional FOIA Coordinator, to Isabella Pardales (March 23, 2023, 10:15 AM) (Exhibit 3).

response.[21] On April 4, 2023, we requested the Northern Long-eared Bat ("NLEB") Biological Assessment ("BA") only to be incorrectly informed it was not considered a public document.[22] Upon submission of this objection, the public still has no access to the NLEB BA. The Final EA makes repeated reference to similar, unspecified past harvest projects to justify the no impact conclusion.[23] The DDN similarly claims the decision "tiers to management decisions made over 30 years ago" and claims the land is "now ready for active management."[24] No references or citations are provided to those "management decisions" or past harvest activity so the public can verify these claims. These are just a few examples of the types of information not timely provided to the public, even when requested.[25]

The Forest Service cumulatively received over 600 unique comment letters regarding the Tarleton IRP, and yet did not summarize or analyze them in a *meaningful* publicly available way.[26] After the release of a second draft EA and FONSI, the Forest Service published a two-page, overly simplified summary of the public involvement to date. The document effectively amounts to a single page of comment summary and lacks substantive and meaningful consideration of issues raised by the public. The Forest Service initiated a second 30-day comment period and yet failed to provide more than a cursory summary of public comments on the Project. Instead, we took it upon ourselves to summarize the 500+ comments.[27] Over 90% of comments were in opposition to the Project. The Appalachian Trail Conservancy stated: "[i]n the land that comprises the Tarleton IRP, ATC recognizes a substantial wild and intact landscape of a scale uncommon throughout the length of the A.T. . . opportunities to maintain intact forests at this scale are few and far between and should be considered in this broader context."[28] The TPL suggested future management decisions at Lake Tarleton should be folded into the WMNF Plan revision to ensure a complete and thorough public process.

On March 7, 2023, we inquired about comment responses for the second comment period and were told by the WMNF that responses are not available for public review.[29] In conflict with this response, we received a draft of the "Tarleton Second 30-Day Comment Period Concern

---

[21] Letter from Derek Ibarguen, WMNF Forest Supervisor, to Rob Wipfler (April 12, 2023) (Exhibit 4).
[22] E-mail from Suzanne Gifford, USFS Ecologist and Wildlife Biologist, to Zack Porter (April 10, 2023, 1:37 PM) (Exhibit 5).
[23] Final EA at 6, 7, 19, 24, 25.
[24] DDN at 2.
[25] Members of the public should not be required to submit FOIA requests to view project documents.
[26] *Id.* at 4.
[27] Standing Trees, *Categorization of Lake Tarleton Comments* (July 2022) (Exhibit 6).
[28] Appalachian Trail Conservancy, *Comment on Updated DEA* (May 11, 2022); Trust for Public Land, *Comment on Updated DEA* (May 11, 2022).
[29] E-mail from Brooke Brown, Pemigewasset District Ranger, to Rob Wipfler (March 30, 2023, 9:07AM) (Exhibit 1).

Responses" on April 14, 2023, through a FOIA request.[30] We also received a detailed document responding to our comments.[31] However, this document does not constitute a final or official response, and it was only received as the result of a FOIA request. The public *never* received a draft or final comment response document. Standing Trees, members of The Lake Tarleton Coalition, and other members of the public were under the impression the Forest Service would provide a cumulative and intelligible comment response document. By way of example, when assessing the Santa Fe Mountains Landscape Resiliency Project, the Forest Service prepared a "Public Comment Period Content Analysis and Response" document prior to the release of a Final EA after receipt of 123 public comment letters.[32] This document was thirty-three pages long and substantively responded to raised issues, summarizing representative comments for consistent issues. Yet upon receipt of over 500 public comment letters for the Tarleton IRP, the Forest Service failed to analyze or respond to the public's concerns with clarity or transparency.

In regards to the Lake Tarleton region, the WMNF was specifically asked in comments during the Forest Plan revision "to provide a management plan for the Lake Tarleton area."[33] As the Lake Tarleton area was newly added to the WMNF, and it is a unique and treasured landscape. In response to this public comment, the WMNF said:

> The White Mountain Forest Plan revision does not include a level of detail that specifies separate management plans for local areas such as Lake Tarleton. The Forest Plan identifies the general purpose and desired land conditions for each management area, and allows projects and activities to be planned on a case-by-case basis.[34]

This response ignores the fact that the WMNF should have analyzed alternative Management Area ("MA") designations for this landscape. In all four alternatives considered during Forest Plan revision, the Lake Tarleton region was designed MA 2.1. In refusing to acknowledge, discuss, and analyze an adequate range of management options for the Lake Tarleton area prior to the publication of the 2005 Forest Plan, the Forest Service told the public that future "project and activities" in the Lake Tarleton area will be planned "on a case-by-case

---

[30] Tarleton Second 30-Day Comment Period Concern Responses, U.S. FOREST SERVICE (Sept. 5, 2022) (Exhibit 7).

[31] Copy of Tarleton LongForm PDFRTCDRAFT Working, U.S. FOREST SERVICE (Apr. 14, 2023) (Exhibit 8).

[32] *Santa Fe Mountains Landscape Resiliency Project: Draft Environmental Assessment Public Comment Period Content Analysis and Response*, U.S. FOREST SERVICE 1 (2021) https://drive.google.com/file/d/1z6lid22zC8WZvVzkpUtNANVsnuh-0wKm/view (Exhibit 9 ).

[33] U.S. FOREST SERV., 2005 WMNF FOREST PLAN – FINAL ENVIRONMENTAL IMPACT STATEMENT- APPENDIX A A-1, A-234 (2005) (hereinafter "WMNF Plan - Final EIS - Appendix A").

[34] *Id.*

basis" and that "public participation will be an important part of the process we use for making site-specific management decisions."

This refusal to conduct a robust analysis during plan revision placed an added burden on the WMNF during future plan development to conduct robust public engagement and scoping. And yet, local residents and business owners surrounding Lake Tarleton, including Kingswood Camp, heard nothing from the Forest Service with regards to proposals for the Lake Tarleton area for over 15 years following completion of the WMNF Plan. When Kingswood Camp and local residents did hear from the WMNF, it was only *after* the Forest Service had developed plans for the Tarleton IRP.

In sum, if the WMNF claims the 2005 Forest Plan was not the time to assess possible management options for the Lake Tarleton region, and the Forest Service was committed to future "public participation" for "site-specific management decisions" on a "case-by-case basis," the WMNF has failed to follow-through on its promises.

The overall effect of the described inadequacies is the impediment of public participation, in violation of NEPA's clear mandate to "encourage and facilitate public involvement in decisions which affect the quality of the human environment."[35] The Forest Service's decisions to impede public participation are in violation of NEPA's mandate, as the public should not have to "parse the agency's statements to determine" project impacts.[36]

***Requested Remedy: The Forest Service must adequately engage with the public and complete an EIS for the Tarleton IRP to cure the described inadequacies.***

**b. The Purpose and Need Statement Is Legally Deficient Under NEPA, NFMA, and Relevant Executive Orders.**

NEPA directs the Forest Service to "specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action."[37] The statement should accurately reflect the proposed action's purpose and need because it informs the range of alternatives the agency considers as part of its NEPA analysis.[38] The Final EA states the primary purpose of the Tarleton IRP is "to implement the management direction in the Forest Plan by advancing forest plan goals, objectives, and desired conditions for vegetation, wildlife, and other resources."[39] The Forest Service claims the Project is needed:

> (1) to improve wildlife and habitat diversity within the Tarleton HMU; (2) help meet the goals and objectives for wildlife and vegetation described in the Forest Plan; (3) increase

[35] 40 C.F.R. § 1506.6(a).
[36] *League of Wilderness Defs.-Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 761 (9th Cir. 2014).
[37] 40 C.F.R. § 1502.13; *See* 40 CFR § 1501.5(c)(2), § 1502.13 (2020).

[38] *League of Wilderness Defs.-Blue Mountains Biodiversity Proj. v. U.S. Forest Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012).
[39] Final EA at 5.

forest health, vitality, and resiliency within the project area, including the effects of climate change, and insect and disease outbreaks; (4) address the lack of open forest conditions; (5) provide a sustainable yield of high-quality timber products; (6) promote wildlife habitat objectives; (7) address the lack of adequate forested buffer along the shoreline of Lake Katherine; (8) improve aquatic habitat; (9) expand one existing apple orchard; (10) redesign the Tarleton Fields Wildlife Opening; and (11) to construct a boat launch on Lake Katherine.[40]

The purpose and need statement suffers from two major flaws. First, this detailed purpose and need statement precludes adequate alternative action analysis, a failing of the EA discussed below.[41] It structures the Final EA to presuppose that the Forest Plan goals could *only* be accomplished by *this* proposed action, as action alternatives that fit the above listed needs would be unduly narrow. This unreasonably narrow purpose and need statement and the resulting lack of alternatives analysis—discussed further below—violates NEPA.[42] The purpose and need statement should be framed in a way that supports consideration of an accurate range of alternatives.

Second, the purpose and need statement is outdated for failing to incorporate recent authorities that must inform it. A properly crafted purpose and need statement would integrate an accurate account of Forest Plan objectives and current Executive Orders.[43] The purpose and need statement for the Tarleton IRP fails on both accounts. The Forest Service repeatedly claimed the purpose and need for the Tarleton IRP is driven by WMNF Plan goals and objectives. Yet the WMNF Plan is profoundly outdated at nearly 17 years old, and in utter conflict with NFMA's intent that forest plans be updated on a regular basis to reflect updated science, management objectives, and community needs. The Forest Service claims revision of the WMNF Plan is out of scope for the Project, yet the Project is entirely predicated on the WMNF Plan.[44] The Tarleton IRP further fails to reconcile the purpose and need statement with current Executive Orders 14072 and 14008, which aim to foster forest conservation, enhance forest resilience, and assess mature forests.[45] Before proceeding with the Tarleton IRP, the Forest Service should reconcile this more recent direction with the objectives of the WMNF Plan. The FS must connect stand conditions, best science, and desired future conditions to this supposed need for the Project. The

---

[40] Final EA at 6-7.
[41] *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.,* 123 F.3d 1142, 1155 (9th Cir. 1995).
[42] *Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058, 1070-72 (9th Cir. 2010).
[43] Exec. Order No. 14072, 87 Fed. Reg. 24851 (Apr. 22, 2022) (Comment Exhibit 6); Exec. Order No 14008, 86 Fed. Reg. 19 (Jan. 27, 2021) (Comment Exhibit 45).

[44] Tarleton Second 30-Day Comment Period Concern Responses, U.S. FOREST SERVICE Seq#27 (Sept. 5, 2022) (Exhibit 7).

[45] Exec. Order No. 14072, 87 Fed. Reg. 24851 (Apr. 22, 2022) (Comment Exhibit 6); Exec. Order No 14008, 86 Fed. Reg. 19 (Jan. 27, 2021) (Comment Exhibit 45).

purpose and need statement in the Final EA is legally deficient under NEPA, NFMA, EO 14072, and EO14008.

***Requested Remedy: The Forest Service should provide a more accurate purpose and need statement that promotes exploration of reasonable alternatives in compliance with the WMNF Plan and Executive Orders 14072 and 14008. The Forest Service should update the WMNF Plan as it is required to do under NFMA.***[46]

**c. The Final EA Failed to Analyze an Adequate Range of Alternatives.**

NEPA mandates that an EA describe the environmental impacts of both the proposed action and alternatives to the proposed action.[47] In our comment on the Updated Draft EA for the Project, we explained that an EA must include at least a "brief discussion[ ]" of reasonable alternatives to the proposed action.[48] "An alternative is reasonable if it is objectively feasible as well as 'reasonable in light of [the agency's] objectives.'"[49] The Final EA fails to meet its obligation for an alternative analysis under an EA for several reasons.

First, a "No Action Alternative" is the bare minimum alternative analysis an agency should undertake for an EA.[50] One of the most critical purposes of a No Action Alternative is to establish a baseline against which the proposed action can be measured. However, the Final EA only includes a discussion of the Project and a "*Consequences* of No Action" discussion.[51] The Consequences of No Action section of the Final EA is not an analysis, but a list of potential detrimental effects of not moving forward with the Project. NEPA requires agencies to consider both the detriments *and benefits* of proposed projects, which would include considering the benefits of reasonable alternatives as well. Our comment—and those of others—outline numerous benefits of not moving ahead with the Project (i.e. taking No Action).[52] These benefits include: (1) the benefit of retaining older, mature trees for in-situ carbon storage and avoiding foregone sequestration that would occur with logging; (2) the benefit of retaining mature forests to meet the intent of Executive Order 14072; (3) habitat benefits for the Northern Long-eared Bat and other species that benefit from mature or interior forests or are sensitive to harvest impacts, including species that depend on or prefer early successional habitat created through natural processes; (4) avoiding potential detrimental impacts to water quality due to runoff, sedimentation, and potential herbicide contamination; (5) avoiding loss or damage to historic and

---

[46] 16 U.S.C. § 1604(f)(5).
[47] 40 C.F.R. § 1501.5(c)(2).
[48] *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1323 (D.C. Cir. 2015) (quoting 40 C.F.R. § 1508.9(b)).
[49] *Id*. (quoting *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 72 (D.C. Cir. 2011)).
[50] 40 CFR § 1502.14(c).
[51] Final EA at 8.
[52] Comment Letter from Standing Trees & Lake Tarleton Coalition to Brooke M. Brown, Pemigewasset District Ranger (May 11, 2022) at 12-13. (hereinafter "Comment on Updated Draft EA") (Exhibit 10).

cultural resources located within the project area; (6) avoiding visual and noise impacts to the recreating public, nearby residents, and local businesses; (7) avoiding a potential violation of Forest Plan standards to maintain very high visual quality standards for MA 8.3 (Appalachian Trail) lands; and (8) avoiding potential, unanalyzed economic impacts to Kingswood Camp and local residents, among many others. These are major benefits that the Forest Service has wholly ignored, in blatant violation of NEPA. Accordingly, the "Consequences" section of the 2023 Final EA is not an analysis of a No Action Alternative.

Second, the Forest Service's consideration of alternatives is insufficient. CEQ regulations mandate that federal agencies "shall to the fullest extent possible . . . [u]se the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment."[53] It is also incumbent upon federal agencies to "[s]tudy, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."[54] Furthermore, an agency may consider only the proposed action when there are no "unresolved conflicts concerning alternative uses of available resources."[55] Unresolved conflicts exist when the agency lacks a consensus about the proposed action based on input from interested parties.[56]

Given the many different facets of the Project and the legally deficient purpose articulated in the Final EA—"to implement the management direction in the Forest Plan by advancing forest plan goals, objectives, and desired conditions for vegetation, wildlife, and other resources"—it is inconceivable that there was only one way to achieve that purpose. This is especially true for the logging portions of the Project. While reasonable alternatives may not be available for certain recreational enhancement portions of the Project (for example, improvements to the Lake Katherine boat launch), the logging activities are different in kind. The sheer number of different silviculture prescriptions for the proposed action demonstrates that even if logging is needed—we assert it is not—there is a wide variability in how logging, if any is warranted at all, can achieve desired conditions. This variability necessarily implies additional

---

[53] Copy of Tarleton Long Form PDFRTCDRAFT Working, U.S. FOREST SERVICE (Apr. 14, 2023) (Exhibit 8); 40 C.F.R. § 1500.2(e) (emphasis added). The Forest Service claims "no reasonable alternatives [to the proposed Tarleton IRP] have been brought at this time" and "no unresolved conflicts have been brought forward at this time." *Id*. This is a seriously erroneous misstatement of the record, as the Forest Service has received suggested reasonable alternatives to the Project on multiple occasions. The Project also raises countless unresolved conflicts, as is evident by the number of comments submitted in opposition to the Project.

[54] *Id*. § 1501.2(c); see also 42 U.S.C. § 4332(2)(E).
[55] 42 U.S.C. § 4332(E); see also 36 C.F.R. § 220.7(b)(2)(i).
[56] National Environmental Policy Act Procedures, 73 Fed. Reg. 43,084, 43,092 (July 24, 2008) (codified at 36 C.F.R. Part 220).

reasonable alternatives exist that the Forest Service either did not identify, or, at a minimum, did not consider.

A recent case in federal district court in New Hampshire is instructive on this issue. In *Conservation Law Foundation. v. U.S. Army Corps of Engineers*, 457 F. Supp. 3d 33 (D.N.H. 2019), a recent preliminary injunction opinion regarding the range of alternatives considered in an EA, the Court emphasized 40 C.F.R. § 1502.14, quoting from the regulation that agencies must:

> (a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.
>
> (b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.[57]

The Court went on to hold that the agency was likely to succeed on the merits because, unlike here, "the EA provided reasonable, common-sense explanations for rejecting alternatives." [58] In that case, the agency considered five alternatives, including a true no-action alternative.[59] The agency assessed the alternatives in quantitative terms, and for each alternative, the agency provided a rationale for why it was rejecting it in favor of the proposed action.[60]

By contrast, here, even after reviewing comments on the Project, the Forest Service did not analyze *any* alternatives to the Project, much less provide any rationale, quantitative or otherwise, for why it rejected them. To be sure, numerous reasonable alternatives exist—alternatives apparent to the agency and the public alike—and the Forest Service could have analyzed any of them, but failed to do so. Below, we reiterate a suggested reasonable alternative the Forest Service should have considered. As stated elsewhere in this objection, to the extent the Forest Service intends to move forward with the Project, it must complete an EIS. As part of that EIS, it must consider all reasonable alternatives, including a true No Action Alternative.

Additionally, the Final EA fails to address or even acknowledge any reasonable alternatives, including those listed in our comment letter[61] and those submitted by other parties. In a letter to Brooke Brown[62] and in our comment letter on the Updated Draft EA,[63] we suggested the following as one of several possible combinations of project components:

---

[57] *Conservation L. Found. v. U.S. Army Corps of Engineers*, 457 F. Supp. 3d at 56 (emphasis in original).
[58] *Id*.
[59] *Id*. at 57.
[60] *Id*. at 57–58.
[61] Comment on Updated Draft EA at 14-15 (Exhibit 10).
[62] Letter from The Lake Tarleton Coalition to Brooke Brown (July 20, 2022) (Exhibit 11).
[63] Comment on Updated Draft EA at 14 (Exhibit 10).

- Alternative 3: Combine improvements to recreation resources with small-scale habitat restoration and a Forest Plan amendment designating the Lake Tarleton-Webster Slide Scenic Area while omitting the unnecessary harvest and treatment activities included in the current proposed action. In this alternative, the WMNF could consider small-scale habitat restoration and recreation improvements including:
    - Natural woody debris inputs into Lake Katherine to improve fish habitat;
    - Restoration of natural buffer along the shore of Lake Katherine through removal of non-native species, tree planting, etc.;
    - Restoration of historic apple orchards;
    - Restoration of non-native tree plantations on former Mt. Sentinel State Forest if and where project goals do not conflict with standards and guidelines for MA 8.3 (Appalachian National Scenic Trail);
    - Conduct a narrowly-focused, geographically-explicit Forest Plan amendment to designate the Lake Tarleton-Webster Slide Scenic Area according to WMNF Plan Management Area 8.5. Like the nine other Scenic Areas on the WMNF, this one would be managed to prohibit timber management, maintain outstanding scenic integrity, and promote well-managed, low-impact recreation in balance with protection of the Appalachian Trail corridor and cultural and natural resources including archaeological sites, fish and wildlife, and water quality.

The Forest Service failed to address this reasonable alternative or any others in the Final EA. If the Forest Service analyzed and ultimately rejected this or any other alternative, an explanation for that decision should have been included in the Final EA.[64]

Since early 2022, hundreds of concerned citizens have petitioned the WMNF to permanently protect Lake Tarleton from logging and development as was intended and envisioned at the time that the land was acquired for public ownership in 2000.[65] A process to consider alternatives for the Lake Tarleton acquisition other than the current Management Area allocations should have taken place during revision of the 2005 WMNF Plan. However, to the best of our knowledge, this analysis never occurred. All four alternatives considered in the 2005 Forest Plan Final EIS contain identical Management Area allocations for Lake Tarleton and surrounding lands. This is difficult to comprehend, considering how recently the 5,300 acres surrounding Lake Tarleton had been acquired, and how clear the intent was to put this landscape into management for outstanding scenic and ecological integrity. Further, according to Ch. 70 of the 1992 Directives for the 1982 Planning Rule, the forest block stretching from Lake Tarleton to Webster Slide and Wachipauka Pond should have been identified as an Inventoried Roadless

[64] Furthermore, the Forest Service erroneously indicated in a FOIA response to a Lake Tarleton Coalition member that "[n]o reasonable alternatives" and "[n]o unresolved conflicts have been brought forward at this time." Tarleton Second 30-Day Comment Period Concern Responses, U.S. Forest Service (Sept. 5, 2022) (Exhibit 7). This is an egregious misstatement of the record, as project alternatives and significant unresolved conflicts have been provided to the Forest Service by Standing Trees and many other interested parties since the project's proposal.
[65] Lake Tarleton and WMNF Petition -With List of Signers (Feb. 8, 2022) (Exhibit 12).

Area and evaluated during the Forest Plan Revision for its potential for wilderness designation by Congress.[66]

The Tarleton IRP highlights the need to modify the 2005 WMNF Plan to match the reasons why Lake Tarleton was protected. Forest Plan Management Area 8.5, Scenic Areas, are managed to:

> [M]eet the objectives for which each has been designated. Most have been recognized as having 'outstanding natural beauty. They will exhibit late successional vegetation with related wildlife species. Others have been identified for their recreation potential. As a result, evidence of human activity will range from substantially unnoticeable to very evident, and road networks vary from none to high density.[67]

Scenic Areas in the WMNF include Gibbs Brook, Greeley Ponds, Lafayette Brook, Lincoln Woods, Mount Chocorua, Pinkham Notch, Rocky Gorge, Sawyer Pond, and Snyder Brook. All of these are located east of I-93. As recreational focal-points, Scenic Areas are important economic drivers for nearby communities. Lake Tarleton and Webster Slide are located along the Appalachian Trail corridor at the westernmost end of the WMNF. Although this is a relatively quiet region of the WMNF, it is within a short distance of the Hanover and White River Junction area. The Lake Tarleton area is the most accessible portion of the WMNF from points south along I-91, including large metropolitan areas in western Massachusetts and central Connecticut. Scenic Areas are underrepresented in the western WMNF, a situation that can easily be corrected with a Forest Plan amendment.

The Forest Service's own 2015 Planning Rule Directives outline the reasons why Forest Plan amendments are an important tool for keeping plans up to date, especially those that continue beyond a plan's 15-year intended lifespan as outlined in the National Forest Management Act.[68] According to the 2015 Directives:

> Plan amendments are intended to be an adaptive management tool to keep plans current, effective, and relevant between required plan revisions (every 15 years). Amendments help Responsible Officials adapt an existing plan to new information and changed

---

[66] U.S. Forest Service 1992 Directives for the 1982 Planning Rule, FSH 1909.12 – Land and Resource Management Planning Handbook, Chapter 7 – Wilderness Evaluation (Aug. 3, 1992) (Comment Exhibit 23).

[67] U.S. FOREST SERV., 2005 WMNF FOREST PLAN - CHAPTER 3- MANAGEMENT AREA DIRECTION 3-1, 3-61 (2005) (hereinafter "WMNF Plan - Chapter 3").

[68] FSH 1909.12 – Land Management Planning Handbook, Chapter 20, U.S. Forest Service 2015 Planning Direction. (Comment Exhibit 55).

> conditions. Maintaining plans through amendment also may reduce the workload for subsequent plan revisions.
>
> Amendments may be broad or narrow in scope, depending on the need to change the plan. An assessment for a plan amendment is not required, but may be developed at the discretion of the Responsible Official[.][69]

The Forest Service's NEPA-implementing regulations echo this, providing that "[a] plan may be amended at any time . . . and should be used to keep plans current and help units adapt to new information or changing conditions. The responsible official has the discretion to determine whether and how to amend the plan and to determine the scope and scale of any amendment."[70] Section 219.13 provides further instruction regarding the amendment process.[71] An amendment to designate Lake Tarleton and the surrounding land as a Forest Management Scenic Area serves as a feasible alternative to the current Project. But ultimately, the Forest Service erroneously failed to consider any alternatives—including a Forest Plan amendment—that would have served important project purposes as well as overall plan purposes.

***Requested Remedy: The Forest Service should implement the suggested reasonable Alternative #3. Alternatively, the Forest Service should complete an EIS to further explore Project options.***

#### d. The Final EA Fails to Take a "Hard Look" at Numerous Project-Area Environmental Resources.

Under NEPA, the Forest Service must take a "hard look" at the environmental impacts of the planned action, even after a proposal has received initial approval.[72] The Forest Service did not fully discuss relevant issues and failed to make meaningful statements regarding the actual impacts of the Project. As proposed, the Tarleton IRP is insufficient. Throughout the Final EA, the Forest Service failed to provide more than mere conclusory statements to support its findings. The discussion below highlights some of the continued inadequacies with the Final EA's analysis of project-area environmental resources.

##### i. Sensitive Species

The Final EA references the Tarleton IRP Biological Evaluation, which determined that two federally listed or proposed species and twelve Regional Forester Sensitive Species have potential to occur in the analysis area.[73] The Final EA ultimately determined that the Proposed Action may affect, but is not likely to adversely affect, the Northern Long-eared Bat ("NLEB"),

---

[69] *Id*. (Comment Exhibit 55).
[70] 36 C.F.R. § 219.13(a).
[71] *See also* 16 U.S.C. § 1604(f)(4)-(5) (identifying when and how forest plan revisions and amendments may be completed).

[72] *Marsh v. Or. Natural Resources Council*, 490 U.S. 360, 374 (1989).
[73] Final EA at 19.

and that the Project would not jeopardize the continued existence of the tricolored bat. However, the Forest Service failed to provide a Biological Assessments ("BA") for these species. As further detailed below in this objection, a species-specific BA is required to "evaluate the potential effects of an action on listed and proposed species…[to] determine whether any such species or habitat are likely to be adversely affected by the action and is used in determining whether formal consultation or a conference [with USFWS] is necessary."[74] Without these species-specific BA's, the public lacks important information related to Federally listed and proposed listed species that might be impacted in the Project area. This information is necessary for the public to make informed comments and objections. Furthermore, according to the 2005 WMNF Plan:

> The White Mountain National Forest will provide sufficient habitat and protection to preclude the need for species listing under the Federal Endangered Species Act due to National Forest habitat conditions or effects of activities. For species currently listed under the Federal Endangered Species Act or designated Regional Forester's sensitive species, the Forest Service will contribute to conservation and recovery of species and their habitats.[75]

As previously raised in our comment on the Updated Draft EA, NLEB habitat requirements are the opposite of the type of habitat that will be generated from the Project. According to the USFWS Species Status Assessment Report for the NLEB, dated March 22, 2022, the bat depends on mature and old forests for roosting and foraging.[76] Preferred roosting habitat is large diameter live or dead trees of a variety of species, with exfoliating bark, cavities, or crevices. Bats change roosts approximately every two days,[77] and females often return to the same maternity area over multiple years.[78] Additionally, "mature forests are an important habitat type for foraging NLEBs[,]" and "most foraging occurs . . . under the canopy . . . on forested hillsides and ridges."[79] Furthermore, NLEBs "seem to prefer intact mixed-type forests . . . for forage and travel rather than fragmented habitat or areas that have been clear cut."[80]

---

[74] 50 C.F.R. § 402.12.
[75] U.S. FOREST SERV., 2005 WMNF FOREST PLAN - CHAPTER 1- GOALS AND OBJECTIVES 1-1, 1-8 (2005) (hereinafter "WMNF Plan - Chapter 1").

[76] *Species Status Assessment for the Northern long-eared bat (Myotis septentrionalis) Version 1.2*, USFWS (Aug. 2022) (hereinafter Species Status Assessment) https://www.fws.gov/media/species-status-assessment-report-northern-long-eared-bat (Exhibit 13).
[77] *Id*. at 18.
[78] *Tarleton Integrated Resource Project: Biological Evaluation*, U.S. FOREST SERVICE, 9 (Mar. 2023) https://www.fs.usda.gov/project/?project=56394 (hereinafter "Biological Evaluation").
[79] Species Status Assessment at 18 (Exhibit 13).
[80] *Id*. at 18-19 (Exhibit 13).

The WMNF, including the Lake Tarleton project area, contains extensive mature forests that are beginning to acquire the characteristics of an old forest, likely providing some of the highest-quality NLEB habitat in New England. Some of the silviculture treatment prescriptions involve the removal of mature trees.[81] In combination with recently-approved projects and anticipated logging projects (including Bowen Brook Integrated Resource Project, Deer Ridge Integrated Resource Project, Wanosha Integrated Resource Project, Sandwich Vegetation Management Project, Peabody West Integrated Resource Project, Lost River Integrated Resource Project, and others), WMNF is set to eliminate or degrade several thousand acres of NLEB habitat across a large region. As discussed in further detail below, the Forest Service failed to evaluate the cumulative impact of these combined and geographically proximate projects.

Failing to protect the NLEB is a violation of the ESA and NEPA, which provides an independent obligation that agencies continue to take a "hard look" at project impacts. Where "new circumstances or information" arise that are "relevant to environmental concerns and bear[] on the proposed action or its impacts," and "a major Federal action remains to occur," the agency must prepare supplemental NEPA documentation.[82] Additionally, one of the objectives listed in the 2005 WMNF Plan states:

> Within five years of listing, [the Forest Service will] develop conservation approaches for all sensitive species. Biological diversity will be conserved by maintaining viable reproducing populations for all native plant and animal species. For species where the Forest alone cannot support a viable population, species persistence will be maintained, and the Forest Service will contribute to maintaining or improving viability where possible.[83]

To our knowledge, the Forest Service has not developed conservation approaches for all sensitive species within the WMNF that were listed five or more years ago. If it has, these approaches are not apparent in the Biological Evaluation. The Biological Evaluation provides information (some of which is controversial and conflicts with more accurate and recent scientific studies)[84] supporting the WMNF's assertion that federally listed and sensitive species will not be impacted by the Project, but it fails to substantially address any conservation methods and recovery strategies for actually protecting these species.

---

[81] For example, an estimated 100 acres will be clear-cuts with reserves, which "would result in an immediate change from mature to regeneration age structure." Final EA at 11. Overstory removal also removes "the majority of the mature overstory within a stand." *Id*. at 12.

[82] 40 C.F.R. § 1502.9(d). See *Marsh v. Or. Natural Resources Council*, 490 U.S. 360, 374 (1989) (An agency must at least take a "hard look" at the environmental impacts of the planned action, even after a proposal has received initial approval.)

[83] WMNF Plan - Chapter 1 at 1-8.

[84] *See, e.g.*, Species Status Assessment at 18-19 (describing NLEB preferred habitat, including foraging habitat) (Exhibit 13).

Furthermore, the Final EA indicates that a design feature for sensitive plant species was added to the design features table.[85] The only addition to the Botany Resources section of the Project Design Features table is one sentence addressing a single Butternut Tree on the project grounds, and no additions were made to the Wildlife section.[86] Protection for the bald eagle is the only other individual species referenced in the table,[87] while protections for all threatened, endangered, proposed and sensitive ("TEPS") species listed in the Biological Evaluation[88] are conspicuously absent. The Forest Service should include these species in the project-specific minimization measures and standard operating procedures table. Through the completion of an EIS, the Forest Service would have an opportunity to do an in-depth analysis of the Project's impacts on TEPS species and ensure their protection.

Finally, the uplisting of the NLEB is a "significant new circumstance[]" and provides "information relevant to environmental concerns and bearing on the proposed action or its impacts." [89] The Forest Service must therefore complete additional NEPA analysis to adequately address the impacts of these significant new circumstances. This analysis should be done in an EIS, in addition to additional consultation under the ESA.

***Requested Remedy: The Forest Service should seek additional project-specific consultation from USFWS and complete an EIS to ensure adequate measures for species survival and protection.***

**ii. Historic and Cultural Resources**

In our comment on the Updated Draft EA, we stated that historical and cultural resources exist within the project area and cited support for this assertion. The FS completely fails to acknowledge these resources in the Final EA, and simply reiterates what was contained in the Updated Draft EA. One of the goals listed in the WMNF Plan states that "[t]he White Mountain National Forest will identify, evaluate, preserve, protect, stabilize, interpret, and when necessary, mitigate for loss of heritage resources at a Forest-wide and project level."[90] The Historic and Cultural Resources section of the Tarleton IRP Final EA does not realize this goal.

In fact, the Final EA provides a woefully short discussion of Project impacts on historic and cultural resources. The Final EA initially obfuscates this issue by failing to make clear whether historic and cultural resources even exist within the Project area. The scant discussion of this resource merely indicates that "archeologists completed a cultural resource review" and "[n]o historic properties will be affected by the proposed project activities."[91] It is not made clear whether no properties will be affected because none exist in the project area, or whether they do exist, but the Forest Service anticipates that potential impacts would be mitigated. This

[85] Final EA at 5.
[86] Final EA at 17.
[87] Final EA at 16.
[88] Biological Evaluation at 8.
[89] 40 C.F.R. § 1502.9(d).
[90] WMNF Plan - Chapter 1 at 1-6.
[91] Final EA at 20.

ambiguity persists in the EA's subsequent mention of historic properties in its "significance" discussion that states "[a]s a result of project design, the project would not adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places."[92] Here, the reader must infer the existence of historic and cultural resources, but again, no details are provided regarding what resources are actually present in the project area. Further, no analysis is provided to explain how impacts to project-specific resources would be mitigated. The lack of any detail or analysis is yet another example of the Final EA's failure to provide clear NEPA documentation to allow for public review and scrutiny, even after we raised these issues in our comment on the Updated Draft EA.

To be clear, historic and cultural resources *do* exist within the project area, as known by local residents, including members of The Lake Tarleton Coalition, and as documented by the recent Cultural Resource Reconnaissance Report ("CRRR") prepared for the Tarleton IRP.[93] This document, which to our knowledge has still not been made available to the general public,[94] reveals that the project area contains at least 29 known cultural resources, including 19th century farmstead sites, cellar holes, building foundations, wells, stone walls, historic roads, and pre-contact lithic scatter, among others.[95] That same document concluded that the Project had potential to directly impact these cultural resources.[96] Even if the Forest Service must redact the

---

92 Final EA at 25.

93 White Mountain National Forest, *Cultural Resource Reconnaissance Report* (April 7, 2019) (hereinafter "CRRR") (Comment Exhibit 9); Public Comment on Tarleton IRP from Stephen Alden regarding these resources, (Comment Exhibit 30).

94 In fact, Standing Trees was only able to obtain a copy of this report through a FOIA request submitted by one of its members. Members of the public should not be required to submit FOIA requests to view project documents. The Tarleton IRP CRRR was prepared to evaluate the Tarleton IRP, and as such, it should be considered part of the Project Record. The April 2022 Tarleton IRP Draft EA stated that "the project record is incorporated by reference and contains all relevant data, methods, analyses, references, and other technical documentation used in this assessment." *Tarleton Integrated Resource Project: Draft Environmental Assessment and Preliminary Finding of No Significant Impact*, U.S. FOREST SERVICE, at 18 (Apr. 2022) https://www.fs.usda.gov/project/?project=56394.; First, this general incorporation does not fulfill NEPA's requirement that "incorporated material shall be cited in the statement and its content briefly described[,]" 40 C.F.R. § 1502.21, and thus the Project Record is not properly incorporated by reference. Secondly, even if it was properly incorporated, "[n]o material may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment." *Id.* The CRRR was not reasonably available for inspection during the comment or objection periods because the only reason it was available for review is because a member of Standing Trees had the forethought to request this report months prior to the opening of the comment period. Had they not done so, we may not have even been made aware of this report and its ability to review this document and fully participate in the public comment and objection processes would have been prejudiced.

95 CRRR at 4 (Comment Exhibit 9).

96 *Id.*

precise locations of the resources due to concerns about theft or vandalism,[97] NEPA still requires a robust consideration of what these resources are and how they may be impacted, regardless of the sensitivity of their precise locations. It is also highly possible that the Project area contains significant Indigenous resources that would have been discovered through more rigorous consultation and research.[98] The failure of the Forest Service to even mention these resources in the Final EA—much less analyze potential impacts and explain how direct impacts may be avoided—is egregious, especially after being given the opportunity to correct this section for the Final EA. The lack of acknowledgement in the Final EA misleads the public regarding cultural resources in the project area. By completing an EIS, the Forest Service would have an opportunity to correct its analysis of the historical and cultural resources within the Project area, ensure the protection of these resources, and properly provide this information to the public.

***Requested Remedy: The Forest Service should complete an EIS to further determine cultural and historical resources within the Project area and means for protecting these resources.***

#### iii. Climate Change

While New Hampshire may be a relatively small state, its temperate deciduous forests are among the planet's most effective carbon sinks. The WMNF contains some of the oldest and most carbon-dense ecosystems in New England. The insubstantial, one-paragraph climate change analysis in the Final EA fails to address the unique values of the WMNF and is inconsistent with Council on Environmental Quality ("CEQ") guidance, the Forest Service Climate Adaptation Plan, EO 14072, and EO 14008. The Final EA incorrectly implies that prescribed treatments will enhance the forests' ability to withstand climate change. Final EA fails to cite any authority for its claims. And the section remains unchanged from the Updated Draft EA, despite numerous concerns over its inadequacy. The Forest Service cherry-picked the science it wished to use and failed to respond to comments regarding climate change impacts, in violation of NEPA. NEPA requires agencies to address and explain opposing viewpoints and contrary scientific information along with their rationale for choosing one viewpoint over another.[99] The Forest Service's analysis in the Final EA is insufficient because it includes virtually no references to any material in support of or in opposition to its conclusions.[100]

New England's carbon storage levels remain artificially low due to timber harvest frequency and intensity. Timber harvest accounts for 86% of annual forest carbon loss across the Northeast US. The Final EA suggests that in the absence of prescribed treatments, natural

---

[97] Copy of TarletonLongFormPDFRTCDRAFT Working, U.S. FOREST SERVICE (APRIL 14, 2023) (Exhibit 8).

[98] CRRR at 10. (Comment Exhibit 9)

[99] 40 C.F.R. § 1502.9(b) (requiring agencies to disclose, discuss, and respond to "any responsible opposing view"); *WildEarth Guardians v. Jewell*, No. 1:16-CV-00605-RJ, 2017 WL 3442922 (D.N.M. Feb. 16, 2017); *WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013).

[100] *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 444 F. Supp. 3d 832, 858-59 (S.D. Ohio 2020).

thinning and other processes would result in carbon emissions.[101] The Project would instead have *only* a "temporary influence on atmospheric greenhouse gas conditions."[102] This incorrectly implies that the prescribed treatments will enhance the forests' ability to absorb carbon.[103] The Forest Service concludes carbon initially emitted from the proposed action would only have a *temporary influence* on emission concentrations because as the forest regrows, carbon is removed from the atmosphere.[104] This is based on a common misconception that young forests are better than old at removing carbon, and ignores strong scientific evidence that carbon storage and sequestration is maximized in un-logged stands in northern New England.[105] Old forests store more carbon than young forests, and they continue to accumulate carbon over time.[106] The rate of carbon sequestration actually increases as trees age.[107] As raised in our comment, recent studies show that among land uses in New England, timber harvest is the leading cause of tree mortality[108] and has the greatest impact on aboveground carbon storage.[109] Forests in New Hampshire are still recovering from extensive clearing in the eighteenth and nineteenth centuries.

---

[101] Final EA at 6.
[102] Final EA at 20.
[103] Harris et al., *Attribution of Net Carbon Change by Disturbance Type Across Forest Lands of the Conterminous United States*, 11 CARBON BALANCE AND MGMT. 1 (2016) (Comment Exhibit 14).

[104] Final EA at 20.
[105] Keeton et al., *Late-Successional Biomass Development in Northern Hardwood-Conifer Forests of the Northeastern United States* 57 FOREST SCIENCE (Jan. 18, 2011) (Comment Exhibit 22).
[106] Keith et al., *Re-evaluation of Forest Biomass Carbon Stocks and Lessons from the World's Most Carbon-Dense Forests*, 106 PNAS 11635 (July 14, 2009) (Comment Exhibit 18); Luyssaert et al., *Old-growth Forests as Global Carbon Sinks*, 455 NATURE, 213 (2008) (Comment Exhibit 19); Leverett et al., *Older Eastern White Pine Trees and Stands Sequester Carbon for Many Decades and Maximize Cumulative Carbon*, 4 FRONTIERS FOR. GLOB. CHANGE 1 (May 2021) (Comment Exhibit 20); Thom et al., *The Climate Sensitivity of Carbon, Timber, and Species Richness Covaries with Forest Age in Boreal- Temperate North America*, (2019) (Comment Exhibit 29).

[107] Stephenson et al., *Rate of Tree Carbon Accumulation Increases Continuously with Tree Size,* 507 NATURE 90 (Jan. 2014) (Comment Exhibit 21).

[108] Brown et al., *Timber Harvest as the Predominant Disturbance Regime in Northeastern U.S. Forests: Effects of Harvest Intensification* 9 Ecosphere 1 (March 2018) (Comment Exhibit 15).

[109] Duveneck and Thompson, *Social and Biophysical Determinations of Future Forest Conditions in New England: Effects of a Modern Land-use Regime* 55 GLOB. ENV'T CHANGE 115 (March 2019) (hereinafter "Duveneck and Thompson") (Comment Exhibit 16).

Timber harvesting in New England has been found to have a larger effect on aboveground carbon storage than forest conversion to non-forest uses.[110]

On January 9, 2023, the CEQ released Interim Guidance for agencies to "make use of immediately" when considering greenhouse gas emissions and climate change under NEPA. This guidance had yet to be released upon the submission of our comment on the Updated Draft EA. Section VII of the CEQ guidance states "agencies should consider applying this guidance to actions in the EIS or EA preparation stage if this would inform the consideration of alternatives or help address comments raised through the public comment process."[111] Numerous public comments on this Project, including ours, raised the issue of the Forest Service's failure to adequately consider climate change impacts. Yet, the CEQ guidance—now in effect and directly applicable to these concerns—is entirely absent from the climate change analysis section of the Final EA.

The CEQ guidance requires agencies to "quantify proposed actions' [Greenhouse Gas ("GHG")] emissions, place GHG emissions in appropriate context and disclose relevant GHG emissions and relevant climate impacts, and identify alternatives and mitigation measures to avoid or reduce GHG emissions."[112] Agency decisions should be based on the best available science and account for the urgency of the climate crisis.[113] The guidance clarifies "NEPA requires more than a statement that emissions from a proposed Federal action or its alternatives represent only a small fraction of global or domestic emissions."[114] Yet, the Tarleton IRP Final EA explicitly states: "the proposed action affects a relatively small amount of forest land and carbon on the White Mountain National Forest and, in the near-term, might contribute an extremely small quantity of greenhouse gas emissions relative to national and global emissions" in blatant violation of CEQ guidance.[115] As CEQ has concluded, this approach "is not a useful basis for deciding whether or to what extent to consider climate change under NEPA."[116] In addition, no mitigation measures were considered. We cannot foresee all the ways in which the Forest Service fails to comply with the CEQ guidance because there was no attempt to abide by it.

---

[110] *Id.*

[111] Council on Environmental Quality, *National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change*, 88 Fed. Reg. 1196 (Jan 9, 2023) (Exhibit 14).
[112] *Id.*
[113] *Id.*
[114] *Id.* at 1201.
[115] Final EA at 20.
[116] *Id.*

Moreover, the Forest Service's approach to assessing climate impacts of the Tarleton IRP is not in compliance with EO14072 and EO 14008.[117] Both expressly direct the Forest Service to take much more extensive action than the insubstantial effort reflected in the Final EA. The Forest Service responded (in part) to EO 14008 with the publication of its Climate Change Adaptation Plan, which explicitly acknowledged that:

> [o]ld-growth and mature forests, and other forests with similar characteristics, are an ecologically and culturally important part of the National Forest System. They reside within a continuum of forest age classes and vegetation types that provides for a wide diversity of ecosystem values. Many forests with old-growth characteristics have a combination of higher carbon density and biodiversity that contributes to both carbon storage and climate resilience.[118]

EO 14072 aims to "enhance carbon storage" and the "climate resilience" of our mature and old-growth forests.[119] The Forest Service "Climate Adaptation Plan" recognized the importance of areas protected from logging as it relates to climate-informed stewardship of mature and old-growth forests on Federal lands.[120] The Forest Service itself identifies carbon uptake and storage as "a major goal for the Forest Service" in helping ecosystems adapt to a changing climate.[121] This vision was further supported by EO 14008 which aimed to "conserve and restore public lands. . . increase reforestation. . . and address the changing climate" through the adoption of climate-smart forestry practices.[122] The climate change analysis for the Tarleton IRP fails to mention EO 14072, EO 14008, and the Forest Service's own goals. Despite supposed policy alignment across the Executive branch, the Forest Service failed to ensure the Tarleton IRP is consistent with EO 14072 and EO 14008.

Furthermore, there is no such thing as an "extremely small quantity of greenhouse gas emissions" or effect on a "relatively small amount of forest land"[123] when on the global scale, forest protection represents approximately *half or more* of the climate change mitigation needed to hold temperature rise to 1.5 degrees Celsius.[124] The one-paragraph climate change analysis

---

[117] Exec. Order No. 14072, 87 Fed. Reg. 24851 (Apr. 22, 2022) (Comment Exhibit 6); Exec. Order No 14008, 86 Fed. Reg. 19 (Jan. 27, 2021) (Comment Exhibit 45).

[118] U.S. DEP'T OF AGRIC., USDA FOREST SERVICE CLIMATE ADAPTATION PLAN 1, 13 (July 2022).
[119] *Id.*
[120] U.S. DEP'T OF AGRIC., USDA FOREST SERVICE CLIMATE ADAPTATION PLAN 1, 13 (July 2022).

[121] *Id.* at 42.
[122] Exec. Order No 14008, 86 Fed. Reg. 19 (Jan. 27, 2021) (Comment Exhibit 45).

[123] Final EA at 20.
[124] Erb et al., *Unexpectedly Large Impact of Forest Management and Grazing on Global Vegetation Biomass*, 553 NATURE 73 (2018) (Comment Exhibit 13).

ignores our remarkable forest ecosystems here in Northeastern North America, and the unique potential of our temperate deciduous forests to contribute on a global scale to climate stabilization and resilience. The WMNF is an insurance policy against a changing climate and increasing extinction rates. It is irresponsible not to consider the high untapped capacity for carbon storage and sequestration of Eastern U.S. forests. The Final EA does not once mention the remarkable and unique capacity of the WMNF to contribute to climate stabilization and resilience at a global scale.[125]

Numerous claims made in the Final EA are easily refuted. The Forest Service failed to acknowledge or consider science that we identified in our comment and in this objection. Federal courts have set aside NEPA analysis when an agency fails to respond to scientific analysis that calls into question the agency's assumptions or conclusions.[126] The Forest Service cherry picked the science it wished to use and failed to respond in a meaningful way to scoping comments regarding climate change impacts. Ultimately, the Forest Service failed to take a hard look at climate change under relevant authorities.

***Requested Remedy: The Forest Service should complete an EIS and additional analysis to address the unique values of the WMNF and ensure compliance with relevant authorities: CEQ guidance, the Forest Service Climate Adaptation Plan, EO 14072, and EO 14008.***

**iv. Water Quality Impacts/Hydrology**

Notwithstanding the Final EA's discussion of the Clean Water Act ("CWA") and hydrology impacts in the Project area, the Final EA still fails to take a hard look at impacts to water quality and the watershed. Additional recent and site-specific analysis is necessary to understand the true impacts that the Project will have not just on Lakes Tarleton and Katherine, but the broader basin and watershed in general. For example, the Forest Service has not addressed the potential threats of cyanobacteria and harmful algal blooms from the proposed activities. Additionally, the Forest Service fails to disclose a plan for preventing logging discharge of organic matter and nutrients from entering riparian areas and waterways upstream from the fen/swampy area that feeds Eastman Brook. Furthermore, the Tarleton IRP lacks any

---

[125] Dinerstein et al., *A Global Safety Net to Reverse Biodiversity Loss*, 6 SCI. ADVANCES 1 (Sept. 2020) (Comment Exhibit 44); Jung et al., *Areas of Global Importance for Terrestrial Biodiversity, Carbon, and Water*, 5 NATURE 1499 (2020) (Comment Exhibit 26).

[126] *High Country Conservation Advocs. v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174 (D. Colo. 2014) (concluding the FS violated NEPA by failing to mention or respond to an expert report on climate impacts); *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1168 (9th Cir. 2003) (concluding that the Forest Service's failure to disclose and respond to evidence and opinions challenging scientific assumptions in an EIS violated NEPA); *Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 704 (9th Cir. 1993) (stating "[i]t would not further NEPA's aims for environmental protection to allow the Forest Service to ignore reputable scientific criticisms that have surfaced").

discussion of ecological evaluations and monitoring activities that must occur to prevent cyanobacterial increases in the lakes.

Land use and climate change are playing an increasingly important role in the cyanobacterial population increase in non-eutrophic lakes. We suggest the Forest Service perform a thorough stratigraphic and hydrological analysis of the entire proposed treatment area and the adjoining forest area to fully grasp what the impacts might be. We also propose that the Forest Service perform a thorough stratigraphic population analysis of the nitrogen-fixing cyanobacteria Gloeotrichia in the lake and its surrounding area to assess not only the risk to Lake Tarleton, but the risk logging activities pose in the current age of rapid climate change.

***Water Quality Data.*** The Forest Service relies on studies conducted in 2007 to support its presumption that Lake Tarleton is impaired due to mercury contamination and acidity, and Lake Katherine is impaired due to mercury contamination.[127] However, changes in water quality fluctuate frequently due to influences such as precipitation, runoff, use of pesticides and herbicides, recreation, and climate change, among many others. In fact, the CWA and the New Hampshire Department of Environmental Services indicate that water quality assessments must be conducted every two years.[128] The need for updated water quality status is especially important for lakes used for swimming, fishing, and boating. The Final EA fails to provide the current status of the water quality within Lake Tarleton, Lake Katherine, and their tributaries. The Forest Service cannot rely on data that is nearly 16 years old to support its assumption that the lakes in the Project area are contaminated. In fact, Lake Tarleton, Lake Katherine, and Lake Armington are known to have exceptional water quality.[129] All three are free of aquatic invasive species.[130] Lake Armington is located only one tenth of a mile from Lake Tarleton with a stream connecting the two lakes. Due to its proximity and connectivity to Lake Tarleton, Lake Armington should have been discussed, or at least mentioned, in the Final EA's environmental impacts section.

Pursuant to NEPA's "hard look" mandate, an agency must rely on adequate baseline data that enables the agency to carefully consider information about direct environmental impacts and may not rely on outdated data to do so.[131] Indeed, "establishing appropriate baseline conditions is

---

[127] Final EA at 20.

[128] *Water Quality Assessment and TMDLs*, N.H. DEP'T. ENV'T. SERVS. https://www.des.nh.gov/water/rivers-and-lakes/water-quality-assessment (last visited Apr. 23, 2023) (Exhibit 15).

[129] See *Volunteer Lake Assessment Program Individual Lake Reports*, N.H. DEP'T. ENV'T. SERVS. https://www.des.nh.gov/sites/g/files/ehbemt341/files/documents/2021-tarleton-piermont.pdf (Exhibit 16); Virtual Interview with Rob Wipfler, Co-Director of Kingswood Camp for Boys and President of The Lake Tarleton Association (April 27, 2023).

[130] Virtual Interview with Rob Wipfler, Co-Director of Kingswood Camp for Boys and President of The Lake Tarleton Association (Apr. 27, 2023).

[131] *N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1083–87 (9th Cir. 2011); *Cascade Forest Conservancy v. Heppler*, 2021 WL 641614, at 17–20 (D. Or. Feb. 15, 2021).

critical to any NEPA analysis," because without establishing a baseline, "there is simply no way to determine what effect the [project] will have on the environment and, consequently, no way to comply with NEPA."[132] It is unclear if baseline data was even gathered for use in the Final EA's analysis, because no analysis was presented. It is impossible for the public to evaluate or weigh in on the adequacy of the agency's analysis without a baseline and current data on the actual water quality of the lakes in the Project area.

Further, the WMNF Plan forest-wide guideline for vegetation management G-1 requires that "[n]o more than 15 percent of the area of watersheds of first and second order perennial streams should be treated with even-age regeneration methods in a five-year period."[133] The Final EA makes no mention of this standard, either in the Hydrology discussion or within its cumulative impacts discussion. Eastman Brook, both a tributary and outflow of Lake Tarleton, is one such stream.[134] The Final EA fails to indicate what percent of the watershed had been, or will be, treated with even-age (clear-cutting) methods. The public cannot be expected to independently evaluate whether this standard is being followed. In addition, the Final EA makes no mention of Eastman Brook being a 303(d) impaired water under the CWA.[135] The potential for exacerbation of Eastman Brook's impaired condition is an obvious and important impact that the Forest Service should have evaluated in the Final EA.

Additionally, the Final EA states that there will be field visits prior to project implementation "to refine treatment unit boundaries and acres including modifications to address on-site conditions[,]" including potentially "reduc[ing acres] to meet visual and *water quality objectives*, to incorporate reserve patches of uncut trees in final harvest stands, and *to incorporate protective buffers around features such as vernal pools*, cultural resources, nest trees, and *riparian zones*."[136] Emphasis to this statement was clearly added to highlight the water-related resources, but for *all* resources mentioned, these on-site baseline conditions should be identified *prior* to completing the NEPA analysis. The Forest Service should have used that information to describe the impacted environment, provide analysis of *how* these resources may

---

[132] *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1101 (9th Cir. 2016).
[133] U.S. FOREST SERV., 2005 WMNF FOREST PLAN - CHAPTER 2- FOREST-WIDE MANAGEMENT DIRECTION 2-1, 2-29 (2005) (hereinafter "WMNF Plan - Chapter 2").
[134] According to Table 2-01 in the WMNF Plan, only four orders of streams exist: 1st, 2nd, 3rd, and 4th. WMNF Plan - Chapter 2 at 2-25; Appendix H of the WMNF Plan contains a list of third- and fourth- order streams, on which Eastman Brook is not listed. U.S. FOREST SERV., 2005 WMNF FOREST PLAN - LAND AND RESOURCE MANAGEMENT PLAN – APPENDIX H H-1, H-2 (2005) (hereinafter "WMNF Plan – Appendix H"). This presents yet another need for an updated WMNF Plan.
[135] *New Hampshire's 2020-2022 303(d) List*. U.S. EPA, https://www.epa.gov/system/files/documents/2022-03/2020-2022-nh-303d-list.pdf (last updated Mar. 1, 2023) (Exhibit 17).
[136] Final EA at 10.

be impacted, and describe how the agency might propose to address those impacts.[137] Further, it is especially important that the treatment unit boundaries be defined prior to any implementation because of the potential for boundaries to stray into protected riparian areas. Specifically, the WMNF Plan forest-wide guideline G-1 for Riparian and Aquatic Habitats states that "[t]ree cutting and harvest should not occur within 25 feet of the bank of mapped perennial streams[.]"[138] To our knowledge, no map of the project area was provided that shows both the location of Eastman Brook along with the harvest unit boundaries. However, by comparing the "Tarleton Scoping Full Size Project Area Map" with the "Proposed Treatment Harvest Units" map, it appears that unit boundaries for both clearcut and group selection logging come precipitously close to Eastman Brook.[139] The Final EA does not mention this guideline, nor does it make clear that these 25-foot buffers are integrated into the project design. Without this information, it is impossible to tell if this WMNF Plan guideline is being met, and further demonstrates the failure of the Forest Service to take a hard look at how the Project's timber harvesting activities might impact water quality.

***Boat Launch***. The Final EA also fails to mention or analyze potential impacts of the addition of the boat launch to Lake Katherine in the Hydrology section. The installation of the boat launch will invite additional use[140] and increase the risk of introduction of aquatic invasive species. If the Forest Service plans to construct a boat launch, it should also be responsible for providing a watercraft cleaning station at the upgraded access point. While addressing one risk of boat-launch standards, the Forest Service is inviting another—likely more serious—threat of invasive species introduction. For these reasons, the Forest Service fails to take a "hard look" at the direct and indirect impacts, and ignored the cumulative effects of reasonably foreseeable impacts.

***Herbicides.*** Additionally, the Final EA includes a description of types and methods of herbicide use in the botany resource design features.[141] As we pointed out in our comment on the Updated Draft EA, the botany resources description indicates that the Project will involve the use of herbicide treatments, but fails to include any discussion on herbicides and their potential impacts to water resources (or any resources for that matter) in the Final EA. The Forest Service must complete adequate analysis of the impacts to water quality and hydrology, at a minimum, at

---

[137] The same issue is present with regard to the planned transportation system changes – "access driveways, each less than 500 feet in length, would be constructed or reconstructed to access log landings. Final locations of log landings and associated access roads may be modified during implementation planning[.]" *Id*. Because the location of roads and landings will affect the type and intensity of impacts to surrounding resources, this information should be known *prior* to making a finding of no significant impact. Otherwise, the Forest Service could claim no impacts will result from the currently proposed positioning but then change the proposed road and landing locations while evading public scrutiny of the impacts they have newly catalyzed.
[138] WMNF Plan - Chapter 2 at 2-24.
[139] Final EA at 28.
[140] Final EA at 21.
[141] Final EA at 18.

the watershed scale, since water quality impacts may compound as water from brooks, rivers, and streams meet and intermix.

***Timber Harvesting Impacts on Water.*** Furthermore, the Final EA relies on the Maine Albany South Environmental Assessment to support its assertion that impacts of timber harvesting on water quality and the basal area thresholds within the Project area are expected to be negligible.[142] However, this reference illustrates the inadequacy of the Final EA. First, nearly all the riparian and aquatic resources and water quality information contained in the Albany South IRP EA is site-specific.[143] Although the document contains some broadly applicable indicators and measures for assessing effects to water resources, the Albany South EA dedicates the vast majority of its analysis to applying these standards to specific features within that project area. The Tarleton Final EA fails to conduct such an analysis, only mentioning general standards for the percent harvest levels at the basal area, and the projected harvest percentages for the Tarleton IRP.[144] Second, much of the sources cited in the Albany South IRP EA are outdated, going back as far as 35 years.[145] Third, the Tarleton IRP Final EA misleads the public to believe that this project was conducted in 2022, when in fact, the Albany South EA was published in 2017.[146] The Final EA also references studies in the White Mountains related to water quality and harvest levels, but does not cite any references to these studies.[147]

The Forest Service concludes its Hydrology section by stating "[n]o measurable adverse effects to water quality or quantity are expected due to project implementation."[148] However, the lack of current site-specific data, and sources to support the Forest Service's conclusion make it

---

142 Final EA at 20 (citing to *Albany South Integrated Resource Project: Final Environmental Assessment*, U.S. FOREST SERVICE, 131-149 (Dec. 2017) https://www.fs.usda.gov/project/?project=39614).
143 *Albany South Integrated Resource Project: Final Environmental Assessment*, U.S. FOREST SERVICE (Dec. 2017) https://www.fs.usda.gov/project/?project=39614 (hereinafter "Albany South EA").
144 Final EA at 20; The combined acreage of Lakes Tarleton and Katherine is over two and a half times larger than Lake Virginia located in the Albany South project area. Nevertheless, it provides good context for what a proper EA should look like as it relates to the hydrology and water quality impacts of a Forest Service project. The Albany South EA devotes 34 pages to sections on Water Resources and Riparian and Aquatic Habitat, each with subsections covering project-specific: existing conditions, effect indicators and measures, environmental consequences, various alternatives, direct and indirect effects to water quality, timber harvest impacts on water quality, fish habitat quality and productivity, cumulative effects, and climate change among others. Albany South EA at 130-164; Despite the much larger combined lake acreage within the Tarleton IRP, the Final EA Hydrology section consists of a meager half page. *Compare* Albany South EA at 130-164, *with* Final EA at 20.
145 Albany South EA at 131.
146 *Id*.
147 Final EA at 20.
148 *Id*.

impossible for the public to make informed opinions about the Project and its potential implications on water quality. The Final EA fails to meet the NEPA "hard look" standard as it relates to hydrology and water quality in the project area.

***Requested Remedy: The Forest Service should complete an EIS and additional NEPA analysis to determine the impacts of the Project on hydrology and water quality.***

### v. Recreation

The Lake Tarleton area is beloved for the number of recreational opportunities it provides: camping, hiking, swimming, fishing, boating, birdwatching, photography, observing wildlife, ice fishing, and generally relaxing in a pristine natural setting.[149] Lake Tarleton State Park, which was established concurrently with the addition of the lands surrounding the lake to the WMNF, is a popular area for water-based recreation. Kingswood Camp is a long-running summer overnight camp, first established as Camp Serrana in 1909, located on the west shore of the lake. The Dartmouth Outing Club operates a cabin on the lakeshore. The ridgeline that forms the southern and eastern boundary of the Lake Tarleton watershed is traversed by the famous Appalachian National Scenic Trail. Piermont Mountain, rising to the west of Lake Tarleton and Lake Katherine and accessed via two popular user-created trails, provides a stunning vista over the lake basin, Webster Slide, and Mount Moosilauke. Several user-created campsites exist around the shore of Lake Tarleton, accessible by either boat (typically canoe or kayak) or by foot using a user-created trail around the southern shore of the lake. Both the lakeside trail and campsites fall within the proposed harvest areas. According to the local community, the area has also experienced a dramatic increase in ice fishing and winter recreation on both Lake Tarleton and Lake Katherine since the pandemic. For the past few winters, the parking area at Lake Tarleton is consistently filled to capacity[150] and the lake is teeming with ice houses, tents, snowmobiles, trucks, etc.[151] Those seeking winter recreation would be hit by a wall of timber harvesting noise reflecting off the ice and the wafting of diesel fuel for several consecutive winters.

The WMNF makes no attempt to assess potential impacts to the aforementioned long-running recreational activities and related businesses that are dependent upon the unique scenery and recreational opportunities afforded by Lake Tarleton. Nor does the WMNF assess potential impacts on the public's ability to enjoy long-established recreational resources in the project area, with the exception of a brief review of possible impacts to the Appalachian Trail. The Final EA also only briefly considers the likelihood and impacts of illegal motorized use, including both wheeled and oversnow vehicles, in harvested areas and on improved roads and skid trails. Furthermore, with clearings located only a few hundred feet from the shores, the potential for snowmobiles to access logged lands via Lake Tarleton would be all but certain.

---

[149] Photo: Canoeing on Lake Tarleton (Exhibit 18).
[150] Photo: Lake Tarleton parking area in wintertime (Exhibit 19).
[151] Photo: Recreation activities on Lake Tarleton in wintertime (Exhibit 20).

When the Trust for Public Land ("TPL") unveiled its proposal to protect Lake Tarleton to the Piermont and Warren, NH Selectboards, to the general public, and to donors, TPL was clear in its vision and expectations for White Mountain National Forest management. As noted in the introduction, a September 5, 2001 article in the Bradford Opinion Journal reported TPL's goal to "protect and conserve the 'wilderness' quality of the Lake Tarleton area, stressing low impact recreational activities."[152]

While the Final EA makes passing reference to some of these recreational activities,[153] some are ignored entirely, and those that do make the cut are quickly dismissed as not being negatively impacted, or at least for not long. For example, despite concerns raised by birdwatchers and enthusiasts during previous comment periods,[154] no analysis or discussion is provided addressing impacts to bird population, diversity, or distribution resulting from the proposed logging activities.

There is also no discussion of the Project's potential to displace recreational use of the area. In the Socioeconomics section of the Final EA, it states ". . . recreational users are likely to disperse to other recreation sites" due to timber harvesting activities.[155] However, the Recreation section does not discuss or even mention potential displacement; instead, it merely states that "[p]otential noise impacts to hikers . . . would be minimized[.]"[156] If the Forest Service believes that recreationists will be displaced as a result of the project, it should actually address those potential impacts.

Another primary concern, only given scant attention in the Final EA, is the issue of impacts to the Appalachian Trail. The Appalachian Trail travels through the Project area in two separate places.[157] The Project activities occur within two Forest Management Areas—MA 8.3, which is Appalachian National Scenic Trail ("Appalachian Trail"), and MA 2.1, which is General Forest Management.[158] Despite the close proximity of the iconic Appalachian Trail, there is little analysis of impacts to that resource and the multitude of hikers that use and enjoy it. Further, even though the Appalachian Trail is managed in conjunction with the National Park Service (NPS), there is no indication in the Final EA that the Forest Service consulted with NPS. Nor is there any indication that the Forest Service consulted with the Appalachian Mountain Club or the Dartmouth Outing Club, as required by the WMNF Plan MA 8.3 standard S-2, for

[152] September 5, 2001 article in the Bradford Opinion Journal (Comment Exhibit 1).
[153] Final EA at 21.
[154] *See generally* Gail Coffey, *Comment on 2021 DEA* (Aug. 5, 2021) (Comment Exhibit 32); Anonymous, *Comment on 2021 DEA*, (Aug. 5, 2021) (Comment Exhibit 33); John Cooley, *Comment on 2021 DEA* (Aug. 5, 2021) (Comment Exhibit 34); Elaine Felatra, *Comment on 2021 DEA* (Aug. 5, 2021) (Comment Exhibit 35); among others.
[155] Final EA at 21.
[156] *Id*. at 21.
[157] Final EA at 27 (Figure 1).
[158] *Id*. at 5.

when management actions affect AT values. All of these groups are conspicuously absent from the list of "Agencies or Persons Consulted" in the Final EA.[159]

For MA 8.3, the Forest Plan sets forth Desired Conditions including emphasizing "a remote backcountry recreation experience in a predominantly natural or natural-appearing landscape."[160] Even though the purported purpose of the Project is "to implement the management direction in the Forest Plan,"[161] there is no mention in the Final EA as to how the Project will support this desired condition. To the contrary, the project activities—specifically, the clear-cuts and overstory removal—will alter the landscape to make it less natural or natural-appearing. And while the logging is occurring, it will detract from any sense of "a remote backcountry recreation experience" along those portions of the Appalachian Trail. The visual impacts to the trail are discussed below in the section addressing Scenic Values.

The Forest Service compounded its lack of analysis by failing to consult with NPS or other necessary organizations. The Forest Service must provide adequate analysis of project impacts and cumulative impacts to recreation. This should be evaluated within the context of the local project planning area and at the forest level, because impacts to Lake Tarleton, Lake Katherine, Lake Armington, Piermont Mountain, Webster Slide, the Appalachian Trail, and surrounding recreation areas will be felt most acutely at the local level. In addition, the WMNF Plan itself requires that such "projects must be evaluated in terms of their effects on both the individual sites and on Forest-wide development levels."[162]

***Requested Remedy: The Forest Service should conduct an EIS to determine the impacts that the Project will have on recreation in the area.***

**vi. Scenic Values**

The Final EA made an addition of only a short paragraph addressing scenery within the project area. The Final EA claims that the project is consistent with Forest Plan standards and guidelines for scenery management, but only makes passing mention of standards for MA 8.3, and does not even cite to or mention the standards that apply to MA 2.1 located within the project boundary.[163] The Tarleton IRP Scenery Specialist Report indicates that the analysis area for cumulative effects is the viewshed from just nine public land viewpoints, and the timeframe is from 30 years in the past to 30 years in the future."[164] The Report further explains, "[t]his timeframe allows for all the harvested openings to fully restock, develop a full canopy of vegetation, and reach a height with enough spread and density to allow the shadow and textural

---

[159] *Id*. at 23.
[160] WMNF Plan - Chapter 3 at 3-45.
[161] Final EA at 5.
[162] WMNF Plan - Chapter 2 at 2-17.
[163] Final EA at 21.
[164] *Tarleton Scenery Management Specialist Review and Summary*, U.S. FOREST SERVICE, https://www.fs.usda.gov/project/?project=56394 (last updated Mar. 15, 2023) (hereinafter Scenery Specialist Report).

differences to begin to blend with the adjacent surrounding."[165] The Report also indicates that depending on the viewpoint, project impacts can be seen for up to a distance of 10 miles by the "casual observer."[166] Logging projects that can be seen up to 10 miles away and take 30 years to "begin to blend" with their un-logged natural surroundings are clearly significant. These long-lasting eyesores will negatively impact not only the surrounding community, but those recreating in the area.

Although the Tarleton Scenery Specialist Report indicates the Project will follow Forest Standards and Guidelines, it does not specifically reference them. The Scenery Management Standards for MA 8.3 Appalachian Trail are as follows:

> S-1: The AT is a Concern Level 1 Travelway, and middleground and background areas on National Forest lands seen from the AT must be managed for scenery in accordance with Scenic Integrity Objectives identified through the Scenery Management System.
>
> S-2: All management activities will meet a Scenic Integrity Objective of High or Very High.[167]

Relevant MA 2.1 (General Forest Management) guidelines include:

> G-1: In evaluating cumulative effects for viewed landscapes from established concern level 1, open, higher elevation viewpoints affording expansive or large-scale views, no more than 9 percent of the acreage within the view should be treated with regeneration vegetation management activities within a 30 year period. Total area affected during any one entry period with new regeneration treatment should not exceed 4 percent of the acreage. Assessment may need to be made from multiple viewpoints (that view a common land base). The assessment will apply to each view separately.
>
> G-3: For areas with a "High" Scenic Integrity Objective, created openings should be minimally evident from trail, road, or use area vantage points. Maximum observed size should not exceed 4-5 acres. If openings occur, they should appear as natural occurrences and be well distributed in the viewed landscape.

---

[165] *Id.*
[166] *Id.*
[167] WMNF Plan - Chapter 3 at 3-52.

> G-7: For projects where group cutting is the preferred prescription, and views from a superior viewpoint are a concern, groups should be laid out in an informal distribution pattern and varied in size.[168]

Based on the above standards and guidelines, because the AT is a Concern Level 1 travelway, on MA 2.1 lands visible from the trail "no more than 9 percent of the acreage within the view should be treated with regeneration vegetation management activities within a 30 year period. . . [and t]otal area affected during any one entry period with new regeneration treatment should not exceed 4 percent of the acreage."[169] The Forest Service fails to indicate the amount of acreage within the view that would be impacted by these management activities to confirm that this standard is being met. Although the Forest Service concedes "substantial harvesting happened from the mid 1980's through the mid 1990's throughout the Lake Tarleton viewshed[,]" it hastily concludes that this harvesting "primarily occurred outside the 30-year cumulative effects timeframe."[170] In other words, is unknown how many acres have already been impacted by harvesting within the last 30 years, as significant logging was still occurring in the mid-1990's. The Forest Service cannot claim to be in compliance with the MA 2.1 Guidelines if it does not know how many acres have been harvested in the area within the last 30 years.

The Final EA also states that the visual impacts will "fade and blend over time as the forest regenerates."[171] This statement may mislead the public to believe that visual impacts will be short-lived, but the Forest Service itself admits that the impacts of its suggested logging "is on the order of decades to centuries because that is how long it can take for forested stands" to return to pre-harvest condition.[172]

The Tarleton Scenery Specialist Report indicates "[t]he chosen viewpoints are on public lands, provide the best perspectives of the project area and are areas considered to be of reasonable access and highest visitation by the general public as well as recreationalists and tourists."[173] Even if the existing scenery impacts analysis were sufficient, which we contest, the Final EA failed to evaluate scenic impacts as viewed from significant locations within the area. For example, Piermont Mountain is located just across the lake from the proposed action and hosts a popular hiking trail and scenic views facing the project area. Although the Forest Service indicates it only selected public lands for viewpoint analysis, Piermont Mountain is the most prominent open summit overlooking the forest surrounding Lake Tarleton,[174] with a popular trail that is highly prized and utilized by members of the local community, including Kingswood Camp and Camp Walt Whitman, also located in the area. Furthermore, the Forest Service failed to include even a single viewpoint on Lake Tarleton, as seen by boaters, paddlers, and ice

---

[168] WMNF Plan - Chapter 3 at 3-6 to 3-8.
[169] *Id.* at 3-6.
[170] Scenery Specialist Report at 2-3.
[171] Final EA at 21.
[172] Biological Evaluation at 7.
[173] Scenery Specialist Report at 1.
[174] Photo: Sunset from Piermont Mountain with Lake Tarleton in the foreground, logging activities are proposed for the hillside above the lakeshore (Rob Wipfler) (Exhibit 21).

recreationists. Additionally, the Tarleton Scenery Specialist Report lacks discussion of how the proposed actions will alter views from local residences, which could impact property values. Despite the obvious reasons for assessing visual impacts from these viewpoints, the Forest Service failed to conduct these analyses. Because the Forest Service failed to consider significant impacts to scenic values, it should correct its errors through completion of an EIS.

***Requested Remedy: The Forest Service should conduct an EIS to determine the true impacts that the Project will have on scenery in the area.***

#### vii. Socioeconomics

The Final EA focuses its discussion of socioeconomic impacts on the displacement of recreational opportunities and concludes that "socioeconomic changes to the local communities are expected to be negligible."[175] As we previously mentioned in our comment on the Updated Draft EA, the analysis of this impact is insufficient in one of two ways. Either (1) the Forest Service entirely neglected to analyze socioeconomic impacts flowing from the supposed "sustainable yield of high-quality timber products to support local economies and communities[,]"[176]in which case it failed to take a hard look at socioeconomic impacts; or (2) it did analyze these impacts, but concluded that these supposed benefits, in fact, were expected to be negligible, in which case the economic benefit of the proposed logging cannot be used to justify the project's implementation.

Furthermore, the Degree of Effects section of the Final EA indicates that management actions can take up to 10 years to complete. This is a significant amount of time, especially when taken into consideration with the time necessary for reforestation to occur in proposed timber harvest areas.[177] As such, the Project as proposed has a likelihood of impacting local businesses, as those who usually engage in recreational activities in the area (including but not limited to swimming, boating, hiking, fishing, hunting, picnicking, bird watching, ice fishing, and wildlife observation) will seek other locations for outdoor recreation. The Final EA even acknowledges that "recreational users are likely to disperse to other recreation sites."[178] For Lake Tarleton and Armington residents, and local businesses like Kingswood Camp, whose economic survival is dependent on Lake Tarleton's recreation and scenery resources, physical relocation is not an option.

The Final EA also failed to disclose how noise levels, traffic and road conditions, and safety hazards of the Project actions might impact local residents. East and west of the Tarleton area, the roads are narrow and steep. Logging trucks and machinery are likely to congest the area with noise and may experience dangerous weather conditions as logging occurs during the winter

---

[175] Final EA at 22.
[176] *Id*. at 6.
[177] After timber harvesting, it takes approximately 30 years ". . . for all the harvested openings to fully restock, develop a full canopy of vegetation, and reach a height with enough spread and density to allow the shadow and textural differences to begin to blend with the adjacent surrounding." Scenery Specialist Report at 4.
[178] Final EA at 21.

months. These are major concerns of the people living in the vicinity and along Route 25C, which the Forest Service should have addressed in its analysis of socioeconomic impacts on the community.

***Requested Remedy: The Forest Service should conduct an EIS to determine the true socioeconomic impacts that the Project will have on the local community.***

#### viii. Soils

The Final EA fails to provide adequate analysis, discussion, and clarity surrounding impacts to this resource. As previously mentioned in our comment on the Updated Draft EA, this section repeatedly mentions "non-detrimental soil disturbance" in relation to meeting Forest Service Soil Quality Standards,[179] but the referenced guidance does not in fact include that term at all.[180] Instead, it merely identifies types of soil disturbance, without categorizing them as detrimental or non-detrimental. It is unclear where this term came from, and its repeated use in the Final EA belies the actual potential impacts to the project area, which the Soils Specialist Report concluded may include soil disturbance on up to 20% of the project area.[181]

The only "detrimental" soil impact that the Final EA admits to, the impact of expanding the Lake Katherine parking lot, is ostensibly justified by pointing to the fact that the WMNF Plan FEIS (not even the plan itself) "allowed up to a certain amount of new construction to be built within the life of the plan and based on current monitoring the forest has yet to meet that threshold."[182] This "certain amount" is not identified, nor is the unspecified "threshold." These ambiguous references and unsupported conclusions do not meet the Service's obligation to take a hard look at impacts, nor do they provide the public with clear NEPA documentation. If the Forest Service had truly been monitoring the amount of construction encompassed within this allocation, it would have been included in the Final EA.

***Requested Remedy: The Forest Service should complete an EIS to determine detailed soil impacts that Project will have on the area.***

#### ix. Vegetation & Forest Health

The Tarleton IRP proposes 690 acres of logging and fails to explain how the proposed logging will comply with the WMNF Plan, EO 14072, and EO 14008.[183] As raised in our comment on the Updated Draft EA, and in this objection, there is clear scientific evidence that

[179] Final EA at 22.
[180] USDA Forest Serv., Forest Service Manual Eastern Regions; Supplement No. R9 RO 2550-2012-1; FSM 2500 – Watershed and Air Management, Chapter 2550 – Soil Management (Jan. 31, 2012) (Comment Exhibit 37).
[181] Robert A. Colter, *Soils Specialist Report* 12 (Jan. 2020) (hereinafter Soils Specialist Report).
[182] Final EA at 22.
[183] Exec. Order No. 14072, 87 Fed. Reg. 24851 (Apr. 22, 2022) (Comment Exhibit 6); Exec. Order No 14008, 86 Fed. Reg. 19 (Jan. 27, 2021) (Comment Exhibit 45).

counsels in favor of protecting mature forests.[184] Aggressive measures are necessary to stave off climate and extinction catastrophe.[185] This vision was endorsed by the Biden Administration through EO 14072 and EO 14008.[186] The Forest Service has not revealed how it intends to implement either in the context of this Project, instead describing the effects on vegetation as "minor and local."[187] The Forest Service also failed to disclose, discuss, and respond to the scientific evidence we raised in our comment.[188]

Vegetation management goals are described in the Final EA to "create small and large openings in the forest" to allow tree regeneration, vegetation regeneration, and increase wildlife habitat diversity.[189] These management practices are increasingly being called into question, including in a new study released in early 2023.[190] The absence of old forests in New England has led to the elimination or decline of elk, caribou, wolverine, wolves, cougars, pine marten, and salmon.[191] Large swaths of intact forest minimize harmful vectors for the spread of invasive species and ticks, and allow for a mix of both early and late successional habitats as required by New England's forest-dependent species. Unlogged forests in New England exhibit the greatest structural complexity and tree species diversity,[192] as well as the greatest resilience to climate change.[193] The Forest Service suggested the project area is ready for "active management" to cultivate a healthy forest with improved biodiversity yet provided no scientific evidence.[194] The Forest Service states natural means would create "less young forest habitat overall. . . likely

---

184 *See supra* Sections (I)(b), (I)(d)(iii).
185 Ceballos et al., *Vertebrates on the Brink as Indicators of Biological Annihilation and the Sixth Mass Extinction*, 117 PNAS 13596 (June 2020) (Comment Exhibit 41).

186 Exec. Order No. 14072, 87 Fed. Reg. 24851 (Apr. 22, 2022) (Comment Exhibit 6); Exec. Order No 14008, 86 Fed. Reg. 19 (Jan. 27, 2021) (Comment Exhibit 45).

187 Final EA at 22.
188 Comment on Updated Draft EA at 20-23, 31-36.
189 *Id.* at 9.
190 Kellett et. al., *Forest-clearing to Create Early-successional Habitats: Questionable Benefits, Significant Costs,* FRONTIERS FOR GLOB. CHANGE 1 (Jan. 9, 2023) (Exhibit 22).
191 Evans and Mortelliti, *Effects of Forest Disturbance, Snow Depth, and Intraguild Dynamics on American Marten and Fisher*, 13 ECOSPHERE 1 (Nov. 24, 2021) (Comment Exhibit 52).

192 Miller et al., *Eastern National Parks Protect Greater Tree Species Diversity than Unprotected Matrix Forests*, 414 FOREST ECOLOGY AND MGMT. 74 (April 15, 2018) (Comment Exhibit 48); Miller et al., *National Parks in the Eastern United States Harbor Important Older Forest Structure Compared with Matrix Forests*, 7 ECOSPHERE 1 (July 2016) (Comment Exhibit 49).

193 Thom et al., *The Climate Sensitivity of Carbon, Timber, and Species Richness Covaries with Forest Age in Boreal- Temperate North America*, (2019) (Comment Exhibit 29).
194 DDN at 2.

reducing overall wildlife species diversity in the project area over the long-term,"[195] but provides no analysis of: a) how much young forest habitat is already present on public lands (including the high-voltage powerline corridor through the project area) or surrounding private lands; b) how much would be created naturally with a no-action alternative; or c) how its proposed "young forest habitat" differs from what would occur naturally in the forest. Proposed harvests are neither preferable nor as necessary as the Final EA makes it out to be. Climate change has put a spotlight on the damaging effects of outdated forestry practices and beliefs.[196] The Forest Service's proposal that providing non-shade conditions for some species of trees to thrive is not in agreement with what we know of how large trees can transfer nutrients to smaller trees through fungal communities in the soil.[197] It is also at odds with how healthy forests mature and support the complex food web and balance in a natural undisturbed forest ecosystem. The public is left to wonder whether this "need for management" is entirely based on commercial interests for a more profitable forest—as selective and clearcutting extirpate the largest, most profitable trees for timber. The Forest Service failed to address and explain opposing viewpoints and contrary scientific information along with their rationale for choosing one viewpoint over another.[198]

The Final EA fails to take a hard look at stand ages and species composition within the Tarleton Habitat Management Unit ("HMU"). The Forest Service suggests the Tarleton HMU is not meeting its "MA 2.1 Habitat Composition and Age Class Objectives" as outlined in the outdated WMNF Plan. These Age Class Objectives and Potential Natural Vegetation are not informed by the latest scientific understanding of the ecology of New England forests.

As raised in our comments previously, the WMNF's determination that the natural tendency of the majority of the forest is towards spruce/fir, and that hardwoods, including beech, are unnaturally abundant is erroneous and factually baseless. Hardwoods were the dominant tree species in the WMNF prior to European settlement, and beech was the most dominant of the hardwoods.[199] The WMNF's age class analysis is similarly erroneous. The project analysis fails to account for regeneration and young-aged trees because it only accounts for these conditions at an artificial stand scale that would rarely if ever occur under natural conditions in the forest. As a result of this foundational error, the Tarleton IRP presupposes that the *only* way to achieve

---

[195] Final EA at 8.
[196] Gabriel Popkin, *Forest Fight*, 374 SCIENCE 1184 (Dec. 3, 2021) (Exhibit 23).
[197] Simard et. al., *Net Transfer of Carbon Between Ectomycorrhizal Tree Species in the Field*, 388 NATURE 579 (Aug. 7, 1997) (Exhibit 24).
[198] 40 C.F.R. § 1502.9(b) (requiring agencies to disclose, discuss, and respond to "any responsible opposing view"); *WildEarth Guardians v. Jewell*, No. 1:16-CV-00605-RJ, 2017 WL 3442922 (D.N.M. Feb. 16, 2017); *WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013).

[199] Lorimer and White, *Scale and Frequency of Natural Disturbances in the Northeastern US: Implications for Early Successional Forest Habitats and Regional Age Distributions* 185 FOREST AND ECOLOGY MANAGEMENT 41(2003) (Comment Exhibit 38).

desired age class goals is to conduct logging activities. This determination biases the agency against other valid management approaches, constraining the development of alternatives.

Standing Trees and members of The Lake Tarleton Coalition have repeatedly requested information about stand age classes in the Project. WMNF continuously failed to produce a stand age class map[200] or detailed records of past harvest activity and explicitly stated they are unaware of the stand age classes for cutting units.[201] Finally, as the result of our FOIA request, we received a Stand Age data document for Lake Tarleton HMU. [202]This document reveals the Lake Tarleton HMU is actually quite unevenly aged, with many mature trees.[203] The document is not a map, however, and fails to import an accurate sense of scale. The public still does not have access to this information, making it impossible to determine whether the Project complies with the WMNF Plan. The public is unclear whether the WMNF has complied with Standard S-3 or Guideline G-1 of the WMNF Plan.[204] The WMNF Plan also states "[n]o harvest will occur in stands identified to provide old forest habitat." We raised these issues in our comment, but no analysis has been made available publicly to demonstrate Forest Plan compliance.

Like the Draft EA, the Final EA fails to acknowledge EO 14072 and the obligation imposed on the WMNF to conserve mature and old-growth forests. Just days ago, on April 20, 2023, the Forest Service released a report titled "Mature and Old-Growth Forest: Definition, Identification, and Initial Inventory on Lands Managed by the Forest Service and Bureau of Land Management" as required under EO 14072.[205] Simultaneously, the Forest Service sent a letter to Regional Foresters stating that "[w]e will shortly issue guidance on using this information" in the aforementioned report.[206] On April 21st, the Forest Service published an Advance Notice of Proposed Rulemaking that seeks input on how the agency should "adapt current policies to protect, conserve, and manage the national forests and grasslands for climate resilience,"

---

200 E-mail from Scott Hall, USFS NEPA Planner, to Elaine Faletra (November 19, 2021) (Comment Exhibit 5).

201 E-mail from Brooke Brown, Pemigewasset District Ranger, to Rob Wipfler (March 30, 2023, 9:07AM) (Exhibit 1).

202 Letter from Derek Ibarguen, WMNF Forest Supervisor, to Rob Wipfler (April 12, 2023) (Exhibit 4).

203 Lake Tarleton HMU Stand YOO (March 28, 2019) (Exhibit 25).

204 "Timber harvest is prohibited in old growth forest" WMNF Plan - Chapter 2 at 2-13; "Outstanding natural communities should be conserved" WMNF Plan - Chapter 1 at 1-9.

205 MATURE AND OLD-GROWTH FORESTS: DEFINITION, IDENTIFICATION, AND INITIAL INVENTORY ON LANDS MANAGED BY THE FOREST SERVICE AND BUREAU OF LAND MANAGEMENT, U.S. DEP'T OF AGRIC. 1 (Apr. 2023) (Exhibit 35).

206 Letter from Chris French, USFS Deputy Chief, to Regional Foresters (Apr. 18, 2023) (Exhibit 26).

including "concerns about…past and current management practices, including inappropriate vegetation management."[207]

The Final EA was released prior to the availability of the initial inventory and report, issuance of guidance to Regional Foresters, and completion of proposed rulemaking, foreclosing the opportunity to protect the very mature forest the Executive branch and national Forest Service are now setting out to protect. This initial inventory was available to the public only a week before the end of the objection period for this Project. The public is left guessing as to this Project's compatibility with EO 14072 Given this guidance and the presence of mature forest in the project area, proceeding with this project without further analysis would irretrievably commit limited resources against the direction of EO 14072. The Final EA fails to acknowledge EO 14072 and the obligation imposed on the WMNF. The Forest Service has recognized current scientific standards and the instruction of EOs 14072 and 14008 require it to re-examine projects. For example, the Forest Service recently withdrew the Flat Country Project in Oregon because the proposed project was inconsistent with EO 14072 and EO 14008.[208] Of concern was the project's purpose to regenerate younger age classes and the negative impacts the treatments would have on mature forest characteristics.[209] The WMNF failed to recognize and address new policy addressing mature forest conservation under by EO 14072 and 14008.

The WMNF Plan gives the forest a distinct advantage in meeting its NFMA, EO 14072, and EO 14008 obligations by clearly defining mature, old, and old-growth forests. Until detailed analysis is completed to comply with WMNF Plan and EO requirements to conserve mature and old-growth forests, the Tarleton IRP cannot legally proceed under NEPA and NFMA.

***Requested Remedy: The Forest Service should complete an EIS, developing an adequate range of alternatives and taking into account the analysis required under the WMNF Plan, EO 14072, and EO 14008.***

#### x. Wildlife

The Forest Service fails to acknowledge the impacts that the Project will have on wildlife and the important role that mature and old-growth forests play in this delicate ecosystem. The 2018 Vermont Conservation Design Natural Community and Habitat Technical Report is instructive for the state of New Hampshire and the White Mountain National Forest:

---

[207] Letter from Chris French, USFS Deputy Chief, re: Advance Notice of Proposed Rulemaking (Apr. 21, 2023) (Exhibit 36).

[208] *Flat Country Regional Review*, U.S. FOREST SERVICE, https://www.fs.usda.gov/detail/r6/landmanagement/planning/?cid=fseprd1080564 (last visited Apr. 23, 2023).

[209] FLAT COUNTRY PROJECT REVIEW REPORT, U.S. FOREST SERVICE 1, 12 (Sept. 27, 2022), https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd1080562.pdf.

> The state's native flora and fauna that have been here prior to European settlement are adapted to this landscape of old, structurally complex forest punctuated by natural disturbance gaps and occasional natural openings such as wetlands or rock outcrops. The complex physical structure of old forests creates diverse habitats, many of which are absent or much less abundant in younger forests.[210]

What the White Mountain National Forest calls "old forests" are northern New England's *natural forests*. As such, much of New Hampshire's community of life evolved over millennia within these remarkable original forests. A combination of overhunting and habitat loss following European settlement led to the disappearance of wide-ranging carnivores such as cougars, wolves, and wolverines. Elk and caribou met a similar fate. Some species we might take for granted today, such as bear, moose, beaver, and loons, were on the brink of extirpation only a short while ago. Lynx, Northern Long-eared Bat, and pine marten currently teeter on the edge. Salmon, once prolific in the Connecticut River system, struggle to naturally reproduce. Many of New Hampshire's imperiled bird species are adapted to interior forests and reliant upon complex forest structure for their survival, including standing snags and large living trees.[211] Indeed, the availability of dead and dying trees and downed wood is critical for the health of many species, from bats to pine marten to invertebrates.[212] Mature, unfragmented interior forests make ideal habitat for a variety of native and imperiled species. However, this type of forest is rare in New England overall. This makes the WMNF an important concentration of such habitat within New England. When this habitat is fragmented or degraded, through activities such as logging, these species experience increased threats from interactions with humans, predation, changes in microclimates, the spread of invasive species and ticks, and other fragmentation and edge effects.

One of the Wildlife Objectives listed in the WMNF Plan is to "[m]aintain high quality mature forest and old forest habitats on a majority of the Forest," as there is good reason for leaving mature forests intact.[213] The Final EA incorrectly emphasizes the value of clearings, open spaces, orchards, soft mast, and young forest for bear, deer, turkey, pollinators, and other wildlife.[214] These are abundant and widespread species with wide-ranging individuals who select

---

[210] Zaino et al., *Vermont Conservation Design-Natural Community and Habitat Technical Report*, VT. FISH AND WILDLIFE DEPT. 15 (March 2018) (Comment Exhibit 17).

[211] Robert A. Askins, *The Critical Importance of Large Expanses of Continuous Forest for Bird Conservation*, 25 BIOLOGY FACULTY PUBLICATIONS 1, 25 (2015) (Comment Exhibit 50).

[212] Thorn et al., *The Living Dead: Acknowledging Life After Tree Death to Stop Forest Degradation*, 18 FRONTIERS IN ECOL. AND THE ENV'T 505 (2020) (Comment Exhibit 51); Evans and Mortelliti, *Effects of Forest Disturbance, Snow Depth, and Intraguild Dynamics on American Marten and Fisher*, 13 ECOSPHERE 1 (Nov. 24, 2021) (Comment Exhibit 52).

[213] WMNF Plan - Chapter 1 at 1-20.

[214] Final EA at 7.

both open areas and forest areas.[215] These species would not likely have differences in productivity, health, or distribution as a result of the proposed action or no action. In particular, the Final EA proclaims a need for the expansion of one existing apple orchard to create a larger opening to "improve wildlife habitat diversity in the Lake Tarleton HMU."[216] The Final EA leads the public to believe there would be benefits to these species from the proposed actions. These species are able to access abundant resources of these types on lands adjacent to the Forest, and are not considered "habitat limited." It is arbitrary to determine that the Forest should commit resources to benefit these species beyond their current condition. It is also capricious to determine the proposed action would have a different outcome for these species compared to no action. As a result, it would be arbitrary and capricious to carry out the proposed action to create more open space, orchards, or young seral forest in the proposed action area.

Our native ecosystems preserve–and present the opportunity to restore–the greatest levels of wildlife and biodiversity. The Forest Service cannot ignore the vast amount of scientific data showing how mature and old-growth forests support a wide range of wildlife. The Final EA's discussion of wildlife is inadequate, and the completion of an EIS is necessary to determine the true impacts that the Project would have on wildlife in the area.

***Requested Remedy: The Forest Service should analyze an adequate range of alternatives to consider options that would benefit imperiled species, and should complete an EIS to determine the best practices for protecting wildlife and its habitat.***

**xi. Impacts of Road Construction**

Although "Transportation" and the need for a transportation analysis is included as one of the "needs" for the project, there is no analysis of transportation or the impacts of roads in the Environmental Impacts discussion.[217] Instead, the only discussion surrounding transportation is in the description of the proposed action, which states that "no new road construction or decommissioning is included under the Proposed Action," but then immediately notes that "system roads would be maintained or reconstructed to provide safe access to vegetation management areas and to meet modern design standards."[218] Thus, on its face, the Final EA is internally inconsistent on this point, and again, the Forest Service neither provides nor cites to these referenced standards.

The Final EA did not analyze, or even mention, the potential for roads and skid trails to contribute to water quality issues through increased erosion and sedimentation, soil compaction resulting from the use of heavy machinery used to achieve the proposed road activities, and renewed fragmentation of wildlife habitat, among other things. For example, although no "new" roads are proposed, the reconstruction of some of these roads may be equivalent to opening a new road, where those roads may have already been reclaimed by the forest. This is another example of a persistent theme of the Final EA of not identifying a baseline against which impacts

---

[215] *See* Kellett et al. (2023) (Exhibit 22).
[216] Final EA at 7.
[217] Final EA at 7.
[218] Final EA at 15.

can be measured. Because the existing condition of roads in the project area have not been described, it is impossible for the public to tell whether or not road reconstruction may result in significant impacts.

***Requested Remedy: The Forest Service should complete an EIS to determine the impacts of road reconstruction in the Project area.***

### xii. Cumulative Impacts

The Forest Service not only fails to provide virtually any details in the Final EA's cumulative impacts analysis, but entirely removes previously mentioned past projects that were included in the Updated Draft EA under this section.[219] When considered together, the combined resource impacts of these actions—past, present, and future—are both significant to the human environment and deeply troublesome.

The Forest Service is required by NEPA to consider the cumulative impacts of the Project.[220] Cumulative impacts are defined as "effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or persons undertakes such other actions. Cumulative effects can result from individually minor but collectively significant actions taking place over a period of time."[221] Cumulative effects analysis requires that the agency define and apply a consistent geographic scope in which to analyze cumulative effects.[222] The geographic scope determines which nearby projects will be included in its analysis, and agencies "must provide support for its choice of analysis area[.]"[223]

In the Updated Draft EA, the Forest Service made slight reference to past activities on surrounding lands (including private timber cuts) as well as other ongoing Forest Service projects that involve logging in the WMNF (including Bowen Brook, Pemi Northwest, and Wanosha IRP).[224] In our comment on the Updated Draft EA, we pointed out that other than mentioning these projects, the Draft EA did not discuss what those projects entail, or how the impacts and potential impacts from those projects relate to the Project at issue. Even worse, the Final EA entirely eliminates the list of these non-Federal and Federal projects from its cumulative impacts analysis, and also fails to identify additional proposed and ongoing Forest Service projects in the WMNF. In addition to the projects mentioned in the Updated Draft EA,[225] other Forest Service projects in the WMNF include Sandwich Vegetation Management Project, Peabody West Integrated Resource Project, Lost River Integrated Resource Project, and Hales

---

[219] *Compare* DEA at 21, *with* Final EA at 18-19.
[220] 40 C.F.R. § 1508.7.
[221] 40 C.F.R. § 1508.1.
[222] *LOWD/BMBP v. Connaughton*, 2014 WL 6977611, at 9-11 (D. Or. Dec. 9, 2014).
[223] *Id*. at 9, citing *Native Ecosystems Council v. Dombeck*, 304 F. 3d 886, 902 (9th Cir. 2002).
[224] DEA at 21.
[225] DEA at 21 (listing Forest Service projects in WMNF including Bowen Brook, Pemi Northwest, and Wanosha Integrated Resource Project).

Location Wildfire Resiliency Project.[226] All of these projects involve substantial logging, carbon emissions, and/or habitat alteration or destruction. An e-mail sent by District Ranger Brooke Brown to Rob Wipfler stated that "[s]uccess (achievement) in transitioning these stands from hardwood to spruce/fir is not attained in a single management action. Future actions will be needed to continue with establishing regeneration and overstory recruitment."[227] It is unclear whether the Forest Service has assessed the cumulative impacts of these anticipated future logging operations, as that information is absent from the Final EA and project record. It is also unclear whether the Forest Service has accounted for the amount of early successional habitat located on private lands adjacent to the project area and throughout the WMNF region.

The Final EA failed to identify or explain the temporal and geographic scopes of its cumulative impacts analysis for a majority of the resources. Although it acknowledges that such analysis must address activities "overlap[ping] in space and time with effects of the proposed project[,]"[228] it does not actually define that "space" or analysis area. As noted, it vaguely states that "these analysis boundaries vary by resource" and are "documented in the project record."[229] In addition to its failure to define the geographic scope of the cumulative impacts analysis, the Final EA's cumulative impacts analysis contains no actual analysis at all and does not even state whether the Project is expected to contribute cumulatively to resource impacts within the analysis area. The Forest Service cannot just make a blanket statement about impacts without supporting it with an actual geographic scope and analysis or some level of detail. As-is, the public has no way of actually evaluating the cumulative impacts of the Forest Service's Project, because the public is not given any detail to look into the matter themselves.

Further, as we stated in our comment on the Updated Draft EA, the cumulative effects analysis fails to consider effects of the action on climate change or effects of climate change on the action. The analysis also fails to consider the unauthorized access that will inevitably result during and after the proposed action as a result of improvements to Charleston Road. The exclusion of these important components of a cumulative effects analysis contribute to the long list of reasons why this analysis is remarkably inadequate and incomplete.

Finally, as discussed in other sections of this objection, shortly after the Forest Service's issuing of the Final EA, the uplisting date of the Northern Long-eared Bat (NELB) went into effect pursuant to the Endangered Species Act. The Forest Service was aware of the NLEB uplisting several months in advance, but the Final EA does not address it in its cumulative

---

[226] *White Mountain National Forest: Projects*, U.S. FOREST SERV., https://www.fs.usda.gov/projects/whitemountain/landmanagement/projects.; *See* WMNF U.S. Forest Service Logging Projects Map (Exhibit 27).
[227] E-mail from Brooke Brown, Pemigewasset District Ranger, to Rob Wipfler (Apr. 24, 2023, 3:50 PM)) (Exhibit 28).
[228] Final EA at 19.
[229] Final EA at 19; The only documents that provide a cumulative analysis in the project record are limited to the Biological Evaluation, Soils Specialist Report, and Scenery Specialist Report. See *Tarleton Integrative Resource Project*, *Supporting*, U.S FOREST SERV., https://www.fs.usda.gov/project/?project=56394.

impacts section. However, the Forest Service did create a Biological Evaluation for the Tarleton IRP which includes a brief discussion of the NLEB. The Biological Evaluation indicates "the analysis area for cumulative effects for TESP species resulting from the activities included under the Proposed Action encompasses National Forest System lands located within the Tarleton HMU" and "activities on private and state-owned land adjacent to the HMU."[230] In other words, the cumulative impacts analysis for the NLEB and other TESP species only includes a relatively small area (although no map was provided showing the exact spatial scale of the effects analysis). When taken into consideration with all the other Forest Service projects within the WMNF[231] discussed above, the cumulative impact is significant. Because these projects may result in logging of mature trees that the bats use for roosting and foraging, the Forest Service must analyze the cumulative effects this Project will have on bat habitat, "when added to other past, present, and reasonably foreseeable future actions . . . ."[232] To be certain, the cumulative effects of Forest Service projects on the NLEB will be substantial and consequential, not just within the WMNF but also throughout the bat's national habitat range. This is because USFWS has issued a batched (and botched) Biological Opinion allowing 2,408 planned and ongoing FS actions in the Eastern and Southern Regions to continue.[233] This action area contains 22,543,398 acres of forested National Forest System lands.[234] Due to the dire state of the NLEB, every individual bat and every logging or habitat destruction activity within its habitat matter. Failure to protect this species is a violation of the ESA.

For all the reasons set forth above, the Forest Service significantly fails NEPA's hard look requirement of considering all cumulative impacts, and NEPA's implementing regulations. The absence of detail and any real analysis in the Final EA shows that very little analysis occurred, and to the extent any did, the Forest Service has hidden most of it from the public.

***Requested Remedy: The Forest Service should complete an EIS and additional NEPA analysis to ensure that all cumulative impacts of the Project are addressed and made available to the public.***

## II. The Tarleton IRP is Significant and Requires an EIS.

The Final EA's finding of no significant impact ("FONSI") violates NEPA because its finding is unsupported by the facts and the Project is a major federal action that will significantly impact the quality of the human environment. The Forest Service should conduct additional analysis in the form of an EIS.

---

[230] Biological Evaluation at 7.
[231] *See* WMNF U.S. Forest Service Logging Projects Map (Exhibit 27).
[232] 40 C.F.R. § 1508.7.
[233] Letter from Karen Herrington, Acting Assistant Regional Director for Ecological Services, Region 3 USFWS, to Gina Owens, Regional Forester Eastern Region U.S. Forest Service (Mar. 31, 2023) (re Northern Long-eared bat Biological Opinion) (in Tarleton IRP project file at filename Biological Opinion NLEB Reinitiation Forest Service R8 and R9 Final.pdf) (hereinafter "BiOp").
[234] BiOp at 6.

**a. The FONSI is Conclusory and Unsupported by the Facts.**

A FONSI must "present the reasons why an action . . . will not have a significant effect."[235] Review of an agency's FONSI is conducted in three steps: first, the agency must have accurately identified the relevant environmental concern; second, once the agency has identified the problem it must have taken a hard look at the problem in preparing the EA; and third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding.[236] As described in our comment on the Updated Draft EA and expanded upon here, the Final EA fails to adequately describe the impacted environment and take a hard look at impacts to those resources. Despite this, the Forest Service has advanced a finding of no significant impact without providing convincing reasoning to support this finding.

The FONSI is grounded in the analysis of the EA. This is troublesome because much of the EA relies heavily on the purported lack of impact from past, similar projects to justify this project.[237] Yet no analysis regarding past WMNF projects and their alleged lack of impact is actually provided.[238] The FONSI must "present[] the reasons why an action. . . will not have a significant effect[.]"[239] It is inadequate to state that because other actions did not have a significant impact, thus this Project will also have no significant impact. The Final EA's failure to support its FONSI is alone sufficient to require additional or supplemental NEPA analysis in the form of an EIS.[240]

**b. The Final EA Fails to Adequately Define the Context or Discuss the Intensity of Project Impacts, Which Weigh in Favor of a Finding of Significance.**

An EIS is required for all "major federal actions significantly affecting the quality of the human environment[.]"[241] Under NEPA, the analysis of significance "requires consideration of both context and intensity[.]"[242] As raised in our comment on the Updated Draft EA, the Forest Service's "analysis" of the context and intensity of impacts is cursory and incomplete. Substantial questions are raised as to whether the Tarleton IRP may cause significant degradation

---

235 40 C.F.R. § 1508.13.

236 *Nw. Bypass Grp. v. United States Army Corps of Eng'rs*, 470 F. Supp. 2d 30, 61 (D.N.H. 2007).

237 Final EA at 22, 24-25.

238 The closest the Final EA comes to discussing past activities is two sentences in the "Vegetation and Wildlife Habitat Management" section that only mentions private timber sales, but not federal actions. Final EA at 6.

239 40 C.F.R. § 1508.13.

240 *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 44 F. Supp. 3d at 859.

241 42 U.S.C. § 4332(2)(C).

242 40 C.F.R. § 1508.27.

to some human environmental factor.[243] The Projects' context and intensity of impacts overwhelmingly require a finding of significance and the preparation of an EIS.

**i. Context**

The Final EA's failure to appropriately identify, or—in some instances—failure to identify at all, the context within which to evaluate impacts of the proposed project is a critical failure. Without first establishing the proper context within which to conduct its analysis, it is impossible for the Forest Service to properly evaluate the intensity of project impacts. While a single housefire may be inconsequential on the scale of the city, the impacts on the affected home are devasting. Context is the key to determining the significance of an impact, and that is why context must be properly defined and supported for each resource being evaluated.

The CEQ's NEPA-implementing regulations provide that:

> [T]he significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend on the effects in the locale rather than in the world as a whole. Both short and long-term effects are relevant.[244]

Establishing the proper setting and scale ("context") within which to evaluate the impact of an action is critical, yet the FONSI's discussion of "context" does not establish the context for the analysis of resources impacted by the project at all.

What is presumably the Context section of the FONSI does not indicate whether the project qualifies as a major federal action significantly affecting the quality of the human environment, nor does it provide any discussion or detail about what the context is. But the Final EA suggests that the Project is not a major federal action. The only sentence conceivably addressing the matter of context is the statement that "[p]roject activities would occur over an area totaling less than about one percent of the total acreage within the WMNF."[245] Therefore, we must assume this statement is intended to identify the project area—that "less than one percent" of the WMNF—as the context. However, the Forest Service fails to provide any actual analysis explaining the impacts of the project on the local area.

---

[243] *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149-50 (9th Cir. 1998) (citations omitted) (emphasis original); See also *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864-65 (9th Cir. 2005) ("To trigger this [EIS] requirement a plaintiff need not show that significant effects will in fact occur, but raising substantial questions whether a project may have a significant effect is sufficient." (internal quotations, citations, and alterations omitted)).

[244] 40 C.F.R. § 1508.27(a).

[245] Final EA at 23.

Nor do individual sections of the Final EA properly establish the context for its "analysis" of those resources. For example, under the "Environmental Impacts" discussion of the National Historic Preservation Act ("NHPA") which the EA later identifies as "Heritage," the Final EA does not even allude to the context of its discussion, and the reader is left guessing.[246] The climate change section similarly lacks clarity, first appearing to limit the context of the discussion to "a relatively small amount of forest land" in the project area, but then attempting to minimize the appearance of any potential impacts by stating that any emissions would be "extremely small. . . relative to national and global emissions." *Id.* The Forest Service must provide the context for its analysis of each resource.

The context of analysis for other resource sections are similarly amorphous or unclear. For example, the Vegetation section indicates that "[i]mpacts to vegetation are considered in the context of forest health."[247] Presumably this analysis is at the forest scale, but then it appears to switch the relevant context by declaring that "[o]verall, effects on vegetation would be minor and local." *Id.* The discussions of Socioeconomics and Hydrology fare no better. In fact, the only sections that remotely appropriately define the context of their analyses are the discussions of Federally Listed and Regional Forester Sensitive Species, Scenery, and Soils. Even then, the context is not discussed in the Final EA, but in separate documents.[248] This goes to show that the Forest Service is capable of properly defining the context of its analysis for the purpose of determining significance, but did not do so for the vast majority of its resource analyses.

The Forest Service needs to correct these omissions and prepare an EIS to address the significant impacts of the proposed federal action, or at the very least conduct additional analysis and prepare a supplemental EA that clearly defines the context of its proffered "analysis." And give citizens a chance to respond to that supplemental EA. The failure to properly address the significance of the local impacts is a fatal and "major analytical lapse."[249]

Further, the Forest Service's choice to begin the "Context" or "Degree of Effects" discussion by noting that the project area accounts for "less than about one percent" of the forest is a clear attempt to improperly minimize and obfuscate the localized impacts to the Lake Tarleton area. The Forest Service is not allowed to sweep the significant impacts to the Lake

---

[246] Final EA at 20.
[247] Final EA at 22.
[248] *See* Biological Evaluation at 7-8; Soils Specialist Report at 2-3.
[249] See *Anderson v. Evans*, 371 F.3d 475, 490–92 (9th Cir. 2004) ("In short, the record establishes that there are 'substantial questions' as to the significance of the effect on the *local* area . . . And because the EA simply does not adequately address the local impact of the Tribe's hunt [for whales], an EIS is required."); *Sierra Club v. Marsh*, 769 F.2d 868, 881 (1st Cir. 1985) (finding it improper for the Corps to look at impacts to the entire Maine coastline when evaluating the impacts of a development on a particular island. "Here, the nature of the action, and the geographical character of Sears Island, suggest that the appropriate 'locale' is Sears Island and its immediate surroundings.").

Tarleton area under the rug by pointing to the vastness of the forest surrounding it.[250] This is equivalent to the Forest Service proposing to burn the house down and telling the family that impacts are minimal because the rest of the city is still there. To be certain, with greater consideration of the context of this Project, the Forest Service would find that the Tarleton IRP is a major federal action significantly affecting the quality of the human environment.

**ii. Intensity**

Intensity refers to the "severity of impact."[251] NEPA provides a list of 10 non-exclusive factors to consider when evaluating intensity.[252] Because the Forest Service failed to define the context of its analysis for most project-area resources, its analysis of intensity, which is intrinsically linked to the context within which it is evaluated, is also necessarily inadequate. As raised in our comment on the Updated Draft EA, the discussion provided for the majority of the 10 consideration factors is cursory, often pointing to the supposed success of prior unnamed projects, and referring to unspecified "analysis" in order to make findings that each factor weighs against a finding of significance. Each shortcoming is addressed individually below, as many of these considerations are implicated by the Tarleton IRP. The presence of even just "one of these factors may be sufficient to require an EIS in appropriate circumstances."[253] The following should be considered in evaluating intensity:

***(1) "Impacts that may be both beneficial and adverse. A significant effect may exist even if the federal agency believes that on balance the effect will be beneficial."***[254]

The Final EA does not describe potential adverse effects of the Project. For example, in the discussion of "Clearcuts with Reserves" there is no mention of known detrimental impacts of clear-cut logging, such as the potential to spread ticks and invasive plants, increased erosion, decreases in water quality, and soil compaction from logging activities. *Only* perceived benefits are discussed. The Final EA fails to acknowledge potential adverse impacts, and thus the Forest Service has not met its obligation to "consider... [i]mpacts that may be both beneficial and adverse."[255] This factor also weighs in favor of a finding of significance and the preparation of an EIS.

***(2) "The degree to which the proposed action affects public health or safety."***[256]

The Final EA states the Forest Service "implemented this type of project and similar activities . . . many times on the Forest and in the region, without substantial impacts to public

[250] *See Pac. Coast Fed'n of Fisherman's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1035-37 (9th Cir. 2001) (an agency cannot minimize the impact of an activity by adopting a scale of analysis so broad that it trivializes the site-level impact).
[251] 40 C.F.R. § 1508.27(b).
[252] 40 C.F.R. § 1508.27(b)(1)-(10).
[253] *Ocean Advocates v. U.S. Army Corps of Eng'rs,* 402 F.3d 846, 865 (9th Cir. 2005).
[254] 40 C.F.R. § 1508.27(b)(1).
[255] 40 C.F.R. § 1508.27(b)(1).
[256] 40 C.F.R. § 1508.27(b)(2).

health or safety."[257] Repeated reliance on the fact that similar projects have occurred in the past ignores the fact that each project location is unique and therefore requires its own analysis of potential impacts. It would undermine the entire purpose of NEPA to allow for general *types* of past actions to justify future actions. NEPA analysis is done on a project-specific basis. The Forest Service fails to describe the "potential impacts to public health and safety" or to ensure that these are minimized or avoided.[258] Valid public safety concerns were raised during scoping comment periods, and never addressed. This factor also weighs in favor of a finding of significance and the preparation of an EIS.

***(3) "Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas."***[259]

In the Final EA, the Forest Service makes a conclusive statement that the Project area is "not unique" and there are "no unique geographic areas." Contrary to this suggestion, the Project area is absolutely unique, as it includes the largest lake entirely within the White Mountain National Forest—indeed, Lake Tarleton is one of the cleanest and least developed lakes of its size in the entire White Mountain region. We do not agree with the Forest Service's refusal to recognize potential Inventoried Roadless Areas, park lands, and ecologically critical areas within the Project area. Lake Tarleton has been proposed for special management since before the revision of the WMNF Plan in 2005, and is now proposed for reclassification as a Scenic Area. The WMNF failed to honor the reasons for which the lake was protected more than two decades ago. The WMNF has also failed its obligation to identify the area encompassing Lake Tarleton and surrounding Lands as an Inventoried Roadless Area under the 1992 Directives for the 1982 Planning Rule. The Forest Service should correct the omission and recognize the Project area for its roadless qualities and wilderness potential. For many of the reasons raised earlier in this objection, the Project area is ecologically critical. Especially in light of the NLEB's listing as an Endangered Species. NLEB's are known to occur in the Project area and yet the Forest Service fails to recognize the importance of mature forest for the species. The intensity of potential impacts to this area is high when considering the above outlined unique characteristics, as well as those raised in our comment on the Updated Draft EA. The unique characteristics of the Tarleton HMU weighs in favor of a finding of significance and the preparation of an EIS.

(4) ***"The degree to which the effects on the quality of the human environment are likely to be highly controversial."***[260]

For the purposes of this factor, "[a] substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI . . . casts serious doubt upon the reasonableness of an

[257] Final EA at 24.
[258] Final EA at 24.
[259] 40 C.F.R. § 1508.27(b)(2).
[260] 40 C.F.R. § 1508.27(b)(4).

agency's conclusions."[261] The word "controversial" refers to situations where "substantial dispute exists as to the size, nature, or effect of the major federal action."[262] The Forest Service ignores the high degree of scientific controversy over the Project's implementation and reasoning. Substantial scientific dispute clearly exists related to: management for early successional habitat, management to improve carbon storage and sequestration, management for climate adaptation and resilience, and protection of water quality. In Section (I)(d)(iii), we elaborate on the importance of mature forests in climate change adaptation and mitigation. The Forest Service fails to respond to or consider recent studies that support the protection of mature forests. In Section (I)(d)(ix), we expand on the failure of the Forest Service to recognize and address the growing importance of mature forest conservation, in line with policy alignment across the Executive Branch as a result of EO 14072 and 14008. The Forest Service's determinations and reasoning in the EA are inconsistent with greater efforts to protect and conserve mature forests, rooted in scientific understanding ignored by the Forest Service. Further, there is significant controversy over the Forest Service's failure to assess impacts to local residents and businesses. Substantial dispute exists as to the effect of the Tarleton IRP on the human environment, weighing in favor of a finding of significance and the preparation of an EIS.

***(5) "The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.*[263]**

The Forest Service attempts to justify its decision based on the existence of past projects implemented in the Forest and the region.[264] Absent is any supporting information or authorities for the public to validate this claim. The possible effects on the human environment are highly uncertain *and* involve unique or unknown risks because the Project is predicated on "similar actions" implemented in the WMNF.[265] This reasoning escapes the heart of NEPA: *project*-specific analysis. The Forest Service denied the public due consideration of this specific Project's impacts. Foreclosing the opportunity to assess unique or unknown risks. This flawed analysis weighs in favor of a finding of significance and the preparation of an EIS.

***(6) "The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration."*[266]**

The Tarleton IRP will irretrievably harm the forests surrounding Lake Tarleton, flying in the face of a community-led conservation history as detailed in our Introduction. The proposed

---

[261] *Nat'l Parks Conservation Ass'n.,* .3d 722, 736 (9th Cir. 2001).
[262] *Town of Cave Creek v. FAA*, 325 F.3d 320, 331 (D.C. Cir. 2003) (quoting *North American Wild Sheep v. U.S. Department of Agriculture*, 681 F.2d 1172, 1182 (9th Cir. 1982)) (emphasis in original); See also *Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1229 (10th Cir. 2002) (same); *Town of Superior v. U.S. Fish and Wildlife Serv.*, 913 F. Supp. 2d 1087, 1120 (D. Colo. 2012) (same).
[263] 40 C.F.R. § 1508.27(b)(5).
[264] Final EA at 25.
[265] Final EA at 25.
[266] 40 C.F.R. § 1508.27(b)(6).

action could harm or disqualify the contiguous landscape from Ch. 70 Wilderness Inventory and evaluation in subsequent Forest Plan revisions. The Forest Service places too much weight on prior implementation of a *type* of activity, which says nothing about the impact of that activity on a specific location. Project–specific evaluation is critical because where and how activities occur in the landscape determines the nature of the impact. This is a dangerous precedent to establish for future actions and weighs in favor of a finding of significance and the preparation of an EIS.

***(7) "Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts."*** [267]

We expand in Section I(d)(xii) on the Final EA's lack of analysis regarding cumulative impacts. As previously explained, there are a number of potential cumulative impacts resulting from this Project that will rise above the claimed level of "minor or less."[268] This factor also weighs in favor of a finding of significance and the preparation of an EIS.

***(8) "The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historic resources."***[269]

The Forest Service ignores the numerous historic and cultural resources that exist within the project area, as expanded upon in Section I(d)(ii). The Final EA makes no mention of the fact that the inventory fails to catalogue or acknowledge known gravesites within the project area. It is highly likely these unacknowledged resources would be lost or damaged if the Project was implemented. The potential loss of these resources counsels in favor of significance and the preparation of an EIS.

***(9) "The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973."***[270]

We expand in Section III on the Final EA's complete lack of consideration for the endangered NLEB. The recent uplisting of the species and absence of transparency from both the Forest Service and USFWS weighs heavily in favor of a finding of significance, necessitating a full analysis of the impacts to the NLEB and other endangered and threatened species in an EIS.

***(10) "Whether the action threatens a violation of federal, state, or local law or requirements imposed for the protection of the environment."***[271]

[267] 40 C.F.R. § 1508.27(b)(7).
[268] Final EA at 25.
[269] 40 C.F.R. § 1508.27(b)(8).
[270] 40 C.F.R. § 1508.27(b)(9).
[271] 40 C.F.R. § 1508.27(b)(10).

As expanded upon at length in this objection, the Forest Service failed to demonstrate compliance with a number of laws imposed for the protection of the environment: NEPA, NFMA, CWA, and the ESA. In Section III, we expand on the concern the Project will lead to violations of the ESA and the requirements imposed for the protection of the NLEB. In Section IV, we elaborate on how the Project violates NFMA and the WMNF Plan. The Project threatens the violation of numerous Federal requirements, weighing in favor of a finding of significance and the preparation of an EIS.

***Requested Remedy: For all of the reasons outlined above the Forest Service should withdraw its FONSI and prepare an EIS to evaluate the significant impacts posed by this Project.***

## III. The Analyses and Protections for the Endangered Northern Long-eared Bat Are Deficient.

While we acknowledge that the Forest Service has reinitiated consultation with U.S. Fish and Wildlife Service ("USFWS") regarding the Norther Long-eared Bat ("NLEB"), the Forest Service still fails to meet its legal obligations under the ESA and other federal statutes for the following reasons.

### a. The Tarleton IRP Fails to Comply with the ESA.

Congress passed the Endangered Species Act ("ESA") in 1973 for the purpose of conserving endangered and threatened species and the ecosystems upon which they rely.[272] According to the Supreme Court, the "plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost."[273] On November 30, 2022, USFWS published a final rule reclassifying the NLEB, uplisting the bat from threatened to endangered under the ESA.[274] Though initially set to become effective on January 30th, 2023, in an unusual and unprecedented move, USFWS delayed the effective date of the uplisting until March 31, 2023.[275] The NLEB status is currently in place, with part of its known habitat range within the Tarleton IRP area. Federal agencies, including the Forest Service, are required to be in compliance with the ESA as it relates to the endangered status of the NLEB.

Section 9 of the ESA broadly prohibits the "take" of any listed species.[276] "Take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."[277] Section 7 of the ESA requires every federal agency to consult with USFWS to "insure that any action authorized, funded, or carried out by such agency

---

272 16 U.S.C. § 1531(b).
273 *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).
274 Endangered and Threatened Wildlife and Plants; Endangered Species Status for Northern Long-Eared Bat, 87 Fed. Reg. 73,488-504 (Nov. 30, 2022), https://www.govinfo.gov/content/pkg/FR-2022-11-30/pdf/2022-25998.pdf (Exhibit 29).
275 Endangered and Threatened Wildlife and Plants; Endangered Species Status for Northern Long-Eared Bat; Delay of Effective Date, 88 Fed. Reg. 4,908-10 (Jan. 26, 2023), https://www.govinfo.gov/content/pkg/FR-2023-01-26/pdf/2023-01656.pdf (Exhibit 30).
276 16 U.S.C. § 1538(a).
277 *Id.* at § 1532(19).

. . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species."[278] To assist in the completion of this statutory requirement, the agency undertaking the action ("action agency") must complete a Biological Assessment ("BA").[279] The purpose of the BA is to "evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat."[280] USFWS reviews the BA, and if the agency determines that the proposed action may affect listed species or critical habitat, USFWS must formally consult with the action agency.[281] USFWS then produces a Biological Opinion ("BiOp") to determine whether the agency action is likely to jeopardize the continued existence of a listed species.[282] If the action is likely to jeopardize listed species, the BiOp must include reasonable and prudent alternatives to the action as proposed.[283]

First, as indicated above, the Forest Service is required to complete a BA evaluating the potential effects of the action (the Project) on listed species.[284] Accordingly, a species-specific BA should have been conducted for the NLEB and the Tricolored bat. On April 4, 2023, we sent an e-mail to the Forest Service requesting a BA for the NLEB.[285] The Forest Service incorrectly indicated that the BA was not a public document, interpreted this as a Freedom of Information Act ("FOIA") request, and forwarded the request to the Forest Service Eastern Region (R9) Acting Regional FOIA Coordinator.[286] We have yet to receive the requested NLEB BA. Assuming the BA has been completed by the Forest Service, it should not need to be requested. BA's conducted by the Forest Service are considered public records and should be easily accessible by the public upon completion. This is especially important for the public to have all the necessary information to make informed comments and objections to projects, such as the Tarleton IRP. Furthermore, the NLEB BA for the proposed action should have been provided to USFWS for that agency to accurately review whether the proposed action would affect the NLEB. The BA is also necessary for USFWS to prepare an accurate BiOp. It is unclear whether the Forest Service has provided a NLEB BA to USFWS for review. What is clear is that the BA is not currently available to the public.

Furthermore, as indicated in Section 7 of the ESA, agencies may not engage in activity that results in the destruction or adverse modification of endangered and threatened species'

---

[278] 16 U.S.C. § 1536(a)(2).
[279] *Id.* at § 1536(c)(1).
[280] 50 C.F.R. § 402.12.
[281] 50 C.F.R. § 402.14.
[282] *Id.* at § 402.14(h).
[283] *Id.* at § 402.12(h)(2).
[284] *Id*. at § 1536(c)(1).
[285] E-mail from Suzanne Gifford, USFS Ecologist and Wildlife Biologist, to Zack Porter (April 10, 2023, 1:37 PM) (Exhibit 5).
[286] E-mail from Marry Stewart, Acting Regional FOIA Coordinator, to Zack Porter (April 10, 2023, 11:52am) (Exhibit 31).

habitat.[287] In blatant disregard of this obligation, the Forest Service concedes that in the Tarleton IRP area "roosts may be removed during timber harvests" and "foraging habitat may be impacted by project activities"[288] Therefore, the Project as-is would violate the ESA through destruction and adverse modification of endangered bat habitat.

### b. The Biological Evaluation for the Tarleton IRP Is Insufficient.

A Biological Evaluation is prepared in accordance with legal requirements set forth under Section 7 of the ESA,[289] and must be compliant with the Forest Service Manual,[290] the WMNF Plan,[291] and USDA Forest Service Standards and Guidelines.[292] The 2023 Biological Evaluation for the Tarleton IRP indicates that the NLEB was documented throughout the WMNF, roosting and foraging habitat exists within the action area, and individuals were captured in the area prior to the onset of white-nose syndrome.[293] The Methodology section of the Biological Evaluation for the Project indicates acoustic bat surveys were conducted at two sites in the action area by New Hampshire Fish and Game biologists in July 2019.[294] However, the Biological Evaluation fails to mention any results from these surveys. It does not appear that the Forest Service has attempted to conduct any additional surveys or capture efforts in the area for over three and a half years. For these reasons, information on the activity of NLEB in the Project area is not only scarce and inadequate, but also outdated. Additionally, the Tarleton IRP Biological Evaluation indicates that, "[t]here are no known hibernacula or roost trees within the action area, so there are no habitat features that would require a buffer from project activities."[295] Without any supporting data, studies, or evidence, this appears to be a conclusory statement, leaving the public wondering how the Forest Service came to this determination. Due to the recent and severe impacts on the species from threats such as white-nose syndrome, climate change, and habitat loss,[296] the Forest Service should conduct additional studies to determine the current status of the NLEB in the project area before taking any action.

The Biological Evaluation indicates that the Forest Service used the USFWS Information for Planning and Conservation ("IPaC") website to determine which federally-listed species may occur within the action area.[297] However, the Forest Service Tarleton IRP website fails to mention whether the Forest Service completed the Determination Key review process ("DKey")

---

[287] 16 U.S.C. § 1536(a)(2).
[288] Biological Evaluation at 10.
[289] 16 U.S.C. 1536(c).
[290] FSM 2672.42.
[291] WMNF Plan - Chapter 1.
[292] USDA Forest Service 2005a.
[293] Biological Evaluation at 9.
[294] Biological Evaluation at 6. The Biological Evaluation also mentions that the New Hampshire Fish and Game Department conducted an unsuccessful two-night capture effort in July 2019. *Id.* at 9. It is unclear whether this was the same effort as the acoustic survey.
[295] Biological Evaluation at 9.
[296] BiOp at 19.
[297] Biological Evaluation at 7.

under IPaC to evaluate the effects of the project on the NLEB. According to the Standing Analysis and Implementation Plan, "[t]ree removal could affect NLEBs by the loss and/or fragmentation of foraging and commuting habitat and the removal and loss of roost trees. Actions that implement the conservation measures for NLEBs will not result in a gap in forested habitat of greater than 1,000 feet or isolate habitat."[298] Additionally, "[t]ree removal projects proposed within the 3.0 miles of NLEB captures or detections, within 1.5 miles of known roosts, and within 5.0 miles of hibernacula will not be eligible for a predetermination of NLAA [Not Likely to Adversely Affect]." [299]

As previously mentioned, although the Forest Service indicates that there are no known hibernacula or roost trees within the action area, the Forest Service fails to provide any substantive data or studies to support this assertion. It is unclear what field studies or actions—if any—the Forest Service actually undertook to make this determination. The Forest Service must also consider roosts, hibernacula, or bat presence directly outside of the activity area that might fall within the USFWS DKey range requirements.

Furthermore, USFWS also indicates that only tree clearing projects up to *10 acres* are eligible for a predetermined outcome of Not Likely to Adversely Affect the NLEB.[300] Currently, the Biological Evaluation indicates the action may affect but is not likely to adversely affect the NLEB,[301] however, the Final EA asserts that clearcuts in the project area where all trees are removed in a stand will "create large openings (*greater than 10 acres but no more than 30 acres*)."[302] The Final EA estimates that a total of approximately 100 acres will undergo clearcut treatment in the Tarleton IRP area.[303] This proposed action clearly does not support a finding of Not Likely to Adversely Affect the NLEB as the Forest Service indicated in the Final EA and Biological Evaluation. The determination of Not Likely to Adversely Affect is inconsistent with the USFWS DKey requirements, and the Forest Service is required "to coordinate with the local USFWS Ecological Services Field Office and/or follow a supplemental consultation process." [304]

USFWS also provides an NLEB State-Specific Information Sources document[305] and advises government agencies to consult with the appropriate office to determine whether rare or listed species are located within a project area and may be affected by a proposed action. The Forest Service should consult with the New Hampshire Division of Forests & Lands ("NHB Data

---

[298] *Standing Analysis and Implementation Plan – Northern Long-Eared Bat Assisted Determination Key*, Version 1.1, USFWS (April 2023) at 19 (hereinafter "DKey") (Exhibit 37).
[299] DKey at 22 (Exhibit 37).
[300] DKey at 12, 22 (Exhibit 37).
[301] Biological Evaluation at 11.
[302] Final EA at 10.
[303] Final EA at 9.
[304] DKey at 5. (Exhibit 37).
[305] *Northern Long-Eared Bat: State-Specific Information Sources*, USFWS, https://www.fws.gov/sites/default/files/documents/Roost%20Tree%20and%20Hibernacula%20-%20State-Specific%20Data%20Links_2.pdf (last visited April 23, 2023) (Exhibit 32).

Check Tool")[306] to ensure that the proposed activities do not overlap with the required distances from NLEB hibernaculum, staging or swarming areas, recorded captures or acoustic detection locations, and roosts. In fact, the Forest Service should consult with the New Hampshire Division of Forests and Lands for *all* federally listed, proposed listed, and regional forester sensitive species within the project area. A consultation would provide additional species support assistance to the Forest Service and help ensure compliance with various statutes.

**c. The Forest Service Fails to Meet NFMA Requirements.**

The Forest Service fails to meet its obligations under NFMA as they relate to the NLEB and other TESP species. The Forest Service's NFMA implementing regulations outline forest plan ecosystem diversity and species protection requirements.[307] The statute states:

> The plan must include plan components, including standards or guidelines, to maintain or restore the diversity of ecosystems and habitat types throughout the plan area. In doing so, the plan must include plan components to maintain or restore . . . [r]are aquatic and terrestrial plant and animal communities[.][308]

Additional, species-specific NFMA plan components indicate that:

> The responsible official shall determine whether or not the plan components . . . provide the ecological conditions necessary to: contribute to the recovery[309] of federally listed threatened and endangered species, conserve proposed and candidate species, and maintain a viable population of each species of conservation concern within the plan area. If the responsible official determines that the plan components . . . are insufficient to provide such ecological conditions, then additional, species-specific plan components, including standards or guidelines, must be included in the plan to provide such ecological conditions in the plan area.[310]

The Forest Service's Biological Evaluation and the Project fail to meet these requirements for several reasons. First, the Biological Evaluation provides an incomplete project effects analysis on the species,[311] because it includes no discussion of how the Forest Service

---

[306] *NHB DataCheck Tool*, NH DIVISION OF FORESTS AND LANDS, https://www4.des.state.nh.us/NHB-DataCheck (last modified Feb. 28, 2022) (Exhibit 33).
[307] 36 C.F.R § 219.9.
[308] 36 C.F.R. § 219.9(a)(2).
[309] NFMA definition of "Recovery": "For the purposes of this subpart, and with respect to threatened or endangered species: *The improvement in the status of a listed species to the point at which listing as federally endangered or threatened is no longer appropriate*." *Id*. at § 219.19 (emphasis added).
[310] 36 C.F.R. § 219.9 (b)(1).
[311] Biological Evaluation at 9-10.

plans to maintain or restore the NLEB or other TESP species in the project area. The Forest Service admits to some negative short-term project effects on the NLEB, but then references conflicting scientific evidence to assert long-term benefits. For example, the Biological Evaluation suggests that some of the project activity outcomes (such as open habitat for foraging) may yield long-term benefits to the NLEB.[312] This suggestion is in direct conflict with other studies that describe preferred habitats for the NLEB.[313] Second, the Biological Evaluation fails to explain how the Project will contribute to the recovery of the NLEB to the point at which its listing as endangered is no longer necessary. Finally, the Biological Evaluation indicates the Project activities may indirectly impact the NLEB, but it does not include discussion of species-specific plan components to provide the required ecological conditions necessary for the bat's recovery. For these reasons, the Forest Service fails to meet its obligations under NFMA as they relate to the NLEB and other TESP species.

***Requested Remedy: The Forest Service should complete additional NEPA analysis to adequately address the impacts of the Project on the NLEB. This analysis should be done in an EIS, with additional consultation with USFWS under the ESA.***

**IV. The Project Is in Violation of NFMA.**

NFMA requires the Forest Service to develop and implement a Forest Plan for each unit of the National Forest System.[314] Projects in each forest must be consistent with their relevant Forest Plan[315] and reviewing courts must be able to reasonably ascertain the Forest Service's compliance with that Forest Plan.[316] The WMNF Plan is nearly 17 years old and beyond this glaring deficiency, the Project fails to meet numerous goals and objectives of the WMNF Plan.

The WMNF Plan requires the use of "the latest scientific knowledge to restore the land and forest where needed" and emphasizes a focus on "ecosystem viability within the context of New England."[317] NFMA constrains the Forest Service timber harvest in the National Forest System to situations where "cuts are consistent with the protection of soil and the regeneration of the timber resources."[318] As discussed in our comment on the Updated Draft EA, and in this objection at great length, the project fails to use the latest scientific knowledge to restore the

---

[312] Biological Evaluation at 10.
[313] *See*, *e.g.*, Species Status Assessment at 18-19 (explaining "most foraging occurs . . . under the canopy . . . on forested hillsides and ridges" which "coincides with data indicating that mature forests are an important habitat type for foraging NLEBs.". Furthermore, NLEBs "seem to prefer intact mixed-type forests . . . for forage and travel rather than fragmented habitat or areas that have been clear cut." (Exhibit 13).
[314] 16 U.S.C. §§ 1600–1614; 16 U.S.C. § 1604.
[315] *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1061-62 (9th Cir. 2002); *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 850 (9th Cir. 2013).
[316] *Native Ecosystems Council v. U.S. Forest Serv.,* 418 F.3d 953, 963 (9th Cir. 2005).

[317] WMNF Plan - Chapter 1 at 1-3.

[318] 16 U.S.C. § 1604(g)(3)(E)(i), (F)(v).

land. The Project ignores relevant scientific knowledge of healthy forests and their importance to building climate resilience. The proposed treatments are not appropriate methods to meet the objectives and requirements of the WMNF Plan considering the best available science. NFMA empowers responsible officials to "document how the best available scientific information was used" and "explain the basis for that determination,"[319] as high quality scientific analysis and public scrutiny are essential to NEPA implementation.[320] The Tarleton IRP does not use the best available science based on its failure to analyze and incorporate the conclusions of numerous recent studies on forest ecology, biodiversity, forest carbon, water quality, and more.

The Forest Service also fails to consider the project within the greater context of New England, and the importance of the project area's endangered habitat which provides for species protection and interconnectivity. The Project fails to contribute to the "conservation and recovery" of the NLEB and its habitat, as required by the WMNF Plan.[321] The Project will also contribute to air pollution, in opposition to the WMNF Plan goal to "protect or maintain air quality."[322]

The Project's top-down planning and failure to fully address deep public concerns offends the premise of the WMNF Plan that project-specific decisions would reflect particularized public feedback. During the 2005 WMNF Forest Plan revision, the public requested a management plan for the Lake Tarleton area. In response, the Forest Service stated:

> The White Mountain Forest Plan revision does not include a level of detail that specifies separate management plans for local areas such as Lake Tarleton. The Forest Plan identifies the general purpose and desired land conditions for each management area and allows projects and activities to be planned on a case-by-case basis.[323]

No management plan for the Lake Tarleton Area was ever created. The Forest Service instead implored that "[p]ublic participation will be an important part of the process we use for making site-specific management decisions."[324] The Forest Service has continued to discourage public efforts to sustain the natural and cultural resources of the Lake Tarleton area by severely limiting public participation in this Project.

***Requested Remedy*: *The Forest Service must ensure the Tarleton IRP complies with the WMNF Plan. The Forest Service should update the WMNF Plan, as required under NFMA.***

[319] 36 C.F.R § 219.3 (2017).
[320] 40 C.F.R. § 1500.1(b).
[321] WMNF Plan - Chapter 1 at 1-8.
[322] *Id.* at 1-3.
[323] WMNF Plan - Final EIS - Appendix A at A-234.

[324] WMNF Plan - Final EIS - Appendix A at A-234.

## CONCLUSION

For the foregoing reasons, we object to the Tarleton IRP. The Forest Service should implement our suggested Alternative #3. This alternative would improve recreation resources, habitat restoration, and designate the land as a protected Scenic Area through a Forest Plan amendment—as the public intended when the land was acquired by the WMNF over 20 years ago. Alternatively, to cure the manifest errors in the Final EA and FONSI, and given the significance of this Project, the Forest Service should prepare an EIS to adequately evaluate the significant impacts posed by the Tarleton IRP. The Forest Service should also update the WMNF Plan as required under NFMA to clarify and protect the outstanding resource value of the Lake Tarleton area. We look forward to hearing from you to discuss the issues raised in this objection.

Respectfully submitted,

STANDING TREES
By its attorneys:

Sarah Christopherson
Isabella Pardales
*Student Attorneys*

Christophe Courchesne
*Senior Attorney*

Environmental Advocacy Clinic
Vermont Law & Graduate School
PO Box 96, 164 Chelsea Street
South Royalton, VT 05068
(802) 831-1627 (direct)
(802) 831-1631 (fax)
ccourchesne@vermontlaw.edu

THE LAKE TARLETON COALITION

AND

OTHER INDIVIDUAL OBJECTORS NAMED ABOVE

## Table of Exhibits

| Number | Exhibit Title |
|---|---|
| 1 | E-mail from Brooke Brown, Pemigewasset District Ranger, to Rob Wipfler (March 30, 2023, 9:07 AM) |
| 2 | E-mail from Isabella Pardales to Region 9 FOIA Coordinator (March 2, 2023, 8:01 AM) |
| 3 | E-mail from Marry Stewart, Acting Regional FOIA Coordinator, to Isabella Pardales (March 23, 2023, 10:15 AM) |
| 4 | Letter from Derek Ibarguen, WMNF Forest Supervisor, to Rob Wipfler (April 12, 2023) |
| 5 | E-mail from Suzanne Gifford, USFS Ecologist and Wildlife Biologist, to Zack Porter (April 10, 2023, 1:37 PM) |
| 6 | Standing Trees, *Categorization of Lake Tarleton Comments* (July 2022) |
| 7 | Tarleton Second 30-Day Comment Period Concern Responses, U.S. FOREST SERVICE (Sept. 5, 2022) |
| 8 | CopyofTarletonLongFormPDFRTCDRAFT Working, U.S. FOREST SERVICE (Apr. 14, 2023) |
| 9 | *Santa Fe Mountains Landscape Resiliency Project: Draft Environmental Assessment Public Comment Period Content Analysis and Response*, U.S. FOREST SERVICE 1 (2021) https://drive.google.com/file/d/1z6lid22zC8WZvVzkpUtNANVsnuh-0wKm/view |
| 10 | Comment Letter from Standing Trees & Lake Tarleton Coalition to Brooke M. Brown, Pemigewasset District Ranger (May 11, 2022) |
| 11 | Letter from The Lake Tarleton Coalition to Brooke M. Brown, Pemigewasset District Ranger (July 20, 2022) |
| 12 | Lake Tarleton and WMNF Petition -With List of Signers (Feb. 8, 2022) |
| 13 | *Species Status Assessment for the Northern long-eared bat (Myotis septentrionalis) Version 1.2*, USFWS (Aug. 2022) https://www.fws.gov/media/species-status-assessment-report-northern-long-eared-bat. |
| 14 | COUNCIL ON ENVIRONMENTAL QUALITY, *National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change*, 88 Fed. Reg. 1196 (Jan 9, 2023) |
| 15 | *Water Quality Assessment and TMDLs*, N.H. DEP'T. ENV'T. SERVS. https://www.des.nh.gov/water/rivers-and-lakes/water-quality-assessment (last visited Apr. 23, 2023) |
| 16 | *Volunteer Lake Assessment Program Individual Lake Reports*, N.H. DEP'T. ENV'T. SERVS. https://www.des.nh.gov/sites/g/files/ehbemt341/files/documents/2021-tarleton-piermont.pdf |
| 17 | *New Hampshire's 2020-2022 303(d) List*. U.S. EPA, https://www.epa.gov/system/files/documents/2022-03/2020-2022-nh-303d-list.pdf (last updated Mar. 1, 2023). |

| | |
|---|---|
| 18 | Photo: Canoeing on Lake Tarleton (Zack Porter) |
| 19 | Photo: Lake Tarleton parking area in wintertime (Elaine Felatra) |
| 20 | Photo: Recreation activities on Lake Tarleton in wintertime (Elaine Felatra) |
| 21 | Photo: Sunset from Piermont Mountain with Lake Tarleton in foreground (Rob/Mike Wipfler) |
| 22 | Kellett et. al., *Forest-clearing to Create Early-successional Habitats: Questionable Benefits, Significant Costs,* FRONTIERS FOR GLOB. CHANGE 1 (Jan. 9, 2023) |
| 23 | Gabriel Popkin, *Forest Fight*, 374 SCIENCE 1184 (Dec. 3, 2021) |
| 24 | Simard et. al., *Net Transfer of Carbon Between Ectomycorrhizal Tree Species in the Field*, 388 NATURE 579 (Aug. 7, 1997) |
| 25 | Lake Tarleton HMU Stand YOO (March 28, 2019) |
| 26 | Letter from Chris French, USFS Deputy Chief, to Regional Foresters (Apr. 18, 2023). |
| 27 | WMNF U.S. Forest Service Logging Projects Map |
| 28 | E-mail from Brooke Brown, Pemigewasset District Ranger, to Rob Wipfler (Apr. 24, 2023, 3:50 PM) |
| 29 | Endangered and Threatened Wildlife and Plants; Endangered Species Status for Northern Long-Eared Bat, 87 Fed. Reg. 73,488-504 (Nov. 30, 2022), https://www.govinfo.gov/content/pkg/FR-2022-11-30/pdf/2022-25998.pdf. |
| 30 | Endangered and Threatened Wildlife and Plants; Endangered Species Status for Northern Long-Eared Bat; Delay of Effective Date, 88 Fed. Reg. 4,908-10 (Jan. 26, 2023), https://www.govinfo.gov/content/pkg/FR-2023-01-26/pdf/2023-01656.pdf. |
| 31 | E-mail from Marry Stewart, Acting Regional FOIA Coordinator, to Zack Porter (April 10, 2023, 11:52am) |
| 32 | *Northern Long-Eared Bat: State-Specific Information Sources*, USFWS, https://www.fws.gov/sites/default/files/documents/Roost%20Tree%20and%20Hibernacula%20-%20State-Specific%20Data%20Links_2.pdf |
| 33 | *NHB DataCheck Tool*, NH DIVISION OF FORESTS AND LANDS, https://www4.des.state.nh.us/NHB-DataCheck (last modified Feb. 28, 2022) |
| 34 | Trust for Public Land, *Residents Celebrate Protection of Lake Tarleton (NH)* (Aug. 23, 2000) https://www.tpl.org/media-room/residents-celebrate-protection-lake-tarleton-nh#:~:text=Warren%2C%20New%20Hampshire%3A%20Today%20U.S.,Warren%2C%20Piermont%2C%20and%20Benton. |
| 35 | MATURE AND OLD-GROWTH FORESTS: DEFINITION, IDENTIFICATION, AND INITIAL INVENTORY ON LANDS MANAGED BY THE FOREST SERVICE AND BUREAU OF LAND MANAGEMENT, U.S. DEP'T OF AGRIC. 1 (Apr. 2023) |
| 36 | Letter from Chris French, USFS Deputy Chief, re: Advance Notice of Proposed Rulemaking (Apr. 21, 2023) |
| 37 | *Standing Analysis and Implementation Plan – Northern Long-Eared Bat Assisted Determination Key*, Version 1.1, USFWS (April 2023) |

# Project-level carbon assessment for the White Mountain National Forest: Tarleton Integrated Resource Project

## 1.1 Carbon and Greenhouse gas emissions

Forests play a significant role in the global carbon cycle by storing about 1.4 billion metric tons every year. In addition, forests worldwide store over one trillion metric tons of carbon in plants and soil. Forestry has gained attention in recent decades because of its potential to influence the exchange of carbon with the atmosphere, either by increasing storage or releasing carbon emissions. Forests can take up and store atmospheric carbon through photosynthesis and release carbon through mortality, plant respiration, microbial decay, fire, and use of wood fiber. Forests can store carbon in soils and plant material as well as in harvested wood products that store carbon outside of the forest ecosystem. In addition, wood fiber can be used to substitute for products that are more energy-intensive to produce, such as concrete and steel, creating a substitution effect which can result in lower overall greenhouse gas emissions.

A complete and quantitative assessment of forest carbon stocks and the factors that influence carbon trends (management activities, disturbances, and environmental factors) for the White Mountain National Forest is available in the project record (Dugan et al. 2019). This carbon assessment contains additional supporting information as well as references for this proposed action.

### 1.1.1 Affected Environment

The carbon legacy of the White Mountain National Forest is tied to the history of Euro-American settlement, land management, and disturbances. As the first region to be widely settled in the United States, eastern forests have had a long history of intensive harvesting and conversion of forests to agriculture. Historical disturbance dynamics, forest regrowth and recovery, and forest aging have been most responsible in driving carbon accumulation trends since 1950. Forest carbon stocks in the White Mountain National Forest increased by about 22 percent between 1990 and 2013, which suggests that the National Forest is maintaining a carbon sink (USDA Forest Service, 2015). Any negative effects on carbon stocks caused by disturbances and environmental conditions appear to have been modest and exceeded by forest growth (Dugan et al. 2019).

According to satellite imagery, timber harvesting was the dominant disturbance type on the White Mountain National Forest from 1990 to 2011, although harvesting during this time affected no more than 0.3 percent of the forested area in any given year (USDA Forest Service, in review). During this period, about 2.3 percent of the forested area experienced some level of harvest including even-aged (clearcut, seed tree, shelterwood, and thinning) and uneven-aged (individual and group selection) treatments. Carbon removals from the forest ecosystem associated with harvests have been relatively small compared to the total amount of carbon stored in the forest, with removals from the ecosystem from 1990 to 2011 equivalent to about 1 percent of non-soil carbon stocks (USDA Forest Service, in review). However, these estimates represent an upper bound, because they do not account for continued storage of harvested carbon in wood products or the effect of substitution.

## 1.1.2 Direct, Indirect and Cumulative Effects of Alternative B (*Assuming Alt A is "no-action"*)

The proposed timber project would be conducted on approximately 1230 acres. This scope and degree of change would be minor, affecting a maximum of 0.1 percent of the approximately 800,000 acres of forested land in the White Mountain National Forest. In addition, the effect of the proposed action focuses on aboveground carbon stocks that is stored in live woody vegetation which comprises about 35 percent of the total ecosystem carbon stocks of the White Mountain National Forest (USDA Forest Service 2015). About 39 percent or more of the ecosystem carbon is in the soils, a very stable and long-lived carbon pool (McKinley et al. 2011, USDA Forest Service 2015, Domke et al. 2017)

Climate change is a global phenomenon, because major greenhouse gasses (GHGs)[1] mix well throughout the planet's lower atmosphere (IPCC 2013). Considering emissions of GHGs in 2010 was estimated at 13,336 ± 1,227 teragrams[2] carbon globally (IPCC 2014) and 1,881 teragrams carbon nationally (US EPA, 2015), the Wanosha IRP makes an extremely small contribution to overall emissions. Because local GHGs emissions mix readily into the global pool of GHGs, it is difficult and highly uncertain to ascertain the indirect effects of emissions from single or multiple projects of this size on global climate. Therefore, at the global and national scales, this proposed action's direct and indirect contribution to GHGs and climate change would be negligible. In addition, because the direct and indirect effects would be negligible, the proposed action's contribution to cumulative effects on global GHGs and climate change would also be negligible. Lastly, carbon emissions during the implementation of the proposed action would have only a momentary influence on atmospheric carbon concentrations, because carbon will be removed from the atmosphere with time as the forest regrows, further minimizing or mitigating any potential cumulative effects.

The Fifth Assessment Report of the Intergovernmental Panel on Climate Change (IPCC) summarized the contributions of global human activity sectors to climate change (IPCC 2014). From 2000 to 2009, forestry and other land uses contributed just 12 percent of the human-caused global $CO_2$ emissions[3]. The forestry sector's contribution to GHG emissions has declined over the last decade (IPCC 2014, Smith et al. 2014, FAOSTAT 2013). The largest source of GHG emissions in the forestry sector globally is deforestation (Pan et al. 2011, Houghton et al. 2012, IPCC 2014), which is defined as the removal of all trees to convert forested land to other land uses that do not support trees or allow trees to regrow for an indefinite period of time (IPCC 2000) (e.g., conversion of forest land to agricultural or developed landscapes). However, forest land in the United States has had a net increase since the year 2000, and this trend is expected to continue for at least another decade (Wear et al. 2013, USDA Forest Service 2016). In addition, estimates of forested area on the White Mountain National forest have increased since 1990 (USDA Forest Service 2015).

The proposed activities in the Tarleton IRP are not considered a major source of GHG emissions. Forested land will not be converted into a developed or agricultural condition or otherwise result in the loss of forested area. In fact, forest stands are being retained and thinned and/or regenerated to maintain a

---

[1] Major greenhouse gases released as a result of human activity include carbon dioxide ($CO_2$), methane, nitrous oxide, hydrofluorocarbons, and perfluorocarbons.

[2] This report uses carbon mass, not carbon dioxide (CO2) mass, because carbon is a standard unit and can easily be converted to any other unit. To convert carbon mass to CO2 mass, multiply by 3.67 to account for the mass of the oxygen (O2).

[3] Fluxes from forestry and other land use (FOLU) activities are dominated by $CO_2$ emissions. Non-$CO_2$ greenhouse gas emissions from FOLU are small and mostly due to peat degradation releasing methane and were not included in this estimate.

vigorous condition that supports enhanced tree growth and productivity, thus contributing to long-term carbon uptake and storage. In 2010, forests in the United States removed about 757 megatonnes[4] of $CO_2$ from the atmosphere after accounting for natural emissions (e.g., wildfire and decomposition) (US EPA 2015).

Some assessments suggest that the effects of climate change in some United States forests may cause shifts in forest composition and productivity or prevent forests from fully recovering after severe disturbance (Anderson-Teixeira et al. 2013), thus impeding their ability to take up and store carbon[5] and retain other ecosystem functions and services. Climate change is likely already increasing the frequency and extent of droughts, fires, and insect outbreaks, which can influence forest carbon cycling (Kurz et al. 2009, Allen et al. 2010, Joyce et al. 2014, Vose et al. 2018). In fact, reducing stand density, one of the goals of this proposed action, is consistent with adaptation practices to increase resilience of forests to climate-related environmental changes (Joyce et al. 2014). This proposed action is consistent with options proposed by the IPCC for minimizing the impacts of climate change on forests, thus meeting objectives for both adapting to climate change and mitigating GHG emissions (McKinley et al. 2011).

Forests have a “boom and bust” cycle with respect to carbon, as forests establish and grow, experience mortality with age or disturbances, and regrow over time. Forest management activities such as harvests and hazardous fuels reduction have characteristics similar to disturbances that reduce stand density and promote regrowth through thinning and removal, making stands and carbon stores more resilient to environmental change (McKinley et al. 2011, Swanston et al. 2016). The relatively small quantity of carbon released to the atmosphere and the short-term nature of the effect of the proposed action on the forest ecosystem are justified, given the overall change in condition increases the resistance to wildfire, drought, insects and disease, or a combination of disturbance types that can reduce carbon storage and alter ecosystem functions (Millar et al. 2007, Amato et al. 2011). Furthermore, any initial carbon emissions from this proposed action will be balanced and possibly eliminated as the stand recovers and regenerates, because the remaining trees and newly established trees typically have higher rates of growth and carbon storage (Hurteau and North 2009, Dwyer et al. 2010, McKinley et al. 2011).

In the absence of forest harvest, the forest where this proposed action would take place will thin naturally from mortality-inducing natural disturbances and other processes resulting in dead trees that will decay over time, emitting carbon to the atmosphere. Conversely, the wood and fiber removed from the forest in this proposed action will be transferred to the wood products sector for a variety of uses, each of which has different effects on carbon (Skog et al. 2014). Carbon can be stored in wood products for a variable length of time, depending on the commodity produced. It can also be burned to produce heat or electrical energy, or converted to liquid transportation fuels and chemicals that would otherwise come from fossil fuels. In addition, a substitution effect occurs when wood products are used in place of other products that emit more GHGs in manufacturing, such as concrete and steel (Gustavasson et al. 2006, Lippke et al. 2011, McKinley et al. 2011). In fact, removing carbon from forests for human use can result in a lower net contribution of GHGs to the atmosphere than if the forest were not managed (McKinley et al. 2011, Bergman et al. 2014, Skog et al. 2014). The IPCC recognizes wood and fiber as a renewable resource that can provide lasting climate-related mitigation benefits that can increase over time with active management (IPCC 2000). Furthermore, by reducing stand density, the proposed action may also reduce the risk of more severe disturbances, such as insect and disease outbreak and severe wildfires, which may result in lower forest carbon stocks and greater GHG emissions. The prescribed treatments also enhance the diversity of tree species, ages, and structures that are present in forest ecosystems, and this diversity

[4] A megatonne is one million metric tons; equal to about 2.2 billion pounds.
[5] The term “carbon” is used in this context to refer to carbon dioxide.

can increase the ability of forests to withstand increasing pressures from climate change and other stressors.

In summary, this proposed project affects a relatively small amount of forest land and carbon on the White Mountain National Forest and, in the near-term, might contribute an extremely small quantity of GHG emissions relative to national and global emissions. This proposed action will not convert forest land to other non-forest uses, thus allowing any carbon initially emitted from the proposed action to have a temporary influence on atmospheric GHG concentrations, because carbon will be removed from the atmosphere over time as the forest regrows. If harvesting: Furthermore, the proposed project will transfer carbon in the harvested wood to the product sector, where it may be stored for up to several decades and substitute for more emission intensive materials or fuels. This proposed action is consistent with internationally recognized climate change adaptation and mitigation practices.

### 1.1.3 References

Addington, R.N., S.J. Hudson, J.K. Hiers, M.D. Hurteau, T.F. Hutcherson, G. Matusick, and J.M. Parker. 2015. Relationships among wildfire, prescribed fire, and drought in a fire-prone landscape in the south-eastern United States. International Journal of Wildland Fire 24: 778-783.

Agee, J.K. 1998. The landscape ecology of Western forest fire regimes. Northwest Science. 72(Spec. issue): 24–34.

Agee, J. K. and C.N. Skinner. 2005. Basic principles of forest fuel reduction treatments. Forest Ecology and Management 211: 83–96.

Anderson-Teixeira, K.J., A.D. Miller, J.E. Mohan, T.W. Hudiburg, B.D. Duval, and E.H. DeLucia. 2013. Altered dynamics of forest recovery under a changing climate. Global Change Biology 19: 2001–2021.

Allen, C.D., A.K. Macalady, H. Chenchouni, D. Bachelet, N. McDowell, M. Vennetier, and N. Cobb. 2010. A global overview of drought and heat-induced tree mortality reveals emerging climate change risks for forests. Forest Ecology and Management 259: 660–684.

Bergman, R., M.E. Puettman, A. Taylor, and K.E. Skog. 2014. The carbon impacts of wood products. Forest Products Journal 64: 220-231.

Carter, M.C. and C.D. Foster. 2004. Prescribed burning and productivity in southern pine forests: a review. Forest Ecology and management 191: 93–109.

D'Amato, A.W., J.B. Bradford, S. Fraver, and B.J. Palik. 2011. Forest management for mitigation and adaptation to climate change: Insights from long-term silviculture experiments. Forest Ecology and Management 262: 803–816.

Domke, G.M., C.H. Perry, B.F. Walters, L.E. Nave, C.W. Woodall, and C.W. Swanston. 2017. Toward inventory-based estimates of soil organic carbon in forests of the United States. Ecological Applications 27: 1223-1235.

Dugan A, M. Janowiak, and D. McKinley. 2018. Forest carbon assessment for the White Mountain National Forest. March 12, 2019. Report on file at the White Mountain National Forest Supervisor's Office.

Dwyer, J.M., R. Fensham, and Y.M. Buckley. 2010. Restoration thinning accelerates structural development and carbon sequestration in an endangered Australian ecosystem. Journal of Applied Ecology 47: 681–691.

FAOSTAT. 2013. FAOSTAT database. Food and Agriculture Organization of the United Nations, available at http://faostat.fao.org/.

Fowler, C. and E. Konopik. 2007. The history of fire in the southern United States. Human Ecology Review 14: 165-176.

Gustavsson, L., R. Madlener, H.F. Hoen, G. Jungmeier, T. Karjalainen, S. Klöhn, et al. 2006. The role of wood material for greenhouse gas mitigation. Mitigation and Adaptation Strategies for Global Change 11: 1097–1127.

Haffey, C., T.D. Sisk, C.D. Allen, A.E. Thode, and E. Margolis. 2018. Limits to ponderosa pine regeneration following large high-severity forest fires in the United States Southwest. Fire Ecology 14: 143-163.

Houghton, R.A., J.I. House, J. Pongratz, G.R. van der Werf, R.S. DeFries, M.C. Hansen, et al. M.C. 2012. Carbon emissions from land use and land-cover change. Biogeosciences 9: 5125–5142.

Hurteau, M. and M. North. 2009. Fuel treatment effects on tree-based forest carbon storage and emissions under modeled wildfire scenarios. Frontiers in Ecology and the Environment 7: 409-414.

IPCC, 2013. Climate Change 2013: The Physical Science Basis. Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change. Stocker, T.F., D. Qin, G.-K. Plattner, M. Tignor, S.K. Allen, J. Boschung, A. Nauels, Y. Xia, V. Bex and P.M. Midgley (eds.). Cambridge University Press, Cambridge, United Kingdom and New York, NY, USA, 1535 pp. http://www.ipcc.ch/report/ar5/wg1/

IPCC, 2014: Climate Change 2014: Synthesis Report. Contribution of Working Groups I, II and III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change [Core Writing Team, R.K. Pachauri and L.A. Meyer (eds.)]. IPCC, Geneva, Switzerland, 151

IPCC 2000. Intergovernmental Panel on Climate Change (IPCC), Special Report on Land Use, Land Use Change and Forestry, Summary for Policy Makers, 2000. IPCC, Geneva, Switzerland. 20 pp.

Vose, J.M., D.L. Peterson, G.M. Domke, C.J. Fettig, L.A. Joyce, R.E. Keane, C.H. Luce, J.P. Prestemon, L.E. Band, J.S. Clark, N.E. Cooley, A. D'Amato, and J.E. Halofsky, 2018: Forests. In *Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II* [Reidmiller, D.R., C.W. Avery, D.R. Easterling, K.E. Kunkel, K.L.M. Lewis, T.K. Maycock, and B.C. Stewart (eds.)]. U.S. Global Change Research Program, Washington, DC, USA, pp. 223–258. doi: 10.7930/NCA4.2018.CH6

Kurz, W.A., C.C. Dymond, G. Stinson, G.J. Rampley, E.T. Neilson, A.L. Carroll, T. Ebata, and L. Safranyik. 2008. Mountain pine beetle and forest carbon feedback to climate change. Nature 452: 987–990.

Lippke, B., E. Oneil, R. Harrison, K. Skog, L. Gustavsson, and R. Sathre. 2011. Life cycle impacts of forest management and wood utilization on carbon mitigation: knowns and unknowns. Carbon Management 2:303-333.

McKinley, D.C., M.G. Ryan, R.A. Birdsey, C.P. Giardina, M.E. Harmon, L.S. Heath, et al. 2011. A synthesis of current knowledge on forests and carbon storage in the United States. Ecological Applications 21: 1902-1924.

Millar, C.I., N.L. Stephenson, S.L. Stephens. 2007. Climate change and forests of the future: Managing in the face of uncertainty. Ecological Applications 17: 2145-2151.

Pan, Y., R.A. Birdsey, J. Fang, R. Houghton, P.E. Kauppi, W.A. Kurz, O.L. Phillips, et al. 2011. A large and persistent carbon sink in the world's forests. Science 333: 988–993.

Roccaforte J.P., P.Z. Fule, W.W. Chancellor, and D.C. Laughlin. 2012. Woody debris and tree regeneration dynamics following severe wildfires in Arizona ponderosa pine forests. Canadian Journal of Forest Research 42: 593–604.

Skog, K.E., D.C. McKinley, R.A. Birdsey, S.J. Hines, C.W. Woodall, E.D. Reinhardt, and J.M. Vose. 2014. Chapter 7: Managing Carbon. In: Climate Change and United States Forests, Advances in Global Change Research 57, pp. 151-182.

Smith P., M. Bustamante, H. Ahammad, H. Clark, H. Dong, E.A. Elsiddig, H. Haberl, et al. 2014. Agriculture, Forestry and Other Land Use (AFOLU). In: Climate Change 2014: Mitigation of Climate Change. Contribution of Working Group III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change [Edenhofer, O., R. Pichs-Madruga, Y. Sokona, et al. (eds.)]. Cambridge University Press, Cambridge, United Kingdom and New York, NY, USA. 121 pp.

Stephens, S. L., J.K. Agee, P.Z. Fulé, M.P. North, W.H. Romme, T.W. Swetnam, and M.G. Turner. 2013. Managing Forests and Fire in Changing Climates. Science 342: 41–42.

Swanston, C.W., M.K Janowiak, L.A. Brandt, P.R. Butler, S.D. Handler, P.D. Shannon, A.D. Lewis, K. Hall, R.T. Fahey, L. Scott, A. Kerber, L.R. Parker, and M. St. Pierre. 2016. Forest adaptation resources: climate change tools and approaches for land managers. Gen. Tech. Rep. NRS-GTR-87-2. Newtown Square, PA: US Department of Agriculture, Forest Service, Northern Research Station. 161 p.

USDA Forest Service. 2015. Baseline estimates of carbon stocks in forests and harvested wood products for National Forest System Units, Southern Region. 45 pp

USDA Forest Service. 2016. Future of America's forests and rangelands: update to the 2010 Resources Planning Act Assessment. General Technical Report WO-GTR-94. Washington, DC. 250 p.

USDA Forest Service. In review. Assessment of the influence of disturbance, management activities, and environmental factors on carbon stocks, Southern Region. 90 pp.

US EPA. 2015. US inventory of greenhouse gas emissions and sinks: 1990 – 2013. Executive Summary. EPA 430-R15-004 United States Environmental Protection Agency. Washington, D.C. 27 pp.

Vose, J.M., D.L. Peterson, G.M. Domke, C.J. Fettig, L.A. Joyce, R.E. Keane, C.H. Luce, J.P. Prestemon, L.E. Band, J.S. Clark, N.E. Cooley, A. D'Amato, and J.E. Halofsky, 2018: Forests. In Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II [Reidmiller, D.R., C.W. Avery, D.R. Easterling, K.E. Kunkel, K.L.M. Lewis, T.K. Maycock, and B.C. Stewart (eds.)]. U.S. Global Change Research Program, Washington, DC, USA.

Waldrop, T. A. and S.L. Goodrick. 2012. Introduction to prescribed fires in Southern ecosystems. Science Update SRS-054.Asheville, NC: U.S. Department of Agriculture Forest Service, Southern Research Station.80 p.

Wear, D.N., R. Huggett, R. Li, B. Perryman, and S. Liu. 2013. Forecasts of forest conditions in regions of the United States under future scenarios: A technical document supporting the Forest Service 2010 RPA Assessment. US Department of Agriculture Forest Service, General Technical Report SRS-170.

Westerling, A.L., H.G. Hidalgo, D.R. Cayan, and T.W. Swetnam. 2006. Warming and Earlier Spring Increase Western U.S. Forest Wildfire Activity. *Science* 313: 940–43.

Wiedinbyer, C. and M.D. Hurteau. 2010. Prescribed fire as a means of reducing forest carbon emissions in the western United States. Environmental Science and Technology 44: 1926-1932.

| Project Name | Location | Project Status | Description | Timeframe for Analysis |
|---|---|---|---|---|
| Private Timber cuts | Private residences in Warren and Piermont, NH | Completed and Ongoing | Timber harvest on non-FS lands | Past, Present, Reasonably Foreseeable |
| Bowen Brook IRP | Landaff and Easton, NH | Ongoing | Timber harvest on FS lands | Past, Present, Reasonably Foreseeable |
| Pemi Northwest IRP | Benton and Easton, NH | Ongoing | Timber harvest on FS lands | Past, Present, Reasonably Foreseeable |
| Wanosha IRP | Thornton | Ongoing | Timber harvest on FS lands | Past, Present, Reasonably Foreseeable |

| UniqueID | Watershed Name | Watershed Scale | Watershed Acres | Basal Area Removal (%) | Notes |
|---|---|---|---|---|---|
| 1 | Unnamed | HUC-16 1st order | 761 | 6.8 | |
| 2 | Unnamed | HUC-16 1st order | 510 | 1.2 | |
| 3 | Unnamed | HUC-16 1st order | 849 | 0.1 | |
| 4 | Unnamed | HUC-16 1st order | 568 | 0.05 | |
| 5 | Unnamed | HUC-16 1st order | 376 | 11.4 | |
| 6 | Unnamed | HUC-16 1st order | 487 | 4.3 | |
| 7 | Unnamed | HUC-16 1st order | 924 | 11.6 | |
| 8 | Unnamed | HUC-16 1st order | 206 | 9.0 | |
| 9 | Unnamed | HUC-16 1st order | 420 | 0.06 | |
| 10 | Unnamed | HUC-16 1st order | 241 | 15.5 | All proposed treatments in this watershed are uneven-aged |
| 11 | Lake Tarleton | HUC-14 | 4570 | 4.2 | |
| 12 | Eastman Brook | HUC-12 | 13403 | 2.4 | |

# Recreation

## Affected Environment

Recreation impacts are considered in the context of the affected local community and the influx of visitors to the area seeking to enjoy recreational activities. The local community in the project area includes the year-round residents in the towns of Warren and Piermont and the seasonal residents who occupy second homes or camps that are scattered throughout the project area. Recreational activities in the area include hiking, dispersed camping, hunting, fishing, boating including kayaking and canoeing, driving for pleasure, snowmobiling, backcountry Nordic skiing, snowshoeing and mountain biking.

## Environmental Impacts

### No Action Alternative

Under the No Action Alternative, no project activities would be implemented. Therefore, no changes would occur to recreation activities in the project area.

### Proposed Action

The WMNF Forest Plan identifies the goal to manage the recreation program to provide a range of quality recreation activities and opportunities. Furthermore, the purpose of this goal is to minimize increased development activities in the backcountry and to protect and manage high and low use areas and facilities (Forest Plan, p. 1-10). The proposed action includes one recreation project to create a developed site at what is now a user-created boat launch parking area on Lake Katherine. This project will involve designing a parking area to meet FS standards for layout and drainage with intent of having a capacity of up to 6 vehicles with a turn-around space. The proposal is to have a gravel or concrete parking area which is delimited with vehicle barriers (embedded rocks or curbs) to contain motorized traffic, up to two picnic tables, an informational kiosk, site sign and to add this site to the Forest's inventory of recreation sites to be managed as such in the future. This site will not have a trailer type boat launch in the proposed action and the intent is to provide lake access for hand-launched watercraft. The shoreline at the launch site can be hardened with rip-rap as needed to control erosion. The State of NH regulates the type of watercraft allowed and for Lake Katherine:

> **Katherine, Lake** - Piermont
> RSA 270:122 - No person shall use or operate a boat equipped with any type of petroleum-powered motor in excess of 5 HP on Lake Katherine in Piermont. (https://www.nh.gov/safety/divisions/nhsp/fob/marine-patrol/restricted.html)

This site will be designed for non-winter, non-motorized watercraft use and the public should not expect the lot to be plowed for snow removal in the winter. This proposal will focus addressing the non-winter users, although we recognize there are winter users who have used this access point for launching bob houses for ice-fishing and that use will continue to be allowed.

The effects of the Lake Katherine boat launch parking area proposal could result in increased use at the site after the project is completed due to increased visibility and recording as WMNF recreation site. The extent of increase is difficult to anticipate, however the increase in recreational kayaking and stand-up paddle boarding in recent years, combined with the predominantly non-motorized boat use on Lake Katherine, could increase the popularity of the Lake for people seeking this activity.

> *"In terms of specific paddlesports, recreational kayaking continues to grow in popularity and seems to be replacing many Americans' desires to canoe. Stand up paddling, on the other hand, doesn't have nearly as high a participation rate as either canoeing or recreational kayaking,*

*but its popularity has soared in recent years, gaining 1.5 million participants since 2013."(2019 SPECIAL REPORT ON PADDLESPORTS & SAFETY BY THE OUTDOOR FOUNDATION)*

The area for the Lake Katherine boat launch parking area is classified in the Recreation Opportunity Spectrum (ROS) as Roaded Natural which helps inform managers what the user's experience should be in order to consistent with the spectrum of recreational settings within the Forest. In terms of access, Roaded Natural allows for full motorized access to the site as a norm for this area. The ROS attribute of remoteness is of little relevance and facilities and site management allows for some facilities designed for primarily for user comfort and convenience. Roaded Natural also sets the norm for the user expectation for social encounters to be moderate to high at developed sites. The norm for visitor impacts allows for subtle site hardening and the norm for visitor management allows for regimentation and controls that are obvious and numerous but harmonize with the surrounding area. In conclusion, the proposed Lake Katherine boat launch parking area project complies with the WMNF Forest Plan prescribed ROS of Roaded Natural in terms of how it could affect the user's experience.

One of the most notable recreation activities in the project area is the presence of 2.59 miles of the Appalachian National Scenic Trail (AT). While no recreation projects are proposed for the AT, there is a considerable amount of timber harvest proposed in the Trail's proximity, which will affect the AT user's experience. If the user is present during timber harvesting activities, they will be exposed to noise, smell and in some areas, sights of the operations or their aftereffects. The effects of harvesting on scenery is addressed in a separate visual analysis and will not be discussed in this report. Timber harvesting is proposed for winter only harvesting when the number of trail users is considerably less than non-winter seasons. The number of registered AT thru hikers have been recorded at the southern end of the AT and provide some indication of the pattern of the number of users throughout the year.

Registered Appalachian Trail Users by Month*
1200
1000
800
600
400
200
0
Jan
Feb
Mar
Apr
May
Jun
Jul
Aug
Sep
Oct
Nov
Dec
2015
2016
2017
2018
2019

*Source: Headquarters, Appalachian Trail Conservancy

It is worth noting that the chart above only represents registered AT hikers at Harpers Ferry, WV and is therefore not an accurate count of AT hikers in NH. Northbound hikers would likely arrive in NH two months later than the months shown in the chart and southbound hikers one- and one-half months

earlier. On average, for the years concerned, 89% of registered thru hikers were northbound hikers; not surprising given the weather changes throughout the summer. The results are however indicative of the amount of use in the months of concern for this analysis, which are typically December through February when winter timber harvesting would normally occur. In summary, the number of winter users of the Lake Tarleton project area's section of the AT is very low.

The proposed harvest units vary in distance from the AT from 560 feet to 2,332 feet with the closest segment located in the former Sentinel Mountain State Forest on the AT corridor in Warren. This area was thoroughly reviewed by the IDT and an internal issue emerged with the initially proposed harvest units extending up to the edge of the AT under some exception language in the Forest Plan that relates to allowing harvesting in MA 8.3 if the management area abuts MA 2.1. The issue was resolved by the deciding official who dropped the harvest units of concern from the proposal. The distance to the closest edge of the harvest units in this area now is a little more than 500 feet for most of the section as shown in the following graph.

Distance from AT to Closest Harvest Unit
Distance to Closest Harvest Unit (ft)
2500
2000
1500
1000
500
Area of Sentinel Mtn Forest
Area from Rt 25C to Wachipauka Pond
100
900
1,700
2,500
3,300
4,100
4,900
16,100
16,900
17,700
18,500
19,300
20,100
20,900
21,700
22,500
23,300
24,100
24,900
25,700
26,500
27,300
28,100
28,900
29,700
Selected AT Segments from South to North in Project Area (ft)

For the AT users that are present in the winter months, during timber harvest, it is worth examining the impact of noise from harvesting operations. The attenuation of noise over distance can be estimated through a calculation using the inverse square law.

The sound attenuation formula is as follows:
$SPL_2 = SPL_1 - 20 * \log(R_2 / R_1)$
where:
$SPL_1$ is the Sound Pressure Level at point 1,
$SPL_2$ is the Sound Pressure Level at point 2,
$R_1$ is the distance from the sound source to point 1, and
$R_2$ is the distance from the sound source to point 2.
https://www.omnicalculator.com/physics/distance-attenuation#what-is-the-spl-(sound-pressure-level)

In the real world, the inverse square law is always an idealization because it assumes exactly equal sound propagation in all directions. If there are reflective surfaces in the sound field, then reflected sounds will add to the directed sound and you will get more sound at a field location than the inverse square law predicts. If there are barriers between the source and the point of measurement, you may get less than the inverse square law predicts. Nevertheless, the inverse square law is the logical first estimate of the sound you would get at a distant point in a reasonably open area.

Tree cutting with a chainsaw generates sound power of 115.7 total dB(A) and tree breaking and hitting ground generates sound power of 125.4 total dB(A). (Iglesis-Merchan, et. Al., 2019) Applying these to the inverse square law assuming a measurement distance of 30 meters yield decibel levels in the range of 88 dB to 113 dB, which is the range one could expect from heavy noisy truck traffic to a rock concert.

Sound Pressure from AT to Closest Harvest Unit
Distance to Closest Harvest Unit (ft)
2500
2000
1500
1000
500
0
120
110
100
90
80
70
60
700
3,400
2,600
2,000
300
17,100
18,200
4,200
18,800
5,100
24,600
26,500
19,400
19,700
29,000
29,100
21,100
28,500
28,300
29,600
29,900
Distance along AT from South to North in Project Area (ft)
Distance to Closest Harvest Unit (ft)
Tree Cutting (dB)
Tree Falling (dB)

It is also worth revealing the potential effects of timber harvesting on the Recreation Opportunity Spectrum of the AT management area (8.3), which is Semi-Primitive Non-Motorized (SPNM). As proposed, there are 239 acres of the total 1263 harvest acres are in MA 8.3 (19%). These harvest units are planned in the AT management area as shown on the following page.

Haverhill
Benton
Lake Constance
Charleston Rd.
Lake Katherine
Lake Tarleton
Lake Armington
Piermont
Warren
Wentworth
Cape Moonshine Rd.
Apple orchard
nonWMNF
USDA
0 0.25 0.5
Mile
1 inch = 1 Mile
Project Proposals
Harvest Units in MA 8.3
Boat Launch
Proposed Harvest Treatments
Map Legend
Road
Appalachian Trail
Tarleton Project Area
Waterbody
National Forest Land
The Forest Service uses the most current and complete data available. GIS data and product accuracy may vary. They may be: developed from sources of differing accuracy, accurate only at certain scales, based on modeling or interpretation, incomplete while being created or revised, etc. Using GIS products for purposes other than those for which they were created, may yield inaccurate or misleading results. The Forest Service reserves the right to correct, update, modify, or replace GIS products without

The setting prescribed for SPNM focuses on a predominantly natural-appearing environment. The user's experience should be one of a high probability of experiencing isolation from the sights and sounds of humans. While these criteria describe the goal for the area's ROS classification, the system recognizes that they are not absolutes. The previous description about noise captures most of the transient adverse impacts to the user's experience; the more long-lasting effects will be to the naturalness of the area following timber harvest which includes very noticeable changes in appearance to the landscape. Since the user's experience in the MA occurs within the setting of passing through

while hiking on the AT, the visual impacts are limited by the hiker's viewshed. It is possible to camp overnight in these areas off trail, however the absence of designated campsites and shelters in the project area tends to make it more of a pass-through experience for most hikers.

The distance to the cutting units from the AT, which is experienced in wooded settings along this section of the AT, except at major road crossings, is sufficient to provide a visual buffer to the cutting units. As a result, most users will not experience a change in the natural appearing landscape because of the timber harvesting. The change in appearance within the cutting units will be very noticeable and obvious to people who hike, walk, snowshoe or Nordic ski away from the AT on the various informal trails and woods roads that are present throughout the area. Freshly harvested stands are not naturally appearing and the byproducts of cutting include the presence of newly created skid trails covered with slash, fresh stumps and an abundance of limbs and woody debris carpeting the forest floor. Fortunately, if done correctly, the rawness of the cutting operations will slowly return to a more natural appearing landscape as debris decomposes and new growth takes over. The natural progression of the stages of reforestation will commence following the timber harvest causing distinct changes to the naturalness over successive generations. Each stage will appear more natural than the stage preceding it to a point where future recreational users of the area may not recognize it as a harvested forest.

The benefits to timber harvesting are detailed in the Forest Plan. Wildlife habitat improvement will contribute to better hunting and wildlife viewing opportunities. The improvements to the timber haul roads throughout the area will improve their sustainability and utility for recreational pursuits that take advantage of these roads, such a winter snowshoeing, Nordic skiing, and hunter access. In the summer, hikers and walkers will also benefit from these improvements in accessibility and openings will result in newly created viewsheds.

In conclusion, the cutting units are far enough away from the AT generally to not directly adversely affect the user's experience except for the noise caused by the cutting operations. The fact that 239 acres will be treated by timber harvests in MA 8.3 will affect the naturalness of the setting, as previously described. These effects will be evident for a long period of time; however, the more profound evidence of these effects will only be experienced for a decade or two as the forest regenerates. There is a special provision to allow for the timber harvesting in MA 8.3 when it abuts MA 2.1 in the Forest Plan, so that box is checked. However, it is important to acknowledge that commercial timber harvesting conflicts with the settings and characteristics of the ROS classification of Semi-Primitive Non-Motorized. Future management actions should be evaluated considering the inconsistencies within the ROS classification of SPNM that this project will produce.

# Tarleton Scenery Management

## Specialist Review and Summary

The Pemigewasset Ranger District of the White Mountain National Forest is proposing the Tarleton Project. A preliminary Scenery Management Analysis (including modeling: figures 2-17) was performed prior to the proposal being finalized. Following the analysis there were several consultations and coordination sessions including the Forester and the District Ranger. Each unit with potential visibility was then reviewed, adjusted, and altered to meet the intent of Forest Plan Standards and Guidelines for Scenery Management. The adjusted design is what became the proposal. This process and resulting proposal were further reviewed via multiple consultations with the National Environmental Policy Act (NEPA) Lead, the Forest Planner / Environmental Coordinator, Forester, and District Ranger, ensuring the proposal meet the intent, including cumulative effects of the Forest Plan Scenery Management Standards and Guidelines.

## Spatial and Temporal Boundaries for Analysis

The analysis area for the direct and indirect effects is the portion of the Project Area that is visible from the viewpoints; this is the zone within which the proposed vegetative management activities would alter the scenery. The timeframe for effects is 30 years into the future. The analysis area for cumulative effects is the viewshed from the viewpoints and the timeframe is from 30 years in the past to 30 years in the future.

This timeframe allows for all the harvested openings to fully restock, develop a full canopy of vegetation, and reach a height with enough spread and density to allow the shadow and textural differences to begin to blend with the adjacent surroundings. This is as seen from a typical viewing distance by the casual observer. This distance is dependent upon the viewpoint, topography, season, and weather conditions, etc., but typically ranges between 0 – 8 miles. It can reach as far as 10 miles in some cases. The viewsheds within the project area range from, at the closest 0.6 of a mile, to and does not exceed 8 miles from any viewpoint to any proposed harvest unit.

## Direct and Indirect Effects Analysis

Nine viewpoints (State Beach, Boat Launch, Mt Cube, Webster Slide 1 and 2, Powerline, Route 25C, and Moosilauke 1 and 2) were selected and initially analyzed. Six were chosen to be modeled and analyzed further (State Beach, Boat Launch, Mt Cube, Powerline, Route 25C, and Moosilauke). The analysis and calculations were based upon their viewsheds. (Figures 2, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, and 17)

The chosen viewpoints are on public lands, provide the best perspectives of the project area and are areas considered to be of reasonable access and highest visitation by the general public as well as recreationalists and tourist. 'Bootleg' trails or non-Forest Service system trails are not typically analyzed for viewpoints.

Although the initial nine viewpoints were analyzed, Webster Slide 1 and 2 and Moosilauke 2 were not modeled with Google Earth any further as the units visible were already in compliance with Forest Scenery Standards and Guidelines as noted from the GIS workflow data and mapping.

destructive sampling methods conclude these harvests were continuously patchy and primarily occurred outside of the 30-year cumulative effects timeframe.

There has also been no even-aged harvesting implemented in the Sentinel Mountain area within the past 30 years.

The analysis was performed on the initial project proposal when it was up to 155 acres of even-aged harvest in the context of a 5,375-acre project area. The proposed regeneration treatments do not approach or surpass 4 percent of the viewshed acreage (per entry threshold per the Forest Plan). Also, previous stands in this viewshed treated with regeneration treatments extend past 30 years of age limit for analysis and would therefore not surpass the 9 percent of viewshed acres (threshold per the Forest Plan) for cumulative effects.

In summary the Tarleton Project meets the intent of the Forest Plan Standards and Guidelines for Scenery Management for cumulative effects.

## Executive Summary

The proposed project was designed to meet the intent and spirit of the Forest Plan's Standards and Guidelines for Scenery Management. A preliminary Scenery Management Analysis including modeling was performed prior to the proposal being finalized. Each unit with potential visibility was reviewed, altered and or deleted to meet the intent of the Forest Plan Standards and Guidelines for Scenery Management.

Nine viewpoints (State Beach, Boat Launch, Mt Cube, Webster Slide 1 and 2, Powerline, Route 25C, and Moosilauke 1 and 2) were considered and initially modeled to ensure compliance the intent was meet or they were adjusted to minimize visual impacts. Six were modeled and analyzed further (State Beach, Boat Launch, Mt Cube, Powerline, Route 25C, and Moosilauke). The proposal will have some visual impacts, but those impacts from timber management activities will fade and blend over time as the young forest grows.

The adjusted design is what became the proposal. This process and resulting proposal were further reviewed via multiple consultations with the National Environmental Policy Act (NEPA) Lead / Environmental Coordinator, Forester and District Ranger, ensuring the intent and spirit of the plan, including cumulative effects are being met.

Tarleton Project
Scenery Management (Satellite Model Image - Aerial Map of Proposed Units)
Warren Recreational Trail
Legend
Lake Tarleton State Park
NEPA Unit Number
Proposed Treatment (Improvement)
Proposed Treatment (Regen)
13
25
27
17
12
28
23
2
35
36
30
34
31
Lake Tarleton State Park
25C
39
41
45
42
2 mi
Google Earth

*Figure 1: Tarleton Project Overview Satellite Image*

# Process of Analyzing Maps, Models, and the Landscape

## Spatial and Temporal Boundaries for Analysis

The analysis area for the direct and indirect effects is the portion of the Project Area that is visible from the viewpoints because this is the zone within which the proposed vegetative management activities would alter the scenery; but it does extend to encompass the extents of viewshed from the viewpoint's vantage point. The timeframe for effects is 30 years into the future.

The analysis area for cumulative effects is the viewshed from the viewpoint and the timeframe is from 30 years ago to 30 years in the future.

This timeframe for effects allows all the harvested openings to restock, develop a full canopy of vegetation, and reach a height with enough spread and density to allow the shadow and textural differences to begin to blend with the adjacent surroundings as seen from a typical viewing distance by the casual observer. This distance is dependent upon the viewpoint, elevation in relation to the unit, topography, season, and weather conditions, etc., but typically ranges between 0 to 8 miles.

The visibility of any opening would be greatest for the first years, as species grow, the color and texture begin to return. The shadow lines and lighting differences would be evident depending on the time of day, weather, and season for much longer into the future would be the color and texture. The casual observer would probably stop noticing the typical regen treatment opening as an individual and distinct feature about 20 years after regeneration. Due to the design of this proposal, limited visible regen treatment openings, and their careful placement, should result in the limited potential for actual ground exposure.

Overtime, the keen observer's eye may notice a shadow created by the difference in height between the top of canopy of newly grown vegetation and the far edge of the previously existing timber. Sun angles, cloud effects (shadows) or certain kinds of weather conditions may fade these shadows and as a result openings may be generally unnoticeable to the casual observer.

## Direct and Indirect Effects Overview

Views differ according to the viewpoint's position in the landscape, elevation, and proximity to the units, the project area's aspect of the slope in relation to the viewpoint, season, and weather. From the analyzed viewpoints, the intensity of effects from proposed activities is a function of the distance, size and shape of new visible opening, topography it lays on, vegetation height it is surround by, as well as their proximity to other proposed visible openings, older visible openings and other features that attract the observer's attention.

Estimates of acreages seen will always be less than the total acres treated due to natural screening by topographic features, leading edge vegetation of visible openings and by any reserve areas placed within these openings that would provide additional visual screening. The difference between treated and visible acres would vary considerably depending on the topography, elevation of the viewpoint, and the slope, position, and aspect of where the visible opening is located.

Seasons play an intricate role in a viewshed's appearance and determining which of the features are visible and/or recognizable within it. Typically, leaf-on conditions are assumed for analysis as that is when a majority of the observers have potential of viewing the project area. It should be noted that in the winter all openings will be more evident, with snow highlighting the opening until the regenerated forest develops sufficient height to begin blending with the surrounding landscape. Even without snow, shadow and texture would be accentuated without leaves on trees as limited color exists to blend the eye's focus.

The impact of changes on scenery also varies based on context. The valley bottom is historically a place of agricultural practices. Harvests in these areas would be consistent with traditional and the cultural uses of the area and therefore blend in with appearance of the historically recognized landscape. After the initial years of regeneration, smaller openings would begin to blend into the mosaic of colors and textures covering the valley floor. The larger visible openings would appear similar to historic agricultural openings and the color and texture of these areas would easily blend into the context of the surrounding landscape. However, these openings would take about 20 years or more to begin to fade from being a distinct feature on the landscape. The keen observer would likely notice age differences between the new and old openings, but since the area has been manipulated over time, it would not seem out of place.

Irregular or organic shapes lend themselves to blending into the context of the landscape better than those with rigid or hard lines. Historic agricultural areas would have had to move around and avoid topographical features that would be inoperable. Today's practices are not much different in that areas of inoperability as well as those protected natural features such as streams, wildlife trees, large seed trees or historic remains (such as stone walls and cellar holes) are avoided and protected, leaving shape and a natural edge or in other cases an island of vegetation (reserve area). Organic shaped openings also have more perimeter overall and create leading edges of vegetation that cause shadow effects, reducing visible acres of the opening and its effects as perceived by the observer.

Larger visible openings located higher on the hillsides would appear unnatural and would be noticeable by many casual observers for more years into the future. These areas were avoided in this proposal due recognizing the scenic value placed upon it by the Forest Plan and the public.

Those openings at a distance would fade sooner than those in closer proximity to the viewpoint. Openings that are 4 plus miles distant from a viewpoint would appear less noticeable for their size. As distance increases, visibility of detail diminishes. Due to their greater distance and apparent reduced scale, the appearance of the most distant of the visible openings created by proposed project activities would blend into the surrounding landscape more rapidly, reducing the overall extent of visible disturbance more rapidly.

Scenic effects of newly created openings would initially be more evident, but within 20 years' time, would blend with the existing landscape. The openings would eventually become nearly unnoticeable to most observers, especially during seasons of the year when leaves are on the hardwoods. The changes that would be visible would be consistent with the historic patchwork of forest and openings indicative of the region. Due to the types of proposed treatments, most of the changes that may be potentially visible in this proposal maybe be seen as color, shadows, lighting and textural changes on the landscape and not as bare ground.

Improvement Cut treatments in this proposal will maintain at least 50 percent of their existing canopy and will have the appearance of a Thinning treatment, not an opening, also reducing and potential for impacts to the observed scenic quality of the project area's landscape.

Visible openings created by proposed group selection treatments would be limited in size (see the Forestry section for the acreages of proposed openings). These uneven-aged treatments or group selections openings would affect scenery after the initial harvest and for years to follow, but mostly as textural, lighting and shadow changes. These effects would fade more rapidly than that of the some larger even-aged treatments. The reduced visibility is a direct function of both actual size and the leading edge of vegetation that would provide increased screening of smaller visible opening. Groups are best when they are laid out utilizing design features that encourage their placement upon flatter topography and along slope contours (rather than up or down slope). From a superior viewpoint that is close enough to see detail, openings will remain visible for the full duration of regrowth. Therefore, it is best when group size, location and proximity are random to avoid creating recognizable patterns on the landscape. Due to the inherent smaller scale of the openings, and distance from the analyzed viewpoint distance increases the fade of their visibility to the point of only being recognizable as a change in texture, color, and shadow on the overall landscape. Group selections are, by definition, limited in size.

Group Selection treatments located within 'High / Very High' Scenic Integrity Objective (SIO) Areas in this proposal will be minimized in scale to be sensitive to the scenic quality and reduce the potential for visual effects. They will range in size from one-tenth to one acre. All proposed groups selection treatment is going to be designed to be in accordance with the suggestions of the Forest Plan. For these reasons, they have not been highlighted in the analysis.

## Models, Maps and Photographic Analysis

Two multiple step modeling efforts were combined and used to evaluate which of the proposed openings created by regeneration type treatments or those that visually mimic them (clearcuts, patch clearcuts, improvement cuts, overstory removal, seed tree and shelterwood) would fall within the visible

area of the viewpoint. The analysis looked at group selection treatments holistically as they relate to the other treatments visual effects and their general context in the landscape and were not individually analyzed in this project.

With the data sorted and assembled, the views were modeled to determine how the landscape would appear following proposed treatments (referencing those units that are visible, amount of visibility (acres) and from which viewpoint or viewpoints).

Two modeling technologies were utilized. The first, Google Earth (GE) was used to create isometric views from maps, models, and photographic views from viewpoints. (Figures 5, 6, 7, 9, 10, 11, 13, 14, 15, 16, and 17)

Due to modeling limitations of GE, the foreground vegetation's shadowing is not taken into consideration by the model. The technology overlays a 2D mapping image atop a semi 3D satellite image. Therefore, the model creates an illusion of more bare ground being visible than would ever actually be visible (unless viewed directly down and into an opening, such as from an aircraft).

In the isometric model view, actual leading-edge vegetation will block some of the 'GE visible units' open acres as well will as some more minor topographic features in the foreground. The model creates a reasonable photo-realistic view but cannot accurately depict the actual and always lower number of visible acres. High contrasting colors are incorporated to depict the proposed units to make them stand out on the landscape model for analysis. In actuality, natural colors of the landscape will also diminish contrast and overall visibility.

The second was an ARC GIS workflow designed to show any visibility of the proposed regen treatment units by calculating the canopy height (from LiDAR Data) and cutting out the proposed treatment units. This GIS mapping and data is utilized to provide calculations on visible acres and where the acres are visible. (Figures 3 and 4) (Tables 1 and 2)

Of note, when mapping products and or models are created from different sources of information occasionally differences in results of feature's visibility are found. If differences are noted between models created of different sources of imagery, the analysis is concluded based upon the features depicted with the greatest visibility.

The data derived from the two technology sources (GE and GIS) was combined and analyzed.

Moosilauke 1 & 2
DRAFT
25C
Webster
Slide 1 & 2
25
State
Beach
Rt 25C
DRAFT
Boat
Launch
Powerline
118
DRAFT
Mt. Cube 1
25A
DRAFT
USDA
0 0.5 1 Mile
View Points
Appalachian Trail
Major Road
Project Area
Proposed Harvest
Treatment Areas Not Visible
National Forest Land
Scenic Integrity Objective
High-very high
High
Moderate
Low
N

*Figure 2: Viewpoint Map*

25
31
35
30
29
36
34
32
33
Webster
Slide 1 & 2
10
12
13
11
14
22
21
28
25
26
27
20
19
9
23
17
18
15
16
State
Beach
Rt 25C
6
24
7
5
4
3
Boat
Launch
2
1
Powerline
USDA
0
0.5
1
Mile
View Points
Appalachian Trail
Major Road
Scenic Integrity Objective (DEM)
High-very high
High
Moderate
Low
Proposed Harvest Unit
National Forest Land
37
40
41
39
42
38
45
N

*Figure 3. Scenic Integrity Objectives Map*

25
31
35
29
30
36
34
32
33
Webster
Slide 1 & 2
10
12
13
11
14
22
21
28
25
26
9
27
20
19
23
17
18
15
16
24
6
State
Beach
Rt 25C
7
5
4
3
2
1
Boat
Launch
Powerline
USDA
0
0.5
1
Mile
View Points
Appalachian Trail
Major Road
SIO (Post Harvest)
High-very high
High
Moderate
Low
Proposed Harvest Unit
National Forest Land
37
40
41
39
42
38
45
N

*Figure 4. Cumulative harvest unit area (including Scenic Integrity Objective) visible post-harvest from Viewpoints (hybrid model)*

Tarleton Project (Lake Area)
Scenery Management (Satellite Model Image - Aerial Map of Proposed Units)
Legend
Lake Tarleton State Park
NEPA Unit Number
Proposed Treatment (Improvement)
Proposed Treatment (Regen)
Webster Slide Trail
13
25
12
27
17
28
23
35
36
30
34
31
2
25C
Lake Tarleton
The Green House
Kingswood Camp for Boys
1 mi
Lake Tarleton State Park
Google Earth

*Figure 5. Enlargement Map of Lake Area, Tarleton Project*

*Figure 8. Photo from Viewpoint NH State Boat Launch – Lake Tarleton*

Tarleton Project
Scenery Managment (Satellite Model Image - Boat Launch Viewpoint)
Legend
Proposed Clearcut Treatment
N
Google Earth
Image Landsat / Copernicus

*Figure 9. Viewpoint NH State Boat Launch – Lake Tarleton - Model Image*

NH State Boat Launch – Lake Tarleton

- (3) Regen Units (Clearcuts) are visible totaling 36 acres (ac) and about 3.1 visible acres (Vac)
- Regen Units (from right to left): **17** (10 ac / 1.1 Vac), **25** (10 ac / 1.4 Vac), **23** (16ac / .6 Vac)
- Incorporation of Designed Reserve Areas (causes reduction in treated and visible acres)
- (3) Regen Units are of a Middleground Distance Zone (1.0 - 1.4 miles)
- (1) Improvement Cut (visible only to model as appearance of a thinning) – Unit **30** (20 ac / 8.4 Vac) – Middleground Distance Zone (1.8 miles)
- Observer is close enough to see color, texture, lines and shadows of proposed units – possibility of minimal visibility of actual ground

- Group Selection treatments in area (most of acres would not be visible – appear as color, texture, lines, and shadows)

Tarleton Project
Scenery Managment (Actual Photo Image - 25C Near State Park Old Foundations)
Legend
Proposed Clearcut Treatment
N
10 ft
Google Earth
©2021 Google

*Figure 10. Photo from Viewpoint Route 25C Near State Park Old Foundation*

Tarleton Project
Scenery Managment (Satellite Model Image - 25C Near State Park Old Foundations)
Legend
Proposed Clearcut Treatment
N
Google Earth
Image Landsat / Copernicus
Data SIO, NOAA, U.S. Navy, NGA, GEBCO

*Figure 11. Viewpoint on Route 25C Near State Park Old Foundation - Model Image*

State Rte 25C – Near State Park "Old Foundations"

- (3) Regen Units (Clearcuts) are visible totaling 36 acres (ac) and about 3.7 visible acres (Vac)
- Regen Units (from right to left): **23** (16 ac / 0.9 Vac), **17** (10 ac / 1.4 Vac), **25** (10ac / 1.4 Vac)
- Incorporation of Designed Reserve Areas (causes reduction in treated and visible acres)

- (3) Regen Units are of a Middleground Distance Zone (1.4 - 1.8 miles)
- (1) Improvement Cut (visible: appearance of a Thinning) – Unit **30** (20 ac / 7.1 Vac) – Near Middleground Distance Zone (0.9 miles)
- Observer is close enough to see color, texture, lines, and shadows of proposed units – possibility of minimal visibility of actual ground
- Group Selection treatments in area (most of acres would not be visible – appear as color, texture, lines, and shadows)

*Figure 12. Photo of Viewpoint State Beach*

Tarleton Project
Scenery Managment (Satellite Model Image - State Beach Viewpoint)
Legend
Proposed Clearcut Treatment
N
Google Earth
Image Landsat / Copernicus
Data SIO, NOAA, U.S. Navy, NGA, GEBCO
Image U.S. Geological Survey

*Figure 13. Viewpoint State Beach - Model Image*

NH State Beach – Lake Tarleton

- (4) Regen Units (Clearcuts) are visible totaling 44.3 acres (ac) and about 4.8 visible acres (Vac)
- Regen Units (from right to left): **2** (8.3 ac / 1.5 vac), **23** (16 ac / 0.6 Vac), **17** (10 ac / 1.4 Vac), **25** (10ac / 1.3 Vac)
- Incorporation of Designed Reserve Areas (causes reduction in treated and visible acres)
- (4) Regen Units are of a Middleground Distance Zone (1.4 – 2.0 miles)
- Observer is close enough to see color, texture, lines, and shadows of proposed units – possibility of minimal visibility of actual ground
- Group Selection treatments in area (most of acres would not be visible – appear as color, texture, lines, and shadows)

Tarleton Project (Mount Moosilauke)
Scenery Management (Photographic Image)
T
Google Earth
30 ft

*Figure 14. Photo of Viewpoint Mount Moosilauke*

Tarleton Project (Mount Moosilauke)
Scenery Managment (Satellite Model Image)
Legend
Proposed Treatment (Regen)

*Figure 15. Viewpoint Mount Moosilauke - Model Image*

Proposed 'Regen Treatment' unit that has potentially for visiblity is 2.

- (1) Regen Units (Clearcut) are visible totaling 8.3 acres (ac) and about 4.1 visible acres (Vac)
- Regen Units: **2** (8.3 ac / 4.1 vac)
- Incorporation of Designed Reserve Areas (causes reduction in treated and visible acres)
- (1) Regen Units are of a Background Distance Zone (7.2 miles)
- Observer is too distant to see detail of color, minimal texture, blurred lines, and shadows of proposed units – low possibility of minimal visibility of actual ground
- Group Selection treatments in area (acres would not be visible)

Tarleton Project (Sentinel Mnt Area)
Scenery Management (Satellite Model Image - Aerial Map of Proposed Units)
Legend
Lake Tarleton State Park
NEPA Unit Number
Proposed Treatment (Improvement)
Proposed Treatment (Regen)
39
41
45
42
Sentinel Mountain State Forest
Atwell Hill Trailhead
Wentworth Baptist Church
3000 ft
Google Earth

*Figure 16. Aerial Map of Sentinel Mnt Area - Satellite Model Image*

Tarleton Project (Mount Cube)
Scenery Management (Satellite Model Image - Elevated from Ground ~10 Ft)
Legend
Proposed Treatment (Improvement)
Proposed Treatment (Regen)
N
100 ft
Google Earth
Image Landsat / Copernicus

*Figure 17. Viewpoint Mount Cube - Model Image*

Potentail View from Mount Cube (Sentinel Mountain Area)

- (2) Regen Units (Clearcut / Shelterwood) are visible totaling 19 acres (ac) and about 6.8 visible acres (Vac)
- Regen Units (from right to left): **39** (2.0 ac / 0.8 vac), **42** (17 ac / 6.0 Vac)
- Incorporation of Designed Reserve Areas (causes reduction in treated and visible acres)
- (2) Regen Units are of a Background Distance Zone (3.4 – 3.8 miles)
- (2) Improvement Cuts (visible but distant appearance of a Thinning) – Unit **41** (40 ac / 40 Vac) Unit **45** (6 ac / 2.8 Vac) – Background Distance Zone (3.6 miles)
- Observer is too distant to see detail of color, minimal texture, blurred lines, and shadows of proposed units – low possibility of minimal visibility of actual ground
- Lake Tarleton Units only visible due to modeling color / clarity – 7.1 - 7.8 miles distant

*Table 1: Cumulative harvest unit from an individual viewpoint by* ***post-harvest*** *acres of scenic integrity objective visible.*

| Unit | Viewpoint | SIO | Acres |
|---|---|---|---|
| 1 | Boat Launch | high-very high | 0.8 |
| 1 | Moosilauke 1 | high-very high | 5.7 |
| 1 | Moosilauke 2 | high-very high | 5.8 |
| 1 | Mt. Cube 1 | high-very high | 3.9 |
| 1 | Powerline | high-very high | 3.7 |
| 10 | Boat Launch | high | 3.3 |
| 10 | Boat Launch | moderate | 19.7 |
| 10 | Mt. Cube 1 | high | 5.8 |
| 10 | Mt. Cube 1 | moderate | 41.6 |
| 10 | Route 25C | high | 3.6 |
| 10 | Route 25C | moderate | 39.7 |
| 10 | State Beach | high | 2.1 |
| 10 | State Beach | moderate | 13.7 |
| 11 | Boat Launch | high | 1.6 |
| 11 | Boat Launch | moderate | 26.8 |
| 11 | Mt. Cube 1 | high | 5.8 |
| 11 | Mt. Cube 1 | moderate | 78.6 |
| 11 | Route 25C | high | 5.2 |
| 11 | Route 25C | moderate | 35.5 |
| 11 | State Beach | high | 4.7 |
| 11 | State Beach | moderate | 33.3 |
| 11 | Webster Slide 1 | moderate | 45.8 |
| 11 | Webster Slide 2 | moderate | 51.5 |
| 12 | Mt. Cube 1 | moderate | 1.0 |
| 12 | Webster Slide 2 | moderate | 0.5 |
| 13 | Mt. Cube 1 | moderate | 3.6 |
| 13 | Webster Slide 2 | moderate | 0.6 |
| 14 | Boat Launch | moderate | 12.7 |
| 14 | Mt. Cube 1 | moderate | 27.4 |
| 14 | Route 25C | moderate | 4.5 |
| 14 | Webster Slide 1 | moderate | 8.0 |
| 14 | Webster Slide 2 | moderate | 13.1 |
| 15 | Boat Launch | high-very high | 4.3 |
| 15 | Mt. Cube 1 | high-very high | 4.7 |
| 15 | Route 25C | high-very high | 4.6 |
| 15 | State Beach | high-very high | 4.5 |
| 16 | Boat Launch | high-very high | 7.7 |

| | | | |
|---|---|---|---|
| 16 | Mt. Cube 1 | high-very high | 8.5 |
| 16 | Route 25C | high-very high | 8.9 |
| 16 | State Beach | high-very high | 9.0 |
| 16 | Webster Slide 2 | high-very high | 1.3 |
| 17 | Boat Launch | high-very high | 1.1 |
| 17 | Mt. Cube 1 | high-very high | 3.2 |
| 17 | Route 25C | high-very high | 1.4 |
| 17 | State Beach | high-very high | 1.4 |
| 18 | Boat Launch | high-very high | 6.1 |
| 18 | Moosilauke 1 | high-very high | 2.2 |
| 18 | Moosilauke 2 | high-very high | 2.3 |
| 18 | Mt. Cube 1 | high-very high | 7.3 |
| 18 | Route 25C | high-very high | 8.3 |
| 18 | State Beach | high-very high | 8.3 |
| 18 | Webster Slide 1 | high-very high | 1.3 |
| 18 | Webster Slide 2 | high-very high | 3.5 |
| 19 | Boat Launch | high-very high | 3.2 |
| 19 | Moosilauke 1 | high-very high | 7.6 |
| 19 | Moosilauke 2 | high-very high | 7.7 |
| 19 | Mt. Cube 1 | high-very high | 4.0 |
| 19 | Route 25C | high-very high | 8.6 |
| 19 | State Beach | high-very high | 8.9 |
| 19 | Webster Slide 1 | high-very high | 8.7 |
| 19 | Webster Slide 2 | high-very high | 9.8 |
| 2 | Boat Launch | high-very high | 1.5 |
| 2 | Moosilauke 1 | high-very high | 4.1 |
| 2 | Moosilauke 2 | high-very high | 4.0 |
| 20 | Boat Launch | high-very high | 8.2 |
| 20 | Moosilauke 1 | high-very high | 1.9 |
| 20 | Moosilauke 2 | high-very high | 2.0 |
| 20 | Mt. Cube 1 | high-very high | 9.1 |
| 20 | Route 25C | high-very high | 9.6 |
| 20 | State Beach | high-very high | 9.7 |
| 20 | Webster Slide 1 | high-very high | 0.7 |
| 20 | Webster Slide 2 | high-very high | 1.7 |
| 21 | Moosilauke 1 | high-very high | 15.0 |
| 21 | Moosilauke 2 | high-very high | 14.6 |
| 21 | Mt. Cube 1 | high-very high | 2.5 |
| 21 | Route 25C | high-very high | 5.7 |
| 21 | State Beach | high-very high | 6.2 |
| 21 | Webster Slide 1 | high-very high | 26.0 |
| 21 | Webster Slide 2 | high-very high | 28.1 |
| 22 | Boat Launch | moderate | 2.1 |

| | | | |
|---|---|---|---|
| 22 | Mt. Cube 1 | moderate | 4.3 |
| 22 | Route 25C | moderate | 2.3 |
| 22 | State Beach | moderate | 1.5 |
| 22 | Webster Slide 1 | moderate | 15.8 |
| 22 | Webster Slide 2 | moderate | 17.7 |
| 23 | Boat Launch | moderate | 0.6 |
| 23 | Mt. Cube 1 | moderate | 5.0 |
| 23 | Route 25C | moderate | 0.9 |
| 23 | State Beach | moderate | 0.6 |
| 24 | Boat Launch | high-very high | 8.1 |
| 24 | Mt. Cube 1 | high-very high | 8.9 |
| 24 | Route 25C | high-very high | 8.9 |
| 24 | State Beach | high-very high | 8.8 |
| 25 | Boat Launch | moderate | 1.4 |
| 25 | Mt. Cube 1 | moderate | 2.6 |
| 25 | Route 25C | moderate | 1.4 |
| 25 | State Beach | moderate | 1.3 |
| 25 | Webster Slide 1 | moderate | 0.6 |
| 25 | Webster Slide 2 | moderate | 0.8 |
| 26 | Boat Launch | high-very high | 1.2 |
| 26 | Moosilauke 1 | high-very high | 6.7 |
| 26 | Moosilauke 2 | high-very high | 6.3 |
| 26 | Mt. Cube 1 | high-very high | 3.6 |
| 26 | Route 25C | high-very high | 5.4 |
| 26 | State Beach | high-very high | 5.7 |
| 26 | Webster Slide 1 | high-very high | 7.0 |
| 26 | Webster Slide 2 | high-very high | 7.9 |
| 27 | Mt. Cube 1 | moderate | 2.7 |
| 28 | Mt. Cube 1 | moderate | 3.3 |
| 29 | Boat Launch | high | 2.0 |
| 29 | Boat Launch | moderate | 8.0 |
| 29 | Moosilauke 1 | moderate | 8.7 |
| 29 | Moosilauke 2 | moderate | 6.5 |
| 29 | Route 25C | moderate | 16.4 |
| 3 | Boat Launch | high-very high | 5.6 |
| 3 | Boat Launch | moderate | 1.4 |
| 3 | Mt. Cube 1 | high-very high | 8.3 |
| 3 | Mt. Cube 1 | moderate | 1.5 |
| 3 | State Beach | high-very high | 4.7 |
| 3 | State Beach | moderate | 1.0 |
| 30 | Boat Launch | high | 2.3 |
| 30 | Boat Launch | moderate | 6.1 |
| 30 | Route 25C | high | 2.2 |

| | | | |
|---|---|---|---|
| 30 | Route 25C | moderate | 4.9 |
| 31 | Boat Launch | high | 7.9 |
| 31 | Boat Launch | moderate | 1.2 |
| 31 | Route 25C | high | 5.5 |
| 31 | Route 25C | moderate | 1.5 |
| 32 | Moosilauke 1 | moderate | 30.7 |
| 32 | Moosilauke 2 | moderate | 31.3 |
| 32 | Webster Slide 1 | moderate | 4.5 |
| 32 | Webster Slide 2 | moderate | 5.5 |
| 33 | Boat Launch | moderate | 2.1 |
| 33 | Moosilauke 1 | moderate | 61.4 |
| 33 | Moosilauke 2 | moderate | 61.1 |
| 33 | Route 25C | moderate | 24.0 |
| 33 | Webster Slide 1 | moderate | 50.1 |
| 33 | Webster Slide 2 | moderate | 51.7 |
| 35 | Boat Launch | high | 25.3 |
| 35 | Boat Launch | low | 0.5 |
| 35 | Mt. Cube 1 | high | 7.5 |
| 35 | Route 25C | high | 29.8 |
| 35 | Route 25C | low | 0.6 |
| 36 | Boat Launch | high | 0.7 |
| 37 | Moosilauke 1 | high | 3.2 |
| 37 | Moosilauke 1 | moderate | 2.7 |
| 37 | Moosilauke 2 | high | 3.2 |
| 37 | Moosilauke 2 | moderate | 2.7 |
| 37 | Mt. Cube 1 | high | 23.4 |
| 37 | Mt. Cube 1 | high-very high | 0.5 |
| 37 | Mt. Cube 1 | moderate | 47.9 |
| 38 | Mt. Cube 1 | high | 11.6 |
| 39 | Mt. Cube 1 | high | 0.8 |
| 4 | Boat Launch | high-very high | 11.6 |
| 4 | Boat Launch | moderate | 1.5 |
| 4 | Mt. Cube 1 | high-very high | 26.2 |
| 4 | Mt. Cube 1 | moderate | 1.6 |
| 4 | State Beach | high-very high | 12.2 |
| 4 | State Beach | moderate | 1.9 |
| 40 | Mt. Cube 1 | moderate | 15.4 |
| 41 | Mt. Cube 1 | high | 18.6 |
| 41 | Mt. Cube 1 | high-very high | 1.0 |
| 41 | Mt. Cube 1 | moderate | 19.3 |
| 42 | Mt. Cube 1 | moderate | 6.0 |
| 45 | Mt. Cube 1 | high | 3.0 |
| 45 | Mt. Cube 1 | moderate | 2.8 |

| | | | |
|---|---|---|---|
| 5 | Boat Launch | high-very high | 13.3 |
| 5 | Boat Launch | moderate | 1.9 |
| 5 | Mt. Cube 1 | high-very high | 21.7 |
| 5 | Mt. Cube 1 | moderate | 6.2 |
| 5 | Route 25C | high-very high | 0.9 |
| 5 | Route 25C | moderate | 1.7 |
| 5 | State Beach | high-very high | 19.9 |
| 5 | State Beach | moderate | 6.6 |
| 5 | Webster Slide 2 | high-very high | 6.8 |
| 5 | Webster Slide 2 | moderate | 3.6 |
| 6 | Boat Launch | moderate | 6.8 |
| 6 | Moosilauke 1 | moderate | 8.4 |
| 6 | Moosilauke 2 | moderate | 8.8 |
| 6 | Mt. Cube 1 | moderate | 12.3 |
| 6 | Route 25C | moderate | 7.3 |
| 6 | State Beach | moderate | 18.1 |
| 6 | Webster Slide 2 | moderate | 9.7 |
| 7 | Boat Launch | moderate | 59.1 |
| 7 | Moosilauke 1 | moderate | 9.7 |
| 7 | Moosilauke 2 | moderate | 9.7 |
| 7 | Mt. Cube 1 | high-very high | 0.6 |
| 7 | Mt. Cube 1 | moderate | 78.8 |
| 7 | State Beach | moderate | 50.0 |
| 7 | Webster Slide 1 | moderate | 2.8 |
| 7 | Webster Slide 2 | moderate | 7.6 |
| 9 | Boat Launch | high | 4.6 |
| 9 | Boat Launch | moderate | 12.1 |
| 9 | Moosilauke 1 | moderate | 0.8 |
| 9 | Mt. Cube 1 | high | 10.4 |
| 9 | Mt. Cube 1 | moderate | 46.0 |
| 9 | Route 25C | high | 8.8 |
| 9 | Route 25C | moderate | 22.9 |
| 9 | State Beach | high | 7.5 |
| 9 | State Beach | moderate | 20.1 |
| 9 | Webster Slide 1 | moderate | 3.4 |
| 9 | Webster Slide 2 | moderate | 9.5 |

*Table 2: Distance from viewpoints to proposed units that are visible.*

| Unit | Viewpoint (Units Visible From) | Distance (ft / miles) |
|---|---|---|
| 2 | State Beach | 2.0 miles |
| | Moosilauke | 37,800 / 7.2 m |
| 12 | Mt Cube | 40,700 / 7.7 m |
| | Webster Slide | 3,700 / .7 m |
| 13 | Mt Cube | 40,900 / 7.8 m |
| | Webster Slide | 2,950 / .6 m |
| 17 | Boat Launch | 6,400 / 1.2 m |
| | Mt Cube | 38,200 / 7.2 m |
| | 25C | 9,400 / 1.8 m |
| | State Beach | 9,300 / 1.8 m |
| 23 | Boat Launch | 5,550 / 1 m |
| | Mt Cube | 37,700 / 7.1 m |
| | 25C | 7,650 / 1.4 m |
| | State Beach | 7,500 / 1.4 m |
| 25 | Boat Launch | 7,500 / 1.4 m |
| | Mt Cube | 39,400 / 7.5 |
| | 25C | 9,200 / 1.7 m |
| | State Beach | 9,000 / 1.7 m |
| | Webster Slide | 3,000 / .6 m |
| 27 | Mt Cube | 38,800 / 7.3 m |
| 28 | Mt Cube | 38,500 / 7.3 m |
| 30 | Boat Launch | 9,500 / 1.8 m |
| | 25C | 4,500 / .9 m |
| 31 | Boat Launch | 10,000 / 1.9 m |
| | 25C | 4,500 / .9 m |

| | | |
|---|---|---|
| 34 (no visibility) | - | - |
| 35 | Mt Cube | 41,200 / 7.8 m |
| | Boat Launch | 9,500 / 1.8 m |
| | 25C | 5,200 / 1 m |
| 36 | Boat Launch | 8,650 / 1.6 m |
| 39 | Mt Cube | 19,800 / 3.8 m |
| 41 | Mt Cube | 19,000 / 3.6 m |
| 42 | Mt Cube | 18,100 / 3.4 m |
| 45 | Mt Cube | 18,500 / 3.5 m |

Project Name:

1

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 155 | 1 | 10/18/18 | 1941 | 89 | 13 | |

| BA | QMD | % AGS - BA | | AS | SIO | ELT |
|---|---|---|---|---|---|---|
| 160 | 10.9 | | | | VH | 405D |

Planned Rx: Group Selection
Past Harvest: N/A
- Difficult skid. Old field trending toward SF. SW regen w/ some BE/RO regen mixed in.
- Stonewalls and possible cellar hole by road
- Could lump N end into Stand 2. If too visible, consider deferring treatment due to access, visibility, and heritage sites on S end.
- 1/11/22 → up to 1 ac groups
- Dropped 7/21/22

Resource Concerns: MA 8.3

SOH: W

2

| Comp | Stand | Date | YoO | EV | Acres (with or without skip) | Treated |
|---|---|---|---|---|---|---|
| 155 | 2 | 4/17/19 | 1937 | 84 | 37* | 30 |

| BA | QMD | % AGS - BA | | AS | SIO | ELT |
|---|---|---|---|---|---|---|
| 145 | 11 | 45% | 65 | | VH | 405D/115A |

Planned Rx: Clearcut
Past Harvest: N/A
- Old road runs adjacent to Stand 24 to forest boundary. Rocks in place to restrict access.
- Adjacent clearcut indicates regen would be a mix of HW w/RO.
- Stand is variable in composition, some areas low quality HW, some tend to be more SF w/ large diameter RS/WP.
- 11/5/20 will need to cross stream if not using new landing. Better option may be to skid N to existing landing.
- Viz → seems like modeling may be slightly off — may need to consider where PA goes to break view for compliance. May also be completely fine. Compare Hybrid/"New" Model.

Resource Concerns: MA 8.3, F+G Recs

SOH: W

3

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 155 | 3 | 9/19/18 | 1944 | 87 | 29 | |

| BA | QMD | % AGS - BA | | AS | SIO | ELT |
|---|---|---|---|---|---|---|
| 183 | 10.1 | 62% | 114 | | VH | 115A |

Planned Rx: Single Tree Selection w/ Groups
Past Harvest: N/A
- Nice opportunity to manage for mixedwood. Uneven stocking, possibly from unknown management in the 1960's. Dense softwood in areas.
- Pond on E end of stand, beaver activity. Perrenial Stream from pond.
- 1/11/22 → Up to 1 ac Groups

Resource Concerns MA 8.3, Perrenial Stream

SOH: W

4

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 155 | 4 | 1905 9/19/18 | | 87 | 33 | |

| BA | QMD | % AGS - BA | | AS | SIO | ELT |
|---|---|---|---|---|---|---|
| 147 | 9.7 | 64% | 93 | | VH | 105D/115A |

Planned Rx: Single Tree Selection w/ Groups
Past Harvest: N/A
- Diverse stand with different options.
- Mix of SW/HW regen. RO component 38% of BA.
- Red Pine component not picked up during inventory.
- 1/11/22 → Up to 1ac Groups

Resource Concerns: MA 8.3

SOH: W

* 4/26/21 → Walked all 4 crossings. #1 ok, wet area on W side of line makes it tricky. #2 + #3 seem best. #4 still necessary (found approved breach close to powerline)

Project Name:

(15)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 155 | 15 | 6/11/21 | 1898 | 85 | 6 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 88 | 10.2 | 81% | 72 | | VH | 4156 |

**Planned Rx:** Single Tree Selection w/ Groups
**Past Harvest:** N/A

- Maintained trail between Stand 15 + 16
- High quality wood in overstory, YB/SM poles, some areas very sparse. RO component not picked up inventory
- 6/11/21 - confirmed botany PA is ok. Hay scented fern found in small opening along U24 boundary
- 1/11/22 → Up to 1 ac Groups

**Resource Concerns:** MA 8.3 Powerline Access, Botany PA

**SOH:** W

(16)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 155 | 16 | 6/11/21 | 1889 | 81 | 12 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 120 | 12.9 | 69% | 83 | | VH | 4156 |

**Planned Rx:** Single Tree Selection w/ Groups
**Past Harvest:** N/A

- RO component → 11% / 23.4 QMD, WA → 30%, 13 QMD
- 6/11/21 → Confirmed botany PA works. There is a 140 year old patch on far Eastern side that should be re-delineated.
- 1/11/22 → Up to 1 ac groups
- Large Botany PA, Dissolve to U18

**Resource Concerns:** MA 8.3, Powerline Access Botany PA

**SOH:** W

(17)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 155 | 17 | 4/17/19 | 1927 | 89 | 10 | 6 |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 132 | 11.0 | 58% | 76 | | VH | 4156 |

**Planned Rx:** Patch Clearcut
**Past Harvest:** N/A

- Great opportunity to manage for a mix of hardwood species. Aspen/PB regen opportunity. Rich site - RO/BW component. Stand quality isn't bad. Alt approach could be dominant tree thinning.
- Road goes up through, eroded, stonewalls, stream running over road. May be a good place to funnel units to cross powerline. Old road = abandoned PWL ROW
- Basically 10.5 ac of visibility from all viewpoints.
- 4/26/21 → Doesn't seem like a stonewall along old power line
- 5/25/21 → Brook/Ken A would like to see the unit split into 3 sections, Patches on N and S with PA in central section. No buffer necessary in N and S section.
- 6/11/21 → Botany walkthrough. Confirmed reserve is ok. There is an existing trail crossing N→S to old road that is approved for use through PA. Potential heritage site encountered, charcoal dump within PA
- 7/21/22 Reduced to 6 ac patch CC

**Resource Concerns** MA 8.3, Powerline Access, Botany PA

**SOH:** W

(18)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 155 | 18 | | 1941 | 85 | 10 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 136 | 10.9 | 61% | 84 | | VH | 4156 |

**Planned Rx:** Single Tree Selection w/ Groups
**Past Harvest:** N/A

- 1/11/22 → Up to 1 ac Groups

**Resource Concerns:** MA 8.3, Powerline Access

**SOH:** W

Project Name: Tarleton

(19)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 155 | 19 | | 1909 | 81 | 13 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 113 | 11.0 | 44% | 50 | | VH | 4156 |

Planned Rx: Single Tree Selection w/Groups
Past Harvest: N/A

- Red Oak component not picked up in plots, HW site ready for regeneration, consider UEA regeneration.
- SM = 44% of BA → mostly UGS
- 1/11/22 → Up to 1 ac groups
- 7/21/22 Dropped

Resource Concerns: MA8.3, Powerline Access

SOH: W

(20)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 155 | 20 | | 1907 | 81 | 11+1 | 12 |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 150 | 11.1 | 55% | 83 | | VH | 4156 |

Planned Rx: Single Tree Selection w/Groups
Past Harvest: N/A

- 1/11/22 → Up to 1 ac groups

Resource Concerns: MA8.3, Powerline Access

SOH: W

(21)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 155 | 21 | 9/24/18 | 1890 | 81 | 31 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 102 | 12.4 | 37% | 38 | | VH | 4156 |

Planned Rx: Single Tree Selection w/Groups
Past Harvest: N/A

- Overstory Falling apart, consider exceeding 20%. Blowdown, mixed HW regen. RO component on South end of the Stand. Moderate Moose Brows[illegible]
- 1/11/22 - Up to 1 ac groups
- 7/21/22 Dropped

Resource Concerns MA8.3, Powerline Access

SOH: W

(22)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 155 | 22 | 9/24/18 | 1894 | 89 | 22 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 105 | 11.3 | 57% | 60 | | M | 4136/115A |

Planned Rx:
Past Harvest:

- wet areas on North end. Moderate Moose Browse, BE/STR pole understory. Some RO regen, hobblebush.
- RO component → 10%, 18.4 QMD
- Could break out patch or GS to manage for HW's.
- 1/11/22 → Up to 1 ac groups
- 7/21/22 Dropped

Resource Concerns: [illegible] Powerline Access

SOH: W

Project Name:

(24)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 155 | 23 | 9/24/18 | 1928 | 81 | 36 | |

| BA | QMD | % AGS - BA | | AS | SIO | ELT |
|---|---|---|---|---|---|---|
| 130 | 10 | | | | | 4156/102c |

Planned Rx: Group Selection

Past Harvest: N/A

- Getting close to AT – may need to be sensitive. Heavy beech understory / Hobblebush in majority of stand

Defer due to visibility and skid length

Resource Concerns:

SOH:

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 155 | 24 | 10/25/18 | 1927 | 81 | 11 | |

| BA | QMD | % AGS - BA | | AS | SIO | ELT |
|---|---|---|---|---|---|---|
| 127 | 10.4 | 34% | 43 | | VH | 4156/115A |

Planned Rx: Single Tree Selection w/ Groups

Past Harvest: N/A

- Beech understory with some RO/SW regen. RO→15 GHD. Richer areas have less beech. Intermittent stream. Can also consider thinning.
- 1/11/22 → Up to 1 ac groups

Resource Concerns: MA 3.3, Powerline Access

SOH: W

(25)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 155 | 25 | 9/17/19 | 1894 | 96 | 10 | |

| BA | QMD | % AGS - BA | | AS | SIO | ELT |
|---|---|---|---|---|---|---|
| 112 | 10.2 | 68% | 76 | | M | 4156 |

Planned Rx: Clearcut

Past Harvest: N/A

- High priority, older stand to still have PB composition. 61% of BA = Birch species. Great regen opportunity. RO over/understory component. Some SW regen.
- Consider all options to mitigate visuals → Buffer and feathering. Stand has a ton of Aspen/Birch but much of it is close to the powerline. Understory = alot of STM/BE
- 4/29/20 – Stonewall will need to be breached. Alot of Asp/PB/WA/RO
- Visibility → Everything within moderate threshold
- 5/25/21 → No issues with powerline not having buffer

Resource Concerns Powerline Access

SOH: W

(27)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 155 | 27 | 9/17/20 | 1919 | 89 | 11 | 6 |

| BA | QMD | % AGS - BA | | AS | SIO | ELT |
|---|---|---|---|---|---|---|
| 107 | 9.8 | 50% | 53 | | M | 4156 |

Planned Rx: ~~Clearcut~~ Thin

Past Harvest: N/A

- RO = 3 BA, 18 GHD AS = 20 BA, 14 GHD, WP = 3 BA, 26 GHD WA = 20 BA, 11.1 GHD
- Wet towards the powerline, significant component of overstory is Asp/WA. Already some blowdown of large diameter Aspen. Great regen opportunity. Overstory WP could be retained if necessary, but would probably blow down. More overstory RO toward middle of stand.
- Aspen/Birch regen outweighs SF conversion. Would also regenerate some RO.
- Combine band on E side w/ 166/6 to thin to breakup view of powerline. Lookup value of cc vs thin plot 503.

Resource Concerns: F+G Recs

SOH: W

JA-1606

Project Name: Tarleton

(28)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
| --- | --- | --- | --- | --- | --- | --- |
| 155 | 28 | 4/17/2019 | 1909 | 89 | 10 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 89 | 9.0 | 52% | 44 | | M | 4156 |

**Planned Rx:** Clearcut
**Past Harvest:** N/A

- Stand a bit drier/rockier than 27, Still some Aspen, a lot of WA. Fairly continuous SF/NHW understory. Average diameter is a bit small, but so much of which is WA, makes regeneration a good option. More RO than 27, could try to retain some. RO = 4BA, 11.0QMD AS = 20BA, 13.7QMD

**Resource Concerns:** F+G Recs

**SOH:** W

| Comp | Stand | Date | YoO | EV | Acres | Treated |
| --- | --- | --- | --- | --- | --- | --- |
| 155 | 39 | 9/24/18 | 1894 | 81 | 8 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 92 | 12.1 | | | | VH | 4156 |

**Planned Rx:** Clearcut
**Past Harvest:** N/A

- NHW stand, overstory beginning to fall apart. Existing stand won't be around long enough for GS. Fairly low stocking across stand, heavy beech/Str understory. → Ice Storm Damage

Defer due to visibility and skid length

**Resource Concerns:**

**SOH:**

(26)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
| --- | --- | --- | --- | --- | --- | --- |
| 155 | 43 | 9/24/18 | 1894 | 81 | 10 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 116 | 11.8 | 41% | 48 | | VH | 4156 |

**Planned Rx:** Single Tree Selection w/ Groups
**Past Harvest:** N/A

- NHW stand with few wet/open areas. Heavy beech midstory and browse. Stone wall and old road within Stand
- 1/11/22 → up to 1 ac groups

**Resource Concerns** MA 8.3, Powerline Access

**SOH:** W

| Comp | Stand | Date | YoO | EV | Acres | Treated |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | | | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| | | | | | | |

**Planned Rx:** Skid Crossing Powerline
**Past Harvest:**

① - Old road crossing, there is a culvert but dry enough. Apple tree then into old skid road in Stand 45 → very wet!

② - Crossing at 155/14 direct to landing. Need to clarify FP 8.3 restrictions. Looks dry enough, small wet area E of landing on trail.

③ - Cross somewhere North of 20/25 and tie into skid from 160/6 or 155/27. Skid trail will need to run through west side of 160/45.

5/12/21 - TJ + Eric from National Grid

TJ Baldwin
Eric George

- ground wires need protection - gravel or panels
- Easement ~ 82.5 ft from center point of side towers (center)
- about ± 60ft from end line to edge, will need to have Power company come out and top trees that may fall on line.
- As low as 28ft of sag, allow outside of 30ft of poles
- Preference to not leave buffer that will later blow over

6/11/21 → All crossings cleared by Baltany

**Resource Concerns:**

**SOH:**

Project Name: ______________________

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| | | | | | | |
| BA | QMD | % AGS - BA | | AS | SIO | ELT |
| | | | | | | |

Planned Rx:

Past Harvest:

Resource Concerns:

SOH:

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| | | | | | | |
| BA | QMD | % AGS - BA | | AS | SIO | ELT |
| | | | | | | |

Planned Rx:

Past Harvest:

Resource Concerns:

SOH:

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| | | | | | | |
| BA | QMD | % AGS - BA | | AS | SIO | ELT |
| | | | | | | |

Planned Rx:

Past Harvest:

Resource Concerns

SOH:

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| | | | | | | |
| BA | QMD | % AGS - BA | | AS | SIO | ELT |
| | | | | | | |

Planned Rx:

Past Harvest:

Resource Concerns:

SOH:

Project Name: Tarleton

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 160 | 2 | 8/10/18 | 1953 | 20 | 12 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 163 | 10.2 | | | | H | 115A |

**Planned Rx:**

**Past Harvest:**

- Great opportunity to release SF regen and recruit. Stand transitioning to more softwood closer to lake.

Defer → Wet/BMZ/only wait up road

**Resource Concerns:**

SOH:

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 160 | 4 | 7/3/18 | 1989 | | 100 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| | | | | | M | 115A |

**Planned Rx:**

**Past Harvest:**

- Patches of Mature trees, but overall → very young. Consider TSI for RO release/pruning
- 4/16/19 → Stand too variable, not quite ready for TSI.

**Resource Concerns:**

SOH:

(13)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 160 | 6 | 7/19/18 | 1940 | 89 | 53 | 14 |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 112 | 10.7 | 66% | 74 | | M | 115A/415G/115C |

**Planned Rx:** Clearcut

**Past Harvest:** N/A

- Area of Stand North of Charleston Road
- RO/SM regen overtopped by StM/beech poles, fairly consistent heavy midstory. WA showing signs of dieback
- 7/10/20 → Wet spot along S edge will need to get cut off
- 7/27/20 → More Black Cherry than I remember, fairly good quality, good quality RO. Barbed wire, past harvest. Fair amount of PB blowdown. Makes sense to stop unit along N rim → see Lidar.

**Resource Concerns** Visibility from Webster Slide + Boat Launch, F+G Recs

SOH: W

(14)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 160 | 6 | 7/19/18 | 1940 | 89 | 53 | 37 |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 112 | 10.7 | 66% | 74 | | M | 115A/415G/115C |

**Planned Rx:** Thinning

**Past Harvest:** N/A

- Area of Stand South of Charleston Road
- RO/SM regen overtopped by StM/beech poles, fairly consistent midstory (heavy). WA showing signs of dieback
- High Quality RO overstory → 32 BA, 16.9 QMD
- Focal Species → RO/BC/WP/SM/RS
- 11/5/20 → Either of the Northern 2 crossings to Unit 11 should work with a skid panel.
- 4/26/21 → found a site to breach wall, wall pretty broken

**Resource Concerns:** Stonewall and c.H. on for E side, F+G Recs

SOH: W

JA-1609

PBWTAR_13904

Project Name:

(35)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 160 | 5 | 8/14/20 | 1934 | 84 | 37 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 106 | 9.0 | 67% | 71 | | H/M | 115A/415G |

Planned Rx: Improvement Cut
Past Harvest: N/A

- RO Component → 14%, QMD 19.2, 14BA, 50/50 AGS/UGS
- Very nice RO component, especially upslope. Pockets of heavily cut have good RO pole regen. Also real good layer of SW.
- Group selection not appropriate here. Need to come up with some combo to facilitate SW/RO. Knock back to 60 BA, favor RO + SW and midstory TSI? Wildlife says favor RO over SW.

SE→NW Direction — 9/27/21 → Found break in interior stonewall towards southern center, suitable for skid and cleared w/heritage. SW seems to end just upslope. Found spot to cross Charleston Rd. Found another break but erosion from past harvest makes it unsuitable. Found a good one mid way to cross Charleston, total of 3 interior crossings. Found extensive barberry in PA in NW corner and some stonewalls with suitable breaks close to old landing.

Resource Concerns: VIZ, Botany Buffer/PA, Stonewalls, Blue State Boundary Point, F+G Recs, Tamarack, Barberry in PA in far NW corner

SOH: W

(31)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 160 | 7 | 4/30/19 | 1947 | 89 | 21 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 100 | 9.6 | 77% | 77 | | M | 115A/102C/415C (Ledge on W side) |

Planned Rx: Improvement Cut + TSI?
Past Harvest: N/A

Diverse stand with hilly but operable terrain. Alot of really nice overstory RO and some WP. RO = 20 BA, 14.5 QMD, WP = 6 BA, 21 QMD. Parts of stand have really good layer of softwood regen, other areas are more sparse. Evidence of past harvest, but unknown. Consider managing RO/WP as focal species by IC/Thin from below approach. Don't worry about SF understory at this time.

- 8/11/20 – Heritage site in NE corner. Dry for most part. I like the idea of pushing RO/SF. Maybe try to re-delineate stands to align w/ELTS. Add TSI option.

Resource Concerns: VP + Wet Spots, Maybe Wetland Buffer, Heritage Site, F+G Recs

SOH: W

(34)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 160 | 8 | 4/30/2019 | 1942 | 84 | 23 | H? |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 74 | 11.2 | 54% | 40. | | M/H | 115A? |

Planned Rx: Clearcut
Past Harvest: N/A

- Low quality hardwoods make up overstory, some RO/BC but mostly RM, very little SF regen. Aspen clusters, PB, and RS 10-12" can be found. Evidence of past harvest, BE/STM/YB understory. Overall, poor quality and need to work around wet areas. Great habitat opportunity.
- 8/19/20 – Walked potential skid. Do-able, back through 029. Some wet areas to avoid. Wood 50/50 quality. Will get insane YB/ASP/SM/PB response. Fair amount of BC stock to cut, ok to leave.

Resource Concerns VIZ, Wetlands, maybe perennial stream, F+G Recs

SOH: W

(32)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 160 | 13 | 3/16/19 | 1954 | 81 | 81 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 85 | 10.7 | 64% | 55 | | M | 115A/115C |

Planned Rx: Single Tree Selection with Groups
Past Harvest: N/A

- UEA Northern Hardwood stand. Seems thinned in the past, some heavily cut patches. Thinning has resulted in a flush of SH poles → Nice opportunity to manage for complexity and structure. RO = 2%, 2BA, 20 QMD. Some topography and steep sections, sloping towards RT 25C. Skid system seemingly in place. Seems like a 9 ac patch on S side that could be teased out as new stand.
- 4/16/19 – Defer section SW of perennial stream. Several heritage sites, especially near landing. Need to drop N edge – too steep
- A 11/9/20 – Went out w/ Heritage staff and decided it was ok to establish 15-20 ft opening in large heritage PA near landing. Landing itself pretty wet but this is apparently only reasonable spot.

Resource Concerns: Heritage Sites, Maybe NNIS, VIZ, Perennial Stream, Groups up to 2 ac?

SOH: W

Project Name: Tarleton

(33)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 160 | 27 | 3/26/19 | 1965 | 81 | 68 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 91 | 8.9 | 70% | 64 | | H/M | 115A/115C |

Planned Rx: Single Tree Selection with Groups
Past Harvest: N/A

• Stand Mimics Stand 13. Productive site mostly, upper limits less productive. SM/RO/WA/BE poles, some topography. 4-5 ac patch in middle of stand. Several heritage sites. Drop Northern edge, too steep

Resource Concerns: Heritage Sites, NNIS + Reserve, Bald Eagle WP Buffer, Groups up to 1 ac?

SOH:

(30)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 160 | 30 | 4/3/19 | 1963 | 11 | 20 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 117 | 8.6 | 66% | 77 | | M | 115A |

Planned Rx: Improvement Cut
Past Harvest: N/A

• Strong SF understory throughout Stand. A fair amount of WP/Mature SF and low quality hardwoods in overstory.
• Evidence of fairly heavy harvest, similar to ¼ ac groups with RO/PB overtopping RM/STR and softwood. Wet areas and potential perennial stream? ← Intermittent
• 8/14/20 - Small wetland in middle close to road. Pretty wet on SE side. Decent WP volume, Stream N→S through middle dry 8/14/20. Consider IC → Skid trails with small openings. This will move along softwood to align with 115A. Too many wet areas and weird features to successfully implement a GS cycle.
• 9/27/21 → confirmed w/ Heritage, no stone wall from U36. Be aware of extensive barberry in NW corner of U36.

Resource Concerns: Stonewalls, Big Rock Piles, Blue State Boundary Paint, Small wetland, Stream? F+G Recs

SOH: W

(29)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 160 | 29 | 7/10/18 | 1948 | 87 | 91 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 101 | 10.0 | 70% | 71 | | M | 115A/415C ↓ YB poles indicator |

Planned Rx: Group Selection
Past Harvest: N/A

• Stand has 2 age classes heavily cut, likely early 1990's. Good time to turn this over to UEA management and focus on residual uncut areas. Wetlands and beaver activity.
• 8/14/20 - Very diverse stand, WP=3BA, 22.9 QMD RO=3BA, 18.3 QMD. Many existing trails that can be utilized with wet areas. Primary skid just off South side of landing works. Gets close to small wetland, existing trail works mostly with viable workarounds. Fair amount of BC throughout. YB primary midstory species. GS is a great option given potential buffers and existing UEA structure. Good sized groups will get YB/WA/SM mix with BC/RO.

Resource Concerns: Wetlands, VP's, Perennial Streams, Protected Beaver Ponds, F+G Recs, Groups up to 1 ac?

SOH: W

(36)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 160 | 36 | 4/30/19 | 1953 | 96 | 12 | 12 |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 87 | 10.5 | 46% | 40BA | | M | 115A? |

Planned Rx: Overstory Removal
Past Harvest: N/A

• Stand seems very similar to Stand 8 (U34) a bit more softwood understory, WP overstory
• 8/14/20 - RO component = 7BA, 12.4 QMD. Everything else confirmed. Consider more of a partial removal if softwood is the goal. Not sure about 115A. Probably will be more of a mixedwood type for a while before getting to softwood type. I don't see a huge reason to retain WP component, will likely blowdown if LT'd. Alternate option is a shelterwood approach to help build softwood understory while retaining some overstory canopy. Enough good quality RO and other species. Dense pockets of SM midstory a bit puzzling.
• 9/27/21 → For NW wall that goes into U30 does not exist. Found big break in N→S wall suitable.

Resource Concerns: VIZ, Blue Paint State Boundary, Stonewalls, Wet Areas, F+G Recs

SOH: W

Project Name:

~~12~~

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 160 | 39 | 7/19/18 | 1938 | 96 | 10 | 7.8 |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 108 | 9.6 | 41% | 44BA | | M | 115A/115C |

**Planned Rx:** Clearcut
**Past Harvest:** N/A

- Pockets of thick BF midstory, great release and PB/AS/RO regen opportunity before seed source is lost. Retain some RO/WP for future seed. Wet area along E edge.
- 7/27/20 – ASP = 16BA, 13.8QMD RO = 12BA, 14.1 QMD. Strong AS/PB component with some RO - smaller/younger. No regen concerns. Lower priority than U13. Skid potential issue – very far and through large Heritage Pt. Consider skid that gets onto Charleston Road, then crosses at Shome bridge, then through U14.
- 7/21/22 – Dropped

**Resource Concerns:** VIZ, Adjacent Wetland, F+G Recs

**SOH:** W

11

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 160 | 40 | 7/20/18 | 1940 | 89 | 113 | 17 |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 119 | 10.7 | 64% | 76BA | | M | 115C |

**Planned Rx:** Thinning
**Past Harvest:** N/A

- RO = 10 BA, 12 QMD → High Quality RO and other hardwoods. Consider thinning to put some girth on. West side drops off and South side decreases in quality. Need to figure out skid plan. Recent CC on South side was skid through excessively wet area. Some evidence of WA dieback
- 7/27/20 – Large heritage site complex on Northern side with stonewalls, well, apple orchard, and foundations. Excellent place to thin to favor RO. Found decent place to skid/cross into U14. S/W end may need to be dropped if cant get up to crossing. Dead butternut noted, could be more.
- 4/26/21 → Found opening in wall close to stream, approved a breach location.
- 7/21/22 – reduced for skid distance. Basically just to support orchard work.

**Resource Concerns:** Dead Butternut, large complex of Stonewalls and Heritage sites, WL Opening/Orchard, Perennial Stream, F+G Recs

**SOH:** W

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 160 | 41 | 7/13/18 | 1937 | 84 | 13 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 87 | 7.7 | | | | M | 115A |

**Planned Rx:** Thinning
**Past Harvest:** N/A

- Stand too small for GS, tree diameters too small to regenerate. Mixedwood regen and poles.

Defer due to Skid length

**Resource Concerns**

**SOH:**

~~10~~

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 160 | 42 | 4/18/19 | 1949 | 89 | 66 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 82 | 9.9 | 58% | 47BA | | M | 115C/105D → Ledge? |

**Planned Rx:** Group Selection
**Past Harvest:** N/A

- Alot going on. Some slopes and wet areas to deal with. A large VP, rock piles, cellar holes.
- Rocky upland hardwood site with patches of softwood, some clusters of Aspen. Good presence of RO. Evidence of fairly heavy thinning in past. GS is a good option with complexities. Will need to skid East through stand U11. Defer SW section. If skid is too long, will need to defer
- 1/11/22 → Up to 1 ac groups
- 7/21/22 Dropped

**Resource Concerns:** Skid Length, Heritage site, Steep, VP

**SOH:** W

* 4/26/21 → doesn't seem like stonewall probably old charleston fence

9

Project Name: Tarleton

| Comp | Stand | Date | YoO | | EV | Acres | Treated |
|---|---|---|---|---|---|---|---|
| 160 | 43 | 4/18/19 | 1938 | | 89 | 70 | 11/85 |
| BA | QMD | % AGS - BA | | | AS | SIO | ELT |
| 115 | 10.4 | 67% | 76 | | | M/H | 115C/105D |

Planned Rx: Group Selection

Past Harvest: N/A

- Northern Hardwood stand with softwood inclusions and a fair amount of BC. WA = 6BA, 15.2 QMD. Skid through South section of Stand 57 not an option—too wet and beaver activity. Signs of Heavy/intermediate cutting all over stand. Some traces of existing skids paralleling lake, Perennial Stream on Southern edge, crossing by inholding only reasonable option. Several wet areas to avoid. Bench just E of points 284-285 good option. 2 Ac aspen cluster west of point 282.
- 12/8/21 - conversation w/ Ken → 1ac tops for Viz

Resource Concerns: Lake RMZ (300 Ft), wet areas, Perennial Stream

SOH: W

23

→ May want to tease out LSF plots or New plots

1962, rest of stand 1990

| Comp | Stand | Date | YoO | | EV | Acres | Treated |
|---|---|---|---|---|---|---|---|
| 160 | 45 | 4/17/19 | 1990? | | 81 | 61 | 16 |
| BA | QMD | % AGS - BA | | | AS | SIO | ELT |
| 80 | 9.2 | 80% | 64BA | | | M | 415G |

Planned Rx: Patch Clearcut

Past Harvest: N/A

- AGS + BA heavily skewed by larger pole section. Focus patch on older section with maturing Aspen/WA/PB. Relatively wet stand, heavily cut portion indicates regeneration would be mix of HW, mostly Aspen/WA.
- 4/29/20 - Pockets of single tree aspen blowdown. Time to regenerate - a ton of Aspen. A few stonewalls across slope, some stone piles that don't appear to be significant. Cross slope skid doesn't seem like an issue. Gets a little wetter closer to landing, try to avoid and/or trees.
- 4/26/21 → Found and approved 2 spots to breach wall W-E

Resource Concerns: VIZ, Stonewalls, butternut

SOH: W

5

| Comp | Stand | Date | YoO (1962) | | EV | Acres | Treated |
|---|---|---|---|---|---|---|---|
| 160 | 46 | 4/17/19 | 1972 | | 87 | 45 | |
| BA | QMD | % AGS - BA | | | AS | SIO | ELT |
| 138 | 10.2 | 55% | 76BA | | | M-VH | 115A |

Planned Rx: Group Selection

Past Harvest: N/A

- WP = 11BA, 12.6 QMD. Rocky/Ledgy stand, primarily BF/RS/RM/PB with scattered WP and NHW pockets. Great regeneration potential, some areas thick SF regen.
- Evidence this stand was once picked over, but not as hard as adjacent HW stands. A lot of Age diversity, my guess is the stand as a whole is older than 1972, probably closer to 1950-1965
- 11/9/20 - Regarding heritage site in N end of Unit, went out with heritage staff → Documented it is ok to use/expand stonewall opening and skid within 50 ft (WMNF) arbitrary buffer on high/flat/dry side. Try to hug flag line.
- 1/11/22 → Up to 1ac groups

Resource Concerns: Heritage Sites, stonewalls, MA 8.3

SOH: W

7

| Comp | Stand | Date | YoO | | EV | Acres | Treated |
|---|---|---|---|---|---|---|---|
| 160 | 58 | 3/26/19 | 1925? | | 81 | 101 | 19/90 |
| BA | QMD | % AGS - BA | | | AS | SIO | ELT |
| 84 | 9.1 | 49% | 41BA | | | H-M | 105D |

Planned Rx: Group Selection

Past Harvest: N/A

- RM/SM/PB = QMD 11-12.3
- Stand very heavily cut, regenerating NHW mix with some residual areas uncut. Won't be a ton of volume but good time to turn this over to UEA with GS. Good skid trail back to landing. Heavily cut areas regenerating mix of YB/WA/PB, some SM/BF.
- 12/8/21 - conversation w/ Ken D → 1 ac tops for Viz

Resource Concerns: Lake RMZ (300 Ft)

SOH: W

(8)

Project Name:

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 160 | 59 | 3/26/19 | 1931 | 87 | 22 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 98 | 11.1 | 64% | 62BA | | | 1156/115A |

Planned Rx: Clearcut
Past Harvest: N/A

- Lowland hardwoods, fair amount of mature/fading Aspen especially closer to lake. Stand diameter is a bit low but overstory is overall pretty poor quality
- 6/16/20 → Nice regen opportunity but no reasonable way to get to landing - too wet. Dryer by lake but too close
  ↳ Deferred 6/18/20

Resource Concerns:

SOH: W

(6)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 160 | 47 | 7/20/18 | 1988 | 81 | 30 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 71 | 9.6 | 72% | 51BA | | | 115A |

Planned Rx: Group Selection
Past Harvest: N/A

- Much of Stand heavily cut, could manage w/ GS and put in skid system to connect back to landing
- 11/5/20 - Definitely seems like a way to get up to landing but it will take very careful layout. Worth it?
- 1/11/22 - Up to 8 ac groups

Resource Concerns:

SOH: W

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| | | | | | | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| | | | | | | |

Planned Rx:
Past Harvest:

Resource Concerns

SOH:

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| | | | | | | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| | | | | | | |

Planned Rx:
Past Harvest:

Resource Concerns:

SOH:

Stand 1 Is WP stand

Project Name: Tarleton

(41)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 163 | 1 | 2/28/18 | 1973 | 89 | 40 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 96 | 8.4 | 74% | 71BA | | | 115G/115A |

Planned Rx: Improvement Cut

Past Harvest: N/A

- Pole stand with wet spots and significant WA component. Consider laying out a skid system to make next thinning easy - Target WA and mature aspen. May need to tweak boundary. Diameters and density seem more than 96BA; maybe ok to do thinning now, especially if enough RO.
- 9/27/21 → Rectangular SW off road does exist. Found opening that will need to be expanded but works. Found another in the far SE corner. The linear wall S of the rectangle does not exist on the ground.

Resource Concerns: Stonewalls, F+G Recs, NWS KV

SOH: W

(42)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 163 | 2 | 5/17/18 | 1926 | 3 | 17 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 197 | 16.5 | 94% | 186 | | | 1156 |

Planned Rx: Seed Tree

Past Harvest: N/A

- Very little regen, some areas have major blowdown. High priority for treatment, WP too old/big to thin and will likely blowdown. N end has wet spots. WP - 80% of BA, 21.3 QMD
- 6/16/20 - Andy agreed with strong potential for blowdown. Hardwood understory supports 115G. More fresh blowdown. Try leaving some strategic LT'S, transition to HW cover type while retaining some WP.
- 9/27/21 → Mapped stonewall not exist on ground. Area over by boundary seems wet. Great place for panel using a break at the corner, may need to go into W finger.

Resource Concerns: Stonewalls, Heritage Site, wetland, F+G Recs, NWS KV

→ Super canopy WP for Nesting Habitat

SOH: W

~~(43)~~

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 163 | 3 | 5/15/18 | 1916 | 7 | 13 | 3 |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 177 | 12.8 | 74% | 131BA | | VH | 115A/2D |

Planned Rx: Clearcut

Past Harvest: N/A

- Norway spruce plantation → 94%, 166BA, 13 QMD
- No regen, very dark, some natural mortality

↳ Dropped 10/8/20 due to AT adjacency

Resource Concerns MA8.3

SOH: W

(45)

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 163 | 5 | 5/17/18 | 1916 | 87 | 6 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 148 | 11.3 | 57% | 84BA | | | 1156 |

Planned Rx: Improvement Cut

Past Harvest: N/A

- Norway spruce = 36BA, 18.7 BA WP - 8BA, 24.4 QMD
- Stand as a whole is somewhat wet. Very diverse understory. RO component not picked up in inventory. UEA stand, nice pole/small sawtimber class. Older age class beginning to fall out. Consider dominant tree thinning approach, target all Norway Spruce
- 9/27/21 → Stonewalls don't actually come into unit or don't exist on the ground

Resource Concerns: ~~Stonewalls~~, F+G Recs, NWS KV

SOH: W

(44) → Deferred 6/18/20 due to Access

Project Name:

40

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 163 | 6 | 3/26/19 | 1966 | 87 | 23 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 86 | 11.5 | 70% | 60BA | | | 115G |

Planned Rx: Group Selection w/STS
Past Harvest: N/A

• NHW stand with VEA feel. Fair amount of WA in overstory, most of overstory is in small sawlog size class. Scattered WP. Rich areas, majority of stand has BF & RS regen, sometimes sparse. A combo of STS/GS would move this toward MW. West end seems wet but still operable if supercold.
• 6/16/20 → 115G confirmed with Andy, no issues with winter ground with some slash.
• 9/27/21 → confirmed w/ Heritage ok to cross old road near berm. No wall on S side and severely broken wall downhill of big berm. Try to hug side of berm.
→ Found butternut, barberry in heritage site, tamarack, NW Spruce
• 8/4 – went out with Botanist, confirmed [illegible] black ash. Consider keeping out wet area [illegible] road and on the west side for black ash mgmt. [illegible] wise

Resource Concerns: Heritage Site, Stonewalls, Wetlands, [illegible] tree), Exclude [illegible] acres on NW side, Groups up to 2A
NWS KV

SOH: W

37

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 163 | 7 | 5/17/18 | 1922 | 89 | 84 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 100 | 10.5 | 60% | 60BA | | | 115G/2D |

Planned Rx: Group Selection [illegible] 89
Past Harvest: Group Selection 1998 (State) [illegible] groups

• Very mixed stand. Significant WP overstory component not picked up in inventory. Marginally productive sites upland. Old Groups variable – some have regen failure due to moose browse. Skid trails in place.
• 11/9/20 – Old groups mixed bag. Some actually have great diversity. Consider TSI in old groups. Consistent PB declining component across stand and should be targeted.
• 9/27/21 → No existing openings along southern border. Confirming a new breach ± 420 ft from Cape Moonshine, between SM and coppiced YB. Good flat area to jump on old skid system.

Resource Concerns: Stonewalls, Heritage site, Fab Rec, Tamarack, Groups up to 2 ac
NWS KV?

SOH: W

39

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 163 | 9 | 2/28/18 | 1916 | 7 | 2 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 180 | 13.2 | | | W | VH | 115/102c |

Planned Rx: clearcut
Past Harvest: N/A

• Norway Spruce Stand, sloped, west facing operable slopes. Nearly 100% NWS. No regen, density driven mortality [illegible]
• 6/16/20 – Soils shallow with plateaus. Soil pit indicates deeper, deep enough for WP. Some areas showing multi tree mortality and breakage. Confirmed mostly 115c "Ledgy with deep pockets"
• 10/8/20 – Consider managing as single group and merge w/ U37. AT Buffer makes it too small to manage as own stand and too small to plant.

Resource Concerns MA 8.3

SOH: W

38

| Comp | Stand | Date | YoO | EV | Acres | Treated |
|---|---|---|---|---|---|---|
| 163 | 12 | 2/28/18 | 1937 | 81 | 14 | |
| **BA** | **QMD** | **% AGS - BA** | | **AS** | **SIO** | **ELT** |
| 108 | 9.5 | 57% | 62BA | | | 115A/2D |

Planned Rx: Group Selection
Past Harvest: N/A

• Manage w/ Stand 7. Some inoperable ground. Consider combining after treatment.

Resource Concerns: MA 8.3, Botany PA, Groups up to [illegible]?

SOH: W

Updated 10/8/20

* Denotes a Unit fully or partially in MA 8.3

| NEPA Unit | Compartment / Stand | Forest Type | Gross Acres | Estimated Treated Acres | Harvest Prescription | Season of Harvest | Site Prep Acres | Tree Release Acres | Plant | Regen Objective |
|---|---|---|---|---|---|---|---|---|---|---|
| **1*** | 155 / 1 | 89 | 13 | 3 | Group Selection | W | 3 | | | UEA MW |
| **2*** | 155 / 2 | 84 | 30 | 30 | Clearcut | W | 30 | | | EA HW |
| **3*** | 155 /3 | 87 | 29 | 29 | Single Tree Selection with Groups | W | 6 | | | UEA MW |
| **4*** | 155 / 4 | 87 | 33 | 33 | Single Tree Selection with Groups | W | 6 | | | UEA MW |
| **5*** | 160 / 46 | 87 | 45 | 9 | Group Selection | W | 9 | | | UEA SW |
| **6** | 160 / 47 | 81 | 30 | 6 | Group Selection | W | 6 | | | UEA MW |
| **7** | 160 / 58 | 81 | 101 | 20 | Group Selection | W | 20 | | | UEA HW |
| **9** | 160 / 43 | 89 | 70 | 14 | Group Selection | W | 14 | | | UEA HW |
| **10** | 160 / 42 | 89 | 65 | 13 | Group Selection | W | 13 | | | UEA MW |
| **11** | 160 / 40 | 89 | 114 | 114 | Thinning | W | | | | |
| **12** | 160 / 39 | 96 | 8 | 8 | Clearcut | W | 8 | | | EA AB |
| **13** | 160 / 6 | 89 | 14 | 14 | Clearcut | W | 14 | | | EA AB |
| **14** | 160 / 6 | 89 | 37 | 37 | Thinning | W | | | | |
| **15*** | 155 / 15 | 85 | 5 | 5 | Single Tree Selection with Groups | W | 1 | | | UEA HW |
| **16*** | 155 / 16 | 81 | 12 | 12 | Single Tree Selection with Groups | W | 3 | | | UEA HW |
| **17*** | 155 / 17 | 89 | 11 | 11 | Clearcut | W | 11 | | | EA AB |
| **18*** | 155 / 18 | 85 | 10 | 10 | Single Tree Selection with Groups | W | 2 | | | UEA HW |
| **19*** | 155 / 19 | 81 | 13 | 13 | Single Tree Selection with Groups | W | 3 | | | UEA HW |
| **20*** | 155 / 20 | 81 | 11 | 11 | Single Tree Selection with Groups | W | 2 | | | UEA HW |
| **21*** | 155 / 21 | 81 | 31 | 31 | Single Tree Selection with Groups | W | 6 | | | UEA HW |
| **22** | 155 / 22 | 89 | 22 | 22 | Single Tree Selection with Groups | W | 5 | | | UEA HW |
| **23** | 160 / 45 | 81 | 16 | 16 | Clearcut | W | 16 | | | EA AB |
| **24*** | 155 / 24 | 81 | 11 | 11 | Single Tree Selection with Groups | W | 2 | | | UEA HW |
| **25** | 155 / 25 | 96 | 10 | 10 | Clearcut | W | 10 | | | EA AB |
| **26*** | 155 / 43 | 81 | 10 | 10 | Single Tree Selection with Groups | W | 2 | | | UEA HW |
| **27** | 155 / 27 | 89 | 6 | 6 | Clearcut | W | 6 | | | EA HW |
| **28** | 155 / 28 | 84 | 8 | 8 | Clearcut | W | 8 | | | EA AB |
| **29** | 160 / 29 | 89 | 91 | 18 | Group Selection | W | 18 | | | UEA HW |
| **30** | 160 / 30 | 11 | 20 | 20 | Improvement Cut | W | | 20 | | |
| **31** | 160 / 7 | 89 | 20 | 20 | Improvement Cut | W | | 20 | | |
| **32** | 160 / 13 | 81 | 71 | 71 | Single Tree Selection with Groups | W | 15 | | | UEA HW |
| **33** | 160 / 27 | 81 | 68 | 68 | Single Tree Selection with Groups | W | 14 | | | UEA HW |
| **34** | 160 / 8 | 84 | 14 | 14 | Clearcut | W | 14 | | | EA HW |
| **35** | 160 / 5 | 84 | 38 | 38 | Improvement Cut | W | | 38 | | |
| **36** | 160 / 36 | 96 | 12 | 12 | Overstory Removal | W | | 12 | | EA MW |
| **37*** | 163 / 7 | 89 | 84 | 17 | Group Selection | W | 17 | | | UEA HW |
| **38*** | 163 / 12 | 81 | 14 | 3 | Group Selection | W | 3 | | | UEA HW |
| **39*** | 163 / 9 | 7 | 2 | 2 | Patch Cut | W | | | 2 | EA WP |
| **40** | 163 / 6 | 87 | 23 | 23 | Single Tree Selection with Groups | W | 5 | | | UEA HW |
| **41*** | 163 / 2 | 89 | 40 | 40 | Improvement Cut | W | | | | |
| **42** | 163 / 1 | 3 | 17 | 17 | Seed Tree | W | | 17 | | |
| **45** | 163 / 5 | 87 | 7 | 7 | Improvement Cut | W | | 7 | | |
| **Totals** | | | **1,286** | **876** | | | **292** | **114** | **2** | |

| | | | | |
|---|---|---|---|---|
| Clearcut | | 117 | 115 | |
| OSR | | 12 | 15 | |
| Patch Cut | | 2 | 5 | |
| Seed Tree | | 17 | 20 | |
| Improvement Cut | | 125 | 130 | |
| Thinning | | 151 | 150 | |
| Group Slection | | 103 | 110 | |
| STS/GS | | 349 | 350 | |
| | 888 Total Treatment | | 900 Round | 895 |
| Site Prep | | 292 | | |
| Release and Weed | | 114 | | |
| Plant | | 2 | | |

United States Department of Agriculture
Forest Service

# Tarleton Integrated Resource Project

## Biological Evaluation

**Pemigewasset Ranger District, White Mountain National Forest, Grafton County, New Hampshire**

**September 2023**

Prepared by:

_/S/ Brett Hillman_ 3/15/2023

Brett Hillman, District Wildlife Biologist Date

_/S/ Dan Sperduto_ 1/5/2022

Dan Sperduto, Forest Botanist Date

**For more information, please contact:**

Brett Hillman
Pemigewasset Ranger District, White Mountain National Forest
71 White Mountain Drive
Campton, NH 03223
Phone: 603-536-6127
Email: brett.hillman@usda.gov

# Contents

Introduction ....................................................4
Proposed Project Description ....................................................4
Location ....................................................4
Proposed Action ....................................................6
Methodology ....................................................6
Probability of Species Occurrence ....................................................7
Effects Analysis of the Proposed Action ....................................................7
Federal Threatened, Endangered & Proposed Species ....................................................9
Northern Long-eared Bat ....................................................9
Tricolored Bat ....................................................11
Regional Forester Sensitive Species ....................................................13
Little brown bat and eastern small-footed bat ....................................................13
American Peregrine Falcon ....................................................13
Common Loon ....................................................14
Osprey ....................................................15
Pied-billed Grebe ....................................................16
Headwater *Ameletus* Mayflies ....................................................16
Yellow-banded Bumblebee and Monarch Butterfly ....................................................17
American Ginseng ....................................................19
References ....................................................21
Appendix A: Effects Evaluation Summary ....................................................24
Animals ....................................................25
Plants ....................................................32

**List of Tables**

Table 1: TEPS species that occur or may occur in the action area. ....................................................8

**List of Figures**

Figure 1. Action area map. ....................................................5

# Introduction

This document accounts for potential effects of the Tarleton Integrated Resource Project on US Fish and Wildlife Service (USFWS) Endangered, Threatened and Proposed species and USDA Forest Service (FS) Region 9 Regional Forester Sensitive Species (RFSS), collectively referred to as Threatened, Endangered, Proposed and Sensitive (TEPS) species. Wildlife biologists and botanists have reviewed this project and investigated available information on species distributions and habitat (using topographic maps, aerial photos, field reconnaissance, previous surveys, vegetation data, and/or habitat requirement data for each species) to assess the potential for effects to TEPS species. The Biological Evaluation (BE) process is intended to identify and document activities that may affect any TEPS wildlife, fish, or plant species; or designated/proposed critical habitat of record for the action area. This BE is prepared in accordance with legal requirements set forth under Section 7 of the Endangered Species Act (16 U.S.C. 1536 (c)). This process also complies with the Forest Service Manual (FSM 2672.42) and White Mountain National Forest (WMNF) Land and Resource Management Plan (Forest Plan) Wildlife Objectives, Standards and Guidelines (USDA Forest Service 2005a).

An additional document (Hillman 2020a) was prepared by the Wildlife Biologist to detail what is currently known about the wildlife and wildlife habitat of the action area in addition to how Forest Plan Standard and Guidelines would apply to the project. TEPS species are discussed in this document although, unlike the BE, they are not the sole focus.

## Proposed Project Description

### Location

The project is located on National Forest System lands in the Towns of Piermont and Warren in Grafton County, NH (Figure 1). The elevation of the action area ranges from 1060 to 2180 feet. Three lakes (Tarleton, Katherine, and Constance) are contained within and another (Armington) abuts the action area.

The action area consists of two parcels of land separated by about two miles. The larger of the two constitutes the original boundary of the Tarleton HMU and is over 5,100 acres in size. The smaller parcel, which is nearly 250 acres in size, is located to the south and is the former Sentinel Mountain State Forest. A newer acquisition, this parcel was added to the Tarleton HMU because of its proximity.

For more information on the habitat composition of the Tarleton HMU, see Hillman (2020b).

Benton
Haverhill
Charleston Rd
Eastman Brook
Apple orchard
25
Lake Katherine
Lake Tarleton
Piermont
Warren
Cape Moonshine Rd
Sentinal Mountain Area
Orford
Wentworth
USDA
0 0.5 1 Mile
Proposed Actions
Gates or Barriers
Boat Launch
Road Maintenance
Apple Orchard
Wildlife Opening
Proposed Harvest Treatments
N
Map Legend
Road
Appalachian Trail
Project Area
Town
National Forest Land
VICINITY MAP
VT
ME
NH
Project Location
White Mountain National Forest

**Figure 1. Action area map.**

## Proposed Action

The following activities are included under the Proposed Action:

1. Vegetation and wildlife habitat management:
    a. Conduct commercial and non-commercial treatments within about 1,230 gross acres of forest stands in the action area; about 690 acres within those stands are proposed for silvicultural treatment.
    b. Use a variety of silvicultural treatments to meet objectives, including clearcuts with reserves, overstory removal, seed tree, thinning, improvement cutting, single tree selection, and group selection. Pre-commercial timber stand improvements and post-timber harvest mechanical site preparation are also proposed on select sites.
    c. Reconfigure the existing wildlife opening located on both sides of Route 25C. Remove nonnative Scots pine in the process.
    d. Adopt an existing apple orchard as a permanent wildlife opening and continue to maintain it as such. This orchard is also proposed to be expanded.
    e. Add large woody material to Lake Katherine to improve aquatic habitat.
2. Transportation system improvements:
    a. Reconstruct and maintain about 1.7 miles of road. No new road construction is proposed, and no unauthorized roads have been identified for decommissioning.
    b. Add about 4.5 miles of unauthorized roads to the Forest Service road system.
    c. Install up to ten barriers or gates to control access for resource protection and administrative use within the action area.
3. Other activities:
    a. Redesign the Lake Katherine boat launch to address safety and resource concerns.

All tree removal activities would occur during the winter season, i.e. outside of the active season for bats. Consult the Environmental Assessment for more details on these activities.

# Methodology

Literature reviews were conducted to determine the life histories and habitat requirements of each TEPS species. In addition, all past field surveys and other sources of occurrence information were reviewed to determine known locations of TEPS species relative to the action area.

The general habitat condition of the action area was determined from field reviews of stand conditions, which are stored in compartment records, as well as recent field reviews conducted within the action area between 2018 and 2020 by Forest Service staff during the planning of this project. Each compartment received field visits to assess habitat conditions and determine the presence of important or rare habitat features (i.e., vernal pools, milkweed, deer wintering areas, bear-clawed trees, raptor nests, etc.).

Acoustic bat surveys were conducted at two sites in the action area by New Hampshire Fish and Game biologists in July 2019.

Botanical field surveys were conducted throughout the entire action area by Botanical Technicians during the 2012-2013, 2016, 2017, and 2018 field seasons (unpublished WMNF data, Campton, NH). Prior to surveys, WMNF Botany staff reviewed information on TES and RFSS plant occurrences in the vicinity of the action area and similar geographic settings on the WMNF.

Comprehensive data on occurrences of rare plants in New Hampshire are available to the WMNF through regular updates from the New Hampshire Natural Heritage Bureau (Biotics database). Botanical surveys were conducted in nearly all stands within the action area as well as within many surrounding stands that are not proposed for activities. All species encountered within a stand were recorded in a network of plots, and other habitat and ecological characteristics were documented in these plots, and as appropriate between plot points. Follow-up surveys were conducted in stands that contained appropriate habitat for particular rare plants.

# Probability of Species Occurrence

All TEPS species were considered for evaluation of effects resulting from the Proposed Action (Appendix A). Based on the review of all available information, the species listed in Table 1 have potential to occur or are documented within the action area. All the species listed in Table 1 are analyzed for effects in the proceeding section. The U.S. Fish and Wildlife Service (USFWS) Information for Planning and Conservation (IPaC) website was used to determine which federally-listed species may occur within the action area.

# Effects Analysis of the Proposed Action

For each species listed in Table 1, the direct, indirect, and cumulative effects are evaluated in this section. The spatial and temporal scales of the effects analysis are defined here.

The analysis area for direct and indirect effects on TEPS species includes stands proposed for harvest and the immediate areas associated with the connected actions of road reconstruction and maintenance, gate installation, landing construction and reconstruction, skid trails, expansion and maintenance of wildlife orchards and openings, and reconstruction of the Lake Katherine boat launch. The temporal scope for direct effects on TEPS species is the time period that encompasses active timber harvest operations and all other ground disturbing and tree removal activities because this is when species would most likely be affected by the proposed activities. The temporal scope for indirect effects is on the order of several decades to centuries because that is how long it can take for forested stands to provide similar habitat structure post-harvest compared to pre-harvest.

The analysis area for cumulative effects for TEPS species resulting from the activities included under the Proposed Action encompasses National Forest System lands located within the Tarleton HMU. This area was chosen because the habitat objectives for the HMU provide a measurable assessment of how the Proposed Action contributes to the habitat objectives of the WMNF, as defined in the Forest Plan (USDA Forest Service 2005a). This area is large enough to cover the home ranges of both wildlife and plant species and to account for effects to habitat connectivity and travel and migration corridors of some of the species discussed in this document. This large area also provides for the consideration of habitat diversity at the landscape level as well as recent or proposed projects near the action area that may affect habitat diversity. Activities on private and state-owned land adjacent to the HMU was also considered.

The temporal scope for cumulative effects for TEPS species is ten years in the past and fifteen years in the future (2013 to 2038) because this time period encompasses recent and active harvest operations and connected actions as well as reasonably foreseeable future actions that have or would occur concurrently within the cumulative effects analysis area. It also includes the timeframe when any regeneration harvests would move into a young age class.

Activities considered for the cumulative effects analysis include past timber sales, ongoing hazard tree removal, future timber stand improvement work, treatment and removal of non-native invasive plant species, and all other vegetation management activities.

There were a number of vegetation management activities conducted within the project area prior to the start of the cumulative effects analysis period (25 or more years ago; see page 7 of the Environmental Assessment). As a result, the project area contains some young forest habitat mixed in with more mature forests. There is minimal regeneration-aged habitat since no vegetation management has been conducted in over two decades. For a more detailed description of the present-day habitat composition that has resulted from those harvests, see Hillman (2020b).

**Table 1: TEPS species that occur or may occur in the action area.**

| Species | Status | Probability of Occurrence |
|---|---|---|
| Northern long-eared bat | Federally endangered | Known to occur in action area (at least historically). Potential foraging and roosting habitat exists in forested stands. Individuals typically roost in cavities and under exfoliating bark of live or dead trees. |
| Tricolored bat | Federally proposed endangered | May occur in action area although it has not been observed. Presence is assumed. Potential foraging and roosting habitat exists in forested stands of varied ages and structures. Individuals typically roost in live or dead foliage in the forest canopy. |
| Little brown bat and eastern small-footed bat | RFSS | Known to occur in action area (at least historically). Potential foraging and roosting habitat exists in forested stands. Little brown bats typically roost in manmade structures, tree cavities, and under exfoliating bark of live or dead trees. Eastern small-footed bats typically roost in rock features but also known to roost in trees. |
| American peregrine falcon | RFSS | Suitable habitat for foraging does occur within open areas on both sides of Route 25C; no known occurrences within action area. |
| Common loon | RFSS | Known to nest annually on Tarleton and Armington. May nest occasionally on Katherine. All three lakes likely serve as stopover habitat during migration. |
| Osprey | RFSS | Has been observed at Tarleton and Armington but no nest sites are known. |
| Pied-billed grebe | RFSS | Suitable nesting and foraging habitat likely exists in small areas near the margins of the lakes, but there is no evidence of breeding within the action area. The species has been observed during spring migration season and all three lakes may serve as stopover habitat during migration. |
| Headwater *Ameletus* Mayflies | RFSS | No known occurrences in action area. Potential habitat does occur in headwater streams. |
| Monarch butterfly | RFSS | Species documented in powerline corridor and is likely also present in permanent wildlife opening, orchards, open wetlands, and other natural and manmade open areas. |

| | | |
|---|---|---|
| Yellow-banded bumblebee | RFSS | No known occurrences in action area. Potential habitat exists within wildlife openings, orchards, and powerline corridor, so species is assumed to be present. |
| American Ginseng | RFSS | Suitable habitat exists but is limited in extent; known from the greater vicinity of the action area. |

# Federal Threatened, Endangered & Proposed Species

This section considers the potential impacts of the project on the northern long-eared bat and tricolored bat.

## Northern Long-eared Bat

### Life History and Occurrence Information

A summary of the northern long-eared bat's (NLEB) life history and occurrence information is available in the project record (USDA Forest Service 2019a) and a brief overview of key habitat requirements is included in Table 1. White-nose syndrome has decimated the NLEB across its range, including within the action area.

The NLEB has been documented throughout the WMNF. Roosting and foraging habitat does exist within the action area and Chenger (2004) captured individuals along Charleston Road prior to the advent of white-nose syndrome. Although the New Hampshire Fish and Game Department (NHFGD) did not capture any NLEBs during a two-night repeated effort in July 2019 (NHFGD 2019), presence of the NLEB is assumed. There are no known hibernacula or roost trees within the action area, so there are no habitat features that would require a buffer from project activities.

### Habitat Suitability and Analysis of Effects

This effects analysis assumes that all Forest Plan Standards and Guidelines, in particular those applicable to wildlife reserve trees (USDA Forest Service 2005a, p. 2-35), and the NLEB conservation measures developed by the Eastern Region of the USDA Forest Service (Sandeno 2015) would be followed.

All tree removal activities are proposed to take place in the winter when bats are not active on the landscape. And since no known hibernacula exist within the action area, the NLEB is not expected to be present within the action area when these activities take place. No other activities included in the Proposed Action that would take place during the NLEB active season (April 1 to October 30) would directly affect the NLEB. Therefore, no direct effects related to tree removal activities are anticipated.

Indirect effects include those that impact bats through alteration of habitat, such as the removal of unidentified roost trees when bats are not present. Site fidelity is common in NLEB, and females often return to the same maternity area over multiple years (USFWS 2022a, USDA Forest Service 2014). The removal of preferred roost trees while bats are hibernating can impact maternity colonies when bats return to the landscape (USFWS 2022a), though research has shown that an NLEB maternity colony can persist with a 17 percent reduction of the roost trees associated with that colony. This would be consistent with the ephemeral nature of snags (Silvis et al. 2015). The degree of impact can be significant in fragmented landscapes or when a high percentage of summer habitat is removed, or it may be minor if tree removal occurs in a largely forested area (USFWS 2022a).

Under the proposed action, 690 of 5,375 acres (13 percent) in the HMU would receive silvicultural treatments. Most of this acreage (550 of 690 acres) would receive intermediate or uneven-aged regeneration treatments, such as thinning and single-tree selection, that would result in most or all potential roost trees remaining within treated stands. There would still be ample roost trees available within treated stands, within the action area as a whole, and across the mostly forested landscape beyond the action area after the proposed timber harvests have been conducted. Across the WMNF, there is evidence to support that the northern long-eared bat is not limited by the availability of roosting habitat (Sease and Prout 2015). Therefore, if preferred roost trees were removed, any maternity colonies that potentially occur within harvested stands would have alternative roost trees available, although they may have to shift to other, more suitable roosting locations within or outside of the action area.

A key need of this project is to diversify the forest in part to improve wildlife habitat; it has been shown that forest management resulting in a heterogeneous forest (in terms of forest type, age, and structural characteristics) may benefit the northern long-eared bat (USFWS 2022a). So, while removing unidentified roost trees may negatively impact bats in the short-term, the diversified forest that would result from the proposed action may yield long-term benefits. It is possible for land managers to regenerate forests while still meeting NLEB's roosting habitat requirements provided potential roost trees are retained (USFWS 2022a).

It is also important to note that while unidentified roosts may be removed during timber harvests, the landscape would still be available to bats as foraging and commuting habitat. For the most part, loss of roosting habitat would be a short-term, temporary effect because harvested stands would grow back post-harvest. By implementing Forest Plan Standards and Guidelines related to wildlife reserve trees (USDA Forest Service 2005a, p. 2-35), trees that have the potential to serve as roosts would remain in harvested stands.

While foraging habitat may be impacted by project activities, these impacts may be beneficial since the NLEB is known to forage over open habitats. Bats appear to follow physical land features such as roads, trails, streams, and ridge lines. Therefore, there may be indirect beneficial effects to foraging habitat resulting from the creation of new roads and trails, including skid trails, under the Proposed Action. There would be no indirect effects to foraging habitat adjacent to riparian areas and wetlands as these areas are protected (USDA Forest Service 2005a, pages 2-24 to 2-26).

Timber harvests and other vegetation management activities have occurred and are likely to occur on non-federal land within the action area, particularly within the powerline corridor that runs through the action area. Federal actions that have occurred in the past or are expected to occur in the future include small-scale vegetation management activities such as the maintenance of wildlife openings and the treatment of nonnative invasive plant species. These actions are considered as potential cumulative effects to the Proposed Action.

The USFWS estimates up to 1.0 percent of the New Hampshire NLEB population will be disturbed and 0.1 percent of the pup population and less than 0.05 percent of the adult population will be harmed annually from the combination of timber harvest, prescribed fire, forest conversion, and wind turbine operation (USFWS 2016b). Therefore, the vast majority of individuals and populations that survive white-nose syndrome would be unaffected by these activities.

Bats infected with white-nose syndrome are in poor health when they emerge from hibernation and the stress of being forced to find new summer habitat can decrease their chances of survival, recovering from their infection, and successfully rearing pups (USFWS 2022a). Leaving an ample supply of potential roosts in harvested areas helps to mitigate this threat.

The cumulative loss of roosting habitat is not anticipated to be adverse because the NLEB is not considered to be limited by the availability of such habitat on the WMNF (Sease and Prout 2015). As far as the treatment of nonnative invasive plants is concerned, the Forest Service has determined such activities would have no effect on bats (Prout 2006). The powerline corridor is managed as scrub-shrub habitat and therefore does not serve as roosting habitat for bats. Continued maintenance will result in the corridor serving as foraging and commuting habitat in perpetuity.

### Determination of Effects

No direct effects are anticipated, and indirect and cumulative effects may impact only a small number of bats and lead to subtle shifts in the locations of summer roosts. Therefore, the Proposed Action may affect, but is not likely to adversely affect, the northern long-eared bat.

Initially, it was determined the Proposed Action would have no effects beyond those previously disclosed in the programmatic Biological Opinion (BO) on implementing the final 4(d) rule dated January 5, 2016 (USFWS 2016). Streamlined consultation with the United States Fish and Wildlife Service (USFWS) under Section 7 of the Endangered Species Act was completed in February 2021. However, on November 30, 2022, the USFWS issued a rule to reclassify the NLEB as endangered. This action removed the final 4(d) rule because such rules only apply to species designated as threatened. As a result, the Forest Service reinitiated consultation on August 22, 2022 (USDA Forest Service 2022a, 2022b, 2022c) and the USFWS issued its corresponding BO on March 31, 2023 (USFWS 2023a, 2023b). The agency concurred with the Forest Service's determination that the project may affect, but is not likely to adversely affect, the northern long-eared bat. As this is a may effect, but not likely to adversely affect determination, there are no reasonable or prudent measures to incorporate. Therefore, the project, as proposed, is in compliance with the Endangered Species Act.

## Tricolored Bat

### Life History and Occurrence Information

A summary of the tricolored bat's (TCB) life history and occurrence information is available in the project record (USDA Forest Service 2019b) and a brief overview of key habitat requirements is included in Table 1. Like the NLEB, the TCB has suffered population declines due to white-nose syndrome.

The TCB has been documented on the WMNF, although far less frequently than the other species considered in this document. This species was likely rare, or at least uncommon compared to other species, even before the advent of white-nose syndrome. Neither Chenger (2004) nor NHFGD (2019) captured any individuals during survey efforts in the action area. However, roosting and foraging habitat does exist within the action area and the presence of the species is assumed. There are no known hibernacula or roost trees within the action area, so there are no habitat features that would require a buffer from project activities.

### Habitat Suitability and Analysis of Effects

This effects analysis assumes that all Forest Plan Standards and Guidelines, in particular those applicable to wildlife reserve trees (USDA Forest Service 2005a, p. 2-35), and the NLEB conservation measures developed by the Eastern Region of the USDA Forest Service (Sandeno 2015) would be followed.

All tree removal activities are proposed to take place in the winter when bats are not active on the landscape. And since no known hibernacula exist within the action area, the TCB is not expected to be present within the action area when these activities take place. No other activities included in the Proposed Action that would take place during the TCB's active season (April 1 to October 30) would directly affect the species. Therefore, no direct effects are anticipated.

Indirect effects include those that affect bats through alteration of habitat, such as the removal of unidentified roost trees when bats are not present. While the TCB is not limited by the availability of roosting habitat (USFWS 2022c) and ample roost trees would still be available within the action area and the surrounding area after the proposed timber harvests have been conducted, bats may be impacted if existing maternity roost trees are removed. The TCB does exhibit a high degree of summer roost site fidelity, so the removal of preferred roost trees or trees in a preferred roosting stand could lead to a shift in summer occupancy.

While foraging habitat may be impacted by project activities, these impacts may be beneficial since the TCB is known to forage over open habitats. Bats appear to follow physical land features such as roads, trails, streams, and ridge lines. Therefore, there may be indirect beneficial effects to foraging habitat resulting from the creation of new roads and trails, including skid trails, under the Proposed Action. There would be no indirect effects to foraging habitat adjacent to riparian areas and wetlands as these areas are protected (USDA Forest Service 2005a, pages 2-24 to 2-26).

The activities that have the potential to pose cumulative effects to the TCB are the same as those discussed for the NLEB. As with the NLEB, the tricolored bat is not believed to be limited by availability of roosting habitat at the present time nor is it expected to be in the future (USFWS 2022c). Therefore, the cumulative effects related to the temporary loss of potential summer roosting habitat due to vegetation management activities within the action area are not anticipated to be adverse.

There may be impacts that are additive to those associated with white-nose syndrome. The USFWS (2021) determined losses or shifts of summer habitat may compound the impacts of white-nose syndrome as infected bats may be forced to expend additional energy locating adequate summer roosting habitat. This is more of an issue in landscapes that are already highly fragmented (USFWS 2021). Leaving an ample supply of potential roosts in harvested areas helps to mitigate this threat.

The powerline corridor is managed as scrub-shrub habitat and therefore does not serve as roosting habitat for bats. Continued maintenance will result in the corridor serving as foraging and commuting habitat in perpetuity.

The Forest Service has determined that activities involved in treating nonnative invasive plant species would have no effect on bats (Prout 2006).

## Determination of Effects

Because no direct effects are anticipated and indirect and cumulative effects may impact only a small number of bats and lead to subtle shifts in the locations of summer roosts, the Proposed Action would not jeopardize the continued existence of the TCB. Conferencing with the USFWS on the TCB is not required.

Early in the planning stages of this project, the TCB was not listed under the Endangered Species Act. However, effects were considered since the species was listed as an RFSS. It was determined the Proposed Action may impact individuals but would not likely cause a trend toward federal listing or loss of viability. On September 14, 2022, the USFWS issued a proposed rule to list the

TCB as endangered (USFWS 2022c). Therefore, the BE has been updated to address the newly-acquired federal status of the TCB.

# Regional Forester Sensitive Species

This section considers the potential impacts of the project on RFSS that have the potential to occur within the action area.

## Little brown bat and eastern small-footed bat

### Life History and Occurrence Information

Summaries of the little brown and eastern small-footed bat's life history and occurrence information can be found in the project record (USDA Forest Service 2019c, 2019d). These two bat species have habitat requirements similar to the NLEB and TCB, although the eastern small-footed bat is less likely to be found roosting in the action area because it prefers roosting in areas containing exposed rock. Both species have also been negatively impacted by white-nose syndrome.

These species can be found throughout the WMNF. Chenger (2004) captured eastern small-footed and little brown bats in the action area in 2004 while NHFGD (2019) captured neither species at the same sites in 2019. Regardless of the recent survey results, the presence of both species within the action area during the active season is assumed. There are no known hibernacula or roost trees within the action area, so there are no habitat features that would require a buffer from project activities.

### Habitat Suitability and Analysis of Effects

As with the NLEB and tricolored bat, direct effects to these bat species are not anticipated since tree removal activities would take place while bats are hibernating. No hibernacula for these species are known to exist within the action area.

Tree removal activities, including timber harvest and connected actions, could result in the removal of unidentified roost trees. Even if bats are not present, this loss of habitat represents an indirect effect. As was the case with the NLEB and TCB, it is not believed that the woodland bats discussed here are limited by availability of roosting habitat.

Cumulative impacts to these species associated with white-nose syndrome and the removal of potential roost trees are similar to those of the NLEB and TCB.

### Determination of Effects

The Proposed Action may impact individual eastern small-footed and/or little brown bats but would not likely cause a trend toward federal listing or loss of viability.

## American Peregrine Falcon

### Life History and Occurrence Information

A summary of the American peregrine falcon's (*Falco peregrinus anatum*) life history and occurrence information can be found in the project record (USDA Forest Service 2019e). There are no known observations of the species within the action area although the species has been observed in the general vicinity (eBird 2022). While the American peregrine falcon is a subspecies of the

peregrine falcon, this analysis makes no distinction between the different subspecies that may exist in the action area.

### Habitat Suitability and Analysis of Effects

Potential foraging habitat within the action area includes the large open area along Route 25C, much of which is managed as a wildlife opening (the rest is located on state- and privately-owned property). Since the peregrine falcon is present in this part of New Hampshire year-round, individuals may be present within the action area when project activities, chiefly vegetation management, take place within this wildlife opening.

Direct effects are possible if activities occur while falcons are foraging within the opening. If this is the case, individuals would likely be displaced until activities have ceased. Negative indirect effects include the potential loss of perch trees if the non-native Scots pine trees are removed from the opening. However, there are ample perch trees of native species that would remain within and adjacent to the opening. Overall, the occasional maintenance of this wildlife opening results in a net indirect benefit to the species because, without maintenance, the opening would revert to a forested condition and the foraging habitat that exists today would be lost.

As mentioned above, the open character of the adjoining state- and privately-owned land contributes to the size and quality of peregrine falcon foraging habitat within the action area. The continued maintenance of these open lands represents a beneficial cumulative effect to the species.

### Determination of Effects

The Proposed Action may impact individual peregrine falcons but would not likely cause a trend toward federal listing or loss of viability.

## Common Loon

### Life History and Occurrence Information

A summary of the common loon’s (*Gavia immer*) life history and occurrence information can be found in the project record (USDA Forest Service 2019f). Both Lake Tarleton and Lake Armington actively support breeding loons while Lake Katherine does not typically support any breeding activity. Lake Constance has never been monitored for loons but is likely too small to support breeding (eBird 2022, Cooley 2019). The three larger lakes may also serve as stopover habitat during migration (eBird 2022).

### Habitat Suitability and Analysis of Effects

Suitable nesting, foraging, and migration stopover habitat occurs within the action area on the lakes listed above. While timber harvests are proposed in the general vicinity of known nest sites on Lake Tarleton (Cooley 2019), these activities would occur during the winter when loons are not present on the landscape. Additionally, the shoreline of Lake Tarleton would be buffered form timber harvest activities by 300 feet.

The only proposed activities that have the potential to impact the common loon is the work proposed at Lake Katherine (boat launch improvements and large wood addition along the shoreline). There is no breeding or chick rearing habitat within close proximity to this site, so no direct impacts are anticipated during the common loon’s most sensitive life stages. Direct impacts would only occur in the form of temporarily displacing loons that may be foraging close to the boat

launch during project activities. Ample foraging habitat still exists elsewhere in the lake as well as within the other lakes in the action area, so these effects would be insignificant.

Indirect effects are not anticipated because activities would not alter common loon habitat in any way. Forest Plan Standards and Guidelines regarding vegetation removal near waterbodies would ensure that loon habitat is not impacted by these activities.

A possible cumulative effect is the potential for increased boating traffic on Lake Katherine as a result of the improved boat launch. If this were to occur, loons may be temporarily displaced more frequently than they currently are by boaters.

### Determination of Effects

The Proposed Action may impact individual common loons but would not likely cause a trend toward federal listing or loss of viability.

## Osprey

### Life History and Occurrence Information

A summary of the osprey's (*Pandion haliaetus*) life history and occurrence information can be found in the project record (USDA Forest Service 2019g). The species is known to roost and forage on and around Lakes Tarleton, Armington, and Katherine (eBird 2022) although there is no evidence of nesting activity on these lakes (Kline and Settel 2020).

### Habitat Suitability and Analysis of Effects

Suitable foraging and roosting habitat exist in the action area. Although nesting activity has not been documented, ample nesting habitat exists in the action area in the form of tall trees and utility poles (particularly within the powerline corridor).

The only proposed activities that have the potential to impact the osprey is the work proposed at Lake Katherine (boat launch improvements and large wood addition along the shoreline). Direct impacts would only occur in the form of temporarily displacing ospreys that may be foraging or roosting close to the boat launch during project activities. Ample foraging and roosting habitat still exist elsewhere along the lake as well as within the other lakes in the action area, so these effects would be insignificant.

No indirect effects in the form of habitat alteration are anticipated. There are design features in place that would protect potential nest trees in the event ospreys attempt to nest within the action area in the future.

A possible cumulative effect is the potential for increased boating traffic on Lake Katherine as a result of the improved boat launch. If this were to occur, ospreys may be temporarily displaced more frequently than they currently are by boaters.

### Determination of Effects

The Proposed Action may impact individual ospreys but would not likely cause a trend toward federal listing or loss of viability.

## Pied-billed Grebe

### Life History and Occurrence Information

A summary of the pied-billed grebe's (*Podilymbus podiceps*) life history and occurrence information can be found in the project record (USDA Forest Service 2019h). While breeding has not been documented in the action area, the species has been observed on Lake Tarleton during the spring migration season (eBird 2022).

### Habitat Suitability and Analysis of Effects

Suitable breeding and foraging habitat likely exist in small areas near the margins of the lakes where emergent vegetation exists. The lakes also serve as stopover habitat during migration.

The only proposed activities that have the potential to impact the pied-billed grebe is the work proposed at Lake Katherine (boat launch improvements and large wood addition along the shoreline). No breeding habitat occurs in this section of the lake, so direct impacts would only occur in the form of displacing grebes that may be foraging or roosting close to the boat launch during project activities. Ample foraging and roosting habitat still exist elsewhere along the lake as well as within the other lakes in the action area, so these effects would be insignificant. No indirect effects in the form of habitat alteration are anticipated.

A possible cumulative effect is the potential for increased boating traffic on Lake Katherine as a result of the improved boat launch. If this were to occur, grebes may be temporarily displaced more frequently than they currently are by boaters.

### Determination of Effects

The Proposed Action may impact individual pied-billed grebes but would not likely cause a trend toward federal listing or loss of viability.

## Headwater *Ameletus* Mayflies

### Life History and Occurrence Information

Two species of mayfly – *Ameletus browni* and *Ameletus tertius* – may occur within the action area although no surveys have been conducted. For detailed descriptions of the species' life histories and occurrence information, see USDA Forest Service (2019i, 2019j).

### Habitat Suitability and Analysis of Effects

*A. tertius* is typically found in larger streams than *A. browni*, although both may be present within the watercourses impacted by this proposed project. According to Prout (2019), although both species are globally rare, they are common on the WMNF and so presence is assumed where potential habitat exists; therefore, presence of both species is assumed within the action area.

It is believed that minimizing sedimentation through the use of best management practices and design features during project implementation is sufficient to protect these species (Prout 2019). While individuals may still be impacted in localized areas (e.g., stream crossings for timber harvests), given the broad distribution of these mayflies across the WMNF, it is unlikely this project would have an adverse effect on the population of an individual stream or on the WMNF population as a whole. Indirect effects to habitat would also be localized and temporary. Previous timber

harvest activities may have impacted individuals and habitat, but these would have also been localized and temporary.

### Determination of Effects

The Proposed Action may impact individual *Ameletus* mayflies but would not likely cause a trend toward federal listing or loss of viability.

## Yellow-banded Bumblebee and Monarch Butterfly

### Life History and Occurrence Information

The monarch butterfly (*Danaus plexippus*) and yellow-banded bumblebee (*Bombus terricola*) are pollinator species that require ample floral resources throughout the growing season. Detailed life history information for the monarch (USDA Forest Service 2019k) and yellow-banded bumblebee (USDA Forest Service 2019l) can be found in the project record. The monarch butterfly has been observed within the action area (Hillman 2020) and the presence of the yellow-banded bumblebee is assumed.

### Habitat Suitability and Analysis of Effects

Direct impacts to both species could occur from activities that would take place in open areas while these species are active on the landscape. While adults may be able to fly away from equipment or people as they approach, monarch caterpillars and bumblebee colonies, if present on the site, could face harm or mortality.

The Forest Service does take measures to minimize the chance for and the magnitude of the direct impacts associated with the maintenance of permanent upland openings. Mowing and other mechanical treatments are primarily conducted in October and November to lessen the impact on potential individuals and their habitat. When spraying herbicides to treat infestations of non-native invasive plants, it is standard operating procedure to avoid insects when possible.

Overall, indirect impacts to both species would be beneficial. The expansion and continued maintenance of openings and maintenance of roadsides would perpetuate open habitats into the future, while timber harvests would temporarily create new habitat since the forb and shrub species that colonize harvested areas would provide floral resources that did not exist prior to tree removal.

Past, present, and future vegetation management and connected actions associated with vegetation management including road and landing construction, reconstruction, or maintenance as well as ongoing maintenance of existing roads, invasive plant control, and continued maintenance of permanent wildlife openings and the powerline corridor in the cumulative effects analysis area could result in the temporary loss of some existing herbaceous vegetation used by this species. These effects would be of short duration, as these areas would revegetate upon completion of these activities. Activities that create new or maintain existing open habitat would result in long-term benefits to these species. Some projects likely to create pollinator habitat include the creation of new landings, roads, or larger canopy gaps associated with timber harvest activities.

### Determination of Effects

The Proposed Action may impact individuals of both species but would not likely cause a trend toward federal listing or loss of viability.

## Butternut

### Life History and Occurrence Information

The butternut (*Juglans cinerea*) ranges from New Brunswick through southwestern Quebec and southern Ontario to southeastern Minnesota, south to scattered populations in northwestern Arkansas and northern Mississippi, Georgia, Alabama, and South Carolina (Schultz 2003). In New Hampshire, butternut is found at old homesteads and on rich or semi-rich soils including floodplains, talus slopes, and other forest gaps and edges with adequate light. On the WMNF, butternut is found in scattered locations at elevations below 1500 feet, mostly on the Pemigewasset and Saco Ranger Districts.

Butternut is a monoecious, wind-pollinated (Schultz 2003), and relatively short-lived tree among hardwoods, reaching 75 to 100 year maximum ages. Butternut bears seed at age 20 with optimum seed production occurring at age 30 to 60. When ripe, butternut seeds are dispersed by gravity and squirrels or other rodents (Schultz 2003). Mammals don't transport nuts very far (SVE 2002). Floodplain habitat indicates a likelihood that some seed migration occurs during flood events (Williams 2002). Butternut were also dispersed by Native Americans and early settlers, giving rise to its association with old homesteads, even in areas that have been long revegetated (SVE 2002). Butternuts remain dormant up to 2 years until exposed to temperatures of 68-86 F for 90 to 120 days. Butternut is capable of vegetative reproduction and can also be propagated by grafting (Rink 1990).

Butternut is extremely susceptible to a canker fungus of unknown origin, *Sirococcus clavigignenti-juglandacearum*. Since its identification in 1967, the canker fungus *S. clavigignenti-juglandacearum* has greatly reduced populations of butternut throughout the tree's range (NatureServe 2018), and killing mature, immature and seedling trees (Prey and Kuntz 1982). The canker spores are spread by rainwater and possibly insects (Ostry et al 1994). The fungus kills the tree by forming cankers on all woody parts of a tree. The cankers eventually coalesce and girdle the tree (Tisserat and Kuntz 1981). The canker is thought to be an introduced species; putative resistance in butternut is rare, suggesting that the two species did not evolve together. Asian species of Juglandaceae show much higher levels of resistance (Schultz 2003).

Historically, butternut was abundant in parts of the Midwest and common in the Northeast (Schultz 2003). Prior to the spread of the canker, butternut was an important food source for wildlife, especially in the northern part of its range. White-tailed deer, squirrels, cottontail rabbits, and other rodents eat the mast of butternut (Strode 1978). Now butternut is uncommon to rare in many areas, and most trees are infected with the canker (NatureServe 2018). Williams (2002) noted 60 percent infection among 25 trees north of Tripoli Road on the WMNF.

Although the amount of old farmland habitat has decreased in northern New England over the last several decades, resulting in succession to more vigorous, longer-lived and shade-tolerant species, habitat loss is not considered a limiting factor rangewide: the threat of succession is localized and negligible compared to loss from the canker.

### Habitat Suitability and Analysis of Effects

Butternut was documented at a single location along Charlestown Road near its north-western end in the Project Area. It is possible that the individual could be directly impacted by road maintenance activities, mowing, or logging activities.

Heavy machinery could negatively impact undiscovered individuals in other parts of the project area, resulting in damage or death. Undiscovered individuals could be indirectly positively impacted by increased light conditions to the forest floor after completion of harvest, creating appropriate habitat conditions for butternut germination or growth response of established saplings. The potential for unknown individuals to be impacted is low, as botanical surveys did not find butternut in other areas of the Project Area with suitable habitat. In addition, buffer areas around historic habitations could protect any undetected individuals in these areas.

### Determination of Effects

The Proposed Action may impact a single individual of butternut but would not cause a trend toward federal listing or loss of viability. The effects of the Proposed Action are not demonstrably greater than the No Action alternative because a) vehicular traffic and road maintenance would occur regardless, and b) flagging of the individual for avoidance of direct impacts will reduce the likelihood of unintentional impacts. Butternut canker remains by far the greatest long term threat to all individuals rangewide.

## American Ginseng

### Life History and Occurrence Information

Northern New England, including the WMNF, is at the northeastern edge of the American Ginseng's (*Panax quinquefolius*) global range. Within New Hampshire and Maine, occurrences are concentrated in or around the WMNF, forming a core portion of the species' range within both states. Most populations of this species on the WMNF are relatively small within a global context, rarely consisting of more than 150 individuals, and usually with fewer than 100 individuals. The distribution, life history, and habitat requirements for American ginseng are described in the Species Data Collection Form for this species, which was developed during the Forest Plan revision effort (USDA Forest Service 2002).

There is no evidence that *Panax quinquefolius* was ever a common plant in New England. This is a long-lived species that takes several years to mature. It requires cold temperatures during the winter months to prompt the seed to break dormancy. In the Northeast, it is found growing in shady northern hardwood forest on a wide range of sites, but primarily under sugar maple in rich or semi-rich mesic hardwood forests. It requires adequate moisture but does not inhabit wet hollows or swamps (USDA Forest Service 2005b, Appendix G, pp. 153-157). Plants usually occur under a closed canopy, sometimes on slopes and ravines. They may occur on rich soils with limestone or marble parent material (NatureServe 2018), or other calcium-bearing rock types, although these rock types do not occur on the WMNF. It prefers high tree density and an open to moderately shrubby understory (Anderson et al. 1993). Recommended light levels to maximize growth range from 8-30% of full sunlight, while high light intensity reduces growth and can cause early senescence (Anderson et al. 2002). Limiting factors include limited extent of suitable habitat, extensive clearing of forest habitats, trampling, grazing by deer and moose, digging of its roots for commercial sale, the small population sizes of most populations, gravity-dispersed seeds, and climate change.

Occurrences of this species were both previously known and newly discovered within the action area, indicating that suitable habitat is both present and occupied. Previously documented populations were resurveyed by a qualified botanist and population location and extent of individuals and habitat were verified. Other suitable habitat areas encountered were surveyed by a qualified individual at an appropriate time of the season.

## Habitat Suitability and Analysis of Effects

Ginseng was not recorded within the action area. The proposed harvest units do not occur in known American ginseng population areas. As such, there are no expected direct or indirect effects to known populations of American ginseng under the proposed action. There are known populations of ginseng in the project vicinity (within the HMU), but not within the areas of proposed treatments or other management that might affect the populations. Potential habitat in the action area was surveyed by a qualified individual at an appropriate time of year and no new populations or individuals were located in remaining areas proposed for harvest. Some small areas of appropriate habitat are included within proposed reserve areas.

It is possible that individuals could be directly impacted if heavy machinery operating in the snow-free season impacted habitats containing undiscovered individuals, or by increased deer browse enhanced by nearby openings. Undiscovered individuals could be indirectly impacted by increased light conditions to the forest floor after completion of harvest. However, the potential for unknown individuals to be impacted is low, as botanical surveys did not reveal ginseng in parts of the action area with potentially suitable habitat. Some small areas of suitable ginseng habitat are included in reserve areas adjacent to but not within treatment areas, but no individuals were observed in these areas.

Much of the private land adjacent to the action area has not been surveyed for rare plants. The WMNF does not have access to information on private lands, but it is presumed based on our general knowledge of the landscape that there is likely suitable habitat present in some areas. There is some potential that recent harvesting in these areas may have affected unidentified populations or potential habitat.

Hikers, hunters, and mineral collectors can trample plants, but existing trails do not occur immediately adjacent to known American ginseng plants; therefore, the likelihood of trampling from foot traffic is discountable. Ginseng collectors can directly affect plants and populations by collecting roots and killing plants or diminishing their vigor; it is unknown whether populations in the action area have been subject to collection activity historically.

Deer are known to browse on ginseng plants. Deer browse constitutes a significant threat in the central part of the plant's range where deer densities are high. Deer populations, however, are very low within the cumulative effects analysis area (NHFGD 2015) and browse pressure is presumed to be a less substantive threat here in northern New England.

Past and proposed timber harvest, road and landing construction, re-construction, as well as ongoing maintenance of existing roads in the analysis area during the snow-free season may have negatively affected ginseng by displacing individuals. Actions that open up the canopy and increase sunlight could indirectly affect ginseng individuals or populations by creating unfavorable light conditions. Known and possibly unknown populations in unmanaged areas would continue to exist in the action area following implementation. Unmanaged areas would not be impacted by implementation and may support establishment of new Ginseng colonies. Some managed areas (i.e., single tree selection areas) have the potential to be future colonization sites for American ginseng.

## Determination of Effects

The Proposed Action may impact individual American ginseng plants but would not likely result in a loss of viability or trend toward federal listing.

# References

Anderson, R., J. Fralish, J. Armstrong, and P. Benjamin. 1993. The ecology and biology of *Panax quinquefolius* L. (Araliaceae) in Illinois. *Am. Midl. Nat.* 129:357-372.

Anderson, R.C., M.R. Anderson, and G. Houseman. 2002. Wild American ginseng. Native Plants Journal 3(2): 93-105.

Chenger, J. 2004. 2004 woodland bat survey in the White Mountain National Forest – August 8 – 18, 2004. Bat Conservation and Management, Inc. Carlisle, PA. 38 pp.

Cooley, J. (Senior Biologist, Loon Preservation Committee). 2019. Personal communication via email to Brett Hillman, Assistant District Ranger - Wildlife, Pemigewasset Ranger District, November 8, 2019.

eBird. 2022. eBird: An online database of bird distribution and abundance [web application]. eBird, Cornell Lab of Ornithology, Ithaca, New York. Available: http://www.ebird.org. (Accessed: October 26, 2022).

Hillman, B. 2020a. Tarleton Integrated Resource Project: wildlife and wildlife habitat assessment. Campton, NH. 21 pp.

Hillman, B. 2020b. Rationale for habitat objectives in the Lake Tarleton Habitat Management Unit. Campton, NH. 14 pp.

Kline, L. and K. Settel. 2020. Personal communication via email to Brett Hillman, Assistant District Ranger - Wildlife, Pemigewasset Ranger District, February 25, 2020.

NatureServe. 2018. NatureServe Explorer: An online encyclopedia of life [web application]. Arlington, Virginia, USA: NatureServe. Available: http://www.natureserve.org/explorer.

NHFGD (New Hampshire Fish and Game Department). 2015. New Hampshire White-Tailed Deer Assessment. Concord, NH. 168 pp.

NHFGD (New Hampshire Fish and Game Department). 2019. New Hampshire northern long-eared bat survey. Modified by S. Houghton to include only data from the White Mountain National Forest. 22 pp.

Ostry, M.E.; Mielke, M.E.; and Skilling, D.D. 1994. Butternut-strategies for managing a threatened tree. Gen. Tech. Rep. NC-165. St. Paul MN: USDA Forest Service, North Central Forest Experiment Station.

Prey, A.J. and Kuntz, J.E. 1982. The distribution and impact of butternut canker in Wisconsin.

Prout, L. 2006. Wildlife report: Forest-wide NNIS treatment project. 37 pp.

Prout, M. (Fisheries Biologist, Supervisor's Office, WMNF). 2019. Personal communication via email to Brett Hillman, Assistant District Ranger - Wildlife, Pemigewasset Ranger District, WMNF. April 19, 2019.

Rink, G. 1990. *Juglans cinerea* L. Butternut. Silvics of North America Volume 2. *Hardwoods Agric. Handb.* 654:386-389.

Sandeno, C. 2015. Programmatic Biological Assessment Northern Long-Eared Bat for Land and Resource Management Plans of the U.S. Forest Service Eastern Region. USDA Forest Service Eastern Regional Office, Milwaukee, WI. 219 pp.

Schultz, J. 2003. Conservation Assessment for Butternut or White walnut (*Juglans cinerea*) L. USDA Forest Service, Eastern Region, Milwaukee, WI.

Sease, J. and L. Prout. 2015. Biological assessment for ongoing project activities with determinations of no effect or may affect, not likely to adversely affect for the northern long-eared bat on the Green Mountain and White Mountain National Forest. Unpublished report, White Mountain National Forest, Campton, NH. 2 March 2015. 120 pp.

Silvis, A., W. M. Ford, and E. R. Britzke. 2015. Effects of hierarchical roost removal on northern long-eared bat (*Myotis septentrionalis*) maternity colonies. PLoS ONE 10(1): e0116356. doi:10.1371/journal.pone.0116356.

Strode, D. D. 1978. Butternut/*Juglans cinerea* L. *in* A practical field method of site evaluation for eight important southern hardwoods. USDA Forest Service Gen. Tech. Report SO-14. Baker and Broadfoot.

SVE Panel. 2002. GMNF/WMNF species viability evaluation expert panel for upland forest plants. Panel held June 3-4, 2002, Concord, NH.

Tisserat, N.A. and J. E. Kuntz. 1981. Epidemiology of butternut canker. Gen. Tech.Report NC-74. Black walnut for the future. USDA Forest Service, North Central Forest Experiment Station.

USDA Forest Service. 2022a. Biological Assessment for the re-initiation of consultation on ongoing projects being implemented in the Eastern and Southern Regions of the USDA Forest Service. August 18, 2022. 11 pp.

USDA Forest Service. 2022b. Re-Initiation of consultation cover letter. August 22, 2022. 1 p.

USDA Forest Service. 2022c. Re-Initiation of consultation project list. 21 worksheets.

USDA Forest Service. 2019a. Species abstract – northern long-eared bat. 21 pp.

USDA Forest Service. 2019b. Species abstract – tricolored bat. 20 pp.

USDA Forest Service. 2019c. Species abstract – little brown bat. 18 pp.

USDA Forest Service. 2019d. Species abstract – eastern small-footed bat. 22 pp.

USDA Forest Service. 2019e. Species abstract – American peregrine falcon. 14 pp.

USDA Forest Service. 2019f. Species abstract – common loon. 18 pp.

USDA Forest Service. 2019g. Species abstract – osprey. 13 pp.

USDA Forest Service. 2019h. Species abstract – pied-billed grebe. 14 pp.

USDA Forest Service. 2019i. Species abstract – *Ameletus browni*. 10 pp.

USDA Forest Service. 2019j. Species abstract – *Ameletus tertius*. 12 pp.

USDA Forest Service. 2019k. Species abstract – monarch butterfly. 14 pp.

USDA Forest Service. 2019l. Species abstract – yellow-banded bumblebee. 14 pp.

USDA Forest Service. 2014. Northern long-eared bat species data summary. Eastern Region, USDA Forest Service, Milwaukee, WI. 42 pp.

USDA Forest Service. 2005a. White Mountain National Forest Land and Resource Management Plan. Campton, NH.

USDA Forest Service. 2005b. Final Environmental Impact Statement for the White Mountain National Forest Land and Resource Management Plan. Campton, NH.

USDA Forest Service. 2002. Species Viability Evaluation: *Panax quinquefolius*. Campton, NH.

USFWS 2023a. Biological Opinion on NLEB Forest Service Regions 8 and 9 consultation re-initiation. August 31, 2023. 57 pp.

USFWS 2023b. Re-Initiation of consultation project list. March 31, 2023. 17 worksheets.

USFWS. 2022a. Species Status Assessment Report for the northern long-eared bat (*Myotis septentrionalis*), Version 1.2. August 2022. Bloomington, MN. 169 pp.

USFWS. 2022b. Endangered and threatened wildlife and plants; Endangered species status for northern long-eared bat. 87 FR 73488. (November 30, 2022.)

USFWS. 2022c. Endangered and threatened wildlife and plants; Endangered species status for tricolored bat. 87 FR 56381. (September 14, 2022.)

USFWS. 2021. Species Status Assessment Report for the Tricolored Bat (*Perimyotis subflavus*), Version 1.1. December 2021. Hadley, MA. 166 pp.

USFWS. 2016a. Endangered and threatened wildlife and plants; 4(d) rule for the northern long-eared bat. 81 FR 1900. (January 14, 2016.)

USFWS. 2016b. Programmatic Biological Opinion on Final 4(d) Rule for the northern long-eared bat and activities excepted from take prohibitions. 5 January 2016. 109 pp.

Williams, J. R. 2002. Personal knowledge from John R. Williams based on plant survey efforts in 1990, 2000, and 2002.

# Appendix A: Effects Evaluation Summary

This appendix incorporates information from pre-field and field review of federally endangered, threatened, and proposed species and Regional Forester Sensitive Species within the Tarleton Integrated Resource Project area.

Note: Plants are grouped according to their primary habitats or communities and may occur occasionally in other habitats. Consult the detailed habitat requirement description provided below, project level assessments of habitats, distribution of the species on the Forest, and summary of potential occurrence for each plant within the action area.

**Capital letters in the "Comments" field that apply to plants correspond to the following notations:**

A) Action area is out of range of the species in this part of the Forest or in this part of the state.

B) The species has a low potential to occur because the habitat observed was marginal (i.e. rocky slopes were not exposed enough; not nutrient rich enough; and/or lacked typical plant associates indicative of appropriate habitat conditions).

C) Suitable or potentially suitable habitat was searched and the species was not found.

D) Known occurrences and portions of the Action area that contain suitable or potentially habitat would not be affected by the Proposed Action due to location (i.e., steeper slopes, excluded stands, or designated reserve areas).

## Animals

| Species | Status | Taxa | Habitat requirements | Suitable habitat/Known occurrences within the action area | Effects determination | Comments |
|---|---|---|---|---|---|---|
| **Canada lynx** *(Lynx canadensis)* | Threatened | Mammal | Denning habitat is spruce-fir 120+ years old, white pine / hemlock 150+ years old, and Mixed wood 120+ years old. Foraging habitat is spruce-fir, coniferous, mixed wood forests and brushy wetlands frequented by snowshoe hare and red squirrel. Travel corridors include ridges, saddles, and riparian corridors. | Species not believed to occur so far south in New Hampshire; HMU is not a part of a Lynx Analysis Unit. | No effect. | No further analysis required. Since action area is not within a Lynx Analysis Unit, Forest Plan Standards and Guidelines concerning lynx habitat (p. 2-14 to 2-16) do not apply. |
| **Northern long-eared bat** *(Myotis septentrionalis)* | Endangered | Mammal | Winter hibernacula include caves and mines. Summer roost sites include tree cavities and under loose bark; may take shelter in outbuildings and human dwellings. Studies on the WMNF found that NLEB prefer to roost in hardwoods <2,000 feet in elevation. | Habitat present; species assumed to be present. Chenger (2004) captured individuals within HMU in 2004. NHFGD did not capture any in follow-up effort in 2019. | Project is not likely to adversely affect the northern long-eared bat. | See effects analysis. |
| **Tri-colored bat** *(Perimyotis subflavus)* | Proposed endangered | Mammal | Hibernates in caves, mines, and other structures. Roosts in live or dead foliage of deciduous tree. | Habitat present; species assumed to be present. No individuals captured during 2004 or 2019 trapping efforts. | Project would not jeopardize the continued existence of the tricolored bat. | See effects analysis. |

| Species | Status | Taxa | Habitat requirements | Suitable habitat/Known occurrences within the action area | Effects determination | Comments |
|---|---|---|---|---|---|---|
| **Eastern small-footed bat** *(Myotis leibii)* | RFSS | Mammal | Uses caves, mines and old buildings for winter hibernacula. Uses rock outcrops and crevices in cliffs exposed to sun, buildings and bridges. Most likely forages in openings and along forest roads and wetlands. | Habitat present; species assumed to be present. Chenger (2004) captured individuals within HMU in 2004. NHFGD did not capture any in follow-up effort in 2019. | May adversely impact individuals, but not likely to result in a loss of viability in the Planning Area, nor cause a trend toward federal listing. | See effects analysis. |
| **Little Brown Bat** *(Myotis lucifugus)* | RFSS | Mammal | Hibernates in abandoned caves and mines. Roosts in barns, attics, outbuildings, and tree cavities. Feeds over wetlands and still water. Unlikely to occur in high elevation forests. | Habitat present; species assumed to be present. Chenger (2004) captured individuals within HMU in 2004. NHFGD did not capture any in follow-up effort in 2019. | May adversely impact individuals, but not likely to result in a loss of viability in the Planning Area, nor cause a trend toward federal listing. | See effects analysis. |
| **Northern bog lemming** *(Synaptomys borealis sphagnicola)* | RFSS | Mammal | Uses sedge meadows, bogs, riparian areas, openings, krummholz, and softwoods. Requires moist to wet loose soils and dense herbaceous or mossy understory & burrows. | No suitable habitat within action area. | No effect. | No further analysis required. |

PBWTAR_13940

**JA-1643**

| Species | Status | Taxa | Habitat requirements | Suitable habitat/Known occurrences within the action area | Effects determination | Comments |
|---|---|---|---|---|---|---|
| **Bicknell's thrush** *(Catharus bicknelli)* | RFSS | Bird | Occupied habitats are characterized by high numbers of standing dead conifers with a dense understory of red spruce, black spruce balsam fir, birch, and krummholz communities of high elevations >2,500 feet. | No suitable habitat within action area. | No effect. | No further analysis required. |
| **American peregrine falcon** *(Falco peregrinus anatum)* | RFSS | Bird | Nests on high rocky cliffs and forages in open areas. | Suitable habitat for foraging does occur within open areas on both sides of Route 25C; no known occurrences within action area. | May adversely impact individuals, but not likely to result in a loss of viability in the Planning Area, nor cause a trend toward federal listing. | See effects analysis. |
| **Common loon** *(Gavia immer)* | RFSS | Bird | Nests on lakes greater than 6.5 ha (16 ac) but prefer lakes smaller than 24 ha (60 ac) with clear water, small islands, and an irregular shoreline. Also found on major rivers. Requires prey base of small fish and amphibians for young. | Known to nest annually on Tarleton and Armington. May nest occasionally on Katherine. Three largest lakes likely serve as stopover habitat during migration. | May adversely impact individuals, but not likely to result in a loss of viability in the Planning Area, nor cause a trend toward federal listing. | See effects analysis. |

| Species | Status | Taxa | Habitat requirements | Suitable habitat/Known occurrences within the action area | Effects determination | Comments |
|---|---|---|---|---|---|---|
| **Osprey** *(Pandion haliaetus)* | RFSS | Bird | Nests in dead snags, living trees, cliffs, utility poles, wooden platforms on poles usually near or above rivers, lakes, ponds, & water bodies. Typically feed on fish. | Species has been observed at Lakes Tarleton and Armington but no nest sites are known. | May adversely impact individuals, but not likely to result in a loss of viability in the Planning Area, nor cause a trend toward federal listing. | See effects analysis. |
| **Pied-billed grebe** *(Podilymbus podiceps)* | RFSS | Bird | Freshwater marsh & water bodies usually ≥12 acres (5 hectares) with open water & emergent vegetation Requires prey base of fish, amphibians, and invertebrates. | Suitable habitat likely exists in small areas near the margins of the lakes, but there is no evidence of breeding within the action area. All three lakes may serve as stopover habitat during migration. | May adversely impact individuals, but not likely to result in a loss of viability in the Planning Area, nor cause a trend toward federal listing. | See effects analysis. |
| **Wood turtle** *(Glyptemys insculpta)* | RFSS | Reptile | Found along permanent low gradient streams and rivers and in forest, pasture, shrub-land and riparian margins. Eggs are laid in open sunny areas sandy or gravelly soil, commonly in clearings. Overwintering occurs in bottoms or banks of streams. | Not known to occur within HMU. Streams may be too high-gradient to provide adequate wood turtle habitat (i.e. no sandy substrate). | No effect. | No further analysis required. |

| Species | Status | Taxa | Habitat requirements | Suitable habitat/Known occurrences within the action area | Effects determination | Comments |
|---|---|---|---|---|---|---|
| **Brown's ameletus mayfly** *(Ameletus browni)* | RFSS | Insect | Larvae prefer erosional areas in cold, fast moving, well-oxygenated headwater streams of relatively high pH, with canopy cover, rocks or boulders present | Habitat present; species assumed to be present. | May adversely impact individuals, but not likely to result in a loss of viability in the Planning Area, nor cause a trend toward federal listing. | See effects analysis. |
| **Third ameletus mayfly** *(Ameletus tertius)* | RFSS | Insect | Larvae found in well oxygenated small & large streams with high pH, canopy cover & rocks or eroding banks in depositional areas & submerged grasses & detritus along margins of riffles & transitional areas | Habitat present; species assumed to be present. | May adversely impact individuals, but not likely to result in a loss of viability in the Planning Area, nor cause a trend toward federal listing. | See effects analysis. |
| **White mountain fritillary** *(Bolaria chariclea montina)* | RFSS | Insect | Lush, moist areas near sheltered spots, wet springs, & rocky outcrops > 4,500 feet in Presidential Range. Alpine goldenrod food. Larval host maybe blueberry, violets or willow. | No suitable habitat within action area. | No effect. | No further analysis required. |

| Species | Status | Taxa | Habitat requirements | Suitable habitat/Known occurrences within the action area | Effects determination | Comments |
|---|---|---|---|---|---|---|
| **Yellow-banded bumblebee** *(Bombus Terricola)* | RFSS | Insect | Frequent meadows, crop fields, orchards, gardens, wetlands and other locations with flowering plants. They require loose soil and decomposing logs for overwintering as well as abandoned burrows for their underground nests. | Potential habitat exists within wildlife opening, orchards, and powerline corridor. Species is assumed to be present. | May adversely impact individuals, but not likely to result in a loss of viability in the Planning Area, nor cause a trend toward federal listing. | See effects analysis. |
| **Appalachian tiger beetle** *(Cicindela ancocisconensis)* | RFSS | Insect | Open sand or mix of sand and cobble of mid-sized rivers; feed & live on the sandy areas exposed by receding rivers. | No suitable habitat within action area; the small streams within action area do not provide key habitat features typical of larger streams. | No effect. | No further analysis required. |
| **Monarch butterfly** *(Danaus plexippus)* | RFSS | Insect | General breeding habitat occurs in openings and fields with abundant milkweed and wildflowers. | Species documented in powerline corridor and is likely also present in permanent wildlife opening, orchards, open wetlands, and other natural and manmade open areas. | May adversely impact individuals, but not likely to result in a loss of viability in the Planning Area, nor cause a trend toward federal listing. | See effects analysis. |

| Species | Status | Taxa | Habitat requirements | Suitable habitat/Known occurrences within the action area | Effects determination | Comments |
|---|---|---|---|---|---|---|
| **White mountain butterfly** *(Oenesis melissa semidea)* | RFSS | Insect | It inhabits alpine and subalpine communities above 4,900 feet, specifically the dwarf shrub/sedge-rush meadow community. | No suitable habitat within action area. | No effect. | No further analysis required. |
| **Incurvate emerald** *(Somatochlora incurvata)* | RFSS | Insect | Breeds in bogs, fens, and similar peatlands, usually in sphagnum moss. | No suitable habitat within action area. Species has never been documented in the vicinity of the action area. | No effect. | No further analysis required. |

JA-1648

JA-1649

## Plants

| Species | Status | Natural community | Habitat requirements | Suitable habitat/Known occurrences within the action area | Effects determination | Comments |
|---|---|---|---|---|---|---|
| **Small-whorled pogonia** *(Isotria medeoloides)* | Threatened | Hardwood and Mixed Forests | Primarily in maturing stands of deciduous or mixed deciduous-coniferous forests (often with an oak component); also often on soils with hardpan or occasionally shallow bedrock, but not very dry or enriched. Less than 1,500 feet in elevation on southerly aspects (west to south to east). | No suitable habitat within action area. | No effect. | No further analysis required. The action area is beyond the current and historical range of this species. Nonetheless, the species was surveyed for in stands with appropriate elevation and stand conditions. The species was not encountered and habitat was deemed not suitable enough to support the species. |
| **Autumn Coralroot** *(Corallorhiza odontorhiza)* | RFSS | Hardwood and Mixed Forests | Can be found in a variety of deciduous and mixed forest habitats. Requires mycorrhizal host, but details unknown. | No suitable habitat within action area. | No effect. | No further analysis required. |
| **Nodding Pogonia** *(Triphora trianthophora)* | RFSS | Hardwood and Mixed Forests | Mid-elevation beech hardwoods usually on south-facing slopes. Deep leaf litter with humus. | No suitable habitat within action area. | No effect. | Only occurs in eastern and southern portions of the National Forest east of the Pemigewasset River. |

| Species | Status | Natural community | Habitat requirements | Suitable habitat/Known occurrences within the action area | Effects determination | Comments |
|---|---|---|---|---|---|---|
| **Climbing Fumatory** *(Adlumia fungosa)* | RFSS | Rich Hardwood Forests and Talus Slopes | In northern New England, primarily in mesic to dry-mesic, enriched hardwood forests, including rich talus and other rocky slopes; reports in the region of occurrence on burned sites (not known on WMNF presently). | Potentially suitable habitat within action area was searched and the species was not found; no known occurrences in action area. | No effect. | No further analysis required. |
| **Smooth Rock-cress** *(Arabis laevigata)* | RFSS | Rich Hardwood Forests and Talus Slopes | Rocky, open forests and woodlands of rich mesic or dry-mesic slopes, particularly on talus slopes on southern side of the Forest. Typically south or west-facing slopes below 1,500 ft. elev. | Very limited potentially suitable habitat within action area was searched and the species was not found; no known occurrences in action area. | No effect. | No further analysis required |
| **Missouri Rock-cress** *(Arabis missouriensis)* | RFSS | Rich Hardwood Forests and Talus Slopes | Likely restricted on the WMNF to semi-open conditions of richer sites, particularly on talus slopes on southern side of the Forest. Typically south or west-facing slopes below 1,500 ft. elev. Associated species include red oak, ash, basswood, sugar maple. | Very limited potentially suitable habitat within action area was searched and the species was not found; no known occurrences in action area | No effect. | No further analysis required |

| Species | Status | Natural community | Habitat requirements | Suitable habitat/Known occurrences within the action area | Effects determination | Comments |
|---|---|---|---|---|---|---|
| **Cutleaf Toothwort** *(Cardamine concatenata)* | RFSS | Rich Hardwood Forests and Talus Slopes | Rich woods species. In Maine, typical habitats are rich woods, wooded bottoms and calcareous rocky banks. In New Hampshire, habitats include nutrient rich mesic forests, talus slopes, and cliffs/ledges. Often growing in association with other spring ephemerals such as spring beauty (*Claytonia caroliniana*) and trout lily (*Erythronium americanum*). | No suitable habitat within action area. Potentially suitable habitat was searched, but deemed not enriched enough to support this species. | No effect. | No further analysis required. |
| **Pubescent Sedge** *(Carex hirtifolia)* | RFSS | Rich Hardwood Forests and Talus Slopes | Mesic, typically rich, upland and riparian, deciduous forests; possibly in meadows. | No suitable habitat within action area. | No effect. | Only known occurrences of this species located on the eastern edge of the WMNF in calcium rich soil. No further analysis required. |
| **Fogg's Goosefoot** *(Chenopodium foggii)* | RFSS | Rich Hardwood Forests and Talus Slopes | Cliff bases, rocky talus slopes and outcrops, and in sparsely wooded areas; apparently associated with circumneutral habitats. | Potentially suitable habitat within action area was searched and the species was not found; no known occurrences in action area. No suitable habitat found. | No effect. | No further analysis required |

| Species | Status | Natural community | Habitat requirements | Suitable habitat/Known occurrences within the action area | Effects determination | Comments |
|---|---|---|---|---|---|---|
| **Greater Yellow Lady's-slipper** *(Cypripedium parviflorum var. pubescens)* | RFSS | Rich Hardwood Forests and Talus Slopes | Rich forests and wetlands. In NH, occurs in dry-mesic to wet, nutrient-rich forests, woodlands, and seepage wetlands. | Potentially suitable habitat within action area was searched and the species was not found; no known occurrences in action area. | No effect. | No further analysis required |
| **Goldie's Woodfern** *(Dryopteris goldiana)* | RFSS | Rich Hardwood Forests and Talus Slopes | Damp woods in rich mesic hardwood forests. | Potentially suitable habitat within action area was searched and the species was not found; no known occurrences in action area. | No effect. | No further analysis required |
| **Butternut** *(Juglans cinerea)* | RFSS | Rich Hardwood Forests and Talus Slopes | Rich, moist, alluvial soils and dry, rocky hillsides (talus) influenced by calcium-rich bedrock. Old farmsteads. | Suitable habitat exists in the form of old farmsteads, and field and road edges. A single individual is documented within the project area. | May affect individuals but not likely to result in trend toward listing of affect viability of the species. | No further analysis required |
| **Mountain Sweet-Cicely** *(Osmorhiza berteroi)* | RFSS | Rich Hardwood Forests and Talus Slopes | Rich to semi-rich, moist, deciduous, montane woods in northern New Hampshire; also roadside embankments within these forests. | No suitable habitat within action area (out of range) | No effect. | No further analysis required. |

| Species | Status | Natural community | Habitat requirements | Suitable habitat/Known occurrences within the action area | Effects determination | Comments |
|---|---|---|---|---|---|---|
| **American Ginseng** *(Panax quinquefolius)* | RFSS | Rich Hardwood Forests and Talus Slopes | Moist, rich or semi-rich deciduous woods often rocky or on thick humus in colluvial settings. | Suitable habitat exists, but limited in extent; known from the greater vicinity of the project area (in the Upper Baker HMU, but outside the action area of the project). Suitable habitat searched but no populations found. | May affect undetected individuals, but not likely to result in a trend toward federal listing or affect the viability of the species. | Most semi-rich areas in the action area occur on glaciofluvial soils and are not rocky and colluvial, thus generally not suitable habitat. Suitable semi-rich rocky habitat was limited in extent, but some was recommended as a reserve area. |
| **Three-leaved Black Snake Root** *(Sanicula trifoliata)* | RFSS | Rich Hardwood Forests and Talus Slopes | Limy deciduous woods below 1500'. Most occurrences on steep slopes. Appears associated w/ dense, lush ground cover and relatively closed canopy but has been found near clearcuts and cliffs which may indicate tolerance of gap conditions. | Potentially suitable habitat within action area was searched and the species was not found; no known occurrences in action area. Habitat not rich enough. | No effect. | No further analysis required |
| **Northern Comandra** *(Geocaulon lividum)* | RFSS | High-Elevation Spruce-Fir Forests | High elevation boggy habitats and damp humus in high-elevation balsam fir and spruce-fir forests, typically with peaty/mossy cover and semi-open canopy (including fir waves). Most sites (n=8) at 3300 – 4300 feet elevation; two at 2200-2400. | No suitable habitat within action area. | No effect. | No further analysis required. |

**JA-1653**

| Species | Status | Natural community | Habitat requirements | Suitable habitat/Known occurrences within the action area | Effects determination | Comments |
|---|---|---|---|---|---|---|
| **Boreal Bedstraw** *(Galium kamtschaticum)* | RFSS | Forest Seeps and Swamps (mostly above 2,000 feet elevation) | Prefers cool, somewhat rich seep habitat in the mountains with non-channelized flowing near-surface water within wet hardwood, mixed, or conifer woods, swamps, and streamsides. | No suitable habitat within action area. | No effect. | Seeps are too far south and low elevation. No further analysis required. |
| **Broad-leaved Twayblade** *(Listera convallarioides)* | RFSS | Forest Seeps and Swamps (mostly above 2,000 feet elevation) | Wet, cold woods, usually in deep shade; peaty glades, spruce/fir woods; thickets, nutrient poor mossy-forested seeps. | No suitable habitat within action area. | No effect. | Seeps too far south and low elevation. No further analysis required. |
| **Heartleaf Twayblade** *(Listera cordata)* | RFSS | Forest Seeps and Swamps (mostly above 2,000 feet elevation) | Seeps and wet, cold woods, sphagnum bogs, and ascending to sub-alpine scrub; bases of wet, seepy ledges, outcrops/cliffs, spruce/fir woods on lime. | No suitable habitat within action area. | No effect. | Seeps too far south and low elevation. No further analysis required. |
| **Dragon's Mouth** *(Arethusa bulbosa)* | RFSS | Swamps and Open Wetlands | Most often found in open, wet sphagnum bogs, in full sunlight. Commonly associated with such minerotrophs as alder, sweet gale (*Myrica gale*), several sedges (*Carex* sp.), bog rosemary and leather leaf (*Chamaedaphne calyculata*). | No suitable habitat within action area. | No effect. | No further analysis required. |

| Species | Status | Natural community | Habitat requirements | Suitable habitat/Known occurrences within the action area | Effects determination | Comments |
|---|---|---|---|---|---|---|
| **Bailey's Sedge** *(Carex baileyi)* | RFSS | Swamps and Open Wetlands | Wetland species of circumneutral fens, swampy woods and meadows. Ditches and disturbed openings in regions of calcium-rich bedrock. | No suitable habitat within action area. | No effect. | No further analysis required. |
| **Wiegand's Sedge** *(Carex wiegandii)* | RFSS | Swamps and Open Wetlands | Boggy or peaty soils, including montane bogs; acidic soils of drier, shrubby, sometimes disturbed, margins of acidic Sphagnum bogs or poor fens. | No suitable habitat within action area. | No effect. | Not far enough north or high enough elevation for this species. No further analysis required. |
| **Northern Adder's Tongue** *(Ophioglossum pusillum)* | RFSS | Swamps and Open Wetlands | Variety of early-successional, seasonally moist to wet habitats, including open fens, bogs, marsh edges, pastures, old fields, grassy shores, wet thickets, cedar and hardwood swamps, floodplain woods, wet swales, damp sand, and roadside ditches. WMNF occurrence is in an old log landing that has been mowed during roadside mowing. | Potentially suitable habitat within action area was searched and species was not found. | No effect. | No further analysis required. |
| **Sweet Colt's-foot** *(Petasites frigidus var. palmatus)* | RFSS | Swamps and Open Wetlands | Swampy woods, meadows with circumneutral or rich soils. White cedar swamps. | No suitable habitat within action area. | No effect. | No further analysis required. |
| **Anderson's sphagnum** *(Sphagnum andersonianum)* | RFSS | Swamps and Open Wetlands | Low hummocks in very poor ericaceous fens. Largely high elevation. | No suitable habitat within action area. | No effect. | No further analysis required. |

| Species | Status | Natural community | Habitat requirements | Suitable habitat/Known occurrences within the action area | Effects determination | Comments |
|---|---|---|---|---|---|---|
| **Angerman's Sphagnum** *(Sphagnum angermanicum)* | RFSS | Swamps and Open Wetlands | Poor fens, including at edges of ponds. Largely high elevation. | No suitable habitat within action area. | No effect. | No further analysis required. |
| **Sphagnum** *(Sphagnum flavicomans)* | RFSS | Swamps and Open Wetlands | Medium to tall hummocks in bogs and poor fens. Occurs in *Sphagnum rubellum/Vaccinium oxycoccus* dwarf heath moss lawn in New Hampshire | No suitable habitat within action area. | No effect. | No further analysis required. |
| **Auricled Twayblade** *(Listera auriculata)* | RFSS | Riparian (Streams, Rivers, Alluvium) | Temporarily flooded and seasonally ice-scoured riverbanks with calcareous soils. Stream banks, mossy woods, alder thickets, boggy alluvial woods, cedar swamps, gravel riverbank, and lake and pond shores | No suitable habitat within action area. | No effect. | No further analysis required. |
| **Pink Wintergreen** *(Pyrola asarifolia)* | RFSS | Riparian (Streams, Rivers, Alluvium) | Rich or moist woods and swamps; moist alluvial woods of low river terrace forests. In broader region, in calcium-rich soil areas, including northern white cedar swamps | No suitable habitat within action area. | No effect. | No further analysis required. |
| **Piled-up Sedge** *(Carex cumulata)* | RFSS | Rocky Ridges or Sandplains | Open ledges, dry sandy soils; open oak forests or hardwood talus; clearings; burned oak-pine rocky summit woodlands. | No suitable habitat within action area. | No effect. | Best habitat is on open outcrops above action area.<br>No further analysis required. |

| Species | Status | Natural community | Habitat requirements | Suitable habitat/Known occurrences within the action area | Effects determination | Comments |
|---|---|---|---|---|---|---|
| **White Mountain Silverling** *(Paronychia argyrocoma)* | RFSS | Rocky Ridges or Sandplains | Mid-elevation, bare rocky summits, ledges, and cliffs; sand/gravel barrens of Saco River between Bartlett and Fryeberg. | No suitable habitat within action area. | No effect. | No further analysis required. |
| **Canada Mountain Ricegrass** *(Piptatherum canadense)* | RFSS | Rocky Ridges or Sandplains | Dry, rocky openings just below treeline into krummholz zone, and on moderate elevation rocky ridges and talus slopes; sandy deciduous woodlands; early successional plant communities; along sandy roadsides, and on open, sparsely brushy ground. | No suitable habitat within action area. | No effect. | No further analysis required. |
| **Douglas Knotweed** *(Polygonum douglasii)* | RFSS | Rocky Ridges or Sandplains | Prefers exposed rocky-gravelly slopes and hillside ledges in well-drained soil where little other vegetation grows. Can also grow in nutrient-enriched hardwood forests if the canopy is open enough; often associated with rocks even in forest. | Potentially suitable habitat within action area was searched and species not found. | No effect. | Best habitat is on open outcrops above and outside the action area.<br>No further analysis required. |
| **Robbins' milkvetch** *(Astragalus robbinsii var. minor)* | RFSS | Cliffs | In northern New England, this species is found on calcareous or circumneutral cliffs and ledges, sometimes in riverside settings. | No suitable habitat within action area. | No effect. | No further analysis required. |

| Species | Status | Natural community | Habitat requirements | Suitable habitat/Known occurrences within the action area | Effects determination | Comments |
|---|---|---|---|---|---|---|
| **Fragrant Fern** *(Dryopteris fragrans var. remotiuscula)* | RFSS | Cliffs | Prefers cracks on typically cool, seasonally dry, shaded, overhanging cliffs influenced by periodic calcium-rich seepage. Associated species include *Woodsia ilvensis*, *Campanula rotundifolia*, *Cystopteris fragilis*, *C. tenuis*, *Diervilla lonicera* and various calciphilic bryophytes. | No suitable habitat within action area. | No effect. | No further analysis required. |
| **Creeping Juniper** *(Juniperus horizontalis)* | RFSS | Cliffs | In NH, restricted to exposed cliff-tops and faces on calcium-bearing rocks; otherwise mainly coastal in northern New England, including headlands, cliffs, and sandy or rocky fields. | No suitable habitat within action area. | No effect. | No further analysis required. |
| **Prairie Goldenrod** *(Oligoneuron album)* | RFSS | Cliffs | Occurs primarily on dry, calcareous cliffs and ledges. May also occur in open fields and roadsides. All known NH occurrences are on calcium-rich soil or bedrock. | No suitable habitat within action area. | No effect. | No further analysis required. |
| **Alpine Bearberry** *(Arctostaphylos alpina)* | RFSS | Mesic Alpine | Typically on the exposed end of the dry/mesic heath meadow system of alpine communities. *Arctostaphylos alpina* is usually found in small, isolated populations on ridgelines of the Presidentials | No suitable habitat within action area. | No effect. | No further analysis required. |

| Species | Status | Natural community | Habitat requirements | Suitable habitat/Known occurrences within the action area | Effects determination | Comments |
|---|---|---|---|---|---|---|
| **Scirpus-like Sedge** *(Carex scirpoidea)* | RFSS | Mesic Alpine | Strongly associated with circumneutral or calcareous rocky summits, outcrops, and cliffs. In NH, only known from open ledges and subalpine habitats. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **Sitka clubmoss** *(Lycopodium sitchense)* | RFSS | Mesic Alpine | Alpine to subalpine barrens in open, stony, or well-drained habitats. In Maine alpine, summits of snowbank gullies. (= *Diphasiastrum sitchense*) | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **Mountain Sorrel** *(Oxyria digyna)* | RFSS | Mesic Alpine | Typically occurs in snowbank communities and on rocky slopes and ledges of headwalls. May occur near alpine streamsides. Above 3500' in northern New England. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **Robbin's Cinquefoil** *(Potentilla robbinsiana)* | RFSS | Mesic Alpine | Alpine zone in Presidential Range of WMNF. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **Boott's Rattlesnake Root** *(Prenanthes boottii)* | RFSS | Mesic Alpine | Variety of alpine habitats, moist tundra, steep cirque ledges and crests, and disturbed alpine sites such as trail-sides and hut areas | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |

| Species | Status | Natural community | Habitat requirements | Suitable habitat/Known occurrences within the action area | Effects determination | Comments |
|---|---|---|---|---|---|---|
| **Alpine Meadow Grass** *(Poa pratensis ssp. alpigena)* | RFSS | Mesic Alpine | In NH, occupies nutrient poor soils in alpine/subalpine dry-mesic heath and meadow communities, including Bigelow sedge meadows. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **Little Yellow Rattle** *(Rhinanthus minor ssp. groenlandicus)* | RFSS | Mesic Alpine | Open alpine habitats; extant locations have moderate human disturbance, although historic locations included natural settings. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **Moss Campion** *(Silene acaulis var exscapa)* | RFSS | Mesic Alpine | Moist, alpine meadows. Gravelly barrens. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **Boreal Blueberry** *(Vaccinium boreale)* | RFSS | Mesic Alpine | Alpine and subalpine meadows, heaths, and bogs, often exposed gravelly or rocky sites. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **Arnica** *(Arnica lanceolate)* | RFSS | Wet Alpine | Alpine ravines, damp banks and rock ledges. At low elevations on rocky river banks, gravel bars, beaches, and alluvial flats of rivers and streams at low elevations. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **Dwarf White Birch** *(Betula minor)* | RFSS | Wet Alpine | Bogs and wet, rocky alpine slopes, summits and gullies. Acidic rocky barrens and peaks. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |

| Species | Status | Natural community | Habitat requirements | Suitable habitat/Known occurrences within the action area | Effects determination | Comments |
|---|---|---|---|---|---|---|
| **Langsdorf's Blue Joint** *(Calamagrostis canadensis var. langsdorfii)* | RFSS | Wet Alpine | Wet-mesic snowbank habitat in alpine ravines and near alpine lakes or streams. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **Alpine Bitter Cress** *(Cardamine bellidifolia)* | RFSS | Wet Alpine | Cold ravines or on wet mossy rocks in the alpine area. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **Black Sedge** *(Carex atratiformis)* | RFSS | Wet Alpine | In New England, wet alpine or subalpine open habitat, such as wet cliffs, calcareous alpine seeps, river shores, ravines, and open meadows. On WMNF, restricted to wet or damp alpine habitats, including brooks and ravine snowbanks. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **Hair-like Sedge** *(Carex capillaris)* | RFSS | Wet Alpine | NH plants are ssp. *fuscidula*, which occur in wet-mesic alpine meadows. Elsewhere in NE, the ssp. *capillaris* occurs in high-pH boreal cliffs, seeps, and Rivershore outcrops. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **Head-like Sedge** *(Carex capitata ssp. arctogena)* | RFSS | Wet Alpine | Wet, acidic, rocky or gravely soil in the alpine. May also occur in similar dry habitats. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |

PBWTAR_13958

JA-1661

| Species | Status | Natural community | Habitat requirements | Suitable habitat/Known occurrences within the action area | Effects determination | Comments |
|---|---|---|---|---|---|---|
| **Pale painted cup** *(Castilleja septentrionalis)* | RFSS | Wet Alpine | In New Hampshire and Maine, alpine snowbank and rill habitats, particularly on alpine ravine headwalls and brooks; rarely adventive at lower elevations (historically). | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **Oakes' Eyebright** *(Euphrasia oakesii)* | RFSS | Wet Alpine | Alpine. Exposed gravelly slopes or ledges or open ledgy areas. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **Proliferous Fescue** *(Festuca prolifera)* | RFSS | Wet Alpine | Alpine, in cool, wet snowbank ravine settings, and along alpine brooks. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **Mountain Avens** *(Geum peckii)* | RFSS | Wet Alpine | Moist alpine areas. Snowbank, wet meadow, streamside communities in the alpine. Occurs rarely at low elevation sites, in rocky streams. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **Moss Bell-heather** *(Harrimanella hypnoides)* | RFSS | Wet Alpine | Snowbank communities, wet seeps, and crevices in alpine habitats. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **Alpine Cudweed** *(Omalotheca supina)* | RFSS | Wet Alpine | Gravelly slopes and ravines at high altitudes; exposed alpine areas and snowbank communities. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |

| Species | Status | Natural community | Habitat requirements | Suitable habitat/Known occurrences within the action area | Effects determination | Comments |
|---|---|---|---|---|---|---|
| **Wavy Bluegrass** *(Poa laxa ssp. fernaldiana)* | RFSS | Wet Alpine | Typically found on high, wet cliffs, especially beneath little overhangs on cliffs; also in dry/mesic heath meadow system of alpine communities in NH, which includes an array of *Carex* meadows, strong heaths, *Diapensia* shrublands, fell fields, and barren rock. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **Viviparous Knotweed** *(Polygonum viviparum)* | RFSS | Wet Alpine | Snowbank communities, wet mossy rocks and seeps, and near streams in alpine and subalpine areas. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **Silverleaf Willow** *(Salix argyrocarpa)* | RFSS | Wet Alpine | Moist soils in alpine or subalpine streamside, ravine and snowbank habitats. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **Dwarf Willow** *(Salix herbacea)* | RFSS | Wet Alpine | In NH, typically occurs in cool, wet ravines, snowbank communities, and along alpine brooks. Grassy, sandy, or rocky places in alpine areas; often on thinner soils than other snowbank/wet ravine species. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **White Mountain Saxifrage** *(Saxifraga paniculata)* | RFSS | Wet Alpine | Typically alpine areas with exposed calcareous gravel and rocks. Can grow below alpine on limy, seepy, open cliffs. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |

| Species | Status | Natural community | Habitat requirements | Suitable habitat/Known occurrences within the action area | Effects determination | Comments |
|---|---|---|---|---|---|---|
| **Alpine Brook Saxifrage** *(Saxifraga rivularis)* | RFSS | Wet Alpine | Alpine ravines, wet and mossy areas, wet cliffs, and some dry-mesic heath alpine/subalpine communities. May benefit from reduced competition associated with moderate disturbance. May be a nitrophile. | No Known occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **Arizona Cinquefoil** *(Sibbaldia procumbens)* | RFSS | Wet Alpine | Snowbank/wet meadow/streamside alpine communities; only occurrence is at bottom of a snowfield. | No Known occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **Mountain Hairgrass** *(Vahlodea atropurpurea)* | RFSS | Wet Alpine | In northern New England, is limited to the alpine/subalpine zone, especially herbaceous snowbanks communities. | No Know occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |
| **American alpine speedwell** *(Veronica wormskjoldii)* | RFSS | Wet Alpine | Wet, seepy, and sometimes rocky alpine ravine snowbank settings, including along brooks or rills. | No Known Occurrences within action area | No Suitable Habitat within action area | No Further Analysis Required |

JA-1664

| STAND_ID | YEAR_OF_ORIGIN | FOREST_TYPE | LSC | ELTCODE | VEGETATION_TYPE | HMACODE | GIS_ACRES | HABITAT | PNV | AGE_CLASS | HMU_Name | Join1 | TOTAL_BA | EVEN_UNEVEN | OPPORTUNITY_AREA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09220400018007 | 1891 | 81 | 810 | 415g | 0 | 8.3 | 0.016789115 | hardwood | hardwood | mature | Lake Tarleton | 092204001550118.3415g | | | |
| 09220400018008 | 1894 | 81 | 810 | 102c | 0 | 8.3 | 0.078152432 | hardwood | hardwood | mature | Lake Tarleton | 092204001550128.3102c | | | |
| 09220400018008 | 1894 | 81 | 810 | 115a | 0 | 8.3 | 8.657614078 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550128.3115a | | | |
| 09220400018023 | 1894 | 81 | 810 | 115c | 0 | 8.3 | 15.4643403 | hardwood | hardwood | mature | Lake Tarleton | 092204001550128.3115c | | | |
| 09220400018023 | 1894 | 81 | 810 | 115g | 0 | 8.3 | 0.520618108 | hardwood | hardwood | mature | Lake Tarleton | 092204001550128.3115g | | | |
| 09220400018033 | 1894 | 81 | 810 | 405d | 0 | 8.3 | 0.548213903 | hardwood | mixedwood | mature | Lake Tarleton | 092204001550128.3405d | | | |
| 09220400019017 | 1915 | 81 | 810 | 102c | 0 | 8.3 | 2.515667941 | hardwood | hardwood | mature | Lake Tarleton | 092204001550138.3102c | | | |
| 09220400019017 | 1915 | 81 | 810 | 115c | 0 | 8.3 | 10.37784042 | hardwood | hardwood | mature | Lake Tarleton | 092204001550138.3115c | | | |
| 09220400019020 | 1915 | 81 | 810 | 415g | 0 | 8.3 | 4.375977246 | hardwood | hardwood | mature | Lake Tarleton | 092204001550138.3415g | | | |
| 09220400019024 | 1909 | 89 | 500 | 102c | 0 | 8.3 | 1.847271342 | hardwood | hardwood | mature | Lake Tarleton | 092204001550148.3102c | | | |
| 09220400019025 | 1909 | 89 | 500 | 415g | 0 | 8.3 | 25.11395112 | hardwood | hardwood | mature | Lake Tarleton | 092204001550148.3415g | | | |
| 09220400019025 | 1898 | 81 | 500 | 102c | 0 | 8.3 | 0.720612087 | hardwood | hardwood | mature | Lake Tarleton | 092204001550158.3102c | | | |
| 09220400019025 | 1898 | 81 | 500 | 415g | 0 | 8.3 | 5.636092709 | hardwood | hardwood | mature | Lake Tarleton | 092204001550158.3415g | | | |
| 09220400020019 | 1889 | 81 | 720 | 102c | 0 | 8.3 | 0.139073656 | hardwood | hardwood | mature | Lake Tarleton | 092204001550168.3102c | | | |
| 09220400020019 | 1889 | 81 | 720 | 415g | 0 | 8.3 | 12.03135883 | hardwood | hardwood | mature | Lake Tarleton | 092204001550168.3415g | | | |
| 09220400020024 | 1927 | 81 | 500 | 415g | 0 | 8.3 | 7.152784506 | hardwood | hardwood | mature | Lake Tarleton | 092204001550178.3415g | | | |
| 09220400020024 | 1941 | 81 | 500 | 415g | 0 | 8.3 | 10.07280485 | hardwood | hardwood | mature | Lake Tarleton | 092204001550188.3415g | | | |
| 09220400020025 | 1909 | 81 | 500 | 415g | 0 | 8.3 | 13.21367067 | hardwood | hardwood | mature | Lake Tarleton | 092204001550198.3415g | | | |
| 09220400020025 | 1907 | 81 | 500 | 415g | 0 | 2.1 | 0.000623111 | hardwood | hardwood | mature | Lake Tarleton | 092204001550202.1415g | | | |
| 09220400021019 | 1907 | 81 | 500 | 415g | 0 | 8.3 | 11.34637217 | hardwood | hardwood | mature | Lake Tarleton | 092204001550208.3415g | | | |
| 09220400021019 | 1890 | 81 | 500 | 115a | 0 | 8.3 | 2.909343886 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550218.3115a | | | |
| 09220400155001 | 1890 | 81 | 500 | 415g | 0 | 2.1 | 0.002789699 | hardwood | hardwood | mature | Lake Tarleton | 092204001550212.1415g | | | |
| 09220400155001 | 1890 | 81 | 500 | 415g | 0 | 8.3 | 28.07676686 | hardwood | hardwood | mature | Lake Tarleton | 092204001550218.3415g | | | |
| 09220400155001 | 1894 | 89 | 500 | 115a | 0 | 2.1 | 5.003768949 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550222.1115a | | | |
| 09220400155001 | 1894 | 89 | 500 | 415g | 0 | 2.1 | 16.87875083 | hardwood | hardwood | mature | Lake Tarleton | 092204001550222.1415g | | | |
| 09220400155001 | 1894 | 89 | 500 | 415g | 0 | 8.3 | 5.12552E-05 | hardwood | hardwood | mature | Lake Tarleton | 092204001550228.3415g | | | |
| 09220400155002 | 1928 | 81 | 500 | 102c | 0 | 8.3 | 13.95127302 | hardwood | hardwood | mature | Lake Tarleton | 092204001550238.3102c | | | |
| 09220400155002 | 1928 | 81 | 500 | 115a | 0 | 8.3 | 4.678387561 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550238.3115a | | | |
| 09220400155002 | 1928 | 81 | 500 | 415g | 0 | 8.3 | 17.79658401 | hardwood | hardwood | mature | Lake Tarleton | 092204001550238.3415g | | | |
| 09220400155002 | 1927 | 81 | 0 | 102c | 0 | 8.3 | 0.016113764 | hardwood | hardwood | mature | Lake Tarleton | 092204001550248.3102c | | | |
| 09220400155002 | 1927 | 81 | 0 | 415g | 0 | 8.3 | 10.53444932 | hardwood | hardwood | mature | Lake Tarleton | 092204001550248.3415g | | | |
| 09220400155003 | 1894 | 96 | 500 | 415g | 0 | 2.1 | 10.04432084 | aspen-birch | hardwood | mature | Lake Tarleton | 092204001550252.1415g | | | |
| 09220400155003 | 1894 | 96 | 500 | 415g | 0 | 8.3 | 0.005496304 | aspen-birch | hardwood | mature | Lake Tarleton | 092204001550258.3415g | | | |
| 09220400155003 | 1886 | 55 | 720 | 102c | 0 | 6.1 | 49.63210488 | oak-pine | hardwood | mature | Lake Tarleton | 092204001550266.1102c | | | |
| 09220400155004 | 1886 | 55 | 720 | 102c | 0 | 8.3 | 0.080350384 | oak-pine | hardwood | mature | Lake Tarleton | 092204001550268.3102c | | | |
| 09220400155004 | 1886 | 55 | 720 | 115a | 0 | 6.1 | 0.624250121 | oak-pine | strong spruce-fir | mature | Lake Tarleton | 092204001550266.1115a | | | |
| 09220400155004 | 1886 | 55 | 720 | 115c | 0 | 6.1 | 10.17352041 | oak-pine | hardwood | mature | Lake Tarleton | 092204001550266.1115c | | | |
| 09220400155004 | 1886 | 55 | 720 | 115c | 0 | 8.3 | 2.47622E-06 | oak-pine | hardwood | mature | Lake Tarleton | 092204001550268.3115c | | | |
| 09220400155005 | 1919 | 89 | 500 | 415g | 0 | 2.1 | 10.8368971 | hardwood | hardwood | mature | Lake Tarleton | 092204001550272.1415g | | | |
| 09220400155005 | 1909 | 89 | 500 | 115a | 0 | 2.1 | 0.302984737 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550282.1115a | | | |
| 09220400155006 | 1909 | 89 | 500 | 415g | 0 | 2.1 | 9.84641686 | hardwood | hardwood | mature | Lake Tarleton | 092204001550282.1415g | | | |
| 09220400155006 | 1928 | 81 | 720 | 102c | 0 | 8.3 | 15.60503976 | hardwood | hardwood | mature | Lake Tarleton | 092204001550298.3102c | | | |
| 09220400155007 | 1928 | 81 | 720 | 115a | 0 | 8.3 | 6.58208843 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550298.3115a | | | |
| 09220400155007 | 1928 | 81 | 720 | 115c | 0 | 8.3 | 2.148539889 | hardwood | hardwood | mature | Lake Tarleton | 092204001550298.3115c | | | |
| 09220400155008 | 1928 | 81 | 720 | 405 | 0 | 8.3 | 0.076482396 | hardwood | hardwood | mature | Lake Tarleton | 092204001550298.3405 | | | |
| 09220400155008 | 1928 | 81 | 720 | 415g | 0 | 8.3 | 0.455392264 | hardwood | hardwood | mature | Lake Tarleton | 092204001550298.3415g | | | |
| 09220400155009 | 1879 | 81 | 720 | 102c | 0 | 8.3 | 57.09853894 | hardwood | hardwood | mature | Lake Tarleton | 092204001550308.3102c | | | |
| 09220400155010 | 1906 | 81 | 720 | 102c | 0 | 8.3 | 15.64994015 | hardwood | hardwood | mature | Lake Tarleton | 092204001550318.3102c | | | |
| 09220400155010 | 1906 | 81 | 720 | 415g | 0 | 8.3 | 0.020178231 | hardwood | hardwood | mature | Lake Tarleton | 092204001550318.3415g | | | |
| 09220400155010 | 1925 | 81 | 810 | 102c | 0 | 8.3 | 26.14968953 | hardwood | hardwood | mature | Lake Tarleton | 092204001550328.3102c | | | |
| 09220400155011 | 1925 | 81 | 810 | 115c | 0 | 8.3 | 0.977398033 | hardwood | hardwood | mature | Lake Tarleton | 092204001550328.3115c | | | |
| 09220400155011 | 1891 | 87 | 720 | 102c | 0 | 6.1 | 0.007110243 | mixedwood | hardwood | mature | Lake Tarleton | 092204001550346.1102c | | | |
| 09220400155011 | 1891 | 87 | 720 | 102c | 0 | 8.3 | 28.79462703 | mixedwood | hardwood | mature | Lake Tarleton | 092204001550348.3102c | | | |
| 09220400155011 | 1891 | 87 | 720 | THETA2 | 0 | 8.3 | 8.663328922 | mixedwood | non-forest | mature | Lake Tarleton | 092204001550348.3THETA2 | | | |
| 09220400155011 | 0 | 99 | 200 | 115a | 50 | 8.3 | 1.867085715 | opening | strong spruce-fir | open | Lake Tarleton | 092204001550338.3115a | | | |
| 09220400155011 | 0 | 99 | 200 | 115a | 50 | inhold | 0.009577908 | opening | strong spruce-fir | open | Lake Tarleton | 09220400155033inhold115a | | | |
| 09220400155012 | 1930 | 81 | 720 | 115a | 0 | 2.1 | 9.555956962 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550352.1115a | | | |
| 09220400155012 | 1930 | 81 | 720 | 115a | 0 | 6.1 | 0.004224353 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550356.1115a | | | |
| 09220400155012 | 1930 | 81 | 720 | 115a | 0 | 8.3 | 0.02649365 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550358.3115a | | | |
| 09220400155012 | 1930 | 81 | 720 | 115c | 0 | 2.1 | 0.103924344 | hardwood | hardwood | mature | Lake Tarleton | 092204001550352.1115c | | | |
| 09220400155012 | 1930 | 81 | 720 | 115c | 0 | 6.1 | 0.004376608 | hardwood | hardwood | mature | Lake Tarleton | 092204001550356.1115c | | | |
| 09220400155013 | 1889 | 81 | 720 | 102c | 0 | 8.3 | 6.530899454 | hardwood | hardwood | mature | Lake Tarleton | 092204001550368.3102c | | | |
| 09220400155013 | 1889 | 81 | 720 | 415g | 0 | 8.3 | 0.748941222 | hardwood | hardwood | mature | Lake Tarleton | 092204001550368.3415g | | | |
| 09220400155013 | 1941 | 81 | 720 | 102c | 0 | 8.3 | 6.649366058 | hardwood | hardwood | mature | Lake Tarleton | 092204001550378.3102c | | | |
| 09220400155014 | 1941 | 81 | 720 | 415g | 0 | 8.3 | 0.513906034 | hardwood | hardwood | mature | Lake Tarleton | 092204001550378.3415g | | | |
| 09220400155014 | 1883 | 81 | 720 | 102c | 0 | 8.3 | 8.367362057 | hardwood | hardwood | mature | Lake Tarleton | 092204001550388.3102c | | | |
| 09220400155015 | 1883 | 81 | 720 | 415g | 0 | 8.3 | 8.330301464 | hardwood | hardwood | mature | Lake Tarleton | 092204001550388.3415g | | | |
| 09220400155015 | 1894 | 81 | 500 | 102c | 0 | 8.3 | 2.8472598 | hardwood | hardwood | mature | Lake Tarleton | 092204001550398.3102c | | | |
| 09220400155016 | 1894 | 81 | 500 | 415g | 0 | 8.3 | 5.197756342 | hardwood | hardwood | mature | Lake Tarleton | 092204001550398.3415g | | | |
| 09220400155016 | 1930 | 81 | 720 | 102c | 0 | 8.3 | 5.307348633 | hardwood | hardwood | mature | Lake Tarleton | 092204001550408.3102c | | | |
| 09220400155017 | 1930 | 81 | 720 | 115a | 0 | 8.3 | 4.136300777 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550408.3115a | | | |
| 09220400155018 | 1930 | 81 | 720 | 115c | 0 | 6.1 | 0.000130763 | hardwood | hardwood | mature | Lake Tarleton | 092204001550406.1115c | | | |
| 09220400155019 | 1930 | 81 | 720 | 115c | 0 | 8.3 | 3.974636802 | hardwood | hardwood | mature | Lake Tarleton | 092204001550408.3115c | | | |
| 09220400155020 | 1891 | 87 | 720 | 102c | 0 | 6.1 | 0.060674548 | mixedwood | hardwood | mature | Lake Tarleton | 092204001550416.1102c | | | |
| 09220400155020 | 1891 | 87 | 720 | 102c | 0 | 8.3 | 15.38570548 | mixedwood | hardwood | mature | Lake Tarleton | 092204001550418.3102c | | | |
| 09220400155021 | 1910 | 81 | 720 | 115a | 0 | 8.3 | 2.995134132 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550428.3115a | | | |
| 09220400155021 | 1894 | 81 | 0 | 415g | 0 | 2.1 | 0.004456539 | hardwood | hardwood | mature | Lake Tarleton | 092204001550432.1415g | | | |
| 09220400155021 | 1891 | 87 | 720 | THETA2 | 0 | 8.3 | 4.382127605 | mixedwood | non-forest | mature | Lake Tarleton | 092204001550418.3THETA2 | | | |
| 09220400155022 | 1894 | 81 | 0 | 415g | 0 | 8.3 | 9.72426971 | hardwood | hardwood | mature | Lake Tarleton | 092204001550438.3415g | | | |
| 09220400155022 | 1915 | 87 | 700 | 115a | 0 | 8.3 | 7.917419337 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204001550448.3115a | | | |
| 09220400155022 | 1928 | 20 | 165 | 115a | 0 | 2.1 | 6.803168579 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204001600012.1115a | | | |
| 09220400155023 | 1928 | 20 | 165 | 115a | 0 | 6.1 | 2.96747E-06 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204001600016.1115a | | | |
| 09220400155023 | 1928 | 20 | 165 | 115c | 0 | 2.1 | 0.0009308 | mixedwood | hardwood | mature | Lake Tarleton | 092204001600012.1115c | | | |
| 09220400155023 | 1928 | 20 | 165 | 115c | 0 | 6.1 | 0.019454706 | mixedwood | hardwood | mature | Lake Tarleton | 092204001600016.1115c | | | |
| 09220400155024 | 1953 | 20 | 500 | 115a | 0 | | 0.00030911 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 09220400160002115a | | | |
| 09220400155024 | 1953 | 20 | 500 | 115a | 0 | 2.1 | 9.381249365 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204001600022.1115a | | | |
| 09220400155025 | 1990 | 89 | 500 | 115a | 0 | 2.1 | 14.96729802 | hardwood | strong spruce-fir | young | Lake Tarleton | 092204001600032.1115a | | | |
| 09220400155025 | 1990 | 89 | 500 | 415g | 0 | 2.1 | 11.10904893 | hardwood | hardwood | young | Lake Tarleton | 092204001600032.1415g | | | |
| 09220400155026 | 1990 | 89 | 500 | 415g | 0 | 6.1 | 0.000610506 | hardwood | hardwood | young | Lake Tarleton | 092204001600036.1415g | | | |
| 09220400155026 | 1990 | 89 | 500 | 115a | 0 | 2.1 | 64.29260118 | hardwood | strong spruce-fir | young | Lake Tarleton | 092204001600042.1115a | | | |
| 09220400155026 | 1990 | 89 | 500 | 115a | 0 | 6.1 | 4.02403E-05 | hardwood | strong spruce-fir | young | Lake Tarleton | 092204001600046.1115a | | | |
| 09220400155026 | 1990 | 89 | 500 | 415g | 0 | 2.1 | 40.17233763 | hardwood | hardwood | young | Lake Tarleton | 092204001600042.1415g | | | |
| 09220400155026 | 1990 | 89 | 500 | 415g | 0 | 6.1 | 0.091315937 | hardwood | hardwood | young | Lake Tarleton | 092204001600046.1415g | | | |
| 09220400155027 | 1991 | 92 | 500 | 405 | 0 | 2.1 | 4.86845E-05 | aspen-birch | hardwood | young | Lake Tarleton | 092204000180072.1405 | | | |
| 09220400155028 | 1929 | 81 | 500 | 102c | 0 | 2.1 | 1.30855E-05 | hardwood | hardwood | mature | Lake Tarleton | 092204000180082.1102c | | | |
| 09220400155028 | 1929 | 81 | 500 | 102c | 0 | 6.1 | 0.000369441 | hardwood | hardwood | mature | Lake Tarleton | 092204000180086.1102c | | | |
| 09220400155029 | 1886 | 81 | 500 | 2d | 0 | 2.1 | 3.42294E-07 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204000180332.12d | | | |
| 09220400155029 | 1940 | 81 | 810 | 102c | 0 | 8.3 | 4.14123E-05 | hardwood | hardwood | mature | Lake Tarleton | 092204000190178.3102c | | | |
| 09220400155029 | 1940 | 81 | 810 | 405 | 0 | 8.3 | 8.63356E-05 | hardwood | hardwood | mature | Lake Tarleton | 092204000190178.3405 | | | |
| 09220400155029 | 1880 | 13 | 710 | 102c | 0 | 6.1 | 0.000211089 | spruce-fir | hardwood | mature | Lake Tarleton | 092204000180236.1102c | | | |
| 09220400155029 | 1880 | 13 | 710 | 102c | 0 | 8.3 | 3.00367E-05 | spruce-fir | hardwood | mature | Lake Tarleton | 092204000180238.3102c | | | |
| 09220400155030 | 1950 | 81 | 710 | 102c | 0 | 8.3 | 5.86344E-05 | hardwood | hardwood | mature | Lake Tarleton | 092204000190208.3102c | | | |
| 09220400155031 | 1910 | 81 | 710 | 102c | 0 | 8.3 | 0.000242258 | hardwood | hardwood | mature | Lake Tarleton | 092204000190248.3102c | | | |
| 09220400155031 | 1900 | 13 | 710 | 102c | 0 | 8.3 | 0.000203266 | spruce-fir | hardwood | mature | Lake Tarleton | 092204000190258.3102c | | | |
| 09220400155032 | 1900 | 13 | 710 | 405 | 0 | 8.3 | 4.65239E-06 | spruce-fir | hardwood | mature | Lake Tarleton | 092204000190258.3405 | | | |
| 09220400155032 | 1900 | 13 | 710 | THETA2 | 0 | 8.3 | 7.02644E-05 | spruce-fir | non-forest | mature | Lake Tarleton | 092204000190258.3THETA2 | | | |
| 09220400155033 | 1925 | 87 | 810 | 115a | 0 | 8.3 | 0.000131365 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204000200198.3115a | | | |
| 09220400155033 | 1925 | 87 | 810 | 115g | 0 | 8.3 | 6.96603E-06 | mixedwood | hardwood | mature | Lake Tarleton | 092204000200198.3115g | | | |
| 09220400155034 | 1930 | 92 | 720 | 115g | 0 | 8.3 | 0.00016296 | aspen-birch | hardwood | mature | Lake Tarleton | 092204000200248.3115g | | | |
| 09220400155034 | 1930 | 92 | 720 | 405d | 0 | 8.3 | 0.000394776 | aspen-birch | mixedwood | mature | Lake Tarleton | 092204000200248.3405d | | | |
| 09220400155034 | 1900 | 81 | 710 | 102c | 0 | 8.3 | 7.72846E-05 | hardwood | hardwood | mature | Lake Tarleton | 092204000200258.3102c | | | |
| 09220400155035 | 1900 | 81 | 710 | 115c | 0 | 8.3 | 2.75917E-05 | hardwood | hardwood | mature | Lake Tarleton | 092204000200258.3115c | | | |
| 09220400155035 | 1941 | 81 | 500 | 115g | 0 | | 1.110037689 | hardwood | hardwood | mature | Lake Tarleton | 09220400155001115g | | | |
| 09220400155035 | 1941 | 81 | 500 | 115g | 0 | 8.3 | 2.594531357 | hardwood | hardwood | mature | Lake Tarleton | 092204001550018.3115g | | | |
| 09220400155035 | 1938 | 87 | 810 | 115g | 0 | | 0.000145997 | mixedwood | hardwood | mature | Lake Tarleton | 0922040002101911 5g | | | |
| 09220400155035 | 1938 | 87 | 810 | 115g | 0 | 8.3 | 3.20061E-05 | mixedwood | hardwood | mature | Lake Tarleton | 092204000210198.3115g | | | |
| 09220400155036 | 1941 | 81 | 500 | 115g | 0 | inhold | 0.068891429 | hardwood | hardwood | mature | Lake Tarleton | 09220400155001inhold115g | | | |
| 09220400155036 | 1941 | 81 | 500 | 405d | 0 | 8.3 | 13.84103104 | hardwood | mixedwood | mature | Lake Tarleton | 092204001550018.3405d | | | |
| 09220400155037 | 1941 | 81 | 500 | 405d | 0 | inhold | 0.337910514 | hardwood | mixedwood | mature | Lake Tarleton | 09220400155001inhold405d | | | |
| 09220400155037 | 1937 | 81 | 500 | 115a | 0 | 8.3 | 16.17825272 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550028.3115a | | | |
| 09220400155038 | 1937 | 81 | 500 | 115a | 0 | inhold | 0.038238491 | hardwood | strong spruce-fir | mature | Lake Tarleton | 09220400155002inhold115a | | | |
| 09220400155038 | 1937 | 81 | 500 | 115g | 0 | 8.3 | 3.348893592 | hardwood | hardwood | mature | Lake Tarleton | 092204001550028.3115g | | | |
| 09220400155039 | 1937 | 81 | 500 | 405d | 0 | 8.3 | 16.9594448 | hardwood | mixedwood | mature | Lake Tarleton | 092204001550028.3405d | | | |
| 09220400155039 | 1937 | 81 | 500 | 405d | 0 | inhold | 0.847330248 | hardwood | mixedwood | mature | Lake Tarleton | 09220400155002inhold405d | | | |
| 09220400155040 | 1905 | 81 | 500 | 105d | 0 | 2.1 | 1.188188218 | hardwood | mixedwood | mature | Lake Tarleton | 092204001550042.1105d | | | |
| 09220400155040 | 1944 | 87 | 500 | 115a | 0 | 2.1 | 2.059475853 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204001550032.1115a | | | |
| 09220400155040 | 1944 | 87 | 500 | 115a | 0 | 8.3 | 26.98229741 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 092204001550038.3115a | | | |
| 09220400155040 | 1944 | 87 | 500 | 115a | 0 | inhold | 0.236195544 | mixedwood | strong spruce-fir | mature | Lake Tarleton | 09220400155003inhold115a | | | |
| 09220400155041 | 1905 | 81 | 500 | 105d | 0 | 8.3 | 20.98026344 | hardwood | mixedwood | mature | Lake Tarleton | 092204001550048.3105d | | | |
| 09220400155041 | 1905 | 81 | 500 | 115a | 0 | 2.1 | 1.752155459 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550042.1115a | | | |
| 09220400155041 | 1905 | 81 | 500 | 115a | 0 | 8.3 | 9.312781924 | hardwood | strong spruce-fir | mature | Lake Tarleton | 092204001550048.3115a | | | |
| 09220400155042 | 1923 | 87 | 720 | 115g | 0 | 8.3 | 0.309506036 | mixedwood | hardwood | mature | Lake Tarleton | 092204001550058.3115g | | | |
| 09220400155043 | 1923 | 87 | 720 | 405d | 0 | 8.3 | 32.87555235 | mixedwood | mixedwood | mature | Lake Tarleton | 092204001550058.3405d | | | |
| 09220400155043 | 1908 | 87 | 810 | 115g | 0 | 8.3 | 3.841076126 | mixedwood | hardwood | mature | Lake Tarleton | 092204001550068.3115g | | | |

**United States Department of Agriculture**
Forest Service

# Tarleton Integrated Resource Project

## Wildlife and Wildlife Habitat Assessment

**Pemigewasset Ranger District, White Mountain National Forest, Grafton County, New Hampshire**

**September 2020**

Prepared by:

/s/ Brett Hillman 9/22/2020

Brett Hillman, District Wildlife Biologist Date

foraging opportunities. American woodcock (*Scolopax minor*) habitat likely exists in and around the wildlife opening, orchards, and powerline right-of-way.

A variety of ducks may be found in the HMU at different times of the year. Hooded mergansers (*Lophodytes cucullatus*) were observed on Lake Tarleton during fall migration in 2019. Common merganser (*Mergus merganser*), mallard (*Anas platyrhynchos*), American black duck (*Anas rubripes*), wood duck (*Aix sponsa*), and Canada goose (*Branta canadensis*) have all been documented from one or more of the lakes (eBird 2019). Wood duck and hooded merganser breeding habitat may exists in beaver ponds within the HMU.

### Mammals

White-tailed deer (*Odocoileus virginianus*) bedding areas have been noted in the wildlife opening and the species is likely present throughout the HMU. There are no known deer wintering areas within the HMU, which is unsurprising given the lack of softwood-dominated stands. As mentioned previously, moose sign has been observed near wetlands in the project area. The American black bear (*Ursus americanus*) is also likely present throughout the HMU as ample foraging opportunities exist. The apple orchards may provide soft mast for all three species.

The presence of beavers and snowshoe hare have been noted and other furbearers, including those in the Mustelidae family, are likely present.

## Threatened, Endangered, and Sensitive Species

Table 3 lists all (animals only) 21 federally-listed threatened, federally listed endangered, and Regional Forest Sensitive Species that may occur on or near the WMNF. The table also includes the general habitat requirements of each species and whether they may occur within the HMU.

**Table 3: Threatened, endangered, and sensitive animal species.**

| Species | Status | Taxa | Habitat requirements | Suitable habitat/Known occurrences within the action area |
|---|---|---|---|---|
| Rusty-patched bumblebee *(Bombus affinis)* | Endangered | Insect | Prairies, woodlands, marshes, agricultural landscapes and residential parks and gardens with abundant wildflowers. | Potential habitat exists within wildlife opening, orchards, and powerline corridor; species not known to occur on WMNF. |
| Canada lynx *(Lynx canadensis)* | Threatened | Mammal | Denning habitat is spruce-fir 120+ years old, white pine / hemlock 150+ years old, and Mixed wood 120+ years old. Foraging habitat is spruce-fir, coniferous, mixed wood forests and brushy wetlands frequented by snowshoe hare and red squirrel. Travel corridors include ridges, saddles, and riparian corridors. | Species not believed to occur so far south in New Hampshire; HMU is not a part of a Lynx Analysis Unit. |

| Species | Status | Taxa | Habitat requirements | Suitable habitat/Known occurrences within the action area |
|---|---|---|---|---|
| Northern long-eared bat *(Myotis septentrionalis)* | Threatened | Mammal | Winter hibernacula include caves and mines. Summer roost sites include tree cavities and under loose bark; may take shelter in outbuildings and human dwellings. Studies on the WMNF found that NLEB prefer to roost in hardwoods <2,000 feet in elevation. | Habitat present; species assumed to be present. Chenger (2004) captured individuals within HMU in 2004. NHFGD did not capture any in follow-up effort in 2019. |
| Eastern small-footed bat *(Myotis leibii)* | RFSS | Mammal | Uses caves, mines and old buildings for winter hibernacula. Uses rock outcrops and crevices in cliffs exposed to sun, buildings and bridges. Most likely forages in openings and along forest roads and wetlands. | Habitat present; species assumed to be present. Chenger (2004) captured individuals within HMU in 2004. NHFGD did not capture any in follow-up effort in 2019. |
| Little Brown Bat *(Myotis lucifugus)* | RFSS | Mammal | Hibernates in abandoned caves and mines. Roosts in barns, attics, outbuildings, and tree cavities. Feeds over wetlands and still water. Unlikely to occur in high elevation forests. | Habitat present; species assumed to be present. Chenger (2004) captured individuals within HMU in 2004. NHFGD did not capture any in follow-up effort in 2019. |
| Tri-colored bat *(Perimyotis subflavus)* | RFSS | Mammal | Hibernates in caves, mines, and other structures. Roosts in live or dead foliage of deciduous tree. | Habitat present; species assumed to be present. No individuals captured during 2004 or 2019 trapping efforts. |
| Northern bog lemming *(Synaptomys borealis sphagnicola)* | RFSS | Mammal | Uses sedge meadows, bogs, riparian areas, openings, krummholz, and softwoods. Requires moist to wet loose soils and dense herbaceous or mossy understory & burrows. | No suitable habitat within action area. |
| Bicknell's thrush *(Catharus bicknelli)* | RFSS | Bird | Occupied habitats are characterized by high numbers of standing dead conifers with a dense understory of red spruce, black spruce balsam fir, birch, and krummholz communities of high elevations >2,500 feet. | No suitable habitat within action area. |

**Concern: [Seq#35]**

The 100 foot buffer added as a protection measure for dispersed recreation along Lake Tarleton is inadequate to protect the lake from runoff and erosion that may be caused by vegetation management activities. [ID#37]

**Response: [Seq#35]**

Based on monitoring of vegetation management activities in the WMNF, and following the National BMP Monitoring Program, the 100-foot buffer has been effective in preventing sediment from reaching waterways, however to preserve the dispersed recreation features adjacent to Lake Tarleton the responsible official has approved extending the buffer to 300 feet. The design feature lowering the max group size from two acres to one acre for group selection units and the harvesting strictly occurring in winter during frozen ground conditions will also help prevent sediment from reaching waterways. [ID#37]

**Concern: [Seq#36]**

Implement the Lake Katherine Boat Launch action as soon as allowable to stabilize the bank and reduce the current runoff issue. [ID#38]

**Response: [Seq#36]**

The Lake Katherine Boat Launch action is planned to be implemented the spring or summer after the final decision for the Tarleton IRP is signed. The focus of this effort will be on resource protection with an emphasis to protect the fragile lake shore environment and addressing impacts to soil, water, and vegetation. The project will provide a small gravel parking surface to accommodate a maximum of six vehicles and will facilitate car-top and hand-launched watercraft. [ID#38]

**Concern: [Seq#37]**

Commenter states that the WMNF should buffer and protect any intermittent stream to the same level that perennial streams are protected when following National Core and State BMP's. [ID#39]

**Response: [Seq#37]**

Any perennial streams in the project area will be buffered per the Forest Plan G-1 (p. 2-24).

The WMNF does recognize that intermittent streams can experience very high flow rates during storms. While we do not explicitly provide buffers to intermittent streams, we still do apply all applicable BMPs as they relate to erosion and sedimentation, such as choosing the best skid trail crossing locations and

DRAFT

White Mountain National Forest

# Appendix D
# Age Class Definitions by Habitat Type

Forest habitats on the White Mountain National Forest have been divided into four broad age classes: regeneration, young, mature, and old. Regeneration forest is typically 0-9 years old, following a stand-replacing natural disturbance or harvest. Young forest starts at age 10 and lasts 30-60 years, depending on the forest type. Mature forest encompasses the ages at which harvest is most desirable for each forest type, while old forest starts after the traditional rotation age for each forest type. This appendix documents the ages at which each age class starts and ends by habitat type.

| Habitat type | Age class* | Age in years |
|---|---|---|
| Spruce-fir | R | 0-9 |
| | Y | 10-39 |
| | M | 40-89 |
| | O | 90+ |
| Mixed wood | R | 0-9 |
| | Y | 10-59 |
| | M | 60-119 |
| | O | 120+ |
| Northern hardwood | R | 0-9 |
| | Y | 10-59 |
| | M | 60-119 |
| | O | 120+ |
| Aspen-birch | R | 0-9 |
| | Y | 10-39 |
| | M | 40-69 |
| | O | 70+ |
| Oak-Pine | R | 0-9 |
| | Y | 10-69 |
| | M | 70-119 |
| | O | 120+ |
| Hemlock | R | 0-9 |
| | Y | 10-69 |
| | M | 70-119 |
| | O | 120+ |

*R = regeneration forest; Y = young forest; M = mature forest; O = old forest

# Exhibit 3

# Rationale for Habitat Objectives in the Peabody West Habitat Management Unit

Prepared by: William O'Neill, Wildlife Biologist

For: Androscoggin Ranger District, White Mountain National Forest

Date: 7/6/2022

## Contents

Introduction ........ 1

Background ........ 3

Existing Conditions ........ 4

Methods ........ 4

Suitability of Harvest ........ 4

Habitat Composition ........ 4

Age Class Composition ........ 5

Desired Future Conditions ........ 5

Age Class Objectives ........ 7

References ........ 8

Appendix A. Tables ........ 9

**List of Tables**

Table 1 Current conditions, Potential Natural Vegetation (PNV), and objectives by habitat type in the Peabody West Habitat Management Unit (HMU) ........ 3

Table 2 Relationship between current habitat and Potential Natural Vegetation on MA 2.1 lands within the Peabody West HMU ........ 4

Table 3 Long-term habitat composition objectives for each habitat type ........ 6

Table 4 Age class composition by habitat type for the Peabody West HMU ........ 9

Table 5 Existing MA 2.1 conditions by habitat type in the Peabody West HMU ........ 9

Table 6 MA 2.1 forest objectives in the Peabody West HMU. ........ 9

Table 7 Comparison of MA 2.1 land current conditions, Forest Plan desired conditions, and project-level objectives for regeneration age habitat by acres ........ 10

Table 8 Comparison of MA 2.1 land current conditions, Forest Plan desired conditions, and project-level objectives for young age habitat by acres ........ 11

Table 9 Comparison of MA 2.1 land current conditions, Forest Plan desired conditions, and project-level objectives for mature age habitat by acres ........ 11

**List of Figures**

Figure 1. Peabody West HMU Management Areas and Proposed Harvest Units. ........ 2

# Introduction

The White Mountain National Forest (WMNF) Land and Resource Management Plan, or Forest Plan (U.S. Department of Agriculture, Forest Service 2005), includes goals and objectives to move the WMNF toward a stated desired future condition. The Forest Plan addresses a variety of concepts and processes to ensure landscape level goals and objectives are accomplished during project development and implementation. The Forest Plan is incorporated by reference throughout this document.

The Forest Service has developed a strategy to manage wildlife habitat on the WMNF within delineated Habitat Management Units (HMU). Watershed, compartment boundaries, and transportation systems were considered when delineating HMUs across the WMNF. Within each HMU, vegetation is managed to provide a diversity of habitats, to conserve existing wildlife populations, and to ensure habitats are distributed across the landscape in an ecologically appropriate way (Forest Plan, pp. 1-20 to 1-22). The rationale for using the HMU concept in managing the WMNF can be found in the project record (U.S. Department of Agriculture, Forest Service 2019). HMUs range in size from 6,000 to 49,000 acres. Habitat composition and age class objectives are determined for each HMU. Land capability (the ability of a site to grow certain tree species) are a key component in determining habitat objectives for an HMU. For example, sites that more readily grow softwoods would be managed for this habitat type while sites that more readily grow northern hardwoods would be managed for this habitat type.

Lands within HMUs designated as Management Area (MA) 2.1 provide for a sustained yield of high-quality timber products, provide a balanced mix of habitats for wildlife, provide a variety of recreation opportunities, and manage high-use or highly developed recreation areas to acceptable social and ecological standards while retaining some low-use and less developed areas. According to the Forest Plan:

> *"Habitat management objectives must be developed for an individual Habitat Management Unit (HMU) prior to implementation of vegetative management in that HMU. These objectives must be based on land capability, current condition in the HMU, and landscape needs to meet management area objectives" (Forest Plan, p. 2-33).*

HMUs can encompass a variety of management areas within which different types of vegetation management activities are and are not permitted. This document summarizes information used by an interdisciplinary team in developing the long-term habitat objectives in the Peabody West HMU. The raw data and calculations used in this analysis can be found in the project record (USDA Forest Service 2020).

Peabody West Project
Management Areas
Wildlife Map
Map Legend
Road
General Forest Management
Wilderness
SPNM, (allowing snowmobiles)
SPNM, (no motorized trails)
Alpine Zone
Appalachian Trail
Scenic Areas
Town
National Forest Land
N
Project Proposals
Harvest Units
Ski Glade
Spring Brook Wildlife Opening
2
Randolph
Gorham
Dolly Copp Road
Martins
Low and Burbanks
Great Gulf Wilderness
16
Greens
Beans
Thompson
and Meserves
Peabody River
Sargents
0
0.5
1
Mile

Figure 1. Peabody West HMU Management Areas and Proposed Harvest Units.

## Background

The Peabody West HMU is located on National Forest System lands in Coos County, New Hampshire. The Peabody West HMU is about 15,500 acres with project activities occurring on about 3,000 acres of MA 2.1 lands. The remaining acreage comprises six different MAs where timber harvest and other activities are not permitted including Wilderness MA 5.1, Semi-Primitive Recreation MA 6.1, Semi-Primitive Non-Motorized Recreation MA 6.2, Alpine Zone MA 8.1, Appalachian National Scenic Trail MA 8.3, and Scenic Areas MA 8.5 (Figure 1). The remainder of the land base under Forest Service ownership is located within MA 2.1 where large-scale vegetation management activities, including commercial timber harvests, are permitted. From this point forward, only those timber stands that fall within MA 2.1 will be considered because Forest Plan objectives regarding the composition of habitat types and age classes only pertain to lands in MA 2.1 (Forest Plan, pp. 1-20 to 1-21). The Peabody West HMU is an ideal candidate for vegetation management due to the following characteristics:

- No management has been conducted in this HMU since 2006
- Regeneration age class habitat is lacking in all habitat types across the HMU
- Numerous management opportunities exist to address desired conditions, including the following:
    - Increase habitat diversity by enhancing the aspen-birch and spruce-fir habitat types
    - Maintain current levels of hemlock
    - Match actual habitat types to expected habitat types given the capability of the land to produce different natural communities
    - Convert stands on non-compatible ecological land types to forest types consistent with land capability (i.e., hardwood stands growing on hardwood sites)
    - Maintain and expand the current wildlife opening

**Table 1 Current conditions, Potential Natural Vegetation (PNV), and objectives by habitat type in the Peabody West Habitat Management Unit (HMU)**

| Habitat Type | Current Total Acres in entire HMU | Potential Acres in entire HMU[1] | Current Acres in MA 2.1 | Potential Acres in MA 2.1 | HMU Objectives (acres/%) in MA 2.1 |
|---|---|---|---|---|---|
| Hardwood | 5,867 | 3,869 | 4,487 | 3,688 | 1,237/17% |
| Mixedwood | 3,368 | 149 | 2,061 | 149 | 2,037/28% |
| Spruce-fir | 3,969 | 9,907 | 401 | 3,438 | 3,856/53% |
| Aspen-birch | 266 | 0 | 225 | 0 | 73/1% |
| Oak-pine | 1 | 0 | 1 | 0 | 0 |
| Hemlock | 0 | * | 0 | 0 | 0 |
| Wildlife Openings | 1945 | 0 | 78 | 0 | 73/1% |
| Other[2] | 21 | 1,511 | 21 | 0 | 0 |
| Total Acres | 15,436 | 15,436 | 7,275 | 7,275 | 7,275 |

[1] Potential acres are based on Ecological Land Type (ELT) capability

* While hemlock can be a climax forest type, ELTs have not been identified that are more likely to become hemlock than spruce-fir in the long-term, so hemlock potential is part of the spruce-fir PNV numbers.

[2] Current acres are those that do not have a designated forest type, are not an identified wildlife opening, or not forested, such as wetlands, rock, and alpine habitat. Potential acres are those that ELTs indicate are unlikely to be forested (e.g., bogs, rocks).

# Existing Conditions

## Methods

The Androscoggin District Silviculturist and foresters determined existing conditions of the Peabody West HMU through field stand exams in 2018. The results of the stand exams were recorded in the Forest Service Geographical Information Systems (GIS) vegetation database. An analysis of the data was conducted by exporting stand-level information from the GIS database into a spreadsheet where the tabulated data described in the proceeding sections were calculated.

Acres cited in this document represent estimates based on on-the-ground exams and remote sensing data. Actual stand boundaries and acres may differ slightly from the numbers analyzed in this document.

## Suitability of Harvest

Of the 7,275 acres of the HMU located in MA 2.1 land, 2,240 acres are considered unsuitable for harvest because of steep slopes and/or excessively wet soils. Therefore, about 5,035 acres are suitable for vegetation management in the Peabody West HMU. The forested acreage that is unsuitable for harvest is divided across several habitat types (Table 6). Since these stands would never be harvested, they would eventually attain old-growth characteristics.

## Habitat Composition

The existing habitat composition for MA 2.1 lands in the HMU is summarized in Table 2, which includes a column representing the potential for the forest to produce each habitat type based on the ecological land type (ELT) of a stand. Each ELT, which is determined based on factors such as soil type and slope, is likely to produce a certain climax or late successional forest community. This community is known as the potential natural vegetation (PNV). Because of the intense timber harvest history on the WMNF, the ELTs of many forested stands are no longer supporting the natural vegetation that would be expected. Restoring habitat composition so that the actual vegetation reflects the PNV is a key habitat management objective in the Forest Plan (Forest Plan, p. 1-20). See the project record for more information on the rationale for the forest plan land management approach based on ELTs and corresponding PNV (U.S. Department of Agriculture, Forest Service 2019).

Based on the PNV, there is far more hardwood and far less spruce-fir habitat on the landscape than the natural capability of the land would indicate. This is likely due to the intensive forestry conducted in the region during the late 19th century and the slow successional processes since that time (U.S. Department of Agriculture, Forest Service 2019, DeGraaf, et al. 2006). Natural successional processes were further arrested in the late 20th century when a high percentage of the HMU was harvested again prior to the Forest Service's acquisition of the land.

**Table 2 Relationship between current habitat and Potential Natural Vegetation on MA 2.1 lands within the Peabody West HMU.**

| Habitat | MA 2.1 Acres | Acres on Potential HW[1] sites | % on Potential HW sites | Acres on Potential MW[1] sites | % on Potential MW sites | Acres on Potential SF[1] sites | % on Potential SF sites |
|---|---|---|---|---|---|---|---|
| Hardwood | 4,487 | 2,842 | 63% | 89 | 2% | 1,556 | 35% |
| Mixedwood | 2,061 | 595 | 29% | 55 | 3% | 1,411 | 69% |
| Spruce-Fir | 401 | 91 | 23% | 0 | 0% | 310 | 78% |
| Aspen-Birch | 225 | 137 | 61% | 5 | 2% | 84 | 37% |
| Oak-Pine | 1 | 0 | 0% | 0 | 0% | 1 | 100% |

| Habitat | MA 2.1 Acres | Acres on Potential HW[1] sites | % on Potential HW sites | Acres on Potential MW[1] sites | % on Potential MW sites | Acres on Potential SF[1] sites | % on Potential SF sites |
|---|---|---|---|---|---|---|---|
| Hemlock | 0 | 0 | 0% | 0 | 0% | 0 | 0% |
| Total | 7,1752 | 3,665 | NA | 149 | NA | 3,362 | NA |

[1] HW = hardwood; MW = mixedwood; SF = strong spruce-fir

[2] Wildlife openings and other habitat types were removed for this analysis

Mixedwood habitat type is likely to persist in the analysis area as it currently exists, although not in the same locations. Aspen-birch and oak-pine, less common habitat types, are created and maintained by disturbance and therefore don't represent climax communities (Leak, Yamasaki and Holleran 2014). For this reason, they will make up zero percent of the future acreage of these stands barring any disturbance. Hemlock is a shade tolerant species with a tendency to seed into areas that have little to no disturbance and are warm or mesic. Its development is facilitated by small micro-gaps encouraging recruitment to the mid- and overstory (Anderson and Gordon 1994).

Table 2 displays the acres and percentages of each habitat type that occurs on each stand by PNV. Currently, hardwood and mixedwood make up a significant portion—2,967 acres—of the habitat type composition present on strong spruce-fir sites. Of the 3,362 acres that show strong spruce-fir characteristics based on ELTs, only 310 acres are currently dominated by spruce-fir. For mixedwood stands, a high percentage currently existing are growing on strong spruce-fir sites (69 percent) while a disproportionately small percentage of mixedwood stands are growing on sites that would favor that habitat type (3 percent).

Mixedwood habitat type is likely to persist in the analysis area as it currently exists, although not in the same locations. Aspen-birch and oak-pine, which are less common habitat types, are created and maintained by disturbance and therefore don't represent climax communities (Leak, Yamasaki and Holleran 2014). For this reason, they would make up zero percent of the future acreage of these stands barring any disturbance. Hemlock is a shade tolerant species with a tendency to seed into warm or mesic areas that have little to no disturbance. Its development is facilitated by small micro-gaps encouraging recruitment to the mid- and overstory (Anderson and Gordon 1994).

## Age Class Composition

In addition to habitat composition in terms of natural community types, management objectives in the Forest Plan also call for a variety of habitat conditions in terms of age class composition (Forest Plan, p. 1-21). Three age classes are recognized: regeneration (0 to 9 years old for all habitat types), young (10 to 59 years for northern hardwoods and mixedwood and 10 to 39 years for all other habitat types), and mature (60 to 119 years for northern hardwood and mixedwood, 40 to 89 years for spruce-fir, and 40 to 69 years for aspen-birch). The age class composition for the Peabody West HMU is provided in Table 4.

The mature age class is dominant among all habitat types although there is still a high percentage of young forest owing to the extensive logging that occurred in the project area at the end of the 20th century. All the aspen-birch habitat type is mature and therefore may not persist for much longer in the absence of active management or natural disturbance. Regeneration-age class forest is currently not a component of the age class composition for any of the habitat types.

# Desired Future Conditions

On the 2,240 forested acres within MA 2.1 of the HMU that are unsuitable for timber harvests, the trends that already predominate on the landscape will continue. These stands will mature slowly, and natural disturbance may still occur at small scales through single-tree or group mortality. Stand-replacing disturbances, which lead to stand regeneration and young forest age classes, are typically infrequent and small in scale. Therefore, regenerating forests are likely to remain limited.

Although most of the forest is mature and wildlife species that rely on mature forest have populations that are resilient, there have been declines in populations of species that rely on regenerating forest habitat and openings during their life cycles (DeGraaf, et al. 2006). For these species, patch size is critical in providing food and cover, with the diversity of species increasing as regenerating patch size increases to 30 acres (DeGraaf, et al. 2006, Costello, et al. 2000, Prout 2017).

About 5,035 acres of land suitable for management occurs in MA 2.1 land in which there are opportunities to diversify age classes, encourage forest composition to better reflect the ecological capability of the land, and allow for the maintenance or enhancement of less common or declining forested habitat types such aspen-birch, oak-pine, and hemlock.

A detailed rationale of the desired forest composition objectives can be found in Table 3.

**Table 3 Long-term habitat composition objectives for each habitat type**

| Habitat type | Objective | Rationale |
|---|---|---|
| Hardwood | Decrease current level of hardwood habitat. | Northern hardwood is the current dominant forest type on MA 2.1 lands in the HMU (4,487 acres); most of these stands are mature (3,257 acres). 2,110 acres of hardwood habitat is located on potential hardwood sites that would be managed to sustain hardwood forests, including the even-aged regeneration of stands. There are 1,110 acres of mature hardwood stands located on sites with a very strong potential to transition into spruce-fir and could be managed to promote softwood using uneven-aged methods or to promote aspen-birch habitat using even-aged methods, which would then transition into spruce-fir over time. |
| Mixedwood | Decrease current level of mixedwood habitat. | Mixedwood stands are the second most dominant forest type on MA 2.1 lands in the HMU (2,061 acres). However, only 155 acres of existing young and mature mixedwood stands occur on mixedwood sites. The vast majority of young and mature mixedwood stands (1,411 acres) are located on strong spruce-fir sites. These would be managed to transition into spruce-fir habitat types using uneven-aged methods. These sites can also be managed to hasten the transition of hardwood forest to mixedwood. |
| Spruce-fir | Increase current level of spruce-fir habitat. | Because of the high potential for spruce-fir within this HMU, most spruce-fir stands would be managed to retain that spruce-fir habitat. The mixedwood and hardwood sites located on sites with strong spruce-fir potential would be managed to transition into spruce-fir over the long-term. The aspen-birch habitat type could occur in the short term as part of this process. |
| Aspen-birch | Increase the current level of aspen-birch habitat. | Almost all the aspen-birch on MA 2.1 lands in the HMU are mature aged (95 percent) and would be lost if no management is conducted to regenerate this habitat type. Hardwood and strong spruce-fir sites have an aspen-birch component, so clearcut, patch cut, and group selection harvests could maintain these areas as aspen-birch habitat or increase the size of them. Group selection harvest would perpetuate the healthy paper birch component within a stand. Well-timed re-entry would be needed to perpetuate full regeneration of aspen-birch groves. In other cases, without frequent re-entry, aspen-birch would occur as a more ephemeral component of forest succession. |
| Oak-pine | Where present, retain oak and pine as components of forested stands. | Some young and mature white pine and oak exists in this HMU from past land use. These stands enhance forest diversity and provide seed sources and wildlife habitat. Group selection would maintain these stands for the long-term, providing multiple age classes while retaining the mature character of the stands. |

| Habitat type | Objective | Rationale |
|---|---|---|
| Hemlock | Maintain or increase the current level of hemlock habitat. | Hemlock stands are not abundant in this HMU. Retention of existing acres of hemlock in the HMU is feasible through uneven-aged management. Uneven-aged management facilitates understory development by creating small gaps and recruitment to the mid- and overstory. Individual hemlock trees, where present, would be retained as inclusions in stands to increase forest diversity. |
| Wildlife openings | Maintain or slightly increase current level of wildlife opening | 9 acres of MA 2.1 land in the HMU is currently maintained as a wildlife opening. Open habitat may be increased by maintaining and expanding an existing 9-acre wildlife opening by 10 acres within the HMU. Two existing wildlife openings within the HMU will no longer be maintained. |
| Other | No change from current level. | There are no composition goals associated with the other habitats (i.e., wetlands and open water) that can be reached with vegetation management activities. |

## Age Class Objectives

Age class objectives for the suitable lands within this HMU should be similar to the objectives outlined in the Forest Plan except where local ecological or social conditions make it appropriate and desirable to have more or less regeneration age habitat in the HMU. See Table 6 for the desired future condition of the MA 2.1 lands within the HMU.

There is a lack of stands in the regeneration age class for all habitat types on lands within MA 2.1 Forest-wide. The Forest Service estimated that it would create about 9,400 acres of even-aged regeneration habitat during the first decade of the Forest Plan, or about 940 acres annually. By 2017, the Forest Service should have created about 11,280 acres (940 acres annually over 12 years) of regeneration-age stands via clearcuts, patch cuts, and shelterwood cuts. As of the end of 2017, the WMNF had created about 4,660 acres of this age class, less than half of what was planned (Prout 2017).

To address this deficiency, regeneration objectives for this HMU have been set at levels that are twice as high as those detailed in the Forest Plan. Within Peabody West HMU, existing conditions within numerous stands present opportunities to work towards meeting this increased regeneration age class goal. The regeneration goal for aspen-birch is at least 252 acres or 112 percent since this habitat class is incredibly deficient on the Forest and in the Peabody West HMU. The simplest and fastest way to create aspen-birch regeneration acres to meet Forest Plan objectives is by clearcuts and patch cuts in ELTs suited for aspen-birch. Due to the lack of regeneration for aspen-birch in the Peabody West Project, it is extremely important to keep or even add to the proposed clearcuts and patch cuts in the project even though it might be visible from scenic points throughout the landscape. It is important to push towards the Forest Plan guidance to increase regeneration on the WMNF, which is severely lacking in the Peabody West HMU.

There are no spruce-fir or aspen-birch stands in the young age class. Stands in the young age class cannot be created immediately by silvicultural treatments but would exist in the future as the regeneration age class continues to grow. Therefore, the regeneration age class is needed now to provide the young age class in the future.

Over 75 percent of all habitat types in the Peabody West HMU are in the mature age class with mixedwoods, aspen-birch, and oak-pine accounting for over 90 percent (Table 4). A relatively low percentage of MA 2.1 land (Table 6) that is forested is unsuitable for harvest and would continue to grow older as the forest matures. The mature age class objective is based on the portion of MA 2.1 land in the HMU that is suitable for harvest and is not committed at any one time to the other age class objectives.

## References

Anderson, H. W., and A. G. Gordon. 1994. *The tolerant conifers: eastern hemlock and red spruce, their ecology and management.* Research Information Paper No. 113, Ministry of Natural Resources, Ontario Forestry Research Institute, Ontario: Ontario Forestry Research Institute, 48.

Costello, C. A., M. Yamasaki, P. J. Pekins, W. B. Leak, and C. D. Neefus. 2000. "Songbird response to group selection harvests and clearcuts in a New Hampshire northern hardwood forest." *Forest Ecology and Management 127* 41-54.

DeGraaf, R. M., M. Yamasaki, W. B. Leak, and A. M. Lester. 2006. *Technical guide to forest wildlife habitat management in New England.* Technical Guide, Lebanon: University Press of New England, 52.

Leak, W. B., M. Yamasaki, and R. Holleran. 2014. *Silvicultural guide for northern hardwoods in the northeast.* Technical , Durham: General Technical Report NRS-132, Northern Research Station, 52.

Prout, L. 2017. "Personal communication via email to Bonnie Woods, Assistant District Ranger-Wildlife." Campton, NH, December 4.

U.S. Department of Agriculture, Forest Service. 2002. "Ecological Approach." Campton, NH.

U.S. Department of Agriculture, Forest Service. 2019. "Terrestrial Habitat Management Reference Document." Campton, NH.

U.S. Department of Agriculture, Forest Service. 2005. *White Mountain National Forest Final Environmental Impact Statement for the Land and Resource Management Plan.* Laconia, NH: White Mountain National Forest. https://www.fs.usda.gov/detail/whitemountain/landmanagement/planning/?cid=STELPRDB5199941.

U.S. Department of Agriculture, Forest Service. 2005. "White Mountain National Forest Land and Resource Management Plan." Campton, NH.

JA-1682

# Appendix A. Tables

**Table 4 Age class composition by habitat type for the Peabody West HMU**

| Age class | HW[1] Acres | HW % | MW[1] Acres | MW % | SF[1] Acres | SF % | AB[1] Acres | AB % | OP[1] Acres | OP % | H[1] Acres | H % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Regeneration | - | 0% | - | 0% | - | 0% | - | 0% | - | 0% | - | 0% |
| Young | 1,240 | 21% | 168 | 5% | 21 | 1% | 9 | 3% | 1 | 100% | - | 0% |
| Mature | 4,627 | 79% | 3,200 | 95% | 3,948 | 99% | 257 | 97% | - | 0% | - | 0% |
| Total | 5,867 | | 3,368 | | 3,969 | | 266 | | 1 | | - | |

**Table 5 Existing MA 2.1 conditions by habitat type in the Peabody West HMU**

| Age class | HW Acres | HW % | MW Acres | MW % | SF Acres | SF % | AB Acres | AB % | OP Acres | OP % | H Acres | H % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Regeneration | - | 0% | - | 0% | - | 0% | - | 0% | - | 0% | - | 0% |
| Young | 1,230 | 27% | 168 | 8% | 21 | 5% | 9 | 4% | 1 | 100% | - | 0% |
| Mature | 3,257 | 73% | 1,893 | 92% | 380 | 95% | 216 | 96% | - | 0% | - | % |
| Total | 4,487 | | 2,061 | | 401 | | 225 | | 1 | | - | |

**Table 6 MA 2.1 forest objectives in the Peabody West HMU.**

| Age class | HW[1] Acres | HW % | MW[1] Acres | MW % | SF[1] Acres | SF % | AB[1] Acres | AB % | OP[1] Acres | OP % | H[1] Acres | H % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Regeneration | 179 | 4% | 21 | 1% | 4 | 1% | **252** | 112% | 0 | - | - | - |
| Young | 359 | 8% | 103 | 5% | 12 | 3% | 50 | 22% | 0 | - | - | - |
| Mature | 3,769 | 84% | 1,628 | 79% | 281 | 70% | 59 | 26% | 0 | - | - | - |
| Unsuitable[2] | 905 | 20% | 938 | 46% | 244 | 61% | 152 | 67% | 1 | 100% | - | - |

[1] HW = hardwood; MW = mixedwood; SF = spruce-fir; AB = aspen-birch; OP = oak-pine; H = hemlock

[2] Unsuitable = land that cannot be harvested

**Table 7 Comparison of MA 2.1 land current conditions, Forest Plan desired conditions, and project-level objectives for regeneration age habitat by acres**

| Habitat Type | Current Conditions | Forest Plan Objective | Project-level Objective |
|---|---|---|---|
| Hardwood | 0 | 135-179 | 179 |
| Mixedwood | 0 | 21 | 21 |
| Spruce-fir | 0 | 4-8 | 4 |
| Aspen-birch | 0 | N/A | **252** |
| Oak-pine* | 0 | N/A | 0 |
| Hemlock* | 0 | N/A | 0 |

* There are no objectives for the oak-pine or hemlock habitat types in the Forest Plan

**Table 8 Comparison of MA 2.1 land current conditions, Forest Plan desired conditions, and project-level objectives for young age habitat by acres**

| Habitat Type | Current Conditions | Forest Plan Objective | Project-level Objective |
|---|---|---|---|
| Hardwood | 1,230 | 673-897 | 359 |
| Mixedwood | 168 | 103 | 103 |
| Spruce-fir | 21 | 12-24 | 12 |
| Aspen-birch | 9 | N/A | 50 |
| Oak-pine* | 1 | N/A | 0 |
| Hemlock* | 0 | 0 | 0 |

* There are no objectives for the oak-pine or hemlock habitat types in the Forest Plan

**Table 9 Comparison of MA 2.1 land current conditions, Forest Plan desired conditions, and project-level objectives for mature age habitat by acres**

| Habitat Type | Current Conditions | Forest Plan Objective | Project-level Objective |
|---|---|---|---|
| Hardwood | 3,257 | 2,505-2,774 | 3,769 |
| Mixedwood | 1,893 | 999 | 1,628 |
| Spruce-fir | 380 | 125-142 | 281 |
| Aspen-birch | 216 | N/A | 59 |
| Oak-pine* | 0 | 0 | 0 |
| Hemlock* | 0 | 0 | 0 |

* There are no objectives for the oak-pine or hemlock habitat types in the Forest Plan

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer and lender.