———————————————————————

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

———————————————————————

Case No. 25-2086

**STANDING TREES, INC.,**
Plaintiff - Appellant,

v.

**US FOREST SERVICE; DEREK IBARGUEN**, in the official capacity as Supervisor of the White Mountain National Forest**; BROOKE BROWN**, in the official capacity as District Ranger for the Pemigewasset Ranger District**; JOSHUA SJOSTROM**, in the official capacity as District Ranger for the Androscoggin Ranger District**,**
Defendants - Appellees.

———————————————————————

On Appeal from the United States District Court for the District of New Hampshire
Judge Joseph Laplante, Case No. 1:24-cv-138-JL-TSM

———————————————————————

# PLAINTIFF-APPELLANT'S FINAL OPENING BRIEF

———————————————————————

Christophe Courchesne, Associate Professor and Director
Rachel Westrate, Fellow
ENVIRONMENTAL ADVOCACY CLINIC
Vermont Law and Graduate School
P.O. Box 96, 164 Chelsea St.
South Royalton, VT 05068
(802) 831-1630
ccourchesne@vermontlaw.edu
*Counsel for Plaintiff-Appellant Standing Trees, Inc.*

On the brief: Environmental Advocacy Clinic student attorneys
Joe Anderson, Blythe Faris, Eric Grimes, and Julia Wickham

**RULE 26.1(A) CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26(1), Plaintiff-Appellant Standing Trees, Inc., certifies that it is a non-profit corporation with no parent corporation and that no public company owns any interest in it.

# TABLE OF CONTENTS

RULE 26.1(A) CORPORATE DISCLOSURE STATEMENT ............................. ii

TABLE OF CONTENTS ...................................................................... iii

TABLE OF AUTHORITIES ................................................................. vi

GLOSSARY OF ABBREVIATIONS ....................................................... xii

STATEMENT IN SUPPORT OF ORAL ARGUMENT ............................................1

STATEMENT OF JURISDICTION ...........................................................2

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................3

STATEMENT OF THE CASE...............................................................3

    I.      Factual Background ........................................................4

        A.      Peabody ......................................................7

        B.      Tarleton .....................................................8

    I.      Procedural Background .................................................9

    II.     Legal Background.........................................................10

        A.      National Forest Management Act ........................................10

        B.      National Environmental Policy Act .....................................11

SUMMARY OF ARGUMENT................................................................14

ARGUMENT ..................................................................................15

I.      Standard of Review......................................................15

II.     The Service's Blurred Forest-Classification Framework Violated NFMA and NEPA.................................................................16

A.      The Service's Uneven and Incomplete Old Growth Investigations Left Old Growth Forest Vulnerable to Logging. ...................................19

B.      The Service Failed to Apply the Plan's Old-Forest-Habitat Protections by Conflating That Category with "Mature Forest" and Declining to Identify It. ..............................................................................19

C.      The Service Built Its Hard Look on a Mess of Stand-Age Information. ................................................................................................25

III.    The Projects Are Inconsistent with the Plan, in Violation of NFMA. ...........27

IV.     The Service's Mishandling of Alternatives Violated NEPA and the APA. .....32

A.      The Service Failed to Develop Alternatives Despite Both Projects Involving Unresolved Conflicts. ...........................................................32

B.      The Service Improperly Rejected Standing Trees' Mid-Range Alternatives. ........................................................................................36

1.    Cases Excusing Rejections of "Mid-Range" Alternatives Are Inapt. ....37

2.    The Service's Own Partial Implementation Choices Expose Its Categorical Rejection of Standing Trees' Alternatives as Arbitrary and Unreasonable. ..................................................................................40

3.    The Burden to Develop Alternatives Was the Service's, Not Standing Trees'. ...................................................................................................41

C.      The Service Failed to Conduct a Genuine No-Action Analysis, Which Undermines NEPA's Informed-Decisionmaking Function. .........43

V.      The Service's Incomplete Baseline and Conclusory Explanations Violated NEPA's Hard Look Requirement. ..............................................................45

A.      The Service Failed to Reasonably Consider Project-Specific Baseline Data for Lake Tarleton, Peabody's Waters, and Bats. ...........................46

B.    The Service Failed to Provide a Reasonably Complete Discussion of the Projects' Impacts to Scenery. ..........................................................52

VI.    The Service Failed to Analyze the Cumulative Impacts of Its Actions.........53

A.    The Service Failed to Assess Cumulative Impacts from Actions Fully Within Its Authority. ................................................................54

B.    The Service Arbitrarily Determined the Geographic Scope of Its Cumulative Impacts Analysis. ..............................................................55

C.    The Service Failed to Recognize the Lack of Cumulative Effects Analysis Throughout the Projects..........................................................57

VII.    The FONSIs Cannot Stand. ...............................................................57

CONCLUSION ............................................................................................59

CERTIFICATE OF COMPLIANCE ........................................................60

CERTIFICATE OF SERVICE ..................................................................61

ADDENDUM ............................................................................................ i

ADDENDUM TABLE OF CONTENTS................................................. ii

# TABLE OF AUTHORITIES

**Cases**

*Adams v. EPA,* 38 F.3d 43 (1st Cir. 1994) ................................................................43

*Advocs. for Transp. Alts., Inc. v. Army Corps of Eng'rs*,
    453 F. Supp. 2d 289 (D. Mass. 2006) ................................................... 49, 52

*All. for the Wild Rockies v. Forest Serv.*,
    907 F.3d 1105 (9th Cir. 2018) .................................................... 16, 18, 22, 25

*Associated Fisheries v. Daley*,
    127 F.3d 104 (1st Cir. 1997) ..............................................................................16

*Bob Marshall All. v. Hodel*,
    852 F.2d 1223 (9th Cir. 1988) ................................................................. 32, 35, 43

*California v. Block*, 690 F.2d 753 (9th Cir. 1982)
    ................................................................................................................52

*Calvert Cliff's Coordinating Comm., Inc. v. Atomic Energy Comm'n*,
    449 F.2d 1109 (D.C. Cir. 1971) .......................................................................43

*Citizens Against Burlington v. Busey*,
    938 F.2d 190 (D.C. Cir. 1991) ............................................................. 36, 40

*City of New York v. DOT*,
    715 F.2d 732 (2d Cir. 1983) ..............................................................................39

*Conservation L. Found. v. Ross*,
    374 F. Supp. 3d 77 (D.D.C. 2019) ...................................................................49

*Ctr. for Biological Diversity v. Forest Serv.*,
    No. 23-2882, 2025 WL 586358 (9th Cir. Feb. 24, 2025). ...................... 46, 49

*Ctr. for Biological Diversity v. Forest Serv.*,
    No. CV 23-110-M-DWM, 2025 WL 3549515 (D. Mont. Dec. 11, 2025) ....13

*Custer Cnty. Action Ass'n v. Garvey*,
    256 F.3d 1024 (10th Cir. 2001) .......................................................................43

*DOT. v. Public Citizen*,
    541 U.S. 752 (2004) ..........................................................................................36

*Dubois v. USDA*,
    102 F.3d 1273 (1st Cir. 1996) ................................................................ passim

*Earth Island Institute v. Forest Serv.*,
 87 F.4th 1054 (9th Cir. 2023)......................................................................38

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
 36 F.4th 850 (9th Cir. 2022).......................................................................57

*Env't Prot. Info. Ctr. v. Forest Serv.*,
 234 F. App'x 440 (9th Cir. 2007)................................................................42

*FCC v. Fox Television Stations, Inc.*,
 556 U.S. 502 (2009)....................................................................................56

*Gifford Pinchot Task Force v. Perez*,
 2014 WL 3019165 (D. Or. 2014)................................................................48

*Great Basin Res. Watch v. BLM*,
 844 F.3d 1095 (9th Cir. 2016)............................................................... 46, 47

*Historic Bridge Found. v. Buttigieg*,
 22 F.4th 275 (1st Cir. 2022).......................................................................51

*Ida. Sporting Congress v. Rittenhouse*,
 305 F.3d 957 (9th Cir. 2002)......................................................................28

*Jimenez-Portillo v. Garland*,
 56 F.4th 162 (1st Cir. 2022).......................................................................15

*Kern v. BLM*,
 284 F.3d 1062 (9th Cir. 2002)............................................................... 13, 53

*Kettle Range Conservation Grp. v. Forest Serv.*,
 2023 WL 4112930 (E.D. Wa. 2023)...........................................................58

*Klamath-Siskiyou Wildlands Ctr. v. BLM*,
 387 F.3d 989 (9th Cir. 2004)......................................................................53

*Kleppe v. Sierra Club*,
 427 U.S. 390 (1976)............................................................................. 54, 55

*Lands Council v. McNair*,
 537 F.3d 981 (9th Cir. 2008)......................................................................27

*League of Wilderness Defs. v. Connaughton*,
 2014 WL 6977611 (D. Or. Dec. 9, 2014)...................................................55

*League of Wilderness Defs. v. Connaughton*,
 752 F.3d 755 (9th Cir. 2014)......................................................................26

*Loper Bright Enters. v. Raimondo*,
 603 U.S. 369 (2024)....................................................................................34

*Los Padres ForestWatch v. Forest Serv.*,
  25 F.4th 649 (9th Cir. 2022)..................................................................................50

*Marsh v. Or. Nat. Res. Council*,

490 U.S. 360 (1989) ...................................................................................11, 49

*Monroe Cnty. Bd. of Commissioners v. Forest Serv.*,
  No. 1:24-CV-01560-TWP-KMB, 2025 WL 2687723 (S.D. Ind. Sept. 18,
  2025) .........................................................................................................14

*Mont. Wilderness Ass'n v Connell*,
  725 F.3d 988 (9th Cir. 2013)...............................................................................37

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)................................................................... 27, 31, 36

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
  668 F.3d 1067 (9th Cir. 2011)................................................... 47, 51

*Nantucket Residents Against Turbines v. Bureau of Ocean Energy Mgmt.*,
  100 F.4th 1 (1st Cir. 2024) ...............................................................................50

*Nat. Res. Def. Council, Inc. v. Callaway*,
  524 F.2d 79 (2d Cir. 1975)...............................................................................39

*Nat'l Parks Conservation Ass'n v. Semonite*,
  916 F.3d 1075 (D.C. Cir. 2019) .......................................................................58

*Native Ecosystems Council v. Dombeck*,
  304 F.3d 886 (9th Cir. 2002) ..........................................................................55

*Native Ecosystems Council v. Forest Serv.*,
  418 F.3d 953 (9th Cir. 2005) ...................................................... passim

*Neighbors of Cuddy Mountain v. Forest Serv.*,
  137 F.3d 1372 (9th Cir. 1998)....................................................................11, 55

*Ocean Advocs. v. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2005).............................................................................58

*Ohio Forestry Ass'n v. Sierra Club*,
  523 U.S. 726 (1998)...........................................................................................10

*Pacific Coast Fed. of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*,
  265 F.3d 1028 (9th Cir. 2001)) ........................................................................57

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)......................12

*Safeguarding the Historic Hanscom Area's Irreplaceable Res., Inc. v. FAA*,
651 F.3d 202 (1st Cir. 2011) ....................................................................54

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025)........................................................................ passim

*Sierra Club v. Marsh*,
872 F.2d 497 (1st Cir. 1989)....................................................................12

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)..................................................................................34

*Standing Rock Sioux Tribe v. Army Corps of Eng'rs*,
985 F.3d 1032 (D.C. Cir. 2021) ..............................................................59

*Te-Moak Tribe of W. Shoshone v. DOI*,
608 F.3d 592 (9th Cir. 2010) .............................................................. 38, 42

*W. Watersheds Project v. Moore*,
No. 25-7252, 2026 WL 440305 (9th Cir. Feb. 9, 2026) ................................14

*W. Watersheds Project v. Schultz*,
No. CV 22-149-M-DWM, 2025 WL 2658776 (D. Mont. Sept. 17, 2025) ...13

*WildEarth Guardians v. USDA*,
135 F.4th 717 (9th Cir. 2025)..................................................................46

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008)......................................................................................27

**Statutes**

5 U.S.C. § 701 ...............................................................................................2

5 U.S.C. § 702 ...............................................................................................2

5 U.S.C. § 703 ...............................................................................................2

5 U.S.C. § 704 ...............................................................................................2

5 U.S.C. § 705 ...............................................................................................2

5 U.S.C. § 706 ...............................................................................................2

5 U.S.C. § 706(2)(A).....................................................................................16

16 U.S.C. § 1271 ..........................................................................................30

16 U.S.C. § 1273(b) .....................................................................................30

16 U.S.C. § 1600 ..........................................................................................10

16 U.S.C. § 1604 ................................................................................10

16 U.S.C. § 1604(f)(5)(A).....................................................................6

16 U.S.C. § 1604(g)(3)(C) ...................................................................11

16 U.S.C. § 1604(i) ...................................................................... 16, 27

16 U.S.C. § 472a .................................................................................10

16 U.S.C. §1614..................................................................................10

28 U.S.C. § 1291 ...................................................................................2

28 U.S.C. § 1331 ...................................................................................2

28 U.S.C. § 1346 ...................................................................................2

28 U.S.C. § 1391(e) ...............................................................................2

28 U.S.C. § 2201 ...................................................................................2

28 U.S.C. § 2202 ...................................................................................2

28 U.S.C. § 2412 ...................................................................................2

42 U.S.C. § 4321 .................................................................................11

42 U.S.C. § 4332(2)(C) (2023) ...........................................................12

42 U.S.C. § 4332(H) (2023)...................................................... 32, 34, 41

Consolidated Appropriations Act, Pub. L. No. 118-42, § 407, 138 Stat. 25 (2024)..6

**Regulations**

36 C.F.R. § 219.1(b) (1982) ................................................................27

36 C.F.R. § 219.11(d) ..........................................................................11

36 C.F.R. § 219.12(k) (1982) ..............................................................11

36 C.F.R. § 220.7(b)(2)(i) ............................................................ 33, 34

36 C.F.R. § 220.7(b)(2)(ii) ..................................................................43

36 C.F.R. § 220.7(b)(2)(iii) .................................................................41

36 C.F.R. § 220.7(b)(3)(i) ...................................................................12

36 C.F.R. § 220.7(b)(i)........................................................................33

36 C.F.R. pt. 220 .................................................................................13

40 C.F.R. § 1502.2(b) ..........................................................................12

40 C.F.R. § 1508.27(a) (1978) ............................................................58

40 C.F.R. § 1508.9 (1978)............................................................57

40 C.F.R. pt. 1500 (1978).............................................................12

46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981).........................................43

73 Fed. Reg. 43,084, 43,092 (July 24, 2008)..........................................33

85 Fed. Reg. 43,304 (July 16, 2020)..................................................13

90 Fed. Reg. 10,610 (Feb. 25, 2025) .................................................13

90 Fed. Reg. 11,221 (Mar. 5, 2025) ..................................................13

90 Fed. Reg. 29,632 (July 3, 2025)...................................................13

**Other Authorities**

Council on Envtl. Quality, Memorandum for Heads of Federal Departments and
Agencies Implementation of the National Environmental Policy Act
(Feb. 19, 2025), https://ceq.doe.gov/docs/ceq-regulations-and-
guidance/CEQ-Memo-Implementation-of-NEPA-02.19.2025.pdf ...............13

Merriam-Webster, Advance, Merriam-Webster.com Dictionary,
https://www.merriam-webster.com/dictionary/advance................................39

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| Administrative Procedure Act | APA |
| Biological Opinion | BiOp |
| Council for Environmental Quality | CEQ |
| Decision Notice | DN |
| Environmental Assessment | EA |
| Environmental Impact Statement | EIS |
| Finding of No Significant Impact | FONSI |
| Final Environmental Impact Statement | FEIS |
| Inventoried Roadless Area | IRA |
| Management Area | MA |
| Manomet Late Successional Index | LSI |
| National Environmental Policy Act | NEPA |
| National Forest Management Act | NFMA |
| U.S. Fish and Wildlife Service | USFWS |
| U.S. Forest Service | Service |
| White Mountain National Forest | Forest |
| 2005 White Mountain Land and Resource Management Plan | Plan |

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Oral argument will assist the Court in considering the complex issues in this case. This appeal presents novel and important issues under both the National Forest Management Act—a statute that the First Circuit has rarely addressed—and the National Environmental Policy Act—the subject of recent Supreme Court jurisprudence. Plaintiff-Appellant respectfully requests that the Court schedule an oral argument.

## STATEMENT OF JURISDICTION

The U.S. District Court for the District of New Hampshire had jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal questions); 1346 (United States as defendant); 2201 (declaratory judgment); 2202 (further relief); 2412 (costs and fees); and 5 U.S.C. §§ 701–706 (Administrative Procedure Act).

Venue was proper in the District Court under 28 U.S.C. § 1391(e). The District Court's judgment entered September 23, 2025, granting summary judgment to the Defendants pursuant to a written order dated August 20, 2025. Plaintiffs timely filed a notice of appeal on November 6, 2025. This Court has jurisdiction over this appeal of a final decision of the District Court, pursuant to 28 U.S.C. § 1291.

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

The issues before this Court are whether:

1. The Forest Service ("Service") violated the National Forest Management Act ("NFMA") and the Administrative Procedure Act ("APA") by failing to reasonably explain the adherence of its Peabody and Tarleton Projects to the White Mountain National Forest Plan and by failing to make the Projects consistent with the Plan;

2. The Service violated the National Environmental Policy Act ("NEPA") and the APA in failing to engage in lawful, reasoned decisionmaking by refusing to study, develop, and describe appropriate alternatives for both the Peabody and Tarleton Projects; and

3. The Service violated NEPA and the APA in failing to take a hard look at the Peabody and Tarleton Projects' environmental impacts, invalidating the Service's Findings of No Significant Impact.

**STATEMENT OF THE CASE**

Standing Trees, Inc., a nonprofit forest and wildlife conservation organization, appeals the September 23, 2025 Judgment of the United States District Court for the District of New Hampshire (Laplante, J.) granting summary judgment to the United States Forest Service ("Service") and related federal defendants challenging two projects in New Hampshire's White Mountain National Forest ("Forest"), the Peabody West and Tarleton Integrated Resource Projects ("Projects"). *Order*, Add.–1; *Judgment*, JA0439. The Service approved the Projects based on Environmental Assessments ("EA") and Findings of No Significant Impact ("FONSI") under the National Environmental Policy Act ("NEPA"), concluding that the Projects complied with the 2005 White Mountain National

3

Forest Land and Resource Management Plan ("Plan") and the National Forest

Management Act ("NFMA"). JA0881–0917 (Peabody EA & FONSI), 4867–69

(Peabody Decision Notice), 11968–2001 (Tarleton EA & FONSI), 11929–34

(Tarleton Decision Notice). The District Court held that the Projects were

consistent with the Plan, thus not in violation of NFMA; that NEPA did not require

alternatives or baseline information; and that the Service's "hard look" and

cumulative impacts analyses were adequate. This appeal asks the Court to reverse

those rulings and vacate the Service's decisions because it abdicated its statutory

duty to adhere to the Plan's binding standards and guidelines, it failed to comply

with NEPA's requirements to study alternatives and give a hard look at the

Project's environmental and cumulative impacts, and its analysis and explanations

were inadequate under the standards for reasoned decisionmaking of the

Administrative Procedure Act ("APA").

## I.    Factual Background

The Forest spans more than 800,000 acres across New Hampshire and

Maine. JA0741. It is managed under the Plan which has a primary goal to "sustain

a healthy forest and use the latest scientific knowledge to restore the land and

forest where needed." JA0662. Under the Plan, "[m]anagement will recognize the

Forest's support to local economies while realizing the importance to society of a

natural appearing landscape distinct from the human altered environments

otherwise dominant in the East." JA0662. The Plan identifies more than 30 goals and 60 objectives to guide and direct management. JA0662–717.

The Plan is a "programmatic document that does not make project-level decisions." JA0657. The Service analyzed the environmental impact of the Plan under NEPA, and on September 13, 2005, it issued a Final Environmental Impact Statement ("FEIS") alongside a Record of Decision. JA0645, 0737–86. The Service selected "Alternative 2," which represented a middle-ground alternative balancing vegetation management with scenic values and "minimizing conflicts with other important Forest uses." JA0756. Both Projects tier to the Plan FEIS. JA0882, 01294.[1] The Plan and its FEIS envision a measured level of "regeneration forest"[2] across the landscape and anticipate natural disturbances to maintain regeneration forest across one to six percent of the Forest at any time. JA1671; JA0648.

The Plan allocates all lands into Management Areas ("MAs") and prescribes desired conditions and management direction for those areas. JA0656-57. The District Court likened MAs to a "zoning ordinance." Add.–7. Both Project areas lie

---

[1] By "tiering," a project incorporates, by reference, the analysis and information from the Plan's FEIS without having to repeat it. JA0657. The Service only included in the Administrative Record the cover page for the FEIS and a brief summary accompanying the Record of Decision. JA0737–86. Relevant and cited portions are included in the Joint Appendix.
[2] Regeneration forest is "typically 0–9 years old" and is typically created through stand-replacing natural disturbances or even-aged harvest. JA1671.

within MA 2.1, the "General Forest Management" area. JA0720. About 360,000 acres, or forty-five percent, of the Forest are designated as MA 2.1 lands, where desired conditions are diverse forest. JA0646; JA0720. The Plan employs a system of forest age-classes and habitat categories to support timber production, clean water, habitat for diverse flora and fauna including endangered species, recreational opportunities, and retention of rare and unique natural features. JA0720. Openings are to occur in a manner consistent with scenic objectives. *Id*. MA 2.1 lands must support a diverse range of recreation opportunities, including hiking, camping, fishing, hunting, and biking. *Id*. Logging in old growth forest and stands that contain old forest habitat is strictly forbidden across the Forest, including in MA 2.1. JA0694, 0733. Here, the Service authorized two Projects that will conduct intensive timber harvesting in areas designated as MA 2.1.

Under NFMA, forest plans must be updated every fifteen years, and the Service must review forest conditions at least every five years to determine if plan revision is warranted, although Congress has allowed for expired forest plans to remain in effect. JA0658; 16 U.S.C. § 1604(f)(5)(A); Consolidated Appropriations Act, Pub. L. No. 118-42, § 407, 138 Stat. 25 (2024). The Plan here is over twenty-years old.

A.    <u>Peabody</u>

The Peabody West Project ("Peabody") is located in the shadow of Mount Washington, on the slopes of the iconic Presidential Range. JA0901. It borders the vast Great Gulf roadless and wilderness complex. *Id*. The Appalachian Trail traverses the ridges that circle half the Project area. *Id*. Mature and old forests dominate the area, and the Service identified several patches of old growth forest and other "exemplary natural communities." JA1682, 1075–85. Most of the area and surrounding landscapes appear unaltered. JA1154; *see* JA0734. No known clearcuts have occurred in the Peabody area for more than 30 years. JA1143. The Peabody area includes two rivers eligible for Wild and Scenic-designation and habitat for endangered species. JA0908, 0906.

Despite these remarkable qualities, the Service set "regeneration objectives" for Peabody at "levels that are twice as high as those detailed" in the Plan. JA1680. The Service explained it did so because the Forest is not attaining regeneration forest objectives. JA1680. The Service authorized about 2,220 acres of logging, including 600 acres in the Great Gulf Inventoried Roadless Area ("IRA"). JA0878. It authorized large even-aged treatments—the Service's clinical term for clearcutting and similar harvests—that exceed Plan guidelines by 300–500 percent. JA0903. To support these intensive cuts, the Service authorized harvest during March through October, the active season for the endangered northern long-eared

bat ("bat"). JA0914–15, 0599. This includes the maternity season, March through July, a period presenting the greatest risk of killing or injuring mothers and their non-volant pups in roost trees. JA0599, 0612.

B.      Tarleton

The Tarleton Project ("Tarleton") centers on Lakes Tarleton and Katherine. JA1318. The Tarleton area includes popular public boat launches, campgrounds, hiking trails, and a small number of private residences. JA1318, 1530. The lakes and surrounding forest support local businesses, like Kingswood Camp, which has operated an outdoor summer camp on the shores of Lake Tarleton since 1985. JA0187. About two miles of the Appalachian Trail run through the Project area. JA0198. The Tarleton area includes a mix of mature and old-forest stands and riparian corridors. JA1310–11. Both lakes are impaired due to mercury contamination, and Lake Tarleton is also impaired due to acidity. JA1310; JA0278. The lakes provide habitat for fish and wildlife, and support water-based recreation. JA1311.

As with Peabody, the Service invoked the Forest-wide "lack" of regeneration forest as a primary driver for Tarleton's management direction. JA1393. The Service authorized logging over 690 acres. JA1299.

Tarleton's prescribed clearcuts will occur on slopes that drain into streams and impaired lakes. Local lake associations and volunteers monitor water quality

and have reported impaired, but improving, water quality. JA1482–85, 1526.[3] The

Service used water quality data from 2007 for Lake Tarleton, providing only

limited measurements. JA1317. The Service's water quality analysis rests on a

methodology developed for a different project. JA1310–11.

Although the Service authorized the Projects within months of each other,

neither of the EAs mention the other Project. JA0881–917, 1291–324.

## I.      Procedural Background

Standing Trees participated in the administrative process for both Projects. It

submitted detailed comments and objections raising concerns including Plan

consistency, regeneration harvest levels, alternatives, water quality, endangered

species, and cumulative impacts. JA0808–46 (Peabody Draft EA Comment);

JA0998–1059 (Peabody Objection); JA1326–81 (Tarleton Draft EA Comment);

JA1497–562 (Tarleton Objection).

The Service issued the Final EA and FONSI for Peabody before the

administrative objection period on April 27, 2023. JA0881. In his objection

response, Forest Supervisor Derek Ibarguen instructed that an updated EA be

---

[3] The AR index (JA0169) incorrectly labels Standing Trees' Tarleton Objection
Letter beginning at AR13050. However, the Objection is stamped at AR13065.
Hereinafter, the joint-appendix number is used to reference the Objection.

issued[4] alongside the final Decision Notice ("DN"). JA0996–97. The Service issued the DN for Peabody on February 7, 2024. JA0880.

The Service published a Final EA and FONSI alongside a DN that authorized Tarleton on November 13, 2023. JA1291–324, 1285–90.

On May 16, 2024, Standing Trees filed this action in the United States District Court for the District of New Hampshire, challenging the Service's authorizations of Tarleton and Peabody under NFMA, NEPA, and the APA. JA0009. The parties filed cross-motions for summary judgment. JA0186–88; JA0260–99. On August 20, 2025, the District Court granted summary judgment to the Service and entered judgment on September 23, 2025. Add.–1; JA0439. Standing Trees filed a timely notice of appeal on November 6, 2025. JA0440-41.

## II.     Legal Background

### A.     National Forest Management Act

NFMA is a substantive statute: it requires the Service to develop a land and resource management plan for each National Forest, known as a forest plan, and mandates that every project the Service implements be consistent with that forest plan. *See generally* 16 U.S.C. §§ 472a, 1600, 1604, 1614; *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 737 (1998) (explaining NFMA mandates forest plan

---

[4] This document is not located in the AR, or on the Peabody project page on the Forest website.

adherence). When the Service authorizes site-specific projects, it must demonstrate they are "consistent with the land resource management plan of the entire forest." *Neighbors of Cuddy Mountain v. Forest Serv.*, 137 F.3d 1372, 1377 (9th Cir. 1998).

The Plan here directs Forest management through a hierarchy of binding commitments. A standard is a "course of action that must be followed," and can only be deviated from through a Plan Amendment. JA0656. A guideline is "a required course of action" but may be departed from if site-specific conditions so require; the Service must document such deviations in the project analysis and signed decision. JA0656.

To ensure all plans remain responsive and effective, NFMA requires the Service to conduct "continuous monitoring and assessment in the field" to track the effects of the plans. 16 U.S.C. § 1604(g)(3)(C); 36 C.F.R. § 219.11(d); § 219.12(k) (1982). The Plan specifies two of the purposes for monitoring and evaluation as "[k]eeping the Plan current" and "[e]nsuring compliance with specific standards, laws, and regulatory requirements." JA0728.

B.    National Environmental Policy Act

NEPA "promotes its sweeping commitment to 'prevent or eliminate damage to the environment and biosphere' by focusing Government and public attention on the environmental effects of proposed agency action." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989) (quoting 42 U.S.C. § 4321). "NEPA itself does

11

not mandate particular results, but simply prescribes the necessary process" so that an agency must "consider all significant environmental impacts before choosing a course of action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *Sierra Club v. Marsh*, 872 F.2d 497, 502 (1st Cir. 1989). That process serves "twin aims": ensuring that the agency takes a "hard look" at the environmental consequences of the proposed action, and making information on those consequences available to the public, "which may then offer its insight to assist the agency's decisionmaking through the comment process." *Dubois v. USDA*, 102 F.3d 1273, 1285–86 (1st Cir. 1996). As a part of the requisite hard look, NEPA requires the agency "to study all alternatives that appear reasonable and appropriate to study… as well as significant alternatives suggested by other agencies or the public during the comment period." *Id.* at 1289.

NEPA requires an agency to prepare an in-depth EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C) (2023). An EIS is not required if the agency determines—based on an EA—the proposed action will not have a significant impact on the environment (i.e., a FONSI). 36 C.F.R. § 220.7(b)(3)(i).[5]

---

[5] The Service stated it completed the EAs for the Projects in compliance with the Council on Environmental Quality's ("CEQ") NEPA regulations at 40 C.F.R. pt. 1500 (1978). JA0884, 1294. The District Court applied these regulations in its opinion. *See, e.g.,* Add.–38 (citing 40 C.F.R. § 1502.2(b)). The 1978 CEQ NEPA

NEPA "establishes 'action-forcing' procedures" and operates as a "cross-check" to ensure that an agency's decision is "fully informed," "well-considered," and "reasonably explained." *Kern v. BLM*, 284 F.3d 1062, 1066 (9th Cir. 2002) (citations omitted); *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 173, 185, 180 (2025). Agencies fail this procedural cross-check when they lack site-specific information to make an informed decision, do not make material reasonably available for inspection by the public, or do not provide a convincing statement of reasons for the decision. *See, e.g., Ctr. for Biological Diversity v. Forest Serv.*, No. CV 23-110-M-DWM, 2025 WL 3549515 at *4 (D. Mont. Dec. 11, 2025); *W. Watersheds Project v. Schultz*, No. CV 22-149-M-DWM, 2025 WL 2658776 at *4 (D. Mont. Sept. 17, 2025), *appeal dismissed sub nom. W. Watersheds Project v. Moore*, No. 25-7252, 2026 WL 440305 (9th Cir. Feb. 9,

---

regulations were updated and replaced effective September 14, 2020. 85 Fed. Reg. 43,304 (July 16, 2020). CEQ subsequently rescinded its NEPA regulations, effective March 27, 2025. 90 Fed. Reg. 10,610, 10,612 (Feb. 25, 2025) (providing history of regulations), as corrected, 90 Fed. Reg. 11,221 (Mar. 5, 2025). CEQ directed agencies to voluntarily rely on those regulations while "defending against challenges to reviews completed while those regulations were in effect." Council on Envtl. Quality, Memorandum for Heads of Federal Departments and Agencies Implementation of the National Environmental Policy Act (Feb. 19, 2025), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/CEQ-Memo-Implementation-of-NEPA-02.19.2025.pdf. When the Service prepared the EAs, it was subject to CEQ's NEPA regulations, and also its own regulations. 36 C.F.R. pt. 220. In 2025, the USDA promulgated department-wide NEPA regulations at 7 C.F.R. pt. 1b and rescinded the Service's separate regulations. 36 C.F.R. pt. 220 (effective July 3, 2025); 90 Fed. Reg. 29,632 (July 3, 2025).

2026); *Monroe Cnty. Bd. of Commissioners v. Forest Serv.*, No. 1:24-CV-01560-TWP-KMB, 2025 WL 2687723 (S.D. Ind. Sept. 18, 2025).

## SUMMARY OF ARGUMENT

The Service acted unlawfully, arbitrarily, and capriciously in approving the Peabody and Tarleton Projects. The Service violated NFMA by failing to identify and protect old growth forest *and* by ignoring the Plan's protections for old-forest-habitat, which in turn violated NEPA's hard look requirement. The Service further violated NFMA by approving Projects that are inconsistent with Plan standards and guidelines. For example, the Service approved cuts five times larger than binding Plan scenic-limits, impaired the values of two river segments eligible for Wild and Scenic-designation, and failed to conduct the Plan-required investigation for endangered species.

The Service violated NEPA by refusing to study and develop alternatives for the two Projects, which are steeped in conflict over the appropriate balance of Forest uses. It rejected Standing Trees' reasonable, middle-ground proposals, and failed to conduct a true no-action analysis with consideration of accompanying benefits. The Service also failed to take a hard look at impacts to multiple key resources, by proceeding without current, site-specific baseline information for water quality and bats, and by brushing aside substantial scenic and other impacts.

14

The Service also violated NEPA by treating these Projects in isolation, carving out an unduly narrow analysis area and never considering their effects alongside the many other past, present, and reasonably foreseeable logging projects under its control in the Forest. Without cumulative accounting for impacts on carbon, water, bats, or scenery, and without the alternatives analysis and hard look required by NEPA, this record cannot sustain the Service's FONSIs.

Here, the NFMA and NEPA violations are ones of law and reasoning, not technical disagreements over policy and methodologies. Both Projects are unlawful, and approving them was arbitrary and capricious under the APA, warranting reversal of the District Court's judgment and vacatur of the Service's decisions.

## ARGUMENT

The Service violated NFMA, NEPA, and the APA in its analysis and approval of the Peabody and Tarleton Projects.

## I.     Standard of Review

The appeal of an order granting summary judgment is subject to *de novo* review. *See Jimenez-Portillo v. Garland*, 56 F.4th 162, 166 (1st Cir. 2022). Agency decisions under NFMA and NEPA are reviewed pursuant to the APA, which provides that a court will set aside an agency action if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

§ 706(2)(A); *All. for the Wild Rockies v. Forest Serv.*, 907 F.3d 1105, 1112 (9th Cir. 2018). An agency action is arbitrary and capricious if the agency "relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise." *Associated Fisheries v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997).

## II. The Service's Blurred Forest-Classification Framework Violated NFMA and NEPA.

The Service's analysis erroneously conflated two forest classifications that the Plan keeps separate: habitat categories and age-class categories. In doing so, the Service violated both NFMA and NEPA. It violated NFMA's forest plan-consistency requirement by merging distinct habitat types, stripping them of Plan-mandated protections. This substantive failure to collect the necessary information to ensure Plan-consistency also precipitated a procedural failure under NEPA to take a hard look at the impacts of harvesting in old forest habitat and old age-class. An agency action must comply with NFMA's substantive and planning standards, *and* the agency must provide adequate analysis and reasonable explanation for its decisions under NEPA. 16 U.S.C. § 1604(i); *Native Ecosystems Council v. Forest Serv.*, 418 F.3d 953, 965 (9th Cir. 2005) (finding agency violated NEPA because

its analysis was inconsistent with plan). The Service's failure to comply with the Plan here is in violation of NFMA and NEPA.

The Plan categorizes forest conditions along two separate axes: age-class and habitat. Age-classes are a coarse, but objective, way of grouping stands solely by age. JA0652; JA1671. Habitat categories, by contrast, describe the progression of forest succession—how big the trees are, how many vertical canopy layers the forest has, and how much dead wood it contains, including standing dead wood (snags). *See* JA0732, 0733. As decades of growth and natural tree death occur, simple young stands evolve into complex late-successional forest.

The Plan distinguishes three late-stage habitat types—mature forest habitat, old forest habitat, and old growth forest—that reflect increasingly complex and long-developing forest conditions. Mature forest habitat is a mid-successional stage with a closed canopy, larger trees, and early mortality beginning to create snags, downed wood, and canopy gaps. JA0732. Stands containing mature forest habitat are considered economically mature for harvest. JA1671, 1079.

The next step, old forest habitat, "starts with [the conditions] for mature forest and can include greater size, decadence, [and] structural complexity," as repeated cycles of growth and mortality produce larger, older trees, multi-layered canopies, and abundant dead wood. JA0733. These stands are generally considered beyond economic maturity and provide greater ecological and other values than

use as timber. JA1671, 1079–80. At the far end of the successional ladder, the Plan recognizes "old growth forest." To qualify, a stand must contain three or more age-classes, multiple vertical canopy layers, an abundance of trees over 200 years old, substantial structural complexity, and be at least 10 acres in size. JA0733. In New England, old growth forest now occupies under one percent of the region's forests. JA0919. Recognizing the ecological value of late-successional conditions, the Plan draws a categorical line prohibiting harvest in stands identified to provide old forest habitat and of old growth forest. JA0733, 0694.

The Service uses the Manomet Late Successional Index ("LSI") as its method for tracking the presence of late successional and old growth forest. JA1079–83, 0802. Despite employing a graded framework that specifically tracks habitat complexity, the Service failed to make any old forest habitat designations. JA1079. It repeatedly blurred age-class and habitat terminology in the Projects' records, conflating classifications that trigger materially different Plan protections and frame different questions for NEPA's effects analysis. JA0990-91, 1428–29. The Service's conflation of the Plan's forest classifications violated NFMA and NEPA, as it precludes a reasonable determination—based on the record—that the Service has complied with the Plan. *See All. for the Wild Rockies*, 907 F.3d at 1116–17. Contrary to the District Court's decision, the Service's blurred framework reflects its failure to consider the relevant factors and articulate a

rational connection between its findings and chosen classification. *See Native Ecosystems Council*, 418 F.3d at 965 (reversing lower court because Service's compliance with forest plan was not supported by record).

A. The Service's Uneven and Incomplete Old Growth Investigations Left Old Growth Forest Vulnerable to Logging.

Rare and Unique Features Standard S-3 states that "timber harvest is prohibited in old growth forest." JA0694. Compliance with that prohibition is a mandatory condition of any project-level decision. To determine compliance with the standard, the Service must identify whether old growth forest is present within the Project area and the stands selected for logging. For Peabody, the Service applied the LSI to score stands and treated scores over 8 as old growth forest. *See* JA0802, 1075–85.

For Tarleton, the Service never used LSI—or any method—to determine whether stands in the 690 acres selected for harvest met the Plan's old growth forest criteria. The Service nevertheless decided to authorize harvest at Tarleton, in violation of NFMA's Plan-consistency requirement. The failure to look for old growth forest also violated NEPA's requirement to take a hard look.

B. The Service Failed to Apply the Plan's Old-Forest-Habitat Protections by Conflating That Category with "Mature Forest" and Declining to Identify It.

Old forest habitat is a distinct, Plan-protected condition, backed by a command that "no harvest will occur in stands identified to contain old forest

19

habitat." JA0733. Old forest habitat's desired conditions "start with those for mature forest" and go on to include late-successional features. JA0733. Yet, in these Projects, the Service never identified such stands and therefore cannot claim to comply with the Plan or to have taken a hard look at impacts to such stands in violation of NFMA, NEPA, and the APA.

The Service was aware of its obligation to identify and protect old forest habitat; instead, it merged mature and old categories, labeling all as mature forest habitat. *See* JA1428–29. The Service acknowledged "there is no reasonable way to distinguish mature forest habitat stands from those that provide old forest habitat . . . using currently available data." JA1428.[6] Faced with this limitation, the Service explained it could verify stand conditions in the field or combine the categories. JA1429. It chose the latter.

The Service offered two justifications for the decision to combine mature and old forest habitat, both fatally flawed. First, it explained, "there are no species on the WMNF that require old (instead of mature) forest habitat," so combining the two "age classes" would not "substantially alter the analysis of habitat suitability."

---

[6] Contrary to this explanation, the Service stated in its response to public EA comments "Stads [sic] proposed for harvest have been evaluated for structural charactereistics [sic] of old forest habitat and these features have determined to be absent." JA0862. The Service provides no supporting evidence and no explanation of the methodology it chose or how it made the determination. JA0862. Nor does it reconcile this determination with previous statements that it could not identify old forest habitat with currently available data. JA1428.

JA1429. This conflates two distinct concepts. To reiterate, *age classes* are solely based on age. JA1671. *Forest habitats* describe structural conditions, such as large trees, snags, decadence, and canopy layers. *See* JA0732, 0733. The Plan protects old forest habitat based on those structural characteristics, not based on wildlife needs or age class. JA0733.

Second, the Service recharacterized the Plan's old forest habitat protection as "simply a placeholder for unsuited lands that will eventually grow old and remain unharvested, not an objective that is managed for from the suited land base." JA1429. This is wrong on multiple levels. Old forest habitat *is* a management objective: Wildlife Habitat Management Objective 3 directs the Service to "maintain high quality mature and old forest habitats on a majority of the forest." JA0679. The claim also conflates three distinct concepts: old forest habitat (a structural condition), old age-class (a temporal category), and land unsuitable for harvest (an operability classification).

This conflation rests on a 2009 Administrative Correction that relabeled the Plan's "old age objective" as "land unsuitable for harvest." JA0680. But that Correction did not eliminate the Plan's old forest habitat protections—in fact, it does not even mention old forest habitat. JA0680 (noting administrative revision). The Administrative Correction left the Plan's old age-class and old forest habitat

21

definitions intact. *Compare* JA0680 (noting administrative revision), *with* JA0733 (not revised), *and* JA1671 (not revised).

The Service cannot use administrative relabeling of an age-class objective to eliminate the old age-class or substantive harvest prohibition for old forest habitat that the Correction never addressed. The Plan contains an unavoidable command for the Service to identify and protect stands providing old forest habitat before authorizing harvest, and proscribes any harvest in stands that contain such habitat, wherever they occur. *See* JA0733. The Service never did that identification. It lumped all late-stage forest into a single "mature forest habitat" category that stripped old forest habitat of its Plan-mandated protection, in violation of NFMA and NEPA. Courts have vacated projects when the Service's analysis employed a definition for old forest habitat that did not match the definition in the Plan resulting in a baseless finding that no old forest habitat was present. *All. for the Wild Rockies*, 907 F.3d at 1116–17. Here, the Service took it one step further by functionally removing the definition of old forest habitat from its analysis and likely subjecting old forest habitat to harvest.

The Service's choice to forgo identification of old forest habitat contradicts its own methodology. The LSI distinguishes late-successional forest from economically mature forest. JA1080. The Service acknowledges that stands scoring below 6 are "economic[ally] mature," while stands between 6 and 8 are in

"[late-successional] stages," with 9 and 10 being "statistically similar to old growth." JA1080. Stands scoring from 6–8 likely contain old forest habitat. JA1080; *see* Figure 1. The Service conducted an analysis that selectively applied the LSI, only identifying and protecting old growth forest in Peabody. The Service never used the LSI or any other method to identify old forest habitat.



| LS Index Score | Number of large (≥ 16" DBH) trees (alive or dead) | | | | |
|---|---|---|---|---|---|
| | Percentile of OG stands | / plot | / acre | / ha | |
| 0 | 0 | 0 | 0 | 0 | |
| 1 | 0 | 1 | 1-2 | 1-9 | |
| 2 | 0 | 2 | 3-5 | 10-14 | |
| 3 | 0 | 3-4 | 6-9 | 15-24 | |
| 4 | 0 | 5-6 | 10-13 | 25-34 | |
| 5 | 0 | 7-8 | 14-17 | 35-44 | Threshold between economic mature and LS stages |
| 6 | < 4 | 9-10 | 18-21 | 45-54 | |
| 7 | 20 | 11-13 | 22-27 | 55-69 | |
| 8 | 48 | 14-17 | 28-35 | 70-89 | Threshold above which a stand is old-growth or is statistically similar to old-growth. |
| 9 | 76 | 18-20 | 36-40 | 90-100 | |
| 10 | 100 | >20 | >40 | >100 | |

*Figure 1. Manomet Late Successional Index (LSI) Table.* JA1080 (image produced from original source to improve legibility).

The Plan's prohibition is mandatory: "no harvest will occur in stands that contain old forest habitat." JA0733. The Service failed to identify which stands contain old forest habitat in either project. The Service lumped all late-successional forest into a single mature forest habitat category and authorized harvest in landscapes dominated by mature and old forest.

Standing Trees, before the District Court, raised an example from Peabody of how the Service's blurred approach invites logging in stands that appear to contain old forest habitat. The Service identified old growth forest, a subset of old

forest habitat, in stands 71, 73, and 75. *See* JA1079–85 (describing old growth forest and late successional forest communities).[7] In its briefing, the Service represented—and the District Court accepted—that stands 71, 73 and 75 were not slated for harvest, as required by the prohibition against harvesting old growth forest. Add.–32–34.

But the Peabody EA's maps show the contrary—that those stands, which the Service concedes contain old growth forest, overlap with portions of two timber units.[8] Yet, the record contains no map that overlays stands, timber units, and old growth forest in a single document, underscoring that the Service never squarely analyzed whether it authorized harvest in stands that contain old forest habitat in violation of Plan definitions.[9] The Service never delineated old forest habitat in any Project documents, failing to acknowledge key Plan prohibitions and forest health

---

[7] The Botany Report misidentified stand 73 as stand 72.

[8] Stands are naturally or artificially established communities of trees forming a distinct "silvicultural or management entity." JA0735. Timber units do not necessarily track stands. *Compare* JA1171 (black lines depicting stand boundaries) *with* JA0328 (map depicting timber units). Here, *stands* 71, 73, and 75 overlap with *timber units* 72 and 74.

[9] The Service established a "botany reserve" composed of the old growth and late successional forests it identified in stands 71, 73, and 75. *Compare* JA1168 (map depicting botany reserve in lavender adjacent to southernmost stands at Peabody) *with* JA1083-85 (three maps depicting locations of large old trees along north bank of West Branch of Peabody River). This botany reserve lies across portions of stands 71, 73, and 75 overlapped by timber units 72 and 74. *Compare* JA1171 (stand boundaries) *with* JA0327 (depicting timber units in green).

attributes making its assertions baseless.[10] *See All. for the Wild Rockies*, 907 F.3d at 1116–17 (quoting *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 936 (9th Cir. 2010)) ("'[F]uzzy assurances' do not erase the specific inconsistencies identified in the record.").

Without identifying and explaining how it protected old forest habitat, the Service violated NFMA's plan-consistency requirement and failed to take the hard look NEPA demands. *See All. for the Wild Rockies*, 907 F.3d at 1116–17.

C.     The Service Built Its Hard Look on a Mess of Stand-Age Information.

In the Service's decisionmaking on these Projects, it appears that the Service used what its own counsel called "a mess" of stand data that lumped stands a few decades old with stands nearly one and a half centuries old into a single "mature" category. *Oral Argument Transcript*, JA0403, Line 3, 6. In the most extreme case, a 405-year old stand and a 54-year old stand are both labeled "mature." JA1172.

Stand age-class distinctions matter. Depending on species, the mature age-class (economically mature) begins between 40 and 70 years. JA1671. Old age-class—stands beyond economic maturity—begins between 90 and 120 years

---

[10] Despite the absence of such an analysis, the District Court accepted the Service's assurance that these stands were not slated for harvest. The District Court found the "Service excluded *those areas* from receiving silvicultural treatments." Add.–32. The District Court misapplied the relevant protection: the Plan mandates that "[n]o harvest will occur *in stands* identified to provide old forest habitat." JA0733 (emphasis added).

depending on species. JA1671. The Project timber units include numerous stands in the old age-class. JA1169, 1212. The environmental impact between harvesting a 60-year-old and 140-year-old stand is significant—an impact NEPA requires be studied. Older stands provide different habitat, store more carbon, exhibit different scenery for users of the forest, and take lifetimes to replace. JA0925–29, 0940–53. By collapsing mature and old age-classes into one category, the Service turned a blind eye to, and prevented the public from understanding, what the Projects proposed to cut.

Standing Trees requested complete stand-age information at every opportunity for comment for both Projects. The Service did not produce these until after Tarleton's administrative objection period ended, and not until it produced the administrative record for this case for Peabody. A member of the public would not know whether the Service proposed to harvest recently mature timber or one a century older, frustrating meaningful public involvement under NFMA and NEPA. *See League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 761 (9th Cir. 2014) (public should not have to "parse the agency's statements to determine" project's impacts).

Similarly, to the extent this information was missing from the decisionmaking process, its omission hindered the Service's capacity to identify stands that might contain old forest habitat, which is more likely to occur in older

stands. Separate from Plan and NFMA compliance, NEPA independently requires the Service to analyze the environmental consequences of its proposed action. This failure to consider an important aspect of the problem renders the analysis arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In sum, the Service blurred and conflated the Plan's various forest categories, and authorized harvest without the stand-level analysis needed to apply the Plan's protections or satisfy NEPA's hard look requirement. These failures to consider important aspects of forest health violated the APA and the Service's obligations under NFMA and NEPA. *See All. for the Wild Rockies*, 907 F.3d at 1116–17.

## III. The Projects Are Inconsistent with the Plan, in Violation of NFMA.

NFMA requires the Service to ensure all activities conducted within a national forest are compliant with the relevant plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.1(b) (1982). The Service must support its plan-consistency conclusions with reliable studies and explain its reasoning. *Lands Council v. McNair*, 537 F.3d 981, 994 (9th Cir. 2008), *overruled in part on other grounds Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008). A record showing the Service failed to comply with a plan standard, or failed to provide a rationale for deviating from a plan guideline, goes against the purposes of Congress in enacting NFMA and requires a project to

be set aside. *Ida. Sporting Congress v. Rittenhouse*, 305 F.3d 957, 970–71 (9th Cir. 2002). Here, the Service violated the Plan by disregarding binding standards for scenery and Wild and Scenic rivers, and failing to investigate for endangered species before authorizing harvest.

*Scenery.* In Peabody, the Service violated Plan Scenery Management Standard S-2, which provides that Scenic Integrity Objectives "will" be met in one of three ways. JA0707. The Service may (i) apply the techniques of the "*National Forest Landscape Management Handbook*"; (ii) follow examples set out in Plan Appendix H; or (iii) follow "guidelines developed specifically for the [Forest] to achieve Scenic Integrity Objectives…." JA0707. Because the Service did not document or explain how it followed the first two options,[11] it must comply with the third: following Plan Guidelines. *See* JA1140–55.

Relevant here, in areas with a 'High' Scenic Integrity Objective, Guideline G-3 requires that new openings "be minimally evident from trail, road, or use area vantage points," JA0723, and have a "[m]aximum observed size" of 4–5 acres. The guideline requires they "appear as natural occurrences and be well-distributed in the viewed landscape." *Id*. Natural disturbances "occur at small scales through single-tree or group mortality," and are "usually less than 0.2 acres in size."

---

[11] Neither the Management Handbook nor the Plan Appendix H are cited in the final EA, nor any decision documents, despite being in the record. JA0460–517, 0903, 1141, 1132.

JA1678; JA0647. By contrast, in Peabody, timber harvest clearcuts range from 10–30 acres and remove "all trees in a stand" except for 5 percent held as "reserves"; patch cuts remove all trees in an area between 2 and 10 acres with no reserves. JA0887. Such "regeneration" cuts are visible to the "casual observer" for at least 20 years. JA1141.

The Service authorized cuts far exceeding the 4–5 acre guideline in three units, including a 26-acre clearcut, a 9-acre patch cut, and a 10-acre expansion of a wildlife opening. JA0879, 0902–03.[12] The 26-acre clearcut (timber unit 19) and 9-acre patch cut (timber unit 20) are adjacent—not well distributed, as the guideline requires. *See* JA1150–54. The justification for the deviation does not explain how clearing all of the trees from two adjacent stands—37 acres combined—could appear as a "natural occurrence" as required by G-3. JA0878, 0723. The Service relies solely on the need to "move the forest toward desired conditions for regeneration," arguing that "because the Forest Plan permits flexibility… this Project is consistent with Forest Plan guidance." JA0878. That circular reasoning is not the reasoned explanation NFMA requires, even if this were just a routine guideline deviation. But here, Standard S-2 made compliance

---

[12] The Peabody Scenery Specialist Report also notes that at least four other patch cuts will exceed guideline G-3's 4–5 acre limit by up to 3.3 acres, including timber units 36, 69a, 69b, and 69c. JA1148–53. Other than in figures appearing in tables, the Service does not mention let alone justify these exceedances. *See* JA4867 (discussing Units 19, 20, and the wildlife opening).

with G-3 mandatory, and lack of compliance with a standard cannot be justified.
The Service's authorization of cuts exceeding 4–5 acres thus violated standard S-2.

*Wild and Scenic Rivers.* The Service also violated the Plan's Wild and Scenic Rivers Standard S-1, which requires the Service "[m]anage eligible rivers to maintain their classification and eligibility until Congress" decides whether to designate them. JA0713. A river is "eligible" when it is free-flowing and possesses "outstandingly remarkable" scenic, recreational, geologic, fish and wildlife, historic, cultural, or similar values. 16 U.S.C. §§ 1271, 1273(b). Peabody contains two such eligible river segments. JA0907–08. The Service authorized even-aged logging that will impact these outstandingly remarkable values. *Id*. The Service claims these impacts will be temporary and reversible. JA0908. But the Plan is unambiguous: management must maintain eligibility, not temporarily impair it. JA0713; *see Native Ecosystems Council*, 418 F.3d at 962 ("[a]n agency's position that is contrary to the clear language of a Forest Plan is not entitled to deference"). Even if temporary impairment were permitted, the Service neither explained its findings nor disclosed what "short-term" impacts are and how long they would last. JA0907–08. By authorizing logging that degrades the very values that make these segments eligible, the Service violated Standard S-1 of the Plan.[13]

---

[13] The District Court, in crediting the Service's faulty reasoning and lack of evidence, stated that the Project areas will "immediately begin to revert to pre-

***Northern Long-Eared Bat.*** Rare and unique features Standard S-1 requires the Service to "investigate[]" all project sites "for the presence of [threatened and endangered] species and/or habitat prior to beginning any authorized ground-disturbing activity . . ." JA0694. The Plan defines threatened and endangered species to include both plants and animals listed as endangered under the Endangered Species Act, such as the bat. JA0736, 0442.

The Service did not conduct any site-specific investigations of the Project areas for bats. Instead, it relied on project-level biological evaluations, which merely summarize potential habitat, and a region-wide U.S. Fish and Wildlife Service ("USFWS") Biological Opinion ("BiOp"), which purports to analyze impacts to the bat for nearly 3,000 projects across the entire Eastern United States in just 55 pages. JA1195–96, 1626–28, 0593.

The Service argued that this paper review was enough to satisfy the Standard because "investigate" does not necessarily require surveys. *Defendants Mem.*, JA0296; Add.–43. But S-1 only provides a narrow carve-out allowing biologists to forgo *plant* surveys when they determine occurrence is unlikely due to lack of habitat; nothing in the Standard permits the Service to avoid project-specific

---

project" conditions—something the Service never claimed and the record does not support, in violation of the APA. Add. 42; *see State Farm*, 463 U.S. at 43 (reviewing court may not supply reasoned basis for agency's action that agency itself has not given).

investigation for an endangered animal where it has actively identified potential habitat. Because the Service conducted no site-specific bat investigation for the Projects, its reliance on paper reviews and a region-wide BiOp does not satisfy the Standard, violating NFMA. *See Native Ecosystems Council*, 418 F.3d at 962.

## IV. The Service's Mishandling of Alternatives Violated NEPA and the APA.

NEPA requires agencies to study, develop, and describe appropriate alternatives and to use a neutral no-action baseline to enable agency and public to weigh environmental tradeoffs. The Service did the opposite here: it refused to develop alternatives despite unresolved conflicts over resources; rejected Standing Trees' concrete, goal-advancing proposals; and framed "no action" to ignore environmental benefits. These choices violated NEPA's alternatives mandates and the APA's requirement of reasoned, record-based decisionmaking. *See Seven Cnty*, 605 U.S. at 172 (agency must address feasible alternatives).

### A. The Service Failed to Develop Alternatives Despite Both Projects Involving Unresolved Conflicts.

NEPA imposes a duty to "[s]tudy, develop, and describe appropriate alternatives to recommended courses of action in *any proposal* which involves unresolved conflicts concerning alternative uses of available resources" 42 U.S.C. § 4332(H) (2023) (emphasis added).[14] "Any proposal" means the duty to develop

---

[14] This "constitutes an independent requirement" from the EIS alternatives requirement. *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1229 (9th Cir. 1988).

alternatives applies whether the Service prepares an EIS or an EA. This Court has recognized NEPA requires an "agency to try on its own to develop alternatives," rather than depending on stakeholders to design them. *Dubois*, 102 F.3d at 1291.

The Service's NEPA regulations track this requirement by providing that "[w]hen there are no unresolved conflicts concerning alternative uses of available resources (NEPA Section 102(2)(E)) [an] EA need only analyze the proposed action and proceed without consideration of alternatives." 36 C.F.R. § 220.7(b)(i). Recognizing that the term "unresolved conflicts" is not self-defining, the Service's preamble to its regulations explains: "[w]hen there is consensus about the proposed action based on input from interested parties," the Service need not consider alternatives, but "[o]therwise, [the Service] need[s] to develop reasonable alternatives to meet project needs." 73 Fed. Reg. 43,084, 43,092 (July 24, 2008). The preamble underscores "typically, most Forest Service proposals will have alternatives." *Id*. The language confirms a no-alternatives EA is the narrow exception, and the presence of "no consensus" among interested parties triggers alternatives analysis.

The Service's argument below—that § 220.7(b)(2)(i) is a broad permission slip—merits no deference because it contradicts NEPA's text and the Service's own contemporaneous preamble. Courts respect an agency's construction only when it is thorough, reasoned, and consistent with earlier pronouncements; the Service's

33

illogical reading of § 220.7(b)(2)(i) fails that test and is not entitled to deference or respect. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Contrary to the ruling below, § 220.7(b)(2)(i) cannot erase 42 U.S.C. § 4332(H)'s command that agencies "study, develop, and describe" alternatives when a proposal involves unresolved conflicts.

Standing Trees and other interested parties submitted reasonable and technically feasible alternatives for both Projects in its comments and objections showing there was no consensus.[15] The Projects will commit MA 2.1 stands to intensive harvest in ways that foreclose or diminish other forest uses and benefits over the Plan lifespan. These protection-versus-extraction conflicts meet the Service's "no consensus among parties" standard for requiring alternatives and are exactly the kind of "conflicts as to the proper use of resources" that trigger NEPA's

---

[15] Standing Trees said more than log less. Its comments cited peer-reviewed scientific literature demonstrating both the technical feasibility and ecological desirability of its alternatives. For Peabody, Standing Trees proposed beaver reintroduction, girdling, and chop-and-drop to create early successional habitat without even-aged management, increased watercourse buffers, and avoidance of mature and old forest harvest. JA0814–15, 1034. For Lake Tarleton, Standing Trees and the Lake Tarleton Coalition proposed small-scale habitat restoration, natural buffer and apple orchard restoration, and a Plan amendment designating the Lake Tarleton–Webster Slide Scenic Area. JA1339–40, 1513–15.

alternatives requirement, in either an EIS or EA. *See Bob Marshall All.,* 852 F.2d at 1229.[16]

Yet the Service arbitrarily asserted, and the District Court accepted, that neither Project involved unresolved conflicts, using a record statement that "[n]o unresolved conflicts have been brought forward at this time." Add.–15, n.40 (citing JA1514). But JA1514 is Standing Trees' Tarleton objection, not a reasoned agency finding. The objection refutes the Service's bare, formulaic assertion denying the presence of unresolved conflicts with no analysis, no weighing of competing views, and no explanation of consensus among interested parties. *See* JA1238. Similarly, at Peabody, the Service dismissed Standing Trees' proposed alternatives as "not alternatives in terms of addressing unresolved conflicts," without explaining why. JA0866.

These naked assertions are quintessentially arbitrary. To satisfy NEPA and the APA, the Service had to show a rational connection between the facts and its decision to treat those Projects as lacking conflicts and justifying a no-alternatives

---

[16] The District Court implicitly acknowledged such conflicts, citing "tension between scenery impacts and vegetative practices like even-aged silviculture." Add.–18. That "tension" triggers the duty to develop alternatives. And contrary to the District Court's distinguishing of *Bob Marshall*, Add.–15, the conflicts Standing Trees has identified—over the choices between harvest and old-and-mature forest habitats, carbon storage, watershed protection, and backcountry recreation—fall squarely within that case's understanding of NEPA's alternatives requirement.

EA; it did not. *See State Farm*, 463 U.S. at 43. This Court should reverse the District Court's ruling and hold that the Service acted unlawfully, and arbitrarily and capriciously, in approving the Projects without studying, developing, and describing appropriate alternatives. *See Dubois*, 102 F.3d at 1289–90.

B.   The Service Improperly Rejected Standing Trees' Mid-Range Alternatives.

NEPA's rule of reason requires agencies to analyze reasonable alternatives that serve a project's basic purpose and add useful, non-duplicative information about environmental tradeoffs. *DOT v. Public Citizen*, 541 U.S. 752, 767 (2004). In *Dubois*, this Court reversed a decision by the District Court for the District of New Hampshire that upheld a Forest EIS because the Service failed to consider a reasonable, more protective alternative. 102 F.3d at 1289–90. This Court refused to shift technical analysis to the plaintiff, who needed only to propose reasonable alternatives, not supply detailed scientific or legal critiques. *Id.* at 1291. Here, Standing Trees presented "reasonable" non-redundant alternatives directed toward the same ends as the proposed action, and they would have meaningfully supplemented the existing options already before the agency. *See supra*, note 15; *Citizens Against Burlington v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991). By treating mid-range proposals as dismissible "partial implementations," the Service inverted NEPA's rule of reason and deprived itself and the public of analysis that would have illuminated the Projects' tradeoffs. Add.–18.

36

### 1. Cases Excusing Rejections of "Mid-Range" Alternatives Are Inapt.

Standing Trees proposed reasonable and technically feasible alternatives that move MA 2.1 stands toward the same objectives as the proposed action, but changed how and where logging would occur, but using different and more protective methods. *See supra*, note 15. The District Court treated several Ninth Circuit cases as a freestanding "no-mid-range alternatives" doctrine, but those cases simply disfavored redundant alternatives; they do not excuse an agency from analyzing non-redundant, goal-advancing mid-range alternatives, like those Standing Trees' proposals.

*Montana Wilderness Association v. Connell* does *not* stand for the idea that "mid-range" alternatives may be ignored because they do not "foster informed decisionmaking and public participation." Add.–19 (citing 725 F.3d 988, 1005 (9th Cir. 2013)). *Connell* was a redundancy case: the agency had already considered six alternatives, including a mid-range alternative, and the Ninth Circuit held NEPA did not require analysis of a second, nearly identical mid-range variant because the plaintiff had not explained how it would add anything new. 725 F.3d at 1004. Here, by contrast, the Service analyzed *only* the proposed action and a lopsided "consequences of no action" option. Reasonable alternatives—including Standing Trees' proposals for qualitatively and quantitatively different management—would have improved informed decisionmaking and public

37

participation by providing genuinely distinct options and sets of tradeoffs. *See*

*Dubois*, 102 F.3d at 1290–91 (finding NEPA violation where Service failed to

study reasonable alternatives that would have informed the choice among

competing courses of action).

Nor does *Earth Island Institute v. Forest Service* exonerate the Service's

rejection of Standing Trees' alternatives. 87 F.4th 1054, 1065 (9th Cir. 2023). *Earth*

*Island* distilled a two-part test from prior Ninth Circuit cases: an alternative is

"reasonable if it 1) advances the project's purpose and need, and 2) is 'significantly

distinguishable from alternatives actually considered, or which have substantially

similar consequences.'" 87 F.4th at 1065 (quoting *Te-Moak Tribe of W. Shoshone v.*

*DOI*, 608 F.3d 592, 602 (9th Cir. 2010); Add.–18. The court rejected the plaintiff's

proposed alternative for "merely relying on a subset of actions included in the

Service's preferred action alternative" and not meaningfully changing the

configuration or consequences. 87 F.4th at 1065.

Standing Trees' alternatives meet both *Earth Island* requirements. The

Service critiqued any alternative that would cut materially less or use different

prescriptions and buffers as failing to "advance" the purpose and need because they

would "not meet the need as well as the full Proposed Action," Add.–16 (citing

JA0859). This reasoning conflates *advancing* the Projects' goals with matching the

proposed action's exact outputs, as if an alternative does not advance the purpose

unless it meets the need "as well as" the preferred action. Add.–16. That treats "advance" as equal or better, which is at odds with the ordinary meaning of "advance," i.e., to move something forward at all, not to reach the same end-point as quickly or completely as the preferred option.[17] NEPA does not require every reasonable alternative to achieve those ends "as well as" the preferred project. *See City of New York v. DOT*, 715 F.2d 732, 742 (2d Cir. 1983) ("reviewing courts have insisted that the agency 'consider such alternatives to the proposed action as may partially or completely meet the proposal's goal'" (quoting *Nat. Res. Def. Council, Inc. v. Callaway*, 524 F.2d 79, 94 (2d Cir. 1975)). Standing Trees' proposals advanced project objectives using varying types of harvest and management techniques. *See supra*, note 15.

Unlike *Earth Island*, Standing Trees' alternatives proposed a materially different configuration. *See supra*, note 15. These different mixes of prescriptions and buffers are the very kinds of tradeoffs the Service itself made behind the scenes by refining these Projects and in studying alternatives at the Plan level. *See infra*, Part VI.B.2. Further, the Service itself described Standing Trees' alternatives as a "partial implementation" of the proposed action that materially altered the Projects' tradeoffs. JA0859. In rejecting Standing Trees' non-redundant, goal-

---

[17] *See* Merriam-Webster, Advance, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/advance (last visited Feb. 26, 2026) (defining "advance" as "to bring or move forward")

advancing alternatives, the Service sought to define project objectives so narrowly that only its proposal was presented and the NEPA process unlawfully became a "foreordained formality." *Citizens Against Burlington*, 938 F.2d at 196.

2.  *The Service's Own Partial Implementation Choices Expose Its Categorical Rejection of Standing Trees' Alternatives as Arbitrary and Unreasonable.*

The Service's excuses for rejecting Standing Trees' alternatives do not hold water for another reason: the agency itself, before the public NEPA process, decided to adopt its own partial-implementation configurations of original proposals. That "good for me, but not for thee" inconsistency renders the rejection arbitrary and capricious under the APA.

Both Projects follow the same pattern. At Peabody, the Service invoked a Forest-wide shortfall in regeneration habitat to set regeneration objectives for the area at "levels that are twice as high as those detailed in the Forest Plan." JA1680. The Service asserted the proposal could still meet the purpose and need, even after it halved the treated acreage. JA0788. At Tarleton, the Service scaled back its own proposal by reducing logged acres from 880 to 690 and increasing no-harvest buffers along Lake Tarleton from 100 to 300 feet; all the while, it maintained that the revised project met its purpose and need. JA1208, 1294, 1393. When Standing Trees proposed alternatives with scaling and additional protective measures, the Service dismissed them as "partial implementations" that did not meet the purpose

and need of the Projects. Treating the Service's own step-down designs as reasonable while rejecting Standing Trees' reasonable modifications is arbitrary and contrary to the APA.[18]

The Service's NEPA regulations anticipate the iterative design Standing Trees was urging to continue, explaining an EA may describe "modifications and incremental design features developed through the analysis process to develop the alternatives considered." 36 C.F.R. § 220.7(b)(2)(iii). The Service expects its officials to refine proposals through partial-implementation design choices. The Service's NEPA regulations do not authorize rejection of reasonable, goal-advancing alternatives under the guise of "partial implementation." Contrary to the District Court's acceptance of that label at face value, the Service's conclusory dismissal cannot substitute for NEPA's duty to consider reasonable alternatives.

> 3. *The Burden to Develop Alternatives Was the Service's, Not Standing Trees'.*

NEPA places the obligation to "study, develop and describe appropriate alternatives" on the agency itself. 42 U.S.C. § 4332(H); *see Dubois*, 102 F.3d at 1291 ("agency must *on its own initiative* study all alternatives that appear

---

[18] The Plan's FEIS reflects the same approach at the Forest-wide level. JA0756, 0649–51(electing scaled-back alternative that moderated harvest to balance other Forest values but still meet management objectives, rather than maximum-intensity option).

reasonable…"). The District Court faulted Standing Trees for failing "to provide evidence or a concrete, specific explanation of how early successional habitat creation would meet the Peabody goals for forest age class composition." Add.–18. But courts have rejected efforts to make plaintiffs do an agency's job. *Te-Moak*, 608 F.3d at 605 (requiring plaintiffs to show what impacts would occur "would require the public, rather than the agency" to ascertain impacts and "would thwart one of the 'twin aims' of NEPA—to 'ensure[ ] that the *agency* will inform the *public* that it has indeed considered environmental concerns in its decisionmaking process'" (citations omitted)).

NEPA obligated the *Service* to study these facially viable, distinct alternatives and offer a reasoned, record-based explanation—not require Standing Trees to supply comprehensive proposals. *Dubois*, 102 F.3d at 1291 (agency must study "significant alternatives that are called to its attention by… the public."); *Env't Prot. Info. Ctr. v. Forest Serv.*, 234 F. App'x 440 (9th Cir. 2007) (vacating EA because Service did not "develop" alternatives); *Te-Moak*, 608 F.3d at 605 ("Plaintiffs must show only the potential for [] impact"). Allowing the agency to sidestep this obligation by pointing to the commenter's lack of technical elaboration is precisely the burden-shifting NEPA forbids. *See Dubois*, 102 F.3d at 1291 ("purpose of public participation regulations is simply 'to provide notice,'

not 'present technical or precise scientific or legal challenges . . . '" (quoting

*Adams v. EPA*, 38 F.3d 43, 52 (1st Cir. 1994)).

C. The Service Failed to Conduct a Genuine No-Action Analysis, Which Undermines NEPA's Informed-Decisionmaking Function.

The no-action alternative is an "integral part of [NEPA's] statutory scheme," because it "guides the substance of environmental decisionmaking and provides evidence that the mandated decisionmaking process has actually taken place." *Bob Marshall All.*, 852 F.2d at 1228. The Service's NEPA regulations permit consideration of a no action alternative by "contrasting the impacts of the proposed action and any alternative(s) with the current condition and expected future condition if the proposed action were not implemented." 36 C.F.R. § 220.7(b)(2)(ii). This regulation does not reinvent the no-action alternative; it simply requires what courts and CEQ have long held NEPA requires: an honest comparison between the project and taking no action.[19]

The Service's "Consequences of No Action" analyses do not treat no action as a neutral benchmark; instead, the Service presents "no action" as a problem,

---

[19] *See Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1040 (10th Cir. 2001) (no-action alternative's purpose is to "compare the potential impacts of the proposed major federal action to the known impacts of maintaining the status quo"); *see also Calvert Cliff's Coordinating Comm., Inc. v. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971); Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981).

describing only its supposed shortcomings while omitting the substantial environmental benefits of forgoing the Projects that the record itself identifies.[20] In these sections, the Service describes only what would not be achieved—continued departure from MA 2.1 age-class objectives, limited young-forest habitat, and recreation improvements.

Through comments and objections, members of the public then squarely put before the Service the specific environmental benefits of no action, including continued carbon storage in mature stands, high-quality bat and interior habitat, better protection for water quality and Wild and Scenic-eligible rivers, and preservation of existing scenic and roadless values. JA1036–37, 1337–38. Yet, the 'consequences of no action' discussions never weigh those benefits, including their benefits for achieving many other related Plan objectives; they describe only what would not be achieved, constituting a failure to consider an important aspect of the problem.

In practice, the Service prioritizes MA 2.1 age-class objectives whenever they collide with other Plan goals, including for scenery and water quality, but

---

[20] The Service's "consequences of no action" were that both Project areas "would not meet the need to advance Forest Plan goals or [] wildlife habitat diversity objectives…." JA0902, 1298. For Tarleton, the landscape "would trend towards a homogenous even-aged structure," despite a contrary statement that "natural successional processes would continue." JA1298. The Service ignored that successional processes create highly desirable habitat and forest conditions.

NEPA requires that the agency must first disclose and weigh the environmental tradeoffs of its choice. Here, the Service simply characterized those collateral impacts as minor and not significant, never articulating the concrete environmental benefits forgone. *See infra*, Part V. By treating the no-action alternative as if its benefits were zero and its costs overwhelming, the Service has put a thumb on the scale against no action, in violation of NEPA's requirement to consider a neutral baseline. *See Dubois*, 102 F.3d at 1289 (requiring consideration of relative merits).

**V.    The Service's Incomplete Baseline and Conclusory Explanations Violated NEPA's Hard Look Requirement.**

NEPA's hard-look requirement obligates the Service to ground its analysis in accurate baseline information and to articulate a rational, record-based connection between that information and its choices before it proceeds. *See Dubois*, 102 F.3d at 1284. Although "purely procedural," NEPA enforces that procedure by requiring agency decisions to be "fully informed," "well-considered," and "reasonably explained." *Seven Cnty.*, 605 U.S. at 179–180, 184–185. The Service's approvals here, by contrast, ignored or failed to gather crucial project-specific data without explanation. The Service rested its analysis on a threadbare baseline for water quality and endangered species, and on borrowed methods and cursory justifications that never tied those facts to its choices. Those gaps were not mere disagreements supporting deference to the Service but rather violations of NEPA's

45

hard-look requirement. *Ctr. for Biological Diversity v. Forest Serv.*, No. 23-2882, 2025 WL 586358 at \*4 (9th Cir. Feb. 24, 2025).

A.   The Service Failed to Reasonably Consider Project-Specific Baseline Data for Lake Tarleton, Peabody's Waters, and Bats.

NEPA requires an agency to provide informed assumptions and accurate data to carefully consider the significance of a project's impacts. *WildEarth Guardians v. USDA,* 135 F.4th 717, 732 (9th Cir. 2025). The Service, however, approved intensive logging around Peabody's Wild-and-Scenic-eligible rivers, Tarleton's two impaired lakes, and habitat for endangered bats without establishing project-specific baselines. Instead, the Service made uninformed assumptions offering only generic thresholds, borrowed analyses, and thin, non-project-specific information. An agency cannot satisfy NEPA by predicting changes from unknown or unexplained starting points. *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1103 (9th Cir. 2016) ("baseline estimate must be based on accurate information and defensible reasoning" (citation modified)).

***Water Quality.*** Across both Projects, the Service either ignored readily available project-specific data or it collected no water quality data at all. Instead, it relied almost exclusively on a methodology it borrowed from another project, Albany South. JA1479, 1310–11. Each Project's water quality findings appear in a scant section in each EA.

46

For Tarleton, the Service ignored current and detailed water quality data from a state agency report for Lake Tarleton—the impaired lake at the heart of the Project—even after Standing Trees notified the Service that the report was available. JA1526 (footnote 129).[21] The Service clearly knew this data existed—as evident from its reference to a similar report for Lake Katherine—but arbitrarily ignored the data from Lake Tarleton and failed to explain why it was omitted. JA1395, 1397; *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1086 (9th Cir. 2011). Instead, the Service considered a harvest threshold borrowed from a separate project as a complete proxy for water quality assessment, then declared there would be "no measurable adverse effects" if harvest stays below that level. JA1310–21. The Service's failure to explain its omission of Lake Tarleton data "frustrated" NEPA's hard look requirement. *Great Basin Res. Watch*, 844 F.3d at 1104.

Peabody's analysis is thinner still: although the Service identified two rivers eligible for federal Wild-and-Scenic-designations, the Service conducted *zero* site-specific, baseline analysis of water quality. JA0905. The Peabody EA never describes existing chemistry of the area's waters or aquatic conditions—merely

---

[21] The report that Standing Trees attached to its Objection letter was omitted from the AR. The report can be found here: https://www.des.nh.gov/sites/g/files/ehbemt341/files/documents/2021-tarleton-piermont.pdf.

asserting that some of the streams do not have fish habitat, "so there are no concerns about changes in water quality in those watersheds." JA0905. The EA asserts that the area's geology mitigates any concerns regarding pH and aluminum leaching—two logging-related water quality impacts. *Id*. The Service invokes Albany South's threshold—even while proposing to exceed it—to assure that there will be no measurable water-quality effects. *See id*. But even these threadbare assertions regarding Peabody's hydrology are not well supported by the methodology the Service borrowed.

The Service, at Albany South, used site-specific water chemistry sampling to ensure the forest and geology could support the harvest threshold. JA1121. Standing alone, Albany South's threshold might look like "a conservative value that can be applied to other project area watersheds," but the description is conditioned on the Service conducting *actual* site-specific water chemistry studies. JA1121 (studying sensitivity of Albany South's specific forests, waters, and geology to changes in pH and aluminum). Here, by contrast, the Service did no comparable sampling—or any sampling at all. It relied, instead, on generalized statements about geology to avoid developing water quality baselines. JA0905; *Gifford Pinchot Task Force v. Perez*, 2014 WL 3019165, at *33 (D. Or. 2014) (no way to comply with NEPA without baseline data). Saying only that "potential impacts to riparian and aquatic resources and water quality discussed in the Albany

South EA would be broadly applicable," JA0905, 1310, and that "studies in the White Mountains" show the validity of the Albany South method, JA1479, the Service, in the District Court's words, did "not provide specific reasons *why*, such as land or watershed similarities." Add.–23 (emphasis added).

This analysis did not, as the District Court wrongly concluded, deserve the "extreme degree of deference" afforded in other cases. Add.–21–22. *Contrast Conservation L. Found. v. Ross*, 374 F. Supp. 3d 77, 97 (D.D.C. 2019) (agency used complex and multistep process, relying on multiple experts); *Marsh*, 490 U.S. at 383 (agency hired two independent experts to assess methodology); *Advocs. for Transp. Alts., Inc. v. Army Corps of Eng'rs*, 453 F. Supp. 2d 289, 304 (D. Mass. 2006) (agency considered criticisms and comments to methodology prepared in supplemental EIS). The Service's unreasoned water quality analysis does not constitute a hard look given the failure to consider pertinent data and the lack of reasoned rationale for the chosen methodology. *Ctr. for Biological Diversity*, 2025 WL 586358, at *4.

***Northern Long-Eared Bat***. The forests targeted by the Projects are the primary habitat for the bat, and suspected hibernacula in the Forest provide habitat in the winter months. JA0601, 1425. The Service relies on a general USFWS BiOp and a two-day assessment, at only Tarleton, to claim the Projects will not have an adverse impact on the bat; but this surface level analysis without adequate or

accurate data does not fulfill the Service's obligation to take a hard look at species impacts.

The BiOp purports to analyze thousands of projects across twenty-eight National Forests. JA588-95; *see also Nantucket Residents Against Turbines v. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1, 12 (1st Cir. 2024) ("Reliance can be arbitrary and capricious…if the agency blindly adopted the biological opinion without conducting its own independent investigation."). The Service also cites an independent two-day acoustic survey from 2019 that used equipment the Service acknowledged was faulty. JA1626. The final EAs claim there are "no known hibernacula," notwithstanding information from the USFWS regarding possible winter hibernacula in the Forest. JA1626, 1179, *see also* JA0600 (stating that bats also hibernate in other unaddressed types of hibernacula). Despite these red flags, the Service declined to conduct any additional site-specific surveys or to identify and protect hibernacula or roost trees within the Project areas.

Contrary to the District Court's conclusion, Add.–26–27, the Service's assumption of presence is not a substitute for site-specific data capable of informing a meaningful analysis of impacts. *Los Padres ForestWatch v. Forest Serv.*, 25 F.4th 649, 657 (9th Cir. 2022) (stating that court "cannot defer to a void") (citations omitted). Without knowing where hibernacula are present or a

meaningful attempt to assess bat presence or habitat, the Service could not reasonably assess the Projects' impacts.

Whether or not the Service is entitled to weigh environmental harms against other values, Add.–27, the Service must first identify and analyze those harms, then offer a reasonable explanation for its decision. Where the Service assumed the presence of an endangered bat and acknowledged the risk of direct and indirect harm, NEPA does not permit the Service to then deny any responsibility, without detailed explanation and despite demonstrated capabilities, to gather site-specific information to assess those risks. *Cf.* JA0551–52(explaining summer surveys were conducted in Albany South project area with 33 points surveyed including two additional locations just outside project area and seven potential bat maternity colonies identified). NEPA does not mandate any specific outcome, but it does require an agency to conduct reasonable analysis. *Historic Bridge Found. v. Buttigieg*, 22 F.4th 275, 280 (1st Cir. 2022); *Seven Cnty.*, 605 U.S. at 180. The Service's assessment for the bat must be reasonably explained for the decision to constitute a hard look. Reliance on a generalized BiOp, a two-day assessment from 2019 with faulty equipment, and a meaningless assumption of presence does not meet NEPA's requirements. *See N. Plains Res. Council, Inc.* 668 F.3d at 1086.

B.     The Service Failed to Provide a Reasonably Complete Discussion of the Projects' Impacts to Scenery.

Courts grant substantial deference to agency choices *if* they do not "turn a blind eye" to the criticisms of the methodology and make a "reasonable determination" that the model was adequate. *Advocs. for Transp. Alts., Inc.*, 453 F. Supp. 2d at 310. In the absence of any reasonable justification for its decision to exceed its own scenic guidelines, the Service violated NEPA. *California v. Block*, 690 F.2d 753, 769 (9th Cir. 1982).

The Service identified numerous clearcuts exceeding Plan guidelines, by 100 to 500 precent. JA0903; *see also supra*, Part III (describing NFMA violation of scenery guidelines). Yet there is no discussion or explanation from the Service on *why* it deviated from its own Plan guidelines—in violation of NEPA. JA0896; *see Dubois,* 102 F.3d at 1284. The only "discussion" on exceeding scenic guidelines is a reference to the Forest Landscape Architect reviewing final layouts *after* the NEPA review process to ensure units 19 and 20 are "well-distributed," JA0896. This "design element" does not address four other units that exceed plan scenery management guidelines by up to 3.3 acres. *Id.*; *see supra*, note 12. The only explanation is to "better meet project-level objectives . . . and move the forest toward desired conditions consistent with the Forest Plan." JA0903. This paltry rationale is a far cry from the case relied on by the District Court. Add.–31 (citing *Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058, 1073 (9th Cir. 2010)).

52

In *National Parks*, the agency included a 56-page report "based on an extensive monitoring study" and included "*specific* mitigation methods" to reduce impacts to Bighorn Sheep. 606 F.3d at 1073 (emphasis added).

The Service provides no indication of how 26 acres of clearcut forest are to be considered "well distributed." JA0896, 0903; *see also supra*, Part III. This unreasoned decision to exceed the scenic guidelines at Peabody was arbitrary and capricious, in violation of NEPA and the APA.

## VI.    The Service Failed to Analyze the Cumulative Impacts of Its Actions.

The Service also failed to take a hard look at the Projects' impacts under NEPA by considering the Projects' impacts in isolation. *See Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 994 (9th Cir. 2004) ("total impact from a set of actions may be greater than the sum of the parts"). This violated NEPA's requirement that agencies evaluate the cumulative and incremental effects of their foreseeable actions to ensure a fully informed and "well-considered" decision. *Kern*, 284 F.3d at 1078 (finding NEPA requires agency to analyze "impact of reasonably foreseeable timber sales" and future actions); *Seven Cnty.*, 605 U.S. at 180.

Ignoring the cumulative impacts of environmental consequences *without* looking at other Service-authorized projects in the Forest defies both law and logic,

and this Court "should" require the environmental consequences of the Projects to "be considered together." *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976).

A.    The Service Failed to Assess Cumulative Impacts from Actions Fully Within Its Authority.

Agencies need not speculate about uncertain future actions, but they are required to account for the combined effects of "past, present, and reasonably foreseeable" projects within their control. *Safeguarding the Historic Hanscom Area's Irreplaceable Res., Inc. v. FAA*, 651 F.3d 202, 217 (1st Cir. 2011). The Service never analyzed the cumulative effects of the Projects or any of the other current and proposed Service logging projects within the Forest. JA0911, 1315. The EAs offer no aggregated analysis of the environmental impacts to carbon storage, water quality, bats, or scenery.

*Seven County* does not exonerate the Service's analysis. There, the Supreme Court held that the Surface Transportation Board's NEPA review of a proposed 88-mile rail line for oil-trains in Utah need not consider indirect and attenuated impacts of greenhouse gases emitted from downstream use of transported oil on the Gulf Coast, over a thousand-miles away from the project. *Seven Cnty.*, 605 U.S. at 174, 188. By contrast, here the environmental impacts that the Service failed to assess are *far* more direct. The cumulative impacts of the Projects and other projects in the Forest—the loss of carbon sequestration, effects on water

quality, and impacts to bats, forest health, and scenery—are environmental impacts that arise within each Project areas themselves.

"Importantly," the Board in *Seven County* had "no regulatory authority over those separate projects." *Id.* at 188. Here, the Service *does* have authority over the other projects in the Forest. The Service designs, approves, and implements all logging projects in the Forest. Unlike in *Seven County*, there is no separation between the Service's action and the environmental effects. The Service cannot disclaim responsibility for impacts that flow directly from the logging projects it authorizes, all under the same Plan. *Neighbors of Cuddy Mountain*, 137 F.3d at 1378–79 (finding that Service's analysis is inadequate for three other projects' combined effects on depleting old growth).

B. The Service Arbitrarily Determined the Geographic Scope of Its Cumulative Impacts Analysis.

A lawful cumulative effects analysis must define a rational geographic scope and "provide support for its choice of analysis area." *League of Wilderness Defs. v. Connaughton*, 2014 WL 6977611, at *9 (D. Or. Dec. 9, 2014) (citing *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902 (9th Cir. 2002)); *Kleppe*, 427 U.S. at 414. Here, the Service failed to adopt a meaningful geographic scope for analyzing cumulative impacts in the Projects by only considering impacts within the geographic boundaries of each Project. Historically, the Service has considered cumulative impacts across projects in the Forest. *See* JA0553, 0578.

For the Projects here, the Service abandoned that rational scope without acknowledgment or explanation. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must "display awareness that it *is* changing position"). Faulting a facially incomplete cumulative effects analysis is not, as the District Court found, Add.–38, a mere disagreement over methodology.

This failure is apparent given the Projects' stated purpose. In the Peabody EA, the Service explains that management is intended to ensure "diverse habitats are distributed *across* the [Forest]." JA0882 (emphasis added). However, despite grounding its purpose at the Forest-wide scale, the Service conducted no analysis of how these Projects interact with other timber harvests within the Service's jurisdiction. Indeed, the Service *never* analyzed these contemporaneous Projects in tandem or added together their impacts in the EAs, JA1315, 0911, something the District Court managed off-hand.[22] The geographic scope of the cumulative effects analysis contradicts the Service's own framing of the purpose of the Projects.

---

[22] The District Court found it pertinent to combine the total acreages of the Projects, even distinguishing acres by treatment types, to support its conclusion regarding the carbon cumulative effects analysis. Add.–36. That is exactly the starting point for a cumulative impacts analysis—and the Service did not even go that far.

C. <u>The Service Failed to Recognize the Lack of Cumulative Effects Analysis Throughout the Projects.</u>

With regard to carbon, scenery, harvested acres, water quality, and bats, the Service fails to consider *any* cumulative impacts within the Forest. *See supra*, Parts II, V. To take the example of carbon, the Service repeatedly labels greenhouse gas emissions as "negligible," and "relatively small," but provides no actual project-specific quantification, no reasonable comparative framework, and no evidence of cumulative accounting. JA1098–99, 1564–65. Analytically, the Service's approach is wholly irrational: an agency may not trivialize site-level impacts by comparing them to global totals while ignoring cumulative effects within the affected landscape. *See Pacific Coast Fed. of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1035–37 (9th Cir. 2001).

## VII. The FONSIs Cannot Stand.

The Service's deficient analysis of environmental impacts and alternatives resulted in flawed EAs, and thus the Findings of No Significant Impact ("FONSIs") must be vacated. *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 874 (9th Cir. 2022). In violation of NEPA and the APA, the Service failed to support its conclusions that the Projects would not significantly affect the environment with "sufficient evidence and analysis," which undermined the reasonableness of the FONSIs. 40 C.F.R. § 1508.9 (1978); *see Kettle Range*

*Conservation Grp. v. Forest Serv.*, 2023 WL 4112930, at \*12 (E.D. Wa. 2023); *see supra*, Parts II, V–VI.

To determine whether an action will significantly affect the environment, agencies must consider the action's context and intensity. *See Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019); 40 C.F.R. § 1508.27(a) (1978). The Service violated its obligation to consider the proper context of the Projects because it arbitrarily and capriciously ignored both localized adverse effects of the Projects and the cumulative impacts of these and other projects on the Forest as a whole. *Supra*, Parts V–VI; *see* 40 C.F.R. § 1508.27(a) (1978) ("significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality"); *Ocean Advocs. v. Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2005) (agency "must provide a useful analysis of the cumulative impacts of past, present, and future projects" (citations omitted)).

The Service also did not consider the intensity of the Projects. It dismissed adverse effects as "limited" without data, justification or analysis. The Service made generalized assertions about the lack of impacts to resources such as scenery, water quality, and bats, ignoring classifications for the Projects' mature and old forests, and baselessly denying the Projects' cumulative impacts. *Supra*, Parts II–III, V–VI. This cursory analysis of intensity was arbitrary and capricious. *See*

*Native Ecosystems Council*, 418 F.3d at 965. The Service chose expediency over proper analysis and reasoned consideration when issuing the FONSIs.

## CONCLUSION

Standing Trees respectfully requests the Court to reverse the District Court and vacate the Service's decision to authorize the Projects. *See, e.g.*, *Standing Rock Sioux Tribe v. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021).

Respectfully Submitted,

/s/ Christophe Courchesne

Christophe Courchesne, Associate Professor
and Director
Rachel Westrate, Fellow
ENVIRONMENTAL ADVOCACY CLINIC
Vermont Law and Graduate School
P.O. Box 96
164 Chelsea St.
South Royalton, VT 05068
(802) 831-1630
ccourchesne@vermontlaw.edu

*Counsel for Plaintiff-Appellant Standing Trees, Inc.*

On the brief: Environmental Advocacy Clinic student attorneys Joe Anderson, Blythe Faris, Eric Grimes, and Julia Wickham

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), the undersigned herby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because:

Exclusive of the portions exempted by Fed. R. App. P. 32(f), the brief contains 12,832 words.

The brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Time New Roman font as provided by Fed. R. App. P. 32(a)(5)-(6).

Dated: June 12, 2026          */s/ Christophe Courchesne*

Christophe Courchesne
Associate Professor and Director
Environmental Advocacy Clinic
Vermont Law and Graduate School
P.O. Box 96, 164 Chelsea St.
South Royalton, VT 05068
(802) 831-1630
ccourchesne@vermontlaw.edu

*Counsel for Plaintiff-Appellant*
*Standing Trees, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2026, in accord with the Court's order of the same day, I electronically filed the foregoing final brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: June 12, 2026

*/s/ Christophe Courchesne*

Christophe Courchesne
Associate Professor and Director
Environmental Advocacy Clinic
Vermont Law and Graduate School
P.O. Box 96, 164 Chelsea St.
South Royalton, VT 05068
(802) 831-1630
ccourchesne@vermontlaw.edu

*Counsel for Plaintiff-Appellant*
*Standing Trees, Inc.*

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

Case No. 25-2086

**STANDING TREES, INC.,**
Plaintiff - Appellant,

v.

**US FOREST SERVICE; DEREK IBARGUEN**, in the official capacity as
Supervisor of the White Mountain National Forest**; BROOKE BROWN**, in the
official capacity as District Ranger for the Pemigewasset Ranger District**;
JOSHUA SJOSTROM**, in the official capacity as District Ranger for the
Androscoggin Ranger District,
Defendants - Appellees.

_____

On Appeal from the United States District Court for the District of New Hampshire
Judge Joseph Laplante, Case No. 1:24-cv-138-JL-TSM

_____

**ADDENDUM TO PLAINTIFF-APPELLANT'S OPENING BRIEF**

_____

# ADDENDUM TABLE OF CONTENTS

| | |
|---|---|
| Memorandum & Order (Aug. 20, 2025) [ECF37] | Add. 1–44 |
| Judgment (Sept. 23, 2025) [ECF38] | Add. 45 |
| 5 U.S.C. §§ 701–706 | Add. 46–48 |
| 16 U.S.C. §§ 1271–1273 | Add. 49–51 |
| 16 U.S.C. § 1604 | Add. 52–54 |
| 42 U.S.C. § 4332 (1970) | Add. 55–57 |
| 42 U.S.C. § 4332 (2023) | Add. 58–59 |
| 36 C.F.R. § 220.7 (2008) | Add. 60–61 |
| 40 C.F.R. §§ 1502, 1508 (1978) | Add. 62–72 |
| 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981) | Add. 73–74 |
| 73 Fed. Reg. 43,084, 43,092 (July 24, 2008) | Add. 75–76 |
| Council on Envtl. Quality, Memorandum for Heads of Federal Departments and Agencies, Implementation of the National Environmental Policy Act (Feb. 19, 2025) | Add. 77–83 |
| Peabody West Stand Map [AR8939] | Add. 84 |
| Peabody West Timber Unit Map [AR4895] | Add. 85 |
| Peabody West Botany Reserve Map [AR7672] | Add. 86 |
| Peabody West Late Successional and Old Growth Forest Report [AR6285–89] | Add. 87–91 |
| Peabody West Viewable Even Age Impact Map [AR6521] | Add. 92 |
| Merriam-Webster, "Advance", Merriam-Webster.com Dictionary | Add. 93 |

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Standing Trees, Inc.

　　　v.                                    Case No. 1:24-cv-138-JL-TSM
                                         Opinion No. 2025 DNH 099

United States Forest Service, et al.

**<u>MEMORANDUM ORDER</u>**

Plaintiff Standing Trees, Inc. challenges the U.S. Forest Service's authorization of the Tarleton Integrated Resource Project and Peabody West Integrated Resource Project under the National Environmental Policy Act (NEPA), the National Forest Management Act (NFMA), and the Administrative Procedure Act (APA).  The parties cross-moved for summary judgment based on the administrative record.  This court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343 as this action arises under the Constitution and laws of the United States.

The court is not called upon to consider the propriety of the Tarleton and Peabody projects. The question presented is whether the defendants U.S. Forest Service, White Mountain National Forest Forest Supervisor Derek Ibarguen, District Ranger for the Pemigewasset Ranger District Brooke Brown, and District Ranger for the Androscoggin Ranger District Joshua Sjostrom, collectively the Forest Service, followed the correct procedures and applied the correct statutory and regulatory standards in approving the resource management projects.  After considering the administrative record and briefing

**Add. 1**

by the parties and amici,[1] and holding oral argument, the court grants summary judgment

for the Forest Service.

## I.    Applicable standard

The plaintiff brought its claims under the NEPA, NFMA, and APA.  Neither NEPA

nor NFMA provides a private right of action, so courts review the Forest Service's

approval of a final agency action under the APA. *Utah Envt'l Cong. v. Bosworth*, 443

F.3d 732, 739 (10th Cir. 2006). The court's review is limited to the administrative record.

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (citing *Camp v. Pitts,* 411

U.S. 138, 142 (1973)); *Lovgren v. Locke*, 701 F.3d 5, 20 (1st Cir. 2012).  "Under the

APA, we may not set aside an agency decision unless it is 'arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law,' or 'unsupported by substantial

evidence.'"  *Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024) (quoting 5 U.S.C. §§

706(2)(A), (E)).

> "A decision is arbitrary and capricious 'if the agency has
> relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect of the
> problem, offered an explanation for its decision that runs
> counter to the evidence before the agency, or is so
> implausible that it could not be ascribed to a difference in
> view or the product of agency expertise.'"

*Id.* (quoting *Craker v. DEA*, 714 F.3d 17, 26 (1st Cir. 2013), quoting *Motor Vehicle Mfrs.*

*Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43(1983)).  "Under this standard,

we are required to determine whether the agency's decision is supported by a rational

---

[1] Several conservation agencies and the State of New Hampshire filed amicus briefs in support of
the defendants.

2

**Add. 2**

basis, and if so, we must affirm." *River Street Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009); *see also Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n*, 59 F.3d 284, 290 (1st Cir. 1995) ("While this is a highly deferential standard of review, it is not a rubber stamp; in order to avoid being deemed arbitrary and capricious, an agency decision must be rational."). "Because the APA standard affords great deference to agency decisionmaking and because [agency] action is presumed valid, judicial review, even at the summary judgment stage, is narrow." *Assoc. Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997).

"APA review…involves neither discovery nor trial." *Atieh v. Riordan*, 727 F.3d 73, 76 (1st Cir. 2013). "[T]he focal point for judicial review [under 5 U.S.C. § 706(2)(A)] should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Consequently, "material facts" cannot be admitted or opposed as they might in other civil actions with discovery and possible trial. The "validity" of the agency's action must "stand or fall…on the administrative record made." *Id.* at 143.

## II.    Standing

Standing Trees has standing to bring this lawsuit, and the defendants did not argue otherwise. It is a membership-based conservation organization with a focus on forests on public lands in New Hampshire and Vermont.[2] Standing Trees advocates for regional policies promoting "clean water, clean air, forest health, public health, and unfragmented

---

[2] Pl.'s Mem. Mot. Summ. J. Ex. A (doc. no. 14-2) (Decl. of Zack Porter (on behalf of Standing Trees)), ¶ 6.

**Add. 3**

habitat."[3]  The organization represents its members, such as Kingswood Camp, a youth outdoors camp, who engage in outdoor activities and have nature-based business interests, which the projects could impact.[4]

Standing requires an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010) (citing *Horne v. Flores,* 557 U.S. 433, 445 (2009)).  A membership-based organization like Standing Trees must also show: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n.*, 432 U.S. 333, 343 (1977).  Based on declarations of Standing Trees and several of its members affected by the projects, Standing Trees meets these requirements.  *See Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 67-68 (D.C. Cir. 2022) (finding declarations acceptable to demonstrate satisfaction of standing requirements).

III.   **Background**

   a.  **National Environmental Policy Act**

   NEPA "promotes its sweeping commitment to 'prevent or eliminate damage to the

---

[3] *Id.*

[4] *See generally* Pl.'s Mot. Summ. J. Ex. A-L (doc. nos. 14-2 through 14-13) (Decls. of Zack Porter (on behalf of Standing Trees), Gerald Curran, Elaine Faletra, Peter Faletra, Eric Jones, Rebecca Lovejoy, Jamie Sayen, Nataliya Sundina, Michael Wipfler, Robert Wipfler, Peter Ascher, and Robin Sadek Ascher).

**Add. 4**

environment and biosphere' by focusing Government and public attention on the environmental effects of proposed agency action." *Conservation L. Found. v. U.S. Army Corps of Eng'rs*, 457 F. Supp. 3d 33, 43 (D.N.H. 2019) (quoting *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 371 (1989)) (quoting 42 U.S.C. § 4321).  "NEPA itself does not mandate particular results, but simply prescribes the necessary process" that an agency "consider all significant environmental impacts before choosing a course of action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *Sierra Club v. Marsh*, 872 F.2d 497, 502 (1st Cir. 1989).

As part of this process, NEPA regulations require an agency to prepare an in-depth Environmental Impact Statement (EIS) for "every major Federal action significantly affecting the quality of the human environment." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 16 (2008) (citing 42 U.S.C. § 4332(2)(C)) (cleaned up).  "An agency is not required to prepare a full EIS if it determines—based on a shorter environmental assessment (EA)—that the proposed action will not have a significant impact on the environment." *Id.* (citing 40 CFR §§ 1508.9(a), 1508.13); *see also Conservation L. Found.*, 457 F. Supp. 3d at 43.  In that case the agency must also prepare a Finding of No Significant Impact (FONSI).  36 C.F.R. § 220.7(b)(3)(i).  "There is no universal formula for what an EA must contain and consider," but the regulations state that they should "'include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.'" *Id.* (quoting *Friends of Congaree Swamp v. Federal Highway Admin.*, 786 F. Supp. 2d 1054, 1062 (D.S.C. 2011) (quoting

5

**Add. 5**

40 C.F.R. § 1508.9)).

Courts analyze the validity of a FONSI under a four-factor test:

> First, the agency must have accurately identified the relevant environmental concern. Second, once the agency has identified the problem it must have taken a "hard look" at the problem in preparing the EA. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Conservation L. Found.*, 457 F. Supp. 3d at 61 (citations omitted).  But the "role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one."  *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 555 (1978). As the Supreme Court recently emphasized,

> "[W]hen assessing significant environmental effects and feasible alternatives for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry . . . Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness."

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. ---, 145 S. Ct. 1497, 1513 (2025).

**b.  National Forest Management Act**

The NFMA directs the Forest Service to develop "one integrated plan for each unit of the National Forest System," and to ensure that such plans "provide for multiple use and sustained yield" of forest resources.  16 U.S.C. § 1604(e), (f).  The land management

6

**Add. 6**

plans, also called forest plans, establish planning goals and objectives for management of National Forest resources. 16 U.S.C. §§ 1604(a), 1604(g)(1)-(g)(3).  While forest plans establish management goals and broad standards and guidelines, they do not authorize actions or projects, which are proposed, analyzed, and approved by the Forest Service once a forest plan is in place.  *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 729-30 (1998).  "All projects within a forest must comply with the overall plan for that forest."  *Sierra Club v. Wagner*, 555 F.3d 21, 23 (1st Cir. 2009) (citing 16 U.S.C. § 1604(i)).  "The Forest Plan is, then, somewhat analogous to a city's zoning ordinance."  *Sierra Club v. Wagner*, 581 F. Supp. 2d 246, 251 (D.N.H. 2008).

NFMA challenges are reviewed under the APA.  In reviewing a NFMA challenge, courts "give great deference to the Forest Service's interpretation of its own regulations.'"  *Utah Envtl. Cong. v. Richmond*, 483 F.3d 1127, 1134 (10th Cir. 2007) (quoting *Bar MK Ranches v. Yuetter,* 994 F.2d 735, 738 (10th Cir.1993)).  A court may "conclude that the Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan."  *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020) (quoting *Lands Council v. McNair*, 537 F.3d 981, 994 (9th Cir. 2008), *overruled on other grounds by Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 n.10 (9th Cir. 2009).

c.  **White Mountain National Forest**

The White Mountain National Forest (WMNF) encompasses nearly 800,000 acres

7

**Add. 7**

in New Hampshire and western Maine, and is the largest public land area in New England.[5]  Established in 1914, the land has a history of intensive harvesting and conversion of forests to agriculture.[6]  The WMNF offers recreational opportunities and provides, among other things, wildlife habitat and timber.  The Forest Service manages these potentially competing interests according to its multiple-use mandate, which requires that the Forest is "administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528.  To guide its decisions while implementing the multiple-use mandate, the Forest Service developed the 2005 Land and Resource Management Plan for the White Mountain National Forest (the "Forest Plan") under NFMA, the Forest Service's 1982 Planning Rule, and NEPA.[7]  Standing Trees does not challenge the Forest Plan itself in this litigation.

Portions of the Forest, including the Peabody West and Tarleton habitat management units (HMUs),[8] currently do not meet the Forest Plan's desired conditions for habitat composition and age class objectives.[9]  For example, Forest Service analyses show that they both lack "regeneration-age" forest habitat, softwood species like spruce and fir, and open forest conditions more favorable to shade intolerant tree species which, but for historical disturbances like intensive logging, would be more prominent.[10]

---

[5] Defs.' Mem. Mot. Summ. J. (doc. no. 16-1) at 5 (citing AR3621, AR3624).
[6] *Id.* (citing AR13259).
[7] *Id.* at 5-6 (citing AR3620).
[8] A habitat management unit is a "block of Forest land in which habitat composition and age class objectives will be established to help ensure that habitats are well distributed across the Forest and provide a framework for analyzing project impacts to wildlife habitat at a local scale." *Id.* at 6 n. 4 (citing AR3586).
[9] *Id.* at 6 (citing AR3433-34, AR11973, AR12350-55, AR17907-14.
[10] *Id.* (citing AR4877-78, AR11973)

**Add. 8**

### d. Peabody and Tarleton Projects

The Forest proposed the Peabody and Tarleton Projects in 2019 with the aim of "advancing forest plan goals, objectives, and desired conditions for vegetation, wildlife, and other resources."[11]   The Peabody project is located in the Androscoggin Ranger District, largely west and north of the Peabody River and the West Branch of the Peabody River.[12]   The project authorizes activities in a 3,000-acre project area, including parts of Great Gulf Inventoried Roadless Area, with silvicultural treatments proposed on 2,220 acres.[13]   Project activities include "commercial and non-commercial [silvicultural] treatments, expansion of a wildlife opening, road construction and reconstruction, and recreational improvements for mountain biking, skiing, and swimming."[14]   The Peabody EA identifies the objectives and proposed prescription and acreage for the silvicultural treatments.[15]   The proposed silvicultural treatments aim to:

> "provide commercial wood products; create small and large
> openings in the forest to allow regeneration of trees and other
> vegetation and increase wildlife habitat diversity; provide additional
> growing space to enhance crown and bole development; and
> encourage the establishment of shade-intolerant species in the
> understory…[as well as] retaining existing disease-free, mast-
> producing trees for wildlife; discouraging beech regeneration;
> removing decadent, poor-quality trees to capture economic value;
> and removing beech saplings during treatment to reduce their

---

[11] AR11972; *see also* AR4868 ("I weighed the effects of the proposed action against taking no action. While taking no action would allow natural successional processes to continue, it would not advance the goals and objectives of the Forest Plan. Therefore, taking no action would not meet the need for the project.").

[12] Defs.' Mem. Mot. Summ. J. (doc. no. 16-1) at 7 (citing AR4892 (Figure 1)).

[13] *Id.* (citing AR4877); Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1) at 5.

[14] Defs.' Mem. Mot. Summ. J. (doc. no. 16-1) at 7 (citing AR4867, AR4881, AR4892-95 (Figures 1-4)).

[15] AR4881 (Table 1).

**Add. 9**

dominance in the new stands."[16]

All proposed silvicultural treatments would occur on Management Area (MA) 2.1 "General Forest Management" lands, whose purpose includes "providing timber products and a balanced mix of habitats for wildlife species."[17]  The majority of the treatments will take place in mature forests, which make up the vast majority of the forest on the MA 2.1 land in the Peabody West HMU.[18]

The Tarleton project is located in the Pemigewasset Ranger District, bordering Lake Katherine and Lake Tarleton.[19]  The federal government acquired the land comprising the project as recently as the late 1990s and early 2000s.[20]  Before the Forest bought the land, the area was heavily harvested by private timber companies and contained tracts managed by the state of New Hampshire.[21]  The Tarleton Project authorizes vegetation management, wildlife, and recreation activities on a 755-acre project area in the 5,375-acre Tarleton HMU.[22]  Objectives for the silvicultural treatments in the Tarleton EA are largely identical to those in the Peabody EA, mentioned above.[23]  All proposed silvicultural treatments would occur on either general forest management lands or MA 8.3 (Appalachian National Scenic Trail) lands and must align with the

---

[16] AR4881.

[17] Defs.' Mem. Mot. Summ. J. (doc. no. 16-1) at 7 (citing AR3474).

[18] *See* AR17915 (table with existing tree age class conditions on MA 2.1 lands in the Peabody West HMU showing that between 73 and 96 percent of all habitats are mature growth forest).

[19] Defs.' Mem. Mot. Summ. J. (doc. no. 16-1) at 7 (citing AR11995 (Figure 1)).

[20] AR11930.

[21] Defs.' Mem. Mot. Summ. J. (doc. no. 16-1) at 7 (citing AR11973-74).

[22] *Id.* (citing AR11971, AR11995-98 (Figures 1-4), AR11976 (Table 1) (vegetation treatments), AR11977-82 (defining treatments)).

[23] AR11976-77.

10

**Add. 10**

designated purpose and requirements for the land.[24]  The Forest Plan directs the Forest

Service to manage MA8.3-designated land, which surrounds the portion of the

Appalachian Trail that "traverses the state of New Hampshire and the White Mountain

National Forest," to provide for "recreation," "conservation," and "enjoyment."[25]  The

Forest Service asserts that no units proposed for treatment within Appalachian Trail lands

are within 500 feet of the trail itself, and thus meet Forest Plan scenic requirements.[26]

### e.  Project approval process

The Forest Service conducted a public process over four years to develop and

analyze the Project proposals, including "[holding] open houses, solicit[ing] comments

and objections from the public, conduct[ing] field and site visits, use[ing] Forest Service

experts to analyze environmental effects, and revis[ing] and modif[ying] proposed

activities."[27]  Standing Trees submitted timely comments on and formal objections to the

Projects.[28]  The Forest Service rejected the comments and objections, and, according to

Standing Trees, declined to make material changes to the Projects.[29]  Then, upon

finalizing environmental assessments and finding "no significant impact," the Forest

Service released FONSIs documenting why, in its view, neither project requires an EIS.[30]

The Forest Service District Rangers signed decision notices authorizing the

---

[24] Defs.' Mem. Mot. Summ. J. (doc. no. 16-1) at 7-8.

[25] AR3516.

[26] Defs.' Mem. Mot. Summ. J. (doc. no. 16-1) at 8 (citing AR11988-89, AR3523).

[27] *Id.* at 6.

[28] Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1) at 2 (citing AR12079 , AR13065 , AR4679, AR6124).

[29] *Id.* (citing AR12907, AR6107).

[30] Defs.' Mem. Mot. Summ. J. (doc. no. 16-1) at 7 (citing AR4876-912 (April 2023 Peabody final EA and FONSI), AR11968-12001 (November 2023 Tarleton final EA and FONSI)).

**Add. 11**

Tarleton and Peabody projects in November 2023 and February 2024, respectively.[31]

Habitat restoration work unrelated to timber harvest began in summer 2024 in Tarleton.[32]

The Forest Service awarded a timber sale contract for Peabody, but, at the time of the

hearing, had not yet advertised or awarded a contract for the associated road work.

## IV.    Discussion

Standing Trees argues that the Forest Service violated NEPA, NFMA, and the

APA in three ways when it authorized the Peabody and Tarleton projects:  first, it failed

to analyze alternatives, including a "no action" alternative;  second, it failed to take a

"hard look" at the projects' environmental impacts; and third, it failed to design the

projects consistently with the requirements of the Forest Plan.

### a.  Alternatives analysis

Standing Trees claims that the Forest Service failed to analyze alternatives to "log

less" or otherwise reduce the Projects' negative environmental impacts, including by

failing to analyze a genuine a no-action alternative.[33]  The EAs for both the Tarleton and

Peabody projects document consideration of an action and no-action alternative, in that

they contrast the impacts of the proposal with the current condition and expected future

condition of the environment.[34]  *See* 36 C.F.R. § 220.7(b)(ii) ("The EA may document

consideration of a no-action alternative through the effects analysis by contrasting the

impacts of the proposed action and any alternative(s) with the current condition and

---

[31] Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1) at 2 (citing AR4867-69, AR11929-34).
[32] Joint Case Mgmt. Plan (doc. no. 8), at 7.
[33] Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1), at 10, 12.
[34] AR4897, 11975, 11973-74, 17906-18 (describing existing conditions in the HMUs).

**Add. 12**

expected future condition if the proposed action were not implemented.").

"No specific number of alternatives is required or prescribed" in an EA. 36 C.F.R. § 220.7(b)(2). When "an agency makes an informed decision that the environmental impact will be small…a 'less extensive' search [for alternatives] is required." *Conservation L. Found.*, 457 F. Supp. 3d at 57 (quoting *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 960 (7th Cir. 2003)). "Under the NEPA, agencies must consider only reasonable alternatives, meaning alternatives bounded by some notion of technical and economic feasibility, and only alternatives that would bring about the ends of the proposed action." *Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, 123 F.4th 1, 22 (1st Cir. 2024), *cert. denied sub nom. Responsible Offshore Dev. v. Dep't of Interior*, No. 24-966, 2025 WL 1287066 (U.S. May 5, 2025), and *cert. denied sub nom. Seafreeze Shoreside Inc. v. Dep't of Interior*, No. 24-971, 2025 WL 1287076 (U.S. May 5, 2025) (cleaned up). The Ninth Circuit Court of Appeals, for example, has "repeatedly held that an agency satisfies NEPA when it considers only two alternatives—action and no action." *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1065 (9th Cir. 2023) (citing *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1154 (9th Cir. 2008); *see also Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233, 1245-49 (9th Cir.2005) (agency complied with NEPA where the agency considered only a no-action and preferred alternative in EA). An agency "must at least consider a preferred alternative and a no action alternative, and give full and meaningful consideration to all *reasonable* alternatives." *Earth Island Inst.*, 87 F.4th at 1065 (cleaned up) (emphasis in original).

**Add. 13**

### i. No-action alternative

The Forest Service, following 36 C.F.R. § 220.7(b)(ii), contrasted the impacts of its proposed projects with the current and expected future conditions in the areas, if the proposed projects were not implemented.  According to Forest Service analyses, the conditions in the Tarleton and Peabody HMUs, where the projects are located, do not currently meet the Forest Plan's standards for tree and wildlife habitat diversity.[35]  For example, the Peabody Project's HMU rationale document notes that because of the WMNF's intense timber harvest history, many of the forest stands in the project area no longer support the natural vegetation that would be expected for that ecological land type, or have any regeneration-age-class forest, resulting in declining populations of wildlife species that rely on regenerating forest habitat.[36]  The Forest Service's analysis concludes that "taking no action would result in lower diversity of tree species, ages, and structures in the project area and the [HMUs] overall," and "wildlife habitat diversity would continue to decline."[37]  The EA for Tarleton notes, in addition to increasing forest tree and wildlife habitat diversity, that "[w]ithout management action, no improvements to the

---

[35] *Id.*

[36] AR17910-12 (Peabody West Integrated Resource Project HMU Rationale). *See also* AR17916-17 (Tables 7-9), showing that while the Forest Plan calls for nearly 200 acres of regenerative-age habitats in the Peabody HMU MA2.1 land area, none currently exist.

[37] AR4897, 11975.  In an amicus brief, the State of New Hampshire offers its position: "the proposed activities are essential for wildlife habitat management and overall forest health…the New Hampshire Fish and Game Department supports the proposed active forest management to maintain and regenerate certain habitat types in support of a variety of wildlife species.  Even if there were no economic benefit associated with these activities, the State would prefer the proposed Peabody West and Tarleton management activities over a no-action alternative purely from an ecological perspective."  State of New Hampshire Amicus Curiae Br. (doc. no. 22) at 2-3 (citation omitted).

**Add. 14**

shoreline or aquatic habitat at Lake Katherine would occur," resulting in higher water temperature, less cover for aquatic animals, and stormwater that would run off into the lake before it could be adequately filtered for pollutants.[38]  By analyzing the current and future expected conditions of the Peabody and Tarleton project areas without any interventions, and demonstrating that the proposed interventions are necessary to bring the condition of the lands into compliance with the Forest Plan, the Forest Service sufficiently documented consideration of a no-action alternative.

## ii.  Other alternatives

Standing Trees, citing 42 U.S.C. § 4332(H), argues that the Forest Service was required to conduct a full analysis of their proposed alternatives to "log less"[39] because the agency's proposal "involves unresolved conflicts concerning alternative uses of available resources."[40]  An agency must "give full and meaningful consideration to all

---

[38] AR11975.

[39] Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1) at 12.

[40] *Id.* at 10-11.  The Forest Service stated in a in a Freedom of Information Act (FOIA) response to a Lake Tarleton Coalition member that "[n]o reasonable alternatives" and "[n]o unresolved conflicts have been brought forward at this time," AR13082, which Standing Trees called an "egregious misstatement."  *Id.*  The court asked counsel at oral argument to specify what "unresolved conflicts" exist, beyond the conclusory statement in the briefs that the project areas "include unique 'use[s]' and 'resources' that will be affected by the Tarleton project, including air, water, forest land, scenery, recreation, and wildlife habitat in which Standing Trees and its members have abiding interests."  Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1) at 11.  Counsel for Standing Trees repeated the claim that unresolved conflicts exist but did not specify what they were.  Standing Trees cites to *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1229 (9th Cir. 1988) for the proposition that the Forest Service is required to consider alternatives beyond the proposed action because it "opens the door to potentially harmful…activity."  Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1) at 11.  But that case is distinguishable from this.  In that case, the court found that the agency's proposed action—selling mineral leases on national forest land—would affect the area's suitability for wilderness designation in the future because the "sale of leases cannot be divorced from post-leasing exploration, development, and production."  *Hodel*, 852 F.2d at 1229.  But Standing Trees has not demonstrated that similar circumstances exist here.

15

**Add. 15**

reasonable alternatives." *Earth Island Inst.*, 87 F.4th at 1065 (citations omitted). "An alternative is reasonable if it 1) advances the project's purpose and need, and 2) is significantly distinguishable from alternatives actually considered, or which have substantially similar consequences." *Id.* (cleaned up).

Standing Trees proposed alternatives to both projects. In its comments on Peabody, it cited the Albany South Project to argue the Forest Service should have considered an alternative that eliminated timber harvesting in a portion of the project area, and proposed that the Forest Service meet Forest Plan objectives by creating "complex early successional habitat rather than simplified regeneration-age forest through even-aged management."[41] The Forest Service argues that Standing Trees' proposal "functionally represents a partial implementation of the full Proposed Action and would not meet the need as well as the full Proposed Action,"[42] in part because age class composition, a key objective for the projects to bring the HMUs up to Forest Plan

---

No projects are proposed in designated wilderness or Roadless Area Conservation Rule areas. AR6473. The Peabody project proposes about 600 of the total 17,000 acres (about 4 percent) of the Great Gulf Inventoried Roadless Area for treatment, of which 80 acres would receive even-aged treatment. AR6473. No new roads are proposed in the area. AR6474. The Forest Service evaluated potential impacts to the Great Gulf Inventoried Roadless Area and found that the proposed project would have "limited, short term effects" but would not impact future eligibility for the area's designation as a potential wilderness. *Id.*; *see also,* AR6121. As the Forest Service made clear in their responses to comments by Standing Trees, the areas chosen for the projects had already been evaluated and deemed unsuitable for wilderness designation, so the projects would not affect the area's suitability for future wilderness designation. AR12903-04; AR6120-21.

[41] AR4845, AR4686; s*ee also,* AR13082 (asking the Forest Service to "omit[] the unnecessary harvest and treatment activities included in the current proposed action.").
[42] AR4845.

**Add. 16**

standards, "can be adjusted only through timber harvest."[43]  This explanation makes

sense; as the Forest Service explains in the Peabody EA, uneven-age management

techniques like group and single tree selection create gaps in the forest of up to two acres.

Larger gaps allow for shade-intolerant trees to grow, which, over time, would "lead to

complex vertical and horizontal vegetative structure,"[44] but regeneration-aged forest is

only created at up to two acres at a time.  Conversely, even-age treatments like

clearcutting and patch cutting produce the greatest amount of early-successional habitat

and regeneration-age tree structure, one of the stated purposes of the Peabody project.[45]

The abundance of light and warming of the forest floor resulting from clear cutting would

lead to herbaceous cover, the growth of shade-intolerant trees, and regeneration of certain

hardwood trees.[46]  As the Peabody HMU rationale document points out, certain types of

wildlife depend on the early-successional and young forest habitat created by clear- and

patch cutting.[47]  For example, a comment letter from the Ruffed Grouse Society &

---

[43] Defs.' Mem. Mot. Summ. J. (doc. no.16-1) at 10-11; *see also* AR4845, AR12904, AR6107, AR10553.

[44] AR4810.

[45] *See* AR17910-12.

[46] AR4808.

[47] AR17910-12;  *see also,* WMNF Ecological Approach (AR12701-13) ("Most of the wildlife species on the WMNF need more than one forest age-class to meet their life requirements. Many use both mature and regenerating forest, or even mature forest and permanent openings. A few birds require permanent openings or the earliest stages of regenerating forest to meet most of their needs. There are no vertebrate animals or vascular plants in this area that are old growth forest obligates. There are a few invertebrate animals, nonvascular plants, and lichens that may require old growth conditions, but more information is needed to determine if these species are old growth obligates. Most plant species do well either in mature or regenerating forest, not both. The WMNF has species that need each of these habitats, and others that rely on upland or wet openings.  Therefore, maintaining ecological sustainability requires that we provide a mix of habitats across the landscape…A number of the species dependent on openings and regenerating forest habitats have experienced substantial population declines in recent decades due to the

**Add. 17**

American Woodcock Society supporting the proposed silvicultural treatments in the

Peabody project states that "[n]umerous bird and wildlife species require forest habitat

diversity and are declining…[including] the Ruffed grouse, American woodcock,

Golden-winged warbler, Spruce grouse and New England cottontail," and recommends

"actions include incorporating young forest habitat conditions across landscapes."[48]  The

letter notes that "there is tension between scenery impacts and vegetative practices like

even-aged silviculture," and offers support to the project to "mitigate these tensions and

ensure forest habitat conditions aren't overly compromised by aesthetic considerations."[49]

Standing Trees did not provide evidence or a concrete, specific explanation of how

"complex early successional habitat creation" would meet the Peabody project goals for

forest age class composition.  In short, without more evidence distinguishing Standing

Trees' proposal from the even- and uneven-aged management techniques already planned

by the Forest Service, the court credits the Forest Service's explanation that Standing

Tree's proposed alternative represents a partial implementation of the full proposed

action, which it was not required to evaluate fully.  *See Earth Island Inst.*, 87 F.4th at

1065 ("NEPA [does not] require agencies to evaluate 'mid-range' alternatives between

action and no action."); *Aertsen v. Landrieu*, 637 F.2d 12, 21 (1st Cir. 1980) ("HUD did

---

reforestation of farmland, changes in harvest practices, and loss of forest and farmland to
development."
[48] AR4672-74.
[49] *Id.*; *see also,* WMNF Ecological Approach (AR12711) ("All experts questioned agree that the
Forest could provide even more young forest habitat than is proposed in the current Forest Plan
while maintaining ecological sustainability of mature and old forest habitats on the landscape. By
contrast, a segment of the public is strongly opposed to regeneration harvest on the Forest.")

**Add. 18**

not discuss the purely hypothetical use of the site for high-cost housing, stores, schools, churches, parks, or other purposes.  But no one had made a realistic proposal for such other purpose.  Thus the only unresolved conflict concerning an alternative … was a continuation of the status quo. That alternative HUD plainly considered. The department had no obligation to go further."); *see also Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 1004-05 (9th Cir. 2013) (finding that such alternatives are not "necessary to foster informed decisionmaking and public participation").

Similarly, in response to the proposed Tarleton project, Standing Trees' suggested alternative involves "omitting the unnecessary harvest and treatment activities" and instead "consider[ing] small-scale habitat restoration" and recreation "improvements," including amending the Forest Plan to designate a new scenic area where timber harvesting would be prohibited.[50]  As with its suggested Peabody project alternative, Standing Trees' proposal for how to accomplish the projects' habitat composition goals is vague;[51] Standing Trees does not proposed anything more specific than to omit "unnecessary" harvesting and consider "small-scale" silvicultural treatments.   As with the Peabody project, because the alternatives proposed by Standing Trees did not "advance the project's purpose and need," or they did so in a way that represented a "partial implementation" of the full proposed action, the Forest Service was not required

---

[50] AR13082.  Standing Trees specifically stated at oral argument that it *does not* challenge the existing Forest Plan in this litigation.

[51] Like the Peabody project, the Tarleton rationale document states that the area lacks regeneration age forest, which is created by even-aged harvesting.  The Tarleton project seeks to increase the amount of regeneration-age forest.  *See* AR12351-56.

**Add. 19**

to conduct a fulsome analysis of the proposals.  *See, e.g. Lovgren*, 701 F.3d at 37

(holding that an agency need not consider alternatives which are "infeasible, ineffective,

or inconsistent with the basic policy objectives" for the management of the area);

*Landrieu*, 637 F.2d at 21; *see also Seven Cnty. Infrastructure Coal*, 145 S.Ct. at 1512

("Black-letter administrative law instructs that when an agency makes those kinds of

speculative assessments or predictive or scientific judgments, and decides what qualifies

as significant or feasible or the like, a reviewing court must be at its 'most deferential.'").

### b.  "Hard look" at impacts

Standing Trees claims that the Forest Service failed to take a "hard look" at the

environmental impacts of the projects as required by the NEPA and the APA.  This

includes the direct, indirect, and cumulative effects of a project.  In particular, Standing

Trees claims that the Forest Service failed to investigate and disclose site specific

conditions relevant to the projects' impacts on water quality, the northern long-eared bat,

scenic and recreational resources, forest health, and climate.

When an agency has authorized a project subject to NEPA's procedural

requirements, "the only role for a court is to insure that the agency has considered the

environmental consequences; it cannot interject itself within the area of discretion of the

executive as to the choice of the action to be taken." *Conservation L. Found.*, 457 F.

Supp. 3d at 54 (quoting *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S.

223, 227–28 (1980)).  "Inherent in NEPA … is a 'rule of reason.'" *Seven Cnty.

Infrastructure Coal*, 145 S. Ct. at 1513.  "[Courts] apply a rule of reasons because [they]

should not 'fly speck' an [EA] and hold it insufficient based on inconsequential or

**Add. 20**

technical deficiencies." *Conservation L. Found.*, 457 F. Supp. 3d at 57 (quoting *Dubois v. U.S. Dep't of Agriculture*, 102 F.3d 1273, 1288 (1st Cir. 1996)).  "An agency decision is acceptable even if there will be negative environmental impacts resulting from it, so long as the agency considered these costs and still decided that other benefits outweighed them." Id. at 54 (quoting *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 184 (4th Cir. 2005)); *see also Conservation L. Found. v. Ross*, 374 F. Supp. 3d 77, 111 (D.D.C. 2019) (quoting *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 191 (4th Cir. 2009)) ("Agency actions with adverse environmental effects can [] be NEPA compliant where 'the agency has considered those effects and determined that competing policy values outweigh those costs.'").

*Water quality*.  Standing Trees asserts that the Forest Service did not look at the water quality within the impacted areas using site-specific analysis, but rather made generic assertions that water quality would not be significantly impacted based on assumptions from the Albany South project—a different, unrelated site.[52]  The court finds that the Forest Service took a sufficiently hard look at specific site impacts based on the Albany South methodology.

"Courts pay agencies 'an extreme degree of deference' when decisions 'involve complex judgments about sampling methodology and data analysis that are within the

---

[52] Pl.'s Reply (doc. no. 27) at 10.  Standing Trees focused in its briefing and oral argument specifically on the effects on water quality from the timber harvesting activities and did not address the arguments it raised during the comment period about impacts of other proposed activities on water quality.  *See* Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1) at 16-17; AR13094-98; AR12910-12. The court therefore limits its analysis to water quality impacts stemming from timber harvesting activities.

**Add. 21**

agency's technical expertise.'" *Ross*, 374 F. Supp. 3d at 89 (quoting *Kennecott Greens*

*Creek Mining Co. v. Mine Safety & Health Admin.*, 476 F.3d 946, 956 (D.C. Cir. 2007));

*see also Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) ("When specialists

express conflicting views, an agency must have discretion to rely on the reasonable

opinions of its own qualified experts even if, as an original matter, a court might find

contrary views more persuasive."); *Advocs. for Transp. Alts., Inc. v. U.S. Army Corps of*

*Eng'rs*, 453 F. Supp. 2d 289, 304 (D. Mass. 2006) (citing *Town of Norfolk v. U.S. Army*

*Corps of Eng'rs*, 968 F.2d 1438, 1446 (1st Cir. 1992)) ("[T]he Court grants substantial

deference to the agency's choices regarding methodology and technical analyses").  Here,

the Forest Service conducted an analysis, based on its own methodology, which considers

the project-specific watersheds, harvest amounts, harvest types, and geological features.

For both the Tarleton and Peabody projects, the Forest Service used an "analysis

protocol" developed in Albany South, another tree harvesting project in the White

Mountain National Forest, to analyze whether the projects were likely to have measurable

impacts on water quality in the surrounding areas.[53]  The protocol uses a measure of the

"percent basal area removed in a watershed that contains a perennial stream"[54] to assess

whether the tree harvest is likely to impact the watershed.  Basal area is the cross-section

of a tree at breast height (4.5 feet above ground) and is a measure of tree stand density.[55]

Based on studies cited in the Albany South project, timber harvest levels in the White

---

[53] AR4900, 11987-88; *see also* AR12910.
[54] AR4900.
[55] Defs.' Mem. Mot. Summ. J (doc. no. 16-1) at 15.

**Add. 22**

Mountain National Forest below 20 percent of the basal area of a watershed do not have a measurable impact on the watershed's water quality.[56]  According to the Forest Service this makes percent basal area removal a "viable" indicator for whether a project should have adverse effects on water quality.[57]

The Albany South project is in the eastern part of the White Mountain National Forest, 18 miles from the Peabody project area and 50 miles from the Tarleton project area.[58]  The Albany South EA, incorporated by reference in the administrative record for both projects, discusses extensively the expected effects of the project on water quality and hydrology.  The Forest Service states in the Peabody and Tarleton EAs that the "potential impacts to riparian and aquatic resources and water quality discussed in the Albany South EA would be broadly applicable to the current proposal,"[59] but it does not provide specific reasons why, such as land or watershed similarities.  Instead it states that "studies in the White Mountains" show the validity of the method of using a  20 percent basal area removal threshold in the White Mountain National Forest.[60]  The Forest Service also described the State and Forest Plan standards and best practices that it would implement during the project to minimize, and potentially even improve, water quality in the project areas.[61]  Given the projects' geographic proximity and the studies showing the validity of the approach in the White Mountain National Forest, it is not arbitrary and

---

[56] AR11988.
[57] AR2331, AR6382.
[58] AR11987–88; AR4900.
[59] AR4900, AR11987.
[60] AR12910.
[61] AR12911-12.

23

**Add. 23**

capricious to find that the methodology used in the Albany South project would be

applicable to the Tarleton and Peabody projects, even if the EAs lack specific

comparisons between the Albany South water quality findings and the Tarleton and

Peabody projects. *Advocs. for Transp. Alts., Inc.*, 453 F. Supp. 2d at 304. ("[T]he Court

grants substantial deference to the agency's choices regarding methodology and technical

analyses."); *Seven Cnty. Infrastructure Coal*, 145 S. Ct. at 1515 ("The bedrock principle

of judicial review in NEPA cases can be stated in a word: Deference.")

Using its selected methodology, the Forest Service conducted site-specific

analysis. For instance, the Peabody EA explains that:

> "In the proposed action, percent basal area removed exceeds 20
> percent in 12 watersheds, ranging in size from 9 acres to 698 acres.
> Of these 12 watersheds, seven do not provide perennial fish habitat,
> so there are no concerns about changes in water quality in these
> seven watersheds. Five watersheds in the project area are probable
> to contain fish habitat and exceed 20 percent basal area removal. Of
> these five watersheds, the highest basal area removed is 27.3
> percent."[62]

The Peabody EA conducts additional analysis of the potential changes in water quality

for the five watersheds of concern in the project, finding that the changes that would be

of concern to aquatic ecosystems are a decrease in pH or an increase in aluminum. It

then analyzes the impact of the projects on water pH and aluminum, finding that the

expected effects on pH would be "minor" and on aluminum leaching to not approach

toxic thresholds.[63]

---

[62] AR4900.

[63] *Id.*

24

The Tarleton EA shows project-specific analysis in that it calculates the percent of basal area removed in project site watersheds, finding that "the highest amount of harvest in a watershed as part of this project would be 15.5 percent basal area removal, while the project would remove 4.2 percent of the basal area in the Lake Tarleton watershed and 2.4 percent of the Eastman Brook watershed."[64]  It goes on to conclude that "[n]o measurable adverse effects to water quality or quantity are expected,"

The agency did not produce baseline data for water quality in the area, as suggested by Standing Trees, relying instead on water quality data obtained by the State of New Hampshire.[65]  Nevertheless it adequately analyzed expected site-specific impacts using the methodology it devised in another project, and its analysis falls well within a "broad zone of reasonableness."  *See Seven Cnty. Infrastructure Coal*, 145 S.Ct. at 1513 ("Courts should afford substantial deference and should not micromanage [] agency choices so long as they fall within a broad zone of reasonableness.").

***Northern long-eared bat***.  Standing Trees contends that the Forest Service failed to conduct site-specific surveys on the northern long-eared bat, instead relying on a 2019 bat survey of the WMNF and a biological opinion done by the U.S. Fish and Wildlife Service.[66]  The Forest Service, acknowledging that bats and bat roost trees may be present in project areas, assumes impacts would be minimal, and moreover, that the projects could actually improve northern long-eared bat habitat.  Though it took no

---

[64] AR11988.
[65] *See* Pl.'s Reply (doc. no. 27) at 10; AR12912; *see also* AR17673.
[66] Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1) at 18.

**Add. 25**

measures to identify and protect roost trees in the project design, the Forest Service was not required to do more.

"We review biological opinions under § 706 of the Administrative Procedure Act." *Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1, 12 (1st Cir. 2024).  "[W]hen reviewing a lead agency's reliance on a consulting agency's biological opinion, we must ask whether the reliance itself was arbitrary and capricious. Reliance can be arbitrary and capricious if the underlying biological opinion was deficient, or if the agency blindly adopted the biological opinion without conducting its own independent investigation." *Id.* (cleaned up).

Standing Trees points to no deficiencies in the U.S. Fish and Wildlife Service's biological opinion, other than its breadth (it "purports to assess 2,927 projects across twenty-eight national forests in only fifty-five pages.") and lack of analysis specific to each project.[67]  In addition to obtaining the biological opinion (which included the two project areas), the Forest Service conducted project-specific biological evaluations for both projects.[68]  Both evaluations include discussions of potential impacts to the northern long-eared bat that go beyond the U.S. Fish and Wildlife Service's biological opinion by, among other things, including findings from other studies.[69]  Although only two bats were identified in the area during a 2019 study conducted by the State of New Hampshire, the Forest Service assumed that bats were present.  The project-specific

---

[67] *Id.*
[68] AR9238-58 (Peabody BE), 13915-61 (Tarleton BE).
[69] *See, e.g.* AR9244 (biological evaluation citing Sease and Prout study, detailing direct and indirect impacts on bat populations).

**Add. 26**

biological evaluations note that the projects included a "risk of impacting [the bats']

maternity colonies with the degree of tree removal proposed," they nevertheless conclude

that "the cumulative loss of roosting habitat is [] not anticipated to be adverse [to the

overall population level of northern long-eared bats] because the [bat] is not considered

to be limited by the availability of such habitat."[70]  The evaluations also discuss other

direct and indirect impacts, including the "beneficial" indirect impact to bats' foraging

habitat that may result from project activities.[71]

Finally, while acknowledging that the projects may impact bat roosts, the Forest

Service has the discretion to weigh the identified impacts and "decid[e] that other values

outweigh the environmental costs." *Robertson*, 490 U.S. at 350 ("It would not have

violated NEPA if the Forest Service, after complying with the Act's procedural

prerequisites, had decided that the benefits to be derived from downhill skiing at Sandy

Butte justified the issuance of a special use permit, notwithstanding the loss of 15

percent, 50 percent, or even 100 percent of the mule deer herd."); *Historic Bridge Found.*

*v. Buttigieg*, 22 F.4th 275, 280 (1st Cir. 2022) ("NEPA does not mandate any specific

outcome; it only requires agencies to conduct environmental studies.").

In this case, the Forest Service adequately studied the northern long-eared bat by

relying on a U.S. Fish and Wildlife Service's biological opinion and conducting

biological evaluations of its own for each project.  The agency could still comply with

NEPA even if it found that the bats were likely to face much more serious environmental

---

[70] *Id.*
[71] *Id.*

**Add. 27**

consequences from the projects, but here, it reasonably relied on various studies showing that only two bats had been identified in the project area, the bats can roost in multiple habitats that would be unaffected by the projects, and that the projects may actually benefit the bat's foraging habitat.  *See Seven Cnty. Infrastructure Coal*, 145 S.Ct. at 1513 ("Courts should afford substantial deference and should not micromanage [] agency choices so long as they fall within a broad zone of reasonableness.").

*Scenic and recreational resources*.  Standing Trees asserts that the Forest Service failed to take a hard look at the Projects' scenic and recreational impacts because it excluded from its review publicly-identified resources of outstanding scenic and recreational value.  Standing Trees claims that, for the Tarleton project, the Forest Service should have selected a floating viewpoint from the surface of Lake Tarleton, and for the Peabody project, the Forest Service failed to analyze and inform the public about impacts to trails in the White Mountain National Forest, including the Appalachian Trail and the Great Gulf Trail.  The court nevertheless finds that the Forest Service took the necessary hard look at the projects' scenic and recreational impacts.

Finding that the scenic impacts of the projects were an "issue warranting detailed analysis," the Forest Service prepared scenery and recreation specialist reports for each Project and summarized the findings in the EAs.[72]  The Forest Service identified four viewpoints in Peabody and nine viewpoints in Tarleton that, it states, "best represented a

---

[72] AR4887-88, AR4897-98, AR6462-64, AR6498-506 (Peabody); AR11983, AR11988-89, AR13793-80, AR13826-50 (Tarleton).

**Add. 28**

Project area's viewshed,"[73] based on Forest Service specialists' "knowledge of the Project area, mapping tools, and site visits."[74]   Using these viewpoints, the Forest Service modeled and adjusted the design of some of the timber harvesting units to "minimize visual impacts and to ensure Forest Plan compliance," including increasing the no-cut logging buffer around Lake Tarleton.[75]  The Forest Service also followed Forest Plan guidelines to ensure that the scenic effects from the Appalachian Trail complied with Forest Plan standards for areas around the trail.

No tree harvesting project would be without scenic impacts.  As with other environmental impacts, the Forest Service's methodology and selection of viewpoints is entitled to deference.  *Town Of Winthrop v. F.A.A.*, 535 F.3d 1, 13 (1st Cir. 2008) ("Agencies are entitled to select their own methodology as long as that methodology is reasonable. The reviewing court must give deference to that decision.") (cleaned up). This includes not selecting a viewpoint from the surface of Lake Tarleton.  The court finds the Forest Service's claim that "[v]iewpoints within the boundary of Lake Tarleton itself were not selected because they would not be fixed points that could be precisely revisited for scenery monitoring over time" to be unrealistic, as GPS coordinates could have been used to select a fixed point within the lake.  But the fact that the Forest Service chose not to use a lake-surface viewpoint for its analysis does not mean that it "entirely failed to consider an important aspect of the problem."  *See Motor Vehicle Mfrs. Assn. of*

---

[73] Defs.' Mem. Mot. Summ. J. (doc. no. 16-1) at 19 (citing AR4898, AR4896 (map), AR11988, AR11999 (map)).
[74] *Id.* at 20 (citing AR13826-50).
[75] AR4898, 11988-99.

**Add. 29**

*U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

When it came to the Peabody project, the Forest Service specifically evaluated impacts to the Great Gulf Wilderness,[76] and did a scenery analysis based on four viewpoints. The EA notes that the planned clear-cuts would exceed the size guidelines under the Forest Plan for areas with high scenic integrity, but explains that the larger acreage (54 acres over three patches) was intended to better meet the project's objectives and move the land toward desired conditions under the Forest Plan.[77] Again, the Forest Service is entitled to deference for its decision that policy interests outweigh potential environmental impacts. *Conservation L. Found.*, 374 F. Supp. 3d at 111 ("Agency actions with adverse environmental effects can thus be NEPA compliant where the agency has considered those effects and determined that competing policy values outweigh those costs.") (quotation marks omitted). The EA also discusses mitigation measures that the Forest Service took to limit scenery impacts, including reducing the size of some treatments and implementing a specific design element "to ensure that openings are well-distributed in the landscape to the maximum extent practical."[78]

In *Sierra Club v. Wagner*, the First Circuit upheld similar FONSIs by the Forest Service on timber projects in the White Mountain National Forest, explaining that the projects' visual effects on potential designated wilderness area would not be irreversible or irretrievable and that the visual effects of clear cutting would begin dissipating almost

---

[76] AR6473-74 (finding no lasting effects to the Great Gulf Wilderness).
[77] AR4898.
[78] AR4891.

**Add. 30**

from the start.  555 F.3d at 29.  Similarly, here, because the agency's methodology for choosing viewpoints was rational and the agency made a "reasonably complete discussion" of the projects' scenic impacts and mitigation measures, it has met its "hard look" obligation under NEPA.  *See Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1073 (9th Cir. 2010) (citing *Okanogan Highlands Alliance v. Williams,* 236 F.3d 468, 473 (9th Cir. 2000)) (holding that the agency took a "hard look" where the EIS contained "a 'reasonably complete' discussion of this mitigation measure," and noting that the court "[is] not authorized to substitute [its] judgment for that of the agency.").

*Forest health*.  Standing Trees claims that the Forest Service failed to disclose stand age information, precluding the public from understanding whether the Service had sufficiently investigated the forest health conditions that are central to the projects' purpose.  The court disagrees.  The Forest Service adequately disclosed information that would inform the public about how it analyzed forest health and would allow public comment on the proposed timber harvest areas.

An "old" forest is distinct from "old growth forest," which is itself distinct from "old forest habitat," as defined by the Forest Plan.  "Old" forest stands are classified based simply on the age of the trees.  The classification depends on the type of tree in the stand: for instance, stands of northern hardwood trees over 119 years are in the "old" age class, while stands of aspen or birch trees only need to be 70 to be classified as "old."[79]

---

[79] AR6117.

**Add. 31**

An "old growth forest" is a stand of at least 10 acres with three or more age classes and an "abundance of trees at least 200 years old."[80] "Old forest habitat," as that term is used in the Forest Plan, does not have an age-class definition, it refers to a qualitative state of structural complexity.[81] The Forest Plan prohibits tree harvesting in old growth forest or "stands identified to provide old forest habitat."[82] Thus, while a stand may have trees in the "old" age class, it does not necessarily follow that the stand is characterized as old growth or old forest habitat.

The Forest Service used ecological surveys and other studies, incorporated by reference, to analyze the project areas and make recommendations for even- and uneven-age harvesting.[83] The proposed project areas are shown in maps in the draft EAs and the ecological and botany surveys identifying old growth habitat were cited in the Forest Service's responses to comments.[84] The Forest Service specifically represented that the stands at issue (namely stands 71, 72, and 75 in Compartment 34 of the Peabody project) are not selected for treatment.[85] The administrative record shows that Forest Service employees studied stands throughout the project areas, and, on finding old growth habitat, or forest conditions trending toward old growth habitat, the Forest Service excluded those areas from receiving silvicultural treatments.[86] Emails in the record

---

[80] AR3595.
[81] Id.
[82] Id., AR3448.
[83] See, e.g. AR6117, AR6264, AR4802 (draft EA), AR4877 (EA).
[84] See AR6117.
[85] See Defs.' Reply (doc. no. 31) at 13 (citing AR7834-35, chart showing stand IDs selected for treatment).
[86] AR6116.

**Add. 32**

confirm that the Forest Service, after conducting studies involving gathering stand data and history data and taking tree cores on standardized plots, revised its proposals for where treatment would occur once it confirmed that some proposed treatment areas had old growth characteristics.[87]  For example, the maps, botany survey, and chart cited by the Forest Service show that the identified late successional forest in stand 71 in the Peabody project was not selected for treatment, contrary to Standing Trees' claims.[88]  The Forest Service's revisions to its original proposed treatments demonstrate its "willingness to receive evidence on the matters." *Vermont Yankee Nuclear Power Corp.,* 435 U.S. at 554.

Standing Trees further contends that the charts showing stands selected for treatment are difficult for non-technical readers to understand, and that the Forest Service failed to disclose stand information during the comment period.[89]  Although the stand data is difficult to understand and was not immediately available without a request, both the draft and final EAs identified the HMU Rationale documents, which in turn cite stand

---

[87] AR4527, AR6116.

[88] *See* AR4895, AR7425, AR6287, AR7834-35.

[89] Standing Trees also contends that the internal email from a Forest Service botanist, mentioned above, explaining the outcome of forest analysis, which identified old growth habitat and recommended dropping those areas from treatment, as a "post-hoc rationalization" that "did not exist at the time the decision was authorized."  Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1) at 29-30.  The Forest Service suggests that, as the decision notice authorizing the Peabody project is dated February 7, 2024, several months after the June 26, 2023 email, the email predates the decision to authorize and is not post-hoc.  *See* AR4527, 6116.  The court is persuaded that the email is not "post-hoc rationalization," but instead, as discussed above, an explanation of the steps the Forest Service took to ensure that no silvicultural treatments took place in old forest habitat.

**Add. 33**

surveys as one of the sources the Forest used to assess forest health.[90]  Standing Trees

requested and received the stand surveys.[91]  The surveys are written for technical users

within the Forest Service and difficult for laypeople to understand, but Standing Trees did

not seek clarification of the documents.  *Friends of the Clearwater v. Petrick*, 588 F.

Supp. 3d 1071, 1097 (D. Idaho 2022) ("The Forest Service was not impeding agency or

public review because the documents were available for inspection.").

      ***Cumulative impacts***.  Standing Trees argues that the Forest Service failed to look

at projects' cumulative impacts, particularly with respect to the projects' greenhouse gas

emissions.

      The Forest Service is required to consider "the incremental impact of the action

when added to other past, present, and reasonably foreseeable future actions[.]"

*Safeguarding the Historic Hanscom Area's Irreplaceable Res., Inc. v. F.A.A.*, 651 F.3d

202 (1st Cir. 2011) (quoting 40 C.F.R. § 1508.7).  These include "individually minor but

collectively significant actions taking place over a period of time."  *Nw. Bypass Grp. v.*

*U.S. Army Corps of Eng'rs*, 552 F. Supp. 2d 97 (D.N.H. 2008) (quoting 40 C.F.R. §

1508.7).  But the Supreme Court cautions that,

> "In analyzing those scope questions, it is critical to
> disaggregate the agency's role from the court's role. So long
> as the EIS addresses environmental effects from the project at
> issue, courts should defer to agencies' decisions about where
> to draw the line—including (i) how far to go in considering
> indirect environmental effects from the project at hand and
> (ii) whether to analyze environmental effects from other

---

[90] *See* AR4803-04 (August 2022 Peabody draft EA), 11815 (April 2022 Tarleton draft EA);
AR4877-78, AR11973-74, AR12350, AR17910.
[91] AR12901; *see* AR9885 (FOIA response dated April 14, 2023).

**Add. 34**

projects separate in time or place from the project at hand."

*Seven Cnty. Infrastructure Coal*, 145 S. Ct. at 1513.

With respect to greenhouse emissions, the Forest Service conducted a forest-wide carbon assessment and two project-specific carbon assessments.[92]  The former was a quantitative assessment while the latter were qualitative assessments.  The forest-wide assessment describes the effect of timber harvesting in the White Mountain National Forest on carbon emissions from 1990 onward.[93]  The project-specific assessments disclose potential impacts of the projects, discuss potential positive and negative impacts of the projects on greenhouse gas emissions, and ultimately provide a detailed and reasoned basis to support the Forest Service's finding that the Projects' impacts on greenhouse gas emissions and global climate change would be negligible.[94]   Although the assessments do not delve into all of the indirect impacts of the projects (for instance, Standing Trees faults them for failing to quantify the impact if the harvested timber were all sold and burned as firewood), or quantify the total estimated amount of greenhouse gas emissions, they are sufficiently detailed for the significance of the projected impacts.

---

[92] AR5678-703 (Forest-wide carbon assessment); 6322-27, 13259-65 (Project-level carbon assessments).  Standing Trees previously relied on guidance from the Council on Environmental Quality stating that "federal agencies must disclose and consider the reasonably foreseeable effects of their proposed actions including the extent to which a proposed action and its reasonable alternatives…would result in reasonably foreseeable GHG emissions that contribute to climate change," which "requires more than a statement that emissions from a proposed Federal action or its alternatives represent only a small fraction of global or domestic emissions." 88 Fed. Reg. 1196, 1200-01 (Jan. 9, 2023).  That guidance was withdrawn in May 2025, after oral argument was held in this case.  90 Fed. Reg. 22,472 (May 28, 2025).  The court therefore does not consider the guidance.
[93] AR13259; AR5679.
[94] AR6323, AR13260.

35

**Add. 35**

*See id.;* 40 C.F.R. § 1502.2(b) ("Environmental impact statements shall discuss effects in proportion to their significance. There shall be only brief discussion of other than important issues. As in an environmental assessment and finding of no significant impact, there should be only enough discussion to show why more study is not warranted.").  As noted in the Tarleton assessment and reiterated by the Society for the Protection of New Hampshire Forests in its comment letter, the largest source of GHG emissions in the forestry sector is deforestation, or removing all the trees to convert forested land to other uses.[95]  The Peabody and Tarleton projects are not deforestations, and as the assessments note, may make the areas more resilient to effects of climate change like wildfire, drought, insects, and disease, by reducing stand density and promoting regrowth through thinning and removal.[96]  And as the assessments and commenters noted, the climate impacts of the projects will begin to diminish immediately as new trees grow.

Courts in other circuits have found that it is less important to measure the impact of timber harvesting in small logging projects than it is to measure extraction impact in oil, coal, and gas-type projects because the biomass fuel stocks regenerate more quickly and act as a carbon sink, decreasing the net carbon dioxide emissions of the project. *See, e.g. Swomley v. Schroyer*, 484 F. Supp. 3d 970, 976 (D. Colo. 2020), *aff'd,* 2021 WL 4810161 (10th Cir. Oct. 15, 2021) (finding that a short, less detailed analysis of carbon

---

[95] AR10896.  The Society for the Protection of New Hampshire Forests wrote the letter supporting the Tarleton project during the comment period, after which it conducted a field visit to the Tarleton project with Forest Service employees (AR9723).  The Society was one of 10 amici to contribute to an amicus brief in support of the defendant.  Amicus Brief Society for Protection of New Hampshire Forests (doc. no. 25).
[96] AR13261.

**Add. 36**

impacts was sufficient for a logging project of 1,600 acres); *Hapner v. Tidwell*, 621 F.3d 1239, 1245 (9th Cir. 2010) (logging project involving "a relatively small amount of land" and thinning rather than clearcutting trees did not require discussion of global warming in EA).  Standing Trees points to *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 687 F. Supp. 3d 1053 (D. Mont. 2023), *aff'd in part, rev'd in part and remanded sub nom. Ctr. for Biological Diversity v. United States Forest Serv.*, 2025 WL 586358 (9th Cir. Feb. 24, 2025), in which a court found insufficient an EA that used "cookie-cutter and boilerplate" analysis of the emissions impacts of a logging project of 3,902 acres, including logging in old growth stands and clearcutting of 1,783 acres.  *Id*. at 1075.  In finding the analysis inadequate, the court relied on binding Ninth Circuit precedent under which "the USFS is required to determine 'the extent to which this particular project's [carbon emissions] will add to the severe impacts of climate change.'" *Id*. (quoting *350 Montana v. Haaland*, 50 F.4th 1254, 1266 (9th Cir. 2022)).[97]

Here, the projects will involve logging on around 3,000 acres across *both* projects, with even-age treatment (clear-cutting and patch-cutting) on about 325 acres total.[98]  This case involves about 900 fewer acres of treatment than the project discussed in *Ctr. for Biological Diversity*, no logging in old-growth habitat, and less than a quarter of the amount of clear-cutting (about 325 acres versus 1,783 acres).  Peabody and Tarleton together involve almost twice the overall land area as the project analyzed in *Swomley*,

---

[97] Standing Trees also relies on oil and gas drilling lease cases, one of which involved releasing methane. In those cases, the fact that the projects would lead to significant GHG emissions was uncontroversial and the need for further study more evident.
[98] AR4881; AR11976.

**Add. 37**

but they do not clearly result in such increased greenhouse gas emissions as to require detailed quantitative assessments. 40 C.F.R. § 1502.2(b) ("Environmental impact statements shall discuss effects in proportion to their significance…there should be only enough discussion to show why more study is not warranted."). Although the studies are qualitative rather than quantitative and do not discuss every possible impact of harvesting wood, the analyses fall within the bounds set by 40 C.F.R. § 1502.2(b).

Finally, though the Forest Service did not expressly analyze all of the literature Standing Trees presented, "an agency need not respond to every single scientific study or comment." *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1021 (9th Cir. 2012). And even if a plaintiff disagrees with the agency's responses, "that disagreement does not render the Forest Service's review and comment process improper." *Id.*

c. **Consistency with Forest Plan**

Apart from its NEPA challenges, Standing Trees brings several complaints under the NFMA, alleging that the projects violate the NFMA because they do not comply with the WMNF Forest Plan.[99] The plaintiff alleges that Peabody violates Forest Plan standards for scenery and eligible Wild and Scenic Rivers, and that neither Project contributes to the conservation and recovery of the northern long-eared bat. The court disagrees. The Forest Service's EAs and supporting documentation show that its interpretation and application of Forest Plan standards is not arbitrary and capricious.[100]

Although the First Circuit Court of Appeals has not expressly specified the

---

[99] Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1), at 29-32.
[100] *See, e.g.*, AR4906, AR11993 (FONSIs documenting compliance with Forest Plan).

**Add. 38**

standards applicable to Forest Plan-based challenges, other circuit courts give the Forest Service ample latitude in ensuring the consistency of its actions with Forest Plans: "We will conclude that the Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan." *Oregon Nat. Desert Ass'n*, 957 F.3d at 1035 (quoting *The Lands Council*, 537 F.3d at 994). "[T]he Forest Service's interpretation and implementation of its own Forest Plan is entitled to substantial deference." *Id.* (quoting *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012)); *see also Utah Envtl. Cong.*, 483 F.3d at 1134 (quoting *Bar MK Ranches,* 994 F.2d at 738) ("[W]e give great deference to the Forest Service's interpretation of its own regulations, and we will only reject those interpretations when they are 'unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning.'"); *Cherokee Forest Voices v. U.S. Forest Serv.*, 182 Fed.Appx. 488, 494 (6th Cir. 2006) ("Substantial deference is due to the Forest Service's interpretation of a Forest Plan.").

In reviewing the Forest Service's project authorizations, courts in the Ninth Circuit use a "clear error of judgment" standard. *Forest Guardians*, 329 F.3d at 1098 (quoting *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 573 (9th Cir. 1998)).

***Scenic standards***.  Standing Trees alleges that the Peabody project violates Forest Plan "scenic standards" because some of the visible openings from proposed clear- and

**Add. 39**

patch-cuts exceed the acreage allowed by the Forest Plan.[101]  This contention is inaccurate.  Peabody is located entirely within MA 2.1 (General Forest Management) lands, for which for which the Forest Plan has scenery management "guidelines," but not "standards."[102]  This distinction matters, because in a Forest Plan, a "standard" must be followed while a "guideline" "permits operational flexibility to respond to variations in conditions."[103]  If a guideline is not followed, "the rationale for doing so must be documented in a project-level analysis and signed decision."[104]

Relevant here is Guideline 3, which limits visible openings to 4-5 acres in "high" scenic integrity areas in MA 2.1 land.[105]  The Forest Service acknowledged that three of the treatment units have relatively large treatments and would exceed the guideline in size (26 acres in Unit 19, nine acres in Unit 20, and 19 acres in the wildlife opening),[106] but also argued that, because the project area conditions did not meet Forest Plan standards for age class composition objectives, "it is not possible for the project area to be consistent with both MA 2.1 habitat management direction and MA 2.1 scenery management direction."[107]  Consistent with Forest Plan requirements, the Forest Service explained the rationale for modifying MA 2.1 Guideline 3 for these three units and documented the modification in the signed Peabody Decision Notice.[108]  Under the

---

[101] Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1), at 30.
[102] AR3477-79.
[103] AR3438; *see also* *Oregon Nat. Desert Ass'n v. United States Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020) ("forest plan[] 'standards,' [] are considered binding limitations").
[104] *Id.*
[105] AR3477.
[106] AR4898.
[107] AR6113.
[108] AR4867.

**Add. 40**

APA's deferential standard of review, the court defers to the Forest Service's established procedure to modify Forest Plan guidelines. *Or. Nat. Desert Ass'n*, 957 F.3d at 1035 (in reviewing a NFMA challenge, courts "give the Forest Service ample latitude in ensuring the consistency of its actions with Forest Plans.")

*Wild and Scenic Rivers*. Standing Trees also alleges that the Peabody project does not comply with Forest Plan standards for the Peabody River and the West Branch of the Peabody River, which are eligible for designation as Wild and Scenic Rivers.[109] The Forest Plan requires the Service to "[m]anage eligible rivers to maintain their classification and eligibility until Congress designates the segments or decides not to designate them[.]"[110] As Standing Trees notes, the Forest Plan also includes a guideline directing the Forest Service to include a 575 foot (slightly over 0.1 mile) "Riparian Management Zone" along fourth order and larger streams.[111] The guideline directs that in these riparian management zones, "uneven-aged silvicultural practices should be used."[112]

The Forest Plan does not specify whether the Forest Plan's requirements mean that eligible rivers must be managed to maintain eligibility *at all times* up to the point at which Congress decides on the segments' designation, or whether the Forest Service may undertake forest management practices that could affect, for a period, a river's potential eligibility. Here, the Forest Service analyzed impacts to the two eligible rivers and

---

[109] Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1), at 30-31.
[110] AR3467.
[111] AR3460.
[112] AR3459.

**Add. 41**

determined that, "[g]iven the scope and location of proposed project activities, the proposed action would have limited, short-term effects on potential outstandingly remarkable values but would not result in an irreversible or irretrievable change in the condition of the river corridor or its potential for designation in the future."[113]  The project follows the Forest Plan guideline to include Riparian Management Zones near the rivers in that the 14 acres of even-aged treatments proposed near the rivers are more than 0.1 miles away from the rivers.

The Forest Service's interpretation and implementation of the Forest Plan, which calls for management of the WMNF subject to multiple uses, is entitled to substantial deference.  *See Or. Nat. Desert Ass'n*, 957 F.3d at 1035; *Cherokee Forest Voices*, 182 Fed. Appx. at 494.  The Forest Service interpreted the Forest Plan to allow for forest management that would not have a lasting impact on the rivers' eligibility for Wild and Scenic designation in the future.  This interpretation is reasonable, especially in light of the design measures the Forest Service plans to use to mitigate some impact on the rivers, in line with Forest Plan guidelines,[114] and the fact that the project area will immediately begin to revert to pre-project conditions.

*Northern long-eared bat*.  Separate from its complaints brought under NEPA, Standing Trees alleges that the Forest Service violated the WMNF Forest Plan[115] by failing to "inventory the occurrence of northern long-eared bats in the project area."[116]

---

[113] AR4902-03 and AR4903 (Table 7).
[114] AR4890, AR4902.
[115] AR 3448.
[116] Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1) at 32.

**Add. 42**

Standing Trees claims that the Forest Service is required to conduct surveys for all new ground-disturbing projects unless biologists determine that threatened, endangered, or sensitive species occurrence is unlikely (because, for example, no habitat exists).[117]

The Forest Service correctly points out that the Forest Plan requires surveys only for threatened, endangered, or sensitive *plant* species, and that for endangered animal species, the Service is only required to "investigate" the project sites.[118]  As discussed above, the Forest Service complied with the Forest Plan because it investigated the effects of both projects on the bat, through project-specific biological evaluations and through consultation with the U.S. Fish and Wildlife Service.  *See supra*, Section IV.b.  The biological evaluations noted that 2019 surveys had identified only two bats in the project areas, and found that while the projects may affect bats' roosting habitat, new clearings could improve bats' foraging habitat.  *Id.*  The Forest Service's interpretation of Forest Plan standards for investigating the northern long-eared bat was reasonable.  *Utah Envtl. Cong.*, 483 F.3d at 1134 ("[W]e give great deference to the Forest Service's interpretation of its own regulations, and we will only reject those interpretations when they are 'unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning.'").

V.   **Conclusion**

"[T]he central principle of judicial review in NEPA cases is deference…The ultimate question is not whether an [environmental assessment] in and of itself is

---

[117] *Id.* at 31.
[118] Defs.' Mem. Mot. Summ. J. (doc. no. 16-1) at 34 (citing AR3448).

**Add. 43**

inadequate, but whether the agency's final decision was reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal.*, 145 S. Ct. at 1511-14.  In light of the size and likely impacts of the projects, the Forest Service here has met its obligations to address alternatives, take a hard look at impacts, and explain its reasoning under NEPA, and to comply with the WMNF Forest Plan under the NFMA and the APA.  The court grants summary judgment in favor of the defendants.

        SO ORDERED.

                                                Joseph N. Laplante
                                                United States District Judge

Dated: August 20, 2025

cc: Counsel of Record

**Add. 44**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Standing Trees, Inc.

    v.                                     Case No. 24-cv-138-JL-TSM

US Forest Service, et al.


JUDGMENT


In accordance with the Memorandum Order by Judge Joseph N. Laplante dated August 20, 2025, judgment is hereby entered.

The prevailing party may recover costs consistent with Fed. R. Civ. P. 54(d) and 28 U.S.C. § 1920.


By the Court:

_____
Tracy A. Uhrin
Clerk of Court


Date: September 23, 2025

cc: Counsel of Record


**Add. 45**

action, the Chief Counsel is authorized to present his or her views with respect to compliance with this chapter, the adequacy of the rulemaking record with respect to small entities and the effect of the rule on small entities.

(c) A court of the United States shall grant the application of the Chief Counsel for Advocacy of the Small Business Administration to appear in any such action for the purposes described in subsection (b).

(Added Pub. L. 96–354, § 3(a), Sept. 19, 1980, 94 Stat. 1170; amended Pub. L. 104–121, title II, § 243(b), Mar. 29, 1996, 110 Stat. 866.)

AMENDMENTS

1996—Subsec. (a). Pub. L. 104–121, § 243(b)(1), which directed substitution of "the Committees on the Judiciary and Small Business of the Senate and House of Representatives" for "the committees on the Judiciary of the Senate and the House of Representatives, the Select Committee on Small Business of the Senate, and the Committee on Small Business of the House of Representatives", was executed by making the substitution for "the Committees on the Judiciary of the Senate and House of Representatives, the Select Committee on Small Business of the Senate, and the Committee on Small Business of the House of Representatives" to reflect the probable intent of Congress.

Subsec. (b). Pub. L. 104–121, § 243(b)(2), substituted "his or her views with respect to compliance with this chapter, the adequacy of the rulemaking record with respect to small entities and the" for "his views with respect to the".

CHANGE OF NAME

Committee on Small Business of Senate changed to Committee on Small Business and Entrepreneurship of Senate. See Senate Resolution No. 123, One Hundred Seventh Congress, June 29, 2001.

EFFECTIVE DATE OF 1996 AMENDMENT

Amendment by Pub. L. 104–121 effective on expiration of 90 days after Mar. 29, 1996, but inapplicable to interpretative rules for which a notice of proposed rulemaking was published prior to Mar. 29, 1996, see section 245 of Pub. L. 104–121, set out as a note under section 601 of this title.

EFFECTIVE DATE

Section effective Jan. 1, 1981, see section 4 of Pub. L. 96–354, set out as a note under section 601 of this title.

TERMINATION OF REPORTING REQUIREMENTS

For termination, effective May 15, 2000, of reporting provisions in subsec. (a) of this section, see section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance, and page 191 of House Document No. 103–7.

## CHAPTER 7—JUDICIAL REVIEW

Sec.
701. Application; definitions.
702. Right of review.
703. Form and venue of proceeding.
704. Actions reviewable.
705. Relief pending review.
706. Scope of review.

SHORT TITLE

The provisions of sections 551 to 559 of this title and this chapter were originally enacted by act June 11, 1946, ch. 423, 60 Stat. 237, popularly known as the "Administrative Procedure Act". That Act was repealed as part of the general revision of this title by Pub. L. 89–554 and its provisions incorporated into sections 551 to 559 of this title and this chapter.

## § 701. Application; definitions

(a) This chapter applies, according to the provisions thereof, except to the extent that—

(1) statutes preclude judicial review; or

(2) agency action is committed to agency discretion by law.

(b) For the purpose of this chapter—

(1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

(A) the Congress;

(B) the courts of the United States;

(C) the governments of the territories or possessions of the United States;

(D) the government of the District of Columbia;

(E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

(F) courts martial and military commissions;

(G) military authority exercised in the field in time of war or in occupied territory; or

(H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891–1902, and former section 1641(b)(2), of title 50, appendix;[1] and

(2) "person", "rule", "order", "license", "sanction", "relief", and "agency action" have the meanings given them by section 551 of this title.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 103–272, § 5(a), July 5, 1994, 108 Stat. 1373; Pub. L. 111–350, § 5(a)(3), Jan. 4, 2011, 124 Stat. 3841.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| (a) ........... | 5 U.S.C. 1009 (Introductory clause). | June 11, 1946, ch. 324, § 10 (introductory clause), 60 Stat. 243. |

In subsection (a), the words "This chapter applies, according to the provisions thereof," are added to avoid the necessity of repeating the introductory clause of former section 1009 in sections 702–706.

Subsection (b) is added on authority of section 2 of the Act of June 11, 1946, ch. 324, 60 Stat. 237, as amended, which is carried into section 551 of this title.

In subsection (b)(1)(G), the words "or naval" are omitted as included in "military".

In subsection (b)(1)(H), the words "functions which by law expire on the termination of present hostilities, within any fixed period thereafter, or before July 1, 1947" are omitted as executed. Reference to the "Selective Training and Service Act of 1940" is omitted as that Act expired on Mar. 31, 1947. Reference to the "Sugar Control Extension Act of 1947" is omitted as that Act expired on Mar. 31, 1948. References to the "Housing and Rent Act of 1947, as amended" and the "Veterans' Emergency Housing Act of 1946" have been consolidated as they are related. The reference to former section 1641(b)(2) of title 50, appendix, is retained notwithstanding its repeal by § 111(a)(1) of the Act of Sept. 21, 1961, Pub. L. 87–256, 75 Stat. 538, since § 111(c) of the Act provides that a reference in other Acts to a provision of law repealed by

---

[1] See References in Text note below.

§ 111(a) shall be considered to be a reference to the appropriate provisions of Pub. L. 87–256.

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

REFERENCES IN TEXT

Sections 1884 and 1891–1902 of title 50, appendix, referred to in subsec. (b)(1)(H), were a part of the various Housing and Rent Acts which were classified to section 1881 et seq. of the former Appendix to Title 50, War and National Defense, and had been repealed or omitted from the Code as executed prior to the elimination of the Appendix to Title 50. See Elimination of Title 50, Appendix note preceding section 1 of Title 50. Section 1641 of title 50, appendix, referred to in subsec. (b)(1)(H), was repealed by Pub. L. 87–256, § 111(a)(1), Sept. 21, 1961, 75 Stat. 538.

AMENDMENTS

2011—Subsec. (b)(1)(H). Pub. L. 111–350 struck out "chapter 2 of title 41;" after "title 12;".

1994—Subsec. (b)(1)(H). Pub. L. 103–272 substituted "subchapter II of chapter 471 of title 49; or sections" for "or sections 1622,".

## § 702. Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, § 1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .............. | 5 U.S.C. 1009(a). | June 11, 1946, ch. 324, § 10(a), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 removed the defense of sovereign immunity as a bar to judicial review of Federal administrative action otherwise subject to judicial review.

## § 703. Form and venue of proceeding

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by stat-

ute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, § 1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .............. | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, § 10(b), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

## § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .............. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, § 10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the

Add. 47

effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............... | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, § 10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............... | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, § 10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.    Congressional review.

Sec.
802.    Congressional disapproval procedure.
803.    Special rule on statutory, regulatory, and judicial deadlines.
804.    Definitions.
805.    Judicial review.
806.    Applicability; severability.
807.    Exemption for monetary policy.
808.    Effective date of certain rules.

## § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of jurisdiction in each House of the Congress by the end of 15 calendar days after the submission or publication date as provided in section 802(b)(2). The report of the Comptroller General shall include an assessment of the agency's compliance with procedural steps required by paragraph (1)(B).

(B) Federal agencies shall cooperate with the Comptroller General by providing information relevant to the Comptroller General's report under subparagraph (A).

(3) A major rule relating to a report submitted under paragraph (1) shall take effect on the latest of—

(A) the later of the date occurring 60 days after the date on which—

(i) the Congress receives the report submitted under paragraph (1); or

(ii) the rule is published in the Federal Register, if so published;

(B) if the Congress passes a joint resolution of disapproval described in section 802 relating to the rule, and the President signs a veto of such resolution, the earlier date—

(i) on which either House of Congress votes and fails to override the veto of the President; or

(3) an appropriate official of government with a background in science or natural resources management, including any official of State or local government, designated by the Secretary;

(4) 1 member appointed by the Secretary from nominations submitted by water trail user organizations; and

(5) 1 member appointed by the Secretary from nominations submitted by hunting and fishing enthusiast organizations.

**(c) Chairman**

The Chair of the advisory committee shall be the government official referenced in subsection (b)(3), who shall serve as a non-voting member.

**(d) Support for committee action**

Any action, recommendation, or policy of the advisory committee must be supported by at least five of the members appointed under subsection (b)(1).

**(e) Terms**

Members of the advisory committee appointed by the Secretary shall be appointed for terms of three years, except that the members filling five of the eleven positions shall be initially appointed for terms of two years, with subsequent appointments to those positions extending for terms of three years.

**(f) Duties**

The advisory committee shall meet at least twice annually to—

(1) review utilization of allocated moneys by States;

(2) establish and review criteria for trail-side and trail-head facilities that qualify for funding under this chapter; and

(3) make recommendations to the Secretary for changes in Federal policy to advance the purposes of this chapter.

**(g) Annual report**

The advisory committee shall present to the Secretary an annual report on its activities.

**(h) Reimbursement for expenses**

Nongovernmental members of the advisory committee shall serve without pay, but, to the extent funds are available pursuant to section 1261(d)(1)(B) [1] of this title, shall be entitled to reimbursement for travel, subsistence, and other necessary expenses incurred in the performance of their duties.

**(i) Report to Congress**

Not later than 4 years after December 18, 1991, the Secretary shall prepare and submit to the Committee on Environment and Public Works of the Senate, and the Committee on Transportation and Infrastructure of the House of Representatives, a study which summarizes the annual reports of the National Recreational Trails Advisory Committee, describes the allocation and utilization of moneys under this chapter, and contains recommendations for changes in Federal policy to advance the purposes of this chapter.

**(j) Termination**

The advisory committee established by this section shall terminate on September 30, 2000.

---

[1] See References in Text note below.

(Pub. L. 102–240, title I, § 1303, Dec. 18, 1991, 105 Stat. 2068; Pub. L. 104–59, title III, §§ 325(h), 337(e), Nov. 28, 1995, 109 Stat. 592, 603; Pub. L. 105–178, title I, § 1112(d), June 9, 1998, 112 Stat. 151.)

**Editorial Notes**

REFERENCES IN TEXT

Section 1261 of this title, referred to in subsec. (h), was repealed by Pub. L. 105–178, title I, § 1112(c), June 9, 1998, 112 Stat. 151.

AMENDMENTS

1998—Subsec. (j). Pub. L. 105–178 added subsec. (j).
1995—Subsec. (b). Pub. L. 104–59, § 337(e)(1)(A), substituted ''12'' for ''11'' in introductory provisions.
Subsec. (b)(2) to (5). Pub. L. 104–59, § 337(e)(1)(B), (C), added par. (2) and redesignated former pars. (2) to (4) as (3) to (5), respectively.
Subsec. (c). Pub. L. 104–59, § 337(e)(2), substituted ''(b)(3)'' for ''(b)(2)''.
Subsec. (i). Pub. L. 104–59, § 325(h), substituted ''Transportation and Infrastructure'' for ''Public Works and Transportation''.

## CHAPTER 28—WILD AND SCENIC RIVERS

Sec.
1271. Congressional declaration of policy.
1272. Congressional declaration of purpose.
1273. National wild and scenic rivers system.
1274. Component rivers and adjacent lands.
1275. Additions to national wild and scenic rivers system.
1276. Rivers constituting potential additions to national wild and scenic rivers system.
1277. Land acquisition.
1278. Restrictions on water resources projects.
1279. Withdrawal of public lands from entry, sale, or other disposition under public land laws.
1280. Federal mining and mineral leasing laws.
1281. Administration.
1282. Assistance to State and local projects.
1283. Management policies.
1284. Existing State jurisdiction and responsibilities.
1285. Claim and allowance of charitable deduction for contribution or gift of easement.
1285a. Lease of Federal lands.
1285b. Establishment of boundaries for certain component rivers in Alaska; withdrawal of minerals.
1286. Definitions.
1287. Authorization of appropriations.

## § 1271. Congressional declaration of policy

It is hereby declared to be the policy of the United States that certain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values, shall be preserved in free-flowing condition, and that they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations. The Congress declares that the established national policy of dam and other construction at appropriate sections of the rivers of the United States needs to be complemented by a policy that would preserve other selected rivers or sections thereof in their free-flowing condition to protect the water quality of such rivers and to fulfill other vital national conservation purposes.

(Pub. L. 90–542, § 1(b), Oct. 2, 1968, 82 Stat. 906.)

## Editorial Notes

### CODIFICATION

Section consists of subsec. (b) of section 1 of Pub. L. 90–542. Subsecs. (a) and (c) of section 1 are classified to section 1272 of this title and as a note under this section, respectively.

## Statutory Notes and Related Subsidiaries

### SHORT TITLE OF 2018 AMENDMENT

Pub. L. 115–229, § 1, Aug. 2, 2018, 132 Stat. 1629, provided that: ''This Act [amending section 1274 of this title and enacting provisions classified as a note under section 1274 of this title] may be cited as the 'East Rosebud Wild and Scenic Rivers Act'.''

### SHORT TITLE OF 2014 AMENDMENT

Pub. L. 113–244, § 1, Dec. 18, 2014, 128 Stat. 2864, provided that: ''This Act [amending section 1274 of this title and section 615i of Title 43, Public Lands, and enacting provisions classified as a note under section 1274 of this title] may be cited as the 'Crooked River Collaborative Water Security and Jobs Act of 2014'.''

### SHORT TITLE OF 2009 AMENDMENT

Pub. L. 111–11, title V, § 5002(a), Mar. 30, 2009, 123 Stat. 1147, provided that: ''This section [amending section 1274 of this title and enacting provisions classified as a note under section 1274 of this title] may be cited as the 'Craig Thomas Snake Headwaters Legacy Act of 2008'.''

### SHORT TITLE OF 2006 AMENDMENT

Pub. L. 109–452, § 1, Dec. 22, 2006, 120 Stat. 3363, provided that: ''This Act [amending section 1274 of this title and enacting provisions classified as a note under section 1274 of this title] may be cited as the 'Musconetcong Wild and Scenic Rivers Act'.''

Pub. L. 109–370, § 1, Nov. 27, 2006, 120 Stat. 2643, provided that: ''This Act [amending section 1276 of this title] may be cited as the 'Lower Farmington River and Salmon Brook Wild and Scenic River Study Act of 2005'.''

### SHORT TITLE OF 2005 AMENDMENT

Pub. L. 109–44, § 1, Aug. 2, 2005, 119 Stat. 443, provided that: ''This Act [amending section 1274 of this title] may be cited as the 'Upper White Salmon Wild and Scenic Rivers Act'.''

### SHORT TITLE OF 2002 AMENDMENT

Pub. L. 107–365, § 1, Dec. 19, 2002, 116 Stat. 3027, provided that: ''This Act [amending section 1274 of this title and enacting provisions classified as a note under section 1274 of this title] may be cited as the 'Caribbean National Forest Wild and Scenic Rivers Act of 2002'.''

### SHORT TITLE OF 2001 AMENDMENT

Pub. L. 107–65, § 1, Nov. 6, 2001, 115 Stat. 484, provided that: ''This Act [amending section 1276 of this title] may be cited as the 'Eightmile River Wild and Scenic River Study Act of 2001'.''

### SHORT TITLE OF 2000 AMENDMENTS

Pub. L. 106–418, § 1, Nov. 1, 2000, 114 Stat. 1817, provided that: ''This Act [amending section 1274 of this title and enacting provisions classified as a note under section 1274 of this title] may be cited as the 'Lower Delaware Wild and Scenic Rivers Act'.''

Pub. L. 106–357, § 1, Oct. 24, 2000, 114 Stat. 1393, provided that: ''This Act [amending section 1274 of this title and enacting provisions classified as a note under section 1274 of this title] may be cited as the 'White Clay Creek Wild and Scenic Rivers System Act'.''

Pub. L. 106–318, § 1, Oct. 19, 2000, 114 Stat. 1278, provided that: ''This Act [amending section 1276 of this title] may be cited as the 'Taunton River Wild and Scenic River Study Act of 2000'.''

Pub. L. 106–299, § 1, Oct. 13, 2000, 114 Stat. 1050, provided that: ''This Act [amending section 1274 of this title and enacting provisions classified as a note under section 1274 of this title] may be cited as the 'Wekiva Wild and Scenic River Act of 2000'.''

Pub. L. 106–192, § 1, May 2, 2000, 114 Stat. 233, provided that: ''This Act [amending section 1274 of this title and provisions classified as a note under section 1274 of this title] may be cited as the 'Lamprey Wild and Scenic River Extension Act'.''

### SHORT TITLE OF 1999 AMENDMENT

Pub. L. 106–20, § 1, Apr. 9, 1999, 113 Stat. 30, provided that: ''This Act [amending section 1274 of this title and enacting provisions classified as a note under section 1274 of this title] may be cited as the 'Sudbury, Assabet, and Concord Wild and Scenic River Act'.''

### SHORT TITLE OF 1994 AMENDMENTS

Pub. L. 103–313, § 1, Aug. 26, 1994, 108 Stat. 1699, provided that: ''This Act [amending section 1274 of this title and enacting provisions classified as a note under section 1274 of this title] may be cited as the 'Farmington Wild and Scenic River Act'.''

Pub. L. 103–242, § 1, May 4, 1994, 108 Stat. 611, provided that: ''This Act [amending sections 1274 and 1276 of this title and enacting provisions classified as a note under section 1274 of this title] may be cited as the 'Rio Grande Designation Act of 1994'.''

### SHORT TITLE OF 1993 AMENDMENT

Pub. L. 103–170, § 1, Dec. 2, 1993, 107 Stat. 1986, provided that: ''This Act [amending section 1274 of this title] may be cited as the 'Red River Designation Act of 1993'.''

### SHORT TITLE OF 1992 AMENDMENTS

Pub. L. 102–275, § 1, Apr. 22, 1992, 106 Stat. 123, provided that: ''This Act [amending section 1274 of this title and enacting provisions classified as a note under section 1274 of this title] may be cited as the 'Arkansas Wild and Scenic Rivers Act of 1992'.''

Pub. L. 102–249, § 1, Mar. 3, 1992, 106 Stat. 45, provided that: ''This Act [amending sections 1274 and 1276 of this title and enacting provisions classified as a note under section 1274 of this title] may be cited as the 'Michigan Scenic Rivers Act of 1991'.''

### SHORT TITLE OF 1991 AMENDMENTS

Pub. L. 102–215, § 1, Dec. 11, 1991, 105 Stat. 1664, provided that: ''This Act [amending section 1276 of this title] may be cited as the 'White Clay Creek Study Act'.''

Pub. L. 102–214, § 1, Dec. 11, 1991, 105 Stat. 1663, provided that: ''This Act [amending section 1276 of this title] may be cited as the 'Lamprey River Study Act of 1991'.''

Pub. L. 102–50, § 1, May 24, 1991, 105 Stat. 254, provided that: ''This Act [amending sections 1274 and 1276 of this title and enacting provisions classified as notes under sections 1a–5 and 1274 of this title] may be cited as the 'Niobrara Scenic River Designation Act of 1991'.''

### SHORT TITLE OF 1990 AMENDMENTS

Pub. L. 101–628, title VII, § 701, Nov. 28, 1990, 104 Stat. 4497, provided that: ''This title [amending section 1276 of this title] may be cited as the 'Sudbury, Assabet, and Concord Wild and Scenic River Study Act'.''

Pub. L. 101–628, title XIII, § 1301, Nov. 28, 1990, 104 Stat. 4509, provided that: ''This Act [probably should be ''this title'', amending section 1274 of this title] may be cited as the 'Clarks Fork Wild and Scenic River Designation Act of 1990'.''

Pub. L. 101–357, § 1, Aug. 10, 1990, 104 Stat. 418, provided that: ''This Act [amending section 1276 of this title] may be cited as the 'Pemigewasset River Study Act of 1989'.''

Pub. L. 101–356, § 1, Aug. 10, 1990, 104 Stat. 417, provided that: ''This Act [amending section 1276 of this

title] may be cited as the 'Merrimack River Study Act of 1990'.''

Pub. L. 101–306, § 1, June 6, 1990, 104 Stat. 260, provided that: ''This Act [amending section 1274 of this title] may be cited as the 'East Fork of the Jemez River and the Pecos River Wild and Scenic Rivers Addition Act of 1989'.''

### SHORT TITLE OF 1988 AMENDMENTS

Pub. L. 100–557, title I, § 101, Oct. 28, 1988, 102 Stat. 2782, provided that: ''This Act [amending sections 1274 and 1276 of this title and enacting provisions classified as notes under section 1274 of this title] may be referred to as the 'Omnibus Oregon Wild and Scenic Rivers Act of 1988'.''

Pub. L. 100–547, § 1, Oct. 28, 1988, 102 Stat. 2736, provided: ''That this Act [amending section 1274 of this title and enacting provisions listed in a table of Wilderness Areas set out under section 1132 of this title] may be cited as the 'Sipsey Wild and Scenic River and Alabama Addition Act of 1988'.''

### SHORT TITLE OF 1986 AMENDMENT

Pub. L. 99–590, title II, § 201, Oct. 30, 1986, 100 Stat. 3332, provided that: ''This title [amending section 1276 of this title] may be cited as the 'Farmington Wild and Scenic River Study Act'.''

### SHORT TITLE OF 1972 AMENDMENT

Pub. L. 92–560, § 1, Oct. 25, 1972, 86 Stat. 1174, provided: ''That this Act [amending section 1274 of this title and enacting provisions classified as a note under section 1274 of this title] may be cited as the 'Lower Saint Croix River Act of 1972'.''

### SHORT TITLE

Pub. L. 90–542, § 1(a), Oct. 2, 1968, 82 Stat. 906, provided that: ''This Act [enacting this chapter] may be cited as the 'Wild and Scenic Rivers Act'.''

## § 1272. Congressional declaration of purpose

The purpose of this chapter is to implement the policy set out in section 1271 of this title by instituting a national wild and scenic rivers system, by designating the initial components of that system, and by prescribing the methods by which and standards according to which additional components may be added to the system from time to time.

(Pub. L. 90–542, § 1(c), Oct. 2, 1968, 82 Stat. 906.)

### Editorial Notes

#### CODIFICATION

Section consists of subsec. (c) of section 1 of Pub. L. 90–542. Subsecs. (a) and (b) of section 1 are classified to section 1271 and section 1271 note, respectively.

## § 1273. National wild and scenic rivers system

### (a) Composition; application; publication in Federal Register; expense; administration of federally owned lands

The national wild and scenic rivers system shall comprise rivers (i) that are authorized for inclusion therein by Act of Congress, or (ii) that are designated as wild, scenic or recreational rivers by or pursuant to an act of the legislature of the State or States through which they flow, that are to be permanently administered as wild, scenic or recreational rivers by an agency or political subdivision of the State or States concerned that are found by the Secretary of the Interior, upon application of the Governor of the State or the Governors of the States concerned, or a person or persons thereunto duly appointed by him or them, to meet the criteria established in this chapter and such criteria supplementary thereto as he may prescribe, and that are approved by him for inclusion in the system, including, upon application of the Governor of the State concerned, the Allagash Wilderness Waterway, Maine; that segment of the Wolf River, Wisconsin, which flows through Langlade County; and that segment of the New River in North Carolina extending from its confluence with Dog Creek downstream approximately 26.5 miles to the Virginia State line. Upon receipt of an application under clause (ii) of this subsection, the Secretary shall notify the Federal Energy Regulatory Commission and publish such application in the Federal Register. Each river designated under clause (ii) shall be administered by the State or political subdivision thereof without expense to the United States other than for administration and management of federally owned lands. For purposes of the preceding sentence, amounts made available to any State or political subdivision under chapter 2003 of title 54 or any other provision of law shall not be treated as an expense to the United States. Nothing in this subsection shall be construed to provide for the transfer to, or administration by, a State or local authority of any federally owned lands which are within the boundaries of any river included within the system under clause (ii).

### (b) Classification, designation, and administration of rivers

A wild, scenic or recreational river area eligible to be included in the system is a free-flowing stream and the related adjacent land area that possesses one or more of the values referred to in section 1271 of this title. Every wild, scenic or recreational river in its free-flowing condition, or upon restoration to this condition, shall be considered eligible for inclusion in the national wild and scenic rivers system and, if included, shall be classified, designated, and administered as one of the following:

(1) Wild river areas—Those rivers or sections of rivers that are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted. These represent vestiges of primitive America.

(2) Scenic river areas—Those rivers or sections of rivers that are free of impoundments, with shorelines or watersheds still largely primitive and shorelines largely undeveloped, but accessible in places by roads.

(3) Recreational river areas—Those rivers or sections of rivers that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past.

(Pub. L. 90–542, § 2, Oct. 2, 1968, 82 Stat. 906; Pub. L. 94–407, § 1(1), Sept. 11, 1976, 90 Stat. 1238; Pub. L. 95–625, title VII, § 761, Nov. 10, 1978, 92 Stat. 3533; Pub. L. 113–287, § 5(d)(29), Dec. 19, 2014, 128 Stat. 3267.)

**Add. 51**



mit to the President a recommended Renewable Resource Program (hereinafter called the ''Program''). The Program transmitted to the President may include alternatives, and shall provide in appropriate detail for protection, management, and development of the National Forest System, including forest development roads and trails; for cooperative Forest Service programs; and for research. The Program shall be developed in accordance with principles set forth in the Multiple-Use Sustained-Yield Act of June 12, 1960 (74 Stat. 215; 16 U.S.C. 528–531), and the National Environmental Policy Act of 1969 (83 Stat. 852) [42 U.S.C. 4321 et seq.]. The Program shall be prepared not later than December 31, 1975, to cover the four-year period beginning October 1, 1976, and at least each of the four fiscal decades next following such period, and shall be updated no later than during the first half of the fiscal year ending September 30, 1980, and the first half of each fifth fiscal year thereafter to cover at least each of the four fiscal decades beginning next after such updating. The Program shall include, but not be limited to—

(1) an inventory of specific needs and opportunities for both public and private program investments. The inventory shall differentiate between activities which are of a capital nature and those which are of an operational nature;

(2) specific identification of Program outputs, results anticipated, and benefits associated with investments in such a manner that the anticipated costs can be directly compared with the total related benefits and direct and indirect returns to the Federal Government;

(3) a discussion of priorities for accomplishment of inventoried Program opportunities, with specified costs, outputs, results, and benefits;

(4) a detailed study of personnel requirements as needed to implement and monitor existing and ongoing programs; and

(5) Program recommendations which—

(A) evaluate objectives for the major Forest Service programs in order that multiple-use and sustained-yield relationships among and within the renewable resources can be determined;

(B) explain the opportunities for owners of forests and rangeland to participate in programs to improve and enhance the condition of the land and the renewable resource products therefrom;

(C) recognize the fundamental need to protect and, where appropriate, improve the quality of soil, water, and air resources;

(D) state national goals that recognize the interrelationships between and interdependence within the renewable resources;

(E) evaluate the impact of the export and import of raw logs upon domestic timber supplies and prices; and

(F) account for the effects of global climate change on forest and rangeland conditions, including potential effects on the geographic ranges of species, and on forest and rangeland products.

(Pub. L. 93–378, § 4, formerly § 3, Aug. 17, 1974, 88 Stat. 477, renumbered § 4 and amended Pub. L. 94–588, §§ 2, 5, Oct. 22, 1976, 90 Stat. 2949, 2951;

Pub. L. 101–624, title XXIV, § 2408(b), Nov. 28, 1990, 104 Stat. 4061.)

REFERENCES IN TEXT

The Multiple-Use Sustained-Yield Act of 1960, referred to in text, is Pub. L. 86–517, June 12, 1960, 74 Stat. 215, as amended, which is classified generally to sections 528 to 531 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 528 of this title and Tables.

The National Environmental Policy Act of 1969, referred to in text, is Pub. L. 91–190, Jan. 1, 1970, 83 Stat. 852, as amended, which is classified generally to chapter 55 (§ 4321 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 4321 of Title 42 and Tables.

AMENDMENTS

1990—Par. (5)(F). Pub. L. 101–624 added subpar. (F).
1976—Par. (4). Pub. L. 94–588 substituted ''implement and monitor'' for ''satisfy''.
Par. (5). Pub. L. 94–588 added par. (5).

TRANSFER OF FUNCTIONS

For transfer of certain enforcement functions of Secretary or other official in Department of Agriculture under this subchapter to Federal Inspector, Office of Federal Inspector for Alaska Natural Gas Transportation System, and subsequent transfer to Secretary of Energy, then to Federal Coordinator for Alaska Natural Gas Transportation Projects, see note set out under section 1601 of this title.

## § 1603. National Forest System resource inventories; development, maintenance, and updating by Secretary of Agriculture as part of Assessment

As a part of the Assessment, the Secretary of Agriculture shall develop and maintain on a continuing basis a comprehensive and appropriately detailed inventory of all National Forest System lands and renewable resources. This inventory shall be kept current so as to reflect changes in conditions and identify new and emerging resources and values.

(Pub. L. 93–378, § 5, formerly § 4, Aug. 17, 1974, 88 Stat. 477, renumbered § 5, Pub. L. 94–588, § 2, Oct. 22, 1976, 90 Stat. 2949.)

## § 1604. National Forest System land and resource management plans

### (a) Development, maintenance, and revision by Secretary of Agriculture as part of program; coordination

As a part of the Program provided for by section 1602 of this title, the Secretary of Agriculture shall develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System, coordinated with the land and resource management planning processes of State and local governments and other Federal agencies.

### (b) Criteria

In the development and maintenance of land management plans for use on units of the National Forest System, the Secretary shall use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences.

**(c) Incorporation of standards and guidelines by Secretary; time of completion; progress reports; existing management plans**

The Secretary shall begin to incorporate the standards and guidelines required by this section in plans for units of the National Forest System as soon as practicable after October 22, 1976, and shall attempt to complete such incorporation for all such units by no later than September 30, 1985. The Secretary shall report to the Congress on the progress of such incorporation in the annual report required by section 1606(c) of this title. Until such time as a unit of the National Forest System is managed under plans developed in accordance with this subchapter, the management of such unit may continue under existing land and resource management plans.

**(d) Public participation in management plans; availability of plans; public meetings**

The Secretary shall provide for public participation in the development, review, and revision of land management plans including, but not limited to, making the plans or revisions available to the public at convenient locations in the vicinity of the affected unit for a period of at least three months before final adoption, during which period the Secretary shall publicize and hold public meetings or comparable processes at locations that foster public participation in the review of such plans or revisions.

**(e) Required assurances**

In developing, maintaining, and revising plans for units of the National Forest System pursuant to this section, the Secretary shall assure that such plans—

(1) provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with the Multiple-Use Sustained-Yield Act of 1960 [16 U.S.C. 528–531], and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness; and

(2) determine forest management systems, harvesting levels, and procedures in the light of all of the uses set forth in subsection (c)(1) of this section, the definition of the terms ''multiple use'' and ''sustained yield'' as provided in the Multiple-Use Sustained-Yield Act of 1960, and the availability of lands and their suitability for resource management.

**(f) Required provisions**

Plans developed in accordance with this section shall—

(1) form one integrated plan for each unit of the National Forest System, incorporating in one document or one set of documents, available to the public at convenient locations, all of the features required by this section;

(2) be embodied in appropriate written material, including maps and other descriptive documents, reflecting proposed and possible actions, including the planned timber sale program and the proportion of probable methods of timber harvest within the unit necessary to fulfill the plan;

(3) be prepared by an interdisciplinary team. Each team shall prepare its plan based on inventories of the applicable resources of the forest;

(4) be amended in any manner whatsoever after final adoption after public notice, and, if such amendment would result in a significant change in such plan, in accordance with the provisions of subsections (e) and (f) of this section and public involvement comparable to that required by subsection (d) of this section; and

(5) be revised (A) from time to time when the Secretary finds conditions in a unit have significantly changed, but at least every fifteen years, and (B) in accordance with the provisions of subsections (e) and (f) of this section and public involvement comparable to that required by subsection (d) of this section.

**(g) Promulgation of regulations for development and revision of plans; environmental considerations; resource management guidelines; guidelines for land management plans**

As soon as practicable, but not later than two years after October 22, 1976, the Secretary shall in accordance with the procedures set forth in section 553 of title 5, promulgate regulations, under the principles of the Multiple-Use Sustained-Yield Act of 1960 [16 U.S.C. 528–531] that set out the process for the development and revision of the land management plans, and the guidelines and standards prescribed by this subsection. The regulations shall include, but not be limited to—

(1) specifying procedures to insure that land management plans are prepared in accordance with the National Environmental Policy Act of 1969 [42 U.S.C. 4321 et seq.], including, but not limited to, direction on when and for what plans an environmental impact statement required under section 102(2)(C) of that Act [42 U.S.C. 4332(2)(C)] shall be prepared;

(2) specifying guidelines which—

(A) require the identification of the suitability of lands for resource management;

(B) provide for obtaining inventory data on the various renewable resources, and soil and water, including pertinent maps, graphic material, and explanatory aids; and

(C) provide for methods to identify special conditions or situations involving hazards to the various resources and their relationship to alternative activities;

(3) specifying guidelines for land management plans developed to achieve the goals of the Program which—

(A) insure consideration of the economic and environmental aspects of various systems of renewable resource management, including the related systems of silviculture and protection of forest resources, to provide for outdoor recreation (including wilderness), range, timber, watershed, wildlife, and fish;

(B) provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives, and within the multiple-use objectives of a land management plan adopted pursuant to this section, provide, where appropriate, to the degree practicable, for steps to be taken to preserve the diversity of tree species similar to that existing in the region controlled by the plan;

Add. 53

(C) insure research on and (based on continuous monitoring and assessment in the field) evaluation of the effects of each management system to the end that it will not produce substantial and permanent impairment of the productivity of the land;

(D) permit increases in harvest levels based on intensified management practices, such as reforestation, thinning, and tree improvement if (i) such practices justify increasing the harvests in accordance with the Multiple-Use Sustained-Yield Act of 1960, and (ii) such harvest levels are decreased at the end of each planning period if such practices cannot be successfully implemented or funds are not received to permit such practices to continue substantially as planned;

(E) insure that timber will be harvested from National Forest System lands only where—

(i) soil, slope, or other watershed conditions will not be irreversibly damaged;

(ii) there is assurance that such lands can be adequately restocked within five years after harvest;

(iii) protection is provided for streams, streambanks, shorelines, lakes, wetlands, and other bodies of water from detrimental changes in water temperatures, blockages of water courses, and deposits of sediment, where harvests are likely to seriously and adversely affect water conditions or fish habitat; and

(iv) the harvesting system to be used is not selected primarily because it will give the greatest dollar return or the greatest unit output of timber; and

(F) insure that clearcutting, seed tree cutting, shelterwood cutting, and other cuts designed to regenerate an evenaged stand of timber will be used as a cutting method on National Forest System lands only where—

(i) for clearcutting, it is determined to be the optimum method, and for other such cuts it is determined to be appropriate, to meet the objectives and requirements of the relevant land management plan;

(ii) the interdisciplinary review as determined by the Secretary has been completed and the potential environmental, biological, esthetic, engineering, and economic impacts on each advertised sale area have been assessed, as well as the consistency of the sale with the multiple use of the general area;

(iii) cut blocks, patches, or strips are shaped and blended to the extent practicable with the natural terrain;

(iv) there are established according to geographic areas, forest types, or other suitable classifications the maximum size limits for areas to be cut in one harvest operation, including provision to exceed the established limits after appropriate public notice and review by the responsible Forest Service officer one level above the Forest Service officer who normally would approve the harvest proposal: *Provided*, That such limits shall not apply to the size of areas harvested as a result of natural catastrophic conditions such as fire, insect and disease attack, or windstorm; and

(v) such cuts are carried out in a manner consistent with the protection of soil, watershed, fish, wildlife, recreation, and esthetic resources, and the regeneration of the timber resource.

**(h) Scientific committee to aid in promulgation of regulations; termination; revision committees; clerical and technical assistance; compensation of committee members**

(1) In carrying out the purposes of subsection (g) of this section, the Secretary of Agriculture shall appoint a committee of scientists who are not officers or employees of the Forest Service. The committee shall provide scientific and technical advice and counsel on proposed guidelines and procedures to assure that an effective interdisciplinary approach is proposed and adopted. The committee shall terminate upon promulgation of the regulations, but the Secretary may, from time to time, appoint similar committees when considering revisions of the regulations. The views of the committees shall be included in the public information supplied when the regulations are proposed for adoption.

(2) Clerical and technical assistance, as may be necessary to discharge the duties of the committee, shall be provided from the personnel of the Department of Agriculture.

(3) While attending meetings of the committee, the members shall be entitled to receive compensation at a rate of $100 per diem, including traveltime, and while away from their homes or regular places of business they may be allowed travel expenses, including per diem in lieu of subsistence, as authorized by section 5703 of title 5, for persons in the Government service employed intermittently.

**(i) Consistency of resource plans, permits, contracts, and other instruments with land management plans; revision**

Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans. Those resource plans and permits, contracts, and other such instruments currently in existence shall be revised as soon as practicable to be made consistent with such plans. When land management plans are revised, resource plans and permits, contracts, and other instruments, when necessary, shall be revised as soon as practicable. Any revision in present or future permits, contracts, and other instruments made pursuant to this section shall be subject to valid existing rights.

**(j) Effective date of land management plans and revisions**

Land management plans and revisions shall become effective thirty days after completion of public participation and publication of notification by the Secretary as required under subsection (d) of this section.

**(k) Development of land management plans**

In developing land management plans pursuant to this subchapter, the Secretary shall identify lands within the management area which

**Add. 54**



(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

J.R. BIDEN, JR.

## SUBCHAPTER I—POLICIES AND GOALS

### § 4331. Congressional declaration of national environmental policy

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

(Pub. L. 91–190, title I, § 101, Jan. 1, 1970, 83 Stat. 852.)

#### Statutory Notes and Related Subsidiaries

##### COMMISSION ON POPULATION GROWTH AND THE AMERICAN FUTURE

Pub. L. 91–213, §§ 1–9, Mar. 16, 1970, 84 Stat. 67–69, established the Commission on Population Growth and the American Future to conduct and sponsor such studies and research and make such recommendations as might be necessary to provide information and education to all levels of government in the United States, and to our people regarding a broad range of problems associated with population growth and their implications for America's future; prescribed the composition of the Commission; provided for the appointment of its members, and the designation of a Chairman and Vice Chairman; required a majority of the members of the Commission to constitute a quorum, but allowed a lesser number to conduct hearings; prescribed the compensation of members of the Commission; required the Commission to conduct an inquiry into certain prescribed aspects of population growth in the United States and its foreseeable social consequences; provided for the appointment of an Executive Director and other personnel and prescribed their compensation; authorized the Commission to enter into contracts with public agencies, private firms, institutions, and individuals for the conduct of research and surveys, the preparation of reports, and other activities necessary to the discharge of its duties, and to request from any Federal department or agency any information and assistance it deems necessary to carry out its functions; required the General Services Administration to provide administrative services for the Commission on a reimbursable basis; required the Commission to submit an interim report to the President and the Congress one year after it was established and to submit its final report two years after Mar. 16, 1970; terminated the Commission sixty days after the date of the submission of its final report; and authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, such amounts as might be necessary to carry out the provisions of Pub. L. 91–213.

#### Executive Documents

##### EXECUTIVE ORDER NO. 11507

Ex. Ord. No. 11507, eff. Feb. 4, 1970, 35 F.R. 2573, which related to prevention, control, and abatement of air and water pollution at federal facilities was superseded by Ex. Ord. No. 11752, eff. Dec. 17, 1973, 38 F.R. 34793, formerly set out below.

##### EXECUTIVE ORDER NO. 11752

Ex. Ord. No. 11752, Dec. 17, 1973, 38 F.R. 34793, which related to the prevention, control, and abatement of environmental pollution at Federal facilities, was revoked by Ex. Ord. No. 12088, Oct. 13, 1978, 43 F.R. 47707, set out as a note under section 4321 of this title.

### § 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, and shall accompany the proposal through the existing agency review processes;

(D) Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

(i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

(ii) the responsible Federal official furnishes guidance and participates in such preparation,

(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

(iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.[1]

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(F) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(G) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(H) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(I) assist the Council on Environmental Quality established by subchapter II of this chapter.

(Pub. L. 91–190, title I, § 102, Jan. 1, 1970, 83 Stat. 853; Pub. L. 94–83, Aug. 9, 1975, 89 Stat. 424.)

### Editorial Notes

#### AMENDMENTS

1975—Par. (2)(D) to (I). Pub. L. 94–83 added subpar. (D) and redesignated former subpars. (D) to (H) as (E) to (I), respectively.

### Statutory Notes and Related Subsidiaries

#### CERTAIN COMMERCIAL SPACE LAUNCH ACTIVITIES

Pub. L. 104–88, title IV, § 401, Dec. 29, 1995, 109 Stat. 955, provided that: ''The licensing of a launch vehicle or launch site operator (including any amendment, extension, or renewal of the license) under [former] chapter 701 of title 49, United States Code [now chapter 509 (§ 50901 et seq.) of Title 51, National and Commercial Space Programs], shall not be considered a major Federal action for purposes of section 102(C) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(C)) if—

''(1) the Department of the Army has issued a permit for the activity; and

''(2) the Army Corps of Engineers has found that the activity has no significant impact.''

### Executive Documents

#### EX. ORD. NO. 13352. FACILITATION OF COOPERATIVE CONSERVATION

Ex. Ord. No. 13352, Aug. 26, 2004, 69 F.R. 52989, provided:

---

[1] So in original. The period probably should be a semicolon.

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

SECTION 1. *Purpose*. The purpose of this order is to ensure that the Departments of the Interior, Agriculture, Commerce, and Defense and the Environmental Protection Agency implement laws relating to the environment and natural resources in a manner that promotes cooperative conservation, with an emphasis on appropriate inclusion of local participation in Federal decisionmaking, in accordance with their respective agency missions, policies, and regulations.

SEC. 2. *Definition*. As used in this order, the term ''cooperative conservation'' means actions that relate to use, enhancement, and enjoyment of natural resources, protection of the environment, or both, and that involve collaborative activity among Federal, State, local, and tribal governments, private for-profit and nonprofit institutions, other nongovernmental entities and individuals.

SEC. 3. *Federal Activities*. To carry out the purpose of this order, the Secretaries of the Interior, Agriculture, Commerce, and Defense and the Administrator of the Environmental Protection Agency shall, to the extent permitted by law and subject to the availability of appropriations and in coordination with each other as appropriate:

(a) carry out the programs, projects, and activities of the agency that they respectively head that implement laws relating to the environment and natural resources in a manner that:

(i) facilitates cooperative conservation;

(ii) takes appropriate account of and respects the interests of persons with ownership or other legally recognized interests in land and other natural resources;

(iii) properly accommodates local participation in Federal decisionmaking; and

(iv) provides that the programs, projects, and activities are consistent with protecting public health and safety;

(b) report annually to the Chairman of the Council on Environmental Quality on actions taken to implement this order; and

(c) provide funding to the Office of Environmental Quality Management Fund (42 U.S.C. 4375) for the Conference for which section 4 of this order provides.

SEC. 4. *White House Conference on Cooperative Conservation*. The Chairman of the Council on Environmental Quality shall, to the extent permitted by law and subject to the availability of appropriations:

(a) convene not later than 1 year after the date of this order, and thereafter at such times as the Chairman deems appropriate, a White House Conference on Cooperative Conservation (Conference) to facilitate the exchange of information and advice relating to (i) cooperative conservation and (ii) means for achievement of the purpose of this order; and

(b) ensure that the Conference obtains information in a manner that seeks from Conference participants their individual advice and does not involve collective judgment or consensus advice or deliberation.

SEC. 5. *General Provision*. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities or entities, its officers, employees or agents, or any other person.

GEORGE W. BUSH.

## § 4332a. Repealed. Pub. L. 114–94, div. A, title I, § 1304(j)(2), Dec. 4, 2015, 129 Stat. 1386

Section, Pub. L. 112–141, div. A, title I, § 1319, July 6, 2012, 126 Stat. 551, related to accelerated decisionmaking in environmental reviews.

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF REPEAL

Repeal effective Oct. 1, 2015, see section 1003 of Pub. L. 114–94, set out as an Effective Date of 2015 Amendment note under section 5313 of Title 5, Government Organization and Employees.

## § 4333. Conformity of administrative procedures to national environmental policy

All agencies of the Federal Government shall review their present statutory authority, administrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of this chapter and shall propose to the President not later than July 1, 1971, such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this chapter.

(Pub. L. 91–190, title I, § 103, Jan. 1, 1970, 83 Stat. 854.)

## § 4334. Other statutory obligations of agencies

Nothing in section 4332 or 4333 of this title shall in any way affect the specific statutory obligations of any Federal agency (1) to comply with criteria or standards of environmental quality, (2) to coordinate or consult with any other Federal or State agency, or (3) to act, or refrain from acting contingent upon the recommendations or certification of any other Federal or State agency.

(Pub. L. 91–190, title I, § 104, Jan. 1, 1970, 83 Stat. 854.)

## § 4335. Efforts supplemental to existing authorizations

The policies and goals set forth in this chapter are supplementary to those set forth in existing authorizations of Federal agencies.

(Pub. L. 91–190, title I, § 105, Jan. 1, 1970, 83 Stat. 854.)

### SUBCHAPTER II—COUNCIL ON ENVIRONMENTAL QUALITY

## § 4341. Omitted

#### Editorial Notes

##### CODIFICATION

Section, Pub. L. 91–190, title II, § 201, Jan. 1, 1970, 83 Stat. 854, which required the President to transmit to Congress annually an Environmental Quality Report, terminated, effective May 15, 2000, pursuant to section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance. See, also, item 1 on page 41 of House Document No. 103–7.

## § 4342. Establishment; membership; Chairman; appointments

There is created in the Executive Office of the President a Council on Environmental Quality (hereinafter referred to as the ''Council''). The Council shall be composed of three members who shall be appointed by the President to serve at his pleasure, by and with the advice and consent of the Senate. The President shall designate one of the members of the Council to serve as Chairman. Each member shall be a person who, as a result of his training, experience, and attainments, is exceptionally well qualified to analyze



Executive Order No. 11752

Ex. Ord. No. 11752, Dec. 17, 1973, 38 F.R. 34793, which related to the prevention, control, and abatement of environmental pollution at Federal facilities, was revoked by Ex. Ord. No. 12088, Oct. 13, 1978, 43 F.R. 47707, set out as a note under section 4321 of this title.

### § 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will ensure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) consistent with the provisions of this chapter and except where compliance would be inconsistent with other statutory requirements, include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) reasonably foreseeable environmental effects of the proposed agency action;

(ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;

(iii) a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

(v) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.

Prior to making any detailed statement, the head of the lead agency shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, and shall accompany the proposal through the existing agency review processes;

(D) ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document;

(E) make use of reliable data and resources in carrying out this chapter;

(F) consistent with the provisions of this chapter, study, develop, and describe technically and economically feasible alternatives;

(G) any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

(i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

(ii) the responsible Federal official furnishes guidance and participates in such preparation,

(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

(iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.[1]

(H) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(I) consistent with the provisions of this chapter, recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(J) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

---

[1] So in original. The period probably should be a semicolon.

(K) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(L) assist the Council on Environmental Quality established by subchapter II of this chapter.

(Pub. L. 91–190, title I, § 102, Jan. 1, 1970, 83 Stat. 853; Pub. L. 94–83, Aug. 9, 1975, 89 Stat. 424; Pub. L. 118–5, div. C, title III, § 321(a), June 3, 2023, 137 Stat. 38.)

### Editorial Notes

#### Amendments

2023—Par. (2)(A), (B). Pub. L. 118–5, § 321(a)(1), (2), substituted ''ensure'' for ''insure''.

Par. (2)(C). Pub. L. 118–5, § 321(a)(3)(A), (C), inserted ''consistent with the provisions of this chapter and except where compliance would be inconsistent with other statutory requirements,'' before ''include in every'' in introductory provisions and substituted ''the head of the lead agency'' for ''the responsible Federal official'' in concluding provisions.

Par. (2)(C)(i) to (v). Pub. L. 118–5, § 321(a)(3)(B), added cls. (i) to (v) and struck out former cls. (i) to (v) which read as follows:

''(i) the environmental impact of the proposed action,

''(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

''(iii) alternatives to the proposed action,

''(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

''(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.''

Par. (2)(D). Pub. L. 118–5, § 321(a)(6), added subpar. (D). Former subpar. (D) redesignated (G).

Pub. L. 118–5, § 321(a)(4), substituted ''any detailed'' for ''Any detailed''.

Par. (2)(E), (F). Pub. L. 118–5, § 321(a)(6), added subpars. (E) and (F). Former subpars. (E) and (F) redesignated (H) and (I), respectively.

Par. (2)(G), (H). Pub. L. 118–5, § 321(a)(5), redesignated subpars. (D) and (E) as (G) and (H), respectively.

Par. (2)(I). Pub. L. 118–5, § 321(a)(5), (7), redesignated subpar. (F) as (I) and inserted ''consistent with the provisions of this chapter,'' before ''recognize''.

Par. (2)(J) to (L). Pub. L. 118–5, § 321(a)(5), redesignated subpars. (G) to (I) as (J) to (L), respectively.

1975—Par. (2)(D) to (I). Pub. L. 94–83 added subpar. (D) and redesignated former subpars. (D) to (H) as (E) to (I), respectively.

### Statutory Notes and Related Subsidiaries

#### Certain Commercial Space Launch Activities

Pub. L. 104–88, title IV, § 401, Dec. 29, 1995, 109 Stat. 955, provided that: ''The licensing of a launch vehicle or launch site operator (including any amendment, extension, or renewal of the license) under [former] chapter 701 of title 49, United States Code [now chapter 509 (§ 50901 et seq.) of Title 51, National and Commercial Space Programs], shall not be considered a major Federal action for purposes of section 102(C) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(C)) if—

''(1) the Department of the Army has issued a permit for the activity; and

''(2) the Army Corps of Engineers has found that the activity has no significant impact.''

### Executive Documents

#### Ex. Ord. No. 13352. Facilitation of Cooperative Conservation

Ex. Ord. No. 13352, Aug. 26, 2004, 69 F.R. 52989, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

SECTION 1. *Purpose*. The purpose of this order is to ensure that the Departments of the Interior, Agriculture, Commerce, and Defense and the Environmental Protection Agency implement laws relating to the environment and natural resources in a manner that promotes cooperative conservation, with an emphasis on appropriate inclusion of local participation in Federal decisionmaking, in accordance with their respective agency missions, policies, and regulations.

SEC. 2. *Definition*. As used in this order, the term ''cooperative conservation'' means actions that relate to use, enhancement, and enjoyment of natural resources, protection of the environment, or both, and that involve collaborative activity among Federal, State, local, and tribal governments, private for-profit and nonprofit institutions, other nongovernmental entities and individuals.

SEC. 3. *Federal Activities*. To carry out the purpose of this order, the Secretaries of the Interior, Agriculture, Commerce, and Defense and the Administrator of the Environmental Protection Agency shall, to the extent permitted by law and subject to the availability of appropriations and in coordination with each other as appropriate:

(a) carry out the programs, projects, and activities of the agency that they respectively head that implement laws relating to the environment and natural resources in a manner that:

(i) facilitates cooperative conservation;

(ii) takes appropriate account of and respects the interests of persons with ownership or other legally recognized interests in land and other natural resources;

(iii) properly accommodates local participation in Federal decisionmaking; and

(iv) provides that the programs, projects, and activities are consistent with protecting public health and safety;

(b) report annually to the Chairman of the Council on Environmental Quality on actions taken to implement this order; and

(c) provide funding to the Office of Environmental Quality Management Fund (42 U.S.C. 4375) for the Conference for which section 4 of this order provides.

SEC. 4. *White House Conference on Cooperative Conservation*. The Chairman of the Council on Environmental Quality shall, to the extent permitted by law and subject to the availability of appropriations:

(a) convene not later than 1 year after the date of this order, and thereafter at such times as the Chairman deems appropriate, a White House Conference on Cooperative Conservation (Conference) to facilitate the exchange of information and advice relating to (i) cooperative conservation and (ii) means for achievement of the purpose of this order; and

(b) ensure that the Conference obtains information in a manner that seeks from Conference participants their individual advice and does not involve collective judgment or consensus advice or deliberation.

SEC. 5. *General Provision*. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities or entities, its officers, employees or agents, or any other person.

GEORGE W. BUSH.

### § 4332a. Repealed. Pub. L. 114–94, div. A, title I, § 1304(j)(2), Dec. 4, 2015, 129 Stat. 1386

Section, Pub. L. 112–141, div. A, title I, § 1319, July 6, 2012, 126 Stat. 551, related to accelerated decisionmaking in environmental reviews.

### Statutory Notes and Related Subsidiaries

#### Effective Date of Repeal

Repeal effective Oct. 1, 2015, see section 1003 of Pub. L. 114–94, set out as an Effective Date of 2015 Amend-

(ii) Agency and administrative unit;

(iii) Title of the proposed action; and

(iv) Location of the proposed action, including administrative unit, county, and State.

(2) Decision to be implemented and the reasons for categorically excluding the proposed action including:

(i) The category of the proposed action;

(ii) The rationale for using the category and, if more than one category could have been used, why the specific category was chosen;

(iii) A finding that no extraordinary circumstances exist;

(3) Any interested and affected agencies, organizations, and persons contacted;

(4) Findings required by other laws such as, but not limited to findings of consistency with the forest land and resource management plan as required by the National Forest Management Act; or a public interest determination (36 CFR 254.3(c));

(5) The date when the responsible official intends to implement the decision and any conditions related to implementation;

(6) Whether the decision is subject to review or appeal, the applicable regulations, and when and where to file a request for review or appeal;

(7) Name, address, and phone number of a contact person who can supply further information about the decision; and

(8) The responsible official's signature and date when the decision is made.

### § 220.7 Environmental assessment and decision notice.

(a) *Environmental assessment.* An environmental assessment (EA) shall be prepared for proposals as described in § 220.4(a) that are not categorically excluded from documentation (§ 220.6) and for which the need of an EIS has not been determined (§ 220.5). An EA may be prepared in any format useful to facilitate planning, decisionmaking, and public disclosure as long as the requirements of paragraph (b) of this section are met. The EA may incorporate by reference information that is reasonably available to the public.

(b) *An EA must include the following:*

(1) Need for the proposal. The EA must briefly describe the need for the project.

(2) Proposed action and alternative(s). The EA shall briefly describe the proposed action and alternative(s) that meet the need for action. No specific number of alternatives is required or prescribed.

(i) When there are no unresolved conflicts concerning alternative uses of available resources (NEPA, section 102(2)(E)), the EA need only analyze the proposed action and proceed without consideration of additional alternatives.

(ii) The EA may document consideration of a no-action alternative through the effects analysis by contrasting the impacts of the proposed action and any alternative(s) with the current condition and expected future condition if the proposed action were not implemented.

(iii) The description of the proposal and alternative(s) may include a brief description of modifications and incremental design features developed through the analysis process to develop the alternatives considered. The documentation of these incremental changes to a proposed action or alternatives may be incorporated by reference in accord with 40 CFR 1502.21.

(iv) The proposed action and one or more alternatives to the proposed action may include adaptive management. An adaptive management proposal or alternative must clearly identify the adjustment(s) that may be made when monitoring during project implementation indicates that the action is not having its intended effect, or is causing unintended and undesirable effects. The EA must disclose not only the effect of the proposed action or alternative but also the effect of the adjustment. Such proposal or alternative must also describe the monitoring that would take place to inform the responsible official whether the action is having its intended effect.

(3) Environmental Impacts of the Proposed Action and Alternative(s). The EA:

(i) Shall briefly provide sufficient evidence and analysis, including the environmental impacts of the proposed action and alternative(s), to determine

whether to prepare either an EIS or a FONSI (40 CFR 1508.9);

(ii) Shall disclose the environmental effects of any adaptive management adjustments;

(iii) Shall describe the impacts of the proposed action and any alternatives in terms of context and intensity as described in the definition of ''significantly'' at 40 CFR 1508.27;

(iv) May discuss the direct, indirect, and cumulative impact(s) of the proposed action and any alternatives together in a comparative description or describe the impacts of each alternative separately; and

(v) May incorporate by reference data, inventories, other information and analyses.

(4) Agencies and Persons Consulted.

(c) *Decision notice.* If an EA and FONSI have been prepared, the responsible official must document a decision to proceed with an action in a decision notice unless law or regulation requires another form of decision documentation (40 CFR 1508.13). A decision notice must document the conclusions drawn and the decision(s) made based on the supporting record, including the EA and FONSI. A decision notice must include:

(1) A heading, which identifies the:

(i) Title of document;

(ii) Agency and administrative unit;

(iii) Title of the project; and

(iv) Location of the action, including county and State.

(2) Decision and rationale;

(3) Brief summary of public involvement;

(4) A statement incorporating by reference the EA and FONSI if not combined with the decision notice;

(5) Findings required by other laws and regulations applicable to the decision at the time of decision;

(6) Expected implementation date;

(7) Administrative review or appeal opportunities and, when such opportunities exist, a citation to the applicable regulations and directions on when and where to file a request for review or an appeal;

(8) Contact information, including the name, address, and phone number of a contact person who can supply additional information; and

(9) Responsible Official's signature, and the date the notice is signed.

(d) *Notification.* The responsible official shall notify interested and affected parties of the availability of the EA, FONSI and decision notice, as soon as practicable after the decision notice is signed.

## PART 221—TIMBER MANAGEMENT PLANNING

AUTHORITY: 30 Stat. 34, 44 Stat. 242; 16 U.S.C. 475, 616.

**§ 221.3  Disposal of national forest timber according to management plans.**

(a) Management plans for national forest timber resources shall be prepared and revised, as needed, for working circles or other practicable units of national forest. Such plans shall:

(1) Be designed to aid in providing a continuous supply of national forest timber for the use and necessities of the citizens of the United States.

(2) Be based on the principle of sustained yield, with due consideration to the condition of the area and the timber stands covered by the plan.

(3) Provide, so far as feasible, an even flow of national forest timber in order to facilitate the stabilization of communities and of opportunities for employment.

(4) Provide for coordination of timber production and harvesting with other uses of national forest land in accordance with the principles of multiple use management.

(5) Establish the allowable cutting rate which is the maximum amount of timber which may be cut from the national forest lands within the unit by years or other periods.

(6) Be approved by the Chief, Forest Service, unless authority for such approval shall be delegated to subordinates by the Chief.

(b) When necessary to promote better utilization of national forest timber or to facilitate protection and management of the national forests, a management plan may include provisions for requirements of purchasers for processing the timber to at least a stated degree within the working circle, or

**Add. 61**

### §1502.1 Purpose.

The primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the federal government. It shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paperwork and the accumulation of extraneous background data. Statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is more than a disclosure document. It shall be used by federal officials in conjunction with other relevant material to plan actions and make decisions.

### §1502.2 Implementation.

To achieve the purposes set forth in §1502.1 agencies shall prepare environmental impact statements in the following manner:

(a) Environmental impact statements shall be analytic rather than encyclopedic.

(b) Impacts shall be discussed in proportion to their significance. There shall be only brief discussion of other than significant issues. As in a finding of no significant impact, there should be only enough discussion to show why more study is not warranted.

(c) Environmental impact statements shall be kept concise and shall be no longer than absolutely necessary to comply with NEPA and with these regulations. Length should vary first with potential environmental problems and then with project size.

(d) Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of the Act and other environmental laws and policies.

(e) The range of alternatives discussed in environmental impact statements shall encompass those to be considered by the ultimate agency decisionmaker.

(f) Agencies shall not commit resources prejudicing selection of alternatives before making a final decision (§1506.1).

(g) Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made.

### §1502.3 Statutory requirements for statements.

As required by sec. 102(2)(C) of NEPA environmental impact statements (§1508.11) are to be included in every recommendation or report.

On proposals (§1508.23).

For legislation and (§1508.17).

Other major federal actions (§1508.18).

Significantly (§1508.27).

Affecting (§§1508.3, 1508.8).

The quality of the human environment (§1508.14).

### §1502.4 Major Federal actions requiring the preparation of environmental impact statements.

(a) Agencies shall make sure the proposal which is the subject of an environmental impact statement is properly defined. Agencies shall use the criteria for scope (§1508.25) to determine which proposal(s) shall be the subject of a particular statement. Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement.

(b) Environmental impact statements may be prepared, and are sometimes required, for broad federal actions such as the adoption of new agency programs or regulations (§1508.18). Agencies shall prepare statements on broad actions so that they are relevant to policy and are timed to coincide with meaningful points in agency planning and decisionmaking.

(c) When preparing statements on broad actions (including proposals by more than one

**Add. 62**

under §1506.10). The information required by this section may be entered on Standard Form 424 (in items 4, 6, 7, 10, and 18).

### §1502.12 Summary.

Each environmental impact statement shall contain a summary which adequately and accurately summarizes the statement. The summary shall stress the major conclusions, areas of controversy (including issues raised by agencies and the public), and the issues to be resolved (including the choice among alternatives). The summary will normally not exceed 15 pages.

### §1502.13 Purpose and need.

The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.

### §1502.14 Alternatives including the proposed action.

This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§1502.15) and the Environmental Consequences (§1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

### §1502.15 Affected environment.

The environmental impact statement shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration. The description shall be no longer than is necessary to understand the effects of the alternatives. Data and analyses in a statement shall be commensurate with the importance of the impact, with less important material summarized, consolidated, or simply referenced. Agencies shall avoid useless bulk in statements and shall concentrate effort and attention on important issues. Verbose descriptions of the affected environment are themselves no measure of the adequacy of an environmental impact statement.

### §1502.16 Environmental consequences.

This section forms the scientific and analytic basis for the comparisons under §1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA which are within the scope of the statement and as much of section 102(2)(C)(iii) as is necessary to support the comparisons. The discussion will include the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented. This section should not duplicate discussions in §1502.14. It shall include discussions of:

(a) Direct effects and their significance (§1508.8).

(b) Indirect effects and their significance (§1508.8).

(c) Possible conflicts between the proposed action and the objectives of federal, regional, state, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned. (See §1506.2(d).)

(d) The environmental effects of alternatives including the proposed action. The comparisons under §1502.14 will be based on this discussion.

(e) Energy requirements and conservation potential of various alternatives and mitigation measures.

(f) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

(g) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(h) Means to mitigate adverse environmental impacts (if not fully covered under §1502.14(f)).

[43 FR 55994, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

### §1502.17 List of preparers.

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the environmental impact statement or significant background papers, including basic components of the statement (§§1502.6 and 1502.8). Where possible the persons who are responsible for a particular analysis, including analyses in background papers, shall be identified. Normally the list will not exceed two pages.

### §1502.18 Appendix.

If an agency prepares an appendix to an environmental impact statement the appendix shall:

(a) Consist of material prepared in connection with an environmental impact statement (as distinct from material which is not so prepared and which is incorporated by reference (§1502.21)).

(b) Normally consist of material which substantiates any analysis fundamental to the impact statement.

(c) Normally be analytic and relevant to the decision to be made.

(d) Be circulated with the environmental impact statement or be readily available on request.

### §1502.19 Circulation of the environmental impact statement.

Agencies shall circulate the entire draft and final environmental impact statements except for certain appendices as provided in §1502.18(d) and unchanged statements as provided in §1503.4(c). However, if the statement is unusually long, the agency may circulate the summary instead, except that the entire statement shall be furnished to:

(a) Any federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate federal, state or local agency authorized to develop and enforce environmental standards.

(b) The applicant, if any.

(c) Any person, organization, or agency requesting the entire environmental impact statement.

(d) In the case of a final environmental impact statement any person, organization, or agency which submitted substantive comments on the draft. If the agency circulates the summary and thereafter receives a timely request for the entire statement and for additional time to comment, the time for that requestor only shall be extended by at least 15 days beyond the minimum period.

### §1502.20 Tiering.

Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§1508.28). Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or

**Add. 64**

12

environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions. (Section 1508.28).

## §1502.21 Incorporation by reference.

Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the statement and its content briefly described. No material may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference.

## §1502.22 Incomplete or unavailable information.

When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.

(a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are

not known, the agency shall include within the environmental impact statement: (1) A statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment; and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

(c) The amended regulation will be applicable to all environmental impact statements for which a Notice of Intent (40 CFR 1508.22) is published in the FEDERAL REGISTER on or after May 27, 1986. For environmental impact statements in progress, agencies may choose to comply with the requirements of either the original or amended regulation.

[51 FR 15625, Apr. 25, 1986]

## §1502.23 Cost-benefit analysis.

If a cost-benefit analysis relevant to the choice among environmentally different alternatives is being considered for the proposed action, it shall be incorporated by reference or appended to the statement as an aid in evaluating the environmental consequences. To assess the adequacy of compliance with section 102(2)(B) of the Act the statement shall, when a cost-benefit analysis is prepared, discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities. For purposes of complying with the Act, the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis and should not be when there are

important qualitative considerations. In any event, an environmental impact statement should at least indicate those considerations, including factors not related to environmental quality, which are likely to be relevant and important to a decision.

### §1502.24 Methodology and scientific accuracy.

Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement. An agency may place discussion of methodology in an appendix.

### §1502.25 Environmental review and consultation requirements.

(a) To the fullest extent possible, agencies shall prepare draft environmental impact statements concurrently with and integrated with environmental impact analyses and related surveys and studies required by the Fish and Wildlife Coordination Act (16 U.S.C. 661 *et seq.*), the National Historic Preservation Act of 1966 (16 U.S.C. 470 *et seq.*), the Endangered Species Act of 1973 (16 U.S.C. 1531 *et seq.*), and other environmental review laws and executive orders.

(b) The draft environmental impact statement shall list all federal permits, licenses, and other entitlements which must be obtained in implementing the proposal. If it is uncertain whether a federal permit, license, or other entitlement is necessary, the draft environmental impact statement shall so indicate.

### PART 1503—COMMENTING

Sec.
1503.1  Inviting comments.
1503.2  Duty to comment.
1503.3  Specificity of comments.
1503.4  Response to comments.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).
SOURCE: 43 FR 55997, Nov. 29, 1978, unless otherwise noted.

### §1503.1 Inviting comments.

(a) After preparing a draft environmental impact statement and before preparing a final environmental impact statement the agency shall:

(1) Obtain the comments of any federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved or which is authorized to develop and enforce environmental standards.

(2) Request the comments of:

(i) Appropriate state and local agencies which are authorized to develop and enforce environmental standards;

(ii) Indian tribes, when the effects may be on a reservation; and

(iii) Any agency which has requested that it receive statements on actions of the kind proposed. Office of Management and Budget Circular A–95 (Revised), through its system of clearinghouses, provides a means of securing the views of state and local environmental agencies. The clearinghouses may be used, by mutual agreement of the lead agency and the clearinghouse, for securing state and local reviews of the draft environmental impact statements.

(3) Request comments from the applicant, if any.

(4) Request comments from the public, affirmatively soliciting comments from those persons or organizations who may be interested or affected.

(b) An agency may request comments on a final environmental impact statement before the decision is finally made. In any case other agencies or persons may make comments before the final decision unless a different time is provided under §1506.10.

### §1503.2 Duty to comment.

Federal agencies with jurisdiction by law or special expertise with respect to any environmental impact involved and agencies which are authorized to develop and enforce environmen-

ments and environmental impact statements which address classified proposals may be safeguarded and restricted from public dissemination in accordance with agencies' own regulations applicable to classified information. These documents may be organized so that classified portions can be included as annexes, in order that the unclassified portions can be made available to the public.

(d) Agency procedures may provide for periods of time other than those presented in §1506.10 when necessary to comply with other specific statutory requirements.

(e) Agency procedures may provide that where there is a lengthy period between the agency's decision to prepare an environmental impact statement and the time of actual preparation, the notice of intent required by §1501.7 may be published at a reasonable time in advance of preparation of the draft statement.

## PART 1508—TERMINOLOGY AND INDEX

Sec.
1508.1  Terminology.
1508.2  Act.
1508.3  Affecting.
1508.4  Categorical exclusion.
1508.5  Cooperating agency.
1508.6  Council.
1508.7  Cumulative impact.
1508.8  Effects.
1508.9  Environmental assessment.
1508.10  Environmental document.
1508.11  Environmental impact statement.
1508.12  Federal agency.
1508.13  Finding of no significant impact.
1508.14  Human environment.
1508.15  Jurisdiction by law.
1508.16  Lead agency.
1508.17  Legislation.
1508.18  Major Federal action.
1508.19  Matter.
1508.20  Mitigation.
1508.21  NEPA process.
1508.22  Notice of intent.
1508.23  Proposal.
1508.24  Referring agency.
1508.25  Scope.
1508.26  Special expertise.
1508.27  Significantly.
1508.28  Tiering.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 56003, Nov. 29, 1978, unless otherwise noted.

### §1508.1 Terminology.

The terminology of this part shall be uniform throughout the federal government.

### §1508.2 Act.

"Act" means the National Environmental Policy Act, as amended (42 U.S.C. 4321, *et seq.*) which is also referred to as "NEPA."

### §1508.3 Affecting.

"Affecting" means will or may have an effect on.

### §1508.4 Categorical exclusion.

"Categorical exclusion" means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a federal agency in implementation of these regulations (§1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the reasons stated in §1508.9 even though it is not required to do so. Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

### §1508.5 Cooperating agency.

"Cooperating agency" means any federal agency other than a lead agency which has jurisdiction by law or special expertise with respect to any environmental impact involved

in a proposal (or a reasonable alternative) for legislation or other major federal action significantly affecting the quality of the human environment. The selection and responsibilities of a cooperating agency are described in §1501.6. A state or local agency of similar qualifications or, when the effects are on a reservation, an Indian tribe, may by agreement with the lead agency become a cooperating agency.

### §1508.6 Council.

"Council" means the Council on Environmental Quality established by title II of the Act.

### §1508.7 Cumulative impact.

"Cumulative impact" is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

### §1508.8 Effects.

"Effects" include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

### §1508.9 Environmental assessment.

"Environmental assessment":

(a) Means a concise public document for which a federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

### §1508.10 Environmental document.

"Environmental document" includes the documents specified in §1508.9 (environmental assessment), §1508.11 (environmental impact statement), §1508.13 (finding of no significant impact), and §1508.22 (notice of intent).

### §1508.11 Environmental impact statement.

"Environmental impact statement" means a detailed written statement as required by section 102(2)(C) of the Act.

### §1508.12 Federal agency.

"Federal agency" means all agencies of the federal government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. It also includes for purposes of these regulations states and units of general local government and Indian tribes assuming NEPA responsibilities under section 104(h) of the Housing and Community Development Act of 1974.

**Add. 68**

### §1508.13 Finding of no significant impact.

"Finding of no significant impact" means a document by a federal agency briefly presenting the reasons why an action, not otherwise excluded (§1508.4), will not have a significant effect on the human environment and for which an environmental impact statement there fore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (§1501.7(a)(5)). If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference.

### §1508.14 Human environment.

"Human environment" shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment. (See the definition of "effects" (§1508.8).) This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.

### §1508.15 Jurisdiction by law.

"Jurisdiction by law" means agency authority to approve, veto, or finance all or part of the proposal.

### §1508.16 Lead agency.

"Lead agency" means the agency or agencies preparing or having taken primary responsibility for preparing the environmental impact statement.

### §1508.17 Legislation.

"Legislation" includes a bill or legislative proposal to Congress developed by or with the significant cooperation and support of a federal agency, but does not include requests for appropriations. The test for significant cooperation is whether the proposal is in fact predominantly that of the agency rather than another source. Drafting does not by itself constitute significant cooperation. Proposals for legislation include requests for ratification of treaties. Only the agency which has primary responsibility for the subject matter involved will prepare a legislative environmental impact statement.

### §1508.18 Major federal action.

"Major federal action" includes actions with effects that may be major and which are potentially subject to federal control and responsibility. Major reinforces but does not have a meaning independent of significantly (§1508.27). Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action.

(a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§§1506.8, 1508.17). Actions do not include funding assistance solely in the form of general revenue sharing funds, distributed under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. 1221 *et seq.*, with no federal agency control over the subsequent use of such funds. Actions do not include bringing judicial or administrative civil or criminal enforcement actions.

(b) Federal actions tend to fall within one of the following categories:

(1) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 *et seq.*; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

(2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative

**Add. 69**

uses of federal resources, upon which future agency actions will be based.

(3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(4) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

### §1508.19 Matter.

"Matter" includes for purposes of Part 1504:

(a) With respect to the Environmental Protection Agency, any proposed legislation, project, action or regulation as those terms are used in section 309(a) of the Clean Air Act (42 U.S.C. 7609).

(b) With respect to all other agencies, any proposed major federal action to which section 102(2)(C) of NEPA applies.

### §1508.20 Mitigation.

"Mitigation" includes:

(a) Avoiding the impact altogether by not taking a certain action or parts of an action.

(b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(e) Compensating for the impact by replacing or providing substitute resources or environments.

### §1508.21 NEPA process.

"NEPA process" means all measures necessary for compliance with the requirements of section 2 and title I of NEPA.

### §1508.22 Notice of intent.

"Notice of intent" means a notice that an environmental impact statement will be prepared and considered. The notice shall briefly:

(a) Describe the proposed action and possible alternatives.

(b) Describe the agency's proposed scoping process including whether, when, and where any scoping meeting will be held.

(c) State the name and address of a person within the agency who can answer questions about the proposed action and the environmental impact statement.

### §1508.23 Proposal.

"Proposal" exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated. Preparation of an environmental impact statement on a proposal should be timed (§1502.5) so that the final statement may be completed in time for the statement to be included in any recommendation or report on the proposal. A proposal may exist in fact as well as by agency declaration that one exists.

### §1508.24 Referring agency.

"Referring agency" means the federal agency which has referred any matter to the Council after a determination that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality.

### §1508.25 Scope.

"Scope" consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§§1502.20 and 1508.28). To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:

(a) Actions (other than unconnected single actions) which may be:

(1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.

(3) Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequencies together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

(b) Alternatives, which include:

(1) No action alternative.

(2) Other reasonable courses of actions.

(3) Mitigation measures (not in the proposed action).

(c) Impacts, which may be: (1) direct; (2) indirect; (3) cumulative.

### §1508.26 Special expertise.

"Special expertise" means statutory responsibility, agency mission, or related program experience.

### §1508.27 Significantly.

"Significantly" as used in NEPA requires considerations of both context and intensity:

(a) *Context.* This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short and long-term effects are relevant.

(b) *Intensity.* This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of federal, state, or local law or requirements imposed for the protection of the environment. [43 FR 56003, Nov. 29, 1978; 44 FR 874, Jan. 3, 1979]

### §1508.28 Tiering.

"Tiering" refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared. Tiering is appropriate when the sequence of statements or analyses is:

(a) From a program, plan, or policy environmental impact statement to a program, plan, orpolicy statement or analysis of lesser scope or to a site-specific statement or analysis.

(b) From an environmental impact statement on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or analysis at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe.

**Add. 72**

## COUNCIL ON ENVIRONMENTAL QUALITY

**40 CFR Parts 1500, 1501, 1502, 1503, 1504, 1505, 1506, 1507, and 1508**

### Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations

March 17, 1981.

**AGENCY:** Council on Environmental Quality, Executive Office of the President.

**ACTION:** Information Only: Publication of Memorandum to Agencies Containing Answers to 40 Most Asked Questions on NEPA Regulations.

**SUMMARY:** The Council on Environmental Quality, as part of its oversight of implementation of the National Environmental Policy Act, held meetings in the ten Federal regions with Federal, State, and local officials to discuss administration of the implementing regulations. The forty most asked questions were compiled in a memorandum to agencies for the information of relevant officials. In order efficiently to respond to public inquiries this memorandum is reprinted in this issue of the **Federal Register.**

**FOR FURTHER INFORMATION CONTACT:**
Nicholas C. Yost, General Counsel, Council on Environmental Quality, 722 Jackson Place NW., Washington, D.C. 20006; 202–395–5750.

March 16, 1981.

### Memorandum for Federal NEPA Liaisons, Federal, State, and Local Officials and Other Persons Involved in the NEPA Process

Subject: Questions and Answers About the NEPA Regulations

During June and July of 1980 the Council on Environmental Quality, with the assistance and cooperation of EPA's EIS Coordinators from the ten EPA regions, held one-day meetings with federal, state and local officials in the ten EPA regional offices around the country. In addition, on July 10, 1980, CEQ conducted a similar meeting for the Washington, D.C. NEPA liaisons and persons involved in the NEPA process. At these meetings CEQ discussed (a) the results of its 1980 review of Draft EISs issued since the July 30, 1979 effective date of the NEPA regulations, (b) agency compliance with the Record of Decision requirements in Section 1505 of the NEPA regulations, and (c) CEQ's preliminary findings on how the scoping process is working. Participants at these meetings received copies of materials prepared by CEQ summarizing its oversight and findings.

These meetings also provided NEPA liaisons and other participants with an opportunity to ask questions about NEPA and the practical application of the NEPA regulations. A number of these questions were answered by CEQ representatives at the regional meetings. In response to the many requests from the agencies and other participants, CEQ has compiled forty of the most important or most frequently asked questions and their answers and reduced them to writing. The answers were prepared by the General Counsel of CEQ in consultation with the Office of Federal Activities of EPA. These answers, of course, do not impose any additional requirements beyond those of the NEPA regulations. This document does not represent new guidance under the NEPA regulations, but rather makes generally available to concerned agencies and private individuals the answers which CEQ has already given at the 1980 regional meetings. The answers also reflect the advice which the Council has given over the past two years to aid agency staff and consultants in their day-to-day application of NEPA and the regulations.

CEQ has also received numerous inquiries regarding the scoping process. CEQ hopes to issue written guidance on scoping later this year on the basis of its special study of scoping, which is nearing completion.

Nicholas C. Yost,

*General Counsel.*

### Index

1. Range of Alternatives
2. Alternatives Outside the Capability of Applicant or Jurisdiction of Agency
3. No-Action Alternative
4. Agency's Preferred Alternative
5. Proposed Action v. Preferred Alternative
6. Environmentally Preferable Alternative
7. Difference Between Sections of EIS on Alternatives and Environmental Consequences
8. Early Application of NEPA
9. Applicant Who Needs Other Permits
10. Limitations on Action During 30-Day Review Period for Final EIS
11. Limitations on Actions by an Applicant During EIS Process
12. Effective Date and Enforceability of the Regulations
13. Use of Scoping Before Notice of Intent to Prepare EIS
14. Rights and Responsibilities of Lead and Cooperating Agencies
15. Commenting Responsibilities of EPA
16. Third Party Contracts
17. Disclosure Statement to Avoid Conflict of Interest
18. Uncertainties About Indirect Effects of A Proposal
19. Mitigation Measures
20. Worst Case Analysis
21. Combining Environmental and Planning Documents
22. State and Federal Agencies as Joint Lead Agencies
23. Conflicts of Federal Proposal With Land Use Plans, on Policies and Controls
24. Environmental Impact Statements on Policies, Plans or Programs
25. Appendices and Incorporation by Reference
26. Index and Keyword Index In EISs
27. List of Preparers
28. Advance or Xerox Copies of EIS
29. Responses to Comments
30. Adoption of EISs
31. Application of Regulations to Independent Regulatory Agencies
32. Supplements To Old EISs
33. Referrals
34. Records of Decision
35. Time Required for the NEPA Process
36. Environmental Assessments (EA)
37. Findings of No Significant Impact (FONSI)
38. Public Availability of EAs v. FONSIs
39. Mitigation Measures Imposed in EAs and FONSIs
40. Propriety of Issuing EA When Mitigation Reduces Impacts

### Questions and Answers About the NEPA Regulations (1981)

1a. Q. What is meant by "range of alternatives" as referred to in Sec. 1505.1(e)? [1]

A. The phrase "range of alternatives" refers to the alternatives discussed in environmental documents. It includes all reasonable alternatives, which must be rigorously explored and objectively evaluated, as well as those other alternatives, which are eliminated from detailed study with a brief discussion of the reasons for eliminating them. Section 1502.14. A decisionmaker must not consider alternatives beyond the range of alternatives discussed in the relevant environmental documents. Moreover, a decisionmaker must, in fact, consider all the alternatives discussed in an EIS. Section 1505.1(e).

1b. Q. How many alternatives have to be discussed when there is an infinite number of possible alternatives?

[1] References throughout the document are to the Council on Environmental Quality's Regulations For Implementing The Procedural Provisions of the National Environmental Policy Act. 40 CFR Parts 1500–1508.

**Add. 73**

A. For some proposals there may exist a very large or even an infinite number of possible reasonable alternatives. For example, a proposal to designate wilderness areas within a National Forest could be said to involve an infinite number of alternatives from 0 to 100 percent of the forest. When there are potentially a very large number of alternatives, only a reasonable number of examples, covering the *full spectrum* of alternatives, must be analyzed and compared in the EIS. An appropriate series of alternatives might include dedicating 0, 10, 30, 50, 70, 90, or 100 percent of the Forest to wilderness. What constitutes a reasonable range of alternatives depends on the nature of the proposal and the facts in each case.

2a. Q. If an EIS is prepared in connection with an application for a permit or other federal approval, must the EIS rigorously analyze and discuss alternatives that are outside the capability of the applicant or can it be limited to reasonable alternatives that can be carried out by the applicant?

A. Section 1502.14 requires the EIS to examine all reasonable alternatives to the proposal. In determining the scope of alternatives to be considered, the emphasis is on what is "reasonable" rather than on whether the proponent or applicant likes or is itself capable of carrying out a particular alternative. Reasonable alternatives include those that are *practical or feasible* from the technical and economic standpoint and using common sense, rather than simply *desirable* from the standpoint of the applicant.

2b. Q. Must the EIS analyze alternatives outside the jurisdiction or capability of the agency or beyond what Congress has authorized?

A. An alternative that is outside the legal jurisdiction of the lead agency must still be analyzed in the EIS if it is reasonable. A potential conflict with local or federal law does not necessarily render an alternative unreasonable, although such conflicts must be considered. Section 1506.2(d). Alternatives that are outside the scope of what Congress has approved or funded must still be evaluated in the EIS if they are reasonable, because the EIS may serve as the basis for modifying the Congressional approval or funding in light of NEPA's goals and policies. Section 1500.1(a).

3. Q. What does the "no action" alternative include? If an agency is under a court order or legislative command to act, must the EIS address the "no action" alternative?

A. Section 1502.14(d) requires the alternatives analysis in the EIS to "include the alternative of no action."

There are two distinct interpretations of "no action" that must be considered, depending on the nature of the proposal being evaluated. The first situation might involve an action such as updating a land management plan where ongoing programs initiated under existing legislation and regulations will continue, even as new plans are developed. In these cases "no action" is "no change" from current management direction or level of management intensity. To construct an alternative that is based on no management at all would be a useless academic exercise. Therefore, the "no action" alternative may be thought of in terms of continuing with the present course of action until that action is changed. Consequently, projected impacts of alternative management schemes would be compared in the EIS to those impacts projected for the existing plan. In this case, alternatives would include management plans of both greater and lesser intensity, especially greater and lesser levels of resource development.

The second interpretation of "no action" is illustrated in instances involving federal decisions on proposals for projects. "No action" in such cases would mean the proposed activity would not take place, and the resulting environmental effects from taking no action would be compared with the effects of permitting the proposed activity or an alternative activity to go forward.

Where a choice of "no action" by the agency would result in predictable actions by others, this consequence of the "no action" alternative should be included in the analysis. For example, if denial of permission to build a railroad to a facility would lead to construction of a road and increased truck traffic, the EIS should analyze this consequence of the "no action" alternative.

In light of the above, it is difficult to think of a situation where it would *not* be appropriate to address a "no action" alternative. Accordingly, the regulations require the analysis of the no action alternative even if the agency is under a court order or legislative command to act. This analysis provides a benchmark, enabling decisionmakers to compare the magnitude of environmental effects of the action alternatives. It is also an example of a reasonable alternative outside the jurisdiction of the agency which must be analyzed. Section 1502.14(c). See Question 2 above. Inclusion of such an analysis in the EIS is necessary to inform the Congress, the public, and the President as intended by NEPA. Section 1500.1(a).

4a. Q. What is the "agency's preferred alternative"?

A. The "agency's preferred alternative" is the alternative which the agency believes would fulfill its statutory mission and responsibilities, giving consideration to economic, environmental, technical and other factors. The concept of the "agency's preferred alternative" is different from the "environmentally preferable alternative," although in some cases one alternative may be both. See Question 6 below. It is identified so that agencies and the public can understand the lead agency's orientation.

4b. Q. Does the "preferred alternative" have to be identified in the Draft EIS and the Final EIS or just in the Final EIS?

A. Section 1502.14(e) requires the section of the EIS on alternatives to "identify the agency's preferred alternative if one or more exists, in the draft statement, and identify such alternative in the final statement . . ." This means that if the agency has a preferred alternative at the Draft EIS stage, that alternative must be labeled or identified as such in the Draft EIS. If the responsible federal official in fact has no preferred alternative at the Draft EIS stage, a preferred alternative need not be identified there. By the time the Final EIS is filed, Section 1502.14(e) presumes the existence of a preferred alternative and requires its identification in the Final EIS "unless another law prohibits the expression of such a preference."

4c. Q. Who recommends or determines the "preferred alternative?"

A. The lead agency's official with line responsibility for preparing the EIS and assuring its adequacy is responsible for identifying the agency's preferred alternative(s). The NEPA regulations do not dictate which official in an agency shall be responsible for preparation of EISs, but agencies can identify this official in their implementing procedures, pursuant to Section 1507.3.

Even though the agency's preferred alternative is identified by the EIS preparer in the EIS, the statement must be objectively prepared and not slanted to support the choice of the agency's preferred alternative over the other reasonable and feasible alternatives.

5a. Q. Is the "proposed action" the same thing as the "preferred alternative"?

A. The "proposed action" may be, but is not necessarily, the agency's "preferred alternative." The proposed action may be a proposal in its initial form before undergoing analysis in the EIS process. If the proposed action is

**Add. 74**



# DEPARTMENT OF AGRICULTURE

## Forest Service

### 36 CFR Part 220

#### RIN 0596–AC49

### National Environmental Policy Act Procedures

**AGENCY:** USDA Forest Service.

**ACTION:** Final rule.

**SUMMARY:** The Department of Agriculture is moving the Forest Service's National Environmental Policy Act (NEPA) codifying procedures from Forest Service Manual (FSM) 1950 and Forest Service Handbook (FSH) 1909.15. In addition to codifying the procedures, the Department is clarifying and expanding them to incorporate Council on Environmental Quality (CEQ) guidance and to better align Forest Service NEPA procedures with its decision processes.

This rule gives Forest Service NEPA procedures more visibility, consistent with the transparent nature of the Forest Service's environmental analysis and decision making. Also, the additions to the Forest Service NEPA procedures in this rule are intended to provide an environmental analysis process that better fits with modern thinking on decisionmaking, collaboration, and adaptive management by describing a process for incremental alternative development and development of adaptive management alternatives. Maintaining Forest Service explanatory guidance in the FSH will facilitate timely responses to new ideas, new information, procedural interpretations, training needs, and editorial changes to assist field units when implementing the NEPA process.

**DATES:** *Effective Date:* These NEPA procedures are effective July 24, 2008.

**ADDRESSES:** The Forest Service NEPA procedures are set out in 36 CFR part 220, which is available electronically via the World Wide Web/Internet at *http://www.gpoaccess.gov/cfr/index.html*. Single paper copies are available by contacting Martha Twarkins, Forest Service, USDA, Ecosystem Management Coordination Staff (Mail Stop 1104), 1400 Independence Avenue, SW., Washington, DC 20250–1104. Additional information and analysis can be found at *http://www.fs.fed.us/emc/nepa*.

**FOR FURTHER INFORMATION CONTACT:** Martha Twarkins, Ecosystem Management Staff, (202) 205–2935, Forest Service, USDA. Individuals who use telecommunication devices for the deaf (TDD) may call the Federal Information Relay Service (FIRS) at 1–800–877–8339 between 8 a.m. and 8 p.m. Eastern Daylight Time, Monday through Friday.

**SUPPLEMENTARY INFORMATION:** Council on Environmental Quality (CEQ) regulations at 40 CFR 1507.3 require Federal agencies to adopt procedures as necessary to supplement the requirements of the CEQ's regulations implementing the National Environmental Policy Act (NEPA). The regulation further encourages agencies to publish agency explanatory guidance for CEQ's regulations and agency procedures. In 1979, the Forest Service chose to combine its implementing procedures and explanatory guidance in Forest Service directives FSM 1950 and FSH 1909.15.

Descriptions of Forest Service NEPA authority, objectives, policy, and responsibilities remain in FSM 1950. Forest Service explanatory guidance interpreting CEQ and Forest Service procedures in regulation remain in FSH 1909.15. For an explanation of NEPA and the NEPA process, see CEQ's ''A Citizen's Guide to the NEPA—Having Your Voice Heard'' at *http://ceq.eh.doe.gov/nepa/Citizens_Guide_Dec07.pdf.*

This rule gives Forest Service NEPA procedures more visibility, consistent with the transparent nature of the Forest Service's environmental analysis and decision making.

Maintaining Forest Service explanatory guidance in directives will facilitate quicker responses to new ideas, new information, procedural interpretations, training needs, and editorial changes to assist field units when implementing the NEPA process.

Since the last major update of Forest Service NEPA policy in 1992, CEQ has issued guidance that the Department believes is appropriate to incorporate into Forest Service NEPA procedures with this regulation. The Department also believes it is appropriate to incorporate several concepts that the Forest Service currently uses, but for which explicit provisions in its current procedures are lacking.

Finally, this rule will allow for better integration of NEPA procedures and documentation into the current Forest Service decisionmaking processes, including collaborative and incremental decisionmaking.

On August 16, 2007, the Forest Service published a proposed rule to move its NEPA procedures from FSH 1909.15 to 36 CFR part 220 (72 FR 45998). The majority of implementing procedures found in FSH 1909.15 transfer to 36 CFR part 220 and remain intact. Forest Service explanatory guidance remains in the revised FSH 1909.15 being published concurrently with this rule and available at *http://www.fs.fed.us/cgi-bin/Directives/get_dirs/fsh?1909.15*. Key changes in this final rule:

• Clarify actions subject to NEPA by summarizing the relevant CEQ regulations in one place.

• Recognize Forest Service obligations to take immediate emergency responses and emphasize the options available for subsequent proposals to address actions related to the emergency when normal NEPA processes are not possible.

• Incorporate CEQ guidance language regarding what past actions are ''relevant and useful'' to a cumulative effects analysis.

• Clarify that an alternative(s), including the proposed action, may be modified through an incremental process.

• Clarify that adaptive management strategies may be incorporated into an alternative(s), including the proposed action.

• Incorporate CEQ guidance that states environmental assessments (EAs) need to analyze alternatives to the proposed action if there are unresolved conflicts concerning alterative uses of available resources as specified by section 102(2)(E) of NEPA.

The CEQ was consulted on the proposed and final rule. CEQ has issued a letter stating CEQ has reviewed this rule and found it to be in conformity with NEPA and CEQ regulations (per 40 CFR 1507.3 and NEPA section 102(2)(B)). This letter is available at *http://www.fs.fed.us/emc/nepa*.

To improve clarity, this final rule received numerous corrections to punctuation, grammar, abbreviations, and citations. These edits did not change the substance or meaning of any of the rule's provisions. Substantive changes from the proposed to this final rule are discussed in the responses to comments that follow.

### Comments on the Proposal

The proposed rule was published in the **Federal Register** on August 16, 2007, for a 60-day comment period. The Forest Service received 10,975 responses, consisting of letters, e-mails, web based submissions, and faxes. Of those, approximately 200 contained original substantive comments; the remaining responses were organized response campaign (form) letters. Comments were received from the public, from within the Forest Service,

**Add. 75**

to lead to a decreased analysis and consideration of ''no-action.'' They emphasize that informed and meaningful consideration of alternatives, including the no-action alternative, is an integral part of the NEPA process.

*Response.* After consideration of the comments, the Department has chosen to keep the provision in the final rule. There is no specific CEQ requirement to include a no-action alternative in an EA and the language follows CEQ's EA guidance *Preparing Focused, Concise and Timely Environmental Assessments* (see *http://ceq.eh.doe.gov/nepa/regs/ Preparing_Focused_Concise_and _Timely_EAs.pdf*). By contrasting the impacts of the proposal and alternatives with the current condition and expected future condition of the environment, the effects of a no-action alternative are considered. This provision is provided as an option for responsible officials to use if in their best judgment it serves the need of the analysis.

*Comments.* Respondents want the Forest Service to provide a definition for ''unresolved conflicts'' and to present examples of such actions. Others want to know who decides whether there are ''no unresolved conflicts concerning alternative uses of available resources.''

*Response.* The term ''unresolved conflicts'' comes directly from NEPA (42 U.S.C. 4332(2)E). Typically, most Forest Service proposals will have alternatives; however, the final rule specifically recognizes that in some situations there may be no conflicts regarding a proposed action and in such cases alternatives would not be required.

On September 8, 2005, the CEQ issued EA guidance to federal agencies entitled *Preparing Focused, Concise and Timely Environmental Assessments*, that explained language at section 102(2)(E) of NEPA ''unresolved conflicts concerning alternative uses of available resources'' (42 U.S.C. 4332(2)(E)). The CEQ guidance states: ''When there is consensus about the proposed action based on input from interested parties, you can consider the proposed action and proceed without consideration of additional alternatives. Otherwise, you need to develop reasonable alternatives to meet project needs'' (Attachment to September 8, 2005, Memorandum for Federal NEPA Contacts *http://ceq.eh. doe.gov/nepa/regs/Preparing_Focused_ Concise_and_Timely_EAs.pdf*). Ultimately, the responsible official must decide on whether alternatives to the proposed action are appropriate, ''based on input from interested parties.''

**Regulatory Certification**

*National Environmental Policy Act*

The final rule would move existing procedures for implementing the National Environmental Policy Act (NEPA) from the Forest Service handbook to 36 CFR part 220 and provide additional direction. The rule would not directly impact the environment. Forest Service NEPA procedures are procedural guidance to assist in the fulfillment of agency responsibilities under NEPA, but are not the agency's final determination of what level of NEPA analysis is required for a particular proposed action. The CEQ set forth the requirements for establishing agency NEPA procedures in its regulations at 40 CFR 1505.1 and 1507.3. The CEQ regulations do not require agencies to conduct NEPA analyses or prepare NEPA documentation when establishing their NEPA procedures. The determination that establishing agency NEPA procedures does not require NEPA analysis and documentation has been upheld in *Heartwood, Inc.* v. *U.S. Forest Service*, 230 F.3d 947, 954–55 (7th Cir. 2000).

*Regulatory Impact*

This final rule has been reviewed under USDA procedures and Executive Order 12866 issued September 30, 1993, as amended by Executive Order 13422 on regulatory planning and review and the major rule provisions of the Small Business Regulatory Enforcement and Fairness Act (5 U.S.C. 800). It has been determined that this is not an economically significant action. This action to issue agency regulations will not have an annual effect of $100 million or more on the economy nor adversely affect productivity, competition, jobs, the environment, public health or safety, nor state or local governments. This action will not interfere with an action taken or planned by another agency. This action will not alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients of such programs. However, because of the extensive interest in National Forest System (NFS) planning and decision-making, this final rule to establish agency implementing procedures for NEPA in the Code of Federal Regulations (CFR) has been designated as significant and, therefore, is subject to Office of Management and Budget (OMB) review under Executive Order 12866.

In accordance with the OMB Circular A–4, ''Regulatory Analysis,'' a cost/benefit analysis was conducted. The analysis compared the costs and benefits associated with the current condition of having agency implementing procedures combined with agency explanatory guidance in Forest Service Handbook (FSH) and this final condition of having implementing direction in regulation and explanatory guidance in FSH.

Many benefits and costs associated with the rule are not quantifiable. Benefits, including collaborative and participatory public involvement to more fully address public concerns, timely and focused environmental analysis, flexibility in preparation of environmental documents, and improved legal standing indicate a positive effect of the new rule.

Moving implementing NEPA procedures from the FSH to regulation is expected to provide a variety of potentially beneficial effects. This rule gives Forest Service NEPA procedures more visibility, consistent with the transparent nature of the Agency's environmental analysis and decision-making.

Maintaining agency explanatory guidance in the FSH would facilitate timely agency responses to new ideas, new information, procedural interpretations, training needs, and editorial changes to addresses and internet links to assist field units when implementing the NEPA process. Finally, the changes to the Forest Service NEPA procedures are intended to provide the Forest Service specific options to meet the intent of NEPA through collaboration, the establishment of incremental alternative development, and the use of adaptive management principles.

Based on the context of this analysis, no one factor creates a significant factor, but taken together does create the potential for visible improvements in the agency's NEPA program.

Moreover, this final rule has been considered in light of Executive Order 13272 regarding proper consideration of small entities and the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), which amended the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*). An initial small entities flexibility assessment has been made and it has been determined that this action will not have a significant economic impact on a substantial number of small entities as defined by SBREFA.

*Federalism*

The Agency has considered this final rule under the requirements of Executive Order 13132, Federalism. The Agency has concluded that the rule



February 19, 2025

**MEMORANDUM FOR HEADS OF FEDERAL DEPARTMENTS AND AGENCIES**

**FROM**:      Katherine R. Scarlett      KATHERINE SCARLETT      Digitally signed by KATHERINE SCARLETT Date: 2025.02.19 14:55:57 -05'00'
                  Chief of Staff

**SUBJECT**:      Implementation of the National Environmental Policy Act

### I.      Purpose and Overview

On January 20, 2025, President Donald J. Trump signed Executive Order (E.O.) 14154, *Unleashing American Energy*.[1] Section 5(b) of E.O. 14154 directs the Council on Environmental Quality (CEQ) to provide guidance on implementing NEPA to expedite and simplify the permitting process. Consistent with section 5(c) of the E.O., the guidance and any resulting agency NEPA implementing regulations must "expedite permitting approvals and meet deadlines established in the Fiscal Responsibility Act of 2023 (Public Law 118-5)" (FRA).[2] Agencies must prioritize efficiency and certainty over any other policy objectives that could add delays and ambiguity to the permitting process. Accordingly, CEQ is issuing this guidance[3] to assist agencies with the implementation of NEPA and E.O. 14154.

Consistent with E.O. 14154, Federal agencies must revise or establish their NEPA implementing procedures (or establish such procedures if they do not yet have any) to expedite permitting approvals and for consistency with NEPA as amended by the FRA, including the deadlines established in NEPA. **While these revisions are ongoing, agencies should continue to follow their existing practices and procedures for implementing NEPA consistent with the text of NEPA, E.O. 14154, and this guidance. Agencies should not delay pending or ongoing NEPA analyses while undertaking these revisions. For such analyses, until revisions are completed via the appropriate rulemaking process, agencies should apply their current NEPA implementing procedures with any adjustments needed to be consistent with the NEPA statute as revised by the FRA. Moreover, although CEQ is rescinding its NEPA implementing regulations at 40 C.F.R. parts 1500–1508, agencies should consider voluntarily relying on those regulations in completing ongoing NEPA reviews or defending against challenges to reviews completed while those regulations were in effect. CEQ will provide ongoing guidance and assistance through monthly meetings of the Federal Agency NEPA Contacts and the NEPA Implementation Working Group required by section 5(c) of E.O. 14154. CEQ encourages agencies to use the final 2020 rule "Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act" as an initial framework for the development of revisions to their NEPA implementing**

---

[1] E.O. 14154, *Unleashing American Energy*, 90 Fed. Reg. 8353 (Jan. 29, 2025).

[2] *Id.* § 5(c).

[3] The contents of this guidance do not have the force and effect of law and are not meant to create legal rights or obligations with respect to any public party. This guidance does not establish new policy requirements. This memorandum is intended only to provide clarity to agencies regarding existing requirements under the law or agency policies.

**Add. 77**

**procedures,[4] consistent with this guidance, E.O. 14154, and to the extent permitted by applicable law.**

The National Environmental Policy Act (NEPA or the Act), 42 U.S.C. §§ 4321 et seq., establishes the national environmental policy of the Federal Government to use all practicable means and measures to foster and promote the general welfare, create and maintain conditions under which humans and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.[5] NEPA contains procedural requirements to carry out the policy stated in section 101 of NEPA. Specifically, the statute requires Federal agencies to provide a detailed statement on proposals for major Federal actions significantly affecting the quality of the human environment.[6] The purpose and function of NEPA is satisfied if Federal agencies have considered relevant environmental information, and the public has been informed regarding the decision-making process. NEPA does not mandate particular results or substantive outcomes. NEPA's purpose is not to generate paperwork for its own sake or litigation, but to provide for informed decision-making and foster excellent action.

## II.      Implementation of NEPA

Congress amended NEPA in the Fiscal Responsibility Act of 2023[7] (FRA) to provide more specific details on how agencies must comply with NEPA's environmental review mandate and provide a more efficient and predictable process for all types of actions and projects.

In section 102 of NEPA, as part of the FRA amendments, Congress clarified the requirements for environmental impact statements (EIS). Agencies must analyze and disclose the "reasonably foreseeable environmental effects of the proposed agency action;"[8] "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;"[9] "a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;"[10] "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity;"[11] and "any irreversible and irretrievable commitments of Federal resources that would be involved in the proposed agency action should it be implemented."[12] The amendments to section 102 of NEPA also require that agencies ensure the professional integrity, including scientific integrity, of the discussion and

---

[4] 86 Fed. Reg. 43304 (July 16, 2020).
[5] 42 U.S.C. § 4331.
[6] *Id.* § 4332(2)(C).
[7] Pub. L. No. 118-5, § 321, 137 Stat. 10.
[8] 42 U.S.C. § 4332(2)(C)(i).
[9] *Id.* § 4332(2)(C)(ii).
[10] *Id.* § 4332(2)(C)(iii).
[11] *Id.* § 4332(2)(C)(iv).
[12] *Id.* § 4332(2)(C)(v).

**Add. 78**

analysis in environmental documents;[13] make use of reliable data and resources in NEPA reviews;[14] and study, develop, and describe technically and economically feasible alternatives.[15]

Congress added new section 106, through the FRA amendments to NEPA, to clarify that there are certain situations when environmental documents are not required.[16] It also affirmed CEQ's historical practice that established certain levels of NEPA review (categorical exclusions (CEs), environmental assessments (EAs), and EISs), emphasizing that an EIS, the most elaborate of these levels of review, is only required for a proposed agency action that "has a reasonably foreseeable significant effect on the quality of the human environment."[17] Additionally, this section clarifies that, when determining the appropriate level of review, an agency may make use of "any reliable data source" and that an agency is "*not* required to undertake new scientific or technical research" unless "essential to a reasoned choice among alternatives, and the overall costs and time frame of obtaining it are not unreasonable."[18]

Congress also added new section 107 of NEPA, which provides clear direction for agencies to establish the lead agency with respect to a proposed agency action, identify cooperating agencies,[19] and prepare a single, coordinated environmental document if a proposed action will require action by more than one Federal agency.[20] Section 107(e) sets page limits for EISs and EAs.[21] Section 107 also establishes deadlines for the completion of EAs and EISs,[22] which are critically important to expedite permitting approvals and prioritize efficiencies. Section 107 also includes a right for project sponsors to challenge an agency's alleged failure to act in accordance with applicable statutory deadlines.[23]

Congress also added new section 108 of NEPA, which allows agencies to rely on programmatic environmental documents for five years without additional review and beyond that term of years so long as the agency reevaluates the analysis in the programmatic environmental document and any underlying assumptions to ensure reliance on the analysis remains valid,[24] and new section 109, which provides agencies the authority to adopt and use other agencies' CEs.[25] Finally, Congress added new section 111, which provides includes key definitions for NEPA terms, including "major Federal action."[26]

---

[13] *Id.* § 4332(2)(D).
[14] *Id.* § 4332(2)(E).
[15] *Id.* § 4332(2)(F).
[16] *Id.* § 4336(a).
[17] *Id.* § 4336(b)(1).
[18] *Id.* § 4336(b)(3)(A), (B).
[19] *Id.* § 4336a(a).
[20] *Id.* § 4336a(b).
[21] *Id.* § 4336a(e).
[22] *Id.* § 4336a(g)(1)(A)-(B).
[23] *Id.* § 4336a(g)(3).
[24] *Id.* § 4336b(1), (2).
[25] *Id.* § 4336c.
[26] *Id.* § 4336e.

**Add. 79**

### III. Agency Implementing Procedures

Section 102 of NEPA directs all Federal agencies to "identify and develop methods and procedures, in consultation with [CEQ], . . . which will ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decision-making along economic and technical considerations."[27] In addition, section 103 of NEPA requires agencies to review their authorities, regulations, policies and procedures and propose measures to align them with the intent, purposes, and procedures of NEPA.[28] Section 2(b) of E.O. 11514, *Protection and Enhancement of Environmental Quality*, issued by President Nixon in 1970, also requires agencies to "[d]evelop procedures to ensure the fullest practicable provision of timely public information and understanding of Federal plans and programs with environmental impact in order to obtain the views of interested parties. These procedures should include, whenever appropriate, provision for public hearings, and should provide the public with relevant information, including information on alternative courses of action."[29] Consequently, since 1970, Federal agencies have relied on agency-specific NEPA procedures to meet these mandates.

As noted above, consistent with E.O. 14154, Federal agencies must revise their NEPA implementing procedures (or establish such procedures if they do not yet have any) to expedite permitting approvals and for consistency with NEPA as amended by the FRA, including the deadlines established in NEPA. **While these revisions are ongoing, agencies should continue to follow their existing practices and procedures for implementing NEPA consistent with the text of NEPA, E.O. 14154, and this guidance. Agencies should not delay pending or ongoing NEPA analyses while undertaking these revisions. For such analyses, until revisions are completed via the appropriate rulemaking process, agencies should apply their current NEPA implementing procedures with any adjustments needed to be consistent with the NEPA statute as revised by the FRA. Moreover, although CEQ is rescinding its NEPA implementing regulations at 40 C.F.R. parts 1500–1508, agencies should consider voluntarily relying on those regulations in completing ongoing NEPA reviews or defending against challenges to reviews completed while those regulations were in effect. CEQ will provide ongoing assistance through monthly meetings of the Federal Agency NEPA Contacts and the NEPA Implementation Working Group required by section 5(c) of E.O. 14154. CEQ encourages agencies to use the 2020 rule "Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act" as an initial framework for the development of revisions to their NEPA implementing procedures,[30] consistent with this guidance, E.O. 14154, and to the extent permitted by applicable law.**

Agencies' NEPA implementing procedures need not restate the text of NEPA, but should describe how the agency will meet the statute's requirements taking into account the agency's unique authorities and mission, with the goal of prioritizing efficiency and certainty over any other policy objectives.

---

[27] *Id*. § 4332(2)(B).

[28] *Id*. § 4333.

[29] E.O. 11514, *Protection and Enhancement of Environmental Quality*, 35 Fed. Reg. 4247 (Mar. 7, 1970).

[30] 86 Fed. Reg. 43304 (July 16, 2020).

**Add. 80**

Agencies should consider the following in revising or establishing their NEPA implementing procedures:

- Project Sponsor Preparation: Agencies should develop transparent, clear, and predictable procedures for review of project sponsor-prepared environmental assessments and environmental impact statements. Project sponsor prepared environmental documents should be prioritized for expeditious review.

- Deadlines established by Congress: Agencies should ensure that their NEPA implementing procedures comply with the deadlines that Congress established in section 107 of NEPA.

- Reasonable Range of Alternatives: When developing an EIS, agencies should, to the extent otherwise required by applicable law, only consider a reasonable range of alternatives to the proposed action that are technically and economically feasible and that meet the purpose and need for the proposed action. The consideration of alternatives should include an analysis of any adverse environmental effects of not implementing the proposed action in the case of a no action alternative to the extent that a no action alternative is feasible.

- Effects: Federal agencies should analyze the reasonably foreseeable effects of the proposed action consistent with section 102 of NEPA, which does not employ the term "cumulative effects;" NEPA instead requires consideration of "reasonably foreseeable" effects, regardless of whether or not those effects might be characterized as "cumulative."[31]

- Federal Funding: Proposed agency actions with "no or minimal Federal funding" and "loans, loan guarantees, or other forms of financial assistance where a Federal agency does not exercise sufficient control and responsibility over the subsequent use of such financial assistance or the effect of the action" are not "major Federal actions."[32] Federal agencies should carefully consider the threshold above which an action would constitute a "major Federal action" in light of this direction from Congress and their specific programs and authorities.

- Environmental Justice Considerations: E.O. 14148[33] revoked E.O. 14096.[34] E.O. 14173[35] revoked E.O. 12898.[36] Therefore, NEPA documents should not include an environmental justice analysis, to the extent that this approach is consistent with other applicable law.

---

[31] *Id*. § 4332(2)(C)(i).
[32] *Id.* § 4336e(10)(B)(i), (iii).
[33] E.O. 14148, *Initial Rescissions of Harmful Executive Orders and Actions*, 90 Fed. Reg. 8237 (Jan. 28, 2025).
[34] E.O. 14096, *Revitalizing Our Nation's Commitment to Environmental Justice for All*, 88 Fed. Reg. 25251 (Apr. 26, 2023).
[35] E.O. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 31, 2025).
[36] E.O. 12898, *Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*, 59 Fed. Reg. 7629 (Feb. 16, 1994).

**Add. 81**

### A. Consistency and Predictability

To promote consistency and predictability across the Federal Government, all agency implementing procedures, at a minimum, should:

- o Clearly delineate the sequence of major decision points for the agency's programs and actions subject to NEPA, ensuring that the NEPA process begins at the earliest reasonable time and allows for integration of the NEPA process with other environmental reviews and consultation requirements to avoid delays later in the process and to avoid or address potential conflicts;

- o Identify activities or decisions that are not subject to NEPA at a threshold stage such that no further consideration is necessary as to whether any environmental document may be required with respect to those activities or decisions;

- o Include specific criteria for and identification of those typical classes of action that:

  - ▪ Normally do not significantly affect the quality of the human environment. The procedures should provide the process for establishing new CEs, for revising existing CEs, for considering extraordinary circumstances in applying CEs, and for determining when documentation of a CE may be required.

  - ▪ Require environmental assessments but not necessarily environmental impact statements; or

  - ▪ Require environmental impact statements;

- o Establish how the agency will reevaluate and supplement environmental assessments and environmental impact statements, as appropriate;

- o Discuss how the agency will identify the lead agency, joint lead agencies, cooperating agencies, and participating agencies;

- o Establish protocols for engaging with State, Tribal, territorial, and local government agencies;

- o Establish protocols for public involvement, including public meetings and hearings, and how the agency will consider and address public comments;

- o Explain where interested persons can get information or status reports on environmental impact statements, environmental assessments, and other elements of the NEPA process;

- o Discuss when programmatic NEPA documents may be appropriate;

- o Include procedures for concluding or terminating (where appropriate) the NEPA process;

6

**Add. 82**

o Include processes for consideration of emergency actions;

o Include the procedures to guide project sponsors' preparation of environmental assessments and environmental impact statements; and

o Include specific criteria for providing limited exceptions to public availability for classified proposals.

**IV.     Timing & Process for Agencies Updating NEPA Regulations**

Agencies should complete the revision of their procedures no later than 12 months after the date of this memorandum. Within departments, it may be efficient for sub-components of a department to adopt their own procedures, as departments deem appropriate.

To ensure consistency and predictability amongst agency NEPA procedures, agencies must consult with CEQ while developing or revising their NEPA procedures.

All Federal agency NEPA implementing procedures—both proposed and final—must be submitted to the Office of Management and Budget (OMB) for a significance determination and possible interagency review consistent with E.O. 12866[37] after the agency's consultation with CEQ is concluded. In consultation with the Office of Information and Regulatory Affairs, agencies should conduct timely and efficient E.O. 12866 reviews of significant NEPA procedures.

Federal agencies should provide a minimum of 30 days but no longer than 60 days for public comment on proposed NEPA regulations, to the extent that public comment is required. To the extent that public comment is not so required, agencies should not undertake public comment procedures.

During the 12–month period of revision or development of agency NEPA procedures, CEQ will host monthly meetings of the Federal Agency NEPA Contacts[38] and the NEPA Implementation Working Group required by section 5(c) of E.O. 14154 to share additional guidance and provide assistance to agencies.

Agencies must develop a proposed schedule for updating their procedures and coordinate with CEQ to allow for planning and efficient review of those updates. Agencies must submit to CEQ at nepa@ceq.eop.gov these proposed schedules, along with a lead point of contact for NEPA procedures, within 30 days of this memorandum. Agencies should contact CEQ to address questions regarding implementation as they are working to revise all relevant materials.

If your staff has any questions regarding this memorandum, contact Jomar Maldonado, Director for the National Environmental Policy Act, at (202) 395-0827 or Jomar.MaldonadoVazquez@ceq.eop.gov or Amy B. Coyle, CEQ's Principal Deputy General Counsel, at (202) 395-3621 or Amy.B.Coyle@ceq.eop.gov.

---

[37] E.O. 12866, *Regulatory Planning and Review*, 58 Fed. Reg. 51735 (Oct. 4, 1993).
[38]  https://ceq.doe.gov/nepa-practice/agency-nepa-contacts.html.

**Add. 83**



00034

PBWTAR_8939

 
**Figure 4. Detail showing location of timber units subject to design elements REC-4 and REC-5 relative to adjacent recreation opportunities.**



*Peabody Features Base-line Data*

**Legend**

- Feautures_Peabody_GW_2020
- StandRecon_2020_0214
- StandRecon_2020_0327
- StandRecon_ASPB_2020_0221
- 1562_old_forest
- Landings
- StandRecon_Track_2020_0214
- StandRecon_Track_2020_0221
- Track_Peabody_2020_0312
- Track_Peabody_Williams_Wigler_2020_0312
- Track_Peabody_Williams_Wigler_2020_0327
- Track_Peabody_Williams_Wigler_Farina_Gibbons_2020_0507
- Track1_Peabody_Williams_Wigler_2020_0327
- Track1_Peabody_Williams_Wigler_2020_0409
- Track1_Peabody_Williams_Wigler_newroad_2020_0409
- FS Road (NRM all roads)

**SALE_NAME**
- Peabody_West_Botany_Reserves_gw_draft

0  0.15  0.3    0.6    0.9    1.2  Miles

**Add. 86**

PBWTAR_7672

**Historic Evidence for Forest Continuity**

- Dolly Copp Homestead (dates)
- 1921 became public campground
- Map drawn in 1915 after USFS purchased land from Libby & Sons indicated the areas in current day stand 77 & 81 were forested.

## Comp 34_Stand 71, 72, 75: Hemlock -Spruce – Northern Hardwood Forest (Late Successional/ Old Growth and Exemplary Natural Community)

| **Compartment:** 34 | **Stand:** 71, 72, 75 | | FSVeg Std ID: |
|---|---|---|---|
| **VGS Point IDs:** | | | |
| **PB73:** 44.310045, -71.225427 | **Slope:** 5 | **Aspect:** 34 | **Wet:** perennial stream nearby |
| **PB74:** 44.311991, -71.223387 | **Slope:** 2 | **Aspect:** 65 | **Wet:** intermittent stream nearby |
| **PB75:** 44.316108, -71.218666 | **Slope:** 0 | **Aspect:** 0 | **Wet:** perennial stream nearby |
| **SOI:** 44.31357, -71.220008 | **Slope:** 0 | **Aspect:** 0 | **Wet:** perennial stream nearby |
| **PB84:** 44.302024, -71.238655 | **Slope:** 40 | **Aspect:** 73 | **Wet:** |
| **Date:** 9/16/2021, 9/17/2021, 10/22/2021 | | | |
| **Observer(s):** ESD, DDS | | | |
| **TES/TES Habitat:** *Vaccinium cespitosum* (alpine bilberry) – NH state listed. Potential *Neottia auriculata*, *Pyrola asarifolia* habitat on floodplains, terraces, and overflow channels. Wet, mossy stream channel cutting through terrace forest (*P. asarifolia*). *N. auriculata* is strongly associated with rivers that deposit sediments and are routinely scoured—usually in floodplain---within sandy alluvial or outwash deposits (NHNHI 2001). | | | |
| **NNIS:** A small amount of Tansy (*Tanacetum vulgare*) and colt's foot (*Tussalago farfara*) along riverbank. | | | |
| **Cultural:** A large metal tub and glass bottles within the floodplain of the north part of the stand. | | | |
| **Special Notes:** The primary area of late-successional and old growth forest occurs along the lower portion of the West Branch of the Peabody River down to and beyond the confluence with the Peabody River. | | | |

**Summary:**

This mature hemlock – spruce forest occurs along the north side, lower section of the West Branch of the Peabody River and the adjacent terrace/floodplain by the junction with the Peabody River mainstem. This narrow band of forest along the river contains the lower part of the Great Gulf trail. Numerous areas exceed the index threshold for late successional/old growth using the Manomet LS

**Add. 87**

index (Whitman and Hagan 2007). Some cored spruce and hemlock exceeded 200 years of age, at least one cored spruce exceeded 300 years. There is a diversity of coarse woody debris and standing dead or snapped trees of different sizes and degrees of decomposition, including many large dead and downed trees in some places, particularly the lower southern? 2/3 of the mapped area. Strong pit and mound topography is evident, with no obvious signs of logging. A short distance upslope into hardwoods there is more obvious evidence of logging, i.e. stumps present and younger forest including shade intolerant hardwoods, *Acer rubrum* (red maple), *Betula papyifera* (paper birch), as well as *Fagus grandifolia* (American beech).

The old and maturing hemlock and red spruce are accompanied by scattered old red maples, *Betula allegheniensis* (yellow birch), and other hardwoods, but this is primarily a softwood dominated stand.

Much of the EO along the West Branch is on high terrace and not currently flooded, but lower terrace areas have some channels that flooded historically or may still flood at high water. These old channel features have embedded seeps and swampy areas and floodplain characteristics. The low terrace area on the east side of the Peabody River by the junction with the West Branch contains numerous active and ancient overflow channels with a diversity of plant species. Dominant and common species in the understory include *Medeola virginiana, Oxalis montana, Dryopteris intermedia, Mitchella repens, Pyrola elliptica, Oclemena acuminata, Cinna latifolia, Osmunda cinnamomea, Uvularia sessilifolia, Mainanthemum canadense, Aralia nudicaulis.* In lower terrace floodplain regions, typical herbaceous species of floodplain forests including *Brachyelytrum aristosum, Vaccinium angustifolium, Thelypteris noveboracensis,* are present, while in perennially flooded river channels at higher elevations, large areas of sphagnum moss and *Pyrola* sp. colonies abound.

Hemlock – Spruce – Northern Hardwood Forest communities are common below 2000 ft. elevation in the lowlands of the WMNF (more common than lowland spruce-fir forest). Examples on terrace flats, and those on slopes of ravines and stream drainages, are more commonly dominated by hemlock and spruce with fewer northern hardwoods, as is this example. More mixed composition of this type (with northern hardwoods mixed in) are found on finer till or terrace sediments, and in early to mid-successional examples, and gaps among the hemlock and spruce.


**VGS Descriptions**

**PB73:** On benched slope next to W branch of Peabody. Uphill of here, to NW, there is evidence of logging; younger forest and increased beech component. No evidence of logging here in this maturing hemlock-spruce northern hardwood forest. Ski trail is about 500ft to NW. Some places in stand have a much more diverse understory along with similar forest type.

**PB74:** More representative of lower floodplain area. Hemlock-spruce northern hardwood forest, high diversity, fairly mature forest.

**PB75:** Bench between two main channels of Peabody River. Fairly young forest dominated by paper birch. One very large (>36' DBH) white pine nearby.

**SOI:** Several very mature hemlocks along river. (Point taken for LSI score)

**PB84:** Fairly open canopy and subcanopy, mainly dominated by *Acer rubrum* and *Betula allegeniensis*. Dense hobblebush layer with moderate *Picea rubens* regen. in shrub layer. Deep layer of leaf litter and since it's late in season, likely an incomplete herb layer documented. Gently sloping and with many large erratic boulders, more boulders outside of plot. Elev. 1650ft.

**Add. 88**

## Manomet Late Successional Index (LSI) Score

All plots that were measured surpassed the threshold of economically mature/late successional forest according to the Manomet LSI. Twelve of the fourteen plots measured surpass the threshold for old growth according to the Manomet LSI with an LSI score of 9 or 10 (yellow highlight).

| Site | Lat | Long | Trees/plot (0.25 acre) | LSI Score |
|---|---|---|---|---|
| LSI11 | 44.31163 | -71.2224 | 23 | 10 |
| PB74 | 44.31199 | -71.2234 | 7 | 8 |
| PB73 | 44.31005 | -71.2254 | 8 | 8 |
| LSI10A | 44.31196 | -71.2222 | 16 | 10 |
| LSI11A | 44.31304 | -71.2218 | 9 | 9 |
| LSI12 | 44.31166 | -71.2229 | 14 | 10 |
| LSI13 | 44.3052 | -71.2316 | 10 | 9 |
| LSI14 | 44.31145 | -71.2193 | 9 | 9 |
| LSI15 | 44.31183 | -71.2194 | 15 | 10 |
| LSI16 | 44.31292 | -71.2196 | 18 | 10 |
| LSI17 | 44.31351 | -71.2188 | 11 | 10 |
| LSI18 | 44.31404 | -71.2189 | 14 | 10 |
| LSI19 | 44.31364 | -71.2196 | 11 | 10 |
| LSI20 | 44.31311 | -71.2201 | 13 | 10 |



**Add. 89**

**Tree Cores:**

Mature tress within stand are up to and over 300 years old.

| Compt/Stand/Species/ID | DBH (in) | Origin | Ring Count (min age) | Notes |
|---|---|---|---|---|
| PW_C34S71_BETALL | 15.9 | 1888 | 133 | wide curvature |
| PW_C34S71_PICRUB_1 | 19.7 | 1839 | 182 | close to pith; release dates: 1857 & 1888-present |
| PW_C34S71_PICRUB_2 | 24 | 1722 | 299 | curvature; release date: 1875 |
| PW_C34S71_PICRUB_3 | 21.7 | 1874 | 147 | close to pith |
| PW_C34S71_PICRUB_4 | 25.2 | 1881 | 140 | missing curvature |
| PW_C34S71_PICRUB_5 | 19.3 | 1832 | 189 | wide curvature |
| PW_C34S71_PICRUB_6 | 21.8 | 1822 | 199 | curvature |
| PW_C34S71_PICRUB_7 | 16.9 | 1839 | 182 | curvature |
| PW_C34S71_TSUCAN_1 | 7.9 | 1920 | 101 | close to pith; understory tree |
| PW_C34S71_TSUCAN_2 | 23.3 | 1927 | 94 | curvature |
| PW_C34S71_TSUCAN_3 | 22.6 | 1837 | 184 | missing curvature |
| PW_C34S71_TSUCAN_4 | 24.6 | 1854 | 167 | curvature; release date: 1886 or 1888 |
| PW_C34S71_TSUCAN_5 | 24.7 | 1855 | 166 | curvature |
| PW_C34S71_TSUCAN_6 | 23.6 | 1750 | 271 | some curvature; missing center |
| PW_C34S71_TSUCAN_7 | 22.4 | 1860 | 161 | curvature; missing rings |
| PW_C34S72_PICRUB_1 | 21.5 | 1846 | 175 | curvature; release date: 1888 |
| PW_C34S72_PICRUB_2 | 22 | 1905 | 116 | wide curvature |
| PW_C34S75_PICRUB_1 | 18.5 | 1883 | 138 | close to pith |

*note: highlighted ring counts are likely 150+ year old trees, based on proximity to pith (curvature) and addition of years (est. 10) to reach core height.

**Add. 90**



**Add. 91**



**Figure 16: Scenic Integrity Objective Map**

**Add. 92**

 advance

verb 3 ∨ Synonyms Synonym Chooser Example Sentences Word History Phrases

**Flights to Phoenix**

FROM $**175**\*

\*Round trip. Price subject to change.
Add'l fees may apply. Add'l terms apply.

Bo

# advance 1 of 3 verb

ad·vance ( əd-ˈvan(t)s ◀ )

**advanced; advancing**

Synonyms of *advance* ›

*transitive verb*

**1** : to accelerate the growth or progress of

*advance* a cause

**2** : to bring or move forward

*advance* a pawn

**3** : to raise to a higher rank

was *advanced* from clerk to assistant manager

**4** **archaic** : to lift up : **RAISE**

**5** : to bring forward in time

*especially* : to make earlier

*advance* the date of the meeting

**6** : to bring forward for notice, consideration, or acceptance :



**Add. 93**