Case No. 25-2086

_____

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

STANDING TREES, INC.,
*Plaintiff-Appellant*,

v.

US FOREST SERVICE; DEREK IBARGUEN, in the official capacity as Supervi-
sor of the White Mountain National Forest; BROOKE BROWN, in the official ca-
pacity as District Ranger for the Pemigewasset Ranger District; JOSHUA
SJOSTROM, in the official capacity as District Ranger for the Androscoggin
Ranger District**,**
*Defendants-Appellees*.

_____

On Appeal from the United States District Court for the District of New Hampshire
Judge Joseph Laplante, Case No. 1:24-cv-138-JL-TSM

_____

**FEDERAL APPELLEES' FINAL ANSWERING BRIEF**

_____

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

JOHN P. TUSTIN
ROBERT P. STOCKMAN
*Attorneys*
Environment and Natural Resources Div.
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3275
Robert.Stockman@usdoj.gov

# TABLE OF CONTENTS

Table of Contents ....................................................................................... i

Table of Authorities ................................................................................ iii

Glossary ................................................................................................. viii

Introduction ................................................................................................1

Jurisdiction .................................................................................................2

Issues Presented ........................................................................................3

Statement of the Case ................................................................................3

    A.  Statutory background ....................................................................3

        1.  NFMA .......................................................................................3

        2.  NEPA ........................................................................................5

    B.  Factual background ......................................................................6

        1.  The Forest and Forest Plan ......................................................6

        2.  Project development and public processes ..............................8

    C.  District court proceedings ..........................................................16

Standard of Review .................................................................................17

Summary of Argument ............................................................................17

Argument ..................................................................................................19

  I.  The Forest Service reasonably found the two projects are consistent with the Forest Plan. ..................................................................................19

    A.  The projects are consistent with the Forest Plan's language on old growth forest and old forest habitat. ...............................................20

        1.  The projects are consistent with the Forest Plan's standard prohibiting harvest in old growth forest. .........................................22

        2.  The projects are consistent with a correct interpretation of the Forest Plan's objective mentioning old forest habitat. ...............22

3. The Forest Service's NFMA analyses can reasonably be discerned, and NFMA does not require Plaintiff's preferred methodologies or level of detail. ..................................................................26

4. The Forest Service's discussion of old growth forest and age classifications complied with NEPA. .................................................31

B. The projects are consistent with the Forest Plan's provisions regarding scenery, wild and scenic rivers, and species. ...........................................32

   1. Scenery..................................................................................................32

   2. Wild and Scenic Rivers .....................................................................35

   3. Northern long-eared bats ...................................................................36

II. The Forest Service complied with NEPA. ..................................................39

A. The Forest Service reasonably considered appropriate alternatives........41

   1. The Forest Service compared the proposals to the effects of a no-action alternative..................................................................................42

   2. The Forest Service reasonably considered alternatives in developing the proposals and reviewing public comments.....................................44

   3. The Forest Service reasonably rejected Plaintiff's alternatives. .......46

   4. Plaintiff's focus on the presence or absence of "unresolved conflicts" reflects confusion. ............................................................49

B. The Forest Service evaluated the environmental effects. .........................51

   1. Water Quality......................................................................................52

   2. Northern long-eared bat......................................................................54

   3. Scenery................................................................................................55

   4. Cumulative impacts and geographic scope ........................................55

C. The Forest Service reasonably concluded that the projects would not have a significant impact..........................................................................57

Conclusion .............................................................................................................57

Certificate of Compliance

# TABLE OF AUTHORITIES

Page(s)

Federal Cases:

*Alaska Dep't of Envtl. Conservation v. EPA*,
540 U.S. 461 (2004)..................................................................................27

*All. for the Wild Rockies v. Bradford*,
856 F.3d 1238 (9th Cir. 2017) ...............................................................26

*All. for the Wild Rockies v. U.S. Forest Serv.*,
907 F.3d 1105 (9th Cir. 2018) ...............................................................20

*All. To Protect Nantucket Sound, Inc. v. U.S. Dep't of Army*,
398 F.3d 105 (1st Cir. 2005)...................................................................31

*Am. Rivers v. FERC*,
201 F.3d 1186 (9th Cir. 1999) ...............................................................51

*Appalachian Voices v. FERC*,
139 F.4th 903 (D.C. Cir. 2025)..............................................................40

*Badger Helicopters Inc. v. FAA*,
154 F.4th 902 (8th Cir. 2025) ................................................................40

*Baker v. Smith & Wesson, Inc.*,
40 F.4th 43 (1st Cir. 2022).....................................................................39

*Balt. Gas & Elec. Co. v. NRDC*,
462 U.S. 87 (1983)..................................................................................27

*Beyond, Nuclear v. U.S. Nuclear Regul. Comm'n*,
704 F.3d 12 (1st Cir. 2013).....................................................................42

*Bob Marshall All. v. Hodel*,
852 F.2d 1223 (9th Cir. 1988) ...............................................................50

*Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*,
583 U.S. 416 (2018)................................................................................25

*Dep't of Transp. v. Public Citizen*,
  541 U.S. 752 (2004)......................................................45, 46, 51

*Dubois v. Dep't of Agriculture*,
  102 F.3d 1273 (1st Cir. 1996).....................................................49

*Earth Island Inst. v. U.S. Forest Serv. (Earth Island I)*,
  697 F.3d 1010 (9th Cir. 2012) ...............................41, 42, 47

*Earth Island Inst. v. U.S. Forest Serv. (Earth Island II)*,
  87 F.4th 1054 (9th Cir. 2023) ...............................42, 45, 48, 50

*Ecology Ctr. v. Castaneda*,
  574 F.3d 652 (9th Cir. 2009) .....................................................32

*Friends of Animals v. Burgum*,
  164 F.4th 738 (9th Cir. 2026) ....................................................42

*Friends of the Wild Swan v. Weber*,
  767 F.3d 936 (9th Cir. 2014) .....................................................30

*Headwaters, Inc. v. BLM*,
  914 F.2d 1174 (9th Cir. 1990) ...................................................44

*Historic Bridge Found. v. Buttigieg*,
  22 F.4th 275 (1st Cir. 2022)......................................................32

*Lovgren v. Locke*,
  701 F.3d 5 (1st Cir. 2012)........................................................48

*Marsh v. Oregon Nat. Res. Council*,
  490 U.S. 360 (1989)..............................................................53

*Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*,
  100 F.4th 1 (1st Cir. 2024)...............................17, 27, 55

*Native Ecosystems Council v. Marten*,
  883 F.3d 783 (9th Cir. 2018) .....................................................19

*Native Ecosystems Council v. U.S. Forest Serv.*,
  428 F.3d 1233 (9th Cir. 2005) ....................................................42

*Nevada Land Action Ass'n v. U.S. Forest Serv.*,
   8 F.3d 713 (9th Cir. 1993) ...............................................................................21

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) .............................................................................................3

*Oregon Nat. Desert Ass'n (ONDA) v. U.S. Forest Serv.*,
   957 F.3d 1024 (9th Cir. 2020) ........................................ 19, 24, 27, 30

*Protect Our Parks, Inc. v. Buttigieg*,
   39 F.4th 389 (7th Cir. 2022) ..........................................................................51

*Roosevelt Campobello Int'l Park Comm'n v. EPA*,
   684 F.2d 1041 (1st Cir. 1982)........................................................................47

*Safeguarding the Historic Hanscom Area's Irreplaceable Res., Inc. v. FAA*,
   651 F.3d 202 (1st Cir. 2011) ......................................................... 40, 56

*Save Our Heritage, Inc. v. FAA*,
   269 F.3d 49 (1st Cir. 2001)..............................................................................57

*Seacoast Anti-Pollution League v. Nuclear Regul. Comm'n*,
   598 F.2d 1221 (1st Cir. 1979).........................................................................46

*Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*,
   123 F.4th 1 (1st Cir. 2024) ............................................................... 42, 44

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*,
   605 U.S. 168 (2025)................................. 5, 6, 31, 39, 40, 41, 51, 55, 56

*Sierra Club v. Wagner*,
   555 F.3d 21 (1st Cir. 2009)........................... 4, 5, 19, 20, 21, 32, 36, 57

*Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*,
   608 F.3d 592 (9th Cir. 2010) .........................................................................44

*Town of Marshfield v. FAA*,
   552 F.3d 1 (1st Cir. 2008)............................................................... 56, 57

*Vermont Yankee Nuclear Power Corp. v. NRDC*,
   435 U.S. 519 (1978)................................................ 28, 30, 39, 45, 46

*W. Watersheds Project v. BLM*,
721 F.3d 1264 (10th Cir. 2013) ....................................................................44

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ....................................................................24

Federal Statutes:

5 U.S.C. § 706(2)(A) ....................................................................2

NFMA:

16 U.S.C. § 1604(a) ....................................................................4

16 U.S.C. § 1604(e) ....................................................................3

16 U.S.C. § 1604(e)(1) ....................................................................3

16 U.S.C. § 1604(*i*) ....................................................................4, 19

16 U.S.C. § 1271 ....................................................................35

28 U.S.C. § 1291 ....................................................................2

28 U.S.C. § 1331 ....................................................................2

NEPA:

42 U.S.C. § 4332(2)(C) ....................................................................5, 51

42 U.S.C. § 4332(H) .................................................... 41, 45, 49

42 U.S.C. § 4336(b)(2) .................................................... 5, 31, 39, 44

42 U.S.C. § 4336(b)(3)(B) ....................................................................52

42 U.S.C. § 4336a(e)(2) ....................................................................39

42 U.S.C. § 4336e(7) ....................................................................6

BUILDER Act, Pub. L. 118-5, Div. C, Tit. III, § 321, 137 Stat. 38-46 (2023) ....... 5

Federal Regulations:

36 C.F.R. Part 220.................................................................................6

26 C.F.R. § 220.3 (2020) .......................................................................6

36 C.F.R. § 220.7(b)(2).........................................................................42

36 C.F.R. § 220.7(b)(2)(i)................................................................ 49, 50

36 C.F.R. § 220.7(b)(2)(ii)............................................................... 43, 49

40 C.F.R. § 1508.13 (2005) ....................................................................6

# GLOSSARY

APA  Administrative Procedure Act

EA  Environmental Assessment

EIS  Environmental Impact Statement

FONSI  Finding of No Significant Impact

Forest  White Mountain National Forest

HMU  Habitat Management Unit

NEPA  National Environmental Policy Act

NFMA  National Forest Management Act

**INTRODUCTION**

The Forest Service manages the nearly 800,000-acre White Mountain National Forest (Forest) under a multiple-use Forest Plan that it adopted pursuant to the National Forest Management Act (NFMA).

Parts of the Forest, such as the Peabody and Tarleton Habitat Management Units, do not meet the goals and objectives established in the Forest Plan. Those areas lack younger tree habitats that help sustain healthy and diverse ecosystems. The Forest Service developed the Peabody Project and Tarleton Project to bring these areas closer to meeting Plan objectives for a diverse mix of species and age classes. Combined, the projects involve silvicultural treatments on about 3,000 acres, including more substantial "even-aged regeneration" treatments—such as clearcuts—on about 320 acres total (~.04% of the Forest). JA886; JA1299.

In compliance with the National Environmental Policy Act (NEPA), the Forest Service engaged in an extensive public process and prepared an Environmental Assessment (EA) for each project evaluating its environmental effects. In both developing the projects and considering public comments, the Forest Service compared the proposals to the consequences of taking no action and considered alternative courses of action, and it modified the proposals to reduce and mitigate impacts. The Forest Service found the projects do not have significant environmental effects requiring further analysis under NEPA. The Forest Service also

1

concluded that the projects are consistent with the Forest Plan, as required by NFMA. The projects will not harvest any old growth forest, and they advance Forest Plan goals and objectives by diversifying wildlife habitat, providing high quality timber, and addressing other recreation and transportation needs.

Plaintiff sued, alleging that the projects violated NFMA and NEPA. In a thorough opinion, the district court rejected Plaintiff's claims. The court found that Plaintiff had failed to meet its burden under the Administrative Procedure Act (APA) of showing the Forest Service's decisions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

On appeal, Plaintiff presents a smorgasbord of arguments, several of which are forfeited for failure to raise below. None have merit. This Court should affirm.

## JURISDICTION

(a) The district court had subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331 because those claims arose under NFMA, NEPA, and the APA.

(b) The court's judgment was final because it disposed of all claims against all defendants. JA439. This Court has jurisdiction under 28 U.S.C. § 1291.

(c)     The district court entered judgment on September 23, 2025.  JA439.

Plaintiff filed a timely notice of appeal on November 6, 2025, 44 days later.

JA440.

## ISSUES PRESENTED

1.     Whether the Forest Service reasonably determined that the projects

are consistent with the Forest Plan under NFMA?

2.     Whether the Forest Service reasonably considered appropriate alterna-

tives and evaluated the environmental effects of the projects under NEPA?

## STATEMENT OF THE CASE

### A.     Statutory background

#### 1.     NFMA

NFMA provides, among other things, that forest planning is governed by the

multiple-use management concept of the Multiple-Use Sustained-Yield Act of

1960.  16 U.S.C. § 1604(e) & (g).  "'Multiple use management' is a deceptively

simple term that describes the enormously complicated task of striking a balance

among the many competing uses to which land can be put," *Norton v. S. Utah Wil-*

*derness All.*, 542 U.S. 55, 58 (2004), including "outdoor recreation, range, timber,

watershed, wildlife and fish, and wilderness," 16 U.S.C. § 1604(e)(1).

NFMA "provides for management of national forests at two levels, the pro-

grammatic (or plan) level and the project level (where the Forest Service

implements the broader programs and goals laid out in the forest plan)." *Sierra Club v. Wagner*, 555 F.3d 21, 23 (1st Cir. 2009) (citation omitted). Forest plans are planning documents and operate like zoning ordinances, defining the uses allowed in parts of the forest, establishing management goals, and setting standards and guidelines for site-specific management. 16 U.S.C. § 1604(a), (e), (g). The Forest Service achieves the goals of the forest plan through discretionary project-level decisions. *Sierra Club*, 555 F.3d at 23. Before proceeding with a site-specific project, the Forest Service must ensure that the project is "consistent with the" the forest plan. 16 U.S.C. § 1604(*i*).

As here, a forest plan often establishes broad goals and objectives that the Forest Service strives to achieve but that are not binding. JA655-56. The forest plan then sets forth standards and guidelines that provide more specific, technical direction. JA656. A "standard is a course of action that must be followed, or a level of attainment that must be reached," and in general, "standards limit project-related activities." JA656. While a "guideline also is a required course of action or level of attainment," a guideline "permits operational flexibility to respond to variations in conditions." JA656. "Guidelines can be modified or not implemented if site-specific conditions warrant a deviation." JA656. "The rationale for deviating from a guideline must be documented in a project-level analysis." JA656.

### 2. NEPA

NEPA establishes the process by which federal agencies evaluate the environmental effects of certain proposed federal actions. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 173 (2025). "NEPA is a *purely procedural statute*." *Id.* at 180. The statute "'does not mandate particular results[] but simply prescribes the necessary process' for an agency's environmental review." *Id.* at 177 (citation omitted).

At its core, NEPA requires that federal agencies prepare a "detailed statement," an environmental impact statement (EIS), for proposed "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). But most federal actions do not require an EIS.

An agency may prepare an EA instead of an EIS for a proposed action that is not likely to have significant effects or when the significance of the effects is unknown. *Sierra Club*, 555 F.3d at 24. An EA "shall be a concise public document prepared by a Federal agency to set forth the basis of such agency's finding of no significant impact or determination that an [EIS] is necessary." 42 U.S.C. § 4336(b)(2).[1] If an agency determines that the action "will not have a significant

---

[1] Congress amended NEPA in 2023. BUILDER Act, Pub. L. 118-5, Div. C, Tit. III, § 321, 137 Stat. 38-46 (2023). These amendments codified several "basic principles that NEPA, correctly interpreted, already embodied but that have been too often overlooked." *Seven Cnty.*, 605 U.S. at 181 n.3.

effect on the human environment," the agency makes a Finding of No Significant Impact (FONSI) and need not prepare an EIS. 40 C.F.R. § 1508.13 (2005); 26 C.F.R. § 220.3 (2020);[2] *see also* 42 U.S.C. § 4336e(7).

In *Seven County*, the Supreme Court explained that in NEPA cases the "role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one." 605 U.S. at 185 (citation omitted). The Court underscored that "[t]he bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Id.*

### B. Factual background

#### 1. The Forest and Forest Plan

The Forest encompasses nearly 800,000 acres in northern New Hampshire and western Maine. JA746; JA749; JA654 (map). As the first region to be widely settled in the United States, eastern forests have a long history of intensive harvesting and conversion of forests to agriculture, JA1563, often before federal

---

[2] The Forest Service prepared the NEPA analyses under the 1978 version of the NEPA regulations, as amended, promulgated by the Council on Environmental Quality. JA884; JA1294. Those regulations have been rescinded. 91 Fed. Reg. 618 (Jan. 8, 2026). The rescission rule states that agencies should, in defending agency actions, continue to rely on the version of the regulations that was in effect at the time. *Id.* at 625. Similarly, the Forest Service complied with its applicable NEPA regulations, 36 C.F.R. Part 220, which the Department of Agriculture has now rescinded, 91 Fed. Reg. 17,062-01, 17,090 (April 3, 2026). This brief cites the versions applicable at the time of the NEPA processes.

acquisition. The Forest offers a wide range of recreational opportunities, provides habitat for wildlife and plants, and protects biodiversity and water quality. JA747-48. The Forest also continues to provide timber and other forest products. JA747.

In 2005 the Forest Service adopted a new Land and Resource Management Plan (the Forest Plan) for the Forest, consistent with NFMA and the Forest Service's multiple-use mandate. JA745-46. The Forest Plan allocated lands to various management areas. Many portions of the Forest are allocated to areas that do not emphasize active habitat management or commercial timber harvest. JA760-66. The Forest Plan allocated other lands—including the ones at issue here—to more active management, including timber production. JA756. The Forest Plan provides for a sustainable level of timber products from the Forest, with an average harvest intensity of 3,430 acres treated per year, accounting for less than 1% of the Forest land base. JA756; JA764.

The silviculture activities here all occur in two types of management areas that allow more active management. JA882; JA1299. Most of the activities will occur on land designated as Management Area 2.1 (General Forest Management) which provides: a sustained yield of timber products; a balanced mix of habitats for wildlife; and a variety of recreational opportunities. JA720-25. The Forest Plan also identifies habitat composition objectives (including percentages of hardwood, aspen-birch, wildlife openings, etc.) and age class objectives (including

regeneration age class, young age class, and mature age class) for lands allocated to Management Area 2.1.  JA679-81; *see also* JA1670-71.

The Forest Service also manages wildlife habitat within delineated areas called Habitat Management Units (HMUs).  JA1674; JA1386; JA731.  The Forest includes 49 HMUs.  The Forest Service manages vegetation within each HMU "to provide a diversity of habitats, to conserve existing wildlife populations, and to ensure habitats are distributed across the landscape."  JA1386.  HMUs can overlap with a variety of management areas within which different types of vegetation management activities are or are not permitted.  JA1674.

### 2.    Project development and public processes

The Forest Service developed the two projects challenged here because the Peabody West HMU and the Tarleton HMU are not meeting the Forest Plan's desired goals, objectives, and conditions for habitat, vegetation, wildlife, and other resources.  *See* JA882-84; JA1295-96.  Each project involves issues unique to its area, and the two HMUs are in different districts and are about 40 miles apart.

For both projects, the Forest Service's analyses of the two HMUs revealed that neither meets the Forest Plan's habitat composition and age class objectives in similar ways.  JA882-83, JA885; JA1295-96; *see also* JA1676-81; JA1388-94.  Both HMUs effectively contain no regeneration age (0-9 years old) forest habitat and lack open forest conditions favorable to shade intolerant species, such as birch

8

and aspen.  JA883; JA1296; JA1682.  Indeed, across the Forest, the Forest Service has created far less regeneration-age stands than was planned.  *See* JA1680.  The Plan includes objectives for regeneration age forest habitat, in part, because some wildlife species rely on such habitat.  *See, e.g.*, JA679; JA1679; JA1443-44; JA805-07.  The HMUs also have less spruce-fir and aspen-birch than envisioned in the habitat objectives.  JA1676-84; JA1388-94.  The HMUs' current conditions reflect the history of intense timber harvest on the Forest (generally before federal acquisition).  JA1677; JA1390.

To move the Forest landscape towards desired conditions, the Forest Service proposed the Peabody Project in March 2019 and the Tarleton Project in October 2019.  JA879; JA1287.  Over four years the agency conducted two robust public processes to develop and analyze the project proposals, holding open houses and soliciting public comments on the scoping of the projects and on draft EAs. JA879; JA1287-89.  The agency considered all the comments it received and reasonably responded.  *See, e.g.*, JA791-93; JA1200-06; JA855-77; JA1263-84.  Forest Service experts also conducted field surveys and analyzed the environmental effects of the proposals.  The agency modified the proposed projects based on its analyses and in response to public comments.  *E.g.*, *infra* at pp.44-45.  The agency analyzed the environmental effects for each project in an EA specific to that

project, and each culminated in a FONSI that documented that each project has no significant effects requiring an EIS.  JA881-917; JA1291-1324.

### a.  Peabody Project

The Peabody Project is in the Androscoggin Ranger District.  *Compare* JA897 (map of project), *with* JA1675 (HMU map).  The Forest Service identified the Peabody Project's purposes as advancing Forest Plan goals, objectives, and desired conditions for vegetation, wildlife, and other resources in the Peabody HMU.  JA882.  As relevant here, the agency explained that the project is needed "to provide a sustainable yield of high-quality timber products and to improve wildlife habitat diversity" to help "achieve the desired future conditions for wildlife and vegetation" set forth in the Forest Plan.  JA882; *see also* JA1673-84.

Forest Service experts used several sources of data to prioritize field assessments of stand conditions.  JA885.  The Forest Service then examined stands and analyzed existing conditions.  *See, e.g.*, JA1673-84; JA1060-97 (Botany Survey Summary).  In this process, the agency excluded old growth and late successional forests.  *See infra* at pp.26-31.  As the EA explained, "[n]o treatments are proposed in old forest or old growth habitats."  JA885.

The project will conduct commercial and non-commercial vegetation treatments on about 2,220 acres, all within lands allocated to Management Area 2.1.  JA885.  The Forest Service developed site-specific objectives and corresponding

silvicultural approaches for each stand it was harvesting. JA885-90. The EA summarizes the acreage being addressed for each treatment; describes the treatments and their effects; and provides a map of their locations. JA885-90; JA897 (map). The record also explains that the treatments leading to more harvest, such as clear-cuts and patch cuts, are the most effective at increasing regeneration age class and encouraging shade intolerant species, such as aspen-birch. *E.g.*, JA1679-80.

Before implementation, field visits will occur to refine treatment boundaries to address site-specific conditions. JA886. Treatment areas may be reduced to meet visual and water objectives, to incorporate reserve patches of uncut trees, or to create buffers around features such as vernal pools, nest trees, and riparian areas. JA886. The project also includes many design elements to reduce potential impacts on various resources. JA893-96. For example, the project requires implementation of best management practices to minimize soil erosion and protect water quality. JA894-95.

The Forest Service analyzed the environmental effects of the proposed project, summarized them in the EA while referring to more detailed analyses in the record, and contrasted these effects with the consequences of taking no action. JA881-917. Among other things, the agency considered potential impacts on scenery; aquatic resources and water quality; various species including the northern long-eared bat; and rivers which are potentially eligible to be designated under the

Wild and Scenic River Act.  JA902-09.  The Forest Service found the project would have no, negligible, or minimal adverse impacts.  *See* JA902-09.

In comparison, taking no action would result in lower diversity of tree species, ages, and structures; declines in wildlife habitat diversity; and potential declines in stand vigor over time.  JA902.  In other words, taking no action would not advance the Forest Plan's goals or objectives.  JA902.

The Forest Service made a finding of no significant impact after considering the context and intensity of the project's potential environmental effects.  JA909-11.  As to context, the project only will occur on about 3,000 acres of the more than 800,000 acres of the Forest over several years.  JA909.  The Forest Service considered the ten intensity factors from then-existing NEPA regulations and found none warranted a finding of significance.  JA910-11.  Among other things, the Forest Service has implemented this type of project many times and the effects are well known; there are no unique characteristics of the area that would be measurably impacted; and the project is not likely to adversely impact any endangered or threatened species.  JA910-11.  The EA also documented the consistency of the project with the Forest Plan under NFMA.  *E.g.*, JA903-04.

In early 2024, the Androscoggin District Ranger approved the Peabody Project, finding it will "advance Forest Plan goals and objectives by providing high

quality timber products, diversifying wildlife habitat, and addressing other recreation and transportation management needs." JA878-80.

### b. Tarleton Project

The Tarleton Project is in the Pemigewasset Ranger District. JA1294; JA1387 (map). The Forest Service identified the Tarleton Project's purposes as advancing Forest Plan goals, objectives, and desired conditions for vegetation, wildlife, and other resources. JA1295. As relevant here, the project is needed to: improve wildlife habitat diversity; to increase forest health and provide timber products; create a forested buffer along the shoreline of Lake Katherine to improve water quality; and break up a large wildlife opening into smaller openings. JA1296-97.

As with the Peabody project, Forest Service experts designed the Tarleton Project based on several sources of information, including field stand exams. *See infra* at pp.29-30; JA1297, JA1299; JA1388. The Forest Service only acquired much of the land in this HMU recently, and the evidence reveals that much of the area was heavily harvested before acquisition, between the late 1980s and early 1990s. JA1297; JA1390. "None of the stands proposed for management in the project area meet the Forest Plan definition of 'old-growth' forest." JA1488.

The project will conduct commercial and non-commercial vegetation treatments on about 690 acres. JA1299. All treatments will occur on lands allocated to

Management Area 2.1 or adjacent lands in Management Area 8.3 (Appalachian National Scenic Trail). JA1299. The Forest Service developed site-specific objectives and approaches for each stand, and the Tarleton EA summarized the acreage for each type of treatment and the effects of the treatments. JA1299-1303; JA1319 (map). As with Peabody, the Tarleton Project includes field visits to refine treatments and many elements designed to reduce potential impacts on various resources. JA1300; JA1306-08.

The Tarleton project includes some unique aspects such as breaking an existing, 63-acre wildlife opening into three smaller openings totaling 49 acres, with the remaining 14 acres left to develop naturally. JA1304. It will also establish a minimum 75-foot-wide forested buffer along Lake Katherine. JA1304. For the harvest in lands allocated to Management Area 8.3, JA1222, the Forest Service ensured no activities would occur within the foreground of the Appalachian Trail, consistent with the Forest Plan, JA1312.

The Forest Service analyzed the environmental effects of the proposed project, summarized the potential impacts in the EA, and compared these effects with the consequences of taking no action. JA1309-14. The agency found the project would have negligible to no adverse impacts. *See* JA1310-13.

In comparison, taking no action would result in lower diversity of tree species and ages. JA1298. "There would be less young forest habitat overall which

14

would favor wildlife species preferring older forests, likely reducing overall wildlife species diversity in the project area over the long-term." JA1298. Some of the proposed treatments are expected to increase tree growth and tree quality, generally resulting in a greater resilience to insects and disease. JA1302-03. Without improvements to the shoreline around Lake Katherine, "stormwater would continue to runoff into the lake before it can be fully filtered of phosphorus, sediment, and possibly other pollutants." JA1298. In other words, taking no action would not advance the Forest Plan's goals or objectives. JA1298.

The Forest Service made a finding of no significant impact. JA1314-16. "Project activities would occur over an area totaling less than about one percent of the total acreage within the [Forest]." JA1314. The agency considered the ten intensity factors and found none warranted a finding of significance. JA1314-16. The agency found the project "is consistent with" the Forest Plan. JA1294; JA1315.

In late 2023, the Pemigewasset District Ranger approved the Tarleton Project, finding it "will advance forest plan goals and objectives by diversifying wildlife habitat and addressing other recreation and transportation management needs."

JA1285-90.  The project "will have minimal impact on the environment and will benefit multiple resources."  JA1287.[3]

## C.  District court proceedings

Before the district court, Plaintiff contended that the Forest Service violated NEPA and NFMA in three ways: failing to analyze sufficient alternatives; failing to take a "hard look" at the projects' environmental impacts; and "fail[ing] to design the projects consistently with the requirements of the Forest Plan."  Appellant's Addendum (ADD.) 12.  The court rejected these arguments.

With respect to NEPA, the district court first found that the Forest Service had adequately analyzed alternatives and reasonably responded to Plaintiffs' suggested alternatives.  ADD.12-20.  The court also ruled that the agency reasonably evaluated the potential environmental impacts of the projects, including impacts to water quality, forest health, northern long-eared bats, scenery, and cumulative impacts.  ADD.20-38.

With respect to NFMA, the district court rejected Plaintiff's argument that the projects were not consistent with the Forest Plan.  ADD.38-43.  Plaintiff only contended that "Peabody violates Forest Plan standards for scenery and eligible Wild and Scenic Rivers, and that neither Project contributes to the conservation

---

[3]    Since the decisions, the agency has begun implementing both projects, *see* JA68, but such post-decision information is not in the administrative records.

and recovery of the northern long-eared bat." ADD.38. The court found that the projects are consistent with these components of the Forest Plan. ADD.38-43.

The court granted summary judgment to the government.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo. *Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1, 12 (1st Cir. 2024). The Court reviews the Forest Service's decisions and compliance with NFMA and NEPA under the APA. "As a result," the Court has "a 'narrow role to play.'" *Id.* (citation omitted). The Court "may set aside 'an otherwise proper agency action if [the action] is arbitrary and capricious or ... not based on substantial evidence.'" *Id.* (citation omitted). "This standard of review is deferential, especially when the agency action involves 'technical or scientific matters within the agency's area of expertise.'" *Id.* (citation omitted).

## SUMMARY OF ARGUMENT

This Court should affirm. As detailed below, Plaintiff failed to raise several of the arguments it makes on appeal before the district court, and they are thus forfeited. In any event, the Forest Service reasonably authorized the two projects, in compliance with NFMA and NEPA.

I.    The Forest Service reasonably determined the projects are consistent with the Forest Plan under NFMA. Neither project will harvest any old growth

17

forest, consistent with the Plan's standard. The projects are also consistent with the Plan's objectives regarding old forest habitat (a different category), properly interpreted. The agency reasonably explained its determinations, and the administrative record supports its conclusions. The Forest Service followed its scenic guidelines in developing the projects, and it reasonably explained its choices to deviate from one guideline because there was an inevitable tradeoff between meeting the habitat and scenery goals for the area. The projects are also consistent with the standard to maintain rivers' eligibility for potential designation as wild and scenic rivers. While the projects will have limited, short-term effects, those visual effects will fade and the rivers remain eligible. And the Forest Service fulfilled its obligation to investigate for the presence of endangered, threatened, and sensitive species because it prepared site-specific biological evaluations considering all available information, including survey data.

II. The Forest Service complied with NEPA by considering alternatives and preparing EAs evaluating the projects' likely environmental effects. The EAs reasonably evaluated the proposed actions and the consequences of taking no action. The agency also explored various alternatives as it developed the projects and as received during the public comment process. It reasonably considered the alternatives proposed by Plaintiff and provided explanations for not analyzing them in-depth. That is all NEPA requires.

The Forest Service reasonably evaluated the environmental effects of the proposed actions, including effects on resources such as water quality, the northern long-eared bat, scenery, and carbon sequestration. The agency analyzed cumulative impacts more than required by law. Both Supreme Court and this Court's precedent clarify that the agency had no obligation to analyze the combined effects of these two geographically separate, independent projects. The Forest Service reasonably concluded that the projects would not have significant impacts on the environment requiring EISs.

## ARGUMENT

**I.      The Forest Service reasonably found the two projects are consistent with the Forest Plan.**

The Forest Service reasonably determined that both projects are "consistent with" the Forest Plan. 16 U.S.C. § 1604(*i*). Plaintiff has failed to establish that those determinations were arbitrary or capricious. As the district court explained, "[t]he Forest Service's interpretation and implementation of its own Forest Plan is entitled to substantial deference." ADD.39 (quoting *Oregon Nat. Desert Ass'n (ONDA) v. U.S. Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020), and collecting cases); *see also Sierra Club v. Wagner*, 555 F.3d 21, 26 (1st Cir. 2009). Courts regularly "adopt[] the agency's interpretation of parts of the Plan that are 'susceptible to more than one meaning unless the interpretation is plainly erroneous or inconsistent with the [Plan].'" *Native Ecosystems Council v. Marten*, 883 F.3d 783,

19

793 (9th Cir. 2018) (citation omitted).[4]  Such deference is particularly warranted when, as here, the Forest Service's consistency determinations required making scientific and technical "judgment calls as to the likely impact of proposed actions."  *See Sierra Club*, 555 F.3d at 25.

Under NFMA and this specific Forest Plan (JA655-56), "[c]onsistency … depends upon the component type" in the Forest Plan.  *See All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1110 (9th Cir. 2018).  "The Forest Service must strictly comply with a forest plan's 'standards,' which are considered binding limitations, but it may deviate from the forest plan's 'guidelines,' so long as the rationale for deviation is documented."  *Id.*; JA655-56.

### A.  The projects are consistent with the Forest Plan's language on old growth forest and old forest habitat.

The Forest Service reasonably determined that the projects would not harvest old growth forest as defined within the Forest Plan.  *See, e.g.*, JA885; JA1488.  The projects also maintain high quality mature forest and old forest habitats consistent with the relevant habitat objective, JA679, and indeed, do not harvest old forest habitat, properly understood.  The projects are thus consistent with the Forest Plan.

---

[4]  In its Opening Brief, Plaintiff does not argue that the district court erred (ADD.39) in deferring to the Forest Service's interpretations of its Forest Plan and thus has forfeited any such argument.

At the outset, Plaintiff has forfeited the first argument it raises on appeal (Br. 16-27) that the Forest Service violated *NFMA* in assessing old growth forest and old forest habitat because Plaintiff failed to develop it below. Plaintiff argued that the Forest Service's *NEPA* analysis of these issues was inadequate, but Plaintiff only cursorily suggested that the decisions therefore also violated a Forest Plan goal to use the "latest scientific knowledge." JA225 (citing JA662). Even *if* such a cursory assertion could preserve an argument, that is not Plaintiff's NFMA argument on appeal. Its original motion for summary judgment never quoted or cited the Forest Plan language it now discusses (JA694 and JA733, discussed below). For this reason, the district court never mentions these issues when ruling on the *NFMA* claims. ADD.38-43. This Court should refuse to reach this aspect of Plaintiff's NFMA claim because, as explained in *Sierra Club*, a party cannot raise a "new legal theory" on appeal merely because it would support "the same result" as different arguments made below. 555 F.3d at 26.

Even if this Court reaches these NFMA arguments, they lack merit. Plaintiff asserts (Br. 16-27) that the Forest Service "blurred" various classifications, but Plaintiff blurs them to infer legal duties that do not exist. Plaintiff's similar conflation of NFMA and NEPA also confuses the issues. "[T]he statutory schemes are entirely separate." *Nevada Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 n.2 (9th Cir. 1993). We address NFMA first, then NEPA.

**1.** **The projects are consistent with the Forest Plan's standard prohibiting harvest in old growth forest.**

On appeal, Plaintiff identifies (Br. 19) only one binding requirement in the Forest Plan relevant here. Under Rare and Unique Features Standard S-3, the Forest Plan provides that "Timber harvest is prohibited in old growth forest." JA694. That standard "must be followed." JA656. The Forest Plan's glossary then provides a detailed description of "old growth forest." JA733. Among other things, the description provides that there must be an "abundance of trees at least 200 years old," "little or no evidence of past timber harvest or agriculture," and "[s]tands need to be at least 10 acres in size to be identified as old growth." JA733. For both projects, the Forest Service found that no treatments would occur in old growth forest. *See* JA885; JA1488. The Forest Service's determinations find ample support in the administrative record, as explained *infra* at pp.27-30.

**2.** **The projects are consistent with a correct interpretation of the Forest Plan's objective mentioning old forest habitat.**

Plaintiff also relies (Br. 19-20, 23) on a separate description in the Forest Plan's glossary for "old forest habitat," JA733, but Plaintiff reads into that description duties that it does not create.

The phrase "old forest habitat" only appears twice in the Forest Plan. In the body of the Plan, the sole mention of "old forest habitat" is that the Forest Service has a wildlife "objective" for "habitat management" to "[m]aintain high quality

mature forest and old forest habitats on a majority of the Forest."  JA679.  This is one of several objectives for wildlife habitat management.  JA679.

As explained in a 2019 guidance document, this objective guides wildlife habitat analyses, and since "no species … require old (instead of mature) forest habitat," the Forest Service need not distinguish mature from old forest habitat.  JA1427-41.  That interpretation is correct given that the only mention of "old forest habitat" is in the "wildlife" objective section and discusses the goal of maintaining mature and old forest habitats together as a "majority."  JA679.  The natural reading is that they may be considered together and need not be distinguished.  That interpretation finds further support in the Forest Plan's details about habitat objectives which follow it.  JA679-80.  The Plan provides percentage objectives for certain habitat types in terms of tree species and for age class, but none of those specific objectives include any percentage for old forest habitat.  JA680.[5]

---

[5]  An earlier version of the Forest Plan contained percentage objectives for an "old age class objective" (not old forest habitat), but given confusion about its import, in 2009 the Forest Service corrected it to "percentage of land unsuitable for harvest."  Administrative Correction 2, https://usfs-public.app.box.com/s/i0bxmpvpores9n27f9pwyz58wmdmb547 (last visited May 15, 2026).  The Plan explains that "[l]and unsuitable for harvest is not available for timber harvest, so should continue aging for the long-term."  JA680.  As the district court explained, "Standing Trees does not challenge the Forest Plan itself in this litigation."  ADD.8.

Both projects advance wildlife habitat objectives and maintain high quality mature forest and old forest habitats on a majority of these HMUs, no matter how the lands are labeled. *See* JA1684; JA1394; *see also* JA862; JA866. Consistent with the Forest Plan (JA680), the habitat rationales also explain that "forested acreage that is unsuitable for harvest" will "eventually obtain old-growth characteristics." JA1677; JA1388-89. And well over half of the *Forest* includes such mature forest and old forest habitats, *see* JA970; JA1393, meeting the objective for such habitats on "a majority of the Forest" (not in individual HMUs). JA679. The projects are plainly consistent with the objective, and Plaintiff develops no argument to the contrary.

Instead, Plaintiff's NFMA argument (Br. 19-25) about "old forest habitat" turns on its reading of the "glossary" of the Plan. The glossary provides a general, qualitative description of "old forest habitat" as including "[d]esired habitat conditions start[ing] with those for mature forest" and then notes that "[n]o harvest will occur in stands identified to provide old forest habitat." JA733. Plaintiff takes that sentence out of context and insists it is a "command." Br. 19. It is not.

Just as Congress does not "hide elephants in mouseholes" when drafting statutes, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), forest plans do not bury binding requirements in descriptions in the glossary; they set them forth in the body of the plan as standards. JA656; *see also, e.g.*, *ONDA*, 957 F.3d

24

at 1035. This Forest Plan explains at the outset that the "[s]tandards and guidelines provide more concrete direction" and that "[a] standard is a course of action that must be followed." JA655-56; *see also* JA745. Lest there be any confusion, "[s]tandards are preceded by the identifier S-# for each resource." JA656. As with any legal document, sentences in forest plans cannot be read in isolation; they must be interpreted in their context, including their structural placement.

Here, this sentence in the glossary is not a command because it is not a standard nor any other component of the Forest Plan (such as a guideline) that requires consideration in project development. Its placement within a description in the glossary undermines Plaintiff's theory that it is meant to bind the Forest Service going forward. *Cf. Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 428-31 (2018) (interpreting language in "definition" as providing "meaning" rather than a legal effect, due to placement and formulation). Moreover, all forest meeting the detailed and specific "old growth forest" description also fits within the broader and more general description of "old forest habitat," JA733, so interpreting this isolated sentence in the glossary as a prohibition similar to Standard S-3 would render that Standard surplusage. That is not plausible.

The sentence is best read as a part of the description, observing that the Forest Service plans no harvests in those stands it has "identified to provide" old forest habitat. JA733. Such an interpretation makes sense, particularly when compared

to the "old growth forest" Standard S-3 above, which expressly "prohibit[s]" harvest in "old growth forest," without any similar qualification. Revealingly, in trying to argue that the description imposes a "mandatory" "prohibition," Plaintiff misquotes the language and changes that tempering language to a more definitive "that contain old forest habitat." *Compare* Br. 23, *with* JA733. And to the extent that Plaintiff suggests (Br. 22) this language separately creates a "command" "to identify … old forest habitat," that interpretation is even less plausible as "identified to provide" is a mere participial adjective modifying the words "stands." That is no way to set forth a command or directive. Plaintiff's arguments do not "render[] the Forest Service's interpretation unreasonable," and this Court should defer to the Forest Service's interpretation. *See All. for the Wild Rockies v. Bradford*, 856 F.3d 1238, 1243 (9th Cir. 2017).

In any event, neither project will harvest old forest habitat, properly understood. *See, e.g.*, JA862; JA857 ("While some old forest may occur in the Peabody HMU, these stands are not proposed for treatment.").

### 3. The Forest Service's NFMA analyses can reasonably be discerned, and NFMA does not require Plaintiff's preferred methodologies or level of detail.

The Forest Service reasonably determined that neither project would harvest old growth forest. *See, e.g.*, JA885 (citing JA1673-84); JA1488. Plaintiff does not point to any evidence contradicting those determinations, and despite ample

26

opportunity, Plaintiff still identifies no specific old growth forest (or even old forest habitat) stands that are authorized for treatment. Instead, Plaintiff insists (Br. 16-27) the Forest Service did not document its analysis with the level of detail Plaintiff prefers. But that is not the standard for reviewing the Forest Service's compliance with NFMA.

Under the APA's arbitrary or capricious standard, an agency "need only show that it has 'considered the relevant factors and articulated a rational connection between the facts found and the choice made.'" *Nantucket Residents*, 100 F.4th at 12 (quoting *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 105 (1983)). Courts will "conclude that the Forest Service act[ed] arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan." *ONDA*, 957 F.3d at 1035 (citation omitted). "[E]ven when an agency explains its decision with 'less than ideal clarity,' a reviewing court will not upset the decision on that account 'if the agency's path may reasonably be discerned.'" *Id.* (quoting *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 497 (2004)).

Here, the Forest Service's conclusions are correct, and its path may reasonably be discerned. As the district court explained, "both the draft and final EAs identified the HMU Rationale documents, which in turn cite stand surveys as one

of the sources the Forest used to assess forest health." ADD.33-34. "The administrative record shows that Forest Service employees studied stands throughout the project areas, and, on finding old growth habitat … the Forest Service excluded those areas" from treatments. ADD.32. The Forest Service's "revisions to its original proposed treatments demonstrate its 'willingness to receive evidence.'" ADD.33 (quoting *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 554 (1978)).

For the Peabody Project, the EA found that "[n]o treatments are proposed in old forest or old growth habitats." JA885 (citing the HMU Rationale). The HMU Rationale summarizes the evidence that the Forest Service collected in evaluating stands, *see, e.g.*, JA1673-84, and the Botany Survey Summary provides a more detailed analysis of stands, JA1060-97. The record further explains that the Forest Service excluded old growth and late successional forests by: (i) measuring the density of large trees in stands; (ii) returning to stands with density consistent with late successional or old growth; (iii) collecting tree cores and other data to identify and delineate boundaries of those stands; and (iv) then removing old growth or late successional stands. *See, e.g.*, JA802-04; JA990-91 (explaining "four stands with identified old-growth characteristics … are documented as dropped"); JA876-77; JA1169-70; JA1060-97. Plaintiff only alleges (Br. 23-24) one specific error in this analysis: that stands identified in the Botany Survey as within Compartment 34,

28

stands 71, 73, and 75, JA1081-85, might be within "timber units" numbered 72 and 74. But as the government and district court explained (JA342-44; ADD.32-33), the record contains a table identifying stands selected for harvest and these stands are not listed, JA1169-70 (the relevant stand numbers are in the third column immediately to the right of the compartment column).

Similarly, for the Tarleton Project, the Forest Service explained that it classified each stand during field examinations, and "[n]one of the stands proposed for management in the project area meet the Forest Plan definition of 'old-growth' forest." JA1488. That discussion cites the HMU rationale for that project, JA1488, which summarizes the conditions and areas chosen for treatment, JA1382-94. The administrative record includes detailed notes and analyses of these stands based on visual estimations, core samples, and other information, including consideration of age. *E.g.*, JA1603-16; JA1458-68; JA1212-21. The record also delineates the areas selected for various treatments. JA1617; JA1325. The Forest Service's analysis worksheet shows that *none* of the studied stands meet the requirements for old growth forest; the single oldest measured year of origin was 1879 (which was not selected for harvest)—less than 150 years old—and most of the data revealed much younger tree stands. JA1458-68; JA1603-16; JA1665. "Old growth forest" requires, among other things, an "abundance of trees at least 200 years old."

JA733.  Given intensive harvesting of Tarleton during the years before federal acquisition, JA1390, the absence of old growth forest is hardly surprising.

Plaintiff does not identify errors with the Forest Service's reasoning.  Plaintiff instead suggests (Br. 19, 22-27) this is insufficient because the Forest Service did not: (1) always perform the Manomet Late Successional Index (LSI), which the Forest Service used when assessing certain older stands; (2) provide a single map overlapping the stands, timber units, and old growth; or (3) otherwise document its identification of stands and age analyses to Plaintiff's satisfaction.  But Plaintiff does not identify any statute, regulation, or Forest Plan provision that imposes such obligations.  As such, their claims must fail because under NFMA a court "may not impose procedural requirements not explicitly enumerated in the pertinent statutes." *ONDA*, 957 F.3d at 1034 (citation omitted) (rejecting argument NFMA implicitly imposes certain documentation requirements).  "Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." *Vermont Yankee*, 435 U.S. at 543 (cleaned up).  Moreover, courts properly defer to "the Forest Service's scientific judgments regarding methodology and its interpretation of its own forest plans." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 948 (9th Cir. 2014).  Thus, the Forest Service's decisions about how to identify and document its

avoidance of old growth forest are best seen as "a means of assessing compliance with the existing standard," not an attempt to evade it. *See id.*

### 4. The Forest Service's discussion of old growth forest and age classifications complied with NEPA.

Plaintiff broadly asserts (Br. 25-27) that the Forest Service violated NEPA by not providing more detailed information about the age classes of areas selected for harvest. Nothing in NEPA required this level of detail, much less all the underlying data. Plaintiff identifies no statute or regulation imposing such a requirement, and this Court should not impose one. *See, e.g.*, *All. To Protect Nantucket Sound, Inc. v. U.S. Dep't of Army*, 398 F.3d 105, 115 (1st Cir. 2005) (refusing to impose duty to publish draft EA absent regulatory requirement).

As discussed more *infra* at pp.39-40, an EA is "a concise public document," 42 U.S.C. § 4336(b)(2), and thus may summarize information; it need not provide a stand-by-stand account. And courts must "afford substantial deference" to an agency's decisions about the "level of detail" to provide in NEPA documents and what information is useful to its decision. *Seven Cnty.*, 605 U.S. at 181, 183. Similarly, neither NEPA nor NFMA forecloses agency experts from preparing notes and analyses "for technical users within the Forest Service," even if they may be "difficult for laypeople to understand." ADD.34. And the public participation requirements for EAs are not as onerous as for EISs. *See, e.g.*, *All. To Protect Nantucket Sound*, 398 F.3d at 115.

As the district court explained, the "Forest Service adequately disclosed information that … would allow public comment on the proposed timber harvest areas." ADD.31. Plaintiff "requested and received the stand surveys," and Plaintiff "did not seek clarification of the documents." ADD.34. Thus, Plaintiff cannot now complain about an alleged lack of clarity in stand data. *See Historic Bridge Found. v. Buttigieg*, 22 F.4th 275, 282-83 (1st Cir. 2022).

## B. The projects are consistent with the Forest Plan's provisions regarding scenery, wild and scenic rivers, and species.

### 1. Scenery

On appeal, Plaintiff contends (Br. 28-30) that the Peabody Project violates scenic standards and guidelines. But in district court Plaintiff did not make the argument that Scenery Management Standard S-2 (JA707) turns all the scenery guidelines into binding obligations. That aspect of this argument is thus forfeited. *See Sierra Club*, 555 F.3d at 26. In any event, S-2 explains scenery objectives "will be met by … [f]ollowing … guidelines developed" for the relevant management areas, as well as by following other listed guidance documents. JA707. That language does not transform the guidelines into binding standards; if the guidelines were meant to be standards, they would be standards. *See Ecology Ctr. v. Castaneda*, 574 F.3d 652, 660 (9th Cir. 2009) (recognizing that guidelines incorporated into Forest Plan did not create a mandatory standard even if some isolated language was cast in mandatory language).

The Forest Service followed the relevant guidelines and reasonably provided rationales for its limited deviation from them. *See, e.g.*, JA987-88 (discussing S-2 and explaining deviation); JA911. Both precedent and this specific Forest Plan provide that the Forest Service may deviate from guidelines, so long as "the rationale for deviating from a guideline" is "documented." JA656.

The Peabody EA summarizes the effects of the project on scenery and incorporates the detailed Scenery Specialist Report. JA901-03; JA1140-55. Based on analysis from four viewpoints within the area (JA1146-52), the Forest Service modified the proposal to minimize impacts, including reducing the size and selected treatments in places. JA903; JA1142; JA797-99. Despite these efforts, the project still "includes three relatively large even-aged treatments" which exceed the Scenery Management Guideline G-3. JA903. G-3 provides that for areas with a "high" scenic integrity objective, "[m]aximum observed size should not exceed 4-5 acres." JA723. Here, the largest exceedance will initially impact 19.1 acres when viewed from Mount Carter. JA1150. The modeled impact would be:



JA1148.  To address the guidance's additional statement that "openings … should appear as natural occurrences and be well-distributed," JA723, the project includes a design element to ensure openings are "well-distributed … to the maximum extent practical."  JA988; JA896; *see also* JA656 (explaining that word "*should*" indicates "greater flexibility").  As the above photo illustrates, the openings are like those resulting from larger natural disturbances (such as from ice storms); they lack sharp edges and are not squares.  JA1147-53.

The Forest Service then provided a rationale for deviating from the scenic guideline, consistent with the Forest Plan.  JA987-88; JA903; JA911.  "These units provide key opportunities to move the forest toward desired conditions for regeneration habitat."  JA878.  "Due to the lack of regeneration for aspen-birch in the Peabody West Project, it is extremely important to keep or even add to the proposed

34

clearcuts and patch cuts in the project even though it might be visible." JA1680.

"[I]t is not possible for the project area to be consistent with both [Management Area] 2.1 habitat management direction and [Management Area] 2.1 scenery management direction," and the Forest Service reasonably chose "for Forest Plan habitat objectives to take precedence" over Scenery G-3. JA987-88. Plaintiff does not (and cannot) contend that this tradeoff could be avoided, and as the district court observed, "[n]o tree harvesting project would be without scenic impacts." ADD.29. The Forest Service thus complied with NFMA by providing a rationale for deviating from G-3.

### 2. Wild and Scenic Rivers

The Forest Service reasonably determined that the Peabody Project meets the Wild and Scenic River Standard S-1 to "[m]anage eligible rivers to maintain their classification and eligibility until Congress designates the segments or decides not to designate them," JA713, which includes, among other factors, maintaining long-term scenic value. *See* 16 U.S.C. §§ 1271, 1281.

The Forest Service analyzed potential impacts to portions of the Peabody River and West Branch Peabody River and included a design feature to reduce or avoid impacts. JA907-08; JA1197-99. The project also includes elements to protect water quality and minimize soil loss and erosion to protect all waters. JA894-95. As the Scenery Specialist Report explains, the visible effects of treatments will

be greatest in their first year, and as vegetation grows, visual effects fade.  JA1141; *see Sierra Club*, 555 F.3d at 29 (explaining "the visual blight would begin to be dissipating almost from the start").

The Forest Service explained that the project would "have limited, short-term effects on potential outstandingly remarkable values but would not result in an irreversible or irretrievable change in the condition of the river corridor or its potential for designation in the future."  JA908.  Given these limited, short-term impacts, the Peabody Project "maintains" the rivers "eligibility" for future designation.  In the context of forest management, where scenic values continually change due to various natural events, managing to "maintain" eligibility is best understood as "to support or provide for" or "sustain" eligibility over the long-term.  *See* Maintain, Merriam-Webster, https://www.merriam-webster.com/dictionary/maintain (last visited May 15, 2026).  And the final clause of Standard S-1 indicates that the relevant timeframe is not moment-to-moment but "until Congress designates the segments or decides not to designate them."  JA713.  As the project will not have a lasting effect on the rivers' eligibility, it preserves it for a future decision by Congress.  Thus, the project is consistent with this standard.

### 3.  Northern long-eared bats

Forest Plan Rare and Unique Feature S-1 provides: "project sites must be investigated for the presence of [Threatened, Endangered, and Sensitive (TES)]

species and/or habitat," and it separately states that "TES plant surveys must be completed," unless an expert determines occurrence is unlikely. JA694; JA736. The agency complied with this standard.

The Forest Service prepared a site-specific biological evaluation for each project. JA1173-93; JA1618-64. In those evaluations, biologists and botanists "investigated available information on species distributions and habitat (using topographic maps, aerial photos, field reconnaissance, previous surveys, vegetation data, and/or habitat requirement data for each species)" to assess potential effects on such species. JA1175-77; JA1621-24. "[A]ll past field surveys and other sources of occurrence information were reviewed." JA1177; JA1623. Botany staff conducted field surveys for plants. JA1177; JA1623-24.

Plaintiff focuses (Br. 31-32) on the northern long-eared bat. The biological evaluations summarize the available data for that species and assessed the potential impacts of the projects. JA1178-79; JA1626-28; JA1642. "White-nose syndrome has decimated the [bat] across its range, including within the action area." JA1626. The New Hampshire Fish and Game Department attempted to, but did not, capture any northern long-eared bats over two nights across the Forest in July 2019. JA1179; JA1626; JA1401-22. Acoustic bat surveys were also conducted at two sites in Tarleton in July 2019, but no northern long-eared bats were detected.

37

JA1623; JA1210. "There are no known hibernacula or maternity roosts within" either project area. JA1179; JA1626.

Still, the Forest Service conservatively assumed this species is present. JA1179; JA1626. The Forest Service consulted on these projects with the Fish and Wildlife Service. That consultation tiered to lengthy biological opinions addressing forest projects over much larger areas. JA1179; JA1627; *see also* JA588-644; JA579-84. The Fish and Wildlife Service has estimated that only 0.1 percent of the pup population and less than 0.05 percent of the adult population will be harmed annually by the combination of timber harvest, prescribed fire, forest conversion, and wind turbines. JA1627; JA1178; JA579-84. Thus, the "vast majority of individuals and populations that survive white-nose syndrome would be unaffected by these activities." JA1627. Furthermore, the Peabody and Tarleton Projects leave ample roost trees in their respective areas, and they may yield beneficial effects in improved habitat and forage. JA1179; JA1627. The Forest Service found that the projects are not likely to adversely affect northern long-eared bats, and the Fish and Wildlife Service concurred. JA1179; JA1628; JA588-89.

The Forest Service met its obligations under S-1 because it "investigated" for northern long-eared bats. "To investigate" means "to observe or study by close examination and systematic inquiry." Investigate, Merriam-Webster, https://www.merriam-webster.com/dictionary/investigate (last visited May 15,

2026).  The biological evaluations reflect study by closely and systematically examining the available evidence.  Plaintiff implies (Br. 31) surveys are required, but while S-1 requires *plant* surveys absent a finding, that duty is limited to "plant[s]" unlike the prior, more general duty to "investigate" "species."  JA694; *see also* ADD.43.  The Forest Service acted intentionally by using narrower language in the second sentence about plant surveys after using broader terminology before, and the best interpretation is that surveys are not required for animals.  *See, e.g.*, *Baker v. Smith & Wesson, Inc.*, 40 F.4th 43, 48 (1st Cir. 2022).

## II.     The Forest Service complied with NEPA.

The Forest Service complied with NEPA by considering alternatives and preparing EAs evaluating the projects' environmental effects.  "NEPA imposes no substantive environmental obligations or restrictions" and is "purely procedural."  *Seven Cnty.*, 605 U.S. at 173.  Under NEPA, an agency must evaluate the environmental effects of certain projects and consider appropriate alternatives.  *Id.* at 169.  An agency has broad flexibility in fulfilling those obligations, and "the only procedural requirements imposed by NEPA are those stated in the plain language of the Act."  *Vermont Yankee*, 435 U.S. at 548.

An EA is "a concise public document" "set[ting] forth the basis of [the] agency's finding of no significant impact."  42 U.S.C. § 4336(b)(2).  By statute, EAs are now limited to 75 pages.  42 U.S.C. § 4336a(e)(2).  "An EA is meant to be

less detailed than an EIS." *Safeguarding the Historic Hanscom Area's Irreplaceable Res., Inc. v. FAA*, 651 F.3d 202, 217 (1st Cir. 2011).

Plaintiff insists (Br. 45-53) that the Forest Service violated NEPA's so-called "hard look requirement," but Plaintiff is mistaken on both the law and the record. Plaintiff does not identify any precedent where this Circuit has applied the "hard look" standard to an EA, rather than an EIS. Moreover, as applied in some cases, the hard-look standard "dramatically expanded NEPA's compliance burden," *Appalachian Voices v. FERC*, 139 F.4th 903, 921-23, 926-27 (D.C. Cir. 2025) (Henderson, J., concurring), and *Seven County* has directed the courts to engage in a "course correction … to bring judicial review under NEPA back in line with the statutory text and common sense," 605 U.S. at 184.

Thus, "[w]hen assessing significant environmental effects and feasible alternatives for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting" NEPA documents. *Seven Cnty.*, 605 U.S. at 182-83. "Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 183. "*Seven County*'s emphasis on deference has even greater force" when reviewing "only an [EA]." *Badger Helicopters Inc. v. FAA*, 154 F.4th 902, 913 n.2 (8th Cir. 2025).

40

**A. The Forest Service reasonably considered appropriate alternatives.**

The EAs reasonably evaluated the proposed action and the consequences of taking no action. The Forest Service also explored various alternative courses of action as it developed the projects and as submitted by commenters during the public comment process. In response, the Forest Service sometimes modified the proposals to incorporate aspects of those alternatives, and otherwise the Forest Service briefly explained why the alternatives did not merit detailed study. In doing so, the Forest Service fulfilled its obligations under NEPA.

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action," 42 U.S.C. § 4332(H), but it leaves agencies leeway in how they meet this responsibility. *Seven County*'s admonition to defer to agencies expressly includes deference to their assessment of alternatives. 605 U.S. at 182-83. "NEPA's 'statutory and regulatory requirements do not dictate the minimum number of alternatives that an agency must consider.'" *Earth Island Inst. v. U.S. Forest Serv. (Earth Island I)*, 697 F.3d 1010, 1022 (9th Cir. 2012) (citation omitted). The Forest Service's NEPA regulations also provided: "No specific number of alternatives is required or prescribed." 36 C.F.R. § 220.7(b)(2).

Even when preparing an EIS, "the concept of alternatives must be bounded by some notion of feasibility." *Beyond Nuclear v. U.S. Nuclear Regul. Comm'n*,

41

704 F.3d 12, 19 (1st Cir. 2013) (citation omitted). "[A]gencies must consider only 'reasonable' alternatives, meaning alternatives 'bounded by some notion of technical and economic feasibility,' and only alternatives that would 'bring about the ends of the proposed action.'" *Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*, 123 F.4th 1, 22 (1st Cir. 2024) (citations omitted).

Every circuit to address the issue has recognized "that an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005) (collecting cases). After all, "it makes little sense to fault an agency for failing to consider more environmentally sound alternatives to a project which it has properly determined … will have no significant environmental effects anyway." *Earth Island I*, 697 F.3d at 1023 (citation omitted).

Thus, courts have "repeatedly held that an agency satisfies NEPA when it considers only two alternatives—action and no action." *Earth Island Inst. v. U.S. Forest Serv. (Earth Island II)*, 87 F.4th 1054, 1065 (9th Cir. 2023); *Friends of Animals v. Burgum*, 164 F.4th 738, 756 (9th Cir. 2026) (collecting cases).

### 1. The Forest Service compared the proposals to the effects of a no-action alternative.

The Forest Service's then-applicable regulations provided that an EA "may document consideration of a no-action alternative through the effects analysis by contrasting the impacts of the proposed action and any alternative(s) with the

current condition and expected future condition if the proposed action were not implemented." 36 C.F.R. § 220.7(b)(2)(ii). As the district court explained, the "EAs for both the Tarleton and Peabody projects document consideration of an action and no-action alternative, in that they contrast the impacts of the proposal with the current condition and expected future condition of the environment." ADD.12.

The EAs provide this contrast in two crucial ways. First, each EA provides a separate section labeled the "consequences of no action" which detail the consequences of taking no action and allowing "natural successional processes" to continue without management. JA1298; JA902. For example, compared to the proposals, taking no action would result in lower diversity of tree species, ages, and structures; failing to meet certain wildlife objectives; decreased stand vigor; and foregoing improvements to recreation and transportation. JA902; JA1298. Both EAs conclude that taking no action "would not meet the need to advance forest plan goals or wildlife habitat diversity objectives." JA1298; JA902. Second, throughout the EAs and administrative record, the Forest Service analyzes the existing conditions and the consequences, both negative and beneficial, of implementing the proposed projects relative to the existing conditions. *See, e.g.*, JA993 (explaining that Soils Specialist Report provides "clarification of effects from the no-action alternative and the proposed action"); JA1156-66. Nothing in NEPA requires the Forest Service to repeat each of those observations under the "no action"

heading, and imposing such an obligation would render EAs repetitive and undermine the goal of keeping them "concise." 42 U.S.C. § 4336(b)(2). And Plaintiff does not (and cannot) dispute that the EAs established that taking no action would fail to "bring about the ends of the proposed action," and thus they are not reasonable alternatives. *See Seafreeze Shoreside*, 123 F.4th at 22 (citations omitted).

Courts regularly uphold EAs that "devote[] considerably less space to presenting and discussing" the "no action" alternative. *See, e.g.*, *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1181 (9th Cir. 1990); *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 602 (9th Cir. 2010) (upholding "no action" analysis that "consisted of only one paragraph"). "[T]he concept of a no-action" may be relatively "self-evident," *Headwaters*, 914 F.2d at 1181, and less analysis particularly makes sense when, as here, it continues a status quo that the agency has found "detrimental to land conditions," *W. Watersheds Project v. BLM*, 721 F.3d 1264, 1274 (10th Cir. 2013).

### 2. The Forest Service reasonably considered alternatives in developing the proposals and reviewing public comments.

The Forest Service also considered alternative courses of action and adjusted the proposals based both on its own analyses and public comments. *See* JA981 (explaining "proposed action evolved throughout project development in a way that minimized the value of creating a set of alternatives" for documentation in EA). While not analyzed as separate alternatives in the EA, the agency's

consideration of these options served the purposes of 42 U.S.C. § 4332(H). And

"NEPA does not require an agency to consider 'every conceivable permutation' of

its proposed alternatives." *Earth Island II*, 87 F.4th at 1065 (collecting cases).

After the public scoping process, the Forest Service reduced the geographic

scope of silvicultural activities from the initial proposals by about 51% for Pea-

body (4,500 to 2,220 acres) and 22% for Tarleton (890 to 690 acres). *Compare*

JA788; JA1208, *with* JA885; JA1299. The agency further modified the proposed

actions in response to public comments. As an example, the agency increased the

no-cut buffer along Lake Tarleton from 100 to 300 feet. JA1287; JA1294;

JA1669. The agency also modified the Peabody Project to remove all activities

from the Hermit Lake Complex. JA851; JA790. As with its analysis of old growth

forest, the Forest Service's "revisions to its original proposed treatments demon-

strate its 'willingness to receive evidence on the matters.'" ADD.33 (quoting *Ver-*

*mont Yankee*, 435 U.S. at 554).

The Forest Service's thorough consideration of alternative courses of action

and responses to public comments thus reveal that it fulfilled its "responsibility to

ensure that it complie[d] with NEPA," *Dep't of Transp. v. Public Citizen*, 541 U.S.

752, 765 (2004), and the agency did not attempt to shift its burden to Plaintiff.

### 3. The Forest Service reasonably rejected Plaintiff's alternatives.

The Supreme Court has repeatedly clarified that a party must identify the alternatives they want analyzed in comments before the agency to preserve the arguments for judicial review. *Public Citizen*, 541 U.S. at 764; *Vermont Yankee*, 435 U.S. at 553. This principle is particularly crucial in the context of alternatives because otherwise there "would be no end to the alternatives" that might need to be considered. *Seacoast Anti-Pollution League v. Nuclear Regul. Comm'n*, 598 F.2d 1221, 1231 (1st Cir. 1979).

Plaintiff's comments identified some alternative actions and effectively requested extremely scaled back timber management, and—despite their voluminous nature—provided little evidence for how their preferences would achieve the purposes of the projects. JA814-15; JA1339-40. The Forest Service reasonably considered those alternatives and provided explanations for not analyzing them in-depth. NEPA requires no more.

Most important, the Forest Service concluded Plaintiff's alternatives were unreasonable because they would not fulfill the purpose and need and failed to meet the projects' goals for vegetation, wildlife, and other resources. *See, e.g.,* JA981; JA1473-74. For Peabody, Plaintiff proposed an alternative that would eliminate timber harvesting in a portion of the project area (JA814-15), and the agency reasonably explained that Plaintiff's proposals "functionally represent[] a

46

partial implementation of the full Proposed Action and would not meet the need as well as the full Proposed Action." JA859; JA875. For Tarleton, Plaintiff's alternative would "prohibit timber management" and amend the Forest Plan (JA1339), and the agency explained this would not meet the purpose and need and that amending the Forest Plan was outside the scope of this analysis. JA1473 (identifying response on JA1240). As the district court summarized, the Forest Service's explanations for rejecting Plaintiff's requests to decrease the timber harvest so substantially "make[] sense …. [E]ven-age treatments like clearcutting and patch cutting produce the greatest amount of early-successional habitat and regeneration-age tree structure, one of the stated purposes." ADD.17; *see* JA1391-93, JA1678-80 (HMU Rationales).

On appeal, Plaintiff does not argue that its alternatives would meet the Forest Service's goals nearly as well as the projects; Plaintiff insists (Br. 39) that partial achievement suffices. But courts regularly uphold an agency's analysis when the agency "explained that its proposed alternative was better at accomplishing its goals than Plaintiffs' proposed alternative." *Earth Island I*, 697 F.3d at 1022. Indeed, this Court has upheld rejection of alternatives when "none of the alternatives will be substantially preferable to the proposed site." *Roosevelt Campobello Int'l Park Comm'n v. EPA*, 684 F.2d 1041, 1047 (1st Cir. 1982). The district court found that Plaintiff "did not provide evidence or a concrete, specific explanation"

47

for how its proposed alternatives would meet the project purposes. ADD.18. Plaintiff still points to none. Even in the context of an EIS, an agency need not consider alternatives which are "ineffective[] or inconsistent with the basic policy objectives." *Lovgren v. Locke*, 701 F.3d 5, 37 (1st Cir. 2012).

The Forest Service also reasonably declined to consider Plaintiff's alternatives because they largely amounted to partial or incomplete implementations of the projects, and thus their effects would fall within "the range of effects of the proposed action in comparison to the absence of any activity." JA1473-74; JA859; JA875. An agency need not analyze alternatives that are not "significantly distinguishable from alternatives actually considered, or which have substantially similar consequences" because further analysis is unnecessary "to foster informed decisionmaking and public participation." *Earth Island II*, 87 F.4th at 1065 (cleaned up). As in *Earth Island II*, Plaintiff's alternatives "merely rely[] on a subset of the actions included in the Service's preferred action alternative." *Id.* Plaintiff has failed to explain with specificity how its alternatives would have substantially different effects than are already captured in the analysis. And to the extent that they might (such as the request to amend the Forest Plan to change the entire management approach towards Tarleton), they do not serve the purpose and need and are outside the scope of this analysis. *E.g.*, JA1473.

Plaintiff's reliance on *Dubois v. Dep't of Agriculture*, 102 F.3d 1273, 1291 (1st Cir. 1996), is misplaced. First, *Dubois* involved an EIS, making its precedential value low in a case involving an EA. Second, *Dubois*, involved a situation where the agency "did not in any way explain its reasoning or provide a factual basis for its refusal to consider" a proposed alternative. *Id.* at 1289-90. Here, the Forest Service provided sound reasons for rejecting Plaintiff's alternatives, and the proposed projects have no significant environmental consequences.

### 4. Plaintiff's focus on the presence or absence of "unresolved conflicts" reflects confusion.

Plaintiff contends (Br. 32-36) that there are allegedly "unresolved conflicts" here and thus more alternatives were required. Not so.

As explained above, the Forest Service *did* consider the consequences of a no action alternative, not just the proposed alternative. Thus, the agency need not rely on the exceptions provided by the statute and regulations that *no* alternatives need to be considered in the absence of unresolved conflicts. *See* 42 U.S.C. § 4332(H); 36 C.F.R. § 220.7(b)(2)(i). The Forest Service's regulation presented this as an option, but another option is to consider the effects of the "no-action alternative" under 36 C.F.R. § 220.7(b)(2)(ii). The Forest Service effectively considered "no-action" under that provision, as explained above. When the Forest Service responded to Plaintiff's objections (which occurs at the end of the administrative process), it explained that it had adequately considered "no action" and

other alternatives. JA981; JA1473-74. The Forest Service did not rely on the lack of unresolved conflicts or 36 C.F.R. § 220.7(b)(2)(i) in those responses or in district court. JA332-33.[6]

Many circuits have upheld EAs which analyzed just the proposal and no-action alternative, and none of those precedents required the agency to prove that there was no "unresolved conflict." *See, e.g.*, *Earth Island II*, 87 F.4th at 1065. Indeed, the one case Plaintiff identifies (Br. 35) as supporting this argument arose when the agencies had *not* considered "the no action alternative." *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988). That case is also inapt because the court found the Forest Service had failed to consider not issuing oil and gas leases in an area it had previously identified as potential wilderness where it had "declared that development activities that might reduce the land's wilderness potential are prohibited." *Id.* at 1226. Plaintiff identifies no similar unaddressed conflict here.

When the Forest Service stated that Plaintiff had not identified an unresolved conflict (JA1238) or "alternatives in terms of addressing unresolved resource conflicts" (JA866), the Forest Service was correct. The district court asked Plaintiff's counsel to identify the so-called "unresolved conflicts," and the court found

---

[6] To be sure, in responding to comments on Tarleton, the agency did cite this regulation (JA1238), but the later response to the objection clarified the agency's position.

Plaintiff "did not specify what they were."  ADD.15 n.40.  Even on appeal, Plaintiff (Br. 32-36) does not specify the alleged "unresolved conflict" so much as a lack of consensus, but "NEPA does not contain a 'heckler's veto.'"  *Protect Our Parks, Inc. v. Buttigieg*, 39 F.4th 389, 398 (7th Cir. 2022) (citation omitted).  While this Court need not reach this issue, Plaintiff's failure to identify the unresolved conflicts "beyond … conclusory statement[s]" forecloses this challenge.  ADD.15 n.40.

## B.    The Forest Service evaluated the environmental effects.

The Forest Service reasonably evaluated the environmental effects of the proposed actions.  At the outset, Plaintiff misunderstands (Br. 45-57) NEPA's requirements.  Even for an EIS, NEPA requires an agency to consider only the environmental effects of the "'proposed action'—that is, the project at hand."  *Seven Cnty.*, 605 U.S. at 182 (quoting 42 U.S.C. § 4332(2)(C)); *see also Public Citizen*, 541 U.S. at 767-68.  Thus, contrary to Plaintiff's implications (*e.g.*, Br. 45), "[a] baseline is not an independent legal requirement"; it is a practical means "often employed to identify the environmental consequences" of the proposal.  *See Am. Rivers v. FERC*, 201 F.3d 1186, 1195 n.15 (9th Cir. 1999).  Here, the Forest Service appropriately considered and described the existing conditions of the project areas and how they would develop without the projects, providing a useful baseline *as necessary* to assess the effects of the proposed actions.  *See supra* at pp.42-44.

Congress has also clarified that an agency need not "undertake new scientific or technical research unless" it "is essential to a reasoned choice among alternatives…." 42 U.S.C. § 4336(b)(3)(B).

Thus, Plaintiff's arguments that the Forest Service had to collect and consider more data about existing conditions collapse because Plaintiff fails to establish that the information would meaningfully inform the assessment of the *projects'* impacts, much less was *essential* to a reasoned choice.

### 1. Water Quality

The Forest Service analyzed each project's potential water quality impacts, *e.g.*, JA905; JA1310-11, and incorporated various protective measures, *e.g.*, JA904-05; JA1307; JA1310-11; JA1480. The Forest Service "assess[ed] the impacts of timber harvesting on water quality" by considering the "percent basal area removed" in the relevant watershed. JA905; JA1310-11. Basal area is the cross-section of a tree at breast height (4.5 feet above ground), JA730, and provides a common way to measure the density of a stand.

Both EAs cite and incorporate by reference the methodology and the supporting analysis developed for this Forest in the Albany South Water Resources Report prepared for that earlier project. JA1104-24. That Report synthesizes multiple studies and concludes one can be confident "that no detrimental effect on water quality will occur if basal area removal remains below 20 percent." JA1121.

52

That is a "conservative value," JA1121, and "[r]emoval of less than 25 percent of the basal area in a watershed" is another surrogate threshold, JA1119. Plaintiff suggests that these thresholds require site-specific sampling, but the Report does not say that. *Compare* Br. 47-48, *with* JA1122. Both EAs explain that because of the "similar types of activities" involved, the analysis developed there "would be broadly applicable to the current proposal." JA905; JA1311. Courts must be at their most deferential in reviewing this type of technical and scientific judgment. *See, e.g.*, *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989).

For the Tarleton Project, the EA disclosed that of the twelve watersheds, the percent basal removal area ranges from 0.5% to 15.5%. JA1571. Thus, "[n]o measurable adverse effects to water quality or quantity are expected due to project implementation." JA1311. Indeed, the creation of a buffer along Lake Katherine could improve water quality. *See* JA1296. The EA also disclosed that three waters in the project area are already listed as impaired (the baseline), all three due to mercury contamination and two due to acidity. JA1310-11. But the EA explained that the project design "would reduce or avoid impacts to water quality or quantity to de minimis levels" with no measurable increases in acidity or mercury expected. JA1310-11. Plaintiff insists (Br. 47) the Forest Service needed to consider yet another state report Plaintiff cited in a footnote of its comments, but it identifies no reason such analysis would change the conclusion.

The Forest Service similarly applied the methodology to Peabody. JA905; JA1125-26. The EA forthrightly acknowledged that the 20 percent threshold would be exceeded in 12 watersheds, only seven of which provide fish habitat, with highest basal area removed at 27.3 percent. JA905; JA1125. The Forest Service then explained that the "potential changes in water quality … that would be of concern to aquatic ecosystems are a decrease in pH or an increase in aluminum." JA905. But given the specific geology of the area and the conservatism of the threshold, the Forest Service expected the effects to be minor and short-term, with little effect on aquatic ecosystems. JA905.

Thus, the agency considered potential impacts on water quality, and its analysis supports a finding of no significant impact.

### 2. Northern long-eared bat

The Forest Service reasonably evaluated potential impacts to the northern long-eared bat and summarized those evaluations in the EAs. JA906; JA1309. As discussed *supra* at pp.37-39, the Forest Service prepared site-specific biological evaluations for each project reviewing available information, including all past field surveys. JA1173-93; JA1618-64. The Forest Service considered the available survey data from July 2019 which found no northern long-eared bats in the area. *See* JA1179; JA1626; JA1401-22. Plaintiff asserts (Br. 51) the equipment was "faulty" but cite no support.

In any event, the Forest Service assumed bats are present, JA1179; JA1626, but it reasonably concluded there would be no significant impacts because timber harvest has minuscule impacts on the population, *see* JA1627; JA1178; JA579-84. The Forest Service reasonably relied on these analyses when evaluating the impacts under NEPA, and Plaintiff has not established this reliance was arbitrary or capricious. *See Nantucket Residents*, 100 F.4th at 21.

### 3.   Scenery

The Forest Service reasonably evaluated the effects of the projects on scenery. As discussed *supra* at pp.32-35, the agency considered the effects of the Peabody Project on scenery in the EA and a detailed Scenery Specialist Report. JA901-03; JA1140-55. Similarly, the Tarleton Project EA summarizes the more detailed analysis in its Scenery Specialist Report. JA1311-12; JA1578-1602.

Plaintiff attempts (Br. 52-53) to repackage its NFMA argument as a NEPA challenge, but "NEPA does not require the agency to weigh environmental consequences in any particular way." *Seven Cnty.*, 605 U.S. at 173. Because Plaintiff identifies no alleged errors in the Forest Service's evaluation of scenery impacts but just how it weighed the consequences, any NEPA claim fails.

### 4.   Cumulative impacts and geographic scope

The Forest Service's interdisciplinary team reasonably considered the direct and indirect effects of the projects, and "those cumulative actions that occur in the

relevant spatial and temporal boundaries for their resource," as documented for each resource. JA902; JA1309. The geographic scope of the analyses varies by resource. JA902; JA1309.

With respect to carbon storage, the Forest Service conducted a forest-wide carbon assessment and two project-specific carbon assessments. JA954-79; JA1098-1103; JA1563-69. Among other things, these assessments note that the projects affect a maximum of 0.5 percent (Peabody) and 0.1 percent (Tarleton) of the 800,000 acres of the Forest. JA1098; JA1564. As the district court explained, these assessments support the Forest Service's conclusion that impacts on emissions are negligible. ADD.35 (citing JA1099, JA1564). Plaintiff fails to identify any errors or to explain how such errors would lead to overlooking meaningful environmental effects. Their argument must fail. *See Town of Marshfield v. FAA*, 552 F.3d 1, 4 (1st Cir. 2008).

Moreover, the Forest Service had no obligation to consider the two projects combined as so-called "cumulative impacts." *Seven County* directs agencies "to focus on the environmental effects of the project itself, not on the potential environmental effects of … geographically separate projects." *Seven Cnty.*, 605 U.S. at 190. This Court has also recognized that "NEPA requires a cumulative analysis only 'to ensure that a project is assessed as a whole and not sliced into small component parts.'" *Safeguarding Historic Hanscom*, 651 F.3d at 218 (quoting

*Marshfield*, 552 F.3d at 4).  Given the projects' geographic separation and independent value, the Forest Service did not need to analyze the two projects together.

**C.      The Forest Service reasonably concluded that the projects would not have a significant impact.**

As explained *supra* at pp.12, 15, in each EA, the Forest Service concluded that the projects would not have a significant impact on the environment after assessing their context and intensity.  JA909-11; JA1314-16.  Plaintiff attacks those conclusions, but a "substantive attack on an impact assessment is not easy."  *Sierra Club*, 555 F.3d at 28.  Plaintiff's cursory assertions (Br. 57-59) do not identify specific errors in the analysis that could make a meaningful difference, as necessary to carry its burden.  *See id.* at 28-31.

Much like the project in *Sierra Club*, these timber projects are small relative to a Forest that "is almost 800,000 acres and has a history of mixed uses included timber harvesting."  *Id.* at 28.  Even if there were errors in the Forest Service's analysis (there are not), they would be minor and did not result in significant environmental consequences being overlooked; thus, they would be harmless error.  *See Save Our Heritage, Inc. v. FAA*, 269 F.3d 49, 61 (1st Cir. 2001).

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court.

Respectfully Submitted,

*s/ Robert P. Stockman* _____

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

JOHN P. TUSTIN
ROBERT P. STOCKMAN
*Attorneys*
Environment and Natural Resources Div.
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3275
Robert.Stockman@usdoj.gov

June 26, 2026
90-1-4-17630

58

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,686 words, including the eighteen words contained in the image on p.34, and excluding the parts exempted under Federal Rule of Appellate Procedure 32(f).

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Word.

 *s/ Robert P. Stockman*
Robert P. Stockman

Counsel for the Federal Defendants